# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ENRICHETTA RAVINA,** | |
| **PLAINTIFF,** | **COMPLAINT** |
| **-- against --** | **JURY TRIAL DEMANDED** |
| **COLUMBIA UNIVERSITY,** | **Case No.** |
| **DEFENDANT.** | |

Plaintiff Enrichetta Ravina ("Plaintiff" or "Ms. Ravina"), by and through her attorneys, Sanford Heisler Kimpel, LLP, brings this action against Columbia University ("Defendant," "Columbia," or "the University"). Plaintiff alleges upon knowledge concerning her own acts and upon information and belief as to all other matters.

## I.   OVERVIEW

1.   Columbia University is one of the top research universities in the world, and Columbia Business School -- which is celebrating its centennial year – provides a top-ten ranked MBA program.

2.   On Columbia Business School's homepage, Senior Vice Dean Katherine W. Phillips appears in a video entitled "Making the Promise of Diversity a Reality."  She begins by stating: "Diversity is a topic that sometimes people hear just the word itself, and it makes them a little nervous.  They don't want to talk about it.  They shy away from it.  But it turns out that right now we are in an age where we are seeing there are, indeed, benefits to diversity that if organizations can capture, they can really get a competitive advantage.  The tricky thing is that it is not always as easy to capture those benefits as we would like.  And so where we are right now

1

is recognizing that there is a promise of diversity, and then there is kind of the reality of it. It takes some hard work to actually make sure you get those benefits."

3.     This statement could serve as a self-diagnosis for the school. While Columbia pays lip-service to the ideals of diversity, the reality is that Columbia simply does not support or promote its female faculty the way it does the men.   As of the start of this academic year, there were just eleven women who were tenured faculty members at Columbia Business School – out of a total of seventy-nine tenured faculty.

4.     Columbia's failures surrounding Plaintiff Enrichetta Ravina – a female junior faculty member with tremendous potential – have been especially acute.

5.     Enrichetta Ravina joined Columbia as an Assistant Professor of Finance with tremendous promise. Her academic research puts her at the cutting edge of a new field of finance research, centered on the analysis of large datasets, that studies the actual choices of real investors in the United States. Currently, there are fewer than a dozen academics who have been able to analyze and publish research based on actual U.S. investor data, and only a handful publish in the field of retirement research.

6.     Ms. Ravina was well on her way to establishing herself within that small community when she gained access to data that would allow her to analyze the investment decisions of nearly 4 million individuals saving for retirement. No academics have published retirement research using datasets as large and representative as this one.

7.     However, when a tenured, senior faculty member who held veto power over this research began subjecting Ms. Ravina to *quid pro quo* sexual harassment, Columbia refused to stop his discriminatory behavior. Instead, Columbia allowed Ms. Ravina to continue to be

victimized and her career to languish. Columbia then retaliated against her and now is on the eve of denying her tenure and wrongfully terminating her.

8.      Ms. Ravina's harasser – Professor Geert Bekaert, who is the Leon G. Cooperman Professor of Finance and Economics at Columbia Business School – waited until after Ms. Ravina had invested substantial time in this unique dataset, such that she could not reasonably abandon the research without grievously delaying or ruining her career, before he began harassing her. At the point she became captive to his whims, Professor Bekaert began subjecting Ms. Ravina to sexual harassment. He infused their conversations and meetings with sexual content, including talking about how often he watched pornography, applauding the use of prostitutes, and describing his sexual exploits. He sought an intimate relationship with Ms. Ravina, insisting that she meet with him off-campus, touching her inappropriately, demanding that she compliment him, describing her as "sexy," and indicating that he was "horny."

9.      When Ms. Ravina rejected his sexual advances, Professor Bekaert sabotaged her work, unduly delaying and undermining joint research projects. The more she resisted his sexual advances, the worse his behavior became. He made it clear that he would stall their collaboration and Ms. Ravina's publication efforts until and unless she gave in to his sexual advances. In one of his most explicit demands for a sexual *quid pro quo*, Professor Bekaert told Ms. Ravina that if she were "nicer" to him, he would allow her work to proceed faster.

10.      When confronted with this intolerable environment, Ms. Ravina repeatedly implored Columbia's senior leaders, including Columbia Business School Dean R. Glenn Hubbard, to intervene. But Columbia's senior leaders repeatedly dismissed and even mocked her complaints, calling her situation a "soap opera," accusing her of flirting with her harasser,

and giving her "life advice" to give up her research agenda and start over. Columbia's senior leaders made clear that there was nothing they would do to protect Ms. Ravina.

11.     Moreover, rather than meaningfully intervene to stop the harassment, Columbia fiercely retaliated against her. After telling Ms. Ravina that she would be on paid leave for the 2015-2016 academic year, Columbia suddenly revoked the paid leave and informed her that her tenure process would run this year on an expedited basis. She was given shorter-than-usual deadlines to submit materials that generally take many months to put together, and she was told that her tenure process would conclude in just a few months – when typically the tenure process at Columbia Business School takes at least six months to a year.

12.     Ms. Ravina's situation is so egregious that her colleagues have petitioned Columbia in concern and protest. For example, in or about February 2015, numerous tenured faculty members petitioned Columbia to establish protocols to protect junior faculty members like Ms. Ravina where interactions with senior faculty like Professor Bekaert significantly obstruct the ability of junior faculty to work. On information and belief, in January 2016, again numerous tenured faculty members in Ms. Ravina's department sent a letter to the Dean of Columbia Business School and the Provost of Columbia University, advocating that Ms. Ravina's tenure clock be extended because of the obstruction of her work by the senior faculty member. Columbia has ignored those petitions.

13.     Ms. Ravina has suffered from *quid pro quo* harassment from Professor Bekaert for more than three years, and Columbia's senior leaders have knowingly refused to stop it for nearly two years.[1] With every other course of action exhausted and with Columbia's unlawful

---

[1] By agreement with Columbia, the applicable statutes of limitation on Ms. Ravina's claims under federal, state, and local laws were tolled from September 25, 2015 through March 20, 2015.

discrimination and retaliation meaning she soon will be unlawfully denied tenure and wrongfully terminated, Ms. Ravina hopes to finally get meaningful relief by bringing this action.

14.     Ms. Ravina brings claims under the New York City Human Rights Law; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*; and Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq.*  She brings claims of gender discrimination, *quid pro quo* sexual harassment, hostile work environment, retaliation, discrimination in promotion, and unlawful termination.

15.     Ms. Ravina seeks injunctive relief and damages in excess of $20 million.

## II.     THE PARTIES

16.     **PLAINTIFF ENRICHETTA RAVINA** has been an employee of Columbia University since July 1, 2008, serving as Assistant Professor in the Finance and Economics Division at Columbia Business School.  Ms. Ravina is domiciled in Manhattan, and she works for Columbia University in Manhattan.

