I6MJRAVD                      Decision

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ENRICHETTA RAVINA,

4                   Plaintiff,

5            v.                          16 Civ. 2137 RA

6   COLUMBIA UNIVERSITY, et al.,

7                   Defendants.

8   ------------------------------x

9

10

11                                       June 22, 2018
                                         2:00 p.m.
12

13

14

15   Before:

16                   HON. RONNIE ABRAMS,

17                                       District Judge

18

19

20

21

22

23

24

25

1           (Telephonically in open court)

2           (Case called)

3           THE COURT:  Good afternoon to all of you.

4           Mr. Sanford, I have on the phone.  Is that right?

5           MR. SANFORD:  Yes, your Honor.  Good.  Afternoon.

6           THE COURT:  Good afternoon.

7           We are here today regarding defendants' motion for

8    summary judgment.  I don't think anyone requested oral

9    argument, so I am ready to rule today.  If, however, there is

10   something you want to add, I promise to keep an open mind.

11          I am going to rule orally, and it is just because of

12   the July trial date.  I assume you would rather, even if it

13   requires sitting here for a little bit, would like getting my

14   ruling and my reasoning sooner rather than later.  That is my

15   intention today.

16          So the parties are familiar with the background of the

17   case and the general summary judgment standard.  I am not going

18   to go over that.  I will recite the relevant facts and the

19   standard of review for each claim as I discuss it.

20          As a preliminary matter, plaintiff's motions to strike

21   and to file a sur-reply are denied.  I am denying defendant

22   Bekaert's motion for summary judgment and granting in part and

23   denying in part defendant Columbia's motion for summary

24   judgment.  There are a lot of claims in this case, so I am

25   going to tell you how I've grouped them and how I'll discuss

I6MJRAVD                          Decision

1    them today.

2            Plaintiff's complaint contains 18 counts.  She has

3    brought all 18 against Columbia and the first four against

4    Professor Bekaert.  The claims are brought pursuant to either

5    New York City's human rights law, Title VII or Title IX.  Many

6    of the counts deal with the same allegations, so I have grouped

7    them as follows:

8            First, the city and federal hostile work environment

9    claims, Counts 3, 9 and 15;

10           Second, the city and federal retaliation claims,

11   Counts 4, 10 and 16;

12           Third, the city and federal quid pro quo claims,

13   Counts 2, 8 and 14; and

14           Fourth, the city and federal discrimination claims

15   related to tenure and termination, Counts 1, 5, 6, 7, 11, 12,

16   13, 17 and 18.

17           In short, for the reasons I'll outline  this

18   afternoon, I am granting summary judgment on Bekaert's

19   nonsupervisory status, the federal quid pro quo claims against

20   Columbia, and any liability stemming from alleged direct

21   discrimination by Columbia.  I am denying summary judgment as

22   to the rest of the claims.

23           In other words, I am allowing to go to trial all of

24   the claims alleging discrimination and retaliation against

25   Professor Bekaert as well as the claims against Columbia that

I6MJRAVD                    Decision

1    are based on the following theories:

2            That Columbia negligently handled plaintiff's

3    complaints, allowing Bekaert's alleged retaliation and

4    discrimination to negatively affect her tenure prospects and

5    the claim that Columbia retaliated against plaintiff for her

6    complaints.

7            So I'll start with the hostile work environment claims

8    against Professor Bekaert and Columbia brought pursuant to both

9    federal and New York City law.  I am denying summary judgment

10   on those claims except to the extent that I find that Bekaert

11   was not plaintiff's supervisor.  So I'll first recite the

12   relevant standards.

13           At summary judgment, a plaintiff making a federal

14   hostile work environment claim must demonstrate that a

15   reasonable trier of fact could conclude:

16           One, that the workplace was permeated with

17   discriminatory intimidation that was sufficiently severe or

18   pervasive to alter the conditions of his or her work

19   environment;

20           Two, the specific basis exists for imputing the

21   conduct that created the hostile work environment to the

22   employer.  Citing Rojas, 660 F.3d at 106.  Courts should look

23   at the totality of circumstances and relevant factors including

24   the frequency and severity of the conduct, whether it was

25   physically threatening or humiliating, and whether it

1    unreasonably interfered with the plaintiff's work performance.

2    Rivera, 743 F.3d at 20.  The environment need not be

3    unendurable or intolerable before it is actionable, and the

4    severe or pervasive standard does not mean that employers are

5    free from liability in all but the most egregious cases.

