I75JRAVC                        Conference

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  ENRICHETTA RAVINA,

 4                Plaintiff,

 5          v.                            16 Civ. 2137 RA

 6  GEERT BEKAERT, et al.,

 7                Defendants.

 8  ------------------------------x

 9

10

11                                        July 5, 2018
                                          2:00 p.m.
12

13

14

15  Before:

16                    HON. RONNIE ABRAMS,

17                                        District Judge

18

19

20

21

22

23

24

25

1          (In open court)

2          (Case called)

3          THE COURT:  Good afternoon, everyone.  I assume you

4     received my orders with a kind of bottom-line rulings.  I was

5     just trying to get you things as soon as possible.

6          What I'd like to do now, and I know I said this on the

7     summary judgment ruling as well, I am going to do it orally.  I

8     know that can be a little tedious.  I apologize in advance.

9     The goal is to get you the information sufficiently in advance

10    of trial, and if there is any need for clarification, we can do

11    that.  I was thinking I would go through and just briefly state

12    my reasoning on the various motions.

13         Then I have a draft juror questionnaire I was going to

14    talk about, and we can take a break so you can review the

15    questions I was going to ask.  I will tell you how I conduct my

16    jury selection.  You can let me know if you have any

17    objections, any objections to the questionnaire.  I give it out

18    that morning and we go through it together with the jurors.  I

19    have a case summary I intend to read to the jurors.  I will go

20    through that with you as well.

21         Depending on the time today and your pretrial order,

22    you have made objections to various exhibits, and so what I

23    will ask you is in light of my rulings, have those changed at

24    all?

25         Obviously, objections that are foundational in nature

1  we can wait for the trial, but if there are substantive

2  objections to things we can deal with in advance without

3  keeping the jury waiting, I would like to do that.  So we can

4  talk about if we should do that today or if you can confer with

5  each other and maybe narrow the number of exhibits in dispute.

6  　　　　　MR. SANFORD:  On that point, we have been

7  communicating with defendants' counsel, and I don't know that

8  we are close, but at least we're having extensive

9  communications about documents and hope that we can get those

10 resolved by tomorrow or the next day.  We'll let the Court

11 know.

12 　　　　　THE COURT:  I appreciate that.  Thank you very much.

13 Just let me know in advance if there are exhibits that I should

14 take a look at.

15 　　　　　I am going to say this at the end as well when we talk

16 about logistics, whatever issues you can raise with each other

17 and then with me so we don't keep the jury waiting would be

18 very much appreciated.  I am going to have you come at 9:30

19 every day.  I will be here if you need to see me if we need to

20 resolve any issues.  I will be here after court as well.  If

21 there are issues you want to raise in the end of the day or

22 morning, I encourage you to do that.  Obviously, not objections

23 on the fly, but anything else you can raise with your adversary

24 in advance, please do that.

25 　　　　　First, as to trial bifurcation, the parties, you all

1  know, don't disagree that or agree that trial should be

2  bifurcated, but there was disagreement as to how.  As I

3  indicated in my order on Tuesday, I think the simplest way to

4  divide the trial is into liability and damages phases.  I know

5  neither side is entirely happy with that, but I think it is the

6  simplest way and it will avoid the need to present complex

7  economic evidence until necessary, until after a verdict on

8  liability if necessary.

9          Courts are well within their proper discretion

10  bifurcating issues of liability and damages to achieve

11  expedition and economy.  I cite a few cases.  Briefly, the

12  Dallal case, 352 Fed.App'x at 512; Amato, 170 F.3d at 316, and

13  Getty Petroleum, 862 F.2d at 15.  Especially actually in

14  employment discrimination cases, U.S. v. City of New York, 2007

15  WestLaw 2581911, at *2.

16          I understand Columbia's points about punitive

17  liability and economic damages, but I don't think deal with all

18  the damages later will prejudice Columbia.  The jury will

19  consider the punitive liability standard during the first

20  phase, but it won't hear any evidence, for example, about

21  Columbia's finances until necessary in the second phase, if

22  there is one.

23          Now, just in terms of so I am not missing anything

24  with respect to judicial economy, is there anyone, if we

25  proceed in the way I suggested, is there anyone other than Ms.

1    Ravina who will likely have to testify in both phases?

2                MS. HARWIN:  I believe so.  Potentially Professor

3    Ravina's psychiatrist, but we haven't made a final

4    determination whether there will be any --

5                THE COURT:  If you can bring the mike closer.

6                MS. HARWIN:  Sorry, your Honor.  Potentially Ms.

7    Ravina's psychiatrist might testify in both phases, but we

8    haven't made a final determination as to that.

9                THE COURT:  Let me know that in advance.

10                Look, at the back table, there may be an objection to

11   that in the first phase, but I will wait and hear that out.

12   That was really my intention was to avoid people having to

13   testify twice.  Ms. Ravina is obviously here.  I am not sure

14   that psychiatrist testimony is necessary in the first phase,

15   but I will hear you out before I make a decision.

16                So as I noted also in my order in light of that

17   ruling, I am deferring for the time being rulings on motions

18   related to the admissibility of damages, specifically Ravina's

19   motions 1, 2 and 3, 11 and Columbia's motion to preclude

20   Ravina's economic damages analysis.  Obviously, there is only

21   going to be one trial, so we are going to finish the first

22   phase, and if there is a finding of liability, we'll go

23   straight to the second phase to utilize the jury's time.

24                I will say on those motions, I understand you still

25   need rulings on them, and I will rule on them as quickly as

1   possible.  I will try to get to what I thought you needed

2   soonest.

3           So next as to Ms. Ravina's ex-boyfriend, Motion No. 4,

4   she moves to exclude any evidence or reference to her history

5   with her ex-boyfriend who she has represented stalked her in

6   2005, leading to her filing a police report and sued her in

7   2007 over her allegedly wrongful possession of a handheld

8   device that he owned.  She denied any wrongdoing, and the case

9   was settled.

10          Ravina's motion is granted.  Under 402, irrelevant

11  evidence is not admissible in proceedings such as this one, the

12  concerned alleged sexual misconduct.  Rule 42 prohibits

13  evidence of the victim's sexual predisposition or past sexual

14  behavior unless such evidence's probative value substantially

15  outweighs any harm to the victim and unfair prejudice to any

16  party.  Rule 412 encompasses sexual harassment lawsuits.

17          Columbia I think rightly contends the evidence is not

18  of a sexual nature and relevant as a possible alternative cause

19  to any emotional distress experienced by Ms. Ravina.  As I

20  said, the Court generally agrees.  The fact Ravina may have

21  been stalked by her ex-boyfriend concerns his behavior and not

22  hers.  It is not enough that the stalking was performed by

23  someone with whom Ravina may have previously had sexual

24  relations.

25          So 412, in my view, is not applicable, but I am going

1    to exclude the evidence on 403 grounds.  The probative value of

2    the evidence is too limited, in my view.  Ms. Ravina's

3    interactions with her former boyfriend occurred in 2005 and

4    2007.  Columbia's psychiatric expert characterizes the stalking

5    incident as kind of distant and did not include it in his

6    report.

7               In contrast, I think the risk of unfair prejudice is

8    significant.  The jury might hear about a prior police

9    complaint concerning unwarranted male attention and think that

10   Ms. Ravina is hypersensitive to such behavior.  See the Outley

11   case, 837 F.2d 592.  That risks substantially outweighs any

12   marginal view arguing a distant event partly contributed to

13   emotional distress years later.  As for Ms. Ravina's settlement

14   of a lawsuit brought by the ex-boyfriend, I don't think that is

15   relevant.  I think it might distract the jury, and I will keep

16   that out on 402 and 403 grounds.

17              Now to motion No. 5.

18              MR. HERNSTADT:  Excuse me.  Do you want to hear if we

19   have comments or questions?

20              THE COURT:  If you have questions, feel free to do

21   that as we go along.

22              MR. HERNSTADT:  I wanted one clarification on that

23   ruling regarding the ex-boyfriend.  There is an email

24   interaction, and there has been some testimony about the fact

25   she mentioned to Professor Bekaert, an interaction that she had

1    a stalker.  It doesn't name him.  It doesn't say he is an

2    ex-boyfriend.  It doesn't go into any of the details from way

3    back when, but that discussion led to his sharing some

4    information about friends of his who had a stalker, including

5    one of the women that he allegedly discussed with her having

6    met him in Asia when he was on sabbatical.

7            The testimony from Professor Bekaert will be that she

8    sent him email saying I am dealing with a stalker, and he wrote

9    back I am so sorry, I have had a stalker, I have friends with a

10   stalker, this woman I met in Asia had a stalker, and that led

11   to a discussion about people he met while in Asia.  That is the

12   only context in which the stalker would be mentioned.  It won't

13   be mentioned it is an ex-boyfriend.  I don't believe Professor

14   Bekaert knows that and none of the other materials that were

15   discussed in the materials were discussed in the motion.

16           THE COURT:  Is this all by email chain?

17           MR. HERNSTADT:  Email and testimony.

18           THE COURT:  Is plaintiff seeking to admit that other

19   testimony about who he met in Asia?

20           MS. HARWIN:  We are not seeking to introduce an email

21   in which Professor Bekaert discusses his alleged talker, nor

22   are we eliciting testimony regarding Professor Bekaert's

23   commence about a stalker.  None of that will be elicited by us.

24           THE COURT:  Does that solve the problem?

25           MR. HERNSTADT:  I don't believe so because the email

1    in which the stalker was mentioned is an email that discusses a

2    number of things, including the work they're doing and

3    professor Ravina asking Professor Bekaert hey, what is your

4    social life like in Hong Kong?  It is a chatty email as well as

5    a work email.

6           It is one of a series E-mails and it is the reason why

7    Professor Bekaert had a discussion with Professor Ravina about

8    a woman he met in Asia.  It is the genesis of that

9    conversation.  If they're not going to seek to elicit any

10   information about this woman, the stewardess that was in

11   several motions, including the motion for summary judgment, if

12   they won't seek to elicit any testimony from Professor Bekaert

13   about the stewardess, and Professor Ravina won't testify about

14   her at all, then it won't come up.

15          MS. HARWIN:  I don't believe this argument was raised

16   by defendants in connection with this issue.  It is the first

17   time we are hearing about it.  Plaintiff Ravina does plan to

18   testify about Professor Bekaert speaking about stewardesses.

19   This is the first time we are hearing about that.

20          THE COURT:  Do you want to think about it?

21          I think for me it is the first time I recall hearing

22   this specific argument, but I want to be able to see the

23   correspondence.  I don't want the jury to be left with a

24   misleading impression how a conversation started or unfolded,

25   so I am happy to look at whatever you want me to look at to

1    help determine this.  If you need time to think about it, I can

2    give you that as well.

3            MS. HARWIN:  I ask if Mr. Hernstadt will provide us

4    with the correspondence.

5            THE COURT:  Just brin the mike closer.

6            MS. HARWIN:  I ask if Mr. Hernstadt can provide

7    plaintiff's counsel with that correspondence and then

8    plaintiff's counsel can review it.

9            THE COURT:  If you can do that so we have the precise

10   kind of contours of, in your view, how the conversation

11   unfolded, then I can rule based on that.

12           MR. HERNSTADT:  It is also in the testimony Professor

13   Bekaert testified about this.  This is not news.

14           The only reason I didn't bring it up in conjunction

15   with the motion is I read that motion as referring only to the

16   court complaint and the settlement and the events of 2007.  It

17   was only in your ruling that I realized oh, there is going to

18   be a reference to stalker and that may be embraced by this.  It

19   was just to make sure there is no surprises at trial.

20           THE COURT:  Would you share that information with me

21   and plaintiff's counsel and then we can talk about it Monday

22   morning or sufficiently in advance of the testimony.

23           MR. HERNSTADT:  Very good.

24           THE COURT:  All right.  Professor Ravina's motion No.

25   5, she also moved to exclude evidence relating to her

1  qualifications for tenure and the deliberations that produced

2  her tenure denial.  That motion is denied.

