I791rav1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ENRICHETTA RAVINA,

 4                  Plaintiff,

 5           v.                           16 CV 2137 (RA)

 6   COLUMBIA UNIVERSITY,
                                          Jury Trial
 7              Defendant.

 8   ------------------------------x

 9                                        New York, N.Y.
                                          July 9, 2018
10                                        9:45 a.m.

11   Before:

12           HON. RONNIE ABRAMS

13                                        District Judge

14

15                          APPEARANCES

16

17   SANFORD HEISLER SHARP LLP
          Attorneys for Plaintiff
     BY:  DAVID SANFORD
18        ALEXANDRA HARWIN
          MELINDA KOSTER
19

20   PROSKAUER ROSE LLP
          Attorneys for Defendants
21   BY:  BETTINA B. PLEVAN
          RACHEL S. FISCHER
22        STEVEN D. HURD

23   HERNSTADT ATLAS PLLC
          Attorneys for Defendant Bekaert
24   BY:  EDWARD HERNSTADT

25
```

I791rav1

 1          (In open court)

 2          THE COURT:  I signed off on the newest request to

 3   bring in technology.  Is there anything else you need on that

 4   front for purposes of today?

 5          MR. SANFORD:  I don't think so, your Honor.  Thank you

 6   very much.

 7          THE COURT:  Okay.

 8          MS. PLEVAN:  Nothing else.

 9          THE COURT:  You're all okay.

10          Okay.  So I think the most pressing issue is to

11   discuss the case summary, and I understand you just handed up

12   two different copies.  So I'm happy to review them now.

13          So do you want to be heard at all on the differences

14   between these?  I mean, frankly, I'm inclined to take

15   plaintiff's description from plaintiff and defendants'

16   description from defendants.  But it seems like Professor

17   Bekaert's is the same in both and that it's Professor Ravina's

18   and Columbia's that differ a little bit.  Does anyone have a

19   problem with letting me use plaintiff's description?

20          MR. SANFORD:  We're fine with that, your Honor.

21          THE COURT:  Okay.

22          MR. HERNSTADT:  There were two things in plaintiff's

23   description that I would object to.  One is the "otherwise

24   treating her inappropriately."

25          Also, under New York City Human Rights Law, gender

I791rav1

1    discrimination includes everything, so breaking it up into

2    different pieces doesn't seem appropriate.  That's why we had

3    it a little simpler in the original version, which was sent to

4    them last week.

5         Also, the last sentence, "In addition, he interfered

6    with her ability to obtain tenure."  Retaliation is already

7    covered --

8         THE COURT:  Just go back a minute.  When you talked

9    about under New York City Human Rights Law.

10        MR. HERNSTADT:  The New York City Human Rights Law has

11   a prohibition against gender discrimination.  Unlike federal

12   law, it hasn't been broken into separate types of gender

13   discrimination, like hostile work environment, quid pro quo.

14   It's just different treatment because of gender.  And to break

15   it up here in court, under the federal law, where there is no

16   federal discrimination claim left in this case, I thought it

17   was inappropriate.  I was okay with "discriminated against her

18   based on gender and sexually harassing her," because I think

19   that communicates fully what the allegations are, but the last

20   phrase, "otherwise treating her inappropriately," it's sort of

21   a piling on without adding anything to the actual allegation.

22        THE COURT:  What does that phrase add in your view,

23   the "otherwise treating her inappropriately"?  And

24   "inappropriately," what does that even mean?

25        MS. HARWIN:  Well, as defense counsel just said, the

I791rav1

1    New York City Human Rights Law, which we adhered to here, these

2    are modifiers.  These are examples of types of conduct that

3    qualified for that, sexually harassing, subjecting to hostile

4    work environment, and "otherwise treating inappropriately" is

5    to capture the idea that it's not limited to those categories

6    of sexual harassment or hostile work environment.  "Other

7    inappropriate treatment" based on gender also qualifies as a

8    violation of the New York City Human Rights Law.

9         Also, your Honor, because sexual harassment, hostile

10   work environment are a more familiar concept to many people

11   than the unitary standard of the New York City Human Rights

12   Law, I think it is important to include some of that additional

13   description.

14        THE COURT:  All right.  What about changing that

15   phrase to "discriminated against her based on her gender by,

16   among other things, sexually harassing her and subjecting her

17   to hostile work environment," period?

18        MS. HARWIN:  That's fine, your Honor.

19        THE COURT:  And then Mr. Hernstadt, what was your

20   other objection?

21        MR. HERNSTADT:  The last sentence that "Ravina claims

22   that Bekaert's conduct interfered with her ability to obtain

23   tenure at Columbia Business School," that's not a claim that's

24   been leveled specifically against him.  The claim against

25   Professor Bekaert is that he delayed or obstructed her work and

I791rav1

1    that therefore that made it difficult for her to get tenure,

2    which is the retaliation claim.  Retaliation is already

3    covered.  Alleges that both Bekaert and Columbia retaliated

4    against her, but it's because of her complaints.  To blame

5    Bekaert for this really loads the deck.  This is something

6    that -- most of the case about tenure is against Columbia, not

7    against Bekaert.  Whatever wrongs that have been argued that he

8    did are limited to delaying work on one of the papers on

9    which -- of the many papers on which Professor Ravina was

10   working.

11            THE COURT:  Would you be more comfortable with the

12   language if we added in the fact that Ravina claims that

13   Bekaert's conduct delayed her work and thus interfered with her

14   ability to obtain tenure?

15            MR. HERNSTADT:  I would prefer it's limited to delayed

16   her work.  You know, that's a big stretch for plaintiff that

17   she's going to have to prove that Bekaert's delays interfered

18   with her tenure.  That's not what their case has been up to

19   now.  Up to now it's been Bekaert delayed, that harmed her, but

20   that she didn't get tenure because of a lot of things that not

21   just Bekaert, but both defendants did.

22            And I'm not saying you should put Columbia in.  I'm

23   saying that I think it's sufficient for a case summary to say

24   that, and that Bekaert's conduct delayed her work, and caused

25   her harm, if they want to say that.  I think it's inappropriate

I791rav1

```
1    to get so specific at this point in the case.  They have to

2    hear the evidence.

3           MS. HARWIN:  Your Honor, this was building on the

4    description that you provided.  I think we just broke it up

5    into a different sentence or moved it from one spot to another.

6    Given the cat's paw theory of liability, I think it's critical

7    to have some sentence that deals with this issue, especially in

8    light of the description provided by Columbia, which deals with

9    tenure squarely.

10          THE COURT:  I'm going to allow in the sentence.  If

11   you want me to add in more language, then I'm willing to do

12   that to focus on delaying her work, but otherwise I'll leave it

13   as is.

14          So, Mr. Hernstadt --

15          MR. HERNSTADT:  Yes.  You could say by delaying her

16   work --

17          THE COURT:  -- do you have a problem with that,

18   saying, "Ravina claims that by delaying her work, Bekaert's

19   conduct interfered with her ability to obtain tenure at

20   Columbia Business School"?  Are you comfortable with that?

21          MS. HARWIN:  I don't think that we would want that

22   couched in quite that way, which is --

23          THE COURT:  How else would his conduct interfere with

24   her ability to obtain tenure, from your perspective?

25          MS. HARWIN:  Well, there's also evidence regarding
```

7

I791rav1

1    Professor Bekaert's relationship with Robert Hodrick, his

2    disparagement of her in the field, and so we wouldn't want to

3    limit it to simply the feature of delaying work, but that is

4    certainly a component.

5              THE COURT:  All right.  I think in light of the

6    allegations with respect to retaliation, I'm going to leave in

7    that sentence as is.

8              All right.  But otherwise, do we need to talk about

9    the last paragraph at all or no?

10             Okay.  All right.  So we have a summary.

11             I'm going to hand out now the jury questionnaire.  We

12   made the few corrections that we discussed.  So I don't know if

13   you need to look at these again, if that's not necessary?

14             I also wanted to let you know, it turns out that I'm

15   going to sit Friday from 9:30 to 5:30, the way we are the rest

16   of the week, okay?  That sentencing was pushed off for another

17   reason.

18             So anything we need to talk about regarding the voir

19   dire?

20             I just want to make sure we talk about what's most

21   pressing first.  I understand that plaintiff has withdrawn the

22   request to call Dr. Goldberg and that that was a pressing issue

23   timewise.  It's no longer an issue.  But is there anything else

24   with respect to voir dire that we need to discuss?

25             MS. HARWIN:  Not from our perspective, your Honor.

I791rav1

1          THE COURT:  Okay.  And defendants?

2          MS. PLEVAN:  No, I don't think so, your Honor.

3          THE COURT:  Okay.  Are there any rulings?  Because I

4     got a host of letters this morning, so I haven't yet read

5     everything yet.  Is there anything you need to know for

6     purposes of opening statements?  Are there any particular

7     rulings you need?  I'll make sure that over the lunch break or

8     in advance of opening statements I give you rulings on them,

9     but I'm happy to hear you out on whatever is most pressing from

10    your perspectives.

11         MR. SANFORD:  I think the only thing from plaintiff's

12    perspective, your Honor, is slides we'd like to use in opening.

13    We sent slides to defense counsel this morning.  They object.

14    They're fairly neutral.  We're happy to share them.  We're

15    getting hard copies made up right now in the conference room in

16    the courthouse, so we'll have copies for the Court.  We also

17    will get them loaded on the screen for the Court's review.

18         THE COURT:  I'm happy to take a look at them.  Are

19    they demonstratives?  Are they exhibits?

20         MR. SANFORD:  They're demonstratives.  And it's just

21    kind of a neutral recitation following the outline of my

22    opening.

23         MS. PLEVAN:  Your Honor, the last few times I asked

24    permission to use slides in openings, the judge did not want

25    that, so I didn't raise it as a possibility here.  Neither did

I791rav1

1    Mr. Sanford at our final pretrial conference.  These were

2    delivered to us literally at 7:30 this morning.  They are not

3    completely neutral at all.  We object in general on principle.

4    It's just too late to have shown these to us this morning.  And

5    secondarily, there are many, many slides that refer generally

6    to things so we object to them coming in.  And other places

7    where the statements are not neutral.

8         THE COURT:  Issues that I have not ruled on the

9    admissibility of that particular evidence yet?

10         MS. PLEVAN:  Well, to the extent that there are

11    objections to exhibits that, you know, clearly have not been

12    ruled on -- and I have to now find them.

13         THE COURT:  I'm happy to take a look at them.  I will

14    tell you I don't normally have attorneys use slides on opening

15    statements.  On summation I'm more open to using

16    demonstratives, but --

17         MR. SANFORD:  Well, your Honor, I don't think it's a

18    major deal, and I'm happy to withdraw.

19         THE COURT:  Okay.  All right.  So that issue is

20    decided.

21         Is there anything else that you need to know for

22    purposes of your opening statements?  Any particular rulings

23    you need, anything you want to talk about that will affect

24    either voir dire or opening statements?

25         MS. PLEVAN:  Not voir dire, but the issue of the

I791rav1

1    de facto tenure.

2            THE COURT:  Okay.  So why don't we talk about that.

3    And I created a timeline, and I want to have you help me walk

4    through the timing and also clarify what statements were made

5    in the settlement context and which weren't, in your view.

6            So on March 22nd of 2016, plaintiff filed this

7    lawsuit.  On March 25th, plaintiff's counsel tells Columbia's

8    counsel that Professor Ravina will sign any sort of waiver

9    necessary for de facto tenure.  What context was that statement

10   made in?  And is that date accurate?

11           MR. MELZER:  That's the date of an email from

12   plaintiff's counsel to defense counsel and in the context of

13   trying to resolve matters in the lawsuit, and it also refers to

14   prior communications that said, "As you know, our client has

15   repeatedly indicated that she is willing to sign any sort of

16   waiver necessary for de facto tenure."  That refers to prior

17   oral communications made in February 2016.  I also now

18   understand that our client communicated her willingness to

19   waive de facto tenure during the fall of 2015 to her division

20   chair, Professor Zeldes, as well as another professor in her

21   department.

22           THE COURT:  And I'm sorry.  You are Mr. McKnight, is

23   that right?

24           MR. MELZER:  Mr. Melzer.

25           THE COURT:  Mr. Melzer.  All right.  I'm sorry.  Thank

I791rav1

1    you.

2            So just to be clear, the first statement was made

3    between lawyers in an effort to resolve the suit.

4            MR. MELZER:  The statements in February and March of

5    2016, correct.  But my client made statements to people in her

6    department, her division chair and another senior professor, in

7    the fall of 2015, that she was willing to waive de facto tenure

8    if that were an issue.  Columbia didn't directly tell her that

9    that was an issue involving the extension, but because of

10   things that she heard through the grapevine, she did make --

11   she volunteered that to the division chair, that she was

12   willing to do so.

13           MS. PLEVAN:  This was not disclosed yesterday.  This

14   was brand new information.  But I'm not sure it matters,

15   really.  It's clear that throughout this -- I mean, first of

16   all, that the conversations, or these email communications,

17   were all related to the preliminary injunction hearing, as a

18   way of resolving it with consent and a stipulation.  Again,

19   very similar to the point we made earlier, that a resolution of

20   an issue that didn't get resolved in that way, so it wasn't

21   some sort of document that the plaintiff signed saying, I

22   hereby waive something.  And there are answers to this.  But

23   now we're hearing for the first time this morning that, well,

24   she said something about de facto tenure to somebody in her

25   division.  And I think we can't view that as being something

I791rav1

1   that's legally effective or would be effective for lots of

2   reasons that we state in the letter we submitted to the Court

3   this morning.  There are serious questions about whether a

4   waiver could be effective at all and particularly involving a

5   discrimination claim where it in effect would be a waiver of a

6   future right.  But she's referring I believe to a conversation

7   she's having with her division chief, who doesn't have

8   authority in this area anyway for the university.  It was an

9   issue for the provost.  But it's more settlement discussions.

10  I mean, they're talking about how could she, you know, persuade

11  somebody to give her more time, which is --

12          THE COURT:  If she made these statements outside the

13  context, not through a lawyer but herself to individuals at

14  Columbia, why shouldn't that come in just to tell the jury a

15  complete story?  I mean, as I said the other day, I do think

16  it's appropriate for Columbia to explain the timing based on

17  its concern about de facto tenure, but on the other hand, I

18  want to allow plaintiff, if it's not solely within the context

19  of settlement talks, the opportunity to say, I don't really

20  believe that's true, I think that's a pretext, and here's why;

21  I made these statements that I was willing to waive it.  I

22  mean, I'm inclined to allow both sides to get out the

23  appropriate facts to make their arguments.

24          MS. PLEVAN:  There was a response to that --

25          THE COURT:  Yes.  That's why I'm trying to figure out

I791rav1

1    exactly what was in the context of settlement discussions, what

2    wasn't, and how can you both get out your positions.

3              MS. PLEVAN:  I think what we would ask, and probably

4    hearing the guidance from you regarding the openings, that we

5    be allowed to go into this subject of de facto tenure

6    ourselves, but the Court did direct the plaintiff to say

7    specifically when this waiver allegedly occurred, and we're

8    hearing new things now, and I would ask that by the end of the

9    day they provide us with a writing representing what that

10   testimony is going to be.

11             THE COURT:  Okay.  You just mean a letter indicating

12   exactly precisely when --

13             MS. PLEVAN:  Yes.

14             THE COURT:  -- what statements were made.

15             MS. PLEVAN:  Because it wasn't in the letter they

16   served on us.

17             THE COURT:  Okay.  I think that's fair.

18             So can you just put that in writing later today

19   exactly what you're relying on with respect to prior statements

20   made by Professor Ravina regarding a willingness to waive

21   tenure --

22             MR. MELZER:  Yes, your Honor.

23             THE COURT:  -- or waive the de facto tenure issue.

24   Okay.  But I am going to allow Columbia to argue this.  I think

25   the harder question was what to allow plaintiff to elicit, to

I791rav1

1    counter that argument.

2              MS. PLEVAN:  It's for that particular context, so once

3    we get the representation as to when and where exactly this

4    occurred -- and I understand your Honor's thinking on this.

5              THE COURT:  Okay.

6              MR. MELZER:  Well, your Honor, our client did -- I'm

7    advised that she did raise it with her division chair, who's a

8    member of Columbia administration.  It was raised by the

9    lawyers numerous times in the settlement context.  However, it

10   is not a communication on the validity or amount of the

11   underlying claims that were being negotiated.  It is strictly

12   related to Columbia's knowledge and notice that a waiver is

13   available and that plaintiff had made clear that she was

14   willing to and intended to make that waiver if an extension

15   were granted.  The only purpose of and relevance to the waiver

16   is if there is an extension.  So there is absolutely no reason

17   or sense in just waiving something until there is an extension

18   involved.

19             The other thing that we would ask the Court is to

20   preclude any argument that the waivers made are not enforceable

21   under the law because that argument is legally baseless.

22   Columbia only cites general law prohibiting prospective waivers

23   of Title VII rights.  However, waivers of contractual provision

24   for de facto tenure, in order to preserve the possibility of an

25   extension of the tenure clock, are not waivers of Title VII

I791rav1

1    rights.  And it's simply not implicated here.  Title VII

2    shouldn't be used to actually inhibit plaintiff's rights.

3    Here, she was willing to trade off a de facto tenure in order

4    to have more time on the clock, and that's a perfectly

5    legitimate tradeoff for someone in her position to make, and it

6    wouldn't be, you know, implicating her rights not to be -- she

7    wasn't agreeing to be discriminated against in the future; she

8    wasn't agreeing that if she was discriminated against, she

9    couldn't have a claim for it.  She was just saying, give me

10   extra time, and during that extra time I have, I won't claim

11   that I get tenure by default or automatically, and that's

12   acceptable and legitimate under all the applicable law, and

13   there's nothing to say otherwise.

14          MS. PLEVAN:  We don't know what she was offering, and

15   that's part of the problem.  And the more talk I hear from

16   plaintiff's counsel, the more concerned I actually am about

17   this, because I think it sounds like whatever Professor Ravina

18   said, it was another settlement conversation, and the fact that

19   it wasn't between lawyers doesn't mean that that's not what it

20   was, and that's what it sounds like to me.  And we are going to

21   have a problem of getting into this issue.  I mean, we can't be

22   precluded from saying, you don't think it's enforceable, or

23   would be enforceable, or that it wouldn't be enforceable.

24          MR. MELZER:  We don't want to have legal argument to

25   the jury about what kind of waivers are enforceable and

I791rav1

1    prospective waivers and all this stuff because it's not a

2    legitimate argument --

3              MS. PLEVAN:  That's the problem with getting into the

4    settlement.

5              MR. MELZER:  -- involving those kind of arguments.

6              THE COURT:  Well, look, in the first instance, why

7    don't you put to paper exactly what the context was, what was

8    said and to whom, and then we'll be able to analyze it a little

9    bit more.  I think what's relevant here is Columbia's state of

10   mind, what the thinking was, not whether they were right under

11   the law or wrong under the law, but what their thinking was,

12   because that's I think what's relevant here, on this issue.

13   But I think in the first instance, since Columbia apparently

14   was not aware of these purported statements, you should specify

15   exactly when they were made and to whom.

16             MR. MELZER:  Yes.  We will do that.  But even the

17   statements made in February, March -- February and March

18   between the lawyers and in April by the plaintiff to the Court

19   are relevant because Columbia engaged in the continuous course

20   of conduct right through the vote, and even after all of those

21   instances of waiver in February and March and April, Columbia

22   is pressing the vote forward, is mustering the faculty, telling

23   them that they have to vote, trying to maintain a quorum to

24   vote, and telling them also that they have to vote and when

25   they vote and when they deliberate, they should disregard

I791rav1

Bekaert's conduct and how it may have affected Ravina and her

record.  So even at that time their state of mind is relevant.

They know that plaintiff has made repeated statements that if

there is an extension, she will waive de facto tenure because

she does not want the de facto tenure provision to be an

obstacle to an extension, and they still continued to push the

vote forward in a way that sets up the conditions for a denial,

and that's basically what we are claiming here.

        THE COURT:  But why doesn't this run afoul of

Rule 408?

        MR. MELZER:  The reason is because the discussions

were about plaintiff's claims of discrimination and

retaliation.  The communications that, if I get an extension,

that de facto tenure shouldn't be an obstacle to an extension,

if an extension were in play, I will waive de facto tenure,

doesn't go to the validity or amount of the underlying claim

that is being negotiated between the parties.  It goes to

Columbia's knowledge and notice, which is a separate purpose

from the purposes that are prohibited by 408, to the knowledge

and notice that plaintiff has volunteered to waive this and

that a waiver is available and feasible when an extension may

implicate de facto tenure rights.

        MS. PLEVAN:  I think, briefly, your Honor, that -- and

we've cited cases in the letter that we submitted this morning

at page 3 -- that this is going to the validity because it's

I791rav1

1    her claim that she made that waiver, and she made it in the

2    context of settlement discussions, either initially by her

3    lawyer, and now I'm not exactly clear what the other

4    conversation -- when that occurred, but it was in the context

5    of resolving this dispute, and she's trying to establish that

6    claim, that claim that she gave a waiver, and that's why I

7    think it clearly is covered by 408.

8            MR. MELZER:  The claim is not that she gave a waiver.

9    Her claim is that she was discriminated against and retaliated

10   against.  Columbia has raised the defense that if they had

11   given her the extension that she wanted as a remedy, then it

12   would have run up against de facto tenure.  Plaintiff then

13   said, to the extent that might be an obstacle, I want to clear

14   that obstacle, I waive it.  So that only goes to Columbia's

15   notice of the waiver and knowledge that a waiver is feasible

16   and available.  Columbia's notice and state of mind is at issue

17   in the case.  The mere -- the fact that something is a fact

18   that is relevant evidence doesn't mean that it goes to the

19   validity or amount of the underlying claim that was being

20   discussed between the parties.

21           THE COURT:  All right.  So since I got the letter this

22   morning, pursuant to our agreed-upon schedule, I haven't looked

23   at all the cases yet, so I'm going to do that and I'll rule as

24   soon as I can on this.  I understand the time sensitivity.

25           The jury should be here around 10:30.  They're

I791rav1

