```
I71nrav1
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ENRICHETTA RAVINA,

                    Plaintiff,

          v.                              16 CV 2137 (RA)

COLUMBIA UNIVERSITY,

                                          Jury Trial

                    Defendant.

------------------------------x

                                          New York, N.Y.
                                          July 10, 2018
                                          9:30 a.m.

Before:

          HON. RONNIE ABRAMS

                                          District Judge
                                          and a Jury

                              APPEARANCES


SANFORD HEISLER SHARP LLP
     Attorneys for Plaintiff
BY:  DAVID SANFORD
     ALEXANDRA HARWIN
     MELINDA KOSTER


PROSKAUER ROSE LLP
     Attorneys for Defendants
BY:  BETTINA B. PLEVAN
     RACHEL S. FISCHER
     STEVEN D. HURD

HERNSTADT ATLAS PLLC
     Attorneys for Defendant Bekaert
BY:  EDWARD HERNSTADT

I71nrav1

1              (Trial resumed)

2              (Jury not present)

3              THE COURT:  Thank you, everyone.  You can be seated.

4    Thanks.

5              Just for future reference, so you know my practice, if

6    you're here between 9 and 9:30 before the jury has come in and

7    you need to see me to discuss any issue relevant to the

8    morning's session, just let my deputy know, and I'll come out.

9              OK.  But, while we are here, why don't we discuss some

10   of the pending issues.

11             Are they ready?

12             THE DEPUTY CLERK:  Waiting on one.

13             THE COURT:  OK.

14             First I will turn to plaintiff's request for a number

15   of limited depositions of witnesses disclosed by defendants

16   either on the last day of or subsequent to the close of

17   discovery.

18             I have already ruled that the late witness disclosures

19   do not warrant the drastic remedy of preclusion under Rule 37,

20   in large part because plaintiff for the reasons I discussed at

21   length at the final pretrial conference had good reason to know

22   that all the witnesses were relevant to the case, and I thus

23   ruled that late disclosures did not constitute trial by ambush

24   tactics by either of the defendants.

25             Plaintiff has now asked, as an alternative to

I71nrav1

1    preclusion, to conduct one-hour depositions of the nine

2    witnesses in question.

3              As an initial matter, I am denying that request as to

4    Columbia's six witnesses that the university disclosed on the

5    last day of discovery.  At that point plaintiff had already

6    used her allotted depositions, but could have asked the Court

7    for more if she felt they were necessary.  In addition, it is a

8    little hard to believe that plaintiff would have used six of

9    her ten depositions for those witnesses.

10             There are three other witnesses, however, Marie

11   Hoerova, Mark Broadie and Robert Hodrick, who were not

12   disclosed until June 12, 2018, which is nearly a month after

13   the close of discovery.

14             In its earlier argument for preclusion, plaintiff

15   characterized the testimony of these and other witnesses to be

16   of marginal relevance, so the importance of these late-stage

17   depositions, therefore, would seem to be marginally relevant.

18   That said, why don't I turn to defendants.  Tell me, with

19   respect to these three witnesses, what their relevance is, and

20   then I will hear from plaintiff.  Obviously we have spoken

21   about Marie Hoerova.

22             MR. HERNSTATD:  We have spoken about Mr. Marie

23   Hoerova.

24             Robert Hodrick is a professor at Columbia Business

25   School, and plaintiff wrote about him extensively in her

I71nrav1

```
 1    opposition papers, saying that because he is a mentor and a

 2    friend of Geert Bekaert that he, therefore, was I guess

 3    essentially a tool used by Professor Bekaert to influence the

 4    tenure proceedings.  He was part of the tenure committee that

 5    reviewed Professor Ravina's tenure consideration.

 6          The only reason he is on the witness list is because

 7    plaintiff brought him into this case and made this accusation

 8    that he somehow tainted these proceedings without any basis for

 9    it.  So his sole function would be to come in and say that's a

10    bunch of nonsense.

11          THE COURT:  Where are we on who's intending to call

12    Maria Hoerova?  I know we had the motion to preclude her

13    testimony, but then we think her testimony may be relevant to

14    provide context for the e-mails.  At this point are you waiting

15    to see what plaintiff does with Maria Hoerova?

16          MR. HERNSTATD:  No, since your Honor has ruled that

17    plaintiff cannot discuss the consensual aspect of the

18    relationship and that the argument that Professor Ravina is

19    just like Ms. Hoerova is not going to be something that is in

20    this case, we don't need to call her.

21          THE COURT:  All right.  Then with respect to the

22    remaining one -- sorry, is it Broadie?

23          MS. PLEVAN:  Broadie.

24          Actually, the plaintiff identified Professor Broadie

25    to us during the course of discovery as the person who at the
```

I71nrav1

1  business school had been given a break in service as a

2  curriculum specialist.

3          So they have been aware -- I think in May of 2017 they

4  served a 30(b)(6) deposition notice, and among the topics was

5  someone who had knowledge about Professor Broadie.  So,

6  although we didn't put him on our disclosures, they knew about

7  him way back.

8          THE COURT:  All right.  In light of that, I'm not

9  going to direct defendants to -- I am not going to allow these

10  late depositions at that point with respect to the two

11  remaining witnesses.

12          So next I want to address plaintiff's request for

13  reconsideration of my November 2017 denial of the motion to

14  compel production of certain records of male faculty at

15  Columbia.

16          That motion is denied.

17          During discovery plaintiff asked the Court to compel

18  production of a range of documents for five male faculty

19  members at Columbia, including their annual reports.  Columbia

20  had provided to plaintiff the materials of the five male

21  faculty that were presented as part of their tenure

22  applications, but not their regular annual reports.  The Court

23  agreed with that distinction both on relevance grounds and

24  finding that the request for the annual reports was overly

25  burdensome in light of the fact that Columbia had already

I71nrav1

handed over enough material to allow plaintiff to see what the male faculty members tenure packages looked like.

The Court maintains that view.  In my view these annual reports of the male faculty are not relevant because they were not part of the tenure decisions for those individuals.

By contrast, Ms. Ravina's annual evaluations are relevant to allow defendants to attempt to establish any deficiencies in scholarship and when they arose and, in terms of the timing, to establish a motive for fabrication of the allegations, which is essentially what I understood from Mr. Bekaert's opening to be part of his defense.  So I think that her annual reviews in contrast to the male faculty members are relevant for that purpose.

And because plaintiff has long known that her annual evaluations were potentially a key issue in this case, the testimony of Professor Wei Jiang about the annual evaluation process should not come as a surprise.  Professor Jiang will be allowed to testify about the evaluation process so that the jury may understand the context of plaintiff's evaluations. The Court will not keep out her probative testimony merely because Columbia's witness disclosure for her listed tenure review rather than annual evaluation review is a possible subject.

Plaintiff is not thus demonstrated that her testimony

I71nrav1

1    on this subject comes as a surprise, nor that she will be

2    prejudiced by it.  See the *Patterson* case, 440 F.3d 117.

3              Next I will turn to the dispute concerning the context

4    of the conversation between Professor Ravina and Professor

5    Bekaert that mentioned Professor Ravina's past incident with a

6    possible stalker.

7              The Court has ruled that any reference to her past

8    experiences with her ex-boyfriend should be kept out on Rule

9    403 grounds, and I maintain that position.  Professor Bekaert,

10   however, argues that plaintiff's comments to him about her

11   history with a stalker provides important context for their

12   conversations.

13             Plaintiff appears to have first mentioned her 2007

14   stalker experience in a January 27, 2013, e-mail to Professor

15   Bekaert.  Bekaert sympathized with Ms. Ravina and relayed a

16   similar experience that happened to a friend of his in

17   Australia.  In his deposition he testified that it was this

18   e-mail exchange that he believes later led to a conversation

19   about his possible relationship with a flight attendant who had

20   also been stalked.

21             The Court finds that the purported stalking connection

22   to this one conversation between the parties does not justify

23   the inclusion of a reference the Court has found to be unfairly

24   prejudicial under Rule 403.

25             Professor Bekaert may testify, if it reflects the

I71nrav1

conversation as he remembers it, that he told plaintiff about

his relationship with a flight attendant in response to her

telling him about a past relationship of her own, but he

shouldn't be any more specific as to the stalking subject

matter.  So he can mention that it was about a past

relationship of hers, but not mention the stalking.

All right.

MR. HERNSTATD:  Your Honor, may I ask just to clarify?

THE COURT:  Yes.

MR. HERNSTATD:  Professor Bekaert did not testify that

Professor Ravina told him that it was a boyfriend, simply a

stalker.  So there isn't any reference to past relationships or

past or a boyfriend.  It was that she said I am dealing with --

and the e-mail is very clear on that -- I am dealing with a

stalker.  He responded, oh, that's awful, that's terrible.  The

e-mail doesn't say anything about a past relationship.  It just

references in passing a stalker.

We have absolutely no intention to get into past

relationships.  We are not going to mention the guy's name.

THE COURT:  Is there another more innocuous way that

you can think of to get it out without getting the fact of a

stalker?

MR. HERNSTATD:  The problem is that the e-mail chain

that mentions stalker is also relevant because it contains a

Ms. Ravina -- Professor Ravina asking Professor Bekaert about

I71nrav1

1    his social life in Hong Kong.  What's going on?  What's your

2    social life like in Hong Kong?  And then it continues and

3    reaches the thing where she -- in passing.  It's one of several

4    paragraphs, and it's one of the things that she's dealing with

5    that she lists --

6         THE COURT:  Right.  Why can't we just delete that

7    aspect of it, but include the back and forth otherwise to

8    provide context?  I want to give you the ability to provide the

9    context that he's not mentioning it out of nowhere.

10        MR. HERNSTATD:  I don't see how Professor Bekaert can

11   talk about -- can say, yes, I certainly mentioned this

12   stewardess that I met in my travels, because she had a stalker

13   issue too, just like you.  That is the only -- that is the

14   connection.

15        THE COURT:  Right.

16        MR. HERNSTATD:  He would be severely prejudiced if he

17   can't explain how Professor Ravina came to know that he had met

18   and possibly dated someone that he met while in Asia without

19   that connection.

20        THE COURT:  Let me just ask, is this going to come out

21   on Professor Ravina's testimony?

22        MS. HARWIN:  Nothing about a stalker is going to come

23   out.

24        THE COURT:  OK.  Then why don't we bring the jury in,

25   because they are here now, and we will talk about it.

I71nrav1

| | |
|---|---|
| 1 | MR. HERNSTATD:  Your Honor, her testimony is going to |
| 2 | be that Professor Bekaert told her that he slept with a |
| 3 | stewardess.  That didn't happen.  That is a false statement. |
| 4 | The only way that we can show that is with Professor Bekaert's |
| 5 | testimony about how she even had a clue that he knew a |
| 6 | stewardess. |
| 7 | THE COURT:  All right. |
| 8 | MR. HERNSTATD:  Otherwise he's hamstrung on that |
| 9 | particular allegation. |
| 10 | THE COURT:  Remind me.  What is the exhibit number of |
| 11 | the e-mail? |
| 12 | MR. HERNSTATD:  Your Honor, I don't have the letter I |
| 13 | sent you.  But it is attached to the -- |
| 14 | THE COURT:  Let me take another look at the e-mail, |
| 15 | and we will talk about it at the break. |
| 16 | MR. HERNSTATD:  I gave you the transcript -- |
| 17 | THE COURT:  I know.  I have it.  I just want to see if |
| 18 | I can bring it up right now.  I will get it, and we'll talk |
| 19 | about it at the break. |
| 20 | MR. HERNSTATD:  Thank you, your Honor. |
| 21 | THE COURT:  Bring in the jury. |
| 22 | (Continued on next page) |
| 23 | |
| 24 | |
| 25 | |

```
 1              (Jury present)

 2              THE COURT:  Good morning, everyone.

 3              JUROR:  Are we supposed to stand until you tell us to

 4   sit down?

 5              THE COURT:  No.  We are standing for you.  Everyone

 6   can be seated.

 7              Thank you all for coming so promptly this morning.

 8              Plaintiff, you may call your first witness.

 9              MS. HARWIN:  We call plaintiff Enrichetta Ravina.

10   ENRICHETTA RAVINA,

11       the Plaintiff herein,

12       having been duly sworn, testified as follows:

13              MS. HARWIN:  Good morning, ladies and gentlemen of the

14   jury, and good morning Professor Ravina.

15              THE WITNESS:  Good morning.

16   DIRECT EXAMINATION

17   BY MS. HARWIN:

18   Q.  Professor Ravina, where are you from originally?

19   A.  I'm from Torino, the northwest of Italy.

20   Q.  Could you speak up a little bit.

21   A.  OK.

22              THE COURT:  I am going to ask you both to speak up

23   actually and use the microphones.

