I7b1rav1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ENRICHETTA RAVINA,

4                    Plaintiff,

5          v.                              16 CV 2137 (RA)

6  COLUMBIA UNIVERSITY,

                                           Jury Trial
7                    Defendant.

8  ------------------------------x

9                                          New York, N.Y.
                                           July 11, 2018
10                                         9:31 a.m.

11 Before:

12         HON. RONNIE ABRAMS

13                                         District Judge

14

15                        APPEARANCES

16

17 SANFORD HEISLER SHARP LLP
        Attorneys for Plaintiff
   BY:  DAVID SANFORD
18      ALEXANDRA HARWIN
        MELINDA KOSTER

19

20 PROSKAUER ROSE LLP
        Attorneys for Defendants
21 BY:  BETTINA B. PLEVAN
        RACHEL S. FISCHER
22      STEVEN D. HURD

23 HERNSTADT ATLAS PLLC
        Attorneys for Defendant Bekaert
24 BY:  EDWARD HERNSTADT

25

I7b1rav1

1              (Trial resumed; jury not present)

2              THE COURT:  I'm sorry to get started later today than

3    anticipated.

4              Why don't we just talk about what we think we need to

5    address for this morning in terms of exhibits that are in

6    dispute, and then I'll address Professor Rhode at the break and

7    any other issues.

8              So are there particular exhibits that you think are

9    going to be used this morning with Professor Ravina that we

10   need to discuss outside of the hearing of the jury, or can we

11   wait until the break?

12             MR. HERNSTADT:  I'm not sure when they're going to

13   submit them, but 258 is an exhibit that they plan to introduce

14   that has been objected to.

15             THE COURT:  All right.  258?

16             MS. PLEVAN:  And also 120.

17             THE COURT:  Okay.

18             MS. PLEVAN:  Well, 99, which we had discussed

19   yesterday.

20             THE COURT:  Sorry.  258, 120, and what was the last

21   one?

22             MS. PLEVAN:  99.

23             THE COURT:  99.  Okay.  Let me look for those.

24             So 99 is the one we started talking about yesterday.

25   Okay.  So I'm happy to hear you both out on 99.

I7b1rav1

1          MS. HARWIN:  Your Honor, 99 is an example of further

2    protected activity by Professor Ravina making further

3    complaints of discrimination and retaliation to one of the top

4    administrators at Columbia University.  Professor Suzanne

5    Goldberg used to be involved in meetings but subsequently

6    became an administrator.  After Professor Ravina wrote to her

7    as administrator, Professor Goldberg, then a vice president at

8    the university, responded in a way where she declined to get

9    involved in any way and nothing happened to further address the

10   concerns Professor Ravina was raising.  It's further protected

11   activity.  The lack of university response to it is material to

12   the case.

13         MS. PLEVAN:  Briefly, your Honor, because we argued

14   this at least in principle yesterday --

15         THE COURT:  Yes.

16         MS. PLEVAN:  -- extensively.  And again, Suzanne

17   Goldberg's role here was acting as Professor Ravina's advisor,

18   not as an appointed official of Columbia.  That's evident in

19   this communication and in many others that followed where she

20   did respond to Professor Ravina, so it's in addition misleading

21   to suggest that this shows a lack of response even by Professor

22   Goldberg, but it's also a long, self-serving statement by

23   Professor Ravina that's clearly hearsay and not presented in

24   the official channels as a complaint and will be prejudicial to

25   the jury even if they are told that it's not being offered for

I7b1rav1

1      the truth.

2              MS. HARWIN:  Your Honor, the policies at Columbia are

3      very clear that officers of instruction and supervisory,

4      managerial employees like Suzanne Goldberg are designated

5      reporters.  They have a duty to report.  Here, we have a

6      situation where Professor Goldberg responded, she indicated she

7      wasn't able to advise, so quite clearly is not acting as an

8      advisor, says quite the opposite, and nothing is done with this

9      email.

10             THE COURT:  She's not even in the business school.

11     She's at the law school.

12             MS. HARWIN:  Well, she at this time is the vice

13     president for university life.  She's at a universitywide

14     office.  In addition to her professorial duties, she's a

15     universitywide administrator.

16             MS. PLEVAN:  That's not how she got involved here at

17     all, and a week before this email is the announcement of her

18     taking this new position.  But Professor Ravina had been

19     working with her for over six months at that point, and they

20     have this relationship that grew out of her role at the law

21     school.  Nothing to do with her position that she was appointed

22     to in late January of 2015.

23             MS. HARWIN:  This is not --

24             THE COURT:  You're saying different things about

25     whether she is someone who can be considered someone at

I7b1rav1

Columbia to whom a report legitimately can or should be made.

And I understand there are differing opinions about that, but I

want the jury to get a fair impression.  I don't want them to

be left with a misleading impression that this is the

appropriate person to complain to if that's not case.  And if

she was really acting as an advocate for Ms. Ravina, I want the

jury to know that as opposed to, again, having a misleading

impression.  So if I were to consider admitting this, how is

the jury going to find out that information?

            MS. HARWIN:  I believe, your Honor, that there is

deposition testimony by Columbia's 30(b)(6) witness regarding

the role of this office of university life, so I believe that

there is testimony on that, and we can grab that.

            But additionally, within this correspondence itself,

what prompts -- or the initial email in the chain is the

announcement of her new role.  Professor Ravina follows up

about the new role, congratulates her, says that she hopes that

there would be an executive vice president of junior faculty

life.  Professor Ravina was a junior faculty member.  This is

on page 7.  And Professor Goldberg responds and says, "I'm sure

this new EVP, me, will have in mind issues that are important

to junior faculty life as well."  And then Professor Ravina

responds to her.

            MS. PLEVAN:  This is advisory legal advice she's

giving her about how to handle -- and she's asking her

I7b1rav1

| | |
|---|---|
| 1 | advice -- how to handle Professor Bekaert, how to handle her |
| 2 | situation at the business school.  It reads entirely like an |
| 3 | employee seeking advice from an employment lawyer, and that's |
| 4 | what Professor Goldberg's background was as a lawyer.  And |
| 5 | again, the letter itself is this five-page self-serving |
| 6 | statement by Professor Ravina about her problems.  It's the |
| 7 | rankest form of hearsay, and -- |
| 8 | THE COURT:  I mean, it's that, but if it's being |
| 9 | admitted for notice provided to Columbia, which I understand is |
| 10 | disputed, which is what I want before the jury, then it's not |
| 11 | being admitted for the truth, which I'll tell the jury, but for |
| 12 | the fact that she made these statements to this individual. |
| 13 | Again, whether that individual is really a report to Columbia |
| 14 | when she's already been reporting to Columbia and this person |
| 15 | had, at least according to Columbia, been acting as her |
| 16 | advocate, is that really a report to Columbia. |
| 17 | MS. HARWIN:  So I want to be very clear.  The record |
| 18 | is quite clear that Professor Goldberg was not providing legal |
| 19 | advice to Professor Ravina.  There was no attorney-client |
| 20 | relationship or anything like that.  When Suzanne Goldberg was |
| 21 | attending these meetings, I believe there's testimony from |
| 22 | Professor Goldberg on that point.  But beyond that, we have an |
| 23 | email here, which is not a request for advice.  It's not a |
| 24 | request for advice.  There's no -- |
| 25 | THE COURT:  That's not my question.  My question is |

I7b1rav1

1    not whether this is a request for advice.  My question is not

2    whether she was really acting as her lawyer.  My question was,

3    was she acting as her advocate in a way or is this really an

4    attempt to notify Columbia of things they've already been

5    notified about.

6          MS. HARWIN:  This is a notification.  As you see at

7    the end of this email on page 6, states clearly, "Bekaert

8    continues to retaliate to this day."  Says later, "At this time

9    I need the harassment and retaliation to stop and to be able to

10    return to do research effectively and immediately."

11          MS. PLEVAN:  She's reporting to her, not asking her to

12    do anything there, but I think, your Honor, it has to be read

13    in the context -- and I'd like the opportunity to show you all

14    the other emails that she exchanges with Professor Goldberg

15    because together it makes it clear what their relationship was.

16          THE COURT:  Look, I'm going to allow this in, but I

17    will give Columbia leeway to cross-examine Professor Ravina on

18    what relationship Ms. Goldberg played and I'm going to tell the

19    jury that this is not being admitted for the truth of anything

20    in it.

21          MS. PLEVAN:  Your Honor, then why do we need all the

22    details?  I mean, what is it notice of?  Then redact this

23    document to take out all the details.  What is the plaintiff

24    claiming this is notice of?  That was the statement.  Notice to

25    Columbia.  We were already on notice.  I mean, this is, you

I7b1rav1

1    know, long after she's talked to four other people.  What is

2    she giving notice of?

3           THE COURT:  I mean, it's just showing sort of one more

4    effort of plaintiff to get out her story.  Whether it's true or

5    not is for the jury to decide.  You know, I am a little

6    troubled by my lack of appreciation of what Ms. Goldberg's role

7    really was, but if she had this position, not just at the law

8    school but the one that she was just appointed to, as this vice

9    president for university life, and Ms. Ravina is reaching out

10   to her, again, to try and tell her story to someone else, I

11   think that the jury should hear that.  I think that that's

12   relevant.  Whether it was Ms. Goldberg's obligation to tell

13   anybody else, particularly when Columbia was already aware of

14   certain facts, I mean, I think that that's evidence that either

15   side is free to present before the jury as well.

16           So I'm going to allow that in.

17           All right.  The other two, 258 and 120.

18           So Plaintiff's 120.

19           MS. PLEVAN:  There are other exhibits that contain the

20   email at the bottom of 120, from Mr. Zeldes, Professor Zeldes,

21   to Ms. Ravina.  So I assume this is only being offered to add

22   the email from Professor Ravina to Professor Zeldes at the top,

23   which is hearsay and it's incomplete, because this is an email

24   string.  So for that reason as well, we object, and if the

25   Court believes that Professor Ravina's email should come in,

1     then we think the entire chain should come in, and that would

2     be Defendant's Exhibit MV, which has Professor Zeldes' response

3     to this December 24 email.

4             THE COURT:  That's fair.  I think it is appropriate to

5     allow in Ms. Ravina's email to Zeldes, but I also think it's

6     fair to allow in his response.

7             MR. SANFORD:  We have no objection to that.

8             MS. PLEVAN:  The request is that instead of 120, which

9     will leave the jury with a mistaken impression of the dialogue,

10    that the only one to be offered in evidence should be

11    Defendant's Exhibit MV, which has Professor Zeldes' response.

12            MR. SANFORD:  This is a classic case, your Honor, of

13    engaging in protected activity, and as your Honor knows, this

14    case is marked by multiple instances of protected activity.

15    This is another one involving a claim by Professor Ravina about

16    the process being unfair and retaliatory.  There's nothing

17    that's more classic than that.  So many --

18            THE COURT:  I said it was coming in.

19            MR. SANFORD:  Okay.

20            THE COURT:  Yes.  So I think the only question is, as

21    I understand it, Columbia wants more of the exhibit in.  I

22    think plaintiff can put in their exhibit, and then if defendant

23    wants to make clear that that's incomplete, then they can make

24    that clear.

25            MR. SANFORD:  We have no problem with that, your

I7b1rav1

1    Honor, but I would like to see the document.

2           THE COURT:  Yes.  So if you don't have a problem with

3    it, why don't you use the defendant's exhibit.  If you want to

4    put a plaintiff's sticker on it as well, you're free to do

5    that.  But then we'll just have one exhibit.  Is that the idea?

6           MR. SANFORD:  That's fine, your Honor, but if I could

7    take one moment to just take a look at that exhibit.

8           THE COURT:  That's fine.

9           MS. PLEVAN:  MV.

10          THE COURT:  MV?

11          MR. SANFORD:  Do you have an extra copy?

12          MS. HARWIN:  MV is actually a longer chain that

13   includes people other than plaintiff and so we can't introduce

14   that through plaintiff, and so we need to introduce our version

15   because --

16          THE COURT:  But there's consent.  I haven't even been

17   making you lay a foundation because a lot of exhibits have been

18   on consent, so if it's on consent, I don't think there's a

19   problem.

20          MS. HARWIN:  We would rather deal with MV with those

21   witnesses who are involved in that email communication.  I

22   think that Plaintiff's 120 should come in and MV can come in as

23   well through those witnesses.

24          THE COURT:  Are there other witnesses you're going to

25   call about that?  You know what, can it come in on cross?  Is

I7b1rav1

1    she on the --

2                     MS. PLEVAN:  Yes.

3                     THE COURT:  So it will just be made clear to the jury

4    that the plaintiff produced part of the chain but not all of

5    the chain by choice and then defendant can introduce all of it.

6                     MS. PLEVAN:  We'll deal with it.  It's more time,

7    but --

8                     MR. SANFORD:  Thank you, your Honor.

9                     THE COURT:  Okay.  And then 258 I think is the last

10   one that we wanted to talk about before we bring the jury in.

11                    MS. HARWIN:  258 is an email from Professor Ravina to

12   her division chair on August 21, 2015.  This is further

13   protected activity by Professor Ravina.  In this email she

14   talks about getting to the point of needing to go to court.

15   She states, "I don't see any alternative at this point.  We hit

16   an impasse.  If Geert," meaning Professor Bekaert, "has a

17   reasonable response that protects my work and well-being, I

18   remain willing to give up the right to go to court.  In public.

19   He should propose it."  She says later, "I cannot wait any

20   longer on the resolution of this issue."

21                    This is clear protected activity.  It precedes the

22   revocation of the leave.

23                    THE COURT:  What's the objection to it?

24                    MR. HERNSTADT:  The objection, your Honor, is that

25   it's both filled with hearsay and double hearsay, and the

I7b1rav1

```
 1    hearsay and double hearsay that is the body of the email are
 2    the settlement negotiations that are being conducted between
 3    her attorney and Professor Bekaert's attorney.  She starts
 4    reciting on the first page, A, Geert added to the agreement.
 5    B, Geert tried to restrict the definition.  C, Geert -- all of
 6    that are the settlement negotiations.  She's quoting from --
 7    she's referring to and describing the draft settlement
 8    agreement that's going back and forth between the parties.
 9              THE COURT:  No settlement discussions, okay?
10              MS. HARWIN:  So we're fine if you want to --
11              THE COURT:  Why don't you do that.  Can we bring the
12    jury in now, though?  All right?  So I think those are the only
13    issues.
14              MS. HARWIN:  But I would ask that --
15              MR. HERNSTADT:  Well --
16              THE COURT:  Why don't you redact it right now.  Just
17    talk about what you're going to redact, have the paralegal do
18    it.  Only show the relevant portions of it that don't have to
19    do with settlement discussions.
20              MR. HERNSTADT:  Okay.
21              MR. SANFORD:  Thank you, your Honor.  And just
22    briefly, does your Honor have a ruling on Professor Rhode?
23              THE COURT:  I do.  I'm going to grant Columbia's
24    motion to exclude.  I'm not going to allow her to testify.
25    I'll state my basis at the break.
```

I7b1rav1

```
 1              MR. SANFORD:  Thank you, your Honor.

 2              THE COURT:  Let's bring the jury in.  Thanks.

 3              MS. PLEVAN:  Plaintiff's 99, the Goldberg, can we ask

 4      that the jury be instructed at the time that it's offered that

 5      it's not being offered for the truth of the statements made?

 6              THE COURT:  Okay.  Yes.

 7              MS. PLEVAN:  Thank you.

 8              MR. HERNSTADT:  Your Honor, at a time when we have

 9      more time, I do want to revisit the --

10              THE COURT:  Stalker?

11              MR. HERNSTADT:  Yes.  Thank you.  That's not today's

12      issue, though.

13              THE COURT:  No, but I'm happy to do that during the

14      break or at the end of the day.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25
```

I7b1rav1                     Ravina - Direct

1              (Jury present)

2              THE COURT:  Good morning, folks.  Thank you for your

3     promptness.  I'm sorry to get started late.

4              Everyone can be seated.

5              I promise you we were working in here.  We were just

6     trying to sort out some issues to make the testimony flow a

7     little bit faster, so thank you for your patience.

8              Professor Ravina?

9              MS. HARWIN:  Good morning, your Honor.  Good morning,

10    ladies and gentlemen of the jury.

11    ENRICHETTA RAVINA, resumed.

12    DIRECT EXAMINATION CONTINUED

13    BY MS. HARWIN:

14    Q.  Good morning, Professor Ravina.

15    A.  Good morning.

16    Q.  Professor Ravina, since the 2011-2012 academic year, how

17    much of your research focus has been on the retirement research

18    project that you embarked on with Professor Bekaert?

19             THE COURT:  And I should remind you that you're still

20    under oath.

21             THE WITNESS:  Yes.

22    A.  Most of my time, starting 2011-2012, intensifying

23    afterwards, was spent on this platform that would have given me

24    various papers.  I spent time both devising empirical

25    strategies, I spent time directing the research assistants, and

I7b1rav1                    Ravina - Direct

1    this was a very large data set, so it needed a very concerted

2    effort to push it out quickly and be able to take advantage of

3    all the papers that could come out of it and make an impact in

4    the field.

5    Q.   Why did you focus on this retirement research project?

6    A.   I did it because this was an extraordinary opportunity.   It

7    was an opportunity to study a topic that is very important for

8    policy, for individuals' savings, and for academic prestige as

9    well.   And I felt -- and I believe I got feedback in line with

10   this from my colleagues and from Professor Bekaert himself --

11   this was the way to go.   If you have a golden opportunity, you

12   take it.

13   Q.   You've testified that Professor Bekaert interfered with the

14   project.   So why did you continue to work on it after Professor

15   Bekaert began stalling the progress?

16   A.   So it started -- it didn't happen all at once.   It started

17   slowly.   It was delaying, I -- at the time that the delays

18   started, I would never imagine that we would have gotten into

19   2016.   It was early on.   We were in the late spring 2013, and

20   at the beginning I thought, well, these are just delays.   They

21   will be solved.   And then slowly and slowly, the stalling

22   became worse and worse, and I tried to do everything I could to

23   solve it, to work on my own, to try to push the project forward

24   by getting approval.

25              Later on, when I realized this was not possible, I

1    tried to get the university, to intervene, to create a fence

2    around me so that I can proceed.  And it was only after the

3    summer of 2014 that I realized, well, this is a situation that

4    maybe cannot be solved.  The university is abandoning me.  They

5    are not doing anything.  Time is passing.  At a point it was

6    too late to switch.  In the -- I needed more time to put

7    together a different data set.  I tried.  I looked for

8    alternatives.  I looked for alternatives, and I eventually was

9    able to get other data sets from large firms.  But it was only

10   in the late spring, summer, and fall that this data came in,

11   and it was ground zero.  I needed to start to do all the work.

12        And also, like I was -- I was trying still to push all

13   the rest of the projects along, in case -- nobody ever told me,

14   look, it's over, this is not going to happen.  And other people

15   would say, well, let's try this.  There is a relationship

16   manager.  We'll solve it in the future.  And a lot of people,

17   among my senior colleagues, were making a concerted effort to

18   help.

19        So I was trying to push both.  And I am now working

20   also on these alternative data sets, but at the time, when they

21   arrived, it was way too late to prepare them and write papers

22   on them, like I did in the fall of 2012 and spring of 2013, for

23   this data set.

24   Q.  Professor Ravina, I want to follow up on some of these

25   points that you just made.  You talked about coming to the

1  realization that this was a problem that maybe cannot be solved

2  and that that was in the summer.  What summer of what year was

3  that?

4  A.  So the first strong signal that I got was in —— when I was

5  going back and forth with the university early on, after

6  meeting with Dean Phillips in July 2014, after meeting with

7  Dean Hubbard in July —— in September 2014, after seeing that

8  the relationship manager has no authority, you know, slowly,

9  slowly, these realizations came to me.  I kept trying, though.

10  I didn't want to just give up or say, you know, well, she

11  didn't make any effort.  I did make effort.  But it became more

12  and more clear that the probability was becoming low, lower and

13  lower.

14          I was getting mixed signals though.  As late as May

15  2014, I believe Professor Bekaert was telling me that it was my

16  fault that the project wasn't proceeding, and this project

17  could yield three papers by the end of 2014.  So even then I

18  was like, okay, if I have three projects by the end of 2014,

19  this is the way to go.  This is the place to put my resources.

20  As time passes, then I'm trying to keep that option open, but

21  I'm also trying to go with some alternative, just because

22  otherwise my career would be completely destroyed, like it

23  ended up being.

24  Q.  Professor Ravina, you talked about communications from

25  Professor Bekaert in 2014.

1          MS. HARWIN:  I'd like to call up, Brian, Plaintiff's

2     Exhibit 36.  And Brian, could you bring up the second page of

3     that document.

4     Q.  Professor Ravina, if I could direct your attention to the

5     third paragraph of the email in the middle of that page.

6          Professor Ravina, do you see where it says, "We could

7     have 5/6 papers out of this project, three for sure by the end

8     of this year"?

9     A.  Yes.  I can see it in the small.  I don't think it's

10    brought up.  Is that the one that starts, "You are

11    confronting"?

12         MS. HARWIN:  Brian, could you call out the language in

13    the third paragraph, "We could have 5/6 papers out of this

14    project, three for sure by the end of this year."

15    Q.  When did Professor Bekaert write that to you?

16    A.  Sometimes in May 2014.  I cannot see the date, but it is in

17    the email.

18         MS. HARWIN:  Brian, can you bring out the date on that

19    email.

20    A.  May 6.

21    Q.  Thank you.

22         After you made your complaints to Columbia University

23    about Professor Bekaert, did you do anything to kickstart any

24    other kind of research apart from the research you were doing

25    with Professor Bekaert?

I7b1rav1                         Ravina - Direct

A.  So I was spending quite a lot of time trying to solve this issue, especially because when I talked to the university, it started being like an obstacle race.  There is an obstacle in front of you, you have to overcome it, you have to respond to the request, and then keep going.

At the same time, however, like I mentioned, I started contacting other companies to see if I could get a similar or also very nice data set for my research.  These type of interactions take quite a lot of time.  Companies contribute to research because they want to learn something new, because of the prestige of helping knowledge continue, but it's not their main day-to-day activity.  So, you know, it takes long to make a contact, convince them, and then eventually sign a contract, then get the data.  It was a long process.  So I was doing this on the side and I was still going back and forth with Professor Bekaert and with the university to at the same time push the retirement data project.

Q.  Professor Ravina, you testified before about the efforts of colleagues.  Can you just provide me with a general overview of what you were referring to there.  And before you go into that, can you clarify, were you talking about Columbia administrators or someone else at Columbia?

A.  So no, I was not talking about Columbia administration. I -- I was referring to my senior colleagues in the department.

Q.  And what efforts did the senior colleagues in your

1   department make?

2                   MS. PLEVAN:  Objection.

3                   THE COURT:  Sustained.

4   Q.  Professor Ravina, can you explain how Professor Bekaert's

5   conduct and Columbia's response to it affected your ability to

6   perform research.

7                   MS. PLEVAN:  Objection.

8                   THE COURT:  Overruled.  You can answer that.

9   A.  This type of work and doing research --

10                  MR. HERNSTADT:  Your Honor, from her understanding of

11  that.

12                  THE COURT:  Yes, of course.  I mean, this is all just

13  based on your understanding and your impressions, but you can

14  answer it with that caveat.

15  A.  Doing research is a job that requires your mind to be on

16  all the time.  You think about stuff not only when you are at

17  work, but you have to generate idea, solve empirical issues, be

18  creative.  So you need a clear mind to do this type of job.

19  And given what was going on, I didn't have a clear mind.  My

20  mind was completely consumed by the harassment, the

21  retaliation, going back and forth with the university.  I was

22  feeling abandoned.  I was meeting indifference at every step.

23  There were many meetings.  It's not that we lacked meetings.

24  And they took a lot of time.  But nothing was getting done.  We

25  were just meeting, meeting.  I was -- I was getting requests to

1    respond to stuff, to write documents, I was talking with my

2    colleagues as well in the department about this.

3              All this and the worry, that took on me a very -- a

4    very large toll.  I didn't give up.  I tried to fight back,

5    solve the situation, but definitely it had a very, very large

6    toll.  I felt abandoned and I felt I had this large problem

7    that was continuously occupying my mind.

8    Q.  Professor Ravina, can you tell us a little bit more about

9    how that manifested, when this was occupying your mind and you

10   described also worries.

11   A.  I couldn't sleep --

12             MS. PLEVAN:  Objection, your Honor.

13             THE COURT:  Sustained.

14   Q.  Can you explain on a day-to-day basis how what you've just

15   described affected your ability to perform the research.

16   A.  Yes.  So if you do research, you know, you -- like any

17   other job, you wake up, you go to the office, and then ideally,

18   you sit down, respond to emails that came in, meet research

19   assistants, meet colleagues or co-authors to discuss issues,

20   submit to conferences, think about your academic work, and

21   maybe provide feedback to the work of others.  So your day is

22   occupied by that.

23   Q.  So how --

24   A.  I would go --

25   Q.  Yes.  How was your experience different from the typical?

I7b1rav1                     Ravina - Direct

A.   I would go to the office and I would just feel blank.  I
would be worrying about this constantly.  I would try to -- I
would try to work, but like I had a very pressing issue.  My
life and my career and, you know, at Columbia, but even beyond
that, were affected by it.  I had a big problem that could not
exit my mind.  I could not just set it aside.  It was
dominating my mind.

        And in addition to that, there was also meetings and
other stuff, but it was mainly like, how do I solve this big --
this big issue is affecting my professional future.  It's
affecting my personal future.  I don't know what is going to
happen.  I've been trying all sorts of approaches.  I talked
with everybody that I could think of and find, and nothing
would happen.  After a while, you feel very alone in some way
when this happens.  Like you are around people, but you are
really in your own -- in your own tunnel.  Like life proceeds
around you and your colleagues that are thinking, well, where
is my paper -- I hope my colleagues will like this, should I
work on something, and instead, you don't have these worries.
You have the worry of being overtaken and destroyed by this
machine that is just huge administration and powerful
university that is indifferent to you and waiting for you to
disappear.  And if you have to spend your days like this, it's
very difficult to concentrate and -- so much.
Q.   Take a moment.

I7b1rav1                    Ravina - Direct

```
 1   A.  I'm sorry.  I'll be fine.
 2            You can go ahead.
 3   Q.  Professor Ravina, you were a tenure track professor at
 4   Columbia, correct?
 5   A.  Yes.
 6   Q.  Can you remind us when the tenure process typically starts
 7   at Columbia Business School.
 8   A.  Typically the tenure process starts in the spring of
 9   your -- mine -- sixth year on the clock.
10   Q.  When would your sixth year on the tenure clock have been?
11   A.  So it would have been 2014-15, so it would be the spring of
12   2015.
13   Q.  What discussions did you have about your tenure clock in
14   2014?
15   A.  My tenure clock came up in the September meeting with the
16   dean, among the remedies for what was going on.
17   Q.  Before you get there --
18   A.  Yes.
19   Q.  -- so this was the September 16, 2014 meeting with Dean
20   Hubbard, Vice Dean Horan, and Professor Goldberg?
21   A.  And me, yes.
22   Q.  And you.  Okay.  So what came up during that meeting
23   with -- I'm sorry.  Let me make sure I got the date right.
24            Was that the September 16th meeting or was that the
25   June 16th meeting?
```

1    A.  It was -- it was discussed in both, in both instances, but

2    the first time was June.

3    Q.  Okay.  So why don't you start with the June meeting.  What

4    was the discussion during the June 16, 2014 meeting about your

5    tenure clock?

6    A.  So in this first meeting, it was suggested that in addition

7    to making a plan from -- to protect me from the retaliation and

8    to protect my work, I would get as a remedy an additional year

9    on the tenure clock.

10   Q.  Was that your idea?

11   A.  It was Suzanne Goldberg's idea.

12   Q.  And what did you think of that idea, that your tenure clock

13   be extended?

14   A.  I thought it was -- I thought it was a good idea.  I had

15   spent a lot of emotional and physical time with resources to

16   deal with this, and I just wanted to get more time to get a

17   fair chance.

18   Q.  What did Dean Hubbard say in response to the suggestion of

19   you receiving additional time on your tenure clock?

20   A.  He said -- he said that it was not up to him, it was up to

21   the provost, but that he would ask.

22   Q.  So according to the typical tenure schedule at Columbia

23   Business School, you would have been approached about going up

24   for tenure in spring 2015?

25   A.  So the typical -- what typically happens is that tenure

1    track professors get one year or one semester of leave

2    automatically, and they get -- by doing this, they get an

3    additional year on the tenure clock.  I cannot think of anyone

4    that didn't take this additional year.  So when I visited the

5    New York Fed in 2012, that was my additional year.  So this is

6    why, if you count, 2014-15 is the sixth year of my tenure

7    clock.  I start in July 2008, and the sixth year would be 2014.

8    Sixth year.

9    Q.  Thank you for explaining that.

10             So the person who typically approaches the junior

11   faculty about starting the process is the division chair?

12   A.  Yes.

13   Q.  And is that what happened with you in the spring of 2015?

14   Were you approached by your division chair to start your tenure

15   process?

16   A.  No.  He talked to me, but he said that my tenure process

17   would be delayed.

18             MS. HARWIN:  Brian, can you bring up Plaintiff's

19   Exhibit 105.

20             And I move for its admission.  That's one to which

21   there is no objection.  We talked about it this morning.

22             THE COURT:  All right.  So it will be admitted.

23             (Plaintiff's Exhibit 105 received in evidence)

24             MS. HARWIN:  Thank you, your Honor.

25   Q.  Professor Ravina, do you recognize this document?

1                    MS. PLEVAN:  Could we look at it.

2       A.  Do I respond?

3                    THE COURT:  Just wait one minute.  Thanks.

4       BY MS. HARWIN:

5       Q.  All right.  Professor Ravina, do you recognize this

6       document?

7       A.  Yes.  It's my 2015 year-end letter.

8       Q.  And who sent you this letter?

9       A.  Dean Hubbard.

10      Q.  Please look at the second-to-last paragraph on the second

11      page.

12                   JUROR:  It's not on our screen.

13                   MS. HARWIN:  Brian, can you bring that up for the

14      jurors.  Can everyone see it now?

15                   JUROR:  Not yet.

16                   MS. HARWIN:  Okay.

17                   THE COURT:  Can everybody see?  Not yet?  Okay.

18                   MS. HARWIN:  Okay.  It seems like we're having an

19      issue with the court's system on the document.

20                   THE COURT:  Okay.  Do you want to use the Elmo?  Or do

21      we not have a screen?

22                   (Discussion off the record)

23      BY MS. HARWIN:

24      Q.  Professor Ravina, we were talking about the June 1, 2015

25      letter that you received from Dean Hubbard.

1   A.  Yes.

2   Q.  Turning to this paragraph, I'd like to call your attention

3   to the content here, and I'll read it aloud and then ask you a

4   question.

5          It says, "In past years your senior colleagues have

6   provided with you formal feedback on your work to date and an

7   outline of what's needed to achieve tenure at Columbia.  I join

8   them in their assessment that your publication --"

9               THE COURT:  Slow down.

10              MS. HARWIN:  Thank you, your Honor.

11              THE COURT:  Thank you.

12  Q.  "I join them in their assessment that your publication is

13  not currently on track for promotion or tenure at Columbia."

14         Let me ask a question about this part first.  Is that

15  consistent with the annual reviews that you had received in the

16  year 2014 as well?

17  A.  Yes.

18  Q.  And let me turn to the next part.

19              MS. HARWIN:  And Brian, if you could highlight for me.

20  Q.  It says, "I hope that your upcoming leave is productive for

21  you and that you will let me know what the school can do to

22  help support you in bringing your work to publication and

23  planning for your future career."

24         Let me ask you, what did you understand that sentence

25  to mean?

