I7cnrav1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ENRICHETTA RAVINA,

                    Plaintiff,

          v.                            16 CV 2137 (RA)

COLUMBIA UNIVERSITY,
                                        Jury Trial
                    Defendant.

------------------------------x

                                        New York, N.Y.
                                        July 12, 2018
                                        9:30 a.m.

Before:

          HON. RONNIE ABRAMS

                                        District Judge
                                        and a Jury

                              APPEARANCES

SANFORD HEISLER SHARP LLP
     Attorneys for Plaintiff
BY:  DAVID W. SANFORD
     ALEXANDRA HARWIN
     ANDREW C. MELZER
     HERBERT V. McKNIGHT
     MELINDA L. KOSTER
     AMY DONEHOWER

PROSKAUER ROSE LLP
     Attorneys for Defendants
BY:  BETTINA B. PLEVAN
     RACHEL S. FISCHER
     STEVEN D. HURD
     PATRICK KRAMER RICE

HERNSTADT ATLAS PLLC
     Attorneys for Defendant Bekaert
BY:  EDWARD HERNSTADT

1

2              (Trial resumed; jury not present)

3          THE COURT:  My deputy just told me you wanted to raise

4    an issue before the jury came in.

5          MR. HERNSTADT:  Yes, your Honor.  We have edited the

6    exhibit V.

7          THE COURT:  Yes.  V?

8          MR. HERNSTADT:  The portions of V that I wanted to

9    use, we broke it into seven subdocuments.  Four of them we

10   found the original e-mail, and I don't believe plaintiff has an

11   objection to those.

12             Three of them we did not, and so we edited out all of

13   the identifying stuff.  I have a set that I can give to your

14   Honor.

15         THE COURT:  Is there an objection to trying to

16   authenticate it with the plaintiff?

17         MS. HARWIN:  We do object, your Honor.  These are

18   e-mails that still don't have, as you noted they should have,

19   headers identifying the top of the e-mail, the sender,

20   recipients, the dates, the times of these e-mails as you will

21   see.

22         THE COURT:  All right.

23         MR. HERNSTADT:  Those would be the e-mails that are

24   marked V2,3 and 4.  1, 5, 6, and 7 are sort of regular e-mails

25   for lack of a better word.

I7cnrav1

1          MS. HARWIN:  It is a copy-and-paste job.  We can't

2    authenticate it.

3          THE COURT:  Well, you can ask her if she recognizes

4    it.  It may well be that she recalls when these conversations

5    were.  I mean, one of them has the date and time.  It's just

6    the response doesn't.

7          MS. HARWIN:  That's right, your Honor.

8          MR. HERNSTADT:  Your Honor --

9          THE COURT:  Again, I think it is fine to ask Professor

10   Ravina, and then just make clear to the jury what is not on

11   here, namely, the time of the response.  But you can still ask

12   if these are fair and accurate copies, even though they don't

13   contain all of the information of the correspondence between

14   them.

15         Again, from my perspective, as long as the jury gets a

16   fair impression of what it is and it can be authenticated that

17   it is what you're representing it to be, I don't have a

18   problem.  But why don't we see what she says.

19         MR. HERNSTADT:  Your Honor, I believe yesterday

20   Ms. Ravina also authenticated V4.  I asked her about these

21   e-mails, and she identified them as being e-mails between the

22   two of them.

23         MS. HARWIN:  Your Honor, I don't believe that she

24   authenticated them as reflecting the complete correspondence.

25   I believe her testimony was that she couldn't do that.

I7cnrav1

```
1           THE COURT:  Well, you are still permitted to ask her
2      about them and then just make clear, if it's not the complete
3      correspondence, make that clear so the jury is, again, left
4      with an accurate impression of what it is, so that they know it
5      is some of the correspondence but it is not the entire
6      correspondence.  OK.
7           MS. HARWIN:  Your Honor?
8           THE COURT:  Yes.
9           MS. HARWIN:  If plaintiff isn't able to authenticate
10     them, Defendant Bekaert can authenticate them during his own
11     examination and represent them to be e-mails he copied and
12     pasted.  They will still have the ability --
13          THE COURT:  That is fine.  Again, she is on these
14     e-mails.  I mean, her name is on them.  There is a date and
15     time.  It seems like for many of them the final e-mail in the
16     back and forth for whatever reason doesn't have the to and
17     from, but she will either recall them or not.
18          MS. HARWIN:  That is fine, your Honor.
19          THE COURT:  We will see what she says.
20          MR. HERNSTADT:  Your Honor, I will be reviewing these
21     e-mails with Professor Ravina, but I would like to publish them
22     to the jury.
23          THE COURT:  OK.  That's fine.  All right.
24          MS. HARWIN:  Subject to her identification.
25          THE COURT:  Understood.
```

I7cnrav1

1              Thank you.

2              MS. HARWIN:  Your Honor, we have one small pending

3    matter.  We have a pending pro hac motion.

4              THE COURT:  OK.  Who is that for?

5              MS. HARWIN:  For Amy Donehower.

6              THE COURT:  Where are you admitted?

7              MS. DONOWER:  I am admitted in the states of New York

8    and Florida.

9              THE COURT:  I assume you are in good standing?

10             MS. DONOWER:  Yes, your Honor.

11             THE COURT:  Then I will grant that application.

12             MS. DONOWER:  Thank you.

13             MS. HARWIN:  Thank you.

14             THE COURT:  We're waiting for one juror.

15             MS. HARWIN:  While we are waiting, your Honor, do you

16   have rulings on any of the designations of testimony.

17             THE COURT:  I actually want to go through those

18   together.  I think they are going to take a little bit of time.

19   It seems like there is a very broad issue in this case, and it

20   arises both in connection with the three exhibits, the 100, 130

21   and 160 and with the deposition designations and I assume it

22   will with some of the testimony about whose opinion is

23   relevant, who expressed an opinion when, and if and why that's

24   relevant.  I think it comes up in a lot of different contexts.

25   What other professors said or thought about based on Professor

I7cnrav1

1    Ravina's recitation of the facts, is that relevant?  And, if

2    so, why is that relevant?  To whom were those beliefs

3    expressed?

4              And then, on the Columbia side in the depositions,

5    whose opinion matters about what?  So I'm happy to talk about

6    it in the context of the particular exhibits or deposition

7    designations, but I don't know if you want to address that

8    issue more generally.

9              Do you understand where I am coming from?

10             I mean, obviously we discussed this in the context of

11   the experts.  I didn't think it was appropriate.  I think,

12   unlike in some sex discriminations cases, the allegations here

13   are pretty easy to understand.  I don't think it was necessary

14   to have an expert.  I don't think it would have aided the jury,

15   whereas I think in some cases it might.

16             But then with respect to professors at the time and

17   the petitions, for example, and their agreement with Professor

18   Ravina and their advocacy on her behalf, why does it matter?

19             I understand it matters that Columbia was put on

20   notice and administrators from Columbia reacted to particular

21   things, but why does it matter how many people may have agreed

22   or disagreed with her?  Why is that relevant?  Isn't that

23   ultimately an issue for the jury to decide?

24             MR. SANFORD:  Well, your Honor, one of the issues in

25   the case, certainly from defendants' perspective, is the fact

I7cnrav1

1    that the faculty voted unanimously to deny Professor Ravina

2    tenure.  That is clearly front and center of their case.

3                They're going to be allowed to put that case on.  We

4    should be allowed to talk about the process leading up to that

5    vote, the concerns expressed about the process, and be able to

6    contextualize that unanimous vote.

7                If we are not able to do that, the jury is going to be

8    left with what we understand to be a highly misleading

9    impression that the unanimous vote rejected her, and that's

10   pretty much the end of the matter, and it really isn't the end

11   of the matter.  There's a big context here, and we should be

12   allowed to present that context to the jury and let the jury

13   decide for itself what that vote was about.

14               THE COURT:  Wasn't the vote unanimous?

15               MR. SANFORD:  Yes.  And a lot of the people who voted

16   as part of that vote also are people who signed the petitions.

17               So the question is what happened?  Why did they vote

18   against Professor Ravina when in fact many of them signed the

19   very petitions calling the vote into question?

20               There is a story there, and we should be able to tell

21   that story.

22               THE COURT:  Are you trying to call those particular

23   witnesses, or do you want to tell it through hearsay through

24   the petitions?

25               MR. SANFORD:  We want to tell it through Professor

I7cnrav1

Bolton because Professor Bolton is going to be testifying.

THE COURT:  Did he vote on the tenure decision?

MS. PLEVAN:  He did not.

MR. SANFORD:  He did not vote.

MS. PLEVAN:  So he was not at the meeting either.  And I -- well.

THE COURT:  OK.

MS. PLEVAN:  I mean, I think your Honor understands our position and that these petitions do contain hearsay completely when it is expressions of opinions.

Again, we submitted a letter early this morning about this, you know, addressing both the hearsay issue and the relevance issue.  But what ultimately happened is what happened, and that's what is relevant here, not what some people may have thought when they're not going to be here to be cross-examined.

Their opinions it's clear are based on what they heard from Professor Ravina and maybe talking to each other or whatever their hypothetical, you know, assumptions were about the facts.

They are not people who were witnesses to anything. They just were expressing their opinions about this, and if it comes in, we have no ability to undermine and in some cases we don't even know who was writing or expressing that opinion.

THE COURT:  Let's say I agreed with you on that

I7cnrav1

general premise, and I am not saying that I am.  Honestly I
haven't read your letter yet because I just got it this
morning, but I will do so today.

           With respect to Plaintiff's 160, why is it not
relevant to the tenure vote that these professors are not in a
position to provide an evaluation of Professor Ravina's tenure
case at that time?

           Why is that not relevant?

           I understand your position with respect to the
recitation of what happened between Professor Ravina and
Professor Bekaert and maybe even, although I haven't decided
one way or the other, about the request, how many professors
asked to have her tenure clock extended.

           But why is it not at the very least relevant that this
many professors said to Columbia, look we can't weigh in on
tenure one way or the other?

           MS. PLEVAN:  Why?  Well, I guess I would say I don't
know why it is relevant that they said it.  They are entitled
to show up and vote their conscience or vote whatever they
think.

           THE COURT:  Did they not submit --

           MS. PLEVAN:  We don't know what they were thinking,
what they knew or didn't know at the time.  It was a lot of
lack of information, and I think there's already been a
reference to the fact that these people for the most part at

I7cnrav1

 1   this time did not know that Professor Ravina had been offered a

 2   break in service if she would change her title.  They were not

 3   aware of that.  That was explained to them at a meeting two

 4   days before the tenure vote.

 5              MR. SANFORD:  Well, for the same --

 6              MS. PLEVAN:  So this -- I didn't interrupt.

 7              That's the danger of allowing this to come in without

 8   our ability to cross-examine, because we could say well, you

 9   know, what did you learn between March 25 and April 16 that led

10   you to vote, assuming that the reason for that was even

11   relevant.

12              MR. SANFORD:  For the very same reason, your Honor,

13   the people we don't know the motives or the understandings of

14   the people who in fact voted, and they are going to say that

15   the unanimous vote was against Professor Ravina.  For the exact

16   same reason --

17              MS. PLEVAN:  It is a fact.

18              MR. SANFORD:  That is a fact, but to your Honor's

19   question we don't know what they were thinking or why they

20   voted the way they did.  This helps contextualize that thinking

21   and helps explain what that vote was about.

22              THE COURT:  Is it critical to you that it be elicited

23   that it was a unanimous vote from Columbia's perspective?  If

24   Columbia takes off the table the fact that it was unanimous.

25              MS. PLEVAN:  I said it in my opening.

I7cnrav1

```
1          THE COURT:  I know.  But Mr. Sanford said in his
2    openings that lots of professors came and supported her.  So
3    there have been things said in openings that I think there is a
4    question about whether it's properly admitted or not.
5          But as to it being unanimous, if plaintiff's argument
6    is in part at least, well, if defendants are going to say this
7    was unanimous I want to make clear it wasn't unanimous, if you
8    took off the table the unanimity of the vote, in your view does
9    that affect the admissibility of these petitions, which I
10   understand your position on anyway?
11         Look, the jury is here.
12         MS. PLEVAN:  I would like to think about that.
13         THE COURT:  Think about that.
14         The jury is here, and I think that we need to talk
15   more generally about this issue.  I also want to get a little
16   bit better of an understanding of the tenure vote and make sure
17   that I understand, if all of the professors vote, if the fact
18   that these professors who submitted the petition means they
19   didn't submit information that they would have submitted
20   otherwise in a normal vote, I just want to make sure that I
21   understand it.  But I don't want to keep the jury waiting this
22   morning.
23         I'm happy to hear you.
24         MR. SANFORD:  I wanted to say, your Honor --
25         THE COURT:  Go ahead.
```

I7cnrav1

1          MR. SANFORD:  Whether it's unanimous or whether they

2     get to say she was just rejected, the important part is the

3     fact of the rejection and the conception of that rejection.  If

4     we are not able to say what that context is, we would be very

5     prejudiced in putting on our case.

6          THE COURT:  But she was rejected.  I mean, that's a

7     fact.

8          MS. PLEVAN:  Once again, why people voted the way they

9     did --

10         THE COURT:  There is no objection to Professor Bolton

11    testifying, and he's going to testify I assume about his own

12    advocacy on her behalf, and how Columbia reacted to that.  So I

13    don't think the jury will be left with the impression that

14    Columbia wasn't notified by professors that there was

15    disagreement about this.

16         MR. SANFORD:  Well, the jury will be left with the

17    misimpression that there weren't any legitimate concerns here

18    expressed by the majority of the senior tenured professors in

19    the division.  There were 36 people in the division, and

20    roughly half signed on to two of the petitions.  22 total

21    signed on to a third petition.

22         THE COURT:  Are you saying the school doesn't have the

23    right to make a different decision even if it disagrees with

24    its professors, not on the tenure vote because the tenure vote

25    was unanimous, they voted against her, but even if it wasn't,

I7cnrav1

```
1    if a certain number of professors disagree with the decision on

2    tenure, how does that weigh in on liability in a sex

3    discrimination case?

4         MR. SANFORD:  They certainly have a right to do

5    whatever they want to do.  The question is whether this was

6    pretextual for a different motive.  Our position is that it was

7    pretextual for a different motive.  They had a motive here to

8    do what they did.  We should be able to show what that real

9    motive was along the way.

10        Dean Johar --

11        THE COURT:  What does that have to do with the motive?

12   What does what those professors thought or didn't think, who

13   aren't testifying, what does that hearsay, how does that weigh

14   in on the motive of Columbia?

15        If I am allowing in all of the notice provided to

16   Columbia in the form of Ravina's testimony, in the form of

17   Professor Bolton's testimony, why does it matter how many other

18   people who can't be cross-examined may have also had that

19   opinion?

20        MR. SANFORD:  There is a process here in place at

21   Columbia which is very standard.  The process was not followed

22   in this case, and we should be able to show that there were

23   irregularities in the process.

24        THE COURT:  What process?  What was irregular?

25        MR. SANFORD:  Well, faculty generally are entitled to
```

I7cnrav1

1    put on the executive committee agenda a matter of concern for

2    the faculty or for the administration.  Senior Dean Johar

3    testified to that.

4            Point of fact, your Honor, if I may just call the

5    Court's attention to one thing in the letter that you will read

6    this morning, Columbia misrepresents a very important fact, and

7    I draw your attention to the second page of Columbia's letter

8    where Columbia says this petition is not relevant because --

9    and they're talking here about Exhibit 100, because the

10   executive committee is comprised of senior faculty from the

11   various divisions of Columbia Business School, the decision

12   among faculty to adopt or not adopt a proposed policy would

13   therefore not be probative of the Columbia's actions.

14           Nothing could be further from the truth.  We have

15   testimony, sworn testimony from Senior Vice Dean Johar, who

16   clearly says that -- and I have the designations, the

17   deposition cites, your Honor.  She says that the committee is

18   comprised of the senior vice dean and the dean and the chair.

19           It is an administrative, a high administrative

20   committee.  It is not just comprised of faculty members.  The

21   faculty were trying to put on notice to the administration a

22   set of concerns, and that committee decided not to put it on

23   the agenda.  That is highly irregular.

24           THE COURT:  That will come out.

25           The fact that the faculty tried to do that Professor,

I7cnrav1

1    Bolton can testify to that, right?

2            Why do you need how many people voted?  Why do you

3    need the petition itself, which is hearsay, and all of these

4    people that can't be cross-examined?

5            MR. SANFORD:  Well --

6            THE COURT:  What matters is the process, is whether

7    objections were lodged and how Columbia responded.

8            But why do you need -- I mean, you are trying to get

9    in the professors' recitation of what happened between

10   Professor Ravina and Professor Bekaert that they have no

11   independent knowledge of, and then there's the hearsay for all

12   of these people who can't be cross-examined.

13           MR. SANFORD:  As this Court has done throughout this

14   trial, and as I imagine the Court will continue to do

15   throughout the trial, the Court can give a limiting instruction

16   with respect to these petitions so that the jury understands it

17   is not being admitted for the truth.  Columbia University was

18   put on notice.  A big part of our case is what did Columbia

19   know and when did it know it and what did it do about it.

20           THE COURT:  All of that is coming in.  But how many

21   people voted on a petition, I don't know why that's relevant to

22   the issues you just mentioned.

23           MR. SANFORD:  There may be a big difference, your

24   Honor, between Professor Bolton putting Columbia on notice

25   versus half of the senior faculty putting Columbia on notice.

I7cnrav1

1          Whether a matter gets on the agenda item before the

2     executive committee may be very relevant to determine whether

3     it's one person asking for an agenda item for half the faculty,

4     and there's a big difference between the two.

5          The jury should be able to understand half the faculty

6     was requesting an agenda item, and for the only time in Dean

7     Johar's experience it was rejected.

8          Why was it rejected?  That is a very important

9     consideration for us and the jury should hear that.

10          THE COURT:  OK.  All right.  In any event, let's bring

11     in the jury this morning.  They are here now.

12          MR. SANFORD:  Thank you, your Honor.

13          THE COURT:  Sure.

14          I just wanted to notify you that I understand one of

15     the jurors took the elevator with the defendant this morning,

16     but he didn't say anything.

17          She said good morning.  He didn't say anything,

18     behaved perfectly appropriately.

19          Then another juror ran into someone in the building

20     who works in the building that has nothing to do with this

21     case, so I just wanted to let you know that they have reported

22     those interactions.

23          (Jury present)

24          THE COURT:  Good morning, everyone.

25          JURORS:  Good morning.

I7cnrav1                    Ravina - Cross

1                   You can all be seated.

2                   You may proceed.

3                   MR. HERNSTADT:  Thank you, your Honor.

4     ENRICHETTA RAVINA, resumed.

5     CROSS EXAMINATION

6     BY MR. HERNSTADT:

7                   MR. HERNSTADT:  Good morning, everybody.

8     Q.  Good morning, Professor Ravina.

9     A.  Good morning.

10    Q.  Yesterday we looked at a few exhibits.  I would like to

11    take you through them again very briefly.

12                  If you could take a look at V3.

13                  Do you remember talking about -- I had asked you if

14    you and Professor Bekaert had had a discussion about going to

15    see going to dinner at the local Italian restaurant in

16    Professor Bekaert's neighborhood with the owner who was from

17    Torino, and your responding that, Yes, I am going to see

18    Mr. Veronesi, and it sounds good for the restaurant.  I am from

19    Torino.  What is the name of the place?  Have a good rest and

20    see you tomorrow.

21                  Do you remember that?

22    A.  Yes.

23    Q.  OK.  And taking a look at the section of the e-mail, is

24    this an e-mail from you to Geert saying that?

25    A.  This is pieces.

I7cnrav1                        Ravina - Cross

1   Q.  Excuse me?

2   A.  It is not complete.

3   Q.  This is the one on page 963?

4   A.  96 -- yes, it's not complete.

5   Q.  I'm sorry?

6   A.  It is not complete.

7   Q.  Yes.  It's not complete, but do you recognize this e-mail?

8            This is -- do you recognize this as an e-mail between

9   you and Geert in which at the bottom of the page he says,

10  Actually, I still got to take you to an Italian restaurant in

11  my neighborhood.  The owner is from Turin.

12           And then you respond, Geert, sounds good for the

13  restaurant.  I am from Torino.  What is the name of the place?

14           Is that an exchange between the two of you?

15  A.  Yes, but I don't know if it is a full exchange.

16           MR. HERNSTADT:  OK.  I move to admit it as an exchange

17  between the two of them.

18           THE COURT:  I am going to admit it, but recognize

19  plaintiff's testimony that it's not a complete compilation of

20  the correspondence necessarily but just take that for what it's

21  worth.

22           You may proceed.

23           (Defendant's Exhibit V3 received in evidence)

24           MR. HERNSTADT:  Thank you.

25           I would look like to publish it to the jury.

1          MS. HARWIN:  Just to be clear for the record, are we

2     only admitting the second page?

3          MR. HERNSTADT:  Yes, just the second page.

4          MS. HARWIN:  We would request that that specifically

5     be numbered as an exhibit.

6          THE COURT:  OK.  Why don't you specifically number

7     that later, please.  Thank you.

8     BY MR. HERNSTADT:

9     Q.  Professor Ravina, do you remember we also talked about an

10    e-mail exchange between you and Professor Bekaert on July 31,

11    2012, where he said, If you finish a revision, I will pay

12    dinner at my local restaurant.

13          And that was, you know, eight months or so after that

14    November exchange we just looked at.

15          Do you recall that?

16    A.  I recall discussing an email like that also with my

17    counsel.

18    Q.  That was Plaintiff's Exhibit 8 that we looked at yesterday,

19    right?

20    A.  Yes.

21    Q.  And then I showed you an e-mail exchange between you and

22    Professor Bekaert in which you, in response to his e-mail

23    offering to pay dinner if you finish your revisions, you say,

24    Ah, I'm on a tragic diet, so no dinner.  But I will still try

25    to finish nevertheless.

I7cnrav1                     Ravina - Cross

1          And then you and he had a continuing exchange about a
2     tragic diet.
3          I would like you to look at what's been marked as V4,
4     which starts on 965 and then concludes on 964.
5          Can you take a look at that e-mail exchange and tell
6     me if that is an e-mail exchange between you and Professor
7     Bekaert.
8     A.   It contains e-mails between me and Professor Bekaert, but
9     it looks like a copy and paste, and it's not clear if there are
10    missing parts.
11         There is no date on the first e-mail, and I don't know
12    if there were other elements in this e-mail that you are
13    keeping out or that they are out of the these pages.
14    Q.   The e-mail you say that there's no date on, that's the last
15    e-mail in the chain, correct?
16    A.   Right.
17    Q.   It has your full address block with the Columbia Business
18    School logo and everything?
19    A.   Yes.  But there could be other e-mails in between for
20    context.
21    Q.   OK.  But the e-mails that are on this page are e-mails
22    between you and Professor Bekaert starting at 10:57 p.m. on
23    July 31.  Your response is 10 -- 12:58 on August 1, so two
24    hours later.
25         Then his response is at 10:30 a.m. on August 1, so the

I7cnrav1                    Ravina - Cross

1    next morning.

2              And then there's last undated e-mail from you.

3              His 10:30 a.m. e-mail says, A tragic diet?

4              And then your -- the undated e-mail response from you

5    is smiley face, a diet one cannot make any deviations from

6    anymore so that it works.

7              Those are e-mail exchanges between you and Professor

8    Bekaert, correct?

9    A.  Yes.

10   Q.  I understand you don't know if there may be other e-mail

11   exchanges, but --

12             MR. HERNSTADT:  I would seek to admit Exhibit V4

13   with -- subject to her testimony that she's not sure that there

14   may be other e-mails.

15             THE COURT:  I am going to admit it with that caveat,

16   as I mentioned earlier.

17             (Defendants' Exhibit V4 received in evidence)

18   BY MR. HERNSTADT:

19   Q.  Professor Ravina, do you recall my asking you about -- my

20   asking you about an e-mail exchange with Professor Bekaert in

21   which you tell him that you will be happy to come to the Upper

22   West Side --

23             MR. HERNSTADT:  I'm sorry, could I have Exhibit 4

24   published to the jury, so they can see it as well.

25             THE COURT:  Yeah.

I7cnrav1                     Ravina - Cross

1          MR. HERNSTADT:  I don't know.  Do you guys see it?

2          I would like to put it up and let the jury have a

3   chance to see what we are talking about before we move on.

4          MR. HERNSTADT:  It starts on the right at the bottom

5   and goes up.

6   Q.  Professor Ravina, one last question about Exhibit V4.

7          At the bottom of that last e-mail, the one that starts

8   smiley face a diet one cannot make any deviations from, you

9   offered to go to coffee with him, right?

10  A.  Yes.  Not to upset him too much, I offered an alternative.

11  Q.  I asked you if you offered to go to coffee with him and the

12  answer is no -- I mean, the answer is yes, correct?

13  A.  I said --

14  Q.  It is a yes-or-no question.

15  A.  I said I could go for coffee instead.

16  Q.  You said, I can go for coffee?

17  A.  Yes.

18  Q.  Thank you.

19  A.  Yes.

20  Q.  I would like you to look now at Exhibit V7.  This is on

21  April 13, 2013.

22         You had e-mailed Professor Bekaert after your

23  evaluation with Wei Jiang, and you say, I just talked with Wei

24  Jiang.  We need to work big time.

25         And you and Professor Bekaert had an exchange about

1    how many papers you should do in the next year.

2              Do you recall that?  That's Exhibit 261 that you

3    looked at yesterday.

4    A.  Um, yes, I remember this part.

5    Q.  And then you -- you and Professor Bekaert met on that, the

6    next day, on Sunday, April 14, correct?

7    A.  Correct.

8    Q.  And that's the meeting at the coffee shop that you

9    described in your direct testimony, right?

10   A.  Yes, the meeting at the coffee shop.

11   Q.  Right.  OK.  And in this meeting -- in this e-mail, D7 --

12             MR. HERNSTADT:  Which I would like to publish to the

13   jury.  I don't believe there is an objection to this e-mail.

14             THE COURT:  All right.

15             MS. HARWIN:  No objection.

16             THE COURT:  Go ahead.

17   BY MR. HERNSTADT:

18   Q.  In this e-mail you say:  Of course I will come to the Upper

19   West Side.  It's out of the question.  Lucerne, office, any

20   other place you like that's convenient.  It would be rude to go

21   anywhere else given the time constraints, plus you are always

22   very nice and let me pick, and I do -- I do like the Upper West

23   Side.  I just like to go to new places, but there is no time.

24             Do you see that?

25   A.  Yes.

1    Q.  In this e-mail you say, You always are very nice you let me

2    pick, that is because you are the one who always picked the

3    restaurants you went to with Professor Bekaert, correct.

4    A.  Yes.  He was only interested in going to dinner.

5    Q.  Just answer yes or no, please.

6    A.  He didn't care about --

7    Q.  I am not asking you for an explanation.  Thank you.

8            MR. HERNSTADT:  Your Honor, I would like -- we went

9    over Exhibit AP yesterday.

10           I would like to have that admitted.

11           THE COURT:  Which one was AP?  I thought that was

12   admitted already.

13           MR. HERNSTADT:  That's right.  I'm sorry.

14           THE COURT:  OK.

15           MR. HERNSTADT:  OK.

16   BY MR. HERNSTADT:

17   Q.  So let me take you back to the dinner that you had at, at

18   Casa.

19           You testified that Professor Bekaert asked you about

20   your boyfriend at that dinner, right?

21   A.  Yes.

22   Q.  And then later you shared a taxi home and, when you were

23   exiting the taxi he put his hand on your back?

24   A.  He passed his --

25   Q.  Just yes or no, please.

I7cnrav1                    Ravina - Cross

1   A.  Not accurate.

2   Q.  OK.  You never spoke to him about either of those -- either

3   of those incidents, right?

4        You never spoke to him about talking to -- asking you

5   about your boyfriend, right?

6   A.  Yes, we talked together at the restaurant.

7   Q.  Afterwards you never told Professor Bekaert that his asking

8   you about your boyfriend was unwelcome, right?

9   A.  Um, not directly, no.

10  Q.  OK.

11  A.  Not in those words.

12  Q.  Afterwards, you never told Professor Bekaert not to ask you

13  questions about your boyfriend, right?

14  A.  Um --

15  Q.  Right?

16  A.  Look, I didn't give him any --

17  Q.  Professor Ravina, please.  That is an easy question.  If

18  you didn't do it, then you just say, no, I didn't do it.

19       You never told him don't talk -- don't ask me

20  questions about my -- about my boyfriend, right?

21  A.  I never replied to any questions about my boyfriend.

22  Q.  OK.  You never spoke to him at all about his touching your

23  back, correct?

24  A.  No.  I just rushed out.

25  Q.  And you never complained to Columbia about either of those

I7cnrav1                        Ravina - Cross

1   incidents, correct, until many, many months later?

2   A.  I complained to the Title IX, to the EOAA office and to the

3   administrators.

4   Q.  My question is you never complained to Columbia about that

5   incident until almost two years later, when you went to the

6   EOAA?

7   A.  I reported -- no.

8   Q.  The first time you complained to Columbia about either of

9   those incidents that took place in September 2012 was when you

10  spoke to Dean Phillips in July of 2014, correct?

11  A.  No.

12  Q.  And the day after that dinner you sent Professor Bekaert a

13  thank you e-mail, correct?

14  A.  Yes, not to upset him.

15  Q.  Please just answer the questions yes or no.  Commentary is

16  unnecessary.  Your lawyer will have a chance to ask you more

17  questions if he wants to.

18          So the day after you sent him a thank you e-mail, and

19  then two weeks after you sent him an e-mail saying that I'm

20  sorry that you cannot talk to me yesterday.  It was an

21  overreaction to M.  Of course, you can stop by my office

22  anytime because we are working together and actually discussing

23  research, smiley face.

24  A.  Can I see the e-mail?

25  Q.  I'm sorry?

I7cnrav1                     Ravina - Cross

1    A.  Can I please see the e-mail?

2    Q.  You don't remember that?

3    A.  I would like to see the context.

4    Q.  My question is do you remember the e-mail?

5    A.  I don't remember it fully, no.

6    Q.  OK.  You don't remember it.

7           MR. HERNSTADT:  I would move this into evidence,

8    Exhibit AW.

9           MS. HARWIN:  No objection, your Honor.

10           THE COURT:  AW will be admitted.

11           (Defendants' Exhibit AW received in evidence)

12   BY MR. HERNSTADT:

13   Q.  And I direct -- looking at this e-mail, this is an e-mail

14   in which you and Professor Bekaert, Bekaert are talking

15   about -- looking at applying for a Chazen grant for your 401(k)

16   project, correct?

17   A.  Correct.

18   Q.  And I'm directing your attention to the third paragraph --

19   I'm sorry, the PS, which is the -- at the bottom of that

20   e-mail.

21           Do you see, You can stop by my office anytime because

22   we are working together?

23   A.  Yes, I see the e-mail.

24   Q.  Do you recall that Professor Bekaert was on sabbatical in

25   Asia in the spring of 2013?

I7cnrav1                    Ravina - Cross

1   A.  This is not about this e-mail anymore?

2   Q.  No.

3   A.  OK.  Yes, I recall he was on sabbatical.

4   Q.  While he was away you continued to have an e-mail

5   correspondence with him, correct?

6   A.  Yes.

7   Q.  Do you recall that in late January of 2013 Professor

8   Bekaert sent you notes on what was referred to as a benchmark

9   problem?

10  A.  I am going to wait for the e-mail.

11          MR. HERNSTADT:  May I approach, your Honor?

12          THE COURT:  Yes.

13          THE WITNESS:  Thank you.

14  BY MR. HERNSTADT:

15  Q.  So, Professor Ravina, have you had a chance to take a look

16  at the e-mail?

17  A.  I did, yes.

18  Q.  I am directing you to the first e-mail, which is on the

19  fourth page of this multi e-mail exchange.  This is January 28,

20  2013 at 12 p.m.

21          Professor Bekaert writes, Hi, Enrichetta.  Some quick

22  notes on the benchmark program -- problem.

23          Do you see that?

24  A.  Yes, I see it.

25  Q.  So you respond:  I am printing the files right now.  The

1    handwriting is no issue -- is no problem at all, and then you

2    send him a work -- a paragraph about the work.  Do you see

3    that?

4    A.  Yes, I'm telling him that I --

5    Q.  I am not asking you do explain it, Professor Ravina.  Just

6    if you see it?

7    A.  I see it.

8    Q.  And then Professor Bekaert responds and in his response he

9    tells you that he's been stalled several times on his other

10   document, had to give a public lecture yesterday, 190 people.

11          And he says at the end of that paragraph, And then of

12   course I got a busy social agenda, too.  HK is pretty cool.

13          Do you see that?

14   A.  Yes.

15   Q.  And then you responded that 190 people is a celebrity

16   turnout, right?

17   A.  Yes, in the later e-mail.

18   Q.  Then you corrected his spelling of the word cool with a C,

19   not a K, right?

20   A.  Not exactly.

21   Q.  You said, Isn't cool spelled with a C smiley face with a

22   wink?

23   A.  Yes.

24   Q.  And then you asked him:  What is your social life like in

25   Hong Kong?  Is there anything HK specific?

I7cnrav1                         Ravina – Cross

1    A.   Yeah.  I wanted to know about museums and stuff, yeah.

2    Q.   And then you discussed with Professor Bekaert a sensitive

3    personal matter about your life, right?

4    A.   Correct.

5    Q.   And Professor Bekaert responded with concern, correct?

6    A.   He said that a friend of his --

7    Q.   I'm sorry.

8             Yes or no.

9    A.   I cannot tell from the e-mail if he was concerned or not.

10            MR. HERNSTADT:  Your Honor, can we have a sidebar,

11   please.

12            THE COURT:  Sure.

13        (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. HERNSTADT:  I don't want to get into it with her,

3     but she's going to fight me on it.

4          THE COURT:  OK.

5          Is she going to fight him on the characterization of

6     the stalker as a sensitive personal matter?

7          MS. HARWIN:  No.  No that wasn't the issue.  She

8     answered that yes.  It was the follow-up, which was whether

9     Professor Bekaert expressed concern, and she said that that is

10    not a question she can answer.

11         THE COURT:  Please, one at a time.

12         MR. HERNSTADT:  Normally I would then ask her about

13    the e-mail where he says:  Wait a minute, are you being

14    stalked?  Did I miss an e-mail?  I would be shocked, as I have

15    another close friend who has the same problem in a very bad

16    way.

17         In another one he says:  Horrible.  You should tell me

18    some other time.  That sounds scary, all caps.

19         THE COURT:  I don't think you need to get into what it

20    is.  Draw her attention to a particular line, ask her to read

21    it herself, and then make clear what your question is.

22         MR. HERNSTADT:  I will try again.  If she says no --

23         THE COURT:  Just try again.

24         MR. HERNSTADT:  Your Honor?

25         THE COURT:  Yes.

I7cnrav1                    Ravina - Cross

1          MR. HERNSTADT:  I would like to publish only from --

2          THE COURT:  Just come back, folks.

3          MR. HERNSTADT:  I want to publish from 190 down to

4    there.  That's it.  From 190 down the rest of the e-mail, but

5    starting at 190.

6          MS. HARWIN:  Essentially this last sentence?

7          MR. HERNSTADT:  No.  That's out.  Everything else is

8    out.  Just from here down.

9          MS. HARWIN:  Then you are not -- you are missing the

10   part, "I will read the files."

11         MR. HERNSTADT:  I will put that in.

12         MS. HARWIN:  What I would suggest is you can redact

13   that --

14         MR. HERNSTADT:  It is too hard to do that.

15         MS. HARWIN:  It is not hard.  It is a minor redaction,

16   so redact that line.

17         And the rest below can come in --

18         MR. HERNSTADT:  Look, if you want to put in, Mom

19   improving, not out of danger, and take out --

20         MS. HARWIN:  You can redact that whole sentence.

21         MR. HERNSTADT:  OK.  But then I am going to put in

22   glad.  We'll start here, I'm glad --

23         MS. HARWIN:  That has be to redacted.

24         MR. HERNSTADT:  You are going to redact mom --

25         MS. HARWIN:  Redact that sentence.

I7cnrav1                        Ravina - Cross

1              MR. HERNSTADT:  Sorry, I had first class today --

2              MS. HARWIN:  That is fine.

3              But you are just doing there and nothing above it.

4              THE COURT:  It is from this down, but with this one

5        line out.

6              MS. HARWIN:  Yes.

7              THE COURT:  Right?

8              MS. HARWIN:  Correct.

9              MR. HERNSTADT:  From mom?

10             THE COURT:  Right.

11             Do we all agree with that?

12             MS. HARWIN:  Not below, that's fine.

13             THE COURT:  Yes.

14             MS. HARWIN:  I am not going to bother.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I7cnrav1                        Ravina - Cross

```
 1               (In open court)

 2               THE COURT:  We are going to admit the portion that we

 3     discussed and you can follow up on the questions.

 4               You were asking that is Exhibit BE.

 5     BY MR. HERNSTADT:

 6     Q.  Professor Ravina, I would like you to take a look at, you

 7     know, we had been discussing a section of this e-mail chain in

 8     which you discussed a sensitive personal matter about your life

 9     with Professor Bekaert, right?

10     A.  Right.

11     Q.  And I asked you if -- and I said that Professor Bekaert

12     responded with concern to the sensitive personal matter that

13     you revealed to him?

14     A.  Um --

15     Q.  Correct?

16     A.  You said that, but I said I couldn't tell from the e-mail.

17     Q.  You said what?  I'm sorry?

18     A.  I could not tell from the e-mail whether it was concern or

19     what was his feeling toward it.

20     Q.  So I would like you to take a look at the rest of the

21     e-mails in the chain --

22     A.  Uh-huh.

23     Q.  -- and his responses, and tell me, if upon reviewing them,

24     you would agree that he's expressing concern about your

25     sensitive personal matter?
```

I7cnrav1                          Ravina - Cross

1              MR. HERNSTADT:  Your Honor, I would like to publish

2       the e-mails as redacted.

3              THE COURT:  Yes.

4              MR. HERNSTADT:  We are going to put them up on the

5       screen so you all can see it too.

6              I'm sorry about the delay.  Technical difficulties.

7       So we are going to show you the last page, and then we will

8       show you the third page, and then we'll show you the second

9       page with certain matters that are not going to come in.

10             (Counsel conferred)

11             MR. HERNSTADT:  Can we publish, your Honor.

12             THE COURT:  The portion we discussed, yes.

13             MR. HERNSTADT:  They've got it.  OK.

14      BY MR. HERNSTADT:

15      Q.  So what you are seeing is the last page and then in a

16      minute we will replace that with page 3, and the page on the

17      left is page 2.

18             Now we have page 3.  You can see the chain of e-mails.

19             Professor Bekaert -- Professor Ravina, now that you

20      have had a chance to review the e-mail, would you say that

21      Professor Bekaert responded with concern?

22      A.  No.

23      Q.  OK.

24             THE WITNESS:  Can I give more --

25             THE COURT:  No, you have to answer yes or no as best

I7cnrav1                    Ravina - Cross

1    you can.  OK.  If you can't say that, you can't.  But you are

2    talking about something personal that I didn't think the jury

3    needed to hear about.  Did he respond by saying that's

4    horrible, it's scary, and things like that?

5              THE WITNESS:  Yes.  But he's referring to his own

6    experience if you look on page 1.

7              MR. HERNSTADT:  Can the witness speak up.  I couldn't

8    hear that.

9              THE WITNESS:  Yes.  Sorry.

10             He responded to this by telling me he had a similar

11   experience and that this experience was awful, stressful, and

12   terrible.

13             MR. HERNSTADT:  Your Honor, I would like to publish

14   the entire e-mail to the jury at this point.

15             THE COURT:  I think I am going to let that happen.

16             MS. HARWIN:  Your Honor, can we please sidebar?

17             THE COURT:  We can sidebar.

18         (Continued on next page)

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  I have made every effort to keep this out.

3    She has been present for all of these discussions.  She knows

4    what the issue is.

5          I specifically directed her to his statements, that

6    that is horrible and scary, and she denied that he was even

7    talking about what she said.

8          MS. HARWIN:  I think she was looking at this part,

9    your Honor.

10         Your Honor --

11         THE COURT:  He was expressing concern, or at least

12   that is a valid point for the defendant to make, and she's

13   denying it.

14         MS. HARWIN:  Your Honor, I mean this is baiting to get

15   this out.

16         THE COURT:  I tried to direct her to the intent, the

17   particular lines, so that this doesn't come in, and she is

18   unwilling to.  I mean, if that is her view, that he didn't

19   express concern, I think that he's it's fair game to talk about

20   what exactly was said and let the jury figure out if that's

21   expressing concern.

22         MS. HARWIN:  Your Honor, the question posed was

23   whether she found him to be expressing concern.  She didn't

24   perceive this exchange to be an expression of concern.

25         THE COURT:  OK.

I7cnrav1                        Ravina - Cross

1              MS. HARWIN:  That is her testimony.

2              THE COURT:  Then he's allowed to show the exchange,

3    and let the jury figure it out.

4              MS. HARWIN:  I would suggest, your Honor, that we

5    could redact that --

6              MR. HERNSTADT:  No.

7              MS. HARWIN:  -- which is did he respond:  Horrible,

8    you should tell me some other time, but it really sounds scary.

9              THE COURT:  No.  I have tried to keep this out.  I

10   made clear that how this should be done.  I even tried to

11   direct her to particular statements.  I think now it is fair

12   cross-examination.

13             MS. HARWIN:  But, your Honor --

14             THE COURT:  Sorry.

15             MS. HARWIN:  Your Honor.

16             THE COURT:  No.

17

18

19

20

21

22

23

24

25

I7cnrav1                    Ravina - Cross

1              (In open court)

2              MR. HERNSTADT:  Your Honor, I would like to publish

3    the entire e-mail to the jury.

4              THE COURT:  Sure.  Go ahead.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7c1rav2                        Ravina - Cross

1    BY MR. HERNSTADT:

2    Q.  So Professor Ravina, I'd like to direct your attention to

3    page 2, and at 10:29 p.m. on January 29th, you sent Professor

4    Bekaert an email that says, "Hi, Geert.  How are you?  Sorry, I

5    had the first class today and I've been swamped on all sorts of

6    issues, even the housing, if everything else is not enough.

7    Mom is improving.  Not out of danger, though.  And stalker is

8    being neutralized.  Sort of.  I hope I don't die."

9            You continue, "I will read the files before going to

10   sleep tonight."  And then we've seen what comes below that.

11           Professor Bekaert responded at 10:35 p.m., so six

12   minutes later, "Wait a minute.  Are you getting stalked?  Did I

13   miss an email?  I have 80 or so open.  I would be shocked as I

14   have another close friend who has the same problem in a very

15   bad way.  Glad to hear your mom is doing better."

16           And the next email you respond, "Yes.  Maybe I forgot

17   to tell you.  I had a stalker for -- in 2007.  Awful,

18   stressful, and terrible.  Now he's resurfacing because I'm

19   applying for citizenship.  Long story."

20           And then you express some significant fears.

21   A.  Yes.

22   Q.  And he responds -- your response was at 10:44, so nine

23   minutes after Professor Bekaert's, and then he responds at

24   10:46, two minutes later, "Horrible.  So tell me some other

25   time but it sounds SCARY," in all caps.  "Normally stalkers

```
 1    like you a lot and they should not kill you, but all your

 2    friends, we are in danger."  And he tells you he has a friend

 3    in Australia who is getting phone calls from a fellow financial

 4    economist.  Do you see that?

 5    A.  Yes.

 6    Q.  Professor Bekaert is expressing concern in his immediate

 7    responses to you in which he says that he would be shocked and

 8    that it's horrible and it sounds really scary, isn't he?

 9          That's a yes or no question.

10    A.  I didn't interpret it that way.

11    Q.  I'm sorry?

12    A.  It would require more -- this answer -- this question

13    requires more explanation than a yes or no.

14    Q.  Okay.  Let's move on.

15          The next time you saw Professor Bekaert was at a

16    dinner in April of 2013, right?

17    A.  No.

18    Q.  You mentioned you had lunch with him in April 2013, right?

19    A.  Yes.

20    Q.  Okay.  And then you had a dinner with him a couple nights

21    later in the East Village, right?

22    A.  Three months after this email, yes.

23    Q.  And you were eager to meet him for dinner, right?

24    A.  Say again?

25    Q.  You were eager to meet him for dinner.
```

I7c1rav2                          Ravina - Cross

1    A.  No.  I wouldn't characterize it that way.

2    Q.  You gave him a choice of nights, didn't you?

3    A.  I needed to talk to him and he wanted to go to dinner.

4    Q.  I'm asking questions that are really yes or no questions.

5    I don't need an explanation.  Your lawyer can ask you

6    questions.

7    A.  Can I see the email.

8    Q.  Let's take a look at Exhibit 18.

9            THE COURT:  Is this in evidence already?

10           MR. RICE:  No.

11           THE COURT:  No.

12           MR. HERNSTADT:  We'd like to move it into evidence.

13           THE COURT:  Why don't you try and lay a foundation

14   first.

15   BY MR. HERNSTADT:

16   Q.  Professor Ravina, if you take a look, this starts with an

17   email dated April 4, 2013.  I'd like you to look at the second

18   page.  This is where the email chain starts, at April 3rd at

19   5:09.  You say, "When are you in New York?  Next week?"

20           And then Professor Bekaert responds, "Yup.  I'm in New

21   York.  Need some good times to meet perhaps."

22           And you say, "Cool."  Smiley face.  "How about Tuesday

23   afternoon?"

24           Professor Bekaert responds, "I cannot.  Tuesday I

25   cannot.  Doctor's appointment in the morning.  At Betterment in

I7c1rav2                         Ravina - Cross

1    the afternoon.  Betterment, some investment firm, in the

2    afternoon."

3           You say, "Ok.  Monday, any time?"

4           And then in the last -- I'm sorry.  He responds, and

5    then you asked him about someone that you know together and he

6    responds, "You know him?  Do you want to go to dinner sometime

7    too?"

8           And you respond, "Yes, let's go to dinner.  Let's go

9    for dinner.  Any time except Monday works."

10          Do you see that?

11   A.  Yes.

12   Q.  This is an email exchange between you and Professor

13   Bekaert?

14   A.  Yes.

15          MR. HERNSTADT:  I'd like to publish it to the jury.

16          MS. HARWIN:  Objection, your Honor.  This seems to

17   have defense counsel's internal markings on it.  I'd request

18   that a clean, unmarked copy be provided.

19          THE COURT:  Are there markings on it?

20          MR. HERNSTADT:  This is your exhibit.

21          MS. HARWIN:  We've produced it without markings.

22          THE COURT:  Do you have a copy?

23          MS. HARWIN:  We do not have hard copies in the

24   courtroom.

25          THE COURT:  I probably have one here, so --

1            MR. HERNSTADT:  This is what we got from plaintiff's

2     counsel.

3            MS. HARWIN:  I believe we can probably publicize an

4     unmarked copy.

5            THE COURT:  Okay.  I mean, yes.  Is your concern the

6     highlighting?

7            MS. HARWIN:  Yes.

8            THE COURT:  That's what I got from your binders.

9            MS. HARWIN:  I apologize, your Honor.  Our electronic

10    copy doesn't have that.  But we can publicize an electronic

11    copy that doesn't.

12           THE COURT:  Okay.  Thanks.

13           MR. HERNSTADT:  Well, I'll move on.  We'll come back

14    to it?

15           THE COURT:  We can put it on, right?

16           MR. HERNSTADT:  Oh, how long will that take you?

17           THE COURT:  They can do it right now, I think.

18           Here we go.

19           MS. HARWIN:  No objection, your Honor.

20           THE COURT:  So it will be admitted.

21           (Plaintiff's Exhibit 18 received in evidence)

22           THE COURT:  Can you all see?  Okay.  Thanks.

23    BY MR. HERNSTADT:

24    Q.  So looking at the first page of that exhibit, there's an

25    email that's at 8:44 p.m. on April 4th from Professor Bekaert

I7c1rav2                      Ravina - Cross

1   saying, "You know him?  Do you want to go to dinner sometime

2   too?  Do you want to meet the two RAs together or me

3   separately?"

4            And then an hour or so later, Professor Ravina, you

5   respond, in the second sentence, "Yes, let's go for dinner."

6            THE DEPUTY CLERK:  Sorry.  The screens are not on.

7            MR. HERNSTADT:  Oh, I'm sorry.

8            Can we publish this to the jury.

9            THE DEPUTY CLERK:  Okay.

10           THE COURT:  Thank you.

11           MR. HERNSTADT:  So if I may direct the jury, there's

12   an email in the middle of the page, "Do you know him?  Do you

13   want to go to dinner sometime too?"  From Professor Bekaert to

14   Professor Ravina.

15           And then right above it is an email from Professor

16   Ravina, about an hour later.  In the second paragraph, she

17   says, "Let's go to dinner.  Yes, let's go to dinner.  Any time

18   except for Monday works."

19   BY MR. HERNSTADT:

20   Q.  Professor Ravina, I'd like you to take a look, if you

21   would, at Exhibit BL.

22           MR. HERNSTADT:  Sometimes the technology doesn't

23   always work.

24   Q.  Professor Ravina, do you recognize this as an email

25   exchange between you and Professor Bekaert on April 7th?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I7c1rav2                        Ravina - Cross

1    A.  Yes.

2              MR. HERNSTADT:  Move to admit.

3              MS. HARWIN:  No objection.

4              THE COURT:  All right.  It will be admitted.

5              (Defendant's Exhibit BL received in evidence)

6              MR. HERNSTADT:  Can we publish it to the jury.

7              Okay.

8    BY MR. HERNSTADT:

9    Q.  Do you see on April 7th, Professor Bekaert writes you, "If

10   you want to go to dinner, just let me know and give me one or

11   more evenings that you can make it."

12             And then at the top of the page, you respond, "Sounds

13   good for dinner.  We can go on Tuesday, Friday, or Saturday if

14   you are free in the weekend.  I might be free on Thursday too,

15   but I have made half an agreement and I need to ask if we are

16   still on before doing something else.  Which day works for

17   you?"

18             Do you see that?

19   A.  Yes.

20   Q.  So you were giving him a choice of three or four nights for

21   dinner, correct?

22   A.  Yes.

23   Q.  And you were even ready to cancel another dinner to have

24   dinner with him, right?

25   A.  Yeah.  I needed to work -- to make progress.

I7c1rav2                         Ravina - Cross

1    Q.   You hadn't seen Professor Bekaert since the prior fall,

2    correct?

3    A.   Correct.

4    Q.   And in the fall of 2012, you worked at the Fed and you were

5    at Columbia only once a week, right?

6    A.   Approximately, yes.

7    Q.   And during that time that you did not see Professor Bekaert

8    much, which was you said the fall and then he was away in the

9    spring of 2013, right?

10   A.   There was a sabbatical in Hong Kong.

11   Q.   And then you didn't see him during the summer of 2013,

12   right?

13   A.   I saw him sometimes but not often.

14   Q.   You didn't see him at all during the summer of 2013, did

15   you?

16   A.   I think I saw him -- he came back in the summer, but he was

17   traveling a lot.  I might have seen him sometime in the office

18   or maybe late August.

19   Q.   You don't remember seeing him, do you?

20   A.   I didn't go to any dinner in the summer.

21   Q.   My question is:  You don't remember seeing him, do you?

22   A.   2013.  I corresponded with him.  I don't remember meeting

23   him in person.

24   Q.   All right.  He was in New York for one week, or for a few

25   days in June, do you remember that?

I7c1rav2                          Ravina - Cross

```
 1    A.   I remember knowing about it.  I'm not --

 2    Q.   Do you remember that he was in New York for one week in

 3    June, approximately?

 4    A.   I remember him June.

 5    Q.   You had an email correspondence where you wanted to take

 6    him to buy an iPhone, correct?

 7    A.   Yes, his was broken.

 8    Q.   And he didn't have time so you didn't see him, right?

 9    A.   Yeah, I didn't -- I don't think I saw -- I saw him.

10    Q.   So you didn't see Professor Bekaert from sometime in the

11    fall 2012 until the fall of 2013, except for those meetings

12    that we've been talking -- that you mentioned in April, right?

13    A.   I saw him in April, that week in April.

14    Q.   You saw him in April.

15    A.   Yeah.

16    Q.   So for a year you saw him --

17    A.   No.  Sorry.  Not for a year.

18    Q.   So going back to this April dinner, you testified that he

19    told you about an entrepreneur he met in Hong Kong, right?

20    A.   Yes.

21    Q.   He never told you that he slept with her, right?

22    A.   No.

23    Q.   And he never told you that he was romantically interested

24    in her, did he?  Yes or no?

25    A.   He said he was not interested.
```

I7c1rav2                          Ravina - Cross

1   Q.  I'm sorry?

2   A.  He said he was not interested.

3   Q.  He never told you that he -- okay.  I'll move on.

4           He told you about her business success growing up in

5   mainland China, becoming a business owner in Hong Kong, right?

6   A.  Yes.

7   Q.  The next incident was -- oh, I'm sorry.

8           You also testified that he spoke to you about a

9   stewardess, right?

10  A.  Yes.

11  Q.  And you remember that he told you that he had met a

12  stewardess who had been stalked.

13  A.  No.

14  Q.  You don't remember him telling you that he met a stewardess

15  who had been stalked by a pilot and that the business that they

16  both worked for would do nothing and so she quit?

17  A.  No, that's not the story the way --

18  Q.  You don't remember that.

19  A.  I remember a different story.

20  Q.  Okay.  The next time you saw him was at the coffee the day

21  that he was leaving New York on April 14th, correct?

22  A.  Yes.

23  Q.  And you said that you wanted to meet to talk about work

24  that you'd been doing on the projects, right?

25  A.  And my reviews, yes.

I7c1rav2                          Ravina - Cross

1   Q.   And that he couldn't see the work because he's forgotten

2   his reading glasses, right?

3   A.   Right.

4   Q.   And you also met with him because you were desperate after

5   your meeting with Wei Jiang two days before on the Friday when

6   you got your evaluation and learned that your tenure prospects

7   were not good, right?

8   A.   I was very concerned, I was desperate to proceed with the

9   work.  I don't know if desperate is the right word, but yeah,

10  very, very concerned.

11  Q.   And you sent him an email the day before -- this is 261,

12  which is in evidence -- and that you started that email by

13  saying, "I need three more papers by spring 2014.  I thought

14  about Beauty."  Now that's one of your single-authored papers,

15  right?

16  A.   Right.

17  Q.   "And JFE."  What paper is that?  Is that the habit paper?

18  A.   No.

19  Q.   What paper is that?

20  A.   It's a paper on relative risk aversion.

21  Q.   That's the risk aversion paper that eventually got

22  published in 2016?

23  A.   Yes.

24  Q.   And you had -- that was revise and resubmit status, right?

25  A.   We were thinking of submitting it to the JFE.

I7c1rav2                          Ravina - Cross

1    Q.   Okay.  So you were still working on that paper, right?

2    A.   I am still working?  No.

3    Q.   You were then -- at the time of this email, you were still

4    working on the paper.

5    A.   Yes.

6    Q.   "One 401(k) paper and one wealth paper."  And the wealth

7    paper, the high net worth papers you were doing with Professor

8    Viceira in Harvard, right?

9    A.   Yes.

10   Q.   So in response to your meeting with Professor Jiang when

11   you learned about your poor tenure chances, you identified four

12   different papers that you thought you would try and get by the

13   next year, right?

14   A.   By the spring of 2014.

15   Q.   And by get, you mean either published or submitted for

16   publication, right?

17   A.   Drafts that are ready, not necessarily submitted but ready

18   to be presented, posted.

19   Q.   Okay.  So at least an initial draft that could be presented

20   at conferences.

21   A.   Correct.

22   Q.   Okay.  And then a year goes by, and in March of 2014, you

23   know that your evaluation is coming up, and I'd like you to

24   take a look at what's been marked as Exhibit CU.

25           MR. HERNSTADT:  Which I move into evidence.

I7c1rav2                    Ravina - Cross

1              MS. HARWIN:  No objection, your Honor.  I believe it's

2    already been admitted as a plaintiff's exhibit.

3              THE COURT:  It will also be admitted as CU.  Thanks.

4              (Defendant's Exhibit CU received in evidence)

5    Q.  I'd like to ask you to take a look at the first page at the

6    very bottom.  This is an email from you to Professor Bekaert

7    March 6 at 1:25 p.m.  Do you see that?

8    A.  Yes.

9    Q.  And you say, "They are all R&R."  I'm sorry.  Let's look

10   back another email.

11             Professor Bekaert, that morning, at 10:37 a.m., says,

12   in an email to you, the second paragraph, "BTW," by the way,

13   "real quick, Habit is still R&R at RFS."  And Habit is one of

14   your single-authored papers, right?

15   A.  Yes.

16   Q.  And this one was the revise and resubmit or reject and

17   resubmit at a journal with the initials RFS, correct?

18   A.  Revise, yes.

19   Q.  "And Beauty R&R at JF," and that's the Journal of Finance,

20   right?

21   A.  Journal of Finance.

22   Q.  "But neither has gone into the second round.  What is the

23   status of the paper with Paravisini?"  And that paper is the

24   risk aversion paper we just talked about?

25   A.  Correct.

I7c1rav2                    Ravina - Cross

1    Q.  Okay.  So now let's go to the first page and your response

2    there is, "They are all R&R."  So you have three papers R&R,

3    right?

4    A.  Yes.

5    Q.  You say, "I decided to cut some energy away from teaching.

6    Anyway, if I didn't get a teaching award with 4.8, I never will

7    and who cares, although I will do the meetings and thinking

8    necessary to push the projects forward.  I will work on R&Rs

9    only so that I get rid of all of them."  Do you see that?

10   A.  Yes.

11   Q.  "No other working papers that are submitted.  It was a

12   mistake to work so much on this 401(k) crap."  Do you see that?

13   A.  Yes.

14   Q.  And then you say, "I will never pass the review.  But I

15   might have a lot of papers soon, at least."  You see that?

16   A.  Yes.

17   Q.  So in March of 2014 you're still working on R&Rs that you

18   haven't finished, correct?

19   A.  Correct.

20   Q.  And you regret having decided to spend so much time on

21   401(k), correct?

22   A.  The project with Professor Bekaert, yes.

23   Q.  That's right.  Okay.  And one of your initial thoughts was

24   to kick one of the Financial Engines authors off the paper and

25   put him on something else, right?

I7c1rav2                         Ravina - Cross

1    A.  No.

2    Q.  Well, let's look back a page to the email before Professor

3    Bekaert's asking you about the status of your R&Rs.

4    A.  Yes.

5    Q.  And you say, "Is there any way we could kick Kenton out of

6    AE --"  And that's the automatic enrollment paper, right?

7    A.  Yes.

8    Q.  "Is there any way we can kick Kenton out of the AE and put

9    him on something else?  That way we can get another co-author,

10   and --"

11   A.  Yes, I was trying to rearrange co-authors.  "Kick," I used

12   the strong word, but --

13   Q.  So you wanted to push one of the Financial Engines authors

14   off the paper and replace him with someone else, right?

15   A.  Asking if he wanted to postpone, not push.

16   Q.  Okay.  So that "kick Kenton out of AE" means ask him.

17   Okay.  I will move on.

18   A.  Yes.

19   Q.  After that April coffee meeting that we spoke about, April

20   2013 coffee meeting, the next time, the next incident that you

21   testified about was a dinner in late September.  Do you

22   remember that?

23   A.  Yes.

24   Q.  And you claim that he forced you to invite him to dinner,

25   right?

I7c1rav2                          Ravina - Cross

1   A.  Yes.

2   Q.  You said that the only thing discriminatory about that

3   dinner was that you were pressured to invite him to the dinner,

4   right?

5   A.  No.

6   Q.  Do you recall being deposed?

7   A.  Yes.

8   Q.  And do you recall being asked the following question and

9   giving the following answer at your deposition:

10          "Did anything discriminatory happen at that dinner?

11          "A.  The fact itself that I got pressured into

12  inviting him -- pressured in inviting him to that dinner is

13  discriminatory."

14  A.  Yes, but that was --

15  Q.  Do you remember that question and answer?

16  A.  Yes.

17  Q.  So I'm asking you anything -- that the only thing

18  discriminatory about the dinner itself was that he invited you

19  to the dinner, right?

20  A.  So how do you define dinner timewise?

21  Q.  Going into a restaurant, sitting down, eating, and dinner's

22  over.

23  A.  So he accompanied me home, and that's part of the dinner, I

24  don't know.

25  Q.  I didn't ask you that.

1    A.   Okay.  So if you mean from entering the restaurant to

2    exiting the restaurant, I was being pressured to go to dinner

3    with someone I didn't want to go to dinner.

4    Q.   So the only thing discriminatory you felt about the dinner

5    itself, walking in the door and walking out the door, is the

6    fact that you felt that you had to go, correct?

7    A.   Correct.

8    Q.   And then he talked about his daughter at the dinner, right?

9    A.   Among other things.  Daughter and his wife.

10   Q.   And there was no discussion about sexual exploits or

11   anything like that, right?

12   A.   Not at the dinner.

13   Q.   The next day you invited him to dinner in October with

14   friends of yours, right?

15   A.   Yeah, I didn't want to go to dinner again by myself.

16   Q.   Well, I'm just asking you a question.  The next day you

17   invited him to dinner with a friend of yours, right?

18   A.   With friends of mine, yes.

19   Q.   And Professor Bekaert declined that invitation because his

20   daughter was in town and he was unavailable, right?

21   A.   Right.

22            MR. HERNSTADT:  Could we take a look at BZ.

23            Your Honor, I've asked that the couple handwritten

24   notes on the top be redacted.

25            THE COURT:  Okay.

I7c1rav2                         Ravina - Cross

1   Q.  Professor Ravina, you see this email exchange, dated

2   September 27, 2013?

3   A.  Yes.

4   Q.  And that's before you had the dinner that we just talked

5   about, right?

6   A.  No.

7           THE COURT:  Are you seeking to admit this?

8           MR. HERNSTADT:  I'm sorry?

9           THE COURT:  Are you seeking to admit this?

10          MR. HERNSTADT:  Yes, please.

11          THE COURT:  Is there any objection?

12          MS. HARWIN:  No, your Honor.

13          THE COURT:  All right.  BZ will be admitted.

14          (Defendant's Exhibit BZ received in evidence)

15  BY MR. HERNSTADT:

16  Q.  So this is just after the dinner that we just talked about?

17  A.  Yes.

18  Q.  Okay.  And so you asked him at the bottom email, you said,

19  "In the meantime, though, I'm going to dinner with Alexander

20  and Anthony.  We were thinking 10/25.  Are you around?  Do you

21  want to come?  I've told them I would invite you."  Do you see

22  that?

23  A.  Yes.

24  Q.  And Professor Bekaert says, "Arrgh, my little princess is

25  coming that very day so I will have to go to dinner with her in

I7c1rav2                          Ravina - Cross

1   a less distinctly glamorous place than you have in mind."  Do

2   you see that?

3   A.  Yes.

4   Q.  And then you said, "Oh, too bad.  Are you interested in

5   another date or is this semester too tough for you?  You might

6   join in the future."

7   A.  Yeah.

8   Q.  You see that?

9   A.  Yes.

10  Q.  So you invited him to dinner and he declined because his

11  daughter was in town, correct?

12  A.  Yeah, with a group.

13  Q.  You also said that he walked you home after that dinner,

14  correct?

15  A.  What dinner?

16  Q.  The dinner we were just talking about.

17  A.  So --

18  Q.  Not the one that you invited him to that he didn't go to.

19  Just before that we were talking about a dinner where you said

20  that the only thing discriminatory was the fact that you felt

21  that you had to go, right?

22  A.  Understood.

23  Q.  Okay.  And after that dinner, though, you asked him to walk

24  you home, right?

25  A.  No.

1    Q.  You walked -- he walked you home after that dinner, right?

2    A.  Yes.

3    Q.  And you testified that he tried to kiss your mouth, right?

4    A.  Yes.

5    Q.  And that's more serious than a kiss on the cheek, right?

6    A.  Yes.

7    Q.  In fact, it's a new detail that you've added to your story

8    for the first time when you testified the other day, right?

9    A.  No.

10   Q.  Do you remember being --

11            MR. HERNSTADT:  I'm sorry, your Honor.

12   Q.  Do you remember being deposed in this case?

13   A.  Yes.

14   Q.  And do you remember testifying, being asked the next -- the

15   following question and giving the following answer:

16            "Q.  So what was the next incident?  Have you told me

17   everything about the dinner?

18            "A.  No.  Actually, you are right.  So we walked

19   together after the dinner.  I had felt I had ate a lot and so I

20   wanted to walk.  So he walked with me.  We ran into a friend of

21   mine, chatted briefly with her, kept going, and he insisted to

22   not leave me at the corner on my street but to enter street.

23   So I -- we went in there.  I was -- I had recently moved to a

24   place that had a stoop, so I was -- I felt the stoop was

25   like -- I was not used to going up and down the stoop.  So we

I7c1rav2                         Ravina - Cross

1   were discussing that, and so I start going up, and he said, no,

2   do you want me to help you?  And I said, no, no, thank you, and

3   then he pulled me back and he kissed me on my cheek.  At this

4   point I pulled away and left."

5            Do you remember being asked that question and giving

6   that answer?

7   A.  Yeah.

8   Q.  And that testimony was truthful, wasn't it?

9   A.  Yeah, the kiss landed on the cheek.

10  Q.  That's the only question I had.

11  A.  Yes.

12  Q.  And you never told Professor Bekaert not to kiss you,

13  right, not then or ever, right?

14  A.  Yeah, I wasn't -- yeah, I didn't think I should specify

15  that you should not kiss me, but no, I never told him, don't

16  kiss me.

17  Q.  You never told him that, right?

18  A.  No.

19  Q.  And you didn't complain to Columbia at the time about that

20  incident, right?

21  A.  I complained later at the EOAA.

22  Q.  No, I said, you didn't complain to Columbia at that time,

23  right?

24  A.  Yeah, I was trying to avoid him, I --

25  Q.  You complained many months later, right?

I7c1rav2                          Ravina – Cross

1    A.   Yeah, after trying to solve the issue.

2    Q.   And you and Professor Bekaert had another dinner a few days

3    later, right?

4    A.   Yes.

5    Q.   And nothing improper happened at that dinner, right?

6    A.   No.

7    Q.   And the day after that dinner, you -- that was the dinner

8    on September 30, 2013, correct?

9    A.   It was the dinner, yeah, after I tried to invite him to the

10   group dinner.  It ended up being a solo dinner, yes.

11   Q.   So was it September 30th?

12   A.   I believe it was around September 30, yes.

13   Q.   And the next day you sent Professor Bekaert an email in the

14   morning -- sorry, the early afternoon, at 12:41 p.m., inviting

15   him for coffee, right?

16   A.   I offered to bring him coffee.

17   Q.   Professor Ravina, take a look at this email.  Do you

18   recognize this as an email exchange between you and Professor

19   Bekaert?

20   A.   Yes.

21              MR. HERNSTADT:  I would move to admit.

22              THE COURT:  Any objection?

23              Any objection to CA?

24              MS. HARWIN:  Subject to just a little more foundation.

25              THE COURT:  Okay.

I7c1rav2                        Ravina - Cross

1            MR. HERNSTADT:  Your Honor, the witness has identified

2       it as an email exchange between herself and Professor Bekaert.

3            MS. HARWIN:  I would just ask for one additional

4       question as to whether it's complete.

5            THE COURT:  Yes, I would do that.  And shouldn't the

6       top of this be redacted or -- oh, that is redacted.

7            Yes.  Why don't you clarify that.

8  BY MR. HERNSTADT:

9  Q.  Professor Ravina, is this a complete -- do you know if this

10  is a complete email, complete email chain?

11  A.  The top is not complete.  It misses dates and to and from.

12  Q.  Okay.  Other than that, this is an email exchange between

13  you and Professor Bekaert?

14  A.  The following part is.

15            MR. HERNSTADT:  Okay.  I move to admit.

16            THE COURT:  I'll admit it on that basis, CA.

17            (Defendant's Exhibit CA received in evidence)

18  Q.  Do you see your exchange starting at the bottom of the

19  page, "I'm going for coffee to Joe.  Do you want anything?"

20  A.  Yes.

21  Q.  And Professor Bekaert says, "No, sorry.  I was at the

22  doctor's.  Will go for coffee really late.  Am behind here."

23            And you respond by telling him that you're at the

24  doctor's too.  "I am at the doctor's too.  I will be back at 5

25  and will try not to go for more coffee, but if I break down,

I7c1rav2                          Ravina - Cross

 1   I'll email to see if you want me to get one for you as well."

 2          Do you see that?

 3   A.  Yes.

 4   Q.  And then Professor Bekaert says, "Hope you are fine."  And

 5   you respond, at least this part, "What will happen to your

 6   knee?  Do you know already?"  Do you see that?

 7   A.  Yes.

 8   Q.  So this is an email in which you exchange -- you discuss

 9   each of your medical appointments and getting each other --

10   your getting him coffee, I guess, correct?

11   A.  Correct.

12   Q.  And you also -- one second.

13          MR. HERNSTADT:  I want to make sure this is not one of

14   those emails.

15   Q.  So Exhibit CB, Professor Ravina, I'd like you to take a

16   look at it.  Do you see the email in the center of the page?

17   Do you recognize that as an email that you sent to Professor

18   Bekaert on October 4, 2013?

19   A.  Just a second.  I'm going to get the exhibit.

20          Thank you.

21   Q.  Professor Ravina, do you recognize that as an email that

22   you sent to Professor Bekaert?

23   A.  So it's incomplete.  There is one of my email and then

24   there is another one on top that is not fully dated, and there

25   might be other emails in this chain that I don't see.

1   Q.  Right.  I'm just asking you if this is an email that you

2   sent to Professor Bekaert, the one that's October 4th at

3   6:43 p.m.

4   A.  Yeah, it might -- it might contain a chain that is not

5   there.  It's one of the emails.  Well, there is no -- I don't

6   know if this was part of a back-and-forth on something or not.

7   Q.  I'm not asking you that.  I'm asking if this is a complete

8   email to you.  Right?

9   A.  So I don't want to be difficult, but complete email meaning

10  it's one piece of an email, yes.  Whether responses and

11  previous back and forth before, I don't know.

12  Q.  Professor Ravina, I'm not asking you if it's part of a

13  chain.

14  A.  Okay.

15  Q.  I'm asking if this email is a complete email.

16          And right above it is part of an email from Professor

17  Bekaert to you, right?

18  A.  It's part of an email, yes.

19  Q.  And you remember receiving that part of an email from

20  Professor Bekaert, right?

21  A.  Yes.

22          MR. HERNSTADT:  Move to admit, your Honor.

23          THE COURT:  Any objection?

24          MS. HARWIN:  No, your Honor.

25          THE COURT:  All right.  So these portions of CB will

I7c1rav2                         Ravina - Cross

1    be admitted.

2              (Defendant's Exhibit CB received in evidence)

3    BY MR. HERNSTADT:

4    Q.  So you see on October 4, 2013, which is a few days after

5    your dinner on September 30th, you sent Professor Bekaert an

6    email, and I'd like you to look at the PS at the bottom of that

7    email.  "Just watched a movie with Owen Wilson on the plane to

8    Santa Barbara (super beautiful place), and I think he's really

9    hot."  Smiley face.  Do you see that?

10   A.  Yes.

11   Q.  And Professor Bekaert responds at the top of the page,

12   "Your Owen Wilson fascination is, eh, fascinating.  I have no

13   jealousy whatsoever of this guy's looks, but let me show you a

14   guy who's really hot, Gerard Butler," and then puts a link and

15   signs it G.  Do you see that?

16   A.  Yes.

17   Q.  So a few days after that dinner, you send him an email

18   about how hot you think Owen Wilson is, right?

19   A.  Yeah, an actor.

20   Q.  During the dinner at Ai Fiori you testified about -- which

21   was a couple weeks later, right?

22   A.  No.

23   Q.  It was October 13th?

24   A.  No.

25   Q.  Okay.  You had a dinner at Ai Fiori?

I7c1rav2                           Ravina - Cross

1    A.  Ai Fiori, yes.

2    Q.  And Professor Bekaert was at the dinner, right?

3    A.  Yes.

4    Q.  And at that dinner you testified that Professor Bekaert

5    held your hand, right?

6    A.  Yes.

7    Q.  And you said that this incident took place while you were

8    talking about television, right?

9    A.  Right.

10   Q.  About television shows, is that correct?

11   A.  Yes, I believe so.

12   Q.  And you never told him not to hold your hand, right?

13   A.  Not in words.

14   Q.  I'm asking about -- you told him -- you never said with

15   words, don't do that.

16   A.  I waited, and after --

17   Q.  Professor Ravina, this is a straight yes or no.

18   A.  Correct, I did not tell him.

19   Q.  Thank you.

20          And a couple of weeks after that dinner you sent him

21   an email that said that you were dreaming about Belgian

22   chocolate, right?

23   A.  I don't think so.  Do you have the email?  I don't know how

24   you -- I remember sending this as part of an email.  I don't

25   remember if it was a few weeks after.

I7c1rav2                        Ravina - Cross

1    Q.  So I'd like you to take a look at what's on the page.  This

2    is part of an email chain, dated October 28, 2013.

3    A.  Yeah, it's an incomplete email chain.

4    Q.  Do you recognize this as emails between you and Professor

5    Bekaert?

6    A.  Yes.

7    Q.  But it's an incomplete chain, right?

8    A.  Yes.

9              MR. HERNSTADT:  Move to admit.

10             THE COURT:  Are you seeking to admit it?  Yes.

11             All right.  Any objection to CG?

12             MS. HARWIN:  I would request that it be produced with

13   the full email that's on the top.  It seems like only the

14   signature line and --

15             THE COURT:  Do you have the email on the top?

16             All right.  Then why don't you just take out --

17             MR. HERNSTADT:  The top?

18             THE COURT:  -- her name on the top, because there's

19   nothing above it.  So you just have the email and then you have

20   the response.  Otherwise it will be admitted.

21             MR. HERNSTADT:  Thank you, your Honor.

22             (Defendant's Exhibit CG received in evidence)

23   BY MR. HERNSTADT:

24   Q.  Professor Bekaert, do you see the bottom email, you're

25   sending Professor Bekaert a link to a paper which you describe

1    as a more problematic paper?  Is that a paper that relates to

2    the papers, the 401(k) papers you were working on with

3    Professor Bekaert?

4    A.  Yes.

5    Q.  And then after your signature, you say, "Enrichetta," and

6    then you say, "BTW," by the way, "I've ordered Belgian

7    chocolate on Amazon.  I close my eyes and dream about it.  I

8    might be addicted."  Do you see that?

9    A.  Yes.

10   Q.  Do you see Professor Bekaert's response about a half an

11   hour after your first email?

12   A.  Yes.

13   Q.  He says, "Not at all.  They do not use individual data,

14   just aggregate data."  He's responding to the paper, correct?

15   A.  In that email specifically, yes.

16   Q.  And he doesn't say anything about the chocolate that you're

17   dreaming about, right?

18   A.  Not in that specific email.

19   Q.  You've said that Professor Bekaert asked you for advice

20   about dating, right?

21   A.  Yes.

22   Q.  And one person he asked you about was his former doctor, is

23   that correct?

24   A.  His doctor.

25   Q.  So I'd like you to take a look at what's been marked as CG.

I7c1rav2                          Ravina - Cross

 1    This is an email chain -- I'm sorry.  CJ.  Sorry.  This is an

 2    email chain dated November 19, 2013, right?

 3    A.  I'm not sure if this is a chain of emails, but yes, it is a

 4    chain, or part of a chain dated November 19.

 5    Q.  I'm sorry?

 6    A.  It is an email chain or part of an email chain dated

 7    November 19.

 8    Q.  If you look at the third page, the second to third page,

 9    that's the first email in the chain, correct?

10    A.  Which one?

11    Q.  That's an email November 19, 2013, at 12:26 a.m.  That's

12    the first email in the chain, correct?

13    A.  Yeah, it was a conference email.

14    Q.  Right.  And then you forwarded that to Professor Bekaert

15    and then there was back and forth between you and Professor

16    Bekaert, right?

17    A.  Yes.  I don't know if the first page is the last one.

18    Q.  There may be subsequent ones.

19    A.  Correct.

20              MR. HERNSTADT:  Move to admit, your Honor.

21              THE COURT:  Any objection?

22              MS. HARWIN:  No, your Honor.

23              THE COURT:  All right.  CJ will be admitted.

24              (Defendant's Exhibit CJ received in evidence)

25    Q.  So you'll note on the second page -- I'm sorry.  You said

I7c1rav2                          Ravina - Cross

1   this is a conference paper, right?

2   A.   The first email I'm telling -- I'm forwarding to him the

3   acceptance of a paper, so work matter.

4   Q.   This is the automatic enrollment paper, right?

5   A.   Yes.

6   Q.   And Professor Bekaert had finished writing the first draft

7   of that paper and then you submitted it to the WFA, correct?

8   A.   Correct.  And this --

9   Q.   That was on November 19, 2013, you had a completed paper,

10  initial draft of a paper submitted to -- for a conference,

11  right?

12  A.   Yeah, a partial draft.

13  Q.   And you forwarded the fact of your submission to Professor

14  Bekaert saying, "Here it is," with some commentary about the

15  paper, right?

16  A.   This was the receipt from the conference website saying

17  that the submission had gone through.

18  Q.   Right.  Okay.  And you forwarded that notice to Professor

19  Bekaert so that he would know that you submitted the paper,

20  right?

21  A.   Yeah.

22  Q.   And then he responded, "You did not attach the paper.  I am

23  really mad."  Right?

24            Do you see that?  That's at the top of the second

25  page.

I7c1rav2                          Ravina - Cross

1  A.  The top of the second page.  Well, I thought he wrote the

2  draft, so --

3  Q.  I'm sorry?

4  A.  I thought that he -- he was -- he completed the partial

5  draft.

6  Q.  No, no, I'm just --

7  A.  Yeah, he say that I did not attach the paper.

8  Q.  And then he goes on --

9  A.  And that he was mad.

10  Q.  "-- BTW, my old hematologist writes, 'My covering

11  replacement is cursing my name, I was told.  But there is a new

12  physician coming in January, supposed to be excellent.  I give

13  you permission to see her as long as you don't take her to

14  dinner.'"  And then he asks, "Do I read anything into that?"

15  Do you see that?

16  A.  Yes.  Yes.

17  Q.  And then you respond, the next morning, "Aha, I had missed

18  it.  Yes, I would read, don't hit on your doctor."  Smiley

19  face.

20  A.  Right.

21  Q.  Do you see that?

22  A.  Yes.

23  Q.  Okay.  And then he asked you, "Ok, so nothing about how she

24  feels about this.  I told you about this, right?  She wanted

25  some information about portfolio management.  Doctors are

I7c1rav2                          Ravina - Cross

notoriously horrible when it comes to financial matters.  And I

proposed a coffee or lunch to discuss.  In a reply email, she

turned the invitation into a dinner invitation.  Unfortunately,

she moved to Yale in the meantime and has been making noises

the dinner invitation is still on, but we did not connect yet."

You see that?

A.  I do.

Q.  And then he writes back, "On my way to no free lunch.  Let

me think about it."

A.  Yeah, I was -- I told him that I would tell him later.  I'd

respond.

Q.  And your testimony is that this is discriminatory because

he's asking you for dating advice, right?

A.  It's part of a chain of events, over -- by itself, one

thing like this, no.

Q.  I'm sorry.  That was -- my question was, is this part -- is

this discriminatory?

A.  It is part of the discriminatory behavior.

Q.  Okay.  And this email exchange where he quotes to you an

email from his former hematologist and asks you if he should

read anything into it, that was the same day that you submitted

a paper to the WFA, right?

A.  Correct.

Q.  Completed draft of one of the 401(k) -- a completed initial

draft of one of the 401(k) papers, right?

I7c1rav2                          Ravina - Cross

1    A.   A partial draft.

2    Q.   But it was submitted to a conference, right?

3    A.   Yes.

4    Q.   And that's part of the process you described of how papers

5    get done; you submit the conference, you get feedback, you

6    continue to work on the paper until it's ready to submit to a

7    journal, right?

8    A.   Ideally you submit a complete paper and then you go.  We

9    didn't have a complete paper.

10   Q.   So you testified also that on Valentine's Day, Professor

11   Bekaert gave you -- or around Valentine's Day, it wasn't on

12   Valentine's Day itself but around Valentine's Day -- Professor

13   Bekaert gave you chocolate and a CD, right?

14   A.   Yeah, in a gift bag.

15   Q.   Okay.  We just saw an exhibit where you told Professor

16   Bekaert that you'd ordered Belgian chocolate and you dream

17   about it, right?

18   A.   Months before.

19   Q.   Okay.  And you've asked him for chocolate on other

20   occasions too, right?

21   A.   He had chocolate in his office.  And every once in a while,

22   he gave me chocolate.

23   Q.   I'd like you to take a look at what's been marked V3.

24   A.   I think the screen is off.

25   Q.   You got me.

I7c1rav2                         Ravina - Cross

1             Okay.  Professor Ravina, please take a look at what's

2       been marked as V3.  Do you recognize this as a partial email

3       exchange between Professor Bekaert and you?

4       A.  Do you have the email?

5       Q.  It's in the packet of emails that we gave you earlier this

6       morning.

7       A.  Oh.

8       Q.  So it's V3.

9       A.  I found it.

10      Q.  So I'm going to ask you to look at the email dated

11      October 28, 2011 from you to Professor Bekaert, which is in

12      response to an email from him to you, 20 something minutes

13      earlier, also on October 28, 2011.  Do you recognize that as an

14      email exchange between you and Professor Bekaert?

15      A.  This -- this is an ex -- excerpt from a incomplete email

16      chain that we have discussed earlier today.

17      Q.  So it's a partial chain, right?

18      A.  Yeah, it's -- it takes two emails out of context.

19      Q.  Okay.

20      A.  Yeah.

21            MR. HERNSTADT:  Move to admit, your Honor.

22            THE COURT:  I'll admit it.

23            (Defendant's Exhibit V3 received in evidence)

24      Q.  I direct your attention to the PS.

25      A.  Yes.

1    Q.   You say, "PS:  Don't forget the chocolate."  Smiley face.

2    "Beer is not needed.  Barolo is better."  Do you see that?

3    A.   Yes.

4    Q.   Barolo is an Italian wine, right?

5    A.   Yes.

6    Q.   So in this email you're telling him not to forget the

7    chocolate.  Correct?

8    A.   Correct.

9    Q.   Okay.

10   A.   But it's part of a long -- can I see the whole chain?

11   Q.   There's no question.  Sorry.

12            After February 2014, you didn't see Professor Bekaert

13   again in person until June, right?

14   A.   Can you repeat the date?

15   Q.   After you saw him in February of 2014, you did not see

16   Professor Bekaert again in person until June, right?

17   A.   I think I saw him a few -- I was trying to cut down on

18   seeing him, but I saw him after February, I believe, 2014.

19   Q.   He wasn't in New York except for a few days each month,

20   right?

21   A.   On February 2014?

22   Q.   From February, March, April, May.  He was out of the

23   country the entire time except for a few days each month,

24   right?

25   A.   So in February 2014 or '13?  Are you referring to his

I7c1rav2                         Ravina - Cross

1    sabbatical?

2    Q.   2014.

3    A.   The -- 2014.

4    Q.   We're talking about after the CD and the chocolate that you

5    testified about.

6    A.   Mm-hmm.  So I saw him less, but I believe him -- but I

7    believe I saw him a few times, yeah.  And he asked me also to

8    meet.  He was around.

9    Q.   You claim -- you testified that he demanded compliments

10   from you, right?

11   A.   Yes.

12   Q.   Okay.  And we heard about a Brazilian magazine with an

13   interview, that he forwarded you the interview?

14   A.   He forwarded me the PDF of the magazine.

15   Q.   Of the magazine, right?

16   A.   Yeah.

17   Q.   And it had a story in it about an international conference

18   in Brazil, right?

19   A.   It was in Portuguese, but he told me that it was an

20   interview about the conference that he went to and some --

21   Q.   It was a conference about international diversification,

22   right?

23   A.   He told me it was a conference on international finance.  I

24   don't know what it was -- I don't think I -- it was in

25   Portuguese and I actually didn't read it.

I7c1rav2                         Ravina - Cross

1   Q.  Well, you knew it was about international diversification,

2   right?

3   A.  I don't know if it was about international diversification.

4   It was about international finance.

5   Q.  Okay.  And he didn't ask for a compliment in the email that

6   we saw yesterday, right?  That was Exhibit 16 that you talked

7   about.

8   A.  Can I see it?

9   Q.  Well, I'll show you in a minute.

10  A.  Okay.

11  Q.  The magazine had photos of him and other people that were

12  at the conference, right?

13  A.  I remember it had the photo of him.  I don't remember other

14  people at the conference.

15  Q.  And your response to seeing that PDF of the magazine was --

16  a photo, the photo of him, at least, was to write back, on

17  December 12, at 4:03 p.m. and say, "Very nice!  I am very

18  impressed."  Smiley face.

19         MR. HERNSTADT:  Actually, your Honor, move to admit.

20  I'd like to put this up for the jury to see.  This is Exhibit

21  V5.

22         THE COURT:  Any objection?

23         MS. HARWIN:  One moment, your Honor.

24         THE COURT:  This is one of the ones we discussed

25  earlier.

I7c1rav2                         Ravina - Cross

| | |
|---|---|
| 1 | MS. HARWIN:  No objection, your Honor. |
| 2 | THE COURT:  It's admitted. |
| 3 | (Defendant's Exhibit V5 received in evidence) |
| 4 | BY MR. HERNSTADT: |
| 5 | Q.  So you see that there's an email from Professor Bekaert at |
| 6 | the bottom of the page, December 12th at 3 p.m., and he's |
| 7 | forwarding an email from Ricardo Diaz de Olivera Brito.  The |
| 8 | subject is, "Your interview with pictures."  He's forwarding |
| 9 | that to you, and his message is, "Locally famous.  Geert."  Do |
| 10 | you see that? |
| 11 | A.  So yeah, he's forwarding his interview with pictures. |
| 12 | Q.  Right.  And what he forwarded was a PDF of the entire |
| 13 | magazine, right? |
| 14 | A.  I don't remember if it was the entire magazine. |
| 15 | Q.  Okay.  So it's a PDF of something, right? |
| 16 | A.  I think it was a PDF of the article, the -- that covered |
| 17 | him. |
| 18 | Q.  And your response at 4:03 is, "Very nice! I am very |
| 19 | impressed."  Smiley face.  "No less than great defender of |
| 20 | international diversification.  The photo is super awesome too. |
| 21 | You are definitely the most good looking of the entire |
| 22 | publication."  Do you see that? |
| 23 | A.  Yeah. |
| 24 | Q.  Does that refresh your recollection as to what you saw, |
| 25 | that it was the entire publication? |

I7c1rav2                          Ravina - Cross

1    A.  I responded "entire publication," but I meant the PDF,

2    whatever he sent me.  I didn't see the rest of the publication.

3    Q.  Does seeing the email that refers to the entire publication

4    refresh your recollection that he sent you the magazine, right?

5    A.  He send me a PDF of -- I believe it was his interview only.

6    Q.  Just yes or no.  If it doesn't, just say no and we'll move

7    on.

8    A.  No, it doesn't refresh.

9    Q.  Did you call him no less than the great defender of

10   international diversification?

11   A.  Yes.

12   Q.  Does that refresh your recollection that this conference

13   was about international diversification?  Yes or no?

14   A.  Yes.

15   Q.  And international diversification was one of the papers

16   that you and Professor Bekaert did together, right?

17   A.  Not at that time.  A year later.

18   Q.  That was the paper that you guys got published, right?

19   A.  Three years later.

20   Q.  Yeah.  And here you say, "You are definitely the most good

21   looking of the entire publication," right?

22   A.  He was the only one, I remember.

23   Q.  Okay.  Let's look at Exhibit 16, which is in evidence.

24          I'm looking at the last email, the third page.  This

25   is an email from you to Professor Bekaert on December 12th at

```
 1   7:15.  So about three hours later, three hours after the email
 2   where you said, "You are definitely the most good looking of
 3   the entire publication," you send him an email that says, "I
 4   agree it is not Vanity Fair, but you are by far far far the
 5   most good looking."  Do you see that?
 6   A.  Can I see the whole chain?
 7   Q.  This is your exhibit -- this is an exhibit that you were
 8   shown by your counsel when you were testifying.
 9   A.  I don't have it in front of me.
10   Q.  Okay.  Yeah, sure.  You can --
11           MR. HERNSTADT:  Could we show the witness Exhibit 16
12   from the other day.
13           Okay.  We'll put it up on the screen.
14   Q.  So looking at the first email in the chain on page 3, this
15   is now the second time you've told him how good looking he is
16   in that publication, right?
17   A.  Yeah, that's what he asked.
18   Q.  4:03, you said, "You are definitely the most good looking,"
19   and at 7:15 you say, "You are by far far far the most good
20   looking."
21   A.  Yes.
22   Q.  And then you actually subsequently say that when he
23   writes -- when he responds to that, that he's not offended but
24   his ego is floating, you respond, and he says, "Tough
25   competition.  Imagine putting me in a journal with some actors,
```

1   and non -- and just noneconomic -- economists.  Not offended at

2   all.  My ego is floating.  Will take a look in the mirror after

3   hard day of work."  Do you see that?

4   A.  Yes.

5   Q.  And then you respond, "You would do much better because you

6   are very intelligent and intellectual and yet not unfortunate

7   looking."  Do you see that?

8   A.  Yes.

9   Q.  And then immediately after that you add, "Not unfortunate

10  looking is an Italian expression that means good looking."

11  Right?

12  A.  Yeah.  I needed to give compliments.

13  Q.  You'd sent him two different emails telling him how good

14  looking he is, right?

15  A.  Yes.

16  Q.  You claim that Bekaert sending you music was also unwanted

17  attention, right?

18  A.  Yes.

19  Q.  Do you remember at the dinner before you asked him to

20  coffee -- we saw that email about getting coffee on October 1,

21  2013?

22  A.  I don't remember the exact date.

23  Q.  This is Exhibit CA, when you said you were going to coffee

24  to Joe, do you want anything, and then you talked about your

25  doctor's appointments.  Do you remember that, on October 1?

1    A.  Yes.

2    Q.  And that was right after a dinner, right?  That was the day

3    after you had a dinner?

4    A.  It was a day after we had the dinner.

5    Q.  Okay.  And at that dinner you talked about music, right?

6    A.  About TV show, not music.

7    Q.  The next morning -- sorry -- the next evening -- I'd like

8    you to look at Exhibit AQ.

9             MR. HERNSTADT:  Move to admit, your Honor.

10            THE COURT:  Any objection?

11            MS. HARWIN:  No objection.  I believe it's already in

12   evidence as a plaintiff's exhibit.

13            THE COURT:  All right.  It will be admitted.

14            (Defendant's Exhibit AQ received in evidence)

15   BY MR. HERNSTADT:

16   Q.  So this is the day after that dinner, right?  And you send

17   him an email from someone who could be a research assistant,

18   right?  Do you see that on the second page?

19   A.  So yesterday --

20   Q.  Is that what that is, you're sending him an inquiry from

21   someone who could be a research assistant?

22   A.  The last email is me propose -- proposing to hire a

23   research assistant, yeah.

24   Q.  And in his response, I'd like you to look at the second

25   line where he says, "BTW, I forgot to send you some music," and

I7c1rav2                         Ravina - Cross

1    then he sends you a bunch of songs.

2    A.  Yes.

3    Q.  Links to a bunch of songs.

4    A.  Yes.

5    Q.  Do you see that?

6    A.  Yes.

7    Q.  That's because the night before you discussed music and he

8    said he would send you music, right?

9    A.  No.

10   Q.  And do you remember on October 4th, a couple of days later,

11   you told him that you liked the music he sent you, right?

12          I'd like you to take a look at what's been marked AR.

13          MR. HERNSTADT:  And that I would move into evidence.

14          THE COURT:  Any objection to AR?

15          MS. HARWIN:  No, your Honor.

16          THE COURT:  It will be admitted.

17          (Defendant's Exhibit AR received in evidence)

18   Q.  So if you look at AR, the email at the bottom of the page,

19   this is October 4th, three days later.  You say here, "Hi,

20   Geert.  I've been listening to the songs.  I like them.  I like

21   the first and I very much like Manifesto, actually, but only

22   when I listen to it while looking at the future video on

23   YouTube.  It's very fascinating and complements the music well.

24   I am very surprised I like your music.  I feel very

25   intellectual."  Smiley face.  Do you see that?

I7c1rav2                         Ravina - Cross

1   A.  Yes.

2   Q.  And then a few days after that, you wrote Professor Bekaert

3   and told him that you liked Bryan Ferry more than a musician

4   named Gabriel Ríos, correct?

5   A.  Yeah, he kept talking about music and making me listening

6   to music.

7               MR. HERNSTADT:  I'd like to admit Exhibit AT.

8               THE COURT:  Any objection?

9               MS. HARWIN:  No, your Honor.

10              THE COURT:  All right.  AT will be admitted.

11              (Defendant's Exhibit AT received in evidence)

12  Q.  So this is an email on October 10.  The bottom one is from

13  Professor Bekaert to you at 11 a.m.  And he says, "Enrichetta,

14  I realized I forgot to give you more info about the Puerto

15  Rican-Belgian singer who's now trying to make it in New York

16  and often gigs in Rockwood."  And he sends you a link.

17              And you write back, "I like Bryan Ferry more," right?

18  A.  Yes.

19  Q.  I'd like you to take a look at what's been marked Exhibit

20  AV.

21              MR. HERNSTADT:  Move into evidence, your Honor.

22              THE COURT:  Any objection?

23              MS. HARWIN:  No, your Honor.  I believe it's part of a

24  chain that's in evidence.

25              THE COURT:  It will be admitted.

1            (Defendant's Exhibit AV received in evidence)

2      BY MR. HERNSTADT:

3      Q.  So this is the next day, the day after you said you liked

4      Bryan Ferry, and you send Professor Bekaert -- the very bottom

5      email is from you at October 11, 2012, and it's to Professor

6      Bekaert, and it's an empty email except for its subject line

7      that says, "Do you have any other good singers?"  Do you see

8      that?

9      A.  Yes.

10     Q.  So you're asking Professor Bekaert for more music, right?

11     A.  I was asking for his attention for more work, actually.

12     Q.  I'm sorry.  The email says, "Do you have another good

13     singer?"  That's you asking him for another good singer,

14     correct?

15     A.  Literally, yes.

16     Q.  Thank you.

17            And he responds, "Tons, but you did not like the music

18     I sent you so much."  And then mentions some more music.  And

19     in the second paragraph, he talks about work, right?

20     A.  Yeah, he says the emails are piling up, but he has no time.

21     Q.  And you say, "Sounds good," is your response at the top of

22     the page.  "Sounds good.  I'll check the music I already have."

23     Right?

24     A.  Yeah, and then I talk about the work.

25            MR. HERNSTADT:  Your Honor, this would be a good time

i7cnrav3                    Ravina - Cross

 1  for a break.

 2              THE COURT:  All right.  Why don't we take our morning

 3  break now.  Just remember, don't discuss the case and keep an

 4  open mind.  Thank you.

 5              (Jury not present)

 6              THE COURT:  All right.  So I'll see you all in 15

 7  minutes.

 8              (Recess)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  We can bring the jury in.  Thank you.

2            (Jury present)

3            THE COURT:  Everyone can be seated.  Thanks.

4            MR. HERNSTADT:  If I may.

5            Thank you, your Honor.

6    BY MR. HERNSTADT:

7    Q.  Professor Ravina, you and Professor Bekaert teased each

8    other about bluntness, did you not?

9    A.  We had an e-mail exchange in which I used this bluntness to

10   tell him something that I needed to.

11   Q.  Do you remember having an e-mail exchange with Professor

12   Bekaert, November 19, 2012.  It is a long exchange about a

13   variety of subjects, including getting RAs.

14           I would like you to take a look --

15           MR. HERNSTADT:  Move to admit, your Honor.

16           THE COURT:  Any objection?

17           MS. HARWIN:  No, your Honor.

18           THE COURT:  All right.  It will be admitted.

19   BY MR. HERNSTADT:

20   Q.  I would like you to take a look at the fifth page of the

21   exhibit.  It is an e-mail on November 16, 2012, from you to

22   Professor Bekaert.

23           And you write:  Hi, Geert.  What is the exact

24   agreement we have with Wei and Kenton about coauthorship?

25           Do you see that?

i7cnrav3                      Ravina - Cross

1    A.   Yes.

2    Q.   And Wei and Kenton are the coauthors from Financial

3    Engines, right?

4    A.   Correct.

5    Q.   Who provided the data to you, correct?

6    A.   They did.

7    Q.   You go on you say:  I really like them and I'm happy to be

8    coauthor with them as long as they want, but I'm trying to

9    understand if they would be willing to let Jia and Bronson be

10   on a paper before their job market, conditional on their good

11   performance, which I am confident will be there.  What is your

12   assessment?

13          Do you see that?

14   A.   Yes.

15   Q.   Jia and Bronson, are they research assistants?

16   A.   Ph.D. students and research assistants.

17   Q.   Working on the 401(k) project?

18   A.   Um --

19   Q.   Jia was working the 401(k) project, right?

20   A.   Jia was and --

21   Q.   And Bronson was considering working on the project, right?

22   A.   Correct.

23   Q.   I would like you to go forward to the third page.  There is

24   an e-mail from you to Professor Bekaert on November 17 saying:

25   Hi, Geert.  I thought about it, reread all the e-mails, and

i7cnrav3                    Ravina - Cross

1    it's clear you don't want to ask Wei and hire Bronson.

2              Do you see that?

3    A.  Yes.

4    Q.  Do you see Professor Bekaert's response, the next e-mail,

5    this is November 17 at 8:58.

6              He says:  Eat a praline before reading this e-mail.

7              Praline is a sweet candy, is that right?

8    A.  It's piece of chocolate I think.

9    Q.  A piece of chocolate?

10   A.  Yes.

11   Q.  You do not understand anything apparently.  I am only

12   asking you to be fair with Bronson and tell him the risk of

13   working with data from a private company.  In fact, we run the

14   same risks.  They can shut it down after one paper.  That is

15   all.  I don't want -- I do -- sorry.  I want to get as much

16   as -- out of Wei and Kenton as possible before we muddy the

17   waters with requests with papers, etc.  We are still trying to

18   get more data and information from them at this point.  So,

19   yes, it is strategically superior now to work with two good RAs

20   without having Wei and Kenton suddenly worrying about all these

21   other projects they will have to get approved before we even

22   started the real academic work on the first and certainly

23   before we got all the information we need.

24             Do you see that?

25   A.  Yes.

1   Q.  He signs off:  What's so complicated about this?  Jeez.

2   Exclamation point.  Paren, so this is an example of the blunt

3   Belgian.  Like it?  Geert.

4            Do you see that?

5   A.  Yes.

6   Q.  And you respond -- and this is at the top of page 2.

7            The e-mail starts at bottom of page 1, but all that's

8   on there is, Hi.

9            It says:  I like the blunt Belgian version, so I hope

10  you will appreciate my reply, smiley face with a wink.  With

11  all due respect you don't understand anything.

12           Do you see that?

13  A.  Yes.

14  Q.  And you are teasing each other here, calling each other

15  blunt, right?

16  A.  I wouldn't characterize that way.

17  Q.  OK.  And the same day you had another exchange, that last

18  exchange with the -- sorry, the I like the blunt Belgian

19  version, that's the early morning of November 19, correct?

20  A.  Yes.

21  Q.  So, that -- that same date at the end of the day do you

22  recall an exchange with Professor Bekaert where he had sent an

23  e-mail to Professor Zeldes, one of your colleagues that you've

24  testified about, the head of the department, that you thought

25  was very blunt, right?

i7cnrav3                        Ravina - Cross

1   A.  Yeah.  I thought it was offensive.

2   Q.  Do you remember that he said:  We have a simple question.

3   Your portfolio shared paper with Amerix is a really nice and

4   useful paper.  It gets tons of Google scholar citations but was

5   never published.  Why?

6           Then he continues:  We worry about this, because we

7   now have a similar but even better dataset from FE, and the

8   answer may be very relevant for us.

9           You thought that was offensive?

10  A.  Yes.  I thought that was offensive.

11  Q.  So you told him you were trying to do damage control,

12  right?

13  A.  Right.

14  Q.  He said, I thought I was super nice and not blunt.

15          Right?

16  A.  Can you show me where it is?

17  Q.  Sure.  Well --

18  A.  What page?

19  Q.  Do you recall -- do you recall -- do you recall --

20  A.  I recall the e-mail exchange.

21  Q.  Do you recall his saying that to you I thought I was super

22  nice and nonblunt?

23          I can show it to you --

24  A.  Please.

25  Q.  -- to refresh your recollection, if you want.

i7cnrav3                    Ravina - Cross

1              MR. HERNSTADT:  May I approach, your Honor?

2              THE COURT:  Yes.

3    BY MR. HERNSTADT:

4    Q.   It starts at the top of the second page, and then goes to

5    the first page.

6              Do you see where he says I thought I was super nice

7    and nonblunt?

8    A.   Yes.

9    Q.   Do you recall now that that's -- that's what he wrote you?

10   A.   Among the many things, yes.

11   Q.   OK.  So please don't look any more.  Let me ask you another

12   question.

13             Do you recall responding to him by saying:  Well, let

14   me be blunt.  You must be kidding.  I can't believe you put my

15   name in this message.  From now on PR goes through me for both

16   colleagues and Wei and Kenton.  Seriously, you are like an

17   elephant in the China shop of feelings.  It's almost funny.

18             Do you remember writing that to him?

19   A.   Sorry.  It was not on the --

20   Q.   No, I'm asking if you remember writing it.  I don't want

21   you to look at the e-mail unless you need it to refresh your

22   recollection.

23   A.   Yes, I can see the e-mail I wrote.

24   Q.   Do you remember writing that to him?

25   A.   Now that I see the e-mail, yes.

i7cnrav3                    Ravina - Cross

1    Q.  OK.  Thank you.  You testified -- here, I'll take that

2    back.  Thanks.

3           You testified that Professor Bekaert stopped you from

4    working on your other papers, the two single-authored R and Rs

5    and your other research papers, like the papers with Professor

6    Viceira and other papers you testified about yesterday.

7    A.  Yes, I did.

8    Q.  And you said that he stopped you from working on those

9    papers by encouraging you to focus on the Financial Engines

10   work, right?

11   A.  He prevent from me --

12   Q.  I'm just asking if that's what he said to you; that he

13   stopped you from working on those papers by encouraging you to

14   work on the Financial Engines work, correct?

15   A.  He encouraged me to work on the Financial Engines papers,

16   and as a result I give --

17   Q.  I'm not asking you a question that requires a long

18   response.

19   A.  OK.

20   Q.  I just asked you if that was correct.

21   A.  If you mean like stop, like physically stop, no, I did not.

22   Q.  OK. I'll try to be clearer.

23          So he prevented you -- the reason that you could not

24   work on your other papers is because he encouraged you to work

25   on the Financial Engines work, correct?

i7cnrav3                        Ravina - Cross

1    A.  Yes.

2    Q.  Is that your testimony?

3    A.  Among other things.

4    Q.  But --

5    A.  Other things as well.  And I thought was a good idea.

6    Q.  I'm just --

7    A.  Sorry.

8    Q.  -- asking you if about that is correct?

9    A.  Um --

10   Q.  If it's not correct, you can say that?

11   A.  It's partially correct.

12   Q.  OK.  He actually -- Professor Bekaert actually encouraged

13   you to work on all of your papers, didn't he?

14   A.  At some point in times he did encourage me to work also on

15   the other papers as well.

16   Q.  Well, do you remember being deposed?

17   A.  Yes.

18   Q.  OK.  Do you remember being asked the following question and

19   giving the following answer:

20   "Q.  Did he ever stop you from working on any article that was

21   not related to Financial Engines?

22   "A.  Yes.

23   "Q.  Which article?

24   "A.  All of the other articles that I was working on.  He

25   encouraged me to focus on the Financial Engines work.  And

1   as -- as a result, I had less time and resources to work on the

2   rest."

3           Do you remember that?

4   A.  Yes.

5   Q.  Do you remember being asked the following question and

6   giving the following answer:

7   "Q.  Did Professor Bekaert cause any of the delays that meant

8   you did not complete the beauty and habit papers over the last

9   eight years?

10  "A.  By encouraging me to work on Financial Engines data, it

11  created lack of time to work on those papers."

12          Do you recall that answer?

13  A.  Yes.

14  Q.  And that's your testimony, right?

15  A.  Yes.

16  Q.  In reality, though, the professor advised you over and over

17  again to finish your single-authored papers, did he not?

18  A.  At some points he said that as well.

19  Q.  He repeatedly told you this would have the biggest impact

20  on your CV, your list of publications which would help you to

21  tenure, right?

22  A.  Once he told -- at some time he would tell me that.

23  Sometimes he would tell me about the 401(k) paper.

24  Q.  And that was particularly true, his encouragement became --

25  to do your single-authored papers became particularly important

i7cnrav3                    Ravina - Cross

1    given the three-year delay between 2009, when you started

2    talking about the Financial Engines work, and 2012 when you got

3    the actual data from them, correct?

4    A.  Um, no, not fully.

5    Q.  OK.

6    A.  He said it at other times as well.

7           MR. HERNSTADT:  Let's take a look at Exhibit AF, which

8    I would move into evidence.

9           Move to admit, your Honor.

10          THE COURT:  Any objection?

11          MS. HARWIN:  No, your Honor.

12          THE COURT:  All right.  AF will be admitted.

13          (Defendant's Exhibit AF received in evidence)

14   BY MR. HERNSTADT:

15   Q.  Professor Ravina, this is an e-mail exchange between you

16   and Professor Bekaert dated December 21, 2011, correct?

17   A.  Correct.

18   Q.  So two months after you got the Financial Engines contract

19   signed, is that right?

20   A.  Yes.

21   Q.  I direct your attention to the first page the e-mail from

22   Professor Bekaert to you at 9 am.

23          This e-mail exchange starts with Professor Bekaert

24   sending you a paper that he thought would be relevant to the

25   401(k) papers, is that correct?  Another paper?

1   A.   He sent a list of papers from a -- from subscribing to an

2   electronic journal.

3   Q.   OK.

4   A.   Yes.

5   Q.   And then on the first page Professor Bekaert writes to you,

6   Great, will check it out.

7        That's referring to a link that you had sent him about

8   an article, right?

9   A.   This refers to the work that I had completed with research

10  assistants --

11  Q.   OK.

12  A.   -- on the data.

13  Q.   Then he says:  On entire -- on something entirely

14  different, is your vitae on the web current?  What is the

15  status of your habit and beauty papers?  As I told you before,

16  you really got to get these published.

17        Do you see that?

18  A.   Yes.

19  Q.   The habit and beauty papers, those were the two

20  single-authored R and R papers that we have been talking about?

21  A.   Yes.

22  Q.   By R and R I mean revise and resubmit or reject and

23  resubmit, right?

24  A.   Right.

25  Q.   He's encouraging you to complete those papers, right?

1   A.  Yes.

2   Q.  You respond:  You are right.  I am working on the habit 90

3   percent of my time.  And, despite I am in Jerusalem now and

4   will go to Italy tomorrow, I don't plan to have any vacation.

5   I hope I make it.  I will update the CV too.

6           When you say I hope I make it, you mean you hope to

7   complete the habit paper, correct?

8   A.  I just said I was overworked and I make it.

9   Q.  OK.  And you are working 90 percent of your time on that

10  habit paper, correct?

11  A.  During that break, yeah.

12  Q.  And then he asked you again -- you know, it's R and R and

13  RFS.  RFS is a journal, correct?

14  A.  Yes.

15  Q.  He asked you about the beauty paper where it's at.

16          He says, What about the beauty paper?

17          He's asking when are you going to work on that, right?

18  A.  Yeah, I believe so.

19  Q.  And we've seen Exhibit 8.  This is a July 20 -- the July 31

20  e-mail 2012?

21          He's asking you about the re -- the revisions and

22  incurring you -- encouraging you to work your revisions in this

23  e-mail too, correct?

24  A.  There is to some technical issue.

25          MR. HERNSTADT:  I can't hear.  I'm sorry.

i7cnrav3                       Ravina - Cross

1              THE COURT:  A technical issue?

2              THE WITNESS:  Yes.  A technical issue.

3              THE COURT:  We are working on it.

4              MR. HERNSTADT:  I'm sorry.

5    BY MR. HERNSTADT:

6    Q.  So, you remember seeing this e-mail earlier this morning

7    which starts, How are your revisions coming along?

8              And you respond that it's proceeding well.  I will

9    have the whole thing sent and posted on SSRN by Monday.

10             That means that -- you will have completed one of your

11   revisions and posted it by Monday, right?

12   A.  Yes.

13   Q.  SSRN is a -- that's a place a -- a place where scholars

14   post draft versions of papers so other scholars can look at

15   them, is that correct?

16   A.  Yes.  When a draft is completed or revised, it is posted to

17   SSRN and becomes public.

18   Q.  And then he follows up at the bottom of page 1:  Do you not

19   have two revisions?

20             And you say you have two more revisions, which you

21   will do next.

22             And he offers to buy you dinner if you finish your

23   revision.

24             Do you see that?

25   A.  Yes.  He invited me to dinner.

i7cnrav3                    Ravina - Cross

1    Q.  He's encouraging you to finish your revisions, isn't he?

2    A.  Yes.  He's also encouraging me to finish my revisions.

3    Q.  Let's look at Exhibit AX.

4              MR. HERNSTADT:  Move to admit, your Honor.

5              THE COURT:  Any objection to AX?

6              MS. HARWIN:  No, your Honor.

7              THE COURT:  All right.  AX will be admitted.

8              (Defendants' Exhibit AX received in evidence)

9    BY MR. HERNSTADT:

10   Q.  We have seen an e-mail in December of 2011 where he's

11   encouraging you to do the work and July 2012 where he's

12   encouraging you to do your revisions.

13             Here's October 19, 2012.

14             I would like you to look at the e-mail from Geert to

15   you on the top of the second page.  It's dated October 19,

16   2012.

17   A.  Yes.

18   Q.  He's responding to -- he's responding to the -- the rest of

19   the e-mail chain.

20             He says:  This is too fast, please slow down.  Get

21   that habit paper out.

22             Do you see that?

23   A.  Yes.

24   Q.  So he's encouraging you to get the habit paper done,

25   correct?

i7cnrav3                    Ravina - Cross

1   A.  Yes.  He's telling me to slow down the work on the

2   401(k) --

3   Q.  And --

4   A.  -- and get the paper out, the habit paper out.

5   Q.  Professor Ravina, I just asked you about that sentence.

6          He's encouraging you to get the habit paper out,

7   right?

8   A.  Yes, among the other things.

9   Q.  Then on the top of the page -- I'm sorry.  The first page.

10  This is your response to him and there's some work talk, but

11  the -- at the very bottom, the second line from the bottom, you

12  said:  While working on the habit paper I can definitely afford

13  to send out two e-mails a week, and have this go -- going

14  further.

15         Do you see that?

16  A.  Yes.

17  Q.  So you are telling him that you are working on that paper

18  on October 19, 2012, and while working on the 401(k) project,

19  correct?

20  A.  Yes.  I was pushing both, yes.

21         MR. HERNSTADT:  OK.  BF.

22  BY MR. HERNSTADT:

23  Q.  So --

24         MR. HERNSTADT:  Move to admit, your Honor.

25         THE COURT:  Any objection?

1          MS. HARWIN:  No, your Honor.

2          THE COURT:  All right.  BF will be admitted.

3          (Defendants' BF received in evidence)

4     BY MR. HERNSTADT:

5     Q.  This is an exchange between you and Professor Bekaert dated

6     February 8, 2013.  So know we are in 2013, the beginning part

7     of 2013.

8          if you look at of the page there is an e-mail from

9     Professor Bekaert dated February 7 at 7:08 a.m

10         He says:  BTW -- by the way -- what is the situation

11    with beauty and habit?  Geert.

12         And you respond:  Well, the beauty got a reject and

13    resubmit from the Journal of Finance because someone else, you

14    know, wrote the same paper as I did.  So, no, I'm not having

15    fun.  This is my problem No. 3.  I didn't have the time to make

16    any progress on the habit.

17         Then if you look at the top of the page, Professor

18    Bekaert responds:  That is actually what prompted my question.

19    I saw it and said, shoot, you just cannot have things lying

20    around.  You need to decide whether you can make a push with

21    these two papers and how.  They are single-authored.  If you

22    just get one in a top journal, it will really help your career.

23    Please spend some time planning on that.  I'm willing to talk.

24    Geert.

25         Do you see that?

1   A.   Yes.

2   Q.   And here -- Professor Bekaert here is encouraging you to

3   get your single-authored papers completed submitted and

4   published, right?

5   A.   Among the other things in this e-mail chain, yes.

6   Q.   And let's take a look at Exhibit 261.

7            Now we're into April of 2013.

8            We've seen this e-mail before.  This is the one where

9   you say you -- you need -- at the top, you say you need three

10  more papers by spring 2014, and you identify four papers that

11  you plan to work on and do nothing else.

12           Do you see that?

13  A.   Yes.

14  Q.   And that's in response to the e-mail from Professor Bekaert

15  that says -- well, let's look at the one -- the first e-mail in

16  the chain says:  I just talked with Wei Jiang.  We need to work

17  big time.

18           And then Professor Bekaert responds:  Yeah, but the

19  biggest gain per unit of time for you is to get your two

20  single-authored paper published in a top journal or at least

21  one.  I keep telling you, but you do not seem to listen.  We

22  will get a slew of papers done, no question, but getting them

23  published will take time unless we follow the strategy of send

24  the first couple to financing journals rather than econ

25  journals.

1              Do you see that?

2    A.  Yes.

3    Q.  He's telling you that getting your single-authored papers

4    published is very important for your career and encouraging you

5    to do so, correct?

6    A.  In parts of the e-mail, yes.

7    Q.  Let's look at CV.

8              So that was -- let's see.  We did February 2013,

9    March -- I'm sorry, April 2013.  Now we are in March 2014.

10             If you look on the second page, we've seen this

11   e-mail.  This is where he's asking you again on March 6 at

12   10:37 a.m., by the way, real quick, and he goes through your

13   two single-authored papers and where they stand and asks you

14   about a third paper that you have been working on, correct?

15   A.  Correct.

16   Q.  So, again, he's following up with you on getting your

17   single-authored papers done, right?

18   A.  Yes, he doesn't want to write more drafts on the 401(k),

19   and he is encouraging me to do the others.

20   Q.  During this whole time, from December 2001 to March 2014,

21   you are working on those papers, right?

22             MS. HARWIN:  Objection.

23             THE COURT:  Overruled.

24   A.  I'm working mainly on the 401(k), and I'm trying to push

25   the other papers along.

1    Q.  We just saw the e-mails where you say you're going to spend

2    90 percent of your time on habit, and then you later say you

3    are going to work on habit and beauty and one 401(k) paper and

4    the high net worth paper full-time and nothing else.

5           Do you remember that?  That was 261.  We just saw

6    that.

7    A.  Yes.  But we also saw the e-mails in which I --

8    Q.  I am just --

9    A.  -- told him --

10   Q.  I am not asking about that exhibit, Professor Ravina?

11   A.  I saw those partial exhibits, yes.

12   Q.  So, in Exhibit CU -- let's look at the -- your response at

13   the bottom of the page.

14          Again, you say I will work -- this is the end of the

15   first paragraph:  I will work on R and Rs only so that I get

16   rid of them.

17          Do you see that?

18   A.  Yes.

19   Q.  So, in March of 2014 you're saying that is all you are

20   going to work on, get those R and Rs done.

21          You say:  No other working papers that are submitted.

22   It was a mistake to work so much on this 401(k) crap.

23          Are you saying here that it was a mistake to follow

24   the plan that you laid out for yourself in the exhibit we just

25   saw, 261, and work only -- in April of 2013, so a year

i7cnrav3                    Ravina - Cross

1    earlier -- to work only on your two single-authored papers, a

2    paper with Professor Viceira at Harvard and one 401(k) paper?

3    A.   No.  I'm saying --

4    Q.   OK.  And you've testified that Professor Bekaert controlled

5    the Financial Engines data, is that right?

6    A.   He was the gatekeeper, yes.

7    Q.   Now, Professor Bekaert never used the word gatekeeper,

8    right?

9    A.   Um, I don't recall the actual word, but he communicated

10   that he was the gatekeeper.

11   Q.   Right.  But you are the one who came up with the word

12   gatekeeper, right?  That's your word?

13   A.   I don't remember if he said the exact words gatekeeper.

14   That was the -- what he communicated to me like --

15   Q.   Do you remember being deposed in this case?

16   A.   Yes.

17   Q.   And did you get the following question and give the

18   following answer:

19   "Q.  Who came up with the word gatekeeper?

20   "A.  I think it is a summary of his role between the company

21   and me as someone that is in control.  I came up with it,

22   but --

23   "Q.  When did you come up with that word?

24   "A.  Maybe now."

25          Do you remember giving that testimony?

1   A.  Yes.  This is consistent with what I'm telling you.

2   Q.  That's the testimony you gave then?

3   A.  Yes.

4   Q.  You made up that word in your deposition, right?

5          MS. HARWIN:  Objection.

6          THE COURT:  Overruled.

7   A.  The word to describe --

8   Q.  That's --

9   A.  -- the situation, yes.

10  Q.  Yes.

11  A.  The situation.  No, of course not.

12  Q.  So the Financial Engines contract you saw it in 2011,

13  right, when it was signed?

14  A.  Yes.

15  Q.  And you have seen it since then, right?

16  A.  We saw it on the first day.

17  Q.  And there's nothing in the contract that gives Professor

18  Bekaert any control over the data, correct?

19  A.  I disagree.

20  Q.  What in the contract gives Professor Bekaert control over

21  the data?

22  A.  Um --

23  Q.  Let ask you a different question.  There's nothing in the

24  contract as written that gives Professor Bekaert control over

25  the data, correct?

i7cnrav3                         Ravina - Cross

1    A.  I disagree.

2    Q.  OK.  And are you saying that you interpret some words to

3    give him that power?

4    A.  Um, yes.

5    Q.  So, what is your interpretation that gives him the power to

6    control the contract?  Is it the fact that Financial Engines

7    withdraw the data at any time?

8    A.  Part of it, yes.

9    Q.  And the fact that they have to preapprove everything,

10   right?

11   A.  Yes.  And the fact that they are his friends.

12   Q.  OK.  And that -- and he was friends with the Financial

13   Engines people?

14   A.  Very much, yes.

15   Q.  There's nothing in the contract about his being friends

16   with Financial Engines people, right?

17   A.  No.

18   Q.  All right.

19   A.  And there's --

20   Q.  And there's no provision in the contract that says

21   Professor Bekaert has control of the data, right?

22   A.  Um --

23   Q.  It specifically explicitly says that, right?

24   A.  Yes.  That's correct.

25   Q.  OK.

i7cnrav3                        Ravina - Cross

Q.  And the contract is between Financial Engines, Professor

Bekaert, and you as equal parties to the contract, correct?

A.  Correct.

Q.  You have said that -- it is also the case that Professor

Bekaert never said to you personally, from his mouth to your

ears, that Financial Engines would cancel the contract without

him, correct?

A.  Not in those words.

Q.  And it's also the case that you -- you said that you

couldn't contact Financial Engines without his permission?

A.  I was told to go through him by Professor Bekaert.

Q.  OK.  But you wrote to Financial Engines without his

permission, right?

A.  Every once in a while, yes, I needed to proceed.

Q.  All right.  For example, in October of 2014, you wrote to

Wei Hu at Financial Engines to intercede with Professor Bekaert

about his complaints that the fund matching data that you had

given him in the fall of 2014 was bad.

        Do you remember that?

A.  Yes, upon suggestion of the vice dean.

Q.  So you wrote him an e-mail asking him to step in and

resolve the dispute between Professor Bekaert who said the fund

matching data was not usable and had to be fixed and your

position that it was usable, correct?

A.  Correct.

i7cnrav3                        Ravina - Cross

1    Q.  And you wrote to him on October 8, right?

2    A.  Yes.

3    Q.  And then you wrote to him again on October 21, the same --

4    the same e-mail, right?

5    A.  Uh-huh.  Probably, yes.

6    Q.  Do you remember --

7           MR. HERNSTADT:  Sorry.  Move to admit, your Honor.

8           THE COURT:  Any objection to HL?

9           MS. HARWIN:  No, your Honor.

10          THE COURT:  It will be admitted.

11          (Defendants' Exhibit HL received in evidence)

12   BY MR. HERNSTADT:

13   Q.  Do you recognize this e-mail, Professor Ravina?

14          This is an e-mail exchange between yourself and Wei Hu

15   at Financial Engines as well as other people?

16   A.  Yes.

17   Q.  This is a long exchange, seven pages, of Professor Bekaert

18   and you exchanging your positions on the -- whether the data is

19   OK and whether there's an issue that has to be resolved,

20   correct?

21   A.  Correct.

22          MR. HERNSTADT:  Let's look at HR.

23          THE WITNESS:  Thank you.

24          MR. HERNSTADT:  Move to admit.

25          THE COURT:  Any objection to HR?

1          MR. HERNSTADT:  Any objection?

2          MS. HARWIN:  I'm sorry, your Honor.

3          No, your Honor.

4          THE COURT:  All right.  HR will be admitted.

5          (Defendants' Exhibit HR received in evidence)

6   BY MR. HERNSTADT:

7   Q.  Do you remember H -- HL was your October 8 e-mail to

8   professor -- to Wei Hu, right?

9   A.  Right.

10  Q.  If you look at the top of HR, you see there is an October

11  21 -- there's two e-mail -- there's a response and then there's

12  a -- below the response from Wei Hu there is an e-mail from you

13  to him and to Kenton Hoyem on October 21.

14          And this is you resending your October 8 e-mail,

15  correct?

16  A.  Yes, to get a response.

17  Q.  Because he hadn't responded to it?

18  A.  Correct.

19  Q.  And then his response is, Enrichetta -- at the top of the

20  page -- I am afraid we are not equipped to help you with data

21  investigation for the near to medium near future.

22          And then in the second paragraph, he says, If we

23  cannot get agreement among the coauthors, I don't know what to

24  suggest.  This seems to be a precondition for papers to get

25  across the finish line.

i7cnrav3                              Ravina - Cross

1              Do you see that?

2   A.   Yes.

3   Q.   These are e-mails that you sent to Wei Hu without

4   permission from Professor Bekaert, right?

5   A.   No.  It was after I had reported him already.

6   Q.   I'm sorry?

7   A.   It was in the fall 2014, and the vice dean told me to send

8   the e-mail.

9   Q.   He told you to send this e-mail, Professor Bekaert did?

10  A.   No, no.  At that point I tried to communicate directly with

11  the company, and at the suggestion from the Vice Dean Phillips.

12  Q.   I'm sorry.  Professor Ravina, my question was that this is

13  an e-mail that Professor Bekaert -- that you did not ask

14  permission from Professor Bekaert to send, correct?

15  A.   Correct.

16  Q.   That you sent and in fact copied Professor Bekaert on it,

17  correct?  The first one on October 8?

18  A.   Yes.

19  Q.   OK.  Professor Bekaert did e-mail you on -- about a year

20  earlier, though, suggesting that he should see some of the

21  e-mails you send to Wei Hu before they go out, didn't he?

22  A.   He did it in e-mail and he also in person.

23  Q.   Let's look at CF, please.

24              THE COURT:  Thank you.

25              Any objection to CF?

i7cnrav3                    Ravina - Cross

1              MS. HARWIN:  No objection, your Honor.

2              MR. HERNSTADT:  I would like you to look at the second

3      page, which is an e-mail --

4              THE COURT:  Are you moving for its admission?

5              MR. HERNSTADT:  I'm sorry.  I'm sorry.

6              Move for admission.

7              THE COURT:  It will be admitted, and you can publish

8      it.

9              (Defendants' Exhibit CF received in evidence)

10     BY MR. HERNSTADT:

11     Q.  This is another long e-mail, a long e-mail chain between --

12     if you go to the first page, it starts on October 11 -- the

13     last page, sorry -- or the second to last page.

14             Do you see the first e-mail is October 11, 2013, and

15     it's to Kenton Hoyem and Wei Hu.

16             Those are the Financial Engines people, right?

17     A.  It is from Kenton Hoyem.

18     Q.  It is from you to him?

19     A.  Oh, the following e-mail is from me to Kenton Hoyem, Wei

20     Hu, and Professor Bekaert.

21     Q.  Yes.  I'm asking about the very first e-mail in the chain.

22     A.  A different one was highlighted.  Apologies.

23     Q.  I'm sorry.  I can't understand you.  I'm sorry.

24     A.  A different e-mail was highlighted.  I apologize.

25     Q.  No.  That's our fault.  Sorry.

1            So, the first e-mail is from you to Kenton Hoyem and

2    Wei Hu, and you say, Hi, Kenton, how are you?  And then talk

3    about merging data with information.  It is a business e-mail

4    about the paper, right?

5            So this is you writing Financial Engines directly,

6    correct?

7    A.  Correct.

8    Q.  Did you have to get permission -- you had -- you didn't

9    have to get permission from Professor Bekaert to write this

10   e-mail, correct?

11   A.  No, he got upset I didn't.

12   Q.  I'm sorry?

13   A.  I believe he got upset that I did not.

14   Q.  OK.  Then there is an e-mail from Kenton to you on October

15   11, and then the next e-mail is from Tony to you on October 11

16   and then there is a series of e-mails between you and Tony.

17           Now, Tony is also at Financial Engines, correct?

18   A.  Yes, I believe so.

19   Q.  And Professor Bekaert is not copied on those e-mails, is

20   he?

21   A.  Um, OK.  So let's see.

22   Q.  Starting --

23   A.  No, we took the issue offline to discuss he the details.

24   They e-mailed -- they only e-mailed me back, e-mailed back me,

25   I believe, but let me look at.

1  Q.  So there's two or three e-mails back and forth without

2  Professor Bekaert, and then on October 17 you wrote Tony again,

3  and you brought Professor Bekaert back into it, and there's a

4  back and forth and back and forth.

5           So let's go to the second page of the document.

6           This is a back and forth about data issues between you

7  and Financial Engines, correct?

8  A.  Um, correct.

9  Q.  So --

10  A.  The first --

11  Q.  On October 18 at 5:48 Professor Bekaert writes you and only

12  you, the other CCs have fallen off now:  When I saw your e-mail

13  I thought you turned into a blunt Geertrui for a while.  Holy

14  Christ.  From now on I deal with FE I think.

15           Do you see that?

16  A.  Yes.  I see it.

17  Q.  He Geertrui is a feminine way of saying Geert, correct?

18  A.  Correct.

19  Q.  You wrote back:  If I had turned into Geertrui, no one

20  would be working on the paper, right?

21  A.  Yes.

22  Q.  He then he writes back:  Thanks for the all the

23  encouragement.  Seriously, I need to see the e-mail to Wei

24  before you send it.  We need them on our side or the whole list

25  of papers is in danger.

i7cnrav3                    Ravina - Cross

1        Do you see that?

2   A.   Yes.

3   Q.   It's because he thought that you were much too blunt with

4   Wei and that he would be offended and possibly pull the data,

5   correct?

6   A.   No.

7   Q.   And you wrote back, I was blunt, but what I said was true.

8        And you said:  See below.  I can't believe I'm

9   apologizing.

10       And you write an apologetic e-mail back to Wei,

11  correct?

12  A.   Yes.  Because it was blown out of proportion.

13  Q.   Yes is the answer.  Thank you.

14       In fact, you went to Financial Engines in January of

15  2016 and asked them to give you the right to use the data to do

16  papers on your own and without Professor Bekaert, right?

17  A.   Correct.

18  Q.   And they agreed, right?

19  A.   They agreed.

20  Q.   And you have had sole control over the data for two and a

21  half years now, right?

22  A.   They didn't sign a contract yet, but, yes, I'm using the

23  data.

24  Q.   And you're proceeding as if you have an agreement with

25  them, right?  You are doing research with them?

1    A.  I don't expect them to renege on it.

2    Q.  OK.  So you have been working for two and a half years with

3    the data and Professor Bekaert's out, right?

4    A.  Yes.

5    Q.  OK.  And you have no publications with that data after two

6    and a half years of it being solely in your control, right?

7    A.  Yes, no publications.

8    Q.  And you haven't submitted any papers to any journals or

9    conferences, correct?

10   A.  I submitted to Financial Engines.

11   Q.  My question was you haven't submitted it to any journals or

12   any conferences, correct?

13   A.  Not yet, correct.

14   Q.  Professor Bekaert agreed in discussions with the dean's

15   office that you talked about yesterday that he would do a

16   submission draft of the international diversification paper by

17   the end of 2014, correct?

18   A.  Um, I'm not -- no, not correct.

19   Q.  And on Jan -- on December 31, 2014, Professor Bekaert send

20   you and Financial Engines' coauthors a second draft of that

21   international diversification paper, right?

22   A.  He did send a partial draft on December 31.

23   Q.  And you responded --

24            MR. HERNSTADT:  We will take a look at Exhibit JU,

25   please.

i7cnrav3                    Ravina - Cross

1          THE COURT:  Any objection to JU?

2          MS. HARWIN:  No.  No, your Honor.

3          THE COURT:  JU will be admitted.

4          (Defendants' Exhibit JU received in evidence)

5   BY MR. HERNSTADT:

6   Q.  Let's look at the first e-mail on the bottom of the second

7   page.  This is December 31 about 1 p.m.

8          Professor Bekaert's writing the coauthors and other

9   CCs and says:  Hi, all.  Well, I almost made it.  Attached is a

10  revised version of the international diversification paper and

11  new tables.  I put track on so you can see the changes.  I'm

12  not completely done.

13         He tells you:  I need to finalize Section V and

14  robustness checks and go over the conclusions and introductions

15  again.

16         And that was Professor Bekaert sending a paper that he

17  says was not completely done to the coauthors, correct?

18  A.  Correct.

19  Q.  And your response at the top of the page was:  Hi, Geert.

20  This is too little too late.  The preliminary version of the

21  paper I have worked on is attached.

22         Do you see that?

23  A.  Yes.

24  Q.  You did a separate draft of the paper, right?

25  A.  Yes.

1   Q.  And you sent it to -- to them at December 31 at 5:30 p.m.,

2   about five hours later, four and a half hours later, right?

3   A.  Yes, yes.

4   Q.  You never told Professor Bekaert that you were working on

5   your own draft of the international diversification paper,

6   right?

7   A.  No.

8   Q.  You never --

9   A.  I did tell him, sorry, to make sure it comes.

10  Q.  I'm sorry?

11  A.  It is incorrect.  I did tell him.

12  Q.  You told Professor Bekaert you were doing your own draft?

13  A.  I communicated I needed the codes and the tables to do my

14  own draft, yes.

15  Q.  So there is an e-mail that says -- between you and

16  Professor Bekaert, because you hadn't spoken to Professor

17  Bekaert in a couple of years at this point, right?

18  A.  Um, I believe it was since mid-July.

19  Q.  OK.  I'm sorry you're right.

20          So, six months or so you haven't spoken with Professor

21  Bekaert?

22  A.  Um.

23  Q.  Right?

24  A.  No.  Not in person.

25  Q.  OK.  So you're saying that there is an e-mail in which you

1  tell Professor Bekaert you are working on your own version of

2  the international diversification paper, right?

3  A.   It's either an e-mail are it is communicated through

4  Division Chair Zeldes or Vice Dean Horan.

5  Q.   And you don't know what they said or didn't say, correct,

6  to Professor Bekaert?

7  A.   I believe that --

8  Q.   No, no.  You don't know what they said or didn't say to

9  Professor Bekaert, right?

10  A.   Yeah.  But I trusted they did say that.

11  Q.   You don't know, right?

12  A.   I wasn't there when they --

13  Q.   Right?

14  A.   -- spoke with Professor Bekaert.

15  Q.   And there's no e-mail from you to Professor Bekaert saying

16  I am working on a second draft the paper, right?

17  A.   There might be, actually.

18  Q.   OK.  You never told the Financial Engines coauthors that

19  you were working on your own draft of the paper, correct?

20  A.   Nobody did.  They only received the drafts when they were

21  ready.  They were not informed of who was doing what.

22  Q.   So that means you never told them that you were working on

23  your own draft of the paper, correct?

24  A.   Right.  I didn't need to.

25  Q.   And they were extremely unhappy to receive two drafts of

i7cnrav3                    Ravina - Cross

1   the same paper, weren't they?

2   A.  Yes, I agree.

3   Q.  Let's look at JV, please.

4            THE COURT:  Any objection?

5            MS. HARWIN:  No objection your Honor.

6            THE COURT:  It is admitted.

7            (Defendants' Exhibit JV received in evidence)

8            MR. HERNSTADT:  Thank you, your Honor.

9   BY MR. HERNSTADT:

10  Q.  This is an e-mail from Wei Hu to you and Professor Bekaert

11  copying Kenton Hoyem on December -- I'm sorry January 12, 2015.

12           Do you see that?  That was -- those were -- you guys

13  were the four coauthors, correct?

14  A.  Correct.

15  Q.  And Wei Hu writes:  Enrichetta and Geert, I'm incredibly

16  pained by the acrimony I am witnessing over e-mail.  I have

17  been relatively silent until now because I wanted to see if you

18  and the university could figure out a solution to move forward.

19  I have also been relatively unable to opine on the details of

20  the work due to a million other things going on.  Let me say

21  this.  Financial Engines does not have the time to consider two

22  alternative drafts of this research.  The two of you have much

23  more motivation to make this work than I do.  I would hate to

24  put a stop to this research altogether, but that is a matter of

25  sunk costs.  If I can save myself and my team from future

i7cnrav3                         Ravina - Cross

1   unnecessary hassle, I will do so.

2          Do you see what he says, the last line in bold:  Work

3   it out and come with one paper that you agree on.

4          Do you see that?

5   A.  Yes.

6   Q.  You understood this e-mail to mean that unless you and

7   Professor Bekaert could get a paper together and stop doing

8   things like sending two drafts of the same paper, they might

9   well pull the data?

10  A.  Yes.  I understood it that way.

11  Q.  As he says, I would hate to put a stop to this research

12  altogether?

13         And this was a concern that Professor Bekaert had

14  expressed to you, for example, in that e-mail we saw where you

15  thought you were being much too blunt and he said we don't want

16  them to pull the data, right?

17  A.  The e-mails from three years earlier?

18  Q.  Yeah.  Do you remember the e-mail from 2011 where he said,

19  I want to get as much out of Wei as we can, because -- he

20  pointed out that the risk was on you guys because they could

21  stop the work at any time, right?

22  A.  Yes.

23  Q.  That was before you even got the data?

24  A.  Yes.  The risk was more on me, because I wasn't tenured.

25  Q.  The fact that there were two drafts, you wrote your own

1    draft of this international diversification paper also delayed

2    the completion of the paper and its submission to a journal,

3    right?

4    A.   No.

5    Q.   Well, because then you had to spend a couple of months

6    combining the two drafts, didn't you?

7    A.   Professor Bekaert insisted that --

8    Q.   It's a yes-or-no question.  Either did or you didn't.

9    A.   We spent months --

10   Q.   Yes?

11   A.   -- reaching a draft.

12   Q.   You testified that in 2009 or '10, when you first started

13   to talking to Professor Bekaert and Financial Engines about the

14   project, you expected to -- that by 2016 you would have five or

15   six papers submitted?

16   A.   Before -- yeah.

17   Q.   And you thought four or five papers published, right?

18   A.   At that point, yes, I believed so.

19   Q.   And then when the contract didn't get signed for two years

20   and you didn't get the data until the late summer of 2012, your

21   expectation of how many papers you would get published dropped

22   to two, right?

23   A.   I don't recall that part.

24   Q.   And you acknowledge that the delays in 2013 -- up until

25   2013 weren't Professor Bekaert's fault, right?

i7cnrav3                    Ravina - Cross

1   A.  Um --

2   Q.  The delay, the two years to sign the contract, the almost a

3   year to get the data, none of that is Professor Bekaert's

4   fault, right?

5   A.  I said I didn't know his involvement, but it is up to late

6   summer 2012.

7   Q.  So you --

8   A.  -- not 2013.

9   Q.  As far as you know, he did nothing to delay the paper up

10  until the spring of 2013, right?

11  A.  The summer of 2013, yes, and --

12  Q.  OK.

13  A.  And I worked on the rest of the time, I worked myself on

14  the data.

15  Q.  And you were ready to start writing papers, the first paper

16  you said in April 2013, right?

17  A.  Yeah.  Late March, April.

18  Q.  OK.  And two drafts -- drafts, initial drafts of two papers

19  were completed in November and then December of 2013, right?

20  A.  Um, yeah, two partial drafts were completed.

21  Q.  And they were submitted to conferences, which is a first

22  step in the publishing process that you described the first day

23  you testified, right?

24  A.  Yes.

25  Q.  And, in fact, you were out of the country on vacation when

i7cnrav3                    Ravina - Cross

1    Professor Bekaert completed the initial draft of the

2    international diversification paper, right?

3    A.   It was the Christmas break.

4    Q.   I'm sorry?

5    A.   It was between Christmas and New Year's.  I was in Italy.

6    Q.   You were away on vacation, right?

7    A.   Right.

8    Q.   Shortly before you left on vacation, sort of late November

9    or early December, the research assistant, Andrea Kiguel, who

10   worked on that paper quit, right?

11   A.   Correct.

12   Q.   And you told Professor Bekaert that she had quit and that

13   he had better hire her back, and then you left for vacation,

14   right?

15   A.   I told Professor Bekaert to revise his life advice and work

16   with Andrea, because I couldn't -- I didn't want to spend my

17   vacation working with him, and I needed to go to Italy later on

18   that month.

19   Q.   So we know there's one paper that you and Professor Bekaert

20   worked on of the three that were identified that was ultimately

21   accepted for publication in 2016 in time for your tenure vote

22   right?  The international diversification paper, correct?

23   A.   Correct.

24   Q.   OK.  That was submitted to the Journal Finance in April of

25   2015, right?

i7cnrav3                          Ravina - Cross

1   A.  Correct.

2   Q.  And then Professor Bekaert got a solicitation from the JFE,

3   which is another top journal, right?  In June of 2015, correct?

4   A.  Yes.

5   Q.  That was exciting news, right?  It was a solicitation with

6   a referee's report that was extraordinary, right?

7   A.  Exactly, yes.

8   Q.  So I -- I'm going to ask you to look at LK, which is --

9              THE COURT:  Any objection to LK?

10             MS. HARWIN:  No objection, your Honor.

11             THE COURT:  All right.  LK will be admitted.

12             MR. HERNSTADT:  Thank you, your Honor.

13             (Defendants' Exhibit LK received in evidence)

14  BY MR. HERNSTADT:

15  Q.  I would like to direct your attention to the second to last

16  page of the exhibit.

17             Do you see near the top this is an e-mail from

18  Professor Bekaert to the rest of the -- the authors of the

19  paper?

20             He says:  Hi, all.  Well, this is surely an

21  interesting development.  I have had my papers solicited

22  before, but I have not had them solicited with a referee report

23  already attached and one I view as easy -- easy to respond to.

24             Do you see that?

25  A.  Yes.

i7cnrav3                      Ravina - Cross

1    Q.  That was very exciting news for you guys, right?

2    A.  Yes, I believe so.  Yes, I agree.

3    Q.  And the four authors all agreed that, since you already

4    submitted it to the Journal of Finance you should wait and hear

5    back from them before you move the paper over to the JFE,

6    correct?

7    A.  Yeah.  I was the most reluctant, but I agreed as well.

8    Q.  OK.  So let's look at the -- let's page forward.

9            You can see there's an e-mail from Kenton and Hoyem

10   saying:  This is certainly a good problem to have.  My

11   recommendation is to wait for the JF to respond.  Other

12   strategies are acceptable to me -- are also acceptable to me.

13           Do you see that?

14   A.  The highlighter is a different e-mail on the tech.

15   Q.  I'm sorry?

16   A.  I think that the tech highlights a different e-mail.

17   Q.  This is from Kenton?

18   A.  Oh, yes.

19   Q.  That was one -- and Wei Hu also thought it was fantastic

20   news.  That is the next e-mail at the bottom of the page.

21   A.  Correct, yes.

22   Q.  I guess that is a slightly earlier e-mail.

23   A.  Right.  I understood you were referring to Wei Hu's e-mail.

24   Q.  He says:  If it's just sitting on the editor's desk, then a

25   no-harm-no-foul retraction would seem OK -- I'm sorry.  He

1  first says:  I think it is a professional courtesy to keep the

2  paper with JF, assuming it has been sent to a referee already.

3  If it is just sitting on the editor's deck then a

4  no-harm-no-fall retraction would seem OK.

5          Do you see that?

6  A.  Yes.

7  Q.  Then on the next page, you weigh in.  This is June 19.

8          And you say:  This is good news.

9          And in the second paragraph you say:  I agree with Wei

10 that we should wait and see what happens at the Journal of

11 Finance first.

12         Do you see that?

13 A.  Yes.

14 Q.  So you all agreed to wait and see what happened at the

15 Journal of Finance, right?

16 A.  Right.

17 Q.  And you heard back from the Journal of Finance in late

18 August, correct?

19 A.  Um, I think so, correct.

20 Q.  OK.  And I'm going to ask you to take a look at Exhibit LN.

21 And if you would take a look at the third to last page of the

22 exhibit.

23         THE COURT:  Any objection to LN?

24         MR. HERNSTADT:  I'm sorry.

25         Move to admit.

1             MS. HARWIN:  Your Honor, this appears to be two

2    separate e-mail chains.  If one of the two -- I would think it

3    would make sense to move them separately.

4             THE COURT:  Do you want to make it into two exhibits.

5             MR. HERNSTADT:  I'm not sure why that's necessary.

6    They are all about the same topic.

7             THE COURT:  Just make them into two exhibits.

8             MR. HERNSTADT:  Two exhibits, fine.

9             THE COURT:  You can even make them LN1 and LN2 if

10   that's easier.

11   Q.  So we'll make the first six pages LN1 and the next three

12   pages LN2.

13            THE COURT:  All right.  With that they will be

14   admitted.

15            (Defendants' Exhibits LN1 and LN2 received in

16   evidence)

17            MR. HERNSTADT:  Thank you.

18   BY MR. HERNSTADT:

19   Q.  So looking at LN2 --

20            MR. HERNSTADT:  I would move to admit, which is the

21   last three pages of the exhibits.

22            THE COURT:  OK.

23            MS. HARWIN:  No objection.

24   BY MR. HERNSTADT:

25   Q.  Professor Ravina, do you see this is a -- an e-mail.  The

i7cnrav3                         Ravina - Cross

1    second e-mail down is from you to the Financial Engines team

2    and a couple of other CCs, and you're informing them that JF

3    got back to you with three referee reports and a lot to do, and

4    you say that you would like to go with the JFE, correct?

5    A.   Correct.

6    Q.   And all of your coauthors agreed, and the group decided to

7    move the paper from the Journal of Finance to the JFE, correct?

8    A.   Eventually, yes.  Not immediately.

9    Q.   Well, let's take a look.  The first e-mail in the chain is

10   Kenton Hoyem, and he is saying I agree that the JFE is a better

11   option at this time.

12            Do you see that?

13   A.   Yes.

14   Q.   So he is agreeing?

15   A.   He agreed.

16   Q.   And Wei Hu also agreed around that same time, right?

17   A.   Yeah.  The coauthors at Financial Engines agreed at the

18   same time --

19   Q.   Right.

20   A.   -- I don't remember when Professor Bekaert finally agreed,

21   but he might have agreed around this time as well.

22   Q.   He agreed on August 25, right?

23   A.   Where is this e-mail?

24   Q.   No.  I'm asking you.  If you don't see it in e-mail you

25   don't remember?  Is that your -- that what you are saying?

i7cnrav3                    Ravina - Cross

1    A.  I remember going back and forth a lot on these, and that

2    eventually Professor Bekaert agreed.  I don't know if it's

3    around -- I don't remember if it's exactly around this time,

4    but I don't dispute that he agreed eventually.

5    Q.  Let's look at Exhibit SE.

6              So if you look at Exhibit SE --

7              MR. HERNSTADT:  I would like to move to admit, please?

8              THE COURT:  Any objection?

9              MS. HARWIN:  No objection, your Honor.

10             THE COURT:  All right.  SE will be admitted.

11             (Defendants' Exhibit SE received in evidence)

12   BY MR. HERNSTADT:

13   Q.  I direct your attention to the second to last page of the

14   exhibit.

15             The e-mail that starts near the top of the page,

16   that's the e-mail from you to the Financial Engines team.

17             And you say -- in the thing you say:  Hi, I haven't

18   heard from Wei yet, but I assume he's just buy with the JFE

19   too.

20             And you attach the reports.

21             Do you see that?

22   A.  Yes, I do.

23   Q.  So you had not heard from Wei Hu at that time you had heard

24   only from Kenton, right?

25   A.  Yes.

1   Q.  And then let's go to -- if you look at the bottom of the

2   page -- OK.

3          This is the third page from the end.  If you look at

4   the bottom, there is an e-mail from Professor Bekaert on August

5   25.  So this is before the e-mail you sent saying you had not

6   heard from Wei Hu.

7          In it Professor Bekaert says:  Hi, all.  This does

8   look very useful.  I want to take a careful look.  It may be

9   that we want to take some of the comments in writing and

10  packaging the message on board.  However, I agree that the JFE

11  looks like the better bet at this point.  Regardless of how

12  much work it takes the probability of an eventual publication

13  at the JF is definitely lower than at the JFE, given the

14  reports.

15         Do you see that?

16  A.  Yes.

17  Q.  So Professor Bekaert is saying let's go with the JFE,

18  right?

19  A.  Correct.

20  Q.  And that's the same day you sent the e-mail out and the

21  same day Kenton Hoyem responded, right?

22  A.  Yes.

23  Q.  It then took you a month to do the first revisions in

24  response to the referee's report, right?

25  A.  Yes.  In the month I completed all the -- I did the

i7cnrav3                         Ravina - Cross

1    complete revision.

2    Q.  So you got the referee report on August 25 and you sent in

3    a -- you sent in your draft of the revised paper on September

4    24, right?

5    A.  Yeah, we heard from the other journal.

6    Q.  I'm just -- I'm just asking if you sent in the revised

7    draft on September 24.  Right?

8    A.  Yes.

9    Q.  A month later.

10   A.  A month after the other journal response, yes.

11   Q.  Right.  You got -- you got the -- you made the decision to

12   go to the JFE August 25.  September 24 you sent it in draft?

13   A.  September 24 I was done with the revision, yes.

14   Q.  And -- but you told all of the tenured professors at the

15   Columbia Business School that when Professor Bekaert got the

16   JFE solicitation in June that you did a revision in two weeks

17   and then he delayed for six months, correct?

18   A.  Not correct.

19   Q.  Let's take a look at Exhibit ON.

20             All right.  I would like you to take a look at page 7

21   of that exhibit.

22   A.  I am waiting for the exhibit.  I don't think I have it

23   here.  If I have, let me know and I will look for it.

24   Q.  You are going to find it in your --

25   A.  I am not sure if you gave it to me already.  Did you?

i7cnrav3                    Ravina - Cross

1   Q.  I think -- yeah, it was admitted yesterday.  Ms. Plevan

2   gave it to you?

3   A.  Give me a second.

4   Q.  We will put it up on the screen so you can see it.

5        MR. HERNSTADT:  ON.

6   A.  I might --

7   Q.  We can give you a copy.

8   A.  Yeah.  Thank you.  I do better while reading paper.

9   Q.  So looking at --

10  A.  Thank you.

11  Q.  -- the sixth page of the exhibit.  There's a number of -- a

12  bold No. 4 that says retirement research.

13       Do you see that?

14  A.  Yes.

15  Q.  And at the bottom of that page is the article in italics,

16  Who is Internationally Diversified?

17       Do you see that?

18  A.  Yes.

19  Q.  And that's the article we have been talking about?

20  A.  Correct.

21  Q.  And Exhibit ON, this is your tenure statement that was sent

22  to the tenured faculty at Columbia Business School, correct?

23  A.  Correct.

24  Q.  This is in March of 2016?

25  A.  Correct.

i7cnrav3                          Ravina - Cross

1              MR. HERNSTADT:  OK.  Next page.

2     BY MR. HERNSTADT:

3     Q.  And the next page, do you see a line that starts -- about

4     ten lines down, in June -- it's a new sentence.

5              In June 2015, the paper was solicited by the

6     prestigious Journal of Financial Economics, one of the top

7     journals in my field with a revise and resubmit request already

8     attached.  And I completed the revision in under two weeks, but

9     my senior coauthor withheld final approval for nearly six

10    months.

11             That is not an accurate statement, is it?

12    A.  It is.

13    Q.  We've just seen that the revision took you a month, not two

14    weeks, correct?

15    A.  Two weeks of full-time work, and a month -- I sent it a

16    month later.

17    Q.  We also just saw that all of the authors, including you,

18    decided to wait from mid-June, when the paper was solicited,

19    until the end of August, three months later, before even

20    agreeing to go to the Journal of Financial Economics, correct?

21             We just saw that, right?

22    A.  Those were partial -- those were not the only

23    conversations?

24    Q.  I'm sorry?

25    A.  Those were not the only conversation.

i7cnrav3                          Ravina - Cross

1    Q.   OK.

2    A.   I had asked earlier.

3    Q.   I'm asking about the e-mails we saw among the coauthors.

4    We just saw them.  It was solicited in June.  Everyone agreed

5    let's wait.  You waited until the end of August.

6              Right?

7    A.   Based on what we saw --

8    Q.   Right?

9    A.   Yes.

10   Q.   That's what happened, correct?

11   A.   OK.

12   Q.   OK.  And so this -- this is misleading, right?

13   A.   No.

14   Q.   OK.  You -- so your testimony is that saying that he --

15   that he withheld final approval for six months is somehow an

16   accurate description of the joint decision by all the authors

17   to wait three months, the month that it took you to, to do a

18   revision, and then I take it a couple of months where the

19   parties are figuring out all -- all of these people are

20   figuring out what should be in the final paper?

21             Is that what you are saying?

22   A.   I'm saying that it took two weeks to do the review.

23   Q.   No.  I'm not asking you -- I'm asking you if what I

24   described to you is what your -- is what your testimony is?

25   A.   I want to listen to your description carefully.  Can you

1    repeat.

2    Q.  Is your testimony that when you say here that the paper was

3    solicited in June that you completed a revision in two weeks

4    and that your senior author withheld approval for six months --

5    A.  It is.

6    Q.  -- that that is an accurate statement, and that it is not

7    misleading in any way?

8    A.  Yes.

9    Q.  OK.  Professor Bekaert walked way from the second paper,

10   the automatic enrollment paper, in February 2015, right?

11   A.  Correct.

12   Q.  You still haven't finished a revision of the 2014 draft,

13   have you?

14   A.  Um, I don't -- I have drafts after that, but the paper is

15   not complete.

16   Q.  So you haven't completed a revision, correct?

17        The last four years since he walked away you haven't

18   finished a revision of the 2014 draft, correct?

19   A.  I completed revisions, but I have not submitted the paper.

20        THE COURT:  Mr. Hernstadt, just tell us when it's a

21   good time to take lunch.

22        Now?

23        MR. HERNSTADT:  Yeah, we can stop now.

24        THE COURT:  OK.

25        MR. HERNSTADT:  I was hoping to finish.  I don't have

i7cnrav3                    Ravina - Cross

1    a lot longer, but it's probably at least a half hour.

2              THE COURT:  All right.  Why don't we take our lunch

3    now.  Why don't we meet back at 10 after 2.  OK.  Thank you.

4              (Jury not present)

5              THE COURT:  What I would like to do -- you can step

6    down.  Thanks.

7              Instead of doing it now, what I would like to do is

8    meet after court today.  I'm happy to take a break if you want

9    to and then meet and discuss outstanding issues.  I'm happy to

10   hear you out.

11             If I'm ready to rule, I'll rule.  If not, I'll rule

12   first thing in the morning on whatever I can.

13             Does that work for everyone?  I don't want to keep you

14   late.  I just want to make sure I hear you out, and I can't do

15   it now.

16             MR. SANFORD:  That's fine, your Honor.

17             THE COURT:  All right.

18             Everybody have a good lunch.

19             (Luncheon recess)

20

21

22

23

24

25

I7c1rav4

AFTERNOON SESSION

2:22 p.m.

1

2

3              (In open court; jury not present)

4              MR. HERNSTADT:  Your Honor?

5              THE COURT:  Yes.

6              MR. HERNSTADT:  There is one -- Just want to get to

7    the mic.

8              THE COURT:  Okay.

9              MR. HERNSTADT:  There is one issue which is an exhibit

10   that apparently the plaintiffs are going to use on the direct,

11   or their cross-examination of Professor Bekaert.  This is

12   Exhibit 103.  And the issue with --

13              (Jury present)

14              THE COURT:  Do you want to go to sidebar?

15              MR. HERNSTADT:  Yes, please.

16              THE COURT:  Come over now.  Thanks.

17              (At the sidebar)

18              MR. HERNSTADT:  Exhibit 103 --

19              THE COURT:  Just wait for the lawyers.

20              All right.

21              MR. HERNSTADT:  Exhibit 103 is the exhibit that --

22   it's one of the -- those exhibits.

23              THE COURT:  Right.

24              MR. HERNSTADT:  The problem with it is, I realize that

25   this is in response to the settlement negotiations.  At this

I7c1rav4

1   point in the negotiations, they're talking about his walking

2   away from the data set and writing one more paper, with one of

3   the assertions of this.  And he just learned that, about

4   Professor Ravina demanding to determine the subject of the

5   paper, not letting him select it.  He wanted the choice of a

6   couple different topics.  She said no, it's got to be this.

7   And that's what his response is.  And you can see that.  And I

8   brought -- if your Honor wants to see, I brought the other --

9          MS. DONEHOWER:  Your Honor, the issue of these

10   redactions had been discussed extensively and the

11   representation that this is about settlement is in direct

12   contrast to defense's prior position to this Court, which is

13   that the redactions were only on relevance grounds, they're

14   redactions related to personal matters, and they're also

15   directly in contrast to the deposition testimony of the

16   defendant.  He said it was personal and confidential --

17          THE COURT:  We don't have time to -- just argue the

18   merits of it.  So --

19          MR. HERNSTADT:  There was attorney-client privilege

20   materials and so -- right below that is from the -- it's what

21   the response was.

22          THE COURT:  This is part of the settlement discussions

23   and the rest of them aren't coming in.  These two statements

24   shouldn't come in either.  I agree with that.

25          All right.  They're going to redact those two

I7c1rav4                          Ravina - Cross

1    statements on page 66654.

2              MR. HERNSTADT:  That's the first page of the document.

3    So it's 66656.

4              THE COURT:  Oh.  Yes, you're right.  Okay.

5              MR. HERNSTADT:  The first two pages are still --

6              MS. DONEHOWER:  Everything else --

7              MR. HERNSTADT:  Well, this one --

8              THE COURT:  If these are part of the settlement

9    discussions, then they shouldn't come in, unless there's

10   agreement on both sides that they should.

11             MS. DONEHOWER:  We'll discuss this.

12             THE COURT:  So let's just try and finish this cross,

13   and let me know before we get to this document, please.  Thank

14   you.

15             MR. HERNSTADT:  Do you want to hold onto that?

16             THE COURT:  No.  Sorry.

17             MR. HERNSTADT:  Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

I7c1rav4                          Ravina - Cross

 1              (In open court; jury present)

 2              MR. HERNSTADT:  If I may, your Honor?

 3              THE COURT:  Yes.

 4     BY MR. HERNSTADT:

 5     Q.  Good afternoon, Professor Ravina.

 6     A.  Good afternoon.

 7     Q.  We left off this morning, I'd asked you that -- you

 8     confirmed that you had not yet completed a revision of the 2014

 9     draft of the automatic allocation paper, right?

10     A.  I continue working, but it is not submitted or posted, yes.

11     Q.  So that's more than four years ago, and it took you and

12     Professor Bekaert three years to complete two initial drafts of

13     papers and see one of those papers unaccepted -- sorry --

14     accepted for publication, right?

15     A.  Yes, and the other is the one we discussed.

16     Q.  That for you is an unacceptable delay, is that your

17     testimony?

18     A.  I agree, yes, it is.

19     Q.  Okay.  Now you remember -- we've talked about this a couple

20     of times -- the 2013 email you sent to Professor Bekaert, 261,

21     that you said you needed three more papers and you're going to

22     work on beauty, the risk aversion paper that had already been

23     submitted, the habit paper that was R&R also, and the paper --

24     one of the papers with Professor Viceira at Harvard and do

25     nothing else?  Do you remember saying that?

I7c1rav4                          Ravina - Cross

1   A.  No, that's not what the email says.

2   Q.  "I need three more papers by spring 2014.  I thought about

3   beauty, JFE," which is the habit paper, right?

4   A.  No.  It's the risk aversion.

5   Q.  Oh, the risk aversion paper.  Sorry.  So beauty, risk

6   aversion, which was already submitted, one 401(k) paper and one

7   wealth paper, the paper with Professor Viceira, right?

8   A.  Yes.

9   Q.  Nothing else.  And do nothing else.  That's -- right?

10  That's what you said in April.

11  A.  Yes.

12  Q.  In fact, in response to Professor Bekaert saying that your

13  biggest gain of time is to get your two single-authored papers

14  published in a top journal was that you should take a job

15  somewhere else, right?

16         MR. HERNSTADT:  Oh, could we publish 261 to the jury.

17  I thought it was on.  I'm sorry.

18         So we were looking at the top sentence.

19  Q.  So my question, Professor Ravina, was that your response to

20  Professor Bekaert's telling you that your biggest gain in time

21  is for you to get your two single-authored papers published in

22  a top journal was that maybe you should take a job somewhere

23  else, correct?

24  A.  I had gotten a -- an expression of interest from the Fed

25  and I was discouraged.

I7c1rav4                         Ravina - Cross

1              MR. HERNSTADT:  So let's look at Exhibit V7.

2              Move to admit, your Honor.

3              THE COURT:  I'm sorry.  I didn't hear you.  Move to

4     admit V7?  Is there any objection?

5              MS. HARWIN:  No, your Honor.

6              THE COURT:  It will be admitted.

7              (Defendant's Exhibit V7 received in evidence)

8     BY MR. HERNSTADT:

9     Q.  So V7 starts the way 261 starts, with, "I just talked to

10    Wei Jiang, we need to work big time," right?

11    A.  Yes.

12             MR. HERNSTADT:  If we could publish this to the jury,

13    please.

14    Q.  And then the next email is Professor Bekaert's email

15    saying, "Yes, but perhaps the biggest gain per unit of time is

16    for you to get your two single-authored papers published in a

17    top journal."  Do you see that?

18    A.  Yes.

19    Q.  And this is a slightly different thread because then the

20    next response is from you saying, "Maybe I should get an offer

21    at the New York Fed.  They like me."  Do you see that?

22    A.  Yes.

23    Q.  So your initial response was, maybe you should just go work

24    somewhere else, right?

25    A.  I was discouraged.  I got another offer.

I7c1rav4                    Ravina - Cross

1   Q.  My question is, that was your response, right?

2   A.  I should consider an offer, yes.

3   Q.  Right.  You knew from the moment you started working with

4   Professor Bekaert that he's an extremely busy guy, right?

5   A.  Yes.

6   Q.  And you knew he worked on many papers at the same time with

7   many different co-authors, right?

8   A.  Yes, he had many, many papers.

9   Q.  And he worked with different co-authors, many papers at the

10  same time, right?

11  A.  At the same time, I don't know.  I saw his CV and there

12  were many, many papers, I assume at the same time also.

13  Q.  And you knew that he had a normal teaching schedule, right?

14  A.  Yes.

15  Q.  And that he traveled all the time for consulting and for

16  conferences --

17  A.  Yes.

18  Q.  -- right?  You never asked him to set aside all of his

19  other work and devote all of his time to the 401(k) project,

20  right?

21  A.  Absolutely not, yes.

22  Q.  And he never said he would do that, right?

23  A.  Right.

24  Q.  And you had no expectation that the only work he would do

25  would be on those 401(k) projects, right?

I7c1rav4                          Ravina - Cross

1    A.  No.  I wanted to do the work.

2    Q.  So you had no expectation that Professor Bekaert would

3    devote all of his work -- that the only work that he would do

4    would be the 401(k) project, right?

5    A.  Yes, no.

6    Q.  Yes.  And for the first few years that you worked together,

7    you accepted that as normal, right, how busy he was?

8    A.  I accepted how busy he was for as long as I worked with

9    him.

10   Q.  So you accepted how busy he was.  And he even warned you,

11   you know, when you were just starting to work with the data in

12   October 2012, that -- how busy he is and that sometimes his

13   co-authors find it necessary to yell at him for not getting

14   back fast enough, right?  He warned you that might be an issue

15   because of how overloaded his schedule was.

16   A.  I don't remember the exact email, but he told me so, yes.

17   Q.  And he told you that too.  That's not a surprise to you,

18   right?

19   A.  No.

20              MR. HERNSTADT:  Let's look at AS.

21              Move to admit, your Honor.

22              THE COURT:  Any objection?

23              MS. HARWIN:  No objection.

24              THE COURT:  All right.  AS will be admitted.

25              (Defendant's Exhibit AS received in evidence)

1  BY MR. HERNSTADT:

2  Q.  So the first email in this chain, you're talking about the

3  research assistants you're starting to use on the 401(k)

4  project, right?  Nancy's the research assistant?

5  A.  Yes.

6  Q.  And the next email is his response.  He says, "What you

7  suggested is a splendid idea."  He says there's an -- "We have

8  a -- we'll have an enviable RA team, I think."  And he says, "I

9  still need to go through a bunch of emails, but it is really

10  busy for me now.  I did nothing but RFS stuff this weekend."

11  And RFS is a journal that he worked on, right?

12  A.  Yes.

13  Q.  "What a pain in the butt this is.  And have one

14  presentation set of slides due this week plus must prep two

15  talks for Thursday, then teach, and of course some of my

16  co-authors find it necessary to also yell at me for not getting

17  back fast enough.  Maybe you will too in the future."  Do you

18  see that?

19  A.  Yes.

20  Q.  He's letting you know how busy he is and what it will be

21  like to work with him, right?

22  A.  He's saying he's very busy, yes.  I don't know if I agree

23  with the second part of what he said.

24  Q.  We've talked about a number of the papers that you've been

25  working on for years, the paper with Professor Viceira since

I7c1rav4                    Ravina - Cross

1   2008, or 2007.  You'd been working on a paper called -- about

2   credit frictions with two of your former colleagues at

3   Columbia, right?

4   A.  Correct.

5   Q.  And you started that paper in 2011, right?

6   A.  About -- around that time.

7   Q.  And you sort of had to restart it in 2012 with a new data

8   set, right?

9   A.  Around that time, yes.  I don't remember the exact time,

10  month.

11  Q.  And now in 2018, six years later, you don't have a draft

12  yet, do you?

13  A.  There is a draft.

14  Q.  You haven't submitted a draft to a journal, to a

15  conference?

16  A.  We submitted it to a conference, not a journal.

17  Q.  Sorry?

18  A.  The draft, early draft was submitted to a conference, but a

19  draft is not submitted to a journal.

20  Q.  After you filed this lawsuit --

21          THE COURT:  Just to be clear, what exhibit are you on?

22  Are you still on AS?

23          MR. HERNSTADT:  I'm not on an exhibit.

24          THE COURT:  All right.  Go on.

25  Q.  After you filed this lawsuit, your law firm issued a press

1   release, right?

2   A.  I believe so.

3   Q.  And you gave interviews to the press, right?

4   A.  I did.

5   Q.  And you sat for photographs, right?

6   A.  They wanted a photograph, yeah.

7   Q.  And you sat, and they took pictures of you.

8   A.  Yeah, yes.

9   Q.  And all of the major newspapers in New York covered your

10  lawsuit, right?

11  A.  I think -- I don't know if all the major --

12  Q.  There's an article in the New York Times, right?

13  A.  Yes.

14  Q.  The New York Post, right?

15  A.  Possibly.  I don't remember the New York Post.  Apologies

16  to the New York Post.

17  Q.  And it was also covered in a publication called Poets and

18  Quants, right?

19  A.  Yes.

20  Q.  With a photo they took of you, right?

21  A.  I don't remember which publication took a photo of me.

22  Q.  Okay.  But it was published with a picture of you in it,

23  right?

24  A.  Possibly, yeah.

25  Q.  And that is -- Poets and Quants is widely read by people in

I7c1rav4                         Ravina - Cross

1    the business school world, right?

2    A.   I believe students mainly, but probably other --

3    Q.   And students in particular, right?

4    A.   Students in particular, yeah, I believe students.

5    Q.   And this press coverage that you got is what you wanted;

6    you wanted publicity of your claims against Professor Bekaert

7    and Columbia, right?

8    A.   I wanted my story to be heard.

9    Q.   And the articles all included your claims against Professor

10   Bekaert with the details of the most salacious allegations you

11   made against him, right?

12              MS. HARWIN:   Objection.

13              THE COURT:   Overruled.

14   A.   I believe they read the complaint.

15   Q.   And you did it because you wanted people to know your

16   story, right?

17   A.   Yeah, I wanted my story to be heard.

18   Q.   And if it caused embarrassment to Professor Bekaert and

19   Columbia, they deserved it, right?

20   A.   I'm not saying this.  I wanted my story to be heard, and

21   there was a lawsuit.  I came in front of this court to make my

22   claim.

23   Q.   Professor Ravina, do you remember being deposed in this

24   case?

25   A.   Yes.

1    Q.  Do you remember being asked the following questions and

2    giving the following answers:

3              "Were you looking to punish Professor Bekaert?

4              "A.  I was always trying to reach a solution.

5              "Just -- just answer that yes or no, please.

6              "A.  Not directly.

7              "You said that, though, to people, didn't you, that

8    you wanted to punish him?

9              "To whom did I say that?

10             "Q.  You don't remember that?

11             "A.  I don't think I've ever seen going public on this

12   as punishing anyone.  To the contrary, I thought this is

13   vindicating my story, making sure that people knew about my

14   story.  I didn't say -- if embarrassment would come out of it

15   for Columbia or for Professor Bekaert, I think they deserve it

16   for what they did, but that was not my main reason for going

17   public."

18             Do you remember giving that testimony?

19   A.  Exactly right, yes.

20   Q.  So you think that Professor Bekaert and Columbia deserve

21   the embarrassment that your press coverage caused, right?

22   A.  Their behavior caused, yes.

23   Q.  That the press coverage caused them, right?

24   A.  The press coverage made it public, but --

25   Q.  My question is, the press coverage, right?  Yeah.

I7c1rav4                         Ravina - Redirect

1    A.  I didn't say anything yet.

2    Q.  Correct?

3    A.  The press coverage made public a situation that I hope is

4    embarrassing.

5    Q.  You thought that Professor Bekaert and Columbia deserved

6    any embarrassment that your press coverage caused them, right?

7    A.  That their action caused them?

8    Q.  No, my question is, the embarrassment that your -- do you

9    remember your testimony?  I just read it back to you.  If

10   embarrassment would come out of it for Columbia and for

11   Professor Bekaert, I think they deserve it for what they did.

12   So my question is:  So you think they deserve the embarrassment

13   that came out of the press coverage, right?

14   A.  For what they did.

15   Q.  Sorry?

16   A.  For what they did.

17            MR. HERNSTADT:  Nothing further.

18            THE COURT:  Redirect?

19            MS. HARWIN:  Could we take a few-minute break, your

20   Honor.

21            THE COURT:  All right.  But let's just keep it to just

22   two minutes so -- if you like, you can stay here, but you can

23   also go back and use the restroom, and we'll just be a few

24   minutes.  Thanks.

25            (Recess)

1   REDIRECT EXAMINATION

2   BY MS. HARWIN:

3   Q.   Good afternoon, Professor Ravina.

4   A.   Good afternoon.

5   Q.   I want to begin with a few follow-up questions from

6   yesterday.

7            When you were questioned by Columbia's counsel

8   yesterday about your CV, had you been provided with a full copy

9   of that CV while you were questioned?

10  A.   No.

11  Q.   I'd like to --

12           MS. PLEVAN:  Is there an exhibit number, please?  What

13  exhibit number are you referring to?

14           MS. HARWIN:  I apologize, your Honor.  I just want to

15  find the exhibit number.

16           Could we bring up Defendant's Exhibit OP.

17           MS. PLEVAN:  I just wanted an identification.

18           MS. HARWIN:  And can we scroll down to the date on

19  that CV.

20  BY MS. HARWIN:

21  Q.   Professor Ravina, turning your attention to the bottom of

22  that exhibit, do you see where it says, "Last updated February

23  2016"?

24  A.   Yes.

25  Q.   Can you clarify, is this the version of the CV that you

I7c1rav4                         Ravina - Redirect

1   submitted to Division Chair Zeldes in April 2016 prior to your

2   tenure vote?

3   A.   I believe so.  April 2016.  So I submitted it on March 1st.

4   Q.   And then you subsequently provided an updated CV in April,

5   is that correct?

6   A.   Yes, yeah.

7   Q.   Is this the subsequent updated version you provided in

8   April?

9   A.   I would have to look at it.

10          If you're ready, if you have all the pages, I can

11  turn.

12          THE COURT:  I'm sorry.  You want the hard copy?

13          THE WITNESS:  Do you mind?  Yes.  Or can you scroll

14  the page on the screen, yeah.  Like for example, page 2 --

15  Q.   I'll get that exhibit and then we'll come back to that.

16  A.   Thank you.

17          MS. HARWIN:  Why don't we start with Plaintiff's

18  Exhibit 234.

19          Could you bring that one up.

20          Let's scroll down to that second page.  And could we

21  also bring up the third page as well.

22  Q.   Professor Ravina, I just want to go through your papers and

23  identify which ones were published or accepted for publication

24  in peer-reviewed journals at the time of your tenure vote.

25          So looking at the first paper listed at the bottom of

1   page 2, was that paper accepted for publication in a

2   peer-reviewed journal?

3   A.   Yes.

4   Q.   Looking at the second page of your CV, the first item

5   listed on the second page, was that accepted for publication in

6   a peer-reviewed journal at the time of your tenure vote?

7   A.   No.

8   Q.   Looking at the item right below that, was that article

9   accepted or submitted for publication in a peer-reviewed

10  journal at the time of your tenure review?

11  A.   Yes.

12  Q.   Looking at the next article after that, was that article

13  submitted to or accepted for publication in a peer-reviewed

14  journal at the time of your tenure review?

15  A.   Yes.   This is a peer-reviewed journal.

16  Q.   And looking at the next article, was that article accepted

17  for or published in a peer-reviewed journal at the time of your

18  tenure vote?

19  A.   Yes, it was.

20  Q.   Looking at the article below that, was that article

21  accepted for or submitted to a peer-reviewed publication at the

22  time of your tenure vote?

23  A.   Yes, it was.

24  Q.   Can you identify the number of publications that you had

25  that were submitted to or accepted by peer-reviewed

1    publications at the time of your tenure vote.

2    A.   Five.

3    Q.   Since you left Columbia, have you completed any additional

4    papers?

5    A.   Yes.

6    Q.   And can you identify the papers that you've completed since

7    leaving Columbia.

8    A.   I completed the one on top of page 3, "An Assessment of the

9    Mating Motive Explanation of the Beauty Premium."

10              I've completed a revision of the first of the work

11   papers, "Love and Loans."

12              I completed a paper on investor ideology.

13              I completed a paper on retirement saving adequacy in

14   the US.

15              Can you go to the next page.

16              And I complete -- submitted to conferences some of

17   these papers, and I have submitted an abstract for inclusion in

18   a publication for the first one, "Measuring Financial Anxiety."

19   Q.   Okay.   Thank you.

20              Looking at some of the other papers listed in your CV,

21   I know we've talked about delays to your work caused by

22   Professor Bekaert.   I want to look at some of these other

23   papers and ask you some questions about them as well.

24              Looking at your habit formation paper listed on

25   page 3, were there any particular challenges associated with

1    the habit paper that affected your ability to publish that

2    work?

3    A.   This -- yes.  So this was a paper that was sent to a

4    journal and I received a critique and list of things to do,

5    like part of the process.  And among the things that were

6    required to do was to collect data on an entire new state

7    within the US.  So it was a lot of data, additional data to be

8    collected, like almost starting from scratch and doing an

9    additional paper on top of it.  So it would require a lot of

10   work.

11   Q.   Are there any particular challenges associated with your

12   paper right under that one concerning the portfolios and

13   financial decisions of high-net-worth US households that

14   affected your ability to publish that paper?

15   A.   So this is a paper about the spending and the financial

16   decisions of houses in the US that have on average more than

17   $10 million, and it's data from every single trade or every

18   single -- for some of the household, credit card swipe that

19   they do over several years, every day, and so it's a huge

20   amount of data that has never been used before and it requires

21   like tremendous resources to put together and make useable.

22   Q.   Are there any particular challenges associated with your

23   beauty paper that affected your ability to publish that work?

24   A.   So there were -- in the case of the beauty paper, what I

25   needed to do was call people back into the lab, so this is a

I7c1rav4                    Ravina - Redirect

paper in which, among the various things, there are people that

are invited into a lab, they see pictures, and they have to

vote on whether the picture is good looking, whether the person

appears trustworthy to classify them.  So it requires a lot of

work to set this up and to -- and to collect this additional

data.  And I have been able to complete that work and to

resubmit the paper to the Journal of Finance.

Q.  You testified on direct examination and on

cross-examination about Professor Bekaert demanding compliments

and you providing some to him.  Can you explain to the jury why

you provided compliments to Professor Bekaert, like telling him

that he was good looking.

A.  Yes.  I had a senior co-author that had a lot of power on

my career and on a set of projects, but because he was a senior

in my department, because he was my mentor, and because of his

special relationship with this company, it was a person that

would get easily upset sometimes and he would ask me

compliments and pressure me to give him compliments, complain

that I wasn't giving compliments, and I felt that in order not

to cross him, every once in a while, I would give him a

compliment.

Q.  You testified on direct examination and on

cross-examination about Professor Bekaert kissing you on the

cheek.  Can you tell us again what happened when Professor

Bekaert kissed you.

I7c1rav4                          Ravina - Redirect

1    A.  So I was going up the stoops in my -- in front of my

2    building and he pulled me by one arm --

3               MR. HERNSTADT:  Objection.  She testified on direct as

4    to this.  This is just giving the same testimony again.

5               THE COURT:  Overruled.

6               I don't want to go over everything again, but I'll

7    give you leeway on this.

8    A.  So I was going up the steps and he pulled me back, and he

9    pulls me and he tries to -- to kiss me, and I turn and the kiss

10   ended up on my cheek.

11   Q.  When you testified at your deposition that Professor

12   Bekaert kissed you on the cheek, was that correct?

13   A.  It was correct, yes, that the kiss ended up on my cheek.

14   Thanks to the fact that I turned.

15   Q.  Will you explain your and Professor Bekaert's

16   back-and-forth using the term "blunt Belgian" and specifically

17   how you used it in one of the emails that we saw earlier today.

18

19   A.  Yes.  So Professor Bekaert would define himself as blunt,

20   or blunt Belgian, quite often.  When he would offend someone,

21   he would say, well, you know, I'm the blunt Belgian.  And at

22   this stage that we saw in the emails today, I needed to agree

23   with him to make sure that we were giving the students working

24   with us a good deal, meaning that if they were doctorate

25   student, they would be able to become co-authors, put their

I7c1rav4                    Ravina - Redirect

1    name on the papers, you know, in time, before they finish their

2    degree.  And Professor Bekaert was reluctant to hire one of

3    these people, and he seemed to say at that point that there was

4    only one paper that we should do on this, not the many papers

5    that we had discussed, and that on this paper there should be

6    the two co-authors from the company, which I'm fine with, but

7    that these students should wait for later, and this could be --

8    could not be in time for their graduation date.  And --

9              MR. HERNSTADT:  Your Honor, this has nothing to do

10   with the question.  She's now talking about papers and research

11   assistants and not the question.

12             THE COURT:  Overruled.

13   A.  So we had been going back and forth on this, and it was an

14   important issue to make the papers go forward.  And so in order

15   not to cross him and offend him, but at the same time to make

16   the point across that we needed to give a good deal to these

17   people, I started by saying, you know, I know you are the blunt

18   Belgian so I hope you don't get offended if I'm going to be

19   direct to you and I'm going to tell you this series of things.

20   Q.  You testified both on direct examination and also on

21   cross-examination about Professor Bekaert telling you to work

22   on other research at times.  Can you explain, first of all, was

23   there a time in 2011-2012 academic year where you were working

24   on other papers in addition to the Financial Engines research?

25   A.  Yes, I was working mostly on the Financial Engines research

1   but I also worked on other papers, and tried to push everything

2   along.

3           MS. HARWIN:  Could we bring up --

4   Q.  Well, actually, you know, before we bring it up, as the

5   Financial Engines project got under way, can you explain how

6   that impacted your ability to work on those other papers that

7   were outstanding.

8   A.  So as the data came in, first the company data and later

9   the first batch of individual data and then all the data set, I

10  was doing revisions to the Financial Engines -- to the platform

11  data set, to push it forward, and then if there was a break, if

12  I had a vacation or I had free times, I would try to move along

13  the other projects as well.

14          MS. HARWIN:   Could we bring up Defendant's Exhibit CU.

15  Q.  Turning your attention towards the bottom of that email, do

16  you see where you write, "It was a mistake to work so much on

17  this 401(k) crap"?

18  A.  Yes.

19  Q.  Can you explain what brought you to the point of writing

20  that.

21  A.  It was by then March 2014.  I had put a lot of resources

22  starting in the late sum -- starting earlier on, but really

23  going full time in the late summer of 2012, during 2013, and

24  also after, to make this project go forward.  Indeed, getting

25  together the data and making them ready for the first paper

1    took less than expected.  In the spring of 2013, I was ready to

2    write the first paper.  And nevertheless, it was now March 2014

3    and no papers were submitted, although the work done between

4    March 2013 and a year later, March 2014, was not much overall,

5    but the series of projects that were so promising turned out

6    being blocked at different points in time by Professor Bekaert

7    stopping -- refusing to give approval, delaying, stalling,

8    stringing me along, and so *ex-post*, looking back, you know, it

9    was -- if I had known what had happened, I definitely wouldn't

10   have done it.  And by then is March 2014, I'm already knee deep

11   into this research, and I realize that, knowing everything that

12   had happened and including on top of it the harassment and the

13   retaliation, this was definitely not a project that I should

14   have done, despite it looked a great idea early on.

15   Q.  Professor Bekaert suggested at times that you work on other

16   papers besides your retirement research.  Can you explain what

17   your reaction was to that as the retirement research with him

18   was under way.

19   A.  It was unrealistic that I could work on all the papers at

20   the same time.  Choices need to be made.  Either I was working

21   on the 401(k) research or I was working on the other papers.

22   Working full time on all these papers, it's impossible, for a

23   person and a team of assistants.

24           MS. HARWIN:  Turning to Defendant's Exhibit HR, can we

25   turn to the first email in that chain.

I7c1rav4                    Ravina - Redirect

1   Q.  Okay.  Professor Ravina, I'm going to turn your attention

2   to where Professor Bekaert writes, "I went over the fund

3   matching data with Andrea.  I again apologize for Andrea

4   sending you an interim report."  And then he writes, "While

5   this is a good first pass, unfortunately, I feel that the

6   matching job can and should be improved."

7           Turning your attention to the next email, can you

8   explain the issue that was being discussed in these

9   correspondence.

10  A.  The issue discussed there was what you might remember, or

11  not, was called the fund matching the first day.  It was a very

12  time-consuming task that Professor Bekaert wanted me to do to

13  complete the draft, and the agreement was that I would complete

14  this fund matching, send it, and in the first week of September

15  or the second, he would write the draft.

16  Q.  Continue to scroll up in this email.

17          Did there come a time when you wrote to Financial

18  Engines on your own concerning this issue?

19  A.  Yes.  So Professor Bekaert was raising -- muddying the

20  water, raising issues about this data.

21  Q.  Professor Ravina, just --

22  A.  Sorry.

23  Q.  No, it's no problem.  Just before we get there, can you

24  identify which email is the one where you reach out to

25  Financial Engines.

I7c1rav4                    Ravina - Redirect

1  A.  So it's not the one that is highlighted.  I think it's the

2  one below.

3  Q.  Okay.

4  A.  Yeah.

5  Q.  And when you wrote to them first on October 8, 2014, can

6  you explain what was the reason why you reached out to

7  Financial Engines on your own.

8  A.  So we were at a standstill.  Professor Bekaert kept saying

9  that the fund matching quality was low, that he wanted me to do

10 more work.  He didn't want to write the draft.  He wanted me to

11 do more work, to do stuff and continue working.  And I

12 expressed my expert opinion that like in all papers in

13 economics, you know, you have imperfect data, you need to make

14 sure that you have a sound analysis, but with million of data

15 points, every single one is not going to be the perfect data

16 set -- the perfect data point.  But I was and I am confident

17 that this was good enough and the statistical analysis looks

18 good.  So I explained that to him and to the research assistant

19 whose work he was basing his comments on, and since things were

20 not proceeding and we had disagreement, I was already talking

21 with the university at this point, and the vice dean of

22 faculty, Kathy Phillips, proposed that I write to the company,

23 summarize the issue, and ask them to give their opinion, weigh

24 in one way or the other.  So this is what I was doing.

25          MS. HARWIN:  Can we bring up Defendant's Exhibit BZ.

1        Oh, I'm sorry.  Can we bring up Exhibit AF.

2   Q.  Professor Ravina, turning your attention to this email

3   dated December 21, 2011, do you see how you write, "I'm working

4   on the habit 90 percent of my time and despite I am in

5   Jerusalem and will go to Italy tomorrow, I don't plan to have

6   any vacation.  I hope I make it.  I will update the CV too."?

7   A.  Yes.

8   Q.  When you wrote you were working on the habit 90 percent of

9   your time, you're referring to during that winter break period?

10  A.  Yes.

11  Q.  Okay.  Can you explain how the time commitment associated

12  with the Financial Engines research project changed after that

13  time.

14  A.  So we are now in December 2011 and we have received the

15  company data, the 370 US companies that are part of the data

16  set, and work was being done and proceeding well on collecting

17  all the information.  Then in the following semester, in the

18  spring 2012 semester, there were like -- things were -- were

19  calmer, we got 100,000 individual data points only.  And then

20  after that, in the end of the summer 2012, we got the full

21  3.8 million individual data, each individual of several many

22  times.  So as the time passes, I am doing work on these papers,

23  but then as the new data arrive, I switch and -- to make sure

24  that there are no delays on this international paper, on

25  automatic enrollment and all these other papers that could come

1    out from this data set.  No delays on the platform.

2    Q.  What stage was the research project at when Professor

3    Bekaert's sexual advances began?

4    A.  The project was at the point in which we have gotten the

5    data and I had started doing the work to put together the team,

6    I had written codes, I was like full swing into the analysis.

7    Q.  And at what point was the research project when you started

8    to experience Professor Bekaert stalling the work?

9    A.  That started happening after the spring of 2013, after the

10   meeting at the coffee place in which I told him that I really

11   needed this project to go forward because of my review.  After

12   that he started postponing, sending first the skeleton, where

13   he ended up doing copy and pasting later.  After that, he

14   started requesting that I agree on steps with him, do not do,

15   you know -- I was busy, but I could have done the work by

16   myself and pushed the stuff forward, but I needed to agree with

17   him on all specific steps, and this, of course, was creating a

18   problem because I would meet and we would go for coffee, but

19   there was no -- except general stuff, there was actually no

20   specific plan being made and there was no specific approval

21   going forward.

22   Q.  Professor Ravina, were those delays due to Professor

23   Bekaert being busy?

24   A.  He did have time to come for coffee, so I believe Professor

25   Bekaert is a busy academic, but he had enough time to talk to

I7c1rav4                     Ravina - Redirect

me about his personal life, his sexual adventures, and also,

most of these things don't require a lot of time.  It's just a

matter of --

          MR. HERNSTADT:  Objection.

          THE COURT:  Overruled.

A.  It's just a matter of reading maybe some email, although he

was deferring to my expertise at this point and just say, yes,

let's go ahead.  So that could be few weeks delays, if you're

really, really busy, but it cannot turn into weeks after week,

month after month, and stretch for -- for more than a year --

for years, actually.

Q.  Can you explain what you experienced as the interplay

between the sexual advances you were experiencing and the

delays on the work that you were experiencing.

A.  The sexual advances and the experiences -- and the delays

were coming together.  I would go, ask for -- to proceed, I

would send an email about a research assistant or about some

specific items, and the sex talks would be the response.  The

delays, oh, sorry, I cannot do it.  I'm busy.  There is time to

send songs but there is no time to quickly go through the

emails and say yes or no.  The two were -- were linked.  Work

was brought up, sex was brought up, delay happened, approval

did not happen.  And as time passed, it became clearer and

clearer to me that -- about the link.  At the beginning, you

know, some delay can happen.  But then as time passes and the

I7cnrav5                          Ravina - Redirect

1    delay happen, I felt it is as if there is a delay and, you

2    know, let's see if you are changing your mind after these

3    dinners and, you know, you pulled away and/or later on, when

4    you told me, you know, there is -- you are already as nice as

5    you can be.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7cnrav5                        Ravina - Redirect

1    Q.  How did the delays on the Financial Engines research

2    project differ from the kinds of ordinary delays on your other

3    research projects?

4    A.  So, most of the delays in the research project come at the

5    data level.  The data, that is really a lot of work and the

6    part that once you -- before starting, you don't know about is

7    what's the data will look like if the dataset is new.  And

8    also, like, the data is, in these type of projects I work on

9    millions and millions of observations.  So who knows how in

10   good shape the data will be.

11             But the moment the data is ready, at that moment then

12   the analysis should go relatively fast, and this was not the

13   case here.  The data was ready for the international paper in

14   March 2013, and the international paper ended up being

15   submitted after strenuous back and forth from a bunch of

16   people, only 2016, just before my tenure vote.

17   Q.  Let's talk about that paper for a minute.

18             You talked before about six months of delay in

19   finalizing that paper.  You circulated a draft of that paper

20   around September 24 of 2015, is that approximately correct?

21   A.  Yes.  So you're referring to the delay that I brought in my

22   tenure application?

23   Q.  Yes.

24   A.  Yes.

25   Q.  Can you explain what that -- let me ask the first question.

1    The September 24, 2015, draft that you circulated, that was

2    circulated to Professor Bekaert?

3    A.  Yes, I sent it to him.  Yes.

4    Q.  Let's bring up Defendants' Exhibit SE.  This e-mail is

5    dated November 2, 2015?

6    A.  Yes.

7    Q.  As of the time Professor Bekaert sent this e-mail, had he

8    approved sending out your draft for publication yet?

9    A.  No.

10   Q.  I would like to call your attention to the second

11   paragraph.

12          Do you see where he writes:  "I understand

13   Enrichetta's concerns about timing, but, frankly, there

14   are/were lots of small issues with the paper and the response

15   report.  Moreover, as the senior academic researcher on this

16   team, I want to make sure everything is absolutely correct and

17   our submission maximizes the chance of getting accepted."

18          Do you see that?

19   A.  Yes.

20   Q.  As of November 2, 2015, Professor Bekaert hadn't approved

21   sending out that draft, right?

22   A.  Right.

23   Q.  In December did Professor Bekaert approve sending out the

24   draft for publication?

25   A.  I believe that eventually later in December he did -- he

1    gave his -- the first approval, but he ended up not

2    approving -- let me explain.  He gave the first approval to

3    send the paper to the company.  So that's what happened.

4    Q.  And then when was approval ultimately given to send out the

5    paper for publication?

6    A.  In late February by Professor Bekaert.

7    Q.  And can you explain what was going on between late

8    September 2015 and late February 2016 that caused delay?

9    A.  So, like the e-mails say, Professor Bekaert raised a lot of

10   small issues, but he raised a lot of them, and he would not

11   give agreement.  And we would keep going back and forth,

12   including the relationship manager, into these back and forths.

13           I had to do a lot of busy work to write a lot of very

14   long detailed e-mails trying to push through this paper that

15   was ready, and nevertheless was not getting -- it was not

16   getting first sent to the company and then after, later,

17   December being sent to the company, it was not farther approved

18   to be sent again to the company and to submit to publication.

19   Q.  Was your paper finally approved for submission for

20   publication before or after your tenure application to Columbia

21   was due?

22   A.  It was approved one week after.

23   Q.  Was Professor Bekaert aware of your tenure clock pressures

24   at the time he was suggesting all of these changes to the

25   paper?

1   A.  Yes.

2   Q.  How do you know that?

3   A.  I had seen e-mails that he was invited to my tenure vote

4   several times, and I believe he was sent my tenure application

5   as well.

6   Q.  Defendant Bekaert's lawyer introduced some parts of e-mails

7   that appeared to be copied and pasted.  Were all of these

8   e-mails that you reviewed complete?

9   A.  I believe they were not.

10  Q.  Can you give an example of an e-mail that didn't appear

11  complete to you?

12  A.  Yes.  There was one about talking about beer and wine that

13  was not a complete e-mail as far as I remember.

14  Q.  Could you bring up Exhibit VZ.  Sorry.  That's not right at

15  all.  V7.

16          Can we bring up V3.

17          THE COURT:  V3 or V7?

18          Did you change it from V7 to V3.

19          MS. HARWIN:  Sorry.

20  BY MS. HARWIN:

21  Q.  Is this the e-mail that you're referring to that appeared

22  incomplete?

23  A.  Yes.  This is the beer e-mail.

24  Q.  And when you say that it appeared incomplete, do you mean

25  that there were additional e-mails that were subsequent or

1   additional e-mails earlier in the chain?

2   A.  Both.  There were e-mails earlier in the chain and

3   communications earlier in the chain, and if this is the only

4   page I believe that -- at least the header is missing, and

5   there might be a subsequent e-mail after that as well.

6   Q.  You previously indicated I believe yesterday that you

7   wanted to update your response to a question, but I know you

8   weren't provided with the opportunity to do so yesterday.

9        The question was you didn't file any separate

10   complaint with the EOAA office after that, is that correct?

11   A.  Yes.

12   Q.  OK.  And can you explain what your answer is to that

13   question?

14   A.  So, we were discussing about retaliation happening at

15   various points in time, but there was a time around which I

16   submitted an appeal to overturn the results of this preliminary

17   fact-finding that Director Dunn and the EOAA had done.  While

18   the appeal was ongoing, I had written to the associate provost

19   to tell her that I was available to talk with the appeal

20   officer if she wanted to, and I was -- also wanted to give an

21   update on what had happened since November 17, the date of the

22   letter and since the investigation.

23        And she has -- we went back and forth and I did

24   receive the appeal response at some time, but I was also, at

25   the same time, after that appeal letter, I believe

1    corresponding with Melissa Rooker, the associate provost, about

2    the retaliation, because she had communicated to me that any

3    retaliation and anything that happened after Director Dunn did

4    the investigation would not be included and considered in the

5    appeal, but that if I wanted to, I could let her know if there

6    was extra retaliation.  And I wrote to her and I did let her

7    know that the retaliation was continuing, and I provided a few

8    examples of that.

9            And I had received the response from her saying that

10   she believed she did not want to start an investigation at this

11   point because there were conversations I believe or

12   communications going on between the lawyers.

13           And I believe that part of this chain and my response

14   to her is that I thought that the EOAA was a fact-finding

15   office, and that whether there were communications or not going

16   on should not be affecting whether she would conduct a

17   fact-finding investigation on the retaliation.

18           So part of this chain, and I believe she did not get

19   back to me on that -- part of that chain I was -- happened

20   after I received the appeal I believe, or I wasn't a hundred

21   percent sure that after receiving the appeal I did not

22   communicate with Vice Provost Rooker any longer.

23   Q.  Professor Ravina, on your direct examination and on your

24   cross-examination you talked a lot about a lot of different

25   components.  You've talked about coffees and dinners.  You've

1    talked about compliments and physical advances and you've

2    talked about issues --

3                MR. HERNSTADT:  Your Honor, is there a question?

4                THE COURT:  Yes.  I'm already there.

5                MS. HARWIN:  Yes.

6                THE COURT:  Let's --

7    BY MS. HARWIN:

8    Q.   Can you explain how all those pieces fit together in your

9    experiences with Professor Bekaert?

10   A.   So Professor Bekaert subjected me to a course of sexual

11   harassment and retaliation for rebuffing him and later on for

12   reporting him for years.  If you take all these elements --

13               MR. HERNSTADT:  Your Honor, this is not responding to

14   the cross-examination.

15               THE COURT:  Let's not have speeches.  All right.  If

16   you want to ask a specific question, that's responsive to the

17   cross-examination, go ahead.

18               MS. HARWIN:  Your Honor, I would ask that she be able

19   to finish this answer.

20               THE COURT:  Just ask a question.

21               I think she has answered that.

22               Do you want to ask another question?

23               MS. HARWIN:  Sure.

24   BY MS. HARWIN:

25   Q.   Professor Ravina, you've testified about these different

1   elements, and I'd like you to explain how you experienced the

2   accumulation of these different events concerning Professor

3   Bekaert.

4                THE COURT:  Is this the last question of your

5   redirect?

6                MS. HARWIN:  Yes, it is.

7                THE COURT:  I'm going to allow the last question.  You

8   can go ahead, and then we will move on to recross.

9                MR. HERNSTADT:  I ask that the witness not be

10  permitted to make a long speech.

11               THE COURT:  Just try to be succinct.  I think you've

12  already answered this question before, and I don't think it's

13  really responsive to cross-examination, but I'll allow you to

14  answer this one more time.

15  A.   I think that the accumulation of events in the story of

16  this case is very important.  You take each element by itself,

17  and you're like, well, is this a big deal?  Is it not?  Well,

18  some people might say yes, some people might say not.

19               MR. HERNSTADT:  Your Honor --

20               THE COURT:  Overruled.

21               Go ahead.

22  A.   Once you look at all these instances and then, like, the

23  climate that they were creating, their evolution over time, and

24  their increasing over time and becoming more and more like

25  aggressive, abusive directly and harassing, I think -- I think

1    this gives you the whole picture of what happened and in this

2    context should each of these elements be viewed.

3              THE COURT:  All right.

4              Any recross?

5              MS. PLEVAN:  Just briefly, your Honor.

6              THE COURT:  Sure.

7    RECROSS EXAMINATION

8    BY MS. PLEVAN:

9    Q.  Professor Ravina, we're not going to go over all your

10   papers again, but I did want to clarify a few things.

11             When you referred just now in response to questions to

12   papers that were completed by you, that doesn't mean they were

13   submitted to any publication, correct?

14   A.  Some of them were and some not.

15   Q.  Right.  Some were not submitted, and certainly if they

16   weren't submitted they haven't been published, correct?

17   A.  Correct.

18   Q.  Just with respect to the publication of one of the papers

19   you said was published as of the time of your tenure review,

20   the one that was published in the Revista -- I won't be able to

21   pronounce this, but in the Italian journal, that is not a

22   refereed journal, is it?

23   A.  It is.

24   Q.  Do you remember at your deposition at page 25, at the very

25   beginning of your deposition, being asked about this paper and

1  being asked, Why did you put it under other papers at line 21,

2  and did you answer:  "Because it was invited paper, so despite

3  the press -- it was invited so despite its prestigious, it is

4  not refereed."

5          Do you remember giving that answer?

6  A.  Yes.

7  Q.  OK.  And that was correct and accurate, correct?

8  A.  They are both accurate.

9  Q.  But it was not refereed?

10  A.  My paper was --

11  Q.  Just answer this question.  It was a not refereed journal,

12  correct?

13  A.  No.  The journal is a refereed journal.

14  Q.  Even though you said in your deposition under oath it was

15  not refereed, correct?  Is that right?

16  A.  My article was.

17  Q.  Is that right, Professor Ravina?

18  A.  No, it is not.  I said it in the deposition, but it's not

19  right.

20          MS. PLEVAN:  OK.  Thank you.

21          MS. HARWIN:  Your Honor, could she have an opportunity

22  just to explain.

23          THE COURT:  You can ask that one question on redirect

24  if you want to.

25          Go ahead.

1    RECROSS EXAMINATION

2              MR. HERNSTADT:  Just a few questions, your Honor.

3    BY MR. HERNSTADT:

4    Q.  Professor Ravina, you testified in looking at that exhibit

5    about the international diversification paper that you gave a

6    draft to Professor Bekaert on September 24 and then it took a

7    few months before it was then submitted to the Financial

8    Engines people, right?

9    A.  It was submitted to the Financial Engines people after I

10   think three months and then submitted again.

11   Q.  OK.  And I --

12   A.  The Financial Engines people, and the total was six months.

13   Q.  Professor Ravina, I'm trying to ask yes-or-no questions.  I

14   am not asking for an explanation.  So your answer is it was

15   submitted after a few months, right?

16   A.  To whom?

17   Q.  To the Financial Engines people.

18   A.  Last submission to Financial Engines, six months; first

19   submission, three months.

20   Q.  Professor Ravina, we saw the document.  We looked at it.

21   And you sent the draft September 24, and you said it was then

22   sent over to Financial Engines in December, right?

23   A.  In late December for the first time.

24   Q.  OK.  That's a few months after September 24, correct?

25   A.  It's three months.

I7cnrav5                         Ravina - Recross

1   Q.   OK.   And there was a back-and-forth discussion between you

2   and Professor Bekaert about issues that he saw with the paper,

3   and you disagreed with him, right?

4   A.   Yes.   But before --

5   Q.   And your conclusion is that the paper was ready, right?

6   A.   On September 24.

7   Q.   And is it your position that when you say the paper is

8   ready it's ready regardless of what your coauthors think?   Is

9   that your position?

10          Yes or no.   That is a yes or no question.

11  A.   My expert opinion was that it was ready.

12  Q.   OK.   You said --

13          MR. HERNSTADT:   If we could look at AF, please.

14  BY MR. HERNSTADT:

15  Q.   You were asked, again, about this exhibit.   And you were

16  asked to explain what you meant when you wrote:   I am working

17  on the habit 90 percent of my time, and you -- your answer I

18  believe was that it was 90 percent of your time while you were

19  on vacation.

20          Is that correct?

21  A.   During the break.

22  Q.   Let's look at the e-mail before that you're responding to.

23          Professor Bekaert says -- he's asking you:   Is your

24  vitae on the web?

25          That's your CV, right?

1          Right?  The vitae is your CV that lists all of your

2     publications and your works in progress?

3     A.  I believe so, yes.

4     Q.  He says:  What is the status of your habit and beauty

5     papers?  As I told you, before you really got to get these

6     published.

7          Right?

8     A.  Right.

9     Q.  OK.  Now, let's see your answer to that.

10          You say, You are right.

11          So you're saying he's right, you really got to get

12     those two papers published, right?

13     A.  Every paper needs to be published, yes.

14     Q.  So you are going to get two papers published by working on

15     one of the papers 90 percent of the time on your vacation?

16          That is what your answer is?

17     A.  I was telling him he was right, and I was telling him I

18     would work on it.  I wasn't saying that working 90 percent on

19     vacation will get it published.

20     Q.  OK.

21     A.  Indeed, I agree that it's unrealistic for it.

22     Q.  Professor Ravina, thank you.

23     A.  Sure.

24     Q.  In April of 2013 you said -- and this is Exhibit 261 -- I

25     need three papers by spring 2014.  I thought about beauty, JFE,

1    which we know is the risk aversion paper that did get

2    published, you worked on it and resubmitted it, and it was

3    finally published, one 401(k), and one wealth, and we know

4    that's the high net worth papers that you were working on with

5    Professor Viceira at Harvard, and to do nothing else.

6            That is what you said in April of 2013, right?

7    A.   Yes.

8    Q.   And then in March 2014, you said --

9            MR. HERNSTADT:  Let's look at the bottom of the page.

10   BY MR. HERNSTADT:

11   Q.   The first paragraph at the bottom of the page, you're

12   telling Professor Bekaert -- he's asked you about these papers.

13           You say, at the end of the second paragraph you say, I

14   will work on R and Rs only so that I can get rid of them, so

15   that I can get rid of all of them.

16           Right?

17   A.   Yes.

18   Q.   You see that that's March of 2014.  Notwithstanding you're

19   also testifying -- you have also testified that you wanted to

20   spend all of your time on the 401(k) papers that were only

21   ready to start writing in the spring of 2013, right?

22   A.   Most of my time, yeah.

23   Q.   And in 2013 you said you needed four papers, right?

24   A.   Three.

25   Q.   Only one of which was a 401(k) paper.  You said one 401(k)

1   paper.  By the end of 2013 --

2             Right?

3   A.  No.

4   Q.  End of -- we just saw the e-mail.

5   A.  March 2013.

6   Q.  We just saw the e-mail.

7   A.  Yes.

8   Q.  No. 261 you said one 401(k) paper, correct?

9   A.  Yes.  Not at the end.

10  Q.  That is what you said in your e-mail.

11            At the end of 2013 you had two 401(k) papers, right?

12  A.  Um --

13  Q.  At the end of 2013 you had drafts of two 401(k) papers?

14  A.  Two partial drafts.

15  Q.  Right.

16  A.  Yes.

17  Q.  By the spring of 2014 you had two 401(k) papers that were

18  in draft form that were moving forward, correct?

19  A.  The same that I had in the end of 2013.

20  Q.  Two months later you are in the same place?

21  A.  Three months later I was in the same place.

22  Q.  And you had not gotten anywhere with your beauty paper,

23  right?

24  A.  Uh --

25  Q.  And that still hasn't been published, right?

I7cnrav5                      Ravina - Redirect

1   A.  It is submitted, and I --

2   Q.  And you haven't gotten anywhere with the high net worth

3   paper that still hasn't been published, right?

4   A.  Right.

5   Q.  And you published one of the 401(k) papers, right?

6   A.  Eventually, yes.

7   Q.  In time for tenure, right?

8   A.  Just before.

9   Q.  In time for tenure, right?

10  A.  A few days before I was voted.

11  Q.  And it was presented to all of the people on the tenure,

12  who were reviewing your tenure, right, they knew all about it?

13  A.  They knew all about it.

14  Q.  The e-mail was sent to them saying, Hey, she just got this

15  paper published, this is part of her tenure package now, right,

16  bringing it to their attention?

17  A.  Yes, together with the harassment that was also part.

18           MR. HERNSTADT:  OK.

19           THE COURT:  I will allow you if you have any questions

20  but just direct it towards the recross.

21  REDIRECT EXAMINATION

22  BY MS. HARWIN:

23  Q.  Professor Ravina, I will do one question on a minor point.

24           Can you explain the issue concerning the refereed

25  journal versus refereed paper?

1    A.    Sure.  So this Italian journal is the most prestigious

2    Italian journal, and it is a refereed publication, meaning

3    people that want to publish there, send the paper, they'll get

4    sent to an anonymous referee.  It's gets critiqued against a

5    list, and they also go back and forth.

6              However, I believe in every issue there is one paper

7    that it is not refereed, but that is invited by the editor.

8    The editor thinks there is a theme or a topic that is

9    interesting or important and he invites a professor to write

10   about it.

11             So my paper in that journal was invited.  He didn't

12   need to submit it to the referee process, but that is a

13   refereed journal.

14             MS. HARWIN:  Thank you.

15             THE COURT:  All right.

16             You can step down.  Thank you.

17             Should we take our afternoon break now?

18             Does that make sense?

19             MR. SANFORD:  Yes, your Honor.

20             THE COURT:  Why don't we take a ten-minute break, and

21   then we can come back and have the afternoon session.

22             Thank you.

23         (Continued on next page)

24

25

I7cnrav5                         Ravina - Redirect

```
 1                    (Jury not present)

 2                    THE COURT:  You can step down.

 3           Thank you.

 4                    (Witness left the stand)

 5                    THE COURT:  Is there anything we need to talk about

 6      with respect to the next witness that I understand is Professor

 7      Bekaert.

 8                    MS. DONEHOWER:  I don't believe so, your Honor.

 9           We've resolved the only issue we had.

10                    THE COURT:  Great.  Then I'll see you in ten minutes.

11           Thank you.

12                    (Recess)

13                    MS. HARWIN:  Your Honor, just one brief housekeeping

14      matter.

15                    THE COURT:  Sure.

16                    MS. HARWIN:  I had previously told you that there were

17      some exhibits that we wanted to move in and we would to confer

18      with defendants.  I want to move to admit those.

19                    THE COURT:  Sure.

20           Is there any disagreement as to their admissibility?

21                    MS. PLEVAN:  No.

22                    THE COURT:  Why don't you do that in front of jury,

23      just so it will be on the record and the jury will hear it.

24                    MS. HARWIN:  I want to give the list now so the

25      defendants can confirm.
```

I7cnrav5                        Ravina - Redirect

1                 THE COURT:  Sure.

2                 Tell me when you're ready.

3                 MS. HARWIN:  I believe it's Exhibits 1, 2, 4, 10.

4                 MS. PLEVAN:  I don't have 10.

5                 MS. HARWIN:  Double check that.

6                 MS. PLEVAN:  I have a list here.  It doesn't have 10.

7   We will have to check.

8                 MS. HARWIN:  18, 19, 25, 26, 30, 41, 43, 70, 71, 78,

9   106, 192, 245, 260C.

10                THE COURT:  Is there any objection to any?

11                MS. PLEVAN:  Two of them I have to check.

12                THE COURT:  Why don't you check right now and just let

13  me know.

14                MS. PLEVAN:  OK.  10 we had no objection to.

15                THE COURT:  OK.

16                MS. PLEVAN:  The same with 41.

17                THE COURT:  Why don't we bring the jury in.

18                You can stand up, Ms. Harwin, and just note it for the

19  record.  You can say, as we discussed, I am moving for the

20  admission of these.

21                Then you can move on to your next witness.  Thank you.

22                MS. HARWIN:  Sure.

23                MR. HERNSTADT:  Your Honor, do you want the next

24  witness to take the stand now or after the jury comes in.

25                THE COURT:  Yes.  I think he can take the stand.  Yes.

I7cnrav5                         Ravina – Redirect

1              MR. HERNSTADT:  Thank you, your Honor.

2              THE COURT:  You can just stand and wait and then you

3     will be sworn in.

4              THE WITNESS:  OK.

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Everyone can be seated.  Ms. Harwin, you

3    wanted to note something for the record, and then we will swear

4    in the next witness.

5              MS. HARWIN:  Yes, your Honor.

6              I move to admit some exhibits without objection from

7    defendants.  Those are Exhibits 1, 2, 4, 10, 18, 19, 25, 26,

8    30, 41, 43, 70, 71, 78, 106, 192, 245 and 260C.

9              THE COURT:  They will be admitted.

10             (Plaintiff's Exhibits 1, 2, 4, 10, 18, 19, 25, 26, 30,

11   41, 43, 70, 71, 78, 106, 192, 245, and 260C received in

12   evidence)

13             THE COURT:  Now, if you would stand, Professor

14   Bekaert.

15   GEERT BEKAERT,

16        a Defendant herein,

17        having been duly sworn, testified as follows:

18             THE COURT:  You may proceed.

19             MS. DONEHOWER:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MS. DONEHOWER:

22   Q.  Good afternoon, Professor Bekaert.

23   A.  Good afternoon.

24   Q.  You still work at Columbia Business School, correct?

25   A.  I do.

1    Q.  That is a part of Columbia University?

2    A.  It is.

3    Q.  You are a tenured professor there?

4    A.  I am.

5    Q.  You have worked at Columbia for about 18 years?

6    A.  Since -- yeah, since 1999, 2000.

7    Q.  That includes four years since Columbia first told you that

8    Professor Ravina had made a report about your behavior?

9    A.  Yes, I believe that's about right.

10   Q.  You have an office at Columbia?

11   A.  Yes.

12   Q.  You have taught Columbia students?

13   A.  Oh, yes, plenty.

14   Q.  Columbia pays your salary?

15   A.  Absolutely.

16   Q.  You have a Columbia e-mail address?

17   A.  Yes, I do.

18   Q.  You were a Columbia University professor in 2009, right?

19   A.  Yes, I was.

20           THE COURT:  I am going to ask you to speak a little

21   bit louder in the microphone.  Thank you.

22           THE WITNESS:  All right.

23   BY MS. DONEHOWER:

24   Q.  It was then that you initially approached Professor Ravina

25   about working together?

I7cnrav5                          Bekaert - Direct

1    A.  Yes, I did.

2    Q.  You had a dataset that you offered her, correct?

3    A.  Yes.  I'm sorry the dataset was not mine.  It's Financial

4    Engines' dataset.

5    Q.  You had a relationship with a company that had a dataset

6    that you offered to her to work on, correct?

7    A.  Indeed.

8              MR. HERNSTADT:  I'm sorry.  Could I just ask that the

9    witness speak into the microphone.

10             Geert, it is hard to hear you back here?

11             THE WITNESS:  Sorry.

12             THE COURT:  Thank you.

13             I am going to be reminding a lot of people of that

14   throughout the trial.

15             THE WITNESS:  I'm sorry.

16   BY MS. DONEHOWER:

17   Q.  You offered that dataset to Professor Ravina because you

18   thought she was talented?

19   A.  I thought she was talented, yes.

20   Q.  You also thought that she had the right background to help

21   you?

22   A.  That was probably the main reason, yes.

23   Q.  The dataset had information about millions of participants

24   in almost 300 401(k) plans?

25   A.  It was about 4 million participants if I'm not mistaken.

1   Q.  I'm sorry.  I couldn't hear you.

2   A.  About 4 million.

3   Q.  4 million?

4   A.  3.8 to be precise.

5   Q.  2.8?

6   A.  3.8.

7   Q.  Sorry.  3.8.

8          You offered Professor Ravina the opportunity to

9   coauthor papers with you?

10  A.  Yes.

11  Q.  It was a unique opportunity?

12  A.  Yeah.  I would describe it as such, yes.

13  Q.  You thought the research would be helpful for professor

14  Ravina's career, correct?

15  A.  Yes.

16  Q.  You were entirely new to the type of research you were

17  doing with her?

18  A.  Not quite.  It depends what you define as new.  The topic,

19  for example, international diversification, the first paper,

20  that's entirely my topic.  I wouldn't say that actually I new

21  to this topic.  What was new to me was working with data on

22  large -- a large dataset on individuals containing confidential

23  information.  I had never done that before, and Enrichetta had.

24  Q.  Working on a project with a large dataset on individuals

25  was entirely new to you?

1    A.  Yes.

2    Q.  You relied on Professor Ravina's vast knowledge and

3    experience?

4    A.  I definitely relied on her experience to work with those

5    datasets, yes.

6    Q.  At times you told Professor Ravina you were out of your

7    depth?

8    A.  I did, in e-mails.

9    Q.  Your project with Professor Ravina was based on this

10   dataset that we just talked about?

11   A.  Which project are you referring to?

12   Q.  The retirement project, if you would like to call it the

13   Financial Engines project?

14   A.  So all of them -- yes, well, it was based on that dataset

15   and other data.

16   Q.  The dataset dame from Financial Engines?

17   A.  Absolutely.  I mean, the key dataset, the part that was

18   unique came from Financial Engines.  There is a lot of

19   nonunique data that go into it as well.

20   Q.  The key dataset --

21   A.  Yes.

22   Q.  -- came from Financial Engines?

23   A.  Absolutely.

24   Q.  You have been a long-term consultant for Financial Engines?

25   A.  Yes.  I am no longer a consultant for Financial Engines.  I

I7cnrav5                    Bekaert - Direct

1    just want to make that clear.

2    Q.  You worked with Financial Engines starting in 1997?

3    A.  Correct.

4    Q.  That was more than a decade before you approached Professor

5    Ravina about this project?

6    A.  Yes.

7    Q.  You told Professor Ravina that you would work with

8    Financial Engines to get access to the data?

9    A.  Yes.

10   Q.  You were the principal party who negotiated the terms of

11   the agreement with Financial Engines?

12   A.  The principal party?  What do you exactly mean?

13   Q.  Your words, Professor Bekaert.  Whatever you understand

14   those words to mean.  Were you the principal party?

15   A.  No.  The contract was completely symmetric between

16   Enrichetta and I.

17   Q.  You are represented by counsel in this lawsuit?

18   A.  Yes.

19   Q.  You have -- your counsel has filed papers on your behalf,

20   motions, things like that?

21   A.  Right.

22   Q.  You authorized him to do that?

23            MR. HERNSTADT:  Objection, your Honor.

24            MS. DONEHOWER:  Fair enough.

25            The question is withdrawn.

1          Can the defendant -- the witness please be shown

2     docket No. 52, which is --

3     BY MS. DONEHOWER:

4     Q.  Do you have that document in front of you, Mr. Bekaert?

5     A.  Yes, I do.  Sorry.

6     Q.  Sorry, Professor Bekaert.

7          MR. HERNSTADT:  I would ask that Professor Bekaert be

8     allowed to see the paragraph in the complaint to which this is

9     responding.

10         THE COURT:  Sure.

11         MS. DONEHOWER:  I think we handed the Court two

12    copies.

13         THE COURT:  You can have my copy.  This is the answer,

14    but I think do you have a copy of the complaint on hand as

15    well?

16         MS. DONEHOWER:  I don't believe we have a copy of the

17    complaint printed, but I do not believe the complaint to be

18    necessary for this particular impeachment purpose, your Honor.

19         MR. HERNSTADT:  Your Honor, I think he needs to know

20    what this is answering.

21         THE COURT:  I think it's fair just to show it to him

22    so he knows what this is an answer to.

23         If it is a problem we can pull one off the docket.

24         MS. DONEHOWER:  Mr. McLeod, are you able to pull it?

25    You have it.

I7cnrav5                        Bekaert - Direct

1    BY MS. DONEHOWER:

2    Q.  Do you see it in front of you, Professor Bekaert?

3    A.  Yes.  Yes, I do.

4    Q.  So you see what you were answering?

5            MR. HERNSTADT:  I'm sorry.

6            Is that the entire paragraph 35?

7            Thank you.

8    A.  Can I ask what document this is?

9    Q.  We are looking right here, Professor Bekaert, at an answer

10   and a complaint.

11   A.  Oh.

12   Q.  A complaint filed by the plaintiff and an answer filed by

13   you, and I'm directing your attention to what is paragraph 35.

14           MR. HERNSTADT:  I'm sorry, your Honor.

15           We were seeing the complaint.  He's being asked about

16   the answer to the amended complaint.  I don't know if it's the

17   same paragraph.

18           THE COURT:  Why don't we pull up the amended

19   complaint, paragraph 35.  I mean, the answer says it's an

20   answer to the complaint, not the amended complaint.

21           MS. PLEVAN:  Well --

22           THE COURT:  That's fine.

23           MS. DONEHOWER:  We will come back to this later,

24   Professor Bekaert.

25   A.  OK.

1   Q.  You and professor Ravina entered into a contract with

2   Financial Engines?

3   A.  We did.

4   Q.  And the contract addressed the terms under which the

5   dataset would be provided to you and to Professor Ravina?

6   A.  I believe it did.

7   Q.  The contract provided that, upon Financial Engines'

8   request, at any time you and Professor Ravina would have to

9   return any copies of the dataset to them?

10  A.  I really don't know by heart the contract terms, but that

11  sounds probably right.

12          MS. DONEHOWER:  OK.  Can we please pull up Plaintiff's

13  Exhibit 6, which has been admitted into evidence, at page 3,

14  paragraph 8.

15  BY MS. DONEHOWER:

16  Q.  Professor Bekaert, I will give you a minute to read here.

17  That provides that upon Financial Engines' request at any time

18  you and Professor Ravina would have to return any copies of the

19  dataset to them, right?

20  A.  Yes.

21  Q.  It also provides that upon Financial Engines' request at

22  any time you would have to destroy or delete any other copies

23  of the data?

24  A.  Yes.

25          MS. DONEHOWER:  We can take that down.

1          Thank you, Mr. McLeod.

2     BY MS. DONEHOWER:

3     Q.  The contract also provided that you and Professor Ravina

4     would not publish any article based on the data without

5     approval from Financial Engines?

6     A.  Absolutely.

7     Q.  In your opinion, it was you who obtained the dataset from

8     Financial Engines?

9     A.  Well, without me Enrichetta could have never known about

10    the dataset.  Yes, I was the first one to detect the dataset.

11    Q.  In your opinion, it was a good deed for you to offer the

12    dataset to Professor Ravina?

13    A.  I think it was a unique opportunity for both of us.

14    Q.  But it was a good deed on your behalf to offer it to her?

15    A.  I don't know what you mean by good deed, but I would say

16    yes.

17    Q.  Some research projects in your field can last for eight,

18    nine, or ten years?

19    A.  Some, but it's somewhat unusual.

20    Q.  I'm sorry.  Can you repeat your answer?

21    A.  It is a quite unusual for them to take that long.  There is

22    a whole distribution of time.  Ten would be towards the long

23    end.

24    Q.  Some projects are very long, and some projects go much more

25    quickly?

1    A.  Yes.

2    Q.  When it takes a long time from the start of research to

3    publication, that is not a good thing for junior scholars?

4    A.  No, it isn't.

5    Q.  Because the tenure clock is very short?

6    A.  Yes.  I think it actually is too short.

7    Q.  As a general matter, when you work with untenured faculty,

8    members you feel a sense of obligation?

9    A.  I do.

10   Q.  You feel that it is your obligation to help them speed up

11   the publication process?

12   A.  I do.  That -- oh, OK.  That's OK.

13   Q.  You knew that preparing the Financial Engines data for

14   analysis was time consuming?

15   A.  Absolutely.

16   Q.  You expected that after receiving the data years would be

17   devoting to preparing and analyzing it?

18   A.  Yes.  Although in the end it actually went relatively fast.

19   Q.  But you expected the project to be years of preparation of

20   data and analysis of data?

21   A.  Years, no.  Maybe one to two years at most.

22   Q.  The dataset was gigantic?

23   A.  Yes.

24   Q.  It had to be cleaned?

25   A.  Absolutely.

1    Q.  That takes a long time?

2    A.  It does.  But it's done all the time.

3    Q.  But not by you?

4    A.  No.

5    Q.  Professor Ravina was the principal actor in overseeing the

6    preparation of the dataset?

7    A.  At the initial phase there was definitely joint work there,

8    but the actual cleaning of the data was definitely Enrichetta's

9    work, and it is a heavy job.

10   Q.  You told Professor Ravina that you and she could write

11   papers based on the dataset?

12   A.  Absolutely.

13   Q.  You told her that you could imagine writing four or five

14   papers based on it simultaneously?

15   A.  It's possible, yes.

16   Q.  It's possible that you told her that or it's possible that

17   you could have done that?

18   A.  Well, I don't remember the exact phrasing.  I mean, clearly

19   this dataset had -- I think at one point I used the term many

20   legs.  I mean, there's lots of potential projects you could do

21   with the dataset.

22   Q.  And at another time you used you actually said four or

23   five?

24   A.  It's possible, yes.

25              MS. DONEHOWER:  Can we please see Plaintiff's Exhibit

I7cnrav5                        Bekaert - Direct

1    14 which is admitted into evidence.

2    BY MS. DONEHOWER:

3    Q.  At the top of this chain, this document there is an e-mail

4    from you to Professor Ravina, correct?

5    A.  Yes.  Sorry, yes.

6    Q.  It's dated November 19, 2012?

7    A.  Yes.

8    Q.  I would like you to look please at the beginning of this

9    e-mail.

10           It says, "Well, there are always risks in this.  As

11   you said, once the data are in good shape, you could

12   essentially imagine writing 4/5 papers simultaneously."

13   A.  Yes.

14   Q.  You told Professor Ravina --

15           MS. DONEHOWER:  Thank you, Mr. McLeod.

16   BY MS. DONEHOWER:

17   Q.  You told Professor Ravina at least one of the projects

18   could go "super fast"?

19   A.  It's possible that I said that.  I don't remember that, but

20   it's possible.

21           MS. DONEHOWER:  Can we please see Plaintiff's Exhibit

22   260C, which has been admitted into evidence.

23           Can we please look at page 1 the bottom e-mail.

24           About five lines from the bottom, there is a sentence

25   that says, "The international project can indeed go super fast

1    but we do have to sketch what analysis we want to run."

2    BY MS. DONEHOWER:

3    Q.  You sent that e-mail to Professor Ravina, Professor

4    Bekaert?

5    A.  Yes.

6    Q.  On March 16, 2013?

7    A.  Indeed.

8          MS. DONEHOWER:  Thank you, Mr. McLeod.

9    Q.  You never had desire to spend private social time with

10   Professor Ravina, right?

11   A.  That is a strange question.  I mean, the social time comes

12   with research.

13   Q.  So --

14   A.  It's a normal thing in the profession.

15   Q.  My question is about you and what your desire was.

16          is it your testimony that you never had desire to

17   spend private social time with Professor Ravina?

18   A.  I find that a very odd question.  Desire?  What does desire

19   mean?

20   Q.  You have answered this question before, correct?

21   A.  I don't remember.

22          I think when people work together it's a very -- I

23   mean, in my life as a researcher with most of my coauthors,

24   there is a combination of professional and social life.  A lot

25   of times it's the normal outcome.

I7cnrav5                          Bekaert - Direct

1    Q.  Thank you, Mr. Bekaert.  I would like you to -- well, you

2    were deposed in this matter, correct?

3    A.  Sure.

4    Q.  You came to the Sanford Heisler --

5                THE COURT:  He said he didn't remember it.

6                Do you want to refresh his recollection?

7                MS. DONEHOWER:  Yes.  Thank you, your Honor.  Can we

8    please show from Professor Bekaert's deposition we are at 226:

9    12 to 21.

10               (Video played)

11               THE COURT:  When you refresh recollection, you don't

12   show it to the jury.

13               MS. DONEHOWER:  I'm sorry.

14               I apologize, your Honor.

15               THE COURT:  That's all right.

16               MS. DONEHOWER:  I believe --

17               THE COURT:  I don't know if you want to use the

18   headphones or if you want to give him a written version.

19               MS. DONEHOWER:  I think headphones.

20   BY MS. DONEHOWER:

21   Q.  Professor Bekaert, does that refresh your recollection

22   about whether you have ever had any desire to spend private

23   social time with Professor Ravina?

24   A.  Yes.

25   Q.  And is it your testimony now that you have never had desire

1    to spend private social time with professor Ravina?

2    A.  Yes.  As I said, it tends to come with research.  I mean,

3    you don't start research project with somebody because you

4    desire to have private social time with them.  The need for,

5    you know, the collaboration starts elsewhere.  But I would say

6    that it would be very hard to do joint research with somebody

7    you really dislike.  So I will say that when I approached

8    Enrichetta, I knew her already a little bit.  I thought she was

9    a nice person that would be fun to work with.

10   Q.  So are you now testifying that you did have desire to spend

11   private social time with her?

12   A.  No, that's not what I am saying.  I am just saying that if

13   you do research and it's going to be a very intense

14   collaboration, it would be very difficult to do it with a

15   person you don't like.

16   Q.  I am going to ask you just a yes-or-no question, Professor

17   Bekaert?

18   A.  Sure.

19   Q.  And if it's possible to answer it yes or no, I would ask

20   for a yes-or-no answer.

21   A.  Yes.

22   Q.  Did you ever have desire to spend private social time,

23   however you define it, with Professor Ravina?

24           THE COURT:  Can you answer that yes or no.

25           MR. HERNSTADT:  Your Honor, I think we need to get a

1    definition of private social time.

2              THE WITNESS:  I don't know what she means.

3              THE COURT:  All right.

4              If you can't answer it yes or no, you don't have to.

5    But, as I say to all the witnesses, if you can answer a

6    question yes or no, do; but if you really can't, then you say

7    so.

8    A.  Yes, I find that very difficult to answer.

9    Q.  At no time did you ever indicate any wish for a personal

10   relationship of any kind with Professor Ravina, correct?

11             MR. HERNSTADT:  Again, your Honor, I object.  These

12   questions are using ambiguous terms, and we all know what this

13   case is about.  If they're asking whether he's interested in

14   romantic interaction, they should ask that and not ask

15   questions using ambiguous words like "private social time" or

16   "personal time."

17             MS. DONEHOWER:  Your Honor, I'm only using Professor

18   Bekaert's own words in any of these questions.

19             THE COURT:  As I said if you can answer a question yes

20   or no, you should do so.  If you can't, say so.  If you need

21   clarification, then say that.

22             THE WITNESS:  I definitely want clarification of

23   "personal relationship," because that could be something that I

24   did not want to have with Enrichetta.  She was a friend.

25   That's very different from maybe what you have in mind, so I

I7cnrav5                         Bekaert – Direct

1    want you to clarify what personal relationship is.

2                    (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7c1rav6                          Bekaert - Direct

1    Q.  We'll come back to that later and we will do that.

2    A.  Okay.

3           MS. DONEHOWER:  Can you please bring up Plaintiff's

4    Exhibit 8.

5           I'd like to look, please, at the top email on this

6    page.  This has been admitted into evidence.

7    Q.  This is an email that you sent to Professor Ravina,

8    correct?

9    A.  Absolutely.  Absolutely.

10   Q.  On July 31, 2012?

11   A.  Yes.

12   Q.  It says, "Just keeping tabs on you."  Right?

13   A.  Yeah.

14   Q.  In this email you invited Professor Ravina to dinner?

15   A.  It's a conditional invitation.

16   Q.  And the condition on which the invitation is based is

17   whether or not she finishes a revision of the work.

18   A.  Of -- I think it was her single-authored work.

19          MS. DONEHOWER:  Can we please go down to the email

20   below.

21   Q.  You two are emailing about a full set of tables, correct?

22   A.  Yes.

23   Q.  And these are tables that you're working on jointly?

24   A.  Yes.

25          MS. DONEHOWER:  Could we please go up to the next

1    email.

2              MR. HERNSTADT:  Your Honor, could the witness be

3    permitted to see the entire exchange.  He's seeing just

4    isolated bits.

5              THE COURT:  If you need to see the whole thing, just

6    let us know.

7    BY MS. DONEHOWER:

8    Q.  Just below that, Professor Ravina discusses doing

9    additional revisions, right?

10             I'm sorry.  That was unclear.

11             If I'm looking at the email on the bottom of this

12   callout, Professor Ravina is discussing revisions, correct?

13   A.  Yes.

14   Q.  And at the top email you say, "If you finish a revision, I

15   will pay dinner at my local Italian restaurant with the Torino

16   owner."  Right?

17   A.  Yes.

18   Q.  "Shoot, maybe you will not want to finish then."  Correct?

19   A.  Yes.

20   Q.  You offered to pay for this dinner.  Correct?

21   A.  Yes.

22   Q.  Around that same time you gave Professor Ravina chocolate.

23   A.  I give a bunch of people chocolates.  I wouldn't remember.

24   Q.  And one of those people to whom you gave chocolate was

25   Professor Ravina, correct?

I7c1rav6                          Bekaert - Direct

1    A.  Sure.  She asked for it many times, too.

2    Q.  Yes or no, please, Professor Bekaert.

3    A.  Yes, yes.

4    Q.  You also sent her songs?

5    A.  Yes.

6    Q.  One of those songs was called Soul Meets Body?

7    A.  It's possible.  I don't remember all the songs I sent.

8           MS. DONEHOWER:  Could we please pull up Plaintiff's

9    Exhibit 10.  This was just admitted into evidence just before

10   Professor Bekaert took the stand.

11   Q.  The very top email here is from you to Professor Ravina,

12   correct?

13   A.  Yes.

14   Q.  It's dated August 3, 2012.  Right?

15          MS. PLEVAN:  Copy, please.

16          MR. HERNSTADT:  We don't have a copy.

17          MS. DONEHOWER:  Yes, no problem.

18          MR. HERNSTADT:  Just give me one second, please.

19   Q.  That's the date on this email?

20   A.  Yes.

21   Q.  Do you see that there are attachments to this email?

22   A.  Yes, I do.

23   Q.  And do you see that the first one here is a song called

24   Soul Meets Body?

25   A.  Yes.

1    Q.   And Love Will Tear Us Apart?

2    A.   Yes.

3    Q.   In September 2012 --

4              MS. DONEHOWER:   Actually, can we pull that back up,

5    Mr. McLeod.

6              Can we look at the email below to which Professor

7    Bekaert was responding.   Thank you.

8    Q.   In the first line of this email, Professor Ravina thanks

9    you for chocolates that you had just brought her?

10   A.   Yes.   Well, I don't know in what capacity the chocolate was

11   given.   I don't remember.

12   Q.   You don't know whether it was a gift?

13   A.   It's -- it -- no, I have -- as Enrichetta testified

14   herself, I have chocolate in my office all the time, so I never

15   ever gave Enrichetta a gift.   She -- it could be that there

16   would be chocolate -- that she just picked up chocolate in my

17   office.   I don't remember.

18   Q.   Let me just check.   You said that you never ever gave

19   Professor Ravina a gift, correct?

20   A.   Absolutely.

21   Q.   You said -- you testified about five minutes ago that you

22   gave people chocolate all the time.

23   A.   Yes.   Those are not gifts.   I mean, I'm known as

24   Mr. Chocolate.   I have always --

25   Q.   Do people pay for the chocolates when you give them to

1    them?

2    A.  No.

3    Q.  Okay.  Let's look at the rest of this email that Professor

4    Ravina sent to you.  Let's look at the third paragraph, please.

5           She's talking about specific investment funds,

6    correct?

7    A.  Yes.

8    Q.  And in the email below that, she's talking more about

9    collecting fund information?

10   A.  Yes.

11   Q.  She's talking about company-level data and individual-level

12   data?

13   A.  Yes.

14   Q.  And can we go up to your response to her, please.

15          Your response doesn't respond to any of the issues

16   about investing in funds that she raised, does it?

17   A.  It -- it says that I will do it later.

18   Q.  It says that you'll do it later.  That's the entirety of

19   your response on the fund issues?

20   A.  It clearly is in this email.

21   Q.  And instead of responding on the fund information, you sent

22   her music.

23   A.  In this particular email, yes.

24   Q.  And in other emails, right?

25          MR. HERNSTADT:  Objection, your Honor.  Is she

1  referring to any particular emails?

2          THE COURT:  Overruled.

3          Do you recall any other email?

4          THE WITNESS:  Yes.

5  Q.  In September 2012 you also asked Professor Ravina to

6  dinner?

7  A.  It's possible.

8          MS. DONEHOWER:  Can we please see Plaintiff's

9  Exhibit 11, which is in evidence.  Page 2, the last email

10 there.

11         MS. PLEVAN:  Copies, please.

12         MS. DONEHOWER:  Sorry.  These are admitted, but we're

13 happy to give you additional copies.  Sorry.  This is Tab 21.

14         MS. PLEVAN:  We have it.

15 BY MS. DONEHOWER:

16 Q.  Do you see that email, Professor Bekaert?

17 A.  I do.

18 Q.  This is an email from you to Professor Ravina?

19 A.  It is.

20 Q.  It's dated September 27, 2012, correct?

21 A.  Correct.

22 Q.  You write, "Hey, Enrichetta."  Sorry.  "Hi, Enrichetta.

23 Are we having dinner on Saturday or you got other plans?  As I

24 told you, for me it need not be a 2 Michelin star dinner.  No

25 pressure, by the way.  We can always do it some other time."

1   Correct?

2   A.   Correct.

3   Q.   Professor Ravina responded to your email, right?

4           MS. DONEHOWER:   Actually, Mr. McLeod, just one moment.

5   Q.   Can you please tell us what time you sent this email,

6   Professor Bekaert.

7   A.   The timing says 9:45.

8   Q.   And Professor Ravina responded to your email.

9           MS. DONEHOWER:   Can we please go up to her response,

10  which is at the top of page 2.

11  Q.   And in her response she did not accept your invitation,

12  correct?

13  A.   In this response, no.

14  Q.   She said she had just been out to a dinner?

15  A.   It appears so.

16  Q.   And so you asked her again.

17          MS. DONEHOWER:   Let's help Professor Bekaert out.   On

18  the bottom of page 1.   Thank you.

19  Q.   So in this -- this is another email from you to Professor

20  Ravina, correct?

21  A.   Yes.

22  Q.   And in it you say, "As I said, I am willing to postpone or

23  to have a small sushi plate or salad somewhere...   Or do you

24  only go to dinner with Italians?"   Right?

25  A.   Yes.

1    Q.  And the email continues?

2    A.  Yes.

3    Q.  It says, "Mi dispiace.  Non parlo Italiano"?

4    A.  Yes.

5    Q.  At that point Professor Ravina finally agreed to go to

6    dinner with you?

7    A.  I have to say my memory is based on what I saw before.  I

8    think that email came up before.  So I think she accepted, yes,

9    or she left reservations or something.

10   Q.  After that you sent Professor Ravina more music?

11   A.  I also remember this from the emails going back and forth

12   today or yesterday.

13   Q.  Is that a yes or no, Professor Bekaert?  After that you

14   sent her more music?

15             MR. HERNSTADT:  Would it help to see the email?

16             THE WITNESS:  It would actually help because I'm not

17   sure about the timing.

18             MS. DONEHOWER:  No problem.  Can we please see

19   Plaintiff's Exhibit 12.

20             THE COURT:  Just don't direct your comments to the

21   witness, Mr. Hernstadt.

22             MS. HARWIN:  I'm sorry.  I heard him saying that he

23   was trying to remember from the email, and I thought that was

24   his saying that he wanted to see the whole email.

25             THE COURT:  That's fine.  Just don't interrupt unless

1    you have an objection.  Thank you.

2                MR. HERNSTADT:  Sorry.

3    BY MS. DONEHOWER:

4    Q.  Professor Bekaert, do you recognize this email in front of

5    you?

6    A.  Yes.

7    Q.  This is another email from you to Professor Ravina,

8    correct?

9    A.  It is.

10   Q.  It's dated October 1, 2012, 9:49 p.m., correct?

11   A.  Yes.

12   Q.  And let's look at the second line.

13              In the second line here you say, "BTW, I forgot to

14   send you some music."  Right?

15   A.  Yes.

16   Q.  And you go on to describe the songs that you have just sent

17   her, correct?

18   A.  Yes.

19   Q.  You say, "They are soft and somewhat schmaltzy"?

20   A.  Mm-hmm.

21   Q.  You refer down in the middle of the page to a song called

22   Love Is the Drug?

23   A.  Yes.

24   Q.  And you also mention a song called Let's Stick Together?

25   A.  Yes.

I7c1rav6                              Bekaert - Direct

1   Q.  You sent these songs to Professor Ravina in an email.

2             MS. DONEHOWER:  Can we look at the subject line of

3   that email, please.

4   Q.  The subject line is Research Project on 401(k) Plans and

5   Investment Patterns, correct?

6   A.  Correct.

7   Q.  Because this email was a response to an email that

8   Professor Ravina had sent to you, right?

9             MS. DONEHOWER:  Let's show --

10  A.  I'm sure it is.

11            MS. DONEHOWER:  If you don't mind, Mr. McLeod.

12  A.  That's fine.

13  Q.  In this email, Professor Ravina is discussing a potential

14  research assistant?

15  A.  Yes, that's correct.

16  Q.  And she's also discussing having detailed instructions for

17  undergraduate research assistants, right?

18  A.  Yes.

19            MS. DONEHOWER:  Okay.  Can we look back up at

20  Professor Bekaert's email, please.

21  Q.  Okay.  And the only part of this email in which you respond

22  to the issues she's raised about research assistants is in the

23  first line, right?

24  A.  Correct.

25  Q.  A day later you sent Professor Ravina even more songs?

 1    A.  Yes.

 2              MS. DONEHOWER:  Can we please see Plaintiff's

 3    Exhibit 13.

 4              Could we look at the top -- the first line here.

 5    Q.  You write -- this is an email from you to Professor Ravina,

 6    correct?

 7    A.  Yes.

 8    Q.  And you write, "As a reward for all your hard work, here is

 9    a The National song called Lucky You," right?

10    A.  Yup.

11    Q.  And you write that it came from an album called Sad Songs

12    for Dirty Lovers, question mark -- I'm sorry -- comma,

13    exclamation point.

14    A.  It does.

15    Q.  Is the exclamation point part of the album title?

16    A.  No.  I think it's a great title.

17    Q.  And you listened to this song before you sent it to

18    Professor Ravina?

19    A.  One of my favorite songs of all time.

20    Q.  So you know the lyrics?

21    A.  I don't know them by heart.  I may know certain lines but

22    not really by heart, no.

23    Q.  Well, let me know whether you recognize some.  The song

24    includes the lyrics, "Wherever you will ever be, you're never

25    getting rid of me," correct?

1    A.  That definitely sounds familiar, yes.

2    Q.  It also includes the lyrics, "You own me, there's nothing

3    you can do, you own me," right?

4    A.  It does.

5    Q.  You also asked Professor Ravina to dinner in 2013, right?

6    A.  20 -- can you -- we had several dinners in 2013, so I'm

7    sure one of them I was inviting her.  I'm not sure.

8              MS. DONEHOWER:  I'd like to mark, please, Plaintiff's

9    Exhibit 18, for identification purposes.

10             This is in?  Okay.  I apologize.  I believe this has

11   been admitted into evidence already.

12             THE COURT:  Any objection?  This is definitely in?

13   There's no dispute about that?

14             MS. PLEVAN:  That it's in evidence?

15             MR. HERNSTADT:  I think this is in evidence.  I think

16   we put this in evidence.

17             THE COURT:  All right.  As long as we're agreed,

18   that's fine.

19             MR. HERNSTADT:  But I don't know if it's the entire

20   exhibit.

21             MS. DONEHOWER:  In case there's any dispute, we will

22   show to Professor Bekaert only the first page.

23             MR. HERNSTADT:  No objection.

24             THE COURT:  Okay.  All right.  So if it wasn't

25   admitted, it's admitted, but either way, you can show it and

I7c1rav6                      Bekaert - Direct

1   publish it to the jury.

2              MS. DONEHOWER:  Thank you.

3   BY MS. DONEHOWER:

4   Q.  Do you see this email that you sent to Professor Ravina on

5   April 4, 2013?

6   A.  Yes.

7   Q.  And in this email you are asking her whether she wants to

8   do dinner sometime, correct?

9   A.  Yes.

10  Q.  You also went for coffee with Professor Ravina all the

11  time, correct?

12  A.  All the time?  It's kind of impossible to do because I was

13  barely ever there, so --

14  Q.  So your answer is no?

15  A.  No.

16  Q.  You were deposed in this matter, Professor Bekaert?

17  A.  Yes, I was.

18  Q.  You answered questions under oath during your deposition?

19  A.  Yes, I did.

20  Q.  You took an oath to tell the truth at that deposition?

21  A.  Yes.

22  Q.  And you did tell the truth at that deposition?

23  A.  Yes.

24  Q.  And the answer you provided at deposition was different

25  than the answer you're now providing today?

1   A.  Depending on how you define "all the time."

2   Q.  How you would define it, Professor Bekaert?

3   A.  Well, if we -- it depends on the time --

4   Q.  I'm not asking for your definition.  I'm asking -- giving

5   you a definition of "all the time."  Did you go for coffee with

6   Professor Ravina all the time?

7   A.  Maybe you should define what you mean under "all the time"

8   because I'm -- if I'm not in the country, I cannot go for

9   coffee.

10  Q.  Professor Bekaert, it's just a yes or no question, please.

11  A.  Then I will say no.

12          MS. DONEHOWER:  Can we please see plaintiff's

13  deposition at 259/8.

14  Q.  Do you see your deposition testimony here --

15  A.  Yes.

16  Q.  -- professor Bekaert?  And --

17  A.  Well, it's --

18  Q.  -- you were asked:  "Do you recall ever going to coffee

19  with Ms. Ravina and talking about your joint research?"  And

20  you answered:  "All the time."

21          Did I read that correctly?

22  A.  Yes, you did.

23  Q.  Thank you.

24          Your romantic interest in a co-author might affect --

25          MR. HERNSTADT:  Objection, your Honor.

1          THE COURT:  Let's hear the question.

2   Q.  Your romantic interest in a co-author might affect how fast

3   you worked on a project.

4   A.  What do you mean?

5   Q.  If you can't answer the question, Professor Bekaert, please

6   provide the best answer you can, and if it's yes or no, that's

7   even better.

8   A.  No.

9   Q.  You were interviewed by Columbia about Professor Ravina's

10  report to the university about your behavior, correct?

11  A.  Yes.

12  Q.  By Director Michael Dunn?

13  A.  Yes.

14  Q.  You told Director Dunn that if you were romantically

15  involved with a co-author, you would actually have sped the

16  project up?

17  A.  I don't remember saying that.

18          MS. DONEHOWER:  Can we please see Plaintiff's

19  Exhibit 81.  I'd like to mark this --

20          THE COURT:  Again, he said he doesn't remember, so

21  let's just try and refresh his recollection.

22          MS. DONEHOWER:  Well, if it's okay with your Honor,

23  I'd like to move it into evidence as well.  I don't believe

24  that there is an objection from Columbia.

25          THE COURT:  Is there any objection?

 1             MR. HERNSTADT:  Objection, yes.

 2             MS. DONEHOWER:  You object to Director Dunn's notes?

 3             MR. HERNSTADT:  No, I'm sorry.  I don't object to

 4    Director Dunn's notes, but I object.  He says he doesn't

 5    remember.  Are you going to refresh his recollection?  It's not

 6    being presented to --

 7             THE COURT:  Anyway, there's no objection to the

 8    document so that will come in.  And he said he doesn't

 9    remember, but if you want to ask him a question, you can do

10    that.

11             MS. DONEHOWER:  Thank you, your Honor.

12             (Plaintiff's Exhibit 81 received in evidence)

13             THE COURT:  And you can publish it.  So, Plaintiff's

14    81.

15    BY MS. DONEHOWER:

16    Q.  You've seen these before, Professor Bekaert, these notes?

17    A.  No.

18    Q.  No?

19    A.  No.

20    Q.  You told Director Dunn that if you did have romantic

21    interests -- I apologize.

22             Does this refresh your recollection about whether or

23    not you told Director Dunn that if you had romantic interest in

24    a co-author, you wouldn't stall the papers, you would do the

25    opposite?

1    A.  It's possible that I said that, 'cause he wrote it down.  I

2    remember --

3    Q.  If it's only possible, is the other possibility that

4    Director Dunn made that up?

5    A.  I'm sure he didn't make it up, so I must have said

6    something like this.  I remember very little from that meeting.

7    Q.  Thank you.

8         Professor Bekaert, your career has been a model of

9    productivity, right?

10   A.  I guess it depends who you ask.

11   Q.  You have over 60 published papers, correct?

12   A.  That's correct.

13   Q.  The Financial Engines data that we talked about before

14   became useable in mid 2013, right?

15   A.  I think it became useable.  It wasn't quite ready but it

16   was useable.

17   Q.  One of the papers you worked on with Professor Ravina was

18   about international diversification.

19   A.  Correct.

20   Q.  Professor Ravina did an enormous amount of work on that

21   paper, correct?

22   A.  Yes, she did, in the initial stages, absolutely.

23   Q.  In April 2013 you told Professor Ravina not to do anything

24   on the paper because you wanted to write up a bullet point

25   skeleton, right?

1   A.  That's -- I don't know if I formulated it this way, but I

2   do know that we wanted to figure out what we were going to do

3   with the papers, yes.

4           MS. DONEHOWER:  Can we please see Plaintiff's

5   Exhibit 20 which has been admitted into evidence.

6   Q.  Do you see this email that you sent to Professor Ravina on

7   April 17, 2013?  Do you see that, Professor Bekaert?

8   A.  Yes, I do.

9   Q.  Can you tell me what time you sent this email, please.

10  A.  It says 9:58.

11  Q.  And please look at the second line here.  You wrote, "I

12  would not do anything right now on this int. div. project as I

13  still want to write up a bullet point skeleton for the paper to

14  jump-start us," right?

15  A.  Yes.

16  Q.  And for a noneconomist, does a bullet point skeleton just

17  mean an outline?

18  A.  You can -- yeah, I would say, yes, roughly.

19  Q.  You told Professor Ravina that waiting for you was

20  obviously not great because you were so busy.  Right?

21  A.  Yes, I was very busy at that time.

22  Q.  As of June 2013, you had not started on the paper, correct?

23  A.  I think I submitted a preliminary draft in May.

24          MS. DONEHOWER:  I'd like to mark Plaintiff's

25  Exhibit 57, please.  Page 1, paragraph 2.

1             I believe that the parties have agreed that this

2       exhibit will be admitted into evidence.

3             THE COURT:  Any objection to Exhibit 57?

4             MS. PLEVAN:  No objection.

5             MR. HERNSTADT:  No objection.

6             THE COURT:  All right.  57 will come in.

7             (Plaintiff's Exhibit 57 received in evidence)

8       BY MS. DONEHOWER:

9       Q.  Do you see the second paragraph here, Professor Bekaert?

10      A.  I do.

11      Q.  And you see where you wrote, "The fact that we did not

12      start in June 2013 with the int. div. paper is likely my

13      fault"?

14      A.  That's what I wrote, yes.

15      Q.  And then you added a parenthetical statement after it,

16      correct?

17      A.  Correct.

18      Q.  You said, "Although I did" start, I imagine, "and then she

19      really pissed me off with something, so I stopped working on it

20      for a few months."  Isn't that --

21      A.  I wrote, yes.

22      Q.  And the "she" who really pissed you off was Professor

23      Ravina, correct?

24      A.  Yes.

25             MS. DONEHOWER:  Can we please see Plaintiff's

1    Exhibit 22, which has been admitted into evidence.

2              Let's please look at the email on the bottom of

3    page 1, all the way down, June 23rd.

4              Thank you.

5    Q.  Professor Bekaert, do you see this email that you wrote to

6    Professor Ravina?

7    A.  Yes, I do.

8    Q.  Okay.  Do you see the third paragraph from the bottom where

9    you told Professor Ravina that -- I'm sorry.

10             The second paragraph here, you say, "BTW, we should

11   still meet somehow also about the mentoring thing"?

12   A.  Yes.

13   Q.  "Need to know where you stand."  Correct?

14   A.  Yes.

15             MS. DONEHOWER:  Oh, I'm sorry.  Mr. McLeod, do you

16   need a moment?

17             JUROR:  We can't see it.

18             MS. DONEHOWER:  Oh, I apologize.

19             Just in time for you to figure everything out,

20   Mr. McLeod, I want to --

21             Yes, that's a great idea.  Can we go back, please, to

22   Plaintiff's Exhibit 57.

23             Your Honor, can I ask whether the jury was able to see

24   Plaintiff's Exhibit 20 when we showed it?

25             THE COURT:  Did you all see 20?

1              JUROR:  No.

2              THE COURT:  Why don't you go back, do it again.

3              MS. DONEHOWER:  Yes.

4              So we're at Plaintiff's Exhibit 20 at page 1, the

5    bottom of page 1, the bottom email.

6    BY MS. DONEHOWER:

7    Q.  Quickly, because we've discussed it, Professor Bekaert, you

8    said -- you asked Professor Ravina not to do anything on the

9    international diversification project because you wanted to

10   write up a skeleton and you told her that waiting for you was

11   obviously not great, correct?

12             MR. HERNSTADT:  Objection.  The email speaks for

13   itself.  She's adding words to it.

14             THE JURORS:  We did see this one.

15             MS. DONEHOWER:  Oh, you did.  I apologize.

16             So if we could see Plaintiff's Exhibit 57, please.

17             Oh, I'm sorry.  I don't believe that one is moved into

18   evidence just yet.  So can we mark it.  We are at Tab 29.

19             Oh, they have it.

20   BY MS. DONEHOWER:

21   Q.  As of June 2013, you had not started on the international

22   diversification project, right, Professor Bekaert?

23   A.  That's false.

24             MS. DONEHOWER:  Okay.  Can we please look at page 1,

25   paragraph 2, the second --

I7c1rav6                          Bekaert - Direct

1          THE COURT:  I think we went through this.  Did this

2    not come up on the screen?

3          JUROR:  No.

4          THE COURT:  Okay.  Please proceed.

5          MS. DONEHOWER:  I'll be very quick, your Honor.

6    BY MS. DONEHOWER:

7    Q.  The first line of the second paragraph says, "The fact we

8    did not start in June 2013 is likely my fault, although I did

9    and then she really pissed me off with something so I stopped

10   working on it for a few months," correct?

11   A.  Yes.

12   Q.  And the "she" who you were referring to, I believe you just

13   testified, was Professor Ravina, correct?

14   A.  Yes.  Enrichetta.

15          MS. DONEHOWER:  Okay.  Can we please pull up

16   Plaintiff's Exhibit 22, which has been admitted into evidence.

17   Q.  Please take a look at the email on the bottom of page 1.

18   That's an email from you to Professor Ravina, correct?

19   A.  Yes.

20   Q.  And in the second paragraph you say that you would like to

21   speak with her about the mentoring thing, correct?

22   A.  It appears to be, yes.

23   Q.  In the line below that -- let me go back.

24          The mentor thing, you've called yourself Professor

25   Ravina's mentor on other occasions as well, correct?

I7c1rav6                          Bekaert - Direct

1    A.  I was mentoring her.

2    Q.  So you mentioned it because you saw yourself as her mentor.

3    A.  I saw -- yes, I saw myself as her mentor, absolutely.

4    Q.  And you told Professor Ravina that you needed to know where

5    she stood in this email, right?

6    A.  Yes, I believe we had a pre -- when I was in New York

7    before --

8    Q.  The question is about what you said in the email, Professor

9    Bekaert.

10   A.  Yes.

11   Q.  You told her you needed to know where she stood, correct?

12   A.  That's what the email says.

13   Q.  And on the next line down here you talk about the Financial

14   Engines data set, right?

15   A.  That's what the email says, yes.

16   Q.  You said, "The more I think about it, the more I come up

17   with new potential papers."

18   A.  Yes.

19   Q.  And then you said, "This could be a career," and again you

20   add a parentheses, "or not if people balk at the data,"

21   correct?

22   A.  Correct.

23   Q.  You stopped working on the international --

24            MS. DONEHOWER:  Thank you, Mr. McLeod.

25   Q.  You stopped working on the international diversification

1   paper for months in 2013, correct?

2   A.  I think that's an incorrect characterization of what's

3   going on with the project.

4   Q.  To the extent that you can answer yes or no, Professor

5   Bekaert, is that a yes or a no?

6   A.  I can't -- I mean, project -- progress was being made on

7   the project during the summer.

8           MS. DONEHOWER:  Can we please show Professor Bekaert

9   his deposition transcript at 288/5 to 10.

10          (Video played)

11          MR. HERNSTADT:  Your Honor, objection.

12          THE COURT:  Yes, let's not --

13          MS. DONEHOWER:  Just the transcript, please,

14  Mr. McLeod.

15  A.  Can I rephrase my answer?

16  Q.  You'd like to rephrase your answer now?  Can you do that in

17  a yes or no, Professor Bekaert?

18  A.  Well, I mean, my -- my recollection is that there was --

19  Q.  If it's not a yes or no, then I think we'll please look at

20  the deposition transcript, which is at 288/5 to 10.

21          "So it is true that you stopped working on the 2013

22  international diversification paper for a few months, correct?"

23  And your answer was "Yes" at your deposition, correct?

24  A.  Yes, mm-hmm.  Yes, yeah, absolutely.

25  Q.  And the reason you had stopped working, as we saw before,

1    was that Professor Ravina did something that had really pissed

2    you off.

3    A.  Yes.  You have jogged my memory now.  So --

4    Q.  On October 2013, you decided that you would be the one to

5    deal with Financial Engines, correct?

6    A.  Say that again?

7    Q.  By October 2013, you decided that instead of Professor

8    Ravina contacting Financial Engines, the company that held your

9    data set, from which you got the data set, you would be the one

10   to contact them.

11   A.  I don't recall that.  It's possible, but I -- I don't

12   recall.

13          MS. DONEHOWER:  We have already admitted into evidence

14   this morning Defendant's Exhibit CF.  Can we please pull that

15   up.  C as in cow, F as in Frank.

16   Q.  Looking at page 2, there is a middle email from you to

17   Professor Ravina, October 18, 2013.  Do you see that email?

18   A.  Yes, I do.

19   Q.  Will you please read that for us, that email.

20   A.  "When I saw -- when I saw your email, I thought you turned

21   into 'blunt Geerta' for a while.  Holy Christ.  From now on, I

22   deal with FE, I think."

23   Q.  You told Professor Ravina that you needed to see any emails

24   she wrote to Financial Engines before she sent them, correct?

25   A.  I think this is a humorous email and --

1   Q.  This is a new question, Professor Bekaert.  You said --

2          MS. DONEHOWER:  Thank you, Mr. McLeod.

3   Q.  You said that you needed to see any emails that Professor

4   Ravina wrote to Financial Engines before she sent them,

5   correct?

6   A.  I -- it's possible.  I don't -- I don't think this email

7   implies this.  You mean that this email implies --

8   Q.  No.  Ever.  Ever, Professor Bekaert.

9   A.  I don't recall.

10          MS. DONEHOWER:  Can we please see Plaintiff's

11  Exhibit 26, which has been admitted into evidence.

12  Q.  Page 1, bottom email, you sent this to Professor Ravina,

13  correct?

14  A.  Yes.

15  Q.  Okay.  That second line, "Seriously, I need to see the

16  email you write to Wei before you send it.  We need them on our

17  side."  Correct?

18  A.  Absolutely, yeah.  I think it's about the same issues,

19  right?

20  Q.  By December 2013, you told Professor Ravina you would leave

21  her off of future emails about the project, right?

22  A.  I don't recall this email, but I'm sure you'll bring it up.

23          MS. DONEHOWER:  Can we please bring up Plaintiff's

24  Exhibit 30, which has been admitted into evidence.

25  Q.  Do you see the last sentence here, Professor Bekaert?

1   A.  Yes.

2   Q.  This is an email you wrote to Professor Ravina --

3   A.  Yes.

4   Q.  -- on December 17, 2013, correct?

5   A.  Yes.

6   Q.  You wrote, "I will leave you off future emails, but you

7   need to help putting tables together as I do not know how to do

8   that."  Right?

9   A.  Correct.

10  Q.  You did a draft of the international diversification paper

11  in December 2013, correct?

12  A.  Correct.

13  Q.  But you refused to show it to Professor Ravina.

14  A.  Excuse me?

15  Q.  You refused to show the draft that you had written to

16  Professor Ravina.

17  A.  Refused?  It's possible through some email.  I think she

18  was on vacation so -- I don't know what the point is.

19          MS. DONEHOWER:  Okay.  Can we please see Plaintiff's

20  Exhibit 24 that has been admitted into evidence.

21          Thank you, Mr. McLeod.

22          Page 1, paragraph 3.  If we could just see

23  paragraph 3.  There's a lot of text.

24          Thank you.

25  Q.  And in the first line, the first sentence, you wrote, "So,

I7c1rav6                         Bekaert - Direct

1    while I have started nibbling away at the draft, I will not

2    show you anything."  Right?

3    A.  Yeah.

4    Q.  And you said that was because she did not seem to grasp the

5    concept of an evolving work in progress.  Right?

6    A.  Right, I wrote that, yes.

7    Q.  Thank you.

8          You were also supposed to be working on the automatic

9    enrollment paper in 2013, right?

10   A.  I think that project started somewhere in the summer of

11   20 -- what did you say?  What was the timeline?

12   Q.  2013, Professor Bekaert.  This is a different -- so we were

13   talking about the international diversification paper.  Moving

14   on to a different paper, the automatic enrollment paper, you

15   were also working on that in 2013.

16   A.  Yes, yes, we were, absolutely.

17   Q.  Professor Ravina came up with the initial idea for that

18   paper, right?

19   A.  Yes, she did.

20   Q.  She pulled most of the weight on that project, right?

21   A.  I believe that she did the initial work, but then I did

22   most of the work on the drafts that were sent to the

23   conference.

24   Q.  I'm going to --

25   A.  Well, in terms of the writing, not the tables and so forth.

1   Q.  Well, the tables, the data analysis, is that fair to say

2   that's the more time-consuming parts of the process, generally?

3   A.  Well, depends.  People underestimate how long it takes to

4   actually write the draft, and --

5   Q.  So Professor Ravina did most of the weight on the data

6   analysis, correct?

7   A.  Professor -- Enrichetta, together with the assistants.

8   Q.  Because it was not your area.

9   A.  The automatic enrollment paper, that was definitely newer

10  to me, yes.

11  Q.  And you felt totally out of your depth working on it?

12  A.  I'm sure I said that.

13  Q.  Because you did.

14  A.  Well, I learned fast.

15          MS. DONEHOWER:  Can we please see Plaintiff's

16  Exhibit 27.  I'm going to mark this.  This is another email

17  exchange between Professor Bekaert and Professor Ravina.

18          Oh, I apologize.  This has already been admitted into

19  evidence.

20  Q.  This is an email you wrote to Professor Ravina in November

21  of 2013, correct, Professor Bekaert?

22  A.  Correct.

23  Q.  Do you see the first line there, "Hi, Enrichetta.  I do

24  feel totally out of my depth"?

25  A.  Absolutely.

1  Q.  You and Professor Ravina agreed to submit this paper for a

2  conference, right?

3  A.  Yes.

4  Q.  At Harvard Business School?

5  A.  I thought it was a WFA -- the Western Finance Association

6  meetings, which has a submission that --

7  Q.  So that's a no, it wasn't at Harvard Business School?

8  A.  It may have been submitted to Harvard Business School, but

9  the key thing was the WFA, which had a submission deadline

10  November --

11  Q.  Professor Bekaert, the key things for me are the kind of

12  deadlines that come up.

13          MS. DONEHOWER:  So can we please pull up Plaintiff's

14  Exhibit 25, at page 2, paragraph 2.

15          Ms. Stack, is this in?

16          Your Honor, we move to admit Plaintiff's Exhibit 25

17  into evidence?

18          THE COURT:  Any objection to 25?

19          MS. PLEVAN:  One second, your Honor.

20          No objection.

21          MR. HERNSTADT:  No objection.

22          THE COURT:  All right.  25 will be admitted.

23          (Plaintiff's Exhibit 25 received in evidence)

24  Q.  So you see this is an email from Corinne Lineker?  It's a

25  call for papers and it discusses a conference, right down here

1   in the middle, that will take place at Harvard Business School,

2   right?

3   A.  Yes.

4   Q.  The deadline for submission to the conference was

5   October 18, 2013.  Do you see that?

6   A.  Absolutely.

7   Q.  You worked on the introduction for the paper?

8   A.  My recollection is that at that time --

9   Q.  Is that a yes or no, Professor Bekaert?  Did you work on

10  the introduction for the paper?

11  A.  I did, but I don't think I made that deadline.

12  Q.  That's correct, Professor Bekaert.  We'll get there.

13  A.  Okay.

14  Q.  So if we look at page 1, the bottom email there from

15  October 14, 2013, you wrote, "Hi, Enrichetta.  I am working on

16  the intro."  Right?

17  A.  Yes.

18  Q.  You sent your draft, your draft introduction to Professor

19  Ravina on October 14, 2013, correct?

20  A.  That's what the email says.  Oh, wait.

21  Q.  No.

22  A.  What did you -- what was your question?

23  Q.  Did you send your draft introduction to Professor Ravina on

24  October 14, 2013?

25          Let me help you out.

1              MS. DONEHOWER:  If we go to the top email, please.

2    Q.  Do you see that this is an email from you to Professor

3    Ravina?

4    A.  Yes.

5    Q.  And do you see that there is an attachment entitled

6    Automatic Enrollment?

7    A.  Yes.

8    Q.  And you see right there it says, "So here is a very

9    preliminary 'bad' cut and paste intro to the paper," right?

10   A.  Yes.

11   Q.  You wrote it was not your area yet "so you got to cut me

12   some slack," correct?

13   A.  Correct.

14   Q.  This email was sent on October 14, 2013?

15   A.  Yes.

16   Q.  That was four days before the deadline for the submission?

17   A.  Yes.

18   Q.  And you, as you said, didn't make that deadline?

19   A.  I -- I actually don't remember, yes.  I -- I thought we

20   made that deadline for the WFA, not for this conference.

21   Q.  That's a yes or no.

22   A.  I don't remember which one.

23   Q.  So you and Professor Ravina agreed on a deadline, a new

24   deadline for the automatic enrollment paper after you missed

25   that one, right?

1      MR. HERNSTADT:  Objection, your Honor.  There's been

2  no testimony that there was any prior deadline.

3      THE COURT:  All right.  You can ask the question.

4      MS. DONEHOWER:  Sure.  I'll rephrase.

5      THE COURT:  Clarify, if necessary.

6  Q.  Did you and Professor Ravina agree on a deadline for the

7  automatic enrollment paper?

8  A.  The November, I think 17 deadline was the big one.  That's

9  WFA, Western Finance Association meetings, which is one of the

10  premier conferences in finance.

11  Q.  That's a yes, correct, Professor Bekaert?

12  A.  Yes.

13      MS. DONEHOWER:  Could we please see Plaintiff's

14  Exhibit 27, which is in evidence.

15  Q.  Please look at the email that starts at the bottom of the

16  first page.  You see the date that this email was sent?

17  A.  Yes.

18  Q.  That's November 15, 2013?

19  A.  Correct.

20  Q.  I think you just testified that the deadline was

21  November 17th?

22  A.  Yes.  17 or 18, something.

23  Q.  This was either two or three days before the deadline?

24  A.  Yes.

25  Q.  You wrote in the first line that you felt totally out of

1   your depth so it was not going well?

2   A.   Right.

3   Q.   Can I please direct your attention to page 1, at the second

4   paragraph from the bottom.

5        Actually, let's go to the middle email, please, from

6   Professor Ravina to you.

7        So Professor Ravina in response said, "Can you please

8   send me what you have written so far so I better understand

9   where this is going?"  Do you see that?

10  A.   Yes.

11  Q.   And you responded to her?  Do you see your response?

12  A.   Yes.

13  Q.   And you did not include what you had worked on so far?

14  A.   No.

15  Q.   You wrote back, "I've barely got anything, to be honest.

16  I've cut and paste a bit."  Did I read that correctly?

17  A.   Yes.

18  Q.   Let's move on, please, to the first half of 2014.

19       You and Professor Ravina had a disagreement about

20  hiring a research assistant, correct?

21  A.   Can you refresh my memory on when that was?

22  Q.   Sure.

23       MS. DONEHOWER:  Can we please pull up Plaintiff's

24  Exhibit 35, which is admitted into evidence.

25  Q.   This is a long one, so I'm going to direct your attention

1    to the top of page 7.  And this is an email that you wrote to

2    Professor Ravina, correct?

3    A.  Yes.

4    Q.  In the first line of this email you said, "This has to

5    stop.  You are insane."

6    A.  Yes.

7    Q.  Okay.  And then continuing on in that paragraph, about

8    halfway down, you said, "Are you out of your mind?"  Right?

9    A.  Yes.

10   Q.  At the very last couple lines of that paragraph, you said,

11   "What is wrong with you?  Seriously."

12   A.  Indeed.

13   Q.  You said -- let me see.  Page 7, paragraph 2, lines 1 and

14   2, it looks like it's the second sentence into that second

15   paragraph.  "Do you seriously suggest I need to give you a

16   week-by-week schedule of when I will work on the project?  Come

17   on.  How could I?"  Right?

18   A.  I see that, yes.

19   Q.  You also said that you and Professor Ravina could have

20   three papers by the end of the year, right?

21   A.  In this email, you mean?

22   Q.  Page 7, paragraph 2, line 3, right below, "We will have

23   three papers by year end (at the minimum)," correct?  Do you

24   see that?

25   A.  Oh, yes.  Now I see it.  Thank you.

I7c1rav6                          Bekaert - Direct

1    Q.   So this was sent on April 15, 2014?

2    A.   Yes.

3    Q.   And the year end there would have been December 31, 2014.

4    A.   It would have been, yes.

5    Q.   You knew that Professor Ravina already had two papers

6    published at this point?

7    A.   You mean on her regular CV, you mean she had published

8    other papers?

9    Q.   Correct.

10   A.   I think so, yes.   Two or three.

11   Q.   So with three more papers Professor Ravina would have had

12   five papers by the end of 2014?

13   A.   If these papers would have -- would have been published,

14   but --

15   Q.   If these papers with you had been published, she would have

16   had five, correct?

17   A.   If they would have been published.   I don't suggest they

18   would be published.

19   Q.   Okay.   But she would have had three papers at the year end,

20   minimum.   We've --

21   A.   Yes.

22   Q.   That's okay.

23           MS. DONEHOWER:   Let's go to page 5, the top email,

24   right, please.

25   Q.   You wrote to Professor Ravina on April 22, 2014, correct?

1   A.  We had a lot of email exchanges during that time, yes.

2   Q.  And the first line in that email exchange, you told her you

3   were livid?

4   A.  Yes.

5   Q.  You wrote, in the last line there of that paragraph, "It

6   seems you have a masochistic desire to not be productive and

7   shoot yourself in the foot, which is really what you are doing

8   right now."  Right?

9   A.  Yeah.

10  Q.  Can we please -- there are more emails in this exchange,

11  right, Professor Bekaert?

12  A.  I think it went on between March and May.

13          MS. DONEHOWER:  Okay.  Can we please look at page 2,

14  Mr. McLeod.

15          Thank you.

16  Q.  The middle email there from Professor Ravina to you, this

17  is part of that same chain, correct?

18  A.  Yes.

19  Q.  And in it, Professor Ravina writes to you, right?

20  A.  Yeah.

21  Q.  She wrote, "Hi, Geert.  We need to re-evaluate our working

22  relationship to make sure that everyone is treated

23  professionally, respectfully, and correctly and that everyone's

24  needs are met, so that we can work and communicate

25  productively."  Correct?

1    A.  Yes.

2    Q.  And you responded to her?

3    A.  I'm sure I did.

4    Q.  In that response, you wrote, "Yes, let's meet next week.  I

5    will bring a whip."

6    A.  That's what I wrote, yes.

7    Q.  This is the same email chain when you were talking about

8    masochistic desires, Professor Bekaert?

9    A.  It's possible.  I'm sure it is.

10            MS. DONEHOWER:  Could we please see Plaintiff's 36,

11   which has been admitted into evidence.

12            On the last page, please.

13   Q.  Do you see the email in the middle of the page?

14            I apologize.

15            Yes.  There's an email in the middle of the page from

16   Professor Ravina to you, correct?

17   A.  Correct.

18   Q.  And in it she asks you to meet?

19   A.  Yes.

20   Q.  And she says --

21            MS. DONEHOWER:  I'm sorry.  Mr. McLeod, is it possible

22   to see the date on this?

23   Q.  This appears to have been sent on either May 3rd or

24   May 4th, 2014, correct?

25   A.  Correct.

1    Q.  And in her email Professor Ravina asked you to be prepared

2    to discuss your working relationship, aggregate savings in the

3    AE paper, and seminar comments on the international one?

4    A.  Correct.

5    Q.  The AE paper was the automatic enrollment paper, correct?

6    A.  Mm-hmm.

7    Q.  And you responded to her that you would be abroad for a

8    whole month?

9    A.  Yes, I was abroad for a whole month.

10   Q.  And above that, Professor Ravina wrote to you, right?

11   A.  Yes.

12   Q.  And she said, "Well, since it is months that we are talking

13   about, send me the aggregate savings analysis and we will go

14   from there," correct?

15   A.  Correct.

16   Q.  You responded to her email?

17   A.  Sure.  I'm sure I did.

18   Q.  And you did not send her the analysis in your response?

19   A.  I think I hadn't had the analysis ready at that point.

20   Q.  You didn't send her the analysis because you didn't even

21   have it ready, correct?

22   A.  I -- yeah, I'm pretty sure that's right.

23   Q.  Instead, you talked about the RA?

24   A.  Yes, because the project couldn't move on --

25   Q.  It's a yes or no question, Professor Bekaert.  You talked

1    about the RA, correct?

2    A.  Yes, as you can see, absolutely.

3    Q.  And you said that Professor Ravina was not making any

4    sense.

5    A.  Of course.

6    Q.  Professor Ravina told you that she was trying to get a

7    schedule, right?

8    A.  Yeah, I think you showed that before.

9            MS. DONEHOWER:  Mr. McLeod, could we please see

10   page 3, the middle email.

11   Q.  Professor Ravina said that she needed a schedule to

12   organize her work correctly, right?

13   A.  Yup.

14   Q.  I'm sorry.  Effectively.  She wrote, "I don't understand

15   why you get back insulting me instead of just giving me the

16   schedule."  Correct?

17   A.  That's what she wrote.

18   Q.  And you did not give her a schedule.

19   A.  I don't believe I did.

20   Q.  Because you can't ask someone like you for a concrete

21   schedule?

22   A.  It is true I don't work with schedules, no.

23           MS. DONEHOWER:  Could we please see page 3, the top

24   email.

25   Q.  In that first paragraph, the second sentence, you wrote to

I7c1rav6                    Bekaert - Direct

1  her, "You cannot ask someone like me for a concrete schedule.

2  It is constantly changing.  Why do you need my schedule to work

3  on this?  This is ridiculous."  Right?

4  A.  Yes.

5  Q.  You told Professor Ravina that you were really, really

6  pissed off.  I'm down in the -- one, two, three -- third

7  paragraph.  You told her you were really, really pissed off,

8  correct?

9  A.  Of course.

10 Q.  And when you signed off, you told her to wise up?

11 A.  Yup.

12 Q.  On May 6 you wrote to Professor Ravina again?  Do you see

13 that email from you to her?

14 A.  Yes, it appears so.

15 Q.  And I'm looking down in the third paragraph, second

16 sentence.  "The only reason I can think of is that you wanted

17 confrontation and wanted to aggravate me," and you said, "Well,

18 I am aggravated," correct?

19 A.  Yeah.

20 Q.  You said, "I just do not understand you.  We could have

21 five or six papers out of this project."  Right?

22 A.  Yup.

23 Q.  You said, "We could have three for sure by the end of this

24 year," right?

25 A.  Yup.

1    Q.  Is that right?

2    A.  Yes.

3    Q.  And you acknowledged how much work she had put into the

4    projects already, correct?

5    A.  Sure.

6    Q.  You asked, "Why are you being so pig-headed, given how much

7    work you already put in?"

8    A.  Yeah.

9    Q.  Professor Ravina told you that she needed to finish

10   projects in a certain time frame, right?

11   A.  Yes.

12   Q.  She told you that time frame was important?

13   A.  I'm sure she did, and I also understood that.

14   Q.  And she also told you that all the deadlines that you had

15   been working on with her had passed?

16   A.  What do you mean with deadlines?

17        MS. DONEHOWER:  Well, let's go up to page 1, please,

18   paragraph 2.

19   Q.  Professor Ravina writes to you, "In general, I need to

20   finish the AE project within a certain time frame, which

21   doesn't seem very strange to me.  As I've told you before, the

22   fact that these projects eventually get done is not the

23   relevant issue here.  We have been talking for months about all

24   the conferences in the summer and all the deadlines have

25   passed."  Correct?

1    A.   That's what she writes.

2    Q.   Again, in the next paragraph, she told you that you needed

3    to re-evaluate your working relationship to make sure that

4    everyone is treated professionally, respectfully, and

5    correctly?

6    A.   Yes.

7    Q.   This was at least the second or third time that she asked

8    you to be professional?

9    A.   The second time, I believe.

10          MR. HERNSTADT:   Objection.   There's no question here.

11   Misstating the words of the email.

12          THE COURT:   Overruled.

13          You all will have the emails if you want it.

14          You may proceed.

15          MS. DONEHOWER:   Thank you, your Honor.

16   BY MS. DONEHOWER:

17   Q.   And you sent this email on May 6th -- I'm sorry.   Professor

18   Ravina sent this email on May 6, 2014, correct?

19   A.   Correct.

20   Q.   You responded by telling her to stop writing?

21   A.   Are you referring to an email?

22   Q.   Well, let me see.   Page 1, paragraph 2.   Yes, I am.

23          So if you look down to second paragraph here, it says,

24   "Stop writing and do something constructive."   Do you see that?

25   A.   Yes.

1    Q.  And in the parentheses above that, you wrote, "I cannot

2    give you a schedule and asking for one is silly," right?

3    A.  Yes, I did write that.

4    Q.  And then in the first paragraph, moving up, the second

5    sentence there, you said, "So you fix it or I am going to have

6    to take very drastic action."  Right?

7    A.  Yes.

8    Q.  You did not specify what that very drastic action was in

9    this email, did you?

10   A.  I did not.

11   Q.  You knew that Professor Ravina would be applying for tenure

12   the following academic year?

13   A.  I don't think I was completely abreast of her exact

14   schedule, but --

15   Q.  You were her mentor, right?

16   A.  Right, mm-hmm.

17   Q.  You asked her how much of -- "How much of 'I am away for

18   three weeks' did you not understand," right?

19   A.  I did.  I think this was because we wanted to have a

20   meeting.

21   Q.  That was a yes or no question, Professor Bekaert.

22   A.  I wrote that, yes.

23   Q.  You had meetings -- so eventually you learned that

24   Professor Ravina had made a report about your behavior to the

25   university, correct?

I7c1rav6                          Bekaert - Direct

1    A.  Eventually, yes.

2    Q.  You see this email dated May 6, 2014?

3    A.  Correct.

4    Q.  And you learned about that report she made around July

5    2014?

6    A.  I think it was mid July, maybe.

7    Q.  So that's a yes?

8    A.  Yes.

9    Q.  Okay.  You had meetings with Columbia administrators about

10   her report?

11   A.  Yes.

12   Q.  The first meeting was in July 2014?

13   A.  I believe that's correct.

14   Q.  That was with Glenn Hubbard?

15   A.  Yes.

16   Q.  And Vice Dean Horan, Vice Dean Janet Horan was also there?

17   A.  I believe that's correct.

18   Q.  You don't recall either Dean Hubbard or Vice Dean Horan

19   telling you during that meeting that sexual harassment was

20   prohibited at Columbia University?

21   A.  No.  The meeting was not about sexual harassment.

22   Q.  Really.  You don't recall them ever telling you that sexual

23   harassment -- you don't recall them ever, at any time, telling

24   you that sexual harassment is prohibited.

25            MR. HERNSTADT:  Objection.  At the meeting or ever?

1            MS. DONEHOWER:  Ever.  Ever.

2            MR. HERNSTADT:  Okay.

3            MS. PLEVAN:  Those two people?

4            MS. DONEHOWER:  Those two people.

5    A.   Okay.  I don't think so.

6    Q.   You don't think they ever told you that.

7    A.   I -- I don't recall right now.

8    Q.   You don't recall anyone at Columbia ever expressing to you

9    a concern that gender was a factor in the way that you treated

10   Professor Ravina?

11           THE COURT:  When you say "anyone at Columbia," do you

12   mean administrators, do you mean professors?

13           MS. DONEHOWER:  Sure.  I apologize, your Honor.  I'll

14   rephrase.

15   Q.   You don't recall any Columbia administrators -- start

16   there -- ever expressing to you a concern that gender was a

17   factor in your treatment of Professor Ravina.

18   A.   Sorry.  I'm a little bit stuck with the -- the -- what you

19   call gender.  I think Glenn had discussions about that we had

20   to fix this, but my recollection of the first meetings was --

21   had nothing to do --

22   Q.   I'm not asking about the first meeting, Professor Bekaert.

23   I'm asking you, do you have any recollection of any Columbia

24   administrators at any time expressing a concern that gender was

25   a factor in the way you treated Professor Ravina?

I7c1rav6                          Bekaert - Direct

1   A.  I think they probably had.

2          MS. DONEHOWER:  Can we please see the transcript from

3   the deposition at 352.

4   Q.  Professor Bekaert, in your deposition you were asked:  "At

5   any point has anyone communicated concern to you that gender

6   was a factor in your treatment of Ms. Ravina?"  Right?

7   A.  Mm-hmm.

8   Q.  And your answer was:  "No, I don't think so."

9   A.  Yeah, I don't recollect anything concretely.

10  Q.  You don't recall -- thank you.

11         You don't recall anyone at Columbia ever expressing to

12  you a concern about how you behaved disrespectfully towards

13  women?

14  A.  Say this again, please?

15  Q.  You don't recall anyone -- and we'll say -- we'll limit it

16  to Columbia administrators.

17         You don't recall any Columbia administrators ever

18  expressing to you a concern that you behaved disrespectfully

19  towards women?

20  A.  I have no concrete recollection, but there could have been

21  certain conversations that I had that probably would speak to

22  this, but I don't have a concrete recollection.

23         MS. DONEHOWER:  Can we please see Professor Bekaert's

24  deposition transcript at 352/12 to 22.

25  Q.  You see a question that was posed to you, Professor

1    Bekaert, and it was --

2    A.  Yes.

3    Q.  "At any point had anyone expressed concern to you about

4    your behaving disrespectfully towards women?"  Right?

5    A.  Right.

6    Q.  And you answered:  "Disrespectful of women, any of my

7    colleagues?"  And the question limited it to Columbia.  Did

8    you -- were you ever disrespectful to women at Columbia, and

9    you answered:  "At Columbia, I don't remember any such

10   instance."  Correct?

11   A.  Correct.

12   Q.  When Dean Hubbard told you about Professor Ravina's report

13   at this first meeting, he said that you needed to have a

14   research divorce; that's how he characterized it?

15   A.  Yes.

16   Q.  And the issue that he told you you needed to address was

17   about which papers were going to be worked on?

18   A.  I think it -- I think there was already the idea of

19   somebody --

20   Q.  Yes or no question, Professor Bekaert.  Was one of the

21   issues which papers were going to be worked on?

22   A.  I believe so.

23   Q.  And another issue was who was going to do the work on those

24   papers, you or Professor Ravina.

25   A.  Well, it was about a research -- research divorce, right,

I7c1rav6                          Bekaert - Direct

1    so --

2    Q.  Well, Professor Bekaert, excuse me.  This is the first time

3    in this case that I ever heard the term "research divorce," so

4    I'm trying to draw it out a little bit what a research divorce

5    could possibly be, and my understanding is that you --

6               MS. PLEVAN:  Objection, your Honor, to the commentary.

7               THE COURT:  Okay.  Let's not make speeches but just

8    ask questions, please.

9               MS. DONEHOWER:  I apologize, your Honor.

10   Q.  The research divorce was about who was going to work on the

11   papers, right?

12   A.  It was also about how to split up, you know, the --

13   Q.  I didn't ask what it was also about.  Was part of the

14   research divorce who was going to work on the papers?

15   A.  Who was going to -- oh, I guess so.

16   Q.  And part of the research divorce was who would get to work

17   with the rest of the data set from Financial Engines?

18   A.  Right.  I thought that was the main -- the bigger issue.

19   Q.  At that July 2014 meeting or shortly thereafter, Columbia's

20   dean's office told you not to talk to Professor Ravina about

21   what she had reported to the university, correct?

22   A.  Say this again?

23   Q.  Sorry.  You testified that you met with Dean Hubbard in

24   July 2014, right?

25   A.  Yes.

I7cnrav7                    Bekaert - Direct

1   Q.  And at that meeting Columbia's dean's office, Glenn Hubbard

2   being the dean of Columbia Business School, told you not to

3   talk to Professor Ravina about the report she had made, right?

4   A.  I think I was not supposed to talk to Enrichetta at all.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  They told you not to talk to her at all, but you did not

2    listen, right?

3    A.  I don't think I talked to her.  I wrote her an e-mail.

4    Q.  You thought that it meant you couldn't talk to her in

5    person, but you could e-mail her?

6    A.  No.  I think the -- I think -- I don't remember the details

7    of the --

8    Q.  Is that a yes or a no, Professor Bekaert?

9              Was it your understanding coming out of the meeting

10   that you were not allowed to speak with Professor Ravina or you

11   were asked not to speak with Professor Ravina in person, but it

12   was OK for you to e-mail her?

13   A.  I could only e-mail with somebody CC'ed on it.

14   Q.  But you did not listen?

15   A.  I think I violated that rule, yes.

16   Q.  Almost right away?

17   A.  Yes.

18             MS. DONEHOWER:  Can we please see Plaintiff's Exhibit

19   47, which is was admitted into evidence.  This e-mail is dated

20   July 14, 2014.

21             I don't believe the jurors have the exhibit.

22             THE COURT:  All right.  It is not up.

23             MS. DONEHOWER:  Thank you, Ms. Cavale.

24   Q.  Do you see this e-mail, professor Bekaert?

25   A.  Yes, I do.

1    Q.   This is dated July 14, 2014?

2    A.   Yes.

3    Q.   From you to Professor Ravina?

4    A.   Yes.

5    Q.   And you wrote to her, "I guess we are both here.  The

6    dean's office has told me not to talk to you, hence the

7    silence.  If you want to explain yourself, you can.  I am here.

8    I am intrigued to know who set you up to this."

9         Correct?

10   A.   Absolutely.

11   Q.   You felt that Professor Ravina owed you an explanation?

12   A.   At this -- this was the first time I was confronted with

13   this.

14   Q.   That is a yes-or-no question, Professor Bekaert.  You felt

15   that Professor Ravina owed you an explanation, correct?

16   A.   I would say yes.

17   Q.   No one at Columbia ever indicated to you that you would

18   face any consequences if you failed to CC someone on the

19   e-mails with Professor Ravina, correct?

20   A.   Do you mean whether they had like a punishment in place for

21   when the rule was violated?  I don't think that was the case,

22   no.

23   Q.   In fact, there were no punishments or consequences for

24   having e-mailed her without CC'ing someone almost immediately

25   after you were asked not to do so?

I7cnrav7                        Bekaert – Direct

1    A.  I don't think there were.  I think I was reprimanded.

2             MS. DONEHOWER:  Thank you, Professor.

3             Your Honor, I know you wanted to have some argument.

4    It may be a good time to stop.

5             THE COURT:  Why don't we stop for the day, ladies and

6    gentlemen.  Have a nice evening.  Remember don't discuss or

7    research the case.  Keep an open mind, and we will start again

8    tomorrow at 9:30.

9             Thank you.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  I am going to take a break and come back

3       at 5:30.  Thanks.

4            MS. DONEHOWER:  Thank you.

5            MR. SANFORD:  Thank you.

6            (Recess)

7            THE COURT:  You all can be seated.

8            So, let's discuss the petitions, but, as I said this

9       morning, I think what would be helpful for me is to have a

10      little bit more context about exactly what happened in the vote

11      and what you anticipate the jury will hear about the tenure

12      vote.

13           By that I mean did the professors who submitted this

14      petition -- let me get out the particular one.  Like, for

15      example, with respect to Plaintiff's Exhibit 160, did those

16      professors who said that they were not in a position to provide

17      an evaluation for tenure, did they provide an evaluation?  Did

18      they not provide an evaluation, but they would have otherwise?

19           I just want to make sure I understand as much about

20      the process as I can because, I think that that goes to

21      relevance.

22           And then, with respect to the request for a change in

23      policy, how did that play out?

24           So just factually if you can help me out there.

25           MS. HARWIN:  I can provide some context, if it would

I7cnrav7                      Bekaert - Direct

1    be helpful, your Honor.

2             As I believe has been now established through

3    testimony, Professor Ravina was told in December of 2015,

4    mid-December, she would have to submit her tenure application

5    mid-January.

6             She filed a request for an extension of her tenure

7    clock.  It was denied.

8             She filed a subsequent request with additional

9    information.

10            At that point a number of professors, about half of

11   her division, submitted a petition to the provost, the person

12   considering her request for an extension, as well as Dean

13   Hubbard, the dean of Columbia Business School, in support of

14   her extension request.  That was the second petition.  I think

15   it's No. 130.

16            THE COURT:  Right.

17            MS. HARWIN:  Subsequently, her request for an

18   extension was denied, and Columbia was proceeding with a vote

19   on her tenure.

20            At that point there were significant faculty

21   objections.  There were threats of a boycott of the vote.

22            As the vote neared and Columbia indicated an intent to

23   proceed at this time, about half the faculty put together this

24   petition stating that they were not in a position to evaluate

25   Professor Ravina's tenure candidacy.

1            The dean's office of Columbia Business School

2     organized a meeting of the faculty in which they spoke to

3     faculty members, and we contend persuaded them to vote and --

4            THE COURT:  I'm sorry.  When you say they --

5            MS. HARWIN:  Dean Hubbard, Vice Dean Phillips, and

6     Division Chair Zeldes held a meeting with the division that

7     Professor Ravina was part of, gave them guidelines for the

8     tenure evaluation of Professor Ravina in light of her

9     allegations.  All the professors were welcome at this meeting.

10           MR. SANFORD:  All the professors in her division, all

11    the tenured faculty in her division, which are the people who

12    would be expected to vote on her tenure application, attended

13    this meeting, and some of them ultimately voted on Professor

14    Ravina's tenure, some of them declined to vote on Professor

15    Ravina's tenure, some of them formally abstained from voting on

16    Professor Ravina's tenure case.

17           So, following this meeting, they went in different

18    directions in terms of how everyone voted or did not vote.

19           THE COURT:  So how many tenured professors were there

20    in her division?

21           MS. HARWIN:  It was approximately 36 who were tenured

22    professors in her division not on leave at the time of her

23    tenure vote.

24           THE COURT:  And how many voted on tenure?

25           MS. HARWIN:  I believe it was 19, which included an

1    abstention.  So I believe it was 18 who cast affirmative votes

2    to deny tenure.

3              THE COURT:  There was one abstention or two?

4              MS. HARWIN:  There was one person who I believe

5    attended the meetings and abstained and one person who declined

6    to attend the meeting and abstained.

7              THE COURT:  Is it your position that the others didn't

8    show up in protest?

9              MS. HARWIN:  I mean they provided a statement

10   indicating they weren't in a position to evaluate the tenure.

11             MS. PLEVAN:  Who is the "they"?

12             MS. HARWIN:  The people who were signatories to this

13   petition, and then did not attend the subsequent meeting.

14             MS. PLEVAN:  There is not any evidence that's going to

15   be proffered to that effect.  People didn't attend for

16   different reasons.  I don't think there's any evidence in the

17   record about the reasons other than e-mails that were sent by

18   some people stating what their conflicts were.

19             There may be people who said other things.  I don't

20   recall specifically.

21             THE COURT:  Right.

22             If it doesn't come out what the vote was, that it was

23   unanimous, why would it matter how many professors opposed

24   going to a tenure vote?  Why is that relevant?

25             Why is that not only not unduly prejudicial, even if

1   you could argue that it's relevant to the effect on Columbia

2   that it knew that this was a disputed issue?

3          MS. PLEVAN:  One other factor, your Honor, too is the

4   lawsuit was filed just before those last, certainly the last

5   e-mail was sent, and it was public because it was in the paper.

6   So I just wanted to add that in terms of context --

7          THE COURT:  Right.

8          MS. PLEVAN:  -- and why people may have been raising

9   questions.

10         MS. HARWIN:  So, there are numerous ways that this is

11  relevant.  One of them, and I'll stick with what I think is

12  extremely close to the actual tenure vote, and the issues

13  relating to tenure in this case, which have to do with the

14  cat's paw theory of liability.

15         One of the things that, the basis for the petition in

16  which these faculty members expressed that they couldn't

17  evaluate Professor Ravina's tenure case was because of the way

18  in which her work had been impeded and how that affects the

19  ability to evaluate a tenure candidate.

20         It goes to the heart of the evaluation process.  If

21  Columbia is going to proffer testimony -- I'm sorry, your

22  Honor.

23         THE COURT:  Go ahead.  You can finish.

24         MS. HARWIN:  If Columbia is going to proffer testimony

25  about its evaluation process and how Professor Ravina was

```
1    evaluated, even apart from whether it was unanimous or not

2    unanimous, but if they are discussing the way in which she was

3    evaluated and arguing that that was a meaningful or fair

4    evaluation under the circumstances, we need to be able to

5    present an opposing faculty view that that was not something

6    that could be done in light of the circumstances that she

7    faced.

8              THE COURT:  Were the professors told not to consider

9    any circumstances other than her qualifications?

10             MS. PLEVAN:  No.

11             MS. HARWIN:  Yes.  Your Honor, yes, at the meeting.

12             MS. PLEVAN:  That was not in the testimony, your

13   Honor.  That is the argument, but that is not what the dean

14   says he said, that they should focus on her tenure case, not

15   her lawsuit.

16             MS. HARWIN:  That's --

17             THE COURT:  But, in any event, there is going to be

18   testimony about that?

19             MS. PLEVAN:  About?

20             THE COURT:  About what he said to them?

21             MS. PLEVAN:  Yeah.  It wasn't at the vote meeting.  It

22   was two days before.  Yes.  Absolutely.

23             THE COURT:  That's coming out, and it's for the jury

24   to decide.

25             MS. HARWIN:  Yes.  Yes, your Honor.
```

1              THE COURT:  Look, I have a number of concerns.

2              One is obviously the hearsay concern, that you want

3    these petitions to come in with all these different names and

4    those people are not available for cross-examination, aside

5    from Professor Bolton, I don't know if there's anyone else, to

6    say where did you get this information and why do you believe

7    it to be true?

8              So that is a real concern.  Particularly in light of

9    that, there's a real prejudice to Columbia to suggest that all

10   of these people agreed with Professor Ravina, suggesting maybe

11   they had personal knowledge of what happened and there's a

12   reason that they agreed with her.

13             So, that's my primary concern, the combination of the

14   hearsay, the lack of personal knowledge, and the resulting

15   prejudice.

16             On the other hand, if the jury is being told that

17   there is a unanimous tenure vote and a host of different

18   professors indicated that they were not in a position to weigh

19   in, I think that that's relevant too.

20             MS. PLEVAN:  I am not sure what you are saying is

21   relevant, your Honor.  And we can certainly consider her not

22   talking about the unanimity.  It isn't a unanimous and was

23   never going to be stated as unanimous of the whole division.

24   It would only be the people who came to the meeting that voted.

25   So certainly we wouldn't be stating that it was unanimous of

1    the division.  It was a quorum was present and, you know, the

2    people who were present are the ones who voted.

3              THE COURT:  What if we kept the numbers out, but

4    Professor Bolton testifies about meetings he was at and says he

5    and other faculty members tried to persuade the business school

6    not to move forward with the vote to give her more time on

7    tenure.

8              Does that solve the problem from your perspective if I

9    don't admit the actual petition with all of the names so that

10   you see how many people there are and what their names are?

11             MS. PLEVAN:  Yes.  And we would be willing to not

12   refer to the unanimous vote at the tenure review.

13             THE COURT:  Why doesn't that do what you want it to

14   do?

15             If you have Professor Bolton testifying about

16   interactions he had with Columbia administrators, efforts he

17   made -- and he can say with others, but not get into how many

18   and who they were -- to try and put off the tenure vote so that

19   you get out the notice to Columbia, and then you get the

20   administrator's responses to that without getting out the names

21   and the numbers of the people who can't be cross-examined.

22             MS. HARWIN:  Well, with respect to the unanimity, I

23   believe it was a key point made by Ms. Plevan on opening.

24             THE COURT:  Mr. Sanford also made a point about all of

25   the professors moving forward, I don't remember the exact

1    language in his opening.

2              MS. HARWIN:  So Mr. Sanford did not use the term

3    petitions.  He talked about protest in general terms, but did

4    not use the word petition.

5              MS. PLEVAN:  Boycott I think it was.

6              THE COURT:  But there was a suggestion that there was

7    a groundswell of support for her.

8              So I think there were statements made on both openings

9    that the question is what evidence should actually come in on

10   both sides.

11             But why doesn't that get out what you want to get out,

12   which is Columbia is on notice that this was an issue, that

13   professors were concerned about it, that some professors felt

14   that they were not in a position to vote on tenure because they

15   didn't -- number one that they thought her tenure clock should

16   be extended, and then, number two, that once it wasn't extended

17   that some professors felt that they weren't in a position to

18   provide an evaluation of her tenure case at that time?

19             Why doesn't that allow to you make the arguments you

20   want to make and get in the relevant evidence without the

21   hearsay?

22             MS. HARWIN:  Your Honor, is the idea that Professor

23   Bolton would be able to present the petitions including his

24   signature, but not the signatures identifying others?

25             MS. PLEVAN:  I would add that our objection would

1    include Professor Bolton testifying about what other people

2    thought or told him.

3              THE COURT:  Yes.

4              MS. PLEVAN:  He can talk about what he did.

5              THE COURT:  Yes.

6              So I haven't decided this yet.  I'll tell you where my

7    thinking is, understanding it's not a decision.

8              What I was thinking would be a fair compromise would

9    be to let in on 160 the date, who it's to, dear John and Glenn

10   and then just the -- hold on.  Let me ask.  Is Charles

11   Calomiris testifying?

12             MS. PLEVAN:  No.

13             THE COURT:  OK.  Then scratch that.

14             Then on the next page, because I wanted to get at the

15   date that it was relayed to the administration because the date

16   of the petition is March 25, 2016, but it looks like it was

17   relayed on April 13.

18             So, again, I didn't want the jury to have any

19   misleading information.  So you all will help me on the dates

20   and when information was provided, but I would allow in,

21   because Professor Bolton was a signatory to this, the date,

22   March 25, 2016, Dear Provost Coatsworth and Dean Hubbard,

23   redact the first line, and then say -- and redact the word

24   "therefore" and include the words, "The undersigned tenured

25   faculty members in the finance and economic division of

Columbia Business School are not in a position to provide an

evaluation of Enrichetta Ravina's tenure case at this time."

        Professor Bolton can testify that this is something he

signed along with others, without getting into who and how

many, and then he can testify about when this was given to

Columbia.

        That's what I was inclined to do on 160.

        I thought 130 was closer, but I was inclined to do

something similar, which is again, if the person who wrote the

letter isn't testifying, I wouldn't want that to come in, but

allow in on 130 the date, January 22, 2016, who it's to, and

then just include the first line:  "The undersigned tenure

faculty members in the finance and economics division of

Columbia Business School wish to express their support for

Enrichetta Ravina's request to have her tenure clock extended,"

redact the rest, include the "sincerely" and then redact again

the signatures and let Professor Bolton say, Look, this is a

petition I submitted with others, without getting into who it

was.

        Those two things, and I was not inclined to allow in

100 at all.

        So that you can see that there was a document that

went to the administration.  Professor Bolton can testify about

his interactions.  He can say he wasn't the only one without

any numbers.

1          Is that a fair compromise?

2          MS. PLEVAN:  I don't know, your Honor, because it does

3    let these documents, which are hearsay -- and I mean, we don't

4    know whether these are really legitimate signatures from these

5    people.

6          THE COURT:  That's why I'm not letting the signatures

7    in.  I am just allowing the language in that Professor Bolton

8    is going to say that he signed that letter, that he along with

9    others signed that letter, and only allowing that language that

10   I mentioned and not see any of the names or any of the

11   signatures and none of the cover letters either.

12         So he's going to testify, yes, I signed these two

13   documents, and what happened as a result from his perspective.

14         MS. HARWIN:  Your Honor, just to clarify, Professor

15   Bolton's signature would not need to be redacted.

16         THE COURT:  Not unless it's clear sort of where it is

17   on the page.

18         Frankly, I would be inclined to take his signature off

19   and have him just testify I signed this.  Columbia is not going

20   to dispute that he signed it, so I don't think anyone is going

21   to think he didn't.

22         What I don't want to do is suggest that he looks like

23   he's in the second line to the left so it looks like there are

24   this many names, because that's what we are trying to avoid.

25         MS. HARWIN:  Well, your Honor, if Professor Bolton is

1    allowed to testify, I would think that even if the names are

2    redacted the content would be retained because he would be

3    testifying as to why he signed on to this language and why he

4    supported it and the basis for it.

5         MS. PLEVAN:  But the document contents are hearsay.  I

6    mean, so --

7         MS. HARWIN:  But he would be in court explaining the

8    basis.

9         MS. PLEVAN:  Well, he can testify.  I think, in fact,

10   your Honor, as part of this, Professor Bolton was not deposed.

11   We should have an offer of proof about what he's going to say,

12   because there are hearsay issues there, too.  So I think it

13   would be helpful.

14        MR. HERNSTADT:  Your Honor, has already ruled that

15   Professor Bolton would not be permitted to testify about what

16   he learned from Professor Ravina and what --

17        THE COURT:  That's why I was keeping the rest of it

18   out.  Because he's basically reciting here what she told him.

19        MS. HARWIN:  That is not fully accurate, your Honor.

20        THE COURT:  Is that not accurate?

21        What is not accurate about that?

22        Did he have personal knowledge of what happened

23   between them?

24        MS. HARWIN:  Professor Bolton met with numerous

25   administrators.  He also met with --

1          THE COURT:  That I'm getting out.  Again Columbia's

2    reaction to this is relevant.  That is what I am allowing in.

3          The fact that the administration was on notice that

4    certain professors weren't in a position to vote on tenure,

5    again, I think is relevant, and how Columbia reacted to that is

6    relevant.

7          What I don't know why it's relevant is what his

8    opinion was of the situation and who's right or wrong based on

9    what he was told by others or based on his review.

10          I mean, Professor Ravina testified very, very clearly

11    in a way that the jury could clearly understand.  I don't think

12    we need other people coming in and saying if they believed her

13    or others, just on the flipside, coming in to testify that they

14    believed Professor Bekaert.  What matters is what was told to

15    Columbia and how Columbia reacted.

16          That's what I'm trying to allow you to get in without

17    allowing in all of the hearsay and the recitations of what was

18    told to him.

19          MS. HARWIN:  Your Honor, for much of the time in

20    question, Professor Ravina and Professor Bekaert's

21    communications were all by e-mail.

22          Professor Bolton --

23          THE COURT:  The jury has seen them, right?

24          MS. HARWIN:  Professor Bolton reading those e-mails

25    has just as much personal knowledge of them as Professor Ravina

1    or Division Chair Zeldes.

2              THE COURT:  What Bolton thinks reading those e-mails

3    is not relevant here.  That is exactly my point, which is

4    exactly why I did not let your experts testify.

5              I don't want other people -- this is the jury's job,

6    to look at the evidence and figure out who do I believe and

7    what do I think happened and do I think this violated the law.

8              But I don't need Professor Bolton to come in and tell

9    us his opinion about what happened.  What I need him to say is,

10   look, I was concerned about this, and I brought it to

11   Columbia's attention, and this is how it was brought to

12   Columbia's attention and this is how Columbia responded.

13             MS. HARWIN:  Your Honor, that point is I think exactly

14   right.  I was concerned about this, and I brought this to

15   Columbia's attention and this is how Columbia responded.

16             THE COURT:  Right.

17             MS. HARWIN:  The issue is if he can't testify about

18   what the "this" is.  I was concerned about this.  If there's no

19   context from what the concern was, the rest of the testimony

20   is --

21             THE COURT:  But does Columbia not have the same

22   information that he had at that time?  I mean, is there really

23   a question about what the "it" was what he was concerned about,

24   I mean about the course of conduct between the two of them?

25             I mean, is there really going to be a question for the

1    jury on what he was going to Columbia -- if he's going to

2    Columbia and saying, I am not in a position to provide an

3    evaluation of her tenure case at this time, is it going to be

4    unclear to the jury why?

5            MS. HARWIN:  Well, Columbia has taken the position

6    that faculty could undertake an evaluation of Professor

7    Ravina's tenure process.  They are going to argue that there

8    was an evaluation that was meaningful in some way or fair in

9    some way.

10           THE COURT:  That's why I'm inclined to let in the fact

11   that he submitted this with others, this petition indicating

12   that he was not in a position to vote on her tenure, right?

13           I mean, I am trying to allow you to make that argument

14   without allowing in the hearsay and the prejudice that comes

15   from all these other people signing the document.

16           I will think more about the argument that if I am

17   taking out everyone else's name whether he should be permitted

18   to show the whole petition.  I will think more about that.  It

19   is technically hearsay, but he is going to be here to testify

20   about it.

21           MR. HERNSTADT:  Your Honor, to the extent --

22           THE COURT:  Can you bring the mic a little closer

23   please, Mr. Hernstadt.  Thank you.

24           MR. HERNSTADT:  Your Honor, to the extent that the

25   petition references anything about she didn't have -- wasn't

1   able to get her work done, or I think one of them does --

2               THE COURT:  Yes.  Look, I was inclined to keep out all

3   of the -- and now we are talking about 130 -- everything after

4   the first line --

5               MR. HERNSTADT:  Yes.

6               THE COURT:  -- which includes him saying "several of

7   Enrichetta's potentially most important research papers, which

8   are the outcome of many years of work assembling a unique

9   database and analyzing it have been delayed either from being

10  revised for publication or being sent out for initial review to

11  refereed journals due to a continuing conflict between

12  Enrichetta and a coauthor.  That coauthor is a tenured faculty

13  member at Columbia Business School, and we believe" -- because

14  there you have the we -- "has not met his obligation as a

15  coauthor and a senior colleague to do all that he can to speed

16  up the process."

17              So let's say I were to take this out.  Do you have any

18  problem with him testifying to that, though?

19              MR. HERNSTADT:  Yes.  That is all hearsay.  The only

20  basis for testimony like that is he heard it from Enrichetta.

21  He might have seen the e-mails and he might have interpreted

22  them himself.  But, as your Honor said, that's the jury's job.

23  He never spoke to Professor Bekaert.  He has no idea what

24  Professor Bekaert's position is on that, what work he did, why

25  there was no delay.

1          Indeed, he doesn't know any of the stuff that the jury

2     will hear so that they can make a determination about whether

3     there was a delay or not.  It's not his job, and he can't opine

4     on that.

5          He certainly can't put in a petition saying that

6     everyone feels the same way because Enrichetta told all of her

7     colleagues that Professor Bekaert was delaying.  None of them

8     spoke to Professor Bekaert about it.

9          It's complete hearsay.

10         MS. HARWIN:  What Mr. Hernstadt is describing is

11    cross-examination, and there will be an opportunity for

12    cross-examination of Professor Bolton.

13         MR. HERNSTADT:  Not of all of the people who signed

14    this.  None of them here.  Professor Bolton can't testify about

15    something he has no personal knowledge of.  In fact, your Honor

16    has already ruled on that.

17         THE COURT:  I will think about it one more night.  I

18    will think about what you said today.  If you want to say

19    anything else on it tonight, you can.  I'll tell you that's how

20    I was leaning, that 100 wouldn't come in.  100 in any event

21    is --

22         MS. HARWIN:  We'd like an opportunity to be heard on

23    100, but if I could just on this one more time?

24         THE COURT:  Sure.

25         MS. HARWIN:  Your Honor, I would like to ask, in light

1   of where you are leaning, whether Columbia will be permitted to

2   present any evidence regarding the opinions expressed by people

3   at Professor Ravina's tenure vote?

4           THE COURT:  That is a fair question.

5           If I am not going to allow in what Professor Bolton's

6   thinking was on tenure -- did he vote on tenure?

7           MS. HARWIN:  He did not.

8           THE COURT:  He did not.

9           What his thinking was as to why he chose not to vote,

10  is it fair to get out the thought process of those people who

11  did vote about tenure?

12          MS. PLEVAN:  Well, the only evidence we were going to

13  proffer was the presentation, what the reading committee

14  presented at the tenure review meeting.

15          THE COURT:  Basically what they looked at?

16          MS. PLEVAN:  Right, what they looked at and what was

17  said.  You know, the oral and written presentation.  We don't

18  have any witnesses who were voting to testify about -- I mean,

19  we weren't planning to call witnesses to testify about why they

20  voted the way they voted.

21          MS. HARWIN:  In Ms. Plevan's opening, there was

22  statements I believe that the consensus was that Professor

23  Ravina's record was not in the ballpark.

24          THE COURT:  You don't dispute that, and she even

25  testified that she knew she wasn't going to make tenure because

1    by the time she got to the tenure vote she just hadn't

2    published enough, and she knew she wasn't there.

3           My understanding is, even though I think the tenure

4    vote is relevant, from your perspective I thought the argument

5    is that she wasn't in that position because of Bekaert's

6    conduct and Columbia's unwillingness to extend the time for the

7    vote.

8           MS. HARWIN:  As she testified, it was not a surprise

9    to be denied tenure, but I do think it's different if Columbia

10   is allowed to present witnesses who will testify about what

11   people said at the tenure process, their opinions and the

12   exchanges and presentations and discussions.  Even the slides

13   and materials used in the tenure vote are hearsay documents.

14          THE COURT:  Right.

15          But here, if that's the case, so if they hear what the

16   committee presented and then the jury hears from Professor

17   Bolton and through the portions that I read from these two

18   petitions that say that faculty members in the finance and

19   economics division expressed their view in support of her

20   request for the tenure clock extended and then again said that

21   that they were not -- some of them, he and others, unclear how

22   many -- are not in a position to provide an evaluation of her

23   tenure at this time, and then you have her personal statement

24   saying all of the personal things that have happened to her,

25   and you have heard all this testimony about all the personal

1    things that have happened to her and what's been said at

2    Columbia, I don't think the jury will be left with a misleading

3    impression of what they knew at the time of the tenure vote.

4              What's missing if all of that comes in?  Because then

5    you are reducing the hearsay concern.  You are reducing the

6    prejudice that comes from people who aren't here to be

7    cross-examined, but you are getting out the main points that

8    Columbia was on notice that there are faculty who weren't in a

9    position to vote.  I think it's clear why.  I don't think it's

10   a mystery.

11             MS. HARWIN:  I think that that goes a good way to

12   address the concerns regarding making sure there's evidence on

13   notice.  But there is another probative purpose, and that is

14   pretext, that Columbia's proceeding with the tenure vote at

15   this time in light of its own faculty objections and quite

16   significant ones, quite -- vociferous?  The word is not going

17   coming to me, but that but that goes to the intent of Columbia

18   in moving forward.

19             THE COURT:  All right.

20             Ms. Plevan, do you want to be heard.

21             MS. PLEVAN:  I don't really understand the argument,

22   so I don't have anything to say.

23             THE COURT:  Well, that is what I am inclined to do, is

24   allow in Professor Bolton's testimony, but limit it to his

25   interactions with Columbia and not his own personal view,

1   having read e-mails or spoken to Professor Ravina, of the

2   situation.

3           It will become clear to the jury, because he advocated

4   on her behalf, that he believed her, but I don't think he needs

5   to get into exactly why, but based on the situation that he,

6   along with others, but again not making at all clear how many,

7   submitted these two petitions to Provost Coatsworth and Dean

8   Hubbard.

9           Then I think we don't get out the fact that the tenure

10  vote was unanimous, but we will allow in the reading materials.

11  I think that's the fairest balance consistent with the rules of

12  evidence.

13          That's what I am inclined to do, but, again, I'll

14  think about it for the night if you want me to.

15          I'm happy now to stay and talk about deposition

16  designations.  If you would rather, if it is not necessary for

17  tomorrow I'm happy to do it tomorrow instead.  It is really up

18  to you.

19              MR. SANFORD:  Your Honor, before we turn --

20              THE COURT:  Yes.

21              MR. SANFORD:  With respect to petition 100 --

22              THE COURT:  Sure.

23              MR. SANFORD:  -- may I be heard?

24              THE COURT:  Yes, of course.

25              MR. SANFORD:  Columbia submitted a letter to this

I7cnrav7                    Bekaert - Direct

1    court on July 12.  It was this morning.

2            On page 2 of the letter under the title, "B.  The

3    Petitions Are Not Relevant," Columbia writes the following, if

4    I may cite to it:  "This petition" -- and they're referring

5    here to Exhibit 100, your Honor -- "is not relevant because the

6    executive committee is comprised of senior faculty from the

7    various divisions of Columbia Business School.  The decision

8    among faculty to adopt or not adopt a proposed policy would

9    therefore not be probative of Columbia's actions because the

10   executive committee is not the administration of Columbia

11   Business School or Columbia University."

12           If I may refer to Dean Johar's deposition in which she

13   says that in fact the executive committee is comprised of the

14   senior vice dean, contrary to Columbia's representation,

15   comprised of the dean, contrary to Columbia's representation,

16   and comprised of the chair, in addition to faculty.

17           And then in her deposition --

18           MS. PLEVAN:  Plus elected -- you are not reading the

19   entire passage.

20           MR. SANFORD:  May I please finish.

21           THE COURT:  Let Mr. Sanford finish.

22           MR. SANFORD:  You will have your opportunity.  Thank

23   you.

24           In Dean Johar's deposition there were two questions

25   and answers I would like to cite for the Court:

1    "Q.  And what was the role of Columbia Business School's

2    executive committee?

3    "A.  It's the governing body for the Columbia Business School.

4    The agenda items are set by the senior vice dean, the

5    consultation -- in consultation with the executive committee

6    members.  Faculty can also submit requests and put items on the

7    agenda.  And the meeting is held once a month to discuss these

8    agenda items, which usually have to do with administration of

9    the school.  They could be issues to do with faculty or

10   students or general governance issues."

11            THE COURT:  Let me just ask you something about 100.

12   All I have is an e-mail from one professor claiming to speak

13   for others, and then I have a document that's unsigned.

14            So can you explain exactly what this is and how you

15   intended to introduce it into evidence?

16            MR. SANFORD:  I think what Professor Bolton will

17   testify to is that this is actually a fairly common way that

18   the business school goes about making representations.

19            What he did in this petition is make a representation

20   that he has spoken with and a lot of people have spoken about

21   this issue and spoken with the people who are copied on this

22   petition and they are in support.

23            He also cites extensively from one person who is not

24   supporting the petition, and that's included in the petition as

25   well.

1          At the very end, the petition, the last paragraph, the

2     last line is, "Given the sentiments expressed by such a large

3     group of our division, it seems to me that this issue should

4     get the utmost attention from the executive committee."

5          That did not happen.

6          Dean Johar -- if I could ask the Court's indulgence

7     for just one more minute on the transcript.

8          THE COURT:  Sure.  Go ahead.  Absolutely.

9     BY MR. SANFORD:

10    "Q.  And can any faculty at Columbia Business School add to the

11    agenda for the executive committee meeting?

12    "A.  That was made very clear.  The governance report that was

13    issued -- I was a member of the governance committee ex

14    officio -- and this governance committee report I think issued

15    in 2013 I guess made it very clear and explicit that any

16    faculty member could submit an agenda item and prior to that as

17    well people have submitted agenda items through their chairs

18    usually.

19    "Q.  Are you aware of any circumstances in which a faculty

20    member has requested that an issue be considered by the

21    executive committee and the executive committee has declined to

22    consider the issue raised by the faculty member?

23    "A.  Not to my knowledge."

24         So here we have a circumstance where, perhaps in an

25    unprecedented circumstance, the executive committee chooses not

I7cnrav7                       Bekaert - Direct

1    to put on the agenda a petition that is represented by

2    Professor Bolton as having the support of all the people copied

3    on this.

4              The question is, why is that?  What happened here?

5              This goes directly to pretext, because Columbia is

6    saying that this was a fair process and they did not have a

7    discriminatory motive in doing what they did.  They are saying

8    what they did was nondiscriminatory.

9              We have a right -- the burden shifts back to us to

10   prove that in fact it was discriminatory.  This is really

11   important significant evidence to show that.

12             MS. PLEVAN:  Your Honor, I have a number of things to

13   say.

14             First of all, I guess Mr. Sanford was criticizing my

15   statement to the Court in the letter, but he didn't read all of

16   what Dean Johar said.  I think "governing body" again is a

17   phrase that would require some interpretation, but she says

18   that the people on -- besides the senior vice dean it's

19   executive -- sorry.

20             It's the chair of the division plus two elected

21   members from the finance and economics division and from other

22   divisions, people who -- my understanding is, regardless of

23   what she said, is that it's people who are elected as members

24   of the faculty.

25             So we have no document here as to what the role of

1    this committee is or what it has any authority to do.  That's

2    number one.  But that was just intended as context.

3            What I haven't heard is any kind of offer of proof as

4    to what they claim happened here.  I mean, I don't know what

5    they are talking about.  This is an e-mail that was sent by

6    Patrick Bolton to Kathy Phillips, and they seem to want to make

7    representations or make statements about this is relevant

8    because of something that happened afterwards.

9            But there hasn't been any representation as to what

10   that evidence is going to be.  I know of, and there has been

11   testimony in the record about some informal discussions that

12   took place, and my understanding was that people decided not to

13   pursue it as a result of those discussions.

14           So I would like to hear what this alleged pretextual

15   conduct is.

16           THE COURT:  So what happened?

17           MS. HARWIN:  I believe Columbia is well aware -- they

18   defended and attended depositions in which there was testimony

19   on this subject.

20           The testimony is that the senior vice dean and I

21   believe Dean Hubbard as well made a decision not to present

22   this to the executive committee apparently notwithstanding the

23   policy of Columbia Business School that any agenda item

24   presented by a faculty member must be presented to the

25   executive committee.

1          Notwithstanding that policy, these senior

2    administrators who met with Professor Ravina about her

3    complaints made a decision not to present it.  It is a policy

4    that was designed specifically to address Professor Ravina's

5    concerns and experiences as well as provide a general policy

6    for the business school moving forward to ensure this wouldn't

7    happen again.

8          THE COURT:  All right.

9          MS. PLEVAN:  The other objection, your Honor, is on

10   relevance, because this was not going to be about Professor

11   Ravina.  The idea of doing this may have come about or come to

12   Professor Bolton because of what Professor Ravina was telling

13   her about her circumstance, but this was about whether to adopt

14   a broad-based principle that would give essentially some

15   control to junior faculty over senior faculty and whether that

16   was a good idea and what would happen with that broad policy

17   statement, not a typical thing that faculty would vote for, is

18   not relevant to Professor Ravina.  I mean, it would not have

19   impacted her one way or the other.

20         MS. HARWIN:  It certainly would have impacted her.  It

21   was designed -- and there's testimony I believe by Division

22   Chair Zeldes that this was designed to enable her to move

23   forward on her projects.  It would have had direct application

24   to her situation, because what it would have done is implement

25   a policy with a presumption as to what would happen to data in

1    the event of a research dispute.

2          So, if implemented, this would have resolved, it would

3    have essentially taken out the last year of delay on her tenure

4    clock.

5          THE COURT:  Right.

6          So I am going to think about this tonight.  I'll tell

7    you again where I'm leaning.  I'm leaning towards not allowing

8    in the letter, allowing in the petition without the first line

9    or the last line, and without the signature pages.

10          But I will think about it tonight.  I will think about

11    the arguments you made.  That's what I think --

12          MS. PLEVAN:  We would like to consider that too,

13    because the letter does state the other side, what's bad about

14    this idea as expressed by one faculty member.

15          THE COURT:  OK.  So think about -- if I were inclined

16    to allow in part of this, again, just on the theory that it's

17    putting Columbia on notice that this is a request by faculty,

18    what did Columbia do about it -- if there are particular

19    redactions that need to be made.  I took out reference to how

20    many people have supported the proposal.

21          MR. HERNSTADT:  Your Honor, I would just note one

22    thing.

23          THE COURT:  Yes.

24          MR. HERNSTADT:  Which is that Ms. Harwin has said that

25    this would have resolved the problem for Professor Ravina.  The

1    policy is that there is a presumption.  What would have

2    happened had this policy been changed is that finally people

3    would have listened to someone other than Professor Ravina.

4    All of their information is coming from Professor Ravina either

5    verbally or through the e-mails that she is selecting t show

6    that.

7              And if they pass this thing, there would be a

8    presumption, and at that point there would be an actual

9    opportunity for Professor Bekaert to be heard and an actual

10   opportunity for the people that are making decisions and taking

11   positions based on what they have heard only from Professor

12   Ravina then to hear his side and to make an actual informed

13   determination about whether delay has actually occurred.

14             This is prejudicial because it skips all that.  All it

15   does is say, you know, there is a faculty member who has

16   complained, so let's change everything based on that complaint.

17             It reinforces one side of the evidence based only on

18   hearsay.

19             THE COURT:  Let me think about it.

20             I told you sort of how I'm leaning on these three

21   documents, but I need to think more about it, particularly 100,

22   which I will do tonight.

23             As I said, if anyone wants to do this tomorrow, if it

24   is not time pressing I'm happy to.  If you want to start

25   talking about deposition designations, I'm happy to stay right

I7cnrav7                         Bekaert - Direct

1    now and do it.

2              Do you want to start talking about that?

3              MS. HARWIN:  Sure, your Honor.

4              THE COURT:  OK.  I'll start with Suzanne Goldberg's

5    deposition testimony.

6              I did ultimately let in that e-mail chain once her

7    role changed.  But I have to say I looked at your letters, and

8    when I look at the actual testimony and I'm only really looking

9    at what's being disputed.  This sure looks like the same sort

10   of testimony that I excluded from Professor Broadie and

11   Dr. Caren Goldberg from testifying about.

12             Suzanne Goldberg appears to be presenting summary

13   opinions about the disputed conduct in question without adding

14   much that is especially helpful.  She talks about power

15   asymmetry, which again Professor Ravina did very clearly, about

16   her own characterizations of the conduct, the e-mails and

17   Professor Ravina's response.

18             So, especially if she wasn't an administrator at the

19   relevant times, I am frankly inclined to exclude all of her

20   testimony.

21             The one exception that I had was a discussion of the

22   tenure clock that was on page 103.

23             But there is a question, line 24:  "Do you believe

24   that a request for an extension of the tenure clock is a

25   reasonable one under the circumstances that Ms. Ravina

1   described to you?"

2              But, you know, again, my problem with that again, is

3   that she's sort of weighing in on exactly what should have

4   happened.

5              I am happy to talk about that, but frankly I am

6   inclined to not allow in any of the disputed designations in

7   her testimony.

8              MS. FISCHER:  Your Honor, if can I speak to that.

9              THE COURT:  Yes.

10             MS. FISCHER:  On that page 103, 104 designation that

11  you just referenced.

12             THE COURT:  Yes.

13             MS. FISCHER:  The next question that was not

14  designated, but the next question that was asked, which is on

15  page 104 line 11:

16  "Q.  Are you aware of any instances in which Columbia grants an

17  extension of the tenure clock?"

18             There is an objection and then:

19  "A.  It's really outside of my knowledge base.  It's very

20  technical, so people get leaves for maternity, parenting, and I

21  don't know how that interacts with the tenure clock rules.

22             "They get leaves for other reasons.  It's, again, not

23  my area, and the tenure process operates on a different way at

24  the law school, so I really don't have that kind of

25  familiarity."

1          So it's pretty clear that even this question it's

2     misleading to suggest that she has some knowledge or something

3     that would be relevant to this case.

4          THE COURT:  Do you want to respond, Ms. Harwin?

5          MS. HARWIN:  I think it's helpful to have some

6     additional context, your Honor.  The argument made by Professor

7     Bekaert's counsel in opening was that essentially this was a

8     plan B, a way for Professor Ravina to get tenure or get an

9     extension of her tenure clock or something like that, and

10    Professor Ravina was not the one who initially had or suggested

11    this idea of an extension of the tenure clock.

12         She testified about that, but having the brief

13    deposition testimony of Professor Goldberg on her view of it is

14    helpful in that regard in light of what defendant Bekaert's

15    arguments are in this case.

16         THE COURT:  I have to tell you I am not going to allow

17    this in.  It seems like she really doesn't have an expertise in

18    this area anyway, and I was concerned in any event.

19         So I don't think any of the disputed designations

20    regarding her should come in.

21         So that's the first deposition.

22         Is there one that's most pressing that you want to

23    talk about first?

24         Again, I don't want to keep you here too late if you

25    don't want to stay.

1          Is there one that you think you are going to introduce

2     tomorrow?

3          MS. HARWIN:  Your Honor, we are not sure of the exact

4     order of introduction, but Melissa Rooker was Columbia's

5     30(b)(6) witness on Columbia policies.  So that would be one we

6     would think would be helpful to get a ruling on sooner.

7          THE COURT:  The first disputed excerpt I believe

8     starts on page 49.

9          Why is it relevant if she provided performance

10    evaluations for the people working in the EOAA office?

11         MS. HARWIN:  It is relevant that Director Dunn, the

12    person who conducted Professor Ravina's investigation, was not

13    evaluated in any way for his performance.

14         MS. FISCHER:  I am not sure that I see the relevance.

15         Just a few lines up she does say she provided -- the

16    question on the bottom of 49 has to do with overseeing the

17    investigations, and then she describes on the top of 50 how she

18    did that.

19         I just think it's a little bit misleading because I

20    think that it suggests that she is not overseeing them when in

21    fact the testimony is otherwise.

22         THE COURT:  I am going to allow this in, lines 9

23    through 14.  I do think on balance it's relevant.

24         The next disputed section I think is page 71.

25         I don't think that this is relevant.  What happened in

other cases turns on their merits, so I am going to exclude

page 71, line 7 through 12.

          MS. HARWIN:  Your Honor, I would say that this is

probative in light of what Professor Ravina testified about

Dean Hubbard's comments that at most what they would do is send

him to training.  That's been the outcome of the other

investigations we have seen.

          That's how Columbia's EOAA apparently seems to deal

with these issues.  I think it's probative.

          (Continued on next page)

I7c1rav8

```
1          THE COURT:  The problem I have is that she can't be
2     cross-examined further to highlight the fact that it really
3     depends on the particular situation, right?  I mean, is there
4     other testimony that comes in where she says -- obviously it
5     depends.
6          MS. HARWIN:  Defendants are planning to call her as a
7     witness.
8          MS. FISCHER:  She's testifying in our case.
9          THE COURT:  So she is.  Okay.  In that case, I will
10     allow that in, because she can be cross-examined on that.  Just
11     in general what I really don't want to do, because I'm
12     concerned about the timing of the trial, is to have someone
13     testify and then also read designations and have a lot of
14     duplicative testimony.
15          All right.  Let's keeping moving.  93.
16          MS. HARWIN:  This is basic testimony about who's a
17     supervisor, manager under Columbia's policies.  I don't see how
18     this would not come in.  And she's a 30(b)(6) witness of the
19     university on this issue.
20          MS. FISCHER:  The issue of manager, supervisor is no
21     longer a legal issue in the case.
22          MS. HARWIN:  This has to do nothing with the issue of
23     supervisory liability.  This has to do with reporting channels
24     and responsibilities at Columbia.  Under Columbia's policies,
25     people defined as managers and supervisors have duties to
```

I7c1rav8

1    report and duties to act, duties that we contend were not

2    complied with in this case, and so the identification of who

3    counts as a manager, supervisor under Columbia's policies is

4    relevant.

5              THE COURT:  I'm going to allow this in.  This is also

6    an issue of who was managing and supervising Professor Bekaert,

7    not whether he was supervising her.

8              MS. HARWIN:  That's correct.

9              THE COURT:  So I'm going to allow that in.

10             I assume you all will take out the objections --

11             MS. HARWIN:  Yes, your Honor.

12             THE COURT:  -- on designations.

13             All right.  Why is the segment on 104 -- sorry.  I

14   think the next one is 106, is that right?

15             MS. FISCHER:  It's a counterdesignation, yes.

16             THE COURT:  Is 106 the next disputed issue in Rooker?

17             MS. FISCHER:  It's plaintiff's objection.

18             THE COURT:  Okay.  So --

19             MS. HARWIN:  I'm sorry, your Honor.  I just want to

20   look at the immediate preceding designation.

21             We will withdraw this objection, your Honor.

22             THE COURT:  So 106 is coming in.

23             I think the next objection is 170.

24             MS. FISCHER:  I think there's a series of questions

25   here where they're hypotheticals.  They are not directed, or at

I7c1rav8

least in our view, not closely directed to the facts at issue
here.  And that was our objection mainly to this line of
questioning.

          MS. HARWIN:  These are not hypotheticals.  These are
questions about aspects of Columbia's policies.  It's a
question under Columbia's policies.  Is Columbia Business
School authorized to direct, respond, and to step away from
academic research if academic research is being used for a
discriminatory, harassing, or retaliatory purpose.  It's a
factual question, whether that's allowed or not allowed under
Columbia's policies.

          Next question:  Where a complaint is made to personnel
at Columbia Business School about possible harassment,
discrimination, retaliation, what obligation --

          THE COURT:  I'm going to allow 170 in.

          I will tell you, just having looked at it last night,
I think the segments that start on pages 171, 172, 178, 179,
182, 186, 192, 193, 194, and 198, are all relevant and within
Rooker's accumulated personal experience overseeing these
matters, and that's what her job was, so I was going to let in
all of those.

          So I was going to turn now to 181.  So maybe you can
explain to me what the purpose of this is.  The question is:
"But an EOAA investigator is not required to ask follow-up
questions if a complainant says that she's EOAA investigators?"

I7c1rav8

```
1          MS. HARWIN:  Looks like the transcript there is

2     garbled.  I wonder if there's anyone in the courtroom who can

3     bring up the video because that's -- I hope that is not the

4     question I asked.  I don't believe it is.

5          THE COURT:  No, no.  It doesn't make sense as is.  I'm

6     sure it's a transcript issue.

7          MS. HARWIN:  Right.  But, I mean, just looking at the

8     preceding questions, it's talking about sort of the

9     requirements for follow-up questioning and whether the EOAA

10    investigatory process requires follow-up questions as to

11    certain matters.

12         THE COURT:  If that's the case, I'm fine with it, but

13    it was unclear to me.  So why don't you look at the transcript

14    and just get back to me.

15         MS. HARWIN:  We will look at the video.

16         THE COURT:  On 203 --

17         MS. FISCHER:  Your Honor, before we move on beyond

18    this section --

19         THE COURT:  Yes.

20         MS. FISCHER:  -- we do have a counterdesignation at

21    183, page 183.

22         MS. HARWIN:  We don't object to that.

23         THE COURT:  Okay.  There's no objection to that.

24         So on 203, so the first disputed question, she didn't

25    know the answer to.  I'm not going to allow in the question
```

I7c1rav8

about what's the ranges to number of witnesses investigated

because I really think that varies depending on the case.  And

she said she doesn't know.  "I don't know.  Maybe 20 max.  I

don't know."  So I'm not going to allow in that.

          MS. HARWIN:  Your Honor, a 30(b)(6) witness testifying

that she doesn't know is probative as well, and that's

something that we certainly would be permitted to show to a

jury, that the 30(b)(6) witness for Columbia University, the

head of this office, doesn't --

          MS. PLEVAN:  Are we going to educate the jury about

30(b)(6)?

          THE COURT:  Sorry?

          MS. PLEVAN:  I just disagree with the suggestion that

because a witness was designated a 30(b)(6) witness and

apparently the claim is she didn't know everything, the remedy

for that is to ask for another witness or to pursue the issue

with the Court in discovery, not to argue in front of the jury

that the lawyers didn't properly prepare the witness for the

deposition.

          MS. HARWIN:  That's not the issue.  This isn't about

a -- we're not seeking an additional discovery period.  The

issue is that she speaks for and on behalf of Columbia

University.  Her testimony, what she knows or doesn't know, is

relevant, and it's further probative given that she was the

person who oversaw the office of equal opportunity and

I7c1rav8

1    affirmative action when Ms. Ravina's case was investigated and

2    someone that Ms. Ravina communicated with about her complaint.

3         THE COURT:  I'm not going to allow this in.  I also

4    think every case is different.  I mean, you may have a rape

5    case where there are only, you know, two people that are

6    relevant witnesses, so the suggestion of exactly how many just

7    depends on the case.  And then in addition, the fact that she

8    just doesn't know, I don't think this should come in.  So

9    that's that.

10        Then let's go to 209 I think to 212.  Is that what's

11   next?  Sorry.  What's the next one you have?  Sorry?

12        MS. HARWIN:  17, your Honor.

13        THE COURT:  217?

14        MS. HARWIN:  No, 209 at line 17.

15        THE COURT:  Okay.  Thank you.

16        MS. HARWIN:  I don't understand the basis for this

17   objection.

18        THE COURT:  Yes, I thought this was fine.  Obviously

19   taking out the objection.

20        MS. FISCHER:  Well, I guess -- okay.  I mean, I guess

21   the term for best practice, the question for her should have

22   been, you know, under the policies, but she'll be here and she

23   can explain.

24        THE COURT:  Okay.  All right.  So I'm going to allow

25   in that excerpt from 209 to 212 because I think it deals

I7c1rav8

1    directly with her job responsibilities, and I think the same is

2    true for 236.

3           MS. HARWIN:  And I believe there are some pages in

4    between, your Honor, 222, 224, 230, and 232.

5           THE COURT:  Right.  Sorry.  I don't mean to go out of

6    order.

7           So let's go to 230.  Can you explain the context of

8    what she's talking about, saying what it means to investigate

9    or not or using the word investigate.

10          MS. HARWIN:  Sure, yeah.  So under Columbia's

11   policies, people who are described as managers or supervisors

12   have duties, duties to report and duties to act.  One of the

13   questions here is, if a complainant raises concerns about how

14   the business school has been responding to a complaint, is that

15   something that the EOAA investigator is required to

16   investigate, and of course that is something that Professor

17   Ravina brought to the EOAA's attentions, concerns about how

18   Columbia administrators were handling her complaints.  That was

19   not investigated.  At all.

20          MS. FISCHER:  I believe the testimony was that

21   Professor Ravina came to certain administrators regarding a

22   research dispute, and the sexual innuendos start -- was raised

23   later.  So I'm not sure what this is getting at exactly.

24          MS. HARWIN:  Your Honor, it's undisputed that there

25   were discussions in Professor Ravina's meeting with Senior Vice

I7c1rav8

1   Dean Phillips about sexual advances, sexual innuendo, dinner,

2   all those things, and Professor Ravina specifically reported to

3   Director Dunn, Senior Vice Dean Phillips' response and handling

4   of that report.

5          MS. FISCHER:  Senior Vice Dean Phillips -- within 24

6   or 48 hours of that report, this was in the hands of the EOAA,

7   so, you know, this is a misleading suggestion that's being made

8   here.

9          MS. HARWIN:  This is a piece of testimony as to

10  policy.  "Do EOAA investigators have to investigate that kind

11  of allegation?"  The testimony is, "No.  I would not say

12  investigate.  They don't have to investigate."

13         THE COURT:  I'm going to allow it in given that she's

14  going to testify and can explain what she meant.  I do think

15  it's relevant.

16         MS. FISCHER:  It's a similar objection on 232.  I

17  mean, you know, similar concerns.

18         THE COURT:  I'm going to allow that in, but again,

19  even though I said I don't want duplicative testimony, I'll

20  allow you to ask her to clarify it, because I don't think it's

21  as clear as it could be.

22         And then what do we have left?  247?  Oh, wait.  We

23  have 236.

24         MS. FISCHER:  Well, 236 goes, I believe, outside, you

25  know -- Melissa Rooker was the head of the EOAA office and this

I7c1rav8

1    is a question outside of the EOAA office, how would someone

2    handle this, right?

3        THE COURT:  Yeah.  I think if that's outside of her

4    duties and she doesn't know the answer, that doesn't really add

5    a lot.

6        MS. HARWIN:  I don't see how this would possibly be

7    out of her duties.  The line of questioning is about a failure,

8    about whether and who investigates failures to report or act.

9        MS. FISCHER:  Well, then --

10       MS. HARWIN:  She's the head of the office.  And she

11   was designated by Columbia to speak for Columbia as to the

12   policies.  And so, I mean, this is just squarely relevant to

13   that, how is that investigated if someone has allegedly

14   violated the policies as to a duty to report or act.

15       THE COURT:  But her job was to talk about EOAA, right?

16   And so then the question is, if EOAA does something --

17       MS. HARWIN:  She was not designated to testify to the

18   office, no.  She was designated as the designee for policies as

19   to discrimination, retaliation, harassment during the

20   applicable period.

21       THE COURT:  If that's the case, I'm going to let that

22   in.

23       MS. FISCHER:  Well, okay.  I mean, I'm not sure that

24   we understand the relevance of that portion.

25       THE COURT:  I mean, it's really asking how the

I7c1rav8

1     university investigates itself.  Like if there's an allegation

2     that the complaint wasn't handled properly, kind of what

3     happens next.  But I think she can clarify that in any event.

4               MS. FISCHER:  Did the plaintiff make a -- well, I'm

5     not sure there's anything in plaintiff's testimony that would

6     make that relevant.

7               THE COURT:  But it's clearly relevant to plaintiff's

8     case that the university didn't handle the allegation well and

9     was negligent in how it handled it.

10              And then lastly I think for this one is 247.

11              MS. HARWIN:  I think there are a number of other ones.

12    Perhaps --

13              THE COURT:  Are there?

14              MS. HARWIN:  Oh, I'm sorry, your Honor.  You're right.

15    There are a number without objections.  Apologies.  247.

16              THE COURT:  Okay.

17              MS. FISCHER:  This is missing the answer to the

18    question.  I don't know if that was intentional.

19              MS. HARWIN:  Oh, I assume it was not.  So --

20              MS. FISCHER:  That's the objection.

21              MS. HARWIN:  Okay.

22              THE COURT:  All right.  So you can sort that out.  I

23    assume you'll get the answer.  Are we missing a page?

24              MS. HARWIN:  Yeah, we just need to extend that to

25    line 11 instead of 10.

I7c1rav8

1          THE COURT:  Okay.  All right.  Do you want to do

2     another one tonight, or do you want to just meet tomorrow?  Can

3     we finish this tomorrow, you think?

4          MS. PLEVAN:  We can finish tomorrow, but we need to

5     talk about tomorrow, because we were asked to produce a witness

6     tomorrow.

7          THE COURT:  All right.  Let's talk about tomorrow.

8          MS. PLEVAN:  Unfortunately, well, I think we kind of

9     know the length, but I don't know -- I mean, the vice provost,

10    former Vice Provost Brown, Professor Brown, you asked us to

11    produce him tomorrow.

12         THE COURT:  Do you think realistically he'll testify

13    tomorrow?

14         MR. SANFORD:  I don't think it's realistic at this

15    point, your Honor.

16         THE COURT:  Okay.

17         MR. SANFORD:  If he does, it would be late in the day.

18         MS. PLEVAN:  Well, I think the problem is to have him

19    hanging out here.

20         THE COURT:  Is he the next witness after Professor

21    Bekaert?

22         MR. SANFORD:  Yes, your Honor.

23         THE COURT:  Okay.

24         MS. PLEVAN:  Well, he won't be if he's not called

25    tomorrow, because we were asked to produce Mr. Dunn, who is not

I7c1rav8

```
1   subject to subpoena, but is coming from out of state, he does

2   not work for Columbia anymore, so he would have to be the first

3   witness on Monday regardless, because --

4               THE COURT:  I'm sorry.  Mr. Dunn?

5               MS. PLEVAN:  Mr. Dunn, right.

6               THE COURT:  Okay.

7               MS. PLEVAN:  I don't know for sure how long he would

8   be, but there could be an issue about witnesses tomorrow.

9   Unless we agree that Mr. Brown goes on after lunch tomorrow

10  regardless of where things stand.

11              MR. SANFORD:  We would prefer not to do that, your

12  Honor.

13              THE COURT:  So how much longer does plaintiff have on

14  their direct?

15              MR. SANFORD:  I think we'll have Professor Bekaert up

16  all morning.

17              THE COURT:  All right.  Can you all tell me what your

18  estimate is for Professor Bekaert?  I don't want to make

19  someone sit here, but I also don't want to waste the jury's

20  time if we can keep moving.

21              MR. HURD:  Your Honor, unless something unexpected

22  happens, Columbia doesn't intend to ask any questions.  I spoke

23  to Mr. Hernstadt before he left and he said he thought he'd

24  probably have three or four hours because he's going to do his

25  regular thing with Professor Bekaert rather than re-call him.
```

I7c1rav8

1          THE COURT:  Okay.  I think in light of that, I don't

2     think you need to call -- it's also a Friday in summer.  I also

3     don't think you need to call another witness.  Is everyone

4     comfortable with that?

5          MS. HARWIN:  So your Honor, we'd be happy to, you

6     know, work with Columbia for another day for Vice Provost

7     Brown.  If Monday is not going to work because of other

8     witnesses, we can pick another day or, you know, Tuesday or --

9          MS. PLEVAN:  I mean, it may involve -- I mean, Dean

10    Hubbard, they requested him on Monday, and I'm not positive

11    whether he's available Tuesday or not, so I'm pretty sure --

12         THE COURT:  Why don't you all talk about it.

13         MS. PLEVAN:  I'm pretty sure Brown is available

14    Tuesday.

15         THE COURT:  But you don't have to have Brown come

16    tomorrow.

17         But tell me this.  Where are we in scheduling?  Did we

18    not move as quickly as we thought?  Are we about where we

19    thought we'd be?  I mean, obviously these are the two most

20    critical witnesses so we anticipated they'd be lengthy, but --

21         MR. SANFORD:  I think we're a little behind where we

22    thought we would be, your Honor, but I think that it's likely

23    that we can rest our case on Tuesday.

24         THE COURT:  Okay.  All right.

25         MR. HURD:  Well, don't forget you have Bolton on

894

I7c1rav8

1    Wednesday.

2              MR. SANFORD:  Well, with the exception of Professor

3    Bolton, who is coming back from overseas to appear on

4    Wednesday.

5              THE COURT:  Okay.  So we may need to go out of order a

6    little bit.  And so --

7              MS. PLEVAN:  We probably would start calling

8    witnesses.

9              THE COURT:  Exactly.  So if you're done Tuesday

10   morning, for example, I'll just tell the jury, with your

11   consent, that we're going to take things out of order, this

12   happens sometimes due to scheduling issues of witnesses, and I

13   think that's fine.

14             MR. SANFORD:  That's fine, your Honor.

15             THE COURT:  Okay.  All right.  So why don't we address

16   Phillips, Horan, Johar, and Zeldes tomorrow, okay?

17             All right.  Have a good night.  Thanks for staying so

18   late.

19             ALL COUNSEL:  Thank you, your Honor.

20             MS. HARWIN:  Oh, your Honor, I'm sorry.  Due to a

21   death in my family, I'm not going to be in court tomorrow, or I

22   may be in court only for the morning half hour or something

23   like that.

24             THE COURT:  Do you want me to say something or not?

25             MS. HARWIN:  Yes.  That probably makes sense.

I7c1rav8

1          THE COURT:  Okay.  What do you want me to say?  I'll

2     say whatever you want me to.

3          MS. HARWIN:  You can say due to a death in the family.

4     That's fine.

5          THE COURT:  All right.  Okay.  I mean, given how many

6     lawyers there are, I don't think they'll --

7          MS. HARWIN:  They probably won't miss me.

8          THE COURT:  I didn't mean it that way, but I'm happy

9     to tell them that.  But thanks for letting me know.

10          Have a good night.

11          ALL COUNSEL:  Good night, your Honor.

12          (Adjourned to July 13, 2018, at 9:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

                              INDEX OF EXAMINATION

Examination of:                                    Page

ENRICHETTA RAVINA

Cross By Mr. Hernstadt . . . . . . . . . . . 603

Redirect By Ms. Harwin . . . . . . . . . . . 739

Recross By Ms. Plevan  . . . . . . . . . . . 763

Recross Mr. Hernstadt  . . . . . . . . . . . 765

Redirect By Ms. Harwin . . . . . . . . . . . 770

GEERT BEKAERT

Direct By Ms. Donehower  . . . . . . . . . . 775


                              PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 18    . . . . . . . . . . . . . . . . . . 630

 1, 2, 4, 10, 18, 19, 25, 26, 30, 41,  . . . . 775

            43, 70, 71, 78, 106, 192, 245,

            and 260C

 81    . . . . . . . . . . . . . . . . . . 808

 57    . . . . . . . . . . . . . . . . . . 811

 25    . . . . . . . . . . . . . . . . . . 822


                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

```
                        DEFENDANT EXHIBITS

Exhibit                                          Received

V3   . . . . . . . . . . . . . . . . . . 604

V4   . . . . . . . . . . . . . . . . . . 607

AW   . . . . . . . . . . . . . . . . . . 613

BL   . . . . . . . . . . . . . . . . . . 632

CU   . . . . . . . . . . . . . . . . . . 638

BZ   . . . . . . . . . . . . . . . . . . 643

CA   . . . . . . . . . . . . . . . . . . 648

CB   . . . . . . . . . . . . . . . . . . 651

CG   . . . . . . . . . . . . . . . . . . 653

CJ   . . . . . . . . . . . . . . . . . . 655

V3   . . . . . . . . . . . . . . . . . . 660

V5   . . . . . . . . . . . . . . . . . . 664

AQ   . . . . . . . . . . . . . . . . . . 668

AR   . . . . . . . . . . . . . . . . . . 669

AT   . . . . . . . . . . . . . . . . . . 670

AV   . . . . . . . . . . . . . . . . . . 671

AF   . . . . . . . . . . . . . . . . . . 682

AX   . . . . . . . . . . . . . . . . . . 686

unidentified . . . . . . . . . . . . . . 688

HL   . . . . . . . . . . . . . . . . . . 696

HR   . . . . . . . . . . . . . . . . . . 697

CF   . . . . . . . . . . . . . . . . . . 699

JU   . . . . . . . . . . . . . . . . . . 704
```

```
1                     DEFENDANT EXHIBITS CONTINUED

2    Exhibit                                      Received

3    JV    . . . . . . . . . . . . . . . . . . 707

4    LK    . . . . . . . . . . . . . . . . . . 712

5    LN1 and LN2   . . . . . . . . . . . . . . 715

6    SE    . . . . . . . . . . . . . . . . . . 717

7    V7    . . . . . . . . . . . . . . . . . . 730

8    AS    . . . . . . . . . . . . . . . . . . 732

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```