I7d1rav1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ENRICHETTA RAVINA,

4                  Plaintiff,

5            v.                          16 CV 2137 (RA)

6   COLUMBIA UNIVERSITY,
                                         Jury Trial
7              Defendant.

8   ------------------------------x

9                                        New York, N.Y.
                                         July 13, 2018
10                                       9:37 a.m.

11  Before:

12          HON. RONNIE ABRAMS

13                                       District Judge

14

15                       APPEARANCES

16

17  SANFORD HEISLER SHARP LLP
         Attorneys for Plaintiff
18  BY:  DAVID W. SANFORD
         ALEXANDRA HARWIN
19       MELINDA L. KOSTER
         AMY DONEHOWER
20       HERBERT V. McKNIGHT
         ANDREW C. MELZER

21  PROSKAUER ROSE LLP
         Attorneys for Defendants
22  BY:  BETTINA B. PLEVAN
         RACHEL S. FISCHER
23       STEVEN D. HURD
         PATRICK KRAMER RICE

24
    HERNSTADT ATLAS PLLC
25       Attorneys for Defendant Bekaert
    BY:  EDWARD HERNSTADT

I7d1rav1                    Bekaert- Direct

1              (Trial resumed; jury not present)

2              THE COURT:  I think we've addressed all the issues for

3    purposes of today and we can continue to discuss deposition

4    designations later today, but why don't we bring in the jury.

5              Do you want to come back up to the stand, Professor.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7d1rav1                     Bekaert - Direct

1            (Jury present)

2            THE COURT:  Good morning, everyone.  Thank you again

3    for being so prompt.

4            Okay.  Everyone can be seated.

5            I remind you, Professor, you're still under oath.

6            You may proceed.

7            MS. DONEHOWER:  Thank you, your Honor.

8    GEERT BEKAERT, resumed.

9    DIRECT EXAMINATION CONTINUED

10   BY MS. DONEHOWER:

11   Q.  Good morning, Professor Bekaert.

12   A.  Good morning.

13   Q.  We were talking yesterday about what Columbia characterized

14   to you as the research divorce.  Dean Hubbard told you that you

15   should walk away from the joint research with Professor Ravina,

16   correct?

17   A.  He said -- not in so many words.  This was not in the

18   official meeting.  The official meeting was about research

19   divorce.

20   Q.  At any time, Professor Bekaert, did Dean Hubbard tell you

21   that he thought you should walk away from the joint research

22   with Professor Ravina?

23   A.  Several of my colleagues suggested this.

24   Q.  Professor Bekaert, I'm speaking specifically about Dean

25   Hubbard.  If you could please answer my question with a yes or

I7d1rav1                          Bekaert - Direct

1    no, if that's possible.

2              And let me ask you, just so it's very clear, Dean

3    Hubbard told you that he thought you should walk away from the

4    joint research with Professor Ravina, correct?

5    A.  At one point in time, yes.

6    Q.  He was not the only one who thought you should walk away

7    from the joint research with Professor Ravina, correct?

8              MR. HERNSTADT:  Objection.

9              THE COURT:  Overruled.

10   A.  I believe there's one other professor who said so.

11   Q.  Some faculty members told you to walk away from the joint

12   research?

13   A.  I thought that's what I said before.  I said one other

14   faculty member told me this.

15   Q.  Was it one or some?

16   A.  I remember one.  Could be -- could be -- I remember one in

17   particular.

18   Q.  You previously testified that some faculty members told you

19   you should walk away from the joint research, correct?

20   A.  It's possible, yes.  I mean, I --

21   Q.  For instance, Professor Charles Calomiris said he thought

22   you should walk away?

23   A.  That's the person I was referring to.

24   Q.  A professor at Columbia Business School?

25   A.  Yes.

1    Q.  Professor Robert Hodrick said he thought you should walk
2    away?
3    A.  Right.
4    Q.  So that's at least two in addition to Dean Hubbard,
5    correct?
6    A.  Well, these are in private conversations where there's a
7    whole context to the conversation.
8    Q.  Professor Bekaert, just asking you about numbers.
9    A.  Okay.
10   Q.  So in addition to the dean of Columbia Business School, at
11   least two Columbia Business School professors told you that you
12   should walk away from this joint research, correct?
13   A.  Yes.
14   Q.  Dean Hubbard never directed you to walk away from the joint
15   research, though, right?
16   A.  Well, he couldn't, because once you start looking at the
17   whole situation, it was impossible to walk away from the
18   research.
19   Q.  So Dean Hubbard never told you to walk away from the
20   research because he could not do that, right?  He could not
21   direct you to walk away from the joint research?
22   A.  The situation was way more complex than that.
23   Q.  So is that a no, Professor Bekaert?  Let me --
24           THE COURT:  When you say "he could not," could you
25   define what "could not" means.  He's unable to in his role or

1   can you clarify what that means, please?

2           MS. DONEHOWER:  Thank you, your Honor.

3   Q.  It is your understanding that Dean Hubbard was not able to

4   direct you to walk away from the joint research?

5   A.  Again, I find this very confusing question.  There was a

6   particular --

7   Q.  If you are able to answer yes or no, that's great.  If you

8   cannot answer yes or no --

9   A.  I cannot answer this question because it's not formulated

10  in a clear manner.

11  Q.  So you cannot -- we'll come back.

12          It's fair to say that you are an accomplished

13  academic?

14  A.  That's for others to judge.

15  Q.  Pardon?

16  A.  That's for others to judge.

17  Q.  Okay.  Well, let's look at your CV just a little bit.

18          You are the Leon G. Cooperman Professor of Finance and

19  Economics at Columbia Business School, right?

20  A.  I am.

21  Q.  Isn't it true that this is a chaired professorship?

22  A.  Yes.

23  Q.  You have held that position since 2009, right?

24  A.  2000 -- no, much earlier.  Oh, wait.  I mean, that title --

25  I mean, I've been a chaired professor for as long as I can

1    remember; earlier than that, I believe.

2    Q.  A chaired professor at Columbia for as long as you can

3    remember.

4    A.  I actually -- my offer came with a chair, that I only took

5    up one year after I joined, which I think would be 2000.

6    Q.  Thank you, Professor Bekaert.

7            Before you were at Columbia, you were a professor of

8    finance at Stanford University, right?

9    A.  Stanford Business School, yes.

10   Q.  It is fair to say that you have a lot of connections in

11   business schools around the world?

12   A.  What do you mean with connections?

13   Q.  Well, we'll go through it.

14           You are an international research fellow at the Kiel

15   Institute of World Economics, correct?

16   A.  That might still be on my vitae, but it doesn't really mean

17   anything.

18   Q.  So a no would suffice, Professor Bekaert, if that's not --

19   if that's not true anymore.  But let me rephrase.

20   A.  It's not accurate.

21   Q.  Your CV says you are an international research fellow at

22   the Kiel Institute of World Economics, correct?

23   A.  My CV says that, yes, probably.

24   Q.  You are on advisory board, Emerging Markets Group of the

25   Cass Business School in London.

1    A.  Yes.

2    Q.  You did your predoctoral studies in Belgium, correct?

3    A.  You mean my undergrad studies?  I did, yes.

4    Q.  Isn't it true that you have done consulting in Frankfurt,

5    China, Belgium, and at the European Central Bank?

6    A.  Three of those -- sorry.  Three of those are correct, and

7    Belgium, I'm not so sure.  I've given presentations and keynote

8    speeches, but I don't think I've done active consulting in

9    Belgium.

10   Q.  Well, just to ease it, we can go one by one, if that makes

11   it easier for you.  So we'll do that, and you can just tell me

12   yes or no for each of these.

13           You have been a visiting scholar in Hong Kong?

14   A.  Yes.

15   Q.  Beijing?

16   A.  Yes.

17   Q.  And Shanghai?

18   A.  Yes.

19   Q.  The Netherlands?

20   A.  Yeah.

21   Q.  Brazil?

22   A.  I suppose, yeah.  I've given lecture series there, yes.

23           MS. DONEHOWER:  Can we please see -- we'd like to mark

24   Defendant's Exhibit QU, please.  I believe we have consent on

25   this.

I7d1rav1                        Bekaert - Direct

1              Your Honor, I'd like to --

2              THE COURT:  Any objection to QU?

3              MR. HERNSTADT:  No objection.

4              MS. PLEVAN:  No objection.

5              THE COURT:  All right.  It will be admitted.

6              (Defendant's Exhibit QU received in evidence)

7     BY MS. DONEHOWER:

8     Q.   Professor Bekaert, we're going to show you what's marked as

9     Defendant's QU, the first page.  Do you recognize this

10    document?

11    A.   Appears to be my CV.

12             MS. DONEHOWER:  And I'd like to turn to pages 4 to 5,

13    please.

14             Your Honor, I don't believe the jury is able to see it

15    just yet.

16             THE COURT:  Give us a minute.

17             MS. DONEHOWER:  Oh, sorry.

18             THE COURT:  Can you all see it or not yet?

19             THE JURORS:  No.

20             THE COURT:  Okay.  We had someone from our technology

21    department come in this morning and apparently it didn't go in

22    the right direction, so I'm sorry.

23             THE JURORS:  Oh.

24             THE COURT:  Oh, there you go.

25    BY MS. DONEHOWER:

1    Q.  We're looking here, Professor Bekaert, at pages 4 and 5 of

2    your CV, correct?

3    A.  Correct.

4    Q.  Those pages list --

5    A.  What is the date on the CV?  Can I -- it's something that's

6    constantly updated, so I want to --

7    Q.  I'm going to just ask you some questions about your CV.  If

8    you can answer them, that's great.  If you can't answer them,

9    then you can let me know.

10   A.  Okay.

11   Q.  But on pages 4 and 5, this is a CV that you prepared,

12   correct?

13   A.  It -- it -- yeah.

14   Q.  And on pages 4 to 5, it lists other work experience and

15   qualifications?

16   A.  Yes.

17            THE COURT:  Do you want me to give him this copy?

18            THE WITNESS:  I can see it.

19            MS. DONEHOWER:  Oh, we have a copy.

20            THE WITNESS:  For me it always came up, actually.

21            THE COURT:  Okay.

22            MS. DONEHOWER:  Thank you, your Honor.

23   BY MS. DONEHOWER:

24   Q.  It includes other work experience in, as we discussed,

25   Beijing?

I7d1rav1                        Bekaert - Direct

1    A.   Yeah.

2    Q.   Shanghai, Brazil?

3    A.   Yeah, the lecture.

4    Q.   Belgium?

5    A.   Where is Belgium?

6    Q.   Second line from the bottom, correct?

7    A.   Right.

8    Q.   At the top of page 5, there is a position in Barcelona.

9    Right?

10   A.   This is not a position.  This is a class I taught.

11   Q.   It lists a class that you taught in Barcelona, correct?

12   A.   Right, right.

13   Q.   At a university there, at a graduate school of economics

14   there, correct?

15   A.   Yes, Pompeu Fabra.

16   Q.   You have over 60 published papers, Professor Bekaert?

17   A.   Yes.

18   Q.   You have been a reviewer for many, many journals as well?

19   A.   Absolutely, yes.

20   Q.   If we look at page 15, do you see that big block of text in

21   the middle of the page?

22   A.   Mm-hmm.

23   Q.   That lists all the journals for which you have been an ad

24   hoc reviewer, correct?

25   A.   I hope it's complete, but it -- I -- yeah.

1   Q.  There could be even more, but at least for these, you have

2   been an ad hoc reviewer, correct?

3   A.  For those I have, and in the past, over the last, I would

4   say ten years I --

5   Q.  It's a yes or no question.  These are the journals for

6   which you have at some point been an ad hoc reviewer, correct?

7   A.  That's correct.

8   Q.  And if we look below this list, there are even more

9   journals.

10          Well, those are program committees.  I apologize.  But

11  if we look at the next page, you'll see positions listed where

12  you were associate editor at various points.

13  A.  Mm-hmm.

14  Q.  You see at the third line from the top, you either are or

15  were the managing editor of the Journal of Banking and Finance,

16  right?

17  A.  Yes, and that means that I do not review --

18  Q.  I'm just asking about the position, Professor Bekaert.

19  A.  Okay.

20  Q.  Just below that, it says that you are the advisory editor

21  for the Emerging Markets Review, correct?

22  A.  Correct.

23  Q.  And there's a number of other journals for which you've had

24  positions on this list, right?

25  A.  Mm-hmm.

I7d1rav1                        Bekaert - Direct

1   Q.  Is that right?

2   A.  Correct.

3   Q.  You are a member of the American Finance Association?

4   A.  Yes.

5   Q.  You are familiar with Professor Patrick Bolton from

6   Columbia Business School, correct?

7   A.  He's a colleague.

8   Q.  He is also the former president of the American Finance

9   Association?

10  A.  I believe he is.

11  Q.  You were here in court on Monday, right, Professor Bekaert?

12  A.  I was, yes.

13  Q.  You heard your lawyer deliver his opening statement?

14  A.  Yes.

15  Q.  You heard him describe emails you had sent as pungent?

16  A.  I think I remember him using that word, but I'm not sure.

17  Q.  Do you recall your lawyer saying that you had sent a

18  "handful of very pained emails"?

19  A.  I don't remember the exact phrasing.

20  Q.  Professor Bekaert, when you hear the word "handful," how

21  many do you think that is?

22  A.  Well, I would say it's five or six, or four.

23  Q.  You think that you sent five or six pungent emails?

24  A.  I don't think I made that statement.  You're trying to put

25  words in my mouth.

1   Q.  So you disagree with the statement that your lawyer made?

2   A.  I don't disagree or agree.  I don't really know the context

3   of the statement.  I don't know -- I don't -- you don't give me

4   any context so I'm not sure what we're talking about.

5   Q.  Professor Bekaert, on this project you were working on with

6   Professor Ravina, you knew that she needed the Financial

7   Engines people on at least two of the three projects, correct?

8   A.  I think there was an implicit understanding that some of --

9   Q.  It's a yes or no question, Professor Bekaert.  Did you know

10  that on this retirement project, she needed at least -- she

11  needed the Financial Engines people on at least two of the

12  three projects?

13  A.  I do not recall whether that was a written agreement.  It

14  was I think an implicit agreement.  I can't really -- there's

15  no other way for me to answer that question.  I'm sorry.

16          MS. DONEHOWER:  Your Honor, we'd like to mark

17  Plaintiff's Exhibit 73, please.  This is the exhibit, your

18  Honor, we agreed to some redactions this morning.  So we'll

19  just --

20          THE COURT:  73?

21          MR. HERNSTADT:  No objection.

22          THE COURT:  All right.  73 will be admitted.

23          (Plaintiff's Exhibit 73 received in evidence)

24  BY MS. DONEHOWER:

25  Q.  Professor Bekaert, this is an email that you sent, correct?

1    A.  It is.

2    Q.  You sent this email on September 12, 2014?

3    A.  Yes.

4    Q.  Look at the first paragraph here, please.  You wrote, "Yes,

5    I thought of that risk that she wants to somehow force me off

6    the papers."  When you wrote that, the person who you're

7    referring to as wanting to force you off the papers is

8    Professor Ravina, correct?

9    A.  Yes.

10   Q.  And the papers were the retirement project papers?

11   A.  Of course.

12   Q.  You then wrote, "But she needs the FE people on at least

13   two of the three projects, and I still have quite a bit of

14   power, I think."  Correct?

15   A.  Oh, yes.  This actually describes the --

16   Q.  That's a yes or no question.  That's what you wrote, right?

17   A.  Oh, that's what I wrote, yes, absolutely.

18   Q.  You went on, "If I say my name cannot be taken off, that is

19   it, and she is just stalling the projects," right?

20   A.  Yes, I wrote that.

21   Q.  You wrote, "If she goes it alone against my will, I will

22   stop her," right?

23   A.  Yes.

24   Q.  "I know every single editor."  That's what you wrote,

25   right?

I7d1rav1                    Bekaert - Direct

1   A.  Of course.  Well, of course.  It's there for everyone to

2   see.

3   Q.  You meant editors at financial journals, correct?

4   A.  Yes.

5           MS. DONEHOWER:  If we could please go to the second

6   page of this document.

7   Q.  The first full email at the top of this second page is also

8   from you, right?

9   A.  Yes, this -- this -- I just wanted to make sure.

10  Q.  This is sent from your Columbia -- the email address from

11  which you sent this email is gb241@columbia.edu, correct?

12  A.  Yes.  And I --

13  Q.  In the first paragraph, the last two sentences -- actually,

14  let me back up one moment.

15          Professor Bekaert, this is after you learned that

16  Professor Ravina had reported your conduct to Columbia,

17  correct?

18  A.  This was -- yeah, this was after --

19  Q.  Yes or no will suffice if you can answer that way, please.

20  A.  I don't like the way you phrased the question -- phrased

21  the reporting, but anyway, okay, this is after the research

22  divorce was being -- had been discussed.

23  Q.  This is after Columbia informed you about the complaint

24  that Professor Ravina had made, right?

25  A.  Yes, that would be a better way of putting it.

1    Q.  If you look in the first paragraph, it's the last three

2    sentences, please.  You wrote, "Can I write to the dean that I

3    feel she is unstable and is spewing nonsense?"  The "she"

4    you're referring to there is Professor Ravina?

5    A.  Absolutely.

6    Q.  And the dean is Dean Glenn Hubbard of Columbia Business

7    School?

8    A.  Yes.

9    Q.  You wrote, "I would not put it in these words.  Maybe I

10   should go talk to him and Katie.  I do not fully trust him in

11   this."  Right?

12   A.  Yes.

13   Q.  Does Katie refer to Vice Dean Katherine Phillips?

14   A.  It does.

15   Q.  You continued to work with Professor Ravina after she made

16   her complaint to the dean's office, correct?

17   A.  Yes.

18          MS. DONEHOWER:  I'd like to look at Plaintiff's

19   Exhibit 67, please.

20          Your Honor, I offer to move this document into

21   evidence.

22          THE COURT:  Any objection to 67?

23          MR. HERNSTADT:  Just a minute.  We haven't had a

24   chance to look at this.

25          THE COURT:  Sure.

1           MR. HERNSTADT:  No objection.

2           THE COURT:  All right.  67 will be admitted.

3           (Plaintiff's Exhibit 67 received in evidence)

4    BY MS. DONEHOWER:

5    Q.  Professor Bekaert, let's look down, please, at the bottom

6    email on this page.  This is an email that you sent?

7    A.  Again, this is another email to a friend.

8    Q.  Professor Bekaert, if you could please yes or no questions,

9    answer them yes or no, I would appreciate it, please.

10          You sent this from your Columbia email address,

11   correct?

12   A.  I did.

13   Q.  You were discussing here in the first line what you refer

14   to as the Enrichetta saga, right?

15   A.  Yes.

16   Q.  If you look at the middle of the paragraph, three lines

17   from the top, you write, "I just have to spend enormous amounts

18   of time replying to her in the most neutral way possible."

19   Right?

20   A.  Yes.

21   Q.  And then there's a parentheses after that.  Could you

22   please read what's in the parentheses.

23   A.  "You can imagine what a hard time I'm having with that.  I

24   would even in normal circumstances, but now writing something

25   bland and neutral when I'm thinking what an incredible mean

1    beast she is is torture."

2    Q.  What do you mean by "beast"?

3    A.  Probably bitch.

4    Q.  You felt that writing to her in a bland and neutral way was

5    torture for you?

6    A.  At this point in time, yes.

7    Q.  I'd like to quickly look at a few other emails between you

8    and Professor Ravina.

9              MS. DONEHOWER:  If we could look at Plaintiff's

10   Exhibit 68, please.

11             I'd like to offer this into evidence.

12             THE COURT:  Any objection to 68?

13             MR. HERNSTADT:  Yes, your Honor.

14             THE COURT:  Do you want to meet at sidebar?

15             MR. HERNSTADT:  I'm sorry.  Could you just have

16   another minute?

17             THE COURT:  Yeah, sure.

18             MR. HERNSTADT:  No objection, your Honor.

19             THE COURT:  Okay.  68 will be admitted.

20             (Plaintiff's Exhibit 68 received in evidence)

21   BY MS. DONEHOWER:

22   Q.  Professor Bekaert, this is an email exchange between you

23   and Professor Ravina, correct?

24   A.  It looks like also involving Andrea Kiguel.

25   Q.  Andrea Kiguel is a research assistant who worked for you

1    and Professor Ravina for some time, correct?

2    A.   Correct.

3    Q.   Isn't it true that this email exchange happened in August

4    and September 2014?

5    A.   Yes.

6            MS. DONEHOWER:   Can we please look at pages, I believe

7    it's 3 and 4.

8    Q.   Do you see the discussion on these pages 3 and 4, Professor

9    Bekaert?

10   A.   I do.  I obviously can't process it very -- I see it, but

11   yeah.

12   Q.   I'll give you a minute to skim it.  My question is:  Does

13   this relate to certain specific issues you were having with

14   respect to the research project?

15           MR. HERNSTADT:   Your Honor, if the witness wants a

16   hard copy of these.  It looks like the first page starts in the

17   middle of something.

18           MS. DONEHOWER:   Your Honor, I would request that

19   Mr. Hernstadt not offer speaking objections, but we are happy

20   to hand up a hard copy if the witness would like it.

21           THE COURT:   I think that's fine.  And if you do need a

22   whole document to see context, just let us know.

23           THE WITNESS:   I'm having a hard time figuring out what

24   paper this is about, so --

25   BY MS. DONEHOWER:

1    Q.  Is this related to the papers on the retirement project,

2    any one of them?

3    A.  Oh, sure, it has to be, 'cause otherwise I wouldn't be

4    conversing with Enrichetta.

5    Q.  Can you please look at the third paragraph on page 3.  It

6    says, "On point A."  This appears to be written by Professor

7    Ravina, correct?

8    A.  Yes.

9    Q.  Do you see that she writes, "On point A, again, if there is

10   any work that has been done by you and overlaps with any of the

11   tasks in the schedule, please send it to me because I am not

12   aware of it."  Do you see that?

13   A.  Yup.

14   Q.  And below that, there is another paragraph that starts GB.

15   Do you see that?

16   A.  Yes.

17   Q.  That's you?

18   A.  That's me.

19   Q.  And if we look at each of these in turn, each of these

20   points, you have a response to each of the points there, right?

21   A.  Yes.

22         MS. DONEHOWER:  If we could please, Mr. McLeod, move

23   up the document a bit to the top email, on the first page.

24   Q.  This is an email that you sent to the research assistant

25   Andrea Kiguel, right?

I7d1rav1                     Bekaert - Direct

1    A.  Yes.

2          MS. DONEHOWER:  Mr. McLeod, can you include a little

3    bit of the email below to show just the date.  That's great.

4    Q.  Professor Ravina had written to you on August 29, 2014,

5    right?

6    A.  Yes.

7    Q.  Do you see that Dean Glenn Hubbard is copied on her email?

8    A.  He is.

9    Q.  And on the email above, you sent this -- you forwarded her

10   email to Andrea Kiguel on September 3, 2014?

11   A.  I did.

12   Q.  A couple days later, right?

13   A.  Right.

14   Q.  And you wrote, "Hi, Andrea.  It was clear I was not going

15   to have time to respond to this just yet anyway, so I figured I

16   would spare you a few days longer."  Right?

17   A.  Yes.

18   Q.  And you said that you would not respond -- that you would

19   respond towards the end of the week, right?

20   A.  Yes.

21   Q.  You referred a little bit lower to the international

22   diversification paper that you were writing with Professor

23   Ravina?

24   A.  Yes.

25   Q.  And you said to Andrea, "Imagine what she will do if I do

1    not make the deadline, which I guess I won't," right?

2    A.   Yes.

3    Q.   Even when Professor Ravina came up with a schedule, you

4    sometimes failed to make the deadlines, right?

5    A.   I told her many times that schedules in this business don't

6    work.

7    Q.   Prior to Professor Ravina's report, Columbia never provided

8    you with training on its sexual harassment policies, right?

9    A.   I do not remember such a training, no.

10   Q.   It has been your representation previously that they never

11   provided you with training; not that you couldn't remember it

12   but that they actually never provided you with it, right?

13   A.   Yes.  Before the complaint -- no, there was actually one

14   after.

15   Q.   Right.  So let me make my question clear, in case it

16   wasn't.

17         Prior to Professor Ravina's report, Columbia

18   University never provided you with training on its sexual

19   harassment policies, right?

20   A.   I don't think so.

21   Q.   There was another sexual harassment complaint made against

22   you at Columbia, correct?

23   A.   I'm not sure it was actually an official complaint or -- at

24   least it was dropped.

25   Q.   The complaint was brought by a student in one of your

I7d1rav1                          Bekaert - Direct

1   classes?

2   A.   Yes.

3   Q.   The student accused you of harassing her?

4   A.   I -- that's not how it was represented -- presented to me.

5           MS. DONEHOWER:  Can we please see Plaintiff's

6   Exhibit 31.

7           MR. HERNSTADT:  Objection, your Honor.

8           THE COURT:  All right.  Can I see it, please.

9           MS. DONEHOWER:  Oh, sorry.

10          Your Honor, we offer Plaintiff's Exhibit 37 into

11  evidence.

12          THE COURT:  Any objection to 37?

13          MR. HERNSTADT:  No objection, your Honor.

14          THE COURT:  Ms. Plevan, any objection?

15          MS. PLEVAN:  No, your Honor.

16          THE COURT:  All right.  37 will be admitted.

17          (Plaintiff's Exhibit 37 received in evidence)

18  BY MS. DONEHOWER:

19  Q.   The student said that during class you discussed your

20  travels in Hong Kong, right?

21          MR. HERNSTADT:  Objection, your Honor.

22          THE COURT:  Overruled.  Go ahead.

23  Q.   Are you able to answer the question without referring to

24  the document, Professor Bekaert?  Do you recall a student

25  reporting to the university, to Columbia University that you

1   had mentioned your travels in Hong Kong?

2   A.  I recall being called into the Title IX office.

3   Q.  That's a yes or no question, please, Professor Bekaert.  Do

4   you recall a student making a report about you mentioning in

5   class your travels in Hong Kong?

6   A.  Yes.

7   Q.  The student reported that you rubbed your hands together

8   and said --

9           MS. DONEHOWER:  Well, let's go, Mr. McLeod, please, to

10  page 1, the last line, the paragraph that goes from page 1 to

11  page 2.

12          THE COURT:  Just to be clear, what's in the document

13  isn't being admitted for the truth.  You can still ask him

14  questions about if it's true or not, but I want that to be

15  clear.

16          MS. DONEHOWER:  Thank you.

17  BY MS. DONEHOWER:

18  Q.  Professor Bekaert, would you please read this paragraph for

19  us.

20  A.  "The student -- the student who submitted the report to

21  EOAA chose not to participate in the investigative process.

22  The report alleged that in your asset management course, you

23  were discussing your travels in Hong Kong when you rubbed your

24  hands together and said, 'Hong Kong, where the ladies are

25  nice.'  The student said that he or she found this comment

1    offputting.  The report also alleged that other students in the

2    class seemed shocked by this comment."

3    Q.  Prior to the time that this student reported you to the

4    EOAA, you had told -- the student had accused you of harassing

5    her?

6    A.  We had --

7    Q.  It's a yes or no, Professor Bekaert.  Did she accuse you of

8    harassing her?

9    A.  I don't remember what was in the email trails.  I'm sorry.

10   Q.  Just to refresh your recollection --

11             THE COURT:  Accused him directly?

12             MS. DONEHOWER:  Yes, your Honor.

13   Q.  To refresh your recollection --

14             MS. DONEHOWER:  If we can just show the witness but

15   not publish, Plaintiff's Exhibit 31, please.  The second page.

16             That's fine.

17   Q.  If you could please look down at the last line of this

18   email, Professor Bekaert, and let me know whether this

19   refreshes your recollection that the student accused you of

20   harassing her.

21   A.  This is part of an email trail between the student --

22             MS. DONEHOWER:  Your Honor, I would request an

23   instruction that the witness answer the questions yes or no to

24   the extent that it's possible.

25             THE COURT:  If you can answer yes or no, do.  If you

1    can't, just say that you can't and we'll follow up.

2    A.  Can you repeat the question.

3    Q.  Does this refresh your recollection that the student

4    accused you of harassing her?

5    A.  It says something like that in the email, yes.

6    Q.  And you responded to the student, "I am harassing you?  I

7    am keeping this email in a safe place and you can just hope I

8    am too busy to take this further," right?

9              MR. HERNSTADT:  Your Honor, objection.

10             THE COURT:  I'm sorry.  The objection is?

11             MR. HERNSTADT:  Is this being used to refresh his

12   recollection?

13             MS. DONEHOWER:  I'm not asking him from the document.

14   I'm asking him if he knows --

15             MR. HERNSTADT:  The document is not in evidence, and

16   she's reading from it.

17             MS. DONEHOWER:  We can take the document down if your

18   Honor prefers.

19             THE COURT:  Don't put up documents that aren't in

20   evidence and just ask a question.

21             MS. DONEHOWER:  Sure.  I apologize.

22   BY MS. DONEHOWER:

23   Q.  You told the student, you said to the student, "I am

24   harassing you?  I am keeping this email in a safe place --"

25             MR. HERNSTADT:  Your Honor.

I7d1rav1                          Bekaert - Direct

1          MS. DONEHOWER:  I just --

2          THE COURT:  Just ask a short, direct question.

3          MS. DONEHOWER:  Sure.

4    Q.  You told the student that she should hope you were too busy

5    to take the issue further, right?

6    A.  Yes, because I was being harassed by the student --

7    Q.  Your counsel will have the opportunity to come up and

8    further explore these issues with you.

9          MS. DONEHOWER:  If we can please bring back up

10   Plaintiff's Exhibit 37, which has been admitted into evidence.

11   Q.  This is the EOAA outcome letter, correct, from that report

12   that we were discussing before about Hong Kong?

13   A.  I believe so.

14   Q.  Do you see the signature at the middle of page 2?

15   A.  Yes.

16   Q.  This was signed by Director of Investigations Michael Dunn,

17   right?

18   A.  Yes.

19          MS. DONEHOWER:  I don't believe the jury are able to

20   see this document at the moment.

21          THE COURT:  This is 37?

22          MS. DONEHOWER:  Yes.

23   Q.  This letter is signed by Director of Investigations Michael

24   K. Dunn, correct?

25   A.  Correct.

```
1   Q.  Michael K. Dunn is the same person who ultimately
2   investigated Professor Ravina's complaint, right?
3   A.  Correct.
4   Q.  You see the date on the top of the first page?
5   A.  Yes.
6   Q.  It's May 15, 2014, right?
7   A.  Correct.
8   Q.  Director Dunn asked you whether you had made the statement
9   about women in Hong Kong, right?
10  A.  Yes.
11  Q.  But you did not tell him whether you said it or not.
12  A.  I definitely denied it.
13          MS. DONEHOWER:  Can we look at plaintiff's exhibit
14  here at page 2, paragraph 2.  That's it.
15          If you could please, Mr. McLeod, highlight the last
16  sentence there.
17  Q.  Do you see that last sentence, Professor Bekaert?
18  A.  Yes.
19  Q.  Director Dunn wrote, "When I asked if you made the alleged
20  statement concerning women in Hong Kong, you did not state
21  whether or not you did so."  Right?
22  A.  That's Mr. Dunn's interpretation, but I definitely said to
23  him in some kind of fashion that I did not say it.  There's no
24  reason for me to say something like this in my class and I did
25  not say that.
```

I7d1rav1                    Bekaert - Direct

1    Q.  So you believe Director Dunn was wrong in his letter.

2    A.  I mean, you don't allow me to give context, but --

3    Q.  It's just yes or no.  You believe that when he wrote this

4    in the letter, he was wrong.

5    A.  I think he misheard me.  He --

6    Q.  Professor Bekaert, please, yes or no.

7            THE COURT:  If you can answer yes or no.  If you

8    can't, just say you can't.

9    A.  I can't really answer this.  There's a lot of context here

10   you don't allow me to give, and so I cannot answer this

11   question.  It's all --

12   Q.  Well, we have Director Dunn saying that you did not answer

13   the question, and today you're testifying that you did, even

14   though he wrote something to the contrary, right?

15   A.  I cannot answer this question without the context.  I'm

16   sorry.  And I'm willing to give the context.

17           THE COURT:  Do you want him to answer the context?

18           MS. DONEHOWER:  No.  I just want the witness to

19   acknowledge that what he is saying on the stand is different

20   than what is written in this letter.

21   A.  This is an important issue, so I want to give an answer.

22   Q.  Professor Bekaert, there's no question pending at the

23   moment.

24   A.  Okay.

25   Q.  Even without -- even though he reported that you did not

I7d1rav1                    Bekaert - Direct

1    answer his question, Director Dunn concluded that you hadn't

2    violated Columbia's sexual harassment policy, right?

3    A.   Correct.  I didn't.

4    Q.   You testified -- let's go back to this issue of the

5    research divorce.

6            There wasn't much progress on what Columbia called the

7    research divorce during the summer of 2014, was there?

8    A.   Depends how you define progress, but I would say no.

9    Q.   The progress got postponed to the fall?

10   A.   A lot of people were traveling.

11   Q.   It's just a yes or no question, Professor Bekaert, not an

12   explanation.  The progress got postponed to the fall, correct?

13   A.   Yes.

14   Q.   In the fall, the dean's office shifted the responsibility

15   for addressing Professor Ravina's complaint to the finance and

16   economics department?

17   A.   I think that's roughly right, yes.

18   Q.   Then after that, Professor Steve Zeldes and Senior Vice

19   Dean Charles Dunn took over?

20   A.   That would be Charles Jones.

21   Q.   Charles Jones.  So Professor Steve Zeldes and Senior Vice

22   Dean Charles Jones took over, right?

23   A.   I think that's correct.

24   Q.   After a while, Dean Hubbard was not in the meetings about

25   the issues between you and Professor Ravina anymore?

I7d1rav1                    Bekaert - Direct

1   A.  Yeah, the personnel changed.

2   Q.  Thank you.  And that's because he's a very busy man?

3   A.  I cannot speak for Mr. Hubbard.

4   Q.  I'm asking whether it was your understanding that he was

5   not in the meetings because he was a busy man.

6   A.  I really cannot speak for Dean Hubbard.

7   Q.  I'm not asking you to speak for Dean Hubbard, Professor

8   Bekaert.

9           THE COURT:  Please rephrase that question.

10          MS. DONEHOWER:  Sure.

11          I'll withdraw.  I'll move on, your Honor.

12  Q.  Eventually, Columbia conducted an examination of Professor

13  Ravina's report, an investigation of her complaint, right?

14  A.  I assume so, yes.  I mean, I got called in to the Title IX

15  office, yes.

16  Q.  During Columbia's investigation, you met with Director

17  Michael Dunn again?

18  A.  Yes.

19  Q.  Your first meeting was on September 24, 2014?

20  A.  September when?

21  Q.  Very specific information.  It was around September 2014,

22  right?

23  A.  I think it was towards the end of September, yes.

24  Q.  Shortly after the September email that we just discussed

25  earlier where you talk about going to speak with Dean Hubbard,

 1   right?

 2   A.  I'm not sure what you're referring to.

 3   Q.  We looked at a September 12th email that you had sent

 4   saying that you should go speak to Dean Hubbard and Katie

 5   Phillips.

 6   A.  Right.

 7   Q.  And you met with Michael Dunn after you sent that email,

 8   right?

 9   A.  Yes.

10   Q.  That was about four months after Columbia ended its

11   previous investigation about a student's complaint, about you?

12   A.  You mean whether May versus September is four months?  I

13   guess so, yes.

14   Q.  Director Dunn asked you some questions at your first

15   meeting with him, right?

16   A.  He did.

17   Q.  He took notes at your meeting?

18   A.  I -- don't remember.  I think he did, yeah.  I think he had

19   a pad with him.

20   Q.  You understood that it was important to tell Director Dunn

21   the truth?

22   A.  At that first meeting I had no idea what happened to me.

23   Q.  My question is about your understanding.  Did you

24   understand, Professor Bekaert, that it was important to tell

25   Director Dunn the truth?

I7d1rav1                         Bekaert - Direct

1    A.  Of course.

2    Q.  And you told him the truth, right?

3    A.  Like I said, I was totally flabbergasted, but I told --

4    Q.  It's a yes or no question, Professor Bekaert.  It

5    shouldn't -- just, did you tell him the truth?

