I7gnrav2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ENRICHETTA RAVINA,

                    Plaintiff,

          v.                              16 CV 2137 (RA)

COLUMBIA UNIVERSITY,

                                          Jury Trial

                    Defendant.

------------------------------x

                                          New York, N.Y.
                                          July 16, 2018
                                          9:15 a.m.

Before:

          HON. RONNIE ABRAMS

                                          District Judge


                          APPEARANCES


SANFORD HEISLER SHARP LLP
     Attorneys for Plaintiff
BY:  DAVID W. SANFORD
     ALEXANDRA HARWIN
     MELINDA L. KOSTER
     AMY DONEHOWER
     HERBERT V. McKNIGHT
     ANDREW C. MELZER

PROSKAUER ROSE LLP
     Attorneys for Defendants
BY:  BETTINA B. PLEVAN
     RACHEL S. FISCHER
     STEVEN D. HURD
     PATRICK KRAMER RICE

HERNSTADT ATLAS PLLC
     Attorneys for Defendant Bekaert
BY:  EDWARD HERNSTADT

I7gnrav2

1           (Trial resumed)

2           (Jury not present)

3           THE COURT:  Good morning, everyone.  You can be

4    seated.  Thank you.  All right.

5           So first things first:  Mr. Hernstadt, is there

6    anything else you wanted us ask to ask of the juror.  I know

7    you said you wanted to get back to us on Monday about that.

8           MR. HERNSTADT:  Yes, could we do a sidebar on that.

9           THE COURT:  Do you want to do it right now?

10          MR. HERNSTADT:  Now, sure.

11          (Page 1168 sealed)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7gnrav2

1    THE COURT:  Which designations should we talk about

2  next?

3    MS. HARWIN:  I believe the ones that are pending are

4  Stephen Zeldes, Kathy Phillips, Gita Johar, and Janet Horan.

5    THE COURT:  That's correct.  I am just asking, in

6  terms of order, which one would you like to address first?

7  Just address the ones you think you might use first.

8    MS. HARWIN:  I believe defendants were planning to

9  call Senior Vice Dean Johar only by deposition so it may make

10  sense to do that one first.

11    THE COURT:  All right.

12    On this I think the first objected-to portion was page

13  23.

14    Why is this relevant, the portion on 23?

15    MS. HARWIN:  Are you referring to has anyone else

16  served in that role?

17    THE COURT:  Yes.

18    I thought that was objected to from lines 3 to 20.  My

19  question is, what is the relevancy of this portion?

20    MS. FISCHER:  We just think this is background, like

21  Ms. Harwin said, Ms. Johar is not testifying here in person.

22  And so this just shows, you know, when she was in that role,

23  and we just thought it was relevant background to her position.

24    THE COURT:  And what's the prejudice from this?  I

25  think you cited 403 as well.

I7gnrav2

1          MS. HARWIN:  I think it's confusing and it's

2     unnecessary.  It doesn't relate to anything that is the subject

3     of her testimony.

4          THE COURT:  I am going to allow it as background.  I

5     don't see any harm in it.  It's marginally probative just to

6     provide context for how long she was in the position.

7          All right.

8          Then on page 69 we have an objection to lines 11

9     through 22.

10         What does it matter how many other instances there

11    were in the past 25 years of faculty members issuing a joint

12    statement?

13         MS. HARWIN:  It goes to the irregularities in the

14    process, that this was an unprecedented event, what is going on

15    at the business school with respect to these petitions.  This

16    wasn't a routine, typical part of ordinary tenure

17    deliberations.  It was a quite unusual circumstance.  It's

18    probative as well on the issue of pretext.

19         MS. FISCHER:  If I would just note that Professor

20    Johar, at the time Vice Dean Johar, she was not in plaintiff's

21    division.  So, first of all, there is a relevance issue because

22    if we are talking about objections to tenure she was in a

23    totally different division.  So what she may have seen in that

24    role wouldn't be relevant here.  That's one.

25         And, two, I don't think it goes to irregularities.  I

I7gnrav2

1    mean, I just think it's not relevant.  I don't think it goes to

2    irregularities as they'll be described in the testimony.  I

3    think it's confusing and potentially prejudicial, particularly

4    from someone who is coming from a different division, who would

5    have seen different tenure processes and procedures.

6            MS. HARWIN:  Your Honor, this wasn't just a member of

7    a different division.  She was on the executive committee of

8    the Columbia Business School.  She was a member of that

9    governing body.  She served as the vice dean and see served as

10   the senior vice dean.

11           MS. FISCHER:  And that is a three-year term.  So, even

12   if that were true, and if that is now the stated relevance,

13   then it is even less relevant because the testimony was it is a

14   three-year term as vice dean.

15           THE COURT:  In any event, I do think this is unduly

16   prejudicial.  We have talked about these petitions numerous

17   times.  I am allowing in the fact that there was a petition,

18   but whether or not faculty members have issued a joint

19   statement of this sort in the past is not probative of whether

20   what is alleged to have happened actually happened, number one.

21   And I do think as to pretext or retaliation this is unduly

22   prejudicial.  So I am not going to allow this in.

23           Let's go to page 70.

24           So we have lines 5 through 19.

25           MS. FISCHER:  I have different line numbers, just a

I7gnrav2

 1    little.

 2              THE COURT:  From page 70, you don't have 5 through 19?

 3              You tell me what you have.

 4              MS. FISCHER:  I have 67:12 to 68:1.

 5              Is that right?

 6              MS. HARWIN:  I think your Honor has the right numbers.

 7              THE COURT:  We just talked about page 69 and now we

 8    are on page 70.  Did I miss something on page 67?

 9              MS. HARWIN:  I don't believe so, your Honor.

10              THE COURT:  I have already allowed in the petitions,

11    which is what Exhibits 26 and 27 are.

12              I think that they're Exhibits 160 and 130.

13              MS. FISCHER:  So again here we are asking for

14    Professor Johar's opinion.  She was no longer the vice dean

15    when these petitions were sent.  So this is another example of

16    asking somebody at the time these petitions were sent her view.

17    She was no longer in the executive committee.  So her view on

18    something that was never before her, never came to her because

19    she was out of the role at the time that these were provided, I

20    don't believe that that would be relevant at all.

21              MS. HARWIN:  Senior Vice Dean Johar had served on the

22    promotion and tenure committee before.  It is a question about

23    the considerations properly before the promotion and tenure

24    committee.

25              MS. FISCHER:  But, again, this is something that was

I7gnrav2

1    never before her.  Now it is after the fact, should this be

2    considered or not.  It's possible she would have had a

3    different view than people who were on the committee at the

4    relevant time, but what does it matter?  It was never before

5    her.

6          THE COURT:  Just a second, please.

7          So, this is opinion testimony by a lay witness

8    pursuant to Rule 701, is that right?  Is that the purpose or

9    the rule pursuant to which it's being offered?

10          MS. FISCHER:  That is one of our objections.

11          MS. HARWIN:  Her testimony is provided as someone who

12    has been a senior administrator at the university, who was on

13    the promotion and tenure committee, as to what her view is as

14    to appropriate considerations before that committee.

15          MS. FISCHER:  While she was on the committee, it was

16    is prior to when these petitions were presented.  I think it's

17    confusing and it's really not relevant.  The whole argument we

18    have heard from plaintiff is these petitions were relevant

19    because they were the notice.  Well, she wasn't on the

20    committee at the relevant times.

21          THE COURT:  I am not going to allow the testimony on

22    page 70 for that reason.

23          77, lines 5 through 9.

24          MS. HARWIN:  These are lines concerning the Senior

25    Vice Dean Johar's perception of the e-mail she reviewed in

I7gnrav2

1    connection with Professor Ravina's complaint.

2              THE COURT:  That is precisely the jury's job, to

3    determine whether the e-mails.  I assume these are e-mails sent

4    by Professor Bekaert, whether they're demeaning, whether they

5    constitute harassment, and/or retaliation.  So I'm not going to

6    allow in 77.

7              MS. HARWIN:  Your Honor, it goes to Columbia's notice.

8    Senior Vice Dean Johar was provided at this meeting with these

9    e-mails.  She's testified she perceived them as demeaning.

10   Columbia's EOAA, which should have been triggered by these

11   e-mails, did not initiate an investigation until months later.

12   It's squarely relevant --

13             THE COURT:  The jury will know she got the e-mails,

14   right.  The jury will know that she got the e-mails, that

15   Columbia got the e-mails, and the jury will know when the

16   investigation was started.

17             Again, I feel like plaintiff has tried to tell the

18   same story through ten different witnesses' own perceptions of

19   how they characterize the conduct, but what really matters is

20   what the jury thinks of the conduct, and then when Columbia was

21   notified about it and what they did about it.

22             I mean, why does her personal view and that she said

23   they could be construed that way, why does that matter?

24             MS. HARWIN:  Columbia's policies specifically discuss

25   demeaning communications or conduct.  So having her on notice

I7gnrav2

1     that these are demeaning and how Columbia acts afterwards is

2     relevant to this.  I will note additionally that defendants

3     have designated other testimony concerning her perception of

4     these e-mails.

5               THE COURT:  OK.  So show me those.

6               MS. HARWIN:  If you look at the immediate prior

7     designation 76:18 through -- 76:18 through 4 is a description

8     of those e-mails again.  And then, again, previously on 75:22:

9     "Did anything stand out to you in those e-mails?"

10              Defendant says, "Yes, they were rude."

11              "How were they rude?"

12              And then it goes on on the top of 76.

13              THE COURT:  In light of that I will allow in lines 5

14    through 9 on page 77.

15              All right.  Next is page 80.  This is lines 19 on page

16    80 -- why don't we go in the first batch through 81, line 20.

17              MS. HARWIN:  Your Honor, this is fine.

18              THE COURT:  This is fine?

19              MS. HARWIN:  Yes.

20              THE COURT:  OK.  So this will come in.

21              Then we have on page 81 starting at line 21.

22              MS. HARWIN:  This is a further continuation of what

23    happened at that meeting.

24              MS. FISCHER:  This is hearsay.

25              MS. HARWIN:  This is about the nature of the report

I7gnrav2

1    being conveyed to Vice Dean Johar.

2              MS. FISCHER:  Well then, it can't be offered for the

3    truth, first of all.

4              Second of all, you know, especially the lines toward

5    the end of that section, "Sitting here today after 25 years at

6    Columbia Business School," you know, I think that this goes

7    back to what we were talking about earlier.  This is, you

8    know, --

9              THE COURT:  All right.  I will allow in up to line 17

10   on 82, "that I thought it was inappropriate."  I will allow

11   that in.  And then I think we go to 87.

12             87 is fine as well, taking out the objection.

13             It is more of, again, her reaction, and it seems like

14   both sides believe that testimony regarding her opinion about

15   the situation is relevant.

16             So, 87 will come in.

17             Now let's look at 90 and 91.

18             MS. HARWIN:  The objection here is that this is sort

19   of wasting time.  It is just some context that is not really

20   necessary here about sort of her general meetings with Dean

21   Hubbard.  So we have a pretty limited objection.

22             THE COURT:  What is the relevance to 90 and 91?

23             MS. FISCHER:  I believe this is just relevant

24   background, you know, about how this is all coming to the

25   attention of the dean's office.

I7gnrav2

```
1         THE COURT:  All right.  I will allow it.  I don't

2    think it's prejudicial in any way?

3         Then let's go to 103.

4         What is the relevance about complaints about a faculty

5    issues.  I just want to make sure I understand this question.

6    Does this include this allegation?

7         MS. HARWIN:  We understand this to not include this

8    allegation.  So any other faculty issues.

9         MS. FISCHER:  I don't see the relevance, and I think

10   it is a little unclear.  And, you know, Professor Johar will be

11   here in person to provide clarification.

12        THE COURT:  Yes.  I think this will be confusing,

13   because it is not clear, in any event, if she's being asked

14   about this situation or another one.

15        MS. HARWIN:  Your Honor, there's no dispute obviously

16   that she was aware of this one.  So, you know, when she answers

17   not to my knowledge, I think it's pretty clear she's answering

18   not as to other issues.

19        MS. FISCHER:  Can we get a proffer on the relevance.

20        MS. HARWIN:  On this we also have --

21        THE COURT:  The next page there is a more direct

22   question about this:  "During your time at the university have

23   you been aware of any complaints of gender discrimination,

24   harassment, or retaliation beside Ms. Ravina's?

25        "Not that I can recall."
```

1           What's the relevance of that?

2           MS. HARWIN:  We have other pending complaints,

3    including one against Professor Bekaert, brought shortly before

4    Professor Ravina's complaint against Professor Bekaert.  So her

5    lack of awareness of that is pertinent.  She was the senior

6    vice dean.

7           MS. FISCHER:  I am not sure why that's pertinent.  Can

8    we have an explanation?

9           MS. PLEVAN:  Which page and line are we on?

10          THE COURT:  Right now I was looking at 114, lines 12

11   through 17.  Again, the purpose from your perspective

12   Ms. Harwin is that she should have known of this prior

13   complaint and that she didn't.

14          MS. HARWIN:  Yes.

15          MS. PLEVAN:  She says earlier she's not involved with

16   students.

17          THE COURT:  She is testifying in person.  In light of

18   that, I won't allow this in if she is not the person who would

19   have gotten student complaints.

20          MS. HARWIN:  Your Honor, she was involved with

21   faculty, and so she certainly should have been aware of

22   complaints against faculty.  This is not a complaint against a

23   student.  It is a complaint against a senior tenured faculty

24   member, someone who she testified she met with every three

25   years regarding his work at Columbia.

I7gnrav2

1          THE COURT:  Is there any dispute that she is a person

2     who should know about complaints about faculty members, given

3     her position?

4          MS. FISCHER:  Well, to the extent the complaint was

5     not upheld, meaning the student dropped the issue, so I think

6     there would be a dispute about whether this would have properly

7     gone before her as an issue.

8          You know, plaintiff is trying to make the suggestion

9     that there's something negligent about this situation, when the

10    reality is and the testimony will show, if this comes up with

11    Mr. Dunn, that the student didn't pursue it.  How is that

12    really relevant to show anything at all?  I don't think it is.

13         THE COURT:  I am not going to allow that.  She

14    couldn't recall anyway.  So I don't think it's especially

15    probative, and I do think it may be confusing given that the

16    complaint had been withdrawn.

17         Then we have 117.  It sounds like, again, both sides

18    have designated her view of what happened.

19         Why is this any different?

20         MS. HARWIN:  It is not, your Honor.

21         THE COURT:  So I am going to allow in 117.

22         Then I think lastly is 127, lines 14 through 20.

23         I am going to allow in the lines on 127 as well.

24         So that's Johar's deposition designations.  We will

25    bring the jury in and continue the testimony now.

I7gnrav2

1    We have four more we will work on one or two during

2    lunch and the rest at the end of the day if that's OK with

3    everyone.

4              MS. HARWIN:  Thank you, your Honor.

5              THE COURT:  Thank you.  Do you want to bring --

6              MS. PLEVAN:  The plaintiffs are now going to call

7    Mr. Dunn.

8              THE COURT:  We are going out of order?

9              MS. PLEVAN:  Yes.

10             THE COURT:  All right.  Thank you.

11             MS. PLEVAN:  Should we bring him in.

12             THE COURT:  Sure.How long do you anticipate Mr. Dunn's

13   testimony will be?  Do you have any sense?

14             MS. FISCHER:  Plaintiffs go first.

15             MS. HARWIN:  We would anticipate probably going

16   through until lunch.

17             THE COURT:  All right.

18             MS. FISCHER:  Mr. Dunn is here.

19             THE COURT:  All right.  You can come on up.

20             Thank you.

21             (Continued on next page)

22

23

24

25

i7gnrav2                    Dunn - Direct

1              (Jury present)

2              THE COURT:  Good morning, everyone.

3              Everyone can be seated.  So, just for scheduling

4     reasons, we are going a little bit out of order.  And we are

5     going to take this witness next, and then we will resume

6     Professor Bekaert's testimony at a later date.  But it is just

7     for scheduling reasons.  Thank you.

8     MICHAEL K. DUNN,

9          called as a witness by the Plaintiff,

10         having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MS. HARWIN:

13    Q.  Good morning, Mr. Dunn.

14    A.  Good morning.

15             MS. HARWIN:  Good morning, ladies and gentlemen of the

16    jury.

17    BY MS. HARWIN:

18    Q.  Mr. Dunn, you were director of investigations and deputy

19    Title IX coordinator for Columbia University?

20    A.  Yes.  Within the Office of Equal Opportunity and

21    Affirmative Action.

22    Q.  You were Columbia's investigator of investigations and

23    deputy Title IX coordinator from July 2013 to June 2015?

24    A.  Yes, that's correct.

25    Q.  As deputy Title IX coordinator, you were responsible for

i7gnrav2                      Dunn - Direct

1   coordinating enforcement of federal law Title IX?

2   A.   Yes.   I was responsible for enforcing Columbia's policies

3   on discrimination and harassment.

4   Q.   Title IX refers to the federal law that prohibits gender

5   discrimination in higher educational institutions that receive

6   federal funding, is that correct?

7   A.   Yes.

8   Q.   You investigated professor Ravina's complaint against

9   Professor Bekaert, correct?

10  A.   Yes, I did.

11  Q.   You also investigated another sexual harassment complaint

12  against Professor Bekaert?

13  A.   Yes, I did.

14  Q.   You completed your first sexual harassment investigation

15  into Professor Bekaert just a few months before you started to

16  investigate Professor Ravina's complaint against Professor

17  Bekaert, is that correct?

18  A.   Yes, I believe that's correct.

19  Q.   At the same time that you were investigating Professor

20  Ravina's complaint against Professor Bekaert, you were also

21  conducting sexual harassment investigations into some other

22  male professors at Columbia Business School, is that correct?

23  A.   Yes, it is.

24  Q.   I would like to talk for a little bit about your

25  professional background.

i7gnrav2                    Dunn - Direct

1            MS. HARWIN:  I would move to admit Defendant's Exhibit

2   C.

3            THE COURT:  Any objection?

4            MS. FISCHER:  The screens are not working.

5            THE COURT:  Just a minute on the screens.

6            MS. FISCHER:  No objection.

7            THE COURT:  C will be admitted.

8            (Defendants' Exhibit C received in evidence)

9   BY MS. HARWIN:

10  Q.  Director Dunn, do you recognize Defendant's Exhibit C?

11  A.  Yes, I do.

12  Q.  Is this your résumé?

13  A.  Yes, it is.

14  Q.  Let's turn to the second page of your résumé.  Before you

15  became Columbia University's director of investigations in July

16  2013, you worked in Columbia's center for student advising,

17  student affairs?

18  A.  Yes.

19  Q.  Is that correct?

20  A.  Yes, I did.

21  Q.  You worked in Columbia's center for student advising,

22  student affairs from March 2010 through June 2013?

23  A.  Yes, that's correct.

24  Q.  Columbia's center for student advising, student affairs is

25  an academic advising office?

i7gnrav2                    Dunn - Direct

1    A.  Yes, it is.

2    Q.  Before working in this academic advising office, you worked

3    as a lawyer, is that correct?

4    A.  Yes, I did.

5    Q.  You worked as a lawyer for less than two years, from

6    September 2008 to March 2010, correct?

7    A.  That's correct.

8    Q.  As a lawyer you never worked on any cases involving

9    discrimination or retaliation, correct?

10   A.  Yes, that's correct.

11   Q.  You stopped practicing law in March 2010, correct?

12   A.  Yes.

13   Q.  By the time you began your investigation into Professor

14   Ravina's complaint, you had not been practicing law for four

15   years, correct?

16   A.  Yes, that's correct.

17   Q.  You began investigating Professor Ravina's complaint

18   against Professor Bekaert just over a year before you became

19   Columbia University's director of investigations, is that

20   right?

21   A.  I'm sorry.  Could you repeat that question.

22   Q.  Sure.  You began investigating Professor Ravina's complaint

23   against Professor Bekaert just over a year after you became

24   Columbia University's director of investigations?

25   A.  Yes, that's correct.

i7gnrav2                    Dunn - Direct

1   Q.  When you were Columbia's director of investigations you did

2   not receive any formal training on Columbia's policies against

3   discrimination harassment or retaliation, correct?

4   A.  Yes, that's correct.

5   Q.  You did not receive any training or instruction concerning

6   the antidiscrimination and antiretaliation law that this case

7   is brought under, known as the New York City Human Rights Law,

8   correct?

9   A.  Yes, that's correct.

10  Q.  You also did not receive any training or instruction

11  regarding the federal antidiscrimination and antiretaliation

12  law, known as Title VII, correct?

13  A.  Yes, that's correct.

14  Q.  You understand Title VII is a federal law that prohibits,

15  among other things, gender discrimination in employment?

16  A.  Yes, I do.

17  Q.  You testified before that you work in Columbia's Office of

18  Equal Opportunity and Affirmative Action.  Is that office

19  referred to as the EOAA?

20  A.  Yes, it is.

21  Q.  When you worked in Columbia's EOAA your boss was Associate

22  Provost Melissa Rooker?

23  A.  Yes, that's correct.

24          MS. HARWIN:  I move to admit Plaintiff's Exhibit 17.

25          I believe the parties have already stipulated that

i7gnrav2                          Dunn - Direct

1    these are admissible.

2              MS. FISCHER:  No objection?

3              THE COURT:  All right.  17 will be admitted.  Thank

4    you.

5              (Plaintiff's Exhibit 17 received in evidence)

6    BY MS. HARWIN:

7    Q.  I'm showing you what's been marked and admitted as

8    Plaintiff's Exhibit 17.  Do you recognize these as the Columbia

9    University employment policies and procedures on discrimination

10   and harassment that were in effect at the time that you

11   investigated Professor Ravina's complaint?

12   A.  Yes, I do.

13   Q.  The EOAA, where you worked, is responsible for Columbia

14   University's employment policies and procedures on

15   discrimination and harassment, correct?

16   A.  That's correct.

17   Q.  The EOAA is the compliance office for Columbia University

18   concerning antidiscrimination laws?

19   A.  Yes, that's correct.

20   Q.  The EOAA is charged with investigating allegations of

21   discrimination, harassment and retaliation for all of Columbia

22   University, correct?

23   A.  Yes, I believe that's correct.

24   Q.  You have described the EOAA as a small shop, correct?

25   A.  Yes.

i7gnrav2                          Dunn - Direct

1    Q.  The EOAA had limited staffing, correct?

2    A.  Yes, that's correct.

3    Q.  When you started out, there were only around three or four

4    people in that office, correct?

5    A.  Yes, that's correct.

6    Q.  And that included a front desk person?

7    A.  Yes.

8    Q.  So there were only two or three employees in the EOAA who

9    conducted investigations for Columbia University, correct?

10   A.  Yes, that's correct.

11   Q.  You had a big workload, correct?

12   A.  Yeah.

13   Q.  At any given time you had 15 to 20 cases that you were

14   addressing?

15   A.  Yes, to the best of my recollection.

16   Q.  When you investigated Professor Ravina's complaint, you had

17   approximately 15 to 20 cases on your plate at the time,

18   correct?

19   A.  Yes, to the best of my recollection.

20   Q.  You felt overwhelmed at Columbia?

21   A.  At times, yeah.

22   Q.  Your work at Columbia was challenging?

23   A.  Yes, it was.

24   Q.  The EOAA was a stressful environment?

25   A.  Yes, it was.

i7gnrav2                        Dunn - Direct

1    Q.  This contributed to your decision to leave Columbia,

2    correct?

3    A.  Yes, it did.

4    Q.  Let's talk about your first sexual harassment investigation

5    into Professor Bekaert.

6              Your first sexual harassment investigation into

7    Professor Bekaert was initiated by a report made by a female

8    student, is that correct?

9    A.  Yes.

10   Q.  You learned about the female student's complaint against

11   Professor Bekaert from a Columbia Business School administrator

12   named Nayla Bahri?

13   A.  Yes, that's correct.

14   Q.  You learned about the female student's complaint against

15   Professor Bekaert in February 2014, correct?

16   A.  I believe that's correct, yes.

17             MS. HARWIN:  Move to admit Plaintiff's Exhibit 31.1,

18   which is identical to the Exhibit 31 that was previously

19   produced to defendants prior to the pretrial order.

20             THE COURT:  Any objection?

21             MR. HERNSTADT:  May I see the exhibit?

22             No objection, your Honor.

23             MS. FISCHER:  No objection.

24             THE COURT:  All right.  31.1 will be admitted.

25             (Plaintiff's Exhibit 31.1 received in evidence)

i7gnrav2                          Dunn - Direct

1    BY MS. HARWIN:

2    Q.  Mr. Dunn, I'm showing you what's been marked as 31.1.  Is

3    this an e-mail that you received from Nayla Bahri forwarding

4    e-mails from Professor Bekaert and the female student?

5    A.  Yes, it is.

6    Q.  Nayla Bahri was a dean at Columbia Business School at that

7    time, correct?

8    A.  I don't recall.

9    Q.  Let's look at the student's e-mail of January 31, 2014, at

10   1:06 a.m.

11             MR. HERNSTADT:  What page?

12             MS. HARWIN:  That is on the first page.

13   BY MS. HARWIN:

14   Q.  The female student said there that she needed to file an

15   official complaint against Geert Bekaert on grounds of

16   harassment, correct?

17   A.  Yes.  That's correct.

18   Q.  The female student said that Professor Bekaert has been

19   harassing me repeatedly, correct?

20   A.  Yes, that's correct.

21   Q.  The female student said that Professor Bekaert was using

22   threats that are intended to make me feel unsafe, correct?

23   A.  Yes, that is correct.

24   Q.  The female student was concerned about the e-mails that

25   Professor Bekaert was sending her, correct?

i7gnrav2                          Dunn - Direct

1                MS. FISCHER:  Objection.

2                THE COURT:  Sustained.

3    Q.  The female student expressed concerns about the e-mails

4    that Professor Bekaert was sending her?

5    A.  As expressed in that e-mail I would say yes.

6    Q.  Turning to page 2 of this exhibit, the first e-mail on that

7    page ends with the female student writing to Professor Bekaert

8    saying, "Now stop harassing me."

9                Did I read that correctly?

10   A.  Yes, you did.

11   Q.  You also learned that the female student had concerns about

12   what Professor Bekaert said in the classroom, correct?

13   A.  Yes, I did.

14               MS. HARWIN:  I move to admit Plaintiff's Exhibit 32.

15               Any objection to 32?

16               MR. HERNSTADT:  Yes, your Honor.

17               MS. PLEVAN:  Yes.

18               THE COURT:  You do have an objection?

19               MR. HERNSTADT:  Yes, your Honor.

20               THE COURT:  Let's have a sidebar.

21               Thanks.

22           (Continued on next page)

23

24

25

1          (At sidebar)

2          MS. HARWIN:  I believe this has already been addressed

3   in the motion in limine that was decided.  Was this not

4   addressed?

5          MR. HERNSTADT:  This was addressed and you excluded

6   these exhibits.  And then the letter came in regarding certain

7   of the exhibit.  This particular one is double hearsay.  This

8   is Nayla Bahri saying to Michael Dunn what the student told

9   her.  It also contains more salacious details than are in the

10  actual notes than Dunn took in his interview of his student.

11  It is improper and prejudicial.  He licked his lips.  The

12  student never said that to Dunn.  That isn't in Dunn's notes in

13  his actual hearing what the student said as opposed what Nayla

14  Bahri said the student said to her.

15         MS. HARWIN:  Your Honor, this is the complaint form.

16  This is the document that starts the investigation.  There's

17  going to be subsequent testimony regarding what happened during

18  the meeting.  But this is the initial triggering event.

19         MR. HERNSTADT:  They have --

20         MS. HARWIN:  Again, this was specifically ruled on

21  that these were admissible.

22         MR. HERNSTADT:  It was ruled that they were not.

23         THE COURT:  Let me look at the ruling at this.

24         MR. HERNSTADT:  At least that's my recollection.

25         MS. HARWIN:  The ruling specifically said that the

i7gnrav2                        Dunn - Direct

1    comments about Hong Kong were admissible, and then there was

2    subsequently --

3              THE COURT:  The underage woman comment was staying

4    out.  I understand this is different.

5              MS. HARWIN:  This is totally different.  This is about

6    the prior complaint against Professor Bekaert.  The ruling

7    specifically allowed the comment regarding women in Hong Kong

8    to be brought in.

9              MR. HERNSTADT:  Right.  And it is in.  It is in over

10   and over again.  It is in Exhibit 37, which has already been

11   admitted, which is letter from Dunn.

12             THE COURT:  Who is Nayla Bahri?

13             MS. HARWIN:  That is the person who, a dean at

14   Columbia Business School.

15             MS. FISCHER:  She is in the student affairs office is

16   my understanding.

17             MS. HARWIN:  I believe a dean of students.

18             MR. HERNSTADT:  She was the person who forwarded that

19   e-mail chain that was just admitted.  The problem with this is

20   that it is double hearsay, and it is very prejudicial.  But it

21   includes something that is not in the notes of the interview

22   with the student.  I am sure they are going to put the notes of

23   the interview with the student in.

24             MS. HARWIN:  This is the complaint form that triggered

25   the investigation.  So, of course, it proceeds the notes.

i7gnrav2                      Dunn - Direct

1           MR. HERNSTADT:  It is not the report of the student.

2      It is the report of someone saying this is what the student

3      said.  It is inherently hearsay, and it is prejudicial.

4           THE COURT:  I am going to allow it in.  It is about

5      what information he and Columbia had about complaints.  You can

6      cross-examine him about the basis of his knowledge, but I am

7      going to allow this.

8           MS. HARWIN:  Thank you.

9           MR. HERNSTADT:  He got this --

10          THE COURT:  This is what he's being told.  This is

11     what Columbia knows at this time.  That's what is relevant,

12     right.

13          MR. HERNSTADT:  He's being told -- this is what Nayla

14     Bahri says the student said to her.

15          THE COURT:  It may not be true, but it's what Columbia

16     is being told.

17          MR. HERNSTADT:  Would you make it clear to the jury?

18          THE COURT:  Yes.  All right.

19          (Continued on next page)

20

21

22

23

24

25

I7g1rav2                          Dunn - Direct

1              (In open court)

2              THE COURT:  So I'm going to allow in Exhibit 32.  But

3    I'm just going to remind you, as I've done with certain other

4    exhibits, that this is not being admitted for the truth of

5    what's said in here but rather the fact that it was said, and

6    to whom it was said.

7              You may proceed.

8              MS. HARWIN:  Thank you, your Honor.

9    BY MS. HARWIN:

10   Q.  Director Dunn, we're showing you what's been marked as

11   Plaintiff's Exhibit 32 now in evidence.

12             Is this a complaint form that you completed concerning

13   the female student's complaint against Professor Bekaert?

14   A.  Yes, it is.

15   Q.  Under the Narrative Information section, it reads, "I got a

16   call from Nayla Bahri.  She was working with a student who had

17   a conflict with a professor over a grade.  The student told

18   Nayla that the professor made inappropriate comments in class,

19   discussing his travels in Hong Kong and talking about his

20   preference for Asian women.  She said he rubbed his hands

21   together and licked his lips as if to say, it's delicious."

22             Did I read that correctly?

23   A.  Yes, you did.

24   Q.  This complaint form that you submitted on February 5, 2014

25   does not mention the student's report about receiving harassing

I7g1rav2                           Dunn - Direct

1   emails from Professor Bekaert, correct?

2   A.   That's correct.

3   Q.   You subsequently spoke with the female student regarding

4   her report, correct?

5   A.   Yes, that's correct.

6           MS. HARWIN:   I move to admit Plaintiff's Exhibit 33.

7           MS. FISCHER:   No objection.

8           THE COURT:   All right.   It will be admitted.   Thank

9   you.

10          (Plaintiff's Exhibit 33 received in evidence)

11  Q.   Director Dunn, these are your notes from meeting with the

12  female student about Professor Bekaert?

13  A.   Yes, that's correct.   My I see a hard copy of this exhibit?

14  Q.   Yes.

15  A.   Thank you.

16  Q.   Mr. Dunn, I'd like you to turn your attention to the second

17  page of your notes from meeting with the student about

18  Professor Bekaert.

19          You wrote down, on the second page, "Would make

20  comments, rub hands together – 'HK, where the ladies are

21  nice.'"

22          Did I read that correctly?

23  A.   Yes, you did.

24  Q.   HK refers to Hong Kong?

25  A.   Yes, it does.

I7g1rav2                    Dunn - Direct

1  Q.  So this means, "Would make comments, rub hands together –

2  'Hong Kong, where the ladies are nice.'"  Is that right?

3  A.  Yes, that's right.

4  Q.  Let's stay on the second page of your report.

5       When you spoke to the female student, she told you

6  that she didn't want to pursue anything and that she was afraid

7  of retaliation and embarrassment, correct?

8  A.  Yes, that's correct.

9  Q.  That says, "Doesn't want to pursue anything.  Afraid of

10  retal, embarrassment," correct?

11  A.  Yes, that's correct.

12  Q.  And when you write "retal," you mean retaliation?

13  A.  Yes.

14  Q.  Let's turn to the first page of your notes.

15       Towards the middle of that page, you write, "In his

16  last email, it sounded threatening."  Did you write those

17  words?

18  A.  I did write those words.

19  Q.  Let's turn back to Exhibit 31, the last email that

20  Professor Bekaert wrote to the student.

21       Do you see that email from Professor Bekaert dated

22  January 31, 2014?

23  A.  Yes, I do.

24  Q.  Professor Bekaert wrote to the student, "Am I harassing

25  you?  I am keeping this email in a safe place and you can just

I7g1rav2                          Dunn - Direct

1    hope --"

2              MR. HERNSTADT:  Objection.  That misreads the email.

3              MS. HARWIN:  Let me restate that.

4              THE COURT:  Okay.

5    Q.  The student wrote, "I am harassing you?  I am keeping this

6    email in a safe place and you can just hope I am too busy to

7    take this further."

8              MR. HERNSTADT:  Your Honor, misreading the email.  The

9    student's not writing that.

10             MS. HARWIN:  I apologize.  Let me restate it.

11   Q.  In this email from January 31, 2014, Professor Bekaert

12   wrote to the student, correct?

13   A.  Correct.

14   Q.  And in that email, Professor Bekaert wrote to the student

15   and said, "I am harassing you?  I am keeping this email in a

16   safe place, and you can just hope I am too busy to take this

17   further."

18             Did I read that correctly?

19   A.  Yes, you did.

20   Q.  Did there come a time when you ended your investigation

21   into the female student's complaint into Professor Bekaert?

22   A.  Yes.

23   Q.  You issued an outcome letter on May 15, 2014, correct?

24   A.  Yes, I believe that's correct.

25   Q.  That was over three months after you began your

I7g1rav2                          Dunn - Direct

1   investigation, correct?

2   A.  Yes.

3           MS. HARWIN:  Let's bring up Plaintiff's Exhibit 37,

4   which I believe is already in evidence.

5   Q.  Mr. Dunn, do you recognize this letter as the outcome

6   letter you issued at the end of your investigation?

7   A.  Yes, I do.

8   Q.  You addressed this letter to Professor Bekaert?

9   A.  Yes, I did.

10  Q.  Your letter only discusses the student's allegation that in

11  the classroom Professor Bekaert rubbed his hands together and

12  said, "Hong Kong, where the ladies are nice."  Is that correct?

13  A.  Yes, that's correct.

14  Q.  Your letter does not mention anywhere that the female

15  student reported that Professor Bekaert was harassing her

16  repeatedly and using threats that were intended to make her

17  feel unsafe, correct?

18  A.  Yes, that's correct.

19  Q.  The student's allegation about Professor Bekaert's comment

20  about women in Hong Kong was a concerning allegation to you,

21  correct?

22  A.  Yes, it was.

23  Q.  You had a professor and a roomful of students, and there's

24  certainly a power imbalance in that context, correct?

25  A.  Between the professor and students, yes.

I7g1rav2                          Dunn - Direct

```
 1   Q.  But the only student you spoke to about Professor Bekaert's
 2   classroom conduct was the one student who lodged the complaint,
 3   correct?
 4   A.  That is correct.
 5   Q.  You didn't reach out to speak to any other students
 6   regarding Professor Bekaert's classroom conduct, correct?
 7   A.  Yes, that's correct.
 8   Q.  Let me turn your attention back to this exhibit,
 9   Plaintiff's Exhibit 37, to the second page, the first full
10   paragraph.
11           You spoke to Professor Bekaert about this complaint
12   against him?
13   A.  Yes, I did.
14   Q.  And in this outcome letter you wrote, "When I asked if you
15   made the alleged statement concerning women in Hong Kong, you
16   did not state whether or not you did so."  Is that correct?
17   A.  Yes, that's correct.
18   Q.  So Professor Bekaert would not state whether or not he made
19   the comment about women in Hong Kong?
20   A.  Yes, that's correct.
21   Q.  And you believed that it was certainly possible that
22   Professor Bekaert did make the comment about women in Hong
23   Kong, correct?
24           MR. HERNSTADT:  Objection, your Honor.
25           THE COURT:  Sustained.
```

I7g1rav2                          Dunn - Direct

1   Q.  When you issued this outcome letter, you did not rule out

2   the possibility that Professor Bekaert made the comment about

3   women in Hong Kong, correct?

4   A.  Yes, that's correct.

5   Q.  Let's stay on this exhibit, on the last page.

6           In the second to last paragraph, you write, "Although

7   I was unable to substantiate the allegations."  Did I read that

8   correctly?

9   A.  Yes, you did.

10  Q.  So your letter stated that you were unable to substantiate

11  the allegations against Professor Bekaert?

12  A.  Yes.

13  Q.  In your outcome letter you told Professor Bekaert that you

14  had not found a violation of Columbia University's policies and

15  procedures on discrimination and harassment, correct?

16  A.  Yes, that's correct.

17  Q.  Your investigation into the student complaint against

18  Professor Bekaert ended on May 15, 2014?

19  A.  Yes, that's correct.

20  Q.  You were contacted about Professor Ravina's complaint

21  against Professor Bekaert by the Columbia Business School's

22  dean's chief of staff on July 18, 2014, correct?

23  A.  Yes.

24  Q.  So this was approximately two months after you closed your

25  last sexual harassment investigation into Professor Bekaert?

I7g1rav2                          Dunn - Direct

1   A.  Yes.

2              MS. HARWIN:  I move to admit Plaintiff's Exhibit 50.

3              MS. FISCHER:  No objection.

4              THE COURT:  All right.  It will be admitted.

5              (Plaintiff's Exhibit 50 received in evidence)

6   Q.  Do you recognize this document in evidence as Plaintiff's

7   Exhibit 50 as an EOAA complaint form you submitted about

8   Professor Ravina's concerns about Professor Bekaert?

9   A.  Yes, I do.

10  Q.  And turning to the top, you submitted that complaint form

11  on July 21, 2014?

12  A.  Yes, I did.

13  Q.  But you didn't contact Professor Ravina about her complaint

14  until August 6, 2014, correct?

15  A.  Yes, that's correct.

16  Q.  You interviewed Professor Ravina for the first time on

17  August 12, 2014?

18  A.  Yes, that's correct.

19  Q.  So your first interview with Professor Ravina was nearly

20  four weeks after the dean's chief of staff contacted you about

21  Professor Ravina's complaints, correct?

22  A.  Yes.

23             MS. HARWIN:  I move to admit Defendant's Exhibit FG.

24             THE COURT:  Any objection?

25             MS. FISCHER:  No objection.

I7g1rav2                        Dunn - Direct

1              THE COURT:  All right.  FG will be admitted.

2              (Defendant's Exhibit FG received in evidence)

3    Q.  Showing you Defendant's Exhibit FG.

4              Do you recognize this email as one that you sent to

5    your boss, Melissa Rooker, on July 25, 2014?

6    A.  Yes.

7    Q.  And this was before you had any contact whatsoever with

8    Professor Ravina, correct?

9    A.  Yes.

10   Q.  In this email on July 25, 2014, you wrote, "The sexual

11   harassment concern seems fairly contained, that he insisted a

12   junior female colleague go out to dinner with him and that the

13   woman felt there was more to his invitation."

14             Did I read that correctly?

15   A.  Yes.

16   Q.  As of July 25, 2014, it was your perception that the sexual

17   harassment concern was fairly contained, correct?

18   A.  Yes.

19   Q.  You interviewed Professor Bekaert for the first time about

20   Professor Ravina's complaints on September 19, 2014, correct?

21   A.  Yes.

22   Q.  So the first time you interviewed defendant Bekaert about

23   Professor Ravina's complaints was over two months after the

24   dean's chief of staff contacted you about Professor Ravina's

25   complaint, correct?

1   A.  Yes.

2   Q.  Before we get off this email, I want to return to it for

3   just a moment.

4           At the end of the portion where you're talking about

5   Professor Bekaert, you write, "As you may recall, we had a case

6   with this respondent in the spring, so it may require a

7   heightened response."  Is that what you wrote?

8   A.  Yes.

9   Q.  When you used the term "respondent," you were referring to

10  Professor Bekaert, correct?

11  A.  Yes, that's correct.

12  Q.  So what you meant there was, "As you may recall, we had a

13  case with Professor Bekaert in the spring, so it may require a

14  heightened response," correct?

15  A.  Yes.

16          MS. HARWIN:  I move to admit Plaintiff's Exhibit 65.

17          THE COURT:  Any objection to 65?

18          MS. FISCHER:  No objection.

19          THE COURT:  All right.  It will be admitted.

20          (Plaintiff's Exhibit 65 received in evidence)

21  Q.  Turning to this email, it's dated August 26, 2014, correct?

22  A.  Yes, that's correct.

23  Q.  And you sent this email to Janet Horan, who was the vice

24  dean at Columbia Business School?

25  A.  Yes.

I7g1rav2                          Dunn - Direct

1   Q.  And you sent this email before you interviewed Professor

2   Bekaert, correct?

3   A.  Yes.

4   Q.  And at this time when you sent this email on August 26,

5   2014, you advised Vice Dean Horan that you didn't see a strong

6   case for an allegation of sexual harassment in violation of

7   university policies, correct?

8   A.  Yes, that's correct.

9            MS. HARWIN:  Let's turn to Plaintiff's Exhibit 75.

10           I move to admit it.

11           MS. FISCHER:  No objection.

12           THE COURT:  All right.  75 will be admitted.

13           (Plaintiff's Exhibit 75 received in evidence)

14   Q.  Mr. Dunn, do you recognize this as an email that you sent

15   to Vice Dean Janet Horan on September 15, 2014?

16   A.  Yes.

17   Q.  And this was still before you had interviewed Professor

18   Bekaert, correct?

19   A.  Yes.

20   Q.  And you sent this email to Vice Dean Horan on September 15,

21   2014, saying, "I'm not sure I see a violation of EOAA

22   policies," correct?

23   A.  Yes, that's correct.

24   Q.  You met with Professor Ravina on August 12, 2014 and

25   November 12, 2014, correct?

I7g1rav2                        Dunn - Direct

1   A.  Yes, that's correct.

2              MS. HARWIN:  Move to admit Plaintiff's Exhibit 63.

3              MS. FISCHER:  No objection.

4              THE COURT:  All right.  63 will be admitted.

5              (Plaintiff's Exhibit 63 received in evidence)

6   Q.  Mr. Dunn, are these the notes that you took of your

7   August 12, 2014 interview with Professor Ravina?

8   A.  Yes, they are.

9   Q.  We can't go through everything that Professor Ravina

10  reported in detail, but I'm going to ask you some questions

11  about these notes.

12             Turning to Exhibit 63 at the top, it says, "GB, her

13  senior professor."  Did I read that correctly?

14  A.  You know, that might be "he's senior professor."  I'm not

15  sure if that's "her" or "he's."  And at this late date I can't

16  recall what I wrote.

17  Q.  GB refers to Professor Geert Bekaert?

18  A.  Yes.

19  Q.  Your notes say "he's senior professor" or "her senior

20  professor," correct?

21  A.  Yes.  When I look at the "r" in the word "professor" and

22  the "r" in the word "together," they vary, so I'm just not

23  sure.  I'm sorry.

24  Q.  Let's turn to page 4 of those notes.

25             Turning to the paragraph that begins GB, "GB told her

I7g1rav2                          Dunn - Direct

1    that he was her mentor."  Is that correct?  Did I read that

2    accurately?

3    A.  Yes, that's correct.

4    Q.  When you wrote, "GB told her that he was her mentor," you

5    were again referring to Professor Geert Bekaert?

6    A.  Yes, I was.

7    Q.  Okay.  And whenever you wrote GB in your notes concerning

8    this case, you were referring to Professor Bekaert?

9    A.  Yes, I believe so.

10   Q.  In connection with your investigation in this case, you

11   reviewed email correspondence in which Professor Bekaert

12   referred to himself as Professor Ravina's mentor, correct?

13   A.  Yes, that's correct.

14   Q.  Professor Ravina reported to you that Professor Bekaert had

15   invited her to dinner with romantic intentions, correct?

16   A.  She did definitely report that he invited her to dinner.  I

17   don't recall if she mentioned specific romantic intentions.

18   Q.  Let's turn to the first page of your notes.

19            Turning to the large paragraph in the middle, after

20   that paragraph marker, it says, "He would invite her to dinner

21   occasionally.  He seemed to take it like romantic, not just

22   colleague."  Did I read that correctly?

23   A.  Yes, you did.

24   Q.  Turning your attention to the fourth page of your notes.

25   I'm sorry.  The third page of your notes.

I7g1rav2                          Dunn - Direct

1            It says, "Dinner, he'd offer."  Correct?

2    A.  Yes, that's correct.

3    Q.  Next it says, "First x."  Does that mean first time?

4    A.  I believe so, yes.

5    Q.  Professor Ravina told you that at the dinner Professor

6    Bekaert asked if she was living with a boyfriend, correct?

7    A.  Yes, that's correct.

8    Q.  Professor Ravina reported to you that Professor Bekaert had

9    said, "I would feel bad doing this," correct?

10   A.  That's correct.

11   Q.  Your notes indicate that Professor Ravina responded, "We're

12   co-authors."  Correct?

13   A.  Correct.

14   Q.  Turning to page 2 of your notes.  Do you see the arrow with

15   the letters GB above it?

16   A.  Yes, I do.

17   Q.  Your notes indicate that GB asked for dating advice,

18   correct?

19   A.  Yes.

20   Q.  On to the next page.  You wrote, "He kept stalling her

21   papers to see if she would date him.  Her impression."

22           It continues, "Each week he'll want to go to coffee,

23   not do work."

24           Did I read that correctly?

25   A.  Yes, you did.

I7g1rav2                        Dunn - Direct

```
1   Q.  Turning to the bottom of that page, you wrote,

2   "Uncomfortable," which I believe you abbreviated "uncomf."  Is

3   that correct?

4   A.  That is correct.

5   Q.  "Uncomfortable when he does no work, just goes for coffee,"

6   correct?

7   A.  Yes, that is correct.  I apologize for my handwriting.

8   Q.  Let's turn back to the first page of that exhibit.

9           At the bottom of the large paragraph in the middle of

10  that first page, you write, "E stopped coffee/dinner with him.

11  He became abusive, harassing, etc."  Did I read that correctly?

12  A.  Yes, you did.

13  Q.  E refers to Professor Enrichetta Ravina?

14  A.  Yes.

15  Q.  Let's turn to page 4.

16          In the middle of that, in the middle of that page, you

17  wrote, "Nothing major, but when you look at all this

18  together...  She can't avoid him fully.  If I upset him, he

19  won't work."

20          Did I read that correctly?

21  A.  Yes, you did.

22          MS. HARWIN:  Let's turn to Exhibit 87.

23          I move to admit Plaintiff's Exhibit 87.

24          MS. FISCHER:  No objection.

25          THE COURT:  All right.  It will be admitted.
```

 1              (Plaintiff's Exhibit 87 received in evidence)

 2   Q.   Director Dunn, do you recognize these as notes from your

 3   interview with Professor Ravina on November 12, 2014?

 4   A.   Yes, I do.

 5   Q.   Towards the top of page 1, you wrote, "The power.  He's

 6   senior, been stalling papers six to seven months, one year

 7   before that."

 8              Did I read that accurately?

 9   A.   Yes.

10   Q.   Continuing on that page below, you wrote, "Mentor.  He told

11   her he was mentor."

12              Did I read that correctly?

13   A.   Yes.

14   Q.   Turning lower down on that page to the very bottom of it,

15   you wrote, "If he didn't want to exercise power, why call him a

16   mentor?"

17              Did I read that accurately?

18   A.   Yes, you did.

19   Q.   Turning to the top of page 2, Professor Ravina reported to

20   you that Professor Bekaert asked her for compliments?

21   A.   Yes.

22   Q.   That he begged for them?

23   A.   Yes, that's what she said.

24   Q.   Professor Ravina reported that she had to tell Professor

25   Bekaert he looked good, correct?

I7g1rav2                         Dunn - Direct

1   A.  Yes, that's correct.

2   Q.  Also on page 2 of your notes Professor Ravina reported to

3   you an incident where Professor Bekaert had told her to look at

4   a mug with a message about being horny.  Correct?

5   A.  Yes, that's correct.

6   Q.  Turning to page 3 of your notes, towards the middle of the

7   page, it says, "As time passes, comments get more explicit."

8   Did I read that accurately?

9   A.  I believe so.

10  Q.  Turning to page 4 in your notes, you wrote, "ER not in

11  position to say no, deny request.  He's senior colleague,

12  co-author, mentor."

13          Did I read that correctly?

14  A.  Yes, you did.

15  Q.  It continues right after, "ER thought, why do I have to

16  answer this question instead of working?"  Correct?

17  A.  Yes, that's correct.

18          MS. HARWIN:  I move to admit Plaintiff's Exhibit 55.

19          MS. FISCHER:  No objection.

20          THE COURT:  55 will be admitted.  Thanks.

21          (Plaintiff's Exhibit 55 received in evidence)

22  Q.  Before you spoke to Professor Ravina for the first time,

23  you spoke to Vice Dean Janet Horan about her concerns, correct?

24  A.  Yes, that's correct.

25  Q.  And this document reflects your notes from your July 25,

I7g1rav2                          Dunn - Direct

1   2014 conversation with Janet Horan?

2   A.  Yes, it does.

3   Q.  In your notes from speaking to Janet Horan, you wrote, "JH

4   reminded of power imbalance."

5           Did I read that correctly?

6   A.  Yes, you did.

7   Q.  JH refers to Vice Dean Janet Horan?

8   A.  Yes.

9           MS. HARWIN:  I move to admit Plaintiff's Exhibit 76.

10          THE COURT:  Any objection?

11          MS. FISCHER:  No objection.

12          THE COURT:  76 will be admitted.

13          (Plaintiff's Exhibit 76 received in evidence)

14  Q.  You spoke to Vice Dean Janet Horan again about Professor

15  Ravina's complaints about Professor Bekaert on September 16,

16  2014, is that correct?

17  A.  Yes, it is.

18  Q.  And this was after your initial conversation with Professor

19  Ravina, correct?

20  A.  Yes, that's correct.

21  Q.  Towards the bottom of those notes, in your notes from your

22  conversation with Vice Dean Horan, you wrote, "What to do?

23  Still a senior tenured faculty member."

24          Did I read that correctly?

25  A.  Yes, you did.

I7g1rav2                          Dunn - Direct

1   Q.  Continuing on in your notes with Vice Dean Horan, your

2   notes from this conversation also state, "The fact that he

3   inserted himself in position of authority, with someone

4   struggling to get tenure, then getting in their way."

5           Did I read that correctly?

6   A.  Yes.

7   Q.  Professor Ravina reported to you that the emails from

8   Professor Bekaert got worse, correct?

9   A.  I don't recall that.

10  Q.  Let's turn to Exhibit 87 again, on the fifth page of that

11  document.

12          You wrote in your notes, "When emails were getting

13  worse, ER got therapist."

14          Did I read that correctly?

15  A.  Yes.

16  Q.  Professor Ravina provided you with examples of email

17  communications with Professor Bekaert, correct?

18  A.  Yes, that's correct.

19  Q.  Professor Ravina provided you with an email where Professor

20  Bekaert talked about bringing a whip to their next meeting?

21  A.  Yes, I believe she did.

22  Q.  Professor Ravina provided you with an email where Professor

23  Bekaert threatened to take drastic action, correct?

24  A.  Yes.  There was an email in which the term "drastic action"

25  was used.

I7g1rav2                              Dunn - Direct

1    Q.  When you met with Professor Ravina, you felt that Professor

2    Ravina was honestly expressing her opinions and beliefs about

3    what was going on in the situation with Professor Bekaert,

4    correct?

5    A.  Yes, that's correct.

6    Q.  You found that Professor Ravina was deeply affected and

7    troubled by what she perceived had happened and what she had

8    experienced, correct?

9    A.  Yes, that's correct.

10   Q.  You also met with Professor Bekaert about Professor

11   Ravina's complaint, correct?

12   A.  Yes, that's correct.

13            MS. HARWIN:  Move to admit Plaintiff's Exhibit 77.

14            MR. HERNSTADT:  No objection.

15            MS. FISCHER:  No objection.

16            THE COURT:  It will be admitted.  Thanks.

17            (Plaintiff's Exhibit 77 received in evidence)

18   Q.  Director Dunn, these are your notes from your conversation

19   with Professor Bekaert on September 19, 2014?

20   A.  Yes, they are.

21   Q.  Turning to the second page of your notes, Professor Bekaert

22   told you that he had personal conversations with Professor

23   Ravina?

24   A.  Can you point me to where you're looking?

25   Q.  Towards the middle of the page, it says, "Professional

I7g1rav2                          Dunn - Direct

1    conversation, personal as well."  Correct?

2    A.  That's correct.

3    Q.  When asked whether he had physical contact with Professor

4    Ravina, Professor Bekaert did not say a definitive no to you,

5    correct?

6    A.  Again, is there an area in the notes where you're looking?

7    That would be helpful.

8    Q.  That's a general question for you.

9    A.  Could you repeat the question.

10   Q.  Sure.  When asked whether he had physical contact with

11   Professor Ravina, Professor Bekaert did not say a definitive

12   no, correct?

13   A.  I believe that's correct, yes.

14   Q.  Professor Bekaert told you it was possible that he asked

15   Professor Ravina for dating advice, correct?

16   A.  I believe that's correct, but it would be great to confirm

17   in the notes, if possible.

18   Q.  I can just refresh your recollection with Plaintiff's

19   Exhibit 90.

20        So the question is, again:  Professor Bekaert told you

21   it was possible that he asked Professor Ravina for dating

22   advice, correct?

23   A.  Yes, that's correct.

24   Q.  And in fact, you confirmed that Professor Bekaert did ask

25   Professor Ravina for dating advice, correct?

I7g1rav2                    Dunn - Direct

1   A.  Yes, that's correct.

2   Q.  You also confirmed with Professor Bekaert that he keeps a

3   mug in his office that contains a message about being horny,

4   correct?

5   A.  Yes, that's correct.

6   Q.  Professor Bekaert claimed to you that he could not recall

7   having a conversation with Professor Ravina about the horny mug

8   in his office, correct?

9   A.  I believe that's correct, yes.

10  Q.  Professor Bekaert told you he was not sure whether he had

11  commented to Professor Ravina about the attractiveness of his

12  research assistants, correct?

13  A.  I believe that's correct, but again, it would be helpful to

14  confirm in the materials.

15  Q.  Could we go back to Plaintiff's Exhibit 90, at page 5.

16          You wrote, "When asked whether he commented on the

17  attractiveness of the RAs," research assistants, "Professor

18  Bekaert did not think he had made these kinds of remarks but

19  was not sure."  Is that right?

20  A.  Yes, that is right.

21  Q.  So Professor Bekaert told you he was not sure whether he

22  had commented to Professor Ravina about the attractiveness of

23  his research assistants, correct?

24  A.  Yes, that is correct.

25  Q.  You didn't receive any information or evidence that

1   contradicted her report that Professor Bekaert commented on the

2   attractiveness of research assistants, correct?

3   A.  Yes, that's correct.

4   Q.  Let's return to Exhibit 77, your notes from your first

5   meeting with Professor Bekaert.

6            Turning to page 4, towards the bottom, you wrote, "GB

7   agreed to help salvage her career.  She had two articles to

8   revise at top journals - single author.  That plus 3 GB

9   articles could have gotten tenure."

10           Did I read that correctly?

11  A.  I believe the second word in the first sentence is not

12  "agreed" but is "hoped" instead.  But otherwise, you did read

13  that correctly.

14  Q.  Okay.  Let me read it again one more time then.

15           You wrote in your notes from your meeting with

16  Professor Bekaert, "GB hoped to help salvage her career.  She

17  had two articles to revise at top journals - single author.

18  That plus 3 GB articles could have gotten tenure."

19           Is that correct?

20  A.  Yes, that is correct.

21  Q.  But Professor Bekaert told you that he had stopped working

22  for a few months on his project with Professor Ravina, correct?

23  A.  Is that indicated in the notes anywhere?

24  Q.  If we turn to page 2, towards the bottom, you wrote, "He

25  stopped working for a few months."  Correct?

I7g1rav2                          Dunn - Direct

1    A.  Yes, that is correct.

2    Q.  Professor Bekaert acknowledged to you that he sent an email

3    to Professor Ravina in which he threatened to take very drastic

4    action, correct?

5    A.  Yes, that's correct.

6    Q.  Professor Bekaert acknowledged that his email threatening

7    to take drastic action was a bad thing for a senior faculty

8    member like him to say to a junior untenured faculty member

9    like Professor Ravina, correct?

10   A.  Could I look at the notes to see where that is reflected?

11   Q.  Let's turn to page 7 of your notes here.

12           You wrote, "If you don't start making sense, I'm going

13   to take drastic action."

14           Towards the bottom of that paragraph, you write, "Bad

15   from senior faculty to junior untenured."

16           Correct?

17   A.  Yes, that is correct.

18   Q.  And it is Professor Bekaert who acknowledged it was bad

19   from a senior faculty member to a junior untenured faculty

20   member, correct?

21   A.  Yes, that's correct.

22   Q.  But you didn't make any judgment about whether it was a bad

23   thing for a senior faculty member to threaten to take drastic

24   action against a junior untenured faculty member, correct?

25   A.  Do you mean during the interview or in the outcome letter?

I7g1rav2                          Dunn - Direct

1   Q.  In the course of your investigation.

2   A.  I don't believe so, no.

3   Q.  Professor Bekaert acknowledged to you that he sent

4   Professor Ravina an email in which he discussed bringing a whip

5   to their next meeting?

6   A.  Yes, I believe he did.

7   Q.  You reviewed the email where Professor Bekaert told Ravina

8   that he would bring a whip to their next meeting, correct?

9   A.  Yes, I did.

10  Q.  You did not read Professor Bekaert's whip email as

11  demeaning towards Professor Ravina?

12  A.  I thought it was unprofessional and insulting.

13  Q.  Did you find the email in which Professor Bekaert said he

14  would bring a whip to a meeting to be demeaning towards

15  Professor Ravina?

16  A.  Yes.

17  Q.  Director Dunn, I'm going to ask to bring up your deposition

18  testimony.

19          Do you recall being deposed in this matter?

20  A.  Yes, I do.

21  Q.  Okay.  You came to my office, I asked you questions, you

22  answered those questions under oath?

23  A.  Yes, I did.

24  Q.  You swore to tell the truth while providing that testimony?

25  A.  Yes, I did.

I7g1rav2                          Dunn - Direct

1   Q.  Okay.  At your deposition, I asked you the question -- and

2   this is on page 108 --

3           THE COURT:  He said yes, so I'm not sure why you're

4   going through this.

5           MS. HARWIN:  Impeachment, your Honor.

6           THE COURT:  All right.  Go ahead.

7           Sorry.  Go ahead.

8   Q.  At your deposition I asked you the question, "Did you find

9   the email in which Professor Bekaert said he would bring a whip

10  to a meeting to be demeaning towards Ms. Ravina?"

11          Your answer was, "Based on the exchange, I did not

12  read it to be demeaning."

13          That was your sworn testimony, correct?

14  A.  Yes.

15  Q.  And at the time you didn't find Professor Bekaert's whip

16  email to be aggressive, correct?

17  A.  At the time of the investigation, of the deposition?  I'm

18  sorry.  I'm just unclear.

19  Q.  Prior to appearing here in court today, is it your

20  perception that Professor Bekaert's whip email was aggressive?

21  A.  I'm not sure.

22  Q.  I'm going to refer you again to your deposition testimony.

23          On page 109 of your deposition, I asked you, "Did you

24  find the email in which Professor Bekaert said he would bring a

25  whip to a meeting to be aggressive?"

I7g1rav2                         Dunn - Direct

1              You answered, "No, I did not find it to be

2       aggressive."

3              That was your sworn testimony, wasn't it?

4       A.  Yes, it was.

5       Q.  And you didn't find Professor Bekaert's whip email to be

6       hostile, correct?

7       A.  No, I did not.

8       Q.  When you investigated Professor Ravina's complaint against

9       Professor Bekaert, the only witness you interviewed, besides

10      Professor Ravina and Professor Bekaert, was a Columbia research

11      assistant named Nancy Xu, correct?

12      A.  Yes, that is correct.

13      Q.  Ms. Xu was the only person you considered necessary to

14      interview apart from Professor Ravina and Professor Bekaert,

15      correct?

16      A.  Yes, that's correct.

17      Q.  Ms. Xu stopped working on the research project with

18      Professor Ravina and Professor Bekaert around December 2012,

19      correct?

20      A.  Yes, I believe that's correct.

21      Q.  You interviewed Ms. Xu at the end of August 2014?

22      A.  Yes.

23      Q.  So at the time you interviewed Ms. Xu, she had not worked

24      for Professor Ravina and Professor Bekaert together for almost

25      two years, correct?

I7g1rav2                         Dunn - Direct

1   A.  Yes, that's correct.

2   Q.  But the harassment that Professor Ravina complained to you

3   about had continued past December 2012, correct?

4   A.  Yes, that's correct.

5   Q.  She alleged harassment in 2013, correct?

6   A.  Yes, that's correct.

7   Q.  She alleged harassment in 2014, correct?

8   A.  Yes, that's correct.

9   Q.  She alleged ongoing conduct at the time you met with her,

10  correct?

11  A.  Yes.

12          MS. HARWIN:  I'm going to move to admit Plaintiff's

13  Exhibit 66.

14          THE COURT:  Any objection?

15          MS. FISCHER:  No objection.

16          THE COURT:  It will be admitted.

17          (Plaintiff's Exhibit 66 received in evidence)

18  BY MS. HARWIN:

19  Q.  Mr. Dunn, I'm showing you Plaintiff's Exhibit 66 now in

20  evidence.  Are these notes from your interview with Nancy Xu?

21  A.  Yes, they are.

22  Q.  These are dated August 28, 2014, correct?

23  A.  Yes, that's correct.

24  Q.  Ms. Xu told you that her opinion was biased, correct?

25  A.  Can you point me to the notes.

I7g1rav2                          Dunn - Direct

1   Q.  Sitting here today, can you recall whether Ms. Xu told you

2   that her opinion was biased?

3   A.  I believe she did, yes.

4   Q.  Let's turn to page 2 of these notes.

5           Towards the top, in the first line indented, those

6   first three words, "N's opinion biased," do you see that?

7   A.  Yes.

8   Q.  Ms. Xu also told you that she was very loyal to Professor

9   Bekaert, correct?

10  A.  Yes, that's correct.

11  Q.  Turning towards the middle of that page, it says, "N v.

12  loyal," correct?

13  A.  Yes, that's correct.

14  Q.  That means "Nancy very loyal," correct?

15  A.  Yes, that's correct.

16  Q.  Ms. Xu told you that Professor Bekaert would be serving on

17  her dissertation committee?

18  A.  I don't recall that specific point.

19  Q.  Turning to the first page of these notes, the third line,

20  it says, "GB will be on her committee"?

21  A.  Yes.

22  Q.  You understood Ms. Xu to be telling you that Professor

23  Bekaert would be serving on her dissertation committee,

24  correct?

25  A.  Yes.

I7g1rav2                         Dunn - Direct

1    Q.  Ms. Xu told you that she wanted to be on Professor

2    Bekaert's team?

3    A.  I believe so.

4    Q.  Turning towards the fifth line in that page, it says,

5    "Wants to be on that team."  Correct?

6    A.  Yes, that's correct.

7    Q.  There's also a reference right below to what I believe is

8    Bob Hodrick, a professor at Columbia Business School?

9    A.  Yes, that's correct.

10   Q.  Ms. Xu told you that she saw Professor Bekaert as a father

11   figure, correct?

12   A.  Yes, that is correct.

13   Q.  And Ms. Xu told you that she worked with Professor Bekaert

14   and with Professor Hodrick, correct?

15   A.  Yes, she did.

16   Q.  You talked to Ms. Xu about whether she had witnessed,

17   experienced, or heard any sexually harassing behavior from

18   Professor Bekaert?

19   A.  Yes, I did.

20   Q.  And continuing on this exhibit, Exhibit 66, on the first

21   page, towards the second paragraph from the bottom, it says,

22   "Any SH re GB?  No."

23        Are those your notes regarding your question to Nancy

24   Xu about sexual harassment concerning Professor Bekaert?

25   A.  Yes, that's correct.

I7g1rav2                          Dunn - Direct

1    Q.  Okay.  So your notes regarding your question about sexual

2    harassment read, "Any sexual harassment re Geert Bekaert?  No."

3    Did I read that correctly?

4    A.  Yes, you did.

5    Q.  You perceived Ms. Xu's opinion to be biased on the question

6    of whether she had witnessed or seen sexual harassment from

7    Professor Bekaert to Professor Ravina, correct?

8    A.  Yes.

9    Q.  Let's turn to your outcome letter, which is Exhibit 90.

10            When you issued your outcome letter, you included

11   Ms. Xu's claim that she never witnessed, experienced, or heard

12   any sexually harassing behavior from Professor Bekaert,

13   correct?

14   A.  Yes, that's correct.

15   Q.  And your outcome letter did not disclose that Ms. Xu

16   admitted to you that her opinion was biased, correct?

17   A.  Correct.

18   Q.  Your outcome letter did not disclose that Ms. Xu admitted

19   to you that she was very loyal to Professor Bekaert, correct?

20   A.  Correct.

21   Q.  So the only witnesses that you interviewed in connection

22   with Professor Ravina's complaint were Professor Ravina,

23   Professor Bekaert, and this graduate student named Nancy Xu who

24   admitted that she was biased and very loyal, correct?

25   A.  Yes, that's correct.

I7g1rav2                           Dunn - Direct

1   Q.  Professor Ravina told you that a professor named Daniel

2   Wolfenzon had been appointed as a relationship manager for her

3   and Professor Bekaert, correct?

4   A.  Yes, I believe that's correct.

5   Q.  You never interviewed the relationship manager that

6   Columbia appointed to monitor communications between Professor

7   Bekaert and Professor Ravina, correct?

8   A.  Yes, that's correct.

9   Q.  You never interviewed Stephen Zeldes, the chair of

10  Professor Ravina's and Professor Bekaert's division at Columbia

11  Business School?

12  A.  Yes, that's correct.

13  Q.  You were also aware that Professor Ravina had met with

14  Suzanne Goldberg, a Columbia law school professor with

15  expertise on gender issues, correct?

16  A.  Yes, that's correct.

17  Q.  You never interviewed Professor Goldberg about Professor

18  Ravina's complaints, correct?

19  A.  Yes, that's correct.

20  Q.  You were aware that Professor Ravina had spoken to

21  colleagues at Columbia about her concerns about Professor

22  Bekaert, correct?

23  A.  I was never aware of any colleagues by name with whom

24  Professor Ravina spoke, to the best of my recollection.

25          (Continued on next page)

1  Q.  You never interviewed any faculty members at Columbia

2  Business School about Professor Bekaert's interactions with

3  Professor Ravina, correct?

4  A.  That is correct.

5  Q.  You never interviewed any professors at Columbia Business

6  School about whether Professor Bekaert's conduct was normal

7  behavior for a professor, correct?

8  A.  That is correct.

9  Q.  Before you concluded your investigation into Professor

10  Ravina's complaints, you never provided Professor Ravina with

11  any kind of written summary of what you understood her

12  complaints to be about, correct?

13  A.  That is correct.

14  Q.  In your final outcome letter, you examined whether

15  Columbia's policy against sexual harassment had been violated,

16  correct?

17  A.  That is correct.

18  Q.  You quote Columbia's sexual harassment policy in your

19  outcome letter?

20  A.  Yes.

21  Q.  Let's turn back to that outcome letter, which is Exhibit

22  90.  You write: "Under Columbia University's employment

23  policies and procedures on discrimination and harassment,

24  sexual harassment is defined as follows:

25          "Unwelcome sexual advances, requests for sexual favors

1    and other verbal, physical, or visual conduct or behavior of a

2    sexual nature constitute sexual harassment when:

3           "Submission to such conduct is made either explicitly

4    or implicitly a term or condition of an individual's

5    employment; or,

6           "Submission to or rejection of such conduct by an

7    individual is used as the basis for employment decisions

8    affecting that individual; or,

9           "Such conduct has the purpose or effect of

10   unreasonably interfering with an individual's work performance

11   or creating an intimidating, hostile, demeaning or offensive

12   working environment."

13          Did I read that correctly?

14   A.  Yes.

15   Q.  Columbia's sexual harassment policy goes on and says,

16   "Sexual harassment may include a range of subtle and

17   not-so-subtle behaviors, among them:  Sexual violence; sexual

18   jokes and innuendo; verbal abuse of a sexual nature; commentary

19   about an individual's body, sexual prowess or sexual

20   deficiencies; leering, catcalls, or touching; insulting or

21   obscene comments or gestures; and the display or circulation,

22   (including through e-mail) of sexually suggestive or explicit

23   objects or pictures in the learning, living or working

24   environment."

25          Did I read that correctly?

I7qnrav3                          Dunn - direct

1  A.  Yes, you did.

2  Q.  In your outcome letter you wrote:  "I did not find evidence

3  to support that Professor Bekaert's actions or communications

4  constituted sexual harassment in violation of university

5  policies."  Correct?

6  A.  Yes, that's correct.

7  Q.  Let's turn on the bottom of your outcome letter, towards

8  the bottom of page 6 and the top of page 7.

9           In your outcome letter you told Professor Ravina:  "I

10 found that you and Professor Bekaert engaged in a friendly

11 working relationship that soured when you did not communicate

12 effectively regarding your concerns about the status of your

13 projects.  I determined that your professional relationship

14 with Professor Bekaert was friendly and at times mutually

15 flirtatious."

16          Did I read that accurately?

17 A.  Yes.

18 Q.  You went on and wrote: "However, this relationship

19 eventually devolved into unprofessional and inappropriate

20 communication.  Professor Bekaert communicated in a more

21 egregious manner and addressed you in unnecessarily aggressive

22 tones that were ill suited for his position.  In sum, however,

23 I did not find evidence to support that Professor Bekaert's

24 actions or communications constituted sexual harassment in

25 violation of university policies."

I7qnrav3                         Dunn - direct

1          Is that correct?

2     A.   Yes, that is correct.

3     Q.   And you provided Professor Bekaert with a copy of this

4     letter, correct?

5     A.   Yes.

6     Q.   Professor Bekaert was provided with a copy of this letter

7     containing these conclusions, correct?

8     A.   Yes, that's correct.

9     Q.   At the time you investigated Professor Ravina's complaint

10    against Professor Bekaert, Columbia had policies that

11    prohibited other forms of gender-based misconduct besides what

12    Columbia's policy labeled sexual harassment, correct?

13    A.   Yes, that's correct.

14    Q.   In addition to its sexual harassment policy, Columbia also

15    had a policy that prohibits gender discrimination, correct?

16    A.   Yes, that's correct.

17    Q.   Let's turn back to Exhibit 17, Columbia's employment

18    policies on discrimination and harassment.

19          On page 3, it states, "Discrimination -- and this is

20    towards the top.

21          "Discrimination is defined as:

22          "Treating members of a protected class less favorably

23    because of their membership in that class; or,

24          "Having a policy or practice that has a

25    disproportionately adverse impact on protected class members."

I7qnrav3                          Dunn - direct

1           Did I read that correctly?

2    A.  Yes.

3    Q.  OK.  This means that at the time Columbia investigated

4    Professor Ravina's complaints, Columbia had a written policy

5    that prohibited treating a woman less favorably because she is

6    female, correct?

7    A.  Yes, that is correct.

8    Q.  You did not investigate whether Professor Bekaert violated

9    Columbia's policy against gender discrimination, correct?

10   A.  Correct.

11   Q.  You did not reach any conclusions as to whether Professor

12   Bekaert engaged in gender discrimination in violation of

13   Columbia's policy, correct?

14   A.  That's correct.

15   Q.  In addition to this policy against gender discrimination,

16   at the time you investigated Columbia also had a policy that

17   prohibits what it calls discriminatory harassment, correct?

18   A.  That is correct.

19   Q.  Columbia's policy in effect at the time said:

20   "Discriminatory harassment is defined as subjecting an

21   individual to humiliating, abusive, or threatening conduct that

22   creates an intimidating, hostile, or abusive work environment,

23   that alters the conditions of employment, or unreasonably

24   interferes with an individual's work performance on the basis

25   of the individual's membership in a protected class.

1   Discriminatory harassment includes but is not limited to:

2   Epithets or slurs; negative stereotyping; threatening,

3   intimidating or hostile acts; denigrating jokes; and display or

4   circulation in the working, learning and living environment

5   (including through e-mail) of written or graphic material."

6          Did I read that correctly?

7   A.  Yes, you did.

8   Q.  According to Columbia's policies, sexual harassment is one

9   form of discriminatory harassment, correct?

10  A.  That's correct.

11  Q.  But there are other forms of discriminatory harassment

12  beyond sexual harassment, correct?

13  A.  That is correct.

14  Q.  And under Columbia's policies there are other forms of

15  discriminatory harassment on the basis of gender other than

16  sexual harassment, correct?

17  A.  I believe so, but I want to review the policy language to

18  be sure.

19  Q.  At the time Columbia investigated Professor Ravina's

20  complaints, Columbia had a discriminatory harassment policy --

21          MS. HARWIN:  Let's keep that up, if we could.  I would

22  like to stay with this policy.

23  BY MS. HARWIN:

24  Q.  At the time Columbia investigated Professor Ravina's

25  complaints, Columbia had a discriminatory harassment policy

I7qnrav3                           Dunn - direct

1    that prohibited subjecting a woman to humiliating, abusive, or

2    threatening conduct that creates an intimidating, hostile, or

3    abusive work environment, correct?

4    A.  Yes, if it was on the basis of the woman's membership in a

5    protected class.

6             MS. FISCHER:  Objection.

7             THE COURT:  Was there an objection?

8             MS. FISCHER:  It misstates, but I think it's been

9    addressed.

10            THE COURT:  Overruled.

11   BY MS. HARWIN:

12   Q.  At the time Columbia investigated Professor Ravina's

13   complaints, Columbia had a discriminatory harassment policy

14   that prohibited subjecting a woman to humiliating, abusive, or

15   threatening conduct that creates an intimidating, hostile, or

16   abusive work environment based on her gender, correct?

17   A.  Yes, that's correct.

18   Q.  And at the time Columbia investigated Professor Ravina's

19   complaints, Columbia had a discriminatory harassment policy

20   that prohibited subjecting a woman to humiliating, abusive, or

21   threatening conduct that unreasonably interferes with her work

22   performance based on her gender, correct?

23   A.  Yes, that is correct.

24   Q.  At the time Columbia investigated Professor Ravina's

25   complaints, Columbia had a discriminatory harassment policy

I7qnrav3                          Dunn - direct

1    that prohibited epithets or slurs based on gender, correct?

2    A.  Yes, that's correct.

3    Q.  At the time Columbia investigated Professor Ravina's

4    complaints, Columbia had a discriminatory harassment policy

5    that prohibited threatening intimidating or hostile acts based

6    on gender, correct?

7    A.  Yes that's correct.

8    Q.  At the time Columbia investigated Professor Ravina's

9    complaints, Columbia had a discriminatory harassment policy

10   that prohibited denigrating jokes based on gender, correct?

11   A.  Yes.  That's correct.

12   Q.  But you did not investigate whether Professor Bekaert had

13   engaged in discriminatory harassment against Professor Ravina,

14   correct?

15   A.  Well, as the policy states, sexual harassment is a form of

16   discriminatory harassment so I would say we did investigate

17   that.

18   Q.  Director Dunn, you recall being deposed in this matter?

19   A.  Yes.

20   Q.  I am going to bring up your deposition testimony.

21        The question was asked at page 159:

22   "Q.  You did not reach any conclusion --

23        MS. FISCHER:  What line?

24        MS. HARWIN:  21.

25   "Q.  You did not reach any conclusion as to whether Professor

I7qnrav3                           Dunn - direct

1  Bekaert had engaged in discriminatory harassment, is that

2  correct?"

3         You answered:  "That was not an allegation that was

4  raised that we investigated, that is correct."

5         Was that your sworn testimony?

6  A.  Yes.

7  Q.  OK.  Director Dunn, I am going to ask the question again

8  then:  You did not investigate whether Professor Bekaert had

9  engaged in discriminatory harassment in violation of Columbia's

10 policy, correct?

11        MS. FISCHER:  Objection.

12        THE COURT:  Overruled.

13 A.  To the best of my recollection, at the time of the

14 deposition, I was not recalling the fact that sexual harassment

15 is a form of discriminatory harassment.  I answered the

16 question the best I could then.  As I look at the policy

17 language now, you know, I do feel that since discriminatory

18 harassment includes sexual harassment it wouldn't be honest for

19 me to say that we did not investigate that.

20 Q.  Director Dunn, you investigated sexual harassment?

21 A.  Yes, correct.

22 Q.  Sexual harassment is defined as one type of discriminatory

23 harassment, correct?

24 A.  Yes.

25 Q.  There are other types of discriminatory harassment,

I7qnrav3                         Dunn - direct

1  correct?

2  A.  Yes.

3  Q.  We have reviewed Columbia's policy concerning

4  discriminatory harassment, correct?

5  A.  Yes.

6  Q.  We have reviewed numerous aspects of Columbia's policy

7  against discriminatory harassment?

8  A.  Yes.

9  Q.  You did not investigate whether these aspects of Columbia's

10 policy against discriminatory harassment were violated,

11 correct?

12 A.  Yes.  I did not investigate all possible forms of

13 discriminatory harassment.

14 Q.  OK.  You did not conduct investigation into discriminatory

15 harassment in violation of Columbia's policies, correct?

16 A.  I feel like I've already answered this question.

17 Q.  You conducted an investigation into sexual harassment,

18 correct?

19 A.  Yes.

20 Q.  Columbia has a separate policy concerning discriminatory

21 harassment, correct?

22 A.  Yes.

23 Q.  You didn't investigate whether Professor Bekaert violated

24 this separate policy on discriminatory harassment, correct?

25 A.  Yes.

I7qnrav3                         Dunn - direct

1            MS. HARWIN:  Thank you.

2            I think we are at a good stopping point, your Honor.

3            THE COURT:  All right.  So why don't we take our

4    morning break.  Just remember don't yet discuss the case and

5    keep an open mind.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7qnrav3                    Dunn - direct

1              (Jury not present)

2              THE COURT:  How much longer do you have with this

3      witness?

4              MS. HARWIN:  I don't know if we'll go all the way to

5      lunch, but for some somewhere in between the end of this and

6      lunch.

7              THE COURT:  All right.  Thank you.

8              (Recess)

9              THE COURT:  Are we ready for the jury?

10             MS. HARWIN:  Yes, your Honor.

11             THE COURT:  All right.

12             (Continued on next page)

```
 1                  (Jury present)

 2                  THE COURT:  All right.  Everyone can be seated.

 3          Thank you.

 4          You may proceed.

 5                  MS. HARWIN:  Thank you, your Honor.

 6                  Mr. Dunn, let's turn back to your outcome letter,

 7  which is Exhibit 90.

 8                  When you issued your outcome letter on November 17,

 9  2014 at the end of your investigation into Professor Ravina's

10  complaint, you wrote at the top, "I've conducted a preliminary

11  fact-finding review of the allegations of sexual harassment."

12                  Is that correct?

13  A.  Yes.  That's correct.

14  Q.  And when you investigated Professor Ravina's complaint, you

15  conducted only a preliminary fact-finding review, correct?

16  A.  Yes, that's correct.

17  Q.  You did not conduct a formal investigation according to

18  Columbia's policies, correct?

19  A.  Yes, that's correct.

20  Q.  Turning to the bottom of your outcome letter, on the very

21  last page, your final recommendation set forth in that

22  paragraph, it says, "I recommend that Professor Bekaert receive

23  training on appropriate professional communications."

24                  Did I read that correctly?

25  A.  Yes, you did.
```

I7qnrav3                      Dunn - direct

1    Q.  OK.  So your final recommendation was that Professor

2    Bekaert receive a training on appropriate professional

3    communications?

4    A.  Yes.

5    Q.  At Columbia, training is something that you did all the

6    time, correct?

7    A.  Yes.

8    Q.  In your view, training was not punitive, correct?

9    A.  Yes, that's correct.

10   Q.  This training that you recommended was not a disciplinary

11   action, correct?

12   A.  Yes, that's correct.

13   Q.  Let's turn to Plaintiff's Exhibit 49.

14          THE COURT:  Any objection?

15          MS. FISCHER:  No objection.

16          THE COURT:  All right.  49 will be admitted.

17          (Plaintiff's Exhibit 49 received in evidence)

18   BY MS. HARWIN:

19   Q.  Let's turn to the last page of this exhibit.  This is an

20   e-mail from the dean's chief of staff Laura Lee to you dated

21   July 19, 2014, correct?

22   A.  Yes, that's correct.

23   Q.  This is the e-mail that triggered your investigation into

24   Professor Ravina's complaint, correct?

25   A.  Yes.  Following up on her phone call from the day before.

I7qnrav3                          Dunn - direct

1  Q.  Turning to the bottom of that e-mail, on July 19, 2014,

2  nearly four months before you completed the investigation, as

3  part of that initial e-mail communication the dean's chief of

4  staff wrote:  "Glenn would also like to set up one-on-one Title

5  IX training for Geert.  Please advise on how best to move

6  forward."

7          Did I read that correctly?

8  A.  Yes, you did.

9  Q.  You received that e-mail from the dean's chief of staff,

10  correct?

11  A.  Yes, I did.

12  Q.  You understood Glenn to refer to Dean Glenn Hubbard, the

13  dean of Columbia Business School?

14  A.  Yes, I did.

15  Q.  When he referred to one-on-one Title IX training for Geert,

16  you understood that to refer to training concerning the federal

17  law Title IX?

18  A.  Yes.

19  Q.  And we discussed before that's the federal law that

20  prohibits gender discrimination in higher educational

21  institutions that receive federal funding?

22  A.  Yes.

23  Q.  Columbia is one of these higher educational institutions

24  that receives federal funding, correct?

25  A.  Yes.

1    Q.  On July 23, 2014, you responded to Columbia Business School

2    administrators, correct?

3    A.  Yes, that's correct.

4    Q.  And as part of your e-mail response on July 23, 2014, still

5    nearly four months before you completed the investigation, you

6    told them, "We should discuss further the idea of title IX

7    training for Geert.  We may need to engage an outside trainer

8    here."

9            Did I read that correctly?

10   A.  Yes, you did.

11   Q.  These e-mails about Title IX training for Professor Bekaert

12   were exchanged before you interviewed Professor Ravina,

13   correct?

14   A.  Yes, that's correct.

15   Q.  And these e-mails about Title IX training for Professor

16   Bekaert were exchanged before you interviewed Professor

17   Bekaert, correct?

18   A.  Yes, that's correct.

19   Q.  These e-mails about Title IX training for Professor Bekaert

20   were exchanged before you interviewed anyone in this case,

21   correct?

22   A.  Yes, that's correct.

23   Q.  Let's turn to Plaintiff's Exhibit 65.  This is an e-mail

24   that you sent on August 26, 2014 to Vice Dean Janet Horan,

25   correct?

I7qnrav3                          Dunn - direct

1    A.  Yes, that's correct.

2    Q.  You sent this e-mail before you had interviewed Professor

3    Bekaert, correct?

4    A.  Yes, that's correct.

5    Q.  This was over two and a half months before you completed

6    your investigation?

7    A.  Yes.

8    Q.  In this e-mail, you told Vice Dean Horan, "I think the

9    original plan to get Professor Bekaert some training by an

10   outside professional would be sufficient here."

11            Did I read that correctly?

12   A.  Yes, you did.

13   Q.  On August 28, 2014, two days later, you had another e-mail

14   with Vice Dean Janet Horan, correct?

15   A.  I don't recall that, but it is very possible.

16            MS. HARWIN:  Let's bring up Plaintiff's Exhibit 64.

17            And I move to admit it.

18            MS. FISCHER:  No objection.

19            THE COURT:  All right.  64 will be admitted.

20            (Plaintiff's Exhibit 64 received in evidence)

21   BY MS. HARWIN:

22   Q.  Mr. Dunn, turning to the top e-mail, that is an e-mail that

23   you wrote to Vice Dean Janet Horan on August 28, 2014.

24   A.  Yes.

25   Q.  And this was an e-mail that you sent after meeting with

I7qnrav3                          Dunn - direct

1    Nancy Xu, correct?

2    A.  Yes, that's correct.

3    Q.  Nancy Xu was the witness who described herself as biased

4    and very loyal, correct?

5    A.  Yes, that's correct.

6    Q.  After that meeting you wrote, "I think the original plan of

7    additional Title IX training for Professor Bekaert would be

8    appropriate."

9         Did I read that correctly?

10   A.  Yes, you did.

11   Q.  Let's turn to Exhibit 75, which I believe is already in

12   evidence.  On September 15, 2014, two months before you

13   completed your investigation, you told Vice Dean Horan that,

14   "Whatever the outcome of this matter, sexual harassment

15   training would be appropriate."  Correct?

16   A.  Yes, that's correct.

17   Q.  You recommended that a lawyer named Mary Ellen Donnelly

18   provide the training, correct?

19   A.  Yes, that's correct.

20   Q.  Mary Ellen Donnelly is someone that Columbia worked with

21   frequently around these issues, correct?

22   A.  To the best of my knowledge, yes.

23   Q.  Mary Ellen Donnelly is a defense attorney who represents

24   management in employment discrimination cases, especially in

25   higher education, correct?

I7qnrav3                    Dunn - direct

1    A.  I don't have any basis to know that.

2    Q.  You recommended Mary Ellen Donnelly, correct?

3    A.  Yes, that's correct.

4    Q.  But it's your testimony that you didn't know that she was a

5    defense attorney who represents management in employment

6    discrimination matters, especially in higher education?

7    A.  Today, four years after the fact, I don't recall that

8    information.  I don't know if I knew it at the time.

9    Q.  Let's turn back to Plaintiff's Exhibit 90, your outcome

10   letter in Professor Ravina's complaint.  When you issued your

11   outcome letter, your final recommendation was that Professor

12   Bekaert receive a training on appropriate professional

13   communications, right?

14   A.  Right.

15   Q.  As part of your final outcome letter, you did not recommend

16   that Professor Bekaert engage in any training on gender

17   discrimination, correct?

18   A.  Correct.

19   Q.  As part of your final outcome letter, you did not recommend

20   that Professor Bekaert engage in any training on discriminatory

21   harassment, correct?

22   A.  Correct.

23   Q.  As part of your final outcome letter, you did not recommend

24   that Professor Bekaert engage in any training on sexual

25   harassment, correct?

I7qnrav3                          Dunn - direct

1   A.  Correct.

2   Q.  You did not have any antidiscrimination, antiharassment or

3   antiretaliation training in mind when you recommended that he

4   receive training on appropriate professional communications,

5   correct?

6   A.  Yes, that's correct.

7   Q.  I would like to turn to the topic of retaliation.

8           When Professor Ravina met with you, she expressed

9   concern about retaliation from Professor Bekaert, correct?

10  A.  Yes, I believe so.

11  Q.  Let's turn back to Exhibit 63.  On the third page you

12  wrote,  "Concerned re retal."

13          Did I read that correctly?

14  A.  Yes.

15  Q.  Continuing on from where you wrote, "Concerned re retal.,"

16  you wrote, "GB doesn't respect the rules.  Worried he'll spread

17  bad things to other colleagues."

18          Did I read that accurately?

19  A.  Yes, you did.

20  Q.  When you wrote, "GB doesn't respect the rules," you were

21  referring to professor Geert Bekaert, correct?

22  A.  Yes, that's correct.

23  Q.  When you wrote, "Worried he'll spread bad things to other

24  colleagues," it was Professor Ravina who was worried that

25  Professor Bekaert would spread bad things to other colleagues,

I7qnrav3                         Dunn - direct

1   correct?

2   A.  Yes, that's correct.

3   Q.  Professor Ravina expressed to you that she was fearful that

4   Professor Bekaert may poison other colleagues' impressions of

5   her, correct?

6   A.  I am not sure if she used the words "fearful" and "poison,"

7   but it has a similar meaning to what's reflected here.

8   Q.  In your outcome letter you wrote to Professor Ravina, "You

9   expressed concern about retaliation and fear that Professor

10  Bekaert may poison other colleagues' impressions of you."

11          Is that right?

12  A.  Yes, that's right.

13  Q.  Professor Ravina expressed concern to you that if she upset

14  Professor Bekaert he would not continue to work on the project,

15  correct?

16  A.  Yes, that's correct.

17  Q.  Turning back to Exhibit 63, on page 4, your interview notes

18  state, "She can't avoid him fully.  If I upset him, he won't

19  work."

20          Do you see that?

21  A.  Yes, I do.

22  Q.  During your interviews with Professor Bekaert, you

23  recognized that he was upset about Professor Ravina's complaint

24  against him, right?

25  A.  I believe so, yes.

I7qnrav3                          Dunn - direct

1   Q.  Professor Bekaert admitted to you that the joint research

2   between him and Professor Ravina was not at the top of his list

3   because he was upset with Professor Ravina, correct?

4   A.  I believe so, yes.

5   Q.  Professor Bekaert told you that he felt stabbed in the back

6   by Professor Ravina sharing her concerns with the dean's office

7   at Columbia Business School, correct?

8   A.  It would be helpful to see the notes to refresh my memory,

9   but I believe that sounds accurate.

10  Q.  In your outcome letter you wrote, "Professor Bekaert said

11  that he felt 'stabbed in the back' when he found out that you

12  forwarded to Dean Hubbard the e-mails you and Professor Bekaert

13  exchanged in spring 2014."   Correct?

14  A.  Yes, correct.

15  Q.  Professor Bekaert told you that Professor Ravina got under

16  her skin -- got under his skin, correct?

17  A.  Yes, that's correct.

18  Q.  Let me restate that question so it's clear.

19           Professor Bekaert told you that Professor Ravina got

20  under his skin, correct?

21  A.  Yes, that's correct.

22  Q.  Let's turn back to Exhibit 77.  At page 5 you say in your

23  notes:  "When ER's e-mails went to dean, GB felt stabbed in the

24  back.  She got under his skin with them.  Then she got stand

25  off."

1         Did I read that correctly?

2    A.  I think the last word might be "standoffish," but otherwise

3    it was correct.

4    Q.  Let me read that again, then.

5         You wrote:  "When ER's e-mails went to dean GB felt

6    stabbed in back.  She got under his skin with them.  Then she

7    got standoffish."

8         Correct?

9    A.  Yes, that's correct.

10   Q.  I'm going to show you Plaintiff's Exhibit 47, which is in

11   evidence already.

12        Do you recognize this document?

13   A.  Yes, I do.

14   Q.  This is an e-mail that Professor Ravina shared with you in

15   the course of your investigation?

16   A.  Yes, it is.

17   Q.  Professor Ravina also talked to you about this e-mail

18   during an interview, correct?

19   A.  I believe so, yes.

20   Q.  Turning back to exhibit -- actually before we go there, in

21   this e-mail Professor Bekaert wrote to Professor Ravina saying:

22   "The dean's office has told me not to talk to you, hence the

23   silence.  If you want to explain yourself, you can.  I'm here.

24   I'm intrigued to know who set you up to this."

25        Did I read that correctly?

I7qnrav3                          Dunn - direct

1   A.  Yes, you did.

2   Q.  Professor Ravina talked to you about this e-mail during

3   your interview, correct?

4   A.  I believe so, yes.

5   Q.  Turning back to Exhibit 63, on the second page.  There's a

6   discussion in the second to last paragraph of your notes.  Is

7   that a discussion of that e-mail?

8   A.  Yes, it is.

9   Q.  The notes read:  "In meantime, she runs into GB in a hall.

10  Then GB e-mails E without CC'ing Glenn.  Sorry for the silence.

11  They said I can't talk to you.  If you want, you can explain

12  yourself.  I'm in office.  Intrigued to know who put you up to

13  this."

14          Did I read your notes correctly?

15  A.  Yes, you did.

16  Q.  After the description of that e-mail in your notes, your

17  notes contain the word "intimidating."

18          Did I read that correctly?

19  A.  Yes, you did.

20  Q.  The next line says, "She e-mailed Glenn, etc.," correct?

21  A.  Yes, that's correct.

22  Q.  And Glenn refers to the dean of Columbia Business School,

23  Glenn Hubbard, correct?

24  A.  Yes, that's correct.

25  Q.  When you were investigating Professor Ravina's concerns,

I7qnrav3                           Dunn - direct

Columbia had a policy that prohibits retaliation, correct?

A.  Yes, that's correct.

Q.  Let's turn back to those policies.  Exhibit 17, on page 4.

"Columbia's employment policies and procedures on

discrimination and harassment, say the following with respect

to retaliation:

          "Retaliation occurs when an employer takes an adverse

action against an employee because she or he has engaged in a

protected activity, such as filing a complaint of

discrimination or harassment.  Retaliation may be found even

when the underlying charge does not constitute discrimination

or harassment in violation of university of policies, and all

persons who participate in a discrimination or harassment

proceeding, not only the complainant, are protected against

retaliation."

          Did I read that correctly?

A.  Yes, you did.

Q.  The policy continues:  "A retaliatory adverse action is an

action taken to deter a reasonable person from opposing a

discriminatory or harassing practice, and/or from participating

in a discrimination or harassment proceeding or more generally,

from pursuing his/her rights.  Examples of adverse actions

include termination, denial of promotion or demotion, and

unjustified negative evaluations or references."

          Did I read that correctly?

I7qnrav3                          Dunn - direct

1    A.  Yes, you did.

2    Q.  Under Columbia's policy, then, retaliatory adverse actions

3    include termination, correct?

4    A.  Yes.

5    Q.  Include denial of promotion or demotion, correct?

6    A.  Yes, that's correct.

7    Q.  And under Columbia's policies retaliatory adverse action

8    includes unjustified negative evaluations or references,

9    correct?

10   A.  Yes, that's correct.

11   Q.  When you worked at Columbia you investigated very few

12   retaliation complaints, correct?

13   A.  Yes, that's correct.

14   Q.  And you did not investigate whether Professor Bekaert

15   violated Columbia's policy against retaliation, correct?

16   A.  Yes, that's correct.

17   Q.  You never investigated whether Professor Bekaert disparaged

18   Professor Ravina to other colleagues, correct?

19   A.  Yes, that's correct.

20   Q.  You concluded that investigating whether Professor Bekaert

21   poisoned other than colleagues' impressions of Professor Ravina

22   would be going too broad in the scope of the investigative

23   process, correct?

24   A.  Yes, that's correct.

25   Q.  I would like to bring up Plaintiff's Exhibit 61.

1          This is an e-mail from Professor Bekaert dated August

2     6, 2014.

3          Were you aware that while your investigation into

4     Professor Ravina's complaint was pending Professor Bekaert sent

5     an e-mail from his Columbia e-mail address asking if he could

6     just strangle Professor Ravina and get it over with?

7     A.  The question is was I aware of this e-mail?

8     Q.  Were you aware of Professor Bekaert sending this e-mail

9     saying "can I just strangle her and get it over with"?

10              MS. FISCHER:  Objection.

11              THE COURT:  Has this been admitted?

12              MS. FISCHER:  I believe it has.

13         The witness -- you can't see the e-mail.  It is just

14    one section that they are showing him.  Can they show the

15    witness a copy.

16              THE COURT:  Sure.

17         Why don't you show the witness a copy.

18              MS. HARWIN:  Sure.

19              THE COURT:  Thanks.

20              THE WITNESS:  Thank you.

21              THE COURT:  Is this something you've ever seen before?

22              THE WITNESS:  No, it is not.

23    BY MS. HARWIN:

24    Q.  Director Dunn, in the course of your investigation, you did

25    not become aware that Professor Bekaert sent an e-mail from his

I7qnrav3                      Dunn - direct

```
 1   Columbia e-mail address asking if he could just strangle
 2   Professor Ravina and get it over with, correct?
 3              MS. FISCHER:  Objection.
 4              THE COURT:  Sustained.  I think he already said that
 5   he had never seen the e-mail.
 6   BY MS. HARWIN:
 7   Q.  Director Dunn, you had a close working relationship with
 8   Vice Dean Janet Horan and others at Columbia Business School,
 9   correct?
10   A.  Yes, that's correct.
11   Q.  At some point you told Vice Dean Horan that Professor
12   Ravina's case had been a real burden for her and her
13   colleagues?
14   A.  Yes, I believe I wrote -- actually can we look at the
15   e-mail that it's from?
16   Q.  If we turn to Plaintiff's Exhibit 75, on that first
17   paragraph -- I'm sorry, in the second paragraph the first
18   sentence says:  Thanks, Janet, and again, I'm sorry I haven't
19   been able to wrap this up more quickly.  I know it's been a
20   real burden for you and your colleagues."
21              Did I read that correctly?
22   A.  Yes, you did.
23   Q.  Professor Ravina expressed concern to you that Professor
24   Bekaert was stalling her research under the university's watch,
25   correct?
```

I7qnrav3                          Dunn - direct

1    A.  Yes, that's correct.

2              MS. HARWIN:  I move to admit Defendants' Exhibit IT.

3              THE COURT:  Any objection?

4              MS. FISCHER:  No objection.

5              THE COURT:  IT will be admitted.

6              (Defendant's Exhibit IT received in evidence)

7    BY MS. HARWIN:

8    Q.  Director Dunn, these are typed notes that you prepared from

9    your interview with Professor Ravina on November 12, 2014, is

10   that correct?

11   A.  Yes, that is correct.

12   Q.  You wrote in your notes from meeting with Professor Ravina,

13   "He's senior to her.  Been stalling her papers for 6-7 months

14   under the university's watch and for 1 year before that."

15             Did I read that correctly?

16   A.  Yes, you did.

17   Q.  Turning back to Exhibit 63, your notes from your first

18   meeting with Professor Ravina, on that last page you wrote,

19   "New relationship manager, Daniel W.  Glenn punted it to DW, to

20   EOAA.  Seems to think nothing will happen."

21             Did I read that accurately?

22   A.  Yes, you did.

23             THE COURT:  These are your notes of what Professor

24   Ravina was saying to you?

25             THE WITNESS:  Yes, that's correct.

I7qnrav3                          Dunn - direct

1    BY MS. HARWIN:

2    Q.  Professor Ravina reported to you that Dean Hubbard punted

3    it, correct?

4    A.  Yes, that's correct.

5    Q.  Professor Ravina reported to you that Dean Hubbard seemed

6    to think nothing would happen, correct?

7    A.  Based on my reading of these notes, my impression would be

8    that Professor Ravina seemed to think that nothing would

9    happen.

10   Q.  That's your interpretation today?

11   A.  Yes.

12   Q.  You didn't report Professor Ravina's comments about Dean

13   Hubbard in your outcome letter, correct?

14   A.  That's correct.

15   Q.  Professor Ravina also reported to you about a meeting she

16   had with Senior Vice Dean Phillips, correct?

17   A.  Yes, that's correct.

18   Q.  Turning to page 3 of these notes, the first paragraph, it

19   says, "KP "--

20           That's a reference to Kathy Phillips, the senior vice

21   dean?

22   A.  Yes.

23   Q.  "Katherine Phillips told Enrichetta, I want you to be happy

24   in life.  Enrichetta, I just want professional working

25   environment, not life advice."

I7qnrav3                         Dunn - direct

1                Did I read that correctly?

2    A.  Yes, that's correct.

3                MS. FISCHER:  Can we clarify whose notes -- whose

4    statements these are.

5                THE COURT:  Again, is this from what Professor Ravina

6    is saying to you?

7                THE WITNESS:  Yes.  This is what Professor Ravina told

8    me about this interaction with Kathy Phillips.

9    BY MS. HARWIN:

10   Q.  Professor Ravina reported to you this interaction with

11   Senior Vice Dean Phillips, correct?

12   A.  Yes.

13   Q.  But you didn't report Professor Ravina's comments about

14   Senior Vice Dean Phillips in your outcome letter, correct?

15   A.  Yes, that's correct.

16   Q.  In addition to investigating Professor Ravina's complaints,

17   from time to time you were asked to provide the dean's office

18   of Columbia Business School with guidance and additional

19   information about her case, correct?

20   A.  Yes, that's correct.

21   Q.  You provided the dean's office with advice on e-mails they

22   wanted to send to Professor Bekaert and Professor Ravina,

23   correct?

24   A.  Yes, that is correct.

25   Q.  You also provided the dean's office with advice on what

1    they should say to Professor Ravina in person, correct?

2    A.  Yes, that is correct.

3    Q.  Before Professor Ravina met with Dean Hubbard and Vice Dean

4    Horan on September 16, 2014, you provided Vice Dean Horan

5    bullet points for that meeting, correct?

6    A.  I believe so, but it would help to see the e-mail again.

7    Q.  Let's bring back up Exhibit 75.

8           Turning to the bottom e-mail there, you wrote,

9    "Following up on our conversation, here are some bullet points

10   in preparation for your meeting tomorrow."  Correct?

11   A.  Yes, that's correct.

12   Q.  You provided bullet points for their meeting, correct?

13   A.  Yes, that is correct.

14   Q.  OK.  And then, turning to a subsequent e-mail, in your

15   e-mail to Vice Dean Horan above, you told her that it would be

16   fine to talk to Professor Ravina about the "unprofessional tone

17   of the communications."

18          Is that correct?

19   A.  Yes, that's correct.

20   Q.  We talked about before that you interviewed just one

21   third-party witness besides Professor Ravina and Professor

22   Bekaert when you investigated Professor Ravina's complaint, but

23   you didn't complete your investigation into Professor Ravina's

24   complaint until November 17, 2014, correct?

25   A.  Yes, that is correct.

I7qnrav3                        Dunn - direct

1  Q.   This was about four months after you had been contacted by

2  the dean's chief of staff at Columbia Business School.

3  A.   Yes, that is correct.

4  Q.   Looking back, you wish that you had completed your

5  investigation into Professor Ravina's complaint more quickly,

6  correct?

7  A.   Yes, that's correct.

8  Q.   You believed that completing your investigation in a

9  shorter time frame would have made Professor Ravina's situation

10 better, correct?

11 A.   Yes, that's correct.

12 Q.   One of the reasons it took four months to complete your

13 investigation was the high caseload you had, correct?

14 A.   Yes, that's correct.

15 Q.   Columbia considered it prompt to complete an investigation

16 within 60 days, is that correct?

17 A.   Yes, that's correct.

18 Q.   But due to the volume of cases and the EOAA's limited

19 staffing, Columbia wasn't always able to complete

20 investigations in 60 days, correct?

21 A.   Yes, that's correct.

22 Q.   You didn't complete Professor Ravina's investigation in 60

23 days, correct?

24 A.   Yes, that's correct.

25 Q.   You didn't complete the student investigation's complaint

I7qnrav3                    Dunn - direct

1   into Professor Bekaert in 60 days, correct?

2   A.  Yes, that's correct.

3   Q.  You also investigated a complaint about a male professor at

4   Columbia Business School who had sexual relations with a female

5   student, correct?

6   A.  Yes, that is correct.

7   Q.  Columbia received a report about this male professor

8   through the university's compliance hotline, correct?

9   A.  Yes.  That is correct.

10          MS. HARWIN:  Move to admit Plaintiff's Exhibit 69.1.

11          THE COURT:  Any objection?

12          MS. FISCHER:  No objection.

13          THE COURT:  69.1 will be admitted.

14          (Plaintiff's Exhibit 69.1 received in evidence)

15  BY MS. HARWIN:

16  Q.  Do you recognize Exhibit 69.1 as the compliance hotline

17  report about this male professor?

18  A.  Yes, I do.

19  Q.  And this hotline report was dated August 25, 2014, correct?

20  A.  Yes, that is correct.

21  Q.  This was submitted at the time that Professor Ravina's

22  complaint was also pending, correct?

23  A.  Yes, that is correct.

24  Q.  Turning to page 1 of the report, at the bottom, where it

25  says, "Report Summary."

1           The report alleged that a professor at Columbia

2   Business School had sexual relations likely in his office with

3   a business school student.  Is that correct?

4   A.  Yes, that is correct.

5   Q.  Let's turn to the next page of the report.  On the bottom

6   paragraph the report said, "The fact that this event occurred

7   and has become so well known, yet no action taken on the part

8   of Columbia, both creates an uncomfortable work environment for

9   female students, professors, and administration at the school."

10          You received this report?

11  A.  Yes, I did.

12  Q.  And you conducted an investigation, correct?

13  A.  Yes, I did.

14  Q.  As part of your investigation you interviewed the male

15  professor who was the subject of the complaint, correct?

16  A.  Yes, I did.

17  Q.  This male professor acknowledged that he had engaged in a

18  romantic and sexual relationship with a female student,

19  correct?

20  A.  Yes, that's correct.

21  Q.  And the male professor told you that he could not recall

22  with certainty the accuracy of the allegation that he had

23  engaged in sexual relations in his office at Columbia Business

24  School, is that correct?

25  A.  Yes, that's correct.

1   Q.   So the male professor's report to you was that he could not

2   recall with certainty the accuracy of that allegation, correct?

3   A.   I'm sorry.  Of which allegation?

4   Q.   The allegation that he had engaged in sexual relations in

5   his office?

6   A.   Yes, that is correct.

7   Q.   Looking we are where in this hotline report, the allegation

8   states at the bottom, "The fact that this event occurred and

9   has become so well known, yet no action taken on the part of

10  Columbia, both creates an uncomfortable work environment for

11  female students, professors and administration at the school."

12       But the only female student you interviewed was the

13  one that this professor had sexual relations with, correct?

14  A.   Yes, that is correct.

15  Q.   You didn't interview any other female students about

16  whether this conduct had created an uncomfortable work

17  environment for them, correct?

18  A.   Yes, that's correct.

19  Q.   You didn't interview any female professors about whether

20  this conduct had created an uncomfortable work environment for

21  them, correct?

22  A.   Yes, that's correct.

23  Q.   The only professor you interviewed was a male professor who

24  claimed he had no knowledge of the allegations, correct?

25  A.   Yes, that's correct.

I7qnrav3                        Dunn - direct

1   Q.  You didn't interview any female administrators about

2   whether this conduct had created an uncomfortable work

3   environment for them, correct?

4   A.  Yes.  That is correct.

5   Q.  You found that the male professor's actions reflected poor

6   judgment and created a very difficult situation both

7   professionally and personally for the male professor and the

8   student, correct?

9   A.  Yes, that is correct.

10  Q.  But still you did not find that the male professor's

11  actions violated university policy, correct?

12  A.  Yes, that is correct.

13  Q.  You concluded in your letter --

14          MS. HARWIN:  And let's bring it up, Plaintiff's

15  Exhibit 69.2.  I move to admit, your Honor.

16          THE COURT:  Do you recall if this student was in that

17  professor's class or one of his classes?

18          THE WITNESS:  The student had been, but the

19  relationship began after the class had ended and after the

20  professor had submitted the grades, which is why it I didn't

21  violate any policy, because the professor had no academic

22  authority over the student.

23          THE COURT:  Thanks.

24          Any objection to 69.2?

25          MS. FISCHER:  No objection.

I7qnrav3                         Dunn - direct

1          THE COURT:  All right.  It will be admitted.

2          (Plaintiff's Exhibit 69.2 received in evidence)

3   BY MS. HARWIN:

4   Q.  You conclude on the second page of your letter, "At this

5   point" -- I apologize, the third page of your letter -- "I did

6   not find evidence to support that this relationship created a

7   hostile learning or working environment for the student," and

8   you continue -- let's go on to the paragraph right above.

9          It says, "At this point, I did not find evidence that

10  any other CBS faculty members, staff members or students

11  experienced a hostile environment because of this situation."

12         That's what you wrote?

13  A.  Yes, that's correct.

14  Q.  And that was your conclusion after you did not interview

15  any female professors, any female students, any female staff

16  other than the one student who had sexual relations with this

17  professor, correct?

18  A.  Yes, that's correct.

19  Q.  At the bottom of your letter you referred this matter to

20  CBS for appropriate action, correct?

21  A.  Yes, that's correct.

22  Q.  "CBS" means Columbia Business School?

23  A.  Yes, it does.

24  Q.  You did not recommend that this professor receive any

25  discipline, correct?

I7qnrav3                          Dunn - direct

1    A.  Correct.

2    Q.  And you did not complete this investigation within the

3    60-day time frame that Columbia considers a prompt

4    investigation, correct?

5    A.  That's correct.

6    Q.  You also investigated a complaint against another male

7    professor at Columbia Business School, correct?

8    A.  Yes, that's correct.

9    Q.  And that investigation also took place during the fall of

10   2014, correct?

11   A.  Yes, it did.

12          MS. HARWIN:  Move to admit Exhibit 69.3.

13          THE COURT:  Any objection?

14          You can just pass it up.  Thanks.

15          MS. FISCHER:  No objection.

16          THE COURT:  All right.  It will be admitted.  Thanks.

17          (Plaintiff's Exhibit 69.3 received in evidence)

18   BY MS. HARWIN:

19   Q.  Do you recognize this document as the EOAA complaint form

20   that you completed concerning the report against this other

21   male professor at Columbia Business School?

22   A.  Yes, I do.

23   Q.  The first page of the EOAA complaint report, under the

24   heading "Narrative Information" reads:  "I got a call from

25   Janet Horan at CBS about" -- and the name has been redacted --

I7qnrav3                        Dunn - direct

1    "an EMBA student said she had been in the professor's course

2    and that he was sexist, demeaning to women, and inappropriate.

3    The student referred Janet to the course evaluations, which

4    included these concerns."

5            Did I read that correctly?

6    A.  Yes, you did.

7    Q.  After being notified about this complaint, you did not

8    interview any students in this class besides the female student

9    who brought the complaint, correct?

10   A.  Yes, that's correct.

11   Q.  You reviewed some end-of-semester course evaluations for

12   the class?

13   A.  Yes, I did.

14            MS. HARWIN:  I move to admit Exhibit 69.5.

15            THE COURT:  Any objection?

16            MS. FISCHER:  No objection.

17            THE COURT:  All right.  69.5 will be admitted.

18            (Plaintiff's Exhibit 69.5 received in evidence)

19   BY MS. HARWIN:

20   Q.  Do you recognize Exhibit 69.5 as one of the course

21   evaluations that you reviewed for this male professor's class?

22   A.  Yes, I do.

23   Q.  Let's turn to the second page of the evaluation.

24            Under the heading, "Additional Comments About the

25   Instructor," it reads:  "There was a severe lack of

I7qnrav3                          Dunn – direct

1   psychological safety within this class due to the professor's

2   public shaming.  This shaming occurred on both in class based

3   on in-class comments, based on turned-in confidential and

4   nonconfidential written assignments, as well as professor

5   requested constructive criticism about the class."

6           It continues, and there's a typo: "I was offended that

7   Columbia would hire a professor with overt sexism instilled

8   into his subconscious which affects his underlying values that

9   seep into his alignment, allocation, and critique of

10  assignments.  This can be seen in his allocation of woman only

11  playing the role of woman and men only playing the role of men

12  in a role, until he runs of female in play scenarios.  Tendency

13  to pick apart and put down the strongest and most well-spoken

14  woman in the class.  Does not do the same with the all-male

15  groups."

16  Q.  Did I read that correctly?

17          THE COURT:  Just to be clear, does this have anything

18  to do with Professor Bekaert?

19          THE WITNESS:  Absolutely not.

20  BY MS. HARWIN:

21  Q.  This was another professor at Columbia Business School,

22  correct?

23  A.  Yes, that is a correct.

24  Q.  And this was an investigation?

25          MR. HERNSTADT:  Your Honor, could we get the same

1    clarification about the professor No. 1 that we talked about.

2             THE COURT:  I think I had asked that, but if not,

3    professor No. 1, the previous one, was also not about Professor

4    Bekaert, correct?

5             THE WITNESS:  That's correct.  It was not about

6    Professor Bekaert.

7             MS. HARWIN:  I am going to move into introduce

8    Plaintiff's Exhibit 69.6.

9             Move to admit, your Honor.

10            THE COURT:  Any objection?

11            MS. FISCHER:  No objection.

12            THE COURT:  All right.  It will be admitted.

13            (Plaintiff's Exhibit 69.6 received in evidence)

14   BY MS. HARWIN:

15   Q.  Showing you Exhibit 69.6, this is another of the course

16   evaluations you reviewed for this male professor's class,

17   correct?

18   A.  Yes, that's correct.

19   Q.  Turning to the second page, under Additional Comments About

20   the Instructor," the last line reads, "Most importantly, the

21   professor did not want to hear opposing views and would

22   verbally abuse and humiliate individuals based on personal,

23   ethnic reasons rather than the validity of the argument."

24            Did I read that correctly?

25   A.  Yes, you did.

1           MS. HARWIN:  I move to admit Plaintiff's Exhibit 69.7?

2           THE COURT:  First, let me just clarify again, does

3   this have do with Professor Bekaert?

4           THE WITNESS:  No.

5           THE COURT:  What are these forms?

6           Are these forms that every student fills out after

7   every course?

8           THE WITNESS:  Yes.

9           THE COURT:  OK.  All right.  And this is for what

10  year?  This was for the summer of 2014?

11          THE WITNESS:  Yes.

12          THE COURT:  OK.  All right.  You may proceed.

13          Is there any objection to 69.7?

14          MS. FISCHER:  We don't have it.

15          THE COURT:  Any objection?

16          MS. FISCHER:  No objection, but we would appreciate

17  the same clarification.

18          THE COURT:  OK.  So this will be admitted.

19          (Plaintiff's Exhibit 69.7 received in evidence)

20          THE COURT:  Again, if you can just at the start

21  clarify if this has anything to do with Professor Bekaert.

22          MS. HARWIN:  Your Honor, just to be clear, we have

23  redactions that identify in these the professor as professor 2,

24  and in the complaint we were talking about redactions referring

25  to professor 1.  So I think it is clear in the documents.

1            THE COURT:  So, putting aside Professor Bekaert, about

2       whom these are not, these do not relate to him, we are talking

3       about a professor 1 and a professor 2?

4            MS. HARWIN:  That's correct, your Honor.

5            THE COURT:  OK.

6       BY MS. HARWIN:

7       Q.  Director Dunn, turning to Exhibit 69.7, this is another

8       course evaluation that you read for this male professor's

9       class, professor 2, correct?

10      A.  Yes.

11      Q.  Turning to the second page, the first sentence, "Professor

12      2 was at best ineffective and at worst inappropriate."

13           Did I read that correctly?

14      A.  Yes, you did.

15      Q.  You issued an outcome letter at the end of your

16      investigation into this professor, professor 2?

17      A.  Yes, I did.

18           MS. HARWIN:  Move to admit Exhibit 69.4, the outcome

19      letter at the end of that investigation.

20           THE COURT:  Any objection?

21           MS. FISCHER:  No objection.

22           THE COURT:  All right.  It will be admitted.

23           (Plaintiff's Exhibit 69.4 received in evidence)

24      BY MS. HARWIN:

25      Q.  Mr. Dunn, you recognize this as the outcome letter that

1    concluded your investigation into professor 2, correct?

2    A.  Yes, I do.

3    Q.  You did not state in your outcome letter that a student

4    complained about the male professor's overt sexism, correct?

5    A.  I did not use those words "overt sexism" in the letter to

6    the best of my knowledge, but I did address --

7    Q.  Thank you.  You did not state in your outcome letter that a

8    student complained about a lack of psychological safety in the

9    male professor's classroom, correct?

10   A.  I believe that's correct, yes.

11   Q.  After interviewing no students in the class besides the one

12   who brought the initial complaint, you concluded that you had

13   not found evidence to support that it was more likely than not

14   that this male professor violated Columbia's employment

15   policies, correct?

16   A.  Yes, that is correct.

17   Q.  And nowhere in this outcome letter did you use the word

18   "sexism," correct?

19   A.  May I look at the next page of the document?  I don't

20   believe I used the word "sexism," no.

21   Q.  Turning to the last page, you referred this matter to

22   Columbia Business School for "appropriate follow-up", is that

23   correct?

24   A.  Yes, that is correct.

25   Q.  And you did not receive -- you did not make any

1    recommendation that this male professor receive any discipline,

2    correct?

3    A.  Yes.  That is correct.

4    Q.  Your only recommendation for follow-up was that professor

5    visit Columbia Business School's Institute for Teaching

6    Excellence to ensure that his pedagogical methods and goals are

7    aligned with the values and expectations of the CBS community.

8             Is that correct?

9    A.  I recommended that he continue to work at the Teaching

10   Excellence Institute since he had already been connected with

11   them.

12   Q.  Your recommendation was that he work with the Institute for

13   Teaching Excellence to "insure that your pedagogical methods

14   and goals are aligned with the values and expectation of the

15   CBS community," correct?

16   A.  My recommendation was that he continue --

17   Q.  Did I quote you accurately?

18   A.  I think it is an incomplete quote, but it is literally

19   accurate.

20   Q.  You recommended that he continue working with the Center

21   for Teaching Excellence, correct?

22   A.  Yes, that is correct.

23             MR. HERNSTADT:  Your Honor.

24             THE COURT:  Yes.

25             MR. HERNSTADT:  I just note that the transcript shows

I7qnrav3                        Dunn - direct

1    that she literally did not quote it accurately.  She left out

2    words.

3               THE COURT:  It is in front of the jurors in any event,

4    so I will leave it to them to read it.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. HARWIN:

2    Q.   Director Dunn, today we talked about four different

3    investigations that you did -- two investigations into

4    Professor Bekaert and two investigations into other male

5    professors at Columbia Business School, correct?

6    A.   Yes, that's correct.

7    Q.   All of these investigations were conducted in the year

8    2014, correct?

9    A.   Yes, that is correct.

10   Q.   None of these investigations were completed within 60 days,

11   correct?

12   A.   Yes, that is correct.

13   Q.   All of these investigations were against male professors at

14   Columbia Business School, correct?

15   A.   Yes, that is correct.

16   Q.   All of these investigations involved allegations of sexual

17   harassment, correct?

18   A.   Yes, that is correct.

19   Q.   And in none of these investigations did you conclude with a

20   finding that Columbia's policies had been violated, correct?

21   A.   Yes, that is correct.

22   Q.   And at the conclusion of all of these investigations, you

23   did not recommend any disciplinary action, correct?

24   A.   Yes, that is correct.

25   Q.   Director Dunn, when you worked as the Director of

1    Columbia -- I'm sorry.  Let me restate that.

2              Director Dunn, when you worked at Columbia as the

3    university's director of investigations and deputy Title IX

4    director, Columbia had over 40,000 students, faculty, and

5    staff, correct?

6    A.  Yes, I believe that's correct.

7    Q.  Was it over 45,000 students, staff, and faculty at Columbia

8    University at that time?

9    A.  I don't know.

10   Q.  I want to turn back to your investigation of Professor

11   Ravina's complaint.

12             Turning back to Exhibit 90, on the last page, at the

13   conclusion of your investigation, you wrote, "I refer this

14   matter to CBS for appropriate action and training."  Correct?

15   A.  Yes, that's correct.

16   Q.  CBS again referred to Columbia Business School, correct?

17   A.  Yes.

18   Q.  The reason you included that language was to make sure that

19   Columbia Business School had the flexibility to take steps

20   beyond simply training, correct?

21   A.  Yes.

22   Q.  You thought that your EOAA letter gave Columbia Business

23   School the flexibility to re-assign work projects, correct?

24   A.  Yes.

25   Q.  You're not aware of any Columbia policy that prohibited

I7g1rav4

1    Columbia administrators from taking action to address Professor

2    Ravina's complaint after you found no violation of Columbia's

3    sexual harassment policy, correct?

4    A.   There were a lot of negatives in that sentence.  Could you

5    just say that one more time, please.

6    Q.   You're not aware of any Columbia policies that prohibited

7    Columbia administrators from taking action to address Professor

8    Ravina's complaint after you found no violation of Columbia's

9    sexual harassment policies, correct?

10   A.   Yes, that's correct.

11           MS. HARWIN:  Your Honor, I believe we're at the

12   conclusion of my examination.  There are some documents I'll

13   want to double-check have been admitted into evidence, but in

14   order to not waste the jury's time, I'm happy to do that

15   checking over lunch and then get back to Court.

16           THE COURT:  That's fine.

17           Okay.  Are you prepared to start the cross-examination

18   now or would you rather take an early lunch?

19           MS. FISCHER:  If we could take an early lunch, I would

20   appreciate that.

21           THE COURT:  So why don't we take an early lunch.

22   We'll go until 1:30.  And just remember, keep an open mind and

23   don't discuss the case.  Thank you.

24           (Continued on next page)

25

I7g1rav4

```
1              (Jury not present)

2              THE COURT:  Do you want to do deposition designations

3    now or would you rather take the hour for lunch and do it at

4    the end of the day?  We have three left.  I'm happy to do them

5    at the end of the day.

6              MS. FISCHER:  I would prefer the end of the day.

7              THE COURT:  That's fine.  Thanks.

8              MS. PLEVAN:  I had been asked to produce Dean Hubbard

9    today, but I don't think we're going to get to him, but are you

10   still asking --

11             THE COURT:  Let me know.  How long is your cross?  If

12   we come back at 1:30, then we have four hours.

13             MS. FISCHER:  It's going to be several hours.

14             MR. HERNSTADT:  And your Honor, then we have to

15   complete Professor Bekaert, and that is not going to be

16   completed --

17             THE COURT:  Is Professor Bekaert going before Dunn?

18   Oh, then there's no way we'll get to him.

19             MS. PLEVAN:  Before Hubbard.

20             THE COURT:  Before Hubbard.  Excuse me.  That's what I

21   meant.  So then there's no way we're going to get to him.

22   There's no reason for him to come today.

23             MS. PLEVAN:  Okay.  He was happy to come, but --

24             THE COURT:  Okay.  Thank you.

25             (Luncheon recess)
```

I7g1rav4                         Dunn - Cross

                        AFTERNOON SESSION

                            1:41 p.m.

           (In open court; jury not present)

           THE COURT:  The jury is back now.  We're going to

bring them in now.

           I think when we hand the exhibits out, just going

forward for plaintiffs, could you do it a little bit faster,

like maybe have one other person hand it back and hand it up to

me at the same time, just to speed things up a little bit.

           MS. HARWIN:  Absolutely.

           THE COURT:  Great.  Thank you so much.

           Other than the deposition designations and the damage

issues, are there any other rulings that you're waiting for?

We'll talk about it at the break.

           (Continued on next page)

1          (Jury present)

2          THE COURT:  Everyone can be seated.  Thank you.

3          You may proceed.

4    CROSS-EXAMINATION

5    BY MS. FISCHER:

6    Q.  Good afternoon, Mr. Dunn.

7    A.  Good afternoon.

8    Q.  Do you recall this morning you were asked some questions by

9    Professor Ravina's lawyer about your background and your

10   résumé?

11   A.  Yes.

12   Q.  Without going over all that again, I'd like to just start

13   with your role as director of investigations at Columbia.

14          When did you start working in that position?

15   A.  In summer of 2013.

16   Q.  What were the duties, your duties and responsibilities as

17   director of investigations and Title IX coordinator at

18   Columbia?

19   A.  As director of investigations and deputy Title IX

20   coordinator for faculty and staff concerns, I was responsible

21   for investigating allegations of violations of the policy on

22   discrimination and harassment for employees, as well as

23   providing training to different groups of students, faculty,

24   and staff at the schools throughout the university.

25   Q.  Did Columbia provide you with any training in connection

I7g1rav4                          Dunn - Cross

1   with your position?

2   A.  Yes, they did.

3   Q.  What kind of training did Columbia provide to you?

4   A.  Right before I began the position officially, I attended a

5   institute that was put on by the Association of Title IX

6   Administrators, or ATIXA, and it was a Title IX coordinator

7   training to learn about Title IX, about the role of a

8   coordinator, how to investigate, things like that.

9           And then in addition, a couple weeks after that, I

10  went to the conference of the National Association of College

11  and University Attorneys, or NACUA, and I attended a number of

12  sessions on Title IX issues there as well.

13          And then throughout my time working in EOAA, we had

14  other trainings through webinars we participated in, outside

15  trainers coming in to provide in-services for us, things like

16  that.

17          MS. HARWIN:  Your Honor, I would note that the

18  realtime feed is not coming through.

19          THE COURT:  All right.  We will look into that.  Thank

20  you.

21  BY MS. FISCHER:

22  Q.  I believe you testified earlier to this, but what was the

23  name of the boss you reported to?

24  A.  Melissa Rooker.

25  Q.  Did you communicate with her about investigations you were

I7g1rav4                          Dunn - Cross

1    working on?

2    A.   Yes.

3    Q.   In what way would you discuss investigations with her?

4    A.   She and I stayed in very close contact throughout

5    investigations.  I would talk to her about interviews I was

6    conducting, how they were going, what I learned, what my next

7    steps were going to be, how things were proceeding.  I really

8    valued her insights and her thoughts on the best way to

9    proceed.

10   Q.   Would she provide input to you and give her insights to

11   you, just to be clear?

12   A.   Yes, she would.

13   Q.   At some point did your employment with Columbia come to an

14   end?

15   A.   Yes, it did.

16   Q.   And when was that?

17   A.   June 2015.

18   Q.   Did you leave Columbia voluntarily?

19   A.   I did, yes.

20   Q.   And when you stopped working at Columbia, did you become

21   employed somewhere else?

22   A.   Yes.  I took on a new role elsewhere.

23   Q.   I'm not sure I heard that.  Sorry?

24   A.   Sorry.  Yes, I took on a new role elsewhere.

25   Q.   Where do you currently work?

1    A.  I work at St. Mary's College in Maryland.

2    Q.  Why did you leave Columbia in June of 2015?

3    A.  It was a mix of personal and professional reasons.  We

4    found out we were having a third kid, and Manhattan is just a

5    tough place to raise a family.  Maryland is close to where all

6    of our family lives and so we really wanted to be near them.

7    And the role at St. Mary's College in Maryland was to be

8    Title IX coordinator there, and I had found from my work at

9    EOAA that I really enjoyed working on Title IX issues in

10   particular, and this new role gave me the chance to be more

11   student facing and working with students, which I really value

12   also, so it seemed like a really good fit in those ways.

13   Q.  Do you recall being asked this morning about ever feeling

14   overwhelmed in your position at Columbia?

15   A.  Yes, I do.

16   Q.  Can you please explain whether you felt overwhelmed and how

17   so.

18   A.  I think in any stressful job, you know, there are always

19   moments when you feel overwhelmed, just given the workload and

20   the finite resources there are.  You know, I found the work

21   really meaningful and challenging, and it gave me a lot of

22   satisfaction.  I felt like I was doing good.  But it was

23   certainly overwhelming at times in terms of the workload and

24   just the sensitivity and difficulty of the issues we were

25   dealing with, and the personal costs it had on the folks

1    involved.

2              MS. FISCHER:  I'd like to turn now to Plaintiff's 17,

3    which is admitted.

4    Q.  And Mr. Dunn, I think you testified earlier you're familiar

5    with this policy?

6    A.  Yes.

7    Q.  What is the purpose of this policy?

8    A.  So the purpose of this policy is to, you know, articulate

9    that Columbia University doesn't tolerate discrimination and

10   harassment.  And it explains the role of EOAA in enforcing the

11   policies on discrimination and harassment, which include things

12   like, as we discussed this morning, discriminatory harassment,

13   sexual harassment, sexual assault, retaliation, and this policy

14   outlines what options and resources people have if employees

15   allegedly violate these issues and how those situations can be

16   addressed.

17   Q.  So does this policy address what someone can do or should

18   do if they experience the type of behavior that's prohibited

19   under the policy?

20             MS. HARWIN:  Objection.

21             THE COURT:  Overruled.

22   A.  Yes, it does.

23             MS. FISCHER:  If we could go to page 6 of the policy,

24   please.

25   Q.  On this document you see there's (A) preliminary review and

1  (B) formal investigation are indicated here?  Do you see that,

2  Mr. Dunn?

3  A.  Yes.

4  Q.  Can you please explain what Columbia's practice was with

5  respect to investigations.

6  A.  Columbia's practice, you know, when I worked in EOAA was to

7  really use the preliminary review framework to investigate

8  these matters, as indicated in the outcome letter.  And so, you

9  know, we would still conduct the same kind of investigation in

10 terms of talking to the parties, talking to witnesses,

11 gathering evidence, but we used the preliminary review

12 framework.

13 Q.  When you were employed by Columbia, did the name Enrichetta

14 Ravina ever come to your attention?

15 A.  Yes, it did.

16 Q.  Do you recall how it was that Professor Ravina first came

17 to your attention?

18 A.  I believe I got a phone call from Laura Lee in July of 2014

19 informing me of this issue between Professor Ravina and

20 Professor Bekaert and letting me know that some EOAA-related

21 matters had come up in the course of the business school's

22 efforts to address the situation.

23 Q.  I'd like to show you what's been marked Defendant's ET.

24            MS. FISCHER:  I don't believe it's in evidence.

25            THE COURT:  Any objection?

1    MS. HARWIN:  No, your Honor.

2    THE COURT:  All right.  ET will be admitted.  Thank

3    you.

4    (Defendant's Exhibit ET received in evidence)

5    BY MS. FISCHER:

6    Q.  Mr. Dunn, if you look at page 2 of this document, starting

7    in the middle of the page, it is an email from Laura Lee and it

8    begins, "Dear Michael."  Do you see that?

9    A.  Yes, I do.

10   Q.  What did Laura Lee tell you that she had -- what did Laura

11   Lee tell you in this email?

12   A.  Basically she made me aware of the situation that folks in

13   the business school had been working on between Professor

14   Ravina and Professor Bekaert.  Ms. Lee talked about some of the

15   meetings that had been had with Professor Goldberg and other

16   folks at the business school, and it also talked about some of

17   the remedies that the business school was trying to implement

18   and the steps they were taking to address the situation.

19   MS. FISCHER:  If we could go to page 3.

20   Q.  Do you see on that, right toward the bottom there, it says,

21   "Glenn would also like to set up one-on-one Title IX training

22   for Geert."  I believe you were asked about that this morning.

23   Is Glenn Hubbard -- is the Glenn noted here Glenn Hubbard?

24   A.  Yes.

25   Q.  He's the dean of the business school?

I7g1rav4                        Dunn - Cross

1    A.  Yes.

2             MS. FISCHER:  And if we could go back to page 2.

3    Q.  The top of the page, the sentence beginning with Third, it

4    says, "Third, we should discuss further the idea of Title IX

5    training for Geert.  We may need to engage an outside trainer

6    here."

7             Why did you suggest Title IX training in response to

8    Laura Lee's July 19th email?

9    A.  I was responding to Professor Hubbard's suggestion, which

10   Laura had articulated, that he wanted to set up one-on-one

11   training for Professor Bekaert, so I was trying to, you know,

12   follow up on that idea to continue that conversation.

13   Q.  If you look at page 1 of that email, please.  There's an

14   email from Katherine Phillips, also known as Kathy Phillips, to

15   you.

16            MS. FISCHER:  If we could just zoom in on that, the

17   first paragraph.

18   Q.  The first reads, "I had been meaning to make one correction

19   to the information provided by Laura.  That is that Enrichetta

20   had a follow-up conversation only with me.  Glenn was not

21   present at the meeting.  I met with Enrichetta on July 16, 2014

22   at 11:30 a.m.  It was that meeting that she mentioned possible

23   sexual innuendo.  She noted that Geert had repeatedly asked

24   throughout the dinner that she was -- had been trying to avoid

25   him and that she thought he might have had more intentions than

I7g1rav4                    Dunn - Cross

1    just dinner."  Do you see that?

2    A.  Yes, I do.

3    Q.  How long after that report had been made to Kathy Phillips

4    were you made aware of Professor Ravina's complaint of sexual

5    innuendo?

6    A.  Based on these emails, it looked like I was made aware in

7    the -- I believe the 18th or the 19th, so just a couple days

8    after that meeting between Professor Ravina and Kathy Phillips.

9            MS. FISCHER:  Going back to page 2, please.

10   Q.  The second paragraph in the email from Laura Lee to you,

11   Mr. Dunn, that begins on June 16th, the second sentence says,

12   "As a follow-up, Enrichetta sent an email which I will forward

13   to you under separate cover with some suggested remedies for

14   the situation."

15           Was an additional email sent to you with the remedies

16   that were discussed?

17   A.  Yes.

18   Q.  And what did you understand those -- what's referred to

19   here as remedies, what did you understand those to be in

20   reference to?

21   A.  They were in reference to the joint research project

22   between Professor Ravina and Professor Bekaert, you know, ways

23   to divide the authorship and to outline next steps,

24   implementing a relationship manager, things like that.

25           MS. FISCHER:  I'd like to show the witness Exhibit EG,

1    which we're going to move into evidence.

2              THE COURT:  Any objection to EG?

3              MS. HARWIN:  No, your Honor.

4              THE COURT:  All right.  EG will be admitted.

5              (Defendant's Exhibit EG received in evidence)

6    BY MS. FISCHER:

7    Q.  Looking at that email on the bottom of page 1, starts in

8    the middle of page from Professor Ravina to several people,

9    with Glenn Hubbard, Janet Horan, Suzanne Goldberg.  The top --

10   I guess the third paragraph, "I've thought about it and a good

11   relationship manager would be Daniel Wolfenzon."

12             Do you have an understanding of what the relationship

13   manager was all about, as described here?

14   A.  To the best of my recollection, my sense was that the

15   relationship manager would kind of serve as a mediator between

16   the two people and would just help kind of mediate the

17   conversations and the interactions between them as they -- as

18   they worked on these papers and moved forward on all the

19   research.

20   Q.  And looking at the bottom of page 1 and the top of page 2,

21   does this appear to describe Professor Ravina's proposal as to

22   how to resolve her dispute with Professor Bekaert about who

23   should work on what paper?  I guess that's on the bottom of

24   page 1.

25             MS. HARWIN:  Objection.

1          THE COURT:  What's the objection?

2          MS. HARWIN:  Mischaracterizes the email.  It has some

3   further information before the proposal.

4          THE COURT:  Can you rephrase the question.

5          MS. FISCHER:  That's fine.

6   BY MS. FISCHER:

7   Q.  Mr. Dunn, you were sent this email, this was forwarded to

8   you, correct?

9   A.  Yes, it was.

10  Q.  What did you understand to be contained in Professor

11  Ravina's email on the bottom of this page?

12  A.  I understood this to be Professor Ravina's proposed

13  remedies for the solution and her summary of what she and the

14  business school folks had agreed on in terms of next steps.

15  Q.  Given that this email was sent to Dean Hubbard and Janet

16  Horan, did you understand from this email that the business

17  school was going to in some way assist in the resolution of the

18  research dispute between Professor Ravina and Professor

19  Bekaert?

20  A.  Yes.

21          MS. FISCHER:  I'd like to mark EH.

22          THE COURT:  Any objection to EH?

23          MS. HARWIN:  No, your Honor.

24          THE COURT:  All right.  It will be admitted.

25          (Defendant's Exhibit EH received in evidence)

I7g1rav4                          Dunn - Cross

1   Q.  Mr. Dunn, is this a second email that Laura Lee sent to
2   you?
3   A.  Yes, it is.
4   Q.  And just going back to EG, what is the date on both of
5   these emails?
6   A.  Both were sent on July 19, 2014.
7           MS. FISCHER:  If we could look at the bottom email
8   from Professor Ravina.
9   Q.  The fourth paragraph, "In particular, I need a resolution
10  on which papers Geert's name is on," and then it goes on from
11  there.
12          And then the bottom paragraph, "More generally, it
13  would be a great time -- it would be great to start with the
14  relationship manager."
15          Based on your reading of this email, did you
16  understand that the business school was working to resolve the
17  research dispute between Professor Ravina and Professor
18  Bekaert?
19          MS. HARWIN:  Objection, your Honor.
20          THE COURT:  What's the objection?
21          MS. HARWIN:  It's quite leading.
22          THE COURT:  All right.  I'll allow it.  Just watch the
23  leading going forward.
24  A.  Yes, that was my understanding, that, you know, this
25  reflected the business school's efforts to resolve the research

1    question.

2    Q.  Did you speak with anyone else about Professor Ravina's

3    allegations prior to beginning your investigation?

4    A.  Yes.

5    Q.  Who did you speak with?

6    A.  I spoke with Janet Horan and Kathy Phillips, as well as

7    Melissa Rooker in my office.

8    Q.  I'm sorry?

9    A.  As well as Melissa Rooker in my office.

10            MS. FISCHER:  Can we look at FI, please, which we

11   offer into evidence.

12            THE COURT:  Any objection to FI?

13            MS. HARWIN:  No objection, your Honor.

14            THE COURT:  FI will be admitted.

15            (Defendant's Exhibit FI received in evidence)

16   BY MS. FISCHER:

17   Q.  Mr. Dunn, Defendant's Exhibit FI, are these notes from a

18   conversation with Kathy Phillips?

19   A.  Yes, they are.

20   Q.  What was Kathy Phillips' role at this time?

21   A.  I believe she was a fairly new vice dean at the business

22   school.

23   Q.  What did Kathy Phillips tell you during your discussion

24   with her?

25   A.  She spoke to me about her conversation with Professor

1  Ravina on July 16th, or -- July 16, 2014, talking about what

2  Professor Ravina had said about Professor Bekaert insisting on

3  going to dinner and how Professor Ravina's -- had discussed her

4  efforts to avoid him, that they weren't friends, and that there

5  were more emails to kind of corroborate these allegations, and

6  so in the conversation we agreed that I would be reaching out

7  to Professor Ravina in early August.

8  Q.  Looking at that, there's a little arrow and it says KP?

9  A.  Yes.

10 Q.  What does that portion say?

11 A.  "KP hadn't heard of sexual innuendo until July 16th."

12 Indicating that there weren't really concerns about sexually

13 harassing nature until that conversation on July 16th.

14 Q.  I believe mentioned you also spoke with Janet Horan?

15 A.  Yes.

16         MS. FISCHER:  Can we please look at Defendant's

17 Exhibit FH.

18         You know, I'm sorry.  That's admitted as Plaintiff's

19 55.

20         THE COURT:  All right.  Go ahead.

21         MS. FISCHER:  So let's use Plaintiff's 55.  It's the

22 same document.

23 BY MS. FISCHER:

24 Q.  Are these notes that you took from your discussion with

25 Janet Horan?

I7g1rav4                          Dunn - Cross

1    A.  Yes, they are.

2    Q.  What did Janet Horan tell you during this discussion?

3    A.  She told me about a meeting that happened on July 10th with

4    Janet, Glenn Hubbard, and Professor Bekaert, where Professor

5    Bekaert talked about his relationship with Professor Ravina,

6    and Janet also told me about the July 16th meeting with Kathy

7    Phillips and Professor Ravina as well, as well as an upcoming

8    meeting that Monday with Professor Ravina and Professor

9    Goldberg.

10          MS. FISCHER:  At the bottom, can we zoom in on that

11   note.

12   Q.  "GB out of country till August," is that what that says?

13   A.  Yes, that's correct.

14   Q.  Was there any significance to the fact that Professor

15   Bekaert was out of the country?

16   A.  That would just mean that in terms of the investigation, I

17   wouldn't be able to speak with him in person until he got back

18   in the country.

19   Q.  Why did you speak with Vice Dean Horan and Vice Dean

20   Phillips before beginning your investigation?

21   A.  Really to get a better understanding of the context of the

22   allegations that were being made and to make sure that I

23   understood what the business school was already doing to

24   address this issue between these two professors, and to make

25   sure that the efforts by EOAA would not be at cross-purposes

I7g1rav4                         Dunn - Cross

1      with what CBS was doing to address the situation.

2                  MS. FISCHER:  Can we please look at Plaintiff's 49,

3      which I believe is admitted.

4                  And if we could look at page 2, please, in the middle

5      of the page.

6      Q.  Mr. Dunn, do you recognize this to be an email from you --

7      A.  Yes.

8      Q.  -- to Katherine Phillips, I guess yourself and Laura Lee?

9      A.  Yes.

10     Q.  And the second paragraph of that email, "I am out of the

11     office next week, but I'll reach out to you early in the week

12     of August 4th to check in."

13                 And then if we could look on page 1, the top email on

14     that page, "Hi, Kathy."  This is an email from you.  "Hi,

15     Kathy.  Yes, thanks for the call.  As we discussed, I'll reach

16     out to Enrichetta directly when I return on August 4th

17     regarding the sexual harassment concerns."

18                 And after receiving the report from Laura Lee

19     somewhere around July 18th, I think, did you plan to begin the

20     investigation of Professor Ravina's concerns as soon as

21     practicable after that?

22                 MS. HARWIN:  Objection, your Honor.

23                 THE COURT:  Sustained.  Why don't you rephrase that.

24     Q.  Did you plan to begin your investigation of Professor

25     Ravina's concerns as soon as practicable?

I7g1rav4                          Dunn - Cross

1        MS. HARWIN:  Objection, your Honor.

2   Q.  When did you begin -- when did you plan to begin your

3   investigation of Professor Ravina's complaint?

4        THE COURT:  That's better.  Thank you.

5   A.  I planned to begin it as soon as I could after I returned

6   from, you know, our annual week of vacation.  I don't want to

7   send an email about the investigation and then say, and by the

8   way, I'm not available for the next week so nothing's going to

9   happen.  I thought it would be better to do that when I

10  returned so that we could move more quickly.

11  Q.  Did you provide updates on the investigation to Melissa

12  Rooker, your boss?

13  A.  Yes, I did.

14       MS. FISCHER:  Could we pull up FG, please, which is

15  admitted into evidence.

16  Q.  And Mr. Dunn, is this an email you sent to Ms. Rooker?

17  A.  Yes, it is.

18  Q.  What was the purpose of this document, of this email?

19  A.  I wanted to make sure that Melissa was aware of some of the

20  pressing issues that -- that were on my desk, especially as I

21  was going to be out of the office for a week.  In case anything

22  new developed or in case immediate steps needed to be taken, I

23  wanted to make sure that she had some context.

24  Q.  And looking at that paragraph, which is numbered 2, the

25  second sentence, "There are many nonEOAA issues in this case."

1    What did you mean by that?

2    A.   There I was referring to some of the interpersonal dynamics

3    and some of the -- some of the other research dynamics that,

4    you know, at that early date did not seem to be related to any

5    kind of sexual harassment situation.  You know, already it was

6    a very complicated situation that many people at the business

7    school were -- were trying to resolve and so I wanted to kind

8    of give Melissa a sense of the complication in this issue at

9    that point.

10   Q.   The sentence goes on, "The sexual harassment concern seems

11   fairly contained."  What did you mean by that?

12   A.   Really just that, you know, as I wrote down there, that --

13   that it seemed to be contained to sort of issues of dinner

14   invitations and some of the pressures that were kind of

15   stemming from that, at that early stage.

16   Q.   What did you do next as part of your investigation?

17   A.   So after I came back in the week of August 4th, I reached

18   out to Professor Ravina I believe on August 6th, in order to,

19   you know, get the ball rolling and schedule a conversation with

20   her.

21            MS. FISCHER:  Could we pull up Defendant's Exhibit FS,

22   please.

23   Q.   Mr. Dunn, is this your correspondence with Professor

24   Ravina?

25   A.   Yes, it is.

1           MS. FISCHER:  We offer Exhibit FS into evidence.

2           MS. HARWIN:  No objection.

3           THE COURT:  It's admitted.

4           (Defendant's Exhibit FS received in evidence)

5    Q.  And looking at page 2 of this email, on what date did you

6    contact Professor Ravina?

7    A.  August 6, 2014.

8    Q.  Did you interview Professor Ravina?

9    A.  Yes, I did.

10   Q.  When did you interview Professor Ravina?

11   A.  August 12, 2014.

12   Q.  Did you take notes during your interview?

13   A.  Yes, I did.

14           MS. FISCHER:  Can we please bring up Plaintiff's 63,

15   which is admitted.

16   Q.  And Mr. Dunn, are these your notes from that interview?

17   A.  Yes, they are.

18   Q.  What did Professor Ravina tell you during the interview?

19   A.  Well, it was a pretty wide-ranging conversation.  We talked

20   about how she met Professor Bekaert, why they began working

21   together, and she told me about some of the problems they had

22   had with research assistants and how that had affected the

23   progress of the work.  She spoke with me about, you know, how

24   invested she was in the work and how she felt that it was being

25   stalled because she wouldn't have dinners or coffees with

1  Professor Bekaert, and she also told me about a number of other

2  issues that were concerning to her about, you know, his gifts

3  of chocolates to her, giving her a CD, touching her hand on a

4  barstool at a restaurant, and some other issues like that.

5  Q.  How did the interview end?

6  A.  I believe it ended with Professor Ravina indicating that

7  she would be sending me emails to kind of illustrate the

8  dynamics between her and Professor Bekaert.

9  Q.  During the interview did you give Professor Ravina the

10  opportunity to share with you whatever she wanted?

11  A.  I don't remember the interview specifically, but my

12  practice then and now is to always, you know, begin with a very

13  open-ended question to say, you know, can you talk to me about

14  what's going on, and then to sort of hear whatever the person

15  wants to share, and then to end the interview by saying, is

16  there anything I didn't ask you that I should have?  Is there

17  anything you want to add?  And so that's always been my

18  practice, so I believe that's what I did in this case.

19       MS. FISCHER:  Can we please look at page 5.

20  Q.  The last note in this document, what does that say?

21  A.  It just says, "E will send."

22  Q.  What is that a reference to?

23  A.  I believe that refers to the email correspondence between

24  Professor Ravina and Professor Bekaert.

25  Q.  Did Professor Ravina say why she wanted to give you emails?

I7g1rav4                              Dunn - Cross

1           MS. HARWIN:  Objection.

2           THE COURT:  Overruled.

3    A.  I don't recall from the conversation, but I believe there

4    is email correspondence between Professor Ravina and I where

5    she, you know, discussed sending me all the emails.

6           MS. FISCHER:  Can we please pull up Defendant's

7    Exhibit FV.

8    Q.  Mr. Dunn, is this an email correspondence between you and

9    Professor Ravina?

10   A.  Yes, it is.

11          MS. FISCHER:  We offer FV into evidence.

12          THE COURT:  Any objection?

13          MS. HARWIN:  No objection.

14          THE COURT:  FV will be admitted.

15          (Defendant's Exhibit FV received in evidence)

16   Q.  Look at the bottom of page 1, please.  And this appears to

17   be an email from Professor Ravina to you.  Can you please read

18   the sentence beginning with, "I've put."

19   A.  "I've put together some emails on the abusive and insulting

20   behavior of Geert toward me as well as some collateral evidence

21   on dinner invitations, emails asking for compliments, and

22   dating advice."

23   Q.  And then the next sentence?

24   A.  "I've printed them, and I'll drop them off with your

25   assistant tomorrow if it is okay for you."

1   Q.  And if we could look at page 2, please, the top of page 2,

2   which -- is this a continuation of that message?

3   A.  Yes.

4   Q.  And here, Professor Ravina wrote, "I would be surprised if

5   this is the only instance in which Geert displayed such

6   behavior.  You might want to challenge the nature of his

7   correspondence with the female RAs, especially Nancy Ran Xu,

8   the first RA we hired who got into the program thanks to him,

9   as she looks like the most vulnerable one, and maybe MBA

10  students in his classes."

11          Do you see that?

12  A.  Yes, I do.

13  Q.  Based on this email, did you understand that Professor

14  Ravina identified Ms. Xu?

15          MS. HARWIN:  Objection.

16  Q.  Did you know of Ms. Xu, prior to reading this email, as

17  someone who might have relevant knowledge to this case?

18  A.  No, I did not.

19  Q.  Did Professor Ravina provide you with emails --

20  A.  Yes, she did.

21  Q.  -- as she said she would in this email?

22  A.  Yes, she did.

23          MS. FISCHER:  Can we pull up Exhibit U, please.

24  Q.  Mr. Dunn, are these emails that Professor Ravina provided

25  to you?

1   A.  Yes, they are.

2           MS. FISCHER:  We offer Exhibit U.

3           THE COURT:  Any objection to Exhibit U?

4           MS. HARWIN:  Your Honor, if they plan to provide

5   questioning on documents, we would ask that they be

6   individually admitted rather than this large document

7   compilation.

8           THE COURT:  Do you have any objection to the entirety

9   of the emails provided?  Are they objectionable to you, even if

10  you want them individually marked for clarity?

11          MS. HARWIN:  We don't have any certification that this

12  is a complete record of the emails.

13          THE COURT:  Is this the complete set of emails that

14  she gave you?

15          THE WITNESS:  To the best of my knowledge, yes.

16          THE COURT:  And when you say to the best of your

17  knowledge, I mean, do you remember the form in which she gave

18  them to you?  Did she send them email by email?  Did you print

19  them out, or did she give them to you in a packet like this?

20          THE WITNESS:  She gave me a printed packet like this.

21          THE COURT:  Like this?  Okay.

22          All right.  I'm going to allow it, but when you go

23  through the emails, just be very clear on which one you're

24  talking about so that we can all keep track.

25          MS. FISCHER:  Sure.

I7g1rav4                          Dunn - Cross

1              (Defendant's Exhibit U received in evidence)

2    BY MS. FISCHER:

3    Q.  How many pages of emails did Professor Ravina provide to

4    you?

5    A.  170.

6    Q.  And did she drop them at your office?

7    A.  Yes, she did.

8    Q.  Did you read the emails that Professor Ravina provided to

9    you?

10   A.  Yes, I did.

11   Q.  Looking at page -- I'm not going to go through all of them,

12   but looking at page -- the little serial number on the bottom,

13   the Bates number, Columbia 713, and this email is an email from

14   Glenn Hubbard to Professor Ravina and Professor Bekaert, do you

15   see that?

16   A.  Yes, I do.

17   Q.  Do you see the sentence that begins on the second line, "I

18   have asked Steve Zeldes and Charles Jones for guidance on a

19   project relationship manager.  While we find a relationship

20   manager for your papers going forward and pursue an agreement

21   between you -- between you about the papers, the authorship

22   should remain as it presently is."

23           Did you understand what was meant by relationship

24   manager, project relationship manager?

25   A.  I believe so, yes.

I7g1rav4                          Dunn - Cross

1    Q.  Let's skip to page -- and what was your understanding?

2    A.  Just that this project relationship manager would help them

3    determine the best way to proceed on the papers, to, you know,

4    divide the work and hammer out an agreement about where they

5    should go moving forward.

6    Q.  Skip to page 725.  If you look in the middle of the page,

7    an email from Professor Ravina to Professor Bekaert, the second

8    paragraph, "Your behavior in your emails are inexcusable, no

9    matter whether you need more or less regressions."

10            That's an email from Professor Ravina.  Do you see

11   that?

12   A.  Yes.

13   Q.  And then the top email on that page from Professor Bekaert

14   to Professor Ravina, "We can have a nice debate on whose

15   behavior was more inexcusable, but in my case it did not start

16   with me.  Mine was provoked by yours."

17            Do you see that?

18   A.  Yes, I do.

19   Q.  What was your impression of this email upon reading it?

20   A.  I mean, I thought this exchange was pretty childish in many

21   ways and not very professional or collegial, but I also saw

22   that Professor Ravina was not, you know, deferring to Professor

23   Bekaert or kind of, you know, being cowed by him.  She was

24   really going toe to toe and, you know, giving as good as she

25   got, in terms of the tone and the message of the emails.

I7g1rav4                           Dunn - Cross

1    Q.   Look at page 748, Bates No. 748.  Do you see this email?

2    And this is, the beginning of the second half of the page, from

3    Professor Ravina.  Did you review this email?

4    A.   Yes, I did.

5    Q.   And what did you understand this email to be about?

6    A.   I understood that she was letting go the research

7    assistant, the RA who had been working on one of the projects

8    with Professor Ravina and Professor Bekaert.

9    Q.   If we could look at the prior page, which shows the next

10   iterations in the chain, or the next emails in the chain at the

11   bottom.  Professor Bekaert wrote an email.

12   A.   Yes.

13   Q.   "Hi, Enrichetta.  Again, please explain this decision.  I'm

14   flabbergasted."  Do you see that?

15   A.   Yes.

16   Q.   What did you understand this exchange to be about?

17   A.   I understood that Professor Bekaert had not been aware that

18   the RA was going to be let go and that Professor Bekaert was

19   shocked because he had been assuming the RA would be there so

20   he could continue working on the paper.

21   Q.   And then if we look at the email one above that from

22   Professor Ravina to Professor Bekaert.

23   A.   Yes.

24   Q.   It says, "Hi, Geert.  What do you mean what happened?  I've

25   asked you twice when you will have time to work on this paper

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I7g1rav4                         Dunn - Cross

1     and you never responded.  I figured it's undetermined."  And it

2     goes on from there.

3             And then let's look at the next email, which is on the

4     prior page.  "Enrichetta, this has to stop.  You are insane.

5     I'm committed to the project."  And it goes on from there.

6             What was your understanding of this particular

7     exchange?

8     A.   Based on this exchange, to me it communicated the fact that

9     Professor Bekaert did want to continue working on this and was

10    committed to doing so but that Professor Ravina had decided to

11    let the RA go when -- when Professor Bekaert wouldn't really

12    firmly commit to a short-term time frame for getting it done.

13    And then he kind of continued to talk about his working style

14    and how busy he is, which is why that -- he couldn't commit to

15    that kind of narrow time frame.

16    Q.   Take a look at page 779, Bates No. 779.  There's an email

17    right in the middle of the page from Professor Bekaert.  It's

18    actually the one right below that, where Professor --

19    4:32 p.m., where Professor Bekaert writes, "Where did all this

20    money go?  I'm going to Joe's.  Need anything?  Or want to join

21    so you can insult me a bit more?"

22            Are you familiar with Joe's?

23    A.   Yes.

24    Q.   What is Joe's?

25    A.   Joe's is a coffee shop on the Columbia campus.

I7g1rav4                         Dunn - Cross

1   Q.  And Professor Ravina's response is just right above that.

2   In the bottom of her note, the last sentence of her note, "I

3   had to go home because a friend of mine --" it says "if mine"

4   "-- of mine who is staying with me lock herself out.  I'll be

5   back later and we can go for coffee and I will insult you more

6   on Monday after Nicholas."  With a little smiley face.

7            Do you see that?

8   A.  Yes.

9   Q.  Did you have any particular impression of this exchange?

10  A.  You know, this indicated to me that, again, they were both

11  kind of seemingly in good spirits, joking about how they insult

12  each other, and this was as recently as in March of 2014.  And

13  again, it seemed that they were each sort of responding in kind

14  and that, you know, Professor Ravina did not seem to be

15  deferring to Professor Bekaert or being pressured by him.

16            MS. FISCHER:  Can we please take a look at 809.  I

17  want to start with the last email in this chain.

18            809, on the bottom.  Thank you.

19  Q.  The bottom email from Professor Ravina, do you recognize

20  this as something we've seen?

21  A.  Yes.

22  Q.  And this particular document, which I guess begins on 803,

23  is this all one exchange?

24  A.  Yes, this is one email thread.

25  Q.  And is that about the RA who was fired?

I7g1rav4                          Dunn - Cross

1   A.  Yes, it started from there.

2   Q.  On the page 803, you'll see -- let's just look at the few

3   emails on that page.

4       Professor Bekaert wrote to Professor Ravina, "Yes,

5   let's meet next week.  I will bring a whip."  Do you see that?

6   I think you were asked about that this morning.

7   A.  Yes, I see that.

8   Q.  What was your impression of this email?

9   A.  I did think it was an obnoxious email to send.  Again, not

10  very professional.  But I did not take the line about bringing

11  a whip to be related to sexual harassment or anything based on

12  gender.  I took it as Professor Bekaert kind of expressing

13  being a taskmaster, bringing a whip to make sure the work

14  finally gets done, which was my read in the context of this

15  email exchange.

16  Q.  What do you mean in the context of the email exchange?

17  A.  Looking at the emails they had shared about, you know, who

18  was going to do what, like what the next step is on this

19  project, the emails on page 803, he asks her again, "Can you

20  confirm the tables."  It seemed like he was really focused on

21  getting those tasks done, which was the context in which I read

22  that comment about bringing a whip.

23      MS. FISCHER:  Can we please look at page 833.  And

24  actually, the chain starts on the next page, 834.

25  Q.  And here, that bottom email from Professor Bekaert to

Professor Ravina, first sentence, "Are we having dinner on

Saturday or you got other plans?"  And then the last sentence,

"No pressure, by the way.  We can always do it some other

time."

          And then looking at the bottom of page 833, which

appears to be a response, Professor Ravina says she just got

back from dinner with Paola and Alex.  "Ah, you guys want me to

be fat."  You see that?

A.  Yes.

Q.  And the next email, Professor Bekaert says, "As I said, I'm

willing to postpone."

          And then Professor Ravina's email on top, do you want

to just read the first two lines.

A.  Okay.  "Since salad seemed a little sad to me, I went for

sushi.  I've left a message for reservations at Yasuda and

Kanoyama, and if it doesn't work, we can try Blue Ribbon or

Gari."

Q.  What were your impressions of this email?

A.  I thought that this email certainly showed a certain level

of friendliness between the two of them and I thought that, you

know, Professor Ravina mentioned four possible restaurants that

they could go to and that, you know, if she didn't want to go

to dinner with him in this instance, it would have been easy to

say, well, Yasuda's booked so I can't make it.  But here we see

Yasuda and three other alternatives, which indicated to me she

I7g1rav4                          Dunn - Cross

1    was happy to go to dinner in this context.

2              MS. FISCHER:  Can we please look at page 843.

3    Q.  And what's the date of this particular exchange?

4    A.  September 27, 2013.

5    Q.  Looking at the bottom email in that chain from Professor

6    Ravina to Professor Bekaert, the second paragraph says, "In the

7    meantime, I'm going to dinner with Alexander and Anthony."  Do

8    you see that?

9    A.  Yes.

10   Q.  And then the next line, "Are you around?  Do you want to

11   come?  I've told them I would invite you."  Do you see that?

12   A.  Yes.

13   Q.  And then Professor Bekaert responds, "Arrgh, my little

14   princess Emma is coming that day so I will have to go to dinner

15   with her to a distinctly less glamorous place than you have in

16   mind."

17             Did you understand from that that Professor Bekaert

18   was saying he was not able to go with Professor Ravina to

19   dinner with these other colleagues?

20   A.  Yes.

21   Q.  And what did Professor Ravina respond?

22   A.  She said, "Oh, too bad," and then asked if he was

23   interested in another date, or if the semester was too tough.

24   Q.  Did you have any particular impressions of this email?

25   A.  You know, this email struck me as an instance where

1    Professor Ravina was going to dinner with two other colleagues

2    and seemed to be going out of her way to invite Professor

3    Bekaert to join them and then -- and again, you know, created

4    an opportunity for them to reschedule if Professor Bekaert was

5    unavailable on that date.

6    Q.  Did it appear to you that Professor Ravina was trying to

7    avoid Professor Bekaert?

8    A.  No.

9             MS. FISCHER:  Can we please look at page 845.

10   Q.  And what's the date on this exchange, Mr. Dunn?

11   A.  April 7, 2013.

12   Q.  Looking at that bottom email from Professor Bekaert to

13   Professor Ravina, "Subject:  Dinner meeting.  Hi, Enrichetta,

14   if you want to go to dinner, just let me know and give me one

15   or more evenings that you can make it.  And then as to work, I

16   hope to get to the various emails tomorrow."

17            Do you see that?

18   A.  Yes.

19   Q.  And then what is -- can you please read the first two

20   sentences in Professor Ravina's response.

21   A.  "Sounds good for dinner.  We can go on Tuesday, Friday, or

22   Saturday, if you are free in the weekend."

23   Q.  And the next sentence, please.

24   A.  "I might be free on Thursday too, but I have made half an

25   agreement and I need to ask if we are still on before doing

1    something else."

2    Q.  Did it appear to you in this exchange that Professor Ravina

3    wanted to avoid having dinner with Professor Bekaert?

4    A.  No, it did not.

5    Q.  And what was your impression of this email?

6    A.  Again, this seemed like -- like a friendly dinner between

7    colleagues, that Professor Ravina was very, you know, willing

8    to go to dinner and was offering a bunch of different options

9    to see what might work best.

10             MS. FISCHER:  Can we move now to page 857.

11             Actually, the email I'm looking at begins on the

12   bottom of page 856.

13             There we go.  If we could zoom in.  It's a little hard

14   to read on the screen.

15   Q.  Okay.  And this is an email from Professor Ravina to

16   Professor Bekaert, is that right?

17   A.  Yes.

18   Q.  And the subject is, "Re: Your interview with pictures."

19   What does Professor Ravina write Professor Bekaert in this

20   email?

21   A.  "Are you offended?  I agree it's not Vanity Fair, but you

22   are by far far far the most good looking."

23             MS. FISCHER:  And if we could move up in that chain,

24   and again, I think we need to zoom in a little bit.

25             In the middle of the page there's an email from

1    Professor Ravina to Professor Bekaert, at 7:46 p.m.  If we

2    could zoom in on that.

3    Q.  And then what did Professor Ravina write to Professor

4    Bekaert?

5    A.  "Not unfortunate looking is an Italian expression that

6    means good looking."

7    Q.  I think I missed one.

8         MS. FISCHER:  Right below that there's an email from

9    Professor Ravina to Professor Bekaert at 7:40 p.m.  Can we pull

10   that one up.

11   Q.  And what did Professor Ravina write to Professor Bekaert

12   here?

13   A.  She says, "You would do much better because you are very

14   intelligent and intellectual and yet not unfortunate looking."

15   Q.  And then now can we go back to the one right above that.

16   Here Professor Ravina wrote, "Not unfortunate looking is an

17   Italian expression that means good looking," right?

18   A.  Yes.

19   Q.  What was your impression of this exchange?

20   A.  You know, obviously Professor Ravina was giving a

21   compliment to Professor Bekaert in terms of him being good

22   looking and intellectual, and I was also struck by the fact

23   that she kind of repeated and amplified the compliment a couple

24   times over in the course of the email thread.

25        MS. FISCHER:  Can we please take a look at page 876.

```
 1    Q.  And at the top of the page Professor Bekaert wrote this
 2    email to Professor Ravina, and I'm looking at the second
 3    paragraph.  "My old hematologist writes, My covering
 4    replacement is cursing --" I'm sorry.  I skipped one.
 5           No, I didn't.  "My covering replacement is cursing my
 6    name, I was told, but there's a new physician coming in January
 7    who's supposed to be excellent.  I give you permission to see
 8    her as long as you don't take her to dinner."  Professor
 9    Bekaert wrote, "Do I read anything into that?"
10           And now let's look at the next email in the chain,
11    which is on the prior page.
12           Bottom email, what did Professor Ravina respond?
13    A.  She wrote, "Ah, haha.  I had missed this.  Yes, I would
14    read, don't hit on your doctor."  Smiley face.
15    Q.  And what was your impression overall of Professor Ravina
16    and Professor Bekaert's communications, based not only on this
17    email but based on the emails she provided to you?
18    A.  Based on these emails, it looked like they had had a very
19    friendly relationship that at times was flirtatious between
20    them.
21    Q.  Did the emails match up with how Professor Ravina had
22    described her interactions with Professor Bekaert?
23    A.  No, they did not.
24    Q.  Can you explain what you mean by that.
25    A.  After I reviewed the emails, the emails present a very
```

1   different picture than what Professor Ravina had expressed to

2   me during our interview.  And so once I reviewed the emails

3   which she had wanted to supply to me to kind of illustrate what

4   she had been talking about, instead what I saw was a pretty

5   flirtatious relationship between colleagues and one where

6   they -- she was, you know, spending time together and

7   communicating with each other and it just did not really align

8   with the -- with the idea of sexual harassment that we had been

9   discussing during our interview.

10  Q.  Did you keep Columbia Business School administrators

11  apprised of how the investigation was going?

12  A.  Yes, I did.

13          MS. FISCHER:  Can we please pull up plaintiff's 64,

14  which is admitted.

15          And let's look at page 3, please.

16  Q.  Vice Dean Horan wrote to you, "I'm checking in to see if

17  you had the opportunity to follow up with Professor Ravina.  Do

18  you have any guidance or additional information for us?"

19          Do you see that?

20  A.  Yes.

21          (Continued on next page)

22

23

24

25

1   Q.  Now let's look at the next e-mail in the chain, please.

2              This is an e-mail that you sent, right?

3   A.  Yes, it is.

4   Q.  Can you please read your note right there, your note to

5   Vice Dean Horan?

6   A.  "Hi, Janet.  I'm sorry for the delay in replying.  I did

7   meet with Professor Ravina, and she sent me additional

8   information about her correspondence and interactions with

9   Professor Bekaert.  After reviewing the materials, I don't see

10  a strong case for an allegation of sexual harassment in

11  violation of university policies.  It is also difficult to

12  separate that issue from the problematic relationship between

13  the two parties.  I think the original plan, to get Professor

14  Bekaert some training by an outside professional, would be

15  sufficient here.  What do you think?  Any other updates?"

16  Q.  That sentence, "I don't see a strong case for an allegation

17  of sexual harassment in violation of university policies," if I

18  could focus your attention just on that for a moment.

19             Can you explain how you came to have that view?

20  A.  Well, I was trying to be careful with my language, knowing

21  that we hadn't even spoken to Professor Bekaert yet, that there

22  was still a lot more investigating to do.  But the fact that I

23  had spoken with Professor Ravina, and then when she gave me all

24  of these different e-mails that seemed to undermine her

25  allegations, that led to my perception at that point that I

didn't see a strong case for an allegation of sexual

harassment, since the e-mails didn't really align with what she

had shared with me.

Q.  Looking at the next sentence, "It's also difficult to

separate that issue from the problematic relationship between

the two parties."

     What do you mean by that?

A.  To the best of my recollection, the problematic

relationship I was referring to was reflected in the kind of

immature communications that I also saw in the e-mails, you

know, the bickering and kind of the unprofessional fighting and

arguing that they were engaging in.

Q.  Can we please look at page 1 of this document.

     The bottom e-mail on the bottom of page 1 from you to

Vice Dean Horan:  Thanks, Janet.

     One other note:  Professor Ravina had mentioned a

student research assistant who might have witnessed or

experienced inappropriate behavior, so I reached out to the

student to see if she would be willing to speak with me.

     Who was the student you referred to in this e-mail?

A.  That was Nancy Xu.

Q.  Did you interview Ms. Xu?

A.  Yes, I did.

Q.  Can we please look at Plaintiff's Exhibit 66, which is in

evidence.

1        Mr. Dunn, are these your handwritten notes from your

2    interview of Ms. Xu?

3    A.  Yes, they are.

4    Q.  Why did you interview Ms. Xu?

5    A.  Professor Ravina had identified Ms. Xu by name as someone

6    who might be good for me to talk to, as someone who may have

7    witnessed or experienced sexual harassment by Professor

8    Bekaert.

9    Q.  And what did Ms. Xu tell you during your interview?

10   A.  She spoke with me about her past interactions with both

11   Professor Bekaert and Professor Ravina.

12       She said that she had a really positive experience

13   with Professor Bekaert, she had never experienced any sexual

14   harassment, heard about it from other people, witnessed

15   anything.  She said she saw him as a father figure.

16       She also spoke with me about her relationship with

17   Professor Ravina.  She said that she -- they didn't like each

18   other.  She said that Professor Ravina had been very insulting

19   to her, and that's what led into Nancy Xu's kind of open

20   statements about the bias she felt based on that past personal

21   history with the parties.

22       MS. HARWIN:  Your Honor, we would seek a limiting

23   instruction clarifying that this is not admitted for the truth,

24   but for her report.

25       THE COURT:  That is exactly right.  When he's saying

I7gnrav5                        Dunn - Cross

1   what someone else said to him, it is not being admitted for the

2   truth of it, but the fact that it was said to the Columbia

3   representative.

4           MS. FISCHER:  Can we please look at the top of page 2.

5   BY MS. FISCHER:

6   Q.  Mr. Dunn, ask you please read starting, you know, that

7   first paragraph on the top of page 2.

8           MS. HARWIN:  Objection.

9           THE COURT:  Overruled.

10          Is this in evidence?

11          MS. FISCHER:  Yes.

12          THE COURT:  Is it in evidence?

13          MS. HARWIN:  It is, your Honor.

14          THE COURT:  All right.  So overruled.

15  A.  "ER not professional as a woman, clothes, she wears

16  button-down shirts, gaps in buttons, can see bra, button

17  missing.  Nancy would have put something under it.  Her dress

18  not appropriate."

19  Q.  Now can we look at the two lines immediately below that,

20  please.

21  A.  "Nancy's opinion biased.  Felt ER, Professor Ravina

22  insulted her.  Nancy quit December 2012, began fall 2012."

23          THE COURT:  This is what Nancy said to you?

24          THE WITNESS:  Yes, that's correct.

25          MS. FISCHER:  Thank you.

Q.   This note, "N's opinion biased," which I believe you said

means Nancy's opinion biased, did you understand what that was

in reference to?

          Did you have any understanding what that was in

reference to?

A.   Yes, I did.

Q.   What was your understanding?

A.   My understanding was that Nancy had kind of a personal bias

against Professor Ravina.  After their interactions with her

she just thought you know very poorly of Professor Ravina on a

personal level.

Q.   Can we go back to page 1, please, and the last two

paragraphs on that page.  All right.

          The first one, "Any SH re GB."

          Does that mean any sexual harassment regarding Geert

Bekaert?

A.   Yes, it does.

Q.   Is that a question you asked Ms. Xu?

A.   Yes.  That was the general shorthand for the question I

asked.

Q.   Why don't you tell us what the question was if you can.

A.   The question would have been very broad about whether Nancy

had experienced sexual harassment or whether she had seen

anything or heard about anything secondhand, just anything at

all about Professor Bekaert sexually harassing anyone.

1  Q.  What did Ms. Xu respond?

2  A.  She said no.

3  Q.  Now let's look at the next paragraph, "SH GB to ER."

4          What does that shorthand mean?

5  A.  That was asking Nancy specifically about any sexually

6  harassing behaviors that Professor Bekaert directed towards

7  Professor Ravina.

8  Q.  What did Ms. Xu respond?

9  A.  She said no.

10  Q.  How did your interview with Ms. Xu impact your analysis, if

11  it did?

12  A.  It was -- it didn't really change the analysis too much

13  from where things stood after speaking with Professor Ravina

14  and reviewing the e-mails, in that Nancy did not corroborate

15  any allegations of sexual harassment, or, you know, raise new

16  concerns about sexually harassing behavior by Professor

17  Bekaert.

18  Q.  You saw that notation "N's opinion biased."  What did you

19  make of that?

20  A.  I took that as, as an example of Nancy's self-awareness

21  frankly.  You know, the fact that she sort of shared this

22  information with me, and that, you know, she had her own

23  personal experiences which she spoke with me about.  And so I

24  did not, I did not completely discount Nancy's opinion because

25  of that statement that I -- it was good, you know, good to be

I7gnrav5                          Dunn - Cross

1    aware of.

2              MS. FISCHER:  Can we please pull up Plaintiff's

3    Exhibit 75 which is admitted.

4    BY MS. FISCHER:

5    Q.  Mr. Dunn, is this an exchange between you and Janet Horan?

6    A.  Yes, it is.

7    Q.  What is the date on this, please.

8    A.  September 15, 2014.

9    Q.  Let's look at the second page, which is a continuation of

10   an e-mail from you I believe.

11             The first bullet -- "Following up on our conversations

12   here are some bullet points in preparation for your meeting

13   tomorrow.

14             "I am looking into the sexual harassment allegations

15   and have spoken with Enrichetta and others.  I will be speaking

16   with Geert later this week."

17             Then it goes on several more bullets.

18             The next bullet:  "As things stand now, I am not sure

19   I see a violation of EOAA policies, but I need to speak with

20   Geert and conclude the investigative process before making any

21   final determinations."

22             We previously saw an e-mail with similar language.

23             Here, when you wrote you didn't see a violation of

24   EOAA policies, why did you write that?

25   A.  That was to give Janet an update on the status of the

I7gnrav5                    Dunn - Cross

1    investigation and where things stood and to give her

2    appropriate context in preparation for the meeting that she had

3    the next day.

4    Q.  The next bullet, "I agree that extra sexual harassment

5    training would be appropriate since EOAA received other

6    concerns about Geert earlier this year."

7         Again, is this -- the reference to other concerns

8    about Geert earlier this year, what is that a reference to?

9    A.  That was a reference to the student complaint that, that

10   the university had received earlier in 2014 that we touched on

11   a bit this morning.

12   Q.  Let a look at page 1 of this e-mail, Vice Dean Horan's

13   e-mail to you that begins in the middle of the page, saying, "I

14   would not share the third and fourth bullets, but would like to

15   share a portion of bullet 1 and 2.  Can we share the

16   following."

17        And then she notes that you've completed one more --

18   that you have one more interview to complete, but as things

19   stand now you are not sure you see a violation of EOAA

20   policies.

21        While we await the conclusion of this investigation,

22   we will remove the dean from the oversight role where he is

23   copied on all e-mails and will appoint a senior faculty member

24   to that role.

25        Did you understand that to be the relationship

1   manager?

2   A.   Yes.

3   Q.   So did you understand that to be an ongoing issue?

4   A.   Yes.

5   Q.   The next paragraph, "OK with you if we decide to -- if we

6   address the unproductive and unprofessional tone of their

7   communication."

8        And then let's look at your response:  "That sounds

9   good to me,.  It's fine if you want to mention unproductive and

10  unprofessional tone of the communications.  That would not

11  really fall under my purview."

12       What did you mean by that?

13  A.   Under the EOAA policies, we are only investigating and

14  looking at issues of discrimination and harassment, and here we

15  saw communications that were unprofessional, not civil,

16  childish at times.  And that's beyond the scope of our office's

17  limited focus, but it's certainly something that merits

18  intervention, and I was happy to see that the business school

19  was implementing some remedies to address that.

20  Q.   And the next paragraph begins, "Thanks, Janet.  And again

21  I'm sorry I haven't been able to wrap this up more quickly.  I

22  know it's been a real burden for you and your colleagues."

23       What did you mean by that last sentence?

24  A.   I don't recall writing that sentence, but as I look back

25  now, you know, I think I was talking about the difficulty of

I7gnrav5                    Dunn - Cross

1   the case, but also just the length of time it was taking to

2   conclude the investigative process, you know, given the

3   materials that we had to review, the folks we had to talk to.

4   I knew that sort of all this time without having a clear

5   conclusion from EOAA left things very open and was burdensome

6   for the folks involved obviously and also the business school

7   administration.

8          MS. FISCHER:  Can we please pull up Plaintiff's

9   Exhibit 76, which is in evidence.

10  BY MS. FISCHER:

11  Q.  And what is this document, Mr. Dunn?

12  A.  These are notes from a conversation I had with Janet Horan

13  on September 16, 2014.

14  Q.  What did you discuss with Vice Dean Horan on September 16,

15  2014?

16  A.  We discussed a number of topics related to this matter.

17  One of the main ones was this whole notion of whether or not

18  Professor Bekaert was Professor Ravina's mentor or whether he

19  had held himself out as such.

20          We also talked about an upcoming meeting that Glenn

21  Hubbard and Kathy Phillips were going to have with Professor

22  Bekaert in a few days, and we talked about the general status

23  of the case and the next steps to be taken.

24  Q.  Can we please focus on the middle note that begins,

25  "Glenn."

1          It says, "Glenn, Kath meet with GB on Monday."

2          And then the last bullet there, "GB to recuse himself

3     from three papers.  He can't hold this up anymore."

4          Do you see that?

5     A.  Yes, I do.

6     Q.  Now, let's go back --

7          MS. HARWIN:  Your Honor, I would just ask that when

8     e-mails be read that they be read accurately.

9          MS. FISCHER:  Sure.  I didn't mean to misread it.  I'm

10    happy for the witness to reread it.

11         THE COURT:  All right.

12         MS. FISCHER:  It was not on purpose.

13    BY MS. FISCHER:

14    Q.  Mr. Dunn, can you please read this portion of your notes?

15    A.  "Glenn Kath meet with GB on Monday, perhaps nine to nine

16    thirty.  Relationship manager everything done oral, no sniping.

17    GB to recuse himself from three papers.  He can't hold this

18    work up anymore."

19    Q.  Now let's look at the very next line.

20    A.  "What to do, still a senior tenured faculty member."

21    Q.  Was this something that Vice Dean Horan related to you?

22    A.  Yes.  I believe I was taking notes of what she was sharing

23    during the conversation, her statements.

24    Q.  And do you have any understanding of what she meant by

25    this?

I7gnrav5                          Dunn - Cross

1   A.  At this date, I -- I really don't.

2           MS. FISCHER:  Can we please show the witness

3   Defendants' GT.

4           THE COURT:  Any objection?

5           MS. HARWIN:  No, your Honor.

6           THE COURT:  GT will be admitted.

7           (Defendants' Exhibit GT received in evidence)

8   BY MS. FISCHER:

9   Q.  Looking at the e-mail that begins on the bottom of page 4,

10  is this an e-mail you sent to Professor Bekaert?

11  A.  Yes, it is.

12  Q.  Were you asking him to meet with you?

13  A.  Yes.

14  Q.  And what did Professor Bekaert respond?

15  A.  He was traveling, but he could meet in the -- a few -- week

16  and a half later.

17  Q.  And was a meeting scheduled?

18  A.  Yes.

19  Q.  Did you prepare for your interview of Professor Bekaert?

20  A.  Yes, I did.

21  Q.  How did you prepare?

22  A.  I believe I made a bulleted list of topics and issues that

23  had been raised by Professor Ravina that I wanted to be sure to

24  cover during my conversation with Professor Bekaert.

25          MS. FISCHER:  Can we please pull up Defendants'

I7gnrav5                         Dunn – Cross

1    Exhibit GP?

2              We offer GP.

3              THE COURT:  Any objection?

4              MS. HARWIN:  No, your Honor.

5              THE COURT:  All right.

6              GP will be admitted.

7              (Defendants' Exhibit GP received in evidence)

8    BY MS. FISCHER:

9    Q.  Mr. Dunn, is this the list that you just alluded to?

10   A.  Yes, it is.

11   Q.  And I believe you said you interviewed Professor Bekaert,

12   right?

13   A.  Yes.

14             MS. FISCHER:  Can we please take a look at Plaintiff's

15   Exhibit 77, which is admitted.

16   BY MS. FISCHER:

17   Q.  Are these your notes from your interview of Professor

18   Bekaert?

19   A.  Yes, they are.

20   Q.  And what date did you interview Professor Bekaert?

21   A.  September 19, 2014.

22   Q.  What did Professor Bekaert tell you during your interview?

23   A.  He spoke with me about how he had begun working with

24   Professor Ravina, why they were working together on these

25   different research projects, he spoke with me about the nature

1    of their relationship, which he described as a friendship, you

2    know, social relationship, and he also responded to the

3    specific allegations that Professor Ravina had raised.

4    Q.  Looking at --

5            MS. FISCHER:  Can we go to page 2, please, actually

6    page 3.

7    BY MS. FISCHER:

8    Q.  Do you see there's little numbers in the margin it appears

9    to be?

10   A.  Yes.

11   Q.  Are those a reference to your -- the notes that you took,

12   your preparation in preparation for the interview?

13   A.  Yes, they are.

14   Q.  How did Professor Bekaert describe his working relationship

15   with Professor Ravina?

16   A.   In very general terms he said that they had a friendly

17   social relationship.  He suggested that, that she may have --

18   if I recall correctly, been a little more flirtatious towards

19   him, but he described, you know, what had been until recently a

20   positive working relationship.

21           MS. FISCHER:  Can we please skip to page 7.

22   BY MS. FISCHER:

23   Q.   In the middle of the page it says -- why don't you read it

24   to us, Mr. Dunn.  It looks like it says they were friends.

25   What does that say?

I7gnrav5                          Dunn - Cross

1    A.  "They were friends, everything could have been resolved

2    over coffee.  We need an RA, etc."

3            MS. FISCHER:  Can we go back to Defendant's Exhibit

4    GT, please.

5    BY MS. FISCHER:

6    Q.  On the bottom of page 2, there is an e-mail from Professor

7    Bekaert to you.

8            "Dear Michael, thanks for the meeting on Friday.  The

9    topic came as I total shock to me, and I wonder if I can set up

10   another meeting now that I had some time to reflect.  I also

11   have some information that might be relevant."

12           When was your first meeting with Professor Bekaert?

13   A.  September 19, 2014.

14   Q.  So this is three days later?

15   A.  Yes.

16   Q.  And was a second meeting arranged?

17   A.  Yes, it was.

18           MS. FISCHER:  Can we please pull up Defendants'

19   Exhibit HA.

20   BY MS. FISCHER:

21   Q.  Mr. Dunn, are these your notes from your second meeting

22   with Professor Bekaert?

23   A.  Yes, they are.

24           MS. FISCHER:  We offer HA.

25           MS. HARWIN:  No objection.

1        THE COURT:  HA will be admitted.

2        (Defendants' Exhibit HA received in evidence)

3   BY MS. FISCHER:

4   Q.  Do these notes reflect things that Professor Bekaert told

5   you during that meeting?

6   A.  Yes, they do.

7   Q.  What did Professor Bekaert tell you during your second

8   meeting with him?

9   A.  So, we covered a lot of different topic areas.  At this

10  meeting, he sort of talked more about his relationship with

11  Professor Ravina, you know, who would make the dinner

12  invitations, the kind of friendship they had and from his

13  perspective.

14        I believe at this point Professor Bekaert also

15  referenced different e-mail correspondence that the two of them

16  had had to kind of illustrate their relationship, and then he

17  also addressed the whole question of whether he was delaying

18  her papers or her work.

19        And he also talked about how he felt hounded and

20  harassed in this situation.

21  Q.  After the meeting did Professor Bekaert provide you with

22  e-mail correspondence he had exchanged with Professor Ravina?

23  A.  Yes, I believe he did.

24        MS. FISCHER:  Can we please look at GY, Defendants'

25  GY.  It's already in evidence.

1    BY MS. FISCHER:

2    Q.  Looking at that top e-mail, Mr. Dunn, is this an e-mail

3    that Professor Bekaert sent to you?

4    A.  Yes, it is.

5    Q.  Can you read the first paragraph, please.

6    A.  "Here is a recent e-mail of hers.  I am asking for better

7    quality inputs so one of the papers can be finalized.

8    Enrichetta's e-mail is a long-winded way of saying that she

9    will not do it, in the process recounting and misinterpreting a

10   negative comment the discussant may have made about one of my

11   papers."

12   Q.  And the next sentence.

13   A.  "Unfortunately I will send some more."

14   Q.  Did Professor Bekaert show you any more of his e-mails with

15   Professor Ravina?

16   A.  Yes, he did.

17              MS. FISCHER:  Can we pull up Defendants' Exhibit V.

18   Q.  Are these the e-mails that Professor Bekaert gave to you?

19   A.  Yes, they are.

20              MS. FISCHER:  We offer Exhibit V into evidence.

21              THE COURT:  Again, this is the form in which he gave

22   them to you, like in one stack?

23              THE WITNESS:  I don't recall the form Professor

24   Bekaert's e-mails came from.

25              THE COURT:  On a few of these there's underlining or

1   an X on the side.  Is that something he did or you did?

2           THE WITNESS:  Yeah, I'm sorry.  To clarify, he

3   underlined and made the Xs and the notes.

4           THE COURT:  But these are the e-mails that he gave

5   you, is that right?

6           THE WITNESS:  Yes.

7           THE COURT:  Any objection to V?

8           MS. HARWIN:  Your Honor, we would ask that these be

9   produced in redacted format in light of the markings.

10          MS. FISCHER:  I didn't hear what she just said.

11          THE COURT:  She wants them in redacted form.  I am

12  going to overrule that in light of the representation that was

13  made that these were given by Professor Bekaert in this form.

14          This is what Columbia received and the form it

15  received it, so I am going to admit V.

16          (Defendants' Exhibit V received in evidence)

17          MS. FISCHER:  Your Honor, I am happy to continue, but

18  I am going to be on this for a little bit.

19          THE COURT:  Can everyone hang in for about 15 minutes

20  more?  Why don't we go about 15 minutes more until 3:15, and

21  then we will take our afternoon break.

22          MS. FISCHER:  That's fine.

23  BY MS. FISCHER:

24  Q.  How many pages of e-mails did Professor Bekaert give to

25  you?

I7gnrav5                          Dunn - Cross

1   A.  About 60 pages.

2   Q.  And, again, I am not going to go through every page, but

3   let's look at page 946, using the Bates numbers.

4           The second e-mail from the top, Professor -- an e-mail

5   from Professor Ravina to Professor Bekaert:  "Hi, Geert.  How

6   are you?  Are you around tomorrow?  Do you want to go for

7   coffee and discuss the details of asset allocations of 401(k)

8   plan participants project" -- of the asset allocations.

9           Do you see that?

10  A.  Yes.

11  Q.  Let's look at page 950.

12          Can you read the last sentence on that page which

13  appears to be signed "Enrichetta" at the bottom?

14  A.  "You were like an elephant in the China shop of feelings.

15  It's almost funny."

16  Q.  Let's take a look at page 955, please -- actually the

17  e-mail begins on the bottom of 954.

18          Is this an e-mail from Professor Bekaert to Professor

19  Ravina that was provided to you?

20  A.  Yes.

21  Q.  Can you read the first two sentences --

22          MS. FISCHER:  Can we go back.  I think we skipped a

23  sentence -- the first two sentences of that e-mail.  Yeah.

24  A.  Eat a praline before reading this e-mail.  You do not

25  understand anything apparently.

I7gnrav5                          Dunn - Cross

1   Q.  And now let's --

2              THE COURT:  Excuse me, if I can.  So in some places

3   there are dates and what look like descriptions of an e-mail to

4   come.

5              Do you know what I'm referring to?

6              THE WITNESS:  Yes.

7              THE COURT:  In various places?

8              THE WITNESS:  Yes.

9              THE COURT:  So is it your understanding that Professor

10  Bekaert wrote that?

11             THE WITNESS:  Yes.

12             If I recall, I believe Professor Bekaert sent me a

13  Word document or something similar in which these e-mails had

14  be pasted, and then he also added some of his own notes and

15  headers --

16             THE COURT:  OK.

17             THE WITNESS:  -- discussing the content of the

18  e-mails.

19             THE COURT:  All right.

20             Again, ladies and gentlemen, this is an instance where

21  that is not being admitted for the truth of what's said but

22  rather the fact that that's what was said and what was produced

23  to Columbia.

24             Please proceed.  Thank you.

25             MS. FISCHER:  Thank you.

I7gnrav5                    Dunn - Cross

1           Let's look on page 954.  954, please.

2           And it is next to that X.

3    BY MS. FISCHER:

4    Q.  Can you please read the first two lines of the e-mail.

5    A.  "I like the blunt Belgian version, so I hope you will

6    appreciate my reply.  Smiley face.  With all due respect, you

7    don't understand anything."

8    Q.  And I understand this may have been pasted into a document,

9    but who does it appear this e-mail is from?

10   A.  It appears to be from Professor Ravina.

11   Q.  Let's go to page 960, please, the bottom of page 960.  It

12   appears to be an e-mail from Professor Bekaert to Professor

13   Ravina.

14          It says, "I'm here but will leave in the early

15   afternoon to go to work in Midtown.  Lunch perhaps?"

16          And then let's look at Professor Ravina's response.

17          "Sounds good, I went to yoga at 6:30 so anytime you

18   are hungry just stop by.  E."

19          Do you see that?

20   A.  Yes.

21   Q.  Looking at 961 -- I guess it starts on the bottom of 960,

22   so you can leave it right there the very last e-mail on that

23   page.

24          Does that appear to be an e-mail from Professor Ravina

25   to Professor Bekaert?

I7gnrav5                         Dunn - Cross

1    A.  Yes.

2    Q.  And it looks like they're setting up a time, it's not clear

3    for what.

4    A.  Yes.

5          MS. HARWIN:  Objection.

6          MS. FISCHER:  I will withdraw and I will move on.

7          THE COURT:  OK.

8    BY MS. FISCHER:

9    Q.  Let's look back on page 961.  Under the heading October

10   2010 -- and I understand this may not have been your heading,

11   Mr. Dunn -- does there appear to be an e-mail from Professor

12   Ravina to Professor Bekaert?

13   A.  Yes.

14   Q.  And what is the last sentence of that e-mail?

15   A.  "I'll look for you for coffee."

16   Q.  Let's move on to page 962.

17          The e-mail beginning in the middle of the page from

18   Professor Ravina to Professor Bekaert, do you see that?

19   A.  Yes.

20   Q.  Can you please read the PS.

21   A.  "P.S.  Don't forget the chocolate, smiley face, beer is not

22   needed, the Barolo is better."

23   Q.  Just to be clear, I know you have been asked this, but

24   these markings on the page, was this document given to you with

25   these markings?

I7gnrav5                          Dunn - Cross

1    A.  Yes, it was.

2              MS. FISCHER:  Let's look at page 963.

3    Q.  The bottom of page 963, there is a note here -- e-mail from

4    Professor Bekaert, it appears to be to Professor Ravina.  Can

5    you please read the sentence beginning with "actually."

6    A.  "Actually, I still got to take you to an Italian restaurant

7    in my neighborhood.  The owner is from Turin.

8    Q.  And what was Professor Ravina's response?

9    A.  The relevant part, in red, "Sounds good for the restaurant,

10   I'm from Torino.  What's the name of the place?"

11             MS. FISCHER:  Let's move on to page 968.

12   Q.  In the middle of that page there is an e-mail that says

13   September 25, 2012, 10:11 p.m. from Professor Bekaert.

14             Can you just read the first line.

15   A.  "Yes.  I am feeling totally out of my depth with the tasks

16   you are giving me."

17   Q.  Now can we look up at Professor Ravina's response to that

18   e-mail.  Can you just read the first line.

19   A.  It says, "No.  You are super good."

20             MS. FISCHER:  Skip to page 971, please.

21   Q.  The middle of the page it's an e-mail from Professor

22   Ravina.

23             Can you please just read the portion that begins

24   "P.S."

25   A.  "P.S.  Sorry for telling you that you cannot talk to me

I7gnrav5                        Dunn - Cross

1  yesterday.  It was overreaction to M.  Of course, you can stop

2  by my office anytime because we are working together and we are

3  actually discussing research.  Smiley face."

4        MS. FISCHER:  Let's move on to page 977.

5  Q.  The bottom of page 977, an e-mail from Professor Ravina to

6  Professor Bekaert.  Do you see that, Mr. Dunn?

7  A.  Yes.

8  Q.  Can you just read that e-mail to us.

9  A.  "I'm going for coffee to Joe.  Do you want anything?"

10 Q.  What was Professor Bekaert's response?

11 A.  Sorry, I was at the doctor's.  Will go for coffee really

12 late and behind.  Geert."

13 Q.  And what did Professor Ravina respond to that.

14 A.  "I am at the doctor's, too.  I will be back at 5 and will

15 try not to go for more coffee, but if I break down, I'm e-mail

16 you and decide if you want to get one for you as well.  Smiley

17 face."

18        MS. FISCHER:  Let's go to page 978.

19 Q.  The e-mail in the middle of the page from Professor Ravina

20 to Professor Bekaert.  Can you please just read the section

21 P.S. that's at the bottom of that e-mail.

22 A.  "P.S.  I've just watched a movie with Owen Wilson on the

23 plane to Santa Barbara, a super beautiful place, and I think he

24 is really hot.  Smiley face."

25 Q.  Let's look at the next page, 979.

1          In the middle of the page there is e-mail from

2    Professor Ravina to Professor Bekaert.

3          Do you see that?

4    A.  Yes.

5    Q.  And underneath you see it says -- there is a note there and

6    then it says "Enrichetta."

7    A.  Yes.

8    Q.  Can you just read the next line, please.

9    A.  BTW I've ordered Belgian chocolate on Amazon.  I close my

10   eyes and dream about it.  I might be addicted."

11         MS. FISCHER:  Let's go to the next page, 980.

12   Q.  The e-mail on the bottom of 980 is an e-mail from Professor

13   Ravina to Professor Bekaert.  And, by the way, what's the date

14   on this communication?

15   A.  January 24, 2013.

16   Q.  And what did professor Ravina write here?

17   A.  "BTW, thank you very much for listening to me yesterday.  I

18   really appreciate it."

19   Q.  Now let's look at Professor Bekaert's response, the next

20   e-mail.  We are just going to look at the first paragraph.

21   "Hi, Enrichetta don't mention it.  If you need to talk, let me

22   know.  I hope your mom recovers."

23         And then now let's look at the top e-mail in that

24   chain and the top of this page.

25         "Geert, thank you very much.  I'm really sorry about

your parents.  That must have been very tough."

And then the next paragraph, "My mom woke up a little bit today, moved eyes, hand, and mouth but did not say anything.  And it's signed from Professor Ravina."

Is that right?

A.  Yes, that's correct.

MS. FISCHER:  Let's look at page 981.

The e-mail -- the first e-mail on that page appears to be -- I'm sorry, on the top of that page.  Yes, that's the one.

It appears to be an e-mail from Professor Ravina.

BY MS. FISCHER:

Q.  Can you just read the last paragraph, beginning with "thank you."

A.  "Thank you for your offer to talk with me.  It is very nice of you, but you seem busy enough.  Tomorrow morning is your Saturday night, and then I leave."

MS. FISCHER:  Let's take a look at the bottom of page 982 and the top of 983.

Q.  Does that appear to be an e-mail from Professor Bekaert to Professor Ravina?

A.  Yes.

Q.  Can you just read the last paragraph.

A.  "Hang in there.  Sending you positive thoughts.  But please do not bottle it all up.  Talking helps.  You can get sick if you bottle it up.  Trust me.  I know."

I7gnrav5                         Dunn - Cross

1             MS. FISCHER:  Let's go on to page 984.

2    A.  Can I just say one thing about that?

3    Q.  Please.

4    A.  You know, I thought that that whole exchange, you know,

5    reflected two people who you, you know, cared about each other

6    on some level and were trying to be supportive to each other.

7             When I wrote the outcome, I didn't talk about that

8    piece in particular because I wanted to give them both the

9    dignity of, you know, grieving and mourning the people they

10   love in private.  And so, you know, I'm sorry that we have to

11   kind of revisit this in this context.  That can't be easy.

12            I just want to say that.

13   Q.  Thank you.  Well, why don't we pause here for a minute.

14   Looking at the various e-mails that we've looked at so far, did

15   you have any particular impressions after reading these

16   documents?

17   A.  Again, you know, I thought that these e-mails highlighted

18   the friendly and social relationship that these two people had,

19   and I thought there were a number of comments that, that seemed

20   to be somewhat flirtatious, whether, you know, talking about

21   how hot Owen Wilson is or, you know, talking about dreaming of

22   Belgian chocolates or different things.  It just showed

23   different levels of their relationship.

24            MS. FISCHER:  If we can look at page 984, please, the

25   e-mail on the top of the page from Professor Bekaert to

I7gnrav5                    Dunn - Cross

1   Professor Ravina.

2   BY MS. FISCHER:

3   Q.  Can you just read the second paragraph.

4   A.  "On something entirely different:  Is your vitae on the web

5   current?  What is the status of your habit and beauty papers?

6   As I told you before, you really got to get these published."

7           MS. FISCHER:  And now let's look at the next page,

8   985.

9   Q.  The middle of that page, there is an e-mail from Professor

10  Bekaert, it's actually underlined.  And, again, these are not

11  your underlines, right, Mr. Dunn?

12  A.  That's correct.

13  Q.  What's underlined here?

14  A.  "Yeah, but the biggest gain per unit of time is for you to

15  get your two single-authored papers published in a top journal

16  or at least one.  I keep telling you, but you do not seem to

17  listen."

18  Q.  What is the date on this?

19  A.  April 13, 2013.

20  Q.  What was your impression of these last couple of

21  communications we just looked at?

22  A.  I thought that Professor Bekaert was looking out for

23  Professor Ravina's professional advancement.  He was trying to

24  encourage her and direct her to really make sure that she

25  advanced along the tenure track and got those papers published

I7gnrav5                         Dunn - Cross

1    even when he wasn't directly involved with them.

2              MS. FISCHER:  I would like to look -- stay on these

3    two pages for just a moment.

4    BY MS. FISCHER:

5    Q.  At the bottom of page 984 and the top of 985 is an e-mail

6    from Professor Bekaert to Professor Ravina.

7              Do you want to just read that e-mail?

8    A.  "Barrage of e-mail.  Will see if I got time left to call or

9    meet.  You may need to swallow your disgust and come to the

10   Upper West Side.

11   Q.  Now let's look at Professor Ravina's response.  Can you

12   please read that e-mail.

13   A.  "Of course, I will come to the Upper West Side.  It is out

14   of the question.  Lucerne office or other place you like/it's

15   convenient.  If it would be very rude to go anywhere else given

16   the time constraints.  Plus, you are always very nice and let

17   me pick, and I do like the Upper West Side.  I just like to go

18   to new places, but there is no time.

19             "I also don't have any time constraints either so

20   anytime today or tomorrow works.

21             "Thank you, I really appreciate it."

22             MS. FISCHER:  Let's take a look at 986, and we're

23   almost done with this.

24   Q.  On the bottom of the page it appears that there is an

25   e-mail from Professor Bekaert, 1:39 p.m.

1    What's the date on that, Mr. Dunn?

2    A.  June 23, 2013.

3    Q.  Can you just read that first paragraph, beginning "BTW."

4    A.  "BTW, should we still meet somehow also about the mentoring

5    thing.  Need to know where you stand.  It is going to be tough,

6    though.  Maybe we can have a brief talk on the phone."

7    Q.  What was Professor Ravina's response?

8    A.  "You don't want to be my mentor anymore?"

9    Q.  Let's look at the next e-mail.  What did Professor Bekaert

10   respond?

11   A.  "Sorry.  It would be tough to meet right now given, my

12   schedule, but hey maybe you tell me.  Should I be your mentor?

13   You never listen to me anyway."

14        MS. FISCHER:  Now let's look at just that top e-mail

15   on the page.

16   Q.  If you can just read the second paragraph?

17   A.  "I would love for you to be my mentor, of course only if

18   you want to."

19        MS. FISCHER:  And we will look at just one more e-mail

20   in this packet.  If you can go to page 9 -- the bottom of page

21   990 and the top of 991.

22   BY MS. FISCHER:

23   Q.  Is this an e-mail from Professor Bekaert to Professor

24   Ravina that was provided to you?  I'm sorry.  We are not on the

25   right page yet.  Here we go.  Starting on the bottom of 990,

1    the very last --

2    A.  Yes.

3    Q.  -- e-mail on the page.  There you go.

4    A.  Yes, this e-mail was provided to me.

5    Q.  All right.  And can you just read the note that begins

6    "BTW."

7    A.  "BTW, real quick, habits is still R and R at RFS.  Beauty R

8    and R at JF, but neither has gone into the second round.

9            "What is the status of the paper with Parvisini?"

10   Q.  And then just the next paragraph there.

11   A.  "Are there any other active working papers, papers

12   submitted?  Your CV/website are very unclear about the status

13   of your research."

14   Q.  Looking at this exhibit and -- did reviewing these e-mails

15   change your impression of this case?

16   A.  Yes.

17   Q.  How?  In what way?

18   A.  As I said before, you know, it showed some different kind

19   of flirtatious interactions between the two of them.  And I

20   think that this also clarified some of the mentoring question,

21   you know, whether or not Professor Bekaert was a formal mentor

22   as assigned by the division or the business school.  It seemed

23   to be a very kind of mutual mentoring relationship in which

24   Professor Ravina kind of appreciated him in that role and he

25   was willing to be a mentor to her whether or not there was an

1   official status attached to it.

2           And in that mentoring role he was trying to support

3   and encourage her, based on my reading of the e-mails, to work

4   on a number of papers and research projects beyond the ones

5   that they were working on together.

6           MS. FISCHER:  Is now a good time?

7           THE COURT:  Are you done or do you have a little bit

8   more.

9           MS. FISCHER:  No, I have more.  I am a happy to go on.

10          THE COURT:  Why don't you go for a few more minutes,

11  because we are going to go to 5:30 today.

12          MS. FISCHER:  No problem.

13          THE COURT:  I just want to take the break in the

14  middle.

15          MS. FISCHER:  OK.

16          Why don't -- can we -- can we pull up Plaintiff's

17  Exhibit 80, which is not in evidence, and I believe it's been

18  redacted.

19  BY MS. FISCHER:

20  Q.  Mr. Dunn, can you identify Plaintiff's Exhibit 80?

21  A.  Those --

22  Q.  Are these your notes?

23  A.  Yes, these are my notes from a conversation that I had with

24  Janet Horan on September 24, 2014.

25          MS. FISCHER:  We offer Exhibit Plaintiff's Exhibit 80.

I7gnrav5                          Dunn - Cross

1                  MS. HARWIN:  No objection.

2                  THE COURT:  It will be admitted.

3                  (Plaintiff's Exhibit 80 received in evidence)

4     BY MS. FISCHER:

5     Q.  Before we get there, I want to turn back for just a second,

6     and we don't have to look at the documents again, but those

7     e-mails we just reviewed, I believe Exhibits U and V.

8                  Did your review of those e-mails impact your opinion

9     as to whether Professor Bekaert was delaying his work with

10    Professor Ravina?

11    A.  Yes.

12    Q.  In what way?

13    A.  After reviewing those e-mails, there were numerous

14    exchanges between Professor Bekaert and Professor Ravina about

15    the status of the work and why it was or was not advancing.

16    And from those e-mails I could see that there had been issues

17    in which Professor Ravina fired the research assistant who had

18    been supporting the work, Professor Bekaert hadn't been aware

19    of that, and that led to a very contentious dialogue between

20    them in terms of, you know, hire the RA back or who would do

21    the regressions in order to keep the work moving forward.

22                  In addition, there was an episode where Professor

23    Ravina rescheduled a meeting with the research assistant but

24    hadn't told Professor Bekaert about it because she didn't know

25    for sure if he was coming.

1          There were just instances like that that presented a

2   very plausible narrative of why things were delayed in a way

3   that had nothing to do with any kind of sexual harassment or

4   any kind of gender-based harassment.

5          MS. FISCHER:  Let's pull up -- thank you.  Let's pull

6   up Plaintiff's Exhibit 80 again, please.  And can we just zoom

7   in on the bottom paragraph that says "Professor Bekaert."

8   BY MS. FISCHER:

9   Q.  Do these notes reflect a discussion you had with Vice Dean

10  Horan?

11  A.  Yes, they do.

12  Q.  And what was discussed?

13  A.  We talked about a meeting that took place on the previous

14  Monday morning with Janet Horan, the dean of the business

15  school, Kathy Phillips, and Professor Bekaert.

16         He expressed annoyance that this was still going on,

17  denied that there was any sexual harassment happening.

18         And it looked like Dean Hubbard had talked about the

19  power issue there and the appearance that he, Professor

20  Bekaert, was preventing Professor Ravina from getting her

21  papers done.

22         And then it also discussed Daniel Wolfenzon as the new

23  relationship manager, and they talked about a proposed new

24  schedule from Professor Ravina to finish up the papers.

25         MS. FISCHER:  Let's look at the next page.  I believe

I7gnrav5                          Dunn - Cross

1    this continues just zooming in on the top.  Thank you.

2    BY MS. FISCHER:

3    Q.  What else was said?

4    A.  Professor Hubbard -- Dean Hubbard said that they were both

5    acting unprofessionally, and then they were working on setting

6    up an additional follow-up meeting to continue to address the

7    situation.  And my next step from this conversation with Janet

8    was that I was going to be meeting with Professor Bekaert later

9    that day.

10            MS. FISCHER:  Could you please show Mr. Dunn

11   Defendants' Exhibit HU.

12   Q.  Is this an e-mail correspondence between you and Andrew

13   Ang, Mr. Dunn?

14   A.  Yes, it is.

15   Q.  What is the date on this communication?

16   A.  October 21, 2014.

17   Q.  Who is Andrew --

18            MS. FISCHER:  We offer Defendants' Exhibit HU into

19   evidence?

20            THE COURT:  Any objection?

21            MS. HARWIN:  No objection.

22            THE COURT:  HU will be admitted.

23            (Defendants' Exhibit HU received in evidence)

24   BY MS. FISCHER:

25   Q.  Who was Andrew Ang?

A.   Professor Ang was the department chair of Professor Ravina

and Professor Bekaert's department.

Q.   Why did you contact Professor Ang?

A.   I contacted him to find out more about how mentoring worked

among senior and junior faculty in their division.  I was

trying to corroborate what the parties had told me about

whether or not Professor Bekaert was a formal mentor in the

division's eyes to professor Ravina.

Q.   And what did Professor Ang respond to you?

A.   He said that there were no specific assignments made of

mentors, but that all senior faculty members were generally

expected to serve as mentors to the junior faculty members.

Q.   How did this exchange impact your investigation, if it did?

A.   Well, I believe that Professor Bekaert had told me that he

was Professor Ravina's formal or official mentor, so this

information, you know, affected his credibility on that point.

        But, otherwise, even beyond what Professor Ang told

me, the e-mails that we had just looked at showed that

Professor Ravina and Professor Bekaert had a kind of voluntary,

mutually agreed upon mentoring relationship that was

independent of any formal designation.

        MS. FISCHER:  Let's move on to Defendants' Exhibit ID,

please.

Q.   Mr. Dunn, is this an e-mail exchange between you and

Melissa Rooker?

1   A.  Yes, it is.

2            MS. FISCHER:  We offer Exhibit ID.

3            THE COURT:  Any objection?

4            MS. HARWIN:  No, your Honor.

5            THE COURT:  ID is admitted.

6            (Defendants' Exhibit ID received in evidence)

7   BY MS. FISCHER:

8   Q.  Mr. Dunn, there is an e-mail from you that begins in the

9   middle of this top section:  "Hi, Melissa.  Not yet.  I was

10  working on Bekaert all afternoon."

11           And there's some information that's redacted.

12           Do you have any understanding of what "I was working

13  on Bekaert all afternoon," what that is a reference to?

14  A.  I believe I may have been working on drafting the outcome

15  letter and compiling and synthesizing all the information and

16  evidence we had gathered.

17           MS. FISCHER:  Can we please pull up Defendants'

18  Exhibit IF.

19           THE WITNESS:  Thank you.

20  BY MS. FISCHER:

21  Q.  Mr. Dunn, do you recognize this as an e-mail between you,

22  Kathy Phillips, and Janet Horan?

23  A.  Yes, I do.

24           MS. FISCHER:  We offer Exhibit IF into evidence.

25           THE COURT:  Any objection?

1          MS. HARWIN:  No objection.

2          THE COURT:  IF will be admitted.

3          (Defendants' Exhibit IF received in evidence)

4    BY MS. FISCHER:

5    Q.  If you look on page 2 of this document, Mr. Dunn, that

6    bottom e-mail from you, "Hi, Janet could you please send me a

7    copy of Professor Ravina's most recent faculty activity form.

8    Thanks very much, Michael."

9          What is a faculty activity form?

10   A.  A faculty activity form basically compiles all of a faculty

11   members' academic activity, so their research, their papers,

12   research in progress, teaching, teaching evaluations, grant

13   applications, everything they've done in their role as a

14   faculty member during a certain period of time.

15   Q.  And what was the date of your e-mail to Vice Dean Horan?

16   A.  October 28, 2014.

17   Q.  Why did you request Professor Ravina's faculty activity

18   form?

19   A.  To the best of my recollection, I think that I had

20   requested this form so that I could have a better sense of how

21   Professor Ravina's professional trajectory was going on terms

22   of her progression on the tenure track.

23   Q.  Let's look at page 1 of this document, please, this e-mail

24   from Kathy Phillips to you.

25          It reads, "Hi, Michael attached please find the most

I7gnrav5                    Dunn - Cross

recent FAR report."

          Is an FAR a faculty activity form or a faculty

activity report?

A.  Yes.

Q.  Is that the same thing that you had requested in your

e-mail below?

A.  Yes.

Q.  "From Enrichetta Ravina which was submitted for the January

1-December 31, 2013, time frame.  I am including the CV that

was submitted as well."

          MS. FISCHER:  And then if we could take a look at the

document -- at the page that begins with Bates No. 903.

Q.  Well, first let me ask you, Mr. Dunn, does this appear to

be Professor Ravina's faculty activity report?

A.  Yes.

Q.  Is this the document that you requested?

A.  Yes.

Q.  Does it appear to be attached to the e-mail from professor

Phillips?

A.  Yes, it does.

Q.  All right.  Let's look in the bottom of that page, 903,

under "Not Yet Submitted."

          Can you please just read under B the, those three

lines.

A.  "In the first part of the year, in addition to working on

I7gnrav5                         Dunn - Cross

1    the revisions above, I have done a lot of work and analysis on

2    the 401(k) dataset to make it ready with the expectation that I

3    have had more advanced drafts than the two below, but it looks

4    like things will be moving now."

5    Q.  Did you have an understanding of who filled out this form?

6    A.  I believe that Professor Ravina filled it out.

7    Q.  How did reviewing professor -- well, did you review this

8    document at the time?

9    A.  Yes, I did.

10   Q.  How, if at all, did this document impact your assessment?

11   A.  To the best of my recollection, I don't think this document

12   had a big impact on the assessment of whether Professor Bekaert

13   had engaged in any policy violations, but it was helpful to

14   better understand the academic and research questions involved

15   in the issue.

16           MS. FISCHER:  Can we please pull up Defendants'

17   Exhibit IG.

18   BY MS. FISCHER:

19   Q.  Mr. Dunn, is this an e-mail exchange between you and

20   Professor Bekaert?

21   A.  Yes, it is.

22           MS. FISCHER:  Can we offer Exhibit IG.

23           THE COURT:  Any objection?

24           MS. HARWIN:  No, your Honor.

25           THE COURT:  IG will be admitted.

1        (Defendants' Exhibit IG received in evidence)

2   Q.  Mr. Dunn, if you look at the e-mail that begins on the

3   bottom of the first page and it continues, did you ask

4   Professor Bekaert for an additional interview?

5   A.  Yes, I did.

6   Q.  And what was the date that you asked him for another

7   interview?

8   A.  October 28, 2014.

9   Q.  Why did you ask professor Bekaert for an additional

10  interview?

11  A.  I had -- I had one kind of very specific question I wanted

12  to ask him about, so I wanted to find a time for us to speak.

13  Q.  And did you speak with him?

14  A.  Yes, I did.

15        MS. FISCHER:  Can you please pull up Defendants'

16  Exhibit IO.

17        THE WITNESS:  Thank you.

18  Q.  Mr. Dunn, is this an e-mail you sent to Professor Ravina?

19  A.  Yes, it is.

20  Q.  What is the date of this e-mail?

21  A.  November 7, 2014.

22        MS. FISCHER:  We offer Exhibit IO.

23        THE COURT:  Any objection?

24        MS. HARWIN:  No objection.

25        THE COURT:  It will be admitted.

I7gnrav5                           Dunn - Cross

1           (Defendants' Exhibit IO received in evidence)

2    BY MS. FISCHER:

3    Q.  Can you please just read the first two sentences.

4    A.  "I hope you are well.  I am in the process of finalizing

5    the report and I've just a few follow-up questions I'd like to

6    ask to clarify a few points."

7    Q.  And then did you ask her for a time to meet?

8    A.  Yes, I presented some different windows of time for a phone

9    call -- for a meeting.

10   Q.  And did you in fact speak with Professor Ravina again?

11   A.  Yes, I did.

12   Q.  Did you prepare a -- why don't we show you defendants

13   Exhibit D.

14           Do you recognize this document?

15   A.  Yes, I do.

16   Q.  What is this document?

17   A.  This is a document of the issues I wanted to speak with

18   Professor Ravina about.

19           MS. FISCHER:  We offer Exhibit D.

20           THE COURT:  Any objection?

21           MS. HARWIN:  No objection.

22           THE COURT:  It will be admitted.

23           (Defendants' Exhibit D received in evidence)

24   BY MS. FISCHER:

25   Q.  Why were you e-mailing Professor Ravina or why did you --

1    why did these issues come up at that time, meaning in November

2    of 2014?

3    A.  To the best of my recollection, you know, these issues were

4    really drawn from what Professor Bekaert had shared with me,

5    the information that he had provided.  And so I wanted to speak

6    with Professor Ravina in order to get her perspective on what

7    Professor Bekaert had said and to learn more from Professor

8    Ravina about some of the issues that Professor Bekaert had

9    introduced to me.

10   Q.  I believe you said, but did you speak with Professor

11   Ravina?

12   A.  Yes, I did.

13          MS. FISCHER:  Can you please pull up Defendants'

14   Exhibit IT?

15   Q.  Look at this document.

16          MS. FISCHER:  It's actually -- can you -- can we look

17   at the first couple pages of this document, please.

18   BY MS. FISCHER:

19   Q.  Are these your typed up notes?

20   A.  Yes, they are.

21          MS. FISCHER:  And now can we look on the next page.

22   Q.  Are these your handwritten notes?

23   A.  Yes.

24   Q.  And are these notes you took during your discussion with

25   Professor Ravina?

1    A.   Yes, they are.

2    Q.   And what date was your discussion with Professor Ravina?

3    A.   November 12, 2014.

4    Q.   And what did Professor Ravina discuss with you during this

5    interview?

6    A.   We spoke about a lot of the different issues that had been

7    raised; everything from, you know, who made arrangements for

8    the dinner to the question of to whom Professor Bekaert gave

9    chocolates; the whole question of mentorship, comments about

10   Owen Wilson being hot, for example.

11           We also talked about the mug in Professor Bekaert's

12   office, and then we talked more about the alleged delays of the

13   papers.  Those were some of the main issues that we focused on.

14   Q.   Had Professor Ravina mentioned the mug to you in prior

15   conversations?

16   A.   No, this was the first I had heard about the mug.

17           MS. FISCHER:  Can we please pull up Defendants'

18   Exhibit IQ.

19   Q.   I would like to look at the e-mail -- is this an e-mail

20   exchange between you and Professor Bekaert, Mr. Dunn?

21   A.   Yes, it is.

22           MS. FISCHER:  We offer Exhibit IQ into evidence.

23           THE COURT:  Any objection?

24           MS. HARWIN:  No, your Honor.

25           THE COURT:  IQ will be admitted.

I7gnrav5                        Dunn - Cross

1           (Defendants' Exhibit IQ received in evidence)

2           THE COURT:  Feel free to go through this document, but

3   I think we should probably take a break soon.

4           MS. FISCHER:  OK.

5   Q.  Look at the e-mail at the bottom of page 1, going on to the

6   top of page 2.  I'm sorry.

7           The e-mail on page 1 from you to Professor Bekaert at

8   1:40 p.m.

9           "Dear Geert, would you have time for a five-minute

10  call this afternoon anytime after 3 p.m.  I have a very

11  specific follow-up question for you."

12          Why did you e-mail Professor Bekaert on November 12?

13  A.  To the best of my recollection, I sent this e-mail after

14  speaking with Professor Ravina so that I could ask him about

15  this new allegation involving the mug.

16  Q.  And what date -- was this -- when did you e-mail Professor

17  Bekaert in relation to when Professor Ravina raised the issue

18  of the mug with you?

19  A.  I believe it was the same day.

20          MS. FISCHER:  Why don't we look back at IT, the third

21  page, which shows -- Mr. Dunn's notes.

22  BY MS. FISCHER:

23  Q.  What's the date there?

24  A.  November 12, 2014.

25          MS. FISCHER:  And now let's look back at IQ.

I7gnrav5                    Dunn - Cross

1  Q.  What's the date that you asked Professor Bekaert to speak?

2  A.  November 12, 2014.

3            MS. FISCHER:  Now is a good point.

4            THE COURT:  Ladies and gentlemen, why don't we take

5  our afternoon break.  Please remember keep an open mind and

6  don't discuss the case.

7            (Jury not present)

8            THE COURT:  Please come back in 15 minutes.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7g1rav6                         Dunn - Cross

1                    (In open court; jury not present)

2                    THE COURT:  Everyone can be seated and we'll bring the

3      jury in.

4                    (Jury present)

5                    THE COURT:  All right.  Everyone can be seated.

6                    Please proceed.

7                    MS. FISCHER:  Thank you.

8      BY MS. FISCHER:

9      Q.  Right before the break, Mr. Dunn, we were looking at

10     defendant's IQ.

11                   MS. FISCHER:  If we could just pull that up again,

12     please.

13     Q.  And Mr. Dunn, looking at this document, did you have a

14     further discussion with Professor Bekaert?

15     A.  Yes, I did.

16                   MS. FISCHER:  Can you please pull up Defendant's

17     Exhibit IU.  IU.  Thank you.

18     Q.  Mr. Dunn, are these your handwritten notes?

19     A.  Yes, they are.

20     Q.  And what's the date on them?

21     A.  November 12, 2014.

22                   MS. FISCHER:  We offer Defendant's IU into evidence.

23                   THE COURT:  Any objection?

24                   MS. HARWIN:  No, your Honor.

25                   THE COURT:  All right.  It will be admitted.

1      (Defendant's Exhibit IU received in evidence)

2  Q.  Mr. Dunn, are these your notes from your discussion with

3  Geert Bekaert?

4  A.  Yes, they are.

5  Q.  What was discussed?  What did you discuss with Professor

6  Bekaert on November 12th?

7  A.  We talked about the mug that Professor Ravina had mentioned

8  to me that day, and we also talked about Professor Bekaert's

9  busyness and all the projects he was working on.

10 Q.  In the middle of the page, there's a note, "GB to send me

11 the vitae."  Do you have an understanding of what that's in

12 reference to?

13 A.  Yes.  He was going to send me his curriculum vitae, which

14 had the listing of all of his current and ongoing projects.

15 Q.  Before we get there, looking at No. 1 in this document,

16 what did Professor Bekaert tell you about the mug?

17 A.  He told me that the mug had written on it, it said,

18 "Cultured, refined, sophisticated," and then I believe on the

19 bottom of the mug, it said "and horny."  I asked Professor

20 Bekaert about the interaction with Professor Ravina and the mug

21 and he said that she had pointed it out.  He said he didn't

22 remember.  And that he had received it from friends a long time

23 ago.

24 Q.  After this conversation did Professor Bekaert send you his

25 vitae or CV?

I7g1rav6                          Dunn - Cross

 1   A.  Yes, he did.

 2            MS. FISCHER:  Could we pull up Defendant's Exhibit IR,

 3   please.

 4   Q.  Is this an email you received from Professor Bekaert?

 5   A.  Yes, it is.

 6            MS. FISCHER:  We offer Defendant's IR into evidence.

 7            THE COURT:  Any objection?

 8            MS. HARWIN:  No, your Honor.

 9            THE COURT:  IR will be admitted.

10            (Defendant's Exhibit IR received in evidence)

11            MS. FISCHER:  Thank you.

12   Q.  And Mr. Dunn, what's the date of this communication?

13   A.  November 12, 2014.

14   Q.  Looking at the first paragraph, the fourth to last line of

15   the first paragraph beginning in the middle, how did Professor

16   Bekaert describe the mug?

17   A.  "It is indeed a bizarre memento," that line?

18   Q.  Yes.

19   A.  So he -- he said that he had -- it was his own memento, in

20   his words, he said he had gotten it from his mother-in-law, and

21   he said that he thought it was funny but people can disagree.

22   Q.  And the next paragraph begins, "Second, on me being busy."

23   Did Professor Bekaert email you about his being busy?

24   A.  Yes, he did.

25   Q.  And what did he communicate to you on that topic?

A.  He talked about the extensive number of projects he had

going on at once and he talked about how he would, you know,

work simultaneously on some, there would be delays in others,

others moved forward more incrementally, and he just spoke

about how he managed all of these different projects and he

talked about how he believed he had been the one who was making

progress on these research partnerships with Professor Ravina.

            MS. FISCHER:  Can we look at page 2 of this email,

please.

Q.  Does this appear to be a continuation of Professor

Bekaert's email to you?

A.  Yes.

Q.  Looking at where it says, "In summary," in the middle of

the page, what's the first sentence in point A there?

A.  "Yes, I am really, really busy, but frankly, I do produce

and get my research mostly written up and published.  When I am

in New York, I work mostly seven-day weeks."

Q.  And then B, can you please read the first sentence.

A.  "I was actually happy with the progress on the projects

with Enrichetta.  The main cause preventing rapid progress was

that we got the data very late, and by then it was becoming

quite difficult to salvage Enrichetta's career."

Q.  And the next sentence, please?

A.  "I have no idea why she did not take my advice and put more

time in the revise and resubmits she had at top finance

1    journals."

2    Q.  Now let's look at C.

3    A.  "I am --"

4    Q.  Just the first sentence.

5    A.  "I am taken aback at Enrichetta's attempts to put a

6    different spin on the personal conversations, dinners, and

7    encounters we of course did have.  I considered us to be good

8    friends."

9    Q.  And then now let's just look at the bottom paragraph on

10   that page.  Can you just read the first two sentences, please.

11   A.  "This case is very upsetting to me.  I considered her to be

12   a good friend, and I tried to help her in many ways.  I also

13   spoke on her behalf in faculty meetings as I did believe early

14   on that a combination of her personal work, the R&Rs, and our

15   joint work could revive her career."

16   Q.  And the next sentence?

17   A.  "And after a few strong emails, ironically essentially

18   about her stalling the projects, I'm suddenly made the

19   scapegoat for all and any of her perceived failures."

20   Q.  Did Professor Bekaert attach his CV to this email?

21   A.  Yes, he did.

22   Q.  Let's just take a look beginning on page 67032.

23         Is this the CV that Professor Bekaert sent to you?

24   A.  Yes, it is.

25   Q.  And what were -- and did you review it, Professor Bekaert's

1   CV?

2   A.  I did, yes.

3   Q.  What were your impressions after reviewing this email and

4   Professor Bekaert's CV?

5   A.  The CV and the email did confirm sort of how busy he was in

6   terms of the number of projects he was working on and that he

7   had in the pipeline.  The email address also -- the email

8   itself -- excuse me -- also served to kind of summarize his

9   entire position on this issue and summarize his narrative of

10  what was going on with Professor Ravina.

11  Q.  Did you come to a conclusion as to whether or not

12  Columbia's EOAA policies were violated?

13  A.  I did.

14  Q.  And did you memorialize your conclusions in a letter?

15  A.  Yes, I did.

16          MS. FISCHER:  Can we please display Plaintiff's 90,

17  which I believe is admitted.

18  Q.  Is this the letter that you just referred to?

19  A.  Yes, it is.

20  Q.  Called an outcome letter?

21  A.  Yes.

22          MS. FISCHER:  Let's look at page 6 of this document,

23  the middle paragraph on that page.

24  Q.  "In conclusion, based on a review of the allegations,

25  interviews with the parties involved, and a review of the

I7g1rav6                         Dunn - Cross

1   relevant documentation, I did not find evidence to support that

2   Professor Bekaert indeed used sexual harassment in violation of

3   Columbia University's employment policies and procedures on

4   discrimination and harassment."

5           Was that the conclusion that you reached?

6   A.  Yes, it was.

7   Q.  How did you come to this conclusion?

8   A.  I came to that conclusion based on the interviews with

9   Professor Ravina and Professor Bekaert, all the conversations

10  we had, you know, reviewing all of the voluminous emails that

11  they gave to me, the conversation with Nancy Xu, as well as

12  reviewing Professor Ravina's faculty activity report and

13  Professor Bekaert's CV and the materials he provided.

14  Q.  And based on your review of those materials, how did you

15  come to this conclusion?

16  A.  Well, given the nature of their relationship, I didn't find

17  evidence of unwelcome sexual advances or unwelcome sexual

18  activity by Professor Bekaert towards Professor Ravina.  I

19  didn't find evidence that Professor Bekaert was delaying

20  Professor Ravina's papers, and even if so, there wasn't any

21  evidence that any delay was motivated for sexual harassing

22  reasons.  Instead, as I wrote in this letter, I found that

23  there was a -- a friendly relationship that was flirtatious at

24  times.  They both acted inappropriately and unprofessionally.

25  I noted that Professor Bekaert's behavior was more egregious

I7g1rav6                         Dunn - Cross

```
 1  than Professor Ravina's in part due to his role and the power
 2  imbalance there with him as a senior tenured faculty member,
 3  and so I did recommend that he should receive additional
 4  training.  But as -- even though I did find that the actions
 5  were unprofessional, I did not find that they violated these
 6  very specific policies on sexual harassment and the other
 7  issues covered by EOAA.
 8  Q.  Well, do you recall being asked this morning about whether
 9  you investigated sexual harassment or, as you just described,
10  other EOAA issues?
11  A.  Yes.
12  Q.  Did you investigate all of the issues that Professor Ravina
13  raised with you?
14  A.  Yes, I did.
15  Q.  Why is your letter -- I'm looking at page 1, where there's
16  a definition of sexual harassment.  Why does your letter state
17  the sexual harassment -- or appear to state the sexual
18  harassment portion of the EOAA policy and not the
19  discriminatory harassment or gender discrimination portion?
20  A.  Sexual harassment was the main issue that was implicated by
21  the concerns that Professor Ravina had raised, and sexual
22  harassment is a form of discriminatory harassment.  It's a form
23  of discrimination.  And so this language was included because
24  that would be the main focus of the investigation and of our
25  analysis.
```

1  Q.  Had Professor Ravina used the term "gender discrimination"

2  or "discriminatory harassment," would your investigation have

3  been any different?

4  A.  No, I don't believe so.

5  Q.  Did you investigate the pace of Professor Ravina's research

6  to see if her papers were held back by Professor Bekaert?

7  A.  I did not investigate that specific question.

8  Q.  Why not?

9  A.  Because the investigation was focused on whether Professor

10  Bekaert engaged in sexual harassment towards Professor Ravina.

11  There are any number of reasons why papers could be delayed, if

12  they are delayed, by Professor Bekaert.  I needed to focus my

13  investigation on the very specific purview of EOAA, which is

14  whether sexual harassment is occurring.

15        MS. FISCHER:  Could we have the second to last page of

16  the outcome letter, the last line that contains the sentence

17  that contains, to the last page.

18  Q.  "I found that you and Professor Bekaert engaged in a

19  friendly working relationship that soured when you did not

20  communicate effectively regarding your concerns about the

21  status of your projects."

22        Do you see that, Mr. Dunn?

23  A.  Yes, I do.

24  Q.  Were you blaming Professor Ravina for what happened?

25  A.  I did not intend to, and as I look back now, I think that's

I7g1rav6                        Dunn - Cross

one sentence that I wish I could rewrite in that I do not think

that Professor Ravina solely failed to communicate effectively

and that's what soured the relationship.  I do think it was a

mutual process they were both responsible for.  And so I do

think that this sentence is -- could be written in a more clear

way.  I should have written, "I found that you and Professor

Bekaert engaged in a friendly working relationship that soured

when you both did not communicate effectively," or something

along those lines.

Q.  And did you note in your letter that Professor Ravina and

Professor Bekaert both did not communicate effectively?  Is

that noted anywhere in your letter?

A.  Yes, I believe it is.  And I note a few sentences down that

Professor Bekaert communicated in a more egregious manner and

addressed Professor Ravina in unnecessarily aggressive tones

that were ill suited for his position.  So I tried to be clear

about that.

Q.  As part of your investigation, I believe you testified that

you interviewed -- who did you interview as part of your

investigation?

A.  I spoke with Professor Ravina twice, Professor Bekaert

three times, and I spoke with Nancy Xu once.

Q.  Why didn't you interview anyone else?

A.  The parties didn't identify anyone else as being a

potential witness who could speak to the allegations that they

I7g1rav6                         Dunn - Cross

1    were discussing.

2    Q.  What do you mean by "speak to the allegations"?

3    A.  People who had, you know, direct firsthand information

4    about what was happening, people who had seen things or been

5    present, you know, more than just hearing things secondhand or

6    as hearsay.

7    Q.  Looking back at the outcome letter still in front of you,

8    the very last paragraph, "In light of these conclusions, I

9    refer this matter to CBS for appropriate action and training."

10            Why did you refer this matter to Columbia Business

11   School for appropriate action and training?

12   A.  Because even though we found that there wasn't a violation

13   of the EOAA policies, we certainly found communication and

14   professional interactions that were not up to par and that

15   reflected a certain lack of professionalism, and so even if it

16   wasn't a formal policy violation that might merit some kind of

17   punitive or disciplinary action, there was certainly room for

18   improvement in how Professor Bekaert in particular was engaging

19   with Professor Ravina.

20            May I add one thing too to my last answer about

21   interviewing people.  I think it's important to note also that

22   in addition to the conversations with the parties and Nancy, I

23   had also received almost 250 pages of emails between these two

24   people, many of which overlapped, which also offered

25   black-and-white proof of the nature and the dynamics between

1   them, and so those emails were really helpful also in

2   illustrating how these two people interacted with each other.

3          MS. FISCHER:  Could we please pull up Plaintiff's 63.

4   It's already in evidence.

5   Q.  And Mr. Dunn, can you just identify this again.  I just

6   have one or two questions about this.

7   A.  These are the notes that I wrote during my first meeting

8   with Professor Ravina on August 12, 2014.

9          MS. FISCHER:  Can we go to page 3 of this document,

10  please.  Second paragraph.

11  Q.  Can you please read the second paragraph.

12  A.  "Concerned regarding retaliation.  GB doesn't respect the

13  rules.  Worried he'll spread bad things to other colleagues."

14  Q.  Why didn't you investigate whether Professor Bekaert

15  retaliated against Professor Ravina?

16  A.  Well, with this statement, Professor Ravina expressed that

17  she was worried about possible future retaliation.  She never

18  alleged to me that he engaged in retaliation, you know, during

19  this conversation -- during this conversation or anything like

20  that.  She expressed concern that he would retaliate in the

21  future.  And in part that's why I made sure to emphasize the

22  prohibition on retaliation during my conversations with him.

23         MS. FISCHER:  Can we please pull up Plaintiff's 47.

24         THE COURT:  It's already admitted.

25         MS. FISCHER:  This is already admitted, yes.

I7g1rav6                         Dunn - Cross

1   Q.  And Mr. Dunn, do you recall this email?

2   A.  Yes, I do.

3   Q.  And what's the date on this email?

4   A.  July 14, 2014.

5   Q.  Was this email sent before or after Professor Ravina met

6   with Kathy Phillips and complained of what was then referred to

7   as sexual innuendos?

8   A.  I believe it was sent before.

9   Q.  Mr. Dunn, you were asked some questions earlier about the

10  timing of your investigation and why it took several months to

11  complete.  Why did your investigation, which began sometime in

12  July or early August, take until November for you to complete?

13  A.  It took that much time to complete because we needed to do

14  a really thorough job and we needed to follow up on all the

15  different issues that were being reported.  In addition to the

16  multiple interviews I had with the parties, you know, it took

17  time to go through all those emails, to ascertain what I needed

18  to follow up on, and then after I spoke with one party about

19  it, I needed to go back to the other and learn more.  And so

20  even with something like the mug, which was new information

21  that came up fairly late in the investigative process, I needed

22  to go back and speak with the parties again about that.

23          And so, you know, also at the same time as this

24  investigation, there were other investigations going on, other

25  matters that might become urgent or high priority on any given

I7g1rav6                          Dunn - Cross

1      day, so it was a matter of really trying to make sure that we

2      could do the best we could.

3             And, you know, I note emails in here that I sent well

4      after working hours, which I think reflects kind of how we were

5      trying to move things forward and resolve this as expeditiously

6      as possible, but knowing that we can't rush it.  And if we did

7      an investigation in one week, I'd be really concerned that we'd

8      miss things.  You know, it takes time to be thorough.  And in a

9      case like this, I know that it's -- the investigation took

10     longer than any of us would have liked, but I -- I felt some

11     relief in the fact that the business school was already

12     implementing a number of remedies to address the situation even

13     as the investigation was ongoing.

14     Q.  Could you just expand on that last statement.  What

15     remedies are you referring to?

16     A.  Well, the business school had identified a relationship

17     manager, they were working on plans regarding the authorship of

18     the papers, they were talking about Professor Ravina's tenure

19     clock and Professor Bekaert's involvement in that process, the

20     dean and other high-level administrators were involved in

21     ongoing conversations, and even at the point where I became

22     involved as a member of EOAA, it's not like, well, EOAA is

23     dealing with it so now the business school is going to stop.

24     All of those conversations and meetings continued and I became,

25     you know, another member of the team trying to address the

 1    situation, even as we worked to get at the bottom of it through

 2    the investigative process.

 3            MS. FISCHER:  Could we please pull up Defendant's

 4    Exhibit JB.

 5            THE COURT:  Any objection?

 6            MS. HARWIN:  No, your Honor.

 7            THE COURT:  It will be admitted.

 8            (Defendant's Exhibit JB received in evidence)

 9    BY MS. FISCHER:

10    Q.  Mr. Dunn, do you recognize this as an email correspondence

11    you had with Professor Ravina?

12    A.  Yes.

13    Q.  And what's the date of this correspondence?

14    A.  Professor Ravina emailed me on December 1st and I replied

15    to her on December 2, 2014.

16    Q.  On the first two pages, that's right.

17            In Professor Ravina's email to you beginning on the

18    bottom of page 1, can you just read the first sentence of her

19    email to you.

20    A.  "I've read your report carefully and I profoundly disagree

21    with it."

22    Q.  And the next sentence?

23    A.  "It is a biased, incomplete, and inadequate account of what

24    has happened."

25    Q.  Let's look at the top of page 2.  Can you just read the

1    first sentence, please.

2    A.   "Some of the most striking examples of facts and parts that

3    are missing in the report, despite being included in the emails

4    I sent you and in our conversations, are below.  It is by no

5    means a complete list."

6    Q.   Let's now look at these bullets.

7            The first, "The report completely ignores my complaint

8    about the way the school handled the case," what did you

9    understand that to be a reference to?

10   A.   I understood this to be an expression of Professor Ravina's

11   I guess frustration or disappointment at the way that the

12   business school had delayed the case or encouraged her to

13   forget about this or treating the case as a hot potato, always

14   landing on someone else's desk.  And that the college -- the

15   university was effectively siding with Professor Bekaert.

16   Q.   Did you believe that the business school delayed taking

17   care of her case --

18   A.   No, I did not.

19   Q.   -- handling her case?

20   A.   No, I did not.

21   Q.   If you look about five lines down, it says, "The report

22   also ignores the central issues related to protecting my

23   intellectual property."  Do you see that?

24   A.   Yes.

25   Q.   Did you have any understanding about whether Professor

Ravina's concerns about her work and the division of labor on

the projects she worked on with Professor Bekaert were being

handled?

A.  I'm sorry.  Can you repeat that question.

Q.  Sure.  I can make that more clear.

Did you have any understanding about whether Professor

Ravina's concerns about her work or, as she called it, her

intellectual property were being handled?

A.  Yes.

Q.  And what was that understanding?

A.  She was worried about Professor Bekaert, you know, delaying

her work in such a way that would prevent her from getting

publications out the door that would impede her progress

towards tenure.

Q.  If we go just a few lines down, it says, "These claims are

supported by dozens of emails I dropped by your office and of

which you have acknowledged receipt."

Did you think that Professor Ravina's claims were

supported by the dozens of emails she dropped by?

A.  No, I did not.

Q.  Looking down at the next paragraph, it says, "Second, you

have left multiple facts and emails out, have taken others out

of context, and, by doing so, twisted their meaning and

portrayed my responses as flirting with Geert."  Do you see

that?

1    A.  Yes.

2    Q.  Did you agree with what Professor Ravina wrote here?

3    A.  I did not.

4    Q.  In the next paragraph, "The report completely dismisses my

5    version of what happened."  Do you see that?

6    A.  Yes, I do.

7    Q.  Did Professor Ravina -- did you understand Professor

8    Ravina -- what did you understand Professor Ravina to be

9    communicating to you in this email?

10   A.  I interpreted this email, and really that sentence itself,

11   as kind of saying that we did not take this seriously and that

12   we -- we presented a very biased investigation and that we sort

13   of never were going to give her a fair shake in the

14   investigative process, and I absolutely disagree with that.  We

15   took Professor Ravina's version of what happened, to use her

16   language, incredibly seriously.  I chased down every allegation

17   that she raised, whether it was -- whether Professor Bekaert

18   gave her a music CD, whether he touched her hand, the

19   invitations to dinner and coffee, all those different elements.

20   And in fact when I spoke with Professor Ravina, she had told me

21   that looking at all these things individually, it's nothing

22   major, but when you look at it all together -- and so I did the

23   best I could to track down all those small little elements and

24   piece them together.  And I understand that she might disagree

25   with the conclusion that I reached, I understand that it's a

1   disappointing and frustrating outcome to read, because I know

2   this is a very, very big issue and a serious thing in her life,

3   and I respect that, but I think it's not fair to say that I

4   dismissed her version of what happened or didn't take it

5   seriously or I wasn't fair in my treatment of this issue.

6   Q.   During your multiple interviews of Professor Ravina, or

7   after the fact, the communications, did Professor Ravina ever

8   tell you that Professor Bekaert had raised his sex life or

9   sexual adventures with her?

10  A.   No, she did not.

11  Q.   During your multiple interviews with Professor Ravina or in

12  writing after your investigation concluded or during your

13  investigation, did Professor Ravina ever tell you that

14  Professor Bekaert had raised pornography with her?

15  A.   No, she did not.

16  Q.   During your multiple interviews of Professor Ravina or

17  otherwise in writing, did Professor Ravina ever tell you that

18  Professor Bekaert had placed his hand on her back?

19  A.   No, she did not.

20  Q.   During your multiple interviews with Professor Ravina or in

21  writing, did Professor Ravina ever tell you that Professor

22  Bekaert tried to kiss her?

23  A.   No, she did not.

24  Q.   During your multiple interviews with Professor Ravina or in

25  writing during your investigation or afterwards, did Professor

I7g1rav6                          Dunn - Cross

1   Ravina ever tell you that Professor Bekaert spoke to her about

2   prostitutes?

3   A.  No, she did not.

4   Q.  When was the first time you heard of any of those things?

5   A.  In the course of this litigation.

6   Q.  Had Professor Ravina raised any of those issues that I just

7   mentioned, would you have investigated them?

8   A.  Yes, absolutely.

9   Q.  I believe you testified to this earlier, Mr. Dunn, but are

10  you aware of any other complaints made to the EOAA office about

11  Professor Bekaert?

12  A.  Yes, I am.

13          MS. FISCHER:  Can we please pull up Plaintiff's 32.  I

14  think it's in evidence.

15  Q.  Can you please describe the substance of the complaint that

16  you received concerning Professor Bekaert, other than the one

17  that Professor Ravina brought.

18  A.  I received a call from Nayla Bahri, who worked in the

19  business school, and she shared with me information about a

20  student who had had a long email exchange with Professor

21  Bekaert and afterwards had reported that she felt threatened

22  and harassed by him and mentioned this comment about -- a

23  comment along the lines of saying, "Hong Kong, where the ladies

24  are nice," in class.  This student had changed her mind about

25  whether or not she wanted to file a report and go through a

formal process.  I met with the student, and to the best of my

recollection, I believe she told me that she wasn't bothered by

the comment, but that -- and that she felt kind of embarrassed

at how she acted during that email exchange.  She had called

Professor Bekaert an arrogant ass in the email also.  And she

did not want to move forward with any kind of investigation.

So in light of the information that the student shared with me,

I wanted to honor her privacy and honor her wishes to not

pursue an investigation, but to be thorough, I did look at the

course evaluations from that course to see if other students

had raised concerns along these lines, and I decided to bring

in Professor Bekaert for a conversation, given his role as a

faculty member.  And this was all before the Professor Ravina

issue came up.

          So after speaking with the student who had initially

raised this issue and when she decided to not move forward with

it, I still wanted to make sure we did our due diligence and so

we took those other steps to address it and to hopefully head

off any future issues, although that didn't work out as we

might have hoped.

Q.  So just to be clear, Mr. Dunn, how did you come to the

conclusion with respect to that student complaint?  And we can

pull up the report, if that's helpful.

          So how did you come to the conclusion that Columbia's

policies were not violated, with respect to the student

1  complaint about Professor Bekaert?

2  A.  Yes.  So I think with that student complaint -- and again,

3  this was after the student had indicated that she did not want

4  to move forward with her concerns about her own interactions

5  and exchanges with Professor Bekaert, which she had previously

6  said were harassing or threatening.  When I looked at that

7  comment about "Hong Kong, where the ladies are nice," Professor

8  Bekaert did not deny the comment, and so it's certainly

9  possible that he may have said it, but in the analysis, I

10  determined that if he did say this comment, that that one

11  comment by itself would not necessarily create a hostile

12  environment.  And so that's what led to the outcome that was

13  reached there.

14  Q.  Can we just briefly -- let's take a look at the emails that

15  you've referred to, which are Plaintiff's Exhibit 31.1, which

16  were admitted.

17        Is this the email chain you were referring to?

18  A.  Yes, it is.

19  Q.  On the bottom of page 1, is that the exchange you were

20  referring to?

21        And we can look on the top of page 2 so it's complete.

22  A.  Yes, it is.

23  Q.  What did you understand to be the topic of the dispute

24  between Professor Bekaert and this student?

25  A.  The email chain began with kind of a normal question about

I7g1rav6                        Dunn - Cross

1    the student wanting to review her exam to see how the grade was

2    calculated, and then the question turned into how the grades

3    were calculated and how negative points were applied or

4    positive points were applied within the grading system, and it

5    devolved into exchanges like this.

6    Q.  Two other investigations were discussed with you this

7    morning, Mr. Dunn.

8            The first, which we've been referring to as involving

9    Professor 1 --

10           MS. FISCHER:  Can we please bring up Plaintiff's 69.1,

11   which is admitted.

12           And can we show the witness both pages.

13   Q.  Mr. Dunn, what do you recall about the situation that was

14   presented here?

15   A.  So this case began with this anonymous report that was

16   filed through the hotline, the compliance hotline system.  It

17   was actually several weeks after the report was received on

18   August 25, 2014 that we received the report in EOAA.  I believe

19   that was around September 22, 2014.

20           The challenge with an anonymous report like this is

21   that it can be very difficult to know who to talk to about the

22   situation and who has been affected by it.  So in this case we

23   knew the identity of the professor who allegedly had the affair

24   with a student, and we also had several professors identified

25   who -- who may have learned about it or who knew about what was

I7g1rav6                          Dunn - Cross

going on.  So I reached out to those three professors who had

been identified as possible witnesses.  I was able to get in

touch with one, who said that he had never heard anything about

it.

     I did speak with the accused professor, and he

acknowledged having the affair with the student.  He told me

about everything that had happened there within the context of

his own personal life, and he told me that the affair had

happened with a student after the class had ended and after the

grades had been submitted.  Under Columbia's policies, faculty

are prohibited from having relationships with students if they

have academic authority over them, but that is no longer the

case after a class is done and the grade is turned in.

     The professor identified the student with whom he had

had the affair.  I contacted her.  She was very anguished to

hear from me, to know that this issue was coming up.  She was

really worried about her privacy and the effects that this

could have on her life.  She did not want the university to

really do anything or to be involved in this situation.  And so

I did my best to honor her privacy sort of throughout that

investigative process.  She also confirmed to me that the

affair happened when the professor no longer had any academic

authority over her.

     So there was no question then that this did not

violate the policy on relationships between faculty and

1384

I7g1rav6                         Dunn - Cross

1    students.

2            In terms of the question of a possible hostile

3    environment, again, there was no one who had been identified as

4    allegedly experiencing the hostile environment.  We didn't know

5    where this report came from.  And I determined that it would

6    not be appropriate for me to pick up the phone or start

7    emailing people to say, hey, did you hear about this professor

8    having an affair with a student, and if so, did it create a

9    hostile environment for you?  That seemed to be beyond the

10   scope of the office.  You know, it's not appropriate for EOAA

11   to become the sex police all over the university, and it seemed

12   to be something that would be really harmful to the student I

13   talked to who had already expressed her pain about the

14   situation.  But through this, we were able to speak with the

15   professor to deal with it appropriately at the business school,

16   and so I think we were able to fully address the issue even if

17   we didn't find that there was a violation of policy.

18   Q.  You were also asked -- and just to be clear, I know this

19   was referenced earlier, but -- that complaint, the consensual

20   relationship, did not involve Professor Bekaert.

21   A.  Yes, that's correct.

22   Q.  And you were also asked about another complaint you

23   investigated in the business school that also did not involve

24   Professor Bekaert.

25           MS. FISCHER:  Can we pull up, please, 69.3, which is

I7g1rav6                        Dunn - Cross

1   in evidence.

2   Q.  And Mr. Dunn, to your recollection what was this complaint

3   all about?

4   A.  I got a call from Janet Horan, who had spoken with a

5   student who complained about this professor's behavior in

6   class.  As I wrote in this report, she said that he was sexist,

7   demeaning to women and inappropriate.  So I met with that

8   student because I was looking broadly at this as a

9   discriminatory harassment issue.  And the student was very

10  explicit in saying that this professor was an equal opportunity

11  offender and that he did not target any group of people or any

12  protected class or anyone else.  And the student actually told

13  me that if the professor had been doing this, she would have

14  reported it earlier.

15  Q.  When you say "had been doing this," what do you mean?

16  A.  Had been harassing people on the basis of their identities,

17  or their membership in a protected class, like their race,

18  their gender, what have you, that the student would have

19  reported it even sooner.  She said that this professor was just

20  generally argumentative and combative and demeaning towards

21  students.

22          And so at that point the student who had brought this

23  issue forward had now said to me that, look, there's not an

24  EOAA issue here.  So even with that in mind, out of an

25  abundance of caution and to make sure that we were thorough, I

1    did look at all of the course evaluations from this course.  A

2    couple people did include comments that related to, you know,

3    EOAA-related concerns, but there was nothing specific to really

4    follow up on there.  And I also met with the professor himself.

5    He had also talked to Janet Horan, so I knew about their

6    conversation.  And I spoke to the professor about all of these

7    issues.  And throughout this process, even before the

8    investigation got under way, the professor was scheduled to be

9    teaching a new section of the course, and so two people from

10   the business school were going to be sitting in class to make

11   sure that he was behaving appropriately -- someone I believe

12   from student affairs and somebody from the Teaching Excellence

13   Institute.

14        And so again, based on what the student had told me,

15   based on all those conversations and information, I didn't find

16   that there was a policy violation, but as we discussed this

17   morning, I recommended that the professor continue to utilize

18   that Teaching Excellence Institute and that the business school

19   continue to work closely with him to make sure that he was

20   behaving appropriately in the classroom.

21             (Continued on next page)

22

23

24

25

1  Q.  Do you recall this morning you were shown several course

2  evaluations from that course?

3  A.  Yes.

4  Q.  Were those the entirety of the evaluations that you

5  reviewed?

6  A.  No.

7  Q.  Did you review others?

8  A.  Yes, I did.

9  Q.  Did you review all the evaluations from that course?

10  A.  Yes, I did.

11  Q.  Mr. Dunn, I think you were asked this morning about the

12  timing of these other investigations that you conducted, that

13  they may have taken more than 60 days from beginning to end.

14          Can you explain why that might have been the case.

15  A.  As I mentioned earlier, you know, these cases are

16  complicated and thorough.  It takes time to address them fully.

17  It is a mix of scheduling interviews, conducting interviews,

18  looking at written materials, whether they're e-mails or course

19  evaluations, things like that.

20          And it is important to note also that, you know, all

21  three of these cases that we have been talking about were

22  happening roughly simultaneously.  So there might be one day

23  where I am doing work on all three cases trying to move

24  everything forward as best as I can.

25          Then other issues arise, things that become

1    emergencies or different priority levels, and I know that for

2    anyone involved in a given EOAA case the only issue they care

3    about is their own, and this is a totally reasonable.

4            One of the challenging aspects of the job to make sure

5    that we can balance everything that is going on and keep things

6    moving forward.  I wish that we could resolve them sooner in

7    many cases, but we have to make sure that we put in the time to

8    do the best job we can.

9            MS. FISCHER:  Thank you.

10           Nothing further.

11           THE COURT:  OK.  Any redirect?

12           MR. HERNSTADT:  Your Honor, I have a few questions.

13           THE COURT:  You do?  I'm sorry.  Go ahead.

14           MR. HERNSTADT:  That's OK.  Thank you, your Honor.

15   CROSS EXAMINATION

16   BY MR. HERNSTADT:

17   Q.  Good afternoon, Mr. Dunn.

18   A.  Good afternoon.

19   Q.  I just have a few questions.

20           I would like to ask you to take a look at Exhibit 63

21   at page 3, the third paragraph on page 3.

22           Do you have the document in front of you?

23   A.  I do not.

24   Q.  OK.  Sorry.  The third paragraph, starting, "He kept

25   stalling her."

1              Do you see that paragraph?

2    A.   Yes.

3    Q.   This refers to Professor Bekaert stalling -- this is

4    Professor Ravina's telling you about what she said was

5    Professor Bekaert's stalling her paper to see if she would --

6    if he would date her -- date him.

7    A.   Could we please zoom out of this document, just so I can

8    confirm for myself what we are looking at here.

9    Q.   Sure.  Do you want to take a look at the first page, see

10   what it is?

11   A.   That would be helpful.  I'm sorry.

12   Q.   Yes.  This is what you were shown earlier today, your notes

13   on interview with Professor Ravina on August 12, 2014.

14   A.   Yes.  Thank you.

15   Q.   Going to page 3, to that paragraph.

16              This is Professor Ravina telling you that Professor

17   Bekaert was stalling her paper to see if she would date him, is

18   that correct?

19   A.   Yes.  That's correct.

20   Q.   She said that, Each week he want to go to coffee and not do

21   work.  And then -- is that right?

22   A.   Yes.  That's correct.

23              MR. HERNSTADT:  And I'm sorry, no, just the -- to

24   here.

25   Q.   And then the last bullet point there is started summer

1    2013.

2              Do you see that?

3    A.   Yes.

4    Q.   So Professor Ravina told you that his stalling papers to

5    see if -- he would date her and that he -- and he would want to

6    go to coffee every week, started in the summer of 2013?

7    A.   Yes.  That's my read of the notes.

8    Q.   Did you ever determine whether Professor Bekaert was in the

9    country or in New York in the summer of 2013?

10   A.   I did not.

11   Q.   On the next page, the second paragraph down -- this is on

12   page 4 -- Professor Ravina recounted to you that he held her

13   hand once at a restaurant sitting at bar, he put hand on her

14   stool, he held it for a moment.

15             Do you see that?

16   A.   Yes.

17   Q.   Is that what Professor Ravina told you, that he held it for

18   a moment?

19   A.   Yes, it is.

20   Q.   Did Professor Ravina ever tell you that he held her hand

21   for 30 seconds?

22   A.   Not that I recall.

23   Q.   I would like you to look at Exhibit HA.  You can see from

24   the top of the first page this is your interview with Professor

25   Bekaert.

I7gnrav7                              Dunn - Cross

1   A.  Yes.

2            MR. HERNSTADT:  So going down to the third from the

3   bottom.  This is October 12, 2013.

4   BY MR. HERNSTADT:

5   Q.  Did Professor Bekaert show you a text from Professor

6   Ravina?

7   A.  I don't recall if he showed me the text or just described

8   it.

9   Q.  And he told you that Professor Ravina had invited him to

10  drink Prosecco with her, is that correct?

11  A.  I believe so, yes.

12  Q.  And Prosecco is a kind of sparkling wine, is that right?

13  A.  I can confirm that, yes.

14  Q.  OK.  Fair enough.  I would like you to take a look at

15  Exhibit 77, please, on page 4 -- let's take a look at the first

16  page so you can see what we're talking about.

17           These are your notes of your interview with Professor

18  Bekaert on September 19, 2014, correct?

19  A.  Yes.  That's correct.

20  Q.  So, on page 4, the last paragraph, it starts --

21           MR. HERNSTADT:  I'm sorry, one up, please.

22  Q.  It starts, "Formal mentor," question mark.

23           Do you see that?

24  A.  Yes.

25  Q.  And Professor Bekaert responded to you, not really, but

I7gnrav7                          Dunn – Cross

1   they viewed him as such.

2              Do you see that?

3   A.  Yes.

4   Q.  So Professor Bekaert was clear that he wasn't a formal

5   mentor that they -- they being both Professor Ravina and

6   Professor Bekaert -- treated him as a mentor.

7              MS. HARWIN:  Objection.

8   Q.  Is that what the notes say?

9              THE COURT:  These are notes based what Professor

10  Ravina said to you, is that correct?

11             THE WITNESS:  I believe this is what Professor

12  Bekaert --

13             THE COURT:  Professor Bekaert said to you.

14             Overruled.

15  BY MR. HERNSTADT:

16  Q.  I am trying to confirm that Professor Bekaert told you,

17  when asked if he was a formal mentor, his response was not

18  really, but they viewed him as such, is that correct?

19  A.  Yes, that's correct.

20  Q.  And then I would like you to take a look at Exhibit 87,

21  please.  Wait a second.

22             And these are your notes of professor -- of your

23  interview with Professor Ravina on November 11, 2014, is that

24  correct?

25  A.  November 12, 2014.

I7gnrav7                          Dunn - Cross

Q.  I'm sorry.  November 12, 2014.

Looking at the top of the second page, it says that, "ER got e-mails from GB asking for compliments, begging."

Did Professor Ravina ever provide you with e-mails showing Professor Bekaert begging her for complaints?

A.  No, she did not.

Q.  Is the only e-mail about compliments the e-mail that you discussed earlier where Professor Ravina started the e-mail chain by telling him he was by far, far, far the most good-looking?

A.  Yes, I believe so.

Q.  I'd like you to take a look at Exhibit IT, please.  This is about two-thirds of the way down the first page, the cartoon mug.  So at the bottom of that box.

MR. HERNSTADT:  No.  That's the second page.  Can we go back to the first page of the exhibit.

BY MR. HERNSTADT:

Q.  So these are your typed notes of your interview with Professor Ravina on November 12?

A.  Yes, that's correct.

Q.  Do you see the fifth bullet point up from the bottom, this is the discussion of the mug, correct?

A.  Yes.  That's correct.

Q.  This is what Professor Ravina told you occurred in connection with this mug, right?

I7gnrav7                      Dunn - Cross

1   A.  Yes, that's right.

2   Q.  And she said that he told her to look -- he being Professor

3   Bekaert -- told her to look at the cup, she saw the bottom and

4   made a nervous laugh.

5        Who made the nervous laugh?  Professor Bekaert or

6   Professor Ravina?

7   A.  I believe Professor Ravina.

8   Q.  Did Professor Ravina tell you that at that point Professor

9   Bekaert looked at her and said it's true?

10  A.  No, she did not.

11  Q.  I'd like to ask you a couple of questions about the MBA

12  student, if I may.

13       So -- we've looked at that e-mail exchange.  This is

14  Exhibit 31.1.  I'm not going to ask you to go back through it.

15  But there's nothing about sex or ladies in that e-mail

16  exchange, right?

17  A.  No, there's not.

18  Q.  And this e-mail exchange was the focus of the MBA student's

19  complaint, was it not?

20  A.  Yes.  Along with the alleged comment about women in

21  Hong Kong.

22  Q.  So looking at Exhibit 33, these are your notes of your

23  interview with the student, is that correct?

24  A.  Yes, that's correct.

25  Q.  If you look at first long paragraph on the first page, it

1    starts "e-mail convo."  This is about the long e-mail exchange?

2    A.  Yes.

3    Q.  So this was virtually the first thing she said to you in

4    the interview, correct?

5    A.  Yes, that's correct.

6    Q.  And then turning to the second page right underneath --

7           MR. HERNSTADT:  Right there.  No, no, sorry this one

8    here.  Doesn't that's it.  Both lines.  Sorry.

9    BY MR. HERNSTADT:

10   Q.  Do you see where she says, "Doesn't need disc. action, not

11   accusing of SH"?

12   A.  Yes.

13   Q.  Is this the student saying that she doesn't need a

14   discrimination action because she's not accusing Professor

15   Bekaert of sexual harassment?

16   A.  I believe it would be doesn't need disciplinary action.

17   Q.  Disciplinary action.  Sorry.

18   A.  And she was not accusing him of sexual harassment.

19   Q.  Right above that there's a quote, "HK where the ladies are

20   nice."

21           This is what she said about -- that Professor Bekaert

22   said in class, is that correct?

23   A.  Yes.  That was the alleged comment.

24   Q.  And she didn't say anything about that he licked his lips,

25   is that correct?

I7gnrav7                          Dunn - Redirect

1   A.  Yes, that's correct.

2   Q.  And then, looking on the third page at the top of the page,

3   the first two lines, this is the student saying to you that --

4   is that sex comments?  Is that short for comments?

5   A.  Yes, it is.

6   Q.  Had no impact on environment, never felt uncomfortable,

7   because of the comments?

8   A.  Yes.

9           MR. HERNSTADT:  I have nothing further, your Honor.

10          THE COURT:  All right.

11          Thank you, Mr. Dunn.

12  REDIRECT EXAMINATION

13  BY MS. HARWIN:

14  Q.  Director Dunn, you testified that you had multiple meetings

15  with Professor Ravina, correct?

16  A.  Yes.

17  Q.  One of those meetings was on August 12, 2014, correct?

18  A.  Yes.

19  Q.  You had only one other meeting with Professor Ravina,

20  correct?

21  A.  Yes.

22  Q.  That meeting was on November 12, 2014?

23  A.  Yes.

24  Q.  Three months after you first met with her, correct?

25  A.  Yes, that's correct.

1   Q.  And five days before you ended your investigation, correct?

2   A.  Yes, that's correct.

3   Q.  And the second time you met with Professor Ravina that was

4   already after you had started to draft your report, correct?

5   A.  Yes, that's correct.

6   Q.  You testified about receiving e-mails from Professor Ravina

7   on or around August 14, 2014, correct?

8   A.  Yes, that's correct.

9   Q.  You testified there were about 170 pages of e-mails?

10  A.  Yes, that's correct.

11  Q.  And you testified that you formulated impressions of

12  Professor Ravina's case based on reviewing those e-mails,

13  correct?

14  A.  Yes, that's correct.

15  Q.  You never reached out to Professor Ravina to discuss those

16  e-mails, correct?

17  A.  Yes, that's correct.

18  Q.  You never spoke to her about your impressions of those

19  e-mails, correct?

20  A.  Yes, that's correct.

21  Q.  You subsequently received e-mails from Professor Bekaert,

22  correct?

23  A.  Yes, that's correct.

24  Q.  And you told Professor Bekaert that Professor Ravina had

25  provided e-mails to you, correct?

I7gnrav7                        Dunn - Redirect

1    A.  I don't recall.

2    Q.  In an e-mail Professor Bekaert sent to you he referenced

3    e-mails that you had received from Professor Ravina, correct?

4    A.  I don't recall.

5    Q.  The e-mails that you received from Professor Bekaert were

6    cut and pasted into some kind of document?

7    A.  Yes, they were, presumably.

8    Q.  And you didn't verify the accuracy or completeness of the

9    documents he provided to you, correct?

10   A.  Well, I asked Professor Ravina about them.

11   Q.  Your testimony is that you asked Professor Ravina about the

12   documents that Professor Bekaert provided?

13   A.  Yes.  I asked her about a number of the issues that had

14   been raised in the documents that I received from Professor

15   Bekaert.

16   Q.  But you didn't show any of the e-mails to Professor Ravina,

17   correct?

18   A.  Yes, that's correct.

19   Q.  So you never verified the accuracy or completeness of those

20   e-mails with Professor Ravina, correct?

21   A.  I disagree with that for the reasons I just stated.

22   Q.  You never showed her the e-mails that Professor Bekaert

23   gave you, correct?

24   A.  That's correct.

25   Q.  Many of the allegations that Professor Ravina made included

1    allegations regarding things that occurred in person, correct?

2    A.  Yes, that's correct.

3    Q.  You don't have a clear independent recollection of what

4    Professor Ravina said to you during your meetings with her

5    apart from what's written in your notes, correct?

6    A.  Today, four years later, no, I do not.

7    Q.  You received e-mails from Professor Ravina on or around

8    August 14, 2014?

9    A.  Yes.

10   Q.  You subsequently received e-mails from Professor Bekaert,

11   correct?

12   A.  Yes, that's correct.

13   Q.  And you subsequently met with Professor Bekaert after

14   meeting with Ms. Ravina on September 19, on September 24, and

15   you had another discussion with him on November 11, is that

16   correct?

17   A.  I believe so, yes.

18   Q.  You had a meeting with Professor Bekaert on October 28,

19   2014?

20   A.  I believe so, yes.

21   Q.  And you don't have any records of what you discussed with

22   Professor Bekaert on October 28, 2014, correct?

23   A.  I have no separate notes from that conversation.

24   Q.  So there's no record of what you discussed with Professor

25   Bekaert on October 28, 2014, correct?

I7gnrav7                          Dunn - Redirect

1    A.  Yes, that's correct.

2    Q.  Professor Bekaert told you at some point that he had never

3    initiated any dinner with Professor Ravina, correct?

4    A.  I don't recall if he said he had never initiated a dinner.

5    I don't recall.  I'm sorry.  He --

6               MS. HARWIN:  Can we bring up Plaintiff's Exhibit 77.

7    Can we turn to page 2.

8    BY MS. HARWIN:

9    Q.  Turning to line 5, on page 2 of your notes, it says,

10   "Dinners mostly came from her, GB never initiated."

11              Did I read that correctly?

12   A.  Yes, you did.

13   Q.  Professor Bekaert claimed to you he never initiated dinners

14   with Professor Ravina?

15   A.  Yes, he did.

16   Q.  You subsequently received information that contradicted

17   what Professor Bekaert had claimed to you, correct?

18   A.  I don't think that's really a yes-or-no question, because

19   the sentence above, "GB never initiated says dinners mostly

20   came from her," which implies that some dinners did come from

21   him.

22   Q.  Let me clarify.

23              You wrote, "GB," Geert Bekaert, "never initiated,"

24   correct?

25   A.  Yes.

1   Q.  In the course of your investigation, you learned he did

2   initiate dinners, correct?

3   A.  Yes.

4   Q.  And he did initiate coffees with Professor Ravina, correct?

5   A.  I believe so, yes.

6   Q.  Professor Bekaert initially claimed to you, as reflected in

7   your interview notes, that the mug in his office came from

8   friends?

9   A.  Yes, I believe so.

10  Q.  And Professor Bekaert subsequently told you that the mug

11  came from his mother-in-law, correct?

12  A.  Yes, he did.

13  Q.  As part your outcome letter you concluded that that mug was

14  inappropriate for the workplace, right?

15  A.  Right.

16  Q.  But you didn't issue any kind of directive requiring

17  Professor Bekaert to remove it from his office, correct?

18  A.  Correct.

19  Q.  When you first met with Professor Ravina on August 12,

20  2014, you didn't prepare any kind of list of questions or

21  document to guide your interview with her, correct?

22  A.  Correct.

23  Q.  You did prepare a list of questions to meet with Professor

24  Bekaert, correct?

25  A.  Yes, that's correct.

I7gnrav7                          Dunn - Redirect

1   Q.  By the time you met with Professor Ravina again in November

2   of 2014, November 12, 2014, you had decided that the issues of

3   research stalling that she had brought up with you were not

4   issues that required further attention from you, correct?

5   A.  I'm not sure.  Can you point me to a place where I

6   indicated that.

7   Q.  By the time you had your second interview with Professor

8   Ravina you had decided that the issue of Professor Bekaert's

9   blocking Professor Ravina's research was not something you

10  needed to address further, is that correct?

11  A.  I guess I repeat -- is that coming from a statement I made?

12  It would just be really helpful for me to know where you're

13  drawing that from.

14  Q.  Let me call your attention to your deposition testimony.

15  When you were deposed in this matter on page 228, I asked the

16  question:

17  "Q.  As to your second meeting with Professor Ravina, why

18  didn't your agenda include questioning Ms. Ravina about her

19  concerns about Professor Bekaert intentionally delaying

20  progress on her paper?"

21         You answered:  "At that time I had, I had determined

22  that this -- that that was not an issue that we needed to

23  address further."

24         Correct?

25  A.  I don't mean to be difficult.  It's just what you are

1    showing me now is a question about whether she was experiencing

2    retaliation, and your characterizing it as delaying the paper.

3    So I'm just not totally clear what we're talking about.

4              MS. FISCHER:  Can we have the page and line that's

5    being referenced, please.

6              MS. HARWIN:  Sure.  228.

7              Let me withdraw that question.

8    BY MS. HARWIN:

9    Q.  As part of your investigation, you investigated whether

10   Professor Bekaert had engaged in sexual harassment in violation

11   of Columbia's policies, correct?

12   A.  Yes, that's correct.

13   Q.  You did not investigate whether any administrators at

14   Columbia Business School had failed to satisfy their duties

15   under Columbia's policies concerning discrimination,

16   harassment, or retaliation, correct?

17   A.  Yes, that's correct.

18   Q.  I would like to bring up Defendants' Exhibit FI.

19             These are the notes from your conversation with Senior

20   Vice Dean Katherine Phillips?

21   A.  That's correct.

22   Q.  You wrote, "GB insisted on going for dinner.  She felt

23   uncomfortable like he wanted more."

24             Did I read that correctly?

25   A.  Yes, you did.

1   Q.  She said, "We're not friends.  She tried to avoid him.  He

2   asked her for dinner.  He wanted more than that."

3              Did I read that correctly?

4   A.  Yes.

5   Q.  Let me continue on.

6              "She said there are more e-mails, KP didn't ask for

7   them."

8              KP refers to Katherine Phillips?

9   A.  Yes, that's correct.

10             MS. HARWIN:  I would like to bring up Exhibit 80.

11  Q.  These are your notes from your conversation with Janet

12  Horan on September 24, 2014?

13  A.  Yes, that's correct.

14  Q.  OK.  Turning towards the bottom, where you write about

15  Professor Bekaert, you wrote, "He was annoyed this is still

16  going on, said he met with me, denied sexual harassment."

17             Did I read that correctly?

18  A.  Yes.

19  Q.  Then you wrote, "GH," referring to Glenn Hubbard?

20  A.  Yes.

21  Q.  You wrote, "Power issue here, appears you're preventing her

22  getting papers done."

23             Correct?

24  A.  Yes, that's correct.

25  Q.  You wrote below, "He got really upset," correct?

I7gnrav7                         Dunn - Redirect

1   A.  Correct.

2   Q.  And after that Professor Bekaert wrote, "Going back to see

3   MKD."

4               MS. FISCHER:  Objection.

5               MS. HARWIN:  I'm sorry.

6               Let me restate that.

7   BY MS. HARWIN:

8   Q.  After that you wrote, "Going back to see MKD," correct?

9   A.  Yes, that's correct.

10  Q.  That was a reference to Professor Bekaert going back to see

11  you?

12  A.  Yes, that's correct.

13  Q.  Prior to finalizing your outcome letter in this case, you

14  reached out to the dean's office of Columbia Business School

15  for Professor Ravina's faculty activity reports, correct?

16  A.  Yes, I did.

17  Q.  You didn't tell Professor Ravina that you had sought out

18  her faculty activity reports, correct?

19  A.  I believe that is correct, yes.

20  Q.  Under Columbia's policies against discrimination,

21  harassment, or retaliation an individual is entitled to be free

22  of discrimination, harassment, or retaliation regardless of her

23  progress along the tenure track, correct?

24  A.  Yes, that's correct.

25  Q.  Under Columbia's policies an individual doesn't need to use

1    the words gender discrimination to trigger an investigation

2    into gender discrimination, correct?

3    A.  Yes, that's correct.

4    Q.  Under Columbia's policies an individual doesn't need to use

5    the word discriminatory harassment to trigger an investigation

6    into discriminatory harassment, correct?

7    A.  Yes, that's correct.

8    Q.  An individual doesn't need to use the word sexual

9    harassment to trigger an investigation into sexual harassment,

10   correct?

11   A.  Yes, under our policies that's correct.

12   Q.  And an individual doesn't need to use the word retaliation

13   to trigger an investigation into retaliation, correct?

14   A.  Yes, that's correct.

15   Q.  Professor Bekaert shared with you e-mails in which he

16   discussed Professor Ravina completing other work separate and

17   apart from their research project, correct?

18   A.  Yes, that's correct.

19   Q.  But you didn't show those e-mails to Professor Ravina and

20   talk to her about them, correct?

21   A.  No, I don't believe so.

22   Q.  In your meetings with Professor Ravina she talked about

23   Professor Bekaert stalling the research to that day, correct?

24   A.  Yes, I believe so.

25   Q.  She talked about Professor Bekaert muddying the waters with

1    respect to their research, correct?

2    A.  I believe she did use that phrase, although I am not sure

3    when or where.

4            MS. HARWIN:  Let's bring up Exhibit 87.

5            Can we go towards the end of that exhibit.

6    BY MS. HARWIN:

7    Q.  Looking at the bottom of page 4, do you see where you

8    wrote, "He's been stalling to this day."  Correct?

9    A.  Correct.

10   Q.  Looking at the line below, "He's trying to muddy water."

11   Correct?

12   A.  Correct.

13   Q.  Looking at the line below, "saying things aren't correct."

14           Did I read that correctly?

15   A.  Yes, you did.

16   Q.  Then lower down it says, "Don't know if GB spoke badly

17   retal. to other colleagues."  Correct?

18   A.  Correct.

19   Q.  This was the second meeting at which Professor Ravina had

20   expressed concern to you about retaliation, correct?

21   A.  Correct.

22           MS. HARWIN:  I would like to bring up Exhibit 77.

23   Q.  During one of your meetings with Professor Bekaert, he

24   indicated that Professor Ravina should have brought her

25   concerns to him, and they could discuss it over coffee?

I7gnrav7                        Dunn - Redirect

1    A.  Yes, that's correct.

2    Q.  Under Columbia's policies someone who has experienced

3    discrimination or harassment or retaliation is not obligated to

4    confront directly the person who has discriminated against,

5    harassed, or retaliated against her, correct?

6    A.  Yes, that's correct.

7          MS. HARWIN:  I'd like to bring up Plaintiff's Exhibit

8    17.  If we could turn a few pages along to the next page.  OK.

9    BY MS. HARWIN:

10   Q.  It says at the top of that page, "Under no circumstances

11   should an individual feel pressured to address the alleged

12   offender or directly handle the matter alone, and a decision

13   not to confront a person she or he believes to be

14   discriminatory or harassing will not be viewed negatively."

15          Did I read that correctly?

16   A.  Yes, you did.

17   Q.  And that was Columbia's policy, is that correct?

18   A.  Yes, that's correct.

19   Q.  Director Dunn, relationships change over time, correct?

20   A.  Yes, that's correct.

21   Q.  Professor Ravina alleged that Professor Bekaert's

22   interactions with her had changed over time, correct?

23   A.  I am not sure without a document in front of me that I can

24   say with confidence that she said it changed over time or

25   whether it was always bad.

I7gnrav7                        Dunn - Redirect

1  Q.  And how the interactions with Professor Bekaert had changed

2  over time was not a question that you investigated as part of

3  your investigation, correct?

4  A.  Yes, that's correct.

5         MS. HARWIN:  I'd like to refer back to Plaintiff's

6  Exhibit 37.

7  Q.  Was it your testimony that the reason for the limited

8  investigation into this allegation had to do with protecting

9  the privacy of the student who complained?

10 A.  I believe so.

11        MS. HARWIN:  Let's continue scrolling down in this

12 document on to the next page, if we could.

13 Q.  In your report, you talk about what the student said,

14 correct?

15 A.  Correct.

16 Q.  You said the student said that she or he -- that he or she

17 found this comment off-putting, correct?

18 A.  Correct.

19 Q.  And in the next paragraph you talk about Professor

20 Bekaert's suspicions of who filed this complaint against him,

21 correct?

22 A.  Correct.

23 Q.  You said, "In an interview with me you said you suspected

24 that this report was filed by a student with whom you had a

25 conflict over the class grading policy."  Correct?

I7gnrav7                        Dunn - Redirect

1   A.  Correct.

2   Q.  And in the second-to-last paragraph, you note specifically

3   Professor Bekaert's belief in the identification of the

4   complaining student, correct?

5   A.  Correct.

6   Q.  You talked before about Professor Ravina firing a research

7   assistant who had been supporting the project with Professor

8   Bekaert and Professor Ravina?

9   A.  Yes.

10  Q.  And that factored into your conclusions, the firing of this

11  research assistant?

12  A.  It was an important fact to understand why a certain

13  project was not making progress, yes.

14  Q.  You said that this research assistant had been supporting

15  the project with Professor Ravina and Professor Bekaert?

16  A.  I believe I said that, yes.

17  Q.  In fact, the research assistant who was let go had never

18  worked with them on the project, correct?

19  A.  I'm not sure.

20  Q.  The research assistant actually had never begun doing

21  anything on this project, correct?

22  A.  I'm not sure without a document in front of me.

23  Q.  Sitting here today, you don't know whether this research

24  assistant who was let go was or was not involved in supporting

25  the project at the time he was released, correct?

1   A.  As I recall Professor Ravina's e-mail to the research

2   assistant I believe that research assistant was prepared to

3   begin work on this project, perhaps they had not.  I don't

4   recall.

5   Q.  Your office at Columbia was located in Low Library?

6   A.  Yes, it was.

7   Q.  That is also where the provost of Columbia University is

8   located?

9   A.  Yes, it is.

10  Q.  That is also where the president of Columbia University is

11  located?

12  A.  Yes, it is.

13  Q.  You reviewed notes that you took listing that Janet Horan

14  reminded of the power imbalance, correct?

15  A.  I don't recall without the document in front of me.

16  Q.  Turning to Exhibit 55, the top of that e-mail said, "JH

17  reminded of power imbalance."  Correct?

18  A.  That is correct.

19  Q.  We also reviewed your notes from your conversation with

20  Janet Horan from September 24, 2014, correct?

21  A.  Yes, we did.

22  Q.  I believe that's Exhibit 80.  Those notes, they refer to

23  Glenn Hubbard saying, "power issue here, appears you're

24  preventing her getting papers done."  Correct?

25  A.  Correct.

1   Q.  And Professor Ravina explained to you that Professor

2   Bekaert was her senior professor, her senior coauthor, her

3   mentor, correct?

4   A.  Correct.

5   Q.  But you concluded there was no power imbalance as between

6   Professor Bekaert and Professor Ravina, correct?

7   A.  No, that's not correct.

8   Q.  You concluded that the power imbalance between them was not

9   relevant in this case, correct?

10  A.  No, that's not correct.

11  Q.  You testified that there did not seem to be a power

12  imbalance, correct?

13  A.  Can you say more about how I testified.  More context might

14  be really helpful to help me answer that.

15          MS. HARWIN:  So, can we bring up Mr. Dunn's testimony

16  at page 147?

17          Can we go up to page 46 as well.

18          MS. FISCHER:  Can you just give us the line.

19          THE COURT:  The line, please.

20  BY MS. HARWIN:

21  Q.  If you could refer your attention, Director Dunn, to page

22  146 at line 14 and continue reading until 147 at line 11 to

23  refresh your recollection.  Then I'm going to ask you a

24  question.

25  A.  Thank you.

I7gnrav7                          Dunn - Redirect

1    Q.   OK.  You testified there did not seem to be a power

2    imbalance, correct?

3    A.   Yes, in the respect that I described in the deposition

4    here.

5    Q.   You reviewed their e-mail exchanges and you concluded there

6    didn't seem to be a power imbalance, correct?

7    A.   Yes.

8    Q.   When you were examining the relationship between Professor

9    Bekaert and Professor Ravina, you further testified, "The

10   alleged power imbalance that, whatever we're talking about here

11   was not relevant to that."  Correct?

12   A.   Again, could you show me where I stated that?

13            MS. HARWIN:  Can we bring up the page we were just

14   looking at a moment ago.

15            If we go back to 146 at the top.

16            Could you review from line 2 down to line 13 and then

17   I will ask you a question when you are done reviewing.

18            MR. HERNSTADT:  Can we get the page before so we can

19   see the question, please.

20            MS. HARWIN:  The question is at the top of page 146.

21            MR. HERNSTADT:  I don't see a Q.  I'm sorry.

22            THE COURT:  You are not showing this to the jury.

23            JUROR:  It is on our screens.

24            THE COURT:  OK.  It shouldn't be.

25            THE WITNESS:  OK.  Thank you.

1    BY MS. HARWIN:

2    Q.   So, in looking at the interactions between Professor

3    Bekaert and Professor Ravina, you concluded that the alleged

4    power imbalance was not relevant to that, correct?

5    A.   Not in the context of their mutually flirtatious

6    relationship, no.

7    Q.   Professor Bekaert characterized the relationship as

8    mutually flirtatious, correct?

9    A.   I believe so.

10   Q.   And you subsequently characterized the relationship as

11   mutually flirtatious, correct?

12   A.   Yes.

13   Q.   Professor Bekaert said that he had tried to encourage

14   Professor Ravina's other work, correct?

15   A.   Yes, that's correct.

16   Q.   And you subsequently concluded that Professor Bekaert had

17   tried to encourage Professor Ravina's other work, correct?

18   A.   Yes, that's correct.

19            THE COURT:   Just to be clear, we only have a few more

20   minutes with this witness, so I am just going to ask you to try

21   to wrap up.

22            MS. HARWIN:   Give me one moment, your Honor.

23            THE COURT:   Sure.

24   BY MS. HARWIN:

25   Q.   You spoke to several Columbia administrators about

1    Professor Ravina's situation, correct?

2    A.  Yes, that's correct.

3    Q.  When you spoke to them, those weren't what you considered

4    investigative interviews, correct?

5    A.  Yes, that's correct.

6    Q.  It was your perception that Columbia Business School was

7    handling the situation with Professor Ravina in some respects,

8    correct?

9    A.  Yes, that's correct.

10   Q.  We reviewed a document that was provided to you by Laura

11   Lee, one of the two e-mails that she forwarded to you, and in

12   that e-mail Professor Ravina asked -- and this is Defendants'

13   Exhibit EH -- in that Professor Ravina asked, "Since we are

14   meeting so far into the future, can we implement some of the

15   measures we discussed in advance of the meeting."  Correct?

16   A.  That is correct.

17   Q.  But you are not aware of whether any of those measures were

18   actually implemented in advance of the next meeting, correct?

19   A.  That is correct.  Actually, I would amend that to say I

20   think in some of my notes with Janet Horan and Kathy Phillips

21   over time that we did talk about the meetings that were taking

22   place with the parties, so I may have received updates on those

23   things then.

24   Q.  So there was another meeting held on September 16, 2014,

25   correct?

1  A.   A meeting among whom?

2  Q.   There was another meeting between Professor Ravina, Dean

3  Hubbard, Vice Dean Horan, Professor Suzanne Goldberg on

4  September 16, 2014, correct?

5  A.   I believe so, yes.

6  Q.   As far as you know, at that time none of the interim

7  measures that Professor Ravina requested had been implemented,

8  correct?

9  A.   I don't know.

10  Q.   You talked about the business school being involved in

11  resolving issues concerning authorship of papers, correct?

12  A.   Yes, that's correct.

13  Q.   At the time you concluded your investigation, those issues

14  of authorship were unresolved, correct?

15  A.   I believe that's correct, yes.

16  Q.   And at the time the appeal letter issued from Professor

17  Ravina's appeal, those issues were still unresolved, correct?

18  A.   I don't know.

19  Q.   Your investigation ended on November 17, 2014, correct?

20  A.   That's correct.

21  Q.   Were you subsequently informed by Melissa Rooker or anyone

22  else that Professor Ravina had subsequently reported ongoing

23  retaliation?

24  A.   I've seen information to that effect through this

25  litigation process, but I don't recall if I was aware back

I7gnrav7                       Dunn - Redirect

1    then.

2    Q.  You conducted only one investigation concerning Professor

3    Ravina, correct?

4    A.  That is correct.

5    Q.  You never initiated any other investigation into any of the

6    concerns that she raised subsequent to your outcome letter,

7    correct?

8    A.  That is correct.

9            MS. FISCHER:  Objection.

10           THE COURT:  What's the objection?

11           MS. FISCHER:  It is repetitive.

12           THE COURT:  I do think this is getting very

13   repetitive.  I am going to overrule the objection, but we have

14   to wrap up.

15           MS. HARWIN:  We are closing up, your Honor.

16           MR. HERNSTADT:  Your Honor, I think we may also have

17   just a handful of questions.

18           THE COURT:  OK.  I understand.  I want to make sure we

19   can let the jury go home.

20   BY MS. HARWIN:

21   Q.  Mr. Dunn, you talked about the reasons you left Columbia.

22           You talked about some family reasons.

23           In addition to the family reasons why you left, other

24   reasons you left Columbia University were because the work in

25   EOAA was challenging and it was a stressful environment,

1    correct?

2    A.  I like challenging work.  It's good to be challenged at

3    work.  You know --

4    Q.  Director Dunn --

5    A.  Yeah.

6    Q.  -- I just want to make sure I get a clear answer to the

7    question.  The fact that the work was challenging was a reason

8    you left, correct?

9    A.  I would not characterize it that way.

10   Q.  But at deposition you did characterize it that way,

11   correct?

12   A.  Perhaps I did.

13   Q.  OK.  At your deposition you testified that the fact that

14   the work in EOAA was challenging and it was a stressful

15   environment were factors in your decision to leave, correct?

16   A.  Yes, they were factors.

17              MS. FISCHER:  Can we have the page, please.

18              MS. HARWIN:  I think he's answered the question, but

19   it's page 29.

20              Thank you.

21              MS. FISCHER:  I will be very brief.

22   RECROSS EXAMINATION

23   BY MS. FISCHER:

24   Q.  Mr. Dunn, you were asked about your preparation for your

25   interview of Professor Bekaert and why didn't you prepare a

I7gnrav7                         Dunn - Recross

1    list of questions in preparation for your first interview with

2    Professor Ravina.

3    A.   When I'm conducting a first interview with someone,

4    especially a complainant who is raising allegations of some

5    kind of discrimination or harassment, I want to be very open to

6    learn about whatever that person wants to share, and I don't

7    want to narrow the conversation or channel it in a way that

8    might exclude other things.

9         So I want to start with a very open-ended question

10   just to kind of find out whatever might be going on so that the

11   person can share with me whatever is happening.

12        And then, as the conversation continues, we can go

13   back and answer more specific questions about any details that

14   might have emerged.  And I think you see that in the notes that

15   I took from that first meeting.

16   Q.   Relatedly, why did you prepare a list of questions or

17   topics for subsequent interviews during your investigation?

18   A.   Well, because in that first interview Professor Ravina set

19   the parameters for the investigation.  She told me what the

20   allegations were, she told me what the violations were that she

21   had perceived.  And so when I was meeting with Professor

22   Bekaert or anyone else, I wanted to make sure that I covered

23   all the ground that Professor Ravina had defined as the

24   possible violations.

25        MS. FISCHER:  Thank you.  That's all.

I7gnrav7                        Dunn – Recross

1           THE COURT:  Mr. Hernstadt.

2           MR. HERNSTADT:  Thank you, your Honor.

3    RECROSS EXAMINATION

4    BY MR. HERNSTADT:

5    Q.  Mr. Dunn, you recall being shown your notes, Exhibit 77,

6    where there were two lines on page 2, "Dinners mostly come from

7    her, GB never initiated."

8           Do you see that?

9    A.  Yes.

10   Q.  You subsequently learned that he did initiate some dinners,

11   correct?

12   A.  Yes, that's correct.

13   Q.  And that was in e-mails provided to you by Professor

14   Bekaert, right?

15   A.  Yes, that's correct.

16   Q.  You were also asked about the mug, and we saw in your notes

17   that the comment that he said his friends gave it to him and

18   then in an e-mail a story about -- if we could look at IR, the

19   bottom of IR.

20          If you look at the bottom of the first paragraph, four

21   lines up, starting in the middle of the fourth line up, "It is

22   indeed a bizarre memento."

23   A.  Yes.

24   Q.  Do you see that?

25          The interview that you had with Professor Bekaert was

1   on November 12, correct?

2   A.  That's correct.

3   Q.  And the date of this e-mail is November 12, right?

4   A.  Correct.

5   Q.  So the story in this e-mail is the same day that you

6   actually sat down and met with him, right?

7   A.  Yes, that is correct.

8   Q.  Last question, Mr. Dunn:  Did you hold against Professor

9   Ravina her decision to go to EOAA rather than have a

10  conversation with Professor Bekaert?

11  A.  No, I did not.

12  Q.  And you were shown a section of a provision of the rules --

13  this is Exhibit 17 top of page 5 -- do you remember seeing at

14  the very top of the page under no circumstances should an

15  individual feel pressured?

16  A.  Yes.

17              (Continued on next page)

18

19

20

21

22

23

24

25

I7g1rav8

1    BY MR. HERNSTADT:

2    Q.  Do you see that that's the last section?  We'll look at the

3    entire provision in the rules.  It's under a section that's

4    entitled Self-Help.  It says, "An individual who believes he or

5    she is the subject of discrimination or has been may choose to

6    deal with the alleged defender directly."

7            So this is the rest of the section that you were shown

8    by plaintiff's counsel?

9    A.  Yes.

10           MR. HERNSTADT:  I have no further questions, your

11   Honor.

12           THE COURT:  Anything else?

13           MR. HERNSTADT:  Thank you, Mr. Dunn.

14           MS. HARWIN:  Just as a matter of housekeeping, your

15   Honor, we would move to admit Plaintiff's Exhibit 85.

16           THE COURT:  Any objection to 85?

17           MS. FISCHER:  No objection.

18           THE COURT:  All right.  85 will be admitted.

19           (Plaintiff's Exhibit 85 received in evidence)

20           THE COURT:  All right.  Thank you.  You may step down.

21           (Witness excused)

22           THE COURT:  All right.  Ladies and gentlemen, I think

23   this is a good time to adjourn for the day.  Just remember,

24   don't discuss the case, don't research anything, and I'll see

25   you tomorrow morning.  Have a nice night.

I7g1rav8

```
 1                (Jury not present)

 2                THE COURT:  Everyone can be seated.

 3                So first I want to talk about the schedule.  Tomorrow

 4    I have a criminal proceeding, so we're going to stop a little

 5    bit before 5, and then on Monday, we're only going to be

 6    sitting in the afternoon, and so I just wanted to let you know

 7    that now.

 8                I am getting a little concerned about the pace of the

 9    trial.  As I stated at the beginning of the trial, I don't like

10    to set time limits because you all know who's most important,

11    but I think already we're seeing a lot of the same exhibits

12    over and over.  I understand they're with different witnesses,

13    and again, I want to let you all try your cases, but I'm

14    getting concerned about timing.  So I just wanted to let you

15    all know that and ask you to maybe impose time limits on

16    yourselves going forward.

17                I don't know what the timing estimate for the trial is

18    now.  I don't know if you all have a better sense.  Perhaps all

19    three of these witnesses are the lengthiest and so I need not

20    worry.  But I just wanted to raise that concern generally.  I

21    don't know if any of you have a better sense.  Does plaintiff

22    still think you're going to rest tomorrow?  Or Wednesday?

23                MR. SANFORD:  I anticipate, your Honor, that we'll be

24    resting by close of business Wednesday.

25                THE COURT:  Okay.  All right.  And from the
```

I7g1rav8

defendants' perspective, do you have any sense of how long, if

that's the case, when your case will rest?

MS. PLEVAN:  Well, I think there's a possibility of

Friday.

THE COURT:  Okay.  Good.  All right.  Good.

MS. PLEVAN:  But I'm concerned that Mr. Sanford was a

little optimistic about Wednesday, because, I mean, we're

producing two of our witnesses for their case and we're going

to cross-examine them.

THE COURT:  You're doing that tomorrow or Wednesday?

MS. PLEVAN:  Well, I think we'll need to talk.  I hope

they're both available Wednesday, but --

THE COURT:  Okay.

MS. PLEVAN:  Or at least one of them.  But I

understand we're going to continue with Mr. Bekaert tomorrow

and then Mr. Hubbard.  I have to be sure Mr. Brown is available

Wednesday.

THE COURT:  Okay.

MS. PLEVAN:  But, you know, we will be examining him

too, so --

THE COURT:  All right.  Just as much as we can move

things along.  I mean, I'm saying it to everybody, not to

anyone individually.  But as much as we can move things along,

recognize what the jury has already seen.  I recognize that

there are situations where you need to raise the same exhibit

I7g1rav8

1  with numerous witnesses, but maybe we can speed that process a

2  little bit, because again, the jury has now seen a number of

3  the exhibits more than once.

4         So with that, let's see how things go tomorrow.

5         So I was thinking we could talk about the remaining

6  deposition designations.  I think we have Katherine Phillips,

7  Janet Horan, and Stephen Zeldes left.

8         So why don't we turn to the Zeldes deposition.  What

9  was his role with the university, and what role did he play

10 with respect to Professor Ravina's complaints?

11        MS. PLEVAN:  Do you want me to address this?

12        THE COURT:  Sure.

13        MS. PLEVAN:  Well, Professor Zeldes served a term in a

14 position that rotates as chair of the division in which

15 Professor Ravina resided, so for a period of three years -- I'd

16 have to check starting exactly when -- he served in that role.

17        THE COURT:  All right.

18        MR. MELZER:  Your Honor, I'd like to clarify a little

19 bit about that role as the division chair.

20        What the testimony in this case will show, we believe,

21 is that as the division chair, he is under the university's

22 discrimination and harassment policies.  He is considered the

23 supervisor of faculty in his department and has reporting and

24 EOAA responsibilities.  As the division chair, he is also in

25 charge of implementing the tenure process in the division, and

I7g1rav8

 1    in this particular case, he took upon it himself to help broker

 2    what has been referred to as the research divorce, and he did

 3    that with the approval, the knowledge and approval of the

 4    dean's office.  So he had an integral role at every stage of

 5    this relationship, overseeing the tenure process and acting as

 6    an intermediary in the dispute between Professor Ravina and

 7    Professor Bekaert on behalf of the dean's office.

 8         MS. PLEVAN:  I don't agree with everything that's

 9    being said.  I don't know if it matters, but certainly with

10    respect to the tenure process, there were people above Mr. --

11    he was an implementer and a scheduler of meetings and so forth,

12    not a decision-maker on policy or interpretation.

13         THE COURT:  All right.  So why don't we go to the

14    particular designations to which there are objections.

15         So I think the first is on 88.  This goes to the

16    question I've asked a number of times.  Is it relevant what his

17    particular belief was?  And why?

18         MR. MELZER:  Yes, because he is the division chair.

19    Again, he has this role in the process where he is the

20    supervisor with EOAA responsibilities.  He is mediating this

21    dispute.  He's spoken to Ms. Ravina; Professor Ravina has

22    complained to him dozens of times about her situation, the

23    discrimination and retaliation and harassment that she's

24    alleging.  He's also spoken to Professor Bekaert a number of

25    times.  He's interacting with and coordinating with the dean's

I7g1rav8

1    office, so his impressions of what is going on go to the mental

2    state of the university and the university's alleged negligence

3    in responding to the situation.

4              THE COURT:  All right.  Does anyone want to respond?

5              MS. PLEVAN:  Well, I don't think that's relevant to

6    the question that's here, and I don't think what -- certainly

7    on his role I've already commented, but it's certainly not

8    established in this record that he had the role that Mr. Melzer

9    was describing.  But he's being asked here, you know, whether

10   he believed what she reported, and that's just not -- I mean,

11   that's lay opinion.  It's not factual --

12             MR. MELZER:  But if you look at --

13             MS. PLEVAN:  -- testimony.

14             THE COURT:  Please don't interrupt, Mr. Melzer.

15             MR. MELZER:  I apologize, your Honor.  I got ahead of

16   myself.

17             THE COURT:  Ms. Plevan, is your answer complete?

18             MS. PLEVAN:  I just say, I think he describes -- he

19   rambles on, it's not really responsive to the question, but he

20   is being asked an opinion, not for facts.  He's not being

21   asked, what did she tell you or what did he tell you, so his

22   reaction to it is not relevant.  I mean, it's not admissible as

23   an opinion.

24             MR. MELZER:  Your Honor, I do think that he's talking

25   about his personal observations here as to how Bekaert acted,

I7g1rav8

as someone who was directly witnessing these interactions, and

Professor Zeldes will be called as a witness.  They've

suggested that they may call him.  And, you know, he can

clarify anything about that.  But our reading of the testimony

is that he's talking about what he personally --

        MS. PLEVAN:  He is not being called.

        THE COURT:  Okay.  He is not being called as a

witness.

        MR. MELZER:  So we do think he's talking about what he

personally witnessed and observed as the division chair who is

the supervisor of these individuals who his acting as a broker,

you know, directly involved with this situation.  So, you know,

if he's observing Professor Bekaert being annoyed and upset and

angry, that's directly relevant to the allegations of

retaliation.

        THE COURT:  Did he relay his own personal views?

Because he says in this excerpt a number of times, "So this is

my own impression of things," just making it clear it was his

own opinion.  I mean, did he relay that opinion?  Did that

opinion play some role in the investigation?

        Look, with respect to Mr. Dunn, obviously the way he

approached it affected the outcome of the investigation and

what happened, but with Zeldes, does it matter what he thinks

personally?  I guess I'm sort of asking the same question

again.  I apologize, but --

1    MS. PLEVAN:  Well, I don't think he was part of the

2    investigation, and there's certainly no evidence that he was

3    ever in contact with Mr. Dunn on this subject.  I mean, he

4    wasn't, about the investigation.

5    THE COURT:  Did he talk to anyone at Columbia who made

6    decisions about whether to extend the tenure vote or anything

7    else?  Again, I'm trying to get a sense of, does it matter what

8    he thought, did he relay these views to anyone else who could

9    have affected what the university did?

10    MS. PLEVAN:  I don't believe there's any indication

11    that he had any, and I don't believe he had any contact with

12    the provost's office concerning the leave request.  I mean, he

13    in general had conversations with people -- I don't want to

14    misstate that -- at the business school from time to time.  But

15    it would depend on the specifics.

16    MR. MELZER:  I think there is testimony that he's in

17    regular contact with the dean's office about these matters, and

18    the dean's office has reporting obligations.  As a supervisor

19    and the division chair, he has reporting obligations to the

20    EOAA, so what was said and what was not said is directly

21    relevant.

22    MS. PLEVAN:  There's no date here either, so I don't

23    know what the -- I mean, this is supposed to be proffered on

24    notice or -- that's not the question.  The question is, did he

25    believe her when she said certain things?  That's the question.

I7g1rav8

1    And that's what he responds to.  And there's no indication of

2    when this took place.

3        MR. MELZER:  We also know that Professor Zeldes is a

4    person who's receiving the faculty objections about the tenure

5    vote and the process, that it was going forward prematurely,

6    and he is the one conveying, you know -- setting up the

7    meetings, trying to get people to go ahead and vote, and

8    scheduling those meetings on what we've argued is an

9    accelerated and premature basis.  And he's doing that with

10   knowledge that is imputed to the university of this situation

11   that he is observing regarding Bekaert's behavior and

12   intentions.

13       THE COURT:  All right.  Let me just come back to --

14   I'm sorry.

15       MS. PLEVAN:  Yeah, and I did want to be clear, because

16   I didn't say anything, I don't think, about the supervisor

17   issue.  I'm not sure on what basis the argument is being made

18   that he's her supervisor.  I mean, he can't hire, fire, do any

19   of the other things that a supervisor normally can do.  He's in

20   a quasi-administrative role that rotates through the

21   department, and he gets the right to schedule and talk to

22   people and things like that.

23       MR. MELZER:  We have entered into evidence Plaintiff's

24   Exhibit 17, which says that department chairs and people in

25   similar positions are considered supervisory or managerial

I7g1rav8

personnel in relation to the faculty in their department.

Provost Rooker was questioned on that policy and appeared to

confirm that division chairs are supervisors of faculty in

their division.

        MS. PLEVAN:  My recollection is that -- and we'll dig

it out tonight if we need to -- that the testimony is to the

contrary.  I don't recall about -- I mean, Ms. Rooker, she's an

investigative person.  She wouldn't have knowledge.  But other

people have testified that the term "department chair" in the

policy means the department of history of Columbia University

and it doesn't mean division chair, which is a lower position.

        THE COURT:  I'm going to think about that.  I'll let

you know, I promise, shortly, but I don't want to keep you

here.  So let's just proceed and I will let you know that

shortly.

        So I think the next objection is on 113, line 3, is

that right?

        MR. MELZER:  Yes, that's right, and that actually --

        MS. PLEVAN:  113?

        THE COURT:  113, at line 3, is that right?

        MR. MELZER:  Yes, and that actually refers to some of

the testimony of Director Dunn today.  In his outcome letter,

which was sent to -- Division Chair Zeldes received the outcome

letter.  In it, as was testified to today, Director Dunn didn't

acknowledge the power imbalance or the imbalance between a

I7g1rav8

junior female and a senior male.  Professor Zeldes, in this

role that we've discussed, saw that as a blind spot in the

investigation outcome, a blind spot or deficiency, the failure

to recognize this imbalance and this power dynamic, and

Professor Zeldes in fact testified that Dean Hubbard agreed

with him on that point.  So the administration is perceiving a

blind spot or deficiency in the outcome of the EOAA

investigation, but they don't do anything about it, so we think

that is highly relevant to the state of mind of the university

and the alleged negligence in this case.

MS. PLEVAN:  There's no foundation for Mr. Zeldes to

have any knowledge of the investigation.  He didn't.  I mean,

he read -- he was copied on the outcome letter.  So for him to

be asked what was his understanding about the role the office

played, I mean, he has no basis for it.  He was not involved in

it at all.  What his reaction is is not relevant.

MR. MELZER:  We're not entering this for his

understanding of the role, of the role that the EOAA office

played.  But as the division chair, directly involved in these

proceedings and interacting closely with the parties and with

the dean's office, a division chair is aware that there is a

power imbalance between junior and senior faculty who are

working together, and he observed, like I said, a blind spot in

the outcome of the investigation, the failure to recognize

that, and importantly, he testified -- I don't know if it's

I7g1rav8

1    here but it's a couple pages later in the transcript -- that

2    Dean Hubbard agreed with him.  And we think that's very

3    important.

4              THE COURT:  All right.  That as well I will let you

5    know shortly, no later than tomorrow morning, because I know

6    you have to get these in order.

7              Let's look at 147.

8              MR. MELZER:  So this again goes to notice to the

9    university as to what concerns the faculty members had, and

10   it's a party admission.  It's the university and the faculty

11   were trying to convince Professor Bekaert to move forward on

12   the research on the one hand, move faster, but also on the

13   other hand to back off some of the projects and let Ravina take

14   them over.  This was something that the administration and

15   Zeldes agreed with and were behind, but, you know, again, the

16   evidence will show that they did not successfully implement

17   that.

18             MS. PLEVAN:  Your Honor, this to me is a lot like the

19   petitions.

20             THE COURT:  Yes, same issue, I think.

21             MS. PLEVAN:  It's a similar type of event, and these

22   people who he is referring to who raised comments or made

23   comments are not here to be cross-examined, so I think it's

24   clear hearsay.

25             MR. MELZER:  Like the petitions, we believe it is

I7g1rav8

1    relevant to notice to the university, and I think there is --

2              MS. PLEVAN:  Notice of what?  I don't even understand

3    what notice.

4              MR. MELZER:  To the university about the concerns that

5    the faculty had, and in fact, he's talking about "we."  So he's

6    including himself in this.

7              THE COURT:  Well, there are different lines that say

8    different things.

9              So I am approaching this much the same way that I

10   approached the petitions, which is out of a concern about the

11   hearsay of the people who can't be cross-examined here and a

12   concern about the prejudice as a result.  But the question at

13   the meeting attended with a group of senior faculty members at

14   Columbia, what concerns did those faculty members raise --

15             MS. PLEVAN:  Who would not themselves have firsthand

16   knowledge, your Honor.  I mean --

17             THE COURT:  Well, I do think it's relevant that there

18   was a meeting attended with a group of senior faculty members.

19   Is that coming in through a different designation that I'm not

20   seeing?

21             MS. PLEVAN:  Well, it's going to come in in live

22   testimony.

23             THE COURT:  It's going to come in through Bolton.

24             MS. PLEVAN:  I mean, there are witnesses who were

25   there who will testify.

I7g1rav8

1        THE COURT:  So I'll allow the first portion of the

2    line, "They raised the concerns that we had a junior faculty

3    member who they felt was not able to get her research done in

4    an effective way," period.  I think we should take out, because

5    I think it's unduly prejudicial, "in part because of Geert's

6    unwillingness to move quickly and move it forward, and so there

7    was a general sense of trying to encourage him to back off.

8    And that he wasn't backing off."

9        Is there anyone else who's at that meeting who's going

10   to testify?  Was Professor Bolton at this same meeting?

11       MS. PLEVAN:  I don't know if Professor Bolton was

12   there.  He wasn't deposed.  But Dean Hubbard was there and he's

13   going to testify.

14       THE COURT:  Okay.  Dean Hubbard was there.  Okay.  So

15   he can be asked about the meeting.

16       Yeah, I also am uncomfortable in the way in which he's

17   speaking for others.  So I'll just allow in that portion that,

18   "They raised concerns that we had a junior faculty member who

19   they felt was not able to get her research done in an effective

20   way."  And we can leave out the rest.

21       And then the next disputed excerpt I think is on 235.

22   So he's reading an email exchange and asking if it refreshes

23   his recollection as to any communications he had with Wei

24   Jiang.  And he says, "Yes, but I still don't remember exactly

25   what conversation pursued."  And then the question is, "Why did

I7g1rav8

1  she have that question about whether the reading committee

2  should do something different?"  I don't think it should come

3  in, his interpretation of why someone had a question.  So I

4  don't think that should come in, because he doesn't have any

5  personal knowledge.  He's just relaying, he's speculating.

6        MR. MELZER:  I think he's talking about what she told

7  him, so he starts out by having a general sense of what was

8  discussed and what he remembers and then gets into what she was

9  expressing.

10        THE COURT:  Is Wei Jiang testifying?

11        MS. PLEVAN:  Yes, he is.

12        MR. MELZER:  Yes, he is.

13        THE COURT:  Then we don't need to get into -- I mean,

14  he also doesn't even remember exactly what was said.  I don't

15  think this is especially reliable.  And then he's relaying why

16  someone else had a question.  So I don't think 235 and 236

17  should come in.

18        I think the next question is on 241.

19        MR. MELZER:  In particular, what is relevant here is

20  that Wei Jiang is --

21        THE COURT:  We're past that.  We're on 241 now.

22        So 241, the question is, "Is one of the things that is

23  evaluated in tenure vote the academic promise of the tenure

24  candidate?"  What's the problem with this, with his take on

25  what's considered in the tenure vote?

1          MS. PLEVAN:  I think it's the rest of it, your Honor,

2     probably not that first question.  Because that first question

3     I think is probably fine.  But after that, it's really getting

4     into other people's heads.

5          MR. MELZER:  He's exactly the person to speak on this,

6     your Honor.  He is the person who runs the tenure vote meeting,

7     he's in charge of implementing the tenure proceedings and

8     telling people what they should be considering.  This is --

9     he's the guy.

10          MS. PLEVAN:  But was it important to whom?  He doesn't

11     say.  What does that mean, was it important?  And it's just,

12     you know, beyond the scope of his personal knowledge.

13     Everybody votes, but he can't get inside their heads.

14          MR. MELZER:  He doesn't need to.  He is running this

15     process and setting forth the ground rules as to what's

16     important and what should be considered.  He's conveying them

17     from what he hears from the dean's office.

18          MS. PLEVAN:  There's no evidence that the division

19     chair has any authority to determine what people consider or

20     not consider.  He schedules the meetings.  That's what the

21     evidence will show.

22          MR. MELZER:  And he also runs the meeting itself.

23          THE COURT:  I'm going to let you --

24          MR. MELZER:  He provides instruction.

25          THE COURT:  I'm going to let this in.  I mean, if you

1     want to have someone else like Dean Hubbard talk about who had

2     what role, that's of course fine, including Zeldes, so it's

3     sort of clear the limitations of his authority, but --

4          MS. PLEVAN:  Well, your Honor, the material on

5     page 243, there is no basis or foundation for his -- he talks

6     about, "My own take was."  He only knows what he's heard from

7     other people, that part of it.  The question beginning 243,

8     line 3 through -- well, and then the last one, is something

9     possible, he says it's possible.  I mean, that's speculation.

10    But the material from 243, line 3 through line 22, there's no

11    basis for his making that statement.  There's no foundation for

12    his having personal knowledge.  What he knows is what he's

13    heard from Professor Ravina and perhaps from Professor Bekaert,

14    but he doesn't know.

15         MR. MELZER:  I think what is relevant here is that

16    people from the dean's office, Dean Hubbard and Senior Vice

17    Dean Phillips, are instructing the faculty on what the

18    considerations will be and how they're limited in what

19    considerations that there can be and that those considerations

20    are limited to the current record of research, teaching, and

21    service.  He has a contrary point of view.  He disagrees with

22    what they're saying.

23         THE COURT:  Okay.  I'm going to allow it in up to 243,

24    line 22.  I'm not going to allow in what was possible and what

25    was not possible, but I'm going to allow in 241, line 23

I7g1rav8

through 243, line 22.

         And then I think the next disputed excerpt is at 294.
I disagree that this isn't relevant.  I think I've ruled on the
relevance of the tenure vote, so 294 is coming in.

         And then we can look at 312.  Is the objection on 312
privilege?

         MR. MELZER:  There is no specific reference here to
the content of any communications.  All it says is, after
discussion with counsel, something happened.

         THE COURT:  I'm actually looking at 312.  So just walk
me through 312.  The section I thought was disputed is line 24.
"Why was Professor Bekaert included on the emailed invitations
to Ms. Ravina's tenure vote?"

         "Well, that was after discussion, after discussion
with counsel.  After discussion with counsel, a decision was
made that Professor Bekaert should be included."

         MR. MELZER:  So the normal process is that everybody
is on and a specific decision was made not to take him off, and
we think that's relevant that the university is sending
Professor Bekaert invitations and schedules about the vote,
that they're sending him Professor Ravina's tenure materials.

         THE COURT:  It's after counsel.  I mean, it directly
says "after discussion with counsel."  How is that not
privileged?

         MR. MELZER:  Because there's no specific reference

I7g1rav8

1    about any kind of communications with counsel or what those

2    communications are.  It just --

3            THE COURT:  It's a direct reference.

4            MR. MELZER:  It's just timing.

5            THE COURT:  The direct reference is page 313, line 7

6    and then again, line 8.  I don't know what you mean there's no

7    direct reference.

8            MR. MELZER:  We would be willing to redact that

9    portion about a discussion with counsel, but there was a

10   decision made that Professor Bekaert would not be removed from

11   communications about the tenure vote, and that's relevant

12   because he's receiving these communications, he knows when all

13   the meetings are happening, where they're happening, he's

14   received the personal statement from Professor Ravina that

15   talks about these claims and allegations, and I think there's

16   some evidence that he is responding to them and trying to act

17   on what he receives.

18           MS. PLEVAN:  Maybe we don't have a dispute, your

19   Honor, because we only objected to 313/5 through 7.

20           THE COURT:  Okay.  That's fine then.

21           MS. PLEVAN:  So if Mr. Melzer is saying he will take

22   that out, then --

23           THE COURT:  Okay.  Great.

24           MR. MELZER:  We would be willing to do that if we go

25   to the end of the page at 25 to refer to -- that there was a

I7g1rav8

1    decision made.

2              MS. PLEVAN:  I'm only looking at what you designated.

3    So I don't know what you're -- you didn't designate --

4              MR. MELZER:  We would agree to designate later in the

5    page to line 25, to refer to a decision being made without any

6    reference to counsel.

7              THE COURT:  Are you all right with that, Ms. Plevan?

8              MS. PLEVAN:  What you already have, 18 through 25;

9    starting at 18 through 25.

10             MR. MELZER:  Yes, that's fine, your Honor.

11             MS. PLEVAN:  We didn't object to that.  We didn't

12   object to that.

13             THE COURT:  All right.  So there's no dispute on that.

14             And then lastly with Zeldes, 318.

15             MR. MELZER:  Yes.  The only thing that would be played

16   here is the word "No," so we're objecting under Rule 1006 as it

17   being under the rule of completeness.

18             MS. PLEVAN:  The question should be included.  That's

19   a typo.

20             THE COURT:  Sorry.  What's the dispute?

21             MS. PLEVAN:  No, I think it was just supposed to be

22   the question above it, starting at line 17.

23             THE COURT:  Yes.  I'm sorry.  I'm missing what the

24   objection is.  If there's no objection to the follow-up of,

25   "No, no view is expressed, no view is expressed," what is the

I7g1rav8

1    dispute?

2              MR. MELZER:  I don't think there is any longer.  The

3    only designation was to the answer, the word "No."

4              THE COURT:  Okay.  But you'll include the question.

5              MR. MELZER:  Correct.

6              THE COURT:  Okay.  So we're done on that.

7              As I said, I'll get back to you first thing in the

8    morning on the two excerpts that I reserved decision on.

9              So let's go next to Janet Horan.  It seemed like many

10   of these objections were based on completeness, so you may have

11   to give me a little bit more context.

12             MS. HARWIN:  Your Honor, before we proceed, it might

13   be helpful just to know if defendants are planning to call

14   Ms. Horan or not.

15             THE COURT:  Are you planning to call Janet Horan?

16             MS. PLEVAN:  Yes.

17             THE COURT:  Yes.  Okay.

18             All right.  So the first objection is on 403 and

19   32(a)(3).

20             MS. HARWIN:  With respect to 34 and 35, we have a

21   somewhat partial selection here, and there's also quite a bit

22   of testimony where she's just answering that she doesn't know

23   anything, which it wastes time, it doesn't add to anything.

24   She's just saying she doesn't know the answer to things.

25             THE COURT:  All right.  So from defendants'

I7g1rav8

1    perspective, what's the relevance of -- well, obviously I can

2    see the relevance of the first question and answer on 34,

3    lines 13 through 22.

4            MS. PLEVAN:  She's asked earlier about the policy and

5    addressing complaints of discrimination.  So --

6            THE COURT:  But what's the relevance if she doesn't

7    know, if she says, it's not my possibility, I wouldn't know?

8            MS. PLEVAN:  Okay.  You may be right.

9            THE COURT:  I mean --

10           MS. PLEVAN:  It's been a while since I looked at this.

11           THE COURT:  No, take your time.  The questions that

12   she says she doesn't know of the policy or that it's not her

13   responsibility, that she doesn't know, I'm inclined to leave

14   that out.

15           MS. HARWIN:  And your Honor, with respect to page 34,

16   I forgot to add, the first question is a question about, "What

17   trainings are personnel affiliated with the dean's office

18   required to participate in?"  And the answer there is

19   nonresponsive.  She says, "The dean and senior vice dean

20   organize in-person training for the faculty," which doesn't

21   address the question of what trainings the dean's office are

22   required to attend.  So it's misleading and confusing.

23           THE COURT:  Yes, I don't find that confusing.  I think

24   the answer is pretty clear.  So I'm going to leave in 13 to 22.

25   But again, I'm inclined not to include the questions to which

I7g1rav8

1     she just doesn't know the answer.

2            MS. PLEVAN:  It might be useful for us to look this

3     one over.

4            THE COURT:  Okay.  We can talk about this tomorrow.

5     I'm not in a rush.  I just want to get what you need to use.

6     So we can do that tomorrow.  Feel free to look that over

7     tonight.

8            Do you want to talk about Katherine Phillips now or

9     tomorrow?

10            MS. PLEVAN:  Sure, because she's going to do that one.

11            THE COURT:  All right.  So we'll talk about Katherine

12     Phillips.  Okay.

13            MS. HARWIN:  Your Honor, I just start with the same

14     question as to whether she is planning to testify, because that

15     might be helpful as we proceed.

16            THE COURT:  Are you planning to call Ms. Phillips?

17            MS. FISCHER:  Yes, your Honor.

18            THE COURT:  As I said earlier, I just want to make

19     sure we're not introducing designations and then having someone

20     testify to the same thing, because as I said, I'm already

21     worried about this trial going over.  We don't need both.  I

22     understand if there's a need to cross-examine someone about

23     something, but we don't need to go over the very things that

24     she testifies to.  Or any of the people for whom you're

25     designating the testimony.  We don't need both the live

I7g1rav8

1   testimony and the designations, if it's about the same thing.

2   If it's literally the same questions, we don't need both.

3         MS. FISCHER:  I agree.  I mean, I just don't know how

4   to address that because, you know, these are particularly, you

5   know -- Vice Dean Phillips and some of the others, Janet Horan,

6   they're going to be here and certainly, you know, the topics

7   that they testified to at deposition --

8         THE COURT:  If they're here, you can ask them in

9   person.

10        MS. FISCHER:  We agree.

11        THE COURT:  And then you can use any depositions to

12  impeach them, but I don't think we should both be reading the

13  designations and be literally asking them the same questions.

14  Okay?  I'm saying that to both sides.  I don't know who's

15  asking for what, but I'm saying that to both sides.  I don't

16  want to read the very questions that people are asked.  Again,

17  you can still use it to impeach them, but we don't need to do

18  everything twice.  And I'm worried we're already doing that in

19  this trial a little bit.

20        So, I mean, if that's the case, do we need to go over

21  this?  Do you want to take a closer look tonight and let me

22  know tomorrow, given that you now know that she's going to

23  testify?

24        MS. HARWIN:  Perhaps, your Honor, it would be helpful

25  just to go over plaintiff's designations if defendants may

I7g1rav8

1   withdraw their counterdesignations in light of her anticipated

2   testimony.

3          MS. FISCHER:  Well --

4          THE COURT:  But if defendants are going to ask her

5   these questions, then we don't need to designate it.  It's the

6   same point.  And I understand that once you rest, that if you

7   feel like something hasn't been read into the record that you

8   wanted, that you had designated, I understand that concern, but

9   again, I don't want to do things twice.

10          So how do you want to do this?  Do you want to --

11          MS. HARWIN:  We can confer with defendants.

12          THE COURT:  Okay.  Why don't you do that.

13          Okay.  Good.  So why don't we meet tomorrow.  Let me

14   see what I have in the morning.

15          All right.  So I'll see you tomorrow morning.  I'll

16   let you know about those two excerpts that I haven't decided on

17   yet, and then you'll let me know if you've made any progress in

18   talking about Katherine Phillips or, for that matter, Janet

19   Horan.  Okay?

20          All right.  Have a nice evening.

21          ALL COUNSEL:  Thank you.

22          (Adjourned to July 17, 2018, at 9:00 a.m.)

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   MICHAEL K. DUNN

 4   Direct By Ms. Harwin . . . . . . . . . . .1181

 5   Cross By Ms. Fischer . . . . . . . . . . .1278

 6   Cross By Mr. Hernstadt . . . . . . . . . .1388

 7   Redirect By Ms. Harwin . . . . . . . . . .1396

 8   Recross By Ms. Fischer . . . . . . . . . .1418

 9   Recross By Mr. Hernstadt . . . . . . . . .1420

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1
                            DEFENDANT EXHIBITS
     Exhibit                                              Received
2      C   . . . . . . . . . . . . . . . . . . .1183

3      FG   . . . . . . . . . . . . . . . . . .1202

4      IT   . . . . . . . . . . . . . . . . . .1254

5      ET   . . . . . . . . . . . . . . . . . .1284

6      EG   . . . . . . . . . . . . . . . . . .1287

7      EH   . . . . . . . . . . . . . . . . . .1288

8      FI   . . . . . . . . . . . . . . . . . .1290

9      FS   . . . . . . . . . . . . . . . . . .1296

10     FV   . . . . . . . . . . . . . . . . . .1298

11     U   . . . . . . . . . . . . . . . . . . .1301

12     GT   . . . . . . . . . . . . . . . . . .1325

13     GP   . . . . . . . . . . . . . . . . . .1326

14     HA   . . . . . . . . . . . . . . . . . .1329

15     V   . . . . . . . . . . . . . . . . . . .1331

16     HU   . . . . . . . . . . . . . . . . . .1348

17     ID   . . . . . . . . . . . . . . . . . .1350

18     IF   . . . . . . . . . . . . . . . . . .1351

19     IG   . . . . . . . . . . . . . . . . . .1354

20     IO   . . . . . . . . . . . . . . . . . .1355

21     D   . . . . . . . . . . . . . . . . . . .1355

22     IQ   . . . . . . . . . . . . . . . . . .1358

23     IU   . . . . . . . . . . . . . . . . . .1361

24     IR   . . . . . . . . . . . . . . . . . .1362

25     JB   . . . . . . . . . . . . . . . . . .1374

```
 1                        PLAINTIFF EXHIBITS

 2    Exhibit No.                                 Received

 3    17     . . . . . . . . . . . . . . . . . .1186

 4    31.1   . . . . . . . . . . . . . . . . . .1188

 5    33     . . . . . . . . . . . . . . . . . .1195

 6    50     . . . . . . . . . . . . . . . . . .1201

 7    65     . . . . . . . . . . . . . . . . . .1203

 8    75     . . . . . . . . . . . . . . . . . .1204

 9    63     . . . . . . . . . . . . . . . . . .1205

10    87     . . . . . . . . . . . . . . . . . .1209

11    55     . . . . . . . . . . . . . . . . . .1210

12    76     . . . . . . . . . . . . . . . . . .1211

13    77     . . . . . . . . . . . . . . . . . .1213

14    66     . . . . . . . . . . . . . . . . . .1221

15    49     . . . . . . . . . . . . . . . . . .1239

16    64     . . . . . . . . . . . . . . . . . .1242

17    69.1   . . . . . . . . . . . . . . . . . .1259

18    69.2   . . . . . . . . . . . . . . . . . .1263

19    69.3   . . . . . . . . . . . . . . . . . .1264

20    69.5   . . . . . . . . . . . . . . . . . .1265

21    69.6   . . . . . . . . . . . . . . . . . .1267

22    69.7   . . . . . . . . . . . . . . . . . .1268

23    69.4   . . . . . . . . . . . . . . . . . .1269

24    80     . . . . . . . . . . . . . . . . . .1346

25    85     . . . . . . . . . . . . . . . . . .1422
```