I7h1rav1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ENRICHETTA RAVINA,

                    Plaintiff,

          v.                          16 CV 2137 (RA)

COLUMBIA UNIVERSITY,
                                      Jury Trial
                    Defendant.

------------------------------x

                                      New York, N.Y.
                                      July 17, 2018
                                      9:29 a.m.

Before:

          HON. RONNIE ABRAMS

                                      District Judge


                          APPEARANCES


SANFORD HEISLER SHARP LLP
     Attorneys for Plaintiff
BY:  DAVID W. SANFORD
     ALEXANDRA HARWIN
     MELINDA L. KOSTER
     AMY DONEHOWER
     HERBERT V. McKNIGHT
     ANDREW C. MELZER

PROSKAUER ROSE LLP
     Attorneys for Defendants
BY:  BETTINA B. PLEVAN
     RACHEL S. FISCHER
     STEVEN D. HURD
     PATRICK KRAMER RICE

HERNSTADT ATLAS PLLC
     Attorneys for Defendant Bekaert
BY:  EDWARD HERNSTADT

I7h1rav1

```
1              (Trial resumed; jury not present)
2              THE COURT:  Good morning, everyone.  You can be
3    seated.
4              Should we wait for Ms. Plevan?  Did she step out?
5              MR. HERNSTADT:  She stepped out to the restroom.
6              THE COURT:  That's fine.  No worries.
7              MR. HERNSTADT:  Thank you.
8              Your Honor, we're all here.
9              THE COURT:  Oh, hi.  How are you.
10             So I wanted to briefly rule on the two Stephen Zeldes
11   excerpts on which I reserved ruling on yesterday.  I'm going to
12   keep both excerpts out.  The first excerpt goes -- I'm sorry.
13   One second.
14             The first excerpt goes from page 88, line 15 to
15   page 89, line 16, and the second runs from page 113, line 3 to
16   page 114, line 13.  Both portions are similar.  They concern
17   Professor Zeldes' opinion about the underlying conduct at
18   issue.  There's already been ample evidence, and there will
19   likely be more, about Columbia's notice and handling of
20   plaintiff's complaint.  The jury is perfectly well equipped to
21   evaluate that conduct and the response without prejudicial
22   opinions from people such as Zeldes, who had no personal
23   knowledge of the events.  Furthermore, his testimony in these
24   sections is ripe with caveats that demonstrate both the
25   secondhand nature of any opinions he can provide and that he's
```

I7h1rav1

1   not speaking for Columbia in these excerpts.

2            For example, at page 89 at lines 12 and 13, he

3   explicitly notes, "This is my own impression of things," rather

4   than a reflection on the administrative response; and notes

5   again on line 15 that his comments represent merely his own

6   impressions.  And on page 113 he notes that he had never seen

7   many of the underlying materials firsthand.

8            So given that lack of personal knowledge and lack of

9   relevance to Columbia's official position, I'm not going to

10  allow those two portions in.

11           Did you have any success with discussing either

12  Phillips or Horan, which I think are the two remaining?

13           MS. HARWIN:  Your Honor, with respect to Janet Horan,

14  our plan would be to reserve the topics in the designations for

15  a cross-examination of Janet Horan, and if you were to listen

16  to the video, you would hear my very sore voice that day.  So

17  it probably is best just to deal with it on cross-examination.

18           THE COURT:  That makes sense.

19           MS. HARWIN:  And we haven't had a chance to talk about

20  Phillips yet, but we will, with defense.

21           THE COURT:  Okay.  Great.  Thanks.

22           Are there any other issues that we need to address or

23  can we check on the jury?

24           MS. PLEVAN:  Well, I think there may be a scheduling

25  issue, but Mr. Sanford and I spoke about it.  We have

I7h1rav1

Mr. Hubbard available for when Mr. Bekaert is done, but I

understand the plaintiff wants to play some deposition

excerpts, but we have not been able to review them.  And in one

case, there is a correction that the witness made to the

deposition and that would have to be resolved before --

THE COURT:  Okay.  All right.

MR. SANFORD:  Your Honor --

MS. PLEVAN:  Anyway, I should say we would like

Mr. Hubbard to be called, you know, whenever Mr. Bekaert is

done rather than play videos in between and have him waiting.

MR. SANFORD:  What I have told Ms. Plevan is that a

lot depends on today's schedule.  If, for example, Professor

Bekaert goes all the way till 4:30 and we're just left with a

half an hour or 45 minutes, it would be our preference to play

a video for half an hour, 45 minutes.  That's how long the

videos tend to be, and Ms. Rooker's video portion is about 45

minutes.  There is a little dispute, but we can resolve that

dispute regarding the video today.  And rather than have

Hubbard on the stand for part of today for half an hour and

then carry over, we'd prefer to start him in the morning, if it

comes to that.  Otherwise, if it's much earlier, we're happy to

start with Hubbard earlier.

THE COURT:  So why don't we see where we are.  Why

don't you try and resolve whatever disputes there are.  I mean,

I don't want to keep the jury waiting, so if there's a dispute

I7h1rav1

1    and you're not in a position to play the depositions, then

2    we'll call the witness --

3                 MR. SANFORD:  Understood.

4                 THE COURT:  -- but otherwise, I'd be happy to work

5    with you.

6                 We're missing one juror.

7                 MS. HARWIN:  Your Honor, in light of the fact that

8    we're waiting for the jury, I think it may be worth just

9    resolving the substantive issues that defense counsel raised

10   with respect to the deposition transcripts.

11                MS. PLEVAN:  I'm not sure what you're referring to.

12   Our problem is, we got the clips, you know, at midnight and

13   we're all here, so that's going to make it difficult.

14                THE COURT:  So you haven't had a chance to review it

15   yet.

16                MS. PLEVAN:  Correct.  And in one case, we know

17   there's an issue, because the witness subsequently corrected,

18   you know, made a correction.

19                THE COURT:  You want to add the correction in?

20                MS. PLEVAN:  I don't know how to, you know -- I don't

21   even know technically how to do that.

22                MS. HARWIN:  That's the issue I was referring to, your

23   Honor, that there is -- almost all the corrections made by the

24   witnesses concerning these excerpts have to do with spelling

25   corrections.  That will be corrected, so that's not an issue.

I7h1rav1

```
1    But one issue that defense counsel raised is their desire to
2    strike an answer that the deponent subsequently substantively
3    revised, and the Second Circuit is clear that even when a
4    deposition transcript is amended, the original answer remains
5    part of the record, can be read at trial, and defendants are
6    entitled to -- they're going to be bringing this deponent
7    Melissa Rooker to testify.  They can have her correct her
8    answer as she'd like.
9            THE COURT:  Well, I think if you're going to show the
10   original answer that she then corrected, you should show the
11   correction with it, because otherwise I do think the jury will
12   be left with a misleading impression.  So I don't want that.
13   So if you want to play it, then play the correction with it, or
14   with the correction written.
15           MS. HARWIN:  The correction is written.
16           THE COURT:  Okay.  So then I would show that but do it
17   at the same time, okay?
18           MS. HARWIN:  We can make that work, your Honor.
19           THE COURT:  Okay.  Great.  Thanks.
20           And then why don't we see where we are in scheduling,
21   and I'm happy to work with you.  As I said, the only thing I
22   don't want to do is keep the jury waiting, but otherwise,
23   subject to, you know, individuals' schedules, I'm happy to have
24   plaintiff put on your case in the way you want to.
25           MR. SANFORD:  Thank you.
```

I7h1rav1                              Bekaert – Cross

```
 1              THE COURT:  Okay.  We talked about Juror No. 4's job
 2    search, and just to be clear, he hadn't expressed a preference
 3    for any particular firm.  It was more someone coming to him.
 4    And I think I'm going to have Ms. Cavale say to him what we
 5    discussed at the sidebar, which is that Proskauer should be
 6    left off any list for the time being.  Okay?  All right.
 7              THE DEPUTY CLERK:  And not address the other issue?
 8              THE COURT:  And don't address the other issue.
 9    Thanks.
10              MR. HERNSTADT:  Your Honor, do you want Professor
11    Bekaert back on the stand?
12              THE COURT:  Yes, please.  Thank you.
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

I7h1rav1                         Bekaert - Cross

1          (Jury present)

2          THE COURT:  Good morning, everyone.

3          THE JURORS:  Good morning.

4          THE COURT:  Everyone can be seated.

5          You may proceed.

6          MR. HERNSTADT:  Thank you, your Honor.

7   GEERT BEKAERT, resumed.

8   CROSS-EXAMINATION

9   BY MR. HERNSTADT:

10  Q.  Good morning, Professor Bekaert.

11         THE COURT:  I'll remind you you're still under oath.

12         THE WITNESS:  Yes.

13  A.  Good morning.

14  Q.  We left off Friday afternoon talking about the

15  international diversification paper.  Do you remember?

16  A.  Yes.

17  Q.  Who was the research assistant on that paper?

18  A.  It's Andrea Kiguel.

19  Q.  And how long did she work on that paper with you?

20  A.  Well, I think she started with Enrichetta and I somewhere

21  in early 2013, and then we worked together from the end of 2013

22  to somewhere in the beginning of 2015, when we had to like get

23  these two papers together.  We had two drafts, and then we

24  turned it over with the codes and everything to Enrichetta, and

25  she sort of took over the paper.

I7h1rav1                         Bekaert - Cross

1    Q.   We've also heard about an automatic enrollment paper.

2    A.   Right.

3    Q.   What was the timeline for the automatic enrollment paper?

4    A.   The automatic enrollment paper is actually something that

5    was conceptualized by Enrichetta, so she had the initial idea

6    and she came up with this I think somewhere in the summer of

7    2013, and then she produced some sort of outline, a skeleton, I

8    think sometime in September of 2013, I believe.

9             MR. HERNSTADT:  I'd like to show you what's been

10   marked as Exhibit BY and move that into evidence.

11            THE COURT:  Any objection?

12            MS. DONEHOWER:  No objection.

13            THE COURT:  BY will be admitted.

14            (Defendant's Exhibit BY received in evidence)

15   BY MR. HERNSTADT:

16   Q.   I'd like you to take a quick look through the exhibit.  Is

17   this the skeleton that Professor Ravina did for the automatic

18   enrollment paper?

19   A.   Correct.

20   Q.   And that was September 26, 2013?

21   A.   Correct.

22   Q.   Is this the skeleton that you used to do an initial draft

23   of the paper?

24   A.   Well, obviously it's just a skeleton, so a lot of work had

25   to be done to turn this into a -- into a draft, but the big

I7h1rav1                    Bekaert - Cross

1    outline that we set in 2013 for this paper was the WFA, the

2    Western Finance Association meetings, which had a deadline of

3    around mid November somewhere, I think the 17 of November, so

4    basically that skeleton turned into a full draft of a paper,

5    and, I mean, preliminary, but we had a full draft by the end of

6    November.

7    Q.  So looking at what's on your screen, that's page 3 of

8    Exhibit BY.

9    A.  Yeah.

10   Q.  Is this the skeleton outline that Professor Ravina sent to

11   you?

12   A.  Yes.

13   Q.  Or the first page of it?

14   A.  Right, that's the first page, yeah.

15   Q.  You mentioned that the deadline was to submit to the WFA.

16   When was that?

17   A.  I don't know precisely, but I think it's something like

18   November 17.  It's actually not November 15; that I know.

19   Couple days later.

20   Q.  Do you recall being asked about an earlier deadline at a

21   conference at Harvard Business School?

22   A.  Yeah, I remember that it was talked about last week.

23   Q.  Was that a deadline you were trying to meet?

24   A.  It's a far less important conference.  I mean, the WFA is

25   one of these big conferences, so I think the Harvard Business

I7h1rav1                          Bekaert - Cross

1   conference was like a one-off conference, and my recollection

2   is that it came quite early after this, so that would be

3   difficult to meet.

4   Q.  So I'll show you what's been admitted as Exhibit 25.  And

5   if you look at the second page, is that the conference, the

6   Harvard Business School conference?

7   A.  Correct, yeah.

8   Q.  And the submission deadline is when?

9   A.  It's October 18, 2013.

10             MS. DONEHOWER:  Your Honor, I apologize for the

11   interruption.  We're having a technical problem, where we're

12   not able to see the document.

13             THE COURT:  Okay.

14             MR. HERNSTADT:  Your Honor, I should wait so that she

15   can see the exhibits we're talking about?

16             THE COURT:  Yes, just wait one minute.

17             MR. HERNSTADT:  Of course.

18             THE COURT:  If not, just give her a hard copy.  You

19   can take mine if you need another.

20             MR. HERNSTADT:  Your Honor, unfortunately because it's

21   already admitted, it's buried in boxes.

22             THE COURT:  Okay.

23             MR. HERNSTADT:  So I think we're going to try and have

24   counsel switch seats because the other screen is working.

25             THE COURT:  Okay.

I7h1rav1                          Bekaert - Cross

1           MS. DONEHOWER:  Never mind.

2           THE COURT:  Oh, it's up?  Okay.  Great.  Thank you,

3     all.

4     BY MR. HERNSTADT:

5     Q.  Professor Bekaert, I had asked you what the date of the

6     Harvard Business School conference was.

7     A.  October 18, 2013.

8     Q.  What was the date of Exhibit BY, the skeleton that we just

9     looked at?

10    A.  September 26.

11    Q.  Were you going to be able to complete a draft to submit for

12    the October 18th deadline based on that skeleton?

13    A.  It would be almost impossible.  I mean, the skeleton really

14    didn't have any results yet in it.  It was just sort of an

15    outline and so it would be -- given our schedules, to get a

16    draft together in that short amount of time is nearly

17    impossible.

18    Q.  Were you able to submit it to the WFA conference?

19    A.  We were, but even for that, to make that deadline, we had

20    to work really hard.  I remember the days leading up to that

21    deadline, both of us were basically working full time on this

22    draft.

23    Q.  What was the progress of the automatic enrollment paper in

24    2014?

25    A.  Well, in 2014, obviously we didn't have a research

I7h1rav1                         Bekaert - Cross

1  assistant for this, for this project, and so I wanted to hire

2  one, and this is what led to all these emails back and forth

3  that I think we talked a little bit about yesterday, and it

4  didn't seem like Enrichetta wanted to hire one, and so we get

5  all these kind of unpleasant emails back and forth, and then

6  ultimately -- I think this was only in June -- Enrichetta says

7  that she's going to do the work on the automatic enrollment

8  paper, so obviously we didn't make much progress at all during

9  that time.

10  Q.  I'm going to come back to the research assistant issue in a

11  little while.

12  A.  Right.

13  Q.  Did Professor Ravina ask if she could submit the automatic

14  enrollment paper -- sorry.

15          Did Professor Ravina ask Financial Engines if she

16  could submit the automatic enrollment paper without a full

17  review by Financial Engines?

18  A.  I vaguely remember that.  Just to make sure, any time we

19  wanted to put a paper out somewhere, a new draft, we had to get

20  the permission from Financial Engines.

21          MR. HERNSTADT:  I'd like to show you an exhibit that's

22  marked EP, and move to admit.

23          MS. DONEHOWER:  No objection.

24          THE COURT:  Okay.  It will be admitted.

25          (Defendant's Exhibit EP received in evidence)

1    Q.  I'd like you to look at page 4 of the exhibit.  Do you see

2    this --

3              MR. HERNSTADT:  Just show the top of page 3 so we can

4    see who it's from.

5    Q.  Do you see this email from Professor Ravina to Wei Hu dated

6    July 21, 2014?

7    A.  Okay.

8    Q.  And Wei Hu is the co-author from Financial Engines?

9    A.  Right, and the director of their finance program.

10   Q.  And do you see in the second and third paragraph, is

11   Professor Ravina asking permission to submit the paper without

12   a full review by Financial Engines?

13   A.  Yeah.  It appears that that's the case, yes.

14   Q.  What happened?

15   A.  Well, I think I actually tried to sort of intervene and --

16   on her behalf with Wei.

17             MR. HERNSTADT:  Let's take a look at page 2 and the

18   email that starts a little -- I'm sorry.  Page 3, the email

19   back from Wei Hu.

20   Q.  If you look at the first sentence of his email, is that his

21   response?

22   A.  Okay.  Yes.

23   Q.  And he says, "I am severely tempted to bend the rules to

24   this but cannot find a justification to do so -- for doing so."

25   A.  Correct.

I7h1rav1                    Bekaert - Cross

1    Q.  And then let's look at the next email in this chain, which

2    starts at the bottom of page 2 and carries over to the top of

3    page 3.

4              Is that your response to Wei Hu's email?

5    A.  It is.

6    Q.  I'd like you to look at the last paragraph.  Could you read

7    that, please.

8    A.  Of the email?

9    Q.  The last paragraph of the email.

10   A.  "I do think -- I do think an effort should be made to let

11   the presentation go through.  This is by far the best way to

12   promote the work among interested scholars, and indeed, it

13   would be terrible to deny Enrichetta this chance."

14   Q.  Did Wei Hu agree with your effort to persuade him to let

15   Professor Ravina do the presentation?

16   A.  I think he did not.

17   Q.  And do you see the date of this email?

18   A.  It's July 22nd.

19   Q.  When is July 22nd with respect to the meeting that you had

20   with the dean's office when you learned that Professor Ravina

21   had made -- had gone to the dean about you?

22   A.  I think this is maybe a week or two weeks -- or two weeks

23   after that.  I think I met with the dean and Janet half July,

24   maybe a little bit before that.

25   Q.  I'd like you to take a look at what is in evidence and what

1    was shown yesterday to Mr. Dunn.  This is an email dated

2    July 19, 2014.  And this is from Professor Ravina to Janet

3    Horan and others.  If you look at the third paragraph of this

4    email --

5              MS. DONEHOWER:  Objection.

6              THE COURT:  What's the objection?

7              MS. DONEHOWER:  602, your Honor.

8              MR. HERNSTADT:  If I may be allowed, I'm going to ask

9    him about his knowledge.

10             THE COURT:  All right.  Just his knowledge.

11             MR. HERNSTADT:  Yes, your Honor.

12   BY MR. HERNSTADT:

13   Q.  If you could look at the third paragraph of the email, the

14   last sentence of the third paragraph says, "I also need

15   financial -- I also need clearance from Financial Engines to

16   give the paper to the discussion for the conference, and it

17   would be great if Geert doesn't slow that down."

18             Do you see that?

19   A.  I see that.

20   Q.  And that email is on July 13?

21   A.  Yes.

22   Q.  Did anyone from the dean's office tell you that Professor

23   Ravina was going to seek clearance from Financial Engines and

24   ask you not to interfere?

25   A.  I don't recollect that.

I7h1rav1                    Bekaert – Cross

1   Q.   What is the reallocation paper?

2   A.   Yeah, we talked about that before.   This is a paper that we

3   did together, Enrichetta, I, and Nicolas Crouzet.   He was a

4   former research assistant and he ended up going to

5   Northwestern.   And it's basically about how people rebalance

6   their portfolios, say from risky to not so risky assets,

7   depending on the shocks that they face.

8   Q.   And what was the progress of the reallocation paper?   What

9   was the timeline for that paper?

10   A.   I think we started it in 2013, but then Nicolas was a

11   student still and so he went on the job market, and it's a

12   pretty long process, so you put your materials in in the fall

13   and then in the winter, you fly out to different universities

14   to give presentations.   So that slowed it down a little bit.

15   And then of course in 2014, we have that research divorce

16   happening, so that also wasn't really contributing to the

17   progress of the paper.

18          MR. HERNSTADT:   I'd like to show you an exhibit marked

19   HD and move to admit.

20          MS. DONEHOWER:   No objection.

21          THE COURT:   All right.   HD will be admitted.

22          (Defendant's Exhibit HD received in evidence)

23   Q.   If you could look at the second and third paragraphs of

24   this exhibit, of this email from Nicolas Crouzet to you.

25          Do you see where he says in the last sentence, where

I7h1rav1                       Bekaert - Cross

1    he says, "I wanted to write to you because I understand there's

2    been some difficulties between Enrichetta and you lately.   I

3    just wanted to say that I hope this doesn't affect our

4    relationship in general and our work relationship in

5    particular."

6    A.   Correct.

7    Q.   Could you read the next paragraph.

8    A.   "For the project on reallocation, I sincerely hope you will

9    consider continuing the work.  You were absolutely central to

10   the stuff we've done so far, and I find it difficult to imagine

11   a paper coming out of this without you."

12   Q.   And then continuing to the first sentence of the next

13   paragraph, if you could read that.

14   A.   Which one?

15   Q.   "I wanted to respond."

16   A.   Oh.  "I wanted to respond to your email about how to deal

17   with unevenly spaced observations, but I thought it might be

18   good to wait for things to clear out first."

19   Q.   Is that referring to one of the issues that you were

20   dealing with in the reallocation paper?

21   A.   Right.  It's just a data issue that we were trying to

22   resolve.

23            MR. HERNSTADT:  I'd like you to look at what's been

24   marked as KQ and move to admit, your Honor.

25            THE COURT:  Any objection?

I7h1rav1                          Bekaert - Cross

1           MS. DONEHOWER:  No objection to the document coming

2    in, but I do object to this witness testifying about portions

3    of it, your Honor.

4           THE COURT:  All right.  This document will be

5    admitted.

6           (Defendant's Exhibit KQ received in evidence)

7           THE COURT:  Let's just ask Professor Bekaert just

8    questions about his own personal knowledge.  And you can have

9    him read something that's in evidence if you want to do that,

10   but we don't want him speculating as to why other people said

11   what they did.

12          MR. HERNSTADT:  Oh, absolutely not, your Honor.

13   BY MR. HERNSTADT:

14   Q.  Professor Bekaert, if you could look at the first page, the

15   second email down, this is an email dated February 27 from

16   Professor Ravina to Mr. Crouzet.  Do you see the first

17   sentence?

18   A.  Yes.

19   Q.  She says, "I share your frustration, but there is no point

20   in working if we don't have assurance that the project will go

21   to fruition."

22          At this time, February of 2015, was there a question

23   about -- pardon me.

24          At this time, in February of 2015, was the

25   reallocation paper one of the matters that were being discussed

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   as part of the research divorce?

2   A.  Yeah, it absolutely was, so we were -- we were trying to

3   work out how to move forward with the different projects, and

4   so for this particular one, my proposal was actually that

5   obviously Enrichetta and I couldn't work together, so what I

6   had been proposing to Nicolas and also to the dean's office and

7   the chair and so on was to basically have me and Nicolas work

8   together and then let Enrichetta and Nicolas make all the

9   decisions, so I wouldn't be involved at all.  I would just talk

10  to Nicolas and then Nicolas and Enrichetta could make all the

11  decisions about the paper, you know, where it should go to for

12  a conference, how it should be published and so forth.  I

13  thought that was the best way to work this.  And I would be

14  sort of out of the decision process, but I would still

15  contribute to the project through Nicolas.

16  Q.  So turning to the third page of the exhibit, do you see the

17  email from Nicolas Crouzet to you dated March 11, couple weeks

18  after the email that we just looked at?

19  A.  Correct.

20  Q.  Do you see that?  If you could look at the second and third

21  paragraph of that email.  And --

22  A.  All right.

23  Q.  And read them out, please.

24  A.  Should I read them out?

25  Q.  Sure.  Actually, do these two paragraphs present the issue

I7h1rav1                      Bekaert - Cross

1  that you were trying to resolve in the research divorce?

2  A.  Yeah, correct.  I -- I just -- I think that it was -- so I

3  had this proposal up there that a lot of people agreed with,

4  and then I think this is sort of the back-and-forth between

5  Enrichetta and Nicolas about this proposal and how it would

6  work in practice, so I obviously didn't see those emails.  This

7  is between Nicolas and Enrichetta.

8  Q.  And do you see the second sentence, Mr. Crouzet writes, "I

9  realize the problem is that being an arbiter, she means for

10 me -- she meant for me to set deadlines and enforce them.

11 That's what she said in her email."

12 A.  Okay.

13 Q.  Was that something that Professor Ravina wanted as part

14 of -- a commitment from you as part of the research divorce?

15 A.  I guess so.  I think -- I think the issue was that, you

16 know, what would happen if Enrichetta and I disagreed on

17 something, but in some sense that was -- I was actually not

18 worried about this.  I just thought that Nicolas, he's a very

19 sensible guy, so I felt like if I could just work with him,

20 then they would have to work it out between themselves and take

21 the decisions and I wouldn't be involved, but I think

22 Enrichetta had sort of anticipated potential problems with this

23 for some reason.

24         MR. HERNSTADT:  If we could look at page 2, the bottom

25 of page 2, top of page 3.

I7h1rav1                    Bekaert – Cross

Q.  Do you see the email one minute later?  Is this your

response to Mr. Crouzet?

A.  It is.

Q.  And what are you instructing in this email?

A.  This is actually -- it's working out this -- this research

divorce and how to work on this paper.  I think Enrichetta had

stressed again that it was important to set schedules and

deadlines, and I think what I described here is my general view

that, you know, with people like me and most people, this just

doesn't work because you get shocks and you have to be able to

adjust the schedule dynamically as things change.  And so it's

a little bit about this.  It's about sort of saying, hey, you

know, I know that this -- this, you know -- that she wants to

set deadlines, and I'm actually making even a joke that I was

kind of worried that if she was working with him and would set

a deadline and he wouldn't make it, that she might get upset

with him.

          (Continued on next page)

