1710

I7inrav1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ENRICHETTA RAVINA,

4                   Plaintiff,

5           v.                          16 CV 2137 (RA)

6   COLUMBIA UNIVERSITY,
                                        Jury Trial
7               Defendant.

8   ------------------------------x

9                                       New York, N.Y.
                                        July 18, 2018
10                                      9:20 a.m.

11  Before:

12          HON. RONNIE ABRAMS

13                                      District Judge

14                          APPEARANCES

15

16  SANFORD HEISLER SHARP LLP
            Attorneys for Plaintiff
17  BY:  DAVID W. SANFORD
         ALEXANDRA HARWIN
18       MELINDA L. KOSTER
         AMY DONEHOWER
19       HERBERT V. McKNIGHT
         ANDREW C. MELZER
20
    PROSKAUER ROSE LLP
21          Attorneys for Defendants
    BY:  BETTINA B. PLEVAN
22       RACHEL S. FISCHER
         STEVEN D. HURD
23       PATRICK KRAMER RICE

24  HERNSTADT ATLAS PLLC
            Attorneys for Defendant Bekaert
25  BY:  EDWARD HERNSTADT

I7inrav1

1              (Trial resumed)

2              (Jury not present)

3              THE COURT:  Good morning, everyone.

4              Everyone can be seated.  Were there any issues you

5     would like to discuss before we bring in the jury today?

6              MS. HARWIN:  Very briefly, your Honor.

7              THE COURT:  Sure.

8              MS. HARWIN:  I understand that defense counsel wants

9     to revisit the issue that I believe you ruled on yesterday

10    concerning the amended testimony of Columbia's 30(b)(6) witness

11    Melissa Rooker.  I will let them raise it.

12             THE COURT:  All right.

13             MS. FISCHER:  Yes, your Honor.

14             Melissa Rooker in her deposition errata did make two

15    corrections to her testimony.  I understand counsel designated

16    certain portions of her deposition, and they want to play her

17    testimony.  One of the portions of her testimony that they want

18    to play before the jury is the portion that was later

19    corrected.  Our view is it's going to be confusing.  I mean, I

20    think they want to show the corrections along with the

21    testimony.

22             Ms. Rooker is going to be testifying here in person.

23    We have no problem with plaintiff's counsel asking her the

24    questions, in terms of when she's here in person, but in terms

25    of playing deposition testimony that's been corrected, I think

I7inrav1

```
 1   it's going to be confusing and potentially prejudicial, because
 2   the jury is not going to understand potentially why they are
 3   being shown two different things.
 4           THE COURT:  I am going to allow them to do that, but
 5   if you want me to instruct the jury that it is not uncommon,
 6   how the procedure works, that after a deposition individuals
 7   are given the opportunity to make any corrections, and that's
 8   what you are seeing here, I am happy to do that.  Or if you
 9   would like me to use different language, I am amenable to your
10   suggestions.
11           MS. FISCHER:  If it is going to be played, then we do
12   prefer that you give an instruction along those lines.
13           THE COURT:  OK.
14           MS. HARWIN:  Additionally, your Honor, she was a
15   30(b)(6) witness.  One of the instructions we think would be
16   helpful to provide to the jury would be as to what a 30(b)(6)
17   witness is.
18           THE COURT:  That you can ask her when she testifies I
19   think.  That you can ask her.  What I want to prevent is
20   something misleading, and I don't think there's anything
21   misleading about not describing exactly what a 30(b)(6) witness
22   is.
23           MS. HARWIN:  At the start of the testimony, there is a
24   question as to, you know, what she is testifying to as a
25   30(b)(6) witness.  So I think that is context that the jury --
```

I7inrav1

```
 1              THE COURT:  What exactly are you asking me to say?
 2              MS. HARWIN:  Just to explain to the jury what a Rule
 3    30(b)(6) witness is, and either you or I could read out the
 4    topics as to which she was designated by Columbia as a 30(b)(6)
 5    witness.
 6              THE COURT:  I think you can ask her that when she's
 7    here.
 8              OK.  Are there any other issues?
 9              OK.
10              So we're still waiting for a few jurors.  So we'll let
11    you know as soon as they get here.
12              (Recess)
13              THE COURT:  Good morning.
14              Mr. Hernstadt, did you have an issue you wanted to
15    raise?
16              MR. HERNSTADT:  Yes, your Honor.  This morning counsel
17    handed me a subpoena to Ms. Kiguel, who will be testifying on
18    Friday, seeking, in addition to the testimony that we are
19    already producing her for, any and all written communications
20    including but not limited to e-mails or text messages between
21    you and defendant Bekaert between January 1, 2014, and July 23,
22    2018.
23              I got this ten minutes ago.  I have reached out to
24    Ms. Kiguel.  I have no idea -- she works full-time.  She has a
25    small child at home.  I have no idea until I speak to her how
```

I7inrav1

1      burdensome this may be.

2                  THE COURT:  All right.

3                  MR. HERNSTADT:  Regardless, she was on the first

4      initial disclosure as a witness.  This is a subpoena that could

5      have been sent two years ago.  To give it to us 48 hours before

6      she is going to testify -- a person who works full-time, I have

7      no idea whether she has a moment to do this before she comes

8      and testifies -- is kind of over the top.  I would ask that it

9      be quashed.

10                 THE COURT:  Does plaintiff want to respond?

11                 MS. DONEHOWER:  Your Honor, as we discussed with

12     Mr. Hernstadt this morning, the subpoena has not been served

13     yet, because we are going to work it out on consent on the

14     first basis.

15                 Mr. Hernstadt proposed some limitations on it, which

16     we will absolutely agree to do, including limiting anything on

17     Columbia's server, because I believe that we have already

18     requested that.

19                 We will also agree to limit and not ask for anything

20     that was copying Professor Ravina.  But I do think for purposes

21     of trial we should have some disclosure about her, especially

22     her recent communications with Professor Bekaert.

23                 THE COURT:  When you say "recent communications" were

24     you intending to limit the time frame dramatically?

25                 MS. DONEHOWER:  We can limit the time frame, your

I7inrav1

1       Honor.

2                  THE COURT:  Why don't you do that and let me know.  I

3       am not sure why you are doing this so late.

4                  MS. DONEHOWER:  Well, we received -- there's been a

5       changing list of who's going to be called as witnesses.  We

6       recently learned that Ms. Kiguel actually was going to be

7       called as a witness.  So we are just trying to make sure we

8       have the documents necessary for her examination just before

9       trial.

10                 THE COURT:  Why don't you speak to Mr. Hernstadt,

11      propose whatever limitation on the time frame that you would

12      propose, and then let's see where we are.

13                 MS. DONEHOWER:  Yes, your Honor.

14                 MR. HERNSTADT:  Your Honor, the first thing I have to

15      do is speak to Ms. Kiguel.

16                 THE COURT:  I understand.

17                 MR. HERNSTADT:  I have no idea if she is willing to

18      accept service of this.  I am going to ask her.

19                 THE COURT:  Sure.

20                 MR. HERNSTADT:  I have no idea whether she has the

21      capacity to do even a limited search.

22                 THE COURT:  Ask her.  Why don't you suggest how you

23      would like to limit it, ask her, and then why don't we see

24      where we are.

25                 MR. HERNSTADT:  Your Honor, I will do so.

I7inrav1

| | |
|---|---|
| 1 | MS. DONEHOWER:  Thank you, your Honor. |
| 2 | THE COURT:  Thanks. |
| 3 | OK.  We are still missing one juror, so hopefully we |
| 4 | can start shortly. |
| 5 | MS. HARWIN:  Your Honor, while we are waiting? |
| 6 | THE COURT:  Yes. |
| 7 | MS. HARWIN:  I have proposed language with respect to |
| 8 | the instruction concerning the deposition testimony that we |
| 9 | just discussed. |
| 10 | THE COURT:  OK. |
| 11 | MS. HARWIN:  What I thought was something sort of |
| 12 | simple, one or two sentences, along the lines that the federal |
| 13 | rules allow deponents to make changes to her testimony after |
| 14 | the fact under oath, and both the original testimony and the |
| 15 | amended statement can be considered by you at trial. |
| 16 | MS. FISCHER:  Your Honor? |
| 17 | THE COURT:  Yes. |
| 18 | MS. FISCHER:  First of all, I believe you said earlier |
| 19 | that you would instruct that it's common or not uncommon for |
| 20 | this to happen, so we would want that included.  Also, rather |
| 21 | than changes, and I'm trying to -- I didn't get all the |
| 22 | testimony down -- but the word corrections, I think those are |
| 23 | two different things.  These are corrections to her testimony. |
| 24 | THE COURT:  Remind me what the precise rule is. |
| 25 | MS. HARWIN:  I believe it's Rule 30(e). |

I7inrav1

|       |                                                                   |
|-------|-------------------------------------------------------------------|
| 1     | The term in the rule is "changes" not "corrections."              |
| 2     | THE COURT:  So I will use the term in the rule.                   |
| 3     | MS. HARWIN:  Your Honor, with respect to frequency, I             |
| 4     | don't think that that's material, and I am not sure even          |
| 5     | factually whether the type of change being made by this           |
| 6     | deponent we can say is a frequent type of change.                 |
| 7     | THE COURT:  I am not going to talk about frequency,               |
| 8     | but I am also not going to include the sentence you,              |
| 9     | Ms. Harwin, asked for.  I am going to say I want to advise you    |
| 10    | that the Federal Rules of Civil Procedure allow a deponent to    |
| 11    | make changes to her testimony under oath after the fact, so she  |
| 12    | has done that here, and leave it at that.                         |
| 13    | MS. HARWIN:  I just want it to be clear to the jury,             |
| 14    | though, that they are allowed to consider either statement.      |
| 15    | THE COURT:  I am just going to say what the rule says.          |
| 16    | That is all I am going say.                                       |
| 17    | MS. FISCHER:  Thank you, your Honor.                             |
| 18    | MS. HARWIN:  The second sentence I made was based on            |
| 19    | the case law in the Second Circuit regarding the status of       |
| 20    | these changes.  I know it's not specifically stated there, but   |
| 21    | that is the case law in the Second Circuit.  I can provide       |
| 22    | authority if that would be helpful.                               |
| 23    | THE COURT:  Feel free to do so.                                  |
| 24    | MS. HARWIN:  OK.  Give me a moment.                              |
| 25    | I believe *Podell v. Citicorp Diners Club*, which is 112       |

I7inrav1

1    F.3d 98 (2d Cir. 1997).

2           THE COURT:  I will take a look at that.  But, in any

3    event, the original is being placed before the jury, so it is

4    not as if they aren't being shown that.  Then I am just going

5    to advise them what the rule says.  But I will take a look at

6    that case in any event.

7           MS. HARWIN:  Thank you.

8           THE COURT:  We are just waiting for one juror.  I just

9    looked at the *Podell* case.  It suggests a district court should

10   do exactly what I am doing, which is allowing both the original

11   testimony and the correction to be read at trial.  So that's

12   what I'm already doing.

13          MS. HARWIN:  I am not suggesting otherwise.  It was

14   just a suggestion with respect to the instruction, just so that

15   the jury understands that they can consider both.  That's all.

16          THE COURT:  Yes.  I think since both will be before

17   the jury, but I will think about how, if at all, to tweak what

18   I am going to say.

19          MS. HARWIN:  Thank you, your Honor.

20          THE COURT:  Sure.

21          I will just say so that's why you are seeing both the

22   original answer and the correction.

23          All right.  Thank you.

24          (Recess)

25          (Jury present)

1          THE COURT:  Good morning, everyone.

2          Everyone can be seated.  Thank you.

3          THE COURT:  Plaintiff you can call your next witness.

4          MR. McKNIGHT:  Your Honor, at this time, we would like

5    to call Dean Hubbard.

6     ROBERT GLENN HUBBARD,

7          called as a witness by the Plaintiff,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. McKNIGHT:

11   Q.  Good morning, Dean Hubbard.

12   A.  Good morning.

13   Q.  For the record, sir, would you state whether you reside in

14   New York City.

15   A.  I do.

16   Q.  Are you currently employed?

17   A.  I am.

18   Q.  For whom are you employed, sir?

19   A.  Columbia University.

20   Q.  How long have you been employed at Columbia University?

21   A.  I joined the faculty in the summer of 1988.

22   Q.  What positions do you currently hold?

23   A.  I am a professor of economics on our faculty of arts and

24   sciences, professor of finance and in economics in the Business

25   School, where I'm also the dean.

1   Q.  Focusing on your responsibilities as dean, would you

2   describe those responsibilities for the ladies and gentlemen of

3   the jury, please.

4   A.  Of course.  I am the person that the trustees of the

5   university and the president will hold accountable for the

6   business school in terms of strategy, its budget and finances,

7   its prestige and reputation, ability to recruit faculty, staff

8   and students, so a number of constituents.

9   Q.  How long have you been dean?

10  A.  I became dean in 2004.

11  Q.  To whom do you report exactly?

12  A.  My de jure report is the president of the university.  I

13  see myself as also being responsible to the faculty, to

14  students, to alumni, to the broader business community, but to

15  the president of the university is the formal answer.

16  Q.  All right.  Thank you.

17         If there is a potential discrimination matter that's

18  brought to your attention, isn't it true that you have a

19  responsibility to turn that over to the Columbia Office of

20  Equal Employment and Affirmative Action?

21  A.  Yes.  That is exactly my understanding.

22  Q.  As the dean of Columbia University Business School, you

23  have a direct-line responsibility for enforcement of Columbia's

24  antidiscrimination, antiharassment, and antiretaliation

25  policies if a faculty member feels that she has been the victim

I7inrav1                          Hubbard - Direct

1    of discrimination, is that right?

2    A.  If I am understanding your question, you might be asking me

3    a legal question, my understanding as a layperson is my

4    responsibility to report and my responsibility to carry out any

5    action that might be mandated by an investigation.

6    Q.  Under the policies of the school.  I am not asking you for

7    a legal instruction at all.  Is that your responsibility under

8    the policies of the university?

9    A.  I take what I just said as, yes, my responsibility to the

10   trustees.

11   Q.  And as you stated, you are responsible for enforcement and

12   implementing the Columbia antidiscrimination, antiharassment,

13   and antiretaliation policies, correct?

14   A.  Yes.  Insofar as I just testified, that is exactly my

15   understanding.

16   Q.  And one of the ways you go about enforcing these policies,

17   sir, is by encouraging diversity, isn't that correct?

18   A.  Yes.  Diversity is very important for our school, whether

19   you mean faculty or students or staff.  It has been a big issue

20   for me in my deanship.

21   Q.  As of 2016, would you agree that about one-third of the

22   tenure-track faculty --

23            MS. PLEVAN:  Objection.

24            THE COURT:  Are we getting into the statistics of

25   diversity?  What are we --

1          MR. McKNIGHT:  Your Honor, I was just going to ask him

2     about the --

3          MS. PLEVAN:  Sidebar, your Honor.

4          THE COURT:  OK.  Let's have a sidebar.

5     (Continued on next page)

I7inrav1                         Hubbard - Direct

1              (At sidebar)

2              MS. PLEVAN:  The ruling on summary judgment is that

3      the university is not being held, that there is no claim

4      against the university for direct discrimination.  I don't see

5      why information about statistics on diversity would be

6      relevant.

7              MR. McKNIGHT:  Your Honor, I am asking -- excuse me.

8      Go ahead.

9              MS. PLEVAN:  The only basis for liability is whether

10     Professor Bekaert engineered what happened.

11             MR. McKNIGHT:  Your Honor, I am asking about the

12     statistics of diversity with respect to Columbia Business

13     School just with respect to the intent issue, your Honor.

14     Nothing else.

15             THE COURT:  I don't think that's relevant, so the

16     objection is sustained.

17             MR. McKNIGHT:  Very well.  I am happy to move on.

18             THE COURT:  Thank you.

19             (Continued on next page)

20

21

22

23

24

25

1          (In open court)

2  Q.  Dean Hubbard, if a faculty member is deemed to have

3  violated a rule or policy of the school, then you may be

4  required to implement that decision, correct, as part of your

5  responsibilities?

6  A.  I am not sure what your question is.  It depends on the

7  policy, and it would depend on the finding in an investigation

8  but, yes, I might be, if that is your question.

9  Q.  You have authority or at least some limited authority at

10 the Columbia Business School to set salaries within reason,

11 correct?

12 A.  Yes.  That is one of my responsibilities as dean.

13         MR. McKNIGHT:  Could we have Plaintiff's Exhibit No.

14 17, please.  This has been admitted into evidence.

15 BY MR. McKNIGHT:

16 Q.  Dean Hubbard, do you recognize what's been identified as

17 Plaintiff's Exhibit No. 17, the Columbia University Employment

18 Policies and Procedures on Discrimination and Harassment?

19 A.  Yes.  The full document is much longer than this, but this

20 may be a summary of that.

21 Q.  All right.  This policy that you are looking at right now

22 was in effect at 2013.  Do you recall that?

23 A.  Yes, sir.

24 Q.  And then there is another policy that went into effect in

25 2015, correct?

I7inrav1                        Hubbard - Direct

1    A.   University policy, yes.

2    Q.   Right.  I take it that as part of your responsibilities as

3    dean that you have reviewed these policies, correct?

4    A.   Yes.  It is an annual requirement for deans in the

5    university.

6    Q.   And consistent with your --

7            MR. McKNIGHT:  You may take it down, please,

8    Mr. McLeod.

9    Q.   Consistent with your responsibilities as dean, and I think

10   you testified to this before, but I am just trying to be clear

11   on it, if one has deemed to have violated the policies that

12   prohibit discrimination at Columbia University, then it might

13   be part of your responsibility to enforce that action at that

14   time?

15   A.   That is correct.

16   Q.   Would you agree, sir, that under the EOAA, the equal

17   opportunity affirmative action policies at Columbia University,

18   the management and supervisory personnel have a duty to take

19   reasonable and necessary action to prevent discrimination and

20   harassment?

21           MS. PLEVAN:  Objection.

22           THE COURT:  Overruled.

23   A.   They do.  Although I am not sure what the legal definition

24   of management and supervisory is in an academic institution,

25   but, yes, those are the words in the policy, if that's your

1    question.

2    Q.  All right.  I am only referring to the words in the policy,

3    and we'll get to the definition of management shortly, sir.

4            Would you agree that under the Columbia University

5    equal opportunity policies that we talked about that the

6    supervisory personnel as defined by the policies include

7    faculty in such roles as department chairs?  Would you agree?

8    A.  That's my understanding, yes.

9    Q.  And they would also include deans such as yourself?

10   A.  Most certainly.

11   Q.  And they would include academic vice deans, correct?

12   A.  Yes.  The people who would be under me on my team, yes.

13   Q.  Very well.

14           Isn't it true that under the Columbia policies against

15   discrimination harassment and retaliation, you were Professor

16   Ravina's supervisor at Columbia University for purposes of

17   these policies?

18   A.  That is a legal question.

19   Q.  Just under the policy, sir.  Not a legal question.

20           MS. PLEVAN:  Objection.

21   A.  The only way --

22           THE COURT:  We will just let the witness answer.

23   A.  The only way I know how to answer it is, it is my job to

24   interpret and execute the policies.  Whether I meet the legal

25   test of what a supervisor is is something I can't answer.

I7inrav1                    Hubbard – Direct

1   Q.  Are you supervisor as you understand the policies under

2   these rules?

3   A.  I am charged with their implementation and execution, but I

4   can't say whether that fits the definition legally of a

5   supervisor, as opposed to staff, who would directly be under my

6   supervision.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7i1rav2                         Hubbard - Direct

1    BY MR. McKNIGHT:

2    Q.  I'm asking you about your understanding of the policy.

3    A.  That's really a legal question.  My understanding is that I

4    implement them and I do my best to do that.  Whether it meets

5    the word "supervisor," I'm not sure.

6            MR. McKNIGHT:  Can we have Plaintiff's Exhibit 17,

7    please.

8            And could we go to page 8098.

9    Q.  Would you look at this paragraph, sir, and see whether it

10   refreshes your recollection as to whether you have certain

11   duties to act as defined by the policy itself; not the legal

12   definition but the policy.

13           MS. PLEVAN:  Objection.

14   A.  Yes, I think this says --

15           MS. PLEVAN:  Objection.

16           THE COURT:  Sorry.  Just give me one second.

17           My transcript is down.  Can you repeat the question.

18   Q.  Dean, I'm asking you whether, in looking at this part of

19   the policy, whether you recognize that under the policy itself,

20   that you as a manager have certain responsibilities to act

21   under the Columbia University policies.

22           MS. PLEVAN:  That's a different question.

23           THE COURT:  All right.  So I'll allow this question to

24   go forward.

25   A.  Yes, I think I already testified that is my understanding

1      of the policy.

2      Q.  Okay.  And Dean Hubbard, would you degree that this duty

3      that we just described, that we just discussed, is triggered

4      upon learning directly or indirectly of conduct that might

5      violate the university's policies in this regard?

6      A.  That would certainly be a trigger, yes.

7      Q.  And another duty under the policy, wouldn't you agree,

8      would be you would have a duty to report any, once you learn,

9      indirectly or directly, of an allegation of discrimination,

10     correct?

11     A.  That is absolutely true.

12     Q.  And that in order to draw the line completely, that duty to

13     report is a duty to report to the employment office at the

14     Office of Employment Opportunity and Affirmative Action.

15     A.  That is correct.

16     Q.  And so when I say EOAA, you understand what I'm talking

17     about then, correct?

18     A.  Exactly so.

19     Q.  Very well.

20            Now you first learned about Professor Ravina and that

21     she had made a complaint against Professor Bekaert from Senior

22     Vice Dean Johar, correct?

23     A.  I'm not sure what you mean by "complaint."  The first I

24     heard of a professional dispute between the two colleagues was

25     from Senior Vice Dean Gita Johar.

I7i1rav2                    Hubbard - Direct

1   Q.  And at the time that you learned about this, you then

2   followed up with a meeting on June 16, 2014, correct?

3   A.  That's absolutely correct.  Professional disputes are

4   something that I need to be aware of.

5   Q.  Now you had a meeting on June 16, 2014, correct?

6   A.  Yes, sir.

7   Q.  And who was at that meeting?

8   A.  My recollection was Professor Ravina and myself, of course,

9   Vice Dean Horan, and Suzanne Goldberg.

10  Q.  All right.  So Professor Ravina is there, Vice Dean Horan,

11  and Professor Susan Goldberg, correct?

12  A.  Suzanne, yes, Goldberg.

13  Q.  Suzanne.  And Professor Suzanne Goldberg is a professor at

14  the Columbia law school, correct?

15  A.  She was at the time --

16  Q.  At the time.

17  A.  -- a professor of professional practice in the law school,

18  yes.

19  Q.  And at the time her expertise at Columbia Law School was in

20  gender discrimination, correct?

21  A.  Yes, among other things.

22  Q.  And at this particular meeting on June the 16th, 2014, you

23  learned that Professor Ravina complained that Professor Bekaert

24  had been disrespectful to her, correct?

25  A.  I'm not sure the word "disrespectful" was used, but yes,

I7i1rav2                    Hubbard - Direct

1   there had been a significant professional disagreement that

2   didn't sound like a happy time, so whether that's

3   disrespectful, I'm not sure of that word.

4   Q.  Dean Hubbard, you remember that your deposition was taken

5   in this matter, correct?

6   A.  Yes.

7              MR. McKNIGHT:  All right.  Can we show the dean his

8   deposition testimony at page 51.  Just show it to him for a

9   moment.

10             THE COURT:  Okay.

11             MR. McKNIGHT:  Page 51, line 16 to page 52, line 1.

12  Q.  Would you take a moment and read that and tell me whether

13  it refreshes your recollection about whether there was a

14  complaint made to you at that time about the fact that

15  Professor Bekaert had been disrespectful to Professor Ravina.

16  A.  I'm sorry.  Where would you like me to read?

17  Q.  From --

18             MS. PLEVAN:  What page and line?

19  Q.  I'm on page -- going from page 51, line 16, to page 52,

20  line 1.

21  A.  Okay.  You'd have to scroll through, though, if you want me

22  to read it, but -- my screen is blocked with -- it's not

23  scrolling down.

24             THE COURT:  It's not scrolling down.

25             MR. McKNIGHT:  All right.  We can do it another way.

1            Could I have Plaintiff's Exhibit No. 199, please.

2            Once again, without publishing it to the jury.

3   Q.   I direct your attention to paragraph 20.

4   A.   It's not visible to me.

5   Q.   All right.

6   A.   Oh, here it is.  I -- yes.

7   Q.   All right.  And looking at paragraph 20, is your

8   recollection refreshed that Professor Ravina complained to you

9   about Professor Bekaert being disrespectful to her?

10  A.   Yes, I definitely see that word, yes.

11  Q.   Thank you.

12           And do you recall also at this meeting that Professor

13  Ravina complained about the timeliness of the work and the

14  papers between Professor Bekaert and Professor Ravina?

15  A.   Yes, that was the real concern brought up in the meeting

16  from Professor Ravina, and I had offered to assist.

17  Q.   And she complained to you that Bekaert was not working in a

18  timely way, correct?

19  A.   I believe that was one of her concerns, yes.

20  Q.   And you would agree that Professor Ravina also communicated

21  to you at that time that Bekaert was not living up to his part

22  of the bargain with respect to the papers that they were

23  working on, correct?

24  A.   I think there was a dispute again about timeliness and

25  effort on the project, so I -- you could interpret it that way,

I7i1rav2                         Hubbard - Direct

1    yes.

2    Q.  Again, Professor, I'd like to show you your deposition,

3    just publish it to you.  At page 56, line 25 to page 57,

4    line 24.

5              Take a moment and look that over.

6    A.  Yes, it says exactly what I just said to you at line 5

7    through 8 on page 57.  If you'd like, I can read it.

8    Q.  But your understanding was at that time that she

9    communicated that they were having difficulty in terms of the

10   delay.  Did you understand that, that she complained, at least,

11   that he was delaying things?

12   A.  Certainly there was a concern about timeliness in finishing

13   papers and projects, yes.

14   Q.  And you understand also that Professor Bekaert was ranked

15   higher than Professor Ravina at the time, correct?

16   A.  Yes, he was a tenured professor in our school.

17   Q.  And you recognize also that a junior person might be more

18   reticent to express concerns to a senior colleague than someone

19   who is a peer, correct?

20   A.  I agree that that's possible.

21             MR. McKNIGHT:  I'd like to admit Plaintiff's Exhibit

22   No. 40, your Honor.

23             MS. PLEVAN:  I don't know what it is yet.

24             MR. McKNIGHT:  For the record, it's a series of emails

25   dated June 19, 2014.  The last was Professor Ravina to Janet

I7i1rav2                      Hubbard - Direct

1   Horan, and it was cc'd to --

2            THE COURT:  You actually don't need to announce it for

3   the jury.  We'll see if it comes into evidence.

4            MR. McKNIGHT:  Okay.  That's fine.

5            THE COURT:  Is there any objection?

6            MS. PLEVAN:  No objection.

7            THE COURT:  Okay.  So 40 will be admitted.  Thank you.

8            MR. McKNIGHT:  Thank you, your Honor.

9            (Plaintiff's Exhibit 40 received in evidence)

10  BY MR. McKNIGHT:

11  Q.  Now turning to the bottom of page 2.  Do you recall that

12  this meeting -- actually, go to the first page.  I apologize.

13           Do you recall at this meeting that after the meeting

14  Professor Ravina summarized what was discussed at the meeting,

15  correct?

16           MS. PLEVAN:  I'm sorry.  Does the witness have a hard

17  copy of the exhibit?

18           THE WITNESS:  I have it on the screen.  I can read it

19  on the screen.

20           MS. PLEVAN:  It's a two-page document, so --

21  A.  I have it.  I'm sorry, sir.

22           THE COURT:  Please proceed.  Thank you.

23  Q.  All right.  Professor Ravina after the meeting contacted

24  you and Janet Horan, who was the vice dean, correct?

25  A.  Yes.  If you're asking about this email, yes, that would be

I7i1rav2                    Hubbard - Direct

1    the contact.

2    Q.  And then summarized her recollection about what happened at

3    that meeting, correct?

4    A.  Yes.  That recollection isn't entirely accurate, but I do

5    agree that all of these things were discussed at the meeting.

6    Q.  Very well.

7              MR. McKNIGHT:  I'm through with that document, your

8    Honor.

9              THE COURT:  Okay.  Thank you.  You can just leave it

10   right here.  Thank you.

11   Q.  Did there come a time, sir, when you directed your chief of

12   staff, Laura Lee, to contact Director Michael Dunn of the EOAA

13   office?

14   A.  Yes.

15   Q.  Okay.  And you recall that you directed her to do this

16   somewhere around mid-July 2014, correct?

17   A.  Yes, as soon as I became aware of the allegation.

18   Q.  All right.  And at the time you directed her to do this

19   because you were concerned about the power relationship between

20   Professor Bekaert and Professor Ravina, correct?

21   A.  That's a general concern in such relationships.  It's not

22   really the reason for reaching out to Michael Dunn, but yes,

23   that is a concern.

24   Q.  And, well, let's explore that for a moment.

25              You did have a concern about the power relationship,

1    and that was one of the reasons that you said that you directed

2    her to contact Mr. Dunn, correct?

3    A.   Yes.

4    Q.   All right.  And part of your concern about the power

5    relationship was that he was her senior and she was junior,

6    correct?

7    A.   That is an element of the -- there are differences in

8    academic ranks, so yes, if that's your question.

9    Q.   And right at the time that you made that referral to the

10   EOAA, you had some concerns that triggered that policy,

11   correct, which is why you made the referral?

12   A.   That's correct.  That's what I was answering before.

13   Q.   Very well.

14        And at the time that you actually made this referral,

15   you didn't have any information -- at least at the time you

16   personally did not know that there was any complaint about

17   sexual harassment at that time, correct?

18   A.   I don't recall exactly.  It was in mid-July when I learned

19   from vice dean -- Senior Vice Dean Phillips about that

20   allegation, so I'm not sure -- they're all close in time.

21   Q.   Very well.

22        But by mid-July then, as you're testifying, you were

23   aware that there was a sexual harassment component to her

24   allegations.

25   A.   Yes, Senior Vice Dean Phillips informed me of that and

I7i1rav2                          Hubbard - Direct

 1    that's why I went to EOAA.

 2    Q.  Very well.

 3            MR. McKNIGHT:  At this time I would like to move

 4    Exhibit No. 48 into evidence, please.

 5            THE COURT:  Any objection to 48?

 6            MS. PLEVAN:  No objection, your Honor.

 7            THE COURT:  Okay.  48 will be admitted.  Thank you.

 8            (Plaintiff's Exhibit 48 received in evidence)

 9    BY MR. McKNIGHT:

10    Q.  You just testified that you directed Laura Lee to contact

11    the EOAA office, correct?

12    A.  Yes, sir.

13    Q.  And this exhibit, Plaintiff's Exhibit No. 48, reflects the

14    communication between Laura Lee and Michael Dunn, correct?

15    A.  Let me just take a moment.

16            Yes, it appears to be.

17    Q.  And you'll see that the first -- the first email in the

18    chain, which is on page 2, that begins, "Dear Michael," is the

19    one that went from Laura Lee to Michael Dunn, Michael being

20    Michael Dunn, correct?

21    A.  Yes, sir.

22    Q.  All right.  And then if you go to the first page, Laura Lee

23    is forwarding that on through the chain, correct, up the chain

24    of command and it reaches you, correct?

25    A.  Yes.

1   Q.  All right.  And I take it when you received it on

2   July 21st, you reviewed the contents of this email, correct?

3   A.  Correct.

4           MR. McKNIGHT:  And can we look at the page 2 that

5   begins on the second page, please.

6   Q.  And you'll note that it says, "On July 9, Janet and Glenn

7   met with Geert."  Now Geert would be who?

8   A.  Professor Bekaert.

9   Q.  And Janet is Janet Horan, correct?

10  A.  That's correct.

11  Q.  "To discuss the complaints and Enrichetta's proposed

12  remedies."  Now Enrichetta refers to who?

13  A.  Professor Ravina.

14  Q.  And then it goes on, "He was 'shocked' by the complaints

15  and acknowledged his brusque style but claimed his treatment of

16  Enrichetta is consistent with how he treats other faculty more

17  broadly."  Correct?

18  A.  Yes.

19  Q.  And do you recall that discussion at the July 9th meeting?

20  A.  I do.  I had numerous discussions with Professor Bekaert on

21  this point.

22  Q.  And would you agree that he mentioned dinner invitations

23  that he made to Enrichetta that were unprompted?

24  A.  Yes, that's why I noted it here.

25  Q.  I didn't hear that answer, please.

1    A.  Yes, that's why I noted it here.

2    Q.  All right.  Very well.

3           And you'll also note that he was also asked to always

4    copy the dean's office in future email communications with

5    Enrichetta and he also continued to email her without copying

6    the dean's office, correct?

7    A.  Yes.  I asked for that for two reasons.  One, to make sure

8    I could monitor the behavior between the two of them; and

9    second, as a parent, sometimes the notice that your father is

10   there puts people on their watch, so --

11   Q.  Let's just focus on this.

12          So there was a meeting in July, correct, and you were

13   there?

14   A.  By "meeting," you mean the meeting with Professor Bekaert.

15   Q.  Absolutely.

16   A.  Yes, okay.

17   Q.  And at that meeting you told him one of the things you

18   wanted him to do was to copy you on all the communications,

19   correct?

20   A.  That is correct.

21   Q.  All right.  And do you agree here that as of July 19th,

22   when this email went out, that he already was failing to copy

23   you on all of the emails that were coming out?

24   A.  Yes.  I believe they were both failing to do so, but this

25   refers to him.

I7i1rav2                          Hubbard - Direct

1    Q.  This refers to him, correct?

2    A.  Correct.

3    Q.  And that's all that's mentioned in this email on July 19th,

4    correct?

5    A.  Because the subject is a meeting with him, but yeah.

6    Q.  Is that correct that this is all this email says, sir?

7    A.  Absolutely.

8    Q.  All right.  Thank you.

9         MR. McKNIGHT:  Can we turn to the third page of this,

10   please.

11   Q.  At the time that you were talking -- or at least you

12   authorized Laura Lee to send this to Mr. Dunn on your behalf,

13   correct?

14   A.  On the third page is not a note to Mr. Dunn, but -- do you

15   mean earlier note?  Yes, on page 2, yes, that's --

16   Q.  Page 2.  But page 2 continues over to page 3, correct?

17   A.  Yes.  All of that note.

18   Q.  Right.  And you'll see that there is a suggested email that

19   would go to Geert and Enrichetta about how to handle this

20   situation further, correct?

21   A.  Yes, it follows up on my idea for a cc.

22   Q.  Right.  And it also follows up on your idea for having a

23   project relations manager, correct?

24   A.  Yes, that had been my idea.

25   Q.  All right.  And you'll look below that where Laura Lee said

I7i1rav2                         Hubbard - Direct

1    that, that you, Glenn, would also like to set up one-on-one

2    Title IX training for Geert.  Do you see that right there?

3    A.   Yes, that was my request.

4    Q.   Now as the dean of the business school, were you aware in

5    July of 2014 that the EOAA office had just completed an

6    investigation with respect to Professor Geert, an alleged

7    sexual harassment in May of 2014?

