I7j1rav1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ENRICHETTA RAVINA,

4               Plaintiff,

5          v.                          16 CV 2137 (RA)

6   COLUMBIA UNIVERSITY,
                                       Jury Trial
7               Defendant.

8   ------------------------------x

9                                      New York, N.Y.
                                       July 19, 2018
10                                     9:42 a.m.

11  Before:

12          HON. RONNIE ABRAMS

13                                     District Judge

14

15                      APPEARANCES

16

17  SANFORD HEISLER SHARP LLP
         Attorneys for Plaintiff
    BY:  DAVID W. SANFORD
18       ALEXANDRA HARWIN
         MELINDA L. KOSTER
19       AMY DONEHOWER
         HERBERT V. McKNIGHT
20       ANDREW C. MELZER

21  PROSKAUER ROSE LLP
         Attorneys for Defendants
22  BY:  BETTINA B. PLEVAN
         RACHEL S. FISCHER
23       STEVEN D. HURD
         PATRICK KRAMER RICE
24
    HERNSTADT ATLAS PLLC
25       Attorneys for Defendant Bekaert
    BY:  EDWARD HERNSTADT

I7j1rav1

1       (Trial resumed; jury not present)

2       THE COURT:  So we're still waiting for one juror, but

3   I understand you had an issue.

4       MS. PLEVAN:  Yes, your Honor, concerning the

5   deposition designations on video.

6       THE COURT:  Okay.

7       MS. PLEVAN:  And Ms. Fischer may have some things to

8   add, but I think we were able, very late last night, to sign

9   off on the two of them, Johar and Rooker.  But there were a

10  number of mistakes in the part of the correction to the

11  transcript itself, with respect to Phillips.  We may be able to

12  look at that during -- we got the revised version at --

13      MS. FISCHER:  This morning.

14      THE COURT:  Okay.

15      MS. PLEVAN:  But --

16      MS. FISCHER:  It needs to be -- there was a

17  back-and-forth with counsel and some edits that had to be made.

18  We understand that they've made those changes and that it

19  should be ready, but just in all fairness, we want to --

20      THE COURT:  Look at it.

21      MS. FISCHER:  -- look at it ourselves.

22      THE COURT:  Okay.  Can you do that during lunch?

23      MS. FISCHER:  Yeah.

24      MS. PLEVAN:  In the case of Mr. Zeldes, there's a lot

25  more, because plaintiff's counsel sent us a version like at

I7j1rav1

1   midnight that didn't have -- I mean, that didn't include his

2   changes to the transcript on the part that was transcribed.

3            THE COURT:  Okay.

4            MS. PLEVAN:  And, I mean, literally we were doing this

5   at 2 in the morning, which is not the way it should have been.

6   But our position on Zeldes, which, you know, he has eight pages

7   of corrections to his transcript, is they can read the

8   transcript today, they don't have to show a video, but we're

9   not in a position to go back and, you know, spend the time that

10  we need to to review all these additional changes.

11           MS. HARWIN:  Can I explain.

12           THE COURT:  Yes.  Bring the mic closer, please.

13           MS. HARWIN:  Sorry, your Honor.

14           So with respect to Phillips, the updated video has

15  been provided and so that reflects the corrections that they

16  sought, and so I don't anticipate any issue there.

17           With respect to Zeldes, there are two issues.  There's

18  the video and the transcript.  The video was sent.  There's no

19  issue with the video.  There's no dispute with respect to the

20  video.

21           The issue with the transcript is that -- and I raised

22  this with counsel yesterday in the middle of the day at court,

23  which was that on the errata sheet that the deponent submitted,

24  there were a number of things identified as transcription

25  errors that, when we were inputting them, we actually -- they

I7j1rav1

1   weren't transcription errors, that actually the original

2   transcript was correct.  And things identified as transcription

3   error corrections that were actually wrong, they still didn't

4   match the actual content.  And so I raised this with counsel

5   yesterday and I said that we had identified some areas where

6   the transcription errors identified weren't actually errors,

7   and so we sent last night the proposed revised transcript

8   identifying those areas by line number where the listed

9   transcription errors weren't ones, and then we -- this was an

10  issue that I had raised with counsel.  We didn't understand

11  that to be an issue at all.  Then this was raised last night

12  for the first time that this was a concern, at 2 a.m., and then

13  we sent a revised transcript reflecting it the way defense

14  counsel wanted it.

15          So again, there's no issue with the video, and we have

16  sent the transcription to them reflecting the edits they want

17  at this point.  So we have either the version that I think is

18  more correct, which was provided last night, or the version

19  that they prefer, which is less correct but is what they

20  prefer, that we also provided.  Again, the video is not at

21  issue.  It's simply those pages of the transcript, which are

22  not a lot of pages of transcript to very quickly review.  It's

23  only a couple of specific lines, which I already identified the

24  line numbers where there are issues.  So it's a very discrete,

25  quick thing to check.

I7j1rav1

 1          THE COURT:  Just to be clear, what are we talking

 2     about?  Are we talking about you needing more time to review

 3     things, are we talking about a substantive difference to look

 4     at?  You need more time?

 5          MS. PLEVAN:  Yeah, what counsel did was disregard the

 6     witness' correction because she thought he characterized it

 7     incorrectly.  Because he called it in the reason column of his

 8     errata sheet "transcription error," and they thought, no, it's

 9     a substantive change, they didn't make the change.  I mean, you

10     know, so we're in this pickle of time because of --

11          THE COURT:  Well, I don't have a problem with doing it

12     out of order.  I'm not going to stop the trial because I don't

13     want to waste the jury's time, but you can rest subject to the

14     introduction of one more deposition, you know, video deposition

15     tomorrow, and you all can work out when would be an appropriate

16     time to do it.  But I think that that's the best solution so

17     that, you know, you all have the time you need to review it,

18     but we also don't keep the jury waiting.  Is everyone okay with

19     that?

20          MS. PLEVAN:  Yes.

21          MS. HARWIN:  Sure.

22          THE COURT:  Okay.  We're still waiting for one juror.

23          Professor, do you want to come back up to the stand.

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Thanks.

I7j1rav1                        Brown – Redirect

1              Can you tell me what the exhibit number was -- there

2      was a document yesterday we were discussing that I didn't allow

3      in now but we were going to revisit with -- I think it was

4      Kathy Phillips?

5              MS. HARWIN:  We'll find that for you, your Honor.

6              THE COURT:  Okay.  Thank you.

7              (Continued on next page)

1          (Jury present)

2          THE COURT:  Good morning, everyone.

3          JURORS:  Good morning.

4          THE COURT:  Everyone can be seated.

5          I'm going to remind you that you're still under oath.

6          THE WITNESS:  Yes, your Honor.

7          THE COURT:  You may proceed.

8          MR. McKNIGHT:  Thank you, your Honor.

9          Good morning, ladies and gentlemen.

10    CHRISTOPHER L. BROWN, resumed.

11    REDIRECT EXAMINATION

12    BY MR. McKNIGHT:

13    Q.  Good morning, Professor.

14    A.  Good morning, sir.

15    Q.  Now, Professor, just to be clear, a break in service is not

16    the only way to postpone a faculty member's tenure review

17    process, isn't that correct?

18    A.  That is correct.

19    Q.  And you have described using a break in service to postpone

20    the tenure review process as a loophole, correct?

21    A.  Colloquially.  I wouldn't call it -- yes, sir, I did use

22    the term "loophole."

23    Q.  But there is a written policy by Columbia authorizing

24    postponement of tenure review in a personal hardship

25    circumstance, isn't that correct?

I7j1rav1                        Brown - Redirect

1   A.  Yes.

2   Q.  So when Professor Ravina made her request for postponement

3   of her tenure review process based upon personal hardship, that

4   was a mechanism that was actually authorized under Columbia's

5   policies to postpone her tenure review, correct?

6   A.  Yes.  Correct.

7   Q.  Thank you.

8           Now under Columbia's policies, a faculty member whose

9   tenure review process is postponed due to personal hardship

10  leave that has been granted would not be subject to de facto

11  tenure, is that correct?

12          MS. PLEVAN:  Objection.

13          THE COURT:  What is the objection?

14          MS. PLEVAN:  Vague.

15          THE COURT:  Can you rephrase that, please.

16  Q.  Professor Brown, if a faculty member is granted personal

17  leave hardship under the policies, that person then would not

18  be subject to de facto tenure because there would be an

19  interruption, correct?

20  A.  They would still be subject to de facto tenure; presumably

21  it would just be --

22  Q.  Put off?

23  A.  -- postponed.  I mean, it wouldn't -- it would not -- the

24  question of de facto tenure, if I may --

25  Q.  No.  I just want to know if, when you said that it would be

I7j1rav1                        Brown - Redirect

1    postponed, correct, it means it would push it further down the

2    road, is that correct?

3    A.   It depends on how long the personal hardship leave was for.

4    Q.   All right.  And so I'm saying let's suppose a personal

5    hardship leave was for two years.  Would it push the de facto

6    tenure issue down the road?

7    A.   I'm pausing because it's never occurred so it would have to

8    be -- it's the kind of matter that would be discussed in the

9    office.  But if someone was on a personal hardship leave, they

10   would not presumably come up for tenure while they were on that

11   leave, and so what would happen, I believe -- I don't -- it's

12   a -- because it hasn't occurred before, it would be discussed

13   at some length in the office to figure out how to handle it.

14   Q.   All right.  You don't know of any Columbia policy that

15   forbids giving a leave with pay for personal hardship, isn't

16   that correct?

17   A.   I think the handbook is pretty clear.

18   Q.   So your answer is that there is a policy that forbids

19   giving leave with pay for personal hardship, correct?

20   A.   It's -- sorry.  It's not a yes or a no answer.  Well, I

21   guess it could be a yes or no answer.  The statement in the

22   faculty handbook is that personal leaves are given without pay.

23   Is there a statement that says people are forbidden to be paid

24   on a personal leave?  I don't think there is a statement of

25   that kind.

1   Q.  All right.  Thank you.

2           You're aware that in December 2015 Columbia provided

3   Professor Ravina with a deadline to submit her tenure

4   application materials, correct?

5   A.  Yes.

6   Q.  And you received an email, I guess it was dated January the

7   8th, 2016, concerning the support of several faculty members

8   for Professor Ravina's extension request, did you not?

9   A.  I did.

10  Q.  All right.  You did?

11  A.  Wait a second.  Let me -- I actually need to see the

12  exhibit because I don't know if it was addressed directly to

13  the provost or whether it came to me.

14  Q.  All right.

15  A.  So I think I -- I mean, I'm aware of the -- I'm aware of

16  what you're referring to, but I think I ought to see the

17  document to confirm that it was addressed to me or that it came

18  to me as a copy.

19  Q.  Very well.

20          MR. McKNIGHT:  Can we publish Plaintiff's Trial

21  Exhibit No. 22, please.

22  Q.  Now if you'll look at the email that's displayed before

23  you, do you see that, "Today I received a phone call from

24  Charles Calomiris," correct, "who spoke on behalf of Patrick

25  Bolton"?

I7j1rav1                         Brown - Redirect

1   A.  Yes.

2   Q.  "And they spoke strongly in favor of the three-year

3   extension of the tenure clock that Enrichetta Ravina has

4   requested."  Do you see that?

5   A.  Yes, I do.

6   Q.  All right.  So you received email where several faculty, at

7   least these two, spoke in support of the extension request,

8   correct?

9   A.  Yes.

10  Q.  All right.  And these same senior colleagues --

11          MS. PLEVAN:  Objection, your Honor.  Several grounds.

12          THE COURT:  Okay.  Are you asking a question separate

13  from what's in the document?

14          MR. McKNIGHT:  No.  I was going to continue in the

15  document.

16          THE COURT:  All right.  And the objection?

17          MS. PLEVAN:  Well, the content but also repetition.

18          THE COURT:  Okay.

19          MS. PLEVAN:  We've done this already.

20          THE COURT:  I'll allow it, but just focus on -- I

21  mean, this document is already in evidence, so just focus on

22  what's in it instead of characterizing it otherwise.

23          MR. McKNIGHT:  Very well.

24          MR. HERNSTADT:  And your Honor, again, it's not being

25  presented that any of this is true.

1           THE COURT:  Right.  This is not being admitted, again,

2    for the truth but for the fact that this information was

3    relayed at this time.

4    BY MR. McKNIGHT:

5    Q.  And at this time you received information through this

6    email that the senior colleagues involved were concerned

7    that -- let me read it from the beginning so I don't

8    mischaracterize.

9           "He said that he did not want to speak about the

10   personal issues involved but said that the senior colleague

11   involved was holding up publication of jointly-authored

12   articles and had behaved badly in other ways."

13          And so you received this, sir?

14   A.  I did.

15   Q.  Thank you.

16          Now on January --

17          MR. McKNIGHT:  I'm through with this.  Thank you.

18   Q.  On January 15, 2016, you denied Professor Ravina's

19   extension request but indicated that she could provide

20   additional details, correct?

21   A.  I denied her request for a paid leave.  I did not deny her

22   extension request.  The -- I would just point out that the

23   request had three or four different items in it, and I denied

24   the -- the compound request.  Item -- individual aspects of the

25   request, which is why I wanted to speak with her, we could

1    have -- we could have dealt with.  So I would -- to say that I

2    denied an extension or postponement of tenure review is to

3    mischaracterize the position that my office took.

4              MR. McKNIGHT:  Can we see Plaintiff's Exhibit No. 115,

5    please.

6              I'm sorry.  I apologize.  Can we have Plaintiff's

7    Exhibit 171, please.

8    Q.  So your recollection, sir, is that you at least

9    communicated with her on that date and you indicated that she

10   could provide additional details, correct?

11   A.  That's correct.

12   Q.  All right.  And on January 20, 2016, you sent her an email

13   and you -- do you recall that?

14   A.  I do.

15             MR. McKNIGHT:  Okay.  Can we see Defendant's Exhibit

16   NR.

17   Q.  And this is the email that you sent to her, Defendant's

18   Exhibit NR?

19   A.  Correct.

20   Q.  And in this particular email, you only offered to discuss

21   with her the associate research scholar option, is that

22   correct?

23   A.  In this email, that is correct.

24   Q.  On January 22, 2016 --

25             MR. McKNIGHT:  We can move off of this particular

1    line.

2    Q.   –– Senior Vice Dean Phillips sent Professor Ravina an email

3    setting forth three options on how she could proceed, is that

4    correct?  Do you remember that?

5    A.   Yes.

6    Q.   And of those three options, those three options that came

7    up in this particular suggestion from Phillips would mean that

8    her tenure would come up in the spring of that year, correct?

9    A.   I don't believe that's what it says.

10                MR. McKNIGHT:  All right.  Can we see Defendant's

11   Exhibit NZ.

12                Can you expand paragraph 3.

13   Q.   And here it says, "If you choose to take the associate

14   research scholar appointment, your tenure review materials

15   would be due later this spring 2016 semester," correct?

16   A.   Yes.

17   Q.   Now on January 25, 2016, Professor Ravina provided you with

18   a follow-up letter with additional details in support of her

19   hardship leave, correct?

20   A.   Yes.

21   Q.   And two days later Professor Ravina responded to you with

22   an email, correct?  Do you remember that?

23   A.   I actually don't recall that.  I would like to see that

24   document.

25                MR. McKNIGHT:  All right.  Can we see Defendant's

I7j1rav1                         Brown - Redirect

1    Exhibit OC, please.

2    A.  Yes.

3    Q.  And in that email she thanked you for your invitation,

4    correct, at the bottom of the page?

5    A.  Yes.

6    Q.  And she prepared a response letter that she discussed with

7    you, correct?

8    A.  Yes.

9    Q.  And she was polite to you.

10   A.  I don't know what to say to that.

11   Q.  All right.  And you responded, correct, in the email above

12   that?

13   A.  I did.

14   Q.  All right.  And that was dated January 27, 2016, and looks

15   like the time is 3:41, correct?

16   A.  Correct.

17   Q.  And you indicated that you had received her correspondence

18   or her email below.

19   A.  Yes.

20   Q.  And at this time you didn't offer to meet with her about

21   her email, is that correct, in this email?

22   A.  I had offered to meet with her several times --

23   Q.  Sir --

24   A.  Sorry.  No, I did not -- I did not extend yet another

25   invitation for her to meet with me, no, I did not.

I7j1rav1                         Brown – Redirect

1    Q.  Thank you.

2             MR. McKNIGHT:  Could we have Exhibit No. 130, please.

3    Q.  You recall receiving this particular exhibit which is

4    marked as Exhibit 130, correct?

5    A.  So I had -- I did see -- yes.  I'm not sure how it came to

6    me.  I don't believe it was addressed to me directly.  But I

7    have seen that.  I did see that at around about that time, yes.

8    Q.  All right.  And you received it before you communicated

9    with Professor Ravina that her request had been denied, isn't

10   that correct?

11   A.  I don't think that's true.

12   Q.  You received it before your final denial of her request for

13   tenure, isn't that correct?

14   A.  I did not require -- deny her request for tenure.

15            MS. PLEVAN:  Objection.

16   Q.  Not request for tenure.  You're right.  I misspoke.

17            THE COURT:  So withdraw.  Why don't you --

18            MR. McKNIGHT:  I withdraw the question.

19   Q.  You received it before you denied her request for an

20   extension.

21   A.  I'll say again, I did not deny her request for an

22   extension.  The request for an extension is not what I

23   received.

24   Q.  All right.  Request for leave of absence.

25   A.  With pay and a two-year -- there were three things.  All

1  three of those things were in the --

2  Q.  I'm just asking about the denial --

3        MS. PLEVAN:  The witness should be allowed to --

4        THE COURT:  You've got to clarify what's being asked,

5  though.

6  A.  If I denied something, there was -- there were three things

7  that were put together that were not separable in the way that

8  they were presented to me.  I suggested that we separate them.

9  She did not want to separate them.  So I turned down the

10 compound request, yes.

11 Q.  And before you turned down the compound request, you had

12 received this document that's on the screen, correct?

13 A.  I had.

14 Q.  Thank you.

15        Now you testified yesterday that a break in service

16 always involves leaving an instructional position, correct?

17 A.  Yes.  In the way that we -- in the way that we do it.  I

18 mean, just -- just to be clear, the break in -- yes, you leave

19 an instructional position to take a position at the university

20 that's not instructional so that there is not a record of

21 continuous service that would force the tenure review.

22 Q.  Isn't it true that the male faculty member Mark Broadie,

23 who received a break in service, taught during his break in

24 service?

25 A.  I have no idea.

1          MR. McKNIGHT:  Can we have Exhibit No. 171, please.

2          THE COURT:  This isn't being published to the jurors.

3          MR. McKNIGHT:  I believe it's in evidence, so I

4     believe it can be.

5          MS. PLEVAN:  No, it's not.

6          THE COURT:  I did not admit it.

7          MR. McKNIGHT:  Okay.  Very well.

8     BY MR. McKNIGHT:

9     Q.  Professor Brown, I direct your attention to paragraph 7.

10    A.  Oh, okay.  So I must have -- so when I did this -- when we

11    had the deposition, I didn't recall this, but I must have -- we

12    must have gone back and looked at the record.  So I stand

13    corrected.  He did teach at some point during those years.

14    Q.  In fact, he taught several courses during those years,

15    isn't that correct?

16    A.  I'd have to look at the record to know.

17    Q.  Isn't that what you said, sir?

18    A.  He taught several courses, yes.

19    Q.  Thank you.

20    A.  It only takes one semester to achieve a break in service,

21    so if there was one semester that he did not teach, then that

22    would -- in an administrative position, then that would achieve

23    a break in service, so even if he taught courses later, it

24    wouldn't have any bearing on de facto tenure.

25    Q.  But as you sit here today, you don't know when he taught

I7j1rav1                        Brown - Redirect

1    those teach -- those courses during that six-year period, do

2    you?

3    A.  I do not.

4    Q.  Thank you.

5        Now the research associate scholar position that

6    Senior Vice Dean Phillips outlined for Professor Ravina was a

7    one-year position, correct?

8    A.  I think I should probably see the letter, but that sounds

9    correct.  I think I probably should see it before I confirm it.

10        MR. McKNIGHT:  Could we see Defendant's NZ.

11   A.  Yes, that's what it says.  That's what the offer says.

12   Q.  All right.  Thank you.

13        Now you testified at deposition that you're not aware

14   of anyone in the office of provost objecting to a longer break

15   of service for Professor Ravina, correct?

16   A.  That's correct.

17   Q.  And you further testified that the provost's office did not

18   take any position as to how long a break of service Professor

19   Ravina could obtain, correct?  Let me restate that.

20        In Professor Ravina's case, the provost's office did

21   not take any position as to how long a break in service would

22   have been appropriate under Ms. Ravina's -- Professor Ravina's

23   circumstances, correct?

24        MS. PLEVAN:  Objection.

25        THE COURT:  What's the objection?

1   　　　　　MS. PLEVAN:  Well, the form.  And what he's referring

2   to.  The provost's office.

3   　　　　　THE COURT:  Okay.  So can you rephrase that.

4   　　　　　MR. McKNIGHT:  Your Honor, that's how the question was

5   posed to him.

6   　　　　　THE COURT:  At the deposition?

7   　　　　　MR. McKNIGHT:  Yes.

8   　　　　　THE COURT:  Can you answer that?

9   A.  Please restate the question.

10  Q.  In Professor Ravina's case, the provost's office did not

11  take any position as to how long a break in service would have

12  been appropriate under Ms. Ravina's circumstances.

13  A.  I believe that's right, yeah.

14  Q.  And the male professor at Columbia University named Mark

15  Broadie received six years off the tenure clock, correct?

16  A.  He was -- yes, that seems to be the case, yes.

17  Q.  And the male professor, Mark Broadie, earned tenure 16

18  years after he first joined the faculty at Columbia, isn't that

19  correct?

20  A.  I'd have to do the math.  What was the year of his first

21  date of appointment?

22  Q.  Let me see if I can help you with that again.

23  　　　　　MR. McKNIGHT:  Could we show the witness Plaintiff's

24  Trial Exhibit No. 171.

25  Q.  Would you take a moment to review this document, Professor

I7j1rav1                          Brown – Redirect

1    Brown, and tell me whether Professor Broadie --

2    A.   It looks like it was 14 years rather than 16 years.

3    Q.   All right.  I'll accept the mathematical correction.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7jnrav2                        Brown - Redirect

1    Q.  If Professor Ravina's work had been impeded, that would be

2    a relevant consideration for faculty members voting on her

3    tenure, correct?

4              MS. PLEVAN:  Objection.  Beyond the scope.

5              THE COURT:  What is the basis of the objection?

6              MS. PLEVAN:  Beyond the scope.

7              THE COURT:  I will allow that.

8    A.  Please repeat the question.

9    Q.  If Professor Ravina's work had been impeded, that would be

10   a relevant consideration for a faculty member's voting on her

11   tenure.  A relevant consideration.

12   A.  So I have to ask to specify.  Which faculty members?

13   Q.  The faculty members who would be voting on her tenure

14   consideration, sir.

15   A.  Voting?  Just voting?

16   Q.  Yes, voting.

17   A.  OK.  A relevant consideration?

18   Q.  Yes.

19   A.  Would it be a relevant consideration?  I mean --

20             MS. PLEVAN:  Objection.

21             Is this an abstract question?  I am just not clear.

22             THE COURT:  By abstract you mean?

23             MS. PLEVAN:  Hypothetical.

24             THE COURT:  Do you have a policy on that one way or

25   the other?

1        THE WITNESS:  There's no policy for sure.  Tenure

2   votes, faculty use their best judgment.  It would depend -- I

3   mean, if we are talking hypothetically, it would depend on the

4   nature of the impediment.  It would depend on a lot of things,

5   how much people would factor it into account.  There was a

6   variety -- I don't -- and individual faculty make individual

7   decisions about how they vote.

8   Q.  Let me rephrase the question.

9        Do you believe it was appropriate or would have been

10  appropriate for tenure faculty members at Columbia Business

11  School to consider the reasons why Ms. Ravina's work was

12  impeded when making a determination as to her tenure?

13        MS. PLEVAN:  Objection.

14        THE COURT:  You know, let's have a sidebar for a

15  minute.  All right.

16        (Continued on next page)

17

18

19

20

21

22

23

24

25

I7jnrav2                    Brown - Redirect

1                  (At sidebar)

2                  MS. PLEVAN:  First of all, I asked him no questions on

3      this subject whatsoever.  I mean, really this form of

4      examination is like getting two chances to cross-examine, so I

5      would respectfully request that this be restricted

6      significantly.  He had his chance when he called the witness to

7      ask him questions.

8                  THE COURT:  What was it on cross that led you to ask

9      this, that you think opened the door to this.

10                 MR. McKNIGHT:  Well, I asked him --

11                 THE COURT:  I am asking what it was.

12                 MS. PLEVAN:  What did I ask him.

13                 THE COURT:  What it was on Columbia's cross that makes

14     this within the scope of your examination today?

15                 MS. PLEVAN:  That is what I am objecting to.

16                 MS. HARWIN:  There was discussion --

17                 MS. PLEVAN:  I thought we would have one person

18     arguing.

19                 THE COURT:  Let's just have one person arguing each

20     thing.

21                 MR. McKNIGHT:  They talked about how the tenure

22     process proceeded, and they talked about other examples of

23     breaks in service and what they considered there.  So I thought

24     it was fair to talk about whether this is a relevant

25     consideration.

1          MS. PLEVAN:  I didn't ask him any questions about the

2     tenure vote at all at the division level, practices, about that

3     at all.  It has nothing to do with breaks in service.

4          MR. McKNIGHT:  As to what should be properly

5     considered in that process, I think that he's the expert in

6     that area.  They brought it up, so I am asking about it.

7          THE COURT:  Did they bring it up?  That is what I am

8     asking.  How did they bring it up?

9          MS. HARWIN:  The --

10          MR. McKNIGHT:  Wait.

11          They brought up the university-wide tenure, the

12     factors that would be considered.

13          THE COURT:  They brought up what factors that would be

14     considered?

15          MR. McKNIGHT:  Yes.

16          MS. PLEVAN:  Where?  Where did I open it up?

17          MR. McKNIGHT:  You introduced the policy into

18     evidence.

19          MS. PLEVAN:  He never testified about it, though.

20          THE COURT:  Just the general policy?

21          MR. McKNIGHT:  They brought it in and asked him, is

22     this the policy and is this what you consider.

23          THE COURT:  They asked what you should consider?

24          MS. PLEVAN:  No, I did not ask him that question.

25          MR. McKNIGHT:  They introduced the document, your

I7jnrav2                    Brown - Redirect

1  Honor.

2             THE COURT:  The document said what.

3             MR. McKNIGHT:  The document has the policy about

4  voting on tenure.

5             THE COURT:  About factors that you can consider?

6             MS. PLEVAN:  The quality of the work, the service to

7  the school.

