I7knrav1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ENRICHETTA RAVINA,

                    Plaintiff,

          v.                          16 CV 2137 (RA)

COLUMBIA UNIVERSITY,

                                      Jury Trial

                    Defendant.

------------------------------x

                                      New York, N.Y.
                                      July 20, 2018
                                      9:40 a.m.

Before:

          HON. RONNIE ABRAMS

                                      District Judge


                         APPEARANCES


SANFORD HEISLER SHARP LLP
     Attorneys for Plaintiff
BY:  DAVID W. SANFORD
     ALEXANDRA HARWIN
     MELINDA L. KOSTER
     AMY DONEHOWER
     HERBERT V. McKNIGHT
     ANDREW C. MELZER

PROSKAUER ROSE LLP
     Attorneys for Defendants
BY:  BETTINA B. PLEVAN
     RACHEL S. FISCHER
     STEVEN D. HURD
     PATRICK KRAMER RICE

HERNSTADT ATLAS PLLC
     Attorneys for Defendant Bekaert
BY:  EDWARD HERNSTADT

I7knrav1

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Good morning, everyone.  The jury is here.

4          Is there anything we need to address before they come

5     in, or is it something we can address at the break.

6          MS. HARWIN:  Your Honor, there are some documents that

7     we want to admit, but given that the jury is here, I think it

8     makes sense to do it during a break or at lunch.

9          THE COURT:  Let's do it during the break.  Let's bring

10    the jury in now.  Thank you.

11         (Jury present)

12         THE COURT:  Good morning, everyone.

13         Everyone can be seated.

14         The defendants can call their next witness.

15         MS. PLEVAN:  The plaintiffs are going.

16         THE COURT:  That's right.

17         MS. HARWIN:  Your Honor, at this point we would play

18    excerpts from the video deposition of Division Chair Stephen

19    Zeldes.  I would simply clarify something that I didn't clarify

20    yesterday, which is that, when the videos jump, that's where

21    often where interposed objections and the like have been

22    omitted just in case that wasn't clear.

23         THE COURT:  All right.  Thank you.

24         (Video played)

25         THE COURT:  Is that it?  All right.

1              Is the defendant ready to call your next witness?

2              MR. HERNSTADT:  Yes, your Honor.

3              Your Honor, Andrea Kiguel.

4              THE COURT:  All right.

5    ANDREA KIGUEL,

6          called as a witness by the Defendant Bekaert,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. HERNSTADT:

10             MR. HERNSTADT:  May I, your Honor?

11             THE COURT:  Yes, of course.

12             MR. HERNSTADT:  Thank you.

13   Q.  Good morning, Ms. Kiguel.  Thank you for being here.

14             Ms. Kiguel, where are you from?

15   A.  I was born here.  I lived in the U.S. until I was 11, and

16   then I moved to Argentina, where I grew up.

17   Q.  And where did you do your undergraduate studies?

18   A.  In Argentina.

19   Q.  What was the focus of those studies?

20   A.  I majored in economics in Argentina.  They put a very large

21   focus on small open economies, which are essentially emerging

22   markets.

23   Q.  After you finished your undergraduate studies, did you

24   continue your education?

25   A.  Yes, I went straight into my master's for a year and a half

1   in Buenos Aires as well.  Then I moved to New York in 2007,

2   where I worked for three years during the global financial

3   crisis.

4   Q.  At some point did you become a graduate student at Columbia

5   Business School?

6   A.  Yes.  During the crisis I thought interesting time to go

7   back to school.  I had learned -- there were a lot of

8   interesting research topics.  I was working with emerging

9   markets, and I wanted to do my Ph.D. with a focus on

10  international finance.

11          There are very few people in academia who know about

12  emerging markets and Geert is one of them.  And Columbia in

13  that sense seemed like a really good fit for me.

14  Q.  By "Geert," you mean Professor Bekaert?

15  A.  Yes, sorry.

16  Q.  When did you start the Ph.D. program?

17  A.  I started in 2010.

18  Q.  What were your areas of focus as a Ph.D. student?

19  A.  So, my Ph.D. was in finance.  I specifically was in the

20  asset pricing field and I wanted focus on international finance

21  and emerging markets, questions about financial integration,

22  political risk, and that kind of stuff.

23  Q.  Did you work as a research assistant for Professor Bekaert

24  and Professor Ravina?

25  A.  Yes.

1   Q.  How did that come about?

2   A.  Professor Ravina e-mailed me I think in January 2013 saying

3   that there was an opportunity to be a research assistant on a

4   project with her and Professor Bekaert.  I had heard some

5   things about Enrichetta that made me a little bit skeptical

6   about working on the project, but I thought it was a good

7   chance to meet Geert so I agreed to meet with her.

8   Q.  What did you do on the 401(k) project?

9   A.  At first, the first data she gave me was data on

10  individuals.  So she had me create some variables, run some

11  summary statistics.  This was good because it was a good way to

12  get to know the data and get started on the project.

13  Q.  Were you working on data that was provided by Financial

14  Engines?

15  A.  Yes.  So the data on the individual people was provided by

16  Financial Engines, and then there were a couple of other

17  databases.

18          So the second database she had me work on was the data

19  on the firms.  So these were the companies that the people

20  worked at, and that was a different database, which also needed

21  to have summary statistics run.  And when you run all these

22  things, you start checking the data and trying to see what

23  you're dealing with.  So, some problems came up here and there.

24  The data wasn't as clean as we thought, but we were working on

25  making it better.

1   Q.  Were there just those two databases?

2   A.  So, when I started the project that, was my understanding.

3   Then in around April she introduced a third dataset on the fund

4   data, which was really not a dataset yet.  It was just a bunch

5   of forms that were PDFs.

6           These forms needed to be sent to India to get whatever

7   was in the PDF into Excel and somehow organize the data to make

8   it something that we could work with as a database.

9   Q.  These forms, were these the 5500 forms?

10  A.  Yes.  They were called Form 5500s.  They were fairly

11  different.  Even though they all had the same name, you had a

12  lot of dispersion across companies, so it wasn't a super

13  standardized way to get them into a database easily.

14  Q.  You said that these forms were sent to India to be

15  converted.  How long did that process take?

16  A.  So, I guess I first heard of this in April.  It must have

17  taken four, five months because we got a first take from them.

18  It was a total mess.  I mean, the people in India just

19  mechanically do what they're told, and there's no processing.

20  So, we sent it back.

21          Nicolas and I had gone through the first take of the

22  project.  We suggested some things that we thought could be

23  improved, so they improved that.  Then it came back to us.  We

24  went through it again, suggested more changes, and they sent it

25  back.

i7knrav1                    Kiguel - Direct

1            So it was a back-and-forth process.  It took a long

2      time.

3      Q.  When you finally got it back, I think you said four or five

4      months later, was it in good shape and ready to use at this

5      point?

6      A.  No, not really.  It was -- so the idea was to have all the

7      names of the funds in one column and then we match it to a

8      database that has information on mutual funds so you can get,

9      you know, the fees or other information, what kind of fund it

10     is.  It was not feasible to make a match there.

11     Q.  Were you pursuing your own research at this time?

12     A.  In 2013 I was trying to find a research topic, but it was

13     very hard to find time to work on my research because

14     Enrichetta was pretty all consuming.  I mean, she wanted me

15     working on her projects all the time, which is not super normal

16     in academia.  She seemed to want things --

17            MS. HARWIN:  Objection.

18     A.  -- with a sense of urgency.

19            THE COURT:  Overruled.

20     BY MR. HERNSTADT:

21     Q.  At some point did you quit as a research assistant?

22     A.  So I tried quitting a few times.  The first time was in May

23     2013-ish.  When we were working on the fund data, I just wasn't

24     excited about the project.  And it wasn't really that related

25     to the things that I wanted to be working on.  But Enrichetta

made a good point that, you know, you put some time into this,

you'll be a coauthor on a paper.  So I stayed, and then I kept

working on it.

Q.  Did Professor Ravina indicate that you would be a coauthor

on the first paper that they were working on?

A.  No.  They had an agreement with Financial Engines, so the

first two papers that they published would be with Financial

Engines, and then the papers afterwards the research assistants

could be coauthors on.

       This is important for me because, it would have been a

chapter of my dissertation, and it would have probably been a

good publication.

Q.  So you didn't quit in May?

A.  So I didn't quit in May, no.

Q.  Did there come a time when you tried to quit again?

A.  Yes.  So I think around October, November when I really

wanted to start working on my thesis and I felt like all I was

doing what cleaning data without a direction, I wasn't really

working towards a paper, it was always just build variables,

clean this, clean that, I said I need more time for my own

research and I wanted to quit.

       And Enrichetta I talked to Enrichetta about this, and

we thought we could maybe work out an arrangement where we

would reduce the amount of time I worked to two days a week.

       But when we started working in this new way, it just

i7knrav1                    Kiguel - Direct

1    became very hard.  Her e-mails were -- there was a change in

2    our relationship there.  Her e-mails became pretty mean and

3    hurtful.  Like every time I saw an e-mail from Enrichetta in my

4    inbox I would just get anxious and not even want to open it,

5    because I didn't want to deal with the situation.

6           She wanted things done in two days that were just not

7    feasible in two days.  For example, one of the things was the

8    fund matching.  She wanted that done in two days.  That was

9    kind of the turning point, when she e-mailed me that and said

10   what you are doing isn't good enough.  You need something else.

11          I went up into her office and I said, I don't want to

12   work on this project anymore, it's done.  And she said OK.

13          And that was November.

14          And it took her until September to get -- of the next

15   year to get what she wanted me to do in those two days.

16   Q.   Did you work as a research assistant for anyone else?

17   A.   Yes.  So in I think September or October of 2013, Bob

18   Hodrick reached out to me, and he was somebody else at the

19   business school who did international finance and I thought --

20   I had a lot of respect for, and he did things very much related

21   to topics I was interested in doing for my dissertation.

22          So, when he reached out to me -- it was for a short

23   project.  It was a six-week project, he needed a research

24   assistant to do something -- I accepted.

25          And I said, let's not tell Enrichetta, because the

i7knrav1                    Kiguel - Direct

1    last time I tried to do something else, she kind of ruined that

2    for me.

3              So I worked secretly with Bob on this project.  I

4    realized what it was like to work with somebody who treats you

5    well, who's nice, who teaches you, who doesn't get upset if you

6    do something wrong, because ultimately you are a Ph.D. student,

7    and you are there to learn.

8              And so my experience with Bob was great, and I think

9    that also marked the turning point for me with saying the

10   relationship I had with Enrichetta just isn't good and she's

11   mean to me, and I don't want to put myself through this

12   anymore.

13   Q.   You mentioned an earlier opportunity?  What was that?

14   A.   So, Geert in May 2013 had e-mailed me saying that him and

15   Cam Harvey, the other person in finance, probably the only two

16   people in the country who do real emerging market finance,

17   which is exactly what I wanted to do, were going to write a

18   review paper on the emerging market literature.

19             He invited me to be an author on the paper, to work

20   with them and do the paper.  It wasn't like a super-duper

21   publication, but for me it was great because they don't teach

22   you emerging markets in school.  So it was a great way for me

23   to learn the literature and get to work with Geert and get to

24   work with Cam and have exposure to the things I really wanted

25   to do.  And I thought it would be a great opportunity for me to

1   do the research and focus on my thesis working with the two of
2   them.
3           But I made the mistake of talking about this with
4   Enrichetta.  When I talked to Enrichetta about this, she
5   e-mailed Geert and said it was a waste of my time, that why was
6   I doing this.
7           And essentially Geert e-mailed me saying, you know
8   what, let's postpone the paper.  We'll leave it for another
9   time.
10          I was really bummed out because it was what I wanted
11  to do, so when I had the opportunity with Bob I just didn't
12  tell her.
13  Q.  Did you eventually do that paper with Cam Harvey and
14  Professor Bekaert?
15  A.  Yes, we did it in 2016.
16  Q.  You said you quit the 401(k) project in November of 2013.
17  What happened with that project after that, if anything?
18  A.  I felt great.  I was done with the project.  But I think a
19  week or two later Geert e-mailed, me and we were going to meet
20  for my thesis.
21          When we met, he said, Look, I want you to come back,
22  help me for a month on this project.  We have a deadline to
23  present this paper.  I think it was January 2 or 3, whenever
24  the AFA conferences were in January 2014.
25          And Enrichetta is going on vacation, so you are the

1    only person who knows the data.  Can you help me?  We'll write

2    this paper.

3            And I agreed to come back, but what I told Geert was I

4    didn't want any contact with Enrichetta.  If I was going to

5    work, I only wanted to work with him.

6            So he said OK.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7k1rav2                        Kiguel - Direct

 1   BY MR. HERNSTADT:

 2   Q.  And how much time did you spend working on -- this is --

 3   sorry.  Withdrawn.

 4         Is that the international diversification paper?

 5   A.  Yeah, that was our international diversification paper.

 6   Q.  How much time did you spend working on that paper at the

 7   end of 2013?

 8   A.  So we started in early December, you know, Geert was

 9   finishing up classes, so we started working on it maybe 40

10   hours a week, that first week, but then the second and third

11   weeks, I mean, I was going to Argentina December 24th for

12   vacation, so that was our hard deadline.  Those days we were

13   working, I don't know, 12-, 14-hour days.  Geert was in Europe,

14   I was in New York, so we were kind of working around the clock.

15   Q.  And was the paper completed on time?

16   A.  Yes.

17   Q.  Did you work on any of the 401(k) projects, papers in 2014?

18   A.  Unfortunately, yes.  So when I agreed to work on the paper,

19   I thought by the end of December, I would be done.  There were

20   some loose ends so, I mean, when I commit to something, I

21   finish it.  So I -- I -- in January, I worked with both Geert

22   and Enrichetta to finish the loose ends.  I mean, I wasn't

23   happy about having contact with Enrichetta, but it was fine.

24   Whatever.  We had to finish it.

25         Then through I think February and March, we had a

1    little bit of back-and-forth, but I gave Enrichetta all the

2    databases, all the codes, you know, we finished the draft, I

3    gave her everything, and I thought, okay, this is done.

4              And then in May, I had an email from her to me and

5    Geert suggesting that we start working on another paper that

6    Geert and I had thought of when we were working on the

7    international diversification paper in December.  So she wanted

8    a planning meeting for that.  So I said something like I

9    couldn't before mid-June and neither could Geert, so we just

10   pushed that forward.

11   Q.  You had mentioned the funds data, from these 5500 forms.

12   Were you working on that in 2014?

13   A.  I -- not in early 2014.  We were waiting for the data to

14   come from her.

15   Q.  I'm sorry.  You were?

16   A.  We were waiting for the data to come from Enrichetta.  She

17   was, in theory, responsible for -- for that.

18   Q.  Just to get timing straight, I'd like to show you what's

19   been marked as and admitted as Exhibit 39.

20             MR. HERNSTADT:  May I approach.  Thank you.

21   Q.  I'd like you to look at the second page.  And the two

22   emails at the top of the page, there's an email from Professor

23   Bekaert to you on July 28 and then your email in response.  Are

24   these emails about the fund data?

25   A.  Yes, they are.

 1   Q.  And what's happening here?

 2   A.  So Geert asked me if I had the fund data from India, and I

 3   used to have access to this data but it was no longer in any

 4   folder that I had access to, so I just mentioned that the data

 5   was not there anymore.

 6   Q.  Was the data in a shared Dropbox?

 7   A.  It used to be, and at this point it was no longer in a

 8   shared Dropbox that I was in.

 9   Q.  And so you had no access to the data at that point.

10   A.  No.  Zero access.

11   Q.  I'd like to show you what's in evidence as 57.

12           MR. HERNSTADT:  We'll just put that up on the screen,

13   if you would.  57.

14   Q.  You can see there are two emails on this page.  The bottom

15   one is from you to Professor Bekaert, and the second one is

16   your response to Professor Bekaert.  Do you see that?

17   A.  Yes.

18   Q.  Is this email from you, is that a complete email?

19   A.  No.

20   Q.  I'd like to show you -- and I'll hand this up -- what's

21   been marked as FW.

22           MR. HERNSTADT:  I think that's also in evidence.

23   A.  Thank you.

24   Q.  So looking at FW, you see there's an email from you at the

25   bottom and then a response from Professor Bekaert?

 1  A.  Yes.

 2  Q.  And then your response to Professor Bekaert.

 3       The two emails on the bottom, are those the same as

 4  the emails that we saw in FW?

 5  A.  Yes.

 6  Q.  And then your email at the bottom of the page continued,

 7  correct?

 8  A.  Yes.

 9  Q.  And how long is the whole exchange?

10  A.  What do you mean how long?

11  Q.  How many pages is the whole exchange?

12  A.  Oh.  11.

13  Q.  I would like you to take a look at page 3 -- the bottom of

14  page 3, top of page 4.

15  A.  Yes.

16  Q.  I'm sorry.  Actually, you see -- I'm sorry.  Let's look at

17  the top of page 4.

18       Page 3.  I'm sorry.  That's an email from Professor

19  Ravina to Professor Bekaert, August 31, 2014 -- sorry --

20  August 21, 2014, at 6:50, do you see that?

21  A.  Yes.

22  Q.  And then I'd like you to look at the top of page 4, where

23  it says, International Paper.  What is being discussed here, if

24  you know?

25  A.  So this is the fund data from the Form 5500s, the ones that

1   in November she wanted me to do in two days, where she said she

2   was going to provide a list of all the fund names that then I

3   could merge with the mutual fund data to get the fund features,

4   and she said she would send this by August 25th.

5   Q.  And then let's go back to page 2, at the bottom of the

6   page, and look at your response to her email.

7   A.  The one that says, "This is me trying to be objective," or

8   lower?

9   Q.  I'm sorry.  I keep mixing up the pages.  Bottom of page 1.

10  And this is your response to Professor Bekaert sending you

11  Professor Ravina's email?

12  A.  Yes.

13  Q.  And do you see your first line, "Her email is a little

14  weird, and, frankly, it's full of accusations that are hard to

15  take seriously"?

16  A.  Yes.

17  Q.  Was that your reaction to her email, her long email?

18  A.  Yeah.  I mean, this was a stressful time.  It's hard to

19  have constructive debates when you're going back and forth with

20  aggressive emails, so it's -- just felt awkward to me at that

21  point.

22  Q.  And then looking on page 2, the second full paragraph, the

23  short one that says, "On another note."

24  A.  Yes.

25  Q.  "What work is she doing for the international paper?  I

1    never gave her the data and she never asked for the final

2    database, so I'm not sure what she's working with.  Is she

3    referring to cleaning the 401(k) plan features?  Don't you need

4    that for all the projects?"

5              The cleaning the 401(k) plan features, is that the

6    fund data that you've been talking about?

7    A.   Yes.

8    Q.   And at this point you're still waiting for it?

9    A.   Yeah.  We couldn't finish the international diversification

10   paper without it.  That was the important thing that was

11   missing from the first draft.

12   Q.   And then let's look at the bottom of the page where you

13   say, "My last thoughts."

14   A.   Yes.

15   Q.   Is this your impression of where things stood as of

16   August 22, 2014, with respect to the database and also the

17   progress on the papers?

18   A.   Yes.

19   Q.   And if you look, the fourth line down, you said, "She put

20   so much pressure on getting things done fast that mistakes

21   happened.  It's a huge data project.  However, given what we've

22   used so far for the international project, the paper could have

23   been started in June 2013."

24   A.   Yeah, because we -- we weren't using this data.

25   Q.   Because you still didn't have -- you were in the same place

I7k1rav2                         Kiguel - Direct

```
 1   with the funds data in August of 2014 that you were in June of

 2   2013?

 3   A.  Yes.

 4   Q.  And could a submission draft of a paper be completed

 5   without the funds data?

 6   A.  I don't think any academic journal would have taken it

 7   seriously.

 8   Q.  So you were the research assistant on the data, on the

 9   international diversification paper in 2014 then?

10   A.  Yes.

11   Q.  To your knowledge did Professor Bekaert delay work on the

12   international diversification paper on 2014?

13   A.  Not on my end.

14   Q.  Were there any delays?

15   A.  Oh, I mean, there was the delay of the fund data that

16   wasn't coming, so there was really no big progress to be made

17   without it.

18   Q.  And we've seen some of the emails.  We just looked at a

19   couple of them.  Did the email exchanges between Professor

20   Bekaert and Professor Ravina have any impact on the pace of the

21   work?

22   A.  Oh, for sure.  I mean, you had --

23             MS. DONEHOWER:  Objection.

24   A.  -- so many people cc'd --

25             THE COURT:  I'm sorry.  The objection --
```

I7k1rav2                          Kiguel - Direct

1          MR. HERNSTADT:  From her perspective as the research

2     assistant.

3          THE COURT:  From your perspective, as far as you know.

4          MS. DONEHOWER:  If I may, your Honor.

5          THE COURT:  Yes.

6          MS. DONEHOWER:  There are 601 issues here, because

7     it's not clear to me that she is copied on all of the emails

8     between them.

9          THE COURT:  Okay.  Just the emails that you were

10    copied on at the time and based on your experience.

11    A.  Yeah, so based on my experience, everything that I had to

12    answer, I took a few days to answer.  I mean, every time I got

13    an email from this whole situation, I would take a step back

14    because if I answered anything impulsively, it was reflecting

15    on -- on me, on the university, and everyone involved in the

16    case, so I wasn't about to email something in the heat of the

17    moment where I was angry or -- or upset.  So on my end, it

18    caused -- I caused delays because of the -- the whole

19    importance of the situation.  Every time I went through data, I

20    wasn't going to do a quick check and then send a response based

21    on that.  I -- I checked things maybe five, six times before I

22    responded to an email because I didn't want to be blamed for

23    something that was wrong.  So that's my end.  I don't know --

24    Q.  I'm sorry?

25    A.  I don't know what went on beyond me.

I7k1rav2                        Kiguel - Direct

Q.  Did Professor Bekaert -- as far as you knew, did Professor
Bekaert devote all of his time to working on the international
diversification paper?

A.  No.  I mean, Geert was always working on multiple projects
at the same time.  He's somebody who works against deadlines,
so when he has a deadline, he'll work around the clock.  But
he's not -- he always has a bunch of things.  He might spread
himself too thin.  But that's something you know when you work
with Geert.

         I mean, typically advisors meet with their students
once a week.  With Geert, I had a different relationship.  We
would meet maybe once every three weeks or once a month, but
our meetings were super long, like we could meet on a weekend
and we would have a five-hour meeting.  We would get into all
the details of the papers we were working on.  It was super
intellectually stimulating.  He added a lot to my way of
thinking.  It was pretty cool to get to pick somebody's brain
like that who -- who's been doing this for so many years, so
I -- he's always working on a lot of things.  It's his nature,
and I think it's why he loves doing what he does, but --

Q.  You got the fund data from Professor Ravina sometime in the
fall of 2014, is that right?

A.  Yes.

Q.  And so what happened with the papers after you got that
data?

I7k1rav2                          Kiguel - Direct

1    A.  So she asked me to do the merge ID to the other database,

2    and when I started merging them, I realized that a lot of the

3    funds that she was matching to didn't exist during the sample

4    period of Financial Engines, so I had kind of some doubts about

5    the data.

6           There were a few other problems.  In some cases, it

7    appeared that there were no international funds, which for our

8    paper would have been a problem.  So I used a snapshot we had

9    from Financial Engines.  So they gave us a snapshot of one

10   point in time of the funds that -- that each plan had in it, so

11   it was kind of like a control for me to see how much overlap

12   there was with those -- the snapshot we got and her data, and

13   about a third of the data had no overlap with the snapshot that

14   we had.  So I had my doubts about how -- how good the data was,

15   but, you know, it's a first take on a database so, I mean, I'm

16   not -- I'm not one to make that call, but -- but I -- there

17   were a lot of red flags.

18          So I emailed back saying, these are the things that I

19   think maybe we could double-check, maybe we could limit the

20   sample to just this period, but -- it just turned into more

21   back-and-forth emails.

22   Q.  There's been a lot -- there's been some -- withdrawn.  Let

23   me try again.

24          Were there codes that were being used in connection

25   with the international diversification paper?

I7k1rav2                         Kiguel - Direct

1    A.  Yes.  So since so many people worked on the data, when

2    you -- when you work with a big database, you build the code to

3    be able to recreate whatever you start with to whatever you

4    finish.  So we had codes that would build the -- build

5    variables, take subsamples, combine the databases, 'cause you

6    had to combine the database with the individuals, with the

7    companies, with the fund data, and then there was the code for

8    the analysis, so which regressions you run, what sample you use

9    to run each regression, how -- how you do the whole paper.

10   Q.  Did you become aware that Professor Ravina asked Professor

11   Bekaert to send her the codes and data for the international

12   diversification paper?

13   A.  Yes.  I was on the emails.

14   Q.  And what happened?

15   A.  Well, at this point we were working on the final draft, and

16   we were getting close to finishing the papers.  And I was going

17   through a lot personally.  I had my own personal issues to deal

18   with at that time.  So I asked Geert if we could just send her

19   all the codes with the final draft.  So I would clean up the

20   codes, I would -- since we had so many databases and some

21   weren't even allowed to be on Dropbox because of the

22   sensitivity of the information, I had some codes in some

23   folders, some codes in other folders, so I really had to get a

24   lot of information together to send to her.  And I would have

25   preferred to do this just one time.  So we agreed that what's

1   the final draft, we would send her all the final codes, and

2   since we were almost there anyways and the time was better used

3   to finish up the draft.

4   Q.   Did Professor Ravina ever tell you that she was doing her

5   own draft of the international diversification paper?

6   A.   No.

7   Q.   And by tell you, I mean in any kind of an email, did she

8   communicate to you --

9            MS. DONEHOWER:   Objection.

10           THE COURT:   What's the objection?

11           MS. DONEHOWER:   Form, your Honor.

12           THE COURT:   Why don't you rephrase that, please.

13           MR. HERNSTADT:   Sure.

14   Q.   Did you ever receive an email from Professor Ravina telling

15   you that she was doing her own draft of the international

16   diversification paper?

17   A.   No.

18   Q.   Did you ever learn from Professor Bekaert that Professor

19   Ravina was doing her own draft of the paper?

20   A.   No.

21   Q.   Did you want to -- withdrawn.

22           Did you ever indicate in an email to Professor Ravina

23   that you wanted to be taken out of the situation between

24   Professor Bekaert and Professor Ravina regarding the paper?

25   A.   No.

I7k1rav2                         Kiguel - Direct

1   Q.  Did you ever tell anyone that you wanted to be taken out of

2   that situation?

3   A.  I -- I think I said that I didn't want to be involved in

4   their back-and-forth discussions, but I was committed to

5   finishing the paper because I committed to it and I felt that I

6   had to see it through.

7   Q.  Did Professor Bekaert have to give you permission to send

8   the codes to Professor Ravina?

9   A.  I mean, no.

10  Q.  Did you ever ask Professor Bekaert if you could send the

11  codes to Professor Ravina?

12  A.  No, because we had agreed that we would give her the codes

13  with the final draft to save time and minimize my interaction

14  with her.

15  Q.  What was your reaction -- what was your impression when you

16  saw that Professor Ravina had done her own draft of the

17  international diversification paper?

18  A.  I was pretty shocked.  I feel like everybody's time was

19  wasted.  I mean, she was working on one paper, we were working

20  on another paper.  We could have used our time more

21  efficiently.

22  Q.  Did having two different drafts of the same paper slow down

23  the process of completing a draft that could be submitted for

24  publication?

25  A.  Oh, of course, because now we had to consolidate the two

I7k1rav2                          Kiguel - Direct

1    versions of the paper.

2    Q.  Did you ever look at Professor Ravina's version of the

3    paper?

4    A.  Not in too much detail.  Just --

5    Q.  Did you ever see any problems with the paper?  Did you

6    identify any problems with her draft of the paper?

7    A.  We had defined the -- some variables differently.  I think

8    the expense ratios, we defined one way, she defined another.

9    So there were some emails with Financial Engines, who, they

10   agreed with our definition.  And that was one point I remember.

11   Q.  You talked a bit about the funds data and the funds

12   information, and you had mentioned a snapshot that you found as

13   a work-around for problems with the data.  Was that used in the

14   final version of the paper that was submitted?

15   A.  Yes.  Nobody used the -- the Form 5500s.

16   Q.  Did you ever see, see or hear, you personally, Professor

17   Bekaert harass or demean Professor Ravina?

18   A.  No.  I thought they were friends.  I mean, I -- I was in

19   meetings with the two of them together and they seemed to have

20   a good working relationship.

21   Q.  Did you ever observe Professor Bekaert treating male

22   research assistants differently than female research

23   assistants?

24   A.  No.  I mean, another classmate of mine, Andre, was working

25   with Professor Bekaert as well, and I felt like he gave us both

I7k1rav2                    Kiguel - Direct

1   the same amount of attention.  We both had our long meetings

2   with him.  I didn't notice any differential treatment.

3   Q.  Did you ever hear Professor Bekaert comment on the

4   attractiveness of research assistants?

5   A.  No.

6   Q.  How long have you worked with Professor Bekaert?

7   A.  Since 2013, and we still meet and -- and talk about things.

8   Q.  Do you ever see Professor Bekaert and Professor Ravina have

9   coffees together?

10  A.  Yes.

11  Q.  Did you ever see Professor Ravina have coffees with other

12  people at Columbia Business School?

13  A.  Yes.

14  Q.  Did Professor Ravina ever talk to you about her other

15  projects, projects other than the 401(k) plan, papers?

16  A.  Yeah.  Yeah.  I mean, when we got along at the beginning,

17  she would, you know -- she told me she was working on a project

18  with some Italian banks; then she mentioned she was trying to

19  get some database from -- a new database from some other place;

20  and we talked about the things she was working on.

21  Q.  Did she ever discuss with you her single-authored papers?

22  A.  No.

23  Q.  Did you ever ask Professor Bekaert why so many people were

24  being copied on emails in the second half of 2014?

25  A.  Yeah.  I mean, I was really confused when I started seeing

I7k1rav2                        Kiguel - Cross

1  Glenn Hubbard cc'd on emails that I was working on, in the

2  chain with Enrichetta, so I naturally asked him about it in a

3  meeting.

4  Q.  What did he tell you?

5          MS. DONEHOWER:  Objection.

6          THE COURT:  Overruled.  You can answer that.

7  A.  I can answer?

8          Oh, sorry.  What was the question?  Now I don't --

9  Q.  I was asking -- I asked if you had asked Professor Bekaert

10  about all the other names on the emails.

11  A.  Oh, yeah.

12  Q.  And I asked:  What did he tell you about that --

13  A.  He just --

14  Q.  -- if anything?

15  A.  -- he mentioned that Enrichetta and him were having some

16  problems and that he started to realize why I didn't like

17  working with her and that she brought the university into

18  the -- the situation and that's why they were on the emails.

19  Q.  By the way, did Professor Bekaert ever give you chocolate?

20  A.  Yeah, they were from a box that he would get on the plane.

21  He gave them to everybody.

22          MR. HERNSTADT:  Thank you.

23          No further questions, your Honor.

24          THE COURT:  Cross-examination?

25          MS. DONEHOWER:  Can I have just two minutes, your

1    Honor?

2              THE COURT:  Of course.

3    CROSS-EXAMINATION

4    BY MS. DONEHOWER:

5    Q.  Good morning, Ms. Kiguel.

6    A.  Good morning.

7    Q.  Ms. Kiguel, you were a PhD candidate at the Columbia

8    Business School, correct?

9    A.  Yes.

10   Q.  You graduated with your PhD in finance?

11   A.  Not yet.  I --

12   Q.  I'm sorry?  I didn't hear you.

13   A.  I had a baby.  I'm working full time.  I'm almost there,

14   but not yet.

15   Q.  Oh, I see.  I understand.

16              Well, when you were studying for your PhD, it was in

17   the finance and economics division?

18   A.  Yes.

19   Q.  Professor Bekaert is a senior tenured professor in the

20   finance and economics division?

21   A.  Yes.

22   Q.  He was your advisor?

23   A.  Yes.

24   Q.  You also worked with him, as you testified, as a research

25   assistant?

1    A.  Yes.

2    Q.  You co-authored a paper with him?

3    A.  Yes.

4    Q.  You also have a work in progress with Professor Bekaert and

5    Professor Robert Hodrick, right?

6    A.  Yes.

7    Q.  And you're aware that Professor Hodrick and Professor

8    Bekaert are friends, correct?

9    A.  Yeah.  Bob was his advisor.

10   Q.  For some time you worked for Professor Ravina as well,

11   right?

12   A.  Yes.

13   Q.  And you testified this morning that you got along with her

14   at the beginning?

15   A.  Yes.

16   Q.  Professor Ravina had more experience with this kind of

17   large database project, correct?

18   A.  Of course.  I learned a lot from her.

19   Q.  And this was your first project using a database with

20   millions of observations?

21   A.  Yes.

22   Q.  You testified this morning about some hurtful emails you

23   received from Professor Ravina during the period when you were

24   working with her.  Those emails were about your work, right?

25   A.  Yes.

I7k1rav2                         Kiguel - Cross

1    Q.  They weren't about your character or your integrity.

2    A.  No.

3    Q.  You also testified this morning about some emails that you

4    characterized as aggressive after you were working exclusively

5    for Professor Bekaert, right?

6    A.  Yes.

7    Q.  I'd like to look at just a few of those emails you

8    discussed with defense counsel.

