I7N3RAV1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  ENRICHETTA RAVINA,

4              Plaintiff,

5         v.                          16 CV 2137 (RA)

6  COLUMBIA UNIVERSITY,
                                      Jury Trial
7              Defendant.

8  ------------------------------x

9                                    New York, N.Y.
                                     July 23, 2018
10                                   1:45 p.m.

11 Before:
            HON. RONNIE ABRAMS
12
                                     District Judge
13
                        APPEARANCES
14

15 SANFORD HEISLER SHARP LLP
        Attorneys for Plaintiff
16 BY:  DAVID W. SANFORD
        ALEXANDRA HARWIN
17      MELINDA L. KOSTER
        AMY DONEHOWER
18      HERBERT V. McKNIGHT

19      ANDREW C. MELZER

20 PROSKAUER ROSE LLP
        Attorneys for Defendants
21 BY:  BETTINA B. PLEVAN
        RACHEL S. FISCHER
22      STEVEN D. HURD
        PATRICK KRAMER RICE
23      HARRIS M. MUFSON

24 HERNSTADT ATLAS PLLC
        Attorneys for Defendant Bekaert
25 BY:  EDWARD HERNSTADT

I7N3RAV1

1         (In open court; jury not present)

2         THE COURT:  Good afternoon, everyone.  I understand

3    you have some issues regarding exhibits you'd like to raise.

4         MR. MELZER:  Yes, your Honor, we have a number of

5    exhibits that we'd like to discuss before the jury comes in and

6    resolve any objections.  We talked about, these are documents

7    that are relevant to Professor Phillips, and we would like to

8    admit at this stage.

9         MS. PLEVAN:  Part of the problem, and Ms. Fischer may

10   handle some of this, is that we're on the defendant's case now.

11   And if they want to cross-examine Professor Phillips and use

12   those documents or ask her about them.  But I don't think it is

13   proper for them to just offer these exhibits.  There are also a

14   lot of objections to I a number of them.

15        THE COURT:  I agree.  I thought, I don't know if they

16   are same exhibits or not, but we already addressed this in

17   terms of exhibits that you didn't use with any witnesses, that

18   aren't being admitted pursuant to stipulation.

19        But that being said, with respect to any witnesses who

20   are still testifying, if you can lay a foundation through that

21   witness, and there is a proper basis for admissibility, then I

22   don't have a problem with it.  But you can't just admit

23   documents you forgot to admit earlier.

24        MR. MELZER:  We understand that, your Honor.  They can

25   be admitted through this witness.  We thought it would be

I7N3RAV1

1    efficient and facilitate the process to resolve and discuss

2    objections before the jury came in.

3            THE COURT:  Okay.  I'm happy to address the

4    objections.

5            MR. MELZER:  So the first exhibit is actually a

6    defense exhibit, MY, so we don't expect that there would be any

7    objection to that one.

8            THE COURT:  Again, if you don't think there is an

9    objection, you should go over them with counsel beforehand

10   before you bring them to me.  Did you not do that?

11           MR. MELZER:  Yes, we did.

12           THE COURT:  Is there an objection?

13           MS. PLEVAN:  We got the list as we were leaving the

14   office.

15           MS. FISCHER:  MY is okay.  We have no objection to

16   using it, assuming they're going to use it through this

17   witness.

18           THE COURT:  Say that again, please?

19           MS. FISCHER:  Assuming, as was just indicated, that

20   they'll use it, admit it through the witness.

21           THE COURT:  Okay.  So, it seems like there is no

22   objection.

23           MR. MELZER:  So the next one.  May I approach?

24           THE COURT:  Yes.

25           MR. MELZER:  The next one is Exhibit 113.  And we

I7N3RAV1

1    think that there is a dispute about this exhibit.

2            From our position, this is a professor who is making

3    statements about the case, and then Professor Phillips is

4    making an admission, a party admission that she thinks he is

5    right.

6            MS. FISCHER:  Your Honor, you may recall that this

7    came up when Dean Hubbard was testifying about this exact

8    document, and the Court would not allow it because this is a

9    hearsay document concerning settlement discussions.  And it was

10   on those grounds that it was not permitted.

11           So I understand Katherine Phillips is the witness who

12   will be here.  Victor Goldberg is somebody, you see the first

13   line, he got an e-mail from Professor Ravina asking for

14   recommendation for an arbitrator.  And these are his, it is

15   about settlement discussions, and it is about things he heard

16   from her.

17           MR. MELZER:  I think the relevant point here is that

18   Katherine Phillips is agreeing with what he is saying.  "I

19   think he is right."  Which is a party admission.  It reflects

20   the administration's state of mind and view of these

21   circumstances, which is relevant to the case.

22           MS. FISCHER:  It is still settlement discussions, and

23   it is still hearsay.

24           THE COURT:  If it was just a hearsay objection, then I

25   wouldn't have a problem with her reaction to it.  Because it's

I7N3RAV1

```
1    not being admitted for the truth of what was said.  Rather, her

2    reaction and Dean Hubbard's reaction.  But the settlement, if

3    this is in fact regarding settlement, then that's a separate

4    problem.

5         MS. FISCHER:  It is about settlement.  It is about the

6    the resolution.  And I don't see how Professor Phillips could

7    address this e-mail and what it is she agrees or disagrees with

8    without getting into that.

9         MR. MELZER:  This is also about discussions about

10   Columbia and I do think that Columbia has been able to get in

11   some testimony and evidence about discussions between the

12   lawyers in this context.

13        MS. PLEVAN:  Nothing of substance, your Honor.

14        MR. HERNSTADT:  On the second page in particular, this

15   I think is what we addressed last time.  It starts at the

16   bottom of the third page.  It starts at the bottom of the first

17   page and carries over.  "Enrichetta told me that the other

18   party had pulled out of the arbitration."  That's all about

19   settlement discussions.  And then the whole commentary in the

20   third paragraph on the second page is all hearsay.  It's very

21   prejudicial as well.  He's making judgments as well as

22   implicating settlement.

23        MR. MELZER:  We would agree to redactions about the

24   arbitration.

25        THE COURT:  Then what's left?  Even if he doesn't say
```

I7N3RAV1

```
 1   the word "arbitration," what in this is not about arbitration
 2   and what follows?
 3          MR. MELZER:  The last paragraph, the first couple of
 4   sentences, and then Professor Phillips' response, "I think he
 5   is right.  Even though he's only heard half the story, but I
 6   still think he is right."
 7          THE COURT:  Right about what exactly?
 8          MR. MELZER:  Right that she has a -- Geert's behavior
 9   seems to be reprehensible and the response has been inadequate.
10          MS. FISCHER:  Right that the situation has dragged on.
11          THE COURT:  That's what it sounds like, that it's
12   dragged on.
13          MS. FISCHER:  That's a reference to settlement
14   discussions.
15          MR. HERNSTADT:  As is "I feel like my hands to be tied
16   by lawyers."  This is all about settlement and about
17   negotiations that Mr. Goldberg knows nothing about, except
18   perhaps what Ms. Ravina told him.  And which at least on one
19   side, even Ms. Phillips has limited knowledge.
20          MR. MELZER:  I think half the story, when she's
21   talking about half the story, that doesn't refer to settlement
22   talks.  He's not hearing half, but referring to half the story
23   meaning Professor Ravina's side of the case versus Professor
24   Bekaert's side of the case, and even though she's only heard
25   half the story, Dean Phillips still thinks she's right.
```

I7N3RAV1

1            MR. HERNSTADT:  To be perfectly clear, the settlement

2    discussions at issue here are those between Professor Bekaert's

3    lawyers and Professor Ravina's lawyers.  Columbia's lawyers are

4    not even involved.

5            THE COURT:  I think this is too much about the

6    arbitration, about settlement, about hands being tied by

7    lawyers.  So I don't think this should come in.

8            MR. MELZER:  Thank you, your Honor.

9            THE COURT:  Are there any other exhibits?

10            MR. MELZER:  Yes.  This one is 133 which has already

11    been redacted per the Court's instructions.  So we think that

12    this has been gone over and should be admitted.  We understand

13    there were objections at one point.

14            MR. HERNSTADT:  Objection, your Honor.

15            MS. PLEVAN:  At the proper time through a witness.

16            THE COURT:  Are you doing it with Phillips' cross?

17            MR. MELZER:  Yes.

18            THE COURT:  All right.  So there is no objection, I

19    don't think.  Again, if you can go over these things in

20    advance, that would be helpful.

21            MR. HERNSTADT:  We don't object to how it was edited.

22    That doesn't mean there won't be an objection as to how it's

23    sought to be admitted.

24            THE COURT:  All right.  Well, let's see with the

25    witness.

I7N3RAV1

1           MS. FISCHER:  This particular document is actually two

2     things put together.  So I'm not sure what counsel intended to

3     use it for.

4           THE COURT:  229?

5           MR. MELZER:  229.

6           MS. FISCHER:  229 is two things put together, and I

7     think what -- if I'm right, I think what you want is the first

8     page.

9           MR. MELZER:  We intend to use the first page to

10    reflect Professor Phillips' prepared remarks for a meeting

11    relating to the tenure process for Professor Ravina.  That's

12    what we believe this first page to be.

13          THE COURT:  Were they attached initially?

14          MR. MELZER:  Yes.  They're sequential in Bates number

15    and they're labeled 229-1 and 229-2.

16          THE COURT:  Aside from how they're produced in

17    discovery, were they connected as a single document initially?

18          MS. FISCHER:  I think it's two different things, and

19    if counsel wants to use the first page, we have no objection

20    for what's been proffered here.  I just think the second page

21    is something else.

22          MR. MELZER:  That's fine, your Honor.

23          THE COURT:  Okay.

24          MR. MELZER:  There are just two more.

25          THE COURT:  Okay.

I7N3RAV1

1          MR. MELZER:  The next one is Exhibit 233.  An e-mail

2     from Professor Calomiris to Kathy Phillips, and we think an

3     inference from this is it is a notice that Professor Ravina was

4     threatening to file suit in this case.  And that it would

5     connect to other documents that would support a similar

6     inference.

7          MR. HERNSTADT:  Your Honor, I object to the

8     parenthetical in the second paragraph on the third line.

9          MS. FISCHER:  We object on hearsay because what

10    counsel is saying is that this is what was going to happen.

11    She was going to file a lawsuit.  We don't know what Professor

12    Ravina told Professor Calomiris at this time, so we object to

13    the use of the document.

14         MR. MELZER:  We do not seek to admit it for the truth.

15    Again, we seek to admit it for notice to Columbia that

16    Professor Ravina was threatening to bring a lawsuit.  There was

17    an e-mail one week earlier from Professor Ravina to Professor

18    Zeldes which has been redacted expressing similar sentiments,

19    but a lot of the stuff that would suggest a lawsuit is coming

20    has been redacted.  And we also think it connects to what

21    Professor Phillips testified about the message in December.

22         THE COURT:  All right.  I'll allow this in, but I am

23    going to take out that parenthetical on the third line of the

24    second paragraph.

25         MR. HERNSTADT:  Your Honor, one observation, that this

I7N3RAV1

1   is not notice to Columbia of Professor Ravina's intent.  It is

2   notice to Columbia of Professor Calomiris' hearsay observations

3   about what he thinks.  He doesn't even say she's telling him

4   this, it seems to me.  That seems, that's not notice of

5   anything, other than Professor Calomiris' interpretation of

6   what Professor Ravina hasn't even said to him.  It seems so

7   attenuated it doesn't provide any useful notice.

8        MR. MELZER:  In context it definitely supports an

9   inference that Professor Ravina is threatening to sue and that

10  Columbia is on notice of that intent.

11       THE COURT:  All right.  I'm going to allow it in with

12  that parenthetical out, and I'll instruct them it is not being

13  admitted for the truth.  Then you can make the arguments on it

14  that it is just his perception.  And you can cross Ms. Phillips

15  on that as well.

16       MR. MELZER:  Thank you, your Honor.

17       The last one is Exhibit 155 and we have discussed this

18  between the parties and there is objection to it.  And I can

19  tell you what our understanding of this is and what we intend

20  to use it for.

21       This is a message from Noel Capon who was a

22  longstanding professor at the business school.  If you turn to

23  the last page, he was a business school community member since

24  1969, a faculty member since 1979, has been a tenured professor

25  since 1988, and is a former division chair from 2000 to 2006.

```
 1              He sent this to the faculty and administration of the

 2      business school, Professor Phillips is one of the recipients,

 3      Dean Hubbard was one of the recipients, and we intend to use a

 4      specific line and we would be open to redacting the rest of the

 5      of this message that he sent.  That line is on page 155-7.

 6              On the second-to-last paragraph, the first line, the

 7      unprecedented acceleration in Ravina's case seems like a

 8      baldfaced attempt to get rid of her.

 9              And there are really two purposes for admitting that

10      statement.  One is that it is notice to the administration of

11      faculty objections to proceeding with the vote at this time.

12      This was sent on April 11.

13              THE COURT:  This again is hearsay.  If you wanted to

14      call the witness, you could have called the witness.  You

15      called Professor Bolton.  So that's already in.  You can go on

16      though to your next point.

17              MR. MELZER:  Yeah, it does establish notice since the

18      administration is receiving it and then disregarding the

19      objections and proceeding with the vote just a couple days

20      later, similar to the faculty petitions.  Another instance of

21      that kind of notice.

22              And the second reason is that it tends to rebut

23      Professor Phillips' statement on the stand in testimony that

24      timing issues are not procedural irregularities.  And this

25      gentleman, who has been at the business school as a professor
```

1    for 40 years, was a division chair, was intimately familiar

2    with the tenure process over all this time, is saying that in

3    his view, this is an unprecedented acceleration which would

4    be --

5              THE COURT:  That's classic hearsay.  That's not going

6    to come in.

7              This does raise a broader issue in my mind, which is

8    that I have, and we've been working together to keep out

9    anything that reflects offers made during settlement

10   discussions.  Right.  Pursuant to Rule 408.

11             But I do want to make sure that to the extent that she

12   was threatening suit and that's a protected activity, I want to

13   make sure that I haven't left that out of the story.  So if

14   there is any, and that's why I just allowed in, even though it

15   wasn't directly on point, I allowed in one of the e-mails you

16   just mentioned which suggests that she's losing patience, which

17   suggests she may bring suit.

18             Is there anything that I have excluded that leaves out

19   the part of the story that she intended to file suit and maybe

20   we can reach a stipulation on that so settlement is not coming

21   in.

22             MR. MELZER:  May Ms. Harwin address that?

23             THE COURT:  Yes.

24             MS. HARWIN:  Your Honor, I think there are some

25   redactions that have been to documents that make that very

I7N3RAV1

1    clear, her intent to bring suit.  One of the examples is an

2    e-mail that proceeds very quickly.  This e-mail from Charles

3    Calomiris, it is that e-mail we reviewed dated August 21, 2015

4    which has to do with her intent to bring suit.  She talks about

5    not seeing an alternative, and in that part of the redacted

6    portion she talks specifically about her right to go to court.

7                MS. PLEVAN:  Which exhibit are you referring to?

8                MS. HARWIN:  258.  And it appears in a number of

9    different exhibits now with that content about going to court

10   redacted.

11               THE COURT:  Is there any stipulation that can be

12   reached?  Again, what I think is relevant is the timing, is the

13   notice to Columbia.  I don't want settlement offers coming in.

14   If part of your allegation is that there was retaliation after

15   she threatens suit, the fact that she threatens suit.

16               MS. PLEVAN:  I think she testified, your Honor, to

17   some extent.  I don't know what the proffer would be.  And

18   we'll certainly listen to what counsel says, but I think she

19   testified on her own case about filing a lawsuit against

20   Professor Bekaert, and about other aspects of --

21               THE COURT:  Ms. Harwin, what do you think is missing

22   from the narrative, if anything?  Perhaps nothing.  About the

23   timing of her threat to sue and retaliation in response to

24   that?

25               MS. HARWIN:  So, several things.  I will say with

I7N3RAV1

```
1    respect to that first document, the August 21 e-mail that's
2    been significantly redacted, the clear words that she's talking
3    about going to court, that that's not just an inference but
4    something that's stated in the document.  I do think is a
5    relevant thing that is not at this point before the jury in a
6    document.
7            I would say with respect to subsequent protected
8    activity, I think that this would be an appropriate subject for
9    stipulation.  A couple sort of discrete things that there was a
10   ruling that when Professor Ravina testified regarding
11   communicating an intent to bring suit, and testified
12   subsequently that was testimony -- I'm sorry, that was a
13   communication through counsel.  I think that second component,
14   that it was through counsel was not permitted, I think that's a
15   subject for stipulation.
16           THE COURT:  Is any of that relevant to Ms. Phillips?
17           MS. HARWIN:  No.
18           THE COURT:  Why don't we finish her testimony and why
19   don't we revisit this issue, and give me the exact exhibit
20   numbers over the break.
21           Ms. Plevan, did you want to respond briefly?
22           MS. PLEVAN:  No.  I don't think we would stipulate to
23   that.  But there is other testimony of other protected
24   activity.  It is not just filing a lawsuit or threatening to
25   file a lawsuit.
```

1          THE COURT:  Right.  But if there is an allegation that

2    there was specific retaliation after the threat to file the

3    lawsuit, the jury needs to know when the threat to file the

4    lawsuit was made.

5          MS. PLEVAN:  I think the plaintiff testified about

6    that.

7          THE COURT:  All right.  So let's talk about that at

8    the break.  All right?  Okay.  We're ready for the jury.  Thank

9    you.

10         Good afternoon.

11         THE WITNESS:  Hi.

12         (Jury present)

13         THE COURT:  I'll remind you, you're still under oath.

14    KATHERINE PHILLIPS,

15         called as a witness by the Defendant,

16         having been previously sworn, testified as follows:

17    DIRECT EXAMINATION (Continued)

18    BY MS. FISCHER:

19    Q.  Good afternoon, Professor Phillips.

20         In the spring of 2016, did you become aware of

21    questions or concerns that faculty members may have had about

22    Professor Ravina's tenure review process?

23    A.  Yes, I did become aware of that.

24    Q.  How did you become aware?

25    A.  Conversation with Steve Zeldes, who was the chair at the

1   time.

2   Q.  Are you aware of anything that happened in response to

3   hearing of those concerns?

4   A.  Yes.  So we decided that we would have a meeting to try to

5   answer some of those questions that the faculty had.

6   Q.  Do you recall when that meeting was held?

7   A.  It was some time in April of 2016.

8   Q.  Who was invited to the meeting?

9   A.  It was the senior faculty, tenured faculty of the Finance

10  and Economics Division.  Myself, Glenn Hubbard was there, the

11  dean.

12  Q.  Was there this before the divisional meeting where the vote

13  was scheduled to take place on Professor Ravina's tenure case?

14  A.  Yes.

15  Q.  Did you prepare remarks in advance of that meeting?

16  A.  I did, I wrote down some things, yes.

17          MS. FISCHER:  Can we please pull up Defendant's

18  Exhibit E, for the witness.  We're using the first page of this

19  document which we've labeled E-1.

20  Q.  Professor Phillips, do you recognize this document?

21  A.  Yes.

22  Q.  Are these the remarks that you prepared?

23  A.  It looks like it, yeah.

24          MS. FISCHER:  We offer E-1.

25          MR. MELZER:  No objection.

1                THE COURT:  E-1 will be admitted.

2                (Defendant's Exhibit E-1 received in evidence)

3    Q.  So Professor Phillips, at that April meeting that you just

4    testified to, did you read this to the faculty who were

5    present?

6    A.  I didn't read it in its entirety.  I do remember reading

7    the bullet points or the numbered one and two points pretty

8    much in their entirety to the group.

9    Q.  I want to start briefly with the first paragraph.  The

10   first paragraph, the sentence that begins on the second line

11   says, "As you know, there are several matters regarding

12   Enrichetta's time here that are now in the hands of the courts

13   for consideration.  These are issues that we as a faculty

14   cannot resolve, they are matters for litigation that should not

15   be discussed here today."

16               What did you mean by that statement?

17   A.  Well, I was trying to convey for the faculty and for

18   everybody in the room that there were issues that the lawyers

19   and that people were involved in trying to resolve, and that we

20   as a faculty were not lawyers, we couldn't kind of litigate the

21   issues, and so we -- that really wasn't our job to do.

22               So I was trying to try to keep the conversation

23   focused and not, you know, kind of having people bringing in

24   information from kind of, that wasn't relevant or that wasn't

25   pertinent for the conversation that day.

1    Q.  Did you tell the faculty members at that meeting that they

2    could not take Professor Ravina's complaints or allegations

3    concerning Professor Bekaert into account?

4    A.  No, I did not.

5    Q.  Let's look at point one, number one on this page.  Starting

6    on the fourth line, at the end of that line, it says,

7    "According to the tenure procedures, candidates are to be

8    considered for tenure by the end of the sixth year on the

9    tenure clock, usually toward the end of the spring semester.

10   If the candidate agrees, the tenured faculty members in the

11   division meet to decide whether to consider a candidate for

12   tenure.  As you know, this did not happen in Enrichetta's

13   case."

14          What did you mean by that?

15   A.  This is actually a direct quote from the tenure materials,

16   the procedure documents that we use at the school which I

17   believe we've already seen here.

18          Basically, I wrote all of this down to try to make

19   sure that I understood and everyone in the room understood how

20   each year of Professor Ravina's time on the clock was being

21   counted.  And basically to convey that, you know, it seemed to

22   me there were kind of questions or concerns about the timing of

23   when we were having this meeting.  And so I was trying to

24   convey to everyone that we were aware, the meeting was supposed

25   to happen but it didn't happen.  So, now we're at this time.

1    Q.  Looking now at the next point, two, at the beginning.  It

2    says, "Enrichetta had one leave in 2012-2013 that extended her

3    tenure clock.  This can only happen once under university

4    statutes.  The only other type of leave that extends the tenure

5    clock without special approval from the provost but still must

6    be approved is a parental workload relief.  Other stoppage of

7    the tenure clock can only happen if the candidate agrees to go

8    off track and stop the clock, and this is rarely used and only

9    under the permission of the university.  The university offered

10   Enrichetta this means of temporarily going off the tenure track

11   and thereby postponing her tenure decision.  This would also

12   allow her to still be paid and still be working here at the

13   university."

14           Is that a reference to the associate research scholar

15   role?

16   A.  Yes, it is.

17   Q.  The next sentence, "Her tenure meetings with delayed within

18   the 2015-16 year as she considered this option, and the hope

19   was that a solution could be worked out."

20           What did you mean by that?

21   A.  My understanding was that there were kind of lots of

22   conversations happening between the lawyers of the university

23   and of Professor Ravina, and that they were trying to find some

24   kind of reconciliation for the situation that we were in.

25           I certainly was kind of informed that I should kind of

I7N3RAV1                        Phillips - Direct

1    hold off on -- on moving things forward because there was a

2    potential opportunity for reconciliation to happen that would

3    potentially change the timing of her tenure review.  So, it was

4    basically a reference to us kind of waiting.