17.     **DEFENDANT COLUMBIA UNIVERSITY** is a private university that, upon information and belief, receives federal funding.  The University is based in Manhattan.

## III.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over claims brought under the New York City Human Rights Law pursuant to 28 U.S.C. § 1367.

19.     Plaintiff timely filed a charge with the United States Equal Employment Opportunity Commission on March 18, 2016 and is in the process of perfecting her right to sue. There is no requirement of administrative exhaustion under the New York City Human Rights Law or Title IX.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f).   Defendant is headquartered in the Southern District of New York and the unlawful employment practices complained of herein occurred in the Southern District of New York.

## IV.     <u>FACTUAL ALLEGATIONS</u>

### A.     **Ms. Ravina's Educational and Professional Background**

21.     Ms. Ravina earned her Bachelor of Arts degree in Monetary and Financial Economics from the University of Torino in 1998, graduating *summa cum laude*.  She earned her PhD in Economics from Northwestern University in 2005.

22.     From 2005 to 2008, Ms. Ravina was an Assistant Professor of Finance at New York University Stern School of Business.  Ms. Ravina was subsequently recruited by Columbia, and in 2008 she was appointed Assistant Professor of Finance at Columbia Business School.

23.     During her period of employment with Columbia, Ms. Ravina also served as a Visiting Scholar at Harvard Business School during the fall semester of the 2010-2011 academic year and as a Visiting Scholar at the Federal Reserve Bank of New York during the fall semester of the 2012-2013 academic year.

### B.     **Ms. Ravina's Strong Performance at Columbia**

24.     As an academic economist, Ms. Ravina researches the asset allocation, borrowing, and investment decisions of individual households.

25.     Ms. Ravina's work puts her on the cutting edge of a new area of finance research: using extremely large datasets containing individual-level observations to analyze personal financial decisions.  Currently, there are fewer than a dozen academics who have been able to analyze and publish research based on actual U.S. investor data, only a handful publish in the

6

field of retirement research, and none have published retirement research using datasets as large and representative as Ms. Ravina's.

26.     Ms. Ravina's research has attracted substantial interest in the academic community.  Ms. Ravina has presented her work at top economics conferences, including those convened by the American Economic Association, the American Finance Association, and the National Bureau of Economic Research.   She has also been invited to speak at leading universities and economic research institutions, including Cornell University, Yale Law School, Wharton School of the University of Pennsylvania, Massachusetts Institute of Technology, London Business School, and the Board of Governors of the Federal Reserve.

27.     Ms. Ravina's academic research has also been featured in popular financial media, including outlets such as the *Wall Street Journal*, the *Financial Times*, the *Atlantic*, *Slate*, Bloomberg, and Reuters.

28.     During her tenure at Columbia, Ms. Ravina has applied for and been awarded numerous grants to support her academic research, from both Columbia and outside institutions.

29.     In addition to her academic research, during her tenure at Columbia, Ms. Ravina has taught six semester-long corporate finance courses -- consisting of three sections per semester -- to Columbia Business School's full-time MBA students and its executive MBA students.

**C.      Sexual Harassment and Retaliation by Professor Geert Bekaert**

30.     For much of her time at Columbia, Ms. Ravina has devoted her research efforts to a large and unique dataset concerning the allocation of individual retirement savings.   Her analysis of this dataset is expected to make a major contribution in her academic field.

31.     During the 2009-2010 academic year, Professor Bekaert approached Ms. Ravina and informed her that he could provide her with access to this large dataset because he had a long-standing relationship with the company that owned the data.

32.     Professor Bekaert suggested that Ms. Ravina focus her academic efforts on co-authoring papers with him related to this dataset.  The research fell within Ms. Ravina's area of expertise and had the potential to make a significant contribution to her field of research. However, pursuing this line of research would necessarily dominate her time and efforts.

33.     With the encouragement of Professor Bekaert and other senior faculty at Columbia, she agreed to pursue this area of research to the virtual exclusion of others.

34.     Preparing such a large dataset for analysis is a very time-intensive undertaking. Ms. Ravina spent more than two years negotiating the terms surrounding the handling and analysis of the dataset and then preparing the dataset for analysis, including writing the codes; training around forty research assistants and directing their work; selecting, collecting, and assembling additional publicly available data to link to the proprietary dataset; and making an array of decisions that shaped the final dataset.  Professor Bekaert did not play any active role in preparing the dataset.

35.     For scholars in Ms. Ravina's field, analysis that hinges on such a large dataset typically involves a particular focus in the early years on preparing and working with the dataset for statistical analysis and then a glut of publications on the back end.

36.     After Ms. Ravina invested substantial time in preparing the dataset for analysis and was prepared to move forward with her publications, however, Professor Bekaert began subjecting Ms. Ravina to overt sexual harassment.  Professor Bekaert waited to subject her to

this predatory conduct until she had invested so much time into the project that she could not reasonably abandon the work without grievously delaying or ruining her chances at tenure.

37.    Once Ms. Ravina was inextricably invested in the project, during the 2012-2013 academic year Professor Bekaert started inserting sexual content into his conversations and meetings with Ms. Ravina.  For example, he told Ms. Ravina that he watched pornography regularly and that prostitutes were necessary to take care of a man's sex drive.  He told Ms. Ravina about his sexual exploits, including sexual advances he made towards his doctor, how he had slept with a hostess in Hong Kong, and how he wanted to sleep with a young woman he met near Columbia who he believed was underage.  He frequently asked Ms. Ravina for dating advice and discussed his attempts at picking up and sleeping with women.

38.    Professor Bekaert sought an intimate relationship with Ms. Ravina.  He repeatedly insisted that they meet at social settings like coffee shops and over dinners rather than in more traditional academic settings – a troubling trend that other women in academia also face.[2]  At those "meetings," he refused to have substantive or detailed discussions of their joint research and instead used those interactions to further harass Ms. Ravina.

39.    At one of those dinners, he held her hand in his.  In another instance, Professor Bekaert said the way Ms. Ravina walked was "sexy."  He also frequently asked her for compliments and reassurance that he was not "too old."  Once when Ms. Ravina was alone with him in his office, Professor Bekaert forced her to read out loud a message on his mug about being "horny."

---

[2] *See, e.g.*, A. Hope Jahren, *She Wanted to Do Her Research.  He Wanted to Talk "Feelings,"* N.Y. TIMES, Mar. 4, 2016, http://www.nytimes.com/2016/03/06/opinion/sunday/she-wanted-to-do-her-research-he-wanted-to-talk-feelings.html.

40.     Professor Bekaert's harassment was deeply upsetting to Ms. Ravina, and she repeatedly rejected Professor Bekaert's sexual advances.  Again and again, she tried to focus conversations and meetings with Professor Bekaert on their joint research – but to no avail.