6    Feingold, 366 F.3d at 150.  Unwelcome sexual advances, requests

7    for sexual favors, and other verbal or physical conduct of a

8    sexual nature can create an actionable hostile work environment

9    claim.  Meritor, 477 U.S. at 65.

10           For a city hostile work environment claim, Section

11   8-107(1)(a) of the New York City Administrative Code makes it

12   unlawful for an employer or an employee or agent thereof,

13   because of the gender of any person, to refuse to hire or

14   employ or to bar or to discharge from employment such person or

15   to discriminate against such person in compensation or in

16   terms, conditions or privileges of employment.

17           The City Human Rights Law is not co-extensive with its

18   federal and state counterparts.  Rather, the city law has broad

19   and remedial purposes, and I am quoting from Section 8-130, and

20   "courts must analyze the law's claims separately and

21   independently from any federal and state law claims, construing

22   its provisions broadly in favor of discrimination plaintiffs to

23   the extent that such a construction is reasonably possible.  I

24   am citing the Ya-Chen Chen case, 805 F.3d at 75.  Rather than

25   set out different standards for hostile work environment and

other types of gender discrimination claims, the city law

contains only the provision prescribing imposition of different

terms, conditions and privileges of employment based on gender.

Clarke, 2013 WestLaw 2358596, at *11.

　　　　To establish a claim under the city law, plaintiff

need only demonstrate by a preponderance of the evidence that

she has been treated less well than other employees because of

her gender.  Mihalik, 715 F.3d at 110.  Severity and

pervasiveness are relevant only to the issue of damages.

Furthermore, the discriminatory motive need not be the sole

motive.  Id. at 113.  In analyzing such claims, courts must

consider the totality of the circumstances.

　　　　Turning to the record in this case, plaintiff has

testified to an extensive history of what she characterizes as

unwarranted sexual advances by Defendant Bekaert.  For example,

according to plaintiff, at a dinner with her in 2012, Bekaert

asked if she had a boyfriend, said it was good she didn't, and

laughed in reaction to her attempt to characterize the dinner

as merely one between colleagues.  That is from plaintiff's

additional facts, at 357-360.

　　　　In a taxi after that dinner, plaintiff testified

Bekaert ran his hand down her back, 360.  At another dinner in

2013, Bekaert allegedly boasted to plaintiff about his sexual

history, 367-370.  Plaintiff testified such conduct continued

at least during fifteen more interactions in the Fall of 2013,

I6MJRAVD                    Decision

381-92.  Plaintiff also testified that Bekaert pulled her

toward him and kissed her after another dinner in September

2013, 387.  At another dinner shortly afterwards, plaintiff

testified that Bekaert made another unwanted advance on her by

grasping her hand, 389.  During some of these interactions,

plaintiff claims that Bekaert directed the conversation to the

topics of pornography and prostitutes, 391-392.

        According to plaintiff, in the context of similarly

sexual talk, Bekaert told plaintiff that if she were nicer to

him, her academic papers would progress at a faster pace, at

399.  The conduct allegedly continued in 2014, including an

instance when plaintiff testified that Bekaert told her that he

was horny after she had gone to see him in his office for work

purposes, 403.

        In these instances, accepted as true at this stage,

and others make out a prima facie case for plaintiff's hostile

work environment claim under the relatively low standard of the

City Human Rights Law.  See the Baez case, 2017 WestLaw, 57858,

at *5, as well as the severe or pervasive federal standard.

        In response, Bekaert asserts that the defense that

such incidents were no more than petty slights or trivial

inconveniences, an argument which, if true, would relieve him

of liability.  Mihalik, at 111.  Columbia similarly argues that

Bekaert's conduct towards plaintiff was not unwelcome, and in

any event was not sufficiently severe or pervasive.

I6MJRAVD                    Decision

1           At this stage, on this record, however, the Court

2      finds a reasonable jury could find otherwise.  The incidents

3      described by plaintiff were not isolated -- they were

4      purportedly numerous and spread out over a multi-year period.

5      Bekaert and Columbia characterize many of the interactions with

6      plaintiff very differently than she does, but the Court cannot

7      at this stage assume the role of the jury and determine matters

8      of credibility and conflicting testimony.