3          She argues she is pursuing a claim based on the terms

4  and conditions of her employment leading up to her tenure

5  consideration.  Thus, she contends her qualifications and

6  deliberations about them are not relevant to the events that

7  shaped and preceded them.  While she may now frame her

8  allegations in that light, I do think Columbia cannot be

9  precluded from presenting a more fulsome picture of all

10 relevant events or from arguing that any alleged discrimination

11 or retaliation was not the proximate cause of its decisions

12 which were instead based on an independent assessment of her

13 records.  See Staub, 562 U.S. at 419; and Collins, 305 F.3d at

14 118-19.  The jury will ultimately, of course, decide the issue

15 of causation.

16         Limiting Columbia's ability to effectively assert this

17 defense I think would be highly prejudicial to Columbia.

18 Professor Ravina's record at Columbia Business School is not a

19 peripheral issue, as she argues, but dispute central to the

20 case.

21         She also challenges the admission of the

22 tenure-related records on hearsay grounds, including an

23 argument the records do not qualify as business records, and

24 she argues that the evaluations lack sufficient information

25 about who wrote them, specific dates and that Columbia has not

1   explained their methodology and they were distributed shortly

2   after her lawsuit, suggesting an improper motivation.

3          On this, as with the other physical exhibits, get back

4   to me and let me know if there is still an objection as to

5   admissibility of the document, and I will rule on that, okay?

6          MS. HARWIN:  Your Honor, if Columbia is allowed at

7   trial to present argument or evidence concerning plaintiff's

8   record preceding her ultimate tenure vote, I would ask that

9   Columbia be required to produce the annual reviews of males and

10  others in her department who were evaluated for tenure,

11  something that Columbia has withheld from production.

12         We have never seen the evaluations of other people,

13  any annual evaluations of people who subsequently went up for

14  tenure, and plaintiff is prejudiced in her ability to defend

15  against Columbia's defenses without the ability to see those

16  documents.

17         MS. PLEVAN:  It is just too late for that kind of

18  request, your Honor.  The tenure issues have been the subject

19  of extensive deposition testimony, document production.

20  Plaintiffs made whatever discovery requests they made during

21  the course of the case.  We objected to some things.  They

22  didn't bring it to you.  The case has been pending for two

23  years.  I think it is just too late to make that request now on

24  the eve of trial.

25         THE COURT:  I have to say I think that's right.  I

1    frankly don't -- I was surprised to see that, in your view,

2    this case was not about if she was properly granted tenure or

3    not, or at least that is the argument you're making now, and I

4    have always thought that that was clearly a part of this case,

5    and so I am not going to resolve discovery disputes now.

6             MS. HARWIN:  It is something we raised and it was

7    something we brought to the court's attention previously.

8             MR. HERNSTADT:  I'm sorry?

9             MS. HARWIN:  It was something we raised previously, it

10   was something we did bring to the court's attention before.  At

11   that time the request was denied, but given what we

12   subsequently saw in Columbia's arguments in summary judgment,

13   and over and over again the plaintiff was never on track to

14   receive tenure, I do think it would be fair for plaintiff to be

15   entitled to view those documents for other people who did

16   subsequently go on to to be evaluated for tenure in her

17   department.

18            We are not looking for a large set of documents, but

19   Columbia identified a number of people in Ms. Ravina's division

20   who were evaluated for tenure but have not produced any of the

21   similar evaluations that those people received.

22            THE COURT:  Remind me when my prior ruling was on

23   that, and I will look back at it.

24            MS. HARWIN:  I believe it was last summer.

25            THE COURT:  You can look back and write me a letter on

1    that.

2               MS. HARWIN:  I'm sorry?

3               THE COURT:  You can look back and write me a letter on

4    that if you would like to.

5               MS. PLEVAN:  This issue was in the case from the

6    moment it was filed, and there was a preliminary injunction

7    hearing on the tenure questions.

8               THE COURT:  Yes.  No, no, I don't intend to revisit

9    the ruling, but I am happy to look at it and see if in your

10   view I was, I don't know, given misleading information or if at

11   the time that I made that ruling, the case was going in a

12   different direction.  I don't recall that.  I am happy to look

13   back at what you're mentioning now.

14              With respect to the motion to exclude evidence,

15   plaintiff's Motion No. 6, or reference to her unsuccessful

16   motion for temporary restraining order and preliminary

17   injunction at the outset of the case in spring 2016, the

18   parties agree that the outcome of the motion is not relevant,

19   and I agree with them.

20              I also agree with Columbia, however, that it should be

21   permitted to argue the filing of the motion motivated the delay

22   of Professor Ravina's vote, but only for that purpose and

23   without reference to the outcome.  If plaintiff would like an

24   appropriate limiting instruction, present it to me in advance,

25   and I will consider it.

1          MS. HARWIN:  It would be appropriate to identify,

2     rather than identifying it as a motion for temporary

3     restraining order, just say there was a court proceeding.  I

4     don't think there was any need to identify the nature of the

5     motion which would be prejudicial and confusing to the jury.

6          THE COURT:  Does Columbia want to be heard on that,

7     Ms. Plevan?

8          MS. PLEVAN:  I am happy to consider some agreed-upon

9     language like that, the filing of court proceedings or

10    something.

11         THE COURT:  If you could talk about that and then let

12    me know if it is still a live issue.

13         With respect to plaintiff's Motion No. 7, Professor

14    Ravina also asks the Court to preclude Columbia from arguing

15    its decisions regarding her tenure were motivated by a desire

16    to avoid granting her de facto tenure.  She disputes the basis

17    for an argument contending she was willing to waive de facto

18    tenure and the arguments, in fact, are a pretext for

19    impermissible motives.

20         I think Columbia's entitled to argue its fear of de

21    facto tenure motivated its tenure conduct rather than

22    impermissible animus.  If it does so, she will be permitted to

23    argue she waived any such right.

24         MS. PLEVAN:  I do have a question and concern about

25    this aspect because I don't know what plaintiff is proffering

I75JRAVC                         Conference

in the summary judgment papers.  She made reference to an

affidavit that Professor Ravina filed in connection with the

preliminary injunction motion, in which she said, and this is

all that was cited to support the, "I waived it" argument.

        "If the Court grants my request to enjoin Columbia

from making any decisions with respect to my tenure candidacy

pending the entry of judgment, I will waive any right I

otherwise would have to receive an additional tenure year."

        There are a lot of other issues here, but this is a

conditional offer to waive which never came to fruition because

the Court denied the motion for injunction.  So I think the

brevity of the statement is of concern because I don't think

there is any testimony that the plaintiff can give to the

effect that she waived de facto tenure because it didn't

happen.  If they're referring to something else, maybe they can

enlighten us.

        MS. HARWIN:  There were numerous communications in

which plaintiff waived any right to de facto tenure, including

mediations, other settlement negotiations with the parties and

subsequently in open court as well.  This was something done

repeatedly, and I do think that obviously the parties don't

want to have to draw on their settlement negotiations or

anything like that, but this is just a fact, this is something

plaintiff --

        MS. PLEVAN:  It is not a fact because, first of all,

I75JRAVC                    Conference

1    the only other ones I am aware of are things that lawyers said

2    to each other in the context of mediation, and then Columbia

3    took the position that it's not, in their view, enforceable if

4    she were to do it.  There is no piece of paper that says, "I'm

5    waiving."

6         We are going to have to get into a legal argument that

7    is going to be very confusing to the jury as to what that means

8    and what it is all about when there really isn't any admissible

9    evidence to the effect that, "I waived my right to de facto

10   tenure."

11        THE COURT:  Outside of settlement discussions, what is

12   there?  Outside of settlement discussions, what is there?

13        MS. HARWIN:  Outside of settlement discussions, there

14   is also our communications with the Court in connection --

15        THE COURT:  Lawyer communications or her?

16        MS. HARWIN:  Me with her in open court, me.

17        MS. PLEVAN:  That is an additional offer I just read

18   from.

19        THE COURT:  Is that what was just read?

20        MS. HARWIN:  I believe there was additional colloquy

21   before the Court in addition to the affidavit in which I, on

22   behalf of Plaintiff Ravina, represented we would do whatever is

23   necessary to ensure an enforceable waiver.

24        MS. PLEVAN:  I didn't hear Ms. Harwin, but it is the

25   same thing.  The same issue, if the Court will grant an

1    injunction, she will waive de facto tenure.

2            Putting aside the legal enforceability of that, which

3    is another issue that would have to go before the jury, that

4    didn't come to happen.  There wasn't any waiver because the

5    Court was offered to do something if the Court granted an

6    injunction, which the Court did not do.

7            MS. HARWIN:  The point Ms. Plevan is making is exactly

8    why we moved to exclude this because it could confuse the jury,

9    require an aside though argument regarding enforceability that

10   is not material to the issues before the jury.

11           THE COURT:  But Columbia's motivation is surely before

12   the jury.  If they acted with animus or not, and if they had

13   some other reason to move with a speed with which they moved,

14   that is clearly relevant.

15           MS. PLEVAN:  This is a provision that is in the

16   statutes and faculty handbook of Columbia University, this

17   concept of de facto tenure.  It is not just an argument that

18   somebody made up.

19           MS. HARWIN:  It is an argument where plaintiff stated

20   repeatedly to Columbia in many forms that this was not an

21   issue, that she, in connection with --

22           THE COURT:  Give me the other form.

23           If she stated it to Columbia at some other date, not

24   as part of a settlement negotiation, but said that to Columbia,

25   tell me exactly when she said that and exactly what was said

1    and not well, if the Judge grants this, then I will waive this.

2    Show me that, and I will consider it.

3          MS. HARWIN:  These were ongoing settlement

4    negotiations that preceded and followed the filing of the TRO

5    motion.  It was in connection with settlement negotiations and

6    mediations, but that doesn't mean it didn't exist.

7          As we are thinking about Columbia's motivation, we

8    can't pretend statements were made that were known to Columbia

9    and its agents weren't made.  They were made, and subsequently

10   in connection with a court proceeding, representations were

11   further made that pertained to that court proceeding, but there

12   were repeated representations and there is no basis to pretend

13   they don't exist.

14         Our suggestion to the Court, our request to the Court

15   is to avoid this sideshow by not engaging with this issue

16   before the jury.

17         THE COURT:  You still want to argue that, take the

18   timing and use it against Columbia before the jury?

19         MS. HARWIN:  Well, there are concerns about the timing

20   and irregularities in the tenure process, but this specific

21   defense made by Columbia with respect to de facto tenure when

22   it is an issue that our client mooted by repeatedly

23   representing that she wasn't seeking that and would waive it in

24   order to get an extension is misleading, confusing to the jury,

25   and as Ms. Plevan said, requires all kinds of arguments

1    regarding enforceability that a jury isn't adept to settle.

2                 THE COURT:  Why don't you get back to me again and

3    tell me exactly when she offered to waive it and in what

4    context, okay, because I think it would be misleading to the

5    jury to have them believe that Columbia acted a certain way and

6    timed a tenure vote a certain way without knowledge of this as

7    a possible reason that they did so.  I am happy to hear you out

8    on the waiver issue further.

9                 MS. HARWIN:  Thank your Honor.

10                THE COURT:  All right.

11                With respect to Ms. Ravina's recordings, that's

12   plaintiff's Motion No. 8, she has asked the Court to exclude

13   any reference or cross-examination as to the number of

14   recordings she made of conversations between herself and

15   Columbia employees.  This motion is denied.  She rightly notes

16   that such recordings are not illegal and the jury should be

17   allowed to infer that she had long been creating a record,

18   arguably for eventual litigation.

19                The Court understands her objection.  I think the risk

20   is not sufficient to keep out the probative context.  This

21   motion is denied.  This is another one where I am happy to give

22   a limiting instruction if you want me to, but I think it is

23   fair cross-examination of her.  I assume that is the only way

24   it would come in any way, is just cross-examination of her as

25   to a number of calls she made -- recordings, rather.

1              MS. PLEVAN:  I think that's right.

2              THE COURT:  Then with respect to plaintiff's Motion

3     No. 9, to preclude defendants from eliciting character evidence

4     about her from Defendant Bekaert's witnesses Nancy Xu or Andrea

5     Kiguel, K I G U E L.  Character evidence is, of course,

6     generally prohibited by Rule 404 (a), but Professor Bekaert

7     contends that these witnesses' testimony is intended to rebut

8     Professor Ravina's characterizations of alleged obstruction of

9     her research projects and add context to certain e-mails.

10             To the extent that these witnesses restrict their

11    testimony to such factual matters, Professor Ravina's motion is

12    denied; but to the extent that they're getting into character,

13    let me know.  It seems like from the representations defendants

14    made, there is no intention to get into character at all,

15    correct?