```
 1   watching the initial video.  One thing I'll just say is, I know
 2   we have a lot of lawyers here, and I'm fine with whomever you
 3   want to argue each particular issue or handle each particular
 4   witness, but I'm just going to ask you, per issue or per
 5   witness, if we can have one lawyer per witness.  So if one
 6   lawyer is questioning the witness on direct, that's the lawyer
 7   that should handle the objections, etc., okay?
 8           Anything else we need to talk about?  I was thinking
 9   of just giving you a short break before the jury comes in.  Are
10   there any other issues?
11           MR. HERNSTADT:  Yes, your Honor.  Just to return to
12   the issue of the opening statement.
13           THE COURT:  Yes.
14           MR. HERNSTADT:  While I appreciate that Mr. Sanford's
15   withdrawn the exhibits, the demonstratives, based on the
16   demonstratives, it's clear that he's going to address exhibits
17   that have been challenged, that he's going to talk about them
18   in the opening statements.  So I think that has to be resolved
19   before opening.
20           THE COURT:  Are there any exhibits that I have not
21   ruled on the admissibility of and there's an objection to?  We
22   can either not have you talk about them in opening or we can
23   talk about them now.
24           MR. HERNSTADT:  Additionally, there's one slide that
25   says Bekaert sends defamatory emails about Ravina to
```

I791rav1

1    colleagues.  There's no defamation claim in this case.  That's

2    a legal claim, and I think it's inappropriate for him to add

3    claims that have never been raised to his opening statement.

4              MR. SANFORD:  I don't make any claims about defamation

5    in the opening statement, your Honor.

6              THE COURT:  Okay.  So let's just walk through the

7    exhibits.  Are there any exhibits, the admissibility of which

8    are disputed at this point that you intend to reference in your

9    opening?  If so, I just want to make sure we talk about them

10   before the opening.

11             MR. SANFORD:  Your Honor, I do reference the faculty

12   petitions.  There are three petitions at issue in this case.

13   Defendant I believe has objected.  I'm not sure what the

14   objection is based on because there's nothing that could be

15   more relevant to the case than faculty petitions, putting the

16   administration on notice about faculty concerns relating to

17   Professor Ravina, so I do mention those petitions.  If the

18   Court would like to address that first, perhaps we could start

19   there.

20             THE COURT:  What exhibit numbers are those?

21             MR. HURD:  I believe the two exhibits that Mr. Sanford

22   are referring to are Plaintiff's Exhibits 130 and 160.

23             MR. SANFORD:  And 100, your Honor.

24             THE COURT:  And 100?  All right.  Do you want to be

25   heard on that, and then I'll make sure to review these prior to

I791rav1

1    openings.

2              MR. SANFORD:  Yes, your Honor.  The three exhibits,

3    starting with the first faculty petition, which is Exhibit 100,

4    is contained in an email from Professor Patrick Bolton to

5    Senior Vice Dean Phillips and members of the Columbia Business

6    School, finance and economics division, attaching the faculty

7    petition.  We intend to introduce that petition through

8    Professor Bolton and perhaps through other people as well.  The

9    petition, in light of Professor Ravina's circumstance, calls

10   for a change in Columbia University's policies, with respect to

11   senior and junior faculty.  And again, your Honor, there's

12   nothing from our side that could be possibly more relevant than

13   that type of petition, by the faculty, putting the

14   administration on notice of the problems that Professor Ravina

15   was experiencing and the proposed solution by the faculty --

16   the senior faculty, the tenured faculty.  I think there was a

17   majority of the senior tenured faculty in her division that

18   signed that petition, calling for change in policy.

19             MR. HURD:  Your Honor, that has nothing to do with

20   Ms. Ravina.  It's a general policy that they're trying to

21   instill that has to do with how different faculty treat each

22   other.  It has nothing specific to do with Professor Ravina and

23   would be completely irrelevant, and it's also filled with

24   hearsay about how this came about and why, why they want it.

25             MR. SANFORD:  That's not quite right, your Honor.

I791rav1

Chairman Zeldes testified that the petition was drafted and

communicated in light of Professor Ravina's circumstance.

MR. HURD:  But it's not relevant to this trial.  This

trial is about Professor Ravina, not Columbia's policies on how

faculty treat each other generally.

MR. HERNSTADT:  Your Honor, I understand you want one

person to deal with these things, but --

THE COURT:  No.  You represent a different

defendant --

MR. HERNSTADT:  Exactly.

THE COURT:  -- so you're free to argue any issue you

want to argue.

MR. HERNSTADT:  I add to what Mr. Hurd said.  To the

extent it talks about her circumstances referring to Professor

Bekaert or delays, there's no personal knowledge.  It's based

only on what Professor Ravina told other professors at the

college.  And it's also prejudicial.  She's been going around

telling people that these terrible things are happening to her.

They have no personal knowledge whatsoever.  It's pure hearsay.

And based on that, they've created a petition that paints my

client in a very poor light.  But they have no personal

knowledge of it, and it would be inappropriate for this

petition to come in.

MR. SANFORD:  Your Honor, the majority of the senior

tenured faculty of the division were concerned about the power

I791rav1

1    dynamic between junior and senior faculty members.  They were

2    concerned in particular about the circumstance that Professor

3    Ravina found herself in when there was a conflict.  The

4    question is what to do and who to give the presumption to.  The

5    faculty thought that the presumption should be given to the

6    junior faculty member.  That's what the petition was about.

7    It's directly relevant to this case.  It's directly relevant to

8    Professor Ravina's circumstance.

9              THE COURT:  What issue is it directly relevant to?

10             MR. SANFORD:  To the issue of what kind of response

11   Columbia University should give a junior faculty member who

12   finds herself in the situation that Professor Ravina found

13   herself in, and the question is what should that policy be,

14   what should the action be, what should Columbia's action be in

15   light of being put on notice that there's a problem between a

16   junior faculty member and a senior faculty member.  They were

17   calling for a change in policy because they were concerned that

18   the policies in place at Columbia were inadequate to address

19   Professor Ravina's circumstance.

20             THE COURT:  But even if that's the case, number one, I

21   want you to address the hearsay concern; and number two, I want

22   you to address why that necessitates a finding of liability on

23   discrimination or retaliation as opposed to a disagreement

24   about a policy.

25             MR. SANFORD:  Well, we claim that Columbia was

I791rav1

1    negligent in its response.  Given the history of what happened

2    here, Columbia was on notice and was on notice over and over

3    again, and that's what the testimony is going to show.  The

4    question is, what did Columbia do about it?  And it's our

5    contention that Columbia did nothing about it, did nothing

6    about it throughout the entire process, and then took certain

7    actions which were extremely harmful to Professor Ravina.  So

8    this is a question of when Columbia was on notice of a problem,

9    how they were put on notice, in this case by faculty, and what

10   they did about it.  It's simply a question of what they did in

11   light of being confronted with certain claims by Professor

12   Ravina and by others who were supporting her.  And our case is

13   about what Columbia did and didn't do, and if we can't put on

14   our case to show what Columbia did and didn't do, we're going

15   to be hamstrung.

16          THE COURT:  Well, this isn't about what Columbia did

17   and didn't do; it's about what was said by professors, as I

18   understand it, to Columbia, correct?

19          MR. SANFORD:  Yes, and what Columbia did in light of

20   what was said.

21          MR. HURD:  Your Honor --

22          THE COURT:  I'll take a look at the exhibits.

23          Yes, go ahead.

24          MR. HURD:  I'm sorry.  I don't want to interrupt.  But

25   to be clear, it's an unsigned petition that Professor Bolton

I791rav1

1     represents in an email is supported by the faculty.  It is not

2     a signed petition by a majority of the faculty at Columbia.

3              THE COURT:  All right.  So Exhibits 100, 130, and 160.

4              MR. SANFORD:  Yes, your Honor.

5              THE COURT:  And you intend to try and admit them

6     through the testimony of Professor Bolton.

7              MR. SANFORD:  Yes, your Honor, at least through

8     Professor Bolton, and perhaps other witnesses as well.

9              THE COURT:  And anything else you want to say about

10    this issue?

11             MR. HERNSTADT:  Only that I think, as Mr. Sanford has

12    made clear, everything in these petitions is based on what

13    Professor Ravina told these professors.  It's pure hearsay, and

14    I think he's made that clear.

15             THE COURT:  All right.  So I'll take a look at the

16    exhibits.

17             Is there anything else we need to talk about this

18    morning?

19             MR. SANFORD:  There are emails that I reference, your

20    Honor, in opening.  Emails between Professor Bekaert and

21    Professor Ravina, emails sent by Professor Bekaert to the

22    community, and again, there is very little that's more relevant

23    than those emails to our case.

24             THE COURT:  All right.  And what are those exhibit

25    numbers?  These are ones that there have been objections to

I791rav1

```
 1    that I have not ruled on?