24   A.  I am from Torino.  It's in Italy, in the northwest of

25   Italy.
```

I71nrav1                    Ravina - direct

1   Q.  Can you tell us a little bit about your upbringing.

2   A.  I was born in a small village just outside of Torino.

3   Growing up -- I have a sister who is five years younger.  I

4   grew up in this area, and I studied, in high school I studied

5   the Latin, Greek, philosophy, math, I enjoyed art history, and

6   I moved to the U.S. only after college.

7   Q.  Let me back up a little bit.

8           Professor Ravina, how are you feeling today?

9   A.  Nervous, anxious, for lack of a better word, yeah.

10  Q.  Why are you feeling anxious?

11  A.  Well, this is an experience that has taken over my life for

12  the past four, six years, since 2012, for the past six years,

13  and what gets decided in this trial is going to influence the

14  rest of my life both professionally and personally.  So I -- I

15  feel it is an important moment.

16  Q.  I understand that this is a stressful experience, and I am

17  going to try make the examination today as straight --

18          MS. PLEVAN:  Your Honor.

19  Q.  -- forward as possible.

20          THE COURT:  Yes.  Let's not make speeches.

21          MS. HARWIN:  Thank you.

22          THE COURT:  Thanks.

23  BY MS. HARWIN:

24  Q.  Professor Ravina, can you tell us about your educational

25  background.

I71nrav1                    Ravina - direct

1   A.  After high school, I didn't know what to do.  In Italy when

2   we enter college, we need to decide what topic we study

3   immediately, so we pick an area and then our colleges are all

4   separated.

5          So I ended up picking economics and business.  I

6   thought this was a nice -- it was -- I thought it was an

7   interesting topic for various reasons.

8   Q.  And what were the reasons why you were interested in

9   economics?

10  A.  For a personal reason was that my father was an

11  entrepreneur.

12  Q.  What do you mean "entrepreneur"?

13  A.  He had a company.  This company was producing gourmet foods

14  and selling it to supermarkets, shops, and other outlets.  This

15  was a good opportunity to understand better how that worked

16  basically.

17  Q.  Where did you go to college?

18  A.  I went to the University of Torino.

19  Q.  You mentioned -- I'm sorry let me restart that question.

20          When did you move to the United States?

21  A.  I moved to the U.S. in 1999 to study for a Ph.D.

22  Q.  Did you have any family in the United States?

23  A.  No.

24  Q.  What is a Ph.D.?

25  A.  A Ph.D. is a five- to six-year course of study in which

I71nrav1                          Ravina - direct

1    people highly specialized on a subject, their main activity is

2    to conduct research, and after a Ph.D. they usually become

3    professors and researchers.

4    Q.  Why did you decide to go to graduate school in the U.S.

5    rather than in Italy?

6    A.  The U.S. is, at least for my discipline, the U.S. is the

7    best place to go to graduate school in terms of people we can

8    collaborate with and learn from, from the point of view of

9    resources, interactions, conferences, and ability to pursue

10   interesting and good work.

11   Q.  When you decided to get a Ph.D., did you have any kind of

12   career path in mind?

13   A.  I wanted to be a professor.

14   Q.  Why did you want to be a professor?

15   A.  I think being a professor in my field at least is

16   interesting, and it is a good profession because it has various

17   aspects that I find fulfilling.

18            One is that it is intellectually hard and stimulating.

19   You need to solve problems.

20            A second one is that it is a topic that has an effect

21   on people's lives.  The things that we study have an impact to

22   our -- to improve our people to make financial decisions, like

23   it has practical application.

24   Q.  Do you specialize in any particular field in economics?

25   A.  Yes.  I specialize in behavioral finance and household

I71nrav1                        Ravina - direct

1    finance.

2    Q.  Can you explain what behavioral finance is?

3    A.  Behavioral finance is an area of finance that studies how

4    psychology affects the way people make investments, emotions,

5    how these emotions affect the stock market or people deciding

6    to buy on the credit card, how do they save for retirement and

7    other topics of this type.

8    Q.  Can you explain what the field of household finance is.

9    A.  The field of household finance is a relatively new field.

10   It is very hot, and it's expanding right now, and it studies

11   the financial decisions of individuals, like people as opposed

12   to large financial institutions, banks, companies or the stock

13   market in general, so how people save and spend.

14   Q.  What kind of individual financial decisions fall within the

15   field of household finance?

16   A.  Those would be financial decisions about saving for

17   retirement, for example.  Do people save enough?  Do they --

18   how do they save?  What do they invest in?

19        It could be about borrowing on credit cards, deciding

20   how to, you know, how much to borrow, do they realize the

21   effect of borrowing and so on.

22        And another area could be peer-to-peer lending, people

23   lending to each other instead of borrowing from banks.

24   Q.  About how long have economists been researching household

25   finance?

I71nrav1                        Ravina - direct

1   A.  Household finance started as a field in 2006 when the then

2   president of the American Finance Association defined it as a

3   field and propelled research.

4   Q.  As an economist, how do you go about studying ordinary

5   people's financial decisions?

6   A.  There are various ways.  A very promising way of doing so

7   is to partner up with firms and to collect large administrative

8   datas detailing what people do in their financial decisions.

9   Q.  Do these datasets contain people's private information?

10  A.  No.  So, before getting the dataset the company takes away

11  all the identifiable information and gives everybody a numeric

12  number.  And then we have a duty coming from both the company

13  and the university to make sure that even with the few

14  information that we have about people, usually gender, zip code

15  and age, we are not able to reverse engineer the identity of

16  anybody.  And there is also an area of study that specializes

17  in ways to reverse engineer and make sure that privacy is

18  protected, and at the same time we can do the study for the

19  benefit of understanding the behavior.

20  Q.  Where have you done economic research?

21  A.  Before I had been at Columbia I was a professor at NYU, the

22  business school, Stern.  I also did research when I was a Ph.D.

23  candidate in Northwestern.  I did research at Harvard Business

24  School and at the Federal Reserve Bank of New York.

25  Q.  You mentioned being a professor at NYU.  What was your

I71nrav1                         Ravina - direct

1    title there?

2    A.  I was an assistant professor of finance.

3    Q.  When was that?

4    A.  I started in July 2005 until June 2008.

5    Q.  What was your position at Harvard?

6    A.  I was a visiting scholar in the finance unit.

7    Q.  When were you at Harvard?

8    A.  In the fall of 2010.

9    Q.  What is the Federal Reserve?

10   A.  The Federal Reserve, it's the central bank of the U.S.

11   It's the institution that prints the money, decides the

12   interest rates and has a mandate to deal with inflation and

13   unemployment in the company.

14   Q.  When were you at the Federal Reserve?

15   A.  In the fall of 2012.

16           MS. HARWIN:  This is Plaintiff's Exhibit 234.

17   BY MS. HARWIN:

18   Q.  Professor Ravina, do you recognize this document?

19           THE COURT:  Speak up, please.

20           Thank you.

21           MS. HARWIN:  Sure.

22   BY MS. HARWIN:

23   Q.  Professor Ravina, do you recognize this document?

24   A.  Yes, it is my CV.

25           MS. HARWIN:  Your Honor, I move to admit Plaintiff's

I71nrav1                    Ravina - direct

1    Exhibit 234?

2              THE COURT:  Any objection?

3              MS. PLEVAN:  No objection.

4              THE COURT:  It will be admitted.

5              (Plaintiff's Exhibit 234 received in evidence)

6    BY MS. HARWIN:

7    Q.  Can you please explain the categories of information

8    contained in your CV.

9    A.  So, the CV is several pages.  They cover the academic

10   appointments of a professor, the education grants, prizes and

11   honors, the publications, the service to the profession in

12   terms of being on committees, organizing conferences.  It also

13   covers the classes that I have been teaching over these years

14   and also selected media mentions of the research.

15   Q.  When you say media mentions, what kind of media attention

16   has your research received?

17   A.  So, my research was featured in the Financial Times, the

18   Wall Street Journal, Slate, Bloomberg, among others.

19   Q.  Did there come a time when you began to work as a faculty

20   member for one of the defendants in this case, Columbia

21   University?

22   A.  Yes.  I started at Columbia University on July 1, 2008.

23   Q.  Where did you work at Columbia?

24   A.  In the finance and economics division in the business

25   school.

I71nrav1                        Ravina - direct

1   Q.  How does Columbia rank among business schools?

2   A.  I think it's in the top ten.

3   Q.  Why did you come to Columbia?

4   A.  I was recruited.

5   Q.  When you say you were recruited, what do you mean by that?

6   A.  Every year there is a recruiting committee in each

7   department that looks for new professors, and somebody in the

8   Columbia faculty approached me and asked me if I was interested

9   in moving to Columbia.

10  Q.  Did you decide to join the faculty?

11  A.  Yeah, I did.

12  Q.  Why did you decide to join the faculty at Columbia?

13  A.  I thought Columbia was a good fit for me and my research,

14  because they were both finance and economics, and a lot of the

15  topics that I am working on and I was working on are at the

16  confluence of both finance and economics, so it would have been

17  a good environment for me to collaborate with other colleagues

18  who were interested in similar stuff.

19  Q.  Your title was assistant professor of finance and

20  economics?

21  A.  Yes, it was.

22  Q.  Can you explain what the job of an assistant professor at

23  Columbia Business School involves?

24  A.  Yes.  So, assistant professors do various things.  One

25  thing is to do research.  Another thing is teaching graduate

I71nrav1                    Ravina - direct

1    students in this case, and then there is a component of service

2    to the school and the profession in general.

3    Q.  What expectations, if any, did you have about the

4    possibility of being promoted at Columbia when you came?

5    A.  So my position was a tenure-track position.  This means

6    that we have a certain amount of time to amass credentials,

7    work on publications, do well in the teaching and the service,

8    and then we will be evaluated for tenure.

9    Q.  Can you explain what tenure is.

10   A.  Well, tenure in short is a job for life.  So, after people

11   are evaluated for tenure, then they don't need to prove

12   themselves anymore.  They need to keep working and do what they

13   were doing before, but there is no pressure anymore.  They are

14   just -- they have a job for life unless they do something very

15   bad.

16   Q.  When you say "very bad," like publish a bad paper?

17   A.  No.  So, something that is against the policy of the

18   university, something that is illegal, something major.

19   Q.  What happens when you are considered for tenure?  What is

20   that process like?

21   A.  So --

22            MS. PLEVAN:  Objection.

23            THE COURT:  What is your understanding of the process?

24   I will allow you to answer that.

25            THE WITNESS:  My understanding of the process is that

1   after a certain period of time people have to put -- the

2   candidate has to put together a package.  This package will be

3   evaluated by the team, the tenured senior professors inside the

4   department, by the school.

5          And also another important component are a letter of

6   support or evaluation coming from the academic community at

7   large from experts in the field of the candidate.  So, they

8   will write these letters.  They are between ten and twenty, it

9   depends on the school.  And then the department will receive

10  them, they will read them and take them into consideration.

11  Q.  Can you explain a little bit more about this process of

12  letters from outside the university and how people from outside

13  the university weigh in on tenure.

14  A.  So people get tenure in a university, a specific

15  university, but they really get tenure in the profession at

16  large in their specific field.  Having letters from outside

17  gives advice to the tenure professors in the school about the

18  impact of the research, the potential understanding of the

19  research in the academic community.

20  Q.  What is your understanding of the factors that go into a

21  tenure decision at Columbia?

22  A.  So, it is various factors.  We need to publish papers and

23  do good research.  Our teaching will be evaluated as well and

24  our service.

25  Q.  When does the tenure process typically start at Columbia

I71nrav1                         Ravina - direct

1    Business School?

2    A.   Typically it starts in the sixth year that the person is on

3    the tenure clock, specifically in the spring of the sixth year.

4    Q.   Can you explain the concept of the tenure clock?

5    A.   So, the tenure clock is the set of years that count for a

6    person to put together their publication record, their teaching

7    record, and their service.

8    Q.   How common is it for tenure-track professors in your field

9    to publish multiple papers shortly before coming up for tenure?

10           MS. PLEVAN:   Objection.

11           THE COURT:   I will allow it as to what your

12   understanding is.

13   A.   My understanding is it's quite common.  Many of the people

14   in my field have published very closely to getting a promotion.

15   This is especially true for people in household finance,

16   because there are large datasets to put together and to work on

17   and to amass, and so usually they create a platform and then

18   they push out a lot of papers close to their tenure moment.

19   Q.   Did anyone at Columbia ever communicate to you that the

20   timing of your publications factors into the tenure decision in

21   any way?

22   A.   No.  People can publish at any time during the tenure

23   clock.  It doesn't matter.

24   Q.   Can you provide any kind of analogy or illustration to sort

25   of explain what publishing on the tenure clock is like?

I71nrav1                      Ravina - direct

A.  It is a little bit like a race, you know, in the Olympics

or on track.  People run.  They have -- they know that they

have a certain amount of the track to cover, and so they

basically people say, OK, start running, and you run.  At the

end we will see, after the seven years we will see, or six or,

you know, after seven years or whatever time we'll see who

arrives, who makes it to the finish line.

            (Continued on next page)

I7a1rav2                     Ravina - Direct

1  BY MS. HARWIN:

2  Q.  You testified before that the tenure process usually starts

3  after six years.  Are there any exceptions to that?

4  A.  There are various exceptions.  The tenure clock, it can be

5  stopped in -- for leaves, for various reasons.

6  Q.  During your time at Columbia, did you teach courses?

7           MR. HERNSTADT:  Excuse me, your Honor.  The transcript

8  has stopped and it's difficult to hear Professor Ravina.  So if

9  we could --

10          THE COURT:  All right.  I think the court reporters

11  are switching, so it will just take a minute.

12          MR. HERNSTADT:  Thank you, your Honor.

13          THE COURT:  But I'm going to ask both of you just to

14  speak up so everyone in the courtroom can hear you, because

15  mine is also paused, but it should come up shortly.

16          MR. HERNSTADT:  We didn't hear the last thing that

17  Professor Ravina said, so maybe when we start again, we could

18  start there.

19          THE COURT:  Okay.  Do you want to just ask that

20  question again.

21  BY MS. HARWIN:

22  Q.  I believe the question was about your prior testimony that

23  the tenure clock usually -- or the tenure process usually

24  begins during the spring of the sixth year.  And I asked:  Are

25  there any exceptions to that?

1    A.   There are, and I said that there are exceptions.   The

2    tenure clock, it can be stopped -- stopped for various reasons.

3    Q.   During your time at Columbia, were there courses that you

4    taught?

5    A.   Yes.   I taught a course called Corporate Finance.

6    Q.   And what topics did you teach in your Corporate Finance

7    course?

8    A.   The Corporate Finance course covers topics of valuation.

9    Valuation is a methodology that allows the people to determine

10   the price of a stock, the price of a company when the company

11   goes public, but it can be used to determine the price of

12   anything that produces cash in the future.

13          So if we have, for example, an apartment building and

14   this apartment building gives us rent but we also have costs

15   like maintenance, taxes, and all these, this is the methodology

16   to put all this information together and tell us what is the

17   value of this apartment building today based on all the future

18   cash and expenses that we will get out of it.

19   Q.   Who are your students when you taught Corporate Finance?

20   A.   I had several type of students.   The main type of students

21   that I had are MBAs, people that are doing master's in business

22   administrations.   They are graduate students, and they come to

23   the -- to Columbia Business School for two years to do their

24   degree.

25          I also had executive MBAs.   These are people that do

their degrees while they're working.  So they come on Friday

and Saturday, usually every other week.

          I also taught the class in the college, so for people

that are college students, and these were working on getting

college degrees.

Q.  You talked about doing economic research as part of your

work.  Can you explain what steps you have to take in order to

publish an economics research paper in your field.

A.  So it might depend on the type of paper, the topic that we

are covering, but what usually people do is they come up with

an idea that they think is interesting and they think that the

community, the academic community and hopefully the general

public will think is interesting.  And then you have to devise

the strategy to answer this question, in a scientific and

compelling way.

          In my field, one type of research that is very common

and very valuable is to answer a question about individual

financial behavior by looking at what they are actually doing.

So partnering with the firm and seeing, okay, every month

people tend to save this much for retirement, they invested in

this specific way.  And so basically it's like they think

that -- they identified like HR administrative information so

many, many companies putting them together, sifting through

this data, and understanding what can we -- what can we learn

when we look at so many people and in terms of how they react,

I7a1rav2                        Ravina - Direct

1    how they save, in terms of policies that we might implement to

2    help them save better, for example.

3    Q.  Could you walk me through -- once you've come up with a

4    strategy for how to analyze a question, how do you go about

5    actually performing the research and ultimately publishing it?

6    A.  So there are various steps.  If the strategy entails

7    getting data, then either the data needs to be publicly

8    available, so somewhere in the library, or they are acquired

9    from a company or -- these are usually the two things.  So

10   either public or acquired from a company or another

11   institution.  There is a process of getting this data, agreeing

12   with the companies, doing all the prework of the identifying

13   the data, applying to the university about the project, making

14   sure that it doesn't hurt the individuals, then all these data

15   eventually comes to the researchers, and at that point it's a

16   matter of assembling a team to go through the data and making

17   sure that this paper is ready for academic analysis.  Usually

18   the data is at the company level and they don't do this type of

19   research.

20          Once the team is assembled, then there are other

21   things -- in this case there are million and million --

22   millions and millions of observations.  Of course we cannot

23   check them one by one.  So there are going to be like

24   statistical methods to try to see is there something -- does

25   this data square, like is it accurate, are there outliers, why,

I7a1rav2                        Ravina - Direct

and what's going on in this information.  After that, it's a

time in which we create algorithms and codes, so we write a

series of instructions for the computer to analyze all the

data, to process, process all the information to find what the

summary, what causes what, what can we learn, do people save a

lot for retirement.  Then we do this analysis and we say yes,

no, and then why.  We'll evaluate the process, we create

various codes, computer codes, we go again to the data, we

analyze it, and it's a back-and-forth.  This takes quite a long

time.

Q.  After you've done that kind of preparing of the data, can

you just describe in general terms what are the steps to get it

through publication.

A.  So after the data is ready and it's been analyzed and the

conclusions have been extracted from the data, then it's time

to write it down.  So all the works of this needs to be

condensed in 30, 40 pages.  The data is very precise in

describing all the work that has been done.  To this 30 pages

we can add tables, figures to support the analysis, and after

that happens, then we start -- professor starts presenting the

paper to the academic community, so we post it on our website,

and then we get invited to conferences, seminars, in which we

have an allotted amount of time to explain the research, and

then other researchers will critique us, will give us

suggestion, will discuss, so that the paper can be improved,

I7a1rav2                         Ravina - Direct

1   further improved.

2   Q.  Then after the conference process, what happens in terms of

3   actually submitting to a publication?

4   A.  So after the conference process, the paper gets sent to a

5   journal, submitted to a journal, so there is a website, we

6   submit the paper, and then while -- while the paper is at the

7   journal, there is going to be one or more anonymous referees,

8   so other researchers in our field, whose identity we don't

9   know, that they're going to be asked to prepare a report about

10  the paper.  So they will tell us what they like, what they

11  would like to be changed, and they prepare a list of things

12  that should be changed before the paper goes into publication,

13  and this can take one, two, three rounds of back and forth with

14  these referees.  They send us like four, five pages on average,

15  can be longer or shorter, then the researchers implement the

16  request, or respond to the request in some way, send the paper

17  back with the response, the referee reads it again, sends it

18  back, we revise it, then after two or three of these

19  interactions, the paper will get accepted.

20          Once the paper is accepted, there is only a matter of

21  doing a copy editor, language, to make sure that everything is

22  nice, the formatting for the journal and stuff like that, and

23  then you will get eventually published.

24  Q.  Professor Ravina, you testified before you joined the

25  faculty at Columbia in 2008.  I'd like you to walk me through

I7a1rav2                    Ravina - Direct

1   very briefly the academic papers that you published since 2008.

2   We can refer back to Plaintiff's Exhibit 234.

3           MS. HARWIN:  Brian, can you bring that up.

4   Q.  Professor Ravina, can you turn to page 2, the last line.

5   Actually, you know what, let's turn to page 3, the line marked,

6   "What Independent Directors Know, Evidenced from Their

7   Trading."  Can you provide just a one-sentence description of

8   what that paper was about.

9           MS. PLEVAN:  Speak up, please.

10  A.  So this paper, what it was about, directors of public

11  company, and what we are doing in this paper is we look at the

12  way they trade the company stock when they buy and when they

13  sell, and we trying to understand what do they know about

14  future earnings, about the prospects of the companies, from --

15  from trading.  And the reason why this is important is because

16  independent directors are involved in keeping the management in

17  check, and they can already fulfill this role if they actually

18  knowing what's going on in the company, so this was our test

19  for that.

20  Q.  And looking one line above that on the third page, can you

21  give a one-sentence summary of what the paper "Appearance,

22  Inferences About Credit Quality and Learning" was about?

23  A.  Yes.  So this is the paper that studies how people -- how

24  appearance, the way people present themselves, affects their

25  financial transactions.  So when we go for an interview or when

we meet a counterparty of any type, in addition of having our

CV and having some hard information about us, also the way we

present ourselves matters.  For an interview, we dress up, for

example.  What is the value of this first impression.  So this

is how -- this paper -- this is the topic of this paper.  Can

we see two people that are similar otherwise, in this case in

terms of credit quality, but they present themselves

differently, what's the value of making a good impression.  And

then what about the counterparty?  Do lenders learn about were

the people that, you know, how the appearance that actually is

connected to *ex-post*, the default afterwards.

Q.  Professor Ravina, turning to the paper on top of that,

"Risk Aversion and Wealth, Evidence from Person-to-Person

Lending Portfolios."  Can you give just a one-sentence summary

of that paper.

A.  This paper analyzes the risk attitudes of individuals by

looking at the way they lend money to others, on peer-to-peer

lending platform.

Q.  And looking at the line above that, "An Assessment of the

Mating Mode of Explanation of the Beauty Premium in

Market-Based Settings," can you give me a one-sentence summary

of that paper.

A.  This paper discusses the theory in biology that mating

motives motivate people, not only -- in various aspects of

life.  And it studies how the beauty of a counterparty actually

I7a1rav2                        Ravina - Direct

1    affects the perception, behavior.  There is a quite large

2    literature that shows that people that are better looking do

3    better in life, do better at work, they get promoted more

4    often, just because of that, and this paper studies this.

5    Q.  Professor Ravina, turning to the next section on your CV,

6    which discusses working papers, can you explain what a working

7    paper is.

8    A.  A working paper is a draft of the paper, so 30 to 40 pages

9    draft that captures all the analysis that has been done on the

10   research, presents the results, but it's not been submitted to

11   publication yet, or if it is submitted, is not -- has not

12   reached acceptance level yet, is in the process of the back and

13   forth with the referees.

14   Q.  The paper there entitled "Investor Ideology," can you give

15   a one-sentence description of what that paper is about.

16   A.  This is a paper that studies how the mutual funds, where

17   people put their money into save -- so Vanguard, BlackRock, and

18   all these mutual funds where we put our retirement savings --

19   vote when it comes to company issues.  So how do they vote on

20   CEO pay, how do they vote on the environment, how do they vote

21   on all the proposals that come to the fore in a company

22   meeting.

23   Q.  Professor Ravina, how common is it in your field to do

24   research with co-authors?

25   A.  It is the norm.

1   Q.  Did there come a time when you started to co-author

2   research with the other defendant in this case, Professor Geert

3   Bekaert?

4   A.  Yes.

5   Q.  When you came to Columbia, what did you know about

6   Professor Bekaert?

7   A.  I knew that Professor Bekaert was a senior tenured

8   professor in the department.  He's not in my field.  His field

9   is asset pricing.  So I just knew that he was very powerful and

10  very well known in his field, but I didn't interacted much with

11  him before.

12  Q.  Before working with Professor Bekaert, what did you know

13  about his publication record?

14  A.  I know that he was published author and he was very

15  prolific in the academic community.

16  Q.  You used the word "prolific."  What do you mean by that?

17  A.  Writing many papers; publishing many, many papers.

18  Q.  How did you and Professor Bekaert start working together?

19  A.  Toward the end of 2009, Professor Bekaert approached me,

20  asking me if I was interested in working on -- on a set of

21  projects based on a large data set coming from a company that

22  he had a relationship with.

23  Q.  What did Professor Bekaert tell you about his relationship

24  with the company?

25  A.  He told me that he had been a consultant for this company

1   since the inception of the company, that he was friends with

2   the executives, they had projects together, and they wanted to

3   take advantage of the trove of data, the huge amount of data

4   that they had.

5   Q.   What was the name of the company?

6   A.   Financial Engines.

7   Q.   What is Financial Engines?

8   A.   Financial Engines is a company that does various things.

9   It's a publicly traded company.  They -- they do recordkeeping;

10  they administer retirement -- employer retirement plans; they

11  give financial advice to invest for retirement; and in some

12  cases they also manage the account for the worker.  So if the

13  worker doesn't want to make choices, they pay a fee and

14  Financial Engines makes the choices for them.

15  Q.   Did the retirement plans that Financial Engines administers

16  have any particular name?

17  A.   So most of the plans administered by Financial Engines are

18  401(k) plans.

19  Q.   What are 401(k) plans?

20  A.   401(k) plans are the plans that help people save money for

21  retirement and they come through the employer.  About

22  60 percent of workers in the US work at companies that give

23  them a 401(k).  So this allows them to every month set aside

24  part of their salary and invest it tax-free for retirement.

25  Q.   Can you tell us more about what was the project that

Professor Bekaert proposed working on with this data set.

A.   The initial project, the initial project was to look at the risk attitudes of people investing for retirement.  One of my paper was on risk attitudes, and Professor Bekaert just heard the presentation from one of my co-authors and he said that his data set would be very, very valuable and it could -- we could work on that topic and many other topics using this -- this data.

Q.   Did Professor Bekaert say why he was approaching you about this project?

A.   It was -- he told me that he was approaching me for my expertise in this field.  I had worked before with large data set.  I was working in house of finance, and this is a project about individual decisions and so I was a good person to -- to work together with him on this topic.

Q.   How did you respond to Professor Bekaert's offer to work together on this project?

A.   I -- I thought it was a great opportunity.  It was very valuable data set because even up to this point, no one has been able to analyze the retirement savings decisions of millions and millions of Americans to understand what we should do about retirement, are people saving enough, can we help them.  So it was a huge potential set of projects.  It was good for me because it was a set of projects that is in my field and not in Professor Bekaert's field, so there would not be

I7a1rav2                    Ravina - Direct

clouding of the contributions.  It was also good because it was

an opportunity for me to work with a senior professor in my own

department.

Q.  What would that mean to work with a senior professor in

your department?

A.  Senior professors in our -- in the department vote for

tenure, and so it was a good opportunity to show how good I was

and to have somebody on my side when the tenure process would

come to -- to its end.

Q.  What discussions did you have with Professor Bekaert about

the roles that each of you would play on the joint research

project?

A.  My role would be to get the data together, overview the

research assistants, work on statistical analysis.  That area

was my expertise.  Professor Bekaert's role would be more

general and he would have done more work when writing the draft

with the result would come.

Q.  Why would you be the one doing the work relating to the

data?

A.  The work relating to the data and empirical analysis as

well requires the specific expertise, and this was my area of

expertise but not Professor Bekaert's.

Q.  What was Professor Bekaert's expertise with working with

data?

A.  So Professor Bekaert's area of research is asset pricing,

I7a1rav2                        Ravina - Direct

so these are very small data sets that look at the stock
market, broadly speaking, over time.  So he had never worked
before with large data sets with individual-level observation,
month after month, year after year, and so this was not his
area of expertise, and he didn't have the statistical and
empirical approach, abilities to do this work because he was
doing other work.

Q.   Did you and Professor Bekaert have any discussions about
whether any publications would come out of this joint research
project?

A.   Yes.  Early on, when Professor Bekaert approached me to
discuss the potential to work together, he pointed out that
this was a very valuable data set, that four, five, maybe six
papers that would have a huge impact in the field would come
out of it.  And I agreed that was the case.

Q.   When you use the term "valuable data set," can you explain
what you mean by that.

A.   For an academic, a valuable data set is the data set that
allows you to answer a lot of important questions in your
field.  It allows you to create many work, make an impact, and
publish the work and do well as an academic.  This for us was
valuable.

Q.   When did you discuss with Professor Bekaert the kind of
publications that would come out of this joint research?

A.   So early on, when he proposed to me to do this -- this

I7a1rav2                        Ravina - Direct

1    work, and we discussed it, and then we discussed also various

2    points in -- in later years.

3              MS. HARWIN:  Brian, could you bring up on Professor

4    Ravina's screen Plaintiff's Exhibit 14.

5    Q.  Professor Ravina, do you recognize what's been marked as

6    Plaintiff's Exhibit 14?

7    A.  Yes.  It's a set of email that I exchanged with Professor

8    Bekaert about potential research assistants and other matters.

9    Q.  When is this email exchange dated?

10   A.  November 19, 2012.

11             MS. HARWIN:  And I move to admit Plaintiff's

12   Exhibit 14.

13             THE COURT:  Any objection?

14             MS. PLEVAN:  No objection.

15             MR. HERNSTADT:  No objection.

16             THE COURT:  All right.  It will come in.  Thank you.

17             (Plaintiff's Exhibit 14 received in evidence)

18   BY MS. HARWIN:

19   Q.  Professor Ravina, can you take a look at the first page,

20   the top email from Professor Bekaert to you.  I'm going to

21   start on the second sentence.  Do you see where Professor

22   Bekaert wrote, "As you said, once the data are in good shape,

23   you could essentially imagine writing 4/5 papers

24   simultaneously."

25   A.  Yes.

I7a1rav2                    Ravina - Direct

1   Q.  How common would it have been to write multiple papers

2   simultaneously from a single set of data?

3   A.  In general, it's not very common.  Usually there are only

4   few papers that come out from a set of data.  But if a

5   researcher can find a data set that can be a platform in and

6   generate many papers at the same time because the topic is so

7   interesting and the data is not available to anybody else, then

8   that's very valuable.  So it's -- it's uncommon in a good way.

9   It's like an extraordinary opportunity.

10  Q.  The next sentence beginning, "For someone who spent 4/5

11  years," who is that next sentence referring to?

12  A.  This is --

13          MR. HERNSTADT:  Objection.  This is an email from

14  Professor Bekaert.  She can't testify about what he's intending

15  to mean here.

16          THE COURT:  What was your understanding, receiving

17  this, about who this is a reference to?

18          THE WITNESS:  My understanding was he referred to the

19  potential research assistants that we discussed in the email

20  immediately before.

21  BY MS. HARWIN:

22  Q.  This next sentence wasn't about you.

23  A.  No, no.  It's about the research assistant.

24  Q.  Turning on to the next sentence, where Professor Bekaert

25  continued, "But this is surely definitely, if we get the

I7a1rav2                    Ravina - Direct

1   detailed plan information, a project with tons of legs."  Did

2   you get the detailed plan information for this project?

3   A.  Yes, we did.

4   Q.  Did you enter into a research agreement with the company

5   Financial Engines?

6   A.  Yes.

7          MS. HARWIN:  Your Honor, to streamline things, there

8   are a number of exhibits to which there are no objections.  Can

9   I just move to admit Plaintiff's Exhibit 6, as to which

10  defendants didn't object?

11         THE COURT:  Assuming there's no objection, that's

12  fine.

13         MR. HERNSTADT:  No objection.

14         MS. PLEVAN:  I didn't hear what she said.

15         THE COURT:  Plaintiff's 6, do you have any objection

16  to the admission of Plaintiff's Exhibit 6?

17         MS. PLEVAN:  No objection.

18         THE COURT:  Okay.  All right.  So Plaintiff's 6 will

19  be admitted.

20         (Plaintiff's Exhibit 6 received in evidence)

21  BY MS. HARWIN:

22  Q.  Professor Ravina, do you recognize this document?

23  A.  Yes.  It is the research agreement, the contract signed

24  with Financial Engines.

25  Q.  Can you turn to page 6 of this agreement.  Can you identify

the signatures on this page.

A.   Yes.   It's signed by Professor Bekaert, me, and Christopher Jones, who was the CIO, chief investment officer, of Financial Engines.

Q.   Could you take a look on the first page of this agreement at paragraph 1.   Could you turn your attention to the second sentence, which I'll read aloud.

"The researchers will not at any time do either of the following, either alone or with any third party: submit any confidential information to any journal or other publication in connection with the publication or prepublication process; or (2) publish any article or other writing based on any of the confidential information ("Article") in any journal or otherwise distribute any article or other written or spoken media via electronic means without FEI's prior written approval, which shall not be unreasonably withheld or delayed."