1   A.  I understood it to refer to a leave for -- I had a leave

2   coming up, and when people are on leave, their tenure -- the

3   clock is stopped, so my -- I wouldn't have a tenure review in

4   that year, in the upcoming year.

5   Q.  Let's just stick with the upcoming leave.  When you use the

6   term "leave," can you explain what that term means.

7   A.  A leave is an interruption of your service, and your --

8   Q.  I'm sorry.  Let me ask a clearer question on that.  Do you

9   mean a leave of absence?  Is that what that term means?

10  A.  Yeah, so a leave is a leave of absence.  A leave of

11  absence, there are some rules for a leave of absence, and --

12  Q.  And Professor Ravina, we're going to get to those rules, so

13  let me wait on that part.

14      So when you look -- let me restart that question.

15  Looking at this letter, when this referred to an upcoming

16  leave, what was your understanding as to what your employment

17  status would be in the 2015-2016 academic year, the year

18  immediately after this letter?

19  A.  I understood that I would be an assistant professor of

20  finance and economics at Columbia, and my clock, tenure clock

21  would be stopped for the -- for that year.

22  Q.  And let me turn to the next sentence.

23      MS. HARWIN:  And Brian, if you could continue

24  highlighting.  It says -- you can keep that highlight up as

25  well.

I7b1rav1                          Ravina - Direct

```
 1   Q.  "As you are aware, your annual review is currently on hold
 2   pending the conclusion of external conversations regarding your
 3   tenure clock."
 4         When Dean Hubbard referenced external conversations,
 5   what did you understand that to mean?
 6   A.  Conversations between the lawyers -- my lawyer and the
 7   university lawyer and Professor Bekaert's lawyer.
 8   Q.  And the external conversations that were ongoing between
 9   the lawyers included discussions regarding your tenure clock,
10   is that correct?
11   A.  Yes, it did.
12         THE COURT:  We're otherwise going to stay out of
13   lawyer discussions.
14         MS. HARWIN:  That's correct.
15         THE COURT:  That's pursuant to the rules of evidence.
16   Q.  In what ways would having a leave be helpful for you?
17   A.  A leave would be a partial alleviation of what's going on.
18   A leave would give me more time to work on the research.  Of
19   course a leave was not enough because we also needed -- I also
20   needed the retaliation and the harassment from Professor
21   Bekaert to stop.
22   Q.  Let me go back to that.  You said it would be a partial
23   alleviation and that you needed the retaliation and harassment
24   to stop.  So let's step back to the ways in which a leave would
25   be helpful.
```

A.  So a leave is time that is taken off your clock, so we stop

the clock, it stops ticking, and you catch up with the work

that you were prevented from doing earlier on.  So this is why

a leave is a partial remediation.  It's helpful.

Q.  When you say it was a partial alleviation, can you explain

why that would only be a partial response.

A.  So if you stop the clock, that's good.  The clock stops

ticking.  However, if during the time the clock is stopped the

retaliation continues, your papers are stalled, Professor

Bekaert does not agree to push the papers forward -- and this

is what the company said, we need the agreement of everybody --

then there is no point in getting extra time.  That extra time

will be continued, will go in the same way that it went before.

You have just some extra time in which you're harassed and

retaliated against.  So it was good that I had extra time, but

that was not really the solution.  I wasn't there to get extra

time or tenure per se.  I wanted to stop the retaliation and I

wanted to be protected while I was catching up with the work

that was prevented.

          THE COURT:  Why didn't you ask for another mentor at

that stage?

          THE WITNESS:  I -- okay.  So I did early on already.

So in June 2014, one of the things that I asked Dean Hubbard is

to change my mentor.  And he said yes.  And Patrick Bolton

became my mentor.  And then later on, in September 2016, we

1    discussed the mentor issue again, because in the meantime, I

2    had discovered that actually the department was not assigning

3    mentors.  I was the only one having a mentor.  Dean Hubbard

4    thought I had a mentor, I thought I had a mentor.  But

5    Professor Bekaert had represented himself as my mentor.  But no

6    other junior had a mentor.  There were no mentors.

7    BY MS. HARWIN:

8    Q.  So Professor Ravina, I'll ask you a follow-up about that.

9           You testified before that Professor Bekaert had told

10   you during your 2012 evaluation that he had been assigned as

11   your mentor.

12   A.  Yes.  Assigned as my mentor by the department.

13   Q.  And who was it who communicated to you that that statement

14   wasn't true?

15   A.  So I realized by chance.  During August 2014, I was talking

16   with another junior colleague, another tenure track, and he was

17   having an issue, and so I told him, well, who is your mentor?

18   Why don't you ask your mentor?  And he was like, well, my

19   teaching mentor?  And I was like, no, no, not the teaching

20   mentor; the research mentor.  And he goes like, I don't have a

21   mentor.  And then I thought, well, it is only in his second

22   year, maybe they forgot.  So I asked my colleague Andrew --

23           MR. HERNSTADT:  Objection, your Honor.  This is all

24   hearsay.

25           THE COURT:  Sustained.

1          Don't say what other people said to you.  We are just

2    working pursuant to the rules of evidence.  So please proceed.

3    A.  So I tried to find out if other people had mentors.  I

4    tried to find out if maybe only women have mentors.  Nobody had

5    a mentor.  They say, well, we would like a mentor --

6          MR. HERNSTADT:  Objection.

7    A.  Sorry.

8          I realized that no one else had a mentor.

9          THE COURT:  All right.  You can proceed.

10   Q.  So Professor Bekaert characterized himself to you as your

11   mentor?

12   A.  Yes, he did.

13   Q.  Was that something that he did often?

14   A.  Yeah.  He repeatedly said he was my mentor, and he told me

15   I was in trouble, he was my mentor -- we discussed yesterday

16   that at some point he threatened not to be my mentor anymore.

17   So this was a recurring conversation.

18   Q.  We just talked before about your June 1, 2015 letter from

19   Dean Hubbard and your ongoing concerns about Professor Bekaert.

20   After receiving that letter from Dean Hubbard, were you able to

21   resolve your concerns about Professor Bekaert?

22   A.  No.

23         MS. HARWIN:  Your Honor, the next exhibit is one that

24   we discussed previously, and I'm waiting on something from

25   Mr. Hernstadt.

I7b1rav1                    Ravina - Direct

 1                 THE COURT:  Do you want to talk amongst yourselves.

 2     Or you can show parts of it to the jury and not the rest and

 3     sort out the details later.

 4                 (Discussion off the record)

 5                 (Continued on next page)

1            (At sidebar)

2            MR. HERNSTADT:  Your Honor, I did an edit of the

3     letter.  This letter says:  This is a proposal to involve

4     outside consultants in the negotiations.  Unfortunately, as I

5     described below Geert's responses to the agreement that my

6     legal counsel presented to his lawyer makes clear that he is

7     not serious about trying to settle.

8            MS. HARWIN:  We will consent to these redactions on

9     this first page.  I don't think that is something the Court

10    needs to rule on.  We will consent to the redactions up to

11    here.  Additionally, we will consent to this redaction.

12            So, can you give me the print copy and I can just show

13    the judge what the issues that are in dispute, which is, she

14    says there has already a solution, one that the school has

15    championed that has taken three months of my time and energy on

16    an agreement on the papers negotiated by the lawyers.

17            THE COURT:  You shouldn't have that in if it's about

18    papers negotiated by the lawyers.

19            MS. HARWIN:  It is about the school's proposed

20    solution.

21            THE COURT:  Pursuant to the lawyers' agreement, so I

22    wouldn't include that.

23            MS. HARWIN:  This is just a generic sentence.  The

24    next sentence can be redacted.

25            MR. HERNSTADT:  You and I are operating in good faith.

1   Geert is not.  Thus bringing it external will only make the

2   process longer.

3            That implies it's longer because someone is not

4   operating in good faith.

5            THE COURT:  I don't think you need that.

6            MS. HARWIN:  This sentence, this paragraph we're fine

7   redacting.

8            THE COURT:  Does anyone want in the "good faith" part?

9            OK.  No.  You will take it out on consent.

10           MS. HARWIN:  And then here is where you're getting to

11  protected activity, which is stated, go through one more

12  iteration, considering the negotiations failed, I don't see any

13  alternative at this point.  If Geert has a reasonable

14  response --

15           This is where she's discussing going to litigation.

16           MR. HERNSTADT:  What she's discussing is we have

17  told --

18           THE COURT:  Who is this to?

19           MS. HARWIN:  Stephen Zeldes, her division chair at

20  Columbia.

21           MR. HERNSTADT:  She says here, It's been three months.

22  What he sent back -- that is the draft -- we have told Geert

23  we'll go through one more iteration of the agreement while I

24  investigate all my options.  It is his response to the last

25  draft, and then she talks about what is in the last draft.

I7bnhar2                        Ravina - Direct

1    This whole paragraph is about --

2              MS. HARWIN:  That sentence, the last two sentences of

3    that paragraph can be redacted.  But the imminence of bringing

4    suit, that is critical.  The jury needs to be able to see this

5    protected activity.  So that first sentence -- this next

6    paragraph, this is her asking for information without the

7    university's response.

8              MR. HERNSTADT:  This is the petition, this paragraph.

9    What would you propose that would allow in protected activity,

10   but not allow in negotiations?  This paragraph, the first

11   paragraph is entirely about negotiations.  It goes to the last

12   draft.  He says he wants to give up nothing, preserve rights to

13   prevent -- that is the negotiation.

14             I don't see any alternative.  We have an impasse on

15   these basic issues.  That is about the negotiations.

16             If he has a reasonable response, that is about the

17   negotiations.

18             THE COURT:  I think that's right.  It is all about the

19   negotiations.

20             MR. HERNSTADT:  This sentence here is about the

21   petition.  It should be out at least for now.

22             MS. HARWIN:  This is very general language.  It is not

23   talking about the negotiations.

24             THE COURT:  It is clear it is about the negotiations.

25   It is entirely clear that it is about settlement discussions.

I7bnhar2                        Ravina - Direct

1              MS. HARWIN:  The fact of ongoing settlement

2     discussions is not confidential.  It is the information within

3     it regarding settlement offers.  Columbia on its opening

4     brought up settlement negotiations between counsel.  The fact

5     that there are discussions ongoing is --

6              THE COURT:  But I don't understand what you are losing

7     by taking out the back and forth about the particular

8     negotiations, but including in the communication.

9              MS. HARWIN:  We only want to include the parts that

10    are -- so what we propose is that first sentence where she

11    talks about investigating her options, this next paragraph

12    where she talks about going to court and public -- I mean, we

13    are not saying this next sentence or the sentence after that

14    about her view about his settlement position -- here, your

15    Honor.  Let me give you a clean one.

16             THE COURT:  This is OK.

17             MR. HERNSTADT:  That first sentence is directly about

18    the negotiations.  Unless the plaintiff is saying that I should

19    then bring in the contracts and show the changes that she made

20    and all the new terms that she added in.

21             MS. HARWIN:  We have no interest in introducing any of

22    the details at all.

23             THE COURT:  I will allow in this one clause, I will

24    investigate all my options.

25             MS. HARWIN:  How about, Given it has been three

I7bnhar2                          Ravina - Direct

1    months?

2              MR. HERNSTADT:  No.

3              THE COURT:  Is the three months the three months of

4    negotiations?

5              MR. HERNSTADT:  Yes.

6              THE COURT:  No.  If you want to say I will investigate

7    all my options, I will allow in that phrase.

8              MR. HERNSTADT:  This was marked.  Do you want to see a

9    clean one?

10             THE COURT:  No.  That's OK.

11             MR. HERNSTADT:  OK.

12             THE COURT:  I think it's fine to say, In the meantime,

13   please inform me of the internal process for grievance and

14   conflict resolution.  I am sorry it has come to this point in

15   your efforts to solve this.

16             I mean, it's clear that she's going to investigate all

17   of her options.

18             MS. HARWIN:  We need this part.

19             THE COURT:  What?

20             MS. HARWIN:  We need where she talks about going to

21   Court.

22             THE COURT:  I think that's clear:  I'm sorry that it

23   has come to this point and your efforts to solve this amicably

24   have been so far unsuccessful.

25             MS. HARWIN:  I don't think that that will be clear to

I7bnhar2                          Ravina - Direct

1    the jury unless you want a stipulation or instruction stating

2    clearly that the redacted material talks about going to court.

3              THE COURT:  I think in saying I remain willing to give

4    up the right to go to Court and public, that's part of the

5    negotiation, right?

6              Do you want to talk?

7              MR. McKNIGHT:  Just for a moment.

8              It seems like we have more redaction than nonredaction

9    on the document, so what I was going to suggest is perhaps we

10   do a stipulation as to the parts that you say are acceptable

11   and create a stipulation.  Rather than giving a complete

12   blacked out, saying there was a communication on that date and

13   make it clean.

14             THE COURT:  That is fine.  Why don't you do that now.

15             It is early for a break.  Is there anything else you

16   can do and then take the break, or not really?

17             MS. HARWIN:  This really does --

18             (In open court)

19             THE COURT:  Ladies and gentlemen, we are going to take

20   a break.  I'm sorry it's so early, but we don't want to keep

21   you here sitting.  You will be more comfortable.

22             Why don't we take a short break, we will resolve this

23   small legal issue, and we'll come back and proceed.

24             (At sidebar)

25             Just let me know when you're ready.

I7bnhar2                          Ravina - Direct

```
1              (Jury not present)

2              (Recess)

3              (In open court)

4              THE COURT:  We have one remaining dispute regarding

5    the stipulation?

6              MS. HARWIN:  We are able to agree to use the document

7    and have agreed largely on almost all the redactions.  There

8    are two items which are yellow highlighted items that are

9    disputed.

10             MR. HERNSTADT:  Your Honor, the second --

11             THE COURT:  I don't think the faculty petition should

12   come in.

13             MS. HARWIN:  Your Honor, she is asking for information

14   about the status of a request to implement a policy that would

15   help her.  I mean, I don't see how her requesting --

16             THE COURT:  This is about the policy generally,

17   correct?

18             MS. HARWIN:  It was a policy that Division Chair

19   Zeldes testified was designed to help her progress in the

20   research.  It was a petition to establish a policy with the

21   idea that it would help her.  She's inquiring as to the status

22   of it.

23             THE COURT:  Ms. Plevan, did you want to respond?

24             MS. PLEVAN:  I'm sorry.  I had stepped away.  Which

25   exhibit?  There are three exhibits.
```

1          THE COURT:  We are talking about the petition.

2          MS. PLEVAN:  Right.

3          MS. HARWIN:  We are talking about the portion of this

4     that references that first petition.

5          MS. PLEVAN:  We got a letter late last night with

6     their position.  We would like to submit a letter overall, but

7     we certainly continue to object to the submission of the

8     petitions on hearsay and relevance and prejudice.

9          THE COURT:  My understanding is that that particular

10    petition was relevant to a policy more generally and not

11    specifically as to what was going to happen to her.

12         MS. PLEVAN:  Correct.

13         MS. HARWIN:  There was testimony from Division Chair

14    Zeldes that the petition was designed to help her --

15         MS. PLEVAN:  It was --

16         THE COURT:  One at a time please.

17         MS. HARWIN:  It was for the implementation of a

18    general policy, which would have a presumption as to the status

19    of data in the event of a dispute.  But the motivation for the

20    petition was to address Professor Ravina's situation, and if

21    that petition had been -- or if the policy they requested had

22    been implemented, it would have resolved it.

23         THE COURT:  Is there a way to address it in a

24    stipulation or otherwise so it addresses the policy and not the

25    faculty petition?  I don't mind her inquiring as to whether the

I7bnhar2                        Ravina - Direct

1    policy was being changed and whether it was going to help her.

2    What I don't want is the reference to the hearsay regarding the

3    petition of other professors.

4              MS. PLEVAN:  Which is not signed either.  Just to

5    further emphasize this is a petition supposedly that was

6    prepared to go to the executive committee, which is the

7    faculty.

8              Their argument was that it was notice, and it got

9    somehow rejected by Columbia.  But the executive committee is

10   the faculty representatives of the faculty of the business

11   school.  It is not the administration.  So I am just making

12   that point now too for all the petitions being irrelevant.

13             THE COURT:  I don't think the petition of the faculty

14   should come in.  I think it's hearsay what other people were

15   requesting.  If you want to stipulate or if there is a way to

16   redact this so she's asking about if the policy is going to be

17   implemented, that's fine.  I don't want the references to the

18   faculty petition.

19             MS. HARWIN:  Your Honor, that's the term that was used

20   to describe it.  I was a petition to implement a policy.

21   There's no hearsay here.  It is simply asking what happened to

22   it.

23             THE COURT:  But it is a reference, I think it is a

24   clear reference to hearsay.  I mean, when she is saying I

25   understand that the senior faculty submitted to the executive

1    committee this petition, that is a clear reference to something

2    others submitted requesting action.

3        MS. HARWIN:  There's no dispute that it was submitted.

4    The fact of its submission is something that has been testified

5    to.  There is no dispute about that.

6        MS. PLEVAN:  There is an e-mail circulating it to some

7    people, so I don't know --

8        THE COURT:  Look, I don't think this reference should

9    come in.  If she wants to testify that that she understood that

10   there was discussion about a policy change, if she wants to

11   testify about a request to find out the status of the policy,

12   that's fine.  But I don't want her referencing what other

13   professors were petitioning.

14        OK.  What is the next dispute?

15        MS. HARWIN:  Your Honor, would it be acceptable to say

16   in the meantime, Please advise me what happened to the

17   petition, and delete the words, that I understand the senior

18   faculty and the department, so it just says the petition

19   submitted to the executive committee?  I would be grateful if

20   you could update me on the status of this petition.

21        MS. PLEVAN:  That is not what it is.  So again the use

22   of the word "petition" I think is not accurate description.

23        MS. HARWIN:  That's the way it was described

24   internally.  That's the term she used.

25        THE COURT:  I think it's fine to get the fact that

```
 1   there was a petition.  What I don't want getting out is that it
 2   was other faculty making this petition.  That is what I don't
 3   want, because that is hearsay, and I think this is a clear
 4   reference to try to get in that hearsay.
 5           I don't have a problem referring to it as a petition.
 6   If she's going to explain that there was an effort, without
 7   saying what other faculty members were saying or doing, there
 8   was an effort to change this policy, then I don't mind the
 9   reference to the petition.  OK.
10           MS. HARWIN:  Thank you.
11           THE COURT:  There was one more dispute as I understand
12   it.
13           MS. HARWIN:  I believe the only issue was that.  I
14   don't see any alternative at this point.
15           THE COURT:  All right.
16           MS. PLEVAN:  Also, I don't think the witness has
17   personal knowledge of what other professors were writing.
18           THE COURT:  That's why I don't want to get into what
19   the other professors were writing.  But this is from her
20   referencing the status of this petition, so if she wants to
21   talk about the petition, which she understood to be an effort
22   to change a policy, that's fine.  I just don't want her talking
23   about what other professors were doing.
24           MS. HARWIN:  Yes.
25           THE COURT:  That's just pursuant to the rules of
```

I7bnhar2                          Ravina - Direct

1    evidence, Professor, is what he what we call hearsay.  That's

2    why I'm not admitting that reference in.

3              Can we bring the jury in?

4              MS. HARWIN:  Right.

5              So, your Honor, we will just redact that, that I

6    understand the senior faculty and the department part so

7    that --

8              THE COURT:  That's fine.

9              MS. HARWIN:  Thank you, your Honor.

10             MR. McKNIGHT:  Didn't you object to that other

11   sentence?

12             THE COURT:  Would you bring a mic closer, please.

13             MR. McKNIGHT:  I'm sorry.  I thought there was still a

14   dispute about "I don't see an alternative at this point."

15             I want to make sure we got that cleared up.

16             Was there some dispute about that?

17             MR. HERNSTADT:  I don't see any alternative at this

18   point is the opening of a paragraph that talks about the

19   negotiations between the parties.  Standing alone, it doesn't

20   make any sense.  Because the alternative that's being referred

21   to is the alternative of, you know, negotiating.

22             THE COURT:  Sorry.  Could you highlight that, please.

23             MS. HARWIN:  It is the first highlight on that page.

24             MR. HERNSTADT:  It is the first highlight.  It says,

25   "I don't see any alternative at this point:  We hit an impasse

1    on numerous basic issues."

2              THE COURT:  I think you can take out the colon I think

3    that is the way it's left -- you can tell me if this is

4    misleading -- it says, "I will investigate all my options.  I

5    don't see any alternatives at this point."

6              That really seems to reference back to the prior

7    sentence, which is, "I will investigate all my options."

8              If you take out the colon, it doesn't suggest that

9    there's more coming.

10             MR. HERNSTADT:  Your Honor, you're correct, but that

11   is not how it reads in the letter.  In other words, it's

12   importing a new meaning that isn't in the letter, but the

13   letter goes on, "If Geert has a reasonable response that

14   protects my work and well-being, I remain willing to give up

15   the" -- etc.

16             It is all about negotiation.  It's importing a

17   different meaning than it actually has in the letter, and I

18   don't think that is appropriate.

19             MS. HARWIN:  It's about going to court.  It's about

20   the possibility of going to court imminently.

21             We had requested and the Court denied some additional

22   content here to mention the part about the right to go to Court

23   and public.  One alternative, if that would be helpful, would

24   be, "I don't see any alternative at this point" and then just

25   include the language about the right to go to court and public,

I7bnhar2                         Ravina - Direct

1   because that provides context.

2           if there is additional context there that would be

3   helpful, we're fine with that.  But I think the repetition of

4   this language, "I will investigate my options, I don't see any

5   alternative, I cannot wait any longer," is significant.  And I

6   think it is clear in the full context when you have all of

7   those pieces.

8           MR. HERNSTADT:  Your Honor, the first sentence says,

9   "I don't see an alternative, we hit an impasse on basic

10  issues."

11          The second sentence is about a reasonable response

12  from Professor Bekaert.

13          And the third sentence is he should propose it.

14          It is clearly about negotiation.

15          The phrase in and of itself is not necessarily

16  objectionable.  It just doesn't mean what the jury will most

17  likely interpret it to mean in this letter, and I think that's

18  imposing a new meaning on it and isn't right.

19          MS. HARWIN:  The alternative is going to court and

20  going public.  That's what she says.  The context for that is

21  that there is an impasse and a perception of bad faith.

22          THE COURT:  I do think that "I don't see any

23  alternative at this point," I think it's misleading just on its

24  own.  So I would take that out.  But I do have a question as to

25  whether she can testify about statements that she made about an

1     effort to go to Court.

2            MS. HARWIN:  Your Honor, my concern is that testimony

3     about her statements, this is an e-mail that is subsequently

4     forwarded to other administrators, so taking out content from

5     the written document and relying on testimony about statements

6     doesn't really convey --

7            THE COURT:  It's clearly all of the back and forth

8     that the lawyers engaged in.  That's what she's referring to

9     here.  I also don't think that "I don't see any alternative at

10    this point" adds anything if you don't have the following

11    language, so I think saying, "I will investigate all of my

12    options," and then she can elaborate on that I think is

13    sufficient.

14           Why don't we do that.  Why don't we take out that

15    line.  We'll leave in the reference to the petition, and we'll

16    bring the jury in.  OK.

17           MS. HARWIN:  Thank you.

18           THE COURT:  Professor, you can come back to the stand.

19    Thank you.

20           MR. McKNIGHT:  Your Honor, the technician said he

21    needed a couple of minutes in order to make the redactions.

22           THE COURT:  OK.  We can still bring them in.

23           we can bring the jury in.

24           Thanks.

25           MS. HARWIN:  Your Honor, we won't have a hard copy to

I7bnhar2                    Ravina - Direct

1   pass up, but we will display on screen, and we'll print copies

2   later.

3            THE COURT:  That's fine.

4         (Continued on next page)

1               (Jury present)

2               THE COURT:  Thank you all for your patience.

3               Everyone can be seated.

4               You may proceed.  I am not sure if we're ready on the

5       tech.

6               MS. HARWIN:  Brian, before you bring it up, I am going

7       to go back to another exhibit.  Just let us know when you're

8       ready and then we can proceed.

9               You're ready.

10              Brian, can you bring up Plaintiff's Exhibit 99.

11              THE COURT:  I am just going to remind you to speak up

12      a little.  Thank you.

13              MS. HARWIN:  Yes.  Thank you, your Honor.

14              Plaintiff's Exhibit 99 is already in evidence.

15      BY MS. HARWIN:

16      Q.  Professor Ravina, can you take a look at the first page,

17      the bottom of the page.

18              When did you write this e-mail to Suzanne Goldberg?

19              MS. HARWIN:  Is this up on everyone's screen?

20              JURORS:  Not yet.

21              MS. HARWIN:  OK.

22              THE COURT:  Why don't you provide a little bit of

23      context for Professor Goldberg.

24              Who is Professor Goldberg?

25              She wasn't at the business school, is that right?

I7bnhar2                     Ravina - Direct

1          THE WITNESS:  No.  Professor Goldberg is a law

2    professor in the law school at Columbia, and her expertise is

3    gender and law.

4    BY MS. HARWIN:

5    Q.  Did Suzanne Goldberg subsequently take on an additional

6    position at the university, at Columbia?

7    A.  Yes.  Shortly before this e-mail, she became the executive

8    vice president for university life.  This is a role that

9    addresses the life of students.  There was a movement, there

10   was rape on campus, there were a lot of issues, and I believe

11   she took on this position in response to those.

12          MS. HARWIN:  Is that e-mail ready?

13          JURORS:  Yes.

14          MS. HARWIN:  OK.

15   BY MS. HARWIN:

16   Q.  Let me turn to the seventh page of that e-mail.

17          Professor Ravina, turning your attention to the top of

18   that e-mail, the e-mail from Suzanne Goldberg to you on January

19   22, 2015, at 6:01 p.m., what did Vice President Goldberg tell

20   you about her role and junior faculty life?

21   A.  She told me that her role, executive vice president --

22          MS. PLEVAN:  Objection, your Honor.

23          THE WITNESS:  I understood --

24          THE COURT:  Sustained.

25   BY MS. HARWIN:

1   Q.  Did you receive the e-mail from Professor Goldberg in which

2   she wrote, "I am sure this new EVP, me will have in mind issues

3   that are important to junior faculty life as well"?

4   A.  Yes.

5   Q.  OK.  Did you subsequently send an e-mail to Vice President

6   Goldberg in response?

7   A.  Yes.

8   Q.  And turning your attention to page 1 of this e-mail, can

9   you read the first sentence of your e-mail.

10  A.  "Well, I'm desperate."

11  Q.  And when you wrote this on January 28, 2015, can you

12  describe generally what was making you feel desperate?

13  A.  It was January 2015.  I had been harassed since 2013.  I

14  had reported this to the university in May 2014, and no

15  measures had been taken.  Nothing was happening.  I was just --

16  there was indifference toward me.  My situation was moved from

17  one desk to another.  There was no solution, and I wasn't

18  seeing the end of the tunnel.

19          So I tried to appeal to Suzanne Goldberg to see if she

20  could be addressing my problem in addition to student life.

21  Q.  And turning your attention to page 6, do you see --

22          THE COURT:  Just to be clear, folks, this is being

23  admitted not for the truth of what's contained in the e-mail,

24  but for the fact that it was said and to whom it was said.

25  BY MS. HARWIN:

1    Q.  In your e-mail at the end of it on page 6, do you see where

2    you wrote, "At this time I need the harassment and retaliation

3    to stop and to be able to return to do research effectively and

4    immediately"?

5             How did Suzanne Goldberg respond to your e-mail?

6    A.  She didn't want to get involved.

7    Q.  And where is her response?

8    A.  So, it is on the top of page 1, where it says, "Enrichetta,

9    I'm sorry to hear that this continues to be so difficult.  I'm

10   really not able to advise anymore."

11   Q.  Thank you.

12            MS. PLEVAN:  Can you finish the sentence, please.

13            MS. HARWIN:  I have a follow-up question.

14   BY MS. HARWIN:

15   Q.  What was your understanding as to why Vice President

16   Goldberg would not get involved at this point?

17            MR. HERNSTADT:  Objection.

18            MS. PLEVAN:  Objection.

19            THE COURT:  Sustained.

20   BY MS. HARWIN:

21   Q.  What had changed in your relationship with Professor

22   Goldberg since she had joined you in initial meetings going to

23   this time when she sent that e-mail on February 1, 2015?

24   A.  So, early on, Professor Goldberg was a law professor in the

25   law school.  But now she became an administrator.  She was part

I7bnhar2                          Ravina - Direct

1     of the administration of the university overall as executive

2     vice president.

3     Q.  I would like to turn now to Plaintiff's Exhibit 258.

4     Professor Ravina, do you recognize this document?

5     A.  Yes.

6     Q.  And what is this document?

7     A.  It is an e-mail that I sent to the chair of the department,

8     Stephen Zeldes, on August 21, 2015.

9     Q.  Has some of the content of this e-mail been redacted?

10    A.  Yes, the blank part.

11    Q.  The white part?

12    A.  The white part following "Hi Steve," and later on also.

13    Q.  Please take a look at the top of page 3 of this document.

14           Can you read aloud what you wrote to Division Chair

15    Zeldes.

16    A.  "I will investigate all my options."

17    Q.  When you wrote to Division Chair Zeldes, "I will

18    investigate all my options," what were you referring to when

19    you sent this on August 21, 2015?

20    A.  I was ready to bring a suit to sue Columbia and Professor

21    Bekaert.

22    Q.  Turning your attention to the bottom of that e-mail, you

23    said, "I cannot wait any longer on the resolution of this

24    issue.  The personal and" --

25           THE COURT:  Just to be clear, 258C will be admitted in

I7bnhar2                        Ravina - Direct

1   its present form.

2                  MS. HARWIN:  Thank you, your Honor.

3                  THE COURT:  Thank you.

4                  (Plaintiff's Exhibit 258C received in evidence)

5   BY MS. HARWIN:

6   Q.  You write, "I cannot wait any longer on the resolution of

7   this issue" --

8                  THE COURT:  Speak up please.  Thank you.

9                  MS. HARWIN:  Thank you.

10  Q.  "The personal and professional costs of these continuous

11  delays for me are enormous."

12              After you wrote this, were you able to resolve your

13  concerns about Professor Bekaert and Columbia?

14  A.  No.

15  Q.  After sending this e-mail referring to taking legal action,

16  did you take any legal action?

17  A.  I did.

18  Q.  What legal action, if any, did you take concerning

19  Professor Bekaert?

20  A.  On September 23 -- around September 23, 2015, I filed a

21  lawsuit against Professor Bekaert in state court.

22  Q.  Did you take any legal steps with respect to Columbia?

23  A.  I didn't sue them immediately, but I entered into an

24  agreement to preserve my right to sue later on.

25  Q.  After you took these steps, what did Columbia do?

1   A.   They revoked my leave.

2   Q.   What do you mean when you say that Columbia revoked your

3   leave?

4   A.   They told me that the letter that I got from Dean Hubbard

5   on letterhead and signed was a mistake.

6   Q.   Who in the Columbia administration communicated to you that

7   the signed letter from Dean Hubbard was a mistake?

8   A.   It was Senior Vice Dean Phillips.

9   Q.   And in what way did she communicate this to you?

10   A.   She left me a voice mail on my office phone.

11   Q.   I would like to play that voice mail, which is Defendant's

12   Exhibit LW, which I understand has no objection.

13                THE COURT:   Is there any objection to LW?

14                MS. PLEVAN:   No objection.

15                THE COURT:   All right.

16                It will be admitted.

17                (Defendants' Exhibit LW received in evidence)

18                MS. HARWIN:   Brian, can you play LW.

19                (Audio played)

20   BY MS. HARWIN:

21   Q.   Had any of your previous annual letters from Dean Hubbard

22   ever been deemed a mistake?

23   A.   No.

24                THE COURT:   Could you bring the mic a little closer.

25                Thank you.

I7bnhar2                         Ravina - Direct

1    BY MS. HARWIN:

2    Q.  Did you understand this voice mail to be referring to the

3    year-end letter from Dean Hubbard of June 1, 2015?