6    A.  I think so.  I mean -- yes.

7    Q.  You told Director Dunn that you had dinners with Professor

8    Ravina?

9    A.  Sure.

10   Q.  You also told him that you never initiated a dinner

11   invitation?

12   A.  I don't remember that.

13            MS. DONEHOWER:  Could we please pull up Plaintiff's

14   Exhibit 77.

15            THE COURT:  Is it in evidence?

16            MS. DONEHOWER:  It's not yet in evidence.  Sorry.

17   Let's just mark it.

18            THE COURT:  So not for the jury.

19            MS. DONEHOWER:  No, not for the jury.  I apologize.

20            (Continued on next page)

21

22

23

24

25

1          MS. DONEHOWER:  I would like to offer this document

2     into evidence, your Honor.

3          THE COURT:  I don't think you have yet met the

4     requirements of Rule 613.

5          MS. DONEHOWER:  I believe there is consent on this

6     document, but if not I can lay a foundation and go into it.

7          THE COURT:  Is there consent?

8          MR. HERNSTADT:  No.  I think you're right, your Honor.

9     BY MS. DONEHOWER:

10    Q.  You told Director Dunn that you had never initiated a

11    dinner invitation, correct?

12    A.  I don't know.

13         MS. DONEHOWER:  If we could just show but not publish

14    to the witness, please, Plaintiff's Exhibit 77 at page 2.

15         Let's show him the first page 2.

16         MR. HERNSTADT:  Where is it?

17    BY MS. DONEHOWER:

18    Q.  Professor Bekaert, do you recognize these as Director

19    Dunn's notes?

20    A.  I'm sorry.  How could I recognize --

21    Q.  I am just asking if it refreshes your recollection.

22         MS. DONEHOWER:  If we look at -- there you go, a

23    little bit further down.  Great.  Thank you, Mr. McLeod.

24    BY MS. DONEHOWER:

25    Q.  Professor Bekaert, does this refresh your recollection

1    about whether you told Director Dunn that you had never

2    initiated a dinner invitation?

3    A.   It does not.  I mean, I don't really -- this meeting for me

4    was a blur.

5    Q.   This is a yes-or-no question, Professor Bekaert.

6    A.   No, it doesn't.

7    Q.   It doesn't refresh your recollection.  Thank you.

8            Do you recalling telling him that you had no romantic

9    interest in Professor Ravina?

10           That's what you told him, you had no romantic interest

11   in Professor Ravina, right?

12   A.   Yes, I have never had a romantic interest in Enrichetta.

13   Q.   You told Director Dunn that there was no physical contact

14   between you and Professor Ravina?

15   A.   Absolutely not.

16   Q.   You also said if there physical contact, it was the other

17   way around?

18   A.   It is possible.

19   Q.   What you meant is if there was physical contact it was

20   because Professor Ravina had touched you?

21   A.   Yes, that is possible.

22   Q.   You told Director Dunn that your relationship with

23   Professor Ravina was maybe flirtatious?

24   A.   I don't recalling saying that.

25           MS. DONEHOWER:  Can we please show the witness but not

1   publish Plaintiff's Exhibit 77 at page 8.

2   Q.   Professor Bekaert, does this refresh your recollection that

3   you told Direct Dunn that your relationship may be flirtatious?

4   A.   No.

5               MS. DONEHOWER:   You how about Plaintiff's Exhibit's

6   81, please.   Can you show that just to Professor Bekaert,

7   please, at page 1 second to last paragraph.

8   BY MS. DONEHOWER:

9   Q.   Does this refresh your recollection that you told him that

10  it may be flirtatious?

11  A.   Not really.

12  Q.   You and Columbia's investigator, Director Dunn, discussed

13  Professor Ravina's claim that you had talked about the

14  attractiveness of female research assistants, right?

15  A.   I vaguely remember something of this.

16  Q.   You told him that you weren't sure whether you had

17  discussed the attractiveness of your research assistants?

18  A.   It's possible.   I don't really remember.

19  Q.   You and Columbia's investigator discussed Professor Ravina,

20  discussed an incident in your office with a mug?

21  A.   That came much later.   That was not at the first meeting

22  and not at the second meeting.

23  Q.   At any meeting with Director Dunn, so -- withdrawn.

24               You had multiple meetings with Director Dunn, right?

25  A.   I believe I had two meetings, and there was one phone call.

1    Q.  So in your two meetings or one phone call, at any of those

2    times, you discussed with him an incident in your office with a

3    mug, right?

4    A.  He called me.

5    Q.  That is just a yes-or-no question, Professor Bekaert.

6            Did you discuss with Director Dunn an incident with a

7    mug?

8    A.  An alleged incident.

9    Q.  An alleged incident.  This alleged incident concerned a mug

10   that you keep in your office at Columbia Business School?

11   A.  It does.

12   Q.  An office that's -- you often -- you sometimes meet with

13   students in your office, right?

14   A.  Yes.

15   Q.  And you met with Professor Ravina in your office?

16   A.  Yes.

17   Q.  And the mug says on the bottom I'm horny essentially?

18   A.  Yes.  It is at the bottom, though.

19   Q.  You told Director Dunn that you couldn't recall asking

20   Professor Ravina to read the mug, right?

21   A.  Sure.  I never --

22   Q.  You told Director Dunn that you can be charming?

23   A.  I don't recall that.

24   Q.  You told Director Dunn that the power gap between you and

25   Professor Ravina had never crossed your mind, right?

```
1    A.   Yep.

2    Q.   In that same interview you told Director Dunn that you were

3    the only person who could have helped Professor Ravina?

4    A.   I don't remember that.

5    Q.   Can we please show just the witness Plaintiff's Exhibit 77

6    at page 7, lines 4 to 5.

7              Does that refresh your recollection?

8    A.   No.   Can I --

9    Q.   You and Director Dunn also discussed some of the e-mails

10   that you sent with Professor Ravina?

11   A.   Um, I think we discussed certain phrases in e-mails.

12   Q.   It is just a yes-or-no question, Professor Bekaert.

13             Did you discuss with him specific e-mails that you had

14   sent at any time at any of your meetings or phone calls,

15   e-mails you had sent with Professor Ravina?

16   A.   I think we discussed snippets of e-mails.

17   Q.   You only provided him with snippets of e-mails?

18   A.   Oh, I am not sure what the question is.   Can you rephrase

19   the question, please.

20   Q.   Sure.   Did you provide professor --

21   A.   Oh, yes.

22   Q.   Did you provide Investigator Michael Dunn with e-mails

23   between you and Professor Ravina?

24   A.   Oh.

25   Q.   Yes or no?
```

1   A.  I'm sorry.  I misunderstood the question.  Yes.

2   Q.  Did you provide him with e-mails or snippets of e-mails?

3   A.  No, basically full e-mails.

4   Q.  Full e-mails.  OK.

5          You discussed some of those full e-mails with Director

6   Dunn, right?

7   A.  That was in the second meeting.

8   Q.  Is that a yes?

9   A.  Yes.  I --

10  Q.  You discussed an e-mail in which you had told Professor

11  Ravina if you don't start making sense I'm going to take

12  drastic action?

13  A.  I don't recall discussing this with Mr. Dunn, but it may

14  have been in my e-mail trail.

15  Q.  You acknowledged to Director Dunn that the threat to take

16  drastic action was bad coming from a senior faculty member to a

17  junior untenured professor?

18  A.  Yes.  I regret writing that e-mail.

19  Q.  You told Director Dunn that you did not know how you could

20  write an objective letter for Professor Ravina now?

21  A.  Of course.

22  Q.  You told Director Dunn that you felt Professor Ravina had

23  stabbed you in the back?

24  A.  That's quite possible.  Because --

25  Q.  You told him that she had gotten under your skin?

1    A.   That's definitely possible.

2    Q.   You told Director Dunn, Columbia's investigator, that

3    Professor Ravina was irrational, right.

4    A.   I don't know if I told him this, but it is part of the

5    e-mail trail.

6            MS. DONEHOWER:   Can I please see not -- just to show

7    to the witness please, Plaintiff's Exhibit 77 at page 7.

8            It's paragraph 6.

9    BY MS. DONEHOWER:

10   Q.   Professor Bekaert, does this refresh your recollection that

11   you told Columbia's investigator that Professor Ravina was

12   irrational?

13   A.   It kind of doesn't, and it doesn't even seem to say that.

14   I think it refers to the e-mail trail where the word irrational

15   was being used.

16   Q.   Did you tell Director Dunn that Professor Ravina's e-mails

17   were irrational?

18   A.   I think what the snippet is saying --

19   Q.   I am not asking about the document.  The document is not in

20   evidence.

21   A.   Right.

22   Q.   I am asking whether you told -- this is intended to refresh

23   your recollection --

24   A.   Oh, yes.

25   Q.   -- see if it jogs your memory.

1          Does this refresh your recollection that you told him

2     that her e-mails were irrational?

3     A.  It does not.

4     Q.  You told Director Dunn that it was you who had been

5     harassed?

6     A.  I don't recall saying that, but I probably felt that way at

7     that time, yes.

8          MS. DONEHOWER:  Can the witness please be shown

9     Plaintiff's Exhibit 81.

10          MR. HERNSTADT:  What page?

11          MS. DONEHOWER:  Page 5, paragraph 2, line 1.

12     BY MS. DONEHOWER:

13     Q.  Does this refresh your recollection that you told

14     Columbia's investigator that you felt harassed?

15     A.  It is actually hard for me to read this to be honest.  I

16     can't make out the first word.

17          THE COURT:  He said he can't read it.

18          MS. DONEHOWER:  OK.

19     BY MS. DONEHOWER:

20     Q.  Director Dunn eventually issued a letter about Professor

21     Ravina's Title IX complaint, right?

22     A.  Yes.

23     Q.  He issued it on November 17, 2014?

24     A.  I don't remember the exact date.

25          MS. DONEHOWER:  Can we please pull up Plaintiff's

1    Exhibit 90, which is already in evidence.

2    Q.  Is this the letter you were just referring to, Professor

3    Bekaert?

4    A.  That you were referring to, I am sure.  Yes.

5    Q.  And the date at the top of the page is November 17, 2014,

6    right?

7    A.  Yes.

8    Q.  You see the first paragraph towards the bottom of that

9    paragraph Director Dunn wrote, "I have not found a violation of

10   Columbia University's employment policies and procedures on

11   discrimination and harassment."

12          Right?

13   A.  Uh-huh.

14   Q.  You believe that this letter cleared you of all wrongdoing?

15   A.  Yes.

16   Q.  You told people that Columbia University cleared you of all

17   wrongdoing?

18   A.  Define people.

19   Q.  Well, let's take, for example, business school professors.

20          You told business school professors that Columbia

21   University had cleared you of all wrongdoing?

22   A.  I actually didn't even discuss this --

23   Q.  That is a yes-or-no question, Professor Bekaert.

24          Did you tell any business school professors at any

25   time that Columbia University had cleared you of all

1    wrongdoing?

2    A.   Only my friends.

3    Q.   Who are business school professors, right?

4    A.   Yes, some of them.

5    Q.   After you received Director Dunn's letter, you still

6    continued still to work with Professor Ravina?

7    A.   There was an agreement to continue working on certain

8    papers --

9    Q.   That's a --

10   A.   -- yes.

11          MS. DONEHOWER:   OK.   Thank you.   Can we please just

12   mark but not publish Plaintiff's Exhibit 91.

13          Your Honor, plaintiff would like to move this document

14   into evidence.

15          THE COURT:   Any objection to 91?

16          MS. PLEVAN:   No objection.

17          MR. HERNSTADT:   No, your Honor.

18          THE COURT:   All right.   91 will be admitted.

19          (Plaintiff's Exhibit 91 received in evidence)

20   Q.   Professor Bekaert, do you see this is an e-mail chain, it

21   includes you, it includes Professor Ravina, it includes Dean

22   Glenn Hubbard, it includes Vice Dean Janet Horan, it includes

23   Professor Daniel Wolfenzon.

24          Is that everyone that you see on this page?

25   A.   Yes.   Did you mention -- yes, yes, yes.

1          MS. DONEHOWER:  I would like to start a little bit

2     further back -- well, I'm sorry.  If we could just -- yeah,

3     let's start perhaps at the beginning of this chain.

4     BY MS. DONEHOWER:

5     Q.  So this first e-mail is from Professor Ravina to Andrea

6     Kiguel, who you already testified was a research assistant who

7     worked with you, right?

8     A.  Yes.

9     Q.  And here she's cover -- she's CC'd, Professor Ravina has

10    CC'd Daniel Wolfenzon.

11          He was at the time working as the relationship

12    manager?

13    A.  Yes, he was appointed.

14    Q.  And she also CC'd Dean Glenn Hubbard?

15    A.  Yes.

16    Q.  This e-mail was sent on November 20, 2014, right?

17    A.  Yes.

18    Q.  And Professor Ravina wrote to Andrea.  She said, "How are

19    you?"

20          And then further down she asks, "Can you please send

21    me the codes you used to run the regressions and create the

22    tables so I can rerun after dropping the few managed accounts

23    in file 15."

24          And then on third line there she asks for analysis and

25    tables.

I7dnrav2                      Bekaert - Direct

1   A.  Uh-huh.

2   Q.  Is that correct?

3   A.  Yes.  That's correct.

4           MS. DONEHOWER:    If we can look at the page before

5   that, please, Mr. McLeod.  Page 3, bottom e-mail.

6   BY MS. DONEHOWER:

7   Q.  Here Professor Ravina is following up, right?

8   A.  It appears so.

9   Q.  She sent this e-mail on December 3, 2014?

10  A.  Yes.

11  Q.  And this time the e-mail was directed to you, right?

12  A.  And the same people CC'd, yes.

13  Q.  And she writes in the last sentence, "When can I expect the

14  codes and tables?"

15  A.  Yes.

16  Q.  This was about two weeks after her prior e-mail, right?

17  A.  It was.

18  Q.  Just above that you responded, right?

19          Do you see a response, Professor Bekaert?

20  A.  Yes.

21  Q.  You told her, "The issue is currently under discussion

22  between the lawyers"?

23  A.  Yes, that's what's there.

24  Q.  You did not include the codes in your response?

25  A.  No.

I7dnrav2                    Bekaert - Direct

1  Q.  You didn't include the data?

2  A.  No.

3  Q.  You didn't include the tables?

4  A.  No, of course not.

5  Q.  On the prior page at the bottom of page 2 Professor Ravina

6  sent you another e-mail, right?

7  A.  Yes.

8  Q.  And she wrote, "This is not under discussion between the

9  lawyers I am asking to get the tables and codes of the

10  international paper to be able to work."

11        Right?

12  A.  That's what she wrote.

13  Q.  You responded to her in the e-mail above.

14        Do you see that?

15  A.  Yes.

16  Q.  You wrote, "It was under discussion last I heard, but I am

17  informed just now that there are some potential changes.  At

18  one point, I hope to get clarity on this, but in the meantime,

19  I am working on the article with Andrea."  Right?

20  A.  Yes.

21  Q.  You still did not send her any data?

22  A.  At that point, no.

23  Q.  It's true that you didn't send her any codes or tables at

24  that point?

25  A.  No.  There was no reason to.

1    Q.  When you told Professor Ravina that you hoped to get

2    clarity on it at some point, you didn't specify when you hoped

3    to do that?

4    A.  It doesn't appear to be in the e-mail, no.

5    Q.  It also wasn't true that you were hoping to get clarity,

6    right?

7    A.  It was very clear what was true, which is that I had

8    committed to --

9    Q.  It is yes or no.  That wasn't true when you told her I'm

10   hoping to get clarity that wasn't true, what you wrote to her?

11   A.  Sure, it was true.

12   Q.  You already knew that you did not intend to send her the

13   codes when you sent her that e-mail, right?

14   A.  I sent her the codes eventually.

15   Q.  I am asking at that moment when you sent her the e-mail we

16   just discussed you already knew that you did not intend to send

17   here the codes, right?

18   A.  I cannot put myself in my frame of mind at that point.

19           MS. DONEHOWER:  OK.  Let's look at the e-mail at the

20   top of the page, please.  I'm sorry.  Not the e-mail at the

21   top, the second e-mail down, please.

22           Mr. McLeod, I'm sorry about this.  Can you actually

23   pull up the top to e-mails.  Thank you very much.

24   BY MS. DONEHOWER:

25   Q.  You forwarded this exchange to Dean Glenn Hubbard, right?

1    A.  Yes.

2    Q.  And you also forwarded it to Vice Dean Janet Horan?

3    A.  Yes.

4    Q.  That e-mail on the bottom is from you, right?

5    A.  Indeed.

6    Q.  And this is just a few hours after you had sent the e-mail

7    to Professor Ravina where you said that you hoped to get some

8    clarity, right?

9    A.  Well, I think this is me asking for the clarity.

10   Q.  Timing.  Timing.  I am just asking you, this e-mail was

11   sent a few hours after the one you sent to Professor Ravina,

12   yes?

13   A.  Absolutely, yes.

14   Q.  You wrote here, "This is driving me nuts.  What do I do?  I

15   am not going to send it.  Andrea is not going to send it,

16   period."

17   A.  Yeah.

18   Q.  I just feel -- "I feel like just saying no."  Right?

19   A.  That's what I wrote.

20   Q.  You wrote your own draft of the international

21   diversification paper?

22   A.  We did, because that's what we agreed upon.

23   Q.  That was a yes Professor, Bekaert?

24   A.  Yes, that's an emphatic yes.

25   Q.  And you told your research assistant that you were going to

1    mostly ignore the work that Professor Ravina had done?

2    A.   It's -- I -- did you have a context, because I don't

3    remember saying that, but --

4              MS. DONEHOWER:   Your Honor, I would like to just mark

5    at this point Plaintiff's Exhibit 58.

6              THE COURT:   OK.

7              MS. DONEHOWER:   Your Honor, plaintiff would like to

8    offer Exhibit 58 into evidence.

9              THE COURT:   Any objection?

10             MR. HERNSTADT:   I just need a second.   It's a long

11   exhibit.

12             No objection, your Honor.

13             THE COURT:   It will be admitted.

14             (Plaintiff's Exhibit 28 received in evidence)

15   BY MS. DONEHOWER:

16   Q.   As Mr. Hernstadt mentioned, this is a -- well, I apologize

17   because the witness doesn't have a copy, but if I could give

18   him a copy just to look at the length.

19             Professor Bekaert, you agree with your counsel's

20   assessment that this is a long exhibit?

21   A.   Yes.

22   Q.   It's many pages of e-mails about this project, this

23   research project?

24   A.   Yes.

25   Q.   At the top e-mail is from you to Andrea Kiguel, correct?

1   A.  Yes.

2   Q.  She was the research assistant we discussed before?

3   A.  Yes.

4   Q.  You wrote to Andrea, "She is insane"?

5   A.  It's right there, yes.

6   Q.  You were referring to Professor Ravina, right?

7   A.  Absolutely.

8   Q.  You wrote:  "This makes no sense.  I do not think her data

9   match ours, so I am going to mostly ignore her work."  Right?

10  A.  Yep.

11  Q.  You told Professor Ravina that if she duplicated work that

12  was too bad because she would just have to work from your

13  version?

14  A.  Could you give me the context.

15          MS. DONEHOWER:  Can we please pull up what's been

16  admitted into evidence as Defendant's Exhibit JU, page 1,

17  bottom e-mail.

18          This is an e-mail that you wrote to Professor Ravina,

19  right?

20  A.  Yes.

21  Q.  And copied here are Wei Hu, who is with Financial Engines,

22  right?

23  A.  Yes.

24  Q.  And Kenton Hoyem, who is another one of your coauthors from

25  Financial Engines, correct?

1   A.  Correct.

2   Q.  You also copied Daniel Wolfenzon, a professor from the

3   business who was the relationship manager, right?

4   A.  Yes.

5   Q.  And Andrea Kiguel, your research assistant, right?

6   A.  Yes.

7   Q.  Isn't it true that you wrote in this e-mail to Professor

8   Ravina:  "I told you loud and clear I was working on the paper.

9   If you duplicated work, that is too bad, but the main version

10  we will be working from is mine."  Right?

11  A.  Yes.

12  Q.  You said, "I will see if I can use anything of yours," and

13  then you admonished her in the last line, "You should have

14  communicated better."  Right?

15  A.  Yes.

16  Q.  Professor Ravina continued to ask you for these codes and

17  tables and data?

18  A.  It is a possible.  I don't recall the exact e-mails.

19          MS. DONEHOWER:  I would like to mark, please,

20  Plaintiff's Exhibit 95.

21          THE COURT:  Thank you.

22          MS. DONEHOWER:  I would like to move Plaintiff's

23  Exhibit 95 into evidence, please.

24          THE COURT:  Any objection?

25          MR. HERNSTADT:  No, your Honor.

1              MS. PLEVAN:  No objection.

2              THE COURT:  All right.  It will be admitted.

3              MS. DONEHOWER:  Thank you.

4              (Plaintiff's Exhibit 95 received in evidence)

5     BY MS. DONEHOWER:

6     Q.  Professor Bekaert, let's look at the bottom e-mail on this

7     first page, please.  This is from Professor Ravina to you,

8     correct?

9     A.  Correct.

10    Q.  And she copied Vice Dean Janet Horan of the business

11    school, of Columbia's business school, correct?

12    A.  Correct.

13    Q.  She's copied Dean Glenn Hubbard of Columbia Business

14    School, right?

15    A.  Yes.

16    Q.  She's copied the relationship manager, Daniel Wolfenzon?

17    A.  Yes.

18    Q.  She's copied Andrea Kiguel, the research assistant?

19    A.  Yes.

20    Q.  She wrote in the second paragraph, second sentence there,

21    "I find it quite" -- I apologize, third sentence:  "I am asking

22    you, in front of everyone, to let her do so, to let Andrea send

23    the codes."

24              That's what she was asking you, right, to let Andrea

25    send the codes and tables?

1   A.   That's what's written there.

2   Q.   Thank you.  So in this e-mail --

3        MS. DONEHOWER:   I apologize, Mr. McLeod.

4   Q.   -- she was asking you in front of the administration of the

5   Columbia Business School, correct?

6   A.   Yes.   There's --

7   Q.   And she said that it had been close to two years that you

8   had been e-mailing you were working on the paper, right?

9   A.   That's what she says, yes.

10  Q.   And she said that the last time you did so was during the

11  summer under the watch of the school, right?

12  A.   That is what she writes, yes.

13  Q.   While you were e-mailing with Professor Ravina about the

14  research project, you were also e-mailing other people about

15  her, right?

16  A.   Yes, friends and some.

17  Q.   One of these people was Marie Hoerova?

18  A.   Yes.

19  Q.   She is a principal economist in the financial research

20  division of the European Central Bank?

21  A.   Yes.

22  Q.   Around this time you asked Ms. Hoerova, can I just strangle

23  her and get it over with?

24  A.   I am sure that's in an e-mail to her.

25  Q.   The "her" you were referring to was Professor Ravina?

1    A.  You mean in the sentence you just said?

2    Q.  Yes.

3    A.  Yeah, I am sure it is.

4    Q.  You also said that you would be over-the-hill professional

5    with Professor Ravina?

6    A.  I don't recall it precisely, but it is possible that was in

7    an e-mail.

8              MS. DONEHOWER:  I would like to mark, please,

9    Plaintiff's Exhibit 61.

10   A.  Actually, excuse me --

11             MS. DONEHOWER:  There's no question pending, Professor

12   Bekaert.

13             THE WITNESS:  Can I ask a technical question.

14             THE COURT:  A technical question about?

15             THE WITNESS:  The previous question I would strangle,

16   if I don't see the document, can we not bring it up afterwards?

17             THE COURT:  You know what, your lawyer will be able to

18   ask you any follow-up questions.  If you don't remember saying

19   something in particular or you don't remember how you phrased

20   it, just say that.

21             THE WITNESS:  If I would like to see the context, I

22   actually have to have the document brought up?

23             THE COURT:  Yes.

24             THE WITNESS:  I would like to see the context then.

25   She's --

1          MS. DONEHOWER:  Your Honor, we are seeking to move

2     Plaintiff's Exhibit 61 into evidence, please.

3          THE COURT:  OK.  Let's see if this is the document she

4     is referring to.

5          THE WITNESS:  If it is all the same document, because

6     I am not sure --

7          THE COURT:  Is there any objection to 61?

8          MR. HERNSTADT:  No objection, your Honor.

9          MS. PLEVAN:  Same.

10          THE COURT:  OK.

11          MS. DONEHOWER:  We can publish, I'm sorry.

12          THE COURT:  OK.  It is admitted, Exhibit 61.

13          (Plaintiff's Exhibit 61 received in evidence)

14          THE WITNESS:  I just wanted to see it.

15          MS. DONEHOWER:  Mr. McLeod can you please bring up.

16     Thank you.  Let's start please at page 4, paragraph 1.

17     BY MS. DONEHOWER:

18     Q.  Professor Bekaert, do you see at the end -- do you see the

19     second paragraph in this e-mail?

20     A.  I am trying to -- OK.

21     Q.  Page 4, Professor Bekaert.

22     A.  OK.  Yes.

23     Q.  Can you please read that second paragraph for us.

24     A.  The RA is getting exasperated too, given Ravina's

25     proclivity to insert little notes on how her work was deficient

1    and not accepting responsibility for, for example, giving her

2    the wrong file.  Can I just strangle her and get it over with?"

3    Q.  Can we please move to --

4              MR. HERNSTADT:  I'm sorry.

5              Is this Exhibit 61?

6              MS. DONEHOWER:  Page 1, yes.

7              MR. HERNSTADT:  Sorry.

8              MS. DONEHOWER:  We are looking at page 1, the bottom

9    e-mail.

10   BY MS. DONEHOWER:

11   Q.  Do you see the second -- the third sentence in this first

12   paragraph.  You wrote, "I will be over the hill professional

13   with her," right?

14   A.  Correct.

15   Q.  The "her" you were referring to was Professor Ravina?

16   A.  Yes.

17   Q.  You wrote that may actually a get under her skin -- that

18   may actually get more under her skin than me giving in to her

19   schemes, right?

20   A.  Yes.

21   Q.  Around this time, August 2014, you were e-mailing with a

22   finance professor in Australia?

23   A.  I don't remember all my e-mails, but I am sure it is true.

24             MS. DONEHOWER:  Can we please mark Plaintiff's Exhibit

25   60.

1            MS. DONEHOWER:  Your Honor, we would like to move

2     Plaintiff's Exhibit 60 into evidence.

3            THE COURT:  Any objection to 60?

4            Any objection, Mr. Hernstadt?

5            MR. HERNSTADT:  No, your Honor.

6            THE COURT:  OK.  60 will be admitted.

7            (Plaintiff's Exhibit 60 received in evidence)

8     BY MS. DONEHOWER:

9     Q.  Do you see this e-mail exchange is between you and

10    professor Shumi Akter?

11    A.  Uh-huh.

12    Q.  She is a finance professor in Australia, correct?

13    A.  Correct.

14    Q.  This e-mail exchange is in August 2014, right?

15    A.  Yes.

16    Q.  If you look at page 2, please.

17           Do you see in the second paragraph, that last

18    sentence -- well, actually that whole sentence that says, "It

19    is actually partially professional/partially personal but

20    bizarre and painful at the same time.  Essentially a coauthor

21    who has gone berserk."

22           The coauthor you were referring to there was Professor

23    Ravina, right?

24    A.  Can I just read the complete -- I suspect it is.  It's not

25    a hundred percent clear from the context, but I suspect it is.

1           MS. DONEHOWER:  Can we show Professor Bekaert, please,

2    page 1, the top e-mail.

3    BY MS. DONEHOWER:

4    Q.  Can you please read here what you wrote, Professor Bekaert?

5    A.  The whole thing?

6    Q.  Yes, please.

7    A.  Yup.  "It's unreal what she did, but I'm not even going to

8    write about it.  I'm scared shitless about anything I put in an

9    e-mail these days."

10          MS. DONEHOWER:  Your Honor, we would like to mark

11   Plaintiff's Exhibit 89, please.

12          Your Honor, we would like to move this document into

13   evidence.

14          THE COURT:  Any objection?

15          MR. HERNSTADT:  No objection, your Honor.

16          THE COURT:  All right.  It will be admitted, 89.

17          (Plaintiff's Exhibit 89 received in evidence)

18          MS. DONEHOWER:  Can we please show the witness

19   Plaintiff's Exhibit 60 -- I'm sorry.  89.

20   BY MS. DONEHOWER:

21   Q.  This is an e-mail from you to George Panayatov?

22   A.  Panayatov, yes.

23   Q.  It is dated November 16, 2014, right?

24   A.  Yes.

25   Q.  Can you read the first three sentences of this e-mail,

1    please, Professor Bekaert.

2    A.  Well, the ones that are not redacted, OK.

3            "The earliest I will be able to do it is in all

4    likelihood Monday evening.  Still have a visitor in, and

5    tomorrow I got nothing but meetings during the day, including

6    crap with the university about this Enrichetta.  I tell you

7    that woman is insane and incredibly evil."

8    Q.  You weren't too scared to write that in an e-mail, were

9    you?

10   A.  I probably shouldn't have, but --

11   Q.  George Panayotov is a professor at the Hong Kong University

12   of Science and Technology, right?

13   A.  Yes.

14   Q.  He is in the department of finance, correct?

15   A.  Yes.  He's an assistant professor there.

16   Q.  We just went over that e-mail, but there's more e-mails

17   where you've described your opinion of the plaintiff, Professor

18   Ravina, right?

19   A.  Well, with some friends there might be.

20   Q.  A handful?

21   A.  I don't know.

22   Q.  We have already discussed that you knew Professor Ravina

23   needed Financial Engines to publish the retirement project

24   papers, right?

25   A.  What do you mean "needed?"

1   Q.  The e-mail we discussed earlier you had sent where she

2   needed -- you said that she needed them for at least two of the

3   projects.

4           Do you recall that e-mail, your testimony from this

5   morning?

6   A.  Right.  That was an e-mail to my research assistant.  It

7   was not an official document.  It was an opinion.

8   Q.  An opinion about what Professor Ravina needed.  Your

9   opinion in fact, right?

10  A.  I think it was an implicit agreement --

11  Q.  When you said was an opinion you meant it was your opinion,

12  right?

13  A.  We needed coauthorship.

14  Q.  Whose opinion Professor Bekaert?

15          Was it your opinion?  Yes or no.

16  A.  Sure.

17  Q.  You are familiar with Wei Hu, right?

18  A.  Yes.

19  Q.  He is the vice president of financial research at Financial

20  Engines?

21  A.  I don't know if that's his position still, but at the time

22  he was.

23  Q.  At the time that you were working on the retirement

24  projects?

25  A.  Right.

1    Q.   That includes 2014?

2    A.   Yes.

3              MS. DONEHOWER:  If we could please mark Plaintiff's

4    Exhibit 96.

5              Your Honor, plaintiff would like to move this document

6    into evidence, please.

7              THE COURT:  Any objection to 96?

8              MR. HERNSTADT:  No.  No objection, your Honor.

9              THE COURT:  96 will be admitted.

10             (Plaintiff's Exhibit 96 received in evidence)

11   BY MS. DONEHOWER:

12   Q.   Professor Bekaert, this e-mail is from you to Mr. Hu,

13   correct?

14   A.   Correct.

15   Q.   This was sent less than two months after Director Dunn's

16   investigation outcome letter?

17   A.   Yes.

18   Q.   Let's start by going down, please --

19             MS. DONEHOWER:  Actually Mr. McLeod, I apologize, to

20   the e-mail below this one.

21   BY MS. DONEHOWER:

22   Q.   That's an e-mail from Professor Ravina to you, right?

23   A.   Yes.

24   Q.   And she copied here Mr. Hu.

25   A.   She did.

I7dnrav2                      Bekaert - Direct

1    Q.  She also copied the relationship manager?

2    A.  Yes.

3    Q.  And she asked you, or she said to you in this e-mail, "It's

4    months I hear from the dean's office that you want to drop your

5    name from the AE paper and that then you keep changing your

6    mind."  Right?

7    A.  That's what she writes?

8    Q.  That's what she wrote.  The automatic enrollment paper you

9    understood that -- I apologize.  You understood the AE paper to

10   refer to the automatic enrollment paper, right?

11   A.  Yes.

12   Q.  OK.  And then this e-mail -- after this e-mail you did not

13   reply at all, right?

14   A.  I would not recall.  I'm sorry.

15   Q.  OK.  If we could go up to the top e-mail.  What you did was

16   you sent this to Wei Hu, right, to Mr. Hu?

17   A.  Of course.  This is what it says.

18   Q.  You did not copy Professor Ravina on this e-mail?

19   A.  No, it was a private e-mail to Wei.

20   Q.  It was private, and we know it was private because you

21   titled it confidential, right?

22   A.  Yes.  I actually had meant to call him on this.

23   Q.  This is just the question.  Please answer the question,

24   Professor Bekaert, if you can.

25   A.  Sure.

1    Q.  In the first paragraph you said -- I am on the second line

2    here:  "Given what we are dealing with, this is a bit

3    dangerous, but I am hoping you will simply delete the e-mail

4    and not mention it to anyone."

5            Did I read that correctly?

6    A.  You read that correctly.

7    Q.  You wanted to make sure that Mr. Hu did not mention this

8    e-mail to Professor Ravina?

9    A.  Yeah.  It's a private conversation.

10   Q.  You wanted to make sure that he did not mention this e-mail

11   to Columbia University?

12   A.  I wanted to keep it private.

13   Q.  This was sent from your Columbia e-mail address, right?

14   A.  Yes.

15   Q.  You wanted to make sure that this e-mail didn't end up in

16   court, right?

17   A.  I mean, at this time I was definitely thinking there would

18   be a court case about this.

19   Q.  And if there was, you wanted to make sure that this e-mail

20   was confidential and didn't get out to anyone else, right?

21   A.  Not really, because actually --

22   Q.  OK.  Not really.

23            So the next sentence here you wrote, "I know you do

24   not want to take sides, which I resent a bit."  Right?

25   A.  Yeah.

1   Q.  You told Mr. Hu that he had known you for a long time?

2   A.  Yes.

3   Q.  And you told him that a quick look at your vitae should

4   reveal that you work well with tons of people, right?

5   A.  Yes.

6   Q.  You told him that you did nothing wrong, correct?

7   A.  Yes.

8   Q.  And isn't it true that you told him that was confirmed

9   officially by Columbia University?

10  A.  Yes.

11  Q.  You told Mr. Hu, "We are dealing with at best a very sick

12  person, at worst an incredibly evil person."  Right?

13  A.  Yes.

14  Q.  The incredibly evil person you were referring to is the

15  plaintiff, Professor Ravina?

16  A.  Yes.

17  Q.  You said next that you could give Mr. Hu a list of at least

18  three RAs she, quote, dealt with to talk to, right?

19  A.  That's what is written there.

20  Q.  What you also wrote in the next paragraph is that Professor

21  Ravina's behavior was crazy, correct?

22  A.  Correct.

23  Q.  You said, "I cannot find any other word for it," right?

24  A.  Yes.

25  Q.  You said, "She simply does everything to make our lives

1    miserable."  Right?

2    A.   That is absolutely right.

3    Q.   You wrote, "I really do not want to communicate with her

4    anymore.  My RA gets physically ill at the mentioning of her

5    name."  Correct?

6    A.   Absolutely correct.

7            MS. DONEHOWER:  And I am not going to go into too much

8    detail but if we scan down the rest of this e-mail, maybe just

9    pull up points one and two, please, Mr. McLeod.

10   BY MS. DONEHOWER:

11   Q.   You gave Mr. Hu details about certain negotiations that you

12   had with Professor Ravina?

13   A.   It appears so.

14   Q.   In the second line here you told Mr. Hu from Financial

15   Engines that you essentially gave in on all Professor Ravina's

16   demands?

17   A.   Yes.

18   Q.   And you said that she still rejected your proposal?

19   A.   Yes.

20   Q.   You offered to give him more details, right?

21   A.   Yes.

22   Q.   That is paragraph 4 of this page.  I apologize, page 1,

23   paragraph 4.  One, two, three, four.

24           Do you see the last line of this e-mail, Professor

25   Bekaert?

1    A.  You mean the whole sentence or --

2    Q.  Let's just look at the part in brackets.  You wrote, "I can

3    tell you what she apparently goes after now, but it is best to

4    wait and see" -- oh, I apologize.  I'm reading the wrong part.