```
 1   Q.  Do you see the highlighted portion?  Is this what you were
 2   prepared to agree to, what you agreed to with Mr. Crouzet?
 3   A.  Yes.  So I basically confirm yet again that when it comes
 4   to any decisions, I am entirely OK with leaving it up to them,
 5   so I would be out of that process.  They would just have to
 6   work it out between them.
 7   Q.  Are you agreeing to the deadline?
 8   A.  What deadline?
 9   Q.  The deadline -- any deadline that Mr. Crouzet is setting?
10   A.  Yes, yes.
11   Q.  Professor Bekaert, did you delay work on the 401(k) papers
12   at any time between 2012 and 2014?
13   A.  I did not.
14   Q.  Did you devote all of your time to the 401(k) papers?
15   A.  Of course not.  I think we explained this before.  I did
16   lots of other research.  I always worked on many projects
17   simultaneously.  It is true that in 2013 I was particularly
18   busy, I had, I think, three revise and resubmits.
19           We have talked about this before.  If you get a revise
20   and resubmit, you better focus your attention on that.  In
21   particular, two of my revise and resubmits had actually
22   revision deadlines.  Some journals basically say six months
23   your paper has to be back.
24           So I definitely had to work on this.  I was traveling
25   more than I otherwise would do.  I was on sabbatical, so I was
```

1    in Asia, you know, Beijing.  I was teaching in Australia.

2              So, there was a lot of traveling going on, I had to do

3    consulting, I had to do editorial work, I was working with two

4    students.

5              So there's all these other things that I have to

6    manage and work on.  So -- but I still worked obviously on the

7    401(k) papers as well.

8              But you cannot expect, and I don't think Enrichetta

9    ever expected me to devote 100 percent of my time to just these

10   projects.

11             If you look at my vitae, you can see that's just

12   impossible.

13   Q.  We have talked a lot about your travel schedule.  I would

14   like you to look at Exhibit 222, please.

15             MR. HERNSTADT:  And move to admit.

16             THE COURT:  Any objection?

17             Are you moving to admit all of them or just --

18             MR. HERNSTADT:  Just page 5.

19             THE WITNESS:  I have looked at it.

20             THE COURT:  Yes.

21             What is your position?

22             MS. DONEHOWER:  I do object, your Honor.

23             I think this is more appropriate to develop through

24   testimony, but obviously no objection if the witness seeks to

25   use it to refresh his recollection.

1          THE COURT:  I agree with that.

2          I don't think this document should come in, but if it

3     refreshes his recollection as to the dates he was present in

4     New York, he can look at that and see if it refreshes his

5     recollection.

6          MR. HERNSTADT:  Sure.

7     BY MR. HERNSTADT:

8     Q.  Professor Bekaert, I would like you to take a look at the

9     exhibit that I have shown you.  Does this help refresh your

10    recollection about how often you were in New York between

11    August 2012 and July 2014?

12    A.  It does.

13    Q.  And how often were you in New York in that time frame?

14    A.  Well, very little.  I mean, this is -- it's sort of a good

15    outline for me that, like in -- even -- my sabbatical started

16    at the end of 2012, but even in the fall semester of 2012 I was

17    traveling a lot.

18         There's not a single month that I was really present

19    for more than a week in New York sort of continuously.  One

20    reason for that was not only was I doing the usual traveling to

21    Europe, because I have consulting there in Frankfurt, I want to

22    see my kids, my teaching at Columbia was actually not in

23    Columbia.

24         I was in the Berkeley Columbia program, so I was

25    teaching in Berkeley for four of the five blocks of my

1    teaching.  So I was really gone a lot.

2         In December September I left for Australia and then I

3    came back to Belgium, and I never came back to New York until

4    April.  My apartment was even rented out to an MIT professor.

5         I was one week in New York in April, a couple of days

6    in June, and then I was again in Asia and Australia.

7         I only came really back in the fall of 2013.  And even

8    in the fall of 2013 I would be in New York sort of roughly at

9    most two weeks a month pretty much.

10        And 2014, again, was very, very busy.  In January I

11   only spent like a week here; in February a little bit less than

12   a week.  And this is even -- if you look at these dates, the

13   travel sorts are sort of the first and the last date.

14        I was here a little bit more in March, but I had a

15   block week of teaching, a few days in April; in May, two days;

16   and then in June I was maybe altogether seven days or so.

17        So I just -- this was an incredibly busy period in

18   terms of traveling mostly because of the sabbatical and other

19   commitments.

20   Q.  Do you recall yesterday Mr. Dunn's notes showing that

21   Professor Ravina said that your stalling by wanting to get a

22   coffee every week and not work started in the summer of 2013?

23   A.  I recall that, yes.

24   Q.  Did you see Professor Ravina at all in the summer of 2013?

25   A.  No.  I was simply not here.  I want to correct that.  I was

I7hnrav2                    Bekaert - Cross

1    here a few days in June, but we weren't able to meet.  And then

2    I was only back in August, which I didn't see her, and then I

3    was back for two days or so and then I was back in the fall.

4    Q.  Do you remember being shown an e-mail on your testimony --

5    the questions you were being asked by plaintiff's counsel, that

6    is Exhibit 57.  I will show you the e-mail.

7            Do you remember being shown this e-mail?

8    A.  I have -- I don't really have a good recollection of this I

9    must say.

10   Q.  If you look at the e-mail, the top e-mail, this is from you

11   to Andrea Kiguel, and you say that, in the second paragraph you

12   say, The fact that we did not start in June is likely my fault

13   although I did --

14   A.  Yes.

15   Q.  -- and then she really pissed me off with something, so I

16   stopped working on it for a few months.

17   A.  Now I remember.  Sorry.

18   Q.  OK.  Did you delay the international diversification paper?

19   A.  No, I did not.

20   Q.  So, can you explain?

21   A.  Yeah.  Can I see the e-mail just --

22   Q.  Sure.  I'm sorry.

23   A.  They took the e-mail away.  I want to re-- OK.  Yes.

24           I wrote this right after this whole stressful period

25   with the research divorce started.  I am actually -- it's

1    really odd that I wrote this, because I mean I just told you

2    how busy I was during this period, so I never intentionally

3    delayed this project.

4           In fact now, looking back on all the e-mails, the

5    progress on the projects was amazing, you know, during 2013.

6           What had happened, though, is that after our meeting

7    from April 2013 we started to have a little bit of a -- I would

8    say sort of a research discussion, you know, what does the

9    paper have to go, the international diversification paper.

10          We had a little bit of a disagreement.  I wanted it to

11   be sort of a general descriptive paper; Enrichetta wanted to be

12   looking at a focused question.

13          But I still produced an outline in skeleton.  You have

14   seen the outline in the skeleton that Enrichetta produced on

15   automatic enrollment.  I would say that mine was actually more

16   detailed, and I produced that in Asia while I was in Asia at

17   end of May.

18          But Enrichetta had reacted to that quite negatively.

19   She had sort of expected it to be more detailed or something

20   like this, so we had a little bit of a dispute there, and also

21   about where does this paper have to go?  Is it going to be

22   focused or is it going to be more general?

23          So that's probably what I was referring to, with, you

24   know, she pissed me off at something.  That was kind of like I

25   had done this work and I got this negative reaction.

1          And then during the summer, though, the work kept

2     going -- you know, you don't see even, you see just a small

3     portion of the e-mails.  There was lots of e-mails going back

4     and forth with Andrea that we were still learning about data.

5          And remember the hard deadline for that paper was, we

6     needed to get a draft because that conference was looming

7     January 2014.  It had to be presented at that conference.  And

8     we did that.  We got the draft together right on time.

9          So I wouldn't call it -- I wouldn't call it a delay if

10    you get the data together in preliminary format in April 2013

11    and then produce two drafts before the end of the year.  I

12    think that's an extraordinary success actually.

13    Q.  Professor Bekaert, looking at this exhibit, is this your

14    responding to an e-mail from Andrea Kiguel, correct?

15    A.  Correct.

16    Q.  And is this the full e-mail chain, the full conversation?

17    A.  It doesn't look like it, because it seems to end at a

18    colon, objective parentheses colon.

19    Q.  I would like you to look at Exhibit FW.

20          MR. HERNSTADT:  Move to admit, your Honor.

21          THE COURT:  Any objection.

22          MS. DONEHOWER:  No objection.

23          THE COURT:  FW will be admitted.

24          (Defendants' Exhibit FW received in evidence)

25    BY MR. HERNSTADT:

I7hnrav2                          Bekaert - Cross

1    Q.  Professor Bekaert, looking at the second e-mail -- the

2    first e-mail is an e-mail from Ms. Kiguel to you.  The second

3    e-mail, is that the same e-mail that we just looked at at

4    Exhibit 57?

5    A.  Yeah, it appears to be.

6    Q.  If you look on the second page, the fourth line down.

7    A.  OK.

8    Q.  The single line that ends with colon, is that the last line

9    on Exhibit 57?

10   A.  Yeah, it appears to be.

11   Q.  How long is this exhibit?

12   A.  Well, it is a lot of pages.  I can't count very fast.  I

13   think it's about ten.

14   Q.  And without getting into detail, what is this exhibit?

15   What are these e-mails back and forth?

16   A.  It's really about research, but also about the kind of

17   difficult -- I mean how difficult it became to work with

18   Enrichetta after this research divorce and Andrea complaining

19   about her working relationship with Enrichetta.

20   Q.  Thank you.  Did you intentionally make time to work on the

21   401(k) papers?

22   A.  All the time.  You know, as I discussed many times before,

23   I thought that we made extraordinary progress on these papers.

24   Q.  Were you in charge of the 401(k) projects?

25   A.  No.  I mean, it is a completely symmetric project.  Anytime

1   I work with collaborators, I want to be an even level, you

2   know, so they can shout at me, if they want.  So for this

3   project it was much the same.

4   Q.  As between you and Professor Ravina, who was in charge of

5   the sort of initial database --

6   A.  Right.

7   Q.  -- phase of the projects?

8   A.  Initially I would say Enrichetta completely managed the,

9   sort of the first part of the data management, so she did all

10  of that by herself.

11          And basically I didn't want executive authority there.

12  I didn't really get involved too much.  It is only later that

13  we became, sort of that we worked together.  And, again, in

14  that relationship, there was no bosses, as can you see from the

15  e-mail traffic.  I mean, we just were coauthors.

16  Q.  As between you and Professor Ravina, who had the final

17  approval about submitting a paper to -- you know, withdrawn.

18  Let me ask a different question.

19          Who among the four coauthors had the final approval

20  power about submitting papers to journals?

21  A.  Well, the way it works in our profession, if you coauthor

22  papers, you just have to agree, all of you, you know, where to

23  submit and when to submit.  You just have to come to an

24  agreement.

25          What was special here is that not only did we have to

1  come to an agreement, everything we sent out had to be approved

2  by the firm, by Financial Engines.  Wei and Kenton could sign

3  off.  Then it had to go to the legal department of the firm to

4  get it signed off.

5  Q.  Did you ever tell Professor Ravina that she had to go

6  through you in dealing with Financial Engines?

7  A.  I don't recall that.

8  Q.  Do you remember an e-mail that we saw last week in which

9  you called her blunt and said she had to show you her e-mails

10  to Wei Hu before she sent them?

11  A.  Yes.  Yes.  But that was just sort of a joke.  We had a lot

12  of e-mails back and forth about each other's bluntness.  This

13  was one of them.

14       I think it just referred to that particular e-mail

15  that she sent to Wei that I thought was not quite right.

16       One of the issues that I was very sensitive to in this

17  relationship is that Wei somebody I know personally, but I also

18  know how busy he is, you know, he's working -- he's heading up

19  the finance group at Financial Engines, publicly traded

20  company.  You don't want to bother him with little details.

21  You do not want to aggravate him.

22       So I was a little bit sensitive on how we approached

23  him because in the end they controlled the data.  If they say

24  we've had enough, it's over.

25       I thought both Enrichetta and I had to be a little bit

1   sensitive to their time constraints.  We didn't want to bother

2   them with little things.  We only wanted to give them stuff

3   that was substantive enough for them to make time and look at

4   it.

5   Q.  Professor Bekeart, you heard a lot of testimony last week

6   from Professor Ravina accusing you of sexual harassment.

7       Was what Professor Ravina told us last week, was that

8   true?

9   A.  None of it is true.  I never had any romantic interest in

10  Enrichetta, and I never asked her for a date and I never talked

11  about sex.  I just had no idea where this is coming from --

12  well, I do have an idea.

13  Q.  You were asked about -- I'm sorry.  Withdrawn.  You heard

14  Professor Ravina talk about something that happened in Stanford

15  in the 1990s, and also a complaint about -- from an MBA

16  student.

17      Do you remember those?

18  A.  Yes.

19  Q.  What happened at Stanford?

20  A.  OK.  It is a really long time ago.  So this is probably

21  1994 or 1995.

22      So, basically, was going on, I was preparing my green

23  card file, which is a very long process.  You have to have

24  medical records, fingerprinting, the whole works.

25      My file had to be sent to my lawyer's office in San

1    Francisco, and they would then, you know, do some additional

2    work and submit it to the immigration office.

3              So I had given it to my assistant at Stanford on

4    Friday, and it had to be there on Monday morning at 9.  When I

5    came to my office in the morning, it was to frantic phone calls

6    from the lawyer's office that they hadn't received the FedEx

7    package.

8              So I sort of went to my assistant, and it turns out

9    that she had sort of handed it off to another friend of hers,

10   because she had to leave, and the file was actually submitted

11   to the immigration office itself.  There was no FedEx tracking

12   number whatsoever, so that was extremely upsetting.

13             I mean, I got really, really sort of -- I think I may

14   have yelled at her.  I used some strong words, which I regret

15   now.  And so that's really what this incident is about.

16   Q.  Did your assistant file a complaint?

17   A.  I don't think there was an official complaint at all.

18   Q.  What happened?

19   A.  Well, I -- the only thing that happened is that I

20   obviously -- I think she may have gone to the dean's office.

21   And I only know this because the dean's office contacted me,

22   and then I had a conversation with the senior -- with the

23   senior vice dean about it, you know, my communication skills,

24   and I shouldn't have used these strong words against an

25   assistant.

1   Q.  Were you told that a discrimination complaint had been

2   filed?

3   A.  No.  There was no complaint against me at Stanford at all.

4   And I'm a hundred certain of this because Enrichetta's team

5   subpoenaed Stanford and there was nothing.

6   Q.  Did you tell Professor Ravina about this incident?

7   A.  I did.  It's kind of a fun story and -- well, it's not a

8   fun story, but the reason that I tell the story to people --

9   I've actually told it to many, many people -- is that I mean

10  after a crazy day, where I was so frightened that I was going

11  to lose this file -- I mean, this was my green card

12  application, so I was in all states.

13          We actually miraculously recovered the file, and

14  that's what the story is really about.  It was a miracle that

15  we got the file back, and that is what the story -- that's why

16  I tell the story.  I won't bore you with the details, but

17  that's really what the story was.

18  Q.  Do you recall being asked about or hearing testimony about

19  a complaint from an MBA student?

20  A.  Yes.

21  Q.  What happened there?

22  A.  Well, what happened, you know, you have heard Mr. Dunn

23  testify that this was an anonymous complaint.  So, again, I

24  was -- this was in early 2014.  I was traveling a lot.

25          I came back from one of those travels.  I was in

Hong Kong.  I came back to New York.  So, I got called into the
Title IX office.  For me that was a real shocking event.

        The only thing Mr. Dunn told me is that there was an
anonymous complaint that some student had said that I in class
had said something like and then you go to Hong Kong where the
women are nice.

        I was totally flabbergasted.  I was like where the
hell does that come from?  How on earth could I say something
in my class?

        I remember either at the end of the meeting with
Mr. Dunn or when I was walking to my office I kind of made the
link with the e-mails that I had been having with this student
in my class, very unpleasant e-mails essentially about her
grade.

        So, while I was in New York, this student, she had had
received a very low grade and she wanted to see her exam, but I
was in Hong Kong so I had my assistant go over the exam with
her.

        And then she wrote me back, and she didn't understand
her grade.  So I was trying to explain the grading scheme.  It
was a multiple choice exam with positive points if you get it
right, but if you get it wrong we deduct points.

        This was very clearly explained I thought, but I think
the way that my assistant had graded it confused her a little
bit.  So basically there was this back and forth about this

1    grading scheme.

2              And, you know, I'm definitely not the best

3    communicator.  I didn't think I used strong words, but what

4    aggravated me the most was that she had, like, forwarded the

5    e-mails to her friends and said Professor Bekaert doesn't grade

6    fairly, which is absolutely not true.

7              And so it was a very unpleasant exchange, and I didn't

8    think I used strong words at all.  But, looking back at it, I

9    should have stopped it much earlier for sure.

10   Q.  Did you tell Mr. Dunn whether you had spoken the words he

11   asked you about, about women in Hong Kong being nice?

12   A.  Yes, there's no way that I've ever said that.  I made the

13   link with this e-mail exchange, and when I went back to my

14   office, I forwarded that e-mail exchange, because all of this

15   happened while I was in Hong Kong, and there was some strange

16   remarks from the student about Hong Kong.

17             And I said, oh, this is obviously where this is coming

18   from, and I forwarded this to Mr. Dunn.

19   Q.  Did Mr. Dunn ever confirm to you that you had guessed the

20   student's identity?

21   A.  I'm not sure about that.  Actually, not at first at least,

22   but then in the outcome letter I think there was a reference to

23   the sort of e-mail exchange with the student, which was much

24   later.  It was like in May.

25   Q.  What happened to the complaint?

I7hnrav2                         Bekaert - Cross

1    A.  I think it was dropped.

2    Q.  Did you threaten the student?

3    A.  No, I did not.

4    Q.  Let's take a look at Exhibit 31.  If you look at the e-mail

5    at the bottom --

6               MR. HERNSTADT:  Actually, can you go to the e-mail

7    before that as well, going down on page 2.

8               So if you look at the -- let's carry that out.

9    BY MR. HERNSTADT:

10   Q.  These are some of the last e-mails exchanged between you

11   and the student.

12              Do you see how she ends her e-mail on January 30?

13   A.  Yes.

14   Q.  She ends it, "Now stop harassing me"?

15   A.  Correct.

16   Q.  And would you look at your response?

17   A.  I see it.  Yes, I remember it.

18   Q.  What does this e-mail mean, the one from you to the

19   student?

20   A.  Well, what I wanted to say here is -- I mean, OK, she just

21   called me a pompous arrogant ass essentially.  So I guess I was

22   upset.

23              What I meant is that I wanted to potentially take this

24   to the disciplinary committee and then -- you know, we have

25   this disciplinary office headed up by this person Nayla, she

I7hnrav2                          Bekaert - Cross

1    was mentioned, in Mr. Dunn's office -- the testimony.  And so

2    my idea was maybe I should talk to Nayla about this and maybe

3    we can make this something official.

4         What I ended up doing was I ended up talking to Nayla

5    and making it sort of unofficial, and then Nayla informed me

6    that the student had complained about every single class in

7    that particular semester, and I figured well something special

8    is going on here.

9              MS. DONEHOWER:  Objection.

10             THE COURT:  Yes.  Sustained.

11             Why don't we strike that answer and why don't you ask

12   another question.

13             THE WITNESS:  OK.

14   BY MR. HERNSTADT:

15   Q.  Did you tell Professor Ravina about this incident?

16   A.  I did.

17   Q.  Why?

18   A.  Well, it sort of came up.  I mean, we had a discussion

19   about teaching in the early 2014.

20             Enrichetta had sort of -- she was a little bit

21   displeased with I think sort of a lack of recognition for her

22   teaching turnaround.  So when she first came to the school -- I

23   mean, she was inherently a good teacher I believe, but she had

24   had this one class in which -- and she told me the story in

25   which some investment banking students were sort of ganging up

1     on her.  You know, she was relatively knew, and they really

2     sort of ruined the class for her, and she got like bad teacher

3     evaluations.

4              And then the school -- they're very, very nervous

5     about bad teacher evaluations.  So they actually took her out

6     of the MBA program, and let her teach some undergrad classes

7     and she had gone back wack to the MBA program, and had done

8     spectacularly well.  She had some really good teacher

9     evaluations like 4.8 out of 5.

10             And she was expressing some disappointment that she

11    wasn't awarded the favorite teacher award or something like

12    this.

13             So we had this discussion about teaching and the

14    investment banker students.  I wanted to sort of say, look, I

15    am an experienced teacher, and I also have problems with

16    students.  It can happen to anyone.  And this is how this story

17    came up.

18    Q.  By the way, the e-mail exchange between you and the MBA

19    student, was there anything in that e-mail about comments you

20    made in class about women in Hong Kong?

21    A.  No, not at all.

22             And if you see in the outcome letter from Mr. Dunn, he

23    had checked the teacher evaluations, just as he did with these

24    other professors, I even checked it myself, you know, and just

25    nothing there.  And this was also a class that I did really,

I7hnrav2                          Bekaert - Cross

1       really well.

2                   I mean, there's just no single student made any remark

3       about this alleged incident, because it didn't happen.

4       Q.  And did she in the e-mail exchange between you say anything

5       about that?

6       A.  Not that I recall.

7       Q.  As of 2012, what was your relationship with Professor

8       Ravina like?

9       A.  I think we had a great relationship.  We worked well

10      together.

11                  I mean, we obviously, you know, were still sort of

12      just getting the data in and we were preparing for that, and I

13      think we were very friendly, and, you know, we had lunches and

14      coffees and so forth.

15      Q.  We've seen e-mails -- well, let's take a look at Exhibit

16      BA, which is in evidence.

17                  THE COURT:  All right.

18      Q.  Do you see this e-mail from Professor Ravina to you on

19      November 19, 2012?

20      A.  I do.

21      Q.  And she says, "I like the blunt Belgian version so I hope

22      you will appreciate my reply," wink face.

23      A.  Yes.

24      Q.  "With all due respect, you don't understand anything."

25      A.  Correct.

I7hnrav2                        Bekaert - Cross

```
 1   Q.  Was this unusual that she would write you an e-mail like

 2   this?

 3   A.  No, not at all.  I mean, we were friendly with one another

 4   and we were sort of at this -- you know, there was never kind

 5   of like a -- you know, we were just equal partners in this

 6   relationship, and we could sort of be very honest with one

 7   another.

 8           I worked with my students like this, too.  If my

 9   students want to call me an idiot, that's fine.  I mean, you

10   want to have people feel comfortable so that you, you know, are

11   really productive in terms of research.

12   Q.  And I would like you to look at Exhibit SM.

13           MR. HERNSTADT:  And move to admit.

14   Q.  I would like you to look at the second e-mail on this page

15   from Professor Ravina to you.  That's also on November 19,

16   2012.