8    A.   I don't recall being --

9              MS. PLEVAN:  Objection, to the characterization.

10             THE COURT:  Why don't you rephrase that.

11   Q.   All right.  Were you aware of the fact that there had been

12   an investigation of alleged sexual harassment against

13   Professor --

14             MS. PLEVAN:  Objection, your Honor.

15   Q.   -- Bekaert --

16             THE COURT:  Yes.  You know what, I'll let you answer

17   the question to the best of your knowledge, and if you have a

18   problem with the characterization, let me know that.

19             THE WITNESS:  Yes, your Honor.

20   A.   I don't recall being aware at the time of such an

21   investigation.  I wasn't copied on any of the correspondence.

22   I am aware of that now.  I wouldn't describe it the way you

23   did.  I'm a layman, but I think you mischaracterized it.

24   Q.   All right.  So at the time that this happened in July, you

25   didn't know about any prior investigations by the EOAA into

I7i1rav2                    Hubbard - Direct

1   conduct by Professor Bekaert.

2   A.  I don't recall knowing that at the time.

3   Q.  But at the time you decided to recommend that Professor

4   Bekaert might need Title IX training, correct?  That was your

5   recommendation?

6   A.  I thought he would benefit from it, yes.

7   Q.  And what is Title IX training?

8   A.  Well, Title IX training would be familiarity with the

9   university's discrimination procedures, for harass -- what is

10  the definition of harassment, but more broadly it also touches

11  on the environment for the workplace, how to deal with

12  colleagues.  It's more than a sexual document.

13  Q.  Now earlier they had a dispute about their papers and their

14  collaborative work, correct?

15  A.  They had myriad disputes about myriad papers, but yes.

16  Q.  But that's a yes, right, correct?

17  A.  Yes.

18  Q.  Simple question.

19          And as you were discussing some of this, you

20  recommended to Professor Bekaert that he stand down.  You used

21  those terms to describe it, correct?

22  A.  I most definitely did.

23  Q.  And you recognized that the marginal value of the papers

24  that they were working on was not high to Professor Bekaert but

25  the marginal value was high to Professor Ravina, so you

1    suggested that Professor Bekaert stand down at that time,

2    correct?

3    A.   That was my logic, although Professor Bekaert tried to

4    assure me, that it was --

5    Q.   Sir, right now I want you to answer me yes or no, and if

6    you want to explain later on, you'll be given the opportunity,

7    all right?

8    A.   I'm trying to give a complete answer so the question isn't

9    misleading.

10   Q.   Right now I'm asking you a yes or no question, and you'll

11   be able to answer fully later.  Fair enough?

12   A.   I'll answer the best of my ability.

13   Q.   Very well.

14           And as you were moving through this process, you said

15   that you were not in a position to enforce the outcome,

16   correct?

17   A.   I'm not sure what you mean by "the outcome."

18           MR. McKNIGHT:  Well, can we look at -- show him,

19   please, show the professor his deposition, page 99, lines 22 to

20   24, please.

21           THE WITNESS:  Oh, I see.  You misread it.

22           MS. PLEVAN:  I'm sorry.  I don't know how much the

23   witness has, but there's context and --

24           THE WITNESS:  I have it, and he misread the word,

25   which is important to the question.  So you may want to ask

1    your question again with the correct word and then I'll answer

2    it.

3    BY MR. McKNIGHT:

4    Q.  All right.  You'll agree that you told Professor Bekaert to

5    stand down, correct?

6    A.  I answered that question.  Same answer, yes.

7    Q.  All right.  And at that time that you told him to stand

8    down, Dean, you weren't ordering him to stand down, correct?

9    A.  You can't make people work on a project or work with

10   somebody else on a project, work by themselves.  That's not

11   part of life.

12   Q.  All right.  I'm asking you, again, a yes or no question.

13   You weren't giving him an order and requiring him to stand down

14   at that particular point, were you, sir?

15   A.  There's no human way I could, as long as there's a First

16   Amendment, no.

17   Q.  Very well.  So you didn't believe that you had any

18   authority to actually force him to stand down at that time.

19   A.  I don't have authority to tell people what they can work

20   on.  I can try to create an environment that makes them in his

21   interest, and that's what I tried to do.

22   Q.  And consistent with that, under Columbia policy, you

23   believed that you had no authority to issue a formal direction

24   to Professor Bekaert that he should not work on any future

25   papers arising from the data set he and Professor Ravina were

1    working on, correct?

2    A.  I don't have the authority to order any faculty member in

3    any circumstance to do that.

4           MR. McKNIGHT:  Okay.  Now can we turn back to Exhibit

5    No. 48, please.

6           And page 2.

7    Q.  Now by the time you received this email -- and you received

8    it -- I think we already established you received it on

9    July 21st, correct?  You agree with me to that?

10          MS. PLEVAN:  Which email are you --

11          MR. McKNIGHT:  Well, at the top of the email, on the

12   first page it says, "OK - thanks," and Dean Hubbard received

13   the entire email chain at that time.

14   Q.  You will agree that you got it at that time?

15   A.  This chain, yes.

16   Q.  Yes.  And so at the time that you received this chain, if I

17   can go back to page 2 -- which is part of the chain, correct?

18   A.  Yes, sir.

19   Q.  All right.  And at least at that time you were aware that

20   Professor Ravina felt that Geert's behavior made her

21   uncomfortable and that she believed there was some sexual

22   innuendo, citing frequent invitations to dinner alone for the

23   two of them, correct?

24   A.  Yes, that was my understanding from Senior Vice Dean

25   Phillips.

1  Q.  All right.  Thank you.

2          Now at some point in these back-and-forths with

3  Professor Bekaert -- because you met with him on a number of

4  occasions, correct?

5  A.  Yes, sir.

6  Q.  And also at some point in time you met with Professor

7  Ravina, correct?

8  A.  Never alone, but in the setting with Vice Dean Horan and

9  Professor Goldberg.

10  Q.  But in the process of some of these meetings when you met

11  with Professor Bekaert, you warned him against retaliating in

12  any way, did you not?

13  A.  I most definitely did.

14  Q.  And at the time that you warned him against retaliating,

15  though, you didn't tell him what consequences might occur if he

16  retaliated against Professor Ravina under these circumstances,

17  did you?

18  A.  I advised him that there could be legal consequences.  I'm

19  not a lawyer, but I was really there as an academic saying

20  that's just untoward behavior, don't do it.

21  Q.  But you met with Professor Bekaert a number of times to try

22  to encourage him to adopt a different approach to Professor

23  Ravina, correct?

24  A.  I'm not sure what you mean by a different approach.  We had

25  a number of meetings where I suggested actions, ultimately most

1   of which he took, but --

2   Q.  But you met with him a number of times to get him to adopt

3   a different approach with respect to the papers they were

4   working on with Professor Ravina, correct?

5   A.  "Approach" is a very general term, but I did offer concrete

6   suggestions.

7           MR. McKNIGHT:  All right.  Can we go to deposition,

8   86, lines 2-5.  Please don't publish it to the jury.

9   Q.  Do you see the top of the page there from lines 2 to 5?

10  A.  Yes.  I'm summarizing a number of things that I had said to

11  him, so yes.

12  Q.  All right.  And you agree then from looking at that line

13  that you repeatedly tried to get him to adopt a different

14  protocol and approach to the papers, correct?

15  A.  That's certainly true.

16  Q.  All right.

17          MR. McKNIGHT:  Your Honor, I would like to move

18  Plaintiff's Exhibit No. 51 into evidence, please.

19          MS. PLEVAN:  No objection.

20          THE COURT:  All right.  51 will be admitted.

21          (Plaintiff's Exhibit 51 received in evidence)

22  Q.  Now if you look at the email from Professor Ravina to you,

23  Glenn Hubbard, dated July 25, 2014 -- do you see that?

24  A.  I don't see that.

25  Q.  It's in the middle of the page.

 1    A.  I don't see an email from Professor Ravina on that page.

 2             MS. PLEVAN:  Mine says the 25th.  I don't see --

 3             MR. McKNIGHT:  Right.

 4    Q.  Let's go to -- I'm sorry.  Let's go to No. 52.

 5    A.  I should put this away or --

 6    Q.  Yes.  Put that one away.  Let's go to 52.  And I'll return

 7    to 51.

 8             THE COURT:  Any objection to 52?

 9             MS. PLEVAN:  No objection.

10             THE COURT:  All right.  52 will be admitted.

11             (Plaintiff's Exhibit 52 received in evidence)

12             MR. McKNIGHT:  All right.  Thank you.

13    BY MR. McKNIGHT:

14    Q.  Do you see, Dean, this email dated July 25th from

15    Enrichetta Ravina, Professor Ravina to you on that date,

16    correct?

17    A.  Yes.

18    Q.  And you'll see that on line 1, "I have received the email

19    below from Geert yesterday and a similar email today on which

20    Glenn is not cc'd," correct?

21    A.  I agree that's what it says, yes.

22    Q.  All right.  And so again, this goes back to one of the

23    rules you implemented and it was not at this time being

24    followed by Professor Bekaert, correct?

25    A.  I believe the sentence goes on to say he shifted to bcc but

1  yes, the cc was not being followed.

2  Q.  All right.  And your response to this was, "The university

3  needs to pick this up.  This level of immaturity is

4  inappropriate."  Isn't that what you wrote?

5  A.  Yes, when one is down to fighting between bcc and cc --

6  Q.  Sir, I asked you whether this is a correct statement of

7  what you wrote.

8  A.  It's on the page, so yes.

9  Q.  Thank you.

10       MR. McKNIGHT:  Now let's go back to No. 51, please.

11  Q.  Now do you remember this particular email exchange?

12  A.  This meaning the entire chain?

13  Q.  Yes.  Take a moment and look at the email exchange.

14  A.  One moment.

15       Okay.  I remember this, yes.

16  Q.  All right.  And if you go to I guess the second page --

17  which would be Bates stamp 1883, right?

18  A.  Yes.

19  Q.  This is the email to you from Professor Bekaert, correct?

20  A.  Yes, it is.

21  Q.  And in this particular situation, if we look at the second

22  full paragraph, "First, it is almost impractical to have Glenn

23  cc'd on every email between us.  For example, over the last

24  week (during my vacation), there have been lots of emails

25  concerning all three different projects, a number initiated by

1   Enrichetta, some by me, some by co-authors."  "I ended up not

2   cc'g Glenn partly because I simply forgot."  Do you see that?

3   A.  I see that.  Those are his words.

4   Q.  All right.  And during the course of this email he was

5   recommending that you go to a different system of blind cc'g

6   you, correct?

7   A.  Yes, he's recommending that.

8   Q.  And that he felt that would be a better approach, correct?

9   A.  That is his view, yes.

10  Q.  All right.  And then you heard from Laura Lee about that,

11  correct?

12  A.  I don't remember if she's on this.

13  Q.  Look on the first page.

14          And if you look at the second line, "Also, if Geert

15  does a bcc, then Enrichetta," that would be Professor Ravina,

16  "will not know that he is complying, although we will."  Do you

17  see that?

18  A.  Yes, that is her statement.

19  Q.  All right.  And your response to this at the time was, "I

20  am weary of being in the middle of this."  Isn't that what you

21  wrote?

22  A.  That's correct.

23  Q.  All right.  And right now, we're only a few days after

24  you -- or let's take it back one.  You're four days after the

25  formal complaint was filed to the EOAA, correct?

1  A.  Yes, but that's not the "this" that's being referred to.

2  Q.  Just hear me out.  Is this four days after the formal

3  complaint was filed?

4  A.  Should be about that length of time, yes.

5  Q.  And it's less than a month, sir, after you first learned

6  about any problems between the two of them on June 16th,

7  correct?

8  A.  That's correct.

9  Q.  All right.  Thank you.

10        And then after you wrote, "I am weary of being in the

11  middle of this," you'll see that Katherine Phillips -- who is

12  the vice dean, correct?

13  A.  She was the senior vice dean.

14  Q.  Senior vice dean.  I'm sorry.  She wrote back, "Glenn, I'm

15  sorry that this is dragging on" to you, correct?

16  A.  Those are her words, yes.

17  Q.  All right.  Thank you.

18            MR. McKNIGHT:  Can we go to Exhibit No. 56, please.

19            MS. PLEVAN:  No objection.

20            THE COURT:  All right.  56 will be admitted.

21            (Plaintiff's Exhibit 56 received in evidence)

22  Q.  Now, Dean, do you recall receiving this email that's dated

23  July 25, 2014?

24  A.  Yes, I do.

25  Q.  All right.  In this email you receive correspondence from

1   Janet.  Who's Janet again?

2   A.  Janet Horan is our vice dean for operations.  Think of her

3   as a COO of our school.

4   Q.  All right.  And Janet Horan reports that she spoke to

5   Michael Dunn.  Who's Michael Dunn?

6   A.  Michael Dunn would have been one of the Title IX officers

7   at the time.  I don't believe he's at the university anymore,

8   but at the time he would have been there.

9   Q.  All right.  And in this email Ms. Horan is notifying you

10  that Michael Dunn has advised her that he believes that you're

11  taking all the right steps in dealing with the current

12  situation, correct?

13  A.  Those are her words to me, yes.

14  Q.  And at that time also she notifies you that Michael,

15  Michael Dunn, "is going to provide us with the names of

16  trainers that we can call upon to meet with Geert and address

17  the issues at hand," correct?

18  A.  Yes.

19  Q.  And given that this is July 25th, would you agree that that

20  refers back to your earlier recommendation about Title IX

21  training?

22  A.  In all likelihood, yes.  I'm not really sure what their

23  conversation was.

24  Q.  All right.  Thank you.

25          MR. McKNIGHT:  Can we look at Exhibit No. 44.

I7i1rav2                          Hubbard - Direct

1            I'd like to move that into evidence, please.

2            THE COURT:  Any objection?

3            MS. PLEVAN:  One second, your Honor.

4            THE COURT:  Sure.

5            MS. PLEVAN:  No objection.

6            THE COURT:  44 will be admitted.

7            (Plaintiff's Exhibit 44 received in evidence)

8   BY MR. McKNIGHT:

9   Q.  Dean, would you take a moment to review the email here.

10  You were supposed to meet with Professor Ravina and Professor

11  Goldberg on August 6, 2014, correct?

12  A.  May I just read it one second, please?

13  Q.  Sure.

14  A.  Okay.  I'm there.  I'm sorry.  Your question?

15  Q.  If you go back to say the second page, maybe this will help

16  you with it.

17          Do you see on the second page where it says, "Hi,

18  Janet and Glenn, Thank you.  August 6, 3 p.m. works for both

19  Suzanne and me," correct?

20  A.  Yes, I see that.

21  Q.  All right.  So you were supposed to have a meeting on

22  August 6th.

23  A.  Indeed it's still on my calendar.  I noticed that in

24  preparation for today.

25  Q.  But there was no meeting on August 6th, right?  It was

1    canceled.

2    A.  No.  My assistant's notes say that the guests didn't show

3    up, but I don't recall one way or the other.

4    Q.  Well, if you look at the top there, right, on August 6th,

5    where you say, "I will schedule a meeting.  I apologize if the

6    ball got dropped on my end.  I'm trying to engage the

7    university here, and I have reached out to Michael Dunn as I do

8    not have the time to personally monitor all of this multiple

9    times a day."

10           Does that refresh your recollection that the

11   August 6th meeting did not happen?

12   A.  I already said it didn't happen.

13   Q.  Very good.  Thank you, sir.

14           MR. McKNIGHT:  Can we have Exhibit No. 42, please.

15           I'd like to move that into evidence.

16           No, no, skip 42.

17           THE COURT:  Any objection?

18           MS. PLEVAN:  No objection.

19           THE COURT:  All right.  42 will be admitted.

20           (Plaintiff's Exhibit 42 received in evidence)

21   BY MR. McKNIGHT:

22   Q.  After this August 6th meeting was canceled, you met with

23   Professor Ravina on September 16, 2014, correct?

24   A.  Yes.

25   Q.  And at that time Professor Ravina continued to make

1  complaints to you about the work and the delays and the

2  progress of the papers, correct?

3  A.  That's absolutely true.

4  Q.  And she conveyed to you that she was having an extremely

5  difficult time with Professor Bekaert, correct?

6  A.  I would characterize that as accurate, yes.

7  Q.  Now you characterized Professor Ravina's emails to

8  Professor Bekaert as a soap opera, correct?

9  A.  I characterized many of the emails as a soap opera, yes.

10 Q.  And you called Professor Ravina's emails with Professor

11 Bekaert as disgraceful, correct?

12 A.  I could well have used that word.  I don't recall, but I

13 could easily remember -- or easily imagine saying that to both

14 of them.

15 Q.  And you called Professor Ravina's communications with

16 Professor Bekaert unprofessional, correct?

17 A.  I called both of them unprofessional to each other, in the

18 nth degree.

19 Q.  Now you're aware that the EOAA made a determination

20 November of 2014, correct?

21 A.  You'll have to be more specific with me.

22 Q.  All right.

23 A.  About what?

24 Q.  The EOAA office made a determination about its

25 investigation into the allegations between Professor Ravina

1    against Professor Bekaert in November of 2014, correct?

2    A.  Yes, sir, that I'm aware of.

3    Q.  And you were aware of that as soon as it occurred, correct?

4    A.  I was copied on the decisions being sent out.

5              MR. McKNIGHT:  Can we see Exhibit No. 91.

6              THE COURT:  Any objection to 91?

7              MS. PLEVAN:  Is it already in evidence?

8              MR. McKNIGHT:  I'd like to move it into evidence.

9              MS. PLEVAN:  It's a different exhibit then.

10             THE COURT:  Take a minute.

11             MS. PLEVAN:  I do have one objection to the top of the

12   first page, your Honor.

13             MR. McKNIGHT:  Your Honor, I don't believe there was

14   any objection noted in the pretrial order, but --

15             THE COURT:  Can you say the objection in a word or

16   should we meet at sidebar?

17             MS. PLEVAN:  Privilege.

18             THE COURT:  Okay.  Can we take out the first email.

19             MR. McKNIGHT:  Yes, your Honor.

20             THE COURT:  Okay.  Thank you.

21             MS. PLEVAN:  Really it would be the top email

22   exchange.

23             MR. McKNIGHT:  Your Honor, can we please meet at

24   sidebar?

25             THE COURT:  Sure.

I7i1rav2                    Hubbard – Direct

1            (At the sidebar)

2            THE COURT:  Here he's saying, "I really need to meet

3    with a lawyer."  Would you be amenable to just taking that line

4    out?

5            MS. PLEVAN:  Yes.

6            THE COURT:  Okay.  So can we just take the line out,

7    "I really need to meet with a lawyer.  I need to know what's

8    going on."

9            MR. McKNIGHT:  Your Honor, this was admitted

10   yesterday.

11           THE COURT:  Oh, was it?

12           MS. PLEVAN:  Oh.  Well, I'd still like to take it out,

13   but I don't recall that.  It was being offered, so I just

14   assumed it hadn't been.

15           THE COURT:  Okay.  I assumed it hadn't been either.

16   Okay.  Next time, if something's already been admitted, just

17   let me know that.

18           MR. McKNIGHT:  Very well.

19           THE COURT:  Okay.  I mean, it's not communication with

20   a lawyer, but -- and it's already in.  I would have kept it

21   out, but if it's already in, it's in.

22           Thank you.

23           MR. McKNIGHT:  All right.  Thank you, your Honor.

24           (Continued on next page)

25

I7i1rav2                          Hubbard - Direct

 1              (In open court)

 2              THE COURT:  You may proceed.

 3              MR. McKNIGHT:  Thank you, your Honor.

 4              THE COURT:  All right.  So it turns out this is

 5    already in evidence, 91.

 6    BY MR. McKNIGHT:

 7    Q.  If we can look at Bates stamped 0171 for a moment.

 8    A.  Okay.

 9    Q.  And if you look at the bottom, you'll see that Professor

10    Ravina is complaining about not receiving certain codes and

11    tables that she needs for her work, correct?

12    A.  I see those are her words, and it would be their work, but

13    yes.

14    Q.  All right.  And you're cc'd on this particular email,

15    correct?

16    A.  Yes, per the original instruction.

17    Q.  All right.  And this is another example of the ongoing

18    dispute in terms of delaying work, at least as she has alleged

19    to you before, correct?

20    A.  It's a dispute.  Whether it's a bona fide delay is --

21    Q.  I didn't ask about whether it's bona fide, but she's

22    continuing to complain about the same thing she was complaining

23    to you earlier when she first met you in June 16, 2014; that's

24    my question.

25    A.  Not literally the same, but yes, in that family.

I7i1rav2                    Hubbard - Direct

```
 1   Q.  All right.  And as you can see, there's some resistance
 2   from Professor Bekaert above that in terms of providing her
 3   with these codes, correct?
 4   A.  I'm not sure.  Where would you like me to read?  I don't
 5   see that.
 6   Q.  Well, if you look above that, the next email, he doesn't
 7   agree to provide her with the codes right away in the next
 8   email up, which is December 5, 2014, correct?
 9   A.  Now I'm confused.  I see a December 4th email from him.
10   Q.  I meant December 5, 2014 --
11   A.  I don't see --
12   Q.  -- from Professor Bekaert, at the top of the page.
13   A.  Oh, I'm sorry.
14   Q.  Right?  So that's the next email.  He doesn't agree to send
15   her the codes in that email, correct?
16   A.  Yes, 'cause he says there's much more work to do.  Again,
17   this is a conversation between them.  I'm just reading words.
18   Q.  Again, I just asked you a question.  He doesn't agree to
19   send her the codes then, correct?
20   A.  Yes, and he articulates why.
21   Q.  And then there's another email on the first page,
22   December 5, 2014, and she's writing again, "Geert, can you send
23   me the codes and tables that you have done so far, like I asked
24   on November 20th?"  Do you see that on the first page,
25   December 5, 2014?
```

1   A.  Those are her words to him, yes.

2   Q.  And then Geert above that says, "I'm not going to send it,

3   Andrea is not going to send it, period.  I feel like just

4   saying no."  Correct?

5   A.  Those are his words, yes.

6   Q.  Again, this is in the same family of issues that were

7   raised with you in June of 2014.

8   A.  Yes, insofar as the dispute over the papers, yes.

9            MR. McKNIGHT:  Can we see Plaintiff's Exhibit No. 53,

10  please.

11           Your Honor, I'd like to move 53 into evidence, please.

12           THE COURT:  All right.  Let's take a look.

13           Any objection to 53?

14           MR. HERNSTADT:  Your Honor, just one moment, please?

15           THE COURT:  Sure.

16           MR. HERNSTADT:  No objection, your Honor.

17           MS. PLEVAN:  No objection.

18           THE COURT:  All right.  53 will be admitted.

19           (Plaintiff's Exhibit 53 received in evidence)

20  BY MR. McKNIGHT:

21  Q.  All right.  I'm going to direct your attention to Bates

22  stamp 8396, at the bottom of the page.

23           And now, Dean, you would agree that this is

24  December 9, 2014, correct?

25  A.  That's what it says, yes.

1    Q.  All right.  And in this Professor Ravina says, "Geert, I am

2    still waiting for the codes and tables that I asked you for

3    three weeks ago.  When are you going to send them?  How long

4    does it take to format them?  And please, like I said, feel

5    free to send them unformatted."

6              Do you see that?

7    A.  Those are her words, yes.

8    Q.  All right.  And so you see that Professor Ravina is still

9    complaining about the same sorts of issues that she had in June

10   of 2014, correct?

11   A.  Correct.

12   Q.  Same family.

13             All right.  And then you'll note, if you go to the

14   bottom of Bates stamp 8395 over to the next page --

15   A.  I see that.

16   Q.  -- you see that she's still pushing Professor Bekaert about

17   getting these codes from him, correct?

18             MS. PLEVAN:  Objection, your Honor.

19             THE COURT:  Would you characterize it that way?  You

20   can use your own words.

21   A.  I -- of course I'm not able to speak to whether lawyers

22   were or were not involved.  It's -- I'm not a party to this

23   email.  But she is asking to get tables and codes, but I'm just

24   reading someone else's emails.  It's not clear that this is

25   testimony from me.

1

2   Q.  Let's go to the next e-mail up on 8395, in the middle of

3   the page.

4           This is December 9, 2014 at 8:22 p.m., correct?

5   A.  Yes.  That's what it says.

6   Q.  And it's from Professor Bekaert, right?

7   A.  That's what it says.

8   Q.  And you are CC'd on it?

9   A.  Yes, I am.

10  Q.  And at this point Professor Bekaert notes, "I am going to

11  let the dean's office and university lawyers deal with this."

12          Correct?

13  A.  Those are his words, yes.

14  Q.  And if you look at the next paragraph, he says:  "At this

15  point I am just working on the paper with Andrea.  There is no

16  point in turning over anything anyway, as it would require much

17  time on our part, which we do not have, and (b) it would

18  require communications between you and Andrea, which cannot

19  happen, and (c) it would mean we would have two teams working

20  on one paper simultaneously, which makes no sense."

21          Do you see that?

22  A.  I see that.

23  Q.  And you were made aware of this at the same time that it

24  was sent out, correct?

25  A.  Yes.  And those seemed like reasonable points to me.

1   Q.  I just asked you whether you were made aware of it.  Were

2   you?

3   A.  I am CC'd on it.

4         MR. McKNIGHT:  Very well.  Can we go to the first page

5   of this exhibit, please.

6   BY MR. McKNIGHT:

7   Q.  This is on December 11, 2014, at 8:21, correct?

8   A.  Yes.  That's the date on the e-mail.

9   Q.  And it's from Professor Ravina and it's addressed to you

10  and Janet Horan and Daniel Wolfenzon.

11        Who is Daniel Wolfenzon?

12  A.  I had asked Professor Wolfenzon, who is a colleague in the

13  finance group, to help be a relationship manager between

14  Professor Bekaert and Professor Ravina, essentially to smooth

15  out some of these issues that the jury has been hearing about.

16  Q.  Is he that relationship manager that we talked about

17  before?

18  A.  Yes.  He was acting at my request to do that.

19  Q.  Let's look at this particular e-mail.  She writes:  "Hi

20  Glenn and Janet.  I have asked Geert something very simple and

21  clear, to send the tables and codes he has already generated so

22  I can complete the paper, send it to the company for review and

23  then submit it."

24        Do you see that?

25  A.  Those are her words, yes.

1    Q.  "It takes at most one hour."  Do you see that?

2    A.  Those are also her words.

3    Q.  "Can you please reiterate to him that he needs to send

4    them?  The university lawyer stated soon after November 20th,

5    that tables and codes were on their way, and Geert needed just

6    a little more time for formatting."

7              Do you see that?

8    A.  Those are her words, yes.

9    Q.  She writes, "Clearly the request above doesn't entail any

10   formatting.  Additionally, three weeks have passed.  I need to

11   replicate these codes and tables at great expense of my time,

12   and this affects my work on this and other papers."

13             Do you see that?

14   A.  Those are her words, yes.

15   Q.  So you were, again, familiar with this at the time that it

16   was sent out in the world of e-mail, right?  Right away?

17   A.  Yes, I am familiar with this is her perspective.

18   Q.  And above that, at the top of the page, is your response,

19   correct?

20   A.  Correct.

21   Q.  In your response you say: "Why can't Geert give her

22   whatever she's asking for?  He could still continue to work on

23   the papers."

24             Isn't that your response at that time?

25   A.  Absolutely.

I7inrav3                          Hubbard - Direct

1    Q.  All right.  Thank you.

2           And, again, this problem is in the same family of

3    problems that you were notified about in June of 2014, correct?

4    A.  I'm sorry.  By "this problem" you mean formatting of codes

5    or --

6    Q.  The delay in getting codes and a response from Professor

7    Bekaert is in the same family of issues that were brought to

8    your attention in June of 2014?

9    A.  Yes.  From her perspective, that is true.

10   Q.  All right.

11          At the end of the year in 2014, there was a dispute

12   between Professor Bekaert and Professor Ravina about the

13   authorship or control of certain papers, correct?

14   A.  I don't recall, but that could well be true.

15   Q.  And at that time you expressed that you thought that Geert

16   should just walk away from some of these papers, correct?

17   A.  Yes.  I believe I wrote him Christmas Eve before 6 a.m.

18          MR. McKNIGHT:  All right.  Can we have Plaintiff's

19   Exhibit No. 244.

20          Your Honor, I would like to move Plaintiff's Exhibit

21   No. 244 in evidence, please.

22          THE COURT:  Any objection?

23          MS. PLEVAN:  No objection.

24          THE COURT:  All right.  244 will be admitted.

25          (Plaintiff's Exhibit 244 received in evidence)

I7inrav3                          Hubbard - Direct

1   BY MR. McKNIGHT:

2   Q.  Looking at the first page of this, that's Bates stamped

3   2429.  Do you see that, the e-mail at the bottom?

4   A.  Yes, I do.

5   Q.  Again, Professor Ravina is writing to Professor Bekaert and

6   you are CC'd on it, right?

7   A.  Yes, sir.

8   Q.  She says:  "More than a month ago, when I asked for the

9   codes and tables for the international paper, which I am still

10  waiting for, I have been told Andrea would like to take herself

11  out of this situation.  You should also give her permission to

12  send the codes and tables I am still waiting for."

13          Do you see that?

14  A.  I see that she wrote those words, yes.

15  Q.  All right.  And so, again, she is still having the same

16  type of problems, same family of problems that she had before,

17  at least from her perspective, correct?

18  A.  Her perspective.  His is on the subsequent page.

19  Q.  Right, right.  You respond to that particular e-mail on

20  December 31, at 11:44 p.m. and your response is, "Sigh."

21  Correct?

22  A.  That's correct, to the entire chain of e-mails.

23  Q.  All right.  That's what you wrote, correct?

24  A.  Absolutely correct, but to the chain, yes.

25  Q.  And then above that, Janet Horan writes, "I thought the

1   response might be worse."  Correct?

2   A.  Those are her words, yes.

3   Q.  And who's Janet Horan again?

4   A.  She is our vice dean for finance and operations,

5   essentially the COO of the school.

6   Q.  And your response simply was, "There's that."  Correct?

7   A.  Correct.

8          Although I am confused on your time stamps.  These

9   don't appear to be in order, so I am not sure this document is

10  legitimate as a train, but for what it's worth.

11         MR. McKNIGHT:  There's no question pending.

12         I would like to admit plaintiff's trial Exhibit No.

13  211, please.

14         THE COURT:  Any objection?

15         MS. PLEVAN:  No objection.

16         THE COURT:  All right.  It will be admitted.

17         (Plaintiff's Exhibit 211 received in evidence)

18  BY MR. McKNIGHT:

19  Q.  This is an e-mail dated February 19, 2015, from Professor

20  Bekaert to Janet Horan and it CCs you, correct?

21  A.  Yes.

22  Q.  And the subject of the e-mail is "Re AE Paper," correct?

23  A.  Yes.

24  Q.  And he writes:  "Hi Janet.  I still question this strategy.

25  My accepting this is achieving exactly nothing for neither me,

1  nor the university regarding this whole time-wasting process."

2  Correct?

3  A.  Those are his words to her.

4  Q.  All right.  And you are CC'd on this, correct?

5  A.  Yes, I am.

6  Q.  And then your response is simply, "Additional trouble."

7  Correct?

8  A.  Yes.

9  Q.  That's what you wrote?

10  A.  Yes.

11         MR. McKNIGHT:  I would like to move into evidence

12  Plaintiff's Trial Exhibit No. 102, your Honor.

13         THE COURT:  Any objection?

14         MS. PLEVAN:  We did have an objection.

15         Just one moment.

16         MR. McKNIGHT:  Again, your Honor, there was no

17  objection noted.

18         THE COURT:  What is the objection?

19         MS. PLEVAN:  Relevance.

20         THE COURT:  Do you want to meet at the sidebar to

21  explain.

22         It is time for our morning break.  Why don't we do

23  that now rather than waiting.  Remember, don't discuss the

24  case, keep an open mind, and I will see you in a few minutes.

25         Thank you.

1              (Jury not present)

2              THE WITNESS:  May I be excused as well?

3              THE COURT:  Yes.  Just come back in a few minutes.

4              If you could just walk me through it.  If you need a

5    minute, that's fine.

6              (Witness not present)

7              MS. PLEVAN:  I think our objection is focused on the

8    second and third pages.

9              THE COURT:  OK.

10             MS. PLEVAN:  It doesn't seem to be related to the

11   first page.

12             MR. McKNIGHT:  Your Honor, they are just the context

13   for the first page.  It's the full e-mail set.  Their usual

14   complaints have been that we have suffered from a lack of

15   completeness, and here we have given the whole e-mail train.

16             THE COURT:  Did Mr. Hubbard receive the whole chain?

17             MS. PLEVAN:  That is what I am not clear about, but I

18   guess I am just going to -- let me just look.

19             Yes.  I think it must have been, your Honor, so I will

20   withdraw the objection.

21             THE COURT:  OK.  All right.  Why don't we just take

22   our morning break.

23             Thank you.

24             (Recess)

25

1          (Witness resumed)

2          THE COURT:  Why don't we bring the jury back in now.

3          (Jury present)

4          THE COURT:  Everyone can be seated.  Thanks.

5          You may proceed.

6          MR. McKNIGHT:  Thank you, your Honor.

7    BY MR. McKNIGHT:

8    Q.  I would like to have Plaintiff's Exhibit No. 102, please.

9          THE DEPUTY CLERK:  Is this admitted?

10          THE COURT:  Yes.  I should note for the record that I

11   just admitted it pursuant to our conversation.

12          MR. McKNIGHT:  Thank you, your Honor.

13          (Plaintiff's Exhibit 102 received in evidence)

14   BY MR. McKNIGHT:

15   Q.  Dean Hubbard, can we look at the e-mail from Professor

16   Ravina at the bottom of the first page, please.

17   A.  Yes, I'm there.

18   Q.  All right.  And that is an e-mail dated March 13, 2015,

19   correct?

20   A.  That's correct.

21   Q.  And it is sent to Janet Horan, and you are also on the line

22   of receivers, correct?

23   A.  Yes, I am.

24   Q.  And Daniel Wolfenzon, the relationship manager, is also on

25   that line, correct?

I7inrav3                        Hubbard – Direct

 1   A.  That's correct.

 2   Q.  And there is another name on the line, Stephen Zeldes.

 3          Do you see that?

 4   A.  I do.

 5   Q.  And what is his official title?

 6   A.  At the time Professor Zeldes, who is an economist, was the

 7   chairperson of the finance and economics division.

 8   Q.  In this particular e-mail, Professor Ravina writes:  "I've

 9   received Janet's phone call and e-mail yesterday about the

10   relationship manager being CC'd (thank you).  I would like

11   indeed to follow protocol and have the relationship manager

12   CC'd, not BCC'd on all communications, as we discussed and

13   agreed in the summer."