8             THE COURT:  I am going to --

9             MS. PLEVAN:  I also have another question, another

10 objection.

11            THE COURT:  Let's go to the next question.

12            I am going to allow you --

13            MS. PLEVAN:  I object to the fact that he's asking him

14 his opinion.

15            THE COURT:  That's what I wanted to get at.  Why is

16 his personal opinion relevant?

17            MR. McKNIGHT:  First of all, he was a 30(b)(6) witness

18 on this topic.

19            MS. PLEVAN:  He is not as a 30(b)(6) witness.

20            THE COURT:  He is not here as a 30(b)(6) witness.

21            MR. McKNIGHT:  He is the vice provost.  His specialty

22 and his consideration, area of the concern for the school is

23 the tenure process and review.  He testified to that earlier.

24            MS. PLEVAN:  But he's not here as an expert.  It is an

25 opinion question.  It is not a fact question.

1      MR. McKNIGHT:  It is a fact question as to what

2  factors should be considered.  That is a fact, not an opinion.

3      THE COURT:  All right.  Why don't we --

4      MR. HERNSTADT:  Your Honor, it also assumes something

5  that is the ultimate question here.  It assumes that there was

6  someone who blocked her work.  He's being asked something which

7  assumes something that the jury has to decide, and then asks an

8  opinion about it.

9      THE COURT:  I think the jury will still decide that

10 issue.  I am going to let you ask the question.  I want to

11 clarify with him first, though, if he is qualified to answer

12 the question of what factors are legitimate factors to be

13 considered.

14     MR. HERNSTADT:  For the business school, too.

15     THE COURT:  For the business school.

16     MR. McKNIGHT:  Your Honor, I want to show you -- look

17 at the bottom of the page.

18     THE COURT:  What is this?

19     MR. McKNIGHT:  This is his 30(b)(6) deposition.  At

20 the bottom of page 306 to here, that was the question and

21 answer.  I am just asking him that again, because that's what

22 he testified to.

23     MS. PLEVAN:  I don't have the ability to invoke a

24 ruling at the deposition.

25     THE COURT:  I will allow you to ask that.

1              (In open court)

2              THE COURT:  Professor Brown.

3              THE WITNESS:  Yes.

4              THE COURT:  Are you in a position to weigh in on what

5    factors can and cannot be considered in making a tenure

6    determination at the business school?

7              THE WITNESS:  I can weigh in on what the university's

8    expectations are for faculty in evaluating tenure cases.  I

9    think the answer to that is yes.

10             THE COURT:  So you can ask the question.

11             MR. McKNIGHT:  Very well, your Honor.

12   BY MR. McKNIGHT:

13   Q.  Do you believe it was appropriate for tenure faculty

14   members at Columbia Business School to consider the reasons why

15   Ms. Ravina's work was impeded when making a determination?

16             THE COURT:  Let's not focus specifically on

17   Ms. Ravina.  Why don't you just ask the question more

18   generally.

19             MR. McKNIGHT:  All right.

20   BY MR. McKNIGHT:

21   Q.  Do you believe it was appropriate for tenure faculty

22   members at Columbia Business School to consider the reasons why

23   a candidate for tenure work was impeded when making a

24   determination as to tenure?

25   A.  If it's determined that -- the faculty members believe that

I7jnrav2                    Brown - recross

```
 1    a candidate's work has been impeded for some reason, certainly,

 2    yes, it is appropriate to take that into account.

 3              MR. McKNIGHT:  Can I have one moment, your Honor?

 4              THE COURT:  Sure.

 5              MR. McKNIGHT:  Your Honor, I have no further

 6    questions.

 7              THE COURT:  OK.  Recross?

 8    RECROSS EXAMINATION

 9    BY MS. PLEVAN:

10    Q.  Professor Brown, did Professor Ravina ever agree to meet

11    with you?

12    A.  No.

13    Q.  All right.  To the best of your knowledge, did she ever

14    agree to meet with you and Dr. Phillips?

15    A.  Together, no.

16    Q.  Or separately?

17    A.  I do not know what she did or didn't do with Dean Phillips,

18    but she did not agree to meet with me or with me and Dean

19    Phillips together.

20    Q.  Did you know anything about Mark Broadie at the time that

21    you made the decision to deny Professor Ravina's request for a

22    personal hardship leave?

23    A.  I had never heard of Mark Broadie.

24    Q.  You only learned about him later in connection with this --

25    A.  I learned about Mark Broadie the day before the deposition.
```

I7jnrav2                        Bolton - Direct

1        MS. PLEVAN:  I have no further questions.

2        THE COURT:  All right.

3        You can step down.  Thank you.

4        THE WITNESS:  Thank you.

5        (Witness excused)

6        THE COURT:  Plaintiff, you can call your next witness.

7        MR. SANFORD:  Plaintiff calls Professor Bolton.

8   PATRICK Bolton,

9        called as a witness by the Plaintiff,

10       having been duly sworn, testified as follows:

11  DIRECT EXAMINATION

12  BY MR. SANFORD:

13  Q.  Good morning, Professor Bolton.

14  A.  Good morning.

15  Q.  Where are you currently employed?

16  A.  I am employed at Columbia University and Columbia Business

17  School.

18  Q.  What do you do at the Columbia Business School?

19  A.  I do research and I teach.

20  Q.  What is your title?

21  A.  Barbara and David Zalaznick professor of business.

22  Q.  Is that a tenured professorship?

23  A.  Yes.

24  Q.  Is that an endowed professorship?

25  A.  Yeah.

1   Q.   What is your primary area of expertise?

2   A.   My primary area of expertise is corporate finance,

3   financial contracting, and financial regulation.

4   Q.   Do you also teach?

5   A.   Yes.

6   Q.   What is your primary area of teaching?

7   A.   Corporate finance, financial regulation and contract

8   theory.

9   Q.   How long have you been an economics professor?

10  A.   30 years.

11  Q.   Have you been an economics professor at any schools other

12  than Columbia?

13  A.   Yes.  Prior to joining Columbia I was a professor at

14  Princeton university and prior to joining Princeton I was a

15  professor in Belgium and in the Netherlands at the Free

16  University of Brussels and Tilburg University, and prior to

17  that I was professor at the London School of Economics, and

18  prior to that I was, for a brief period, in a research

19  department at the École Polytechnique in Paris, and prior to

20  that I was assistant professor at Harvard and UC Berkeley.

21  Q.   Thank you.  How long have you been employed at the Columbia

22  Business School?

23  A.   Since 2005.

24  Q.   Have you held any leadership positions in your professional

25  field?

1   A.  Yes.  I was president of the American Finance Association.

2   Q.  And what is the American Finance Association?

3   A.  The American Finance Association is the main professional

4   organization for academic scholars in finance.

5   Q.  Who voted for you to be president of the American Finance

6   Association?

7   A.  All the members of the American Finance Association vote to

8   elect the president.

9   Q.  And what is the role of president?

10  A.  There are two main roles.  One role is to organize the

11  annual meeting of the American Finance Association, and the

12  second role is to deliver the presidential address in the

13  next -- in the following meeting.

14  Q.  How much influence does the American Finance Association

15  have in the field of finance economics?

16  A.  It's the most important association in the world for

17  finance.

18  Q.  And how many members are there approximately in the

19  organization?

20  A.  Oh, multiple thousands.

21  Q.  Who is the president of that organization after you?

22  A.  Professor Campbell Harvey from Duke University.

23  Q.  Do you know Professor Ravina?

24  A.  Yes.

25  Q.  How did you come to know her?

1    A.  I was -- I came to know her when I -- we recruited her to

2    join our division as assistant professor.

3    Q.  Why did the Columbia Business School seek to recruit

4    Professor Ravina?

5    A.  We always look for the best talent we can find.  We

6    identified her as a top scholar in her field, and we were

7    delighted when she decided to join our school.

8    Q.  What work was Professor Ravina doing that made the Columbia

9    faculty interested in recruiting her?

10   A.  Her area is empirical research focused on household finance

11   and behavioral finance.  In particular, she is one of the first

12   scholars to have looked at peer-to-peer lending platforms, and

13   this is a very interesting area and she's really a pioneer in

14   that area.

15   Q.  What position did you recruit Professor Ravina for at

16   Columbia?

17   A.  As a tenure-track assistant professor.

18   Q.  And did she eventually join the faculty at Columbia?

19   A.  Yes.

20   Q.  What division of the business school did Professor Ravina

21   join?

22   A.  The finance and economics division.

23   Q.  After Professor Ravina joined the faculty of Columbia

24   Business School, did you interact with her at all?

25   A.  I interacted with her as I do with other colleagues of my

I7jnrav2                          Bolton - Direct

division.  I would meet her at the faculty meetings, seminars,

workshops.

Q.  Were you one of the faculty members who reviewed Professor

Ravina's performance as part of her annual review?

A.  Yes.  The senior faculty at Columbia reviews all the junior

faculty.  That's part of our duties.

Q.  If I could ask you to speak into the mic.

A.  Sorry.  Yes.  So the senior faculty reviews all the junior

faculty at Columbia.  That's --

Q.  What is Professor Ravina's area of scholarly focus?

A.  So, she's an empiricist working in behavioral finance and

household finance.

Q.  Have you ever worked with Professor Ravina on any research?

A.  I started a project recently, in November of 2017, last

year with her.

Q.  And can you describe to the ladies and gentlemen of the

jury the nature of that research.

A.  So what we study is how institutional investors, like

Vanguard or BlackRock, vote the shares that they hold as asset

managers in the companies, in the publicly traded companies.

This is -- it's a very important new area of research that

takes a political science perspective on voting, but it's

voting in the corporate context.

Q.  How would you describe the quality of Professor Ravina's

research and scholarly work?

I7jnrav2                         Bolton - Direct

1    A.  It's outstanding.  She is a critical member of the team.

2    She has very, very unique skills as an empirical researcher.

3    We have an extremely large dataset with millions of

4    observations.  We're doing an estimation that requires a

5    mainframe computer.  She has experience with that, and so we

6    rely on her.

7    Q.  What is the division of labor in your collaboration with

8    Professor Ravina?

9    A.  So I am trained as an economic theorist, so I don't have

10   very developed empirical skills.  I'm learning this.  Professor

11   Ravina is the empirical scholar in the team, together with the

12   two other coauthors, Professor Tao Li, a former student of mine

13   who is in the university of Florida, and Professor Howard

14   Rosenthal, who is a very distinguished political scientist.

15   Q.  You mentioned that you began your collaboration in November

16   of 2017?

17   A.  Yes, November 2017.

18   Q.  Please tell the jury what's happened since with respect to

19   that research.

20   A.  So --

21            MR. HERNSTADT:  Objection, your Honor.

22            THE COURT:  What is the basis for the objection?

23            MR. HERNSTADT:  Relevance and sidebar, please.

24            THE COURT:  OK.  We will have a sidebar.

25            (Continued on next page)

I7jnrav2                         Bolton - Direct

1             (At sidebar)

2             THE COURT:  First, what is the relevance?

3             MR. SANFORD:  Your Honor, I just have a couple of

4    questions.

5             THE COURT:  What is the relevance?

6             MR. SANFORD:  He is talking about the nature of her

7    his research with her and that fairly quick turnaround that

8    he's managed to have since November of 2017.  I have two more

9    questions on it.

10            MR. HERNSTADT:  Your Honor, the problem is she's not

11   at Columbia when this is work is taking place.  He's trying to

12   set up some kind of a comparison between her work with

13   Professor Bolton.  It's totally inappropriate, and it is not

14   relevant to this case.

15            MR. SANFORD:  They've raised the issue of productivity

16   with respect to her scholarship since leaving Columbia.  It is

17   squarely relevant for that reason.

18            MR. HERNSTADT:  The issue of her productivity is the

19   issue of productivity between 2009 and 2016, not 2017 or 2018

20   with somebody else.  We don't know anything about this paper.

21   We can't testify about it.  We can't cross-examine him on it.

22   I know nothing about this paper.  She submitted this paper last

23   month.

24            MR. SANFORD:  They raised it on cross-examination.

25   The nature of her research since, they asked that question on

I7jnrav2                        Bolton - Direct

cross-examination.  I think I should be entitled to ask a

couple of questions.

          MR. HERNSTADT:  We did not ask about her research

since.  We asked about her productivity.  If she wants to

testify, and we already elicited the fact that she's submitted

a paper last month.  He's testifying about, oh, she is a

crucial member of the team, and we worked together, we've

divided the labor, clearly saying this is a relevant

comparison.  That is not appropriate here.

          MR. SANFORD:  Given the cross-examination, it seems --

I have two more questions.

          THE COURT:  I will allow it.

          MR. SANFORD:  Thank you.

          (Continued on next page)

 1              (In open court)

 2   Q.   Professor Bolton, can you speak about what's happened since

 3   you started collaborating in November of 2017?

 4              THE COURT:  Just to be clear, this is when Professor

 5   Ravina is not at Columbia?

 6              THE WITNESS:  Yes.

 7              THE COURT:  It is much more recent?

 8              THE WITNESS:  Yes, exactly.  It's very recent.

 9              THE COURT:  All right.

10              So it doesn't bear on anything regarding her work at

11   Columbia?

12              THE WITNESS:  No.

13              THE COURT:  You can ask the question with that said.

14              MR. SANFORD:  Thank you, your Honor.

15   BY MR. SANFORD:

16   Q.   You may answer.

17   A.   We put out a working paper in February of this year, and

18   then we submitted the working paper for publication in a new

19   journal that is being created by the American Economic

20   Association.  It is called the American Economic Review

21   Insights, which is really designed for the type of article,

22   very, innovative topic that we were writing.

23              We have since heard back from the journal.  We were

24   not -- the journal decided to decline publishing our paper.  We

25   have made some small revisions, and we have submitted it again

I7jnrav2                    Bolton - Direct

1   to one of the leading finance journals, the Journal of

2   Financial Economics, and we're waiting to hear back from the

3   journal.

4   Q.  How would you evaluate Professor Ravina's ability to

5   generate publishable work in a timely fashion?

6            MR. HERNSTADT:  Objection, your Honor.

7            THE COURT:  Yes.  Sustained.

8   BY MR. SANFORD:

9   Q.  Did there come a time when you learned that Professor

10  Ravina was engaged in a research project with Professor Geert

11  Bekaert?

12  A.  Yes.  That was -- I learned it first from Professor Bekaert

13  at one of our faculty meetings.

14  Q.  Based on your understanding as the past president of the

15  American Finance Association and your 30 years of scholarship,

16  publishing, collaborating and teaching, what was the

17  significance of this research project with Professor Bekaert

18  for Professor Ravina's career.

19            MR. HURD:  Objection.

20            THE COURT:  Sustained.

21  BY MR. SANFORD:

22  Q.  Professor Bolton, how common is it for academic economist

23  to do research with coauthors?

24  A.  It's very common.

25  Q.  Have you collaborated with junior faculty members on

I7jnrav2                        Bolton - Direct

1    research?

2    A.  Yes.

3    Q.  How have you assisted junior faculty members in the process

4    of collaboration?

5            MR. HERNSTADT:  Objection, your Honor.

6            Relevance.

7            THE COURT:  Just give me a second.

8            I will allow it.  You can answer that.

9    A.  Can you say the question again?

10   Q.  Yes.  How have you assisted junior faculty members in the

11   process of collaboration?

12   A.  It's a complete collaboration of equals in my case.  And,

13   you know, I mean, assisted is not really the right word.  We

14   really jointly work together on the project.

15   Q.  Did there come a time when you became aware of Professor

16   Ravina's concerns regarding her working relationship with

17   Professor Bekaert?

18   A.  Yes.

19   Q.  When did you become aware?

20   A.  In May 2014.

21   Q.  And did you ever speak with Professor Ravina about her

22   concerns with Professor Bekaert?

23   A.  Yes.  I spoke to --

24           MR. HURD:  Objection.

25           THE COURT:  Sustained.

I7jnrav2                          Bolton - Direct

 1  BY MR. SANFORD:

 2  Q.  When was your first conversation with Professor Ravina

 3  regarding her concerns about Professor Bekaert?

 4  A.  In May --

 5          MR. HERNSTADT:  Objection, your Honor.

 6          THE COURT:  I will allow that.

 7          MR. HERNSTADT:  The reference -- withdrawn.

 8          THE COURT:  All right.  You know what, let's have one

 9  more sidebar.

10          Thanks.

11      (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7jnrav2                      Bolton - Direct

1          (At sidebar)

2          MR. HERNSTADT:  Sorry, your Honor.

3          THE COURT:  So, just as I understand it, it is going

4    to be clear from his testimony that he got information from

5    her, right?

6          MR. SANFORD:  Yes.

7          THE COURT:  As I understand it, defendants want to

8    argue that anyway, that all the information he had and why he

9    went and you know pushed the faculty petitions and the like is

10   because of the information he obtained from her, is that right?

11         I am asking from defendants' perspective.

12         MR. HURD:  Yes.  That is correct.

13         THE COURT:  What is the problem with him saying that

14   he spoke to her and got information from her?

15         MR. HURD:  There is nothing wrong with that.  What he

16   can't say is what information he got.  We don't want him to be

17   testifying about everything she told him.

18         MR. SANFORD:  I don't have any intention of getting

19   into those details, but we have to lay some foundation for the

20   fact that he knows there is a conflict.  I am just asking --

21         MR. HURD:  I don't have an objection to that.

22         THE COURT:  What was the last objection to the timing?

23         MR. HERNSTADT:  The expression of his concerns.

24         I withdrew it.

25         THE COURT:  OK.  You withdrew it.

I7jnrav2                    Bolton - Direct

1                Let's move on.

2                MR. HERNSTADT:  Yes.

3                I may be reading it a little too carefully.

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (In open court)

 2     BY MR. SANFORD:

 3     Q.  Did you ever speak with Professor Ravina about her concerns

 4     with Professor Bekaert?

 5     A.  Yes.

 6     Q.  And when was the first conversation with Professor Ravina

 7     regarding her concerns about Professor Bekaert?

 8     A.  In May 2014.

 9     Q.  After hearing Professor Ravina's concerns about Professor

10     Bekaert, what did you do?

11     A.  I brought the information to the dean, to the attention of

12     the dean's office together with my colleague Professor Santos.

13     Q.  When you say to the dean's attention, what are you

14     referring to?

15     A.  We asked for a meeting with the vice, senior vice dean of

16     the business school to basically convey that information to the

17     vice dean.

18     Q.  Who was the senior vice dean of the business school at that

19     time?

20     A.  Professor Gita Johar.

21     Q.  And did you actually have that meeting?

22     A.  We did.

23     Q.  And who exactly attended the meeting?

24     A.  The meeting was with her, Professor Santos, Professor

25     Ravina, and myself.

1   Q.  To the best of your recollection, when did that meeting

2   occur?

3   A.  Mid-May 2014.

4   Q.  At that meeting what did you tell Vice Dean Johar?

5   A.  We told her of Professor Ravina's -- well, revelation that

6   she had been sexually harassed by Professor Bekaert.

7   Q.  Did you make any suggestions to Dean Johar as to how to

8   respond to the information presented by Professor Ravina?

9   A.  No specific recommendation.  We shared with her our concern

10  about the -- this is a very serious matter.

11  Q.  And what did Dean Johar say?

12  A.  She said she was going to speak with Dean Hubbard about

13  this.

14  Q.  Did you hear anything further from Vice Dean Johar about

15  Professor Ravina?

16  A.  No.

17  Q.  Did Dean Hubbard's office follow up with you about

18  Professor Ravina after your meeting with Vice Dean Johar?

19  A.  No.

20  Q.  Professor Bolton, do you know whether Columbia ever

21  conducted a Title IX investigation into any of Professor

22  Ravina's complaints about Professor Bekaert?

23  A.  Yes.  Yes, I do.

24  Q.  Did anyone ask to interview you as part of Columbia's Title

25  IX investigation?

I7jnrav2                    Bolton - Direct

```
 1    A.  No.

 2              THE COURT:  Do you have any personal knowledge of what

 3    happened between them?

 4              THE WITNESS:  No personal knowledge.

 5              THE COURT:  OK.

 6    BY MR. SANFORD:

 7    Q.  Did you read the Title IX outcome letter that Columbia

 8    issued at the end of its investigation?

 9    A.  I did.

10    Q.  I would like to show you what's marked as Plaintiff's

11    Exhibit 90 in evidence?

12              MR. SANFORD:  And publish to the jury.

13    Q.  Is this a copy of the outcome letter as you understand it?

14    A.  Yes.

15    Q.  What is the date of that outcome letter?

16    A.  It's November 17, 2014.

17    Q.  Did you talk to any Columbia administrator about the

18    outcome of Columbia's investigation?

19    A.  Yes, I did.  I had a meeting with -- again, with Professor

20    Santos.  The two of us had a meeting with the head of our

21    division, Professor Zeldes, and the head of our subdivision,

22    Professor Charles Jones, and --

23    Q.  When you say the head, you are talking about the chairman,

24    Steve Zeldes?

25    A.  Yeah, the chairman, yeah.
```

I7jnrav2                        Bolton - Direct

1  Q.  What did you say to Division Chair Zeldes about the outcome

2  of the investigation as far as you understood it?

3  A.  We --

4           MR. HURD:  Objection.

5           THE COURT:  I will allow that.

6           You can answer.

7  A.  So we conveyed to them that we thought that this letter

8  didn't resolve anything and that something needed to be done to

9  try and address the case.  And, you know, we -- that this was

10 not at all something that was satisfactory.

11 Q.  And did you talk to Professor Ravina about the Title IX

12 investigation outcome?

13 A.  I did.

14 Q.  How did Professor Ravina appear to you when you spoke with

15 her about the Title IX investigation outcome?

16          MR. HURD:  Objection.

17          THE COURT:  Sustained.

18 Q.  After Columbia's investigation concluded, did you ever

19 escalate your concerns beyond the Columbia Business School?

20 A.  I did.  I should mention that Professor Ravina appealed the

21 letter that is on display and that the appeal was rejected.

22          At that point the procedures are that the only -- the

23 last step that's possible is to bring the case to the attention

24 of the president of the university, Lee Bollinger, and that's

25 what I did.

I7jnrav2                     Bolton - Direct

1   Q.  And I would like to show you and only you what's marked as

2   Plaintiff's Exhibit 237.

3           Do you see that, sir?

4   A.  Yes.

5   Q.  Do you recognize this as an e-mail to President Bollinger?

6   A.  Yes, I do.

7   Q.  What is the date?

8   A.  It's January 13, 2015.

9           MR. SANFORD:  Move to admit, your Honor.

10          MR. HURD:  Objection.

11          THE COURT:  All right.  Let's see each other at the

12  sidebar one more time.

13          Can you bring up a copy of this, please.

14      (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I7jnrav2                      Bolton - Direct

1          (At sidebar)

2          THE COURT:  OK.  So what is the objection?

3          MR. HURD:  Hearsay.

4          THE COURT:  This is.

5          MR. HURD:  What he's reciting to the president of

6   Columbia university is all information, not all, but most of it

7   is information --

8          THE COURT:  Let's see how we should redact it in a

9   manner consistent with how I redacted the petitions, allowing

10  the notice to Columbia about the complaint and specifically

11  Bollinger, but redacting any hearsay that may be unduly

12  prejudicial.

13         MR. HURD:  The first paragraph "a disturbing case of

14  sexual harassment involving a male senior colleague and a

15  female junior colleague of mine of the business school."

16         MR. SANFORD:  Putting the president of the university

17  on notice of what he understands to be the case goes to notice.

18         MR. HURD:  What he understands to be the case because

19  of what Professor Ravina told him.

20         MR. SANFORD:  It goes to notice.

21         MR. HERNSTADT:  If you take that out, it will read, I

22  am writing to you concerning a case that was brought to the

23  attention of the Dean of the business school last year and the

24  Title IX officer.  It is clear exactly what we are talking

25  about.

1           MR. SANFORD:  The jury should be able to see exactly

2     what we are talking about, which is notice about a sexual

3     harassment matter if there is an issue in this case, your

4     Honor, as to whether or not they were put on notice about

5     sexual harassment and when they were and that they did about

6     it.

7           MR. HERNSTADT:  That is the subject line, "sexual

8     harassment case at the business school."  The entire second

9     paragraph should come out.

10          MR. HURD:  Yes.

11          MR. SANFORD:  Again, the entire two paragraphs puts

12    them on notice of the severity of the issue, the concerns

13    expressed.  And the question again is what did Columbia do.

14          MR. HURD:  But you don't need all those paragraphs in

15    order to show that they were put on notice in the sense that

16    they contacted Lee Bollinger.  Everything he recites is what he

17    believes or what Ms. Ravina told him and is hearsay.  It is not

18    necessary for what he is saying he wants to get it in for,

19    which is the notice.

20          THE COURT:  Do you have a problem with him testifying

21    that he told the Bollinger that there was a grave injustice?

22          MR. HURD:  His opinion as to whether or not it was

23    grave injustice is based on what Ms. Ravina was telling him.

24    He just testified he had no firsthand language.

25          MR. SANFORD:  With a limiting instruction, that is

1    perfectly clear.  The question, again, is what is the severity

2    and how are the words being used to impress upon the president

3    of the university that there is a serious issue that goes to

4    notice.  This isn't just a casual e-mail.

5          MR. HERNSTADT:  There is no --

6          MR. SANFORD:  Columbia's hair should have been on fire

7    as a result of this.  The question is what happened.

8          MR. HERNSTADT:  There is no basis to permit him to

9    share his hearsay opinions, if --

10          MR. SANFORD:  With a limiting instruction, it is

11   perfectly appropriate.

12          MR. HERNSTADT:  The e-mail subject line is "sexual

13   harassment case at the business school."  That's notice to the

14   president of the university.

15          All of the rest of this is Professor Bolton's opinion

16   based on what Ms. Ravina told him.  The fact that it is

17   something Mr. Sanford said should be setting their hair on fire

18   is irrelevant.  His opinion is not admissible, and all of the

19   language even in the first paragraph is very loaded language.

20          MR. SANFORD:  This is an e-mail that occurs

21   approximately one year before the tenure vote, your Honor.

22   These are issues that are relevant to our case in order to show

23   what happened in the process leading up to the tenure vote and

24   what Columbia knew when it knew it and what it did about it.

25   It is the same issues that you had.

 1             MR. HURD:  You can get this in --

 2             THE COURT:  This is what I think you should do.  I

 3     think you should take out the word "disturbing" up here.  And

 4     then in the second paragraph take out the line about Suzanne

 5     Goldberg.  I don't know how that is relevant.

 6             Then leave in the line, leave in, the second paragraph

 7     should be the following two lines:  I have followed the case

 8     from the beginning, as my junior colleague first approached me

 9     with the revelation, and I immediately joined her in bringing

10     the case to the dean's office.  In my judgment the case has

11     been poorly handled by the school and the Title IX office."

12             Then, "If your time allows, I would like to make an

13     appointment to be able to give you further information."