9              MS. DONEHOWER:  If we could please pull up Plaintiff's

10   Exhibit 39, which we looked at a few moments ago.

11             And could we -- yeah, if we could go to the second

12   page.

13   Q.  If you'll notice at the bottom of the second page, this is

14   an email between Nicolas Crouzet, Geert Bekaert, and Professor

15   Ravina, correct?

16   A.  Yes.

17   Q.  You're not copied on this email, right?

18   A.  No.

19   Q.  But you did receive a copy of this email, didn't you?

20   A.  I did.

21   Q.  And you received it because Professor Bekaert forwarded it

22   to you, right?

23   A.  Yes.

24   Q.  And after he forwarded you this email, you had a

25   back-and-forth with him.

I7k1rav2                         Kiguel - Cross

1              MS. DONEHOWER:  If we could go down to the bottom

2       email on page 1.

3       Q.  In the process of forwarding you this email, he told you

4       that he had stopped trusting Enrichetta completely, right?

5       A.  Yes.

6       Q.  And he told you that he assumed she would do anything to

7       make his life miserable, right?

8       A.  Yes.

9       Q.  This was in July 2014, correct?

10      A.  Yup.  That's what the date says.

11             MS. DONEHOWER:  Can we please turn to Defense Exhibit

12      FW, which we also looked at this morning.

13             And the second page.

14             I think it's page 3, please.

15      Q.  This email that's at the bottom -- that's kind of taking up

16      most of page 3, you characterized this email this morning as

17      aggressive, right?

18      A.  Page 3?

19      Q.  Yes.  There's an email from Professor Ravina to Professor

20      Bekaert on page 3.  Do you see that?

21             MR. HERNSTADT:  Objection, your Honor.  Misstates the

22      testimony.  She didn't identify this email in particular as

23      aggressive.

24             THE COURT:  Okay.  You know what, let the witness

25      clear it up.

I7k1rav2                    Kiguel - Cross

1          Is this the email you were referring to this morning?

2          THE WITNESS:  I don't think I say it's aggressive

3     here.  I just said it's weird.

4          MS. DONEHOWER:  I'll move on.

5     BY MS. DONEHOWER:

6     Q.  So if you look down at paragraph C -- I'm sorry.  Yes,

7     paragraph C.  Thank you.

8          This is an email -- this is from the email from

9     Professor Ravina to Professor Bekaert, right?

10         MS. DONEHOWER:  Can we -- sorry, Mr. McLeod.  Can we

11    just pull up the To and From again.  I know you just had that

12    up there.  Thank you.

13    Q.  And the only person cc'd on this email is Dean Glenn

14    Hubbard, right?

15    A.  Yes.

16    Q.  You were not copied on this email?

17    A.  No.

18    Q.  And if we look down at some of what Professor Ravina wrote

19    in paragraph C, if we look on the second line, she wrote,

20    "After having been trained exclusively by me on the various

21    tasks for more than a year, at a great expense of my time since

22    December 2013, when you became her advisor, Andrea is your RA

23    only," correct?

24    A.  I'm not sure that's accurate, but yes, she wrote that.

25    Q.  And if we look further down, about four lines from the

I7k1rav2                         Kiguel - Cross

1    bottom, there's a sentence that starts, "Of the 40 RAs who

2    worked on these projects so far, the only two that gave me

3    problems are the ones you are involved with."  Do you see that?

4    A.  I see that.  That was her perception.  I know that's not

5    true.

6    Q.  Well, when you received this email, you understood that

7    when she mentioned the two RAs who gave her problems, one of

8    the ones she was referring to was you, correct?

9    A.  One of the ones -- yes, I assume she was referring to me.

10   Q.  And you only received this email -- I mean, Professor

11   Ravina didn't send this email to you, right?

12   A.  No.

13   Q.  You only received this email because Professor Bekaert

14   forwarded it to you, right?

15   A.  Yes.

16            MS. DONEHOWER:  If we could look at the top of that

17   same page, page 3.

18   Q.  When he forwarded it to you, he directed your attention to

19   the parts of -- part C, right?

20   A.  Yes.

21   Q.  And he signed off, "Peachy."

22   A.  I guess, yeah.

23   Q.  You felt the need to defend yourself when you read this

24   email that Professor Bekaert forwarded to you.

25   A.  Well, I did.  I didn't like that she accused me of not

being responsive because going through my emails, she -- I had

responded to every question she had asked me in a very timely

manner.

         MS. DONEHOWER:  If we could please look at page 2.

Q.  This is -- on pages 1 -- the bottom of page 1 and page 2 is

an email from you to Professor Bekaert, right?

A.  Yes.

Q.  And if we look at page 2, the third paragraph from the

bottom, here, at the very end of this sentence you wrote, "It's

a huge data project.  However, given what we've used so far for

the international project, the paper could have been started in

June 2013."  Right?

A.  Yes.

Q.  And Professor Bekaert responded to your email.

A.  Yes.

         MS. DONEHOWER:  Can we please pull out his response,

Mr. McLeod.

         It's in the middle of page 1.

Q.  And on that point, he responded, at the beginning of

paragraph 2, "The fact that we did not start in June 2013 with

the int. div. paper is likely my fault, although I did and she

really pissed me off with something so I stopped working on it

for a few months."  Did I read that correctly?

A.  That's what I see.

Q.  And he also in the first paragraph told you that he

I7k1rav2                          Kiguel - Cross

1   believed Professor Ravina was behaving like an immature child,

2   right?

3   A.  Yes.

4   Q.  And he sent this to you in August 2014?

5   A.  Yes.

6           MS. DONEHOWER:  I'd like to mark and move to admit

7   into evidence Plaintiff's Exhibit 212.

8           THE COURT:  Any objection to 212?

9           MR. HERNSTADT:  One second, your Honor.

10          THE COURT:  Sure.

11          MR. HERNSTADT:  No objection, your Honor.

12          THE COURT:  All right.  212 will be admitted.

13          (Plaintiff's Exhibit 212 received in evidence)

14  BY MS. DONEHOWER:

15  Q.  Ms. Kiguel, if you could please look at the email on the

16  bottom of page 1, this is an email from Professor Ravina to

17  you, correct?

18  A.  Yes.

19  Q.  And this is about the fund matching?

20  A.  Yes.

21  Q.  And if we look just above this email, Professor Bekaert

22  forwarded a copy of this email to you, correct?

23  A.  Yes.

24  Q.  And he wrote, "Is she delusional?"  Right?

25  A.  Yes.

I7k1rav2                        Kiguel - Cross

1    Q.  He was referring -- you understood him to be referring to

2    Professor Ravina?

3    A.  Yes.

4    Q.  And when you responded to him, you used his word, right?

5    You called her "delusional."

6    A.  Yeah.  I -- I didn't like her.  She was mean to me.  I --

7    true.

8              MS. DONEHOWER:  If we could please mark and move to

9    admit Plaintiff's Exhibit 58.

10             MR. HERNSTADT:  No objection.

11             THE COURT:  All right.  58 will be admitted.

12             (Plaintiff's Exhibit 58 received in evidence)

13             MS. DONEHOWER:  If we could just blow up the email at

14   the bottom of that page, please.

15   BY MS. DONEHOWER:

16   Q.  Do you see, Ms. Kiguel, that this is another email from

17   Professor Ravina and it's to the --

18             MR. HERNSTADT:  Has a copy been given to the witness?

19             THE WITNESS:  Yes, I have it.

20             THE COURT:  Yes.

21             MR. HERNSTADT:  Thank you.

22   Q.  It's also on your screen, Ms. Kiguel, if that helps.

23             But do you see this is from Professor Ravina to the

24   Financial Engines co-authors, to Professor Bekaert, and then

25   there's a couple other people cc'd on this email?

I7k1rav2                         Kiguel - Cross

1    A.  Yes.

2    Q.  And you were not copied on this email, right?

3    A.  No.

4    Q.  Professor Ravina, at the bottom of the kind of second

5    paragraph there, writes, "We should have done this before

6    asking you to do all this work.  We are very sorry."  Right?

7    A.  She does say that, yes.

8    Q.  She does not mention your name, right?

9    A.  No.

10   Q.  And she doesn't criticize you to the Financial Engines

11   folks?

12   A.  No.

13   Q.  So even though you were not copied on this email, you did

14   end up receiving a copy, right?

15   A.  Yes.

16   Q.  Because Professor Bekaert forwarded it to you, right?

17   A.  Yes.

18   Q.  If you could look, please, at the top of that page.

19          MS. DONEHOWER:  Thank you.

20   Q.  When he forwarded it to you, he wrote, "Hi, Andrea, Do not

21   try to get too upset."  Right?

22   A.  Yes.

23   Q.  You could not have been upset by the email if you had never

24   received it, right?

25   A.  No.

I7k1rav2                         Kiguel - Cross

1    Q.  He wrote, "She is insane."  Correct?

2    A.  Yes.

3    Q.  And he wrote that he was going to mostly ignore her work?

4    A.  Yes.

5    Q.  There were other occasions on which Professor Bekaert told

6    you that Professor Ravina was insane?

7    A.  Yeah.  It comes up in emails.

8    Q.  By contrast, in her emails Professor Ravina wrote that she

9    understood why you might want to take yourself out of the

10   situation, right?

11   A.  She didn't understand, really, but she wrote that, yes.  We

12   hadn't talked in years.

13   Q.  Stata is a data analysis software, correct?

14   A.  Yes.

15   Q.  You used it to do work on the international diversification

16   paper?

17   A.  Yes.

18   Q.  And you used it to check or identify mistakes with the

19   data, right?

20   A.  Yes.

21   Q.  That was the only software that you used to work on the

22   international diversification paper, correct?

23   A.  On my end, yes.

24   Q.  Professor Bekaert does not know how to use Stata, right?

25   A.  No, but he knows how to check work.  He's been doing this a

I7k1rav2                           Kiguel – Cross

```
 1   long time, and he would catch my mistakes when I had them.

 2   Q.  You testified that you did not witness directly Professor

 3   Bekaert sexually harass or -- Professor Ravina, right?

 4   A.  I did not see anything.

 5   Q.  You were not present for all of their interactions.

 6   A.  I was not present for all their interactions.

 7   Q.  They had dinners that you were not present for, correct?

 8   A.  I understand that.

 9   Q.  And coffees that you were not present for.

10   A.  Yes, I was only around them a few times.

11   Q.  And they had emails on which you were not copied, right?

12   A.  Yes.

13   Q.  After Professor Ravina filed this lawsuit, you sent an

14   email about her to Professor Bekaert, correct?

15   A.  When I -- yes, I think so.

16          MS. DONEHOWER:  Can we please pull up Plaintiff's

17   Exhibit 137, which is in evidence.

18          THE COURT:  It's in evidence.

19          MS. DONEHOWER:  Yes.

20   Q.  Ms. Kiguel, do you see this email that you sent to

21   Professor Bekaert about Professor Ravina?

22   A.  Yes.

23   Q.  And in this email you called her horrible?

24   A.  I was in shock.

25   Q.  You called her horrible, right?
```

1   A.  I don't think I used that word.

2          MS. DONEHOWER:  Could we please highlight the subject

3   line for Ms. Kiguel.

4   A.  Oh, sorry.  I missed that.  Yes, I do.

5   Q.  And you also called her a disgusting person?

6   A.  Yes.

7          MS. DONEHOWER:  Could we please look at the top of the

8   page, this same page.  Thank you.

9   Q.  Do you see at the bottom of this paragraph on the top, you

10  wrote, "It seems that rumors travel fast in academia"?

11  A.  Yes.

12  Q.  Would you characterize this email that you had sent to

13  Professor Bekaert as a private email conversation with a

14  friend?

15  A.  Yeah, it was, I thought, yes.

16  Q.  Are you aware that Professor Bekaert forwarded your email

17  to the vice dean of Columbia Business School Kathy Phillips?

18  A.  Yes.

19  Q.  Are you aware that Professor Bekaert sent your email to

20  other people as well?

21  A.  Yes.

22  Q.  Did Professor Bekaert ask for your permission to send your

23  email to other finance professors?

24  A.  No.

25  Q.  Are you aware that he sent it to Professor Campbell Harvey?

I7k1rav2                      Kiguel - Redirect

1    A.  Yes.

2    Q.  Are you aware that he left your name in the email when he

3    sent it on?

4    A.  Yes.

5    Q.  Are you aware that he sent your email calling Professor

6    Ravina a disgusting person to more than 25 people?

7    A.  No.

8    Q.  Are you aware that Professor Bekaert testified that after

9    Professor Ravina started this lawsuit, he got a list of a

10   number of PhD students who worked with Professor Ravina?

11   A.  Yes.

12   Q.  And are you aware that he said -- that he said in an email

13   that he got that list from you?

14   A.  He asked me for the list, so I wouldn't be surprised.

15   Q.  And you're aware that he hoped to get that list to have

16   those people describe their experience with Professor Ravina?

17   A.  Yeah.

18              MS. DONEHOWER:  Thank you.  No further questions.

19              THE COURT:  Any redirect?

20              MR. HERNSTADT:  Yes, please.

21   REDIRECT EXAMINATION

22   BY MR. HERNSTADT:

23   Q.  Hi.  You were asked about emails that you described as

24   hurtful, and you were asked if they were about work and not

25   about your character.  Do you remember that?

I7k1rav2                        Kiguel - Redirect

1    A.  Yes.

2    Q.  What made these emails hurtful?

3    A.  It was her tone, the way she -- she would approach a topic.

4    It was -- somehow it was a sense of urgency, that you had done

5    everything wrong and every -- the world was, you know -- it was

6    awful.

7           I mean, in other cases, you're a PhD student, you're

8    learning, so with Bob, for example, or with Geert, whenever I

9    made a mistake, it was, okay, you know, fix it, it's not the

10   end of the world.  And it was -- just the way she was.  I don't

11   know how to describe it precisely, but it was aggressive.

12   Q.  Is there a power imbalance between PhD students and

13   professors such as Professor Ravina who supervise PhD students

14   when they're RAs?

15   A.  I -- I guess she was my super -- she was a supervisor so --

16   Q.  Did you have any issues with the expectations that

17   Professor Ravina had of you as a RA working for her?

18   A.  Yeah.  I felt, like with the fund data, when she wanted me

19   to do things in two days that weren't feasible, yeah, that's a

20   problem with expectations.

21   Q.  Were her expectations reasonable?

22   A.  No.

23   Q.  You were asked to look at Exhibit 39.

24          On the first page, at the bottom of the page, you were

25   asked to look at the email from Professor Bekaert in which he

I7k1rav2                     Kiguel - Redirect

1  said that he stopped trusting Enrichetta completely.

2  A.  Yes.

3  Q.  And then look at your response, if you would.

4        Who controlled the data, this Dropbox?

5  A.  Enrichetta.  Geert didn't even really know how to use

6  Dropbox, I think.

7  Q.  So if you have no access to the Dropbox, is that something

8  that you created?

9  A.  No.  Enrichetta.

10 Q.  You say that, "I asked Katrina for the data."  Do you know

11 who Katrina is?

12 A.  She was an RA who worked on the fund matching data.

13 Q.  And who did she work for?

14 A.  Enrichetta.

15 Q.  And you said, "You mentioned you wanted to run regressions

16 but she told me the data was proprietary and she wouldn't give

17 it to me."

18 A.  Yes.

19 Q.  Were you working on the international diversification at

20 that time?

21 A.  Well, we were trying to finish it, but -- yes, around this

22 date, Enrichetta had to present this in a conference, and she

23 sent an email with -- with a bunch of comments from her

24 discussion that needed to be addressed.

25 Q.  And a research assistant that was working for Professor

I7k1rav2                         Kiguel - Redirect

1    Ravina refused to give you the data that you needed to work on

2    the papers, is that what this says?

3              MS. DONEHOWER:  Objection.  Objection.

4              THE COURT:  What is the objection?

5              MS. DONEHOWER:  I understand the question about the

6    email, but I just want to be clear that there are hearsay

7    issues involved and that things are not being offered for their

8    truth.

9              THE COURT:  All right.  What's contained in the emails

10   aren't themselves being offered for the truth.

11             You can continue.

12             MR. HERNSTADT:  Yeah, I'm just asking about what's

13   written in the emails.

14             THE COURT:  Yes.  You can do that.

15   BY MR. HERNSTADT:

16   Q.  The next line is, "Worst case scenario, I have an unclean

17   version of the file from November, but it would be useful to

18   get her cleaned version."

19             What are you saying here?

20   A.  I mean, I had a very old version of the database that

21   hadn't been cleaned up at all, but it was -- if we had to

22   finish the paper, we could have started with that and worked on

23   cleaning that up.

24   Q.  You were asked again about FW and you were asked about

25   Professor Bekaert's response to you saying that -- the second

I7k1rav2                    Kiguel - Redirect

1    sentence, the second paragraph, where he says, we could have --

2    "the fact that we did not start in June 2013 is likely my

3    fault."  Can we look at your email again where you say, on the

4    next page --

5    A.  Yes.

6    Q.  -- at the bottom of the second -- third to last paragraph?

7    A.  "My last thoughts"?

8    Q.  Right.  No, where it says, "It's a huge data project.

9    However, given what we've used so far for the international

10   project, the paper could have been started in June 2013."

11   A.  Yes.

12   Q.  What are you saying here?

13   A.  Well, I'm saying she had me cleaning a lot of data and

14   working on -- on generating variables, cleaning data, but

15   nothing was actually -- no analytical work was being done in

16   the things that I was asked to do, and that the -- those things

17   that we actually needed to write the international

18   diversification paper, we had all in June 2013.

19   Q.  You were asked about -- oh, sorry.  Withdrawn.

20          And did Professor Bekaert delay the international

21   diversification paper, as far as you know, based on your

22   working with him?

23   A.  As far as I know, on my end, no.

24   Q.  You were asked about Exhibit 212.

25   A.  Yes.

1    Q.  So this is in the top paragraph, your response to Professor

2    Bekaert, you say that -- you say "totally delusional"?

3    A.  Well, I just didn't understand why she didn't want to rerun

4    the algorithm with a few more conditions on the data, to get

5    something more precise.

6    Q.  Why do you think it was important to rerun the algorithm?

7    A.  Because I was getting a lot of funds that weren't matching

8    our samples, so that -- to me that was a red flag, that the

9    matches were wrong.

10   Q.  And what was Professor Bekaert's take on whether this was

11   an actual problem?

12   A.  He agreed.

13   Q.  And lastly, you were shown Exhibit 137.  And on the second

14   page, this is your first email, where the subject line is, "ER

15   is horrible"?

16   A.  Yes.

17   Q.  What were you responding to here?  Why did you send this

18   email?

19   A.  I was responding to the fact that I was reading about this

20   in the news.  It seemed surreal to me that a project that I was

21   working on was suddenly everywhere for everyone to read, and

22   I -- I didn't know what was going on.  It was just -- I was

23   shocked.  I -- I was very shocked.

24   Q.  And did you have any problem with Professor Bekaert sending

25   your email to Cam Harvey?

I7k1rav2                        Kiguel - Redirect

1   A.  No.  I liked -- I had a good relationship with him, Cam.

2           MR. HERNSTADT:  I have nothing further, your Honor.

3           THE COURT:  All right.  Anything else?

4           MS. DONEHOWER:  No more questions, your Honor.

5           THE COURT:  All right.  Thanks.  You can step down.

6   Thank you.

7           THE WITNESS:  Thank you.

8           (Witness excused)

9           THE COURT:  Why don't we take our morning break now.

10  Just remember, don't discuss the case, keep an open mind.

11  Thank you.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (Jury not present)

2                  THE COURT:  Would you all like to talk about the

3      exhibits now or during the lunch break?

4                  MS. HARWIN:  Happy to talk now, your Honor.

5                  THE COURT:  Sure.

6                  MS. HARWIN:  Let me just grab my list of documents.

7             So I understand that there are a number of exhibits as

8      to which there aren't objections and then there are several

9      with objections.  So I can address those.

10                 MS. PLEVAN:  I don't think counsel is here.

11                 MS. HARWIN:  Ah, yeah.  Probably should wait for

12     Mr. Hernstadt.

13                 THE COURT:  Okay.  All right.  Do you want to do it

14     during lunch?

15                 MS. HARWIN:  Or -- just let him know that we're

16     waiting for him?

17                 MS. PLEVAN:  I think he wants to --

18                 THE COURT:  Okay.  Let's do it during lunch.

19                 (Discussion off the record)

20                 MS. HARWIN:  So there are some exhibits as to which I

21     understand there are no objections.  That's Exhibit 100 --

22                 THE COURT:  I don't need to hear them.  You can read

23     them in front of the jury, if there's no objection.

24                 MS. HARWIN:  Okay, fine.

25                 MS. PLEVAN:  Well, we'd like to get a hard copy of 103

I7k1rav2                          Kiguel - Redirect

 1   as revised, please --

 2            MS. HARWIN:  Yes.  We're going to give you an amended

 3   one.

 4            MS. PLEVAN:  -- before we formally agree.

 5            MS. HARWIN:  So one item in dispute is apparently

 6   Exhibit 133.

 7            THE COURT:  Do you have a copy of that, please?

 8            MS. HARWIN:  Yes.

 9            Which is an email between Professor Bekaert and Senior

10   Vice Dean Katherine Phillips, which discusses the status of

11   Professor Ravina's tenure process.

12            MR. HERNSTADT:  Your Honor, the problem with this

13   email is that very little of it actually discusses that.  We

14   proposed some redactions.  I think we agreed on some of them.

15            If you see Professor Bekaert's email, the bottom

16   email, he's talking about a situation that has not come up in

17   this case, which was a visiting professor he was --

18            THE COURT:  The first paragraph, you mean, is not

19   relevant to this case?

20            MR. HERNSTADT:  Yes.  That's "the incident a few weeks

21   ago."

22            THE COURT:  Okay.  So can we take that out?

23            MS. HARWIN:  I think it probably makes sense to

24   discuss that in connection with the top email, in light of what

25   I understand his position is on that.

1              MR. HERNSTADT:  Okay.  So I think the first paragraph

2       I don't think was in relationship.

3              The second paragraph, what I would like to do is leave

4       the first line.  "I was told that a meeting on Enrichetta's

5       tenure case."

6              MS. PLEVAN:  I would object to the first paragraph.

7              MR. HERNSTADT:  No, the first paragraph --

8              MS. PLEVAN:  Oh, okay.

9              MR. HERNSTADT:  -- I don't think that Ms. Harwin has a

10      problem with that being deleted.  At least that was the

11      understanding I got.

12             MS. HARWIN:  The issue has to do with essentially what

13      the status of the next email is, so I think we can address the

14      first paragraph depending on what the resolution of this second

15      paragraph is.

16             MR. HERNSTADT:  And the entire -- the next two

17      sentences in the email from Professor Bekaert are referring to

18      the situation that had happened a few weeks ago.  So that

19      should go too.

20             And then on the response from Ms. Phillips, I don't

21      have a problem with the first two sentences.  I don't know

22      about Ms. Plevan.  But the rest of it refers back to the

23      situation.  And you can see that because of the name in the

24      last sentence.  And the discussion had been that the Title IX

25      office would work with the business school to try to figure out

I7k1rav2                        Kiguel - Redirect

1    how to address the situation that had arisen.

2              MS. HARWIN:  So there's no dispute it appears with

3    respect to the content of the first sentence in that top email,

4    or the second sentence in that top email.  The next sentence --

5              MS. PLEVAN:  We're okay with that.  You didn't ask,

6    but we're okay with it.

7              MS. HARWIN:  So the next sentence reads, "Geert," and

8    this is, again, from Senior Vice Dean Katherine Phillips.  It

9    states, "Geert, I understand your concern and have been in

10   conversations with the Title IX office and some others about

11   helping you and the division move forward."  So the first

12   part --

13             THE COURT:  But the next sentence then says, "I agree

14   that it is critical that this be addressed before Tanya joins

15   the faculty."

16             MS. HARWIN:  Mm-hmm.  So that next sentence, we

17   don't -- we're fine with redacting that.

18             THE COURT:  It does seem related.

19             MS. HARWIN:  Well, I think that that is -- I don't

20   think that that's quite apparent.  You know, the relevant

21   portion of the preceding sentence is her statement that she's

22   been in conversations with the Title IX office and others about

23   "helping you and the division move forward."

24             THE COURT:  I don't know who Tanya is.  Is that issue

25   related to the Title IX office?

1          MR. HERNSTADT:  No, it isn't, your Honor.  This issue,

2     the Title IX office --

3          MS. PLEVAN:  I think they were consulting about

4     advice.  I mean, this is long after, you know -- the report is

5     back in November of 2014.  This is February 2016.  So there's

6     evidence that they consulted the Title IX office about various

7     matters, and this is a totally different matter.

8          MR. HERNSTADT:  This is about a particular situation

9     that arose.  That's what Professor Bekaert's email is about.

10     You know, I think the entire email should not come in because

11     it's all about that, and the reference to tenure is in that

12     context.  You know --

13          THE COURT:  Again, I don't know who Tanya is, but if

14     Tanya has nothing to do with the Title IX office, what's wrong

15     with leaving in Kathy Phillips' line, "Geert, I understand your

16     concern and have been in conversations with the Title IX office

17     and some others about helping you and the division move

18     forward"?  What's wrong with that?

19          MR. HERNSTADT:  Because it's about a particular

20     situation that has nothing to do with this case.

21          THE COURT:  That's what I was just asking, does it

22     have to do -- the next sentence says, "I agree it is critical

23     that this be addressed before Tanya joins the faculty."

24          MR. HERNSTADT:  Those two sentences are about the same

25     thing.  The reference to Title IX has nothing to do with

I7k1rav2                     Kiguel - Redirect

1    Professor Ravina or this case, nothing.

2              THE COURT:  That's what I just asked.

3              MR. HERNSTADT:  Oh, I'm sorry.  I must have

4    misunderstood you, your Honor.  There's no connection

5    whatsoever.

6              MS. HARWIN:  Your Honor, that's simply counsel's

7    interpretation of the email.  Plaintiff is entitled to present

8    a different --

9              THE COURT:  Why do you believe that has to do with

10   this case?

11             MS. HARWIN:  The statement is not about the -- that

12   statement that we're talking about says, "I have been in

13   conversations with the Title IX office and some others about

14   helping you and the division move forward."  It's not a

15   statement about this particular incident.  The particular

16   incident that's being discussed arose because of Professor

17   Ravina's case.  What's being discussed, just by way of context,

18   is, after --

19             MR. HERNSTADT:  I'd like to do that on a sidebar.

20             THE COURT:  All right.

21             MS. HARWIN:  Well, the sidebar is still a record

22   matter.

23             THE COURT:  This is just because of the sensitivity?

24             MR. HERNSTADT:  Yeah.

25             THE COURT:  All right.  Okay.  So let's do that.

I7knrav3

1              MR. HERNSTADT:  Your Honor, the situation was that --

2              MS. HARWIN:  If I could, please.

3              MR. HERNSTADT:  No.  I think the situation is an

   important piece of background.

5              THE COURT:  OK.  Just let him go.

6              MR. HERNSTADT:  The situation was that Professor

7    Bekaert had met a potential candidate when he was visiting a

8    colleague at Duke.

9              That candidate then came to Columbia to do a talk, and

10   then they normally have a dinner.  He signed up for the dinner

11   because he had already met her and because she was friends with

12   his friend, this is Professor Harvey.

13             He was uninvited from that dinner.  And the reason he

14   was uninvited that was told to him is because of the Enrichetta

15   case and the sexual harassment.

16             He was very upset about that.  He went to the dean's

17   office, he spoke to Charles Jones, he spoke to Kathy.  That's

18   what he's writing about.  That is what this entire e-mail is

19   about.

20             Tanya is that visiting professor.  He said, What, am I

21   a pariah now, that there is one case against me, that means I

22   can't meet with anybody?  That's what the assistance of the

23   Title IX office is, is in dealing with that particular

24   situation.  That's what his e-mail is all about, and that's

25   what this one is about.

I7knrav3

1              THE COURT:  OK.

2              Let Ms. Harwin respond.

3              MS. HARWIN:  So if I could give sort of a one-sentence

4    or two-sentence summary of the context.  This was a female

5    faculty recruit who was coming to Columbia as part of the

6    recruitment, and there was a dinner that was scheduled that

7    Professor Bekaert had signed up for and he was removed from

8    that dinner, and as Mr. Hernstadt described the context for the

9    concern and the reason that he wasn't invited to the dinner had

10   to do with Professor Ravina's case and allegations against

11   Professor Bekaert.

12              That is just the background.  This e-mail, there's

13   independent inquiry regarding status of Professor Ravina's

14   tenure case.  There is no question about the second part of

15   this first e-mail being admissible as far as I know.

16              It is the e-mail above.   What is said is not unique

17   or specific or exclusive to the situation with this faculty

18   recruit.  Instead it is a general statement about being in

19   conversations with the Title IX office and some others, not to

20   address this faculty recruit dinner, but instead about helping

21   you and the division move forward.  It is an obvious reference

22   to Professor Ravina's case, which, as Mr. Hernstadt described,

23   was the context in which this issue was arising.

24              So we would be amenable to redacting portions having

25   to do with this faculty recruit, if that is what Mr. Hernstadt

I7knrav3

1    requests, but not this sentence.

2              THE COURT:  Isn't the concern expressed that he was

3    uninvited to this dinner?

4              MS. HARWIN:  That is a concern.

5              THE COURT:  Is that not true?

6              MS. HARWIN:  That is a concern he expressed.

7              THE COURT:  Right.

8              MS. HARWIN:  But the issue is not the concern he

9    expressed.  The issue is the statement by the senior vice, that

10   she is in conversations with the Title IX office and some

11   others about helping you and the division move forward.

12             That's the statement.  That is at issue.  That is not

13   a statement about the --

14             THE COURT:  What is the jury going to think the

15   concern is?

16             MS. HARWIN:  I would be amenable to redacting the "I

17   understand your concern" part or "understand your concern" and

18   just leave, "Geert and I have been in conversations."

19             Because that, if this is going to be redacted

20   regarding this dinner, I think it would make sense to redact

21   the part about "I understand your concern."

22             But the relevant portion is about being in

23   conversations with the Title IX office and others about helping

24   you efficiently move forward.  That should come in.

25             MR. HERNSTADT:  Your Honor, the reason the Title IX

I7knrav3

```
1    office is involved is because Professor Bekaert has in effect

2    made a complaint of retaliation that he was being taken off of

3    dinners because of his participation in a sexual harassment

4    case.

5              That is why Title IX is involved.  It has nothing to

6    do with the Title IX investigation of Professor Ravina's

7    complaints in 2014.  We know from the testimony Title IX office

8    was no longer involved.  It had been handed over to the

9    lawyers.

10             THE COURT:  Let's just take out that line.

11             You can include in the first two lines of the

12   response, and then you can include in the first line of the

13   second paragraph.

14             MS. HARWIN:  We need both lines.  We need the whole

15   second paragraph.  Your Honor, this is really critical.  This

16   is an e-mail from --

17             THE COURT:  But not if it's misleading.

18             MS. HARWIN:  Understood, your Honor.

19             THE COURT:  If the Title IX office wasn't involved

20   anymore in investigating this case, it is totally misleading to

21   suggest that is what is happening.

22             MS. PLEVAN:  Michael Dunn wasn't even there then.

23             MS. HARWIN:  This is not misleading.

24             The issue is not that there is a Title IX

25   investigation ongoing.  What it said is there are conversations
```

I7knrav3

1    with the Title IX office.  As part of Columbia policies the

2    Title IX office advises.

3              So this is the context.  This is about how having a

4    conversation with the Title IX office and some others about

5    helping you and the division move forward from Professor

6    Ravina's allegations.

7              MS. FISCHER:  There is no evidence of that in the

8    record.

9              MS. HARWIN:  Your Honor, they are bringing Senior Vice

10   Dean Katherine Phillips in today.  If they have an alternate

11   explanation of this sentence, they can provide it.

12             But plaintiff is entitled to present evidence that

13   this is pertinent to bias on the part of Columbia

14   administrators.  This is significant.

15             THE COURT:  So she's going to testify this morning,

16   right?

17             MS. HARWIN:  She is.

18             THE COURT:  Can you ask her?

19             MS. PLEVAN:  Maybe not until this afternoon.

20             THE COURT:  OK.  In any event today.

21             MS. PLEVAN:  Yes.

22             THE COURT:  Can you ask her a question about did you

23   help him move forward?

24             Is there any objection to, you were Suppose supporting

25   him?  You were helping him move forward?

I7knrav3

1          If she denies it, you can impeach her with this.

2          MR. HERNSTADT:  Move forward on his complaint.  I

3     agree with your Honor this is misleading.

4          THE COURT:  He registered a formal complaint?

5          MS. HARWIN:  He did not.

6          MR. HERNSTADT:  He spoke -- excuse me.

7          MS. HARWIN:  This is not something we have ever heard

8     about.

9          MR. HERNSTADT:  He spoke to the vice chair, Charles

10    Jones.  He spoke to another officer.  And he said, You're

11    getting back at me because I'm involved.  This is destroying my

12    reputation.

13          I think that's sufficient to be construed as a

14    complaint sufficiently that Kathy Phillips spoke to him about

15    it and then consulted with Title IX.  The reference to Title IX

16    has nothing to do with Professor Ravina.

17          THE COURT:  I am saying what's the harm in allowing

18    Ms. Harwin to ask Ms. Phillips, You helped him move forward?

19          If she denies that, then you can impeach him with not

20    the reference to Title IX, but the reference to helping him

21    move forward.