5           We also, my understanding was, she had been offered in

6    those conversations something that would delay the tenure

7    review and that would still allow her to be paid and on the

8    faculty.  So that was, it was really just me trying to

9    communicate to the faculty that we, we've delayed kind of as

10   long as we could in this situation, and that a reconciliation

11   had not, had not happened up to this point.

12          MR. MELZER:  Objection.  Hearsay.

13          THE COURT:  Overruled.

14   Q.  The next sentence, "The delay provided Enrichetta

15   additional time within her 2015-16 tenure review year, but as

16   she approaches the end of the seventh year on her tenure clock,

17   the business school is now faced with the deadline per

18   university statutes."

19          What did you mean by that?

20   A.  My understanding is that the university statute says that a

21   person should be reviewed for tenure within the seventh year,

22   before the seventh year is over, such that either they become

23   tenured at the beginning of the eighth year, or the eighth year

24   is basically the terminal year.  Because you can't enter the

25   ninth year without having a tenure decision made.

1          So, my understanding is that we had to do it before

2     the seventh year ended.

3     Q.  Is it your understanding that after this meeting the

4     divisional meeting was held?

5     A.  Yes, it is my understanding that there was a division

6     meeting thereafter.

7     Q.  You were not present at that meeting, were you?

8     A.  No.

9          MS. FISCHER:  Can we please show the witness Exhibit

10    QH which has been redacted.

11    Q.  Professor Phillips, was the outcome of the vote at the

12    divisional level communicated to you?

13    A.  Yes, it was.  By this e-mail.

14         MS. FISCHER:  We offer QH as redacted.

15         THE COURT:  Any objection?

16         MR. MELZER:  Hearsay.

17         MS. FISCHER:  This is a business record.  This is

18    how -- I'm happy to go to sidebar.

19         THE COURT:  Why don't we go to sidebar.  Thank you.

20         (Continued on next page)

21

22

23

24

25

1          (At the sidebar)

2          MS. FISCHER:  First of all, as you can see, we've

3     redacted out the information that we've discussed.

4          THE COURT:  Right.

5          MS. FISCHER:  This is a business record.  The

6     procedure of the school, which we discussed at length, is first

7     there is the divisional vote, and the outcome of the divisional

8     vote is reported to the promotion and tenure committee, and

9     they take over from there and does their review depending on

10    whether the vote was positive or negative at the divisional

11    level.  This is just showing that that was reported in the

12    normal course.  No substance to it.

13         THE COURT:  Lay the foundation for that and we'll

14    revisit.

15         MR. MELZER:  There should be redaction of the numbers.

16    We weren't allowed to use numbers about people who --

17         MS. FISCHER:  I think that number doesn't say how

18    people voted.  It shows there was a quorum.  That's all that

19    shows.

20         MR. MELZER:  Because there was a vote, there is

21    necessarily a quorum.  If there was no quorum, there couldn't

22    have been a vote.

23         THE COURT:  I think consistent with my prior rulings,

24    we'll take out the number of faculty members.  It will be clear

25    to the jury that the numbers are just not included.

1          (In open court)

2    BY MS. FISCHER:

3    Q.  Professor Phillips, at the time that you were Senior Vice

4    Dean at Columbia Business School, would the outcome of a

5    divisional vote be reported to you in the normal course?

6    A.  Yes, it would be reported to me.

7               THE COURT:  In what form would it be reported?

8               THE WITNESS:  Usually by e-mail like this.  From the

9    Division Chair.

10              THE COURT:  Okay.  Is the Division Chair the person

11   who would have the information at the time?

12              THE WITNESS:  Yes.  The Division Chair is the person

13   who basically is the person who heads the division, and they

14   are the one who is responsible for making sure that the

15   division has its meeting, that a vote is taken, and that the

16   vote is communicated to the dean's office.  So, this is, this

17   is normally how the information would be communicated to me.

18              THE COURT:  So I'm going to admit this as a business

19   record.  We'll redact the numbers pursuant to my ruling.

20              (Defendant's Exhibit QH received in evidence)

21   Q.  Professor Phillips, is this the e-mail where you found out

22   the result of the divisional vote on Professor Ravina's tenure

23   case?

24   A.  Yes it is.

25   Q.  Did Professor Ravina pass the divisional vote?

I7N3RAV1                        Phillips - Direct

1  A.  No, she did not.  She did not have a positive vote.

2  Q.  What was the next step in the tenure review process after

3  Professor Ravina did not pass the divisional vote?

4  A.  So, the materials that were reviewed by the division, the

5  CV, her papers, her personal statement, cite count, teaching

6  record, everything that they reviewed basically is passed on to

7  the promotion and tenure committee.  And then the promotion and

8  tenure committee reviews that material, and they have a

9  conversation about the divisional process.

10  Q.  Did you become aware of additional questions or concerns

11  about the process prior to the promotion and tenure meeting?

12  A.  Yes, I did become aware of more questions.

13          MS. FISCHER:  Can we please show the witness I believe

14  Plaintiff's 163 which is in evidence.  And let's start with

15  page two.

16  Q.  On the bottom of page two, do you recognize this as an

17  e-mail that you sent?  It continues on the next page, but right

18  now I'm looking at the bottom of page two.

19  A.  Yes, it was the e-mail regarding the schedule and agenda

20  issues for the promotion and tenure committee that was to be

21  happening very soon thereafter.

22  Q.  If we look at the next page, on the agenda, it says kind of

23  toward the top of the pages, "Promotion to tenure Enrichetta

24  Ravina Finance and Economics."

25          Does that mean her tenure case was scheduled to be

1   addressed by the P&T on April 20?

2   A.  Yes, that's what that means.

3   Q.  Let's look at the first page of this exhibit.  First page.

4   It is this an e-mail you received from Awi Federgruen?

5   A.  Yes, this is an e-mail I received from Awi Federgruen.

6   Q.  Who was that?

7   A.  Awi was one of the representatives on the promotion and

8   tenure committee.  He was on the DRO division, which is the

9   decision, risk and operations division of the school.

10  Q.  Via e-mail at least did he express that he had questions or

11  concerns about the process?

12  A.  Yes, he communicated to not only myself, but to all the

13  members of the promotion and tenure committee that he wanted to

14  make sure that we had a conversation about how the P&T

15  committee should kind of go forward with addressing Enrichetta

16  Ravina's case, and so he kind of laid out some kind of things

17  from the documents that we usually use.  He kind of pulled some

18  information out.  Was trying to think through kind of the

19  situation we were in.  And he followed with a number of

20  questions.  Maybe, I don't know, 15 or more questions, to try

21  to make sure that all the details that he wanted to understand

22  were laid out.

23  Q.  We can look at the last, if we can look at the last two

24  pages, I'm sorry.  Pages six and seven of this document.

25           Are these the questions you were just referring to?

1    A.  Yes.

2    Q.  Looking back at the first page, the date on this e-mail is

3    April 20, 2016.  Was that the day of the promotion and tenure

4    or P&T committee meeting concerning Professor Ravina?

5    A.  Yes, I'm pretty sure that the meeting happened a little

6    later after this e-mail was sent.  Maybe an hour and a half or

7    more.

8    Q.  Can we pull up Exhibit QK.

9            Do you recognize this document?

10   A.  Yes.

11   Q.  What do you recognize this document to be?

12   A.  It is basically an agenda document that my assistant Monica

13   Lewis would create for all of our promotion and tenure

14   committee meetings, just as an agenda.

15           MS. FISCHER:  We offer QK.

16           MR. MELZER:  No objection.

17           THE COURT:  QK will be admitted.

18           (Defendant's Exhibit QK received in evidence)

19   Q.  This document, this agenda that's dated 4/20/2016, if you

20   look at number nine on the first page, it says Enrichetta

21   Ravina, Finance and Economics Division, Assistant Professor.

22           Does that indicate to you this is the date that the

23   committee discussed her case?

24   A.  Yes.

25   Q.  Given your role as Senior Vice Dean, were you present when

1    the promotion and tenure committee met concerning Professor

2    Ravina's tenure case?

3    A.  Yes, I was.

4    Q.  What was your role in that process?

5    A.  My role in the process is to kind of facilitate the group

6    discussion, to make sure that we kind of go over all of the

7    things that are on the agenda.  I take, you know, keep track of

8    the time and I try to make sure that the members have whatever

9    documentation they want.

10   Q.  If we can pull up QK for another moment.  Right on the top

11   there it says "committee members" and there is a list of names.

12   What is that a reference to?

13   A.  So, the promotion and tenure committee has a representative

14   from each of six subgroups in the school.  So, each one of

15   these members is a representative from one of the divisions in

16   the school.  At the time we had five divisions, but you see

17   that there's six people there because the Finance and Economics

18   Division, both the Finance side and the Economics side had a

19   representative on the committee.

20   Q.  Who were those representatives from the Finance and

21   Economics Division?

22   A.  Yeah, so Robert Hodrick was the representative for the

23   finance side, and Wouter Dessein, number two, was the

24   representative from the Economics side.

25   Q.  When the promotion and tenure committee met that day, how

I7N3RAV1                          Phillips - Direct

1    did the meeting begin?

2    A.  So --

3           MR. MELZER:  Objection to what was discussed during

4    the meeting on hearsay.

5           THE COURT:  Do you want to respond?

6           MS. FISCHER:  Can we have a sidebar?

7           THE COURT:  Sure.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I7N3RAV1                          Phillips - Direct

1             (At the sidebar)

2             THE COURT:  I've already ruled that what was presented

3     to the faculty members at the tenure meeting should be

4     admitted.  So, just walk me through the difference between that

5     and their discussions.

6             MS. FISCHER:  Sure.  So, at the tenure meeting, at the

7     divisional level, it is a substantive discussion of the

8     qualifications for tenure.  This is a procedural discussion

9     where the process was followed.  And that's the question before

10    the promotion and tenure committee.  And what we're trying to

11    elicit is that they discussed these procedural concerns that he

12    had raised.

13            Plaintiff has made I don't know how many arguments on

14    notice.  That people were concerned, that they discussed those

15    concerns, and that they followed the process.  This was a

16    process followed.  The P&T committee discussed whether the

17    process below had been followed.  That's what we want to get

18    out what happened at the meeting.

19            MR. MELZER:  What was said between the members at the

20    meeting are hearsay, and I which don't believe there is a

21    non-hearsay purpose.

22            MS. FISCHER:  It's not offered for the truth.

23            THE COURT:  Are you going to elicit who said what?

24            MS. FISCHER:  The nature of the discussion.

25            THE COURT:  I'm going to allow it in for context as

I7N3RAV1                    Phillips - Direct

1    what she and others at Columbia did about it.  But I don't

2    think we need to get into who said what.

3            MS. FISCHER:  Okay.  That wasn't my intention.

4            THE COURT:  I think if you want me to give an

5    instruction that what was said is not being admitted for the

6    truth, but for how Columbia handled the situation, I'm amenable

7    to that.

8            MS. FISCHER:  That's fine.

9            MR. MELZER:  We would appreciate that.

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          (In open court)

2    Q.  Professor Phillips, generally speaking, what issues, what

3    was the first issue that was addressed at this meeting?

4    A.  So our conversation usually we opened up with a just kind

5    of, you know, hellos and kind of a discussion about the agenda

6    for the day.  When we jumped into Enrichetta Ravina's

7    conversation, we started with the issues that Awi Federgruen

8    had brought up.

9          THE COURT:  In your recitation in saying what

10   happened, I want to let you know I'm not admitting anyone

11   else's statements for the truth of those statements, but

12   rather, how Columbia handled the situation.

13          So please continue.

14   A.  So, Awi Federgruen basically started the discussion a

15   little bit kind of saying you guys got this e-mail that I sent

16   you a little while ago.

17          I actually, you know, kind of gave a little bit of a

18   statement, you guys saw earlier the document that had numbered

19   bullet points one and two on it.  I basically, you know, kind

20   of shared that, those bullet points with the group.

21          I said, well, let's make sure we are all on the same

22   page about the timing when she came to Columbia, each year that

23   she's been on the tenure track, kind of the fact that there,

24   there certainly has been litigation and conversations with lots

25   of legal counsel and things.  That we are, at this current

```
 1   time, you know, after lots of delays, and that this is a, this
 2   is now a moment where we have to kind of do a job that maybe
 3   none of us want to do, but that we basically have a job to do
 4   here.
 5            So we had that conversation.  We looked at some of the
 6   questions.  I think some of what I said answered some of
 7   Professor Federgruen's questions, but we continued to have some
 8   discussion until everybody on the promotion and tenure
 9   committee kind of felt like their questions had been answered
10   and that they, you know, were basically comfortable with moving
11   forward with our discussion.
12            We continued to discuss the actual, you know, kind of
13   the case itself.  So then we started the discussion of the
14   case.  Any time we discussed a case, usually what happens is
15   the, the members of that particular division report to the
16   promotion and tenure committee basically the process that the
17   division followed.  So they report, you know, kind of we had a
18   meeting, we had a quorum, we had a vote, we had a reading
19   committee.  The reading committee presented.  They talk about
20   the content of the conversation, and the promotion and tenure
21   committee members who have also read all of the materials
22   available to them have, you know, pretty in-depth conversation
23   about, about the case.  About the pros and cons of the
24   materials that they've seen, about the case itself.
25            And so they had a discussion about the case, and at
```

I7N3RAV1                         Phillips - Direct

1    some point, you know, it sounded like the discussion was kind

2    of coming to an end, and that's the point when I usually say,

3    you know, are you -- do you guys think you're finished, you

4    know, with the conversation.  Is there anything else that

5    anybody else would like to say.  If not, then we should move on

6    to the next, to the next thing on our agenda, because we had

7    other things on the agenda as well.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  So, first, with respect to the process that you just

2   testified to, did the P&T committee consider whether the

3   process with respect to Professor Ravina's tenure case was fair

4   and without irregularities as provided in the tenure

5   guidelines?

6   A.  Yes.  There was actually a lot of discussion about that

7   when we were talking about Avi Federgruen's questions, because

8   some of his questions revolved around that kind of fair and

9   irregular, what does that mean, how do we assess that?

10          The conversation we had around that was really again

11  to kind of say we need to focus on the divisional process.  Did

12  they have a reading committee?  Did they have a quorum?  Did

13  they take a private vote?  Did they report the vote to us?

14          We did have quite a bit of conversation about the fair

15  and irregular guideline in the document.

16  Q.  In addition to the discussion about the process, was there

17  a substantive discussion about Professor Ravina's record?

18  A.  There was, yes.  There was a substantive conversation.

19  Q.  Can you tell us about that discussion?

20  A.  So that discussion basically looked at the CV and the

21  number of papers that had been published.  There was discussion

22  about the specific papers that were on her CV that had been

23  published and ones that had not been published.  So there was a

24  discussion -- I don't remember all the details of the

25  discussion, because my role there is not to basically evaluate,

1    you know, the candidate, but it's to make sure that the process

2    is being followed.

3              So I don't really remember all the details of the

4    substance, and I think there I would be uncomfortable, because

5    it is not things that I said.  It is things that other people

6    said about the quality of the work that she was doing.  But

7    there was definitely a substantive conversation about the work.

8    Q.  At this meeting was there any indication that Bob Hodrick

9    was prejudiced against Professor Ravina to your understanding?

10   A.  No.

11             MR. MELZER:  Objection to speculation.

12             THE COURT:  Yes.

13             Why don't you rephrase that.

14             MS. FISCHER:  Sure.

15   BY MS. FISCHER:

16   Q.  Did you perceive Bob Hodrick -- to your own perception, did

17   you perceive him to be prejudiced in any way concerning

18   Professor Ravina?

19   A.  No, I did not.

20             MR. MELZER:  Objection.

21             THE COURT:  Overruled.

22             THE WITNESS:  Sorry.

23   BY MS. FISCHER:

24   Q.  Did you ever speak with Professor Bekaert about the P&T

25   committee's consideration of Professor Ravina's tenure case

1    substantively?

2    A.  No, I did not.

3    Q.  Did Professor Bekaert ever contact you and attempt to

4    communicate with you concerning the P&T committee's review of

5    Professor Ravina's tenure, case the substance of it?

6    A.  Not the substance of it.  I recall maybe an e-mail from

7    Professor Bekaert just kind of saying I understand that maybe

8    meetings are happening, and I think he might have said he was

9    concerned about what people might be hearing.

10            MS. FISCHER:  Nothing further.

11            THE COURT:  All right.

12            Cross-examination.

13   CROSS EXAMINATION

14   BY MR. MELZER:

15   Q.  Good afternoon, Professor Phillips.

16   A.  Hello.

17   Q.  I am just going to ask you to confirm a couple of things

18   for the record while you're here.

19            MR. MELZER:  I would like to show the witness Exhibit

20   233 that's been redacted as we've discussed.

21            Mr. McLeod, can you pull it up for the witness.

22   BY MR. MELZER:

23   Q.  Professor Phillips, is this an e-mail that you received

24   from Charles Calomiris on August 28, 2015?

25   A.  Yes.

I7nnrav2                        Phillips - Cross

1    Q.  And Professor Calomiris is a professor in the business

2    school, is that correct?

3    A.  He is.  He is a professor in the finance and economics

4    division.

5            MR. MELZER:  I would like to enter this exhibit into

6    evidence as Plaintiff's Exhibit 233.

7            THE COURT:  All right.

8            It will be admitted.

9            (Plaintiff's Exhibit 233 received in evidence)

10            MR. MELZER:  Can we publish that to the jury.

11   BY MR. MELZER:

12   Q.  I would like next to direct your attention to Defendants'

13   Exhibit MY.

14            THE WITNESS:  Thank you.

15   Q.  To the bottom of the -- to the second page.  Is this an

16   e-mail that you sent to Enrichetta Ravina copying Division

17   Chair Stephen Zeldes?

18   A.  Yes, it is.

19   Q.  And then, turning to the first page, the middle e-mail, is

20   that something that Professor Ravina wrote to you in response?

21   A.  Yes.

22   Q.  And then turning to the top e-mail, you forwarded that to

23   Christopher Brown in the provost's office a couple of weeks

24   later, on January 7, 2016?

25   A.  Yes.

I7nnrav2                    Phillips - Cross

 1              MR. MELZER:  I would like to enter Defendants' Exhibit

 2     MY into evidence.

 3              THE COURT:  Any objection?

 4              MS. FISCHER:  No objection.

 5              THE COURT:  MY will be admitted.

 6              (Defendants' Exhibit MY received in evidence)

 7              MR. MELZER:  And publish this to the jury, this e-mail

 8     chain.

 9              THE COURT:  Yes.  Go ahead.

10     BY MR. MELZER:

11     Q.  I would next like to show you what's been marked as

12     Plaintiff's Trial Exhibit 133, which has been redacted.

13              MR. MELZER:  Mr. McLeod, can you pull that up, please.

14              THE DEPUTY CLERK:  Is it admitted?

15              MR. MELZER:  It's not admitted yet, I don't think.

16     BY MR. MELZER:

17     Q.  The bottom e-mail, is that an e-mail from Professor

18     Bekaert, sent to you on February 20, 2016?

19     A.  Yes, it is.

20     Q.  And he said, "I was told that a meeting on Enrichetta's

21     tenure case has already happened.  That would have been a good

22     opportunity to be a bit more informative.  I shudder at the

23     thought of what misinformation could have been relayed at that

24     meeting regarding the case."

25     A.  Yes.

I7nnrav2                    Phillips - Cross

1    Q.  And you responded to him in the top e-mail, also from

2    February 20, saying, "E.R.'s tenure case has not been discussed

3    in the division."

4            "E.R." refers to Enrichetta Ravina?

5    A.  Yes, sir.

6    Q.  "Something is on the schedule; however, conversations are

7    still ongoing between the lawyers and may change those plans."

8            Is that what you said in the e-mail?

9    A.  Yes.

10            MR. MELZER:  I would like to enter this e-mail chain

11    into evidence as Trial Exhibit 133 and to publish it to the

12    jury.

13            MS. FISCHER:  No objection.

14            THE COURT:  You have already read it to the jury, but

15    you can publish it as well.

16            So it will be admitted.

17            MR. MELZER:  Useful to see it too.

18            (Plaintiff's Exhibit 133 received in evidence)

19    BY MR. MELZER:

20    Q.  Did you have a deposition taken in this case approximately

21    a year ago, in June 2017?

22    A.  Yes, sir, I did.

23    Q.  At the time of your deposition, you were not aware of any

24    efforts being made at Columbia Business School to ensure that

25    systematic gender bias does not occur at Columbia Business

I7nnrav2                    Phillips - Cross

1    School, is that correct?

2              MS. FISCHER:  Objection.

3              THE COURT:  Sustained.

4    BY MR. MELZER:

5    Q.  You are not aware of any efforts being made at Columbia

6    Business School to ensure that systematic --

7              MS. FISCHER:  Objection.

8    Q.  -- gender bias --

9              THE COURT:  Can we have a sidebar for a second.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  What are you doing?

3           MR. MELZER:  I am asking her to confirm that she was

4     not aware of efforts to ensure that there was no systematic

5     discrimination at Columbia Business School.

6           THE COURT:  Instead of referring to her deposition,

7     why don't you just ask her a question.  If you need to, ask her

8     a question, but don't suggest to the jury that she said

9     something previous on a prior occasion.  If you want to ask a

10    question, I will allow it over your objection anyway.  But just

11    procedurally.

12          MR. MELZER:  That's the way I was starting to ask it a

13    second time.

14          THE COURT:  You suggested she said it on a prior

15    occasion.  You don't have any basis for doing that.

16          MS. FISCHER:  We object to this line of questioning.

17    As it is, there is no claim of direct discrimination by

18    Columbia in case.  There is no relevance to the statements that

19    are being proffered.

20          THE COURT:  That is a fair point.

21          What is your response?

22          MR. MELZER:  I think there is a lot of testimony and

23    evidence that has come out in this case about failures in

24    policy, failures in the investigative process, and that that

25    occurs at a systematic level, and the fact that there is no

I7nnrav2                          Phillips - Cross

1    evidence of efforts to address that, you know, goes to the

2    issues in this case regarding negligence and Columbia's

3    response to what was occurring.

4              THE COURT:  Read the question again.

5              MS. PLEVAN:  This is about hiring practices and

6    diversity, not about investigations.

7              MR. HERNSTADT:  There's been no testimony about

8    systematic.

9              THE COURT:  Read the question you asked.

10             MR. MELZER:  "Is it correct that you are not aware of

11   efforts being made at Columbia Business School to ensure that

12   systematic gender bias does not occur at Columbia Business

13   School?"

14             MR. HERNSTADT:  There is no foundation.

15             MR. MELZER:  She was the senior vice dean at the time.

16             THE COURT:  I will let you ask it, but then I can make

17   clear to the jury that there's no direct discrimination case.

18             MS. FISCHER:  Then why we are doing this.  It is not

19   relevant.  It's misleading.  It's suggestive and it's

20   misleading.  If we are going to open up this door, then we are

21   going to have to go into all the diversity initiatives that

22   Columbia has.  It has no bearing on the claims being litigated.

23             MR. HERNSTADT:  There is a classic "have you stopped

24   doing something" question.