41.     When Ms. Ravina rebuffed Professor Bekaert's sexual advances, Professor Bekaert sabotaged Ms. Ravina's work by stalling her research.  Professor Bekaert refused to promptly respond to analyses, drafts, or other communications regarding joint papers – even though he was well known for providing prompt turn-around on other projects.  He insisted that Ms. Ravina perform irrelevant or unnecessary assignments that were time consuming and did not substantively improve or change the research.  He also frequently threatened to persuade the company that owned the data to revoke Ms. Ravina's access to the data, which would have made it impossible for her to publish the research she had spent years preparing and analyzing.

42.     As a senior, tenured faculty member at Columbia, Professor Bekaert functioned in a managerial or supervisory capacity towards Ms. Ravina.  He held himself out to Ms. Ravina as her official "mentor" with respect to her academic career at Columbia, and he was allowed to delay or impede her work.  Furthermore, as a tenured, senior faculty member, he would be able to exert influence and disparage her and her abilities to the other members of the faculty.  Because tenured faculty vote on tenure applications, this influence is of considerable concern.

43.     By the time a tenure application is submitted, successful applicants typically will be able to point to approximately six or seven publications in top journals in their field.  Professor Bekaert was well aware of what delay might mean to her career.

44.     It is in this context that the true menace of Professor Bekaert's explicit *quid pro quo* comments becomes clear; when he explicitly told Ms. Ravina that if she were "nicer" to him,

he would allow her work to proceed faster, Professor Bekaert was informing her that her career hinged on acquiescing to his overtures.

45.     As a result of Professor Bekaert's retaliation for her refusal to acquiesce, Ms. Ravina's research and publication efforts have been delayed by more than two years.  As a result, she has been unable to publish the number of papers she otherwise needs for a successful tenure application.

### D.     Columbia Ratifies and Refuses to Address the Gender Discrimination

46.     Ms. Ravina repeatedly reported the ongoing *quid pro quo* sexual harassment and retaliation to Columbia and how this gendered treatment compromised her ability to do her work, but Columbia failed to take immediate and appropriate corrective action.

47.     In or about May 2014, Ms. Ravina informed two senior faculty members at Columbia Business School about Professor Bekaert's sexual harassment and shared her desire to escape the harassment and protect her ability to work.

48.     In or about May 2014, Ms. Ravina reported Professor Bekaert's sexual harassment to Gita Johar, then Vice Dean for Research.  Upon information and belief, Vice Dean Johar promptly informed the Dean of Columbia Business School, R. Glenn Hubbard, of the sexual harassment.

49.     In or about June 2014, Ms. Ravina met and discussed her concerns with Dean Hubbard; Janet Horan, Vice Dean of Administration; and Suzanne Goldberg, the Herbert and Doris Wechsler Clinical Professor of Law at Columbia Law School.  At the meeting, Dean Hubbard was confrontational towards Ms. Ravina and stated at the outset that there was nothing Columbia could do to help her.

50.     Professor Goldberg, whose presence Ms. Ravina had requested and whose specialties include civil rights and gender law, disagreed with Columbia's position.   She proposed a range of interventions that Columbia could utilize to address the situation.   For example, Professor Goldberg proposed limiting Professor Bekaert's involvement in current research papers involving the dataset and removing him from any future research paper stemming from the dataset.   Columbia refused to take that step.   Columbia did agree to the intermediate step of designating an expert in this field as the "relationship manager" to oversee all communications between Ms. Ravina and Professor Bekaert to facilitate their professional relationship; however, Columbia refused to empower the relationship manager to intervene.

51.     On or about July 15, 2014, Senior Vice Dean Katherine W. Phillips met with Ms. Ravina and pressured her not to pursue any complaints against Professor Bekaert.   She told Ms. Ravina to "forget about" complaining about Professor Bekaert's harassment, and she excused Professor Bekaert's conduct by saying he was just "blunt" because he is Belgian.   Senior Vice Dean Phillips further trivialized Ms. Ravina's concerns by professing to offer what she called "life advice" – specifically, she advised Ms. Ravina to walk away from all projects connected to the dataset.   Given Ms. Ravina's area of specialization and enormous time investment in the project, this would have been extremely detrimental to her career.   Notably, Senior Vice Dean Phillips's private admonitions and chastisements of Ms. Ravina directly contradict her public comments regarding protecting people so that they might thrive and go about their work unhindered by gendered treatment.

52.     In September 2014, Ms. Ravina met again with Dean Hubbard, Vice Dean Horan, and Professor Goldberg.   There, Dean Hubbard mocked Ms. Ravina's complaint, comparing Ms. Ravina's complaint to a "soap opera."   Dean Hubbard proceeded to blame Ms. Ravina for

Professor Bekaert's conduct, accusing her of flirting with Professor Bekaert and scolding her for working with him. Dean Hubbard refused to agree to take any action to curb Professor Bekaert's behavior.

53.     At Professor Goldberg's insistence once again, Dean Hubbard agreed to meet with Professor Bekaert. But Dean Hubbard refused to impose any basic requirements (proposed by Ms. Ravina and Professor Goldberg) on Professor Bekaert. Instead, Dean Hubbard said that if Professor Bekaert did not agree voluntarily, the next step would be to convene a meeting of the senior faculty. When Professor Bekaert refused to voluntarily agree to the set of basic requests proposed by Ms. Ravina and Professor Goldberg, however, Dean Hubbard failed to convene such a meeting of the senior faculty.

54.     In or about October 2014, Ms. Ravina met with Stephen Zeldes, Chair of the Finance and Economics Division at Columbia Business School. Division Chair Zeldes rejected the idea that Columbia had any responsibility for providing Ms. Ravina with a discrimination-free environment or for holding Professor Bekaert accountable for his behavior.

55.     In or about November 2014, Columbia's Title IX office informed Ms. Ravina that it had concluded that there had been no violation of Columbia's policy and blamed Ms. Ravina for "sour[ing]" a working relationship with a colleague by "not communicat[ing] effectively."

56.     On or about December 16, 2014, Ms. Ravina reported Professor Bekaert's continued retaliation to Melissa Rooker, the Associate Provost for Equal Employment Opportunity and Affirmative Action. Associate Provost Rooker declined to investigate this complaint.

57.     Throughout this period, Professor Bekaert continued his *quid pro quo* obstruction of Ms. Ravina's work and, if anything, escalated his retaliation and hostility against her because

of her efforts to get help.  Professor Bekaert also bragged to Ms. Ravina about the inefficacy of Columbia's Title IX office.  He recounted, as an example, an instance when a female MBA student in his class made a complaint against him when he said the Title IX investigator had been "very friendly" to him and that he had "won."