9           The contrary evidence defendants may cast plaintiff's

10     allegations into doubt, but only so much as to leave the matter

11     deeply disputed.  The Court finds that the conduct at issue, as

12     described by plaintiff, is not so innocuous, incredible or

13     isolated that no reasonable jury could find Bekaert liable

14     under either the city law or the federal standard.

15          To impute liability for Bekaert's conduct to Columbia,

16     however, requires additional findings.  Under the city law, a

17     reasonable jury must be able to find that Columbia knew of

18     Bekaert's conduct and failed to take immediate and appropriate

19     corrective action.  See New York City Administrative Law

20     8-107(13)(b)(2).  Under the federal standard, either the liable

21     employee must be a supervisor, or, if he is only a co-worker,

22     the employer must have acted negligently, i.e., not monitored

23     the workplace, failed to respond to complaints, failed to

24     provide a system for registering complaints, or effectively

25     discouraged complaints from being filed.  See the Vance case,

I6MJRAVD                    Decision

570 U.S. at 449.  An employer may try to show that it exercised
reasonable care to prevent and promptly correct any sexual
harassing behavior and that a plaintiff-employee unreasonably
failed to take advantage of any corrective opportunities
provided.  Townsend, 679 F.3d at 50.

          Columbia argues first Bekaert was not a supervisor as
a matter of law.  The Court agrees with Columbia on this point.

          A supervisor is an employee who can take tangible
employment actions against another employee, meaning actions
such as hiring, firing, failure to promote, reassignment with
significantly different responsibilities, or a decision causing
a significant change in benefits.  Vance, at 431.

          Here, plaintiff states that Bekaert assigned her work,
could exclude her from their research project, and evaluated
her performance.  She also argues that there is a natural
asymmetry of power between a senior and junior faculty member.
But those traits fall short of the necessary tangible
employment action mandated by the Supreme Court in Vance.  See
the Murphy case, 2018 WestLaw 1831847, at *6-7.  Plaintiff's
cited cases, all but one of which were decided well before the
Supreme Court's Vance opinion, do not convince the Court
otherwise.

          Plaintiff has also alleged, however, Columbia acted
negligently in handling Bekaert's conduct.  Although a close
question, in my view, the Court ultimately agrees with

1    plaintiff that this is a triable issue for a jury.  Plaintiff

2    alleges that Columbia conducted a delayed and inadequate

3    investigation of Bekaert's conduct that resulted only in

4    training, did not conduct an investigation of Bekaert's alleged

5    retaliation against plaintiff, and that a Columbia

6    administrator attempted to dissuade her from filing complaints.

7             Specifically, plaintiff asserts that it took Columbia

8    two months after her initial complain to formally launch an

9    investigation and that the investigator told Columbia, before

10   he had interviewed any witnesses, that Columbia had taken all

11   the right steps.  Plaintiff's Exhibits 135 and 139.  Plaintiff

12   also testified that the Columbia Business School Dean expressed

13   frustration about dealing with her complaint and predicted that

14   nothing will come out of it.  Ravina deposition at 227-33.

15            While Columbia contends that its response was

16   adequate, at this stage the Court must view the evidence in the

17   light most favorable to plaintiff and assume a jury may credit

18   her version of events.  See Petrosino, 385 F.3d at 226.

19   Perhaps the most serious event -- the alleged attempt to

20   dissuade plaintiff's complaint -- depends on fact-intensive

21   determinations of credibility and context best left to a jury.

22   Plaintiff may not have been entitled to her preferred outcome

23   of Columbia's investigation, but a failure to investigate or an

24   attempt to discourage a complaint, if true, would not meet the

25   required standard of being reasonably calculated to address the

I6MJRAVD                    Decision

problem.  See Cowan, 2017 WestLaw, at *6.  Thus, there is a

triable issue as to whether Columbia acted negligently in

addressing plaintiff's complaints against Bekaert and whether

it failed to take immediate and appropriate corrective action.

        Accordingly, defendants' motions for summary judgment

on both the city and federal hostile work environment claims

are, therefore, denied except as to the supervisory issue.

        I next turn to defendants' motions for summary

judgment on plaintiff's retaliation claims brought pursuant to

both federal and city law.  I am denying summary judgment on

those claims.

        A plaintiff making a federal retaliation claim must

offer evidence that she participated in a protected activity,

suffered an adverse employment action, and there is a causal

connection between her engaging in the protected activity and

the adverse employment action.  Ya-Chen Chen, 805 F.3d at 70.