16             MR. HERNSTADT:  The only conceivable way in which

17    character would be communicated to the jury is that some of the

18    delays were because the research assistants would quit.

19             For example, both of these research assistants will

20    say it was very difficult working with Professor Ravina, she

21    was disorganized, she was hypercritical, and that is one reason

22    why they stopped working with her.

23             The focus of it is not to say Professor Ravina is a

24    bad person.  The focus of it is to explain, the focus of the

25    testimony is to explain the process of what the research

1   assistants did and process of in particular the international

2   diversification paper and that there were no delays and no

3   obstructions, and whatever delays by Professor Bekaert -- and

4   whatever delays and obstructions there may have been taking

5   place were at least the fault, in part the fault of Professor

6   Ravina.  That is the only goal of the testimony.

7            THE COURT:  But it will be as to specific things that

8   she did?

9            MR. HERNSTADT:  Yes.

10           THE COURT:  Right?

11           MR. HERNSTADT:  Yes.  It is not going to be she was a

12   bad person, she was mean.  It is going to be there was a delay

13   because this happened.

14           THE COURT:  Why is that not fair game?

15           MS. HARWIN:  Just for a little context, your Honor,

16   Defendant Bekaert in an email produced in this action made

17   clear that goal --

18           MR. HERNSTADT:  We ask, Ms. Harwin --

19           THE COURT:  Sorry?  Please use the microphone.

20           MS. HARWIN:  This will be a lot better.

21           Defendant Bekaert in his communication produced in

22   this action made clear that he was compiling a list of research

23   assistants precisely to communicate that Professor Ravina has a

24   bad reputation among students, she is impossible to work with,

25   or something to that effect.

1          I believe that the testimony being described here very

2     much is along those lines, where describing the idea numerous

3     research assistants quit because of Professor Ravina.

4     Professor Ravina isn't alleging that the delay is attributable

5     to Professor Bekaert causing numerous research assistants to

6     quit.  There is one specific research assistant at issue, which

7     she is someone who is going to testify, and she can testify

8     regarding her own experiences, but not that Professor Ravina

9     was difficult for her to work with, that that is impermissible

10    character testimony.

11         THE COURT:  I think she can testify specifically as to

12    what happened that affected the timing, correct?  Are we all on

13    the same page about that?

14         MR. HERNSTADT:  That is the goal, is to have her

15    testimony about what happened?

16         THE COURT:  Right, and not about her character

17    generally and how she was perceived in this community as a

18    difficult person to work with.

19         MR. HERNSTADT:  Based on your Honor's ruling, no, that

20    testimony will not be presented by these witnesses.

21         MS. HARWIN:  Just to clarify, so there won't be any

22    testimony about her being purportedly hypercritical or along

23    those lines?  Am I understanding that correctly?

24         MR. HERNSTADT:  To the extent that caused delays, then

25    that would be the testimony, but it will be specifically --

1           THE COURT:  Would that be the testimony?

2           MR. HERNSTADT:  Yes.

3           THE COURT:  She was hypercritical?  Play that out for

4    me a little bit more.  How did that affect --

5           MR. HERNSTADT:  Well, for example, Andrea Kiguel

6    refused to work with her any more because she was so difficult

7    to work with, and that led to some delays.  There are other RAs

8    who left because it was too difficult to work with Professor

9    Ravina.  The testimony in that regard I think will simply be we

10   couldn't keep RAs, we lost RAs and --

11          THE COURT:  Lost what?

12          MR. HERNSTADT:  Lost RAs.  40 different RAs worked on

13   the project, a number of different PhD's worked on the project

14   and left.  Every time an RA leaves, this is something else two

15   witnesses can testify about, you sort of start over again, and

16   that obviously causes a delay.

17          They have to be trained on what has happened before,

18   they have to -- there is massive datasets.  They have to

19   understand what they're working with, what has happened before,

20   what has to happen in the future, and it is a whole learning

21   curve and it is a restarting of the process.

22          The goal -- you know, Ms. Harwin is correct --

23   Professor Bekaert, if he had his way, he can bring in a bunch

24   of people to say she is awful.  That is not what 404 permits

25   and that is not what we are going to do.  The only goal of

I75JRAVC                        Conference

these witnesses is to explain the process of the research, and
where there were delays, what caused those delays.

         MS. HARWIN:  They can testify about the facts about
the specific work they performed on the project, but they
cannot characterize her as hypercritical, rude, difficult,
horrible.  That is exactly what the goal is, to sort of get
that kind of testimony before the jury, and it is improper.

         How Professor Bekaert -- sorry -- how Professor Ravina
worked with subordinates on this research project is not
relevant to her interactions with her superior, Professor
Bekaert.

         THE COURT:  It is relevant to the timing if what
happened was things took much longer because people didn't want
to work with her, that is relevant, right?

         MS. HARWIN:  Your Honor, what we have in this case are
allegations of specific acts of obstruction, not concerned
about the general flow of research assistants on the project,
and so --

         THE COURT:  But defendants are entitled to put up
their defenses as to why things took as long as they did,
right?  You have your version which the jury will hear, and
defendants have their version which the jury should also hear.

         If part of that version is well, the delay took place
in part or in full, I don't know, because a number of RAs quit
because of personality conflicts or something else with

I75JRAVC                      Conference

 1    Professor Ravina, I think that is appropriate to allow the jury

 2    to hear.

 3          Look, I don't want the witnesses going on and on about

 4    her character traits because this is not being admitted as

 5    character evidence, but rather as factual witnesses to testify

 6    about the course of events.  Part of that is giving some flavor

 7    to what was happening, so there is no suggestion that maybe

 8    Bekaert's whispering in their ear you should be getting off

 9    this project, but to let them say in their own words why they

10    withdrew from the particular project.

11          MS. HARWIN:  The fact they withdrew, the fact that

12    some were fired or quit can be introduced by defendants, but

13    the reasons why, the characterizations of are highly

14    prejudicial.

15          THE COURT:  I disagree.  Again I don't want you

16    talking too much, eliciting too much testimony about -- but

17    some basic explanation for why I think is permissible.  If I

18    think it is getting, becoming too prejudicial, then I will

19    reign you in.

20          MR. HERNSTADT:  Understood, your Honor.

21          THE COURT:  That is No. 9.

22          MS. HARWIN:  I would just ask as we get to trial if

23    you would consider an appropriate limiting instruction to the

24    witnesses regarding to their testimony how they can

25    characterize --

I75JRAVC                      Conference

1          THE COURT:  What I will ask both sides, if there are

2     any limiting instructions, please, number one, propose that

3     limiting instruction to me.  I don't know exactly what this

4     limiting instruction would be, if it is just these are being

5     admitted as fact witnesses and not character witnesses or

6     something to that effect, but I will consider any proposed

7     instructions.

8          I Just ask you show it to the other side and make sure

9     you're flagging it for me because you know exactly what is

10    coming better than I do.  Flag it for me so we have the time to

11    talk about it in advance without the jury waiting.

12         With respect to Professor Ravina's Motion No. 10, to

13    exclude a number of witnesses for their failure to be timely

14    disclosed, that motion is denied.  Under Rule 37 (c)(1),

15    witnesses not identified in a part's Rule 26 disclosures may

16    still be called at trial if the failure was substantially

17    justified or harmless, and courts have broad discretion in

18    determining whether sanctions are appropriate.  See the Preuss

19    case, 970 F.Supp.2d at 175.

20         A failure to timely disclose is substantially

21    justified when reasonable parties could differ as to whether

22    disclosure was required and is harmless when there is no

23    prejudice, including, for instance, when the other party is

24    well aware before trial of the identity of an undisclosed

25    witness and the scope of his or her knowledge.  See the Fleet

1   Capital case, 2002 WestLaw 31108380, at *2.  The underlying

2   purpose of the rules is to avoid trial by ambush, and

3   preclusion of evidence is generally disfavored.  See the Mopex

4   case, 2015 F.R.D. at 93.  Indeed, refusing to admit evidence

5   not disclosed during discovery is a drastic remedy that should

6   be reserved for callous disregard or flagrant bad faith for the

7   rules of civil procedure.  See the Arista Records case, 784

8   F.Supp.2d at 417.

9         In weighing exclusion under Rule 37 (c)(1), courts

10   also examine:  One, the explanation for the failure to

11   disclose; two, the importance of the relevance; three, the

12   prejudice suffered by the opposing party; and, four, the

13   possibility of a trial continuance.  See Patterson versus

14   Balsamico, 440 F.3d at 117.

15         Here the Court finds that no exclusion of witnesses is

16   warranted.  Neither defendants' conduct nor the relatively

17   limited effect on Professor Ravina meet the necessary standard

18   to deploy the drastic remedy.  She has been aware of Columbia's

19   witnesses and their relevance to this case for some time.

20         Professor Wei Jiang was one of four presenters of

21   Ravina's tenure case, who is identified in interrogatory

22   responses in August of 2016 and discussed at Ravina's

23   deposition, among others.  Similarly, Professors Gur Huberman

24   and Emi Nakamura considered Ravina's tenure case and were

25   identified in the August 2016 responses.

I75JRAVC                    Conference

1          Professor Anthony Saunders was listed on Ravina's Rule

2     26 disclosures and was questioned by Ravina's counsel at a

3     deposition.  Ravina sought discovery information regarding Mark

4     Broadie in May of 2017, and Angel Flesher, Pearl Spiro, and

5     Charles Jones were either referenced in discovery documents or

6     referenced as sources of information in a deposition.

7          Ravina had reason to be similarly aware of Bekaert's

8     witnesses.  At summary judgment, Ravina argued that Robert

9     Hodrick improperly participated in Ravina's tenure review

10    despite being a friend of Bekaert's, and Ravina has cited

11    Bekaert's e-mails to Marie Hoerova, as evidence in Bekaert's

12    discriminatory motive.

13         Furthermore, Bekaert has presented a valid

14    explanation; namely, that he only sought to call the two

15    witnesses after Ravina signaled she viewed them as relevant in

16    her summary judgment materials.

17         Bekaert has also stated he does not intend to

18    introduce any redacted material from his e-mails with Ms.

19    Hoerova, weakening the force of Ravina's concerns about alleged

20    discovery gamesmanship.

21         The bottom line is it is clear none of these witnesses

22    were a surprise to Ravina and that defendants' intent to call

23    them at trial was not a tactic to conduct trial by ambush.

24    Prejudice, if any, is minimal and does not warrant exclusion.

25         So that is that ruling.  Yes?

I75JRAVC                    Conference

1          MR. SANFORD:  Your Honor, if I may.

2          Defendants identified over 20 witnesses on the very

3     last day of discovery.  They identified some trial witnesses

4     just a few weeks ago.  We would respectfully request, if the

5     Court is not willing to reconsider its ruling, respectfully

6     request that we be allowed to take trial depositions, no more

7     than one hour of witnesses of our choice based on their list

8     that they gave us a couple of weeks ago.

9          THE COURT:  Does anyone want to be heard?

10          MS. PLEVAN:  We obviously would object to that, your

11     Honor, and the disclosures that were made were made a long time

12     ago, and plaintiff took 10 depositions as it was, but even if

13     she had the right to take more, the time to do that was when we

14     made these disclosures.  We made them months and months ago, a

15     year ago.

16          THE COURT:  As to witnesses identified on the last day

17     of discovery, you could have requested then permission to

18     depose them, right?

19          MS. HARWIN:  Your Honor, it was the last day of

20     discovery.

21          MS. PLEVAN:  Last day of fact discovery.

22          MS. HARWIN:  Last day of fact discovery.

23          There were dozens of new people identified, and at

24     that juncture we had no reason to believe any of those people

25     would actually be called by defendants.  The only information

1    we got they would actually appear at trial was a couple of

2    weeks ago.

3              Of course, our strategy in discovery would have

4    proceeded quite differently had we understood any of those

5    people would be potentially called.  The questions you asked at

6    depositions and the ones you choose to take, defendants made

7    clear to us prior to this disclosure they would not be content

8    to take to any more depositions and then provided these names

9    after we had taken our 10 depositions.

10             THE COURT:  I will consider that request.  I will let

11   you know by tomorrow morning.