 2              MR. SANFORD:  Well, to be clear, your Honor, I'm not

 3    making reference -- I'm making reference to certain of the

 4    emails that were sent.  I'm not quoting them; I'm just

 5    characterizing them as emails that were sent from Professor

 6    Bekaert to his colleagues throughout the world; emails that

 7    Professor Bekaert sent to Professor Ravina; or emails that

 8    Professor Bekaert sent to his girlfriend.

 9              THE COURT:  I have ruled that those are admissible.  I

10    don't know if there are still remaining objections to

11    particular emails that I have not ruled on, but in terms of the

12    category of information, I've already ruled that that is

13    proper.

14              MR. SANFORD:  Thank you, your Honor.

15              THE COURT:  So I think we need to just sort out, are

16    there particular emails, particular objections to particular

17    emails that we need to discuss before opening?

18              MR. SANFORD:  I'm not aware of any objections that

19    would apply in light of the Court's ruling.

20              THE COURT:  Okay.

21              MR. HERNSTADT:  There are a couple of emails that are

22    emails between Professor Bekaert and Maria Hoerova also that

23    are prohibited because they talk about one of the matters that

24    we discussed, that your Honor ruled on, in terms of the

25    argument that plaintiff has made that she's just like Maria
```

I791rav1

Hoerova.

THE COURT:  Are you going to reference that particular email?

MR. HERNSTADT:  Those are two emails, No. 73 and No. 79.

MR. SANFORD:  I'll look at those, your Honor.  The email that I planned on referencing was the email that he sent saying that he wanted to strangle Professor Ravina.

THE COURT:  That's coming in.

So if you're going to reference 73 and 79, if there's an outstanding objection that has not been addressed by my ruling already, please let me know that, all right?

Okay.  So the jury will be here in about five minutes, so why don't we take a break.

MS. HARWIN:  Your Honor, if I can just remind you that also there's the pending letter motion that we submitted concerning the issue of performance evaluations, and so I just want to make sure that that's on your Honor's radar, because it potentially affects openings as well.

THE COURT:  Okay.  So tell me exactly what the issue is on that.

MS. HARWIN:  So on that, we had previously moved to preclude evidence concerning plaintiff's annual reviews.  The Court ruled on that.  Defendant subsequently amended their designations for testimony at trial indicating that they intend

I791rav1

1    to elicit testimony regarding the annual evaluation process, a

2    topic that they've never previously designated on their Rule 26

3    disclosures, and we renew our request for discovery, just on

4    the performance evaluations of the males that --

5              THE COURT:  So this is your motion for

6    reconsideration.

7              MS. HARWIN:  Correct, your Honor.

8              THE COURT:  Don't mention that in opening.  I'll

9    consider that request.  I'll hear you out on it, but it

10   shouldn't be mentioned in opening.

11             MS. PLEVAN:  Having ruled on that issue, on the

12   evaluations, I was planning to refer to the evaluations in my

13   opening.

14             THE COURT:  Of the men?  I'm sorry.

15             MS. PLEVAN:  Oh, no, no, no.  I'm sorry.  Of Professor

16   Ravina's.

17             THE COURT:  Professor Ravina's evaluations, of course.

18   I thought this was the motion for reconsideration with respect

19   to the male colleagues, the other people who were up for

20   tenure, correct?

21             MS. HARWIN:  We have moved for --

22             THE COURT:  Reconsideration.

23             MS. HARWIN:  Correct, but in the alternative, if we're

24   not provided with that, we've moved for exclusion of that

25   evidence.

I791rav1

1           THE COURT:  Exclusion of the evidence regarding

2    Professor Ravina?

3           MS. HARWIN:  Correct.

4           THE COURT:  That request is denied.  I will consider

5    your request for reconsideration of the prior ruling, but

6    again, since I got the letters, some of them just this morning,

7    I want to make sure I take the time to review all the cases

8    cited therein.  So I don't think you should mention anything

9    about that on opening, but I don't think you would because you

10   you're really just asking for discovery.

11          MS. HARWIN:  That's correct, your Honor.

12          THE COURT:  All right.  So why don't we take a break

13   just for a few minutes because the jury will be here any

14   minute.  Thank you.

15          (Recess)

16          (Jury selection followed)

17

18

19

20

21

22

23

24

25

I791rav1

        (A jury of eight persons was selected and sworn)

        THE COURT:  Thank you all again for your patience this

morning and your willingness to serve.

        So, folks, as I said we are going to take a lunch

break now.  As I will discuss with you in more detail shortly,

from this point on it is your duty not to discuss the case and

to remain outside the presence of others who may be discussing

it.  So, in that regard, please understand -- I am just going

to wait for a minute so that you all can hear.

        Thank you all again.

        I just want to make sure you understand that the

parties and counsel have been instructed not to have any

contact with any of you, so if you see them in the hall they

are not being rude.  They are just following my instructions if

they don't say hello.

        Unless and until you are excused as a juror, you

should not attempt to gather any information on your own

relating to this case.  Don't engage in any outside reading.

Don't attempt to visit any of the places that may be mentioned.

Don't use the Internet, whether it's Google, Facebook, Twitter,

anything to learn anything about the case or anyone involved in

the case until it's over or to talk about it in any way.

        So that includes with each other.  You are not to talk

about the case until it's time for you to deliberate, and it

includes even your friends and family.  You can advise the

I791rav1

1    people in your life that you have been chosen to sit on a jury

2    in a civil case, but you can't talk about the facts of the case

3    in any way.

4          Again, that applies equally to communications made in

5    person or by way of tools of technology.  The reason for this,

6    of course, is that we want you to decide the case solely based

7    on the evidence that is offered during the course of this trial

8    and not from some other source.

9          I am also just going to ask you to keep an open mind

10   and reserve judgment until after all of the evidence is in.

11   Until you have heard all the evidence and the closing arguments

12   and my instructions on the law you really won't be in a

13   position to reach any conclusions as to this case.

14         So, with that, I hope you have a nice lunch.  Why

15   don't you come back here at 2:45, so a little bit over an hour,

16   and we'll start again promptly then.

17         THE COURT:  Yes?

18         JUROR:  Is it OK to grab our electronics at the other

19   courthouse?

20         THE COURT:  Yes.

21         THE DEPUTY CLERK:  Just follow me.

22         THE COURT:  Allison will help you.  She will actually

23   give you passes to get in, and she'll answer any logistical

24   questions for now.

25         JUROR:  Should we hold on to these or give them back?

I791rav1

1

2                THE COURT:  You can actually give them to Ms. Cavale,

3       and she'll throw them out.  Thank you again for your patience.

4                Why don't you all come back in an hour.  I will look

5       at those exhibits that we talked about.  Other than that, I

6       think we're OK for purposes of opening statements.  I'm hopeful

7       we can get all three openings in this afternoon before 5:30 if

8       we start promptly at 2:45.

9                OK.  Thank you.  Have a nice lunch.

10               (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I791rav3

AFTERNOON SESSION

2:50 p.m.

(In open court; jury not present)

THE COURT:  So we're checking to see if the jury is ready.  What was your intention with respect to 100, 130, and 160?  For purposes of opening only.

MR. SANFORD:  Well, it's important for plaintiff to tell a story that is complete.  If the Court would prefer to rule later as opposed to now, we can certainly do that, and I can extract the relevant portions in the opening.  If the Court would prefer briefing on it, it's an important issue, we're happy to brief it as well.

THE COURT:  In terms of briefing it, it's up to you. I think it's better not to mention it in opening.  I do have hesitations.  I mean, clearly it's hearsay.  What purpose it's being admitted for is not entirely clear to me in terms of the timing, whether it was the investigation, the decision not to put off the tenure vote.  I mean, obviously we have three different letters and different in nature.  But I think we need to explore it further.

MR. SANFORD:  Why don't we do that, and we're happy to provide briefing on the issue, your Honor.

THE COURT:  All right.  Thank you.

And these were going to come in -- I think I asked you this earlier but -- not through Professor Ravina tomorrow but

I791rav3

1    through Professor Bolton and possibly others?

2              MR. SANFORD:  Possibly others, but not tomorrow.

3              THE COURT:  All right.  Thank you.

4              We're missing three jurors.  Are there any issues that

5    we need to address before Professor Ravina's testimony

6    tomorrow, any evidentiary issues that are unresolved?  Either

7    side?  No?  Okay.  All right.  We'll just wait for the jury.

8              Are there any other issues you'd like to raise while

9    we're waiting?  I'm happy to hear you out, but I'm also happy

10   to just wait for the jury.

11             MS. HARWIN:  This isn't a point of argument, but I

12   wanted to point out that the parties submitted to the Court the

13   excerpts of deposition testimony corresponding to the

14   designations, and it would be helpful to get a ruling with

15   respect to the objections at the Court's earliest convenience

16   so we can prepare the video.

17             THE COURT:  That's fine.  And I'm happy to do that,

18   yes.

19             MS. HARWIN:  Thank you.

20             Your Honor, while we're here, we're also awaiting a

21   ruling from you --

22             MS. PLEVAN:  Can't hear you.

23             MS. HARWIN:  We're waiting for a ruling as to whether

24   we can proceed with the one-hour depositions we've requested.

25             THE COURT:  Are you talking about the motion for

I791rav3

1   reconsideration?  You're talking about the separate one for the

2   individuals who were noticed on the last day of discovery?

3            MS. HARWIN:  That's correct, or who were never

4   designated during discovery.

5            THE COURT:  Yes.  I'll let you know.  I'll tell you,

6   I'm not inclined to grant that request, but I will let you know

7   tomorrow morning.

8            MS. HARWIN:  Thank you, your Honor.

9            (Jury present)

10            THE COURT:  Welcome back, folks.  You can be seated.

11   Everyone can be seated.

12            Just to let you know, we can take out some of those

13   chairs if you want a little more space.

14            I'm just going to give you a few additional

15   instructions now that you've been sworn, and hopefully they'll

16   help guide you in your participation in this trial.

17            It will be your duty to find from the evidence what

18   the facts are.  You and you alone are the judges of the facts.

19   From the evidence presented at trial, you will decide what

20   happened.  And you will then have to apply the facts to the law

21   as I will give it to you.  You must follow the law as I explain

22   it, whether you agree with it or not.

23            As I noted earlier, nothing I say or do during the

24   trial is intended to indicate what your verdict should be, so

25   please don't speculate as to what I may be thinking.

I791rav3

1        The evidence from which you will find the facts will

2    consist of the testimony of the witnesses, who will sit right

3    here, and the documents and other things that are received into

4    the record as exhibits.  The lawyers may also agree or

5    stipulate to certain facts.  You are to accept these facts as

6    true, although you must still decide the weight, if any, to be

7    given to those facts.

8        Certain things are not evidence and must not be

9    considered by you as evidence, and I'll list them for you now.

10        Statements, arguments, and questions of the lawyers

11    are not evidence.  Objections to questions are not evidence.

12    Lawyers have an obligation to their clients to make an

13    objection when they believe that evidence is improper under our

14    Federal Rules of Evidence.

15        You should not be influenced by an objection or my

16    ruling on it.  If the objection is sustained, the witness will

17    not be permitted to answer the question and you must ignore the

18    question.  If the objection is overruled, the witness will be

19    permitted to answer and you should treat the answer like any

20    other.

21        If you are instructed that an item of evidence is

22    being received for a limited purpose only, you must follow that

23    instruction.

24        If I strike an answer or instruct you to disregard an

25    answer, then that testimony is not evidence and must not be

I791rav3

1   considered by you.

2           Anything that you may see or hear outside the

3   courtroom also is not evidence and must be disregarded.  Your

4   verdict must be based solely on the evidence, or lack of

5   evidence, presented here in this courtroom at trial.

6           One of your most important tasks is to evaluate the

7   credibility of the witnesses who will testify here at trial.

8   It will be up to you to decide which witnesses to believe,

9   which witnesses not to believe, and how much of any witness'

10  testimony to accept or to reject.  I will give you some

11  guidelines for determining the credibility of witnesses at the

12  end of the case, but in the meantime, please just listen

13  carefully to the witnesses as they testify and keep in mind

14  that you will be called upon to evaluate their credibility and

15  the truthfulness of their testimony.

16          It's important to remember that this is a civil case.

17  You may have heard the term "beyond a reasonable doubt"

18  standard in criminal cases.  That requirement does not apply to

19  a civil case, and you should put it out of your mind entirely.

20  In civil cases the burden is different and it's called proof by

21  a preponderance of the evidence.  To establish facts by a

22  preponderance of the evidence means to prove that the facts are

23  more likely true than not true, and I'll instruct you fully on

24  the burden of proof after all the evidence has been received.

25          Now a few words about your conduct as jurors.  As I

I791rav3

1   noted previously during the trial, you're not to discuss the

2   substance of the case with anyone, nor are you to permit

3   someone to discuss it with you.  Until you retire into the jury

4   room at the end of the case to deliberate, you're simply not to

5   talk about this case.  Don't even discuss the case with each

6   other until you begin your deliberations at the end of the

7   trial.

8          As I noted this morning, if you see the lawyers in

9   this case or any of the witnesses in the hallway or at

10  elevators, don't speak to them.  They're not going to speak to

11  you.  Again, they're not being impolite.  They're just

12  following my instructions.  If anyone should try and talk to

13  you about the case, please bring it to my attention immediately

14  by letting Ms. Cavale know.  Don't tell anyone else, even your

15  fellow jurors.  And don't talk about or read about the facts or

16  the circumstances of this case on social networking sites, such

17  as Facebook, Twitter, Instagram, or SnapChat, and don't tweet

18  or otherwise communicate about the substance of anything you

19  learn during the trial on Twitter or elsewhere.

20         You're instructed not to read, listen to, or watch

21  media reports, television, newspaper, radio, or internet about

22  the case, or similar cases, or any of the individuals involved.

23  And the reason for this, of course, is that you must not be

24  influenced by anything that you may see or hear outside the

25  courtroom.  So if you inadvertently come across a news report

I791rav3

relating to this case or a case that seems similar, just immediately stop reading, listening, or watching, and then just tell Ms. Cavale -- again, and no one else -- about that fact.

If at any point during the trial you recognize someone in the courtroom, including a friend or significant other, just let Ms. Cavale know. If it's during trial, you can just raise your hand.

Finally, just keep an open mind during the course of the trial and reserve judgment until after all the evidence is in. Until you've heard all of the evidence, the closing arguments, and my instructions on the law, as I said earlier, you're really not in a position to reach any conclusions about the case, so keep an open mind until you retire to deliberate.

You are permitted to take notes during the trial. Ms. Cavale has given each of you a notepad and a pen. You can write your name on the notepad. If you do take notes, just take it in those pads and nowhere else, and don't remove your notepads from the courtroom or the jury box. You can give them to Ms. Cavale at the end of the night or just leave them in the jury room.

Remember that any notes are for your use only, and they're only to be used as an aid to your memory. So your memory controls. If you take notes, just be careful not to get so involved in taking notes that you're not paying attention or watching the witnesses as they testify. Once you're in

I791rav3

1    deliberations, if there's a disagreement between one juror's