Professor Ravina, can you explain on a practical level what you understood this provision to mean for your research.

A.   In this case, which is unusual for a research collaboration, any draft that was created from the results needed to be sent to Financial Engines for approval before we were able to post it on the internet, present it at conferences or publishing it or actually showing it to anybody else.

Q.   Professor Ravina, taking your attention to page 3, paragraph 8, do you see where it says, "Upon FEI's request at

I7a1rav2                         Ravina - Direct

1    any time, the researchers will promptly return to FEI all

2    tangible items containing or consisting of any confidential

3    information and all copies thereof and irrevocably delete or

4    destroy any other copies of any confidential information."

5             Professor Ravina, on a practical level, what do you

6    understand this clause to mean for your research?

7    A.  This meant that Financial Engines also had the power to

8    withdraw the data at any time without any reason.

9    Q.  Did there come a time when you began to receive data from

10   Financial Engines for your research project with Professor

11   Bekaert?

12   A.  Yes.

13   Q.  And when did you start receiving data?

14   A.  The first set of data was received shortly after the

15   contract.  It was data about the 370 and more companies that

16   could potentially make up our data set, so a list of the larger

17   US copies.

18   Q.  Approximately how many companies were included in the data

19   you initially received from Financial Engines?

20   A.  It was more than 370, 370.

21   Q.  And what did you do with the company-level data when you

22   received it?

23   A.  So once we received this list, it was a method of looking

24   at all the companies and collecting all the publicly available

25   information out there about these companies, so I put together

I7a1rav2                    Ravina - Direct

1  a set of -- a team and I started looking for publicly available

2  information like stock prices, balance sheets, trade sheets,

3  locations, industries, type of securities that this companies

4  were issuing, characteristics of their retirement plans, and

5  all this information was to be put together with these

6  companies and then sent back to Financial Engines so that they

7  can then put together the individual information, the

8  individual information of the 3.8 million people working at

9  this company, joined -- joined with the company-level

10  information.

11  Q.  And did there come a time when you received this

12  individual-level information from Financial Engines?

13  A.  Yes, we received it at two different batches.  In the

14  spring of 2012, they sent the first 100,000 observations.  To

15  make --

16  Q.  When did you -- I'm sorry.  Go ahead.

17      When did you receive the rest of the Financial Engines

18  data concerning the individuals?

19  A.  The rest was received in later summer 2012.

20  Q.  How big was the full data set from Financial Engines?  Can

21  you quantify it in some way?

22  A.  The full data set was slightly more than 300 companies, so

23  300 employers, and you had the majority of the people working

24  for these companies, so about 300 -- 3.8 million individuals.

25  And for each of these individuals, the data set gave

I7a1rav2                      Ravina - Direct

1   information about what the type, how much the individual was

2   saving and in what security every six months, from 2005 until

3   2011, so every year we would see, for every people -- each

4   person, the amount that they were saving, the total amount they

5   had in their retirement, and then how they were allocating this

6   money across different securities.

7   Q.   And about how many data points were included in the final

8   data set that you got from Financial Engines?

9   A.   It was about 20 million data points.

10  Q.   After you received all of this individual-level data, can

11  you provide an overview of what you did on the project.

12  A.   So once the data was received, the first step was to make

13  it ready for academic analysis.  So I looked for outliers, I

14  make sure that there were no strange data points, like people

15  that are saved to 170, for example, in age, or stuff like that,

16  and I started putting together a team of research assistants

17  that would do all this type of checking work under my

18  supervision, I started writing codes and algorithms to

19  understand the data better.

20  Q.   Let me stop you there.  "Codes" and "algorithms," can you

21  explain what each of those words mean and how they factor into

22  this research.

23  A.   So the code is a master plan of instructions that the

24  researcher sends to a computer to make the calculations

25  necessary to find the results in a publication, so it's very

I7a1rav2                        Ravina - Direct

detailed set of instructions, and out of those instructions the

computer sends out -- spits out the results.

Q.  And you used the word "algorithm."  How does that factor

in?

A.  Algorithm are a strategy, a blueprint for a code.  It's

like the general steps that we will follow to do the research.

First we'll do the summary statistics, then we'll do an

analysis relating amounts saved to age, for example.  And it's

the general blueprint, and then the code goes into more details

about how to actually implement all this list of intentions.

Q.  How big an undertaking was it to prepare this data for

academic use?

A.  It was quite a big undertaking.  It was the first time that

this data set was used for academic research, so all the work

connected to prepare such a data set needed to be done by us,

while sometimes, you know, you have a data set that has already

been used by others so you can skip some of these -- some of

these steps.

Q.  Let me stop you there.  How long did it take to prepare the

data for academic analysis in this project?

A.  I worked full -- almost full time on this data set starting

in the summer of 2012 till the spring of 2013.  In addition to

me, there were like about 40 research assistants, not all in

this period but many of them in this period, that they were

also working.

1          Additionally, for some of the work that required

2    taking information on paper and put it into an electronic

3    format, we hired an outsourcing company that was working on

4    that as well.  I don't know how many people were working for

5    them.

6    Q.  And after you received all of this data, did preparing it

7    for academic analysis take more or less work than you had

8    expected?

9    A.  It's difficult to tell when you receive a data set whether

10   it's -- how much work is it going to be because you haven't

11   seen it before.  So it was a lot of work and -- it was quite a

12   lot of work, actually.  I was pleased in the spring of 2013 to

13   be done, but we weren't done for one of the papers just because

14   like -- of the amount of results, the work put into this, into

15   this effort.

16          THE COURT:  I'm sorry.  Let's just wait a moment,

17   please.

18          (Pause)

19          THE COURT:  I'm just going to say, we all need to be

20   present for all aspects of the trial.  If anyone needs to use

21   the restroom or needs a break for any reason, just raise your

22   hand.  If you don't mind, usually I take a morning break around

23   11 or 11:15, depending on exactly when we started, but if you

24   just need a break before that, just raise your hand and we'll

25   take one, okay?

1              Thank you.  Please proceed.

2     BY MS. HARWIN:

3     Q.  Professor Ravina, did Columbia provide any evaluations or

4     reviews of your work during your time there?

5     A.  Yes.  We were getting a yearly evaluation.

6     Q.  And in what form did you receive evaluations from Columbia?

7     A.  Evaluation came in letter form.  There was a short letter

8     from the dean.  There was also in-person conversation with a

9     tenured professor in the department, and after a certain

10    period, there started to be a longer letter attached to the

11    short one as well.

12    Q.  What role, if any, did Professor Bekaert play in evaluating

13    your work for Columbia?

14    A.  Professor Bekaert was a part of the tenured senior faculty,

15    and so as far as I understand it, he participated in every

16    single yearly evaluation that I had.

17    Q.  Did Professor Bekaert ever play any additional role in

18    evaluating you besides participating in those divisional

19    meetings?

20              MR. HERNSTADT:  Objection.  This should be limited to

21    the witness' understanding.

22              THE COURT:  Yes, it will be.

23              All right.  So we're going to limit that just to your

24    understanding.

25    A.  Okay.  So one of the years, 2012, Professor Bekaert was a

I7a1rav2                          Ravina - Direct

1    senior faculty member that delivered my in-person review.

2    Q.  Before we talk about your 2012 review with Professor

3    Bekaert, can you describe what message you got from your prior

4    reviews about your research.

5    A.  My prior reviews said my research was good, that the papers

6    I was working were on -- were interesting and they had impact

7    in the field.

8    Q.  What message about the need to publish did you get from the

9    feedback you got from Columbia?

10   A.  So in those reviews, Columbia was -- the dean writing the

11   letter was happy about -- he said that I was publishing well.

12   Every year, every academic needs to publish, so I knew that,

13   you know, the objective is to publish, and Columbia was -- the

14   letters say that my colleagues were pleased with my work and my

15   publications.

16   Q.  Let's turn to 2012.  What do you recall Professor Bekaert

17   telling you in your 2012 review?

18   A.  Professor Bekaert told me that my papers were -- the topics

19   I was working on in my papers were quite interesting and they

20   had potential.  He said I needed to publish more.  He

21   specifically liked the habit paper, a paper of mine about how

22   your consumption depends on what your neighbors are consuming

23   and how people compare themselves to others.  And he also said

24   that we were embarking in a research project that would have

25   been very valuable for my tenure application down the road.

I7a1rav2                              Ravina - Direct

1   Q.  Did you receive any kind of written reviews that year, in

2   2012?

3   A.  I also got a written review later on from the -- from the

4   dean.

5   Q.  And what was the overall message from your 2012 written

6   review?

7            MS. PLEVAN:  Objection.

8            THE COURT:  What was your understanding of them?

9            THE WITNESS:  My -- my understanding of what my

10  written reviews in 2012 said was that --

11           MS. PLEVAN:  Objection, your Honor.

12           THE COURT:  Overruled.

13           This is just your understanding of them, and I'm going

14  to allow that.

15           MS. HARWIN:  How about I rephrase the question?

16           THE COURT:  Okay.

17  BY MS. HARWIN:

18  Q.  Professor Ravina, what was your takeaway from the written

19  reviews that you received in 2012?

20  A.  My takeaway was that my work was good, it had impact in the

21  profession, and that I needed to publish more.

22  Q.  And was that a message that you had heard before at

23  Columbia, that you needed to publish more?

24  A.  Yes.  I heard it from Professor Bekaert a few -- earlier on

25  when he delivered the in-person review.

I7a1rav2                        Ravina - Direct

1    Q.  And was it part of your general understanding that

2    publishing more was important at Columbia?

3    A.  This is true for -- for every year, every academic

4    institution; publishing is important.

5    Q.  And that was a message that you'd seen in your prior

6    reviews as well, that it was important to publish.

7    A.  Yes, every review says that it's important to publish, that

8    you are doing well in publishing and --

9    Q.  Turning back to that 2012 meeting with Professor Bekaert

10   about your review --

11            THE COURT:  Could you just bring the microphone a

12   little closer.  Thank you.

13            MS. HARWIN:  Yes.  I'm sorry, your Honor.

14   Q.  Turning back to your 2012 meeting with Professor Bekaert

15   about your review, what, if anything, did Professor Bekaert say

16   about your professional relationship?

17   A.  In that meeting, Professor Bekaert, in addition to saying

18   that he liked my work, said that he was assigned by the

19   department to be my mentor.

20   Q.  And what did you understand that to mean?

21   A.  My understanding of the mentor is someone that is more

22   experienced in the field and that would give you advice about

23   the publication process and someone that would advocate for me

24   during the tenure process at Columbia and the rest of the

25   profession.

1    Q.  And were you in the tenure process at that time?

2    A.  By tenure process, I mean I was in the tenure track, and so

3    I would receive advice along the -- the process of being a

4    tenure -- a tenure track professor at Columbia.

5    Q.  How did you feel about having Professor Bekaert as your

6    mentor?

7    A.  I thought it was good.  He was very powerful, he knew a lot

8    of people, he was well established in the profession, and we

9    were also starting to work, working together on these set of

10   projects.  And so I thought it was good.  I was happy to have a

11   mentor.

12   Q.  After meeting with Professor Bekaert and receiving your

13   reviews in 2012, what did you do to advance your research

14   agenda?

15   A.  I knew that I needed to publish and so I immediately

16   started to do as much work as possible on -- and especially on

17   the 401(k) projects, because these were the projects that out

18   of a platform could create four or five papers at the same

19   time, and I understood that I needed to publish a lot of papers

20   and so this -- this is what I got started on.

21   Q.  And when you say the 401(k) papers, do you mean the joint

22   research with Professor Bekaert?

23   A.  Yes.  I'm using 401(k)/retirement to describe the joint

24   research with Professor Bekaert.

25   Q.  Okay.  Why did you focus on the retirement research with

1  Professor Bekaert?

2  A.   Because of the potential.  A scholar that is able to

3  establish herself as the leader in a certain area is creating a

4  lot of impact and doing well, and so this was the opportunity

5  to make an impact in the field and so I wanted to do that

6  first.

7  Q.   How would focusing on the joint research with Professor

8  Bekaert affect your ability to work on other research projects?

9  A.   I had to set other research projects aside.  I only had a

10  number of hours in the day and this was a very big undertaking.

11  I wanted it to go as fast as possible because I wanted the four

12  or five papers.  So the other stuff that I was doing, every

13  once in a while I would do something, but it was basically

14  sidelined.

15  Q.   And how easy or difficult would it have been to switch

16  between this research with Professor Bekaert and other research

17  projects that you had worked on?

18  A.   So switching from one project to another is not that easy

19  because you have to basically refresh your memory, read all the

20  codes, the algorithms, and so it makes sense to actually work

21  on something and bring it to fruition or at least to a certain

22  stage instead of keeping switching back and forth among stuff.

23       MS. HARWIN:  Your Honor, I'm not sure when you're

24  inclined to take a break, but we're sort of near a good

25  stopping point if you wanted to take a break on the earlier

1    side, or we could go for a while longer.

2            THE COURT:  I would go for a while longer just because

3    we're not going to take lunch until close to 1, so I just like

4    to kind of have it in the middle.  If everyone is doing okay.

5    If anyone needs a break, please let me know.

6            MS. HARWIN:  Okay.  Thank you, your Honor.

7    BY MS. HARWIN:

8    Q.  Professor Ravina, how would you describe your relationship

9    with Professor Bekaert during the 2011-2012 academic year?

10   A.  It was overall professional.  We were not interacting that

11   much.  The earlier part of the data, the company data had

12   arrived, we -- I put together a team, I was keeping him posted

13   on email, but we didn't have many interactions, and overall

14   interactions were professional and polite.

15   Q.  Did you ever notice a change in Professor Bekaert's

16   interactions with you?

17   A.  Yes.  So toward the -- around the summer of 2012, around

18   the time when we started getting the data, he started talking

19   more about personal stuff in our meetings and when we would

20   meet, get together to proceed with the work.

21   Q.  And when you say that Professor Bekaert started talking

22   about personal stuff, can you give an example of a subject that

23   Professor Bekaert raised.

24   A.  Even -- for example, he started inviting me for dinners.

25   He would say that there is -- there was a restaurant close to

1    his house whose owner was from my same city, Torino, and so in

2    emails in which he was discussing work, he would tell me, oh,

3    by the way, as an incentive for you to complete this, I'll

4    invite you for dinner.

5    Q.  And --

6            THE COURT:  I'm just going to ask you to speak a

7    little bit slower, okay?  Thank you.

8            THE WITNESS:  Apologies.

9            THE COURT:  Loud, slow, and clear.  Thank you.

10           MS. HARWIN:  Thank you, your Honor.

11           I'm going to move to admit Plaintiff's Exhibit 8,

12   which I understand has no objection by the defense.

13           THE COURT:  All right.  If there's no objection, it

14   will be admitted.

15           MS. PLEVAN:  No objection.

16           MR. HERNSTADT:  No objection.

17           (Plaintiff's Exhibit 8 received in evidence)

18   BY MS. HARWIN:

19   Q.  Professor Ravina, do you recognize this document?

20   A.  Yes.  It's an email exchange with Professor Bekaert about

21   the research assistant and about dinner invitation, dated

22   July 31, 2012.

23   Q.  Take a look at the second page, those two emails there.

24   Are those the ones you said were about the research assistant?

25   A.  Yes.

I7a1rav2                          Ravina - Direct

1    Q.   Okay.  Then if we can turn to the first page.

2    A.   And -- sorry.  There are other research assistants in the

3    revision of my paper to be complete.

4    Q.   Thank you.  Turning to the first page, do you see the email

5    on the top from Professor Bekaert to you where he wrote -- and

6    there's a misspelling but I'll say it out loud correctly.

7    "Just keeping tabs on you."

8              THE COURT:  Move the mic a little closer.  We can't

9    hear you.  Thank you.

10   Q.   "Just keeping tabs on you.  If you finish revision, I will

11   pay for dinner at my local Italian restaurant with the Torino

12   owner...  Shoot.  Maybe you will not want to finish then...

13   Geert."

14             THE COURT:  Is there a question?

15             MS. HARWIN:  Yes.  Thank you.

16   Q.   Professor Ravina, did you know what Professor Bekaert was

17   talking about when he mentioned the Torino --

18             MR. HERNSTADT:  Objection.

19             THE COURT:  Yes.  Sustained.  Why don't you rephrase

20   that.

21   Q.   Were you familiar with what Professor Bekaert was referring

22   to when he used the term "the Torino"?

23   A.   Yes.  He had been inviting me to this restaurant several

24   times already and he said he wanted me to meet the owner of the

25   restaurant, who was from my same city in Italy, Torino.

I7a1rav2                          Ravina - Direct

| | |
|---|---|
| 1 | Q.  And where was this restaurant located? |
| 2 | A.  It was north of Columbia, close to Professor Bekaert's |
| 3 | house. |
| 4 | Q.  How did you feel when you received Professor Bekaert's |
| 5 | invitations to dinner during the summer of 2012? |
| 6 | MR. HERNSTADT:  Objection.  This is the only |
| 7 | invitation that's been put into the record.  She said |
| 8 | "invitations." |
| 9 | MS. HARWIN:  She provided testimony regarding prior |
| 10 | interactions. |
| 11 | THE COURT:  Overruled.  You can answer. |
| 12 | A.  I didn't want to go for dinner. |
| 13 | Q.  Why didn't you want to go for dinner with Professor |
| 14 | Bekaert? |
| 15 | A.  I thought that it was -- I felt it was being weirdly |
| 16 | personal and I -- I had an unexplained feeling.  I didn't want |
| 17 | to go.  So I -- I put up a excuses to -- not to go. |
| 18 | Q.  How did you understand the last part of Professor Bekaert's |
| 19 | email where he wrote, "Shoot.  Maybe you will not want to |
| 20 | finish then..."? |
| 21 | A.  I under -- |
| 22 | MR. HERNSTADT:  Objection. |
| 23 | THE COURT:  I'm going to allow what you understood |
| 24 | that to mean.  So it's just your perception and reaction to |
| 25 | receiving this email.  Overruled. |

1    A.   I understood it was referring to the fact that I had

2    already declined going to dinner to that -- to this restaurant

3    before and that maybe the fact that my finishing the revision

4    and the dinner were paired together would actually be a

5    disincentive rather than an incentive for me to finish.

6    Q.   Did you end up going for dinner with Professor Bekaert

7    during the summer of 2012?

8    A.   No.

9    Q.   And why not?

10   A.   I avoided and dodged in various ways and it didn't happen.

11   Q.   Did you end up going out to dinner with Professor Bekaert

12   after the summer of 2012?

13   A.   Yes.

14   Q.   And approximately when did you have dinner with Professor

15   Bekaert?

16   A.   The next time was toward the end of September 2012.

17   Q.   And why did you end up having dinner with Professor Bekaert

18   at that time?

19   A.   By then, the work on the project was in full swing, and I

20   would meet with Professor Bekaert several times to discuss the

21   research assistant and to keep him up to date with the

22   progress.  And during those meetings he had kept insisting that

23   I was not going to dinner with him, that I was going to dinner

24   with other people and why I was not going to dinner with him,

25   and so eventually I -- I caved and went for dinner.

1          MS. HARWIN:  I'd like to move to admit Plaintiff's

2     Exhibit 11, which also we understand doesn't have any

3     objections from defendants.

4          THE COURT:  If there's no objection, 11 will be

5     admitted.

6          (Plaintiff's Exhibit 11 received in evidence)

7          MS. PLEVAN:  No objection.

8          MR. HERNSTADT:  No objection.

9     BY MS. HARWIN:

10    Q.   Professor Ravina, turning your attention to Plaintiff's

11    Exhibit 11, a series of emails from September 2012.  Can you

12    explain generally what this email chain is about.

13    A.   This is a dinner invitation from Professor Bekaert.

14    Q.   Could you take a look at the second page, the bottom email

15    from Professor Bekaert to you where Professor Bekaert wrote,

16    "Are we having dinner on Saturday or you got other plans?  As I

17    told you, for me, it need not buy a 2-Michelin-star dinner!  No

18    pressure, by the way.  We can always do it some other time."

19          First, what's a 2-star Michelin dinner?

20    A.   Oh, my understanding is that a 2-star Michelin dinner is a

21    dinner at a very good restaurant, a critically acclaimed

22    restaurant.

23    Q.   What did you think of this email from Professor Bekaert?

24    A.   I felt the pressure to go for dinner.  I felt it was like,

25    okay, it does not need to be the perfect experience in the

1    perfect restaurant, just pick a restaurant and let's go for

2    dinner.

3    Q.  Professor Bekaert wrote, "No pressure, by the way.  We can

4    always do it some other time."  Why did you feel pressure?

5    A.  I felt pressure because I was declining and he kept asking,

6    both in person and via email.  So he was saying no pressure,

7    but at the same time he was not letting go.

8    Q.  Turning your attention to that second page of this email

9    chain.  Can you explain your email response to Professor

10   Bekaert after that email I just read.

11   A.  So I replied that I had already gone for dinner and, you

12   know, I was on a diet, I was -- I would try to get out of the

13   dinner by saying I was on a diet and I could not go to too many

14   dinners close together.

15   Q.  And why did you say that?

16   A.  So that it was an -- an excuse that was not personal to

17   him, it would not offend him, but at the same time it would get

18   me out of the dinners.

19   Q.  And why didn't you want to offend Professor Bekaert?

20   A.  He was my senior colleague, my mentor, we were working on

21   this set of important projects, we were in full swing working

22   on the data, and I wanted, you know, things to go smoothly and

23   not to have any problem.

24   Q.  Turn to the first page, the email on the top from Professor

25   Bekaert to you.  Do you see where he wrote, "As I said, I am

willing to postpone or to have a small sushi plate or salad

somewhere or do you only go to dinner with Italians?  Mi

dispiace.  Non parlo Italiano."

          What did you think of Professor Bekaert's response?

A.  Well, he was telling me -- I understood him telling me, if

you are on a diet, we can get salad or we can get sushi but we

still should go for dinner, and then he was putting pressure

because he was telling me, oh, but so you went to dinner with

these other two people, Paola and Alex, they are Italian, you

are you not going to dinner with me, because I am not Italian,

why are you going to dinner with these other colleagues of

yours.

Q.  Did Professor Bekaert have any other communications with

you about this dinner?

A.  He also insisted that we go for dinner then, talking in the

office about the research assistant.  That was the day in which

we had meetings and he reiterated that, why wasn't I going

for -- to dinner with him, after all, I went to dinner with

Paola and with Alex, and he kept insisting.

Q.  How did your discussions with Professor Bekaert about this

dinner conclude?

A.  In the end, I mean, he was my colleague.  I went to dinner

with these other two colleagues of mine, so I -- I ran out of

excuses, and I agreed that I would arrange a dinner, find a

place.

1   Q.  Did you arrange that dinner?

2   A.  Well, it was Friday.  It was the same day.  I couldn't -- I

3   looked a little bit to do reservations, but I didn't take a lot

4   of time, I needed to work.  So I ended up not getting a

5   reservation and just told him to go for dinner and try to find

6   a place.

7   Q.  You tried to get a reservation, but you weren't able to, is

8   that --

9   A.  Yes.  I called a few places.  There were no reservations,

10  so I stopped calling.

11          MS. HARWIN:  Your Honor, again, I am having difficulty

12  hearing.

13          THE COURT:  Again, we are going to speak loudly and

14  clearly and slowly into the microphones.

15          Thank you.

16  BY MS. HARWIN:

17  Q.  Did you end up going to the dinner with Professor Bekaert?

18  A.  I did.

19  Q.  Who else attended the dinner?

20  A.  It was only the two of us.

21  Q.  What happened when you arrived at that dinner?

22  A.  So, when we arrived at the dinner, there was no table.  We

23  didn't have a reservation, so the people at the restaurant told

24  us to go to the bar.

25  Q.  And what happened when you were at the bar?

I1anrav3                         Ravina - direct

A.   While we were at the bar, Professor Bekaert started asking

me if I have a boyfriend, if I lived with my boyfriend, because

someone told him that I was living with my boyfriend.

Q.   When Professor Bekaert asked you about your boyfriend and

if you lived with your boyfriend, who did you respond to him?

A.   I was so shocked by the question that I just blurted out

the truth, and I said, no, I wasn't living with my boyfriend.

I didn't have a boyfriend.

Q.   How did Professor Bekaert respond to that?

A.   He said, Oh, that's great, because I would feel very bad

about doing this.

Q.   Did he say what he meant by that?

A.   He didn't really say what he meant immediately.  I reacted

to it, and I said something of the -- to the -- I communicated

that this was a dinner between coauthors, so if I had a

boyfriend he would trust me, he would be fine with me.

Q.   You said that you communicated that this was a dinner --

A.   Between coauthors, between colleagues and people that

worked together on papers.

Q.   When you communicated to Professor Bekaert that this was a

dinner between coauthors, colleagues, what was Professor

Bekaert's response to you?

A.   He started laughing.

Q.   How did the dinner with Professor Bekaert end?

A.   So Professor Bekaert lived close to Columbia, so we shared

I1anrav3                         Ravina - direct

the ride -- a taxi ride to the -- he told me he would give me a

ride on the way to his house.

Q.   And what happened when you were in the taxi with Professor

Bekaert?

A.   We were talking about general stuff, and when we arrived at

my corner, I turned to exit from the taxi and he passed his

hand on my back and went down toward my butt.  So I exited

really fast and closed the door.

Q.   How did you feel about Professor Bekaert's actions that

night?

A.   I felt disturbed.  Like, my stomach churned, I grew

concerned that he wanted more than a professional relationship

he wanted more than a colleagues' relationship.  He wanted a

romantic relationship.  And I wasn't -- I didn't want a

romantic relationship.  I wanted to be able to do the work.

And I was quite concerned actually.

Q.   What, if anything, did you do after the dinner with

Professor Bekaert?

A.   I wanted to make sure that he wasn't upset about the fact

that I exited and didn't give him a chance to continue sliding

his hand.  So I sent him a polite note.  I said thank you for

dinner and, you know, making sure that there would be no issues

for me going forward.

Q.   When you say no issues for you going forward, what were you

concerned about?

1    A.  I was concerned about the fact that Professor Bekaert would

2    feel rejected and would be upset and this would jeopardize the

3    presearch project.  So I wanted to make sure that we were on

4    friendly terms, no more, no less.

5    Q.  In your experience, was the way Professor Bekaert acted a

6    normal way to interact with a coauthor?

7              MR. HERNSTATD:  Objection.

8              THE COURT:  Overruled.

9              I will allow it.

10   A.  No other coauthor of mine -- I went to dinners with some of

11   my coauthors usually in a group.  No other coauthor of mine

12   pressured me to go to dinner.  No other coauthor of mine asked

13   me about my boyfriend and told me that he would have felt bad

14   if I have a boyfriend doing what he was doing.  No other

15   coauthor of mine ever passed his hand on my back toward my

16   butt.

17   Q.  You testified before about Professor Bekaert raising

18   personal subjects with you.

19             Do you recall any other personal subjects that

20   Professor Bekaert raised during the fall 2012 semester?

21   A.  There were a few.

22   Q.  Why don't you start with one.

23   A.  One subject that he talked about was that the problems with

24   his wife.

25   Q.  What do you recall Professor Bekaert saying about problems

I1anrav3                         Ravina - direct

1    with his wife?

2    A.  He was saying that his wife never did what he wanted.  He

3    communicated that they had a strained relationship.

4    Q.  Were there any other personal topics that you recall

5    Professor Bekaert raising during the fall 2012 semester with

6    you?

7    A.  He would talk often about being old.  He's like -- he would

8    complain that he felt old, that he was too old.  He would

9    complain that I did not give him any compliments, and he would

10   ask for compliments.

11   Q.  Can you tell us more about that.  In what way did Professor

12   Bekaert ask for compliments?

13   A.  He would say, You don't pay me any compliments.  He would

14   say that he had a fragile ego, that he was a sensitive young

15   man.  The theme of the compliments would come up quite often,

16   and so sometimes I would say no, no, very young.

17   Q.  Why would you say something like that?

18   A.  To pay him a compliment, because he wanted compliments and

19   he kept talking about it while we were meeting for research

20   assistant and for work, and I gave him compliments.

21            MS. HARWIN:  I move to admit Plaintiff's Exhibit 16

22   which I understand doesn't have any objections from defendants.

23            THE COURT:  If there are no objections, 16 will be

24   admitted.

25            MS. PLEVAN:  No objection.

1          MR. HERNSTATD:  No objection.

2          (Plaintiff's Exhibit 16 received in evidence)

3          MS. HARWIN:  Brian, can you bring up Plaintiff's

4     Exhibit 16.

5     BY MS. HARWIN:

6     Q.  Professor Ravina, can you give us some context for what

7     prompted this series of e-mail communications?

8     A.  So this is a series of exchanges, e-mail exchange between

9     me and Professor Bekaert in which he had sent me a publication

10    in Portuguese with an interview of his.

11    Q.  Was that an academic presentation he sent you?

12    A.  It was some talk that he gave somewhere.  I can't really

13    tell because it was in Portuguese.  I understood that there was

14    some talk and there was an interview after the talk maybe and

15    there was a picture of Professor Bekaert in the file that I

16    received.

17    Q.  If you could turn to the last page of this e-mail chain,

18    page 3.

19          Do you see where you wrote, "I agree it is not Vanity

20    Fair, but you are by far, far, far, the most good looking."

21    A.  Yes.

22    Q.  Can you explain what prompted you to write that?

23    A.  Well, he sent me this publication with the picture, and he

24    wanted compliments.  So I say, well, very good picture.

25          But then he started saying, Oh, that's not true.  This

I1anrav3                     Ravina - direct

1   is not a sincere compliment, and so -- something along those

2   lines.

3           And so I felt like, OK, so I gave him more

4   compliments.

5           And then at some point I felt like, you know, it is

6   not that you are the most beautiful person in the world.  Take

7   the compliment.  That was my way of saying that.

8   Q.  Could you go to the previous page, page 2.

9           Do you see the e-mail in the middle of the page from

10  Professor Bekaert to you on December 12, 2012?

11  A.  Yes.

12  Q.  Do you see in the second sentence where he writes, "You are

13  giving me way too many compliments.  I am now waiting for the

14  big e-mail with stuff for me to do . . . "

15          What was your reaction to that e-mail?

16  A.  Well, it was -- I understood it that Professor Bekaert

17  recognized that my e-mails, my compliments were not fully --

18  were not sincere.  My compliments came because he asked for the

19  compliments all the time and because I was in this junior

20  relationship with him and I needed the work to proceed.

21  Q.  Can you turn to the first page of this e-mail exchange.

22          Do you see the second e-mail on the page is from

23  Professor Bekaert to you dated December 13, 2012?

24          Do you see that?

25  A.  I'm sorry.  I'm getting lost.  The third page?

I1anrav3                          Ravina - direct

1   Q.  I'm sorry.  The first page.

2   A.  OK, yes.

3   Q.  The e-mail from Professor Bekaert in the middle.

4         Do you see where Professor Bekaert writes, "Oh, no,

5   keep them coming.  You have not figured out my fragile ego

6   clearly . . . . . I was just surprised.  I will explain one

7   day, maybe, after copious amounts of wine . . . . .

8         "Geert."

9         What was your reaction to that e-mail?

10  A.  That he wanted more compliments, and he wanted me to keep

11  sending compliments.

12  Q.  Did Professor Bekaert ever ask you for compliments again

13  after this e-mail?

14  A.  Yes.  He asked for compliments quite frequently.

15  Q.  Did you ever comment on anyone else's looks to Professor

16  Bekaert?

17  A.  As far as I remember only an actor.

18  Q.  Professor Ravina, were there any other personal subjects

19  that you remember Professor Bekaert raising with you during the

20  fall 2012 semester?

21        THE COURT:  Speak into the mic.

22  Q.  Professor Ravina, were there any other personal subjects

23  that you remember Professor Bekaert raising with you during the

24  fall 2012 semester?

25  A.  During that semester he would also send me songs every once

1    in a while, or he would play songs when I was in his office

2    discussing the research.

3            MS. HARWIN:  Your Honor, I am going to move to admit

4    Plaintiff's Exhibit 12.

5            THE COURT:  You have to speak into the mic.

6            MS. HARWIN:  I am going to move to admit Plaintiff's

7    Exhibit 12, which I understand doesn't have any objections from

8    defendants.

9            MS. PLEVAN:  No objection.

10           MR. HERNSTATD:  No objection.

11           THE COURT:  All right.  12 will be admitted.

12           (Plaintiff's Exhibit 12 received in evidence)

13   BY MS. HARWIN:

14   Q.  Professor Ravina, you talked about Professor Bekaert

15   playing music for you in your office.

16           Did you ever have any kind of e-mail exchanges about

17   music?

18   A.  So, actually in his office, not in mine.

19   Q.  I apologize.  Thank you for the correction.

20           You testified about Professor Bekaert playing music in

21   his office.  Did you ever have any kind of e-mail exchanges or

22   other communications about music?

23   A.  Yes.  We had some e-mail exchanges as well and the one on

24   the screen is an example.

25   Q.  Please take a look at page 2, an e-mail from you and an

I1anrav3                          Ravina - direct

1   e-mail from someone else at the bottom.

2           Can you explain generally what these e-mails were

3   about.

4   A.  This was an e-mail about hiring an additional research

5   assistant who had expertise in a software package called Python

6   and that I thought --

7           THE COURT:  Slow down a little bit.  Thank you.

8   A.  This was about hiring an additional research assistant.  He

9   had expertise in a software that was important for the project,

10  and I was proposing hiring him.

11  Q.  Take a look at the first page the e-mail from Professor

12  Bekaert to you.

13          Do you see where Professor Bekaert writes, "BTW, I

14  forgot to send you some music"?

15  A.  Yes.

16  Q.  Can you explain what music Professor Bekaert sent you?

17  A.  He sent me some music that he characterizes as soft and

18  somewhat schmaltzy.

19  Q.  And what are some of the songs that Professor Bekaert sent

20  you.

21  A.  So, this is rock and neoromantics, "Love is the Drug,"

22  "Let's Stick Together."

23  Q.  The date of the e-mail is October 1, 2012.  About how long

24  after your first dinner with Professor Bekaert did he send you

25  this?

I1anrav3                          Ravina - direct