4    A.  Yes.

5    Q.  What was your reaction to this message from Columbia that

6    the letter had been a mistake?

7    A.  I was incredulous.  This was an official letter prepared

8    and sent to me signed by the dean on letterhead saying that it

9    an upcoming leave.

10            How could it be a mistake?

11   Q.  After that, what did the Columbia Business School

12   administration communicate with you about the status of your

13   tenure process?

14   A.  After that I started to be in limbo.  It wasn't really

15   clear what was going on.

16   Q.  Did there come a time when the Columbia Business School

17   administration communicated with you about the start of your

18   tenure process?

19   A.  Yes.  In December, in mid-December, when the semester was

20   already over, I received a message from Division Chair Steve

21   Zeldes telling me that my tenure process would start

22   immediately.

23   Q.  When did he say that your tenure materials would be due?

24   A.  So my tenure process would proceed on what they defined a

25   compressed basis.  So my material would be due on January 19.

1    Q.  Was mid-December a typical time to be approached about the

2    start of a tenure process?

3    A.  No, it was not.

4    Q.  Was mid-January a typical deadline for a tenure application

5    deadline?

6              MS. PLEVAN:  Objection.

7              THE COURT:  As far as you know, based on what your

8    understanding was of the process.

9    A.  No, it was a compressed deadline.

10   Q.  How did you respond to Division Chair Zeldes' announcement

11   that your tenure timeline was starting?

12   A.  I told him that it was unfair and retaliatory.  It was

13   retaliation to bring me up for tenure on such a compressed,

14   expedited basis.  I asked him how could my colleagues evaluate

15   my body of work given the harassment, retaliation, and neglect

16   that Professor Bekaert and Columbia had been subjecting me for

17   years at that point.

18   Q.  Did you ever send any written communication to Division

19   Chair Zeldes expressing your views about Columbia's decision to

20   start your tenure process at that time?

21   A.  Yes.  I believe I sent him an e-mail about that.

22             MS. HARWIN:  Move to admit Plaintiff's Exhibit 120.

23             Your Honor, it is my understanding there is a

24   technical issue where there is an issue about publishing to the

25   jury.

I7bnhar2                          Ravina - Direct

1           THE COURT:  Can you just publish the part that is not

2     in dispute at this point?

3           MS. HARWIN:  I think your Honor already decided the

4     issue.

5           THE COURT:  OK.

6           MS. HARWIN:  I think it can be published to everyone

7     simultaneously, but insofar as there are documents that need to

8     be identified before publication to the jury, right now the

9     Court is experiencing some technical issues concerning that.

10          THE COURT:  OK.

11          MS. HARWIN:  But for this exhibit we can proceed.

12          THE COURT:  All right.  So 120 will be admitted.

13          (Plaintiff's Exhibit 120 received in evidence)

14    BY MS. HARWIN:

15    Q.  Turning your attention to the top e-mail sent on December

16    24, 2015, is this the e-mail that you sent to Division Chair

17    Zeldes?

18    A.  Yes, I believe so.

19    Q.  Had anything in your ongoing discussions with Columbia

20    happened before you got the message from Division Chair Zeldes

21    that you were going to be starting your tenure process at this

22    time?

23    A.  Yes.  A few days before this communication that my tenure

24    would start immediately, I told him that I had an intention to

25    bring suit against them.

I7bnhar2                        Ravina - Direct

1    Q.  How was that communicated?

2    A.  I believe it was communicated between the lawyers.

3              MS. PLEVAN:  Objection, your Honor.

4              Move to strike.

5              THE COURT:  Yes.  Let's not talk about what any

6    lawyers did, just again consistent with the rules of evidence.

7              So I am going to strike that last question and answer.

8    BY MS. HARWIN:

9    Q.  After Division Chair Zeldes communicated that your tenure

10   review would proceed on a compressed basis, did you take any

11   action concerning your tenure clock?

12   A.  Yes.  I made a formal application for a leave for personal

13   hardship.

14             MS. HARWIN:  Move to admit Plaintiff's Exhibit 245.

15             THE COURT:  Is there any objection to 245?

16             MS. PLEVAN:  I just want to make sure it's complete.

17   There needs to be a foundation, your Honor, because it is not

18   the complete document.

19             MS. HARWIN:  Can I lay the foundation, your Honor?

20             THE COURT:  Sure.

21             MS. HARWIN:  OK.

22   BY MS. HARWIN:

23   Q.  Professor Ravina, is this document Section 76 Columbia's

24   charters and statutes, the code of academic freedom and tenure

25   of Columbia?

1    A.  I'm sorry, but the monitor is not working.  I don't know

2    if --

3              MS. HARWIN:  Can we pass the exhibit to the witness.

4              THE DEPUTY CLERK:  Their screens are not working

5    either.

6    A.  I believe it is the charters and statutes.

7    Q.  Can you explain what the charters and statutes at Columbia

8    are?

9    A.  They are the rules regulating all the aspects of the life

10   in the university.

11   Q.  Was this policy in effect at the time you were applying for

12   your personal hardship leave?

13   A.  I believe so.

14   Q.  Can you turn to page 9 of this exhibit, which is Section

15   71F?

16   A.  Yes.

17   Q.  Is this where Columbia's policy talks about personal

18   hardship leaves?

19   A.  Yes.  I believe so.

20   Q.  I am going to turn your attention to paragraph 71F.

21              Do you see where it says, "The first year" --

22              MS. PLEVAN:  Objection, your Honor.

23              I don't think the document has been admitted into

24   evidence.

25              MS. HARWIN:  I'm sorry.

I7bnhar2                        Ravina - Direct

```
 1              THE COURT:  Are you disputing its authenticity?
 2              MS. PLEVAN:  No.
 3              THE COURT:  Can we supplement it later so that it's
 4     complete?
 5              MS. PLEVAN:  Yes.  Or it can be admitted as --
 6              THE COURT:  Do you have another copy that is a
 7     complete copy?
 8              MS. HARWIN:  Your Honor, we seek to admit it as an
 9     excerpt.  We are not representing this is the hundreds of pages
10     of university's internal guidelines.  This is the section.
11              THE COURT:  I am going to admit it on that basis.  But
12     I will also be open to the admission of the entire set of
13     charters and statutes.
14              (Plaintiff's Exhibit 245 received in evidence)
15     BY MS. HARWIN:
16     Q.  Professor Ravina, turning your attention to that paragraph,
17     71F, do you see where it says, "Except in the case of officers
18     of instruction with one year of full-time service in a
19     nonprofessorial rank, the first year of such leave or exemption
20     from teaching duties will not count as part of the maximum
21     number of years of service allowed for term appointments
22     provided above, Section 71B."
23     A.  Yes.
24     Q.  Can you summarize what you understood this sentence that I
25     just read aloud --
```

I7bnhar2                          Ravina - Direct

1           MS. PLEVAN:  Objection, your Honor.

2           THE COURT:  Objection --

3           You know what, why don't you just rephrase the

4    question as to her understanding of this.  Obviously the

5    document speaks for itself.

6           MS. HARWIN:  Sure.

7    BY MS. HARWIN:

8    Q.  Professor Ravina, turning to the sentence that I have just

9    read aloud and that's highlighted, can you explain what your

10   understanding is of what this means.

11   A.  The first year of leave that you ask will not count on your

12   tenure clock --

13   Q.  OK.

14   A.  -- automatically without further qualifications.

15   Q.  OK.  So the first year of leave automatically does not

16   count towards the tenure clock, is that correct?

17   A.  Correct.

18   Q.  OK.  Let's go on to the next sentence.

19           It says, "Subsequent periods of leave or exemption

20   from teaching duties shall formally count as part of the

21   maximum number of years allowed for term appointments."

22           It goes on to say -- and then I am going to ask you a

23   question -- "In cases of medical, maternity, or compulsory

24   military service leave, however, or for reasons of personal

25   hardship, the president, upon written request from the officer

1    of instruction and with the approval of his or her department

2    and the dean or vice president of his or her faculty, may rule

3    that the leave of absence is not to count for this purpose."

4              Can you explain what you understood this part of

5    Columbia's internal guidelines to mean?

6              MS. PLEVAN:  Objection, your Honor.

7              THE COURT:  Again, I am just going to allow in her

8    understanding of the guidelines.  The document speaks for

9    itself, and Columbia, of course, can call any other witness to

10   provide a different understanding or interpretation.  But I

11   will allow the plaintiff's interpretation.

12   A.  So this means that there is a set of circumstances,

13   medical, maternity, compulsory military service and personal

14   hardship, in which a subsequent leave will also stop the clock.

15             And this is upon the request of the officer of

16   instruction, which would be the professor, in this case me.

17   And it is upon approval of the president.  And it also needs to

18   come with the written approval of the department where the

19   professor works and the dean and vice president of the faculty

20   in this case, the dean of the business school.  If that's the

21   case, then such leave will also stop the clock.  So Columbia

22   can stop the clock if they want.

23   Q.  Did you apply for any kind of leave referenced in this

24   policy?

25   A.  Yes, I applied for a personal hardship leave.

1            MS. HARWIN:  Move to admit Plaintiff's Exhibit 121.

2            MS. PLEVAN:  No objection.

3            THE COURT:  121 will be admitted.

4            (Plaintiff's Exhibit 121 received in evidence)

5    BY MS. HARWIN:

6    Q.  Professor Ravina, can you explain what this document is.

7    A.  This is my application to the provost of Columbia

8    University for a personal hardship leave.

9    Q.  Did Columbia respond to your request for a personal

10   hardship leave?

11   A.  Yes, I got a response in January.

12           MS. HARWIN:  I move to admit Plaintiff's Exhibit 125.

13           THE COURT:  Any objection to 125?

14           MS. PLEVAN:  No.  No objection, your Honor.

15           THE COURT:  125 will be admitted.

16           (Plaintiff's Exhibit 125 received in evidence)

17   BY MS. HARWIN:

18   Q.  How did Columbia respond to your request for a personal

19   hardship leave?

20   A.  It was denied.

21   Q.  This is the letter that denied that --

22   A.  Yes.

23   Q.  -- is that correct?

24           MS. PLEVAN:  Objection, your Honor.

25           THE COURT:  Overruled.

1   A.   Yes, it is the letter that denied it.

2   Q.   Please look at the middle paragraph.

3          Do you see where the vice provost for faculty affairs,

4   Christopher Brown, writes, "As I understand has been previously

5   explained to you, you cannot continue in your current title and

6   be off the tenure clock.  Your title would need to be changed

7   to associate research scholar for you to be off the tenure

8   clock."

9          What was your reaction to that statement from Vice

10  Provost Brown?

11  A.   I felt this was in contrast with what we just read in the

12  statutes.  There were specific cases, and personal hardship was

13  among them, when people don't need to change their position and

14  go off the tenure clock.  They can just stop it for those

15  specific reasons.  So I didn't think this was accurate.

16  Q.   Please look at the third paragraph the first sentence.

17         It says, "Your letter does not provide any details

18  supporting the request for additional leave on the basis of

19  compelling personal need or personal hardship."

20         What was your reaction to that statement by the vice

21  provost?

22  A.   I was also incredulous about this.  I had been telling the

23  university about the sexual harassment, the retaliation, the

24  stalling from Professor Bekaert and the lack of reaction from

25  the administration since May 2014.  So they were aware of the

1   reasons behind the compelling personal circumstances that led

2   to my request for a personal hardship leave.

3        I had explained to them on numerous occasions where

4   the personal hardship came from, sexual harassment.  I told

5   them about the retaliation.  I told them about the effects that

6   this was having on my productivity, my life, about the

7   consequences for my reputation in the profession and for my

8   ability to work.

9        So I was surprised that he said that there was no

10  information about this.  Nevertheless, I responded to this

11  letter, providing again that information.

12  Q.  So, I want to get to your response, but before we do that,

13  I want to ask whether you received any other communications

14  from the Columbia administration about this proposal that you

15  take an associate research scholar position.

16  A.  Yes, I did.

17        MS. HARWIN:  Can we bring up Plaintiff's Exhibit 126.

18        I move to admit it, I believe with no objection.

19        MS. PLEVAN:  No objection.

20        THE COURT:  All right.

21  Q.  Professor Ravina, is this the communication that you

22  received?

23  A.  Yes.  It is dated January 22, 2016, and it is from the

24  senior vice dean Kathy Phillips.

25        THE COURT:  126 will be admitted.

I7bnhar2                        Ravina – Direct

1              (Plaintiff's Exhibit 126 received in evidence)

2              MS. HARWIN:  Thank you, your Honor.

3     BY MS. HARWIN:

4     Q.  What did Senior Vice Dean Phillips say about how taking the

5     position of an associate research scholar as Columbia proposed

6     would affect your tenure application deadline?

7              MS. PLEVAN:  Objection, your Honor.

8              If she wants to read the letter, that's fine.

9              THE COURT:  Do you want to point out certain parts of

10    the letter?

11             MS. HARWIN:  Sure.

12             THE COURT:  All right.  Thanks.

13             (Continued on next page)

I7b1rav3                          Ravina - Direct

BY MS. HARWIN:

Q.  Turning your attention to paragraph C, it says, "If you choose to take the associate research scholar appointment, your tenure review materials would be due later this spring, 2016 semester."

          MS. PLEVAN:  Objection.

Q.  Is that something that you received?

          MS. PLEVAN:  Read the whole paragraph if we're going to read.

          THE COURT:  Overruled.

Q.  Did you receive this communication from Senior Vice Dean Phillips?

A.  Yes, I did.

Q.  So can you explain how would taking this associate research scholar position that Columbia proposed affect your timing for submitting your tenure application deadline.

A.  So if I had taken this position, I would have gotten -- I would -- I would have had to submit my tenure package in that same semester, so that it wasn't an extension that was meaningful in any way.

Q.  How do you believe that the associate research scholar position that Columbia was proposing would have affected your chances of getting tenure?

A.  The research -- the associate research scholar was a demotion.  It was taking me off the tenure track, and it would

I7b1rav3                          Ravina - Direct

1    have been very damaging, because people in the profession would

2    have seen that I was not a tenure track academical -- academic

3    leading professor that was awaiting tenure.  I was demoted to

4    some other position off the tenure track.  And they would have

5    thought -- they would have interpreted this quite against me.

6    Q.  Did you meet with Senior Vice Dean Phillips or the vice

7    provost of Columbia to discuss this option with them?

8    A.  No.  I ended up not meeting.  I was in the meantime

9    preparing a letter of response specifying my personal

10   extenuating circumstances for the personal hardship leave.

11   There were also a lot of negotiations going on between lawyers,

12   so I felt more comfortable responding in writing.

13            MS. HARWIN:  Let me turn to Plaintiff's Exhibit 129,

14   and I move to admit it.

15            And I understand there are no objections.

16            MS. PLEVAN:  No objection if it's not offered for the

17   truth.

18            THE COURT:  All right.  So we agree this is not being

19   admitted for the truth?

20            MS. HARWIN:  This is being admitted as her application

21   for a personal hardship leave.

22            THE COURT:  All right.  So again, this is being

23   admitted not for the truth of what's contained in here but for

24   the fact that the statements were made, the request was made,

25   to whom and when.

1              All right.  129 will be admitted.

2              (Plaintiff's Exhibit 129 received in evidence)

3              MS. HARWIN:  Thank you, your Honor.

4    BY MS. HARWIN:

5    Q.  What is this document, Professor Ravina?

6    A.  This is my letter in response to vice provost Chris Brown's

7    request for additional information.

8    Q.  How many pages was your letter?

9    A.  I believe it was nine.

10             Nine.

11   Q.  And can you provide an overview of the types of information

12   that you provided in support of your request for personal

13   hardship leave.

14   A.  Yes.  I provided Vice Provost Brown and the administration

15   with information about the type of research that I conducted, I

16   explained the importance of this new project and the impact

17   that it would have in the field, and then I proceeded to

18   explain what happened -- the sexual harassment, the pressuring

19   me, the use of this data set, Professor Bekaert being a senior

20   in my department in addition to being a senior co-author on the

21   project, his continuous pressure and harassment -- I explained

22   how after I reported Professor Bekaert, he escalated his

23   retaliation; I explained the indifference and lack of

24   meaningful intervention from the administration; and overall, I

25   explained as well the effect that this had on my productivity,

1      on my life, professional and personal, and I summarized what

2      the personal hardship I had been going through all these years

3      at Columbia was.

4      Q.  Did Columbia respond to this letter you sent?

5      A.  Yes.

6                MS. HARWIN:  I move to admit Plaintiff's Exhibit 134.

7                MS. PLEVAN:  No objection.

8                THE COURT:  134 will be admitted.

9                (Plaintiff's Exhibit 134 received in evidence)

10     Q.  Professor Ravina, is this the response you received from

11     Columbia to your letter further describing your personal

12     hardship request?

13     A.  Yes.

14     Q.  The letter states, "I have considered your January 25, 2016

15     request for a paid leave based on compelling personal

16     needs/personal hardship and determined that it would not be

17     appropriate."

18                Did the vice provost of Columbia give any explanation

19     for why he said your request was not appropriate?

20     A.  No.  That was the whole letter.

21     Q.  Turning to the second sentence, it says, "Based on your

22     current status under university statutes and policies, unless

23     you submit a request for tenure review to the dean by March 1,

24     2016, you will not be considered for tenure."

25                Was this the final deadline that Columbia gave you to

I7b1rav3                          Ravina - Direct

```
 1   submit your tenure materials?
 2   A.  Yes, it was.
 3   Q.  Did you end up submitting a tenure application?
 4   A.  Yes, I did.
 5           MS. HARWIN:  Okay.  Move to admit Defendant's Exhibit
 6   ON.
 7           THE COURT:  Any objection?
 8           MS. PLEVAN:  No objection.  Again, other than, since
 9   they're offering it, not for the truth.
10           THE COURT:  Yes.  ON will be admitted on that basis.
11           (Defendant's Exhibit ON received in evidence)
12   BY MS. HARWIN:
13   Q.  Did there come a time when you filed this lawsuit?
14   A.  Yes.
15   Q.  Was that in March of 2016?
16   A.  Yes.
17   Q.  Did you talk to any reporters about your lawsuit?
18   A.  Yes, I did.
19   Q.  And why did you speak to reporters about your lawsuit?
20   A.  I wanted my story to be heard.  This was -- what was going
21   on with me at Columbia was talked about in the profession.  By
22   then, a lot of people knew something about it.  They knew there
23   was, the professor -- I don't know what they knew, but there
24   were like rumors, and I wanted to make sure that people could
25   hear my story too, that they didn't have any misleading
```

 1  impression of what was going on, and so after filing the suit,

 2  I also talked with -- with reporters so that my story would be

 3  heard.

 4  Q.  Did Columbia subsequently tell you the result of your

 5  tenure vote?

 6  A.  Yes.

 7  Q.  And what was the result of your tenure vote?

 8  A.  I was denied tenure.

 9  Q.  Was that a surprise to you?

10  A.  No.  Based on the record at the time, after all the years

11  of damage by Professor Bekaert and by Columbia neglecting to

12  intervene after his sexual harassment and retaliation, I knew

13  that if we would go forward to a vote, I would not get tenure.

14  Q.  How many years of your time at Columbia were affected by

15  your experiences with Professor Bekaert and how Columbia

16  reacted to it?

17  A.  I started working with Professor Bekaert in 2012.  I

18  started devoting a lot of time to this project to make sure

19  that they went forward and I could create an impactful body of

20  work.  Soon after I made the investment to work on this

21  project, Professor Bekaert started harassing me and, when he

22  was rebuffed, eventually retaliated, and he stalled my work, he

23  created an environment in which I could not continue to work,

24  because of like the stress that all this created on me.

25  Columbia was informed, and instead of meaningfully intervening

1    and do something to stop the harassment, to address the issue,

2    they were just indifferent.  They were letting time pass,

3    slowly, slowly, and years passed till I ended up in 2016,

4    spring 2016, four years later, with my work and my professional

5    life completely ruined.  It also affected my professional life

6    later on, potentially.  Now I'm a visiting professor, nontenure

7    track, at Kellogg Northwestern.  This is a temporary position.

8              MS. PLEVAN:  Objection, your Honor.

9              THE COURT:  I'll just allow you to finish your

10   sentence.

11   A.  And after that I don't know where I would have a job or if

12   I will have a job.

13   Q.  What did being denied tenure mean for your job at Columbia?

14   A.  After being denied tenure, professors get an extra year in

15   which they stay at Columbia and then they have to leave.

16   Q.  And so when did your position at Columbia end?

17   A.  So my -- as a result, my position at Columbia ended on

18   June 30, 2017, a year later.

19   Q.  What was it like to be denied tenure?

20   A.  It was -- it was terrible.  I had -- an academic works --

21   as an academic, you work all your life toward tenure.  It's

22   like doing a marathon in which, you know, you get an

23   opportunity to run, and you start running, and you want to --

24   to get to the finish line.  And all of a sudden you are less

25   than halfway, you are at mile say 11 and you start sprinting,

I7b1rav3                          Ravina - Direct

1    you're like, okay, I got it, I'm sprinting, I have this great

2    project, and all of a sudden there is a wall, and, you know,

3    you have to start -- you have to start going around the walls,

4    jumping obstacles, you have a burden over you, and you're

5    running against people that have no burden, they are going to

6    go very fast.  And as a result, there is no chance that you're

7    going to make it.  Like the tenure clock is on average seven

8    years, because you need all the seven years to have a chance to

9    finish the race.  And for a large part of those seven years, I

10   was jumping obstacles, I was having a burden of the harassment

11   and the retaliation and the stalling on me, where I was trying

12   to run.  And this damaged my career and my professional life,

13   not only at Columbia but in the academic profession in general.

14   You -- you get to tenure not at a school but in the profession.

15   You get evaluated by the entire community.  Once you are denied

16   tenure, you're being denied tenure in front of the entire

17   profession, not only in a specific school.

18   Q.  Professor Ravina, I know this has been a long examination,

19   and this is the last question.  Can you tell us why you brought

20   this case.

21               MS. PLEVAN:  Objection, your Honor.

22               THE COURT:  Overruled.

23   A.  I -- I thought long and hard before bringing this case.  I

24   did it after years in which I've been trying to solve these

25   issues with Columbia in good faith, to try to find a solution

1    that was good for me, was good for the university, and was good

2    for Professor Bekaert.  And only after all these efforts had

3    failed, I brought this -- this lawsuit.  I -- I knew, in

4    abstract, in theory, that discrimination is bad.  But -- and a

5    lot of people go through discrimination.  I understand a lot of

6    people go through discrimination during their life.  Once I was

7    subjected to discrimination, I understood on a whole new level

8    how devastating this can be.  Columbia is a higher education

9    institution.  It's one of the top universities in our country.

10   It should be a place where people go to pursue knowledge.  It

11   should be a place where everybody can go pursue knowledge, be

12   protected and supported in their effort to do so.  And this

13   didn't happen for me.  I was harassed, and the university

14   ignored me, was indifferent about it.  They didn't do anything.

15   I hope this court case corrects this injustice, and I also hope

16   that this court case brings strength and hope to everybody else

17   that is going through discrimination and gives them the

18   strength to come forward, makes them feel less alone.  It's a

19   very lonely situation to be -- to be having this huge burden

20   and problem and obstacle and trying to solve it, and despite

21   you have people around you, you can feel very lonely when this

22   happen, not many in your situation.  I hope that people feel

23   that, you know, that if they are going through discrimination,

24   they're not alone, a lot of people are.  And hopefully they can

25   come forward and this will not happen to other people but this

I7b1rav3

1    kind of harassment and discrimination will be taken seriously.

2              THE COURT:  All right.  Why don't we take a short

3    break because we took one already really this morning, so why

4    don't we just take a five-minute break and then we'll come back

5    and have cross-examination.

6              Remember, don't discuss the case and keep an open

7    mind.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7b1rav3

```
1              (Jury not present)

2              THE COURT:  Everyone may be seated.

3              Yes?

4              MS. HARWIN:  Just a few housekeeping matters.  There

5    are some documents that we want to enter into evidence.  I

6    understand they don't have any objections from defendants.  But

7    I just want to make sure that we actually enter all of them

8    before she leaves the stand.

9              THE COURT:  Why don't you talk to defense counsel

10   about it and make sure there is no problem.

11             MS. HARWIN:  Sounds good.

12             THE COURT:  I'm just going to briefly -- because it is

13   brief.  I know you wanted a ruling with respect to Professor

14   Deborah Rhode.

15             As I noted this morning, I'm going to grant Columbia's

16   motion to exclude her from testifying.

17             I already ruled that Professor Rhode should not

18   testify about the specific facts of the case, lest her

19   conclusions on disputed legal and factual issues usurp the role

20   of the jury.  Plaintiff still seeks to call Professor Rhode,

21   however, for, among other purposes, the purpose of describing

22   gender disparities and power imbalances in academic

23   relationships, the possible consequences of the breakdown of

24   those relationships, the pressure younger academics may feel to

25   placate their older colleagues, and trends in how universities
```

I7b1rav3

respond to complaints.

As I stated in the final pretrial conference, I in no way question Professor Rhode's extensive qualifications on the topics for which she is being offered, and any criticisms of her methodology or expertise would be proper subjects for cross-examination, not reasons for exclusion. I also don't doubt that testimony of this sort may be appropriate in certain cases. But plaintiff here has already testified very clearly and extensively about the specific pressures she felt in her academic relationship with Professor Bekaert and how and why she responded to his purported overtures and other behavior the way she did. She also testified extensively and directly as to how Columbia handled her complaints. The jury does not need an expert witness to tell them what they have already been told but in vaguer terms and divorced from the specific facts of the case.

In other words, expert testimony should not be admitted if it is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help. That's a quote from the Second Circuit in the *Mulder* case, 273 F.3d 101. Plaintiff has already provided the interpretative framework that she seeks to have Professor Rhode provide.

So in sum, Professor Rhode's expert testimony would not aid this jury. The pressures and responses plaintiff has

I7b1rav3                         Ravina - Cross

described in this case are matters of common sense and fully

within the jury's ability to understand and evaluate, so

Columbia's motion to exclude Professor Rhode's testimony is

therefore granted.

        So that's my ruling on that.

        I'll give you a minute to set up and then we'll have

cross-examination.  All right?  Thank you.

        MS. HARWIN:  Your Honor, I just want to make sure we

handle these final exhibits before we --

        THE COURT:  Yes.  You will not be precluded from

seeking to admit them, but why don't you try and resolve those

issues.  But let's try and keep the break short.  Thank you.

        (Recess)

        (Continued on next page)

I7b1rav3                          Ravina - Cross

1             (In open court; jury present)

2             THE COURT:  Everyone can be seated.  Thank you.

3        You may proceed.

4             MS. PLEVAN:  Thank you, your Honor.

5    CROSS-EXAMINATION

6    BY MS. PLEVAN:

7    Q.  Good afternoon, Professor Ravina.

8    A.  Good afternoon.

9    Q.  Now you received your PhD in economics from Northwestern in

10   2005, is that right?

11   A.  Yes.

12   Q.  And you spent the next three years as an assistant

13   professor at NYU, correct?

14   A.  Yes.

15   Q.  So before you started the tenure track that you've

16   described at Columbia, you spent three years as an assistant

17   professor at NYU.  Right?

18   A.  Yes.

19   Q.  And your job at NYU was to teach and to do research and

20   writing, correct?

21   A.  Yes.

22   Q.  And during that three-year period that you were at NYU,

23   only one of your papers was published, isn't that right?

24   A.  Yes.

25   Q.  And that's a paper that is called, "Increasing economic

1    inequalities," or it begins with a phrase like that?

2    A.  That -- I don't know the exact title, but that's the

3    summary.

4    Q.  And you co-authored that article with another professor, is

5    that right?

6    A.  No.

7    Q.  You were the sole author of that paper?

8    A.  No.

9    Q.  So there was a co-author.

10   A.  Yes.

11   Q.  And the co-author was Karen Dynan, is that correct?

12   A.  Yes.

13   Q.  Now that article was published in 2007, is that right?

14   A.  Yes, I believe so.

15   Q.  And that was published in the American Economic Review?

16   A.  Yes.

17   Q.  And that's a peer-reviewed publication?

18   A.  Yes.

19   Q.  And peer review means that it's not just what you wrote,

20   it's what other people had the opportunity to -- other scholars

21   had the opportunity to review it, question it, comment on it

22   before it's published, correct?

23   A.  Yeah, that's a good summary of it.

24   Q.  Now you wrote a thesis as part of your PhD program, didn't

25   you?

I7b1rav3                    Ravina - Cross

1   A.  Yes.

2   Q.  But your thesis was not published in the three years that

3   you were at NYU, isn't that right?

4   A.  No.

5   Q.  It was not, correct?

6   A.  It was not.

7   Q.  Although while you were at Columbia, you worked on

8   preparing your thesis to be published, isn't that right?

9   A.  No.

10  Q.  Didn't you work on preparing or work on your thesis in the

11  spring of 2012 and the summer of 2016?

12  A.  What do you mean by "work on your thesis"?

13  Q.  Work on whatever you thought it needed to be done before

14  you would publish it.

15  A.  I did work on that paper.

16  Q.  You did work on the paper while you were at Columbia,

17  correct?

18  A.  Yes.

19  Q.  And you worked on it in 2012 and again in 2016, correct?

20  A.  I believe so.

21  Q.  And Columbia provided funding for you to hire research

22  assistants to help with this paper, didn't they?

23  A.  Not exactly.

24  Q.  Well, to some extent did Columbia provide some support for

25  you to work on the paper that began with your PhD thesis?

1   A.   That's not a full characterization of --

2   Q.   What did I leave out?

3   A.   That Columbia gives us a budget to work on research, and

4   it's a limited budget, and then can be allocated to any project

5   that we decide, not necessarily one specific project.

6   Q.   And you chose to use some of that budgeted money to work on

7   the thesis that you had done to get your PhD, correct?

8   A.   Part of it.

9   Q.   And what was the topic of the thesis?

10  A.   It was -- it is a data about how the happiness and

11  satisfaction of people depend not only on their income but also

12  on how their neighbors, how the people in their group are

13  doing.

14  Q.   And despite the work you did, the thesis has still not been

15  published, correct?

16  A.   Yes.

17  Q.   And you never submitted it, resubmitted it anywhere for

18  publication, correct?

19  A.   I have submitted it.

20  Q.   Sorry.  You resubmitted it?

21       At the time you were at Columbia, you did not resubmit

22  or submit your PhD thesis for publication anywhere, is that

23  right?

24  A.   Submit or resubmit?

25  Q.   Submit.

I7b1rav3                          Ravina - Cross

1   A.  It was already submitted.

2   Q.  When was it originally submitted?

3   A.  I believe sometime in 2008.

4   Q.  And was it ever resubmitted after that?

5   A.  No.

6   Q.  Now in the period from -- you joined Columbia in July of

7   2008, correct?

8   A.  Yes.

9   Q.  And in the period from July of 2008 until your tenure vote

10  in April 2016, only two other papers besides the one we already

11  talked about that you authored or co-authored were published in

12  a refereed journal, is that correct?

13  A.  With co-authors, yes.

14  Q.  That's correct, right?

15  A.  Yes.

16  Q.  And so that was in total three papers from the time that

17  you finished your PhD until the time of your tenure review,

18  isn't that right?

19  A.  No.

20  Q.  In a peer-reviewed publication.  Sorry.

21  A.  No.

22  Q.  Well, you just said that after you got to Columbia, you

23  only did two that were published, correct?

24  A.  No.

25  Q.  Are you referring to something other than a peer-reviewed

1    publication?

2    A.   No.

3    Q.   Let me take care of this confusion.

4              What's the first paper you had published, Professor

5    Ravina, in a peer-reviewed publication?

6    A.   The one you cited about the increasing happiness and

7    inequality.