5            All right.  We'll continue with this paragraph here.

6            Let's look at -- sure.

7            So in this paragraph here you are discussing Professor

8    Ravina again, right?

9    A.  I think it's about the international diversification

10   project.

11   Q.  And you wrote that, "The main problem was that Enrichetta

12   had started all this craziness in the meantime"?

13   A.  Yes.

14   Q.  You wrote that the data that she had done turned out to be

15   poor quality?

16   A.  Absolutely.

17   Q.  By craziness you meant, among other things, the report she

18   made about your behavior to Columbia University?

19   A.  The craziness was more about the research here.

20   Q.  You told Mr. Hu that the other problem was that you were

21   waiting for the fund matching data?

22   A.  Is that a question?

23   Q.  Yes, I apologize.  That is what you told him, correct?

24   A.  Can I just -- this is what you are saying the e-mail says?

25   Q.  Yes.  I am asking what you told Mr. Hu.

1    A.  Well, I guess what I am saying, the fund matching data --

2    Q.  I am just asking about the e-mail, Professor Bekaert.

3            But let's move down if that's a hard question for you.

4            The last line of this page, you asked Mr. Hu to step

5    in, right?

6    A.  Yes.

7    Q.  You asked him to agree with your plan?

8    A.  Yes.

9    Q.  You meant to step into the disagreement you were having

10   with Professor Ravina?

11   A.  No, this is -- I'm pretty sure this is about the problem

12   that we had at this point, which is that we had two drafts of

13   the same paper.

14   Q.  Let me make sure my question is -- I think the problem is

15   my question.

16   A.  Yes.

17   Q.  You were having a research disagreement with Professor

18   Ravina, right?

19   A.  There was a -- we had a problem.  We had two drafts.  This

20   is what this is referring to.

21   Q.  You had a research problem with Professor Ravina, right?

22   A.  I mean, I don't know what you mean with a research problem.

23   This particular sentence in this e-mail refers to a very

24   particular issue.

25   Q.  If I am wrong you, can just say no?

1   A.  Yeah.  No.  You are having this sentence up here, so I

2   think what you want me --

3   Q.  Professor Bekaert, you asked, you proposed a sensible plan,

4   right?

5   A.  Right.  How can I know what that sensible plan is if I

6   don't see it.

7   Q.  I apologize.  You need to see the whole e-mail --

8   A.  Exactly.

9   Q.  -- to answer my question about whether you proposed a

10  sensible plan?

11  A.  Right.

12          MS. DONEHOWER:  OK.  This is the one on the second

13  page now?

14  BY MS. DONEHOWER:

15  Q.  There is a line on the bottom of the first page and that

16  line says, "I suggest that you simply step in and agree with my

17  sensible plan."

18          That's what you wrote to Mr. Hu?

19  A.  OK.  So now I can answer the question.

20  Q.  Right.  My question is that's what you wrote to Mr. Hu,

21  correct?

22  A.  That sentence, yes.

23  Q.  You told him that you were willing to finalize the paper,

24  but that it was Professor Ravina who was slowing down progress?

25  A.  Absolutely.

I7dnrav2                         Bekaert - Direct

1    Q.  You told Mr. Hu that you thought the dataset could yield

2    fantastic insights?

3    A.  Yes.

4    Q.  You mentioned to him a different project based on the

5    dataset besides the international diversification project?

6    A.  I'm trying -- I cannot read as fast as you.

7              MS. DONEHOWER:  Sure.  Can we please pull up page 2,

8    paragraph 6.

9    BY MS. DONEHOWER:

10   Q.  Do you see that you mention there a project with Nicolas

11   Crouzet?

12   A.  Yes, that's what was referred to as the reallocation

13   project.

14   Q.  You referred to Professor Crouzet as a great guy?

15   A.  Yes.

16   Q.  You said that paper could go forward without a problem?

17   A.  I was hoping for that.

18   Q.  And you apologized in the next paragraph for picking the

19   wrong person to work on these projects, right?

20   A.  Yes.

21   Q.  You told Financial Engines that Professor Ravina was the

22   wrong person to work on these projects?

23   A.  She definitely proved to be.

24   Q.  You said, "I simply had no idea anybody could be like

25   this," right?

1    A.  Yes.

2    Q.  Mr. Hu responded to your e-mail, didn't he?

3    A.  I'm sure he did.

4    Q.  He told you he was not going to take sides, right?

5    A.  I think he did, yes.

6    Q.  And that pissed you off to no end?

7    A.  Since you are saying it, I -- I don't remember the exact

8    formulation, but I think it probably had.

9                MS. DONEHOWER:  170, please.

10               Your Honor, we would like to mark Plaintiff's Exhibit

11   82.

12               I would like to offer this document into evidence,

13   please.

14               THE COURT:  Any objection to 82?

15               MR. HERNSTADT:  No objection, your Honor.

16               THE COURT:  It will be admitted.

17               (Plaintiff's Exhibit 82 received in evidence)

18   BY MS. DONEHOWER:

19   Q.  Professor Bekaert, I would like you to take a look please

20   at page 2.  Do you see the line where you write "PS"?

21   A.  Yes.

22   Q.  Can you please read that paragraph for us.

23   A.  The whole paragraph?

24   Q.  Yeah.

25   A.  "This is how Wei, main guy for the project at Financial

I7dnrav2                        Bekaert - Direct

1   Engines, responded to my e-mail asking him to keep me in the

2   loop if Enrichetta asks to do stuff separately, plus apologize

3   for the e-mails and tell him about Enrichetta's behavior.

4   Vague but still.  It's a sensible answer" --

5           MR. HERNSTADT:  Objection, your Honor.

6           THE COURT:  What is your objection?

7           MR. HERNSTADT:  Can we have a sidebar briefly.

8           THE COURT:  Sure.  Why don't you take it down in the

9   meantime.  Why don't we actually take our morning break now.

10  It is just about time.  Just remember don't discuss the case

11  and keep an open mind.  Thanks.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Everyone can be seated.  Tell me your

3      objection?

4              MR. HERNSTADT:  Your Honor, the objection is that the

5      witness is being shown an e-mail from 2014 and he's being asked

6      about whether he's responding to an e-mail from 2015.  It's

7      clearly misleading.  He is not being shown the actual

8      documents, and he doesn't have a chance to see the whole thing.

9              THE COURT:  If that's true, I agree with you, but I am

10     just going to ask you to show him the whole thing.  Obviously

11     we want the jury to get an accurate answer, and for the witness

12     to be able to answer accurately he has to be able to respond

13     what he's answering to.

14             MS. DONEHOWER:  Would you like us to hand up a copy

15     when we do that?

16             THE COURT:  What do you want them to do.

17             Would you like them to give him the copies?

18             MR. HERNSTADT:  I would like them to give him paper

19     copies of these.  These are long e-mail exchanges.

20             THE COURT:  That's fine.

21             MS. DONEHOWER:  We don't have a problem with that.

22             THE COURT:  That's fine.

23             MR. HERNSTADT:  Thank you, your Honor.

24             THE COURT:  Why don't we come back promptly at 11:30.

25             Thank you.

I7dnrav2                          Bekaert - Direct

 1              (Recess)

 2              THE COURT:  Everyone can be seated, we will bring in

 3   the jury.  Professor Bekaert, you can come back up.

 4              Thank you.

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7d1rav3                        Bekaert - Direct

1                   THE COURT:  I forgot to mention Ms. Harwin's absence.

2      I'm not inclined to do it at this point unless you want me to.

3                   MR. SANFORD:  That's fine, your Honor.

4                   THE COURT:  Okay.  Thanks.

5                   (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Everyone can be seated.  Thank you.

3         You may proceed.

4              MS. DONEHOWER:  Thank you, your Honor.

5    BY MS. DONEHOWER:

6    Q.  Professor Bekaert, I'd like to begin by just clarifying

7    something for the record.

8              We were discussing two different documents before the

9    break.  One was Plaintiff's Exhibit 96, and one was Plaintiff's

10   Exhibit 82.  Do you have your copies of those up there with

11   you?

12   A.  I do not.

13   Q.  Okay.  Well, we'll pull it up.

14             MS. DONEHOWER:  So let's start with Plaintiff's -- can

15   we put those side by side, Mr. McLeod?

16   Q.  Okay.  Just to be clear, so we had started with Plaintiff's

17   Exhibit 96.  That was the email from you to Mr. Hu.  Do you see

18   that?

19   A.  Yes, I do.

20   Q.  And you see the date January 9, 2015?

21   A.  Yes.

22   Q.  Okay.  And then --

23             MS. DONEHOWER:  Oh, I'm sorry.

24             JUROR:  My screen isn't working.

25             THE COURT:  Thank you.

1    Q.   Okay.  So the Plaintiff's 96 was the email from you to

2    Mr. Hu on January 9, 2015, right?

3    A.   Correct.

4    Q.   And then this other exhibit, 82, was an email --

5              MS. DONEHOWER:  If we -- you probably can't do page 2

6    side by side?  Thank you.

7              I apologize.  Page 1, actually, so we can see the

8    date.  Thank you.

9    Q.   So this was an email exchange related to October 2014,

10   right?

11   A.   Yes.

12   Q.   So to clarify, this email, this Plaintiff's Exhibit 82 was

13   before 96, right?

14   A.   Yes.

15             MS. DONEHOWER:  Okay.  So can we please look at page 2

16   of Plaintiff's Exhibit 82.

17   Q.   And you were beginning to read this paragraph here.

18   A.   Right.

19   Q.   Can you go ahead and read that paragraph for us.  You were

20   reading it and we got interrupted?

21   A.   Oh, I see.  "This is how Wei, main guy for the project at

22   Financial Engines, responded to my email asking him to keep me

23   in the loop if Enrichetta asks to do stuff separately, plus

24   apologize for the emails and tell him about Enrichetta's

25   behavior.  Vague but still.  It's a sensible answer, but it

1    still pissed me off to no end.  I have known the guy for like

2    12 years or so."

3    Q.  Okay.  So you sent this email in October 2014, which means

4    that the January 2015 email that you sent to Mr. Hu wasn't the

5    first one you sent him about Ms. Ravina, right?

6    A.  That would be the inference.  I --

7    Q.  You must have sent him some kind of email about Professor

8    Ravina before, right?

9    A.  I would infer that from this email, yes.

10   Q.  And you provided Mr. Hu's response at the bottom, how he

11   had responded to your email, right?

12   A.  Yes.

13   Q.  Mr. Hu told you, "I'm not going to take sides.  At best I

14   can answer questions about the data and give my scholarly

15   opinion about what research makes the most sense," right?

16   A.  Correct.

17   Q.  And that response pissed you -- you characterized it in

18   your second to last sentence there as upsetting you?

19   A.  Yes.

20   Q.  And then after this exchange with Mr. Hu in 2014, you wrote

21   to him again in January 2015, right?

22   A.  Yes.  Other things had happened.

23          MS. DONEHOWER:  Okay.  And if we could please pull up

24   Plaintiff's Exhibit 96 again.  Can we pull out the second

25   paragraph, Mr. McLeod.

I7d1rav3                          Bekaert - Direct

1   Q.   That first sentence, you wrote to Mr. Hu, you wrote, "But

2   whatever you want to think with regard to the international

3   diversification paper, sorry, but this time you will have to

4   act."  Right?

5   A.   Yes.

6   Q.   And if we could please move on to the second page of this

7   document.

8           There's a paragraph under the numeral 3.  You wrote

9   here in the second sentence, "But FE," that refers to Financial

10  Engines, right?

11  A.   It does.

12  Q.   "-- has the final say on the paper, so if it comes from

13  you, she will have to listen."  Right?

14  A.   Yeah.

15  Q.   Three days after this very email in which you wrote to

16  Mr. Hu calling Professor Ravina crazy, he wrote to both you and

17  Professor Ravina, right?

18  A.   He did.

19          MS. DONEHOWER:  Can we please pull up what's been

20  admitted into evidence as Defense Exhibit JV.

21  Q.   He wrote, "I am incredibly pained by the acrimony I am

22  witnessing over email," right?

23  A.   He did.

24          MS. DONEHOWER:  Can we please mark Plaintiff's

25  Exhibit 209.

1            Your Honor, we'd like to enter Plaintiff's Exhibit 209

2       into evidence.

3            THE COURT:  Any objection to 209?

4            MR. HERNSTADT:  No objection, your Honor.

5            THE COURT:  All right.  209 will be admitted.

6            (Plaintiff's Exhibit 209 received in evidence)

7            THE COURT:  Do you still want to pull up JV or 209?

8            MS. DONEHOWER:  We pulled up JV very briefly, but

9       right now we'd like to look at 209, please.

10           THE COURT:  Okay.

11      BY MS. DONEHOWER:

12      Q.  Do you recognize this email, Professor Bekaert?

13      A.  This is JV?

14      Q.  This is 209.

15      A.  Oh, sorry.  Yes.  Wait, wait.  Yes.

16      Q.  This is an email that you sent to Professor Ravina, right?

17      A.  Correct.

18      Q.  It's dated January 21, 2015?

19      A.  Correct.

20      Q.  It's about two weeks after this email you wrote to Mr. Hu

21      calling her crazy?

22      A.  Correct.

23      Q.  If you would please look at page 2.

24           You identified in this part of your email to her your

25      goals, right?

I7d1rav3                          Bekaert - Direct

1    A.  Yes.

2    Q.  And you said that your goals were "(a) to make sure we put

3    forward a united front," right?

4    A.  Yes.

5    Q.  You told Professor Ravina that you wanted to put forward a

6    united front to Financial Engines, right?

7    A.  With regards to this paper, yes.

8    Q.  It was two weeks after you told Financial Engines she was

9    the wrong person to work on this project?

10   A.  Yes.

11   Q.  You wrote, "I have known Wei for a long time and that last

12   email was scary."  Right?

13   A.  Correct.

14   Q.  You wrote that, "The biggest risk we run is that he simply

15   pulls the data.  This would not be the outcome you would like,

16   I would hope."  Right?

17   A.  Absolutely correct.

18   Q.  So two weeks after you told Mr. Hu and reminded him that

19   Financial Engines had the final say on the paper, correct?

20   A.  That's obvious.

21   Q.  Isn't it true that you said this about two weeks after you

22   asked him to step in?

23   A.  Well, yes.

24   Q.  Okay.  Let's move on to the research assistants.

25        We've talked about at least one research assistant.

1   You had a number of research assistants who worked with you and
2   Professor Ravina on the Financial Engines project, right?
3   A.   Correct.
4   Q.   And one of them who we've discussed already was named
5   Andrea Kiguel, correct?
6   A.   Correct.
7   Q.   You continued to work with Ms. Kiguel after Columbia told
8   you that Professor Ravina had filed a complaint about your
9   behavior?
10  A.   Yes.
11  Q.   The same month that you learned about Professor Ravina's
12  report, you were emailing with Ms. Kiguel, correct?
13  A.   I -- can you provide context.
14          MS. DONEHOWER:  Can we please mark Plaintiff's
15  Exhibit 39.
16          Your Honor, we're offering Plaintiff's Exhibit 39 into
17  evidence.
18          THE COURT:  Any objection?
19          MR. HERNSTADT:  No, your Honor.
20          THE COURT:  39 will be admitted.
21          (Plaintiff's Exhibit 39 received in evidence)
22  BY MS. DONEHOWER:
23  Q.   Let's look at the bottom of page 1, the email.  This is an
24  email from you to Andrea Kiguel, right?
25  A.   My screen -- is it supposed to come up on my screen?

1          THE COURT:  If it doesn't -- is it not?  Do you all

2     see it?

3          THE WITNESS:  It says, "Monitor going to sleep."

4          THE COURT:  We're having a monitor problem.

5   Q.  Do you have a hard copy as well?

6   A.  I have a hard copy.

7   Q.  This is an email that you sent to Andrea Kiguel?

8   A.  Yes.

9   Q.  It is dated July 28, 2014?

10  A.  Correct.

11  Q.  You wrote to her, "At this point I have stopped trusting

12  Enrichetta completely and I just assume she will do anything to

13  make my life miserable so she may have done this on purpose,"

14  correct?

15  A.  Yes.

16          All right.  It's going back up.

17  Q.  Can you please look at the -- directing your attention to

18  the first email on this page.  This is another email that you

19  sent to Andrea Kiguel, correct?

20  A.  Correct.

21  Q.  And you said to her, "This is insane," right?

22  A.  Correct.

23  Q.  Another one of your research assistants was named Nancy Xu,

24  correct?

25  A.  She was my research assistant and student, yes.

I7d1rav3                          Bekaert - Direct

1    Q.  She's a professor now, right?

2    A.  She just graduated.

3    Q.  And she got a job as a professor?

4    A.  She did.

5    Q.  And thanks in part to you.

6    A.  Well, I was her main advisor, yes.

7    Q.  You served on her doctoral student committee as well?

8    A.  Yes, as the main advisor.

9    Q.  She has described herself as your spy?

10   A.  I don't know.  I would --

11            MS. DONEHOWER:  Can we please mark Plaintiff's

12   Exhibit 164.

13            Your Honor, we'd like to offer Exhibit 164 into

14   evidence, please.

15            THE COURT:  Any objection?

16            MR. HERNSTADT:  We object, your Honor.

17            THE COURT:  You do?

18            MR. HERNSTADT:  Yes.

19            THE COURT:  Okay.  Why don't we meet at sidebar then.

20            (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2               MS. PLEVAN:  Your Honor, objection.  We said it was

3     incomplete.  It's a four-page document but there's only three

4     pages.

5               THE COURT:  Okay.  Where's the fourth page?

6               MS. DONEHOWER:  Might have been inadvertently omitted.

7     We can pull it up.

8               THE COURT:  So if it's complete, are you okay with it?

9               MR. HERNSTADT:  Well, it refers to emails that were

10    sent to the entire faculty.  It's not clear what it's talking

11    about.  It contains -- it refers to emails from Noel Capon,

12    which has also been objected to on relevance grounds, and I

13    don't know if that was ruled on yet or not.  This is a

14    professor who sent emails to faculty railing about the case and

15    talking about his opinions of the case, and that's what I think

16    is being forwarded here and is being discussed.

17               MS. DONEHOWER:  Your Honor, if I may, what this email

18    shows is that although Columbia claims that they have excluded

19    Professor Bekaert from the tenure review process, there are

20    people providing him information about that process.  He is

21    intervening in the process by sending emails.  We will bring

22    out other exhibits to show that he is communicating with

23    administrators later, so this is subject to connection about

24    that, but he admits here that even when these communications

25    about the tenure review process exclude him within Columbia,

1    he's still getting that information.

2             MS. PLEVAN:  Could you direct us to that part of this.

3             MR. HERNSTADT:  Your Honor, it doesn't have

4    anything --

5             MS. PLEVAN:  Just one second.

6             MS. DONEHOWER:  If you look at the last page here, the

7    middle email from Professor Bekaert, Professor Xu is sending

8    emails telling Professor Bekaert, here's this -- this is

9    totally confidential, here's the email that Professor Ravina

10   sent to all the senior faculty in advance of her tenure vote.

11   He thanks her, he tells her it's helpful, he says that given it

12   was sent to all senior faculty --

13            MS. PLEVAN:  But we don't know what it is.

14            MS. DONEHOWER:  -- no way I would not have found out.

15   Well, I can question him about it.

16            MS. PLEVAN:  There's no attachment.

17            MS. DONEHOWER:  Right, there is no attachment, but I

18   believe --

19            MS. PLEVAN:  That's pure speculation.

20            MS. DONEHOWER:  Well, I believe -- well, we'll see

21   what Professor Bekaert says, but given the timing, this is

22   immediately after an email, you know, if you look at --

23            MS. PLEVAN:  It's after her tenure review.

24            MS. DONEHOWER:  I'm not asking for the attachment.

25            MR. HERNSTADT:  This was sent after the tenure vote,

1    first of all.  Second of all, it talks about the Noel Capon

2    email, which is not in this.  But I think most importantly --

3          MS. DONEHOWER:  This is a reference to it.  He

4    references --

5          THE COURT:  One at a time.

6          MR. HERNSTADT:  May I finish.  We don't know what is

7    in it.  The one thing we do know is that it's April 15th, which

8    is the day after the tenure vote.  So it has nothing to do with

9    the tenure vote.  So if the point they're trying to make is

10   that he's getting secret information about the tenure vote,

11   this email doesn't show that.

12         Moreover, I think that there are emails about, you

13   know, well --

14         MS. DONEHOWER:  I mean, among other things, they are

15   referring specifically -- we know that this is the Noel Capon

16   thing because it's referring specifically to that document from

17   Noel and, you know --

18         THE COURT:  If this is after the tenure vote, why is

19   it relevant?

20         MS. DONEHOWER:  Well, it's certainly relevant to the

21   issue that Professor Xu, who is called as a witness to testify

22   in this case, goes to her --

23         MS. PLEVAN:  She's not a professor.

24         MR. HERNSTADT:  She's --

25         MS. DONEHOWER:  I'm just trying to be respectful.

I7d1rav3                    Bekaert - Direct

1    She's a professor now.

2               MS. PLEVAN:  Thanks for your deference.  Go ahead.

3               THE COURT:  Just explain, if this is after the tenure

4    vote -- so why don't you cross her with it?  I don't

5    understand.  If we don't know what was attached and it's after

6    the tenure vote and you're suggesting that he's involved in the

7    tenure vote because he got something after the tenure vote, why

8    does this go to that?

9               MS. DONEHOWER:  I can limit the question about the

10   language in here about her spying for him, but I do think we

11   should be allowed to elicit testimony about her bias from

12   Professor Bekaert as well.

13              MR. HERNSTADT:  And your Honor, I would object to

14   that.  It's prejudicial.

15              THE COURT:  You can show it to him, not the jury, ask

16   if in fact she referred to herself as his spy, and then either

17   I will clarify or you can clarify that, when this was, so that

18   the jury's not misled, or you can do it on cross, or direct.

19   But if this isn't in advance of the tenure vote, I haven't

20   gotten an explanation yet as to why it's relevant.  If you're

21   only going to her bias, you can just ask him the question and

22   cross him on it.

23              MS. DONEHOWER:  If I may, this goes to show that even

24   though he's theoretically walled off, he is expecting senior

25   faculty to speak to him.  This particular incident is after the

1    tenure vote, but it goes to show that it's no surprise to him

2    that he's getting communications about Professor Ravina.  It

3    goes to --

4              MS. PLEVAN:  What do you mean senior faculty?  Where

5    is that reference?

6              MS. DONEHOWER:  So Nancy Xu says in the bottom email

7    that she's going to do anything for him --

8              MR. HERNSTADT:  Which page are you on?

9              MS. DONEHOWER:  Bottom email on page 3.  She's a

10   student at this time who can't explain how she got this, which

11   was only sent to faculty, but she got it.

12             MS. PLEVAN:  We don't know what the "this" is.

13             MS. DONEHOWER:  She provides it to Professor Bekaert,

14   she notes that it was a document given to all senior faculty

15   except for him, and he says that, "Given that it was sent to

16   all senior faculty, there's no way I would not have found out."

17   And this goes to show that he's communicating with senior

18   faculty even when he's theoretically walled off, which is a

19   critical part of our case.

20             MR. HERNSTADT:  This is hearsay, number one.  We don't

21   know what she's talking about, we don't know what document

22   she's talking about, we don't know --

23             MS. DONEHOWER:  We know she's talking about a

24   confidential document.

25             MR. HERNSTADT:  No, we don't know that.  We know that

I7d1rav3                    Bekaert - Direct

1    she's saying that, that the fact that she's giving it to him is

2    confidential.  Doesn't say that the document is confidential.

3    Certainly if it's sent to all senior faculty, it's not

4    confidential.

5            THE COURT:  We don't even know what -- normally I

6    would say, look, it provides context for his statements, but

7    here, we don't even know what she's talking about and you don't

8    have what's attached so he can't even figure that out.  It's

9    unduly prejudicial.  You can ask her about it if you want to

10   ask bias, and as I say, you can refresh his recollection with

11   respect to whether she referred to herself as your spy after

12   the tenure vote.  Okay?

13           MS. DONEHOWER:  Thank you, your Honor.

14           THE COURT:  Thanks.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MS. DONEHOWER:  Mr. McLeod, can you please publish

3     just to the witness Plaintiff's Exhibit 164.

4              Can we please go to the third page of this exhibit,

5     the bottom email.  And can you please highlight the subject

6     line.

7     BY MS. DONEHOWER:

8     Q.  Professor Bekaert, does this refresh your recollection

9     about whether now Professor Xu identified herself as your spy?

10    A.  Well, in this email, I just see what you see.

11    Q.  And does that refresh your recollection that she called

12    herself your spy?

13    A.  I actually don't remember that.  It's just a subject line,

14    so --

15    Q.  Do you recall Professor Xu telling you how often --

16             THE COURT:  Can you clarify, was Professor Xu a

17    professor at the time?

18             MS. DONEHOWER:  She's a professor now.  She was a

19    student at the time.  I'm happy -- I'm just trying to be

20    respectful, but I'm happy to refer to her either way.

21             THE WITNESS:  Yeah.  At that time she was not a

22    professor.

23             MS. DONEHOWER:  Right.  So I can call her Ms. Xu at

24    the time.  Just to clarify.

25             THE COURT:  When was this in relation to the tenure

 1  vote?

 2              MS. DONEHOWER:  This first email -- I believe the

 3  tenure vote was April 14, 2016, so this is the day after.

 4  BY MS. DONEHOWER:

 5  Q.  Do you recall Ms. Xu describing to you how often she

 6  engaged in spying for you?

 7  A.  No, I don't have any concrete recollection of this.

 8              MS. DONEHOWER:  Can we please move to the first page.

 9  Can you pull up, please, Mr. McLeod, email from Tuesday,

10  April 19, 2016, from Ms. Xu to Professor Bekaert.

11  Q.  Professor Bekaert, if you could read the last sentence to

12  yourself.

13  A.  To my -- out loud or in --

14              THE COURT:  Just to yourself.

15  Q.  To yourself, please.

16  A.  Okay.

17              I have.

18  Q.  And can you please let me know whether that refreshes your

19  recollection about whether Ms. Xu described how often she spent

20  spying for you.

21  A.  Not really.

22              MS. DONEHOWER:  Your Honor, I apologize but could we

23  have just one more moment at the sidebar to discuss a different

24  part of this chain.

25

I7d1rav3                      Bekaert - Direct

1                   (At the sidebar)

2                   THE COURT:  Look, you can ask him, is it true that she

3       said this to you, and I mean, she's going to testify anyway, as

4       I understand.

5                   MR. HERNSTADT:  She's on the list.

6                   MS. DONEHOWER:  Now the other part that is really

7       important, and I'm happy to redact appropriately, but if you

8       look on the second page -- and just to be clear, Ms. Plevan,

9       this was produced to us by Professor Bekaert.

10                  MS. PLEVAN:  Yes, I understand.

11                  MS. DONEHOWER:  We only received three pages.

12                  MS. PLEVAN:  That doesn't make it complete.

13                  MS. DONEHOWER:  It's the only part we received.

14                  MS. PLEVAN:  But that doesn't make it admissible.

15                  THE COURT:  You're trying to get him to say words

16      without allowing him to see context.  It's just misleading.

17                  MS. DONEHOWER:  Okay.  I'm happy to show him the

18      context.  The part that's really important here is, in this

19      April 17, 2016 email, I think this is just clear evidence of

20      intent to retaliate.  "I will not let her get away with this.

21      I got --"

22                  MS. PLEVAN:  I'm sorry.  Where?

23                  MS. DONEHOWER:  "I got a list of a number of PhD

24      students who worked with her from Andrea.  Hopefully I can get

25      some to say how great their experience was with the charming

1    Italian."

2              THE COURT:  I think that's clearly relevant and you

3    can elicit from him the fact that he said this.  It's a

4    statement of a party opponent and an admission, so you can

5    elicit the fact that he said that, but you have to just make

6    the timing clear to.

7              MS. DONEHOWER:  Yeah, no problem.  Now if he denies

8    recalling it, though, then I can enter the document in redacted

9    form.

10             MS. PLEVAN:  But the --

11             MR. HERNSTADT:  I'm sorry.  I didn't hear.

12             MS. PLEVAN:  We don't know what provoked this because

13   attached is some document --

14             MS. DONEHOWER:  We actually do, because in the line

15   below, it says, "I actually did read the observations... from

16   Noel briefly," which is the -- we know that it's the

17   observations Noel Capon sent on --

18             MS. PLEVAN:  No, we don't.

19             MS. DONEHOWER:  -- on the review process.

20             MS. PLEVAN:  No, we don't.  We don't at all.

21             MS. DONEHOWER:  We have with respect --

22             MS. PLEVAN:  We're not letting that in, that's for

23   sure.  I mean -- I'm sorry.  We certainly object to that.

24             THE COURT:  I think that's fair to elicit this line.

25   It's up to defendants how much of the rest you want in to

I7d1rav3                         Bekaert - Direct

1      provide context.  If you think it's misleading without the

2      context, I'll allow in more.  But I think it's only fair to

3      plaintiff to allow in this statement about "I'm not being

4      productive now" through "the charming Italian."  That paragraph

5      I think is fair game and should come in, but again, how much of

6      the rest of this correspondence you want in to provide context,

7      I'll leave to defendants.

8                  MS. PLEVAN:  Okay.

9                  THE COURT:  Okay?

10                 MR. HERNSTADT:  Okay.

11                 THE COURT:  So you can even show him this one line and

12     show it to the jury.  And then over the lunch break if you want

13     more of it in, you can get more of it in.  Is that fair?

14                 MR. HERNSTADT:  Thanks, your Honor.

15                 (Continued on next page)

16

17

18

19

20

21

22

23

24

25

I7d1rav3                          Bekaert - Direct

 1            (In open court)

 2   BY MS. DONEHOWER:

 3   Q.  Professor Bekaert, you wrote to -- when you were

 4   corresponding with Ms. Xu, you told her that you would not let

 5   Professor Ravina get away with this?

 6   A.  Could you -- it's -- can I see the -- this is an email.

 7   Q.  You told her that in an email, correct?

 8   A.  Is that the same email from before?

 9            THE COURT:  Yes, it is.

10   A.  Oh, it's this one?  Okay.  I have a copy.  If you could

11   just tell me where it is.

12   Q.  We're on page 2, Professor Bekaert.

13   A.  Yes.

14   Q.  And that was in April, on April 17, 2016, correct?

15   A.  Yes.

16   Q.  Professor Ravina's -- the first vote on her tenure process

17   had already happened a day or two before, correct?

18   A.  I'm not aware of the date.

19   Q.  And, well, you received calendar invites, right?

20   A.  Yeah, but I don't keep track of that.  I was not involved

21   in the process at all so I don't remember these exact dates

22   right now.

23   Q.  There were additional votes on the tenure process after the

24   first vote, correct?

25   A.  I was not involved at all so --

```
1   Q.  Well, let me ask you about other tenure review processes in
2   which you've been involved.  Typically there's an initial vote
3   at the division level, right?
4   A.  There is a --
5            THE COURT:  Is there an objection?
6            MR. HERNSTADT:  Objection, your Honor.
7            THE COURT:  I mean, is this something you know about?
8            THE WITNESS:  Roughly, yes, I know how the process
9   works.
10           THE COURT:  Okay.  So what's your question?
11  BY MS. DONEHOWER:
12  Q.  You are a senior faculty member in the division of finance
13  and economics, correct?
14  A.  Yes.
15  Q.  And you have participated in tenure votes in the past?
16  A.  Obviously.
17  Q.  And during those votes there's typically first a vote at
18  the division level, correct?
19  A.  Well, there's even -- there's sort of a P&T committee,
20  there's division level votes, and then there's a business
21  schoolwide vote.  It's the first --
22  Q.  There's three different levels of votes, right?
23  A.  Typically, yes.
24  Q.  And we will get back to specific dates later, but on
25  April 17, 2016 you told Ms. Xu that you were going to get a
```

I7d1rav3                      Bekaert - Direct

```
 1   list -- that you had gotten a list of a number of PhD students
 2   who worked with Professor Ravina?
 3   A.   That's what it says, yes.
 4   Q.   And you said that you would try to get some of them to say
 5   how great their experience was with the charming Italian?
 6   A.   Yes.
 7   Q.   That was sarcasm?
 8   A.   Absolutely, yes.  Well, I'm -- it was ironic.  I didn't
 9   mean it.
10   Q.   You know that Professor Ravina wrote a personal statement
11   for her tenure review process?
12   A.   Yes.
13   Q.   You know that because you received a copy of Professor
14   Ravina's personal statement?
15   A.    I was on the faculty email list, the senior faculty email
16   list.
17   Q.   And you read her personal statement?
18   A.   I did.  At one point.
19   Q.   You wanted to respond to it?
20   A.   Yes, 'cause it was defaming me.
21   Q.   You told Vice Dean Phillips that you had read it?
22   A.   I don't remember the context so --
23            MS. DONEHOWER:  Can we please see Plaintiff's
24   Exhibit 217 just to mark into evidence.
25            Your Honor, we're offering Plaintiff's Exhibit 217
```

I7d1rav3                         Bekaert - Direct

1   into evidence.

2                THE COURT:  Any objection?

3                MR. HERNSTADT:  No objection, your Honor.

4                THE COURT:  All right.  It will be admitted.

5                (Plaintiff's Exhibit 217 received in evidence)

6                MS. DONEHOWER:  Thank you.

7   BY MS. DONEHOWER:

8   Q.  Professor Bekaert, just looking at this chain, this is an

9   email exchange between you and Vice Dean Katherine Phillips,

10  correct?

11  A.  Yes.

12  Q.  This email exchange is dated March 25, 2016, right?

13  A.  Yes.

14  Q.  And also March 24, 2016, if you look at the bottom,

15  correct?

16  A.  Yes.

17  Q.  On March 24, 2016, you wrote to Vice Dean Phillips,

18  correct?

19  A.  Correct.

20  Q.  You wrote that Professor Ravina was spewing vicious lies?

21  A.  Yes.

22  Q.  You wrote that you wanted to speak the truth to defend

23  yourself?

24  A.  Yes.

25  Q.  You wrote that you would react to the personal statement

I7d1rav3                     Bekaert - Direct

1    Professor Ravina wrote for her tenure case as well?

2    A.  That's what I wrote in this email.

3    Q.  You wrote that her personal statement was full of factual

4    inaccuracies and blatant lies?

5    A.  It is.

6    Q.  You had read it and evaluated her personal statement and

7    then written to Vice Dean Phillips about it, right?

8    A.  Correct.

9           MS. DONEHOWER:  And can we please pull up Vice Dean

10   Phillips' response to Professor Bekaert.

11   Q.  This response is dated March 25, 2016, correct?

12   A.  Correct.

13   Q.  Can you read the subject line of this email for us,

14   Professor Bekaert.

15   A.  "Regarding ER is horrible."

16   Q.  You wrote to Vice Dean Phillips -- I'm sorry.  Vice Dean

17   Phillips here is writing to you after you had proposed

18   responding to Professor Ravina's tenure personal statement,

19   right?

20   A.  Sorry.  Could you repeat this?

21   Q.  Vice Dean Phillips is responding to the email in which you

22   said you wanted to respond to Professor Ravina's personal

23   statement, correct?

24   A.  That's what the trail would say, yes.

25   Q.  And she said, "You should do what you need to do"?

1    A.   Yeah.

2    Q.   Columbia's investigator Director Michael Dunn stated that

3    some of your emails were not as professional as they could be,

4    right?

5    A.   He did.

6    Q.   He suggested that you have training?

7    A.   He did.

8    Q.   The training was to improve your email communication,

9    correct?

10   A.   I don't remember the exact formulation of -- but I think

11   it's in that letter that we had up before on the Title IX.

12   Q.   Is it your understanding that the only purpose of the

13   training was to improve your email communication?

14   A.   I would have to see the sentence again, but --

15   Q.   I'm not asking about a document, Professor Bekaert.  I'm

16   just asking about your own understanding.  As you sit here

17   today, is it your understanding that when Columbia ordered

18   training for you, the only purpose of that training was to

19   improve your email communication?

20   A.   I don't know whether the word "email" was in there, but it

21   was about communication skills, yes.