17   A.  I see it.

18   Q.  Could you read that out, please.

19   A.  The whole e-mail?

20   Q.  Sure.  It's pretty short?

21   A.  "Well, let me be blunt.  You must be kidding.  I can't

22   believe you put my name on this message.  From now on PR goes

23   through me for both colleagues and Wei and Kenton.  Seriously,

24   you're like an elephant in the China shop of feelings.  It's

25   almost funny."
```

I7hnrav2                        Bekaert - Cross

 1    Q.   Is this also typical of the way you and Professor Ravina

 2    got along in 2012?

 3    A.   Yes, yeah, it is.  I think it's actually a very witty

 4    comment.

 5    Q.   Did she ever use stronger terms towards you?

 6    A.   She did, but, again, it's all jokingly.  I mean, I think

 7    she called me an idiot one time, and, you know, that's fine.

 8               MR. HERNSTADT:  Move to admit SM please.

 9               MS. DONEHOWER:  No objection.

10               THE COURT:  It will be admitted.

11               (Defendants' Exhibit SM received in evidence)

12               MR. HERNSTADT:  I would like to show you Exhibit SK.

13               MS. DONEHOWER:  No objection.

14               THE COURT:  SK will be admitted.

15               MR. HERNSTADT:  Thank you, your Honor.

16               (Defendants' Exhibit SK received in evidence)

17    BY MR. HERNSTADT:

18    Q.   This is an e-mail from Professor Ravina to you in May of

19    2013?  Do you see the last line?

20    A.   Yeah.

21    Q.   What is she saying to you here?

22    A.   That I am an idiot.  But again, it's jokingly.  I mean,

23    it's fine.

24    Q.   Did you take this as an insult?

25    A.   No, not at all.

I7hnrav2                    Bekaert - Cross

Q.  Was this -- I would like you to take a look at the entire

e-mail if you would.

A.  OK.

Q.  What is this e-mail about?

A.  Yeah.  What happened here is we had a little dispute here

about Andrea Kiguel.  So, in short, what happened is I got a

chance to write a paper with Cam Harvey, who is a very

important figure in the field and a good friend of mine, about

emerging markets, a solicited article.

        Andrea always wanted to work with me -- those were the

issues that she wasn't interested in.  So she would have been

the ideal research assistant and actually collaborator,

coauthor on this article, so it could be could go on her vitae.

        So I had approached her to see if she was interested.

I think this is what this is, right?  Yeah.

        And Enrichetta obviously sort of got wind of this and

was very displeased, because she felt like I was taking away

time that Andrea could spend on the 401(k) project.  So this is

what this e-mail exchange is about.

Q.  Did you envision that Ms. Kiguel's work with you on the

paper with Professor Harvey would take time away from the

401(k) papers?

A.  Well, it -- yes and no.  I mean, it -- it -- it sort of is

a little bit unfair to have a student work only on a project as

a research assistant.  I mean, obviously the students want to

1   also get credit and finally get their names on papers.  So I

2   thought she could probably do both.  I mean, at least that was

3   my initial estimate.

4   Q.  Do you see the highlighted bit?

5          Is that what you wrote to Ms. Kiguel on this issue?

6   A.  Yes, I see it.

7   Q.  And is it the case that you would only consider having her

8   be a coauthor on the paper with Professor Harvey if she could

9   work -- combine it with work on the projects with Enrichetta?

10  A.  That's correct.

11  Q.  That you write here?

12  A.  That's correct.

13  Q.  Did Ms. Kiguel do the project with you and professor

14  Harvey?

15  A.  She did, but not then, because it was very clear that

16  Enrichetta was extremely upset about this.

17         So I actually ended up simply telling Cam, you know,

18  we can't do that right now.  I think we need to preserve what

19  Andrea has done for the 401(k) projects.

20         So I basically postponed the project all together and

21  Andrea kept working just on the 401(k) projects.  So I

22  basically followed Enrichetta's advice.

23  Q.  In the spring of 2012, did you think that Professor Ravina

24  was on track for tenure?

25  A.  In the spring of 2012 -- I think that's when I wrote the

I7hnrav2                     Bekaert - Cross

review for her.  I think -- if you look at the reviews, I don't

think she ever got sort of a good review like you're on track.

           The way I think about this is that when -- when I

brought this data to her in sort of 2010, I thought there was a

good chance that we could really salvage her career.

           She had these two R and Rs by herself.  She was

working with Luis Viceira, a famous professor at Harvard.  Some

other working papers with local professors.

           I was thinking, if all that goes well, plus we can add

some projects from the 401(k), there was a tenure case there.

           But then as the years went on, basically these R and

Rs weren't really coming to on fruition, that other work wasn't

coming to fruition, it became less and less likely that was

going to happen.

           And, in any case, she needed the two single R and Rs

to make it.  That was a given.

           So in 2012 that became more and more unlikely.

Q.  And was the delay in getting the contract signed with

Financial Engines and then in getting the data from 2009 to

2012 an issue in terms of your thinking --

A.  Yeah.

Q.  -- in 2012?

A.  Absolutely.  My thinking in 2010 was based on the idea that

we would get the data that year, right?  That we could

immediately start plugging away.

1           But the data only came in 2012.  The contract was only

2    signed in 2011.  That by itself sort of really undermined what

3    I could do to sort of get her tenure -- I mean with, through

4    these 401(k) projects.

5           So remember the data only got ready somewhere in April

6    2014.  Then they weren't fully ready yet.  We were still

7    learning about them and so forth.

8           We did a lot with what we -- in a very short amount of

9    time, but for her tenure it was pretty much too late.

10   Q.  Was it important for Professor Ravina to get publications,

11   even if she was haven't going to get tenure at Columbia?

12   A.  Of course.  Top schools most people don't get tenure.  It

13   is a really tough game.  The time is short, there is a lot of

14   pressure, it's very hard to publish in these journals.

15          But what you do is you keep putting stuff out there,

16   so that you know once you maybe not make it at the first school

17   you can go to another school that's high up there in the ranks

18   so that you don't fall off too deeply.

19          So it was very important for her to keep publishing so

20   that she would have a good record to go on the market with if

21   she would be turned down for tenure at Columbia.

22          I mean, like I said the, majority of the people who

23   start at top schools do not get tenure.  And so then you just

24   have to have enough papers to go on the market with.

25          So the projects remained important, and it remained,

I7hnrav2                          Bekaert - Cross

you know, time sensitive because she needed them for the next

job market.

Q.   Is it unusual for you to have dinners with coauthors?

A.   No, not at all.  This is just sort of part and parcel of we

how we work together.

          Some of my coauthors visit -- you know, I have this

coauthor from Hong Kong who comes over, even stays at my place

sometimes.

          When you go to conferences that's what I do.  I just

recently went to a conference with this one coauthor who was

based in France.  I basically spent the whole day with him,

lunch, coffee, dinner, you know, the whole time.  This is how

you work.

          I remember going to conferences where I would have a

breakfast meeting, a morning coffee meeting, a lunch meeting,

an afternoon coffee meeting, and a dinner meeting all with

different teams of coauthors or single coauthors.  This is part

and parcel of what we do in research.

Q.   Did you have dinners with Professor Ravina?

A.   Of course, I did, although not as many.  I mean, I am

actually surprised how few we had over this long period of

time.

Q.   Did you have a dinner with Professor Ravina at a restaurant

called Casa?

A.   I do remember that restaurant.  I think it was Brazilian,

I7hnrav2                         Bekaert - Cross

1    Portuguese or something like that.

2    Q.   And when was that dinner?

3    A.   The record shows that it's 2012, but I'm not actually sure

4    about that.  It could have also been 2011.

5    Q.   Why do you say that?

6    A.   Well, during this trial some e-mails were shown to me that,

7    that kind of refreshed my memory -- like there was all this

8    stuff about sushi restaurants, and then suddenly we're going to

9    a Portuguese Brazilian restaurant.  I got a little bit

10   confused.

11           I did think we went to some sushi restaurants, but I

12   didn't know.  I know that dinner happened.  I am just not sure

13   about the timing.

14   Q.   You are not sure if it's 2011 or 2012?

15   A.   Exactly.

16   Q.   I would like to show you Exhibit AP and start with the

17   first e-mail.

18           Did you invite Professor Ravina to a dinner in late

19   September 2012?

20   A.   I guess you could read that as an invitation.  I'm just

21   saying are we having dinner on Saturday or do you got other

22   plans.

23   Q.   And were you pressuring her to have dinner with you?

24   A.   Not at all.

25   Q.   I would like you to look at the last line in that e-mail.

I7hnrav2                          Bekaert - Cross

1    A.   Yeah.   It says, "No pressure by the way."

2    Q.   And then look at the first page of the e-mail.

3              At the bottom do you see your -- you say, "As I said,

4    I'm willing to postpone and have a small sushi plate or salad

5    somewhere."

6              Do you see that?

7    A.   Yes.

8    Q.   Is this the e-mail that made you wonder whether --

9    A.   Right.

10   Q.   -- the dinner was in 2011 or 2012?

11   A.   Yeah.   I just thought it was odd that we had all this sushi

12   discussion and then went to the Portuguese restaurant right

13   after, but again I could be wrong I mean, I just don't --

14   Q.   Looking at the e-mail at the top of the page, Professor

15   Ravina's proposing four different restaurants --

16   A.   Correct.

17   Q.   -- for the dinner.

18             Are those sushi restaurants?

19   A.   I believe they are, all four of them.

20   Q.   You heard Professor Ravina testify about your asking her

21   questions about a boyfriend at this dinner.

22             Did that happen?

23   A.   I have no recollection of that.   I don't really know

24   whether she had a boyfriend or not.

25   Q.   You heard her testify that you put your hand on her back in

1    a taxi.

2    A.  Did not happen.

3    Q.  Did she ever tell you she didn't -- in 2012 after this

4    dinner, did she ever tell you she didn't want to have dinner

5    with you?

6    A.  No, never.

7    Q.  Did she ever ask you not to invite her to dinner?

8    A.  Never.

9    Q.  Did you ever send Professor Ravina music?

10   A.  Yeah, I did.

11            I think what's sort of funny about our friendship was

12   that she was sort of the restaurant snob I should say, and I

13   was sort of the music snob.  So I got like education in

14   restaurants, and I tried to give her education -- I told her

15   her musical taste wasn't so great.  I was trying to give her

16   education on music.

17   Q.  I would like to show you Exhibit 12.  Did you ever send her

18   music?

19   A.  Oh, sure.  We talked about it, and then, you know, I sent

20   her samples of all sorts of music that I liked a lot.

21   Q.  Exhibit 12 is an exhibit we've seen before.  Is this --

22   it's October 10, 2012.  Is this shortly after the dinner you

23   had with Professor Ravina?

24   A.  It's October 1.

25   Q.  I'm sorry.  October 1.

I7hnrav2                         Bekaert - Cross

1    A.  It seems that's shortly thereafter.

2    Q.  And you see the second line, by the way -- BTW, I forgot to

3    send some music?

4    A.  Yes.

5    Q.  Did you send her some music with this e-mail?

6    A.  Yes, there was a whole bunch of YouTube links in there.

7    Q.  What was Professor Ravina's response to sending her music?

8    A.  I think she enjoyed it and asked for more I think later.

9    Q.  I would like to show you Exhibit SN.

10            MR. HERNSTADT:  Move to admit.

11            MS. DONEHOWER:  No objection.

12            THE COURT:  OK.  SN will be admitted.

13            (Defendants' Exhibit SN received in evidence)

14            THE WITNESS:  Thank you.

15   BY MR. HERNSTADT:

16   Q.  Do you see the second e-mail on the first page.

17            Is that the e-mail we just looked at?

18   A.  It is.

19   Q.  And do you see her response?

20   A.  I do.

21   Q.  And she responds approximately 18 minutes later?

22            Do you see that?

23   A.  Yes, correct.

24   Q.  What did you understand her response to mean?

25   A.  That she's interested in the music.

I7hnrav2                          Bekaert - Cross

1    Q.  I would like you to -- I would like to show you Exhibit SO.

2              MR. HERNSTADT:  Move to admit, your Honor.

3              MS. DONEHOWER:  No objection.

4              THE COURT:  SO will be admitted.

5              (Defendants' Exhibit SO received in evidence)

6    BY MR. HERNSTADT:

7    Q.  If you look at page 2 of the exhibit, that's that December

8    1 e-mail that we saw where you said, BTW I forgot to send you

9    some music and then you sent her some songs.

10             Do you see that?

11   A.  Correct.

12   Q.  Look at page 1.  Starting at the bottom of the page and

13   moving up, the first e-mail at the bottom of the page is from

14   Professor Ravina to you on October 3?

15   A.  Correct.

16   Q.  What do you understand her to be saying here?

17   A.  Well, she says she has -- that she hasn't listened to the

18   songs yet, but will do it, and then I think she's referring to

19   my birthday.

20   Q.  If you look at the top e-mail, the top two e-mails, is she

21   wishing you -- the top two -- is she wishing you a happy

22   birthday?

23   A.  She is.

24   Q.  Do you recall forwarding to Professor Ravina the PDF of a

25   Brazilian publication with an interview with you that had about

1    a -- from a conference on international diversification?

2    A.  Yeah, I do.

3    Q.  Did you ever ask Professor Ravina for compliments?

4    A.  I did not.

5    Q.  And was there a picture of you in that publication?

6    A.  Yeah, there was.

7    Q.  Did Professor Ravina respond to your sending her the

8    publication?

9    A.  She did.  I think she sort of repeated a line of it, if I

10   remember correctly, because it was about -- the publication

11   was -- the interview was about international diversification,

12   which was the project we were just embarking on, and I think

13   she -- then she also commented maybe on the picture.

14   Q.  Looking at Exhibit V5, which is in evidence, starting at

15   the bottom of the page, is that your forwarding her the

16   magazine on December 12?

17   A.  Yes, it is.

18   Q.  What does your comment mean, locally?

19   A.  Right.  Because it was a Brazilian magazine, right, yeah,

20   it was like locally in Sao Paolo or something.  It was Sao

21   Paolo, yes.

22   Q.  When you sent it to her, did you ask her to compliment you?

23   A.  No, not at all.

24   Q.  And what was Professor Ravina's response at the top of the

25   page?  Do you see it --

1   A.  Yes.

2   Q.  At the bottom, you are definitely the most good looking in

3   the entire publication?

4   A.  I don't think there was too many people in that

5   publication, to be honest.

6   Q.  Did you ask her to give you this kind of feedback?

7   A.  No.

8   Q.  At any time before you sent her this e-mail did you ask

9   her?

10  A.  No.

11  Q.  And looking at Exhibit 16, the exhibit -- we've seen this

12  exhibit before, so I won't take a long time with it, but on the

13  last page of the exhibit does she call you good looking again?

14  A.  Yes.

15  Q.  And this e-mail is about three hours after the first

16  e-mail, is that right?

17  A.  I guess it is.

18  Q.  And what was your reaction to these e-mails?

19  A.  Well, just as it is now.  I find it embarrassing actually,

20  a little bit.

21  Q.  After the dinner in 2012, did you see Professor Ravina

22  before you returned to Columbia after your sabbatical in

23  September 2013?

24  A.  So this was November, right?

25          Yeah.  I think we definitely had some research

1    meetings.  We may have had some coffees.  I don't think there

2    was dinners anymore, because -- I think I described my schedule

3    before.  I was traveling a lot.  And then I took off for

4    Australia, Belgium, and then I went on my sabbatical.  So we

5    didn't see each other too much but there was definitely some

6    research meetings still.  I remember meeting with Nicolas and

7    Enrichetta for sure.

8    Q.  When was that?  Was that fall of 2012 or --

9    A.  I thought it was the fall of 2012.  I'm not sure actually.

10   So many --

11   Q.  Do you recall coming to New York in April of 2013 for a

12   week?

13   A.  Yes, I did.  So I was on sabbatical in Asia.  The first

14   part was Hong Kong, and then that whole first six months, the

15   time that I really came too -- I wanted to come once to New

16   York to sort of take care of a lot of things.  You know, there

17   was, you know, my Ph.D. students, I had some medical condition

18   I had to see a doctor.  And I also went to a conference in

19   Chicago.  So there was like one week that I was in the U.S. in

20   April 2013.  And I had to take a hotel because my apartment was

21   rented out to an MIT professor.

22   Q.  Did you meet Professor Ravina for dinner in the East

23   Village when were you there in April?

24   A.  Yes, I did.  I remember it well because I also -- I was

25   working for a company called Betterment, and I first worked

I7hnrav2                          Bekaert - Cross

with the company which was -- which is actually on Centre

Street, and then we had dinner somewhere in the Lower East Side

that day.  I think it was a Tuesday.

Q.  At this dinner did you talk with Professor Ravina about sex

or sexual exploits?

A.  No, that was never a topic in any of our dinners or

meetings.

Q.  Do you recall what you discussed with Professor Ravina at

this dinner?

A.  Many things.  I would say that the most popular topic in

our dinners was basically her career, you know, sort of the

mentoring thing, you know, where are things going, the

projects, some gossip about the profession.

          We also talked about, Hong Kong, of course because she

actually asked about it.  You know, for me Hong Kong was

actually something completely new.

          I do a lot of work on emerging markets, and before

that sabbatical year and the visit to Brazil I had never been

to emerging markets.  So this was sort of a new thing for me,

so it was exciting.

          So we did talk about, you know, social life in

Hong Kong and so forth as well.

Q.  I would like to show you what's been marked as Exhibit BE,

which is in evidence.

          MS. DONEHOWER:  Objection, your Honor.

I7hnrav2                         Bekaert - Cross

1              THE COURT:  All right.  This is in evidence, right?

2              MR. HERNSTADT:  Yes.

3              MS. DONEHOWER:  If we could have a quick sidebar.

4              THE COURT:  Sure.  Bring over a copy, please.

5         (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7hnrav2                        Bekaert – Cross

1           (At sidebar)

2           THE COURT:  Can I see it.

3           What is the objection?

4           MR. HERNSTADT:  It is marked up.

5           THE COURT:  Sorry.

6           MS. DONEHOWER:  This is the e-mail that refers to the

7       stalker.  I think it was brought in for a very limited purpose

8       related to Professor Ravina's testimony during the

9       cross-examination, but this is, as your Honor found before, a

10      highly prejudicial topic, and I don't think it should continue

11      to come back in.

12          THE COURT:  Yes.  But the door was opened and I let it

13      in, so it's fair game now.  I mean, I tried to keep it out, but

14      on her testimony I thought it was necessary to impeach her to

15      let in.  Now it is in evidence, so he can question him about

16      it.

17          MS. DONEHOWER:  Is he limited to this e-mail or -- we

18      would request an instruction that.

19          MR. HERNSTADT:  We are not going to go past this

20      e-mail.

21          MS. DONEHOWER:  Understood.  Thank you.

22          MR. HERNSTADT:  This e-mail is his --

23          MS. DONEHOWER:  Thank you.

24          (Continued on next page)

25

1          (In open court)

2    BY MR. HERNSTADT:

3    Q.  Take a look at Exhibit DE.  Do you see the e-mail that

4    starts at the bottom of page 2, top of page 3, Professor Ravina

5    to you, and then the -- the top of page 3.

6    A.  I see that, yes.

7    Q.  Do you see at the end of this e-mail Professor Ravina is

8    asking you what is your social life like in Hong Kong?

9    A.  I see that, yes.

10   Q.  At this dinner did you discuss your social life in

11   Hong Kong?

12   A.  Yeah, I did.

13   Q.  And did you discuss anything else about your sabbatical in

14   Asia?

15   A.  Well, there was just a general discussion also about some

16   people I met.  I think there was a reference to this female

17   entrepreneur.  I do recall telling her that story.

18          She was an interesting woman.  She came from nowhere,

19   had moved with her family from Mainland China to Hong Kong.

20   All the -- they lived all in one room, and she had worked

21   herself up to lead sort of a small firm, you know, with ten,

22   twelve people working for her; drove a very nice car.

23          And she sort of took me around a little bit in parts

24   of Hong Kong that I don't think I ever would have discovered by

25   myself.

I7hnrav2                         Bekaert - Cross

1           I think I told her that story.  My daughter had

2    visited with her friends.  We had actually gone out together.

3    So I talked about that.

4    Q.  Did you ever tell Professor Ravina you were romantically

5    interested in this entrepreneur you just discussed?

6    A.  No, no.

7    Q.  So, looking at back this January 2013 e-mail a couple of

8    months before your dinner, if you look at the e-mail on the

9    bottom of the page from Professor Ravina to you, do you see --

10   in this e-mail the first para -- the second paragraph she

11   mentions a stalker.

12          Do you see that?

13   A.  Yes.

14   Q.  Now, did that come up during your dinner with Professor

15   Ravina in the East Village in 2013?

16   A.  It did.  I mean, again, when that came up in the e-mail,

17   you know, this is the first I heard about this, so I was

18   shocked.  I was like what?

19          There is like this off-kilter comment, I got a

20   stalker, and there was sort of no introduction to this.

21          So we had a whole e-mail exchange about this, because

22   I was sort of concerned.  It seemed like it was a very serious

23   thing.

24          So obviously I brought that up -- so what's going on

25   with this -- at the dinner.

1          Then I had met somebody in Hong Kong, this stewardess,

2     and it turns out she had a stalking problem at her firm with a

3     pilot, and, you know, it was very troublesome for her.  I think

4     she actually ended up quitting the firm.

5          And so we talked about that.

6          We had a very lengthy conversation about stalking.  I

7     mean, I have been stalked a couple of times in my life, so we

8     had sort of a whole segment of the dinner that we talked about

9     stalking.

10    Q.  I am going to refer to this person as a stewardess rather

11    than use names.

12         Did you tell Professor Ravina that you had slept with

13    the stewardess at this dinner?

14    A.  Let me be very clear.  Even the words "slept with" is

15    something I never used in dinner conversations, and I -- in

16    this case I couldn't have because I hadn't slept with the

17    stewardess at that point.

18    Q.  Did you ever have an intimate relationship with the

19    stewardess?

20    A.  I did.  You know, we went on a few dates while I was in

21    Hong Kong, and then we decided to meet up again at one point in

22    May -- actually, I traveled to Singapore and we met in

23    Singapore and then we did get romantically involved.

24    Q.  The next time you saw Professor Ravina in September of

25    2013, did you then tell her anything about your romantic

1   involvement with this stewardess?

2   A.  I don't think so.  So, again, yeah, I was gone for five

3   months, and, you know, this is not something we would talk

4   about.

5   Q.  Did you ever tell her at any time that you had slept with a

6   stewardess?

7   A.  I don't recall that, no.

8   Q.  Did you ever talk about sex with Professor Ravina?

9   A.  Never.  The word "sex" again, I don't -- I cannot imagine

10  it entering our conversations.

11  Q.  Do you recall during this week that you were in New York in

12  April meeting Professor Ravina for coffee?

13  A.  Oh, yes.  Yes.  Actually, this was just before I left for

14  the airport.  It was a meeting that she really insisted on

15  having, and it was tough for me because I was really, really

16  busy and I had to leave I think it was a Sunday afternoon.  And

17  we met just before I took off for the airport.

18  Q.  And why did you meet?

19  A.  She had written me an e-mail that I think she had had her

20  review with Wei Jiang who is one of our colleagues at Columbia,

21  and it looked from the e-mail that the review was not great.

22  And she really wanted to talk to me, you know, about what to do

23  and which papers to work on.  And so I said, you know, it's

24  hard for me to -- because I'm very, very busy.  I'm leaving on

25  Sunday.  But maybe just before we -- I think I actually had a

I7hnrav2                    Bekaert - Cross

meeting with a student just before that, so I said maybe just

before I leave I can squeeze in, you know, an hour or 45

minutes or something like this, and this is what we ended up

doing.

Q.   Before we go there, let me just ask you, you mentioned

before when you were talking about how much you travel, seeing

your children, where do your children live?

A.   They mostly live in Belgium.

Q.   How long have they lived in Belgium?

A.   Oh, since, 2001 or '2.

Q.   And has your did your entire family move to Belgium?

A.   Yeah.

Q.   In 2001?

A.   Yeah.

Q.   You stayed in New York?

A.   Right.

Q.   What's your present marital status?

A.   I'm divorced.

Q.   When did you and your wife separate?

A.   Well, when we -- when she -- so, she was never very happy

in the U.S. I have to say.  Actually, the main reason for me to

move to Columbia was basically to try to keep the family

together.  I mean, that was my main intent.

          And it kind of didn't work out.  So, after a couple of

years -- we had then three daughters.  By that time she ended

I7hnrav2                         Bekaert - Cross

1    up leaving for Belgium anyway.

2              In the beginning, I still tried to sort of keep the

3    family together.  I basically traveled to Belgium every two

4    weeks.  I kind of commuted.  And then it sort of -- we started

5    to grow apart and basically effectively separated.

6              (Continued on next page)

I7h1rav3                          Bekaert - Cross

 1    BY MR. HERNSTADT:

 2    Q.  Okay.  Going back to this lunch in April 2013, I'd like to

 3    show you Exhibit 261.

 4           And if you see the bottom of the page, it's an email

 5    from Professor Ravina to you.  "I just talked with Wei Jiang.

 6    We need to work big time."

 7           Is that the review you just talked about?

 8    A.  Yes.

 9    Q.  And I'd like you to look at Exhibit BN.

10           MR. HERNSTADT:  And move to admit, your Honor.

11           THE COURT:  Any objection?

12           MS. DONEHOWER:  I don't have it yet.

13           THE COURT:  Okay.

14           MR. HERNSTADT:  No.  B.  I'm sorry.  BN.

15           THE COURT:  BN?  B as in boy?

16           MR. HERNSTADT:  B as in boy, yes.

17           MS. DONEHOWER:  No objection.

18           THE COURT:  All right.  BN will be admitted.

19           (Defendant's Exhibit BN received in evidence)

20    BY MR. HERNSTADT:

21    Q.  And do you see the email on the top of the page?

22    A.  I do.

23    Q.  Did Professor Ravina want to meet with you, before you left

24    the country that day?

25    A.  Yes, she was asking for the meeting.

I7h1rav3                         Bekaert - Cross

1   Q.  And you had this meeting.

2   A.  Excuse me.  I didn't hear the question.

3   Q.  And did you meet with her?

4   A.  Yes.

5   Q.  What did you talk about at this meeting?

6   A.  Well, obviously we talked about this review, 'cause

7   that's -- that was the purpose of the meeting.  We also talked

8   about research a little bit.  This was one of the only times

9   that I actually had my laptop with me.  I never bring my laptop

10  to meetings.  It's something that I have at home or for

11  traveling.  But this time I had it, so I think we even actually

12  looked at some spreadsheets, which is normally not something I

13  would do.  And I remember it being difficult because the coffee

14  shop -- we didn't go to Nice Matin, we went to some coffee shop

15  down the street, and it was really crowded so it was not very

16  comfortable.  I do remember that as well.  But yeah, I think

17  those were the two topics, research and, you know, her review

18  with Wei.

19  Q.  And was she asking for your advice?

20  A.  Yes.

21  Q.  I'd like to look at the third paragraph.

22  A.  Oh, the same email?

23  Q.  This is in BN, but it's --

24  A.  Okay.

25  Q.  -- the same email that we saw in Exhibit 261.

1      Do you see that?  You had mentioned a sort of

2  mentoring relationship.  Is this an example of the mentoring

3  relationship?

4  A.  Well, I think it shows a mentoring relationship and also a

5  relationship of -- of being friends, right?  Because there's a

6  reference to music, there's a reference to her mom.

7  Q.  What's the reference to her mom?

8  A.  Well, earlier this year her mom got very sick and then I

9  think eventually passed way, so I had tried to call her and --

10  and sort of help her.

11  Q.  Is this an accurate reflection of your relationship in

12  April of 2013?

13  A.  I think it is.

14  Q.  Going back to the coffee meeting, did you walk to the

15  coffee shop from your hotel?

16  A.  Yeah, I -- it wasn't very far.  It was on the -- it was

17  on -- I think 70 -- is it 79th Street?  So I was in the hotel

18  The Lucerne, which is next to Nice Matin.  I think the coffee

19  shop is in the middle of the block on the other side.

20  Q.  Did you comment on her walk as you guys went from the hotel

21  to the coffee shop?

22  A.  No, no, not at all.

23  Q.  Have you ever commented on her walk?

24  A.  No.

25  Q.  Did you, on that day or any other time, ever tell her she

I7h1rav3                          Bekaert - Cross

1   looked sexy?

2   A.  No.

3   Q.  You heard Professor Ravina testify that she brought work on

4   the 401(k) project to look at but that you couldn't see it

5   because you forgot your reading glasses?

6   A.  I heard that testimony, yes.

7   Q.  Is that true?

8   A.  I was a little shocked because I don't have reading

9   glasses.  I never had reading glasses.  You know, I'm

10  nearsighted so I use glasses very rarely, only to see like a

11  movie or to drive, but I don't have glasses now.  I don't -- I

12  mean, if I would put my glasses on, I can't read anything, so I

13  don't have reading glasses.

14  Q.  Take a look at -- I'd like to show you what's been marked

15  as Exhibit SP.

16              MR. HERNSTADT:  And we move to admit.

17              THE COURT:  Any objection?

18              MS. DONEHOWER:  No objection.

19              THE COURT:  SP will be admitted.

20              (Defendant's Exhibit SP received in evidence)

21  Q.  Actually, before we look at it.

22              So I just want to -- 261 we've looked at.  Do you see

23  your email in the middle of the page?  And this is at

24  April 13th at 2:21.

25  A.  Okay.

1   Q.  And in the first paragraph, can you just read that out,

2   please.

3   A.  "Yeah, but the biggest gain per unit of time is for you to

4   get your two single-authored papers published in a top journal,

5   or at least one.  I keep telling you, but you do not seem to

6   listen."

7   Q.  And then the next sentence, please.

8   A.  "We will get a slew of papers done, no question, but

9   getting them published will take time, unless we follow the

10   strategy of sending the first couple to finance journals rather

11   than econ journals.

12   Q.  What are you saying here?

13   A.  Well, the first part of this -- of this email is really

14   saying that for her to get tenure and to make a name for

15   herself in the profession, the most important thing to work on

16   is her own papers.

17              MS. DONEHOWER:  Objection.

18              THE COURT:  I mean, are you explaining what you said?

19              THE WITNESS:  Yeah.

20              THE COURT:  All right.  Overruled.

21   A.  And this is -- this is what I mean by, you know, per

22   activity per unit of time.  I mean, if she wants to get tenure,

23   she is going to get more credit for the papers that she

24   produces by herself than a paper with four co-authors,

25   including somebody like me, who has little bit of -- a good

I7h1rav3                    Bekaert - Cross

1    publication record.  The credit will be shared.  And so a lot

2    of my colleagues told me this as well.  So this is what I

3    wanted to say in the first part of that email.

4              On the -- the second part is more about the submission

5    strategy.  So we have finance journals and economics journals.

6    You can get tenure with only top finance journals, but it is

7    true that especially in a place like Columbia, Ivy League

8    school, and we had still the finance and economics division,

9    the top econ journals are just valued a little bit better, and

10   for my career, actually will be probably better to publish in

11   the top econ journals rather than the top finance journals, but

12   the big difference between the two is, if you start submitting

13   a paper, the finance journals are faster.  Their turnaround

14   time, you know, when the reviewer reports come back in, are

15   faster than for the econ journals.  Some of the econ journals

16   are terrible.  You may have to wait like a year before you get

17   the reviewers' reports back.  So I thought that for her career,

18   it would be better to submit to the finance journals, she would

19   get credit for that anyway, and there was probably no time left

20   to submit to the econ journals.

21   Q.  And then looking at the top of the page, we've seen this

22   before, but this is Professor Ravina's strategy, the first two

23   lines?

24   A.  Yeah.  I think she's referring to the revision of one of

25   her two single-authored papers.  I think this is probably the

I7h1rav3                    Bekaert - Cross

1    beauty paper that, you know, she's working through revision and

2    that she's sort of halfway through, so she had gotten a revise

3    and resubmit to do the revision.

4    Q.  And this is an email sent on April 13 at 2:35 by Professor

5    Ravina, right?

6    A.  Correct.

7    Q.  Okay.  So let's look at SP, please.

8              And do you see, on page 1, the email from you is the

9    same email we just looked at, right?

10   A.  Yes.

11   Q.  And then on the top of the page you see this is a response,

12   another response, a separate response from Professor Ravina at

13   2:38, three minutes after her first one, right?

14   A.  Correct.

15   Q.  And what is she telling you here?  What is your

16   understanding of what she's saying here?

17   A.  Isn't that the one that we saw before?

18   Q.  No.  This is the -- this line here.

19   A.  Oh.  I don't see -- on my screen I just see a date being

20   highlighted.

21   Q.  Do you see the email?

22   A.  Yeah.

23              Okay.  What am I looking at?  I'm not sure.

24   Q.  Do you want to look at the piece of paper?

25   A.  Is it the "forgot to specify"?

I7h1rav3                         Bekaert - Cross

1    Q.   Yes.

2    A.   Okay.  I thought that we went through this.  It's just

3    saying that she's halfway through my GF revision, and I found

4    the original contribution to that and I'm implementing it, so

5    she's just working on that revision for her single-authored

6    paper.

7    Q.   And then let's look at page 2.  This is at 3:02 --

8    A.   Mm-hmm.

9    Q.   -- on April 13th, so it's 24 minutes after the first email

10   we just looked at.

11   A.   Correct.

12   Q.   And she's responding again to the email that we saw from

13   you --

14   A.   Right.

15   Q.   -- saying that the biggest gain per unit of time is the

16   single-authored papers.

17            What is your understanding of what Professor Ravina is

18   saying in this email?

19   A.   Well, she's actually sort of suggesting that maybe we could

20   send papers to the econ journals, 'cause QJE, AER, JPE, those

21   are the three top economics journals.  And so she's basically

22   saying maybe we could send it to them, but like at AER, we

23   can't, because I don't like proprietary data sets, and then she

24   was sort of suggesting the QJE.

25   Q.   Okay.  And then looking at the top of the third page, this

I7h1rav3                    Bekaert - Cross

1   is the same day, 15 minutes later, another response from

2   Professor Ravina.  What's your understanding what she's saying

3   here?

4   A.  I'm not exactly sure, but I sort of -- let's see.

5            Right.  I --

6            MS. DONEHOWER:  Objection.

7            THE COURT:  What's the objection?

8            Oh.  Look, don't speculate.  If you have an

9   understanding at the time, you can say that.

10            THE WITNESS:  I would like to reread my email, so --

11            THE COURT:  Okay.

12            THE WITNESS:  Oh, yeah, I think I now see it.

13   A.  So because she's actually responding to my previous email

14   in which I'm asking -- telling her to really get her two

15   single-authored papers published and I think what Wei had told

16   her is that she had to also work on some of these other papers,

17   and I think this is --

18            MS. DONEHOWER:  Objection.

19   A.  This is a reference to this.

20            THE COURT:  Okay.

21   Q.  Well, okay.  So I'll show you --

22            THE COURT:  I'm just going to overrule that, but

23   again, just don't speculate as to what she was thinking.  If

24   you want to explain the back-and-forth, you can do that, and

25   what your understanding was, but I don't want you to speculate

1    as to what she may be thinking or what other people said to

2    her.

3            THE WITNESS:  Right.  I think it's actually pretty

4    clear from, you know -- because she's responding to this email,

5    and I hadn't read it, so that's, you know --

6            THE COURT:  All right.  You can proceed.

7    BY MR. HERNSTADT:

8    Q.  And Professor Bekaert, if you look again very briefly at

9    261, in the first line, is that Professor Ravina referring to

10   saying she needs three more papers --

11   A.  Right.

12   Q.  -- by spring of 2014?

13   A.  Correct.

14           MR. HERNSTADT:  And then let's go back to SP, page 3.

15   Q.  And she writes, "Then I guess I would need two more by

16   spring 2015."

17   A.  Yeah.

18   Q.  What is your understanding of what Professor Ravina is

19   saying here?

20   A.  Well, that she needs, on top of her single-authored papers,

21   some of these other articles.  That's partly suggested by Wei

22   in the review.

23   Q.  And let's look at the last page of SP.

24           And this is an email that is a minute after the one we

25   just looked at.  What do you understand her to be saying here?

A.  I think she's sort of already talking about the job market

after Columbia, and she had been visiting the New York Fed in

2012.

By the way, I forgot to mention that that's another

reason why we didn't see each other very much then, because she

was actually not at Columbia -- I think she was only one day a

week.  And she's just confirming that, that the New York Fed

does seem to have liked her quite a bit and that that would be

a good job opportunity for her if Columbia wouldn't work out.

Q.  You mentioned that you were in New York this week in April

of 2013 and then for a couple of days in June of 2013.  Did you

see Professor Ravina when you were in New York in June?

A.  No.  I wanted to, but it was -- I was only there for a few

days.  I was basically sort of taking possession of my

apartment again, which had been rented out, and I was on my way

to Australia and Beijing, and when I arrived to New York, my

phone broke down, and for good measure my laptop broke down,

and so I had all these practical issues to deal with, plus some

other practical issues, and meetings that I had to get through,

so it was very difficult to meet with Enrichetta.

MR. HERNSTADT:  Your Honor, this would be a good time

to take --

THE COURT:  All right.  Why don't we take our morning

break now.  Remember, don't discuss the case, and keep an open

mind.

1           (Jury not present)

2           THE COURT:  All right.  Why don't we come back at

3    11:30.  Thank you.

4           (Recess)

5           (In open court; jury present)

6           THE COURT:  Everyone can be seated.  Thank you.

7           You may proceed.

8           MR. HERNSTADT:  Thank you, your Honor.

9    BY MR. HERNSTADT:

10   Q.  Professor Bekaert, I'd like to show you Exhibit -- hang on.

11          Do you remember just before the break we were

12   talking -- you were talking about being in New York in June

13   2013?

14   A.  Correct.

15   Q.  And you said your phone and computer broke?

16   A.  Yes.

17   Q.  I'd like to show you Exhibit BW.

18          MS. DONEHOWER:  No objection.

19          THE COURT:  All right.

20          MR. HERNSTADT:  Move to admit.

21          THE COURT:  BW will be admitted.

22          (Defendant's Exhibit BW received in evidence)

23          MR. HERNSTADT:  Thank you, your Honor.

24   BY MR. HERNSTADT:

25   Q.  You said that you did not see Professor Ravina.  Did she

I7h1rav3                          Bekaert - Cross

1    want to see you?

2    A.  I believe so, yes.

3    Q.  And looking at the bottom of the page, do you recall if

4    Professor Ravina offered to go iPhone shopping with you?

5    A.  Yes, she did.

6    Q.  Did you accept this offer?

7    A.  I did not.  I ended up buying a myTouch phone or something.

8    Q.  All right.  You heard Professor Ravina testify that you

9    discussed pornography with her while on line at a student

10   coffee shop.  Do you remember that?

11   A.  I remember the statement, yes.

12   Q.  Is that true?

13   A.  Of course not.  I -- I just would never discuss a topic

14   like this, and I also don't watch porn.  I mean, I cannot even

15   remember I have watched porn, and discussing this in a -- the

16   busiest coffee shop at Columbia is ridiculous.

17   Q.  Have you ever discussed pornography with Professor Ravina?

18   A.  Never.

19   Q.  You heard Professor Ravina testify that you discussed

20   prostitutes with her.

21   A.  Again, not true.

22   Q.  Have you ever discussed prostitutes with Professor Ravina?

23   A.  No.

24   Q.  Have you ever discussed the attractiveness of research

25   assistants with Professor Ravina?

I7h1rav3                              Bekaert - Cross

1   A.  No.

2   Q.  Did you ever stare at Professor Ravina's breasts in the

3   fall of 2013?

4   A.  No.

5   Q.  Have you ever stared at Professor Ravina's breasts?

6   A.  No.

7   Q.  Do you recall having dinner with Professor Ravina in

8   September 2013, in around September 2013, at a restaurant

9   called Marea?

10  A.  Yes, I do.

11  Q.  Who selected that restaurant?

12  A.  She did.  It's -- it's -- I think it has a Michelin star,

13  and it's not too far away from where she lives.

14  Q.  When you and Professor Ravina had dinner, who chose the

15  restaurant?

16  A.  Like I said, she's sort of a restaurant snob, I would say,

17  and she would always pick them, yeah.

18  Q.  At that dinner at Marea, did you speak to Professor Ravina

19  about sex?

20  A.  No.  I discussed this many times before.  This is not a

21  topic that was ever, ever talked about.

22  Q.  After dinner did you walk Professor Ravina home?

23  A.  Yes, I did.  Actually, she asked for it, because I don't

24  know -- she wanted to just walk off the dinner, and it wasn't

25  too far, so I did, yes.

1    Q.  Did you try to kiss her during this walk?

2    A.  No.  Not at all.  And I should add, in some sense, looking

3    back, I find it strange that we never did sort of cheek kissing

4    because in both our cultures, this is very normal.  I mean,

5    where I'm from, that's what you do, but we never did, so no.

6    Q.  Have you ever kissed Professor Ravina on the cheek?

7    A.  No.

8    Q.  Have you ever tried to kiss her on the mouth?

9    A.  No.

10   Q.  You heard Professor Ravina's testimony about that.

11   A.  Yeah.

12   Q.  Did that happen?

13   A.  No.  I mean, I think the first time I heard about it was at

14   the deposition and then again here, and it sounded like

15   different, but it never happened.

16   Q.  After this dinner did Professor Ravina contact you to tell

17   you not to invite her to any more dinners?

18   A.  Could you ask that question again.

19   Q.  Yeah.  After this dinner, the Marea dinner, did she contact

20   you and tell you, don't invite me to any more dinners?

21   A.  Oh, no.

22   Q.  And after that dinner did you receive any personal emails

23   from Professor Ravina?

24   A.  Yeah, there was personal emails now and then.  What I do

25   remember from that dinner is that we discussed movies and movie

I7h1rav3                        Bekaert - Cross

1  actors, so I remember probably that Owen Wilson comment that

2  came after that dinner, I think.

3  Q.  So I'll show you what's been marked as CB.

4      And the PS, two thirds down the page, "PS – I just

5  watched a movie with Owen Wilson on the plane, and I think he's

6  really hot."  Smiley face.

7  A.  Yeah.

8  Q.  And the date of that is October 4, 2013?

9  A.  Correct.

10 Q.  So was that after the dinner at Marea?

11 A.  Yeah, I think the dinner at Marea was somewhere end of

12 September, yeah.

13 Q.  Did you have a dinner with Professor Ravina at a restaurant

14 called Ai Fiori?

15 A.  Yes, I did remember the name.  During the –- the case

16 proceedings I was –- I refreshed my recollection of the name of

17 the restaurant, yes.

18 Q.  Did you hear Professor Ravina's testimony that she –- that

19 you held her hand when you were talking about television shows

20 at this dinner?

21 A.  I heard the testimony, yes.

22 Q.  Did that happen?

23 A.  No.

24 Q.  Have you ever held Professor Ravina's hand?

25 A.  No.

I7h1rav3                         Bekaert - Cross

1    Q.   Did anything happen at that dinner, unusual?

2    A.   Yeah, I -- that's the dinner that I actually really

3    remember well because the touching of the hand happened, but it

4    was actually the other way around.   So I remember there was

5    discussion from -- actually like I do now, like this, and she

6    sort of did this like, you know, flicked my finger like this

7    with her finger, and I -- I remember this because I went home,

8    I said, this was odd.   And I -- that's actually why I remember

9    that dinner.   I thought it was a very strange moment.   Yeah.

10   Q.   Do you have coffees daily with Professor Ravina in the fall

11   of 2013?

12   A.   Well, that would be impossible, right?   I mean, I'm

13   traveling a lot, she's probably traveling, we have other things

14   to do, there's the data, there's the seminar, you're probably

15   not -- you might not go for coffee then, but we were working

16   really hard together, so I'm quite sure we had several coffees

17   during that semester, you know, but daily, that's practically

18   impossible.   It cannot happen.   I was -- at most like two weeks

19   per month I was there.

20   Q.   Do you recall asking Professor -- do you remember Professor

21   Ravina's testimony that you asked her for advice on dating?

22   A.   Yeah.   I vaguely recall this.

23   Q.   Did you ask Professor Ravina for advice on dating?

24   A.   I wouldn't put it that way.

25   Q.   Let me show you what's been marked and is in evidence as

I7h1rav3                         Bekaert - Cross

1  Exhibit CJ.

2              And at the top of page 2, do you see this email that

3  you are sending to her?

4  A.  I do.

5  Q.  Just to set the time frame, if you look at the bottom email

6  on that page first, do you see that?

7  A.  Yes.

8  Q.  And what does that signify?  This is a November 19 email

9  and it's called WFA Paper Submission.

10 A.  Yes.

11 Q.  What is this email?

12 A.  Yeah, this is -- this is basically telling us that the

13 submission to the WFA of the automatic enrollment paper -- we

14 had worked on that really, really hard -- was successful, so it

15 had been submitted successfully to the conference.

16 Q.  Okay.  So then going up to the top of the page, your email

17 starts, "And you did not attach the paper.  I am really mad."

18 Is that the automatic enrollment paper you're referencing?

19 A.  Correct.

20 Q.  And then below that, there's a BTW.  What is this?  What

21 are these paragraphs?

22 A.  Yeah, it's a reference to this hematologist that I had been

23 consulting, and we had had some personal email exchanges, but

24 she had been -- she had moved to Yale so it was clear that we

25 probably wouldn't be socializing anymore, and I had gotten this

I7h1rav3                    Bekaert - Cross

1    sort of somewhat strange email and, you know, I wanted to sort

2    of see what Enrichetta thought about this.  I had actually

3    asked my friend Mike the same question and wanted to see a

4    female's perspective on that.

5    Q.  Were you asking her for dating advice?

6    A.  I wouldn't call it that way.  I mean, again, the doctor

7    that we're discussing here had moved away so -- but it, you

8    know -- I did personally like this person quite a bit.

9    Q.  Did you tell Professor Ravina that the work on the 401(k)

10   papers would go faster if she were nicer to you?

11   A.  I never said that.

12   Q.  And this email to the doctor is the same day that Professor

13   Ravina had forwarded you the confirmation that the automatic

14   enrollment paper was submitted, is that right?

15   A.  It appears to be, yes.

16   Q.  Did you give Professor Ravina some chocolate and a CD in

17   February 2014?

18   A.  Yeah, I think I did, somewhere in February, yes.

19   Q.  And was that a Valentine's present?

20   A.  No.  Not at all.  I'm kind of known as the chocolate guy in

21   Columbia.  So I'm from Belgium, and we have great chocolate, so

22   I always have chocolate in my office.  I have a little fridge.

23   And a lot of people even come by to get chocolate.  I sometimes

24   give it away to assistants or something like this.

25              But in this particular instance, what happens is that

1    because of this medical condition -- I have to travel for

2    business, and if you travel with Brussels Airlines, they give

3    you these pralines.  It's actually very good ones.  They're

4    Neuhaus.  And they're in a little bag, and I mostly don't eat

5    them myself.  I always give them away or distribute them to the

6    assistants or, you know, if there's a student coming to my

7    office, I'll say, do you want them?

8           And this is what happened here.  So Enrichetta came

9    for a meeting, I had that bag lying around -- I think it was

10   right after I arrived from Belgium -- and I said, you know, do

11   you want the pralines?  Here you go.  So I think it's not even

12   technically a gift because I didn't pay for it either.  I got

13   it from the airline, essentially.

14   Q.  Did you give her a CD?

15   A.  Yeah.  Sort of similar.  Because we had talked about all

16   this music, and so the band that she liked the most -- little

17   bit surprising to me -- was Roxy Music, and I had received a

18   little while before that from a friend of mine a bunch of CDs

19   sort of as a gift, and they were lying -- I had opened up the

20   gift and they were lying around in my office, but they were not

21   useful gifts for me 'cause I'm a big fan of this band so I had

22   everything already.  And that was actually sort of a

23   compilation CD so it had all the music of Roxy Music on it.  So

24   I just said, hey, and I'll, you know, remember Roxy Music, and

25   I just stuck it in the bag and I gave it to her.

I7h1rav3                        Bekaert - Cross

1   Q.  Did Professor Ravina ever ask you for chocolate?

2   A.  Oh, yeah, many people -- people actually did, so I'm sure

3   she did.

4   Q.  Let's take a look at Exhibit V3, which is in evidence.

5          And if you look at the bottom, there's a PS about two

6   thirds of the way down.  Is that Professor Ravina asking you

7   for chocolates?

8   A.  Yeah.  I mean, this is -- it's not unusual.  You know,

9   my -- some of my male colleagues actually come in and ask for

10  chocolate.  It's a normal thing.

11  Q.  Was she a fan of Belgian chocolate?

12  A.  Well, I think it's the best in the world, so should be.

13  Q.  Can we take a look at Exhibit CG, which is in evidence.

14         And do you see at the bottom of the page there's an

15  email from Professor Ravina to you, late October, October 28,

16  2013?

17  A.  Yeah.

18  Q.  Do you see the BTW?

19  A.  Yup.

20  Q.  What was your reaction to this email from Professor Ravina?

21  A.  I -- I remember being a little sort of weirded out.  I

22  didn't know what it meant, so I just didn't react to it.  I

23  just kept talking about research.

24  Q.  We heard testimony yesterday about a mug that's in -- a

25  mug.

I7h1rav3                          Bekaert - Cross

1    A.   Right.

2    Q.   What's the story about this mug?

3    A.   Okay.  I'm sorry, it's a little bit of a long story, but I

4    have this mug in my office.  It's sort of sitting on a shelf,

5    you know, right where I work.  And this mug was given to me by

6    my ex-mother-in-law, and the weird thing about it is that it

7    was only two years in my marriage that I got this mug.  And it

8    just has this ram with horns and it says, "I'm cultured,

9    sophisticated, refined..."  And then when you turn it around --

10   so if the mug is on the shelf, you wouldn't see that -- it says

11   "horny."  And this has been a story in the family for a long

12   time.  I've actually talked about it -- I used to use the mug.

13   I don't use it anymore because it's chipped, and it's just

14   sitting there.

15              MR. HERNSTADT:  Professor Bekaert, I'm going to ask

16   you to look at Exhibit SI, which I move to admit.

17              THE COURT:  Any objection?

18              MS. DONEHOWER:  I object to the entire exhibit being

19   shown, but if they want to show just the portion that's now on

20   the screens, I have no objection to that.

21              THE COURT:  That's fine.  What about the two pages,

22   the second?

23              MS. DONEHOWER:  The second and third pages is perfect,

24   your Honor.

25              THE COURT:  Just the second and third pages of SI.

1       MR. HERNSTADT:  Okay.  I'm moving to admit the entire

2   exhibit, though.

3       THE COURT:  Okay.  But I'm admitting the second and

4   third page.

5       MR. HERNSTADT:  Okay.

6       (Defendant's Exhibit SI received in evidence)

7       MR. HERNSTADT:  I'd like to -- page 2.

8   BY MR. HERNSTADT:

9   Q.  Is this the mug, Professor Bekaert?

10  A.  It is.

11  Q.  And you said it's chipped.  You see, is that what you're

12  referring to?

13  A.  Yes.

14      MR. HERNSTADT:  And then if we could look at page 3.

15  Q.  Is that the bottom of the mug?

16  A.  Correct.

17  Q.  Okay.  I'm sorry.  I interrupted your -- you were talking

18  about the story of the mug.

19  A.  Well, yeah.  So obviously it's a little bit strange to get

20  this from your mother-in-law, so we've been, you know -- my

21  kids know about this as well.  And so the sort of story is

22  like, why did she give that gift?  Did she (A) not look at the

23  bottom, just didn't see that word, (B) you know, she's a

24  very -- she was a very proper woman and -- but her English

25  wasn't that great, so she may have seen the bottom but not

I7h1rav3                          Bekaert - Cross

1  understood what it was, or she does, she had seen the bottom

2  and she completely understood and she has just a really wicked

3  sense of humor, and even my oldest daughter think it's actually

4  that.  And so we sort of -- she passed away a few years ago,

5  and, you know, it's sort of a memento in honor of their

6  grandma, and I'm not going to take out of my office.  I mean,

7  there's nothing sexual about it, in my opinion.

8  Q.  So where is this mug in your office?

9  A.  It's sitting on a shelf.  It's sitting right next to a

10  picture of me in Central Park with my three daughters, you

11  know, and some other stuff that I keep in my office.  I mean,

12  you know.

13          MR. HERNSTADT:  Your Honor, I'd like to admit page 1

14  of the exhibit.

15          MS. DONEHOWER:  If your Honor would like to entertain

16  further argument, we will, but I maintain my objection to

17  page 1 of the exhibit.

18          THE COURT:  Yeah, I don't think it's necessary.

19          MR. HERNSTADT:  Okay.

20  BY MR. HERNSTADT:

21  Q.  When did you first hear that Professor Ravina had made a

22  complaint to the dean's office about you?

23  A.  I think it was somewhere in July of 2014.  I don't know --

24  I don't remember the exact date.  I was traveling, and Janet

25  Horan had set up a meeting somewhere in -- I don't know --

I7h1rav3                    Bekaert - Cross

1   around July 10, 12, I think, 2014.

2   Q.  And how did you learn --

3            THE COURT:  Sorry.  Just to be clear about where the

4   mug was, was it on a shelf?

5            THE WITNESS:  Yes.

6            THE COURT:  Okay.  All right.  You can proceed.  Sorry

7   to interrupt.

8   Q.  How did you learn about what Professor Ravina had gone to

9   the dean about?

10  A.  Well, when I -- so when I had that meeting, it was actually

11  with Dean Hubbard and Janet Horan -- Horan.  I probably

12  mispronounce that.  But so what he told me, that this was

13  really about a research divorce, that, you know, there were

14  some issues being raised about us working together.  Not much

15  detail was given about exactly what issues had been raised.

16  What I thought it referred to was these emails, you know, the

17  March, April, May emails -- I'm sure we're going to come back

18  to them -- between Enrichetta and I that had gotten a little

19  bit heated, and, you know, Glenn said basically, hey, we're

20  going to have to sort of find a way to make the research go

21  forward without you guys talking to one another.  He mentioned

22  the mediator, he mentioned, you know, how we should deal with

23  email traffic, that being sort of monitored by the dean's

24  office and so forth.  So that was basically the gist of the

25  meeting.

I7hnrav4                              Bekaert - cross

1   Q.  When were the e-mails that you thought were the basis of

2   this complaint?

3   A.  Those e-mails sort of took place I think between March and

4   May that same year.

5   Q.  I would like to show you what's been -- Exhibit CU, which

6   is in evidence.  If you look at the bottom of the page, this is

7   an e-mail from Professor Ravina to you --

8   A.  Right.

9   Q.  -- on March 6, 2014.  And again you are talking about her R

10  and R papers.  Do you see that?

11  A.  Yep.

12  Q.  And in the second paragraph, at the end of the second line,

13  she says she will work only -- she will work on R and Rs "only

14  so that I can get rid of all of them"?

15  A.  Correct.

16  Q.  Then at the bottom of the page she says, "I will never pass

17  the review."

18          Is that her evaluation that is coming up in the

19  spring?

20          MS. DONEHOWER:  Objection.

21  Q.  Is it your understanding --

22          THE COURT:  Just one second.

23          MR. HERNSTADT:  I can rephrase, your Honor.

24          THE COURT:  Why don't you do that.

25  BY MR. HERNSTADT:

1    Q.  What is your understanding she's referring to here?

2    A.  We have an annual evaluation of every junior faculty member

3    that takes place in the spring where we basically we have two

4    appointed professors that will write the review, but then we

5    agree on the review with the whole set of senior faculty

6    members, we have a meeting on them.  And I think this refers to

7    this.

8    Q.  Is this e-mail fairly typical of e-mails that went between

9    you and Professor Ravina at around the time of March 2014?

10   A.  Well, I think it shows already a little bit sort of --

11               MS. DONEHOWER:  Objection.

12   A.  OK.  Well --

13               THE COURT:  Look, you can explain it again from your

14   perspective.  So I will let you answer the question.

15               The question was:  Is this e-mail fairly typical of

16   e-mails that went between you and Professor Ravina at around

17   that time of March 2014?

18               So you can answer that.

19   A.  Well, I think parts of it were, but there was a piece that

20   you didn't show that I thought was a little bit odd, because it

21   showed some sort of bitterness.  There was a sentence about

22   401(k) crap which I thought was not normal.

23   Q.  Let's take a look at CU at the bottom of the page.  What

24   are you referring to?

25   A.  It says it was a mistake to work so much on this 401(k)

1    crap.

2           That was unusual for me.  I mean, I thought, you know,