14          "Below is another e-mail Geert sent without CC'ing the

15   relationship manager.  Is there any reason he thinks the rules

16   have changed?"

17          Do you see that?

18   A.  Yes, I do.  Those are her words.

19   Q.  So she's bringing this to your attention, correct?

20   A.  She is sending me this note, yes.

21   Q.  Right.  And you reacted to that on March 13, 2015, simply

22   with the word "sigh," isn't that correct?

23   A.  That's correct.

24   Q.  And then after that Janet Horan responds on March 13, 2015:

25   "I am speaking with Geert on Monday morning at 9:30 about the

1   data question.  I will remind him, although she reminded him in

2   her subsequent message to him."

3          Do you see that?

4   A.  Yes, I do see that.

5   Q.  All right.  And then in response to that you wrote,

6   "THX" -- thanks, correct?

7   A.  Yes, I meant thanks.

8   Q.  "My comment actually referred to her nastiness, though you

9   are right."

10          Do you see that?  That was your response?

11  A.  Yes.  It wasn't literally to that e-mail, but those are my

12  words, yes.

13          MR. McKNIGHT:  All right.  Thank you.

14          I would like to have Plaintiff's Exhibit No. 101.

15          I would like to move admission of Plaintiff's Exhibit

16  No. 101, please.

17          THE COURT:  Any objection?

18          MS. PLEVAN:  Just a moment.

19          No objection.

20          THE COURT:  All right.  101 will be admitted.

21          (Plaintiff's Exhibit 101 received in evidence)

22          MR. McKNIGHT:  Thank you.

23  BY MR. McKNIGHT:

24  Q.  This is an e-mail from Professor Ravina, correct, to

25  Professor Bekaert, right?

1  A.  Yes, it appears to be.

2  Q.  And you are CC'd again, Professor Wolfenzon is CC'd, Janet

3  Horan is CC'd.  She's the senior vice dean, correct?

4  A.  No.

5  Q.  She is just the vice dean?

6  A.  She's vice dean for operations and finance.  Again, you can

7  think of her as a COO of the school, not an academic.

8  Q.  All right.  Thank you.  And Professor Zeldes, who is the

9  acting chair of the division -- is that the correct title?

10  A.  He was the actual chair at that time.

11  Q.  All right.  Thank you.

12        And the subject is "Re Int Division paper," correct?

13  A.  It was, international diversification is I believe what

14  that stands for.

15  Q.  Right.

16        She writes, "Thank you for correcting the typos and

17  rearranging some phrases.  I accepted all your changes with two

18  exceptions."  Correct?

19  A.  Yes.  Those are her words.

20  Q.  She writes, "I have modified the discussion of the

21  interaction between advice and demographics in the following

22  way"  Correct?  And she explains what she did, correct?

23  A.  Yes.  Those are her words.

24  Q.  Then she goes on to ask Professor Bekaert whether -- she

25  says, "Let me know if you are OK with these changes and then I

1    would like to be the one who sends the draft to the company

2    (CC'ing everyone, of course)."

3          Correct?

4    A.  Yes, those are her words.

5    Q.  And then she closes it, best, Enrichetta, correct?

6    A.  Correct.

7    Q.  All right.  And then you respond to this or are you react

8    to it on March 13, 2015 at 3:54 p.m., in an e-mail to Vice Dean

9    Horan, and you write, "So hostile."  Isn't that your response?

10   A.  Yes, the first paragraph is self-evidently hostile

11   especially.

12   Q.  Sir, I just asked you if that is what you wrote.  Is that

13   what you wrote?

14   A.  Yes.  Very defensively, yes.

15         MR. McKNIGHT:  Thank you.  Can we turn to Plaintiff's

16   Exhibit No. 95, please.

17         Your Honor, this is already admitted into evidence.

18         THE COURT:  OK.  You can publish it.

19   BY MR. McKNIGHT:

20   Q.  Focusing on the e-mail at the bottom of page 1, Exhibit No.

21   95, it's Professor Ravina writing again to Professor Bekaert,

22   correct?

23   A.  Yes, it appears to be.

24   Q.  Right.  And you are on the recipient line also?

25   A.  Yes, I am.

1   Q.   OK.  And she writes:  "It's close to two years you have

2   been e-mailing you are working on the paper.  Last time you did

3   so was during the summer, under the watch of the school."

4            Do you see that?

5   A.   Those are her words.  I can read them.  Yes.

6   Q.   All right.  And you respond in an e-mail that is sent just

7   to Vice Dean Horan, "The beat goes on."

8            That's your response, correct?

9   A.   Yes, they had not come to conclusion.

10  Q.   Sir, I -- "the beat goes on" is what you said in the

11  e-mail, correct?

12  A.   Absolutely.

13  Q.   All right.  Thank you.

14           We talked about July 2014 early in the day, correct?

15  A.   Yes, sir.

16  Q.   And the events surrounding how you became aware of the

17  allegations that Professor Ravina was bringing as to the

18  conduct of Professor Bekaert, correct?

19  A.   Yes.  Although those may be two different conversations,

20  but, yes, we talked about all of those things.

21  Q.   Right.  And we also discussed at that time that you asked

22  your chief of staff, Laura Lee, to file a report with the EOAA

23  office at that time based on what you knew at that time,

24  correct?

25  A.   Correct.

1    Q.  And what I want to clarify is that the referral to the EOAA

2    that you made in July of 2014 with respect to Professor Ravina

3    and Professor Bekaert is the only EOAA referral that you made

4    involving those two people.

5    A.  My recollection is that's true, yes.

6            MR. McKNIGHT:  All right.  Thank you.

7            Could we have Exhibit No. 105, please.  It's already

8    admitted into evidence, your Honor.

9            THE COURT:  All right.

10           You can publish it.

11   BY MR. McKNIGHT:

12   Q.  Dean Hubbard, you recognize this as a letter that you sent

13   to Professor Ravina in June of 2015?

14   A.  Yes.  That's the time at which I would send all faculty

15   their annual salary letter.

16   Q.  All right.  I want to focus your attention on the last two

17   paragraphs.

18           You wrote, "In the past year your senior colleagues

19   have provided you with formal feedback an your work to date."

20   Correct?

21   A.  Yes.

22   Q.  "An outline of what is needed to achieve tenure at

23   Columbia."  Correct?

24   A.  Yes.

25   Q.  And then you wrote, "I join them in their assessment that

1   your publication record is not currently on track for promotion

2   or tenure at Columbia."

3   A.   Yes.

4   Q.   All right.  But Dean Hubbard, nowhere in here do you

5   mention the fact that she was having any sort of difficulties

6   with respect to her relationship or her claims of

7   discrimination against Professor Bekaert, correct?

8   A.   Quite the contrary.  The upcoming leave refers to my

9   relieving her from teaching, the second time I had intervened

10  to help her during professional distress.

11  Q.   But in this particular paragraph the word "discrimination"

12  doesn't appear, does it?

13  A.   No, there would be no reason for it to appear.

14  Q.   And in this paragraph the word "harassment" doesn't appear,

15  does it?

16  A.   No, there would be no reason it would.

17  Q.   And in this paragraph, you don't discuss any of the ongoing

18  issues that she's had in the delay that we have been discussing

19  all morning, correct?

20  A.   That's false.  As you are aware, the last sentence refers

21  to the external conversations, meaning between and among

22  counsel about her tenure clock.

23  Q.   And nowhere in here do you discuss retaliation, do you?

24  A.   No, there would be no reason that I would.

25          MR. McKNIGHT:  Can we have Plaintiff's Exhibit No.

I7inrav3                         Hubbard - Direct

1   230, please.

2              MS. PLEVAN:  What number?

3              MR. McKNIGHT:  230.  I'm sorry.

4              MS. PLEVAN:  No objection.

5              THE COURT:  All right.  230 will be admitted.

6              (Plaintiff's Exhibit 230 received in evidence)

7   BY MR. McKNIGHT:

8   Q.  This is an e-mail from Katherine Phillips.

9              Again remind the jury who that might be.

10  A.  Senior Vice Dean Phillips is a professor of management and

11  leadership in our school.  At the time she was our senior vice

12  dean, which is a formal word.  It really means deputy dean.

13  Q.  And she writes to you at this time:  "I am super frustrated

14  for her.  I am going to push, this has to stop.  Not sure what

15  I can do, but this is to the point of ridiculous, really."

16             Now, did you understand the "her" in this sentence to

17  refer to Professor Ravina?

18  A.  I believe that's what Professor Phillips intends.

19             MR. McKNIGHT:  All right.  Thank you.

20             Could we have Plaintiff's Exhibit 263, please.

21             I would like to move 263 into evidence, please.

22             MS. PLEVAN:  No objection.

23             THE COURT:  All right.  263 will be admitted.

24             (Plaintiff's Exhibit 263 received in evidence)

25  BY MR. McKNIGHT:

I7inrav3                          Hubbard - Direct

1   Q.  Now, you will recall that we just looked at an exhibit

2   where Katherine Phillips wrote, "I'm super frustrated for her.

3   I am going to push.  This has to stop."

4          You remember that?  We just did that, correct?

5   A.  Yes.

6   Q.  And then your response to that on 8/22/2015 was, "I know

7   and I agree."  Correct?

8   A.  Yes, the lack of collaboration has to stop.

9   Q.  Your response to this was, "I know and I agree."  Correct?

10  A.  Yes.  And I'm explaining what that meant.  I'm entitled to

11  interpret my own e-mails.

12  Q.  You are entitled to answer my question and just say yes,

13  and they will give you a chance to respond.

14  A.  Those are the words, as you can clearly read.

15  Q.  Thank you.

16          Dean Hubbard, on September 1, 2015, you received an

17  e-mail from Victor P. Goldberg, correct?

18  A.  I recall receiving an e-mail from Vic Goldberg at some

19  point.  I can't say it's that date.  But, yes, I do recall

20  receiving an e-mail, yes.

21  Q.  All right.  And who is Vic P. Goldberg, please.

22  A.  He happens to be an old personal friend, but he is a

23  professor in our law school.  He's actually an economist but he

24  sits in the law school.

25  Q.  He wrote you an e-mail on September 1 --

I7inrav3                          Hubbard - Direct

 1              MS. PLEVAN:  Objection.

 2              THE COURT:  All right.

 3              Is this on relevance grounds?

 4              MS. PLEVAN:  And ultimately hearsay, but --

 5              MR. McKNIGHT:  Your Honor, there is just one question,

 6    and it's to connect another e-mail.  I am not -- we can have a

 7    sidebar on it.

 8              THE COURT:  We can have a sidebar.

 9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       (At sidebar)

2           MR. McKNIGHT:  After Dean Hubbard received this e-mail

3   from Victor Goldberg, he forwards it to Phillips.  My intent is

4   just to establish that the e-mail went from Goldberg to

5   Phillips, because Phillips makes a comment which I think is

6   then relevant.

7           My intent is not to go into what Professor Goldberg

8   said, consistent with your earlier rulings about getting

9   people's descriptions and things like that about their opinion

10  about the case.  It is just to get to the next part.

11          MS. PLEVAN:  What is the question you are going to ask

12  him?

13          MS. FISCHER:  It is a separate document.

14          THE COURT:  Just to be clear, what e-mail are we

15  talking about, 263 that was just admitted?  Which one?

16          MS. PLEVAN:  It is a different one.  You upheld our

17  objection on hearsay grounds to Professor Goldberg's.

18          THE COURT:  OK.

19          MR. McKNIGHT:  He writes that e-mail to professor --

20          THE COURT:  I'm sorry this is 113?

21          MR. McKNIGHT:  I'm sorry.  I apologize.

22          THE COURT:  OK.

23          MS. HARWIN:  I have a clean copy.

24          THE COURT:  Do you have a copy for counsel?

25          Thank you.

1             I will take that one now.  Thank you.

2             MS. PLEVAN:  We object to this on other grounds as

3      well.

4             MR. McKNIGHT:  Your Honor --

5             MS. PLEVAN:  Her comment reflects conversations with

6      him.

7             THE COURT:  I don't think --

8             MR. McKNIGHT:  I know you don't want Vic Goldberg,

9      anything that he said, and I am not going to do that.  I just

10     want to say that he expressed his concerns and that you then

11     forwarded that e-mail to Katherine Phillips.

12            MS. PLEVAN:  Who expressed concerns?

13            MR. McKNIGHT:  Vic Goldberg.

14            MS. PLEVAN:  I would object to anything about content.

15            MR. McKNIGHT:  Let me finish.

16            MS. PLEVAN:  Go ahead.

17            MR. McKNIGHT:  Vic Goldberg he forwards it to her,

18     right, and she has been involved in this since the very

19     beginning.  She's the vice dean.  She's going to testify.  And

20     she more or less adopts it.

21            She even says, although he only has half the story I

22     think he is right.  There's not more than that I can do.  I

23     feel my hands are tied -- let me finish.  And she says, There

24     are lawyers involved, but maybe I should just do what I want

25     and wait for her to see me.

1          As far as I am concerned, that is an admission by her.

2     I'm only trying to get to what she said and then what the dean

3     responded to it.  I am not trying to get what Goldberg said.

4     By saying I think he is right I think that is important.

5               MS. PLEVAN:  Well --

6               MR. HERNSTADT:  Your Honor, apart from everything, if

7     I may just briefly?

8               MS. PLEVAN:  Go ahead.

9               MR. HERNSTADT:  Apart from everything else, the

10    conversation, the e-mail from Mr. Goldberg is about settlement

11    discussions.  It is also false.  What is happening here is

12    Goldberg has been told something that is not true.  He's

13    passing it on.  Then Kathy Phillips is opining about the false

14    information or the hearsay information.  Let's say -- may I

15    finish?

16              MR. McKNIGHT:  Yes, please.

17              MR. HERNSTADT:  Let's say hearsay information.

18              So he passes on some hearsay information to the dean.

19    The dean passes it on to Kathy Phillips, and now it is double

20    hearsay.  And it's about settlement discussions.  It says there

21    is a recommended arbitration -- an arbiter.  I gave her the

22    name.  Enrichetta told me the other party has pulled out of the

23    arbitration.

24              That is all about settlement conversations.  Now she's

25    adopting -- they want to put in something where Kathy Phillips

I7inrav3                         Hubbard - Direct

is adopting or that is the interpretation.

           MS. PLEVAN:  And I would object to asking Phillips

about this for the same reasons.

           MR. HERNSTADT:  Exactly.  Because it's hearsay about

settlement, and it's hearsay within hearsay.

           MS. PLEVAN:  It's commenting on something that is

hearsay.

           MR. HERNSTADT:  What Professor Ravina told Goldberg

and it is about settlement.

           MR. McKNIGHT:  She knows he only has half the

information.  She mentions that in her response.  She knows

that he doesn't know much, and she mentions that.  So I think

that's been dealt with.

           MR. HERNSTADT:  You --

           MR. McKNIGHT:  Let me finish.

           MR. HERNSTADT:  OK.

           MR. McKNIGHT:  She knows that's been dealt with, and

in spite of all that she says she knows and she agrees and she

wished she could do something about it at the end.

           MR. HERNSTADT:  Your Honor, one point is that that's

not correct.  Because at this point they had settlement

conversations with the lawyers.  So Ms. Phillips doesn't know

what is going on.  I am having these discussions with Ann

Clark.  That's what is happening in settlement.  Ms. Phillips

is not part of it.

1          THE COURT:  I will rule later on whether Ms. Phillips

2    can be questioned about it, but I don't think Mr. Hubbard

3    should at this point in time.  They are talking about

4    settlement negotiations.  She's talking about her hands being

5    tied by the lawyers and he's responding that it's frustrating

6    very possibly to hands being tied by the lawyers.

7          So, on privilege, hearsay, and 403 grounds I don't

8    think you should use this with this witness.

9          MR. McKNIGHT:  Very well, your Honor.

10         (Continued on next page)

I7inrav3                         Hubbard – Direct

1              (In open court)

2              MR. McKNIGHT:  Your Honor, I move to admit Plaintiff's

3     Exhibit No. 130, please.

4              THE COURT:  Thank you, any objection to 130?

5              MS. PLEVAN:  Based on the Court's ruling before, no.

6              THE COURT:  Yes, of course.  It will be admitted.

7              (Plaintiff's Exhibit 130 received in evidence)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7i1rav4                          Hubbard - Cross

1                MR. McKNIGHT:  Very well.  If we could publish that,

2     please.

3     BY MR. McKNIGHT:

4     Q.  Dean Hubbard, on January 22, 2016, you received this

5     addressed to Provost Coatsworth, correct, and Dean Hubbard?

6     That would be you, right?

7     A.  Correct.

8     Q.  And it says, "The undersigned tenured faculty members in

9     the Finance and Economics Division of Columbia Business School

10    wish to express their support for Enrichetta Ravina's request

11    to have her tenure clock extended."  Correct?

12    A.  Correct.

13    Q.  And you received a copy of this petition, correct?

14    A.  I did.

15    Q.  All right.  And you're aware that the provost's office

16    subsequently denied Professor Ravina's extension request,

17    correct?

18    A.  Of her tenure clock, yes, that's correct.

19    Q.  All right.  Thank you.

20                MR. McKNIGHT:  I would like to admit Plaintiff's

21    Exhibit No. 160, please.

22                THE COURT:  160 will be admitted.

23                (Plaintiff's Exhibit 160 received in evidence)

24                MS. PLEVAN:  Again, no objection based on the Court's

25    prior ruling.

I7i1rav4                         Hubbard - Cross

1    BY MR. McKNIGHT:

2    Q.  Dean Hubbard, I direct your attention to Plaintiff's

3    Exhibit No. 160.  It's dated March 25, 2016.

4            "Dear Provost Coatsworth and Dean Hubbard, The

5    undersigned tenured faculty members in the Finance and

6    Economics Division of Columbia Business School are not in a

7    position to provide an evaluation of Enrichetta Ravina's tenure

8    case at this time."  Do you see that?

9    A.  I do.

10   Q.  And you received a copy of this?

11   A.  I did.

12   Q.  You are aware that Columbia Business School subsequently

13   proceeded with Professor Ravina's tenure vote, correct?

14   A.  Yes, they were in a position and they did vote.

15   Q.  Excuse me, sir.  You are aware that they subsequently

16   proceeded with her tenure vote, correct?

17   A.  Correct.

18   Q.  All right.  Thank you.

19           Now you attended a meeting, sir, on April 12, 2016

20   about the upcoming tenure vote involving Professor Ravina, did

21   you not?

22   A.  That's my recollection.

23   Q.  And the people who attended that meeting with you included

24   tenured members of the finance and economics division, correct?

25   A.  Those would have been the invitees, yes.

I7i1rav4                          Hubbard - Cross

1   Q.  And you were only there for a short period of time,

2   correct?

3   A.  That's correct.

4   Q.  And at that meeting you told the division that they needn't

5   consider anything in the tenure case except her record,

6   correct?

7   A.  That was my instruction.

8   Q.  All right.  And so with that, they didn't consider any of

9   the allegations that were brought by Professor --

10              MS. PLEVAN:  Objection.

11              MR. McKNIGHT:  I'm just saying what they didn't do,

12  but --

13              MS. PLEVAN:  Well --

14              THE COURT:  I'll allow it.  Overruled.

15              MS. PLEVAN:  Your Honor, he wasn't even present for

16  that meeting.

17              THE COURT:  Is that true?  Were you not present?  I

18  mean, if it's hearsay, then I agree.  But if he has personal

19  knowledge -- I mean, were you present for --

20              MS. PLEVAN:  The tenure vote meeting.

21              THE COURT:  Okay.  I see.

22              THE WITNESS:  If it's helpful, your Honor, I did give

23  the instruction that I said and then I left the meeting.  I was

24  not there.

25              THE COURT:  All right.  So we'll leave it at that.

1    I'm going to sustain the objection.  We'll leave it at that.

2    Thank you.

3    BY MR. McKNIGHT:

4    Q.  When you instructed them not to consider anything but the

5    record, you intended to instruct them to exclude any discussion

6    about the allegations that Professor Ravina made with respect

7    to Professor Bekaert, isn't that correct?

8    A.  They're entitled to do what they wish.

9    Q.  I've asked you a question.

10   A.  My statement to them was that a court would consider those

11   things, they should focus on academics --

12           MR. McKNIGHT:  Your Honor, I'd like him to answer my

13   question.

14           THE COURT:  What did you intend when you instructed

15   them to exclude any discussion about the allegations that

16   Professor Ravina had made?

17           THE WITNESS:  That they limit their decision to an

18   academic one; does her record merit tenure, full stop.

19           THE COURT:  All right.

20           MR. McKNIGHT:  Thank you, your Honor.

21   BY MR. McKNIGHT:

22   Q.  Dean Hubbard, on April 12, 2016, you wrote an email to the

23   Columbia Business School community, correct?

24   A.  Yes.  I don't remember the exact date, but I did write an

25   email around that time.

1  Q.  And the email started, "I know our school community is

2  understandably concerned and saddened, as I am, about the

3  well-publicized and highly unfortunate litigation involving our

4  faculty."  Do you remember that?

5  A.  Yes.

6  Q.  All right.  And you sent that email to the entire

7  community, correct?

8  A.  Yes.  Students and faculty, staff.

9  Q.  All right.  And you're aware that Professor Ravina then

10  responded to your email and wrote to the entire -- at least the

11  faculty of the Columbia Business School, correct?

12  A.  She wrote to some faculty.  I'm not sure what the list was,

13  but yes, she did write a response is my recollection.

14  Q.  All right.  And you received a copy of that response?

15  A.  I'm sure I did.  I don't really recall what it said, but

16  I'm sure I got it.

17  Q.  And then after you received a copy of the response, you

18  then forwarded it to KP2447, and who would that be?

19  A.  That would be Kathy Phillips, senior vice dean, faculty

20  dean of the school.

21  Q.  Right.  And at that time you wrote to her, "Please let me

22  know if we need to do more to get the FE folks to show up to

23  vote, given this."  Didn't you write that?

24  A.  Yes, I write that for every tenured meeting.

25  Q.  And the FE folks, who are they?

I7i1rav4                          Hubbard - Cross

1    A.  FE would stand for finance and economics.  That's just the

2    name of the group.

3              MR. McKNIGHT:  Your Honor, at this time I would move

4    Plaintiff's Exhibit No. 158 into evidence.

5              THE COURT:  Any objection?

6              MS. PLEVAN:  No objection, your Honor.

7              THE COURT:  All right.  158 will be admitted.

8              (Plaintiff's Exhibit 158 received in evidence)

9              MR. McKNIGHT:  Can we go to Bates stamp 1799.

10   BY MR. McKNIGHT:

11   Q.  Dean Hubbard, this is the email we just spoke about, where

12   I read, "I know our school community is understandably

13   concerned and saddened, as I am, about the well-publicized and

14   unfortunate litigation involving our faculty," correct?

15   A.  Yes, that's my email.

16   Q.  Right.

17             MR. McKNIGHT:  And can we go to above that.

18   Q.  And this email in the chain is Professor Ravina's response,

19   correct?

20   A.  Yes, it is her email.

21   Q.  Okay.  And you'll see on the paragraph on the other side

22   where she says, "Please trust that litigation is the last thing

23   I wanted.  I spent years trying to avoid it."  Do you see that?

24   A.  Those are her words, yes.

25   Q.  That's what she wrote in response to your email, correct?

I7i1rav4                      Hubbard - Cross

1    A.  That's what she wrote.

2              MR. McKNIGHT:  All right.  And if we can go to the

3    first page.

4    Q.  And then this is when you forwarded both of these to Vice

5    Dean Phillips, correct?

6    A.  Senior vice dean, the faculty --

7    Q.  Senior vice dean.  I apologize.  I can't keep all the

8    titles straight.

9    A.  I'm sorry.  Think of her as deputy dean, faculty dean.

10   Q.  Very good.

11             MR. McKNIGHT:  Thank you.  I'm through with this

12   exhibit.

13   Q.  You also met with Professor Awi Federgruen --

14   A.  Awi Federgruen, yes.

15   Q.  Federgruen?  All right.  -- about Professor Ravina's tenure

16   case, did you not?

17   A.  Yes.  He was a member of the promotion and tenure committee

18   and that's why he wanted to see me.

19   Q.  And at that time when you met with him, you told him not to

20   assess whether and how much Professor Ravina's progress had

21   been obstructed by Professor Bekaert, isn't that correct?

22   A.  I think I said it the other way around.  I said focus only

23   on the academics; the same instruction I gave before.

24   Q.  All right.  And you told him that he should not try to

25   assess what her record would have looked like in the absence of

I7i1rav4                         Hubbard - Cross

1     the alleged obstructions, correct?

2     A.   That sounds more or less right.   That would be purely

3     speculative and nonacademic.

4     Q.   But that's what you told him, correct?

5     A.   More or less.   If there's something you want me to look at,

6     but --

7                MR. McKNIGHT:   Can I have a moment, your Honor.

8                THE COURT:   Yes.

9                MR. McKNIGHT:   Your Honor, I have no further questions

10    at this time.

11               THE COURT:   All right.   Thank you.

12               MR. McKNIGHT:   Thank you.

13               THE COURT:   Cross-examination?

14    CROSS-EXAMINATION

15    BY MS. PLEVAN:

16    Q.   I guess it's afternoon.   Good afternoon, Dean Hubbard.

17    A.   Good afternoon.

18    Q.   I'd like to ask you a little more about your background.

19    Can you tell us about your educational background.

20    A.   Sure.   I have undergraduate degrees in economics and

21    master's and PhD in economics from Harvard University.   I also

22    studied engineering.

23    Q.   And in addition to your positions at Columbia, have you

24    held any academic positions elsewhere?

25    A.   Sure.   I started my teaching career at Northwestern after I

I7i1rav4                         Hubbard - Cross

1    got my PhD, and had visiting positions at the University of

2    Chicago and Harvard.  And then I've been at Columbia, as I said

3    in earlier testimony, since the late '80s.

4    Q.  And have you held any positions in the government?

5    A.  Yes, on two occasions.  For President George H.W. Bush, I

6    supervised the tax part of the Treasury Department; and then

7    for President George W. Bush, I was the chief economic advisor

8    in the White House.

9    Q.  And in addition to serving as dean and your other

10   activities at Columbia, do you serve on any other boards or

11   commissions?

12   A.  I've been the co-chair of the National Committee on Capital

13   Markets Regulation, and I've been a co-chair of the study group

14   on corporate boards.  I'm also on the board of Met Life, an

15   insurance company; ADP, a payroll company; and the funds

16   complex of BlackRock, which is a big investment manager.

17   Q.  And do you have any other public positions or commissions

18   that you're involved in?

19   A.  Really the Committee on Capital Markets Regulation would be

20   the most visible.

21   Q.  Now at the Columbia Business School, in addition to serving

22   as dean, do you do any teaching?

23   A.  I do.  I've taught every term in the MBA program.  I think

24   deans should teach.  I teach a class called Entrepreneurial

25   Finance.  And then in the undergraduate program, I will go in

I7i1rav4                         Hubbard - Cross

1   and guest lecture in Principles of Economics, which is the

2   freshman-level course in economics.

3   Q.  You described several other people who serve as either vice

4   deans or in similar capacities.  Could you just tell us what

5   the other positions are that are part of the administration of

6   the business school.

7   A.  Sure.  We have a large school, and so the way I think of it

8   is, there's an office of the dean, I'm the one to be held

9   account; but under me is a senior vice dean who really works on

10  faculty life, so think hiring new faculty, the promotion

11  decisions that are being discussed here; there's also a vice

12  dean for research who helps faculty with their research; and a

13  vice dean for teaching; and then on the administration side,

14  you've heard of Vice Dean Horan, who basically keeps the trains

15  running.

16  Q.  And can you describe how the -- well, first of all, how

17  many full-time faculty are there at the Columbia Business

18  School, about?

19  A.  Depending on your definition, around 130 tenure or tenure

20  track faculty.  There's some additional faculty that are

21  professors of practice, and then we have a number of adjunct

22  faculty who are typically practitioners who would come in to

23  teach a single class.

24  Q.  And how is the faculty of the Columbia Business School

25  organized?

```
 1    A.  That's a good question.  At the university, we are one

 2    division called business.  Among ourselves, however, we have

 3    groups.  So you've heard of finance and economics this morning.

 4    I mentioned management.  There's also marketing, decision risk

 5    and operations, and accounting.

 6    Q.  Now how would you describe your role as dean in terms of

 7    your dealing with faculty?

 8    A.  Well, faculty life is obviously part of my job.  The senior

 9    vice dean is principally responsible for that, but I'm the

10    person who sees the highest and lowest days of faculty, so when

11    things are going swimmingly or if things aren't going well, I

12    tend to be the person at those points.

13    Q.  Other than this situation, have you been involved in the

14    past while serving as dean in trying to resolve a faculty

15    dispute like this?

16    A.  Never about research.  I've been teaching 35 years.  I've

17    never seen anything like this.

18    Q.  Do you get involved in disputes of other kinds between

19    faculty?

20    A.  The most common dispute -- and even that I could count

21    fingers on one hand -- would be a teaching dispute, you know,

22    who developed what materials for class, but I have never had to

23    referee something like this in 35 years of being an economist.

24    Q.  You were asked about your authority.  What authority do you

25    have, if any, as dean to decide what a particular faculty
```

I7i1rav4                      Hubbard - Cross

1   member should do in terms of handling their research and

2   writing?

3   A.   Well, because I can't dictate what people work on, but I do

4   make available research funds.  I can change people's teaching.

5   For example, I gave Professor Ravina teaching breaks.  I also

6   complicated Professor Bekaert's teaching schedule somewhat.  I

7   can do those things.  But my power, if you will, or authority

8   is more akin to moral suasion.  I'm more akin to a managing

9   partner in a law firm than a CEO of a company.

10  Q.   Can you fire a tenured faculty member if wanted, in your

11  view?

12  A.   I cannot.  If I felt that something had happened like that,

13  I would have to go to the president of the university and

14  trustees.  They would make that decision.  I have never seen it

15  happen in my time at Columbia.

16  Q.   Did the EOAA investigation of Professor Ravina's complaint

17  about Professor Bekaert conclude that he had violated that

18  policy, the EEO policy?

19  A.   It did not.

20  Q.   You may have mentioned this before, but have you had

21  training yourself on EEO matters at the university?

22  A.   Yes.  All deans do this annually, at a level even more than

23  what we ask our faculty and staff to do.

24  Q.   And does the faculty and staff have training on these

25  subjects as well?

I7i1rav4                         Hubbard - Cross

A.  Yes.  Both upon hiring, new faculty and staff have it, and
then we have general refresh training both at the staff level
and the faculty level.  Separately, we do it for the students
in the MBA program.
Q.  In your role as dean, do you get involved in the annual
reviews of the junior faculty, meaning the faculty without
tenure?
A.  Yes.  Divisions do those reviews, pass those reviews on to
the deputy dean and to myself.  We will make the final
decision, and the letters are all signed by me.
         MS. PLEVAN:  I'd like to show the witness Defendant's
Exhibit ZZ in evidence.
Q.  And is this a copy of an annual letter -- well, first of
all, looking at Defendant's Exhibit ZZ, is that the type of
letter that you provide at this time of year to junior faculty
members generally?
A.  And to senior.  Around the beginning of June, I will write
a letter that summarizes first what's going on in the school,
what's going on in your division, what's going on with you, and
then a punchline, i.e., what your salary is.
Q.  And is Defendant's Exhibit ZZ a letter you sent to
Professor Ravina in June of 2011?
A.  It appears to be, yes.
Q.  And I'd like you to look at the second page, at the
paragraph at the top.  You make reference to publication of an

 1    article, and then in the last part, you say, "Your senior

 2    faculty colleagues have provided feedback on your research

 3    pipeline, and I urge you to heed their advice."

 4            What was the message you were trying to convey to

 5    Professor Ravina?

 6    A.   The message that, again, came first from her colleagues and

 7    reflected through my letter was that there were some working

 8    papers that had not been revised and resubmitted so they were

 9    getting old, if you will, and a concern that she needed to get

10    those published.

11    Q.   Let me ask you to look next at Defendant's Exhibit AL.

12            And is that the evaluation or communication, dean's

13    letter, so to speak, you sent to Professor Ravina in early June

14    of 2012?

15    A.   Yes.  It would be the year after the previous one you

16    showed me.

17    Q.   And let me direct your attention to the second page, the

18    first full paragraph.

19            First, you reference an article that was published,

20    and then you made a comment, "I note, however, the observation

21    of your senior colleagues that you have not yet published a

22    sufficient body of work for promotion after your fourth year at

23    Columbia Business School.  I urge you to seek the advice and

24    counsel of your senior colleagues and hope that you will let me

25    know what the school can do to support you in your research and

I7i1rav4                        Hubbard – Cross

1   to help you bring more of your projects to publication."

2              First of all, what promotion were you referring to in

3   that first sentence?

4   A.  Professor Ravina was never nominated for –– not only at

5   this time but ever, to be promoted to nontenured associate.  If

6   you think about a ladder, you were –– you would start as an

7   assistant professor, nontenured associate, and then tenure,

8   sometimes at the associate professor level, eventually full

9   professor.  So she hadn't made that first step on the ladder,

10  and so I was reflecting her colleagues' view.

11  Q.  And what is the significance of Professor Ravina not having

12  been promoted to the nontenured associate professor, or

13  recommended for that by her colleagues?

14  A.  It is, and is intended to be, a negative signal to a

15  colleague about prospects.

16  Q.  And what were you conveying, or intending to convey, to

17  Professor Ravina when you urged her to seek the advice and

18  counsel of her colleagues?

19  A.  Well, that she could speak with them about how to bring her

20  research to fruition better or about other opportunities

21  professionally for herself.

22              MS. PLEVAN:  I show the witness Defendant's Exhibit BU

23  in evidence.  This is a letter dated June 7, 2013.

24  Q.  Is this the year–end letter you sent to Professor Ravina,

25  dated June 7, 2013?

I7i1rav4                     Hubbard - Cross

1    A.  Yes.  Again, this is in the same annual cycle.  This just

2    is one year since the last one.

3    Q.  And again, at the end there's a message directed to

4    Professor Ravina.  In the next to last paragraph, you said,

5    "Your senior colleagues have provided you with valuable formal

6    feedback on your work to date and an outline of what is needed

7    to achieve tenure at Columbia.  I join them in their assessment

8    that you have not published at a pace necessary to be on track

9    for tenure.  I hope you will seek the counsel of your senior

10   colleagues about your future career plans as you work on

11   revising your papers with the aim of publishing them in the top

12   journals in your field."

13           What were you trying to convey with this message,

14   Dean?

15   A.  Well, again, there had been no nomination from the division

16   to promote her even at the first step, nontenured associate;

17   she was not publishing at the record that would be consistent

18   with tenure at our school; and I wanted her to ask her

19   colleagues both for paper advice but, frankly, career plans.

20   This was not going to work out.

21   Q.  Next let me show you Defendant's Exhibit DF in evidence.

22           Is this the letter you sent, a letter you sent to

23   Professor Ravina, dated June 6, 2014?

24   A.  Yes.  Again, this would be one year hence again.  Same time

25   of year, same reason for the letter.