14             I think his recitation of what allegedly happened,

15     about which he has no personal knowledge, is for the jury to

16     decide whether there was harassment or bullying.  But that is

17     clear that he's putting them on notice that he thinks that this

18     has been badly handled.

19             OK?

20             MR. SANFORD:  OK.

21             THE COURT:  All right.  Thanks.

22             MR. SANFORD:  Your Honor, just to make sure we are

23     going to do this, I would like to publish it to you to make

24     sure you're comfortable with it.  I don't want to make any

25     mistake here.

I7jnrav2                         Bolton - Direct

1           THE COURT:  Sure.

2           MR. HERNSTADT:  Your Honor, in the first paragraph

3      there is a reference in the third line, "Glenn Hubbard later

4      this fall brought the case in the university's Title IX office

5      to dismiss the charge."  It is hearsay.  It is actually

6      inaccurate, as you know.

7           There is no reason to put it in there either.  This

8      case was brought to the attention of the dean of the business

9      school last May.  You can't say the Title IX office dismissed

10     the charges.  What he says about Glenn Hubbard is based on

11     hearsay and we know it to be inaccurate.

12          THE COURT:  If you are saying that she appealed and

13     her appeal has been rejected, you have to say that the charges

14     were dismissed.

15          MR. HERNSTADT:  You can say the university's Title IX

16     officer dismissed the charges and take out the beginning of the

17     sentence.