22          MS. PLEVAN:  The problem with the generalization --

23          THE COURT:  Otherwise don't include it.

24          MS. PLEVAN:  The problem with the generalization is

25    that it exaggerates the significance in a way, because this is

I7knrav3

1    only coming up because he gets told not to come to a dinner.

2          She as the senior vice dean is trying to figure out

3    what to do about that.  It's got nothing to do with Professor

4    Ravina.  It has to do with what his colleagues implemented in

5    connection with this recruiting aspect.

6          MS. HARWIN:  Of course, your Honor, I mean to suggest

7    it.  The reason they implemented it was because of the ongoing

8    concerns about Professor Ravina.

9          My view is that there are two ways to handle it.  And

10   I think that both would work well.  If defendants' view is that

11   this is misleading in this sort of context and this is about a

12   totally separate issue with a faculty recruit and whatever, one

13   option is to just produce the e-mail, and they can explain

14   that.

15         MS. PLEVAN:  You are the one who has to get it into

16   evidence on the basis that it's relevant.

17         MS. HARWIN:  If their view is that they want to be

18   able to present that he had a retaliation claim or something

19   like that, then they can.

20         THE COURT:  If it is not relevant, it is not relevant.

21         MR. HERNSTADT:  Right.

22         THE COURT:  So that's that.  But, as I say, you can

23   ask her if she helped him move things forward.  Or you can ask

24   had her a question about did she make an effort, did she have

25   conversations, without saying with the Title IX office, but did

1    she have conversations with others about helping him and the

2    division move forward.

3         If she denies saying that, I will allow you to impeach

4    her with this without taking the Title IX office out.

5         Otherwise, in terms of the e-mail, you should include

6    the first two lines.

7              MS. HARWIN:  Yes.

8              THE COURT:  Then I was told there was a meeting.

9              MS. HARWIN:  Understood.

10        Then on the last one.  It is in this one.  Right?  I

11   mean the last paragraph of the first e-mail.

12             THE COURT:  "I was told that a meeting" --

13             MR. HERNSTADT:  Right.

14             THE COURT:  And I thought we were taking all of that

15   out.

16             MR. HERNSTADT:  Yes.

17             MS. HARWIN:  No, your Honor.

18        With respect to the second sentence, he's saying that

19   would have been a good opportunity to be a bit more

20   informative, indicating pretty clearly he would want to provide

21   his side of the story in connection with her tenure case.

22        And then the response of Senior Vice Dean Phillips is

23   to inform him, no, it hasn't happened yet.  The tenure case

24   hasn't about been discussed, something is on the schedule,

25   conversations ongoing, may change.

I7knrav3

1          THE COURT:  I think that's fair.

2          MS. HARWIN:  Thank you.

3          THE COURT:  I think this whole second paragraph should

4    come in because it's going to what should have been said at the

5    meeting.

6          OK.  So why don't we just take a two-minute break now.

7          MS. HARWIN:  Thank you, your Honor.

8          THE COURT:  And then we'll do the rest until lunch.

9          Thanks.

10          (In open court)

11          (Recess)

12          THE COURT:  Is everyone here?  Professor Bekaert and

13    Professor Ravina, are they here?

14          MR. McKNIGHT:  They are outside.  Let me go check,

15    your Honor.

16          THE COURT:  OK.

17          Is Professor Bekaert here?

18          MR. HERNSTADT:  I think he's still in the restroom.

19          THE COURT:  OK.

20          MR. HERNSTADT:  Your Honor, I am not sure if he might

21    have walked Ms. Kiguel out and is now trying to get back in.  I

22    am OK with starting the next witness without him.

23          THE COURT:  You are?

24          MR. HERNSTADT:  Yes.

25          THE COURT:  You waive his presence and I can bring the

I7knrav3

 1   jury in?

 2          MR. HERNSTADT:  Yes, your Honor.  I don't want to hold

 3   up the jury.

 4          THE COURT:  Thank you.

 5       (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

i7knrav3                         Horan - Direct

 1                (Jury present)

 2                THE COURT:  All right.  Everyone can be seated.

 3           You may call your next witness.

 4                MS. PLEVAN:  Yes, your Honor.

 5           The defendant Columbia calls Janet Horan.

 6    JANET HORAN,

 7           called as a witness by the Defendant Columbia University,

 8           having been duly sworn, testified as follows:

 9    DIRECT EXAMINATION

10    BY MS. PLEVAN:

11                THE COURT:  Good morning.

12                THE WITNESS:  Good morning.

13    Q.  Good morning, Ms. Horan.  Are you currently employed?

14    A.  I am currently employed at Columbia University.

15    Q.  And what is your position at Columbia University?

16    A.  I am the vice dean for administration and finance at the

17    business school.

18    Q.  Can you tell us your educational background.

19    A.  I have a --

20    Q.  Maybe speak a little closer to the mic.  Thanks.

21    A.  All right.  I have a BBA from Baruch College and a master's

22    from Columbia School of International and Public Affairs in

23    nonprofit management.

24    Q.  And how long have you worked at Columbia?

25    A.  Since November of 1997.

1    Q.  And did you have any work experience before your positions

2    at Columbia?

3    A.  Yes.  Before Columbia, I was for nine years at Yeshiva

4    university, and prior to that at the New School.

5    Q.  And how long have you been the vice dean for administration

6    of the Columbia Business School?

7    A.  I have had that title since 2013.

8    Q.  Did you have similar roles before that?

9    A.  Yes.  Before that I was the senior associate dean for

10   finance and administration.

11   Q.  At the business school?

12   A.  At the business school, yes.

13   Q.  Would you tell us what your duties and responsibilities are

14   in those positions?

15   A.  Yes.  I oversee the administrative side of the school,

16   building operations, IT, HR, finance, and the planning for the

17   new buildings at Manhattanville.

18   Q.  Do you have any -- well, could you tell us a little bit

19   about your human resources role.

20   A.  At the business school, we have a an executive director for

21   human resources who reports to me, and she has a team of five

22   people that work with her.

23   Q.  And who do those people service primarily?

24   A.  Mostly the staff and faculty from a transaction point of

25   view at the business school.  For staff they're more involved

1    in the hiring and career development.

2    Q.  And what do you mean by, for the faculty, transactional

3    standpoint?

4    A.  The hiring is the responsibility of the senior vice dean

5    and the faculty.

6    Q.  And so what does the human resources group do relating to

7    faculty, the group that you're supervising?

8    A.  Right.  Once the faculty, the search committee for the

9    particular academic division has identified their candidate,

10   then they turn over all of the paperwork to HR to process to

11   get them appointed and hired at the university.

12   Q.  Do you have any involvement in implementing training at the

13   business school?

14   A.  We implement, you know, finance training, security, fire

15   drills, some EOAA training within departments.

16   Q.  What type of EEO training has there been at the business

17   school?

18   A.  The university has a required online training that all

19   staff have to participate in.  And then within the school we

20   have had all-staff meetings where we have a trainer come in and

21   speak to the staff about policies and who to report things to,

22   as well as in particular departments if there was a complaint

23   we usually have a training just for that department.

24   Q.  Has any of that training been provided for faculty members?

25   A.  Faculty have had all -- the same, similar format, all of

1    the faculty, a full meeting where they come in and do a

2    training.  And the executive committee has had training, and

3    some individual faculty have had training.  And now there is an

4    online training for faculty.

5    Q.  Did there come a point where you became aware of a problem

6    involving Professor Ravina and Professor Bekaert?

7    A.  At the time Senior Vice Dean Gita Johar had mentioned to me

8    that some faculty had come to speak to her about a research

9    dispute between female and male faculty members, but she at

10   that time didn't mention names to me.

11   Q.  And when was that, that the then vice dean Senior Vice Dean

12   Johar mentioned this, mentioned to you that there was a

13   research dispute between two faculty members?

14   A.  It was in mid to late May of 2014.

15   Q.  When you had this conversation -- first of all, how long a

16   conversation was it with Vice Dean Johar?

17   A.  It was a very brief conversation, just that she hadn't --

18   they mentioned this research dispute, and she wasn't quite sure

19   because she was transitioning out of the role of senior vice

20   dean.  Somebody else was coming in, her term was up, and so she

21   wasn't quite sure what to do to help resolve this.

22   Q.  And when you had this conversation with Dean Johar, did she

23   say the situation involved sexual harassment?

24   A.  She did not say that to me.

25   Q.  Did she say the situation involved sexual innuendos or

1   sexual conduct?

2   A.  No.

3   Q.  Did you make any suggestion to Dean Johar about what steps

4   she should follow?

5   A.  I suggested that she follow up with Dean Hubbard.

6   Q.  Do you know whether she did that?

7   A.  Yes, she did.

8   Q.  Did you later hear of this research dispute again?

9   A.  Yes.

10  Q.  From whom did you hear about it?

11  A.  I was invited to attend a meeting that Dean Hubbard was

12  holding with Professor Ravina and at the time someone else was

13  there.

14  Q.  And who was that fourth person?

15  A.  That turned out to be Suzanne Goldberg.

16  Q.  And did you attend that meeting?

17  A.  I did.

18  Q.  And when was that meeting?

19  A.  That was June 16 of 2014 or there around.

20  Q.  And were you there during the entire meeting?

21  A.  Yes, I was.

22  Q.  In general, what are the issues that Professor Ravina

23  raised at that June 16 meeting?

24  A.  She spoke about this concern she had with getting her

25  research completed with Professor Bekaert, that they had

1   together this dataset that they had spent some time cleaning,

2   and the papers were not making the progress that she needed.

3   Q.  Was there anything else that she raised at that meeting?

4   A.  She had some suggested remedies to keep things moving

5   along.

6   Q.  We'll get to that in a minute.

7   A.  OK.

8   Q.  Did Professor Ravina raise an issue of sexual harassment at

9   this June 16 meeting?

10  A.  No.

11  Q.  At this meeting did anyone mention gender or sexual conduct

12  as the cause of this issue that she was bringing to the dean's

13  attention?

14  A.  No.

15  Q.  Did Professor Goldberg at this meeting raise an issue of

16  sexual harassment?

17  A.  No.

18  Q.  Did Professor Ravina at this meeting say that Professor

19  Bekaert had made sexual advances towards her that she had

20  rejected?

21  A.  No.

22  Q.  Now, you mentioned that Professor Ravina raised issues

23  about potential remedies --

24  A.  Yes.

25  Q.  -- is that right?

i7knrav3                          Horan - Direct

1    A.  Yes.

2    Q.  And what do you recall as the different requests that she

3    made?

4    A.  She had a few different items that she wanted addressed.

5            The first was that Professor Bekaert be recused from

6    participating in her tenure decision.

7            The second was that there were three papers sort of in

8    the works between them that were utilizing this dataset, and

9    she wanted him to step away from the papers at that time so

10   that she could finish them on her own.

11           And there was a request to extend her tenure clock.

12   Q.  Now, with respect to -- well, was there any discussion

13   about her changing mentors at this meeting?

14   A.  There was comment about the mentor, but I don't know that

15   it was a request to change -- that he not be her mentor, but

16   not who would be a new mentor.  But there was a request for a

17   relationship manager.

18   Q.  First, with respect to her request that Professor Bekaert

19   not participate in the tenure process, did Dean Hubbard respond

20   to that at the meeting?

21   A.  Dean Hubbard felt that would not be a problem to have him

22   recused from the tenure process in this case.

23   Q.  Did Dean Hubbard respond on the issue of her getting more

24   time for her tenure review?

25   A.  He replied that that was not within his authority, that's a

1    provost office decision, but that he would reach out.

2    Q.  Reach out to the provost?

3    A.  To the provost, yes.  I'm sorry.

4    Q.  Tell us what you remember about the discussion concerning

5    the relationship manager.  How did that come up?  What was said

6    about that?

7    A.  I don't recall who made that suggestion or recommendation,

8    but it was seen as someone who could make sure that -- was

9    watching over that e-mails would be replied to in a timely

10   manner and a professional tone to the e-mails.

11   Q.  Was there any discussion at this June 16 meeting about

12   reporting Professor Ravina's concerns to the EOAA.

13   A.  Not that I recall.

14   Q.  Did you tell Professor Ravina at this meeting that the

15   Title IX office would not get involved in this matter because

16   of its political nature?

17   A.  No.

18   Q.  Did you ever tell her that?

19   A.  No.

20        MS. PLEVAN:  Let me show the witness Defendants'

21   Exhibit DM in evidence.

22   BY MS. PLEVAN:

23   Q.  Looking at this e-mail, do you recognize that as an e-mail

24   you received from Professor Ravina a few days after the June 16

25   meeting?

1   A.  Yes.

2   Q.  The first -- looking at, I guess it's the second paragraph,

3   "I've thought," if you can look at that paragraph for a minute.

4   A.  Yes.

5   Q.  Does this relate to what you referred to earlier about the

6   relationship manager?

7   A.  Yes, the suggestion.

8   Q.  Could you elaborate a little bit on what was discussed

9   prior to this, at the meeting itself, about what the purpose of

10  the relationship manager would be?

11  A.  The purpose was someone who could weigh in if there was

12  something about timing, as to how long it might take to perform

13  some piece of research that would be able to say, no, it should

14  take, I don't know, a day, not three days, and to make sure

15  that follow-up if things were not being responded to.

16  Q.  Was there a discussion at the June 16 meeting about who

17  that person might be?

18  A.  I don't think any names were mentioned at that time.

19  Q.  Was there any discussion about what would be done in the

20  interim before this relationship manager could be put in place?

21  A.  I don't know that it was at this meeting, but there was a

22  point where the dean himself was being copied on e-mails so

23  that there was somebody watching over this.

24  Q.  And then the next topic in this e-mail is about the papers.

25  Is that what was discussed at the June 16 meeting?

1    A.   Yes.

2    Q.   Then this e-mail from Ms. Ravina also refers to the tenure

3    process as the third topic that was discussed.  Is that an

4    accurate summary of the discussion?

5    A.   Yes.

6    Q.   And her request?

7    A.   Yes, yes.

8    Q.   The last topic, the additional year on the tenure clock,

9    that was Ms. Ravina's summary of what was discussed regarding

10   that topic at the June 16 meeting?

11   A.   Yes.

12   Q.   Is there anything in this June 18 e-mail from Professor

13   Ravina about sexual harassment or sexual advances?

14   A.   No.

15   Q.   Is there anything in this e-mail about the Title IX office

16   or the EOAA office?

17   A.   No.

18   Q.   Let me show you next Defendants' Exhibit DN for

19   identification and offer it into evidence.

20              THE COURT:  Thank you.

21              Any objection?

22              MS. KOSTER:  No objections, your Honor.

23              THE COURT:  All right.  DN will be admitted.

24              (Defendants' Exhibit DN received in evidence)

25   BY MS. PLEVAN:

1   Q.  Ms. Horan, is this the response you sent to Professor

2   Ravina after receiving the e-mail we were just looking at?

3   A.  Yes.

4   Q.  What was your purpose in sending her this e-mail?

5   A.  I was confirming that we were in agreement on the action

6   items of what we had discussed at the meeting in the dean's

7   office.  I was using the RGH1 e-mail.  There had been a problem

8   with a different e-mail address that had been used.  And that

9   we were going to be following up on the things that still

10  needed input from others.

11  Q.  Did that follow-up involve also speaking to Professor

12  Bekaert?

13  A.  Yes, it did.

14  Q.  And in this e-mail on June 19 did you also offer to talk to

15  Professor Ravina further?

16  A.  If she had questions, yes.

17  Q.  Did you and Dean Hubbard meet with Professor Bekaert at

18  sometime after June 19?

19  A.  Yes.

20  Q.  Did you report on that meeting to Professor Ravina?

21  A.  I'm not sure if I did or Dean Hubbard, but, yes, we did get

22  back to her.

23          MS. PLEVAN:  Let me please show the witness

24  Defendants' Exhibit DR.

25          And we offer DR in evidence.

i7knrav3                          Horan - Direct

1              THE COURT:  Any objection?

2              MS. KOSTER:  No objection, your Honor.

3              THE COURT:  DR will be admitted.

4              (Defendants' Exhibit DR received in evidence)

5    BY MS. PLEVAN:

6    Q.  Let me bring to your attention and ask you to look at the

7    e-mail that begins at the bottom of the first page and goes

8    over to the next page.

9    A.  Yes.

10   Q.  Does that refresh your recollection of your communication

11   with Professor Ravina about meeting with Professor Bekaert?

12   A.  Yes, that it was I that followed up.

13   Q.  And what's reflected in that e-mail at the bottom, the one

14   that just starts "Hi Professor Ravina" on July 9?

15              Could you just read what follows.

16   A.  Of course.

17              "I wanted to let you know that Glenn and I met with

18   Professor Bekaert this afternoon and discussed with him the

19   issues you raised in our meeting of June 16.  We do not have

20   exact next steps as yet, but we will keep you informed of

21   developments.

22              "Please let me know if you would like to schedule time

23   to discuss this information."

24   Q.  So did you and the dean meet with Professor Bekaert on July

25   9?

i7knrav3                    Horan - Direct

1    A.  Yes.

2    Q.  I'm sorry.  That was 2014?

3    A.  Yes.

4    Q.  Do you know why the meeting took place on July 9 as opposed

5    to an earlier date?

6    A.  When we initially reached out after the June 16 meeting, he

7    was traveling and not in New York to have a meeting with us.

8    Q.  Would you tell us what you remember about the July 9

9    meeting that you and Dean Hubbard had with Professor Bekaert.

10          First of all, where was it?  Where did the meeting

11   take place?

12   A.  It was in Professor Bekaert's office.

13   Q.  Would you tell us what you remember about what was

14   discussed at that meeting.

15   A.  Well, the dean mentioned to him that Professor Ravina had

16   come the dean's office expressing concern for the time delay in

17   getting their papers done and the moving along of the work,

18   that the tone of his e-mails was frustrating for her.

19   Q.  Did she raise that in the first meeting?

20   A.  The tone of the e-mails?

21   Q.  Yes.

22   A.  She spoke about the tone of the e-mails.

23   Q.  I'm sorry.  Continue.

24   A.  And that she had proposed some remedies to us to get this

25   moving along, and that's what we were there to talk about.

i7knrav3                         Horan - Direct

1    Q.  How did Professor Bekaert react to the report from the dean

2    that Professor Ravina had raised this complaint?

3    A.  He was shocked.  Actually, he was just shocked that, that

4    she perceived that he was slowing down the work; that he felt

5    they were working at a regular pace; that research takes time.

6    He was just shocked.

7    Q.  Did the dean ask Professor Bekaert to do anything with

8    respect to these papers at that meeting?

9    A.  He asked if it were possible for him to just step away from

10   the papers so that she could work on them herself or with the

11   other coauthors, and that was his request.

12   Q.  And how did Professor Bekaert respond to that?

13   A.  He had concerns about stepping away.  He felt that one

14   paper was too far along in a sense for him to just drop his

15   name from it.

16            And he said he would look at it.  They were all in

17   different stages.  He wasn't sure, but he didn't think stepping

18   away was the best thing to do.

19   Q.  Did he say anything about the schedule or the timing of his

20   responding on the papers?

21   A.  He just felt that, you know, he had many other projects.

22   These were not the only research papers that he was working on

23   and that this was the pace of research.

24   Q.  Was the issue of Professor Ravina's tenure consideration

25   discussed at all in that?

i7knrav3                         Horan - Direct

A.  The dean did request that he step away from being a part of

her tenure review, and he was, he agreed to that.

Q.  Was there a discussion about the relationship manager

concept?

A.  Yes.

Q.  Tell us about that discussion, what each person said.

A.  Well, the dean mentioned that the suggestion had come

forward to have a relationship manager who would be copied on

e-mails and who could weigh in if there was a different point

of view from both sides about how long something should take,

and just to make sure that they were keeping things moving

along.

        He mentioned that Professor Ravina had suggested

Professor Daniel Wolfenzon and Professor Bekaert was amenable

to the idea of a relationship manager, but felt that Professor

Wolfenzon was a good friend of Professor Ravina and might not

be the most objective to weigh in on it.

Q.  Was there any discussion about whether he should have

contact with Professor Ravina?

A.  We asked that he not discuss the issue, this, you know, the

perception of stalling of the work, that he continue to work

but not discuss these resolutions directly with her.

Q.  Now, we saw a minute ago Defendants' Exhibit DR, where you

communicated with professor -- told Professor Ravina about this

meeting --

1   A.  Yes.

2   Q.  -- and you proposed having a discussion with her.

3           Did you soon after July 9 have any conversation with

4   Professor Ravina?

5   A.  I don't think we had a conversation again for quite a while

6   between us on this.

7   Q.  Let me show you Defendants' Exhibit DS, which is an e-mail

8   chain, and ask you to look first at the bottom, the e-mail

9   that's at the bottom of the first page.

10  A.  Yes.

11          THE COURT:  Is DS in evidence already.

12          MS. PLEVAN:  I am going to offer it.

13          THE COURT:  OK.

14          MS. PLEVAN:  I will offer Defendants' Exhibit DS.

15          THE COURT:  Is there any objection to DS?

16          MS. KOSTER:  No, your Honor.

17          THE COURT:  DS will be admitted.

18          (Defendants' Exhibit DS received in evidence)

19  BY MS. PLEVAN:

20  Q.  Does that e-mail at the bottom of the first page refresh

21  your recollection about a conversation?

22  A.  That we had a phone call, yes.

23  Q.  Do you remember what you discussed in general in that call

24  with her on July 11?

25  A.  All I would have discussed is the status of where we were

i7knrav3                          Horan - Direct

1    with Professor Bekaert.

2    Q.  Did you around this time receive e-mails that had been

3    exchanged in the past between Professor Bekaert and Professor

4    Ravina?

5    A.  The dean and I both received e-mails from Professor

6    Bekaert.

7              MS. PLEVAN:  Let me show the witness Defendants'

8    Exhibit DQ and offer that in evidence.

9              THE COURT:  Any objection to DQ?

10             MS. KOSTER:  One moment, your Honor.

11             Your Honor, this appears to be a composite.  We object

12   to the exhibit in its current form.

13             THE COURT:  Why don't you just lay the foundation for

14   the exhibit.

15             MS. PLEVAN:  Sure.

16   BY MS. PLEVAN:

17   Q.  Dean Horan, is the e-mail at the top an e-mail that you

18   received from Professor Bekaert the afternoon of July 9, you

19   received a copy of it?

20   A.  Yes.

21   Q.  And did it have attached to it all of the e-mail

22   communications including with attachments that are attached to

23   this now?

24   A.  I think there were two separate e-mails, but, yes, these

25   e-mails.

i7knrav3                          Horan - Direct

1    Q.   Received on that day?

2    A.   Yes.

3              THE COURT:  Do you still have an objection?

4              MS. KOSTER:  The numbers here are not continuous Bates

5    numbers.  It appears that this is a composite containing

6    several different documents.

7              MS. PLEVAN:  It is the two e-mails.

8              THE COURT:  Why don't we divide it into two and try

9    that.

10             MS. PLEVAN:  OK.  We can make as the first two

11   pages -- well, I'm sorry, three pages and then the second one,

12   which I think is consecutive we can make.

13             THE COURT:  Aren't the first two pages --

14             MS. PLEVAN:  Yes.

15             THE COURT:  -- part of the same chain as the third

16   page, which has a different Bates number.

17             MS. KOSTER:  No, your Honor.

18             So we ask that just the first two pages be admitted

19   into evidence and nothing else at this time.

20             THE COURT:  You know, unless the third page was

21   attached --

22             MS. PLEVAN:  I am not sure.  So I am OK taking out the

23   third page.

24             THE COURT:  OK.

25             MS. PLEVAN:  We can check later.

```
 1              THE COURT:  OK.

 2              MS. PLEVAN:  But the second exhibit would begin on the

 3    fourth page and that is consecutive down to the rest of the

 4    document.

 5              THE COURT:  OK.

 6              MS. PLEVAN:  Which would be DQ2.

 7              THE COURT:  All right.  We will admit DQ and DQ2.

 8              MS. KOSTER:  Your Honor, we are still examining this

 9    document, and it appears that it's not continuous.

10              THE COURT:  We will give you a minute to do that.

11              MS. KOSTER:  The last couple of pages that start at

12    64479 it appears that it's not continuous.

13              THE COURT:  Let's not make speeches.

14              Could you go through them.

15              Can you recall which ones came together as one e-mail

16    with various attachments or not?  If you can help us with that,

17    that would be helpful.

18              MS. PLEVAN:  Yes.  I think there's one batch looks

19    like --

20    BY MS. PLEVAN:

21    Q.  Dean Horan, if you would begin on the fourth page, which is

22    Bates stamped at the lower right hand corner 64779.

23    A.  OK.  So this was one of the e-mails that he, Professor

24    Bekaert, had forwarded to the dean and I which he felt was in

25    support of his thinking that they were having a collaborative
```

1    and productive research relationship.

2    Q.  Then let me ask you to identify another e-mail from

3    Professor Bekaert to you and the dean on July 9 with a Bates

4    stamp 64787 in the lower right-hand corner.

5    A.  OK.  Yes.  From a few minutes later, right.

6    Q.  Was that another e-mail that he sent forwarding e-mails and

7    attachments to you?

8    A.  Yes.

9                THE COURT:  Doesn't that start on 64785.

10               Doesn't that start two pages earlier.

11               MS. PLEVAN:  Well at the top of '87 is -- sorry.

12               THE COURT:  OK.

13               MS. PLEVAN:  '85 is another one.

14               There's a series of them here.

15               THE WITNESS:  Right.  Forwarded individually.

16   BY MS. PLEVAN:

17   Q.  64785 is another one that Professor Bekaert sent to you on

18   July 9, 3:28?

19   A.  Yes, the dean and I.

20   Q.  64787 is another one he sent on July 9 at 3:29?

21   A.  Right.  The first one was at 3:26.

22   Q.  And then if you look at 64824, is that an e-mail with

23   attachments that Professor Bekaert sent on July 9 at 3:32 to

24   you and Dean Hubbard?

25   A.  Yes.

1  Q.  And then on 64827, is that an e-mail that he sent on July 9

2  at 3:33?

3  A.  Yes.

4  Q.  And then at 64886, is that an e-mail that Professor Bekaert

5  sent to you and Dean Hubbard at 3:35?

6  A.  I'm getting -- yes.

7  Q.  Will you look at the one that begins 64891.  Is that an

8  e-mail that Professor Bekaert sent on July 9 at 4:52?

9  A.  Yes.

10         MS. PLEVAN:  I'm sorry.  Is this in evidence, your

11  Honor?

12         THE COURT:  I think we are going to mark these as

13  different exhibits, and then I am going see if there's any

14  objection.  I think once we divide them up, I'm hoping that

15  there won't be.

16         MS. PLEVAN:  OK.

17  Q.  Another one 64896 -- I'm sorry, I haven't been reciting

18  numbers as I went along -- an e-mail that you received on July

19  9, at 4:58 p.m. from Professor Bekaert?

20  A.  Yes.

21  Q.  And then there's e-mail -- sorry, Bates stamp 64901, an

22  e-mail you received from Professor Bekaert on July 9 at 5:41?

23  A.  Yes.

24         MS. PLEVAN:  I think that's the chain, your Honor.

25         THE COURT:  Any objections now?

1                We'll divide these into different exhibit numbers?

2                MS. KOSTER:  No, your Honor.

3                THE COURT:  OK.  So they will be admitted.  As you do

4        them just give them a DQ number, please.

5                (Defendants' Exhibit DQ1 through DQ6 received in

6        evidence)

7        BY MS. PLEVAN:

8        Q.  First, did you read these e-mails when you received them?

9        A.  I read the e-mails, not the research.

10       Q.  Did you have any impression based on your reading of these

11       e-mails?

12       A.  Just that there was another side to the -- you know, the

13       delay story.

14       Q.  Let me direct your attention to the e-mail at 64891.

15                What I would like to do is offer that 64891 through

16       64895 as Defendants' Exhibit DQ2?

17                MS. PLEVAN:  Is that admitted?

18                THE COURT:  They are all in.

19                MS. PLEVAN:  I'm sorry.  OK.

20                THE COURT:  I am just saying they are all in.

21                As you go along, just give it a DQ number, and we're

22       all set.

23                MS. PLEVAN:  OK.

24       BY MS. PLEVAN:

25       Q.  Would you just read Professor Bekaert's e-mail at the top

1    there?

2    A.   "Sorry for the deluge of e-mails but I hope it shows you

3    what I said:  It looked as if she was continuing the research

4    path, although progress is surely not as fast as I had hoped

5    for.  I am including this trail too.  It is interesting because

6    there are some references to the 'e-mail fight,' but most of it

7    is about me doing my agreed part for the AE paper.  I am

8    curious about the timing of her complaint.

9              "I continue to find this quite bizarre."

10   Q.   Next I would like you to look at the pages Bates stamped at

11   the bottom 64896 through 64900.

12             We will consider those DQ3.

13             Would you read there Professor Bekaert's e-mail to you

14   and the dean at 4:58 p.m. on July 9?

15   A.   "If you look at this trail, I see a change in tone.  It

16   almost seems she got some piece of bad advice in the middle.

17   At first she seems to really want to go on with research as

18   usual (as she should for her own good), then suddenly she gets

19   aloof and wants to not meet in person but ascribes it to back

20   pain."

21             MS. KOSTER:  If your Honor could clarify that this

22   isn't being admitted for the truth of the matter asserted.

23             THE COURT:  It is just being admitted --

24             MS. PLEVAN:  For what was communicated.

25             THE COURT:  -- for what was communicated and when and

1   to whom.

2               MS. PLEVAN:  And then I would just like to offer as

3   DQ4 the part dean Horan identified, but beginning at 64901

4   through 64903.

5               I would like to offer as DQ5 the e-mail that begins on

6   64821 and goes through 64889.

7               THE COURT:  Those will be admitted as those numbers.

8               Thank you.

9               MS. PLEVAN:  And then, lastly, I believe as DQ6, I

10  would like to offer Bates stamp 64787 through 64820.

11              THE COURT:  OK.  That will be admitted as DQ6.

12  BY MS. PLEVAN:

13  Q.  Now, sometime later in the summer of 2014, did you and Dean

14  Hubbard meet again with Professor Ravina?

15  A.  We met again in September of 2014.

16  Q.  And why did the meeting get scheduled in September?

17              Let me ask you first, was there an attempt to schedule

18  the meeting at an earlier date?

19  A.  There was an attempt to schedule a meeting on August 6.  It

20  was on my calendar, the dean's calendar, but we had missed an

21  e-mail that someone else wasn't available.

22              MS. PLEVAN:  I would like to mark as Defendants'

23  Exhibit -- I'm sorry, offer Defendants' Exhibit DT and show it

24  to the witness.

25              THE COURT:  Any objection to DT?

1              MS. KOSTER:  No objection, your Honor.

2              THE COURT:  DT will be admitted.

3              (Defendants' Exhibit DT received in evidence)

4    BY MS. PLEVAN:

5    Q.  Does DT refer to the scheduling of the meeting in early

6    August that you referred to?

7    A.  Yes.

8    Q.  And did you communicate with the dean about the request

9    that Professor Ravina made in this e-mail?  Let me show you

10   Defendants' DV.

11             MS. PLEVAN:  We offer Defendants' Exhibit DV in

12   evidence.

13             THE COURT:  Any objection?

14             MS. KOSTER:  No objection, your Honor.

15             THE COURT:  All right.

16             DV will be admitted.

17             (Defendants' Exhibit DV received in evidence)

18   BY MS. PLEVAN:

19   Q.  So we looked at DT, which is an e-mail from Professor

20   Ravina.  Is DV an exchange of e-mails between you and the dean,

21   Dean Hubbard, regarding that e-mail?

22   A.  Yes, yes.

23   Q.  And were you communicating with the dean on Sunday, July

24   13, about Professor Ravina's e-mail?

25   A.  Yes.

1   Q.  And in the dean's e-mail he asks you for guidance, and you

2   responded, correct?

3   A.  Yes.

4   Q.  And how did you respond?  What did you recommend as a

5   response?

6   A.  Should I read it?

7   Q.  You can.  Sure.

8           THE COURT:  It is up to you.

9   A.  "We can let her know that we can put the relationship

10  manager in place early this week -- I didn't mention to her

11  that you would be the relationship manager, but that you would

12  be following up about the relationship manager.

13          "I think we will need to bring Kathy into the loop."

14  Q.  Who did that refer to?

15  A.  So Senior Vice Dean Kathy Phillips was -- it was now July,

16  and she was in the role of senior vice dean in the dean's

17  office.

18  Q.  So she had taken over for Gita Johar, who had been the

19  senior vice dean?

20  A.  Through June, yes.

21  Q.  Why don't you continue with "the schedules."

22  A.  "The schedules are tight over the next few weeks, but with

23  the three of us we are more likely to find two of us available.

24  Q.  And so does this -- going back to DT -- refer to the

25  attempt to schedule a meeting for early August of 2014?

1   A.  Yes.

2   Q.  And you referred to an issue of someone not being able to

3   attend then?  Who was that person who couldn't attend?

4   A.  Actually, I don't know that -- we weren't sure who it was,

5   but I know come August 6 it was on our calendar, but Professor

6   Ravina and Suzanne Goldberg didn't come to the meeting, and

7   then we heard there was a scheduling issue.

8   Q.  I see.  You don't know whose schedule was the problem?

9   A.  No, I'm not sure.

10  Q.  OK.  And so was there a communication about the

11  relationship manager being the dean sometime -- for a temporary

12  basis sometime after July 13?