25             THE COURT:  There is no foundation.

I7nnrav2                           Phillips - Cross

1          Could you read the question one more time.

2          MR. MELZER:  "Are you aware of efforts being made at

3    Columbia Business School to ensure that systemic gender bias

4    does not occur at Columbia Business School?"

5          THE COURT:  I am going to sustain the objection to

6    that.

7          MR. MELZER:  OK.

8          THE COURT:  Let's move on from this.

9          MR. HERNSTADT:  Your Honor.

10          THE COURT:  Yes.

11          MR. HERNSTADT:  He's already asked it as if reading

12    from the deposition.  I don't know if there's any kind of an

13    instruction.

14          THE COURT:  I will sustain the objection, and strike

15    the question.

16          MS. FISCHER:  Thank you.

17          (Continued on next page)

18

19

20

21

22

23

24

25

I7nnrav2                         Jiang - Direct

1              (In open court)

2              MR. MELZER:  I have no further questions.

3              THE COURT:  I am going to sustain that last objection,

4    so we are going to strike that last question.

5              Do you have any redirect?

6              MS. FISCHER:  No further questions.

7              THE COURT:  You can step down.  Thank you.

8              THE WITNESS:  Thank you.

9              Just leave all these here?

10             THE COURT:  Yes.  Thank you.

11             (Witness excused)

12             THE COURT:  The defendants may call their next

13   witness.

14             MS. FISCHER:  Columbia calls Wei Jiang.

15    WEI JIANG,

16        called as a witness by Defendant Columbia,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. FISCHER:

20   Q.  Good afternoon, Professor Jiang.  Can you please tell us

21   your educational background, starting with college.

22   A.  I obtained my bachelor in economics from Fudan University

23   in Shanghai, China.  I then obtained my Ph.D. in economics from

24   the University of Chicago.

25   Q.  Did you start working after receiving your Ph.D.?

I7nnrav2                         Jiang - Direct

1    A.  Yes, I did.

2    Q.  Where did you work?

3    A.  I joined Columbia Business School in 2001, right after I

4    obtained my Ph.D. degree.

5    Q.  Have you been working at Columbia Business School since you

6    received your Ph.D.?

7    A.  All the time, except one year, academic year of 2006 to

8    2007, when I worked in Wharton School in the University of

9    Pennsylvania.

10   Q.  Did you receive tenure at Columbia Business School?

11   A.  Yes, I did.

12   Q.  When did you receive tenure?

13   A.  2009.

14   Q.  What division are you in at Columbia Business School?

15   A.  At the time when I joined, it was finance and economics

16   division, and currently just the finance division because it

17   split, two divisions split last year.

18   Q.  You currently have a position in the dean's office at

19   Columbia Business School?

20   A.  Yes, I do.

21   Q.  And what position do you have in the dean's office?

22   A.  I am currently the vice dean for curriculum and

23   instruction.

24   Q.  How long had you had that role?

25   A.  Two full years by now.

I7nnrav2                         Jiang - Direct

1   Q.  What are your responsibilities as vice dean for curriculum

2   and instruction?

3   A.  On a day-to-day basis we manage to make sure that the

4   courses are listed in the right time and in the right place.

5        In the immediate horizon, we monitor and review

6   teaching quality and the viability of the curriculum, and in

7   the longer horizon we also strategize our curriculum offerings

8   based on changing demand and new trends.

9   Q.  Do you conduct research?

10  A.  Yes, I do.

11  Q.  Does your research focus on any particular subject matter?

12  A.  Broadly finance, financial markets and more specifically

13  corporate governance and investments.

14  Q.  Do you teach any courses at Columbia Business School?

15  A.  Yes.

16  Q.  What courses do you teach?

17  A.  I have taught courses in corporate finance, corporate

18  governance, a immersion course in China, and also an

19  econometrics course in panel data.

20  Q.  Have you ever had editorial positions at any journals?

21  A.  Yes, I do.  I am currently an editor at the Review of

22  Financial Studies.  Previously I was an editor in Management

23  Science and also an associate editor at Review of Financial

24  Studies and Journal of Finance.

25  Q.  What kind of things are published in those journals,

1    broadly speaking?

2    A.  All these are called journal interest finance journals.

3    Basically any topic, broadly related to finance could

4    potentially be published, but they need to be novel in topic,

5    important for both theoretical and practical purposes, and also

6    have high execution standards.

7    Q.  Are those journals highly regarded in your field?

8    A.  Yes, they are.

9    Q.  Are those journals peer reviewed?

10   A.  All the journals I just mentioned are peer reviewed.

11   Q.  What does it mean for a journal to be peer reviewed?

12   A.  It means the fundamental assessment of the quality of a

13   paper that's submitted to the journal is reviewed usually by

14   two anonymous experts in the field.

15           So these experts are expected to submit their

16   objective assessment of the paper, and they should not have any

17   conflict of interest at the time.  And the editorial decision

18   is heavily dependent on the input of those peer reviewers.

19   Q.  Once the editor receives feedback from the peer reviewers,

20   what is the role of the editor?

21   A.  The editor themselves would read the paper carefully and

22   then the editor would also look at the reports submitted by the

23   referees or the peer reviewers.  Based on the editor's own

24   reading of the paper as well as the recommendations of the

25   referees, the editor will finally make an editorial decision.

I7nnrav2                        Jiang - Direct

1   Q.  What do you mean by editorial decision?

2   A.  So a decision could entail the following:  The paper, in

3   most cases the paper will be rejected for publication or the

4   paper could be invited back for a revised -- what we call a

5   revise and resubmit, meaning the authors are asked to revise

6   the paper and then resubmit it, and the resubmission will be

7   sent out to the peer reviewers again to either be rejected or

8   convergence toward publication.

9   Q.  Are there different types of reject and resubmits?  Are

10  those also called R and Rs, first of all?

11  A.  The revise and resubmit, we call them R and Rs.

12  Q.  I'm sorry.  Revise and resubmits.

13  A.  Yes.

14  Q.  Are there different kinds much revise and resubmits?

15  A.  Yes.  Revise and resubmits we oftentimes would classify

16  into three categories.

17          A strong revise and resubmit means that the editor is

18  quite confident that the revision will converge to publication

19  within sight.

20          A normal revise and resubmit means the paper needs

21  substantial work.  The editor is reasonably optimistic that a

22  paper will converge toward publication, but the editor doesn't

23  feel they can promise anything.

24          And a weak revise and resubmit means the paper has

25  potential, but it's quite a speculative bet in terms of

I7nnrav2                        Jiang - Direct

1    editorial position and entails much higher likelihood of being

2    rejected in the later round than the regular revise and

3    resubmit or strong revise and resubmit.

4    Q.  Who submits articles for publications in these finance

5    journals?

6    A.  Basically researchers around the world.  Most of them are

7    faculty members at research universities, but also there are a

8    lot of authors from think tanks, research units in government

9    agencies, or in financial institutions.

10   Q.  To your understanding, why do journals such as these use

11   this peer review process?

12   A.  Because the peer reviewers are experts in their field and

13   their opinions should be counted on to assess the

14   publishability of the manuscripts.

15          And the other reason is that this is for the objective

16   assessment, because these are anonymous reviewers.  They're

17   expected to hand in their very candid opinion, so it is not a

18   personal opinion, but a very professional, objective opinion

19   exercised by the experts in the field.

20   Q.  As a tenured professor at Columbia Business School, have

21   you participated in the process of preparing annual evaluations

22   for untenured faculty members?

23   A.  Yes, I have.

24   Q.  Can you please describe for us the annual review process

25   for evaluating untenured faculty.

I7nnrav2                        Jiang - Direct

A.   Yes, each year, usually in the early spring, each untenured
faculty member, which we also call the junior faculty member,
we will assign, the division will assign one primary reader and
one secondary reader.

These two people will divide up the published and
working papers of this person under review, especially the new
work since last year's review.  They will read this work very,
very carefully and then draft a preliminary letter to assess
whether the performance of the person is up to date and whether
the faculty member is on track for tenure to this moment.

And after that the division will have a meeting, and
all senior faculty members are expected to attend, and most of
them do.  In the meeting, the primary reader will read the
drafted letter to all the faculty members, and there will be
questions asked, there will be deliberation, there will be
suggestions or additions.

And, based on a consensus of the resulting discussion,
the primary and the secondary readers will revise the review
letter and hand it in to the chair, and the chair will send the
revised letter to everybody, all the senior members, by e-mail,
see if anyone has suggestions, objections.  This is the time
for you to raise those points.

And after collecting all -- any remaining opinions, if
any, then those reviewer letters will be put on file as well as
sent to the junior member so that the person being reviewed

1   knows how the senior members collectively think about their

2   progress.

3   Q.  On that last point, what is the purpose of providing these

4   evaluations?

5   A.  The top purpose is to provide a very candid feedback to the

6   junior faculty member about their professional progress,

7   especially research progress to this date, especially to give

8   them the candid feedback as to whether they are on track for

9   tenure up to this moment.  And this is also information for

10  future reviews.

11          MS. FISCHER:  Can we please pull up Exhibit BP, which

12  is in evidence.

13  BY MS. FISCHER:

14  Q.  Professor Jiang, do you recognize this to be Professor

15  Ravina's spring 2013 evaluation?

16  A.  Yes, I do.

17  Q.  I would like to just focus your attention on the

18  introductory section at the very beginning.

19          It says -- the first sentence says, "Each year the

20  business school provides junior faculty members with an

21  assessment of their progress and future prospects as seen by

22  the tenured members of their division."

23          Is that consistent with your understanding of what the

24  purpose of these evaluations is?

25  A.  Yes.

1    Q.  And then down to the next paragraph it says to become --

2              MS. FISCHER:  Below those numbers please.

3    BY MS. FISCHER:

4    Q.  It says, "To become tenured at Columbia Business School a

5    candidate must demonstrate excellence in scholarship and an

6    outstanding record that is recognized in the field.  The key

7    criteria are attaining a critical mass of high-quality

8    published papers in top journals and establishing a leadership

9    position and impact in a specifically defined field.  This is

10   particularly important at Columbia, where the senior faculty is

11   required to consider the ranking of a junior faculty member in

12   the candidate's peer group."

13             Does this accurately describe what you believe to be a

14   part of the standard at Columbia?

15   A.  Yes.

16   Q.  You may have mentioned this Professor Jiang, but in

17   preparing evaluations would tenured faculty members who are

18   evaluating the junior faculty member look at how many

19   publications the junior faculty member had accomplished in the

20   past year?

21   A.  Yes.  We not only look at the publications and working

22   papers in the past year, but also cumulatively to this date.

23   Q.  Does the number of publications someone has or a junior

24   faculty member has matter for the purposes of getting tenure at

25   Columbia Business School?

1    A.  Yes.

2    Q.  And why does the number of publications that someone has

3    matter for the purposes of getting tenure?

4    A.  In order to be a recognized outstanding scholar in the

5    field -- which, as what you highlight here is a requirement for

6    tenure at Columbia Business School -- it is important that the

7    scholar publishes an adequate number of work.  It's very

8    difficult for a very small number of papers to generate impact

9    needed for someone to be a recognized and leading figure in the

10   field.

11   Q.  In addition to the number of publications that someone may

12   have, does it matter which journal the faculty member, the

13   junior faculty member gets their work published in?

14   A.  Yes.

15   Q.  Why?

16   A.  Top journals are top journals because they publish the best

17   papers.  On average they tend to publish the best papers that's

18   outstanding.

19        For all authors usually they would consider to submit

20   their best papers, the first choices to top journals, because

21   if you have a paper you first go for the top journal.  Hence,

22   publishing in a top journal is a certification of the quality.

23        And, second, the top journals all have an extremely

24   rigorous referee and review process.  So, during the review

25   process, the paper is usually substantially improved.  So, when

1    the paper is published, not only is it a certification that it

2    was a good paper to start with, but also runs through a process

3    that has been dramatically improved.

4           And, finally, a top journal is a top journal because

5    its journals have high impact.  So if a paper is published in a

6    top journal, it's more likely to have a wide readership.  It is

7    more likely to be followed.  It's more likely to be cited.  So,

8    in order to have a great impact, it is best to publish in a top

9    journal.

10   Q.  As a tenured faculty member in the finance and economics

11   division at Columbia Business School, did you participate in

12   the preparation of Professor Ravina's 2013 annual evaluation?

13   A.  Yes.  I attended a meeting when her review was discussed.

14           MS. FISCHER:  And can we just pull up again Exhibit

15   BP.  I would like to look at the second page, the section at

16   the bottom that says, "Summary."

17           It says, "While Enrichetta is working on many

18   promising projects, she has not published at a pace necessary

19   to be on track for tenure.  Based on the current output and

20   pipeline, review prospects as tenure as unlikely.  We do not

21   believe the promotion to untenured association is warranted at

22   this stage.  The division will vote on her case to untenured

23   associate in spring 2014 and feels the likelihood of promotion

24   is low."

25   BY MS. FISCHER:

I7nnrav2                          Jiang - Direct

Q.  First of all, what does untenured associate mean?

A.  When a junior faculty joins Columbia they are called

assistant professor.

          After they finish four years at Columbia, they will be

considered to be promoted to untenured associate professor.  So

it is an advance in the rank, but it's still an untenured

position.

          And then after their six full years of tenure track is

over, they will be considered to be for tenure review.

          So it is an intermediate rank between assistant

professor, the first position, and a tenured position, and

usually it's a precursor of the likelihood of tenure.

Q.  Did you ever speak with Professor Ravina about her tenure

prospects at Columbia Business School?

A.  I remember after, after she received the --

          MS. FISCHER:  I'm sorry.  Can we hold up a second.

          THE COURT:  Yes.

Q.  I'm sorry.  Go ahead.

A.  OK.  I recall that after she received the spring 2013

review, I cannot remember who sought out whom, but we met to

discuss the review she received.

Q.  And what did you discuss with Professor Ravina in the

spring of 2013?

A.  I basically repeated what was said in the last paragraph as

with the full report but with more elaboration.

1          I also gave her my candid view that the pace of her

2     research productivity to the moment was slower than what is

3     needed for tenure.  Moreover, I encouraged her and I urged her

4     to allocate more time and effort pushing the existing working

5     papers to the finish line in addition to working on starting

6     new projects.

7     Q.  Did Professor Ravina have any explanation as to why she had

8     not been able to get very many papers published up until that

9     point?

10    A.  So my recollection is that the two papers that were listed

11    as rejected and resubmit or revise and resubmit were both

12    pretty tough revision requests from those journals.  There were

13    major hurdles.

14         And the other aspect, it's quite common among

15    researchers that we tend to be more excited about new projects

16    rather than endure the drudgery of revising their old papers.

17    So, when you see new projects, it's very easy to allocate your

18    time to the new projects and be very reluctant to pushing the

19    old ones to the finish line, because there have been many

20    blocks and you have spent so much time on it already and you

21    feel jaded about it.  So I think that was the explanation.

22    Q.  Did you participate in the preparation of Professor

23    Ravina's 2014 evaluation?

24    A.  Yes, I did.

25         MS. FISCHER:  And can we pull up Exhibit DA.  It is in

1   evidence.  Let's look at page 2, 2 and 3.  Thanks.

2   BY MS. FISCHER:

3   Q.  In what way did you participate in the preparation of this

4   document?

5   A.  I was the primary reader of that review.

6   Q.  Did you draft this document?

7   A.  I didn't draft the document you showed me.  I drafted the

8   initial document for the full senior faculty discussion.

9   Q.  And what did you do as the primary reviewer, primary reader

10  with respect to Professor Ravina's 2014 evaluation?

11  A.  Together with the secondary reader, who is a colleague,

12  senior colleague, we read carefully all her finished working

13  papers as well as papers published in peer-reviewed journals to

14  assess those, the quantity, the quality, and the projected

15  impact.

16  Q.  I would like to draw your attention to -- on page 171, No.

17  3.

18          MS. FISCHER:  If we could just zoom in on that for a

19  moment, just at the bottom of that page.

20  BY MS. FISCHER:

21  Q.  The first line says, "None of Enrichetta's papers has been

22  accepted for publication since 2009."

23          And now this review is in 2014.

24          What was the significance of her having no papers

25  accepted for publication since 2009?

 1    A.  So, just speaking from my experience, ever since I received

 2    tenure, all the successful tenure cases I have seen have about

 3    six or more publications in top journals.  So that is for a

 4    six-year tenure clock.

 5               So, to get tenure at Columbia, on average you have to

 6    move at a one-publication-per-year kind of pace.  So, if

 7    someone has not had anything move into publication from 2009 to

 8    2014, that would require a very dramatic catch-up in order to

 9    make the number we usually see.

10    Q.  Looking at the sentence --

11               MS. FISCHER:  If you can keep this up.

12    Q.  -- that starts at the very bottom of the page, it says,

13    "However, according to" -- and then top of page 3 -- "the

14    editorial correspondences provided by Enrichetta the R & R

15    decision" -- here we go.  This is with respect to the habit

16    formation paper.

17               "According to the editorial correspondences provided

18    by Enrichetta, the R & R decision was issued on July 21, 2008,

19    and was explicitly indicated by the editor as being a weak

20    one."

21               What are the editorial correspondences?

22    A.  At the time when I was assigned to be the primary reader, I

23    was puzzled about the status of this paper because I have seen

24    this paper listed as revise and resubmit for many years.

25               So I requested the editorial letter by our

I7nnrav2                          Jiang - Direct

administration, department administrator.  The purpose is for

all the senior faculty to take a look at the editorial letter

to see why, what are the major barriers for revising and

resubmitting the paper back to the journal as well as to see

whether we can help we can offer some suggestions given the

editorial feedback.

Q.  Again, it says the R and R decision was explicitly

indicated by the editor as being a weak one.

        What did you mean by a weak one.

A.  In the letter the editor wrote this revise and resubmit

invitation is a very weak revise and resubmit.

        So the original phrase was a very weak revise and

resubmit.  That means the editor sees some potential in the

paper, but is not confident or optimistic that the revision

will work out.  The editor encourages the authors to take up

the challenge, but will not promise any positive outcome.

Q.  Let's look at the next paragraph.

        'love & Loans, Effects of Beauty and Personal

Characteristics in Credit Markets was originally submitted in

2011 and received a reject and resubmit from the Journal of

Finance.  Enrichetta has not resubmitted the paper, nor has she

indicated a target date for the submission.

        "Similar to the paper discussed above, the topic and

data source were novel when Enrichetta first wrote the paper,

but the competitive edge has deteriorated rapidly during the

I7nnrav2                        Jiang - Direct

1    past few years, given a large volume of papers emerging using

2    the Prosper.com data.  Moreover, two newly published papers by

3    Duarte, Siegel and Young and Pope and Sydnor have somewhat

4    overshadowed the contribution of Enrichetta's paper."

5            Can you explain what was being expressed in this

6    paragraph?

7    A.   The paper in my own view was a very nice paper when it was

8    written.  It got into highly selective conferences.

9            However, because of the delay in sending the paper to

10   the journals and the competition of other -- by other authors

11   with a similar data and a similar paper, by the time when we

12   wrote this review, the novelty of Professor Ravina's paper

13   already wore off and the prospect of that paper being published

14   would be low because similar papers reaching similar inferences

15   already had been published.

16   Q.   Going down now to the second to last paragraph on this

17   page, it says, "Enrichetta submitted three working papers that

18   are in a preliminary or highly preliminary stage."

19           And then, looking a couple of sentences down, it

20   refers to the "Portfolios and Financial Decisions of High

21   Net-Worth U.S. Households, with Luis Viceira and Ingo Walter."

22           "This is the first empirical study on the investment

23   decisions made by wealthy households in the U.S. based on a

24   confidential dataset from a private service company.  The

25   current draft is mostly descriptive, providing many interesting

I7nnrav2                        Jiang - Direct

and novel evidence; however, top journals will likely demand

more analytics.  The paper has potential, and Enrichetta should

make an effort into completing it."

Q.  What were you trying to express there?

A.  So there are two issues.

        One is that the working paper that we reviewed was

very preliminary in the sense there are several places just

with blanks to be completed and filled in, and certain parts,

the references etc., were not complete.  So we urged Professor

Ravina to try to speed it up and make it into complete working

paper.

        And the second feedback is that the draft we reviewed

mostly described the reality.  Basically, the draft shows how

many people there are on average, how old they are, how much

money they have, how they allocate their money.  So this is

what we called a descriptive analysis.

        Now, the top journals welcome those descriptive

analyses, but will definitely require more what we call

analytical outcomes, meaning you have to pose your own

hypothesis.  What do you expect to find?  Why do you expect to

find this?  What kind of theory would motivate your analysis?

        And, once you find some outcome, you reconcile with

your hypothesis.  If they're consistent, you argue whether this

is a causal inference.  If they're not consistent, how would

you justify reconciling.  This is what we call analytical

I7nnrav2                          Jiang - Direct

1    analysis.

2    Q.  Now can we look at the next page of this review, the

3    summary section, the next page.

4           The summary section here says that, "Enrichetta's

5    working papers are at various stages.  Her more recent work

6    appears to be promising.  She needs to bring her projects to

7    fruition, acceptance for publication preferably at selective

8    and high impact outlets.

9           "unfortunately the paucity of publications renders

10   Enrichetta's tenure prospects dim.  The division believes her

11   output does not justify a promotion to untenured associate

12   professor.  The division will vote on Enrichetta's tenure in

13   spring 2015.  A positive outcome is very unlikely."

14          Professor Jiang, whose views are expressed in this

15   summary section?

16   A.  So, this is the consensus view from --

17          MR. McKNIGHT:  Objection, your Honor.  Hearsay.

18          THE COURT:  I will allow it.  You can answer.

19   A.  This is a consensus view from the senior faculty meeting.

20   Q.  Professor Jiang, are you familiar with the term reading

21   committee as it relates to the tenure review process at

22   Columbia Business School?

23   A.  Yes, I am.

24   Q.  Have you ever sat on a reading committee?

25   A.  Yes.

I7nnrav2                          Jiang - Direct

Q.   How many times have you sat on a reading committee?

A.   I think so far four.

Q.   What is a reading committee?

A.   A reading committee is a starting point of a tenure review

process.

        So, when a junior faculty member is put up for tenure

review, a committee is formed by the division chair in

consultation with the senior vice dean.

        So, the reading committee usually consists of four

senior faculty members reasonably close to the research field

of the candidate.  And the reading committee will divide up all

the published papers in peer-reviewed journals and finished

working papers and read them very carefully to assess the

quality.

        The reading committee will also compose all the

objective and quantifiable metrics, such as number of

publications in top journals, the number of publications in

peer-reviewed journals, the number of citations by the

published papers, the number of citations by all papers

outstanding right there.

        And then the reading committee will make a

recommendation to the full tenure committee -- I'm sorry,

tenured faculty members within a division.

        Then there will be a meeting of all tenured members of

the division.  At that meeting the chair of the reading

1    committee will make a presentation to all the senior members.

2    At the end, the reading committee will make a recommendation,

3    and then there will be discussions and deliberations of all the

4    senior faculty members present at the meeting.

5    Q.  And who selects the members of the reading committee?

6    A.  It's appointed by the chair of the division, but it's also

7    in consultation with the senior vice dean.