58.    Indeed, Columbia's willful indifference to the ongoing harassment is part of a larger pattern of ignoring Professor Bekaert's history of harassment.  Upon information and belief, when Professor Bekaert came to Columbia, he had a history of harassing his female subordinates.  Professor Bekaert told Ms. Ravina that when he previously worked at Stanford, so many female assistants had complained about him that it had almost cost him tenure.

**E.    Ms. Ravina's Colleagues Express Their Dismay and Support**

59.    The treatment of Ms. Ravina raised grave concerns among Columbia's tenured faculty members.

60.    On or about October 22, 2014, Professor Goldberg wrote to Vice Dean Horan to express her disappointment in Columbia.  She explicitly noted that "gender is playing a role here in the senior colleague's behavior" and that "there are ways in which [Columbia] could easily, and without significant cost, provide more support to [its] junior faculty members, including to the women."

61.    Upon information and belief, the "relationship manager" appointed to monitor Professor Bekaert's communications with Ms. Ravina also requested that he be empowered to take a more active role in curbing Professor Bekaert's obstructionist conduct, but Columbia refused that request.

62.    Upon information and belief, in or around mid-January 2015, a senior faculty member expressed his concerns about Ms. Ravina's treatment to President Lee Bollinger, but

14

President Bollinger responded that he would not intervene and explained that he had been "advised" to not "get involved."

63.      In or about February 2015, senior faculty members at Columbia Business School took the unusual step of submitting a petition – supported by twenty-two tenured faculty members – requesting that Columbia create a policy to govern situations where "senior faculty members may behave inappropriately or [do] not fulfill their duties" when working with junior colleagues. The faculty petitioners expressed concern about "inappropriate exercises of power or delays" coming from senior faculty members and indicated that the University should impose a "rebuttable presumption that the senior faculty member would step aside" in circumstances like Ms. Ravina's.

64.      Upon information and belief, the Columbia administration never responded to or acted upon the tenured faculty's efforts on Ms. Ravina's behalf.

**F.      Retaliation by Columbia for Complaining of Sexual Harassment**

65.      After repeated efforts to communicate directly with Columbia about ongoing sexual harassment and retaliation failed to result in any meaningful action, Ms. Ravina eventually retained counsel in hopes that outside help might be more effective.

66.      On June 1, 2015, Dean Hubbard informed Ms. Ravina that she would be on paid academic leave for the upcoming 2015-2016 academic year. At Columbia, being placed on such a leave typically removes someone from the tenure clock for that year; accordingly no action with respect to her tenure would be taken during the 2015-2016 academic year. Moreover, when someone is placed on such a leave at Columbia, that person need not teach; in Ms. Ravina's case, this was intended to allow her to focus on what progress she could make on her papers – notwithstanding Professor Bekaert's ongoing obstruction.

67.     When Ms. Ravina indicated that Columbia still needed to do something to rein in Professor Bekaert in order to enable her to make meaningful progress during the 2015-2016 year and that she was prepared to file suit to vindicate her rights if needed, Columbia retaliated against Ms. Ravina.

68.     In late September 2015, Columbia suddenly revoked the unpaid leave that Columbia had previously granted to Ms. Ravina by Dean Hubbard and claimed that the grant of leave had been a "mistake" and that it was not possible to put Ms. Ravina on leave.  However, Columbia's own internal rules expressly authorize the granting of a one-year leave of absence to a professor with only the approval of the professor's department and the dean of her school.

69.     Furthermore, on December 17, 2015, Columbia informed Ms. Ravina that her tenure process would begin immediately and that it would run on an accelerated basis.  She was told that her tenure submissions would be due in January 2016, giving her approximately one month to prepare materials that normally take tenure candidates many months to assemble. Columbia also informed Ms. Ravina that her tenure would be decided by March 2016.

70.     This accelerated process was a stark divergence from the normal tenure process at Columbia, which typically takes at least six months to one year to conclude.

71.     Columbia has a process whereby individuals can request extension of the tenure clock.  Upon information and belief, Columbia has granted extensions of the tenure clock to similarly situated male employees.

72.     On December 24, 2015, Ms. Ravina sent a letter to John Coatsworth, Provost of Columbia University, seeking paid leave and an extension of her tenure clock so that she would submit her application during the spring semester of the 2017-2018 academic year due to "compelling personal need [and] personal hardship."

16

73.    On January 15, 2016, Christopher Brown, Vice Provost for Faculty Affairs, denied Ms. Ravina's request but suggested that Ms. Ravina could follow-up and provide additional information to support her request.

74.    On January 25, 2016, Ms. Ravina responded to Vice Provost Brown with a letter that provided a detailed overview of Professor Bekaert's sexual harassment and the University's failure to intervene and acts of retaliation.

75.    Again, members of the senior faculty banded together in support of Ms. Ravina and to call on Columbia to take steps to remedy the situation.  On information and belief, on or about January 26, 2016, seventeen tenured faculty members in Columbia Business School's Finance and Economics Division submitted a petition to the Dean of Columbia Business School and the Provost of Columbia University, advocating that Ms. Ravina's tenure clock be extended because of the actions of the senior faculty member.

76.    On February 24, 2016, Columbia again denied Ms. Ravina's request without providing any explanation or response to the issues she raised.  Instead, Vice Provost Brown announced a deadline of March 1, 2016, for Ms. Ravina to submit her tenure package – less than a week after learning her request had been denied.

77.    Left with little choice, Ms. Ravina ultimately submitted what tenure materials she could, along with a renewed request that Columbia halt its discriminatory and retaliatorily-accelerated tenure process.

78.    Columbia has not responded to this request. Additionally, Columbia has failed to follow its normal tenure protocols, including failing to promptly distribute Ms. Ravina's tenure submissions to senior faculty members who will vote on her tenure.

79.     Columbia has scheduled a meeting for March 30, 2016, for tenured faculty members in Ms. Ravina's department to review and vote on Ms. Ravina's tenure application. Upon information and belief, Columbia has also invited Ms. Ravina's harasser – Professor Bekaert – to attend.

**G.     Ms. Ravina's Emotional Distress and Reputational Harm**

80.     As a result of Columbia's unlawful conduct, Ms. Ravina has experienced severe emotional distress. She worries constantly about her career and feels despair and hopelessness as a result of Columbia's abandonment. Ms. Ravina has been humiliated time and time again as she had to repeat her story to Columbia administrators. Her distress has manifested in physical symptoms such as recurrent insomnia, substantial weight gain, concentration problems, and intense feelings of desperation. Ms. Ravina's social life and romantic relationship have also been adversely affected.

81.     Ms. Ravina's emotional distress is so severe that, for the past two years, she has seen a psychiatrist weekly in order to cope with her symptoms. She has no prior psychiatric history, and the sole reason Ms. Ravina began seeing a psychiatrist was because of the sexual harassment and retaliation she experienced at Columbia. Her psychiatrist diagnosed her with generalized anxiety disorder, and their treatment has focused on the emotional fall-out from the sexual harassment and retaliation she has suffered at Columbia.