The defendant must also know about the protected activity.

Baldwin, 690 Fed.App'x at 697.  Such a showing establishes a

presumption of retaliation, which a defendant may rebut by

articulating a legitimate, non-retaliatory reason for the

adverse action.  The burden then shifts back to the plaintiff

to establish that the desire to retaliate was the but-for cause

of the action.  Id.

        Under Section 8-107(7) of the New York City

Administrative Code, retaliation in any manner by those engaged

I6MJRAVD                    Decision

in discriminatory conduct is prohibited against persons who
oppose such discriminatory practices or challenged or reported
the practice to authorities.  Plaintiff alleging such
retaliation must show a reasonable jury could conclude that a
defendant's conduct was reasonably likely to deter a person
from engaging in protected activity.  Fincher, 604 F.3d at 723.
There need not be a materially adverse employment action by a
defendant, Id., and summary judgment is appropriate only if the
record establishes as a matter of law that retaliation played
no role in the defendant's actions.  Ya-Chen Chen at 76.  New
York courts have found a jury is generally best suited to
evaluate the impact of retaliatory conduct in the context of
heavy world of workplace realities.  Mihalik, at 112.

        Plaintiff has based her retaliation claims on
Bekaert's conduct, Columbia's decisions surrounding her denial
of tenure and leave, and on imputing Bekaert's behavior to
Columbia.

        Turning first to Bekaert's conduct, it is undisputed
that plaintiff complained of his conduct both to Columbia and
via his lawsuit, and that Bekaert knew of her complaints.
Thus, plaintiff engaged in protected activity and Bekaert knew
of it.

        Plaintiff alleges that Bekaert took the following
adverse actions against her in retaliation for her protected
activity:

I6MJRAVD                    Decision

First, she has presented evidence Bekaert allegedly disparaged her professional reputation by emailing other academics and economists, including Bekaert's then-girlfriend and other close friends, calling plaintiff a damn evil bitch, berserk, insane and incredibly evil, sick and crazy, and other variations on the same theme.

Second, plaintiff has testified and presented evidence Bekaert allegedly obstructed plaintiff's research work.  On October 27, 2014, citing reasons related to the status of the research data, Bekaert wrote, "I no longer think it is a good idea for plaintiff to work on the research project by herself."

Plaintiff also asserts Bekaert delayed her work by not responding to various requests and drafts in a timely manner, had her perform time-wasting exercises, and threatened to revoke her access to data.  Plaintiff has testified that these and other delays were intended to harm her career as punishment for her protected activity.  A number of faculty at Columbia's business school also expressed objections, stating in a January 22, 2016 letter to business school administrators that Bekaert "has not met his obligation as co-author and senior colleague to to do all he can to speed the process of having his and plaintiff's joint work reviewed and published, knowing that failing to do so would have adverse consequences for plaintiff's prospects for tenure, calling the circumstances highly unusual and regrettable."

I6MJRAVD                          Decision

1          Plaintiff cites a number of angry messages Bekaert

2     sent to others about her as evidence of the causal connection

3     between such actions and their retaliatory nature.  In one such

4     email, Bekaert wrote of plaintiff in the context of academic

5     publishing that "if she goes it alone against my will, I will

6     stop her.  I know every single editor."  Plaintiff's Exhibit

7     127.

8          In response, Bekaert disputes the nature of his work

9     with plaintiff, arguing that he and plaintiff worked

10    productively and that any undue delays were the fault of

11    plaintiff.  Bekaert dismisses plaintiff's other allegations of

12    retaliation as vague and conclusory.  The Court disagrees at

13    this stage.  Plaintiff has identified a number of specific

14    actions she alleges to have been made against her in purported

15    retaliation for protected activity.  How to credit and

16    characterize those actions is a disputed factual matter for the

17    jury, as is causation.  Bekaert's anger towards plaintiff in

18    the aftermath of her complaints has been well-demonstrated,

19    allowing a reasonable jury to conclude that retaliation, rather

20    than work-related reasons, motivated Bekaert's subsequent

21    conduct, and that the conduct was reasonably likely to deter

22    plaintiff from protected activity.  See Vega, 801 F.3d at 90

23    and Fincher at 723.