12             MR. SANFORD:  Thank your Honor.

13             THE COURT:  Next I want to talk about --

14             MS. KOSTER:  We also want to flag especially Marie

15   Hoerova is especially prejudicial if her testimony is allowed.

16   She is outside of the jurisdiction.  She lives in Europe.

17   Defendant Bekaert never supplied contact information for her.

18   We had no reason to believe --

19             THE COURT:  Her emails were an issue early on.  You

20   have always known she was a possibility, no?  I have!

21             MS. KOSTER:  In fact, the stands that Defendant

22   Bekaert took deprived us of significant discovery, which leaves

23   us handicapped.

24             MR. HERNSTADT:  I can't understand her.

25             THE COURT:  The stands --

```
1           MS. KOSTER:  The stands that Defendant Bekaert took on
2    redacting communications has deprived of us of substantial
3    discovery.  The vast majority of communications between --
4           THE COURT:  I don't think so.  Didn't I review those
5    redactions before they were made?  Isn't that correct, I
6    reviewed all those redactions?
7           MR. HERNSTADT:  Yes, your Honor.
8           THE COURT:  I only reviewed things that were not
9    relevant to this case.  This is someone that he was engaged in
10   a consensual relationship with.  He had a personal
11   relationship.  I don't think that private things, conversations
12   between them that were totally irrelevant to this case deprive,
13   not being able to see those deprived you of anything.
14          MS. KOSTER:  Defendant Bekaert previously took the
15   stand and said any communications with third parties concerning
16   professional or personal communications were private and
17   irrelevant.
18          Now as part of his description of Maria Hoerova, who
19   he intends to call, he specifically is seeking to elicit
20   testimony concerning the professional interactions.  Those are
21   the very issues that he sought to have redacted as part of the
22   previous communications.
23          The communications we have received between Defendant
24   Bekaert and Ms. Hoerova are heavily redacted.  For each
25   communication, it is generally three out of four pages that are
```

1    redacted.  That gives us a very limited window to their

2    correspondence which is directly at issue if he seeks to call

3    Ms. Hoerova as a witness.

4           Essentially Defendant Bekaert has taken a complete

5    bait and switch on this issue.  Up until last month he has

6    sought to redact Maria Hoerova from any public filings in this

7    case, so this is really a complete surprise to us that she is

8    now suddenly being called as a witness.

9           THE COURT:  Just to be clear, Ms. Harwin, you are not

10   seeking to have her testimony and any material redacted in

11   those emails?

12          MR. HERNSTADT:  No.  The material redacted, 98 percent

13   of that was personal interactions.  I believe one of the emails

14   might have had a paper they worked on together.  They have

15   written three papers together.  They continued to work together

16   as co-authors and were working together since 2006, co-authors

17   together since 2007.

18          The emails in question, and we indicated these all a

19   year ago, the redacted materials were personal materials.  If I

20   may, the only reason that Marie Hoerova is now being considered

21   as a witness is because the plaintiff came up with a new

22   argument in her opposition papers in the summary judgment

23   motion.  Marie Hoerova, she repeated, in fact, in the in limine

24   papers, Marie Hoerova is just like Professor Ravina.  She wants

25   to argue to the jury that Professor Bekaert must have been

1      pressuring Professor Ravina for a romantic relationship because

2      he did the same thing with Professor Hoerova.

3              THE COURT:  I am keeping that argument out.

4              MR. HERNSTADT:  To the extent they're not going to be

5      able to argue that, and it wasn't completely clear to me that

6      that was going to be --

7              THE COURT:  I don't think that his consensual

8      relationships with other people should be part of this trial.

9      This is not a case about a consensual relationship; it is about

10     sexual harassment.  I feel there is argument on both sides with

11     respect to this witness, but I am happy to rule on that first

12     and then come back to this.

13             MR. HERNSTADT:  The only other thing Professor

14     Hoerova, Ms. Hoerova would testify to would be the emails that

15     they want to introduce to show his animus because they're

16     emails, almost all are emails between Bekaert and Ms. Hoerova,

17     and a jury is going to get them and see what he says, and Ms.

18     Hoerova can explain in greater detail what those interactions

19     were about.

20             THE COURT:  Look, in the context of those emails, I do

21     think it is fair to provide context for the relationship, like

22     if you were ever complaining to your girlfriend about something

23     you're very upset by that happens at work, you might be freer

24     with your language than you would otherwise.

25             I was going to keep out the fact that there is a

1   consensual relationship, and I will get to my rulings on that,

2   except to the extent you need that to provide context for the

3   emails, which I do think are relevant, and we can revisit this

4   issue if you want after I read you my ruling on the emails.

5           Is that helpful?

6           MR. HERNSTADT:  Yes.  Thank you.

7           MS. KOSTER:  Just to continue on the issue of the

8   redactions, Defendant Bekaert represented last year that the

9   communications also entailed communications on issues of

10  co-authorship.  These don't only involve personal, private

11  matters, but we suspect that the communications with Ms.

12  Hoerova also concern issues of co-authorship, which is an issue

13  Defendant Bekaert has represented as part of his pretrial order

14  he seeks to elicit testimony from Marie Hoerova on.

15          Again these redactions deprive us of significant

16  information to better have us be able to prepare for trial.  At

17  the least if your Honor is inclined to order the production of

18  material without those redactions, we ask for in-camera review

19  of all of those materials so we can ensure --

20          THE COURT:  I think I reviewed them in-camera already,

21  but I agree with you if, in fact, she is going to testify about

22  her working relationship with him when they were working on an

23  article together, I think those portions of the emails that

24  talk about the articles should be produced.  I think that is a

25  fair point.

1          So I don't know if you want to, Mr. Hernstadt, address

2     what you intended to elicit through her because I do think it

3     is fair.  If it is something he will testify about, then the

4     prior correspondence about that should be produced.  I just

5     thought it was appropriate to keep out the very sensitive

6     personal things that are not relevant to the trial.

7          MR. HERNSTADT:  This is last summer from my

8     recollection is not perfect, but there are a few emails, but

9     not many, that contain sections of papers they were working on

10    together that were not relevant to this case.  Her testimony

11    will not address that at all.

12         To the extent that she talks about the fact they

13    worked together, it will be simply the fact they were

14    co-authors.  If they're not making the argument Marie Hoerova

15    is an analog for Ravina, then she will not testify about that.

16    Her testimony then would be much more limited and really

17    address the emails with the strong language and not much more.

18         I am perfectly willing to go back and look at --

19         THE COURT:  Do that for sure and then we'll hear

20    plaintiff's counsel out on the purpose, in your view, if you

21    intend to make that argument with respect to her.

22         MS. KOSTER:  Thank you, your Honor.

23         We'll reserve further argument concerning Marie

24    Hoerova once we have heard your Honor.

25         MR. HERNSTADT:  I can't understand?

1          MS. KOSTER:  Until we hear your Honor --

2          (Multiple voices)

3          THE COURT:  I will do that.  At the end why don't we

4    talk about what we need to follow up on.

5          Next I want to address Columbia's motion to exclude

6    the expert testimony of Ravina witnesses Rhode and Dr. Caren

7    Goldberg.  Rhode is a renowned law professor that specializes

8    in gender bias and discrimination.  Dr. Goldberg has a Ph.D in

9    human resources management and is a professor of management.

10         There is generally a presumption of admissibility for

11   expert testimony in the Second Circuit.  See Borawick, 68 F.3d

12   at 610, and while experts must, of course, meet certain

13   standards, many disputes, including an expert's credentials,

14   faults in methodology, and lack of textual authority for

15   opinions go to weight rather than admissibility and can be

16   explored on cross-examination.  See McCullock, 61 F.3d at 1044.

17         Furthermore, practical experience can qualify as

18   specialized knowledge under Rule 702.  McCullock, at 1043.

19   Experts need not conduct studies of their own in order to opine

20   on a topic or review of other studies and scientific literature

21   can be enough to qualify experts to testify.  See CSL

22   Silicones, 2017 WestLaw 6055380, at *2.  See Kumho, 526 U.S. at

23   152.  What experts must not do, however, is usurp the role of

24   the jury and make legal conclusions.

25         Turning first to Professor Rhode, she has spent well

I75JRAVC                    Conference

over two decades studying gender bias particularly in the

workplace, is well versed in the relevant social science

research, and has written many academic peer reviewed articles

on the subject.  She states the purpose of her testimony and of

the reports she authored for this case would be to provide an

interpretive framework for the jury to understand the context

of Professor Ravina's experiences at Columbia.  The report

details gender disparities in academic settings as well as at

Columbia Business School in particular.

        Rhode also analyzes Professor Ravina's interactions

with Professor Bekaert and characterizes his conduct as

denigrating.  She also faults Columbia's response to Ravina's

complaint for being consistent with the dismissive treatment

she says is common in the workplace.  She concludes that

Columbia appears to have ignored signs of potential gender bias

even when they were pointed out.

        In her report and again in her deposition, she stated

that she is not making determinations on ultimate legal

questions, only whether the conduct in this case was consistent

with patterns that the research reveals are often associated

with gender bias.  From her Deposition at 58.

        While defendants' objections to her qualifications and

methodology are best reserved for cross-examination or

rebuttal, as there can be little doubt Rhode is exceedingly

well credentialed and well versed in the subject matter of

I75JRAVC                    Conference

gender bias, the Court is persuaded that she has impermissibly

made or comes too close to making legal conclusions.   In

particular, there is a serious risk the jury will be unduly

influenced by her opinion that Columbia handled Ravina's

complaint deficiently, one of the key issues that the jury must

ultimately decide.

        Professor Ravina's lawyers are perfectly capable of

making the case that Columbia acted negligently, by using the

actual evidence in the record.  The jurors do not need an

expert to summarize the record for them and bring them to a

conclusion.  See the Velez case, 210 WestLaw, 11043081, at *8.

Even if Professor Rhode does not use legal language in her

conclusions, the risk of unfair prejudice is too great to

warrant expert evidence on issues properly entrusted to the

jury.

        Dr. Goldberg is similarly well qualified in her area

of expertise, but like Professor Rhode, she offers opinions on

key disputed issues even if she does not use legal language in

claiming not to be making legal conclusions.  Indeed, her first

and most important conclusion is that "Columbia's investigation

of Ms. Ravina's complaints was inadequate, a finding which she

discusses at length and in-depth, but which is properly in the

province of the jury.

        But it does not necessarily follow that all of Dr.

Goldberg's report or testimony need be excluded, though her

1    report is almost entirely about the facts of this case.  It

2    also offers in a salient context section, that which the jury

3    cannot obtain from the record, expert context on gender bias in

4    the workplace.

5         So as I noted in my order, what I would like you to do

6    now is either now or by letter today or tomorrow, is tell me in

7    light of that ruling, I don't want either of these experts

8    testifying about any of the facts in this case and presenting

9    those facts to the jury and their opinions about what happened

10   here, but in light of that, do you still want them to testify

11   and what exactly do you want them to testify to?

12        MR. SANFORD:  Yes, your Honor, we do and we'd be happy

13   to submit something for the Court tomorrow.

14        THE COURT:  Thank you very much.

15        MS. PLEVAN:  I would like to raise another issue which

16   I think is a threshold question here, and that is in light of

17   the court's ruling on summary judgment, I think there is an

18   entirely additional argument here that experts on gender bias

19   about universities in general are simply irrelevant at this

20   point.

21        The Court has ruled that Columbia can only be held

22   responsible on the cat's paw theory, and these experts do not

23   speak to that issue at all.  So I don't see how any of their

24   testimony which relates to gender bias in its entirety really

25   can be used.  It is not an argument we made before because it

I75JRAVC                    Conference

1      was, the briefing was done before the summary judgment.

2               THE COURT:  That is fair.  Why don't you, if you could

3      submit a letter on that, it would be helpful.  I am sorry to

4      give you more work to do.  I know you're working hard.  I do

5      think that would be helpful.  Then if we can be in touch so

6      that we can give sufficient notice to these witnesses, I don't

7      want them to sit in court.

8               MR. SANFORD:  Yes, your Honor, that would be

9      appreciated.  One of the concerns we have is Professor Goldberg

10     has international plans, and so we had hoped to have her come

11     and be here right after Professor Ravina testifies.  So if it

12     turns out that this court rules against having her testify, we

13     would like to give her some notice so she can proceed with her

14     international plans.

15              THE COURT:  If you each submit your letters tomorrow,

16     and then any responses on Monday, and then I will try and rule

17     by Tuesday morning.