2    notes and another juror's notes, or between one juror's notes

3    and another juror's recollection, you can ask to have the court

4    reporter read back the testimony, for it's the official court

5    transcript that controls and not one particular juror's notes.

6            During the course of the trial, exhibits will be

7    received into evidence.  They'll be marked by exhibit number.

8    If there is an exhibit you're particularly interested in

9    seeing, you should feel free to write down that exhibit number

10   and you can ask to see the exhibit once you're in

11   deliberations.  But you should know that at the end of the

12   trial, I'm going to give you a list of all the exhibits that

13   were received in evidence, as well as a list of all the

14   witnesses who testified, so you needn't make notes to keep

15   track of things unless you want to.

16           Now we're going to begin the trial.  As I noted for

17   you earlier, we're going to begin each day at 9:30 and continue

18   to 5:30.  I'm going to ask you to please arrive closer to

19   9 a.m. every day.  As an incentive, I'll have breakfast waiting

20   here for you.  We can't start until all of you are here, and so

21   if any of you are late, that means that all of us -- myself,

22   the lawyers, the court reporter, the witnesses -- everybody

23   will have to wait.  So I'm just going to ask you to be on time.

24           And now I'm just going to tell you briefly how the

25   trial will proceed.

1            First, we'll have opening statements.  Plaintiff's

2    counsel will make an opening statement and then defendants'

3    counsel will make their opening statements.  The opening

4    statements are neither evidence nor argument.  They're simply

5    outlines of what the attorneys believe the evidence will show.

6    And they are given to help you follow the evidence as it's

7    presented.

8            After the opening statements, the plaintiff will

9    present her case.  The plaintiff will call her witnesses, and

10   after each witness testifies on direct examination, counsel for

11   defendants will have an opportunity to cross-examine those

12   witnesses.  After cross-examination there may be a little bit

13   of what we call redirect and recross-examination.

14           Following the plaintiff's case, the plaintiff will

15   rest and the defendants may then present a defense case, and

16   then counsel for plaintiff will have the opportunity to

17   cross-examine any witnesses that are testifying for the

18   defendants.

19           After the presentation of the evidence is completed

20   and both sides have rested, the attorneys will deliver their

21   closing arguments to summarize and interpret the evidence.

22   Just as lawyers' opening statements aren't evidence, the

23   closing arguments aren't either, although they are arguments.

24           Following closing arguments, I will instruct you as to

25   the law, and you will then finally retire to deliberate on your

1    verdict, which must be unanimous, and must be based on the

2    evidence presented at trial.

3            You have a tremendously important task as jurors.  It

4    is to determine the facts.  You and you alone -- not the Court,

5    you and you alone -- are the sole judges of the facts.  The

6    Constitution itself recognizes your unique role in our system

7    of justice.  So please just pay careful attention to the

8    witnesses and the evidence received at trial, as well as my

9    instructions on the law.  Keep an open mind.

10           And with that, we will now proceed.

11           MR. SANFORD:  Thank you, your Honor.

12           THE COURT:  Yes, of course.

13           MR. SANFORD:  May it please the Court.  Ladies and

14   gentlemen of the jury, good afternoon.

15           This is a case about how a senior male professor at

16   the Columbia Business School, Professor Geert Bekaert, here in

17   this courtroom sitting at counsel table for the defendant,

18   abused his power by sexually harassing, discriminating, and

19   retaliating against a junior female professor, Professor

20   Enrichetta Ravina, sitting at plaintiff's counsel table.

21           The case is about an elite institution, Columbia

22   University, and its failure to protect Professor Ravina.  And

23   it is about the harm that Professor Ravina suffered because of

24   what Professor Bekaert and Columbia University did and what

25   each refused to do.

1      The story takes place at Columbia University.  You are

2  going to learn that Professor Ravina was a junior professor at

3  the Columbia Business School.  You will learn that Professor

4  Geert Bekaert offered Professor Ravina a great opportunity, to

5  work with him on a major research project.

6      You will hear testimony that the senior professor has

7  enormous influence and power over the junior professor's career

8  prospects.  Testimony will show that the enormous influence

9  Senior Professor Bekaert had over Junior Professor Ravina was

10  great.  Professor Ravina did not have tenure but was on a track

11  known as tenure track, with the goal of getting tenure.

12  Professor Bekaert has tenure and is a well-known professor in

13  his field.  Professor Bekaert's offer to Professor Ravina held

14  the promise of solidifying her career and setting her up to

15  receive tenure at Columbia University.

16      You will hear testimony that as research got under

17  way, Bekaert became romantically interested in Professor

18  Ravina.  You will see and hear testimony that Bekaert pressured

19  her to go out with him for dinners and coffees, touched her

20  inappropriately, and routinely talked about sex.  While

21  Professor Bekaert was pressuring Professor Ravina, he stalled

22  their research, and while he was stalling her research,

23  Professor Bekaert told Professor Ravina that if she were only

24  "nicer" to him, her papers would move faster towards

25  publication.  She was trapped.

1          Things got so bad that Professor Ravina reached out to

2     Columbia's administrators over and over and over again for

3     help.  But Columbia would not protect or help Professor Ravina.

4     You will hear that the dean of the Columbia Business School

5     called Ravina's situation a soap opera and discouraged her from

6     making a formal complaint to the university.  You will hear

7     that the senior vice dean suggested there was nothing that

8     could be done to control Professor Bekaert and talked about

9     Ravina leaving Columbia University.  Another vice dean did

10    nothing.  A third vice dean would not intervene.  You will

11    learn that Professor Ravina met dozens of times with the chair

12    of her division.  You will hear evidence that Columbia's own

13    office that is supposed to investigate claims of discrimination

14    and retaliation -- the office of equal opportunity/affirmative

15    action -- at first did not even initiate an investigation.  And

16    then, when it finally started an inquiry, its lead investigator

17    totally botched the university's investigation and actually

18    blamed Professor Ravina for Professor Bekaert's conduct.

19         Ultimately the office that investigated Professor

20    Bekaert imposed no disciplinary measures on him.

21         After Professor Bekaert found out about Professor

22    Ravina's complaints, he grew enraged, trashed her reputation in

23    the academic community, and further sabotaged her research.

24    Bekaert repeatedly called Professor Ravina a bitch to other

25    economists, told them she was crazy, and said he wanted to

I791rav3                         Opening - Mr. Sanford

1    strangle her.  Professor Bekaert, who originally is from

2    Belgium, emailed that if this is harassment, the Americans

3    really are total pussies.

4              In an effort to help Professor Ravina, the faculty of

5    Columbia Business School mobilized its efforts.  There were

6    unprecedented faculty protests in support of Professor Ravina.

7    Despite the protests, the dean of the business school directed

8    the faculty to evaluate Professor Ravina's academic record,

9    without any reference at all to the discrimination and

10   retaliation that she had experienced.  The faculty were to vote

11   on Professor Ravina's future, without reference to what slowed

12   and derailed her work.  The result was Professor Ravina did not

13   get tenure and was kicked out of the university.  Columbia got

14   rid of Professor Ravina.  Professor Bekaert, here with us

15   today, remains employed by Columbia University.

16             Now I'd like to pause here for a moment to say that as

17   the judge did, we are grateful for your service.  We recognize

18   the enormous commitment and sacrifice that is involved in your

19   being here with us for the next two or three weeks, and on

20   behalf of everyone on our team, and I'm sure in this entire

21   courtroom, I thank you for that.

22             I'd also like to take this opportunity to introduce

23   our team with us here today.  We have lawyers and legal

24   assistants and technical support, and I'd like to introduce

25   each person and have them stand.

1              Alexandra Harwin is a partner in our New York office.

2              Vince McKnight is a partner in our Washington, DC

3     office.

4              Andrew Melzer is a partner in our New York office.

5              We have two attorneys here, Amy Donehower and Melinda

6     Koster, from our New York office.

7              We have legal assistants, Melody Wong, Ali Stack,

8     Kremena Mestanova, and Talia Stender.  Also with us is our tech

9     support, Ray McLeod and Brian Bucher.

10             Finally, and most importantly, we represent, as I've

11    said, Professor Enrichetta Ravina, and she's at counsel table.

12             I would like to take this opportunity to review some

13    of the evidence you will hear in this case during the next

14    couple of weeks.  Let's start with Columbia University.

15             Columbia University is widely recognized as a top ten

16    university in the United States and indeed is one of the

17    premier academic institutions in the world.  It has over 45,000

18    faculty staff and students.  Columbia Business School was

19    established in 1916.  It attracts students and professors from

20    around the world.  It is one of the many different schools that

21    make up Columbia University and is one of the oldest business

22    schools in the world.  Columbia's website describes Columbia

23    Business School as part of a group of elite business schools.

24             Columbia also claims that its mission is to develop

25    new scholars and teachers.  I would ask you to remember that

I791rav3                    Opening - Mr. Sanford

phrase, "develop new scholars and teachers."

        The Columbia Business School offers different areas of
focus, such as accounting, management, marketing, negotiations,
and what is central to this matter before you, finance and
economics.  Some of the business school's notable alumni
include Warren Buffett, CEO of Berkshire Hathaway; the former
CEO of Citigroup Global Wealth Management; the chairman of the
Estée Lauder Companies; the president of Goldman Sachs; the CEO
of Lockheed Martin; the CEO of Anheuser-Busch; the CEO of Eli
Lilly; the former CEO and chairman of Avis; and the CEO of the
London Stock Exchange.  And there are many other equally
distinguished and accomplished businesspeople who are proud
graduates of the Columbia Business School.

        This case is about that academic institution, that
knew it had a junior faculty member who complained that she was
being harassed and retaliated against by a male senior faculty
member.  Despite that knowledge, Columbia University failed to
protect Professor Ravina, failed to create a safe work
environment conducive to scholarly research and collaboration,
and failed to take appropriate action against Professor Geert
Bekaert.

        During this trial, you are going to hear from
Professor Ravina.  You will learn that she was born and raised
in Italy.  She studied economics at the University of Torino.
Professor Ravina then came to the United States and earned her

I791rav3                         Opening – Mr. Sanford

doctorate in economics from Northwestern University, one of the

top graduate programs in the country.  After receiving her PhD,

Professor Ravina served as an assistant professor of finance

and economics at NYU, a visiting scholar at Harvard, and a

visiting scholar at the New York Federal Reserve Bank.

Columbia Business School recruited Enrichetta Ravina

to be an assistant professor of finance and economics.  The

faculty recruited Professor Ravina because she had been doing

cutting-edge work in the field of household finance and

behavioral finance.  In 2008 Professor Ravina was hired for a

tenure track position at the Columbia Business School.  What

this means is that Columbia would provide Professor Ravina with

several years, called the tenure clock, to conduct economics

research, and we're going to talk a lot about the tenure clock

as this trial unfolds.

Professor Ravina would ideally have opportunities to

collaborate and work with top scholars in the field.  She would

do research and publish articles.  Then she would be considered

for tenure, a one-shot up or down vote by the faculty that is

understood as the single most important decision in an

academic's career.  If tenure is denied, a professor does not

get another chance and must leave the university.

I would like to now spend a few minutes turning to

Professor Ravina's research.

Household finance is a new field of study in which

 1    people work with enormous data sets to study how ordinary

 2    people make financial decisions.  Professor Ravina analyzes

 3    lots of hard data.  Even under the best of circumstances, it

 4    takes a long time to publish this kind of data-driven research.

 5    The data sets that Professor Ravina analyzes often contain many

 6    millions of data points.  It can take years to prepare the data

 7    for analysis and then years more to get the research published.

 8            You will hear testimony from Professor Patrick Bolton,

 9    the recent president of the American Finance Association and a

10    distinguished professor at the Columbia Business School.

11    Professor Bolton describes Professor Ravina's research as

12    pioneering, ambitious, and of exceptional quality.  And he will

13    testify that it is common for research scholars in this area to

14    publish late in their tenure clock.

15            During the 2009-2010 academic year, Geert Bekaert,

16    then and now senior tenured professor at Columbia, approached

17    Professor Ravina with an offer to work on a huge data set of

18    individuals' retirement savings decisions, and you will hear a

19    lot about that from Professor Ravina.  You will learn that

20    Professor Bekaert did not have any expertise in this area.  But

21    Bekaert could get access to the data set because he had worked

22    for years with the company that owned the data, a company

23    you're going to hear a lot about.  The company's name is

24    Financial Engines.  Professor Bekaert told Professor Ravina

25    that once the data were in good shape, she could publish four

1   or five or six papers.  Bekaert said this groundbreaking

2   research would make her career.  He said working on this

3   research was the best decision Professor Ravina had ever made.

4   Bekaert made clear that Professor Ravina would be able to

5   publish a steady stream of high-impact papers in time for her

6   to be considered for tenure.  Professor Ravina recognized that

7   publishing this research would be a critical component in

8   Columbia's evaluation of her for tenure promotion.

9          Professor Ravina saw that this huge project would be a

10   path to her tenure, to her promotion to that lifetime position.

11   When Professor Ravina agreed to work with Bekaert and focus on

12   this research, he held her academic career and tenure prospects

13   in the palm of his hand.  The tenure clock was ticking.

14   Bekaert controlled the relationship with the company that owned

15   the data and, as you will hear, he controlled the timing of the

16   drafts of the papers.  And as a result, he controlled her

17   future and he knew it.

18          And as you will hear, the timing of the work is

19   critical, given the tenure clock Professor Ravina was on.

20   Producing high-quality published papers was critical in

21   determining whether Professor Ravina would get the promotion of

22   tenure.

23          The data for the project started to come in during the

24   2011-2012 academic year, and Professor Ravina went to work.  To

25   kickstart this huge project, Professor Ravina put several

I791rav3                           Opening - Mr. Sanford

1    research projects on the back burner.  She was already working

2    on a number of projects, and she put a halt to it while she

3    started this project with Professor Bekaert.  The research

4    projects she put on the back burner themselves were years-long

5    projects.  Professor Ravina chose to embrace a great project

6    with Geert Bekaert and, in the process, did not have the time

7    to invest in her other projects.

8          The data concerned hundreds of companies and millions

9    of individuals.  It had around 20 million data points.

10   Professor Ravina identified and fixed problems in the data she

11   had received from Financial Engines.  She collected extra data

12   from other sources.  She trained and supervised as many as 40

13   research assistants to work on the project.  40.  Professor

14   Ravina also wrote numerous software codes that were essential

15   to analyze the data.  All this heavy lifting was done by

16   Professor Ravina.

17         By contrast, Professor Bekaert, as a senior tenured

18   professor with a totally different area of expertise, was not

19   doing the data work.  Professor Bekaert did not know how to do

20   certain things that Professor Ravina excelled at.  Professor