```
 1   A.  It was the next day.

 2   Q.  Is it exactly the next day?

 3   A.  I mean, it was the next working day, a few days about,

 4   around it.

 5   Q.  Was this a subject that Professor Bekaert communicated with

 6   you about at other times as well?

 7   A.  Yes.  He would sometimes, like I said, play music in his

 8   office, and he'd send me this music.  He sent me music other

 9   times, yes.

10   Q.  Did you ever bring up music with Professor Bekaert?

11   A.  I think I might have.  At some point I did, yes.

12              THE COURT:  Whenever you want to take a break now,

13   whenever it makes sense for you, Ms. Harwin, let me know.

14              Thank you.

15              MS. HARWIN:  OK.  Just a few more minutes.

16              THE COURT:  Sure.

17              MS. PLEVAN:  No objection.

18              MR. HERNSTATD:  No objection.

19              THE COURT:  13 will be admitted.

20              (Plaintiff's Exhibit 13 received in evidence)

21   BY MS. HARWIN:

22   Q.  Professor Ravina, if you take a look at the second page,

23   the bottom e-mail that you sent.

24              Can you explain why you sent this e-mail?

25   A.  So, yeah, the work was under way, the e-mails were piling
```

I1anrav3                         Ravina - direct

1   up, and I needed Professor Bekaert's approval for various

2   things.  So, I thought that if I would ask for a good singer,

3   he would reply quickly?

4   Q.  Did he?

5   A.  Yes.  He replied actually two minutes later.

6   Q.  What, if anything, did Professor Bekaert say about the data

7   e-mails that you were referring to?

8   A.  Well, he said that he was not sure actually if he was able

9   to go -- if he was ever going to be able to get through them.

10  Q.  Are you referring to the sentence that says, "These data

11  e-mails are piling up.  I am not sure I will ever be able to

12  get through them"?

13  A.  Yes.

14  Q.  Is that the sentence you're referring to?

15  A.  That's the sentence I'm referring to.

16  Q.  Please turn your attention to the first page, the bottom

17  e-mail.

18           Do you see the e-mail from you to Professor Bekaert?

19  A.  Yes.

20  Q.  What were you talking about in your e-mail?

21  A.  Well, I started talking about the data, and I was starting

22  to explain what were the issues with the data.  We needed also

23  to contact people at the company, Kenton, and I was asking him

24  to do that.

25  Q.  Please take a look at the top e-mail on the first page from

I1anrav3                         Ravina - direct

1    Professor Bekaert to you.

2              What was Professor Bekaert's response to the research

3    issues you raised?

4    A.  He did not respond.

5    Q.  Did anything Professor Bekaert's e-mail stand out to you?

6    A.  He sent additional song, one of the songs was called "Sad

7    Songs for Dirty Lovers."

8              And then he provided some links.

9    Q.  Are you referring to the sentence that reads, "As a reward

10   for all your hard work, here's the National song called 'Lucky

11   You.'  It is really sad actually and the last song on a really

12   killer album entitled "Sad Songs for Dirty Lovers" exclamation

13   point?

14   A.  Yes, I'm referring to that.

15             MS. HARWIN:  We are at a good stopping point, your

16   Honor.

17             THE COURT:  Why don't we take our morning break,

18   ladies and gentlemen.  We'll come back in 15 minutes.  Please

19   remember don't discuss the case and keep an open mind.

20             Thank you.

21             (Jury not present)

22             THE COURT:  You can step down as well.  Thank you.

23             See you all in a few minutes.

24             (Recess)

25             THE COURT:  Everyone can be seated.  Thank you.  Are

1   we ready for the jury.

2              Why don't you come back, Ms. Ravina.

3              (Jury present)

4              THE COURT:  Everyone can be seated.  Thank you.  You

5   may proceed.

6   BY MS. HARWIN:

7   Q.  Professor Ravina, we have been speaking about the fall

8   semester of 2012.  Looking at Professor Bekaert's overall

9   behavior with you during that semester, did you see that as the

10  way colleagues normally interact with one another?

11  A.  No.  Actually repeatedly pressuring people to go for

12  dinner, asking for all these compliments, sending the songs was

13  not what I have experienced with other coauthors.

14  Q.  Let's move on to the next semester, the spring of 2013.

15             How often did you and Professor Bekaert interact that

16  semester?

17  A.  That semester we interacted less.  Professor Bekaert was on

18  leave in Hong Kong, and we would communicate sometimes via

19  e-mail, but we met only once when he was back, the week he was

20  back in town.

21  Q.  What was the status of your research project in the spring

22  of 2013?

23  A.  A lot of work was getting done.  The data was coming

24  together, we were shaping the dataset and I was actually quite

25  pleased with the data results.

I1anrav3                    Ravina - direct

1    Q.  What did this progress mean for your ability to begin work

2    on papers?

3    A.  It was great.  So by mid the spring of 2013, the data was

4    ready for at least one research project.

5    Q.  Who had overseen the work to get the data ready for that

6    research paper?

7    A.  I did oversee the work.

8    Q.  In March 2013, can you give a little more information about

9    exactly where the research stood.

10   A.  Yeah.  So, in March 2013, various characteristics of the

11   data had been analyzed and in middle March I was able to run

12   the first statistical analyses actually trying to understand

13   what the data said, so there were the first results out of this

14   effort.

15   Q.  Did you have any discussions with Professor Bekaert around

16   that time about how quickly the work would proceed?

17   A.  Yes.  So I felt that the work would proceed quite quickly

18   because the data was ready, and Professor Bekaert was also

19   optimistic about the progress, the potential and the number of

20   papers that we could quickly get out of this platform.

21   Q.  You testified about meeting Professor Bekaert in person

22   during that semester.  When did you meet Professor Bekaert in

23   person?

24   A.  I met him in April 2013.  For a week he came back, so I met

25   him during that week.

1  Q.  And how many times did you meet with Professor Bekaert

2  during that week when he came back?

3  A.  We met on three occasions in that week.

4  Q.  Where did those meetings take place?

5  A.  The first meeting was at a restaurant for lunch close to

6  Columbia.  The second meeting was a dinner that we had in the

7  Lower East Side.  And the third meeting was at a cafe close to

8  Professor Bekaert's hotel.

9  Q.  Why did you agree to go to dinner with Professor Bekaert in

10 the spring of 2013?

11 A.  I wanted to show the results that I generated.  I wanted

12 work to proceed faster because I needed to write papers.  He

13 said he had limited time, he was consulting for a company while

14 he was there, he had other things to do, so he suggested we go

15 for dinner.

16 Q.  Where did you first meet Professor Bekaert for that dinner

17 that evening?

18 A.  So Professor Bekaert was not in the office that day because

19 he was working at this other company, so he told me to meet him

20 at an Irish bar close to the restaurant.

21 Q.  What happened when you met Professor Bekaert at the bar?

22 A.  He was sitting down at a table.  He was having a beer and

23 he had a bunch of papers in front of him, and he told me, See,

24 I'm working on our project.

25 Q.  What happened next after you met at the bar?

I1anrav3                         Ravina - direct

1   A.  We discussed a little bit at the bar about the project,

2   about this other company that could potentially also give data,

3   and then we moved to the restaurant.

4   Q.  Then what did Professor Bekaert talk about when you had

5   dinner with him?

6   A.  Mainly he talked about his sex life in Hong Kong.

7   Q.  Can you tell us more about what specifically Professor

8   Bekaert said about his sex life in Hong Kong?

9   A.  So, one of the main themes of the conversation was his

10  interactions with this stewardess.  He met a stewardess and he

11  went dancing with her, and he said he was quite shy around her

12  because she was very good looking.

13  Q.  Did he tell you anything more about his interactions with

14  the stewardess?

15  A.  Yes.  So he told me that she was having troubles.  She had

16  an affair with a pilot, she was fired, and that she was

17  thinking of applying to Columbia for an MBA.

18  Q.  Did Professor Bekaert tell you anything about his

19  interactions with her?

20  A.  He said that he felt shy around her.  He also felt, he said

21  that he felt she was trouble and he should stay away from her,

22  but then he slept with her.

23  Q.  I couldn't hear the last part.  Could you say that again?

24  A.  Yes.  So, despite he said that he should stay away from

25  her, he ended up sleeping with her.

I1anrav3                         Ravina - direct

1   Q.  He told that to you?

2   A.  Yeah.  And he smiled.

3   Q.  I couldn't hear that.

4   A.  Sorry.  He told me that and he smiled.

5   Q.  Can you describe how he smiled?

6   A.  He smiled in a -- so --

7          MR. HERNSTATD:  Your Honor, I take it this is her

8   interpretation.

9          THE COURT:  This is just your impression of his smile.

10          THE WITNESS:  Yes.  I saw him smile, and my impression

11   with it was that it was that he was satisfied with it; that

12   there was a woman that was in trouble, and that he saved the

13   day, and, you know, she was fired, she wanted to apply to

14   Columbia.  I felt that his smile was the satisfaction from that

15   and from sleeping with her.

16   Q.  Did Professor Bekaert tell you anything else about his

17   romantic life during that dinner?

18   A.  He talked also a little bit about another woman that he met

19   in Hong Kong.  She was an entrepreneur.

20   Q.  What was that word?

21   A.  Entrepreneur.  She had a company.  He said he was quite

22   impressed that she was so successful.  He said that they met at

23   a bar, and he was with his daughter and she had asked him if

24   she was the girlfriend.  And then he said that he couldn't give

25   her what she wanted.

1   Q.  How long did Professor Bekaert talk about these kinds of

2   topics that night?

3   A.  We talked about those topics most of the night.

4   Q.  Were you talking about these kinds of topics as well?

5   A.  No.  I actually asked him how are things in Hong Kong, and

6   that's the response that I got.

7   Q.  What was your impression of why Professor Bekaert was

8   telling you these things about his sexual and romantic life?

9   A.  My impression was that he was telling me how desirable he

10  was.  He was telling me that there were people after him,

11  people that found him nice.  He was telling me how he was in a

12  dominant position, like he was, the womens were weak, and he

13  would help them and sleep with them.

14  Q.  After this dinner, when was your next meeting with

15  Professor Bekaert?

16  A.  We met once more before he left, the last day that he was

17  there.  I believe it was Sunday of that week.

18  Q.  Where did you meet Professor Bekaert?

19  A.  I met him at a cafe close to his hotel.

20  Q.  Whose idea was it to meet there?

21  A.  He told me that he didn't have time to meet.  He needed to

22  go to the airport, and the only place that he could meet was at

23  the restaurant in his hotel.

24  Q.  And did you end up going to the restaurant in his hotel?

25  A.  No, I proposed that we go somewhere else around there, and

I1anrav3                          Ravina - direct

1     we ended up going to a cafe on the same block or -- yeah,

2     across the street.

3     Q.  Did you meet at that cafe?

4     A.  No.  We met in front of his hotel actually.

5     Q.  And did you walk over to the cafe together?

6     A.  We walked over to the cafe together.

7     Q.  Can you tell me what happened during your walk to the cafe.

8     A.  During the walk to the cafe, he told me that my walk was

9     sexy, I was walking in a sexy way.

10    Q.  After Professor Bekaert told you that your walk was sexy,

11    what did you say in response to that?

12    A.  I said that I wanted to work and I was in real trouble.  I

13    really wanted to work.  I didn't want to talk about anything

14    else but work.

15    Q.  When you got to the cafe -- let me step back.  You said you

16    were in real trouble.  What were you referring to there?

17    A.  I wanted to talk with Professor Bekaert about my 2013

18    review, that I had just -- I just talked with the senior

19    professor about it.

20    Q.  Who had given you your 2013 review?

21    A.  Wei Jiang, the subdivision chair.

22    Q.  Wei Jiang is a professor at Columbia Business School?

23    A.  Yes.  She is a tenured professor at Columbia Business

24    School, and that year she was the one delivering my annual

25    review.

I1anrav3                          Ravina - direct

1    Q.  What did Professor Jiang talk to you about in your 2013

2    review?

3    A.  Well, she told me that my senior colleague liked my papers,

4    their topic and their impact, but that I needed to publish

5    more.  And then she told me a plan to do, so we decided a plan

6    together.

7    Q.  What was her advice with respect to publishing more?

8    A.  She said that I should focus on three papers among the many

9    that I had and that I should aim to submit those by the end of

10    that year, the calendar year or academic year.

11    Q.  Did you receive a written review that year?

12    A.  Yes, I did.

13    Q.  Do you recall what the 2013 review said regarding your

14    prospects for tenure?

15    A.  They said, yes, some good things, but they said they were

16    unlikely.

17           THE COURT:  They said what?

18           THE WITNESS:  They were unlikely.

19    Q.  What was your --

20           THE COURT:  How likely?

21           THE WITNESS:  Not likely.

22           THE COURT:  Not likely.  Unlikely.  OK.

23           You can proceed.

24    BY MS. HARWIN:

25    Q.  What was your overall takeaway from your 2013 review?

I1anrav3                        Ravina - direct

1   A.   That I really needed to work.  I really needed to publish

2   to make sure that I made it on time for tenure.

3   Q.   When you met with Professor Jiang, did Professor Jiang make

4   any comment about whether it was possible or impossible for you

5   to get tenure at Columbia?

6   A.   Yes.  She thought it was possible, and we did a timeline.

7   And then she told me, you know, a good plan would be that you

8   focus on three papers and submit those.

9   Q.   Why did you talk to Professor Bekaert about your review?

10  A.   Because he was my mentor, so I thought this was the topics

11  that I should talk to him, and also because he was the senior

12  coauthor on very important set of projects out of which I

13  wanted to create papers to make it.

14  Q.   What parts of your review did you discuss with Professor

15  Bekaert?

16  A.   I told him about the fact that we needed to work big time.

17  I told him that I was planning on using at least one of the

18  papers out of the 401(k) project, the retirement project that I

19  had with him to make it to tenure.

20  Q.   Did you have any more specific discussions with Professor

21  Bekaert about this retirement project you were working on with

22  him?

23  A.   I also -- I had also brought with me a printout of those

24  first results that I had gotten and that we didn't have an

25  opportunity to discuss yet.  So, I wanted to show them to him

1   so that he would know what they were and the work would

2   proceed.

3   Q.  I'm sorry.

4   A.  I had also sent those results to the coauthors, to the

5   colleagues at the company.

6   Q.  Did you have a substantive discussion about the results of

7   your research so far?

8   A.  No.  He said that he had forgotten his reading glasses and

9   he couldn't talk about it on that case, in that instance.

10  Q.  Did you have any discussions during your meeting with

11  Professor Bekaert about what his level of involvement would be

12  with the project going forward?

13  A.  Our understanding was still the same, that I was doing the

14  data part, which was complete at least for that project, plan

15  the analysis, and he would write the draft, the summary of the

16  results.

17          MS. HARWIN:  I would like to move to admit the first

18  two pages of Defendants' Exhibit BM, which it looks like a

19  composite exhibit with two totally separate e-mails, so only

20  the first e-mail in that string.  We can relabel it with a

21  different number if that would be helpful.

22          MR. HERNSTATD:  Your Honor, if we could take a second

23  to --

24          THE COURT:  Sure.  Take your time.  If you have a

25  preference for whether plaintiff should relabel it let me know

I1anrav3                         Ravina – direct

1    that as well, please.

2              Can I have a copy as well, please.

3              Thank you.

4              MS. PLEVAN:  No objection, your Honor.

5              MR. HERNSTATD:  No objection, your Honor.

6              MS. PLEVAN:  And they can use Defendants' Exhibit.

7              THE COURT:  So it can be admitted, and for the present

8    BM is fine.

9              MS. HARWIN:  To avoid confusion because we're only

10   introducing the first two pages, should we mark it BM1 or

11   something like that?

12             THE COURT:  Sure.

13             (Counsel conferred)

14             MS. PLEVAN:  I apologize.  But if they have changed

15   what is ours then I --

16             THE COURT:  Just make it a plaintiff's exhibit,

17   introduce the portion you want, and we will revisit it on the

18   defense case.

19             MS. HARWIN:  Sounds good.

20   BY MS. HARWIN:

21   Q.  Did you have any discussions with Professor Bekaert about

22   whether his approval would be required for any aspects of the

23   project?

24   A.  Yes.

25             MR. HERNSTATD:  I'm sorry.  I didn't catch that.

I1anrav3                          Ravina - direct

Q.  Did you have any discussions with Professor Bekaert as to
whether his approval would be required for any parts of the
project?

A.  Yes.

        So, while early on Professor Bekaert was relying on my
expertise to decide the steps to look at the data, analyze them
and create the empirical strategy, around this time, he started
telling me that he needed to approve every single step of the
research, that he wanted to be kept informed, which he was, but
also that I could not proceed and make any farther step without
clearing it with him.

Q.  Was that typical for interactions with coauthors?

A.  No.  That was not typical in general, and it was even less
typical in this case because this was not his area of
expertise, and he had said it repeatedly.  He had also shown
that that was the case.

        MS. HARWIN:  Your Honor, the exhibit we just talked
about.  We can relabel as Plaintiff's Exhibit 261.

        THE COURT:  All right.  And it's the April 13 --

        MS. HARWIN:  That is correct.

        THE COURT:  -- e-mail at 2:35.

        MS. HARWIN:  And the rest of that chain, yes.

        (Plaintiff's Exhibit 261 received in evidence)

BY MS. HARWIN:

Q.  Professor Ravina, if you take a look at the first page,

I1anrav3                        Ravina - direct

1   bottom e-mail, can you read what you wrote there?

2   A.  "I just talked with Wei Jiang . . . we need to work big

3   time.  Enrichetta."

4   Q.  Was that a reference to the 2013 review you had just told

5   us about.

6   A.  Yes.

7   Q.  Please take a look at the e-mail above that.

8           Professor Bekaert writes, "Yeah, but the biggest gain

9   per unit of time is for you to get your two single authored

10  papers published in a top journal, or at least one.  I keep

11  telling you, but you do not seem to listen."

12          Did you agree with what Professor Bekaert said there?

13  A.  Actually, no.  The 401(k) paper, like he recognizes in the

14  second part of the e-mail, was actually a better use of time,

15  because out of this platform there would be more than one paper

16  coming out.  It was quite time consuming to do the revisions on

17  the other two.  Since I was on a tight deadline, I wanted to

18  work on the stuff that was bringing out the most papers.

19          (Continued on next page)

20

21

22

23

24

25

I7a1rav4                          Ravina - Direct

BY MS. HARWIN:

Q.  Did you find Professor Bekaert's comment to you about getting these other papers published to be helpful?

A.  The first part?

Q.  Did you find it helpful when Professor Bekaert talked to you about publishing these other papers?

A.  Well, no.  No, I didn't.  And the reason is that I was -- I had done a bunch of work, a lot of work, actually, for the spring, fall 2012 and entire spring 2012 semester, and I was ready to get -- to reap the benefit of this work, and only after I'd done all this work, he was telling me, oh, switch to something else, instead of writing down the results and actually getting the -- the papers out of this work.

Q.  If you look at the email above the third block of text that begins, "I listen to you," can you read the first two sentences there.

A.  "I listen to you and I appreciate immensely your advice and the time you spend taking care of me.  You are so nice.  You even send me songs.  And you took time to call me in Italy when it is for sure not part of your job description and you are so busy."

Q.  And you can read the last sentence of that paragraph as well.

A.  "We can also speak by phone if it is faster for you to scream at me."

I7a1rav4                          Ravina - Direct

1    Q.  Can you explain why you wrote this email.

2    A.  I wrote this email because the -- I started to feel that

3    Professor Bekaert was actually disengaging for the -- from the

4    research instead of pushing it forward, and I was basically

5    humiliating myself to make sure that the project would go

6    forward.

7              MS. HARWIN:  I'd like to move to admit Plaintiff's

8    Exhibit 20, which I also understand doesn't have any objections

9    from defendants.

10             THE COURT:  All right.  Is there any objection to 20?

11             MS. PLEVAN:  No objection.

12             MR. HERNSTADT:  No objection.

13             THE COURT:  Okay.  So it will be admitted.

14             (Plaintiff's Exhibit 20 received in evidence)

15   BY MS. HARWIN:

16   Q.  Can you take a look at the email on the bottom of the first

17   page, the second line, where Professor Bekaert writes, "I would

18   not do anything right now on this int. div. project as I still

19   want to write up a bullet point skeleton for the paper to

20   jump-start us."  Do you see where Professor Bekaert wrote that?

21   A.  Yes, I see it.

22   Q.  What did you think about this email?

23   A.  I was -- I was surprised.  He was -- we had agreed that we

24   would push the work forward, and then few days later, he's

25   telling me, no, let's stop working on this project, wait for me

I7a1rav4                         Ravina - Direct

1   to do a bullet point schedule -- skeleton.

2   Q.  Did Professor Bekaert share this bullet point skeleton with

3   you?

4   A.  I kept asking him quite a few times and eventually, much

5   later on, he did.

6   Q.  Can you look at the next line of Professor Bekaert's email

7   where he writes, "Now waiting for me is obviously not great as

8   I am so busy."

9   A.  Yes.

10  Q.  How did you feel about that statement from Professor

11  Bekaert?

12  A.  Well, I felt that he was telling me that, you know, he

13  didn't have time to work on this project, and one thing that

14  I -- I understood as well is I felt like, well, then maybe I

15  should push forward and I should do the work.  So since we

16  needed to agree on everything on this project and I had been

17  waiting for this skeleton, what I decided to do after this

18  email was to start work on a different paper, always from the

19  same platform, and push that work forward.

20  Q.  And what was the -- let me just step back.

21          Can you describe the specific topic that the research

22  that you were pursuing with Professor Bekaert so far was about?

23  A.  So up to now, the int. div. project is the international

24  diversification project, how people buy stocks from companies

25  from other countries instead of the US stocks and the tendency

1    of people to actually buy stocks from their own country even

2    though, from a point of view of returns, maybe would be better

3    to diversify, for lack of -- quick explanation.

4    Q.  And what was the topic that you planned to move forward

5    with after these communications in April in 2013?

6    A.  The next topic was -- the topic I started working on was

7    the -- we can label it automatic enrollment.  And so this topic

8    studied how people tended to save more if they can -- they get

9    put automatically into a plan and then they have to withdraw

10   instead of having to actively choose to join the plan.  So this

11   is what automatic enrollment is.

12   Q.  Can you describe generally the work you did on this

13   project.

14   A.  On this project, I designed the research question, I

15   designed the empirical strategy, the algorithm, and the list of

16   steps that we were --

17   Q.  When you say "empirical strategy," can you just give a

18   quick explanation of what that means.

19   A.  Empirical strategy is a game plan, a list of things that

20   you will do in order to answer the question in -- in a

21   scientifically sound way; the list of analysis you do, the list

22   of information that you collect; it is the topics that you will

23   cover; it's a general plan on how this final paper and draft

24   will look like, the content and the analysis that goes into it.

25   Q.  What other work did you do on this paper besides developing

1   the game plan or empirical strategy?

2   A.  So I wrote the codes, the implementation line by line of

3   that empirical strategy, I directed the research assistants

4   working on this, and I also selected the additional data from

5   outside that we will put into the main data set.  For example,

6   we did Freedom of Information request.  We requested from the

7   Department of Labor a huge bunch of documents to put in, and I

8   overviewed this.

9   Q.  I want to return to the email that we were just talking

10  about before.

11          On Plaintiff's Exhibit 20, where Professor Bekaert

12  wrote, "Now waiting for me is obviously not great as I am so

13  busy," how did you feel about seeing that from Professor

14  Bekaert in light of what you had talked to him about with your

15  2013 review?

16  A.  Well, I -- I felt bad about it because I needed -- the

17  review said you should work quick and actively to publish, he

18  had been telling me how great this set of projects would be and

19  that we would publish the stuff very --

20          MS. PLEVAN:  Objection.  The document on the screen is

21  not the exhibit.

22          THE COURT:  All right.  Yes.

23          MS. HARWIN:  I apologize.  It should be Plaintiff's

24  Exhibit 20.

25          That's right.

I7a1rav4                    Ravina - Direct

BY MS. HARWIN:

Q.  The line on the bottom of that e-mail, "Now waiting for me

is obviously not great as I am so busy," that's what we're

discussing.

A.  So I was ready to push forward, but there was a concern.

He was very busy.  But also, I needed to clear everything with

him, so on this project, it's not that I could just power

through by myself.  I needed to get the approval.  But he was

busy and it would take a long time, apparently, to give it.

        For example, the skeleton came way later, and it

wasn't really a skeleton in the sense of a game plan, but it

was more copy and paste from some other email.  So I had waited

for like months to get just a copy and paste on stuff.  So I

was concerned.

Q.  Was Professor Bekaert aware of the kinds of pressures you

were facing to publish?

A.  Oh, yeah.  Every tenured professor at some point early in

their career was a tenure track professor, so he went through

the same track, he knew that it's super important to publish,

and this is what people strive for.

Q.  Did you have any conversations with Professor Bekaert in

the spring or summer of 2013 about his mentorship of you?

A.  Yes.  So Professor Bekaert was -- had told me that he

was -- had been assigned by the department to be my mentor, but

in -- during the early summer, spring of 2013, he was

1    basically -- he was -- it looked like to me as he was

2    withdrawing, and this was at a time in which it was important

3    to me to publish, to publish these papers on the 401(k) because

4    that was the platform that generated many papers at the same

5    time, and also, I didn't want to be in trouble with the

6    department.  It would not look good if I lose my mentor who was

7    assigned to me.

8              MS. HARWIN:  I'd like to move to admit Plaintiff's

9    Exhibit 22.  Again, I understand there are no objections from

10   defendants.

11             MS. PLEVAN:  No objection, your Honor.

12             MR. HERNSTADT:  No objection.

13             THE COURT:  All right.  22 will be admitted.

14             (Plaintiff's Exhibit 22 received in evidence)

15   BY MS. HARWIN:

16   Q.  Professor Ravina, can you look at the bottom of the first

17   page, the third paragraph from the bottom that begins "BTW."

18   A.  Yes, I found it.

19   Q.  Do you see where Professor Bekaert writes, "BTW, should we

20   still meet somehow also about the mentoring thing?  Need to

21   know where you stand.  It is going to be tough, though.  Maybe

22   we can have a brief talk on the phone."

23   A.  Yes, I see it.

24   Q.  What did you think of this?

25   A.  I -- I thought -- I thought Professor Bekaert was telling

1    me I was in trouble.  I depended on him, and he was basically

2    jerking me around.  He was saying, we have to meet, we don't

3    have time.  Let's work on the 401(k) papers but it's going to

4    be very tough because I'm very busy.  So I was seeing him

5    basically threatening, at least, if not withdrawing from the

6    mentorship.

7    Q.  You talked about feeling jerked around by Professor

8    Bekaert.  Turning to the next sentence of that email, where

9    Professor Bekaert wrote, "Also, on the FE data set, the more I

10   think about it, the more I come up with new potential papers.

11   This could be a career or not, if people balk at the data."

12   What did you think of that?

13   A.  He was explaining how important this retirement, 401(k)

14   data set was for me and for my career.  He was saying that this

15   could be a career, and then he was doing the pull and saying,

16   well, unless people balk at the data.

17   Q.  What did you say in response to Professor Bekaert's email?

18   A.  I said -- I said that, well, I -- I wanted him to be my

19   mentor.  I said that -- I didn't want to lose the mentor while

20   I was in this situation, to have to propel forward, so I say

21   that I want him to be the mentor, and once more, I -- I sort

22   of, you know, say, you win, you are in control, I would like

23   you to be the mentor.

24   Q.  And looking at your email dated June 23, 2013, are you

25   referring to what you wrote in that second line?

1    A.   Yes.

2    Q.   Turning to the email Professor Bekaert wrote immediately

3    before that, do you see where he wrote, "But, hey, maybe you

4    tell me.   Should I be your mentor?   You never listen to me

5    anyway..."?

6    A.   Yes.

7    Q.   How did you believe it would affect your career if

8    Professor Bekaert stopped being your mentor?

9    A.   It would be bad for me because I would lose somebody that

10   was supposed to give me advice and support in the department

11   and in the profession, it will look bad because people wonder

12   what was wrong, why did I lose my mentor, so not only I would

13   have lost the support of someone important to be on my side

14   and, you know, advocating for me, but it also would have had a

15   negative repercussion for my image, I believe.

16   Q.   Did there come a time when Professor Bekaert returned from

17   his sabbatical in Hong Kong?

18   A.   Yes.

19   Q.   Do you remember what semester he returned?

20   A.   He returned -- he returned at some point I think in the

21   summer, but he traveled, so the fall of 2013.

22   Q.   How was your relationship with Professor Bekaert when he

23   returned to Columbia Business School from that sabbatical?

24   A.   It got worse.   He started talking about sex quite a lot, he

25   started pressuring me to go for dinners, he had made physical

1  advances.  At some point he even told me that if I was -- if I

2  was nicer, my papers would have gone faster.

3  Q.  So I want to talk about each of those separately.

4          You talked about physical advances.  What was the

5  first physical advance that Professor Bekaert made towards you

6  in the fall of 2013?

7  A.  So during the fall he kept again asking to go for dinner

8  and complaining that we will not go for dinner.  He say that

9  one of his co-authors, collaborators, had saw me at a

10 restaurant, why wasn't he invited, why wasn't I going to dinner

11 for him, and so I ended up going to this dinner.  And after the

12 dinner --

13 Q.  So let me stop you.  I want to go slowly here.

14         Did you end up going to dinner with Professor Bekaert?

15 A.  Yes.  I tried to get out of it.  I tried to make it a group

16 thing and propose to go, not the two of us but with some other

17 people, one of -- Paola and Alex that he had complained about

18 before, to make it a all-together outing, to go to an art

19 gallery.

20 Q.  And did this end up being a group thing?

21 A.  No.  He was displeased, didn't want to join them, it was

22 too far away.  He insisted to go for dinner, just the two of

23 us.

24 Q.  And is that what happened?

25 A.  Yes.

I7a1rav4                         Ravina - Direct

1     Q.   When did you go for dinner with Professor Bekaert?

2     A.   In later September 2013.

3     Q.   And no one else was at that dinner?

4     A.   No, no one else.

5     Q.   What happened in connection with that dinner?

6     A.   After we were at the dinner, he was -- he walked me home.

7     I wasn't even very far from the restaurant.  And he insisted

8     that I -- he didn't leave me at the corner but he actually

9     turned into my street and we walked to -- to the stoop, the

10    stoop of my apartment building, and he asked if I --

11    Q.   Sorry.  The stoop meaning there was a stairway?

12    A.   Yeah, outside the apartment, there are a few steps to get

13    into the door of the building.

14    Q.   Okay.

15    A.   That's a stoop.

16    Q.   And what happened when you got to the stoop of your

17    apartment building?

18    A.   So Professor Bekaert asked me, do you want help to go up

19    the stairs?  And I say, no, no, and I started walking up.  And

20    at this point he pulled my -- my arm and he pulled me toward

21    him and tried to plant a kiss on me, and I turned fast and he

22    ended up landing it on my cheek.

23    Q.   What did you do in response to Professor Bekaert's kiss?

24    A.   I pulled -- I pulled back immediately and I just say bye

25    and went up, ran up the stairs and entered my building.

I7a1rav4                          Ravina - Direct

1   Q.  Was this how Professor Bekaert typically said good-bye to

2   you?

3   A.  No, no.  This -- this was not -- this was not bye, this was

4   not greetings of -- greeting, you know, like giving a kiss on

5   the cheek.  It was aiming for the mouth.

6   Q.  How do you know he was aiming for your mouth?

7   A.  Because if I hadn't turned my face really fast, that's

8   where his kiss would have landed.

9   Q.  Were there any other physical advances that Professor

10   Bekaert made on you that semester?

11   A.  Yes.  At a dinner immediately after, quite close in time,

12   we were sitting on the stool --

13   Q.  So let me back up.  There was another dinner after this

14   dinner?

15   A.  Yes, there was another dinner.

16   Q.  And who extended the invitation to that dinner?

17   A.  Professor Bekaert wanted to go after having a long day of

18   work.

19   Q.  And when did that dinner take place?

20   A.  Also in the end of September 2013.

21   Q.  Where did you go for dinner?

22   A.  It's a place called Ai Fiori.  It's in -- I don't know if

23   it's Flatiron.  The mid 30s, in Manhattan.

24   Q.  Did you meet at the restaurant?

25   A.  No.  We went there together by -- by cab.

1    Q.  What happened when you arrived at the restaurant?

2    A.  So we didn't have a reservation, but the bar of the

3    restaurant was actually wide open and so we just sat at the

4    bar.

5    Q.  What happened when you were seated at the bar?

6    A.  We were having conversations, and at some point Professor

7    Bekaert reaches over to my stool and he holds -- he took his --

8    my hand in his hand.

9    Q.  What happened then?

10   A.  So I -- I was sitting and I was holding the hands next to

11   me on the stool, and he grabbed the hand and I just froze.  I

12   didn't say anything.  I remained immobile and silent till he

13   let go.

14   Q.  Why did you have that second dinner with Professor Bekaert

15   after the first one where he tried to kiss you?

16   A.  Because I -- I couldn't -- I couldn't afford to offend him.

17   I didn't want to -- I was -- I was walking a tightrope.  I

18   needed -- I was deep in the project.  I didn't have time to

19   move around and do something else.  And at the same time I --

20   I -- I need -- I needed his support and I needed especially for

21   him to say yes to the -- to the next step.  I had been going to

22   his office regularly to get him to proceed.  He will not

23   proceed.  He would always insist about switching the topic to

24   something about his life, about going for dinner, about sex.

25   I -- I cannot refuse.  I didn't want him to be upset at me or

1  get confrontational.

2  Q.  Was there anything else in addition to Professor Bekaert

3  kissing you and taking your hand at that dinner that you recall

4  Professor Bekaert doing physically that semester?

5  A.  So another -- another episode that disturbed me, and I felt

6  really uncomfortable with, happened in his office.  I was there

7  again to try to make the work proceed, and we were standing,

8  and I was showing him a document and he was standing at his

9  desk next to me, and I was just talking and describing what was

10  in this document, and all of a sudden I just turned to -- to

11  look at him, and he was staring at my breasts.  I was so

12  embarrassed and humiliated that I stopped, and I don't think he

13  realized immediately that I had realized.  So I cleared my

14  voice, and then he realized as well.  It was embarrassing.

15  Said something about, oh, that I look good, then I looked away.

16  Q.  You talked about Professor Bekaert kissing you, taking your

17  hand, looking at your breasts.  Can you describe how you felt

18  about these interactions.

19  A.  I felt -- I felt very -- I felt very bad.  I felt that

20  every time I would go to Professor Bekaert's office, he was not

21  thinking about work.  He was thinking about sex.  And I was

22  there to make the work go forward.  I was growing basically

23  desperate because we were already in the fall of 2013 and

24  nothing had happened on my project despite we were ready in the

25  spring to be analyzed and I was trying to make -- try to get

his approval some way to move forward and trying to work, to

move forward.  If anything, he was stalling more.  He was just

sitting there, saying he was busy, he didn't have time, he

wasn't ready, and it was as if he was sort of waiting to see if

I was changing my mind, if I would sleep with him instead of

like freezing when he'd hold my hand or running up the stairs

when he -- when he would try to kiss me.

Q.  You talked about getting the feeling that Professor Bekaert

was thinking about sex when he was meeting with you.  Is there

anything else he did that semester that gave you that

impression, that he was thinking about sex when he was meeting

with you?

A.  He kept talking about his sex life, how popular he was in

Hong Kong with women.  He said that he was a Westerner and that

the people, they thought, he say, that a Westerner is richer

and so it attracts the women.  He talked about pornography,

prostitution, and how prostitutes are important --

Q.  Sorry.  Let me take you to those in turn.

        Before we get there, can you give a little context

about the kinds of settings where you were meeting with

Professor Bekaert when he was talking about sexual topics in

the fall of 2013.

A.  Yes.

        MR. HERNSTADT:  Your Honor, could I ask that the

questions be a little less leading.

1          THE COURT:  Okay.  Just watch the leading.  Do you

2     want to clarify a little bit.

3     Q.  You talked about a number of conversations involving sexual

4     topics.  I just want to step back, and if you could describe

5     for me the context in which you were meeting with Professor

6     Bekaert besides the dinners we've talked about already.

7     A.  Yes.  So most of the meetings there would take place in

8     Professor Bekaert's office.  I was there, stopping by to try to

9     have the research move forward, and he would swerve, move the

10    conversation to -- to sex.  Sometimes it would happen on

11    line -- he always wanted to -- often wanted to go for coffee.

12    In Italian we say "always," meaning "often," so I apologize.

13    So he often wanted to go for coffee.  I would stop by to get

14    work done and he would say, well, you know, let's go for coffee

15    and let's talk there or let's talk later.  So we would often

16    walk to a coffee place on campus there called the Joe, in the

17    engineering building.

18    Q.  Joe's?

19    A.  Joe.

20    Q.  J-O-E?

21    A.  J-O-E apostrophe S.  Joe's.  These were the main settings

22    where he would speak about sex and how -- about his sex

23    adventures in -- in Hong Kong and in New York as well.

24    Q.  How often did you and Professor Bekaert go to coffee during

25    the fall 2013 semester?

1   A.   It was -- it was numerous times.  Most often we would go

2   for coffee during the day.  I would say dozens.

3   Q.   Why were you having coffee so frequently?

4   A.   Because he would tell me, let's go for coffee.  Coffee was

5   the place where he wanted to talk about work, so either I would

6   go to his office and he'd say, let's go for coffee, or if I

7   wanted to talk to him, I would say, okay, I -- do you want to

8   talk about work?  If you want, we can go out for coffee.

9   Q.   About how many times did Professor Bekaert bring up sexual

10  topics during the fall 2013 semester?

11  A.   Quite frequently.  There was a talk about women in Hong

12  Kong.

13  Q.   Before we get into the specifics, can you just give some

14  sense of the quantity, approximately how many times Professor

15  Bekaert raised sexual topics with you during the fall 2013

16  semester.

17  A.   I would say probably dozen, or more.  A dozen for sure.

18  Q.   So you talked about Professor Bekaert telling you about his

19  popularity with women in Hong Kong.  Can you say more about

20  what Professor Bekaert said to you about this.

21  A.   He was talking -- he kept talking about the stewardess that

22  he had slept with while he was in Hong Kong and about the

23  entrepreneur.  He was talking also more generally.  He wasn't

24  specifying the names or the situations.  He said that he was

25  meeting a lot of women at bars, or hotel bars, and -- and so I

I7a1rav4                          Ravina - Direct

1   told him, you know, sometimes those are worker, work for hire,

2   and that's not necessarily a sign of desirability.

3   Q.  And how did Professor Bekaert respond when you said that?

4   A.  Well, he told me that prostitutes are important.  They keep

5   men out of trouble.  And they are important to satisfy a man's

6   sex drive.

7   Q.  You also talked about Professor Bekaert raising the topic

8   of pornography.  Can you explain how that came up.

9   A.  So we were in line at this coffee place, Joe's, which is

10  quite crowded place at Columbia, and he asked me, you know, do

11  you watch porn, and I say no.  I was like humiliated, demeaned.

12  It came as a surprise.  So I say no.  And then he looked at me

13  strangely as if like I was strange that I wouldn't look at

14  porn, and -- and then he started bragging that he was only

15  getting porn for free, not paying for the website, I guess.

16  Q.  Do you remember Professor Bekaert raising any other topics

17  about his sexual or romantic life that semester?

18  A.  Yes.  He was talking about how desirable he was, and he was

19  also asking -- he was talking about his doctor.  So he had gone

20  to the doctor and he said that it was this young black woman;

21  he thought it was the nurse at first, but she was actually the

22  doctor.

23  Q.  Let me clarify.  Were those Professor Bekaert's words?

24  A.  Yes.

25  Q.  Okay.  Keep going.

1   A.  That he -- he liked her and he was trying to invite her for

2   dinner, and he was asking my advice about what some of the

3   email or communications meant.

4   Q.  What was your impression of why Professor Bekaert was

5   talking to you about these topics?

6   A.  Well, I thought -- my impression was that he was telling me

7   how desirable he was.

8           In another occasion, he had told me about him

9   traveling with his girlfriend and that the stewardess on the

10  plane was only paying attention to him, and his girlfriend was

11  quite upset about that.  And he was telling me, you know, see,

12  some people like me.

13  Q.  He said that to you?

14  A.  Yeah, he say that to me as a contrast.  He told me, you

15  don't like me, but -- my understanding is that he told me, you

16  don't like me, but some people out there do.

17  Q.  How did you feel about all of Professor Bekaert's

18  discussions about sex?

19  A.  I felt -- I didn't want to discuss about sex.  I felt

20  trapped.  I felt that I could not offend him because otherwise

21  he would lash out at me and ruin my chance of publishing with

22  those papers on the 401(k) project and ruin my reputation.  And

23  at the same time I didn't want to -- I didn't want to sleep

24  with him.  I -- I just wanted him to say, yes, let's proceed

25  with this task, go ahead, and let's keep going.

1   Q.  What was your impression of why Professor Bekaert was

2   bringing up sexual topics with you?

3   A.  Well, my impression was that, you know, when he was meeting

4   me, he was thinking about sex.  He was putting sex and work

5   together.  I would go to try to proceed with work, he would

6   talk about sex.  He would talk about how desirable he was, how

7   other people find him desirable.  It was basically postpone

8   continuously about the work, but he was -- always had time to

9   go for coffee at the same time.

10  Q.  While all of these conversations were happening during the

11  fall 2013 semester, what was happening with your research

12  projects?

13  A.  They were -- they were stalled.  There was some work

14  proceeding.  I was trying to have the research assistant to do

15  some work on my -- especially on the automatic enrollment

16  paper, but things were not proceeding.  We were missing

17  deadlines for conferences.  We had agreed that we would send

18  papers to conferences in the spring.  That didn't happen.  In

19  the summer, it didn't happen.  And now there was a big

20  conference coming up, and we didn't have a draft and we were

21  very close to it.  I had submitted a paper to a presentation in

22  early January 2014, and it was already late.

23  Q.  Sorry.  I'm sorry.  I want to keep us in the fall 2013

24  semester.  Were there any ways in which you felt that Professor

25  Bekaert was delaying work on the projects during that semester?

1    A.  Yes.  He was -- he would refuse to make any meaningful

2    approval of steps.  He would talk about work in general terms,

3    but when it came the time to actually say, okay, let's do this,

4    he wouldn't have time, he wouldn't be ready, he would go for

5    coffee, talk about his personal and sex life.

6    Q.  And how typical was that for research collaborations among

7    colleagues, as far as you understand?

8    A.  It was not typical at all.  Usually people -- first, people

9    are very happy if someone else does the work.  So instead of

10   saying, we have to approve everything step by step, I want to

11   be involved, people are very -- I'm very happy if my co-authors

12   do something instead of me doing it, because the work proceeds

13   and I don't need to do it.  But that -- there, it was the

14   opposite.  He had no expertise but he wanted to approve

15   everything, and he was postponing approving over and over.

16   This is not how research collaboration works.

17           MS. HARWIN:  Your Honor, I move to admit Plaintiff's

18   Exhibit 29.

19           THE COURT:  Any objection?

20           MS. PLEVAN:  No objection.

21           MR. HERNSTADT:  No objection.

22           THE COURT:  All right.  29 will be admitted.

23           (Plaintiff's Exhibit 29 received in evidence)

24   BY MS. HARWIN:

25   Q.  Professor Ravina, can you turn to page 3 of this series of

1    emails.

2    A.  I see it.

3    Q.  Okay.  And these are emails between you and Professor

4    Bekaert from November of 2013?

5    A.  And also between me, Professor Bekaert, and two co-authors

6    at the Financial Engines that were collaborating on the

7    international diversification project.

8    Q.  So turning to that email with the Financial Engines

9    co-authors, can you just tell us generally what this email was

10   about.

11   A.  I was trying to make progress on the -- on the projects and

12   so I was telling Financial Engines, basically the algorithm,

13   the main, main ideas that would go in the automatic enrollment

14   project.  I was sending them all the steps and then I was

15   telling them, by the way, the international diversification

16   project will be coming soon.

17   Q.  What did Professor Bekaert say in response to your email

18   discussing this work?

19   A.  He asked me if I needed coffee.

20   Q.  Turning your attention to the first page, do you see where

21   you write, "Are you around tomorrow to discuss a plan of attack

22   for international?"

23   A.  Yes.

24   Q.  Can you explain what that meant.

25   A.  I wanted -- it was just after a conference where we had

1    sent a very preliminary draft, and I didn't want to have the

2    same preliminary draft sent for the January conference, so I

3    wanted to meet with him to decide on the next steps for the

4    international paper to be ready.

5    Q.  How did Professor Bekaert respond to you?

6    A.  "It won't be ready."

7    Q.  What did you say in response to that?

8    A.  Well, I asked him when it would be ready, when we should

9    meet.

10   Q.  Did you eventually meet with Professor Bekaert?

11   A.  I went to his office and I met with him, yes.

12   Q.  Can you describe what happened when you met with Professor

13   Bekaert.

14   A.  So I went to his office because I wanted to see if he had a

15   few minutes to develop this plan and move forward, and -- and

16   instead, he started talking about dating his doctor and his sex

17   life and he took the conversation away from -- from the topic,

18   and I was --

19   Q.  So after Professor Bekaert started taking the conversation

20   in that direction, what happened next?

21   A.  Well, I really -- I was -- I was desperate.  I really

22   needed to proceed.  So I tried to take the conversation back to

23   the projects and I say, you know, I really need to decide what

24   to do and to move forward.  And at this point I was standing

25   and Professor Bekaert was sitting, and he turned and he looked

1    at me and he smiled, and he said, you know, if -- if your

2    paper -- if you were nicer to him -- to me, to Professor

3    Bekaert, your papers would move faster.  And at that point I

4    said -- I said I was already as nice as I could be.  I had like

5    done tons of work, most of the work, took care of the data, I

6    had initiated progress on projects that he wasn't even aware of

7    early on, I would try not to offend him and do everything that

8    he asked.  I even paid him compliments as part of my job

9    description.  There was -- I couldn't be more nicer than that.

10   Q.  So Professor Ravina, just so that we're clear, this meeting

11   was in November 2013?

12   A.  In late November, yeah.

13   Q.  To the best of your recollection what were the words that

14   Professor Bekaert said to you?

15   A.  He said if you were nicer to me, your papers would move

16   faster, or proceed faster.  I think he said move.

17   Q.  And what did you say to him in response to that?

18   A.  I said, I'm already as nice as I can be.

19           MS. HARWIN:  I'd like to move to admit Plaintiff's

20   Exhibit 24.  I understand there aren't objections to this one.

21           THE COURT:  Sorry?

22           MS. HARWIN:  My understanding is there are no

23   objections to this one.

24           MS. PLEVAN:  No objection.

25           MR. HERNSTADT:  No objection.