8    Q.   Where was that published?

9    A.   American Economic Review.

10   Q.   And when was that published?

11   A.   I believe in 2007.

12   Q.   And that's the one we spoke about before, correct?

13   A.   Correct.

14   Q.   And then what's the next paper that you had published, in a

15   peer-reviewed publication?

16   A.   One on independent directors.

17   Q.   Okay.  Let's talk about that.  And that's one you

18   co-authored with your thesis advisor from Northwestern,

19   correct?

20   A.   One of the thesis advisors.

21   Q.   And that's who you worked with on that paper, correct?

22   A.   Yes.

23   Q.   And that was published in 2010, correct?

24   A.   Yes.

25   Q.   So that's the second one you had published, right?  First

1    was 2007, the second one is in 2010, correct?

2    A.  Yes.

3    Q.  And after that one was published, the next one published in

4    a peer-reviewed paper was your risk aversion paper, isn't that

5    right?  That's the third one?

6    A.  I think it comes in the third order.  I would have to look

7    at my CV, but --

8    Q.  Okay.  So we have one in 2007, one in 2010, and then risk

9    aversion is published in 2016, correct?

10   A.  Yes.

11   Q.  And there were two co-authors in that paper, correct?

12   A.  Yes.

13   Q.  And on the risk aversion paper, one of the co-authors was

14   Professor Paravisini from Columbia, is that correct?

15   A.  Yes.

16   Q.  And this paper published in early 2016, you first worked on

17   the data analysis in the summer of 2009, correct?

18   A.  We started then.

19   Q.  Pardon?

20   A.  We started working then, yes.

21   Q.  2009, correct?

22   A.  The data analysis -- overall, correct.

23   Q.  So from the time you started with the analysis, it took

24   eight years before that paper was actually published, correct?

25   A.  No.

I7b1rav3                         Ravina - Cross

1   Q.  Seven years.  Excuse me.  Seven and a half years, is that

2   correct?

3   A.  No.

4   Q.  Well, it was published in 2016 and you started the data

5   analysis in 2009, correct?

6   A.  Yes.

7   Q.  So that's seven years, isn't it?

8   A.  About seven years; a little less than seven years.

9   Q.  And the paper was not accepted for publication until 2015,

10  isn't that right?

11  A.  Yes.

12  Q.  So that paper took a very long time to finish, didn't it?

13  A.  No.

14  Q.  You don't think it was -- took a long time.

15  A.  Not really, no.

16  Q.  And you don't blame Professor Paravisini for stalling or

17  preventing you from finishing it, do you?

18  A.  No.

19  Q.  So I think we're in agreement that from the time that you

20  got your PhD until early 2016, these are the three papers that

21  were published in peer-reviewed journals that you were an

22  author or co-author of, correct?

23  A.  There is another paper -- I forget the date -- that is

24  published in Brain Sciences.

25  Q.  Well, that wasn't before your tenure review, was it?

1   A.  I believe not.

2   Q.  And that's not a peer-reviewed journal, is it?

3   A.  It is peer -- the rules are different because it's a

4   different discipline, it's biology and brain sciences, but

5   there is a peer review process in it.

6   Q.  We'll look at that later.  It's a one-page essay, isn't

7   that correct?

8   A.  It's not an essay; it's a paper.  In science, papers are

9   smaller and shorter than in economics.

10  Q.  This one is one page, correct?

11  A.  Yes.

12  Q.  It was published in 2017, correct?

13  A.  I would have to look at my CV, but -- I believe so.

14          MS. PLEVAN:  May I approach the witness, your Honor.

15          THE COURT:  You may.

16  Q.  Showing Professor Ravina Defendant's RY.

17          And you can see on page 3 the reference to the

18  article, that one-page article you just mentioned?

19  A.  Yes.

20  Q.  And it was published in 2017, correct?

21  A.  Yes.

22  Q.  Now you would agree that at various times Columbia gave you

23  time off for relief from teaching or leave from teaching to

24  enable you to do research and writing, correct?

25  A.  Not completely.

I7b1rav3                         Ravina - Cross

1    Q.  I can't hear you.  I'm sorry.

2    A.  Not completely.

3    Q.  Well, you were given time off when you didn't have to

4    teach, correct?

5    A.  Time off teaching, yes.

6    Q.  Relief from teaching or leave from teaching?

7    A.  Yes.

8    Q.  And during those periods when you had a leave from teaching

9    or relief from teaching, you were expected to work on your

10   research and writing, correct?

11   A.  Yes.

12   Q.  Now you started at Columbia the fall of 2008, correct?

13   A.  No.

14   Q.  Or the summer of 2008.

15   A.  Yes.

16   Q.  And in the following year, the academic year 2009 to 2010,

17   you did not teach, correct, your second year at Columbia?

18   A.  Correct.

19   Q.  And you were at Columbia that whole year, correct?

20   A.  Yes.

21   Q.  And you were on a leave from teaching that year, isn't that

22   right?

23   A.  I was not teaching.

24   Q.  So you could spend all your time that year doing research

25   and writing.

1   A.  Yes.

2   Q.  Now the following semester you were a visiting scholar at

3   the Harvard Business School, correct?

4   A.  Yes.

5   Q.  So you did not teach any classes at Columbia that semester,

6   right?

7   A.  No.

8   Q.  And you didn't teach any classes at Harvard that semester

9   either, correct?

10  A.  Correct.

11  Q.  So again, you could focus on your research and writing that

12  semester, correct?

13  A.  Yes.

14  Q.  And Harvard even gave you a research assistant to help you

15  that semester, didn't they?

16  A.  No.

17  Q.  You don't recall that?

18  A.  I didn't have a research assistant.

19  Q.  Do you recall your deposition being taken in this matter on

20  May 8, 2017?

21  A.  Yes.

22  Q.  And do you recall, at page 42, line 18, being asked this

23  question and giving this answer:

24          "Q.  So going back to the fall of 2010, can you tell

25  us specifically what you did at Harvard that semester.

I7b1rav3                         Ravina - Cross

1              "A.   I got an office at Harvard, I directed the work

2      of a research assistant that Harvard gave me for the project."

3              Was that your testimony?

4      A.   I believe so.  I would have to look at it.

5      Q.   Excuse me?

6      A.   I would have to look at it, but if you're reading, I don't

7      have any reason to --

8      Q.   You agree that was your testimony under oath, is that

9      right?

10     A.   Yes.

11     Q.   And then you were back at Columbia the spring of 2011, is

12     that correct?

13     A.   Yes.

14     Q.   And that semester the only teaching you had was one section

15     of undergraduates, correct?

16     A.   Correct.

17     Q.   So you had the year 2009-2010 without teaching, and the

18     whole year 2010-2011, other than teaching that one

19     undergraduate section, you could spend all your time doing

20     research and writing, correct?

21     A.   Yes.

22     Q.   And in the year 2015, the academic year of 2015-2016, you

23     were again relieved of any teaching responsibilities, correct?

24     A.   Yes.

25     Q.   You were, in a sense, given a leave from teaching that

I7b1rav3                         Ravina - Cross

1   whole year.

2   A.   No.  I wouldn't call it a leave.

3   Q.   You call it relief?  Relief is better?

4   A.   I was told I would not teach.

5   Q.   And therefore you could work on your research and writing,

6   correct?

7   A.   No.

8   Q.   You could, couldn't you?

9   A.   No.

10  Q.   Did somebody tell you you couldn't?

11  A.   Somebody did not -- no.

12  Q.   Okay.  And your last year at Columbia was the year

13  2016-17 --

14  A.   Yes.

15  Q.   -- correct?  And you didn't teach any classes that year

16  either, correct?

17  A.   Correct.

18  Q.   So except for that one undergraduate section one semester,

19  for four of the eight years you were at Columbia, you did no

20  teaching, isn't that right?

21  A.   No.

22  Q.   That's not right?

23  A.   No.

24  Q.   Isn't that what you just said?

25  A.   No.

1    Q.  You didn't teach 2016-17, you didn't teach 2015-16,

2    correct?  That's two years?

3    A.  Correct.

4    Q.  You didn't teach 2009-10, that's three years?

5    A.  No.

6    Q.  You didn't teach 2009 through 2010.

7    A.  No, I did not teach.

8    Q.  Right.  So that's a third year?

9    A.  Yes.

10   Q.  And then we have the year that you were at Harvard and you

11   didn't teach in the fall and you taught one section in the

12   spring.  Correct?

13   A.  No.

14   Q.  Are you changing your testimony?

15   A.  No.  I taught in the summer instead in the spring.

16   Q.  Okay.  But in the academic year was what I was referring

17   to.  So you would agree you may have taught in the summer from

18   time to time, but in the rest of the academic year, four out of

19   the eight years you were there, you didn't teach except for

20   that one section of undergraduate students, correct?

21   A.  So the summer is part of the academic year.

22   Q.  Now I want to refer to -- one paper that's on your résumé,

23   your CV, is the international diversifications paper, correct?

24           MS. PLEVAN:  Oh, move to admit Defendant's RY if I

25   didn't.

1            THE COURT:  Yes.  Is there any objection to RY?

2            MS. HARWIN:  I just note, your Honor, that the

3    identical exhibit has already been admitted by plaintiff.

4            MS. PLEVAN:  That will happen a lot.

5            MS. HARWIN:  But we don't object.

6            THE COURT:  Both will be admitted.  You can read it

7    twice if you want to.  All right.

8            (Defendant's Exhibit RY received in evidence)

9    BY MS. PLEVAN:

10   Q.  Now one of the papers listed on your CV, résumé has the

11   title of International Diversification, is that correct?

12   A.  That's the summary title.

13   Q.  Excuse me?

14   A.  That is not exact title.

15   Q.  I'm using sort of a shorthand.  And that paper is the one

16   that you co-authored with Professor Bekaert, correct?

17   A.  And Kenton Hoyem and Wei Hu and Professor Bekaert, correct.

18   Q.  Yes.

19   A.  Yes.

20   Q.  And that paper was finished and submitted and accepted for

21   publication before you had your tenure vote, isn't that right?

22   A.  I don't remember when it was accepted.

23   Q.  You don't recall that it was part of a package you

24   submitted for your tenure review, that it had already been

25   accepted for publication?

I7b1rav3                          Ravina - Cross

1   A.  I would need to look at my package to look at the time in

2   which it was actually accepted, but it was submitted.

3           MS. PLEVAN:  I'd like to show the witness Defendant's

4   Exhibit OP, which is in evidence.

5   Q.  Let me ask you --

6           THE COURT:  It's in evidence as OP?

7           MS. PLEVAN:  I believe it is.

8           THE COURT:  Okay.

9           MS. PLEVAN:  I believe it was offered as OP.

10          THE COURT:  All right.

11          MS. PLEVAN:  Yeah.

12  BY MS. PLEVAN:

13  Q.  And let me ask you to look at the second page.

14          Now at the time it was sent to Professor -- or to the

15  division, the international diversification paper was still

16  listed under working papers, is that correct?

17  A.  Yes.

18  Q.  Was it accepted soon thereafter?

19  A.  It was accepted sometime in 2016, but I don't remember the

20  exact time when it was accepted.

21  Q.  So at the time of your tenure vote then, you had either

22  three or four papers that were published or accepted for

23  publication in a peer-reviewed journal, is that correct?

24  A.  In -- it depends how the brain science one -- oh, that was

25  later.

I7b1rav3                    Ravina - Cross

1    Q.  That was later?

2    A.  Yes, I agree.

3    Q.  So is that correct what I said?

4    A.  Yes.

5    Q.  Now during the time from when you got your PhD and the time

6    of the tenure vote in April 2016, you had worked on several

7    other papers that were never accepted for publication, isn't

8    that right?

9             Sorry.  Is that correct?

10   A.  Some paper, yes.

11   Q.  And one of the papers you started working on while you were

12   at NYU was called Habit Formation, for short?  You used that

13   term?

14   A.  Yes.

15   Q.  And in Defendant's Exhibit OP, your CV lists that as a

16   working paper, correct, on the second page?

17   A.  Correct.

18   Q.  And am I correct that's the paper that's based on your PhD

19   thesis?

20   A.  Yes.

21   Q.  And you first submitted that paper to a journal while you

22   were at NYU, correct?

23   A.  Yes.

24             (Continued on next page)

25

1    Q.  So that was ten years ago, is that right?

2    A.  Yes.

3    Q.  Was that a yes?

4    A.  It is a yes.

5    Q.  And you received back from whatever journal you submitted

6    it to what's called a revise and resubmit, correct?

7    A.  Yes.

8    Q.  And you received that in October of 2011, correct?

9    A.  No.

10   Q.  Do you think it was a different date?

11   A.  It was sometime --

12   Q.  Around 2011?

13   A.  Um, no.

14   Q.  Before that?

15   A.  Yes.

16   Q.  So, sometime before 2011, you received notice from whatever

17   journal to revise and resubmit this paper that was based on

18   your thesis, correct?

19   A.  Yes.

20   Q.  At the time of your tenure vote, you had not resubmitted

21   it, correct?

22   A.  Yes.

23   Q.  Yes, you had not?

24   A.  Yes, I had not.

25   Q.  And by the time you left Columbia in the middle of 2017,

1   you had not resubmitted that paper for publication, correct?

2   A.  Yes.

3   Q.  Now, another paper that you started working on in 2008 was

4   about investment decisions by high net worth individuals, is

5   that right?

6   A.  Yes.

7   Q.  And you had coauthors on that paper, is that right?

8   A.  Yes.

9   Q.  And one of them was a professor from the Harvard Business

10  School, Professor Viceira?

11  A.  Yes.

12  Q.  You started working on that paper around 2007 or 2008, is

13  that right?

14  A.  '8, yes.

15  Q.  While you were still at NYU, correct?

16  A.  Yes.

17  Q.  And that's a paper that the research involved a lot of data

18  collection, is that correct?

19  A.  Yes.

20  Q.  And you spent a lot of time checking the consistency of the

21  data for that paper, is that right?

22  A.  Yes.

23  Q.  And you originally thought you would finish that paper by

24  2014, didn't you?

25  A.  I might have.

1    Q.  You do remember saying that, don't you, at your deposition?

2    A.  I might have.

3    Q.  You don't dispute it?

4         MS. HARWIN:  I would request that, if you are reading

5    from the deposition, that you put it up on her screen so she

6    can see it as well.

7         MS. PLEVAN:  I am not showing her.  I'm asking her if

8    she --

9         THE COURT:  I don't think that's necessary.  You can

10   proceed.

11        MS. PLEVAN:  I just want to make sure I have it.

12   BY MS. PLEVAN:

13   Q.  For context, I am going ask you if you recall your

14   deposition being taken on May 9, 2017, in this case?

15   A.  Yes.

16   Q.  And do you recall being asked questions about your

17   publications at that deposition?

18   A.  Yes.

19   Q.  And do you recall being asked this question and giving this

20   answer at page 45, line 3:

21   "Q.  Yesterday we talked about the high net worth paper.  You

22   have been working on that project with Professor Viceira since

23   2007, right, or 2008?

24   "A.  Yes, around that time."

25        Was that your testimony?

1    A.  Yes.

2    Q.  And then at 486, line 9, do you recall being asked this

3    question and giving this answer:

4    "Q.  This is one of the papers that you in e-mails in 2013 said

5    you expected to be published by spring of 2014, correct?

6    "A.  I was expecting to have a draft in a very good stage by

7    then."

8            Was that the question you were asked and was that the

9    answer that you gave under oath?

10   A.  I don't remember exactly the answer, but --

11   Q.  You are not disputing that you gave that answer, is that

12   correct?

13   A.  No.

14   Q.  And as of the time -- actually, as of today this paper is

15   still listed as a working paper on your CV, correct?

16   A.  Yes.

17   Q.  So that means it hasn't been published yet, correct?

18   A.  Yes.

19   Q.  And it hasn't been accepted for publication, correct?

20   A.  Yes.

21   Q.  Now, another paper that you began working on while you were

22   at NYU for short may be called love and loans, correct?

23   A.  Yes.

24   Q.  And you first submitted that to a journal in 2009, correct?

25   A.  Yeah.

I7bnrav4                      Ravina - Cross

1   Q.  Pardon?  Yes?

2   A.  I believe so.

3   Q.  And you resubmitted it?  It was rejected, and then you

4   resubmitted it, correct?

5   A.  Yeah.

6   Q.  And you resubmitted it in 2011, is that correct?

7   A.  I don't remember the exact date I resubmitted it.

8   Q.  But around that time?

9   A.  2011, 2012.

10  Q.  And then you had a third round after receiving a reject --

11  I mean you received another notice of rejection and resubmit in

12  2013, correct?

13  A.  I don't remember the date, but I received a reject and

14  resubmit.

15  Q.  And after that second rejection up until the time of your

16  tenure vote you had not resubmitted that paper?

17  A.  Correct.

18  Q.  At no time before you left Columbia did you resubmit that

19  love and loans paper, correct?

20  A.  Yes.

21  Q.  You had not, correct, before you left Columbia?

22  A.  That is correct.

23  Q.  But you did manage to resubmit it just last month in time

24  for this trial, correct?

25  A.  Yes.

1    Q.  Now, is there another paper that you started working on in

2    2008 called, for short, appearance and beauty?

3    A.  I don't remember when I started working on it, but, yeah --

4    yes.

5    Q.  That is another paper?

6    A.  That's a different paper.

7    Q.  And you worked on that paper in 2009 and 2010, is that

8    correct?

9    A.  Yes.

10   Q.  And in 2011 and '12, or that academic year, you were

11   collecting more data for that paper, is that correct?

12   A.  No.  What paper?  No.

13   Q.  Do you recall your deposition being taken again on May 8,

14   2017?

15   A.  Yes.

16   Q.  And at page 49, line 13, do you recall being asked this

17   question and giving this answer under oath:

18   "Q.  Would you describe, in as much detail as you can, the

19   nature of the work you did on the beauty paper in the academic

20   year 2011 to 2012?

21   "A.  I started collecting additional data and run additional

22   analysis.  Most of that analysis focused on linguistics."

23   Q.  Did you give that answer to that question at that time?

24   A.  Yes.

25   Q.  And that relates to this paper, correct?

I7bnrav4                          Ravina - Cross

1    A.  No.

2    Q.  It relates to a different paper?

3    A.  Yes.

4    Q.  OK.  Which paper does that relate to?

5    A.  So, it relates to the paper that you called love and loans.

6    Q.  And that one's not published either, correct?

7    A.  Yes.

8    Q.  All the papers that we have been talking about that you

9    have worked on, starting some of them at NYU and some of them

10   at Columbia, had nothing to do with Professor Bekaert, correct?

11   A.  What do you mean by nothing --

12   Q.  He wasn't participating as a coauthor on any of those

13   papers?

14   A.  Correct.

15   Q.  So you agree it wouldn't have been his fault that those

16   papers never got published, correct?

17   A.  No.

18   Q.  You would also agree that the number of publications is an

19   important factor in consideration for tenure, isn't it?

20   A.  It's one of them.

21   Q.  To the best of your knowledge, the people who have been

22   successful candidates at Columbia Business School in receiving

23   tenure have had many more publications than you, correct?

24   A.  No.

25   Q.  No?

1  A.  No.

2  Q.  You also knew that to receive tenure you would have to be

3  involved in cutting edge research, correct?

4  A.  Yes.

5  Q.  So it was quantity and quality were factors, isn't that

6  right?

7  A.  Yes.

8  Q.  Now, if you go back and look at the papers listed on --

9  Exhibit RY is your current CV, is that correct, the one you

10  just completed?

11  A.  As of June 2018.

12  Q.  June 2018?

13  A.  Yes.

14  Q.  And the only paper that's listed that was published after

15  your tenure review is the one-page article that appeared in

16  Behavioral and Brain Sciences, correct?

17           MS. HARWIN:  Objection.  Mischaracterizes.

18           THE COURT:  Overruled.

19  A.  No.

20  Q.  I'm sorry.  It's the only one, correct?

21  A.  Not correct.

22  Q.  It's the only one that's been published that wasn't on your

23  résumé at the time of your tenure consideration, correct?

24  A.  What's the question?

25  Q.  So, since the time of your tenure vote in April of 2016,

1    under "Actual Publications," the only paper that wasn't on your

2    CV at the time of your tenure consideration is this paper that

3    appeared in Behavioral and Brain Sciences, isn't that right?

4    A.  No.

5    Q.  Well, are you referring to one of the papers was on your CV

6    in 2016 but wasn't published yet?

7    A.  I'm saying that after my tenure vote two papers got

8    published.

9    Q.  But one of them was already on your CV at the time of your

10   vote as an "Accepted for Publication," correct?

11   A.  We didn't establish -- it was not accepted.

12   Q.  Let's go through them so we don't have any

13   misunderstanding.

14            Let's look at your current CV.

15            OK.  At the bottom of page 2, that paper?

16            THE COURT:  That's RY, right?

17            MS. PLEVAN:  Yes, I'm sorry, your Honor.

18            Yes, RY.

19   BY MS. PLEVAN:

20   Q.  That paper is the paper that was accepted for publication

21   as of the time of your tenure review, correct?

22   A.  I am not sure it was accepted.  The other CV doesn't list

23   it as accepted.

24   Q.  But it was on your CV as a completed or submitted for

25   publication, correct?

1   A.  It was on my CV.

2   Q.  OK.

3   A.  But not published.

4   Q.  But submitted for publication, correct?

5   A.  Submit -- um -- I believe it was submitted.

6   Q.  Didn't we just look at that CV, and you said it was

7   submitted for publication, correct?

8   A.  The CV says solicited.

9   Q.  OK.

10  A.  Which is invited.  I believe it was submitted, but I don't

11  remember the exact date.  Definitely it was not published.  It

12  got published in 2017.

13  Q.  Would you agree that the work that the authors were doing

14  on that paper was completed by the time of your tenure review

15  in April of 2016?

16  A.  I wouldn't characterize it that way.  If an answer from a

17  journal was still expected, the answer would say do more work.

18  Q.  Now, keep going on, to page 3.  These are your

19  publications, right?

20          You have that one the one you did with Professor

21  Bekaert, and then at the top of page 3 we have the one in

22  Behavioral and Brain Sciences, correct?

23  A.  Yes.

24          MS. PLEVAN:  And while we're there, why don't we

25  identify that.  Please show the witness Exhibit RS?

1               May I hand it up to the witness?

2               THE COURT:  Thank you.

3   Q.  You recognize Defendants' Exhibit RS, Professor Ravina?

4   A.  Yes.

5   Q.  Is this the article that's referenced in the CV as being

6   published in Behavioral and Brain Sciences in March 2017?

7   A.  Yes, I believe so.

8               MS. PLEVAN:  And we offer Defendants' Exhibit RS?

9               THE COURT:  Any objection?

10              MS. HARWIN:  No objection, your Honor.

11              THE COURT:  RS will be admitted.

12              (Defendants' Exhibit RS received in evidence)

13  BY MS. PLEVAN:

14  Q.  Just to be clear, Professor Ravina, this article begins on

15  the first page toward the middle of the left-hand column and it

16  ends at the very top of the second page, is that correct?

17  A.  Yes.

18  Q.  That's the entire article, correct?

19  A.  Yes.

20  Q.  Did we agree before that Behavioral and Brain Sciences is

21  not a peer-reviewed publication?

22  A.  I --

23  Q.  You don't know?

24  A.  No, I know.  There is a process of peer review to get the

25  article into the journal.

1    Q.  It's not what's known in the field of finance and economics

2    as a peer-reviewed journal, correct?

3    A.  It is in the field of biology and brain sciences.  It's a

4    different field, but there was peer evaluation of this article.

5    Q.  So, again, coming back to your current résumé, what that

6    shows us is that you had the publication with Professor

7    Bekaert, this article from Behavioral and Brain Sciences, this

8    one-page article, the risk aversion paper in February of 2016,

9    and then a publication that we haven't talked about that was in

10   an Italian finance journal, is that correct, in 2011?

11   A.  No.

12   Q.  It is an Italian publication, is that correct?

13   A.  Yes.  It is an Italian journal.

14   Q.  That is not a peer-reviewed journal, right?

15   A.  It is.

16   Q.  It is?

17   A.  Yes.

18   Q.  But what you have listed here is the sum total of the work

19   that was published, is that correct, since you finished your

20   Ph.D.?

21   A.  And then there is the directors and the increasing income

22   inequality.  And that's the total.

23   Q.  I can't --

24   A.  Sorry.

25   Q.  Can you speak a little bit more clearly?

1    A.  Yes, absolutely.  You stopped at the appearance, and then

2    there is a director paper and an increasing income inequality

3    paper, and that's the sum.

4    Q.  I'm asking you about publications that were published?

5    A.  Yes, these are the published.

6    Q.  You are listing the ones that are on the top of page 3,

7    correct?  Is that what you are saying?

8    A.  Yes.

9    Q.  You spoke a little on your direct about your evaluations

10   you received over the years.  They all made clear to you that

11   you needed to be more productive and have more publications,

12   didn't they?

13   A.  No.

14   Q.  In the later years would you agree that that is what was

15   being communicated to you?

16   A.  Yes.

17          MS. PLEVAN:  I would like to show the witness

18   Defendants' Exhibit XX.

19          THE COURT:  Any objection?

20          MS. HARWIN:  I don't believe this is on our list of --

21          MS. PLEVAN:  These are the reviews.

22          (Counsel conferred)

23          MS. PLEVAN:  These are reviews.  The judge ruled on

24   the reviews.  If you have an objection say that you have an

25   objection.  It is up to you.

1          THE COURT:  Do you have an objection?

2          MS. HARWIN:  This hasn't been provided to the

3    plaintiffs as an exhibit.  She can lay a foundation.

4          THE COURT:  That's right.  You can lay a foundation.

5    BY MS. PLEVAN:

6    Q.  Professor Ravina, would you agree that Defendants' Exhibit

7    XX is the faculty evaluation that was done for you in the

8    spring of 2011?

9    A.  I am not sure.

10   Q.  You are not sure?

11   A.  No.

12   Q.  Does it appear to be the evaluation that was done for you

13   in the year 2011?

14   A.  It seems so, but I am not sure I received it.

15         THE COURT:  Do you receive faculty evaluations?

16         THE WITNESS:  Early on we were only receiving the

17   end-of-year letter from the dean, and in later years we started

18   receiving both.  So I'm not sure I received the 2011 longer

19   evaluation.

20         THE COURT:  I am going to admit it subject to

21   connection.  I assume there's someone else who can get this in

22   any way, is that right?

23         (Defendant's Exhibit XX received in evidence)?

24

25   BY MS. PLEVAN:

I7bnrav4                        Ravina - Cross

1    Q.  You received a verbal communication as well at that time

2    about your work, is that correct?

3    A.  Yes.

4    Q.  And will you look at the second page of this faculty

5    evaluation.  The first page summarizes what you have been

6    doing, correct?

7    A.  It appears to be correct.

8    Q.  It is a summary of what you were doing, correct?

9    A.  Yeah, I think so.  It describes the work, yeah, and the

10   teaching and the seminars, yes.

11   Q.  The last sentence of the review said, "However, she needs a

12   greater pace of research productivity to be on track for

13   tenure; it is important that her projects materialize into

14   publications in a timely fashion."

15              Correct?

16   A.  Yes.

17   Q.  You received a letter from Dean Hubbard in the spring of

18   2011, correct?

19   A.  Yes.  June 2011, I believe.

20              MS. PLEVAN:  I would like to show the witness

21   Defendant's Exhibit ZZ.

22              THE COURT:  Any objection?

23              MS. HARWIN:  No, your Honor.

24              THE COURT:  ZZ will be admitted.

25              (Defendants' Exhibit ZZ received in evidence)

BY MS. PLEVAN:

Q.   In that letter -- the letters that came from the dean each
year around this time usually started with a discussion about
what was going on at the school, the business school, is that
correct?

A.   Yes.

Q.   And he would also talk about what was going on in your
division in the letter, is that correct?

A.   Yes.

Q.   And then he would end with comments relating to your
performance to you specifically, correct?

A.   Yes.

Q.   And in this letter in the first paragraph the dean said,
"Your senior faculty colleagues have provided feedback on your
research pipeline, and I urge you to heed their advice."

          That was his message, correct?

A.   Yes.

Q.   And the advice he was telling you to heed was that you
needed to be more productive, correct?

          MS. HARWIN:   Objection.   Argumentative.

          THE COURT:   Overruled.

A.   I was told --

Q.   Can you answer that yes or no?

A.   Can you repeat the question.

Q.   The message that he was referring to as the feedback from

1    your senior colleagues was that you needed to be more

2    productive, isn't that correct?

3    A.  Not fully correct.

4    Q.  He was also referring to the message that you had been

5    given by your senior faculty colleagues in the spring of 2011

6    that your projects -- projects, plural -- had to materialize

7    into publications in a timely fashion, correct?

8    A.  Um --

9    Q.  That was the message, right?

10   A.  Sorry.  I did not receive the written evaluation.  I had

11   just spoken with a senior faculty.

12   Q.  But that was the message they conveyed.  That's what the

13   dean was referring to, the message that you needed to do better

14   at your projects materializing into publications in a timely

15   way, correct?

16   A.  I wouldn't characterize it that way.  Should I provide more

17   explanation?

18   Q.  You don't characterize it that way?

19   A.  Yeah.  That's not the way it was presented to me in the

20   in-person conversation.

21   Q.  Now, you also got reviewed in the spring of 2012, correct?

22   A.  Yes.

23   Q.  Let me show you what's been marked as Defendants' Exhibit

24   AJ.

25              Is that the review that was provided to you in writing

1    in the spring of 2012?

2    A.  Yes.  One of them.

3    Q.  Excuse me?

4    A.  I got two written letters.

5    Q.  OK.  One is the review and the other is the dean's letter,

6    is that correct?

7    A.  Yes.

8    Q.  OK.  So Defendants' Exhibit AJ is the review from the

9    faculty, correct?

10   A.  It's the longer form.

11           MS. PLEVAN:  We offer Defendants' Exhibit AJ in

12   evidence.

13           THE COURT:  Any objection.

14           MS. HARWIN:  No objection, your Honor.

15           THE COURT:  AJ will be admitted.

16           (Defendants' Exhibit AJ received in evidence)

17           THE COURT:  Ms. Plevan, just tell me when it is a good

18   time for lunch.

19           MS. PLEVAN:  OK.

20           THE COURT:  Finish your questioning.

21           MS. PLEVAN:  I will do this first.

22   BY MS. PLEVAN:

23   Q.  First of all, in this review -- and you got a copy of this

24   review, correct?

25   A.  I did.

1   Q.  It refers to the standards for receiving tenure, is that

2   correct, in the introductory section?

3   A.  Yes, there is a link in the introductory section, the

4   second part.

5   Q.  It discusses and then it provides a link to information

6   about the tenure process, doesn't it?

7   A.  Yes.

8   Q.  And this review characterized your progress as marginal,

9   didn't it?

10  A.  Yes.

11  Q.  In fact, in the summary part, the message you were given

12  was, in paragraph 5, "While Enrichetta has produced interesting

13  papers and is working on many promising projects, she has not

14  published at a pace necessary to be on track for tenure.  We

15  characterize her progress in 2011 as marginal.  We have

16  therefore decided not to nominate her for associate professor

17  this year."

18          That was the message, right?

19  A.  Yes.

20  Q.  And that message concerned you, didn't it?

21  A.  Yes.  I wanted to publish more.

22  Q.  And your review meeting that year was with Professor

23  Bekaert, right?

24  A.  Yes.

25  Q.  And he urged you to work on the habit paper to get it

1   published, didn't he?

2   A.  Not only that.

3   Q.  But that was one of the papers he thought you should be

4   working on, one of the old papers that was in your list of

5   working papers, correct?

6   A.  Yes.

7   Q.  And there were other papers that he urged you to work on,

8   too?