22   Q.   And that included your email communications.

23   A.   Of course.  It's a more general term.

24   Q.   You were told that the training would probably only take an

25   hour or two?

I7d1rav3                         Bekaert - Direct

1    A.  I don't remember that.

2              MS. DONEHOWER:  Could we please enter plaintiff's 262.

3    This is a new document which is created as a result of

4    redactions agreed to yesterday.

5              MR. HERNSTADT:  No objection, your Honor.

6              THE COURT:  All right.  It will be admitted.

7              (Plaintiff's Exhibit 262 received in evidence)

8              MS. DONEHOWER:  Mr. McLeod, this is actually the last

9    three pages of 103, if that helps you at all.

10             Oh, you got it.  Thank you very much.

11   BY MS. DONEHOWER:

12   Q.  Do you see that this is an email from vice dean of the

13   business school Janet Horan?

14   A.  Yes, I do.

15   Q.  Sent to you on April 22, 2015, correct?

16   A.  Yes.

17   Q.  And in this email Vice Dean Horan describes the training

18   that Columbia was referring you to?

19   A.  That's correct.

20   Q.  She wrote that the training will probably only take one to

21   two hours?

22   A.  Correct.

23   Q.  She wrote that it was more of a conversation between you

24   and the lawyer who conducts these trainings, right?

25   A.  Yes, you can see that.

1    Q.  You had the training.

2    A.  I did.

3    Q.  Or conversation, as you may.

4    A.  Yes.

5    Q.  And that's what it was; it was just a conversation between

6    you and Columbia's trainer, who was a lawyer, right?

7    A.  It was a conversation in her office about the case, yes.

8           MS. DONEHOWER:  Can we please mark Plaintiff's

9    Exhibit 152.  This is -- it's also in the binders as well.

10          Your Honor, plaintiff offers Exhibit 152 into

11   evidence.

12          THE COURT:  Any objection?

13          MR. HERNSTADT:  No, your Honor.

14          THE COURT:  All right.  It will be admitted.  152.

15          (Plaintiff's Exhibit 152 received in evidence)

16   BY MS. DONEHOWER:

17   Q.  Professor Bekaert, this is an email you wrote to Karl

18   Aquino, correct?

19   A.  Correct.

20   Q.  Karl Aquino is a professor of finance?

21   A.  He is.

22   Q.  And in this email --

23   A.  Oh, no.  Sorry, sorry.

24   Q.  -- you describe to him, among other things in this email,

25   you describe your training with Columbia's trainer.

1   A.  Sorry.

2   Q.  I'm sorry.  You have to answer the question as posed,

3   Professor Bekaert.

4   A.  I --

5   Q.  This email --

6          THE COURT:  I'm sorry.

7   A.  The question was going so fast that I misanswered that

8   question about Karl Aquino.

9   Q.  I apologize.  In this email to Professor --

10  A.  The previous question about who Karl Aquino is, he's not a

11  finance professor.

12  Q.  Okay.  In this email to Karl Aquino -- and we'll come back

13  to Karl Aquino later.  Don't worry.

14  A.  Okay.

15  Q.  You are describing to him the training that you received

16  from Columbia, correct?

17  A.  I'm trying to read it.  Can I?

18  Q.  Yes.  Let me direct your attention down about five lines

19  from the top.  You have --

20          MR. HERNSTADT:  Your Honor, I'm sorry.  May I actually

21  have a sidebar on this document?

22          THE COURT:  Sure.

23          (Continued on next page)

24

25

I7d1rav3                        Bekaert - Direct

1              (At the sidebar)

2              MR. HERNSTADT:  There's a lot of personal information

3    about Mr. Aquino who had his own issue that occurred, and I

4    would like this email to be redacted and not published.

5              MS. DONEHOWER:  No problem.

6              MR. HERNSTADT:  All right.

7              THE COURT:  Okay.

8              MR. HERNSTADT:  Thank you.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7d1rav3                          Bekaert - Direct

1          (In open court)

2          (Discussion off the record)

3          THE WITNESS:  There was some recollection that came by

4   reading this --

5          THE COURT:  Okay.

6          THE WITNESS:  -- but I don't know whether this was --

7   these questions are being fired at me so I'm not sure whether

8   this was --

9          THE COURT:  Just slow down the questions.  Let him

10  answer and make sure he understands the question and

11  understands the context so that the jury gets a fair and

12  accurate answer.

13         MS. DONEHOWER:  Yes, your Honor.

14         THE COURT:  Okay.

15         MS. DONEHOWER:  We're at Plaintiff's 262, but can we

16  please make sure to just pull up the top email.

17         Thank you, Mr. McLeod.

18         MR. HERNSTADT:  152?

19         MS. DONEHOWER:  262.  That's what we just entered.

20         Oh, you're completely right.  Thank you,

21  Mr. Hernstadt.  152.

22         And actually, Mr. McLeod, can you go back for me,

23  please, and just pull up the whole first paragraph.

24         Thank you.

25  BY MS. DONEHOWER:

1   Q.  And if you look five lines down from the top of the page,

2   there is a sentence that starts, "The lawyer."  Do you see

3   that, Professor Bekaert?

4   A.  Yes.

5   Q.  Would you please read that sentence for us.

6   A.  "The lawyer I spoke to, a 50-year-old, immediately told me

7   that it was very clear I had been played and that the legal

8   environment had gone too far to the left and was getting abused

9   left and right by evil people like this Enrichetta."

10  Q.  You're describing the training that Columbia referred you

11  to?

12  A.  That's what this e -- this refers to the meeting with

13  Ms. Donnelly, yes.

14  Q.  You believed that the trainer, the Columbia trainer was on

15  your side?

16  A.  Well, this is an email to my basketball buddy.  I mean, you

17  know -- and he had a similar experience.  So this is how I

18  characterized it.  There was definitely serious conversations

19  having to deal with communication.

20  Q.  Just a simple, one question, Professor Bekaert, which is:

21  Did you believe that the trainer for Columbia was on your side?

22  A.  I believe she understood what the case was about, yes.

23  Q.  And part of your belief was that she was on your side.

24  A.  I think she saw the case for what it was.

25  Q.  If it's possible to answer that question yes or no.  You

1    thought she was on your side.

2    A.  I think I've answered that.

3    Q.  Well, just to be totally clear, do you see the sentence

4    that starts, "The afternoon," right below the highlighting?

5    A.  Yeah.

6    Q.  You wrote, "The afternoon I dreaded turned into a great

7    conversation with a woman who immediately saw through the case

8    and was on my side," correct?

9    A.  Yes.  Yes.

10   Q.  You wrote that Columbia's trainer suggested that in the

11   current environment people in your position should simply not

12   work with women anymore?

13   A.  Yup.

14   Q.  Because it was too risky?

15   A.  That's what I wrote.

16   Q.  And you wrote that that's what Columbia's trainer had

17   suggested?

18   A.  Again, in the context of this email, to a close personal

19   friend.

20   Q.  So you were honest to your friend.

21   A.  Yes.

22   Q.  You felt it was Columbia's trainer's position that you had

23   been played?

24   A.  That's my interpretation of how she had seen the file, yes.

25   Q.  Columbia's trainer also gave you examples of where people

1   lodging a complaint were abusing the system?

2   A.  She -- she gave a couple of examples of, you know -- yes.

3   Q.  Columbia's trainer talked about how you have to be cautious

4   when you're in a position like yours?

5   A.  She was not the only one.

6   Q.  Columbia's trainer told you that you simply should not work

7   with women anymore.

8   A.  I think that's my characterization in this email.  I don't

9   recall whether she literally said it that way, but --

10  Q.  You believe that mentorship is important for junior faculty

11  members, correct?

12  A.  I think it is, yes.

13  Q.  The Columbia trainer told you that there's a lot of

14  protection for people complaining about sexual harassment,

15  right?

16  A.  Yes.

17  Q.  Columbia's trainer told you that -- you described

18  Columbia's trainer as telling you that for people in your

19  position, in your position, there's little recourse, correct?

20  A.  Can we see the context?  I mean, I don't remember writing

21  that.

22  Q.  Well, if we could --

23  A.  But I believe it, actually.

24  Q.  You believe that, that there's --

25  A.  Can you repeat it again?

1    Q.   Sure.  Columbia's trainer told you that for people in your

2    position, there is little recourse, correct?

3    A.   Well, that turned out to be the case, yes.

4    Q.   You felt like a punching bag in this process?

5    A.   Early on in this process, yes, I did.

6    Q.   You felt like being a senior person at Columbia University

7    did not entitle you to very much at all?

8    A.   Can I see the context?  I don't know if I said this

9    literally or where it is.

10             MS. DONEHOWER:  Can we please show just to the witness

11   his deposition transcript at 362/10-23.

12   A.   Yes, I read it.

13   Q.   Did that refresh your recollection about whether you felt

14   like being a senior person at Columbia did not entitle you to

15   very much at all?

16   A.   It does.

17   Q.   And that's how you felt?

18   A.   Absolutely.

19             MS. DONEHOWER:  Can we please pull back up Plaintiff's

20   Exhibit 152.

21             Page 2, please.

22             MR. HERNSTADT:  Can we take it down for a second.

23             MS. DONEHOWER:  Sure.  We can take it down.

24             (Counsel conferring)

25             MS. DONEHOWER:  Can we please pull up this email at

1    the bottom of that page.  Thank you.

2              This hasn't been admitted into evidence, not the

3    paragraph to which you were referring.

4              MR. HERNSTADT:  Okay.  I'm sorry.

5              THE COURT:  You may proceed.

6              THE WITNESS:  It disappeared for me too.

7              Oh, it's back.  Okay.

8              MS. DONEHOWER:  We'd like to publish this to the jury

9    as well, please.

10             THE COURT:  Yes, go ahead.

11   BY MS. DONEHOWER:

12   Q.  Professor Bekaert, can you please read the sentence at the

13   end of the first line that starts, "In a nutshell."

14   A.  "In a nutshell, this is a schizophrenic woman whose bad

15   side I failed to see for a long time -- PhD students, however,

16   were very aware of it -- and who I thought was a friend and so

17   probably trusted too much."

18   Q.  And now if we go down to the bottom of the paragraph.

19             Do you see the sentence, the second from the bottom,

20   it starts, "The laws in this country"?

21   A.  Yes.

22   Q.  Can you please read that from there to the end of the

23   paragraph for us.

24   A.  "The laws in this country are screwed up and totally biased

25   against the privileged white males.  It's amazing how powerless

I7d1rav3                          Bekaert – Direct

1    I am right now, despite having done absolutely nothing wrong."

2              MS. DONEHOWER:   I'd like to mark Plaintiff's

3    Exhibit 46, please.

4              (Continued on next page)

1           MS. DONEHOWER:   your Honor, we are offering

2     Plaintiff's Exhibit 46 into evidence.

3           THE COURT:  Is there any objection?

4           THE WITNESS:  Can I have objections?

5           THE COURT:  No.

6           MR. HERNSTADT:  No objection, your Honor.

7           THE COURT:  All right.  It will be admitted.

8           46.

9           (Plaintiff's Exhibit 46 received in evidence)

10          THE COURT:  Ladies and gentlemen, you will see in some

11    of these documents there are redactions.  Don't speculate as to

12    what might be there.

13          We do that just to be consistent with the rules of

14    evidence.  Don't read anything into it.

15    BY MS. DONEHOWER:

16    Q.  Professor Bekaert, calling your attention to the top

17    e-mail, this is an e-mail that you wrote, correct?

18    A.  Correct.

19    Q.  On July 12, 2014, right?

20    A.  Yes.

21    Q.  This was shortly after you learned that Professor Ravina

22    had complained about your behavior to Columbia University?

23    A.  My understanding at that time was that the complaint was

24    about a series of e-mails.

25    Q.  I just asked whether there was a complaint.  I didn't

 1   characterize it at all.  I said this was shortly after you

 2   learned that Professor Ravina complained about you to Columbia

 3   University?

 4   A.  Right.  You said my behavior.  I wanted to clarify it was

 5   about a series of e-mails.

 6   Q.  The e-mails you had written to her?

 7   A.  Exactly.

 8   Q.  OK.  And it is your testimony that when you spoke to Dean

 9   Hubbard about it, he just told you it was about a research

10   divorce?

11   A.  Yes.

12   Q.  Could you please just read the second sentence of this

13   e-mail that you sent on July 12, 2014.

14   A.  The nonredacted second sentence?

15   Q.  The nonredacted second sentence which actually starts a

16   little bit further up.  It is right after the redaction?

17   A.  "I am dealing with this harassment case.  It's so insane.

18   If this is harassment, the Americans really are total pussies."

19   Q.  Professor Bekaert, you're still employed by Columbia

20   University, correct?

21   A.  I am.

22   Q.  You are still a tenured professor at the Columbia Business

23   School?

24   A.  Yes.

25   Q.  You have not lost your title?

Idnrav4                         Bekaert - Direct

1    A.  No.

2    Q.  You have not been demoted?

3    A.  No.

4    Q.  Your pay has not been cut?

5    A.  It hasn't been cut, no.

6    Q.  Professor Ravina is not employed by Columbia University?

7    A.  She's employed by Northwestern, if I understand correctly.

8    Q.  That is a different university than Columbia?

9    A.  It is.

10   Q.  She had to find another job?

11   A.  She was denied tenure if I am not mistaken.

12   Q.  When Professor Ravina went up for tenure, you expected

13   she'd be denied, right?

14   A.  Of course.

15   Q.  You were served with the lawsuit in this case?

16   A.  Yes.

17   Q.  On September 23, 2015?

18         I apologize.  You were served with a lawsuit.  Let me

19   rephrase.

20         You were served with a lawsuit on September 23, 2015?

21   A.  Yes, it was served while I was teaching.

22   Q.  On Columbia University's campus, right?

23   A.  Yes.  Right in my class.

24   Q.  Starting in January of 2016 you started to receive

25   invitations to meetings about Professor Ravina's tenure review,

```
 1   right?
 2   A.  You mean e-mail invitations?
 3   Q.  Yes.
 4   A.  Yes.  I was -- like I said, I was on the faculty e-mail
 5   list.
 6   Q.  So you were aware, based on these calendar invitations,
 7   about when her meetings were taking place?
 8   A.  Yes.  But it was irrelevant, because I wasn't taking part.
 9   Q.  I am just asking about your awareness, Professor Bekaert.
10   A.  Yes.
11   Q.  Before Professor Ravina's tenure review, you spoke to
12   certain professors at Columbia Business School about the issues
13   that you and she had had?
14   A.  I spoke to very few people, only my friends basically.
15   Q.  You spoke to Professor Bob Hodrick?
16   A.  I definitely did.
17   Q.  He is your close friend?
18   A.  I would consider him a friend and mentor, yes.
19   Q.  He is also a coauthor?
20   A.  Yes, sir.
21   Q.  He was your main Ph.D. adviser?
22   A.  He is.
23   Q.  He is a senior faculty member at Columbia Business School?
24   A.  Absolutely.
25   Q.  You received a calendar invite for one of Professor
```

Idnrav4                        Bekaert - Direct

1   Ravina's tenure meetings that was scheduled for January 25,

2   2016, correct?

3   A.  I would not remember that.

4          MS. DONEHOWER:  Can we please pull up just to show

5   Professor Bekaert Plaintiff's Exhibit 128.

6          Thank you.

7   BY MS. DONEHOWER:

8   Q.  Does this refresh your recollection about whether you

9   received that particular calendar invite?

10  A.  It doesn't really refresh my recollection.  It shows that I

11  got it.

12         MS. DONEHOWER:  I believe that all calendar invites

13  have been admitted into evidence on consent, so we would like

14  to offer Plaintiff's Exhibit 128 into evidence, please.

15         THE COURT:  It is already in?

16         MS. DONEHOWER:  It is already in evidence.  We offer

17  it into evidence.

18         THE COURT:  Although it's been already admitted?

19         MS. DONEHOWER:  I'm sorry.

20         I believe I mischaracterized it before.

21         THE COURT:  Is there any objection?

22         MS. PLEVAN:  There is no objection.

23         MR. HERNSTADT:  They haven't been admitted.  We agree

24  there is no objection.

25         THE COURT:  All right.  It will be admitted then.

Idnrav4                        Bekaert - Direct

```
 1            MS. DONEHOWER:  Thank you.

 2            (Plaintiff's Exhibit 128 received in evidence)

 3   BY MS. DONEHOWER:

 4   Q.  Earlier today, you and I discussed your attorney's opening

 5   statement how he talked about handful of pungent e-mails from

 6   you, correct?

 7   A.  Meaning that you discussed this?  Yes.

 8   Q.  And we have seen a few e-mails in which you used derogatory

 9   terms to refer to Professor Ravina already, right?

10   A.  I think we have seen three.

11   Q.  OK.  Three.  And there's more, though, right?

12   A.  I wouldn't know.  I mean, if you don't tell me, then I --

13            MS. DONEHOWER:  OK.  Can we please mark Plaintiff's

14   Exhibit 127.

15            Your Honor, we offer Plaintiff's Exhibit 127 into

16   evidence.

17            THE COURT:  Any objection?

18            MR. HERNSTADT:  No objection, your Honor.

19            THE COURT:  127 will be admitted.

20            (Plaintiff's Exhibit 127 received in evidence)

21   BY MS. DONEHOWER:

22   Q.  This is an e-mail Professor Bekaert sent from your Columbia

23   University e-mail address, correct?

24   A.  Yes.

25   Q.  The recipient of this e-mail is Shumi Akter?
```

1    A.  Yes.

2    Q.  Can you please read the first sentence of the e-mail that

3    you sent to Ms. Akter?

4    A.  "Ha.  No, the evil bitch was doing some research along

5    those lines and Stephan was too."

6            And I should point out that we have had this person

7    before, so this is not a new person.

8    Q.  Are you aware of whether we've talked about this particular

9    e-mail before?

10   A.  No, the person, though.

11   Q.  The person.

12           When we talked about her before we mentioned that she

13   is a professor at the University of Sydney Australia, correct?

14   A.  Yes, I believe that's where she is, yes.

15   Q.  In the business school?

16   A.  Yes, I think so.

17           MS. DONEHOWER:  Can we please see, Mr. McLeod, page 4.

18   BY MS. DONEHOWER:

19   Q.  Do you see the second paragraph -- I guess it's the third

20   kind of paragraph there that starts "the contract."

21           You wrote to professor Akter, "The contract with ER is

22   not signed yet, but there should be no problem at all to work

23   with the Australian data."  Correct.

24   A.  Correct.

25   Q.  That referred to Australian data from Financial Engines?

Idnrav4                         Bekaert - Direct

1    A.  No.

2    Q.  You wrote in the last sentence here they already scheduled

3    her tenure meeting, so she will have to act fast if she wants

4    to exploit this to the fullest, right?

5    A.  Yes.  I wrote that, sure.

6    Q.  There is a smiley face at the end of your e-mail?

7    A.  Yes.

8    Q.  So you knew that Professor Ravina had to act quickly on her

9    projects, because her tenure vote was coming up?

10   A.  No, I don't think this is what this says.  I answer no.

11          MS. DONEHOWER:  OK.  Got it.  Can we please look at

12   page 2, Mr. McLeod.

13          Actually, can we look at page 1.

14   BY MS. DONEHOWER:

15   Q.  Below the line where you referred to Professor Ravina -- I

16   am just going use the word B instead of the full thing -- there

17   is a line again about the Australian retirement stuff, correct?

18   A.  Correct.

19   Q.  And you wrote, "I assume this would not get back to ER.

20   Besides we should have the agreement signed pretty soon as her

21   tenure case is coming up."  Correct?

22   A.  Correct.

23   Q.  You received more calendar invitations about Professor

24   Ravina's tenure review in February 2016, right?

25   A.  It's possible.

1              MS. DONEHOWER:  Can we please see Plaintiff's Exhibit

2    131.  It has not yet been admitted into evidence, but I don't

3    believe -- I believe that on consent all calendar invites can

4    be admitted, correct?

5              MS. PLEVAN:  Show us the document.

6              MS. DONEHOWER:  Sure.

7              131 and 132, please.

8              THE COURT:  Any objection?

9              MR. HERNSTADT:  No objection.

10             MS. PLEVAN:  No objection.

11             THE COURT:  All right.  They will be admitted.

12             (Plaintiff's Exhibits  131 and 132 received in

13   evidence)

14             MS. DONEHOWER:  Thank you, Mr. McLeod.

15   BY MS. DONEHOWER:

16   Q.  These are, Professor Bekaert, two e-mail invitations that

17   you received about Professor Ravina's tenure case, correct?

18   A.  Yes.  I appear to be on the e-mail list.

19   Q.  And they are dated -- the meetings are scheduled in

20   February 2016, right?

21   A.  Correct.

22             MS. DONEHOWER:  I would like to mark Plaintiff's

23   Exhibit 135, please.

24             THE COURT:  Any objection to 135?

25             MR. HERNSTADT:  No objection, your Honor.

1           THE COURT:  No objection?

2           MR. HERNSTADT:  No objection.

3           THE COURT:  All right.  It will be admitted.

4           (Plaintiff's Exhibit 135 received in evidence)

5    BY MS. DONEHOWER:

6    Q.  Plaintiff's Exhibit 135 is an e-mail exchange where you're

7    writing, Professor Bekaert, and you're writing to Marie

8    Hoerova, correct?

9    A.  Correct.

10   Q.  And you see that these e-mails were sent in March 2016,

11   correct?

12   A.  Correct.

13          MS. DONEHOWER:  Can we please see page 3, Mr. McLeod.

14   A.  There's only two pages.

15   Q.  Do you see that -- yeah -- the e-mail that starts, "ER has

16   already sued."

17          Do you see that, that section of the e-mail?

18   A.  Correct.

19   Q.  About four lines from the bottom, Professor Bekaert, do you

20   see the sentence that says, "Recently one of our Ph.D. students

21   was approached at a conference by a very senior faculty

22   University of Utah member to inquire what was going on with me

23   and ER at Columbia, so it is going around."

24          Do you see that?

25   A.  I see that.

1   Q.  And you wrote that -- can you go ahead and read that last

2   sentence for us, please.

3   A.  You mean the last sentence of the e-mail?

4   Q.  Yes.

5   A.  OK.

6   Q.  Yes.

7   A.  "I am going to try and fight back a bit and at least talk

8   to Wei Jiang, who was the one yanking me off the dinner with

9   the female recruit and apparently also Ms. Gossip."

10  Q.  You wrote to Ms. Hoerova again the next day, right?

11  A.  I don't see the dates here.  What do you mean?  Is this the

12  same e-mail here?

13  Q.  If we could please pull up page 1 of the top e-mail.

14  A.  It seems like it's the -- oh, yeah.  Yes.

15  Q.  Could you read the first two -- let's call it three

16  sentences of that e-mail for us, please?

17  A.  "It's stressful, but I'm coping.  I do think I have some

18  advocates in the dean's office.  Surprisingly perhaps the woman

19  there that's senior vice dean, a no-nonsense black woman and

20  Janet, a senior administrator who sees all the e-mails between

21  ER mean and the FE team, seem to have figured out what kind

22  person ER is."

23  Q.  Can you go ahead and read that next sentence, please.

24  A.  "I think that's somewhat helpful and I still hope that the

25  senior vice dean will undertake some action to inform my

1  colleagues better."

2  Q.  This is about a month before Professor Ravina's tenure

3  vote, right, her first tenure vote?

4  A.  It's possible, yes.  I do not know all the dates.

5  Q.  You wrote that any chance you saw you were not going to

6  hold back to tell the truth, right?

7  A.  I wrote that there, yes.  I wish it was true.

8  Q.  And you also wished that she would go on leave so you did

9  not have to see her face?

10  A.  That's what I wrote.

11  Q.  When you referred to a senior vice dean up there, you were

12  referring to Senior Vice Dean Katherine Phillips, right?

13  A.  Yes.

14  Q.  The senior vice dean of the Columbia Business School?

15  A.  Yes.

16  Q.  And when you referred to Janet, you meant Vice Dean Janet

17  Horan of Columbia Business School?

18  A.  Correct.

19          MS. DONEHOWER:  I would like to mark, please,

20  Plaintiff's Exhibit 137.

21          We are offering Plaintiff's 137 into evidence.

22          THE COURT:  Any objection?

23          MR. HERNSTADT:  No objection, your Honor.

24          THE COURT:  It will be admitted.

25          (Plaintiff's Exhibit 137 received in evidence)

Idnrav4                        Bekaert - Direct

1   BY MS. DONEHOWER:

2   Q.  So on page 1, the second e-mail from the top is from you to

3   Xiaoyan Zhang?

4   A.  Yes.

5   Q.  And you wrote -- well, could you read what you wrote for

6   us, the first two sentences there.

7   A.  The second e-mail?

8          "I'm shocked about the rumor mill.  Sort of the worst

9   nightmare.  The evil bitch being described as a nice person,

10  and I'm the big villain."

11  Q.  Xiaoyan Zhang is the Duke Realty chair professor of finance

12  at Purdue University Krannert School of Management, right?

13  A.  I believe she is now in -- at PBC in China.

14  Q.  At the time she was a chaired professor at Purdue

15  University?

16  A.  Yes.

17  Q.  She is an associate editor of the Journal of Banking and

18  Finance?

19  A.  She is.

20  Q.  She is also an associate editor of a journal called

21  Financial Management?

22  A.  I wouldn't know.

23  Q.  She's also an associate editor of Management Science?

24  A.  She definitely was at one point, but I don't know if she is

25  still.

1   Q.  You sent another e-mail to Professor Zhang on the same day,

2   right?

3   A.  Yes.

4   Q.  Can we please mark Plaintiff's Exhibit 140.

5           Actually these are in your binders.

6           THE COURT:  Thank you.

7           THE WITNESS:  Thank you.

8           MS. DONEHOWER:  We are offering Plaintiff's Exhibit

9   140 into evidence.

10          THE COURT:  Any objection?

11          Mr. Hernstadt, any objection?

12          MR. HERNSTADT:  No.  No objection.

13          THE COURT:  All right.  140 will be admitted.

14          (Plaintiff's Exhibit 140 received in evidence)

15          MS. DONEHOWER:  Can we please pull up page 1, the

16  second e-mail from the bottom.

17  BY MS. DONEHOWER:

18  Q.  Will you please read what you wrote to Professor Zhang.

19  A.  "The evil bitch went ahead, and look at what she says.

20  Pure evil lies.  Unbelievable.  I'm royally fucked as people

21  seem to simply take her on her word."

22          MS. DONEHOWER:  Can we please pull up another e-mail

23  above that.  The second e-mail from the top.

24          Thank you, Mr. McLeod.

25  BY MS. DONEHOWER:

1    Q.  In the first line here you say to Professor Zhang, I figure

2    I should inform Cam, right?

3    A.  I say that, yes.

4    Q.  And by "Cam" you were referring to Campbell Harvey, right?

5    A.  Correct.

6    Q.  And you ask whether you should inform him because he is,

7    quote, well plugged in?

8    A.  No, he's my good friend and a professional.

9    Q.  You wrote in this e-mail, "He will see it.  He could also

10   be a voice of reason and he's well plugged in."  Right?

11   A.  Correct.  That's what I wrote.

12   Q.  Campbell Harvey is the J. Paul Sticht Professor of

13   International Business at the Fuqua School of Business at Duke

14   University, right?

15   A.  He is.

16   Q.  He is an associate editor of the Journal of Financial

17   Economics?

18   A.  He might be.  I'm not sure.

19   Q.  He was formerly the editor of the Journal of Finance?

20   A.  He was.

21   Q.  He was the president of the American Finance Association in

22   2016?

23   A.  I believe that's correct.  I am not sure about the date.

24   Q.  But he has been a president of the American Finance

25   Association at some point?

Idnrav4                        Bekaert - Direct

1   A.  Yes.

2   Q.  He is an important person in your field?

3   A.  I think he is a top scholar.

4   Q.  He's also a top scholar in Professor Ravina's field, right?

5   A.  He's in the wider area of I would say empirical asset

6   pricing and asset management, just as I am, yes.

7   Q.  The day after you sent the e-mail to Professor Zhang that

8   we were just discussing, you did e-mail Professor Harvey,

9   correct?

10  A.  I wouldn't remember, but if you say so --

11  Q.  Can we please mark Plaintiff's Exhibit 136, which is next

12  in the binders.

13            MR. HERNSTADT:  I would like to get the paper.

14            MS. DONEHOWER:  You have the paper in your binders.

15  Check them.

16            MR. HERNSTADT:  Can you please --

17            MS. DONEHOWER:  You can pass it back.

18            MR. HERNSTADT:  Thank you.

19            MS. DONEHOWER:  Plaintiff wishes to move this document

20  into evidence, please.

21            THE COURT:  Any objection to 136?

22            MR. HERNSTADT:  No objection, your Honor.

23            THE COURT:  All right.  It will be admitted.

24            (Plaintiff's Exhibit 136 received in evidence)

25  BY MS. DONEHOWER:

Idnrav4                          Bekaert - Direct

1    Q.  If you look at the e-mail at the top of the first page, you

2    sent a link here to a New York Times article --

3    A.  Correct.

4    Q.  -- about this case?

5    A.  Correct.

6    Q.  And if you look at the recipient list here, Cam Harvey is

7    the first one on there?

8    A.  Yep.

9    Q.  This was sent on March 24, 2016?

10   A.  Yes.  The recipients are all of my coauthors and friends.

11   Q.  You wrote, "This is a sad example of no good deed goes

12   unpunished."

13   A.  I don't see it, but --

14   Q.  Sure.  If we go down to the fourth paragraph here, about

15   three lines from the top of that paragraph you wrote, "In

16   reality, this is a sad example of no good deed goes

17   unpunished."

18   A.  Correct.

19   Q.  "We collaborated for years doing research with a unique

20   dataset I had obtained from a company I worked for, and in

21   return she fabricated a series of completely false allegations

22   about me."  Right?

23   A.  Correct.

24   Q.  You informed professor Harvey, among other people, that the

25   false claims about you were thoroughly investigated?

Idnrav4                        Bekaert - Direct

1    A.  Correct.  Oh, wait.  Where is that?

2    Q.  OK.  So about three lines down from that, on the right-hand

3    side of the page, there's a sentence that starts "in fact."

4           Do you see that sentence?

5    A.  Yes.

6    Q.  You wrote, "In fact, Professor Ravina's false claims about

7    me were thoroughly investigated."

8    A.  Correct.

9    Q.  You were referring to the investigation by Columbia

10   University, correct?

11   A.  Yes.  The Title IX and the appeal.

12   Q.  You wrote, "That included interviews and the review of many

13   e-mails and that the claims were rejected twice years ago."

14          Right?

15   A.  Correct.

16   Q.  You're referring to the rejection of those claims by

17   Director Michael Dunn, correct?

18   A.  And I believe there was an appeal that was rejected as

19   well.

20   Q.  And an appeal.  So if we go down to the bottom of the

21   page -- I'm sorry, it's actually the top of the next page.

22          MS. DONEHOWER:  Sorry about that, Mr. McLeod.

23   Q.  You signed off -- a little bit further down, "A very angry

24   Geert," right?

25   A.  Yes.

1    Q.  Besides professor Campbell Harvey, this e-mail went to

2    other business professors?

3    A.  As I said before, these are my coauthors and friends.

4    Q.  Let's start with Christian Lundblad.  Christian Lundblad is

5    the Richard Levine Distinguished Professor of Finance and an

6    associate dean at the University of North Carolina

7    Kenan-Flagler Business School, right?

8    A.  He is.

9    Q.  He serves or has served as an associate editor of the

10   Journal of Finance?

11   A.  That's possible.  I don't know his vitae by heart.

12   Q.  He has served as an editor of Financial Management?

13   A.  Again, I don't know all of his editorial positions.

14   Q.  You are an editor of the Journal of Banking and Finance,

15   right?

16   A.  I am.

17   Q.  So you know that he is also an associate editor of the

18   Journal of Banking and Finance?

19   A.  Absolutely, yes.

20   Q.  You also sent this e-mail to Stephan Siegel?

21   A.  Stephan Siegel.  He is a former student as well.

22   Q.  Stephan Siegel is an associate -- he is an associate editor

23   the Journal of Banking and Finance as well?

24   A.  He is.

25   Q.  He is a professor of finance and business economics at the

1    University of Washington's Foster School of Business, right?

2    A.  Correct.

3    Q.  You also sentence this e-mail to Eric Engstrom?

4    A.  Yes, another former student.

5    Q.  He is an economist and adviser in the divisions of research

6    and statistics at the Federal Reserve Board of Governors,

7    right?

8    A.  Correct.

9    Q.  You also sent this e-mail to Andrey Ermolov?

10   A.  Yes, another former student.

11   Q.  He is now an assistant professor of finance and business

12   economics at the Gabelli School of Business at Fordham

13   University?

14   A.  Correct.

15   Q.  The same day you sent this e-mail, you e-mailed Yuhang

16   Xing?

17   A.  It's possible, but I -- you know, I don't know who I

18   e-mailed at what date.

19   Q.  This was sent on March 24, 2016?

20   A.  Sure.

21          MS. DONEHOWER:  Can we please mark Plaintiff's Exhibit

22   141?

23          THE COURT:  Any objection to 141?

24          MS. DONEHOWER:  I would like to offer this into

25   evidence, please.

1     MR. HERNSTADT:  No objection, your Honor.

2     THE COURT:  All right.  It will be admitted.

3     (Plaintiff's Exhibit 141 received in evidence)

4  Q.  Yuhang Xing is a professor of finance at Rice University

5  Jones Graduate School of Management?

6  A.  She is.  She's also a former student.

7  Q.  You told Professor Xing that Professor Ravina was very

8  crazy and sick?

9  A.  Yes.

10  Q.  You wrote more e-mails the next day?

11  A.  Yes.  This was right after the media campaign against me,

12  so there might be more.

13     MS. DONEHOWER:  Can we please mark Plaintiff's Exhibit

14  142.

15     I would like to offer this into evidence, your Honor.

16     THE COURT:  Any objection to 142.

17     MR. HERNSTADT:  No objection.

18     THE COURT:  It will be admitted.

19     (Plaintiff's Exhibit 142 received in evidence)

20  BY MS. DONEHOWER:

21  Q.  Professor Bekaert we are at about number 12 now, right, of

22  these e-mails?

23  A.  I don't keep track.  Sorry.

24  Q.  You are not keeping track, but there's more, right?

25  A.  Um, there could be.

1    Q.  OK.

2    A.  I don't know.

3    Q.  You told Professor Xing that Professor Ravina was very --

4    that she's horrible?

5    A.  Professor --

6    Q.  I'm sorry.  I am on the wrong one.  This is Napurnanand

7    Prabhala correct?

8    A.  Correct.

9    Q.  He is the professor of finance and the finance area chair

10   at the University of Maryland Robert H. Smith School of

11   business, correct?

12   A.  Correct.

13   Q.  This e-mail was sent on March 25, 2016?

14   A.  Yes.

15   Q.  Professor Prabhala has served as associate editor at Review

16   of Financial Studies?

17   A.  I believe that's true.

18   Q.  He's also served as an editor on the Journal of Financial

19   Services Research and on Financial Management?

20   A.  That I wouldn't know.

21   Q.  You wrote to him that Columbia University had cleared you

22   of any wrongdoing twice.

23   A.  Yes.

24   Q.  You wrote to him, "I could tell you much more, but writing

25   is probably not too smart."

Idnrav4                    Bekaert - Direct

1   A.  Yes.

2   Q.  You told this University of Maryland professor that

3   Professor Ravina -- let me see.

4            MS. DONEHOWER:  Can we go down and blow up that last

5   paragraph, Mr. McLeod, please.

6   BY MS. DONEHOWER:

7   Q.  Do you see the sentence that starts "ironically"?

8   A.  Yes.

9   Q.  Will you please read that aloud, Professor Bekaert.

10  A.  "Ironically, I wanted to help this person.  In the rumor

11  mill I am now described as an asshole and a villain who must

12  treat his students really badly too, whereas ironically she has

13  the worst of reputations among PG students whom she treats like

14  absolute -- SH."

15           MS. DONEHOWER:  I would like to mark Plaintiff's

16  Exhibit 143, please.

17           THE COURT:  Then tell me when it would be a good time

18  to break for lunch.

19           MS. DONEHOWER:  We can break now.

20           THE COURT:  OK.

21           MS. DONEHOWER:  This would be good.

22           Thank you.

23           THE COURT:  All right.  Why don't we break for lunch.

24  Just remember, don't discuss the case, don't research anything,

25  and keep an open mind.