3    we had made very good progress on the 401(k) papers.  It was

4    also a strange sentence because, you know, I thought she was

5    working on other projects as well.  So now it sort of suggested

6    that she hadn't been.  So for me that was different from what

7    we had had before.

8    Q.  Looking at the top of the exhibit, this is an e-mail from

9    Professor Ravina a little later the same day.

10          You see she says, "It was my mistake in estimation.

11   I'm the one bearing the consequences"?

12   A.  Correct.  Yes, it refers to the same thing.  It seems like

13   there she admits that she made some wrong decisions somewhere

14   along the way, which from the e-mail trail seems to suggest she

15   worked too much on the 401(k) and maybe not on the other

16   papers.  I always thought she had worked on the other papers.

17   That's what she kept telling me.

18   Q.  Let's look at Exhibit CW.  I will ask you a couple of

19   questions first.

20          Do you recall having a meeting scheduled to meet with

21   a research assistant --

22   A.  Yes.

23   Q.  -- in late March of 2014?

24   A.  Yes, I do.  I remember it vividly.

25   Q.  And what happened?

I7hnrav4                          Bekaert - cross

A.  Well, we -- so we were working on all these different

projects, and on the AE project we didn't have a research

assistant.  So a lot of work needed to happen, and I really

thought we needed a research assistant, and we had been losing

some.

          So there was this person from the economics

department, somebody by the name of Anurag, who had contacted

me and suggested that he would be very interested in working

with us -- working with me.

          So I had contacted Enrichetta and told her, Hey, let's

set up a meeting, and maybe then -- you know, she would always

be really very much involved in the hiring of the research

assistants.  She sometimes would even give them tests to check

out whether they are going to be good or not.

          So this was something that she was actually really the

key person for.  So, we set up a meeting.  You know, we had

various schedules.  I had a block week of teaching.  I was

going leave again from the country.  So it had to be sort of a

weekend meeting.  So there was a weekend meeting set up, I

think, for somewhere in the end of March, on March 20 or

something.

          MR. HERNSTADT:  Your Honor, move to admit CW.

          MS. DONEHOWER:  No objection.

          THE COURT:  All right.  CW will be admitted.

          (Defendants' Exhibit CW received in evidence)

1    BY MR. HERNSTADT:

2    Q.  I would like you to look at page 3 of this exhibit, the top

3    two e-mails.

4    A.  Yeah.

5    Q.  Starting -- the top two e-mails you see there is an e-mail

6    from you at 1:04 p.m. on March 22.

7            What is that e-mail?

8    A.  Well, so I thought the meeting was on Saturday.

9    Q.  I'm sorry.  Let's look at the one right below it first.

10   This is March 20.

11           Is this an e-mail from the research assistant

12   candidate?

13   A.  Correct.

14   Q.  And you are setting a -- with you, Professor Ravina, and

15   the candidate?

16   A.  Yes.

17   Q.  You are setting a meeting on Saturday at 12:30, is that

18   right?

19   A.  Right.

20   Q.  And then the e-mail directly above it is March 22.

21           Was that the Saturday?

22   A.  Yes.

23   Q.  And what happened?

24   A.  Yeah.  I showed up for the meeting, and nobody was there.

25   You know, she was not in her office.  I e-mailed, I called, I

I7hnrav4                    Bekaert - cross

1    couldn't reach her.  And -- yeah, so I didn't know what to do.

2    There was -- somehow it seems like the meeting had been

3    cancelled, and I wasn't told.

4    Q.  Then, right above that e-mail, is this the response from

5    the research assistant candidate?

6    A.  Yes, this is from the research assistant.

7    Q.  He says that he got an e-mail from Professor Ravina about

8    rescheduling the meeting --

9    A.  Yes.

10   Q.  -- to Wednesday or Thursday?

11   A.  Yeah.

12   Q.  Did you get an e-mail from Professor Ravina rescheduling?

13   A.  No.  It was odd because I was actually leaving.  For me

14   this was the last time I could meet, and then I was going to be

15   abroad again for a while.  So it was a little bit upsetting

16   actually.

17   Q.  Did you express that you were upset to her?

18   A.  I am sure I did.  I don't remember exactly what I wrote.

19   Q.  Looking on page 2, there is an e-mail in the middle of the

20   page.

21          Is that your response?

22   A.  Yes.

23   Q.  Did Professor Ravina apologize for canceling the meeting

24   and not informing you?

25   A.  I don't -- I'm not -- I don't recall if she actually did.

I7hnrav4                         Bekaert - cross

1  I think she responded in a different way, if I'm not mistaken,

2  but I don't remember an apology.

3  Q.  You say that if you cancel a meeting please let me know.  I

4  wasted a lot of time looking for you.

5        Do you see that?

6  A.  Yes.

7  Q.  Let's look at the next e-mail.  This is from Professor

8  Ravina on Sunday.

9        Looking at the first two lines, is that her response

10 to you?

11 A.  It appears to be, yes.

12 Q.  Is she apologizing for having cancelled the meeting without

13 informing you?

14 A.  No.  It seems like she's scolding at me.

15 Q.  I would like you to look at Exhibit CX.

16        THE COURT:  Any objection?

17        MS. DONEHOWER:  Yes, your Honor.

18        THE COURT:  All right.

19        Do you want to meet at sidebar.

20     (Continued on next page)

21

22

23

24

25

1          (At sidebar)

2          MS. DONEHOWER:  This may not ultimately be a big

3     issue, but it appears to be two different documents stapled

4     together.  We have a Bates number starting 22847 is on the,

5     like, 11th page, and 4950.

6          I don't have any objection to the first ten pages,

7     which seem to be one e-mail chain, but it appears to be a

8     compilation of several different things.

9          MR. HERNSTADT:  The last two pages?

10         MS. DONEHOWER:  Yes.  If we just take off the last two

11    pages, we can put in this one as a complete exhibit.  If you

12    want to put in the last two pages later, that's fine.

13         THE COURT:  Just introduce them separately.

14         MR. HERNSTADT:  That's fine.

15         THE COURT:  Thanks.

16         Just on the mug, I didn't think it was fair to let in

17    the picture of his family, but if you want to elicit the fact

18    that you can't see the word "horny" from where it is on the

19    shelf, or if you want to crop the photo a little bit, I am

20    happy to do that, if it matters to you.

21         MR. HERNSTADT:  It doesn't matter.  I think it was

22    clear.

23         THE COURT:  I thought so too.  I wanted to clarify it

24    was on the shelf not on his desk.  If you want to do anything

25    else --

1           (In open court)

2           MR. HERNSTADT:  Your Honor, can I just take the

3   exhibit back from the witness --

4           THE COURT:  Yes.

5           MR. HERNSTADT:  -- and pull out the last pages.

6   BY MR. HERNSTADT:

7   Q.  We are going to split Exhibit CX into CX and CX-1.

8   A.  OK.

9           MR. HERNSTADT:  I'm sorry for the delay.

10  Q.  Professor Bekaert, looking at Exhibit CX, this is an e-mail

11  exchange that starts March 12 on the second to last page and

12  goes through to March 25.

13          Do you see that?

14  A.  Yeah.  It is a not the second to last page, but on page 8 I

15  see something March 12.

16  Q.  Right.  What is this exchange about?

17  A.  Well, the last few e-mails are basically about trying to

18  come up with a draft, a new draft of the automatic enrollment

19  paper and talking about the analysis that had to be done and

20  also about some of the previous drafts being, having some

21  problems, you know, with discussions of tables not being quite

22  right and stuff like that.

23  Q.  Was there any kind of problems that were holding up the

24  401(k) paper at this time?

25  A.  Well, in my opinion we needed a research assistant.  There

I7hnrav4                          Bekaert - cross

1    was a lot of analysis that still had to be done on this paper,

2    and, you know, it didn't have anybody working on it, so we

3    needed a research assistant.

4              MR. HERNSTADT:  If we could look at page 4 -- move to

5    admit as separated the first eight pages.

6              MS. DONEHOWER:  No objection.

7              THE COURT:  It will be admitted.

8              (Defendants' Exhibit CX received in evidence)

9    BY MR. HERNSTADT:

10   Q.  So, in the middle of the page, there is an e-mail from

11   Professor Ravina to you dated March 24.

12   A.  Uh-huh.

13   Q.  Can you see in the second paragraph she says, "I need you

14   to work on the automatic enrollment paper because the deadline

15   (3/30) is looming."

16             Do you see that?

17   A.  Correct.

18   Q.  Was this a deadline to submit the paper to a conference?

19   A.  I believe it is, yes.

20   Q.  And then looking on page -- I'm sorry.  If you look at the

21   top of that page, do you see this is your response asking if

22   it's the last version --

23   A.  Uh-huh.

24   Q.  -- of the paper?

25             And also you ask, "Does this mean Wei's comments are

1   not in it yet?"

2   A.  Correct.

3   Q.  What impact would that have on preparing a draft for

4   submission, whether Wei's comments are in or not?

5   A.  Again, we have to make sure it's approved by Financial

6   Engines, right?  So he has to agree and then sign off on the

7   draft.

8   Q.  Looking at page 3, the e-mail at the bottom of the page, is

9   this Professor Ravina's response?

10  A.  Yes, it is.

11  Q.  What is she proposing here?

12  A.  Yeah.  Basically kind of split up the future tasks and

13  things that can go in the draft, and then things, you know, we

14  are just not going to have enough time and going to have to

15  keep on a to-do list.

16  Q.  OK.  Looking right above that, do you see there's your

17  response on March 24?

18  A.  Correct.

19  Q.  Do you see in the second line you say, "But we got no RA"?

20  A.  Exactly.

21  Q.  Why is that a problem?

22  A.  Well, so, some of the analysis that we haven't done -- and

23  that I really don't want to bore you with details -- like the

24  discontinuity analysis, that's complicated and would require

25  some work.  So we just needed help I thought from a research

I7hnrav4                          Bekaert - cross

1    assistant to get this paper to go forward.

2              MR. HERNSTADT:  Your Honor, I would like to give the

3    witness what's now been marked CX-1.

4              THE COURT:  All right.

5              THE WITNESS:  Thank you.

6    BY MR. HERNSTADT:

7    Q.  This is an e-mail dated March 27, a couple of days later.

8              In looking at that e-mail, you are talking about --

9    you say the discussion of summary statistics is an absolute

10   mess.  The tables do not really match up with the discussion.

11             And that changing the tables on short notice will be

12   tough.

13             Is this work that a research assistant would be

14   important for?

15   A.  I think for this particular work it depends whether the

16   tables are actually correct.  It would have been good that they

17   would have to be checked.

18             I'm trying to see here -- yeah.  So what I am

19   basically saying is that, given the amount of time that we

20   have, the only thing I can really do for this draft is just

21   clean it up, make sure that at least the discussion of the

22   tables is correct, because it seemed like they weren't

23   matching.  For more work, again, you know, we need the research

24   assistant.

25             MR. HERNSTADT:  Move to admit, your Honor.

I7hnrav4                          Bekaert - cross

1              THE COURT:  Is there any objection?

2              MS. DONEHOWER:  None.

3              THE COURT:  All right.  It will be admitted.

4              (Defendants' Exhibit CX-1 received in evidence)

5    BY MR. HERNSTADT:

6    Q.  I would like to show you Exhibit CY.

7              MR. HERNSTADT:  And move to admit.

8              THE COURT:  Thank you.

9              MS. DONEHOWER:  May I have a moment with my opposing

10   counsel?

11             THE COURT:  Yes, of course.

12             (Counsel conferred)

13             MR. HERNSTADT:  So, we have the same problem so I am

14   going to take the first page off.

15             THE COURT:  OK.

16             MR. HERNSTADT:  And that will be the exhibit.

17             THE COURT:  All right.  Yes.

18             MR. HERNSTADT:  Sorry.

19             THE WITNESS:  Thank you.

20   BY MR. HERNSTADT:

21   Q.  So if you look at Exhibit CY --

22             MR. HERNSTADT:  And I move to admit the exhibit as

23   changed.

24             THE COURT:  Any objection?

25             MS. DONEHOWER:  No objection.

1          THE COURT:  All right.  It will be admitted.  But we

2     are still calling it CY?

3          MR. HERNSTADT:  Yes.

4          (Defendant's Exhibit CY received in evidence)

5     BY MR. HERNSTADT:

6     Q.  This is an e-mail from Professor Ravina to you dated --

7          MR. HERNSTADT:  I'm sorry, your Honor.  I want to

8     change this e-mail.  So I would like to take it off of the

9     screens for a second.

10          THE COURT:  OK.

11     BY MR. HERNSTADT:

12     Q.  So Professor Bekaert, I would like you to look at the

13     e-mail from Professor Ravina to you and to --

14          MR. HERNSTADT:  Oh, crap.  Take it down again.

15          I'm sorry.  Sorry, your Honor.

16     BY MR. HERNSTADT:

17     Q.  I would like you to take a look at the e-mail.  This is

18     from Professor Ravina to you and the RA candidate, is that

19     correct?

20     A.  No, it's actually really to the RA candidate, the research

21     assistant candidate.  I am just CC'd.

22     Q.  What's happening in this e-mail?

23     A.  She's basically telling him that -- to look for a job

24     elsewhere, that we're not even going to consider him for the RA

25     job.

I7hnrav4                         Bekaert - cross

1    Q.  And this is April 11, 2014?

2    A.  Correct.

3    Q.  Is that a problem?

4    A.  Well, yeah, I was like dumbfounded, right?  So this is not

5    something we talked about.  I thought we were going to proceed.

6    I missed a meeting because I thought she was going to proceed

7    with the meeting, and we were going to test this person and,

8    you know, we had been very happy with our previous economics --

9    he was an economics Ph.D. student.  The previous one was

10   Nicolas, worked out fantastically.  So I had high hopes that

11   this would be a very good and productive RA.

12   Q.  Was an RA necessary for the papers to move forward?

13   A.  I really thought so, yeah.  I mean, I didn't see how -- who

14   would do all this work we needed to do, all this analysis.  You

15   know, discontinuity analysis and all sorts of regressions had

16   to be run, and for all of our projects we would have an RA,

17   except for the reallocate project, where the RA became the

18   coauthor and did most of the work, Nicolas.

19          So, yeah, we needed an RA.

20   Q.  What was your reaction?

21   A.  Well --

22   Q.  If you would look at the e-mail on the top of the page.

23   A.  Yeah, I see it.  I mean, I was upset.  I was very upset.

24   You know, I used words like crazy and stuff like this.  What I

25   mean is I didn't think this was rational.  I mean, we need an

1  RA, and she's sort of like letting the opportunity go.  And we

2  had had troubles finding RAs, so I didn't think this was a

3  rational decision, and I was very upset.

4  Q.  Let's look at Exhibit 35.  We have seen this exhibit before

5  so I am not going to go through it in tremendous detail.

6       I would like you to look at page 7.  In the -- I'm

7  sorry, let's start on the top of page 6.

8       This is an e-mail from you to Professor Ravina dated

9  April 15.

10  A.  Yes.

11  Q.  Looking at the body of the e-mail, I would like you to look

12  at the third line down starting with, "but you are

13  canceling" --

14  A.  Yes, yes.

15  Q.  -- and going to the end of that sentence.

16  A.  OK.

17  Q.  Do you see you say, "But you canceling RAs for summer work

18  because I cannot commit to a small task within a week."

19       What are you saying here?

20  A.  What has happened here is, you know, Enrichetta always

21  wants to work with these schedules, which kind of I really

22  don't believe in.

23       Somehow we had agreed that there was a particular part

24  of this paper that I would work on.  It was on, you know,

25  figuring from out from regressions what the effect would be on

1   aggregate savings.

2              This was a small part that would actually be useful

3   for the final part of the paper, and I couldn't find -- create

4   results with this if we wouldn't do all the other analysis

5   coming before it.

6              And somehow, because I couldn't commit to do this

7   within a week, she sort of used that as the reason for saying,

8   Hey, you are not working hard enough on the paper.  I'm not

9   going to even hire the RA.

10             I thought that was just completely strange and

11  irrational, and I just couldn't come up with a good rational

12  reason for this.

13  Q.  So look down two paragraphs the sentence that starts "who

14  will be the RA?"

15  A.  Yeah, yeah.  Do you want me to read it or --

16  Q.  Sure.

17  A.  "So who will be the RA on the AE project?  Even if I think

18  about the aggregate savings rates within the next few weeks,

19  which I indeed plan to do -- I even brought the file on my

20  vacation for crying out loud -- who will do the work?"

21             So, I couldn't even make those computations -- I mean,

22  I could figure out how to do the computations, but I needed to

23  do -- I needed to have the empirical work to actually then

24  bring them to fruition and put them in the paper.

25  Q.  Then I would like you to look at page 4 of the exhibit, the

I7hnrav4                          Bekaert - cross

1    e-mail on the top of the page.

2              This is another e-mail from you to Professor Ravina.

3    A.   Yes.

4    Q.   And it's part of the same exchange of e-mails?

5    A.   Exactly.

6    Q.   Is that right?

7    A.   Yeah.

8    Q.   Do you see the second line, referring to the next sentence?

9    A.   Yes.

10   Q.   Could you read that, please.

11   A.   "You are wasting your time talking about making progress

12   rather than making progress.  Without an RA there is zilch

13   progress, so get an RA and keep going."

14   Q.   At this time, April 23, 2014, was an RA necessary to moving

15   forward with these papers?

16   A.   Yeah.  I mean, who was going to do all this work?

17   Q.   I would like you to look on page 3 -- now, the RA, is that

18   for the automatic enrollment paper --

19   A.   Yeah.

20   Q.   -- or for the --

21   A.   We are talking about the automatic enrollment paper.

22   Q.   OK.

23   A.   It's focused on that paper.

24   Q.   Page 3.  I would like you to look at the e-mail in the

25   middle of the paragraph.

1          This is on April 24, a day later?

2    A.   Right.

3    Q.   It is part of the same e-mail chain?

4    A.   Correct.

5    Q.   And then at the bottom, halfway through the second line

6    down through the end, what are you talking about there?

7    A.   Yeah.  Well, this is actually about the other paper.  This

8    is, you know, remember we had finalized an initial draft of

9    this international diversification paper to be presented at the

10   conference, and so now we had to like start really presenting

11   it left and right to get like other people to comment on it.

12   And I had started that process, so I had to create slides, you

13   know, PowerPoint slides to do that presentation.  Chris here in

14   this e-mail, that is my assistant.

15   Q.   And what are you asking Professor Ravina to do here?

16   A.   Well, I had created some tables, and I wanted them to

17   confirm these tables, that they would be OK to be used in the

18   presentation and to maybe also have Wei and Kenton sign off on

19   it.

20        Maybe -- you know, I think we wanted to work on a new

21   draft that we could then send to, you know, the conferences,

22   and I also was presenting at certain universities.  So we would

23   send a new draft to these people.

24   Q.   Did Professor Ravina confirm the tables for you?

25   A.   I think she never did.

I7hnrav4                         Bekaert - cross

1    Q.  Well, let's --

2    A.  She just ignored the question.

3    Q.  Let's scroll up to see her response to that, the next

4    e-mail up.  Is she confirming the tables?

5    A.  No.  This is actually talking about this other little task

6    that she was giving me for the automatic enrollment paper, that

7    aggregate savings thing.

8    Q.  OK.  So let's look at the next e-mail in the chain.

9            MR. HERNSTADT:  The page before.  That's it.  Yes.

10   The bottom of the page.  Sorry.

11   Q.  And here you are asking again that she, if she would

12   confirm the tables?

13   A.  I do.

14   Q.  And did she confirm the tables?

15   A.  No.

16   Q.  So this is at April 24 at 1 p.m.  Let's look at her

17   response to that.

18            Is Professor Ravina confirming the tables?

19   A.  No, not at all.

20   Q.  What was your impression of this e-mail?

21   A.  I was shellshocked.  I mean, I -- I just -- I -- I mean, we

22   had this good working relationship and she was acting in a very

23   strange way.

24            I mean, I didn't know what the hell this was.  What

25   kind of weird language is this?  I was like very upset.

1          I kept asking the same questions over and over, and

2     she just doesn't give me any answers.  She gives me this stuff

3     which what the hell does that mean?

4     Q.  So did she respond to your questions about who would do the

5     work if you didn't get an RA?

6     A.  Not in the e-mail trails.

7     Q.  Did she respond to your repeated requests that she confirm

8     the tables?

9     A.  No.

10    Q.  And this is what you got?

11    A.  Yeah.

12    Q.  Let's see your response.  What are you saying in this

13    e-mail?

14    A.  I was trying to get a meeting, and I think -- you know, I

15    think in the previous e-mail there must have been something

16    about a meeting request, right?

17         And so I basically wanted sort of to defuse the

18    tension and say, you know, if we can meet, you know, we can

19    whip this research thing back into shape.  Let's get our act

20    together.  Let's get going.  Let's work and forget about all

21    this nonsense here that, you know, there's -- we're just sort

22    of arguing about nothing, and I'm not getting answers to my

23    questions.

24    Q.  And you are also asking her to confirm the tables for your

25    presentation again?

1   A.  Yet again.

2   Q.  Let's look at Exhibit 36.

3   A.  I just want to point out --

4   Q.  I'm sorry.

5   A.  -- it was very urgent for me because I was presenting the

6   week after this.

7   Q.  So, looking at Exhibit 36, I would like you to look at the

8   seventh page -- oh, which is already in evidence.

9            So, OK.  Sorry.

10           Looking at the -- do you see there is an e-mail, the

11  top of the page, from Professor Ravina to you dated May 4?

12  A.  Correct.

13  Q.  A couple of weeks after or a week or so after the previous

14  exhibit.

15  A.  Correct.

16           MR. HERNSTADT:  I'm sorry.  Let's start one page back,

17  at the bottom.

18  BY MR. HERNSTADT:

19  Q.  At the very bottom of the page, do you see you're asking --

20  do you see you're asking Ravina -- Professor Ravina to meet?

21  A.  Correct.

22  Q.  Are you available later this afternoon, early evening?

23  A.  Correct.

24  Q.  This is on May 3?

25  A.  Yeah.

I7hnrav4                          Bekaert - cross

1   Q.  So let's see her response.  She's proposing that you meet

2   the next week?

3   A.  Correct.

4   Q.  And then your response to that?

5   A.  Yes.  This was May 2014.  So I only spent two days in the

6   country.  I was out.

7   Q.  OK.  And let's see Professor Ravina's response at the top

8   of the page.

9   A.  Yeah.

10  Q.  So you had asked for a meeting, you were not available, and

11  she's asking you to send the aggregate analysis again.

12  A.  Again, which, again, is a very small issue for the AE

13  paper.  I didn't really see the relevance of this.

14  Q.  And what is your response to that e-mail?  Let's look at

15  the next, the next one in line.  Now we are on May 5.  What are

16  you saying here?

17  A.  The same thing over and over again.  We have all these

18  issues.  I had also brought up another issue with the AE paper,

19  like a technical issue that we needed to deal with, a

20  selectivity problem.  We just needed a research assistant to do

21  this, all this work, and she had sort of fired him.

22          MR. HERNSTADT:  Can we look at the next page, please.

23  Right there.

24  BY MR. HERNSTADT:

25  Q.  Here's another e-mail from you.  You see in the

1    beginning -- the top of that you say, "Because you gave up the

2    chance to make progress on the paper by letting the RA go for

3    no reason"?

4    A.  Correct.

5    Q.  And then your next e-mail to her on May 6.  You start, "We

6    cannot finalize it without an RA.  Are you going to run

7    everything?"

8    A.  Exactly.

9    Q.  Your next response to her --

10            MR. HERNSTADT:  I'm sorry.  Let's see Professor

11   Ravina's response.  This is now May 6.  I'm sorry, take it

12   down, please.

13   BY MR. HERNSTADT:

14   Q.  Do you see Professor Ravina's response?

15   A.  Yes, I do.

16   Q.  In the first line, "Oh, if the only thing you need to work

17   is an RA and you don't have a lead on this, I do.  You must

18   have missed it -- missed this from all the previous e-mails."

19   Smiley face, smiley face.  It's" -- and she puts the name of

20   the research assistant that she did not hire?

21   A.  Correct.

22   Q.  This is the research assistant we saw in the letter, that

23   earlier e-mail a couple of weeks earlier where she says --

24   A.  Uh-huh.

25   Q.  -- we're not going to take you as an RA?

1    A.  Correct.

2    Q.  What is your response to that?

3          MR. HERNSTADT:  If we go up to the next e-mail, let's

4    just look at the last line.

5    A.  Right.  I am going to read that.

6          Yeah, it says, "If you do not fix the RA error I do

7    not see how the project can proceed.  Is that clear enough?"

8    Q.  Are these e-mails that you believed Professor Ravina went

9    to the dean's office with?

10   A.  I think they were probably part of the package, but there's

11   more coming I think.

12   Q.  How would you characterize the tone of these e-mails?

13   A.  There's just bickering and I got really upset I must admit,

14   because I was asking a very simple question, and she would just

15   refuse to answer the question and get back to me with a

16   schedule about like a trivial issue in the paper that we

17   couldn't even deal with unless we had all the work done with

18   the RA.

19         And then she also came back with this kind of bizarre

20   language that I've never seen.  So I was like what in the hell

21   is happening here?  I just could not understand why she behaved

22   the way she did.  At times I wanted to, like, tear my hair out.

23   I was like, what is happening here?

24   Q.  Are you OK with your tone in these e-mails?

25   A.  No.  I mean, when I look back at them, I capitalized things

1    and I -- I just got very, very upset and -- you know, I have

2    problems with e-mail communication and I am a little blunt.

3    And so I just couldn't understand that somebody, you know, that

4    I had a very good working relationship with was doing all of

5    these things.

6            Looking back, I wish we could have sort of said full

7    stop here, we need to meet, but then we couldn't because I was

8    abroad and -- you know, we couldn't sort of come up with a

9    meeting.

10           Yeah, I wish I hadn't sort of capitalized stuff and

11   used the words "crazy" and "insane" so much.

12           I think the "whip" comment has been misinterpreted

13   here.  I didn't mean anything with it.  I was trying to defuse

14   the situation.  It has nothing do with anything.  But, yeah,

15   obviously I should communicate better.

16   Q.  Was the RA situation resolved at any point?

17   A.  Yeah.  That was the really bizarre part of this.  So we did

18   finally set up a meeting, and because of the travel schedules I

19   think in May so it just didn't work out, because I was gone for

20   most of the time.  So I only came back like in June and so we

21   finally have a date that we could meet.  This was June 9 I

22   believe.

23           And so I go to her office and my first question is, So

24   who will do the RA work?

25           And her answer is, Well, I will.  I've decided that,

1   you know, hiring an RA takes a lot of time, and so it would be
2   more efficient if I am going to do all the work.
3           And I was, like, flabbergasted.
4           I said, What?  If that's what you wanted to do all
5   along, why didn't you tell me in March.  Then we didn't have
6   all of the e-mail traffic.
7           But she never did.  She kept coming back with, you
8   know, just not answering my question and doing -- you know,
9   having all this weird language.  So I was like flabbergasted.
10  I said, what the hell is this?
11  Q.  Did you delay any work on the 401(k) projects because of
12  these e-mails?
13  A.  No.  I mean, work was still going on.  You can look at the
14  e-mail traffic.  There's lots of back and forths, and, you
15  know, there's the other project.  I was presenting that left
16  and right.
17          Some of the reasons that I was gone was actually
18  presenting that paper.  I think there was progress being made
19  on the reallocation project as well.  We were still learning
20  aspects of the data.  Data were being improved, so there was
21  lots of progress.
22  Q.  I would like to show you Exhibit SJ.
23          MR. HERNSTADT:  I move to admit it.
24          THE COURT:  Any objection?
25          MS. DONEHOWER:  No objection.

I7hnrav4                          Bekaert – cross

 1              THE COURT:  All right.  SJ will be admitted.

 2              (Defendants' Exhibit SJ received in evidence)

 3    BY MR. HERNSTADT:

 4    Q.  This is an e-mail from you to Professor Ravina July 4,

 5    2014, is that correct?

 6    A.  Correct.

 7    Q.  And July 4 is when in relation to your meeting with Dean

 8    Hubbard when you learned that Professor Ravina had made

 9    complaints about you?

10    A.  I think it's before it.

11    Q.  And take a look at this e-mail, if you would.

12              At page 3, there is an e-mail from someone to

13    Professor Ravina saying she looks forward to your participation

14    in a meeting in Washington, D.C.

15              Do you see that?

16    A.  OK.  Yes, I do.

17    Q.  What is that?

18    A.  It looks like it's a seminar invitation or a presentation

19    invitation, a meeting that she's going to present at, that

20    meeting or conference.

21    Q.  OK.  Then looking at page 2, in the middle of the page,

22    that is an e-mail from Professor Ravina to you and to your

23    Financial Engines coauthors, is that right?

24    A.  Correct.

25    Q.  And she's asking for your bio for the conference?

I7hnrav4                          Bekaert - cross

1   A.  Yes.  It appears that for that conference they needed like

2   bios for all the coauthors of the paper that would be

3   presented.

4   Q.  And let's look at your response.

5          Did you send her a bio?

6   A.  I did.

7   Q.  And then what is this second paragraph?

8   A.  What I basically offer her is my PowerPoint slides.  I had

9   been presenting the paper, that diversification paper, so I had

10  created a PowerPoint slide presentation.  I was just offering

11  to give that to her so she could use it for her presentation or

12  at least part of it.

13  Q.  And the next line is, "Presentation yesterday went well

14  again."

15          This is a presentation of the diversification paper

16  that you did?

17  A.  Yes, it is.

18  Q.  And then looking at the middle line of the last paragraph,

19  what are you saying here?

20  A.  That we're still waiting for more results for the automatic

21  enrollment paper, the AE paper.

22  Q.  And then 401(k) features?

23  A.  Yeah, that's just -- that's the data that we need for

24  401(k) features refers to this -- we talked about this a lot

25  last week.  To finalize the international diversification

1  paper, we needed the fees for these different funds.  So these

2  were in Enrichetta's camp and hadn't come yet.

3  Q.  So as of July 2 you hadn't received them from Professor

4  Ravina.

5  A.  No.

6  Q.  Could you proceed with the paper without this data --

7  withdrawn.

8        Could you finish the paper without the data.

9  A.  Right.  We were presenting it left and right.  We knew that

10  that was a very big gap.  If we were to submit this, this would

11  be an issue that any referee would bring up.  So, to submit the

12  paper, we needed though those data.  That was absolutely

13  necessary.

14  Q.  This was a week before you met with Dean Hubbard?

15  A.  It sounds about right.  Maybe a little bit more than that.

16  I don't recall the date.

17  Q.  I would like to show you Exhibit 47.

18        MS. DONEHOWER:  Objection, your Honor.

19        Under 106 I believe the jury should be shown an

20  additional part of this exhibit at this time.

21        THE COURT:  Do you have a problem with that?

22        MR. HERNSTADT:  Yes, sure.

23        No problem.

24        THE COURT:  OK.  All right.  Please go ahead.

25        Thank you.

I7hnrav4                         Bekaert - cross

1    BY MR. HERNSTADT:

2    Q.  Let's look at the next e-mail.  This is Professor Ravina's

3    response.

4            Do you see in the second line she says, "I've seen the

5    AE, the automatic enrollment paper, several times; I will look

6    for it when I'm done working"?

7    A.  Yes.

8    Q.  Had you gotten the automatic enrollment paper from

9    Professor Ravina?

10   A.  I am not sure actually.  I don't think -- I don't think I

11   had at that point.  I am not sure.  I don't think so.

12   Q.  Did she send it to you?

13   A.  I don't remember, no.

14   Q.  OK.  Let's look at your e-mail, the one before this, the

15   one below.

16           Do you see it says, "Still waiting for AE paper,

17   results"?

18   A.  Oh, yeah.  OK.

19   Q.  Are you waiting for the paper, or are you waiting for the

20   result or both?

21   A.  I guess both.

22   Q.  OK.  So let's look at Exhibit 47.

23           This is an e-mail that was shown to you last week.

24           Why did you send this e-mail?

25   A.  Well, so I had had this meeting with the dean and Janet,

1    and for me this was like a shock, right?

2            Because I know we had had this little bit of

3    bickering, but I thought it had been resolved, right?

4            And I had this meeting with Enrichetta on June 9.  It

5    seems like it had been resolved.  We had all this e-mail going

6    back and forth with the research proceeding as if nothing had

7    happened.

8            Now I'm kind of learning that behind my back she's

9    been to the dean's office.  So I was like really, really

10   shocked and a little bit dismayed.  At that point in time I

11   couldn't really understand why she would do this.

12           Can I just look at the e-mail again?

13   Q.  Sure.

14   A.  You know, if you look at my last sentence, what it says is,

15   "I'm intrigued to know who set you up to this."  Because I was

16   sort of thinking there's no way she could have done this to me.

17   This doesn't make any sense.  Maybe some senior faculty doesn't

18   like me that set her up or something.

19           So I wanted to really talk to her and understand why

20   are you doing this.  We were on this great road together to

21   lots of papers.  What's going on here?

22           I mean, that's really what -- why I did this, and I

23   probably shouldn't have because the dean told me not to contact

24   her.  But I ran into her, you know, going into my office.  I

25   didn't talk to her.  I just wrote that e-mail.

I7hnrav4                    Bekaert - cross

1    Q.  And after you met with the dean, there was this research

2    divorce process that began?

3    A.  Yes.

4    Q.  So how was this -- how was the research divorce negotiated?

5    A.  Well, so -- well, at first, at that first meeting obviously

6    we couldn't accomplish too much.  So I think the dean set a

7    bunch of ground rules.  We are not going to talk to one another

8    ever again essentially.  So from that point onwards I never

9    talked to Enrichetta ever again.

10          We didn't have any sort of joint meetings.  There was

11   something -- there was something to be said about the e-mail

12   traffic.  So, of course, we needed to proceed on these papers,

13   so there was talk about a mediator.  I think that was proposed

14   at that meeting already, but we didn't agree on a name or a

15   person.

16          So Glenn was going to be -- the dean himself was going

17   to be CC'd in the mean time, and then there was already

18   suggested like at one point we're going to have to somehow

19   negotiate and figure out how we're going to move these projects

20   forward.

21          And there's this huge dataset.  Who will do what?  How

22   are we going to, like, deal with this.  But we didn't have

23   anything concrete because this what the first meeting.

24   Q.  Who participated in these meetings on your side?

25   A.  Yeah.  So the first meeting I think was with Glenn and

Janet.  During the summer I have to say not much happened

because many people were traveling, so it really started up in

earnest in the fall of 2014.

         And I remember meetings with sort of dean's office

people.  One was, I think involved Katie Phillips.  But then it

sort of moved to have also the finance department involved.

         It was really crazy.  You know, I would have a meeting

with Glenn, the chair of the department, the subchair of the

department, and Janet, all present.  And then over time it sort

of shifted more to the finance department.

         So it would be Charles Jones, who was the vice chair,

and Steve Zeldes who was the chair of the department, and then

I had also lots of one-on-one meetings with Steve and then

one-on-one meetings with Janet, who was kind of the point

person in the dean's office.

         There was just countless meetings on this.  It was

just unbelievable and very stressful, too.

Q.  Did the subject of Professor Ravina's tenure come up?

A.  No.  It was really all about how are we going to deal

with -- well, the subject did come up in the very early -- the

very first meeting I think.

         It was immediately agreed that I would not be -- and

have no part whatsoever in Enrichetta's tenure, and I

immediately agreed to that.  Obviously, if you have a conflict,

why would you be want to be involved.  I immediately agreed to

1  that that was never an issue.  The big issue was negotiating

2  this research divorce and how to deal with these different

3  papers.

4  Q.  Were these negotiations successful at the time that the

5  dean's office was involved with them?

6  A.  No, they were not.

7       So we had proposal after proposal, some of which that

8  I thought were really reasonable.  In fact, there was one in

9  particular that we sort of all signed off on.  Glenn thought it

10  was reasonable, Steve thought it was reasonable, Charles

11  thought it was reasonable.

12      The key thing that I always wanted to do with how to

13  carve up things was to make sure that Enrichetta got credit for

14  what she had done.  She had worked a lot on this dataset.  We

15  cannot deny that.

16      So, I always said, look, I still want to -- you know,

17  with the three papers that are already ongoing, we will have to

18  figure out how to deal with that.  And I thought we figured

19  that out.  I still would like to do a paper with Andrea.

20  Andrea Kiguel was the research assistant for the international

21  diversification project.  And the main reason she really wanted

22  to work so hard on that paper was to get some credit down the

23  line.

24      Of course, the international diversification paper,

25  Enrichetta would never agree to that.  So I wanted to do a

1  follow-up paper with Andrea.

2         But my big principle was, whatever paper I would ever

3  write her name would be on it.  So Enrichetta's name would

4  always be on it, because she had done all this work with the

5  data initially.

6         The one proposal that we all thought was reasonable,

7  Enrichetta was also given the opportunity to work on papers

8  without me being involved, and my name would not be on it,

9  right?  So that was seniority of the asymmetry there.

10        That I thought was fair because she did do the work in

11 the beginning on the data, and I wasn't involved in the very,

12 very beginning, you know, with all these undergrad research

13 assistants.

14 Q.  Was there any proposal that dealt with the three papers

15 that we have been hearing about, the automatic enrollment,

16 international diversification, and reallocation papers?

17 A.  Yeah.  I think -- I thought there was very quickly a pretty

18 good agreement on those.

19        For the international diversification paper at that

20 point I was really working with Andrea.  And so early on in the

21 fall of 2014 I had committed to finish a draft on that paper.

22        I think we talked about this before.  I basically

23 committed to giving a keynote speech on that paper at the end

24 of the year, and again we are going to fin -- Andrea and I will

25 finish this paper, and I think Enrichetta agreed that I would

1    still be part of this paper, because we had done so much work,

2    it was my topic, right?

3            On the automatic enrollment paper, at first I wanted

4    to still be on it because I felt like I had ton a lot of work

5    on it, you know.  Remember, I had written the draft, but we got

6    a lot of pressure from the Enrichetta camp that my name would

7    just be taken off, and I ended up agreeing to that somewhere in

8    February 2015.

9            And on the reallocation paper, you've seen it before,

10   Nicolas wanted me to be involved, so what I proposed was

11   something I discussed before that, I would talk with Nicolas,

12   but the decisions about the paper would be taken by Enrichetta

13   and Nicolas without my interference.  So they could just do

14   whatever they want.

15           I think those three things to me looked very

16   reasonable and I think I was sort of hoping that Enrichetta

17   would agree to that, too.

18   Q.  Let me show you Exhibit KO?

19           THE COURT:  After this maybe we will break for lunch.

20           MR. HERNSTADT:  Actually perfect.

21           THE COURT:  OK.

22           MR. HERNSTADT:  I move to admit KO.

23           MS. DONEHOWER:  No objection.

24           THE COURT:  All right.  KO will be admitted.

25           (Defendants' Exhibit KO received in evidence)

I7hnrav4                    Bekaert - cross

1          MR. HERNSTADT:  Actually, I can do this very quickly,

2    in two questions.

3          THE COURT:  Sure.  Go ahead.

4          MR. HERNSTADT:  Great.

5    BY MR. HERNSTADT:

6    Q.  Professor Bekaert, take a look at the e-mail in the middle

7    of the page, it's dated February 19, 2015, from Janet Horan to

8    Professor Ravina and other people.

9          Do you see where she says, "I can share that Geert has

10   confirmed to me that he's dropped his name from the automatic

11   enrollment paper"?

12   A.  Correct.

13   Q.  Is this accurate?

14   A.  Yes.  This is what I was referring to.

15   Q.  You mentioned you wanted to do a separate paper with Andrea

16   Kiguel?

17   A.  Correct.

18   Q.  Did that ever happen?

19   A.  No.  Because of this conflict, you know.

20   Q.  Have you done any work with the dataset since 2015?

21   A.  No.

22          MR. HERNSTADT:  This is a good time to stop, your

23   Honor.

24          THE COURT:  All right.

25          So, ladies and gentlemen, let's take our lunch break.

I7hnrav4                          Bekaert – cross

1           Just remember don't discuss the case and keep an open

2    mind.

3           (Jury not present)

4           THE COURT:  You can step down.

5           THE WITNESS:  Thank you.

6           THE COURT:  I have a criminal proceeding now, so you

7    can leave your things on the tables, just cover anything you

8    think is sensitive.

9           Thank you.

10          (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7h1rav5                        Bekaert – Cross

                              AFTERNOON SESSION

                                  2:06 p.m.

1          (In open court; jury not present)

2          MR. SANFORD:  Your Honor, are you ending at 5 today?

3          THE COURT:  Yes.  Let me just look at my calendar.

4   I'm pretty sure that I have a criminal proceeding at 5.

5          Yes.

6          MR. SANFORD:  Thank you.

7          (Continued on next page)

1           (Jury present)

2           THE COURT:  All right.  Everyone can be seated.

3     Thanks.

4           Proceed.

5           MR. HERNSTADT:  Thank you, your Honor.

6     BY MR. HERNSTADT:

7     Q.  Professor Bekaert, were you upset when you learned that

8     Professor Ravina had gone to the dean about you in July 2014?

9     A.  Of course I was.

10    Q.  How did you react to that?

11    A.  Well, I mean, I reached out to some friends and -- and, you

12    know, I was -- just couldn't understand that somebody who I'd

13    been working with for so long, I had a very friendly

14    relationship with, kind of betrayed me, you know, and had been

15    doing all this research together while she had already done

16    that, and I was like, why is this happening?  I mean, I was

17    very, very upset.

18    Q.  Did you delay work on the 401(k) project after you

19    learned -- because you learned about the fact that she went to

20    the dean's office?

21    A.  No.

22    Q.  So what did you do in response?

23    A.  What do you mean, like --

24    Q.  Well, you said you went to some friends.

25    A.  Oh, yeah.  Well, I reached out for -- I mean, I talked to

1    my girlfriend, talked to some other close friends, some, you

2    know, some of it was venting, you know, looking for support,

3    you know, I just -- in the beginning, for me, it was -- I just

4    couldn't understand why she had done it.  I had lots of

5    sleepless nights trying to understand, why is she doing this?

6    I just couldn't find an explanation.  And I was very frustrated

7    and, you know, probably a little bit angry as well, but -- and

8    I just -- just talked to private friends.

9    Q.  The second half of 2014, from July forward, did you

10   continue to work on the 401(k) project?

11   A.  Yeah.  We'd been talking about this, right?  So we really

12   were -- I was working with Andrea to get this draft together,

13   that you can see the emails.  There's lots and lots of back and

14   forth, so we were continuing to work on this, but the whole

15   process now was kind of undermined by this case, right?  So I

16   had to have all these discussions with the dean's office and

17   with -- with -- with the vice chair and the chair.  So

18   Enrichetta talked about all these meetings; well, for me it was

19   the same thing.  It was incredibly stressful.  I remember, you

20   know, evenings where I would have a tenure meeting till 9 and

21   then still have a meeting with Professor Zeldes about this case

22   and then the next day at 9 I had to teach.  Actually, I had a

23   breakdown in that class 'cause I was so stressed out.  So that

24   was all going on.

25            And then trying to make this process go forward became

I7h1rav5                          Bekaert - Cross

1    very difficult because -- so I had, you know -- I didn't talk

2    with Enrichetta anymore so everything went by email, and every

3    single email, there was something going on.  It was some nasty

4    remark about what had I done allegedly in the past, something

5    negative about Andrea.  It was always something that I had to

6    deal with and sort of try to keep focusing on research and let

7    that go, and it was just extremely frustrating and difficult.

8    Q.  The international diversification paper, how would that

9    compare amongst the papers that you've done in terms of speed?

10   A.  One of the fastest I've ever had.  So I think it was -- so

11   we only had the data, and again, you remember that it wasn't

12   sort of ready for completely finishing the paper, but the data

13   came somewhere in April 2013, where they were sort of ready for

14   initial analysis, and the paper was I think published in April

15   2016.  So that's three years from beginning to end.  That's

16   incredibly fast.

17          And again, some of the data that we had in 2013, it

18   wasn't complete.  We had to still wait for data to be delivered

19   by Enrichetta that we only got in September 2014, and then they

20   weren't high quality.  We discussed this last week.  So I

21   thought that was a great achievement.  And it came in on time

22   even for her tenure.

23   Q.  Do you remember hearing Professor Ravina testify that she

24   put all of her other research on hold to focus only on the

25   401(k) projects?

1    A.  Yeah, I heard that.

2    Q.  Did Professor Ravina ever tell you that?

3    A.  No.  I mean, you've seen the emails.  She -- she sort of

4    reported on her progress on these R&Rs, so I thought she was

5    working on it.  You know, I think we've seen it this morning.

6    She would say, hey, I'm working on the beauty paper, I'm like

7    halfway through revision.  So I thought that this process was

8    going on, that while we were working on the 401(k), she was

9    working on her R&Rs, you know, at least with Sara.  There's all

10   these other projects, and I knew about these projects, because

11   I was sort of checking on her with my mentoring.  Plus every

12   year, we look at this, and there's papers, you know, when we do

13   the review process, that would be listed.

14   Q.  Did Professor Ravina ever ask you to put all of your

15   research on hold and do only the 401(k) papers?

16   A.  No, of course -- of course not.  I mean, she knows that I'm

17   a busy professor and I work on many, many things

18   simultaneously.  That would be crazy.

19   Q.  Did you ever suggest to Professor Ravina that she work only

20   on the 401(k) papers?

21   A.  No, never.  I did the opposite.  I wanted her to work on

22   these R&Rs because those -- the single-author ones, right,

23   because those are going to count more in the tenure process or

24   anywhere she goes.  I mean, if you have a vitae with two

25   single-authored top publications, that's actually rare right

1    now.  I have to say, myself, I only had one of those.  So you

2    like to have one and that's actually sufficient.  But if you

3    would have two, that would count for a lot.

4    Q.  So just to put this a little into context, I'm going to ask

5    you to look at some exhibits.

6          Exhibit AF.  We won't dwell on these because we've

7    seen these before, but just to be clear.

8          This is December 21, 2011, and are you asking her

9    about her single-authored R&Rs in this email?

10   A.  I am.

11   Q.  And you see at the bottom of the page, there's an email

12   from you at 9 a.m. and you say, "As I told you before, you

13   really got to get these published"?

14   A.  Indeed.

15   Q.  And then Exhibit 8, we've seen this before.  In this email,

16   on July 31, 2012, are you asking Professor Ravina about the

17   revisions?

18   A.  I am.

19   Q.  And are you suggesting that she get them finished?

20   A.  Yes, I am.

21   Q.  And Exhibit BF, which is also in evidence.

22          This is February 8, 2013.  Are you asking Professor

23   Ravina how she's doing on her single-authored R&Rs?

24   A.  I am.

25   Q.  And do you see what you say at the top of the page?  It

1  says, first, the second sentence, you cannot --

2  A.  Right.

3  Q.  "You just can't have things lying around."

4  A.  Right.

5  Q.  "You need to decide whether you can make a push with these

6  two papers and how."

7  A.  Right.  Yeah, that's what I explained before.  It's -- in

8  our business, if you get a revise and resubmit, that's what you

9  really want to focus on, because that gets you closer to that

10 finish line of getting a publication and -- and again, this was

11 also -- it's another example of why having strict schedules

12 doesn't make a heck of a lot of sense because, you know,

13 suppose you're scheduled for working on some of your -- your

14 working papers but now suddenly you get a revise and resubmit

15 from a top journal.  Well, you would want to rearrange your

16 schedule to work on that one, because that's going to get you

17 faster to that publication.  That's something that I would

18 naturally do and would also tell, you know, my -- my PhD

19 students to do.

20 Q.  Do you see the next line?  Would you read that, the next

21 two sentences?

22 A.  "They are single-authored.  If you can just get one in a

23 top journal, it would really help your career.  Please spend

24 some time planning on that.  I'm willing to talk."

25 Q.  And this is February 2013.

1   A.  Right.

2   Q.  We've seen Exhibit 261 already today.

3            MR. HERNSTADT:  Could you just pop it up for a second.

4   Q.  Just to be clear on the date, this is April 13, 2013.  And

5   in this email you're encouraging her to complete her

6   single-authored R&R papers?

7   A.  Again, it was, you know, recurring theme.

8   Q.  And Exhibit CU.

9            And this is March 2014.  In the email in the middle of

10  the page, the second paragraph, "Indeed, you need to get rid of

11  the R&Rs"?

12  A.  Same thing.

13  Q.  So from 2011 to 2014, you encouraged her to write these --

14  to finish these papers, is that right?

15  A.  Exactly.

16  Q.  Do you recall being shown a number of emails when you were

17  being questioned by plaintiff's counsel?

18  A.  Yes.  And I -- I think we want to make clear that the

19  timing of these emails is important, right?  Some emails were

20  like before March 2016 and some were afterwards, and I think

21  those are very different.

22  Q.  Why is that?

23  A.  Because when the complaint was launched, it came with a big

24  media campaign, and these latter emails were reacting to that,

25  and so they're very different.

I7h1rav5                         Bekaert - Cross

1    Q.   Okay.  Do you recall being shown emails that you sent

2    shortly after -- starting when you learned that Professor

3    Ravina had gone to the dean about you?

4    A.   Yeah, it's possible.

5    Q.   And what are those emails?

6    A.   I think those were the emails that I described before to

7    my -- to my girlfriend and close friends.

8              MR. HERNSTADT:  So let's take a look at Exhibit 46.

9              And in order not to take a long time with this, I'd

10   like to hand up some of the exhibits to the witness to talk

11   about without necessarily putting them on the screen, which

12   would be 61, 82, 67, 89, and 127.

13             THE COURT:  All right.  Thanks.

14             Are you going to give copies to counsel?

15             MR. HERNSTADT:  I didn't have copies --

16             THE COURT:  Are they all admitted?

17             MR. HERNSTADT:  Yes.

18             (Discussion off the record)

19   BY MR. HERNSTADT:

20   Q.   Do you see Exhibit 46?  This is dated July 12, 2014, is

21   that --

22   A.   Correct.

23   Q.   When is that in time with respect to learning from the dean

24   that Professor Ravina had complained about you?

25   A.   I think it's right after I had that meeting, with the dean

1   and Janet.

2   Q.  And what are you saying in this email?

3   A.  Well, at that point I was basically thinking that this --

4   this research divorce had to do with my emails, the email

5   exchanges that we had in March and April and May that we've

6   talked about this morning, and so that's what I'm referring to

7   here.

8   Q.  Are those emails about the research assistant?

9   A.  Yeah, where I got, you know, upset and started capitalizing

10  things and -- and called her irrational and things like that.

11  Q.  And who is this email to?

12  A.  Marie Hoerova.

13  Q.  And who is that?

14  A.  At the time, you know, she's my girlfriend.

15  Q.  And do you see on the second -- in the second line, you

16  say, "If this is harassment, the Americans really are total

17  pussies"?

18  A.  I see that, yes.

19  Q.  What do you mean by that?

20  A.  What I meant here, I was referring -- I was referring to

21  those emails, so I -- I thought that obviously I -- I expressed

22  myself in a very strong manner in those emails and, you know,

23  very blunt fashion, but I thought, you know -- I was thinking

24  about this -- how can that be a problem?  And however blunt I

25  am in these emails, that can't possibly be counting as

1   harassment.  And that -- that's what I was saying, you know.

2   It had nothing to do with Americans per se; it was about these

3   emails, you know, being perceived as harassment or not, my

4   strong language in them.

5   Q.  And at this time, after learning about the complaint, did

6   you send emails to anyone other than your girlfriend, about how

7   you felt about the complaint?

8   A.  Right.  I think there was a couple of close friends that I

9   may have sent emails to, but we're not talking about many.

10  Most of -- during this period I mostly reached out to Marie.  I

11  mean, we just sort of talked about this all the time.

12  Q.  Okay.  I'd like you to take a look at Exhibit 61.

13          MR. HERNSTADT:  I'm sorry, your Honor.  I'm just

14  trying to make sure the email addresses aren't being shown.

15          THE COURT:  That's fine.

16          MR. HERNSTADT:  Okay.  Thank you.

17  Q.  If you look at your email to Ms. Hoerova, at the bottom of

18  the page, do you see, you say, "This is what I deal with

19  constantly"?

20  A.  Yes.

21  Q.  "The RA is getting exasperated too."

22  A.  Yeah, I see it.

23  Q.  "Given Ravina's proclivity to insert little notes on how

24  her work was deficient and not accepting responsibility, for

25  example, for giving her the wrong file, can I just strangle her

1   and get it over with?"  Do you see that?

2   A.  Yes.

3   Q.  Let's take a look at the email before that.

4         And let me ask you, is this the email that you're

5   commenting on?

6   A.  Yes.

7   Q.  And in your commentary, where you say, "Can I just strangle

8   her and get it over with," what are you saying there?

9   A.  Well, I mean, this is obviously a little bit of a joke.  I

10  mean, I don't mean this seriously.  But this was what I was

11  referring to before.  It's like all these emails that I -- the

12  back and forth with Enrichetta was really painful because there

13  was always, you know, some attempt of her to like rewrite

14  history about what happened in the past, her desire to put

15  everything on schedule, there was negative remarks about Andrea

16  and, you know, that -- and that was difficult because we had --

17  we have, you know, Wei and Kenton also, you know, the other

18  people from Financial Engines, and so I couldn't even defend

19  myself 'cause I felt if I do that too much, then they're going

20  to go ballistic and then, you know, the data might be pulled.

21        So it was a very difficult situation, and I was

22  reacting to that.  I mean, I didn't obviously literally mean to

23  strangle her.  It was just sort of like a comment with my -- my

24  girlfriend about this, and I think the email exchange kind of

25  showed that.

I7h1rav5                          Bekaert - Cross

1    Q.  Well, let's look at her response.

2                MR. HERNSTADT:  You can put it up.

3    Q.  Is this the response from Ms. Hoerova?

4    A.  Yes.  Yes, it is.

5                MS. DONEHOWER:  Your Honor --

6                THE COURT:  Yes.

7                MS. DONEHOWER:  -- could we have a quick sidebar?

8    Would you mind?

9                THE COURT:  Sure.

10               (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (At the sidebar)

 2          MS. DONEHOWER:  If he's going to go into detail about

 3     Ms. Hoerova's impressions of the case, what was happening about

 4     her impressions of the communications between Professor Bekaert

 5     and Professor Ravina, I just want to be sure that we will be

 6     able to tell our side of the story on that.  Your Honor --

 7          MR. HERNSTADT:  I haven't done that.

 8          MS. DONEHOWER:  You're just about to show the response

 9     from Ms. Hoerova.  There are a number of emails where

10     Ms. Hoerova is commenting on the communications between

11     Professor Bekaert and Professor Ravina, and if we're going to

12     go into those here, I just want to make sure that we are able

13     to go back into that when we do redirect.

14          MR. HERNSTADT:  Your Honor, that's not what's

15     happening.  The response is only to the statement, "can I just

16     strangle her," which was brought in by the plaintiff.  She

17     says, "She's definitely not worth strangling.  Just remember, I

18     would get no visitation rights."  And then I'm done.  I'm not

19     going to ask what she thinks of Ravina, I'm not going to ask

20     what she thinks of the case.  I'm not going to ask any of that.

21     They put in the exhibit and pointed out he said, "Can I

22     strangle her."  They asked Mr. Dunn, "Were you aware that he

23     sent an email saying, 'Can I just strangle her?'"  He's saying,

24     this is back-and-forth banter between me and my girlfriend and

25     here's her response.  She says she's not worth strangling.  It

I7h1rav5                          Bekaert - Cross