1    Q.  And let me direct your attention to the second paragraph on

2    page 2.

3         The first sentence reads, "I am glad to see you

4    continuing to work on your three existing working papers and in

5    the preliminary stages of three more papers."

6         Where would you have obtained that information?

7    A.  The faculty member gives me two pieces of information.  One

8    is his or her curriculum vitae, résumé, and the other would be

9    a faculty activity form, where they fill out what they've been

10   doing during the year, what papers they're working on, what

11   they're teaching, what help they'd like from me and so on.

12   That would be the source of my data.

13   Q.  Then added, "However, I share the concern of your senior

14   colleagues that your existing papers have been in your pipeline

15   for several years and urge you to heed their advice to move

16   them forward for submission."

17        And where would you have obtained the information

18   about the concern of the senior colleagues?

19   A.  From their review.  Nontenured faculty member would have to

20   have an annual review at the division level.  I would of course

21   be privy to those reviews.

22   Q.  Now I think you've mentioned that you first heard about

23   issues between Professor Ravina and Professor Bekaert in a

24   conversation with Dean Johar, is that correct?

25   A.  Yes, Gita Johar again was the senior vice dean at the time,

I7i1rav4                         Hubbard - Cross

1   faculty dean.  She was just on her way out.  We break June 30th

2   for term.

3   Q.  And the conversation that you had with her was sometime in

4   late May or early June, is that correct?

5   A.  Sometime in that -- right after she had had the

6   conversation, not with Professor Ravina but with Professor

7   Santos, I believe.

8   Q.  And did you thereafter have a meeting in June with

9   Professor Ravina, Janet Horan, and Suzanne Goldberg?

10  A.  Yes, I thought the topic important and I wanted to learn

11  more.

12  Q.  And why was Suzanne Goldberg present at the meeting?

13  A.  She was there at Professor Ravina's request.  I certainly

14  had no problem with that.

15  Q.  Did Professor Ravina at that meeting mention sexual

16  innuendos or sexual harassment?

17  A.  She did not.  This was purely a professional dispute, as

18  her own email after the fact reveals.

19  Q.  You're referring to the email that she wrote after the

20  meeting?

21  A.  Yes.  As I said before, it's not entirely accurate, but I

22  do agree all those things were discussed.

23  Q.  At that meeting did you say that nothing would come -- I'm

24  sorry.  Let me ask you first:

25          Did Professor Goldberg at that meeting say anything

I7i1rav4                    Hubbard - Cross

1  about sexual innuendos or sexual harassment?

2  A.  She did not.

3  Q.  Did either Professor Goldberg or Professor Ravina at that

4  June 16 meeting ask that you report this dispute to the EOAA

5  office?

6           MR. McKNIGHT:  I would object and ask for a little

7  less leading of her own witness.

8           THE COURT:  I'm going to overrule the objection.  Just

9  be careful not to lead.

10          MS. PLEVAN:  I'm not sure he answered the question.

11 A.  No.  What is the question again?  Sorry.

12 Q.  Did either Professor Goldberg or Professor Ravina ask at

13 this meeting in mid June that you report the dispute with

14 Professor Bekaert to the EOAA?

15 A.  They did not.  The topic didn't come up.

16 Q.  Did you say at this June meeting that nothing would come of

17 a report to the EOAA?

18 A.  No.  As I said, the EOAA never came up in this

19 conversation.  That is simply not true.

20 Q.  At this meeting in June 2014, did you tell Professor Ravina

21 there was nothing you could do because Professor Bekaert

22 treated you badly too?

23 A.  I do recall saying he treated me badly too, but there is a

24 lot I can do and did do, so no, I didn't say the former.

25          MS. PLEVAN:  And let's look at -- and I apologize.  I

I7i1rav4                        Hubbard – Cross

1    think these are in as plaintiff's exhibits, but just from this

2    morning.  So if I can show the witness Defendant's Exhibit DM.

3           Oh, it's in evidence.  Okay.

4    Q.  Now one of the topics -- I'm sorry.

5           DM is the email that Professor Ravina sent after the

6    meeting that you've testified about, is that right?

7    A.  Yes, that's right.

8    Q.  Okay.  And the first subject she addresses is papers, and

9    I'll come back to that.

10          The next topic is tenure process.  Was there a

11   discussion at the mid-June meeting about the tenure process and

12   Professor Bekaert's involvement?

13   A.  There was.  This is accurate.  I said of course Professor

14   Bekaert should recuse himself, if they had this professional

15   disagreement, and I communicated that to him.

16   Q.  And did you later have a discussion with Professor Bekaert

17   about that?

18   A.  I did.  I let him know that he would not be participating,

19   and I let the division chair know that I didn't want Professor

20   Bekaert participating.

21   Q.  Professor Ravina also mentions additional year on the

22   tenure clock.  Was that subject discussed at the June 16

23   meeting with the four of you?

24   A.  It was, and it's correct the comment she has; it depends on

25   the university.  I said I would go to the -- university tenure

I7i1rav4                          Hubbard - Cross

clock is not something that can change, by university statutes,

but I had in mind something else.  And I agreed that I would

speak to the provost.

Q.  And could you just elaborate on why this is not something

you can do and what the role of the provost is, on these

issues.

A.  Sure.  There are in the university handbook -- I'm not a

lawyer so I don't know if you call them statutes, but let's say

rules -- about tenure and the length of time of service before

which time de facto tenure would be granted, so there's a fixed

number of years, and if a person is not judged and then stays

longer, they're given de facto tenure.  So the way the

university gets around that is to have what are commonly called

university's "up or out" rules.  So people are either nominated

for tenure or they're not.  So that's the rule I'm referring

to.

         I did have another plan in mind, and that's the plan I

went to the provost with.

Q.  Okay.  And what was that plan or idea that you had?

A.  I knew that the provost, while he could not change the

tenure clock, can have what's called a break in service.  In

other words, somebody's on the faculty, they have a break in

service outside of the academic title that they held before,

and then they could come back.  I knew that because we had a

faculty member in our school who had done that, before my time

I7i1rav4                    Hubbard - Cross

1    as dean, but I knew of it in the past.  And so it's something

2    that I knew that I could ask John, Provost Coatsworth, if he

3    would consider.

4    Q.  And who is John Coatsworth?

5    A.  John is the provost.  He's a history professor.  He's

6    currently the provost of the university.  You can think of the

7    provost as being chief academic officer.  The president runs

8    the whole university, but it's the provost who's making the

9    academic decisions.

10   Q.  And was Professor Coatsworth the provost in 2014 as well?

11   A.  He was the provost for this period, yes.

12   Q.  And did you speak to him about this issue?

13   A.  I definitely did.

14   Q.  And what did you say to him?

15   A.  I said that given the circumstances, I would like him to

16   consider a break in service, which would effectively give her

17   more time.  In our first meeting he simply took it under

18   advisement and directed Chris Brown, who's another history

19   professor who is a vice provost, to look into it.

20          I followed up with him because I wanted -- I felt like

21   this was a remedy I wanted him to consider, and I believe he

22   did consider it, he did approve it, and it was offered.

23   Q.  And how did Professor Ravina respond to that offer?

24   A.  She declined it.

25   Q.  Now was there a discussion, as referenced in I think the

I7i1rav4                    Hubbard - Cross

1   second paragraph of DM, at this meeting in June about a

2   relationship manager?

3   A.  Yes, there was.  I believed that interjecting a third

4   party, new set of eyes might be able to help the two parties

5   bridge the gap.  There was a lot of "my way or the highway"

6   talk, and I wanted somebody who could bring them together.

7   Q.  And when did you -- well, let me say, after this, sometime

8   after the meeting that took place in mid-June with Professor

9   Ravina and Professor Goldberg and Janet Horan, did you have a

10  meeting with Professor Bekaert?

11  A.  I did.  Multiple meetings.

12  Q.  And do you recall when the first meeting was, or about how

13  long after the June meeting?

14  A.  Would have been in early July.  I don't remember the exact

15  date.

16  Q.  Okay.  And what was the purpose of your meeting with

17  Professor Bekaert?

18  A.  Well, obviously I wanted to hear his perspective.  I had

19  heard Professor Ravina's.  I wanted to express my concern.  I

20  wanted to remind him of his special responsibility because he's

21  a tenured faculty member and that I expected collegiality.

22  Q.  And what did you mean by that?

23  A.  I meant that they needed to have a constructive working

24  relationship or just stop.  But I didn't want to see the kind

25  of fighting that I'd heard about.

1   Q.  And how did Professor Bekaert respond to that?

2   A.  I don't think he was thrilled to hear my suggestions, but I

3   do think he started to think about it, because I know that over

4   time, the suggestions I made about who would author which

5   papers more or less came to fruition.

6   Q.  And can you tell us about that.  Did you participate in

7   further discussions -- I think you said many -- with Professor

8   Bekaert and others regarding the papers that they were working

9   on together?

10  A.  I did.  I tried to tell the group, if you have a hard

11  negotiating problem, break it up into pieces.

12          So part one was a paper that was nearing completion;

13  it was being presented.  I said finish that one.

14          Then there were one or two papers that were in

15  progress.  I said, you all need to decide whose name is on it.

16          Then there was speculation about papers to come.  I

17  said, have another negotiation about that.

18          But break it up into those three buckets.  And that's

19  more or less what the parties did.

20  Q.  Did Professor Bekaert withdraw from one of the papers that

21  they were working on that related to this 401(k) data?

22  A.  He did.

23  Q.  And do you remember which one that was?

24  A.  I believe it's called in this litigation automatic

25  enrollment, but I'm not sure what words the jury's heard, so

1    think of it as 401(k).

2    Q.  And did Professor Bekaert make any kind of commitment on

3    timing on a draft for the international diversification paper?

4    A.  We did discuss timing.  I don't remember what the exact

5    period was.  Our professional meetings were in early January,

6    and so when you see December emails, it's getting a paper ready

7    for that.  And so it's probably in that time frame, but I don't

8    have a specific recollection.

9    Q.  When you spoke with Professor Bekaert about these papers,

10   did he say anything to you about why he wanted to remain on the

11   joint paper?

12   A.  He did.  One, he thought it was more complementary to his

13   research than I had originally thought.  He had been a part of

14   something called Financial Engines.  The jury may have heard

15   this term.  It's a big asset allocation consulting business,

16   but they have a lot of data.  And those are the data that are

17   at issue in this case.  He was much more interested than I'd

18   thought.

19          He also had a number of technical suggestions, which,

20   when he expressed them to me, seemed perfectly reasonable.

21   Q.  And did you give any credit to his technical comments and

22   opinions about the papers?

23   A.  Well, I did for two reasons.  One, in my own research, I

24   have also worked with very large data sets where I've had to do

25   a lot of work.  I know that this is hard, and I know there can

1   be disagreements.  Professor Bekaert has a very successful

2   research track record in this area.  He identified areas where

3   he thought proper care was not being taken.  I thought those

4   points sounded reasonable, without being in the weeds with the

5   two parties.

6   Q.  Did he offer any comments about why some of the research

7   and writing work was taking longer than perhaps originally

8   anticipated?

9   A.  Well, my recollection is he offered two explanations to me.

10  One was in the weeds.  The jury's probably seen the term

11  "codes," about the programs, about whether they had been

12  carefully done and carefully executed.

13         And second, he is a busy scholar with a number of

14  research projects going on at the same time, while also

15  teaching, and he was juggling.

16         Those were the two things that I heard from him.

17  Q.  And did you have any understanding of what he was referring

18  to about the codes, why he was concerned about giving up the

19  codes?

20  A.  Well, maybe it's oversimplifying, but I think of it as

21  holding the pen.  So two people are working on something; it's

22  very important that one person holds the pen and the other one

23  edits.  So having done a lot of empirical projects myself, you

24  don't want two different people rewriting programs and moving

25  the data around.  That's a sure way for error.  Now who holds

I7i1rav4                    Hubbard - Cross

1   the pen, that they have to decide between the two of them, but

2   clearly one of them needed to hold the pen.

3   Q.   One of the topics that was mentioned as I guess a request

4   for remedial action was to involve someone as relationship

5   manager.  Do you recall that?

6   A.   Yes.

7   Q.   And did someone ultimately take on that title,

8   responsibility?

9   A.   Yes.  I was looking for someone who could thread the needle

10  of the right kind of personality and be acceptable to the two

11  parties.  Consulting with other colleagues in finance, I came

12  up with Professor Wolfenzon, Daniel Wolfenzon, whose name has

13  come up.

14  Q.   In fact, did Professor Ravina suggest Professor Wolfenzon?

15  A.   I think she was very pleased with it; may have even been

16  her original idea.

17  Q.   Now did you meet again with Professor Ravina and Professor

18  Goldberg and Dean Horan in September 2014?

19  A.   I did.

20  Q.   And what was the subject of that meeting?

21  A.   Well, it was really a continuation of the subject from

22  before, although now, of course, there's an additional issue

23  arising from the sexual harassment complaint.

24          MS. PLEVAN:  Your Honor, I think this would be a good

25  time, if that's okay.

I7i1rav4                          Hubbard – Cross

 1              THE COURT:  All right.  Why don't we take our break

 2    for lunch now.  Please remember, don't discuss the case, and

 3    keep an open mind.  Thank you.

 4              (Jury not present)

 5              THE COURT:  All right.  I'll see you all at 2.  Thank

 6    you.

 7              (Luncheon recess)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    A F T E R N O O N   S E S S I O N

3                            (2:00 p.m.)

4          THE COURT:  Everyone can be seated, thanks, while we

5     wait and see if the jury is ready.

6          (Jury present)

7          THE COURT:  All right.

8          Everyone can be seated.  Thanks.

9          You may proceed.

10         MS. PLEVAN:  I would like to show the witness page 51

11    of Exhibit T in evidence.

12    BY MS. PLEVAN:

13    Q.  Is that an excerpt from the statutes of the university, of

14    Columbia University?

15    A.  It is.  It's Section 7 of the statutes.

16    Q.  That refers to academic freedom?

17    A.  Yes, which is linked obviously to the topic of tenure.

18    Q.  Right.  And there is a reference there to officers of

19    instruction.  Does that mean faculty?

20    A.  Yes.

21    Q.  Is this paragraph regarding academic freedom related to

22    your comment earlier about the First Amendment?

23    A.  Yes, it is.  Individuals can work on whatever subject they

24    want, and the university is not to punish them for doing that

25    as long as it is a legitimate area of inquiry.  That's what

1   academic freedom is, and that's really why universities have

2   tenure.

3   Q.  You were -- let me do this.  Let me go back to a meeting

4   that you described to some degree that you had in September of

5   2014 with Professor Ravina, Professor Goldberg, and Vice Dean

6   Horan.

7            Do you recall that meeting?

8   A.  Yes, I do.

9   Q.  OK.  In that meeting there was a discussion about trying to

10  establish a schedule, is that correct?

11  A.  Yes.  More or less a schedule for getting the papers to

12  completion.  Before the break I had mentioned the various

13  buckets I considered the papers.  And so trying to get the

14  earliest paper ready first and then the next two papers.

15  Q.  At that meeting, did you throw any papers at Professor

16  Goldberg?

17  A.  I did not.  I don't throw papers at people.

18  Q.  Did you make any comment at that meeting about Professor

19  Ravina's last review being horrible?

20  A.  No.

21  Q.  Now, after this meeting in September, did you continue to

22  meet with Professor Bekaert and others concerning the research

23  projects that they were working on?

24  A.  Yes.  I met with Professor Bekaert on many occasions to try

25  to see if I could get some movement on the projects.

I7inrav5                        Hubbard - Cross

1    Q.   In addition to the meetings that you had, did other people

2    at the business school have meetings as well that they reported

3    to you on?

4    A.   Yes, Kathy Phillips, whose name came up earlier, who is the

5    faculty dean, the senior vice dean, she had many such meetings,

6    as did Janet Horan.

7            On the dean's office calendar there were 35 meetings

8    from the time of original finding out by me in June until the

9    ultimate tenure case, and that's just on the dean's calendar,

10   let alone what everybody else did.

11   Q.   You were shown an e-mail by Professor Ravina's counsel

12   referencing your being weary of being in the middle.

13           What did you mean by that?

14   A.   In terms of the academic battle that was going on between

15   the two of them, I thought this was eminently solvable by

16   people who would take a different negotiating strategy.  Again,

17   in 35 years I had never had to be called upon, nor had anybody

18   I know, to referee such a battle.

19   Q.   You were also shown an e-mail, Plaintiff's Exhibit 102,

20   where you said, you were making a comment about nastiness.

21   What did you mean by that and -- why did you say that I should

22   say?

23   A.   The reference there is really to this and several other

24   e-mails that had come in the recent period before then that

25   really just had a tone of not wanting to resolve a situation.

1   I found it nasty, not the kind of tone I would take if I

2   actually wanted to negotiate a successful outcome.

3   Q.  Let me show you an e-mail from that same day, just an hour

4   earlier, Plaintiff's 101.

5           Is Plaintiff's Exhibit 101 one of the e-mail exchanges

6   you were just referring to?

7   A.  Yes.  It certainly is of that genre.

8           If you look at the e-mail that she writes, the first

9   two sentences are really what's teeing this up as hostile to

10  me.

11          When people edit work, and in this case you have

12  coauthors, obviously each person is doing a lot of work.  So,

13  to open by saying, Oh, you just corrected typos and rearranging

14  phrases, that certainly should be taken as hostile.  I can only

15  infer that it was actually intended as hostile.  But it's

16  clearly hostile.

17  Q.  Why did you think it was hostile?

18  A.  Again, if you are doing work together and two parties are

19  working hard on a document, to say the other person's edits

20  were correcting typos and rearranging phrases is intended to

21  say you are not doing anything, I'm doing the heavy lifting.

22  That is not what you would do if you actually wanted to get a

23  project done.

24  Q.  Now, in these further conversations that you had with

25  Professor Bekaert, did he express his perspective on what

1    needed to be done with the papers that they were working on

2    together?

3    A.  He did.

4    Q.  And do you remember any of the particulars of that?

5    A.  Well, some of the particulars.  I think they came out in

6    the testimony earlier.  He had some concerns about the

7    underlying data, the issue of codes and the data and whether

8    the data had been sufficiently cleaned up to be used

9    effectively.

10           Second, there was a disagreement between the two of

11   them on some of the variables, on what was called specification

12   in the testimony, meaning the models that would be tested.

13   These are legitimate professional disagreements.  I am not the

14   person to say which one is right, merely that they are

15   legitimate disagreements.

16   Q.  Did you ever conclude that Professor Bekaert was

17   intentionally slowing down his work to harm Professor Ravina?

18           MR. McKNIGHT:  Objection, your Honor.

19           THE COURT:  Why don't you rephrase that, please.

20   BY MS. PLEVAN:

21   Q.  What conclusion, if any, did you reach about Professor

22   Bekaert's comments to you regarding the need for more work?

23   A.  My inference was that he felt these papers needed more

24   work.  He has a very significant professional reputation to

25   protect.  He doesn't want sloppy work, and that was his intent.

1    He is a man who had published a large number of papers.  I have

2    to take him at his word on that point.

3              MS. PLEVAN:  Show the witness defendants' IS.

4              THE COURT:  Is IS in evidence?

5              MS. FISCHER:  I don't believe so.

6              THE COURT:  All right.

7    BY MS. PLEVAN:

8    Q.  You recognize defendants' IS as a series of e-mails?

9    A.  Yes, I believe the following e-mail here actually contains

10   a proposed agreement.

11   Q.  Let me just --

12             MS. PLEVAN:  We offer Defendants' Exhibit IS.

13             THE COURT:  Any objection?

14             MR. McKNIGHT:  No objection.

15             THE COURT:  All right.  IS will be admitted.

16             (Defendants' Exhibit IS received in evidence)

17   BY MS. PLEVAN:

18   Q.  And could you describe what this series of e-mails

19   represents, beginning with the e-mail at the bottom of the

20   first page.

21   A.  Janet Horan in my office, who had worked with me a lot on

22   this, is e-mailing Professor Bekaert of a draft of issues that

23   we had had multiple meetings on.  When I say "we," I mean

24   Professor Bekaert and myself accompanied by other folks.  It

25   could be Kathy Phillips, it could be Janet Horan and others.

1          You see what is attached there is essentially what I

2     was talking about this morning.  I said let's break this up.

3          So, international diversification, let's get this

4     going, it's nearly, ready get it presented.

5          The automatic enrollment, he followed my advice and

6     stepped aside.

7          And then there would be a lead taken by the person who

8     I believe had been a graduate student, who was now a junior

9     faculty member, Professor Crouzet, and then there were issues

10    surrounding the dataset and future papers.  This is a proposal

11    that I am making and I gathered is largely accepted by

12    Professor Bekaert.

13          MS. PLEVAN:  I would like to show the witness

14    Defendants' Exhibit JO for identification.  I would like to

15    offer Defendants' Exhibit JO.

16          THE COURT:  Any objection?

17          MR. McKNIGHT:  No objection, your Honor.

18          THE COURT:  All right.  JO will be admitted.

19          (Defendant's Exhibit JO received in evidence)

20    BY MS. PLEVAN:

21    Q.  Could you describe what this series of e-mails represents,

22    Dean Hubbard.

23    A.  Sure, the beginning of the chain is an e-mail from me to

24    Professor Bekaert.  The international diversification paper was

25    this first paper, the paper on which most of the work had been

1    done.  I'm reminding him of an agreement that we had.

2          And again these dates are important.  In my profession

3    the professional meetings are in January.  That's why this

4    focal point.  And then he writes me back, and then I write him

5    back saying I meant it.  Compliance would help.

6    Q.  And do you know whether Professor Bekaert met the December

7    31 deadline?

8    A.  I don't recall one way or the other, sorry.

9          MS. PLEVAN:  OK.  I would like to show the witness

10   Plaintiff's Exhibit 100.

11   BY MS. PLEVAN:

12   Q.  Are you familiar with this document?

13   A.  I am.

14   Q.  And what was the nature of the proposal that was being

15   expressed here, as you understood it?

16   A.  As I understand it, this was a proposal from some

17   colleagues.  It is proposal for me to take to the executive

18   committee.

19          Quick, for the jury's benefit, our executive committee

20   is a faculty committee, the chairs of all the divisions, and

21   then ultimately chaired by me.  So think of it as the faculty

22   leaders of the school.

23          These gentleman are making a proposal that we sort of

24   codify rules of the road on junior faculty working with senior

25   faculty.  That's, loosely speaking, what this proposal is

I7inrav5                         Hubbard - Cross

1     about.  It's set out in the document.

2     Q.  Was this proposal considered by the executive committee of

3     the school?

4     A.  It was.

5     Q.  And did you participate in that discussion?

6     A.  I did.

7     Q.  And what was the decision ultimately reached by the

8     executive committee?

9     A.  The decision was not to have this codification out of fear

10    it would almost chill any working relationship between senior

11    and junior faculty and that it was really getting in the way of

12    academic freedom when you're starting to tell people what they

13    have to do and not do.

14          In fact, the chairman of the finance subgroup was the

15    most passionate arguer against this proposal.

16    Q.  Was there in existence already any mechanism at the

17    executive committee level that was referenced in those

18    discussions?

19    A.  Certainly we have in our school's governing document a

20    provision where a faculty member can be brought before the

21    executive committee for censure if there's something for which

22    that faculty member should be considered for censure.  That is

23    a procedure we have had for many years in our governing

24    document.

25          THE COURT:  Has this document been admitted?

1     MS. PLEVAN:  It was admitted already.

2     THE COURT:  It was, OK.  In any event, I am not

3  sure -- it's 100, correct?  Pursuant to my prior ruling?

4     MS. PLEVAN:  Yes.

5     THE COURT:  It should be admitted.  That is what you

6  are seeking to do?

7     MS. PLEVAN:  Yes.  I'm sorry.

8     THE COURT:  No worries.  So 100 will be admitted.

9     I know the jurors already have it on their screens.

10     (Plaintiff's Exhibit 100 received in evidence)

11  BY MS. PLEVAN:

12  Q.  Moving forward to the spring of 2015, did Professor Ravina

13  make any request to the dean's office, that is, your office,

14  for a leave of absence for the 2015-2016 year?

15  A.  I believe she did.  Depending on what you mean by leave of

16  absence, yes.

17  Q.  I'm sorry?

18  A.  Depending on what you mean by leave of absence, yes.

19  Q.  No.  Did she -- yes, did she make a request to the dean's

20  office to take some kind of leave of absence for the 2015-2016

21  year?

22  A.  I don't recall the exact terms.  I relieved her from

23  teaching for that year.

24  Q.  Do you have any authority to grant her any other kind of

25  leave of absence?

I7inrav5                          Hubbard - Cross

1   A.  I can't do anything that would affect the tenure clock, the

2   expression the jury heard about earlier.  That is what it is.

3   But I can relieve someone from teaching on my own authority.

4           I relieved her from the year of teaching so that she

5   could focus on her research.  That is the second time that I

6   had done so in her time at Columbia.

7   Q.  And when was the first time that Professor Ravina received

8   relief from teaching?

9   A.  She had a very difficult start in teaching in the MBA

10  program, and to make sure she had the time to develop herself

11  as a better teacher while also getting her research program

12  restarted, I gave her a year off from teaching many years

13  before that, my recollection is the 2009/2010 academic year.

14          So this is the second full-year relief she had gotten

15  from me.

16  Q.  Did she receive any relief from teaching in any subsequent

17  year?

18  A.  Yes.  Her last year she did not teach.

19          MS. PLEVAN:  I think the next document is in as a

20  plaintiff's exhibit.  Let me just check.  If I may, your Honor,

21  I am going to ask that the witness be shown Defendants' Exhibit

22  LI.

23          MR. McKNIGHT:  What was that?

24          MS. PLEVAN:  LI.

25          MR. McKNIGHT:  LI.  Thank you.

I7inrav5                         Hubbard - Cross

 1   BY MS. PLEVAN:

 2   Q.  Is that what you have called a year-end letter that you

 3   sent to Professor Ravina in June of 2015?

 4   A.  Yes.  I think before the lunch break we went through a

 5   series of these.

 6            MS. PLEVAN:  We offer Defendants' LI in evidence.

 7            THE COURT:  Any objection?

 8            MR. McKNIGHT:  No, your Honor.

 9            THE COURT:  LI will be admitted.

10            (Defendant's Exhibit LI received in evidence)

11   BY MS. PLEVAN:

12   Q.  Now, in the next to last paragraph of this letter, you see

13   you comment -- well, what is the purpose of that comment there?

14   A.  Well, this is, again, the paragraph I had mentioned in each

15   of these letters where I give faculty a summary of their

16   standing in the school.

17            So you can see, again, publication record not on

18   track.  The upcoming leave refers to her exemption from the

19   teaching duties, and then to ask what the school can do to help

20   in her publication and planning her future career.

21            And then separately I'm having conversations with the

22   provost about a break in service, which would effectively break

23   her tenure clock.

24   Q.  And you use the words "I hope that your upcoming leave is

25   productive."  Do you see that?

1   A.  Yes.

2   Q.  And what did you -- did you intend by that to provide her

3   with some kind of leave of absence?

4   A.  I can't do anything that would change her tenure clock.  I

5   released her from teaching.  She could have spent it wherever

6   she wanted as far as I cared.  But it was really a relief from

7   teaching.

8          Any change in the tenure clock is a provost decision.

9   As I noted in the last sentence, and she was aware of this, I

10  am trying to work on a way to break her service for a tenure

11  clock change.

12  Q.  That's the reference in the last paragraph to external

13  conversations regarding your tenure clock?

14  A.  Correct.  Because there are two kinds of conversations.

15  There's John Coatsworth and myself having an academic

16  conversation, and then there's conversations among attorneys,

17  to which I am not privy.

18  Q.  You mentioned earlier that you were aware of a prior

19  circumstance at the business school where someone had received

20  a break in service?

21  A.  Yes, I am.

22  Q.  And who was that person?

23  A.  It's a gentleman named Mark Broadie.  He is a professor in

24  our decision risk and operations group.  You can think of it as

25  an applied math person who works on finance problems.  Mark has

1    gone on to be one of our most distinguished senior faculty.

2             He, in fact, was one of my vice deans until relatively

3    recently.  He had a break in service.  He was a junior faculty

4    member in the decision risk and operations group.  He went off

5    that track, ultimately came back on, and ultimately received

6    tenure.

7    Q.   And when he went off -- that is, when he started the break

8    in service, was he a tenured or untenured faculty?

9    A.   Neither.  To get a break in service --

10   Q.   I should have been clear.  Just before he took the break in

11   service, what was his position?

12   A.   He was a junior -- an untenured faculty member.  To get the

13   break in service and not violate the up-or-out rules or the

14   tenure clock rules, he would have had go off an academic.

15            My recollection is he was called something like

16   curriculum specialist for a period time, where he did work on

17   cases and teaching materials and helped at the school until he

18   ultimately went back on the tenure clock.  That's what I meant

19   by breaking the clock.

20   Q.   Was that the type of approach that you were discussing with

21   the provost of the university on behalf of Professor Ravina?

22   A.   It was.  When I went to John, Provost Coatsworth, I think

23   we had worked out a title of something like adjunct research

24   scholar.  It can't be something that is -- or maybe it was

25   associate research scholar something like that.  It can't be

1  something that is an academic title or it won't break the

2  clock.  I suggested to him a range of one to two years I

3  thought was appropriate.  That decision of course is his.

4          He ultimately agreed with me and then proposals were

5  made through lawyers, and that part I don't know.

6  Q.  With respect to the application that Professor Ravina made

7  to the provost's office for a personal hardship leave, did you

8  express any opinion to the provost's office about that?

9  A.  The provost didn't seek my opinion, and I didn't offer it.

10 Those are almost never granted at Columbia, but John did not

11 ask my opinion.

12 Q.  Did there come a point in late 2015 when a decision was

13 made to advise Professor Ravina that her tenure review would

14 proceed?

15 A.  Yes, it did.

16 Q.  And were you part of those discussions?

17 A.  Yes.

18 Q.  Was some of that conversation reflected in the document

19 that's in front of you, Defendant' Exhibit MH?

20 A.  Yes, that conversation is accurate.

21          MS. PLEVAN:  We offer defendants' MH in evidence.

22          THE COURT:  Any objection?

23          MR. McKNIGHT:  No objection, your Honor.

24          THE COURT:  MH will be admitted.

25          (Defendant's Exhibit MH received in evidence)

1    BY MS. PLEVAN:

2    Q.  What was the reason that a decision was made to move

3    forward at that point with the tenure review process for

4    Professor Ravina?

5    A.  It really had to do with the up-or-out rules of the

6    university.  I mentioned the de facto tenure concept, of

7    somebody still in place would get de facto tenure but for a

8    review.  So a review had to happen.

9           Separately, of course, there's these discussions about

10   breaking the clock, but since those had not come to fruition,

11   we had to do this review.

12   Q.  By the way, when you spoke to the provost about the break

13   in service as associate research scholar, did you make any

14   comments about what the salary would be for Professor Ravina in

15   that role?

16   A.  We didn't get that far.  If John asked my view, I would

17   have given it, but we didn't get that far.  I think the point

18   was first to get an agreement in principle.  I assumed she

19   would be paid.

20   Q.  All right.  Just to be clear, did Professor Ravina ever

21   accept that alternative?

22   A.  She did not.

23   Q.  Now, you were shown earlier a statement from one or more

24   faculty members to the effect that they supported Professor

25   Ravina getting more time before she came up for tenure.

1        Do you recall that?

2    A.  Yes, I recall that.

3    Q.  All right.  At the point that that came to your attention,

4    did you have any authority to do anything about that timing

5    beyond what you had already done?

6    A.  Well, that's really the issue.  Those faculty did not know

7    that I had already been working on doing essentially what they

8    wanted.

9        You can't lengthen a person's tenure clock.  That's

10   not consistent with the university statutes, but you can break

11   it, and that's what I was trying do.  They didn't know that

12   because I wasn't trying to litigate this in the court of public

13   opinion.

14   Q.  By the way, of the faculty who begin at the Columbia

15   Business School on a tenure track, what percentage achieve

16   tenure, approximately?

17   A.  If you look at when a person begins and then ask how many

18   actually wind up at the end with tenure, it's no more than one

19   in four or one in five.  That's typical of any major

20   university.  People often come from outside the university, and

21   they leave the university for other reasons.  Getting tenure at

22   a top university is hard.

23   Q.  You were also shown earlier an e-mail that you sent to all

24   faculty and students in mid-April 2016.  Why did you send that

25   e-mail?

1    A.  Well, there were numerous stories in the press, many rumors

2    among the student body.  And, for the jury's benefit, my

3    students are millennials.  You can think of them as they come

4    to me at 28 years old, they are looking for a lot of

5    communication from the top, and I think that they were worried

6    and wanted to hear from me.

7            And I wanted them to know, A, I think this is

8    important; B, I am on it; and, C, we have a zero tolerance

9    policy.  And that's what I communicated.

10   Q.  Dean Hubbard, were any of the decision that is were made

11   about scheduling the tenure vote for Professor Ravina a

12   consequence of her threatening litigation or bringing

13   litigation?

14   A.  No.  The timing of this is driven by the timing of her

15   clock when she reaches the up-or-out point.

16           MS. PLEVAN:  I have no further questions.

17           THE COURT:  All right.  Thank you.

18           Mr. Hernstadt, do you have any questions?

19           MR. HERNSTADT:  I do not, your Honor.

20           THE COURT:  OK.  Thank you.

21           Mr. McKnight.

22   REDIRECT EXAMINATION

23   BY MR. McKNIGHT:

24   Q.  Now, Dean Hubbard, good afternoon, first of all.

25   A.  Good afternoon.

1    Q.  You testified about Professor Broadie going off the clock

2    and taking a different position, correct?

3    A.  Yes, sir.

4    Q.  Isn't it true that while Professor Broadie was off the

5    clock he continued to represent himself to the public as being

6    an associate professor in the papers that he published?

7    A.  I don't know that one way or the other.

8    Q.  Counsel in questioning you discussed the notion of academic

9    freedom, correct?

10   A.  Yes.

11   Q.  And wouldn't you agree that academic freedom does not

12   permit Professor Bekaert to sexually harass Professor Ravina in

13   violation of the New York City laws or federal laws?

14   A.  That's certainly true.  Academic freedom is unrelated to

15   that.

16   Q.  And wouldn't you agree that academic freedom doesn't permit

17   the university or Professor Bekaert to retaliate against

18   Professor Ravina in violation of New York City laws or federal

19   law?

20   A.  That's certainly true.  The law is the law.

21   Q.  All right.  You recall hearing about Professor Ravina's

22   complaint about Professor Bekaert initially from Senior Vice

23   Dean Gita Johar.  Am I pronouncing her name correctly?

24   A.  Johar.

25   Q.  Johar.  That is when you heard about it?

A.   The first complaint, right, that was the first occasion I

had.

Q.   And that was in May or early June of 2014, correct?

A.   Around that time.  I don't remember exactly when, but that

sounds about right.