18          THE COURT:  OK.

19          MR. HERNSTADT:  And that's not accurate either.  But I

20     guess that's --

21          THE COURT:  That is his understanding.  I can also

22     make clear if you want me to just to say to him, look, did you

23     articulate in your own words your assessment of this situation

24     in this letter and then leave it at that.  And so it's clear he

25     will --

I7jnrav2                     Bolton - Direct

1              MR. SANFORD:  We will make those redactions, your

2   Honor.

3           (Continued on next page)

```
 1                (In open court)

 2                MR. SANFORD:  We are waiting for a moment for

 3   redactions.

 4                THE COURT:  Just tell us when you're ready.

 5                (Pause)

 6                MR. SANFORD:  Before we publish it to the jury, if we

 7   could just publish it to the Court.

 8                THE COURT:  Yes.

 9                Do you want to bring it up, and I will just make one

10   other change.

11                MR. SANFORD:  Yes, your Honor.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2017

I7jnrav2                         Bolton – Direct

1              (At sidebar)

2              THE COURT:  Take out "to" and take out the comma, so

3    it reads, "The university's Title IX officer dismissed the

4    charges."

5              MR. SANFORD:  Thank you.

6              THE COURT:  Thanks.

7         (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7jnrav2                          Bolton - Direct

1              (In open court)

2              (Pause)

3              THE COURT:  All right.

4              Go ahead.

5              What is this marked?

6              MR. SANFORD:  This is marked as Plaintiff's Exhibit

7       237.

8              Move to admit, your Honor.

9              THE COURT:  Yes.  It will be admitted.

10             MR. SANFORD:  And publish it to the jury.

11             (Plaintiff's Exhibit 237 received in evidence)

12      BY MR. SANFORD:

13      Q.  Professor Bolton, is this a redacted version of the e-mail

14      that you sent to the president of Columbia University,

15      President Bollinger?

16      A.  Yes.

17      Q.  What is the date?

18      A.  It is January 13, 2015.

19      Q.  All right.  If I could ask you to read the unredacted first

20      paragraph.

21      A.  "Dear Lee, it is as a last resort and with full awareness

22      of all the demands on your time" --

23             MR. HURD:  Objection, your Honor.  I believe what he

24      asked him to do is read the unredacted version.  I think he

25      meant redacted version.

1                MR. SANFORD:  The redacted version.

2                THE COURT:  He means the unredacted portions that are

3       on the screen.

4                MR. SANFORD:  That's right.

5                MR. HURD:  I see. OK.

6       BY MR. SANFORD:

7       Q.  If you could start over, Professor Bolton, please.

8       A.  Let me start over.

9                "Dear Lee,

10               "It is as a last resort and with full awareness of all

11      the demands on your time that I am writing to you concerning a

12      case of sexual harassment involving a male senior colleague and

13      a female junior colleague of mine in the business school.  The

14      case was brought to the attention of the dean of the business

15      school last May.  The university's Title IX officer dismissed

16      the charges.  My junior colleague subsequently appealed, and

17      the appeal has now been rejected.

18               "I have followed the case from the beginning, as my

19      junior colleague first approached me with the revelation and I

20      immediately joined her in bringing the case to the dean's

21      office.  In my judgment, the case has been poorly handled by

22      the school and the Title IX office.

23               "If your time allows, I would like to make an

24      appointment to be able to give you further information on this

25      important case."

1          THE COURT:  Just to be clear, we redacted a portion of

2     this letter.  In the redacted portion, you just described your

3     opinion of the situation based on what Professor Ravina had

4     told you, is that fair to say?

5          THE WITNESS:  OK.

6          THE COURT:  Is that right?

7          THE WITNESS:  I -- in the redacted part.

8          THE COURT:  Yes.  Without using the words, you just

9     characterized --

10          THE WITNESS:  I characterized.

11          THE COURT:  -- the situation based on what Ms. Ravina

12     told you.

13          Is that a fair statement?

14          THE WITNESS:  So the redacted part --

15          THE COURT:  Without saying --

16          THE WITNESS:  It's sort of like a two-line assessment

17     of how I feel about this based on what I have learned from

18     Professor Ravina and based on all the other information that I

19     had.

20          THE COURT:  All right.

21          Go ahead.

22          THE WITNESS:  About how the school handled the case.

23          THE COURT:  How the school handled it?

24          THE WITNESS:  Yes.

25          THE COURT:  What's what you're referring to as other

1   information.  OK.  Thank you.

2           MR. SANFORD:  Thank you, your Honor.

3   BY MR. SANFORD:

4   Q.  Did you receive, Professor Bolton, a response from

5   President Bollinger?

6   A.  He replied with a short e-mail.

7           MR. SANFORD:  We go up on that e-mail chain.

8   Q.  Is this President Bollinger's response?

9   A.  Yes.

10  Q.  And this was dated January 15?

11  A.  January 15, 2015, yes.

12  Q.  And the subject line is what?

13  A.  "Sexual harassment case at the business school."

14  Q.  And can you read President Bollinger's response to you?

15  A.  "Patrick, thank you for writing me.  I've talked to Jane

16  Booth, and it seems best for me not to get involved in the

17  specific case at the moment.  On the broader issue or issues, I

18  will need time to think more about this.  I hope you're well.

19  Best, Lee."

20  Q.  What was your reaction to President Bollinger's response?

21          MR. HURD:  Objection.

22          THE COURT:  What did you do when you got this?

23  Instead of just your opinion, is there anything else that you

24  did?

25          THE WITNESS:  Yes.

1              I forwarded his response to Professor Ravina informing

2       her of the response.

3       BY MR. SANFORD:

4       Q.   Did you have other meetings with Columbia faculty and

5       administrators about Professor Ravina's conflict with Professor

6       Bekaert?

7       A.   I did.  I had two meetings that followed this e-mail

8       exchange.

9       Q.   Let's take them in turn.  If you could describe the next

10      meeting that you had.

11      A.   The next meeting I had with Dean Hubbard together with

12      Professor Santos.

13      Q.   When did that meeting occur?

14      A.   That was shortly after this e-mail exchange, in January.

15      Q.   What was the purpose of that meeting?

16      A.   The original purpose of that meeting was to discuss

17      strategizing, how to attract a very prominent senior faculty

18      away from the University of Chicago.  But we then during that

19      meeting broached the subject of Professor Ravina and Professor

20      Bekaert.

21      Q.   And what do you recall being said?

22      A.   Both Professor Santos and I expressed our concern --

23              MR. HURD:  Objection.

24              MR. SANFORD:  This is a meeting with Dean Hubbard,

25      your Honor.

1              THE COURT:  I will allow that.

2              MR. SANFORD:  You may answer.

3   A.  I expressed our concern that nothing had been resolved in

4   the case, and we wanted to convey to the dean that something

5   needed to be done to address the issue.

6   Q.  Did Dean Hubbard follow up with you after that meeting?

7   A.  So, during the meeting, Dean Hubbard said that there's not

8   much he could do, and that was basically the end of the

9   conversation.

10  Q.  Was there a subsequent meeting you had with anyone at

11  Columbia regarding Professor Ravina's conflict with Professor

12  Bekaert?

13  A.  Following that meeting I had another meeting with Dean

14  Hubbard together with Professor Calomiris, and this was

15  specifically to discuss the issue.  We asked for an appointment

16  with the dean to discuss this issue.

17  Q.  And when did that meeting take place?

18  A.  Again, in, you know, shortly after, maybe a few days after

19  the meeting with Professor Santos.

20  Q.  Shortly after the February 9, 2015 meeting?

21  A.  I don't recall the exact date.

22  Q.  OK.  What did Dean Hubbard say at that meeting?

23              MR. HURD:  Objection.

24              THE COURT:  I will allow that.

25  A.  Dean Hubbard told us about his frustration that he would --

1    he would have liked to get this issue resolved, but he said

2    that there was little he could do and that without voluntary

3    cooperation by Professor Bekaert basically that, you know, he

4    was sort of stuck.  And so that's one thing he said.  And then

5    the other thing he said was that it would help if the senior

6    faculty got involved and tried to address this issue.

7    Q.  What, if anything, did you do after that second meeting

8    with Dean Hubbard?

9    A.  We decided to sort of take the issue in our hands and to

10    write a short memo describing what we felt was an adequate

11    policy in situations like this, and the memo that we would then

12    put on the agenda of the executive committee.

13    Q.  All right.  I would like to show you, and only you, not the

14    jury, Plaintiff's Exhibit 214.

15         Do you see this document, sir?

16    A.  Yes.

17    Q.  And drawing your attention to the from and to lines, who is

18    this from?

19    A.  This is an e-mail from Professor Calomiris.

20    Q.  And who is it to?

21    A.  It is to the Senior Vice Dean Katherine Phillips at the

22    time and the head of the executive committee, Garrett van

23    Ryzin.

24    Q.  Going up on the chain, the next e-mail up.  This is another

25    e-mail.  Who is this from?

I7jnrav2                    Bolton - Direct

1    A.   This is an e-mail from the Senior Vice Dean Katherine

2    Phillips, Charlie Calomiris, Garrett van Ryzin, and I'm CC'd in

3    this e-mail together with the chair of the finance and

4    economics division, Professor Zeldes.

5    Q.   If we could take a look at the next e-mail up.  This is

6    also an e-mail from whom?

7    A.   This is an e-mail from Professor Calomiris, Charles

8    Calomiris to the chair of the division, Steve Zeldes.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7j1rav3

1    BY MR. SANFORD:

2    Q.  All right.  And you're copied on that.

3    A.  Yes.

4            MR. SANFORD:  Move to admit, your Honor.

5            THE COURT:  Any objection?

6            MR. HURD:  Yes, your Honor.

7            THE COURT:  Okay.  Why don't we take our morning break

8    now.

9            Please remember, don't discuss the case, and keep an

10   open mind.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7j1rav3

1           (Jury not present)

2           THE COURT:  -- all right.  So let's talk about this

3    and any other exhibits you think are going to elicit

4    objections.

5           Are there any particular aspects of this, Mr. Hurd,

6    you think are especially objectionable to you?  Look, I do

7    think this is part of the notice to Columbia, and they're also

8    statements of a party opponent or admissions from the folks at

9    Columbia.  So then the question is, are there particular

10   aspects of what was said and by whom that need to come out and

11   why?

12          MR. HURD:  Well, I think the emails from

13   Mr. Calomiris -- there are two of them, one at 5:42 and another

14   one at 1:21 on February 17th -- that are all hearsay, and those

15   would not be admissions by a party opponent, and characterize

16   his reaction to Ms. Phillips' response to them and

17   characterizes what he thinks has happened up to date that I

18   think would be hearsay.  Mr. Calomiris is obviously not here.

19   Mr. Bolton is not the speaker in either of those.

20          THE COURT:  Mr. Bolton, Professor Bolton, you can step

21   down, by the way, and just come back maybe in 15 minutes.

22          THE WITNESS:  Okay.

23          THE COURT:  Thank you so much.

24          He's not on any of these emails.

25          MR. SANFORD:  Professor Bolton is, yes, your Honor.

I7j1rav3

1          THE COURT:  Oh, he is?  Where?  I'm sorry.

2          MR. SANFORD:  He's PB, PB2208 at --

3          THE COURT:  Oh, I see.

4          MR. SANFORD:  So if you start with the first page of

5     the exhibit, your Honor, he's copied on the top email, he's

6     copied on the bottom email, he is copied on the third email; he

7     is not on the fourth email from Dean Phillips to Charlie

8     Calomiris.

9          THE COURT:  If Professor Bolton was part of this

10    effort to challenge Columbia's handling of this case, why

11    shouldn't these emails come in not for the truth of what's

12    stated but just for the notice to Columbia?

13         MR. HURD:  Well, if you look at the February 16 email

14    from Mr. Calomiris, he mentions, he says, "We expect that other

15    finance and economics faculty will also want to sign the

16    attached suggestion."

17         THE COURT:  All right.  Well, that we should take out.

18         MR. HURD:  Okay.

19         THE COURT:  Let's look at it again with an eye towards

20    taking the same approach we've taken previously, which is

21    trying to redact but still allow the notice to Columbia to --

22         MR. HURD:  Understood.

23         THE COURT:  -- be admitted before the jury.

24         MR. HURD:  That first email I was just referring to

25    from Mr. Calomiris, I think other than the first sentence,

I7j1rav3

1    everything else should be redacted.

2              THE COURT:  Yes, I agree with that.  So that's the

3    February 16th email.  So that line will come out.

4              MR. HURD:  And then on the February 17 email from

5    Mr. Calomiris, at the top of the first page, I think all of

6    that should come out.  This is just him expressing his

7    frustration and his opinion as to what has been happening.

8              MR. SANFORD:  It's not just his frustration, your

9    Honor, if we look at it.  The idea here is that there was an

10   understanding that Professor Calomiris thought had been reached

11   with the dean, and he's talking about that, and so this is

12   really necessary for context of what this is about.  He says,

13   "We had a specific sequence of strategy in mind," to which he

14   had assumed had been worked out among the three with the dean's

15   office's approval.  And now they're getting, as he says,

16   brushed off.  That's relevant, again, to notice, and relevant

17   to what Columbia did in light of its knowledge.

18             MR. HURD:  But that's his opinion that they were

19   brushed off, and he recites all kinds of facts in here that we

20   don't know if they're accurate or not.

21             MR. SANFORD:  Well, Professor Bolton can be

22   cross-examined on these issues.

23             THE COURT:  But Professor Bolton didn't write this.

24             MR. HURD:  In the second paragraph, your Honor, he

25   uses the word "I" multiple times about what he was willing to

I7j1rav3

1    do and how he feels now.  I don't think Professor Bolton can

2    testify to that.

3              MR. SANFORD:  Professor Bolton can certainly attest to

4    whether or not the facts as alleged in here are accurate.  He

5    can be cross-examined on this document.

6              THE COURT:  Yes, I think this really is hearsay.  And

7    he didn't write it.  So I think the February 17th 1:21 email

8    should come out, but Professor Bolton can say an email was sent

9    expressing frustration and just not get into the particular

10   hearsay that's in here and the, you know, thoughts specific to

11   Professor Calomiris.

12             All right.  Are there any other exhibits we should

13   talk about?

14             MR. SANFORD:  No, your Honor.  I believe everything

15   else I will be referring to by way of exhibits has been

16   admitted.

17             THE COURT:  Okay.  All right.  Thank you.

18             So I'll see you in ten minutes.  Thank you.

19             (Recess)

20             (In open court; jury not present)

21             MR. SANFORD:  Your Honor, if I may, there was one more

22   exhibit we may have an issue with.

23             THE COURT:  Okay.

24             MR. SANFORD:  If we could discuss that, please.

25             THE COURT:  Sure.

I7j1rav3

1          MR. SANFORD:  It's Plaintiff's Exhibit 124.  I don't

2     know if there's going to be an objection to this, but just out

3     of an abundance of caution, I thought we could start --

4          MR. HURD:  There is, your Honor.  Just the one

5     sentence beginning with "Why."

6          THE COURT:  I don't have it before me so --

7          MR. HURD:  I'm sorry.

8          THE COURT:  That's okay.  If you can put it on the

9     screen or just give me a copy, please.

10         MR. SANFORD:  Your Honor, could we approach with a

11    copy?

12         THE COURT:  Yes, of course, thanks.

13         Thanks.  The objection is to which line?

14         MR. HURD:  It's on the top of the first page, your

15    Honor, the first email, the, I guess second sentence, "Why

16    suddenly put Enrichetta up for tenure when we have not even

17    resolved her complaints and we know that she has not been able

18    to pursue her research for the past two years?"

19         THE COURT:  All right.  Let's take out "and when we

20    know that she has not been able to pursue her research for the

21    last two years" because we don't really know that.  But say,

22    "Why suddenly put Enrichetta up for tenure when we have not

23    even resolved her complaints," and then leave the question mark

24    in at the end, okay?

25         MR. SANFORD:  Thank you, your Honor.

I7j1rav3                          Bolton - Direct

1          THE COURT:  All right.  Can we bring the jury in?

2          (Jury present)

3          THE COURT:  Everyone can be seated.  Thanks.

4          You may proceed.

5          MR. SANFORD:  Thank you, your Honor.

6    BY MR. SANFORD:

7    Q.  Professor Bolton, I'd like to --

8          MR. SANFORD:  I don't know if it's been formally

9    admitted, your Honor, 214.  We move to admit.

10          THE COURT:  All right.  It will be admitted.

11          MR. SANFORD:  Thank you.

12          (Plaintiff's Exhibit 214 received in evidence)

13   BY MR. SANFORD:

14   Q.  Professor Bolton, I'd like to show you what is marked as

15   Plaintiff's Exhibit 214 in evidence.  And this is a redacted

16   version of emails.

17          I'd like to start with the first email in the chain on

18   the bottom of 53398.  Do you recognize this email, sir?

19   A.  Yes.

20   Q.  And what is it?

21   A.  So this is an email from the Senior Vice Dean Katherine

22   Phillips to Professor Calomiris.

23   Q.  And it reads, "Dear Faculty Colleagues"?

24   A.  Yes.

25   Q.  And why would it read, "Dear Faculty Colleagues"?

I7j1rav3                          Bolton - Direct

1    A.  Because it would -- it's addressed to -- to all the

2    colleagues.

3    Q.  Okay.  And all the colleagues being whom?

4    A.  In this instance, it would be -- I can't be sure whether

5    it's all faculty or whether it's senior faculty --

6                MR. HURD:  Objection.

7    A.  -- and junior faculty.  I can't tell from this.

8                THE COURT:  We don't need to get into exactly who did

9    what.  You should just testify about what you did.

10                THE WITNESS:  Right.

11                THE COURT:  Thank you.

12                MR. SANFORD:  Thank you, your Honor.

13    Q.  So what's the context of this email, do you know?

14    A.  It's a request to put items on the agenda for the executive

15    committee.

16                MR. SANFORD:  All right.  And if we can go to the next

17    email in that chain.

18    Q.  All right.  And this is an email from Charlie Calomiris,

19    yes?

20    A.  Yes.

21    Q.  To whom?

22    A.  To Kathy Phillips and Garrett van Ryzin.

23    Q.  And just to remind the ladies and gentlemen of the jury,

24    Kathy Phillips is who?

25    A.  Senior vice dean at the time, and Garrett van Ryzin is the

I7j1rav3                    Bolton - Direct

1  chair of the executive committee.

2  Q.  All right.  And there are two people copied.  Who are the

3  two people copied?

4  A.  I'm -- I'm copied, and the chair of the finance and

5  economics division, Steve Zeldes, is copied.

6  Q.  Okay.  Could you read that email that obviously is not

7  redacted.

8  A.  The -- the subject is "Request for Agenda Items for the

9  Executive Committee of the Faculty."

10         "Dear Kathy and Garrett, Patrick Bolton and I would

11  like the executive committee to consider an issue related to

12  appropriate protocols for behavior in collaborations between

13  junior and senior faculty members."

14  Q.  All right.  Thank you.

15         MR. SANFORD:  Can you go to the next email in the

16  chain.

17  Q.  And this is Dean Phillips' response?

18  A.  Response from Dean Phillips, yes, to Charlie Calomiris and

19  to Garrett van Ryzin, and I'm copied on this email and so is

20  the chair of the finance and economic division, Steve Zeldes.

21  Q.  And is what the date of the email?

22  A.  The date of the email is February 17, 2015.

23  Q.  Thank you.  And can you please read that email.

24  A.  "Dear Charles and Patrick, thank you for sending this

25  along.  We will consider this but may have to hold it for the

I7j1rav3                    Bolton - Direct

1   March agenda.  We are also in discussion about junior faculty

2   mentoring, and this discussion dovetails with that one.  We

3   appreciate your engagement, and we'll let you know when this

4   particular document will be best considered and under what

5   auspices.  Talk soon."

6   Q.  Thank you.

7        To your knowledge did the executive committee put this

8   on the agenda for March?

9   A.  Not to my knowledge.

10  Q.  And what was being requested that the executive committee

11  put on the agenda?

12  A.  What was requested is a petition that we wrote.

13  Q.  All right.  I'm going to show you what's been marked as

14  Plaintiff's Exhibit 100.  And this is in evidence.

15        Is this a copy of the petition you were trying to get

16  the executive committee's attention?

17  A.  That's right.

18  Q.  All right.  Let's go through it, please.

19        First of all, who drafted this petition?

20  A.  The petition was drafted by Professor Calomiris, myself,

21  and all our colleagues who were approached and who --

22        MR. HURD:  Objection.

23  A.  -- contributed edits.

24        THE COURT:  Yes, let's not get into what other people

25  did, okay?  All right.

I7j1rav3                          Bolton - Direct

1    Q.  All right.  Can you read that first paragraph.

2    A.  "The opportunity for faculty members to work together on

3    research is of course one of the main benefits of participating

4    in a community of scholars such as we enjoy at Columbia

5    Business School.  In particular, there are many advantages from

6    collaborations between junior and senior faculty."

7    Q.  All right.  Let's go to the next paragraph, please.

8           If you could read the first sentence.

9    A.  "It is possible, however, that as a consequence of the

10   asymmetric power in the relationships between junior and senior

11   research collaborators, owing to the fact that one of them has

12   tenure and the other one does not, senior faculty members may

13   behave inappropriately or not fulfill their duties as senior

14   colleagues when entering into such a collaboration."

15   Q.  Why was this sentence written?

16   A.  It was --

17          MR. HURD:  Objection.

18          THE COURT:  Well, explain your understanding of this

19   sentence.

20   A.  It's -- it's -- this sentence was written to basically put

21   on paper what we thought was a perfectly reasonable principle

22   of behavior in research relations between senior faculty and

23   junior faculty.

24   Q.  Would you read the next sentence, please.

25   A.  "Those duties have never been spelled out, to our

I7j1rav3                    Bolton - Direct

knowledge, nor have school policies for dealing with situations

where there have been a fallout between a senior and junior

faculty member.  We think it would be useful for the executive

committee to do so."

          MR. SANFORD:  Okay.  If we can go to the next

paragraph, please.

          MR. HERNSTADT:  Your Honor, could we just make clear

that this is being introduced for purposes of showing that this

was created and shared but not for the truth of anything that's

in it.

          THE COURT:  Yes.  So again, this isn't being admitted

for the truth of anything that's stated in there.  It's just

for the fact that Professor Bolton, in addition to a few

others, made these statements and to whom they were

communicated.

BY MR. SANFORD:

Q.  Professor Bolton, if you could read the next sentence.

A.  Okay.  "In particular, we suggest that the committee make

explicit the responsibilities of senior faculty to behave

fairly and appropriately when working with junior faculty."

Q.  And the next sentence, please.

A.  "Senior faculty should be cognizant of the power relation

that inevitably shades any collaboration between a senior and

junior faculty member, should avoid any excess pressure on

junior colleagues, and endeavor to avoid delays in research

1    progress that place the junior faculty member's career at risk

2    when a problem arises in the collaboration."

3    Q.  Was it your concern that such policies did not exist at the

4    Columbia Business School at the time that you wrote this

5    petition?

6    A.  Very much so, yes.

7    Q.  If we could go to the next paragraph.

8    A.  Okay.

9    Q.  If you could read the next sentence, please.

10   A.  The next sentence, "We also recommend that, if there is a

11   falling out between a junior and senior faculty member with

12   respect to research project, which threatens to significantly

13   delay progress on said project, the senior faculty member

14   should be expected to step aside and relinquish control and

15   intellectual property over the joint research project to the

16   junior faculty member."

17   Q.  Could you read the next sentence, please.

18   A.  "That is to say, unless the senior faculty member has spent

19   considerable time and effort collecting and parsing the novel

20   data set and the junior faculty member is inappropriately using

21   this data, there should be a rebuttable presumption that the

22   senior faculty member would step aside."

23   Q.  Can you explain for the ladies and gentlemen of the jury

24   what it means to have a rebuttable presumption in this context.

25            MR. HURD:  Objection.

I7j1rav3                          Bolton - Direct

1    A.  It means --

2              THE COURT:  What your understanding is.  I'll allow

3    that.  Overruled.

4    A.  My understanding is that the -- it's a default provision,

5    essentially, that this is the -- this should be the normal

6    policy unless there are really exceptional circumstances as

7    they're stated in the sentence that would, you know, change

8    the -- change the policy.

9    Q.  Thank you.

10             Could you read the next sentence, please.

11   A.  "We propose that the executive committee define some such

12   policy to resolve disputes in a speedy manner, in order to

13   avoid any delays in research progress that could harm the

14   junior faculty's research career and chances for tenure.  In

15   our view, it would be helpful for the school to establish this

16   principle, which would encourage collaborations in a manner

17   that would protect junior faculty from inappropriate exercises

18   of power or delays in their collaborations with senior

19   colleagues while also taking into account the rights of senior

20   faculty."

21   Q.  Did you ever send this petition to anyone?

22   A.  I sent this petition to Senior Vice Dean Kathy Phillips --

23   Kathy Phillips, excuse me, and copied all the -- all the

24   members who had signed on to this petition.

25   Q.  And who is on the executive committee of the Columbia

I7j1rav3                         Bolton - Direct

1    Business School?

2    A.  The executive committee has the chairs of the different

3    divisions, the senior vice dean, and the dean of the

4    business -- business school.

5    Q.  And do you know who signed the petition?

6    A.  Do I know who signed the petition?

7    Q.  Yes.

8    A.  Absolutely.

9    Q.  Did you agree with everything written in this first faculty

10   petition at the time you signed it?

11   A.  Yes.

12   Q.  Do you agree with the petition today?

13   A.  Yes.

14   Q.  What action did the executive committee of Columbia

15   Business School take in response to this petition?

16   A.  No action.

17            MR. HERNSTADT:  Objection.

18            THE COURT:  Overruled.

19   Q.  I'm sorry, sir?

20   A.  No action.

21   Q.  What was your reaction to the executive committee's failure

22   to take action?

23            MR. HURD:  Objection.

24            THE COURT:  Sustained.  You can ask what he did in

25   response, but --

1    Q.  Did you come to have another meeting with anyone at the

2    Columbia Business School regarding the concerns of Professor

3    Ravina regarding Professor Bekaert?

4    A.  Yes.  There was a subsequent meeting to when we -- we sent

5    this petition with Professor Bekaert and a few of my -- my

6    colleagues of the finance and economics division and the chair

7    of the -- of the finance and economics division.

8    Q.  When did that meeting take place?

9    A.  End of March 2015.

10   Q.  What do you recall being said at that meeting?

11   A.  Again, the whole purpose here was for faculty to engage, as

12   the dean wanted us to do, and try and get to a resolution, and

13   here, our concern was that no progress was being --

14             MR. HURD:  Objection.

15             THE COURT:  Sustained.  Just focus on how you felt,

16   not on how anyone else felt, okay?  Well, actually, let me

17   revise that.  Let's just go back to what was said at the

18   meeting and not your reaction, your personal reaction, okay?

19             MR. SANFORD:  Thank you, your Honor.

20             THE WITNESS:  Okay.

21   A.  So the meeting was about conveying to Professor Bekaert

22   that there was a matter of urgency to try to come to resolution

23   on the agreement about the research, the joint research he was

24   doing with Professor Ravina, and that too much time had passed

25   and things were becoming very serious.

I7j1rav3                    Bolton - Direct

1   Q.  Have you served in any capacity at the Columbia Business

2   School in evaluating faculty for tenure?

3   A.  Yes.  I serve -- I evaluate faculty for tenure as a senior

4   faculty member and also, I served on two occasions on the

5   promotion and tenure committee of the business school.

6   Q.  What is the promotion and tenure committee?

7   A.  The promotion and tenure committee is a committee that has

8   members of each division together with the senior vice dean,

9   and every case gets put to the promotion and tenure committee,

10  gets reviewed, and then the promotion and tenure committee

11  makes a recommendation to the full faculty on how to proceed.

12  Q.  Can you explain for the ladies and gentlemen of the jury

13  the significance of the tenure vote in an academic's career.

14          MR. HURD:  Objection.

15          THE COURT:  Sustained.