13  A.  Yes.

14  Q.  There was a reference in DV also to see if you could find

15  Professor Zeldes?

16  A.  Yes.

17  Q.  And what was his role at the time?

18  A.  At the time Professor Zeldes was the chair of the Finance

19  and Economics Division, and Kathy and he were going to try to

20  identify somebody else to be the relationship manager.

21  Q.  After you had this e-mail exchange with Dean Hubbard, did

22  you have some communication with Kathy Phillips?

23  A.  Yes.

24          MS. PLEVAN:  I would like the witness to look at

25  Defendants' Exhibit D7.  We offer that in evidence.

1          THE COURT:  Do you have copies of D7?

2          MS. PLEVAN:  I'm sorry.  DZ.

3          THE COURT:  DZ, OK.

4          Any objection to DZ?

5          MS. KOSTER:  No objection, your Honor.

6          THE COURT:  DZ will be admitted.

7          (Defendants' Exhibit DZ received in evidence)

8   BY MS. PLEVAN:

9   Q.  Now, at the bottom of the page, the first page of DZ, is

10  that an e-mail that you received from Professor Ravina on July

11  15?

12  A.  Yes.

13  Q.  And she was bringing to your attention that she had

14  received an e-mail from Professor Bekaert?

15  A.  Yes.

16  Q.  And did you respond to that e-mail?

17  A.  I did.

18  Q.  OK.  Would you read what you said in response to her

19  e-mail?

20  A.  "Hi Professor Ravina.

21          "I am away, but yesterday Glenn and I briefed Senior

22  Vice Dean Kathy Phillips (copied here) so that we have another

23  person in the dean's office who can assist with this situation.

24  I know that Glenn was trying to speak with the necessary

25  colleagues to help with securing the relationship manager and

1    work to the desired outcomes.  I will coordinate so that one of

2    us follows up with Professor Bekaert."

3    Q.  Why did you send this e-mail to Professor Ravina?

4    A.  I sent the e-mail in response to her e-mail alerting us

5    that Professor Bekaert had reached out.

6    Q.  Was this the first that she learned about Professor

7    Phillips being -- or then Senior Vice Dean Phillips being

8    involved?

9              MS. KOSTER:  Objection.

10             Lack of personal knowledge.

11             THE COURT:  Sustained.

12   BY MS. PLEVAN:

13   Q.  In this e-mail, you advised her that Senior Vice Dean

14   Phillips would be involved, is that correct?

15   A.  Yes.

16   Q.  And can you look at the e-mail above this, which begins, "I

17   can send him an e-mail"?

18   A.  Yes.

19   Q.  Who did you send that communication to?

20   A.  To Dean Hubbard, for sure.  I don't know if Kathy was

21   copied.

22   Q.  What were you conveying in that e-mail?

23   A.  That someone needed to follow up with Professor Bekaert and

24   remind him to comply with what we had requested.

25   Q.  And you sent that e-mail on July 15 at 10:52 a.m.?

 1  A.  Yes.

 2  Q.  And did Vice Dean Phillips, Senior Vice Dean Phillips

 3  respond on July 15 at 11:48?

 4  A.  Yes, she did.

 5  Q.  What did she say in her response?

 6  A.  "We have a meeting with Geert at 1:30."

 7  Q.  And you were on vacation that day?

 8  A.  I was out of town, yes.

 9  Q.  Therefore, you weren't at that meeting that took place on

10  July 15, is that correct?

11  A.  That's correct.

12  Q.  Did you learn later about a meeting that Dean Phillips had

13  with Professor Ravina?

14  A.  Yes.

15  Q.  Did the office of Dean Hubbard take any steps that you

16  became aware of after the meeting that Dean Phillips had with

17  Professor Ravina?

18  A.  That the dean's chief of staff alerted the EOAA office of a

19  complaint.

20         MR. HERNSTADT:  Let me show the witness Defendants'

21  Exhibit EJ.

22         MS. PLEVAN:  We offer that in evidence.

23         THE COURT:  Any objection?

24         MS. KOSTER:  No objection, your Honor.

25         THE COURT:  All right.  EJ will be admitted.

1          (Defendants' Exhibit EJ received in evidence)

2     BY MS. PLEVAN:

3     Q.  Now, I would like you to go back to the first part of the

4     e-mail chain which begins on the second page at the top.

5     A.  Yes.

6     Q.  Almost at the top of that page.

7          Is that the communication that you received a copy of

8     from Laura Lee to Michael Dunn on July 19, 2014?

9     A.  Yes.

10    Q.  And what was Laura Lee's position at that time?

11    A.  She was chief of staff to Dean Hubbard.

12    Q.  Is the material below the words "Dear Michael" the text of

13    the e-mail that Ms. Lee sent to Mr. Dunn and that a copy was

14    provided to you?

15    A.  I'm sorry.  Could you repeat that.

16    Q.  Is what appears after the words "Dear Michael" the e-mail

17    that Ms. Lee, the dean's chief of staff, sent to Michael Dunn

18    on July 19, 2014?

19    A.  Yes.

20    Q.  And you received a copy of that?

21    A.  I was copied, yes.

22    Q.  And in that e-mail Ms. Lee refers to the background of the

23    June 16 meeting --

24    A.  Yes.

25    Q.  -- is that correct?

i7knrav3                          Horan - Direct

1  A.  Yes.

2  Q.  And she refers to the July 9 meeting that you and Dean

3  Hubbard had with Professor Bekaert?

4  A.  Yes.

5  Q.  And she then at the next to last paragraph refers to a

6  meeting that took place after the July 9 meeting in which

7  Professor Ravina spoke to Glenn and Kathy, that's Glenn Hubbard

8  and Kathy Phillips, where she made reference to behavior that

9  made her uncomfortable, is that correct?

10 A.  Yes.

11 Q.  And I would like to turn next to the first page of

12 Defendants' Exhibit EJ, in which, am I correct, there is an

13 e-mail from you to Laura Lee at which you make reference to

14 having a conversation with Michael Dunn back in June, is that

15 right?

16 A.  Yes.

17 Q.  Tell us about that.

18        What conversation did you have with Michael Dunn in

19 June 2014 that you were making reference to here?

20 A.  I had called Michael after the Gita conversation to let him

21 know that we had a research dispute, what faculty had spoken of

22 as a research dispute between a male and a female faculty

23 member and just wasn't sure how to proceed with following up on

24 that, within the dean's office.

25 Q.  Did you say anything else about the nature of the issue

i7knrav3                          Horan - Direct

1    that you were calling Mr. Dunn about other than that it was a

2    research dispute?

3    A.   That's what I knew at the time.

4    Q.   Did you say anything about sexual harassment, sexual

5    advances or sexual innuendos?

6    A.   No.

7    Q.   Why not?

8    A.   Because that wasn't brought to my attention.

9              MS. PLEVAN:  Let me next show the witness Defendants'

10   Exhibit FA and we will offer that in evidence as well.

11             THE COURT:  Any objection to FA?

12             MS. KOSTER:  No objections, your Honor.

13             THE COURT:  All right.  It will be admitted.

14             (Defendants' Exhibit FA received in evidence)

15   BY MS. PLEVAN:

16   Q.   Do you recognize Defendants' Exhibit FA as an e-mail

17   exchange that you had with Dean Hubbard on July 25, 2014?

18   A.   Yes.

19   Q.   Is this an accurate summary of your conversation with

20   Michael Dunn that day, what you conveyed to the dean?

21   A.   Yes.

22   Q.   Let me show you next what we've marked as Defendants'

23   Exhibit FX.

24             MS. PLEVAN:  We offer that in evidence.

25             THE COURT:  Any objection to FX?

1           MS. KOSTER:  No objection, your Honor.

2           THE COURT:  All right.  FX will be admitted.

3           (Defendants' Exhibit FX received in evidence)

4           MS. KOSTER:  I should note I believe this is already

5    in evidence as a plaintiff's exhibit.

6           THE COURT:  All right.

7    BY MS. PLEVAN:

8    Q.  At the bottom of Defendants' Exhibit FX, is that an e-mail

9    you sent to Michael Dunn on August 18, 2014?

10   A.  Yes.

11   Q.  Why did you send that e-mail to Mr. Dunn?

12   A.  I was checking in with Michael Dunn to find out if the

13   investigation was moving along and if he had an idea when it

14   might wrap up.

15   Q.  Is his response to you at the top of -- is that his

16   response?

17   A.  Yes.

18   Q.  Was he communicating the status of the investigation at

19   that time?

20   A.  Yes.

21   Q.  He makes reference to training in that communication?

22   A.  Yes.

23   Q.  Had you raised that with him earlier?

24   A.  I believe Laura had mentioned it earlier.

25   Q.  In her e-mail?

1    A.   In her e-mail.

2    Q.   Now, in September did you meet with Dean Hubbard, Professor

3    Ravina, and Suzanne Goldberg?

4    A.   Yes, we did.

5    Q.   What was your understanding of the purpose of that meeting?

6    A.   To get an update on the progress on the papers, to discuss

7    again the relationship manager.

8    Q.   What do you recall of the meeting?  What was discussed?

9    Maybe start with Professor Ravina.  What did she say at that

10   meeting?

11   A.   At the meeting she had a proposal for a more detailed

12   schedule for each of the papers and particular components as to

13   having a commitment of, you know, if she were to do something

14   by tomorrow, he would have that returned to her by Monday,

15   something -- there were dates inserted into a schedule.

16   Q.   Was anything agreed upon at that meeting regarding a

17   schedule?

18   A.   It was agreed that we would speak with Professor Bekaert

19   about it.

20   Q.   And did she later on propose a specific schedule?

21   A.   There were several versions of the schedule.

22            MS. PLEVAN:  I would like to show the witness

23   Defendants' Exhibit GO and offer that in evidence.

24            THE COURT:  Any objection to Exhibit GO?

25            MS. KOSTER:  Your Honor, this has already been

i7knrav3                          Horan - Direct

1    admitted as Plaintiff's Trial Exhibit 78.

2               THE COURT:  OK.

3               MS. PLEVAN:  I don't know if that's the exact version,

4    so I am just using my copy.

5               THE COURT:  It is admitted.

6               MS. PLEVAN:  Thank you.

7               Does the witness have a copy of this?

8               THE COURT:  Do you have copy?  You can use mine.

9               THE WITNESS:  OK.

10   BY MR. SANFORD:

11   Q.  Is Defendants' Exhibit GO an e-mail that you and Dean

12   Hubbard received from Professor Ravina on September 19 --

13   A.  Yes.

14   Q.  -- 2014?

15   A.  Yes.

16   Q.  Sorry.  Does it have a proposed schedule attached?

17   A.  Yes, it does.

18   Q.  You mentioned other drafts or other versions I think.

19              What happened after this mid-September proposed date?

20   Were there other meetings and discussions about a schedule?

21   A.  There were other discussions about a schedule.

22   Q.  Did you participate in any of those?

23   A.  I know I participated in discussing with Professor Bekaert

24   what might be a schedule that he could work with.

25   Q.  And did you have additional conversations with Professor

1   Ravina about trying to work out a schedule?

2   A.   Probably.

3   Q.   In this process in the summer and fall through the winter

4   of 2014, do you have any estimate about the number of meetings

5   you participated in concerning this subject of the research

6   dispute?

7   A.   25 to 30 meetings.

8            MS. PLEVAN:  Just for the witness I would like to show

9   and offer Defendants' Exhibit GR.

10           THE COURT:  Any objection to GR?

11           MS. KOSTER:  No objections, your Honor.

12           THE COURT:  All right.  GR will be admitted.

13           Thank you.

14           (Defendants' Exhibit GR received in evidence)

15  BY MS. PLEVAN:

16  Q.   Let's go through this.  Is this an e-mail exchange between

17  you and Professor Ravina.  Let me ask you to start with the

18  second page although --

19  A.   With the first e-mail?

20  Q.   Yes.

21  A.   Yes.

22  Q.   Why don't you just read the first e-mail to the jury.

23  A.   "Hi Professor Ravina.

24           "I left you a voice message, but I am following up to

25  let you know that we did meet with Professor Bekaert this

morning and Glenn is now trying to speak with Professor

Wolfenzon to let him know that you he can now schedule time for

the three of you to meet.

            "Let me know if you would like to schedule a time to

discuss my message or this e-mail."

Q.  And then Professor Ravina responded and you responded to

her to set up a call to talk to her, is that correct?

A.  Yes.

Q.  What was the reference to Professor Wolfenzon about?

A.  He had now agreed to be the relationship manager, and

Professor Bekaert had agreed for him to be the relationship

manager.

Q.  Was there any discussion around this time that you were

part of with Professor Bekaert about having a schedule for the

papers?

A.  Yes.

Q.  And what did Professor Bekaert communicate to you about

that?

A.  He had concerns that responding to particular pieces on

research were not something that you could put on a

minute-by-minute, hour-to-hour schedule.  So he had concerns

about committing to particular dates to what he considered to

be an unknown volume of work that would be needed.

Q.  Did you meet with Professor Ravina -- I'm sorry, did you

speak with Professor Ravina on September 22 after exchanging

1    these e-mails to set up a time?

2    A.  I believe we did.  I don't recall the specifics of the

3    conversation.

4            MS. PLEVAN:  I'm going to show the witness Defendants'

5    Exhibit GS.  I am going to offer that into evidence.

6            THE COURT:  Any objection to GS?

7            MS. KOSTER:  No objection, your Honor.

8            THE COURT:  All right.  GS will be admitted.

9            (Defendants' Exhibit GS received in evidence)

10   BY MS. PLEVAN:

11   Q.  GS, the e-mail from you to Dean Hubbard, does that refresh

12   your recollection about your discussion on September 22, with

13   Professor Ravina?

14   A.  That we did speak at 3:15.

15   Q.  And did you tell her, as you say here, that you would let

16   her know you would join the first meeting to help mediate?

17   A.  Yes.

18   Q.  And do you believe you did that?

19   A.  I don't believe the meeting ended up taking place.

20   Q.  Were there discussions there -- you referred to professor

21   Wolfenzon agreeing to be the relationship manager.  Had you

22   and/or the dean had conversations with him about that?

23   A.  We both had conversations with him about that.

24           MS. PLEVAN:  I would like to show the witness

25   Defendants' Exhibit HF, an e-mail dated September 29, 2014, and

1    offer that into evidence.

2              THE COURT:  Any objection to HF?

3              MS. KOSTER:  No objections, your Honor.

4              THE COURT:  HF will be admitted.

5              (Defendants' Exhibit HF received in evidence)

6              THE COURT:  Whenever you think we should take a break

7    for lunch, just let me know.

8              MS. PLEVAN:  OK.

9    BY MS. PLEVAN:

10   Q.  Would you read, Ms. Horan, your e-mail from September 29 at

11   6:24 from you to the dean?

12   A.  At 6:42, sorry.

13   Q.  Yes.  First, is that referencing a conversation you had

14   with Professor Bekaert?

15   A.  On the phone, yes.

16   Q.  OK.  Would you read what you wrote there to the dean.

17   A.  "He was quite reasonable on the phone.  I offered the Bob

18   Hodrick solution, but he doesn't want to burden Bob, so in the

19   end I offered to reach out to Daniel Wolfenzon and ask some

20   preliminary questions.  Geert is concerned that Daniel has made

21   some assumptions based upon information from Enrichetta, and I

22   reminded him that this was not about who is right or wrong, but

23   the goal is to get the papers done, and if everyone works

24   professionally it might only take a small number of meetings."

25             MS. PLEVAN:  Let me next show the witness Defendant's

1    Exhibit HI and offer that into evidence.

2              THE COURT:  Any objection to HI?

3              MS. KOSTER:  No objection, your Honor.

4              But, just like the other exhibits, we seek

5    clarification that this is only admitted for the fact that it

6    was sent, not for the truth of the matter asserted.

7              THE COURT:  So that instruction applies here.

8              HI will be admitted.

9              (Defendants' Exhibit HI received in evidence)

10   BY MS. PLEVAN:

11   Q.  And is Exhibit HI an e-mail you received from Daniel

12   Wolfenzon on October 6, 2014?

13   A.  Yes.

14   Q.  And was this soon after he was asked and agreed to be the

15   relationship -- or soon after he agreed to be the relationship

16   manager?

17   A.  Yes.

18   Q.  And would you just read the first paragraph of the e-mail.

19   A.  "Hi Janet.

20              "I talked to Enrichetta about the paper that is almost

21   ready to submit, and even in that paper, I am not sure I will

22   be able to make progress.  Geert wants some improvements in the

23   data, and Enrichetta believes the data is good enough.  Neither

24   one seems willing to compromise.  I will keep trying.

25              MS. PLEVAN:  This would be a good time to break, your

i7knrav3                    Horan – Direct

1    Honor.

2                THE COURT:  All right.  Good.

3                So, ladies and gentlemen, let's take an hour for

4    lunch.

5                Please don't discuss the case and keep an open mind.

6                Thank you.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Jury not present)

 2                 THE COURT:  Do you want to talk about those remaining

 3      exhibits now?

 4                 MS. PLEVAN:  We could do that.

 5                 THE WITNESS:  Do I go back?

 6                 THE COURT:  Do you want to come back in an hour.

 7                 THE WITNESS:  OK.

 8                 THE COURT:  Thank you.

 9                 If there are issues relevant to this afternoon, we

10      should talk about them now.

11                 MS. HARWIN:  So I believe we've spoken about Exhibit

12      133.

13                 THE COURT:  We have spoken about 133.

14                 MS. HARWIN:  So the next one -- I am just going

15      numerically rather than thematically, but the next one that I

16      understand --

17                 MS. PLEVAN:  Just one second.

18                 MS. HARWIN:  I'm sorry.  I apologize.

19                 I thought you were ready.

20                 MS. PLEVAN:  I think I have it.

21                 The next one we are talking about?

22                 MS. HARWIN:  148.

23                 And then there's a similar issue with respect to 183.

24                 These are both Columbia University documents

25      concerning Columbia's e-mail policy.  The parties previously
```

 1    reached a stipulation regarding the admissibility of certain

 2    types of documents.  The stipulation specified that Columbia

 3    policies would be admissible.

 4              I understand now that defense counsel has taken a

 5    different position and is saying that only certain kinds of

 6    policies.  But that was the parties' stipulation, policies.  We

 7    believe they should be admitted

 8              MS. PLEVAN:  I think we exchanged e-mails.  I don't

 9    think there is a stipulation.

10              MS. HARWIN:  Not an admitted stipulation.  I mean a

11    stipulation by e-mail.

12              THE COURT:  OK.

13              MS. PLEVAN:  I don't have the e-mail here, so I know

14    what I was focused on was they had been objecting to our EEO

15    policies and statutes, and that's what I was focused on.

16              THE COURT:  OK.

17              MS. PLEVAN:  These additions were late exhibits, and I

18    was not focused on them at all.  To me it would be misleading

19    to the jury to introduce the issue of e-mail policy and IT

20    resource policy.

21              THE COURT:  What does the e-mail policy say?

22              MS. PLEVAN:  I don't know what purpose it is being

23    offered for here.

24              THE COURT:  How is it relevant?

25              MS. HARWIN:  Columbia's has an e-mail policy that

1    allows monitoring of faculty member communications --

2                MR. HERNSTADT:  I can't understand her.

3                THE COURT:  Speak up a little, please.

4                MS. HARWIN:  Sure.

5           Columbia has an e-mail usage policy.  It provides for

6    Columbia to be able to monitor faculty member e-mail

7    communications.

8           Professor Bekaert obviously disparaged Professor

9    Ravina widely using his Columbia e-mail account, and we think

10   Columbia's policy on this issue is pertinent.

11               THE COURT:  Pertinent to what?

12               MS. HARWIN:  Columbia enabling this retaliation.

13               THE COURT:  How?

14               MS. HARWIN:  Because Columbia didn't do anything while

15   Professor Bekaert was engaging in disparaging communications

16   over Columbia's e-mail system over an extended period.

17               THE COURT:  Do you want to respond?

18               MS. PLEVAN:  I think it's speculation what their

19   practice is.  There's no evidence of what the practices are.

20          This was not reported.  She didn't make any request of

21   any kind regarding e-mails until the EEO complaint.  She didn't

22   ask anybody to do anything about monitoring his e-mails, and

23   there's no testimony here as to what the normal practice is for

24   doing that or not doing it.

25               THE COURT:  Why don't you give me a copy of the

i7knrav3                        Horan - Direct

1    exhibit, and I'll let you know right when we begin.

2               MS. HARWIN:  Sure.

3               THE COURT:  Are there any others there are disputes

4    about.

5               MR. HERNSTADT:  Your Honor?

6               THE COURT:  Yes.

7               MR. HERNSTADT:  In addition to that, what she's

8    talking about are the e-mails he sent after July 2014 --

9               THE COURT:  Right.

10              MR. HERNSTADT:  -- to his girlfriend and then the

11   e-mails that were sent in March.

12              While I disagree with the characterization it was

13   disparaging, I think the point is none of them were to her,

14   none of them were to anybody at Columbia.

15              These are e-mails that he sent to his friends.  How on

16   earth is a policy that talks about that applicable when there

17   has been no request, there's been no investigation, there's

18   been no reason to apply some kind of a policy.

19              THE COURT:  Which portion of the policy do you think

20   that he violated?

21              MS. HARWIN:  The issue is really not as to Professor

22   Bekaert's violation.  It is that Columbia had the ability to

23   monitor communications and did not do so.

24              It didn't do so while its investigation into Professor

25   Bekaert was ongoing, while that investigation as pending

1              MS. PLEVAN:  There's no foundation for this whatsoever

2      or a witness who could testify about what their practices are

3      in terms of monitoring e-mails.  I don't really know what the

4      argument would be.

5              THE COURT:  Did you ask either Mr. Dunn or anyone else

6      about whether when they're investigating allegations of this

7      sort they monitor people's e-mails?

8              MS. HARWIN:  I don't believe that that question was

9      specifically posed, but whether or not they do something in

10     practice is a choice of the university.

11             The fact is they had a policy that enabled them to do

12     so.  As you know, one of the allegations in this case is that

13     Columbia was negligent in how it investigated and responded to

14     Professor Bekaert.

15             THE COURT:  Is there any suggestion that they didn't

16     get all of the relevant e-mails from Ms. Ravina or from anyone

17     else?

18             Is there any suggestion that they didn't get all the

19     relevant e-mails?

20             MS. HARWIN:  Well, as the investigation was pending,

21     Professor Bekaert was already engaging in e-mail communications

22     making clear his retaliatory intent.  That was ongoing while

23     Professor Ravina was complaining about retaliation.  These were

24     e-mails exchanged on Columbia's server, and that was not

25     identified by Columbia.

1              MS. PLEVAN:  You are referring to 2016 e-mails.

2              MS. HARWIN:  No, I'm referring to 2014 e-mails.

3              MR. HERNSTADT:  Some of those were sent before he knew

4      about retaliation.

5              May I just ask which policy are you saying gives

6      Columbia the power to monitor e-mails?

7              Which exhibit is that?

8              MS. PLEVAN:  Could you direct us.

9              THE COURT:  148.

10             MS. PLEVAN:  Would you direct us to the paragraph?

11             MR. HERNSTADT:  The e-mail usage policy?

12             MS. PLEVAN:  What are you specifically referring to?

13             MS. HARWIN:  There two different policies.  One of

14     them --

15             THE COURT:  Is your view whenever an accusation is

16     made the university should then --

17             MS. PLEVAN:  Start snooping.

18             THE COURT:  Yes.  Just look at everyone's e-mail

19     communications as a matter of course?

20             MS. HARWIN:  That is not our position, your Honor.

21     But this is a case --

22             THE COURT:  But is it negligent not to do so when an

23     allegation has been made not to start read all their e-mails?

24             MS. HARWIN:  That is not a position that we are

25     taking.  But what we do have is a situation when Professor

1   Ravina expressed specific concerns about retaliation that was

2   ongoing, additionally expressed specific concerns about

3   Professor Bekaert engaging in disparagement of her.  The

4   e-mails that were exchanged while this investigation was

5   pending are, I mean just to say the very least, highly

6   probative on this issue.

7            THE COURT:  All right.

8            So just point us to the provision in here, and then

9   just let's go to the next exhibit.

10           MR. HERNSTADT:  I would just note that both of these

11   policies are dated after the time period.

12           THE COURT:  Is that right?

13           MS. PLEVAN:  There's that, too.

14           MR. HERNSTADT:  183 is revised September 2017, and 148

15   is revised April 2016.  So we have no way of knowing what was

16   changed and whether the provisions that they're pointing to

17   were even in effect.

18           THE COURT:  If you are making an application to

19   introduce the policy, it has to be one that was in place at the

20   time, right?

21           MS. HARWIN:  Understood, your Honor.  It is our

22   understanding that the material provisions have not changed,

23   but we will see if we can identify the earlier.

24           THE COURT:  Why don't you do that and then tell me

25   what provision you are looking at and I'll get back to you.

1              MS. HARWIN:  Thank you, your Honor.

2              THE COURT:  What are the other exhibits that there are

3    disputes about?

4              MS. HARWIN:  Yes.  So there are a number of exhibits

5    that are on defendants' exhibit list, so I don't understand

6    there to be an objection to them, but obviously I will give the

7    defendants an opportunity to address and confirm whether that's

8    the case, which are Exhibits IC --

9              MS. PLEVAN:  Sorry.

10             MS. HARWIN:  IC.

11             MS. PLEVAN:  You didn't tell me that.

12             MR. HERNSTADT:  We are hearing about this for the

13   first time.

14             MS. PLEVAN:  You gave me one, 179.

15             MS. HARWIN:  When you were sitting down, I provided

16   you the additional.

17             MS. PLEVAN:  I have been in court.  You said you were

18   going to give us copies.

19             MS. HARWIN:  OK.

20             MS. PLEVAN:  I don't even know what these are.

21             Why don't we do the others, and we will have to look

22   at them.

23             THE COURT:  Yes.  Make sure something is in dispute

24   before you bring it to me.  You can try to resolve it among

25   yourselves.

1              MS. HARWIN:  That's fine.  My understanding is the

2      last items to which there is a dispute have to do with

3      Professor Mark Broadie, which are two articles that he

4      published during the time when he was on this break in service,

5      which identify him with a professorial title.  We submit these

6      should be admitted.

7              THE COURT:  Who should authenticate them?

8              MS. HARWIN:  These are documents that are publicly

9      available resources.  The Court can take judicial notice and

10     admit them.  There's no dispute that these are true copies of

11     published papers.

12             MS. PLEVAN:  I have no idea.  How can you say there's

13     no dispute?

14             MS. HARWIN:  Well, let me say there's no reasonable

15     dispute as to it.  These are something that are downloaded from

16     online.  They are from publicly available sources, of course.

17     Defense counsel can verify that by going and downloading them

18     as well.

19             MS. PLEVAN:  Our primary objection is relevance in any

20     event, your Honor.  I mean, first of all, one of them is --

21     this is all I could print out.

22             THE COURT:  Can I have the copies.

23             MS. HARWIN:  Sure, your Honor.

24             MR. HERNSTADT:  Do you have a copy that is bigger than

25     this?

1                MS. PLEVAN:  Bigger than a postage stamp.

2                MS. HARWIN:  This is the way it displayed

3     unfortunately.  I can't address the technical aspects of why

4     that's the display, but that is the display.

5                And I will say additionally, your Honor -- well, why

6     don't we stay there for now.

7                MS. PLEVAN:  Maybe we can take this in order.

8                THE COURT:  I'm sorry.  I can't read this.

9                MS. HARWIN:  Next time we are talking about this

10    document, I will provide magnifying glasses.

11               THE COURT:  OK.

12               MS. PLEVAN:  Your Honor --

13               MS. HARWIN:  I think this is actually magnified so you

14    can see it now on the screen.

15               THE COURT:  OK.

16               MS. PLEVAN:  I thought we had resolved the Mark

17    Broadie issue yesterday or the day before on this.  They want

18    to offer his CV.  None of these can they lay a foundation for,

19    and the CV is certainly hearsay.

20               THE COURT:  Do you have any of the relevant witnesses

21    who are going to say that they knew that he was violating the

22    spirit of his agreement --

23               MS. PLEVAN:  No.

24               THE COURT:  -- and publishing as a professor or

25    listing himself as a professor.

1              MS. PLEVAN:  You can answer that yes or no.

2              THE COURT:  This one I don't even see that he says

3     that he is a professor.  It says two names and then it says

4     graduate school of business, right?

5              MS. PLEVAN:  Yes.

6              THE COURT:  Does it actually say he was a professor on

7     the Application of Markov Chain Analysis?

8              MS. PLEVAN:  Also, one of them is --

9              MS. HARWIN:  Are we on Exhibit 181?

10             THE COURT:  181.

11             MS. HARWIN:  On 181, it's the last page.  Mark Broadie

12    is an associate professor in the Graduate School of Business at

13    Columbia University.

14             THE COURT:  OK.

15             MS. FISCHER:  Can we have a date?

16             MS. HARWIN:  This is a paper dated -- let me find

17    that, your Honor.  It's listed here.

18             THE COURT:  OK.  I see it.

19             MS. PLEVAN:  Your Honor, I think Chris Brown testified

20    that he didn't know anything about -- he's the decision maker

21    on this issue, and he said he never heard of Mark Broadie when

22    he made the decision.

23             Mark Broadie was surfaced, the plaintiffs surfaced him

24    in this litigation.

25             MS. HARWIN:  That's not accurate.  It is simply not

1    accurate.  Dean Hubbard on the stand testified when he had the

2    idea for break in service he had someone in mind, and that was

3    Mark Broadie.

4               THE COURT:  Did he know that he was publishing --

5               MS. PLEVAN:  No.

6               THE COURT:  -- and saying he was an associate

7    professor even though he wasn't?

8               MS. HARWIN:  The Columbia Business School publishes

9    his CV.  His CV today downloaded from Columbia Business

10   School's website identifies him as an associate professor

11   during this period.

12              MS. PLEVAN:  And all directories identified him as a

13   curriculum specialist.  Come on.

14              MS. HARWIN:  This is not accurate.

15              MS. PLEVAN:  This is just a frolic.

16              THE COURT:  I will think about this.

17              I will think about that situation.

18              MS. HARWIN:  Your Honor, the jury can draw an

19   inference that Professor Broadie was allowed to do something

20   from the fact that he did do something during the period with

21   documents that were clearly in the possession of Columbia

22   Business School, certainly when the publications which were

23   obviously considered as part of his tenure application.

24              MS. PLEVAN:  How do we know they were in anybody's

25   possession?  There is absolutely no witness that can testify

1  about any of this.

2              MS. HARWIN:  Your Honor, these are --

3              MS. PLEVAN:  We don't know --

4              MS. HARWIN:  There's really no reasonable dispute.

5  He's someone who subsequently applied for tenure.  The idea

6  that his publications were not in the possession of Columbia

7  Business School, to say that strains credulity is a great

8  understatement.

9              MS. PLEVAN:  It's --

10             THE COURT:  Let me think about it.

11             Are there any other disputes on exhibits?

12             MS. HARWIN:  So.

13             MS. PLEVAN:  On the last ones you mentioned, I thought

14  you said JC, JG, and JX, we are going to take a quick look at

15  them.

16             But can you tell us for what purpose they were being

17  offered?

18             MS. HARWIN:  These are communications with the EOAA

19  office, two of them between Associate Provost Rooker and

20  Professor Bekaert, and one of them between Associate Provost

21  Rooker and someone else in the provost's office.

22             MS. PLEVAN:  We want to know what you are proffering

23  them for.  Ms. Rooker was here yesterday and she wasn't asked

24  about these.  So we are just trying to understand the relevance

25  of these, what you are proffering them to show.

1          MS. HARWIN:  So JG and JX show notifications to

2     Professor Bekaert of the status of Professor Ravina's

3     complaint, the fact that she filed an appeal, the disposition

4     of the appeal.

5          Both of those are significant in terms of the action

6     that Professor Bekaert takes often closely following Columbia's

7     notifications to him as to the status of Professor Ravina's

8     complaint, which, of course, is pertinent to any question

9     regarding retaliation.

10         The other --

11         THE COURT:  Go ahead.

12         MS. HARWIN:  I'm sorry, your Honor.

13         THE COURT:  No.

14         MS. HARWIN:  The other one is Associate Provost

15    Rooker, an e-mail with the provost for academic appointments

16    asking about Professor Ravina's tenure status.

17         MS. FISCHER:  That one in particular, I can look at

18    the transcript, but I believe Ms. Rooker was asked about this

19    at her deposition and she didn't recall it.

20         Is there a proffer of the relevance of this particular

21    document?

22         THE COURT:  Sorry.  Let's just do one thing at a time.

23         Rooker testified yesterday, right?

24         Why didn't you authenticate these with her?  I know

25    you reserved the right to admit documents, and I'm fine with

i7knrav3                      Horan - Direct

```
 1    that.  I feel like in this trial no one, and I've let you do it

 2    because there was consent, but you have to lay a foundation,

 3    right?

 4            So, if you have a witness here, you have to lay that

 5    foundation and introduce it through that witness.

 6            I think this is relevant, but I don't really

 7    understand why you didn't do it with the appropriate witness,

 8    either with her or with Bekaert and one of the people who was

 9    on the e-mail.

10            MS. HARWIN:  With respect to JC, it is not an e-mail

11    with Professor Bekaert.

12            THE COURT:  I was just talking about, I have JG in

13    front of me.