8    Q.  I think you may have touched on this, but what does the

9    chair of the reading committee do?

10   A.  The chair of the reading committee will assign the tasks to

11   all the reading -- the committee members, mainly to divide up

12   all the papers so that each person can read the assigned paper

13   in great depth.

14          The chair will also assemble various meetings to

15   discuss the matter within a committee.

16          And, finally, the chair will make the presentation to

17   the full senior faculty members at the later meeting.

18   Q.  Are all of the members of the reading committee supposed to

19   read all of the candidates' papers that are submitted?

20   A.  Yes, they do, and they will read their own assigned paper

21   in greater depth.

22   Q.  Were you asked to chair the reading committee that was

23   tasked with evaluating Professor Ravina's tenure case?

24   A.  Yes, I was.

25          MS. FISCHER:  Can we pull up Exhibit NC.

I7nnrav2                         Jiang - Direct

1   Q.  Professor Jiang, is this an e-mail communication between

2   yourself, Stephen Zeldes, and others?

3   A.  Yes.

4            MS. FISCHER:  We offer NY.

5            MR. McKNIGHT:  No objection, your Honor.

6            THE COURT:  NY will be admitted.

7            (Defendants' Exhibit NY received in evidence)

8   BY MS. FISCHER:

9   Q.  Professor Jiang, who asked you to sit on the reading

10  committee concerning Professor Ravina's tenure case?

11  A.  That's professor Steve Zeldes.  He was the chair of the

12  division at the time.

13  Q.  And who else was on the reading committee that reviewed

14  Professor Ravina's tenure case?

15  A.  Professor Daniel Wolfenzon, Professor Emi Nakamura and

16  Professor Gur Huberman.

17  Q.  Do you have any sense of why you were selected for her

18  reading committee?

19  A.  I think I'm if not the most, certainly one of the most

20  closest in Professor Ravina's research field among our senior

21  faculty members.

22  Q.  What did the reading committee do to assess Professor

23  Ravina tenure case?

24  A.  We all read her various papers, and the person who assigned

25  those papers would elaborate more why this paper is of certain

I7nnrav2                          Jiang - Direct

1    quality and whether this paper would generate what kind of

2    impact.

3              And then we will, the committee, work together to

4    compose all the metrics and evaluations of Professor Ravina's

5    research activity, teaching records, professional visibility,

6    professional service, as well as service within the school.

7              And, finally, we provided that presentation material

8    that includes all this information.

9              MS. FISCHER:  Can we please pull up SQ.  It's in

10   evidence.

11   BY MS. FISCHER:

12   Q.  Professor Jiang, do you recognize this to be Professor

13   Ravina's CV?

14   A.  Yes, I do.

15   Q.  And if we look at page 5, there's a date on it.

16             MS. FISCHER:  Show the witness.

17   Q.  Do you see at the bottom there it says, "Last updated April

18   2016"?

19   A.  Yes.

20   Q.  So, do you recognize this to be the CV that was current as

21   of the time of Professor Ravina's vote and consideration?

22   A.  Do you mind going to the published -- there was one paper

23   published last minute.  I wanted to make sure it was there.

24   Q.  Sure.  So let's look at page 2.  Would you like a hard

25   copy?

I7nnrav2                    Jiang - Direct

1    A.  OK.  So that's the most updated, because the first

2    publication was the last-minute publication that we updated.

3    Q.  All right.  So let's go through those publications.

4         Under "Published, Accepted, and Forthcoming," the

5    first item listed there is "Who is Internationally

6    Diversified," which says that it was accepted in the Journal of

7    Financial Economics in April 2016.

8         Is the Journal of Financial Economics a peer-reviewed

9    publication?

10   A.  Yes, it is.

11   Q.  Is it considered a top publication?

12   A.  Yes, it is one of the three top journals in finance.

13   Q.  And what did you think about this paper?  What was your

14   assessment of this paper?

15   A.  So, the assessment of the paper was that the paper was

16   competently executed.  The database was new.  It was the first

17   one -- they were the first one to analyze this particular

18   database.

19        And, also, for 401(k) plan research, this is one of

20   the largest and most comprehensive and most detailed database

21   to date on the topic.

22        On the research topic side, we do not view the

23   research question to be particularly novel because

24   international diversification, there have been many, many

25   attempts.  However, there's value for this study to look at a

I7nnrav2                         Jiang - Direct

1    newer and better data to visit those questions with competent

2    execution.

3    Q.  And, as noted here on this CV, it says that this paper was

4    accepted for publication as of this time April 2016, but not

5    yet published.  Is that taken into account in the tenure review

6    process?

7    A.  We actually consider this paper to be published.

8    Q.  The next paper listed says "Risk Aversion and Wealth,"

9    which was published in Management Science in February 2016.

10         Is that a peer-reviewed publication?

11   A.  Yes, it is.

12   Q.  And is that considered a top journal?

13   A.  It is not one of the top three journals that we usually

14   consider as the top, but it is a very, very respected journal

15   in our profession.

16   Q.  And what was your assessment of this paper?

17   A.  Our assessment is that, again, it's a very careful

18   execution, but it's not a new research question.  So this is

19   why we suspect this was the reason why the paper was not

20   accepted in one of the top journals as they tried.

21   Q.  The next paper listed here says "What Do Independent

22   Directors Know" in the Review of Financial Studies, October

23   2010.

24         Is that a peer-reviewed publication?

25   A.  Yes, it is.

I7nnrav2                          Jiang - Direct

1    Q.  Is that a top publication?

2    A.  Yes, it is.

3    Q.  And what was your assessment of this paper?

4    A.  We all think it's a great paper and also quite impactful

5    paper.  It's one of the first to analyze whether the

6    independent directors would trade on their private information

7    because they serve on the board.  That is a provocative idea.

8    So it's a very fine paper.

9    Q.  And then the next paper listed underneath says, "Increasing

10   Income Inequality" in the American Economic Review, P & P, May

11   2007.

12          Is that a peer-reviewed article or peer-reviewed

13   publication?

14   A.  No, this is not a peer-reviewed publication.

15   Q.  In light of that, was this paper given consideration in

16   Professor Ravina's tenure review process?

17   A.  So P & P meaning papers and proceedings.  So this is

18   invited by the conference organizer after conference was held.

19   So the organizer invited some papers to put in a conference

20   proceedings.

21          Because this is not a peer-reviewed journal, we did

22   not give it too much weight, but we certainly took it into

23   consideration as a general -- it is a broad research portfolio,

24   but we did not give it too much weight.

25   Q.  Looking now at the next section with the heading "Working

I7nnrav2                        Jiang - Direct

1   Papers."

2              What consideration did the reading committee give to

3   the working papers, if any?

4   A.  We always look at finished working papers.  So the purpose

5   of looking at finished working papers is to assess the

6   potential to be published preferably in top journals.

7              Now, we did read the first two papers listed in this

8   section of the CV, but for reasons that were stated in the 2014

9   annual review, we did not think that there's much potential or

10  possibility for these two papers to eventually be published in

11  top journals, and that was our consensus assessment.

12             And then the third paper was quite preliminary.  It

13  listed a draft available upon request.

14             So after we requested, we did obtain the draft, but it

15  was not a polished, finished working paper.

16             And the fourth one was not a finished working paper.

17             MS. FISCHER:  Can we pull up Exhibit PT.

18  BY MS. FISCHER:

19  Q.  Professor Jiang, do you recognize this as a communication

20  between yourself and Katherine Phillips?

21  A.  Yes.

22             MS. FISCHER:  We offer PT.

23             THE COURT:  Any objection.

24             MR. McKNIGHT:  No, your Honor.

25             THE COURT:  PT will be admitted.

1              (Defendants' Exhibit PT received in evidence)

2     BY MS. FISCHER:

3     Q.  Looking at the e-mail the first in the chain, so I guess

4     the bottom on that page, you wrote, "Kathy," to Kathy Phillips?

5     A.  Yes.

6     Q.  "The following was stated on Ravina's 2012 FAR (filed in

7     2013)."

8              What is an FAR?

9     A.  It's the faculty annual review.

10    Q.  And it references the Love & Loans paper?

11    A.  Yes.

12    Q.  And then it says about halfway through, that in the

13    meantime, two other very similar papers written later and based

14    on my work -- I guess Professor Ravina's work -- have been

15    published.

16             And then what was your question concerning this paper?

17    A.  So my question was, because it has a reject and resubmit,

18    but there's no update after the initial reject and resubmit, so

19    I just want to know what is the status at the time, that we

20    need to discuss the case.

21    Q.  And what did you understand as to the status?

22    A.  My understanding was still reject and resubmit without

23    being resubmitted.

24    Q.  Let's go back to SQ, page 2.

25             In that same section on papers, at the bottom, it says

I7nnrav2                          Jiang - Direct

1    "Other Papers."

2              And there's a reference to publication in Rivista di

3    Politica Economica in 2011.

4              What consideration, if any, did you give to this

5    paper?

6    A.   So we did Google the journal and couldn't find any English

7    investigation of it.  So none of the committee members knew

8    Italian.  But then we looked at the citation of this paper, and

9    found the citation to be zero.  So we decided not to put a lot

10   of weight on this publication that's not in the

11   English-language journal and not a journal any of us is aware

12   of.

13   Q.   So, to be clear, how many peer-reviewed papers did

14   Professor Ravina have at the time of her tenure review?

15   A.   I think it's three.

16   Q.   What was the reading committee's assessment as to the

17   quantity of papers that Professor Ravina had gotten published

18   or accepted for publication at that time?

19   A.   We considered it to be significantly below what we expect

20   to be a successful tenure case at Columbia Business School.

21   Q.   Did you, as I think you described previously in discussing

22   the process and the reading committee's role, did you compare

23   the number of papers that Professor Ravina had published or

24   accepted for publication to the number of papers that other

25   scholars had published at other schools?

I7nnrav2                          Jiang - Direct

1   A.  Yes, we did.

2   Q.  And in the normal course, how would you decide who to

3   compare a tenure candidate to?

4   A.  So we will form a peer group from the same cohort.

5            So it has to satisfy the following criteria:

6            One is that the peer is from a peer school, meaning

7   the leading business schools around the world; and,

8            Second, the peer has to be in the same or closely

9   related to research field as the candidate; and,

10           Third, the peer receives his or her Ph.D. from three

11  years ahead to one year below, so basically roughly on the

12  five-year period from three years ahead to one year behind.

13  So, anyone who got a Ph.D. from that five-year time period

14  relative to the candidate's Ph.D. year in a closely related

15  research field and currently already has tenure at a peer

16  school.

17  Q.  Did the process that the reading committee used in

18  evaluating Professor Ravina follow that exact guideline that

19  you just described?

20  A.  No.  We made some adjustments.

21  Q.  So tell us about those adjustments.

22  A.  When the reading committee started its work, all the

23  faculty members already got informed that there was a conflict

24  between the two colleagues of ours.  There was an allegation of

25  a very serious situation.

1            We, the reading committee, felt we were not able to

2      take a stance because we cannot assume that allegations were

3      true, and we cannot dismiss the allegations either.  But we

4      think that if the allegations were true, then Professor Ravina

5      effectively lost two years of time in her research activity,

6      and we would like to adjust for that.

7            So for this reason in the peer group we assembled half

8      of the -- about half or more than half the members would get

9      their Ph.D. two years to three years behind Professor Ravina,

10     to adjust for the fact that she might have lost two years

11     because of the allegation -- alleged situation.

12            MS. FISCHER:  Can we pull up Exhibit NV.

13     BY MS. FISCHER:

14     Q.  Professor Jiang, do you recognize this as an e-mail that

15     you sent --

16     A.  Yes.

17     Q.  -- to Steve Zeldes and Charles Jones?

18     A.  Yes.

19            MS. FISCHER:  We offer NV.

20            THE COURT:  Any objection.

21            MR. McKNIGHT:  No objection.

22            THE COURT:  All right.

23            NV will be admitted.

24            (Defendants' Exhibit NV received in evidence)

25     BY MS. FISCHER:

I7nnrav2                          Jiang - Direct

1    Q.  Can you please -- Professor Jiang, what you were asking

2    Professor Zeldes and Jones in this e-mail.

3    A.  So.  In this e-mail you see mathematic notations, T minus 3

4    to T plus 1.  That is the usual rule.  T minus 3 meaning the

5    peer would be graduating three years ahead, and plus one

6    meaning one year behind look adding one more year.

7           That was the normal procedure.

8           I was seeking clarification from both Professor Zeldes

9    and Professor Jones to see whether we should make an adjustment

10   to the time frame based on what we heard about the allegation.

11   Q.  What was professor Jones' role at that time?

12   A.  Professor Jones was the chair of the finance subdivision.

13          MS. FISCHER:  Can we pull up Exhibit PC.

14   BY MS. PLEVAN:

15   Q.  Professor Jiang, do you recognize this to be an e-mail that

16   you sent to Stephen Zeldes, Charles Jones, and Marina

17   Tourevski?

18   A.  Yes.

19          MS. FISCHER:  We offer PC.

20          THE COURT:  Any objection?

21          MR. McKNIGHT:  No objection.

22          THE COURT:  PC will be admitted.

23          (Defendant's Exhibit PC received in evidence)

24   BY MS. FISCHER:

25   Q.  Who is Marina Tourevski?

I7nnrav2                       Jiang - Direct

A.  She was the department administrator at the time.

Q.  You wrote here that this was an updated list.  "I added two

names from 2008.  There is nobody in 2009 we checked."

          Now let's just look quickly at the attachment.

          Professor Jiang, can you explain what this e-mail is

about?

A.  So, this e-mail informs the leaders of the division that

the reading committee has come up with a peer list for

Professor Ravina.  These peers, they all work, as you look at

their affiliations, they all work at leading business schools

around the world, what we consider to be our peer schools, and

they are all working in a very closely related field,

especially investments and individual investment behavior.

          And they got a Ph.D. for various years.

Q.  So Professor Ravina got her Ph.D. in 2005?

A.  2005.

Q.  So here you have people who received their Ph.D. two years

before her, 2003?

A.  Yes.  Because we usually consider three years ahead to one

year behind.  So this one is our normal range.

Q.  And then you have 2006, '7, '8, which is one two and three

years behind her?

A.  Yes.

Q.  And then 2012?

A.  Yes.  Because that scholar works in the individual

I7nnrav2                    Jiang - Direct

1   investing, that's the closest in terms of database research

2   question, closest to Professor Ravina's research.

3   Q.  Did you prepare a presentation for use at Professor

4   Ravina's tenure review meeting?

5   A.  It's the reading committee's joint work.

6            MS. FISCHER:  Can we pull up QD.

7            THE WITNESS:  Thank you.

8   BY MS. FISCHER:

9   Q.  Professor Jiang, is this the PowerPoint presentation that

10  the reading committee prepared?

11  A.  Yes.

12           MS. FISCHER:  We offer QD.

13           THE COURT:  Any objection.

14           MR. McKNIGHT:  No objection.

15           THE COURT:  QD will be admitted.

16           (Defendants' Exhibit QD received in evidence)

17           MS. FISCHER:  Let's turn to page 3.

18  BY MS. FISCHER:

19  Q.  Is this the peer comparison that you prepared?

20  A.  The reading committee prepared together.

21  Q.  I'm sorry, that the reading committee prepared.

22           Can you please explain what we're looking at on this

23  page.

24  A.  So the first column lists all the names of all scholars

25  that form the peer group.

1          The second column listed where they are, so they are

2     all from other leading business schools.

3          And the third column lists the institutions where

4     these people got their Ph.D., mostly our peer institutions.

5          And the fourth column is a Ph.D. year.

6          The fifth column is a number of publications in top

7     journals, and we call them "A" journals.

8          So the top journals, there were eight that we list as

9     the top journals, there are three top finance journals, and the

10    five top economics journals, so any of those eight would count.

11         And total publications is a number of publications in

12    any peer-reviewed publications.

13         And then the Google cites is, there is a Google,

14    called scholar, Google scholar that will track how many cites

15    each of your papers receives, and we just added up for each

16    paper for each person.

17         And, finally, is your best, most impactful paper, how

18    much citation the paper has received.  So, this is indications,

19    suppose you have a home run, how big a home run that is.

20    Q.   When you compared Professor Ravina, who got her Ph.D. in

21    2005, to people who got their Ph.D.'s two years after she did

22    how did she compare in terms of the number of publications?

23    A.   It's considerably behind.

24    Q.   And when you compared Professor Ravina who people who got

25    their Ph.D.'s in 2008, three years after she did, how did she

I7nnrav2                    Jiang - Direct

1   compare in terms of the numbers of publications?

2   A.   Considerably behind.

3   Q.   Did you draw any conclusions from these comparisons?

4   A.   Our conclusion is that the productivity, the total

5   productivity of quantity of research is substantially behind

6   the peer group.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Did the reading committee also, in addition to the numbers

2    that we're looking at, did the reading committee assess the

3    quality of Professor Ravina's work?

4    A.  Yes, we did.

5    Q.  What was that assessment?

6    A.  So the assessment is most qualitative as well as

7    quantitative.  So the qualitative one is that the overall

8    conclusion is that the quality of the paper is not, they are

9    good papers, the published papers are very good papers, but

10   they're not so outstanding as to compensate the variable

11   quantity.  And from objective perspective, we look at the

12   citations of those papers, and also find that those papers are

13   not highly cited relative to the peers.

14   Q.  Did the reading committee meet to discuss Professor

15   Ravina's tenure case?

16   A.  Yes, we did.

17   Q.  About how many times did the reading committee meet?

18   A.  At least three times.

19   Q.  I'm sorry?

20   A.  At least three times.

21   Q.  What was discussed at those meetings?

22   A.  We discussed which peer to choose, because in lot of

23   scholars out there, so this list was the result of a

24   discussion.  Then we discussed paper by paper, starting from

25   the primary reader, with then a general discussion among the

1    four of us, and then we composed all the quantitative metrics

2    again to form our overall view as well as recommendation.

3    Q.  Did you think Professor Ravina had improved enough from her

4    2014 review to deserve tenure in 2016?

5    A.  There was one, so one additional publication in a top

6    journal, and also one additional publication in a not a top but

7    a well-respected leading, leading journal.

8            But even with the combined number we think both the

9    number and overall impact do not come above the bar for tenure

10   at Columbia Business School.

11   Q.  Did Professor Bekaert provide any input into the reading

12   committee's decision?

13   A.  No.  He never reached out to us; we never reached out to

14   him.

15   Q.  Did Bob Hodrick ever provide any input into the reading

16   committee's assessment?

17   A.  No.  The reading committee did our work.  We never heard

18   from Professor Hodrick.

19   Q.  Did you attend the meeting of the Finance and Economic

20   Division when Professor Ravina's tenure case was voted on?

21   A.  Yes, I did.

22   Q.  What happened at that meeting?

23   A.  It started with, I made the presentation based on the

24   PowerPoint that we have all seen now.  After the presentation,

25   there were some discussions and questions.  The session was

1    relatively short, based on my experience of other cases.  And

2    then there was a voting, based on using secret ballot.

3    Q.  So just to back up for a moment.  Did you present this

4    PowerPoint that we're looking at?

5    A.  Yes, I did.

6    Q.  Were her papers discussed?

7    A.  Yes, her paper was -- all the completed papers were

8    discussed one by one by the reading committee.

9    Q.  Was there discussion about the quantity of Professor

10   Ravina's publications as compared to others?

11   A.  Yes.

12   Q.  As reflected in this chart?

13   A.  Yes.

14   Q.  Did the reading committee make a recommendation at the end

15   of the meeting?

16   A.  Yes, we did.

17   Q.  What was the recommendation that was made?

18   A.  The recommendation that her, the quantity, quality, and

19   impact of her research did not warrant to proceed her tenure

20   case to the next step.

21   Q.  Was a vote taken?

22   A.  The vote was taken.

23   Q.  Can you describe the process by which ballots are taken.

24   A.  After the presentation, after some discussion, there is

25   something called a question, it was seconded, and there was a

I7N3RAV3                    Jiang - Direct

secret ballot and we each vote on the ballot that we are given,

whether you vote in favor of going forward, you would have a

negative vote, or you abstain.

Q.  That's done privately?

A.  That's done privately.  Like I would not know the votes

casted by my colleague on the spot.

Q.  Are you aware of whether the divisional vote was positive

or negative?

A.  I did not know at the time.  But later on, I was informed

of the outcome.

Q.  Do you know whether it was positive or negative?

A.  I was learned Professor Ravina's voting outcome was

negative.

          MS. FISCHER:  Thank you.  Nothing further.

          THE COURT:  All right.  Why don't we take our

afternoon break now and then come back in 10 minutes.  Thank

you.

          (Jury excused)

          (Continued on next page)

I7N3RAV3

1            THE COURT:  Do we need to talk about any additional

2    exhibits?

3            MR. McKNIGHT:  No, your Honor, I don't think so.

4            THE COURT:  How are we doing on timing?  When do you

5    anticipate --

6            MS. FISCHER:  This is our last witness.

7            THE COURT:  Okay.  Thank you.

8            (Recess)

9            THE COURT:  Are we ready for the jury?

10           (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury present)

2                MR. McKNIGHT:  May I proceed, your Honor?

3                THE COURT:  Yes, of course.

4                MR. McKNIGHT:  Thank you.

5     CROSS-EXAMINATION

6     BY MR. McKNIGHT:

7     Q.  Good afternoon, Professor, how are you?

8     A.  Good afternoon.

9     Q.  Good.  In evaluating Professor Ravina's tenured candidacy,

10    the reading committee examined Professor Ravina's publication

11    record as it stood at the time of your review; isn't that

12    correct?

13    A.  Yes, it's correct.

14    Q.  One of the ways that you did that was to compare Professor

15    Ravina's publication and citation counts to those of other

16    scholars; is that correct?

17    A.  Yes.  Not any scholar, but the peer scholars.

18    Q.  As part of this comparison, you compared Professor Ravina

19    to a number of scholars that you designated as superstars,

20    correct?

21    A.  Not me, the reading committee.

22    Q.  All right.  But you participated in selecting the person

23    that you designated as a superstar.

24    A.  Yes, I did.

25    Q.  Isn't it true that you asked Division Chair Zeldes if

1    anyone on the reading committee should seek Professor Ravina's

2    input regarding the scholars to be selected for the peer list?

3    A.   No, I didn't ask for that.

4    Q.   Could I have Defendant's Exhibit NV, please.  I believe

5    it's already in evidence.

6         Professor Wei, I direct your attention to that section

7    where you say "my questions are."  Do you see that?

8         MR. McKNIGHT:  Mr. McLeod, could you blow that up for

9    us.

10   Q.   Do you see number two there?  "Should any of us seek the

11   input from, but not the decision of, the candidate regarding

12   the peers, with the condition that the peers must be tenured at

13   our peer schools working in related fields?"

14        Do you see that?

15   A.   Okay, yes, I see that.

16   Q.   The candidate in that particular question would be

17   Professor Ravina, correct?

18   A.   Yes, correct.

19   Q.   Did you in fact seek her input about the selection of the

20   peers?