82.     As a result of Columbia's unlawful conduct, Ms. Ravina has also suffered substantial reputational harm. Because her work was so substantially obstructed by Professor Bekaert and because Columbia refused to curb the discrimination being perpetrated by its senior, tenured faculty member, Ms. Ravina was forced to submit a tenure application as part of what everyone has acknowledged is a sham tenure review – there is no meaningful chance that she

could be granted tenure at this stage in her scholarship.  If Ms. Ravina is denied tenure and terminated by Columbia, she will suffer irreparable reputational harm.

83.     Columbia's unlawful conduct has also set Ms. Ravina back considerably in terms of her publication record.  This adversely affects her professional reputation in the academic community and is likely to have far-reaching implications for her professional career.

## V.     COUNTS

### COUNT I
### VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—
### GENDER DISCRIMINATION IN TERMS, CONDITIONS, AND PRIVILEGES
### New York City Administrative Code § 8-107

84.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

85.     Plaintiff is a female employee of Defendant.

86.     Defendant has subjected Plaintiff to discrimination in the terms, conditions, or privileges of employment.  Defendant has treated Plaintiff differently from and less preferably than similarly situated male employees.

87.     Plaintiff's sex has been a determining factor in Defendant's subjecting of Plaintiff to discrimination in the terms, conditions, or privileges of employment.

88.     By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

89.     As a result of Defendant's unlawful conduct, Plaintiff has and will continue to suffer harm, including but not limited to emotional distress, reputational harm, lost future employment opportunities, financial losses, and other economic damages and non-economic damages.

90.     As a result of Defendant's unlawful conduct, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

<u>COUNT II</u>
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—**
***QUID PRO QUO* SEXUAL HARASSMENT**
**New York City Administrative Code § 8-107**

91.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

92.     Plaintiff is a female employee of Defendant.

93.     Plaintiff was subject to unwelcome *quid pro quo* sexual harassment based on her sex.  She was subject to unwelcome sexual conduct, including sexual comments and sexual advances.  She rejected the unwelcome sexual advances.

94.     Plaintiff's reaction to that conduct was used as the basis for decisions affecting the compensation, terms, conditions, or privileges of her employment.  Among other things, as a result of Ms. Ravina's rejection of Professor Bekaert's sexual advances, Professor Bekaert, facilitated by Columbia, obstructed Ms. Ravina's ability to research and publish her works.

95.     A reasonable woman would consider that she was being treated less well than other employees under all of the circumstances.  Plaintiff actually considered that she was being treated less well than other employees because she is female.

96.     A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

97.     Defendant created, enabled, and maintained a sexually hostile work environment.

98.     Professor Bekaert acted in a managerial or supervisory capacity towards Plaintiff.

99.     In addition, Defendant knew of Professor Bekaert's conduct and accepted it and/or failed to take immediate and appropriate corrective action.

100.    Moreover, in the exercise of reasonable care, Defendant should have known of Professor Bekaert's conduct and failed to exercise reasonable diligence to prevent such conduct.

101.    Defendant lacks a meaningful and responsive procedure for investigating complaints of discriminatory practices by employees, agents and persons employed as independent contractors and for taking appropriate action against those persons who are found to have engaged in such practices.

102.    Defendant fails to effectively communicate a firm policy against such practices to employees, agents and persons employed as independent contractors.

103.    Defendant lacks a program to educate employees and agents about unlawful discriminatory practices under local, state and federal laws.

104.    Defendant lacks procedures for the supervision of employees and agents and for the oversight of persons employed as independent contractors specifically directed at the prevention and detection of such practices.

105.    By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

106.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will suffer harm, including but not limited to emotional distress, reputational harm, lost future employment opportunities, financial losses, and other economic damages and non-economic damages.

107.   Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT III
## VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—
## HOSTILE WORK ENVIRONMENT
### New York City Administrative Code § 8-107

108.   Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

109.   Plaintiff is a female employee of Defendant.

110.   Plaintiff was subject to a hostile work environment based on her sex.  The hostile work environment included sexual comments, sexual advances, and the obstruction of Plaintiff's work.  All of this conduct was unwanted.

111.   A reasonable woman would consider that she was being treated less well than other employees under all of the circumstances.  Plaintiff actually considered that she was being treated less well than other employees because she is female.

112.   A reasonable person would have considered the conduct to be significant and not trivial or petty. Plaintiff actually considered the conduct to be significant and not trivial or petty.

113.   Defendant created, enabled, and maintained a sexually hostile work environment.

114.   Professor Bekaert acted in a managerial or supervisory capacity towards Plaintiff.

115.   In addition, Defendant knew of Professor Bekaert's conduct and accepted it and/or failed to take immediate and appropriate corrective action.

116.   Moreover, in the exercise of reasonable care, Defendant should have known of Professor Bekaert's conduct and failed to exercise reasonable diligence to prevent such conduct.

117.    Defendant lacks a meaningful and responsive procedure for investigating complaints of discriminatory practices by employees, agents and persons employed as independent contractors and for taking appropriate action against those persons who are found to have engaged in such practices.

118.    Defendant fails to effectively communicate a firm policy against such practices to employees, agents and persons employed as independent contractors.

119.    Defendant lacks a program to educate employees and agents about unlawful discriminatory practices under local, state and federal laws.

120.    Defendant lacks procedures for the supervision of employees and agents and for the oversight of persons employed as independent contractors specifically directed at the prevention and detection of such practices.

121.    By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

122.    As a result of Defendant's unlawful conduct, Plaintiff has suffered and will suffer harm, including but not limited to emotional distress, reputational harm, lost future employment opportunities, financial losses, and other economic damages and non-economic damages.

123.    Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

**COUNT IV**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—**
*RETALIATION*
**New York City Administrative Code § 8-107**

124.   Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

125.   Plaintiff engaged in protected activity, and Defendant was aware of Plaintiff's protected activity.  Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by complaining to Defendant's senior administrators, including Dean Glenn Hubbard, Vice Dean Janet Horan, and Vice Dean Katherine Phillips.  Plaintiff filed a complaint with Columbia's Title IX office.  Plaintiff also notified Defendant of her retention of counsel and her plans to file a complaint to vindicate her rights.

126.   The practices opposed by Plaintiff constitute colorable violations of the New York City Human Rights Law.

127.   Plaintiff suffered actions that would be reasonably likely to deter a person from engaging in a protected activity.  Among other things, Defendant revoked Plaintiff's paid leave and accelerated her tenure process.

128.   There was a causal connection between Plaintiff's protected activities and Defendant's actions.  Defendant subjected Plaintiff to such actions because of and in retaliation for Plaintiff's complaints of discrimination.