24         At trial, Bekaert may of course argue his

25    communications about plaintiff and his girlfriend and other

friends were simply his personal opinions about a contentious

matter.  But because the people to whom Bekaert disparaged

plaintiff plausibly could have been an effect on her career, a

jury must decide the disputed nature of such communications and

whether the intent behind them was retaliation.  Arguments that

any delays were either beneficial to plaintiff or the fault of

plaintiff are similarly disputed factual issues the Court

cannot resolve on summary judgment.

          Turning next to Columbia's conduct concerning

plaintiff's tenure and leave denial, Columbia argues there is

no causal connection between her complaints as to Bekaert's

behavior in 2014 and the denial of tenure two years later.  It

contends there is no evidence of improper motive on the part of

Columbia and the time gap between the two events is too great

to sustain the claim.

          Plaintiff counters there were multiple instances in

which he engaged in protected activity, including an August 21,

2015 email to a Columbia division chair, who communicated its

content to administrators, that she might "go to court," the

filing of her September 23rd, 2015 state lawsuit; and

conversations with Columbia's legal counsel concerning possible

claims against the university.

          Columbia's message apologizing that an earlier letter,

which arguably appeared to grant Ravina leave, had actually

been a "huge mistake" came less than a week, less than one week

1    after the lawsuit, on September 29th, 2015.  Furthermore, on

2    December 15, 2015, plaintiff's counsel told Columbia's counsel

3    that a lawsuit would soon be filed.  The following day, in an

4    email marked "Important Urgent Update," a Columbia

5    administrator wrote that "after meetings with lawyers," it was

6    decided that plaintiff needs to go through the tenure process

7    now, as opposed to the tenur process delay plaintiff testified

8    she had been previously been notified of through her prior

9    counsel.  With roughly a month to submit her materials on what

10   her division chair described as a "compressed timeline,"

11   plaintiff asked for personal leave, but that request was

12   denied.  The Court finds that this close time proximity between

13   plaintiff's protected activity and Columbia's actions is

14   sufficient to establish a causal connection for summary

15   judgment purposes.  See, e.g., Summa v. Hofstra, 708 F.3d at

16   128.

17          Columbia articulates legitimate, non-retaliatory

18   reasons for its conduct:  it argues there is no evidence of

19   influence by Mr. Bekaert on the tenure decision, which was

20   based on plaintiff's inadequate academic publishing record;

21   that the possible June grant of leave to plaintiff was, in

22   fact, an honest mistake; and that Columbia offered plaintiff a

23   break in service rather than leave but plaintiff refused it.

24   Columbia also emphasizes that plaintiff never formally

25   requested leave.

I6MJRAVD                    Decision

1           Plaintiff counters that she is not arguing that the

2     merits of the tenure decision, only abbreviated timeline and

3     conditions that led to it; that the grant of leave is a

4     disputed fact question; and that the offered break in service

5     was illusory and would have required demotion in title.  Given

6     the highly factual nature of these issues, the Court agrees

7     that they should not be decided on summary judgment.

8     Columbia's stated reasons may provide ample evidence with which

9     to rebut any appearance of retaliation, but they not prevent

10    retaliation from being a genuinely disputed factual issue, one

11    that depends on determining context and credibility, as well as

12    the application of Columbia's personnel policies.  Again this

13    was another very close question, in my view.

14           As for Columbia's contention that plaintiff has not

15    demonstrated sufficient knowledge of her protected activity,

16    plaintiff's communications to Columbia's counsel and

17    high-ranking faculty members demonstrate the required "general

18    corporate knowledge."  See the Gordon case, 232 F.3d at 116.

19           In sum, weighing whether Columbia's given reasons

20    preclude retaliation as a but-for cause, of which there may be

21    more than one, is a question best left for the jury.  See Zann

22    Kwan, 737 F.3d at 846 (Note 5).

23           The Court also denies summary judgment on the

24    retaliation claims insofar as they're based on imputing

25    Bekaert's allegedly retaliatory behavior to his employer,

1   Columbia.  As discussed above, a reasonable jury could find

2   that Bekaert retaliated against plaintiff for her complaints

3   about his conduct.  The parties only referred to this

4   implicitly, but a reasonable jury could, on the facts currently

5   on the record, find Columbia liable for such conduct pursuant

6   to the so-called "Cat's Paw" liability, theory of liability.