18              MR. SANFORD:  Thank you.

19              MS. HARWIN:  To clarify, the court's ruling was not

20     that the only basis for Columbia's liability is cat's paw with

21     respect to the tenure denial.  Instead, there are numerous

22     claims, including gender discrimination, premised on sexual

23     harassment, hostile work environment.  The basis for Columbia's

24     liability there is not cat's paw liability, but negligence with

25     respect to its handling of the situation.

1        So that simply doesn't affect the entirety of the

2   opinions proffered by the experts, certainly with respect to

3   Goldberg.  We are talking about opinions squarely or testimony

4   she can proffer specifically regarding human resources norms as

5   to investigations, that is certainly still squarely relevant in

6   this case.

7        Likewise with respect to Rhode, she can proffer

8   testimony regarding power dynamics in academic settings and

9   other matters that squarely go to the sexual harassment

10   elements of this case and not any matters disposed of on

11   summary judgment.  We will provide you with more information by

12   a letter, but I do think that is --

13        THE COURT:  That will likely be a part of your

14   response to Columbia's letter I will get on Monday.

15        MS. HARWIN:  Sure.

16        THE COURT:  Columbia also moves to exclude the

17   testimony of Professors Patrick Bolton and Paola Sapienza on

18   grounds of relevancy, personal knowledge and hearsay.

19        Professor Bolton helped recruit Ravina to Columbia and

20   has worked with her as colleagues of the business school's

21   finance and economics division.  Bolton opposed Columbia's

22   actions concerning the scheduling of her tenure vote, including

23   several meetings with Columbia administrators, and also has

24   extensive experience with Columbia's tenure process from his

25   decade on faculty there and many votes on tenure applications.

I75JRAVC                    Conference

1          He also alleges to have observed Bekaert's obstruction
2     of Ravina's work.  His testimony is, thus, plainly relevant to
3     key disputed facts in the case.  Because the Court has denied
4     Ravina's motion to exclude all reference to her tenure record
5     and qualifications, he also may be relevant for Ravina's
6     attempt to dispute Columbia's characterizations of those
7     factual matters.  So in light of his personal experience,
8     Professor Ravina has demonstrated Bolton's testimony about
9     Columbia tenure.  Columbia's tenure process is within Rule 701
10    (a)'s requirement that a lay witness's opinion be rationally
11    based on his perception.  See the Garcia case, 291 F.3d at 140,
12    as well as within Rule 602's personal knowledge requirement.
13    Defendants may, of course, renew their personal knowledge
14    objections to specific issues as they arise, but there is no
15    basis to wholly exclude his testimony at this time.

16         I caution plaintiff's counsel, however, that he will
17    not be permitted to offer opinions on any matter about which he
18    learned merely by being told about it or shown by Professor
19    Ravina.

20         So now as to Professor Sapienza, who is a finance
21    professor at Northwestern.  She has not worked with Professor
22    Ravina at Columbia, but has a Ph.D, but was her Ph.D advisor at
23    Northwestern and continued to mentor her.  I am not really
24    sure, it seems like she lacks personal knowledge of any facts
25    relevant to this case, but it frankly wasn't clear to me

1    exactly what she could testify to that would add to the record

2    here.  So I actually wanted you to supplement the record.

3            MS. HARWIN:  Insofar as Columbia's presenting argument

4    regarding plaintiff's qualifications, her scholarship,

5    Professor Sapienza is extremely familiar with plaintiff's

6    scholarship and can provide testimony regarding that subject.

7            THE COURT:  Isn't what is relevant, what information

8    Columbia had as opposed to what a professor somewhere else had?

9            MS. HARWIN:  Well, at issue is the characterization or

10   it seems that Columbia is making an issue that the

11   characterization of the quality of plaintiff's scholarship, the

12   quantity of plaintiff's scholarship, and insofar as that is an

13   issue being made by Columbia, we are entitled to bring on

14   testimony regarding that subject.

15           THE COURT:  Why is it that professor Bolton can't

16   testify about that?

17           MS. HARWIN:  He may testify about that as well, but

18   Professor Sapienza also has insight on that subject.

19           THE COURT:  I think that seems cumulative.  I also

20   think that what is important is what information Columbia had

21   before it, not what information her Ph.D advisor somewhere else

22   had before her.  I am not inclined to let Professor Sapienza

23   testify for that reason.

24           MR. SANFORD:  Your Honor, if I may?

25           THE COURT:  Sure.

1        MR. SANFORD:  I must say, I agree with the court's

2   opinion on that, but I would ask the Court to reserve judgment

3   with respect to the potential of using Professor Sapienza as a

4   rebuttal witness.

5        THE COURT:  That I will do, sure.

6        MS. PLEVAN:  I couldn't hear what he said.

7        THE COURT:  I will reserve whether or not she may be

8   an appropriate rebuttal witness.  We'll talk about that, if

9   necessary, at a later date.

10        MR. HURD:  Your Honor, could I just get some

11   clarification on Professor Bolton.  In the plaintiff's

12   opposition to our motion in limine, two other topics that they

13   raised that Professor Bolton might testify to were:  Number

14   one, the consequences of being denied tenure; and, number two,

15   the relationship between junior and senior faculty.

16        I believe the second issue has been decided by the

17   Court in your ruling that Professor Bekaert was not a

18   supervisor of Professor Ravina, so I wouldn't think that issue

19   would be relevant, but the second issue with respect to the

20   effect of the denial of tenure in academia generally, I don't

21   think Professor Bolton has the expertise to talk about that in

22   any form or fashion other than with respect to maybe how

23   Columbia looks at it.  I don't know how he could testify about

24   how other business schools do, yes, business schools do.

25        MR. SANFORD:  If I may, your Honor.

1           There is a legal issue concerning whether or not

2      Professor Bolton was a supervisor, and this Court has ruled on

3      that legal issue.  There is a separate factual issue regarding

4      the dynamics between a junior and senior faculty member, the

5      kind of collaboration or relationship junior and senior faculty

6      members have both in Professor Bolton's personal experience

7      working with, for example, Professor Ravina and in his

8      experience over the course of the last 20 years, in the last 13

9      of which have been at Columbia.  It seems to plaintiff that

10     that is highly relevant.

11          MR. HURD:  I don't believe Professor Bolton has been

12     identified as an expert as to the relationship between senior

13     and junior faculty, and I do believe you've already made a

14     decision on that, and so I would think that would be a

15     completely irrelevant topic.

16          THE COURT:  I don't think it is irrelevant.  It is

17     fair for him to provide context.  There is a difference between

18     a legal issue whether someone is someone else's supervisor and

19     how in practice these relationships matter.

20          I am okay with that.  I think as to the consequences

21     of tenure denial, that seems like there is a question of

22     whether he has the necessary expertise.  I would be surprised

23     if he didn't, but I don't think that -- it seems like something

24     that is better suited for the damages phase as opposed to

25     liability anyway, because that really seems like a damages

1    issue, unless I am missing something?

2            MR. HERNSTADT:  I just want to clarify one thing.  You

3    said that Professor Ravina was not going to be permitted --

4    Bolton is not going to be permitted to testify about things

5    that he was told or shown by --

6            THE COURT:  I don't want him to do again, as I said

7    with respect to Rhode and Dr. Goldberg, I don't want him

8    usurping the goal of the jury and making his own assessment of

9    whether this was handled properly or not.  That is what I don't

10   want.  If he wants to say look, I was there for that and this

11   is what happened, and he can explain his own experience and

12   what he witnessed and heard himself, I am fine with that.

13           MR. HERNSTADT:  Just to be clear, Professor Bolton had

14   zero interaction with Professor Bekaert and has absolutely no

15   personal knowledge of any kind about the research

16   collaboration.  Everything he knows about research

17   collaboration is information that was given to him by Professor

18   Ravina, and that also goes to the junior-senior relationship.

19           THE COURT:  But didn't he have interactions with

20   Columbia administrators?

21           MR. SANFORD:  Yes, he most certainly did extensively.

22           (Multiple voices)

23           MR. SANFORD:  It is my understanding he did have

24   communication with Professor Bekaert, but we understand the

25   court's ruling, and I can assure the Court that Professor

I75JRAVC                     Conference

1  Bolton will be testifying about facts and not opinions.

2            THE COURT:  All right.  So that is my ruling on that.

3            If you need further clarification down the line, let

4  me know that.  So now Columbia seeks to exclude evidence of

5  other complaints against it.  That motion is denied.  Columbia

6  moves to preclude evidence of four other complaints, but my

7  understanding is Professor Ravina only contests two, so the

8  Court is going to focus on those.

9            The first complaint was made against a Columbia

10 Business School professor for allegedly having sexual

11 relationships with a student in his office and for creating an

12 uncomfortable work environment for female students and staff.

13           His second complaint was made against another business

14 school professor by a student who alleged that the professor

15 was sexist and demeaning to women.  Columbia Director of

16 Investigations Michael Dunn, the same official who investigated

17 Professor Ravina's complaint against Bekaert, investigated

18 these complaints.  Ravina alleged that Dunn made similar

19 mistakes in handling all three complaints, demonstrating both

20 Columbia's negligent response system and its notice that the

21 business school was a particular area of concern, a factor

22 relevant to punitive liability.

23           Furthermore, Dunn was investigating these two

24 complaints at or around the same time that he was investigating

25 Ravina's complaints.  The two other complaints are, of course,

1   not identical.  For one, both involved students rather than a

2   dispute between professors, but all three allege improper

3   conduct of a sexual or sexist nature and involved Columbia's

4   response to alleged harassment.

5        The Second Circuit's Perry case, which involved a

6   Title VII hostile work environment claim, criticized the

7   district court's exclusion of evidence of harassment not

8   witnessed or experienced by the plaintiff.  This circuit found

9   one of the critical inquiries with respect to a hostile work

10  environment claim is the nature of the environment itself, 115

11  F.3d at 150.

12       The circuit also found evidence of harassment of

13  non-plaintiffs was probative of the atmosphere of the workplace

14  and the employer defendant's knowledge of it.  Evidence of the

15  other two complaints is similarly probative here, where Ravina

16  alleges not only a hostile work environment and defendants'

17  notice of such, but a deficient system for handling complaints.

18       Columbia's harassment complaint response by the same

19  personnel during the same time period, thus, go to one of the

20  main disputed issues in this case.  That being said, I don't

21  want mini-trials on these two complaints, so I want to keep

22  this testimony short and sweet.  If there are further questions

23  that you have, let me know that.

24       Next Columbia's final evidentiary request is to

25  exclude evidence or reference to its alleged offer before the

1   filing of this lawsuit to extend Professor Ravina's tenure

2   clock by two years.  Ravina alleges in spring 2015, Columbia's

3   counsel told Ravina's then counsel, Anne Clarke, it would

4   extend her tenure clock.  She alleges that Columbia did not

5   follow through on this offer when litigation became more likely

6   and imminent.

7            Whether or not this statement is barred by Rule 408,

8   it is indisputably hearsay, and the Court is not persuaded that

9   it meets the requirements of Rule 807.  Asking a jury to assess

10  the reliability and accuracy of the statement filtered through

11  two layers of memory perception and sincerity is too great a

12  risk.

13           Professor Ravina has indicated she may call Ms. Clarke

14  to provide limited testimony as to the alleged tenure clock

15  extension offer.  As I indicated in my ruling, if she intends

16  to do so, I need more information.  I want more clarity on the

17  exact nature and timing of the statement and why it would not

18  run afoul of Rule 408.  In particular, I want to know precisely

19  what had been communicated to Columbia by plaintiff or her then

20  counsel at the time the offer was made.

21           So just let me know if you're --

22           MS. PLEVAN:  She is not on the witness list, so I

23  assumed that issue had been abandoned.

24           MS. HARWIN:  As your Honor noted, we noted in our

25  response to Columbia's motion in limine, were there a ruling

1     that plaintiff couldn't testify, that we reserve the right to

2     call Anne Clarke, who I will note was also on defendants'

3     belated laundry list of additional witnesses.

4                THE COURT:  That was in the response to in limine

5     motion or response to summary judgment?

6                MS. HARWIN:  The in limine motion.

7                THE COURT:  I will take a look at that.

8                Are you going to try to call Ms. Clarke or are you not

9     sure?  What do you want to do?  I need to assess whether this

10    is something I need to follow up or not.