21   Bekaert admitted to Professor Ravina that he was out of his

22   depth when it came to this kind of research.  In fact, you will

23   learn that Professor Bekaert did not even know how to use the

24   software program needed to analyze the data.

25         While Professor Ravina pored over the data and became

deeply invested in this research project, Professor Bekaert

began pressuring Professor Ravina to have a personal

relationship with him.  Professor Ravina will testify that it

started in the summer and fall of 2012, when Professor Bekaert

pressured her to go to private dinners.  He asked about whether

she had a boyfriend.  He sent her romantic music.  He asked her

to give him compliments to reassure him that he was desirable.

The advances continued in the spring of 2013, when he talked

about his sex life and told Professor Ravina that her walk was

sexy.  Professor Ravina will testify that Professor Bekaert's

harassment intensified during the fall 2013 semester.  He

kissed her, grabbed her hand, and leered at her breasts.  He

also started talking frequently about sex, including comments

about pornography and prostitution.

        The evidence will show that in late November 2013,

Professor Ravina continued to see little evidence of Bekaert's

contribution and went to Bekaert's office to discuss a work

schedule in order to move the research along.  She was

frustrated because the work was not moving fast enough.  Rather

than speaking about the work, he spoke about his sex life.  In

the context of speaking of his sex life, he propositioned her.

Right after speaking about his sexual exploits, Bekaert said

that if Ravina were nicer to him, the papers she was working on

would proceed faster.

        The evidence will demonstrate that Bekaert was

1   offering her a promising career if she accepted his advances.

2   Professor Ravina rejected Bekaert's proposal.  She told

3   Professor Bekaert she was already as nice as she could be.

4          Testimony will show that because Professor Ravina

5   refused to have a personal relationship with him, Professor

6   Bekaert engaged in a pattern of delay by not cooperating with

7   Professor Ravina.  Bekaert would not review her work; he would

8   not produce his own part of the work; he would not give

9   approval for work that Professor Ravina was doing; and he did

10  little to advance prospects for publication.

11         You will hear testimony about how Professor Bekaert

12  routinely refused to cooperate professionally with Professor

13  Ravina at the very same time he was expressing sexual interest

14  in her.  And some of that testimony will come from Professor

15  Bekaert himself.  At one point Professor Bekaert emailed a

16  research assistant and admitted that he had stopped working on

17  the project for months because Professor Ravina had really

18  pissed him off.  All the while Professor Ravina's tenure clock

19  was running.  And that tenure clock was running out.

20         You will also hear evidence that Professor Bekaert

21  threatened to withhold from Professor Ravina anything from his

22  draft of the paper.  He even at one point threatened to leave

23  Professor Ravina off all future emails regarding an important

24  paper.  And Professor Bekaert instructed Professor Ravina to

25  stop writing him about their work.  When Professor Ravina then

1    requested to be treated more professionally, more respectfully,

2    Professor Bekaert responded by threatening that he would bring

3    a whip to their next meeting.

4           The evidence will show that Professor Bekaert's

5    assertion of dominance and control was clear.  When Ravina

6    raised concerns about the delays, Bekaert again threatened to

7    stop working with her on the research.  And again, Bekaert

8    failed to cooperate with Ravina because Ravina was not giving

9    him what he really wanted.  Professor Ravina will testify that

10   she had to walk a fine line of trying to ward off Professor

11   Bekaert's sexual advances without offending him.  You will see

12   extensive evidence of what Professor Bekaert was like when he

13   was angry.

14          Evidence will show that Professor Bekaert asked

15   Professor Ravina to provide him with compliments.  Every so

16   often Professor Ravina threw Bekaert one or two compliments to

17   try to keep him happy.  One time, in response, Professor

18   Bekaert told her to keep them coming.  He said he had a fragile

19   ego.  And he said he'd explain more to her one day, maybe over

20   copious amounts of wine.

21          Professor Bekaert knew that Professor Ravina needed

22   his collaboration.  He even at one point said, "You are giving

23   me way too many compliments.  I am now waiting for the big

24   email with stuff for me to do."  Bekaert realized that a

25   compliment from Professor Ravina was designed to get him to

I791rav3                         Opening - Mr. Sanford

1   work.

2           You will hear testimony that compliments were not

3   enough to get Professor Bekaert to work and that Professor

4   Ravina understood he wanted more than just compliments.  But

5   compliments here and there were as far as Professor Ravina was

6   willing to go.

7           As Professor Bekaert's behavior escalated, Professor

8   Ravina realized that she could not cope with it on her own.

9   She needed help.  By early March 2014, Professor Ravina began

10  meeting with a psychiatrist weekly and told her doctor all

11  about the physical advances, the lewd and abusive comments, and

12  how Professor Bekaert was stalling her research.

13          Professor Ravina suffered through over a year and a

14  half of sexual overtures and delays from Professor Bekaert on

15  their joint research.  Shortly after seeking psychiatric help,

16  Professor Ravina summoned the courage to speak out to Columbia

17  about what was going on.

18          Professor Ravina will testify that beginning around

19  April 2014, she began a series of meetings with faculty and

20  Columbia administrators in the dean's office that lasted

21  through the fall of 2014.

22          She met with multiple professors who tried to help

23  her, but they had no power to do anything.

24          She met with numerous deans at the Columbia Business

25  School.  First she met with Senior Vice Dean Gita Johar.

Professor Ravina described Bekaert's harassment, his failure to

collaborate, and her desire to work in an environment that

would allow her to do her research in peace.

         But Ravina was afraid that Bekaert might retaliate

against her once he found out about her complaints.  So

Professor Ravina asked for assurances from Vice Dean Johar that

Professor Bekaert would not be able to damage her career by

badmouthing her in the academic community.  And Professor

Ravina sought assurances that Bekaert would not be able to

jeopardize the research she had spent years working on.  After

the meeting, weeks went by and Columbia University did nothing.

         Then Professor Ravina met with another administrator

in the dean's office about her concerns -- this time the vice

dean, Janet Horan.  Again, Columbia did nothing.

         Then Professor Ravina met with Dean Hubbard, along

with Vice Dean Horan and Suzanne Goldberg, a Columbia law

professor whose expertise is gender issues.  Dean Hubbard said

there was nothing he could do.  You will hear testimony that

Dean Hubbard discouraged Professor Ravina from speaking to the

office at Columbia that handles harassment and discrimination

complaints.  Dean Hubbard predicted, rather presciently, that,

"Nothing will come out of it.  They will do nothing and at most

they would send Bekaert to training."  Vice Dean Horan claimed

that Columbia administrators would follow up with more specific

action.  But Columbia did nothing.

 1            Professor Ravina then sent an email to Dean Hubbard

 2     and Vice Dean Horan asking them to implement some measures,

 3     promptly, to help her with her work.  Columbia did nothing.

 4            Professor Ravina then met with another senior vice

 5     dean, Katherine Phillips.  Vice Dean Phillips talked to

 6     Professor Ravina about abandoning her research and suggested

 7     there wasn't anything she could do to control Bekaert's

 8     behavior.  Again, Columbia did nothing.

 9            You will see evidence that Dean Hubbard viewed

10     Professor Ravina's concerns as a waste of time.  And you will

11     hear evidence that Dean Hubbard blamed Professor Ravina.  At a

12     subsequent meeting with Professor Ravina in the fall of 2014,

13     Dean Hubbard referred to Professor Ravina's situation as a soap

14     opera and scolded her, saying you, Professor Ravina, should

15     behave more professionally.

16            Now we reach a key moment in the story.  Four years

17     ago today, on July 9, 2014, the dean's office alerted Professor

18     Bekaert of Professor Ravina's complaints against him.  Bekaert

19     became enraged, sending an email asking if he could just

20     strangle Ravina and get it over with.  You will hear and see

21     extensive testimony that Professor Bekaert began a campaign of

22     retaliation that included Professor Ravina's nightmare

23     scenario.  Professor Bekaert began sending emails to colleagues

24     in the academic and finance community throughout the world,

25     referring to Professor Ravina as an evil bitch in action, a

I791rav3                       Opening - Mr. Sanford

1   damn evil bitch, and insane and incredibly evil.  And to make

2   matters even worse, Bekaert sent those emails from his official

3   Columbia email account through the Columbia email server.

4            Now there is an office at Columbia that can provide

5   help in situations like this.  The office of equal opportunity

6   and affirmative action is Columbia's office that handles

7   complaints of discrimination, harassment, abusive conduct, and

8   retaliation.  The university's director of investigations,

9   Michael Dunn -- and he'll testify here during the trial --

10   conducted the investigation.  Professor Ravina will testify

11   that when she met Director Dunn, she described Professor

12   Bekaert's sexual advances.  She expressed concern that

13   Professor Bekaert was retaliating against her, and she

14   explained that Bekaert had delayed her research for a long

15   time.  She also reported that Columbia administrators had done

16   virtually nothing to help her.

17            You will hear testimony that Director Dunn, who

18   conducted this investigation, felt overwhelmed by his workload

19   at Columbia.  You will hear testimony that there were only two

20   or three investigators responsible for handling all

21   discrimination and retaliation complaints for all of Columbia

22   University's faculty, staff, and students.

23            Director Dunn will acknowledge that he interviewed

24   only one witness apart from the principals -- apart from

25   Professor Ravina and Professor Bekaert.  And the only

third-party witness they investigated admitted that she was
biased and very loyal to Professor Bekaert.

        Six months after Professor Ravina's initial complaint,
Columbia ended its investigation.  Columbia stated that Bekaert
had not violated its sexual harassment policy.  Columbia stated
that Ravina was to blame, claiming that she did not communicate
effectively regarding her concerns about the status of her
papers.  Dunn's recommendation was that Professor Bekaert
receive training.  The final letter said that training would
just be about appropriate professional communications -- not
sexual harassment, not retaliation, not abusive conduct; about
appropriate professional communications.

        After Columbia concluded its EO/AA investigation, the
equal opportunity/affirmative action investigation, the
university took the position that there was nothing it could do
to help Professor Ravina.  No one took responsibility for
supervising Bekaert or regulating his behavior, and no one in
the administration acknowledged the toll his behavior had taken
on the progress of Professor Ravina's work.  Columbia did not
provide Bekaert with the so-called training until six months
after Columbia's investigation ended.  Columbia never presented
that training to Professor Bekaert as a disciplinary measure.
Vice Dean Horan told Professor Bekaert that training would just
be a conversation.  You will see evidence that Professor
Bekaert felt vindicated after Columbia's training.

I791rav3                          Opening - Mr. Sanford

1          Now here is another very key point in the story.  The

2     evidence will show that after Columbia's investigation ended,

3     Professor Bekaert retaliated against Professor Ravina by

4     slowing the research down even further.  Professor Bekaert's

5     colleagues advised him to step away from the research, but

6     Bekaert had another plan.

7          Just two months after Bekaert learned of Ravina's

8     complaints, Professor Bekaert boasted how he could block

9     Professor Ravina's research.  He was keenly aware of how much

10    power he held over Professor Ravina.  You will see evidence

11    that Professor Bekaert intended to ignore Professor Ravina's

12    work.  You will see evidence that Professor Bekaert sent

13    Financial Engines, the company with the data that controlled

14    the data, an email disparaging Professor Ravina.  Recognizing

15    how damaging this email was, he asked the recipient at

16    Financial Engines to delete the email, to destroy it, after the

17    person read it.

18         After Columbia's investigations ended, Professor

19    Bekaert's obstruction became even more brazen.  He refused to

20    share with Professor Ravina his draft of their paper and the

21    software codes needed to prepare the paper.  You will see

22    evidence that on December 5, 2014, right after Columbia's

23    investigation ended, Bekaert told Dean Hubbard that he was

24    simply not going to send the codes, not going to send the vital

25    research.  And he sent an email to his research assistant

I791rav3                          Opening – Mr. Sanford

1     saying also he was not going to send the codes that Professor

2     Ravina needed to finish her work.  Without the codes, no

3     drafts.  Without the drafts, no papers get published.  Without

4     published papers, no tenure.  And Professor Bekaert knew it.

5             Bekaert told Dean Horan that he was not giving

6     anything to Professor Ravina, and even then, Columbia did

7     nothing.

8             Professor Ravina's psychiatrist diagnosed her with

9     generalized anxiety disorder.  Her anxiety was so profound that

10    she was having difficulty concentrating and completing work,

11    which continues to this day.  You will hear testimony that her

12    emotional state deteriorated.  She felt abandoned and betrayed

13    by Columbia.  Years of abuse from Professor Bekaert derailed

14    her ability to complete her publications.

15            With that knowledge, Professor Ravina requested that

16    Columbia defer her tenure process.  Deferring the tenure

17    process would mean that Professor Ravina would have more time

18    to publish papers before Columbia would make a decision on

19    whether she would get tenure.  She was asking for more time.

20    The tenure decision is based partly on a professor's

21    publication record, so extra time to get papers done would

22    significantly improve Professor Ravina's chances of getting

23    tenure.

24            (Continued on next page)

25

I79nrav4                     Opening - Mr. Sanford

1           And Professor Ravina needed that extra time because of

2      the delays she suffered due to Bekaert's actions and his

3      inaction.

4           In the summer of 2015, Dean Hubbard sent Ravina a

5      letter confirming that Ravina would be on paid leave for the

6      2015 to 2016 academic year and stating that her annual review

7      is currently on hold, paid leave, 2015 to 2016 academic year.

8           So she understood that her tenure process would be

9      deferred for at least one year.  In September 2015, Professor

10     Ravina filed a lawsuit against Professor Bekaert alleging

11     gender discrimination and retaliation.

12          Two days later -- two days later -- Ravina suggested

13     to Columbia's administration that she might need to bring a

14     suit against Columbia as well.

15          The Columbia administration immediately went to work.

16     A few days later, after Professor Ravina informed the

17     administration that she might bring suit against Columbia,

18     Senior Vice Dean Phillips left Professor Ravina a voice mail

19     claiming that Dean Hubbard's letter confirming that paid leave

20     for 2015/2016 was a mistake.

21          At the end of the fall of 2015 semester Professor

22     Ravina notified Columbia that a lawsuit now was imminent

23     against it.  Immediately thereafter, Senior Vice Dean Phillips

24     announced to Division Chair Zeldes that Columbia's senior

25     administrators had met with the lawyers and decided to move

quickly on Enrichetta's tenure case.  They met with the
lawyers, and they decided to move quickly.

        The following day, Chairman Zeldes told Professor
Ravina that her tenure process would begin immediately and that
she would need to submit her tenure materials in one month.

        Columbia has a policy that allows a professor to
extend her tenure process if she has a personal hardship.
Professor Ravina wrote to the provost requesting leave through
the end of 2017, 2018.  Columbia denied Professor Ravina's
extension request.

        Columbia would not give her the personal hardship
leave that Columbia's own policies allow.  Instead, the vice
provost claimed that Professor Ravina would have to give up her
title of assistant professor for her to be even temporarily off
the tenure clock.

        Columbia would only provide Professor Ravina with what
would amount to, at most, a two-month extension of her deadline
in order to submit her application.

        By contrast, you will hear evidence that Columbia had
given a male faculty member six extra years to do more