```
 1              THE COURT:  All right.  So 24 will be admitted.

 2              (Plaintiff's Exhibit 24 received in evidence)

 3    BY MS. HARWIN:

 4    Q.  Approximately how long after that conversation where

 5    Professor Bekaert talked to you about your papers moving faster

 6    if you were nicer to him, approximately how long after that

 7    conversation did you receive this email from him?

 8    A.  Less than two weeks.  This email is dated December 1st of

 9    2013.

10    Q.  Please take a look at the third paragraph.  Do you see

11    where Professor Bekaert writes, "So, while I have started

12    nibbling away at the draft, I will not show you anything, as

13    you do not seem to grasp the concept of an evolving work in

14    progress"?

15    A.  Yes, I see it.  Yes, I see it.

16    Q.  Just a little context.  How familiar are you with the

17    concept of an evolving work in progress?

18    A.  I am very familiar, like any academic.  Writing a paper

19    requires a lot of iterations, and every step is a work in

20    progress, and people participate and chip in their knowledge

21    and ideas at any stage of the work in progress.

22    Q.  How common is it in the academic world for a co-author to

23    refuse to show a co-author a draft in progress?

24    A.  It's --

25              MR. HERNSTADT:  Objection, your Honor.
```

1           THE COURT:  Just based on your experience, you can

2     answer.

3     A.  Based on my experience and what I've been told by my

4     colleagues, it's extremely uncommon.  It's unheard of.

5     Q.  What was that last part?

6     A.  Unheard of.  Not heard before.  Extremely unusual.

7     Q.  What did you think of Professor Bekaert's statement that he

8     wasn't going to show you anything?

9     A.  I didn't know what to think about it.  It was strange that

10    he didn't want me to show -- to see the draft and the progress.

11    I wasn't sure there was a draft.  The time before in which he

12    was preparing a schedule, a skeleton, it ended up being a bunch

13    of copy and pastes.  I was concerned.  I was disturbed that he

14    didn't share the draft.  It's extremely uncommon and I didn't

15    know what to think.

16    Q.  If you look in the last sentence of that paragraph, I'd

17    like to call your attention to where Professor Bekaert writes,

18    "As we fill in the results, the organization of the tables and

19    the 'angle' on how we sell the paper may change, but I do think

20    that whatever we find, it is going to be super fascinating."

21    What was your reaction to this email overall?

22    A.  Relating to this part, I agreed that this was a very high

23    potential paper, it was a paper that would go over very well

24    and it ended up going well.  I was also feeling that Professor

25    Bekaert was not sharing the -- he wanted -- there was no draft

1  being shared.  It was a -- it was one month before a

2  conference.  I was concerned.  I was concerned about the

3  progress, I was concerned about the situation in general, and I

4  was seeing that Professor Bekaert was trying to -- was

5  starting -- turning even more on me because he was not -- he

6  was not even participating in the work anymore, he wasn't even

7  giving the draft.

8  Q.  You said you felt like he was turning on you.  Why did you

9  feel like he was turning on you?

10 A.  Because after our conversation in the office about I was

11 already as nice as I could be, he had become more aggressive

12 and he started being confrontational with me quite often.

13 Q.  Looking at Professor Bekaert's overall behavior during the

14 fall of 2013, were his interactions with you typical, normal

15 interactions among colleagues?

16 A.  No.  Not at all.  He would talk about sex, he wanted to go

17 for dinner, he would stall the progress.  He would refuse to

18 give approval for someone else, me, to do work instead of him.

19 It was slowing, slowing, and waiting, and this concluded with

20 him not even sharing drafts anymore.

21      MS. HARWIN:  I think we're at a good stopping point,

22 your Honor.

23      THE COURT:  Okay.  So why don't we take our break for

24 lunch and come back in an hour.  Just remember, don't discuss

25 the case and keep an open mind.  Thank you.

I7a1rav4

1                (Jury not present)

2                THE COURT:  Do you have a sense of how much longer you

3     have with this witness on direct?

4                MS. HARWIN:  At least the rest of the day.

5                THE COURT:  The rest of the day?  Okay.  All right.

6     Thank you.  I'll see you after lunch.

7                (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N    S E S S I O N

2                        (1:50 p.m.)

3              THE COURT:  Is everyone ready for the jury?

4              MR. HERNSTATD:  Your Honor.

5              THE COURT:  Yes?

6              MR. HERNSTATD:  I had one thing.

7              THE COURT:  Yes.

8              MR. HERNSTATD:  In the testimony this morning,

9    Mr. Ravina testified about Mr. Bekaert's wife.  That is a

10   conversation that has never been testified before in this case,

11   not in three days of her deposition.  It is the first time we

12   have heard anything like that.

13             Obviously we can't do anything about it now.  That is

14   a consensual relationship, and those were prohibited from the

15   plaintiff's case.  I would like a representation from the

16   plaintiffs or your order that it not come up again, that it not

17   come up in closing arguments, that it not come up with in

18   examination of Professor Bekaert.  His relationship with his

19   wife has nothing to do with this case.

20             MS. HARWIN:  Your Honor, the comments about his

21   relationship with his wife weren't covered by their motion, but

22   we don't intend to have any further testimony about the

23   subject.

24             THE COURT:  Yes.  Let's stay away from any statements

25   that he made about his wife going forward.

I1anrav5                    Ravina – Direct

1            OK.  You can come back up, Professor.

2            MR. HERNSTATD:  Thank you, your Honor.

3            MR. MELZER:  Your Honor, a couple more things that can

4    either be raised now or during the afternoon break.

5            THE COURT:  During the afternoon break.  I don't like

6    to keep the jury waiting.

7            MR. MELZER:  Thank you, your Honor.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  You all can be seated.  Thank you.

3              You may proceed.

4              MS. HARWIN:  Thank you, your Honor.

5              Good afternoon, everyone.

6    BY MS. HARWIN:

7    Q.  Professor Ravina.

8    A.  Good afternoon.

9    Q.  Professor Ravina, turning back to the fall of 2013, why

10   were you having coffee with Professor Bekaert so often?

11   A.  This was the way to make the work proceed.  This was the

12   way to talk about work, because when I would go to his office,

13   he would say, OK, let's go for coffee, let's talk about it

14   later.  So coffee at the time looked to me as a way to find a

15   venue where we could actually talk about the work, approve the

16   progress and go on.

17   Q.  And were those coffees effective at moving the work

18   forward?

19   A.  No, they were not.

20   Q.  Turning to the next semester, the spring semester of 2014,

21   did you continue to have coffees at that same frequency as you

22   did in the fall of 2013?

23   A.  No.  At that point, I give up on the coffee.  I gave up

24   going frequently to Professor Bekaert to ask for approval, and

25   I cut down as much as I could on interactions and coffees.

1    Q.  As the spring semester of 2014 proceeded, did Professor

2    Bekaert continue raising any sexual topics with you?

3    A.  Yes, he did.

4    Q.  Where did these conversations typically happen?

5    A.  It was either in his office or my office.

6    Q.  Can you give an example of one of those instances in the

7    spring semester of 2014 when Professor Bekaert raised a sexual

8    topic with you?

9    A.  So, at some point Professor Bekaert came to my office and

10   started telling me about a woman that he had met at a

11   restaurant, at the bar of a restaurant next to his house.  He

12   was saying that he liked her, that he was conflicted about

13   going out with her.  And eventually in a future meeting he told

14   me that they set up a date; he didn't know if she would show

15   up.  He talked about that.

16   Q.  Do you recall any other sexual topics that Professor

17   Bekaert raised during that spring 2014 semester?

18   A.  Yes.  At some point I was in his office, and he told me to

19   take a mug --

20   Q.  Professor Ravina, can you start us off with a little

21   context.  Why were you in his office?

22   A.  I went into his office to do something about the

23   international paper.  I wanted to move forward.  We were in the

24   spring of 2014, and I wanted to proceed with presenting the

25   paper.  I wanted to make progress.

1    Q.  So what happened when you went to Professor Bekaert's

2    office that time?

3    A.  We didn't make progress.  He told me -- there was a mug on

4    his shelf, and he told me to --

5    Q.  There was a -- what was it?

6    A.  A mug.  A cup with a handle where you put coffee.

7    Q.  OK.  And what did Professor Bekaert say about the mug?

8    A.  He told me to look at it.

9    Q.  And what did you do?

10            THE COURT:  To do what?

11            THE WITNESS:  To look at it.

12   BY MS. HARWIN:

13   Q.  And what did you do then?

14   A.  So I took the mug, and it had a cartoon on it and some

15   words.  And it said something like, "I'm refined, I am a

16   scholar, but" dot, dot, dot, or "and" dot, dot, dot.  There

17   were some dots on the mug.

18   Q.  What was going through your head as you read that mug?

19   A.  I thought he wanted another compliment.  He was refined, he

20   was scholar, and I should add something after the end.  And I

21   decided no more compliments.  I just stood silent and put it

22   back.

23   Q.  What did Professor Bekaert do after that?

24   A.  He told me, no, look at the bottom of the mug.  So I took

25   the mug, I turned, and the bottom said "horny" or "very horny."

1   Q.  It said "horny"?

2   A.  Yes.  H-o-r-n-y.

3   Q.  And what did Professor Bekaert do next?

4   A.  I was taken aback.  He laughed and he said that was true.

5   Q.  He said what was true?

6   A.  That he was horny.  I looked at him.  I turned not knowing

7   what to say, and he laughed and said, That's true.

8   Q.  How did you feel when Professor Bekaert said it's true?

9   A.  I felt -- I felt demeaned.  I felt like why am I part of

10  this conversation?  I didn't want to hear about it.  I felt

11  like humiliated by the whole episode.

12  Q.  Did you have any other interactions with Professor Bekaert

13  that semester that stood out to you in some way?

14  A.  At some point later on, it was around Valentine's Day and

15  Professor Bekaert came to my office and he brought a gift bag

16  with a CD and chocolates in it.

17          THE COURT:  It sounds like we are going to be fine.

18  We will follow up and check on it, but why don't we proceed.

19          MS. HARWIN:  Thank you, your Honor.

20  BY MS. HARWIN:

21  Q.  Professor Ravina, can we just go back to where we were and

22  can you describe what Professor Bekaert gave you in February,

23  around Valentine's Day of 2014.

24  A.  It was a gift bag and inside it there was a CD and some

25  chocolates.

I1anrav5                    Ravina - Direct

Q.   Why did you think when Professor Bekaert gave you this
gift?

A.   I interpreted it as a romantic gesture.  I didn't want it,
so I hesitated and I thought about a way to give it back.  I
went, you know, there was no need, and he was a little bit
perplexed, he looked perplexed as well in my understanding.  I
just kept it there, and I threw away the chocolates afterwards.

Q.   How did your relationship with Professor Bekaert change
after February of 2014?

A.   Professor Bekaert started becoming very aggressive.  He
started belittling my work, my professional status, started
saying that the data were wrong.  He started putting more and
more obstacles and, he started saying that we could not
proceed.  He started putting the blame on me that we were not
proceeding, and he became more and more hostile over the course
of the spring semester.

Q.   You talked about belittling you.  Can you give examples of
the kinds of things that Professor Bekaert said to you?

A.   He -- he started telling me I was insane, that I had a
masochistic desire to shoot myself in the foot, that I was
crazy, that he would have thought me to be productive, and
he's -- calling me names.

         And so I tried to veer the conversation to the
professional, and I asked him to be respectful, professional,
and be set up in a way that everybody could do their work so

I1anrav5                         Ravina - Direct

1    that he would stop.

2    Q.  We're going to come back to that in a little bit.

3    A.  If I speak too fast, let me know.

4    Q.  OK.

5           THE COURT:  I will let you know.

6           MS. HARWIN:  If anyone is having trouble hearing me

7    because I'm not speaking loudly enough or if anyone needs to

8    slow down, please raise your hand.

9           THE COURT:  Yes.  Right.

10          MS. HARWIN:  Thank you.

11          THE COURT:  False alarm.

12          We're safe.

13          MS. HARWIN:  Your Honor, we are going to move to admit

14   Plaintiff's Exhibit 34.

15          MS. PLEVAN:  No objection.

16          MR. HERNSTATD:  No objection.

17          THE COURT:  All right.

18          34 will be admitted.

19          (Plaintiff's Exhibit 34 received in evidence)

20   BY MS. HARWIN:

21   Q.  Professor Ravina, do you recognize these e-mails dated

22   March 2014?

23   A.  One second, please.

24          MS. HARWIN:  Brian, can you bring up Plaintiff's

25   Exhibit 34.

1                THE COURT:  Whenever you're ready.

2                THE WITNESS:  I still can't see it actually.

3                THE COURT:  Is it not on the screen?

4                MS. HARWIN:  It is not on --

5                THE COURT:  It is not on mine yet.

6                TECHNICIAN:  It's coming.

7                THE WITNESS:  I can see it.

8                THE COURT:  Can everyone see it now?

9                JUROR:  Yes.

10                THE COURT:  Thank you.

11                MS. HARWIN:  Thank you.

12   BY MS. HARWIN:

13   Q.  Professor Ravina, can you turn to the second page of

14   Plaintiff's Exhibit 34.

15                In the e-mail in the middle of the page from Professor

16   Bekaert to you, in the first paragraph, the first sentence,

17   Professor Bekaert writes, "If you reread this e-mail, you will

18   see that you sound bitter and frankly not very

19   grateful/gracious.  BTW, I got 4.9s in the past and did not

20   win, so don't sweat it."

21                Did you receive this message from Professor Bekaert?

22   A.  Yes, I did.

23   Q.  Can you turn your attention to the second paragraph, where

24   he writes, "Indeed, you need to get rid of the R and Rs."

25                What did you understand Professor Bekaert to be

1   referring to when he used the term "R and Rs"?

2   A.  I understood it was referring to the papers that I had in a

3   draft form and in revised and resubmit form, that they started

4   going through the process at the journal, but not yet

5   completed.

6   Q.  Do you see how Professor Bekaert goes on saying, "By the

7   end the year your CV will look a lot better in any case"?

8          What did you understand that to mean?

9   A.  I understood it to mean that there would be more

10  publications for me in the -- by the end of 2014.

11  Q.  Turning your attention to the top of this page, do you see

12  the second paragraph at the top e-mail, where Professor Bekaert

13  says, "I say this once.  Doing the 401(k) stuff may be the best

14  NPV decision you ever took."

15         Can you translate into plain English what Professor

16  Bekaert was saying about your joint research project there?

17  A.  So, yes, he was saying --

18         MR. HERNSTATD:  Objection.  I think you mean her

19  understanding of what he was saying.

20         THE COURT:  Yes.

21         Just your understanding of what he was saying.

22  A.  My understanding of what he was saying is that the 401(k)

23  stuff, meaning the retirement data project that we had

24  together, may be the best NPV decision.  So NPV decision is --

25  how do you say?  The bang for your buck basically.  It is how

1    much work you put in and how much you get out.  So the NPV is

2    what you get out for putting a certain unit of effort into

3    something.

4    Q.  NPV, does that stand for anything?

5    A.  Yes.  It is a valuation term.  It stands for net present

6    value.

7    Q.  How did you feel about this exchange of e-mails overall?

8    A.  I felt, I felt, I felt that Professor Bekaert was telling

9    me these research projects were valuable.  At the same time he

10   was telling me do something else.  It was a push and pull.  And

11   while this is the best NPV decision, he was telling me to do

12   something else at the same time as well.

13   Q.  Did you ever tell Professor Bekaert explicitly you are

14   harassing me?

15   A.  Not in these words.  I didn't want to offend him.  But I

16   gave him ample signals that I was not interested.  I never made

17   overtures toward him I was polite.  Yeah, I paid him

18   compliments, but it stopped there.

19   Q.  Why didn't you tell Professor Bekaert more explicitly you

20   are harassing me?

21   A.  I didn't want him to stop my project.  I didn't want him to

22   get enraged with me and be negatively affected in the most

23   important projects that I had working for me.

24   Q.  Why were you concerned about that?

25   A.  I had -- because I had seen before -- I saw him before

I1anrav5                        Ravina - Direct

1   getting angry and upset at people who crossed him, and I didn't

2   want to -- I could not afford to cross him.  I didn't want to

3   cross him.

4   Q.  And can you give an example of what Professor Bekaert was

5   like with someone who crossed him?

6   A.  One example that comes to mind is about he was talking

7   about his experience at Stanford before coming to Columbia.

8   And he was very --

9   Q.  Can you just back up.  What was Professor Bekaert doing at

10  Stanford?

11  A.  So, Professor Bekaert was an untenured professor at

12  Stanford before coming to Columbia.

13  Q.  OK.  Thank you.  Keep going.

14  A.  So, while he was at Stanford he stated the assistants, they

15  complained about him.  He was very upset.  He said he almost --

16  it almost cost him tenure, and he was really, really angry

17  about this.

18  Q.  What did Professor Bekaert say, if anything, about the

19  assistants?

20  A.  He said they complained about him.  He said that, he

21  portrayed it as -- it was unfair.  They were after him, and he

22  was upset about it.

23  Q.  Did Professor Bekaert say anything to you about the gender

24  of the assistants?

25  A.  They were women, female assistants.

1    Q.  And what did Professor Bekaert say about how he felt about

2    the complaints?

3    A.  He felt that they -- that they were unfair, that people

4    were after him, that they were not appreciating him and that

5    they were very serious, and they were -- they almost cost him

6    tenure and he was extremely upset about that.

7    Q.  What did Professor Bekaert -- let me reframe that question.

8             What gave you the impression that he was really upset?

9    A.  The tone of his voice, the fact that he was rigid, and,

10   like, it showed physically and in his voice that he was

11   extremely upset.

12   Q.  Did he tell you how he felt about the complaints?

13   A.  He was angry with these women for making the complaints,

14   and he felt that they were -- he was a victim.  They were after

15   him, and I assume he felt that they were unfair.

16   Q.  Can you speak just a little bit louder.

17   A.  Sorry.

18   Q.  Were there any other things that Professor Bekaert said or

19   did that made you concerned about crossing him?

20   A.  Yes.  Later in the year, in actually early 2014 -- this

21   previous episode was in 2013 -- he came to my office, and he

22   was very upset about a student who had reported him to the

23   EOAA, the Office of Equal Opportunity and Affirmative Action.

24   Q.  So let me break that down.  You just spoke about a student

25   who had reported him.  Was that a student at Columbia?

A.   Yes.  He said that a student, a female student in his class
reported him.

Q.   You mentioned the EOAA.  What is the EOAA at Columbia?

A.   It is an office where people report complaints of
harassment, discrimination, or retaliation.

Q.   What is your understanding of what the Office of Equal
Opportunity and Affirmative Action, or EOAA, does with those
kinds of complaints?

A.   So my understanding is that they investigate the complaint.

Q.   What did Professor Bekaert say to you about the female
student's complaint about him?

A.   He was extremely upset.  He said that she had -- she was
accusing him of talking about Asian women in the classroom.  He
said that it was very serious, that he had to go the chair of
the division, go and talk to this office for it, but he also
said that the guy at the office, the investigator understood
him, that he was on his side, and he said that he would, he
would go -- he was enraged.  He wanted to go after this
student.  He was on the complaint committee for the MBAs, and
so good luck to her getting there to report a complaint, and he
was considering reporting the student to the office of student
affairs in the business school.

Q.   Professor Ravina, you used the term "good luck to her."

         Who said that?

A.   Professor Bekaert said good luck to her.  He was on the

 1    committee for the complaints, so the complaint -- I understood
 2    her complaint would not be heard there.
 3    Q.  Following -- let me restart that question.
 4          Did you observe Professor Bekaert interact with any
 5    junior faculty or students who were men?
 6    A.  Yes.
 7    Q.  And how would you characterize Professor Bekaert's
 8    interactions with the male students or faculty that you
 9    observed?
10    A.  His interactions with the male students were actually
11    professional.  We were working on a paper with a research
12    assistant that then became coauthor, and he is a man.  And
13    Professor Bekaert was prepared for the meetings, he was polite
14    with Nikola, the research assistant, and the work was
15    proceeding.
16    Q.  What effect, if any, did your interactions with Professor
17    Bekaert have on your emotional state at this time, in the
18    spring semester of 2014?
19          MS. PLEVAN:  Objection.
20          THE COURT:  I will allow it generally to fill out the
21    story, but I don't want to go into that too much at this point.
22    OK.
23    BY MS. HARWIN:
24    Q.  Professor Ravina, can you describe generally how your
25    interactions with Professor Bekaert were affecting your

1   emotional state?

2   A.  So, I was growing more and more worried.  I was seeing

3   these interactions going south really quickly, and I was scared

4   this person could take away the letter from me, he could bad

5   mouth me in the profession, he could influence the people

6   voting on my tenure, he could influence letter writers.  He

7   could vote against himself.

8          I was starting to become extremely worried, and I was

9   extremely anxious about what was going on.  I wanted to correct

10  the course of what was going on and try to make sure that we

11  get back to some level of at least workable situation.

12  Q.  How was the anxiety that you were feeling manifesting

13  itself?

14  A.  I would have difficulty sleeping.  I would be thinking

15  about the --

16          MS. PLEVAN:  Objection.

17          MR. HERNSTADT:  Objection, your Honor.

18          THE COURT:  I am going to allow it.  You can answer.

19  A.  I would have difficulty sleeping, I started having back

20  pain, I started gaining weight.

21          These things slowly, slowly was like making me more

22  and more worried, and at some point I decided I wanted to see a

23  professional, a psychiatrist to get his help actually first to

24  steer the relationship into a better place.  I figured he's a

25  professional.  Clearly there needs to be a solution.  Things

I1anrav5                        Ravina – Direct

1   are getting worse and worse.  I want to consult with him.

2   Q.   Approximately when did you start seeing a psychiatrist?

3              MS. PLEVAN:  Objection.

4              THE COURT:  Yes.  Sustained.

5              You can move on from this.

6              MS. HARWIN:  Would it be possible to have a sidebar

7   conversation.

8              THE COURT:  Sure.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. HARWIN:  Your Honor, Professor Bekaert's opening

3     argument was that this was a plan B, essentially a con job to

4     get tenure and suggested that this was fabricated.  I should be

5     allowed to present testimony this was sincerely felt, the

6     conduct was very unwelcome, and it had a very significant

7     effect on her.

8          THE COURT:  Obviously, we have bifurcated the trial.

9     I have been giving you leeway so that she can tell the story,

10    particularly as it goes to causation.  I think the fact that

11    she saw a psychiatrist is already out there.  I don't know why

12    you need to get into any more details about it.  If you just

13    want to get out when she did that, that's OK.  But beyond that

14    I don't --

15         MR. HERNSTATD:  She's already done that.

16         MR. SANFORD:  She didn't answer.

17         THE COURT:  I think the pending question was about the

18    timing.

19         MR. SANFORD:  That's right.

20         THE COURT:  I will let you do that.  I don't think you

21    need to get into exactly how it made her feel or what the

22    damages were.

23         MS. PLEVAN:  We would object to how often she saw him

24    or what she talked to him about or anything like that.

25         MS. HARWIN:  I think all of this is probative of the

1  unwelcome nature of the behavior.  It is directly responsive to

2  this claim that this was just a plan B to get tenure.

3         MS. PLEVAN:  People go to psychiatrists when they want

4  to make a lawsuit too sometimes.

5         MR. HERNSTATD:  The timing is --

6         THE COURT:  I think you can get the timing out, and we

7  will see what happens on cross.  Perhaps I'll let you get into

8  it more on redirect.

9         MS. HARWIN:  OK.

10         THE COURT:  OK.

11         MS. HARWIN:  Your Honor?

12         THE COURT:  Yes.

13         MS. HARWIN:  May I ask questions about just the sort

14  of focus or the concern she brought to the psychiatrist?

15         MS. PLEVAN:  Objection.  That is hearsay.

16         MS. HARWIN:  It is not hearsay.  Statements for the

17  purpose of medical diagnosis are definitionally not hearsay.

18         MR. HERNSTATD:  I didn't hear the beginning of that.

19         MS. HARWIN:  That she be allowed to provide testimony

20  about why she was going to a psychiatrist that she was raising

21  with him.

22         THE COURT:  I think that is already in the record.  I

23  think it's clear it was in reaction to this conduct.  I will

24  look back at the transcript now.  If that's not clear, I will

25  let you go there, but I don't think you need to get into the

1    specifics about it because I think that is the clear

2    implication from the testimony, but I can look back at the

3    transcript right now.

4              MS. HARWIN:  Thank you.

5              THE COURT:  Just give me one second.  You all can stay

6    at the sidebar just for a moment, please.

7              I think it is clear that all of this, including the

8    seeing of the psychiatrist, was as a result of defendant

9    Bekaert's conduct.  So I think that's clearly in the record

10   already.  So I don't think you need to go into the details

11   anymore, just exactly what she said to the psychiatrist or not.

12             MS. HARWIN:  We don't intend to probe in a lot of

13   detail.

14             THE COURT:  The timing is not clear, I will allow you

15   to get in the timing of when she started to see him.

16             MS. PLEVAN:  But no substance?  Are we clear about

17   that?

18             MS. HARWIN:  I would like to be able to ask one

19   general question about how her psychiatrist helped her cope

20   with the situation.

21             THE COURT:  I don't think that is relevant to

22   causation.  It may be relevant to damages.

23             MS. HARWIN:  I think it's relevant to the view of the

24   claim that Bekaert is making in this case.

25             THE COURT:  I disagree.  OK.

I1anrav5                      Ravina - Direct

1          MR. HERNSTATD:  Your Honor?

2          THE COURT:  Yes.

3          MR. HERNSTATD:  On the timing --

4          THE COURT:  Yes.

5          MR. HERNSTATD:  -- the beginning of these questions

6    were all about this is the spring of 2014.

7          THE COURT:  OK.  You can clarify --

8          MR. HERNSTATD:  She already said that.

9          THE COURT:  I am going to let her clarify the timing

10   if she wants to clarify when she started seeing the

11   psychiatrist and then just move on from it.

12          MS. HARWIN:  Sure.

13          THE COURT:  OK.

14       (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1               (In open court)

2     BY MS. HARWIN:

3     Q.  Professor Ravina, approximately when did you start seeing

4     your psychiatrist?

5     A.  In March 2014.

6     Q.  Did you ever communicate to Professor Bekaert about how you

7     wanted to be treated by him?

8     A.  Yes.  I told him that I wanted to be treated professionally

9     and respectfully.

10              MS. HARWIN:  I would like to move to admit Plaintiff's

11    Exhibit 35.

12              THE COURT:  Thank you.

13              MS. PLEVAN:  No objection.

14              MR. HERNSTATD:  No objection, your Honor.

15              THE COURT:  All right.  35 will be admitted.

16              (Plaintiff's Exhibit 35 received in evidence)

17    BY MS. HARWIN:

18    Q.  Professor Ravina, when you asked Professor Bekaert to treat

19    you professionally, how did you communicate that to him?  Was

20    that in person, over e-mail, in some other way?

21    A.  I told him both in person and e-mail.

22    Q.  I would like to turn your attention to Plaintiff's Exhibit

23    35.  Can you look at the top of page 7.

24              Do you see where Professor Bekaert writes, "This has

25    to stop.  You are insane"?

1    A.  Yes.

2    Q.  Can you briefly describe for us the issue that Professor

3    Bekaert was responding to when he called you insane?

4    A.  We were discussing -- generally we were discussing having a

5    schedule and a plan to make the work move forward, and more

6    specifically, we were discussing about a research assistant.

7    Q.  Can you just give me a one-sentence summary about the issue

8    with the research assistant.

9    A.  We wanted to hire a research assistant for the summer, but

10   Professor Bekaert would never have time to meet him.  So at

11   some point I told the research -- the applicant to look for a

12   job somewhere else.  There is a specific deadline to get jobs

13   for the summer, and if he kept interacting with us and not

14   looking for another job, he would have missed an opportunity to

15   find work elsewhere.

16   Q.  How did this lead to Professor Bekaert calling you insane?

17   A.  He just started lashing out at me, saying that I was

18   insane, that it was my fault that the work was not proceeding,

19   that I should not be asking him for a schedule.

20          And he started taking what I was saying and making it

21   bigger, but out of context.  He was saying I cannot guarantee

22   that work will be finished next week, but I was not asking to

23   finish next week.  I wanted a plan to be able to proceed.  If

24   it's not next week it's going to be another week, but more than

25   a year had passed and, you know, we had no plans yet.

I1anrav5                          Ravina - Direct

1   Q.  If you turn your attention to the bottom of the second

2   page, do you see where Professor Bekaert wrote, "If you do not

3   start acting normally, I'm going to drop the whole thing.

4   Jeez"?

5   A.  Yes.

6   Q.  What did you understand Professor Bekaert to be referring

7   to when he wrote, "I am going to drop the whole thing"?

8   A.  I understood he said he was dropping the whole project, the

9   whole platform and the whole set of projects that I worked so

10  much in the previous year on.

11  Q.  Can you read what you wrote in response to Professor

12  Bekaert.

13  A.  "Hi Geert.

14          "We need to reevaluate our working relationship to

15  make sure that everyone is treated professionally respectfully

16  and correctly and that everyone's needs are met so that we can

17  work and communicate productively.  Based on the e-mails below

18  and more generally, I feel that is not the case now.

19          Best, Enrichetta."

20  Q.  What brought you to the point of writing this e-mail?

21  A.  He was getting more and more enraged with me.  There was no

22  work being done.  He was calling me names.  He was threatening

23  me to drop the project.  I was trying to stop that.

24  Q.  Did Professor Bekaert respond to your e-mail?

25  A.  Yes.

1    Q.  Please look above your last e-mail at Professor Bekaert's

2    response.

3             Do you see where he writes, "Yes, let's meet next

4    week.  I will bring a whip"?

5    A.  Yes.

6    Q.  What did you think of this e-mail?

7    A.  I thought it was extremely rude.  It was disrespectful.  He

8    was completely ignoring my request to be professional, and he

9    was just telling me, he was telling me that he was in charge,

10   that he would bring a whip and put me into place.

11   Q.  Do you see where Professor Bekaert writes below, saying,

12   "You still have not confirmed these tables, this is urgent"?

13   A.  Yes.

14   Q.  What did you understand that to be about?

15   A.  I wasn't sure.  All the tables were available to Professor

16   Bekaert, so he kept asking for tables for a presentation that

17   he had, but there were no new tables for me to give him.

18   Q.  After your request that everyone be treated professionally,

19   respectfully, and correctly, did your relationship with

20   Professor Bekaert improve?

21   A.  No, it became worse.

22   Q.  What did you do to try to move the project forward at that

23   point?

24   A.  There was nothing really I can do.  I felt I couldn't do

25   anything but -- I talked with some of my colleagues about what

1    was going on and tried to stop the abusive belittling e-mails

2    that I was receiving and to try to be able to salvage the work

3    and create a plan so that I could be protected from Professor

4    Bekaert and I could continue to work.

5    Q.  I want to get there in just a little while, but before we

6    do, you had mentioned before the idea of a schedule.  Did you

7    ever talk to Professor Bekaert about a schedule for work?

8    A.  Yes, I did.

9        I proposed that, since I needed to get his approval on

10   everything and I would do work and then you tell me next time,

11   next week, and he would not approve, I wanted him to tell me

12   when he was available and what was a good time for him to

13   actually review the work and give approval.  This way I could

14   make a plan for my own time as well, and I would not end up

15   doing work that then would be blocked at the approval stage.

16   Q.  How did Professor Bekaert respond to the idea of a

17   schedule?

18   A.  He said that -- he was negative.  He said how could I give

19   him a schedule, that he was above a schedule, that he was too

20   important to have a schedule.

21       MS. HARWIN:  I would like to move to admit Plaintiff's

22   Exhibit 36.

23       THE COURT:  Any objection?

24       MS. PLEVAN:  No objection, your Honor.

25       MR. HERNSTATD:  No objection.

1          THE COURT:  36 will be admitted.

2          (Plaintiff's Exhibit 36 received in evidence)

3    BY MS. HARWIN:

4    Q.  Professor Ravina, is this a series of e-mails that was sent

5    after the last set of e-mails we just looked at?

6    A.  Yes.  It's from May 2014.

7    Q.  Please take a look at the e-mail at the bottom of page 1.

8    Do you see the third paragraph of that e-mail?

9    A.  Yes.

10   Q.  Can you read what you wrote there.

11   A.  "More generally, as I've told you repeatedly, we need to

12   reevaluate our working relationship to make sure that everyone

13   is treated professionally, respectfully, and correctly and that

14   everyone's needs are met so that we can work and communicate

15   productively."

16   Q.  Do you see the e-mail at the top of the page where

17   Professor Bekaert responded to you?

18   A.  Yes.

19   Q.  Please look at the second sentence, where Professor Bekaert

20   writes, "So, you fix it, or I am going to take" -- excuse me.

21   "So, you fix it, or I am going to have to take very drastic

22   action."

23   A.  Yes.

24   Q.  What was Professor Bekaert telling you to fix there?

25   A.  He was -- my understanding is that he was taking my request

1    to have a more respectful interaction, and he was taking and

2    sort of concentrating it and minimizing it to the research

3    assistant, and he was telling me it's your fault, you fix it,

4    else I will take drastic action against you.

5    Q.  Can you read aloud in the second paragraph --

6              MS. HARWIN:  Sorry, Brian.  Can you bring that up

7    again.

8    BY MS. HARWIN:

9    Q.  In the second paragraph of that e-mail, how does Professor

10   Bekaert respond to the idea of the schedule?

11   A.  He said it's silly, that he cannot give me a schedule, and

12   he refuses to give a schedule or making any plan to proceed

13   with the work.

14   Q.  Are you referring to the sentence where Professor Bekaert

15   writes, "You endlessly repeat yourself in these e-mails without

16   apparently reading mine.  I cannot give you a schedule and

17   asking for one is silly.  So, yes, stop writing and do

18   something constructive."

19              Is that the sentence?

20   A.  That's the sentence.

21   Q.  In this e-mail where above Professor Bekaert wrote, "So,

22   you fix it, or I am going to have to take very drastic action,"

23   what did you understand Professor Bekaert to be referring to?

24   A.  I understood Professor Bekaert -- I asked him and he never

25   replied.  I understood that Professor Bekaert would drop the

1   project and potentially take the dataset away from me and give

2   it to someone else with all the work that I had done and all of

3   the analysis that I had prepared.

4   Q.  How did you feel reading these e-mails?

5   A.  I felt extremely concerned.  I felt I could not communicate

6   with him to have a respectful interaction, and the more I

7   asked, the more enraged he was becoming.

8           I felt that the RA, the research assistant story was a

9   pretext.  The research assistant e-mail was available.  He

10  could have called him if he wanted.  The research assistant --

11  we had already missed two meetings with the research assistant,

12  so the research assistant was just a pretext to be angry at me,

13  and I was concerned that he would get worse.

14  Q.  You mentioned before that you had spoken to some people at

15  Columbia.  When did you begin speaking to people at Columbia

16  about Professor Bekaert's behavior?

17  A.  I told --

18          MS. PLEVAN:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A.  I told about Professor Bekaert's behavior, I spoke with

21  some of my colleagues first on juniors and then some people

22  senior in my division.  I spoke with Professor Bolton and

23  Professor Santos.

24  Q.  So you used the term "juniors."

25          What do you mean by the term "juniors"?

I1anrav5                    Ravina - Direct

 1   A.  So junior means nontenure.  Some of my friends that didn't

 2   have tenure and didn't have any power, I just confided in them,

 3   telling them what was going on.  Then after that I talked to a

 4   professor in another department and he told me that I should

 5   talk to the seniors in my department.

 6   Q.  And you mentioned Professor Santos.

 7        Who is Professor Santos?

 8   A.  Professor Santos, Tano Santos is a senior professor in the

 9   finance and economics division at Columbia.  He works on the

10   theory and applied theory.

11   Q.  Who is Professor Bolton?

12   A.  Professor Bolton is also a senior professor tenured in the

13   finance and economics division at Columbia.  He works on

14   theory.  He is very well known in the profession.  He is a

15   member of the American Academy of Sciences.  He was a past

16   president of the American Finance Association.

17   Q.  Is that a prestigious position, the president of the

18   American Finance Association?

19   A.  The president of the American Finance Association is

20   extremely prestigious.  One financial economist gets elected

21   every year.  So there are very few of them.

22        And being a member of the American Academy of Sciences

23   is even more prestigious actually.  It's across all disciplines

24   and very few people get to become members.

25   Q.  What prompted you to reach out to people at Columbia around

I1anrav5                        Ravina - Direct

1   this time?

2   A.  I was concerned that Professor Bekaert was getting more and

3   more aggressive against me, that he would take the data, that

4   he would start bad mouthing me with other people.  I had tried

5   to solve this.  I had tried to invite him to be more

6   respectful.  I was doing the work.

7        And when I saw that he was getting worse and worse

8   instead of improving, I wanted to seek their help to see if we

9   could solve the situation.

10  Q.  Did you ever speak to anyone in the administration at

11  Columbia?

12  A.  Yes.

13  Q.  OK.  Are people in the Columbia administration referred to

14  as administrators?

15  A.  Yes.  So an administrator in a university is someone that

16  is a professor and gets chosen to be in the leadership of the

17  school, taking care of the faculty or teaching or other

18  matters.  Yeah, I would say in a private company the dean and

19  the administrators would be the CEO and the other top

20  executives.

21  Q.  Who is the first administrator at Columbia that you spoke

22  to about Professor Bekaert?

23  A.  I spoke to Gita Johar who was the senior vice dean of

24  faculty.

25  Q.  What was Senior Vice Dean Johar's role at Columbia?

I1anrav5                          Ravina - Direct

1    A.  The senior vice dean of faculty oversees all the matters

2    relating to faculty, their research, their hiring and

3    everything that concerns to them.

4    Q.  How does the senior vice dean rank in the hierarchy at

5    Columbia Business School.

6    A.  She's very high up.  She reports directly to the dean, who

7    is the highest.

8    Q.  What was that last part?

9    A.  Sorry.  I was specifying in the hierarchy the dean is the

10   highest, and then under him there is the senior vice dean of

11   faculty, there is the senior I think vice dean of teaching and

12   the vice dean of administration.  I believe at least those

13   three are immediately below the dean.

14   Q.  When did you speak with the senior vice dean, Gita Johar?

15   A.  In mid-May, 2014.

16   Q.  Was that around May 14, 2014?

17   A.  I believe so.

18   Q.  Did anyone else attend your meeting with Senior Vice Dean

19   Johar?

20   A.  Yes.  Professor Bolton and Professor Santos, the two

21   professors I had spoken to, offered to come with me, so the

22   three of us went.

23   Q.  What did you tell Senior Vice Dean Johar about Professor

24   Bekaert's conduct?

25   A.  I told her that a senior tenured professor in my division

I1anrav5                          Ravina - Direct

1    with whom I was collaborating was being abusive, vindictive,

2    and belittling me.

3    Q.  Did you provide Senior Vice Dean Johar with any examples of

4    things that Professor Bekaert was doing?

5    A.  In addition to telling her, I brought with me some e-mails

6    as an example of the behavior.

7    Q.  What were some of these e-mails that you brought?

8    A.  I remember bringing the one that says I will bring a whip

9    to our meeting.  I brought the one talking about drastic action

10   and some other e-mails in that period about being insane and

11   shooting myself in the foot.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. HARWIN:

2   Q.  What did you tell Senior Vice Dean Johar about your

3   concerns?

4   A.  Well, I told her that I wanted this to stop.  I told her

5   that I wanted to protect myself and my work and that I needed

6   to have some fence around me to be protected from these -- from

7   this behavior.  I also told her that I was concerned about

8   being badmouthed, that Professor Bekaert would get upset and

9   would speak badly about me to other professors at Columbia and

10  in general in the finance academic community.

11  Q.  What was Senior Vice Dean Johar's reaction to what you were

12  reporting?

13  A.  I -- she looked concerned.  She said she was sorry, and --

14  and then she asked what she was supposed to do.

15  Q.  She asked what --

16  A.  She asked -- she asked -- actually she asked Patrick

17  Bolton, you know, is there anything that I can do?  She wanted

18  to help.

19  Q.  Did she articulate any follow-up steps that needed to be

20  taken?

21  A.  At that point Professor Bolton said that she should inform

22  the dean and she agreed she would.

23  Q.  Who is the dean at Columbia Business School?

24  A.  The dean is Glenn Hubbard.

25  Q.  About how long did this meeting last?

I7a1rav6                          Ravina - Direct

A.  It wasn't very long.  About half an hour or maybe little

bit less.

Q.  After this meeting with Senior Vice Dean Johar, how did she

follow up with you about that meeting?

A.  I didn't hear from her any longer.

Q.  Did you speak to any other Columbia administrators about

Professor Bekaert after you spoke to Senior Vice Dean Johar?

A.  Yes.  So about a month later I spoke with Janet Horan, the

vice dean of administration.

Q.  When did -- I'm sorry.  You said you met with her about a

month later?

A.  Yeah, it was approximately a month later.

Q.  What did you talk to Vice Dean Horan about?

A.  So she came to follow up.  I understood that one of my --

the two professors that were at the meeting, since there was no

response, had made inquiries, and she came and she told me that

the dean initial approach -- the dean office initial approach

was to talk to Professor Bekaert, but then after talking to

Professor Santos, they felt that maybe they should talk to me

first.  So she say we will set up a meeting, shortly after, and

then I told her a little bit about the situation.  I told them

about --

Q.  Sorry.  Let me just interrupt you for a second.

          She said that there would be another meeting set up,

is that right?

1   A.   Yes.

2   Q.   Okay.  What did you tell Vice Dean Horan about your

3   concerns about Professor Bekaert?

4   A.   I told her about him being very aggressive and abusive, I

5   told her how I was worried that he would take the data from me,

6   he would turn the other faculty against me.  I told her that I

7   wanted to protect myself.  I also told her that I realized that

8   when you make such a complaint, you end up being in trouble.

9   So in an organization, people that complains are seen as

10  troublemakers, and so I was worried -- I realized that that was

11  not the ideal path for me to go, but at the same time I was

12  growing more and more concerned.  I was scared of what would

13  happen and so I couldn't, like -- I needed to do something.

14  And she told me not to worry, that that was not the case.  And

15  she talked about having the EOAA office -- the office of equal

16  opportunity and affirmative action -- she said that they were

17  informed but they will not intervene at the moment because of

18  the political nature of the situation, the tenure and all.

19  Q.   Did Vice Dean Horan explain what she meant about the

20  political nature of the situation?

21  A.   Not -- not -- not in words.  I thought she might mean the

22  tenure, the fact that this was a senior professor in my

23  department, that he has a lot of power over me and he would

24  vote on my tenure, but she was not -- she didn't articulate

25  more.  That was my impression.

I7a1rav6                    Ravina - Direct

1   Q.  You mentioned that Senior Vice Dean Horan had talked about

2   another meeting.  Did you have a subsequent meeting with her or

3   anyone else in the administration of Columbia Business School?

4   A.  Yes.  So approximately a week later, on June 16, 2014, I

5   had a meeting with Dean Hubbard, Vice Dean Horan, and I also

6   brought a law professor, Suzanne Goldberg, who is an expert in

7   gender and law.

8   Q.  Did you provide any kind of explanation to the Columbia

9   Business School administration about why you were including

10  Suzanne Goldberg in the meeting?

11  A.  In the previous meeting when I was talking with Dean Horan,

12  I was telling her the people I had talked to, and I mentioned

13  that I spoke as well with Suzanne Goldberg.  'Cause Professor

14  Bolton suggested to speak with her, since she was an expert on

15  the topic.  And Vice Dean Horan suggested that I would then

16  bring her as well to the meeting, which I thought was a good

17  idea.  So I asked her to come.

18  Q.  How did the meeting with Dean Hubbard, Vice Dean Horan, and

19  Professor Goldberg begin?

20  A.  We met in the dean office, in the office of the dean, and I

21  started describing how Professor Bekaert was harassing me,

22  being abusive, and the dean stopped me and say there is nothing

23  he could do, that Professor Bekaert was also treating him badly

24  too.

25  Q.  How did you react to that?

1  A.  I was floored.  I didn't know what to say.  I didn't expect

2  him to tell me that, there is nothing I can do, he treats me

3  badly too.  So actually, I was silent.  I was collecting my

4  thoughts.  And actually Suzanne Goldberg replied to him.

5  Q.  And what did Professor Goldberg say to Dean Hubbard?

6  A.  Well, she said that there was a female junior faculty

7  member facing enormous challenges coming from a senior male

8  professor and that the school should try to do something about

9  it.

10  Q.  Was there any discussion at this meeting about getting

11  Columbia's office of equal employment opportunity and

12  affirmative action involved in addressing your concerns?

13  A.  After Suzanne Goldberg say that, we started talking about

14  potential solution and things to do.  And Dean Hubbard say that

15  there was no point in going to the office of equal employment

16  and affirmative action because he told Suzanne Goldberg that

17  she knew very well that nothing would happen and at most, they

18  would send him to training.

19  Q.  What was your reaction to that?

20  A.  I -- I was discouraged.  I was -- I cannot say I was

21  hundred percent surprised, but it's definitely not good news

22  when they tell you that the office that is in charge of

23  investigating and providing solutions for these cases will at

24  most send someone to training, you shouldn't even bother to

25  make a report.

I7a1rav6                      Ravina - Direct

1   Q.  You talked about potential solutions.  Were there any other

2   ideas you talked about during this meeting to try to resolve

3   your concerns about Professor Bekaert?

4   A.  Yes.  Dean Hubbard proposed that someone that was an expert

5   in the field would be cc'd on all the messages going back and

6   forth between me and Bekaert.  And he said that we should only

7   communicate through emails and have this person cc'd.  He told

8   me to pick a person that was an expert and that in the

9   meantime, he would have been the one cc'd.

10  Q.  Was there any discussion about Professor Bekaert's

11  continued involvement in this research with the retirement

12  data?

13  A.  Yes.  We discussed that as well.  So I needed to find a

14  solution about the work so that I could proceed.  And so the

15  solution that -- one solution that we considered was to put

16  Professor Bekaert's name on the project but not having him to

17  have to approve every steps but to be removed from the

18  projects.  Professor -- Dean Hubbard felt that this would not

19  be a good solution and that he himself would not want to be an

20  author on a project in which he doesn't do anything.

21       So another approach that we considered was to split

22  the project in a way that we would finish what we had and then

23  for the future, I would use the data, since I had done all the

24  work to create the platform.  And we went into more specifics.

25  I don't know if you want me to --

I7a1rav6                      Ravina - Direct

1    Q.  You talked before about the idea of someone who would be
2    cc'd on emails.
3    A.  Yes.
4    Q.  After this meeting did someone come to be cc'd on emails?
5    A.  So after the meeting the dean was cc'd on most of the
6    emails.  I always cc'd him on all the emails.
7    Q.  Were you told that the dean's office ever informed
8    Professor Bekaert about your report about him?
9    A.  Yes.  Later, maybe three weeks later, in the first or
10   second week of July, I received an email telling me that they
11   met with Professor Bekaert, but despite we have left -- we had
12   left the meeting on June 16 all agreeing on a plan of action,
13   like which papers that it would be on, the relationship
14   manager, no future involvement in future papers, the message
15   that I had received in July say that they were unsure about the
16   next steps.
17   Q.  After making your reports to Columbia in May and June of
18   2014, did you see Professor Bekaert again?
19   A.  Yes, I crossed him in the hallway, walking the hallway.
20   Q.  And tell me about that interaction when you saw Professor
21   Bekaert.
22   A.  So I was coming back into the building, he was there, I say
23   hi and went straight, and he was quite tense and rigid,
24   actually, and he looked extremely upset.
25   Q.  What was your next interaction with Professor Bekaert after

1    seeing him?

2    A.  Well, when I went back to my office, I sat down and in my

3    inbox there was an email from Professor Bekaert.

4    Q.  Let me pause you right there.

5            MS. HARWIN:  I'd like to move to admit Plaintiff's

6    Exhibit 47.

7            THE COURT:  Any objection?

8            MS. PLEVAN:  Just one minute, your Honor.

9            THE COURT:  Sure.

10           MS. PLEVAN:  No objection, your Honor.

11           MR. HERNSTADT:  No objection.

12           THE COURT:  All right.  It will come in, Exhibit

13   Plaintiff's 63.

14           MS. HARWIN:  It's actually Plaintiff's Exhibit 47.

15   That's the deposition stamp from earlier.

16           THE COURT:  I'm sorry.  47.  Thank you.

17           (Plaintiff's Exhibit 47 received in evidence)

18   BY MS. HARWIN:

19   Q.  Professor Ravina, I'd like to call your attention to the

20   middle of that email.  Do you see where Professor Bekaert

21   writes to you, "The dean's office has told me not to talk to

22   you, hence the silence.  If you want to explain yourself, you

23   can.  I'm here.  I'm intrigued to know who set you up to this."

24           What was your reaction to this email?

25   A.  I understood Professor Bekaert to be extremely scared --

I7a1rav6                         Ravina - Direct

1    sorry.  I was scared.  I understood him to be extremely

2    enraged.  My reaction -- well, my first reaction was there was

3    no dean cc'd on our emails, despite that was the agreement.

4    And also, like he was telling me that I needed to justify

5    myself, that he was extremely upset, and that someone is

6    setting me up against him.

7    Q.  What did you do with this email?

8    A.  I was concerned, so I talked first with Suzanne Goldberg

9    and then I forwarded it to the dean office.

10   Q.  Did you talk to any other Columbia administrator about

11   this?

12   A.  I told Professor Bolton and Professor Santos, and I later

13   on --

14        MS. PLEVAN:  Objection, your Honor.

15   Q.  Let me restate the question, make sure you hear it.

16        Did you speak to any other Columbia administrators

17   about this?

18   A.  So the administrator I talked about this email and other

19   things next is Kathy Phillips, the senior vice dean of faculty.

20   Q.  Did you ever meet with Senior Vice Dean Phillips?

21   A.  Yes.  We met on July 16, 2014.

22   Q.  And how did your meeting with Senior Vice Dean Phillips

23   begin?

24   A.  She told me she was the new senior vice dean of faculty,

25   that her objective was that I leave Columbia being happy.

I7a1rav6                      Ravina - Direct

1    Q.  And when Senior Vice Dean Phillips talked about you leaving

2    Columbia, did you have plans to leave Columbia at that time?

3    A.  No.  I was concerned that she would start the conversation

4    talking about my happiness and talking about leaving Columbia.

5

6    Q.  What were your hopes for your future at Columbia?

7    A.  My hope was that I would solve this issue, I would publish

8    the papers, and just stay at Columbia and get tenure.

9    Q.  What did you say in response to Senior Vice Dean Phillips'

10   comment?

11   A.  So I didn't know what to respond.  I -- I said -- I gave

12   her the benefit of the doubt and said that I was glad that

13   Columbia was actually taking -- offering to give me happiness

14   advice but that this was an extra and that we should first

15   discuss the basics, which was a working environment in which I

16   could do my work.

17   Q.  What else did Senior Vice Dean Phillips say during that

18   meeting?

19   A.  She told me that she didn't want me to look back a year

20   after and regret to have spent all this time on this, and she

21   suggested that I drop the projects and I walk away.

22   Q.  How did you respond to that?

23   A.  Well, I responded telling them that this was not just one

24   project, it was not something that is, you know, one paper,

25   maybe you solve the situation just by dropping it, it was an

1   entire body of research.  I explained to her the value of this

2   data set to make an impact in my field.  Also, even if I would

3   drop the project, there was no guarantee that the harassment

4   would stop.

5   Q.  And what did you tell Senior Vice Dean Phillips about the

6   harassment?

7   A.  I told her about Professor Bekaert turning against me after

8   I rebuffed him, I told her about the dinner invitations, the

9   continuous requests for compliments, I told her about the

10  abusive language, and I told her about my worry that he would

11  take away the data from me and that he would start stalling the

12  progress, giving the data to someone else, badmouth me in the

13  profession at large.

14  Q.  Did Senior Vice Dean Phillips say anything about what could

15  be done to address Professor Bekaert's behavior?

16  A.  Well, she told me that, you know, you cannot control other

17  people, you can only control what you do.  You can only control

18  yourself.  She didn't offer any other solution.

19  Q.  Did Senior Vice Dean Phillips say anything about your joint

20  research with Professor Bekaert besides what you've already

21  talked about?

22  A.  Well, she said that there might be a committee at some

23  point that would decide who owns this data, that I needed to be

24  careful because, you know, the committee could have decided

25  that the data would come to me but they could also decide that

1   the data would go to him, or that nobody would keep -- get to

2   keep the data, and so that I needed to be really careful about

3   that.  We also went into details about who would work on which

4   project, and she tried to get away from the relationship

5   manager, the person cc'd, saying that it would be difficult to

6   implement.

7   Q.  Let me ask you about that.  The term "relationship

8   manager," what was that term?  What does that mean?

9   A.  So this was the role that in the June 16, 2014 meeting, the

10  dean had devised to be someone that is an expert in the field

11  and gets carbon-copied on every email that goes back and forth

12  between me and Professor Bekaert.

13  Q.  What did you think of Senior Vice Dean Phillips' approach

14  to your situation?

15  A.  I was really -- I was really con -- I was in disbelief.  I

16  thought that it was her responsibility to help find a solution

17  to protect me and the work, and that instead, she was trying to

18  convince me to just forget about it, to give away -- to give

19  up, leave the data, and just leave, leave Columbia.

20  Q.  After this meeting with Senior Vice Dean Phillips did you

21  have any further interactions with Professor Bekaert?

22  A.  Yes.  The interaction continued.  I was receiving tons of

23  emails from Professor Bekaert, quite long ones, in which he

24  started saying that the data were wrong, that more stuff needed

25  to be done that were editing the code, and it was basically

1   creating confusion and muddying the waters and sending long

2   emails to look like he was working, while no work was getting

3   done.

4   Q.  I want to go back to some of those points, but before we

5   do, can you describe generally what the working relationship

6   was like with Professor Bekaert after you brought your report

7   to Columbia.

8   A.  It was terrible.  It was launching these attacks about the

9   work -- the work I was an expert in, and the work that he was

10  not an expert at all.  He wasn't -- he wasn't even able to use

11  the software to write the codes, to do the work.  And yet he

12  was telling me that the codes were wrong, that the data were

13  not appropriate.  He also wanted to -- me to engage in a lot of

14  busy work.  He started saying that there were things to do that

15  were crucial for the project that were very important and --

16  and I needed to do them before the project would proceed

17  faster -- farther.

18  Q.  Did this mark a change in any way in Professor Bekaert's

19  approach to the research project?

20  A.  Yes.  It was a drastic change.  Before it was quite

21  disengaged, it was -- he would participate in the project every

22  once in a while.  He would send some email.  But he had said

23  that he was not an expert in this field and I could take the

24  lead and keep going.  After a while, he started saying he

25  needed to approve every single step, but he was still not going

1   into the details because of his lack of knowledge of this

2   field.  And now he started just saying that what I did was

3   wrong, there were mistakes, there were errors, the work could

4   not proceed, I needed to do more stuff that was not important

5   and integral part of the paper.

6   Q.  Thank you.  And Professor Ravina, I'll just ask if you

7   could just slow down a little bit as you're speaking, and I

8   will continue to try to speak louder.

9   A.  Sounds good.  Sorry about that.

10          MS. HARWIN:  I'd like to move to admit Plaintiff's

11  Exhibit 3.

12          MR. HERNSTADT:  No objection.

13          MS. PLEVAN:  No objection.

14          THE COURT:  All right.  3 will be admitted.

15          (Plaintiff's Exhibit 3 received in evidence)

16  BY MS. HARWIN:

17  Q.  Professor Ravina, if you look at the email chain here, can

18  you tell me what the topic of this email exchange is about.

19  A.  I'm writing to Professor Bekaert proposing some steps to go

20  forward with the project, early on in the project.

21  Q.  Please look at the top email from Professor Bekaert to you.

22  Do you see where he wrote, "I am entirely new to this type of

23  research so I'm relying on your vast knowledge and experience"?

24  Is that the kind of comment that you were referring to earlier?

25  A.  Yes.  This is an example of Professor -- Professor Bekaert

1  attitude and understanding early on that I would be the one

2  that takes the lead on the data, the code, the empirical

3  analysis, because of my expertise and his lack of expertise in

4  this topic.

5          MS. HARWIN:  I'd like to move to admit Plaintiff's

6  Exhibit 27.

7          MS. PLEVAN:  No objection, your Honor.

8          MR. HERNSTADT:  No objection, your Honor.

9          THE COURT:  All right.  27 will be admitted.

10          (Plaintiff's Exhibit 27 received in evidence)

11  BY MS. HARWIN:

12  Q.  Professor Ravina, if you could look at the first page, the

13  email on the bottom of the page.  Do you see where Professor

14  Bekaert wrote, "I do feel totally out of my depth so it is not

15  going so well"?  What did you understand Professor Bekaert to

16  mean when he said he was out of his depth?

17  A.  I understood that Professor Bekaert was telling me that he

18  was not an expert in this field, not in terms of handling large

19  data sets, not in terms of conducting the analysis and the

20  statistical -- writing the codes and the algorithms.

21  Q.  Were there any other occasions prior to your making your

22  complaints against Professor Bekaert when he characterized

23  himself as being out of his depth?

24  A.  Yes, at several other junctures in person, he would point

25  out that this was not his area of expertise and he was relying

I7a1rav6                         Ravina - Direct

1   on my expertise.

2   Q.  You talked before about Professor Bekaert claiming that the

3   data was wrong.  Can you give an example or explanation of what

4   Professor Bekaert was doing on that front.

5   A.  Yes.  So one case that comes to mind is that there was a

6   variable which was measured in how many years each worker had

7   spent at the firm, what they were saving for retirement, and

8   like every variable, some of this -- some of these variables

9   didn't make good sense.  You could not stay at the company for

10  90 years, let's say.  That would be too much.  So I had to

11  devise the code to find these strange cases, flag them, in some

12  cases solve them, based on the age of the worker, his amount in

13  the 401(k) retirement plan, and some other variable, and in

14  some other cases drop them because we could not solve the

15  issue.  And he was --

16        THE COURT:  Slow down a little bit.

17  A.  And he was fine with these early on, with my approach, with

18  the code, with what I did.  And then after I reported him, he

19  started saying that this approach was wrong, that this approach

20  was not valid, that there were mistakes, that it needed to be

21  redone, that I needed to look more at things manually, meaning

22  looking at data one by one instead of doing the code, and, you

23  know, there are 20 million data points.  It would take decades

24  to go one by one, or at least many, many years.  So this is

25  definitely something not feasible.

I7a1rav6                    Ravina - Direct

Q.  Professor Ravina, let me ask you about another topic you

raised about busy work.  Can you explain what you meant by that

and give an example of something Professor Bekaert did that was

busy work for you.

A.  So busy work, as I understand it, is a lot of work that you

are doing and a lot of time that you are spending on something

that then proves to be irrelevant, not important, not needed

for the task.  One example of busy work that took quite a lot

of time was about the -- what we can call fund merging.  So

these people investing for retirement could pick among many

funds to put their money in, but there wasn't much information

in the data set about those funds.  It was the case in which we

had to select an outside data set, other information, and merge

it into the data that I had.  It takes quite some time to do

this type of merge.  The names are not exactly the same, maybe

the data set that we are using misses some of the funds.  So

it's quite a complex work.  And this is something that we were

thinking of doing early on for a different project, a project

about the quality, the fees, the return of this fund.  But this

was not an integral part of the international diversification

project, and indeed, we didn't end up using it in that paper

that we submitted and published.  So also the referees were

fine with not having this part.

          Nevertheless, in the summer of 2014, Professor Bekaert

wanted me to complete this merging, and this was a condition

I7a1rav6                    Ravina - Direct