9   A.  Yes.

10   Q.  Now, there is a reference in this review to your not being

11   nominated for or recommended for associate professor, correct?

12   A.  Yes.

13   Q.  That was not a tenured position, was it?

14   A.  No.

15   Q.  But it would have been a promotion to the next highest

16   rank, correct?

17   A.  No.

18   Q.  Well, you were an assistant professor, correct?

19   A.  Yes.

20   Q.  An associate professor is the next level up, isn't it?

21   A.  You could characterize it that way.

22   Q.  That's the tradition in academia, correct?

23   A.  No.

24   Q.  In 2012, in June, you also received a letter from Dean

25   Hubbard, correct?

```
 1    A.  Yes.

 2              MS. PLEVAN:  I would like to show the witness what's

 3    been marked as Defendants' Exhibit AL, a letter dated June 6,

 4    2012, from Dean Hubbard to Professor Ravina.

 5    BY MS. PLEVAN:

 6    Q.  Do you recognize that as a letter you received in June of

 7    2012 from Dean Hubbard.

 8    A.  Yes.

 9              MS. PLEVAN:  We offer Defendants' Exhibit AL in

10    evidence.

11              THE COURT:  Any objection?

12              MS. HARWIN:  Your Honor, we don't object to the

13    admission of this or the prior ones as reflecting the review,

14    but I would note that these contain a lot of hearsay.

15              MS. PLEVAN:  Objection to what she said.

16              THE COURT:  Yes.  This will be admitted.  You can

17    proceed.

18              (Defendants' Exhibit AL received in evidence)

19    BY MS. PLEVAN:

20    Q.  This letter from the dean on page 2, the first paragraph

21    made note of the, I'll quote, "The observation of your senior

22    colleagues that you have not yet published a sufficient body of

23    work for promotion after your fourth year at Columbia Business

24    School."

25              Was he referring to the promotion from assistant to
```

1  associate professor?  Is that your understanding?

2  A.  Yes.

3  Q.  And then he also said, "I urge you to seek the advice and

4  counsel of your senior colleagues and hope that you will let me

5  know what the school can do to support your research and help

6  you bring more of your projects to publication."

7        That was his advice, correct?

8  A.  Yes.

9  Q.  Together with the review, you were concerned about your

10  prospects for tenure at that point, weren't you?

11  A.  No.

12  Q.  No?  You didn't think the comment that your progress was

13  marginal was of concern?

14  A.  Yes.

15  Q.  You were concerned, weren't you?

16  A.  I had still enough time to produce papers to get tenure.

17  Q.  But you were concerned at that point, weren't you?

18  A.  Concerned about what?

19  Q.  That you weren't going to be able to make it?

20  A.  No.

21  Q.  But you were concerned that your progress had been viewed

22  as marginal, correct?

23  A.  I was concerned that I needed to do a lot of work.  I want

24  to do a lot of work.

25  Q.  But you were concerned that the review said your progress

1   in 2011 was marginal, weren't you?

2   A.   I would have been happier if it said it was not marginal,

3   but I had enough time ahead of me to publish, and I had a good

4   package for the tenure time.

5   Q.   Please answer this question, Professor Ravina.  Weren't you

6   concerned by this review -- the review now, back to the

7   review -- stating that your progress in 2011 was marginal?

8   A.   It -- yeah.  I was like I need to work.

9   Q.   You were concerned, weren't you?

10  A.   I am not sure what concerned means, but, yeah, I wanted to

11  do more work, and I felt like, you know, marginal is not a good

12  word.  I want to do more.

13  Q.   Do you remember your deposition on July 18, 2017, at page

14  634 being asked this question and giving an answer at line 14:

15  "Q.  Were you concerned by the review stating that your

16  progress in 2011 was marginal?

17  "A.  I was concerned, yes."

18  A.   I might --

19  Q.   So you were concerned, correct?

20  A.   I might have characterized it was concerned.

21  Q.   And you were under oath then, too, right?

22  A.   Yes.

23             MS. PLEVAN:  This would be a good time.

24             THE COURT:  Why don't we take a break for an hour for

25  lunch.  Folks, just remember don't discuss the case and keep an

I7bnrav4                        Ravina - Cross

1    open mind.  Thank you.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Jury not present)

2                    THE COURT:  Everyone can be seated.  I just want to

3       let you know I have a criminal proceeding now so I am going ask

4       you to move your things a little.  You can leave your things

5       there but you might want to close your computers and leave some

6       room for the lawyers.

7                    As to your objection, Ms. Harwin, with respect to the

8       reviews, you weren't objecting, but I didn't want to have a

9       whole colloquy in front of the jury.  Are you asking me to give

10      a specific instruction?

11                   MS. HARWIN:  Yes, your Honor.

12                   I think an instruction that these are being admitted

13      as the reviews that Columbia prepared or provided to Professor

14      Ravina but not that the content in it is being admitted for the

15      truth.

16                   MS. PLEVAN:  They're business records, though, your

17      Honor.

18                   THE COURT:  Are they not business records?

19                   MS. HARWIN:  Well, they haven't been certified by

20      defendants as business records.

21                   MS. PLEVAN:  I don't know what that means,

22      "certified."

23                   MS. HARWIN:  There's a certification --

24                   MS. PLEVAN:  We don't have a business records witness

25      here at the moment, but they will be.

I7bnrav4                    Ravina - Cross

1              THE COURT:  I am going to let them in.  I do think

2     they're business records.  If you want a witness, someone from

3     Columbia at a later time to establish the basis for that, I

4     will allow that, but I don't want to take everything out of

5     order either.  So I am not going to give that instruction at

6     this time.

7              MS. HARWIN:  I will note for the 2011 she testified

8     she doesn't have a recollection of receiving it.

9              THE COURT:  Right.  And her testimony is in the

10    record, of course.

11             All right.  Thank you, all.

12             (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        A F T E R N O O N     S E S S I O N

4                               (2:10 p.m.)

5              THE COURT:  Is everyone ready for the jury?

6              Great.  Thank you.

7              (Jury present)

8              THE COURT:  Welcome back, folks.

9              Hope you had a nice lunch.  Everyone can be seated.

10             MS. PLEVAN:  Good afternoon, your Honor.  Before we

11     begin, I would like to introduce Elizabeth Conway from the

12     office of general counsel at Columbia who is sitting with us

13     now at counsel table.

14     BY MS. HARWIN:

15     Q.  Professor Ravina, I just want to clarify a few things from

16     before lunch on your papers.

17             First of all, let me show you Defendants' Exhibit PY.

18             Do you recognize this as an e-mail, or one down from

19     the top, an e-mail you sent to professor Zeldes on April 13,

20     2016?

21     A.  Yes.

22             MS. PLEVAN:  We offer Defendants' Exhibit PY in

23     evidence.

24             THE COURT:  Any objection?

25             MS. HARWIN:  No objection, your Honor.

1          THE COURT:  PY will be admitted.

2          (Defendants' Exhibit PY received in evidence)

3   BY MS. PLEVAN:

4   Q.  This is an e-mail in which you sent him the international

5   diversification paper right before the tenure vote, correct?

6   A.  Yes, I believe so.

7   Q.  And you communicated to him that this paper --

8          MS. PLEVAN:  I'm sorry.

9          JURORS:  We can't see it.

10          THE COURT:  Let's give it a minute.

11          Any luck?

12          JURORS:  There it is.

13          THE COURT:  OK.  There is light.

14   BY MS. PLEVAN:

15   Q.  You provided professor Zeldes with the paper on April 13,

16   2016, is that correct?

17   A.  Yes.

18   Q.  And you told him that the paper had been accepted for

19   publication, correct?

20   A.  Yes.

21   Q.  Does that refresh your recollection that at the time of

22   your tenure vote this paper had been accepted for publication?

23   A.  Yes.  I thought you asked me the time of my submission of

24   the package, and it was not.  But at the time of the vote it

25   was.

1    Q.  And you were permitted to submit material up until the day
2    of the vote, correct?
3    A.  I was asked to send an update in this chain of e-mails.
4    Q.  And you understood that if the tenure vote had been later
5    or the following year you would have been able to add material
6    to your package, correct?
7    A.  Yes.
8    Q.  Now, I just wanted to show you your two CVs that show the
9    papers that you had published in your CV from April of 2016 and
10   look at that against the CV you had last month in June of 2018.
11   The exhibit numbers are OP up -- in front of you now is the
12   April 2016 CV, is that correct?
13   A.  Yes.  I gave the exhibits back.
14   Q.  I'm sorry?
15   A.  I gave the exhibits back in the break.
16   Q.  OK.  So, we're showing on the screen OP and RY, Defendants'
17   Exhibit RY, right?
18           Would you look at the sections and compare what was
19   published in 2016, and would you look at in RY, which is your
20   current published.  This shows more than published, but
21   essentially the first five, if I counted that right -- six --
22   just look at the published and forthcoming compared from April
23   2016, compared to the June 2018 published, accepted and
24   forthcoming, there's one additional paper, is that correct?
25   A.  No.

1   Q.  I'm sorry.  Plus the one that we just looked at that was

2   finished and was accepted in April of 2016?

3   A.  So there are four in one and six in other.  There would be

4   five and six if we include the international paper, correct.

5   Q.  If we include the international paper there would be five

6   in April 2016 and six in June 2018?

7   A.  Yes.

8              MS. HARWIN:  Objection.

9              THE COURT:  Overruled.

10             MS. PLEVAN:  Thank you.

11             THE COURT:  Do you want clarification on something?

12             MS. HARWIN:  Yes.  The document being used as OP is

13   dated February 2016, not April 2016.

14             MS. PLEVAN:  It's the one she submitted in April,

15   which she identified earlier in her testimony.

16             THE COURT:  All right.

17             You can proceed.

18             MS. PLEVAN:  I think she said that.  OK.

19   BY MS. PLEVAN:

20   Q.  Let's go back to your reviews and let's pick up with the

21   year 2013.

22             Did you get a review in the year 2013?

23   A.  Yes.

24   Q.  Let me show you what's been marked as Defendants' Exhibit

25   BP.

1              THE COURT:  Thank you.

2    BY MS. PLEVAN:

3    Q.  Do you recognize Defendants' Exhibit BP as the review you

4    received in the spring of 2013?

5    A.  Yes.

6    Q.  As in the prior ones, there is a summary at the end,

7    correct?

8    A.  Correct.

9              MS. PLEVAN:  We offer Defendants' Exhibit BP in

10   evidence.

11             MS. HARWIN:  No objection.

12             THE COURT:  All right.  BP will be admitted.

13             (Defendants' Exhibit BP received in evidence)

14   BY MS. PLEVAN:

15   Q.  And the summary that you received commenting on your

16   progress that year read as follows:  "While Enrichetta's

17   working on many promising projects, she has not published at a

18   pace necessary to be on track for tenure.  Based on the current

19   output and pipeline, we view prospects of tenure as unlikely.

20   We do not believe the promotion to untenured associate is

21   warranted at this stage.  The division will vote on her case to

22   untenured associate in spring 2014, and feels the likelihood of

23   promotion is low."

24             Is that the summary review you received in 2013?

25   A.  Yes.

1    Q.  And you met with tenured faculty member Wei Jiang in the

2    spring of 2013, is that correct?

3    A.  Yes.

4    Q.  And she told you when you spoke to her that you had not

5    published at a pace necessary to be on track for tenure, isn't

6    that right?

7    A.  I don't remember if she used those exact words, but she

8    told me that, yeah, I needed to write more papers.

9    Q.  Well, not just write more papers --

10   A.  And publish more.

11   Q.  -- but that you weren't on track for tenure, correct?

12   A.  I don't remember exactly what she said.

13   Q.  You do remember that she told you that you should pick

14   particular papers that would most likely get published and work

15   on those.  You should focus on two or three papers to get

16   published, correct?

17   A.  Again --

18          MS. HARWIN:  Objection.

19          THE COURT:  Overruled.

20   A.  She told me to focus on two or three papers to publish

21   those.

22   Q.  Do you remember your deposition being taken in July 2017

23   and being asked this question and giving this answer, at page

24   642, line 3:

25   "Q.  During the meeting, did she communicate to you that the

1   consensus of the faculty was that you had not published at a

2   pace necessary to be on track for tenure?

3   "A.  Yes, she did."

4   A.  OK.

5   Q.  Is that correct?  Did you give that testimony?

6   A.  I believe so.

7   Q.  And it's truthful, correct, your testimony?

8   A.  The message was that I needed to publish more papers, yeah.

9   Q.  And also she was telling you you hadn't published at a pace

10  that was needed to get tenure, correct?

11  A.  If I continued on the same pace, I would not get tenure.

12  Q.  This is the spring of 2013, correct?

13  A.  Yes.

14  Q.  That's before you had any serious conflicts about the

15  timing of the work with Professor Bekaert, isn't it?

16  A.  Yes.

17  Q.  You also got a dean's letter in June of 2013, correct?

18  A.  Yes, I believe so.

19          MS. PLEVAN:  I ask the witness to be shown Defendant's

20  Exhibit BU.

21  Q.  Do you recognize Defendants' Exhibit BU as the dean's

22  letter dated June 7, 2013, addressed to you and sent by Dean

23  Hubbard?

24  A.  Yes.  It misses the signature, but I believe that's the

25  letter.

1          MS. PLEVAN:  We offer Defendants' Exhibit BU in

2     evidence.

3          THE COURT:  Any objection?

4          MS. HARWIN:  No objection as long as the last page is

5     included.

6          THE COURT:  Yes.  So it's three pages, correct?

7          MS. PLEVAN:  Three pages, yes.

8          THE COURT:  Right.  It will be admitted.

9          (Defendant's Exhibit BU received in evidence)

10    BY MS. PLEVAN:

11    Q.  In that letter one of the topics that the dean covered was

12    your own evaluation, correct?

13    A.  Yes.

14    Q.  And he told you in this letter that, "Your senior

15    colleagues have provided you with valuable formal feedback on

16    your work to date and an outline of what is needed to achieve

17    tenure at Columbia.  I join them in their assessment that you

18    have not published at a pace necessary to be on track for

19    tenure.  I hope you will seek the counsel of your senior

20    colleagues about your future career plans as you work on

21    revising your papers with the aim of publishing them in the top

22    journals in your field."

23          That was his message, correct?

24    A.  Yes.

25    Q.  Among the messages there was a suggestion that perhaps you

1    should think about going somewhere else, wasn't it?

2                MS. HARWIN:  Objection.

3    A.  No.

4                THE COURT:  Overruled.

5    Q.  You didn't read it that way?

6    A.  No.

7    Q.  Now, you also got a review in the spring of 2014, is that

8    correct?

9    A.  Yes.

10   Q.  I show the witness Defendant's Exhibit DA.  Is Exhibit DA

11   the review you received from the faculty in the finance and

12   economics division for the year -- or given to you in the

13   spring of 2014?

14   A.  It is not clear.  Yeah, it was '14.

15   Q.  Can you speak up a little, please.

16   A.  I'm sorry.  The second page indicates it was spring 2014.

17   Q.  Yes.

18   A.  OK.

19   Q.  The cover note says 2013, but starting on the second page

20   it is a three-page review from the spring of 2014, is that

21   correct?

22   A.  Yes.  I can see the first page, and it is from 2014.

23               MS. PLEVAN:  With that comment, defendants offer

24   Defendants' Exhibit DA in evidence.

25               THE COURT:  Any objection?

1          Ms. Harwin, any objection?

2          MS. HARWIN:  No objection, your Honor.

3          THE COURT:  DL will be admitted.

4          (Defendants' Exhibit DL received in evidence)

5   BY MS. PLEVAN:

6   Q.  This review, you were given a copy of it, correct?

7   A.  Yes.

8   Q.  And one of the comments on the first page of the review

9   under "Research" was that none of your papers had been accepted

10  for publication since 2009, correct?

11  A.  Yes.

12  Q.  That was accurate, wasn't it?

13  A.  I believe so.

14  Q.  And there is a discussion about those papers in this

15  review, correct?

16  A.  It appears to be, yeah.

17  Q.  This came from the senior faculty of your division,

18  correct?

19  A.  Correct.

20  Q.  Would you look at paragraph 6 at the very end.  That's the

21  summary, correct?

22  A.  Correct.

23  Q.  You were told in that summary as follows:  "Enrichetta's

24  working papers are at various stages.  Her most recent work

25  appears to be promising.  She needs to bring her projects to

I7bnrav4                         Ravina - Cross

1    fruition, acceptance for publication, preferably at selected

2    and high-impact outlets.  Unfortunately, the paucity of

3    publication renders Enrichetta's tenure prospects dim.  The

4    division believes her output does not justify a promotion to

5    untenured associate professor.  The division will vote on

6    Enrichetta's tenure in spring 2015.  A positive outcome is very

7    unlikely."

8              That was the message you got, correct?

9    A.  Yes.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7b1rav5                          Ravina - Cross

1    BY MS. PLEVAN:

2    Q.  And that was the message that Professor Andrew Ang

3    communicated to you as well, wasn't it?

4    A.  Yes.

5    Q.  Now your tenure was not actually voted on in the spring of

6    2015, correct?

7    A.  Correct.

8    Q.  You got a whole additional year, right, until the spring of

9    2016?

10   A.  Yes.

11   Q.  Now you also received a letter from the dean in June of

12   2014, is that correct?

13   A.  Yes.

14   Q.  Let me show you what's been marked as Defendant's Exhibit

15   DF.

16            THE COURT:  Any objection on DF?

17            MS. HARWIN:  No, your Honor.

18            THE COURT:  All right.  DF will be admitted.

19            (Defendant's Exhibit DF received in evidence)

20   Q.  Do you recognize Defendant's Exhibit DF?

21   A.  Yes.

22   Q.  And is that the letter you received from Dean Hubbard in

23   June of 2014?

24   A.  Yes.

25            MS. PLEVAN:  We offer Defendant's Exhibit DF in

1   evidence.

2            THE COURT:  Yes.  DF will be admitted.

3   Q.  And this letter follows the same format of a discussion

4   about the school and the division, and then on the second page,

5   it's a communication directed to you, correct?

6   A.  Yes, I believe so.

7   Q.  And in that letter Dean Hubbard said, communicated to you,

8   "Your senior colleagues --" and this is the third to last

9   paragraph -- "Your senior colleagues have provided you with

10  valuable formal feedback on your work to date, and an outline

11  of what is needed to achieve tenure at Columbia.  I join them

12  in their assessment that your publication record is not

13  currently on track for promotion or tenure at Columbia.  I hope

14  you will seek the counsel of your senior colleagues and let me

15  know what the school can do to help support your research."

16            That was his message, correct?

17  A.  Yes.

18  Q.  And now you spoke a little about your understanding of what

19  the timing would be of your tenure review, correct?

20  A.  Yes.

21  Q.  And you understood that typically a person would come up

22  for review in the spring of their sixth year?

23  A.  Yes.

24  Q.  Have you heard the term "up or out date"?

25  A.  Yes.

1   Q.  And what is your understanding of that term?

2   A.  It's a deadline by which you're either voted for tenure or

3   you have to leave the university.

4   Q.  And for you the up or out date was what?

5   A.  So, up or out.  I don't remember, in the definition of "up

6   or out," if that date is the date -- it includes the last year

7   of service in case people are denied.  So I don't know --

8   Q.  Okay.  So the vote would have to occur by the end of your

9   seventh year, is that correct?

10  A.  I would have to recall -- by the end of your seventh year.

11  I think so.

12  Q.  And that would have been the spring of 2016, correct?

13  A.  Correct.

14  Q.  And you had attended meetings about the tenure review

15  process during your time at Columbia, correct?

16  A.  Yes.

17  Q.  You had attended a meeting with Professor Ang and some

18  other junior faculty members where there was a discussion about

19  what the tenure rules were, is that right?

20  A.  Yes.

21  Q.  And you attended several other meetings with various deans

22  during your time there where there was a discussion about the

23  tenure process, correct?

24  A.  I attended one.

25  Q.  One other besides the one with Professor Ang?

I7b1rav5                              Ravina - Cross

1    A.  Yes.

2    Q.  And was that with Vice Dean Phillips, Senior Vice Dean

3    Phillips?

4    A.  Yes, correct.

5    Q.  Now when Professor Bekaert proposed a project, your working

6    on a project with him on the 401(k) data, you were excited and

7    interested in it, weren't you?

8    A.  Yes.

9    Q.  And he first approached you in 2009, is that correct?

10   A.  Correct.

11   Q.  And you thought this was a unique opportunity, didn't you?

12   A.  I did.

13   Q.  It turned out there were lots of delays, first of all, in

14   reaching an agreement with the company Financial Engines, isn't

15   that right?

16   A.  We reached an agreement in October 2011.

17   Q.  Well, I mean, there were delays -- so let's start with the

18   beginning of that process.

19         You first spoke to Professor Bekaert about this in

20   late 2009, and then the agreement, which I think is in

21   evidence, wasn't signed until October 2011, correct?

22   A.  Correct.

23   Q.  So that's two whole years, right?

24   A.  Right.

25   Q.  And certainly some of that delay was the result of

I7b1rav5                        Ravina - Cross

1  Financial Engines taking a long time to negotiate and draft the

2  agreement, correct?

3  A.  I believe some of it was.

4  Q.  Now there were also a lot of delays in getting the data

5  from Financial Engines, isn't that right?

6  A.  Not -- not fully.

7  Q.  You thought originally you'd have the data from Financial

8  Engines within a few months of signing the agreement, isn't

9  that right?

10 A.  Yes.

11 Q.  But you didn't get the bulk of the data until the summer of

12 2012, correct?

13 A.  We got the individual data in the end of summer 2012.  We

14 got the company data with the contract in fall 2011.

15 Q.  But you needed the individual data to do your work,

16 correct?

17 A.  To complete the work, yes.

18 Q.  And you didn't have that till almost a year after you

19 signed the agreement with Financial Engines, correct?

20 A.  Till late summer 2012.

21 Q.  And then there was a lot of time spent by -- and by the

22 way, the delays we've just talked about -- signing the

23 agreement, getting the data -- that didn't have anything to do

24 with Professor Bekaert, right?

25 A.  I don't know.

1  Q.  Well, you don't have any reason to believe that, correct?

2  A.  I don't have any reason to believe that.

3  Q.  And then there was the long period of time when the data

4  had to be cleaned and prepared for analysis, correct?

5  A.  Correct.

6  Q.  And there were a lot of research assistants involved in

7  cleaning the data?

8  A.  Yes.

9  Q.  And you used an outsourcing company as well?

10 A.  Yes.

11 Q.  And you weren't happy with the work that that outsourcing

12 company did, were you?

13 A.  The first version, I sent back.

14 Q.  So that caused delay as well, correct?

15 A.  Yes and no.  Various things were going on at the same time,

16 but yes, the work of the outsourcing company had to be redone.

17 Q.  And the data cleaning and preparation continued until at

18 least the spring of 2013, isn't that right?

19 A.  Yes.

20 Q.  And throughout this period Professor Bekaert and others

21 were encouraging you to work on the papers that you had on your

22 CV as drafts, working papers, didn't they?

23 A.  Yes and no.

24 Q.  Yes and no?

25 A.  Yeah.  They were encouraging me to work on those papers,

1    but they also were encouraging me to work on the retirement

2    data set.

3    Q.  Now in the spring of 2013 you were just finally getting the

4    data, you were happy about all the help you were getting from

5    Professor Bekaert, weren't you?

6    A.  In the spring of 2013, I hadn't been getting a lot of help

7    from Professor Bekaert.  I was the one putting together the

8    data set, cleaning it, overviewing the research assistants, and

9    writing the codes.

10   Q.  Did you communicate to Professor Bekaert in April 2013

11   telling him that you appreciate his advice and the time he

12   spent taking care of you?

13   A.  I believe so.

14   Q.  Pardon?

15   A.  I believe so.

16   Q.  So you appreciated what he was doing for you at that point,

17   correct?

18   A.  I was humiliating myself to get his help.

19          I was humiliating myself to get his help on the

20   project.

21   Q.  And it was in that time frame that you discussed with him

22   his becoming your mentor, correct?

23   A.  No.

24   Q.  Didn't you tell Professor Bekaert in June of 2013 that you

25   would love him to be your mentor?  Yes or no.

1    A.  To continue to be my mentor.

2    Q.  Excuse me?

3    A.  I said that I would love -- he wanted to re -- he

4    threatened, was telling me that he wanted to pull back from

5    being my mentor, and I said that I wanted him to continue to be

6    my mentor.

7    Q.  You told him, "I would love for you to be my mentor, of

8    course, only if you want to."  Wasn't that what you said to

9    him?

10   A.  In that excerpt, yes.

11   Q.  You put that in writing in an email to him, correct?

12   A.  Yeah, but in the context of him telling me that he didn't

13   want me to -- he didn't wanted to be my mentor anymore.

14   Q.  Now you didn't make any complaint to the equal opportunity

15   affirmative action office at Columbia in 2012 or 2013, correct?

16   A.  Correct.

17   Q.  And just going back to these papers for a minute, you

18   worked on the analysis of the data for the 401(k) projects in

19   2013, correct?

20   A.  Correct.

21   Q.  And the international diversification paper, the one that's

22   been published, Professor Bekaert did the first draft of that

23   paper, correct?

24   A.  Correct.

25   Q.  And he did that in the winter break of late 2013, early

1    2014, correct?

2    A.  Correct.

3    Q.  And you used that draft that he prepared to do a

4    presentation that you gave at a conference in January 2014,

5    correct?

6    A.  Correct.

7    Q.  And that was helpful for you, wasn't it?

8    A.  Yes, I applied to the conference to further my career.

9    Q.  And the paper that you did, another paper that you worked

10   on with Professor Bekaert, was the automatic enrollment paper,

11   is that correct?

12   A.  He worked on the paper early on.

13   Q.  Correct.  And you did most of the work on that paper, is

14   that correct?

15   A.  Yes.

16   Q.  And he agreed to not be involved in that paper.

17   A.  Eventually, in 2015.

18   Q.  That paper has not been published, correct?

19   A.  Correct.

20   Q.  Now you mentioned that you reached out, with some

21   colleagues, to speak to Senior Vice Dean Gita Johar in May of

22   2014, is that correct?

23   A.  Sorry.  Can you repeat.  I reach out?  Oh, with some

24   colleagues.  Yes.

25   Q.  And that would have been a few weeks after you got that

1  review in the spring of 2014 telling you your tenure prospects

2  were dim, correct?

3  A.  Probably a month or more.

4  Q.  Okay.  Well, you said it was mid May, and most of the time

5  these reviews were in April, weren't they?

6  A.  Yeah, early April.

7  Q.  Now Gita Johar was just about to end her three-year term as

8  the senior vice dean for faculty affairs, correct?

9  A.  I understood she would end her term on June 30th, yes.

10  Q.  June 30th.

11  A.  Yes.

12  Q.  And this meeting that you had with her was, what, about

13  four years after you first started working with Professor

14  Bekaert, is that correct?

15  A.  It was three -- two years and a half after we got the data

16  and it was one year and maybe a month after the data was ready,

17  in March 2013, for diverse paper.

18  Q.  You were working together for at least four years, correct?

19  A.  We had decided to starting to work on this --

20  Q.  Can you answer that yes or no, Ms. --

21  A.  No, because we just discussed that it took awhile to sign

22  the contract and get the data, so I don't know how you define

23  working.

24  Q.  Okay.  But at least three years you were working together

25  at that point, correct?

1   A.  I would say -- we started analyzing the data in October,

2   November 2011, the bulk of it in the summer of 2012, and yeah,

3   we can calculate from that.

4   Q.  Okay.  Several years, anyway, you would agree, right?

5   A.  Depending on what in the English language "several" means.

6   Q.  Okay.  Now another meeting you referred to was your meeting

7   with Dean Hubbard on June 16, 2014, correct?

8   A.  Correct.

9   Q.  And that was a meeting that Dean Hubbard initiated,

10  correct?

11  A.  I believe, yeah, Vice Dean Horan initiated and set it up.

12  I don't know what they discussed between the two of them.

13  Q.  And there were a number of topics discussed at that

14  meeting, is that correct?

15  A.  Yes.

16  Q.  And one of the topics that was discussed were the papers

17  that you were working on?

18  A.  A plan to push the work on the papers with Professor

19  Bekaert on the data set forward.

20  Q.  And you went over in detail the status of all the papers

21  you were working on with Professor Bekaert, correct?

22  A.  We made a plan by the end of the meeting about what would

23  happen for each of the papers.

24  Q.  And one of the things you talked about in that meeting was

25  the communications between you and Professor Bekaert, correct?

1  A.  Among many -- the various things, yes.

2  Q.  And that gave rise to the discussion about having a

3  relationship manager, correct?

4  A.  That was not the fullness of my report, but after I told

5  about the harassment and the abusive behavior of Professor

6  Bekaert --

7  Q.  Just answer the question, Professor Ravina.  Didn't you

8  talk about having a relationship manager at that meeting?

9  A.  We talked about having a relationship manager.

10 Q.  And it was the dean's idea, correct?

11 A.  Correct.

12 Q.  Okay.  And the dean also said that in the interim, you and

13 Professor Bekaert would send copies of all your emails to the

14 dean, correct?

15 A.  We would carbon copy the dean, cc.

16 Q.  And that was something he was saying would start right

17 away, correct?

18 A.  As soon as Professor Bekaert would be informed, we will

19 start right away.

20 Q.  And he was out of the country at that time, right?

21 A.  I don't know.

22 Q.  And the dean's idea was to have him copied so that it would

23 change the tone of some of the communications, correct?

24 A.  That was the hope.

25 Q.  But you also discussed having a relationship manager who

1    would talk to both of you about the work, correct?

2    A.  Can you be more specific about -- what do you mean by talk

3    about the work?

4    Q.  That the relationship manager would talk to you and would

5    talk to Professor Bekaert about your communications regarding

6    your research and writing papers.

7    A.  I understood that the relationship manager would be an

8    expert cc'd on the emails and he would weigh in, I hope, with

9    some authority about any disagreement on the research.

10   Q.  And speaking of authority, did you think the dean had the

11   authority to tell you what to write or not write in a research

12   paper?

13   A.  What to write or not to write in a research paper?  Not

14   necessarily.

15   Q.  Not at all, right?  Not at all.

16   A.  I would say depends on the circumstances.

17   Q.  Are you familiar with the concept of academic freedom?

18   A.  Yes.

19   Q.  And that means that the university can't tell you what to

20   write or not write, correct?

21   A.  Up to the point in which you don't violate the freedom of

22   someone else, I believe yes.

23   Q.  Now you later suggested Professor Wolfenzon to be the

24   relationship manager, is that correct?

25   A.  Yes.

1   Q.  And Professor Bekaert agreed with that?

2   A.  Not initially.

3   Q.  But he agreed with it.

4   A.  Eventually.

5   Q.  And Professor Wolfenzon agreed too.

6   A.  Professor Wolfenzon?

7   Q.  Yes.

8   A.  No.  Can you repeat?

9   Q.  Did he agree to be the relationship manager?

10  A.  Yes, he agreed.  I -- yeah, he was appointed and he agreed.

11  Q.  And do you remember at this meeting the dean saying, with

12  respect to Professor Bekaert, "If he is not amenable, I will

13  make him amenable"?

14  A.  Yes, referring to the plan about the papers.

15  Q.  Now another subject you discussed at the meeting was

16  Professor Bekaert being removed from any discussion about your

17  tenure, is that right?

18  A.  Correct.

19  Q.  And at that meeting it was agreed, the dean agreed that

20  Professor Bekaert should not be involved in your tenure vote or

21  any discussions about tenure, right?

22  A.  In addition to that, that he would not speak about me and

23  my work to anybody in the school or the profession and will not

24  badmouth me.

25  Q.  And the dean supported that.

1    A.  Yes, he did.

2    Q.  And he agreed to it.

3    A.  He agreed.

4    Q.  And at this meeting, this June 16th meeting, you also

5    raised the subject of getting more time on your tenure clock,

6    correct?