Idnrav4                          Bekaert – Direct

1            You can step down.

2            All right.

3            Why don't we break until about 2.  How much do you

4     have left with this witness?

5            MS. DONEHOWER:  Approximately a half an hour to 45

6     minutes.

7            THE COURT:  All right.  Thank you.

8            (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    A F T E R N O O N   S E S S I O N

3                          (2:00 p.m.)

4          THE COURT:  Everyone can be seated.

5          Are we ready for the jury?

6          MS. DONEHOWER:  If I can raise one issue, your Honor.

7          THE COURT:  Sure.

8          MS. DONEHOWER:  We were discussing Plaintiff's Exhibit

9    164 before.  If we could just reserve to reconsider this maybe

10   Monday morning, depending on if Professor Bekaert is still on

11   the stand, the tenure vote process is actually a little more

12   complicated because there were several stages of the tenure

13   vote.  If it is easier we can lay all of that out in writing,

14   because there are really important relevance concerns here.

15         THE COURT:  Sure.

16         MR. HERNSTADT:  I was fine with the one section that

17   was submitted to the jury.  I didn't feel like we needed to add

18   anything in to complete the document, and I would say let's

19   stop with what we have done.

20         THE COURT:  Do you know what the attachment was?  This

21   is the one with the attachment.  This was the e-mail about the

22   spy, right?

23         MS. DONEHOWER:  I don't know what for sure what that

24   attachment was.  I can't say that we have a copy of the

25   attachment.  There is references to a letter from Noel Kapin,

1    but I think if Professor Bekaert is still on the stand Monday

2    we have some time to think about how to craft it without trying

3    to reference what the specific attachment was, if that's the

4    better part of it.

5            Alternatively, we could ask Professor Bekaert to

6    produce to us a version with the attachment.  That way we could

7    actually figure out what it was, because this is the only

8    version that was produced to us.

9            MR. HERNSTADT:  We produced what we had.

10           THE COURT:  All right.  I will look at it more

11   closely.

12           164?  Is that what you said?

13           MS. DONEHOWER:  Yes.

14           THE COURT:  I will look at it more closely.  If you

15   want to submit a letter, you can.

16           MS. DONEHOWER:  Just as very short background, we had

17   talked specifically about the dates of the tenure votes and the

18   tenure vote was actually a two-stage process.  The tenured

19   faculty voted on April 14, and then it went to a different

20   committee, which was the promotion and tenure committee, on

21   April 20.  And there's kind of two documents in this chain.

22           MS. PLEVAN:  It is not a tenure vote in that sense.

23           MS. DONEHOWER:  Perhaps it's characterized as a review

24   process.

25           MS. PLEVAN:  No, I wouldn't.  It is very limited.  It

Idnrav4                         Bekaert - Direct

1   is a procedural review only.  It is not a review on the merits

2   when someone is voted down.  Someone who voted for tenure, the

3   promotion and tenure committee would look at the merits, but --

4           THE COURT:  So what aspect of the procedure does the

5   second committee look at?

6           MS. PLEVAN:  Just whether, as I recall, just the usual

7   procedures were followed.

8           MS. DONEHOWER:  It is our understanding -- we can

9   brief it for your Honor -- that they look at whether the

10  correct procedures are followed when someone is denied tenure

11  as well from that committee.  So that period in between the two

12  votes is an important period.

13          MS. PLEVAN:  I can't hear.  I'm sorry.

14          THE COURT:  Could you say that again.

15          MS. DONEHOWER:  It is our understanding, and we can

16  brief it for your Honor, that the promotion and tenure

17  committee can consider procedural irregularities when someone

18  is denied tenure as well.  So that is a critical period in

19  between the first tenure vote and the review process.

20          THE COURT:  OK.  I will take a look at the exhibit and

21  I'll let you know.

22          MS. DONEHOWER:  Thank you.

23          THE COURT:  OK.  Why don't we bring in the jury.

24          (Witness resumed the stand)

25          (Continued on next page)

1     (Jury present)

2             THE COURT:  Everyone can be seated.  Thank you.

3             You may proceed.

4             MS. DONEHOWER:  Thank you, your Honor.

5   BY MS. DONEHOWER:

6   Q.  Professor Bekaert, before lunch, we were going through some

7   e-mails, right?

8   A.  Correct.

9   Q.  And there are more to come?

10  A.  Well, I'm sure -- I am not sure what this is referring to.

11  Q.  More e-mails that you sent about Professor Ravina to

12  business school professors around the world.  There are

13  additional ones more than the ones we have been over?

14  A.  I wouldn't know if --

15            MR. HERNSTADT:  Your Honor, we are not getting any --

16            THE COURT:  Your realtime stopped?

17            MR. HERNSTADT:  Our realtime.

18            THE COURT:  Just give us a minute.

19            We all have transcripts on our screens, which is why

20  we are all looking at our screens fairly often, so we have to

21  fix the technology.

22            THE COURT:  Why don't we proceed in the meantime.

23  Make sure, everybody, to speak up and speak into the

24  microphones.

25            MR. HERNSTADT:  Could I just ask that counsel restate

Idnrav4                          Bekaert - Direct

```
 1    the question.
 2                 THE COURT:  Yes, please.
 3                 MR. HERNSTADT:  Please.
 4    BY MS. DONEHOWER:
 5    Q.  The e-mails that you sent about Professor Ravina to
 6    business school professors around the world, we've gone over
 7    approximately ten, right, maybe more?
 8    A.  I don't remember how many we went over.  You are referring
 9    to the e-mails written after the media campaign against me?  Is
10    that what you're referring to?
11    Q.  I'm referring to the e-mails that you sent just prior to
12    the time that Professor Ravina came up for tenure.  Are you
13    aware whether there are additional e-mails that we haven't yet
14    reviewed?
15    A.  I don't remember -- again, the tenure vote of Ms. Ravina --
16    Q.  I am just asking whether you are aware of additional
17    e-mails that you sent about Professor Ravina to business school
18    professors?
19    A.  You spoke about a timing that is not clear to me.  I had
20    nothing do --
21    Q.  March 2015.
22    A.  The relevant date here, these e-mails came all after the
23    media campaign against me was being launched by the team over
24    there, and that's when these his e-mails were sent.
25                 So, I don't know how many I wrote, but there may have
```

Idnrav4                          Bekaert - Direct

1   been many.  I don't know.  I mean, you would have to show them

2   to me.

3   Q.  We'll come back, and you will have your chance to talk to

4   your lawyer.

5           MS. DONEHOWER:  We marked just before lunch

6   Plaintiff's Exhibit 143, which we would like to, I believe we

7   passed up just before lunch, and plaintiff would like to offer

8   into evidence.

9           THE COURT:  Any objection to 143?

10          MR. HERNSTADT:  No, your Honor.

11          THE COURT:  143 will be admitted.

12          (Plaintiff's Exhibit 143 received in evidence)

13  BY MS. DONEHOWER:

14  Q.  Professor Bekaert, this is an e-mail exchange between you

15  and Angela Ng?

16  A.  Correct.  She is also a former student.

17  Q.  The e-mail from you was sent on March 25, 2016?

18  A.  Correct.

19  Q.  Professor Ng is the associate dean of global engagements

20  and external relations at the Chinese University of Hong Kong

21  Business School?

22  A.  I believe she's changed positions.  I am not sure that is

23  what she was at that time.

24  Q.  You told her that Professor Ravina is very crazy and sick?

25  A.  Yes.  I believe it's the same e-mail that we've seen

1    before.

2    Q.  You told her that Professor Ravina was of the type that is

3    abusive towards RA's and staff?

4    A.  Correct.

5    Q.  You told her that a female student of yours had written an

6    e-mail in which she described Professor Ravina as a disgusting

7    person?

8    A.  Correct.

9              MS. DONEHOWER:  We'd like to mark Plaintiff's Exhibit

10   144?

11             MR. HERNSTADT:  No objection, your Honor, I mean if

12   it's moved.

13             MS. DONEHOWER:  We would like to move 144 into

14   evidence.

15             THE COURT:  No objection?

16             MR. HERNSTADT:  No objection.

17             THE COURT:  All right.  It will be admitted.

18             (Plaintiff's Exhibit 144 received in evidence)

19   BY MS. DONEHOWER:

20   Q.  This is an e-mail that you sent to Daniela Georgescu?

21   A.  Yes.

22   Q.  On March 25, 2016, correct?

23   A.  Yes.

24   Q.  If we can please look down at the middle of this first

25   paragraph of this e-mail.  On about the fourth line down, you

Idnrav4                         Bekaert - Direct

 1   told Ms. Georgescu that the university, Columbia University had

 2   recommended you get a training from an outside lawyer on e-mail

 3   communication.

 4            MR. HERNSTADT:  Objection, your Honor.

 5            Now we're not getting the exhibits either.

 6            THE COURT:  Just a second.

 7            MR. HERNSTADT:  We still don't have realtime.

 8            THE COURT:  The realtime they are coming to fix.  It

 9   is going to be a little bit on realtime.

10            MR. HERNSTADT:  I am not sure, without us being able

11   to see -- we're not sure.

12            THE COURT:  That we are going to fix right now.

13            Does the jury have the exhibit?

14            Yes.

15            Is it just your screen, Mr. Hernstadt?

16            MR. HERNSTADT:  No, it's both of them.

17            THE COURT:  OK.

18            Since it seems like some screens are working and some

19   aren't, can you highlight on paper and just give it to defense

20   counsel per exhibit so we can keep moving, please.

21            MS. DONEHOWER:  Yes.

22            Would it work, your Honor, if we just did the callouts

23   and no highlighting until they get it up?

24            THE COURT:  That's fine.  I am not sure what the

25   callouts are.

1          MS. DONEHOWER:  I just, mean to blow up a paragraph.

2          THE COURT:  You can't even do that.  They can't see

3     anything.

4          MS. DONEHOWER:  OK.

5          THE COURT:  So, you want to make clear orally exactly

6     what paragraph you are looking to.

7          MS. DONEHOWER:  No problem.

8          THE COURT:  And just highlight it for them.

9          MS. DONEHOWER:  And highlight it for them.

10         No problem, yes.

11    BY MS. DONEHOWER:

12    Q.  In the middle of the first paragraph of this e-mail, we are

13    at one, two, three, four lines from the top, you say, "The

14    university recommended I got training from an outside lawyer on

15    e-mail communication."  Right?

16    A.  Correct.

17    Q.  And you're referring to Columbia University?

18    A.  Correct.

19    Q.  And you say earlier in that e-mail on the second line that

20    you want to stress that you were cleared from all wrongdoing by

21    the university twice already, right?

22    A.  Correct.

23    Q.  You also wrote about your training.  You described the

24    training that Columbia had sent you to.

25    A.  Correct.

Idnrav4                         Bekaert - Direct

```
 1   Q.  You wrote in the fifth line down from the top, "That
 2   lawyer" --
 3           You're referring there to the Columbia trainer?
 4   A.  Yes.
 5   Q.  -- "having looked at the file immediately concluded that
 6   these e-mails had been provoked, and the woman had played me."
 7           By "woman" you are are referring to Professor Ravina?
 8   A.  Yes.
 9   Q.  You went on that, "The Columbia trainer suggested, given
10   the legal climate in the U.S., to simply not work with females
11   anymore, definitely when not when you are senior to them."
12   Right?
13   A.  Yes.
14   Q.  You told Ms. Georgescu that Professor Ravina was very crazy
15   and sick.
16           We are in the second paragraph now, first line?
17   A.  I see that.
18   Q.  You also wrote to her that you could give her details, but
19   not in writing.  That is in the last sentence of that
20   paragraph?
21   A.  Correct.
22   Q.  Daniela Georgescu is the director of the economics,
23   finance, accountancy, and marketing publishing unit at
24   Elsevier, right?
25   A.  Elsevier, it is a publishing company.
```

Idnrav4                          Bekaert - Direct

1    Q.  Elsevier is a publishing company that publishes the Journal

2    of Banking and Finance?

3    A.  Correct.

4    Q.  It also publishes thousands of other journals, correct?

5    A.  It's a pretty big company.

6    Q.  You copied Carol Alexander on this e-mail, right?

7    A.  Correct.

8    Q.  Isn't it true that Carol Alexander is a professor of

9    finance at the University of Sussex?

10   A.  She is.  She's my coeditor at the JBF.

11   Q.  That's in the United Kingdom?

12   A.  Yes, it is.

13             MS. DONEHOWER:  We'd like to mark Plaintiff's Exhibit

14   145.

15             THE COURT:  Is your screen working now or no?

16             MR. HERNSTADT:  No.

17             THE COURT:  No.

18             MR. HERNSTADT:  We're getting the realtime.

19             THE COURT:  The realtime is back, but not the

20   exhibits?

21             MR. HERNSTADT:  Correct.

22             THE COURT:  We will call the tech folks.

23             Thank you.

24             MR. HERNSTADT:  Thank you.

25             MS. DONEHOWER:  Your Honor, the Plaintiff's Exhibit

1    Exhibit 145 into evidence.

2              MR. HERNSTADT:  No objection.

3              THE COURT:  All right.  145 will be admitted.

4              (Plaintiff's Exhibit 145 received in evidence)

5    BY MS. DONEHOWER:

6    Q.  Professor Bekaert, this is an e-mail you sent to David

7    Marcus and Adel Turki, correct?

8    A.  Correct.

9    Q.  It's dated March 25, 2016, right?

10   A.  Correct.

11   Q.  You told Mr. Marcus that Professor Ravina was very crazy

12   and sick in the first line of the second paragraph?

13   A.  Yes.  It's the same wording as the previous e-mail.

14   Q.  You also told him that you could give him more details, but

15   not by mail?

16   A.  Correct.

17   Q.  Mr. Marcus is the senior vice president at Cornerstone

18   Research Economic and Financial Consulting and Expert

19   Testimony, right?

20   A.  Correct.

21   Q.  That is a leading economic and financial consulting firm?

22   A.  I don't know how leading they are, but they are a financial

23   consulting firm.

24   Q.  You've done work for them before?

25   A.  Yes.  Not anymore.

Idnrav4                        Bekaert - Direct

1    Q.  Cornerstone research has 700 staff and offices in Boston,

2    Chicago, London, Los Angeles, New York, San Francisco, Silicon

3    Valley, and Washington?

4    A.  I wouldn't know.  I can't confirm.

5    Q.  If you look towards the bottom -- actually, on page 2 of

6    this e-mail to Mr. Marcus, at the very top line, you told him,

7    "Feel free to take this to the right people at Cornerstone."

8          Right?

9    A.  Yes, I did.

10          MS. DONEHOWER:  I would like to mark Plaintiff's

11    Exhibit 146.

12          THE COURT:  Thank you.

13          MS. DONEHOWER:  We're offering Exhibit 146 into

14    evidence.

15          MR. HERNSTADT:  Objection, your Honor.

16          THE COURT:  There is an objection?

17          MR. HERNSTADT:  408.

18          THE COURT:  Let's speak at the sidebar.

19          Thanks.

20       (Continued on next page)

21

22

23

24

25

Idnrav4                         Bekaert - Direct

1           (At sidebar)

2           MR. HERNSTADT:  And hearsay.

3           The first page is Professor Bekaert talking about

4   settlement negotiations.  The agreement converged on the papers

5   issue, and it failed to converge when they got a different

6   lawyer making him liable for a million dollars.  Then we have a

7   number of responses from his friend making, you know, talking

8   about things that I don't think are relevant.

9           THE COURT:  Can you redact that.  Do you have an

10  objection to redacting those portions?

11          MS. DONEHOWER:  I have no objection to redacting those

12  portions.

13          THE COURT:  Why don't you just let them know what you

14  are going to publish to the jury, and then make sure you are on

15  the same page about what you are redacting from the actual

16  document.  You can take a minute now.

17          MS. DONEHOWER:  I am only going to publish statements

18  by Professor Bekaert, but I will not publish any of the

19  statements, any A, B, or C that he identified in the last page.

20          MS. PLEVAN:  I don't know which page you are talking

21  about.

22          MS. DONEHOWER:  The last page is page 6.

23          MS. PLEVAN:  There is something about settlement on

24  the fifth page also.

25          MR. HERNSTADT:  Yes, that paragraph.  The last page,

1  in addition to settlement, it talks about, he says all my

2  colleagues are in Enrichetta's camp.

3          MS. DONEHOWER:  That is not a settlement negotiation.

4          MR. HERNSTADT:  But that goes to a petition.

5          MS. DONEHOWER:  This is a statement that he's made.  I

6  don't think he can be disqualified from pointing a statement

7  that he's made.

8          THE COURT:  Tell me what line you are looking at.

9          MR. HERNSTADT:  Right at the top, your Honor.

10         He is quoting someone in that paragraph.  That is

11 something that someone told him.  That makes that hearsay.

12         THE COURT:  Yes.

13         MR. HERNSTADT:  What they told him is also hearsay.

14         THE COURT:  I don't think they should include him

15 reciting the views of his colleagues.

16         MS. DONEHOWER:  His impression at the beginning that

17 his colleagues are in Enrichetta's camp I think this is a

18 statement of a party opponent that we should be allowed to

19 cross-examine him about.

20         THE COURT:  It is a statement of a party opponent that

21 contains hearsay of others, and I think it's just too

22 prejudicial.  As it is, this is pretty cumulative frankly, so I

23 don't think that should come in.

24         MS. DONEHOWER:  I understand, but I don't believe it

25 is cumulative in the sense that it is very important to whom he

Idnrav4                     Bekaert - Direct

 1   was sending these e-mails, because these are all different

 2   branches of the academic world.

 3            THE COURT:  You have made that really clear already,

 4   so I don't want to let in what he's saying about what others

 5   felt and whose side they were on.

 6            MS. DONEHOWER:  Even if that's his understanding of

 7   it?

 8            THE COURT:  Yes.

 9            MS. DONEHOWER:  OK.

10            On page 3 of this exhibit, Professor Bekaert offers

11   his view of how Columbia handled the case in the second

12   paragraph here.

13            MS. PLEVAN:  And refers to what other people allegedly

14   said.  I mean the prejudice seems to outweigh --

15            MS. DONEHOWER:  I think your Honor has already ruled

16   on that third sentence.  Your Honor has ruled on that, but I am

17   talking about the first --

18            MS. PLEVAN:  I don't know what point it serves.  He is

19   talking about people are saying.  His personal feelings about

20   who is handling it.

21            MR. HERNSTADT:  She can ask him about that.

22            MS. DONEHOWER:  His personal perspective on how

23   Columbia handles the case.  He was part of the case.

24            MS. PLEVAN:  The day after he got sued.

25            MS. DONEHOWER:  It is absolutely relevant.  You can

Idnrav4                    Bekaert - Direct

1    cross him about it.

2              MS. PLEVAN:  It's just way over the top.  That is our

3    objection.  The prejudice outweighs the 403 issue.  I don't

4    think we are bound by what he says.  We are not aligned.

5              MS. DONEHOWER:  He says that they refused to

6    fact-find.  He's part of this investigation.  He met with

7    Director Dunn.  He personally observed this process, and he's

8    commenting on his observation.

9              MS. PLEVAN:  But that is what he says at this moment.

10   This is a self-serving document.

11             THE COURT:  I think this is just too prejudicial, his

12   view of how Columbia handled it.  You can ask him what they did

13   and you can ask a whole lot of other witnesses from Columbia

14   about what they did and what they were required to do, but I

15   don't think his personal opinion about if Columbia handled this

16   the right way, I think it is just too prejudicial.

17             MS. DONEHOWER:  OK.  One more issue.

18             This first line I will agree to put in just part of

19   the sentence, but he puts in here, I have a document that she

20   wrote and sent to the faculty, and we can redact the rest of it

21   because I understand he's communicating with his lawyer.  I

22   don't need to get that in.  But it is important to know that

23   prior to the tenure process he is talking about documents that

24   she sent to the faculty that he has copies of.  That is a

25   really important part of the way he insinuated himself into the

Idnrav4                          Bekaert - Direct

1   tenure process.

2              MS. PLEVAN:  How does having a document insinuate

3   anything?

4              THE COURT:  What is wrong with him saying that he had

5   a document, he has a document that she wrote and sent to the

6   faculty?  What is your objection?

7              MR. HERNSTADT:  My objection is to the document.  She

8   should ask him.  If he says he didn't or doesn't remember -- as

9   of the date of this e-mail.  Did you have a document that the

10  plaintiff wrote and sent to faculty members?

11             THE COURT:  I don't have a problem with you including

12  that portion.

13             MR. HERNSTADT:  Just that he had a document that she

14  sent to the faculty.

15             THE COURT:  That's all she wants.

16             MS. PLEVAN:  Ending there?

17             MS. DONEHOWER:  Yes.

18             THE COURT:  All right.

19          (Continued on next page)

20

21

22

23

24

25

I7d1rav5                          Bekaert - Direct

```
 1              (In open court)
 2              MS. DONEHOWER:  May I proceed, your Honor?
 3              THE COURT:  You may.
 4     BY MS. DONEHOWER:
 5     Q.  Professor Bekaert, you communicated about this case with
 6     Andreas Stathopoulos?
 7     A.  Correct.  He's also a former student.
 8     Q.  You communicated with him in March 2016?
 9     A.  It's the end of March, yes.
10     Q.  You told -- Professor Stathopoulos is a professor of
11     finance and business economics at the University of
12     Washington's Foster School of Business, correct?
13     A.  I believe that's correct.
14     Q.  You informed Professor Stathopoulos that you had a document
15     that Professor Ravina had written and sent to the faculty?
16     A.  Can you tell me where that is?  I don't see it.
17     Q.  Page 3, the second full paragraph, first line.
18              MS. DONEHOWER:  I believe if we can just publish just
19     that one snippet.  Thank you.
20     A.  Yeah.
21     Q.  You had a document that Professor Ravina had sent to the
22     faculty?
23     A.  Yeah, it's taken out of context here and I can't find it in
24     the original email.  Can you tell me what the page number is
25     again?
```

I7d1rav5                         Bekaert - Direct

1   Q.  Page 3.

2   A.  What line, approximately?

3   Q.  It is the second full paragraph, which is the third block

4   of text on the page, and it is --

5   A.  Oh, oh.

6   Q.  -- the very beginning.

7   A.  Yes, I got it.

8   Q.  You informed Professor Stathopoulos that you had a document

9   Professor Ravina had written and sent to the faculty of

10  Columbia Business School, correct?

11  A.  Correct.

12  Q.  After you communicated with Professor Stathopoulos, you

13  received an invitation for another meeting about Professor

14  Ravina's tenure review, right?

15  A.  Again, none of these emails of the tenure review -- I don't

16  even know the dates 'cause I was not involved, so I just --

17  Q.  You received calendar invitations for Professor Ravina's

18  tenure review, correct?

19  A.  Yes.  They were irrelevant for me.

20           MS. DONEHOWER:  Can we please pull up Plaintiff's

21  Exhibit 147.

22           We'd like to offer this into evidence.

23           THE COURT:  Let me know if there's an objection to

24  147.

25           MR. HERNSTADT:  No objection.

1                    THE COURT:  All right.  It will be admitted.

2                    (Plaintiff's Exhibit 147 received in evidence)

3       BY MS. DONEHOWER:

4       Q.   This is an invitation you received to Professor Ravina's

5       tenure case?

6       A.   I guess that's what it says.

7       Q.   In April 2016, you were communicating with Rudi Vander

8       Vennet?

9       A.   I do know Rudi and I -- yeah, probably.  I mean, I don't

10      remember, of course, the exact email.  You want --

11                   MS. DONEHOWER:  We'd like to mark Plaintiff's

12      Exhibit 149 and offer it into evidence.

13                   THE COURT:  Any objection to 149?

14                   MR. HERNSTADT:  No objection, your Honor.

15                   THE COURT:  It will be admitted.

16                   (Plaintiff's Exhibit 149 received in evidence)

17      BY MS. DONEHOWER:

18      Q.   You wrote to him on April 1, 2016, right?

19      A.   Correct.

20      Q.   Professor Vander Vennet, where does he teach, Professor

21      Bekaert?

22      A.   He's a professor at the University of Ghent, which is a

23      university in Belgium where I did my undergrad degree, and he's

24      a friend there.

25      Q.   You wrote to him that Professor Ravina was very crazy and

I7d1rav5                         Bekaert - Direct

1    sick?

2    A.  Yes, same language as before.

3    Q.  You also emailed Ben Jacobsen?

4    A.  Who?

5          MS. DONEHOWER:  Can we please pull up -- or can we

6    please mark Plaintiff's Exhibit 150, which we'd like to offer

7    into evidence.

8          MR. HERNSTADT:  No objection.

9          THE COURT:  All right.  150 will be admitted.

10         (Plaintiff's Exhibit 150 received in evidence)

11   BY MS. DONEHOWER:

12   Q.  You see the line To Ben Jacobsen?

13   A.  Yes.

14   Q.  He's a professor of finance at the TIAS Business School?

15   A.  He's moved around a little bit so I kind of don't know

16   exactly where he is right now.

17   Q.  He's a professor?

18   A.  Yes, absolutely.  I was on his external committee.

19   Q.  You told him that Professor Ravina was very evil and crazy?

20   A.  I'm sure it's in the email.  I can't see it quite now,

21   but -- yes, I see it.  I see it.  Thank you.

22         MS. DONEHOWER:  I'd like to mark Plaintiff's

23   Exhibit 151 and offer it into evidence.

24         MR. HERNSTADT:  No objection.

25         THE COURT:  All right.  151 will be admitted.

1          (Plaintiff's Exhibit 151 received in evidence)

2   Q.  I'd like to -- for this one, let's start with the email

3   that Professor Rhodes-Kropf wrote.  I'm sorry.

4          Matthew Rhodes-Kropf, let's talk about him for one

5   minute first.  He is a professor as well?

6   A.  Yes, he is.  He was my former colleague at Columbia.  My

7   neighbor.

8   Q.  And he says his email address is hbs.edu.  Is that Harvard

9   Business School?

10  A.  That's Harvard Business School, but he's not there anymore.

11  Q.  And your email address from which you sent -- I'm sorry.

12  He wrote to you at your Columbia email address, right?

13  A.  Correct.

14  Q.  And the title of this email is Journal Resigning, right?

15  A.  Right.

16  Q.  And isn't it true that this email is about his decision to

17  step away as an associate editor of a journal?

18  A.  Correct.

19  Q.  A journal that you're the editor of.

20  A.  Yes, JBF.

21  Q.  That's correct, right?

22  A.  Correct.

23  Q.  JBF stands for Journal of Banking and Finance?

24  A.  Yes.

25  Q.  You responded to Professor Rhodes-Kropf?

I7d1rav5                        Bekaert - Direct

1    A.  Correct.

2              MS. DONEHOWER:  And if we can pull up the -- well, at

3    least try to pull up that whole first page, I guess.  Thank

4    you.

5    Q.  In your response you respond about what he raised, which

6    was the resignation from the journal, right?

7    A.  Yes.

8    Q.  That was in the first two lines on this email?

9    A.  Correct.

10   Q.  And the entire rest of the email is about Professor Ravina?

11   A.  Yeah, it's just the same email that I sent to other friends

12   in the profession.

13   Q.  Again, you called her very evil and crazy?

14   A.  Indeed.

15   Q.  You also emailed with Karl Aquino, right?

16   A.  I did.

17   Q.  He is a professor at the University of British Columbia

18   Sauder School of Business, right?

19   A.  Yes, but I want to clarify, because there was a mistake

20   made before.  He's not a professor of finance.  He was a friend

21   in grad school, he was my basketball buddy, and he's a

22   professor of organizational behavior.

23   Q.  He's a professor in a business school, right?

24   A.  Yes, he is.

25   Q.  He has served as an associate editor on the Journal of

I7d1rav5                         Bekaert - Direct

1    Management?

2    A.  I don't know his editorial responsibilities.

3    Q.  Are you familiar with the Organizational Psychology Review

4    and the Academy of Management Review and his role on the

5    editorial board there?

6    A.  I'm not familiar with his editorial role, and that last

7    journal you mentioned, that I've heard of.

8              MS. DONEHOWER:  I'd like to mark and offer Plaintiff's

9    Exhibit 152.

10             Actually, I've been informed that that's in evidence.

11             THE COURT:  You can publish it.

12             MS. PLEVAN:  I think we discussed this.

13             THE COURT:  Is there an objection?

14             MS. PLEVAN:  It's not clear if this one --

15             Can you show the next, the whole document.

16             Okay.  Thank you.

17             THE COURT:  All right.  You may proceed.

18             MR. HERNSTADT:  I'm sorry.  Can we take that down,

19   please.

20             MS. DONEHOWER:  This is in evidence, your Honor.

21             (Counsel conferring)

22             MS. DONEHOWER:  Mr. McLeod, can you just show us

23   page 2, please.

24             Thank you.

25   BY MS. DONEHOWER:

1   Q.  And on the bottom email, the line to -- actually, at the

2   very end of line 1, do you see the sentence that says, "In a

3   nutshell"?

4   A.  Yes.

5   Q.  And can you please tell us -- could you please read that

6   sentence for us.

7   A.  "In a nutshell, this is a schizophrenic woman whose bad

8   side I failed to see for a long time -- PhD students, however,

9   were very aware of it -- and who I thought was a friend and so

10  probably trusted too much."

11  Q.  You sent Professor Aquino this email the same day that you

12  received an email about an upcoming meeting on Professor

13  Ravina's tenure?

14  A.  As I said before, I had no interest in attending -- I mean,

15  no direct interest in attending.

16  Q.  I'm not asking about your interest, Professor Bekaert.  I'm

17  only asking about the timing.

18  A.  Well, I don't know.

19  Q.  So we have April -- this was sent on April 10, 2016, right?

20  A.  Yes, Sunday, April 10th.

21          MS. DONEHOWER:  Could we please mark and offer into

22  evidence Plaintiff's Exhibit 139, which is another calendar

23  invite.

24          I apologize.  It's not a calendar invite.  It's the

25  email.

1       THE COURT:  Any objection to 139?

2       MS. PLEVAN:  No objection.

3       MR. HERNSTADT:  No objection, your Honor.

4       THE COURT:  All right.  139 will be admitted.

5       (Plaintiff's Exhibit 139 received in evidence)

6   BY MS. DONEHOWER:

7   Q.  Do you see this top email, Professor Bekaert?

8   A.  Yes.

9   Q.  This was sent from Stephen Zeldes, the division chair, in

10  the Department of Finance and Economics at Columbia Business

11  School?

12  A.  Correct.

13  Q.  It was sent to you on April 10 -- I'm sorry -- April 11,

14  2016?

15  A.  It appears so.

16  Q.  And it includes here the dates of the divisional tenured

17  faculty meetings?

18  A.  Yes.

19  Q.  The first line says that he was writing with an update on

20  the meeting of the divisional tenured faculty to consider the

21  tenure case of Enrichetta Ravina, right?

22  A.  Correct.

23  Q.  And he notes that many of the faculty expressed interest in

24  holding another meeting which would be held on the 12th,

25  correct?

I7d1rav5                          Bekaert - Direct

1   A.   Correct.

2   Q.   We mentioned Professor Stephan Siegel before, but you have

3   exchanged other emails with him as well, right?

4   A.   Stephan Siegel is one of my co-authors and friends, so

5   there's going to be multiple emails.  I wouldn't know what

6   you're referring to.

7          MS. DONEHOWER:  Let's please mark and seek to admit

8   Plaintiff's Exhibit 163, which is Tab 141.

9          MR. HERNSTADT:  Objection, your Honor.

10          THE COURT:  Do you want to see if you can work it out

11   first.  If not, we'll have a sidebar.

12          (Counsel conferring)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1            (At the sidebar)

 2            MR. HERNSTADT:  Your Honor, this is Professor Bekaert

 3    forwarding the Noel Capon statements that we've been talking

 4    about for part of the time today, with commentary about it.

 5            MS. PLEVAN:  It's creating the idea that there's an

 6    issue floating around or a bubble that's just going to be a

 7    distraction.  It's not relevant what Capon says about it.

 8            MS. DONEHOWER:  It's actually before both tenure

 9    votes.  The first tenure vote --

10            MS. PLEVAN:  Why don't you start with what the

11    relevance of Noel Capon's e-mail is.  We're starting with

12    objection to that.  What does that have to do with anything?

13    He's in a different division.

14            MS. DONEHOWER:  But he's in the business school --

15            MS. PLEVAN:  He knows nothing.

16            MS. DONEHOWER:  -- raising concerns about the tenure

17    process.  I'm not trying to get in any of those statements for

18    the truth because those statements are not even attached to

19    this email.

20            MS. PLEVAN:  Again, the prejudice outweighs the

21    relevance because Noel Capon knows nothing about anything here

22    and it's just going to distract the jury and make them think

23    there are some other issues, they're not going to understand

24    it, and he's not going to be able to explain it.  It doesn't

25    seem to have anything to do with Professor Bekaert.

1    MS. DONEHOWER:  Professor Bekaert certainly

2    characterizes it and then discusses factual evidence about how

3    his colleagues in the business school are treating him.

4    "Embarrassed to even talk to me and simply avoid eye contact."

5    MS. PLEVAN:  I'm saying you don't need Noel Capon's

6    email.  My colleague may have other arguments.

7    MR. HERNSTADT:  This is his impression based on this

8    email.  And the lawsuit.

9    MS. DONEHOWER:  No, this is his impression based on

10   all of what's -- this is a critical part of the story.  There

11   are all these protests, there are all these uprisings within

12   Columbia University --

13   MR. HERNSTADT:  Come on.

14   MS. DONEHOWER:  -- and this is happening right before

15   a tenure vote.  He's responding.

16   MS. PLEVAN:  This is a kook.  Noel Capon is a kook.

17   MS. DONEHOWER:  Well, and Professor Bekaert calls him

18   a crackpot.  You guys are welcome to characterize him that way.

19   MS. PLEVAN:  It's a sideshow.

20   MR. HERNSTADT:  And it's all hearsay.  The fact that

21   Professor Bekaert's colleagues turned against him based on what

22   Professor Ravina told them, he didn't talk to any of them.  She

23   talked to all of them, and turned them against him.  That's not

24   relevant to anything.

25   MS. DONEHOWER:  He testified today that he talked to

I7d1rav5                    Bekaert - Direct

 1    them.

 2              MR. HERNSTADT:  Dr. Calomiris.

 3              THE COURT:  Do you have any objection to the two

 4    emails on top, the one from Stephan Siegel to Professor Capon

 5    and his response about being worried about retaliation claims?

 6

 7              MR. HERNSTADT:  Well, "Sorry to hear" refers to below,

 8    so it will be a little --

 9              THE COURT:  All right.  So let's take out the first

10    line here and then you just have -- part of this is irrelevant,

11    but then you have him saying, "I can provide a detailed

12    account... to be helpful," and then his response.

13              MR. HERNSTADT:  I'm fine with that.  Not talking to

14    his colleagues, he doesn't want to be perceived as retaliating.

15              MS. PLEVAN:  She's just asking, do you object to this.

16              MR. HERNSTADT:  No.

17              MS. PLEVAN:  Okay.

18              MS. DONEHOWER:  What about the email on the top of

19    page 2?

20              THE COURT:  I don't think so.  I think it is a

21    sideshow what this other person said.  I think you made your

22    point a hundred times over, so you can do these two with this

23    one line about, you know, "Sorry to hear that here but he'll

24    write him back and say, do you want to provide a --" you know,

25    "it seems they know little about your side of the story."  And

I7d1rav5                          Bekaert - Direct

1  then his response about he thinks he should wait until after

2  the tenure decision and being worried about retaliation claims.

3  All that should come in.  I don't think this other person's

4  statements should.

5           (Continued on next page)

1    (In open court)

2         MS. DONEHOWER:  May I proceed, your Honor?

3         THE COURT:  Yes.

4    BY MS. DONEHOWER:

5    Q.  Showing you what's being marked into evidence as

6    Plaintiff's Trial Exhibit 153.

7         MS. DONEHOWER:  I'm sorry.  Can you take that down,

8    Mr. McLeod, and just can you mark out the bottom part where

9    it's just showing the To and From as well.  I'm sorry I didn't

10   mention that before.