```
 1    shows it's a joke.

 2              MS. DONEHOWER:  These are not jokes between them.  I

 3    have studiously avoided references to their back-and-forth

 4    during direct, but there are other clear communications between

 5    Ms. Hoerova and Professor Bekaert where she is commenting on

 6    the nature of their relationship, but if you're going to start

 7    to say that she can comment --

 8              THE COURT:  The relationship between who?

 9              MS. DONEHOWER:  The relationship between Professor

10    Bekaert and Professor Ravina.  What he does is he sends to

11    Ms. Hoerova the trove of emails that he was intending to send

12    to Director Dunn and asks for Marie Hoerova's opinion on it,

13    and Marie Hoerova says to him, you clearly liked her, just like

14    you like me.  Because they were exchanging --

15              THE COURT:  I don't think allowing this in opens the

16    door to all that.

17              MS. DONEHOWER:  I don't see how it's relevant then

18    though.

19              THE COURT:  The nature of his relationship with a

20    woman, he says, he's trying to explain why he would say

21    something about strangling someone.  He's trying to express how

22    he felt and what he said to Ms. Hoerova.  But I don't think

23    that opens the door to all the other reactions of his

24    girlfriend to this situation.

25              MS. DONEHOWER:  But what he's trying to do is use all
```

I7h1rav5                          Bekaert - Cross

these comments with his girlfriend as a shield --

           THE COURT:  It's his comment to his girlfriend.  So if
you go any further, it's going to open the door.

           MR. HERNSTADT:  I'm not going to, your Honor.  Thank
you, your Honor.

                (Continued on next page)

1             (In open court)

2    BY MR. HERNSTADT:

3    Q.  Professor Bekaert, I was asking about Ms. Hoerova's

4    response, and do you see she says, "She's definitely not worth

5    strangling.  Just remember, I would get no visitation rights."

6    Smiley face.

7    A.  Yes.

8    Q.  Was that the context of the interaction in this email about

9    strangling?

10   A.  Correct.  So I think it shows we're just joking.

11   Q.  I'd like you to look at Exhibit 82.

12            Do you see at the top --

13   A.  Yeah.

14   Q.  -- you say, "Sometimes I want to shout," it continues.

15            Why are you using language like that in this email?

16   Who is this email to?

17   A.  Again, it's to Marie, so my girlfriend.  It's just a

18   private email conversation.  You know, I -- I apologize for

19   the -- the use of those words, but, I mean, I think when

20   somebody does something really bad to you, sometimes you're --

21   you call each other names, and this is what's going on here,

22   but this is a private email between me and my -- my girlfriend.

23   Q.  Did you ever send e-mails using this language to Professor

24   Ravina?

25   A.  No, never.

I7h1rav5                          Bekaert - Cross

1   Q.  Did you ever send emails using this language to anyone on

2   the Columbia faculty?

3   A.  No.

4   Q.  Who did you send emails using this language to?

5   A.  Maybe -- maybe some other close friends, but -- yeah, I

6   mean, won't be that many.

7   Q.  And this is an email that's in August of 2014 so not long

8   after you learned --

9   A.  Right.

10  Q.  -- about the complaint?

11          I'd like you to look at Exhibit 67.

12  A.  Okay.

13  Q.  Professor Bekaert, take a look at --

14          (Discussion off the record)

15  Q.  If you could take a look at this email.

16          Who is this email addressed to?

17  A.  It's a friend of mine, Marie.  A different Marie.

18  Q.  Is she a friend that you're as close with as your

19  girlfriend?

20  A.  Well, no.

21  Q.  And looking at this email, do you use the same kind of

22  language with her that you used with your girlfriend?

23  A.  I would say it's more -- more measured, more moderate.  And

24  this is also somebody who's not in the profession.  I mean, she

25  has nothing to do with economics or anything.

I7h1rav5                    Bekaert - Cross

1    Q.  And take a look at Exhibit 89.

2              This is a little later, November 16, 2014.  You were

3    also shown this email by plaintiff's counsel?

4    A.  Correct.

5    Q.  And who is this email addressed to?

6    A.  It's George Panayotov.  He is a professor at university --

7    at Hong Kong University of Science and Technology.  So that is

8    this is a person I got to know when I was visiting there, and

9    he's now a good friend and a co-author.  He's somebody who

10   sometimes visits me here in New York and, you know, we work

11   together.

12   Q.  Is this email about work that you're doing with him?

13   A.  Yeah.  Most of what's redacted out is actually about our --

14   the paper that we're working on together.

15   Q.  And you see, in the part that we can see, you use some

16   strong language.

17   A.  Yes.

18   Q.  Why is that?

19   A.  Again, same thing.  I'm, you know -- he's a really close

20   friend and, you know, I'm just telling him also what I'm

21   dealing with, 'cause not only, you know, is it emotionally

22   really tough for me right now to have to deal with this, but

23   it's just also a bit of a time sink, because I have all these

24   meetings, all these back-and-forths, you know, I have to walk

25   on eggshells when I write emails to Enrichetta and others on

1    the team.  So this person also wants to get tenure.  He's an

2    assistant professor.  So it sort of takes time away from his

3    projects and, you know, so I have to like let him know what's

4    going on here.

5    Q.  Let's take a look at Exhibit 127.

6         These were emails that were shown the other day by

7    plaintiff's counsel?

8    A.  Yes, I believe so.

9    Q.  Who are these emails addressed to?

10   A.  This is Shumi.  She's also a friend of mine.  She's a

11   professor in Australia, in Sydney.  But she's currently not a

12   co-author.

13   Q.  You were shown this language on the last page.  This is an

14   email you wrote to her.

15   A.  Yup.

16   Q.  And do you see that it talked about there should be no

17   problem at all to work with the Australian data?

18   A.  Correct.

19   Q.  Does this data have anything to do with Financial Engines?

20   A.  No, it does not.  It's basically a potential data set on

21   retirement, retirement data for Australian people, from

22   Australia.  Had nothing to do with Financial Engines.

23   Financial Engines does not do business in Australia at all.

24   Q.  Were you concerned about Professor Ravina perhaps learning

25   that you were considering working on retirement data,

I7h1rav5                          Bekaert - Cross

1    Australian retirement data?

2    A.  Yeah.  Well, I mean, given the difficult situation between

3    us and how she's been reacting to everything, I was concerned

4    that she kind of might go off if she would have heard that I

5    would even try to work on retirement data whatsoever, so I just

6    wanted to keep that quiet.  And in fact, nothing has really

7    been going forward with this to this day.

8    Q.  And looking at the first page of Exhibit 127 --

9    A.  What are you referring to?

10   Q.  The first page of Exhibit 127, where it says in the

11   parentheses in the second paragraph, "I assume this would not

12   get back to ER."

13   A.  Right.

14   Q.  Is that what you were just talking about?

15   A.  Yes, yes.

16   Q.  Do you see in the first line, once again, you're using

17   strong language?

18   A.  Yes.

19   Q.  Why is that?

20   A.  Again, it's the same thing.  I mean, she's a close friend.

21   She was referring to -- it was sort of -- it's sort of like

22   that was like how we called Enrichetta, I mean, given what she

23   had been, you know, basically doing to me, in some sense, you

24   know, going to the dean's office and -- and creating all

25   this -- these problems, and so this is how we just, again, in

1    private emails, were referring to her.  You know, Shumi and

2    Marie were referring to her this way as well.  And sometimes

3    they would write "evil B" dot, you know, things like that.  But

4    again, these are private emails.  This is not the profession.

5    These are private emails, but close friends.

6             MR. HERNSTADT:  Sorry, your Honor.

7             This wasn't available for the jury, so we'll give you

8    a chance to take a look at this.  I apologize.

9             THE WITNESS:  None of them?

10   Q.  And Professor Bekaert, you mentioned emails after there was

11   the press that came out about when Professor Ravina filed her

12   lawsuit?

13   A.  Right.

14   Q.  Let me show you Exhibit -- well, let me ask you a question.

15   When you saw the press that came out after Professor Ravina

16   filed the lawsuit, what was your response?

17   A.  I mean, that was really painful.  I mean, I -- I -- I think

18   I sort of got it through -- I just got contacted by reporters,

19   and this is actually how I was -- how I knew there was a

20   complaint and everything, so I got a reporter from the Daily

21   News, and so, you know, when I started reading about this, it

22   was incredibly painful, right?  I mean, there was all these

23   things being said about me that I'd never heard before, you

24   know, porn and prostitute stuff, it was suggested I had

25   sexually harassed several female assistants at Stanford, and I

1    was reading all these crazy things that I'd never seen before,

2    and all these reporters wanted to contact me.  And then it

3    turned out it wasn't only in the Daily News; it was in the New

4    York Times.  You know, lots of people, you know, friends were

5    contacting me about this.  And for good measure, it was in

6    Poets and Quants, which is the magazine that MBA students read.

7    So all this stuff was out there.  I mean, the next week I had

8    to go teach, so I had to like think about, how do you tell your

9    students about all this stuff?  Sorry.

10           And then there was like a -- an economics blog with a,

11   you know -- it's like 40 pages now, where they go on and off on

12   you and describe you like a villain and whatnot.  Sorry.

13   Q.  Professor Bekaert, did you do anything to try to respond to

14   the press that you were seeing?

15   A.  I -- I -- well, I talked to a lot of people, I talked to my

16   family, and then I started -- I wanted to defend myself, so

17   I -- I started to -- to reach out.  You know, I have this big

18   network of co-authors and friends and I -- I started crafting

19   an email, so I wanted to be -- wanted to make sure that they

20   knew that none of this was true.  Yeah, and that's what I did.

21   And when I was shown these emails last week -- and it's

22   basically the same email.  I sort of wrote an email that I

23   really believed was how I felt, and then I wanted to just send

24   it out to as many people in my network as possible, but a lot

25   of times I actually got contacted by people in my network.

1   They reached out to me and said, you know, we don't believe

2   this, and then I wanted to give them some color on what really

3   happened and that's -- that's what I did.  I wrote that email.

4   Q.  What were you trying to accomplish with these emails?

5   A.  Just wanted to defend my reputation.  I mean, I've worked

6   so hard on reaching where I am, you know, for 20 years, and

7   then suddenly you get this.  You know, and that -- and that

8   rumor mill.  Five years ago, there was some -- some -- some

9   stuff about like who are the nice people in the profession and

10  somebody mentioned me, and now -- and now I'm like the villain,

11  you know.

12  Q.  Professor Bekaert, did you have the goal of trying to harm

13  Professor Ravina in any way?

14  A.  No.  I was just hoping that I could defend myself.

15  Q.  Let's take a look at Exhibit 137.

16          MR. HERNSTADT:  Your Honor, I'd like to hand up, as we

17  did the last time, some of the emails that I'm not going to put

18  on the screen.

19          THE COURT:  Okay.

20          MR. HERNSTADT:  136 --

21          THE COURT:  In evidence?

22          MR. HERNSTADT:  These are all in evidence.  These are

23  emails that were put in evidence by plaintiff last week.

24          THE COURT:  Announce the numbers for the record,

25  please.

I7h1rav5                    Bekaert - Cross

1              MR. HERNSTADT:  136, 137, 141 through 145.

2              May I, your Honor?

3              THE COURT:  Yes.

4              MR. HERNSTADT:  Thank you.

5     BY MR. HERNSTADT:

6     Q.  So Professor Bekaert, I'm going to ask you to look at

7     Exhibit 137.

8              MR. HERNSTADT:  And we're just trying to make sure

9     that there aren't email addresses in it.

10             THE COURT:  Okay.

11    Q.  I'm going to ask you to look at the first email, which is

12    on the second page of 137.

13             And this is an email to you from Andrea Kiguel on

14    March 23rd?

15    A.  Yes.

16    Q.  Is that the date that the lawsuit was filed?

17    A.  I believe it is.

18    Q.  Or close to that day?

19    A.  Close to that date.

20    Q.  Is that the date when the first newspaper articles and

21    press reports came out?

22    A.  Yeah, I believe so.

23    Q.  And is this how you learned that the press -- about the

24    press?

25    A.  I think I actually -- not exactly sure.  I think I -- the

1    first reports I did, I got contacted by reporters, actually,

2    that were sending emails whether I wanted to comment.

3    Q.  Professor Bekaert, I'm going to ask you to take a look at

4    your response to this email.

5    A.  Oh, yeah, mm-hmm.

6    Q.  Do you see above the email we saw from Ms. Kiguel, there's

7    a response from you, "By the way, how did you find out?"

8    A.  Mm-hmm, yes.

9    Q.  And then at the top of the page, is that Ms. Kiguel's

10   response?

11   A.  Correct.

12   Q.  Who is Andre?

13   A.  He's a former student of mine.  He's now at Fordham

14   University.

15   Q.  She said that another student sent you the article in the

16   Daily News.

17   A.  Yeah.

18   Q.  And then she saw something on Google.

19   A.  Right.

20   Q.  And then a thread in a --

21   A.  Right.

22   Q.  -- on a blog, is that right?

23   A.  Correct.

24   Q.  Okay.  I'd like you to take a look at -- let's go to the

25   first page.

1           MR. HERNSTADT:  I'm sorry this is taking so long.

2     We're just trying to make sure it says what it's supposed to

3     say.

4     Q.  Professor Bekaert, this is the next email in the chain.

5     Who is this sent to?  You're sending this chain to someone?

6     A.  Yes.

7     Q.  And who are you sending it to?

8     A.  Xiaoyan is a former student and co-author.

9     Q.  You see that you're using strong language here.

10    A.  Yes.

11    Q.  Why is that?

12    A.  Again, I really believe, not -- I think that here it's

13    still sort of referring to her, you know, with the thing that I

14    used before, like "evil B," but at this point, when I start

15    using "evil," it's heartfelt.  I really mean that.  I really

16    mean that what Enrichetta has done to me is pure evil.  This

17    is -- this is the worst thing that ever happened in my life in

18    terms of somebody doing something to me.  This is, you know, we

19    were working well together, and then to sort of use my status

20    in the profession and my position at Columbia and basically

21    destroy my career with a bunch of lies, I think this is -- this

22    is pure evil, and I -- and this is a different evil from the

23    evil before.  I mean this.  I think I used the word in the

24    deposition "inhumane."  It's like a total lack of empathy.  If

25    you do this to somebody who was your friend, I think that is

1    evil.

2    Q.  Professor Bekaert, I'm going to ask you to look at the

3    exhibits that I handed to you.  This is Exhibits 136, 141, 142,

4    143, 144.  If you could just quickly leaf through them.  I'm

5    just going to ask you, who are these to?

6    A.  Well, most of -- most of them are basically former students

7    and/or co-authors.  There's a few exceptions.  If you want, I

8    can go over them.

9    Q.  Well, 136 is to whom?

10   A.  136 is to, you know, three of -- four of my -- wait, five

11   of my best co-authors, including two former students.

12   Q.  And do you use any strong language in this email?

13   A.  I refer to "touched by evil."

14   Q.  Do you want to read that one sentence.

15   A.  "It's not the full story, which for me is a horrible,

16   'touched by evil' moment in my life."

17   Q.  And in 141, who is that to?

18   A.  141?  That is Yuhang Xing.

19   Q.  And is there any strong language in this email?

20   A.  It's the same language.

21   Q.  And 142, who's that to?

22   A.  142.  That's Mr. Prabhala.

23   Q.  Is there any strong language in this email?

24   A.  "'Touched by evil' experience in life" again.

25   Q.  Is it the same email that we saw in the prior ones?

 1    A.  It's probably somewhat different.  Yuhang was a former

 2    student.  She reached out to me.  This person is a professor at

 3    Maryland.  He's not a former student or co-author, but he

 4    reached out to me, and I -- I think my language is a little bit

 5    different.

 6    Q.  Okay.  143 --

 7                MS. DONEHOWER:  Objection, your Honor.

 8                THE COURT:  To the exhibit?

 9                MS. DONEHOWER:  The exhibit not being shown to the

10    jury while it's being read.

11                MR. HERNSTADT:  I'm happy to show it to the jury.  I'm

12    just trying to avoid delay.

13                THE COURT:  Yes.  Just show it to the jury then.

14                MR. HERNSTADT:  Let's put up 143.

15                142.  I'm sorry.

16    BY MR. HERNSTADT:

17    Q.  Is this the exhibit that you've just been talking about?

18    A.  Correct.

19    Q.  And is there any strong language in this exhibit?

20    A.  I think I used the word "crazy."

21    Q.  I'm talking about the words that we saw before, "bitch --"

22    A.  Oh, no.  Bitch?  No.  I didn't use that word here.  I mean,

23    like I said, I mean something different.  You know, it's

24    different from, you know -- if you call somebody "evil B," you

25    know, you're just calling names.  In this email, when I use the

I7h1rav5                          Bekaert - Cross

1    word "evil," it's a heartfelt evil.  I mean, I really mean that

2    this was an evil deed that was -- that Enrichetta did to me.

3    Q.  I'd like you to look at 143 and 144.

4          Do you use words like "bitch" in either of those

5    emails?

6    A.  I do not.

7    Q.  Are these emails to colleagues?

8    A.  Angela Ng is a former student of mine and co-author.  And

9    what was the other number?

10   Q.  144.

11   A.  144 is to Daniela Georgescu and Carol Alexander, so

12   they're -- I'm the co-author of Journal of Banking and Finance

13   and Carol is my co-editor, and Daniela is the publisher, so I

14   work with those two very closely together.

15   Q.  And you're not using words like "bitch" in these emails?

16   A.  No, not at all.

17   Q.  Let's look at 145.

18   A.  I kind of --

19   Q.  Who is this to?

20   A.  Okay.  Oh, right.  Is it on the screen?  'Cause I don't

21   have it.  This is to Adel Turki and David Marcus of

22   Cornerstone.

23   Q.  And what is Cornerstone?

24   A.  Cornerstone is a consulting firm.  They do litigation

25   support.  And so over the last couple years before this

I7h1rav5                          Bekaert - Cross

1    happened, I had been doing a lot of litigation -- I mean, there

2    was another reason I was busy.  I was doing a lot of expert

3    witness stuff.  So you write reports and you have to go testify

4    and so on.  And Cornerstone was the firm I was working with.  I

5    had -- I was one of their, you know -- I was doing a lot of

6    work for them.  I was on their website with a picture.  While

7    this was happening, I was in the midst of a very, very big

8    case, a very interesting one.  I was going to learn a lot.  It

9    was with a big company in Brazil.  And I had sort of set my

10   research up to be a very useful expert witness for these kinds

11   of cases.  And so I just informed them of, you know, what was

12   going on in the press, which I knew they were going to find out

13   anyway, you know, given the widespread coverage.

14   Q.  What was the reaction from Cornerstone when they learned

15   about it?

16   A.  Well, they -- they yanked me off the case and they took my

17   picture down, and I haven't worked for them ever since.

18   Q.  Do you recall that Professor Ravina filed a lawsuit against

19   you in 2015?

20   A.  Yes.

21   Q.  How did you learn about that?

22   A.  I was served while I was teaching, in my class.

23   Q.  Was there any press in response to that lawsuit?

24   A.  I can't recall much press.  No, I don't think so.  There

25   may have been a release on -- but that was much later.  I don't

I7h1rav5                          Bekaert - Cross

1    think there was much press at all.

2    Q.  Did you send any emails to your colleagues or co-authors

3    about that lawsuit?

4    A.  No.

5          I just want to add for the -- on the press, the one

6    thing that really hurt me as well was that at one point it got

7    sent to all my LinkedIn contacts, so, you know, I'm on

8    LinkedIn, I don't use it that much, but, you know, I'm linked

9    to like friends -- I mean, old friends in Belgium and, you

10   know, people that I know and including friends of my -- my

11   daughters, and that was incredibly painful, so my daughters

12   were up in arms about this, like now they suddenly had to start

13   explaining to their friends what was happening somewhere in the

14   US, so --

15   Q.  Was it a press release that was sent to your LinkedIn

16   contacts?

17   A.  Yeah, I think it was something that the Sanford firm did.

18   I'm not sure.  Yeah, something about the press.

19   Q.  Professor Bekaert, did you take any part in Professor

20   Ravina's tenure considerations?

21   A.  No, not at all.

22   Q.  You testified earlier that you agreed in the first meeting

23   with Dean Hubbard that you would not, is that right?

24   A.  Exactly.

25   Q.  And did you do anything after that point?

I7h1rav5                          Bekaert - Cross

1   A.  No.

2   Q.  Did you talk to any Columbia professors about Professor

3   Ravina's tenure?

4   A.  Not about her tenure, no.

5   Q.  Did you talk to any Columbia professors about Professor

6   Ravina after you had the meeting with the dean's office?

7   A.  Well, lots of people wanted to talk about the case.  As you

8   know, there was -- in the beginning there were these

9   negotiations going on, so that's what colleagues write, and

10  then, you know, sometimes people would sort of come in and --

11  not -- really, most people didn't really talk to me.  I mean,

12  there was one person that I talked to because he was a friend,

13  which is Bob Hodrick.  And so he'd sort of been my mentor, and

14  so I talked to him about the case.

15          I also talked to Charlie Calomiris about the case,

16  'cause he was trying to sort of mediate a little bit between

17  Enrichetta and I this research divorce.  So there was the

18  dean's office and then Charlie, as sort of a -- a private

19  concerned colleague, wanted to come in between us as well and

20  sort of find a solution.

21  Q.  Did you ever talk to -- so you've identified two people.

22  A.  Right.

23  Q.  Did you ever talk to Professor Hodrick about tenure?

24  A.  No.

25  Q.  Did you ever talk to Professor -- about Professor Ravina's

1    tenure.

2    A.  Right.  No.

3    Q.  And did you ever talk to Professor Calomiris about

4    Professor Ravina's tenure?

5    A.  It was all about the case, but, you know --

6    Q.  Okay.

7    A.  Is that -- okay.

8             MR. HERNSTADT:  I have nothing further, your Honor.

9             THE COURT:  All right.  Redirect?

10            MS. DONEHOWER:  Yes.  Could I have just a few minutes

11   to organize myself?

12            THE COURT:  Yes, sure.

13            I should have asked, does Columbia have any questions

14   for Mr. Bekaert?

15            MS. PLEVAN:  No questions, your Honor.

16            THE COURT:  All right.

17   REDIRECT EXAMINATION

18   BY MS. DONEHOWER:

19   Q.  Good afternoon, Professor Bekaert.

20   A.  Good afternoon.

21   Q.  You testified just now about a press release, correct?

22   A.  Correct.

23   Q.  You're not alleging that someone at Sanford Heisler sent a

24   press release to your LinkedIn contacts, correct?

25   A.  I don't really -- I know that there was some press release

1    to the LinkedIn contacts.  I'm not sure who did it.

2    Q.  You don't know who sent it.

3    A.  I don't recall.

4    Q.  You were shown a number of emails just now that you had

5    sent after Professor Ravina made her complaint to Columbia

6    University, correct?

7    A.  What -- what are you -- could you give me the timing,

8    because what do you mean with complaint?

9    Q.  Well, you first learned that she made a complaint about you

10   to Columbia University in July 2014, right?

11   A.  You're talking about that timing.  Yes.

12   Q.  And you sent a number of emails after that that we just

13   went over --

14   A.  Right.

15   Q.  -- with your lawyer.

16   A.  Right.

17           MS. DONEHOWER:  Can we please pull up 136, which you

18   were just recently shown.

19           You're going to have to have some patience with me,

20   Mr. McLeod.  Sorry.  Can we do 137 instead.

21           And can we go down to the first -- the bottom of this

22   chain of emails, please.

23   A.  Excuse me, but you -- I thought you told me about 2014.

24   This is in 2016.  This is after the media --

25   Q.  Professor Bekaert, I'm asking if after Professor Ravina

I7h1rav5                    Bekaert - Redirect

1    made her complaint in July 2014 -- this email comes after that,

2    correct?

3    A.  Yes, but it's after the press campaign.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7hnrav6                         Bekaert - Redirect

1    Q.   OK.

2    A.   That's what I wanted to say.  I mean, the timing is very

3    important.

4    Q.   I am just asking about the timing of 2014 versus 2016.

5    A.   Right.

6    Q.   2016 is after 2014, correct?

7    A.   Correct.

8    Q.   If you could please look at the top of page 2, here.

9         Do you see the end of that paragraph, where it says,

10   "It seems that rumors travel fast in academia"?

11   A.   I am not quite finding this.  What are you saying?  It is

12   page 2?

13   Q.   We are on Exhibit 137.  It is up on your screen.

14   A.   OK.  Sorry.  OK.

15   Q.   Page 2, the top of the page, the end of that first

16   paragraph.

17   A.   Yes.

18   Q.   Do you see that?

19   A.   Yes.

20   Q.   You testified that you did not send any of these e-mails

21   with what you characterized as strong language about Professor

22   Ravina to professors at Columbia University, correct?

23   A.   Yes, I believe that's true.

24   Q.   You also testified that you sent many of them to former

25   students, right?

I7hnrav6                      Bekaert - Redirect

1   A.  Students and coauthors and friends.

2   Q.  And some of those former students were your former students

3   at Columbia?

4   A.  Correct.

5   Q.  You wrote that you just -- I'm sorry.  You testified just

6   now that you just wanted to defend your reputation, right?

7   A.  Yes.

8   Q.  But you didn't stop at defending your reputation, did you?

9   A.  I am not sure what you're referring to.

10  Q.  You also attacked Professor Ravina's reputation and

11  character in these e-mails, right?

12  A.  Well, could you give me the language.

13          MS. DONEHOWER:  Could we please pull up 143.  I'm

14  sorry, 143.

15  BY MS. DONEHOWER:

16  Q.  Your attorney just asked you about this e-mail, and he

17  asked you whether you use the B word in it, right?

18  A.  Uh-huh, yes.

19  Q.  You testified that you didn't use the B word, but you did

20  in the second paragraph call Professor Ravina very crazy and

21  sick, right?

22  A.  Yes.

23  Q.  You also said in this, I guess it's the third paragraph --

24  let me find it -- about halfway down, "In fact, Professor

25  Ravina's false claims about me were thoroughly investigated,

I7hnrav6                          Bekaert - Redirect

1    including interviews and review of many e-mails and rejected

2    twice years ago."  Right?

3    A.  Correct.

4    Q.  When you say "they were rejected twice," you meant they

5    were rejected by Columbia University, right?

6    A.  Yes, the Title IX office.

7          MS. DONEHOWER:  Can we please see 144 as well.

8    Q.  This is the document that you just testified to about your

9    communications with someone at the Journal of Banking and

10   Finance, right?

11   A.  Correct.

12   Q.  And you said that you did not use the B word in this

13   e-mail?

14   A.  Yes.  I had to quickly look it over, so I am not sure.

15   Q.  You did in the second paragraph call Professor Ravina very

16   crazy and sick, right?

17   A.  Yes, because it's the same e-mail.

18   Q.  In the last line of this e-mail you also said --

19          MS. DONEHOWER:  I'm sorry.  I think it goes down a

20   little bit further.  And maybe even further still.  No?

21          THE WITNESS:  No.

22   Q.  Let's look at the very top of this e-mail, please.

23          You wrote to Ms. Georgescu, "I will make you the point

24   person for the JBF."  Right?

25   A.  Yes.

I7hnrav6                          Bekaert - Redirect

1              MS. DONEHOWER:  Can we please when you get a chance,

2      see No. 145.

3      BY MS. DONEHOWER:

4      Q.  This is the e-mail you just testified about that you sent

5      to Cornerstone, right?

6      A.  Correct.

7      Q.  You testified that you did not use the B word in this

8      e-mail as well?

9      A.  Yes, I did not.

10     Q.  But you also in this e-mail called Professor Ravina very

11     crazy and sick in that second paragraph?

12     A.  Yeah, I keep using the same e-mail over and over again.

13     Q.  And then at the last paragraph down there, you begin that

14     paragraph by writing to Mr. Marcus from Cornerstone, "I could

15     give you more details but not by mail."  Right?

16     A.  Correct.

17             MS. DONEHOWER:  And I believe this e-mail goes on,

18     Mr. McLeod.

19     Q.  That's the same e-mail in which you told him, "Feel free to

20     take this to the right people at Cornerstone."  Correct?

21     A.  Correct.

22     Q.  You testified that when you found out about Professor

23     Ravina's lawsuit you privately reached out to your friends and

24     your girlfriend to vent, right?

25     A.  Are you talking about 2016 or 2014?

1   Q.  2016, Professor Bekaert.

2   A.  OK.  Yes, sure.

3   Q.  But you planned your statements about Professor Ravina out,

4   right?

5   A.  Yeah, of course.

6   Q.  You drafted a statement about the case?

7   A.  Well, you mean --

8            MR. HERNSTADT:  Objection, your Honor.

9            THE COURT:  What is the objection?

10           MR. HERNSTADT:  Privilege.

11           THE COURT:  Can you rephrase.

12  BY MS. DONEHOWER:

13  Q.  I am not asking anything about what you did with your

14  attorney.  I am only asking about a statement that is in

15  e-mails which have now been admitted many times over into

16  evidence.

17  A.  So, to be precise, are you referring to this e-mail, to the

18  e-mails?

19  Q.  Let me just make this more clear.

20           MS. DONEHOWER:  If we could please pull up 141.

21           Can we blow up the first two paragraphs there, please.

22  BY MS. DONEHOWER:

23  Q.  Here you refer to, in the third paragraph, your official

24  response -- not third paragraph, third sentence of that first

25  paragraph.  This was your official response, correct?

1   A.   Yes.

2   Q.   This was the statement in which you wrote that "no good

3   deed goes unpunished"?

4   A.   Correct.

5   Q.   This was also the statement in which you had said that

6   Columbia University cleared you of all wrongdoing twice?

7   A.   Correct.

8   Q.   You sent this statement out to more than five people?

9   A.   You mean this portion?

10  Q.   This statement.  This statement that starts, "I have

11  cursorily reviewed."

12  A.   I wouldn't know how many people I sent this to.

13  Q.   Well, I'm certainly not going to go through all the e-mails

14  we have been through already, but you did send it out to more

15  than 25 people, correct?

16  A.   I cannot confirm that number.

17  Q.   The first time you sent the statement out was on March 24,

18  2016?

19  A.   This e-mail seems to say March 24.

20  Q.   So, at least as early as March 24, 2016, and you continued

21  to send the statement out at least through May 2016?

22  A.   It's possible.  I don't know.

23        MS. DONEHOWER:  I would like to mark, please,

24  Plaintiff's Exhibit 166, which has not yet been admitted into

25  evidence.

I7hnrav6                          Bekaert – Redirect

1                MS. DONEHOWER:  That's tab 16.  Thank you.

2                Your Honor, may we approach to hand the witness a

3     copy?

4                THE COURT:  Yes, sure.

5                MS. DONEHOWER:  Thank you.

6                Your Honor, we offer plaintiff's 166 into evidence.

7                MR. HERNSTADT:  Objection.

8                THE COURT:  All right.  Do you want to --

9                MS. PLEVAN:  I would also object to the first

10    paragraph of this.

11               THE COURT:  Why don't we meet at the sidebar.

12            (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. HERNSTADT:  Your Honor, apart from the prejudice

3    of the first paragraph, the plaintiff put in a dozen e-mails

4    around the time after, you know, between March and whatever a

5    couple of months after the case was filed.  They all say the

6    same things.

7          They didn't put this one in, and there's nothing that

8    came out on direct that would give rise to putting in another

9    e-mail.  He explained those e-mails.  He didn't talk about

10   stuff.  I would suggest that they need --

11         THE COURT:  Why is this proper redirect?

12         MS. DONEHOWER:  On cross-examination, the witness

13   testified that all he was doing was venting to a couple of

14   friends, when what this shows, when we show the time at which

15   this happened, was that this was a planned smear campaign that

16   took place over the course of months.

17         All I want to do is show here the date that this smear

18   campaign started for more than a month after it began.  This

19   isn't just emotional pain venting.  This is a planned and

20   deliberate campaign.

21         MR. HERNSTADT:  Your Honor, that misstates the

22   testimony rather dramatically.  Professor Bekaert was very

23   careful in distinguishing between the e-mails that he sent in

24   2014, which were to his girlfriend and a couple of friends and

25   he was venting, and the e-mails he sent in 2016, which were in

1    response to the press campaign.  He was crystal clear about

2    that.

3           This is one of the e-mails in response to the press

4    campaign.  It is one of -- it is in addition to the ten e-mails

5    or so they put in.

6           THE COURT:  I am going to let it in, but I am willing

7    to take out references to "the lawyers were worried about

8    retaliation claims as long as her tenure case was still

9    running.  What a country."

10          Does that deal with your objection?

11          MS. PLEVAN:  Yes, it does, your Honor.

12          THE COURT:  Is there anything else that you think is

13   unduly prejudicial in here other than that?

14          MR. HERNSTADT:  It gets into all kinds of stuff, your

15   Honor.  The second to last paragraph and the last paragraph.

16          MS. DONEHOWER:  None of that is new.  Those kind of

17   paragraphs have been admitted in the other e-mails that he sent

18   out.  I am not going to focus on those.

19          MR. HERNSTADT:  OK.  One second.

20          I will just double check that.

21          THE COURT:  OK.  Right now I just took out that

22   phrase.  OK?

23          MS. DONEHOWER:  I will let him now.

24          MR. HERNSTADT:  I will double check to make sure

25   there's nothing in here that we haven't seen already.

I7hnrav6                    Bekaert – Redirect

1         THE COURT:  Just let me know.

2         MR. HERNSTADT:  Yes, your Honor.

3         (Plaintiff's Exhibit 166 received in evidence)

4      (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7hnrav6                     Bekaert – Redirect

1           (In open court)

2           THE COURT:  We are just going to be a minute.  If

3    anyone wants to stand and stretch, you are free to do so.

4    BY MS. DONEHOWER:

5    Q.  Professor Bekaert, I'm showing you what has been admitted

6    as Plaintiff's Exhibit 166.

7           THE COURT:  Are you ready, Mr. Hernstadt, or do you

8    need a minute?

9           MR. HERNSTADT:  I'm sorry.  I'm checking through the

10   prior e-mails.

11          Your Honor, the problem that I identified is in fact a

12   problem.

13          THE COURT:  OK.

14          MS. DONEHOWER:  I will agree to just redact the second

15   page.

16          THE COURT:  OK.

17          MS. DONEHOWER:  Just to move things along.

18          THE COURT:  Why don't we do that.

19          MR. HERNSTADT:  That will be fine, your Honor.

20          THE COURT:  Thank you.

21   BY MS. DONEHOWER:

22   Q.  Professor Bekaert, do you see the date on this document?

23   A.  It's May 6.

24   Q.  2016, correct?

25   A.  2016, yes.

I7hnrav6                          Bekaert - Redirect

1  Q.  This is another e-mail in which you called Professor Ravina

2  very evil and crazy, right?

3  A.  Correct.

4  Q.  I would like to go over a few of the documents that we saw

5  during your questioning before and a few of those issues.

6          So let's start with Financial Engines.

7          You testified that you could not defend yourself to

8  Financial Engines, correct?

9  A.  I don't recall.

10 Q.  You testified that you were concerned about the e-mails

11 that Professor Ravina was sending that copied Wei Hu and Kenton

12 Hoyem because you couldn't defend yourself?

13 A.  I am not exactly sure what you mean.

14 Q.  Well --

15 A.  Without context I don't really know what you are saying

16 here.

17 Q.  She e-mailed you about research disputes, correct?

18 A.  Um --

19 Q.  I'm sorry.  Let me withdraw it and rephrase it more

20 exactly.

21 A.  Yes.

22 Q.  After July 2014 --

23 A.  Right.

24 Q.  -- Professor Ravina e-mailed you about certain research

25 disputes, and often her e-mails copied Mr. Hu and Mr. Hoyem,

I7hnrav6                          Bekaert - Redirect

1    correct?

2    A.  I would think there was always copying Mr. Hu and

3    Mr. Hoyem.  I mean not always, but mostly, yes.

4    Q.  And you testified that you were concerned that you couldn't

5    defend yourself over those e-mails?

6    A.  Right.  OK.  That's what you mean.  Sorry.  Yeah.

7    Q.  But you did defend yourself, right?

8    A.  I may have at a certain point, yes.

9            MS. DONEHOWER:  Can we please show Plaintiff's Exhibit

10   96, which is in evidence.

11   A.  Right.

12   Q.  You did defend yourself confidentially to Mr. Hu, right?

13   A.  Yes, I did.

14   Q.  That is the e-mail in which in the first paragraph you

15   said, "I know you do not want to 'take sides,' which I resent a

16   bit"?

17   A.  Correct.

18   Q.  You testified that the relationship between you and

19   Professor Ravina and Financial Engines was symmetric, right?

20   A.  Yeah.

21           MS. DONEHOWER:  I would like to mark Plaintiff's

22   Exhibit 109, please.

23           THE WITNESS:  Thanks.

24           MS. DONEHOWER:  I would like to move 109 into

25   evidence, please.

1    THE COURT:  Any objection?

2         MR. HERNSTADT:  Yes, your Honor.  Beyond the scope.

3         THE COURT:  Overruled.  It will be admitted.

4         (Plaintiff's Exhibit 109 received in evidence)

5    BY MS. DONEHOWER:

6    Q.  This is an e-mail exchange between you, Professor Ravina,

7    and also CC'd on here are your Financial Engines coauthors,

8    correct?

9    A.  Correct.

10   Q.  It also copies Vice Dean Horan of Columbia Business School?

11   A.  Yes.

12   Q.  And it also copies Daniel Wolfenzon, who was serving as the

13   relationship manager, right?

14   A.  Correct.

15        MS. DONEHOWER:  Can we please look at the bottom of

16   this page I think it's paragraph 3 of this e-mail, which is the

17   next one.

18        Sorry, Mr. McLeod.  The first page actually, the

19   bottom e-mail.  Thank you.  Second paragraph, second sentence.

20   BY MS. DONEHOWER:

21   Q.  "Moreover, as the senior academic researcher on this team,

22   I want to make sure everything is absolutely correct."  Right?

23   A.  Correct.

24   Q.  And you wrote that "Enrichetta's strategy below did not

25   make much sense."  Right?

1    A.  Correct.

2    Q.  You testified that you did not recall telling Professor

3    Ravina that she needed to clear the e-mails she sent to

4    Financial Engines with you, right?

5    A.  Excuse me.

6    Q.  This morning --

7    A.  Uh-huh.

8    Q.  -- while you were on the stand, you testified that you did

9    not recall telling Professor Ravina that she needed to clear

10   the e-mails she sent to Financial Engines through you?

11   A.  Yes.  I think that's right, but maybe you could give me

12   some context.

13          MS. DONEHOWER:  Well, let's see, please, Plaintiff's

14   Exhibit 26.

15   Q.  Page 1, that bottom e-mail, do you see?

16   A.  Right.

17   Q.  This is an e-mail that you sent on October 18, 2013, right?

18   A.  Correct.

19   Q.  In the second paragraph you wrote, "Seriously I need to see

20   the e-mail you write to Wei before you send it."  Right?

21   A.  Yes.  I --

22   Q.  And Wei referred to Mr. Wei Zhang of Financial Engines?

23   A.  Wei Hu.

24   Q.  Wei Hu, sorry.  Mr. Wei Hu of Financial Engines?

25   A.  Yes, yes, yes, right.

1   Q.   Thank you.  Can we please take a look at -- I want to get

2   some timelines straight here.  You testified that you first

3   learned about Professor Ravina's complaint to the university on

4   July 9, 2014, right?

5   A.   Somewhere around that.

6   Q.   And you testified that that was in a meeting with Dean

7   Glenn Hubbard of Columbia Business School, correct?

8   A.   Correct.

9   Q.   And you testified on Friday that the meeting was not about

10  sexual harassment, right?

11  A.   Correct.

12         MS. DONEHOWER:  Can we please pull up Plaintiff's

13  Exhibit 43.  I apologize.  46.

14  BY MS. DONEHOWER:

15  Q.   So that was the July 9 meeting, and we here see an e-mail

16  that you sent on July 12, right?

17  A.   Correct.

18  Q.   And that's the e-mail in which you say, "I am dealing with

19  this harassment case"?

20  A.   Yes.

21  Q.   This e-mail does not say you were dealing with a research

22  divorce, right?

23  A.   Yes.  It talks about verbal harassment.

24  Q.   Does this e-mail contain the word "verbal"?

25  A.   It doesn't, but that's what I meant.

1    Q.   Thank you, Professor Bekaert.

2              You met with Vice Dean Katherine Phillips on July 15,

3    correct?

4    A.   I don't quite remember.

5    Q.   You met with her in mid-July?

6    A.   I don't -- maybe you can refresh my memory.  I don't

7    remember the meeting.  I may have met with her at some point,

8    but I don't remember.

9              MS. DONEHOWER:  Can we please show and not publish to

10   the jury, because I am not sure it's in evidence, Defense

11   Exhibit DZ.

12   BY MS. DONEHOWER:

13   Q.   If you look just at the top e-mail, does that refresh your

14   recollection, Professor Bekaert, about whether you had a

15   meeting with Vice Dean Phillips on July 15, 2014?

16   A.   Yeah.  I mean, I just -- it's possible.  I don't remember

17   much of this meeting.

18             MS. DONEHOWER:  And can we please pull up Defendants'

19   Exhibit EP, which was admitted into evidence this morning.

20   Q.   Do you remember --

21             MS. DONEHOWER:  Can we take that down for one second,

22   Mr. McLeod.  I believe we are looking at maybe the second page.

23             MR. HERNSTADT:  Starting halfway down the second page.

24             MS. DONEHOWER:  Halfway down the second page, and

25   let's try to avoid showing the e-mails on the top half of the

1    second page.  Thank you.  I think that the e-mail goes on a

2    little bit.  Maybe on the next page.  Thank you very much.

3    BY MS. DONEHOWER:

4    Q.  Do you see the last paragraph here.  This is the e-mail

5    that your counsel showed you this morning where you said, "I do

6    think an effort should be made to let the presentation go

7    through.  This is my far the best chance to promote work among

8    interested scholars, and it indeed it would be terrible to deny

9    Enrichetta this chance."

10               Do you see that?

11   A.  Yes, I do.

12   Q.  Do you see that you sent this e-mail on July 22, 2014?

13   A.  Yes.

14   Q.  That was after you had at least two meetings with Columbia

15   administrators?

16   A.  It's possible.  I can't remember very much about the second

17   meeting.  Maybe there was one meeting with Katie Phillips also

18   present.  I don't know.

19   Q.  So at least one meeting with Columbia administrators?

20   A.  Definitely, for sure.

21               MS. DONEHOWER:  Can we please see -- I'm going to jump

22   to Plaintiff's Exhibit 73.  Can we look at the first e-mail

23   there.

24   BY MS. DONEHOWER:

25   Q.  So that was July 22, 2014.  Now we are looking ahead to

I7hnrav6                        Bekaert - Redirect

1    September 12, 2014, right?

2    A.  Yeah.

3    Q.  And this is the e-mail in which you say in the last

4    paragraph, at the end, "If she goes it alone against my will, I

5    will stop her.  I know every single editor."

6    A.  Yes.

7    Q.  I am going to talk a little bit more about these research

8    disputes.  Your lawyer, when he started out asking you

9    questions, he showed you a number of e-mails, right?

10   A.  What are you referring to, please?

11   Q.  Well, that's fair.  There were a lot of e-mails.

12          MS. DONEHOWER:  If we could please pull up Defendants'

13   Exhibit FM.  And can we hand Professor Bekaert a copy of that.

14   BY MS. DONEHOWER:

15   Q.  Professor Bekaert, if you could please turn to page, I

16   think it's 24 of that exhibit.  There is an e-mail that

17   Professor Ravina sent to you on August 6, 2014, where she says,

18   "I will try to respond briefly."

19   A.  I see.

20          MR. HERNSTADT:  Your Honor, this is not an exhibit

21   that I showed Professor Bekaert today.

22          MS. DONEHOWER:  It was an exhibit you showed him on

23   Friday.

24          MR. HERNSTADT:  OK.

25   BY MS. DONEHOWER:

I7hnrav6                    Bekaert - Redirect

```
 1   Q.  And you answered questions about the research dispute using

 2   this e-mail, correct?

 3   A.  This was last Friday.  I am not so sure, but it's possible.

 4   I have no idea.

 5   Q.  Do you see an e-mail in that packet where you are

 6   forwarding this e-mail to anyone else?

 7   A.  Do you want me to leaf through?

 8   Q.  Yes, please.

 9   A.  Do you know where it is?  It is a lot of pages.  Can you

10   tell me where it is or --

11   Q.  Professor Bekaert, I haven't seen the one where you

12   forwarded her in that packet, but you did in fact forward this

13   e-mail to someone else, right?

14   A.  I wouldn't recall.  I'm sorry.

15            MS. DONEHOWER:  Can we please pull up Plaintiff's

16   Exhibit 61, which is in evidence.  It is on the second -- it

17   must be down a little bit further.