Q.   You don't recall whether Senior Vice Dean Johar told you

about Professor Bekaert's e-mail communications at that time,

do you?

A.   I don't recall one way or another.  What I recall from Gita

is this is a problem.  She was close to being on her way out.

She wanted me to pay attention, hence, I scheduled the meeting.

Q.   And you don't recall Professor Johar talking to you about

harassment by Professor Bekaert at that time, do you?

A.   She did not raise that with me.

Q.   All right.  So, as opposed to your not recalling, your

testimony is she never said it to you?

A.   I never heard that from her.

Q.   Very good.  In the period of time between June of 2014 and

mid-July of 2014, did you have any conversation with Professor

Bekaert in which you used the term "harassment"?

A.   The first meeting I had with him I think is July 9, and

that was not a conversation about harassment.  That was a

conversation about a professional disagreement.  So I don't

recall, but I don't think so.

            MR. McKNIGHT:  All right.  Thank you.

I7inrav5                          Hubbard – Redirect

1              Can we look at Plaintiff's Exhibit No. 40, please.

2     BY MR. McKNIGHT:

3     Q.  I want to direct your attention to page 2, the sentence

4     that begins, "We also talked about extending the tenure clock,"

5     that paragraph.

6     A.  I see it, yes.

7     Q.  All right.  And do you recall at that time that Professor

8     Ravina indicated to you that she had been under a great amount

9     of stress during the past year?

10    A.  She definitely said that, yes.

11    Q.  All right.  Thank you.  You told us earlier about Professor

12    Ravina and Professor Bekaert being assigned a relationship

13    manager or coach, correct?

14    A.  Yes, I did.

15    Q.  And I believe you testified that that idea was generated in

16    June of 2014, that's when you first began to discuss it,

17    correct?

18    A.  That's my recollection, yes.

19    Q.  And isn't it a fact that no relationship manager was

20    assigned at all or this plan wasn't implemented until the fall

21    of 2014?

22    A.  No.  You'll find in the e-mails that I myself became the

23    relationship manager.  I ultimately find Professor Wolfenzon,

24    being the summer, when he returns in the fall, but I functioned

25    as that for that intervening period.

1    Q.  So, when you were being CC'd, you considered yourself to be

2    the relationship manager in the interim period?

3    A.  As I was trying to find Professor Wolfenzon, yes.

4    Q.  Throughout this period of time, you have taken Professor

5    Ravina's complaints and allegations seriously, have you not?

6    A.  Of course.

7    Q.  Were you taking Professor Ravina's concerns seriously when

8    you called her e-mails with Professor Bekaert or the situation

9    between them a soap opera?  Was that serious?

10   A.  It was serious, because that involved their professional

11   lack of communication, and I thought it was soap opera.

12   Sitting here today I think it.

13   Q.  Were you taking her concerns seriously when you referred to

14   her e-mails to Professor Bekaert as being disgraceful?

15   A.  Absolutely.  Both were disgraceful.

16   Q.  But you specifically referred to her e-mails as being

17   disgraceful, did you not?

18   A.  Yes, but I said as much or worse to Professor Bekaert.

19   Q.  Were you taking her concerns seriously when you call her

20   e-mails to Professor Bekaert unprofessional?

21   A.  Absolutely.  They were incredibly unprofessional as were

22   his to her.

23   Q.  But your e-mails again pointed out her as being

24   unprofessional, isn't that correct?  That is what we have in

25   writing.

1   A.  Because I went to see him.  I could not go to see her.

2   Q.  And when you indicated that you were weary of being in the

3   middle of this less than three weeks after hearing about it,

4   were you taking her concerns seriously then?

5   A.  Absolutely.  It's about the professional disagreement

6   matter, which should have been resolved.

7   Q.  When you wrote, "I am trying to engage the university here,

8   and I have reached out to Michael Dunn, as I do not have time

9   to personally monitor all of this multiple times a day," were

10  you taking this situation seriously then, sir?

11  A.  Absolutely.  I went to Michael Dunn, appointed a

12  relationship manager.

13  Q.  And when you wrote, "I do not deserve this, nor will I

14  continue to waste my time, can we get Michael Dunn to commit to

15  take this over," were you taking the matter seriously then,

16  sir?

17  A.  Absolutely.  The "this" to which I referred was the

18  professional disagreement, which I had not seen in 35 years.

19  Q.  When you responded to an e-mail about Professor Bekaert

20  refusing to take his name off one of the papers and saying,

21  "Additional trouble," were you taking the matter seriously

22  then, sir?

23  A.  Yes.  In fact, I was advocating her by saying it.

24  Q.  When you labeled her e-mail with the word "nastiness," were

25  you taking the matter seriously then, sir?

I7inrav5                      Hubbard - Redirect

1   A.  Yes, her e-mails were nasty.

2   Q.  When you called the e-mail that she wrote trying to resolve

3   the situation with Professor Bekaert and indicated that it was

4   "so hostile," were you then again taking the matter seriously?

5   A.  Yes.  In fact, it's self-evidently hostile, as I explained

6   to the jury just a few minutes ago.

7   Q.  All right.  We'll let them decide that.

8           When you wrote, "And the beat goes on," in response to

9   her seeking the release of the codes, were you taking the

10  matter seriously then, sir?

11  A.  Yes.  The comment was about him.

12  Q.  Now, early on you recommended that Professor Bekaert should

13  get Title IX training, correct?

14  A.  Yes, that's correct.

15  Q.  And in fact, he never received any --

16          MS. PLEVAN:  Objection, your Honor.

17          Beyond the scope.

18          THE COURT:  I will allow it.

19  BY MR. McKNIGHT:

20  Q.  In fact, he never received any Title IX training, isn't

21  that correct?

22  A.  That's not correct.

23  Q.  All right.  Under the EOAA policies of Columbia University,

24  management and supervisory personnel such as yourself have two

25  duties, correct?  The duty to report and the duty to act,

1    correct?

2              MS. PLEVAN:  Objection.

3              THE COURT:  Scope?

4              MS. PLEVAN:  Yes, scope, and it was covered on his

5    initial examination.

6              THE COURT:  I will allow it.

7    A.  That is my layman's understanding, yes.

8    Q.  Sir, under the policies, you have a duty to act whenever

9    you learn directly or indirectly of conduct that might violate

10   the policies, isn't that correct?

11   A.  Yes, which is why I reported it.

12             MR. McKNIGHT:  Could we return to Plaintiff's 160 for

13   a moment.

14   BY MR. McKNIGHT:

15   Q.  We talked about this earlier today, correct?

16   A.  Yes, sir.

17             MS. PLEVAN:  Can I just have a minute.  Is this up on

18   the screen?

19             THE COURT:  It is.

20             Is your screen working?

21             MS. PLEVAN:  It is.  Sorry.

22             THE COURT:  OK.

23             You may proceed.

24             MR. McKNIGHT:  Thank you, your Honor.

25   BY MR. McKNIGHT:

1  Q.  Prior to receiving this particular notification, you had

2  spoken to faculty members individually, who indicated to you

3  that they were not in a position to provide an evaluation of

4  Professor Ravina's tenure case at that time?

5  A.  I did speak to faculty members, particularly Professor

6  Calomiris, but that is not what he said.

7  Q.  All right.

8  A.  He intended this --

9  Q.  I don't want to ask you what he said about it.  I am just

10  saying prior to this, you spoke to various faculty members, who

11  expressed a similar concern, correct?

12  A.  They did not when I spoke to them.  That's why I was trying

13  clarify what they wanted to say.

14  Q.  So this is the first time that you learned that some

15  faculty members asserted that they weren't in a position to

16  evaluate Professor Ravina's tenure case at this time?

17  A.  That is the first time they put it this way.

18  Q.  All right.

19  A.  I can tell you, if you wish -- you may or may not -- what

20  they actually said.

21  Q.  Isn't it a fact, sir, that when you wrote the e-mail to

22  determine whether there is going to be a quorum at a subsequent

23  meeting, it was in part because you were concerned about

24  professors who might not show up because of this very concern?

25  A.  No, I typically write those e-mails about any meeting that

1   has any difficulty just to make sure there is a quorum.

2   Q.  Wouldn't you agree that receiving this kind of notification

3   from the faculty as is reflected in 160 was unusual in your

4   tenure as a dean?

5   A.  Certainly unusual.  This entire episode is unusual in my

6   tenure as a dean or a professor.

7   Q.  All right.  When you spoke to the faculty, I believe it was

8   on April 12 you were at a meeting for a short period of time.

9   Am I correct on that date?

10  A.  Yes, sir, on or about that date.  I don't remember the

11  exact date, but I'll take your --

12          MS. PLEVAN:  Objection again, your Honor.

13          Beyond the scope.

14          THE COURT:  I will allow it.

15  BY MR. McKNIGHT:

16  Q.  And you indicated that they were to base their decision on

17  the academic record as it existed at that day, is that correct?

18  A.  Correct.  Which is the way any tenure vote would be taken.

19  Q.  All right.

20          MR. McKNIGHT:  One moment, your Honor.

21          I have nothing further, your Honor.

22          THE COURT:  All right.  Any recross?

23  RECROSS EXAMINATION

24  BY MS. PLEVAN:

25  Q.  Dean Hubbard you just referred to communications or visits

 1  you made to Professor Bekaert.

 2          What did you say to Professor Bekaert when you went to

 3  his office on those occasions to speak to him about the

 4  communications between Professor Bekaert and Professor Ravina?

 5  A.  I told him I thought the communications were unprofessional

 6  and unbecoming, and what I wanted him to do is, A, communicate

 7  in a more professional manner and, B, try to figure out with

 8  these projects how could one get to resolution here.

 9          I talked with him about the idea that the jury's

10  already heard, there were these three buckets and try to

11  separate.  Ultimately that's what happened.

12          MS. PLEVAN:  Thank you.

13          THE COURT:  All right.  You can step down.

14          Thank you, Mr. Hubbard.

15          THE WITNESS:  Thank you, your Honor.

16          (Witness excused)

17          THE COURT:  The plaintiff can call her next witness.

18          MR. McKNIGHT:  Can we have a two-minute break, your

19  Honor.

20          THE COURT:  Sure.

21          MR. McKNIGHT:  OK.

22          THE COURT:  Why don't we break for two minutes.

23  You're welcome to stay here or you're welcome to go back to the

24  jury room, but we are going to keep this very quick.

25          MR. McKNIGHT:  Very well, your Honor.

1             (Recess).

2             THE COURT:  Everyone can be seated.

3             MR. McKNIGHT:  May I proceed?

4             THE COURT:  Yes.

5             MR. McKNIGHT:  Very well.

6             Your Honor, at this time I would like to call Vice

7    Provost Christopher Brown to the stand, please.

8     CHRISTOPHER BROWN,

9          called as a witness by the Plaintiff,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. McKNIGHT:

13   Q.  Good afternoon.

14   A.  Good afternoon.

15   Q.  Now, sir, you are currently employed by Columbia

16   University, is that correct?

17   A.  Yes.

18   Q.  In what capacity are you employed by Columbia University?

19   A.  I am currently employed as a professor of history.

20   Q.  And do you have any other positions that you have occupied

21   at Columbia University?

22   A.  I was recently vice provost for faculty affairs.  I have

23   also been the director of the Society of Fellows in the

24   Humanities.

25   Q.  For what period of time were you the vice provost of

I7inrav5                          Brown - Direct

1   faculty affairs?

2   A.  I was vice provost for faculty affairs from May 2015

3   through December 2017.

4                (Continued on next page)

1    BY MR. McKNIGHT:

2    Q.  And while you were the vice provost of faculty affairs, you

3    worked in the office of the provost at Columbia University,

4    correct?

5    A.  Yes.

6    Q.  And would you agree that the office of the provost

7    administers the tenure review process?

8    A.  That is correct.

9    Q.  And would you agree that the office of the provost has the

10   authority to authorize various leaves?

11   A.  That is correct.

12          I should just say, in the -- on behalf of the

13   president of the university.

14   Q.  All right.  Thank you.

15   A.  Delegated power from the president of the university.

16   Q.  So to be clear then, the provost -- you're the vice provost

17   and you report to the provost.

18   A.  Correct.

19   Q.  And the provost then is connected to the president of the

20   university.

21   A.  Correct.

22   Q.  And you're exercising that authority from above.

23   A.  Yes, delegated to the office.

24   Q.  Thank you.

25          Would you agree that to receive an appointment as an

I7i1rav6                          Brown - Direct

1  instructor or researcher at Columbia University, one needs to

2  have authorization from the provost's office?

3  A.  That is correct.

4  Q.  Would you tell the ladies and the gentlemen of the jury

5  what your duties were as a vice provost of faculty affairs.

6  A.  As vice provost for faculty affairs, I actually had a broad

7  range of responsibility, but the principal ones were to

8  administer the tenure review system, the universitywide tenure

9  review system for the provost.  It's the review that happens

10 after the schools have conducted their individual reviews.

11        I also was responsible for the appointments

12 authorizing -- the office authorizes appointments at the

13 university for everyone who's an instructor or a researcher of

14 any kind.  The office also deals with faculty grievances, with

15 leaves, and with other matters that pertain to faculty issues

16 across the university.

17 Q.  While you were the vice provost, did you work or report

18 directly to Provost Coatsworth?

19 A.  I did.

20 Q.  All right.  And while you worked with Provost Coatsworth,

21 you were authorized to write letters on his behalf?

22 A.  Not an easy question to answer.  I wrote letters that went

23 out under his signature, yes.

24 Q.  All right.  And while you worked for Provost Coatsworth,

25 were your offices located near each other?

I7i1rav6                      Brown - Direct

1    A.   In the same building.

2    Q.   All right.  Did you communicate with each other on a

3    regular basis about various issues which were in your purview?

4    A.   On a regular basis?

5    Q.   And did you --

6    A.   I'm asking -- actually that's a question, on a regular --

7    do you mean on a regular -- regular basis can mean a lot of

8    different things.

9    Q.   All right.  How often did you communicate with the provost

10   about issues that came before you?

11   A.   About once a week.

12   Q.   All right.  And when you say that you communicated with him

13   once a week about issues, how did you do that, by email,

14   telephone, or in person?

15   A.   Email exchange was much more frequent, but I usually met

16   with him once or twice a week.

17   Q.   All right.  So you met with him once or twice a week, but

18   you emailed more frequently.

19   A.   Correct.

20   Q.   How frequently did you email with him, do you think?

21   A.   I have no idea.

22   Q.   All right.

23   A.   Often.

24   Q.   Often?  That would be regularly then.

25   A.   Yes.

1    Q.  All right.  Now one of your job responsibilities was to

2    advise the provost and other offices at Columbia on matters

3    pertaining to the university's faculty, right?

4    A.  Correct.

5    Q.  And as vice provost of faculty affairs, you were charged

6    with overseeing, managing, and directing various

7    responsibilities with respect to academic appointments and the

8    tenure system, correct?

9    A.  Yes.

10   Q.  While you were the vice provost, you were the one who was

11   primarily responsible for interpreting Columbia's policies

12   concerning tenure and leave, correct?

13   A.  Correct.

14   Q.  And you also had the authority at that time to set policy

15   or make recommendations for policy changes at Columbia,

16   correct?

17   A.  I had the authority to make recommendations.  I did not

18   necessarily -- it depends on the issue, but I didn't

19   necessarily have the authority alone to change policy.

20   Q.  All right.

21   A.  Depends very much on the policy and the issue.

22   Q.  Are you familiar with the tenure process at Columbia

23   University?

24   A.  I am.

25   Q.  And are you familiar with the term "tenure clock"?

1    A.  I am.

2    Q.  Would you describe the tenure clock for us.

3    A.  So the tenure clock is the period that faculty members who

4    have a full-time appointment who have not received tenure, the

5    time that they may teach at the university before they receive

6    tenure.  Columbia has an eight-year clock.  So within -- the

7    university, because of that clock, must conduct its review of

8    the candidate by the close of the seventh year.  If they do not

9    receive tenure by then, they have one terminal year at the

10   university in the eighth year.

11   Q.  So seven years to achieve tenure and then possibly a year

12   behind that if they don't get it.

13   A.  Correct.

14   Q.  All right.  And then that gets us to the next term.

15           You're familiar with the term "up or out" date,

16   correct?

17   A.  That's correct, yes.

18   Q.  Would you define the "up or out" date.

19   A.  The "up or out" date is the date by which the candidate has

20   not received -- that the appointment will end, so it's the

21   end -- it's the formal end of the tenure clock.

22   Q.  Does the office of the provost determine a faculty member's

23   "up or out" date?

24   A.  It keeps track of it, yes.

25   Q.  All right.

1   A.  The appoint -- the "up or out" date is actually determined

2   by when someone enters the tenure track and the nature of their

3   career, on tenure track.  And the office of the provost tracks

4   that on an annual basis and informs faculty, informs deans and

5   the faculty of where they are in their tenure clock.

6   Q.  Very well.

7       Now isn't it a fact that there are exceptions to the

8   tenure process that you just described for us?

9   A.  I'm not sure I understand what you mean.

10  Q.  Well, let me see if I can help.

11      Under Columbia's policies, there are a number of

12  circumstances that can postpone a faculty member's tenure

13  review process, is that correct?

14  A.  That is correct.

15  Q.  All right.  The office of the provost has the discretion to

16  adjust the tenure clock for whatever reason the office chooses,

17  isn't that correct?

18  A.  No, it is not.

19  Q.  Sir, do you remember when your deposition was taken, on

20  June 8, 2017?

21  A.  Mm-hmm.  Yes.

22  Q.  I just want to, for a moment, direct your attention --

23      MR. McKNIGHT:  Don't publish it.

24  Q.  -- to page 137.  I'm not going to read it.  I just want to

25  see if this refreshes your recollection, all right?

```
 1   A.  Okay.

 2           MR. McKNIGHT:  137, lines 8 to 13, can you publish

 3   that to Professor Brown, please.

 4   A.  It's supposed to be on this screen?

 5   Q.  Yes, it should be.

 6           MS. PLEVAN:  I'd like the witness to be shown the

 7   context of the question and the answer.

 8           THE COURT:  Okay.  You need to go back.

 9           MR. McKNIGHT:  You can go back to the previous page,

10   136, and go all the way through, 136, line 21, all the way

11   through line 13 on the next page, 137.

12           MS. PLEVAN:  Well, it's above that too.  Line 7, 136.

13           THE COURT:  All right.  Well, he has all of 136 in

14   front of him.

15           MS. PLEVAN:  Okay.

16           THE COURT:  You can read it.

17   A.  Do you want me to read it?

18   Q.  No, I don't want you to read it.  I want you to read it to

19   yourself.

20           I'm just asking you again whether the office of the

21   provost has broad discretion and can adjust the tenure clock

22   for whatever reason the office chooses.

23   A.  Within the -- what that statement misses is, within the

24   ambit of the statutes and the customs and practices that govern

25   tenure.
```

1  Q.  All right.

2  A.  So I extracted from that context.  The way you stated it, I

3  would disagree with.  Within the context in which I meant it,

4  which is that we interpret the rules; we don't make up the

5  rules as we go along.  We interpret the rules that exist, and

6  we have discretion in making judgments within the ambit of the

7  published rules and the established practices.

8  Q.  All right.

9  A.  So the way that you asked the question was that do we have

10  discretion to do whatever we want, and the answer to that is

11  no.

12  Q.  All right.  But you do have broad discretion in these

13  regards.

14  A.  Within the ambit of the statutes of the university and the

15  rules that we have published -- and we publish annually --

16  there is room for judgment and interpretation within that

17  context.

18  Q.  All right.  Well, let's go through it one at a time then.

19       Now under Columbia's policy, a faculty member's tenure

20  review process can be postponed due to child care

21  responsibilities, isn't that correct?

22  A.  Broadly, yes.

23  Q.  And a postponement due to child care responsibilities does

24  not require a change in the faculty member's position or title,

25  isn't that correct?

1    A.   That is correct.

2    Q.   And under Columbia's policies, a faculty member's tenure

3    review process can be postponed due to medical leave, isn't

4    that correct?

5    A.   Yes, that is correct.

6    Q.   And a postponement due to medical leave does not require a

7    change in title, correct?

8    A.   That is correct.

9    Q.   And under Columbia's policy, a faculty member's tenure

10   review process can be postponed due to military service,

11   correct?

12   A.   That's correct.

13   Q.   And a postponement of tenure due to military service does

14   not require a change in the faculty member's position or title,

15   isn't that correct?

16   A.   I mean, I would assume not.

17   Q.   All right.  And Columbia's policy also authorizes granting

18   a leave of absence for personal hardship or compelling personal

19   reasons, isn't that correct?

20   A.   Could you restate the question.

21   Q.   Columbia's policy authorizes the granting of leave of

22   absence for personal hardship or compelling personal reasons.

23   A.   That's correct.

24   Q.   And under Columbia's policy, a faculty member's tenure

25   review process may be postponed due to personal hardship, isn't

1    that correct?

2    A.  That's correct.

3    Q.  And Columbia's policies do not define the terms "compelling

4    personal need" or "personal hardship," isn't that correct?

5    A.  Yeah, I believe that's correct.

6    Q.  And wouldn't you agree that Columbia does not have any

7    specific criteria defining what constitutes a personal hardship

8    or compelling personal need, isn't that correct?

9    A.  Yes.

10   Q.  And the office of the provost does not have a formal

11   criteria for deciding whether or not to offer personal hardship

12   leave, isn't that correct?

13   A.  A formal criteria?

14   Q.  Right.

15   A.  No, it does not.

16   Q.  Okay.  And the office of the provost has the authority to

17   decide whether a personal hardship leave will postpone a

18   faculty member's tenure review process, correct?

19   A.  Repeat the question again, please.

20   Q.  The office of the provost has the authority to decide

21   whether a personal hardship leave will postpone a faculty

22   member's tenure review process.

23   A.  Yes.

24   Q.  Under Columbia's policies, there is no time limit on the

25   duration of a leave of absence that can be taken for compelling

1     personal need or personal hardship, isn't that correct?

2     A.   The only reason why I'm pausing, because I don't think it's

3     ever been tested, but there is no formal -- if you're saying is

4     there any formal policy, no, there is not.

5     Q.   As a person who interprets these policies, at least during

6     that period of time from May 2015 through December 2017, it was

7     your view that personal hardship is very much in the eye of the

8     beholder, isn't that correct?

9     A.   Are you quoting a deposition?

10    Q.   I sure am.

11    A.   That's still my view.

12    Q.   As the person who interprets these policies for Columbia,

13    you've said what one person regards as personal hardship,

14    another regards as personal hardship, and another regards as

15    personal hardship is going to be very different.  Isn't that

16    true?

17    A.   If that's what I said, then that's what I said.

18    Q.   Now you first became aware of Professor Ravina's complaint

19    against Professor Bekaert in the late summer or early fall of

20    2015, correct?

21    A.   Correct.

22    Q.   Now at that time, just to put a time period on it, you had

23    been the vice provost for less than a few months, correct; only

24    a few months?

25    A.   Three or four months.

I7i1rav6                     Brown - Direct

1   Q.  Okay.  And at that time you didn't have a broad

2   understanding of the circumstances surrounding it, correct,

3   when you first heard about it?

4   A.  What is "it"?

5   Q.  When you first heard about the dispute or the allegations

6   or the complaint or that there was an issue between Professor

7   Ravina and Professor Bekaert, you didn't have a deep

8   understanding of the circumstances surrounding that situation

9   at all.

10  A.  That is correct.

11  Q.  Would you agree that prior to Professor Ravina's

12  termination from the university, Columbia never provided you

13  with training or instruction on its policies against

14  discrimination, harassment, and retaliation?

15  A.  I'm not sure what training it would have provided, but no,

16  there was no training.

17  Q.  When you first learned that there was an issue or a dispute

18  between Professor Ravina and Professor Bekaert, it was being

19  handled by another part of the university, not in the provost's

20  office, correct?

21  A.  Yes.

22          MR. McKNIGHT:  Could I have Plaintiff's Exhibit 121.

23          THE COURT:  Is 121 in evidence already?

24          So I understand this is already in evidence.

25          MR. McKNIGHT:  I believe --

I7i1rav6                        Brown - Direct

 1              THE COURT:  It's already been admitted.

 2              MR. McKNIGHT:  That's correct, your Honor.

 3              THE COURT:  Okay.

 4    BY MR. McKNIGHT:

 5    Q.  Professor Brown, you see what's been marked as Plaintiff's

 6    Trial Exhibit 121, correct?

 7    A.  Yup, yes.

 8    Q.  And this is a letter addressed by Professor Ravina to John

 9    Coatsworth, the provost at Columbia University, correct?

10    A.  Yes.

11    Q.  And he's the same Coatsworth that we discussed earlier who

12    was your boss during the period of time that you were there,

13    correct?

14    A.  Yes.

15    Q.  And she writes, "Dear John, I am writing to request a paid

16    leave and a corresponding extension of the tenure clock for the

17    current academic year and the following two -- 2016-2017 and

18    2017-2018 -- with no change in title."  Correct?

19    A.  Yes.

20    Q.  In the second paragraph she says, "I am asking for the

21    leave and extension of the tenure clock because of compelling

22    personal need and personal hardship, in order to be able to

23    focus on research and undo the damage I have suffered."  Do you

24    see that?

25    A.  Yes.

1  Q.  "The university is well aware of the issues I have been

2  confronting and the extensive time spent trying to resolve

3  them."  Correct?

4  A.  Yes.

5  Q.  That wasn't addressed to you, but you eventually learned

6  about this and were assigned the project of dealing with this

7  issue, correct?

8  A.  Yes.

9  Q.  After you received this, didn't you receive it in

10 discussion or through an email with Provost Coatsworth?

11 A.  He emailed it to me, if that's what you mean.

12 Q.  And then didn't you, following email, have a conversation

13 with him about it?

14 A.  I did have a conversation with him about it, yes.

15 Q.  And after you received it, didn't you write Provost John

16 Coatsworth on December 26th that "I believe the faculty member

17 is seeking terms that go beyond what has been offered thus

18 far"?

19 A.  I would like to see the letter, but that sounds right.

20        MR. McKNIGHT:  Okay.  Can we look at Exhibit 122,

21 please.

22 Q.  If you'll look at -- oh, excuse me.

23        MR. McKNIGHT:  Do you have an objection to this,

24 counsel?

25        MS. PLEVAN:  Well, I think based on earlier

1    discussions, the top part is an issue.

2            MR. McKNIGHT:  When you say the top part, do you mean

3    the first page --

4            MS. PLEVAN:  I just wasn't sure.  This hasn't come

5    into evidence?

6            MR. McKNIGHT:  No, it has not.  That's what we're

7    asking for.

8            MS. PLEVAN:  Never mind.  No objection.

9            THE COURT:  All right.  122 will be admitted.

10           (Plaintiff's Exhibit 122 received in evidence)

11           MR. McKNIGHT:  Can we go to Bates stamp -- the second

12   page of the exhibit, please.

13   BY MR. McKNIGHT:

14   Q.  Professor Brown, this is an email from you on Saturday,

15   26th of December 2015, 8:37 p.m., correct?

16   A.  Yes.

17   Q.  And the John there you're writing to is Provost John

18   Coatsworth, correct?

19   A.  That's correct.

20   Q.  And you say, "John, I did not catch the name at first.

21   Sorry for that.  There is actually a long back story on this

22   one.  Counsel is indeed aware of the specifics of the case and

23   accommodation has been worked out.  I believe the faculty

24   member is seeking terms that go beyond what has been offered to

25   her thus far."  Do you see that?

I7i1rav6                          Brown – Direct

1   A.  Yes.

2   Q.  Okay.  And so you'll agree that that's what you said at the

3   time that you received the formal application from Professor

4   Ravina, correct?

5   A.  Just to be exact, he -- he received it.  I did not receive

6   it.

7   Q.  He received it --

8   A.  He received it and sent it to me.  I did not receive it

9   from her.

10  Q.  Very good.  I accept the correction.

11          Now on January 8, 2016, isn't it true that Provost

12  Coatsworth told you that he had received a call from Professor

13  Calomiris, correct?

14  A.  Yes.

15  Q.  And Professor Calomiris spoke on behalf of Patrick Bolton

16  as well, correct?

17  A.  Yes.

18  Q.  And he indicates "they are both extremely distinguished

19  faculty in the Finance and Economics Division of the Business

20  School."

21          MS. PLEVAN:  Objection.  Are you asking him if that's

22  what the document says?

23          MR. McKNIGHT:  That's what it says.

24  Q.  Were you aware of it?  Did you receive it?

25          MS. PLEVAN:  Object to the form, still.

1    THE COURT:  Okay.  Just going forward, let's just ask

2    the questions.  But can you answer that?

3    THE WITNESS:  Yes.  I mean -- yes.

4    Q.  And the next sentence, "Charles spoke strongly in favor of

5    the three-year extension of the tenure clock that Professor --

6    or Enrichetta Ravina has requested."  Do you see that?  Were

7    you aware of this?

8    A.  Yes.

9    Q.  Okay.

10    MR. HERNSTADT:  Your Honor, can we just be clear that

11    this is not being presented that anything in this letter is

12    true, that this is what was written?

13    THE COURT:  All right.  And I've given you this

14    instruction before.  This isn't being admitted for the truth of

15    what's contained in the various emails but the fact that this

16    was said and to whom and by whom and when.

17    MR. McKNIGHT:  Very well.

18    BY MR. McKNIGHT:

19    Q.  Then in the top of this email, then you respond to Provost

20    Coatsworth, correct?

21    A.  Mm-hmm.

22    Q.  And there you say, "Our colleagues are well intentioned

23    here, but on this case we need to act with care," correct?

24    A.  That is what the document says.

25    Q.  All right.  And you also indicated that you wanted to speak

I7i1rav6                        Brown - Direct

1  with Provost Coatsworth on the phone, correct, about this case?

2  A.  Yes.

3  Q.  And in fact, you did eventually speak to him on the phone.

4  A.  I don't recall whether I spoke to him on the phone or in

5  person.

6  Q.  All right.  Isn't it true that you eventually communicated

7  with Provost Coatsworth, who conveyed to you that he was

8  impressed by the number of colleagues and the standing of some

9  of the colleagues who supported postponing Professor Ravina's

10 tenure review?

11 A.  Yes.

12 Q.  And at the time you didn't have any conversations with

13 Professor Calomiris concerning Professor Ravina's request to

14 postpone her tenure, right?

15 A.  I did not.

16 Q.  Okay.  And at the time you didn't have any conversations

17 with Professor Bolton concerning Professor Ravina's request to

18 postpone her tenure review.

19 A.  I did not.

20      MR. McKNIGHT:  Can we have Plaintiff's Exhibit

21 No. 125, which I believe has already been admitted into

22 evidence.

23 Q.  Professor Brown, do you recognize Plaintiff's Exhibit

24 No. 125?

25 A.  I do.

I7i1rav6                         Brown - Direct

1   Q.  All right.  And this is the letter that you wrote to

2   Professor Ravina, right?

3   A.  It is.

4   Q.  Okay.  And in this letter, you denied her initial request,

5   correct?

6   A.  I did.

7   Q.  All right.  However, you gave her the opportunity to

8   provide you with additional details supporting her request for

9   additional leave on the basis of compelling personal need or

10  personal hardship, correct?

11  A.  In the case of requests for leave, the office always

12  receives information that supports the request.  That is a

13  standard practice across the university.

14  Q.  All --

15  A.  I'm just answering the question.

16  Q.  I only -- sir, I only asked you whether you gave her the

17  opportunity in this letter to provide you with some additional

18  information.

19  A.  As the office requires in all cases where a leave is

20  requested.

21  Q.  All right.  Thank you.

22          Now you will agree, would you not, that eventually

23  Professor Ravina got back to you and provided you with some

24  additional information, correct?

25  A.  I would agree with that.

1    Q.  Okay.  And after you received it, you then had learned

2    quite a bit of information about the dispute and the

3    allegations of discrimination and delay and those sorts of

4    things, did you not?

5           MS. PLEVAN:  Objection.

6           THE COURT:  Could you rephrase that, please.

7    Q.  All right.  When you received her response, you learned

8    more specifics about her allegations, correct?

9    A.  Yes.

10          MR. McKNIGHT:  All right.  Could I have Plaintiff's

11   Exhibit No. 200, please.

12   Q.  Are you familiar with Plaintiff's 200?

13   A.  I am.

14   Q.  All right.  And it's a declaration that you presented.

15          MR. McKNIGHT:  I believe it's already in evidence.

16          MS. PLEVAN:  Could we just have a minute.

17          THE COURT:  Yes.

18          MS. PLEVAN:  No, it's not in evidence.

19          MR. McKNIGHT:  I'm sorry.  I'd like to move

20   Plaintiff's 200 in evidence, please, your Honor.

21          MS. PLEVAN:  I'd object, your Honor.

22          THE COURT:  Yes, I don't think that's proper.  If you

23   want to ask him a question or refresh his recollection or

24   impeach him with a portion of it, but --

25          MR. McKNIGHT:  All right.  Very well, your Honor.

1  BY MR. McKNIGHT:

2  Q.  On January 15, 2016, that was the first time you

3  communicated with Professor Ravina about her request, correct?

4  A.  I believe that's right.

5  Q.  All right.  And then but you did have the authority to

6  grant that request at that time.  Just talking about authority.

7          MS. PLEVAN:  Objection.

8          THE COURT:  To grant the request for leave?

9          MR. McKNIGHT:  Yes.

10  Q.  You possessed the authority to grant it if you decided that

11  it was warranted, correct?

12  A.  I think the answer to that has to be no.

13  Q.  All right.

14  A.  And the reason is because Professor Ravina requested a

15  leave of absence with pay, for which there really is no

16  precedent in the office, so it is very unlikely that under

17  those circumstances that I would make a decision to authorize

18  something which had -- in recent institutional memory had never

19  been done.

20  Q.  All right.  Well, let's talk about the recent institutional

21  memory.

22          Isn't it true that this is the first formal request

23  for personal leave and hardship that you received while you

24  were the vice provost?  Formal request.

25  A.  I'm actually generally thinking about that.

1          I recall one case in the summer four or five months

2     earlier where there was a request somewhat similar.  I'm not

3     sure that it was exactly the first.  Assuming it would have

4     been one of the first or the second.  But I don't know -- I

5     can't say for sure that it was the first.

6          I would also say that it's not uncommon to have

7     informal conversations with faculty about what's going on in

8     their professional lives and what steps the university could

9     take to help them deal with them.  As far as formal written

10    requests, I would say that this was probably either the first

11    or the second in my time as vice provost.

12         MR. McKNIGHT:  All right.  Let's return to Exhibit

13    No. 129, please.  It's been admitted.

14         Could we publish this, your Honor.

15         THE COURT:  Has it already been admitted, 129?

16         MR. McKNIGHT:  Yes, it has, your Honor.

17         THE COURT:  All right.  Yes, you may.

18    BY MR. McKNIGHT:

19    Q.  Professor Brown, do you recognize Plaintiff's Exhibit 129?

20    A.  I do.

21    Q.  And this was the response that Professor Ravina provided

22    for you in response to your first letter to her, correct?