16  Q.  How important is it to publish articles within the

17  seven-year time frame in which people have before they come up

18  for tenure?

19  A.  The tenure decision is based on research merits of a

20  candidate, research accomplishments.  That's the first and most

21  important consideration.  Teaching is also important, but less

22  important.  And research is evaluated on productivity -- number

23  of papers, of books written, and how -- how much the -- how

24  great the impact was, and the impact is typically measured by

25  how well it's published; that is, in -- whether it's published

1   in very good journals, highly reputable journals.

2   Q.  In the field of economics, what are the professional

3   consequences of being denied tenure?

4            MR. HURD:  Objection.

5            THE COURT:  Sustained.

6   Q.  At Columbia, what are the consequences of being denied

7   tenure?

8            MR. HURD:  Objection.

9            MR. SANFORD:  I'm sorry, your Honor?

10            THE COURT:  Sustained.

11   Q.  How many tenure votes have you participated in at the

12   Columbia Business School?

13   A.  More than 30, I would -- I would say.

14   Q.  What are the main considerations for obtaining tenure at

15   Columbia?

16   A.  The -- the -- again, the general considerations are

17   research accomplishments, and then, depending on the field

18   you're in and the division you're in, that gets measured

19   differently.  In finance and economics, a sort of -- like an

20   unwritten norm is that the junior faculty has published between

21   four and six articles in good journals, but there's no

22   hard-and-fast rule.  This is just a -- it's a typical case.

23   Q.  When do tenure candidates publish most of their papers?

24            MR. HURD:  Objection.

25            THE COURT:  Sustained.

I7j1rav3                           Bolton - Direct

1    Q.  If a tenure candidate publishes most of her work towards

2    the end of the tenure clock, does that timing affect the

3    outcome of the tenure vote?

4              MR. HURD:  Objection.

5              THE COURT:  Sustained.

6    Q.  Professor Bolton, did there come a time when you learned

7    that Columbia was planning to move forward with Professor

8    Ravina's tenure vote?

9    A.  Yes.

10   Q.  When was that?

11   A.  That was in January 2016.

12   Q.  And to your knowledge how much time was Professor Ravina

13   given to prepare materials for submission to the faculty?

14             MR. HURD:  Objection.

15             THE COURT:  Sustained.

16   Q.  Based on your experiences as a senior faculty member at the

17   Columbia Business School, how long are candidates typically

18   given to prepare tenure materials for submission to the

19   faculty?

20             MR. HURD:  Objection.

21             THE COURT:  That I'll allow.  You can answer that.

22   A.  So the -- the normal procedure is that the candidate is

23   informed in the year prior to the tenure review that the tenure

24   review is coming, that certain materials are required, like a

25   research statement, a package of the articles, and -- and

 1   everything that needs to be submitted for -- for the case to be

 2   considered, by the senior faculty.

 3           MR. SANFORD:  Your Honor, based on prior discussion

 4   with the Court, I move to admit Plaintiff's Exhibit 124, but

 5   I'd like you to see it, if you would, to make sure that it's

 6   comporting with your order.

 7           THE COURT:  Okay.  All right.

 8           Okay.  You can proceed.  Thank you.  It will be

 9   admitted.

10           MR. SANFORD:  Thank you, your Honor.

11           (Plaintiff's Exhibit 124 received in evidence)

12           MR. SANFORD:  I'd like to publish to the jury and to

13   the witness what's been marked as Plaintiff's Exhibit 124 now

14   in evidence.

15           Okay.  I'd like to see the entire email chain,

16   Mr. McLeod.  Thank you.

17   BY MR. SANFORD:

18   Q.  All right.  Do you recognize this document, sir?

19   A.  Yes, I do.

20   Q.  I'd like to draw your attention to the first email in the

21   chain from Chair Zeldes to a number of people dated January 14.

22   Could you describe what this email is about.

23   A.  This is the -- about the tenure meeting.  That is the

24   meeting for senior faculty to determine the tenure decision

25   regarding Professor Ravina.

I7j1rav3                          Bolton - Direct

 1              MR. SANFORD:  Okay.  And if we can go up to the next

 2       email.

 3       Q.  This is a response from Wei Jiang.  Who is Wei Jiang?

 4       A.  Wei Jiang is a senior colleague of mine in the finance and

 5       economics division.

 6              MR. SANFORD:  All right.  If you can go up to the next

 7       email in that chain.

 8       Q.  And this is a response from Chair Zeldes?

 9       A.  Yes.

10       Q.  And what is the chairman doing here in this email, to your

11       knowledge?

12       A.  He's -- he's polling the faculty to determine who will be

13       able to attend the meeting.

14              MR. SANFORD:  And then if we can go up to the top

15       email.

16       Q.  This is an email from you to Chair Zeldes and other people,

17       including Wei Jiang, and who else is copied here?

18       A.  So Steve Zeldes; Wei Jiang; the administrator of the

19       division, Marina Tourevski; Professor Santos; and the head of

20       the subdivision of finance, Charles Jones.

21       Q.  And what's the date of this email?

22       A.  It's January 15, 2016.

23       Q.  And the subject is still the tenure meeting, and that

24       refers to Professor Ravina's tenure meeting that's now being

25       scheduled.

I7j1rav3                    Bolton - Direct

1   A.   That's correct.

2   Q.   Okay.  Could you read that email that you sent, please.

3   A.   "I will be able to attend this meeting but -- full

4   disclosure -- I'm very uncomfortable about holding such a

5   meeting.  Why suddenly put Enrichetta up for tenure when we

6   have not even resolved her complaints?  Also, before I agree to

7   attend the meeting, I want assurances that Geert has been asked

8   not to attend this meeting.  Finally, if I attend, I will

9   disclose my discomfort to the division."

10  Q.   And Geert here is referring to Professor Bekaert?

11  A.   That's correct.

12  Q.   Okay.  After receiving the email from Division Chair

13  Zeldes, did you take any action concerning Professor Ravina's

14  tenure vote?

15  A.   Yes.

16  Q.   What did you do?

17  A.   I signed a petition to support her request for an extension

18  of her clock as assistant professor.

19  Q.   All right.  I'd like to show you and publish to the jury

20  what's been marked as Plaintiff's Exhibit 130 in evidence.

21          Is this a copy of that second petition you were just

22  referring to?

23  A.   That's correct.

24  Q.   And this is dated January 22, 2016?

25  A.   Yes.

I7j1rav3                      Bolton - Direct

1   Q.   And who is it addressed to?

2   A.   It's addressed to Provost Coatsworth and Dean Hubbard.

3   Q.   All right.  And could you read it for the jury, please.

4   A.   "The undersigned tenure faculty members in the finance and

5   economics division of Columbia Business School wish to express

6   their support for Enrichetta Ravina's request to have her

7   tenure clock extended."

8   Q.   Did you agree with everything written in the second

9   petition at the time you signed it?

10  A.   Yes, I did.

11  Q.   Do you agree with this faculty petition today?

12  A.   Yes, I do.

13  Q.   And why did you submit the second -- why did you sign the

14  second faculty petition?

15  A.   Because I was hoping -- well, we were hoping that this

16  would strengthen her support for an extension of her -- of her

17  tenure clock.

18  Q.   What was the outcome of the second faculty petition?

19  A.   No, no response was given to this petition.

20  Q.   Did you ever come to know whether Columbia Business School

21  granted or denied Professor Ravina's request for an extension

22  of her tenure clock?

23  A.   Yes.

24  Q.   What did you come to know?

25  A.   That --

I7j1rav3                          Bolton - Direct

 1          MR. HURD:  Objection.

 2          THE COURT:  I'll allow it.  Go ahead.

 3   A.  That the extension of her tenure clock was not allowed, was

 4   not granted.

 5   Q.  Did anyone ever provide you with an explanation as to why

 6   Professor Ravina's extension request was denied?

 7   A.  No.

 8          MR. HURD:  Objection.

 9          THE COURT:  Overruled.

10   A.  So no, no, the answer is no.

11   Q.  When you supported the extension request, what impact did

12   you believe that extension would have on her tenure prospects?

13          MR. HURD:  Objection.

14          THE COURT:  Sustained.

15   Q.  After Columbia denied Professor Ravina's extension request,

16   did you take any other action with respect to Professor

17   Ravina's tenure vote?

18   A.  Yes, I -- I signed another petition.

19   Q.  I'd like to show you and the jury what's been marked as

20   Plaintiff's Exhibit 160 in evidence.

21          This is dated March 25, 2016?

22   A.  That's correct.

23   Q.  And whom it is addressed to?

24   A.  It's again addressed to Provost Coatsworth and Dean

25   Hubbard.

1    Q.  And who drafted this faculty petition?

2    A.  Professor Calomiris.

3    Q.  And can you read the unredacted portion.

4    A.  "The undersigned tenured faculty members in the finance and

5    economics division at Columbia Business School are not in a

6    position to provide an evaluation of Enrichetta Ravina's tenure

7    case at this time."

8    Q.  Did you agree with everything written in this third faculty

9    petition when you signed it?

10   A.  Yes.

11   Q.  Do you still agree with it today?

12   A.  Yes.

13   Q.  And you still agree that the faculty members were not in a

14   position to provide an evaluation of Professor Ravina's tenure

15   case when it voted and made its tenure decision.

16             MR. HURD:  Objection.

17             THE COURT:  Speak for yourself.  Did you feel that you

18   were not in a position to provide an evaluation?

19             THE WITNESS:  Absolutely.

20   Q.  Can you explain why you were not in a position.

21   A.  Because she did not have the normal time period --

22             MR. HERNSTADT:  Objection.

23             MR. HURD:  Objection.

24             THE COURT:  Yes.  Sustained.

25   Q.  Professor Bolton, can you please describe the process by

I7j1rav3                    Bolton - Direct

1    which the finance and economics division of Columbia Business

2    School votes on a candidate for tenure.

3    A.   So there are multiple steps.  The first step is that the

4    senior faculty of the division reads the work and makes an

5    evaluation of whether the case merits promotion, and then

6    there's a vote by the senior faculty of the division.  That's

7    the first step.  If the vote is favorable, the case gets put to

8    the promotion and tenure committee.  The promotion and tenure

9    committee then makes a recommendation to the full faculty.

10   That's including all the divisions.  Then the full faculty

11   votes whether to move the case forward or not.  That means if

12   the case moves forward, we ask for outside letters, for

13   reviewers to evaluate the work.  When that takes place, when

14   the letters come back, the division does a second evaluation,

15   reads the letters, in the context of the letters, makes a

16   second vote, and then the whole process repeats.  It gets again

17   put to the promotion and tenure committee, promotion and tenure

18   committee makes another recommendation to the full faculty, and

19   the full faculty meets again and makes another vote.  And after

20   that, it's up to the dean to decide whether to move the case

21   forward or not.  If the dean decides to move the case forward,

22   it gets moved to the provost of the university, and there,

23   there's a final decision by the university, at the university

24   level, whether to promote someone for tenure.

25   Q.   Thank you.

1            Was there in fact a division meeting vote held

2     regarding Professor Ravina's tenure?

3     A.   There was.

4     Q.   When did that occur?

5     A.   That was in mid April of 2016.

6     Q.   And do you know the result of that vote?

7     A.   I -- I -- I did not want to know.

8     Q.   Did you vote in the divisional meeting on whether to put

9     forward Professor Ravina for tenure?

10    A.   I did not attend the meeting.

11    Q.   And why didn't you attend it?

12    A.   Because I wanted to be consistent with the petition I

13    signed, and I felt I was not in a position to fairly evaluate

14    her -- her work for -- for promotion.

15            MR. SANFORD:  Thank you very much, Professor Bolton.

16            Your Honor, I have no further questions.

17            THE COURT:  All right.  Thank you.

18            Cross-examination?

19    CROSS-EXAMINATION

20    BY MR. HURD:

21    Q.   Good morning, Professor.

22    A.   Good morning.

23    Q.   My name is Steve Hurd.  I'm one of the lawyers representing

24    Columbia here.

25            I believe you already testified, but you'd agree with

I7j1rav3                     Bolton - Cross

1   me that publishing in top journals is the most important factor

2   in the tenure decision, right?

3   A.   It's one of the factors.

4   Q.   And what are the others?

5   A.   The quality of the work.

6   Q.   So it's both quality of publications and quantity of

7   publications, right?

8   A.   No, it's -- it's the substantive quality of the work.

9   Even -- even an unpublished piece, if it's really deemed to be

10  very good, will be -- will make a significant difference.

11  Q.   Okay.  So it's both the publications and the research that

12  the individual is doing, right?

13  A.   That's correct.

14  Q.   Okay.  But in order to be tenured, you do have to publish

15  in top journals, right?

16  A.   There's no rule written in stone about this.  The

17  publication in top journals is a very important indicator about

18  the quality of the work, because you have to understand that

19  the field is very broad.  Not everybody has the expertise to

20  judge the substance of the work, and in -- because of that, the

21  quality of the journal plays an important role.

22  Q.   Okay.  And that decision on tenure typically occurs in the

23  sixth or seventh year that the individual has been at Columbia,

24  correct?

25  A.   Yes, that's right.

I7j1rav3                         Bolton - Cross

1   Q.  And you agree with me that at the time Professor Ravina was

2   considered for tenure in April of 2016, she didn't have

3   sufficient publications in order to be granted tenure, right?

4   A.  She -- if this had been a normal case, she would not have

5   had that -- the publications required for tenure.

6   Q.  Let's take a look at her résumé at the time.

7              MR. HURD:  Your Honor, may I approach.

8              THE COURT:  Yes.

9   Q.  Showing you what's in evidence as Exhibit OP, and I'll

10  represent to you that that's the résumé of Professor Ravina at

11  the time of the tenure vote.

12             MR. HURD:  And if we could go to the papers section,

13  Humberto.

14  Q.  Do you see the Published and Forthcoming there, on the

15  second page?

16  A.  Yes.

17  Q.  Okay.  So at the bottom of that section, she had

18  "Appearances, Inferences About Credit Quality and Learning,"

19  right?  Do you see that?

20  A.  Yes, that's right.

21             MR. SANFORD:  Your Honor, I object.

22             Could we have a sidebar, please.

23             THE COURT:  Sure.

24             (Continued on next page)

25

I7j1rav3                          Bolton - Cross

1              (At the sidebar)

2              MR. SANFORD:  The representation of the question was,

3    this is the résumé at the time of her tenure vote.  It's dated

4    February 2016.  Her tenure vote took place months after.

5              MR. HURD:  That's the résumé that was submitted with

6    her application for tenure.

7              MS. HARWIN:  There was a subsequent request for

8    admission.  Updated -- there was an updated CV that was

9    available at the time of the tenure vote, but your question

10   is -- this is not her CV.

11             THE COURT:  Do you have the updated one?

12             MS. HARWIN:  It's one of the exhibits.  I don't --

13   but --

14             MR. HURD:  Your Honor, for our purposes, nothing

15   changed in those two except for the Bekaert publication.  But

16   if we want to use that one, I'm happy to use that one.

17             MR. SANFORD:  Let's use the correct one.

18             THE COURT:  Okay.  All right.

19             (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2              MR. HURD:  Your Honor, to save time, while they're

3     looking for that, why don't I just move on, and we'll come back

4     to this.

5              THE COURT:  All right.  That sounds like a good idea.

6              MR. HURD:  Okay.

7     BY MR. HURD:

8     Q.  Professor, I believe you testified you don't work in the

9     same area.  Your area of focus isn't the same as Professor

10    Ravina's, right?

11    A.  There's little overlap.  There's some overlap, but there's

12    little overlap.

13    Q.  Okay.  You typically don't do any work within household

14    finance?

15    A.  That's correct.

16    Q.  And from the time Professor Ravina started at Columbia

17    until the time she left Columbia, you didn't work with her at

18    all, right?

19    A.  I have -- I mentioned earlier that I have a paper with her,

20    a new paper with her.

21    Q.  And you started that in November of 2017, right?

22    A.  That's right.

23    Q.  And that was after she left Columbia, right?

24    A.  That's after she left Columbia.

25    Q.  Okay.  So during the time that she was actually at

I7j1rav3                        Bolton - Cross

1   Columbia, you didn't work with her, is that correct?

2   A.  I did not work with her.

3   Q.  Okay.  And the paper that you have with her now, I believe

4   you said it was rejected for publication?

5   A.  Yeah, but that doesn't mean anything.  It's -- no, it --

6   it's -- it's a new journal.  They are, you know -- it could

7   have as easily been accepted.  It's a, you know -- there's a

8   lot of randomness involved in -- in these things.

9   Q.  But it wasn't accepted, right?

10  A.  No, that's right.

11  Q.  And it isn't being published currently.

12  A.  It's under review currently.

13  Q.  Okay.  So it's not published currently.

14  A.  No, no, that's right.

15  Q.  Okay.  And she started working with you on that in November

16  of 2017?

17  A.  Yes, that's correct.

18  Q.  And there are two other authors along with you and her?

19  A.  That's correct.

20  Q.  Four authors in total?

21  A.  Yes, that's correct.

22  Q.  And it was submitted in June of 2018, right?

23  A.  So the first submission was to the American Economic

24  Review: Insights journal.  That was in late February.

25  Q.  Late February of 2018.

I7j1rav3                         Bolton - Cross

1   A.   Yes.

2   Q.   Now you have a curriculum vitae on the Columbia website,

3   correct?

4   A.   That's correct.

5   Q.   And what a curriculum vitae is or a CV is is a list of all

6   your various accomplishments, right?

7   A.   That's correct.

8   Q.   You have your educational background, yes?

9   A.   Yes.  Sorry.

10  Q.   And your employment background?

11  A.   Yes.

12  Q.   And then you list all of the various publications that

13  you've been able to get published?

14  A.   Yes.  Publications and also working papers.

15  Q.   And also working papers, right?  And on the Columbia

16  website your CV has been updated as of June of this past year,

17  right?

18  A.   Yes, that's right.

19           MR. HURD:  Your Honor, may I approach.

20           THE COURT:  Yes.

21  Q.   This is just for your review, Professor, not for the jury,

22  but is that an accurate version of your current CV?

23  A.   It should be.

24  Q.   And you list on there all of your publications?

25  A.   Yes.

I7j1rav3                    Bolton - Cross

1    Q.  And you have what, by my count five books that you've

2    worked on and published?

3    A.  I have one book that I authored and I have four books where

4    I was editor.

5    Q.  And then you also list all of your papers, and I don't

6    expect you to go through them all, but by my count, there's

7    about 91 of them.  Does that sound right?

8    A.  I didn't make the count myself, but --

9    Q.  Okay.  And then as you mentioned, there's a section on

10   works in progress?

11   A.  Yes.

12   Q.  And there's about 15 of those, right?

13   A.  That looks right.

14   Q.  Okay.  And again, Professor Ravina isn't mentioned on any

15   of those 91 published works or the 15 you're working on, right?

16   A.  Oh, that's -- that's an oversight.  It should be added to

17   the working paper series, yeah.

18   Q.  As of June of 2018, it still hadn't been added to the -- to

19   your working papers.

20   A.  Yeah, that's just an oversight.  I mean, the critical thing

21   is that the first time the paper was in the public domain was

22   when it was put on the -- what's called the Social Science

23   Research Network, SSRN.  That's really what counts as a -- as

24   certification that the work is in the public.  That's what

25   people look at to get -- gain precedence, and we put that out

1    in -- in late January or early February of 2018.

2    Q.  You didn't think it was worthy to put it on your CV at this

3    point, right?

4    A.  That's really secondary.

5            MR. SANFORD:  Objection, your Honor.

6    A.  It's not a question of -- sorry.

7            THE COURT:  You may answer.

8    A.  Oh, yes.  I mean, worth -- it doesn't matter whether it's

9    on the CV or not.  What really matters -- people don't look at

10   the CV.  What people look at is whether it's in the public

11   domain, and there, SSRN is the key -- is the key thing.

12   Q.  Now in May of 2014, Professor Ravina came to you and

13   complained to you about Professor Bekaert, right?

14   A.  She approached first Professor Santos, and Professor Santos

15   informed me and then we had a meeting with her.

16   Q.  And I believe you testified to this on direct, but you

17   didn't have any firsthand knowledge of what she was complaining

18   about, right?

19   A.  No firsthand knowledge.

20   Q.  Okay.  And were you aware that shortly before she had come

21   to Professor Santos and yourself, she had received her annual

22   review for that year?

23   A.  Yes, because I was part of that annual review.

24   Q.  Okay.

25   A.  Yeah.

1  Q.  You were part of her spring 2014 annual review?

2  A.  Yes.

3          MR. HURD:  Okay.  If we could bring up Exhibit DA,

4  which is in evidence.  I have a copy for the witness.

5  Q.  Professor, do you recognize that document as the

6  performance evaluation that you gave Professor Ravina in the

7  spring of 2014?

8  A.  I do.

9  Q.  And I'd like to go through it with you just a little bit.

10          Under the section of Research on the first page, it

11  states that none of Enrichetta's papers has been accepted for

12  publication since 2009.  Do you see that?

13  A.  I do.

14  Q.  And then below that, it talks about some various papers

15  that she's working on, correct?

16  A.  Correct.

17  Q.  It mentions the habit formation paper, do you see that?

18  A.  Yes, I do.

19  Q.  And if you go to the next page, it mentions in the next --

20  in the second paragraph the beauty paper.  Do you see that,

21  "Love and Loans"?

22  A.  "Love and Loans," I see that.

23  Q.  Those were two single-authored papers, correct?  She was

24  working on those by herself?

25  A.  "Love and Loans" is single-author, and I believe the

I7j1rav3                        Bolton - Cross

1    previous one is single-author as well.

2    Q.  Okay.  And then below that, it talks about another paper,

3    "Risk Aversion," that she's working on with Daniel Paravisini

4    and Veronica Rappoport.  Do you see that?

5    A.  I can see that, yes.

6    Q.  Okay.  And then at the bottom paragraph on that second

7    page, it mentions two newer papers -- "Automatic Enrollment"

8    and "Who Is Internationally Diversified," do you see that?

9    A.  I do.  I do.

10   Q.  And it mentions that those are the papers that she's

11   working on with Bekaert, correct?

12   A.  Yes.

13   Q.  And it refers to them as newer papers, right?

14   A.  That's correct.

15   Q.  And then it also says at the end, both of those papers are

16   preliminary and will be evaluated upon completion, right?

17   A.  Yes.

18   Q.  Okay.  So as of the spring of 2014, the papers she was

19   working on with Professor Bekaert were newer and preliminary,

20   right?

21   A.  Yes, that's correct.

22   Q.  And then if you go to the final page of this document under

23   the summary of the review that you gave her, it reads in the

24   second paragraph -- I'm sorry, the third sentence, "She needs

25   to bring her projects to fruition, acceptance for publication,

I7j1rav3                         Bolton - Cross

1   preferably at selective and high-impact outlets."  Did I read

2   that correctly?

3   A.  Yes, you do -- you did, yes.

4   Q.  And then it goes on to say, "Unfortunately, the paucity of

5   publications renders Enrichetta's tenure prospects dim."  Do

6   you see that?

7   A.  Yes, I do.

8   Q.  And then the last sentence in that paragraph, it says, "A

9   positive outcome is very unlikely."  Do you see that?

10  A.  Yes, I do.

11  Q.  And did you agree with that at the time?

12  A.  Yes, I did.

13  Q.  In the spring of 2014.

14  A.  Yes, I did.

15  Q.  Now after she received this review, she came to you, I

16  believe you said, in May of 2014, you and Professor Santos, and

17  complained about Professor Bekaert, right?

18  A.  Yes, that's right.

19  Q.  And you took her complaint to Vice Dean Gita Johar, right?

20  A.  Yes.

21  Q.  And I believe you testified on direct that you don't know

22  what Vice dean Johar did with that information, right?

23  A.  I assumed that she informed Dean Hubbard.

24  Q.  But you don't know.

25  A.  I -- no, I don't know.

1   Q.  Okay.  And you don't know what the dean did in response to

2   that either, right?

3   A.  I don't.

4   Q.  But you do know that it was eventually reported to the

5   Equal Opportunity Affirmative Action group, right?

6   A.  I do know that.

7   Q.  Okay.  And but you never brought it yourself to the EOAA,

8   right?

9   A.  I thought that that was not my duty, that my duty was to

10  alert the dean's office about the issue.

11  Q.  And the dean's office was alerted about the issue, right?

12  A.  It was alerted about the issue.

13  Q.  And someone -- you don't know who, but obviously someone

14  had reported it ultimately to the EOAA, right?

15  A.  That's correct.

16  Q.  And I believe you testified that you did receive, either

17  through Ms. Ravina or otherwise, the outcome letter of the

18  EOAA's investigation, right?

19  A.  Yes, that's right.

20           MR. HURD:  And if we could pull that up.  It's

21  Exhibit 90.

22  Q.  And I believe that's in front of you, Professor.  Do you

23  have it in front of you?

24  A.  I have it in front of me.

25  Q.  And you're aware, are you not, that the EOAA concluded at

I7j1rav3                    Bolton - Cross

1   the end of its investigation that there was no violation of

2   Columbia University's employment policies and procedures on

3   discrimination and harassment, correct?

4   A.   That was the conclusion that was drawn by the Title IX

5   officer.

6            MR. HURD:   Okay.  And if you'd turn to the sixth page

7   in on that letter, the top word is Jealousy.  If that helps.

8   The page -- oh, I'm sorry.  There is a Bates number.  41141.

9   Q.   Do you see that?

10  A.   41141?

11  Q.   Correct.

12  A.   Yes.

13  Q.   And if you go down to the fourth full paragraph beginning

14  with, "In conclusion," the EOAA concluded that it did not find

15  evidence to support that Professor Bekaert engaged in sexual

16  harassment, in violation of Columbia University's employment

17  policies and procedures on discrimination and harassment.  Did

18  I read that right?

19  A.   Yes, you did.

20            (Continued on next page)

21

22

23

24

25

1   Q.  If you go to the next paragraph, the second sentence there,

2   they also determined, they did not find any evidence to support

3   that Professor Bekaert intentionally delayed Professor Ravina's

4   papers because he wanted to date her or for any other sexually

5   harassing purpose.

6           Do you see that?

7   A.  I can see that.

8   Q.  It goes on to say, "In contrast the EOAA found evidence to

9   support that Professor Bekaert worked to advance the projects

10  and encouraged her to focus on other work as well."

11          Correct?

12  A.  Correct.

13  Q.  That last sentence is consistent with the review that you

14  had given her in the spring of 2014, right?

15  A.  Yes.

16  Q.  Where you and your other faculty members said she should

17  focus on the habit paper and the beauty paper and the others,

18  right?

19  A.  Yes.

20  Q.  And that Professor Bekaert's papers were preliminary and

21  newer, right?

22  A.  That was the case.

23  Q.  Now I would like to talk to you about the petition that was

24  admitted earlier -- I think it was already in, but you were

25  shown on direct Exhibit 100.  I believe that's in front of you.

1              If we could pull that up.

2              THE COURT:  Do you need another copy?

3              THE WITNESS:  I have it.

4              THE COURT:  OK.

5   BY MR. HURD:

6   Q.  Do you have 100 in front of you, professor?

7   A.  I do.

8   Q.  OK.  Good.  Your proposal was to have the senior faculty

9   member when there was a conflict step aside and relinquish

10  control of the project, right?

11  A.  As a default.  Unless there were reasons, you know,

12  justifiable reasons not to do that.

13  Q.  So, if you look at the paragraph that begins with, "We also

14  recommend that" it reads, "If there is a falling out between a

15  junior and senior faculty member with respect to a research

16  project, which threatens to significantly delay progress on

17  said project, the senior faculty member should be expected to

18  step aside and relinquish control and intellectual property

19  over the joint research project to the junior faculty member."

20              Do you see that?

21  A.  I see that.

22  Q.  And I believe you testified that the executive committee

23  never addressed this proposal?

24  A.  Not to my knowledge.

25  Q.  You are not aware that they considered it and rejected it?

1    A.  I'm not aware of it.

2    Q.  You are not aware that concerns were raised that this would

3    disincentivize senior faculty from working with junior faculty?

4    A.  I am not aware of it.

5    Q.  You are not aware that there was concern that maybe senior

6    faculty would be concerned about losing their intellectual

7    property if they worked with junior faculty?

8            MR. SANFORD:  Your Honor, objection.

9            This assumes facts not in evidence through his

10   questions.

11           MR. HURD:  I am asking him what he's aware of, your

12   Honor.

13           THE COURT:  Sustained.

14   BY MR. HURD:

15   Q.  Now, we looked on direct at Exhibit 237.  If you could find

16   that in your stack, professor.

17           MR. HURD:  If we could pull that up, the redacted

18   version.

19   BY MR. HURD:

20   Q.  This is an e-mail that you wrote to Lee Bollinger, correct?

21   A.  That's correct.

22   Q.  He is the president of Columbia University?

23   A.  Yes.

24   Q.  And if we could look at the e-mail above that, please.  He

25   responded to you on January 15, right?