14            MS. HARWIN:  With that, your Honor, we didn't have any

15    substantive questions for Associate Provost Rooker, and we

16    assumed this would be admitted on consent, so we didn't really

17    want to take the jury time going through the admission of

18    several exhibits where we don't understand there is any basis

19    for dispute.  These are all on defendants' exhibit list.

20            MS. PLEVAN:  But the problem is the witness is no

21    longer here to address the exhibit.  That is the concern about

22    it.

23            MS. FISCHER:  The witness could have explained, for

24    example, that this was a matter -- of course, that these types

25    of notifications were given routinely and so forth.
```

1              I am not sure what plaintiff trying to insinuate or

2        suggest with these exhibits, but he could have explained the

3        process and procedure if there is a question of the process or

4        procedure.

5              MS. HARWIN:  There's no insinuation with respect to JG

6        or JX that the fact of a notification gives rise to liability

7        to Columbia in itself.  The issue is the response of Professor

8        Bekaert.  So this is just basic contextual information

9        regarding dates and times of events.

10             MR. HERNSTADT:  About which we are unable to respond,

11       to which we can't respond.  They didn't say yesterday when

12       Ms. Rooker was on the stand, they didn't ask us then if we

13       would consent to these.  They didn't mention them until this

14       morning.

15             MS. HARWIN:  Your Honor, I did bring up, and I did

16       provide defendants with -- I mean, the issue of admitting

17       documents was obviously raised prior to Melissa Rooker's

18       testimony.  We didn't have any reason to believe this would be

19       an issue, and so we proceeded.

20             MS. FISCHER:  If we received a list of documents, you

21       know -- obviously we are not sitting and reviewing them at that

22       time for a --

23             THE COURT:  Did you get the list beforehand?

24             MS. FISCHER:  I honestly don't believe so.  I think it

25       was the end of the day.

1          MS. PLEVAN:  No.  It was the end of the day.

2          MS. FISCHER:  It was after their testimony.

3          MS. PLEVAN:  They said they had a list, and then these

4     were added to the list maybe even this morning I think.

5          THE COURT:  At a trial you have to lay a foundation.

6     You have to do it with a witness.  I mean, I understand that

7     you reserved the right to admit documents, but I didn't think

8     it was with witnesses who were already gone.

9          All right.  I will think about this.

10          Why don't we just break for lunch, and we'll come

11     back -- I don't know.  Half an hour.  2.

12          MS. HARWIN:  OK.  Thank you.

13          Your Honor, if there is testimony in deposition, which

14     I believe Ms. Fisher has represented concerning one of these

15     documents, then I would certainly be happy to review it if

16     defendants would request that that line of deposition testimony

17     be admitted as evidence in connection with this.

18          MS. FISCHER:  Again, Ms. Rooker was here, and I think

19     the Court understands our position on that.

20          We could have addressed it yesterday.

21          THE COURT:  Let me think about it.

22          Thanks.

23          MS. HARWIN:  Thank you, your Honor.

24          (Luncheon recess)

25

I7k1rav4

AFTERNOON SESSION

2:13 p.m.

1

2

3          (In open court; jury not present)

4          THE COURT:  I'm not going to allow the exhibit in.

5     When you said you were reserving the right to admit exhibits, I

6     assumed it was either exhibits that were going to be admitted

7     pursuant to stipulation or that you had at least shown a

8     witness, but the notion that you don't even intend to lay any

9     foundation or allow defendants to cross-examine those

10    witnesses, that's just not proper.  I've been lax about

11    foundation because it's been on consent, and most of the

12    exhibits have been emails between the witness and someone else,

13    but that's just improper.

14         So we can proceed.

15         MS. HARWIN:  Your Honor, just to clarify, so I know we

16    were talking about a number of disputed documents.  There were

17    exhibits that were undisputed, so can I --

18         THE COURT:  Oh, yes, of course.

19         MS. HARWIN:  And I just do want to note for the

20    record, your Honor, that prior to our indicating that we rest

21    subject to admission of documents, we did provide the list of

22    almost all of these documents except for these items that are

23    defense exhibits, the last four items that I mentioned, just

24    for the record.

25         THE COURT:  Right.  But if it isn't consent, the fact

I7k1rav4                        Horan - Direct

1    you just said the exhibit numbers isn't really sufficient.  If

2    the witnesses were here to lay the foundation, then I wouldn't

3    have a problem with most of them.  But they're no longer on the

4    stand.  But the ones on which there is consent, of course.  I

5    thought exactly that was the purpose of that reservation.

6              MS. HARWIN:  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  All right.  Everyone can be seated.

 3     Thanks.

 4              MS. PLEVAN:  Thank you.

 5     BY MS. PLEVAN:

 6     Q.  Dean Horan, did you continue to interact with Professor

 7     Ravina in October of 2014?

 8     A.  There was continued communications, yes.

 9              MS. PLEVAN:  I'd like to show the witness Defendant's

10     Exhibit HJ for identification.

11     Q.  And is the first page from the middle down an email

12     exchange between you and Professor Ravina in early October?

13     A.  Yes.

14              MS. PLEVAN:  We offer Defendant's Exhibit HJ.

15              THE COURT:  Any objection?

16              MS. KOSTER:  No objection, your Honor.

17              THE COURT:  HJ will be admitted.

18              (Defendant's Exhibit HJ received in evidence)

19     Q.  So looking at the first page at the bottom, is that an

20     email you received from Professor Ravina on October 6?

21     A.  Yes.

22     Q.  And is she asking you some questions about the papers that

23     are being discussed in terms of a schedule at that point?

24     A.  Yes.

25     Q.  And in your middle email there's a reference to seeing

I7k1rav4                        Horan - Direct

1    Enrichetta at about 9:30.  Did you meet with her at that time?

2    A.  Yes.

3    Q.  And during this period in October, was Professor Zeldes

4    also meeting with Professor Ravina?

5    A.  Yes.

6              MS. PLEVAN:  I'd like to show the witness Defendant's

7    Exhibit HQ.

8              THE COURT:  Any objection to HQ?

9              MS. KOSTER:  No objection, your Honor.

10             THE COURT:  It will be admitted.

11             (Defendant's Exhibit HQ received in evidence)

12   BY MS. PLEVAN:

13   Q.  And is HQ an email exchange you had with Professor Zeldes

14   in mid-October 2014?

15   A.  Yes.

16   Q.  And could you read what he said to you in the second

17   paragraph of his email that's in the middle of the page.

18   And --

19   A.  "We had a productive conversation that I'm hoping could

20   lead to a comprehensive solution.  Happy to discuss when we

21   talk."

22   Q.  And did you understand that he was referring to a

23   conversation with Professor Bekaert?

24   A.  Yes.

25   Q.  And did you forward that -- is the email at the top your

1  forwarding of that to Dean Hubbard?

2  A.  Yes.

3  Q.  Now were any of the efforts that were being made to create

4  a schedule and agreement on the papers that had been raised at

5  the earlier meetings by Professor Ravina, was any kind of

6  agreement ever reached about any of them?

7  A.  On the international diversification paper, they did have

8  agreement to -- that Professor Bekaert would deliver his

9  revisions, I believe it was, by December 31st.

10  Q.  Did he make that deadline?

11  A.  He did, I believe, make that deadline.

12  Q.  And was any agreement reached regarding the automatic

13  enrollment paper?

14  A.  I believe he stepped away from that paper.

15          MS. PLEVAN:  Please show the witness Defendant's

16  Exhibit KO, which is in evidence.

17  Q.  Is the email at the bottom from Professor Ravina asking

18  about whether Professor Bekaert has agreed to drop his name

19  from the AE paper?

20  A.  Yes.

21  Q.  And did you communicate to her on February 19th in the

22  email right above that about that?

23  A.  Yes.

24  Q.  And what did you communicate to her?

25  A.  I apologized for my delayed response but I was confirming

I7k1rav4                          Horan - Direct

1    that Geert has confirmed that he has dropped his name from the

2    automatic enrollment paper, that I had conveyed this

3    information to the university's attorneys.

4    Q.  Now I want to go back to your communications with the equal

5    opportunity/affirmative action office.  Did you have further

6    contact with that office in August of 2014?

7    A.  Other than the email that we looked at earlier?

8    Q.  Well, let me show you what's been marked as Defendant's

9    Exhibit FZ.

10             MS. PLEVAN:  Which I think is in as a plaintiff's

11   exhibit, but --

12             THE COURT:  Any objection?

13             MS. KOSTER:  No objection, your Honor.

14             THE COURT:  All right.  FZ will be admitted.

15             (Defendant's Exhibit FZ received in evidence)

16   BY MS. PLEVAN:

17   Q.  And is this a series of emails beginning on August 18th and

18   continuing through August 28th?

19   A.  Yes.

20   Q.  And between you and Mr. Dunn?

21   A.  Correct.

22   Q.  And was one of the subjects about the training?

23   A.  One of the subjects was requesting the name of a trainer?

24   Q.  Yes.

25   A.  Right.

I7k1rav4                              Horan – Direct

1   Q.  Is that covered in one of these emails?

2   A.  Yes.

3   Q.  Can you point to where that is.

4   A.  Well, it's in the email on August 26th at 5:13 p.m.

5   Q.  And in this next email -- well, let me see.  The one that's

6   at the bottom of the first page, is Mr. Dunn communicating

7   further about the parts of the investigation that he was

8   continuing with at that point?

9   A.  Yes.

10              Read the email?

11  Q.  Pardon?

12  A.  Read the email?

13  Q.  No, that's okay.  The jury can see it.

14  A.  Okay.

15  Q.  Now did you speak with Mr. Dunn in September before the

16  meeting you had with Professor Ravina and Professor Goldberg?

17  A.  Yes, I did.

18              MS. PLEVAN:  And let me ask to show the witness

19  Defendant's Exhibit GK, which we also offer in evidence.  I

20  think it may be in as a plaintiff's exhibit.

21              THE COURT:  Any objection to GK, to the extent it's

22  not already in evidence?

23              MS. KOSTER:  No objection, your Honor.

24              THE COURT:  It will be admitted.

25              (Defendant's Exhibit GK received in evidence)

I7k1rav4                          Horan - Direct

BY MS. PLEVAN:

Q.  Would you look at the -- really, on the second page, but
there's an email that begins, at the bottom, from Michael Dunn,
"Hi, Janet."  Right?

A.  Right.

Q.  And the rest of the email appears on page 2, and is this a
sort of update report from Mr. Dunn about the status of the
investigation?

A.  Yes.

Q.  And what does he say, if you would read the second bullet?

A.  "As things stand now, I'm not sure I see a violation of
EOAA policies, but I need to speak to Geert and conclude the
investigative process before making any final determinations."

Q.  And then would you read -- is the last bullet related to
your request about recommendations of a trainer?

A.  Yes.

Q.  Okay.  And would you read what he wrote there.

A.  "We would recommend Mary Ellen Donnelly of the Putney law
firm as our outside trainer.  However, I would ask that you
please hold off on contacting her until I wrap up our
investigative process, which I would expect to do in the next
week."

Q.  Now did you receive a copy of the report by Mr. Dunn in
November of 2014?

A.  I saw a copy of the report, yes.

I7k1rav4                          Horan - Direct

1   Q.  And after that report, did you take any steps to arrange

2   for training?

3   A.  An appeal was filed so we did not at that time take the

4   training steps.  Well, awaiting the outcome of the appeal.

5   Q.  And at what point was the appeal process resolved and you

6   became aware that the appeal process was resolved?

7   A.  In late January of 2015.

8   Q.  And at that point did you discuss the training with

9   Professor Bekaert?

10  A.  I did.

11  Q.  And tell us about that conversation.

12  A.  Well, he -- two points that he wanted to bring to my

13  attention.  One was that the semester had just started and he

14  was teaching, and that he was still focused on some of the work

15  with the papers, so he inquired if we could hold off the

16  training until the end of the semester.

17  Q.  And did you agree to do that?

18  A.  We agreed to do that because he was not found to have

19  violated university policies.

20  Q.  And did you subsequently put Professor Bekaert in touch

21  with Mary Ellen Donnelly?

22  A.  When the -- the beginning of finals started in April, I

23  reached out to Professor Bekaert and put him in touch with Mary

24  Ellen Donnelly to schedule the training.

25  Q.  And did Ms. Donnelly communicate with you following the

I7k1rav4                          Horan - Direct

1    training?

2    A.   She sent me an email confirmation that they had completed

3    the training.

4              MS. PLEVAN:   I'd like to show the witness Defendant's

5    Exhibit LG.

6    Q.   Is that the email that you received from Ms. Donnelly?

7    A.   Yes.

8              MS. PLEVAN:   We offer Defendant's Exhibit LG.

9              THE COURT:   Any objection?

10             MS. KOSTER:   No objections, your Honor.

11             THE COURT:   LG will be admitted.

12             (Defendant's Exhibit LG received in evidence)

13   Q.   And would you read Ms. Donnelly's email at 4:54 p.m. on

14   May 18th.

15   A.   "I just finished my training with Professor Bekaert.   Since

16   Professor Bekaert is still collaborating with the complainant

17   to some extent, I did spend some time on the antiretaliation

18   provisions of Columbia's policies and the applicable law.   We

19   also discussed his need to keep his professional relationships

20   professional at all times.   I do think Professor Bekaert

21   understood our discussion and will continue to conduct himself

22   appropriately in the workplace."

23   Q.   Now earlier in this case there was some reference to a

24   different investigation conducted by Mr. Dunn concerning a

25   person we've identified as Professor No. 2.   And are you

I7k1rav4                          Horan - Cross

1   familiar with that investigation?

2   A.  Yes, I am.

3   Q.  And what was your involvement in that situation?

4   A.  It had come to my attention that a student had raised an

5   issue about some comments that the adjunct faculty member made

6   in the classroom, and we brought that to Michael Dunn's

7   attention.

8   Q.  And did Mr. Dunn thereafter conduct an investigation?

9   A.  He did.

10           MS. PLEVAN:  I'd like to show the witness Plaintiff's

11  Exhibit 69.4.

12  Q.  Ask you if you've seen the -- if this is the outcome letter

13  from that investigation.

14  A.  Yes.

15  Q.  And I believe you said that this Professor No. 2 was an

16  adjunct professor?

17  A.  Yes, he was.

18  Q.  Besides what's written in this letter, was any action taken

19  by the school concerning Professor No. 2?

20  A.  I myself had a conversation with him about the outcome of

21  the report, and he was not rehired by the school.

22  Q.  So he didn't teach at all at Columbia Business School after

23  this?

24  A.  Correct.

25           MS. PLEVAN:  I have no further questions.

1          THE COURT:  All right.  Cross-examination?

2    CROSS-EXAMINATION

3    BY MS. KOSTER:

4    Q.  Good afternoon, Vice Dean Horan.

5    A.  Good afternoon.

6    Q.  You were one of two senior administrators at Columbia

7    Business School that has primary responsibility for interacting

8    with Columbia's EOAA on complaints involving faculty members,

9    correct?

10   A.  One of two?  Is that --

11   Q.  Are you one of two senior administrators at Columbia

12   Business School that has primary responsibilities for

13   interacting with Columbia's EOAA?

14   A.  I think all the senior administration has responsibility

15   for interacting.

16          MS. KOSTER:  Mr. McLeod, can you please publish for

17   the witness only page 25 of Vice Dean Horan's deposition

18   transcript.

19   Q.  Vice Dean Horan, please turn your attention to line 13.

20   Page 25 of the deposition transcript, line 13.

21   A.  Mm-hmm.

22          I don't -- I didn't understand this to be your

23   question.

24   Q.  Well, does this refresh your recollection that you were one

25   of two senior administrators at Columbia Business School that

I7k1rav4                          Horan - Cross

1   has primary responsibility for interacting with Columbia's

2   EOAA?

3   A.   But this question is different.

4   Q.   So who at Columbia Business School has primary

5   responsibility for interacting with the office of equal

6   opportunity and affirmative action --

7           MS. KOSTER:   Mr. McLeod, can you pull that up once

8   more.

9   Q.   -- regarding complaints involving faculty members at

10  Columbia Business School?

11  A.   Involving myself -- involving faculty, it could be myself

12  or the senior vice dean for the faculty.

13  Q.   Professor Ravina was a junior faculty member and Professor

14  Bekaert was a senior faculty member, correct?

15  A.   Yes.

16  Q.   There was a power differential between Professor Ravina and

17  Professor Bekaert, correct?

18          MS. PLEVAN:   Objection.

19          THE COURT:   I'll allow it.   If you can answer.

20  Q.   I'll restate the question.

21          There was a power differential between Professor

22  Ravina and Professor Bekaert, correct?

23  A.   I don't -- I'm not qualified to answer that.

24  Q.   You were deposed in this case before, correct?

25  A.   Yes.

1  Q.  And you came to the offices of plaintiff Enrichetta

2  Ravina's counsel, correct?

3  A.  I believe that's where it was.  I don't know specifically.

4  Q.  And you answered questions under oath, correct?

5  A.  I did.

6         MS. KOSTER:  Okay.  I'd like to publish, bring up for

7  the witness page 68 of Vice Dean Horan's deposition transcript.

8  Q.  And if you turn your attention to line 2, you were asked,

9  "The concern between the power imbalance between the senior

10 tenured faculty member and a junior untenured faculty member

11 was a concern that you raised to Mr. Dunn," is that correct?

12 A.  Yes, but --

13 Q.  One moment.  And then you answered, "I think it was a fact

14 that I raised to Mr. Dunn."

15        So you answered that the power imbalance between a

16 senior tenured faculty member and a junior untenured faculty

17 member was a fact, correct?

18        MS. PLEVAN:  Objection, your Honor, argumentative.

19        THE COURT:  Just try and answer it the best you can,

20 if you can.

21 A.  No, I -- well, what I can say is I was relaying someone

22 else's conversation to Michael Dunn.

23 Q.  There was a power differential between Professor Ravina and

24 Professor Bekaert, correct?

25 A.  Again, I'm not a faculty member.

1            MS. KOSTER:  Mr. McLeod, can you publish for the

2      witness page 63 of her deposition transcript.

3      Q.  If you can read lines 16 through 24 of your deposition

4      transcript, please.

5      A.  "Why did you approach the Office of Equal Opportunity and

6      Affirmative Action regarding Ms. Ravina's complaint as opposed

7      to another person or office at Columbia University?

8            "Because of the power differential.  That was really

9      the only -- issue, a junior faculty with a senior faculty."

10     But again, I was relaying someone else's question.

11     Q.  So you approached the Office of Equal Opportunity and

12     Affirmative Action regarding Professor Ravina's complaint

13     because of the power differential between Professor Ravina as a

14     junior faculty member and Professor Bekaert as a senior faculty

15     member, correct?

16     A.  The question posed to me by Senior Vice Dean Gita Johar.

17     Q.  After you contacted Director Dunn, he recommended that

18     Columbia Business School follow up with Professor Bekaert and

19     then get back to the EOAA, correct?

20     A.  Follow up with both parties.

21     Q.  And Director Dunn did not explain to you the basis for his

22     recommendation.

23     A.  No.

24     Q.  You testified earlier regarding a meeting that you attended

25     on June 16, 2014, with Professor Ravina, Dean Hubbard, and

1    Professor Goldberg, correct?

2    A.  Yes.

3    Q.  At that meeting Dean Hubbard indicated that there was

4    nothing he could do about Professor Bekaert's communications,

5    correct?

6    A.  Correct.

7    Q.  Dean Hubbard expressed that Professor Patrick Bolton and

8    Professor Tano Santos should have confronted Professor Bekaert

9    directly about his conduct, correct?

10   A.  Had as much authority as he did with Professor Bekaert.

11   Q.  And Professor Bolton and Santos were not Columbia Business

12   School administrators, correct?

13   A.  Correct.

14          MS. KOSTER:  Mr. McLeod, can you please pull up

15   Plaintiff's Exhibit 40.

16   Q.  Vice Dean Horan, you previously testified regarding

17   Defendant's --

18          MS. PLEVAN:  We don't have a hard copy.  Can you

19   please wait.

20          THE COURT:  I assume 40 is already in evidence.

21          MS. KOSTER:  It's already admitted into evidence.

22          Mr. McLeod, can you just scroll down and zoom in on

23   the email from Professor Enrichetta Ravina.

24   BY MS. KOSTER:

25   Q.  So you previously saw this, testified about this email,

I7k1rav4                          Horan - Cross

1   which was introduced to you through Defendant's Exhibit DM.

2              Professor Ravina's email of June 18, 2014 provided an

3   accurate summary of the remedial measures discussed during the

4   June 16, 2014 meeting, correct?

5   A.  Yes.

6              MS. KOSTER:  Mr. McLeod, if you can scroll up to the

7   top of the page.

8   Q.  Would you take a look at your email reply to Professor

9   Ravina.  You confirmed, "Yes, we did discuss all the issues

10  below in our meeting on Monday."  Do you see that?

11  A.  Yes.

12  Q.  And at that meeting you and Dean Hubbard agreed to follow

13  up on all of these suggested remedial measures, correct?

14  A.  I couldn't follow up on the tenure clock issue, but he did.

15  He said he could, yes.

16  Q.  And you see in this email that you wrote, "Glenn and I will

17  be following up on specific actions when the additional

18  conversations are concluded."

19  A.  Correct.

20  Q.  Professor Ravina described a great amount of stress she had

21  been under during the past year and was going through then,

22  correct?

23             MS. PLEVAN:  At the June meeting, you're referring to?

24             MS. KOSTER:  The question is still pending.

25  A.  Yes.

I7k1rav4                        Horan - Cross

Q.  While this email summarized the remedial measures discussed

during the June 16, 2014 meeting, this didn't capture

everything discussed during the meeting, correct?

A.  The meeting was focused on the remedies.

Q.  You testified earlier today that you met with Professor

Bekaert on July 9, 2014 concerning Professor Ravina's

complaints.

A.  Correct.

Q.  And Dean Hubbard also attended that meeting, correct?

A.  It was his meeting, yes.

Q.  Dean Hubbard acknowledged to Professor Bekaert that

Professor Ravina was a junior faculty member in need of getting

her research done.

A.  Yes.

Q.  And you warned Professor Bekaert about the power imbalance

between him and Professor Ravina, correct?

A.  I did not.

        MS. KOSTER:  Mr. McLeod, can you pull up page 120 of

Vice Dean Horan's deposition transcript.

Q.  If you turn to line 12, you were asked at your deposition,

"During the July 9, 2014 meeting with Professor Bekaert, did

you warn Professor Bekaert about the power imbalance between

him and Ms. Ravina?"

        You answered, "Yes."

A.  And I would say I also earlier said this was the dean's

1    meeting in this deposition in here and that I was basically

2    listening.

3             MS. PLEVAN:  I'd like to read the next question and

4    answer at the deposition, your Honor.

5             THE COURT:  Okay.  Why don't you do that.  She said

6    that a number of times that she was relaying a different

7    conversation, so why don't we just make sure the jury gets a

8    full understanding, so if you can read the next question and

9    answer.

10   Q.  The next line, you were asked, "What did you say to

11   Professor Bekaert about the power imbalance between him and

12   Ms. Ravina?"

13            And you responded, "Actually, to clarify, the dean

14   said it to him.  I was there."

15            So Dean Hubbard warned Professor Bekaert about the

16   power imbalance between him and Professor Ravina, correct?

17   A.  The perception, yes.

18   Q.  Dean Hubbard also expressed to Professor Bekaert that the

19   tone of his email was unacceptable, correct?

20   A.  Yes.

21   Q.  Dean Hubbard told Professor Bekaert that any delay of his

22   research with Professor Ravina was unacceptable, correct?

23   A.  Correct.

24   Q.  Dean Hubbard also conveyed to Professor Bekaert that he

25   should prioritize his work with Professor Ravina over his other

1   work, correct?

2   A.  Correct.

3   Q.  Dean Hubbard also conveyed to Professor Bekaert that he

4   wanted Professor Bekaert to step away from his joint papers

5   with Professor Ravina, correct?

6   A.  He suggested that as a solution.

7   Q.  And Dean Hubbard recognized that it was unreasonable for

8   Professor Bekaert not to step away from the joint papers.

9   A.  I don't know if unreasonable --

10          MS. KOSTER:  Mr. McLeod, can you pull up page 175 of

11  Vice Dean Horan's deposition transcript.

12  Q.  So you were asked at your deposition, on line 12, "Did Dean

13  Hubbard express any recognition that Professor Bekaert's

14  conduct towards Ms. Ravina was unreasonable in any way?"

15          And you answered, "He believed, yes, Professor

16  Bekaert's position and not moving away from the papers and

17  moving along was unreasonable."

18          So Dean Hubbard recognized that it was unreasonable

19  for Professor Bekaert not to step away from the joint papers,

20  correct?

21  A.  In his opinion.

22  Q.  But Professor Bekaert refused to step away from the papers,

23  isn't that right?

24  A.  No.

25          MS. KOSTER:  Mr. McLeod, can you please pull up

I7k1rav4                        Horan - Cross

1   page 111 of the witness' deposition transcript.

2   Q.  You were asked at your deposition last year, May 2017,

3   "Professor Bekaert refused to step away from --"

4              MS. PLEVAN:  What line?

5              MS. KOSTER:  This is line 6, the deposition

6   transcript, page 111.

7   Q.  You were asked, "Professor Bekaert refused to step away

8   from the papers at that time?"

9              And you answered, "Yes."

10  A.  But you asked me a different question.

11  Q.  Professor Bekaert refused to step away from the papers,

12  isn't that right?

13             MS. PLEVAN:  I'd like the witness to see the context

14  so she can --

15             THE COURT:  Yes, show the witness the context.

16  A.  But your question is, did he step away, was he stepping

17  away from the papers.  That was not achieved there, but it was

18  achieved.  So "at that time" was in the deposition and I

19  answered yes.  At that meeting.

20  Q.  After meeting with Professor Bekaert on July 9, 2014, you

21  sent an email to Professor Ravina.

22             MS. KOSTER:  Mr. McLeod, can you please pull up

23  Exhibit DR, which has already been admitted into evidence.  And

24  can you please turn to the second page.

25  Q.  And you updated Professor Ravina that you had met with

I7k1rav4                        Horan - Cross

1   Professor Bekaert in the afternoon of July 9th.  And you wrote,

2   "We do not have exact next steps as yet, but we will keep you

3   informed of developments," is that right?

4   A.  Yes.

5   Q.  Professor Bekaert had been told not to raise Professor

6   Ravina's complaint with her, isn't that right?

7   A.  Yes.

8   Q.  But on July 14, 2014, Professor Bekaert sent an email to

9   Professor Ravina that she forwarded to you, right?

10  A.  Yes.

11          MS. KOSTER:  I'd like to move to admit Defendant's

12  Trial Exhibit DY.

13          THE COURT:  Are you going to hand out copies of DY?

14          Any objection to DY?

15          MS. PLEVAN:  No objection.

16          THE COURT:  All right.  DY will be admitted.

17          (Defendant's Exhibit DY received in evidence)

18  BY MS. KOSTER:

19  Q.  Let's turn to the second page of this exhibit.

20          Professor Bekaert's email is titled Silence.  He

21  writes, "Hi, Enrichetta, I guess we are both here.  The dean's

22  office has told me not to talk to you, hence the silence.  If

23  you want to explain yourself, you can.  I am here.  I am

24  intrigued to know who set you up to this."

25          Let's turn to the first page in the email from

I7k1rav4                         Horan - Cross

1    Professor Ravina dated July 15, 2014.  The email is addressed

2    to you and Dean Hubbard, correct?

3    A.  Correct.

4    Q.  And Professor Ravina wrote, on the second paragraph, "I

5    have some concern for my well-being in light of what Geert has

6    said in this email and with his noncompliance with your

7    requirement that he cc you on all communication to me.  Please

8    let me know what safeguards you can put in place to try to

9    prevent this from going any further."  Do you see that?

10   A.  Yes.

11   Q.  A meeting with Professor Ravina was supposed to be

12   scheduled for August 6, correct?

13   A.  Yes.

14          MS. KOSTER:  Mr. McLeod, can you please pull up

15   Exhibit 44, which has already been introduced into evidence.

16          MS. PLEVAN:  Do we have the exhibit?  We can't see it.

17          MS. KOSTER:  Can you turn to the second page,

18   Mr. McLeod.

19   Q.  Could you take a look at the email from Professor Ravina

20   dated July 13, 2014.  Professor Ravina writes --

21          MS. PLEVAN:  Where is it in this exhibit, please?

22          MS. KOSTER:  It's on the second page here.

23   Q.  Professor Ravina confirms, "August 6 at 3 p.m. works for

24   both Suzanne and me."  Professor Ravina was -- by Suzanne,

25   Professor Ravina was referring to Professor Suzanne Goldberg, a

1    Columbia Law School professor, correct?

2    A.  Yes.

3    Q.  And she also wrote, "Since we are meeting so far into the

4    future, can we implement some of the measures we discussed in

5    advance of the meeting," correct?

6    A.  Yes.

7          MS. KOSTER:  Okay.  So Mr. McLeod, if you can turn

8    back to the first page, please.

9    Q.  And then weeks later, on the date that the meeting was

10   supposed to be held, on August 6, 2014, at 1:16, which is a

11   couple of hours before the meeting, Dean Hubbard writes,

12   "Thanks, but my office never reached out.  The meeting is not

13   on my calendar."  Correct?

14   A.  Yes.

15   Q.  And you'll see at the top of the exhibit, Dean Hubbard

16   tells Professor Goldberg, "I will schedule the meeting.  I

17   apologize if the ball got dropped on my end."  Correct?

18   A.  Yes.

19   Q.  And the dean's office meeting wasn't rescheduled until

20   September 16, 2014, correct?

21   A.  I think that was the next available date.

22   Q.  So let's talk about that dean's office meeting on

23   September 16, 2014.

24          Three months had elapsed since your last meeting with

25   Professor Ravina, correct?

I7k1rav4                         Horan - Cross

1   A.  Yes.

2   Q.  And there still wasn't a relationship manager in place by

3   September 16, 2014, correct?

4   A.  The dean at that point was being copied on the emails, and

5   myself, I think.

6   Q.  And at that point there was no conclusion on what could be

7   some next steps to try to bring this matter to a resolution,

8   correct?

9   A.  We did not yet have a resolution.

10  Q.  And there was no conclusion as to which papers Professor

11  Bekaert would step away from, correct?

12  A.  Not yet.

13  Q.  You testified earlier that Professor Ravina sent a proposed

14  work schedule to you and Dean Hubbard after the September 16th

15  meeting, correct?

16  A.  Yes.

17  Q.  You did not take any action to implement the schedule that

18  Professor Ravina sent, correct?

19  A.  No.

20  Q.  No, you did not take any action?

21  A.  No, not correct.

22          MS. KOSTER:  Mr. McLeod, can you please pull up

23  page 184 of Vice Dean Horan's deposition transcript.

24  Q.  If you turn to line 12, you were asked at your deposition,

25  "Did you take any action to implement --"

1          MS. PLEVAN:  Hold on a second.

2          Okay.

3          MS. KOSTER:  I'll withdraw that.

4     Q.  So in fact, Professor Ravina's proposed work schedule that

5     she sent after the September 16, 2014 meeting wasn't

6     implemented, correct?

7     A.  Not that version.

8     Q.  You testified earlier that Professor Goldberg didn't raise

9     an issue of sexual harassment during the June 2016 dean's

10    office meeting, correct?

11    A.  June 2016?

12    Q.  Excuse me.  Let me restate that.

13         You testified earlier that Professor Suzanne Goldberg

14    did not raise an issue of sexual harassment during the June 16,

15    2014 meeting, correct?

16    A.  Correct.

17    Q.  Did Professor Goldberg ever raise any concerns regarding

18    gender in connection with Professor Bekaert's behavior?

19    A.  I don't recall that.

20         MS. KOSTER:  May I approach, your Honor?

21         THE COURT:  Yes.  What are you showing?

22         MS. KOSTER:  I'm handing the witness --

23         MS. PLEVAN:  Whoa, whoa.  What are we -- is this in

24    evidence?

25         MR. HERNSTADT:  Give us a chance to look at what

I7k1rav4                          Horan - Cross

1   you're showing.

2            MS. KOSTER:  I'm handing the witness Plaintiff's Trial

3   Exhibit 83 to refresh your recollection.

4            THE COURT:  You can just read that to yourself.  Don't

5   read it out loud.

6            THE WITNESS:  No, I won't.

7            THE COURT:  See if it refreshes your recollection.

8            MS. PLEVAN:  I'm not sure what the question is, and we

9   may have an objection.

10           THE COURT:  The question was:  "Did Professor Goldberg

11  ever raise any concerns regarding gender in connection with

12  Professor Bekaert's behavior?

13           "A.  I don't recall that."

14  BY MS. KOSTER:

15  Q.  Does this refresh your recollection that Professor Goldberg

16  did raise concerns regarding gender in connection with

17  Professor Bekaert's behavior?

18           MR. HERNSTADT:  Objection, your Honor.

19           THE COURT:  Does it refresh your recollection one way

20  or the other?

21           THE WITNESS:  No.

22           THE COURT:  All right.  You can move on then.

23           MR. HERNSTADT:  Withdrawn.

24  BY MS. KOSTER:

25  Q.  I'd like to call your attention to page 2 of the exhibit.

I7k1rav4                     Horan - Cross

1    You can read to yourself the first paragraph.

2    A.   Yes.

3    Q.   Does that refresh your recollection that Professor Goldberg

4    did raise concerns regarding gender --

5              MR. HERNSTADT:  Objection, your Honor.

6              THE COURT:  Does it refresh your recollection one way

7    or the other?

8              THE WITNESS:  No.

9              THE COURT:  Okay.

10             MS. KOSTER:  I'd like to request a sidebar, your

11   Honor.

12             THE COURT:  Okay.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I7k1rav4                         Horan - Cross

1               (At the sidebar)

2               MS. KOSTER:  Your Honor, at this point defense,

3      Columbia has already opened the door on this issue because Vice

4      Dean Horan was already specifically asked whether Professor

5      Goldberg raised any concerns of sexual harassment and --

6               MS. PLEVAN:  Not at this meeting.  I only asked her

7      the specific meeting because it's before she reported --

8               MS. KOSTER:  But I --

9               THE COURT:  No.  This is months later.

10              MS. KOSTER:  Your Honor, I've already attempted to

11     refresh her recollection on that issue, and essentially I've

12     read the first line in which Professor Goldberg specifically

13     said that gender played a role.  I request permission to use it

14     to impeach the witness on this particular issue.

15              THE COURT:  In any event, what does it matter if

16     Goldberg raised it?  I mean, this is not --

17              MS. KOSTER:  The answer was that it was specifically

18     raised to Vice Dean Horan.

19              MS. PLEVAN:  It had already been investigated at this

20     point.

21              THE COURT:  Let's have one at a time.

22              Go ahead.

23              MS. KOSTER:  At this point Columbia, I think the

24     testimony is hugely confusing because --

25              THE COURT:  It's not confusing at all.  It was

1  admitted for the date to show she didn't mention anything

2  gender based or sexual harassment based when she first reported

3  it.  That was my understanding of the testimony.

4          MS. KOSTER:  Your Honor --

5          THE COURT:  This is months later.  This is October,

6  right?

7          MS. PLEVAN:  Yes.

8          MS. KOSTER:  This is to clarify that in fact Professor

9  Goldberg did in fact raise the concern, and at the time the

10  investigation was still pending at this point, and it was a

11  point in which information could be relayed to the EOAA

12  investigator.  And I believe, your Honor, if we can pull up

13  Exhibit 84 -- let me finish.

14          MS. PLEVAN:  Sorry.

15          MS. KOSTER:  I can bring up Exhibit 84.  I believe,

16  your Honor, that when Professor Goldberg --

17          MS. PLEVAN:  It's not --

18          MS. KOSTER:  Excuse me.

19          I believe, your Honor, that when Professor Goldberg

20  brought this to the attention of Vice Dean Horan, that she even

21  had communicated that this was something that would be relayed

22  to the EOAA.  Again, I would like to be able to review that

23  exhibit to show it to you, but it is squarely relevant because

24  it still goes to the issue of the EOAA investigation and what

25  information administrators were receiving, which in turn they

 1    had a duty to report.  It's not just the dean's office.

 2            MS. PLEVAN:  I just think any question that the

 3    witness was asked on direct was back in June related to whether

 4    Professor Goldberg raised the issue of sexual harassment at the

 5    June meeting.  This doesn't impeach her with respect to that

 6    whatsoever.  And we kept it out for lots of other reasons.  It

 7    would be highly prejudicial to bring it out.

 8            MR. HERNSTADT:  What they're trying to do is exactly

 9    that.  It's hearsay.  She's saying that it's -- she remains

10    persuaded, and that's based solely on what she was told by

11    Ravina.  What matters is what Ravina told them.

12            MS. KOSTER:  Your Honor, it isn't in for the truth of

13    the matter.  You can provide a limiting instruction to the

14    jury.  But the reality is that this is what was told directly

15    to Vice Dean Horan while the investigation was pending, and the

16    defense has already opened the door.

17            THE COURT:  They haven't opened the door.  I already

18    responded to that.  They haven't opened the door.  There's

19    testimony about a particular meeting that was months before

20    this to establish the timeline.  They didn't open the door.  I

21    don't know why what Suzanne Goldberg, her perception of it and

22    what she's saying is her interpretation of it, is what's

23    relevant.  I mean, isn't this all based on what Ms. Ravina told

24    her and the purpose of the two meetings is that they were both

25    there, right?

1          MS. PLEVAN:  Right.

2          THE COURT:  So the idea was, did it come up at the

3    meeting.  This is a separate email that Ravina is not a party

4    to, when Goldberg is saying her own interpretation.  That's an

5    entirely different purpose.

6          MS. KOSTER:  But Professor Goldberg had specifically

7    raised it to Vice Dean Horan's attention and at a critical time

8    when the investigation is pending.  We're very concerned at

9    this point --

10         THE COURT:  Let me ask you a question.  At what point

11   did Ravina mention the sexual harassment?

12         MS. PLEVAN:  Mid-July.

13         THE COURT:  Mid-July.  So that's what I thought.

14         MS. PLEVAN:  That's when it was referred to Mr. Dunn.

15         THE COURT:  There's no question that Columbia was on

16   notice of this.  The purpose of direct was to say she didn't

17   mention it initially, she didn't mention it until a month

18   later.  This is months after that.  You want to get in some

19   other professor's interpretation of the situation, which, as

20   I've said, I've been very hesitant to do, and I think I

21   specifically ruled with respect to Goldberg --

22         MS. PLEVAN:  You did.

23         THE COURT:  -- because I don't want to get out what

24   everyone's different opinion of what was happening was.  The

25   question was, was Columbia on notice; if so, when.  And that's

I7k1rav4                        Horan - Cross

1    what I have let in, and that's why I let in the petitions in

2    limited form.  But this is just her interpretation of what

3    Ravina said.  Her interpretation of how she phrased it, meaning

4    Goldberg phrased it, to this witness is not relevant.  And they

5    did not open the door.

6              MS. KOSTER:  Well, your Honor, the concern at this

7    point is that it gives a very misleading impression for the

8    jury --

9              THE COURT:  I totally disagree.

10             MS. KOSTER:  Professor Goldberg had multiple meetings

11   at this point.  We'd like to elicit information about what

12   Professor Goldberg said at the meetings --

13             THE COURT:  It's not coming in.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                   (In open court)

2     BY MS. KOSTER:

3     Q.  The use of a relationship manager had been raised in the

4     June 16, 2014 meeting with Professor Ravina, correct?

5     A.  Correct.

6     Q.  But Professor Daniel Wolfenzon did not begin to function as

7     a relationship manager until approximately four months later,

8     in October 2014, correct?

9     A.  Correct.

10    Q.  The role of the relationship manager was never set out in

11    writing, correct?

12    A.  It was implemented as described at that meeting.

13    Q.  And it was never set out in writing, correct?

14    A.  Correct.

15    Q.  No one ever provided Professor Wolfenzon with a job

16    description or guidelines as to the role of the relationship

17    manager, correct?

18    A.  We've never had a relationship manager.

19    Q.  Professor Wolfenzon did not receive any training to serve

20    in the role of relationship manager, isn't that right?

21    A.  Correct.

22    Q.  Professor Wolfenzon had expressed concern that he had no

23    real authority to resolve disputes between Professor Bekaert

24    and Professor Ravina, correct?

25    A.  Correct.

I7k1rav4                          Horan - Cross

1   Q.  Professor Wolfenzon expressed concern that he had no

2   authority to compel a faculty member to meet a schedule or

3   deadline, correct?

4   A.  Correct.

5   Q.  You conveyed Professor Wolfenzon's concerns to Dean Hubbard

6   and Division Chair Zeldes, as well as Senior Vice Dean Kathy

7   Phillips, correct?

8   A.  Correct.

9   Q.  Dean Hubbard, Senior Vice Dean Phillips, and Division Chair

10  Zeldes all acknowledged that the relationship manager role had

11  no authority, correct?

12  A.  Correct.

13          MS. KOSTER:  I'd like to move at this time to admit

14  Plaintiff's Exhibit 216, which has not yet been admitted into

15  evidence.

16          Mr. McLeod, can you please --

17          THE COURT:  Any objection to 216?

18          MS. PLEVAN:  No objection.

19          THE COURT:  All right.  216 will be admitted.

20          (Plaintiff's Exhibit 216 received in evidence)

21  BY MS. KOSTER:

22  Q.  Do you recognize this as an email that Professor Wolfenzon

23  sent you on February 14, 2016?

24  A.  Yes.

25          MS. KOSTER:  Mr. McLeod, if you can scroll down

1    actually to the email dated February 13, 2016, at 8:15 p.m.

2    Q.  And Professor Wolfenzon told you, "I would like to talk to

3    you about my role.  I want to help, but would appreciate a

4    clear job description."  Correct?

5    A.  Correct.

6    Q.  At this point Professor Wolfenzon had been serving as a

7    relationship manager for about a year and a half, correct?

8    A.  Yes.

9            MS. KOSTER:  Mr. McLeod, if you can stay on to page 1

10   and zoom in on Vice Dean Horan's response.

11   Q.  And you agreed with him that "we both need some guidelines

12   and clarity," correct?

13   A.  Correct.

14   Q.  This, again, was a year and a half after Professor

15   Wolfenzon began to function as a relationship manager?

16   A.  Correct.

17   Q.  During your communications with Professor Bekaert, you

18   observed that he was upset about Professor Ravina's complaints

19   against him.

20   A.  Yes.

21   Q.  You observed that Professor Bekaert was frustrated about

22   going through the EOAA investigation process, correct?

23   A.  Yes.

24   Q.  Professor Bekaert conveyed that he felt he was the victim

25   in this situation, correct?

I7k1rav4                       Horan - Cross