21   A.   I don't recall.

22   Q.   In the weeks leading up to Professor Ravina's tenure vote,

23   you added a comparator who was characterized as a superstar of

24   the next generation to Professor Ravina's peer list; isn't that

25   correct?

A.   Yes.

Q.   Isn't it a fact that the reading committee prepared a final

comparison list for Professor Ravina that only included two

women?

A.   We didn't -- we just only look at the merit of the

scholarship.  We did not specify the gender in forming the

opinion.

Q.   But the final list only included two women.  Their names

are Victoria Ivashina and Adele Morris; isn't that correct?

A.   Yes.

Q.   Isn't it a fact that your final comparison list for

Professor Ravina included nine men?

A.   I don't have exact math, but I trust your math.  There are

only two women there, yes.

Q.   Now, isn't it true that, as far as you know, no one on the

entire comparison list that you used had ever alleged that a

senior male faculty member had impeded the progress of their

work?

A.   We are not aware of any allegations of such.

Q.   Isn't it true that, as far as you know, no one on your

final comparison list alleged that the progress of his or her

work had been delayed by senior professors, gender

discrimination, or sexual harassment?

          MS. FISCHER:  Objection.

          THE COURT:  Overruled.  You can answer.

I7N3RAV3                          Jiang - Cross

1   A.  We are not aware of any.

2   Q.  Isn't it true that, as far as you know, no one on your

3   final comparison list alleged that the progress of his or her

4   work had been delayed by a senior professor's retaliation?

5   A.  Not any, anyone we are aware of.

6   Q.  Were you aware that Professor Bekaert had projected that

7   the joint research project with Professor Ravina could have

8   produced as many as six papers?

9            MS. FISCHER:  Objection.  Beyond the scope.

10           THE COURT:  I'll allow it.

11           MR. HERNSTADT:  And also no foundation.

12           THE COURT:  I mean --

13           MR. HERNSTADT:  It's a hypothetical.

14           THE COURT:  Why don't you rephrase that.

15           MR. McKNIGHT:  All right.

16   Q.  You testified earlier that you served on the faculty review

17   committee, correct, and that participated in her annual faculty

18   reviews?

19   A.  Which, which year?

20   Q.  In I believe 2013 and 2014 was your testimony today,

21   correct?

22   A.  2013 I participate as a regular senior faculty member.  In

23   2014, I was one of the primary readers.

24   Q.  In that capacity, did you review some of the joint projects

25   that she was working on with Professor Bekaert at that time?

1    A.  It was very, very preliminary.  It's too preliminary to

2    assess the eventual fruition.

3    Q.  At the time that you became aware of information about the

4    joint projects that Professor Bekaert was working on with

5    Professor Ravina, at any time, did you learn that there was a

6    projection that this work might produce anywhere between four

7    and six papers?

8    A.  I think that's very optimistic projection.

9    Q.  I'm just asking whether you were aware of that.  That's

10   all.

11           MS. FISCHER:  Objection.

12   A.  I was not aware.

13           THE COURT:  Overruled.

14   A.  I was not aware there would be four to six papers.

15   Q.  Okay.  Thank you.

16           THE COURT:  Ladies and gentlemen, I want to make clear

17   that a lawyer's question isn't evidence.  The answer that the

18   witness gives is evidence.  So if there is a question, you just

19   think about the answer and not the question in and of itself.

20           You may proceed.

21           MR. McKNIGHT:  Thank you, your Honor.

22   Q.  Before you served as the chair of Professor Ravina's

23   reading committee, you were aware of Professor Ravina's

24   allegations against Professor Bekaert; were you not?

25   A.  Yes, I was.

I7N3RAV3                          Jiang - Cross

1   Q.   At some point in time, did you become aware of a petition

2   for Columbia Business School to adopt a policy concerning

3   research collaboration between senior and junior faculty

4   members?

5   A.   Yes, I am aware.

6   Q.   At the time, you supported that petition; did you not?

7   A.   Yes, I did.

8   Q.   That policy was not adopted, was it?

9   A.   I was not a decisionmaker on that.

10  Q.   I understand that.  But do you have any knowledge of

11  whether that policy that you supported was eventually adopted?

12  A.   My impression was not adopted.

13  Q.   Thank you.  In your role as chair of the reading committee,

14  isn't it true that you felt that your job was to focus on what

15  you called the objective assessment of Professor Ravina's

16  academic merit and to avoid potential influences by

17  non-academic factors, correct?

18  A.   Could you repeat again?  Sorry.

19  Q.   In your role as chair of the reading committee for

20  Professor Ravina, isn't it true that you felt that your job was

21  to focus on the objective assessment of Professor Ravina's

22  academic merit, and to avoid potential influences by

23  non-academic factors?

24  A.   We assessed the merit of the research output of Professor

25  Ravina.

I7N3RAV3                          Jiang - Cross

1                 MR. McKNIGHT:  Can I have Defendant's Exhibit PQ,

2       please.  I don't recall if this has been admitted in evidence.

3                 THE DEPUTY CLERK:  It's on the screen.

4                 MR. McKNIGHT:  If it is on the screen, I want it off

5       the screen until I make sure.

6                 THE COURT:  Is there any objection to PQ, to the

7       extent it hasn't already been admitted?

8                 MS. FISCHER:  No objection.

9                 THE COURT:  PQ will be admitted.

10                 (Defendant's Exhibit PQ received in evidence)

11      Q.  Professor Wei, I direct your attention to the e-mail from

12      you to Stephen Zeldes dated April 11, 2016 at 9:27 p.m.  And in

13      the paragraph that begins "And is tomorrow's meeting

14      mandatory." The second sentence there.  "If my job is to

15      provide an objective assessment of the academic merit of the

16      case, should I be put in a situation to be potentially

17      influenced by non-academic factors."

18                 Do you see that?

19      A.  Yes, I do.

20      Q.  When you wrote that, was it your belief that this was your

21      job, to objectively assess the academic merit of the case and

22      avoid being influenced by non-academic factors?

23      A.  That was what I was told to do.

24      Q.  Who told you to do that?

25      A.  The chair of the division.

I7N3RAV3                          Jiang - Cross

1   Q.  Would that be Stephen Zeldes?

2   A.  Yes.

3   Q.  At the time that you were given the instruction to focus on

4   the objective assessment and avoid non-academic factors, did

5   you consider sexual harassment to be a non-academic factor?

6   A.  Yes.

7   Q.  At the time that you were given this instruction, did you

8   consider gender discrimination to be a non-academic factor?

9            MS. FISCHER:  Objection.

10           THE COURT:  I'll allow it.  You can answer that.

11  A.  We feel that we cannot take stance on the allegation.  So

12  we did not consider these factors.

13  Q.  All right.  So you did not consider gender discrimination.

14  A.  We could not take a stance whether gender discrimination

15  occurred or not.

16  Q.  And at the time you considered retaliation to be a

17  non-academic factor.  Isn't that true?

18  A.  We couldn't take stance whether retaliation happened or

19  not.

20  Q.  At the end of the day, you concluded that Professor

21  Ravina's work was less cited than at least one of the

22  superstars that you compared her to, correct?

23  A.  Yes.  So one of the superstars got PhD in much later year.

24  Q.  All right.  You weren't able to determine how much

25  Professor Ravina would have been able to publish, absent

1   Professor Bekaert's obstruction, were you?

2   A.  Nobody can.

3   Q.  So you cannot say how much Professor Ravina would have been

4   able to publish but for the obstruction, correct?

5           MR. HERNSTADT:  Objection.

6           THE COURT:  Again, those questions assume there is

7   obstruction, and I don't think the witness has answered that

8   way.  So if you can rephrase that.

9           MR. McKNIGHT:  All right, your Honor.  I think that --

10          THE COURT:  Just rephrase the question.

11          MR. McKNIGHT:  Excuse me.  I'll rephrase the question.

12  Q.  At the time that you took charge of the chair of the

13  reading committee, you at least had some information about

14  allegations that were made by Professor Ravina about Professor

15  Bekaert, correct?

16  A.  Yes.

17          MR. HERNSTADT:  Objection.

18          THE COURT:  Overruled.

19  Q.  And at least part of those allegations involved an

20  allegation by Prof --

21          THE COURT:  Could you rephrase your questions and add

22  in the word "alleged."  I think that will take care of it,

23  okay.

24          MR. McKNIGHT:  That's fine.  I didn't know if you

25  wanted more.

I7N3RAV3                         Jiang - Cross

1            THE COURT:  Yes.

2            MR. McKNIGHT:  I'm happy to do it that way.

3   Q.  So you cannot say then how much Professor Ravina would have

4   been able to publish but for Professor Bekaert's alleged

5   obstruction.

6   A.  This is a counterfactual.  So nobody will know what will

7   happen if something happened, did not happen.  So I cannot form

8   a projection.

9            MR. McKNIGHT:  Thank you very much.  I have nothing

10  further, your Honor.

11           THE COURT:  Any redirect?

12           MS. FISCHER:  Just one moment, please.

13           No further questions.

14           THE COURT:  Okay.  Thanks.  You can step down.  Thank

15  you.

16           (Witness excused)

17           (Continued on next page)

18

19

20

21

22

23

24

25

I7N3RAV3

| | |
|---|---|
| 1 | THE COURT:  Do either of the defendants have any |
| 2 | additional witnesses? |
| 3 | MS. PLEVAN:  Defendant Columbia rests, your Honor. |
| 4 | MR. HERNSTADT:  Defendant Bekaert rests, your Honor. |
| 5 | THE COURT:  Does plaintiff have a rebuttal case? |
| 6 | MR. SANFORD:  No rebuttal, your Honor. |
| 7 | THE COURT:  Thank you.  All right. |
| 8 | So ladies and gentlemen, the portion of the trial |
| 9 | where you will hear evidence has been concluded at this time. |
| 10 | Tomorrow morning we'll have the closing statements of the |
| 11 | parties.  So I think it just makes sense to adjourn for the day |
| 12 | and have you come tomorrow morning, and then you'll hear their |
| 13 | arguments arguing what they believe the evidence has shown in |
| 14 | this case. |
| 15 | Please remember, still keep an open mind.  Don't yet |
| 16 | discuss the case.  Don't do any research on the case.  And you |
| 17 | are not in a position to really talk about or fully evaluate |
| 18 | the case until you've heard the closing arguments and my |
| 19 | instructions on the law.  All right? |
| 20 | Thanks, and have a nice evening. |
| 21 | (Jury excused) |
| 22 | THE COURT:  What I'd like to do now is hand out, I |
| 23 | assume you got the charge, draft of the charge.  I'm sorry we |
| 24 | got it later to you than anticipated.  I'm going to give you a |
| 25 | proposed draft of a verdict form. |

1          Why don't we take just a few minutes so that you can

2     review that, and then we'll meet and have a conference charge.

3     Okay?  Thanks.

4          (Recess)

5          THE COURT:  Are you all ready to discuss the charge?

6     I'm happy to go through any objections you have.  I've read

7     your letters and I'm happy to address the Columbia's vicarious

8     liability for an employee's retaliation under the New York City

9     Human Rights Law.  So I'll address that first.

10         I think plaintiff is right here.  The plain language

11    of the statute sets up a clear distinction between when

12    supervisory or managerial authority is required as opposed to

13    when it's not.  And it is not required for Section 7's

14    retaliation provisions.  The three cases cited by plaintiff

15    also support that interpretation.  I don't think it weakens

16    their impact that the relevant employees in those cases may

17    have happened to also exercised managerial or supervisory

18    authority.  The language in those cases doesn't seem to view

19    that as relevant, given that Section 13(a) of the statute

20    establishes vicarious liability based on the retaliatory

21    conduct of an employee or agent without the added supervisory

22    requirement of 13(b)(1).  And I don't believe the defendants

23    have pointed to a case that holds otherwise.

24         Nor for reasons that I've stated at summary judgment

25    during trial, on your motion, am I persuaded that Columbia's

1    argument that plaintiff has no viable retaliation claim against

2    Professor Bekaert.  That's an issue I've determined is for the

3    jury.  So I'm going to keep the instruction to the jury that if

4    it finds Professor Bekaert liable for retaliation, you must

5    also find Columbia liable as his employer.

6            I'm happy to consider any other objections that you

7    have to the draft instructions.

8            MR. MELZER:  We do have a few objections and proposals

9    for revisions.  A couple of language changes and a few

10   substantive issues.

11           On page three, on the role of the jury, we would

12   suggest, of course it's your Honor's discretion, to go from

13   "pass upon" to "evaluate."

14           On page nine --

15           THE COURT:  That's on page three.  The first line of

16   the first full paragraph.

17           MR. MELZER:  Role of the jury.  Page nine, in the

18   second-to-last paragraph, we would suggest changing "which

19   commends itself to your belief" to "you find believable."

20           (Continued on next page)

21

22

23

24

25

I7nnrav4                    Charge Conference

1          THE COURT:  OK.  Those are both fine.

2          MR. MELZER:  On page 15, at the end of the second

3   paragraph, there's some stray language where it says "alleged

4   retaliatory conduct."

5          THE COURT:  Sorry.  That's a mistake.

6          MR. MELZER:  Then the last paragraph on page 15 about

7   personality conflicts.

8          Our view is that that is a Title VII concept about

9   personality conflicts not being a basis for liability for

10  discrimination.  There is a New York case that does state this

11  but it's from 2004.  That's *Forest v. Jewish Guild for the*

12  *Blind*, 3 N.Y.3d 295, which is before the Restoration Act, and

13  all the new law on how the New York City Human Rights Law is

14  different from Title VII and the State Human Rights Act.

15          *Forest* considers the state law and the city claims

16  together and courts no longer do that since the Restoration

17  Act.

18          I would suggest that under the standard, the current

19  standard of liability for being treated less well in part based

20  on gender, a claim can arise from a personality conflict as

21  long as gender has some component in that conduct or behavior.

22          So we would suggest against that paragraph.

23          THE COURT:  Point to the exact language you are

24  looking at.

25          MR. MELZER:  The last paragraph on page 15.

1          "It is not enough for Professor Ravina to show that

2     she had a personal conflict with a coworker, that a coworker

3     disliked her or that" --

4          THE COURT:  It says, "if those motives had nothing to

5     do with illegal discrimination."  Right?

6          So, I mean, you are not saying that is enough if it's

7     not based on gender --

8          MR. MELZER:  Right.

9          I am saying that it is not a necessary instruction

10    under the New York City Human Rights Law.  Treating someone

11    less well in part can be based on a personality conflict where

12    gender is at play in some way.

13          THE COURT:  What if I added if those motives had

14    nothing to do with gender or illegal discrimination?

15          MR. MELZER:  That's fine, your Honor.

16          THE COURT:  OK.

17          MR. MELZER:  The next thing that we would --

18          MR. HERNSTADT:  Your Honor, instead of had nothing to

19    do I think it would be better to say --

20          THE COURT:  Based on?

21          MR. HERNSTADT:  Because of.  I believe that's what

22    most of the cases say.

23          MR. MELZER:  Based in part.

24          MR. HERNSTADT:  The statutes actually use the phrase

25    "because of" including *Mihalik* I believe, your Honor.

1          MR. MELZER:  The case law says someone needs to be

2     treated less well only based in part on gender.

3          MR. HERNSTADT:  Your Honor, that's not what this

4     provision here is.  This sentence is talking about, it has to

5     be because of gender and a personality conflict is not enough.

6          All the contemporary cases say that, that it's the

7     plaintiff's obligation to show that at least in part it is a

8     because of gender.

9          THE COURT:  So if I were to change "had nothing do

10    with" -- I am just going to read the phrase "or that a coworker

11    had ulterior motives for taking a particular action, if those

12    motives were due at least in part to gender or illegal

13    discrimination."

14         I just want to make sure I am not missing the "not,"

15    because it is a double negative.

16         "It is also not enough for Professor Ravina to show

17    that she had a personality conflict with a coworker, that a

18    coworker disliked her or that a coworker had ulterior motives

19    for taking a particular action, if those motives were not due

20    at least in part to gender or illegal discrimination."

21         MR. MELZER:  To eliminate the double negative, can we

22    say "unless those were based at least in part on gender or

23    illegal discrimination"?

24         THE COURT:  What about that?  "Unless those motives

25    were due at least in part to gender or illegal discrimination"?

1          MR. MELZER:  That is fine with us.

2          MR. HERNSTADT:  Your Honor?

3          THE COURT:  Yes.

4          MR. HERNSTADT:  Maybe it is easier to make two

5     sentences.  Put a period after "the particular action" and then

6     say she must also prove that those motives were also based at

7     least in part on gender or because of gender.

8          MR. MELZER:  I think it's suggesting too much about

9     what the plaintiff needs to prove.

10          MR. HERNSTADT:  I think that's her obligation under

11     the law.  She must show that there is a discriminatory animus

12     and that it is because at least in part because of gender.

13          THE COURT:  I am just going to keep it as one

14     sentence.  I know it is a little bit long.  But it just ties

15     the concepts together directly.

16          All right.  What is your next suggestion?

17          MR. MELZER:  The next thing is on page 16 at the

18     bottom, after the sentence, "This is referred to in the law as

19     engaging in protected activity."

20          We would suggest an additional sentence:  Protected

21     activity can consist of expressing disapproval of possible

22     discriminatory conduct or indicating that it is wrong, such as

23     by rejecting a harasser's sexual advances.

24          Our authority for that is *Mihalik v. Credit Agricole*

25     *Chevreux North American Inc.*, 715 F.3d 102 citing *Albunio v.*

I7nnrav4                    Charge Conference

1    *City of New York,* 16 N.Y.3d 472 at 479.  Opposing any practice

2    can consist of making clear disapproval of the discrimination,

3    by communicating in substance that she thought the treatment

4    was wrong.  It can consist of rejecting sexual propositions,

5    that can communicate opposition to activity, denouncing sexual

6    propositions, and opposing discriminatory conduct by rejecting

7    sexual advances.

8              That comes up in *Mihalik* at 112 and 115.

9              THE COURT:  I will take a look at *Mihalik*.  If you

10   want to respond, feel free to do so.

11             MR. HERNSTADT:  Yes, your Honor.

12             I would object to that, your Honor, because that's

13   their theory of the case.  That's what they're trying to prove

14   here.

15             The testimony so far has been that there were no

16   advances.  Only that Professor Ravina understood certain

17   conduct and certain things that were said to be advances.

18             The testimony is actually quite clear that Professor

19   Bekaert never said to her that he wanted anything to do with

20   her romantically or sexually.

21             MR. MELZER:  It is clearly --

22             MR. HERNSTADT:  May I finish?

23             THE COURT:  One at a time.

24             MR. HERNSTADT:  More importantly, it's citing case law

25   or it is putting in an instruction that which they have to

1   prove.

2          I think that a simple explanation of what protected

3   activity is sufficient.  I don't think it's disputed -- maybe

4   the timing of when Professor Ravina first complained about

5   sexual harassment is at issue, but not the fact that at some

6   point she complained of sexual harassment, and then

7   subsequently she filed a lawsuit.

8          That is not in dispute.  I think a simple explanation

9   that doesn't get into descriptions of what they ultimately have

10  to prove is better.

11         MR. MELZER:  We think this is a legal instruction that

12  clarifies what protected activity is in a way that might not be

13  obvious to the jury.  It is particular to New York City Human

14  Rights Law.

15         Someone might not understand that protesting an

16  advance or rejecting an advance or saying that it's wrong to

17  the harasser is itself a form of protected activity.

18         A jury, you know, that -- excuse me -- that that is a

19  category of complaining about or opposing potentially unlawful

20  discriminatory behavior.  Of course, we recognize that the

21  evidence in this case is disputed, and that's exactly what the

22  jury is going to determine.  But it's useful to have a

23  description of what protected activity is when they are

24  determining and applying those facts.

25         MR. HERNSTADT:  This is not a theory that has ever

1    been raised before in this case.  We've seen many different

2    iterations of what the plaintiff has alleged to be retaliation,

3    and this is not something that has ever come up.  So I think to

4    put it in an instruction --

5              THE COURT:  Is that right?

6              Has it not always been the plaintiff's theory that

7    Bekaert impeded her work because she rejected his advances or

8    his interest in her?

9              MR. HERNSTADT:  I think the timing of that, though, is

10   in question.

11             THE COURT:  Walk me through that.

12             MR. HERNSTADT:  Well, it hasn't -- I mean, your Honor,

13   you're correct, but that was always part of the discrimination

14   case.  It was never part of the retaliation case.

15             The retaliation case has always been that he

16   obstructed her work and that he disparaged her reputation, but

17   the timing of that that was always to the complaint to

18   Columbia, not to the rebuffing.

19             THE COURT:  Do you want to respond to that?

20             MR. MELZER:  As your Honor mentioned, it has always

21   been part of our case that she rejected Professor Bekaert's

22   advances, that she did indicate that they were wrong in the way

23   that she was able to, that she was not receptive to them, and

24   because of that he did take an action against her by

25   obstructing her work.

1          So I think it's perfectly reasonable to frame that as

2     retaliation as the New York City law would do.

3          MR. HERNSTADT:  I would just like a representation

4     about what their contention is on this.  When did this happen?

5     What was the sexual advance?  When was it?  And when was it

6     rebuffed?

7          MR. MELZER:  We believe that there were a number of

8     advances that were rebuffed, you know, instances where she

9     indicated in words or in substance that she was not interested

10     in more than a professional relationship.

11          And one example in particular is where she was asked

12     to be nicer to him to advance her papers, and she said I'm

13     already as nice as I can be.  And that's one example in

14     particular.

15          There's another time in April 2014 where she sent him

16     an e-mail stating that we need to reevaluate our relationship

17     so that everyone is treated professionally, respectfully and

18     correctly.

19          We would postulate that is an instance of protected

20     activity under the New York City Human Rights Law.

21          MR. MUFSON:  Your Honor, if I may be heard?

22          THE COURT:  Yes.

23          MR. MUFSON:  I believe the requisite language that

24     plaintiff's counsel is quoting from *Mihalik* is the following,

25     and it may be instructive here.  The Court in *Mihalik* said,

1    "The New York City Court of Appeals has held that opposing any

2    practice can include situations where a person before the

3    retaliatory conduct occurred merely made clear of her

4    disapproval of the defendant's discrimination by communicating

5    to him in substance that she thought his treatment was wrong."

6           Now, I couldn't write quick enough admittedly to take

7    down exactly what the proposal was to amend the instruction,

8    but clearly it was more than what was contemplated by *Mihalik*.

9           In addition, what plaintiff's counsel just represented

10   is not in our view the communication to the defendant that his

11   conduct was wrong.

12          MR. MELZER:  Let me --

13          THE COURT:  I'm sorry.  Let me just ask a question if

14   you don't mind.

15          What about just having a line that's says something to

16   the effect that protected activity can consist of opposing or

17   protesting conduct to the person engaging in such conduct?

18          So add in the concept that you can -- it is not just

19   about going to the school and complaining, but you can complain

20   to the person who is engaging in that conduct.

21          MR. MUFSON:  As long as the conduct is discrimination.

22          The theory behind sort of the expansion of the

23   objection to advances is that, encapsulating protected activity

24   is that the plaintiff has to make clear that she objects to the

25   conduct and views it as discriminatory.