129.   By reason of the continuous nature of Defendant's retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

130.   As a result of Defendant's unlawful conduct, Plaintiff has suffered and will suffer harm, including but not limited to emotional distress, reputational harm, lost future employment opportunities, financial losses, and other economic damages and non-economic damages.

131.    Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

## COUNT V
## VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—
## DISCRIMINATION IN PROMOTION
### New York City Administrative Code § 8-107

132.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

133.    Plaintiff is a female employee of Defendant.

134.    Plaintiff has applied for promotion to the position of tenured professor.  Plaintiff would have been able to compile a successful tenure package if not for Defendant's unlawful acts and omissions, including Professor Bekaert's unlawful harassment of Ms. Ravina and Defendant's enabling of Professor Bekaert to unlawfully obstruct Plaintiff's work.

135.    Defendant lacks a meaningful and responsive procedure for investigating complaints of discriminatory practices by employees, agents and persons employed as independent contractors and for taking appropriate action against those persons who are found to have engaged in such practices.

136.    Defendant fails to effectively communicate a firm policy against such practices to employees, agents and persons employed as independent contractors.

137.    Defendant lacks a program to educate employees and agents about unlawful discriminatory practices under local, state and federal laws.

138.    Defendant lacks procedures for the supervision of employees and agents and for the oversight of persons employed as independent contractors specifically directed at the prevention and detection of such practices.

139.    The tenure review process imposed at this time is a sham process.  Defendant has indicated that it will reject Plaintiff's tenure application.

140.    When Defendant denies Plaintiff's application, Plaintiff's sex will have been a determining factor in Defendant's denial of Plaintiff's application.

141.    When Defendant denies Plaintiff the promotion, Plaintiff will suffer harm, including but not limited to emotional distress, reputational harm, lost future employment opportunities, financial losses, and other economic damages and non-economic damages.

142.    When Defendant denies Plaintiff the promotion, Plaintiff will be entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

**COUNT VI**
**VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW—**
**UNLAWFUL TERMINATION**
**New York City Administrative Code § 8-107**

143.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

144.    Plaintiff is a female employee of Defendant.

145.    Plaintiff has applied for promotion to the position of tenured professor.   Plaintiff would have been able to compile a successful tenure package if not for Defendant's unlawful acts and omissions, including Professor Bekaert's unlawful harassment of Ms. Ravina and Defendant's enabling of Professor Bekaert to unlawfully obstruct Plaintiff's work.

146.    The tenure review process imposed at this time is a sham process.  Defendant has indicated that it will reject Plaintiff's tenure application.

147.    This will result in Plaintiff's termination.  Columbia's internal rules provide that officers of instruction have limited term appointments and will be terminated unless granted tenure.   If tenure is denied during the officer of instruction's eighth year, the terminated employee must exit the University approximately one year later.     Columbia Charters and Statutes § 71(b)(1) and § 71(b)(3).

148.    When Defendant terminates Plaintiff, Plaintiff's sex and protected activities will have been a determining factor in Defendant's termination of Plaintiff.

149.    When Defendant terminates Plaintiff, Plaintiff will suffer harm, including but not limited to emotional distress, reputational harm, lost future employment opportunities, financial losses, and other economic damages and non-economic damages.

150.    When Defendant terminates Plaintiff, Plaintiff will be entitled to all remedies available for violations of the New York City Human Rights Law, including back pay, front pay, compensatory damages, punitive damages, attorneys' fees, costs, and other appropriate relief.

<u>COUNT VII</u>

**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED—
GENDER DISCRIMINATION IN TERMS AND CONDITIONS OF EMPLOYMENT
42 U.S.C. § 2000e *et seq.***

151.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

152.    Defendant has discriminated against Plaintiff by subjecting her to different treatment on the basis of her gender.

153.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to disparate terms and conditions of employment in violation of Title VII.

154.    Defendant's differential treatment of Plaintiff is a direct and proximate result of gender discrimination.

155.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

156.    By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

157.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

158.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.  Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT VIII**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED—**
***QUID PRO QUO* SEXUAL HARASSMENT**
**42 U.S.C. § 2000e *et seq.***

159.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

160.    Defendant has discriminated against Plaintiff by creating and maintaining a hostile work environment where an ongoing, severe, or pervasive pattern and practice of sexual harassment persists in violation of Title VII.

161.    Plaintiff was subject to unwelcome *quid pro quo* sexual harassment based on her sex.  She was subject to unwelcome sexual conduct, including sexual comments and sexual advances.  She rejected the unwelcome sexual advances.

162.    Plaintiff's reaction to that conduct was used as the basis for decisions affecting the compensation, terms, conditions, or privileges of her employment.  Among other things, as a result of Ms. Ravina's rejection of Professor Bekaert's sexual advances, Professor Bekaert, facilitated by Columbia, obstructed Ms. Ravina's ability to research and publish her works.

163.    Professor Bekaert acted in a managerial or supervisory capacity towards Plaintiff.

164.    In addition, Defendant knew of Professor Bekaert's conduct and accepted it and/or failed to take immediate and appropriate corrective action.   Plaintiff repeatedly complained about Professor Bekaert's conduct to Defendant's senior administrators.

165.    Defendant's *quid pro quo* sexual harassment altered Plaintiff's conditions of employment by creating an abusive working environment for her.

166.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

167.    By reason of the continuous nature of Defendant's unlawful conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

168.    As a result of Defendant's unlawful conduct, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

169.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.  Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT IX
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED—
## HOSTILE WORK ENVIRONMENT
## 42 U.S.C. § 2000e *et seq.*

170.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

171.     Defendant has subjected Plaintiff to a sexually hostile work environment in violation of Title VII.

172.     Defendant has denied Plaintiff her personal right to work in an environment free of sexual harassment.

173.     Defendant's discriminatory and harassing practices have been, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive, and retaliatory, and the Defendant tolerated, condoned, ratified and/or engaged in the hostile work environment, or, in the alternative, knew, or should have known, of its existence and failed to take remedial action.

174.     By reason of the continuous nature of Defendant's unlawful conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

175.     As a result of Defendant's unlawful conduct, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

176.     Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.  Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT X
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED—
## RETALIATION

**42 U.S.C. § 2000e-5(f),** *et seq.*

177.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

178.    Plaintiff engaged in protected activity, and Defendant was aware of Plaintiff's protected activity.  Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by complaining to Defendant's senior administrators, including Dean Glenn Hubbard, Vice Dean Janet Horan, and Vice Dean Katherine Phillips.  Plaintiff also participated in an investigation with Columbia's Title IX office.  Plaintiff also notified Defendant of her retention of counsel and her plans to file a complaint to vindicate her rights.

179.    Defendant retaliated against Plaintiff for engaging in protected activity.  Among other things, Defendant revoked Plaintiff's paid leave and accelerated her tenure process.