7        Cat's Paw liability refers to a situation in which an

8   employee is subjected to an adverse employment action by an

9   employer that has no impermissible motive, but has been

10  manipulated by a subordinate who does not have such motive --

11  who does have such motive and intended to bring about the

12  adverse employment action.  See the Vasquez case from the

13  Second Circuit from 2016, 835 F.3d at 272.

14       The Court has already found that Bekaert was not

15  plaintiff's supervisor, but the Second Circuit has extended

16  Cat's Paw liability to cases involving co-workers "if the

17  employer's own negligence gives effect to the co-worker's

18  animus and causes the victim to suffer an adverse employment

19  action."  See Vasquez at 276.  Here, plaintiff alleges that

20  Bekaert retaliated against her, that Columbia insufficiently

21  investigated and acted on her complaints about retaliation, and

22  that her tenure record suffered from the ensuing obstruction of

23  her research and reputational harm, leading to her tenure

24  denial and termination.

25       Thus, a reasonable jury could infer that Bekaert's

I6MJRAVD                      Decision

retaliatory conduct was a but-for, and intentional, cause of

plaintiff's tenure denial and subsequent termination, and that

liability for such conduct should be imputed to Columbia for

its alleged negligence.  For the same reasons, summary judgment

is denied on plaintiff's city retaliation claim against

Columbia, because a triable issue remains whether Columbia

"failed to take immediate and appropriate corrective action" on

plaintiff's complaints of retaliation.  See the New York City

Administrative Code, 8-107 (13)(b)(2).

        The Court, therefore, denies defendants' motion for

summary judgment on plaintiff's federal and city retaliation

claims.  The Court notes that the denial of summary judgment or

retaliation extends to a denial of summary judgment on

plaintiff's claims of unjust termination against Columbia,

Counts 6, 12 and 18, insofar as those counts in the complaint

appear to be based on a theory of retaliation against

plaintiff's protected activities.

        The Court next turns -- and we have a few more minutes

left -- to defendants' motions for summary judgment on

plaintiff's quid pro quo sexual harassment claims brought

pursuant to both federal and city law.  I am granting summary

judgment as to the federal claims against Columbia, but denying

it as to the city claim against Columbia and Bekaert.

        To establish a federal prima facie case of quid pro

quo harassment, a plaintiff must present evidence that she was

I6MJRAVD                    Decision

1    subjected to unwelcome sexual conduct and that her reaction to

2    that conduct was then used as the basis for decisions affecting

3    the compensation, terms, conditions or privileges of her

4    employment.  Fitzgerald, 251 F.3d at 356.  The decision taken

5    must be a tangible employment action, meaning a hiring, firing,

6    failure to be promoted, reassignment with different

7    responsibilities, or a change in benefits.  Schiano, 445 F.3d

8    at 604.  In other words, a tangible employment action is

9    generally the type of official documented action undertaken by

10   a supervisor.  See Ellerth, 524 U.S. at 762.

11         As I have already explained, Bekaert was not

12   plaintiff's supervisor.  Therefore, he did not have the

13   authority to take tangible employment action against her.

14   Plaintiff has presented no evidence to the contrary.

15         Plaintiff contends that the appropriate standard is

16   actually whether there has been a materially adverse change to

17   employment conditions, citing an Eastern District case, but

18   that case did not deal with a quid pro quo harassment claim

19   which Second Circuit precedent makes clear applies the higher

20   showing of tangible employment action.  See Schiano, 445 F.3d

21   at 604.  Plaintiff has not made that showing.

22         Columbia's motion for summary judgment is, therefore,

23   granted as to plaintiff's federal quid pro quo allegations

24   against Columbia, Counts 8 and 14.

25         The New York City Human Rights Law under which

1   plaintiff brings quid pro quo claims against both Bekaert and

2   Columbia has uniquely broad and remedial purposes and does not

3   require a tangible employment action such as hiring or firing.

4   See the Williams case, 61 A.D.3d at 40.  Plaintiff's evidence

5   that Bekaert allegedly conditioned her work progress on her

6   attitude towards him and allegedly retaliated against him when

7   she resisted his advances is, thus, sufficient to make out a

8   triable quid pro quo claim under New York City law.  As for the

9   reasons allegedly outlined, namely an alleged attempt to

10  dissuade plaintiff's complaint and an alleged failure to

11  adequately investigate and correct Bekaert's conduct, there is

12  a triable issue as to whether Columbia should be held liable

13  for Bekaert's alleged conduct.  Summary judgment is, therefore,

14  denied as to the city quid pro quo claim, Count 2, against

15  Bekaert and Columbia.

16          I next turn to Columbia's motion for summary judgment

17  as to plaintiff's discrimination claims against it that stem

18  from her denial of tenure and her termination.  I am granting

19  the motion in part and denying the motion in part.  As for her

20  retaliation claims, plaintiff's discrimination claims are

21  subject to a similar three-part-burden-shifting test, although,

22  of course, the elements differ somewhat.  Plaintiff can

23  establish a prima facie case of discrimination, by showing that

24  (1) she belonged to a protected class, in this case, based on

25  her gender; (2) she was qualified for sought-after position;