11               MS. HARWIN:  Yes, we may, your Honor.

12               I will note, with respect to this issue of Rule 408,

13    Columbia's letter to Ms. Ravina directly, not through counsel,

14    but Dean Hubbard's letter to Professor Ravina, dated June 1st,

15    2015, the one in which he referenced her upcoming leave and

16    identified the pay during that periods, specifically referenced

17    Dean Hubbard, referenced external conversations regarding Ms.

18    Ravina's tenure clock, meaning the conversations between

19    counsel regarding this issue.  It is Columbia in its direct

20    communication to Ms. Ravina that introduces this issue

21    squarely, and Ms. Ravina should be able to testify as to what

22    those conversations were that are being referenced by Dean

23    Hubbard in his letter to her.

24               THE COURT:  Do you want to respond?

25               MS. PLEVAN:  Yes, your Honor, because it is hearsay.

1          It is actually double hearsay, and I don't think they

2     can call Anne Clarke if she is not on their witness list, not

3     on our witness lists, either.  I put the Columbia lawyer on the

4     witness list in case somehow this issue surfaced in a negative

5     way, but the fact that Dean Hubbard refers to a leave is not a

6     key to her testimony -- excuse me -- her testimony, proffered

7     testimony was that she was going to say she had gotten an offer

8     for a two year leave of absence and we took it away.

9          There are dozens of communications between the lawyers

10    about possible resolution here, starting in October 2014 and

11    going through up to the date the suit was filed and thereafter.

12         We can't start introducing -- those are all settlement

13    negotiations.  There were mediations.  This would be opening

14    the door to that whole line of questioning, and it is not

15    accurate to begin with, but the jury is not entitled to hear

16    any of that.  It didn't happen in the settlement context and it

17    is what she specifically said is inconsistent with the record

18    as well.

19         THE COURT:  That is what I want to hear more about.

20         Number one, was it squarely within the settlement

21    context?  I am happy to look back at that letter and see if it

22    opened the door, but as to the inaccuracy point, do you want to

23    respond?

24         MS. HARWIN:  Well, certainly our position that the

25    testimony that Ms. Ravina would proffer regarding the offer

1    that was made by Columbia is certainly accurate and also --

2              THE COURT:  I am not going to allow her to testify

3    through hearsay what someone else told her anyway, but then we

4    have the 408 issue.

5              MS. HARWIN:  With respect to the 408 issue, again the

6    letter sent by Dean Hubbard didn't just reference leave.  It

7    specifically referenced external conversations regarding the

8    tenure clock, meaning lawyer conversations, and so when that is

9    introduced by Dean Hubbard in the letter, plaintiff needs to be

10   able to respond and explain what that is, what is being

11   incorporated by reference into Dean Hubbard's letter to Ms.

12   Ravina.

13             MS. PLEVAN:  The dean is referring to the settlement

14   negotiations that were going on.  I don't know why that

15   reference allows anybody, us or plaintiff, to come in and start

16   talking about those extensive discussions that involved, by the

17   way, Professor Bekaert and agreements that were going

18   back-and-forth with him about the data and all kinds of other

19   complexities to this situation.

20             So I don't see how that opens the door, and again what

21   they wanted to put this in for is to suggest that there had

22   been an offer of a two-year leave, not that there was something

23   else on the table.  She specifically mentioned that that is

24   what her lawyer told her, and that is a most significant

25   departure from what the record shows.

 1           MS. HARWIN:  Revocation of an accommodation like this

 2  is actionable.  The fact that this was made is not being

 3  introduced for purposes that run afoul of Rule 408.  We're not

 4  introducing anything as to the evidence or validity of the

 5  claim.  It is an actionable act, the revocation.

 6           THE COURT:  Do you have cases for the proposition that

 7  settlement discussions can come in in this context?

 8           MS. HARWIN:  Yes, your Honor.

 9           THE COURT:  I will look bat at your motion and look at

10  that letter.  I am not inclined to allow in any of the settle

11  discussions.

12           MS. PLEVAN:  You have to get around the hearsay issue.

13           THE COURT:  The hearsay issue I have ruled on.  If she

14  wants to call Anne Clarke, I am not inclined to let it in

15  anyway, but I will take a look at it.

16           MS. HARWIN:  We'll brief it, your Honor.

17           MS. PLEVAN:  We reserve our right to ask to take

18  Anne's deposition, if she will be allowed to testify, because

19  she was not on the witness list.

20           MS. HARWIN:  Your Honor, she was on Columbia's witness

21  list when on the last day of discovery they provided dozens of

22  new witnesses.  That was so.

23           (Multiple voices)

24           MS. PLEVAN:  I put her name on the list, but that

25  doesn't waive my right to take discovery.

1              THE COURT:  In any event, I will take a look at the

2       letter.  Lastly, I will turn to Professor Bekaert's motions in

3       limine.

4              First, he asked the Court to exclude evidence related

5       to his time at Stanford.  Professor Ravina alleges that

6       Professor Bekaert told her that complaints made against him by

7       female assistants at Stanford almost cost him his tenure and

8       made him very angry.  He describes these complaints as related

9       to two subjects:  His treatment of an assistant after she made

10      an error with his immigration papers and unspecified

11      allegations related to his tenure process.

12             Professor Ravina contends that Professor Bekaert

13      described these incidents by female staff vaguely so as to

14      impress upon her both his career survived previous complaints

15      against him, and he would become very angry at her if she

16      complained.

17             In addition to being admissions by a party opponent,

18      Bekaert's alleged statements are admissible as to their

19      intended effect on Ravina, to intimidate her and discourage her

20      from reporting him.  The statements are also relevant as to the

21      existence of a purportedly hostile work environment and are not

22      more prejudicial than probative.

23             Bekaert's motion is, thus, denied, and I will allow

24      Professor Ravina to testify about his statements to her about

25      these incidents, but there should be no extrinsic evidence of

1     them.  It is only being admitted for the purpose of him saying

2     this to her and what he intended to relay to her.  If anyone

3     suggests a limiting instruction, I will consider it.

4               MR. HERNSTADT:  Yes, one thing I point out, that is

5     only one complaint.  The allegations related to the tenure

6     process was not about a complaint, and the complaint is not

7     about gender discrimination or sexual harassment and it doesn't

8     have any conceivable relevance.

9               Apart from the fact it was 20 years ago and apart from

10    the fact the only evidence is that they're presenting it is

11    that Professor Ravina says that Professor Bekaert told her

12    about this, it is not about gender discrimination.  It doesn't

13    have any bearing on this case.

14              THE COURT:  Let's talk about that.  Do you want to

15    respond?

16              MS. HARWIN:  Absolutely, your Honor.

17              A statement by Professor Bekaert that many female

18    assistants had complained about him and that he was very angry

19    about the complaint is, as you described, intimidation to

20    plaintiff.  That kind of intimidation is part and parcel of a

21    hostile work environment claim.  We cite case law on this

22    subject and it is squarely admissible.

23              MR. HERNSTADT:  These are complaints that he is a

24    grumpy, irascible, mean person.  This is classic 403-type

25    evidence and, frankly, character evidence coming in through his

1   own admission.

2           She says that he yelled at his assistants because she

3   sent his entire immigration file that he needed to get a green

4   card to INS as opposed to his immigration lawyer.  That was

5   very upsetting to him.  He thought he might be kicked out of

6   the country, and he yelled at her, and that was a problem.

7           This is not gender discrimination.  This is not

8   hostile work environment based on gender.  This is a boss who

9   has certain standards he wants to have met, being very upset a

10  very potentially damaging mistake was made.  It has nothing to

11  do with --

12          THE COURT:  It is not being admitted as character

13  evidence similar to the discussion we had earlier with respect

14  to the RAs who quit or were fired from Professor Ravina's work.

15          This is being admitted for the purpose of what he said

16  to her about how he feels when people push back and report him

17  and how he deals with them; and, thus, part of plaintiff's

18  theory that this is how he went about intimidating Professor

19  Ravina, and it is being admitted for that limited purpose, but

20  not as character evidence.  As I said, if you want me to give a

21  limiting instruction, I will consider it.

22          Then Bekaert next moves to exclude evidence related to

23  his other relationships.  This motion is granted in part and

24  denied in part, and I referred a little bit to this earlier.

25  Ravina has testified that Bekaert often discussed sexual

matters with her, including his sexual history and his

attraction to various other women, including some at Columbia.

As was true for his statements related to his time at Stanford,

these statements are both admissions by a party opponent and

relevant and probative as to the existence of a sexual charged,

hostile work environment, whether or not they're true.  Bekaert

comments go to the heart of Ravina's allegations and should not

be excluded on relevance or 403 grounds.  See the Desardouin

case, 708 F.3d at 105-06; and the James case, 2017 WestLaw

3923675, at *9.

Bekaert does, however, highlight Ravina's allegation

that he told her his interests in a girl he thought might be

underage is particularly prejudicial.  While his alleged sexual

comments are highly probative in general, the Court agrees that

the underage comment is not technically relevant or

particularly probative to Ravina's claims, and any relevance to

it must be excluded under 402 and 403 grounds.

Bekaert moves to exclude evidence of his relationships

beyond his comments to Ravina.  These relationships were with a

Columbia adjunct professor and Dutch economist.  There is no

suggestion these relationships were anything but fully

consensual, as I noted earlier.  Bekaert, therefore, asks for

exclusion based on relevancy and 403.  Ravina counters that

evidence of the relationships would rebut Bekaert's defense

that his interactions with Ravina were normal and non-sexual.

1          I disagree.  The basis of Ravina's complaint is that

2     Bekaert sexually harassed her, not that the two were

3     romantically involved.  Bekaert's consensual interactions with

4     other women at Columbia are not relevant or probative to

5     establish how he purportedly mistreated Ravina.

6          The Court notes, however, and this goes back to our

7     discussion earlier, that he, Bekaert, has signaled his

8     intention to call the Dutch economist, Ms. Hoerova, as a

9     witness, and as I said earlier, if he does so, Ravina must be

10    allowed to introduce evidence of the relationship between the

11    two to demonstrate potential bias, or he may want to do it to

12    show the context of the emails.

13         So I am going to allow it in for that purpose.  The

14    same may be true of potential witness Nancy Xu.  The Court will

15    also revisit the issue of the relationship with Ms. Hoerova in

16    the context of those statements.

17         MR. HERNSTADT:  Nancy Xu?

18         THE COURT:  I don't know.  Maybe.

19         MR. HERNSTADT:  They have no relationship.

20         THE COURT:  Then that was a mistake.  Sorry.

21         MR. HERNSTADT:  Sorry.

22         MS. HARWIN:  On Ms. Hoerova, one point of

23    clarification.  With respect to Professor Bekaert's comments

24    regarding the woman and the characterization she might be

25    underage, plaintiff is still permitted to discuss that

1    incident, but without using the term, "underage."  Is that

2    correct?

3              THE COURT:  What's left after the "underage" comment

4    comes out?

5              MS. HARWIN:  He was describing his attraction to

6    another woman who he characterized as possibly underage, but

7    Professor Ravina can testify about that without using that

8    term, that he characterized her as younger, for example?

9              THE COURT:  That's fine.  I think that can come in

10   because it goes to the sexual charged nature of their

11   discussions, but the fact that she may have been underage,

12   looked underage should stay out.

13             MS. HARWIN:  That is fine, your Honor.

14             THE COURT:  Okay.

15             MR. HERNSTADT:  Young, I am sorry?  What does that

16   mean, she can testify that he --

17             (Multiple voices)

18             THE COURT:  I wouldn't say "young," either.  I don't

19   want anything to go to the age of the person.

20             MR. HERNSTADT:  He is interested in a woman that he

21   saw at a bar?

22             MS. HARWIN:  The fact he characterized her as young is

23   relevant because Ms. Ravina, of course, is younger than --

24             THE COURT:  How old is she?

25             MS. HARWIN:  Ms. Ravina is now 42 years' old.

1          THE COURT:  How old was she at the time of this?

2          MS. HARWIN:  You're testing my math, your Honor.

3    About five years younger.

4          THE COURT:  I don't think "young" is really relevant

5    to this particular case.  The nature of the remark generally

6    can come in.

7          So, in sum, the motion is denied as to his sexual

8    comments with the exception of the underage or young comment

9    and granted as to his past consensual relationships with the

10   exception that we discussed.