research.  Columbia was determined to press forward with the
vote on her tenure application.  Professor Bolton sent a letter
to Division Chair Zeldes expressing his discomfort about
holding a meeting to vote on Professor Ravina's tenure at all.

        In particular, Professor Bolton -- and you will hear

I79nrav4                        Opening - Mr. Sanford

1    from Professor Bolton in this trial -- raised concerns about

2    voting because Bekaert prevented Professor Ravina from pursuing

3    research for years.

4           Columbia would not consider Professor Ravina's

5    extension request, and ultimately gave her less than a week to

6    submit her tenure application.  Ultimately Professor Ravina

7    felt she had no choice but to file this case against Columbia

8    charging discrimination and retaliation.

9           This set Professor Bekaert off again and he continued

10   to trammel Professor Ravina's reputation.  After the filing of

11   this lawsuit and right before her tenure vote took place,

12   Professor Bekaert sent e-mail after e-mail after e-mail bad

13   mouthing Professor Ravina to industry figures across the

14   country and, you will see, around the world.

15          Using his official Columbia e-mail account, Professor

16   Bekaert sent e-mails to professors around the world that

17   disparaged Professor Ravina as an evil bitch, a fucking bitch,

18   an unbelievable bitch, a damn evil bitch, an evil bitch in

19   action, an incredible mean bitch, crazy, insane, mentally

20   unstable, sick, paranoid, schizophrenic, berserk, and

21   incredibly evil, among others.

22          He railed against discrimination laws claiming that

23   the laws in this country are screwed up and totally biased

24   against privileged white males.

25          The damage to Professor Ravina's reputation has been

I79nrav4                          Opening – Mr. Sanford

1    worldwide, and Professor Ravina's career prospects have been

2    severely damaged.

3           When the tenure meeting was scheduled, faculty members

4    threatened to boycott.  Columbia postponed the meeting because

5    it was concerned that not enough faculty would take part in the

6    vote.  Instead Dean Hubbard gathered the faculty and told them

7    that she should disregard Professor Ravina's circumstances and

8    focus only on her academic record as it existed at the time.

9    In other words, they had to look at her record in a vacuum

10   without reference to all the things that had occurred.

11          The evidence will show that Dean Hubbard also gave the

12   faculty the false impression that Professor Ravina had been

13   offered an opportunity to defer her tenure process by at least

14   one year.  In fact, Columbia would have made her submit her

15   tenure application that same semester no matter what.

16          Constrained by Dean Hubbard's instructions that the

17   professors not consider Ravina's claims of sexual harassment,

18   gender discrimination and retaliation, the faculty voted to

19   deny Professor Ravina tenure.

20          In sum, ladies and gentlemen, the evidence will show

21   that professor Ravina suffered years of sexual harassment and

22   retaliation.

23          You will see that Columbia knew about the abusive

24   behavior and enabled all of this to happen to Professor Ravina.

25          You will see that Columbia did not protect Professor

1    Ravina.

2           And you will see the actions Columbia took that harmed

3    Professor Ravina.

4           After all this, it was no surprise that Professor

5    Ravina was denied tenure.  I am sure you will listen to the

6    evidence carefully.  At the end of this trial you are going to

7    have an opportunity to hold Columbia and Professor Bekaert

8    accountable.

9           Thank you very much.

10          THE COURT:  Thank you.

11          MR. SANFORD:  Thank you, your Honor.

12          THE COURT:  On behalf of Columbia?

13          MS. PLEVAN:  Good afternoon, ladies and gentlemen.

14          THE DEPUTY CLERK:  Ms. Plevan, one second.

15          Let me get the microphone.

16          THE COURT:  I may have said this during jury

17   selection.  It can be very difficult to hear in this courtroom,

18   so if at any time you can't hear the witness, myself, or one of

19   the lawyers please just raise your hand.

20          Thank you.

21          MS. PLEVAN:  Good afternoon my name is Bettina Plevan.

22   Together with Steven Hurd, Rachel Fischer, and Kramer Rice

23   we're representing Columbia University.  And also here during

24   the trial will be representing representatives of the office of

25   general counsel, but today Patricia Catapano.

1          We will be presenting our case, of course, after

2     plaintiff, Professor Ravina, but you will hear perhaps some key

3     university witnesses testify during plaintiff's case at her

4     request.

5          During the trial, we will present extensive and

6     convincing proof, both documents and witness testimony, that

7     gender played no role in the decisions by the university

8     affecting Professor Ravina and that Columbia did not retaliate

9     against her because she made a complaint of discrimination or

10    threatened and did bring a lawsuit.  The evidence will show

11    that Professor Bekaert did not influence and in fact had

12    nothing to do with the key decisions that Columbia made to deny

13    her tenure and her request and to deny her request for a leave

14    of absence.

15         Professor Ravina's own colleagues, the professors that

16    she worked with in her division, are the ones who unanimously

17    voted against granting her tenure in April 2016.  And you will

18    hear that she was denied tenure because she did not even come

19    close to achieving the quality and quantity of publications

20    needed for tenure at a top business school.  Professor Bekaert

21    did not participate in that process at all.

22         You will also hear that her colleagues, these

23    professors in her division that voted against her, unanimously

24    concluded that, even if Professor Ravina had had several more

25    years to work on her research papers, she would not achieve a

1    record warranting tenure.  I will explain a little more what

2    that evidence will be.

3         The evidence will also show that Columbia did not

4    retaliate against Professor Ravina when it denied her a third

5    leave of absence in 2016 when she requested yet another leave.

6    Instead, it followed its usual practice of offering her what's

7    called a break in service with a change in title.  The title

8    change was required by Columbia's rules, and it was its

9    longstanding practice.  In fact, it had never been done.  This

10   extra time had never been given in the way that she wanted it.

11        Again, Professor Bekaert played no role in these

12   decisions at all.  They were made by the provost's office at

13   the university, not at the business school, and in accordance

14   with past practices.

15        Finally, the evidence will show that Columbia promptly

16   and thoroughly addressed Professor Ravina's complaints about

17   Professor Bekaert's behavior.

18        Now, Columbia University, as you heard and may know,

19   is one of the leading universities in the world, one of the

20   oldest in the United States.

21        In addition to its graduate school, its undergraduate

22   school, there were graduate schools in many different fields,

23   social work, public health, medicine, law, and business.

24        This case involves the Columbia Business School, which

25   is one of the leading business schools in the United States, if

1    not the world.  It is highly selective in the admission of

2    students, in hiring faculty, and, of course, in granting

3    tenure.  The business school has its own dean, Glenn Hubbard,

4    who you will hear testify, and other deans who participated in

5    responding to the concerns that Professor Ravina raised.  But

6    at the heart of this case is Professor Ravina's failure to

7    achieve tenure at Columbia because that is what led to her

8    departure the following year.

9          Like most universities, Columbia awards tenure to its

10   highest achieving professors, and, as you may know, tenure is

11   in effect a guarantee of lifetime employment.  That's because a

12   tenured professor can only be terminated for cause and only

13   after a long, involved process of review, ending in a hearing.

14         It's a very serious process to award someone tenure.

15   You will be hearing a lot of evidence, a description of the

16   tenure process at the Columbia Business School and the very

17   detailed rules about the timing of a tenure decision.  The

18   rules are kind of set in stone, and they're written in

19   something called the statutes.

20         There are also practices that have been followed for

21   many years by the provost's office.  I'll mention just some of

22   those terms.  You have heard about them from plaintiff's

23   counsel, and you will be hearing them also during the course of

24   the trial.

25         First, under the longstanding rules of the university,

1    every junior faculty member on a tenure track has what's called

2    an up-or-out date.  That's the date by which a decision must be

3    made to grant or deny tenure.

4          Professors who are hired without tenure are expected

5    to achieve a sufficient prominence and to have a body of

6    scholarship, that is, research and writing, to achieve or to

7    warrant a grant of tenure at that point.

8          The point is usually the spring of the person's sixth

9    year at the school, but absolutely must be by the end of the

10   seventh year.  If they don't achieve tenure at that point,

11   they're permitted one final year, so that the total time is

12   eight years.  But if they are not granted tenure by the end of

13   the seventh year, they must leave at the end of the eighth

14   year.

15         Now, since every person is guaranteed that final year

16   after a tenure vote, as I said, the vote must take place at the

17   end of the seventh year, which for Professor Ravina was the

18   spring of 2016, and she was at the end of her time.

19         Now, this eight-year maximum period is enforced by

20   another rule that's called de facto tenure.  Others who know

21   this rule will explain during the course of the trial,

22   particularly Christopher Brown, who was then the vice provost

23   of Columbia University.

24         This means, the de facto tenure rule says that if a

25   person for some reason remains after the eighth year, even if

1   they were not voted tenure, they have tenure automatically.

2   Presumably the purpose of that rule to ensure that there are no

3   mistakes made or things granted this kind of status granted by

4   chance.  So everyone pays a lot of attention to these timing

5   rules.

6           This is all relevant because of Professor Ravina's

7   request to get more time and also because she complains that

8   she was being rushed, that by scheduling the tenure vote in the

9   spring of her seventh year, that somehow Columbia was

10   retaliating against her.

11           But, as you will hear, all of these rules required

12   that she go up for tenure in the spring of 2016, her seventh

13   year, so that she wouldn't receive tenure automatically by

14   default.

15           You may be wondering, I've talked about this sort of

16   rigid timetable, whether there are any exceptions to those

17   rules, for example, if people are ill or have child care leave.

18   The university recognizes those types of exceptions, and

19   specifically provides in the faculty handbook to give people

20   extra time if, for example, for maternity leave, for child care

21   leave, for disability leave.  These are very expressly stated

22   in the faculty handbook.  Of course, Professor Ravina did not

23   apply for those because she didn't qualify for either of those

24   types of leaves.

25           What was discussed with her is not a leave of absence,

1    but something called a break in service.  That's when a faculty

2    member goes off the track, so to speak, and takes a position

3    that is not a faculty titled position.  They're able to get

4    additional years of research and writing.

5            In the case of Professor Ravina, because of the

6    concerns that she expressed about her work having been slowed

7    down, Dean Hubbard went to the provost of the university to ask

8    him to offer her a break in service to give her the additional

9    time that she wanted to satisfy the requirements for tenure.

10           She was offered that.  She was offered a break in

11   service with a change in title to research associate scholar.

12           She rejected the offer.  She didn't want to change her

13   title, and the male that was referenced earlier took a change

14   in title.  He got a break in service.  He didn't get a personal

15   hardship leave; he got a break in service.  That's what the

16   evidence will show.  And he was calling himself a curriculum

17   specialist.

18           She was offered the title of research associate

19   scholar.  Had she accepted that offer, she would have remained

20   at Columbia for a year or two and doing her work.  But she

21   rejected that proposal, as you will hear.

22           You will also hear that for a long period of time

23   Professor Ravina did not have adequate research productivity

24   and publications and that she, as I said, earlier was not even

25   close when she came up for tenure.

1          We know that because two years have passed since

2     Professor Ravina left -- since her tenure vote two years ago,

3     and she's not published anything in a peer-reviewed publication

4     in that two-year period.  She's published one paper in what's a

5     non-peer-reviewed paper, meaning one that is not edited by

6     other scholars and reviewed by other scholars.

7          It will be clear to you from all the testimony about

8     her work and her failure to publish that no matter who she was

9     working with, or even if she was working alone, the evidence

10    will show that Professor Ravina has always had trouble

11    finishing her papers.  She will even tell you about papers she

12    started work on years ago, even before she got to Columbia,

13    while she was at NYU, that have languished on her desk for five

14    or more years without her doing the revisions necessary to

15    complete them and submit them for publication.

16         So, while it is not uncommon for scholars to have

17    their papers rejected in the first instance and receive

18    comments back that they have to address, a person who's hoping

19    to achieve tenure really needs to bring the research to the

20    point where it can be published.

21         As you will hear from the evidence, Professor Ravina

22    simply couldn't, or in any event didn't accomplish this

23    objective.  It was really, therefore, inevitable that when she

24    came up for tenure at the last possible moment for her in April

25    of 2016 that she did not qualify and would not receive tenure.

1      We will also present evidence showing that Professor
2   Ravina had been told earlier this was not a new decision by her
3   colleagues.  She had been told that her prospects were poor.
4   You will see that in the annual reviews she received.  Each
5   year the reviews were more pessimistic, more negative, to the
6   point that by 2014, the spring of 2014, two years before the
7   tenure vote, she was told that the prospects for her to obtain
8   tenure were really nil and that she should start looking for
9   another position.  It was just soon after that, within a month,
10  that Professor Ravina first made complaints about Professor
11  Bekaert's behavior.
12      Under the strict tenure timeline I mentioned earlier,
13  it was expected that Professor Ravina would come up for a
14  tenure vote probably the end of her sixth year.
15      That didn't happen then because she was trying to
16  negotiate through her lawyer a leave of absence or some other
17  extension.  But no agreement was ever reached.  At that point
18  steps had to be taken, again because of these technical rules
19  of requiring a vote at a certain point, unless there was an
20  agreement or an acceptance on her part of this break in service
21  that had been offered to her and which she continued to reject.
22      So the business school could not wait any longer and
23  had to move forward because those are the rules.  This was all
24  communicated to her in a letter from her division head in
25  December 2015 telling her she needed to prepare her material,

1   she had to prepare a CV, but she already had one of course, and

2   submit her papers and a personal statement.

3           The tenure vote in fact was delayed to accommodate

4   her, to allow her to finish, because she didn't submit her

5   material until early March of 2016.

6           Now, consistent with practice of the division, the

7   chair appointed -- his name is Stephen Zeldes.  He appointed

8   what is called a reading committee to conduct an in-depth

9   review of Professor Ravina's work and to make a recommendation

10  to the other faculty members.

11          There were four members of the reading committee, two

12  of whom were women, including the chair, Wei Jiang, who you

13  will hear testify.  Another was a friend, one of the male

14  members of the committee, Daniel Wolfson was someone who

15  Professor Ravina was friendly with.  The reading committee

16  reviewed all of her work from the beginning, from the time she

17  finished graduate school, papers that were published and many

18  that were not published and were in draft.

19          They reviewed her other activities as well.  As you

20  will hear Professor Jiang say, although her contributions to

21  the school were good, her scholarship -- meaning, again, the

22  quality, not just the quantity, but also the quality of her

23  publications fell well short of the mark.  That's the testimony

24  you're going to hear.