```
 1   for him to write a draft, write an updated draft on the paper.
 2   And so despite I didn't agree that this was critical, I did it
 3   so to move the work along.  So I spent a lot of time in the
 4   summer to do all this fund merging stuff.
 5   Q.  Professor Ravina, when was your next meeting with the
 6   Columbia Business School administration to discuss what was
 7   going on with Professor Bekaert?
 8   A.  So the next meeting was September 2014, September 16.
 9   Q.  And as of that time, what measures had been taken by
10   Columbia to address your concerns about Professor Bekaert?
11   A.  Except for the relationship manager, no measure -- measures
12   were taken.
13   Q.  How did the September meeting -- well, first of all, who
14   was at the September 2014 meeting?
15   A.  So the September meeting, the same people as the June one.
16   Dean Hubbard, Vice Dean Horan, me, and Suzanne Goldberg.
17   Q.  And how did that September meeting begin?
18   A.  The September meeting began with Dean Hubbard being quite
19   confrontational.  He told me that he had spoken with the EO/AA
20   officer, that I behaved unprofessionally, that both Professor
21   Bekaert and I behaved unprofessionally, and then he took a
22   bunch of papers and threw them at Suzanne Goldberg.
23   Q.  You said Dean Hubbard said that you're behaving
24   unprofessionally?
25   A.  Yes.
```

1  Q.  Was there anything else that Dean Hubbard said about the

2  interactions with Professor Bekaert?

3  A.  I mean, I understood this to -- he also said that this was

4  a soap opera.

5          THE COURT:  This was?

6          THE WITNESS:  A soap -- a soap opera.

7          THE COURT:  A soap opera.

8  Q.  Dean Hubbard said this is a soap opera?

9  A.  Yes.

10  Q.  How did you feel hearing Dean Hubbard's comments starting

11  this meeting?

12  A.  I felt humiliated.  I also felt that he didn't want to deal

13  with this.  This was an important issue, I was being blocked

14  with my work, and the dean of the school tells me that this is

15  a soap opera, that I behaved unprofessionally, that Professor

16  Bekaert behaved unprofessionally, and he doesn't want to have

17  anything to do with that.

18  Q.  Did Dean Hubbard say -- well, let me back up.

19          You had testified before that Dean Hubbard had been

20  cc'd on communications between you and Professor Bekaert.

21  A.  Yes.

22  Q.  During the September meeting did Dean Hubbard say anything

23  about the emails that Professor Bekaert had been sending to

24  you?

25  A.  Yes.  So he said two things.  The first thing was that he

I7a1rav6                    Ravina - Direct

```
 1    recognized that Professor Bekaert was muddying the waters when
 2    he was sending all those long emails saying that this is wrong,
 3    this -- you missed this data, you need more stuff.  So he
 4    understood that it was a pretext but there was no substance to
 5    it.
 6    Q.  When you say muddying the waters, can you explain what you
 7    mean by that.
 8    A.  Confounding people.  Like you see very long emails with a
 9    lot of words and you think, wow, you know, there is a lot of
10    content here, he's saying this, he's saying that, but muddying
11    the water means giving an impression of a lot of content and a
12    lot of work being done and a lot of problems being there, when
13    none of that is actually true in the substance.
14    Q.  You mentioned that Professor Goldberg was at that meeting.
15    Did Professor Goldberg say anything at the meeting about
16    Professor Bekaert's behavior?
17    A.  Yes.  She was concerned and she said that --
18            MR. HERNSTADT:  Objection, your Honor.
19            THE COURT:  Sustained.
20            MS. HARWIN:  Your Honor, can we have a sidebar?
21            THE COURT:  Sure.
22            Why don't we take our afternoon break now, all right?
23    So ladies and gentlemen, just remember, don't discuss the case
24    and keep an open mind.
25            (Continued on next page)
```

1              (Jury not present)

2              THE COURT:  All right.  Everyone can be seated.

3              So do you want to articulate why what Professor

4     Goldberg said isn't hearsay.

5              MS. HARWIN:  Well --

6              THE COURT:  You've got to speak into the mic.  Thanks.

7              MS. HARWIN:  It's not offered for a hearsay purpose.

8     It's offered for the notice to Columbia, a statement by

9     Professor Goldberg that her view was that gender was playing an

10    issue and -- gender was playing a role and Professor Bekaert's

11    behavior, putting Columbia on notice regarding the kind of --

12    the nature of the conduct at issue here is pertinent.

13    Especially when the negligence of Columbia is squarely at

14    issue.

15             MS. PLEVAN:  The record, your Honor, is very clear

16    that Suzanne Goldberg was really acting as an advocate for the

17    plaintiff here.  She may have been a professor at Columbia, but

18    there are numerous examples of Professor Ravina writing to her,

19    consulting her.  She's the person who recommended a lawyer for

20    Professor Ravina.  I mean, her role is really not in any sense

21    attributable to Columbia, and her comments at this meeting

22    don't put anybody on notice; just her opinion being expressed.

23    And I think it runs the risk here, because of how she's been

24    identified, of being highly prejudicial to Columbia.

25             MR. HERNSTADT:  Additionally, she has no personal

knowledge of the interactions between Professor Bekaert and

Professor Ravina.  All of her understanding comes from speaking

with Professor Ravina, and looking at the emails that Professor

Ravina had selected to show her.  So she doesn't have personal

knowledge that would under --

          THE COURT:  The personal knowledge point I would

appreciate if it was being admitted for the truth of it, right?

But if it's just being admitted to put the school on notice,

the question is, do you need her additional statement to put

the school on notice beyond what's already being said?  Does it

add anything other than her opinion?  Do you want to respond to

that.

          MS. HARWIN:  Well, I think it does, your Honor.  One

of the issues that defense counsel has raised is a claim that

this was really a work issue and not a gender issue.  The fact

that you have very clear articulation in this meeting and

subsequent communications with the administration, this is a

gender issue and it's a gender concern, is significant.  It's

also significant in light of the subsequent EOAA investigation

and the issues covered or not covered in that investigation.

          THE COURT:  But why is the opinion of someone else

that that's how it should be perceived as opposed to that being

a jury determination, why does it matter how someone else chose

to characterize the situation when she was already being

reported to Columbia?

1           MS. PLEVAN:  Exactly.  It had already been reported to

2      the EEOAA office.  The investigation had already begun.

3           MS. HARWIN:  Goes to Columbia being on notice that

4      this is a gender issue and Columbia in a subsequent

5      investigation was quite narrowly focused on sexual harassment,

6      didn't investigate gender discrimination generally, I think

7      it's significant in that regard.

8           THE COURT:  Okay.  So tell me exactly what you

9      anticipate she would say.

10          MS. HARWIN:  That Professor Goldberg stated that her

11     view, her belief was that gender was playing a role in

12     Professor Bekaert's behavior.

13          THE COURT:  All right.  I'm just going to think about

14     it over the break.  I'll let you know right before we begin

15     again.

16          Mr. Melzer, I know you wanted to bring up issues.  Can

17     we bring them up at the end of the day or do you need them for

18     this last --

19          MR. MELZER:  At the end of the day is fine.

20          THE COURT:  Okay.  That way we'll have more time.

21          So why don't you all take ten minutes and then we'll

22     come back.  Thank you.

23          (Recess)

24          (In open court; jury not present)

25          THE COURT:  I'm not going to allow in the testimony

1    about what Professor Goldberg said.  I think all of the facts

2    were before Columbia.  What someone else's characterization

3    was, I mean, it's clearly hearsay, but even if it's not being

4    admitted for the truth, the fact that someone characterized it

5    in that way to Columbia I don't think is especially probative,

6    and in any event, I think it's unduly prejudicial.  So I don't

7    think that should come in.

8            MS. HARWIN:  Your Honor, I do think that the

9    repetitive nature of the notice to Columbia, the repeated

10   meetings by Professor Ravina, the fact that you had this

11   professor weighing in and expressing the view that gender was

12   playing a role and so many other instances of notice are

13   relevant to this case, relevant to the negligence, also

14   relative to liability for punitive damages.

15           THE COURT:  All of those examples have already come in

16   already, so, I mean --

17           MS. HARWIN:  There are many more examples that have

18   not come in, will come in.

19           THE COURT:  Well, again, I just think it's unduly

20   prejudicial to allow in someone else's characterization of how

21   they viewed this.  I mean, that's ultimately a decision for the

22   jury to make, and I think it's unduly prejudicial.  All of the

23   facts of what was happening were being relayed to Columbia, and

24   that has come in through the testimony.  So again, I don't

25   think another professor who had no personal knowledge of

I7a1rav6                          Ravina - Direct

1   anything, her characterization of it, in any event, again, I

2   think it's substantially more prejudicial than it is probative.

3   So that's my ruling.

4              Let's bring in the jury.

5              And just to be clear, I'm not limiting any testimony

6   about Ms. Ravina's statements to Columbia at all.  So when you

7   talk about the repetitive nature of the meetings with Professor

8   Ravina and the administrators at Columbia, I'm not limiting you

9   from eliciting any of that.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7a1rav6                        Ravina - Direct

1            (Jury present)

2            THE COURT:  Everyone can be seated.  Thank you.

3       You may proceed.

4            MS. HARWIN:  Thank you, your Honor.

5  BY MS. HARWIN:

6  Q.  Going back to the September 2014 meeting with Dean Hubbard,

7  Vice Dean Horan, Professor Goldberg, were there any discussions

8  at that meeting of any potential solutions to address Professor

9  Bekaert's conduct?

10 A.  Yes.  We talked again about how to split the paperwork --

11 the work on the papers, and we also discussed the opportunity

12 of creating a schedule, a plan with the timing of different

13 tasks being completed by Professor Bekaert and by me so to move

14 the projects along and forward.

15 Q.  Why would you need a schedule to work with Professor

16 Bekaert?

17 A.  It was now September 2014 and I had been trying to make a

18 schedule and make a plan for more than a year now.  Time was

19 passing.  I needed to continue the projects and bring them to

20 fruition, and for this reason, I wanted to agree with Professor

21 Bekaert about the timing and the steps to complete the

22 research.

23 Q.  Did you end up putting together a schedule?

24 A.  Yes.  Dean Hubbard told me to put together a schedule and

25 that he would use such schedule in his next meeting with

I7a1rav6                          Ravina - Direct

1   Professor Bekaert.

2   Q.  Were you ever told by anyone at Columbia what came of the

3   schedule that you proposed?

4   A.  Yes.  Later on, other administrators were put on my case --

5   specifically, Charles Jones, the subdivision chair, and Steve

6   Zeldes, the division chair -- and I had a meeting with Charles

7   Jones in which he told me that he had spoken with Professor

8   Bekaert and they agreed that Professor Bekaert would write the

9   draft three months later.  And I was surprised because for a

10  tenure track faculty, time is important.  We were ready to

11  write a draft in March 2013, so it's now September.  Why --

12  2014.  Why do I need to wait three more months?  I asked them

13  what had happened of the schedule that I gave the dean upon his

14  request?  And they didn't know of the existence of this

15  schedule, so they could not use it.  Sorry.

16  Q.  Going back to that September 2014 meeting with Dean

17  Hubbard, Vice Dean Horan, and Professor Goldberg, you testified

18  before that Dean Hubbard said that you behaved

19  unprofessionally.  Was there anything else that Dean Hubbard

20  said about you during that meeting that stands out?

21  A.  Yes.  During that meeting he also said that he had read my

22  last review, the 2014 review, and that it was horrible.  And at

23  the point, Suzanne Goldberg intervened --

24           MS. PLEVAN:  Objection.

25           THE COURT:  Yes.

I7a1rav6                          Ravina - Direct

1              MS. HARWIN:  Your Honor, this is not the —— this is a

2       different comment, not covered by our prior discussion.

3              THE COURT:  Okay.  But is it not still hearsay?

4              MS. HARWIN:  I don't believe it is, your Honor.

5              THE COURT:  Okay.  Why not?  What someone else said

6       who's not testifying here in court?

7              MS. HARWIN:  It's not being taken for the truth of the

8       matter asserted.

9              THE COURT:  I'm happy to have a sidebar so we can

10      flesh all this out.

11             (Continued on next page)

1          (At the sidebar)

2          MS. HARWIN:  The comment isn't the one about gender

3   playing a role.  This was after Dean Hubbard raised the

4   insulting review and Goldberg responded and pointed out that,

5   notwithstanding any reviews, you need to supply a response to

6   the situation.  And those are the sort of precise wording.

7   It's my wording so it's not quite -- she'll testify to the

8   exact wording.  But it's not about gender playing a role.  It's

9   about the institution's response.

10          THE COURT:  Isn't that still hearsay, what someone

11   else said who's not testifying here in court is being admitted

12   for the truth, that they have an obligation to do that?

13          MS. PLEVAN:  Sounds like it.

14          MS. HARWIN:  It's the effect on the listener, how they

15   respond.  Providing --

16          MS. PLEVAN:  What he did or didn't do is relevant.

17   What her --

18          MS. HARWIN:  It is relevant.

19          MS. PLEVAN:  Suzanne Goldberg's opinion, what she says

20   is our obligation, it is being offered for the truth of her

21   saying, you should be doing this or you should be doing that.

22   And that goes to the truth.

23          THE COURT:  Look, in any event, even if it's not being

24   admitted for the truth but the fact that it was said, again, I

25   do think these characterizations by this other individual who's

1    not a witness as to exactly what Columbia should have done are

2    just too prejudicial.  I mean, she's at the meeting.  She's

3    telling them what happened.  I think it's unduly prejudicial,

4    so I think this should stay out.

5            Is there anything else you're trying to get out about

6    what Professor Goldberg said?

7            MR. MELZER:  Your Honor --

8            THE COURT:  One person per issue.

9            MS. HARWIN:  On this, what we have is a situation

10   where someone is stressing the institutional response to this

11   situation.  Columbia is disregarding it.  The fact that

12   Columbia is disregarding it over and over and over is

13   significant.

14           THE COURT:  That's your summation.  That's the

15   argument.

16           MS. HARWIN:  We can't use it in our summation if we

17   don't have it in evidence, your Honor.

18           THE COURT:  But she's telling what she told Columbia

19   happened to her, right, and she's asking for help, and all of

20   that is coming in.  As I said, I'm not limiting you in any way

21   from telling what she told Columbia was happening, but I don't

22   know why this adds that much, why this is especially probative

23   and why it isn't unduly prejudicial, what someone else's

24   opinion was about how to characterize it.  I mean, that's what

25   you want is the characterization, because you want to argue to

I7a1rav6                     Ravina - Direct

1      the jury they should agree with that characterization.

2               MS. HARWIN:  What's significant is how they respond or

3      don't respond, and the --

4               THE COURT:  But we're not -- in any event, I disagree.

5      I think the fact that everything that the one person with

6      knowledge of what happened, Professor Ravina, is saying to

7      Columbia what happened, all of that is coming in, and then what

8      Columbia did or didn't do, all of that is coming in.  What was

9      said to every administrator and what the administrator said

10     back is coming in.  I think that's what is most probative.  And

11     even if there is probative value in how characterization of

12     that conduct was made to Columbia, I think that that's just too

13     prejudicial.

14               (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court)

 2              THE COURT:  You may proceed.

 3              MS. HARWIN:  Thank you, your Honor.

 4    BY MS. HARWIN:

 5    Q.  Professor Ravina, you spoke before about Dean Hubbard's

 6    comments about your reviews.

 7              Did you receive any kind of review in 2014?

 8    A.  Yes.

 9    Q.  And can you describe generally how were the reviews you

10    received?

11              MS. PLEVAN:  I'm sorry, I didn't hear the question.

12    Q.  How were the reviews you received?

13    A.  So --

14              MS. PLEVAN:  Objection.

15              I'm sorry.

16              THE COURT:  By whom?

17              MS. PLEVAN:  Yes.

18              Are we talking about a conversation or a document?

19              MS. HARWIN:  Let me go back.

20              THE COURT:  Yes, please.  Thank you.

21    BY MS. HARWIN:

22    Q.  Professor Ravina, in what form did you receive reviews in

23    2014?

24    A.  Both in writing through a short letter and a longer letter

25    and with an in-person conversation with one of the senior
```

1   faculty at the division.

2   Q.  OK.  How were your reviews generally?

3   A.  So, these reviews, there were positive elements, but

4   overall the review wasn't good.

5   Q.  What did your 2014 review say about your prospects for

6   tenure?

7   A.  It says that my prospects were very unlikely.

8   Q.  What was the takeaway message you received from the 2014

9   reviews you got?

10  A.  The takeaway message is that I needed a lot of papers to

11  make it to tenure, and the tenure deadline was approaching.  It

12  was not specified, but time was passing.  But, based on the

13  record I had until then, the chances were unlikely.

14  Q.  You just said based on the record you had then, did you

15  speak to division chair -- I'm sorry.  Did you speak to anyone

16  in your division about your 2014 review?

17  A.  Yes.  The senior professor that delivered my review was

18  actually the chair as well, Andrew Ang.

19  Q.  And did you speak to Division Chair Ang about Professor

20  Bekaert's conduct with you?

21  A.  No.  I was tempted to.  He asked me if there was anything

22  he could do, but Professor Ang was a former student of

23  Professor Bekaert, a coauthor of his, a friend, and I didn't

24  think -- I didn't feel comfortable in going forward and asking

25  his help.  I wasn't confident that he would give it.  I felt it

I7anrav7                          Ravina - Direct

1    would be badly received.

2    Q.  You have talked about difficulties in moving the project

3    forward with Professor Bekaert.

4            Were you able to work with anyone at the company that

5    provided the data, Financial Engines, in order to advance the

6    research?

7    A.  Actually, no.  We had two coauthors, two collaborators at

8    the company.  However, Professor Bekaert told me that he was

9    the gatekeeper of that relationship.  And when I attempted to

10   contact these coauthors to ask for their approval, he told me

11   to stop contacting them, wait for him to make farther steps,

12   and do not talk to them.

13   Q.  When you use the term "gatekeeper," can you explain how

14   that worked in practice?

15   A.  In practice my communications with these coauthors needed

16   to go through Professor Bekaert first, and then I could speak

17   to the coauthors.  I attempted a few times not to go that

18   route, but Professor Bekaert got very upset.

19           MS. HARWIN:  Brian, can you bring up Plaintiff's

20   Exhibit 72 for the plaintiff.

21           And, your Honor, we move to admit Plaintiff's Exhibit

22   72.

23           THE COURT:  Is there any objection to 72?

24           MS. PLEVAN:  No objections, your Honor.

25           MR. HERNSTATD:  No objection.

1          THE COURT:  72 will be admitted.

2          (Plaintiff's Exhibit 72 received in evidence)

3   BY MS. HARWIN:

4   Q.  Are these e-mails between you and your coauthors at the

5   company Financial Engines?

6          THE WITNESS:  We still have the technical issue

7   actually.  It is not showing up.

8          MS. HARWIN:  Can we pull up the Exhibit 72.

9          THE WITNESS:  Or I can take it on paper if you prefer.

10  Oh, then you don't see it either, yeah.  I actually think the

11  jury will not be able to see it.

12         THE DEPUTY CLERK:  I don't think any of the screens

13  are on.  Do you have it up and published?

14         TECHNICIAN:  It is on mine.

15         THE COURT:  It is not on mine, and I don't think on

16  the jury's or the witness's.

17         Did it all come up?  Not for the jurors, but I have

18  it.

19         JUROR:  We have it.

20         THE COURT:  OK.  Thank you.

21  BY MS. HARWIN:

22  Q.  Professor Ravina, do you recognize what's been admitted as

23  Plaintiff's Exhibit 72?

24  A.  Yes.

25  Q.  And can you summarize generally your communications with

1    your coauthors at Financial Engines?

2    A.  My communication with the coauthors at Financial Engines

3    that were --

4            MS. HARWIN:  Let me clarify my question.

5            THE DEPUTY CLERK:  One moment.  Juror No. 4 can't see

6    it.  His screen is not working.

7            Do you want to move your chair over here and share

8    with Mr. Harrigan.  There's extra space over here.

9            THE COURT:  Thank you, all.

10           That's great.

11           THE DEPUTY CLERK:  Thank you.  Sorry about that.

12           I'll have it fixed.

13           THE COURT:  Thank you.

14   BY MS. HARWIN:

15   Q.  Professor Ravina, can you summarize the issue on which you

16   were communicating with Financial Engines in this e-mail chain?

17   A.  Yes.  This is, again, the fund matching issues.  Professor

18   Bekaert made claims that the matching issue was wrong,

19   improperly conducted, it needed to be redone.  This is a

20   million of data points.  It's very difficult for someone

21   external to come in and easily say it's true or it's not.

22           So, upon suggestion of, I think, Dean Phillips, I

23   brought to the company, the coauthors at the company to ask

24   them if they could take a stand on this issue.  And these are

25   people that are quite busy.  They have a different full-time

1   job, so I wasn't very hopeful that they would have the time to

2   do this, but, yeah, this is the e-mail response that I get.

3   Q.  If I could turn your attention to the second line of that

4   e-mail, which reads, "If we cannot get agreement among the

5   coauthors, then I don't know what to suggest.  This seems to be

6   a precondition for papers to get across the finish line."

7           On a practical level what did that response from

8   Financial Engines mean for your work on this project?

9   A.  Financial Engines --

10          MR. HERNSTATD:  Objection.

11          THE COURT:  What is the objection?

12          MR. HERNSTATD:  It is not for her to interpret.  The

13  e-mail says what it says, and her saying what it means is

14  inappropriate.

15          THE COURT:  You can just explain what you understood

16  it to mean.  OK?

17          THE WITNESS:  My understanding was that Financial

18  Engines wanted to stay out of it.  They wanted there to be full

19  agreement between me and Professor Bekaert before them

20  reviewing the paper, making any approval for the paper to be

21  posted, to be sent for publication, to be sent to conferences.

22  We needed to agree ourselves first.

23  Q.  So, on a practical level, what was the effect of this

24  position by Financial Engines on the work with Professor

25  Bekaert?

1    A.   Unfortunately, on a practical level it meant that Professor

2    Bekaert could withdraw his agreement on anything, and the

3    project would not move forward, and I could not go to the other

4    two coauthors to ask them to weigh in and say their opinions.

5    Q.   You previously testified that Professor Bekaert had told

6    you about a student complaint about him to Columbia's Office of

7    Equal Opportunity and Affirmative Action.

8         Did anyone from that office, EOAA, ever contact you

9    about your complaints about Professor Bekaert?

10   A.   Yes.

11        About three months after I filed, I -- about three

12   months after I contacted the first administrator at Columbia,

13   Gita Johar, I received a message from Michael Dunn, the

14   director at the EOAA.

15   Q.   You said that was about three months later?

16   A.   Yes.

17   Q.   Does that put us in August of 2014?

18   A.   Yeah.

19        MS. PLEVAN:  Objection.  Leading.

20        THE COURT:  I will allow it.

21        Just watch it going forward.

22        MS. HARWIN:  Sure.

23   A.   So, my first meeting with Gita Johar was in May 2014, May

24   '14.  The time which I got contacted by Michael Dunn was August

25   the 6th, 2014.  So May --

1   Q.  Did you end up meeting with Director Dunn at any point

2   about your complaints about Professor Bekaert?

3   A.  Yes.  On August 12, I met with Michael Dunn.

4   Q.  Did you meet with him on just that one occasion?

5   A.  I met with Director Dunn twice.

6   Q.  OK.  I'll come back to that one.  Let's talk about the

7   first meeting in August.  How long did your meeting with

8   Director Dunn last?

9   A.  It was about an hour.

10  Q.  Obviously, we can't get into every detail of what you

11  shared with him, but can you tell me generally what you told

12  Director Dunn about Professor Bekaert's behavior towards you?

13  A.  I told Director Dunn that I started working with a senior

14  professor in my field about a very important set of projects.

15  I explained to him that that once I was already into the middle

16  of the project and doing work on it, Professor Bekaert started

17  making advances toward me, inviting me for dinner, infusing sex

18  in conversations, asking for compliments.

19          And I explained to Director Dunn that I did not

20  reciprocate these, and, as a result of that, Professor Bekaert

21  started slowing the work more and more to see if I change my

22  mind.  And once I didn't change my mind, he turned hostile

23  toward me.

24          I told him how concerned I was about his e-mails,

25  about his rage toward me, and I explained that it was important

1    for me to make sure that I was continuing working on this

2    project, that Professor Bekaert would not interfere with my

3    professional life; not only this project, but also by bad

4    mouthing me in the profession, by influencing my tenure and

5    every other aspect of my life.

6    Q.  Did you talk to Director Dunn at all about any of the

7    physical advances that Professor Bekaert had made?

8    A.  I did tell him about the physical advances.  I told him

9    about going --

10             THE COURT:  You did or did not?

11             THE WITNESS:  I did.

12   A.  I did tell him about the -- maybe I should slow down.

13             So I did tell him -- yes, I told him about the

14   physical advances.  I told him about the invitations for

15   dinners.  I told him about Professor Bekaert passing his hand

16   on back toward my butt while I was exiting the taxi.

17             I told him about Professor Bekaert trying to kiss me.

18   I told him about Professor Bekaert holding my hand, and I also

19   told him about Professor Bekaert looking at me in a way that

20   made me uncomfortable, in ways that had a sexual connotation.

21   Q.  You previously spoke about how you told Director Dunn that

22   this was a senior professor.

23             Did you say anything else to Director Dunn about the

24   nature of the -- of that kind of relationship between you as a

25   junior faculty member and Professor Bekaert as a senior faculty

I7anrav7                          Ravina - Direct

1   member?