7    A.  I was not the one raising the issue.

8    Q.  Professor Goldberg raised it on your behalf?

9    A.  She raised it and I agreed with her, yes.

10   Q.  And Dean Hubbard said it wasn't up to him, it's a

11   university decision, is that correct?

12   A.  I believe that's correct.

13   Q.  But he said he was open to making that request, didn't he?

14   A.  Yes.

15   Q.  After the meeting you sent an email summarizing what

16   happened at the meeting, is that correct?

17   A.  Yes.

18          MS. PLEVAN:  I'd like to show the witness Defendant's

19   Exhibit DM.

20   Q.  Do you recognize Defendant's Exhibit DM as the email you

21   sent to Dean Hubbard, Professor Goldberg, and Vice Dean Horan?

22   A.  Yes.

23   Q.  Dated June 18, 2014?

24   A.  Yes.

25          MS. PLEVAN:  We offer Defendant's Exhibit DM in

1    evidence.

2              MS. HARWIN:  No objection.

3              THE COURT:  DM will be admitted.

4              (Defendant's Exhibit DM received in evidence)

5    Q.  And this accurately summarizes the topics we just talked

6    about, doesn't it, what was discussed at the meeting?

7    A.  I believe it was the summary of the meeting.  It didn't

8    cover everything what's actually talked about, but it was a

9    summary.

10   Q.  Okay.  Now the next meeting you had was with Senior Vice

11   Dean Phillips in mid July, correct?

12   A.  Correct.

13   Q.  And she had just become the new senior vice dean on

14   July 1 --

15   A.  That's what.

16   Q.  -- of 2014, is that correct?

17   A.  That's what I understood.

18   Q.  And she asked to meet with you, correct?  She set up the

19   meeting?

20   A.  She set up the meeting, yes.

21   Q.  And she had succeeded Dean Johar, right?

22   A.  She took the position that Dean Johar used to have.

23   Q.  And at that meeting you also discussed the different papers

24   and what their status was, isn't that right?

25   A.  Yes.  By then nothing had happened and so I talked with her

I7b1rav5                          Ravina - Cross

1    again about this issue.

2    Q.  And based on what was said at this meeting, what you said,

3    within a few days, the dean reported your concerns to the

4    Title IX or EOAA office, isn't that right?

5              MS. HARWIN:  Objection.

6    A.  I don't know when he report --

7              THE COURT:  Overruled.

8    A.  I don't know when he reported my concerns.

9              THE COURT:  Let me just revise this.  She's only going

10   to know what was told to her, so why don't we rephrase that

11   question.

12   Q.  You're aware, aren't you, that sometime soon after your

13   meeting with Dean Phillips that a report was made to the EOAA

14   office?

15   A.  Director Dunn told me that a report was made, when -- when

16   I met him on August 12.  He didn't tell me when.

17   Q.  And he contacted you before you met with him, right, so --

18   A.  About -- around August 6 he contacted me.

19   Q.  So sometime in early August you heard from Michael Dunn, is

20   that correct?

21   A.  In August 6 -- on August, yeah, 6 or around that date.

22   Q.  And that was so then a few weeks after your meeting or two

23   weeks after your meeting with Kathy Phillips, correct?

24   A.  Yes, three weeks, something like that.

25   Q.  Did he tell you that the dean's office had reported your

I7b1rav5                          Ravina - Cross

1    concerns to the EOAA office?

2    A.  He told me that there was a con -- he received a report

3    and -- and then he told me that we will discuss what happened

4    with Professor Bekaert, not to tell anything to anyone about

5    that.

6    Q.  He told you he had received a report from the dean's

7    office, correct?

8    A.  I don't remember -- I don't remember if he told me who

9    reported, actually, who made the report.  He told me a report

10   has been made.

11   Q.  Okay.

12   A.  It wasn't made by me.

13   Q.  It wasn't made by you, but -- did you assume it was made by

14   the dean's office?

15   A.  I had known from Vice Dean Horan, since June 11, that she

16   had talked with the EOAA but that the office would not

17   intervene.  I don't know all their conversations after that.

18   Q.  And Mr. Dunn didn't tell you how he got involved at that

19   point, when you met with him in early August, is that what

20   you're saying?

21   A.  He told me he had received a report.  I know that from vice

22   dean -- I understood in the meeting with Vice Dean Horan that

23   it was decided that an investigation would not be started at

24   that time.

25   Q.  That was back in June, correct?

I7b1rav5                         Ravina - Cross

1   A.  In June, correct.

2   Q.  And that was before you met with Dean Hubbard?

3   A.  And after I met with Johar.

4   Q.  And but after you met with Kathy Phillips, that's when you

5   heard from Mr. Dunn, correct?

6   A.  The next event after meeting with Kathy Phillips on

7   August 6th was I believe to -- a message from Director Dunn to

8   meet.

9   Q.  And you had not approached, I think you said, the office

10  yourself, although you knew about the EOAA office, correct,

11  before this?

12  A.  Yeah.  Dean Hubbard mentioned in the June 16 meeting.

13  Q.  Well, you also had attended training at Columbia about

14  harassment and discrimination issues, isn't that correct?

15  A.  I don't believe they gave us training.

16  Q.  Did you read the Columbia University policies on

17  discrimination and harassment?

18  A.  Since then I looked at them, but at the time I was not

19  aware of those policies.

20  Q.  At your deposition -- do you recall being deposed on

21  July 18, 2017?

22  A.  Yes.

23  Q.  And do you remember being asked this question and giving

24  this answer, beginning at page 594, line 22:

25          "Q.  Did you become aware through conversations with

1  anyone before June 2014 that Columbia had a policy and

2  procedure for reporting incidents of harassment or

3  discrimination?

4          "A.  We were asked -- the faculty was asked to go to

5  some meeting about harassment and retaliation.  I don't

6  remember all the details of the meeting, but there was someone

7  from some university office explaining what was harassment and

8  she presented some examples, and a number of my colleagues

9  pushed back very hard against her.  I don't remember if she

10  covered the details of where and how to report for harassment

11  and retaliation."

12          Was that your testimony?

13  A.  Yes.

14  Q.  So you did go to a meeting about this subject, correct?

15  A.  Yes, but not -- I'm -- I didn't have any specific

16  information about how to report.  Some examples of harassment

17  were given.

18  Q.  And you didn't look at the faculty handbook.

19  A.  At the time, no.

20  Q.  Now you've mentioned Mr. Dunn's name.  He was the

21  investigator who was assigned to investigate this matter --

22  A.  I --

23  Q.  -- your concerns, is that correct?

24  A.  I believe so.

25  Q.  And he's a lawyer, Mr. Dunn?

1   A.  I -- I think I looked at his CV afterwards and he appeared

2   to have gone to law school.  I didn't know if he was a lawyer

3   at the time.

4   Q.  And Mr. Dunn met with you twice, is that right?

5   A.  Yes.

6   Q.  And you provided Mr. Dunn with emails that you had

7   exchanged with Professor Bekaert, is that right?

8   A.  He asked me emails about the dinners, and I provided those

9   and a few others.

10  Q.  And you also provided him the name of one person that you

11  thought he should interview, isn't that right?

12  A.  That's not the right characterization.  He asked me

13  about --

14  Q.  You gave him one name, isn't that right?

15  A.  He asked me which graduate students were working, who had

16  been working with us, and I gave him a name.

17  Q.  Did you give him any other names?

18  A.  Of graduate students, no.  Of professors that were

19  involved, yes.

20  Q.  But those professors were not people who observed you and

21  Professor Bekaert interacting with each other, correct?

22  A.  Correct.

23  Q.  And Mr. Dunn interviewed Professor Bekaert three times,

24  isn't that right?

25  A.  I don't know.

I7b1rav5                        Ravina - Cross

1    Q.  And you know that Professor Bekaert also provided him with

2    emails, correct?

3    A.  Now, yes.  At the time, I had -- I wasn't given any

4    information.

5    Q.  And you received in November Mr. Dunn's report, the outcome

6    letter, is that correct?

7    A.  Yes.

8    Q.  And it's a six-and-a-half, single-spaced report, isn't that

9    right?

10   A.  I don't remember.  I would have to look at that report.

11   Q.  You don't remember how long it was?

12   A.  No, I don't remember the number of pages.

13   Q.  I'll show you a hard copy to refresh your recollection

14   about its length.

15   A.  Thank you.

16   Q.  Does that document refresh your recollection as to how long

17   Mr. Dunn's report was?

18   A.  Yes.

19   Q.  It's six and a half pages, is that correct?

20   A.  Correct.

21   Q.  Single spaced?

22   A.  Yes, we can characterize it that way.

23   Q.  And in that report he makes specific reference to Columbia

24   University's policies on discrimination and harassment, doesn't

25   he?

I7b1rav5                          Ravina - Cross

1   A.  On the first page, he reports the definition of sexual

2   harassment.

3   Q.  You mentioned that you filed an appeal, is that correct?

4   A.  Yes.

5   Q.  And assigned as the appeal officer was a Professor Melissa

6   Begg, is that right?

7   A.  Yes.

8   Q.  And Professor Begg was an assistant provost of the

9   university, is that correct?

10  A.  I don't remember her correct -- her exact title.

11  Q.  She wasn't a professor at the business school, correct?

12  A.  No, no.

13          MS. PLEVAN:  I'd like to show the witness Defendant's

14  Exhibit JW.  I'm not going to offer it at this time.

15  Q.  But does that help you with the date of the appeal letter,

16  the appeal decision?

17          MS. HARWIN:  There's no pending question.

18  Q.  What was the date that your appeal decision was

19  communicated to you?

20  A.  So in the end of the email chain, there is a letter from

21  Ms. Rooker, the associate provost, dated January 13, 2015, and

22  I believe it was attached to an email.

23  Q.  So somewhere mid January of 2015 is when the appeal

24  decision was communicated to you, is that right?

25  A.  Yes.

1   Q.  And you didn't file any separate complaint with the EOAA

2   office after that, is that correct?

3   A.  No.

4   Q.  Now in the period the second half of 2014 and into the

5   first half of 2015, you spoke about your papers and the

6   schedule with several people at the business school, correct?

7   A.  Sorry.  Can I update my question?  It's not clear from --

8   Q.  I'm not -- there's no question about that pending.

9   A.  The previous question about --

10  Q.  There's no question pending.  You answered the question.

11           THE COURT:  Your lawyer can follow up on redirect,

12  okay?

13           THE WITNESS:  Sorry.

14           THE COURT:  Is there a pending question now?

15           MS. PLEVAN:  Well, I started one, but --

16           THE COURT:  Why don't you start again.

17           MS. PLEVAN:  Yes, I will do that.

18  BY MS. PLEVAN:

19  Q.  So in the last part of 2014, say from the summer on and

20  into the first half of 2015, you had a number of conversations

21  with representatives of the business school about your papers

22  and your interactions with Professor Bekaert regarding the

23  papers, is that correct?

24  A.  Part of those conversations were about the papers and

25  interaction and also about the harassment and the retaliation.

1   Q.   And the what?

2   A.   Harassment and retaliation.

3   Q.   Okay.  But let's just focus on the ones about the paper.

4   You spoke with people about the schedule that you wanted to

5   implement, is that correct?

6          Just yes or no.  Didn't you speak to people such as

7   Vice Dean Horan and Stephen Zeldes about the schedule you were

8   trying to achieve?

9   A.   And I spoke to the dean in the meeting and after that

10  with -- or I continued the conversation with Vice Dean Horan,

11  with Steve Zeldes, Charles Jones, and at some point also

12  Melissa Rooker.

13  Q.   I'm sorry.  The last name?

14  A.   Melissa Rooker, the vice provost, the head of the EOAA

15  office.

16  Q.   And Professor Zeldes in particular was having a lot of

17  discussions with Professor Bekaert about the schedule and the

18  papers, correct?

19  A.   I don't know.

20  Q.   You don't know?

21  A.   I wasn't in that discussion.

22  Q.   Didn't you talk to Professor Zeldes about the conversations

23  he was having with Professor Bekaert, about the papers and the

24  schedule?

25  A.   I knew that Professor Zeldes was involved in talking with

1    Professor Bekaert, but I don't know how often they were

2    talking, the content of their conversation, or the degree of

3    involvement.

4    Q.  Professor Zeldes was trying to help you, wasn't he?

5    A.  I hope so.

6    Q.  And --

7    A.  I don't know.

8    Q.  You yourself had many conversations with Professor Zeldes,

9    right?

10   A.  Not in this period.  In the -- in the fall of 2014, there

11   were not many.

12   Q.  No, I said all the way through 2015.  I didn't limit it to

13   the fall of 2014.

14   A.  They intensified in 2015, the conversations with --

15   Q.  Continued into 2015.

16   A.  They continued and became more frequent.

17   Q.  And you spoke to Professor Zeldes and other senior faculty

18   members in the division, correct?

19   A.  Correct.

20   Q.  And many of these conversations are the ones you tape

21   recorded, correct?

22   A.  I wouldn't say many.  Some of them.

23   Q.  You tape recorded over 80 conversations with your

24   colleagues, isn't that right?

25   A.  I didn't count them.  There were many.  I -- I started

1   recording the conversations in the winter of 2015, after many

2   conversations.

3   Q.  And you produced in this case over 80 tapes of

4   conversations that you taped with your colleagues, correct?

5   A.  I produced many tapes, I believe.

6   Q.  You don't want to say it's 80, though, right?

7   A.  I didn't count them.

8   Q.  And you made these tapes secretly, correct?

9   A.  Yes.

10  Q.  But no tapes of any conversations with Professor Bekaert,

11  correct?

12  A.  No, because --

13  Q.  Just --

14  A.  Correct.

15  Q.  You've answered the question.

16           Now going back to Professor Zeldes, there were about

17  25 conversations you taped with him, isn't that right?

18  A.  I haven't counted them.

19  Q.  So initially in the fall of 2014, you sent Professor Zeldes

20  a proposed work schedule, is that correct?

21  A.  I believe so.  At some point I forwarded him the schedule.

22           THE COURT:  Does anyone on the jury need to stand and

23  stretch?  Are you all okay?  All right.

24  Q.  Professor Ravina, I'm showing you what's been marked as

25  Defendant's Exhibit HT, which is an email that you forwarded to

I7b1rav5                         Ravina - Cross

1    Professor Zeldes sort of attaching an email you sent on

2    September 26 to Dean Horan and Professor Wolfenzon.

3    A.  Yes, that's correct.

4            MS. PLEVAN:  Okay.  We offer Defendant's Exhibit HT in

5    evidence.

6            THE COURT:  Any objection?

7            MS. HARWIN:  No objection.

8            THE COURT:  HT will be admitted.

9            (Defendant's Exhibit HT received in evidence)

10   BY MS. PLEVAN:

11   Q.  And without going into all the details of the schedule and

12   the projects that were being worked on, would it be fair to

13   describe this as a proposal that you were making for how the

14   work that was in process would be completed, or when, and by

15   whom?

16   A.  It was an update on a proposal that I was asked by Dean

17   Hubbard in the September 16th meeting to use in a conversation

18   with Professor Bekaert and that I learned from Professor Zeldes

19   that it was not used.

20   Q.  Well, let's just start with this proposal.  This was your

21   proposal, correct?

22   A.  An updated version, since time had passed.

23   Q.  And there were ongoing discussions about your proposal with

24   the dean and Professor Zeldes, correct?  And Dean Horan.

25   A.  So since nothing happened to the first agreed proposal,

I7b1rav5                          Ravina - Cross

because it was not presented, I updated the -- I believe around

a week later, and I made another proposal.  And I sent it to

Vice Dean Horan and to the relationship manager.

Q.  Okay.  So I think what you're saying is, what's attached

here is an updated version from September 26, correct?

A.  The updated I sent on September 26, yes.

Q.  This schedule was a topic of ongoing discussion in the fall

of 2014, wasn't it?

A.  It became one, yes.

Q.  And the people participating in that discussion were Vice

Dean Horan and Professor Zeldes, correct?

A.  And Professor Wolfenzon and originally the dean.

Q.  Okay.  And people were talking to you and also talking to

Professor Bekaert, correct?

          MS. HARWIN:  Objection.

A.  I don't know what they were saying or whether they were

talking to Professor Bekaert.

Q.  And you understood that what they were doing was trying to

work out a solution, correct, for the schedule?

A.  I was hoping they would work out a solution.

Q.  And at some point Professor Bekaert agreed to deliver the

international diversified revisions or comments by the end of

the year, correct?

A.  After the first deadline for the schedule passed, he

reneged and changed --

I7b1rav5                        Ravina - Cross

1   Q.  Can you just answer the question, please.

2   A.  At some point --

3   Q.  He did.

4   A.  -- he proposed to deliver the draft at the end of December.

5   Q.  And he did that, correct?

6   A.  He sent in a partial draft I believe on December 31, 2014.

7   A partial draft.  Sorry.  Not complete.

8   Q.  Not complete.

9   A.  Not complete, right.

10  Q.  But by definition a draft is not complete, right?

11  A.  No.  I disagree.  A draft is not the final paper, but a

12  draft is a complete.

13  Q.  And part of the other issue that was worked out was that

14  somewhere along the line Professor Bekaert agreed he would not

15  participate in the automatic enrollment paper, correct?

16  A.  That was later.

17  Q.  Yeah.  Now you received this final year-end letter from

18  Dean Hubbard that was dated June 1, 2015, correct?

19          MS. HARWIN:  Objection.

20  Q.  I'm going to --

21          THE COURT:  Overruled.

22  A.  Can you repeat the question.

23          MS. PLEVAN:  Your Honor, I don't know when you want to

24  take a break, but I'm --

25          THE COURT:  I'm happy to take a break now.  Is this a

I7b1rav5                          Ravina - Cross

1    good time?

2              MS. PLEVAN:  Yes.  I think I'll be on this for a

3    while.

4              THE COURT:  Okay.  Ladies and gentlemen, let's take

5    our afternoon break.  Just remember, don't discuss the case and

6    keep an open mind.  Thank you.

7              (Jury not present)

8              THE COURT:  Why don't we take 15 minutes.  Thank you.

9              (Recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Are we ready for the jury?

 2              Is everyone here?

 3              Why don't we bring them in.

 4              (Jury present)

 5              THE COURT:  All right.  Everyone can be seated.  Thank

 6     you.

 7     BY MS. PLEVAN:

 8     Q.  Professor Ravina, you received a year-end letter from Dean

 9     Hubbard in June of 2015, correct?

10     A.  Yes.

11     Q.  You actually received the letter in late August, correct?

12     A.  Sometime in August.

13     Q.  And in that letter the dean made a specific comment about

14     your publication record, isn't that right?

15     A.  I think so.  I don't have the letter in front of me.

16              MS. PLEVAN:  I think this is Plaintiff's Exhibit 105

17     in evidence.  Can we show that to the witness, page 2.

18     BY MS. PLEVAN:

19     Q.  Look at the first page.  That's the letter you got from the

20     dean in August, sometime in August?

21     A.  Sometime -- yeah, it appears to be.

22     Q.  In the next-to-last paragraph, he makes reference to the

23     feedback from your colleagues, correct?