11        Oh, let me come over.

12   Q.  Professor Bekaert, can we please look down on the email,

13   just the one on the bottom of the page.  That's from Professor

14   Siegel to you?

15   A.  Correct.

16   Q.  And he writes that he was at a conference in Chicago?  NBER

17   refers to a conference?

18   A.  It's the National Bureau of Economic Research.  It's not a

19   conference, it's an organization.

20   Q.  Oh, I see.  Thank you.

21        And he wrote that, "There were a bunch of Columbia

22   guys, including Ravina.  It seems they know little about your

23   side of the story."  And he says that he only talked to one of

24   them a bit more.  "I believe providing a more detailed account

25   of what happened, why, and how, at least for your colleagues,

1  could be helpful."  Right?

2  A.  Correct.

3  Q.  And you responded to Professor Siegel?

4  A.  I did.

5  Q.  This was on April 11, 2016, right?

6  A.  Yes.

7  Q.  Can you please read the first paragraph of your response.

8  A.  "I will inform them but must wait until after the tenure

9  decision.  We are worried about retaliation claims.  Legal

10  hurdle is low.  She's super aggressive and crazy and her lawyer

11  team is too.  We do not want an additional claim.  Let's fight

12  the first one first."

13  Q.  And in the second paragraph, the line you also wrote, "I

14  want to scream the truth from the rooftops but cannot.  I just

15  need to be patient."  Right?

16  A.  Correct.

17  Q.  And this was -- April 11th was after all of these March

18  emails that we've spent much of the day reviewing?

19  A.  Yes, after the media campaign against me.

20  Q.  You emailed Joseph Chen as well?

21  A.  Yes, and Joe is a former student as well.

22       MS. DONEHOWER:  I'm just going to mark and admit, seek

23  to admit, please, Plaintiff's Exhibit 162.

24       MR. HERNSTADT:  No objection.

25       THE COURT:  All right.  162 will be admitted.

1              (Plaintiff's Exhibit 162 received in evidence)

2       Q.   This is the email you sent to Mr. Chen?

3       A.   Yes.

4       Q.   He is a professor at the UC Davis Graduate School of

5       Management?

6       A.   Correct.

7       Q.   He is an associate editor of the International Review of

8       Finance?

9       A.   That I don't know.  I don't know his editorial

10      responsibilities.

11      Q.   You told Professor Chen that Professor Ravina was very evil

12      and crazy, right?

13      A.   I'm trying to look for that.  I'm sure it's in there,

14      but -- yeah, I found it.

15              MS. DONEHOWER:  I'd like to mark and seek to admit

16      Plaintiff's Exhibit 162.

17              THE COURT:  Do you all have copies?

18              MR. HERNSTADT:  We're waiting.

19              I thought that was already in.  162 I already --

20              MS. DONEHOWER:  165.  I apologize.  That's Tab 144.

21              THE COURT:  Any objection?

22              MR. HERNSTADT:  No objection, your Honor.

23              THE COURT:  All right.  165 will be admitted.

24              (Plaintiff's Exhibit 165 received in evidence)

25      BY MS. DONEHOWER:

1   Q.  Professor Bekaert, this is an email you sent to Professor

2   Arash Aloosh?

3   A.  Correct.  He's a co-author of mine.  I actually saw him

4   last week.

5   Q.  He is a professor of finance at NEOMA Business School,

6   right?

7   A.  Correct.

8   Q.  That's in France?

9   A.  Yes.

10  Q.  And let me see down here.  Page 1, paragraph 4 -- well,

11  kind of --

12          MS. DONEHOWER:  If we could pull out, Mr. McLeod, the

13  part of the email above, "All the best."  We could pull out his

14  signature and "All the best."

15  Q.  Do you see the line that starts, "Yes, what this woman is

16  doing to me is just unbelievable"?

17  A.  Yes, I do.

18  Q.  And can you read the sentence after that, please.

19  A.  "I'm sometimes still in disbelief on how someone can be

20  that evil."

21  Q.  Can you read the next paragraph as well, please.

22  A.  The whole thing?

23  Q.  Yeah.

24  A.  "I include an email I sent to many of my friends to give

25  you a bit more background.  I should be able to speak the truth

1    soon.  Her tenure case was still going on in the US.  The cards

2    are very much stacked in favor of the on paper weak person and

3    I'm apparently a privileged white male and can do very much.

4    If I spoke the truth earlier, I could be accused of retaliation

5    against her."

6    Q.  We spoke about Professor Campbell Harvey earlier, right?

7    A.  I believe he was mentioned, yes.

8    Q.  He's that president, former president of the American

9    Finance Association?

10   A.  Correct.  He's also a close friend of mine.

11            MS. DONEHOWER:  I would like to mark and seek to

12   admit, please, Plaintiff's Exhibit 167.

13            THE COURT:  Any objection to 167?

14            MR. HERNSTADT:  No, your Honor.

15            THE COURT:  All right.  It will be admitted.

16            (Plaintiff's Exhibit 167 received in evidence)

17   BY MS. DONEHOWER:

18   Q.  Professor Bekaert, we're on about, give or take, No. 24 of

19   these emails now?

20   A.  I have not counted.  Sorry.

21   Q.  Would you agree with me that it's more than a handful?

22   A.  These are all my friends, so -- I have more than a handful

23   of friends, I guess.

24   Q.  Campbell Harvey, Professor Harvey, you told him that

25   Professor Ravina was mentally unstable and vicious.

1         MS. DONEHOWER:  If we can blow up, please, Mr. McLeod,

2   the top email, the last sentence.

3   A.  Yes.

4   Q.  You also emailed Terrence Hendershott?

5   A.  Correct.  He's a former student and basketball buddy of

6   mine from Stanford.

7         MS. DONEHOWER:  I'd like to mark and seek to admit,

8   please, Plaintiff's Exhibit 111.

9         THE COURT:  Any objection to 111?

10        MR. HERNSTADT:  I'm sorry.  It's a long exhibit.

11            Just to part of it, your Honor.

12        THE COURT:  Why don't you see if you can work it out.

13   If not, let's quickly have a sidebar.

14        MR. HERNSTADT:  Okay.

15            (Counsel conferring)

16        MS. DONEHOWER:  It's resolved, your Honor.

17        THE COURT:  All right.  Thank you.  So the rest of

18   111, what's been agreed upon, will be admitted.

19        MS. DONEHOWER:  Thank you.

20            (Plaintiff's Exhibit 111 received in evidence)

21        MS. DONEHOWER:  Mr. McLeod, we're only going to

22   publish the first two pages, okay?  Thank you.

23   BY MS. DONEHOWER:

24   Q.  Mr. Hendershott is a Willis H. Booth Chair in Banking and

25   Finance at the Haas School of Business of the University of

1  California at Berkeley?

2  A.  Yes.

3  Q.  He has served as an associate editor of the Journal of

4  Banking and Finance?

5  A.  Yes, he did.

6  Q.  He's also served as an editor of a journal called

7  Management Science?

8  A.  It's possible.

9  Q.  And also of a journal, the Journal of Financial Markets?

10  A.  I don't know.  I do not know all of his editorial

11  responsibilities.

12  Q.  You told Professor Hendershott that Professor Ravina was

13  simply crazy?

14  A.  Yes.

15          MS. DONEHOWER:  I'd like to please look at page 2,

16  paragraph 4.

17  Q.  You wrote to Professor Hendershott that given your

18  experience, you would never want to work with a junior woman

19  again?

20  A.  I wrote that, yes.

21  Q.  Please look at paragraph 5.

22          You asked him not to share this email?

23  A.  Correct.

24  Q.  There are even more emails in which you disparaged

25  Professor Ravina?

1   A.  I don't know.  I mean, it's possible.

2   Q.  In addition --

3   A.  Excuse me.  I don't know about disparagement.  I mean, I'm

4   just telling the truth.

5   Q.  There are even more emails you sent in which you called

6   her, for instance, evil or crazy?

7   A.  Yes.  Perhaps.  But --

8   Q.  In addition to describing Professor Ravina to professors

9   around the world as darn evil B -- I'm going to use a different

10  term than you did -- and crazy and sick and schizophrenic and

11  insane and incredibly evil, you have also described her as

12  inhumane?

13  A.  I think I called her inhumane in my deposition, yes.

14  Q.  Before Professor Ravina reported your behavior to Columbia,

15  before she made a complaint to Columbia University, it was your

16  opinion that you worked well together for four or five years.

17  A.  Yes.

18  Q.  You thought Professor Ravina, before she made her

19  complaint, was always charming.

20  A.  I don't know if I ever said this in that way.  I don't

21  know.

22          MS. DONEHOWER:  I'd like to show the witness his

23  deposition at 223/18-21, please.

24          THE COURT:  Again, are you trying to refresh his

25  recollection?

1    MS. DONEHOWER:  Just to show the witness to refresh

2    his recollection.

3    THE COURT:  Just pull it up on his screen and the

4    lawyers' and my screen, please.

5    MS. DONEHOWER:  Thank you.

6    MR. HERNSTADT:  What are the lines, please?

7    MS. DONEHOWER:  223/18-21.

8    THE WITNESS:  Can I see a little bit more context?

9    MR. HERNSTADT:  There's no question, your Honor.

10    THE COURT:  Why don't you put all from line 12 on.

11    And the answer, please.  Thank you.

12    MS. DONEHOWER:  Mr. McLeod, you can show him a few

13    more lines, maybe to the bottom of the page, too.

14    MR. HERNSTADT:  I think he should see the entire

15    answer, your Honor.

16    THE COURT:  That's fine.  Can you scroll to the next

17    page as well, please.  Or put them both up.  Thank you.

18    A.  Yes, I remember talking about this.

19    Q.  You remember testifying that before Professor Ravina made

20    her complaint to Columbia University, you said that she was

21    always charming?

22    A.  My screen went dead, but -- my screen is dead, actually.

23    Okay.  Yeah, that's what I write there -- what I said

24    at the deposition.

25    Q.  And you remember testifying that before she made her

I7d1rav5                          Bekaert - Cross

1    complaint to Columbia University, it was your opinion that

2    Professor Ravina was always nice.

3    A.  I would -- well, always?  I mean, obviously as researchers,

4    you could sometimes get into arguments, but in general, I

5    thought of her as a nice person, yes.

6            MS. DONEHOWER:  Thank you, Professor Bekaert.

7            No more questions, your Honor.

8            THE COURT:  All right.  Thank you.

9            Are you ready for cross-examination?  Do you need a

10   break?

11           MR. HERNSTADT:  A break would be useful, your Honor,

12   please.

13           THE COURT:  Okay.  So why don't we take a short break

14   now and then we'll resume.  Just remember, keep an open mind

15   and don't discuss the case.

16           (Recess)

17           (In open court; jury not present)

18           THE COURT:  Are you ready for the jury?

19           ALL COUNSEL:  Yes, your Honor.

20           THE COURT:  Professor Bekaert.

21           (Discussion off the record)

22           (Jury present)

23           THE COURT:  All right.  Everyone can be seated.

24           You may proceed.

25           MR. HERNSTADT:  Thank you, your Honor.

I7d1rav5                          Bekaert – Cross

1    CROSS-EXAMINATION

2    BY MR. HERNSTADT:

3    Q.   Good afternoon, Professor Bekaert.

4    A.   Good afternoon.

5    Q.   How are you doing?

6    A.   Holding up.  It's a tad overwhelming, but I'm glad that I

7    finally will be able to speak the truth, for the first time, in

8    a public forum.

9    Q.   Professor Bekaert, you're not from the United States, are

10   you?

11   A.   No.  I am from Belgium.

12   Q.   Please describe, if you would, your life in Belgium before

13   you came here.

14   A.   I grew up in a very simple family.  My dad finished high

15   school and worked for the National Railway Company as an

16   accountant.  My mom, because of the war, only went to school

17   till age 14 and she was a stay-at-home mom, with a big family

18   to raise.  I have two older sisters and an older brother.  She

19   was the best mom ever.  And so I did my high school and

20   undergrad education in Belgium and worked for one year, and

21   then I came to the States for my PhD at Northwestern Department

22   of Economics.

23             THE COURT:  I'm just going to ask you both to speak up

24   a little bit.

25             THE WITNESS:  Okay.  Sorry.  Yes.

I7d1rav5                    Bekaert - Cross

Q.   Why did you come to the United States for your graduate

studies?

A.   I really wanted to study economics at the highest level,

and so things had been going very well, of course, in Belgium,

and I felt like I didn't have enough knowledge to understand

the academic literature on economics, and, you know, the US is

the country -- this is where all the best economists are, and

so I wanted to do a doctoral degree here and really, you know,

understand economics at the academic level, and that's why I

came here.

Q.   When did you get your PhD?

A.   Northwestern in 1992.  This was not at the business school.

It was the department of economics.  But I was doing research

on currencies, international finance, and so when I went on the

job market to try to have a job as a professor, I went on both

markets.  I went to potentially departments of economics but

also business schools to teach finance.  And so I ended up

taking a job at Stanford, so I had several offers -- NYU,

Wharton, Stanford, but not Columbia, actually, but -- so I took

the job at Stanford Business School in 1992.

Q.   How long were you at Stanford?

A.   I was there till about 1999, actually.

Q.   When did you get tenure?

A.   I was offered tenure in 1998.  What had happened is I had a

family, and my spouse at the time was from Belgium, and she

1   wasn't too -- too happy in the US and so I was doing quite well

2   publishing papers and so forth, and people started to know that

3   maybe I wanted to move back, or closer to Europe, and so sort

4   of a year before I had to come up for tenure, the schools in

5   New York had kind of given me tenure offers, NYU and Columbia,

6   and so Stanford brought me up for tenure one year early and so

7   gave me tenure, and then I ended up staying there for one more

8   year, and then decided to try out New York and also kind of

9   tried to keep the family together in the US, and so that's when

10  I spent a year visiting Columbia, you know, taking up a

11  position at Columbia, but I was actually still a professor at

12  Stanford too but then I never left.  So I stayed here and I

13  resigned from Stanford.  So I've been at Columbia since 1999,

14  2000.

15  Q.  About how many publications does a professor have to have

16  to have a reasonably good chance at tenure?

17  A.  I think it varies, so obviously it varies depending on the

18  school.  So if we're talking top schools like Columbia and

19  Stanford, I would say four, five, six top pubs, maybe more.

20  Maybe some other publications.  But it's not just the quantity

21  that counts.  There are some lower tier schools -- I call it

22  counting beans -- they just sort of look at your vitae and

23  count the number of publications.  But at top schools, one

24  reads papers.  You can have a top publication and, you know,

25  the experts will say, yeah, top publication but we don't like

1    the paper very much.  So it's not only quantity, it's also

2    quality.  So you may have people that have not too -- that have

3    just four publications, but if one of these publications is

4    amazing, it's like a home run paper that everybody wants to

5    read, that person could presumably get tenure.  And then you

6    may have other people with more publications that may not get

7    tenure because people don't think the quality is high enough.

8    But it is actually, I have to say in general, tough.  I mean,

9    we've been speaking about this here before.  These tenure

10   clocks are like you're coming up on your seventh year and so

11   there's a lot of pressure to publish, just -- this is just a

12   very, very difficult game to play and it's a hard road to

13   tenure.

14   Q.  Why did you move to Columbia in the end?

15   A.  It's just, well, I liked Columbia, and it was basically to

16   sort of keep the family here together.

17   Q.  What are your areas of study?

18   A.  So my main area of study -- well, I would say I have a

19   couple, but I'm probably best known in international finance,

20   I'm studying international financial markets, currencies and so

21   forth, equity markets, also do asset pricing, that came up

22   before, and asset management.  So household finance, what we've

23   been talking about, is a subfield of asset management; how do

24   you, you know, manage your portfolios and things like that.

25   Q.  So do you have experience with household finance?

I7d1rav5                           Bekaert - Cross

1    A.   Definitely so.  I actually -- like I said, it's a subfield

2    of asset management, and I teach asset management.  So that's

3    what I teach.  I've been teaching it for over 15 years.  And

4    household finance, I mean, if you remember, it's just studying

5    the financial decisions of people.  I mean, a lot of my

6    experience is actually more in the real world than actually in

7    the academic world, so at Financial Engines, that's essentially

8    what we do.  We're basically taking household finance in

9    practice.  This company tries to help people manage their

10   retirement money and those 401(k) plans.  And the whole idea

11   about that company is actually to provide services of the

12   highest quality to people that would not be served by the usual

13   industries.  If you have a cashier at JCPenney with a small

14   retirement, you know, big asset management firm won't want to

15   cater to them because there's just not enough money there, but

16   at Financial Engines, you try to use technology and algorithms

17   to really help those people come up with good retirement

18   decisions.  So that's what that company does.

19        And I've also worked with other companies like that

20   that do it, not just for retirement savings but for other

21   money.  One company that I've worked for is Betterment, that

22   tries to, it's a global advisor, essentially, so it's on the

23   internet.  You can actually just go in there and get help with

24   your investments for very cheap fees.  That's basically the

25   idea.

I7d1rav5                      Bekaert - Cross

1    Q.  You heard Professor Ravina say that you were out of your

2    depth with data sets.  Do you remember that?

3    A.  Yes.

4    Q.  Is it true?

5    A.  No.  I've stated that because, you know, certain aspects of

6    what we did on those projects, I would feel that I'm out of my

7    depth, but in general, of course, I'm not out of my depth with

8    regard to the research.  I think it was a very serious

9    misrepresentation there.  Besides, the data that we're talking

10   about are the data that I had been working with at Financial

11   Engines, so we're trying to manage, help these people in their

12   retirement plans, and so some of these people would use our

13   advice, some of these people, we actually just manage their

14   portfolios.  We call that managed accounts.  But while we were

15   doing that for these companies -- so Financial Engines would

16   actually have a contract with a company, you know, and converse

17   with the human resources department to help people who have

18   401(k) plans and manage their retirement savings.

19           And while we were doing that, for maybe a subset of

20   the company, we would actually also collect data on everyone,

21   right?  So what are they doing in their retirement savings and

22   so forth.  And we had been tracking these data for a while, and

23   that's how I started to think, wow, this is unique data we

24   have.  You know, we don't know who these people are, of course,

25   that we'll be able to use in the research, but we know their

salary, we know their account balances, we know potentially

where they live and we have actually hard data on how they

invest their retirement savings, and so especially in the

crisis, this was 2007, 2008, you may remember, it was what we

called the great recession, you know, all the markets went

down, a lot of people got unemployed, so that -- and then in my

mind all these interesting questions, you know, what do people

do when they face these huge shocks to their livelihoods in

this recession.  And so I had -- I started to get this idea of,

my god, if we can just get this data and put them to use in

research, that would be fantastic, and so I started to sort of

think about, you know, maybe if we could talk to Financial

Engines, this would be a fantastic set of papers we could write

with this unique data, and of course these are data that I

know.  We've been tracking them within the firm for a long

time.

          (Continued on next page)

1  Q.  We saw one example earlier today or perhaps yesterday when

2  you were being questioned by plaintiff's counsel of your saying

3  in an e-mail to Professor Ravina that you do feel totally out

4  of your depth.

5       What do you mean in this e-mail?

6  A.  This particular research -- I think this is the automatic

7  enrollment paper, yeah.  This was a new topic for me, but

8  actually I think it was a little bit of a new topic for

9  Enrichetta as well.

10      So I'm sort of saying, look, hey, I'm new to this.  I

11 always try to be pretty modest in terms of, you know, what I

12 can do in terms of research.  It is sort of an offbeat comment.

13 You know I am still learning here about this type of research

14 and so forth.

15 Q.  What is the rest of the e-mail?

16      After you say you feel totally out of your depth, so

17 it's not going so well, and then you say, OK, here's what I

18 think now?

19 A.  Right.

20 Q.  Then you proceed to discuss a number of points.

21      What is this about?

22 A.  Well, we are trying to basically figure out the effect of

23 automatic enrollment on savings.  I mean, one of the big

24 puzzles that we have in the U.S. is that actually people don't

25 save enough for retirement.

1      Public policy has been trying to make people save

2  more.  One of these policies that they have tried to promote

3  among companies is this automatic enrollment.  So, people will

4  come in and start working for a company and forget about the

5  fact that they can save tax free for their retirement.

6      That is this under-savings puzzle.  That is trying to

7  promote for company to have, well, once you enter a company and

8  start working for them, we will actually automatically enroll

9  so that you actually start saving without even you doing

10 anything.

11      So that presumably hopefully would increase savings,

12 and, you know, get these people on the way to better

13 retirement.

14      So one of the things that we recognized with this

15 project -- and this was actually something that Enrichetta saw,

16 I mean, the topic, she sort of thought about -- she had the

17 initial idea about this paper -- was to basically look at all

18 these companies that we had data on, and try to figure out

19 which ones that instituted this policy of automatic enrollment

20 and try to test, does it really work?  Does -- people to have

21 this automatic enrollment policy, do they save more?

22      For me that in itself was a new topic.  I think it was

23 a new topic for Enrichetta as well, but she definitely had the

24 initial idea.  I don't want to bore you with details, but the

25 rest of the e-mail I am basically talking about how do we

1  figure this out?  How do we write down the economic model?

2          I think Enrichetta called it sort of modeling.  So, in

3  the modeling phase, I am obviously not of out of my depth.

4  That is what I do for a living.

5          So, this is what this is about, trying to think of the

6  empirical specification, you know, how do we look at the data?

7  How do we figure out to test whether automatic enrollment

8  really does contribute to additional savings.

9  Q.  Professor Bekaert, I would like to draw your attention to

10 the last sentence -- the first sentence of the last paragraph.

11         Do you see that:  Do not get me wrong, this will

12 eventually be a great paper, but we are rushing and we need to

13 rush smartly?

14 A.  Yes, I see that.

15 Q.  What do you mean by that?

16 A.  Well, yeah, I mean, when you are doing research, it is

17 actually really important to get it right from the get-go.  You

18 don't want to, like, do sort of haphazard work quickly, and

19 then rue it, regret this later.

20         This did happen a little bit in this project, that

21 sometimes I think Enrichetta wanted to go really, really fast.

22 But in my experience that is not the right way to go about it.

23 You have to make sure you do things right.

24         So, like, you have this massive dataset, so you want

25 to make sure you really know the data that you are dealing

with, that there's no big holes, that you are coding everything

correctly.  And so you want to do it right in the beginning so

that then you can actually speed up afterwards.  That's sort of

what I mean here.

Q.  Professor Bekaert, what is your approach to research and

publishing?

A.  Uh, well, I described before that it is really a tough

process, right?

        So, especially if you start and you need to get

tenure, you need to get a lot of publications in a short time.

It takes time to write the papers.  It also takes time to get

them published.

        One of the things that hasn't been stressed enough, we

are talking about these top journals, like Journal of Finance,

and we have hear this before Review of Financial Studies, these

are the journals that Enrichetta's papers were sitting at.

        The one thing I think that hasn't been stressed enough

is that when you send a paper to that journal, the rejection

rate is something like -- I think it's like 93 percent.  So it

means you only have a 7 percent chance of getting the paper in.

        Mostly when you get a letter back, it says, We don't

like it.

        The editor says, Yeah, the referees looked at your

paper, and there's all sorts of problems, and we are not going

to publish it.  So it is a very, very tough process to go

1    through.

2              So, if you are starting there as a sort of a junior

3    faculty member, the best way to go about this is you try to

4    work on different projects simultaneously.  It's kind of tough.

5    You have to juggle these different balls.

6              That has many different advantages.  What happens is

7    you can send a paper into a journal.  While that paper is

8    sitting there, you can work on some other projects, and you get

9    the referee report back.

10             And hopefully it says -- it will almost never say, you

11   are accepted, almost never.  It will always say, The referees

12   see some value here, and here's a bunch of things you have to

13   do.  We don't like this specification.  You have to get extra

14   data there.  There's always a bunch of work you have to do.

15             Then, one of the key things that I would always tell

16   people that I mentor is, like, that's the first thing you now

17   do, right?

18             Because the end goal is to get the publication, right?

19   That's what is going to get you tenure.  That's what is going

20   to get you recognition in this field.

21             So, the first thing you do when you get an R and R is

22   you work on the R and Rs, because that is the one thing that

23   one thing gets you close to the finish line, which is that

24   publication.

25             It is tough, because there might be other people you

are working with, and they may have demands on your time and

they may not be happy that you are not working on their

project.

So you have to keep all these balls in the air.  So

the successful people in this profession, that's what they do.

They work with lots of people and they try to sort of move

these projects forward as things come in, as shocks happen and

as the time that they have.

What is also important, though, is that -- for young

people.  It is not important for me anymore of course.  But for

the younger people, it's important to really signal that they

are good.  And that means that, if they possibly can, they

should have one or two single-authored papers, right?  So, one

paper that is completely ascribed to them and only to them.

That is much more valuable than something with

coauthors, because then there's always like who did the work.

In many letters people are sometimes very brutal.  They will

look at a person and say that person looks great on paper, but

he's coauthored four articles with his thesis adviser, and he

is a really famous person.  So, is that really by the person or

is it by the thesis adviser?

So you have that kind of credit allocation that is

difficult.  So it's always a good idea to have one or two

coauthored papers -- sorry, single-authored papers, as we call

it although.  It's becoming less and less common.  Most people

1  work with other people for their papers, and there's more than

2  one author.

3  Q.  Professor Bekaert, when did you first meet Professor

4  Ravina?

5  A.  I think either 2008 or 2009.  I think she joined us --

6  probably 2008 I would say, when she joined Columbia.

7  Q.  What were the circumstances?

8  A.  Well, she was a professor at NYU, and in that particular

9  period Columbia had lost I think something like seven or eight

10  professors through various reasons, somebody didn't make

11  tenure, somebody needed to move.  But it was like a very big

12  shock for us and we really needed to really recruit heavily.

13  We needed seven or eight professors in one year.

14        I didn't actually -- personally thought that was not a

15  great idea to try to recruit that much in one year.  But

16  somehow the recruiting committee thought let's just do it all

17  at once.

18        So it became obvious that we wouldn't be able to

19  recruit just from what we call the junior market, so freshly

20  minted Ph.D.'s coming in, that we would need some other

21  professors somewhere.

22        So that's very common.  It is what people do.  We call

23  it the secondary market.  It's like people who are pre-tenure

24  but they spend a few years in a profession.

25        There's sort of two kinds.  One would be -- you know,

1    for a school like Columbia, there would be people at schools

2    that are sort of a little bit below Columbia but are doing very

3    well or may want to move up, or people that are at institutions

4    like Columbia but are maybe not doing so well.  They have sort

5    of a slow start but they're very promising.

6              You know, like I said, the publication process is very

7    hard, and they look promising, so maybe they will want to reset

8    that clock, that tenure clock, right?

9              So they want to go from I have to get tenure in my

10   sixth year, my seventh year.  Now I can restart at Columbia and

11   I get another seven years.

12             And so Enrichetta was in that last category.  And she

13   looked very promising.  One of the reasons that she looked

14   promising to us -- she had had a slow start, but she had these

15   two single-authored papers that I think the sort of collective

16   wisdom in Columbia was that these papers had a good chance of

17   making it into the top journals.

18             You know, to have one person with two single-authored

19   top journal articles, that is a very good stepping stone to

20   tenure.

21             So that was kind of the circumstances of that.

22             Then I met her -- because I missed her job market

23   talk, but I met her at a colleague in 2008, 2009.

24   Q.  Were you ever assigned to be Professor Ravina's mentor?

25   A.  No, not -- never, not in an official capacity.

1  Q.  Did you ever tell Professor Ravina you were assigned to be

2  her mentor?

3  A.  No.

4  Q.  Did you ever discuss being a mentor to her?

5  A.  Yes, obviously.

6  Q.  With Professor Ravina?

7  A.  Yes.  Obviously, I mean this is very common in the

8  profession.  I mentored a good number of people.  So, you know,

9  one of the obvious relationships that build this way is through

10  students.

11        You start working with a Ph.D. student, you are on the

12  Ph.D. student's committee, and then that Ph.D. student becomes

13  a professor.

14        We just this morning talked about Nancy Xu.  So

15  obviously I will be mentoring Nancy probably the rest of her

16  life.  It's like a lifelong relationship.

17        She has graduated from Columbia.  She is now a

18  professor at Boston College.  We are writing papers together.

19  So that is going to go beyond, you know, just friendship and

20  writing papers together.  Anytime she will have a problem in

21  the profession or a referee report that she needs some advice

22  on, she will come to me, because I am her main adviser.

23        So this mentoring real is very common.  I had my

24  mentors.  This is just a very common thing in the profession.

25  Q.  You were shown a number of e-mails that you sent to people

1    just, you know, an hour ago.

2    A.   Right.

3    Q.   And a lot of them you identified as former students?

4    A.   Yes, most.

5    Q.   Do you mentor those former students?

6    A.   Yes, I mean actually a really interesting example is

7    Andreas, the Greek person, you know, Andrea -- I have to say I

8    have problems pronouncing his name myself Andreas Stathopoulos.

9            He's Greek, and he is at the University of Washington

10   in Seattle.  He was a student at Columbia.  And, interestingly

11   enough, with him I never actually coauthored a paper.

12           He was sort of more theoretical.  We talked about

13   research a lot.  I was his main thesis adviser, but he still

14   sees me in this mentoring role.

15           He would get referee reports back -- he had recently

16   had a problem with an editor that he thought he was treated

17   unfairly, so he would like explain his whole situation to me.

18           So, even with students that I may not even coauthor

19   papers with, I could still be their mentor.

20           So a lot of the people that you heard about today --

21   Stephan Siegel is another example.  He was my student at

22   Columbia.

23           Xiaon Zhang and Yuhang Xing -- these were all Ph.D.

24   students at Columbia that I mentored.

25           Some of them I still mentor.  Some of them I don't

1    mentor.  Some of them have become big professors in their own

2    right, and don't really need mentoring anymore.

3    Q.  What was your relationship like with Professor Ravina when

4    you started working together in 2009?

5    A.  I think it was -- it was very good.  I mean, I thought she

6    was a nice person.  I thought we got along well.

7              We're both from Europe.  She's from Italy, I am from

8    Belgium, so we are sort of a little bit of a shared cultural

9    heritage there.

10             That was definitely one of the -- one element that

11   played a role in me approaching her.  I mean, if you're doing

12   research together, specifically on such a big dataset, you

13   don't want it to be with somebody you can't get along with.

14             I mean, you do want to work together for long hours,

15   you have to write papers together, you have to have lots and

16   lots of meetings.  So you want at least to have some kind of

17   rapport with this person.  Otherwise, it not going to work out

18   very well.

19   Q.  We have heard about Financial Engines a number of times --

20   A.  Yes.

21   Q.  -- since we've started.

22             When did you first start working with Financial

23   Engines?

24   A.  So I started working with Financial Engines in 1997.  So

25   this was a very young company at the time.  It was started by

1   Bill Sharp, who was actually a Nobel-Prize-winning economist,

2   and he was my colleague at Stanford.  He's probably the most

3   impressive economist I have ever met.  And he started this

4   company with the whole idea of using technology to help people

5   through the Internet with their retirement portfolios.

6           So in 1997 he approached me and another colleague at

7   Stanford to help him with modeling, and so I have been working

8   for this company somewhere between 1997 and probably 2012,

9   2013.

10          And so, you know, we developed all of these models.

11  We have patents on these models and this company has been doing

12  reasonably well.  It is now a publicly traded company.

13  Q.  When did you get the idea to do some research papers based

14  on the data that Financial Engines had?

15  A.  Yes, I explained that before, right.  There was

16  basically -- we started tracking the --

17  Q.  I'm sorry.  When?

18  A.  When?  This was about 2009 I think.  That -- yeah, in -- at

19  the end of 2009 we had been tracking the data for a while, and

20  then I said, Wow, this is too good to give up.

21          let me just explain why the data are unique.

22          So, people -- I mean, in research in asset management

23  we want to know why people choose the portfolios they choose.

24  But you don't have data on that, right?  It's something very

25  private.  You just cannot go ask --

1    I mean, so the data that we have are typically

2    surveys.  There's just people who do surveys, and ask, Oh, what

3    portfolio do you have?  How much do you have in equities?  How

4    much do you have in bonds?  But this is not hard data.

5         So what we had at Financial Engines, we had actually

6    these records from the human resources departments on these

7    people.  They were hard data on the actual allocations over

8    different funds of these people.

9         And so that was in that sense very, very unique data,

10   and we had lots of people; it was mentioned before, something

11   close to 4 million people that we had actual data on.  So I

12   thought this was a unique dataset.  I think it may

13   unfortunately become less unique because I think other people

14   are trying to work and get these sorts of datasets together.

15   Q.  Why did you select Professor Ravina to be your coauthor on

16   these papers well?

17   A.  I think actually she was -- she was almost -- back then, if

18   you looked at her profile, she was an ideal fit for a number of

19   reasons.  One is it involves big dataset, and these very big

20   datasets have sort of generated a number of problems.

21        One is you have to be able to manage them, and this is

22   something, yeah, I am kind of out of my depth, that I'm not

23   used to.  I haven't really done this.

24        And then, secondly, because you're using confidential

25   information from people, it's almost like -- it's treated the

I7dnrav6                    Bekaert - Cross

1    same way as if you would do medical experiments on somebody

2    from a university's perspective.

3            So you actually have to go to a university board, you

4    have to do tests.  As a faculty member and you want to do

5    research like this, you have to do -- you have to pass a series

6    of tests.  It's pretty amazing.

7            About that process I knew nothing about, and

8    Enrichetta had done previous work on this.  So, I needed

9    somebody with that kind of experience that could sort of help

10   me walk through that process.

11           So, from that perspective, Enrichetta was very useful

12   as well.

13           And I would say from a research angle too.  I come

14   from sort of an asset pricing perspective, and her field is

15   corporate finance and behavioral finance.

16           It is a little bit of a different field, a different

17   angle.  And I had a bunch of ideas, research ideas of papers we

18   could write with these datasets.

19           I felt like, well, if we take her angle into account,

20   jointly we are going to have many different papers that we

21   could write with this particular dataset.  So it would be sort

22   of jointly beneficial to do that.

23           And then I also already added that she looked like a

24   nice person.  Plus I thought that -- and she's local, so that

25   was useful too.  We could have more meetings together easily,

1    because this was going to be a major project.

2              And then the two other elements I think that played a

3    role was I thought I could -- this data would really help her

4    the most.

5              I looked at some other people that would have been

6    potential candidates, and for her it seemed like if she could

7    sort of do these two single-authored papers, plus all the other

8    stuff she was working and now get maybe a slew of other papers

9    from this project, she could be potentially a good tenure

10   prospect.

11             That is what I was thinking in 2009.

12             Finally, there was a little bit of more sort of an

13   egotistical reason, which is at Columbia -- you know, you have

14   seen obviously from the e-mails and so forth my communication

15   skills are not great, and so I am -- I am a little bit blunt,

16   and, you know, I have had my run-ins with some of my colleagues

17   and the administrations.

18             I'm not the most popular guy.  I thought if I worked

19   with somebody there, and I really helped a junior faculty's

20   career, I am really going to get brownie points in the dean's

21   office.  They are going to appreciate me more because of this

22   relationship.

23             That I think played a role as well.

24   Q.  How did you approach Professor Ravina and ask her to be

25   your partner?  How did this come about?

I7dnrav6                        Bekaert - Cross

1    A.  I just set up a meeting, described the data to her.  And

2    she was very enthusiastic.  I think she immediately saw the

3    opportunity.

4    Q.  So what was the next step in the process of launching these

5    401(k) projects?

6    A.  I had sort of informally talked to the people at Financial

7    Engines as well for this.

8            We had these weekly meetings -- typically on the

9    phone, sometimes I would travel there -- and had already

10   discussed would you ever be willing to let somebody do research

11   on this data?

12           And it seemed, you know, like Wei Hu at the time was

13   the guy to talk to.  And he seemed like he was amenable.

14           So the next step was for Enrichetta and I to go back

15   and talk to Wei.

16           And Wei was very enthusiastic.  He immediately

17   appointed this other person that you have heard of Kenton as

18   sort of another potential coauthor on the project and contact

19   man at the company.

20           So that was the next step.

21           But then, of course, then it became a little bit more

22   problematic.  We were all very enthusiastic, but then you had

23   to sign a contract with a company.

24           Then it became, oh, now we have -- we had the legal

25   teams, the management teams, and that didn't go so well.