18   A.  Oh, that's what you mean, OK.

19   Q.  Thank you.  We are now on the -- is that the fourth page?

20   The fourth page.

21            Do you see that's the same e-mail --

22   A.  Right.

23   Q.  -- that was in Defense Exhibit FM?

24   A.  Yes.

25   Q.  You forwarded that e-mail -- if we look, if we scan up a
```

I7hnrav6                        Bekaert - Redirect

 1   little bit -- to Marie Hoerova?

 2              MR. HERNSTADT:  Your Honor.

 3              THE COURT:  Yes.

 4              MR. HERNSTADT:  This appears to be the same e-mail

 5   twice.  I am trying to understand FM.

 6              MS. DONEHOWER:  I can explain if your Honor would

 7   like.

 8              THE COURT:  OK.

 9              MS. DONEHOWER:  FM is a version of the document that

10   you introduced on Friday.  There has been another version of

11   that chain of e-mails to someone else that was admitted into

12   evidence as Plaintiff's Exhibit 61, which we have a copy of, if

13   that helps you.

14   BY MS. DONEHOWER:

15   Q.  So this is you forwarding that e-mail to Ms. Marie Hoerova?

16   A.  Correct.

17   Q.  In the second paragraph there, at the end, this is where

18   you say, "Can I just strangle her and get it over with"?

19   A.  Correct.

20   Q.  And there were other times when you were e-mailing with

21   Professor Ravina about research disputes and at the same time

22   thinking about what an evil B she was, right?

23   A.  I -- some of these e-mails were upsetting, yes.

24              MS. DONEHOWER:  Can we please mark Plaintiff's Exhibit

25   74, which is another one that has not yet been admitted into

I7hnrav6                        Bekaert - Redirect

1    evidence, but we seek to admit now.

2              THE COURT:  Thanks.

3              MR. HERNSTADT:  Your Honor, this is beyond the scope.

4    I would like to --

5              THE COURT:  Why don't we have a sidebar.

6              Why don't we take our afternoon break now.

7              Do you want to take our afternoon break?

8              MR. HERNSTADT:  OK.

9              THE COURT:  Ladies and gentlemen, please remember

10   don't discuss the case and keep an open mind.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  All right.  You can all be seated.

3            First of all, was FM admitted.

4            MS. DONEHOWER:  Yes, it was, on Friday.

5            THE COURT:  On Friday?

6            MS. DONEHOWER:  Yes.

7            THE COURT:  All right.

8            So tell me, Mr. Hernstadt, you said it's beyond the

9    scope.

10           MR. HERNSTADT:  Your Honor, this e-mail gets into an

11   area that the plaintiffs did not touch upon in their direct and

12   I didn't touch upon in -- or in their cross, and I didn't raise

13   it either, which is an issue that took place in September where

14   Professor Ravina presented the automatic enrollment paper at a

15   conference, and one of the scholars whose work was being

16   commented on in that paper pointed out that there was a very

17   serious defect with the paper.

18           There is an e-mail from that professor that starts on

19   page 2 that points that out and then a back and forth where

20   Professor Ravina responds to the professor in question and then

21   copies everybody, including Dean Hubbard, and it becomes an

22   issue.  Professor Bekaert is complaining here to his girlfriend

23   that she's done this.

24           The problem is that there's an entire underlying -- it

25   opens the door to just an immense amount of information about

1    what was wrong with the automatic enrollment paper, what was

2    wrong with the data, you know, when did people know about it,

3    why does this become an issue.  So this is a whole new sort of

4    area that was not investigated at all.

5            MS. DONEHOWER:  If I may, your Honor?

6            THE COURT:  Yes.

7            MS. DONEHOWER:  It was Professor Bekaert's testimony

8    on his cross-examination that he did not delay this paper --

9    specifically, automatic enrollment he talked about -- or any

10   other because of his feelings and his upsetness at Professor

11   Ravina's protected action.

12           I think that this e-mail -- I am not going to spend

13   much time on this because I know the jurors have already seen a

14   lot of it -- but I think this e-mail among others shows that

15   while he's having what he characterized as mere research

16   disputes, he is actually very, very angry with her and he is

17   engaged in a campaign which we've shown through another e-mails

18   where he decided that he was going to act over the hill

19   professional while at the same time showing things down.

20           Not only that, but if you see the very top of this

21   e-mail he's talking about what he's going to communicate and

22   whether he should communicate with a professor at the Harvard

23   Kennedy School about his dispute with Professor Ravina.

24           I have no interest in publishing or going into the

25   details of potential problems with the automatic enrollment

1  paper, so I'm happy to redact parts about that, if that

2  satisfies Mr. Hernstadt's concern.

3          MR. HERNSTADT:  Your Honor, that would be prejudicial,

4  because his response is a direct reaction to Professor Ravina's

5  decision to publish to at least this professor, first of all, a

6  sort of criticism of Professor Bekaert; and, second of all,

7  that the dean of the Columbia Business School is being copied

8  on their e-mails.

9          That's what he's reacting to.  So you can't put this

10  in just in isolation without giving him an opportunity to

11  explain what is going on here.

12          Moreover, this wasn't put in in direct.  We could have

13  had this discussion on Friday and dealt with it.  This is

14  something new.  It is a new dispute.  It is a new issue.  It

15  contains some of the same words, which I guess is why they want

16  it in.  But without his being able to respond to that, it's

17  completely unfair and prejudicial.

18          THE COURT:  First of all, if I did allow it in, I

19  would let you ask any questions you want to clarify.

20          Did you also have an objection?

21          MS. PLEVAN:  No, I just want point out the only e-mail

22  is the one at the top, to his girlfriend.  At least as I see

23  this exhibit --

24          MS. DONEHOWER:  There is another e-mail, it's kind of

25  hard to see, on the same page from Professor Bekaert also with

1  Marie Hoerova.

2          MR. HERNSTADT:  Right.  He forwards the e-mail that

3  Professor Ravina sent to Dean Hubbard and him and the other

4  professor in question, and then they have a conversation about

5  it because he's very upset at what has just happened.

6          But, your Honor, you know, I think at this point,

7  after a day of direct and cross, to bring in something new is

8  improper.

9          THE COURT:  Let me think about it and we'll take a

10  break and let you know.

11          Did you want to say just one final thing?

12          MS. DONEHOWER:  I think we should have the opportunity

13  to respond to the points that Mr. Hernstadt raised on his

14  cross, which was this was an innocuous research dispute that

15  led to no delays and that was unrelated to Professor Ravina's

16  protected action.

17          I think we should have the opportunity to respond to

18  that.  I'm not trying to rehash old evidence, I understand that

19  your Honor asked us not to, so I am trying -- I can use

20  something we've already introduced into evidence as well.

21          MR. HERNSTADT:  Your Honor, that is not accurate.  The

22  innocuous, if you would -- I don't know if that word was used,

23  but the normal research dispute that Professor Bekaert was

24  talking about was regarding the international diversification

25  paper in May and June of 2013, where he said she wanted a much

1  more focused, he wanted a more general paper, and that that was

2  one of the reasons why it took a little while to get going.

3        MS. DONEHOWER:  He also testified at length about the

4  automatic enrollment paper, which is what this one concerns.

5        THE COURT:  Let me think about it, and we'll come back

6  in a few minutes and I'll let you know.

7        MS. DONEHOWER:  Thank you, your Honor.

8        (Recess)

9        THE COURT:  Everyone can be seated.  I am going to

10  allow in 74.  I think it's proper redirect.

11        Then, Mr. Hernstadt, if you want to go into this issue

12  on recross, you can do so.  So we are going to bring the jury

13  in.

14        Let's keep it short, though, OK?

15        MS. DONEHOWER:  Yes.

16        THE COURT:  I'm really hoping we can finish Professor

17  Bekaert's testimony today by 5.

18        MS. DONEHOWER:  I don't think that will be a problem.

19        MS. PLEVAN:  Dean Hubbard is here actually.

20        THE COURT:  He is.  We finish early.  Today we have to

21  leave at 5.

22        (Continued on next page)

23

24

25

1        (Jury present)

2        THE COURT:  Everyone can be seated.

3        You may proceed.

4        MS. DONEHOWER:  Thank you, your Honor.

5        Can we please show the witness Plaintiff's Exhibit 61

6   BY MS. DONEHOWER:

7   Q.  This is an e-mail you wrote, correct, Professor Bekaert?

8   A.  Correct.

9   Q.  You wrote this e-mail in August 6, 2014?

10  A.  Correct.

11  Q.  You wrote in that first line, third sentence, I will be

12  over the hill professional with her."  Right?

13  A.  Correct.

14  Q.  By "her" you were referring to Professor Ravina?

15  A.  Correct.

16       MS. DONEHOWER:  Can we please show what's been

17  admitted into evidence as Exhibit 74.

18  BY MS. DONEHOWER:

19  Q.  If you see the e-mail at the bottom of the second page,

20  that's an e-mail from Brigitte Madrian, right?

21  A.  Correct.

22  Q.  She is a professor at the Harvard Kennedy School?

23  A.  She is.

24  Q.  And she was discussing some concerns she raised about one

25  of your papers on automatic enrollment?

I7hnrav6                        Bekaert - Redirect

1    A.  Correct.

2    Q.  If we look back, we see that you sent an e-mail to her and

3    then Professor Ravina also sent an e-mail to her, both of you

4    copying Dean Glenn Hubbard?

5    A.  Correct.

6    Q.  And then on September 15, 2014 -- I'm sorry.  Let me back

7    up.  Those e-mails that you exchanged with Professor Ravina and

8    Professor Madrian concerned the automatic enrollment paper?

9    A.  They did, yes.

10   Q.  And then you forwarded the e-mail to Marie Hoerova on

11   September 15, 2014, right?

12   A.  Correct.

13   Q.  And can you please read what you wrote to her?

14   A.  "Evil bitch in action.  I am now sending all the other

15   e-mails.  I've had it."

16        MS. DONEHOWER:  If we could please look at Defense

17   Exhibit BY.  I'm sorry.  B as in boy.

18   BY MS. DONEHOWER:

19   Q.  You testified this morning about a skeleton of a paper that

20   Professor Ravina had given to you, correct?

21   A.  Correct.

22   Q.  And you said that you got it so late that at that point you

23   could not put together a draft?

24   A.  Correct.

25   Q.  And in the first line of this e-mail from Professor Ravina

I7hnrav6                    Bekaert - Redirect

1   to you she writes that this is actually the updated plan for

2   the automatic enrollment paper, right?

3   A.  Correct.

4   Q.  But we saw --

5           MS. DONEHOWER:  Can we please pull up Defense Exhibit

6   CU.

7   Q.  This is an e-mail, if we look at the bottom e-mail on this

8   page, you discussed this e-mail earlier today, you testified

9   about it earlier today, correct?

10  A.  I did.

11  Q.  And you testified about this line that Professor Ravina

12  wrote, "It was a mistake to work so much on this 401(k) crap."

13          Right?

14  A.  Correct.

15  Q.  You testified that it was unusual for Professor Ravina to

16  have said something like that, it surprised you, right?

17  A.  Yeah.

18  Q.  This e-mail was written by Professor Ravina on March 6,

19  2014, right?

20  A.  Correct.

21  Q.  But she had for months at least been expressing concerns

22  about delays in the research projects, right?

23  A.  I don't know.  Maybe you should refresh my memory.  I mean,

24  I don't remember.  It's possible.

25          MS. DONEHOWER:  Let's please look at Plaintiff's

I7hnrav6                          Bekaert - Redirect

1    Exhibit 23, which is not yet in evidence, so let's just mark

2    it, please, and seek to admit it.

3              That's tab 20.

4              THE COURT:  Any objection to 23?

5              MR. HERNSTADT:  No, your Honor.

6              THE COURT:  23 will be admitted.

7              (Plaintiff's Exhibit 23 received in evidence)

8    BY MS. DONEHOWER:

9    Q.  So we were just talking about an e-mail from March 2014,

10   and now we are looking at an e-mail from October 2013, right?

11   A.  Yes.

12   Q.  You see the bottom e-mail here is from you to Professor

13   Ravina, correct?

14   A.  Correct.

15   Q.  You are thanking her for having dinner with you?

16   A.  That's what it says, yes.

17   Q.  If we look at the e-mail that Professor Ravina sent you in

18   response, this e-mail is dated October 1, 2013, right?

19   A.  Correct.

20   Q.  Professor Ravina wrote, "BTW, I have thought about it, and

21   since there was no progress on our papers in the past two

22   years," she says, "can you spend more time on them now?"

23              Right?

24   A.  She says that, yes.

25              MS. DONEHOWER:  Can we please look at Defense Exhibit

1   BA, which was admitted into evidence this morning.  If we could

2   please blow up these top two e-mails.

3   BY MS. DONEHOWER:

4   Q.  You see the date on these e-mails is November 19, 2012,

5   correct?

6   A.  Correct.

7   Q.  And Professor Ravina is asking you to make progress with no

8   time constraint, correct?

9   A.  "Under the no time constraint," yes.

10  Q.  And you responded to her that you were not sure you would

11  manage to do anything in the next three weeks?

12  A.  That's correct.

13  Q.  You testified this morning that you couldn't understand why

14  Professor Ravina had made a complaint about your behavior to

15  Columbia Business School in July -- spring 2014, correct?

16  A.  Well, yeah, I was very surprised about that.

17  Q.  I think the word you used was flabbergasted?

18  A.  Uh-huh.

19  Q.  Let's talk about a few of the things that happened in the

20  spring of 2014.  It was in March 2014 that you called Professor

21  Ravina crazy, right?

22  A.  Um, it's probably that it was in one of these e-mails.  I

23  don't know -- I don't recollect the exact e-mail.

24          MS. DONEHOWER:  Can we please bring up Plaintiff's

25  Exhibit 34, page 2, top e-mail.

1           MR. HERNSTADT:  Is this in evidence?

2           MS. DONEHOWER:  Yes, this is in evidence.

3    BY MS. DONEHOWER:

4    Q.  Do you see that you wrote in the parenthetical statement "I

5    am not sure who is crazier, you or Nancy"?

6    A.  Yes, I do.

7    Q.  And you wrote that on March 6, 2014?

8    A.  Yes.

9    Q.  This is the same e-mail in which you told Professor Ravina

10   that "doing the 401(k) stuff may be the best NPV decision you

11   ever took."  Right?

12   A.  Correct.

13   Q.  And it was in April 2014 that you wrote to Professor Ravina

14   that it seemed like she had a masochistic desire to not be

15   productive?

16   A.  Yes.  I think I remember that was in one of those e-mails

17   that we discussed before.

18   Q.  And it was in April of 2014 that Professor Ravina

19   communicated to you the need to reevaluate your working

20   relationship?

21   A.  Yes.  I'm -- just the timing is unclear to me.

22          MS. DONEHOWER:  Can we please pull up Plaintiff's

23   Exhibit 35, page 2, the middle e-mail.

24   BY MS. DONEHOWER:

25   Q.  Having reviewed this document, Professor Bekaert, does this

1  refresh your recollection that it was in April 2014 that she

2  communicated to you the need to reevaluate your working

3  relationship?

4  A.  Yes.

5  Q.  And she asked to be treated professionally and respectfully

6  and correctly?

7  A.  Correct.

8  Q.  It was in April 2014 that you responded to this request by

9  saying that you would bring a whip to a meeting?

10  A.  I don't know if that's, that e-mail was in direct response

11  to this one.  I am not sure.

12         MS. DONEHOWER:  Let's go to the e-mail in direct

13  response to this one, please.

14  Q.  That was your direct response to her e-mail, right, that

15  you would bring a whip to the next meeting?

16  A.  OK.

17  Q.  And it was in May 2014 that you said to Professor Ravina,

18  "You fix it or I am going to have to take drastic action"?

19  A.  Um, yeah -- could you -- um, I know that I wrote this

20  because it's one of the e-mails that I really regret writing,

21  but I don't know exactly, the exact timing.

22         MS. DONEHOWER:  Can you please bring up Plaintiff's

23  Exhibit 36, the top e-mail.

24         If you could please, Mr. McLeod, highlight the second

25  line, that last sentence on the second line.

I7hnrav6                          Bekaert - Redirect

1   BY MS. DONEHOWER:

2   Q.  Professor Bekaert, you threatened Professor Ravina with

3   drastic action on May 6, 2014, correct?

4   A.  I wrote, "I'm going to have to take very drastic action."

5   Q.  And this was in regard to the RA issue, right?

6   A.  Correct.

7              MS. DONEHOWER:  I would like to mark -- let's start

8   with Defendants' Exhibit CX, please, which was admitted into

9   evidence, yes, this morning.  Thank you.

10  BY MS. DONEHOWER:

11  Q.  We looked at this set of e-mails about the RA issue this

12  morning, correct, Professor Bekaert?

13  A.  Um, I believe so, yes.

14  Q.  You testified that there was a March 30 deadline for this

15  paper?

16  A.  Um, yeah, I recall something like that.

17  Q.  Can we please look at page 3 of this document.

18  A.  I mean not the deadline for the paper.  That's probably

19  some conference submission deadline.

20  Q.  My mistake.  You testified that there was a March 30

21  deadline for submission to a conference?

22  A.  I sus -- I guess that's right.

23  Q.  OK.  In the first full e-mail on the page, which was sent

24  on March 24, 2014, you wrote, "We got no RA"?

25  A.  Yeah.

1   Q.  Because you thought that you needed an RA?

2   A.  Yes.

3   Q.  And you sent this e-mail on March 24, 2014?

4   A.  Correct.

5   Q.  Six days before the deadline?

6   A.  Correct.

7   Q.  When you hire an RA, you typically have to train them,

8   correct?

9   A.  That's right.

10  Q.  You typically have to check their work?

11  A.  Right.  Losing RAs is very, very costly.

12  Q.  And you testified this morning that Professor Ravina never

13  explained how this would get done with no RA, right?

14  A.  I didn't say never.  She eventually did.

15  Q.  But not until months later is what you testified?

16  A.  That's right.

17          MS. DONEHOWER:  Can we please look at the bottom of

18  page 2.

19  Q.  This is an e-mail in direct response to the one we just

20  looked at, right?

21  A.  Yeah.

22  Q.  And in this e-mail Professor Ravina wrote to you:  "The

23  discontinuity analysis will take a while without an AR, but we

24  have an instrument to try out for the selection of firms.  The

25  ERISA rule change in 2006.  That should be doable."  Right?

I7hnrav6                        Bekaert – Redirect

1   A.  I see that, yes.

2   Q.  And you have testified this morning that Professor Ravina

3   had cancelled a meeting with an RA without notifying you?

4   A.  Yes.

5          MS. DONEHOWER:  I would like to mark, please,

6   Plaintiff's Exhibit 264.  And, Mr. McLeod, if we can try to

7   redact the name on the bottom e-mail.

8          THE COURT:  Any objection?

9          MR. HERNSTADT:  Give me one second, your Honor,

10  please.

11         THE COURT:  Sure.

12         MR. HERNSTADT:  No objection.

13         THE COURT:  All right.  264 will be admitted.

14         (Plaintiff's Exhibit 264 received in evidence)

15  BY MS. DONEHOWER:

16  Q.  If you see the bottom e-mail on this page, Professor

17  Bekaert.

18  A.  Yes.

19  Q.  This is the e-mail from the aspiring research assistant?

20  A.  Correct.

21  Q.  And if we could please go up to the e-mail above that.

22  A.  Yeah.

23         MS. DONEHOWER:  There is actually one in between that

24  one and the other one.  It's tiny.

25         Thank you.

I7hnrav6                     Bekaert - Redirect

1  BY MS. DONEHOWER:

2  Q.  Do you see what you wrote in response to his e-mail,

3  Professor Bekaert?

4  A.  Correct.

5  Q.  You wrote, "We do not need anyone right now," right?

6  A.  Correct.

7  Q.  And Professor Ravina responded to you, right?

8  A.  Correct.

9  Q.  She wrote, "We do need someone now," correct?

10  A.  Yes.

11  Q.  She asked, "Can we meet him on Saturday," correct?

12  A.  Yes.

13  Q.  That's the meeting that you were referring to earlier

14  today?

15  A.  Indeed, yes.

16  Q.  You responded to Professor Ravina's e-mail, correct?

17  A.  Yes.

18  Q.  At the top of the page you wrote, "We cannot take a random

19  guy.  We need to get more information."  Right?

20  A.  Yes.

21  Q.  I am going to turn now to a few questions about this EOAA

22  investigation, the prior EOAA investigation into your conduct,

23  the one that took place just before the one, the complaint made

24  by Professor Ravina.

25          Director Dunn investigated you about that student

I7hnrav6                        Bekaert - Redirect

1    complaint, correct?

2    A.  Yes.

3    Q.  The allegation was that in class you had said something

4    along the lines of Hong Kong, where the ladies are nice?

5    A.  Yes.

6    Q.  You testified this morning that you told Director Dunn that

7    you did not make that comment?

8    A.  Um, yes.

9    Q.  You heard Director Dunn testify yesterday that in fact you

10   never told him whether you said it or not, correct?

11   A.  I heard him testify that, yes.

12   Q.  You've also seen his outcome letter?

13   A.  Yes.

14   Q.  In the outcome letter he also says that you never confirmed

15   to him whether you said it or not?

16   A.  Correct.

17   Q.  You testified this morning that you have problems with

18   e-mail communication, right?

19   A.  I may have said that, yes.

20   Q.  Columbia sent you to a training to improve your

21   communications, right?

22   A.  They did.

23   Q.  Did it work?

24           MR. HERNSTADT:  Objection, your Honor.

25           THE COURT:  Yeah.  Sustained.

1    BY MS. DONEHOWER:

2    Q.  Before Columbia's training you told Professor Shumi Akter

3    that Professor Ravina had gone berserk, correct?

4    A.  Um, is that in one of those e-mails that we looked at

5    before?

6    Q.  If you don't remember, then we can show you what's in

7    evidence as Plaintiff's Exhibit 60, please.

8          MS. DONEHOWER:  Page 2, that middle e-mail, I believe.

9          Yeah.  The one that starts 3 August 2014, 11 o'clock.

10   A.  I don't see it.

11   Q.  You sent this e-mail before Columbia's training, right?

12   A.  I don't see it.  I'm sorry.

13         MS. DONEHOWER:  I think we have some technical

14   difficulties.

15         Professor Bekaert's screen is out.

16         THE WITNESS:  Yeah, I don't see anything.

17         THE COURT:  Are your screens working?

18         JURORS:  Yes.

19         THE DEPUTY CLERK:  Is it black?

20         THE WITNESS:  It's completely black, and I didn't do

21   anything.

22         MR. HERNSTADT:  Your Honor?

23         THE COURT:  Yes.

24         MR. HERNSTADT:  All of this is beyond the scope.

25         THE COURT:  I will allow it, but I really want you to

I7hnrav6                          Bekaert - Redirect

1    move on.

2              MS. DONEHOWER:  No problem, your Honor.  I will jump

3    ahead and just ask a few questions.

4              (Continued on next page)

1    　　　　MS. DONEHOWER:  So if we could just please go to

2    Tab 13, or let's do Tab 7, Plaintiff's Exhibit 127.

3    　　　　And I can ask Professor Bekaert first if he remembers.

4    That may speed things up.

5    BY MS. DONEHOWER:

6    Q.  Do you remember, Professor Bekaert, that it was after

7    Columbia's training that you wrote that Professor --

8    　　　　MR. HERNSTADT:  Objection, your Honor.

9    　　　　THE COURT:  Sorry?

10   　　　　MR. HERNSTADT:  Well, I'm sorry.

11   　　　　THE COURT:  I'm sorry.  I don't know what the

12   objection is.

13   　　　　MR. HERNSTADT:  It's beyond the scope.  Training was

14   never discussed in the direct.

15   　　　　THE COURT:  You know, I'll allow it.

16   　　　　MS. DONEHOWER:  Thank you.

17   BY MS. DONEHOWER:

18   Q.  Do you recall that after Columbia's training you continued

19   to refer to Professor Ravina as an "evil B"?

20   A.  I did not recall that.  It's in this email.  It's dated

21   January 26, 2016.

22   Q.  That was after Columbia's training, correct?

23   A.  It was.

24   Q.  And do you recall that after Columbia's training you wrote

25   over and over again that Professor Ravina was very crazy and

I7h1rav7                          Bekaert - Redirect

1    sick?

2    A.  You mean in the same email?

3    Q.  No.  Other emails, Professor Bekaert.

4    A.  I'm not sure what you're referring to, but this is again an

5    email with a -- with a private -- it's a private email

6    conversation with a friend.

7          MS. DONEHOWER:  Can we please look at Plaintiff's

8    Exhibit 67.

9    Q.  You testified about this particular email with your lawyer,

10   correct?

11   A.  I -- I don't see anything, so I'm sorry.

12         MS. DONEHOWER:  Oh.  Do we have 67, a hard copy?  Can

13   we pull it up on a computer.

14         Your Honor, can we approach the witness with a

15   computer that shows this particular exhibit.  This is something

16   that he testified about this morning.

17         THE COURT:  We're not going to get into anything

18   regarding the lawyer, right?

19         MS. DONEHOWER:  No.

20         THE COURT:  Okay.  Is there still an objection?

21         MR. HERNSTADT:  I -- I have to --

22         THE COURT:  A scope objection?

23         MR. HERNSTADT:  I have to see the email.

24         No, your Honor.

25         THE COURT:  Okay.  All right.  You may proceed.  It

I7h1rav7                          Bekaert - Redirect

1    will be admitted.

2              MR. HERNSTADT:  Excuse me, your Honor.

3              MS. DONEHOWER:  It's already admitted.  This was

4    examined on --

5              THE COURT:  Okay.

6              MR. HERNSTADT:  This was admitted on Friday and then I

7    asked him about it today.

8              THE COURT:  I thought you were making a scope

9    objection.

10             MR. HERNSTADT:  No, that was --

11             MS. DONEHOWER:  I moved on.  I'm sorry.  Yeah.

12             MR. HERNSTADT:  I didn't have an objection on this.

13             THE COURT:  Okay.  So let's keep moving.

14             MS. DONEHOWER:  Would you mind us showing the witness

15   on a computer because we're having --

16             THE COURT:  That's fine.

17             MS. DONEHOWER:  Okay.  Thank you.

18   BY MS. DONEHOWER:

19   Q.  Professor Bekaert, do you see, three lines from the bottom

20   of this page, you testified today that this email was more

21   measured than some of your other emails about Professor Ravina,

22   right?

23   A.  Which one is this?  I don't even know.

24   Q.  This is an email that you sent to Marie Bluett.

25   A.  Okay.

I7h1rav7                           Bekaert - Redirect

1    Q.  Do you recall that?

2    A.  Right.

3    Q.  And you testified today that this was more measured than

4    some of your other emails?

5    A.  Yeah, but I only saw the first part, so --

6    Q.  Do you see where you call her an "incredible mean B"?

7    A.  Okay.  Yeah, I see that now.  Yes.

8    Q.  You testified that Ms. Bluett is not in the profession,

9    right?

10   A.  She's not.

11   Q.  And by in the profession, you meant in the academic field

12   of finance and economics?

13   A.  Correct.

14   Q.  And let me just go up a little bit to the second line here.

15           You also wrote, "What is interesting is that I think

16   she is becoming so mean and off base that it must be shining

17   through to independent observers like the dean," right?

18   A.  Yes, correct.

19   Q.  Then you wrote, "I just have to spend enormous amounts of

20   time replying to her in the most neutral way possible.  You can

21   imagine what a hard time I'm having with that."  Right?

22   A.  Correct.

23   Q.  You wrote, "I would even in normal -- I would even in

24   normal circumstances, but now writing something bland and

25   neutral while I am thinking what an incredible mean [B] she is

I7h1rav7                          Bekaert - Redirect

1    is torture."

2    A.   Correct.

3    Q.   And you testified that Marie Bluett is not in the

4    profession, and by the profession, you meant the academic field

5    of finance and economics, correct?

6    A.   Yes.

7    Q.   But Shumi Akhtar is in the profession?

8    A.   Yes, she is.  She's a professor in Australia, as I said.

9    Q.   Yuhang Xing is in the profession?

10   A.   Yuhang Xing, that email was after the media campaign.

11   Q.   My question, Professor Bekaert, is:  Is Yuhang Xing in the

12   profession?

13   A.   Yes, she is.

14   Q.   Is George Panayatov in the profession?

15   A.   Yes, sir.

16   Q.   Is Angela Ng in the profession?

17   A.   She might not be anymore, but --

18   Q.   At the time that you sent her an email, she was in the

19   profession, right?

20   A.   I think she became an administrator.

21   Q.   In finance and economics school?

22   A.   Actually not sure.

23   Q.   Rudi Vander Vennet is in the profession?

24   A.   Yes.

25   Q.   Ben Jacobsen is in the profession?

I7h1rav7                          Bekaert - Redirect

1    A.  He's a professor.

2    Q.  Cam Harvey is in the profession?

3    A.  Yes.  And they're also old friends.

4          MS. DONEHOWER:  Let me go through -- thank you -- a

5    few of the other emails that we saw this morning quickly.

6          Defendant's Exhibit FM, please.

7          THE WITNESS:  I don't see anything.

8          MR. HERNSTADT:  Your Honor, we have a hard copy for

9    the witness.

10          THE COURT:  Okay.  Yeah, do you want to give him the

11   hard copy or continue to bring the laptop up.

12          MS. DONEHOWER:  Sure.  Yes, your Honor.

13          If we could please look at page 2 of this document.

14   BY MS. DONEHOWER:

15   Q.  Do you see that the third email down there is from you to

16   Professor Ravina, right?

17   A.  The second page of this?

18          Oh, it's back up.

19   Q.  Yes.

20          THE COURT:  Thank you.

21   Q.  Do you see that email?

22   A.  Yes, I do.

23   Q.  That is the email you were sending to Professor Ravina, but

24   the text is an email to someone you had written to named Steve,

25   right?

1   A.  Correct.

2   Q.  And this is Steve Zeldes?

3   A.  Yes, it is.

4   Q.  He's the division chair of the finance and economics

5   department at Columbia Business School?

6   A.  He was at one point.  I'm not sure whether he was then, but

7   he later became the division chair.  I'm not sure.

8   Q.  At the time that Professor Ravina made her complaint to

9   Columbia University he was the division chair, correct?

10  A.  Yes, in the fall of 2014, he would have been, yes.

11  Q.  And you were asking Professor Zeldes here about a paper

12  that she wrote that was not published, right?

13  A.  Correct.

14  Q.  If you go up to the email just above that, Professor Ravina

15  wrote to you that she would try to do damage control, right?

16  A.  Yes.

17  Q.  You wrote that you thought you had been super nice,

18  correct?

19  A.  Yup.

20  Q.  And Professor Ravina wrote just above that that she

21  couldn't believe you had put her name in that message?

22  A.  Correct.

23          MS. DONEHOWER:  If we can look very quickly at Defense

24  Exhibit SK.

25  Q.  This is another email we looked at this morning, correct?

I7h1rav7                          Bekaert - Redirect

1  A.  Correct.  I now recognize it.

2  Q.  If you could please look at that, on the first page, the

3  email from you on May 3, 2013.  You wrote, in the first

4  paragraph, "You could perhaps fault me for not doing enough on

5  the project," right?

6  A.  Yup.

7  Q.  You wrote, "I have been swamped and will be again next

8  week.  Travel to Shanghai and Singapore, three lectures, one

9  seminar talk, two talks, completely new.  Yes, I am an idiot."

10 Right?

11 A.  Yeah.

12 Q.  And when Professor Ravina responded to you and said, "Yes,

13 you are an idiot," she was referencing your comment below,

14 right?

15 A.  Yes, she was.

16 Q.  About how you were too busy to work on the projects?

17 A.  Correct.

18 Q.  You testified this morning that when you met with Dean

19 Hubbard, you immediately agreed that you would have no part in

20 Professor Ravina's tenure case, correct?

21 A.  That's my recollection.  It could have been later, but I

22 was immediately ready to not -- to be not part of the tenure --

23 her tenure case.

24 Q.  But you also sent an email to all the senior faculty of

25 Columbia Business School two days before her final tenure vote?

I7h1rav7                          Bekaert - Redirect

1    A.  I -- I don't recall, but it's possible.

2              MS. DONEHOWER:  If I can mark Defense Exhibit QJ,

3    please.

4              We're seeking to move this into evidence.

5              MS. PLEVAN:  Objection.

6              MR. HERNSTADT:  Objection.

7              It's after the tenure vote.

8              MS. DONEHOWER:  I can explain, your Honor.

9              THE COURT:  All right.  Why don't we meet briefly at

10   sidebar.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (At the sidebar)

2            MS. PLEVAN:  This is after the tenure vote.

3            MS. DONEHOWER:  There are multiple phases to the

4   tenure vote.

5            MS. PLEVAN:  I can't hear you.

6            MS. DONEHOWER:  Sorry.  There's multiple phases to the

7   tenure vote.  There's an initial tenure vote, it's in the

8   committee, I believe --

9            MS. PLEVAN:  That's not a tenure vote.

10            MS. DONEHOWER:  -- and then there's a second vote by

11   the promotion and tenure committee, which happened on

12   April 20th.

13            THE COURT:  The procedural review we talked about the

14   other day?

15            MS. PLEVAN:  It's not even a vote and certainly not a

16   vote on the merits.

17            MR. HERNSTADT:  The April 14th is the one that the

18   faculty voted on tenure, and that was the unanimous one.

19            MS. FISCHER:  April 14th.

20            MS. DONEHOWER:  But her tenure prospects are still

21   live before there's a overview process.  So this is the point

22   at which Professor Bekaert slams the door on her tenure

23   prospects.  That's a review process.  It's still possible there

24   were some irregularities, and he is sending this to all the

25   senior faculty before that review happens.

1           THE COURT:  I'll let this in, but what I don't want

2      you to do is refer to it as the tenure vote, if it wasn't a

3      tenure vote.  I want you to refer to the exact names of

4      whatever the meeting was.

5           MS. DONEHOWER:  I'll put the meeting of the promotion

6      and tenure committee regarding Professor Ravina's --

7           MR. HERNSTADT:  Your Honor --

8           MS. PLEVAN:  No.  Well, no, it's not.

9           MS. DONEHOWER:  I'm working on it.  Help me.

10          MS. PLEVAN:  Well --

11          MR. HERNSTADT:  I'd like her to clarify, because he

12     doesn't know what any of these are because he --

13          MS. DONEHOWER:  He already saw all of the calendar

14     invites.

15          MS. FISCHER:  He certainly wouldn't have had a

16     calendar invite for the P&T.

17          MR. HERNSTADT:  He said he didn't pay attention to any

18     of that.  He has no clue on any of this.  She needs to clarify

19     that this was after the tenure vote.  It's not sufficient for

20     her in the future to say that.  The jury's heard that.  The

21     tenure vote is the division vote and it's the only thing that

22     is the vote, and that happened --

23          MS. DONEHOWER:  Before the meeting about Professor

24     Ravina's tenure by the promotion and tenure committee.

25          MS. FISCHER:  There isn't any evidence he has any

I7h1rav7                        Bekaert - Redirect

 1   knowledge of that.

 2            MS. DONEHOWER:  I can't disprove that he knew it.  I

 3   know he was sent the calendar and I know --

 4            MS. PLEVAN:  No, no.  He got no invitation.

 5            MS. DONEHOWER:  If we look at Plaintiff's Exhibit 164,

 6   we see Professor Bekaert saying that if something is sent to

 7   the entire senior faculty, he'll find out about it.

 8            MS. PLEVAN:  But it wouldn't be sent to the entire

 9   senior faculty.  It was a group of ten people.

10            MS. FISCHER:  Do you know what the promotion and

11   tenure committee is?

12            MS. DONEHOWER:  Yes.

13            MS. PLEVAN:  Well, he was not on it.

14            MS. DONEHOWER:  But he's aware --

15            MS. PLEVAN:  No, he wouldn't have been aware.

16            MS. FISCHER:  That's very misleading.

17            MS. PLEVAN:  He wouldn't have been aware of the

18   meeting.

19            THE COURT:  If you don't have a good-faith basis for

20   connecting this up, you can ask him about this and the date on

21   which it was sent, and then through the proper witness, you can

22   ask about what these different meetings were from someone who

23   knows, but I don't want you to mislead the jury if you don't

24   have a good-faith basis.

25            MS. DONEHOWER:  Understood.  I'll just ask about the

I7h1rav7                        Bekaert - Redirect

 1 | dates.

 2 |         MR. HERNSTADT:  Your Honor, can we get a clarification

 3 | that the tenure vote was on the 14th, four days before this

 4 | email.

 5 |         THE COURT:  Who do you want to clarify that?

 6 |         MS. FISCHER:  There was no vote --

 7 |         MS. PLEVAN:  The only vote that took place on the

 8 | merits, the only one.

 9 |         MS. DONEHOWER:  But there's still the review process,

10 | which is part of the same tenure process.

11 |         MS. PLEVAN:  No, it's not a tenure vote.

12 |         MS. DONEHOWER:  I understand -- I understand the

13 | distinction between the division tenure vote and the promotion

14 | and tenure committee review.

15 |         MR. HERNSTADT:  That's not a vote.

16 |         MS. PLEVAN:  You don't understand, because you've been

17 | stating here that he would have known about it, and there's no

18 | way he knew about that meeting.

19 |         MS. DONEHOWER:  No, I'm not saying that he necessarily

20 | knew about it --

21 |         THE COURT:  Just don't tie it to the tenure vote.  You

22 | can ask him a question about if he had this, you can ask the

23 | date, and through a witness who knows the difference between

24 | what the meetings were, you can ask about what those different

25 | meetings are.

1           MS. DONEHOWER:  Understood.  Thank you, your Honor.

2           MR. HERNSTADT:  Your Honor, I'd like, one, either

3    herself or her co-counsel to say that the tenure vote was four

4    days before, because I can't get that from him because he

5    doesn't know when it was.  So I can't clear that up on cross.

6    But the jury has heard the question that said it was before the

7    tenure vote.

8           THE COURT:  Do you have a problem if I ask him, "Do

9    you know when the tenure vote was?"  Will he say no?

10          MR. HERNSTADT:  Yes, I do have a problem, because

11   that's already in their head and I can't clear that up.  I

12   can't show that this email is four days after the tenure vote.

13          THE COURT:  But you can through a different witness,

14   right?

15          MR. HERNSTADT:  Days from now.  But there's prejudice

16   in that.  Particularly since counsel knows this.  This is not

17   the first time we've addressed this.  We've addressed this

18   issue before.

19          MS. DONEHOWER:  We have email where he's asking Kathy

20   Phillips about the tenure vote.  But I'll just ask about the

21   date.

22          THE COURT:  You can ask about the date.

23          I'm going to strike the question and then if you want

24   me to say we'll hear from another witness about the timing of

25   other events, the timing of the tenure vote, if you want me to

1    say that -- I can't testify myself.

2              MR. HERNSTADT:  No, I understand that, but I think

3    counsel has to do it, because she has now told the jury that

4    this is after the tenure vote.  And how do you undo that?  How

5    do you unring that bell?  I don't want to have to wait two or

6    three days with some other witness who has nothing to do with

7    Professor Bekaert.

8              THE COURT:  Can you stipulate to when the tenure vote

9    was?

10             MS. PLEVAN:  I would have thought so.  It was the 14th

11   of April.

12             MS. DONEHOWER:  We can stipulate that the divisional

13   tenure vote was on the 14th.

14             MS. PLEVAN:  It's the only tenure vote.  It's

15   misleading to call it --

16             MR. HERNSTADT:  The division tenure vote of the

17   faculty, April 14th.

18             MS. DONEHOWER:  But I think that if we're going to

19   make this clarification, we should also clarify that there was

20   an additional meeting of the promotion and tenure committee

21   that --

22             THE COURT:  Is there a stipulation right now as to

23   when the tenure vote was, using --

24             MR. HERNSTADT:  The division tenure vote of the

25   faculty.

I7h1rav7                    Bekaert – Redirect

1              THE COURT:  Was on April 14, 2015.  Okay.

2              All right.  So you'll read that stipulation.  Thank

3    you.

4              (Continued on next page)

I7h1rav7                        Bekaert - Redirect

 1              (In open court)

 2              THE COURT:  So I'm going to strike the last question

 3     and answer, and then I understand a stipulation or an agreement

 4     between the parties is going to be read into the record.

 5     BY MS. DONEHOWER:

 6     Q.  Professor Bekaert, you have participated in tenure votes

 7     before?

 8     A.  I have.

 9     Q.  And you understand that there -- that a step in the

10     process --

11              THE COURT:  I'm sorry.  Are we going to read the

12     stipulation?

13              MS. DONEHOWER:  Talk about the date first, your Honor?

14              THE COURT:  Yes.

15              MS. DONEHOWER:  Yeah, sure.  The parties have agreed

16     to stipulate that the divisional tenure vote happened on

17     April 14, 2016.

18              THE COURT:  All right.

19              MR. HERNSTADT:  Very good.

20              THE COURT:  We can proceed.

21              MR. HERNSTADT:  The question that was just asked is