23    A.  That's correct.

24    Q.  All right.  And after you received this response, you were

25    aware that Professor Ravina had made allegations of harassment,

I7i1rav6                         Brown - Direct

1   correct?

2   A.  Yes.

3   Q.  And after you received this, you were aware that Professor

4   Ravina made allegations of retaliation.

5   A.  Yes.

6   Q.  And after you received this, you were aware that Professor

7   Ravina alleged that Professor Bekaert had sabotaged her work.

8   A.  Yes.

9   Q.  And after you received this, you were aware that Professor

10  Ravina alleged that Professor Bekaert was infusing

11  conversations and meetings with sexual content.

12  A.  If that's what's in the -- I don't actually remember.  It's

13  a long document.  I don't remember it word for word.  But if

14  that's what's in the document, then yes, I became aware of it.

15  Q.  And after you received this, you were aware that she

16  alleged that Professor Bekaert was discussing sexual exploits.

17  A.  Again, I'd have to look at it again to know what I took

18  from it, but if that's what's in the document, then, yes, I

19  became aware of it then.

20  Q.  All right.  And you became aware that she alleged that

21  Professor Bekaert was seeking a sexual relationship, correct?

22          MS. PLEVAN:  Objection.

23          MR. McKNIGHT:  I said "alleged."

24          THE COURT:  Overruled.

25  Q.  And after you received this, you were aware that Professor

1   Ravina said that she felt trapped, correct?

2   A.  I don't know that to be in the document, but if it is in

3   the document, I -- again, I have not committed the document to

4   memory, so I don't know -- I'd have to read it again to know in

5   fact what is in it, but if that is in fact in it, then I became

6   aware of it at the time that I read it, yes.

7   Q.  All right.  And after you received this document, you were

8   aware that she alleged that she rejected his advances then.

9   A.  I'll make the same point, which is that I don't know -- I

10  don't recall word for word what is in the document, but if that

11  is what's stated in the document, then I learned about it in

12  reading the document when I received it.

13  Q.  Is it fair to say that when you received Plaintiff's

14  Exhibit No. 29, the letter of January 25, 2016, this was the

15  most complete recitation of her allegations that you had ever

16  seen before this?

17  A.  Certainly.

18  Q.  All right.

19  A.  And so I asked her to come and talk to me about it.

20          MR. McKNIGHT:  Could we have Plaintiff's Exhibit

21  No. 134, please.

22          This is in evidence, your Honor.

23          THE COURT:  Oh, it is.  Okay.  You can publish it.

24  Q.  Professor Brown, do you recognize what's been marked as

25  Plaintiff's Exhibit No. 134?

I7i1rav6                          Brown - Direct

1    A.  I'm sorry.  Yes.

2    Q.  Do you recognize this?  It's a letter dated February 24,

3    2016?

4    A.  Yes.

5    Q.  All right.  And this was your response to Professor

6    Ravina's earlier letter which we had looked at in detail a few

7    seconds ago, correct?

8    A.  This is not the response.  It is a response.  I actually

9    wrote -- I wrote her a couple of times asking to speak with her

10   about her request, both directly and through Dean Phillips.  So

11   this is a response after --

12   Q.  This is a response.

13   A.  This is a response after not receiving a response to my

14   request to have a conversation to talk with her about her

15   request.

16   Q.  We'll get to that.

17   A.  Well, I'm just saying, this is not the response; it is one

18   response.

19   Q.  It is a response.

20   A.  It is one of several responses.

21   Q.  That's fine.  Now in this response, a response --

22   A.  Yes.

23   Q.  -- you said, "I have considered your January 25, 2016

24   request for a paid leave based on compelling personal need and

25   personal hardship and determined that it would not be

1   appropriate."  Correct?

2   A.   That's what it says.

3   Q.   And isn't it true that you denied her request because you

4   determined that the request was not supported by the facts

5   presented in her letter and because such leave is not given

6   with pay, correct?

7   A.   Certainly on the second one, it's -- I mean, I suspect

8   you're quoting deposition.  On the first statement -- there's

9   two different statements.  Maybe we should take them one at a

10  time.

11  Q.   Right now I want to get an answer to the question, and then

12  we'll go from there.

13            Is it true that you denied the request because it was

14  not supported by the facts presented in her letter and because

15  such leave is not given with pay, yes or no?

16            THE COURT:  Why don't you break that down, because

17  it's a compound question as is.

18  Q.   Is it true that you denied the request because it was not

19  supported by the facts presented in her letter?

20  A.   It's more complicated than that.

21  Q.   Please answer my question.  Is it true that you denied her

22  request for leave because it was not supported by the facts

23  presented in her letter?

24            THE COURT:  I'll just say, if you can answer a

25  question yes or no, do so, but if you can't, please let us

1    know.

2              THE WITNESS:  Yeah, I don't think I can answer that

3    yes or no.  I don't think it's --

4              MR. McKNIGHT:  Your Honor, now I return to Plaintiff's

5    Trial Exhibit No. 200.

6              THE COURT:  All right.  Just --

7              MR. McKNIGHT:  All right?

8              THE COURT:  You can show him that one line, or you can

9    read it to him.

10             MS. PLEVAN:  Just to the witness?

11             THE COURT:  Just to the witness.  You can just ask him

12   isn't it true that he said this.

13   BY MR. McKNIGHT:

14   Q.  Professor Brown.

15   A.  Yes.

16   Q.  Did you give a sworn declaration under penalty of perjury

17   on 4/6/2016?

18   A.  Yes.

19   Q.  All right.  And I'd like to direct your attention to

20   paragraph 10.  And at paragraph 10, you said, "I denied the

21   request for leave because it was not supported by the facts

22   presented in her letter."  Is that what you said?

23   A.  That's what's there in the statement, yes.

24             THE COURT:  And you know what, I know I broke it down

25   when you asked the question, but why don't you finish that

1    sentence.

2              MR. McKNIGHT:  All right.

3    Q.  And you said at paragraph 10, "I denied the request for

4    leave because it was not supported by the facts presented in

5    her letter and because such leave is not given with pay."  Is

6    that what you said?

7    A.  Yes.

8    Q.  And you were sworn to tell the truth at the time you gave

9    this statement?

10   A.  Yes.

11   Q.  All right.  Now Columbia Business School did have the

12   authority to pay Professor Ravina during a leave of absence

13   period, correct?

14   A.  I don't know that to be true at all.

15   Q.  Excuse me?

16   A.  The faculty handbook is very clear that leaves of absence

17   are given without pay.

18   Q.  All right.  Your deposition, again, was taken on June 8,

19   2017, correct?  And at that time you were sworn to tell the

20   truth.  Page 139.

21              And also at that time isn't it a fact that you

22   testified as a 30(b)(6) witness?

23   A.  Yes.

24              The question on this page does not specify the type of

25   leave or exemption from teaching duties.

I7i1rav6                      Brown - Direct

1   Q.  Let me read the question.

2   A.  So let me -- so --

3   Q.  Please, sir, let me read the question and answer.

4   A.  Well, it actually matters, because the -- a leave of

5   absence for compelling hardship is actually very clear in the

6   handbook that it's without pay.

7   Q.  Sir, I ask that we read the question.

8   A.  That's very --

9          MR. McKNIGHT:  Your Honor, please instruct the

10  witness.

11         MS. PLEVAN:  He raised the subject, your Honor.

12         THE WITNESS:  I'd like to finish my thought.

13         THE COURT:  You can finish your answer.

14         THE WITNESS:  I mean, he's trying to impeach my

15  testimony, and what I'm saying here is that this is a response

16  to leave or exemption from teaching duties.  There are leaves,

17  leaves for scholarly purposes, a variety of leaves which one

18  can have, and be paid.  A personal leave is not a paid leave.

19  At least that's what the faculty handbook states.

20         So yes, the Columbia Business School is authorized to

21  do it for the kind of leave that I was referring to, and also

22  for an exemption from teaching duties.

23  BY MR. McKNIGHT:

24  Q.  The question reads:  "Does Columbia Business School have

25  the authority to pay a Columbia Business School faculty member

1    during a period when he or she is on leave or exempt from

2    teaching duties?"  And your answer was:  "Yes," correct?

3    A.  Yes.

4    Q.  All right.

5    A.  With the qualification that I just gave, which in the

6    context of the statement was about research leaves and teaching

7    leaves, not leaves of absence.

8    Q.  Professor Brown, at some point in time you learned that

9    there was an offer of an associate research scholar position

10   that was made, correct?

11   A.  Yes.

12   Q.  All right.  But that offer did not originate with you,

13   correct?

14   A.  I don't think so.

15   Q.  And you weren't involved in the original decision to make

16   that offer, correct?

17   A.  I don't know who was talking to whom when.  I don't believe

18   so, but I actually do not know when conversations began or who

19   was involved in them, so I can't say for certain that I wasn't,

20   but I don't believe that I was.

21   Q.  And because you weren't involved in the initial

22   discussions, you don't really know what was the basis of that

23   decision at that time, do you, what prompted it?

24   A.  The basis of what decision?

25   Q.  To make that offer at that time.

1  A.  Well, whatever time it was made, this is a exception that

2  is made for faculty who are experiencing difficulties at the

3  university.

4  Q.  I asked you whether you were aware of the decision-making

5  process at the time the decision was made.  Were you aware of

6  the reasons for the decision being made at the time that it was

7  made, sir?

8  A.  At the time that it was made?  I don't know when it was

9  made.

10  Q.  All right.

11  A.  So I don't know -- I don't know if I was or was not, but

12  what I can tell you is that --

13  Q.  All right.  That was my -- you've answered my question.

14        MS. PLEVAN:  Could he be allowed to explain his

15  answer, your Honor.

16        THE COURT:  You can explain that on cross.

17        THE WITNESS:  Okay.

18  Q.  And you don't know who at Columbia was involved in offering

19  Professor Ravina the one-year associate research scholar

20  position, do you?

21  A.  I believe that Dean Phillips spoke with her at one point,

22  at some point, but I do not know who else might have been

23  involved.

24  Q.  Again, sir, you remember your deposition was taken?

25  A.  I'll never forget it.

1    Q.  All right.  "Who at Columbia was involved in offering

2    Ms. Ravina a one-year associate research scholar position?

3              "A.  I don't know the answer to that."

4              And you were under oath at that time, sir?

5    A.  I understand that.

6    Q.  And are you aware of whether that was Professor

7    Coatsworth's idea at all?  Provost Coatsworth's, I should say.

8    A.  Am I aware?

9    Q.  Right.

10   A.  No, I'm not aware.

11   Q.  All right.  And you don't have any understanding of why a

12   decision was made to offer Professor Ravina a one-year position

13   as an associate research scholar rather than a longer break in

14   service, do you?

15   A.  I do.  I am aware of what the reasons would be.

16   Q.  Again, your deposition was taken, the following question

17   and answers were asked:

18              "Do you have any understanding about why a decision

19   was made to offer Ms. Ravina a one-year position as an

20   associate research scholar rather than a longer break in

21   service?

22              "A.  I don't have any information about that."

23              MS. PLEVAN:  What page and line?

24              MR. McKNIGHT:  Page 163, lines 7 to 11.

25              MS. PLEVAN:  Can you just hold.

 1    A.  I'd like to see it in context, please.

 2              MR. McKNIGHT:  Would you please show him --

 3              MS. PLEVAN:  Could we have a minute.

 4    A.  And what's your question, please?

 5    Q.  I just asked you whether you knew why the decision was

 6    made, sir.

 7              MS. PLEVAN:  Which decision?

 8              MR. McKNIGHT:  The decision to offer Professor Ravina

 9    a one-year position as an associate research scholar --

10              MS. PLEVAN:  When?  Decision made when, please?  Could

11    we have a time.

12              MR. McKNIGHT:  My question stands.

13              MS. PLEVAN:  Well --

14              THE COURT:  Do you understand the question?

15              THE WITNESS:  I am.

16              THE COURT:  Do you feel like you can answer it?

17              THE WITNESS:  I feel like I can answer it in two

18    parts.

19              THE COURT:  Okay.

20              THE WITNESS:  I'm not trying to be -- I'm not trying

21    to be sneaky or tricky here.  It's just that one question in

22    fact embeds two different questions, to which there are two

23    different answers.

24              MR. McKNIGHT:  Your Honor, I'm prepared to move on.

25    He answered the question two different ways.  We'll let that

1    stand.

2              THE COURT:  All right.  Maybe you can follow up on

3    cross-examination.

4              THE WITNESS:  I'd like to follow up.

5    BY MR. McKNIGHT:

6    Q.  Now Columbia University does not have any formal policy

7    that limits the number of years that a tenure candidate's "up

8    or out" date may be postponed due to a break in service, is

9    that correct?

10   A.  Not exactly.  A break in service has the effect of

11   restarting the tenure clock, so a new tenure clock would begin

12   when the faculty member rejoined the faculty and then would

13   have an eight-year clock, technically.

14   Q.  Again, I'll refer you to your deposition.  You were under

15   oath at the time.

16             MS. PLEVAN:  Which page and line?

17             MR. McKNIGHT:  Page 93, line 4 to line 10.

18             MS. PLEVAN:  Could you just give us a minute.

19   A.  This was an answer to the question --

20   Q.  Wait a second.

21             MS. PLEVAN:  Are you asking him a question?

22             THE COURT:  So what's the question?  What are you

23   asking now, Mr. McKnight?

24             MR. McKNIGHT:  I'm asking -- I asked him the question,

25   "Columbia University does not have any formal policy that

1    limits the number of years that a tenure candidate's 'up or

2    out' date may be postponed due to a break in service, is that

3    correct?"  And now I'm reading from the deposition.

4    A.  It is correct, because I was answering a question of how

5    many times you can use it.  There are --

6    Q.  Well --

7    A.  Let me answer the question.  Let me answer the question.

8    You can have a break in service multiple times and be at the

9    university for a long period of time with continual breaks of

10   service that postpone the tenure review.  That's the answer

11   that I was giving to that question.

12   Q.  All right.  Well, let's read your question and answer.

13             So the question is:

14             "So there's no formal policy that sets forth a limit

15   on the number of years that --"

16             And you said, "That seems --"

17             "-- a tenure candidate's 'up or out' date may be

18   postponed due to a break in service, is that correct?"

19             "A.  That seems right."

20   A.  Right, because I was referring to a situation in which --

21   Q.  All right.  She'll give you a chance to respond.

22             THE COURT:  He can answer that.

23             Go ahead.  You were referring to a situation?

24   A.  I was referring to a situation where, to say that there

25   would be a formal limit would be to say that you can only do it

I7i1rav6                      Brown - Direct

1   once, or that once you've done it, there's no formal limit to

2   the number of times in which, theoretically, you could have a

3   break in service and restart your tenure clock.  So that's what

4   I was answering.  I was answering the question of, is there a

5   point at which you can't have a break in service -- sorry about

6   that.  I was gesturing.

7          There's no limit to the number of times you could have

8   a break in service and restart a tenure clock, technically.  So

9   that's the question that I was answering.  What is not the case

10  is that you can have a break in service and then serve for 20

11  years without having a tenure review.

12  Q.  You're not aware of any Columbia policy that restricts the

13  number of years that someone's "up or out" date may be

14  postponed due to a break in service.

15  A.  I think that's right.

16  Q.  You think -- pardon me?

17  A.  I think that's right.  I got caught up in the negatives.

18  I'm not aware that any --

19  Q.  Of any Columbia policy that restricts the number of years

20  that someone's "up or out" date may be postponed due to a break

21  in service.

22  A.  See, again -- oh, I understand what you're asking me.

23          Okay.  There is actually a very firm practice in the

24  office where, if someone's tenure review has been postponed

25  with a break in service, an agreement is made between the

1    provost's office, the school, and the faculty member that

2    indicates both when the faculty member will be returned to the

3    faculty from a break in service and when the tenure review will

4    take place, and the term that's used in the office is in the

5    spirit of the statutes.  So what that means in practice is that

6    a junior faculty member who, for whatever reason, has been

7    awarded a break in service in order to have more time at the

8    university, typically those arrangements specify when the

9    tenure review will take place.  So when a break in service is

10   awarded, there's often a -- there is always an indication of

11   when the tenure review will take place.

12        So it's not the case that a assistant professor coming

13   up for tenure who has a break in service would then have an

14   entirely new eight-year clock.  The break in service is used to

15   allow more time, but the time that's allowed is specified so

16   that -- so that the review takes place in a time that's within

17   the spirit of the statutes.

18        (Continued on next page)

19

20

21

22

23

24

25

1

2   Q.   In Professor Ravina's case, the provost's office did not

3   take any position as to how long a break in service would have

4   been appropriate under Professor Ravina's service, did it?

5   A.   I don't recall.  The length of the break in service,

6   though, is not --

7   Q.   Please, there is no question pending right now.

8           THE WITNESS:  So I don't get to -- if I have something

9   I want to say, I don't get to say it.

10           THE COURT:  The idea is that they have a right to ask

11   yes-or-no questions.  But as I said earlier, if you can't

12   answer something yes or no, just say that, I can't answer it

13   yes or no, and you will have the opportunity.  Ms. Plevan, in

14   addition, will follow up on all these issues.  But feel free to

15   do that.

16           THE WITNESS:  OK.

17   BY MR. McKNIGHT:

18   Q.   Once again, do you remember your deposition was taken at

19   page 158, lines 2 to 7.  We have already been established that

20   you were under oath at that time.

21   "Q.   And did your office take a position as to how long a break

22   in service would have been appropriate under Ms. Ravina's

23   circumstances?

24   "A.   No, we would not have take a position on that.  I can't

25   imagine -- I mean, you know, proof -- I can't imagine we would

1    take a position on that.  Maybe something happened that I don't

2    remember, but I can't imagine taking a position on that."

3            Was that your response at the time, sir?

4    A.   Yes.

5    Q.   Thank you.  And you don't recall anyone in the provost's

6    office discussing the length of the break of service offered to

7    Professor Ravina, do you?

8            MS. PLEVAN:  Objection.

9            Discussing whom with whom?

10           THE COURT:  Could you clarify that question, please.

11   BY MR. McKNIGHT:

12   Q.   You don't recall anyone in the provost's office discussing

13   the length of the break in service offered to Professor Ravina?

14           MS. PLEVAN:  Can you just clarify.

15           Are you asking whether someone discussed it with him?

16           MR. McKNIGHT:  No, just discussing it at all,

17   discussing that particular issue.

18           THE COURT:  In his presence?

19           MR. McKNIGHT:  Just discussing it at all.

20           MS. PLEVAN:  Oh.

21           THE COURT:  I think you have to clarify that.  It is

22   unclear if you mean he heard someone discussing it or he was

23   actually present for the conversation or something was relayed

24   to him.

25   BY MR. McKNIGHT:

1    Q.  In your presence.

2    A.  Honestly, I don't recall.

3              THE COURT:  Mr. McKnight, about how much longer do you

4    have?  Because at some point I want to take another break --

5    but it will have it be a shorter break, we took a short one

6    earlier -- for the afternoon.

7              MR. McKNIGHT:  That's fine.

8              Why don't we take a break now.

9              THE COURT:  All right.  Good.  Just remember keep an

10   open mind and don't discuss the case.

11             Thank you.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1           (Jury not present)

 2           All right.  I would like this break to be no more than

 3    ten minutes, please.

 4           Thank you.

 5           MR. McKNIGHT:  Very well, your Honor.

 6           MR. HERNSTADT:  Your Honor?

 7           THE COURT:  Yes.

 8           MR. HERNSTADT:  I'm sorry either now or at the end of

 9    the break could we have a very brief sidebar?

10           THE COURT:  Sure.  Let's do it now.

11           (At sidebar)

12           MR. HERNSTADT:  I noticed, your Honor --

13           THE COURT:  Let's just wait for a representative from

14    Columbia.

15           MR. HURD:  That's me.

16           THE COURT:  Go ahead.

17           MR. HERNSTADT:  I noticed in Exhibit 129 there was a

18    reference -- this is Professor Ravina's letter to the provost

19    where she's including her whole story -- there is a reference

20    to the underage girl.

21           THE COURT:  OK.

22           MR. HERNSTADT:  I just want to make sure that the

23    plaintiff's team, before they give any exhibits like that to

24    the jury -- so it is in 129.  I don't know if it is in other

25    exhibits.  129 was not put in with that in mind, and they

I7inran7                         McKnight - Direct

 1  didn't highlight it.

 2            THE COURT:  All right.

 3            MR. HERNSTADT:  But it is in there.  If the jury has

 4  it, I don't want them to see it.

 5            THE COURT:  We will take it out.

 6            Before any exhibits go back to the jury, I think you

 7  all should be looking at them very closely, and I am going to

 8  ask everyone to get together and make sure we are on the same

 9  page and exactly what was admitted and what needs to be

10  redacted on the paper.

11            All right.  Thank you.

12            MR. McKNIGHT:  That's fine.  Thank you.

13            MR. HERNSTADT:  Thank you, your Honor.

14            (Recess)

15            THE COURT:  Everyone can be seated.  We'll get the

16  jury and we have to get plaintiff's lawyers obviously.

17            Do you have water?

18            THE WITNESS:  I do.

19         (Continued on next page)

20

21

22

23

24

25

I7inran7                        McKnight - Direct

1              (Jury present)

2              THE COURT:  All right.

3              Everyone can be seated.  Thanks.

4              You may proceed.

5              MR. McKNIGHT:  Thank you, your Honor.

6    BY MR. McKNIGHT:

7    Q.  If a Columbia faculty member goes into a nontenure-track

8    position and then returns to a tenure track position at

9    Columbia, his or her tenure clock starts from zero again, is

10   that correct?

11   A.  If a person leaves an instructional appointment while on

12   tenure track, yes, that is correct.  Specifically -- yes, that

13   is correct.

14   Q.  All right.  Now, you said earlier today that you had

15   wanted, for example, to speak to Professor Ravina.  But there's

16   nothing that Professor Ravina could have said to you in writing

17   or in person that would have persuaded you to change your mind

18   at that time, isn't that correct?

19   A.  That's not correct.

20   Q.  Looking at page 68 of your deposition, line 15.

21             MS. PLEVAN:  Just a second, please.

22             Can you refer me to a question and answer?

23             MR. McKNIGHT:  I am going to start at 268, line 15,

24   and go over to the next page on 268.

25             MS. PLEVAN:  258.

I7inran7                          McKnight - Direct

1             MR. McKNIGHT:  268.  I'm sorry.  Line 15.  I thought

2      that's what I said.

3             MS. PLEVAN:  Are you going to be reading that?

4             MR. McKNIGHT:  I am going to read it.

5      BY MR. McKNIGHT:

6      "Q.  Is there anything that Ms. Ravina could have said to you

7      in writing or in person that could have persuaded you?

8      "A.  I don't know.  To grant a personal hardship leave, I don't

9      know, I don't know.  The fact of the matter is that the

10     university has not done this before.  But I'm very interested

11     in getting to know what faculty you're dealing with and going

12     through, and sometimes some other solutions or some other means

13     of dealing with the situation that had not occurred to me or

14     anyone else emerges out of the course of conversation.

15             "I can't predict what the outcome would be.  I think

16     it's very unlikely that specifically what she was asking for I

17     would have endorsed, but I might have been able to help her

18     think through some other ways to achieve the goals that she was

19     hoping to achieve."

20             That was your testimony, correct, sir?

21     A.  Yes.

22             MR. McKNIGHT:  All right.

23             Could I have Plaintiff's Exhibit No. 126, please.

24     This has already been admitted into evidence, your Honor.

25             THE COURT:  All right.  You may publish it.

I7inran7                         McKnight - Direct

1          MR. McKNIGHT:  All right.

2    BY MR. McKNIGHT:

3    Q.  Now, in looking at paragraph C, sir --

4    A.  Uh-huh.

5    Q.  -- you were aware of this particular offer being made by

6    Vice Dean Katherine Phillips, correct?

7    A.  Yes.

8    Q.  And in paragraph C the options do not include personal

9    hardship leave, correct?

10   A.  I can't see the rest of it, but I believe that's correct.

11   Q.  All right.  Thank you.

12   A.  I will just say that at that point I had already responded

13   to the --

14          MR. McKNIGHT:  There's no question pending.

15          I just asked him whether it was there or not.  That's

16   all.

17          THE COURT:  OK.  All right.

18   BY MR. McKNIGHT:

19   Q.  You remember the letter that you received from Professor

20   Ravina that outlined all of her claims and allegations,

21   correct?

22   A.  Yes.

23   Q.  January 25, 2016.

24   A.  Give the -- yeah, but I thought the date was February 24.

25   Q.  All right.  I apologize.  But you remember that she

I7inran7                        McKnight - Direct

1   notified you of all those issues in the big letter that we

2   discussed before, correct?

3   A.  Yes, that's correct.

4   Q.  You consider that to be a serious matter, correct?

5   A.  Yes.

6   Q.  After you received notification of all the issues that she

7   raised for you in that letter, you did not report any of the

8   things she raised to you to the Equal Employment Affirmative

9   Action Office, did you?

10  A.  I understood that they had already been reported.  I

11  understood that there had already been a report.  I understood

12  that the university had evaluated the allegations.

13  Q.  I have a question for you.  I asked whether you reported,

14  made a report to the Equal Employment Affirmative Action Office

15  after you saw that letter, sir?

16  A.  No.

17  Q.  Thank you.  You never spoke to anyone at the Equal

18  Employment Affirmative Action Office about Professor Ravina, is

19  that correct?

20  A.  I don't know what I said in my deposition, but I don't

21  recall.  I don't think so.

22          So what I -- I understood that there had been an EEOA

23  investigation, and I understood that --

24          MR. McKNIGHT:  Your Honor, I only asked him whether he

25  reported it to them.  I didn't ask him anything else.

I7inran7                        McKnight - Direct

1              MS. PLEVAN:  I think he's just explaining.

2              THE COURT:  I think the next question was -- so, he

3    answered the question about reporting, but then you said, You

4    never spoke to anyone at the Equal Employment Affirmative

5    Action Office about Professor Ravina?

6              MR. McKNIGHT:  Right.

7              THE COURT:  And then he said, I don't think so.  He

8    said, I don't know what I said at my deposition, but I don't

9    recall.  I don't think so.

10             MR. McKNIGHT:  All right.  I think that ends that.

11   BY MR. McKNIGHT:

12   Q.  At some point in time you became aware of a male professor

13   at Columbia University named Mark Broadie, is that correct?

14   A.  Yes.

15   Q.  And you learned that Columbia University allowed Professor

16   Broadie to go off the tenure clock because he had a change in

17   his research focus, correct?

18   A.  Yes.

19   Q.  And Professor Broadie indicated that he needed more time to

20   have additional research papers published in order to be a

21   serious candidate for Columbia, correct?

22   A.  That is what is in the file as I read it.

23   Q.  This happened a long time before you were the vice provost,

24   correct?

25   A.  I was in graduate school.

I7inran7                      McKnight - Direct

1   Q.   During the time that Professor Broadie was off the clock,

2   he was off the clock for about what?  Six years?

3   A.   Approximately.

4   Q.   And his title was changed to curriculum specialist,

5   correct?

6   A.   Yes.

7   Q.   Are you aware that Professor Broadie continued to use his

8   associate professor title while he -- in connection with

9   academic research and papers that he published?

10  A.   I mean, that's -- somebody's told me that, but I -- yeah, I

11  mean, I'm -- am I aware of it?  I have been told that.

12  Q.   So he was allowed to continue to represent himself as an

13  associate professor?

14              MS. PLEVAN:  Objection.

15              THE COURT:  What is the objection?  The basis?

16              MS. PLEVAN:  May we approach, your Honor?

17              THE COURT:  Sure.

18          (Continued on next page)

19

20

21

22

23

24

25

1          (At sidebar)

2          MS. PLEVAN:  The only reason the witness knows about

3     it is because I told him about it, because they brought

4     something up in discovery.

5          THE COURT:  OK.

6          MS. PLEVAN:  That is number one.

7          Number two, the question was -- I forgot what you

8     said, would be allowed to use.  That's misleading, because

9     there's no evidence that he was, quote, allowed to do anything

10    other than he may have done something.  They could ask him what

11    he did.

12         THE COURT:  Do you have any reason to believe that he

13    has a basis for knowing this other than Ms. Plevan telling him?

14         MR. McKNIGHT:  He was the 30(b)(6) representative that

15    was presented to us to speak on these issues.

16         MS. PLEVAN:  That was before.  This was not brought up

17    to him.  That is my recollection.  I don't have the deposition.

18         THE COURT:  Is this the affidavit what are you looking

19    at?  I'm sorry.  I can't see from here.

20         MS. HARWIN:  Yes.

21         MR. McKNIGHT:  Here's his affidavit.  That was used to

22    supplement his 30(b)(6) testimony.

23         MS. PLEVAN:  Do you have another copy?

24         That doesn't address this issue because it came up

25    afterwards.  Sometime after this they produced what they

1    researched, some article.

2              MS. HARWIN:  It did not come about subsequently.  The

3    issue of the title of Professor Broadie during the period when

4    he was off the clock was squarely at issue.

5              MS. PLEVAN:  I am talking about the specific articles,

6    what counsel was about to ask him about, allowed.

7              THE COURT:  You can ask him if he knows if he was

8    permitted to under Columbia's regulations to do that.  If you

9    don't have a good-faith basis for suggesting that that was

10   permissible, I wouldn't suggest it.

11             MS. PLEVAN:  I am not aware of any evidence that

12   anybody permitted Mr. Broadie to do this.

13             THE COURT:  You can ask do you if know if he was

14   permitted, and he can answer no.

15             MS. HARWIN:  Just to be clear, your Honor, there is

16   certainly a good-faith basis, which is the fact that he

17   published articles.

18             THE COURT:  That doesn't mean he was allowed to that.

19   It just means that he did it.  That is not a good-faith basis.

20             MR. McKNIGHT:  There was testimony earlier today from

21   Dean Hubbard about how they keep track of what people are

22   doing.

23             THE COURT:  He didn't seem to they think he was

24   allowed to do it either from my recollection.

25             MR. McKNIGHT:  But he testified about how they keep

1    track of someone's writings on a yearly basis.

2              MS. PLEVAN:  That doesn't mean somebody is allowed.

3              MR. McKNIGHT:  Well, then we have evidence that they

4    actually do it and they keep track of it.

5              MS. PLEVAN:  There is no date here.  When did he

6    submit the articles?

7              MS. HARWIN:  Those dates are in here.

8              MS. PLEVAN:  No, the date of publication is on it.

9              THE COURT:  You can ask him if he was allowed to do

10   it, but I wouldn't suggest that he believed that he was,

11   because I don't think you have a good-faith basis for doing so.

12   You can ask him if he was permitted to do it, and if he knows

13   if he did or didn't.

14             So I will let you ask those questions.

15             MR. McKNIGHT:  Your Honor, can I ask him if he knows

16   if it, in fact, happened?

17             MS. PLEVAN:  The problem with that I didn't think they

18   would go this route.  So I didn't prepare him, and he's going

19   to he knows what I told him.

20             THE COURT:  You ask him if he knows it at the time,

21   right?

22             MS. HARWIN:  Your Honor, he was the 30(b)(6) witness.

23   It wasn't about whether he knew it at the time.  He did know it

24   in preparation.

25             MR. McKNIGHT:  He was the 30(b)(6) person.

1           MS. PLEVAN:  He wasn't asked about it.

2           MS. HARWIN:  He was.  That was specifically the

3      subject of his 30(b)(6) testimony.

4           MS. PLEVAN:  That Mark Broadie published articles.

5           These questions are about the publication of articles.

6      That did not come up at his 30(b)(6) deposition.

7           MR. McKNIGHT:  His titles came up at the 30(b)(6).

8           MS. PLEVAN:  OK.

9           MR. McKNIGHT:  He lists titles on the articles.

10          MS. PLEVAN:  You want to impeach him about something

11     he only heard from me --

12          MR. McKNIGHT:  And his titles, and they keep track of

13     their publications.

14          MS. PLEVAN:  He doesn't keep track of anything.

15          MR. McKNIGHT:  But Dean Hubbard said the school keeps

16     track of it.

17          MS. PLEVAN:  This is just pure speculation.  He has no

18     personal knowledge.

19          THE COURT:  Look.  I will let you ask him, but I don't

20     want you to suggest what the answer is in a leading fashion

21     when you don't have a good-faith basis.  If you just want to

22     ask him, that is fine.  You can ask him.  I will let you ask

23     him in that fashion.  And then you can --

24          MS. PLEVAN:  Other than from what he learned in this

25     case from counsel, does he have knowledge --

1          THE COURT:  Yes.

2          MS. PLEVAN:  -- of Professor Broadie.

3          THE COURT:  Yes.  But I don't think what he learned in

4    preparation from counsel is a proper basis for asking him.

5          MS. HARWIN:  Your Honor, for a 30(b)(6) witness, that

6    is exactly what a 30(b)(6) witness is expected to do, to confer

7    with knowledgeable people.

8          THE COURT:  To find out from counsel?

9          MS. PLEVAN:  To do research?

10         MS. HARWIN:  Counsel can certainly be a valid basis

11   for a 30(b)(6) deposition.

12         MS. PLEVAN:  What are you thinking he should have

13   done?  He should have gone out and done research what Professor

14   Broadie published?

15         MS. HARWIN:  A 30(b)(6) witness is expected to do

16   preparation to testify about the university.

17         THE COURT:  I don't think if your only basis is

18   through counsel in preparation for his deposition that that's

19   fair game, because what one particular person did --

20         MS. PLEVAN:  We didn't know.

21         THE COURT:  -- isn't the same thing as knowing what

22   the role is and speaking on behalf of the university.

23         So, in any event, you can ask him generally about

24   Professor Broadie, but it doesn't sound like you have a

25   good-faith basis for believing that he actually had permission

I7inran7                         McKnight - Direct

1   to do this as opposed to the fact that he did it.

2            But you can ask him if he had permission.  Then if you

3   want to get in through another way the fact that Broadie did

4   it, you can do it through a proper witness.

5            (Continued on next page)

1           (In open court)

2           THE COURT:  Thank you all for your patience.

3    BY MR. McKNIGHT:

4    Q.  Professor Brown, do you know if Professor Broadie was

5    permitted to publish under his title as an associate professor

6    while he was out on break?

7    A.  I do not know if he was.

8    Q.  Do you know the years that he was out on break?

9    A.  Off the top of my head, no.  But I believe it was a four-,

10   five-, six-year period in the mid to late '90s.

11   Q.  Sir, I would like to hand you what's been marked as

12   Plaintiff's Exhibit No. 171.  I just want to show it to you and

13   ask you if it refreshes your recollection.

14           MS. PLEVAN:  Is that in evidence?

15           MR. McKNIGHT:  It is not in evidence.

16           THE COURT:  He's using it to refresh his recollection.

17           MR. McKNIGHT:  May I approach, your Honor?

18           THE COURT:  You may.

19   BY MR. McKNIGHT:

20   Q.  Professor Brown, does this document refresh your

21   recollection as to --

22   A.  Yes, it does.

23   Q.  And can you tell us when Professor Broadie was off the

24   clock.