```
 1   A.  That's correct.
 2   Q.  And he said, "Thank you for writing me.  I've talked to
 3   Jane Booth," right?
 4           Who is Jane Booth?
 5   A.  I believe she is counsel.
 6   Q.  She is the general counsel of the university, right?
 7           And at that point Ms. Ravina also had a lawyer, right?
 8   A.  Yes, but that was for other reasons.
 9   Q.  OK.  So what President Bollinger was telling you is that
10   this is between the lawyers, right?
11   A.  Well, I didn't read it like that.  I just read it that he
12   didn't want -- not want to talk to me.
13   Q.  But he told you that he talked to Jane, and it's best for
14   him not to get involved, right?
15   A.  That's what the e-mail says.
16   Q.  And Jane, like we said, is the general counsel of Columbia,
17   right?
18   A.  Well, I -- you know, I don't know that for a fact, but I
19   assume that, yeah, that she was --
20   Q.  And then you objected to holding the tenure vote in the
21   spring of 2014, right?
22   A.  Yes.
23   Q.  And this was two years after Professor Ravina had come to
24   you and complained?
25   A.  Yes.
```

I7jnrav4                     Bolton - Cross

1   Q.  And it was about a year and a half since the EOAA had

2   determined that there was no violation of Columbia policies?

3   A.  That's correct.

4   Q.  OK.

5   A.  But --

6   Q.  There's no question, Professor.  You then signed a couple

7   of petitions that we looked at, Exhibits 130 and 160, right?

8   A.  Yes.

9   Q.  OK.  And what you were looking to do is have Professor

10  Ravina's tenure clock extended, right?

11  A.  Yes.

12  Q.  You felt that a couple of more years would be beneficial to

13  her in trying to get more publications out, right?

14  A.  It would make up for lost time, because you have to

15  understand from at least --

16          MR. HERNSTADT:  Objection, your Honor.

17          MR. HURD:  Objection, your Honor.

18          THE COURT:  Wait one second.

19          There was an objection.

20          Let's just have a sidebar for a minute.  All right.

21  Thanks.

22          (Continued on next page)

23

24

25

1          (At sidebar)

2          THE COURT:  I feel like from defendants you are both

3    telling me you don't want him to express his opinion and then

4    you are asking him about his opinion about things.  We have to

5    figure out a consistent position and then allow plaintiff to do

6    the same thing.

7          MR. HURD:  It is not that he can't express an opinion.

8    It's that he can't express an opinion based upon things that he

9    was told by Ms. Ravina.  I haven't asked him anything about

10   what he was told by Ms. Ravina or what his opinion is of her

11   allegations.  I am only asking him his opinion of whether the

12   tenure vote should go forward.  I believe that is already in

13   the signed petitions to stop that.

14         MR. HERNSTADT:  His answer is not responsive because

15   of that.  He answered the question and then he wants to

16   volunteer stuff.  The question wasn't about --

17         MR. SANFORD:  I have questions on redirect that I am

18   already drafting based on this line of questioning concerning

19   his opinion about things.  So I agree with the Court that,

20   insofar as Mr. Hurd is opening the door on this issue, I should

21   be allowed to get back in on redirect.

22         MR. HURD:  I am not sure what we are referring to.

23   He's only given an opinion about his objection to the tenure

24   vote, which came out in direct.  He hasn't given any opinion

25   about her allegations or whether he thought her allegations

I7jnrav4                        Bolton - Cross

1     were true or anything like that.

2               THE COURT:  I will look more closely at the

3     transcript.

4               But your objection was?

5               MR. HERNSTADT:  That he is trying to insert his

6     opinion about why the tenure vote should be delayed.  It is not

7     in response to any question he's asked --

8               THE COURT:  Why don't you just ask another question

9     and we will keep moving.

10              MR. HURD:  OK.

11              MR. SANFORD:  Thank you.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2       BY MR. HURD:

3       Q.  Now, Professor, you are aware, are you not, that Columbia

4       offered Professor Ravina a break in service as an associate

5       research scholar?

6       A.  Yes, I am aware of that.

7       Q.  And that would have given her an opportunity to go off the

8       tenure clock and continue to work on her papers, right?

9       A.  With a change of title of the position.

10      Q.  Right.  Change of title to associate research scholar,

11      right?

12      A.  That's correct.  But I've never heard about this title

13      before.

14      Q.  OK.  You encouraged her to take that position, didn't you?

15      A.  No, I didn't.

16      Q.  OK.  And ultimately she did reject it, right?

17      A.  She rejected it because it would have been a demotion.

18      Q.  That is your opinion, that it was a demotion, but you never

19      heard of the title before, right?

20      A.  Well, that's what makes it a demotion.

21      Q.  Then you wrote to Professor Zeldes and said you didn't want

22      to participate in the tenure vote, right?

23      A.  That's correct.

24            MR. HURD:  If we could pull up Exhibit 124, please;

25      which is in evidence.

I7jnrav4                        Bolton - Cross

1    Q.  I believe it's in front of you.

2    A.  Yes, it's on the screen.

3    Q.  And what you wrote is that you're very uncomfortable, the

4    top e-mail there, you're very uncomfortable about holding such

5    a meeting, referring to a tenure meeting, right?

6    A.  Yes.

7    Q.  And then you said, "Before I agree to attend the meeting I

8    want assurances that Geert," Professor Bekaert, "has been asked

9    not to attend this meeting."  Right?

10   A.  That's correct.

11   Q.  And then you say, "Finally, if I attend, I will disclose my

12   discomfort to the division."  Right?

13   A.  That's correct.

14   Q.  And the tenure vote you are aware was held on April 14 of

15   2016?

16   A.  There were multiple attempts to get the faculty together to

17   have a tenure vote and meetings were postponed again and again

18   until mid-April.

19   Q.  You testified that you didn't attend that vote, right?

20   A.  That meeting, I was not at the meeting.

21   Q.  OK.  So you didn't disclose your discomfort to the division

22   at that meeting because you didn't go, right?

23   A.  I didn't go.

24   Q.  And you also didn't vote in support of Professor Ravina

25   obtaining tenure, right?

1    A.  Well, I could not vote in any direction because I was not

2    in a position to make an evaluation.

3    Q.  My question was, you didn't vote in support of Professor

4    Ravina, right?

5    A.  I didn't go to the meeting.

6    Q.  Right.  So you didn't vote?  Yes or no.

7    A.  I didn't go to the meeting.

8    Q.  OK.  You are aware, are you not, that Professor Bekaert

9    also didn't go to the meeting, right?

10   A.  I was not aware of that.

11   Q.  He didn't participate in the tenure vote as far as you know

12   at all, right?

13   A.  As far as I know, I don't -- I don't have any information

14   about that.

15             MR. HURD:  Your Honor, may I approach?

16             THE COURT:  Yes.

17             MR. HURD:  This is the résumé issue.

18             THE COURT:  Thank you.

19   BY MR. HURD:

20   Q.  Professor, I have put in front of you what's been marked as

21   Exhibit SQ.

22             MR. HURD:  And I move for the admission of Exhibit SQ,

23   your Honor.

24             THE COURT:  Any objection?

25             MR. SANFORD:  No objection.

1              THE COURT:  SQ will be admitted.

2              (Defendant's Exhibit SQ received in evidence)

3    BY MR. HURD:

4    Q.  If we could turn to the second page of that under papers.

5    Do you see that?

6    A.  I can see that.

7    Q.  OK.  If we start at the bottom of that section, Increasing

8    Income Inequality, that is a paper that Professor Ravina wrote

9    with a K. Dynan, can you see that?

10   A.  I can see that.

11   Q.  Professor, what does "P and P" mean?

12   A.  That stands for papers and proceedings.

13   Q.  Does that mean that that's not a peer-reviewed paper?

14   A.  This is an invited paper.

15   Q.  It is an invited paper.  So it's not a peer-reviewed paper?

16   A.  That's correct.

17   Q.  What is a peer-reviewed paper?

18   A.  A peer-reviewed paper is one that gets reviewed by

19   anonymous referees.

20   Q.  And those are considered more prestigious than a

21   non-peer-reviewed paper, correct?

22   A.  Not necessarily more prestigious.  They are -- it's

23   different type of publication.

24   Q.  OK.  And above that is What Do Independent Directors Know.

25   Do you see that?  She published that in 2010 with Paolo

1    Sapienza?

2    A.   Paolo Sapienza.  That's correct.

3    Q.   And above that is Risk Aversion and Wealth?

4    A.   Yes, I know that paper.

5    Q.   That was published with D. Parvisini and V. Rapoport?

6    A.   That's correct.

7    Q.   And then the final item there it's indicated that it's

8    accepted for publication but it hadn't been published yet is

9    Who is Internationally Diversified?  Do you see that?

10   A.   I can see that.

11   Q.   That is one of the papers that she published with Professor

12   Bekaert, right?

13   A.   Correct.

14   Q.   And she published that in time for the tenure vote, right?

15   A.   Well, it wasn't published yet.

16   Q.   I'm sorry.  It was accepted.

17   A.   It was accepted.

18   Q.   It was accepted for publication.  I stand corrected.  That

19   was one of the papers that in the spring 2014 review you and

20   your faculty members classified as newer or preliminary, right?

21   A.   Yes.  That's right.

22        MR. HURD:  OK.  If we could go below that, Humberto,

23   to the working papers.

24        These are the some of the papers that are mentioned in

25   the spring 2014 performance review as things she really should

I7jnrav4                        Bolton - Cross

1   get published soon, right?  The Love and Loans and the Habit?

2   A.  Yes.

3   Q.  OK.  And as of the time of her tenure vote, those still

4   hadn't been published, right?

5   A.  One of them is under revision.  That's always promising,

6   but -- both of them are under revision.  That is a very

7   promising stamp.

8   Q.  So one was reject and resubmit in 2012, right?  Do you see

9   that?

10  A.  Yes, I can give it --

11  Q.  Four years earlier?

12  A.  I can give a little bit of context about this.

13  Q.  Please just answer my questions.

14  A.  I think this is important.

15  Q.  Professor, please.

16  A.  This is --

17          THE COURT:  You know what, Mr. Sanford will get back

18  up afterwards and ask you about the context.

19          THE WITNESS:  OK.

20  Q.  The Love and Loans paper had been rejected and asked for a

21  resubmission in November of 2012.  That's what it says, right?

22  A.  That's what it says.

23  Q.  And the Habit paper had been, she received a revise and

24  resubmit in October of 2011, correct?

25  A.  That's what it says.

1    Q.  So four and five years prior to the tenure vote in 2016,

2    right?

3    A.  Yes.

4    Q.  And in 2014, you and your faculty members had encouraged

5    her to work on those papers and get them published, right?

6    A.  Yes.  That's right.

7    Q.  That's in the same performance review where you told her

8    that her tenure prospects were unlikely, right?

9    A.  Yes.  That's right.

10   Q.  The one paper that did get published before her tenure was

11   the paper she was working on with Professor Bekaert?

12   A.  Yes.  Well -- yes.

13   Q.  The one that you classified as newer and preliminary at the

14   time, right?

15   A.  OK, yes.

16          MR. HURD:  OK.  Now, I'd like to pull up -- can we

17   pull up SQ on the one side and RY on the other side, which is

18   also in evidence.

19   BY MR. HURD:

20   Q.  Professor, if you look at your screen, I'm comparing

21   Professor Ravina's CV on the left, which is SQ, which is her CV

22   at the time of the tenure vote, and RY, which is, as far as I

23   know, her current CV.

24          OK?  Do you see that, Professor?

25   A.  Yes, I have that in front of the screen, yes.

1              MR. HURD:  Now, Humberto, could you put both of the

2      paper sections up on that.

3      BY MR. HURD:

4      Q.  These are what's been published in both of these, right?

5      So in 2016 her papers are listed on the left and in 2018 her

6      papers are listed on the right.  Do you see that?

7      A.  I can see that.

8      Q.  OK.  You will agree with me --

9              MR. HURD:  If we could just do the paper section.

10     Q.  The Increasing Income Inequality you see that on the

11     right-hand side.  That's obviously still a publication, right?

12     A.  Right.

13     Q.  And then What Do Independent Directors Know?  That's on

14     both?

15     A.  Yes.

16     Q.  And Risk Aversion, that is on both?

17     A.  Yes.

18     Q.  And then Appearance Inferences About Credit Quality.  I

19     guess that's not on the left one, but that was published in

20     March of 2011.  Do you see that?

21     A.  I can see that.

22     Q.  That is a paper in Rivista di Politica Economica, correct?

23     A.  Correct.

24     Q.  That's not one of the top journals in finance, is it?

25     A.  No.

I7jnrav4                    Bolton - Cross

1    Q.  Is that a peer-reviewed publication?

2    A.  I don't know for a fact.

3    Q.  OK.  And then at the top on the left-hand side and the top

4    on the right-hand side, that's the paper that she had written

5    with Professor Bekaert, right?

6    A.  Yes.

7    Q.  And it had been accepted for publication in 2016, and so

8    then it was just published in 2017, right?

9    A.  Yes.

10   Q.  So the only thing new on this page in her 2018 review is

11   this article, An Assessment of the Mating Motive.  Do you see

12   that?

13   A.  I can see that.

14   Q.  That was published in March of 2017, correct?

15   A.  Correct.

16   Q.  And what is that publication?  Do you know?

17   A.  I couldn't hear your question.

18            MR. SANFORD:  Your Honor, I wanted to object to the

19   last question, because it's highly misleading, given what is on

20   the working paper section on page 3.

21            THE COURT:  You will have the opportunity to correct

22   that.

23            MR. SANFORD:  Thank you, your Honor.

24            MR. HURD:  May I approach, your Honor?

25            THE COURT:  Yes.

1    BY MR. HURD:

2    Q.  Let me show you a copy that is in evidence of Exhibit RS.

3    That is the article that was referenced there on the right-hand

4    side, correct, in her CV for 2018?

5    A.  Can you say that again?

6    Q.  That article that I just showed you, RS, that is the

7    publication that is referred to in Exhibit RY, which is on your

8    right-hand side as a publication?

9    A.  OK.

10   Q.  OK.  And what is Behavioral and Brain Sciences?

11   A.  That is psychology.

12   Q.  That is a psychology publication?

13   A.  Psychology or cognitive -- well, neuropsychology.

14   Q.  OK.

15   A.  Given the title.

16   Q.  And this is a commentary of somebody else's article, right?

17   A.  I haven't read it.  I can't tell.

18   Q.  Well, it keeps referring to a Masta Tripierdi.  Do you see

19   that, in the very first paragraph after abstract?

20   A.  I would have to read the article.

21   Q.  So you don't know what that is?

22   A.  I don't know what this is.

23   Q.  OK.  But it is a one-page publication, right?

24   A.  I haven't -- it's the first time I'm seeing it.

25   Q.  OK.

I7jnrav4                          Bolton - Cross

1    A.  I would really have to read it is.

2    Q.  OK.  So in the two years since the tenure vote in 2016, the

3    only new publication that Professor Ravina has is this

4    document, which you don't know what it is, RV, right?

5             If you are looking at her CV, that's the only new

6    item, right?  Correct?

7    A.  New item you mean as an actual publication?

8    Q.  It's the only new publication on her CV, right?

9    A.  Well, that's what it says on the CV.

10   Q.  So in the two years after the tenure vote she published a

11   one-page publication that you don't know what it is, right?

12   A.  I am just -- I am not sure what you mean by two years.

13   Q.  From the tenure vote on April 14, 2016, to today, which is

14   a little over two years, that's the only thing, this one-page

15   article, this one page commentary is the only thing she has

16   published, correct?

17   A.  Well, that's what is on her CV, yes.

18             MR. HURD:  One moment, your Honor.

19             THE COURT:  OK.

20             MR. HURD:  I have nothing further, your Honor.

21             THE COURT:  All right.

22             Mr. Hernstadt, do you have anything.

23             MR. HERNSTADT:  No, your Honor.

24             THE COURT:  OK.  Redirect?

25             MR. SANFORD:  Thank you, your Honor.

1    REDIRECT EXAMINATION

2    BY MR. SANFORD:

3    Q.  Professor Bolton, I would like to draw your attention back

4    to what's been marked as SQ, Defendants' SQ, Professor Ravina's

5    CV, last updated April 2016.

6    A.  OK.

7    Q.  I would like to draw your attention to Bates 28368, which

8    is the second page.

9    A.  OK.

10   Q.  I believe -- first of all, I would like to give you an

11   opportunity to place in context what you wanted to place in

12   context with respect to her papers based on the questions you

13   were asked in cross-examination.

14           Do you recall what you wanted to say?

15   A.  Yes.  This is the paper Love and Loans.  That is a very

16   high-impact paper.  She's recognized as being the first study

17   on this topic.  She happened to have been in a publication race

18   with another team, and the other team thought to publish it in

19   less high impact journal, got there first, and then she ran

20   into difficulties with referees who didn't recognize --

21           MR. HURD:  Objection.

22   A.  -- the precedence --

23           THE COURT:  Sustained.

24   Q.  Let me draw your attention to the paper section.

25           Based on your understanding of the sequence of events,

1    how much time did Professor Ravina spend dealing with her

2    concerns about Professor Bekaert starting in 2012?

3                MR. HERNSTADT:  Objection.

4                MR. HURD:  Objection.

5                THE COURT:  Sustained.

6    BY MR. SANFORD:

7    Q.  When did Professor Ravina first inform you of her concerns

8    regarding Professor Bekaert?

9                MR. HURD:  Objection.

10               MR. HERNSTADT:  Objection.

11               THE COURT:  That I will allow.

12   A.  In May 2014.

13               THE COURT:  I think that came out on direct anyway.

14               MR. SANFORD:  Yes.  Thank you, your Honor.

15   BY MR. SANFORD:

16   Q.  I would like to draw your attention to the papers.

17               From 2010 to 2016, you see there are two papers

18   published, right?

19   A.  Yes.

20   Q.  And you see that there are no papers published between 2012

21   and 2016, correct?

22   A.  Yes.

23   Q.  Is it your understanding that's the time period in which

24   Professor Ravina had issues with Professor Bekaert?

25               MR. HERNSTADT:  Objection.

I7jnrav                     Bolton - Redirect

1   A.  Yes.

2             THE COURT:  I am going to overrule the objection.

3             Anything else, Mr. Hurd.

4             MR. HURD:  No, your Honor.

5             THE COURT:  Thanks.  You can step down.

6             Why don't we just stop four lunch now.  It is a good

7   stopping point.  Remember don't discuss the case and keep an

8   open mind.

9             Thank you.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (Jury not present)

 2                  (Witness excused)

 3                  THE COURT:  All right.

 4                  Where are we on timing?

 5                  MR. SANFORD:  Your Honor, we have some videos to show.

 6                  THE COURT:  OK.

 7                  MR. SANFORD:  Then, subject to working out the

 8      remaining issues with the videos that we discussed earlier

 9      today, we will rest.

10                  THE COURT:  How long are the videos that you are going

11      to apply, aside from the one that you have a conflict about?

12                  MS. HARWIN:  Aside from that, I think under two hours.

13                  MS. PLEVAN:  How much?  I'm sorry.

14                  MS. HARWIN:  Under two hours.  So you will able to

15      call your first witness.

16                  THE COURT:  From the defense perspective, how long do

17      you think your case will last?  I have a trial scheduled for

18      next week, so I am trying to figure out my own time.

19                  MS. PLEVAN:  I don't think we will be able to finish

20      tomorrow, but I think we'll come close.

21                  THE COURT:  OK.

22                  MS. PLEVAN:  We may be one witness short is what I

23      would say.

24                  THE COURT:  OK.  To the extent that there is a

25      plaintiff's verdict, I still have to rule on a number of issues

I7jnrav                          Bolton – Redirect

1    regarding damages, which may affect timing as well.

2              MS. PLEVAN:  It does affect other witnesses.

3              THE COURT:  Right.  OK.

4              So I will turn to that.  All right.  Thank you.

5              I will see you in an hour.

6              MR. SANFORD:  Thank you.

7              (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      A F T E R N O O N   S E S S I O N

3                            (2:00 p.m.)

4          THE COURT:  Are we ready for the jury?

5          MR. SANFORD:  Your Honor, yes.  I think we're ready.

6          THE COURT:  Great.

7          MR. SANFORD:  We have one issue, your Honor.

8          MS. DONEHOWER:  We have been working with

9   Mr. Hernstadt to try to resolve this issue of a trial subpoena

10  for Ms. Kiguel.  We conferred for him to just ask for the last

11  year or so of documents.  That's when, with Columbia, we

12  received any production from defendants was May 15, 2017.  So

13  we asked just for her communications that she has possession,

14  custody, and control of with defendant Professor Bekaert since

15  that time.

16         What we have heard is she doesn't have a printer and

17  she doesn't have access to Gmail and a bunch of other things,

18  but I believe it would be a limited universe of documents, and

19  it is a reasonable request.

20         MR. HERNSTADT:  Your Honor, I had asked that they give

21  me an electronic copy of the subpoena so I could send it to

22  Ms. Kiguel.

23         They did that this morning.  I sent it to her.  I

24  called her at lunch to ask her if she got it and what her

25  response was, and she said that she's locked out of Gmail at

I7jnrav4

work, so she doesn't have it.  She also said she doesn't have a

printer at home, but she couldn't do anything with it anyway

and she doesn't have time.

          THE COURT:  When is she testifying?  I meant to ask

you anyway when we were talking about scheduling.

          MR. HERNSTADT:  Tomorrow morning.

          THE COURT:  How long your witnesses are going to be?

          MR. HERNSTADT:  My witness is going to be Ms. Kiguel.

I am not going to bring anyone else.  That's the only witness

for Professor Bekaert.  We have her tomorrow morning, and she

is not a long witness, your Honor.

          THE COURT:  She can't either borrow a printer at work

or go to a Kinko's?

          MR. HERNSTADT:  I am just telling you what she told

me, which is that she works full-time.  She can't --

          THE COURT:  Have you served the subpoena on her?

          MS. DONEHOWER:  Not yet, your Honor, because we didn't

want to send a process server out after her.  We understand she

is a third party.  We were hoping to work something out on

consent.  We are happy to do that if that is the way to

proceed.

          THE COURT:  I don't know when realistically you can

serve her if she's testifying tomorrow and get this done, which

I think is the problem.  If you are not willing to accept

service on her behalf and you probably won't serve her until

I7jnrav4

1    tomorrow and she's testifying tomorrow, I don't know what can

2    even be done at this point.

3              MS. DONEHOWER:  We'll try to serve her if that's the

4    best way to proceed.

5              THE COURT:  You can.  She may move to quash the

6    portion requesting documents given the late date at which it

7    was served on her.

8              MS. DONEHOWER:  Understood.

9              THE COURT:  But we will see.

10             This afternoon we just have video depositions,

11   correct?

12             MS. PLEVAN:  We will put on our first witness.

13             THE COURT:  All right.

14             MS. HARWIN:  Your Honor, in the first video we are

15   going to see there are a couple of exhibits that are used so we

16   would move those into evidence.  I understand there is no

17   objection to those, which is Exhibit 257 --

18             THE COURT:  Why don't you do it at the time.  Just

19   make sure with defense counsel that there are no objections.

20             MS. HARWIN:  Meaning as the video is played?

21             THE COURT:  Or just before.

22             MS. HARWIN:  Yes.

23             THE COURT:  But in front of the jury.

24             MS. HARWIN:  Sure.

25             THE COURT:  But plaintiff is now resting, is that

I7jnrav4

1   correct?

2           MR. SANFORD:  After the videos, your Honor.

3           THE COURT:  After the videos.  But in terms of your

4   first witness, the witness is going to go after the videos?

5           MS. PLEVAN:  Yes.  The videos are in their case.

6           THE COURT:  Got it.  Thanks.

7           (Jury present)

8           THE COURT:  All right.  Everyone can be seated.

9           You may proceed.

10          MS. HARWIN:  Thank you, your Honor.

11          We are going to proceed now with the, with showing

12  parts of the video deposition of Senior Vice Dean Gita Johar.

13  I would note that there are several exhibits that are used in

14  the course of the video, and so I would ask that those be

15  admitted.  Those are Exhibits 257, 240 and 267.

16          THE COURT:  Any objection?

17          MS. HARWIN:  That is your DG, but with the stamp from

18  the deposition.

19          THE COURT:  Do you want to just confirm that and let

20  me know if you have an objection.

21          (Counsel conferred)

22          MS. PLEVAN:  No objection.

23          THE COURT:  All right.  That will be admitted.  You

24  can play the depositions now.  Thank you.

25          MS. HARWIN:  Thank you, your Honor.

I7jnrav4

1                (Plaintiff's Exhibits  240, 257, 267 received in

2      evidence)

3                (Video played)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7j1rav5

1          MS. HARWIN:  Your Honor, we will now turn to another

2    video deposition, this time for Senior Vice Dean Katherine

3    Phillips, who succeeded Senior Vice Dean Gita Johar.

4          I would note that this one involves four exhibits,

5    three of which are in evidence, one of which we discussed

6    yesterday at sidebar, 163, and I think we were waiting to hear

7    back from defendants regarding whether there were any proposed

8    redactions, so we should resolve that.

9          THE COURT:  Can you play a video for which there is no

10   objection about anything and then we can talk about it at the

11   break?

12         MS. HARWIN:  It would be our preference to play this

13   one first, because the next video concerns a witness who is

14   going to be testifying live right afterwards.

15         THE COURT:  Okay.  All right.  So you need to speak to

16   defense counsel?

17         MS. HARWIN:  That would be helpful, just for a moment.

18         (Counsel conferring)

19         MS. HARWIN:  And I would note, with respect to the

20   last video we watched and the one we're going to watch, this

21   contains designations both by plaintiff and by defendants, as

22   to both.

23         THE COURT:  You'll let me know if there are any

24   corrections, and I'll instruct the jury on that.

25         MS. HARWIN:  Thank you.

I7j1rav5

1                (Counsel conferring)

2                MS. HARWIN:  Thank you, your Honor.  So I move to

3      admit 163 with no objection.

4                THE COURT:  Okay.  That will be admitted.

5                (Plaintiff's Exhibit 163 received in evidence)

6                (Video played)

7                MS. HARWIN:  So your Honor, we have one more video

8      that I understand will be played now, and the next video will

9      be played at some point during defendant's case.  This video is

10     about 45 minutes and I understand will be succeeded by a live

11     witness, and I don't know if you'd like to play it now or take

12     a break.

13               THE COURT:  Do you all want to take a short break now?

14               All right.  So why don't we take a break now and then

15     we'll play the video and have the witness.

16               MS. HARWIN:  Sounds good.  Thank you, your Honor.

17               (Jury not present)

18               THE COURT:  Are there any remaining objections to any

19     exhibits or anything --

20               MS. HARWIN:  No, your Honor.  The next exhibit is

21     already in evidence.

22               THE COURT:  Okay.  Great.  Thank you.

23               (Recess)

24               (In open court; jury present)

25               THE COURT:  All right.  Everyone can be seated.

I7j1rav5

1            Continue.

2            MS. HARWIN:  The next video that we're going to play

3    is for Associate Provost Melissa Rooker.  And I understand your

4    Honor is going to provide a brief instruction?

5            THE COURT:  So I understand that there will be the

6    deposition testimony and then there will be corrections to the

7    deposition testimony, and the Federal Rules of Civil Procedure

8    allow a deponent, someone who's being deposed, to make changes

9    to his or her testimony under oath after the fact.  So that's

10   why you'll be seeing both the original testimony and the

11   corrections that that person has made.

12           MS. HARWIN:  All right.  We can proceed.  Thank you.

13           (Video played)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I7jnrav6

1          MS. HARWIN:  That completes our videos for today.

2     There's another video that will be shown we anticipate

3     tomorrow.

4          As a matter of housekeeping there are some additional

5     documents that we would like to move into evidence.  I

6     understand some of them are not subject to any objection, but I

7     understand that there are some that defendants may have some

8     objection to, so it may be worth a sidebar just to address

9     those final documents.

10          THE COURT:  All right.  Do you want to do that now?

11          MS. HARWIN:  I think that makes sense.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

I7jnrav6

1          (At sidebar)

2          THE COURT:  First off, I think I have said it a number

3     of times, if you can use the breaks for this kind of thing,

4     like you knew you wanted to do this, we had a lunch break, we

5     had an afternoon break.  The goal is to not keep the jury

6     waiting.

7          MS. PLEVAN:  I was going to suggest -- this is the

8     first time we know about them.  Perhaps we can wait until after

9     the jury is gone.

10         MS. HARWIN:  Your Honor, that would be fine, because

11    they are calling their first witness.  I wanted to make sure

12    that is handled.

13         THE COURT:  If you want to, you can rest subject to

14    the admission of these documents and one deposition.

15         MS. HARWIN:  Sounds good.

16         MS. PLEVAN:  Did they just do that?

17         THE COURT:  Yes.

18         (In open court)

19         THE COURT:  If everyone wants to take just one minute,

20    if anyone needs to use the restroom, go ahead, including the

21    lawyers, and then we will proceed.

22         (Recess)

23         (Continued on next page)

24

25

1          THE COURT:  All right.  I think we are all ready now.

2          Everyone can be seated.

3          Mr. Sanford.

4          MR. SANFORD:  Yes, your Honor.  Subject to reserving

5    our right to play that one video and introduce for admission

6    certain documents, plaintiff rests.

7          THE COURT:  Thank you.

8          MR. SANFORD:  Thank you.

9          MS. FISCHER:  Columbia would like to call its first

10   witness.

11         THE COURT:  Yes.

12         MS. PLEVAN:  Melissa Rooker.

13         THE COURT:  All right.

14    MELISSA ROOKER,

15        called as a witness by Defendant Columbia University,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. FISCHER:

19   Q.  Good afternoon, Ms. Rooker.

20   A.  Good afternoon.

21   Q.  Are you currently employed?

22   A.  Yes.

23   Q.  Where are you currently employed?

24   A.  I currently work for Teachers College, which is an

25   affiliate of Columbia University.

1   Q.  Are you employed by Columbia University?

2   A.  No.

3   Q.  What is your current position at Teachers College?

4   A.  My title is executive director for equity.

5   Q.  And what are your duties and responsibilities in that role?

6   A.  So, I work for the Office of Diversity and Community

7   Affairs, and in my role I'm responsible for assisting with

8   diversity programming.  We do programming for student, staff,

9   and faculty and collaborate with them on that.

10          We also run a grant program which helps to produce

11  this programming.  I also do some compliance work and some

12  investigations with Title IX disability and other

13  discrimination and harassment issues.

14  Q.  Were you formerly employed by Columbia University?

15  A.  Yes.

16  Q.  When did you first start working at Columbia?

17  A.  In 2007.

18  Q.  And how long were you employed at Columbia?

19  A.  I left in April of 2016.

20  Q.  What was your title at the time you left Columbia?

21  A.  Associate provost, equal opportunity and affirmative

22  action.

23  Q.  And did you leave Columbia voluntarily?

24  A.  Yes.

25  Q.  I think the jury has heard a bit about your

1    responsibilities, but if you could just tell us briefly, as

2    associate provost at Columbia what were briefly your duties and

3    responsibilities in that position?

4    A.  So I think I might put it into maybe three buckets for what

5    we did in the office.

6              One might be affirmative action work, with the other

7    equal opportunity and, the other is nondiscrimination.

8              So the office was responsible for producing the

9    affirmative action plan for the university.  So I was

10   responsible for that.

11             The other one, equal opportunity work, would be where

12   we were responsible for monitoring recruitment and hiring

13   practices for the university.  So we were very much responsible

14   for the online platform for recruiting of faculty and reviewing

15   of waivers from the search processes, reviewing search plans

16   for each school and department, and also for reviewing

17   processes for senior administrative hires.

18             And then, finally, the nondiscrimination work was the

19   responsibility for the nondiscrimination policies and

20   procedures, discrimination, harassment, and gender-based

21   misconduct and for conducting investigations and trainings into

22   those items.

23   Q.  We'll get back to that.  Can you please tell us your

24   educational background, starting with college.

25   A.  I have a BA in political science and sociology from

1    American University, and I have a JD from Fordham University

2    School of Law.

3    Q.  Did you start working after law school?

4    A.  I did.

5    Q.  What was the first job that you had?

6    A.  I worked for the New York City Commission to Combat Police

7    Corruption.

8    Q.  And what is that organization?

9    A.  It is a mayoral agency that actually sits under the New

10   York City Department of Investigation, and it monitors the

11   NYPD's anticorruption efforts.

12         Part of the work is to review and evaluate, analyze

13   how the NYPD is fighting internal corruption.  So we would

14   review complaints about corruption within the department.  We

15   would sit in what internal affairs calls steering committee

16   meetings, and so review and listen to internal affairs

17   departments and how they were investigating their cases.  And

18   senior personnel in internal affairs would question them about

19   proper investigative measures.

20         And then we would conduct various audits and reports,

21   and so interview various members of the NYPD, whether at One

22   Police Plaza or at the different precincts, such as commanding

23   officers, to help us evaluate the work that they were doing.

24   Q.  What was the next job that you held?

25   A.  When I left the commission, I then -- my next job would

1   have been with the New York League of Conservation Voters.

2   Q.  And I am not sure you stated it, but when did you leave the

3   job at the New York City Commission to Combat Police

4   Corruption?

5   A.  2000.

6   Q.  You said your next position was?

7   A.  With the New York League of Conservation Voters.

8   Q.  Could you tell us a little bit about that.

9   A.  It was a pro bono volunteer position, I was an

10  environmental advocate there.  It is a nonprofit.  Their goal

11  is to either get candidates and sponsor candidates who have the

12  same environmental agenda that they do or and also to educate

13  the public on various environmental issues.

14          So, while I was there, I worked on programming for

15  public programming, I worked at poll sites, I wrote articles

16  for their newsletter, and went to city hall and drafted

17  testimony for various members of the organization.

18  Q.  And how long were you at that organization?

19  A.  I know I left in 2003.

20  Q.  What did you do next?

21  A.  I went to the University of Rhode Island and I was an

22  internal judicial affairs officer.

23  Q.  Can you please tell us what you did in that role?

24  A.  Sure.  As a judicial affairs officer, I was responsible for

25  investigating complaints against students for violations of the

1   student conduct code, and my particular area was for drug and

2   alcohol violations.

3            So I would get a complaint, primarily from the

4   residence halls, where students may have violated the drug and

5   alcohol code and call the student in, interview any other

6   witnesses, and then I would make a decision about whether they

7   had violated the code and what the disciplinary sanction should

8   be.

9   Q.  Did you ultimately leave that position?

10  A.  Yes.

11  Q.  And what did you do next?

12  A.  I went to the national Association of College and

13  University Attorneys.  It's known as NACUA.

14  Q.  At what time were you at NACUA?

15  A.  I was there from 2004 to 2007.

16  Q.  Can you please just tell us a little bit about what NACUA

17  is.

18  A.  Sure.  NACUA is a wonderful association.  It is a member

19  association of attorneys who work for higher education

20  institutions.  The role of NACUA is to support the attorneys in

21  serving the colleges and universities.

22            So things that NACUA does, for instance, I was the

23  assistant director of legal resources.  It is basically a

24  clearing house.  They have many resources that will help these

25  attorneys to do the work that they need to do on campuses

1    across the country.

2            So part of the work that I would do would be where a

3    member attorney might contact me and say, I have this issue on

4    my campus, I have a real estate issue or a copyright issue, do

5    you have any materials that would be helpful to me because I

6    have to get an answer to my board or to some department?

7            And we could go through the materials, find the

8    information that would be helpful to them, and provide that to

9    them.

10           Additionally, I would work with member attorneys to

11   provide what we call an E-newsletter that would be on one

12   specific topic and work with them to publish that to, again,

13   provide information to member attorneys.

14           Finally, we also do programming.  So lawyers, most

15   lawyers have to take things called continuing legal education

16   classes to maintain their licenses.  So NACUA would produce

17   this programming, and I would work with member attorneys again

18   on varying topics for workshops or for their annual conference

19   to provide this information to other members of the

20   association.

21   Q.  And did there come a time when you left that position?

22   A.  Yes.

23   Q.  What was the next thing you did professionally?

24   A.  I went to Columbia.

25   Q.  What was your position when you first came to Columbia?

1    A.   I started out as director of investigations in the Office

2    of Equal Opportunity and Affirmative Action.

3    Q.   And during what time frame were you director of

4    investigations at the EOAA office?

5    A.   I believe it was from 2007 to 2010.

6    Q.   What were your duties and responsibilities in that role?

7    A.   So, that role initially was primarily just investigations.

8    The office had an associate provost, my position, and then

9    another part-time position.  So I was the one who was

10   responsible for most of the investigations during that time

11   period.

12         Before 2010, I also then gained some of the

13   responsibilities for working on the faculty recruitment part,

14   the equal opportunity aspect of the office that I talked about.

15   Q.   To your knowledge and understanding, what were your

16   qualifications to serve as director of investigations at

17   Columbia?

18   A.   I believe the job description had been a JD required,

19   meaning they wanted someone who had a law degree.  You didn't

20   have to be a lawyer.  It is not a lawyer position.  And they

21   wanted someone who was familiar with higher education, someone

22   who had some experience with some interviewing, possibly

23   investigative work, someone who could work with different

24   members and different constituencies in a university.  I think

25   that's it.

1   Q.  And did you have some of those skills from your prior

2   positions at other organizations?

3   A.  Yes.

4   Q.  Did your title change at some point?

5   A.  Yes.

6   Q.  What did your title change to?

7   A.  So in 2010 my title became executive director.

8   Q.  Was that a promotion?

9   A.  Yes.

10  Q.  And did you have any additional responsibilities when you

11  became an executive director?

12  A.  Yes.  So I continued to engage in the investigative part of

13  the job.  I also was handling almost all of the trainings that

14  our office was doing.  And I then took on all of the faculty

15  recruitment work as well as the senior administrative officer

16  recruitment work.

17  Q.  Then did you hold another position at Columbia?

18          Was that the last position?  The associate provost

19  position, was that the next thing that you did?

20  A.  Yes.

21  Q.  Was that the most recent title you had before leaving

22  Columbia to go to Teachers College?

23  A.  Yes.

24  Q.  Why did you leave Columbia?

25  A.  I was looking to -- I had been in the office for eight and

1    a half years, and I was looking to expand my areas of expertise

2    and knowledge, and I knew that the Teachers College office,

3    they still have the Title IX cases, but I knew that they did

4    more work in diversity and community work, and I was interested

5    in gaining some experience in that type of work.  So that's why

6    I went to TC.

7    Q.  While you were at Columbia, did Columbia have in place an

8    antidiscrimination and antiharassment policy?

9    A.  Yes.

10   Q.  In your roles at Columbia, but particularly the last role

11   you had at Columbia, did you have responsibility with respect

12   to that policy?

13   A.  Yes.

14   Q.  And were Columbia's policies updated?

15   A.  Yes.

16          MS. FISCHER:  Can we please pull up Plaintiff's

17   Exhibit 17.  If we could just go to the last page for just a

18   moment.  I just want to show Ms. Rooker the date.

19          Now we can go back to the first page.

20   BY MS. FISCHER:

21   Q.  Ms. Rooker, do you recognize this policy?

22   A.  Yes.

23   Q.  Was this policy in effect in the 2014 time frame?

24   A.  Yes.

25          MS. FISCHER:  Can we also pull up I don't believe it

1    is in evidence Exhibit S.

2              This may be in as a plaintiff's exhibit.

3              THE COURT:  You can introduce it as a defense exhibit.

4              MS. FISCHER:  Thank you.

5    BY MS. FISCHER:

6    Q.  Ms. Rooker, do you recognize this policy?

7    A.  Yes.

8    Q.  What is this?

9    A.  This is a revised policy from October of 2015 on employee

10   policies and procedures on discrimination, harassment, sexual

11   assault, domestic violence, dating violence, and stalking.

12             MS. FISCHER:  Thank you.

13             We offer Exhibit S.

14             MS. HARWIN:  No objection, your Honor.

15             THE COURT:  S will be admitted.

16             MS. FISCHER:  Thank you.

17             (Defendants' Exhibit S received in evidence)

18   BY MS. FISCHER:

19   Q.  Turning back for a moment to Plaintiff's 17, although I

20   guess I could ask with respect to both policies, but let's

21   focus on Plaintiff's Exhibit 17, given the time frame.

22             What is the purpose of this policy?

23   A.  So the purpose of the policy is to make particularly people

24   who are members of the Columbia University community aware of

25   what the community -- what the university describes as

1    discrimination, harassment, and gender-based misconduct, what

2    community members -- what their rights are under the policy,

3    what their obligations are, what experiences they may have or

4    behavior not to engage in, and what a process might look like

5    if they do experience this type of behavior or are accused of

6    the behavior, and what resources are available to them.

7    Q.  How are members of the Columbia University community made

8    aware of this policy?

9    A.  So there are several methods.  This policy was posted on

10   the office's website.  Additionally, the policy was sent to

11   numerous schools and departments so that they could also post

12   the policy on their websites or link to the policy.

13           Additionally, we would conduct trainings

14   and/orientation presentations to make people aware of the

15   policy.

16   Q.  So you said trainings were conducted?

17   A.  Yes.

18   Q.  And who conducted trainings on the policies?

19   A.  I did.  And it was part of the job description for the

20   investigators.

21   Q.  Where within Columbia was training conducted?

22   A.  We conducted trainings for students, staff, and faculty.

23   Q.  Were trainings ever conducted at Columbia Business School?

24   A.  Yes.

25   Q.  What does training on the policy entail?

1    A.  So we specifically called it a policy training, and it

2    would describe the behaviors that are violations of the policy.

3    And we would -- again, to let whoever is in the audience know

4    that these are behaviors that we want you to become aware of in

5    case you experience the behavior; these are behaviors we want

6    you to become aware of so that you don't engage in these

7    behaviors, and it also had an aspect to the student, because we

8    were the Title IX office, it also had student -- if a student

9    engages in this behavior or comes to you with a complaint what

10   you can do.

11            The policy trainings also made people aware of what a

12   process might look like should a complaint come forward and

13   then what resources were available to them.

14   Q.  And what kind of conduct is prohibited under this policy?

15   A.  Discrimination, harassment, and gender-based misconduct.

16   Q.  I think you mentioned this, but does the policy provide an

17   avenue for employees who've experienced discriminatory

18   harassing conduct to report that conduct?

19   A.  Yes.

20   Q.  Under the policy what is a Columbia employee supposed to do

21   if he or she feels they've experienced discrimination or

22   harassment?

23   A.  So, if they've experienced the behavior themselves, they

24   can certainly report directly to my office.  If they are a

25   union member, they can also report to their union.  If they're

I7jnrav6                         Rooker - direct