```
 1  A.  Yes.

 2  Q.  And in your experience you find that's what people usually

 3  say, correct?

 4  A.  That is a common response.

 5  Q.  You testified earlier regarding director Michael Dunn's

 6  investigation.  Director Michael Dunn completed his

 7  investigation into Professor Ravina's complaint on November 17,

 8  2014, correct?

 9  A.  Yes.

10  Q.  And you were relieved because Columbia's investigation was

11  finally done, correct?

12  A.  Yes.

13  Q.  In Director Dunn's investigative outcome letter, he

14  recommended referring Professor Bekaert -- excuse me --

15  Professor Ravina's complaint against Professor Bekaert to the

16  Columbia Business School for appropriate action and training,

17  correct?

18  A.  Correct.

19  Q.  But it's your understanding that Columbia Business School

20  was not required to take any action, correct?

21  A.  What does that mean?  I don't understand the question.

22  Sorry.

23  Q.  In your view Columbia Business School was not required to

24  take any action in response to the EOAA letter, isn't that

25  right?
```

I7k1rav4                         Horan - Cross

1    A.  Other than the training, is that what you're asking me?

2    Q.  Just asking whether they were required to take any action.

3    A.  No.

4    Q.  In your view Director Dunn's outcome letter left it to the

5    dean and his chair to implement any action, correct?

6    A.  If there was something else to be done, yes.

7    Q.  And in the case of Director Dunn's investigation and the

8    conclusion of it, there was no required action for Columbia

9    Business School, correct?

10            MS. PLEVAN:  Asked and answered.

11            THE COURT:  Overruled.  You can answer that.

12   A.  Can I see the letter again?

13            THE COURT:  Sure.  Do you want to show the letter

14   again.

15   A.  Michael's report?

16            MS. KOSTER:  Mr. McLeod, can you pull up Exhibit 90,

17   which has already been admitted into evidence, and please turn

18   to the last page.

19            MS. PLEVAN:  Can we show the witness the document,

20   because it's a multipage.

21            THE COURT:  Yes.  If you want us to scroll, let us

22   know.

23            THE WITNESS:  Okay.

24            THE COURT:  There you go.

25   BY MS. KOSTER:

I7k1rav4                          Horan - Cross

1   Q.  Turn to the last page.  Director Dunn wrote, "In light of

2   these conclusions, I refer this matter to CBS for appropriate

3   action and training."

4   A.  Yes.

5   Q.  So there was no required action, correct?

6   A.  We agreed upon the training.

7   Q.  While the outcome letter mentioned appropriate action,

8   Columbia's EOAA did not make any recommendations as to the

9   appropriate actions under these circumstances, correct?

10  A.  He was not found to have violated the policies.

11  Q.  I'm just asking whether the EOAA outcome letter made any

12  recommendations as to the appropriate actions to take under

13  these circumstances --

14  A.  No.

15  Q.  -- yes or no.  Okay.

16          When the EOAA started its investigation, Dean Hubbard

17  communicated to you that he felt Professor Bekaert needed

18  Title IX training, correct?

19  A.  Correct.

20  Q.  You shared Dean Hubbard's view that Professor Bekaert

21  needed Title IX training.

22  A.  I shared that with Michael Dunn to get the name of a

23  trainer, yes.

24  Q.  And you held that view as well that Professor Bekaert

25  needed Title IX training, correct?

I7k1rav4                              Horan - Cross

1   A.  That training was needed, yes.

2   Q.  But Columbia's EOAA ultimately recommended that Professor

3   Bekaert receive training on appropriate professional

4   communications, correct?

5   A.  Correct.

6   Q.  Your role as vice dean of Columbia Business School was to

7   arrange for Professor Bekaert's training, correct?

8   A.  Yes.

9   Q.  And you reached out to Professor Bekaert on April 22, 2015

10  to schedule that training, correct?

11  A.  At the beginning of finals, yes.

12  Q.  That was over five months after the EOAA investigation had

13  ended, correct?

14  A.  But three months after the appeal and at the end of the

15  semester.

16  Q.  The EOAA investigative outcome letter was issued on

17  November 17, 2014, correct?

18  A.  Yes.

19  Q.  And you reached out to Professor Bekaert five months later,

20  correct?

21  A.  No.  We spoke about it prior to that, and it was because he

22  was found not to have violated the policies that it could wait

23  till the end of the semester.

24          MS. KOSTER:  I'd like to move to admit Plaintiff's

25  Exhibit 274.  Mr. McLeod, if -- oh, hold on one second.

1               THE COURT:  Any objection?

2               MS. PLEVAN:  No objection.

3               THE COURT:  All right.  274 will be admitted.

4               (Plaintiff's Exhibit 274 received in evidence)

5               MS. KOSTER:  Mr. McLeod, if you can zoom in on the

6     email from Vice Dean Horan dated April 22, 2015, the time stamp

7     10:59 a.m., please.

8     BY MS. KOSTER:

9     Q.  You write, "Good morning.  Now that the semester is coming

10    to an end, I am writing to schedule the one-on-one training

11    that was recommended in the letter from Michael Dunn."

12              And then if you turn up to the next email, Professor

13    Bekaert responded and asked for some more information about the

14    process, correct?

15    A.  Yes.

16              MS. KOSTER:  Then Mr. McLeod, if you can zoom in on

17    Vice Dean Horan's response.

18    Q.  So after Professor Bekaert asked for some more info about

19    the process, you told Professor Bekaert the training will

20    probably only take one to two hours, correct?

21    A.  Correct.

22    Q.  You also told Professor Bekaert that the training would be

23    more of a conversation between you and the lawyer who conducts

24    these trainings, correct?

25    A.  Correct.

1    Q.  You also told Professor Bekaert that the lawyer conducting

2    the training was Mary Ellen Donnelly, right?

3    A.  Right.

4    Q.  Ms. Donnelly is a defense attorney, correct?

5    A.  I have no idea.

6    Q.  Ms. Donnelly represents management in employment law,

7    principally in education, correct?

8    A.  She was the person recommended to us by EOAA to do the

9    training, and that's who we reached out to.

10   Q.  So she was the person recommended to you by Columbia's

11   EOAA, correct?

12   A.  Correct.

13   Q.  And you told Professor Bekaert that Ms. Donnelly had

14   "previously conducted this type of training for employees of

15   the business school," correct?

16   A.  Correct.

17          MS. KOSTER:  I'd like to move to admit Plaintiff's

18   Exhibit 104, please.

19          MR. HERNSTADT:  Objection.

20          THE COURT:  Why don't I take a look at it.

21          MR. HERNSTADT:  Oh, I'm sorry.  I thought this was

22   274.

23          THE COURT:  274 was admitted on consent.

24          All right.  Now we're looking at 104.

25          MS. PLEVAN:  No objection.

I7k1rav4                         Horan - Cross

1              MR. HERNSTADT:  No objection.

2              THE COURT:  All right.  104 will be admitted as well.

3              (Plaintiff's Exhibit 104 received in evidence)

4      BY MS. KOSTER:

5      Q.  Please turn your attention to the email from Ms. Donnelly

6      dated May 18, 2015.

7      A.  Yes.

8      Q.  So Ms. Donnelly confirmed to you that she had just finished

9      her training with Professor Bekaert, correct?

10     A.  Yes.

11     Q.  And she told you, "I do think Professor Bekaert understood

12     our discussion and will continue to conduct himself

13     appropriately in the workplace," correct?

14     A.  Yes.

15     Q.  It was your belief that the only time action can be taken

16     against a tenured faculty member of Columbia Business School in

17     response to an allegation of discrimination, harassment, or

18     retaliation is if there has been a finding of fault by the

19     EOAA, correct?

20     A.  I don't think that's entirely within my jurisdiction.

21             MS. KOSTER:  Mr. McLeod, can you pull up page 92 of

22     Vice Dean Horan's deposition transcript.

23     Q.  At your deposition last year you were asked, on line 13,

24     "The only time that an action has been taken against a tenured

25     faculty member is with a finding of fault at the conclusion of

I7knrav5                          Horan - Cross

1    investigation by the office of equal opportunity and

2    affirmative action."

3            And you answered, "Yes."

4    A.  I didn't understand this to be your question this time.

5    Q.  Well, let me repeat the question.  The only time that an

6    action has been taken against a tenured faculty member of

7    Columbia Business School is in response to an allegation --

8            MS. PLEVAN:  Your Honor, this is not the question she

9    asked.

10            MS. KOSTER:  Mr. McLeod, will you pull up the page

11    again.

12            MR. HERNSTADT:  That's not the question she asked the

13    witness the first time.

14            THE COURT:  All right.  So --

15            (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MS. KOSTER:  Let me ask the question that was posed at

2     her deposition.

3          THE COURT:  OK.

4          You are just asking her.  OK.

5     BY MS. KOSTER:

6     Q.  The only time that an action has been taken against a

7     tenured faculty member is with a finding of fault at the

8     conclusion of investigation by the Office of Equal Opportunity

9     and Affirmative Action, correct?

10    A.  For this type of incident.

11         I can't answer to something else that might happen

12    within the faculty.

13    Q.  So the only time that an action has been taken against a

14    tenured faculty member in response to an allegation of

15    discrimination, harassment, or retaliation at the conclusion of

16    an investigation by the Office of Equal Opportunity and

17    Affirmative Action has been if there's been a finding of fault

18    by the EOAA, isn't that right?

19    A.  To my knowledge, yes.

20         MS. KOSTER:  At this time I would like to move to

21    admit Exhibit KO, Exhibit KF and Exhibit 210.

22         MR. HERNSTADT:  KO is already in.

23         THE COURT:  Is that right?

24         MR. HERNSTADT:  I think it came in under Professor

25    Bekaert's testimony.

1            THE COURT:  KO is already in evidence.

2            So why don't you take a look at KF and 210.

3            MR. HERNSTADT:  No objection, your Honor.

4            MS. PLEVAN:  Yes, no objection to either one.

5            THE COURT:  All right.  They'll both come in.

6            (Defendants' Exhibits KF and 210 received in evidence)

7   BY MS. KOSTER:

8   Q.  You are testifying here today for Columbia, correct?

9   A.  Correct.

10  Q.  You are an at-will employee of Columbia, correct?

11  A.  Correct.

12  Q.  You report to Dean Hubbard, correct?

13  A.  Correct.

14           MS. KOSTER:  Mr. McLeod, can you pull up Exhibit HF.

15           THE COURT:  Why don't we take a break after you finish

16  these exhibits, please.

17           MS. PLEVAN:  Let me just see if we can get a copy.

18           MS. KOSTER:  Take that down for a second.

19           THE COURT:  HF is in evidence.

20           MS. PLEVAN:  Was it admitted today?

21           MS. KOSTER:  HF was admitted earlier today.

22           If we can just take a quick break.

23           THE COURT:  All right.

24           Why don't we take our afternoon break now, ladies and

25  gentlemen.  Keep an open mind, don't discuss the case, and we

I7knrav5                          Horan - Cross

 1    will bring you back in a little bit.

 2                (Jury not present)

 3                THE COURT:  Be back in 15 minutes.

 4                THE WITNESS:  OK.

 5                THE COURT:  Thank you.

 6                (Recess)

 7                THE COURT:  Why don't we bring the jury in.

 8                (Jury present)

 9                THE COURT:  All right.  Thanks.

10                You can be seated.

11                You can proceed.  Thanks.

12    BY MS. KOSTER:

13    Q.  Vice Dean Horan, turning back to where we were before the

14    afternoon break, you testified that you are an at-will employee

15    for Columbia and report to Dean Hubbard, correct?

16    A.  Yes.

17    Q.  Based on your observations, you believe that Dean Hubbard

18    also took Professor Ravina's complaints seriously, correct?

19    A.  Yes.

20    Q.  I'm sorry.  I didn't hear that.

21    A.  Yes.

22                MS. KOSTER:  Mr. McLeod, can you pull up Exhibit HF,

23    which has already been admitted into evidence.

24    BY MS. KOSTER:

25    Q.  You wrote, "If everyone works professionally, it might only

1    take a small number of meetings."  Correct?

2    A.   Correct.

3             MS. KOSTER:  Thank you.  You can pull that down.

4    BY MS. KOSTER:

5    Q.   Vice Dean Horan, this is my last question for you, and it's

6    a simple yes-or-no question.

7             Based on your observations, do you believe that

8    Professor Bekaert always behaved professionally with Professor

9    Ravina?

10            MS. PLEVAN:  Objection.

11            THE COURT:  Sustained.

12   BY MS. KOSTER:

13   Q.   Vice Dean Horan, you communicated repeatedly with Professor

14   Bekaert concerning Professor Ravina's complaints, correct?

15   A.   Yes.

16   Q.   And you monitored Professor Bekaert's communications with

17   Professor Ravina, correct?

18   A.   I was copied on e-mails going forward, yes.

19   Q.   Based on your role in communicating with Professor Bekaert

20   and seeing communications from Professor Bekaert to Professor

21   Ravina, do you believe that Professor Bekaert always behaved

22   professionally with Professor Ravina?

23            MS. PLEVAN:  Objection.

24            THE COURT:  Sustained.

25   BY MS. KOSTER:

1   Q.  Vice Dean Horan, based on everything that you have observed

2   in connection with this matter, do you believe that Professor

3   Bekaert has always behaved professionally with Professor

4   Ravina?

5              THE COURT:  Sustained.

6              MS. KOSTER:  No further questions.

7              THE COURT:  All right.  Any redirect?

8              MS. PLEVAN:  No redirect, your Honor.

9              THE COURT:  You can step down.

10             Thank you.

11             THE WITNESS:  Thank you.

12             (Witness excused)

13             MS. FISCHER:  Your Honor, Columbia calls Katherine

14   Phillips.

15   KATHERINE PHILLIPS,

16        called as a witness by the Defendant Columbia University,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. FISCHER:

20             THE COURT:  You may proceed.

21             MS. FISCHER:  Thank you.

22   BY MS. FISCHER:

23   Q.  Good afternoon, Professor Phillips.

24             Could you start by telling us your educational

25   background, starting with college.

1   A.   Yes.   I have a bachelor's degree in psychology from

2   University of Illinois, Champaign-Urbana, and I have a Ph.D. in

3   organizational behavior from the business school at Stanford.

4   Q.   And what did you do after finishing graduate school?

5   A.   I started as a faculty member at Northwestern at the

6   Kellogg School of Management in 1999.

7   Q.   How long were you there?

8   A.   I was there until the fall of 2011.

9   Q.   Did you receive tenure there?

10  A.   I did.

11  Q.   And what did you do next?

12  A.   Then I moved actually for one year to California just as a

13  bit of a sabbatical, and then I moved to Columbia Business

14  School.   I started on the faculty there as a full professor in

15  the fall of -- July of 2011.

16  Q.   And are you a tenured faculty member?

17  A.   Yes, I am.

18  Q.   Do you have in particular area of focus in your

19  scholarship?

20  A.   Yes, I do research on teams and information sharing in

21  teams, how to make teams more effective, and diversity in

22  organizations.

23  Q.   What division are you in at Columbia Business School?

24  A.   The management division.

25  Q.   Have you ever been in the finance and economics division?

i7knrav5                        Phillips - Direct

1    A.  No.

2    Q.  That's not your area?

3    A.  That's not my area.

4    Q.  Have you ever served as senior vice dean of Columbia

5    Business School?

6    A.  Yes, I did.  From the -- yeah, I did.

7    Q.  Go ahead.  When was that?

8    A.  It was from June -- no, July 1 of 2014, until June 30,

9    2017.

10   Q.  And why did you stop being senior vice dean at that time?

11   A.  Yeah.  It's a three-year term.  Every three years a new

12   faculty member takes on the service role of senior vice dean.

13   Q.  How were you selected for the senior vice dean role to your

14   knowledge?

15   A.  So, to my knowledge, the dean and the current senior vice

16   dean have conversations about who in the school might be a

17   potential faculty member who would be interested and willing to

18   take on the role of senior vice dean.

19        So, I got a call probably first from the current

20   senior vice dean at that time, who was Gita Johar, and then I

21   got asked by the dean to join the dean's office as a senior

22   vice dean.

23   Q.  And what are the duties and responsibilities of the senior

24   vice dean at Columbia Business School?

25   A.  They are many, but the role basically entails interacting

1    with recruits that are, you know, kind of being recruited to

2    the school, everything from kind of trying to give them

3    information about what it means to be a faculty member at

4    Columbia to the process of being evaluated as a faculty member,

5    including the promotion and tenure process; and even retirement

6    agreements, I talk to faculty members about that as well.

7           Many of the kind of things they have to engage with

8    the university around comes through the office of the senior

9    vice dean.

10          The senior vice dean also helps to put together the

11   agendas of different faculty meetings, for both promotion and

12   tenure meetings.

13          She over -- he or she oversees or kind of facilitates

14   the promotion and tenure meetings that happen at the school and

15   kind of works closely with the senior staff of the school to

16   just kind of ensure that things are running smoothly.

17          The position is mostly seen as a faculty-facing

18   position to kind of help the faculty.

19   Q.  Does the senior vice dean have any responsibility with

20   respect to the executive committee at Columbia Business School?

21   A.  Yeah.  Sorry.  So the executive committee is a group of

22   faculty members, most of whom are chairs of the different

23   divisions in the school.  There are two at-large positions, I

24   believe.  And then I serve on it as well as the dean.

25          So we meet on like a monthly basis as the leadership

1   of the school, faculty leadership of the school.

2   Q.  You said there's two at-large positions?

3   A.  Yeah.  So it's a little bit -- it's changed actually over

4   the last couple of years because the finance and economics

5   division used to be one division.

6           So there was a mem -- there's the chair of the finance

7   and economics division, and then, depending on if that person

8   was from the econ. side or the finance side, then there was a

9   member who would be from the other side on the committee and

10  then another at-large member who could come from any division

11  of the school.

12  Q.  What does the executive committee do?

13  A.  So the executive committee kind of meets as a group to

14  think about the kind of things that need to happen in the

15  school.  A lot of them are things that need to happen in each

16  division on a regular basis that needs to be touched on talked

17  about as a group.

18          It's about kind of trying to figure out how to manage

19  what needs to happen in each division effectively.  The dean

20  usually gives a report at the meeting about things that are

21  happening at the school, what's going on with the board of

22  trustees and things like that.

23          The senior vice dean usually gives a report to

24  everybody there about kind of, again, things that are coming up

25  that we need to be trying to prepare for, that kind of thing.

1           Then there's an agenda sent out to the entire faculty

2     and a request sent out to the entire faculty for issues that

3     they think we should be talking about an executive committee.

4     And so the executive committee has a pretty big agenda as the

5     year progresses.

6     Q.  You may have mentioned this.  Does the senior vice dean

7     have responsibilities concerning the tenure review process?

8     A.  Yes.  So the promotion and tenure process at Columbia has

9     many steps but there's a promotion and tenure committee, and

10    that committee has a representative from each of the divisions

11    in the school.

12          And the senior vice dean is responsible for making

13    sure that the meetings happen.  It's like a facilitator

14    position.  There's no vote that the senior vice dean has, but

15    the senior vice dean has to make sure that the people have the

16    materials that they need, that they have -- that we have a

17    calendar for when we're supposed to meet, and that we're

18    following the procedures that have been established for that.

19          MS. FISCHER:  So let's talk about the procedures.

20          Can we pull up Plaintiff's Exhibit 257, please.

21    BY MS. FISCHER:

22    Q.  Professor Phillips, do you recognize this document?

23    A.  Yes, I do.

24    Q.  What is this?

25    A.  This is a summary of the tenure evaluation procedures that

1    we use at Columbia Business School.

2              THE WITNESS:  Thank you for making it bigger.

3    Q.  Would you like a hard copy?

4    A.  No, I think this is fine.

5              MS. FISCHER:  I would also like to bring up Exhibit I,

6    which is not yet in.  Thank you.

7              MR. MELZER:  No objection, your Honor.

8              THE COURT:  It will be admitted.

9              (Defendants' Exhibit I received in evidence)

10   BY MS. FISCHER:

11   Q.  Going back to Plaintiff's Exhibit 257 and looking at this

12   Exhibit I, first of all, what is Exhibit I.

13   A.  So Exhibit I is kind of like a summary of the timeline for

14   the tenure review process.

15   Q.  And how are faculty members made aware of both the

16   timelines as noted in Exhibit I and the processes described in

17   Plaintiff's Exhibit 257 that you saw?

18   A.  So these two documents are available to all faculty members

19   on our faculty governance page.  It's a website where we kind

20   of keep all the documents that might be relevant for faculty

21   members.

22             And then as senior vice dean, there are a couple of

23   times a year a lunch that the senior vice dean hosts for the

24   junior faculty members to kind of pass this out to them and

25   talk about, answer any questions that they might have.

1          So, over the course of a person's time as a junior

2     faculty member, they may have, you know, kind of up to 12 to 14

3     opportunities to come to a lunch and talk about these

4     procedures before they actually have to go up.

5          And then the division chairs are very much aware of

6     these documents, and oftentimes share them with faculty member

7     as they approach, you know, kind of the time for the process to

8     happen.

9     Q.  So let's talk about process.  How does the tenure review

10    process begin?

11    A.  It usually begins with a conversation between the potential

12    candidate who would be up for tenure and the chair of the

13    department, because every year there's an annual review that

14    happens.  So there's kind of ongoing conversation with the

15    junior faculty member on how they are progressing through their

16    time.

17         So this -- this year, the year that they're supposed

18    to kind of start thinking about the tenure process, usually in

19    the spring of the sixth year, they have a conversation with the

20    chair.  And the candidate can decide -- it's really the

21    decision of the candidate according to the document, to decide

22    if they would like to be reviewed for tenure.

23         And at that point, if they do want to be reviewed for

24    tenure, then they have to submit some materials to the

25    division, to the division chair.  So it's kind of to start the

1    process.

2    Q.  So if the candidate wants to go up -- and we can take a

3    look at the document -- what does the candidate have to submit?

4    A.  Yeah.  They have to submit their CV.

5    Q.  Page 2?

6    A.  Yeah.  They have to submit a CV, which is like a curriculum

7    vitae or some people might use the word résumé, but it is a CV

8    that has all of the work that they have produced in their

9    career.  Then they have to give a personal statement and copies

10   of a few of their papers for people to read.

11   Q.  After the candidate submits his or her materials, what

12   happens next?

13   A.  After they submit the materials, the division basically has

14   a process -- assuming that they want to go forward, right?

15   Q.  Assuming they want to go forward.

16   A.  Yeah.  The division then has a process where they assign a

17   reading committee.  Usually three to five faculty members or so

18   will take all of that material.  That material is distributed

19   to everybody in the division.

20            The reading committee then kind of reads everything,

21   and then the division kind of has a meeting about it, and they

22   have a vote on whether or not they should continue to move

23   forward in the process.

24   Q.  So the -- I'm sorry.  So the division votes on the tenure

25   case?

1   A.   Yes.  So the division comes together.  They read all of the

2   materials, they have conversation, and at that meeting they

3   should have a vote on if they think the case warrants to

4   continue in the process.

5   Q.   When on the tenure clock does the divisional vote typically

6   occur?

7   A.   Yeah.  So it usually happens in the spring of the sixth

8   year, spring meaning like April time frame.

9   Q.   Does it have to happen at that time?

10  A.   No.  There are times when it might not happen at that time.

11  Sometimes it can happen earlier in the pro -- in the

12  candidate's time at the school.  There are times when it might

13  happen a little bit later at the candidate's time in the

14  school, but typically it's supposed to start in the spring of

15  the sixth year.

16  Q.   When is the last possible date that -- or time that a

17  tenure vote can happen, divisional vote?

18  A.   Um, well, it -- the last possible time, it's always kind of

19  tricky to answer that question, because the goal is to kind of

20  follow these timelines.  But there's always -- you know, there

21  can be delays in the process, like maybe you can't get a quorum

22  of enough people to kind of come to together to actually do the

23  vote.

24       So, ideally, because there are multiple steps in the

25  process, you want to try to have as much time as you possibly

1    can to have the evaluation happen.  But if it needs to happen

2    in a rush period it can.

3              So, for instance, if somebody gets a job offer from

4    somewhere else, and that doesn't come in until, you know, kind

5    of in their seventh year, for instance, then when might have an

6    expedited process where we bring everybody together and try to

7    really have it happen more quickly.

8              So I can't tell you like a specific date that it has

9    to happen by, because things can happen -- like if you want it

10   to happen quickly, it can.

11   Q.  So what happens after the candidate's division, after the

12   candidate's division has voted on the tenure case?

13   A.  So after the candidate's division has voted on the case,

14   there's one of two things that can happen.

15             One is the material that has been submitted always

16   goes to the promotion and tenure committee.  The promotion and

17   tenure committee also receives the vote that the division came

18   to.

19             And the question is, did they have 50 percent or more

20   in favor of going forward with the case?  If it's 50 percent or

21   more in favor of going forward with the case, then not only

22   does the promotion and tenure committee look at the CV and the

23   personal statement and the papers from the candidate, they also

24   receive a divisional statement.

25             If the vote is less than 50 percent positive, then the

1   promotion and tenure committee looks at the CV and the personal

2   statement and the papers, and they kind of take a look at

3   everything and decide if the vote from the division is accurate

4   or not, right?  Or is it -- not accurate, but is it -- there's

5   language that's used in the documents that says that the

6   process had to be fair and without irregularities in order

7   for -- to kind of stop the process at that point.

8   Q.  OK.

9   A.  I hope that was understandable.  There's a lot of different

10  steps.

11  Q.  Let's talk about that.

12  A.  Yeah.

13  Q.  If we could go back to Exhibit 257, page 2.  No. 4.

14  A.  Yep.

15  Q.  There it says, "Regardless of the outcome of the divisional

16  vote about whether" -- am I in the wrong spot?

17  A.  Yeah.  No. 4 at the top, "Regardless of the outcome of the

18  divisional vote about whether to solicit external letters the

19  case is reviewed" --

20  Q.  Yes.

21  A.  Yes.  So if the division has a vote that's less than 50

22  percent positive, the material still comes down to the P&T

23  committee, and they have a discussion about it.  They assess if

24  the process that was followed by the division was fair and

25  without irregularities.

1              And, if that's true, then at that point the case

2      stops.  There's no -- there's nothing else that happens

3      basically.  The candidate is informed that the division did not

4      have a 50 percent or more positive vote and the P&T committee

5      affirm that and the process is over.

6      Q.  And I think that's reflected -- if we can look on page 4,

7      No. 5.

8              I'm sorry, page 3, No. 5.

9      A.  Uh-huh.  That's right.

10     Q.  What does it mean to be fair and without irregularities?

11     A.  So, when the P&T committee meets and has a discussion about

12     this, they are trying to make sure that the division followed

13     the normal procedures that they would normally follow, which is

14     that they received the materials, that they read the materials,

15     that they put together a reading committee of people to really

16     dig deeply, and that they had a meeting where they had a quorum

17     of people where the reading committee presented their kind of

18     assessment to everyone else in the division, where the division

19     had a conversation about the materials, and that they actually

20     had a vote where they took a private vote and each person voted

21     yes or no for proceeding with the tenure process.

22             So it's really about making sure that the divisional

23     process was followed in the way that it should have been.

24     Q.  If the tenure process starts earlier or later than the

25     spring of the person's sixth year, is that considered an

1  irregularity under this guideline?

2  A.  No.  Because it -- the timing is -- it's a suggested

3  timeline, but it doesn't always happen exactly at that time.

4        So having it be a little bit earlier or having it be a

5  little bit later is not in and of itself an irregularity?

6  Q.  If the candidate does not pass the divisional level and

7  then the P&T committee reviews and finds that the process was

8  fair and without irregularities, what happens next?

9  A.  I'm sorry.  Can you repeat the question?

10  Q.  Sure.  No problem.

11        If the candidate does not pass the divisional level

12  and it goes to the P&T committee and the P&T committee finds

13  that the process was fair and without irregularities, what

14  happens next?

15  A.  Yes.  So basically what happens at that point is the

16  process basically stops, the candidate is informed that the

17  division did not vote 50 percent or more in favor and that the

18  P&T committee affirmed that vote.  And therefore the process at

19  this point is over.  The person has been denied tenure.

20  Q.  And I believe you said that if the candidate passes the

21  divisional level it still goes to the promotion and tenure, or

22  P&T, committee?

23  A.  Yes.  So if the vote by the division is more than 50

24  percent positive, then the P&T committee has a more in-depth

25  process:  They take all the materials that have been provided.

They actually form a subcommittee of two people of the six that
are on the committee, and they do a deep dive into the
material, as do -- everybody reads all of the material, but
those two people are responsible then for doing what we call a
canvassing of the senior faculty of the division.

          They go and they meet with each person in the division
to chat with them about the pros and cons, the positives and
negatives of the case or things that they should be taking into
consideration, is there anything that, you know, kind of, that
the faculty member would like to share with the promotion and
tenure committee so the promotion and tenure committee has a
full view of the assessment of the person.

          And then the promotion and tenure committee comes back
together, and they have a conversation about what they learned
from the canvassing process.

          Also, in the canvassing process they also talk to
people about, like, who should be the external reviewers, the
external letter writers, because that's apart of the full
process that then would happen.

          So, the P&T committee, after doing the canvassing,
they take a vote.  And their vote basically is as a
recommendation to the rest of the faculty on, yes or no, should
they proceed with the process further.

          So this is kind of a -- we usually think of it as the
vote for going out for letters.

 1              And that vote then is presented to the full faculty of

 2       the school, the tenured faculty of the school and the whole

 3       tenured faculty votes to decide on sending out for letters.

 4              So that's kind of the first step of the full

 5       evaluation.

 6              We send out for letters.  We usually give people four

 7       to six weeks to write the letters, and then the letters come

 8       back, and then we meet -- everybody meets again.

 9       Q.  So just -- if we could just go over --

10       A.  Yes.

11       Q.  -- writing out for letters, what that means.  Who's writing

12       the letters?

13       A.  Sending out for letters basically means that you are asking

14       external people who are not part of Columbia Business School,

15       but who are part of the person's field, to read her work, make

16       an assessment of the work, and give a recommendation to

17       Columbia as to whether or not that person should be promoted to

18       a tenured faculty member.  So it's an external assessment.

19       Q.  You said after that external assessment --

20       A.  Yeah.  After the external assessment, those letters come

21       back in.  All the faculty who were involved in the voting are

22       allowed to read those letters.  The division reads the letters.

23              They meet again and have another vote.  That basically

24       is a yes or no on should this person be granted tenure now that

25       we have the internal process that's kind of happened and the

i7knrav5                    Phillips - Direct

1   external process has happened.

2          They take all that information in and they vote.  And

3   then they send they are vote to the P&T committee.  The P&T

4   committee has another conversation and they vote.

5          That goes to the full tenured faculty, and they take a

6   vote.

7          Once the full tenured faculty takes a vote of yes or

8   no, the dean basically -- I'm pretty sure that the procedural

9   documents say that the final recommendation is of the dean.

10  Like everything is kind of -- all of the other votes are to

11  kind of help inform the dean in his decision.

12         So then once that -- all those votes are done, the

13  dean sends a recommendation to the provost to say that we have

14  now voted positive for this person's tenure case and then the

15  provost has to -- the provost, president, somebody over in the

16  university then has to approve it.

17  Q.  Thank you.

18  A.  Uh-huh.

19  Q.  Did Professor Ravina come to your attention in the summer

20  of 2014?

21  A.  Yes, she did.

22  Q.  What were the circumstances of that?

23  A.  Yeah.  So, after I was asked to become the next senior vice

24  dean, I had several meetings kind of in the spring of 2014 with

25  Gita Johar, who was at the time the current, the senior vice

1    dean.

2            And we had conversations about lots of things.  She

3    was trying to catch me up and train me I guess you could say on

4    things that I needed to know.

5            And she told me that, that Enrichetta Ravina and Geert

6    Bekaert had a, you know, antagonistic working relationship and

7    that it had been an issue that had come to her attention.

8            That's how I found out.  That's how I learned about

9    it.  It was like probably June or so.

10   Q.  And at that time what was your understanding of the nature

11   of the dispute between Professor Ravina and Professor Bekaert?

12   A.  Yeah.  It was that they had been sending e-mails back and

13   forth with each other that were, you know, kind of mean or not

14   nice in terms of the way that they were interacting; that

15   Enrichetta was upset.  She felt like the work was being delayed

16   that she was doing with Geert Bekaert, and that, you know, it

17   was just not a good working relationship between the two of

18   them.

19           MS. FISCHER:  Can we please pull up Exhibit DZ.

20   BY MS. FISCHER:

21   Q.  Professor Phillips, do you recognize this, at least the top

22   there, as an e-mail that you received?

23   A.  Yes.

24           MS. FISCHER:  Oh, it's in.  OK.  It's in evidence.

25   BY MS. FISCHER:

1  Q.  Did you meet with Professor Bekaert to address the issues

2  that had been brought to your attention?

3  A.  Yes.  So I was asked to attend a meeting with Glenn Hubbard

4  and Geert Bekaert.  This looks -- yeah, early in my tenure.  I

5  basically had started on the 1st of July, so this was a couple

6  of weeks after I started.

7  Q.  And it says there, at the top e-mail from you on July 15,

8  it says, "We have a meeting with Geert at 1:30 p.m."?

9  A.  Yes.

10  Q.  And did you attend a meeting on that day?

11  A.  I do remember attending a meeting, yes.

12  Q.  What was discussed at that meeting?

13  A.  So at that meeting Glenn Hubbard and Geert had a

14  conversation basically kind of talking about the nature of

15  the -- the kind of antagonistic relationship between Geert and

16  Enrichetta.

17        They talked about the research that the two of them

18  were working on and the desire that Enrichetta had expressed

19  for Geert to basically kind of step away from at least some of

20  the papers that they were anticipating working on together.

21        There was some conversation, you know, kind of about

22  what to do going forward.  I didn't -- I don't remember saying

23  anything myself in that meeting.  I just kind of listened.

24  Q.  Did you subsequently speak with Professor Ravina?

25  A.  I did.  I did.

1    Q.  Did you request that she meet with you?

2    A.  I did.  Glenn Hubbard asked me to speak with her.

3    Q.  Why did you want to speak with her?

4    A.  Well, to give her an update on what the nature of the

5    conversation had been that we had had with Geert, to kind of

6    inform her that he didn't want to step away from some of that

7    research.

8         I think I communicated to her that, you know, Geert

9    was a little surprised by -- he seemed surprised by what was

10   being said.  I remember telling her that Geert was surprised,

11   because he said he thought that they were friends, that

12   everything was OK in their working relationship, and I remember

13   Enrichetta saying to me, no, they weren't friends.

14        So I met with her to kind of give her an update on

15   what we had heard from the meeting with Geert and to see if

16   there was anything I could do to be helpful to her.

17        I, again, like, I was just starting my position and

18   was really eager to be supportive, especially of junior faculty

19   members, which is something that I think was just important to

20   me as a person who was taking on the role of the senior vice

21   dean.

22        And so I expressed to her like my desire to be helpful

23   to her, my desire for her to have, you know, a good experience

24   that was as good an experience as she possibly could at

25   Columbia and beyond Columbia and to just kind of be as

1     supportive as I could.

2              I think Glenn, when Glenn asked me to have the meeting

3     with her, I think I was hoping that I could be, that I could

4     build some rapport with her, because it seemed like there had

5     not been a lot of rapport built up to that point.  So I was

6     trying to be helpful.

7     Q.  Do you know the date of that meeting?

8     A.  I think it was probably a day or two after this July 15

9     date.  So maybe the 16th or 17th or -- not too far after the

10    15th.

11             MS. FISCHER:  Can we pull up EA, please.

12             THE WITNESS:  Thank you.

13             MR. MELZER:  No objection, your Honor.

14             THE COURT:  All right.  EA will be admitted.

15             (Defendants' Exhibit EA received in evidence)

16             MS. FISCHER:  Thank you.

17    BY MS. FISCHER:

18    Q.  Professor Phillips, if you look at the middle of the first

19    page, it is an e-mail that you wrote on July 15 at 4:40 p.m.?

20    A.  Yeah.

21    Q.  You wrote you tried calling her office?

22    A.  Uh-huh.

23    Q.  Let's look at her response.  So July 15 was the day you met

24    with Professor Bekaert you think?

25    A.  So I met -- I'm pretty certain that I met with Professor

1    Bekaert, with Geert Bekaert on the 15th, and then --

2    Q.  And then if we can --

3    A.  -- on the next day --

4    Q.  Yes.

5    A.  -- I believe it would have been the next day, because she

6    wasn't available that day.  It was the next day that -- I

7    think, "Yes, tomorrow at 11:30 a.m. is perfect" Enrichetta says

8    at the top.

9    Q.  Where did you meet with her?

10   A.  I met with her in the senior vice dean -- there's an office

11   that he is designated for the senior vice dean that's in the

12   dean's office.  So I mentioned that it was Gita's old office

13   and Gita was the former senior vice dean.

14   Q.  What did you and Professor Ravina discuss during that

15   meeting?

16   A.  Yeah, so at the meeting I told her that we had had a

17   meeting with Geert Bekaert, that Geert had kind of expressed a

18   desire to not walk away from the -- some of the research that

19   they had been doing together.

20          I expressed to her that I really, you know, kind of

21   wanted to be helpful and cared about her outcomes.

22          You know, she said -- and she told me that she wasn't

23   friends with Geert, that she felt like there was some, you

24   know, not only had he kind of -- there have been these negative

25   e-mails that had gone between them, but that there were e-mails

that she hadn't shared with people that might kind of imply
some sexual innuendo.  He had asked her out to dinner several
times, maybe he wanted something more than just dinner.

          She said things that I kind of thought to myself, wow,
you know, I hadn't heard that before.  Nobody had kind of told
me that that was, that that was the case.  I hadn't heard
anything about sexual innuendo.

          And I don't know if I said anything to her about like,
you know, what I was going to do about that, but I certainly
felt like I needed to immediately report that to somebody.

          And I like asked Glenn Hubbard like had you heard
anything about kind of sexual innuendo or concerns about maybe
there was some sexual harassment going on here?  Because
Enrichetta expressed that to me in the meeting that we had.

          So I passed that information on and tried to get it to
the EOAA office at Columbia to make sure that that was
investigated because -- because it certainly seemed to me to be
an issue, you know, that needed to be investigated further.
Q.  Well, going back for a moment to the meeting, did you ask
Professor Ravina if she needed to keep working with Professor
Bekaert?
A.  I did.  I did ask her that.
Q.  Why did you ask her that?
A.  I asked her that because she had clearly expressed, you
know, that there was antagonism between them, that she wasn't

his friend, that she didn't like him, right, and that she

didn't -- you know, didn't want to continue to work with him,

because, in fact, she wanted him to step away from the papers.

So I basically was asking almost out of naivete

because, you know, why do you keep working with him then,

right?

So, for me, it was, you know, I was basically kind of

asking her, do you really need to keep working with this

person?

There have been times in my own research career where

I have stopped working on a research project with somebody for

one reason or another.  Sometimes it might have been my own

personal schedule that was the problem, somebody was expecting

me to contribute and I wasn't able to in the way that they were

expecting, and maybe I wasn't as committed to that work.  So I

decided that I wasn't going to work on it anymore and that they

should go forward with the work.

So, it was -- it was basically a question that was

sincerely like what can we do to make your life better because

it seems to be unhappy.

Q.   Did you tell professor Ravina that your objective was that

she leave Columbia happy?

A.   Yes.  I actually said something to her which I said to many

people, which is that, you know, I want your experience at

Columbia Business School to be as good as it can be, whether

1    you stay here as a faculty member or if you leave and you go

2    somewhere else.

3          So, when I recruit in my role as senior vice dean, I

4    would meet with every recruit who we were recruiting to come in

5    to Columbia, and I would say to them, like, our goal is to have

6    you have the best experience possible here.  Because the fact

7    of the matter is you are either going to stay here as a faculty

8    member and become a senior faculty member and replicate the

9    experience you had as a junior faculty member on other people,

10   so we want that to be a good one so that you can replicate a

11   positive experience; or you're going to leave and you're going

12   tell other people about what your experience was here, and

13   that's going to have an impact on our ability to be successful

14   as a school.  Because you are going to tell other people I

15   didn't have a good time there, and then other people will say,

16   well, I don't want to go there, and that will be a problem for

17   us.

18         So, in the grand scheme of things, I want you to have

19   a good experience because that's -- that's my goal.  I don't

20   want to be in a place that has a reputation of being a place

21   where junior faculty members don't have a good experience.

22   Q.  So were you suggesting that Professor Ravina should plan to

23   leave Columbia?

24   A.  No, that's not what I was suggesting at all, not at all.

25   Q.  Did you --

1  A.  It certainly wasn't -- it wasn't my -- it wasn't my

2  position.  I had no power or anything like that to tell her

3  that she should stay or heave.

4  Q.  Did you tell Professor Ravina that you thought she should

5  give up the dataset was working on with Professor Bekaert?

6  A.  No.  No.  That's not what I said at all.  Again, I did ask

7  her, do you need to keep working on this research with this

8  person, but I didn't say that she should give up the dataset.

9        Again, that's not -- I didn't know enough.  I was, you

10  know, kind of ignorant.

11        I learned this is a proprietary dataset, that they

12  took a lot of time to get the data.  I mean, I don't -- I don't

13  myself, I don't do research like that.  Most of my research is

14  actually kind of interviewing people or doing surveys or having

15  experiments where people come in.

16        So I'm collecting my data, my own data, as opposed to

17  this situation, where they acquired the data.

18        And, yeah, I think I was just kind of ignorant, quite

19  frankly, of how -- how much -- how, you know, special this data

20  was to her.

21  Q.  I think you spoke -- you said you spoke with Glenn Hubbard

22  after this meeting?

23  A.  I did, yes.  I went straight to his office.

24  Q.  So did your understanding of what Professor Ravina had

25  expressed concerns about change after this meeting?

1   A.  Yes.  Again, I had not heard from Glenn or Janet or Gita, I

2   hadn't heard from anybody that this was something that was a

3   sexual, you know, had sexual innuendo or sexual issues involved

4   in it, so it definitely was my first time hearing that when I

5   met with her on, you know, in July.

6           And I immediately thought, you know, this is something

7   that needs to be, needs to be further investigated or looked at

8   or something -- like I went and I asked Glenn, like, did you

9   know?  Did you ever hear anything like this?  Maybe I'm not

10  understanding something.

11          But, you know, she said there is some sexual innuendo

12  here, and we -- you know, I went to Glenn immediately and I

13  said I think we need to investigate or do -- somebody needs to

14  do something.  We need to send this to the university.

15  Q.  And was a report made to the university?

16  A.  Yes, a report was made to the university.

17          MS. FISCHER:  Can you pull up ER.

18          THE WITNESS:  Thank you.

19  BY THE WITNESS:

20  Q.  Professor Phillips, do you recognize this as an e-mail

21  chain that you were on?

22  A.  Yes.

23          MS. FISCHER:  We offer ER.

24          THE COURT:  Any objection?

25          MR. MELZER:  No objection.

1             THE COURT:  It will be admitted.

2             (Defendants' Exhibit ER received in evidence)

3   BY MS. PLEVAN:

4   Q.  Do you recognize the e-mail that begins on the bottom of

5   page 1 and carries over to page 2 as an e-mail from Laura Lee

6   and it says "Dear Michael"?

7   A.  Yes, I recognize the e-mail.

8   Q.  I just want focus on your e-mail on the top of that page

9   where you wrote, "My meeting with Enrichetta was on July 16

10  from 11:30 to 12:30.  That was the first and only face-to-face

11  meeting I have had with her, and that was the first time I had

12  heard sexual innuendo mentioned, but Glenn might have heard

13  something sooner.

14            "I will also correct Michael that the meeting on the

15  16th was only with me."

16            Why did you send this e-mail?

17  A.  So I was copied -- Laura Lee.  Laura Lee was the kind of

18  like the chief of staff to the dean at the time.  And she had

19  communicated, you know, all of this that you see in the e-mail

20  over to Michael Dunn, who was in the EEOA office.

21            And after I read the e-mail that she sent, there were

22  at least a couple of things here that I thought were incorrect,

23  and I wanted to make sure that the record was correct.

24            So one of them was that, you know, kind of when I had

25  actually met with Enrichetta that it was my first time hearing

1    this, and that Glenn was not -- Glenn was not at the meeting