I7nnrav4                        Charge Conference

1           MR. HERNSTADT:  For example, that e-mail that

2    Mr. Melzer just referred to in April of 2014, there was no

3    sexual advance there.  That was an exchange of e-mails about

4    hiring an RA and the need for research assistant to do the

5    work.

6           THE COURT:  I think the proposal by plaintiff had in

7    the language about discriminatory conduct.  We can play with

8    the language later.

9           MR. HERNSTADT:  Right.

10          THE COURT:  But do you have an objection to adding in

11   the concept that you can object to the person engaging in the

12   conduct?

13          MR. HERNSTADT:  I think it has to be clear that they

14   have to object.

15          One of the problems here, and I think this is their

16   burden, is that they have to show this was actually

17   communicated.  So saying "in substance" I think is too vague.

18   But if the instruction is that the plaintiff communicated to

19   the alleged harasser her or his disapproval -- I forget how

20   your Honor put it, but that would be fine.

21          THE COURT:  I was just adding the concept.  I haven't

22   really wordsmithed it.

23          MR. MUFSON:  Our position is certainly, if it is

24   consistent with the language of *Mihalik*, we would have no

25   objection to it, but that it be clear that the complaint that

1   is being made and as constituting the protected activity

2   constitutes a complaint of discrimination as opposed to -- I

3   mean, that's contrasted with any gripe that an employee has

4   about conduct that occurs in the workplace is not protected

5   activity, or there would be a lot of protected activity in the

6   city.  There has to be more to discrimination.

7               MR. MELZER:  Your Honor, she was raising gender-laden

8   issues that the administration recognized was raising EOAA

9   concerns and referred the matter to the EOAA.  She is not

10  required to use any particular language to signal that it is

11  about gender or sexual harassment.

12              In reference to *Mihalik*, I think it's useful to cite

13  the particular examples that were considered to be protected

14  activity in that case.

15              One of those was the plaintiff questioned her

16  harasser:  What's not working out?  Me and you?  Or me at the

17  company?

18              That in itself was enough, because that implicitly

19  referenced her rejection of his sexual propositions and

20  communicated in substance that she thought the treatment was

21  wrong.

22              The Court considered that in itself to be denouncing

23  the sexual propositions and creating a situation where he would

24  be liable for retaliation.

25              A second one was rejecting his advances on another

1    occasion and telling him that his actions were offensive or

2    shameful and that was enough as well.

3         MR. HERNSTADT:  Your Honor, the facts in *Mihalik* are

4    drastically different than here.  It would be inappropriate to

5    import the actual facts of the case that has no bearing on this

6    case.

7         THE COURT:  Let me take another look at the case, the

8    language in it, and I'll consider the arguments you've made.

9         MR. MELZER:  Thank you, your Honor.

10        The next thing I would like the Court to consider is

11   on page 17, the end of point one regarding Bekaert's liability

12   for harassment, and the question is whether he could have

13   understood or reasonably could have understood that Professor

14   Ravina's complaints were directed at discrimination.

15        So, one, I would suggest that this instruction isn't

16   called for in the New York City Human Rights Law context, but

17   if it is, we would suggest a revision to the language.

18        But let me start with the first one.  My understanding

19   is that this is from a case called *Galdieri Ambrosini* a Second

20   Circuit case from 1998, 136 F.3d 296.  That is a Title VII

21   case, whereas the New York City Human Rights Law is broader,

22   and it may not be appropriate to import this into the New York

23   City Human Rights Law.

24        For example, Title VII has no individual liability of

25   perpetrators.  There's only liability on the part of the

 1    employer.  The New York City Human Rights Law is different.

 2    There is liability for defendant Bekaert as the perpetrator.

 3            THE COURT:  Just to be clear, are you saying that the

 4    whole second element altogether --

 5            MR. MELZER:  Not the second element.  The second

 6    element that he knew of the protected activity, we would just

 7    leave it at that.  But this additional explanation of the

 8    second element requiring him to understand that it is about,

 9    that she was complaining about discrimination.

10            THE COURT:  As opposed to what, though?  Under your

11    theory she can complain about anything and it cannot be

12    discriminatory or retaliation?

13            MR. MELZER:  Let me set forth the scenario that I

14    think is relevant here.

15            If the employee complains to the employer about

16    discrimination, and that's passed on to the perpetrator, but

17    the perpetrator doesn't get the full gist of everything that

18    it's about, it would defeat the purposes of the law to then

19    allow the individual perpetrator to retaliate when the employer

20    is on notice of what this complaint is about.

21            what is relevant is what the victim is complaining

22    about, and the awareness of the employer rather than the

23    details, the specific details of --

24            THE COURT:  Just to walk through it, so if you have a

25    scenario where two colleagues have a purely academic -- well, I

1    should say if one colleague complains about a purely academic

2    dispute, and that's what the other colleague understands, that

3    there was a complaint about an academic dispute and then

4    there's retaliation, that's sufficient for the protected

5    activity?

6              Maybe I didn't phrase that well, but you get the idea.

7              MR. MELZER:  That's not what I am suggesting.  Let me

8    clarify.  If the individual does engage in protected activity

9    by complaining specifically --

10             THE COURT:  The retaliator doesn't need to know that

11   it was complaining about protected activity?

12             MR. MELZER:  So the complainer -- sorry, the victim

13   complains -- engages in protected activity by complaining of

14   conduct that implicates a protected class.

15             THE COURT:  But if it does that, then it's directed at

16   discrimination.

17             MR. MELZER:  Right.

18             THE COURT:  Right.  That's why the language is in

19   there.

20             MR. MELZER:  The complaint is directed at

21   discrimination.  The victim experiences a retaliatory

22   consequence because she complained about discrimination, but,

23   you know, there is a telephone game and the perpetrator, the

24   individual perpetrator doesn't get the full sense of the

25   details of the complaint, but nevertheless has a retaliatory

1   motive and lashes out because of the complaint.

2           THE COURT:  How can you say that the victim

3   experiences a retaliatory consequence because she complained

4   about discrimination if the so-called perpetrator didn't even

5   know she complained about discrimination?

6           That's what I think you just said.

7           That doesn't make sense, right?

8           MR. MELZER:  I think the scenario is that there is a

9   complaint of discrimination, the perpetrator receives that

10  complaint, but is not informed of the precise details.

11          THE COURT:  It was about discrimination.  That's what

12  we are talking about.  It's either about discrimination or it's

13  not, right?  What are the other scenarios in which this can be

14  retaliation under the law here.

15          It can't be about stealing someone's work, right?

16          MR. MELZER:  Right.

17          My suggestion is that it would weaken the

18  antiretaliation provisions of the law for someone to complain

19  about what is discrimination and being talked about in terms of

20  discrimination, and then there's a dispute about how much gets

21  to the retaliator of that complaint.

22          But we can move on.

23          THE COURT:  It sounds like that's withdrawn.  OK.

24          MR. MELZER:  What I would suggest is that the language

25  be revised at the end to say Professor Ravina's complaints were

 1   directed at potential discrimination or retaliation.

 2              THE COURT:  When you say potential, she felt that she

 3   as discriminated against, right.

 4              MR. MELZER:  Right.

 5         But she doesn't have to be complaining about actual

 6   discrimination.  It could have been that she felt -- and I

 7   mean, this is in the law, that even if it wasn't actual

 8   discrimination --

 9              THE COURT:  But she is complaining about it.

10              MR. MELZER:  Correct.

11              THE COURT:  About discrimination from her perspective,

12   right?

13              MR. MELZER:  Correct.

14         MR. MUFSON:  Your Honor, the law requires that the

15   plaintiff put the defendant on notice that she believes that

16   she's being discriminated against, not that there's potential

17   discrimination that could be occurring.

18              THE COURT:  Right.

19              MR. MELZER:  We would say perceived or possible.

20              MR. HERNSTADT:  But she has to make it clear that it's

21   discrimination.  It can't be simply saying I'm uncomfortable.

22   There has to be something that links it to gender in this case

23   or some protected, you know, class.  Otherwise, as you say, it

24   could be anything.

25              THE COURT:  I mean, this doesn't I think directly

1    respond, but if we change it to that Professor Ravina's

2    complaints were about discrimination or retaliation against

3    her.

4              MR. MELZER:  That's fine.

5              THE COURT:  OK.

6              MR. HERNSTADT:  That's fine, your Honor.

7              MR. MELZER:  The next thing is on page 18.

8              THE COURT:  OK.

9              MR. MELZER:  Regarding Columbia's knowledge of

10   protected activity, and I think that the concept of general

11   corporate awareness may be a little vague to the jury and

12   should be clarified.

13             What we would suggest, at the end of that paragraph

14   right before F --

15             THE COURT:  "By that I mean"?  That line?

16             MR. MELZER:  Yes.  So we would add a sentence after

17   that would be our suggestion.

18             After the end of the paragraph and before F, we would

19   say:  It is enough that plaintiff made or brought her

20   complaints to one or more Columbia officials, administrators,

21   or legal representatives.

22             MR. MUFSON:  Frankly, I think that may be more

23   confusing.  I am not sure what an administrator is or an

24   official is.  It could be an officer or someone in management.

25             THE COURT:  How would you -- because there is another

1    section in here where I struggled with that.  I think I used

2    the word administrator, although I wasn't sure that was the

3    right word to use.

4            MR. MELZER:  We could set forth examples, but I think

5    that the idea of general corporate knowledge by itself should

6    be clarified to be helpful to the jury.

7            THE COURT:  From Columbia's perspective, do you have a

8    better articulation of that?

9            MR. MUFSON:  I think generally the contemplation is

10   that corporate knowledge is imputed by knowledge to a manager

11   or supervisor, and that's generally how I believe it's viewed

12   in the legal context.  Here, in the context of a university, it

13   may be a little different, that phraseology.

14           THE COURT:  I just want the jury to know who it is

15   that she complained to that could constitute notice to

16   Columbia.

17           MR. MUFSON:  Yes.  We could say someone in a

18   management role at Columbia.

19           THE COURT:  Is it clear the witnesses, for example,

20   who testified, who was in a management role?

21           I mean, was Chris Brown -- he clearly was a manager,

22   but -- I just want it to be clear to the jury who we're talking

23   about.  I think legal representatives under the law can count

24   too.  Isn't that right?

25           MR. MELZER:  Yes.  And that was part of what we

1    suggested.

2              MS. PLEVAN:  What does that mean?

3              THE COURT:  If you have a better articulation from

4    Columbia, you can think about it while we are doing the rest of

5    it, and then let me know if you have other ideas.

6              MR. MELZER:  An alternative suggestion is one or more

7    Columbia officials such as deans, vice deans, provosts,

8    compliance officers or legal representatives.

9              THE COURT:  Better or worse, from your perspective?

10             MS. PLEVAN:  I don't get the legal representatives.

11             THE COURT:  Is that right?

12             Do you have the case citing for it being the legal

13   representative?

14             MR. MELZER:  Yes, we do.

15             THE COURT:  Who is it factually?  Who are we talking

16   about factually?

17             What legal representative was a representation made to

18   as opposed to you know a dean, vice dean?

19             Why is that helpful to the jury?

20             MR. MELZER:  I believe there were communications of

21   protected activity to -- between, as we discussed earlier,

22   between the lawyers, including in-house counsel and outside

23   counsel.

24             MR. HERNSTADT:  Now we are in settlement negotiations

25   again.

1          THE COURT:  Is there any factual scenario in which a

2    jury could believe that the lawyers were advised, but that the

3    deans, vice deans, vice provost wasn't?

4          MR. MELZER:  Possibly not.

5          But in terms of the authority, we have for this

6    instruction that we're requesting, *Summa v. Hofstra University*,

7    708 F.3d 115,.

8          THE COURT:  I am more focused on the scenario here and

9    sort of how that helps the jury try and figure out, OK, we are

10   looking at the evidence, we know that a statement was made to

11   this person.

12         MR. MELZER:  We are talking about instances of

13   protected activity where it was made clear that a lawsuit was

14   impending.  So this is in addition to complaints to the

15   administration about gender discrimination and would go to the

16   timing --

17         THE COURT:  So, talking about settlement discussions.

18         MS. PLEVAN:  Outside counsel?  I don't think that is

19   appropriate at all.

20         MR. MELZER:  Some of it is settlement discussion.

21         THE COURT:  Let's stay away from settlement

22   discussions.

23         MS. PLEVAN:  I think deans, vice deans, vice provost,

24   and other management employees of Columbia would be acceptable.

25         THE COURT:  Deans, vice deans, provost, vice provost.

1          MS. PLEVAN:  Management.

2          THE COURT:  And others in a managerial position?

3          MS. PLEVAN:  Yeah.

4          MR. MELZER:  And president.

5          THE COURT:  All right.  OK.  Thank you.

6          MR. MELZER:  And we would ask the Court to just refer

7     to that again when we -- at the bottom -- excuse me.  Let me

8     see.

9          On page 19, where it says, Columbia's knowledge of

10    protected activity, I state again that general corporate

11    knowledge is sufficient, and just make another reference to

12    that.

13         MS. PLEVAN:  I think that's overdoing it.

14         THE COURT:  I will make reference to "in the fashion I

15    described earlier," or "as I described earlier."

16         MR. MELZER:  The next thing would be the bottom of 21,

17    the paragraph, "I remind you it is not the role of the jury to

18    second guess the decisions of employers."

19         That paragraph we would suggest is unnecessary and

20    could be confusing in this case.

21         MR. MUFSON:  Your Honor, that is frankly a standard

22    instruction and is derivative from case law.  I'm happy to cite

23    the cases.

24         THE COURT:  Why don't you do that.

25         MR. MUFSON:  Sure.

1          THE COURT:  If you don't have them here, you can --

2          MR. MUFSON:  Just give me one moment.

3          THE COURT:  Sure.  Take a minute.

4          MR. MELZER:  Your Honor, we will withdraw that

5    suggestion.

6          THE COURT:  OK.  All right.

7          What is your next objection?

8          MR. MELZER:  The next suggestion is on punitive

9    damages liability, beginning on page 23.

10         Our concern here is that this may suggest to the jury

11   that, you know, if they find against Professor Ravina, they can

12   go home, but if they find for her they have to say.  So we

13   would suggest to revisions to account for that.

14         What I would suggest as a possibility is to take out

15   the first paragraph, and then with the second paragraph take

16   out the first sentence and the first clause of the second

17   sentence and state, "Instead you will also be asked to answer

18   whether defendants are liable for punitive damages," period,

19   and then go right into, "The law authorizes what are called

20   punitive damages."

21         And then on the next page to take out the final

22   sentence, "If you do not decide for Ravina, you need not

23   consider" --

24         MR. MUFSON:  Your Honor, our view is that the initial

25   paragraph accurately describes the scenario here.

1          THE COURT:  I think it's unfair.  I think it's a fair

2     point.  I don't think we want the jury basing its decision on

3     whether it will have to do additional work.  I will take a look

4     at this tonight and think about how to --

5          MR. MUFSON:  We have other issues to raise with

6     respect to the punitive damages issue, but I can wait until --

7          THE COURT:  All right.

8          MR. MUFSON:  -- plaintiff's counsel has completed his

9     presentation.

10          MR. MELZER:  We are almost done.

11          On page 4, starting with "All Persons Equal Before the

12     Law," the second sentence of that paragraph, "You should

13     consider and decide this case as a dispute between parties of

14     equal standing in the community."  We think it is sufficient to

15     say that they are of equal standing before the law, as equal

16     standing in the community could be confusing.

17          THE COURT:  OK.

18          MR. HERNSTADT:  Your Honor, I believe this is the

19     standard charge.

20          MR. MELZER:  We are asking for a modification that is

21     sufficient for the purposes of the charge.

22          THE COURT:  I don't have any problem with that change.

23          MR. MELZER:  So the next thing is on prior consistent

24     statements, Section L.

25          THE COURT:  Yes.

1          MR. MELZER:  Excuse me.  Prior inconsistent

2    statements.

3          We would suggest adding something at the end that a

4    prior inconsistent statement by a Columbia administrator may be

5    evidence that its explanation for its conduct is pretextual.

6          MR. MUFSON:  We object to that, your Honor.

7          MR. MELZER:  It's based on law that shifting

8    explanations is evidence of pretext.

9          THE COURT:  We have a whole section on pretext.

10          The idea here is to make it clear that with respect to

11    a party or a party representative -- and again I had asked the

12    question about the word administrator, but that that may be a

13    statement of a party opponent and not just introduced as a

14    prior consistent statement.

15          I don't think we need to have that whole discussion in

16    two places, because we have a whole section on that.

17          MR. MELZER:  That's fine, your Honor.  I would just

18    then direct your attention to the pretext section then on page

19    23.

20          THE COURT:  Sure.

21          MR. MELZER:  Where it says in the last paragraph on

22    pretext, "If you find that Professor Bekaert or a Columbia

23    employee has given an implausible or unconvincing explanation"

24    we would suggest in there to add that a changing or shifting

25    explanation, one of those would also be pretext.

1           THE COURT:  Is there a case that you are citing for

2    that proposition?

3           MR. MELZER:  Yes.  I believe that we have cited it in

4    our summary judgment papers and also in our proposed

5    instructions, but we can send it to you again.

6           THE COURT:  All right.

7           I can look back at those.

8           All right.  Is that it?

9           MR. MELZER:  Yes.  That's it.

10          MR. HERNSTADT:  Your Honor, this is something that is

11   just an aside.

12          THE COURT:  Yes.

13          MR. HERNSTADT:  On the motion that you decided, I just

14   note that in the papers submitted by plaintiffs' counsel there

15   is a reference to the use of the word paranoid, and I want to

16   just make sure that that is not going to appear in --

17          THE COURT:  Are you referring to the concern about the

18   use of the word schizophrenic and related words?

19          MR. HERNSTADT:  Yes.

20          MR. SANFORD:  We had an agreement with respect to the

21   word schizophrenic only, your Honor.

22          THE COURT:  I am not going to prevent plaintiff from

23   using the word paranoid.  I think the focus was on

24   schizophrenic.

25          All right.  Who wants to go first on Columbia's part?

1          THE COURT:  Yes.

2          MR. SANFORD:  Before we do, your Honor, if I may just

3    briefly, I spoke with Betsy Plevan earlier today, and she

4    agreed that, if your Honor would allow, we propose eliminating

5    Title VII and Title IX counts on the verdict form.  That would

6    simplify the case for the jury, simplify --

7          MS. PLEVAN:  Assuming you are withdrawing those

8    claims.

9          MR. SANFORD:  Withdrawing the claims, yes.

10         THE COURT:  OK.  All right.

11         MR. SANFORD:  That would mean that with respect to the

12   verdict form we would eliminate questions 6 and 7 and change

13   references on page 4 accordingly.

14         THE COURT:  So, if you are withdrawing those claims,

15   then I have to take out all reference to that in the charge?

16         MR. SANFORD:  Yes.

17         THE COURT:  OK.  Yes.  I have no objection to that.

18         Let's just make sure that we get all the references.

19         So I think we will turn to page 12.  Let's just go

20   through the substantive instructions to make sure that I don't

21   miss anything.

22         In the first paragraph of the overview of the relevant

23   laws, we really just have the New York City Human Rights Law

24   left, correct?

25         MR. SANFORD:  Yes, your Honor.

1          THE COURT:  So that line will read, "Professor Ravina

2     brings claims than the New York City Human Rights Law,"

3     period.  Take out the rest of that.

4          And then we will have in the next paragraph on the New

5     York City Human Rights Law, and we will take out the following

6     two paragraphs on Title VII and Title IX.

7          And then on theories of liability, we will take out

8     No. 3 on page 13.

9          MS. HARWIN:  Your Honor, in that section, just change

10    the word three to two and also change in the last paragraph the

11    word some to one.  The word three appears in the first sentence

12    of that section and the word some.

13         THE COURT:  There's still a claim for gender

14    discrimination and a claim for retaliation.

15         MS. HARWIN:  Correct.

16         THE COURT:  So on all of these claims, one of these

17    claims, or none of these claims is that what you are saying?

18    That "some" should be "one"?

19         MS. HARWIN:  Exactly.

20         THE COURT:  OK.

21         In Section C on 13, let's see if there's anything we

22    need to delete as a result of this development.

23         All right.  Then I think we go to F on 18, right?

24         MR. MELZER:  Yes.

25         THE COURT:  And we take out all of F.

 1              Take out F1.

 2              We are taking out all of page 19.

 3              We will take out all of page 20, all of 21.

 4              Then the next Section will be G, intent and pretext,

 5     correct?

 6              MR. MELZER:  Yes, your Honor.

 7              THE COURT:  OK.  So I will make those changes.

 8              Thank you.

 9              Who wants to be heard first?  Columbia or Mr. Bekaert

10     on behalf of --

11              MR. HERNSTADT:  We are going to speak as --

12              THE COURT:  As one?

13              MR. HERNSTADT:  One team.  It is easier that way.

14              THE COURT:  All right.  Sure.

15              MR. MUFSON:  Thanks.

16              I think that obviated some of the need to go through

17     some of the issues, so hopefully this will be a little quicker.

18              We will start on page 14.

19              Pardon me.  Section D, third line from the bottom.

20              THE COURT:  What page are you on?

21              MR. MUFSON:  Excuse me?

22              THE COURT:  What page are you on?

23              MR. MUFSON:  Page 14, the third line from the bottom.

24              The charge currently reads, "But also covers any form

25     of mistreatment or unequal treatment based on gender."

 1           That phraseology doesn't take into account the petty

 2    slight or trivial inconveniences that are excised from

 3    actionable discriminatory conduct.

 4           MR. MELZER:  That instruction is on page 15, and it's

 5    also an affirmative defense.

 6           MR. MUFSON:  If you will just give me a moment.

 7           That concept may be addressed later on, but it still

 8    might be confusing to the jury, given that it appears that the

 9    two instructions would contradict one another.

10           So we propose that that language be either stricken or

11    incorporates the petty slights or trivial inconveniences.

12           MR. MELZER:  Your Honor, petty slights and trivial

13    inconveniences is not an element of liability.  This is a very

14    carefully constructed statute, and the legislature and courts

15    made a careful judgment that it would only be an affirmative

16    defense and it should be presented as it is in the Court's

17    instructions in that way, that defendants have to prove it by a

18    preponderance of the evidence.

19           It's not part of the elements of the claim.  The

20    elements of the claim are exactly as the court states, that

21    there's any form of being treated less well, unequal treatment,

22    mistreatment that is based at least in part on gender.

23           That's it.

24           MR. MUFSON:  The only other issue I would raise, your

25    Honor, is there's the disjunctive there, mistreatment or

 1   unequal treatment, and it could be viewed that unequal

 2   treatment is the only words that are being modified based on

 3   gender.  That was also another concern that we had avoiding

 4   jury confusion on that issue as well.

 5        MS. PLEVAN:  I think the use of the words any form

 6   suggests that even trivial matters could be actionable, which

 7   is not the law, and *Mihalik* doesn't say that.

 8        THE COURT:  I'm sorry.  I'm missing exactly where

 9   you're referring to.