180.    There was a causal connection between Plaintiff's protected activities and Defendant's retaliatory actions.  Defendant's retaliatory acts were a direct and proximate result of Plaintiff's protected activities.

181.    Defendant's retaliatory acts were materially adverse, and such acts would dissuade a reasonable person from engaging in a protected activity.

182.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

183.    By reason of the continuous nature of Defendant's retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

184.    As a result of Defendant's unlawful retaliation, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

185.   Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.  Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

**COUNT XI**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED—**
**DISCRIMINATION IN PROMOTION**
**42 U.S.C. § 2000e** *et seq.*

186.   Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

187.   Plaintiff is a female employee of Defendant.

188.   Plaintiff has applied for promotion to the position of tenured professor.   Plaintiff would have been able to compile a successful tenure package if not for Defendant's unlawful acts and omissions, including Professor Bekaert's unlawful harassment of Ms. Ravina and Defendant's enabling of Professor Bekaert to unlawfully obstruct Plaintiff's work.

189.   Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

190.   The tenure review process imposed at this time is a sham process.  Defendant has indicated that it will reject Plaintiff's tenure application.

191.   When Defendant denies Plaintiff the promotion, Defendant's denial of the promotion will be a direct and proximate result of gender discrimination.

192.   Defendant's conduct is intentional, deliberate, willful, malicious, reckless and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

193.   As a result of Defendant's failure to promote, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

194.    As a result of Defendant's failure to promote, Plaintiff will be entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.   Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT XII
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED— UNLAWFUL TERMINATION
## 42 U.S.C. § 2000e *et seq.*

195.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

196.    Plaintiff is a female employee of Defendant.

197.    Plaintiff has applied for promotion to the position of tenured professor.   Plaintiff would have been able to compile a successful tenure package if not for Defendant's unlawful acts and omissions, including Professor Bekaert's unlawful harassment of Ms. Ravina and Defendant's enabling of Professor Bekaert to unlawfully obstruct Plaintiff's work.

198.    The tenure review process imposed at this time is a sham process.   Defendant has indicated that it will reject Plaintiff's tenure application.

199.    This will result in Plaintiff's termination. Columbia's internal rules provide that officers of instruction have limited term appointments and will be terminated unless granted tenure.   If tenure is denied during the officer of instruction's eighth year, the terminated employee must exit the University approximately one year later.    Columbia Charters and Statutes § 71(b)(1) and § 71(b)(3).

200.    When Defendant terminates Plaintiff, Defendant will have wrongfully terminated Plaintiff's employment based on her sex and in retaliation for engaging in protected activity.

201.    Defendant's wrongful termination will be an adverse employment action that will

materially and adversely change Plaintiff's overall terms and conditions of her employment in violation of Title VII.

202.    Defendant's wrongful termination of Plaintiff is a direct and proximate result of gender discrimination and her protected activities.

203.    Defendant's wrongful termination is materially adverse and would dissuade a reasonable person from engaging in a protected activity.

204.    As a result of Defendant's unlawful termination, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

205.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including back pay, front pay, compensatory damages, punitive damages, and other appropriate relief.  Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT XIII
### VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS AMENDED — GENDER DISCRIMINATION IN TERMS AND CONDITIONS OF EMPLOYMENT
### 20 U.S.C. § 1681 *et seq.*

206.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

207.    Upon information and belief, at all times relevant to this action, Columbia has received, and continues to receive, federal financial assistance.

208.    Defendant has discriminated against Plaintiff by subjecting her to different treatment on the basis of her gender.

209.    Defendant has discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated male employees and by subjecting her to disparate terms

and conditions of employment in violation of Title IX.

210.    Defendant's differential treatment of Plaintiff is a direct and proximate result of gender discrimination.

211.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

212.    By reason of the continuous nature of Defendant's discriminatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

213.    As a result of Defendant's unlawful discrimination, Plaintiff has suffered and will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

214.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including back pay, front pay, compensatory damages, attorneys' fees and costs, and other appropriate relief.

**COUNT XIV**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,**
**AS AMENDED —**
***QUID PRO QUO* SEXUAL HARASSMENT**
**20 U.S.C. § 1681 *et seq.***

215.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

216.    Upon information and belief, at all times relevant to this action, Columbia has received, and continues to receive, federal financial assistance.

217.   Defendant has discriminated against Plaintiff by creating and maintaining a hostile work environment where an ongoing, severe, or pervasive pattern and practice of sexual harassment persists in violation of Title IX.

218.   Plaintiff was subject to unwelcome *quid pro quo* sexual harassment based on her sex.  She was subject to unwelcome sexual conduct, including sexual comments and sexual advances.  She rejected the unwelcome sexual advances.

219.   Plaintiff's reaction to that conduct was used as the basis for decisions affecting the compensation, terms, conditions, or privileges of her employment.  Among other things, as a result of Ms. Ravina's rejection of Professor Bekaert's sexual advances, Professor Bekaert, facilitated by Columbia, obstructed Ms. Ravina's ability to research and publish her works.

220.   Professor Bekaert acted in a managerial or supervisory capacity towards Plaintiff.

221.   In addition, Defendant knew of Professor Bekaert's conduct and accepted it and/or failed to take immediate and appropriate corrective action.   Plaintiff repeatedly complained about Professor Bekaert's conduct to Defendant's senior administrators.

222.   Defendant's *quid pro quo* sexual harassment altered Plaintiff's conditions of employment by creating an abusive working environment for her.

223.   Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

224.   By reason of the continuous nature of Defendant's unlawful conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

225.   As a result of Defendant's unlawful conduct, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

226.     Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including back pay, front pay, compensatory damages, attorneys' fees and costs, and other appropriate relief.

**COUNT XV**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,**
**AS AMENDED —**
**HOSTILE WORK ENVIRONMENT**
**20 U.S.C. § 1681 *et seq.***

227.     Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

228.     Upon information and belief, at all times relevant to this action, Columbia has received, and continues to receive, federal financial assistance.

229.     Defendant has subjected Plaintiff to a sexually hostile work environment in violation of Title IX.

230.     Defendant has denied Plaintiff her personal right to work in an environment free of sexual harassment.

231.     Defendant's discriminatory and harassing practices have been, and continue to be, sufficiently severe or pervasive to create an environment that is both subjectively and objectively hostile, abusive, and retaliatory, and the Defendant tolerated, condoned, ratified and/or engaged in the hostile work environment, or, in the alternative, knew, or should have known, of its existence and failed to take remedial action.

232.     By reason of the continuous nature of Defendant's unlawful conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

233.     As a result of Defendant's unlawful conduct, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as

humiliation, embarrassment, emotional and physical distress and mental anguish.

234.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including back pay, front pay, compensatory damages, attorneys' fees and costs, and other appropriate relief.