1   (3) she was denied that position; and (4) the denial occurred

2   under circumstances giving rise to an inference of

3   discrimination.  Roge, 257 F.3d at 168.

4         Plaintiff has not created a triable issue whether her

5   tenure denial occurred under circumstances giving rise to an

6   inference of discrimination of Columbia's part, under either

7   federal or New York City Human Rights Law standards.  No

8   reasonable jury could find that Columbia discriminated against

9   plaintiff based only on one administrator's "soap opera"

10  comment and the, at best, marginally different treatment of one

11  male professor decades ago.  Even under the less stringent

12  "treated less well" standard of the New York City Human Rights

13  Law, plaintiff still must show the treatment was "because of a

14  discriminatory intent," and plaintiff has not made such intent

15  for Columbia a triable issue.  Mihalik at 110.

16        Plaintiff's discrimination claims are, however, still

17  viable under the Cat's Paw theory of liability.  As noted

18  previously, that theory holds an employer may be liable for an

19  adverse employment action if it, through negligence, gives

20  effect to the impermissible animus of a victim's co-worker.

21  See Vasuez, at 273.  A reasonable jury could find that Bekaert

22  played a meaningful role in plaintiff's tenure denial and

23  termination by obstructing her research and attacking her

24  reputation and, thus may have "impermissibly tainted the

25  ultimate employment decision.  Bickerstaff, 196 F.3d at 450.

1          Look, as discussed, there are disputed factual issues

2     as to the adequacy of Columbia's handling of plaintiff's

3     complaints, including the testimony that an administrator

4     discouraged the complaint and that the investigation was

5     delayed as well as prejudged by the investigator.  A reasonable

6     jury could find that Columbia was negligent in allegedly

7     failing to adequately investigate and stop such behavior, and

8     in doing so, gave effect to Bekaert's allegedly discriminatory

9     animus.  See Velazquez-Perez, 753 F.3d at 274.

10          Columbia may argue at trial that officials responsible

11    for making a tenure decision based their decision exclusively

12    on an independent evaluation of her Ravina's unobstructed

13    record and may well prevail, but that is another highly

14    disputed factual matter for the jury to decide.  I understand

15    Columbia's position that the tenure decision itself is entitled

16    to substantial deference, and I don't disagree, plaintiff's

17    claims are based on the conditions that shape the vote, not the

18    vote itself.

19          In sum, no reasonable jury could find that Columbia

20    discriminated against plaintiff on the basis of her gender, but

21    triable issues remain as to whether Columbia should have

22    liability for Bekaert's discriminatory conduct imputed to it

23    for its alleged negligence.  The Court, therefore, grants

24    summary judgment on plaintiff's discrimination claims as they

25    relate to any alleged direct discrimination by Columbia, but

1  denies it as they relate to imputing liability to Columbia

2  based on Bekaert's alleged discriminatory conduct.

3          I will put this in an order for you so it will be

4  clear exactly how I ruled as to each claim.

5          In sum, the Court today has granted summary judgment

6  on the following:

7          Plaintiff's federal quid pro quo harassment claims

8  against Columibia, Counts 8 and 14.

9          Plaintiff's discrimination claims against Columbia,

10 Counts 1, 5, 6, 7, 11, 12, 13, 17 and 18, but only as to the

11 alleged direct discrimination by Columbia.  Those claims

12 survive summary judgment insofar as they are based on imputing

13 Bekaert's allegedly discriminatory conduct to Columbia based on

14 Columbia's alleged negligence in handling allegations regarding

15 the conduct.  Additionally, as noted, the termination claims,

16 Counts 6, 12 and 18, also survive based on retaliation.

17         Obviously, none of my rulings express any view on the

18 underlying merits of the case which are highly fact- and

19 credibility-dependent.  Based on my rulings, I think the issues

20 that are primarily going to be disputed at trial are:

21         Whether Bekaert harassed and discriminated against

22 plaintiff;

23         Whether Bekaert retaliated against plaintiff and

24 obstructed her research and tenure prospects; and

25         Whether, in light of the close time proximity between

1  plaintiff's protected activity and certain actions by Columbia,

2  in addition to related factual disputes, whether Columbia

3  retaliated against plaintiff, as well as whether Columbia

4  handled plaintiff's complaints negligently and in so doing gave

5  effect to any animus on the part of Bekaert.