11         Professor Bekaert next seeks to exclude evidence of

12   complaints made against him by other women at Columbia.  His

13   motion is granted in part and denied in part.  The complaints

14   include an allegation by a business school student that he

15   expressed to her an implicitly sexual preference for Asian

16   women and that he had sent her threatening emails; and an

17   allegation by his personal assistant he had verbally abused

18   her.  Though the student ultimately decided not to bring a

19   formal complaint, her allegation was investigated by Michael

20   Dunn, the same official who investigated Ravina's complaint and

21   the other two business school harassment complaints.

22         The sexual tinged comment about Asian women is

23   relevant and probative of his alleged sexual harassment of

24   Ravina and the alleged hostile work environment.  Furthermore,

25   the Columbia investigator viewed the inquiry into the comment

1    as a sexual harassment investigation, Dunn letter, May 15,

2    2014.

3              Columbia's awareness of an allegation of sexual

4    harassment by Bekaert so close in time to Ravina's is also

5    probative of the school's alleged notice and negligent handling

6    of the problem.  The alleged threatening emails, however, are

7    not relevant or probative, as they concern a wholly academic

8    matter which no one alleges was sexual in nature.

9              Bekaert's alleged verbal abuse of his assistant as to

10   which no one alleges was in any way sexual is likewise not

11   probative or relevant.  Ravina does not allege simply that

12   Bekaert was a difficult colleague, but that he sexual harassed

13   her.  It is not enough that the assistant was female to suggest

14   to the jury if Bekaert was abrasive to work matters to one

15   colleague, he was more likely to sexually harass another.

16   Evidence of his general demeanor could create unfair prejudice.

17   Similarly, evidence that Columbia knew of the verbal abuse

18   allegation, unlike the student's sexual harassment allegation,

19   does not bear on how they should have been responded to

20   Ravina's complaint.

21             MR. HERNSTADT:  I want to clarify two things.

22             One is that allegation was not that he made a comment

23   to her.  It is he said something in class to the entire class,

24   and he said Hong Kong, where the ladies are nice, or something

25   like that.  That was the allegation.

1          She did not pursue it.  She told Michael Dunn I did
2    not find that uncomfortable or unwelcome, I did not find that
3    harassing, and she made clear in her discussion with Michael
4    Dunn and her complaint her real issue was with the email chain.
5          So if your Honor wants to permit this, even though
6    this was a complaint not made and even though some of the
7    documents related to this are double hearsay, it is the student
8    telling one Columbia person, who tells another Columbia person,
9    as opposed to notes of an interview with Michael Dunn and the
10   student.
11         THE COURT:  If it comes in, it can come in, the fact
12   that this woman complaining said she didn't view this as sexual
13   harassment.
14         MR. HERNSTADT:  I would then withdraw the motion to
15   exclude the email exchange because that is the basis of the
16   complaint.
17         THE COURT:  That is fair.
18         MR. HERNSTADT:  And she explained to Michael Dunn that
19   was her real problem, he --
20         (Multiple voices)
21         THE COURT:  Part of my thinking was it was just around
22   the same time you have the same investigator hearing about this
23   remark with respect to Professor Bekaert, but I agree with you,
24   I don't want the jury to be left with a misleading impression
25   about the nature of the allegation.  I think that is fine.

1   Then the email correspondence can come in.

2           Again it goes to not for the truth of the matter so

3   much as the fact that Columbia was on notice of this, and then

4   the, you know, the response that this really was not a sexual

5   harassment allegation at all.

6           MS. HARWIN:  Just to clarify, the emails are back in,

7   the email correspondence between Bekaert and --

8           THE COURT:  Yes, yes.

9           MR. HERNSTADT:  If you will permit the allegations to

10  come in, we need the the whole story.

11          THE COURT:  I think that is fair.

12          Then, finally, we have Professor Bekaert's motion to

13  exclude a number of email communications between himself and

14  his friends and includes colleagues concerning Professor

15  Ravina's complaint against him.

16          These emails include comments in which he calls her a

17  damn evil bitch, insane and sick and crazy.  That suggests that

18  if she goes it alone against my will, I will stop her.  I know

19  every single editor and asks whether he can just strangle her

20  and get it over with.

21          These emails arguably demonstrate Bekaert's

22  retaliatory and/or discriminatory animus towards Ravina and

23  again go to the heart of one of the issues in this case.  I

24  don't think it is unduly prejudicial.  At trial he will, of

25  course, be able to try and contextualize the emails and argue

1    that they show no such animus but his natural reactions to

2    being falsely accused of misconduct.  The ultimate

3    determination is a matter for the jury.  The motion to exclude

4    the emails is, thus, denied.

5           Then we come back to the issue with respect to his

6    then girlfriend, Ms. Hoerova.  As I discussed, I have excluded

7    evidence of the relationship except as to show potential bias

8    if she is called as a witness, or if Professor Bekaert

9    requests, to elicit the nature of her relationship to provide

10   context for the emails.

11          So I want that to be clear.  If you have any questions

12   as we go along, let me know.

13          MR. HERNSTADT:  Yes.  The only thing I would say, is

14   the quotes that you read into the record come from a variety of

15   emails at different times that were not to colleagues.  For

16   example, the email in which he says I know everybody, that was

17   an email to one of his research assistants in response to

18   Professor Ravina's trying to cut him out of the project

19   entirely, and he said she can't get away with cutting me out of

20   the project entirely, I know everybody.

21          It was not a colleague or co-author or anyone in

22   the --

23          THE COURT:  Thank you for clarifying that.  I still

24   think they should come in.  You, of course, can do what you did

25   right now and provide context as part of your defense.  So

1    those are my rulings.

2           I think I am going to get a couple of letters tomorrow

3    and then Monday.  You all are going to get together about the

4    exhibits and then let me know, and then we can schedule a time

5    to go over the exhibits, any objections that still remain.

6           What I would like to do now is I would like to just

7    take a break.  I will give you a copy of a proposed case

8    summary that I intend to read and a draft of voir dire

9    questions, and then why don't we come back in a couple of

10   minutes and you'll let me know if you have objections and we

11   can walk through the logistics.

12          I will tell you this with respect to the voir dire

13   questionnaire, so typically in a civil case I have a jury of

14   eight.  Does anyone have an objection to that number?

15          MR. SANFORD:  No, your Honor.

16          MS. PLEVAN:  No, your Honor.

17          THE COURT:  So plaintiff and collectively defendants

18   will each get three peremptory challenges, for a total of six.

19          MS. PLEVAN:  Plaintiffs and defendants?

20          THE COURT:  Sorry?

21          THE PLAINTIFF:  Each defendant?

22          THE COURT:  Defendants together were going to get

23   three.  I will consider a request if you want four, so that you

24   each have two.

25          MS. PLEVAN:  I would request that.

1          THE COURT:  I think that is fair.  Plaintiff will have

2     three.  Each of the defendants will have two, so collectively

3     four, and so that is a total of seven, and so since we'll have

4     a jury of eight, that is going to be a group of 15 prospective

5     jurors we are going to question before you exercise your

6     peremptories.

7          So what I am going to do, and as I said, I will give

8     you a few minutes to read this questionnaire, but I basically

9     hand out the questionnaire to all the prospective jurors, I

10    will sit 15 in the jury box or 14 in the jury box, and one back

11    there, and I will go over it with respect to Prospective No. 1.

12    I will read all the questions.  I will save the individual

13    questions for a little later, and then I will go to Prospective

14    Juror No. 2 and say do you have any yes answers to the

15    questionnaire, and I won't read the whole thing over.

16          I will follow up, I will always follow up with

17    questions, and I will give you the opportunity to let me know

18    if you want me to follow up further before you exercise your

19    peremptories.  That is basically how the process will work.

20          MR. SANFORD:  That sounds fine, your Honor.

21          If may respectfully request that plaintiff get four

22    peremptories as well?

23          THE COURT:  That's fine, I will give plaintiff four.

24          Technically, plaintiff and defendants collectively are

25    entitled to the same amount.  So I think that is four.  We'll

I75JRAVC                    Conference

1    seat 16, and each of the defendants will have two, collectively

2    four.  Why don't we take a break.  Why don't we meet back here

3    in 5, 10 minutes.  Tell Ms. Cavale when you're ready.

4             (Recess)

5             THE COURT:  All right.  Do you want to go through the

6    summary first and see, does anyone have any objections?

7             MS. PLEVAN:  Our inclination was to have a more

8    fulsome statement by the defense.  We started writing

9    something, and I haven't shown it to --

10            THE COURT:  Do you want to do this, do you want to

11   work on one, and if you could submit it to plaintiffs, see if

12   plaintiffs agree, if you can agree on a summary.  You both can

13   write your own paragraphs is fine with me.  Just make sure you

14   get it to me by tomorrow so we can have it turned around by

15   Monday.

16            MS. PLEVAN:  That would be great.

17            THE COURT:  What about the jury questionnaire?  I am

18   happy to start with plaintiffs and see if you have any

19   objections or requests?

20            MS. HARWIN:  Yes, some pretty minor requests.

21            With respect to Question No. 15, we request that the

22   list of all the lawyers be consolidated and not identified by

23   the party associated with the lawyer so it is just a list of

24   all the lawyers together.

25            And also I note now that some of Columbia's prior

1    counsel is, it seems, inadvertently omitted from this list.

2    They should also be included here.

3             MS. PLEVAN:  I didn't hear it.

4             MS. HARWIN:  I am sorry.  I suggested that the listing

5    of attorneys be consolidated in 15 similar to what the parties

6    submitted to you jointly and noted that a couple of Columbia's

7    prior counsel named should be added to the list.

8             THE COURT:  That is fine.  The only thing is I think

9    the real purpose is to have you stand up, and I will have both

10   Professor Ravina and Professor Bekaert stand up when I call

11   their name and turn around and make sure no one recognizes

12   them.  I will do that for the same for the lawyers so not

13   everyone will be standing.

14            I am happy to read the list at once, but then say can

15   I have plaintiff's lawyers please stand, and then the only

16   issue is then you'll have to essentially reintroduce yourself,

17   to the extent you care if the jurors know your name.

18            MS. HARWIN:  That is fine, your Honor.

19            THE COURT:  I am happy to do that.  All right.

20            What next?

21            MS. HARWIN:  With respect to No. 19, it seems like

22   that is already captured in 18, by asking about whether anyone

23   has ever worked for a college or university.  Our view is that

24   19 doesn't need to be separately asked.

25            THE COURT:  I will just add in the tenure point to 18.

I75JRAVC                    Conference

1          MS. HARWIN:  Okay.

2          THE COURT:  That is fine.  I will take out 19.

3          MS. HARWIN:  With respect to 25, just a small tweak in

4     wording, there is a question of wording whether anyone has ever

5     owned.  I would suggest ever owned or operated.

6          THE COURT:  Okay.

7          MS. HARWIN:  At the very end, on the last page there

8     is a question posed who are the members of your household.  I

9     would also add a question as to what is your marital status,

10    because some aspects of marital status wouldn't necessarily be

11    encompassed by members of your house, or is someone separated

12    or divorcing or has a spouse --

13         THE COURT:  What number?

14         MS. HARWIN:  No. 7 on the last page.

15         MR. HERNSTADT:  What was the objection?  I didn't --

16         THE COURT:  She wants me to add in a question about

17    their marital status.  I try not to embarrass people.  I don't

18    ask about age.  I figure we can figure out the general age.  I

19    will throw it in Question No. 8.

20         MS. HARWIN:  Thank you, your Honor.

21         THE COURT:  Do defendants have any objections or

22    requests on the voir dire questionnaire?

23         MS. PLEVAN:  We don't have anything, your Honor.

24         THE COURT:  All right.

25         MR. HERNSTADT:  In terms of tenure question, whether

1    they have been considered for, received or denied, whether they

2    have been considered for tenure, received tenure or denied

3    tenure.

4              THE COURT:  I am going to leave it in in light of that

5    request, leave in Question 19.  It is a little repetitive and

6    other places that are repetitive, too.  In light of the

7    importance of that particular issue here, I will leave in 19,

8    although it was perfectly appropriate request.  I will do that.

9              All right.  So we have our questionnaire?

10             MS. HARWIN:  I just noted there is one more omission.

11             In 16, Donna Fenn, identified in Columbia's may call

12   list, should also be included on 16.