25          And you will see the documents that were presented to

I79nrav4                          Opening - Mr. Sanford

1    the other faculty members at that tenure review meeting.

2              As Professor Jiang will explain, the reading committee

3    unanimously recommended that Professor Ravina be denied tenure

4    because of the lack of publications and the low quality or not

5    high enough quality.

6              The reading committee, as you will hear, considered

7    the impact of the delays caused by her conflicts with Professor

8    Bekaert and compared her accomplishments to people who were

9    much more junior, had fewer years in the field, and the

10   comparison was again not close.

11             For that reason, they recommended that she be denied

12   tenure, and the division itself at the meeting also voted.

13   There was one abstention, but otherwise the vote was unanimous.

14   Not one person voted affirmatively to grant Professor Ravina

15   tenure.

16             So the evidence will show that this decision was made

17   by objective people -- none of the deans you have heard about

18   were at that meeting -- and people who had no animus against

19   Professor Ravina, and some who were her friends and supporters,

20   that they voted no.  Professor Bekaert, again, did not attend

21   the meeting, did not participate in any way in this tenure

22   process.

23             Now, to return for a minute to the issue of leave of

24   absence, Professor Ravina talks about action that was taken

25   after she either filed a lawsuit or threatened a lawsuit.  As I

said earlier, what she asked for was a personal hardship leave, but the evidence will show that this was denied to her for valid institutional reasons and not because she made a claim of discrimination.

One peculiar argument you will hear from Professor Ravina relates to this June 2015 letter she got, the annual dean's letter.  She received the letter in late August, and it mistakenly used the word "leave" in the context of the dean's expression of a hope that she would do more writing in her upcoming leave.  That's what it said.  It didn't say "grant a leave."  You will see the letter in evidence.

But Professor Ravina claims that these two words, your "upcoming leave," meant she had been granted a leave of absence, an absence, a leave she hadn't at that point applied for because months earlier her lawyer was talking to Columbia University lawyers about somehow giving her more time.

She was told, and it is undisputed that she was told by the end of September that this mistake had occurred and it should have referenced, the letter -- you will hear from those involved in signing and writing it -- that it was intended to refer to the fact that she would have the relief from teaching that coming year.  She would not have to teach.

But apparently you will hear to this day she believes this letter granted her more time on the tenure clock than in fact was provided.  This was all made clear to her then.

1              To go back to what I mentioned earlier, what was

2       offered to her was a break in service, the opportunity to take

3       time as a research associate scholar.  That's what had been

4       consistently done by the university in situations like this.

5              It was offered to her.  It was actually offered to her

6       with pay, but she rejected it.  Not only did she reject the

7       idea, but, as the evidence will show, she wouldn't even meet

8       with the vice provost, Chris Brown, or the senior vice dean,

9       Kathy Phillips, to discuss what her options were.

10             Around this time, January of 2016, they both sent her

11      either letters or e-mails practically begging her to meet with

12      them so that they could explain what her options were under the

13      university's procedures and how that option would give her time

14      at least to have a shot at tenure.

15             She refused to meet with them.  Part of that dialogue

16      was the denial of what she asked for, the personal hardship

17      leave.

18             As the vice provost will explain, he denied this

19      request because she had been offered what had been done in the

20      past at the university, this break in service, take a different

21      title.  He was unable to determine whether a personal hardship

22      leave had ever been granted by the university, certainly not in

23      recent times, as he will tell you.

24             He will also tell that you Professor Ravina asked for

25      a paid personal hardship leave when right in the faculty

1      handbook it says that personal hardship leaves are unpaid

2      leaves.

3              With all of that information, the vice provost thought

4      it did not make sense to go in a direction that might set a bad

5      precedent when an offer had been made to her for the break in

6      service.  That was her choice not to take that.

7              The other issue that I want to address is what the

8      evidence will show about Columbia's response to Professor

9      Ravina's complaints about Professor Bekaert.  What the evidence

10     will show is that when Professor Ravina first complained about

11     Professor Bekaert it was in May of 2014.  That's a meeting with

12     the then vice dean, Gita Johar.  The evidence is conflicting.

13     Professor Johar will say there was no discussion about sexual

14     harassment or sexual advances.  She complained at that meeting

15     about the conflict over the writing and that things were not

16     moving quickly.

17             They had been working together at that point for four

18     years on this dataset project.  Professor Ravina was feeling

19     the pressure of running out of time and felt the work was

20     moving slowly, and that is what she complained to Vice Dean

21     Johar about in May of 2014.  That is what she complained about.

22             She then met with Dean Johar, raised the issue with

23     Dean Hubbard, Dean Hubbard scheduled a meeting with her and the

24     others that you will hear about.

25             In that meeting in June of 2014 also no discussion

1   about sexual harassment or anything like that.  There was a

2   discussion about conflict.  And there was a long discussion and

3   there were proposals made.  At that meeting, as you will hear,

4   there was some consensus even about how to go about speaking to

5   Professor Bekaert, how to protect Professor Ravina by ensuring

6   that Professor Bekaert would not participate in any way in her

7   tenure vote, and that efforts would be made to persuade him to

8   work more quickly on her projects.  They will describe these

9   meetings then very differently from Professor Ravina.

10         You will hear from a number of witnesses about all the

11   things the business school did to respond to her concerns.

12   These individuals, these various deans and other faculty

13   members had meetings, dozens of the meetings with the

14   participants.  They had e-mails back and forth, which you will

15   see, dozens and dozens of e-mails trying to get them to work

16   together on these projects in an effective way and to move the

17   research along.

18         It wasn't until Professor Ravina meet with Vice Dean

19   Kathy Phillips in July of 2014 that Professor Ravina for the

20   first time raised an issue beyond the conflict in the work and

21   raised an issue about gender being possibly a component of what

22   was going on.

23         At that point, she -- that is, Dean Phillips -- as you

24   will hear, met with Dean Hubbard immediately, and they took

25   steps under the university's policies to contact the EOAA

1    office, the equal opportunity affirmative action office at the
2    university level.  It was within a few days.

3            Specifically, they sent a written summary of what they
4    had heard, and they are the ones who reported this to the
5    office EOAA office, not Professor Ravina.

6            At the university, as soon as they were aware, the
7    office opened up an investigation, and this was done by -- that
8    office is independent.  It is not part of the business school.

9            You will hear from several people about the
10   investigation.  Primarily you will hear from Michael Dunn, who
11   was the one most involved.  Mr. Dunn is a lawyer by training,
12   with lots of experience in this area.  He's now the head of
13   Title IX office at a college in Maryland.

14           He conducted an investigation.  He met extensively
15   with both Professor Bekaert and Professor Ravina because
16   virtually everything that they were talking about involved just
17   the two of them.  There weren't other witnesses.  And he
18   reviewed a lot emails.  He wrote a report in which he concluded
19   in good faith that he did not find evidence that Professor
20   Bekaert had engaged in sexual harassment.

21           He did recommend that he get training.  And, although
22   it was delayed for whatever reason, the training did take
23   place.

24           All of the intervention by the business school did
25   help alleviate the conflict as well.  I will give you some

1    specifics you will hear about.

2              First, Professor Bekaert agreed as a result of

3    communications with the dean's office that he would withdraw

4    from one of the papers and let Professor Ravina do it totally

5    on her own.  That was her request, and he agreed to do it.

6              It was called the Automatic Enrollment Paper for

7    short.  Professor Ravina has had complete control over that

8    paper, as you will hear, since 2015, but to this day that paper

9    has not been published or even submitted for publication.

10             Another major paper they were working on together was

11   called the International Diversification Paper.  A deadline was

12   set for Professor Bekaert to respond.  He responded within a

13   few hours of the deadline, ultimately with his revisions and

14   comments, and the paper was accepted for publication before her

15   tenure review and in time to be considered as part of the

16   tenure review.

17             Now, Professor Ravina is now back at the Kellogg

18   School at Northwestern, where she earned her Ph.D.  Although

19   she did not get tenure at Columbia, she has a two-year visiting

20   professorship at the Kellogg School, which is a very, as she

21   will say, more highly regarded school than Columbia.

22             At the end of the trial, we will sum up all the

23   evidence about the tenure review and her leave requests, and,

24   as the deans I mentioned to you will explain, their efforts to

25   support her research work which were substantial.  You will

1    hear about that.

2           But at the end of the day what you will hear in the

3    testimony is that her scholarship was not sufficient in quality

4    or quantity to warrant an award of tenure.  In responding to

5    her requests for more time, the university offered her an

6    approach that was consistent with its strict tenure rules and

7    its past practice, but she rejected that offer.

8           For all these reasons, at the end of the case, we will

9    ask you to return a verdict in favor of Columbia University.

10          Thank you.

11          THE COURT:  Thank you.  Why don't we take a short

12   break now, and then we will hear Mr. Bekaert's.  Please

13   remember don't discuss the case and keep an open mind.

14          (Jury not present)

15          THE COURT:  So we will start again in ten minutes.

16          Thank you.

17          (Recess)

18          THE COURT:  Can we bring the jury in.

19          (Jury present)

20          THE COURT:  Everyone can be seated.

21          Mr. Hernstadt.

22          MR. HERNSTATD:  Good afternoon.  If it please the

23   Court, ladies and gentlemen of the jury, my name is Edward

24   Hernstadt.  I represent the defendant Geert Bekaert in this

25   case.

I791rav5                      Closing - Hernstadt

1            MR. HERNSTADT:  It's late.  It's been a long day.  I

2    promise you I'm going to be a little briefer than my esteemed

3    colleagues, so hang in there.

4            In 2009, Geert Bekaert offered the plaintiff,

5    Professor Enrichetta Ravina, the extraordinary opportunity to

6    work with him as co-equal authors on a massive data set of

7    almost 4 million 401(k) plans.  After discussing the project,

8    they both believed that a number of important research papers

9    could evolve from the data about how and why people invest in

10   their retirement savings.

11           You will hear that Professor Bekaert invited Professor

12   Ravina to work on the project because of her familiarity with

13   big data sets, how to manipulate all that information, but also

14   because he thought that the opportunity for the papers that

15   could come out of this data would be very helpful to a young

16   junior professor's career.  In return, in 2014, Professor

17   Ravina turned on Professor Bekaert and blamed him for her

18   inability to complete or publish her academic papers and the

19   inevitable result of that failure, the fact that she would

20   almost certainly not be granted tenure at the Columbia Business

21   School, two years later, when she came up.

22           In the end, based on all the evidence that you will

23   hear and see, this is a story of the betrayal of a research

24   partnership and a friendship through scapegoating to evade the

25   consequences of failure to publish, rather than a case of

discrimination or retaliation.  You will hear that Professor

Bekaert, who also came to the United States, from Belgium, for

his graduate studies and has stayed here, has been a tenured

professor in finance and economics at Columbia since 2000.

He's a respected and prolific author with more than 65

published papers.

You'll also hear that Professor Ravina, who joined

Columbia in 2001, with a single published paper, had a meager

record of publications and had been told in faculty reviews

since 2011 that her lack of publications meant that it was

unlikely she would receive tenure.  In academia, the catch

phrase is "publish or perish."

So with her fate increasingly clear, Professor

Ravina's complaint against Professor Bekaert in 2014 and this

lawsuit are basically her Plan B for getting tenure.

In listening to the testimony and in reviewing the

evidence about their relationship as co-authors and friends

between 2009 and 2016, the timetable of events is crucial.  It

falls into two distinct periods.  There's a "before" period,

from 2009 to 2014, and then the "after" period, when Professor

Ravina made the complaint in 2014.

You will hear that although both professors were

supposed to start work on the 401(k) project soon after they

first contacted Financial Engines, which is the company that

had all the data, in 2009, it took two years, until late

I791rav5                    Closing - Hernstadt

October 2011, for them to even have a contract with Financial

Engines for the data -- a contract, by the way, that put both

Professor Ravina and Professor Bekaert in the same position.

Neither one of them had more power or less power.  They were

co-equal.  And then it took another year, until the summer of

2012, before the bulk of the data was actually delivered and

they could start working with it.

            You will hear testimony that Professor Bekaert and

Professor Ravina were ready to start writing the first 401(k)

research paper in April 2013.  That is about a year before she

first complained.  And then by the end of December 2013, it was

actually completed and submitted to various conferences,

initial drafts of two papers.

            Despite the success, you'll hear that in the spring of

2014, after Professor Ravina received her third straight

negative faculty review, their communications changed

drastically.  This started the "after" period of their

co-authorship.  You will see that the tone of the emails

between them are much sharper and much more critical, and

Professor Ravina's writing emails to Professor Bekaert that

criticized him for not moving fast enough.  And Professor

Bekaert's emails in response are sometimes intemperate and

edgy.  Professor Ravina complained at Columbia about the tone

and the contents of these emails in the spring of 2014; and

subsequently, a few months later, added charges of sexual

I791rav5                    Closing - Hernstadt

1   harassment and delay of her work, all of which Columbia

2   investigated.

3        Let me say one thing about Professor Bekaert's

4   communication skills, because the emails between him and

5   Professor Ravina in the spring of 2014 and some of the other

6   e-mails you heard discussed by plaintiff's counsel are pretty

7   pungent.  He was known by many at Columbia as the blunt

8   Belgian, and this is for a reason, because sometimes he's

9   brusque, he could sometimes be rude, but you will see evidence,

10  emails that will be shown to you of years of interacting

11  between Professor Bekaert and Professor Ravina where the

12  content and the tone is perfectly cordial.  They even share

13  occasional mutual bluntness about each other, tempered by

14  respect.  And that tone is completely absent in the "after"

15  emails.

16       For example, starting in the spring of 2014, every

17  email -- and all these emails are about work -- from Professor

18  Ravina to Professor Bekaert routinely contain claims that

19  Professor Bekaert's delaying work on their 401(k) project, even

20  as the paper that they're discussing in these emails was

21  speeding its way to publication.

22       Now you've heard that in this lawsuit Professor Ravina

23  claims that Professor Bekaert discriminated against her on the

24  basis of her gender.  However, through the course of this trial

25  you'll hear testimony, you will see a wealth of evidence

I791rav5                    Closing - Hernstadt

1   demonstrating that he did not treat Professor Ravina

2   differently because of her gender and he did not retaliate

3   against her after she complained at Columbia about him or after

4   she filed this lawsuit.  Regarding discrimination, you'll hear