2   A.   I did as well.  I explained to Director Dunn the power

3   imbalance between a junior and tenured professor and a senior

4   tenured professor in the discipline, and in their actually

5   department.

6        I explained that I was concerned about that Professor

7   Bekaert was having an effect on my career.  I also explained

8   that Professor Bekaert was also the senior coauthor on our set

9   of projects.  And I explained his tight connection to the

10  company providing the data.

11  Q.   You talked about telling Director Dunn about Professor

12  Bekaert's invitations to dinner.

13       Did you talk to Director Dunn about any of the coffees

14  you had with Professor Bekaert?

15  A.   I told him about coffees as well.  I told him that he was

16  infusing sex in our conversations.  I told him about the

17  various, like adventures in his sexual life and how he was

18  telling it to me.  I spoke about that as well.

19  Q.   Besides topics you raised with Director Dunn relating to

20  harassment, did you raise any concerns with Director Dunn about

21  any other subjects covered by Columbia's policies against

22  discrimination, harassment, retaliation?

23  A.   Yes.  I also told him -- I told Director Dunn that I was

24  extremely concerned about Professor Bekaert's rage and about

25  him retaliating against me because I rebuffed him and because I

1    eventually reported him.

2    Q.  Besides the concerns you raised about Professor Bekaert,

3    did you raise any other concerns to Director Dunn about what

4    you were experiencing?

5    A.  I also told him about the fact that the administration

6    responded by suggesting me to give up, forget about it.  The

7    fact that, despite we would make a plan, then nothing really

8    would happen.  Time was passing.  I was the only one among the

9    people involved that was on a clock, and they were just

10   waiting, putting this issue in front of different

11   administrators, giving me a lot of work to do.  Because every

12   time there was a new administrator I needed to explain the

13   situation, I needed to follow up, respond to their request.  So

14   I was having actually a second job doing this as well.

15   Q.  Did Director Dunn request any kinds of documents from you?

16   A.  He wanted specific e-mails about the dinner invitations.

17   Q.  Did he request any other kinds of documents from you?

18   A.  He did not.  I put on extra ones about the coffees, about

19   his abusive language, but he was interested in only the dinner

20   ones.

21   Q.  Did Director Dunn ever ask you for the names of witnesses

22   that you thought he should interview?

23   A.  No.

24   Q.  What, if anything, did Director Dunn tell you about how the

25   investigation process at Columbia would proceed?

1  A.  He didn't tell me much.  In the first meeting, when we

2  started, he told me that I should not talk to anybody about

3  what was discussed in the meeting, but he didn't specify what

4  the next steps would be.

5  Q.  Did you ever meet with Director Dunn again?

6  A.  I met him -- with him again in November 2014.

7  Q.  Around how long did that second meeting with Director Dunn

8  last?

9  A.  It was a shorter meeting.  He wanted to know a few details

10  about specific issues.

11  Q.  Can you give me an example of the specific issues that

12  Director Dunn was focused on at that second meeting?

13  A.  He wanted to know who paid for the dinners.  He wanted to

14  know more about the chocolates and the Valentine gift.  He

15  wanted to know more about the compliments.

16  Q.  In the course of his investigation, did Director Dunn ever

17  show you any documents?

18  A.  No.

19  Q.  Did Director Dunn ever tell you about any documents that

20  Professor Bekaert had provided to him?

21  A.  No, he did not.

22  Q.  What, if anything, did Director Dunn tell you about the

23  information that Professor Bekaert had provided to him?

24  A.  He didn't tell me anything about the information from

25  Professor Bekaert.

1    Q.  Did you talk to Director Dunn about how your experiences

2    that you have described to him were affecting you?

3    A.  Yes.  I told him that I was suffering from insomnia.  I

4    told him that I was constantly worried.  I told him about

5    getting a herniated disk.  I told him about seeing a

6    psychiatrist connected to this issue.

7    Q.  Did you ever receive information that Columbia ended its

8    investigation?

9    A.  Yes.

10   Q.  How did you come to learn the results of the investigation?

11   A.  Later, in November, I received a letter from Director Dunn.

12   Q.  What was the ultimate conclusion of Columbia's

13   investigation?

14   A.  The letter said that there was a preliminary fact-finding

15   and that they found no violation of Columbia's sexual

16   harassment policy.

17           MS. HARWIN:  Move to admit Plaintiff's Exhibit 90.

18           MS. PLEVAN:  No objection.

19           MR. HERNSTATD:  No objection.

20           THE COURT:  All right.

21           90 will be admitted.

22           (Plaintiff's Exhibit 90 received in evidence)

23   BY MS. HARWIN:

24   Q.  Can you please look at page 6 of this letter, the last

25   line.

1        The first two sentences say there, "I found" --

2        JUROR:  Counsel, I don't have anything here.

3        MS. HARWIN:  Oh, can we make sure that's up.

4        THE COURT:  Just give it a minute.

5        Sometimes it takes a minute.

6        MS. HARWIN:  I think now it's up.

7        THE COURT:  Thank you.

8        MS. HARWIN:  We are on the bottom of page 6.

9   BY MS. HARWIN:

10  Q.  Do you see where it says, "I found that you and Professor

11  Bekaert engaged in a friendly working relationship that soured

12  when you did not communicate effectively regarding your

13  concerns about the status of your projects.  I determine that

14  your professional relationship with Professor Bekaert was

15  friendly and at times mutually flirtatious.

16        What did you think of that finding by Columbia's EOAA?

17  A.  I thought that it was -- I thought that it was inaccurate.

18  I thought that he disregarded my explanation of the facts.  I

19  told him of the overall harassment and retaliation that I was

20  subjected to, and the conclusion was that I had a friendly

21  relationship with professional Bekaert that soured and that it

22  was my fault because I did not communicate about --

23        THE COURT:  Just slow down a little.

24        That's OK.  That's all right.  Thank you.  We want to

25  be able to hear you.

1          THE WITNESS:  I agree.  Sorry about that.

2     A.   This e-mail, this letter was telling me that there was no

3     sexual harassment, that I had a friendly relationship with

4     Professor Bekaert, that I soured it because I did not

5     communicate my concerns about the status of the projects,

6     despite I went multiple times to push the projects along, I

7     told Professor Bekaert that I needed to put the projects along,

8     I proposed to make a schedule and asked him if he was agreeing

9     with that, I told the administration multiple times about the

10    stalling and trying to find a plan to move the project forward.

11         It was also accusing me of being unprofessional and to

12    be mutually flirtatious.  It took all the things that I told

13    him, he took them out of context, he took Professor Bekaert's

14    word for it, with no possibility for me to counteract, and he

15    said it was my fault.

16    Q.   Professor Ravina, did you receive anything in this letter

17    or anywhere else from Columbia indicating that they had

18    investigated whether Professor Bekaert had violated Columbia's

19    policies against gender discrimination?

20         MS. PLEVAN:  Objection.

21         THE COURT:  Sorry.  Give me one second.

22         MS. PLEVAN:  The letter speaks for itself.

23         THE COURT:  Why don't you rephrase that, please.

24    BY MS. HARWIN:

25    Q.   Professor Ravina, was there anywhere in this letter where

1   Columbia indicated that there had been any investigation of any

2   violations of its gender discrimination policy?

3          MS. PLEVAN:  Objection again.

4          THE COURT:  I will allow you to answer based on your

5   reading.  Obviously, the letter is in evidence, so you all can

6   look at it yourselves, but you can answer it.

7   A.  The letter speaks for itself.  Columbia did not talk about

8   the gender discrimination.  They also did not talk about

9   retaliation, despite I told them multiple times.

10  Q.  Is there anything in this letter that discusses whether

11  Columbia investigated whether Professor Bekaert had violated

12  Columbia's policies against discriminatory harassment?

13  A.  Also I did not find any place in the letter, and it's there

14  for you to look at.

15  Q.  What recommendation, if any, did the letter make?

16  A.  The letter said that Professor Bekaert should be sent to

17  training about professional communications and that the

18  business school could take other measures if they wanted to.

19  Q.  So, are you referring to the last page, where it says, "In

20  light of these conclusions, I refer this matter to CBS for

21  appropriate action and training.  I recommend that Professor

22  Bekaert receive training on appropriate professional

23  communications"?

24  A.  Yes.

25  Q.  What, if anything, did you do in response to this letter?

I7anrav7                          Ravina - Direct

1    A.  I filed for an appeal.

2    Q.  Whom did you submit your appeal to?

3    A.  I submitted an appeal to Melissa Rooker, the vice provost

4    in the Office of Equal Opportunity and Affirmative Action.

5    Q.  Was she the associate provost?

6    A.  Yes, it's possible.  Sorry about that.

7              MS. HARWIN:  I would like to move to admit Plaintiff's

8    Exhibit 94.

9              MS. PLEVAN:  No objection.

10             MR. HERNSTATD:  No objection.

11             THE COURT:  All right.  94 will be admitted.

12             (Plaintiff's Exhibit 94 received in evidence)

13   BY MS. HARWIN:

14   Q.  Professor Ravina, is your appeal included in this document

15   that is marked as Exhibit 94?

16             MR. HERNSTATD:  Could you speak into the microphone.

17             Thank you.

18   Q.  Is your appeal included in the exhibit that's marked as 94?

19   A.  I can only see the first page, but I believe it is.

20             MS. HARWIN:  OK.  Can we bring up page 5.  There we

21   go.  And also pages 6, 7, and 8.

22             Brian, can we also bring up pages 7 and 8.

23             Thank you.

24   BY MS. HARWIN:

25   Q.  Professor Ravina, can you describe some of the key concerns

1   that you raised in your appeal of Columbia's investigation

2   findings?

3   A.  Yes.  In my letter of appeal, I expressed some of my

4   concerns.  These concerns were that the investigation was a

5   biased, incomplete, and inaccurate account of the facts.

6   Q.  What did you mean by that?

7   A.  Well, what I meant was that a lot of the evidence that I

8   said and reported was ignored.  The retaliation, for example,

9   was not taken into account.  Some of the facts that I explained

10  were taken out of context and their meaning was twisted and it

11  was basically turned against me.

12        The report from Director Dunn did not show serious

13  investigation about my claim that Professor Bekaert was

14  stalling the papers.

15        Director Dunn was aware that I was speaking with

16  Professor Bolton, Professor Santos.  There were people that

17  were financial economists, and they could have been called to

18  testify about whether there were delays or not.  Those people

19  were not called.

20        The letter also ignored the power imbalance.  It

21  ignored the fact that I was a junior tenure-track professor and

22  he was a senior professor having power on my tenure, on my

23  standing in the profession, and on the dataset that was the

24  basis of a very important set of papers in my field.

25        It ignored the response or lack thereof of the

1   Columbia administration.  It didn't ever investigate the

2   meetings with the dean, the meetings with vice dean, senior

3   vice dean Phillips that tells me to forget about it, just think

4   about my happiness and go somewhere else.

5        It was a very partial, very limited investigation.  It

6   didn't even take into account the full extent of the sexual

7   harassment.

8        It focused on a few episodes, but he excluded part of

9   my story that was like all the sequence of first dinner

10  invitations, asking for compliments, showing how nice he was.

11  And then all of a sudden, when I start putting more and more

12  time in this project and I'm sort of captive even more, then he

13  starts jerking me around and he starts saying, well, the

14  projects are good, but I don't have time.  Many projects can

15  come out of this dataset, but these people don't work at it.

16  He starts going back and forth.  He needs to approve every

17  single step and never approves them.  He has time to go for

18  multiple coffees, but has never time to approve the steps.

19       He ignores the fact that Professor Bekaert was using

20  these papers to exert further control over me.  He was slowing

21  down the work, seeing if I was changing my mind.  And when it

22  was clear that I wasn't and I told him that I couldn't be any

23  nicer, then he turned abusive toward me.  He didn't want to

24  share the drafts.  He started saying that I didn't understand

25  what work in progress was, and slowly, slowly it deteriorated

I7anrav7                        Ravina - Direct

1   even farther into the spring of 2014.

2              He ignored the fact that there were other professors

3   that could have been at least weighing in on the work.  So he

4   ignored -- I told him, for example, that Suzanne Goldberg was

5   another person that was present at the meetings, she played a

6   role, and he also did not interview her as far as I can tell.

7   Q.  Professor Ravina, when you appealed Columbia's findings,

8   what was the outcome of that appeal?

9   A.  The appeal was denied.  However, the appeal officer said in

10  her letter that it was out of her quote-unquote jurisdiction,

11  but the issue of the papers and the authorship of the papers

12  and the work was concerning.

13  Q.  So, Professor Ravina --

14  A.  Sorry.

15  Q.  Let me just bring you back to the document.

16             The last page of Exhibit 94, is that the outcome of

17  the appeal?

18  A.  I believe it is.

19  Q.  OK.  Can you refer me to the part of the letter that you

20  were just starting to talk about.

21  A.  So I was referring to the last paragraph, starting, "I have

22  concerns."

23  Q.  The language reads, "I have concerns regarding the issue of

24  authorship on the projects on which Professor Ravina and

25  Professor Bekaert collaborated.  It seems to me that this issue

1   requires further attention and I would hope it could -- it can

2   be resolved at the school level with the assistance of the

3   dean.  However, I also recognize that it falls outside of the

4   task assigned to me -- that is, to evaluate whether the

5   investigation was conducted in a fair and unbiased manner and

6   that the investigator's conclusion is consistent with the

7   available evidence."

8            Professor Ravina, did anyone in the dean's office ever

9   resolve the concerns that you had about the authorship on the

10  project?

11  A.  No, nobody did.

12  Q.  After the EOAA ended its investigation, did Professor

13  Bekaert remain involved in this research project with you?

14  A.  Yes, he remained involved.

15  Q.  Did you ever have an understanding as to why Professor

16  Bekaert wanted to stay involved in these projects with you?

17  A.  Well, my understanding was that, I mean --

18            MR. HERNSTATD:  Objection.  No foundation.

19            THE COURT:  Yes.

20            Did he say something to you that made you understand

21  why he was staying on?

22            THE WITNESS:  He did through the administrators that

23  were playing as go-between.

24            THE COURT:  Yes.

25            THE WITNESS:  Yes.

1          THE COURT:  The Columbia administrators said something

2     to you, what did they say.

3          THE WITNESS:  They said --

4          MR. HERNSTATD:  Your Honor?

5          THE COURT:  Yes.

6          MR. HERNSTATD:  What the administrator said to the

7     witness about what Professor Bekaert said to her --

8          THE WITNESS:  To them.

9          MR. HERNSTATD:  -- is that --

10         THE COURT:  We are just trying to get at -- it's not

11    being admitted for the truth of it, but to Professor Ravina's

12    state of mind and her understanding of what was going forward.

13         MR. HERNSTATD:  This is Professor Ravina's testimony

14    about what an administrator told her that Professor Bekaert

15    said to the administrator.

16         THE COURT:  Just let me be clear -- go ahead.

17         MS. HARWIN:  I can withdraw this question and move on.

18         THE COURT:  OK.  Good.  Thank you.

19    BY MS. HARWIN:

20    Q.  Professor Ravina, after the EOAA ended its investigation,

21    what were the papers that you and Professor Bekaert were

22    coauthoring at the time?

23    A.  At this time we were coauthoring three papers, one called

24    International Diversification, one called Automatic Enrollment,

25    and another one with the male research assistant, Nikola,

1  called Reallocation.

2  Q.  Did you make any requests regarding professor's roles with

3  respect to any of these papers?

4  A.  Yes.  I had made a request that for the international paper

5  we would both be authors of this paper, but there would be a

6  clear schedule to move the project forward.

7  Q.  What about the automatic enrollment paper?

8  A.  For the automatic enrollment paper, I had done a huge

9  amount of work that was necessary for the paper.  Professor

10  Bekaert only participated in writing a draft in a few days, so

11  I asked that he drop himself from the papers -- from that

12  paper.

13  Q.  Did you ever receive a communication that Professor Bekaert

14  would drop himself from that paper?

15  A.  Early on he played hardball and he did not want to drop

16  himself.  I had asked this in the meetings with the

17  administrators in 2014, and he eventually dropped himself in

18  April 2015.

19  Q.  Right after the EOAA investigation ended, what, if

20  anything, was Professor Bekaert doing on the international

21  diversification paper?

22  A.  Professor Bekaert continued the stalling and the

23  retaliation on this paper and on the others.

24  Q.  And --

25  A.  Early -- sorry.

I7anrav7                    Ravina - Direct

1  Q.  No.  Can you give me an example of what was going on

2  specifically that was stalling those papers, that paper on

3  international diversification?

4  A.  So, as a matter of context --

5          MS. PLEVAN:  Objection.

6          Can we have a time frame here.

7          THE COURT:  Sure.  Can you clarify the time, please.

8          MS. HARWIN:  Yes.

9  BY MS. HARWIN:

10 Q.  The question is about after the conclusion of the EOAA

11 investigation.

12         MS. PLEVAN:  So, after November.

13 A.  After November there was still no draft, despite in

14 September we had agreed that he would work on the draft.

15         Since time was passing, I had decided I will do it

16 myself.  I would finish the analysis, write the draft.

17         So, I requested from Professor Bekaert and his

18 research assistants to get the codes that they had worked on so

19 that I could put them together with mine, make sure that I was

20 replicating every single step they did, and I could move

21 forward.

22         Professor Bekaert refused repeatedly to share the

23 codes, despite it is well known for an academic that once the

24 codes are written it takes a few minutes to attach them to an

25 e-mail and just send them.

```
 1    Q.  And how common is it for a coauthor to refuse to share
 2    codes?
 3              MR. HERNSTATD:  Objection.  Based on her experience.
 4              THE COURT:  Yes.  Based on your experience, you can
 5    answer that, Professor.
 6    A.  Based on my experience, I never heard of anybody asking --
 7              MR. HERNSTATD:  Objection.
 8              THE COURT:  Yes.  Just based on your experience -- go
 9    on.  Don't talk about what other people told you, but just
10    based on your experience.
11    A.  Based on my experience, coauthors share the codes and this
12    never happens.
13    Q.  Was there a relationship manager in place at this time when
14    Professor Bekaert was refusing to share the codes?
15    A.  Yes.
16    Q.  What was the name of the relationship manager at that time?
17    A.  So the name of the relationship manager was Daniel
18    Wolfenzon.
19    Q.  And when Professor Bekaert refused to share the codes,
20    what, if anything, did Professor Wolfenzon do to intervene?
21    A.  He sent an e-mail, CCs me and Professor Bekaert and I
22    believe Dean Hubbard and Vice Dean Horan.
23              MR. HERNSTATD:  Your Honor, this is an exhibit that
24    has been objected to and has not been ruled on.
25              MS. HARWIN:  Why don't I move to admit Plaintiff's
```

I7anrav7                          Ravina – Direct

1    Exhibit 54.

2              THE COURT:  Is there an objection to 54?

3              MR. HERNSTATD:  Yes, your Honor.  The exhibit contains

4    an opinion by --

5              THE COURT:  Let's just meet at sidebar.  Let's not

6    talk about it in front of the jury.

7              MR. HERNSTATD:  Yes.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  First of all, I am going to ask you to get

3     together and get back to me about which exhibits are in dispute

4     and just let me know before that testimony so we don't have to

5     keep the jury waiting going forward.

6           In any event, let's talk about this.

7           MR. HERNSTATD:  This exhibit we objected to because

8     this is Daniel Wolfenzon saying how long it takes to send

9     codes, which is a matter of minutes.  But he has no personal

10    knowledge of this.

11          THE COURT:  Who is Daniel Wolfenzon?

12          MS. PLEVAN:  Just a professor in the department who

13    was recruited to fulfill this role.  He doesn't have an

14    administrative role.

15          MS. HARWIN:  He's recruited for this role because he

16    is a finance economist who can weigh in on disagreements as

17    between Professor Ravina and Professor Bekaert.

18          That is the role that he was selected by Columbia to

19    play.

20          MR. HERNSTATD:  No.  He was selected by Professor

21    Ravina.  He's a friend of Professor Ravina's, and she selected

22    him to be the relationship manager.  What that meant is he was

23    CC'd on the e-mail.  He has no personal knowledge of what was

24    involved.  He's just setting down the opinion that Professor

25    Ravina wants him to communicate to the dean's office.

I7anrav7                    Ravina - Direct

1              MS. HARWIN:  It's simply --

2              THE COURT:  Let's not interrupt.

3              One at a time.

4              MR. HERNSTATD:  Professor Ravina has already testified

5     as to how long she thinks it takes.  His testimony is not going

6     to add anything.  All it is designed to do is buttress her

7     testimony, but from the mouth of someone who has no personal

8     knowledge and no personal involvement in it.  He doesn't know

9     what potential problems there are and how long it would or

10    should take.

11             MS. HARWIN:  He's a finance economist weighing in as a

12    general matter about how long it takes to send codes.

13             THE COURT:  Why is this not hearsay in any event

14    because he can't be cross-examined and on the basis of his

15    knowledge?

16             MR. HERNSTATD:  Exactly.

17             MS. HARWIN:  On this issue, though, the issue is not

18    about the truth of the matter.  It is the fact that this is an

19    e-mail where it's send to Professor Bekaert, it's CC'd to

20    administrators at Columbia Glenn Hubbard and Janet Horan.  This

21    is a question, which we followed up with questions about the

22    response of the administration to this.

23             MR. HERNSTATD:  Your Honor, it is clearly for the

24    truth of the matter.  Professor Ravina has just testified that

25    it would only a take a couple of minutes.  She wants the jury

1    to believe this would be a simple thing and Professor Bekaert's

2    refusing to do it, and it's sort of outrageous.  So now she's

3    buttressing that testimony with hearsay.

4               MS. HARWIN:  This is the person Columbia appointed to

5    this role.

6               THE COURT:  Can't you call him as a witness, I mean if

7    you want to get this in?

8               As I said, I am concerned about the hearsay aspect.

9    This is someone they can't cross-examine about the basis for

10   his knowledge, right?

11              MS. HARWIN:  Again, we are not seeking -- we are fine

12   if you want to have a limiting instruction.  This is not for

13   the truth of the matter.  The point is this is an e-mail upon

14   which Glenn Hubbard, the dean, and Janet Horan, the vice dean

15   are CC'd, and there's going to be follow-up questions regarding

16   their response.

17              MS. PLEVAN:  I don't understand what the notice to

18   them is, but we are just talking right now about this document.

19              THE COURT:  So is the objection just to this top part?

20              MS. HARWIN:  I think it's just to that sentence,

21   right?

22              MS. PLEVAN:  It's the whole e-mail.

23              MR. HERNSTATD:  It's the whole e-mail.

24              MS. PLEVAN:  Is stating what he thinks.  As I said, we

25   can't cross-examine him.

I7anrav7                          Ravina - Direct

1          MR. HERNSTATD:  If you look back, this is a long

2    series of e-mails where she's asking for the code and she sends

3    it to Janet Horan she sends it to Glenn Hubbard.

4          Professor Bekaert, says I am going to let the dean's

5    office and university lawyer deal with this.  She then goes to

6    Daniel Wolfenzon --

7          MS. HARWIN:  The person appointed by Columbia to

8    fulfill this role.

9          MR. HERNSTATD:  His role as the relationship manager

10   is to be the guy who gets CC'd on this stuff.  If his role is

11   to mediate, why did he not talk to Professor Bekaert?

12         THE COURT:  His role is what?  To mediate?

13         MR. HERNSTATD:  His role is not to mediate.  He's

14   basically a CC guy.

15         THE COURT:  I am not going to allow in this portion of

16   54.  I will let you elicit the fact that an e-mail was sent on

17   this subject without saying exactly what he said.  And then you

18   can get out what the response was.

19         Then, if you want to call him to testify about the

20   basis for his conclusion, you can do that.  OK?

21         MR. HERNSTATD:  I'm sorry?

22         THE COURT:  We are not going to let in this portion of

23   the exhibit.  I am going to let her elicit generally that an

24   e-mail was sent and the general subject matter, but not the

25   conclusion.

1        MS. HARWIN:  That an e-mail was sent by professor

2   Wolfenzon weighing in on the amount of time it would take to

3   send this?  That general subject matter?

4        THE COURT:  How about on the subject of --

5        MS. HARWIN:  How long it would take?

6        THE COURT:  Yes.  How much time it would take, and

7   then you can elicit the responses, but not what his conclusion

8   was.

9        MR. HERNSTATD:  Your Honor --

10        THE COURT:  It's being admitted to get the responses,

11   right?  It's not being admitted for the truth of the

12   conclusion, which is why I'm not allowing his actual position.

13        MR. HERNSTATD:  All of this, this entire dispute is in

14   front of the dean's office already.  There is a number of

15   e-mails.

16        THE COURT:  I haven't read this exhibit.  No one told

17   me it was an issue.

18        MR. HERNSTATD:  There are e-mails back and forth,

19   every one of them copied.

20        MS. PLEVAN:  What is the next question to Professor

21   Ravina?

22        THE COURT:  About the timing of the --

23        MR. HERNSTATD:  Yeah, about what she wants -- that

24   she -- not how long it takes, but I am waiting for the codes.

25   I asked for it three weeks ago.  This is December 9.

1              Then she says Professor Bekaert said -- and she copies

2       that to everybody, Daniel Wolfenzon, the people at Financial

3       Engines and Bekaert says this is under discussion.

4              Then she sends the next response to Dean Hubbard and

5       Janet Horan.  This is not under discussion.

6              THE COURT:  What does that add other than his opinion?

7              MS. HARWIN:  The point is really it isn't for his

8       opinion.  The point is this is an instance in which Columbia is

9       put clearly on notice of obstructionist behavior by Professor

10      Bekaert, and Columbia doesn't intervene.

11             THE COURT:  I am not going to allow it for that

12      purpose.

13             MR. HERNSTATD:  I have an objection to the rest of the

14      e-mail.

15             MS. PLEVAN:  I don't.

16             THE COURT:  If she wants to put in parts, she can do

17      that.

18             MR. HERNSTATD:  Thank you, your Honor.

19          (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2    BY MS. HARWIN:

3    Q.   Professor Ravina, you previously testified that sharing

4    codes would be a matter of minutes.  Is that accurate?

5    A.   Yes.

6    Q.   Did the relationship manager at Columbia do anything to

7    direct or order that Professor Bekaert release the codes to

8    you?

9    A.   No.

10             MR. HERNSTATD:  Objection, your Honor.

11             Foundation.

12             THE COURT:  Sustained.

13   BY MS. HARWIN:

14   Q.   As far as you know, did Columbia provide the relationship

15   manager with any kind of authority to intervene, to direct

16   Professor Bekaert to take --

17             MS. PLEVAN:  Objection, your Honor.

18   Q.   -- or not take any action.

19             THE COURT:  I am going to allow, do you know one way

20   or the other what Columbia did with respect to --

21             MS. PLEVAN:  Who's Columbia?

22             THE COURT:  Yes.

23             What did Columbia or any individual acting on behalf

24   of Columbia as you know it do with respect to the release of

25   the codes?

I7anrav7                          Ravina - Direct

```
 1              Is everyone OK with that question?

 2              MS. PLEVAN:  I think so.

 3              THE COURT:  Are you OK with that?

 4              MR. HERNSTATD:  Yes.

 5  A.  Columbia --

 6              THE COURT:  What is your understanding of what

 7  Columbia did or an individual acting on behalf of Columbia with

 8  respect to the release of the codes?

 9              THE WITNESS:  The relationship manager was acting as

10  go-between --

11              MR. HERNSTATD:  Objection.

12              THE WITNESS:  -- on behalf of Columbia.

13              THE COURT:  You know, just to be clear, who is the

14  relationship manager?

15              MS. HARWIN:  Professor Daniel Wolfenzon.

16              Your Honor, can I elicit some general testimony about

17  the nature of this role if that would be helpful?

18              THE COURT:  You can do that.  I don't know if it will

19  get you where you want to go, but sure.

20  BY MS. HARWIN:

21  Q.  Professor Ravina, can you explain what the role of the

22  relationship manager at Columbia was.

23  A.  So the relationship manager was appointed by the dean to be

24  the professor expert in the empirical aspects, the strategy,

25  the field, to be carbon copied on all the messages between
```

I7anrav7                         Ravina - Direct

Professor Bekaert and me and to weigh in with his expertise if

a dispute arose.

Q.  Let me ask a follow-up question.

What was your understanding as to the authority, if

any, that the relationship manager had to take action in the

event that there was a dispute that couldn't be resolved as

between you and Professor Bekaert?

A.  My understanding was that the relationship manager had no

authority whatsoever.  He could say his opinion, but he could

not compel anybody to do anything.

Q.  Did you speak to anyone else at Columbia Business School

about Professor Bekaert's refusal to release the codes relating

to your research project?

A.  This issue was spoken with in the business school with the

Vice Dean Horan and Dean Hubbard, who were carbon copied on the

e-mails as well.

Q.  Did you speak to anyone else in the Columbia administration

about Professor Bekaert's behavior with respect to the codes?

A.  Yes.  While the appeal of the EOAA determination was going

on, I had returned to Melissa Rooker, the associate provost at

that office, the harassment, discrimination, and retaliation

office, telling her that I wanted to talk with the appeal

officer to provide more information and telling her about the

ongoing retaliation.

Q.  Let me pause you for one second.  I would like to move to

I7anrav7                      Ravina - Direct

1    admit Defendant's Exhibit JR.

2              THE COURT:  Is there an objection to JR?

3              MS. PLEVAN:  No objection, your Honor.

4              MR. HERNSTATD:  No, your Honor.

5              THE COURT:  So JR is admitted, Defendants' JR.

6              (Defendants' Exhibit JR received in evidence)

7    BY MS. HARWIN:

8    Q.   Taking a look at the first page -- sorry, taking a look at

9    the second page, that e-mail that you wrote, do you see where

10   you wrote, "Yes, Professor Bekaert continues to retaliate"?

11   A.   Yes.

12   Q.   And do you go on to provide a description of the code

13   issue?

14   A.   Yes.  I provided a description of the code issue in point

15   A, I still don't have the codes and the tables.  And I talk

16   about the stalling.  I provide a description of the opinion

17   from the relationship manager in part B saying that --

18             MR. HERNSTATD:  Your Honor.

19             THE COURT:  Yes.

20             MR. HERNSTATD:  Sorry.  I do object to this exhibit

21   for the same reason that we objected to Exhibit 54.

22             THE COURT:  Which portion of it?

23             MR. HERNSTATD:  The second page under B.

24             MS. HARWIN:  This is a defendants' exhibit.

25             MS. PLEVAN:  It doesn't matter.

I7anrav7                      Ravina - Direct

1              THE COURT:  I assume it's not your exhibit.

2              Melissa Rooker is who?

3              MS. HARWIN:  The associate provost, the head of the

4    Office of Equal Opportunity and Affirmative Action.

5              THE COURT:  I am going to allow this in.

6              All right.  Go ahead.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MS. HARWIN:

2   Q.  Professor Ravina, you talked about the paragraph A and the

3   paragraph B.  Can you continue explaining your email to

4   Associate Provost Rooker.

5   A.  Well, I then told her that the school knew for a while that

6   I needed the codes and there was an opinion of an expert, the

7   relationship manager, for a while --

8            MR. HERNSTADT:  Objection, your Honor.

9   A.  I'm sorry.

10  Q.  Sorry.  I can --

11           THE COURT:  Let's meet at sidebar one more moment.

12           If you all want to stand and stretch, you should feel

13  free to do so.

14           (At the sidebar)

15           THE COURT:  So look, I am going to allow in the

16  exhibit.  But I'm happy to give an instruction if you want me

17  to give it, with respect to B in particular, if you're

18  requesting I give an instruction.  She's including in here, you

19  know, hearsay statements.

20           MR. HERNSTADT:  And she's also calling him an expert

21  on this.  Completely buttressing.  She's taking the same

22  statement --

23           THE COURT:  You can cross-examine her about that.  But

24  as I said, I'm happy to give an instruction if there's an

25  appropriate instruction you want me to give the jury about

1   hearsay or about the purpose for which this is being admitted.

2   The correspondence back and forth between the professor and

3   Ms. Rooker.  Is there anything, is there an instruction you

4   want me to give?

5           MR. HERNSTADT:  Yes, that --

6           MS. PLEVAN:  It's broader than that too, though,

7   because the rest of the document has her own statements about

8   things that are hearsay.

9           THE COURT:  Has?

10          MS. PLEVAN:  Has her appeal letter and other

11  allegations that are hearsay too, so if we're going to

12  instruct, give that guidance to the jury, I think it should

13  apply to anything Professor Ravina is stating here is not being

14  offered for the truth.

15          MS. HARWIN:  This is her report of retaliation.  This

16  is the official office at the university that handles those

17  complaints.

18          MS. PLEVAN:  But they should be told it's not being

19  offered for the truth.

20          THE COURT:  What she says other people said is

21  hearsay, wouldn't you agree?  I mean, what Professor Ravina

22  says that someone else says, it's hearsay.  That --

23          MS. HARWIN:  Your Honor, the point is that this is the

24  report to EOAA and what's significant is how the EOAA responds

25  to the report.

I7a1rav8                          Ravina - Direct

1               THE COURT:  Okay.  So I'll make that clear.

2               MS. HARWIN:  All right.

3               MR. HERNSTADT:  Thank you.

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7a1rav8                         Ravina - Direct

1              (In open court)

2              THE COURT:  Ladies and gentlemen, I just want to be

3     clear about one thing.  So this is a report to the EOAA, and

4     it's being admitted to show that it was made and to see what

5     the response was, but there are some statements contained in

6     here that are what we call hearsay.  They're out-of-court

7     statements by someone who's not a witness here and can't be

8     cross-examined, and they're not being admitted for the truth of

9     those statements.  So I just want to be clear about that.  So

10    you'll see in here statements of other people, and those

11    statements of other people aren't being admitted for the truth

12    of whether they're true or not but the fact that this report

13    was made to the EOAA.  So hopefully when you review the

14    document, that will be made clear.

15             Thank you.

16    BY MS. HARWIN:

17    Q.  Professor Ravina, calling your attention back to your email

18    of December 16, 2014 to the associate provost at Columbia,

19    where you say Professor Bekaert continues to retaliate, did you

20    receive a response from the associate provost?

21    A.  Yes.

22    Q.  On top of your email it says, "Thank you for sharing this

23    information and your concerns with me.  It is my understanding

24    that your attorney is currently consulting with the

25    university's attorney on the issues you raise below.

I7a1rav8                          Ravina - Direct

1   Therefore, at this time EOAA will not be investigating this

2   particular information.  Should the issues not be resolved --"

3            THE COURT:  If you just slow down and --

4            MS. HARWIN:  Sure.

5            THE COURT:  Thank you.

6   Q.  "Should the issues not be resolved through your attorney,

7   EOAA will again review the information and determine if there

8   are additional steps to take."

9            Is that the email you received?

10  A.  Yes.

11  Q.  Okay.  Did the EO -- let me go backwards.  Did the issues

12  ever get resolved through your attorney?

13  A.  No.

14  Q.  Did the EOAA ever contact you again to investigate your

15  allegations of retaliation?

16  A.  No.

17  Q.  Did the EOAA have any substantive communications with you

18  again regarding your report of retaliation?