24     A.  Correct.

25     Q.  And he says he joined them in their assessment that your
```

1    publication record is not currently on track for promotion or

2    tenure at Columbia, right?

3    A.  Yes.

4    Q.  And then he said, "I hope that your upcoming leave is

5    productive for you," correct?

6    A.  Yes.

7    Q.  And when you first read that, you were surprised, weren't

8    you?

9    A.  I was expecting a leave.  I was surprised that it was

10   coming in the form of my year-end letter, but I was not

11   surprised by the leave.

12   Q.  You told Professor Zeldes in one of those taped

13   conversations that you were surprised by this, didn't you?

14   A.  We said many different things.

15   Q.  That was one of them, wasn't it?

16   A.  Definitely -- definitely.

17   Q.  Yes or no, Professor Ravina.

18            Didn't you tell Professor Zeldes, when you got this

19   and it made a reference to leave, you were surprised?

20   A.  I don't remember the exact words.  I remember being

21   surprised that it came in the year-end letter, but I had been

22   discussing the leave with the university for many months at

23   that point.

24   Q.  You are referring to conversations your lawyers were

25   having?

A.  My lawyers and also with Professor Zeldes about the delay

of the tenure.

Q.  Now, Professor Zeldes explained to you that -- well, let me

ask you this question:  You're telling us that you thought that

you would be getting a leave even though you didn't submit a

leave application, is that correct?

A.  Um --

Q.  Just say yes or no.

A.  I applied through the discussions -- through lawyers.

Q.  Well, when you want a leave at Columbia University as a

faculty member, there is a process that's followed, isn't

there?

A.  I believe so.

Q.  Right.  And the normal procedure is to submit a written

application to the dean, correct?

A.  That's one step.

Q.  And that application has to be not only approved by the

dean of the business school, but it has to be approved by the

provost of the university in the provost's office, correct?

A.  That's another step.

Q.  In 2012, when you sought a leave, I guess that was to go to

the Federal Reserve, you submitted a formal letter to Dean

Johar, correct?

A.  Yes.  As part of --

Q.  I ask the witness to look at Defendants' Exhibit AH.

I7bnrav6                        Ravina - Cross

1              Do you recognize Defendants' Exhibit AH as a letter

2     you submitted in April 2012 seeking a leave?

3     A.   Yes.

4              MS. PLEVAN:  We offer Defendants' Exhibit AH in

5     evidence.

6              MS. HARWIN:  No objection.

7              THE COURT:  AH will be admitted.

8              (Defendants' Exhibit AH received in evidence)

9     BY MS. PLEVAN:

10    Q.   Now, within a few weeks of your receiving this letter from

11    the dean, you said he just used the words "upcoming leave,"

12    correct?  That's what he said?

13    A.   I believe so.

14    Q.   He didn't say, "I'm pleased to grant you a leave this

15    year," did he?

16    A.   I thought the --

17    Q.   Just answer that yes or no.

18    A.   No.

19    Q.   And he didn't make reference to a leave application that

20    you made, did he?

21    A.   No.

22    Q.   And when you spoke to Professor Zeldes about this, he told

23    you it must have been a mistake, right?

24    A.   He told me he was not aware.  He told me he was --

25    Q.   He told you it must have been a mistake, correct?

1   A.  He told me that he was not aware of it, and it could be a

2   mistake.  I should double check.

3   Q.  And you also spoke to Vice Dean Phillips, Senior Vice Dean

4   Phillips about this, correct?

5   A.  I believe I might have sent her an e-mail, and I received a

6   voice mail from her.

7   Q.  That was the voice mail that was played earlier, correct?

8   A.  Correct.

9   Q.  Making it very clear you hadn't been granted a leave,

10  correct?

11  A.  Making it clear it was a mistake.

12  Q.  Meaning it wasn't intended to grant you a leave by this

13  letter, correct?

14          MS. HARWIN:  Objection.

15  A.  No, I disagree.

16  Q.  You disagree?

17  A.  Uh-huh.

18  Q.  But you do agree you never applied for a leave?

19  A.  I did through the lawyer and the conversation earlier on --

20          MS. PLEVAN:  Move to strike, your Honor.

21          THE COURT:  Yes.  Let's not get into what the lawyers

22  said.  I'm going to strike that.

23          THE WITNESS:  So the Columbia administration

24  understood that I was seeking a leave, and I wanted to delay my

25  tenure clock as a remedy for what happened.

1          MS. PLEVAN:  I don't think there is a question

2     pending, Professor Ravina.

3          THE WITNESS:  Oh.

4     BY MS. PLEVAN:

5     Q.  But you understood from your conversation with Professor

6     Zeldes, who didn't talk to anybody else, that he didn't think

7     it was possible that you were granted a leave, correct?

8     A.  He was not informed.

9     Q.  What he told you was that it must have been a mistake,

10    correct?

11    A.  Yeah.  He wasn't sure, and he told me to check.

12    Q.  All right.  And -- well, he told you he thought it was a

13    mistake, didn't he?

14    A.  He said it must be, meaning I don't know about it, but he

15    encouraged me, I remember, I think I remember --

16    Q.  You think he would have known about it, right?  He was your

17    division chief, right?

18    A.  By then, I no believe anymore, but clearly I got a letter

19    saying I was on leave, and the chair didn't know about it.

20    Q.  Well, this letter doesn't say you're granted a leave

21    though, correct?

22    A.  It says that I have an upcoming leave.

23    Q.  And you were being given a leave from teaching for that

24    upcoming year, correct?

25    A.  No.

I7bnrav6                    Ravina - Cross

1   Q.  You weren't assigned any teaching for that upcoming year,

2   were you?

3   A.  I learned that only in the --

4   Q.  Just say yes or no?

5   A.  Eventually no.

6   Q.  You weren't assigned any teaching for the fall of 2015 or

7   spring of 2016, correct?

8   A.  I thought I was on leave and I would not get any teaching

9   as part of the leave as well.

10  Q.  In one of your conversations around this time with

11  Professor Zeldes, he told you that a leave would not extend

12  your tenure clock, didn't he?

13  A.  I am not sure.

14  Q.  You have that conversation on tape, don't you?

15  A.  I would have to listen to the tape for --

16  Q.  Do you want to refresh your recollection?  You don't

17  remember that?  OK.  Let's play the tape, 11G, and see if that

18  refreshes -- we will see if this refreshes your recollection.

19          MS. HARWIN:  Your Honor, if it's being used to refresh

20  recollection, should we do it with earphones?

21          THE COURT:  Sure, unless you are seeking to admit it.

22          If you are just refreshing her recollection, the jury

23  doesn't have to hear it, but if you are seeking to admit it --

24          MS. PLEVAN:  I will seek to admit it.  I do want the

25  jury to hear it.

1               THE COURT:  OK.  Why don't you lay the foundation,

2       have her hear it on the earphones, and then just lay the

3       foundation.

4               MS. PLEVAN:  Yes.

5       BY MS. PLEVAN:

6       Q.  This is one of the conversations with Professor Zeldes you

7       tape recorded, isn't it?

8       A.  I haven't heard it.

9       Q.  Excuse me?

10      A.  I haven't heard anything yet.

11              MS. PLEVAN:  Do you object to the playing of the tape

12      recording?

13              MS. HARWIN:  If she's --

14              MS. PLEVAN:  Those were produced by plaintiff.

15              THE COURT:  Do you want her to lay the foundation?

16              MS. HARWIN:  Yes.

17              THE COURT:  OK.

18      BY MS. PLEVAN:

19      Q.  Professor Ravina, did you listen to the tapes that were

20      produced to us in discovery?

21      A.  No.

22      Q.  Did you provide tape recordings to your counsel?

23      A.  Yes.

24      Q.  And among those tape recordings were tape recordings of

25      conversations you had with Professor Zeldes?

1    A.  I believe so.

2    Q.  And some of those conversations dealt with leave of

3    absence, correct?

4    A.  Possibly.

5    Q.  And these tape recordings were done by you with your own

6    machine and you provided it to your counsel, correct?

7    A.  Right.

8            MS. PLEVAN:  I would like to offer this section of the

9    tape recordings.

10           THE COURT:  Do you have an objection?

11           MS. HARWIN:  She should listen to it on the

12   headphones.

13           THE COURT:  Do you have headphones you can put on a

14   computer for a minute?

15           MS. PLEVAN:  Do we have headphones?  I wasn't

16   anticipating an objection.

17           THE COURT:  OK.  All right.

18           So you will just listen to this and hear if it's in

19   fact one of the conversations you recorded.

20           (Pause)

21           THE WITNESS:  That's a conversation between me and

22   Professor Zeldes.

23           THE COURT:  All right.  Any objection?

24           Have you marked it as an exhibit?

25           MS. PLEVAN:  It's part of Defendants' Exhibit Z.  11G

I7bnrav6                          Ravina - Cross

1   is the one segment.

2              THE COURT:  OK.

3              MS. HARWIN:  Counsel hasn't had an opportunity to hear

4   it.  I note that is a composite exhibit.

5              THE COURT:  You can listen to it now.  We will just

6   have the jury wait.

7              (Pause)

8              THE COURT:  Do you have an objection?

9              MS. HARWIN:  No objection, your Honor.

10             THE COURT:  It will be admitted.

11             (Defendants' Exhibit Z, Section 11G received in

12   evidence)

13             MS. HARWIN:  I would ask that it be separately marked,

14   since it is a part of a previously labeled composite exhibit.

15             THE COURT:  Since you are seeking to only admit a

16   portion of it, you will have that separately put on another CD.

17             (Audio played)

18   BY MS. PLEVAN:

19   Q.  That was your conversation with Professor Zeldes, right?

20   A.  One of the conversations, yes.

21   Q.  Now, by the way, you referred earlier in your testimony to

22   an e-mail, I think on your direct testimony about an e-mail you

23   sent to Professor Zeldes in August of 2015.

24             Do you remember that?

25   A.  Yes.

I7bnrav6                          Ravina - Cross

1    Q.  And Dean Hubbard responded to that, didn't he?

2    A.  I believe --

3    Q.  Just yes or no.

4    A.  I don't remember.  I believe I got a short response.

5    Q.  So the dean acknowledged the letter and responded to it,

6    didn't he?

7    A.  He remember he acknowledged the letter.  If you had the

8    letter, I can look at it.

9    Q.  You do remember that there was a response, correct?

10   A.  So I remember that it was forwarded.  I am not sure if the

11   administration responded, but it could have been --

12   Q.  Let me show you this --

13   A.  Yeah.

14   Q.  -- and it's not going to be offered into evidence, but does

15   that refresh your recollection that the dean responded to your

16   letter?

17           (Counsel conferred)

18   BY MS. PLEVAN:

19   Q.  Does that refresh your recollection that the dean responded

20   to that e-mail?

21   A.  Just a second.

22   Q.  I am not asking you to say anything about the contents, but

23   just does that refresh your recollection?

24   A.  I did receive a response on August 27, 2015.

25   Q.  Thank you.

I7bnrav6                    Ravina - Cross

1              THE COURT:  Just note for the record what exhibit you

2      showed her.

3              MS. PLEVAN:  It's Defendants' Exhibit LR.

4              THE COURT:  OK.

5      BY MS. PLEVAN:

6      Q.  Going back to these conversations you were having about a

7      leave and your extension, you also spoke to Professor Zeldes

8      about something called a break in service, correct?

9      A.  Yes.

10     Q.  He told you sometime in 2015 that you would need to change

11     your title to research associate scholar in order to go off the

12     tenure clock, correct?

13     A.  I don't remember if he was the person telling me, but I

14     discussed it with him among many other people.

15     Q.  You do remember that in September 2015 you spoke with your

16     colleagues Professor Calomiris and Patrick Bolton about this

17     possibility, correct?

18     A.  Sometime in the fall of 2015.

19     Q.  And they told you that there was an option of you deferring

20     tenure review for at least a year, correct?

21     A.  No.

22     Q.  Did they tell you there was a possibility of deferring your

23     tenure vote for a year?

24     A.  No.

25     Q.  You did speak to both Professor Calomiris and Professor

I7bnrav6                    Ravina - Cross

1    Bolton on this subject, correct?

2    A.  Yes.

3    Q.  And they told you that they had learned about this

4    possibility from the dean, correct?

5    A.  We discussed that possibility.  They didn't tell me the

6    details.  I don't think they knew the details either.  They

7    were not in the administration.  I was seeking their advice.

8    Q.  Well, they told you that you could get more time on the

9    tenure clock by taking a change in your title, correct?

10   A.  No.

11   Q.  You don't remember them telling you that?

12   A.  No.  I don't think that's what they told me.

13   Q.  Pardon?

14   A.  I don't think that's what they told me.

15   Q.  But you do remember the position of associate research

16   scholar being presented to you in the fall of 2005, correct --

17   excuse me, 2015.

18            THE WITNESS:  Sorry.  It was presented first by the

19   lawyer, is it OK?

20            THE COURT:  That's OK.

21   A.  It was presented -- I was informed by my lawyer about it

22   first.

23   Q.  We are not going to talk about lawyer conversations.  I'm

24   asking you about your conversation with Patrick Bolton and

25   Charlie Calomiris.

1    A.  So they were not --

2    Q.  They told you they had had a discussion with Dean Hubbard,

3    correct?

4    A.  Yes.

5    Q.  And that there was a possibility of you having a position

6    that would give you more time on the tenure clock, correct?

7              MS. HARWIN:  Objection.

8              THE COURT:  Overruled.

9    A.  They didn't, they did not -- they were not part of the

10   administration, and it is not that they told me you have an

11   option.

12   Q.  I didn't ask you if they were part of the administration.

13   They told you they had heard this from the dean of the business

14   school, correct?

15             MS. HARWIN:  Objection, your Honor.

16             THE COURT:  Is it being admitted for the truth of the

17   matter?

18             MS. PLEVAN:  No.

19             THE COURT:  It's hearsay, what others said.  What's

20   the purpose?

21             MS. PLEVAN:  It's for the purpose that the dean told

22   them this and that they were conveying it to her, yes.

23             MS. HARWIN:  That's hearsay, your Honor.

24             THE COURT:  All right.

25             So this question again is not being admitted for the

I7bnrav6                         Ravina - Cross

1   truth, but for the fact that it was said, if in fact it was

2   said.  So, overruled.

3            Do you want to ask the question again?

4            MS. PLEVAN:  Could we read back the question.

5            THE COURT:  Sure.

6            I will read it from my draft transcript here and you

7   can tell me if this is wrong, "They told you they had heard

8   this from the dean of the business school, correct?"

9            Do you want me to go back further?

10           MS. PLEVAN:  I think that's OK.

11           And I can follow up.

12  BY MS. PLEVAN:

13  Q.  Can you answer that?

14  A.  So they told me that at some point the dean had approached

15  them to tell them about this, but I knew already that this

16  was --

17           MS. PLEVAN:  Objection, your Honor.

18           It is not responsive.

19  A.  I didn't hear it from the first time from them.

20           THE COURT:  OK.

21  A.  And they were not announcing it to me.

22           THE COURT:  Do you want to rephrase?

23           MS. PLEVAN:  I am happy to rephrase.

24           THE COURT:  Go ahead.

25  BY MS. PLEVAN:

I7bnrav6                         Ravina - Cross

Q.  Regardless of what you heard before from the lawyer or

anybody else, you did have a meeting in December of 2015 in

which professors Bolton and Calomiris, senior faculty members

in your division, told you about the option that they had heard

about from Dean Hubbard of your becoming a research associate

scholar, correct?

A.  Correct.

          MS. HARWIN:  Objection, your Honor.  This is double

hearsay.

          THE COURT:  Again, I am not admitting it for the truth

of the statement but for the fact that it was said to

Ms. Ravina.

          MS. HARWIN:  But, your Honor, there is no relevant

purpose for which it's being admitted.

          THE COURT:  Let's not argue about it in front of the

jury.

BY MS. PLEVAN:

Q.  You did have conversations with Stephen Zeldes about this

same possibility, correct?

A.  After --

Q.  Just yes or no.

A.  Yes.

Q.  And you told Professor Zeldes that you wouldn't change your

title, isn't that right?

A.  Correct.

1    Q.  And in a conversation with Professor Zeldes, one

2    conversation, he told you that if you went off track in this

3    other position you would be able to come back as an assistant

4    professor, correct?

5    A.  No.

6    Q.  You don't recall him telling you that?

7    A.  He said he had no authority, and he wasn't sure.

8    Q.  I didn't ask you whether he said he had authority.  Didn't

9    he at some point tell you that that could happen, that you

10   could come back?

11   A.  He told me many things.

12   Q.  And that was one of them, correct, that you would be able

13   to come back, that if you took a break in service as a research

14   associate scholar you could come back as an assistant

15   professor?

16          MS. HARWIN:  Your Honor, I would like to register a

17   standing objection to this hearsay testimony being elicited.

18          THE COURT:  Overruled.  This is a statement that was

19   made directly to her.  It is overruled.

20   A.  It didn't depend on him.

21   Q.  I'm sorry?

22   A.  It did not depend on him.

23   Q.  But he said it to you, correct, and he was the chair of

24   your division, correct?

25   A.  As one of the possibilities --

1     Q.  Yes or no, Professor Ravina?

2     A.  He was not giving me a guarantee that I would come back as

3     an assistant professor after the research associate position.

4     Q.  He told you it was possible, though, correct?

5     A.  He told me it was possible.

6     Q.  And he said you could get it in writing, didn't he?

7     A.  He wasn't sure about that.

8     Q.  He thought you could, though, didn't he?

9     A.  I had just gotten a leave in writing.

10    Q.  Excuse me?

11    A.  I had just gotten a leave in writing, and it was revoked.

12    Q.  Now, you would not have, in any event, ever accepted this

13    position because of the title, correct?

14    A.  The title would be made public.

15    Q.  So you would never have, no matter who told you or when

16    they told you or what they told you about this position, you

17    would never have accepted it because you didn't want that

18    title, correct?

19    A.  Never is a strong word.  I don't know.

20    Q.  But that's what you told everybody repeatedly, correct?

21    A.  I did not want to take that demotion.

22    Q.  And you told people repeatedly that you didn't want to take

23    a position with a title change, correct?

24    A.  Yeah.  I didn't want to lose my position of assistant

25    professor.

Q.  Professor Ravina, just answer my question.  You repeatedly
told people you would not change your title in order to have a
break in service, correct?

A.  I didn't want to.

Q.  Now, you referred earlier to your request for personal
hardship leave, and you thought that you could obtain a
personal hardship leave and still come into work every day, is
that correct?

A.  I could either come into Columbia or visit somewhere else.
But I wanted to go -- and part of that leave, the purpose was
for me to catch up on my work and be able to remedy the damage.

Q.  Now, we looked earlier at your letter to the provost's
office and I think the statutes.  Did you also look at the
faculty handbook and what it said about personal hardship
leave?

A.  I looked at the statutes and charters.

Q.  But you didn't look at the faculty handbook that is online
at Columbia?

A.  The statutes were online, probably are still online.

            MS. PLEVAN:  I would like to show the witness
Defendants' Exhibit J and then you can just look at the first
page.

BY MS. PLEVAN:

Q.  Do you recognize this as the faculty handbook 2008 that was
online for use at this time at Columbia University?

1  A.  I did not consult it, but it looks likes the faculty

2  handbook from 2008.

3  Q.  So, throughout this period you never read the faculty

4  handbook?  Is that what you're telling us?

5  A.  Yes.

6  Q.  Have you read it before today?

7  A.  No.

8  Q.  Well, let's look at it anyway.

9          MS. PLEVAN:  I'm sorry.  We offer Defendants' Exhibit

10  J in evidence.

11          THE COURT:  Is there an objection to J?

12          MS. HARWIN:  No, your Honor.

13          THE COURT:  All right.  J will be admitted.

14          (Defendants' Exhibit J received in evidence)

15  BY MS. PLEVAN:

16  Q.  Would you look at what's marked as page 67.  This is a

17  section on other leaves.

18          Do you see the reference to leaves for compelling

19  personal need in the, I guess it's the fourth paragraph?

20  A.  Yes.  I read the first part.

21  Q.  I'm sorry.  I can't hear you.

22  A.  Yes.  I see the paragraph that starts, "Full-time faculty

23  may request" --

24  Q.  It says it's a leave without salary, correct?

25  A.  Correct.

1   Q.  And you weren't interested in a leave without salary in the

2   fall of 2015, were you?

3   A.  I would have preferred the salary.

4   Q.  Pardon?

5   A.  I would have preferred the salary, yes.

6   Q.  You were expecting any leave to be with salary, weren't

7   you?

8   A.  I understood from Professor Zeldes that the dean had said

9   that the business school would have paid the salary regardless.

10  Q.  Well, he was referring to the break in service as a

11  research associate scholar, wasn't he?

12  A.  He was referring to any leave.

13  Q.  You never looked at this at the time, so you didn't see

14  that part about the salary, correct?

15  A.  Correct.  I don't remember if it's in the statutes or not.

16  Q.  OK.  You wrote to the provost's office on December 24,

17  2015, and you got a response in mid-January, correct?

18  A.  Correct.

19          MS. PLEVAN:  I am going to mark it.  I think it's in

20  as a Plaintiff's Exhibit, but it is a Defendants' Exhibit NO.

21  BY MS. PLEVAN:

22  Q.  That was Defendants' Exhibit NO, the first response you

23  received from the vice provost, Christopher Brown?

24  A.  Yes.

25          MS. PLEVAN:  We offer Defendants' Exhibit NO in

1    evidence.

2              THE COURT:  Any objection?

3              MS. HARWIN:  No objection.

4              THE COURT:  NO will be admitted.

5              (Defendant's Exhibit NO received in evidence)

6    BY MS. PLEVAN:

7    Q.  He told you in this letter that you couldn't go off the

8    tenure clock and retain your current title, right?

9    A.  Retain?

10   Q.  He told you in the first paragraph that if you wanted an

11   extension to go off the tenure clock, you would have to change

12   your title, correct?

13   A.  That's what it states.

14   Q.  And you are not aware of any other professor at Columbia

15   University who received a personal hardship leave, correct?

16   A.  I don't know the sources of people's leave and I don't know

17   the leave --

18   Q.  You don't know, right?  You just don't know?

19   A.  I know it's in the statutes, but I don't know anybody --

20   Q.  The question is, You are not aware of any other professor

21   that you know about or that you heard about who received a

22   personal hardship leave, correct?

23   A.  I know --

24   Q.  Just yes or no, Professor Ravina.

25   A.  That's not a yes-or-no question.

I7bnrav6                        Ravina - Cross

1   Q.  Sure, it is.

2   A.  I know people that are on leave and they want leave.  I

3   don't know the specific reason --

4   Q.  Of course not.

5   A.  -- the leave was given.

6   Q.  Therefore, you don't know whether they got a personal

7   hardship leave, correct?

8   A.  Yes, I don't know.

9   Q.  You don't know anybody who got a personal hardship leave?

10  A.  And I don't know --

11  Q.  It's very simple.

12  A.  -- anybody that got any other leave.  Yes.  Nobody told me

13  about their leaves.

14  Q.  Right.  So you don't know whether anybody who needed more

15  time to finish their research or publications ever got a

16  personal hardship leave, correct?

17  A.  Um, correct.

18  Q.  So far as you know, you were not eligible for any other

19  type of leave under the Columbia policies we just looked at a

20  minute ago, correct?

21  A.  I haven't read it before.  Can we go back to the policy?

22  Q.  Sure.  I think it's medical leave, military service, child

23  care leave.  You were not eligible for any of those, correct?

24  A.  I could have -- I picked hardship leave in my request, but

25  I was also seeing a psychiatrist as --

1   Q.  You didn't apply for medical leave, correct?

2   A.  I applied for the hardship one.

3   Q.  And you did not apply for medical leave, correct?

4   A.  I applied for only one.

5   Q.  Right.  So you didn't apply for a medical leave?

6   A.  No.  Not officially or formally.

7   Q.  Well, you didn't apply for it at all to the provost's

8   office, correct?

9   A.  Not to the provost's office.

10  Q.  OK.  Now, in the second letter you got from Vice Provost

11  Brown, he denied your request for that type of leave, correct?

12  A.  Correct.

13  Q.  And he also asked to meet with you, correct?

14  A.  No.

15          MS. PLEVAN:  Let me show the witness, I would like the

16  witness to see Defendants' Exhibit NR.

17  BY MS. PLEVAN:

18  Q.  Is that the e-mail you received from Christopher Brown on

19  January 20, 2016?

20  A.  Yes.

21          MS. PLEVAN:  We offer Defendants' Exhibit NR in

22  evidence.

23          MS. HARWIN:  No objection.

24          THE COURT:  All right.

25          NR will be admitted.

1      (Defendant's Exhibit NR received in evidence)

2   BY MS. PLEVAN:

3   Q.  This is the communication you received from Vice Provost

4   Brown after you submitted some additional information, correct?

5   A.  I believe it was before I submitted the additional

6   information, but I would have to look at the dates.

7   Q.  OK.  I think we looked at them this morning, so the jury

8   will have the different exhibits.

9   A.  It is around this period, but I believe this came before I

10  submitted the additional information.

11  Q.  OK.  So, Professor Brown -- and Vice Provost Brown then --

12  asked to meet with you, is that correct?

13  A.  Correct.

14  Q.  You did not make an appointment to meet with him alone or

15  with Vice Dean Phillips, correct?

16  A.  Correct.

17  Q.  You didn't actually respond to this e-mail at all, did you?

18  A.  I responded with the letter containing additional

19  information.

20  Q.  In this letter you would agree that Christopher Brown, the

21  vice provost, made it clear that you would have to change your

22  title to something like associate research scholar if you were

23  going to go off the tenure track, correct?

24  A.  Which letter?

25  Q.  The one that's in front of you.

I7bnrav6                         Ravina - Cross

1   A.  The e-mail?

2   Q.  Yes.  The e-mail, sorry.  NR.

3   A.  He said that his office was not able to grant my request

4   for a paid leave with an extension of the tenure clock with no

5   change in title.

6   Q.  You received another communication a few days later from

7   Vice Dean Phillips, correct?

8   A.  It was around that period, but I don't remember the exact

9   date.

10          MS. PLEVAN:  I would like the witness to identify

11  Defendants' Exhibit NZ.

12          Is Exhibit NZ, Professor Ravina, a long e-mail, one

13  page, a little bit more, that you received from Vice Dean

14  Phillips on January 22, 2016?

15  A.  Yes.

16  Q.  And you would agree in this e-mail --

17          MS. PLEVAN:  I'm sorry.  I offer Defendants' Exhibit

18  NZ in evidence.

19          THE COURT:  Any objection?

20          MS. HARWIN:  No.

21          THE COURT:  NZ will be admitted.

22          (Defendants' Exhibit NZ received in evidence)

23  BY MS. PLEVAN:

24  Q.  In this e-mail you would agree that Dean Phillips set forth

25  in detail all the different options that, as she saw it, you

1   would have, correct?

2   A.   Three options.

3   Q.   And one of those options was not to come up for tenure at

4   all?

5   A.   Right.

6   Q.   And she offered or she asked to meet with you or asked you

7   to meet with her and Chris Brown that week, correct?

8   A.   Yes.

9   Q.   This was a follow-up really to provost Brown's e-mail to

10  you, right?

11  A.   Say again.

12  Q.   It was a follow-up, she was following up because you hadn't

13  responded to Professor Brown's e-mail, correct?

14  A.   I don't know why she was following up, but it was related

15  to that e-mail.

16  Q.   Then in the second option she referred to your coming up

17  for tenure that year, correct, or in that time period?

18  A.   Coming up for tenure in the spring, submit my material on

19  January 25.

20  Q.   She said you could get more time to submit your materials

21  in that paragraph B, correct?

22  A.   Six more days.

23  Q.   But you later got a much longer extension, correct?

24  A.   I got various deadlines.

25  Q.   Yes.  And the deadline that you finally met was March 1?

1   You submitted them on March 2, correct?

2   A.   The last deadline that I got was March 1, and I submitted

3   during, on early morning March 2.

4   Q.   Dean Phillips referenced a third option there, correct?

5   A.   Yes.

6   Q.   And you referred this morning to the fact that you -- if

7   you took that option, you would have to submit your materials,

8   you know, later that year, in the spring of 2016, right?

9   A.   Later that semester.

10  Q.   But she said that the tenure review would not take place

11  until the following year, correct?  Look in part C.  She

12  said -- well, just you ask answer that.

13  A.   I could --

14  Q.   Not in the spring of 2016, right?

15  A.   I would start submitting material in the spring of 2016,

16  and the tenure process would continue in the following --

17  stretch into the following year.

18  Q.   Right.  During the 2016-2017 year?

19  A.   Correct.

20  Q.   And it could have gone as long as the spring of 2017 if you

21  had another year, correct?

22  A.   Um, that's not what she seems to suggest.

23  Q.   Well, she's not specific, but she says sometime during that

24  year, right?

25  A.   Um --

 1   Q.   The following year.

 2   A.   So, the --

 3   Q.   Correct?

 4   A.   No.

 5   Q.   She is talking about sometime the following year, 2016-2017

 6   school year.

 7   A.   No.  No, not fully correct.

 8   Q.   Excuse me?

 9   A.   Not fully correct.

10   Q.   She says, "We conduct the tenure review during the

11   2016-2017 school year," correct?

12   A.   Yes.

13   Q.   OK.  And you never sat down and had a meeting with her to

14   ask her how late in that year it could be, did you?

15   A.   I did --

16   Q.   Yes or no.

17   A.   No.

18   Q.   But you knew from your own experience you were being

19   reviewed late in the year 2015-2016, correct?

20   A.   What do you mean from my own experience?

21   Q.   You were coming up for review in the spring of your seventh

22   year, correct?

23   A.   I was --

24   Q.   Yes or no, Professor Ravina.

25   A.   I was put up for tenure on a compressed schedule in that

1    year.  I knew that.

2    Q.  I didn't ask you about the schedule.  You got as much time

3    as you really possibly could have been given, correct?

4    A.  No.

5    Q.  If you got an extra year, you would get until -- it's

6    conceivable you could have been given until April of 2017,

7    right?

8    A.  No.

9    Q.  But, in any event, you didn't attend a meeting with either

10   Professor Brown or Provost Brown or Dean Phillips to ask them

11   any questions about what the plan would be, correct?

12   A.  Um --

13   Q.  Just yes or no.

14   A.  No.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I7b1rav7                         Ravina - Cross

1    BY MS. PLEVAN:

2    Q.  Now in terms of the deadlines that you were given for 2016,

3    you received a letter, an email from Professor Zeldes in mid

4    December, correct?

5    A.  Correct.

6    Q.  And that the process had to move forward, right?

7    A.  That it was starting, yes.

8    Q.  And that he was what?

9    A.  That my tenure process would start immediately.

10   Q.  Sorry.  And he gave you a deadline of January 19, 2016

11   initially for your materials, correct?

12   A.  Yes.

13   Q.  And when you talked to him, he explained the whole timeline

14   situation to you, didn't he?

15   A.  He told me that I would go on a compressed schedule and

16   that I needed to submit the material by January 19 and the

17   process would conclude in the spring of 2016.

18   Q.  But it didn't end up being compressed because you got from

19   January 19 to March 2nd to submit your materials, correct?

20   A.  No.

21   Q.  You got an additional six weeks, correct?

22   A.  It was compressed though.

23   Q.  Well --

24   A.  But I got -- I ended up submitting --

25   Q.  -- that's your view.

1   A.  No.

2   Q.  But --

3   A.  It is, but not only mine.

4   Q.  But your deadline was extended an additional six weeks,

5   correct?

6   A.  Correct.

7   Q.  And the materials that were -- I mean, you knew all along

8   that this was going to happen at some point, correct?  I mean,

9   you went to all these meetings and you read the materials, so

10  you knew what the timetable was for tenure review, right?

11  Just -- you were familiar with it, right?

12  A.  At some point, yes.

13  Q.  And there were really three things that had to be submitted

14  as part of a tenure review, right?  One was your CV, which you

15  already had, I assume, right?

16  A.  Yeah, I updated my CV.

17  Q.  And the other was whatever papers -- the other part of the

18  package was papers that you would ask the tenure review

19  committee, the reading committee to look at, correct?  So you

20  had those; whatever they were, you had them, correct?

21  A.  Yes.  I didn't have time to make any changes.  That's what

22  I had.  Plus the statement.

23  Q.  So the third thing that you had to create was a personal

24  statement, correct?

25  A.  Correct.

I7b1rav7                    Ravina - Cross

1   Q.  And so in effect, you had from mid December, when you heard

2   from Professor Zeldes, until March 1st or 2nd to prepare your

3   personal statement, right?

4   A.  Yes and no.

5   Q.  Yes and no.  Okay.  You were not asked to provide any

6   letters of support at that stage, correct?

7   A.  I'm not supposed to provide letter of support at any stage.

8   Q.  And you didn't actually start working on the personal

9   statement until sometime in February, correct?

10  A.  I believe -- I believe so.  I don't remember exactly when.

11  Q.  And when it got to the tenure vote, Professor Bekaert did

12  not participate in any way, did he?

13  A.  I don't know.

14  Q.  You don't know one way or the other, right?

15  A.  It wasn't -- I think he was not physically present, but I

16  don't know.

17  Q.  Well, you don't have personal knowledge of his

18  participating, correct?

19  A.  Can you ask --

20  Q.  You don't know -- you didn't observe Professor Bekaert

21  participating in any way in your tenure vote, right?

22  A.  I disagree.

23  Q.  Did you see him participate or hear him participate in your

24  tenure vote?

25  A.  I believe he influenced the tenure vote.

I7b1rav7                          Ravina - Cross

1    Q.  That's not what I asked you though, is it?

2    A.  Depends what you mean by "participate."

3    Q.  Was he at the meeting?

4    A.  I don't know.

5    Q.  Okay.  You're not aware that he was at the meeting, are

6    you?

7    A.  I'm not aware that he was.

8    Q.  Nobody told you he was at the meeting, right?

9    A.  No, nobody told me who was at the meeting.

10   Q.  And you don't have any personal knowledge of Professor

11   Bekaert talking to other professors in the division about your

12   tenure case, do you?

13   A.  I know that he was talking to people, badmouthing me.

14   Q.  You didn't see or hear him, did you, talk to other people?

15   Yes or no, Professor Ravina?

16   A.  I didn't see him with my eyes talking to other people.

17   Q.  Okay.  That's all we need to know.  That's all we need to

18   know.

19   A.  Okay.

20   Q.  And you don't really know what happened at the tenure

21   review meeting, is that correct?

22   A.  I wasn't there.

23   Q.  You know that the chair of the committee was a woman?

24   A.  I was told afterwards in discovery.

25   Q.  And you agree that there was a quorum present at the

1    meeting?

2              MS. HARWIN:  Objection.

3              THE COURT:  Sustained.

4    Q.  Were you informed in any way about the results of the

5    tenure vote?

6    A.  Yes.

7    Q.  And how were you informed?

8    A.  I believe I received an email to set up a meeting with

9    Division Chair Zeldes and Senior Vice Dean Kathy Phillips.

10   Q.  Did you receive some -- did you attend such meeting?

11   A.  Yes.

12   Q.  And when did that meeting take place?

13   A.  It was either early May, maybe late April 2016.

14   Q.  And at that meeting you were advised that the vote was

15   negative, is that correct?

16   A.  Correct.

17   Q.  And thereafter, you were notified that the following year

18   would be your final year at Columbia, is that correct?

19   A.  Correct.

20             MS. PLEVAN:  I'd like to have the witness identify

21   Defendant's Exhibit QL.

22   Q.  Can you identify Defendant's Exhibit QL as a letter you

23   received from Dean Hubbard dated May 11, 2016?

24   A.  Yes.

25             MS. PLEVAN:  We offer Defendant's Exhibit QL in

I7b1rav7                           Ravina - Cross

1   evidence.

2           THE COURT:  Any objection?

3           MS. HARWIN:  No objection.

4           THE COURT:  QL will be admitted.

5           (Defendant's Exhibit QL received in evidence)

6   BY MS. PLEVAN:

7   Q.  And this letter notified you that you would have one more

8   year after the current academic year to continue at Columbia,

9   correct?

10  A.  Correct.

11  Q.  And you did not have any teaching responsibilities that

12  year, is that correct?

13  A.  Correct.

14  Q.  And even with the additional year that you had of 2016-17

15  and the additional year since then at Northwestern, other than

16  the one-page article we looked at earlier, you have not been

17  able to publish any more papers, correct?

18  A.  Correct.

19          MS. PLEVAN:  No further questions.

20          THE COURT:  All right.  Mr. Hernstadt?  Do you want to

21  begin your cross-examination?

22          MR. HERNSTADT:  If I could take a few minutes before

23  we start, to organize.

24          THE COURT:  All right.  Why don't we take just a

25  couple minutes, if anyone needs to use the restroom.  Thank

1    you.

2              (Recess)

3              (In open court; jury present)

4              THE COURT:  Everyone can be seated.

5              Folks, I know it's been a long day.  I say we'll go

6    for about a half hour and then leave at 5:15.  But I'll leave

7    that up to you.  Thank you.

8              MR. HERNSTADT:  Thank you, your Honor.

9    CROSS-EXAMINATION

10   BY MR. HERNSTADT:

11   Q.  Good afternoon, Professor Ravina.

12   A.  Good afternoon.

13   Q.  The discrimination that you claimed you were subjected to

14   by Professor Bekaert started in the fall of 2012, correct?

15   A.  Yes.

16   Q.  You discussed, however, in your testimony a dinner

17   invitation in July of 2012, correct?

18   A.  Correct.

19   Q.  So that's not discriminatory, right?

20             MS. HARWIN:  Objection.

21             THE COURT:  Overruled.

22   A.  That is discriminatory as well.  I just didn't go to the

23   dinner, but it was not a welcome invitation.

24   Q.  Right.  But you said that the improper conduct started in

25   the fall of 2012, and that's not the fall, right?

1   A.  The conduct in the fall was more improper.

2   Q.  The dinner in July 31 of 2012, that was at his local

3   Italian restaurant, right?

4   A.  There was no dinner on July 31st.

5   Q.  The invitation, what you called a dinner invitation on

6   July 31 was at his local Italian restaurant, right?

7   A.  Close to his house, yes.

8   Q.  And that was not the first time that you and he had email

9   interaction about that restaurant, right?

10  A.  Possibly not.

11  Q.  In fact, in November, November 8, 2011, he said that he had

12  to take you to an Italian restaurant in his neighborhood, the

13  owner is from Turin; do you remember that?

14  A.  Not -- I'm not sure when, but I remember I had received

15  dinner invitations from Professor Bekaert.

16  Q.  You remember him saying, "I got to take you to this

17  restaurant in my neighborhood, the owner's from Turin," right?

18  You remember that?

19  A.  I would have to see the email to --

20           MR. HERNSTADT:  Okay.  If we could take a look at

21  Exhibit V.

22           This is a very large exhibit, but I'm going to direct

23  the witness' attention to a page that's been Bates marked 963.

24  Q.  And at the bottom of the page, do you see, November 8,

25  2011, at 7 p.m., Professor Bekaert writes --

I7b1rav7                       Ravina - Cross

 1              MS. HARWIN:  Your Honor, we object to this exhibit.

 2    These are not emails downloaded from Columbia's server but are

 3    instead a compilation apparently prepared by defendant Bekaert.

 4              THE COURT:  Let's not have a whole argument in front

 5    of the jury.

 6              Was this an email between Mr. Bekaert and Ms. Ravina?

 7              MR. HERNSTADT:  Yes.

 8              THE COURT:  Are you just going to ask about it?

 9              MR. HERNSTADT:  Yes.  I'm going to ask about it, then

10    I will submit it, but --

11    BY MR. HERNSTADT:

12    Q.  And do you see it says, "Actually, I still got to take you

13    to an Italian restaurant in my neighborhood.  The owner is from

14    Turin.  You're going to see Mr. Veronesi (ph)."  Do you see

15    that?

16    A.  Yes.  But this is not the email between me and Professor

17    Bekaert.  There is a characterization of it in the same page

18    that it was not in the emails.

19    Q.  I'm sorry.  You see that Professor Bekaert wrote an email

20    that says that he's going to take you to an Italian restaurant

21    in your neighborhood, right?

22    A.  I see that.

23    Q.  Okay.

24    A.  Yes.

25    Q.  Do you remember that now?

1   A.   It appears to be an email from Professor Bekaert inviting

2   me to a restaurant close to his house.

3   Q.   I just asked if you remembered it now.  You remember it

4   now, yes?

5   A.   Yeah, I remember it.

6   Q.   Okay.  And do you see your response, right above that?

7   "Geert, yes, I'm going to see Mr. Veronesi.  Sounds good.

8   Sounds good for the restaurant.  I am from Torino.  What's the

9   name of the place?  Have a good rest and see you tomorrow."

10          Do you remember now that you had an exchange with

11  Professor Bekaert November 2011 about going to dinner and you

12  said "Sounds good"?

13  A.   Yes, but I never went.

14  Q.   And in fact, the email exchange on July 31 is not an

15  invitation to dinner, is it?

16  A.   Say again?  Can you repeat, please.

17  Q.   The emails that we looked at, which is Plaintiff's

18  Exhibit 8, on July 31, 2012, is not actually an invitation to

19  dinner, is it?

20          THE COURT:  You mean on direct examination?  You said

21  "The emails that we looked at."  Do you mean the ones you just

22  asked about, or on direct examination?

23          MR. HERNSTADT:  I'm sorry.  Plaintiff's Exhibit 8.

24          THE COURT:  Okay.  On direct examination.

25          MR. HERNSTADT:  Yes, I'm sorry.  I didn't hear the --

I7b1rav7                    Ravina - Cross

1          THE COURT:  That's all right.

2          MR. HERNSTADT:  Yes, on direct examination.

3   BY MR. HERNSTADT:

4   Q.  That email is not an invitation to dinner, is it?

5   A.  Let me see the email.

6   Q.  Well, I'm asking what you remember first.  As you recall

7   that email, that was not an invitation to dinner, was it?

8   A.  I -- yes, it was an invitation to dinner and --

9   Q.  Okay.  Let's take a look at the email.

10  A.  Let's take a look, yes.

11         THE COURT:  So this is 8 that's already in evidence,

12  correct?

13         MR. HERNSTADT:  That's 8 that's already in evidence.

14         THE COURT:  Then you can show it to the jury if you

15  want to.

16         MR. HERNSTADT:  Your Honor, I would like to move

17  Exhibit V into evidence, so if that's something we have to

18  discuss, I don't know what --

19         THE COURT:  You mean all of it?

20         MR. HERNSTADT:  Yes.

21         THE COURT:  Not at this point.  We can talk about

22  that.  I mean, is there an objection to V?

23         MS. HARWIN:  Yes, your Honor.

24         THE COURT:  All right.  We'll have to go through it

25  email by email.

1              MR. HERNSTADT:  Okay.  Because there are a number of

2    different pages in that exhibit that I will be referring to.

3              THE COURT:  Okay.

4              MR. HERNSTADT:  But certainly not the whole thing.

5              MS. HARWIN:  May we sidebar, your Honor, on this?

6              THE COURT:  Yes, we can, at the appropriate time, but

7    right now he's just using something that you've admitted.

8    BY MR. HERNSTADT:

9    Q.  So looking at this email exchange, starting at the first

10   email, on July 31 at 6:24 p.m., do you see where Professor

11   Bekaert asks you, "How are your revisions coming?"

12   A.  Yes.

13   Q.  And he's asking you about the papers that you have that are

14   in the revise and resubmit phase, right?

15   A.  Correct.

16   Q.  Okay.  And that's three different papers, right, not just

17   the two single-authored ones, but you have an additional paper

18   that you were working on, the risk aversion paper.

19   A.  Correct.

20   Q.  Okay.  And in your exchange, if we look on the first page,

21   the second -- this email, yes.

22              This is an email, at 6:59, you say that you will

23   finish the revisions first, then send her something.  That's a

24   reference to the RA, that you're going to send her some work,

25   correct?

1    A.  I believe so.

2    Q.  And then you say you have two more revisions which you'll

3    do next, right?

4    A.  Correct.

5    Q.  So as of July 31, 2012, you're planning on working on three

6    different revisions, right?

7    A.  Yes.

8    Q.  So looking at the top email, in response, Professor -- do

9    you see where Professor Bekaert says, "If you finish a

10   revision, I will pay dinner at my local restaurant with the

11   Torino owner," do you see that?

12   A.  Yes.

13   Q.  He's not inviting you to dinner, is he?  He's telling you

14   that he will pay for your dinner if you finish your revisions,

15   right?

16   A.  I think he is offering to invite me for dinner and pay for

17   it.

18   Q.  That's not what it says, is it?  Yes or no?

19   A.  I think colloquially, it depends.  If you will look at the

20   dinner -- or if you look --

21   Q.  Ms. Ravina, I'm asking you if that's what the e-mail says.

22   It says, "If you finish your revision, I will pay for your

23   dinner," correct?

24   A.  Literally, yes.

25   Q.  And you said no.  I'm sorry.  But you understood that to be

1    an invitation, correct?

2    A.   Yes.

3    Q.   And you said no to that invitation, right?

4    A.   I didn't go.  I let it drop.

5    Q.   Well, you responded to Professor Bekaert saying that you

6    couldn't do dinner, right?

7    A.   Where is the response?  I didn't go.

8    Q.   Do you recall responding to him at 12:58 a.m. on

9    August 1st, 1 a.m. that same night, "Ah, I'm on a tragic diet

10   so no dinner, but I will still try to finish nevertheless."

11   A.   It's possible.  It was one of my excuses, yes.

12   Q.   And do you remember him asking, "What's a tragic diet?"

13            Why don't we take a look.  This is Exhibit V at 965.

14            So the middle email.  Well, actually, I'm sorry.

15   Let's look at the bottom email.

16            MS. HARWIN:  Your Honor, I just want to clarify this

17   is not being published to the jury, correct?

18            MR. HERNSTADT:  I'm sorry.  I didn't understand.

19            THE COURT:  Is this being published to the jury?

20            MR. HERNSTADT:  I don't know.

21            No, it is not.

22            THE COURT:  All right.  It shouldn't be unless it's in

23   evidence.

24            MR. HERNSTADT:  Your Honor, I would like to move this

25   into evidence so I can publish it to the jury.

1              THE COURT:  Specifically the July 31, 2012 email, is

2      that right?

3              MR. HERNSTADT:  Yes.  That page and the next page,

4      which is the rest of the email chain.  So that would be 964.

5      Yeah.  And you can see the bottom email is the same email which

6      is the last email in Exhibit 8.

7              THE COURT:  The last email on 965?

8              MR. HERNSTADT:  The bottom email, 965, which is from

9      Professor Bekaert to Professor Ravina, at 10:57 p.m., is the

10     final email in the chain that we saw in Exhibit 8.  So this is

11     a continuation of their conversation.  This is completing

12     Exhibit 8.

13             THE COURT:  All right.  So then there are two more

14     emails you're seeking to admit.

15             MR. HERNSTADT:  That is correct.  So it would be the

16     emails on 965 and the bottom, only the bottom email on 964.

17             MS. HARWIN:  Your Honor, these are emails that were

18     not produced.

19             THE COURT:  Let's not argue in front of the jury.

20     We'll have sidebar, but I don't want you to do that again.

21             MS. HARWIN:  Sorry.

22             THE COURT:  Okay.  We can have a sidebar.

23             (Continued on next page)

24

25

1              (At the sidebar)

2              THE COURT:  First of all, there's no way that I'm

3     admitting this whole document with all of your descriptions of

4     what's what and your Xs on --

5              MR. HERNSTADT:  That's Professor Bekaert's.  This is

6     what Professor Bekaert gave Michael Dunn in the EOAA exhibit.

7              THE COURT:  I know, but what he chose to write himself

8     should not be coming in.  So how he chose to characterize

9     things in terms of the date and how --

10             MR. HERNSTADT:  That, I didn't want that in.  I wanted

11    it to go from here down.  And then this.  If what you're saying

12    is we have to get rid of the Xs.  So 965 and this entire page,

13    that's the final email in Exhibit 8.

14             THE COURT:  Right.  Okay.

15             MR. HERNSTADT:  And then --

16             THE COURT:  And you want all of the ones on 965?

17             MR. HERNSTADT:  All the ones on 965 up to here.  So

18    not his commentary, just email exchange.  So the jury can see

19    the full interaction about this so-called dinner invitation.

20             MS. HARWIN:  This is not an authenticated email

21    exchange.  This is what Professor Bekaert put together, but

22    these are not produced as authentic emails.

23             THE COURT:  He can ask her if this is email

24    correspondence between herself and Professor Bekaert since it's

25    part of the same correspondence.

1          MS. HARWIN:  We wouldn't object to the production of a

2    clean, accurate download from Columbia's servers.

3          THE COURT:  It doesn't matter whether it's from

4    Columbia's system, but I also have a problem with this

5    compilation with his characterizations and Xs on the side.  But

6    I think it's fine.  It's not being admitted for the truth; it's

7    being admitted for the fact that these statements were made to

8    each other, allegedly, and were part of their course of dealing

9    with each other.  And so I'm going to allow you to complete the

10   story.  But I want you to first ask her, show her these three

11   emails.  I mean, you can even give it to her on paper and blank

12   out the other ones and say, is this part of the same email

13   chain?  And if she can authenticate it.  But for tomorrow, I

14   want you to have clean copies of everything, individual

15   exhibits that you're going to use for different purposes, but I

16   don't want you sort of using one big thing that has all of his

17   characterizations, okay?  So you can show her, say, I'm going

18   to show you, and just give her the piece of paper.  If you want

19   to use my copy.  Ask her if this is part of the same email

20   chain.

21         MR. HERNSTADT:  Okay.

22         MR. SANFORD:  Your Honor, these are not coming in

23   tonight to show the jury because of the markings?

24         THE COURT:  Is there a way to delete the marking when

25   you show it on the screen?

1             MR. HERNSTADT:  Let me ask.  I can ask.

2             THE COURT:  Okay.  But just make sure that these

3     characterizations are not in, so all of this would be blanked.

4             MR. HERNSTADT:  I'll try and blank out the Xs and have

5     it from here down without the --

6             THE COURT:  Right.

7             MR. HERNSTADT:  Okay.

8             THE COURT:  But first you should just ask her, right?

9             MR. HERNSTADT:  Right.

10            THE COURT:  Okay.  Thank you.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MR. HERNSTADT:  Your Honor, it's not possible to do

3     what we discussed.  It takes a little time.

4           THE COURT:  Okay.

5           MR. HERNSTADT:  Shall I just proceed with the --

6           THE COURT:  Yes.  If there are questions you can ask

7     without using the exhibits, why don't you do that.

8           MR. HERNSTADT:  Sure.

9           THE COURT:  And then if you're really at an impasse,

10    let me know and we'll stop for the day.

11          MR. HERNSTADT:  Okay.  May I approach?

12          THE COURT:  Yes.

13    BY MR. HERNSTADT:

14    Q.  Professor Ravina, I'd like to show you Exhibit V starting

15    on page 965, and I'm going to ask you to go to 964.  So if you

16    would look at 965 and then only the very bottom of 964.

17    A.  Yes, I've looked at it.

18    Q.  And do you see that the email that's on the bottom of

19    page 965 is the last email in Exhibit 8?

20    A.  Is the last email in exhibit that we looked at before.  I

21    don't know if it was 8, but --

22    Q.  And the rest of the email exchange, that's the continuation

23    of the chain, is that correct?

24    A.  So there is an August 1st, then there is some

25    characterization from Professor Bekaert, then --

I7b1rav7                    Ravina - Cross

Q.  I'm not asking about that.  I'm asking if the email

exchange is a continuation of the email conversation that

started in Exhibit 8.

A.  So it's difficult to tell if this is a complete thread,

where it ends and where is another different email chain.

Q.  I'm sorry.  I'm just asking if this is a continuation of

that email conversation.

A.  I don't know if it's a complete series of emails on this

sheet.

Q.  I'm not asking if it's complete.  I'm asking if it's a

continuation of the email conversation that started in

Exhibit 8.  You recognize it to be that, right?

A.  Well, it's possible, but it's not clear if the emails are

copied one next to each other or they are part of the same

chain.

Q.  They're part of the same conversation, aren't they?  You

recognize that.

A.  I don't know.

Q.  So your testimony is that when you see at July 31 at

10:57 p.m. Professor Bekaert saying, "If you finish a revision,

I will pay dinner at my local Italian restaurant with the

Torino owner," and then two hours later you respond, "Ah, I'm

on a tragic diet so no dinner, but I will try to finish

nonetheless," you don't recognize that to be a continuation of

the conversation that began in Exhibit 8?

1    A.  It's a response to -- to the dinner invitation.

2    Q.  And the next email from Professor Bekaert, "A tragic diet?"

3    That's a continuation of that conversation, right?

4    A.  I think so.

5    Q.  And then the email on page 964 at the very bottom --

6    A.  Yes.

7    Q.  -- where there's a smiley face and then, "A diet that one

8    cannot make deviations from anymore so that it works"?

9    A.  Yeah, a diet with no exceptions, that's --

10   Q.  That's part of the same conversation, right?

11   A.  I think so.

12        MR. HERNSTADT:  Your Honor, I would move to admit

13   these two pages as appropriately redacted.

14        THE COURT:  Is there any objection to these two pages?

15        MS. HARWIN:  Subject to review of how it's produced in

16   the form.

17        THE COURT:  All right.

18   BY MR. HERNSTADT:

19   Q.  Do you see at the bottom of page 964 you conclude that

20   email exchange by saying, "I can go for coffee, though"?

21   A.  Yes.

22   Q.  You didn't see Professor Bekaert in July or August of

23   2014 -- of 2012, right?

24   A.  I don't remember if I saw him or not.

25   Q.  You testified about a dinner at a restaurant called Casa at

1    the end of September 2012?

2    A.  Yes.

3    Q.  And you said he complained that you went to dinner with

4    other people but not him, right?

5    A.  Yes.

6            MR. HERNSTADT:  Let's take a look at Exhibit AP, if we

7    could, please.

8            THE COURT:  And AP has already been admitted, correct?

9            MR. HERNSTADT:  I think so.  I move --

10           THE COURT:  We all agree AP has already been admitted?

11           MS. HARWIN:  I believe it has, your Honor.

12           THE COURT:  I think so too.

13           All right.  You may proceed.

14   BY MR. HERNSTADT:

15   Q.  Professor Ravina --

16           THE COURT:  Do you want it published to the jury?

17           MR. HERNSTADT:  Yes, please.

18           THE COURT:  Okay.

19   Q.  Professor Ravina, looking at the first email in this chain,

20   this is September 27, 2012.  Professor Bekaert says, "Are we

21   having dinner on Saturday or you got other plans?"  Do you see

22   that?

23   A.  Yes.

24   Q.  And then he says, "It need not be a 2-star Michelin

25   restaurant," right?

1    A.  Yes.

2    Q.  You made all the reservations for restaurants at the

3    dinners you went to, right?

4    A.  I was put in charge of Professor Bekaert -- I was put in

5    charge by Professor Bekaert to do them, if possible.

6    Q.  You made all the reservations, correct?  That's a yes or no

7    question.

8    A.  I think there was no reservation made, but I attempted to

9    make a reservation.

10   Q.  And in fact, you made reservations at two restaurants and

11   you had two other restaurants as a backup for this dinner,

12   correct?

13   A.  I ended up not making any reservation for -- for this

14   dinner.

15   Q.  Well, the last line of this email on September 27 at 9:25

16   is, "No pressure, by the way.  We can always do it some other

17   time."  Right?

18   A.  Right.

19   Q.  And you didn't tell him, let's do it another time, right?

20   A.  Yeah.  I didn't want to do it.

21   Q.  Okay.  Just -- and then looking at the next line, you said,

22   "I just got back from a dinner with Paola and Alex.  Ah, you

23   guys want me to be fat."  Right?

24   A.  Right.

25   Q.  You're not saying, I don't want to go to dinner on

1    Saturday, are you?

2    A.  Yeah, I'm saying I don't want to go.  I just came back from

3    a dinner and so I don't want to go.

4    Q.  Okay.  So this is Friday at 2 a.m., and this is your way of

5    saying, I don't want to go to dinner, correct?

6    A.  Correct.

7    Q.  That's your testimony?

8            Okay.  So let's look at the next email.  So Professor

9    Bekaert says, "As I said, I'm willing to postpone, or to have a

10   small sushi plate or salad somewhere."  Do you see that?

11   A.  Yes.

12   Q.  So he's saying, I'm willing to postpone, but you don't say,

13   yeah, let's postpone, right?

14   A.  No.  He told me the office --

15   Q.  I'm sorry.  That was a yes or no question.  You didn't

16   postpone, correct?

17   A.  Yeah, I didn't want to postpone.  I didn't want to go.

18   Q.  You didn't postpone, right?

19   A.  I didn't want to go.

20   Q.  I didn't ask if you wanted to.  I asked, did you postpone,

21   and the answer is no.

22   A.  No postponement.

23   Q.  And let's look at your response.  Instead of postponing,

24   you say, "Okay, since salad seemed a little sad to me, I went

25   for sushi.  I've left a message for reservations at Yasuda and

1   Kanoyama, and if that doesn't work, we can try Blue Ribbon or

2   Gari," right?

3   A.   Right.

4   Q.   And those are all restaurants down around NYU, is that

5   right?

6   A.   No.

7   Q.   Where are they?

8   A.   So they are all over the city.  I believe only one is near

9   NYU, the one called Blue Ribbon.

10  Q.   And then you say, "I'll stop by your office at 4:45."  Now

11  that's not on the way to dinner, is it?

12  A.   No.  We needed to talk about work.  I wanted to talk about

13  work.

14  Q.   Okay.  And then you went to dinner the next night, is that

15  right?

16  A.   I don't remember if it was -- I believe it was the same

17  night, actually, or around that time.

18  Q.   Okay.  So you didn't postpone; instead you left a message

19  for reservations at two restaurants and then went to dinner

20  with him, correct?

21  A.   I ended up going to dinner.

22  Q.   You told him that he's always very nice and lets you pick

23  where to go to eat, right?

24  A.   Can you repeat?

25  Q.   You have told him that he is very nice, always very nice

1   and lets you pick where to go to eat, right?

2   A.  I believe he let me pick where to go to eat, but whether I

3   was going to eat or not was not a choice.

4   Q.  I'm sorry.  I didn't understand that.

5   A.  So --

6   Q.  Did you say that or not?

7   A.  I don't remember whether I say it or not.

8   Q.  So let's take a look.  This is another page in Exhibit V.

9   Well, let's take a look at 984.

10             Do you remember telling Professor Bekaert in April,

11  around April 13, 2013, after you've sent him the email about

12  your meeting with Wei Jiang and your need to get three papers

13  done by next year, do you remember saying that you would come

14  to the Upper West Side to meet him?

15  A.  Yes.

16  Q.  And do you remember telling him that it would be very rude

17  to go anywhere else given the time constraints?

18  A.  Yes.

19  Q.  And that was because he was on his way to the airport,

20  right?

21  A.  Right.

22  Q.  And do you remember saying, "Plus you were always very nice

23  and let me pick"?  Do you remember saying that to him?

24  A.  Yeah.  I didn't want to go to the restaurant in his hotel.

25  I wanted to pick.

I7b1rav7

Q.   Do you remember saying that to him?

A.   I did.

Q.   And do you remember saying, "I just like to go to new

places but there's no time"?

A.   Yes.  That was a new place, but I didn't want to go.

          MR. HERNSTADT:  Your Honor, this would be a good place

to stop.

          THE COURT:  All right.  So why don't we stop for the

day, ladies and gentlemen.  Just remember, don't discuss or

research the case, and have a nice evening.

          (Continued on next page)

I7b1rav7

1              (Jury not present)

2              THE COURT:  All right.  For purposes of tomorrow, you

3      know what you need to do.  You just need to divide this exhibit

4      by the email or email chain that you want to ask about, mark

5      each thing separately, take out all the characterizations of

6      what's said in the email, take out any Xs or anything else,

7      okay?  Yes?

8              MS. HARWIN:  Your Honor, we would request that the

9      actual emails from Columbia's system be used in lieu of this.

10     If the emails are authentic, they should have been produced in

11     discovery and we just use those versions.  I don't see why we

12     would use this compilation.  Many of the emails don't have any

13     actual dates or times attached to them.

14             THE COURT:  I would make sure -- whether it comes from

15     Columbia's computer system or not I don't think is the point.

16     But I do think it's troubling when you don't have the to/from

17     header on all of them and things are cut off, so I would use

18     the best copy that you have and then show it to her, and if

19     she's not able to authenticate it because it doesn't have that,

20     then it won't come in.  Okay?

21             I also wanted to respond to the standing objection

22     made earlier on Columbia's cross-examination, just I think

23     based on hearsay, but I really think it was fair impeachment.

24     I mean, you on direct examination asked about the course of

25     conduct and statements made back and forth between Zeldes and

I7b1rav7

Professor Ravina, and I think it was perfectly appropriate for

Columbia to ask about other statements that were made back and

forth that you did not elicit.  So I just wanted to make that

clear.

          MS. HARWIN:  And your Honor, our concern was that

there wasn't a limiting instruction that this wasn't for a

nonhearsay purpose, and additionally, there was testimony

elicited regarding Professor Bolton, Professor Paravisini, that

didn't have to do with Division Chair Zeldes.  It seemed to be

hearsay and no nonhearsay purpose was identified.

          THE COURT:  Do you want to respond?

          MS. PLEVAN:  I'm not sure I heard, but, you know, I

think it's really the analogue to what she was -- we're

offering these -- these statements were made to her, and

whatever importance she attached to it at the time, that's for

the jury to determine.

          THE COURT:  That's right.  I mean, I think that's fair

impeachment, when she has presented her characterization of

what Columbia did and didn't do, to then elicit conversations

regarding what Columbia said or didn't say, so I think that

that is --

          MS. PLEVAN:  A better way of putting it.

          THE COURT:  -- fair.  It may be too late for a

limiting instruction now, but if there's something else you

want me to do going forward, I just wanted to make that clear.

I7b1rav7

1          So for purposes of tomorrow, you need to know about

2     the deposition designations, and I know there's still an

3     outstanding issue about those three exhibits, but defendants

4     wanted to respond in writing on that, so I think it's 160, 130,

5     and 100.

6          Is there anything else you need to know for purposes

7     of tomorrow?

8          MR. HERNSTADT:  Since it's likely that Professor

9     Bekaert will be testifying tomorrow, the stalker issue?

10          THE COURT:  Okay.  Do you want to talk about that now?

11          MR. HERNSTADT:  Sure.

12          THE COURT:  Let's get out that exhibit.

13          Everyone can sit, by the way.  I don't mean to make

14     you stand.

15          MR. SANFORD:  Your Honor, are we revisiting this

16     issue?  I thought the Court had ruled on it.

17          THE COURT:  I had, but then the question was exactly

18     what is the characterization that can be made, and that's what

19     I think we just wanted to make sure we were all on the same

20     page on.

21          MR. SANFORD:  I see.  Thank you.

22          THE COURT:  I think the way it was left is that I said

23     it could be clear that it was in the context in the response to

24     her saying something personal, but I don't want to

25     mischaracterize anything either, so I just wanted to make sure

I7b1rav7

1    we were all on the same page.  I am not revisiting the ruling

2    that the fact that it was a stalker should not come in.

3              MR. HERNSTADT:  Your Honor, that's actually precisely

4    what I'm asking to do, because I've spoken to Professor Bekaert

5    about how we could phrase this so that the word "stalker"

6    wouldn't come in, and the problem is that Professor Ravina's

7    testimony has left us with no out.  Her testimony is that he

8    felt that she was troubling, he should stay away from her, but

9    then --

10             THE COURT:  Why don't you tell me the page and line.

11             MR. HERNSTADT:  I'm sorry.  This is page 178 of

12   July 10, starting line 10.

13             THE COURT:  But just to be clear, does this go back to

14   177?  Where does the discussion about this woman begin?

15             MR. HERNSTADT:  It starts 177 at line 7.

16             THE COURT:  Okay.  "So mainly he talked about his sex

17   life in Hong Kong."

18             "Can you tell us more about what specifically

19   Professor Bekaert said about his sex life in Hong Kong."

20             "So one of the main themes of the conversation was his

21   interactions with this stewardess.  He met a stewardess and he

22   went dancing with her, and he said he was quite shy around her

23   because she was very good looking."

24             "Did he tell you anything more about his

25   interactions?"

I7b1rav7

1          "Yes, he told me she was having troubles, she had an

2     affair with a pilot, she was fired, and that she was thinking

3     of applying to Columbia for an MBA."

4          MR. HERNSTADT:  If you continue down, she described a

5     smile and she was asked, "Can you describe --" the answer was,

6     "He told me that, and then he smiled."  "He told me that he

7     slept with her, and then he smiled."

8          "Can you describe how he smiled."

9          "Yes.  I saw him smile.  My impression with it was

10    that he was satisfied with it, that there was a woman that was

11    in trouble, that he saved the day, and, you know, she was fired

12    and she wanted to apply to Columbia."

13         The trouble that this woman experienced was that she

14    was being stalked by a pilot, she complained about it to her

15    employer, the airline, and the airline didn't do anything about

16    it so she quit.  In other words, none of this -- none of the

17    details are accurate, but there was a stewardess, there was a

18    pilot, and there was, you know -- and there was trouble.  But I

19    don't know how we get around the testimony of the witness that,

20    I felt that his smile was a satisfaction from that, from saving

21    the day because she was in trouble, without properly explaining

22    what the actual context of that conversation was.

23         MR. MELZER:  Your Honor, the Court has already ruled

24    on this twice and found this to be --

25         THE COURT:  Can you just get into the merits,

I7b1rav7

1   actually.  Can you get into the merits, respond to the merits,

2   in light of this specific testimony, as opposed to my ruling

3   before the testimony.

4           MR. MELZER:  This testimony has nothing to do with a

5   stalker on the part of Professor Ravina.  Any references to a

6   stalker directed towards Ms. Ravina is a sideshow that would be

7   extremely prejudicial.

8           THE COURT:  Can we focus on the language.  I think

9   that would be more helpful.  Let's turn to the language.

10          So when there's a reference to being a woman in

11  trouble and him smiling with satisfaction, let's look at BE and

12  let's think about how we can put the fact that he said this in

13  context without letting in the stalker comment but without also

14  prejudicing the defendants, because it's not irrelevant.  It

15  provides context.

16          MR. MELZER:  We don't have it on our screen.

17          MR. McKNIGHT:  Can we put it up on the screen so we

18  can have it in front of us to talk about it.

19          THE COURT:  I just have a copy.  It's BE.

20          MR. MELZER:  We've suggested a neutral reference to a

21  similar experience or a shared experience.  There should be

22  nothing suggestive for the jury to infer something that may

23  have happened to plaintiff Ravina that would be extremely

24  prejudicial to her case to be thinking about, you know, what

25  she could have gone through and how that might reflect on her

I7b1rav7

character.

THE COURT:  Did they have a conversation about this other than through the email correspondence?

MR. HERNSTADT:  This is the --

THE COURT:  About the stewardess.

MR. HERNSTADT:  This was I think before Professor Bekaert even met the stewardess.  Then he came back on a visit and had dinner with Professor Ravina and said, you remember, you know, we were talking about the stalker, another friend that I met while I was traveling had the same situation, except that, you know, it's really bad, there was a lot of trouble for her because she had to quit her job because her company wouldn't do anything about it, and that has been twisted into something that vilifies my client.  It's not fair.  I mean, he really has to be able to defend himself from these allegations.

MR. MELZER:  References to stalkers against Ms. Ravina, Professor Ravina are just so far afield of the facts in this case and, as the Court recognizes, are highly prejudicial because they would suggest that she's susceptible to this kind of attention by men, that she's prone to --

THE COURT:  I know all those arguments.  I'm really just trying to look at the language and see, in light of the testimony, if there is a way to provide context that's fair to both sides.  So why don't we just try and focus on that, if we could.

I7b1rav7

 1          MR. HERNSTADT:  And I understand the concern, and I

 2     appreciate it.  I just don't know how we can get the

 3     combination of an email that raises the subject and is the --

 4          THE COURT:  Exactly what was inaccurate in her

 5     testimony, in your view?

 6          MR. HERNSTADT:  Everything.  Her testimony that at

 7     that dinner he told her that -- Professor Bekaert told her that

 8     he slept with a woman is false, that the woman --

 9          THE COURT:  That you can cross her on, right?  That

10     has nothing to do with the stalker.

11          All right.  But just keep going.  Walk me through it.

12          MR. HERNSTADT:  That he said -- that he said that she

13     was in trouble and was fired.  I can cross her on this.  What I

14     can't do is undermine her testimony.  I don't necessarily need

15     to talk to her, to Professor Ravina about it at all.  I'm

16     talking about Professor Bekaert.  Professor Bekaert has to be

17     able to tell his story.  He has to be able to say, yeah, at

18     this dinner, yes, I'll tell you what happened.  What happened

19     was, we revisited a conversation that we had in an email

20     exchange because I had met someone that had been suffering from

21     this.

22          THE COURT:  Yes, so why can't you do that?  Just say,

23     look, she had told me something very personal about her life,

24     we had this dinner, and I said, you know, I met someone who's

25     suffering from the same issue, or the same circumstances, or

I7b1rav7

1    that's why I'm talking about how to phrase it without saying

2    that it's a stalker.  I don't see why it's relevant

3    specifically that it was a stalker as opposed to some other

4    personal conversation, that Ms. Ravina volunteered something

5    about her own personal background.  That's what I'm getting at.

6            MR. HERNSTADT:  No, I understand exactly, and the

7    problem is that there's an email that says "stalker" that

8    connects everything together, you know, that sort of underlines

9    the testimony.  We had this email exchange.  This happened.

10   And then we had a conversation, based on that.  And that's the

11   only reason we had that conversation.  This person would never

12   have come up in conversation but for this email.

13           MR. MELZER:  Your Honor kept out references on

14   Ms. Ravina's part about a young or underage woman, and that

15   part of that context Ms. Ravina was unable to testify about,

16   even though it was conversations between the parties.  We think

17   the same idea about prejudice should apply here.

18           THE COURT:  I don't think the circumstances are

19   exactly the same, but I understand your point.

20           I'm still not going to let the stalker reference in.

21   You can ask her if they emailed about it.  I mean, if she

22   denies that they emailed about this personal --

23           MR. HERNSTADT:  Okay.

24           THE COURT:  -- issue, you know, then it will be fair

25   game, the door will be opened, but otherwise I don't think the

I7b1rav7

1    stalker should come in.  I don't think the email should come in

2    unless you're, again, proposing a way that they can be

3    redacted.  I just don't think that fact is helpful enough, and

4    probative enough.

5        MR. MELZER:  When he asks about the email, of course

6    he can't say, did you exchange emails about a stalker, right?

7        THE COURT:  Of course.  Yes.

8        MR. HERNSTADT:  No, I'm not -- no, no.

9        THE COURT:  Of course.

10        MR. HERNSTADT:  That's fine.  I'm prepared to ask

11    Professor Ravina if she -- and I can show it to her and not

12    publish it to the audience.

13        THE COURT:  Right.

14        MR. HERNSTADT:  -- if she recalls having an exchange

15    about a very sensitive personal matter with Professor Bekaert,

16    and then, you know --

17        THE COURT:  And that adds to the stewardess, you know,

18    and you can connect it to the stewardess that she testified

19    about.  But again, I just don't think what the personal matter

20    was --

21        MR. HERNSTADT:  That's fine.  As long as I can

22    establish that there was an email, I can put the email up, show

23    it to Professor Ravina.

24        THE COURT:  Don't show the jury.

25        MR. HERNSTADT:  I won't show the jury.  Professor

I7b1rav7

1    Ravina can confirm it or not.

2              THE COURT:  Right.

3              MR. HERNSTADT:  And --

4              THE COURT:  Right.  And don't talk about it being a

5    stalker.

6              MR. HERNSTADT:  I won't say anything.  I'll just say a

7    very sensitive personal matter.

8              THE COURT:  Okay.

9              MR. HERNSTADT:  Email exchange on this date, do you

10   remember having that exchange with Professor Bekaert that

11   continues, you know --

12             THE COURT:  All right.  Mr. Melzer, are you okay with

13   that?

14             MR. HERNSTADT:  -- in the course of four emails --

15             MR. MELZER:  Yes, your Honor.

16             MR. HERNSTADT:  -- and I'll stop.

17             THE COURT:  Okay.  All right.  Seems like we're all on

18   the same page about this issue.

19             Okay.  Good.  So I'll look at the deposition

20   designations for tomorrow.  I know you need that for tomorrow.

21             Is there anything else you want me to look at tonight

22   that you think you'll need for purposes of tomorrow, a ruling

23   on?  Okay.

24             MS. HARWIN:  No, your Honor.  But I would just request

25   that we have the opportunity to view the redone exhibits so

I7b1rav7

1    that if there are any issues with it, it doesn't have to be

2    something that takes up trial time.

3        THE COURT:  Do you have a problem with that,

4    Mr. Hernstadt?

5        MR. HERNSTADT:  I'm sorry?

6        THE COURT:  Do you have a problem with the exhibits,

7    showing them to plaintiff?

8        MR. HERNSTADT:  No, I don't.  But we have to figure it

9    out.

10        THE COURT:  Okay.  Just do that, send them as soon as

11    you can.  And again, just pay close attention to taking out the

12    characterizations, the Xs, and making sure that they're sort of

13    complete emails so you can see who it's to and from, etc.,

14    okay?

15        MR. HERNSTADT:  Very good.

16        THE COURT:  All right.  Have a nice evening, all.

17    I'll see you tomorrow at 9.

18        ALL COUNSEL:  Thank you, your Honor.

19        (Adjourned to July 12, 2018, at 9:00 a.m.)

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

ENRICHETTA RAVINA

Direct By Ms. Harwin . . . . . . . . . . . . . 363

Cross By Ms. Plevan  . . . . . . . . . . . . . 431

Cross By Mr. Hernstadt . . . . . . . . . . . . 552


PLAINTIFF EXHIBITS

Exhibit No.                                     Received

 105    . . . . . . . . . . . . . . . . . . . 374

 258C   . . . . . . . . . . . . . . . . . . . 404

 120    . . . . . . . . . . . . . . . . . . . 408

 245    . . . . . . . . . . . . . . . . . . . 411

 121    . . . . . . . . . . . . . . . . . . . 414

 125    . . . . . . . . . . . . . . . . . . . 414

 126    . . . . . . . . . . . . . . . . . . . 417

 129    . . . . . . . . . . . . . . . . . . . 420

 134    . . . . . . . . . . . . . . . . . . . 421