1  Q.  So did you go to California, to Financial Engines with

2  Professor Ravina?

3  A.  Yes.

4  Q.  When was that?

5  A.  That was in 2010.

6          So this is actually where I think our friendly

7  relationship really started.  We traveled together in mid 2010.

8  I think it was -- there's this conference.  You may have heard

9  about it.  I think it came up somewhere.  The WFA, the Western

10  Finance Association meeting.  It is always somewhere on the

11  West Coast.

12          I think we both went to that conference, and from that

13  conference traveled to San Francisco to actually meet up with

14  the Financial Engines people, to really get them going on, you

15  know, coming up with a contract for us, because we hadn't had a

16  contract.

17          This was mid 2010.  I had approached them earlier.  We

18  didn't have a contract.  So we wanted to sort of spur them on a

19  little bit, can we please get this contract

20          So we traveled together.  I remember she booked the

21  motel.  I booked the car.

22          It was kind of a memorable trip, because I remember

23  coming back from breakfast that the car was on a tow truck, and

24  we had a meeting like half an hour later with the Financial

25  Engines people.

1    So luckily they were willing to, to still let us drive

2    away.

3    Q.  When did the contract with Financial Engines get signed?

4    A.  If my memory serves me well, I think it was at the end of

5    2011.  I think that's right.

6    Q.  OK.  And once you had a signed contract, what were the next

7    steps to get this project moving?

8    A.  Well, we needed to get the data as soon as we could.  So,

9    this had already been a big delay, right?  So we had been

10   trying to get this thing going from the end of 2009.

11       It took them almost two years to get the contract.

12   This was very frustrating.  I remember this was a very

13   frustrating time especially for Enrichetta as well, because

14   we're sitting there waiting.  We have all these projects that

15   we potentially wanted to do.

16       We even started to hire research assistants that then

17   we had to let go because just the data weren't coming.  The

18   contract wasn't coming.

19       So, after the contract finally was signed, it still

20   took some while -- and I think this has been described before I

21   believe -- until the full dataset arrived that was.  That was

22   August or September 2012 I believe.

23   Q.  In the contract with Financial Engines, who were the

24   parties to that contract?

25   A.  It was just Enrichetta, Financial Engines, and me.

Q.   And did you have more power than Professor Ravina in

contract?

A.   No, this was totally symmetric.

Q.   Was Financial Engines the party with the power?

A.   Well, I won't say -- well, they owned the data.  That was

very clear from the contract.  So there was definitely some

stipulations that suggested that, you know, if they wanted the

data back, well, not much we can do.

        I don't know whether the contract said something about

whether they had to -- their name had to be on the paper.  I

don't think it did.  But definitely every single paper that we

would put out there, you know, put on an Internet site -- like

one of the big things we do as researchers in economics is we

have these Internet sets called SSRN.  So, if you have a

working paper, that's where you post it.

        That could not happen without the permission of the

company.  That does create some problems, and so forth,

because, you know, I already talked about this research process

right, where, you know, you're looking, you're putting a paper

in and then you are doing revisions.  Well, anytime a revision

you do, you are not going to be able to publish it without the

permission of the company.  It had to go through the legal

department of the company.

Q.   So you said the bulk of the data you got in August or

September of 2012?

1    A.   Yes.

2    Q.   Was there any work being done between signing the contract

3    in late 2011 and when you got most of the Financial Engines

4    data in 2012?

5    A.   Well, we started to get organized, right, there was a lot

6    of help that needed to be organized.  So, we needed to hire

7    research assistants.

8         So, there's actually -- that is actually important.

9    That is not something that's been mentioned.  There's two types

10   of research assistants for a big project like this.  There's a

11   lot of kind of simple work that needs to happen.

12        I think Enrichetta gave a good description of this.

13   Like, you know, you have to check whether everything is right

14   and so forth.  And that -- it's a lot, a lot of work, tons of

15   work.  I have no experience with it whatsoever.  That's why I

16   wanted Enrichetta on this project.

17        So I think she hired something like 40 students.  And

18   these are typically undergrad students, right?  So they're just

19   getting paid by the hour.  They're doing certain tasks.  So I

20   think it involves even testing them.

21        That definitely took a lot a lot of work and a lot of

22   a lot of effort from Enrichetta.

23        Then there is a second set of students.  I think

24   Enrichetta referred to this as coding and empirical modeling,

25   so that people who will work with the dataset and help us

1    eventually come up with tables and econometric specifications

2    and tests for the eventual paper.

3              those students are different.  Those are typically

4    Ph.D. students.  We pay them too, but it is a pittance really.

5    I mean, they do a lot more work than what they get paid for.

6              The reason they want to be on the project is because

7    they want to learn.  They want to learn from the senior -- they

8    have the professors.  And the big payoff for them really is to

9    try to get a publication, to try to become coauthors.

10             So typically the way I work with my students is you

11   first, you know, put them on some project, and you kind of test

12   them out:  Are these good people?  Do they do good work?  Do

13   they know what they're doing?  Do they have some creative

14   ideas?

15             And after you figure that out, you say, OK, so now the

16   next project you will be on the paper.  You will get your name

17   on the paper.  And that is obviously great for their career.

18             We thought that this project would not only be

19   interesting for us; it would also be attracting a lots of Ph.D.

20   students because they could see the pipeline of papers that

21   would come out of this big dataset.

22             So that was already going on.  We were interviewing

23   Ph.D. students.  I would be involved in that process.  I was

24   not involved in the process of the sort of undergrad students.

25   I was involved in the graduate students project.

```
 1              Another thing we did in the beginning, you know,

 2     writing grants.  We needed money, right?  These undergrad

 3     students needed to be paid.  We're going to need other data.

 4     Some of this other data is just publicly available, and we were

 5     already trying to collect some of that before the data was

 6     coming in.  For the major bulk of it we had to wait until we

 7     actually got the data.  So there was other things to be

 8     organized on that score as well.

 9     Q.  So there was data that you had to collect --

10     A.  Yes.

11     Q.  -- and clean and --

12     A.  Right.

13     Q.  -- put into the dataset other than what you got from

14     Financial Engines?

15     A.  Absolutely.

16     Q.  Were there any delays in managing these different blocks

17     ever data?

18     A.  Oh, yeah.  One -- well, there's lots of data.

19              I mean, I'll just give you one example, where

20     Enrichetta was also very useful is we really wanted to -- so,

21     for example, we had to specify to Financial Engines what data

22     do we get from you.

23              One piece of data that we really wanted was, where do

24     people live, their zip code.  If you can get their zip code --

25     of course, we can never use the names of the people.
```

1    We have these individuals' information, but if we have

2    the zip code, it turns out there's lots of data available at

3    the zip code level.  You know, education levels, immigration

4    levels.

5        All that information was incredibly useful, and

6    Enrichetta I think had worked with this before, so it was kind

7    of good to know that and sort of merge this data together.

8        Another piece of information that we needed was -- I

9    don't want to go into technical details, but Financial Engines

10   didn't track for the most part what investment options you

11   literally had and the properties of this.

12       I don't know if you have 401(k) plan, but you sort of

13   invest mostly in what we call mutual funds.  Like it is a stock

14   bund or a bond fund from a particular company.

15       That particular information was not in the dataset.

16   That's incredibly important because you want to, for example,

17   know how costly the fund is, how much do they charge in fees.

18   You know, there could be a cheap fund and an expensive fund.

19       That information we didn't have.  But every single

20   401(k) plan has to report to the IRS.  And they have to do this

21   5500 form, and that has all that information.

22       So we knew the companies, so we could actually collect

23   those 5500 forms, but they are in like a PDF format.  So

24   there's also some numbers on there, but you can't really code

25   with them.

1          So that was actually another little problem that we

2     had, and we had to collect those data.  So I sort of came in in

3     the beginning.  There was lots of meetings with Enrichetta in

4     my office on, like, what do we want from these forms.

5          And then Enrichetta to go over, and once we sort of

6     figured out what we want from these forms, she took over and

7     said, OK, who's going to transform all this PDF information in

8     like an Excel spreadsheet so that we can use it in our models.

9          She did all of that.  That's what you heard about,

10    this outsourcing to India.  That's what that was.

11         That didn't go so well.  I think the first batch that

12    came back was actually not right, and then it had to be resent.

13    So that came in much later.

14         And then, once she got this data, it needed to be

15    basically massaged.  And I won't talk about it now, but there

16    was significant delays in the massaging of that data that we

17    needed for some of these papers.

18    Q.  When were you ready to start thinking about what papers you

19    were going to write with the data?

20    A.  Well, the thinking about the types of papers we could write

21    had started earlier.  We even did a bunch of research

22    proposals, got some outside money.

23         We got a couple of grants both from the business

24    school, from one outside institution as well, but the actual

25    sort of thinking about the dataset and figuring out when is it

1    ready, I would say in April -- around April 2013 we could sort

2    of start analysis, meaning we had the dataset in some form that

3    we could start running analysis.

4          And it has been sort of presented that -- yesterday I

5    believe, that the data was ready.  Not quite.  We're still

6    learning about the data.

7          And then we learned about the data in the next year.

8    There was some information we were still missing; for example,

9    that 5500 form information, that hadn't been processed yet.

10   That information was critical for the international

11   diversification paper because we didn't have the fees.

12         So whatever draft we would be writing on that

13   particular paper in 2013 or early 2014 was not something we

14   could submit to a journal because we didn't have those fees

15   data yet.  That only came in in September 2014, really.

16         But even on other information in the dataset, we were

17   learning.  There were certain variables were that coded in a

18   particular way that were missing.

19         I remember one variable was like the tenure of the

20   person in the company.  How long have you been working?

21         That was actually important on some of the projects,

22   including the automatic enrollment paper.

23         We had lots of missing data, a lot of zeros.  That

24   didn't make any sense.  There was a lot of back and forth with

25   the company.  How do we code that?  How do we deal with these

1    missing values?

2              There are a couple of examples that I can give you of

3    things that we only discovered in 2014.

4              A very big one also for the international

5    diversification paper was that we discovered that some of the

6    people in the dataset -- actually, I think it was a discussion

7    of the paper that brought this up.  I think it was Enrichetta's

8    presentation.

9              I think it was the summer of 2014 that brought up this

10   comment:  Hey, aren't some of your people in your dataset

11   taking advice?

12             I mean, if you're giving them advice with your model,

13   of course, they are going to be international diversified,

14   because your model says that they have to be internationally

15   diversified.

16             So it is not the independent decision of that person.

17   It is just because they took advice from you, and they are

18   internationally diversified.  I think we actually discovered

19   this through a discussion at some conference of our paper.  So

20   then we had to start coding that variable.

21             That only happened I think in the summer of 2014.  So

22   this is a year after the data are ready.

23   Q.  So, when you started, even with missing bits of data or

24   holes or things that were still coming in, when you started in

25   April of 2013, how did the work go?

I7dnrav6                     Bekaert - Cross

A.   Yeah, I've -- you know, because of this case, I've looked
back at this with some -- in some detail, and I think we had an
amazing productivity.

          So we were working at about three projects -- I really
don't want to bore you, but you have heard some of these
already.

          One was the international diversification paper.
There was the automatic enrollment paper.  And then a paper has
hasn't been talked about so much was the reallocation paper.

          And I won't bore you with the details, but this was
sort of three projects that we already had identified and were
working on.

          So, by the end of 2013, we had actually produced an
initial draft on the international diversification paper to be
presented at a major conference in January 2014.  We had
produced a draft to be submitted to one of the top conferences
that we have in finance called the Western Finance Association
on this automatic enrollment paper in November 17, 2013.

          And we had made quite a bit of progress on this
reallocation project.  The reallocation project involved
Enrichetta, I, and Nicolas Crouzet.

          So actually the Financial Engines people were not on
that project.  Nicolas was a student that Enrichetta had
identified, and then he became a professor at Northwestern.

          And I think shortly thereafter he gave a presentation

1   on that paper and the feedback on that paper was actually -- I

2   mean, there was not a paper yet, but we had a presentation.

3   And we had also notes.  Nicolas and I had done a lot of

4   statistical work to sort of think this problem through.

5          The economic problem was really when do people change

6   their portfolio?  When do they reallocate, and what makes them

7   reallocate?

8          You know, if they lose their job, are they going to

9   change their portfolio?  If they get take bad shock in their

10   wealth, are they going to change their portfolio?  That was

11   actually the idea.

12          I think actually, of the three projects, that was in

13   academic terms the most promising one, the one I think people

14   would like the most.

15          So we had made progress on that one.  There was tons

16   of e-mails back and forth about that project.  When Nicolas

17   presented it at Northwestern with his new colleagues -- he

18   became a professor they -- were very enthusiastic thinking this

19   could potentially lead to not one but two papers.

20   Q.  You said the international diversification paper was

21   submitted to an important conference --

22   A.  Yes.

23   Q.  -- to be presented?

24   A.  Yes.

25   Q.  Who did the presentation at that conference?

1    A.   Enrichetta did.

2    Q.   Is that important for a junior professor, to appear at

3    conferences like that?

4    A.   I believe it is, yes.

5              So this is something that a junior faculty member can

6    put on their vitae.  They can say I have done a presentation at

7    this conference.  So that is a brownie point.

8              This is something that we discuss in reviews.  We'll

9    say, Hey, where did you present?  If you can say I presented at

10   a major conference, that will be a positive for you.

11             So it's my policy as a senior coauthor, if we're doing

12   conferences, unless the juniors beg me to present, I'll say,

13   You should present.  Because, you know, I've done enough of

14   those, but you should present the paper so that's good for your

15   vitae and it's good experience to begin with.

16             So obviously I let her present the paper.

17   Q.   You heard Professor Ravina's description of the process of

18   putting together an academic paper sort of from start to

19   finish?

20   A.   Right.

21   Q.   I am not going to ask you to repeat all the steps, but was

22   that an accurate presentation of the process?

23   A.   It was reasonably accurate, yes.  You basically -- you

24   know, you bounce around ideas.  You have all this.  Then you

25   start trying to kind of come up with what is the a big idea in

1    the paper?  How are we going to structure the paper?

2               And then you have to put the analysis together.  You

3    want to then set deadlines.

4               The way I do it -- you know, I think I described this

5    before.  You have to work on multiple things simultaneously.

6               So you cannot expect that somebody will just start

7    working a hundred percent of his time his or her time on one

8    project.  That makes no sense.  I could never, ever, commit to

9    that, because I'm working on so many different things

10   simultaneously.

11              But what you do is you basically set yourself hard

12   deadlines, like conferences or a particular presentation.

13              And so for me, for the international diversification

14   paper, the hard deadline was January 2014 we were at the

15   conference, American Economic Association, one of the major

16   conferences in the nation.

17              This is our moment where we're going to present this

18   paper for the first time.  We are going to get a very smart

19   discussant, who will have his thoughts about the paper.

20              We will have the initial draft there.  It's not going

21   to be submission ready.  Remember, there is all this data still

22   missing.  You are not going to be able to submit it.

23              You can say that in the presentation, yeah, we're

24   still missing some stuff, but let's get some comments.  Then we

25   are going to basically start presenting this paper left and

1    right, different conferences universities.

2              You want to have sort of the collective wisdom of the

3    profession shine on the paper.  And you really want to do that,

4    because if you submit too soon, you are going to get rejected

5    anyway.  You have to start over.

6              So you want to make sure that, you know, not just you

7    have thought about the paper, but some other smart people in

8    the profession as well.

9              I think Enrichetta talked about that.  That's what was

10   going on in early 2014, right?

11             So I presented it four or five times I think.  I think

12   Enrichetta did several presentations.

13             And then you get comments, like I already gave you one

14   example.  One discussant pointed out, Well, what about advice?

15   You need to have advice in your paper.

16             At one of my presentations one person was concerned

17   about taxes, you know, taxes in the taxable versus the

18   nontaxable.  Is international even good?

19             So we had to think about that.

20             So all of these comments will make the paper better

21   and better suitable to be submitted to a journal and have less

22   chance of just being summarily rejected by the editors.  You

23   want the paper to be ready.

24   Q.  Did you ever tell Professor Ravina to slow down?

25   A.  Um, I probably -- I probably have.  I did -- let me wait

I7dnrav6                          Bekaert - Cross

1   for you.

2   Q.  Yeah.  Well, take a look at Exhibit AX, which is in

3   evidence.  Yes, which is in evidence.  It is in evidence.  If

4   you look at the top of the second page.

5   A.  Yes.

6   Q.  Actually I'm sorry.  Let's start on the first page.

7          The one, two -- third paragraph down.

8   A.  Yes.

9   Q.  Here she's saying, Take your time, look at the data.

10  Right?

11  A.  Yes.

12  Q.  And that figuring out the actual allocation change is

13  critical?

14  A.  Right.

15  Q.  Do you agree with that?

16  A.  Sure.

17  Q.  Take a look at the top of the second page, the top -- the

18  first -- the first line.

19  A.  Yes, right.

20  Q.  What are you saying here?

21  A.  I'm basically saying that she was moving too fast, that

22  this was a much harder problem than she imagined -- for various

23  reasons.

24         In fact, I think that eventually sort of thinking

25  about this problem led to a whole paper, because the

1   reallocation paper is basically you, you know, just trying to

2   identify reallocations.  It is not something you are going to

3   do in two minutes.

4         In fact, Nicolas and I ended up writing very

5   complicated model schemes to try to come up with this.  This is

6   just saying, Hey, let's not do anything in a haphazard fashion.

7   Let's really think this through so we get it right.

8   Q.  Looking at the paragraph after the three numbered

9   sentences, what are you saying to her in this paragraph?

10  A.   Right.  I'm sort of saying the same thing.  You know, you

11  can't like -- also one of the problems here would be that if

12  you are not thinking it through -- let -- this is actually an

13  important point.

14        Enrichetta was talking about coding and so forth as

15  if -- it sounded almost as if she was doing the coding, but

16  that's not how it works.

17        This is what the Ph.D. students do.  You are

18  instructing the Ph.D. students to do all of that coding.  So if

19  you are not thinking through the problem correctly and you are

20  giving them something to do that then is not useful, you are

21  just wasting their time.

22        So you want to think through things carefully and give

23  them something that is really valuable for the project, and

24  this is what this is really about.

25        MR. HERNSTADT:  Your Honor, if you wanted to have an

I7dnrav6                          Bekaert - Cross

 1  afternoon break, this would be a good time.

 2              THE COURT:  All right.  Why don't we do that.

 3              (Jury not present)

 4              THE COURT:  How late do you want to go today?

 5              MR. HERNSTADT:  I'm sorry?

 6              THE COURT:  How late do you want to sit today?

 7              Is there like a natural break point in your testimony?

 8  Do you want to play it by ear?

 9              Why don't we keep this break short.

10              MR. HERNSTADT:  Yes.

11              That would be fine.  It's been a long week.  I think

12  the jury is getting tired.  I would prefer -- we will take a

13  shorter break now and then just stop at 5.

14              THE COURT:  Is everyone OK with that?

15              MR. SANFORD:  That is fine.

16              THE COURT:  You can let me know after the break if you

17  prefer.  Why don't we just keep this break short.

18              Thanks.

19              (Recess)

20              THE COURT:  All right.

21              Can we bring in the jury?

22              MR. HERNSTADT:  Yes, your Honor.

23         (Continued on next page)

24

25

1          (Jury present)

2          THE COURT:  Everyone can be seated, thanks.

3          You may proceed.

4          MR. HERNSTADT:  Thank you, your Honor.

5    BY MR. HERNSTADT:

6    Q.  Professor Bekaert, let's talk about the papers.

7          What did you do on the international diversification

8    paper?

9    A.  OK.  So just in general?

10   Q.  Yes.

11   A.  OK.  Sorry.  This might be a tad boring.

12         So, yeah, I kind of -- the idea for that paper, this

13   is very closely related to my own research and I -- essentially

14   what I did with aggregate data I wanted to apply to the

15   international diversification paper.

16         So Enrichetta and I had discussions about how to, you

17   know, conceptualize that paper.  That kind of happened in the

18   course of 2013 once we got the data.

19         And, you know, there were some disputes about what

20   exactly is the paper going to look like, you know, with this

21   dataset.

22         So I had written an outline in May I believe in 2013

23   that she didn't react to very well.  Again, remember the final

24   goal was get a draft together by the end of year for the

25   conference presentation in January 2014.  That was the key

1    goal.

2         And we -- the big snag that we hit was that at the end

3    of, I believe the end of November, beginning of December our

4    main research assistant for this project was this, you have

5    heard the name before, Andrea Kiguel, she quit.

6         She quit.  She came to me and said -- no, actually it

7    was Enrichetta who came to me and said, Andrea quit.  So now we

8    had a huge problem, because we had to finish this paper, and we

9    had no research assistant, and it wasn't completely done yet.

10   There was a lot of work that still had to be done.

11        So Enrichetta kind of turned it over to me said:  OK.

12   You deal with it.  Hire her back.

13        I talked to Andrea tried to convince her, if she

14   wanted to work to me and not communicate with Enrichetta

15   because there was a rift there, and said, Let's go.  Let's get

16   this paper done.

17        I ended up writing the draft.  My Christmas break was

18   basically was spent writing the draft for the paper.  I

19   finished it just in time -- I think, well, I finished it just

20   in time for the end of year to send it to the discussant.

21        Then Enrichetta gave the presentation.  We were then

22   going through several presentations of this paper, getting

23   feedback.

24        Why didn't we submit it yet?

25        Well, we had the missing data.  The missing data --

I7dnrav6                     Bekaert - Cross

remember the fees?  You cannot compare a fund with a 3 percent
fee versus a fund with a 20 basis points fee.

          That still had to come in.

          That was actually still in the hands of Enrichetta.
Enrichetta had committed to do that.  This was the data coming
from the Indian firm that had to be processed, and we had to
clean it up with another dataset.  Enrichetta was going to do
that.

          Of course, in the middle of this we had this huge
break, where we had been fighting with one another over e-mail,
and my communications were obviously very poor, and suddenly
there was this complaint.

          So obviously that made things already harder, but she
was supposed to deliver this data.

          That data only came in September 2014.  This was the
first time that we got that data.  I don't know what the
promises were made or the schedule set, but in the end that's
when we got the data, September 2014.

          So I'm working with Andrea.  Andrea, you know, I
instruct her let's look at this data very carefully.  It turns
out we thought the data was very poor.  We had to basically
match fund names with information -- a dataset that had
information on fees and so on with the fund names in these 5500
forms.

          So we had to match from acronyms and that wasn't done

1    very well for certain companies.  So we didn't think the data

2    was high quality enough.

3            Because there was this complaint you know, again, a

4    lot of back and forth, if you look at the e-mail trails it was

5    not productive.  There were all these things going into the

6    e-mails from Enrichetta's side, you know, snappy comments

7    complaining about Andrea's work in the past, trying to rewrite

8    history.

9            This was a very difficult working environment.  She

10   basically snapped back, well, the data are good quality.

11           I didn't want to work with this data, so this was a

12   very difficult sort of situation.

13           Also, there was, you know, negotiations going on,

14   like, how do we divvy up this project and so forth.  So what I

15   had agreed -- by the way, we weren't talking to one another

16   anymore.  There was -- this research divorce had happened.

17           So there was every e-mail first the dean, then there

18   was a mediator.  So I am not talking to her anymore.  It's

19   basically all through either the dean's office or the vice

20   chair or the chair of the department, and there's e-mails,

21   right?

22           While this is going on, there is a discussion of, you

23   know, what has to happen with all these papers.  So it is a

24   very difficult situation, and essentially what -- I mean,

25   obviously Enrichetta was rightfully concerned about, you know,

1    we have to get a draft together, and I didn't want to have a

2    draft on this particular paper.

3            This was the one paper for sure we were going to --

4    I'm going to still be on.  So I had made a commitment to Steve

5    Zeldes and Professor Charles Jones, he's the subchair, and the

6    dean, I am going to write this paper by the end of the year

7    that year.

8            It's going to be done.  Don't ask me to write it the

9    next two weeks.  I am teaching two courses.  I have all this

10   other work, but I am going to set a hard deadline again.

11   Remember the hard deadlines?

12           So I am going to commit -- I have a keynote speech to

13   give at a conference in Australia.  I am going make this the

14   topic.  So I have got to get my act together and get this paper

15   done.

16           So that was, I'm sure, communicated to Enrichetta,

17   and -- either through Steve Zeldes, and I think I even directly

18   wrote to her that there was going to be -- that I was working

19   on this paper that was in my hands.

20           Because I was the only one communicating with Andrea.

21   Andrea did not want to communicate with Enrichetta.  She was

22   the research assistant for this project.  She had all the

23   codes, and she had done all the work, and she didn't want to

24   communicate with Enrichetta.

25           You have seen all these e-mails where I'm refusing to

1  give the codes.  Andrea didn't want to speak to Enrichetta.

2  How could I give the codes if Andrea doesn't want to speak to

3  Enrichetta?

4         So this was -- and I was going to work on the paper.

5  This was ideal for Enrichetta to work on other projects.  I was

6  going to finish the paper.  You have heard already what she

7  ended up doing was secretly working on her own draft.

8  Q.  Professor Bekaert, let me show you an exhibit that's been

9  marked FM?

10  A.  OK.

11  Q.  I would just like you to look at the first -- the bottom

12  e-mail on the first page.

13  A.  OK.

14         MR. HERNSTADT:  Move to admit FM.

15         THE COURT:  Any objection?

16         MS. DONEHOWER:  No objection, your Honor.

17         THE COURT:  It will be admitted.

18         (Defendant's Exhibit FM received in evidence)

19  BY MR. HERNSTADT:

20  Q.  Professor Bekaert, if you look at the e-mail dated August

21  6, 2014, from you to Professor Ravina, you say:  Just one point

22  about the schedule what we had been discussing for eight months

23  or so is that the 401(k) plans features are critical for

24  finalizing the paper.

25  A.  Correct.

I7dnrav6                        Bekaert - Cross

1    Q.  Is that what you are talking about?

2    A.  Yes.  Yeah.  So we needed to have information on, you know,

3    is there -- how many international funds are there, what other

4    funds are available, what are the fees.  That's that

5    information that came from the 5500 forms, and was -- had to be

6    processed and delivered by Enrichetta.

7    Q.  So as of August 6 had you received that information, the

8    fund features information?

9    A.  No, I hadn't.

10   Q.  I would like you to take a look at Exhibit GY, which I move

11   into evidence.

12            THE COURT:  Any objection to GY?

13            MS. DONEHOWER:  No objection.

14            THE COURT:  It will be admitted.

15            (Defendant's Exhibit GY received in evidence)

16   BY MR. HERNSTADT:

17   Q.  I would like you to look at your e-mail, which starts at

18   the bottom of page 2 and continues at the top of page 3.

19   A.  Yes.

20   Q.  Do you see you start by saying:  I went over the fund

21   matching data with Andrea.  I again apologize for Andrea not

22   sending you an interim report.  While this is a good first

23   pass, unfortunately, I feel that the matching job can and

24   should be improved.

25            Professor Bekaert, is this an e-mail you received

I7dnrav6                          Bekaert - Cross

1   after you send the fund matching data?

2   A.   Yes.

3   Q.   What was the problem with this data?

4   A.   The problem with the data was that the matching was just

5   not accurate.

6        It was accurate for certain mutual fund companies, so

7   for certain plan setups it was OK.

8        For others, specifically here as it says, the Fidelity

9   company, which is a company that Financial Engines has a

10  relationship with.  A lot of firms in our dataset would be

11  working with that company.  The matching of these names was

12  just not accurate enough.

13       I felt as a scholar we couldn't work with this data.

14  It would just be sort of some good data and a bunch of noise

15  that is really -- you know, some equity funds were classified

16  as bond funds.

17       It was just not a good enough match, and I'm going in

18  detail to actually show not only what the problems are, but

19  also how they could be corrected, how we could maybe change the

20  matching of the acronyms in a simple way to try to come up with

21  a better match.  That's basically what this e-mail does.

22            (Continued on next page)

23

24

25

I7d1rav7                        Bekaert - Cross

1  BY MR. HERNSTADT:

2  Q.  If a paper were submitted using the fund matching data

3  about comparing fees that different companies charged and other

4  information points that you mentioned, what kind of fate would

5  a paper like that have?

6  A.  Well, it's definitely something that a smart referee would

7  see right away, so I think there's two outcomes, right?  It

8  could be that the referee still says, oh, this is so

9  interesting, I'm going to give you maybe a revise and resubmit,

10  but then you're going to have to put the fees in, or if the

11  referee is not so inclined, he could reject the paper and one

12  of the comments would be, well, this analysis doesn't make

13  sense 'cause you don't even have the fees of the funds.  It's a

14  critical variable.  It has to be in there.  You have to have

15  tables that will allow for these differences in fees.

16  Q.  So you received this fund matching data from Professor

17  Ravina in September of 2014, you had a hard deadline at the end

18  of the year.  What did you do to get the paper finished?

19  A.  Well, I was hoping that she was going to give us better

20  data, but all we got was a series of snappy emails that it was

21  good enough and a whole bunch of complaints probably that also

22  went to other people about me and how I was delaying the

23  project because I was asking for high-quality data, and I was

24  actually willing to start working with her less-quality data,

25  so that's the first thing we did.  I said, Andrea, let's just

I7d1rav7                      Bekaert - Cross

 1    run it with the lesser-quality data because I have my hard

 2    deadline.  And interestingly enough, Andrea found kind of a

 3    work-around.  I told you we were still learning about the data,

 4    and suddenly Andrea learned that, wait a minute, Financial

 5    Engines at one point gave us a snapshot of the funds of the

 6    different companies, not for the period that we're looking at

 7    but for a later period.  It's not perfect, but that -- they're

 8    not matching -- there's no matching.  We actually know what the

 9    lineup is in the funds, and then we can immediately match it

10    with the other data set so that it looks more high quality.

11    And I said, okay, let's just do both, the sort of

12    not-so-high-quality data but for the right periods that

13    Enrichetta delivered, and then we have this match-up from

14    Financial Engines that we didn't even know existed, and let's

15    use that too.  And so that with those two things together, we

16    actually finalized the paper, or I think it was almost complete

17    by the end of the year.

18    Q.  Did Professor Ravina ask you to deliver the codes and data

19    at any point in the fall 2014?

20    A.  Yes.  There were several instances of this.

21    Q.  And did you send her the codes?

22    A.  No, I didn't.

23    Q.  Why not?

24    A.  Well, it didn't make sense.  We were working on the paper.

25    Why would you want to send the codes to Enrichetta to have a

1    second team work on the same paper?  That doesn't make any

2    sense.  Why would you want to do that to begin with?  It was

3    clearly communicated to her that we were working on the paper.

4    I thought it was an ideal situation for her.  If she has

5    pressure for tenure, she can use the whole semester to work on

6    other stuff.  And so we were going to focus on this paper.

7    Plus, again, it is true that I don't do this programming.

8    Andrea was doing all the programming, so handing over the

9    codes, I think it was suggested it was like a two-minute job.

10   No way.  It has to be documented.  So either Andrea had to

11   communicate with Enrichetta, which we didn't want to do, or she

12   had to spend an inordinate amount of time trying to document

13   the codes, and so in some sense it was not even in my hands.

14   If Andrea didn't want to do it, then I couldn't even turn it

15   over, and also, why would I?  We're working on the paper.

16   Q.  Was Ms. Kiguel willing to turn over the codes?

17   A.  I don't think so.  She just -- when she started working

18   with me, she made it very clear that she didn't want to

19   communicate with Enrichetta ever again.

20   Q.  We have learned that Professor Ravina did a second draft of

21   the paper.

22   A.  Yes.

23   Q.  Was that a problem?

24   A.  It was a huge problem.  When that happened, I literally

25   fell off my chair.  I mean, I did my utmost best to finish this

```
 1    draft on time.  I submitted it -- I had committed I am going to
 2    do this by the end of the year.
 3              So I think I kind of submitted it -- the paper right
 4    when I was going to leave for New Year's evening, literally in
 5    Belgium to go eat for New Year's Eve.
 6              I think a couple of hours later we get a second draft,
 7    and I was like, you know, when I came back from the New Year's
 8    Eve, I think, I mean, I said, What?
 9              I still remember it because I think the e-mails
10    started again with some snappy comments about us or about the
11    paper or something like too little too late, and there was a
12    second draft.
13              I immediately -- I was super concerned, because don't
14    forget this is Financial Engines' data, we are working with two
15    people at the firm, busy people that you don't want to like
16    constantly barrage with, you know, our conflict that we are
17    having.
18              And now we are having two drafts.  And I was like
19    thinking, Oh, my God, how are they going to react?  I was
20    really worried that they were going to pull the data.  So this
21    was a huge problem.
22    Q.  Did you know that she was working on another draft?
23    A.  No.
24    Q.  Had Professor Ravina ever told you that she was working on
25    her own draft?
```

I7d1rav7                           Bekaert - Cross

1   A.  No.

2   Q.  Did you ever receive an email addressed to you and the

3   Financial Engines authors saying that Professor Ravina was

4   doing her own draft?

5   A.  No.

6   Q.  So what was the reaction from the Financial Engines

7   co-authors who controlled the data to two drafts being

8   submitted the same day?

9   A.  They were very displeased.  I think Wei sent some very

10  strongly worded emails.  I don't remember the exact wording,

11  but --

12              MS. DONEHOWER:  Objection.

13              MR. HERNSTADT:  Let's take a look at Exhibit JV, which

14  is in evidence.

15              THE COURT:  I'm just going to sustain that objection,

16  but why don't we look at the exhibit.

17  Q.  Is this the email that you're talking about?

18  A.  Yes.

19              THE COURT:  This is already in evidence?

20              MR. HERNSTADT:  This is in evidence, your Honor.

21  Q.  What was your take-away from this email?

22  A.  Can I just --

23  Q.  Yes.  Take a look at it.

24  A.  Maybe can you -- might be good to highlight.

25  Q.  Do you want to -- so this is the email from Wei Hu to you

1    and Professor Ravina.

2    A.   Yes.

3    Q.   Cc'd to Kenton Hoyem on January 12, 2015.  Starts by

4    saying, "I'm incredibly pained by the acrimony I'm witnessing

5    over emails."

6    A.   Well, it's extremely upsetting, because one of the things

7    he actually says here is, "I would hate to put a stop to this

8    research altogether, but that is a matter of sunk costs,"

9    meaning he's quite willing to just pull the plug on the whole

10   project.  So this act of us having two drafts could potentially

11   cost us the whole data set.  I was super concerned with this

12   email.

13   Q.   You saw an email that you had sent to Wei Hu a couple of

14   days before this email --

15   A.   Right.

16   Q.   -- shown to you earlier today --

17   A.   Right.

18   Q.   -- that you asked him to keep confidential.

19   A.   Right.

20   Q.   Do you remember that email?

21   A.   Exactly.

22   Q.   Why did you send him that email?

23   A.   Just because of what I said.  I -- I thought what

24   Enrichetta had done in the fall of 2014 -- 14, it was -- okay,

25   I can't really find a better word but this was crazy.  I mean,

I7d1rav7                        Bekaert - Cross

1   why would you do something like this?  I have committed to

2   write the draft.  This gives you time to work on other stuff.

3   And now you're jeopardizing our relationship with this company.

4   This is your bread and butter for tenure, so to speak, and you

5   have to at least rationally understand that these people, a

6   person like Wei Hu, the head of a research department of a

7   publicly traded company, he's not going to have time for these

8   shenanigans.  This is very, very risky.  So I thought this

9   was -- yeah, I cannot find another word.  This was totally

10   crazy.  We had a situation now.  And we had problems, because

11   now we're going to have two drafts and they want one, so we

12   have to somehow reconcile two drafts and we're not talking to

13   one another.  So we have a huge problem.

14   Q.  Did you think in January of 2015 that Professor Ravina

15   could get tenure based on papers that she would write from the

16   401(k) project?