22     beyond the scope.

23              Withdrawn, your Honor.

24              THE COURT:  Okay.  Withdrawn.  All right.  So --

25              MS. DONEHOWER:  So can we please bring up Defense

I7h1rav7                         Bekaert - Redirect

1    Exhibit QJ.

2    BY MS. DONEHOWER:

3    Q.   This is an email that you sent on April 18, 2016, correct?

4    A.   Correct.

5    Q.   You sent it to Glenn Hubbard?

6    A.   Correct.

7    Q.   He's the dean of Columbia Business School?

8    A.   Correct.

9    Q.   And you copied many, many people on this email?

10   A.   These are the business school faculty.

11   Q.   You wrote a message to the faculty of Columbia Business

12   School.

13   A.   Yes, in response to something else.

14            MS. DONEHOWER:  Can we please look at the text that

15   Professor Bekaert wrote.

16            THE COURT:  Is there any objection at this point to

17   QJ?

18            Oh, it's already up on the screen.

19            MS. PLEVAN:  No objection.

20            MR. HERNSTADT:  No objection.

21            THE COURT:  QJ is going to be admitted.

22            (Defendant's Exhibit QJ received in evidence)

23            THE COURT:  But just going forward, before it's

24   admitted, let's not show it to the jury.  Thank you.

25            MS. DONEHOWER:  Apologies, your Honor.

1    BY MS. DONEHOWER:

2    Q.  If we look at this, maybe four lines down from the top, you

3    wrote that the process would result in your complete

4    vindication, right?

5    A.  Correct.

6    Q.  You testified today that the 401(k) projects with Professor

7    Ravina were completely symmetric, right?

8    A.  Correct.

9    Q.  You believed that there is no power imbalance between you

10   and any of your co-authors?

11   A.  Yes, that's the way I like to conduct research.

12   Q.  You believe there is no power imbalance when you, a

13   tenured, chaired professor, are working with a junior

14   colleague?

15   A.  Again, the way I like to do research, I try to be on the

16   same page --

17   Q.  Is that a yes or a no, Professor Bekaert?  Do you believe

18   that there is no power imbalance when you, a tenured, chaired

19   professor, are working with a junior colleague?

20   A.  I believe so, yes.

21   Q.  You believe there is a power imbalance or there is no power

22   imbalance?

23   A.  I don't think there is a power imbalance, not the way I

24   conduct research.

25   Q.  You believe there is no power imbalance when you are

1    working even with a student, right?

2    A.  Well, yeah, I -- I don't try to exert power over --

3              MR. HERNSTADT:  Objection, your Honor.

4    A.  It's a strange question.  I mean, I don't know what you

5    mean with power in this -- this setting.  If I --

6    Q.  Just your own understanding.

7              THE COURT:  Let's just stop when there's an objection,

8    please.

9              MR. HERNSTADT:  Professor Bekaert testified about how

10   he worked with other professors, his co-authors, just his

11   co-authors; he didn't testify about how he worked with anybody

12   else.

13             THE WITNESS:  Yeah.

14             THE COURT:  How he worked with?  Anyone else?  Meaning

15   students?

16             MR. HERNSTADT:  For example.

17             THE COURT:  Okay.  Do you want to just rephrase the

18   question, do this one more time.

19             MS. DONEHOWER:  Yes, your Honor.

20   BY MS. DONEHOWER:

21   Q.  When you were interacting with a student on a project --

22   A.  Mm-hmm.

23   Q.  -- you believed that there is no power imbalance between

24   you and that student, correct?

25   A.  Again, I don't like the word "power."  I mean, if a student

I7h1rav7                    Bekaert - Redirect

 1   is a research assistant, then obviously I will instruct the

 2   student to do certain things and expect that that student will

 3   do these things.  I don't feel that this is power, but if you

 4   want to call it power, I don't know.  If I co-author with

 5   somebody, I try to make sure that they feel comfortable and

 6   that we're on the same page, so I always tell my -- even my PhD

 7   students that if we work together, that they -- they can yell

 8   at me, they can --

 9   Q.  Professor Bekaert, I believe that your answer was that

10   you -- I'm not sure, actually.  That you do believe there's a

11   power imbalance or that you don't?

12   A.  I just don't understand what you mean.  I think this word

13   "power" requires context.  I can't really answer this.

14           MS. DONEHOWER:  Can we please show just to Professor

15   Bekaert without publishing to the jury his deposition

16   transcript at 305/5-15.

17           Professor Bekaert, at your deposition you were asked

18   whether someone expressed to you a power imbalance in a

19   particular situation and you answered, "I don't think he did,

20   but obviously isn't because I work with anyone in my -- with my

21   co-authors, whether they're students or faculty or colleagues,

22   junior or senior.  I work with all of them on the same basis.

23   I make sure there's no power imbalance."

24           Did I read that correctly?

25   A.  Yes, and that's exactly what I said.

Bekaert - Redirect

1            MR. HERNSTADT:  Objection, your Honor.  That's not the

2    complete answer, your Honor.

3            THE COURT:  Okay.  Do you want to complete the answer?

4            MR. HERNSTADT:  Yes.  "They can call me names, they

5    can say I'm wrong, they can call me an idiot, which Enrichetta

6    did, and I don't have any problem with that."

7            THE COURT:  You may proceed.

8            MS. DONEHOWER:  Thank you.

9    BY MS. DONEHOWER:

10   Q.  You testified this morning that it's not unusual for you to

11   have dinners with a co-author, correct?

12   A.  Correct.

13   Q.  Would it be unusual for you to insist on having dinners

14   with a co-author who didn't want to go?

15   A.  I don't think I ever did.

16   Q.  But would it be unusual?

17           MR. HERNSTADT:  Objection, your Honor.

18           THE COURT:  Overruled.

19   A.  What do you mean?

20   Q.  If you can answer the question --

21   A.  I can't.

22   Q.  -- please do.  If you can't answer it as phrased, then

23   we'll move on.

24   A.  Then you should rephrase.  I can't.

25   Q.  Sure.  When you're talking about having dinner with

I7h1rav7                     Bekaert - Redirect

1   co-authors, you're saying it's not unusual to have dinners with

2   co-authors, right?

3   A.  Yes.

4   Q.  But would it be unusual if the co-author made clear that he

5   or she did not want to go to dinner with you?  Would it be

6   unusual then?

7   A.  I mean, again, I don't see the context here.  I mean, what

8   are you talking about?

9   Q.  Would it be unusual for you to kiss a co-author?

10  A.  Actually, there are some co-authors, you know, female

11  co-authors that I would kiss.  There's a -- in Europe, this is

12  very common.

13  Q.  Do you understand the difference between a romantic kiss

14  and a kiss that's a greeting, Professor Bekaert?

15  A.  Oh, yes.

16  Q.  Would it be unusual for you to have a romantic kiss with a

17  co-author?

18  A.  Of course.

19  Q.  Would it be unusual for you to hold hands with a co-author?

20  A.  Yeah, of course.

21  Q.  Would it be unusual for you to ask for compliments from a

22  co-author?

23  A.  Yeah.

24  Q.  You testified this morning you had never asked for

25  compliments from Professor Ravina, correct?

I7h1rav7                          Bekaert - Redirect

1    A.  I think I did.

2              MS. DONEHOWER:  Can we please pull up Plaintiff's

3    Exhibit 16.

4    Q.  Can you look at the last page very quickly.

5    A.  Yeah.

6    Q.  Do you see this is one of the emails that you were

7    testifying about earlier today?

8    A.  Yes, I do.

9              MS. DONEHOWER:  Can we please look at page 2, and if

10   we could please pull up the first and second emails.  Actually,

11   all the way down to like the middle of the page.

12             Yes.  Thank you.

13   Q.  Do you see the email at the bottom there, 12/12/12?  You

14   wrote, "You are giving me way too many compliments.  I am now

15   waiting for the big email with stuff for me to do."

16   A.  Correct.

17             MS. DONEHOWER:  Can we go up to the email above the

18   one that is called out here, please.

19   Q.  You wrote this email to Professor Ravina on December 13,

20   2012, right?

21   A.  Yes.

22   Q.  You wrote, "Oh, no, keep them coming."

23   A.  I did.

24   Q.  You meant compliments, right?

25   A.  I suspect yes.

1  Q.  "You have not figured out my fragile ego, clearly" is what

2  you wrote, right?

3  A.  Yes.

4  Q.  "I was just surprised," you wrote, "I will explain one day,

5  maybe, after copious amounts of wine," correct?

6  A.  Correct.

7  Q.  You testified this morning that you tried to give Professor

8  Ravina an education in music, correct?

9  A.  Correct.

10       MS. DONEHOWER:  Can we please pull up Plaintiff's

11  Exhibit 13.

12  Q.  This top email, this was part of your effort to give

13  Professor Ravina an education in music?

14  A.  Yeah.

15       MS. DONEHOWER:  I'd like to mark Plaintiff's --

16  Q.  And you testified the other day that you were familiar with

17  the lyrics of these songs -- this song, right, the song Lucky

18  You off of the album Sad Songs For Dirty Lovers?

19  A.  Oh, no.  I mean, I know a couple lines.  I don't -- I'm not

20  familiar with the whole song.  I mean, I heard it many, many

21  times.  Like I said, it's one of my favorite songs.

22       MS. DONEHOWER:  I'd like to mark, please, Plaintiff's

23  Exhibit 190.

24       Plaintiff moves to admit 190.

25       MR. HERNSTADT:  Objection, your Honor.

1        THE COURT:  What is the objection?  I haven't seen it

2   yet.

3        MS. DONEHOWER:  We can lay a foundation, if you'd

4   like.

5        THE COURT:  You really do have to move on now.  Okay?

6   I mean, you can lay --

7        MS. DONEHOWER:  This is my last question, your Honor.

8   Last few.

9        THE COURT:  Okay.  Go ahead.

10        MS. DONEHOWER:  We'd like to move to admit this

11   exhibit.

12        THE COURT:  Why don't you lay the foundation first.

13   BY MS. DONEHOWER:

14   Q.  Professor --

15        MR. HERNSTADT:  Your Honor, she's already attempted to

16   lay a foundation.  He's already said he knows a couple of the

17   words, that's it.

18        THE COURT:  All right.  Yeah, I'm not going to admit

19   this.

20        MS. DONEHOWER:  Okay.

21   BY MS. DONEHOWER:

22   Q.  Professor Bekaert, this was the song that we've referred to

23   earlier where the lyrics are, "You own me," right?

24   A.  I believe that's one of the key lines, yes.

25        MS. DONEHOWER:  Okay.  Nothing further, your Honor.

 1              THE COURT:  All right.  Mr. Hernstadt?

 2     RECROSS EXAMINATION

 3     BY MS. HARWIN:

 4     Q.  Hello again, Professor Bekaert.

 5     A.  Hello.

 6     Q.  You were asked on recross about if you recalled sending

 7     emails to your girlfriend and some close friends in 2004?

 8     A.  '14.

 9     Q.  Sorry.  2014.  Do you recall that?

10     A.  Mm-hmm.

11              MR. HERNSTADT:  I'd like to show the witness

12     Exhibit 136.

13     Q.  And then this was the exhibit that you were shown.  What's

14     the date on that exhibit?

15     A.  It is 3/24/2016.

16     Q.  Did you send different types of emails --

17              MS. DONEHOWER:  Objection, your Honor.

18     Q.  -- in 2014 and 2016?

19              THE COURT:  What is the basis for the objection?

20              MS. DONEHOWER:  Mischaracterizes the prior testimony.

21     It wasn't in 2014, it was after 2014.

22              THE COURT:  Why don't you just clarify that.

23     BY MR. HERNSTADT:

24     Q.  Do you recall testifying that you sent some emails after

25     you learned of Professor Ravina's going to the dean of the

I7h1rav7                    Bekaert - Recross

1    business school in July of 2014?  Do you recall that?

2    A.  I recall that.

3    Q.  And do you recall testifying that you sent emails to

4    friends and colleagues and co-authors in 2016 after the press,

5    the negative press came out --

6    A.  Yeah.

7    Q.  -- about the lawsuit?  Do you recall that?

8    A.  Yes, I do.

9    Q.  Do you recall testifying that the types of emails you sent

10   in 2014 were different than the types of emails you sent in

11   2016?

12   A.  Absolutely.  They were very different, and also the number

13   of people that they were sent to were very different.  You

14   know, after 2014, it was just, you know, a few people -- well,

15   very close friends, including mostly my girlfriend, and after

16   2016, I sent them to my network of co-authors and -- and

17   friends in the profession, but actually mostly co-authors, I

18   have to say, close friends, and many of them actually reached

19   out to me and were -- were trying to figure out what was going

20   on.

21   Q.  Do you recall being shown Exhibit 96 by counsel just now?

22   A.  Yes.

23   Q.  And asked if you were defending yourself in the first three

24   paragraphs of this exhibit?  I'd like you to take the time to

25   read this and ask you, what were you trying to accomplish in

I7h1rav7                        Bekaert - Recross

1   this email to Wei Hu?

2   A.   The big purpose of this email was that this was right after

3   the fall of 2014, so I had committed to finish this

4   international diversification paper, and unbeknownst to me,

5   Enrichetta had produced her own draft, so the two drafts -- my

6   draft came first and then a couple hours later, Enrichetta

7   produced this competing draft, and so Wei Hu had reacted to

8   this very, very negatively.  I mean -- and so what I was trying

9   to do here is like, you know, we got to -- I was hoping that

10  they were not going to pull the data on us because essentially

11  this was -- was very serious.  I mean, I thought we really,

12  really aggravated them, which was clear from some of the email

13  traffic later on, and so I wanted to make sure that he knew the

14  situation, that this was very difficult.  I -- I had obviously

15  not expected this to happen, and I was sort of trying to come

16  up with a solution.

17  Q.   And was that your concern that you were writing about in

18  this email?

19  A.   Yeah.

20  Q.   Professor Bekaert, I'd like you to look at Exhibit 145.

21  This is the email you sent to Cornerstone.

22  A.   Oh, yeah.

23  Q.   And looking at the second page of the email, you said,

24  "Feel free to take this to the right people at Cornerstone."

25  A.   Yes.

I7h1rav7                         Bekaert - Recross

1   Q.  Why were you suggesting that?

2   A.  Well, I just wanted to see whoever they thought that, you

3   know, I had worked with and so forth could -- could see this

4   email.  That was basically my -- my suggestion.  I mean, I've

5   worked with a number of people at Cornerstone.  Those were the

6   two key ones.  I was actually hoping they would show it to

7   other people I had worked with on some cases so they would know

8   sort of the truth and that I hadn't done anything wrong.

9   Q.  Were you concerned that this might impact -- that the press

10  about you might impact your ability to work for Cornerstone?

11  A.  I was concerned about that big time.  I just didn't imagine

12  it was going to have such a big effect.  I basically have no

13  cases since this case broke.

14  Q.  I'd like for you to take a look at Exhibit 109 that you

15  were shown.

16          MR. HERNSTADT:  And if we could look at the entire

17  email at the bottom, that starts at the bottom of the page,

18  continuing on to the next page.

19  Q.  So you were shown the top half of this and asked a couple

20  questions about it.  I'd like to show you the whole email.

21          Do you see on the second line where you say,

22  "Moreover, as a senior academic researcher on this team, I want

23  to make sure everything is absolutely correct and our

24  submission maximizes the chance of getting accepted"?  Do you

25  see that?

I7h1rav7                         Bekaert - Recross

1    A.  Correct.

2    Q.  When you say "senior academic researcher on this team,"

3    what are you talking about?

4    A.  What I was talking about is, the person on this -- on this

5    particular team that has experiences -- experience with

6    publishing.  I mean, I, you know -- you have seen Enrichetta's

7    vitae and you know she has published a few papers, but I've

8    published a lot of papers, right, and I'm an editor myself, so

9    I really know how this process works, and -- and I knew time

10   was of the essence here, so what I wanted to achieve -- this

11   was a pretty straightforward referee report.  I wanted to make

12   sure that we could skip around, you know, this -- sometimes

13   papers can go through four, five rounds, you know, at the same

14   journal and then get published.  That's very, very

15   time-consuming.  So what I wanted to achieve is to produce a

16   draft that was going to be so good that we would have a chance

17   of being almost immediately accepted and then we would gain a

18   lot of time.  So do the work now, you know, do it thoroughly,

19   make sure you cover every single ground that the referee talks

20   about, and then hopefully you can skip around and then you're

21   going to gain months and -- and that's what I was trying to do.

22   Q.  Could you just read the rest of the paragraph.

23   A.  After the yellow?

24   Q.  Yes.

25   A.  "Enrichetta's strategy below does not make much sense.

I7h1rav7                          Bekaert – Recross

1   Given the nature of the report, I think our next version, if

2   done completely well, and looking completely ready, can be

3   accepted right in that round.  This would save tremendous

4   amounts of time.  You do not submit a paper thinking some

5   issues must be fixed in the next round.  You do not want to

6   take that risk."

7   Q.  And was it accepted after this round?

8   A.  It got a conditional acceptance.  The only thing we had to

9   do is I think do some editorial work and some very small

10  comments and we could already use the words "conditionally

11  accepted," so the strategy worked.

12  Q.  And is that faster than going through another two or three

13  or four rounds?

14  A.  Of course.

15  Q.  Professor Bekaert, I'd like you to look at Exhibit 26.

16         MR. HERNSTADT:  And if we could start -- next page.

17  Q.  Okay.  Looking at this page, do you see there's an email in

18  the middle of the page from you to Professor Ravina?

19  A.  Yes.

20  Q.  And this is October 2013, right?

21  A.  Correct.

22  Q.  And you say, "When I saw your email, I thought you turned

23  into blunt Geertruyd for a while."

24  A.  Yeah.

25  Q.  And we had talked about this email before, right?

I7h1rav7                        Bekaert - Recross

1    A.  We did.

2    Q.  What is this email about?

3    A.  This is an email exchange that Enrichetta had actually sort

4    of with Wei without me being involved, and I thought she was --

5    I mean, I don't remember all the details, but she was a little

6    bit too blunt and too rude, and I was concerned that -- that we

7    would aggravate the Financial Engines team.

8               MR. HERNSTADT:  And can we look at the next page,

9    please.

10   Q.  And do you see your email at the bottom of the page?  And

11   this is what you were just asked about.

12   A.  Mm-hmm.

13   Q.  "Seriously, I need to see the email you write to Wei before

14   you send it."  Do you see that?

15   A.  Yes.

16   Q.  Are you telling Professor Ravina she has to run all of her

17   emails to Financial Engines past you?

18   A.  No.  This was just about this particular issue.  I think it

19   was good form in general to sort of be careful.  Again, I

20   explained this before.  We don't want to aggravate these

21   people.  They control the data.  And so we want to make sure

22   that we don't give them like trifle stuff and things that they

23   don't have time for.

24   Q.  I'd like you to look at Exhibit EP.

25               Well, before you do, I just want to clarify something.

1  You met with Dean Hubbard in around July 9, 2014?

2  A.  Yes.

3  Q.  And Dean Hubbard told you then that Professor Ravina had

4  made a complaint about you.

5  A.  Correct.

6  Q.  Was sexual harassment or sexual advances ever mentioned in

7  that meeting?

8  A.  No.

9  Q.  What was the complaint about?

10  A.  I -- he just kept talking about the research divorce.  He

11  didn't even say it was about the emails either.  I mean, I kept

12  asking them this.  I thought it was about the emails.  But the

13  focus was, we have to basically engineer this research divorce.

14  That was basically what I knew at that time.

15  Q.  And you were asked if you were at a meeting with Professor

16  Kathy Phillips --

17  A.  Yes.

18  Q.  -- on July 15.  Do you recall whether you were at a meeting

19  with her on July 15?

20  A.  I just don't recall that meeting.  I'm sorry.  I --

21  Q.  When did you first hear that Professor Ravina had added

22  allegations of sexual harassment or sexual advances?

23          MS. DONEHOWER:  Objection.

24          THE COURT:  Overruled.

25  A.  In September, I believe, with the Title IX investigation.

I7h1rav7                       Bekaert - Recross

1    Q.  I'd like you to look at Exhibit 73, which counsel showed

2    you.

3              MR. HERNSTADT:  Oh, I'm sorry.  No, that's not it.

4    Never mind.

5              Oh, yes.  Exhibit 73.  Sorry.

6    Q.  And if you look at the first paragraph.

7              You were asked about this paragraph of the email?

8    A.  Yes.

9    Q.  What are you talking about here?

10   A.  Yeah, I was actually getting worried that my name would

11   just be yanked off a paper without my permission, and I was

12   just sort of saying, look, that I will not let that happen, you

13   know, 'cause I had worked so hard on these papers myself as

14   well.  That's basically what I mean.

15   Q.  And it says, "If she goes it alone against my will, I will

16   stop her.  I know every single editor."

17   A.  Yeah, that's what I mean.  I mean, suppose that she

18   would -- I mean, there were so many crazy things happening that

19   I was thinking, who knows, suppose she would like try to

20   publish international diversification paper without me.  That

21   would be really, well, crazy, but, you know, that I could not

22   let happen, of course.

23   Q.  When did you meet with Mr. Dunn?

24   A.  I think September 20 something; 21st, maybe.

25   Q.  And did you first learn about allegations of sexual

I7h1rav7                          Bekaert - Recross

1   harassment around the time you met with Mr. Dunn?

2   A.  Yeah.  I mean, that -- that meeting with Mr. -- Mr. Dunn

3   was -- was really weird, because I was like -- I didn't -- I

4   didn't even know what I was accused of.  It was kind of very

5   strange.

6   Q.  I'd like you to look at Exhibit 74, please.

7          Do you have a copy of this exhibit?

8   A.  It's on the screen.  I think.

9          74?  It's on the screen.

10  Q.  Yes.

11  A.  Yeah.

12  Q.  I'd like you to look at the second and third pages, please.

13  A.  Yeah, I see that.

14  Q.  So this is an email from Professor Madrian to you and to

15  Professor Ravina.  Do you see that?

16  A.  Yeah, I see it.

17  Q.  Okay.  And then starting at the bottom of 2, going to the

18  top of 3, do you see your response?

19          MR. HERNSTADT:  No, no.  Page 2.  Yeah, put up 2 and

20  3.  I mean -- I'm sorry.  I'm sorry.

21  Q.  So do you see that on September 14th, you write to

22  Professor Madrian?

23  A.  Correct.

24  Q.  What is this email about?

25  A.  Well, it's -- sorry it's a little bit boring academics,

I7h1rav7                          Bekaert - Recross

1       but --

2       Q.  Briefly then.

3       A.  Briefly.  In the summer of 2014, we -- we actually

4       discovered that our -- the data for the automatic enrollment

5       paper had a very big gap.  We didn't have data on the people

6       nonparticipating in the 401(k) programs, but if you want to

7       figure out how these programs -- automatic enrollment will

8       affect savings, you need those people.  So there was actually a

9       very big gap in the data we weren't aware of before, so we

10      discovered this and we knew that the automatic enrollment paper

11      suddenly was not going to be that great anymore.

12              What happened here is that somehow, despite this,

13      Enrichetta presented the paper in Sweden.  I don't know what

14      happened, but Brigitte Madrian, who is an expert in this field,

15      was there, and immediately noted the problem and basically told

16      me, hey, this paper, without these people, you're going to get

17      what we call biased results.  It's not going to make any sense.

18              And I was actually a little flabbergasted that she

19      would contact me, because we already knew that there was a

20      problem with the paper.

21              And this is what this email is about.  And I'm just

22      telling Professor Madrian that we had only just discovered this

23      problem and that there's no way that I would be willing to

24      publish this paper, put it out there with this problem in it.

25      You know, we had to fix it first.

I7h1rav7                         Bekaert - Recross

1    Q.  And looking at the second paragraph, the bottom there, you

2    say, "Do note that we do not have an active paper yet... and it

3    will not become a public paper if we cannot satisfactorily

4    resolve that."

5    A.  Agreed.

6    Q.  And then let's look at Professor Ravina's email.

7             Now she's writing to you and copying Professor Madrian

8    and Dean Hubbard, right?

9    A.  Correct.

10   Q.  And do you see her response in the first paragraph?

11   A.  I see it.

12   Q.  That's addressed to you?

13   A.  It is.

14   Q.  Would you read that, please.

15   A.  "As you very well know, the paper was submitted to various

16   conferences and presented at one this past weekend.  As you

17   also know, you were not the only one under the impression that

18   data on nonparticipants was included in the sample."

19   Q.  This is September 14, 2014.

20   A.  Yeah.

21   Q.  When did you realize that the data on nonparticipants was

22   not included in the sample?

23   A.  I think it was -- I don't know the precise date, but it was

24   somewhere in the summer.

25   Q.  And was Professor Ravina aware of that as well?

I7h1rav7                          Bekaert - Recross

1  A.  Yeah, of course.

2  Q.  Did you talk about it with Professor Ravina?

3  A.  We knew it was a major problem with the paper now.  I mean,

4  basically without those data, the results were sort of

5  meaningless.  Either we had to get more data or find like

6  another statistical methodology to deal with that bias, which

7  is very, very difficult to do.

8  Q.  What was your reaction to this email?

9  A.  You mean by email or --

10  Q.  The email that she sent to you and Professor Madrian and to

11  Dean Hubbard.

12  A.  I -- I don't quite remember if I wrote an email right after

13  that.

14  Q.  Okay.  Let's take a look at the email, just the bottom one.

15       Right here.

16  A.  Oh, I forwarded that email, yeah.

17  Q.  To whom?

18  A.  To my girlfriend Marie.

19  Q.  And you're using, again, strong language here.

20  A.  Yeah.

21  Q.  What are you saying?

22  A.  I -- I was really aggravated because, I mean, a lot of

23  things had happened, so first of all, she had clearly presented

24  this paper at the conference without sort of properly

25  addressing that we had this huge problem.  I think if I would

I7h1rav7                    Bekaert - Recross

1    have been the presenter, I probably wouldn't -- not -- maybe

2    refused to present, because this paper now didn't really -- our

3    results didn't really make sense, and then it clearly was a

4    conference with some very important people in this topic

5    present because Brigitte is one of the first ones to write on

6    automatic enrollment papers -- or automatic enrollment

7    programs.  She has like the key paper in that -- in that field.

8              And so I think that email implicitly told me that

9    conference did not go well for us.  This is not a good thing.

10             And I was also very concerned with the fact that, you

11   know, we have this email exchange with a famous person in the

12   field at Harvard and the dean is copied on it.  And so I

13   thought that was really awkward, because what is she to think

14   that a very public figure like Glenn Hubbard is cc'd on this

15   email.  And I was like already thinking, gee, do I have to

16   explain this?  What's -- I mean, it was not a good situation.

17             MR. HERNSTADT:  Could we look at CU, please.

18             The next page, please.

19             Actually, you know what, let's skip it.  I'm not going

20   to --

21   Q.  In March 2014, before the emails we spent time looking at

22   about the RAs and whatnot, was Professor Ravina expressing

23   concern about delays with the projects?

24   A.  She sometimes had.  I mean, she started to behave a little

25   bit -- I don't know -- somewhat more erratically, I would say,

I7h1rav7                          Bekaert - Recross

1  in the beginning of 2014.  There were some strange emails, you

2  know, like the crap and --

3  Q.  You started the project in -- you first spoke to Professor

4  Ravina about the 401(k) projects in 2009, right?

5  A.  Right.

6  Q.  And you didn't get a contract with Financial Engines until

7  the end of October 2011.

8  A.  Yeah.

9  Q.  And you didn't get data until late summer 2012.

10  A.  Yeah.

11          MR. HERNSTADT:  I'd like to look at 23.

12  Q.  You were shown this email by counsel.

13  A.  I was.

14  Q.  This is dated October 1, 2013.  And do you see in Professor

15  Ravina's email to you --

16  A.  Correct.

17  Q.  -- says, "There is no progress on our papers in the last

18  two years"?

19  A.  Yeah.

20  Q.  Two years before this email is October 1, 2011, right?

21  A.  Right.

22  Q.  At that point was there even a contract with Financial

23  Engines?

24  A.  No, there wasn't.

25  Q.  And had data arrived?

1    A.  No.

2    Q.  When did the data arrive, the bulk of the data arrive?

3    A.  I think in August or September 2012.

4    Q.  And when were the data in shape so that you could start

5    writing papers?

6    A.  Well, only in April 2013, and again, as I made clear

7    several times, that data set wasn't complete either.  There was

8    still lots of pieces that had to be filled in, as you can see

9    from the example we just discussed.  There was big parts of the

10   data that we didn't fully understand yet, you know, and the

11   automatic enrollment part is one example.  You know, advice

12   fees was another.

13   Q.  I'd like to show you Exhibit BA.

14            Do you remember being shown this just a little while

15   ago?

16            MR. HERNSTADT:  I'm sorry.  B.  B as in boy.

17   A.  Okay.

18            Yeah.

19   Q.  And do you see in the email from Professor Ravina to you,

20   it says, "We will make progress"?

21   A.  Right.

22   Q.  And that's in response to your email -- I'm sorry.

23            "Under no time constraints."  At this time were you

24   guys writing papers?

25   A.  No.  This was still, you know, getting the data together,

I7h1rav7                         Bekaert - Recross

checking the data, starting to create some variables, yeah.

Q.  And as between you and Professor Ravina, who was the one

responsible for that part of the joint project?

A.  So in the beginning, the responsibility, obviously, lay

with her.  She was doing most of the data work, as agreed upon

in the beginning.

Q.  You were asked questions about Exhibits 35 and 36.  Do you

recall that?  The April emails and the May emails about

research assistants.

A.  Right.  Right, right.

Q.  And in those emails what was your concern?  What were you

expressing concerns about in that email, in those emails?

A.  So you're talking about 2014, like the back and forth?

Q.  Yeah.

A.  Yeah, it was about the research assistant, right.  We

needed the research assistant for this automatic enrollment

program.  I was shown some emails that I was asking, "Do we

need one?"  Well, the reason was that there was quite a few

research assistants working there, so we had Nicolas and

Andrea, but then there was also two people, and I think I got

the name wrong in one of those emails.  It was Katrina and

some -- a Chinese student -- I don't remember the name -- that

were working on this.  The data that was still missing, this --

the 5,500 forms and the matching, and I sort of felt that maybe

one of those people could be put on the AE project, so that's

I7h1rav7                    Bekaert - Recross

1    why I was asking, you know, do we even need one.

2    Q.  And you were shown excerpts from those emails.  Are those

3    long emails, email chains?

4    A.  They probably are.  Most of them, they were, yeah.

5                MR. HERNSTADT:  But can we put 35 up on the screen.

6                And I'd just like you to page through it, just so we

7    can see how long it is.

8    Q.  And do you recall being shown excerpts, little snippets

9    from that email?

10   A.  I'm sure I was, yes.

11   Q.  Where you were asked again about the whip email?

12   A.  Right.

13   Q.  And that was a comment at the end of many back-and-forths?

14   A.  Yeah, right.  I actually feel that this was very misleading

15   because I don't think I was responding to the email just before

16   but to one of the previous emails.  I mean, there's so much

17   going on here.  And I -- I was really in some sense happy that

18   we could get a meeting together, and I don't know where in the

19   email chain that happened, but that was really the intent of

20   that, that -- that infamous whip email, which had nothing to do

21   with what people want to make of it.

22   Q.  I'd like you to look at Exhibit 264 that you were shown by

23   plaintiff's counsel.

24               MR. HERNSTADT:  Mr. McLeod, this is a new exhibit.  If

25   you could perhaps pull it up.  264, just the top email.

I7h1rav7                          Bekaert - Recross

Q.  Do you remember being asked about this?  This is an email
about the research assistant that you had the Saturday meeting
with?

A.  Yes, correct.

Q.  And you had said --

          MR. HERNSTADT:  I'm sorry.  If we can look -- the two
emails below that.

Q.  Do you see, you say, "We do not need anyone right now"?

A.  Right.  That's what I was referring to, yes.

          (Continued on next page)

I7hnrav8                     Bekaert - Redirect

1   Q.   And then you see Professor Ravina's response?

2   A.   Yes.

3   Q.   And she says, "We do need someone now that Nicolas is

4   leaving and Andrea is half in and half out."

5   A.   Correct.

6   Q.   Do you agree that you needed someone once you read that?

7   A.   I was still trying to -- in the follow up e-mail you see I

8   was still trying to see if these people that were already

9   working with us could be used, and that didn't appear to be the

10  case.

11  Q.   Do you see in the fourth paragraph she says, "Can we meet

12  him on Saturday"?

13  A.   Correct.

14  Q.   Did you agree to meet him on Saturday?

15  A.   I did.

16  Q.   Do you show up at that meeting?

17  A.   I did.

18  Q.   Did Professor Ravina show up at that meeting?

19  A.   No.

20  Q.   What happened?

21  A.   She apparently cancelled the meeting with the student, but

22  never informed me and the student.  Actually, then I wrote an

23  e-mail to both of them, and the student was very surprised.  He

24  said, I thought you would have known the meeting was cancelled.

25  Q.   You were shown -- do you recall being shown a couple of

I7hnrav8                    Bekaert - Redirect

1   e-mails from Marie Hoerova and Shumi?

2   A.  Yes.

3   Q.  Were those professional communications?

4   A.  No, those were private conversations.

5              MS. DONEHOWER:  Objection.

6              THE COURT:  You used the word they were what

7   communications?

8              MR. HERNSTADT:  Were they professional communications.

9              THE COURT:  I will allow your perception of that.

10  A.  Those e-mails were private conversations with my friends.

11  Q.  Then subsequently you were read a list of names of some of

12  your coauthors and friends?

13  A.  Yeah.

14  Q.  Are those the people that you sent e-mails to in 2016?

15  A.  You mean -- I, yeah, the long list that was shown with the

16  touched by evil.

17  Q.  The list of names that counsel read to you.  She asked you

18  about cam Harvey --

19  A.  Yes.  Those are all mostly my coauthors and past students,

20  former students, yeah, or people really in my close network.

21  Q.  And I would like you to look at SK, please.  The e-mail at

22  the bottom of the first page, do you remember being asked about

23  the line, "You could perhaps fault me for not doing enough on

24  the project"?

25  A.  Yeah, I see that.

I7hnrav8                    Bekaert - Redirect

1   Q.  The date of this e-mail is May 3, 2013?

2   A.  Correct.

3   Q.  And where are you and professor Ravina in the 401(k)

4   project as of the date of this e-mail?

5   A.  We just got the data together, right?  We are sort of

6   starting to do work, and, you know, it -- what it also says is

7   that I'm absolutely swamped.  I'm traveling like crazy.  But I

8   still produced an outline for the international diversification

9   paper.

10          I think somewhere towards the end of May that then

11  became the basis for the final draft that we had to get

12  together by the end of the year for that conference, and we did

13  so.

14  Q.  And I would like you to look at QJ.

15  A.  All right.

16  Q.  This is an e-mail that you sent to your colleagues?

17  A.  I did.

18  Q.  And it's dated April 18, 2016?

19  A.  Yes.

20  Q.  And did you hear the stipulation that was read into the

21  record that the divisional tenure vote was April 14?

22  A.  Yes.

23  Q.  So this is after the divisional tenure vote?

24  A.  This is after the divisional tenure vote, and I was

25  reacting to some other e-mails.

I7hnrav8                         Bekaert – Redirect

1    Q.  Is this after the lawsuit had been filed?

2    A.  I believe it is.

3    Q.  Let's take a look at the text.  If you could just read the

4    first -- the first few lines, the first few sentences.

5    A.  "After Dean Hubbard and Professor Ravina's e-mails to the

6    CBS faculty last week, and in light of comments I have heard

7    from some colleagues, I feel that I must add a few words.  As

8    much as I would like to refute the alligations about me

9    contained in Professor Ravina's lawsuit, that dispute is, as

10   Dean Hubbard pointed out, now in the courts."

11   Q.  And then continuing?

12   A.  "Accordingly, I must respect the process, which I'm sure

13   will result in my complete vindication."

14   Q.  And then, lastly, you were shown, again, the e-mails that

15   professor -- one of the e-mails that Professor Ravina sent you

16   after you forwarded to her the publication of that interview

17   and photo of you --

18   A.  Yes.

19   Q.  -- in Brazil?

20   A.  Right.

21   Q.  And you were shown snippets --

22   A.  Right.

23   Q.  -- of the e-mail where you talk about "keep them coming?

24   A.  Right.

25   Q.  The compliments?

I7hnrav8                        Bekaert - Redirect

1    A.   Right.

2    Q.   What was your reaction to receiving two e-mails from

3    Professor Ravina talking about how good looking you are?

4    A.   I was embarrassed.   Just the way that I dealt with this was

5    that I responded with self-deprecating humor.   She kept going

6    on.   I was like, what do you do.

7              MR. HERNSTADT:   Thank you, Professor Bekaert.

8              I have nothing further.

9              THE COURT:   Are there any additional questions?

10             MS. DONEHOWER:   Given the time, your Honor --

11             THE COURT:   But is Mr. Bekaert's testimony complete?

12             MS. DONEHOWER:   Yes, your Honor.

13             THE COURT:   Thanks.   You can step down.

14             It may make sense just to adjourn for the day, ladies

15   and gentlemen.   Why don't we do that.   Please remember don't

16   discuss the case, keep an open mind, and I will see you in the

17   morning.   Thank you.

18             (Continued on next page)

19

20

21

22

23

24

25

1     (Jury not present)

2          THE COURT:  All right.

3          You can step down.

4          Do we need to talk about scheduling at all?  Do we

5     need to talk about anything?

6          MS. PLEVAN:  Tomorrow we will have Dean Hubbard here

7     in the morning.

8          THE COURT:  We'll have Dean Hubbard in the morning.

9     OK.

10          MS. PLEVAN:  And we have been asked if we could

11     produce Christopher Brown, and he would be here in the

12     afternoon.

13          THE COURT:  Christopher Brown will be here in the

14     afternoon?

15          MS. PLEVAN:  Yes.

16          THE COURT:  OK.

17          MR. SANFORD:  That is fine, your Honor.  We have

18     Professor Bolton I suspect the next morning, and then do videos

19     and rest.

20          THE COURT:  All right.

21          So we don't think you will rest tomorrow?  You think

22     you will rest on Thursday?

23          MR. SANFORD:  I think --

24          MS. PLEVAN:  I am not sure -- sorry.

25          MR. SANFORD:  We would bring Professor Bolton

I7hnrav8                      Bekaert - Redirect

1    initially out of turn in defendants' case but now he's going to

2    wrap up our case.

3            THE COURT:  OK.

4            MS. PLEVAN:  I am not clear about when Professor

5    Bolton -- I mean, he could go on tomorrow I suppose.

6            THE COURT:  All right.

7            MR. SANFORD:  We will have him here available, your

8    Honor.

9            THE COURT:  All right.  Good.  All right.

10           OK.  Can we adjourn for the day?  I have a criminal

11   proceeding now.

12           MR. SANFORD:  Yes, your Honor.

13           THE COURT:  All right.  I'll see you all.  Thank you.

14           MR. HERNSTADT:  Thank you, your Honor.

15           (Adjourned to July 18, 2018, at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                              Page

 3   GEERT BEKAERT

 4   Cross By Mr. Hernstadt . . . . . . . . . . .1457

 5   Redirect By Ms. Donehower  . . . . . . . . .1612

 6   Recross By Ms. Harwin . . . . . . . . . . .1682

 7

 8                        PLAINTIFF EXHIBITS

 9   Exhibit No.                              Received

10    166   . . . . . . . . . . . . . . . . . .1624

11    109   . . . . . . . . . . . . . . . . . .1628

12    23   . . . . . . . . . . . . . . . . . .1645

13    264   . . . . . . . . . . . . . . . . . .1651

14

15

16

17

18

19

20

21

22

23

24

25
```