25   A.  1992 to 1998.

1            MR. McKNIGHT:  One moment, your Honor.

2    BY MR. McKNIGHT:

3    Q.  Did there come a time when you reviewed Professor

4    Broadie's, Mark Broadie's file at Columbia University?

5    A.  Yes.

6    Q.  And in the course of reviewing his file at Columbia

7    University, did you have occasion to review his curriculum

8    vitae?

9    A.  I don't recall.  I mean, maybe I -- generally I don't

10   recall.

11   Q.  Are the curriculum vitae of the professors at the

12   university something -- or the business school something that

13   the school usually keeps track of?

14   A.  So, the --

15            MS. PLEVAN:  Object to the school.

16            THE COURT:  Sorry.  What was the objection?

17            MS. PLEVAN:  "The school."

18            THE COURT:  Why don't you clarify who at the school.

19   BY MR. McKNIGHT:

20   Q.  To your knowledge, does the business school keep track of

21   the curriculum vitae of the professors at the business school?

22   A.  I would expect that they do.

23   Q.  To your knowledge, does the Office of the Provost keep

24   track of the curriculum vitae of the professors at the business

25   school?

1  A.  Keep track of?  The answer -- not in the way that the

2  business school does.  The Office of the Provost receives a CV

3  typically twice in a faculty member's career:  At the date of

4  their appointment and at the time of their tenure review.

5  Otherwise the Office of the Provost does not receive an updated

6  CV on a regular basis.

7  Q.  And you testified I think that Mark Broadie achieved

8  tenure, correct?

9  A.  Correct.

10  Q.  What year was that?

11  A.  1998.

12       MR. McKNIGHT:  Your Honor, we would like to move for

13  the admission of Plaintiff's Trial Exhibit No. 179.

14       MS. PLEVAN:  OK, your Honor.

15       THE COURT:  All right.

16       Let me take a look.

17       Just to clarify, have you seen this?

18       THE WITNESS:  What is this?

19       THE COURT:  I'm sorry.  It's Plaintiff's Trial Exhibit

20  179.

21       THE WITNESS:  I don't believe so.

22       THE COURT:  OK.  Then it won't be admitted.

23       MR. McKNIGHT:  Your Honor, there is a stipulation that

24  all the CVs of the personnel are --

25       THE COURT:  Yes, but --

I7inran7                          McKnight - Direct

1        MS. PLEVAN:  This is of the witnesses, but not this

2  one.  I object to this one.

3        THE COURT:  This should not be admitted through this

4  witness.

5        You can put that down.

6        MR. McKNIGHT:  With the Court's indulgence.

7  BY MR. McKNIGHT:

8  Q.  Professor Brown, I want to go over some of the timing of

9  your interactions.

10  A.  OK.

11  Q.  You already testified that you received a request from

12  Professor Ravina regarding her requests to go on personal and

13  hardship leave, correct?

14  A.  Yes.

15  Q.  And then after that when did you have your next

16  communication with her?

17  A.  Well, I e-mailed her three or four days later because I

18  wanted to speak with her.  The request to me betrayed a

19  confusion and lack of information about --

20  Q.  I just want to know -- I am trying to get a timeline.

21        MS. PLEVAN:  Your Honor, I think he should be allowed

22  to finish.

23        THE COURT:  Why don't we let him answer.

24        MR. McKNIGHT:  All right.

25  A.  The request had several elements of it which suggested that

I7inran7                        McKnight - Direct

there was some confusion and misunderstanding about the

university's policies and practices, and I had turned down the

request, as formally stated in January, on January 15.

        But I wanted to speak with her about ways to recast it

or restate it that would essentially get what she was looking

for.  So I approached her three or four days afterwards by

e-mail.

Q.  At the end of the day, the only option offered to her was

to change her title as you requested to an associate research

assistant, isn't that correct?

A.  Well, she never responded to me.

Q.  I'm saying at the end of the day that was the only option

that was presented to her, correct?

A.  By whom?

Q.  By Columbia University.

A.  I don't know what Columbia offered her.  I don't know what

the nature of the exchanges were between the lawyers.  I know a

little bit about what Professor Phillips, Vice Dean Phillips

told me about conversations with her.

        I never -- I did indicate I believe by e-mail, though

I would have to refresh my memory, that I thought a break in

service would be to her advantage, but one of the reasons why I

meet with faculty is to actually talk through with them what

their concerns are and what the practices are to help them

achieve their goals.

1          So, you know, I never got a chance to offer her

2    anything.

3    Q.  All right.  But, as far as you know, the only offer

4    included the position of associate research assistant?  As you

5    sit here today that's the only offer you are aware of, correct?

6          MS. PLEVAN:  Objection to the term.

7          THE COURT:  Objection to the term?

8          MS. PLEVAN:  It is associate research scholar.

9          THE COURT:  Yeah.

10          MR. McKNIGHT:  Associate research scholar.

11          THE COURT:  OK.  Can you answer that question?

12    A.  I think there was more than that offered.

13          MR. McKNIGHT:  I have nothing further, your Honor.

14          THE COURT:  All right.

15          You may proceed, Ms. Plevan.

16    CROSS-EXAMINATION

17    BY MS. PLEVAN:

18    Q.  Good afternoon, Professor Brown.

19    A.  Good afternoon.

20    Q.  Let me just go back a little bit and ask you if you would

21    tell the jury about your academic background.

22    A.  I am a professor of history.  I have been teaching at

23    Columbia for ten years.

24    Q.  And before you were at Columbia?

25    A.  Before Columbia I taught at Rutgers University for six

years, where I received tenure.  I also taught at Johns Hopkins

University.  My undergraduate degree is from Yale.  My Ph.D. is

from Oxford University in England.

Q.  In addition to your work as vice provost, did you have

experience at the university in any other role that related to

the tenure review process?

A.  I did.

Q.  What was that?

A.  Three years prior to becoming vice provost, I served on the

tenure review advisory committee, which is the 13-member board

that advises the provost on all tenure cases.

          And in the third year I chaired the tenure review

advisory committee, which is to say that I ran the meetings, I

set the schedule, I presided over the tenure process as the

chief reviewer.

Q.  Now, in addition to the provost himself and you as the vice

provost for faculty affairs, who are the other people who work

within the provost's office?

A.  So, the assistant provost for faculty affairs, who is

essentially the deputy of the vice provost, and she handles a

lot of the administrative duties.

          There is also a manager of tenure reviews, who also

participates in the oversight of the -- the scheduling of the

tenure review process.

          There are other people in the office who reported to

1    me who were less directly involved in the tenure reviews.

2    Q.  Now, could you describe -- and I apologize if you have done

3    this a bit before -- but what your responsibilities were as the

4    vice provost for faculty affairs.

5    A.  Yeah.  So the two principal areas are oversight,

6    supervision of the tenure process for the university as a

7    whole, and then oversight, supervision, administration of the

8    appointments process to the university, as well as retirements,

9    the approval of leaves and other matters pertaining to faculty

10   as they become -- and research officers, I should say, and also

11   professional research officers as they become relevant to the

12   Office of the Provost.

13   Q.  And in performing your functions on both the committee and

14   as vice provost, did you become familiar with the tenure rules

15   and practices of Columbia University?

16   A.  I did.

17   Q.  You mentioned earlier an eight-year sort of time frame?

18   A.  Yes.

19   Q.  And you also mentioned, and I would like you to explain,

20   about the last year.  What is that?  Describe that.

21   A.  In the seventh year of counted service, faculty members may

22   be expected to be reviewed in their seventh year.  So that if

23   they do not receive tenure, they have one more year at the

24   university while they look for another position.

25            So, the tenure reviews take place in the seventh

I7inran7                           Brown - Cross

1    counted year, although the eighth year is in fact the last

2    year.

3                Under the university's rules, a faculty member has to

4    be notified by May 31 of their seventh year if they are not

5    going to be -- if they are not going to receive tenure.

6    Q.  And let me just, so the jury will have this information,

7    ask you:  Are these various rules set forth in the faculty

8    handbook and the charter and statutes of Columbia University?

9    A.  So the rules are set forth in the statutes of the

10   university, which in effect is the university's constitution.

11   They are in the faculty handbook, which is the working, living

12   document that informs faculty of their rights and

13   responsibilities as a faculty member.

14               Yes.  So they're laid out actually quite clearly.

15               MS. PLEVAN:  Let me ask the witness to be shown

16   Defendants' Exhibit T, the charter and statutes, beginning at

17   page 51.

18   BY MS. PLEVAN:

19   Q.  And is this section beginning at -- shall I say Section 71

20   the part of the statutes that relates to the tenure rules?

21   A.  Yes.

22   Q.  And is there a term used at the university called de facto

23   tenure?

24   A.  Yes, there is.

25   Q.  And would you look at Section 71d2, which is at page 55.

I7inran7                     Brown - Cross

1    A.   Yes.

2    Q.   And is that a reference to the concept of de facto tenure?

3    A.   It is.

4    Q.   Could you explain to us what the concept of de facto tenure

5    is?

6    A.   The concept of de facto tenure provides that if someone has

7    not been turned down for tenure within a sufficient period,

8    they are presumed to have tenure.  The university must

9    explicitly state that you have not received tenure or you in

10   fact have.

11        The reason why that rule is in place is to prevent the

12   university from delaying and delaying and delaying and saying

13   we are not going to put you up for tenure.  So the strong

14   incentive institutionally is to ensure that a review is done,

15   is complete by the end of the seventh year, so that if they do

16   not receive tenure they have one more year.

17        So, the Office of the Provost takes very special care

18   to make sure that people receive their reviews on time.

19   Q.   Could you just describe what those steps are that are taken

20   by the provost's office.

21   A.   So, because the tenure reviews typically take place in the

22   seventh year of someone's service, at the end of the sixth

23   year, faculty members are expected to present their materials

24   to their schools to be put up for tenure.

25        Tenure is a very complicated process that involves

1  going out for external letters and doing a whole series.  It

2  takes six to nine months to do the process.

3          So the Office of the Provost asks the schools to

4  confirm, to indicate at the end of the sixth year by May 15,

5  who's going to be reviewed the following year so that it knows

6  who will be reviewed in the seventh year.

7          And that is an expectation that all the schools are

8  given, and it's made very clear who is to be reviewed that

9  year.

10  Q.  Do you believe that a professor could waive de facto tenure

11  if they remained on the faculty?

12  A.  I do not.

13  Q.  Are you aware of anyone waiving de facto tenure?

14  A.  I am not.

15  Q.  Are you familiar with the process for terminating a

16  professor with tenure?

17  A.  Terminating a professor with tenure?

18  Q.  In general.

19  A.  Yes.  There is a process that involves a series of

20  hearings, reviews.  It takes multiple steps.

21  Q.  And are these procedures and definitions set forth in the

22  faculty handbook?

23  A.  Stated very clearly in actually quite elaborate detail.

24          MS. PLEVAN:  I would like to show the witness

25  Defendants' Exhibit R.

I7inran7                          Brown - Cross

1   BY MS. PLEVAN:

2   Q.  Professor Brown, could you identify what this document is.

3   A.  So, this is a document, the title is Principles and Customs

4   Governing University-Wide Tenure Reviews.  It sets out

5   expectations that faculty at Columbia University are to meet to

6   be eligible for tenure.  It lays out the qualifications that

7   the university looks for.  It lays out what a dossier needs to

8   contain to be considered by the Office of the Provost.

9               MS. PLEVAN:  We offer Defendants' Exhibit R in

10  evidence.

11              THE COURT:  Any objection?

12              MR. McKNIGHT:  No objection, your Honor.

13              THE COURT:  All right.  R will be admitted.

14              (Defendants' Exhibit R received in evidence)

15  BY MS. PLEVAN:

16  Q.  Does the provost's office from time to time receive

17  requests for the postponement of tenure review?

18  A.  Yes.

19  Q.  And can you approximate how many such requests were made

20  while you were serving as the vice provost?

21  A.  Whew --

22  Q.  Just an estimate.

23  A.  God -- excuse me.  I never thought about it.  Maybe 30.

24  Q.  I'm sorry?

25  A.  30.

I7inran7                    Brown – Cross

1    Q.  And were any of these requests granted?

2    A.  All of those that involved child care leaves.

3              MR. McKNIGHT:  Objection.

4              We may have a sidebar?

5              THE COURT:  The objection is?

6              MR. McKNIGHT:  Could we have a sidebar?

7              THE COURT:  A sidebar?  Yes.  I'm sorry.

8              I didn't hear you.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7inran7                          Brown - Cross

1            (At sidebar)

2            THE COURT:  Hi.

3            MR. McKNIGHT:  Hi, your Honor.

4            They refused to give us any information about the

5    circumstances surrounding people getting de facto tenure and

6    those files and the leave requests.

7            Now they are asking it and using as a defense and a

8    shield, and we haven't gotten any information about what those

9    other circumstance were about de facto tenure.

10           MS. PLEVAN:  I didn't ask him about de facto tenure.

11           MR. McKNIGHT:  I mean, about these other leave

12   requests.

13           MS. PLEVAN:  No.  This comes from his deposition.  He

14   was asked about this.

15           MS. HARWIN:  At deposition he repeatedly refused to

16   answer questions when follow-up questions were asked about

17   this.  It was a consistent refusal and it prevents us from

18   asking appropriate follow-up.

19           MS. PLEVAN:  He didn't give names.

20           MS. HARWIN:  It was not simply an issue of names.

21           MS. PLEVAN:  You asked him how many and he answered

22   the question.

23           MS. HARWIN:  He didn't provide any information at all

24   regarding the context.  It was an over --

25           THE COURT:  If you asked the questions in deposition,

I7inran7                              Brown - Cross

1  you can ask him now.

2          MS. PLEVAN:  I am not going into this in any detail.

3          MS. HARWIN:  Your Honor, he refused to answer them at

4  deposition repeatedly.

5          THE COURT:  This very question?  You asked him this

6  question, and he answered it?

7          MS. HARWIN:  This specific question she's going into

8  now regarding the disposition of requests, when we asked

9  questions regarding the requests that were received, the

10 circumstances, he refused to answer those questions.

11         THE COURT:  When you say refused to answer, what do

12 you mean?

13         MS. HARWIN:  There were many questions that were

14 posed, and he repeatedly would refuse to provide any

15 information regarding the substantive nature, what the duration

16 of any grants were.

17         MS. PLEVAN:  He talked about --

18         THE COURT:  One at a time, please.

19         MS. PLEVAN:  Sure.

20         MS. HARWIN:  When questions were asked about the

21 circumstances, it was only sort of the vaguest terms, any

22 information regarding the school, the year, the context for the

23 request; whether, you know, if it was granted, if so, the

24 duration of the request granted.

25         No information was provided at all.  This was a

I7inran7                         Brown - Cross

1    repeated refusal to provide any information.

2              MS. PLEVAN:  I didn't ask him about the circumstances.

3              MS. HARWIN:  Your Honor, we can't effectively respond

4    when we haven't been able to get any information.  So she's

5    allowed to put on her case, but when we asked questions at

6    deposition he wouldn't answer that.

7              MS. PLEVAN:  I am not asking him to disclose any

8    information that he hasn't already disclosed.  If you didn't

9    think that was adequate, the remedy is to ask for relief, not

10   to save it.  I am not asking him to disclose anything he hasn't

11   already disclosed at his deposition.

12             MS. HARWIN:  The point is can we can't effectively

13   cross-examine him.  We don't have any information.  He refused

14   to answer any questions regarding the circumstances for the

15   requests.

16             THE COURT:  I think if this was asked about at

17   deposition you can ask him now, and you can ask him on redirect

18   for follow-up.  But if this is something that was asked and is

19   in the record already --

20             MS. HARWIN:  But again it's not in the record because

21   he wouldn't answer the questions.

22             THE COURT:  This very question apparently he did

23   answer.

24             MS. PLEVAN:  What is the pending question.

25             MS. HARWIN:  Can you repeat Betsy, what the question

1    was?

2            (Record read)

3

4            MS. HARWIN:  He was about to start a new list of what

5    were the dispositions of these requests.

6            MS. PLEVAN:  I didn't ask him that.

7            THE COURT:  OK.

8            MS. HARWIN:  Do you want to strike that answer?

9            MS. PLEVAN:  What was his answer?

10           MS. HARWIN:  He started talking about child care.

11           THE COURT:  He started talking about child care.

12           MS. HARWIN:  It appeared he was going to continue with

13   other categories.

14           MS. PLEVAN:  I think there was some confusion in his

15   mind about what the question was.

16           THE COURT:  If there was a question that was asked at

17   a deposition and you want to ask about it now, you can ask

18   about it.

19           MS. PLEVAN:  Sure.  Thank you.

20           (Continued on next page)

21

22

23

24

25

1              (In open court)

2    BY MS. PLEVAN:

3    Q.  You used the term previously, Professor Brown, "break in

4    service," I believe?

5    A.  Yes.

6    Q.  And could you describe for the jury what you mean by that.

7    A.  It's an important term in the tenure rules in both the

8    statutes and the handbook that someone must be reviewed after

9    eight years of continuous service in a instructional -- an

10   instructional role.  Because of the language of "continuous,"

11   it means that if someone does not hold an instructional title,

12   then there is a break in their instructional service and so

13   that if they return to instructional title, they're essentially

14   starting over again.  So the break in service is a way of

15   effectively postponing the tenure review, because it doesn't

16   stop the clock, it actually restarts -- it ends one clock and

17   restarts another one.

18   Q.  And are there any requirements for what that person can do

19   or not do during the period of that break?

20   A.  So there are.  The person may not teach.  They may hold

21   only a research position, which is to say they are to do their

22   scholarship but not to be in the classroom.

23              There are three ranks of research scholar at the

24   university.  These are professional officers of research who

25   receive a full salary.  Associate research scholar; research

scholar; and senior research scholar.  An associate research

scholar is the research equivalent of an assistant professor.

An assistant professor teaches; an associate research scholar

conducts research exclusively.

Q.  And you mentioned I think something in your original

testimony about what happens at the time the person begins the

break.  Is there some document that's created?

A.  So, yeah.  So I should say that breaks in service are

instituted -- awarded very, very rarely.  It's an exceptional

step that the office of the provost takes when it deems that

it's necessary and it's useful for a junior faculty member.

That's done very rarely.  And it's always done with the

understanding that it will postpone the tenure review.  Because

it's done with the idea of postponing a tenure review, there's

usually -- when it's instituted, a date is set when the tenure

review will take place rather than the "up or out" date that

had been established.  Right?  So rather than just having a

break in service and leaving it open-ended, the practice is to

have a break in service and then say the new tenure review date

will be.  And that's understood at the moment that there is a

break in service rather than getting negotiated afterwards.

Q.  In the context of -- I think you referred to earlier some

discussions about Professor Ravina being offered a break in

service.  Was there a discussion that you participated in,

either by email or verbally, about what her title would be

1    during that period?

2    A.  Well, a break in service always involves leaving an

3    instructional position and taking up a full-time -- in the way

4    we do it, research position, presumably it could be a full-time

5    administrative position, but the way that it's done is as a

6    full-time research position.

7    Q.  And were you given any information about the other

8    people -- from the other people in the provost's office about

9    what that would mean with respect to Professor Ravina?

10   A.  There might have been some discussion about it, but I knew

11   what it would mean because it had been done even in the short

12   time that I had been there.  I was familiar with precedents in

13   which it had been utilized, so I knew what it involved.  It

14   involved a appointment as a research scholar and then a

15   restarting of the tenure clock with a new understanding, with

16   an understanding of when the tenure review would take place.

17              MS. PLEVAN:  First, your Honor, I neglected to offer

18   Defendant's Exhibit T in evidence.  Only a portion of it is in

19   now.

20              THE COURT:  All right.  T will be admitted.

21              (Defendant's Exhibit T received in evidence)

22              MS. PLEVAN:  And I'd like to show the witness

23   Defendant's Exhibit NG, and offer it into evidence.

24              THE COURT:  Any objection?

25              Is there any objection to NG?

1          MR. McKNIGHT:  Oh, no objection, I'm sorry.

2          THE COURT:  All right.  NG will be admitted.

3          (Defendant's Exhibit NG received in evidence)

4          MS. PLEVAN:  So we can't show it.

5    BY MS. PLEVAN:

6    Q.  So Professor Brown, is Exhibit NG an email exchange,

7    starting at the bottom, between you and the provost?

8    A.  Yes, it is.

9    Q.  And in responding to your email did the provost say to you,

10   "Ravina must have a break in service with a different title if

11   she is to postpone a tenure review"?

12   A.  Yes, he did.

13   Q.  And was that an email he sent you on January 13, 2016?

14   A.  Yes, it is.

15   Q.  And did you get the same information from someone else who

16   works in the provost's office?

17   A.  I don't recall.

18          MS. PLEVAN:  Show OH.

19          We offer Defendant's Exhibit OH in evidence.

20          THE COURT:  Any objection?

21          MR. McKNIGHT:  No objection.

22          THE COURT:  Thanks.  OH will be admitted.

23          (Defendant's Exhibit OH received in evidence)

24   BY MS. PLEVAN:

25   Q.  And is this exhibit an email exchange that you had with

1    Pearl Spiro?

2    A.  Yes, it is.

3    Q.  And who is Pearl Spiro?

4    A.  She's the associate vice provost for academic appointments.

5    Q.  And how long has she worked in the provost's office?

6    A.  Pearl Spiro has worked in the provost's office for close to

7    40 years.

8    Q.  And was this email exchange your asking Ms. Spiro some

9    questions about what someone could do when they were on a break

10   in service as associate research scholar?

11   A.  Yes, it is.

12   Q.  And Ms. Spiro responded, "The only way that the person's up

13   or out date can be moved by the full-time research appointment

14   is if the person does not teach at all for the entire period

15   when they are holding the research appointment."  Is that

16   right?

17   A.  That is correct.

18            THE COURT:  Just FYI, the screens are down.  We could

19   try to reset it but it will turn the mics off, so if you can

20   just use the paper, that would be great, but if you need the

21   screens, let us know and we'll just kind of reset everything.

22   Q.  Did you have any understanding of --

23            THE DEPUTY CLERK:  Hold on.  I'm restarting.

24            MS. PLEVAN:  I see.

25   Q.  Professor Ravina, had she had gotten a one-year break in

1    service, if she had accepted that, would her tenure review have

2    been delayed till the following year, or a year later than when

3    it actually did take place?

4    A.  Yes.

5             MS. PLEVAN:  I'd like to show you Defendant's Exhibit

6    NP.

7             THE COURT:  Any objection to NP?

8             MR. McKNIGHT:  One moment, your Honor.  I'm looking it

9    over.

10            No objection, your Honor.

11            THE COURT:  All right.  NP will be admitted.

12            (Defendant's Exhibit NP received in evidence)

13   BY MS. PLEVAN:

14   Q.  And in this longer email, is the top email to you from

15   Kathy Phillips?

16   A.  Yes, it is.

17   Q.  And she was a senior vice dean at the business school at

18   that time?

19   A.  Correct.

20   Q.  And was this email asking you to set up a meeting with

21   Professor Ravina or reminding you to do that?

22   A.  Encouraging me to do so, yes.

23   Q.  Okay.  And thereafter did you make an attempt to do that?

24   A.  I did.  On Wednesday, I believe two days later, I sent her

25   an email.

1          MS. PLEVAN:  Let me show the witness Defendant's

2     Exhibit NR.

3          Can you show the witness -- yeah, NR.  Can we show it

4     to him?  Pull it up.  It's apparently in evidence but -- Ah.

5          THE COURT:  We're back up.

6          MS. PLEVAN:  Excellent.

7          THE COURT:  Okay.  So any objection to NR?

8          MS. PLEVAN:  Apparently it's in evidence.

9          MR. McKNIGHT:  No objection.

10          THE COURT:  Okay.  Thanks.  NR will be admitted.

11     Thank you.

12          (Defendant's Exhibit NR received in evidence)

13     BY MS. PLEVAN:

14     Q.  And so Professor Brown, is this an email that you sent to

15     Professor Ravina, the one you just referred to?

16     A.  Yeah, it is.

17     Q.  And why did you send this email to her?

18     A.  I think I started to say this before.  But I -- the request

19     on December 24th to which I responded, to which we sent her a

20     letter on January 15th, that letter indicated to me that she

21     did not have as good a grasp of the leave process and practices

22     as was in her -- as I thought would help her, and I really

23     thought that the terms of the request on December 24th really

24     didn't -- didn't really make -- didn't really -- I thought it

25     would be possible, if I met with her, to walk her through how

1   to achieve what it was that I understood she wanted to achieve,

2   which was to have more time before the tenure review and to

3   keep the pay.  And so I thought that having a conversation --

4   my experience is that often faculty have a misunderstanding

5   about a lot of things administratively, institutionally, not

6   from any fault of their own, but my experience has been that

7   when I sit and talk with people, I can actually help them

8   understand how to get what it is that they're looking for.  And

9   so, yeah, I often have that very conversation with the faculty

10  about that, and that was my -- that was my goal.

11  Q.  And did you advise Dean Phillips that you had communicated

12  with Professor Ravina?

13  A.  I believe so.

14          MS. PLEVAN:  Could we show the witness Defense Exhibit

15  NF.  And offer it in evidence.

16          THE COURT:  All right.  Any objection to NF?

17          MR. McKNIGHT:  No objection.

18          THE COURT:  All right.  NF will be admitted.

19          (Defendant's Exhibit NF received in evidence)

20  BY MS. PLEVAN:

21  Q.  And is that the email you sent to --

22  A.  Yeah, I wanted to keep the vice dean apprised of what I was

23  doing to make sure -- 'cause I thought she would want to be

24  involved in the meeting as well.

25          MS. PLEVAN:  And I'd like to next show the witness

I7i1rav8                          Brown - Cross

1   Defendant's Exhibit NQ and offer it into evidence.

2                THE COURT:  Any objection to NQ?

3                MR. McKNIGHT:  No, your Honor.

4                THE COURT:  All right.  NQ will be admitted.

5                (Defendant's Exhibit NQ received in evidence)

6   BY MS. PLEVAN:

7   Q.  And the email on top is to you from Raquel Muñoz?

8   A.  Yes.

9   Q.  Who was that?

10  A.  At the time she was my assistant in the office who handled

11  scheduling and appointments and coordination of office matters.

12  Q.  And in this email is she telling you that she spoke to

13  someone in Kathy Phillips' office and that --

14  A.  Yeah.

15  Q.  -- Dean Phillips had not heard back?

16  A.  We really wanted to try to reach her, wanted to make sure I

17  had the right email address.

18  Q.  And did Professor Ravina ever respond to you by email or

19  phone call?

20  A.  To these -- no, no.

21                MS. PLEVAN:  Let me show the witness Defendant's

22  Exhibit NX.

23                THE COURT:  Any objection to NX?

24                MR. McKNIGHT:  No, your Honor.

25                THE COURT:  All right.  NX will be admitted.

1          (Defendant's Exhibit NX received in evidence)

2     BY MS. PLEVAN:

3     Q.  And is this, just for the record, an email exchange that

4     you had with Kathy Phillips about efforts to meet with

5     Professor Ravina?

6     A.  Yes.

7     Q.  And you were informing her that -- she's informing you she

8     hadn't heard and you were informing her you hadn't heard

9     anything, right?

10    A.  Yes.

11         I have to say, I mean, it's there, but I was surprised

12    that I hadn't heard.  I had not had the experience with a

13    faculty member not wanting to talk to me when I suggested a

14    meeting, so I wasn't -- I was asking her to help understand

15    what was going on 'cause I didn't -- I didn't understand it.

16         MS. PLEVAN:  And I'd like to show the witness

17    Defendant's Exhibit NZ, and I know it's in as a plaintiff's

18    exhibit but I'm not sure what number.

19         THE COURT:  Okay.

20         MS. PLEVAN:  Oh, it's in, apparently.

21         THE COURT:  Okay.  All right.

22         MS. PLEVAN:  Looks like the witness should have a

23    copy, if he can.

24    BY MS. PLEVAN:

25    Q.  And Professor Brown, is this an email you were copied on

I7i1rav8                          Brown - Cross

1    that Kathy Phillips, Dean Phillips sent to Professor Ravina on

2    January 22, 2016?

3    A.  Yes.

4    Q.  And to the best of your knowledge, did Professor Ravina --

5    and I'm sorry.

6            In this email did Dean Phillips lay out for Professor

7    Ravina what her options were?

8    A.  Yes, she did.

9    Q.  And just to direct you, was one of those options, under

10   paragraph C, the associate research scholar that you had

11   referred to in your letter?

12   A.  Yeah, yeah, it was.

13   Q.  And to your knowledge did Professor Ravina ever respond to

14   this email?

15   A.  No.  Yeah, not to my -- not to my knowledge.  I never saw a

16   response or received a response.

17           I wish to emphasize that this was a -- a real

18   concerted effort to try to have a conversation about the

19   context for the letter of the 15th and the suggest -- to try to

20   find a path forward, and I think the tone of this actually

21   makes that pretty clear.  We really wanted to talk to her.

22   Q.  Now let's turn back to the leave request that Professor

23   Ravina made.  And let me show you Defendant's Exhibit MS.

24           THE COURT:  Any objection to MS?

25           MR. McKNIGHT:  No objection, your Honor.

1      THE COURT:  All right.  It will be admitted.

2      (Defendant's Exhibit MS received in evidence)

3   BY MS. PLEVAN:

4   Q.  And was this, MS, the initial communication to the

5   provost's office from Professor Ravina?

6   A.  Yes.

7   Q.  And you were previously shown, I believe, an email that you

8   sent to John Coatsworth on December 26th.

9   A.  Yes.

10  Q.  And where you told him that you would handle this?

11  A.  Yeah.

12  Q.  You mentioned earlier that there is a reference to personal

13  hardship leave in the statutes, I believe?

14  A.  It's certainly in the handbook, and it may be in the

15  statutes as well.

16      MS. PLEVAN:  Can we show the witness the handbook,

17  Defendant's Exhibit J at page 67.

18  A.  67?

19  Q.  Yes.  Is there a reference under Other Leaves to the

20  personal hardship leave?

21  A.  There is in the final paragraph.

22  Q.  And what does it say?

23  A.  "Full-time faculty may request a leave of absence without

24  salary to deal with a compelling personal need."

25  Q.  And is that "without salary" language what you were

I7i1rav8                          Brown - Cross

1   referring to earlier in your testimony?

2   A.  It is.  It is.

3   Q.  And what were you trying to explain about that as an issue?

4   A.  What I was trying to explain was that she could in fact

5   have a leave that would postpone the tenure review, that would

6   be with full pay, but it would not be a leave for a compelling

7   personal need, and that there was another way to get -- to

8   achieve those two goals, which is essentially set up for people

9   not to stay on campus and to do research but to actually leave

10  and go take care of a sick family member in another country or

11  to deal with some exigency in their life that takes them away

12  from the university.  A leave that's intended to do research is

13  a different -- is a different kind of thing.  So that's --

14  that's the reason why we give them without pay, because if

15  somebody's going -- is leaving the country to take care of a

16  dying family member in another country, we don't pay them while

17  they're doing that, but we keep their job.  We allow them to go

18  how much long as they need to go and then come back.

19          So that's what a compelling personal -- that's what

20  that leave is.  That's what it's there for.

21  Q.  At the time you were considering this request, did you have

22  any knowledge about prior instances where this had actually

23  been granted?

24  A.  No.  No, I did not.  There was a instance -- as I think I

25  said, I would have to -- my memory is a little shaky here, but

1    I was approached by a junior faculty member who raised the

2    question I believe of a leave of this kind, and I encouraged

3    that faculty member to think about a different kind of leave

4    because I didn't think that this was appropriate for what that

5    faculty member was looking for.  In situations where the --

6    something has really taken a tenure track faculty member away

7    from their research and they've suffered a hardship of various

8    kinds, in those very rare instances we've allowed them to take

9    a break in service to postpone the tenure review.  And that's

10   done with real care and thought and make sure that it's -- it's

11   merited.  But one thing I think is really important to

12   understand is that that's an exception.  That's a loophole.

13   That's actually a very big step for the university to say we're

14   essentially going to take you off tenure track so you can come

15   back to it later.  So when we offered that, we were offering

16   the kind of exception which is only offered in very rare

17   instances.  And never known someone to -- I mean, usually

18   that's -- that's usually taken as a -- as a good thing.

19   Q.  Let me just have you identify some exhibits and then -- one

20   of them, Defendant's Exhibit NO.  Which is in evidence.

21        Okay.  I just wanted -- is that the letter you sent to

22   Professor Ravina on January 15, 2016?

23   A.  Yes, it is.

24   Q.  All right.

25        THE COURT:  When you testified a minute ago that it's

I7i1rav8                        Brown - Cross

1   a "big step for the university to take you off tenure track and

2   so when we offered that, we were offering the kind of exception

3   which is offered in rare instances," were you referring to the

4   associate position?

5                THE WITNESS:  I was.

6                THE COURT:  Okay.  All right.

7                THE WITNESS:  Research officer position.

8                THE COURT:  Thank you.

9                Research officer position is what was --

10               THE WITNESS:  So the general -- there are two, or

11  actually three types of officers at the university.  There's

12  faculty; there's professional officers of research; and

13  administrators.  And associate research scholar is one of the

14  ranks of the professional officers of research.  So the

15  associate research scholar is the research equivalent of an

16  assistant professor.  In the same way -- so an associate

17  professor is the equivalent of a research scholar, and a full

18  professor is the equivalent of a senior research scholar.  So

19  we have three ranks in the research track that we have in the

20  professorial track, and so the move to research position is of

21  the same status but in research rather than in teaching.

22               THE COURT:  I should just let you know, it is 5:30.

23  If you only have a little bit more --

24               MS. PLEVAN:  I have only a little more.  So that would

25  be great.

I7i1rav8                      Brown - Cross

1          THE COURT:  Why don't we try and finish Professor

2     Brown now.

3          MS. PLEVAN:  Thank you.

4          I'd like to show Professor Brown Defendant's Exhibit

5     OC and offer it into evidence.

6          And we're offering Defendant's Exhibit OC.

7          THE COURT:  Any objection?

8          MR. McKNIGHT:  No, your Honor.

9          THE COURT:  OC will be admitted.

10          (Defendant's Exhibit OC received in evidence)

11     BY MS. PLEVAN:

12     Q.  And is this exhibit an email exchange between you and

13     Professor Ravina?

14     A.  It is.

15     Q.  And it begins with, on the second page, an email from you

16     to her on January 20th?

17     A.  Yes.

18     Q.  And is that the first communication that you had with her

19     on this subject?

20     A.  It's the first time I reached out to her.  I never heard

21     back, but yes, it's the first time.

22     Q.  Right.  And did she respond with some information in her

23     next email?

24     A.  She -- the response that I got was that long document that

25     we discussed earlier, laying out the nature of the hardships

1  that she had -- that she had experienced.

2  Q.  And then in the last email in this chain, at the top of

3  page, the first page, you wrote her that you received her

4  email, this additional submission, and then you wrote, "In the

5  meantime, though, let me encourage you to prepare and submit

6  the materials required for your tenure review as soon as

7  possible."  Why did you include that sentence?