```
 1    a nonfaculty member, they can report to human resources.

 2              They could also report to another member of the

 3    university community, another officer of the community, who has

 4    an obligation to report that information to us.

 5    Q.  Would a dispute between two faculty members about research

 6    fall under this policy?

 7    A.  If it involved discrimination, harassment, or gender-based

 8    misconduct.

 9    Q.  So under this policy --

10              MS. FISCHER:  Why don't we take a look.  Can we look

11    at page 3 of this policy, please.

12    BY MS. FISCHER:

13    Q.  Do you see, Ms. Rooker, in the middle of the page it says,

14    "Duty to Act" and "Duty to Report"?

15    A.  Yes.

16    Q.  Can you please explain what is meant by both of those

17    things.

18    A.  So what the university decided to do is that place all --

19    the university has classifications for different types of

20    employees.

21              So, for officers of the university, which they

22    consider officers of administration, that is most of your staff

23    members; officers of instruction, most of your faculty members,

24    and officers of research, they are a very large research

25    institution, those university officers have an obligation to
```

I7jnrav6                    Rooker - direct

1   report suspected cases of discrimination, harassment, and

2   gender-based misconduct.

3         The procedures for doing so are in there.  The duty to

4   act falls on those persons who are management or supervisory

5   personnel.  Their obligation is to take some reasonable action

6   to try to stop the behavior and to attempt to prevent it from

7   happening again.

8         (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7j1rav7                          Rooker - Direct

 1  BY MS. FISCHER:

 2  Q.  Can you give an example of what you mean by that and --

 3  A.  The duty to act?

 4  Q.  Yes.

 5  A.  So for instance, a way to stop the behavior, if a

 6  supervisor or manager is, let's say, in a staff meeting and

 7  their staff is there and someone makes a comment about

 8  someone's body part or someone's nationality, or starts joking

 9  about someone's age, the manager or supervisor should take

10  action at that point and say, that language is not appropriate,

11  that's not a joke, that's not funny, stop that behavior right

12  now.  That could be considered reasonable and necessary action

13  to stop the behavior.

14          In order to prevent the behavior, a -- similarly, a

15  manager or supervisor could say, you know -- could contact our

16  office and say, I had an incident at my staff meeting, I spoke

17  to the employee in front of everyone, but I think I'm a little

18  concerned what might be going on and I think we maybe need a

19  training, can you all come in and conduct a training for our

20  department.

21          Or maybe a supervisor suspects that two employees are

22  not getting along or they have heard that something is going on

23  and maybe they need to separate those employees or have someone

24  kind of monitor, extra monitor of how their interactions are

25  going.

1   Q.  And with respect to the duty to report, which you've

2   already spoken to, what would trigger the duty to report?  How

3   does that come about?

4   A.  So what we would tell all of the attendees at our trainings

5   is that if you suspect that there is possible discrimination,

6   harassment, gender-based misconduct, on the basis of membership

7   in a protected class -- and protected class are those things

8   that federal, state, local laws have decided need some

9   heightened protection, those classifications such as race or

10  gender, nationality, disability.  If you suspect that this

11  behavior is happening, you have an obligation to report that to

12  our office, and then we would explain what would happen next in

13  that process.

14  Q.  If someone tells a faculty member that they are being

15  harassed, is that something that needs to be reported?

16  A.  The person who learns the information doesn't have an

17  obligation to further investigate, so just on harassment,

18  again, if you suspect that it's harassment based on membership

19  in a protected class, then you may have an obligation to

20  report.

21  Q.  And to be clear, did Columbia have EOAA policies in place

22  during the entire time you worked in the Title IX office?

23  A.  Yes.

24  Q.  And Ms. Rooker, I think you mentioned that when you were

25  associate provost, you did oversee investigations?

1   A.   Yes.

2   Q.   In what way did you oversee investigations?

3   A.   So the -- the investigators in the office all directly

4   reported to me, and so if a complaint or report would come in,

5   then I would have to decide who would take that complaint

6   report.  Complaints could come in in two ways.  They might come

7   in from someone who's actually experienced the behavior, or

8   they might come in from someone that is reporting the behavior

9   because they're saying, my staff member or I learned that this

10  has happened to someone else.  And so when that would come in,

11  I would work with the investigators to then determine what

12  would be the next steps in the process.

13          I met with my team -- all members of my staff, not

14  just the investigators, but I met with my team with one-on-ones

15  weekly.  We also had staff meetings -- we also had meetings to

16  discuss different investigative techniques, so I was

17  supervising each case, running through their list of cases and

18  what the next steps were for each case.

19  Q.   So did you provide guidance to your staff then?

20  A.   Yes.

21  Q.   In the investigative process?

22  A.   Yes.

23  Q.   And what kind of specific guidance would you give your

24  staff as to how to conduct investigations?

25  A.   So I think initially, and as part of overall understanding

1    of what an investigative process is, I would explain to them,

2    you know, how we should start investigations off, you should

3    start by telling people, you know, what is your role in the

4    process, that we're not a confidential office, that you're

5    telling -- you're putting the university on notice by talking

6    to us, that we do hope that you maintain the privacy of this

7    conversation that we're having to maintain the integrity of the

8    investigation.  What does retaliation mean; what do all of

9    these things mean; what does the process look like; how do you

10   open an investigative interview; using, you know, open-ended

11   questions, allowing a complainant, tell me what happened.  And

12   then I sometimes describe it as an inverted triangle, go from

13   open-ended questions to follow-up, to more leading questions,

14   and then, you know, how to end investigative interviews.

15          After that process, what questions to ask for, if

16   there's any documentary evidence, what offices might be able to

17   supply information that would be helpful in a different

18   investigation.

19          So we would review all sorts of steps in an

20   investigative process.

21   Q.  And who would review this?  You would review it with who?

22   A.  With my investigators.

23   Q.  And did that include Michael Dunn?

24   A.  Yes.

25   Q.  What would happen if the EOAA investigator concluded that

1  the policy was violated?

2  A.   So if the investigator determined that there was a policy

3  violation, the next step would be to then determine what

4  disciplinary action we were going to recommend to the

5  supervisor of the respondent, the person who was accused of the

6  behavior.

7  Q.   When you say recommend, the EOAA office imposed discipline

8  on people who were found to have violated the policy?

9  A.   We were only permitted to recommend discipline.  We could

10  not enforce the discipline.

11       MS. FISCHER:  If we could look at page 6 of the

12  policy, please.

13  Q.   Do you see here, Ms. Rooker, it says (A) Preliminary

14  Review; and (B) Formal Investigation?

15  A.   Yes.

16  Q.   Can you explain what these two different things are.

17  A.   So the policy had outlined two different methods of

18  reviewing a complaint or a report that was brought to our

19  office.  Ultimately the investigative process was the same, but

20  I would say the primary difference between these two processes

21  would be that the preliminary review, a letter would be issued

22  to the parties; in a formal investigation, a report would be

23  issued to the parties.  Similar -- the information contained in

24  them are similar, but it's just a different format.  And then

25  in a formal investigation, there would be a written complaint

1    from the complainant.  That would then be shared with the

2    respondent.

3    Q.  Was the investigative process different depending on

4    whether a preliminary review or formal investigation was

5    initiated?

6    A.  No.

7    Q.  With respect to investigations, was there any minimum or

8    maximum number of witnesses that investigators were expected to

9    interview as part of their investigation?

10   A.  No.

11   Q.  Why not?

12   A.  It depends on the facts of the case.  Sometimes a case

13   comes in and maybe there are only two people in the room.

14   Sometimes there's a situation like I described before and it's

15   at a staff meeting.  Sometimes there are, you know, a number of

16   witnesses that might have relevant information and sometimes

17   there's not.  So there wasn't a -- a checklist of you must

18   interview this number of witnesses.

19   Q.  If during the course of an investigation the complainant,

20   the person who's bringing the complaint, raises new facts, is

21   that something that has to be investigated?

22   A.  Again, I think it depends.  The investigator would take

23   that information and determine, are there new facts, is it

24   continuing behavior, is it something that is outside the scope

25   of what the office is responsible for investigating; again, is

I7j1rav7                    Rooker - Direct

1    it discrimination, harassment, gender-based misconduct on the

2    basis of membership in a protected class.

3              MS. FISCHER:  If we could zoom back out and look at

4    pages 3 and 4 of the policy.

5              Great.

6    Q.  So this section that begins on the top of page 3 begins

7    Definitions.  And then there's a number of definitions listed

8    here -- discrimination, discriminatory harassment.  And then

9    going to the next page, you have retaliation, sexual assault,

10   sexual harassment.  I'm skipping over the few things we've

11   already touched on.

12             But when a complaint comes in and the investigation

13   begins, did you expect your investigators to evaluate which

14   type of prohibited conduct was at issue?

15   A.  That would come out during the investigative process.

16   Q.  So can you tell us a little bit about that.  And my

17   question is really, is the investigator required to determine

18   whether it's a case of sexual harassment versus discriminatory

19   harassment versus gender discrimination?

20   A.  So I think what would happen is a complainant, if the

21   complainant was participating, would come in and describe

22   behaviors.  The complainant may describe behavior as

23   discrimination, and that's what the complainant's familiar

24   with, has heard about, may not understand all the meanings of

25   all of the definitions.  And so the investigator's job is to

1    take the behaviors that are alleged to start conducting the

2    investigation and figure out, this behavior, the behaviors that

3    are alleged, can it be one of these definitions?  Is it based

4    on membership in a protected class?  Is it a violation of the

5    policies?  So the investigator should, I guess, have a broad

6    scope of looking at the behavior to determine whether this is a

7    violation of the policy and where it fits, not necessarily just

8    based on what the report says or what the complainant comes in

9    with.

10   Q.  So along the same lines -- I think you discussed this just

11   a few minutes ago.  I think you said the word "harassment"

12   itself would not trigger an investigation, or on its own.

13   A.  On its own.

14   Q.  So why not?

15   A.  Because, again, these definitions -- what this policy is

16   focused on is really narrow.  It is discrimination, harassment,

17   gender-based misconduct, on the basis of membership in a

18   protected class.  Many people, like I said, may view and say, I

19   feel like I'm being discriminated against or I'm being

20   harassed.  Sometimes people are harassed and they're harassed

21   because -- as I might use in my training, they're harassed

22   because they, you know, love a certain sports team and the

23   other people in the office can't stand that team and they are

24   picking on them and harassing them.  It's not good behavior,

25   it's poor employee relations, but it doesn't fall under this

1   policy because they're not being harassed because of their

2   membership in a protected class.  So harassment, saying that I

3   was harassed, itself does not necessarily mean it's a complaint

4   or a report under this policy.

5   Q.  And what about if someone says, I'm being retaliated

6   against?

7   A.  Again, retaliation under this policy means that it's

8   retaliation, again, for making a complaint under this policy,

9   or that they're being retaliated for some level of

10  discriminatory or harassing behavior that they've complained

11  about, while participating in an investigation for that

12  behavior.

13  Q.  After the investigation is completed, do complainants or I

14  guess respondents, for that matter, have the right to appeal?

15  A.  Yes.

16  Q.  And can you tell us a little bit about the appeal process,

17  please.

18  A.  Sure.  So as you said, either party, the complainant or the

19  respondent, has an opportunity to appeal.  There are -- I think

20  in this policy there were three grounds for appeal.  If the

21  party says, you know what, I have new information that was not

22  available at the time of the investigation, or I think there

23  was procedural error that might affect -- have affected the

24  outcome of the investigation, or in cases where someone is

25  found to have violated the policy, if I think the

1    disciplinary -- what is it -- the disciplinary recommendation

2    is too severe -- and sometimes we've actually had complainants

3    say the disciplinary recommendation is too severe.  So what a

4    complainant or respondent would do is they would have to

5    present something to me in writing because I was facilitating

6    the process.  They would either send me an email or send

7    something to me hard copy, in writing, and saying, I'm

8    appealing on these grounds, this is why, and there was no

9    length necessary.

10          Once I get that, then my job was to identify an

11   appellate officer.  The policy says that it has to be a senior

12   officer of the university.  And I would do that.  I would then

13   notify -- once I had a senior officer identified, I would then

14   notify both the complainant and the respondent of who's been

15   identified as the appellate officer.  I would make them aware

16   of the grounds that are available that the appeal is on, and I

17   would then let them know how long the appeal could go and what

18   the process is, quoting from the policy.

19   Q.  Did appeals officers receive any training?

20   A.  Yeah.

21   Q.  What kind of training did they receive?

22   A.  So once the appeal officer was identified, myself and a

23   member of the general counsel's office would then meet with the

24   appellate officer to review the policy, to review the

25   investigative file, to answer any questions that the appellate

1    officer might have about what the process is, what the process

2    should look like, what the definitions mean.

3    Q.  And would the appeal officer be required to memorialize the

4    outcome of the appeal in some way?

5    A.  Yes.

6    Q.  In what way?

7    A.  So at the end of the time frame for the appeal, the

8    appellate officer would be required to write to me and let me

9    know the decision.  The policy says that the appellate officer

10   would make sure that it was determined whether it was, you

11   know, fair, that the investigation was conducted in a fair

12   manner, the determination of the investigator is consistent

13   of -- the investigation is consistent with the evidence and

14   is -- again, if there were disciplinary recommendations,

15   whether they were commensurate with the charges so that someone

16   who is alleged to have, for instance, made one comment is not

17   terminated, let's say, is that commensurate disciplinary action

18   for the allegations.  And so they would submit that to me.

19   Q.  I'd like to turn now to Professor Ravina's complaint.

20           Were you involved in the investigation of Professor

21   Ravina's complaint concerning Professor Bekaert?

22   A.  I supervised the investigator.

23   Q.  And what did that mean?

24   A.  That meant when Michael Dunn received the complaint, the

25   steps that he took, I would be supervising all the steps that

1    he took and engaging with him about what steps to take, what

2    additional measures to engage in.

3    Q.  And would he provide you with updates?

4    A.  Yes.

5    Q.  Did you have any involvement -- are you aware that

6    Professor Ravina appealed the outcome?

7    A.  Yes.

8    Q.  Did you have any involvement in her appeal?

9    A.  So again, as an appeal facilitator, she sent the appeal to

10   me, I then selected the appellate officer, provided the

11   appellate officer with training, provided the appellate officer

12   with the investigative files and the policies, and then once

13   the appellate officer reached a decision, I received that

14   decision.

15            The policy then provides that the provost has to sign

16   off on the appeal decision, so then I sent it to the provost

17   for the provost to sign off.  And then once the provost signed

18   off on the decision, I then notified both of the parties of the

19   outcome of the appeal.

20            MS. FISCHER:  And could we please pull up -- oh, I'm

21   sorry.

22   Q.  Who was the appeal officer who was assigned?  I'm not sure

23   you said.

24   A.  Melissa Begg.  She is a vice provost.

25   Q.  Thank you.

1            MS. FISCHER:  Can we please pull up JP, Defendant's

2       JP.  I don't believe it's in evidence.

3            Could we give a copy to the witness, just, you know,

4       several pages long.  Thank you.

5            THE COURT:  Any objection to JP?

6            MS. HARWIN:  No, your Honor.

7            THE COURT:  JP will be admitted.

8            (Defendant's Exhibit JP received in evidence)

9       BY MS. FISCHER:

10      Q.  Ms. Rooker, do you recognize this document?

11      A.  Yes.

12      Q.  And what is this document?

13      A.  This is -- it looks like it is the appeal, the

14      complainant's appeal notification to me, the request for

15      appeal, and then there are emails after a discussion of the

16      appeal related to possible retaliation.

17      Q.  I'm sorry.  What was that last --

18      A.  Then after information about the appeal and appeal

19      notification, there are emails related to possible retaliation.

20      Q.  Looking at the first page, there's an email from Professor

21      Ravina to you?

22      A.  Yes.

23      Q.  And --

24            MS. FISCHER:  Thank you.  Yes.  That's the one.

25      Q.  And it says, "Melissa --"

1          MS. FISCHER:  Yes, well, let's back up, actually, to

2     the prior email in the chain so we have from Ms. Rooker to

3     Professor Ravina at 9:20 a.m.

4          And let's just look at the second paragraph.

5     Q.  You asked Ms. Ravina, "If you have experienced other

6     behavior that may be possible discrimination, harassment since

7     this investigation concluded, please let me know so the

8     university can appropriately respond."  Right?

9     A.  Yes.

10         MS. FISCHER:  And now let's look at that email right

11    above it.

12    Q.  And Professor Ravina wrote to you that Professor Bekaert

13    continues to retaliate, is that right?

14    A.  Yes.

15    Q.  And then how would you characterize -- if you could read

16    the rest of the first paragraph.  Or the next sentence, at

17    least.

18    A.  You want me to read that out loud?

19    Q.  I'll read it out loud.

20         "On November 20th, I asked him I guess for codes and

21    tables he has done for a joint paper I really need to submit

22    for publication."

23         MR. HERNSTADT:  Your Honor, could we just clarify that

24    that email from Professor Ravina is not being put in for the

25    truth of anything that's said in it but that she said it.

I7j1rav7

<table>
<tbody>
<tr><td>1</td><td>          THE COURT:  Yes, it's not being admitted for the truth</td></tr>
</tbody>
</table>

1          THE COURT:  Yes, it's not being admitted for the truth

2    of what's stated but rather the fact that it was stated and to

3    whom and when.

4          MS. FISCHER:  And now let's look at Ms. Rooker's

5    response.

6    BY MS. FISCHER:

7    Q.  Ms. Rooker, you responded it looks like a week later or

8    thereabouts?

9    A.  Yes.

10   Q.  Did you investigate Professor Ravina's -- what Professor

11   Ravina wrote to you in the prior email?

12   A.  No.

13   Q.  Why not?

14   A.  When I -- when I received this, her email of December 16th,

15   it raised concerns for me, so I escalated it to counsel,

16   because it was my understanding that she had a lawyer and that

17   they were having conversations that I was not privy to and was

18   told that they are handling the issues related below, so that's

19   why I responded in the way that I did.

20   Q.  Can you just read the last sentence of your email, please.

21   A.  "Should the issues not be resolved through your attorney,

22   EOAA will again review the information and determine if there

23   are additional steps to take."

24         MS. FISCHER:  Okay.  Just one second.

25         Nothing further.

I7j1rav7

```
 1              THE COURT:  All right.  Cross-examination?

 2              MS. HARWIN:  No questions, your Honor.

 3              THE COURT:  All right.  You can step down.  Thank you.

 4              THE WITNESS:  Thank you.

 5              (Witness excused)

 6              THE COURT:  Are defendants prepared to call their next

 7    witness?

 8              MS. PLEVAN:  I'm sorry.  We're not.

 9              THE COURT:  We're done for the day?  Okay.

10              All right.  So we're going to end now, and we'll start

11    again tomorrow morning and move forward, all right?  Thanks.

12              Just remember, don't discuss or research the case, and

13    have a nice evening.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25
```

1              (Jury not present)

2              THE COURT:  All right.  I just want to talk about

3      scheduling for a minute.  You can all be seated.

4              So you'll figure out the video issues tonight.  We'll

5      have that at some point.  And then tomorrow we think we'll go

6      all day?

7              MS. PLEVAN:  Yes.

8              THE COURT:  Okay.  And then Monday we think we'll have

9      some testimony but won't take the whole day?  Because remember,

10     on Monday, we're only sitting in the afternoon.

11             MS. PLEVAN:  So tomorrow, yes, we have -- well, we

12     assumed the video would be played first, since it's on their

13     case.

14             THE COURT:  All right.

15             MS. PLEVAN:  And then we have --

16             THE COURT:  Do you think you have enough to fill the

17     day tomorrow?

18             MS. PLEVAN:  We have all the other witnesses on call,

19     so I apologize for that today, but -- so Janet Horan and

20     Professor Phillips and then Professor Wei, either -- I mean, if

21     we got to her tomorrow, you know, but more likely I think it's

22     Monday.

23             THE COURT:  Monday.  So what I really want to figure

24     out is when we think we're going to have the charge conference.

25     And I know I have to get you a draft of the charge, which I'll

I7j1rav7

do as soon as possible, but my thinking is that we'll do it on

Monday after whatever court session we have.  And again, we're

only sitting in the afternoon on Monday.  So my assumption is

that you're going to need Monday afternoon, is that fair to

say, for testimony?

          MS. PLEVAN:  I mean, yeah.  I mean, she's a two-,

two-and-a-half-hour, probably, witness --

          THE COURT:  Okay.

          MS. PLEVAN:  -- Professor Wei.  So --

          THE COURT:  All right.  I mean, if things move faster

tomorrow than we think -- because, again, I don't yet have a

draft for you but I will get one shortly -- then it may be that

I have to send it to you over the weekend and we'll have a

charge conference first thing Monday morning.  But we'll figure

that out tomorrow, okay?  Because what I don't want to do is

bring the jury in on Monday to not sit or to, you know, just

sit for not very long.

          MR. SANFORD:  Just to confirm, your Honor, so that

we'll be playing a video in the morning and defendant will call

Ms. Horan, Ms. Phillips, and Wei Jiang, and then they're done?

          MR. HERNSTADT:  No.  After the video, Professor

Bekaert will be calling witnesses as well, and then defendants

will call their witnesses and then we'll be done.

          THE COURT:  All right.

          MR. SANFORD:  Thank you, your Honor.

I7j1rav7

1              THE COURT:  All right.  So I'll see you all tomorrow

2      morning.  Thank you.  Have a good night.

3              ALL COUNSEL:  Thank you.

4              MS. PLEVAN:  Your Honor, we also do want to make a

5      Rule 50 motion, so --

6              THE COURT:  No, I understand that.  I just --

7              MS. PLEVAN:  Okay.  I just wanted to --

8              THE COURT:  I understand.  If you can reserve that so

9      we don't keep the jury waiting, I'd appreciate it.  I'm happy

10     to do it at the end of any day, but we'll -- I mean, do you

11     want to do that now?  Do you want to do it after the testimony

12     is in?  I mean, I'm happy to do it now.  Are you prepared to do

13     it or would you rather do it tomorrow?

14             MS. PLEVAN:  I am prepared to do it.  Would you rather

15     wait?  I'm prepared to do it now.

16             THE COURT:  Okay.  Why don't we do that now.

17             MS. PLEVAN:  Good afternoon.

18             So defendant Columbia moves under Rule 50(a) for

19     judgment as a matter of law on each of the claims that remain

20     in the case following the Court's ruling on summary judgment,

21     and I will try to take them each in turn.

22             First, on the New York City Human Rights Law

23     discrimination claim, the plaintiff was required to show that

24     Columbia either knew of Professor Bekaert's alleged unlawful

25     discriminatory conduct and acquiesced in it or failed to take

I7j1rav7

immediate and appropriate corrective action, or that we should

have known of his conduct and failed to exercise reasonable

diligence to prevent it.  The evidence does not show, and there

is no evidence, that Columbia knew or should have known

anything of a discriminatory nature until mid July 2014, and

for this I rely on Professor Ravina's own testimony to the

effect that she told Vice Dean Johar that "a senior tenured

professor in my division with whom I was collaborating --" I'm

sorry, I'm quoting -- "was being abusive, vindictive, and

belittling me."  She did not use the words "sexual harassment."

And that's citing pages 246-7 of the transcript.

        Upon learning this information later, about the -- not

this information.  I apologize.

        The other remaining testimony that came in on the case

was that there was no report of discriminatory conduct or

sexual innuendo until there was a conversation with then Senior

Vice Dean Phillips in mid-July 2015, after which the dean's

office reported this information immediately to the EOAA,

following which there was an investigation that was discussed

at length by Michael Dunn in his testimony, and the

investigation, given the nature of the allegations, which

involved the two people, there were no witnesses to any of the

alleged acts and the comments were based on emails, which each

of the participants submitted to Mr. Dunn.  He's an experienced

investigator.  We heard also about the supervision of Michael

I7j1rav7

Dunn.  But that resulted in a decision that there was no policy
violation which, under the circumstances, was a reasonable
decision.

          In addition to all that, the business school took
remedial steps to address the allegations or the concerns that
were expressed by Professor Ravina.  Almost at the very first
meeting that they had in June, the dean agreed that Professor
Bekaert should not participate in her tenure process, and he
agreed to that right away.  The dean said that he would
advocate or initially that he would consider helping her get an
extension on her tenure consideration, the timeline for her
tenure consideration, and he later, as he testified,
recommended that to the provost.  And we heard that that offer
was made to her on more than one occasion, that she would have
a break in service.

          Other remedial steps that were taken include that
Professor Bekaert would agree to have a relationship manager in
the interim.  The dean described his accepting copies of their
materials to monitor what they were saying to each other and to
prevent hostilities.

          They also changed her mentor, as she requested.

          And in due course, Professor Bekaert agreed to a
timetable for a revision to an important paper, and as we know,
it's the one paper that she was able to complete as a co-author
in many, many years, in time for her tenure review.

I7j1rav7

1          And he also agreed to withdraw from another paper, and

2     she had been asking for that relief.

3          So these are just some but important steps that

4     Columbia took responsive to Professor Ravina's complaint that

5     preclude any finding in her favor under the New York City Human

6     Rights Law.

7          And under the alternative grounds, there's been

8     evidence of Columbia's reasonable diligence in general to

9     prevent harassment through policies, procedures, training,

10    that's provided to the dean and the faculty, all of which is

11    inconsistent with a determination under the New York City Human

12    Rights Code in these circumstances.

13         Addressing next the cat's paw theory of potential

14    liability, here, there's no evidence that Columbia allowed

15    Professor Bekaert first to play any meaningful role in the

16    decisions relating to Professor Ravina's tenure.  All the

17    evidence was of his getting notice of meetings.  There's no

18    evidence he participated in any meetings.  There's been no

19    evidence that he lobbied, that he spoke to people, that he did

20    anything to advocate among the professors in the division

21    against her tenure vote.

22         With respect to her other claims, there's also no

23    evidence that Professor Bekaert was allowed to play not just a

24    meaningful role but any role in the decisions regarding her

25    requests for leave of absence, which was the hardship leave,

I7j1rav7

which was handled primarily in the provost's office, but

certainly there's no evidence that Professor Bekaert

participated in that in any way, or that he was involved in

this whole issue of the June 1 letter that refers to -- that

Professor Ravina read as granting her a leave of absence for

the following year.  Professor Bekaert wasn't involved in that

at all.  And therefore, Columbia can't be held responsible on a

discrimination theory.

     The evidence also did not show that anything that

Columbia did with respect to the tenure, or that anything

Bekaert did was a "but for" cause of the denial of tenure, as I

think would be required.  Here, I think we even have an

admission from the plaintiff that the tenure vote was proper,

that she didn't deserve to get tenure.  But in any event, the

reason for her denial of tenure, as the evidence showed, was

based on her own record and the lack of productivity, not

something that Professor Bekaert influenced in any way.  And

that's shown further by the history that I won't recount in any

detail -- I'm sure the Court recalls it -- of her lack of

publication, lack of productivity, and the evaluations that she

received along the way.

     Next, turning to the claim of retaliation, the

plaintiff has not presented any evidence that retaliation

played any part in the scheduling of her tenure review.

There's no evidence that -- they've used the word I think

I7j1rav7

"acceleration" -- was retaliatory.  All the evidence, including

from Professor Ravina's own mouth, is that there was a deadline

and that that deadline, under all kinds of rules of the

university, required that she be considered for tenure by the

spring of 2016.  There's no dispute about that.  And that

that's what determined the timing of her tenure vote.

        The vote itself, there's no evidence that that

involved retaliation.  And there's also been no evidence that

retaliation played any part in the denial of her request for a

personal hardship leave.  Professor Brown, then Vice Provost

Brown, explained his decision, his thought process, his belief

that she had been offered an alternative that was consistent

with past practice of the university -- that is, a break in

service -- and that he was troubled by the fact that the policy

did not seem to be applicable here because she was seeking a

leave with pay and that that was not what was provided for in

the faculty handbook concerning a personal hardship leave.  And

that coupled with the absence of any precedent was the reason

that that leave was denied, not because she made a complaint or

threat of discrimination.  And I think what is evident is that

Professor Ravina had lawyers involved in this very early,

sometime in 2014, and that there's a constant reference in

various documents to lawyers being involved.  That in and of

itself is not a trigger for any retaliatory motive.

        And on the revocation, so-called, the alleged

I7j1rav7

1    revocation of the leave, our position is there's no evidence

2    that Professor Ravina actually ever got any leave for the years

3    2015-16.  Her reading of the dean's letter, which she learned

4    within a few weeks was a mistake -- and that's what the

5    testimony, undisputed testimony is, and there's no evidence

6    that that was ever intended to be a leave or provided for as a

7    leave, other than a relief from teaching.  So telling her it

8    was a mistake, which was the truth, is not an act of

9    retaliation.

10          And finally, we think the Court should dismiss any

11   claim for punitive liability because there is no evidence of

12   any willful or wanton negligence or recklessness or conscious

13   disregard of her rights, the rights of Professor Ravina, that

14   would warrant putting that issue to the jury.

15          Thank you.

16          THE COURT:  Thank you.

17          Mr. Hernstadt, do you want to make a motion?

18          MR. HERNSTADT:  Yes, your Honor.

19          Thank you, your Honor.  Professor Bekaert also moves

20   for judgment as a matter of law because plaintiff has failed to

21   present any evidence that is legally sufficient to permit a

22   reasonable jury to find for her under Rule 50(a).

23          Like a Rule 56 motion for summary judgment, all

24   reasonable inferences are drawn in favor of the nonmoving

25   party, Professor Ravina, and the Court doesn't make credibility

I7j1rav7

judgments or weigh the evidence, but the obligation to draw

reasonable inferences does not mean that the Court must credit

a version of the facts that is belied by the record.  Citing

the *Tabbaa* case, 509 F.3d 89, 93.

THE COURT:  If the jury were to believe plaintiff on

everything, on everything she said, do you think that that

would constitute discrimination and retaliation?

MR. HERNSTADT:  If the jury were to believe everything

she said, it would definitely not constitute retaliation.  I

don't think it would constitute discrimination.  Part of the

problem is that the jury can't believe everything she said.

Certainly not -- well, first of all, believing everything she

said, when it comes to discrimination, the plaintiff has to

show that Professor Bekaert was treating her less well because

of gender.

There are two types of allegations of sexual

harassment or sexual advances.  Not types -- two groups.  There

are the ones that occurred between -- I'm sorry.  They're the

ones that she told Mr. Dunn about and that were in her original

complaint to the EOAA that were in Mr. Dunn's notes, that were

in the report, that's Exhibit 90, and that she also complained

about in her appeal.  She referred only to the things -- she

didn't say in her appeal, oh, Mr. Dunn forgot other claims that

I told him about.  So it's impossible for the jury to believe

the new claims that she brought up, that came about only in

I7j1rav7