2    with me, and Enrichetta -- it was just her and I, me and her.

3    Q.  And did you provide the clarification to Michael Dunn?

4    A.  I did.

5         MS. FISCHER:  Let's pull up ET, which is in.

6    BY MS. FISCHER:

7    Q.  Looking just at that first e-mail, is this the

8    clarification that you provided?

9    A.  Yes.

10   Q.  Did you have any understanding of what Michael Dunn or the

11   EOAA office was going to do with the information you provided?

12

13   A.  So my understanding of what the EOAA office does is they

14   investigate these kinds of situations.

15        So my understanding was that they would move forward

16   to try to understand more about what had happened here.  I did

17   have a conversation -- usually the person who's doing the

18   reporting basically has the obligation to report the

19   information to the EOAA office, and then the EOAA office does

20   the investigation.

21        MS. FISCHER:  You can take it down.

22   BY MS. FISCHER:

23   Q.  So, after you became aware that -- so you became aware that

24   Professor Ravina and Professor Bekaert had a conflict over

25   their research.  Did you try to help resolve that conflict in

1   any way?

2   A.   Yeah.  I mean, even at the meeting on the 16th -- I guess

3   it was the meeting on the 16th -- when I talked to Enrichetta,

4   you know, I was -- part of, again, the goal was try to figure

5   out what we could do to kind of make things better.

6        I do remember even suggesting in that meeting like,

7   you know what would be good, if we could get everybody around

8   the table and try to, you know, figure out some kind of

9   resolution of what to do going forward.  So that was, like the

10  first time I heard it I was trying to be helpful.

11       And then, you know, over the course of time there were

12  lots of conversations about kind of what to do about the

13  collaboration on the research that they were working on

14  together.

15       Out of those initial meetings there was conversation

16  about at least having what would end up being called a

17  relationship manager to be involved in the research process.

18  So I was -- you know, I was basically trying to do what I could

19  to help as -- as one of many people who were involved in this

20  situation.

21       MS. FISCHER:  Can we pull up HM, please.

22  BY MS. FISCHER:

23  Q.   Professor Phillips, can you just tell us what was going on

24  in this e-mail.

25       MS. FISCHER:  First let me offer it.

1    BY MS. FISCHER:

2    Q.  Is this an e-mail between you and some others at Columbia

3    Business School?

4    A.  Thank you.  Yes, it is.  So I think this was a -- this is

5    an e-mail that started with Enrichetta sharing some information

6    with myself and Glenn Hubbard and Janet Horan and Daniel

7    Wolfenzon.

8            Daniel Wolfenzon was a faculty member in the finance

9    and economics division.  He basically was kind of taking on

10   this relationship manager role I believe at this time, so he

11   had been copied on lots of e-mails as a function of that.

12           And it looks like this was Enrichetta kind of giving

13   us an update and a suggestion about how to move forward with

14   one of these papers that they were -- that she was working on

15   with Geert Bekaert.

16           And I think she was asking us for, you know, kind of

17   what we thought of the message that she had written here as a

18   step forward.  And I spoke with people in the dean's office,

19   Janet and Glenn, and tried to think about how to respond back

20   to her on this.

21           MS. FISCHER:  We offer HM.

22           THE COURT:  Any objection?

23           MR. MELZER:  No objection.

24           THE COURT:  HM will be admitted.

25           (Defendants' Exhibit HM received in evidence)

 1    BY MS. FISCHER:

 2    Q.  So what was your goal here in your communications?

 3    A.  My goal was to try to help Enrichetta kind of in her

 4    communication with both Geert and with the colleagues at

 5    Financial Engines, which is the company that had provided the

 6    data.

 7              I think what was going on here was Enrichetta was

 8    suggesting some deadlines for when Geert should finish, you

 9    know, finish the paper, and that she kind of disagreed with him

10    about what needed to be done, what yet needed to be done for it

11    to be finished, but trying to give some deadlines for it.

12              I think one of my reactions was like, you know, kind

13    of trying to make the e-mail that she wrote a little more

14    diplomatic and kind of hoping that it would be more well

15    received by the people who would be on the e-mail chain.

16              MS. FISCHER:  Can you pull up HQ.

17    Q.  Looking at the middle of the page, from Steve Zeldes to

18    Janet Horan, copying you, just the second paragraph, "We had a

19    productive conversation that I'm hoping could lead to a

20    comprehensive solution.  Happy to discuss when we talk."

21              MS. FISCHER:  Now let's look at the next e-mail right

22    above that, please.  You could close that out.  I want to go

23    back to the e-mail.  Sorry.  I can't see it.

24    BY MS. FISCHER:

25    Q.  That e-mail that Steve sent and copied you --

i7knrav5                    Phillips - Direct

1    A.  Uh-huh.

2    Q.  -- what did you understand that, those productive

3    conversations to be about?

4    A.  I believe that Steve was having conversations with Geert

5    Bekaert and also with Enrichetta Ravina about trying to, you

6    know, again find solutions about how to move forward with these

7    papers that they were working on.  And so I believe that was a

8    productive conversation.  I think he was talking about his

9    conversation with Geert.

10                MS. FISCHER:  Thank you.

11                Can we pull up HZ.

12   BY MS. FISCHER:

13   Q.  Professor Phillips, what is this document?

14                Do you recognize this as a communication that you sent

15   and received?

16   A.  Yes.

17                MS. FISCHER:  We offer HZ.

18                THE COURT:  Any objection?

19                MS. PLEVAN:  No objection, your Honor.

20                THE COURT:  HZ will be admitted.

21                (Defendants' Exhibit HZ received in evidence)

22   A.  So this was basically part of those continued efforts to

23   help Enrichetta and Geert come to some kind of agreement.

24                And Steve had been having the conversations, you know,

25   kind of as a go-between a little bit between Enrichetta and

1    Geert, gathering their perspectives about the best ways of

2    moving forward on the collaboration or these papers.

3              And then we had decided that it would make sense for

4    there to be some kind of document written about this that could

5    be held in the senior vice dean's office, you know, for the

6    record.

7              And so I was basically attempting here to write up,

8    you know, what all of the agreement would be between Geert and

9    Enrichetta on how this work would proceed on each of the three

10   papers that they had agreed that they were working on and to

11   try to figure out, you know, kind of pretty -- in a pretty

12   detailed manner, you know, kind of what would happen over time,

13   given that, you know, with collaborations, with research

14   collaborations it could be multiple years before a paper

15   actually goes from, you know, kind of the idea to the actual

16   publication.

17             So the goal was to try to write down what the

18   agreement would be between them so that the next senior vice

19   dean or whoever else might be involved in this process would

20   have some record of what the agreement had been.

21             So that was what this was.  We drafted it up, but that

22   was what this e-mail was trying to do.  This was in -- yeah,

23   October.  October 2014.

24             MS. FISCHER:   Let's look at Exhibit IH.

25   BY MS. FISCHER:

i7knrav5                    Phillips - Direct

1   Q.  Do you recognize this as an e-mail you sent and received?

2   A.  Yes.

3              MS. FISCHER:  We offer IH.

4              THE COURT:  Any objection?

5              MR. MELZER:  No objection.

6              THE COURT:  IH will be admitted.

7              (Defendants' Exhibit IH received in evidence)

8   BY MS. FISCHER:

9   Q.  Look at the bottom e-mail that Geert Bekaert wrote to you,

10  "Kathy, I had a productive meeting with Steve and Charles

11  today.  I do wonder whether you get a good sense of the exact

12  nature of the discussions, as things may get lost in

13  translations.  Anyways, I'm always willing to talk."

14             And then you forwarded this to Glenn Hubbard and

15  wrote:  "I will find out from Steve what these conversations

16  are about.  I hope they are moving him -- more towards being

17  reasonable.  Otherwise I don't see much reason for me to talk

18  to him about things at this point."  And it goes on.

19  A.  Uh-huh.

20  Q.  Did you think Professor Bekaert was being unreasonable?

21  A.  I thought the situation was unreasonable.  I mean, part of

22  what I was trying to say here was that they had been having

23  these conversations -- the document that you saw before --

24  trying to get to a point of agreement between the two of them.

25             And my sense was that, as the senior faculty member,

i7knrav5                         Phillips - Direct

1   maybe Geert could give a little bit more in the situation to

2   try to resolve the situation.

3           So my exasperation a bit there was really about like

4   can we get this resolved already.

5   Q.  And did you continue and make additional efforts to try to

6   help resolve the situation?

7   A.  Yes.  I mean, I think we all were in lots of ways trying

8   to, you know, kind of figure out how to get them to an

9   agreement.

10          My sense is that, you know -- I don't know the timing

11  of all of this, but I know that there were, you know, kind of

12  legal counsel kind of involved in the process at some point or

13  another, and I don't know exactly when that happened, but I

14  think it's -- at some point that that happened.

15          MS. FISCHER:  Can we pull up IN, please.

16          THE WITNESS:  Thank you.

17  BY MS. FISCHER:

18  Q.  Do you recognize this as an e-mail you received or sent?

19  A.  Yes.

20          MS. FISCHER:  We offer IN.

21          THE COURT:  Any objection?

22          MR. MELZER:  One moment, your Honor, please.

23          No objection, your Honor.

24          THE COURT:  OK.  IN will be admitted.

25          (Defendants' Exhibit IN received in evidence)

1   BY MS. FISCHER:

2   Q.  What is the date of this correspondence?

3   A.  The first one at the top is November 7.

4   Q.  Can you describe in just general terms what this e-mail is

5   about.

6   A.  Yeah.  So I was actually walking down Broadway Avenue and

7   Steve Zeldes and I had a conversation.  He told me that he had

8   been in conversation with Geert and kind of felt like, oh, you

9   know, I think we finally came to some kind of agreement about

10  each of these three papers, and he told me what they had talked

11  about.

12          He said -- I think Steve was on his way somewhere, and

13  I was on my way home I think.  So when I got home I tried to

14  write down what Steve had told me about each of the three

15  papers to try to -- again, like, like the document you saw that

16  was the longer letter.  This was kind of like, OK, each paper

17  now we have some kind of agreement of what we would -- what --

18  what Geert would be willing to agree to I guess on these

19  things.  And so I wrote them down.

20          Then we kind of went back and forth a little bit on

21  e-mail again trying to clarify what each of these things meant.

22          So, I wrote it to Steve, Steve then filled in some

23  details on whether or not I had what he -- what he said

24  correct, because it was conveyed in the conversation on the

25  street.

1          MS. FISCHER:  Thank you.

2     Q.  At some point -- or I will ask another way.

3          Did you ever receive a document recommending a change

4     in policy as to how to approach research disputes between

5     junior and senior faculty members?

6     A.  Yes.

7          MS. FISCHER:  Can we pull up Exhibit 100.

8     BY MS. FISCHER:

9     Q.  Is this the document that you received?

10    A.  Yes, it's part of the document that I received.

11    Q.  Looking at the middle paragraph that begins, "In

12    particular," it says, "In particular, we suggest the committee

13    make explicit the responsibilities of senior faculty to behave

14    fairly and appropriately when working with junior faculty."

15         Do you understand "the committee" here to be a

16    reference to the executive committee?

17    A.  Yes.

18    Q.  And then in looking at the second to last paragraph -- I'm

19    sorry last paragraph, just the first portion there:  "We

20    recommend that -- we also recommend that if there is a falling

21    out between a junior and senior faculty member with respect to

22    research project, which threatens -- which threatens to

23    significantly delay progress on said project, the senior

24    faculty member should be expected to step aside and relinquish

25    control and intellectual property over the joint research

1    project to the junior faculty member."

2              Did you understand this as something that was

3    suggested to be brought to the executive committee?

4    A.  Yes.

5    Q.  And did you consider this policy as a member of the

6    executive committee?

7    A.  I received an e-mail from a couple of faculty members with

8    this attached, and I -- this was, I believe, the day before the

9    executive committee meeting.

10             I did look at it.  I read through it.  I talked to

11   Glenn Hubbard about it.  We chatted about it.

12             We -- the next day at the executive committee meeting

13   we didn't put it formally on the agenda of the executive

14   committee, but we did, you know, talk about it a little bit

15   with the executive committee, but we did not have a full

16   blown-out discussion about it with the executive committee,

17   Glenn and I.

18             We decided that it was -- I believe I sent an e-mail

19   back to those faculty members kind of saying, you know, thank

20   you for the suggestion.  It may not be able to go on the

21   February, *i.e.*, the next day's agenda.  And we, we, we had

22   conversation about it, and we decided not to put it formally on

23   the agenda.

24   Q.  So why was it -- what were those conversations about it?

25   A.  Yeah.

i7knrav5                    Phillips - Direct

1    Q.   What was your view of the proposed policy?

2    A.   Yeah.  So there were a few things that made us hesitate

3    about, you know, kind of this policy, one of them being, you

4    know, kind of saying that senior faculty members would

5    relinquish their intellectual property.

6              It wasn't clear to me that the faculty of the business

7    school actually had the power to overrule what would

8    essentially be university policies around intellectual

9    property.  And so, you know, it was kind of -- felt a little

10   beyond the scope of what a policy in the business school could

11   be.

12             I think we were also concerned about kind of writing

13   something down like this that would then perhaps, you know,

14   make senior faculty members say, Well, I'm never going to work

15   with a junior faculty member if they could take my intellectual

16   property and walk away because they said it was delayed too

17   much.

18             We were also concerned about having something like

19   this as a policy at the school and what that would say to

20   faculty at other schools and people out in the field about what

21   it was like to be a faculty member at Columbia Business School,

22   that we would need, to, you know, write something down that

23   would suggest something like this.

24             So there were a lot of things about this document that

25   we were very hesitant about, you know, kind of moving forward

1   with as a policy for the school.

2           And, in any case, we would have had to take it through

3   more than just the executive committee deciding -- the

4   executive committee doesn't just, doesn't just kind of decide

5   on policies for the school.  It would have had to go through a

6   process of adoption.  So, yeah.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MS. FISCHER:

Q.  And while you were on the executive committee -- which was
while you were senior vice dean, right?

A.  Yes.

Q.  While you were on the executive committee, if a faculty
member requested something like this, a policy, to be put on
the executive committee agenda, was there an obligation for the
executive committee to do so?

A.  No.  No.  So I mentioned earlier that every month
essentially I sent out a request to the faculty to say, the
executive committee meeting is coming up in a couple weeks, you
know, if you have any suggestions for things that we should put
on the agenda, please let us know.  And so we would get --
receive emails sometimes from faculty members with suggestions
of things to go on the agenda, and we would discuss them --
myself, the dean, and the member of the executive committee who
was basically like the agenda czar, I guess you could say -- we
would discuss them, and sometimes we would decide, this is
actually not something that belongs in the executive committee
agenda; this is actually a issue for this group over here.
Sometimes we would say, you know, this is -- this is not an
issue that we as a school want to take up right now; sometimes
we would say, this is something that we want to put on the
agenda right now; and sometimes it was, you know, maybe
postpone to some, you know -- next month or the month after

1   that, just depending upon the schedule and what we had going

2   on.

3           Like for instance, one request that I -- one thing

4   that I received from a faculty member one time was about the --

5   we have a statue in front of the building that looked pretty

6   bad, and a person sent me an email and he said, you know, I

7   think we should do something about that statue, like that

8   should go on the executive committee agenda, and I said, you

9   know what, let me find out about that.  And I went and asked

10  about it, and it turned out that there was already a plan to

11  renew that statue.  So I just sent the person a letter back and

12  I said, it's already been taken care of, thanks for bringing it

13  to my attention, and that was it.  It wasn't something that

14  needed to go on the executive committee agenda.  So it just

15  kind of depends, depending on what people send, but it wasn't

16  an obligation that it had to go on the agenda.

17          MS. FISCHER:  Could we please pull up Exhibit LI.  Or

18  I'm sorry.  It's admitted as Plaintiff's 105, which is in.

19  Q.  Professor Phillips, do you recognize this letter?

20  A.  Yes, I do.

21  Q.  And this is a letter that was sent to Professor Ravina.

22  A.  That's correct.

23  Q.  And it's signed by Dean Hubbard.

24  A.  Mm-hmm.

25          MS. FISCHER:  Can we look at the second to last

1   paragraph of this letter.

2   Q.  There's a note that begins toward the end of the third

3   line --

4   A.  Mm-hmm.

5   Q.  -- that says, "I hope your upcoming leave is productive for

6   you and that you will let me know what the school can do to

7   help support you in bringing your work to publication and

8   planning for your future career."

9          Then the next sentence references Professor Ravina's

10  annual review as "currently on hold pending the conclusion of

11  external conversations regarding her tenure clock."

12  A.  Mm-hmm.

13  Q.  Well, first of all, what is this letter?

14  A.  So this is a annual letter that -- every faculty member

15  receives an annual letter every year that is a, you know --

16  early paragraphs are kind of updates on things that are

17  happening at the school, the last letters are kind of an update

18  of what's happening with the person -- the last paragraphs --

19  and then there's usually a salary noted for the next -- for the

20  upcoming year, what your salary will be for the upcoming year,

21  so it's the annual letter, review letter that we sent to

22  everyone, that we sent to every faculty member.

23  Q.  Was Professor Ravina ever granted a leave of absence for --

24  was Professor Ravina ever granted a leave of absence for the

25  2015-16 academic year?

1    A.  So the word "leave" is a -- is a tricky word in this letter

2    because I -- I think it was interpreted in one way and it was

3    meant in another way.

4              So it had been decided at this point that Professor

5    Ravina would not teach in the classroom in the 2015-16 school

6    year, so the upcoming school year, she would not have to teach.

7    My understanding was that that had been communicated to her

8    through the kind of external conversations that were going on.

9    And so when I used -- when we used the word "leave" in the

10   letter, we meant she's out of the classroom.  It's -- I learned

11   later that she thought it meant something else.  And the

12   conversations about -- about her tenure clock were in external

13   conversations, about, you know -- amongst counsel and other

14   folks.  So the leave was not referring to a tenure extension;

15   it was referring to a time out of the classroom.

16   Q.  What would Professor Ravina's normal teaching load have

17   been?

18   A.  So faculty are required to teach three semester courses a

19   year and that basically usually means, you know, kind of three

20   different sections of one class, for instance.

21   Q.  And was Professor Ravina going to be exempt from all

22   teaching duties?

23   A.  She was going to be exempt from all teaching duties for the

24   15-16 academic year.

25   Q.  Why was Professor Ravina's annual review for 2015 put on

I7k1rav6                     Phillips - Direct

1  hold, as stated here?

2  A.  Well, it was put on hold because the -- technically, in the

3  spring of 2015, I believe that would have been the normal time

4  that she would have been being evaluated at that time, and

5  there was lots of conversations and external counsel involved

6  in trying to come to some kind of agreement, like we had been

7  trying to come to some kind of agreement earlier in the year,

8  and so we had decided that it didn't make a lot of sense to

9  kind of put something on the record if there was going to be

10 some agreement made about how to proceed with her -- with her

11 time, with her tenure at Columbia, so we decided not to do it

12 and to try to wait until we heard something about a settlement,

13 about what -- what things would look like.

14 Q.  And you said you came to learn later that Professor Ravina

15 had a different reading of this letter?

16 A.  Yeah, yeah.  So --

17 Q.  And how -- I'm sorry.  Go ahead.

18         I was going to say, how did you come to realize that

19 Professor Ravina thought she had been granted a different kind

20 of leave?

21 A.  Yeah.  So I was having a conversation with Steve Zeldes.

22 This was in the -- in the fall, I believe, of 2015, so maybe

23 two or three months after she had received the letter.  Steve

24 said, no, I was talking to Enrichetta and she thinks that she

25 has extended time on her tenure clock.  And I said, well, how

I7k1rav6                    Phillips - Direct

1    did she -- what are you talking about?  And we looked back at

2    the letter.  He said, well, she said that she received a letter

3    that said that was so.  And I looked back at the letter and I

4    said, oh, no, you know, this is -- this is -- this is not what

5    we intended this to say.  This is a mistake.  I said, that's a

6    mistake.  That's not what we intended this letter to say.  We

7    intended it to say she was, you know, not going to have to

8    teach and that the conversations about her tenure clock were

9    out of our hands, they were being externally communicated

10   about, and it wasn't, you know, kind of determined by us.  It

11   wasn't being determined by us at that point.  It was external.

12        So I -- I thought, man, this is a mistake, and I

13   picked up the phone and called almost immediately after I

14   talked to Steve to try to talk to Enrichetta.  She wasn't

15   there, and I left a message, like, Enrichetta, I'm so sorry,

16   this was a mistake, like, you're not -- this is not a granting

17   of extension of your tenure clock, this is about you being out

18   of the classroom, which I thought had already been communicated

19   to her by external counsel.  So I was -- I was like, man, I

20   messed up.  Or, like, we messed up.  Because this -- she could

21   interpret it -- obviously she interpreted it differently than

22   we intended so -- yeah.

23        MS. FISCHER:  Can we pull up LT.

24   Q.  This correspondence --

25        THE COURT:  Is this in evidence?

1        MS. FISCHER:  It's not yet.  We offer it, but --

2        THE COURT:  Any objection to LT?

3        MR. MELZER:  No objection, your Honor.

4        THE COURT:  LT will be admitted.

5        (Defendant's Exhibit LT received in evidence)

6   BY MS. FISCHER:

7   Q.  Professor Phillips, is this around that time that you were

8   just --

9   A.  Yes.

10  Q.  -- when you found out that Professor Ravina had a different

11  reading of the letter than what you intended?

12  A.  Yes, yes.  This is -- this is an email that I received from

13  Enrichetta.  This was after -- I guess this was after she

14  received the phone message from me.  She sent this email,

15  saying she had gotten the dean's letter a month or so ago and

16  that she was under the impression that she had been approved a

17  leave and that she, you know, found it strange that an official

18  letter would have a mistake.  And again, like on the one hand,

19  it was not a mistake, because we used the word in a certain way

20  that she interpreted in a different way.  We shouldn't have

21  used the word.  I wish I would have recognized that she could

22  have interpreted it the way she did.  So I felt like it was a

23  mistake because I really wished that we had said, as you know,

24  you'll be out of the classroom for the 15-16 year, and

25  communications about your tenure clock are happening in

I7k1rav6                    Phillips - Direct

1   external -- external conversations.  So, you know, this is --

2   this is definitely the email that we had, and I -- I said, oh,

3   wow, we need to communicate something to her and Steve Zeldes

4   as soon as we can to make sure we have clarification around

5   this.  And I felt really bad about it, because I felt like, as

6   the senior vice dean, with it being, you know -- that I

7   shouldn't have made a mistake like this one or that it should

8   have been clearer.

9   Q.  And so this was September of 2015.

10  A.  Mm-hmm.

11  Q.  Did Professor Ravina's tenure process begin later that

12  year?

13  A.  It did begin -- I think it was later.

14  Q.  I can show you a document.

15  A.  I can't remember what the date was now.

16          MS. FISCHER:  Before we get there, can we pull up LB.

17  A.  It would have been 2016, so that's -- yeah.

18          MS. FISCHER:  Before we get there, let's look at LB.

19  Thank you.

20          THE COURT:  Is LB in evidence?

21          MS. FISCHER:  It's not yet.

22  Q.  And Professor Phillips, do you recognize at least the email

23  that begins in the middle of the page?  This is an email that

24  you sent, in the middle of the page?

25  A.  Yes, yes.

1              MS. FISCHER:  We offer LB.

2              THE COURT:  Any objection?

3              MR. MELZER:  No objection to the email being referred

4    to that was sent by this witness.

5              MS. FISCHER:  I'm not going to refer to the others.

6    That's fine.

7              (Defendant's Exhibit LB received in evidence)

8    BY MS. FISCHER:

9    Q.  So looking at the email that begins on the bottom of page 1

10   and continued onto the next page --

11   A.  Mm-hmm.

12   Q.  -- can you tell us -- and this is October 2015.  Can you

13   tell us what we're looking at.

14   A.  So every year in the fall, I sent an email to each division

15   chair, each division chair, so the members that are part of

16   that executive committee, to kind of jump-start the annual

17   review process for all the junior faculty members and all of

18   the senior lecturers and professors that practice in the

19   building, and this was kind of giving a schedule of when things

20   should happen, reminding the chairs of kind of what the process

21   should be for each of these evaluations and what the deadlines

22   were for each of the evaluations, and, you know -- and a -- and

23   a kind of information about where each person in the division

24   that they have to evaluate, kind of what kind of evaluation

25   should they be receiving, like where are they on the -- on the

I7k1rav6                        Phillips - Direct

1   tenure clock or on the -- just annual review process.  So it

2   was -- it's documentation that the -- that we talked about in

3   the executive committee meeting, you know, before that, and

4   then it was sent to them to -- to move along -- to move the

5   process along.

6          MS. FISCHER:  Let's look on page 5 of the document,

7   which appears to be an attachment.

8   Q.   Can you explain what this chart is.

9   A.   Yeah.  So we would maintain a chart like this one that

10  basically had all the junior faculty members from each division

11  listed on it and kept a kind of a -- kind of a running record

12  of the annual reviews that the faculty member had had and who

13  had been assigned within the division to actually, you know, be

14  a part of that review.  We used to have -- we would have a

15  primary and a secondary reader of the person's work, or primary

16  and secondary reviewer.

17         So there are always two faculty members assigned.  The

18  primary reviewer was responsible for actually, you know, kind

19  of drafting a formal letter, annual letter for the junior

20  faculty member, and both the primary and secondary evaluators

21  were supposed to like, you know, talk to the faculty member, to

22  the junior faculty member, and read their work and chat with

23  them and kind of give them, you know, some feedback on how

24  things were going, and then the letter was written, talked

25  about amongst all of the faculty in the division, and then, you

I7k1rav6                    Phillips - Direct

1   know, kind of sent down to the dean's office as this is the

2   person's annual review.

3   Q.  And does this show who the primary and secondary reviewers

4   were for Professor Ravina from 2012 through 2015?

5   A.  Yes.  And there's -- there are two names, and yeah, in each

6   of the columns for 2012, '13, and '14, but not for '15.

7   Q.  Okay.  And I believe you said that, but did Professor

8   Ravina's tenure process begin later that year?

9   A.  So her -- this was in the fall of '15.  So in the spring of

10  '16, yes, there was I believe -- yes, there was conversation

11  about -- we had gotten to the point where the review needed to

12  happen, where it had been on hold, on hold, on hold, hoping

13  that there would be some kind of settlement or some kind of

14  agreement amongst outside counsel about what that tenure

15  process or when the tenure clock should happen, the tenure

16  process should happen, and by the time we got to the late --

17  late -- late school year for this academic year, 15-16, we did

18  start the tenure process for her.

19              MS. FISCHER:  So let's pull up MF, please.

20              THE WITNESS:  Thank you.

21  Q.  Professor Phillips, do you recognize this as an email

22  exchange that you were on in December 2015?

23  A.  Yes.

24              MS. FISCHER:  We offer MF.

25              THE COURT:  Any objection?

1          MR. MELZER:  No objection, your Honor.

2          THE COURT:  MF will be admitted.

3          (Defendant's Exhibit MF received in evidence)

4   Q.  So Professor Phillips, I'd like to draw your attention to

5   the email you sent that's on the bottom of page 1.

6   A.  Mm-hmm.

7   Q.  It says, "Dear Steve and Charles."  And who are Steve and

8   Charles?

9   A.  So Steve was at the time the chair of the finance and

10  economics division, and Charles was the subchair of the finance

11  group.

12  Q.  It says it looks -- "We need to move quickly on

13  Enrichetta's tenure case.  After meetings with the lawyer

14  yesterday, it was decided that she needs to go through the

15  tenure process now."

16          So why did you say you needed to move quickly?

17  A.  Yeah.  So at this date, in December of 2015, I learned that

18  there was no settlement, there was no agreement that was

19  come -- that they had come to at that point, and I said that we

20  need to move quickly because we -- with the tenure review

21  process, you always want to give as much time as you possibly

22  can to do a full review, in case something comes up, so I

23  wanted to get the process started, knowing that we were about

24  to go into the holiday break and all of these things, that we

25  needed to get on the schedule of the faculty in the division.

1  I know how hard it was for the finance and economics division

2  to actually get everybody in the room at the same time to have

3  these meetings, so I really wanted to have the process started

4  now so that once we came back from all of the holidays and

5  everything, we could actually have the division meet and do the

6  initial meeting that would have otherwise happened basically

7  the spring of 2015.  So I was -- I was -- as the person who was

8  the senior vice dean, my job was to try to make sure that the

9  process for the tenure review actually happened, and I wanted

10  to try to get it moving so that we had the whole spring, as

11  much time as we could, to actually do the whole process.

12  Q.  Can you tell us a little bit more about why timing was an

13  issue.

14  A.  So my understanding on the -- why timing was an issue is

15  because, as I mentioned earlier, when we do a -- when we do a

16  tenure review process, there are multiple steps in the process.

17  The division has to meet, the P&T committee has to meet, the

18  full faculty has to come together, the letters have to be

19  written, the people have to come together again, so there are

20  multiple steps in the process, and although you can expedite

21  these things and make it happen, you know, quickly, it's always

22  better to have more time if you can because then you just

23  have -- you can accommodate people's schedules and things

24  better if that's the case.  So my understanding was that there

25  was conversations happening external to me about trying to

I7k1rav6                    Phillips - Direct

1    figure out if she was actually going to be up for tenure or not

2    in this academic year, that she needed to be up if her tenure

3    clock was -- continued ticking, because the university has

4    statutes about how long a person can be on the tenure clock

5    before they have to be reviewed.  Like they -- you can't enter

6    into your ninth year, not even one day.  If you enter into that

7    ninth year even one day, you are automatically tenured.  If

8    you -- and so if we haven't reviewed the person, it's possible

9    for time to tick away and for them to just become tenured

10   automatically.

11           So I was really just trying to kind of move the

12   process along.  So this was now her seventh year on the tenure

13   clock, and the hope was that we would have an evaluation done

14   so that the eighth year could either be her terminal year, that

15   is, her last year on the faculty, or she would become tenured.

16   So the time -- time was of the essence for that reason.

17   Q.  Was the decision to move ahead with the tenure process made

18   because Professor Ravina was threatening to sue Columbia?

19   A.  No.  I -- I don't know anything about like when or all the

20   timing of all of these things with respect to the lawyers.  The

21   lawyers -- there were already lawyers involved for quite a long

22   time before this email was sent, and I don't know if a lawsuit

23   was filed.  Could have been filed before then or, you know --

24   certainly I had -- I had, you know -- I feel like a lawsuit

25   could have happened any day.  So it wasn't -- it wasn't sent in

1    response to any kind of concern about a lawsuit.  I think, you

2    know -- no.

3                MS. FISCHER:  Can we pull up NA, please.

4    Q.  Professor Phillips, do you recognize this as an email that

5    was sent to you in January 2016?

6    A.  Yes.

7                MS. FISCHER:  We offer NA.

8                THE COURT:  Any objection?

9                MR. MELZER:  No objection, your Honor.

10               THE COURT:  All right.  NA will be admitted.

11               (Defendant's Exhibit NA received in evidence)

12   Q.  So Professor Phillips, were deadlines set for Professor

13   Ravina to submit her materials to the division?

14   A.  Yes, there were deadlines set.

15   Q.  And was her review process and were her deadlines expedited

16   because she had threatened to sue the school?

17   A.  No.

18   Q.  Are you aware of whether Professor Ravina got her materials

19   in to the division as expected?

20   A.  So my recollection of this is that in December, from the

21   email that you -- I'm not sure, I think it was Exhibit -- some

22   other exhibit -- we had emailed her in December and had given

23   her a deadline of January, about a month later, which is about

24   typical in terms of the amount of time that people have to kind

25   of submit their CV and their personal statement.  We'd given

1   her about a month to submit the material, and my recollection

2   is that it did not come in at the time that we requested it

3   for, that first deadline.

4               MS. FISCHER:  Can we pull up NW.

5   Q.  Do you recognize this as an email that you received

6   January 21, 2016?

7   A.  Yes.

8               MS. FISCHER:  We offer NW.

9               THE COURT:  Any objection?

10              MR. MELZER:  No objection.

11              THE COURT:  NW will be admitted.

12              (Defendant's Exhibit NW received in evidence)

13  Q.  So as of January 21st, had Professor Ravina submitted her

14  materials?

15  A.  It looks like she had not.

16              MS. FISCHER:  Can we pull up Plaintiff's 126, which is

17  in.

18  Q.  Do you recognize this email, Professor Phillips?

19  A.  Yes.

20  Q.  Can you describe what this email was intended to convey.

21  A.  So now this is January 22, 2016.  I -- I had a conversation

22  with Chris Brown, who was the vice provost, kind of to get his

23  advice about kind of where we were in the process with

24  Enrichetta, and I -- I was concerned that maybe Enrichetta

25  didn't have a really good sense of like what her -- all her

 1   options were.  I wasn't sure what had been communicated to her

 2   and what had not.  There had been a lot of, again, kind of

 3   commun -- a lot of people involved in the process and in

 4   communications that we thought were going to her through

 5   outside counsel and things that I wasn't sure was actually

 6   getting to her.  So I -- I said to Chris that I thought maybe

 7   we should write something down to try to clarify for her what

 8   all of her options are from -- from our point of view, like

 9   what all of her options are, and to try to see if we can have a

10   conversation with her to try to answer any questions she might

11   have and really kind of think through, you know, kind of what

12   the situation was and what we could do about it.

13           So I drafted this email with details of like, you

14   know, here are your options, and I had A -- you know, tried to

15   lay it out really clearly, A, B, and C, and then I asked her if

16   she would -- really implored her, I think it's imperative,

17   Chris Brown and I think it's imperative that we have a

18   conversation with you to try to make sure that, you know, we

19   can go through in concrete detail what all of this means for

20   you and really like -- I don't know.  I was just kind of hoping

21   that maybe, again, it could help get some closure and some

22   resolution for her by having her, you know, have things clear

23   and have her talk to us.  And so I sent this email to her in

24   January after we hadn't received the materials.

25   Q.  So going through this email, in the first paragraph, you

1    wrote, "I was hoping to meet with you and Chris Brown this week

2    to make sure we discussed your options after he sent you the

3    response to your leave request, but since that hasn't happened,

4    I thought I would send this note."

5    A.   Mm-hmm.

6    Q.   Now let's go through the three options that are listed

7    there.

8            What was option A?

9    A.   So option A was basically kind of telling her that she

10   didn't have to come up for tenure if she didn't want to.  So

11   again, like I mentioned earlier, when we were looking at the

12   tenure guideline document, it's really up to the candidate.

13   The candidate can decide, you know what, I don't want to go

14   through the tenure process; instead, I'll just kind of run out

15   my tenure clock here and decide to kind of move on, go

16   somewhere else.  So I was trying to kind of say to her in A,

17   like you don't have to come up for tenure if you don't want to.

18   Sometimes people choose not to come up for tenure because they

19   don't want to be kind of officially turned down for tenure and

20   so that they can leave one institution and go to the next one

21   without there having -- be like a record that they got turned

22   down for tenure.  So I was trying to say to her, you know, if

23   you choose not to come up for tenure, you just have to send a

24   note saying, I don't want to come up for tenure, and in that

25   case, you know, it would mean that her status as a faculty

1    member would finish in June of 2017, which would basically

2    would be the end of the eighth year on record.

3            So that's what -- that's what A was.  It was basically

4    to tell her that she had that option if she wanted to use it.

5    Q.  And what was option B?

6    A.  So option B was, you know, if you choose to come up for

7    tenure, please submit the materials, right?  They were

8    originally due on the 19th, now we're asking you to give it to

9    us a week later, on the 25th, again, with the -- with the hope

10   that you would come up for tenure and the decision, if it's

11   negative, then it will expire again, here's when it would

12   expire, right?  So I was again trying to give her full

13   information of what would happen if she gave us -- if she went

14   through the tenure process.  She'd either be tenured or she'd

15   be expired on the 30th of June 2017.

16   Q.  What was option C?

17   A.  And then option C was communicating this information about

18   the associate research scholar option that Chris Brown told me

19   about, that I tried to communicate clearly here in the message

20   of when she would go off the tenure -- tenure track, that would

21   give her this -- for the 16-17 academic year, you'd be off the

22   track, and then if you choose to do that, kind of here's

23   what -- here's when the review process would happen.

24   Q.  So had Professor Ravina chosen option C, this associate

25   research scholar role, when would her tenure review materials

I7k1rav6                        Phillips - Direct

1   have been due?

2   A.  So it states here that they would have been due later this

3   spring semester of 2016.  So I think the date on this email was

4   January 20 -- January 22nd, so this -- a few months later, we

5   would have been expecting to receive some material from her.

6   Q.  And when had she chosen that option, when would the

7   division have voted on her tenure case?

8   A.  I'm not a hundred percent sure of when the division would

9   have come together to vote.  I mean, the reality is that our --

10  our school year ends around the middle of May, like May 15th or

11  so is like when the classes are over, and so really, depending

12  upon the timing of when she would have submitted the materials,

13  getting the faculty together might not happen until the fall

14  when everybody was kind of back on campus, so it's not -- it's

15  not -- we didn't -- we did not have a specific date that the

16  division would have had to vote, you know, like they would have

17  been required to vote.

18  Q.  Well, it says on the fourth line, "We would conduct a

19  tenure review if you choose during the 2016-17 school year."

20  A.  Yes.

21  Q.  So could it have been that her review would have been, you

22  know, close to a year after this?

23          MR. MELZER:  Objection.

24          THE COURT:  Overruled.

25  A.  It's possible that the -- that the review process could

have been delayed well into the 16-17 school year.  So we start

in September and we don't end again until the middle of May.

And so depending upon the timing of when materials were

received, the candidate kind of can always submit additional

materials as the process goes along, so I don't -- we had

not -- at this point we didn't have specific dates that -- that

things would have had to happen, but it's very possible that it

could have been postponed for several months into the -- into

the school year.

Q.  And I think you mentioned this, but had Professor Ravina

had any updates to her materials -- for example, had any of her

papers been accepted for publication or published -- would she

have been able to update her materials between the spring of

2016, when she initially submitted them, and whenever the

divisional vote occurred?

A.  Absolutely.  Absolutely.  Candidates can update their

materials throughout the entire process.  So, you know, before

the division vote, before the P&T committee votes, before the

full faculty votes, before it goes out for external letters,

like at any time candidates can provide additional updates, so

they can update their CV, they can submit additional papers, to

let us know they have additional work published, whatever it

might be.  So we definitely encourage -- encourage junior

faculty members to keep us up to date on where their materials

stand.

I7k1rav6                    Phillips - Direct

1    Q.  Were you involved in discussions about whether Professor

2    Ravina would get a change in title to associate research

3    scholar?

4    A.   Involved in discussions.  I mean, I --

5    Q.  Was it your decision?

6    A.   It wasn't my decision.  There were -- there were times when

7    I was on the phone when these things were being discussed, but

8    no, I -- it wasn't kind of my decision at all, and in fact, you

9    know, the -- the writing of C was really informed by other

10   people, by Chris Brown and -- and others.

11              THE COURT:  This may be a good time to stop.

12              MS. FISCHER:  I have one more question on this

13   document.  Is that okay?

14              THE COURT:  I just -- if it's one question.  But I saw

15   one of the jurors was raising their hand.

16              MS. FISCHER:  We can stop now or --

17              THE COURT:  Okay.  Either one.  If it's one question,

18   go ahead.

19              MS. FISCHER:  Okay.

20   BY MS. FISCHER:

21   Q.  Could we just look at the second to last paragraph.  It

22   says, "Chris Brown and I believe it is imperative that he and I

23   have a conversation with you to make sure we detail in concrete

24   terms what your options are and to carry out the process going

25   forward."

I7k1rav6

1              Did Professor Ravina ever take you up on your offer?

2   A.  No, she didn't.

3   Q.  Did she ever contact you with any questions about this

4   email?

5   A.  No.

6              THE COURT:  All right.  Thank you.

7              So ladies and gentlemen, Monday we're only sitting

8   half a day.  We're going to go from 2 to 5:30.  We're not

9   sitting in the morning.  We're still on schedule, but I wanted

10  to let you know that.  So if you could please come back

11  promptly at 2.  Thank you, and have a nice weekend.  Just

12  remember, don't discuss or research the case, and keep an open

13  mind.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

I7k1rav6

1                (Jury not present)

2                THE COURT:  All right.  So folks, how are we doing on

3      scheduling?

4                MS. PLEVAN:  Well, we have one more witness after

5      Dr. Phillips.

6                THE COURT:  Okay.

7                MS. FISCHER:  I'm not going to be much longer with

8      this witness, and then I don't know what they have on cross,

9      and then we have one more witness, which --

10               THE COURT:  Okay.  So I think what we should do is,

11     I'm going to send you a draft of the charge tomorrow.  I'll try

12     and do it as soon as I can.  And we'll have a charging

13     conference Monday after court, okay?  I don't want to give you

14     more work to do.  I know you all have a ton of work.  If there

15     is a particular issue you feel the need to write on because you

16     want me to look at a case or something of that sort, like the

17     one issue regarding retaliation, if you can do so by Sunday

18     afternoon so that I can actually read it before Monday, that

19     would be useful.  Otherwise, any kind of wordsmithing or other

20     objections, we can just deal with on the fly, and then I'll

21     turn around a draft so that at least you have, you know, what

22     you need by summations, assuming summations are going to be on

23     Tuesday.

24               And then I know I still need to get you rulings on

25     damages.  And I'll address those issues, you know, on Tuesday.

I7k1rav6

1    Okay?  Yes.

2                MR. SANFORD:  Your Honor, if I may.

3                Assuming we have summations on Tuesday, I spoke with

4    defense counsel a few hours ago and asked if they would be

5    willing to exchange slides so we don't have any issues Tuesday

6    morning, and they said they would think about it over the

7    weekend and get back to me.  So it's possible we'll have that

8    discussion with the Court on Monday.

9                THE COURT:  Of course.  Absolutely.  Anything you need

10   to discuss, we'll discuss on Monday.

11               MR. SANFORD:  Thank you.

12               THE COURT:  Thank you.  All right.  Have a nice

13   weekend, folks.

14               MR. MELZER:  One thing, your Honor.

15               THE COURT:  Yes.

16               MR. MELZER:  To expedite the process with the witness

17   who is being carried over till Monday, we would like to enter

18   some documents into evidence.

19               THE COURT:  Did you meet and confer with defense

20   counsel?  Okay.  So if you could do that, and then if there are

21   any issues, please let me know.

22               MR. MELZER:  Thank you, your Honor.

23               THE COURT:  Thank you.

24               MS. HARWIN:  Your Honor?

25               THE COURT:  Yes.

I7k1rav6

1              MS. HARWIN:  I understand there are objections.  I

2      don't anticipate those will be resolved.  Maybe it's just worth

3      resolving together be --

4              THE COURT:  Okay.

5              MS. FISCHER:  If they want to email us, we can try to

6      work it out first.

7              THE COURT:  Yeah, why don't you do that.  I'll get in

8      a little bit before 2 on Monday so we can start at 1:45.  I'll

9      try to be here at 1:45 and we can address them then, all right?

10             Okay.  Thank you.

11             (Adjourned to July 23, 2018, at 1:45 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2405