10        Could you just --

11        MR. MUFSON:  Sure.  We are at the third line from the

12   bottom on page 14.  The line starts with the word "harassment."

13        THE COURT:  OK.

14        MR. MUFSON:  And then states, "But also covers any

15   form of mistreatment" and then says "or unequal treatment based

16   on gender."

17        So it really could be read extremely broadly by the

18   jury, particularly the phrase "any form of mistreatment."

19        THE COURT:  How would you rephrase this?

20        MR. MUFSON:  I would strike everything after the word

21   "harassment," because you are going to instruct the jury later

22   on on what those terms mean.

23        MR. MELZER:  Your Honor, we would disagree with that.

24   This is an accurate assessment of the law.  We think there's no

25   confusion that it has to be based on gender because it's all

1   modifying the term "gender discrimination" and that gender

2   discrimination under the New York City law is very expansive

3   and covers any kind of mistreatment or unequal treatment

4   whatsoever.  The standard is treated less well based in part on

5   gender.

6           MR. MUFSON:  One way to resolve this is to just state

7   after the word harassment, as I will explain to you what these

8   terms mean next.  Because you go into explaining what those

9   terms mean, and there's no need to duplicate that here.

10           MR. MELZER:  I think the jury understands what sexual

11   harassment is, but may not get the concept of what, you know,

12   the expansive way that gender discrimination is considered

13   under New York City law.

14           THE COURT:  I generally agree with the plaintiff on

15   this.  I'm willing to wordsmith it, but I do think the concept

16   of being treated less well should be in here.  It is a very

17   expansive --

18           MR. MUFSON:  Maybe modify the word.  Maybe say but

19   also covers mistreatment because of gender or unequal treatment

20   because of gender.

21           THE COURT:  OK.

22           But also covers either mistreatment or unequal

23   treatment because of gender.

24           Does that help or not really?

25           MR. MUFSON:  I just think it would be clearer if the

1    word "because of gender" explicitly modified both.

2            THE COURT:  That's fine.

3            MR. MELZER:  We think "based on gender" is better

4    because the standard is that it only need be in part on gender,

5    and "because of gender" suggests more than that.

6            MR. MUFSON:  The phraseology in *Mihalik* is "because of

7    gender."  It is in the statute also.

8            THE COURT:  Let me look at the statute, but I will

9    take out the word "any form" of but add "but also covers

10   mistreatment based on gender or unequal treatment based on

11   gender."

12           I will look at, as I said, whether it should be based

13   on or because of.  I will just look at the statute and *Mihalik*

14   again.

15           MR. MUFSON:  Your Honor, on page 15, it's defendants'

16   view that the plaintiff is pursuing multiple theories of

17   discrimination and that those theories warrant separate

18   instructions, so an instruction regarding hostile work

19   environment, an instruction regarding disparate treatment.

20           So we propose that there be separate instructions on

21   those two theories of discrimination, and I believe that we

22   would be prepared to propose separate instructions on those

23   theories.

24           MR. MELZER:  Your Honor, we would disagree with that.

25   There is a unitary standard under the New York City Human

1    Rights Law that only considers whether someone is treated less

2    well based on their gender.  Having separate instructions could

3    be confusing or misleading and complicate things for the jury.

4    It is entitled to consider all the evidence together and

5    determine whether in any part of it plaintiff was treated less

6    well based at least in part on her gender.

7         The notion of petty slights and trivial

8    inconveniences, for example, is something that is unique to a

9    hostile work environment claim.  It's derivative of the first

10   department's holding in the *Williams* decisions, which was

11   seized upon by the Second Circuit in *Mihalik*.

12        That all flows from a hostile work environment theory

13   of liability that's encapsulated in the broader term of

14   discrimination, but it is a hostile work environment theory.

15        Our view is that is a different theory than disparate

16   treatment and warrants a separate instruction.

17        That is our position.

18        THE COURT:  All right.  I will think about that

19   tonight.

20        MR. MUFSON:  In the first paragraph on page 15 -- my

21   apologies, your Honor.  I just want to get my bearings here.

22        THE COURT:  That's fine.  Take your time.

23        MR. MUFSON:  Here it is, yeah.

24        In the fourth line, we object to the word "negative"

25   and ask that it be stricken.

1            The plaintiff's burden is that she has to prove

2    differential or unequal treatment based on gender because of

3    gender.

4            Negative treatment, I am unaware of that being used in

5    any case law, and I think that is vague and ambiguous.

6            MR. MELZER:  Again it's modified here by "negative

7    treatment at least in part based on her gender" and we think

8    that is an appropriate instruction to convey.

9            It's any kind of negative differential, adverse

10   treatment that has a gender component to it.

11           MR. MUFSON:  I don't know what negative treatment

12   means.

13           THE COURT:  What about adverse?

14           MR. MUFSON:  I think adverse would be fine.

15           THE COURT:  Adverse, differential, or unequal

16   treatment.  OK.

17           MR. MELZER:  We do think that "negative" is more of a

18   colloquial term that the jury will understand rather than a

19   legal term.

20           THE COURT:  Have you ever heard someone talk about

21   negative treatment?

22           MR. MELZER:  Sure.

23           MR. MUFSON:  In a case?

24           THE COURT:  I think adverse --

25           MR. MUFSON:  Thank you, your Honor.

1           THE COURT:  -- grammatically, among other things, is

2    preferable.

3           MR. MUFSON:  The continuation of that sentence on page

4    15, line 4 starts, "Professor Ravina does not need to identify

5    a man who was treated more favorably."

6           We ask that that sentence be stricken.  Frankly, one

7    way to prove discrimination is to prove disparate treatment,

8    that a man was treated more favorably, and that is one of her

9    claims here, so we object to this sentence.

10          MR. MELZER:  One way to prove the treatment is to show

11   a man who was treated more favorably, but there's nothing that

12   requires it in the New York City law.

13          We want to make sure there is not a misleading

14   impression that treated less well means that you have to

15   compare yourself to a man.  There's no case law that imposes

16   that requirement.

17          MR. MUFSON:  Your Honor, our view is that the jury

18   should be instructed on what the plaintiff has to prove, not

19   what she doesn't have to prove.  I think that this sentence can

20   be misconstrued and frankly is confusing and misstates her

21   burden, could potentially misstate her burden.

22          MR. MELZER:  We think it could be confusing to say

23   treated less well without it, because less well compared to

24   whom?  Because it is not a requirement that she specifically

25   identify a man who was treated better.

1          MR. MUFSON:  The treated less well standard is lifted

2     directly from *Mihalik*.  *Mihalik* does not use the language that

3     she doesn't have to identify a man who was treated more

4     favorably than she was.

5          Frankly, I think that it would be prudent just to rely

6     on the language in the case, and that is the standard.  That is

7     she has to prove.  I think it is clear.

8          MR. MELZER:  We think it would avoid a misleading

9     impression.

10          THE COURT:  I don't think it would be misleading

11     without it.  The question is would this be helpful or would it

12     be misleading with it?  But I will think about that.

13          MR. MUFSON:  Thank you.

14          So the next sentence that starts "even a single

15     comment," again this does not incorporate the notion of

16     petty -- let me back up.

17          The reason that we generally believe that there should

18     be multiple instructions based on the different theories of

19     discrimination here is particularly for the confusion that

20     could potentially be caused by these two sentences, right?

21          The sentence, "Professor Ravina does not need to

22     identify a man who was treated more favorably" bears on

23     disparate treatment, whereas the next sentence concerns hostile

24     work environment, comments that were made to her in the

25     workplace -- just to set the framework there.

I7nnrav4                        Charge Conference

1           With respect to this specific sentence it does not

2      incorporate --

3           (Continued on next page)

1              THE COURT:  This is from Mihalik.

2              MR. MUFSON:  This statement is.  But it does not

3     include the notion that petty slights or trivial inconveniences

4     are not actionable.  Like those would not qualify.  So there

5     should be a carve-out that even a single comment that

6     objectifies women, if made in circumstances where the comment

7     would signal views about the role of women in the workplace,

8     except for petty slights or trivial inconveniences.

9              THE COURT:  That's what I say a couple lines later.

10             MR. MELZER:  And the idea here is that if, and this is

11    not only Mihalik, but also Williams, the case from the First

12    Department, this is an accurate statement.  A single comment is

13    sufficient.  If the comment signals views about women in the

14    workplace, it is not a trivial slight or petty inconvenience.

15    It is only a trivial slight or petty inconvenience if it

16    doesn't signal views about the role of women in the workplace.

17    If it is a paper cut.  The idea that because it signals views

18    about the role of women in the workplace, it's serious and

19    injurious, even though it is only one comment.

20             So everything is adequately dealt with the way that

21    this is written about the plaintiff's burden and then the

22    affirmative defense of petty slights and trivial inconveniences

23    and we shouldn't suggest that petty slights and trivial

24    inconveniences is any more than an affirmative defense which on

25    which the burden shifts.

1           MR. MUFSON:  I'll just say the words "may qualify"

2   also are vague.  I think actually the words from <u>Mihalik</u> are

3   actionable.  In the summary judgment context is what the Court

4   was discussing there.  But, even here, if the Court is inclined

5   to maintain this language, we suggest the use of the phrase

6   "may demonstrate discriminatory animus based on gender."

7           MR. MELZER:  It is not only indicative of the intent

8   but in itself it is an actionable conduct that gives rise to a

9   claim.  So it is not just an indicator of intent.

10          MR. MUFSON:  I just think that the phrase "may

11  qualify," may qualify for what?

12          THE COURT:  How about may be sufficient to give rise

13  to such a claim.

14          MR. MELZER:  Sure.

15          MR. MUFSON:  Well, may be sufficient to give rise to a

16  claim of gender discrimination.  I still think that the

17  phraseology should be "may."

18          THE COURT:  I'll consider that.  I just want to look

19  back at <u>Mihalik</u>, I'll look at <u>Williams</u> again, and I'll look at

20  other charges in the district and see if other judges

21  instructed separately on different theories of liability or

22  not.

23          MR. MELZER:  I would like to reiterate that there are

24  no different theories of liability.  Under the New York City

25  Rights Law, gender discrimination claim, it is a single theory

1   of being treated less well and there's different conduct that

2   plays into that.  But it is one theory.  We don't have to

3   establish a hostile work environment, we don't have to

4   establish, you know, disparate treatment as compared to a man.

5   We only have to establish that someone was treated less well.

6   Which includes sexual harassment, but includes any other form

7   of conduct that is based at least on part on gender.  And we

8   think it would be unnecessary, confusing, and proliferate the

9   instructions to have separate instructions for different

10  theories that we're not required to have and don't have.

11          MR. HERNSTADT:  Your Honor, this is so long ago my

12  recollection is --

13          THE COURT:  Bring the mic closer.

14          MR. HERNSTADT:  It is so long ago my recollection is

15  not exactly precise, but I thought that when you described the

16  case to the jury at the beginning of the trial, you mentioned

17  different theories.

18          THE COURT:  Look, I took what you all proposed in

19  terms of the summary, and I, aside from some wordsmithing did

20  the same in this charge in articulating the positions of the

21  parties.

22          MR. HERNSTADT:  I think the plaintiff laid out that

23  different theories.  That because those were the four different

24  claims in the complaint.  There was in the complaint they had a

25  claim for quid pro quo, they had a claim for hostile work

1    environment, they had a claim for gender discrimination, and

2    they had a claim for retaliation.  And I think that was laid

3    out in the opening presentation to the jury.  My recollection

4    may be incorrect on that.

5            MR. MELZER:  They were set forth in the complaint but

6    they're not separate claims at this point.  They're examples of

7    conduct that would go into the theory and the standard of being

8    treated less well, based on gender.

9            THE COURT:  All right.  As I said, I'll think about

10   that tonight.

11           MR. MUFSON:  Your Honor, we request on 15, on page 15

12   that the following language be added.  And this is directly

13   from the Mihalik case.  "The New York City human rights law is

14   not a general civility code.  The plaintiff still bears the

15   burden of showing that the conduct is caused by discriminatory

16   motive.  It is not enough that a plaintiff has an overbearing

17   or obnoxious boss.  She must show that she has been treat less

18   well at least in part because of her gender."

19           MR. MELZER:  Your Honor, we think that is already more

20   than adequately covered by the instruction on the bottom of 15,

21   that I objected to.  About personality conflict, co-worker

22   dislike, and the idea of it not being a general civility code.

23   The way that the statute accounts for that is by creating the

24   petty slights and inconveniences as an affirmative defense and

25   that's the Williams case.  And that is completely instructed

1    here to the jury, and that addresses the idea of it not being a

2    general civility code, and there is plenty in this instruction

3    about needing to be based on gender.

4            MR. MUFSON:  Case after case starting with <u>Williams</u>

5    and ending with <u>Mihalik</u> and subsequent to <u>Mihalik</u>, there are a

6    number of district court decisions that use the phrase to make

7    clear that the New York City Human Rights Law is not a general

8    civility code.  It is the way to distinguish between what is

9    actionable and what is not.  It makes clear to the jury that

10   just because you are not nice to someone or you're not civil to

11   them, that's not discrimination.  You have to prove that the

12   defendant is motivated by discriminatory animus.  That the law

13   that we're talking about here is not a general civility code.

14   We believe that is an important piece of this instruction.  And

15   language that's lifted directly from the Second Circuit's case

16   in <u>Mihalik</u>.

17           MR. MELZER:  We think that is already adequately

18   covered by the instructions.  There is a big difference between

19   a summary judgment decision that expounds the law and a jury

20   instruction that is supposed to simply and efficiently explain

21   to the jury what it needs to do.  So, expansive statements from

22   cases when the concepts are adequately covered aren't

23   necessarily appropriate.

24           THE COURT:  Again, I'll look back at <u>Mihalik</u>, I'll

25   look at <u>Williams</u> and I'll look at some other charges and see

1    how much of the language is and should be used.

2              MR. MUFSON:  Thank you, your Honor.

3              In the second paragraph on page 15, we request that

4    the following be added after the words "on her gender."  Well,

5    strike that.  We request that the first sentence or this

6    paragraph be replaced to state that the plaintiff must prove

7    that her gender was a motivating factor behind Professor

8    Bekaert's alleged actions that he took -- alleged actions that

9    he allegedly took to derail her research and prevent her from

10   earning tenure, to crystalize what the actual actions, adverse

11   actions were.

12             THE COURT:  You said the second paragraph on 15.  The

13   second paragraph on my 15 starts with "If you find that

14   Professor Bekaert treated Professor Ravina less well."

15             MR. MUFSON:  I apologize.  It is the third paragraph.

16             THE COURT:  So --

17             MR. MUFSON:  The first sentence of the third

18   paragraph.

19             THE COURT:  Okay.

20             MR. MUFSON:  It be replaced with "Plaintiff must prove

21   that her gender was a motivating factor behind the actual

22   decisions that Professor Bekaert made to allegedly derail her

23   research and prevent her from earning tenure."

24             MR. MELZER:  Your Honor, the claim considers all of

25   defendant Bekaert's conduct.  It is not limited to interfering

1   with the research and there is no allegation that he made a

2   decision regarding her employment.  The claim considers all of

3   her -- all of his conduct.  The totality of the circumstances.

4   And the charge as written adequately instructs about what her

5   burden is.  She must prove that the conduct is motivated at

6   least in part on gender, which means that it is a motivating

7   factor.  And then about what a motivating factor is.

8          So the jury is entitled to consider all of the conduct

9   and whether it satisfies the standard and reaches decision

10  based on any of the conduct or the conduct together and need

11  not be limited to particular instances of conduct, and there

12  shouldn't be anything suggesting more than what we've tried to

13  prove or that we have proved by suggesting that he made a

14  decision to derail her research or that he made a decision to

15  deny her tenure.

16         It is appropriate for the jury to consider whether any

17  or some or all aspects of his conduct satisfy the standard

18  under the New York City Human Rights Law.

19         THE COURT:  I don't really understand the point of

20  what you want to add.  You basically want me to marshal the

21  evidence on the theory.

22         MR. MUFSON:  The point is to crystalize what the

23  conduct that has been --

24         THE COURT:  I don't think it is appropriate for me to

25  do that.  I think you all can do that.

1              MR. MUFSON:  Our next request is on page 16.  We ask

2      that at the beginning of section two under Columbia, that the

3      following sentence be added:  "If you determine that Professor

4      Bekaert is not liable for discrimination, you must similarly

5      return a verdict in favor of Columbia on plaintiff's gender

6      discrimination claim."

7              MR. MELZER:  Your Honor, I think that's clear enough

8      from the verdict form.  But in principle we're not opposed to

9      that.

10             THE COURT:  Okay.  So we'll add that in.

11             MR. MUFSON:  Then if that's added, we would ask that

12     the word "additionally" be stricken.

13             And then in what currently exists at paragraph one,

14     under section two, we ask that the word "only" be added after

15     the word "discrimination" in the third line.  So, it would

16     read, "This also liable for the discrimination only if you find

17     either one that Columbia knew of Professor Bekaert's conduct."

18             MR. MELZER:  It is clear this is conditional.  But we

19     also think it should be made clear not only that they may find,

20     but if either of these conditions are satisfied, they must find

21     that Columbia is liable for Bekaert's conduct.

22             THE COURT:  Okay.  I'll take those objections into

23     consideration.

24             MR. MUFSON:  We ask that the second paragraph under

25     section two on page 16 be stricken.  As these sort of factors

have not been enumerated as those factors to be considered

under the New York City Human Rights Law.  And frankly, the New

School decision by the Court of Appeals, the New York Court of

Appeals, held that an employer's anti-discrimination policies

and procedures actually shield against liability.  But, I don't

believe employers are required to actively or adequately

monitor their employees.  I am unaware of any such requirement.

          MR. MELZER:  We think this is useful guidance on

things that the jury may consider to flesh out a little bit.

          THE COURT:  Where does it come from?  Does it come

from case law?  Does it come from prior charges?  Where is this

language from?

          MR. MELZER:  We've cited numerous cases on ways that

an employer can be negligent or fail to address discriminatory

conduct.  And I think the law, the New York City law is Title

VII is a floor but not a ceiling.  So law from the Title VII

context can illuminate ways in which the New York City law

would apply.

          New York City law is only broader and more liberal and

expansive, not less so.  So if there are things that are

relevant under Title VII law, they would also be indicative of

a failure to adequately address the situation under New York

City law.

          I think the law is clear under both federal and city

law that the mere fact that an employer has policies on paper

1   doesn't insulate its conduct.  They actually have to enforce

2   those policies in a meaningful way and address the behavior.

3   And that's reflected precisely in one and two, which is

4   language taken directly from the statute.  That Columbia

5   allowed the conduct to continue or failed to take immediate and

6   corrective action or should have known of the conduct yet

7   failed to exercise reasonable diligence to prevent it.  That's

8   in terms of what they actually did and their actual conduct,

9   not simply having a policy.

10          MR. MUFSON:  Your Honor, I would just say that what is

11  or what is not reasonable diligence is a determination for the

12  jury.  But, certainly, the notion that Columbia can be held to

13  have not exercised reasonable diligence by not actively or

14  adequately monitoring its workplace, I'm not even sure,

15  frankly, what that means.  I am unaware of any cases that

16  discuss that phraseology.  I don't know if that means we're

17  supposed to have cameras.  I think that would raise a

18  heightened burden upon Columbia to demonstrate, to meet these

19  factors.

20          What is required, and frankly, I would direct your

21  Honor to the New York Court of Appeals decision in the New

22  School case, which is at, give you the cite, your Honor.  14

23  N.Y.3d 469 (2010), which dealt with the Faragher-Ellerth

24  defense and the inapplicability of that defense under the human

25  rights law, but in so holding, the court addressed the

1    non-supervisory harassment and specifically stated that

2    adopting policies would be reasonable diligence under that

3    prong.

4            THE COURT:  Let's just look back.  I think this

5    language may come from the Vance case.  So, let's look at that.

6    And see if it is outlined there.  But I'll take a look at New

7    School in addition.

8            MR. MELZER:  Your Honor, we're not suggesting that any

9    of these factors are dispositive.  But we are suggesting that

10   it's useful for the jury to have some factors to consider or

11   things that it might consider when determining if a response to

12   workplace conduct or exercising reasonable diligence to prevent

13   discriminatory behavior, it's useful to have certain factors on

14   whether those elements are met.  Again, not that any one of

15   them would be dispositive.  That not having cameras, and we're

16   not suggesting that there need be cameras, but that not having

17   cameras would, you know, is dispositive.  It is to monitor

18   what's going on in the workplace.  One example that we've

19   had -- to be aware of what's going on in terms of

20   discriminatory behavior and attempting to address it.

21           THE COURT:  I understand.

22           MR. MELZER:  Yeah.

23           THE COURT:  I do.

24           MR. MUFSON:  Just briefly note, your Honor, I think

25   the Vance case, the court may address some of these factors.

1          THE COURT:  And just because it's in a case, look, I

2     think this is a theme that we have throughout, which is because

3     a case says something, how much of that language do you need to

4     present to the jury.  If a particular issue is being decided in

5     a particular case, is it something that we need to advise the

6     jury or can they figure out for themselves what it means to

7     have exercised reasonable diligence or not.  Are the examples

8     helpful or will they somehow get stuck on those specific

9     examples.  And that's what I want to think about.  As I said,

10    I'll look at other charges from the district to see how much

11    guidance courts generally give.

12         MR. MUFSON:  Thank you, your Honor.  That is our

13    concern.

14         MR. MELZER:  We think it is useful to have a few

15    examples, and we've cited case law supporting these in our

16    proposed charge and in our summary judgment papers.

17         MR. MUFSON:  Moving on, your Honor, our next, on page

18    16 under section E, the second paragraph -- just forgive me.  I

19    just need one moment, your Honor.

20         THE COURT:  Sure.

21         MR. MUFSON:  It's actually on page 17, the first full

22    sentence on that page.  We object to that sentence.  We object

23    to that sentence and request that it be replaced with --

24         THE COURT:  The one regarding any manner of

25    retaliation, that one?

1            MR. MUFSON:  Yes.  That to meet her burden of proving

2    she is engaged in protected activity it is enough.  And then

3    continue with that sentence.

4            MR. MELZER:  This is directly from the statute.  And

5    emphasizes the broad scope of the New York City rights law that

6    any manner of retaliation is covered.

7            MR. MUFSON:  We don't object to that.  It is just to

8    clarify it to lead into that sentence, to state to meet her

9    burden of proving that she engaged in protected activity, it is

10   enough that Professor Ravina complained about, opposed or

11   pursued good-faith claims of discrimination or harassment.

12           THE COURT:  I'll think about that, too.

13           MR. MUFSON:  After that sentence, we request that the

14   following be added, which is directly from the New York City

15   Human Rights Law.  To ultimately succeed on her retaliation

16   claim, under the New York City Human Rights Law, plaintiff must

17   prove that Professor Bekaert and/or Columbia were motivated at

18   least by part by retaliatory animus in taking adverse actions

19   against plaintiff.

20           MR. MELZER:  I think the idea of retaliatory motive is

21   amply covered in the Court's instructions and what that means.