**COUNT XVI**
**VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972,**
**AS AMENDED —**
**RETALIATION**
**20 U.S.C. § 1681 *et seq.***

235.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

236.    Upon information and belief, at all times relevant to this action, Columbia has received, and continues to receive, federal financial assistance.

237.    Plaintiff engaged in protected activity, and Defendant was aware of Plaintiff's protected activity.  Among other things, Plaintiff opposed the unlawful treatment to which she was being subjected by complaining to Defendant's senior administrators, including Dean Glenn Hubbard, Vice Dean Janet Horan, and Vice Dean Katherine Phillips.  Plaintiff also participated in an investigation with Columbia's Title IX office.  Plaintiff also notified Defendant of her retention of counsel and her plans to file a complaint to vindicate her rights.

238.    Defendant retaliated against Plaintiff for engaging in protected activity.  Among other things, Defendant revoked Plaintiff's paid leave and accelerated her tenure process.

239.    There was a causal connection between Plaintiff's protected activities and Defendant's retaliatory actions.  Defendant's retaliatory acts were a direct and proximate result of Plaintiff's protected activities.

240.    Defendant's retaliatory acts were materially adverse, and such acts would dissuade a reasonable person from engaging in a protected activity.

241.    Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

242.    By reason of the continuous nature of Defendant's retaliatory conduct, Plaintiff is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

243.    As a result of Defendant's unlawful retaliation, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

244.    Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including back pay, front pay, compensatory damages, attorneys' fees and costs, and other appropriate relief.

## COUNT XVII
## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS AMENDED — DISCRIMINATION IN PROMOTION
### 20 U.S.C. § 1681 *et seq.*

245.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

246.    Upon information and belief, at all times relevant to this action, Columbia has received, and continues to receive, federal financial assistance.

247.    Plaintiff is a female employee of Defendant.

248.    Plaintiff has applied for promotion to the position of tenured professor.   Plaintiff would have been able to compile a successful tenure package if not for Defendant's unlawful acts and omissions, including Professor Bekaert's unlawful harassment of Ms. Ravina and

Defendant's enabling of Professor Bekaert to unlawfully obstruct Plaintiff's work.

249.    Defendant has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination in the workplace.

250.    The tenure review process imposed at this time is a sham process.  Defendant has indicated that it will reject Plaintiff's tenure application.

251.    When Defendant denies Plaintiff the promotion, Defendant's denial of the promotion will be a direct and proximate result of gender discrimination.

252.    Defendant's conduct is intentional, deliberate, willful, malicious, reckless and conducted in callous disregard to Plaintiff's rights, entitling her to punitive damages.

253.    As a result of Defendant's failure to promote, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

254.    As a result of Defendant's failure to promote, Plaintiff will be entitled to all legal and equitable remedies available for violations of Title IX, including back pay, front pay, compensatory damages, attorneys' fees and costs, and other appropriate relief.

## COUNT XVIII
### VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, AS AMENDED — UNLAWFUL TERMINATION
### 20 U.S.C. § 1681 *et seq.*

255.    Plaintiff re-alleges and incorporates by reference each and every allegation in this Complaint as though fully set forth herein.

256.    Upon information and belief, at all times relevant to this action, Columbia has received, and continues to receive, federal financial assistance.

257.    Plaintiff is a female employee of Defendant.

258.    Plaintiff has applied for promotion to the position of tenured professor.   Plaintiff would have been able to compile a successful tenure package if not for Defendant's unlawful acts and omissions, including Professor Bekaert's unlawful harassment of Ms. Ravina and Defendant's enabling of Professor Bekaert to unlawfully obstruct Plaintiff's work.

259.    The tenure review process imposed at this time is a sham process.  Defendant has indicated that it will reject Plaintiff's tenure application.

260.    This will result in Plaintiff's termination. Columbia's internal rules provide that officers of instruction have limited term appointments and will be terminated unless granted tenure.   If tenure is denied during the officer of instruction's eighth year, the terminated employee must exit the University approximately one year later.    Columbia Charters and Statutes § 71(b)(1) and § 71(b)(3).

261.    When Defendant terminates Plaintiff, Defendant will have wrongfully terminated Plaintiff's employment based on her sex and in retaliation for engaging in protected activity.

262.    Defendant's wrongful termination will be an adverse employment action that will materially and adversely change Plaintiff's overall terms and conditions of her employment in violation of Title IX.

263.    Defendant's wrongful termination of Plaintiff is a direct and proximate result of gender discrimination and her protected activities.

264.    Defendant's wrongful termination is materially adverse and would dissuade a reasonable person from engaging in a protected activity.

265.    As a result of Defendant's unlawful termination, Plaintiff will suffer harm, including but not limited to lost earnings, lost benefits, and other severe financial losses, as well as humiliation, embarrassment, emotional and physical distress and mental anguish.

266.     Plaintiff is entitled to all legal and equitable remedies available for violations of Title IX, including back pay, front pay, compensatory damages, attorneys' fees and costs, and other appropriate relief.

## PRAYER FOR RELIEF ON CLAIMS

WHEREFORE, Plaintiff prays that this Court:

A.     Award Plaintiff all of her damages under the New York City Human Rights Law; Title VII of the Civil Rights Act of 1964, as amended; and Title IX of the Education Amendments of 1972, as amended, including back pay, front pay, compensatory damages, and punitive damages in excess of $20 million;

B.     Enjoin Defendant from making any decisions with respect to Plaintiff's tenure candidacy pending the conclusion of trial in this matter;

C.     Order Defendant to grant Plaintiff an extension of her tenure clock such that she will not be required to submit her tenure package prior to Spring 2018 and such that a final decision will not be rendered on her tenure prior to the 2018-2019 academic year;

D.     Award Plaintiff all attorneys' fees, costs, and expenses available under law;

E.     Award Plaintiff all pre-judgment interest and post-judgment interest available under law; and

F.     Award Plaintiff such additional and further relief as this Court may deem just and proper.

## VI.    JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by jury.

Dated: March 22, 2016

Respectfully submitted,

_____

Jeremy Heisler (JH-0145)
Alexandra Harwin*
Katherine Kimpel*
David Sanford*
**SANFORD HEISLER KIMPEL, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
kkimpel@sanfordheisler.com
aharwin@sanfordheisler.com
jheisler@sanfordheisler.com
*Attorneys for Plaintiff*

*pending pro hac vice admission

Dated: March 22, 2016

Respectfully submitted,

Jeremy Heisler (JH-0145)
Alexandra Harwin*
Katherine Kimpel*
David Sanford*
**SANFORD HEISLER KIMPEL, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
kkimpel@sanfordheisler.com
aharwin@sanfordheisler.com
jheisler@sanfordheisler.com
*Attorneys for Plaintiff*

*pending pro hac vice admission*

43