6            I assume you will be ordering the transcript.  As I

7  said, I will put sort of the bottom line in a ruling later

8  today.  Thank you for your patience today.  I just wanted to

9  get you a ruling, given the trial is coming upon us.  We are

10  set to proceed for the jury trial on June 9th.  I expect to

11  rule on the redactions that have been requested as well as the

12  motions in limine either before or at the July 2nd final

13  pretrial conference.  Please do let me know if my ruling today

14  in any way moots any of the motions that have been made.  That

15  is my ruling.

16            I know I just got a letter from plaintiff today

17  objecting to the proposed exhibit list.  That motion is denied.

18            I am happy to go off the record if you wanted to, and

19  you may need time to think about this and talk to your clients,

20  but I will say this.  If settlement is a possibility and there

21  is any way the Court can assist in that effort, please let me

22  know.  I know that there were scheduling issues and issues with

23  staffing, and I know that was inconvenient, but I felt like we

24  couldn't move the trial in light of plaintiff's availability

25  and my court schedule.

I6MJRAVD                      Decision

1              We are going to proceed to trial on June 9th.  The

2      only thing that I will say is that I have heard from the jury

3      room that July 9th is a very busy day.  I can check back in

4      closer to that date and let you know, but if it seems like,

5      because they always give precedent to criminal trials, if it

6      seems like we are not going to be able to choose a jury, we may

7      start on the 10th.  I would rather make that decision a little

8      closer to see if all those trials are still going, if you have

9      scheduling issues with witnesses, and it would be preferable to

10     know you can start on the 10th, I can do that, too.  I don't

11     know if you have authorities on that now.  I don't know if you

12     want to be in touch and see how things go.  I don't know if

13     there are particular scheduling issues with respect to

14     witnesses.

15             MS. PLEVAN:  Are there days when you know that you

16     will not sit?

17             THE COURT:  Let me get my calendar.

18             MS. PLEVAN:  I don't know if you sit on Fridays.

19             THE COURT:  I usually don't.  Let me look at the

20     calendar.  I usually always sit on Fridays when a jury is

21     deliberating, but I make exceptions.  If you, for scheduling or

22     other reasons, wanted to sit on that Friday, and we weren't

23     sitting on Monday, I would be happy to do that and rearrange my

24     schedule.  Let me know in advance and I can do that.

25             MS. PLEVAN:  But, otherwise, we would not --

| | |
|---|---|
| 1 | THE COURT:  Otherwise, I think we would not.  Again I |
| 2 | am open to hearing from you because I can accommodate my |
| 3 | schedule.  Do you still anticipate the trial will last |
| 4 | approximately two weeks? |
| 5 | MS. PLEVAN:  Two weeks or a little more depending on |
| 6 | the motions in limine, obviously. |
| 7 | THE COURT:  All right. |
| 8 | MS. PLEVAN:  I think we said 10 days, actually. |
| 9 | THE COURT:  10 days, okay.  I think the only thing is, |
| 10 | I do have a criminal trial scheduled to start on the 23rd.  I |
| 11 | think in light of that, I probably will sit on the Fridays |
| 12 | unless that is an issue for anyone and I will just rearrange my |
| 13 | schedule accordingly.  Then hopefully we'll get through the |
| 14 | trial in those two weeks and I won't have to put off the other |
| 15 | case.  Why don't we, and to go back on what I said, assume we |
| 16 | will sit on the Fridays, okay? |
| 17 | I will, but why don't we be in touch.  Ms. Cavale will |
| 18 | be in touch with you the week of June 2nd and see if June 9th |
| 19 | still seems like so busy a day for the jury room, in which case |
| 20 | we'll start on the 10th, okay?  Thank you for all coming in |
| 21 | today.  Thank you for your patience in sitting and listening, |
| 22 | and again you can, of course, get the transcript from the Court |
| 23 | reporters. |
| 24 | (Court adjourned) |
| 25 | |