13             THE COURT:  How do you spell her name?

14             MS. HARWIN:  D O N N A, F E N N.

15             THE COURT:  Okay.  All right.  So we have that.

16             Does anyone have any other questions about jury

17   selection?  We're going to have 30 prospective jurors come on

18   Monday, so hopefully that should be enough.

19             Are there any better estimates as to the length of

20   trial in light of my rulings?

21             MR. SANFORD:  Your Honor, you mentioned at one point

22   you have a criminal trial that starts on the Monday after the

23   second week.

24             THE COURT:  Right.

25             MR. SANFORD:  I don't know how long this trial will

1    go, but is it possible if that criminal trial is still

2    scheduled at that point, and we're late in the processing, we

3    need a few more days, would it be possible for the court to

4    seat a jury in the criminal trial and postpone the trial?

5          THE COURT:  I am not going to stop this trial.

6          My only point in saying that is to the extent that we

7    can sit a little bit longer, but I am not going to stop the

8    trial.  Don't worry about that.  I will start the criminal

9    trial a few days later if I have to, but I am going to ask for

10   regular updates on where we are and if, for example, we can ask

11   the jury would you be willing to start at 9:30 and sit to 5:30,

12   without obviously putting any pressure on them with respect to

13   deliberations, I may do that.

14         MR. SANFORD:  Would it be this Court's intent to

15   inform the prospective jurors that this may be a three-week

16   trial?

17         THE COURT:  If you think it will be, yes.

18         The other thing I can do now, frankly, I can sit from

19   9:30 to 5:30 to try to keep it within the two weeks, but I

20   don't know what your best estimates are in light of my rulings.

21         Do you think it will go three weeks?

22         MR. SANFORD:  It is very hard to tell given the long

23   witness list we got from Columbia.  It is hard to know how many

24   witnesses they're going to put up and hard to know how long

25   they're going to take on cross.  Is it the court's practice to

1    put the parties on the clock?

2              THE COURT:  It is not unless I feel like the lawyers

3    are not being as responsible as they should be, so I don't

4    normally do that, but I am going to -- if I think there is a

5    need, I'll do that.

6              MR. SANFORD:  Based on my conversations with Ms.

7    Plevan, we have talked about trial management and speculations

8    about it, and she can certainly speak for herself, but it is my

9    understanding, based on those conversations, that it is more

10   likely than not to last a little more than two weeks.

11             THE COURT:  Is that your view?

12             MS. PLEVAN:  It could if we are talking about

13   including the damages, but we still do have unresolved -- there

14   are two experts that we don't know if they're coming at all,

15   and if so, for what.  If they don't, then I think two weeks is,

16   if we are sitting every day, is a possibility, but I am not

17   sure we quite get to damages.

18             In my experience, it is better to tell the jury two to

19   three weeks because if we say two weeks and we're not done,

20   they'll rely on what we said.

21             THE COURT:  I will tell them two to three weeks, but

22   in light of this discussion, does anyone have an objection to

23   sitting 9:30 to 5:30?  Are you okay with that?  I know it is a

24   long day.

25             MR. SANFORD:  We have no objection.

1          THE COURT:  Why don't we do that.  I will change that

2    in the questionnaire and say we are going to sit 9:30 to 5:30.

3    I will ask you to be here at 9:00 to address any issues.

4          I don't normally sit Fridays.  We will sit Fridays.  I

5    will tell you this Friday I have a sentencing at 10:30, and I

6    don't like to adjourn criminal sentencings because families and

7    the like come.  It is not this Friday, but a week from Friday,

8    the 13th.  I will start next Friday at 11:00, okay, but

9    otherwise we'll sit that longer schedule and we'll sit Fridays

10   as well.

11         MR. SANFORD:  Your Honor also mentioned at one point

12   that there is a possible set of criminal matters on Monday

13   which may necessitate starting on Tuesday.  Does the Court have

14   any update on that?

15         THE COURT:  No.  I am going to -- my trial ended the

16   end of last week.

17         THE CLERK:  He he means the busy jury day.

18         THE COURT:  No.  I think now its seems like the jury

19   room is not as busy, so I think we should be fine on getting 30

20   prospective jurors on Monday.  That is no longer an issue.  I

21   fully anticipate picking a jury on Monday, hopefully half a

22   day.  I think we should plan to meet here at 9:30 on Monday,

23   talk about as many of the standing issues as we can, and then

24   the jury will probably be here at about 10:30.

25         MR. SANFORD:  A few other housekeeping matters, your

1    Honor, if I may?

2              THE COURT:  Yes.

3              MR. SANFORD:  First of all, witnesses we plan on

4    calling, some adverse witnesses and hostile witnesses in our

5    case in chief, including Professor Bekaert, what is the court's

6    practice with respect to redirect?

7              Our understanding is that Professor Bekaert's counsel

8    may want to call Professor Bekaert in their case in chief.

9    Would it be this Court's preference to have that happen?

10             Would it be allowable by the Court to have them

11   redirect once and then recall him or just have him on direct

12   one time?

13             MS. PLEVAN:  Did you mean cross?

14             THE COURT:  I think you mean cross, right?  Their

15   cross is essentially their direct.

16             MR. SANFORD:  That's right.

17             THE COURT:  Do you want to be heard on that?

18             MS. PLEVAN:  We have two witnesses, too, and I will

19   raise the same question, whether we have the option of doing

20   the complete direct and cross.

21             THE COURT:  My preference is to have witnesses go

22   once, honestly, so we just move the trial along faster.  I also

23   want to give you the ability to try your own case the way you

24   think it needs to be tried.

25             MR. HERNSTADT:  One thing, I don't know what witnesses

1    they're going to have in what order, and that obviously would

2    have an impact on whether I'd want to have Professor Bekaert do

3    his direct as part of our case in chief.

4          If Professor Bekaert is the first witness, and that

5    was the only time to hear him, I would rather they do their

6    cross, put on the rest of their case, and Professor Bekaert is

7    put on in our case in chief.

8          THE COURT:  What do you want is to do the same thing

9    twice, so I will just say that, but other than that, I am happy

10   to work with you.

11         MR. SANFORD:  That gets to the next question.

12         Can we have an order from the Court requiring the

13   parties to identify their witnesses two days in advance?

14         THE COURT:  Does anyone have an objection to that?

15         MS. PLEVAN:  How far?

16         THE COURT:  Two days in advance?

17         MS. PLEVAN:  Customary is 24 hours.  I am happy to

18   talk about it with him.

19         THE COURT:  Talk about that and see if you can work

20   that out.  If you can do it two days in advance, you should do

21   it two days in advance.

22         That being said, if scheduling is off and you learn

23   about one person the day before, you know, I am okay with that.

24   I want people to act in good faith and as a professional

25   courtesy, give the other side time to prepare.

1        MR. SANFORD:  Would the Court allow the parties to

2   have a legal assistant have use of electronic devices?  I know

3   there is a general rule here not to do so, but it would be a

4   great assistance to counsel if one of our legal assistants

5   could have access to a computer, that would be our computer

6   that a legal assistant would use.

7        THE COURT:  Yes, I think that is -- is that not

8   permitted?

9             (Off-the-record discussion)

10        THE COURT:  I was asking Ms. Cavale about the standing

11  order which only allows lawyers to bring in the computers.

12  That is said if one of you is bringing in your computer, and

13  you want the paralegal to be pulling up the exhibits, I am fine

14  with that.

15        MR. SANFORD:  Thank you, your Honor.

16             Does the Court have a sense how much time we're going

17  to be allowed for opening and closings?

18        THE COURT:  How long do you think your opening is

19  going to be?

20        MR. SANFORD:  I would request one hour.

21        THE COURT:  An hour, that is fine.

22        MS. PLEVAN:  It wouldn't be any longer, maybe less.

23        MR. HERNSTADT:  Less.

24        THE COURT:  Good.

25        MR. SANFORD:  And close?

I75JRAVC                    Conference

1          THE COURT:  I don't have a particular time limit, as I

2     said.  If I'm starting to get concerned about the length of the

3     trial, then it may be we need to add time constraints, but as I

4     said, I am not inclined to put them on at this time.

5          MR. SANFORD:  Finally, we have a couple of issues

6     regarding our technology assistants.

7          MS. KOSTER:  We might have already gone through this.

8          We put in an updated order that supplemented the

9     request for lawyers to bring in their technology for -- it is

10    for three professionals from Duer, and we have also put in a

11    letter request with accompanying orders for seating permission

12    for Duer to install their technology tomorrow.  Those were

13    filed on the docket.

14         THE COURT:  I saw them.  Duer and Equip have worked

15    with our IT people in the past and have gotten approval to do

16    precisely what is being asked for here.

17         To be honest, I am not all that technologically savvy,

18    so I don't know if the size of the monitor or the nature of the

19    VGA switch is compatible.  That being said, if other Judges

20    have specifically approved this equipment with these providers,

21    I am fine with it.

22         MS. HARWIN:  It is our understanding this is their

23    standard protocol and, yes, they do this in the Southern

24    District of New York.

25         THE COURT:  Okay.

I75JRAVC                    Conference

1          MS. FISCHER:  We didn't file it on the docket, but we

2     also have a similar request.  We're going to be utilizing Trial

3     Graphics and another vendor to assist with electronic display

4     of exhibits.  I actually have it here.  I am happy to file it

5     in whichever way you wish, but a request for the representative

6     from Trial Graphics to bring in a laptop and some other related

7     devices and hard drive.

8          In addition, we're seeking the court's permission

9     similarly to bring in a printer.  We have a conference room

10    rented on the 5th floor, so we have similarly a proposed order

11    for that.

12         THE COURT:  Okay.  I will look at the orders.  I will

13    send them to our technology people.  If these are requests

14    normally made and approved, I am happy to approve them as well.

15    I want to run it by our technology people and make sure they

16    have time to meet with your vendors tomorrow.

17         MS. FISCHER:  We can put in a letter?

18         THE COURT:  That is fine.  Anything else?

19         MS. PLEVAN:  One other thing, your Honor, is that the

20    parties have made deposition designations, really primarily the

21    plaintiff to which we have responded, and I wanted to mention

22    that because there are some objections there.

23         THE COURT:  Shall I look at those now?

24         Is that something you think you can work out?  What

25    you want to get is cumulative testimony?  I don't want someone

1  to testify to the same thing that is in a deposition, but --

2          MS. PLEVAN:  We counter-designated, but I think

3  they're all the plaintiff's requested designations.  We would,

4  if they're going to be done by video, just from past

5  experience, we need to see the video clip well in advance

6  because sometimes there are mistakes.

7          THE COURT:  On that I definitely want disclosure well

8  in advance so there can be counter-designations.

9          MS. HARWIN:  We have already done the designation,

10 counter-designation process.  What Ms. Plevan was raising is

11 that there are some unresolved objections, and we would be

12 happy to provide the Court with those pages on which there are

13 unresolved objections because I do think it would be helpful

14 for the proceedings at trial if all that was resolved in

15 advance of the jury being in the room and --

16         THE COURT:  Yes.  Again if you can get me that letter,

17 do it by noon tomorrow, that will be helpful so I can look at

18 everything and hopefully I can get an answer to you on Monday.

19         MS. HARWIN:  We have already provided the Court with

20 the designations.  What is missing are the actual pages to

21 which those designations refer.

22         THE COURT:  Then if you want to provide any

23 explanation for what your objection is, let me know that as

24 well so I can view them in that light.

25         MS. HARWIN:  Thank you, your Honor.

1          THE COURT:  Anything else we need to discuss today?

2          MR. SANFORD:  I think that is it for plaintiff, your

3     Honor.

4          THE COURT:  Okay.

5          MS. PLEVAN:  Nothing else for us.

6          THE COURT:  All right.  In the letters about the

7     technology, just make clear, I mean I have Professor Ravina's

8     right here, but if there is a particular person that should be

9     contacted by our tech people, let me know that.  I don't know

10    if you want to tell me that now or if there are any questions

11    about --

12         MS. FISCHER:  Not a question, but I believe our

13    paralegal and Trial Graphics have already met with the tech

14    people here, but we'll put that in the letter.

15         THE COURT:  Thanks.  I will see you on Monday, at

16    9:30.

17         (Court adjourned)

18

19

20

21

22

23

24

25