5   plaintiff say that for about 18 months, starting at a dinner in

6   September of 2012, Professor Bekaert began infusing the

7   discussions with sexual innuendo and she understood him to be

8   making sexual advances to her.  Professor Ravina also claims

9   that he delayed her work and pressured her to respond to those

10  advances and, when she refused, he retaliated against her by

11  further delaying.  The evidence, though, will demonstrate that

12  Professor Bekaert made no advances of any kind, had no romantic

13  interest of any kind in Professor Ravina, and did not delay

14  their joint work.

15         For example, you're going to hear about everyday

16  events like dinners -- there were five of them in a couple of

17  years -- or the two of them having coffee together, or

18  Professor Bekaert sending to Professor Ravina music to listen

19  to.  These are not romantic events.  These are perfectly normal

20  things that co-authors, that colleagues, that friends, they do

21  together all the time.  These events happened.  There were

22  dinners, there were coffees, he did send her music.  But

23  there's no evidence that they were because of her gender or

24  because he wanted anything from her in any kind of romantic

25  way.

1          You will also hear testimony about certain events,

2     such as supposed discussions of pornography while they're

3     online in a student coffee shop or discussions of sexual

4     exploits, or the placement of Professor Bekaert's hand on

5     Professor Ravina's hand at a dinner.  Or a kiss on the cheek.

6     These are events that just simply did not happen.  The evidence

7     will show that the only reason Professor Ravina says that

8     something like the fact that they actually went to dinner

9     together is harassment is because after the fact, years after

10    the fact, she decided to call it that.

11         You'll see evidence that Professor Ravina never told

12    Professor Bekaert she didn't want dinner with him, that having

13    meals together or coffee together was unwelcome.  She sent him

14    emails thanking him for dinner.  She took the leading role in

15    planning them.  She made all the reservations, she picked all

16    the restaurants.

17         You'll also hear about other incidents that start with

18    something that did occur.  For example, Professor Bekaert

19    indeed spent a sabbatical semester in Asia, and he naturally

20    shared some of his experiences there with Professor Ravina when

21    he got back.  But then these stories are then twisted out of

22    all recognition into something that never happened.  The

23    evidence is clear that Professor Bekaert took no action towards

24    Professor Ravina based on her gender.  He never asked her for

25    sex or even for a date.  He never said that she would have to

I791rav5                     Closing - Hernstadt

1   sleep with him for them to work on their papers.  Indeed,

2   you're going to learn that during this time frame of 18 months,

3   or perhaps a little longer, depending on the testimony,

4   Professor Bekaert was in New York for only four or five months.

5   He spent eight months in Asia, he spent a great deal of time

6   traveling to conferences around the country, and around the

7   world.

8           The evidence will show that they were friends as well

9   as co-authors.  During the "before" period they shared aspects

10  of their personal lives.  For example, you will see how

11  Professor Ravina commented on how handsome Professor Bekaert

12  looked in a magazine article about him, a magazine interview

13  with him.  And she shared with Professor Bekaert how hot she

14  thought a certain actor was.  She invited him to dinner, she

15  invited him for coffee.  She asked him to send her music and

16  thanked him for it.  She told him that she dreamed of Belgian

17  chocolate.  It's perhaps expressed most strongly in the April

18  2013 email from Ravina to Bekaert thanking him for his advice

19  and saying how nice he is to her for all he does.

20          You will also learn that Professor Ravina never told

21  Professor Bekaert she was uncomfortable with anything he did or

22  anything he said.  This is not the behavior of somebody who

23  finds conduct like having co-authors having dinners or coffees

24  together to be harassing or unwelcome.

25          In considering Professor Ravina's claims, please keep

I791rav5                       Closing - Hernstadt

in mind the timing.  The timing is going to be key.  You will

hear testimony and see emails running from 2009, when Professor

Bekaert first invited her to join him as the co-author on the

project, through 2016.  You will hear that even Professor

Ravina had no complaints about their co-authorship until

sometime in late 2012.  After that dinner, the evidence shows

they had virtually no personal contact for more than six

months, until April 2013, when they had a dinner and a lunch,

during the one week that Professor Bekaert was in New York, the

first eight months of that year.  That April lunch is

particularly meaningful because they met after Professor Ravina

emailed Professor Bekaert about a negative faculty review she

had just received, in which her poor tenure prospects were

discussed.

        The majority of the complaints about Professor Bekaert

took place or are alleged to have taken place in the fall of

2013, following his return from sabbatical.  Ironically, this

is an extremely productive period of work for them.  During

that fall they wrote two papers and submitted them both to

conferences.

        After the success of 2013 with two drafts, you will

hear that Professor Ravina was given yet another negative

faculty evaluation in the spring of 2014, discussing her

increasingly poor tenure chances.  This evaluation was even

more devastating than the one in 2013, where she asked him to

I791rav5                    Closing - Hernstadt

1    meet for lunch to talk about what she could do.  She complained

2    to the dean's office.  After this meeting, after this

3    devastating evaluation, the prospect of tenure was fading, and

4    it was fading increasingly fast.  So she responded by launching

5    her Plan B.  She went to the dean's office and she complained

6    that Bekaert was rude and abusive and delaying.

7            Professor Ravina's initial complaints were based on a

8    series of emails between the two of them in March, April, and

9    early May 2014.  Now you're going to see these emails.  They're

10   long.  They're back and forth, back and forth.  And you'll have

11   an opportunity to read them and to look at them and to see what

12   everybody says, as opposed to hearing a pulled quote or hearing

13   that they're rude.  And sometimes they are.  The first set of

14   emails, you'll see that Professor Ravina canceled an interview

15   with a research assistant they were considering hiring.  But

16   she didn't tell Professor Bekaert, so he was the only one who

17   showed up at the Saturday meeting that they had arranged to

18   interview this guy, and understandably, he was upset, and he

19   communicated his unhappiness in a sharp email.

20           April and May emails then focus on the lack of a

21   research assistant to work on the 401(k) project.  Professor

22   Bekaert was upset with Professor Ravina's unilateral decision

23   not to hire an assistant because it meant that work on these

24   papers would be stymied and the project would be delayed.  You

25   will see that Bekaert is clearly irate and expresses himself

coarsely and in a less-than-professional manner, something that

plaintiff focuses on, and complained about it.  But the

evidence will show that the most frustrating thing to Professor

Bekaert about these emails is the delay to the 401(k) project

caused by Professor Ravina's refusal to respond about how they

would move the project forward without a research assistant.

         You will also hear testimony that these exchanges were

actually unnecessary, because Professor Ravina, a month later,

casually informed Professor Bekaert that she planned to act as

a research assistant herself.

         The timetable is also key to understanding the

evidence that, far from delaying their joint work, Professor

Bekaert was Professor Ravina's most productive co-author, even

more so than herself, on her own papers.  Between 2013 and

2016, they created two new papers, one of which was accepted

for publication in time for tenure consideration.  Between 2009

and 2016, Professor Ravina did not finish either one of the

single-authored papers on which she'd been working for many

years.

         Now let me take a second to ask your patience for my

focus on the timetable and all the dates that I'm sharing with

you.  These will become very familiar to you.  You're going to

see the emails, you're going to hear the testimony.  And

they're central to understanding what really happened here,

because they put Professor Ravina's Plan B into very clear

focus.  I'm going to ask you to do your best.

And while I'm at it, let me take a second to explain what I mean by a single-authored paper.  In the sort of specialized world of business school professors, they focus intensely on research and publishing.  You will hear that single-authored papers, which were written by just one person as opposed to two, three, four people, give more benefit to the author than co-authored papers, and in publications, a paper in certain top journals also carries more weight.

You will learn that before Professor Ravina and Professor Bekaert started receiving data on the project in 2012, Professor Ravina had two single-authored papers in what is called the R&R phase, the status, at important journals. You will hear that R&R papers are papers that have been complete, they've been submitted to a journal, they've been reviewed by referees at the journal, and then they're sent back to the author to revise based on comments from the journal before it's finally resubmitted for publication.  This is a very late phase, a paper that's almost done, almost ready to be published.

You will also learn that despite Professor Bekaert's urging Professor Ravina many times over and over and over again, between 2011 and 2014, to finish her R&R papers, she did not.

Professor Ravina's inability to complete her work is

I791rav5                        Closing - Hernstadt

1    also important to recall in the context of her claim that

2    Professor Bekaert delayed or obstructed.  The evidence is clear

3    that Professor Bekaert did not cause any delays on the 401(k)

4    project between 2009 and 2012, or even the spring of 2013, when

5    they're ready to start writing the first paper.  During that

6    same period, Professor Ravina did not finish or submit for

7    publication either of her single-authored papers.

8            You're going to learn that Professor Bekaert removed

9    himself from one of the 401 papers in February, by no later

10   than February 2015, turning it over to Professor Ravina to

11   complete on her own, and again, she didn't.  She hasn't.  The

12   other 401 paper, the international diversification paper that

13   Ms. Plevan mentioned, was drafted, presented at conferences and

14   universities multiple times by both Professor Ravina and

15   Professor Bekaert.  It was redrafted and it was accepted for

16   publication at a top journal in time for her tenure

17   consideration.  That type of success, that type of production,

18   is not delay.  That's a triumph.

19           You will hear about Professor Ravina's expectations

20   about work that she stated she has to do.  In April 2013 she

21   sent an email to Professor Bekaert after a negative faculty

22   review and she lists four papers she says she has to complete

23   by the spring of 2014.  Only one of those papers was a 401(k)

24   paper with Professor Bekaert.  Two of them were her

25   single-authored R&Rs.  Ironically, we know that the only one

I791rav5                       Closing - Hernstadt

1    that actually got finished was the paper with Professor

2    Bekaert, that she accomplished nothing on her two

3    single-authored papers.

4           Finally, the evidence will demonstrate that Professor

5    Bekaert did not take any actions to harm Professor Ravina in

6    response to her complaining to Columbia about him.  You will

7    see, you will hear plaintiff stating he interfered with her

8    work and tried to damage her reputation in the profession.

9    However, the evidence will show that he did not.

10          Professor Ravina will point to emails, and you've

11   heard some of the content of those emails -- they're strong,

12   they're striking -- that Professor Bekaert sent.  These are

13   emails that he sent to his girlfriend and to his closest

14   friends.  These are emails that express his hurt and his sense

15   of shock.  This is an all-too-human reaction, and the actual

16   words used may be surprising and they may be shocking in

17   isolation, but placed in the context of the evidence, the

18   handful of very pained emails that Professor Bekaert sent, they

19   express the understandable distress of a man who's been

20   betrayed by someone he considered a friend and a co-author.

21   You will see these emails.  You will hear testimony about them.

22   You will have a chance to place them in their proper context.

23   And there's no evidence that will be presented to you to show

24   that any of these emails to his girlfriend or to his close

25   friends harmed Professor Ravina's reputation or that she would

I791rav5                      Closing - Hernstadt

have been surprised that he sent them in the first place.

You will hear that following Professor Ravina's filing

of this case, she posed for a photo shoot, she gave interviews

to various press outlets about her lawsuit, and that those

publicity efforts were successful and it resulted in articles

in all the major New York newspapers, as well as articles and

publications and comments on blogs that are followed by members

of their profession, including students.

You will hear that the press coverage was extremely

negative about Professor Bekaert.  And in response, he sent

emails to a number of co-authors, to friends and to colleagues

about it to salvage his reputation.  Again, although you'll see

some of these emails and the responses that Professor Bekaert

sent to his friends and colleagues and co-authors contain very

strong language, such a response to an intentional and damaging

publicity campaign is hardly surprising.  And there's no

evidence that these emails hurt Professor Ravina.  She's been

working at another top business school since the day she left

Columbia.

The evidence presented over the next days by a variety

of witnesses and in many, many emails and other documents will

paint a clear picture of Professor Ravina's Plan B and her

scapegoating of Professor Bekaert and her effort to get around

the incontrovertible fact that her scholarship and publications

did not come close to meeting the level required to be awarded

I791rav5

1    tenure, to earn tenure, at Columbia Business School.  The

2    evidence will show that Professor Bekaert did not engage in any

3    sexualized contact of Professor Ravina or take any actions

4    towards her based on her gender, or in retaliation.  Rather,

5    whether in friendship or in frustration, you will hear that

6    everything Bekaert did or said to Ravina he would have done or

7    said to any colleague, or any friend, male or female.

8            Based on all of this evidence -- and you will have a

9    chance to see it, to place it in context, to understand it --

10   we're confident you will reach a verdict in favor of Professor

11   Bekaert.

12           Thank you.

13           THE COURT:  All right.  Thank you.

14           So ladies and gentlemen, I know it's been a long day.

15   I think it makes sense actually just to have you go home

16   tonight and come tomorrow morning.

17           Again, we're going to start promptly at 9:30.

18   Breakfast will be waiting for you at 9.  And we'll start with

19   the testimony in the morning.

20           Please remember just don't discuss the case, don't

21   research the case, keep an open mind, and have a nice evening.

22

23

24

25

I791rav5

1          (Jury not present)

2          THE COURT:  Everyone can be seated.

3          So we can meet tomorrow at 9 as well to discuss some

4     of the outstanding issues, but one question I did want to ask,

5     based on I believe it was Columbia's opening statement, was the

6     offer for Professor Ravina to be a research associate scholar

7     part of a settlement agreement, part of settlement negotiations

8     in some fashion?  Because again, I still have to decide about

9     the appropriateness of her offer to waive the de facto tenure

10    issue, and so I'm trying to get a sense of what constituted

11    settlement discussions and what didn't.

12          MS. PLEVAN:  No, it wasn't conditioned on anything,

13    and there's a letter -- I mean, actually, I think there are two

14    letters.  There's a letter from the vice provost to her as well

15    as from Kathy Phillips telling her this is what is available.

16          THE COURT:  All right.  Okay.

17          MS. PLEVAN:  So that's primarily what we'd be relying

18    on as the evidence.

19          THE COURT:  Okay.  Does anyone want to be heard on

20    anything else tonight, or I'll see you tomorrow morning at

21    9 a.m.?

22          MR. MELZER:  I just wanted to mention --

23          THE COURT:  Use the mic.  As I said, it can be

24    difficult for people to hear.

25          MR. MELZER:  Thank you, your Honor.

I791rav5

```
1              I wanted to mention that we will be submitting the
2    letter that we spoke about on de facto tenure as soon as
3    possible.  We just need to check on some dates.
4              THE COURT:  Okay.  All right.  Thank you very much.
5              So I'll see you all tomorrow at 9.  Have a nice night.
6              ALL COUNSEL:  Thank you, your Honor.
7              (Adjourned to July 10, 2018, at 9:00 a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```