19  A.  No.

20  Q.  Did you respond to what Associate Provost Rooker wrote?

21  A.  Yes, I did.

22  Q.  And is your response the email dated December 30, 2014?

23  A.  Yes.

24  Q.  Okay.  Thank you.

25  A.  Should I read?

I7a1rav8                        Ravina - Direct

1    Q.   That's all right.

2    A.   Okay.

3    Q.   Did you ever get the codes from Professor Bekaert?

4    A.   I did, months later, after I'd redone the codes myself,

5    created the draft myself, then I got the papers, the codes

6    through Vice Dean Horan and I was asked to go back to my code

7    and change anything that was different between his codes, the

8    code that he sent and my code, and make more changes that were

9    not substantial to the paper but still took a lot of time.

10   Q.   Do you recall the approximate date when you got the codes

11   from Professor Bekaert?

12   A.   It was I believe in the spring of 2015, early spring of

13   2015, maybe February.

14   Q.   You previously testified about having communications with

15   Division Chair Stephen Zeldes about your concerns about

16   Professor Bekaert.

17   A.   Yes.

18   Q.   And what is Stephen Zeldes' position at Columbia Business

19   School?  Let me reframe that.

20          During the time in question, what was Stephen Zeldes'

21   role at Columbia Business School?

22   A.   So Steve Zeldes, who was the chair of the finance

23   economic -- and economics division, was a professor picked to

24   be the head of the department.

25   Q.   And that was the department you worked in?

1   A.  Yes, that was the department I worked in.

2   Q.  And that was the department Professor Bekaert worked in?

3   A.  That was the department Professor Bekaert worked in.

4   Q.  And over what period of time, approximately, were you

5   having conversations with Stephen Zeldes?

6   A.  I made conversation with Stephen Zeldes, he was a

7   go-between between me and the administration, me and Professor

8   Bekaert.  The conversations started in the fall of 2014 and

9   continued all 2015 and part of 2016.

10  Q.  What did you understand Division Chair Zeldes' role to be

11  in addressing your concerns with Professor Bekaert?

12  A.  The way I understood his role is, was plans -- like he was

13  trying -- he was going back and forth, trying to find an

14  agreement about the papers, the timing, the schedule.

15  Q.  And how often did you speak to Division Chair Zeldes about

16  your concerns?

17  A.  Early on, not too often, but there came a time in which we

18  would speak as much as every week sometime.

19  Q.  You had made a report to Associate Provost Rooker about

20  retaliation by Professor Bekaert.  Did you have any discussions

21  with Division Chair Zeldes about --

22          MS. PLEVAN:  Objection to the form of the question,

23  your Honor.

24          THE COURT:  Why don't you rephrase, please.

25  Q.  Did you raise any concerns with Division Chair Zeldes about

1    Professor Bekaert's behavior at Columbia?

2    A.   Multiple times.  I met with Professor Zeldes the first time

3    in the fall of 2014, and I told him about the sexual

4    harassment, the stalling of the papers, the retaliation, and I

5    continued to meet with Professor Zeldes over the course of 2015

6    and 2016.  We talked about the retaliation, we talked about

7    Professor Bekaert being bad faith in his discussions about the

8    use of the data.  We would go back and forth extenuatingly for

9    months, when it became clear to me that he had no intention of

10   reaching an agreement on the use of the data.  It was just

11   stringing me along and making time pass and consuming my

12   resources of time and energy, both physical time but also

13   mental time, going back and forth in these negotiations that

14   were encouraged by Columbia.

15   Q.   Did you ever communicate to Division Chair Zeldes any

16   concerns about Columbia encouraging negotiations between you

17   and Professor Bekaert?

18   A.   Yes.  When, in the spring of 2015, I was told that there

19   was nothing Columbia could do about the papers, about my work,

20   that I should just take a lawyer and negotiate it directly with

21   Professor Bekaert about the papers, the use of the data set,

22   and the ownership, I pointed out to them --

23           MS. PLEVAN:  Objection, your Honor.  Move to strike.

24   Lack of foundation.

25           THE COURT:  Lack of foundation?

                    MS. PLEVAN:  She doesn't say who she's speaking to.

                    MS. HARWIN:  She's speaking to Division Chair Zeldes.

                    MS. PLEVAN:  That's not what she said.

                    THE COURT:  So why don't you clarify that, okay?

BY MS. HARWIN:

Q.  Are you discussing a conversation with Division Chair

Zeldes?

A.  I am.  So I told Professor Zeldes that this was not a

solution, that taking someone that harassed me and use this

data set as a tool of power to control me and telling me to

directly negotiate with him about that data set itself, without

Columbia intervention, so I had to agree with him about the use

of the data without being -- being protected was equivalent to

giving power to continue using this as a tool, the data set,

and the threat of withdrawing the data set as a way to slow my

work, as a way to get revenge and to retaliate against me.

Q.  Is there any kind of record of your conversations with

Division Chair Zeldes?

A.  Yes.  At some point, after many months that this was going

on, I started taping my conversation with -- some of them, at

least, with Division Chair Zeldes and with other people in the

department.

Q.  How many conversations did you record with people at

Columbia?

A.  I don't know.

1              MS. PLEVAN:   Speak into the mic, please.

2     Q.  How many conversations did you record with people at

3     Columbia?

4     A.   I don't know how many.  We had many conversations.   I

5     didn't record them all, but I recorded many of them.

6     Q.   Why did you record the conversations?

7     A.   I recorded them because I wanted to have some documentation

8     of what was going on.  Time had passed.  I had been harassed

9     for a year and a half.  After that I reported it to the

10    university, in 2014, and the university just took my complaint

11    and was indifferent to it.  They ignored it.  They put

12    different administrators on the case, over and over.  It was

13    like a hot potato passed from one desk to another, with any

14    solution.  And I wanted to make sure that all, or most, or as

15    many as I could of the conversations that I had would be

16    documented.  I wasn't able to record them all, but I recorded

17    some.

18    Q.  Do you have any recordings of any of your interactions with

19    Professor Bekaert?

20    A.   No.  By then our communications were by email and I started

21    doing the recordings only way later after the university was

22    con -- completely unresponsive to my concerns.

23             MS. HARWIN:   I'd like to move to admit Plaintiff's

24    Exhibit 99.

25             MS. PLEVAN:   We have an objection, your Honor.

1           THE COURT:  All right.  Let me look at it.

2           MS. HARWIN:  And your Honor, just to be clear, we're

3     not seeking to admit anything for the truth of the matter

4     asserted, simply for the fact of the report.

5           MS. PLEVAN:  But it's prejudicial.

6           THE COURT:  I assume you're not seeking to admit the

7     top one here.

8           MS. HARWIN:  We are, your Honor.

9           THE COURT:  That's not being admitted.

10          Is there anything else you can do now so we can

11    address this later without keeping the jury here?

12          MS. HARWIN:  Sure.  Your Honor, we could admit this

13    exhibit with just the, you know, signature of the person to who

14    it's sent and with the content of the first email redacted.

15          THE COURT:  Sorry.  So which pages are you seeking to

16    admit?

17          MS. HARWIN:  So the rest of it but just the

18    beginning --

19          MS. PLEVAN:  We object to the entire document, your

20    Honor.

21          THE COURT:  Okay.  Yes.  So if you can do something

22    else now for a little while and then if we need to finish

23    early, we can do that, but just so we don't keep the jury

24    waiting while we discuss this.

25          MS. HARWIN:  Okay.

I7a1rav8

BY MS. HARWIN:

Q.  Professor Ravina, can you explain what your feelings were like during the spring of 2015 as you were dealing with this ongoing situation with Professor Bekaert and Columbia.

          MS. PLEVAN:  Objection.

          THE COURT:  I'll allow the one question, but I don't want to stay on this for very long.  You can answer that.

          MS. HARWIN:  Your Honor, maybe we can sidebar before we proceed with the questioning then?

          THE COURT:  Okay.

          Actually, ladies and gentlemen, why don't you go home for the night.  I don't want to keep you here while we discuss this.  So keep an open mind, don't discuss the case with anyone.  And if you can be here at 9, we'll have breakfast waiting for you tomorrow morning.

          Thank you.

          (Continued on next page)

I7a1rav8

1          (Jury not present)

2          THE COURT:  Everyone can be seated.

3          So as I said earlier, I was waiting for you all to get

4     back to me on which exhibits you still had disputes about, and

5     I thought that you were working it out and were going to get me

6     an updated list.  Just because I don't want to do this,

7     especially with long emails, long exhibits that I don't have

8     the time to read everything, I don't want to keep the jury

9     waiting.  So have you been able to narrow it down?  Do you want

10    to work on that tonight?

11         MS. PLEVAN:  I have an outstanding request to

12    Mr. Sanford, so if he would respond, maybe we can make some

13    progress.

14         MR. SANFORD:  I'm not sure I'd characterize it, your

15    Honor, as an outstanding request to me.  We've gone back and

16    forth a number of times in an effort to reach agreement, and it

17    seems very clear, based on the communications we've had, that

18    we're not going to reach agreement, so we'll continue having

19    that conversation tonight, I'm happy to do that, but I'm not

20    optimistic and so we would welcome the Court's guidance.

21         THE COURT:  Well, what I think would be useful for me

22    is if you can submit an updated list to me, at least for the

23    day in question, so I can look at things tonight and I can let

24    you know tomorrow morning.  I don't have to do all of them

25    tonight, but at least with respect to the witnesses you expect

I7a1rav8

1    tomorrow.

2              MS. PLEVAN:  Well, I don't have to comment, your

3    Honor, but the plaintiff has objected to many, many, many of

4    our exhibits.  We did not object to so many of the plaintiff's.

5    And what was being proposed by the plaintiffs was an all or

6    nothing, you know, if we withdraw these objections, will you

7    withdraw, and it just didn't work, because we just weren't

8    going to agree on a hundred percent of everything.  So I would

9    urge that counsel take another look at their objections and --

10             THE COURT:  All right.  Why don't you all take a look

11   at your objections, get me a list that's relevant to tomorrow

12   as soon as you can, because again, I just need the time to

13   review them, and I don't want to do that while the jury is

14   waiting.  If you think you want to point out exactly what the

15   purpose is, let me know.  Again, I'm not trying to give you

16   work to do.  I don't need briefs on everything.  But, I mean, I

17   look at this, I don't really know why you would think it's

18   admissible what Suzanne Goldberg said expressing sympathy.

19   Again, I'm happy to hear you out on that, but I think about it

20   the other way.  I mean, if the defendant was trying to elicit

21   hearsay statements from people who supported Professor Bekaert

22   at the time, that wouldn't be admissible either, right?  So I'm

23   trying to balance here the concerns, for example, expressed

24   earlier with respect to the statement by Ms. Goldberg and the

25   issue I think that's relevant to the outstanding issue with

I7a1rav8

respect to Plaintiff's Exhibits 100, 130, and 160.  I'm trying

to balance plaintiff's desire, legitimate desire to elicit

evidence regarding notice to Columbia about certain issues,

right, with the prejudice that flows from others who don't have

personal knowledge of the situation simply expressing their

opinion, which often or may go to some of the ultimate issues

in the case, and so I'm trying to balance those concerns.

MR. SANFORD:  I understand, your Honor.  We will

continue having a conversation tonight.  If we can't reach

agreement, we will bring it to the Court's attention, and

perhaps we can start tomorrow morning at 9:00 with documents in

mind.

THE COURT:  That's fine.

MS. PLEVAN:  To be clear, on this particular exhibit,

because it applies to others, this exhibit also contains a

four-page self-serving communication from Professor Ravina to

Professor Goldberg, and that's also hearsay, even though it's

the plaintiff.

THE COURT:  And is Professor Goldberg in this context

considered an administrator of Columbia such that the statement

to her would be notice to the school?

MS. PLEVAN:  She came to this meeting as a

representative of Professor Ravina.  Professor Ravina was

referred to her by a law professor that was a friend of a

friend of professor, you know -- a professor at the business

I7a1rav8

1    school.  And Professor Goldberg is the one who referred her to

2    Anne Clark, so she is not acting on behalf of the business

3    school here.  She's acting on behalf of Professor Ravina.

4    That's perfectly clear.  And they have dozens of email

5    communications in which Professor -- she's asking advice about

6    how to handle situations and Professor Goldberg is responding.

7    So her self-serving comments to Professor Goldberg are not

8    admissible, in our view, they're hearsay, and what Professor

9    Goldberg said in response is not admissible.  She's not

10   speaking for -- she's not part of Columbia Business School and

11   she wasn't speaking on behalf of them.

12           MS. HARWIN:  Your Honor, I don't think you've gotten

13   an answer to your question, which is whether --

14           MS. PLEVAN:  Speak up a little, please.

15           MS. HARWIN:  Yes.  I don't think you've gotten an

16   answer to your question, which is whether Suzanne Goldberg was

17   an administrator at Columbia, and the answer is yes, at this

18   time her role had changed and she was a vice president at the

19   university, the head of the office for university life.  And so

20   at this time she is one of the top administrators at the

21   university, and Professor Ravina sent this email to her at that

22   time.  We're not seeking to admit it for any expression of

23   sympathy.

24           THE COURT:  I find that hard to believe.  Honestly.

25   Looking at this top email, "I'm sorry to hear that this

I7a1rav8

1    continues to be so difficult," I mean, if you --

2              MS. HARWIN:  I'd be happy to --

3              THE COURT:  -- if you want to say what the notice was.

4    I know, but when you make a statement like that, it's not

5    entirely credible when I look at what you're trying to admit.

6    I mean, if you're trying to admit it for purpose of notice,

7    then what's important is what was said to this person and not

8    that they expressed sympathy or not.

9              MS. HARWIN:  That's right, your Honor, and certainly

10   we'd be happy to redact that sentence that you view as

11   expressing sympathy, and we'd also suggested I believe the idea

12   of redacting the entire content of her response and just

13   keeping her signature line to show that it's a matter of

14   notice.  So it's not our intent to elicit it as a sympathetic

15   email.

16             MS. PLEVAN:  Again, the context of the relationship

17   here -- and I'm sorry because in a way you have to read all

18   these emails, if they're going to persist in this line of

19   thinking, because it's clear that Professor Goldberg is not

20   acting as a representative of the Columbia Business School or

21   even of Columbia University in that sense.  She's receiving

22   this, she's trying to help this person.  As I said, she's

23   recommending lawyers to her.  She's acting as her advocate when

24   she goes to the meetings.  So what is being said to her by

25   Professor Ravina is hearsay.  It's not there for notice

I7a1rav8

1    purposes.

2            THE COURT:  I'll look at it tonight.

3            MS. HARWIN:  Okay.  And your Honor, I would just say,

4    if you look at the email, it's really quite the opposite.  It's

5    simply not the case that she's providing any advice or counsel

6    or anything of the sort.  She says quite specifically, I'm not

7    able to advise any more.  And so it's simply not an accurate

8    portrayal of this relationship as an advocate.

9            MS. PLEVAN:  I'll refer you to the 30 other emails

10   where she does give advice, including recommending a lawyer.

11           MS. HARWIN:  The question is, was this email sent when

12   Suzanne Goldberg was an administrator at Columbia University.

13           THE COURT:  All right.  I'll take a look at this.

14           MS. HARWIN:  Okay.

15           THE COURT:  So just to go over what I think is

16   outstanding, and then you'll let me know if there are other

17   outstanding issues and then tell me what's most time sensitive

18   so I can make sure to get you answers when you need them.

19           I know the motion to exclude the remaining expert

20   testimony of Professor Rhode is outstanding.

21           Plaintiff's request to admit evidence that she offered

22   to waive any de facto tenure rights, and I received another

23   letter on that.

24           As I just referenced, the issue with respect to

25   Plaintiff Exhibits 100, 130, and 160, I thought plaintiff

I7a1rav8

1     wanted to submit a letter on that.  You don't have to, but if

2     you want to, I'll of course consider it.

3          MR. SANFORD:  Yes, your Honor, we intend to do that

4     this evening.

5          THE COURT:  Okay.  Thank you.

6          I think we need to talk about -- I'm happy to do it

7     now or in the morning, although I don't know how pressing this

8     is, but -- clarification to allow Professor Bekaert to describe

9     the conversation context in, I think it was BE -- it's

10    regarding the stalker issue -- without eliciting the fact that

11    it was a stalker.  I mean, there must be some way to sanitize

12    this in some fashion.  I'm happy to go over it together if

13    you --

14         MR. HERNSTADT:  We have the email and we have the

15    testimony.  The email is crystal clear.  The exchange, I don't

16    know how you sanitize the exchange.  It's mentioned in passing

17    in a couple of words by Professor Ravina, and Professor Bekaert

18    in fact is the more -- I guess had the more emotional response

19    and says, oh, my goodness, that's terrible.  No one should have

20    to subject -- and he tells her I have a friend myself, and

21    that's the link to the conversation that they subsequently had

22    in which he mentioned that he had met a stewardess on his

23    travels and she had been stalked also.

24         MR. MELZER:  Your Honor, Professor Ravina has

25    testified that Bekaert talked about having sexual relations

I7a1rav8

1    with a stewardess.  That has nothing to do with any stalkers,

2    and this shouldn't be used to shoehorn in what the Court has

3    already characterized as highly prejudicial evidence suggesting

4    that Ms. Ravina had a stalker at one point in her life.  What

5    we would suggest is that there could be a reference to prior

6    experiences or prior similar experiences but no specific

7    mention of stalker or anyone stalking Ms. Ravina.

8         MR. HERNSTADT:  Your Honor, I think the prejudice had

9    to do with all of the information about the former boyfriend,

10   who became a stalker, and all of that is out.  She testified,

11   Professor Ravina has --

12        THE COURT:  There's still potential prejudice from

13   Professor Ravina thinking she has a stalker because there may

14   be an argument that she is someone who's hypersensitive to male

15   attention, right?  And that's the concern.  So her testimony

16   about the stewardess was what, just that he --

17        MR. HERNSTADT:  He told her about it.

18        THE COURT:  He mentioned that he had a sexual affair

19   with a stewardess, right?

20        MR. HERNSTADT:  And he has no opportunity to combat

21   that statement if he can't explain how she learned that he even

22   knew a stewardess.  He did not have -- when he met her at that

23   dinner, there was no physical relationship.  He didn't tell her

24   that because it didn't happen.  And how can he explain that in

25   a convincing way if he's not able to explain how this person

I7a1rav8

1     came up in conversation in the first place?  Why on earth would

2     he mention this person?

3              MR. MELZER:  Your Honor, this is an improper launching

4     pad to an irrelevant sideshow.  Once the word "stalker" comes

5     up, it rings a bell that is prejudicial, and then Ms. Ravina

6     would have to potentially explain what happened, and then we

7     would be getting into a course of events that happened, you

8     know, more than ten years ago that have no relevance to this

9     case, that could be a large diversion from the real issues of

10    what is going on and what Ms. Ravina experienced at Columbia.

11             MR. HERNSTADT:  Your Honor --

12             THE COURT:  Just show me exactly where she first

13    mentions the stalker and where he first mentions the

14    stewardess.  And just point me to the page and line, if you

15    could.

16             MR. HERNSTADT:  I do not have the letter in front of

17    me.

18             THE COURT:  Okay.  It's Exhibit BE.  I mean, I can

19    lend you this copy.  And it's also I think from the Bekaert's

20    deposition, which I have here.  It's 233 and 34, right?

21             MR. HERNSTADT:  Right.

22             THE COURT:  So he says --

23             MR. HERNSTADT:  Okay.  And your Honor, I'll point you

24    directly to it.  I just want to respond very quickly to

25    Mr. Melzer, that that is absolutely not going to happen.

There's going to be no discussion -- I'm not going to question

Professor Ravina about a stalker.  I'm not going to argue that

she's a person who thinks she's stalked or even mention the

word "stalker" in any closing argument.  The only point is to

permit Professor Bekaert to explain how Professor Ravina became

aware of the existence of a stewardess.

THE COURT:  I understand.  I'm just saying, I think

that there's some less prejudicial way to get out the fact that

she mentioned something that led to him mentioning that.

MR. HERNSTADT:  So the second page, the email dated

January 29, at 10:29 p.m.

THE COURT:  Okay.

MR. HERNSTADT:  "Hi, Geert, how are you.  Sorry.  I

had the first class today and have been swamped on all sorts of

issues, even the housing, as if everything is not enough.  Mom

is improving, not out of danger, though, and stalker is being

neutralized, sort of.  I hope I don't die."

"Wait a minute.  Are you getting stalked?  Did I miss

an email?  I would be shocked -- I have 80 or so open.  I would

be shocked as I have another close friend who has the same

problem in a very bad way.  Glad your mom is doing better."

And they continue to talk about stalkers for the rest

of the email exchange.

"Yes, I forgot to tell you I had a stalker, 2007."

None of that has to come in.  The first email is sufficient.

I7a1rav8

| | |
|---|---|
| 1 | The rest of this exhibit, in terms of talking about stalkers, |
| 2 | there may be something else that we need to -- |
| 3 | THE COURT:  The first email, which one -- |
| 4 | MR. HERNSTADT:  There may be something else -- yeah. |
| 5 | There may be something else, but certainly the first page, we |
| 6 | don't need the first page at all. |
| 7 | MR. SANFORD:  19191? |
| 8 | MR. HERNSTADT:  19191 could come out.  I could limit |
| 9 | it to, you know, the email, so the exhibit could start on |
| 10 | page 2 with professor -- no, with her email to him telling him |
| 11 | about the stalker. |
| 12 | MR. MELZER:  Stalkers can kill you, stalkers being |
| 13 | neutralized, "I hope I don't die," this is highly prejudicial. |
| 14 | It involves a, you know -- the Court has already excluded this |
| 15 | as very tangential in relevance and extremely prejudicial. |
| 16 | Ms. Ravina suggesting that her life is at risk, which has |
| 17 | nothing to do with anything in this case, and there is no |
| 18 | reason to bring this in.  There should be no email admitted on |
| 19 | this subject, and Professor Bekaert can testify that the reason |
| 20 | he started to talk about the stewardess was because there were |
| 21 | shared personal experiences that brought her to mind. |
| 22 | THE COURT:  Yes, I think that's right.  I think it's |
| 23 | too prejudicial.  I think you can elicit the fact that she |
| 24 | shared personal experiences that led him to -- just as |
| 25 | Mr. Melzer suggested, that led him to share that personal |

experience.  So I think that that provides context without

being so specific.  I don't see why it's relevant that she had

the stalker.  I think there's a way to neutralize the statement

and the context for it by just making clear that she had

brought up something personal and he responded with this

personal comment.

          MR. HERNSTADT:  Your Honor, I understand.  I think

there's other parts of the email that are still useful.  But I

would hope then that if Professor Bekaert is challenged on

that, he would have an opportunity then to introduce what

happened.  His testimony was clear, in his deposition at

page 233.

          THE COURT:  Look, I think that's fair.  I think

plaintiffs should be very careful on cross-examining him about

this specific remark and the context in which it was made.  But

I think it is fair to get out that Professor Ravina had said

something personal that elicited him to make this personal

remark because there were some similarities in what they talked

about, but it's not necessary to get into the details.

          MR. HERNSTADT:  The only concern I have about the

first one is you need to get the phrase correct.

          THE COURT:  Why don't you all talk about that and come

back to me, because that won't happen until his testimony

anyway.

          MR. HERNSTADT:  Okay.

I7a1rav8

1          THE COURT:  I know I need to rule on deposition

2     designation objections.  I assume you all didn't make any

3     progress on that, is that right?

4          MS. HARWIN:  That's correct, your Honor.

5          THE COURT:  Okay.  And when do you hope to admit those

6     deposition designations?

7          MS. HARWIN:  Probably Thursday or Friday.

8          THE COURT:  Okay.  All right.  And then I know you

9     have some issue on damages.  But that can wait a little bit.

10          Are there any other outstanding issues we need to

11     address?

12          MR. SANFORD:  Your Honor, yes.  You asked about

13     pressing issues.

14          THE COURT:  Yes.

15          MR. SANFORD:  The pressing issue that we have is

16     Professor Rhode's schedule.  She has international travel plans

17     and was available for this upcoming Monday, I think maybe

18     Tuesday, possibly even Friday.  So it would be helpful -- she's

19     at Stanford.  She's at Stanford right now.  If we could get a

20     ruling on that issue, that would be great.

21          THE COURT:  So I'll let you know that tomorrow so you

22     can get back to her about the schedule.  All right.  I'll

23     prioritize that.  I'll prioritize that.  You all prioritize the

24     exhibits that I need to look at.  And so if you could just

25     focus me on which exhibits I need to look at for that day or

1    that morning, whatever it may be, that would be helpful and

2    then we just won't keep the jury waiting, okay?

3              MR. MELZER:  The other matter is the waiver with

4    respect to tenure, because that is likely to come up in

5    testimony tomorrow morning.

6              THE COURT:  With who?

7              MR. MELZER:  With Professor Ravina, because she will

8    testify, as I said in the letter, that she had personal

9    conversations with Division Chair Zeldes and another tenured

10   professor in which she volunteered to waive de facto tenure to

11   the extent that it was an issue.

12             THE COURT:  Do you want to respond, Ms. Plevan?

13             MS. PLEVAN:  I can, your Honor.  We got that last

14   night.  But the concern -- well, the big concern I have first

15   is that there are other things somewhat vaguer, so I want to be

16   sure that all that's being offered is the conversation with

17   Professor Zeldes.

18             THE COURT:  Is that right?  Is that all you're seeking

19   to admit?

20             MS. PLEVAN:  Nobody else is relevant.

21             THE COURT:  Mr. Melzer?

22             MS. HARWIN:  Well, there was a context with the

23   conversation with Professor Huberman, so --

24             MS. PLEVAN:  No.  He's not an administrative person in

25   any sense of the word and we don't have a disclosure here.  If

I7a1rav8

1   I recall the conversation, you know, Professor Huberman,

2   speculated that Columbia's de facto tenure provisions might be

3   at issue.  And he's not here to testify.  I don't know what he

4   would say.  I don't know if he agrees or disagrees with what's

5   being represented here or what she would testify to.  It would

6   be hearsay.

7           MR. MELZER:  Professor Huberman is one of their

8   witnesses and --

9           MS. PLEVAN:  Well, he's not going to testify.

10          MR. MELZER:  -- it was the conversation with Professor

11  Huberman that prompted her to raise the issue with Division

12  Chair Zeldes and to volunteer the waiver.  That was how she

13  obtained notice that it might be an issue.  It wasn't --

14          THE COURT:  You could get out what she said to Zeldes.

15  Why do you need hearsay, a hearsay discussion with Professor

16  Huberman?

17          MR. MELZER:  Because that's what made her aware that

18  de facto tenure could be something that was holding up her

19  request for an extension.  Columbia did not inform her of that.

20          MS. PLEVAN:  Well, and it's actually not -- I mean,

21  he's got the issues kind of confused because the issue of

22  de facto tenure is relevant to the timing, not to what kind of

23  leave of absence she might be eligible for.  So I don't know

24  what conversations she had with Professor Huberman, who was

25  only on our list if we needed him because he's on the reading

1      committee of the tenure review.  It had nothing to do with this

2      issue.  And then she says she heard about someone else named

3      Bruce Lehmann, who then submits a hearsay email, so I assume

4      we're not going to be hearing about Bruce Lehmann and that

5      email --

6                  MR. MELZER:  Your Honor, we --

7                  MS. PLEVAN:  Either.  I'm sorry.  I'm raising all of

8      these.  It's not instead of.  But, you know, she can say I had

9      a conversation -- if this is her testimony -- I had a

10     conversation with Professor Zeldes about de facto tenure.  I

11     mean, that's what she --

12                 MR. MELZER:  That's fine.  She will testify that she

13     had a conversation with Professor Zeldes about de facto tenure.

14     Professor Zeldes asked her for precedent.  She obtained an

15     email showing precedent for waivers of de facto tenure and

16     provided that to Columbia.  So Columbia asked for it and

17     received it.

18                 MS. PLEVAN:  Who was it provided to?

19                 THE COURT:  Who did she provide it to?

20                 MS. PLEVAN:  Where is the document where she provided

21     it?

22                 MR. MELZER:  I believe that that was provided

23     potentially between counsel.

24                 MS. PLEVAN:  Yes, exactly.

25                 MR. MELZER:  But she obtained it at Columbia's request

I7a1rav8

1    and then provided it through counsel.

2            MS. PLEVAN:  I think that's disputed, but --

3            THE COURT:  With Professor Zeldes, did she say that

4    she would waive the de facto tenure?

5            MR. MELZER:  She said that, yeah, if that were the

6    issue with regard to her extension, she would waive de facto

7    tenure.

8            THE COURT:  Why can't you just elicit that and nothing

9    between the lawyers and just leave it at that?

10            MR. MELZER:  Yes, that's fine, your Honor.

11            THE COURT:  Okay.  So that's what we'll do on that

12    issue.  But I don't want anything of any settlement

13    discussions, anything involving lawyers back and forth.  And I

14    don't think you need any of the hearsay with Huberman, either.

15            MS. PLEVAN:  And also that we're not going to be --

16    nobody's going to offer this email from the Lehmann person who

17    was at Columbia 30 years ago.

18            MR. MELZER:  In that case they shouldn't be --

19    Columbia should not be able to argue that they couldn't grant a

20    waiver because there was no precedent for it.  That's all we

21    would ask.

22            MS. PLEVAN:  The problem is, it didn't happen to begin

23    with, okay, and that's not, you know -- Lehmann's understanding

24    of what the circumstances were are not reflected in Columbia's

25    records whatsoever.  So that's exactly why we have a hearsay

I7a1rav8

1    rule.  So --

2            THE COURT:  All right.  So we're going to just start,

3    you can elicit for purposes of tomorrow that she offered to

4    waive any de facto tenure rights to Zeldes, Professor Zeldes,

5    and we'll just leave it at that.  And then, you know, if

6    Columbia argues that it was concerned about the validity of the

7    waiver and you want to call someone to testify, I don't know

8    exactly how we would do that.

9            MS. PLEVAN:  I would object, your Honor.  I mean, if

10   they thought they were going down this path, you know, he

11   should have been on their witness list and --

12           THE COURT:  But if you have someone testify that -- I

13   don't know who it would be, you'll know -- look, the reason

14   that -- we were concerned about the validity of the waiver.  I

15   don't know if you're going to have a witness testify.  I mean,

16   they can cross-examine that person on whether that was a

17   legitimate belief or not to show that plaintiff can make her

18   argument that that's a pretextual statement, right?  So --

19           MS. PLEVAN:  I think I understand.

20           THE COURT:  Are we all on the same page about that?

21           MS. PLEVAN:  I think so.

22           MR. MELZER:  Yes, your Honor.

23           THE COURT:  I want to allow plaintiff to make the

24   argument and I want to allow defendants to make their

25   arguments, and I'm just trying to do that without allowing in

I7a1rav8

1    hearsay and anything that's unduly prejudicial.

2              Okay.  So that's my list.  I'll prioritize Professor

3    Rhode and the objections to particular exhibits.  I'll get the

4    letter with respect to 100, 130, and 160.  We'll sort out the

5    issue -- I think I've made myself clear with respect to the

6    stalker.  And then I'll look at the designation, the deposition

7    designation objections in advance of Thursday.

8              MS. HARWIN:  And your Honor, right before the jury was

9    let out, we went to sidebar because there was a question that I

10   posed having to do with Professor Ravina and how she was

11   feeling during the spring of 2015, and I just wanted to confirm

12   that we'll be allowed to elicit some testimony regarding that

13   subject.

14             THE COURT:  Look, damages has been bifurcated so I

15   don't want to get into a whole thing about how she was feeling

16   and the harm that it caused her.  That being said, I will allow

17   you a little bit of leeway to kind of complete the story, but I

18   intend to cut you off pretty quickly if it's really just

19   getting into damages.

20             MS. HARWIN:  The purpose is not for damages.  I mean,

21   as you know, Professor Ravina subsequently applied for personal

22   hardship leave.  One of the aspects of a retaliation claim is

23   whether conduct is reasonably likely to deter complaints.  Some

24   basic information --

25             MS. PLEVAN:  Speak up.

347

I7a1rav8

| | |
|---|---|
| 1 | THE COURT:  Yes, you need to speak up. |
| 2 | MS. HARWIN:  Some basic information regarding |
| 3 | Professor Ravina's emotional state is pertinent to those |
| 4 | issues. |
| 5 | MS. PLEVAN:  I don't see how it's relevant at all.  I |
| 6 | mean, what's relevant is what she submitted in support of her |
| 7 | request. |
| 8 | THE COURT:  Is it her position that she was so upset |
| 9 | by these events that she was unable to get her work done? |
| 10 | MS. HARWIN:  Certainly affected her ability to work, |
| 11 | very much so, yes. |
| 12 | MS. PLEVAN:  No.  That's not -- that's not the same |
| 13 | thing.  She didn't say she couldn't work.  She wanted to work. |
| 14 | THE COURT:  As I said, I'll give you a little bit of |
| 15 | leeway as it relates to the storyline of why she did what she |
| 16 | did, whether she was able to accomplish the work that she was |
| 17 | supposed to accomplish, but I don't want to get into the |
| 18 | damages phase now.  Okay? |
| 19 | MS. HARWIN:  Thank you, your Honor. |
| 20 | THE COURT:  All right.  Okay.  I will see you all in |
| 21 | the morning.  Thank you. |
| 22 | ALL COUNSEL:  Thank you, your Honor. |
| 23 | (Adjourned to July 11, 2018, at 9:00 a.m.) |
| 24 | |
| 25 | |

INDEX OF EXAMINATION

Examination of:                                        Page

ENRICHETTA RAVINA

Direct By Ms. Harwin . . . . . . . . . . . . 111


DEFENDANT EXHIBITS

Exhibit No.                                        Received

 JR   . . . . . . . . . . . . . . . . . . . 314

```
 1                          PLAINTIFF EXHIBITS

 2     Exhibit No.                                     Received

 3     234   . . . . . . . . . . . . . . . . . . 118

 4     14    . . . . . . . . . . . . . . . . . . 138

 5     6   . . . . . . . . . . . . . . . . . . . 140

 6     8   . . . . . . . . . . . . . . . . . . . 154

 7     11    . . . . . . . . . . . . . . . . . . 158

 8     16    . . . . . . . . . . . . . . . . . . 166

 9     12    . . . . . . . . . . . . . . . . . . 169

10     13    . . . . . . . . . . . . . . . . . . 171

11     261   . . . . . . . . . . . . . . . . . . 185

12     20    . . . . . . . . . . . . . . . . . . 188

13     22    . . . . . . . . . . . . . . . . . . 193

14     29    . . . . . . . . . . . . . . . . . . 207

15     24    . . . . . . . . . . . . . . . . . . 211

16     34    . . . . . . . . . . . . . . . . . . 222

17     35    . . . . . . . . . . . . . . . . . . 236

18     36    . . . . . . . . . . . . . . . . . . 241

19     47    . . . . . . . . . . . . . . . . . . 255

20     3   . . . . . . . . . . . . . . . . . . . 261

21     27    . . . . . . . . . . . . . . . . . . 262

22     72    . . . . . . . . . . . . . . . . . . 282

23     90    . . . . . . . . . . . . . . . . . . 291

24     94    . . . . . . . . . . . . . . . . . . 295

25
```