```
 1                        DEFENDANT EXHIBITS

 2    Exhibit No.                                    Received

 3      LW    . . . . . . . . . . . . . . . . . . 405

 4      ON    . . . . . . . . . . . . . . . . . . 422

 5      RY    . . . . . . . . . . . . . . . . . . 445

 6      RS    . . . . . . . . . . . . . . . . . . 458

 7      XX    . . . . . . . . . . . . . . . . . . 461

 8      ZZ    . . . . . . . . . . . . . . . . . . 462

 9      AJ    . . . . . . . . . . . . . . . . . . 465

10      AL    . . . . . . . . . . . . . . . . . . 468

11      PY    . . . . . . . . . . . . . . . . . . 475

12      BP    . . . . . . . . . . . . . . . . . . 478

13      BU    . . . . . . . . . . . . . . . . . . 481

14      DL    . . . . . . . . . . . . . . . . . . 483

15      DF    . . . . . . . . . . . . . . . . . . 485

16      DM    . . . . . . . . . . . . . . . . . . 500

17      HT    . . . . . . . . . . . . . . . . . . 512

18      AH    . . . . . . . . . . . . . . . . . . 519

19      Z, Section 11G   . . . . . . . . . . . . 525

20      J   . . . . . . . . . . . . . . . . . . . 535

21      NO    . . . . . . . . . . . . . . . . . . 537

22      NR    . . . . . . . . . . . . . . . . . . 540

23      NZ    . . . . . . . . . . . . . . . . . . 541

24      QL    . . . . . . . . . . . . . . . . . . 551

25
```