17   A.  No.  No.  It --

18              MS. DONEHOWER:  Objection.

19              THE COURT:  Overruled.

20   A.  No, because, I mean, actually, to be honest -- if you look

21   at the profile of Enrichetta, the only way this data set would

22   have contributed to her tenure was if we had been able to get

23   the data much earlier.  Really, the worst shock that we got was

24   the fact that it took the company till 2012 to give us the

25   data.  I mean, Enrichetta's vitae was not great when I started

1   working with her.  I told you before that that's why I chose

2   her.  I thought, you know, I can really help her.  But she

3   needed to finish the two R&Rs by herself.  She needed to finish

4   the single-authored papers.  Without that, I could write five,

5   six, seven papers with her, it still wouldn't have given her

6   tenure, because these are all jointly-authored papers, with me,

7   with a very senior professor in the -- very senior person in

8   the profession.  She wouldn't get full credit for this.  And

9   all of my colleagues were telling me that too.  They said,

10  yeah, those -- it's great that you have these projects with

11  her, but that's not going to be sufficient, you know, this is

12  chair credit there.  The key to her tenure would have been

13  single-authored papers, if she could get one or preferably two,

14  some other work with other professors.  You want to like, you

15  know -- you don't want to have work with just one.  You know,

16  she had all these other projects that I thought she was working

17  on, with Fishera (ph) and Engel Walter (ph), with Emi Nakamura.

18  If she could have had a couple papers there, couple papers with

19  me and her single-authored papers, yeah, then we could speak

20  about tenure.

21          For us, getting the data ready in 2013, we would

22  have -- I think her -- her out date was maybe 2015.  To get

23  everything published was kind of too late already.  So in some

24  sense, when we got the data, it was already too late.  There's

25  really -- I mean, I definitely -- I could not by myself salvage

1    her tenure case.

2    Q.   Professor Bekaert, what was your initial reaction in terms

3    of which paper you would use when you realized that she'd done

4    a draft of the international diversification as well?

5    A.   I wanted to use my draft.  For very good reasons.

6    Q.   Which draft did you end up using --

7    A.   Her draft.

8    Q.   -- as a basis of the unified paper?

9    A.   Her draft.

10   Q.   Why is that?

11   A.   Because she just kept insisting that it be her draft, you

12   know, and essentially I just wanted to end the ac -- the

13   problem.  I was just worried that if we didn't do anything, if

14   we didn't come up with one draft, the company was going to pull

15   the data, and where would we be then and where would she be?  I

16   mean, that whole project was going to, you know -- the whole

17   set of projects she could potentially do would disappear.  And

18   I thought we were very close to a submittable paper.

19          And so what I ended up doing, I mean, I think I wrote

20   a number of proposals first that basically said, let's start

21   from my draft, then I think I started to give options, the

22   dean's office got involved, so we worked out like a proposal

23   where she basically I think had choice -- had a choice.  Either

24   you work from my draft or you work from your draft.

25          The problem here is that, don't forget, Andrea and I

I7d1rav7                      Bekaert - Cross

1   had been working on the paper.  So the data that she was using

2   and we were using was different.  Our data had already been

3   cleaned more and filtered more, so we had, in some sense, the

4   better data.

5          And so in the end, what had ended up happening is that

6   I sat down with Andrea and said, look, I know you don't want to

7   communicate with her and I know you would like to work further

8   on these -- on these projects, 'cause, you know, Andrea did so

9   much work on these projects as an R -- as a research assistant,

10  and I was really hoping that I could put her name on a paper,

11  but clearly she was not get -- she was not going to get her

12  name on this paper because Enrichetta would have never allowed

13  it, and I said, look, this situation looks pretty bad to begin

14  with.  Let's just spend some time -- why don't you document the

15  data, document the codes.  It's going to be a number of hours.

16  We'll put it all on a -- on a zip disc and give it to Andrea --

17  to Enrichetta, and that's essentially what happened.

18  Q.  Professor Bekaert, I'd like to show you what's in evidence

19  as Exhibit KB.

20          MR. SANFORD:  Oh, it's not in evidence?  Okay.  Sorry.

21  Q.  I'd like to show you KB.

22          MR. SANFORD:  Which I move to admit.

23          THE COURT:  Any objection to KB?

24          MS. DONEHOWER:  No, your Honor.  There's a version of

25  this document that was entered into evidence this morning

1       already.

2                  THE COURT:  I'll also admit this.

3                  MR. HERNSTADT:  Oh, I'm sorry.  It was numbered?

4       Okay.

5                  (Defendant's Exhibit KB received in evidence)

6       BY MR. SANFORD:

7       Q.  Professor Bekaert, you were shown this document earlier

8       today, right?

9       A.  Yes.

10      Q.  And is this an email from you to Professor Ravina with some

11      cc's?

12      A.  Yeah, correct.

13      Q.  And is this you agreeing to use her draft and proposing a

14      way to go forward with that?

15      A.  Can I just --

16      Q.  Yeah.

17      A.  Yeah, I think it's sort of an attempt to reconcile the two

18      drafts.

19      Q.  Earlier you were talking about the issue that you saw on

20      the fee data, that the quality of the fee data wasn't good.

21      A.  Right.

22      Q.  Did Professor Ravina think it was necessary to have this

23      fee data to do the international diversification paper?

24      A.  I would hope she would.  I mean, everybody, every sensible

25      human being, researcher, would think that you need those data

1   in that paper.  And I think she did do analysis with fee data

2   eventually.  But the fees data that she actually used was the

3   ones that Andrea came up with, not hers.

4   Q.  So that was the fee data she used in the final --

5   A.  Yes.

6   Q.  -- paper?

7   A.  Yes.

8   Q.  Was the information that --

9   A.  Right.  She did run another specification that could sort

10  of control for fees, which I think was actually smart, but she

11  did not end up using the data she created and kept going on and

12  on about they were high quality enough.

13  Q.  What happened to the paper after it was -- the two papers

14  were unified and a draft was put together?

15  A.  I think it went to the people at Financial Engines, right,

16  because we -- they wanted to see one draft and we -- we gave

17  them one draft.  So they had some comments, was a little bit

18  back and forth, you know, to finalize the paper, and then we

19  were ready to submit it to a journal.  And so I think somewhere

20  around April 2015.

21  Q.  So let me show you what's been marked as Exhibit KT.

22  A.  Yes.

23  Q.  This is an email dated March 15 at 7:24 a.m. from you to

24  Professor Ravina and some other cc's?

25  A.  Correct.

I7d1rav7                         Bekaert - Cross

1              MR. SANFORD:  Move to admit.

2              MS. DONEHOWER:  No objection.

3              THE COURT:  It will be admitted.

4              (Defendant's Exhibit KT received in evidence)

5   Q.  And you say here, "I've looked over everything, agree with

6   all changes.  I think I changed one letter."  Smiley face.

7   "And liked that you've tightened it further.  We are done.

8   Will you send it to Wei and Kenton."

9              Is this your informing Professor Ravina that you've

10  signed off on the article?

11  A.  I signed off, and I must say, she made some changes that I

12  actually liked, and she improved the paper.

13  Q.  And when did you hear back from -- do you know if she sent

14  this paper to Financial Engines?

15  A.  I assume she did.  I mean, it was in her interest to send

16  it very quickly, but I don't know, yeah.

17  Q.  And when did you hear back from Financial Engines about the

18  paper?

19  A.  They typically took their time.  I don't remember in this

20  instance, but it could have been a couple weeks.

21  Q.  I'd like you to look at Exhibit LA, please.  This is an

22  email from Wei Hu to you and Professor Ravina.

23             MR. SANFORD:  Move to admit.

24             MS. DONEHOWER:  No objection.

25             THE COURT:  All right.  LA will be admitted.

1          (Defendant's Exhibit LA received in evidence)

2    Q.  So this is dated April 8, 2015, and is this Financial

3    Engines giving initial approval to submit the paper?

4    A.  Yes.

5    Q.  So do you recall when the paper was submitted by Professor

6    Ravina?

7    A.  I don't recall the precise date.  Maybe mid April.  I don't

8    know.  Something like that.

9    Q.  I'd like you to take -- I'd like to show you what's been

10   marked as Exhibit LD.  This is an email from an editor at the

11   Journal of Finance to Professor Ravina on April 21, 2015.  Did

12   you ever get a copy of this email?

13   A.  I don't know.  Perhaps.  I'm not sure.

14   Q.  Is this about the time that -- this is an email that says,

15   "Submission to JFE completed successfully."  That's the subject

16   line.

17   A.  Yes, submission to JF.  This is the Journal of Finance.

18   One of the --

19          MS. DONEHOWER:  Objection, your Honor.

20          THE COURT:  I'm sorry.  The objection is to?

21          MS. DONEHOWER:  The lack of personal knowledge.  The

22   witness just testified that he did not know whether he'd ever

23   received this.  He's not a recipient of this email.

24          MR. SANFORD:  And I'm just going to ask if he recalls

25   that this was about the time that the paper was submitted.

```
1            THE COURT:  Just the timing of it?

2            MR. HERNSTADT:  Yes.

3            THE COURT:  All right.  You can ask about the timing.

4    A.  Yeah, I thought it was mid April, so it's a little bit

5    later.  It seems like it's about couple of weeks later than the

6    approval by Financial Engines.

7    Q.  What was the next thing that happened with the paper?  It's

8    now submitted.  It's April 21.  It's submitted to the Journal

9    of Finance.  What's the next thing that happened?

10   A.  Well, we're just waiting for reports, right, so now -- now

11   you're anxiously waiting and hope that the reviewers will do

12   their work.  But for this paper something very special

13   happened.  I think again, the timing is maybe a little bit off

14   in my head, but I think somewhere in June, I get this letter

15   out of the blue from Bill Schwert, and Bill Schwert is the

16   editor from the Journal of Financial Economics.  That's another

17   of the top journals.  So you have Journal of Finance, Journal

18   of Financial Economics.  And he writes to me and says, hey, I

19   looked at your paper.  I -- we think it's a really good paper

20   so I would actually like to solicit it for my journal.  And,

21   you know, I've had solicitations before, but there was actually

22   a referee report attached, so he actually had gone out and got

23   the paper refereed without us asking for it, which is, I

24   mean -- I've never had anything like this happening.  So this

25   was fantastic news, right?  Because now we have a top journal
```

1    that in some sense already immediately gives us a revise and

2    resubmit.  So that was the big thing that happened.

3    Q.  So let me show you what's been marked as Exhibit LK.

4              MR. SANFORD:  And I move to admit, your Honor.

5              THE COURT:  I think we just need copies.

6              MR. HERNSTADT:  Oh, I'm sorry.  It is in evidence.

7              THE COURT:  Oh, okay.

8              MR. HERNSTADT:  Sorry.

9              THE COURT:  You can publish.

10   BY MR. SANFORD:

11   Q.  And I'd like to ask you to look at page 6 of this exhibit.

12   And the bottom of page 6 there's an email from Bill Schwert,

13   William Schwert, to you dated June 18, 2015.  Is that the email

14   you're talking about?

15   A.  Yes.

16   Q.  And what was the response of the co-authors?

17   A.  Oh, I think they were all elated.  It's fantastic news.

18   Q.  And but meanwhile the paper is still at the Journal of

19   Finance?

20   A.  The paper is still at the Journal of Finance, yes.

21   Q.  And had they expressed interest in it or --

22   A.  Well, no, we submitted it to the Journal of Finance.  We

23   jointly decided to go to the -- I mean, the Journal of Finance

24   is slightly above maybe the Journal of Financial Economics, but

25   they're both considered to be top journals.  So we decided to

I7d1rav7                      Bekaert - Cross

1   submit it there.  We were waiting for the reviews, and then we

2   get this -- this great news, out of the blue.

3   Q.  So did you immediately withdraw the paper from the Journal

4   of Finance?

5   A.  No.  We -- we had discussions among the co-authors, you

6   know, emails back and forth what we should do.  I think there

7   was some sense that it would be sort of disrespectful to

8   withdraw it right away.  If it's already under review at a top

9   journal, you don't want to aggravate these editors, right?  I

10  mean, they're very important people.  So I think what was

11  decided was that we would write to the Journal of Finance

12  editor, inform him, you know, we got this great news, could we

13  just inquire about the status, you know, is it already sent

14  out, what are you thinking, so to get some more information,

15  and I think there was some consensus that we would -- if

16  they're telling us that the reports are on their way, let's

17  just wait for the reports and see what they are.  Because maybe

18  the Journal of Finance is still slightly better than the JFE.

19         And so that's what we did.  A letter was crafted to

20  the editor of JF, Bruno Biais.  He got back to us and said

21  something like, I already got two reports, I'm just waiting for

22  a third, and I'm, you know -- he's French, and he sort of said,

23  ah, I'll get it to you fast.  It's going to be within a month.

24         And so the response to that was, let's wait.  You

25  know, it's only a month.  You never know.  The Journal of

I7d1rav7                    Bekaert - Cross

1    Finance, super good journal, we'll get some more feedback.

2    Let's just wait for a month.  And that's sort of what was

3    decided at that juncture.

4    Q.  And did you hear back from the Journal of Finance?

5    A.  We did, but unfortunately it took more than a month, and I

6    think actually I was the first one to sort of start

7    complaining, 'cause I was concerned.  You know, we have this

8    other option at the JFE and we weren't hearing back.  So I

9    think I actually wrote to Enrichetta, Have you heard anything?

10   Because she was the contact person, remember.  She took over

11   the control of the paper, so -- you've seen the letter.  Have

12   you heard anything?  It's like -- I think it was in early

13   August.  What's happening?  And she got back and said -- she

14   was clearly very antsy.  So suddenly there was again a lot of

15   commotion about this.  And we were having emails back and

16   forth, maybe we should pull it because it's taking too long.

17          But while that was happening, the JF reports came in.

18   I think somewhere in mid August or maybe a little bit later, we

19   got the reports from the Journal of Finance.  And amazingly,

20   they also recommended a revises and resubmit.

21          So we now had two revise and resubmits from two top

22   journals.  I've never had this in my career, I have to say.  So

23   that was fantastic news.

24          But we look at these reports together, and there was

25   three reports.  The JFE, one report.  So clearly there was a

1    lot more work to be done for the Journal of Finance than for

2    the JFE.  So after some back and forth, we decided, okay, we're

3    going to respectfully decline to resubmit to the JF and we're

4    going to go full force on the JFE publication, you know, try to

5    do what the referee told us to do, get a new draft, and then

6    resubmit it to the JFE as fast as we can.

7    Q.   And when was it resubmitted to the JFE?

8    A.   Okay.  It was kind of a little bit of a longer process than

9    it -- than I would have anticipated.  I think eventually

10   February, the next year, is that about right?

11   Q.   Was there any delay hearing back from Financial Engines on

12   the final approval?

13   A.   Yes.  A pretty significant one, actually.  It was very sad.

14   So they had -- the revision process of the paper for the JFE

15   was not fun.  At this point, you know, Enrichetta and I had

16   this conflict going on and it -- anything I would propose was

17   sort of, you know -- there would always be these snappy emails

18   that had nothing to do with research.  Anything I would propose

19   would be just rejected because I proposed it.  And so she was

20   then trying to kind of sort of, I don't know, trying to

21   basically tell a story that I'm delaying, whereas I was just

22   trying to respond to the JFE report in a scholarly manner,

23   trying to do everything the referee asked for.

24         Again, we talked about this before.  What you want to

25   do, you want to do things as well as you can.  You don't want

I7d1rav7                        Bekaert - Cross

1   to send in a draft that is hap -- you know, does the --

2   responds to the comments in a haphazard way, doesn't do

3   everything what the referee says.  You want it to read well,

4   you want to make sure that everything in this paper is correct,

5   because if you do that, from the beginning, you're going to

6   gain time.  If you send in sort of a half-baked paper to this

7   referee and don't respect his comments or have some obvious

8   mistakes still in your specifications, you are going to go an

9   extra round.  This referee will have all sorts of comments.

10            MS. DONEHOWER:  Objection.

11            THE COURT:  Overruled.

12  A.  And so essentially I wanted to have this paper in prime

13  shape so that we would have, as quick as we could, wouldn't

14  have extra round, so I was actually hoping, given the report,

15  that we could get an immediate acceptance and not go through

16  extra rounds.  But I sort of met resistance every step of the

17  way.

18  Q.  Professor Bekaert, let me show you what's been marked as

19  Exhibit MA.

20            MR. SANFORD:  And move to admit.

21            THE COURT:  Any objection on MA?

22            MS. DONEHOWER:  No objection.

23            THE COURT:  Okay.  MA is admitted.

24            (Defendant's Exhibit MA received in evidence)

25  Q.  Professor Bekaert, I'd like you to look at page 11 of the

I7d1rav7                          Bekaert - Cross

1    exhibit.  Do you see, halfway down the page, there's an

2    email --

3    A.   11?

4    Q.   -- dated September 24th from Ms. Ravina to you and the

5    Financial Engines team and some other cc's?

6    A.   Mm-hmm.

7    Q.   Is this the email that Professor Ravina sent with her

8    revision of the paper based on the JFE referee's report?

9    A.   I'm trying to read this.

10   Q.   In the first paragraph, she says, "Geert, I've actually

11   been working on the revision as agreed and I attach the paper

12   in response to the JFE revisions -- JFE referee report."

13   A.   Correct.

14   Q.   And so I'd like to take you forward to page 9 of the

15   exhibit.

16            At the bottom of the page there's an email dated

17   October 10, 2015 from you at 8:32 p.m., from you to, among

18   others, Professor Ravina.  It starts, "Hi, Enrichetta."

19   A.   Yes.

20   Q.   Could you read the first paragraph.

21   A.   "I agree we should also make the paper as good and accurate

22   as can be.  It did not -- I did not mean to add lots of

23   additional analysis that could be put in a follow-up paper is

24   what I meant, only to make the current product and message as

25   convincing as possible."

1   Q.  And then the next paragraph?

2   A.  "I'm working on it now, and because the referee raises the

3   issue of fees, was brought back to an issue I brought up before

4   but which was ignored."

5   Q.  So what is the fee issue?

6   A.  It's actually a very simple issue.  So remember that

7   Enrichetta took over the paper and so we had to put this, you

8   know, basically put in this analysis, trying to distinguish,

9   you know, high fee funds from low fee funds, and so Enrichetta

10  had introduced this analysis of the fees in a way that I

11  thought didn't make sense.  I really did not think that she had

12  put it in ratio format, and I just didn't think it made

13  rational sense.  And so I had asked her to basically put it in

14  different format, which I thought was the only way that this

15  could be done in a rational manner.  And rather than sort of

16  just accepting that change, which would just have required a

17  rerun of the regression, very simple change in the variable,

18  what did I get back?  Well, a whole bunch of snappy remarks and

19  saying I'm trying to delay the paper and making a really big

20  stink about this.  So I remember having to spend hours and say,

21  okay, if you don't believe me, I think it's obvious.  I'll give

22  you a little model, I'll do some simulations, and I'll show you

23  that your specifications will not give you the right result.

24  And again, you know, she didn't want to accept it.

25          So ultimately I was desperate.  I said -- actually,

I7d1rav7                         Bekaert - Cross

1    again, asked Wei Hu to step in and said, Wei, can you please

2    help me, because everything I do gets shot back.

3                MS. DONEHOWER:  Objection.

4                THE COURT:  If this is what he said, it's permissible.

5                MS. DONEHOWER:  If I may, your Honor.

6                THE COURT:  Yes.

7                MS. DONEHOWER:  I'm objecting on the grounds that this

8    is not responsive to the question which was just, what is the

9    fee issue.

10               THE COURT:  Overruled.

11   A.  So I reached out to Wei again to kind of come in on this

12   issue.

13   Q.  And what was Wei's response?

14   A.  Wei agreed with me that we had to use my specification.

15   Q.  Did the back and forth delay the completion of the paper?

16   A.  Absolutely.  I mean, those other parts of what you have to

17   do in the process like this that really made it very difficult

18   and acrimonious, you have to write a response report to the

19   referee, so you have to literally sort of repeat his comments,

20   or her comments, and then respond to them, and we were doing

21   this.  We had to go back and forth between me and Enrichetta,

22   you know, with all these other people cc'd on, and just rather

23   than responding to just the, you know, scientific comments,

24   there would be some snappy remarks about me or Andrea or trying

25   some -- rewriting the history.  It was just -- even criticizing

1  the paper.  I couldn't believe it.  And I had to always try to

2  hold back and not react to it because Wei was there and Kenton

3  were there and we already know how sensitive this was for these

4  people.  So it was very, very, very difficult.  And I think it

5  really lengthened the process.

6  Q.  What was the ultimate fate of the paper?

7  A.  Well, we -- we -- I think we got -- this whole acrimonious

8  process took us couple of months, so I think we got it back to

9  the firm maybe in November or December.  It was some back and

10  forth, and then in December I think it went back to Financial

11  Engines, but it took them like a long time to approve.  This is

12  nothing to do with me.  It had to go through legal and

13  everything.  And this was very unfortunate.  Took them a long

14  time to approve.  I think we sent it actually back to the

15  Journal -- the Journal of Financial Economics February or

16  March.  March, I think.  March 2016.  And a week or two weeks

17  later, it's conditionally accepted.  So, you know, it was a

18  huge, huge, huge win, because we basically got the paper

19  conditionally accepted, before her tenure review.

20  Q.  And you only did one round of reviews with the Journal of

21  Finance?

22  A.  Yeah, there was just a small second round, we had to change

23  some small things.  There was very, very -- I mean, we would --

24  I would almost call it editorial comments.  And then we had to

25  like have it copy-edited.  The referee wasn't pleased with some

I7d1rav7

of the writing.  So it was a very, very easy job to send it

back in and get -- and I think even when we got it back, I

think it was a conditional acceptance, meaning that, okay, if

you just do, conditionally, these small change, we will publish

the paper.

Q.  And was the paper published?

A.  Yes.

Q.  The paper was started in April of 2013?

A.  Yes.

Q.  And conditionally accepted in April of 2016.

A.  Yeah.

Q.  Is that a fast process?

A.  That is super fast.  I don't have too many papers like

that.

          MR. HERNSTADT:  Your Honor, this would be a good place

to --

          THE COURT:  Ladies and gentlemen, it's been a long

day.  Why don't we end for the day.  We'll resume Monday

morning at 9:30.  So your breakfast again will be here at 9.

          Have a good weekend.  Remember, don't discuss the

case.  Don't research the case.  And keep an open mind.  Have a

great weekend.

          (Continued on next page)

I7d1rav7

1          (Jury not present)

2          THE COURT:  All right.  Everyone can be seated.

3          So first, as I indicated yesterday, I do want to rule

4    on Plaintiff's Exhibits 100, 130, and 160, so you have that

5    settled for next week.

6          And I'm going to do essentially what I suggested I

7    would likely do yesterday.  And I recognize that neither party

8    is fully satisfied with it, but I think it represents the best

9    way for the jury to receive the full story and the context of

10   what happened while minimizing prejudice and hearsay.

11         So here are the main points.  While plaintiff may, of

12   course, make specific objections to individual pieces of

13   evidence, defendants will be able to elicit evidence about the

14   material discussions and reasoning that informed the tenure

15   denial vote.  Defendants will not make any further reference to

16   the vote of tenure denial being unanimous, which at least

17   Columbia indicated yesterday was an agreeable compromise.

18         Professor Bolton will be able to testify about his

19   efforts to present the various petitions to Columbia, and he

20   may mention that he had support from other faculty, but he

21   should not make reference to or even suggest the number of

22   supporters, and he may not characterize or testify about his

23   opinion of the underlying conduct at issue; rather, just that

24   he was acting in support of Professor Ravina.

25         I mean, we can talk about this.  If he wants to refer

I7d1rav7

1   to her situation or the conflict or something of that sort

2   that's neutral without getting into the recitation of the

3   facts, I'm comfortable with that.  As I said yesterday, I think

4   it will be perfectly clear to the jury that if he did these

5   things to support Professor Ravina, that he thought there was

6   something to it.  But I don't want to hear his opinion one way

7   or the other on that.  He appears not to have any personal

8   knowledge of what happened between Professor Ravina and

9   Professor Bekaert, and the more direct opinion testimony of

10  Professor Bolton about information relayed to him by Professor

11  Ravina won't, in my view, aid the jury in evaluating what

12  happened between the two professors.  But Professor Bolton's

13  efforts to inform Columbia that he and others felt the process

14  had gone awry does go to show notice to Columbia as well as

15  prevent the jury from being misled into thinking that there was

16  no controversy at the school over her tenure application.

17          So turning to the specific exhibits, I'm going to

18  allow what I suggested yesterday, which was for Plaintiff's

19  Exhibit 160, I don't think the cover letter should come in at

20  all because it's not even from someone that I understand is

21  testifying.  For the petition itself, I'm going to allow in the

22  date, the words "Dear Provost Coatsworth and Dean Hubbard" and

23  then take out both the first line and take out the word

24  "therefore" and just have the line "The undersigned tenured

25  faculty members in the Finance and Economics Division of

I7d1rav7

Columbia Business School are not in a position to provide an

evaluation of Enrichetta's Ravina's tenure case at this time."

And then take out all the names and signatures.

On 130, again, the cover letter is out.  You can have

the date, who it's to, and then you can include only the first

line and the word "Sincerely."  So it will read, "The

undersigned tenured faculty members in the Finance and

Economics Division of Columbia Business School wish to express

their support for Enrichetta Ravina's request to have her

tenure clock extended."  And it will say "Sincerely," and he

can talk about signing it.  And it's clear, obviously, that

it's more than one faculty member, but he shouldn't get into

the number.

The email in 100 should not come in, but as I

indicated, I do think that the underlying petition, even though

it was unsigned, should come in, without the first sentence and

the last sentence, and he can just explain what this is.  None

of the faculty names should come in.  And he can explain what

his intention was in pushing this forward.

Dean Hubbard will then be able to explain Columbia's

response in live testimony, so it won't simply be these

petitions without a defendant having a chance to contextualize

them or rebut them.

So as I said, those are my rulings.  I do think it's

the best possible balance that the rules of evidence permit.

I7d1rav7

```
 1    It minimizes prejudice and hearsay but allows both sides to
 2    make the arguments they want to make on one hand about
 3    Columbia's notice and handling of the complaint and on the
 4    other about Professor Ravina's tenure qualifications.
 5            All right.  So that's my ruling on those three
 6    exhibits.
 7            Depending on when you need it, I'm happy to go through
 8    deposition designations now.  Again, I understand it's Friday
 9    afternoon.  I'm happy not to and do it on Monday if you'd
10    prefer.  You can talk amongst yourselves.  I'll leave that to
11    you.
12            MR. SANFORD:  Monday is fine, your Honor.
13            THE COURT:  Okay.  From defendants' perspective?  Are
14    you okay talking about it on Monday?
15            MS. PLEVAN:  In the morning or at the end of the day?
16            THE COURT:  We could talk about it -- let me just look
17    at my calendar on Monday.
18            MS. PLEVAN:  We're going to have a scheduling issue on
19    Monday, I think.
20            THE COURT:  Okay.  Do you want to talk about that?
21            MS. PLEVAN:  Well, I just meant, I don't think we'd
22    want to delay the start time on Monday at all.
23            THE COURT:  Okay.  I mean, I'm happy to meet at 9.
24            MS. PLEVAN:  It may be that we should do it now
25    because they have to prepare what they're going to use and we
```

1   have to review it in advance, so --

2            MR. SANFORD:  Well, your Honor, we're not going to be

3   using videos Monday.  The earliest it would be would be

4   Tuesday.

5            THE COURT:  Okay.  Well, look, if we plan in advance,

6   I'm happy to plan to meet Monday at 9.  I'm also happy to meet

7   after the session on Monday.  And I'm also happy to do one of

8   them now and some of them Monday.  I'm really just trying to --

9   I know it's been a long day, so I'm just trying to be

10  respectful of your schedule.

11           MR. SANFORD:  Monday at 9 is fine for plaintiff, your

12  Honor.

13           THE COURT:  Okay.  Is that all right?

14           MS. PLEVAN:  So you can prepare them Monday night, is

15  that --

16           THE COURT:  We'll start Monday at 9, I believe he

17  said.  So we'll start Monday at 9.  We'll do as much as we can,

18  but understanding you want to start promptly at 9:30 with the

19  jury, which sounds exactly right to me.  And then whatever we

20  don't finish Monday morning, we'll finish Monday after the

21  session.  And if you want to again prioritize these for me, I'm

22  happy to go in whatever order works for you.

23           MR. SANFORD:  That's fine, your Honor.  On scheduling,

24  if I may?

25           THE COURT:  Yes.

1   MR. SANFORD:  We have Mr. Brown, Mr. Hubbard, Mr. Dunn

2   scheduled, and we're happy to confer with Ms. Plevan about that

3   schedule, but it seems that it would be very unlikely that

4   we'll finish Monday.  It looks like we'll be finishing Tuesday

5   with those witnesses.

6         But beyond that, I think Columbia had 22 people on

7   their will call list and I'm fairly confident they're not going

8   to be calling 22 people, so I'm wondering if we could get some

9   guidance from Columbia as to who they plan on calling or at

10  least some sense of the order starting Wednesday.

11        MS. PLEVAN:  Well, I think we've communicated a number

12  of times -- to your colleagues, not to you directly, but -- who

13  our principal witnesses will be, and that hasn't changed, so I

14  mean --

15        THE COURT:  Who are they?

16        MS. PLEVAN:  So, well, I mean, they're the people that

17  they're calling, so obviously Mr. Dunn is in effect our witness

18  too, as is Dean Hubbard, as well as Christopher Brown, and then

19  we certainly have Janet Horan, Dean Phillips, Wei Jiang, and

20  possibly Stephen Zeldes.

21        THE COURT:  Okay.  All right.  So thank you for that.

22        Just wait one minute.  I just wanted to speak to

23  Ms. Cavale.

24        Just wait here for one minute, if you can.

25        (Pause)

I7d1rav7

1     THE COURT:  What I'd like to do is just meet the

2  lawyers at sidebar with the court reporter, please.

3     (Pages 1158-1159 SEALED by order of the Court)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7d1rav7

1          (At the sidebar)

2          MR. SANFORD:  So Mr. Hernstadt was going to tell us

3  what witnesses he'd be calling.

4          MR. HERNSTADT:  I'm definitely going to be calling

5  Andrea Kiguel.  I haven't decided about the rest of the

6  witnesses, but I hope you've prepared that she --

7          MS. PLEVAN:  I don't think he's giving you the precise

8  order.  We've had all this scheduling --

9          MR. HERNSTADT:  I haven't decided yet.

10         MR. SANFORD:  I'd like to know what the witnesses

11  are --

12         MR. HERNSTADT:  I haven't decided which of the other

13  ones that I may or may not call.  But I definitely am calling

14  Andrea Kiguel.

15         MR. SANFORD:  Can we have a date?

16         THE COURT:  Do you know who's going to go first

17  between the defendants?

18         MS. PLEVAN:  Well, I thought because some of our

19  witnesses have medical appointments and so --

20         THE COURT:  On Monday, because we're not going to be

21  resting until Tuesday, earliest, why don't you give them some

22  heads up about who's kind of going to come next on Tuesday,

23  Wednesday.

24         MS. PLEVAN:  We know it will be Hubbard and Brown

25  after, so that may be from Tuesday --

I7d1rav7

1    MR. HERNSTADT:  My witnesses wouldn't be till the end

2    of the week.  We have three or four people lined up.  So that's

3    why --

4    THE COURT:  So who are the three and the four?

5    MR. HERNSTADT:  Dunn, Brown, Hubbard --

6    MS. PLEVAN:  Those are the next.

7    MR. SANFORD:  And then Bolton.

8    MR. HERNSTADT:  And Bolton.

9    MS. PLEVAN:  I forgot Rooker earlier, actually.

10    THE COURT:  Okay.  All right.  Well, just think about

11    the others, and for professional courtesy --

12    MS. PLEVAN:  It's later than we thought, so we now

13    have to go back and talk to people over the weekend.

14    THE COURT:  So just let Mr. Sanford know over the

15    weekend.

16    MS. FISCHER:  There's a couple other things, though,

17    for Monday, for Mr. Dunn.  There's just a couple of things that

18    we emailed plaintiff's counsel about the other day.

19    One, as the Court is aware, there are other

20    investigations that Mr. Dunn did involving faculty members in

21    the business school that may come into evidence in this case.

22    And we would request -- I made this request, I spoke with

23    Ms. Harwin, I know she's not here today -- that the names of

24    the complainants in those investigation files were redacted,

25    and the name of the respondents, we would ask should also be

I7d1rav7

1    redacted.  Just in all fairness to those individuals who are

2    not parties in this case, we would ask the Court's permission

3    to anonymize those files, redacting, and we can use some sort

4    of system, you know, put a letter, whatever, but to redact the

5    names of the respondents as well as identifying information,

6    you know, a course that they taught that's at issue, something

7    like that.

8            MR. SANFORD:  We're fine with that.

9            THE COURT:  Okay.

10           MS. FISCHER:  The other thing is, I know there are a

11   number of objections to, for example, the investigation file

12   involving Professor Ravina's complaint.  I don't know if that's

13   been resolved.

14           MR. SANFORD:  That would be Ali Harwin, so if we could

15   discuss that on Monday.

16           THE COURT:  I just ask if you can get together and

17   talk about these issues and then if there is still a dispute,

18   let me know, okay?

19           ALL COUNSEL:  All right.  Thank you, your Honor.

20           (Adjourned to July 16, 2018, at 9:00 a.m.)

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   GEERT BEKAERT

 4   Direct By Ms. Donehower  . . . . . . . . . . 901

 5   Cross By Mr. Hernstadt . . . . . . . . . . .1077

 6                       DEFENDANT EXHIBITS

 7   Exhibit                                  Received

 8    QU   . . . . . . . . . . . . . . . . . . 907

 9    FM   . . . . . . . . . . . . . . . . . .1123

10    GY   . . . . . . . . . . . . . . . . . .1124

11    KB   . . . . . . . . . . . . . . . . . .1136

12    KT   . . . . . . . . . . . . . . . . . .1138

13    LA   . . . . . . . . . . . . . . . . . .1139

14    MA   . . . . . . . . . . . . . . . . . .1145

15                       PLAINTIFF EXHIBITS

16   Exhibit No.                              Received

17    73   . . . . . . . . . . . . . . . . . . 912

18    67   . . . . . . . . . . . . . . . . . . 916

19    68   . . . . . . . . . . . . . . . . . . 917

20    37   . . . . . . . . . . . . . . . . . . 922

21    91   . . . . . . . . . . . . . . . . . . 942

22    28   . . . . . . . . . . . . . . . . . . 948

23    95   . . . . . . . . . . . . . . . . . . 951

24    61   . . . . . . . . . . . . . . . . . . 954

25    60   . . . . . . . . . . . . . . . . . . 956
```

```
 1                    PLAINTIFF EXHIBITS CONTINUED

 2    Exhibit No.                                      Received

 3    89     . . . . . . . . . . . . . . . . . . 957

 4    96     . . . . . . . . . . . . . . . . . . 960

 5    82     . . . . . . . . . . . . . . . . . . 969

 6    209    . . . . . . . . . . . . . . . . . . 978

 7    39     . . . . . . . . . . . . . . . . . . 980

 8    217    . . . . . . . . . . . . . . . . . . 997

 9    262    . . . . . . . . . . . . . . . . . .1000

10    152    . . . . . . . . . . . . . . . . . .1001

11    46     . . . . . . . . . . . . . . . . . .1011

12    128    . . . . . . . . . . . . . . . . . .1016

13    127    . . . . . . . . . . . . . . . . . .1016

14     131 and 132    . . . . . . . . . . . . . .1019

15    135    . . . . . . . . . . . . . . . . . .1020

16    137    . . . . . . . . . . . . . . . . . .1022

17    140    . . . . . . . . . . . . . . . . . .1024

18    136    . . . . . . . . . . . . . . . . . .1026

19    141    . . . . . . . . . . . . . . . . . .1031

20    142    . . . . . . . . . . . . . . . . . .1031

21    143    . . . . . . . . . . . . . . . . . .1040

22    144    . . . . . . . . . . . . . . . . . .1041

23    145    . . . . . . . . . . . . . . . . . .1046

24    147    . . . . . . . . . . . . . . . . . .1055

25    149    . . . . . . . . . . . . . . . . . .1055
```

1

PLAINTIFF EXHIBITS CONTINUED

2      Exhibit No.                                    Received

3      150    . . . . . . . . . . . . . . . . . .1056

4      151    . . . . . . . . . . . . . . . . . .1057

5      139    . . . . . . . . . . . . . . . . . .1061

6      162    . . . . . . . . . . . . . . . . . .1069

7      165    . . . . . . . . . . . . . . . . . .1069

8      167    . . . . . . . . . . . . . . . . . .1071

9      111    . . . . . . . . . . . . . . . . . .1072

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25