DEFENDANT EXHIBITS

Exhibit No.                                          Received

BY    . . . . . . . . . . . . . . . . . . .1458

EP    . . . . . . . . . . . . . . . . . . .1462

HD    . . . . . . . . . . . . . . . . . . .1466

KQ    . . . . . . . . . . . . . . . . . . .1468

FW    . . . . . . . . . . . . . . . . . . .1478

SM    . . . . . . . . . . . . . . . . . . .1492

SK    . . . . . . . . . . . . . . . . . . .1492

SN    . . . . . . . . . . . . . . . . . . .1501

SO    . . . . . . . . . . . . . . . . . . .1502

BN    . . . . . . . . . . . . . . . . . . .1515

SP    . . . . . . . . . . . . . . . . . . .1518

BW    . . . . . . . . . . . . . . . . . . .1526

SI    . . . . . . . . . . . . . . . . . . .1537

CW    . . . . . . . . . . . . . . . . . . .1543

CX    . . . . . . . . . . . . . . . . . . .1549

CX-1  . . . . . . . . . . . . . . . . . . .1552

CY    . . . . . . . . . . . . . . . . . . .1553

SJ    . . . . . . . . . . . . . . . . . . .1567

KO    . . . . . . . . . . . . . . . . . . .1576

QJ    . . . . . . . . . . . . . . . . . . .1673