8  A.  I included that sentence because she -- the tenure

9  review -- because her "up or out" date was 2017 at that point

10  and she needed to either be reviewed or receive a letter of

11  nonrenewal by May 31st.  We were, by my calculations, nine

12  months behind schedule.  Her tenure dossier should have been

13  submitted in March or April of the previous year.  That's the

14  point at which all assistant professors who were up for tenure

15  had submitted their materials.  And so we were already nine

16  months behind and we were approaching the point at which, if we

17  didn't start the review, the university would have no option

18  but to issue a letter of nonrenewal.  You can't review

19  materials that you have not received.

20        And at that point we had not -- as I understood it,

21  the business school had not received the dossier to conduct a

22  review.  And my job is, above all, is to make sure that people

23  receive fair and thorough reviews, on time, and get notice, on

24  time.

25        And so while we were having this back-and-forth about

1    leaves, I was looking at the calendar and the clock and

2    concerned that if she wanted to be reviewed, we were nearly a

3    year past time, and the process which could have postponed it,

4    I couldn't get her to talk about.  So under those

5    circumstances, it's like, you know, this is -- I didn't want

6    there to be a sense of, oh, I didn't know time had run out.

7    And there are several, in this -- I keep saying, you really

8    have to do this, you really have to do this, we're getting to

9    the point at which we can't do anything.  We were already --

10   the deadline to submit dossiers from the schools to the

11   provost's office for internal candidates is December 15th.  So

12   we were five weeks behind when the business school should have

13   given us a completed review.  So we were already so far beyond

14   our deadlines that it was -- and so, you know, I was just

15   trying to, if you're going to do this, let's do this.

16   Q.  You were shown earlier the letter you sent to Professor

17   Ravina denying her request for a personal hardship leave.

18   A.  Yeah.

19   Q.  Could you explain to the jury why you reached that

20   decision.

21   A.  So the main issue was that it was being paired with a leave

22   of absence with pay, and that wasn't -- that's not what we do.

23   And there was a way to get leave with pay that she wouldn't

24   accept.  As far as I could tell.  I couldn't -- I don't know

25   what she could, because I had never talked to her.  Just from

I7i1rav8

1    what I understood, she wouldn't.  So -- and, you know, the

2    circumstances that she laid out were, you know -- I did not

3    know really anything about the case except there was a case.

4    And then I got this information from her and I didn't, frankly,

5    know how to evaluate it.  I didn't -- all I had was her

6    testimony, serious, as to what was being alleged.  Very

7    serious.  But I was never asked a leave of absence without pay.

8    That wasn't what I was asked.  I was asked leave of absence

9    with pay.  And since it's very clear in the handbook that

10   that's not what we do, and since there was a way to achieve

11   what she said she wanted in a way that we had done in several

12   other instances for faculty members who, you know, had a dying

13   family member overseas and other situations, like this is what

14   we -- granting a exception, granting a break in service is what

15   we do.  So I didn't know what -- I didn't, you know --

16   Q.  Are you aware of anyone that was offered a break in service

17   who refused to accept it because they didn't want to change

18   their title to associate research scholar or some other thing?

19   A.  No, no, no.  I had never heard of that before, and it

20   didn't make any sense to be to me, to be honest.

21          MS. PLEVAN:  I have no further questions.

22          THE COURT:  Any redirect?

23          MR. McKNIGHT:  Yes, your Honor.  Could we start in the

24   morning with that because of the late hour?

25          THE COURT:  How long is it going to be?  Because I was

I7i1rav8

```
1   just trying to prevent Professor Brown from coming again

2   tomorrow.

3            MR. McKNIGHT:  I think it's going to be about half an

4   hour, 45 minutes.

5            THE COURT:  Okay.  All right.  In that case, then,

6   we'll come back tomorrow.  I don't want to keep you all any

7   longer.

8            Sorry.  You're going to have to come back tomorrow

9   morning, too, at 9:30.  Thank you.

10           Folks, have a nice evening.  Remember, keep an open

11  mind, don't discuss the case.  I'll see you tomorrow.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I7i1rav8

```
 1              (Jury not present)

 2              THE COURT:  Do you want to raise any issues?

 3              MR. SANFORD:  Yes, your Honor.  Just scheduling.  If

 4     we may.

 5              THE COURT:  Sure.  The rest of you can be seated, of

 6     course.

 7              Yes.

 8              MR. SANFORD:  Plaintiff will continue with Mr. Brown

 9     in the morning and turn to Professor Bolton and videos.  We

10     envision finishing sometime in the afternoon.

11              Could we get clarity as to who the witnesses are that

12     defendant will start with tomorrow and the next day.

13              (Discussion off the record)

14              MS. PLEVAN:  We're just talking to Professor Brown

15     because he didn't think he was going to have to be here

16     tomorrow morning, so there may be an issue about starting with

17     him first thing in the morning, but we haven't finished that

18     conversation.

19              THE COURT:  Okay.

20              MS. PLEVAN:  So after that would be either Rooker

21     or --

22              THE COURT:  All right.  Can you bring the mic closer,

23     please.

24              MS. PLEVAN:  I'm sorry.

25              THE COURT:  So we've got Brown hopefully first thing
```

I7i1rav8

1    in the morning.  Bolton.

2             MR. SANFORD:  And videos.

3             THE COURT:  Videos.

4             MS. PLEVAN:  It would be Rooker and Horan.

5             THE COURT:  And?

6             MS. PLEVAN:  Horan, Janet Horan.  I don't think they

7    both go tomorrow.  So I just, you know -- but we told them in

8    advance those would be the next people.

9             MR. SANFORD:  That's fine, your Honor.

10            THE COURT:  All right.  Thank you.  Have a good night.

11            MS. PLEVAN:  Would there be any objection to letting

12   Professor Brown come a little later tomorrow if he has a --

13            THE COURT:  Why don't you go ask him now.

14            MS. PLEVAN:  All right.

15            THE COURT:  We can wait.

16            MS. PLEVAN:  We are starting at 9:30?

17            THE COURT:  Yes, we are starting at 9:30 tomorrow.

18            MR. SANFORD:  Your Honor, one other thing?

19            THE COURT:  Yes.

20            MR. SANFORD:  We still have objections to videos to

21   resolve.

22            THE COURT:  Okay.  I'm happy to talk about them now.

23            MS. PLEVAN:  We need Ms. Fischer for that.

24            He said he would cancel the appointment, so --

25            THE COURT:  So he'll be here at 9:30.  We'll finish

I7i1rav8

1    with him, hopefully by 10.  And then we'll have Professor

2    Bolton.  I think we have resolved all the issues with respect

3    to him.  And then you'll have the videos, which we can talk

4    about now.  And then plaintiffs will rest.

5              And you're calling first?

6              Rooker.

7              MS. PLEVAN:  Rooker.

8              THE COURT:  All right.  And then Horan.  Okay.  So

9    that's the schedule.

10             Plaintiff wanted to just discuss remaining issues with

11   respect to the depositions.

12             MS. HARWIN:  That's right, your Honor.  I think the

13   only one remaining that we haven't resolved has to do with

14   Katherine Phillips.  Am I right on that?  Yeah.

15             MS. FISCHER:  I think that's right.

16             MS. HARWIN:  So I believe the initial objections

17   around pages 44 and 45 have to do with communications to Senior

18   Vice Dean Phillips regarding faculty, reservations, regarding

19   the tenure vote.

20             THE COURT:  I'm sorry.  I just don't have everything

21   in front of me but I do have the deposition.  Could you tell me

22   the page and line, please.

23             MS. HARWIN:  Of course.  Page 44, plaintiff's

24   designations are 4 through 8 and 20 through the next page, 3.

25   And then defendants have a counterdesignation in the middle of

I7i1rav8

1    that page in the event that their objection is overruled.

2              THE COURT:  Okay.  So defendants have an objection to

3    page 44, lines 4 through 8?  Is that right?

4              MS. FISCHER:  Yes.

5              THE COURT:  Okay.

6              MS. FISCHER:  I would just note that Vice Dean

7    Phillips said, on 44, line 15, "I don't recall what Charlie

8    Calomiris said to me.  I don't want to speak for him and put

9    words in his mouth.  I'm not sure exactly what he said."

10             So, I mean, I just think that, first of all, it's I

11   think looking for hearsay testimony and it's just kind of --

12   the whole thing is a little unclear.

13             And in addition, I would note Professor Phillips is

14   going to testify here.  So --

15             MS. HARWIN:  There's no hearsay purpose for which it's

16   sought.  It's about, you know, what they expressed to her and

17   the effect on the listener.  It was our suggestion that this

18   sort of middle part where she essentially says, "Wait, what's

19   the question again?" be omitted because then the question is

20   reframed and she does answer it.  So we don't see any need to

21   include that middle portion where she just asks what the

22   question is.  And then sort of -- the line 20 onward, she does

23   answer the question.

24             MS. FISCHER:  And again, it's our position -- I mean,

25   we've gone through this for other designations and other places

I7i1rav8

```
 1    in this case -- that it is hearsay and --

 2              THE COURT:  Tell me your counterdesignation suggestion

 3    again.

 4              MS. FISCHER:  Well, if this were to come in, then --

 5              THE COURT:  Or just tell me what you just said a

 6    minute ago about --

 7              MS. FISCHER:  No problem.  So plaintiff designated

 8    44/4-8.

 9              THE COURT:  Right.  I see that.

10              MS. FISCHER:  Then our counter would be 9 to 19,

11    because there, you know, she says, "On how many occasions?  I

12    recall once."  So that's a clarification because it was a

13    plural question, did he raise concerns, and then, you know,

14    it's a clarification, once.

15              THE COURT:  You know what, I'll allow in 44, lines 4

16    through 8, but not the rest of it.  So she can say that he

17    expressed concerns but not get into the nature of the concerns,

18    particularly when she's saying she doesn't recall exactly what

19    he said and doesn't want to put words in his mouth.  And we're

20    already getting in the fact that professors expressed concern

21    about the difficulty of evaluating the tenure candidacy.  I

22    mean, I let in Exhibit 100 that goes to that very issue.  So

23    this is just hearsay from a particular professor, and it's

24    already clear that professors had expressed this concern, and

25    she's saying that she doesn't remember exactly what he said and
```

I7i1rav8

1    she doesn't want to speak for him.  So I'll allow in the fact

2    that he was one of the professors that expressed concerns about

3    holding the vote prior to April 12th but nothing else.

4           MS. FISCHER:  So we had the same objection -- I'm

5    sorry.  So that takes care of page 44.

6           THE COURT:  Right.  Are there other issues with

7    respect to Phillips?

8           MS. FISCHER:  Well, the ones on 45, 47 -- 46 and 47

9    are all in that same vein.  It's 45/20 to 23 with plaintiff's

10   designation.

11          THE COURT:  Yes.  So as I said --

12          MS. HARWIN:  On 45, 20 to 23, it's not a factual

13   statement.

14          THE COURT:  That I'm fine with, actually.  45/20-23,

15   again, this is already in the record, just not with respect

16   specifically to Professor Calomiris.  I'm not sure how to

17   pronounce his name.  But I'm fine with adding in 20 to 23.  I

18   agree with plaintiff on that.

19          Next.

20          MS. FISCHER:  That's fine.

21          MS. HARWIN:  46, just identification of which other

22   faculty members which identified Patrick Bolton.  It's not

23   disputed that he was someone who expressed concerns so --

24   that's on 46/17 to 21.  That specific designation doesn't

25   discuss the nature of the concerns.

I7i1rav8

1              And then 47/2-6 is a brief follow-up question --

2              THE COURT:  Just stop.

3              MS. HARWIN:  Oh.

4              THE COURT:  So again, I don't want to get into a lot

5      of different professors because that's what I was trying to

6      stay away from, but I think it's fair to allow in Professor --

7      can you tell me how to pronounce his name.

8              MS. HARWIN:  Bolton.

9              THE COURT:  No, no.  Bolton I know.

10             MS. HARWIN:  Calomiris.

11             THE COURT:  Calomiris.  And then since Professor

12     Bolton is testifying anyway, I think that 46/17-21 is okay.

13             Then 47/2-6, I mean, Professor Bolton is going to

14     testify about what concerns he expressed, right?

15             MS. HARWIN:  Yes, your Honor.

16             THE COURT:  So I don't think we need this, do we?

17             MS. HARWIN:  With his testimony, no.

18             THE COURT:  Okay.  All right.  So then next is 59.

19             MS. HARWIN:  59, there are no objections there.

20             THE COURT:  Okay.  Okay.  So where is the next

21     objection?  Counterdesignation at 63?

22             MS. FISCHER:  Yes.

23             MS. HARWIN:  So, I mean, this is of the same type that

24     it seems that the Court has excluded from -- from people

25     providing that kind of testimony, and so I wouldn't see a

I7i1rav8

1   reason why her testimony here would be included, in light of

2   what is not being allowed for others.  Doesn't seem to be

3   consistent.

4              (Continued on next page)

1944

I7inrav9

| | |
|---|---|
| 1 | MS. FISCHER:  I think this is a clarification. |
| 2 | THE COURT:  A clarification of what? |
| 3 | MS. FISCHER:  Well, the prior designation on page 62. |
| 4 | In that answer Professor Phillips said that she |
| 5 | relayed -- they are talking about the April 12 meeting.  She |
| 6 | said at the meeting she relayed that they, being the faculty, |
| 7 | could consider whatever they wanted to, and that the tenure |
| 8 | decision was on the merits of the complaint and that the |
| 9 | complaint was not going to be resolved by virtue of the tenure |
| 10 | discussion. |
| 11 | Without this other piece, it seems incomplete, because |
| 12 | what she's saying here is that people -- you know, people could |
| 13 | take whatever they want into consideration. |
| 14 | THE COURT:  I think that's right.  I think in light of |
| 15 | the prior designation that 63 -- |
| 16 | MS. HARWIN:  Your Honor, I think it's actually |
| 17 | somewhat confusing, because the first designation had to do |
| 18 | with what you conveyed.  The second question has to do whether |
| 19 | you considered it relevant.  It doesn't answer the question of |
| 20 | what was conveyed.  It doesn't complete a prior answer. |
| 21 | THE COURT:  Just tell me -- I'm sorry.  I didn't mean |
| 22 | to interrupt.  Tell me, is 63 line 23 forward coming in? |
| 23 | MS. HARWIN:  I'm sorry your Honor? |
| 24 | THE COURT:  Is page 63, line 23 where the question |
| 25 | starts, "Did anyone at the April 12, 2016 meeting convey that |

I7inrav9

1     the faculty members were allowed to take into account

2     Ms. Ravina's allegations about the reasons?"  Is that coming

3     in, the answer to that?

4              MS. HARWIN:  There is no objection on that.

5              THE COURT:  If there is no objection, I think it is

6     fine to allow in page 63, line 11 through 22, because I think

7     that is just providing context for her answer, and she's clear

8     about what was conveyed.

9              So then what's next after that?

10             MS. FISCHER:  Well, it is a continuation of the same

11    discussion on 64, beginning at line 25 and going into 65.

12             MS. HARWIN:  The answer to 64, the disputed aspect is

13    at line 25 to line 19 on the next page.

14             The answer to the question is, I don't know, I don't

15    really know, like, I don't remember.  I don't see how that is

16    probative of anything.

17             MS. FISCHER:  I actually disagree with that

18    characterization because what Professor Phillips says here, the

19    question is "Were the faculty permitted to take into account

20    Professor Ravina's" -- let me look at it.

21             "The reasons for the delay to her research."

22             And the answer, "Well, they all had her personal

23    statement which included all of these allegations and they

24    could consider it if they wanted to."

25             I think that's very relevant.

I7inrav9

|    |    |
|----|----|
| 1 | THE COURT:  I think that's relevant too.  I think it's |
| 2 | definitely relevant that they had the materials she provided. |
| 3 | MS. HARWIN:  That is not disputed, your Honor. |
| 4 | THE COURT:  It is not a question -- a lot of this |
| 5 | isn't disputed, right? |
| 6 | MS. HARWIN:  Well, let me restate that.  It's not the |
| 7 | issue of whether it's disputed or not.  There are many things |
| 8 | that are not disputed that are not in evidence. |
| 9 | Here her personal statement is in evidence.  There is |
| 10 | no question -- |
| 11 | THE COURT:  But, I mean, you know, the dean testified |
| 12 | this morning about what they were instructed.  Now you want to |
| 13 | designate, you want to introduce designations about the same |
| 14 | thing. |
| 15 | So, I mean, frankly a lot of what we are hearing in |
| 16 | this trial is repetitive.  I don't have a problem with her |
| 17 | making that clear as long as it is in context, which it is. |
| 18 | All right.  What's the next disputed issue on |
| 19 | Phillips? |
| 20 | MS. HARWIN:  There is a long exchange which I think |
| 21 | defendants have included where Phillips doesn't seem to |
| 22 | understand the question.  She is saying -- it is a lot of just |
| 23 | a question where she asks questions and then it doesn't get an |
| 24 | answer.  So then -- |
| 25 | THE COURT:  What page is that? |

1      MS. HARWIN:  86 through 88.  It's 86:13 to 88:14.

2      It's just a lot of, I don't know, like asking what the

3  question is over and over again.

4      MS. FISCHER:  If I may, so the designated portion is

5  86:9 to 12.  It says that her materials were submit -- I'm

6  sorry.  We have to go back to the prior designation to put this

7  in context, which is on 84 to 85, but the relevant portion is

8  on 85.

9      So the question beginning on 85:6 is:  "If Professor

10  Ravina had taken this associate research scholar appointment

11  when would her tenure review materials have been due?"

12      Then there is discussion.

13      Then it goes down at 85:22, Professor Phillips says

14  "Maybe late March."

15      And then 86:9, the question is, which is the next

16  designation, the question is:  "Ms. Ravina's tenure review

17  materials were ultimately submitted at the beginning of March

18  2016, is that correct?

19      "Yes, that's my recollection."

20      But I think without the testimony from Professor

21  Phillips, what Professor Phillips goes on to say on page 88 is

22  that although the tenure materials would have been due, the

23  actual review would be conducted later.

24      So it really goes -- without -- just taking those few

25  lines out of context, the 86:9-12, it seems to suggest that her

I7inrav9

1    tenure review was only postponed by a couple of months while in

2    reality, looking at 88, beginning at line 9 -- beginning at

3    line 6, it would have given her approximately two and a half to

4    three months to submit the initial materials.  Yes, but as

5    continued in the statement there, we would conduct a tenure

6    review if you choose during the 2016-17 school year, which

7    would have been multiple more months.

8              I think that's why, to provide the complete answer of

9    Professor Phillips of how --

10             THE COURT:  Is there any way to cut it down at all?

11             MS. HARWIN:  Your Honor, the question is only about

12   the application deadline.

13             MS. FISCHER:  I think it is a little suggestive, you

14   know, without this context.

15             MS. HARWIN:  And Senior Vice Dean Phillips will be

16   here to testify, but essentially this is just a different

17   question, a quite lengthy exchange where she doesn't seem to

18   understand the question.

19             MS. FISCHER:  That is fine.

20             I just want to just note, I mean, we have said this

21   before.  She's going to have to explain this.  She's coming in

22   person.  She's going to go through all this.

23             THE COURT:  If that's the case, I don't want it to be

24   duplicative anyway, so let's not introduce this.

25             But she should explain it.  I don't want there to be a

I7inrav9

1    suggestion that she didn't mention this at her deposition.

2         MS. HARWIN:  Sure.  There's no --

3         THE COURT:  In general, as I've said before, I don't

4    see the need to introduce deposition designations if someone is

5    testifying.  I don't want to do things twice.  If you want to

6    impeach them, that's one thing.

7         If you are calling a person as a witness, I don't want

8    you to ask the same questions that you have designated.

9         MS. HARWIN:  That's right, your Honor.

10        THE COURT:  OK.

11        MS. HARWIN:  To the extent we're designating, we're

12   not going to repeat the same questions we have already had the

13   jury hear through video.

14        THE COURT:  If there is something you are leaving out,

15   you can ask her about it.

16        MS. HARWIN:  Sure.

17        MS. FISCHER:  Just to be clear, of the people

18   plaintiff has designated two of them, Professor Johar and

19   Professor Zeldes, will not be appearing to testify, and the

20   rest of them will.

21        THE COURT:  Then you can object if plaintiff asks a

22   question that they've already designated testimony on.

23        MS. FISCHER:  Understood.

24        THE COURT:  OK.  So what is next with respect to

25   Ms. Phillips?

I7inrav9

1              MS. FISCHER:  I believe 123.  I actually --

2              THE COURT:  123:9-20?

3              MS. FISCHER:  Yes.

4              I actually think that we should look back at the prior

5     designation also, because it's really a hearsay objection,

6     which I think should have probably designated starting at

7     122:5.  It's again about concerns that other faculty members

8     raised and what they said.

9              MS. HARWIN:  Your Honor, this is about the promotion

10    and tenure committee, which is the committee that does the

11    final review of the tenure process and the tenure determination

12    after the divisional vote.  It is that sort of next level of

13    review which we talked about yesterday.

14             So, one of the things that the tenure -- the promotion

15    and tenure committee is charged with doing is evaluating

16    whether there are any procedural irregularities.

17             This member sent an e-mail with procedural

18    irregularities that he identified, and this is about the

19    substance of the discussion in that meeting regarding the

20    procedural irregularities.

21             It's simply identifying what that topic was that was

22    discussed.  Again, this is the committee that is charged with

23    evaluating that for Columbia.

24             THE COURT:  What is the objection?

25             MS. FISCHER:  I think it's -- I mean, I think it is a

I7inrav9

1    hearsay objection.  This is an individual who is not coming to

2    testify who was given information or heard information from we

3    don't know where.  And he expressed concerns or -- I shouldn't

4    even say that, but he made statements, we don't even -- you

5    know, he wrote an e-mail or he said whatever he said.  He is

6    not here.  We can't ask him where did you get this information

7    from, you know, how did you hear it?

8              It is a hearsay concern, your Honor.

9              THE COURT:  Is this document coming in, what is

10   referred to as Exhibit 105?

11             MS. HARWIN:  We would anticipate so, your Honor.

12             MS. FISCHER:  Can we have the correlation if you have

13   it, please, to plaintiff's exhibit numbers?

14             MS. HARWIN:  I don't know it offhand.

15             But the name Federgruen is not a common one.  If you

16   do a search, I am sure you could find it pretty quickly.

17             MS. FISCHER:  I think we can resolve this now, and at

18   least we will have an understanding, if that's OK.

19             MS. HARWIN:  Your Honor, it may already be in.

20             MS. FISCHER:  I don't think it's in.

21             MS. HARWIN:  Perhaps I'm wrong on that, your Honor.

22   It's Exhibit 163, I believe.

23             Is that in evidence?  OK.

24             (Pause)

25             THE COURT:  I am just waiting for you guys.

I7inrav9

1          MS. HARWIN:  I'm sorry.  I identified the exhibit.

2     It's 163.

3          THE COURT:  OK.  Is there going to be an objection to

4     that exhibit?

5          MS. FISCHER:  Yes.  We have a copy.

6          THE COURT:  I think I can look at that exhibit if you

7     want to pass it up.

8          MS. HARWIN:  I would further note, your Honor, that I

9     believe there was testimony from Dean Hubbard earlier today

10    specifically regarding his conversation with Professor

11    Federgruen, so there's already context for this in the record.

12         MS. PLEVAN:  That's not the same.  That doesn't make

13    the document admissible.

14         MS. HARWIN:  This is a document that was reviewed and

15    considered by the promotion and tenure committee.  It was sent

16    by a member of the promotion and tenure committee to other

17    members of the promotion and tenure committee.

18         THE COURT:  I'm sorry.

19         Why do you have this promotion to associate?

20         Is this all about Ravina?

21         MS. HARWIN:  I'm sorry, your Honor.  Would you mind

22    just identifying where you're looking.

23         THE COURT:  Yes.  I'm just confused exactly -- I am

24    looking down at Katherine Phillips' e-mail to various people,

25    including -- I'm sorry, this is the April 14.  Excuse me.

I7inrav9

1          MS. HARWIN:  My understanding is that the Katherine

2     Phillips' e-mail has to do with the promotion and tenure

3     committee and identifies a number of issues on the agenda of

4     the promotion and tenure committee of which Professor Ravina's

5     case was one, and then there is a specific response about

6     Professor Ravina's case.

7          THE COURT:  Any objection as to all of this or

8     portions?

9          MS. FISCHER:  And --

10         THE COURT:  Who also wrote the questions at the end?

11         MS. FISCHER:  It appears to me that Professor

12    Federgruen did.

13         MS. HARWIN:  Right.

14         That's his enclosure of his letter -- his

15    identification of procedural irregularities or questions

16    associated with that.  That's the e-mail attachment.

17         THE COURT:  Were all of these issues discussed at that

18    meeting?

19         MS. HARWIN:  In the designated portion of testimony,

20    which is what prompted this, that's exactly the question that I

21    posed, your Honor on 123.

22         The objected-to portion asks, were the same questions

23    and concerns raised in the e-mail, concerns that were raised

24    during the promotion and tenure committee meeting, and the

25    answer is yes.

I7inrav9

1          THE COURT:  Again, I think the bulk of this is

2     admissible just to show the notice to Columbia.  But if there

3     are particular portions that you want to point out, I'm happy

4     to talk about them.

5          But on the same theory that I allowed in just limited

6     portions of 130 and 160 and 100, I am going to take the same

7     approach here.  But, you know, I was reading it to see, is he

8     expressing his own view or is he raising questions.

9          Again, I am fine with the notice going to Columbia, so

10     I don't know if you want to respond.  I am generally inclined

11     to admit this.

12          MS. FISCHER:  OK.  I mean, so I would like the

13     opportunity with that in mind to just review it and if I have

14     another --

15          THE COURT:  That's fine.

16          The only problem is that they need videos ready for

17     tomorrow, right?

18          MS. FISCHER:  Oh, right.  I mean, I think you said

19     that the --

20          THE COURT:  I'm happy to go back to the -- you're

21     right as to the document.  You are right about that.  That can

22     be redacted on the spot.  You can do that tomorrow.

23          But I'll tell you I am inclined to let it -- I mean I

24     am going to let it in.  If there are certain portions, we can

25     talk about redacting that I guess tomorrow, because that

I7inrav9

1      doesn't need to be done tonight.  The video does.

2              So let's go back to 123.

3              MS. HARWIN:  That is just essentially the question you

4      posed, your Honor.

5              THE COURT:  Then I think that's fair to allow

6      plaintiff to play this portion for the jury.

7              But, again, I don't want you asking her about it.

8              The next objection is to 128, is that right?

9              MS. HARWIN:  Let me look at that, your Honor.

10             THE COURT:  It is a counterdesignation.

11             MS. FISCHER:  We can withdraw that.

12             THE COURT:  All right.

13             MS. FISCHER:  Like we said, Professor Phillips will be

14     testifying.

15             THE COURT:  All right.  So we'll withdraw that.

16             What about 151:15-20?

17             Are you withdrawing that?

18             MS. FISCHER:  We can withdraw it.

19             THE COURT:  OK.  153.

20             MS. FISCHER:  She's testifying.  I guess plaintiff

21     won't ask about it.

22             MS. HARWIN:  I missed that.

23             THE COURT:  Just on the portions as I have said on the

24     portions if you're designating testimony then we don't want to

25     ask the witness about the same thing.

I7inrav9

1          So that was a counterdesignation, page 153, line 18.

2          Do you want to withdraw that too?

3          MS. FISCHER:  153?

4          THE COURT:  153:18 to 154:5 is what I have.  It is a

5   counterdesignation, but there is an objection.

6          MS. FISCHER:  That's fine.

7          THE COURT:  OK.  Then the final three objections are

8   to page 278, line 17.

9          MS. FISCHER:  Well -- and I guess we've already --

10  this has to do with that what we've called the petition.

11         THE COURT:  All right.

12         MS. FISCHER:  So --

13         MS. HARWIN:  Exhibit 100.

14         MS. FISCHER:  So, based on the Court's ruling, I think

15  that we would have to withdraw this --

16         THE COURT:  OK.

17         MS. FISCHER:  -- objection.

18         THE COURT:  OK.  Then 285 -- sorry, 282.  Excuse me.

19         MS. HARWIN:  This is more context on that same

20  petition.

21         THE COURT:  OK.

22         And then 285.

23         MS. FISCHER:  Fine to withdraw.

24         I just note that this has already been testified to by

25  Dean Hubbard.

I7inrav9

```
 1              THE COURT:  OK.  So that's withdrawn.  So then that's
 2     it.
 3              MS. HARWIN:  So is it my understanding that all of
 4     defendants' counterdesignations have been withdrawn?
 5              THE COURT:  Is that right?
 6              MS. FISCHER:  I have a note --
 7              MS. HARWIN:  And all of the objections --
 8              THE COURT:  I know the last three were withdrawn.  I
 9     don't know if all of them were withdrawn.
10              MS. FISCHER:  I think 44 --
11              MS. HARWIN:  I'm sorry, all except for that chunk in
12     the middle on 59, 63 and 64.
13              MS. FISCHER:  59, 63 and 64, those counterdesignations
14     are staying in, right?
15              MS. HARWIN:  That's my understanding, yes.
16              MS. FISCHER:  In terms of plaintiff's designations I
17     think they were all in except for 44:20 to 45:3.
18              MS. HARWIN:  That's my understanding as well.
19              MS. FISCHER:  Then we have the same understanding.
20              THE COURT:  All right.
21              Anything else we need to discuss tonight?
22              MS. PLEVAN:  Just we don't have the Zeldes
23     designations.  We need to review the tape, so we need a sort of
24     time stop.
25              When we are going to get it?
```

I7inrav9

1           MS. HARWIN:  We will have it for you tonight.

2           MS. PLEVAN:  What time?

3           MS. FISCHER:  Before 2 a.m.?

4           MS. HARWIN:  Before 2 a.m.

5           THE COURT:  If you did get to that as soon a get back

6     to the office.

7           MS. HARWIN:  Yes.

8           There's technical stuff having to do with, you know,

9     excising from the video portions that are here.  But as soon as

10    it's ready, and that's the first thing we are going to turn to

11    when we get back is that.

12          MS. FISCHER:  Like 8?  9?

13          MS. HARWIN:  Last night it took until about 9.

14          MS. PLEVAN:  Zeldes was ruled on.

15          THE COURT:  Right.

16          MS. HARWIN:  We will have it to you around 9.

17          THE COURT:  By when?

18          MS. HARWIN:  By around 9.

19          MS. PLEVAN:  What is the total run time of the four

20    then?

21          MS. HARWIN:  We don't know until the material is

22    excised, because we have to take out the interposed objections

23    as well as the portions that you guys have withdrawn.  We'll

24    know --

25          MS. PLEVAN:  I am not sure about witnesses if --

I7inrav9

1          THE COURT:  Just let them know as soon as you have an

2    estimate.

3          MS. HARWIN:  Yes.

4          I can ballpark, because I believe there are four

5    videos.  The longest one is 45 minutes.  And the others I

6    believe are sort of significantly shorter.  So we are talking

7    about, you know, less than three hours total.

8          THE COURT:  It should be significantly less than three

9    hours.

10         MS. HARWIN:  Yes, your Honor.

11         I don't know the exact run time.

12         THE COURT:  OK.

13         MS. HARWIN:  I know the one that's longest by I think

14   a significant margin I think is 45 minutes.

15         THE COURT:  Just do this.  You should send them to

16   defendants on a rolling basis.

17         MS. HARWIN:  Yes.

18         THE COURT:  As soon as you have one video you should

19   send that video.

20         As soon as you have the next one you should send it.

21         MS. HARWIN:  Not a problem.

22         THE COURT:  OK.

23         I will see you all in the morning.

24         (Adjourned to Thursday, July 19, 2018 at 9:00 a.m.)

25

```
1                     INDEX OF EXAMINATION

2    Examination of:                              Page

3    ROBERT GLENN HUBBARD

4    Direct By Mr. McKnight . . . . . . . . . . .1719

5    Cross By Ms. Plevan  . . . . . . . . . . . .1794

6    Redirect By Mr. McKnight . . . . . . . . . .1832

7    Recross By Ms. Plevan  . . . . . . . . . . .1841

8    CHRISTOPHER BROWN

9    Direct By Mr. McKnight . . . . . . . . . . .1843

10   Cross By Ms. Plevan  . . . . . . . . . . . .1904

11                     PLAINTIFF EXHIBITS

12   Exhibit No.                              Received

13    40   . . . . . . . . . . . . . . . . . . .1734

14    48   . . . . . . . . . . . . . . . . . . .1737

15    51   . . . . . . . . . . . . . . . . . . .1747

16    52   . . . . . . . . . . . . . . . . . . .1748

17    56   . . . . . . . . . . . . . . . . . . .1751

18    44   . . . . . . . . . . . . . . . . . . .1753

19    42   . . . . . . . . . . . . . . . . . . .1754

20    53   . . . . . . . . . . . . . . . . . . .1760

21    244  . . . . . . . . . . . . . . . . . . .1765

22    211  . . . . . . . . . . . . . . . . . . .1767

23    102  . . . . . . . . . . . . . . . . . . .1770

24    101  . . . . . . . . . . . . . . . . . . .1772

25    230  . . . . . . . . . . . . . . . . . . .1778
```

| | | |
|---|---|---|
| 1 | 263 . . . . . . . . . . . . . . . . . . . .1778 | |
| 2 | 130 . . . . . . . . . . . . . . . . . . . .1786 | |
| 3 | 160 . . . . . . . . . . . . . . . . . . . .1787 | |
| 4 | 158 . . . . . . . . . . . . . . . . . . . .1792 | |
| 5 | 100 . . . . . . . . . . . . . . . . . . . .1824 | |
| 6 | 122 . . . . . . . . . . . . . . . . . . . .1859 | |

DEFENDANT EXHIBITS

Exhibit No.                                    Received

| | |
|---|---|
| IS . . . . . . . . . . . . . . . . . . .1820 | |
| JO . . . . . . . . . . . . . . . . . . .1821 | |
| LI . . . . . . . . . . . . . . . . . . .1826 | |
| MH . . . . . . . . . . . . . . . . . . .1829 | |
| R . . . . . . . . . . . . . . . . . . . .1910 | |
| T . . . . . . . . . . . . . . . . . . . .1918 | |
| NG . . . . . . . . . . . . . . . . . . .1919 | |
| OH . . . . . . . . . . . . . . . . . . .1919 | |
| NP . . . . . . . . . . . . . . . . . . .1921 | |
| NR . . . . . . . . . . . . . . . . . . .1922 | |
| NF . . . . . . . . . . . . . . . . . . .1923 | |
| NQ . . . . . . . . . . . . . . . . . . .1924 | |
| NX . . . . . . . . . . . . . . . . . . .1925 | |
| MS . . . . . . . . . . . . . . . . . . .1927 | |
| OC . . . . . . . . . . . . . . . . . . .1931 | |