```
 1   2016, when she wrote to the provost asking for a leave and then
 2   she put it into her complaint.  Those are the most dramatic
 3   ones.  That's the -- that he kissed her, that he talked about
 4   pornography, he talked about prostitutes -- once only for all
 5   these things -- that he talked about his sexual exploits, on a
 6   number of occasions, where he touched Professor Ravina -- I
 7   think there's one other.  Those are new things.  And how can
 8   the jury believe that that's true when the evidence is
 9   Professor Ravina testified that she told Mr. Dunn this, but she
10   didn't explain why she never told him that this stuff was
11   missing from his report.
12           And if you look at her appeal, which is her immediate
13   response to the report, she doesn't say anything about it.  No
14   reasonable juror could believe that she remembers things like
15   he gave her chocolates or he gave her compliments or he invited
16   her to dinners or he invited her to coffees, and even that he
17   touched her hand for a moment, which is what she told Mr. Dunn
18   when they were having dinner at a restaurant, but forget to
19   tell him that he tried to kiss her, that he talked about
20   prostitutes, that he talked about pornography, that he talked
21   about his sexual exploits.  These are the most dramatic claims
22   that she makes.  So no jury could believe that.
23           Most of the other allegations, the ones that she
24   actually reported to Mr. Dunn, are simply not about gender.
25   They're not because of gender.  They don't implicate gender.
```

I7j1rav7

They're normal incidents that occur when you have colleagues
who spend some time together and who are friendly.  That's what
the emails show.  They're unequivocal.

Professor Ravina testified that she was pressured into
having dinner, but if you look at the actual emails on the
days, that testimony is impossible to believe.

There's an email from July 31, 2012, where she says
this is her being pressured.  The email actually says, No
pressure.  We can postpone.  A second time, he says, We can
postpone.  And in the end, Professor Ravina says, Well, we
could go to these four different restaurants and I've left, you
know, calls to two of them to make reservations.  That's not
someone being pressured into anything.

THE COURT:  Why is that not a question for the jury?
That's a test of her credibility, that's a test of his
credibility; they can look at the emails and make the
assessment.

MR. HERNSTADT:  Because the emails are communications,
are things that she said at the time they happened, and that is
as opposed to what she's saying now.  No reasonable jury could
actually believe that.  It's just incredible.

You know, and she's clearly not telling the truth
about certain things.  For example, that July 31, 2012 email,
he says, I will pay you dinner, right -- let's call that an
invitation -- at my local Italian restaurant.  And the

I7j1rav7

testimony was, oh, he's been pressuring me, I don't want to go,

I never wanted to go, I was delaying it.  And then we see an

email from November the year before where he mentioned the

restaurant and she says, about the restaurant, "Sounds good."

So she's on paper at the time saying things that are completely

different than her testimony was here.

THE COURT:  Look, she testified as to why she made

statements of that sort, why she felt pressured to continue to

get along, to compliment him.  It may be the jury doesn't

believe her, but that seems like a jury issue.

But in any event, please continue.

MR. HERNSTADT:  With respect to retaliation, Professor

Ravina suggests that in order to make retaliation, that the

defendant took actions that were reasonably likely to deter a

person from engaging in protected activity.  The plaintiff has

pointed to three things.  One is that he delayed and obstructed

her work or blockaded her work, that he disparaged her in the

profession, and that he sabotaged her tenure.

I think when it comes to sabotaging her tenure, that's

sort of two different issues.  One is the saying that he

delayed her work.  If he delays her work so she doesn't get

publications, that sabotages her tenure.

The other may be the suggestion that plaintiff has

raised that he somehow was involved in the tenure vote.  As

Ms. Plevan pointed out, there is zero evidence that he had

I7j1rav7

anything to do with the tenure vote.  In fact, the only

evidence in the record is that as of July 2014, he withdrew

definitively in the tenure vote and he had nothing to do with

it thereafter.  That's the only evidence on that.  So that

can't be part of it.

When it comes to the allegations of delay, you know,

again, the plaintiff had testified about delays, but if you

look at all of the emails, including emails that she's relying

on, all they show is progress.  It's uncontroverted that the

first delay, the only delay, the most significant delay, is

from 2009 to late October 2011 when the contract is signed, and

then until late August 2012 when the bulk of the data, you

know -- they got 100,000 points in May, they got the rest of

the 20 million data points in late August -- was delivered.  So

we're now in late 2012.

It's also uncontroverted, the evidence is absolutely

crystal clear, that the first paper was ready to start being

written in April 2013.  By the end of 2013 -- again, this is

not controverted, the evidence is unanimous on this -- two

papers had been completed, and submitted to conferences.

And we also know that one of those papers, Professor

Bekaert stepped off of and it's been in the hands of plaintiff

since early 2015, and it still hasn't been redrafted from 2014

and it still hasn't been resubmitted to Financial Engines.

And the third paper was essentially put on hold by the

I7j1rav7

1    co-author because -- the email is the only evidence on this --

2    he didn't want to be an arbiter between Professor Bekaert and

3    Professor Ravina.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

i7jnrav8

1           MR. HERNSTADT:  (Continuing)  The other paper, the

2    only remaining paper was the international diversification

3    paper, which was completed and published.  It was published,

4    according to Professor Bekaert, top three out of his

5    publications, that fast.

6           If you compare it to Professor Ravina's publication

7    history, it's, you know, infinitely faster.  The only other

8    paper she published, refereed paper that she published between

9    2009 and today was a paper she started in 2008 with Professor

10   Parvisini and Rapoport.  That's the evidence.

11          The evidence is uncontroverted, indisputable that

12   there isn't a delay.  Professor Ravina can say that in

13   self-serving e-mails.

14          To the extent there is also evidence of reasons why

15   the paper had fits and starts, it's clear that Professor

16   Bekaert is a busy man who writes with a number of coauthors,

17   including, as he testified and it's uncontroverted, many junior

18   authors who, coauthors who are in the exact same position as

19   Professor Ravina, under a tenure clock.  He can't not do their

20   work.

21          Professor Ravina has not asked him to set aside all

22   his work, but that is essentially the expectation, and he

23   didn't do that.  He traveled a lot.  He was out of the country

24   for eight months in 2013.  And there were problems.

25          While Professor Ravina says that there weren't

i7jnrav8

problems with the data, her own e-mails show that she still has

to deliver certain key pieces of data well into 2014.

We also have the two different papers that are

written, two different versions of the same paper that were

written at the end of 2014.

One thing we do know is that Professor Ravina never

told her coauthors and never told Professor Bekaert she was

writing a second paper.  She asked for data and the codes,

which were not given to her because Professor Bekaert says in

an e-mail, I am writing this paper.  It doesn't make sense for

both of us to have it

Professor Hubbard's testimony is that when you work

with a coauthor one person has the pen, the other edits.

There's no evidence in the record of a delay.  The

fact that Professor Ravina can testify there are no delays,

there is no specific testimony that can counter what is in the

e-mails and that can counter the fact that this paper was

published and it was published in record time.

When it comes disparaging the profession, there are

two separate e-mails they are relying on.  There are e-mails in

2014 when he learned of the complaint, and there's the e-mails

in 2016 after the press campaign was launched against him.

The 2014 e-mails, we have seen a few of them, are to

his girlfriend, and there are two other friends.  They are raw.

He uses the word "bitch" he uses the words "evil bitch."  That

i7jnrav8

1    is only to be expected.  The thing that you would expect

2    someone to do who feels they have been unfairly accused of

3    something by coauthor who they think is a friend is to vent and

4    express their frustration, anger, sadness, sense of their

5    betrayal to their girlfriend and close friends.

6             These are not e-mails that went to Professor Ravina.

7    She never saw them until discovery in this case.  The fact that

8    his girlfriend is also an economist doesn't make them an effort

9    to disparage Professor Ravina in the profession.

10            They are not even disparaging in any real sense of the

11   word.  They don't say that her work is bad.  They don't say

12   that she is incompetent as an economist or a finance professor.

13   They say that he is extremely unhappy with what has happened to

14   their relationship.

15            E-mails like that are not reasonably likely to deter

16   anyone from making a complaint.  They are what every single

17   person who makes a complaint would expect.

18            THE COURT:  There is one e-mail -- and I don't

19   remember the specifics now, it was admitted through plaintiff

20   while Professor Bekaert was on the stand -- it referred to the

21   delay, where he talked about the delay and he talked about his

22   frustration or anger with her in the same e-mail.

23            MR. HERNSTADT:  Right.

24            This is an e-mail from August of 2014.  So this is

25   when they've gotten -- this is to Andrea Kiguel.  They have

i7jnrav8

1    gotten the data that they have been waiting for many, many

2    months about the fund matching data with the fee information,

3    and it was not usable.  And they were spending a great deal of

4    time trying to clean it up and fix it and it is a lot of

5    frustration.

6         He says in this e-mail in June that he may have

7    delayed for a few months because she did something and he was

8    pissed at her.

9         The only thing I can say about that is, if you look at

10   what happened, June is two months after they were ready to

11   start, just ready to begin starting to work on a paper.

12        That paper was completed, a draft of it was submitted

13   to one of the most important finance conferences in the country

14   by December 31, 2013, so that Professor Ravina could do a

15   presentation at this conference in Philadelphia in January of

16   2014.

17        There is no evidence -- he says this, but there is no

18   actual delay.  Professor Bekaert's testimony about it is also

19   uncontroverted, which is that, although they could start

20   working on the paper, data was missing, there were problems

21   with data that had to be massaged, and there was a research

22   disagreement about what type of paper specifically were they

23   going to do.  But those were the normal things that get worked

24   out.

25        The uncontroverted fact is that within six months of

1    June a paper was completed and submitted.  That is not a delay.

2    That is very fast.

3         You know, if the benchmark is how fast is not delayed,

4    look at Professor Ravina's CV.  Look how long it takes her to

5    do papers.  So there's no delay there.

6         That's more that that is not a disparaging the

7    profession, which is what I was talking about.

8         THE COURT:  I know.  I was talking about e-mails.  I

9    wanted to focus on that.

10        MR. HERNSTADT:  No problem.

11        I want to talk about more e-mails.  The 2016 e-mails.

12        What is the evidence on the 2016 e-mails?

13        And it is uncontroverted that Professor Ravina filed a

14   lawsuit and there was a press campaign, that she sat for

15   interviews, she sat for photographs.  It was in the New York

16   Times the Daily News, the New York Post.  It was on Poets and

17   Quants, which Professor Bekaert points out is something that

18   just not economists and finance people read but a lot of

19   students read.

20        It was widely reported.  That was the goal.

21        In response to the reporting, which, by the way, is

22   not a protected activity, engaging in a press campaign is not

23   protected.  Whatever Professor Bekaert did is in response to

24   the press, not in response to the complaint.

25        We know that because it was also uncontroverted that

i7jnrav8

1    he was sued in September of 2015, and there are no e-mails.

2    There's no responses that he sends to his coauthors or

3    colleagues or whatnot.  He did nothing.

4         The press campaign, however, is different.  His

5    reputation that he worked 20 years to achieve is now

6    besmirched, damaged.  He needs to salvage it.  He needs to

7    salvage his relationships, and he wants to assure his friends

8    that he had nothing do with it.

9         So he sends his friends, his colleagues, his

10   coauthors, and in one instance the consulting company that he

11   was hoping to save his job with, e-mails.  Again, these e-mails

12   are not, first of all, not in response to protected activity;

13   and, second of all, not reasonably likely to deter anyone from

14   engaging in the protected activity that Professor Ravina

15   engaged in, which is filing the complaint.

16        They are exactly what you expect.  If you file a

17   complaint, then the person you accuse of sexual harassment and

18   the types of brand-new accusations that she put in the

19   complaint that was never in the EOAA investigation of 2014,

20   like prostitution and pornography, and these very salacious,

21   you know, statements, you have to expect that someone is going

22   to try to at least tell their friends, their coauthors, their

23   colleagues that they had nothing to do with it.

24        The reality is they all work in the profession, but

25   the reality is also -- and Professor Ravina knows this -- these

i7jnrav8

1   are his friends.  They are going to support him.  They are not

2   going to, like, because he sends this e-mail suddenly take his

3   side over hers.

4       This is not reasonably likely to deter anyone from

5   engaging -- from filing a lawsuit to know that by filing the

6   lawsuit and then putting it as loudly and as broadly in the

7   press as possible that someone is going to try to defend

8   themselves privately to their circle of friends and colleagues.

9       That is not just natural, but it must be expected.

10       THE COURT:  All right.

11       Thank you.

12       MR. HERNSTADT:  Thank you, Judge.

13       THE COURT:  Does the plaintiff want to respond?

14       MS. HARWIN:  Your Honor, would you like me to address

15   Professor Bekaert's and professor and Columbia's separately.

16       THE COURT:  Whatever you want.

17       MS. HARWIN:  OK.

18       THE COURT:  It doesn't matter.

19       MS. HARWIN:  What we just heard from Professor

20   Bekaert's attorney was essentially a closing argument, an

21   argument to find his client and his client's explanations more

22   credible than Professor Ravina's.

23       That is just not what is done at this motion.  There

24   is extensive, credible evidence in the record regarding what is

25   an overall course of gender discrimination over a course of

i7jnrav8

1    years.

2            What it is is not isolated incidents, not a handful of

3    e-mails, but what it is, is an overall course of conduct that

4    built and intensified over years.

5            We have in the record descriptions of in 2012 initial

6    dinner invitations, a dinner where Professor Bekaert asked

7    Professor Ravina if she had a boyfriend, said that he would

8    feel bad doing this if she did, where she responded that this

9    was a dinner between colleagues; asking for compliments during

10   that period -- behavior that is clearly gendered in nature,

11   intensifying in 2013 when in that spring Professor Bekaert

12   was -- he was on sabbatical -- when he returned a comment about

13   her being sexy, talking to her about his sexual exploits.  Then

14   the following --

15           THE COURT:  Lets focus on Columbia's knowledge for a

16   minute.

17           Is there any testimony in the record that when she

18   initially met with Mr. Dunn she mentioned what has been

19   referred to as the more salacious comments that were made, the

20   more salacious allegations of his conduct I should say?

21           MS. HARWIN:  Well, you know, I am not sure what is

22   being characterized as salacious, but there is evidence in the

23   record that she talked to Mr. Dunn about the --

24           THE COURT:  She talked to him about Professor

25   Bekaert's alleged attempt to kiss her?

i7jnrav8

1              MS. HARWIN:  Yes.  She testified about that.

2              THE COURT:  At the first meeting initially when she

3    met with Investigator Dunn or Mr. Dunn?

4              MS. HARWIN:  I believe so.

5              THE COURT:  All right.

6              MS. HARWIN:  That's my recollection.  Yes, because the

7    second meeting was a very short meeting on fairly discrete

8    topics is my recollection.

9              THE COURT:  And did she mention his reference to

10   pornography or his sex life when she met with Mr. Dunn, when

11   she first reported the conduct she was complaining about?

12             MS. HARWIN:  With respect to the pornography comment,

13   I am not sure whether there's record evidence on whether that

14   was something that was covered in the initial discussion or

15   subsequent discussion with Michael Dunn.

16             I believe that there were discussions of him about the

17   discussions of attractiveness, popularity, desirability, I mean

18   those kinds of things that obviously we heard quite a lot about

19   here.

20             THE COURT:  What about him touching her back?

21             MS. HARWIN:  I believe that, yes, there's testimony

22   that she reported that to Director Dunn.

23             THE COURT:  Initially?

24             MS. HARWIN:  That's my understanding, yes.

25             THE COURT:  All right.  OK.

i7jnrav8

1              You can proceed.

2              MS. HARWIN:  What she described both in testimony and

3    to Director Dunn was a course of conduct that evolved and

4    developed over time.  So we talked about 2012, we talked about

5    the spring of 2013, in the fall of 2013, which is when they

6    were both at Columbia, that semester there was intensifying

7    conduct, going to coffee very frequently, where Professor

8    Bekaert would bring up these issues over and over again, a

9    number of dinners where these other subsequent incidents, the

10   kiss, the touching on the back occurred.

11             And then Professor Ravina talked about in 2014

12   beginning to avoid these kinds of interactions, no longer doing

13   dinners, cutting back on the coffees, and Professor Bekaert

14   responding in extremely aggressive ways, especially following

15   on what we heard testimony about, about this comment that

16   Professor Bekaert made in his office about if she were nicer to

17   him her papers would proceed faster.

18             THE COURT:  When was that relayed to Columbia, that

19   comment?

20             MS. HARWIN:  It is reflected in Director Dunn's notes.

21   Professor Ravina has testified it is not reflected accurately

22   in his notes, but it is in Director Dunn's notes.

23             THE COURT:  How is it reflected?

24             I understand your position is it isn't reflected

25   accurately, but how is it reflected in his notes?

i7jnrav8

1          MS. HARWIN:  It says if she were friendlier to him

2    papers would proceed faster, words along those lines, but he

3    describes it as an implicit message, which it is not.  It was

4    an explicit statement, but that is reflected in Director Dunn's

5    notes.

6          What we have, again, is an intensifying course of

7    conduct.  And we have in the spring of 2014, before Professor

8    Ravina reports to Columbia, we have Professor Bekaert becoming

9    increasingly abusive after she has rebuffed him and

10   significantly reduced their interactions.

11         We have these e-mails in which he talks about

12   masochistic desire, drastic action, bringing a whip.  She

13   begins therapy that semester and complains to Columbia about

14   what's going on shortly thereafter.

15         The testimony is that -- and we heard today from

16   Professor Bolton that the meeting with Senior Vice Dean Johar,

17   that initial meeting in mid-May 2014, that it was clear that

18   this was about sexual harassment.  This wasn't just about a

19   research dispute, but that it was about significantly more than

20   that.

21         It is uncontroverted that these abusive e-mails were

22   shown to Columbia at that time.  Professor Ravina talked about

23   describing the abusive behavior of Professor Bekaert.  Again,

24   Professor Bolton testified about this.

25         After that report, Columbia did nothing at that time.

Professor Ravina didn't hear back from Senior Vice Dean Johar.

She heard in June that the EOAA was not going to be involved in addressing it; subsequent meeting with the dean in June 2016 where there is testimony that she was discouraged from bringing a complaint, that the dean, that there was nothing that he could do.  It was only with the intervention of Suzanne Goldberg, who was in attendance, that some interim measures were discussed.  But there's no investigation that is undertaken at that time.

It's only in July that a referral is made to the EOAA. No investigation starts until August; no investigation concludes until November.

And the investigation that's done is -- deficient doesn't really begin to describe it.  We have extensive evidence regarding the deficiencies in the investigation.

We have evidence that Director Dunn met with Professor Ravina, she provided him with some documents, he never contacted her to discuss them.  He subsequently met with Professor Bekaert three times, got documents from him, never contacted Professor Ravina to discuss them or show them to her so that he could investigate and make sense of the record before him.

He did not contact any witnesses except for someone who described herself as biased.

THE COURT:  Didn't she recommend that he speak to that

i7jnrav8

1   witness?

2               MS. HARWIN:  It is someone that she identified, but

3   that wasn't the -- first of all, that wasn't her understanding,

4   that that was the only person that he was going to contact.

5   And instead the evidence --

6               THE COURT:  Did she recommend that he speak to anyone

7   else?

8               Is there anyone else she suggested would have

9   information about the course of conduct between these two

10  individuals, both of whom Dunn interviewed?

11              MS. HARWIN:  She talked to him about the colleagues

12  that she had spoken to.  Those would be certainly reasonable

13  people to be interviewed.

14              She testified that Director Dunn didn't ask her for

15  the names of people to interview, and the testimony also is

16  that it is up to the -- it is the discretion of the EOAA

17  investigator to determine who to interview.

18              They are not limited to, nor should they be, held to

19  whoever someone nails.  That is not the standard.  It is not up

20  to Professor Ravina to identify the people that Columbia should

21  be interviewing.  It is up to Columbia to do a fulsome

22  investigation.

23              And where it's deemed that the only person it is

24  necessary to talk to is a research assistant who hasn't worked

25  with them for two years who describes herself as biased --

i7jnrav8

1          THE COURT:  But, again, that was someone recommended

2     by the plaintiff, someone the plaintiff identified.

3          MS. HARWIN:  The issue is not having spoken to the

4     person.  The issue is having spoken to no one else and also

5     relying on that person's report.

6          THE COURT:  Who else would have personal information?

7          So you have all the e-mails, right?

8          Who else would have had personal information?

9          Is there an allegation that someone else was present

10    when he touched on her or tried to kiss her or made some of the

11    statements that aren't in the e-mails?

12         MS. HARWIN:  As you know, your Honor, with respect to

13    the kinds of investigations that are done, you know, it's

14    different from the kinds of evidence that you consider in a

15    courtroom.

16         It is very common for example for investigators to

17    speak to contemporaneous reports, people that Professor Ravina

18    spoke to at the time about events.  That is not something that

19    was done.  There was no request for any information about that.

20         Additionally, there are all these things that are in

21    documents, and there's no effort by Columbia to understand this

22    documentary record, no effort to speak to colleagues who could

23    explain what is going on with respect to the research and

24    whether Professor Bekaert's explanations are credible in any

25    way; something where of course you have a widespread faculty

i7jnrav8

view that becomes quite vocal that these explanations are not

credible at all, you know, based on their review of the

information that is available, including over an extended

period extensive e-mail correspondence between the parties.

          An additional example is the investigator didn't speak

to the relationship manager, the person appointed by Columbia

to monitor the interactions between them.  Didn't speak to him.

          So, the investigation, again, it was delayed, it was

extremely limited, and what we have is ultimately a conclusion

that takes Professor Bekaert, his account in many respects, and

concludes it with a conclusion that Professor Ravina was

essentially to blame for what had gone on.

          Then, after the investigation concludes, Professor

Ravina expresses ongoing concern that retaliation is going on,

expresses it to anyone who will listen to her at the

university, and there's no investigation by Columbia into this

conduct at all.

          There are numerous examples of it.  Maybe I will sort

of go into this issue of retaliation, because that's another

issue raised by defendant Bekaert.

          We have the issue of research delays.  Defendant

Bekaert has presented his arguments about why this didn't

constitute delay.  There is extensive contravening evidence

that this was purposeful, intentional delay and sabotage to her

work.

i7jnrav8

1          We have examples.  Professor Ravina testified about

2     the nature of this busy work that was being generated after her

3     complaints --

4          THE COURT:  Since it's late, I will help just focus

5     this.

6          MS. HARWIN:  Sure.

7          THE COURT:  Professor Bekaert's motion is denied.

8          I think that those are all issues for the jury.

9          Is there anything else you want to say with respect to

10    Columbia's liability?

11         MS. HARWIN:  Sure.

12         So with respect to Columbia's liability on

13    retaliation, Columbia is automatically liable under the New

14    York City Human Rights Law.

15         So that for Bekaert's conduct they are automatically

16    liable.  There is no requirement to prove negligence on a

17    retaliation claim under the New York City Human Rights Law.

18    So, if Bekaert's motion is denied, Columbia's motion as to

19    retaliation based on Bekaert's conduct likewise has to be

20    denied.

21         With respect to the issue of Columbia's own

22    retaliation, what we have are a sequence of events where

23    Professor Ravina engages in protected activity followed closely

24    thereafter with retaliatory conduct.

25         We have a letter from June 2015 which describes an

i7jnrav8

1    upcoming leave.  The testimony is clear, leaves are different

2    from just an exemption from teaching at Columbia.  Everyone

3    knows the difference between them.

4           It is very clear those are not identical things.  When

5    the term "leave" is used, it has a very specific and clear

6    meaning, not the one that Columbia subsequently attributed to

7    that letter.

8           It was sent in June 2015.  There's testimony by, I

9    believe, the dean, by Senior Vice Dean Phillips about the

10   aspect of that letter.  She sends an e-mail in August, on

11   August 21, 2015, indicating an intent to bring suit.

12          That is sent to Division Chair Zeldes, it's forwarded

13   to Dean Hubbard, Senior Vice Dean Horan.  There's no dispute --

14   I'm sorry, Senior Vice Dean Phillips.  There's no dispute that

15   they were aware of this protected activity.

16          Then, within a month after that, and shortly after she

17   brings litigation against Professor Bekaert, the leave is

18   deemed to be a mistake.

19          We listened to a voice mail from Senior Vice Dean

20   Phillips claiming that this was a mistake.  She has to do

21   forensic to figure out what happened.  Of course, we saw in the

22   testimony she was the person who was responsible for writing

23   this.  So it's an implausible story that follows shortly after

24   clear protected activity.

25          Then subsequently she makes a request for an extension

i7jnrav8

1  of her tenure clock.  Defendant Columbia has not proffered any

2  plausible explanation at all as to why what she sought was

3  denied.

4         As Vice Provost Brown testified, essentially there are

5  a number of aspects of her request.  There is the aspect of

6  break in service versus personal hardship leave; the aspect of

7  the duration of the leave; there's the aspect of pay versus no

8  pay.

9         But on none of those things was any credible

10  explanation proffered for Columbia's conduct or, at a minimum,

11  there is certainly a dispute that the jury needs to decide.

12         With respect to the duration of the leave, we have an

13  example of a male given six years on the tenure clock.

14  Professor Ravina is offered a position where she would still

15  have to submit her tenure application that semester.

16         So we have, again, protected activity followed shortly

17  after with the denial of the leave request.

18         So that is on retaliation.

19         Then, going to the issue of the tenure vote and

20  liability there, there is extensive evidence regarding the

21  impact of Professor Bekaert's actions on Professor Ravina's

22  work.

23         The impact on Professor Ravina's work is not limited

24  simply to the paper or papers she was working on with Professor

25  Bekaert, but that was very significant.

i7jnrav8

1          There is evidence where Professor Bekaert is saying

2     very close in time prior to her complaints that there will be

3     three papers by the end of that year, five or six papers would

4     come out of it.

5          After the complaint, of course, it is a totally

6     different story.  The progress stalls drastically.  There is,

7     again, the course of conduct that we've described, and the

8     result is of course you don't have three papers, five papers,

9     six papers.  You have one paper ends up published.

10         Professor Ravina testified very clearly that the

11    impact of all this going on was wide ranging.  It affected her

12    ability to work on all of her work.

13         The ongoing interactions with Professor Bekaert and

14    Columbia to try to address and resolve conduct were consuming.

15    They consumed her energy, they consumed her time, and made it

16    impossible for her to do the kind of research she needed.

17         THE COURT:  Can I just interrupt.

18         Ms. Plevan, I just have one question for you.

19         Do you dispute that under the New York Human Rights

20    Law Columbia is liable as an employer for retaliation based on

21    Bekaert's conduct.

22         MS. PLEVAN:  I wrote down that question because I did

23    not think that was the case based on what the statutory

24    standard is.

25         THE COURT:  We can discuss that I suppose at the

i7jnrav8

1    charge conference.

2            I am going to reserve ruling on the motion until after

3    the jury verdict.  I would, though, on this issue have you

4    write letters on this.

5            MS. PLEVAN:  I was going to say that.

6            THE COURT:  I know there's not a lot of case law on

7    it.  If you could do that.

8            MS. HARWIN:  With respect to which issue?

9            THE COURT:  With respect to retaliation which you just

10   mentioned.

11           MS. HARWIN:  The New York City Human Rights Law?

12           THE COURT:  Yes.

13           MS. HARWIN:  That is just on the face of the statute,

14   your Honor.

15           THE COURT:  I understand.  Put it in a letter.

16           I understand the statutory language there's

17   disagreement, from what I am hearing, about if the statutory

18   language is clear.

19           I think it seems pretty clear, but in any event I am

20   going to ask you to write letters on that.

21           MS. HARWIN:  Sure.

22           THE COURT:  And I am going to reserve ruling on the

23   motion until after the jury verdict.

24           MS. HARWIN:  Thank you, your Honor.

25           MS. PLEVAN:  Thank you, your Honor.

i7jnrav8

1                THE COURT:  Thank you so much.

2                Have a good evening.

3                (Adjourned to Friday, July 20, 2018 at 9:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

CHRISTOPHER L. BROWN

Redirect By Mr. McKnight . . . . . . . . . .1968

Recross By Ms. Plevan . . . . . . . . . . .1990

PATRICK Bolton

Direct By Mr. Sanford . . . . . . . . . . .1991

Cross By Mr. Hurd . . . . . . . . . . . . .2052

Redirect By Mr. Sanford . . . . . . . . . .2084

MELISSA ROOKER

Direct By Ms. Fischer . . . . . . . . . . .2099

                    PLAINTIFF EXHIBITS

Exhibit No.                                   Received

 237   . . . . . . . . . . . . . . . . . . .2018

 214   . . . . . . . . . . . . . . . . . . .2032

 124   . . . . . . . . . . . . . . . . . . .2045

  240, 257, 267   . . . . . . . . . . . . .2093

 163   . . . . . . . . . . . . . . . . . . .2095

                    DEFENDANT EXHIBITS

Exhibit No.                                   Received

 SQ   . . . . . . . . . . . . . . . . . . .2076

 S   . . . . . . . . . . . . . . . . . . . .2109

 JP   . . . . . . . . . . . . . . . . . . .2126