```
                        INDEX OF EXAMINATION

Examination of:                              Page

ANDREA KIGUEL

Direct By Mr. Hernstadt  . . . . . . . . . .2169

Cross By Ms. Donehower . . . . . . . . . . .2195

Redirect By Mr. Hernstadt  . . . . . . . . .2208

JANET HORAN

Direct By Ms. Plevan . . . . . . . . . . . .2231

Cross By Ms. Koster  . . . . . . . . . . . .2301

KATHERINE PHILLIPS

Direct By Ms. Fischer  . . . . . . . . . . .2338

                        PLAINTIFF EXHIBITS

Exhibit No.                              Received

 212   . . . . . . . . . . . . . . . . . .2202

 58    . . . . . . . . . . . . . . . . . .2203

 216   . . . . . . . . . . . . . . . . . .2324

 274   . . . . . . . . . . . . . . . . . .2330

 104   . . . . . . . . . . . . . . . . . .2332
```

```
1                          DEFENDANT EXHIBITS

2    Exhibit                                      Received

3       DN   . . . . . . . . . . . . . . . . .2240

4       DR   . . . . . . . . . . . . . . . . .2242

5       DS   . . . . . . . . . . . . . . . . .2246

6       DQ1 through DQ6   . . . . . . . . . . .2252

7       DT   . . . . . . . . . . . . . . . . .2255

8       DV   . . . . . . . . . . . . . . . . .2255

9       DZ   . . . . . . . . . . . . . . . . .2258

10      EJ   . . . . . . . . . . . . . . . . .2261

11      FA   . . . . . . . . . . . . . . . . .2263

12      FX   . . . . . . . . . . . . . . . . .2264

13      GR   . . . . . . . . . . . . . . . . .2267

14      GS   . . . . . . . . . . . . . . . . .2269

15      HF   . . . . . . . . . . . . . . . . .2270

16      HI   . . . . . . . . . . . . . . . . .2271

17      HJ   . . . . . . . . . . . . . . . . .2292

18      HQ   . . . . . . . . . . . . . . . . .2293

19      FZ   . . . . . . . . . . . . . . . . .2295

20      GK   . . . . . . . . . . . . . . . . .2296

21      LG   . . . . . . . . . . . . . . . . .2299

22      DY   . . . . . . . . . . . . . . . . .2311

23      KF and 210   . . . . . . . . . . . . .2335

24      I   . . . . . . . . . . . . . . . . . .2344

25      EA   . . . . . . . . . . . . . . . . .2358
```

1                           DEFENDANT EXHIBITS
                                (Continued)
2      Exhibit                                        Received

3        ER    . . . . . . . . . . . . . . . . . .2365

4        HM    . . . . . . . . . . . . . . . . . .2368

5        HZ    . . . . . . . . . . . . . . . . . .2370

6        IH    . . . . . . . . . . . . . . . . . .2372

7        IN    . . . . . . . . . . . . . . . . . .2373

8        LT    . . . . . . . . . . . . . . . . . .2385

9        LB    . . . . . . . . . . . . . . . . . .2387

10       MF    . . . . . . . . . . . . . . . . . .2390

11       NA    . . . . . . . . . . . . . . . . . .2393

12       NW    . . . . . . . . . . . . . . . . . .2394

13

14

15

16

17

18

19

20

21

22

23

24

25