22           MR. MUFSON:  This is the introduction to the

23   retaliation claim section.  And our view is that it's slanted

24   towards the, frankly, towards what the plaintiff has to prove

25   and leaves out the ultimate burden which is the motivating

1  factor test.

2          MR. MELZER:  It is right there in element four.

3  Retaliation was a motiving factor of any such actions.  And

4  then again for Columbia, retaliation was a motivating factor of

5  any such actions, and the Court defines motivating factor and

6  what that means.

7          THE COURT:  All right.  I'll consider that as well.

8          MR. MUFSON:  Then the last paragraph before section

9  one on page 17, addresses it prohibits any manner of

10  retaliation.  And we add, we request that the following

11  sentence be added after that sentence.  "However, personality

12  conflicts, petty slights, snubbing, minor annoyances, simple

13  lack of good manners, and other ordinary tribulations of the

14  workplace do not qualify as retaliatory acts."  That is from

15  Mihalik and also from a Southern District decision from 2015,

16  Villar v. City of New York, 135 F.Supp.3d 105, 129.

17          MR. MELZER:  I think that's already been covered in

18  the Court's instructions, but that is addressed by the idea

19  that the actions must be reasonably likely to deter a person

20  from engaging in protected activity.  The jury can understand

21  that standard of what it means to be reasonably likely to deter

22  a person in plaintiff's shoes from engaging in protected

23  activity.

24          THE COURT:  Again, I think we obviously have just a

25  general question about how much language to put in and where,

1    and I'll consider that, too.  And just make sure that it's

2    balanced so it doesn't favor one side or the other.

3             MR. MUFSON:  I would just note there was some language

4    in the federal law retaliation section about sort of

5    encapsulating this concept, but now that the federal

6    instruction has been excised, we believe that this language

7    should be incorporated particularly in this section here and it

8    is directly derivative of the court's decision in Mihalik.  It

9    came from page 20 of the Court's instruction that's no longer

10   going to be given.

11            THE COURT:  Yes.

12            MR. MELZER:  There is also language in Mihalik coming

13   from Williams that the assessment should be made with a keen

14   sense of workplace realities of the fact that the chilling

15   effect of particular conduct is context dependent, and the fact

16   that a jury is best suited to evaluate the impact of

17   retaliatory conduct.

18            A lot of this goes to the summary judgment standard.

19   And so the jury also needs to adopt a keen sense of workplace

20   realities and what is likely to have a chilling effect.  So, if

21   there is going to be, you know, extra language, there should be

22   a good deal of extra language.

23            MR. MUFSON:  I'll move on.

24            We ask and this will be the same request for the

25   instruction in terms of the elements for retaliation for

1  Professor Bekaert and Columbia, but I can cover it once.

2          On page 17, because I think the instructions repeat

3  the four elements twice, that it be made clear after the

4  recitation of the four elements, that the fourth element is the

5  causal connection element.  And courts routinely, they actually

6  either use and sometimes use both, that the plaintiff must

7  prove that retaliation was a motivating factor in any such

8  actions, meaning that there was a causal connection between the

9  protected activity and the adverse actions, and we ask that be

10 clarified there.  So that the following sentence be added at

11 the end of paragraph one under section one on page 17.

12          THE COURT:  After Bekaert.

13          MR. MUFSON:  After that part.  In other words --

14          THE COURT:  Sorry.  Within the Bekaert section, right?

15          MR. MUFSON:  Within the Bekaert section and then again

16 in the Columbia section.  "In other words, plaintiff must prove

17 that there was a causal connection between the protected

18 activity and the adverse action."

19          MR. MELZER:  The elements are clearly stated here.  It

20 says that retaliation had to be a motivating factor in any of

21 the retaliatory actions.  And we think the jury is well

22 equipped to understand that motivating factor connected to the

23 action implies causation without incorporating potentially

24 confusing language about causal connection, which is more legal

25 language.

1           MR. MUFSON:  We believe this would aid the jury and

2     remedy any potential confusion, and frankly, I'm happy to

3     direct the Court to various decisions that use that particular

4     language.  If that would be helpful.

5           THE COURT:  Sure.

6           MR. MUFSON:  Whitley v. Montefiore Medical Group, 2016

7     W L 1267788 (S.D.N.Y. March 30, 2016); Roberts v. UPS 115

8     F.Supp.3d, 344, 370 (E.D.N.Y. 2015); the Mihalik decision also

9     uses similar language. Ya-Chen Chen v. City of New York, 2014

10    WL 1285595 at page 10, which is a Southern District opinion

11    from March of 2014 that was affirmed on appeal by the Second

12    Circuit in 2015.

13          MR. MELZER:  We don't doubt that there's case law

14    often in the legal or summary judgment context which uses that

15    language.  But we think what is important for the jury is that

16    they get the concepts and ideas.  And the concept and idea is

17    already there.

18          THE COURT:  Okay.

19          MR. MELZER:  Of retaliation being a motivating factor.

20          THE COURT:  I got it.  Thank you.

21          MR. MUFSON:  We also ask that at the end, along the

22    same lines, at the end of that first paragraph, after the

23    sentence that we just requested, that the following sentence

24    also be added:  "Plaintiff must prove all of these factors to

25    prove her claim."  Again, to clarify what her burden is.

1          MR. MELZER:  It's clear enough when you're listing

2     four factors that need to be met.

3          MR. MUFSON:  I think the special verdict form that was

4     provided to the parties does not list out the elements of a

5     claim of retaliation.

6          THE COURT:  I think without adding another line, I can

7     add it before we list the factors, "plaintiff must show by

8     preponderance of the evidence each of the following factors" or

9     something to that effect.

10          MR. MUFSON:  That would be fine.  Thank you.

11          MR. MELZER:  That's fine.

12          MR. MUFSON:  In the third paragraph under section one

13     just a minor language change.  Instead of the words "directed

14     at discrimination," or "were directed at discrimination," we

15     propose "concerned gender discrimination."

16          THE COURT:  Tell me where that is again, third

17     paragraph under section one.

18          MR. MUFSON:  Page 17, under the Bekaert section.  The

19     words last sentence, last line of that section.

20          THE COURT:  I think we already changed that to about

21     discrimination or about retaliation against her.

22          MR. MUFSON:  That's fine.

23          MR. MELZER:  We would just ask that discrimination say

24     including sexual harassment.

25          THE COURT:  I think you didn't want me to list all the

1    forms of discrimination, right?  You didn't want me to break it

2    down.

3              MR. MELZER:  That's right.  But just to be clear that

4    sexual harassment is a form of gender discrimination, at least

5    at some point.

6              THE COURT:  Did we not make that clear earlier?

7              MR. MELZER:  It only appears once.

8              MR. MUFSON:  I think that's made clear at the outset

9    of the section on gender -- on gender discrimination.  That

10   there are two theories, right, that harassment and disparate

11   treatment.

12             THE COURT:  I think we say on page 14, we say under

13   that specific law, the term gender discrimination includes the

14   concepts of hostile work environment and sexual harassment.

15   But also covers mistreatment based on gender or unequal

16   treatment based on gender.

17             MR. MELZER:  That's fine.

18             THE COURT:  Okay.

19             MR. MUFSON:  Your Honor, on page 17, subheading two

20   for Columbia we just reiterate for the record, we just

21   reiterate our objections to this instruction for the reasons

22   set forth in our letter of July 22.  We understand your Honor

23   has ruled on this issue, but I wanted to make the record clear.

24             THE COURT:  That's noted for the record.  Thank you.

25             One question I had, and we talked about this a little

 1  earlier and I think we changed one section to include examples

 2  of Columbia representatives like dean, vice dean, provost, vice

 3  provost.  But in the section on prior inconsistent statements,

 4  on page 11, it says where, however, the witness is the

 5  plaintiff, or one of the defendants.  And then I have written

 6  now in the case of Columbia school administrator and by a prior

 7  statement has admitted some fact or facts.

 8          Do we want to change school administrator to say

 9  something different?

10          MR. MUFSON:  I think so.  I think we would use the

11  same language.

12          THE COURT:  Or we can say where, however, the witness

13  is the plaintiff or one of the defendants or a representative

14  thereof.  Unless you think that's too ambiguous.

15          MR. MELZER:  We would prefer administrator to

16  representative.

17          MR. MUFSON:  We would use the same language that was

18  said before.  Because that's, that is the employer for -- as

19  the law views it.

20          THE COURT:  All right.  Again I think we said dean,

21  vice dean, provost, vice provost, president, or --

22          MR. MELZER:  Other members of management.

23          THE COURT:  Other member of management?

24          MR. MUFSON:  Or other employees of Columbia

25  management.

1            THE COURT:  Any additional objections?

2            MR. MUFSON:  Just a few, your Honor.

3            THE COURT:  Okay.

4            MR. MUFSON:  So just back to page, sorry, page 18, we

5    would make the same request with respect to the elements of

6    retaliation that were requested on page 17 with respect to

7    Professor Bekaert apply also for Columbia.

8            THE COURT:  Okay.

9            MR. MUFSON:  Or be added in the instruction concerning

10   Columbia's conduct.

11           MR. MELZER:  We would have the same response.

12           THE COURT:  Yes.

13           MR. MUFSON:  So I'll skip now I believe, just move to

14   page 22, intent and pretext.  Your Honor, I apologize.  We ask

15   since the instruction about no second guessing an employer's

16   business decisions is now going to be eliminated from the

17   instructions, because the federal law instruction is going to

18   be excised, we ask that that concept be added to the prior

19   instruction essentially the effect that it's not for the jury

20   to second guess an employer's decision, that it's for them to

21   find whether or not the employer was motivated by

22   discriminatory retaliatory animus.

23           MR. MELZER:  We think that's misleading and confusing

24   here.  Both under the fact that it is a New York City Human

25   Rights Law claim which is very expansive, and under the broad

1    treated less well standard and the fact that the claims don't

2    just concern decisions.  And the claim of discrimination is

3    based on defendant Bekaert's conduct in terms of first engaging

4    in sexual harassment, and also engaging in alleged obstruction

5    of the research.  And the tenured, as the Court --

6              THE COURT:  We're talking about Columbia here.

7              MR. MELZER:  And the argument that we've been allowed

8    to advance is that Columbia was negligent in failing to prevent

9    defendant Bekaert's conduct from exercising an influence on the

10   tenure vote.  So it is really not based on whether there is a

11   material adverse action based on good reasons, bad reasons,

12   erroneous facts, or no reason at all.  If defendant, under the

13   cat's paw theory, if they are provided with erroneous facts or

14   with stuff that could poison her tenure and then act on that

15   and fail to address it, there is liability.  So, we think this

16   paragraph is unnecessary and confusing.

17             The reality is the Court would instruct the jury on

18   whether defendant Bekaert's conduct meets the standard, and the

19   Court has an instruction to the jury on what means for Columbia

20   to be liable for that conduct.

21             THE COURT:  I think what would be helpful, actually,

22   is obviously I have the instructions that you submitted

23   initially.  For Columbia, since you're proposing so much

24   additional language, just for those critical few pages, 16, 17,

25   18 that we talked about, and maybe in this section, if you can

1    just submit, I don't care if it's handwritten or redlined, but

2    a version of what you're asking.

3              MR. MUFSON:  We would be happy to do that.

4              THE COURT:  I've gotten everything plaintiff proposed,

5    but I think since you're suggesting more language in different

6    places, I want to take a look at it.  And as I said a number of

7    times, I'll look back at case law on other charges and just try

8    and balance how much language to put in.

9              MR. MUFSON:  We can indicate it in red or something.

10             THE COURT:  That's fine.  I don't care about the

11   format.

12             MR. MELZER:  The other thing we would point out, your

13   Honor, is Columbia specifically instructed its faculty that

14   they could not consider the circumstances and those --

15             THE COURT:  Honestly, I'm not really one for

16   marshaling the evidence.  And frankly I included a whole

17   section only because you all asked me to saying what your

18   arguments were.  I don't generally do that.  I did it because

19   everyone wanted me to.  You can make your arguments to the jury

20   but I don't plan on making them.  I want to tell them what the

21   law is.  Beyond what's already in here.

22             MR. MELZER:  So we do think this paragraph is

23   misleading in part because --

24             MR. MUFSON:  What paragraph?

25             MR. MELZER:  The second paragraph on 22, that they're

1    seeking to add to the New York City Human Rights Law

2    instruction.  They instructed the faculty that not to consider

3    the circumstances, not to consider the claims or allegations

4    and just to vote as if those were not in issue.  Just vote on

5    the record as it stood and everything else will be left for a

6    court.

7              THE COURT:  I don't understand what your point is.

8              MR. MUFSON:  Yeah.

9              MS. PLEVAN:  The facts on that issue are disputed in

10   any event.  But I don't know what language --

11             MR. MELZER:  The idea that --

12             THE COURT:  Just tell me exactly what language, I

13   don't need the argument.  I've already got your argument.

14             MR. MELZER:  The language about it's not the role of

15   juries to second guess.  Columbia set it up that the faculty

16   wouldn't be making that decision.  That they should defer it,

17   leave it for the Court.

18             MR. MUFSON:  Our request is just merely that language

19   be added which we can send to the Court for the Court's

20   consideration.  The standard charge that it's not the province

21   of the jury to second guess legitimate decisions by employers.

22   But I think we'll propose the language for your Honor's

23   consideration.

24             THE COURT:  So the language we had in that's now out,

25   because these claims are out, read:  In this regard I remind

1    that you it's not the role of juries to second guess the

2    decisions of employers.  Generally, an employer may take a

3    material adverse employment action against an employee based on

4    a good reason, a bad reason, a reason based on erroneous facts

5    or no reason at all.  Only if Professor Ravina has proved by a

6    preponderance of the evidence that the adverse action would not

7    have occurred but for her protected activity should you find

8    Columbia liable.

9            So what's wrong with that?  Is that not an accurate

10   statement of the law?

11           MR. MELZER:  We think it's confusing and unnecessary

12   under what the New York City Human Rights Law --

13           THE COURT:  Is it an inaccurate statement of the law?

14           MR. MELZER:  Yes, because there doesn't need to be a

15   material adverse employment action under New York City Human

16   Rights Law.

17           MR. MUFSON:  That can be --

18           THE COURT:  What if we change the language to say only

19   if Professor Ravina has proved by a preponderance of the

20   evidence that she was treated less well.

21           Am I confusing the standards?

22           But for her protected activity should you find

23   Columbia liable.

24           MR. MELZER:  That is also an inaccurate statement of

25   the New York City Human Rights Law.  There is no but for

1    standard.

2            MR. MUFSON:  We can propose some language, your Honor,

3    that addresses incorporating the motivating factor standard.

4    But I think the principle it is not the role of juries to

5    second guess the decisions of employers generally and their

6    role is to determine whether there is discrimination or

7    retaliation, really shouldn't be controversial.  That's what

8    law is.

9            THE COURT:  Got it.  Okay.  I understand the

10   positions, so I'll take a look at that.

11           MR. MUFSON:  The last section that we'd like to

12   address is the section on punitive damages that begins on page

13   23, or punitive liability, pardon me.

14           So we object to any instruction on punitive liability,

15   as just as a matter for the record.  If your Honor is inclined

16   to instruct the jury on punitive liability, we ask a number of

17   changes be made to this instruction.  We're happy to submit our

18   proposed language.

19           THE COURT:  Make the argument now because I want to

20   give you an updated draft so you can use whatever language you

21   want to use in your summations.

22           MR. MUFSON:  Sure.  So there are a number of complex

23   terms that are contained in this instruction.  Because those

24   terms come from a recent decision by the New York Court of

25   Appeals, the Chauca decision.  For example, willful or wanton

1    negligent, malice or reckless indifference, recklessness or

2    conscious disregard for the rights of others or conduct so

3    reckless as to amount to such disregard.

4            Other courts have interpreted what that means from a

5    legal perspective.  And so therefore we request that if this

6    instruction is going to be given, that the jury be instructed

7    about what those terms mean.  What reckless, what malice means,

8    or what reckless indifference means.  And we have language that

9    we would -- I'm happy to propose it now.

10           THE COURT:  What do you propose now and tell me which

11   cases it comes from, please.

12           MR. MUFSON:  So, this from the In Re Methyl Tertiary

13   Butyl Ether Products Liability Litigation, which is 2009 WL

14   3347214 (S.D.N.Y. October 19, 2009), which was affirmed 725

15   F.3d 65.  And we would add the following language:  To justify

16   punitive damages, based on wanton and reckless conduct, the

17   defendant must have acted with a conscious indifference and

18   utter disregard of its effect upon the health, safety or rights

19   of others.

20           MR. MELZER:  Your Honor.

21           MR. MUFSON:  May I finish?

22           THE COURT:  Yes.

23           MR. MUFSON:  Also, to support a finding of actual

24   malice there must be a "evil motive on the part of the

25   defendant such that the defendant's actions were done out of

hatred, ill will or spite for the plaintiff."  And just to cite
there, that's from a New York pattern jury instruction civil
2:278 which states an act is wanton and reckless when it
demonstrates conscious indifference and utter disregard for its
effect upon the health, safety and rights of others.

        I'd also direct the Court to Gruber v. Craig, 208
A.D.2D 900, which is a 2nd Department decision from 1994
defining wanton and recklessness.  Which that decision quotes
the New York Court of Appeals decision in Sweeney v. McCormick,
159 A.D.2D 832.

        In addition to defining what those terms mean,
explaining them to the jury, the New York City Human Rights Law
enumerates several factors that mitigate against a finding of
punitive damages.  They're actually listed in the statute
themselves, so we ask that those, those factors be specifically
added to the instruction.  Those include a record of no or
relatively few prior incidents of discriminatory conduct by its
employees, the existence and scope of the university's
anti-discrimination policies and procedures, a meaningful and
responsive procedure for investigating complaints of
discriminatory practices by employees and for taking
appropriate action against those persons who are found to have
engaged in such practices, a policy against discriminatory
practices, which was effectively communicated to employees, a
program to educate employees about unlawful discriminatory

1   practices, procedures for the supervision of employees

2   specifically directed at the prevention and detection of such

3   discriminatory practices.  Each of those are factors that are

4   enumerated in the city law that we ask be added to the charge

5   if one is given.

6          THE COURT:  All right.

7          MR. MELZER:  Yes, your Honor.  First of all, we

8   believe that there needs to be an instruction on this because

9   it is a liability instruction as to whether there is liability

10  for punitive damages that is based on defendant's conduct and

11  an assessment of that conduct.  The language here comes from

12  the very recent Chauca cause and it is meant to be disjoined

13  that all of these things qualify.  And it is also meant to be

14  very expansive, and to specifically contrast with what someone

15  needs to show under Title VII to allow more avenues for

16  achieving punitive damages.  So the actions need to be willful,

17  negligent or wanton, negligence or recklessness or a conscious

18  disregard of the rights of others or conduct so reckless as to

19  amount to such disregard.

20          Taking these are supposed to be expansive, we're not

21  opposed to defining some of these terms, but it should be from

22  cases specific to the New York City Human Rights Law and

23  particularly recent cases that are in light of this standard.

24  And we can look at the factors on that are being referred to,

25  but right now we see no reason to announce factors that would

1    preclude punitive damages, and it may be that those relate to

2    an assessment of the amount which the jury won't be doing at

3    this point.

4            MR. MUFSON:  Your Honor, I've been practicing law for

5    a fair amount of time, and I have difficulty understanding what

6    some of these terms mean.  So, I think that a clarification in

7    the instruction in terms of defining what these terms mean,

8    which it is a clear explanation of the law, would be helpful

9    for the jury.

10           MS. PLEVAN:  It's in the statute.

11           MR. MUFSON:  Right.  In the statute, the enumerated

12   factors.

13           THE COURT:  If something is in the statute, I don't

14   know why we wouldn't include it.  We've had arguments about

15   factors and how many factors we put in or don't put in, which

16   is different than the definitional questions.  If there are

17   factors in the statute, I don't know why we wouldn't tell the

18   jury about them, right.  But in any event.

19           MR. MUFSON:  We can submit a proposed instruction.

20           THE COURT:  I do think if you have cases that deal

21   with the New York City Human Rights Law --

22           MR. MUFSON:  Unfortunately, so we don't have cases

23   under the New York City Human Rights Law because the Chauca

24   decision is only a few months old interpreting what those mean.

25   So we pulled cases and instructions from general, civil --

1          THE COURT:  You're right.  That of course makes sense.

2          MR. MELZER:  Some of them are from federal law or

3     1994.

4          MR. MUFSON:  The definitions haven't changed.

5          THE COURT:  Any additional objections?

6          MR. MUFSON:  Nothing further from Columbia.

7          THE COURT:  Columbia's just going to submit their

8     markups.  If you can footnote them or a separate page, I don't

9     care about the format, note what case or what you rely on for

10    that proposition.  You don't have to do everything you said

11    today.  Just to the extent there are particular cases you are

12    relying on for particular language, like the descriptions or

13    definitions of wanton and other relevant words, you can include

14    that.  I will, whenever I have an updated draft, I'll send you

15    all an updated redlined version of the charge.  And then why

16    don't we meet tomorrow at 9 and go over them so any additional

17    objections I can hear you out and I'll tell you what I'm going

18    to use so you can be prepared for summations.  Okay?

19         MR. MELZER:  Thank you.

20         THE COURT:  I should ask, are there any additional

21    questions to the verdict form other than taking out the

22    question six and seven and changing the numbers?

23         MR. MELZER:  None from plaintiff, your Honor.

24         THE COURT:  I understand I simplified it.  Defendants

25    requested a more complicated verdict form.  I didn't think that

I7N3RAV5                        Charge Conference

1    was necessary.  But, if you have specific objections, I'm happy

2    to hear you out.

3              MS. PLEVAN:  Not at this time, your Honor.

4              THE COURT:  Thank you.

5              (Adjourned until July 24, 2018, at 9 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                         Page

 3    KATHERINE PHILLIPS

 4   Direct By Ms. Fischer  . . . . . . . . . .2422

 5   Cross By Mr. Melzer  . . . . . . . . . . .2443

 6    WEI JIANG

 7   Direct By Ms. Fischer  . . . . . . . . . .2451

 8   Cross By Mr. McKnight  . . . . . . . . . .2492

 9                      DEFENDANT EXHIBITS

10   Exhibit No.                           Received

11    E-1  . . . . . . . . . . . . . . . . . .2424

12    QH   . . . . . . . . . . . . . . . . . .2430

13    QK   . . . . . . . . . . . . . . . . . .2433

14    MY   . . . . . . . . . . . . . . . . . .2445

15    NY   . . . . . . . . . . . . . . . . . .2472

16    PT   . . . . . . . . . . . . . . . . . .2478

17    NV   . . . . . . . . . . . . . . . . . .2481

18    PC   . . . . . . . . . . . . . . . . . .2482

19    QD   . . . . . . . . . . . . . . . . . .2484

20    PQ   . . . . . . . . . . . . . . . . . .2498

21                      PLAINTIFF EXHIBITS

22   Exhibit No.                           Received

23    233  . . . . . . . . . . . . . . . . . .2444

24    133  . . . . . . . . . . . . . . . . . .2446

25
```