# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ENRICHETTA RAVINA,

     PLAINTIFF,

-- against --

COLUMBIA UNIVERSITY
A/K/A THE TRUSTEES OF COLUMBIA
UNIVERSITY IN THE CITY OF NEW YORK
AND GEERT BEKAERT,

     DEFENDANTS.

Case No. 1:16-cv-02137-RA

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BEKAERT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, REMITTITUR OF THE DAMAGES AWARD, OR A NEW TRIAL**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................2

   I.   THE COURT SHOULD DENY DEFENDANT BEKAERT'S RULE 50(b) MOTION....2

      A.  The Applicable Rule 50(b) Standard is Highly Deferential to the Jury's Verdict........2

      B.  Plaintiff Engaged in Protected Activity and Bekaert Was Aware of Such Activity......4

      C.  The Jury Properly Concluded that Bekaert's Conduct Would Be Reasonably
          Likely to Deter a Person from Engaging in Protected Activity ...................................5

         1.  Defendant Bekaert Obstructed Plaintiff's Work Progress .......................................5

         2.  Bekaert Retaliated by Disparaging Ravina in the Profession .................................6

      D.  The Jury Properly Concluded that Bekaert Acted from a Retaliatory Motive .............7

      E.  There is No Basis to Overturn the Jury's Finding of Punitive Liability......................9

  II.  THE COURT SHOULD UPHOLD THE DAMAGES VERDICTS.................................9

      A.  Contrary to Defendant's Arguments, a Deferential Standard Applies ........................10

      B.  The Jury's Compensatory Damages Award Is Reasonable and Must Stand ..............12

         1.  Plaintiff Established Severe and Ongoing Psychiatric and Reputational
            Harm Caused by Defendant Bekaert's Unlawful Retaliatory Conduct ................12

            a.  The Evidence at Trial Established Serious, Ongoing Psychiatric Injury........12

            b.  The Evidence Reflects Serious Harm to Plaintiff's Reputation.....................16

         2.  The Verdict Is Well Within a Permissible Range for Comparable Cases ............19

         3.  The Cases that Bekaert Cites Are Readily Distinguishable..................................23

      C.  There is No Basis to Disturb the Jury's Punitive Damages Award ...........................25

         1.  The Punitive Damages Award is Not Unconstitutionally Excessive....................25

            a.  Bekaert's Protracted Course of Conduct Was Highly Reprehensible ........... 26

            b.  The Fractional Ratio of Punitive Damages to Compensatory Damages
               Strongly Supports the Award..........................................................................27

        c.   The Award Is Comparable to Punitive Damages in Similar Cases .................28

    2.   The Award Is Supported by Evidence of Bekaert's High Net Worth....................28

    3.   *Osorio* Does Not Counsel Against the Punitive Damages Award in this Case .....29

CONCLUSION..........................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Albunio v. City of N.Y.*, 16 N.Y.3d 472 (2011) ............................................................... 4

*Armstrong v. Shirvell*, 596 Fed. Appx. 433 (6th Cir. 2015) ........................................... 28

*Audrey v. Career Inst. of Health & Tech.*, No. 06-CV-5612,
2010 WL 10094570 (E.D.N.Y. Jan. 12, 2010) ........................................................... 5

*Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424 (S.D.N.Y. 2014).................... 9

*Bianco v. Flushing Hosp. Med. Ctr.*, 2009 WL 2984842 (N.Y. Sup. Ct. Sept. 11, 2009)........... 21

*Bick v. City of N.Y.*, No. 95 Civ. 8781, 1998 WL 190283 (S.D.N.Y. Apr. 21, 1998) ................ 24

*Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280 (S.D.N.Y. 2016).................................. 23, 28

*Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157 (E.D.N.Y. 2006).......................... 11, 12, 22

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008) .............................................. 11, 12

*Cain v. Esthetique*, 182 F.Supp.3d 54 (S.D.N.Y. 2016) ....................................................... 16

*Cantu v. Flanigan*, 705 F. Supp.2d 220 (E.D.N.Y. 2010) .................................................... 23

*Caravantes v. 53d St. Partners*, 2012 WL 3631276 (S.D.N.Y. 23, 2012) ........................... 24

*Cavagnuolo v. Baker & McKenzie*, No. 1B–E–D–86–115824,
1993 WL 766865 (N.Y. Div. of Human Rights Dec. 17, 1993)............................... 21

*Chauca v. Abraham*, 30 N.Y.3d 325 (2017) ....................................................................... *passim*

*Chopra v. Gen. Elec. Co.*, 527 F.Supp.2d 230 (D. Conn. 2007) ......................................... 22

*Cross v. N.Y. City Transit Auth.*, 417 F.3d 241 (2d Cir. 2005)............................................ 3

*Cty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir. 1990)........................ 2–3

*Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130 (3d Cir. 2006) ........... 8

*Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332 (W.D. Pa. 2008)................. 8

*Delville v. Firmenich Inc.*, 23 F. Supp. 3d 414 (S.D.N.Y. 2014) ....................................... 6

*Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639 (E.D.N.Y. 2015) ....................................... 5

*DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003).................................................................... 20

*DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir. 1998) ........................... 10

*E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816 (S.D.N.Y. 2013)................................. 5

*Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320 (2d Cir. 1990)................................... 12

*E.E.O.C. v. Die Fliedermaus*, 77 F. Supp. 2d 460 (S.D.N.Y. 1999) ................................ 7

*Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008).......................................................... 9

*Flanagan v. N.Y. City Dept. of Ed.*, No. 13 Civ. 8456,
   2015 WL 11142630 (S.D.N.Y. Aug. 21, 2015)................................................................ 8

*Gagliardo v Connaught Labs, Inc.*, 311 F.3d 565 (3d Cir. 2002) ................................................ 21

*Gallegos v. Elite Model Mgmt. Corp.*, 81 N.Y.S.2d 624 (Sup. Ct. 2004) .................................... 28

*Garrigan v. Ruby Tuesday, Inc.*, No. 14 Civ. 155, 2014 WL 2134613
   (S.D.N.Y. May 22, 2014)........................................................................................... 7

*Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996) ...................................................... 10

*Gentile v. Cty. of Suffolk*, 926 F.2d (2d Cir. 1991)................................................................... 1

*Gonzalez v. Bratton*, 147 F. Supp. 2d 180 (S.D.N.Y. 2001)....................................................... 7

*Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228 (S.D.N.Y. 1999) ................................. *passim*

*Gutierrez v. Taxi Club Mgmt., Inc.*, No. 17 Civ. 532,
   2018 WL 3429903 (E.D.N.Y. July 16, 2018)............................................................... 28

*Harper v. Metro. Dist. Com'n*, 134 F. Supp. 2d 470 (D. Conn. 2001) ...................................... 22

*Health All. Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121 (S.D.N.Y. 2007)............................ 3

*Honzawa v. Honzawa*, 309 A.D.2d 629 (N.Y. App. Div. 2003) ................................................ 16

*In re Payne*, 707 F.3d 195 (2d Cir. 2013) ............................................................................ 12

*Johnson v. Strive E. Harlem Employment Grp.*, 990 F. Supp. 2d 435 (S.D.N.Y. 2014) ............... 7

*Jordan v. Bates Advert. Holdings, Inc.*, 816 N.Y.S.2d 310 (Sup. Ct. 2006)................................ 28

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166 (2d Cir. 2005)............................................. 7

*Katt v. City of N.Y.*, 151 F. Supp.2d 313 (S.D.N.Y. 2001) .................................................... 22

*Kondracke v. Blue*, 277 A.D.2d 953 (N.Y. App. Div. 2000)..................................................... 22

*Lavin-McEleney v. Marist Coll.*, 239 F.3d 476 (2d Cir. 2001)..................................................... 3

*Leather v. Ten Eyck*, 97 F. Supp. 2d 483 (S.D.N.Y. 2000) ...................................................... 1

*Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996)....................................................................... 26

*Legg v. Ulster Cty.*, 2017 WL 3668777 (N.D.N.Y. Aug. 27, 2017)........................................... 23

*Levans v. Delta Airlines, Inc.*, 2016 WL 9447211 (E.D.N.Y. Aug. 1, 2016) ........................ 22, 23

*Lewis v. N.Y. City Transit Auth.*, 12 F. Supp.3d 418 (E.D.N.Y. 2014).......................................... 8

*Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012) .............................................................. 12

*Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir. 1997) .............................................................. 28

*Malarkey v. Texaco, Inc.*, 983 F.2d 1204 (2d Cir. 1993)………………………………………..30

*Maldonado v. Scully,* 86 F.3d 32 (2d Cir. 1996)........................................................................ 3

*Mallis v. Bankers Tr. Co.*, 717 F.2d 683 (2d Cir. 1983) .................................................. 3

*Manufacturers Hanover Tr. v. Drysdale Secs. Corp.*, 801 F.2d 13 (2d Cir. 1986) ...................... 3

*McClain v. Pfizer, Inc.*, No. 3:06–cv–1795, 2011 WL 2533670 (D. Conn. June 27, 2011)... 21–22

*McGrory v. City of N.Y.*, No. 99 Civ.4062, 2004 WL 2290898
     (S.D.N.Y. Oct. 8, 2004) ................................................................................ 24

*McIntyre v. Manhattan Ford Lincoln Mercury*, 256 A.D.2d 269
     (N.Y. App. Div. 1998) ............................................................................ 22, 28

*McMahan v. UMG Mfg. & Logistics, Inc.*, No. 1:06-cv-1149,
     2008 WL 906152 (S.D. Ind. Mar. 31, 2008).................................................... 8

*Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138 (2d Cir. 2001).......................................... 4

*Mickle v. Morin*, 297 F.3d 114 (2d Cir. 2002) ........................................................ 3

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102 (2d Cir. 2013) ............... *passim*

*Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544 (S.D.N.Y. 2010)........................... 26, 27, 28

*Munoz v. Sociedad Espanola De Auxilio Mutuo y Benefiencia De Puerto Rico*,
     671 F.3d 49 (1st Cir. 2012)...................................................................... 21

*N.L.R.B. v. Ferguson Elec. Co.*, 242 F.3d 426 (2d Cir. 2001)………………………….……30

*N.Y.C. Transit Auth. v. State Div. of Human Rights*, 181 A.D.2d 891 (N.Y. App.Div. 1992) ..... 21

*N.Y.C. Transit Auth. v. State Div. of Human Rights*, 78 N.Y.2d 207 (1991)........................ 11, 12

*Ng v. Schram*, No. 10 Civ. 8347, 2014 WL 3812331 (S.D.N.Y. July 31, 2014)..................... 10

*Norton v. Sam's Club*, 145 F.3d 114 (2d Cir. 1998)................................................. 3

*Norville v. Staten Island Univ. Hosp.*, No. 96-CV-5222 (E.D.N.Y. Oct. 17, 2003).................. 23

*Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35 (E.D.N.Y. 2009).................................... 22

*Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029, 2007 WL 683985
     (S.D.N.Y. Mar. 2, 2007) ........................................................................ 20, 22, 29

*Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493 (9th Cir. 2000) ................. 21

*Phillip Morris USA v. Williams*, 549 U.S. 346 (2007) .............................................. 27

*Phillips v. Bowen*, 278 F.3d 103 (2d Cir. 2002) .................................................... 21

*Pollard v. E.I. DuPont De Nemours*, 338 F. Supp.2d 865 (W.D. Tenn. 2003) ...................... 21

*Poventud v. City of N.Y.*, 750 F.3d 121 (2d Cir. 2014) .............................................. 1

*Prozeralik v. Capital Cities Communications*, 222 A.D. 2d 1020 (N.Y. App. 1995) ........... 20, 23

*Purgess v. Sharrock*, 33 F.3d 134 (2d Cir. 1994) ................................................. 23, 28

*Quinby v. WestLB AG*, No. 04 Civ. 7406, 2008 WL 3826695

    (S.D.N.Y. Aug. 15, 2008) ................................................................................. 26, 28

*Rainone v. Potter*, 388 F. Supp. 2d 120 (E.D.N.Y. 2005) ........................................... 24

*Ramirez v. N.Y. City Off-Track Betting Corp.*, 112 F.3d 38 (2d Cir. 1997) ................................ 21

*Rosas v. Balter Sales Co. Inc.*, No. 12-CV-6557,

    2018 WL 3199253 (S.D.N.Y. June 29, 2018) .................................................... 25, 28

*Rose v. Brown & Williamson Tobacco Corp.*, 10 Misc. 3d 680 (Sup. Ct. 2005) ........................ 29

*Ruhling v. Newsday, Inc.*, No. Civ. 04-2430, 2008 WL 2065811

    (E.D.N.Y. May 13, 2008) .................................................................................... 24

*Salemi v. Gloria's Tribeca Inc.*, 115 A.D.3d 569 (N.Y. App. Div. 2014) .................................. 28

*Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305 (S.D.N.Y. 2009) .................................... 5

*Sequa Corp. v. GBJ Corp.*, 156 F.3d 136 (2d Cir. 1998) ................................................. 10

*Sermoneta v. N.Y.C. Transit Auth.*, 151 A.D.3d 565 (N.Y. App. Div 2017) ............................. 13

*Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363 (2d Cir. 1988) ......................................... 10, 29

*Solis-Vicuna v. Notias*, 71 A.D.3d 868 (N.Y. App. Div. 2010) ................................................. 25

*Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226 (E.D.N.Y. 2012) ............................................. 5

*Stampf v. Long Island R. Co.*, 761 F.3d 192 (2d Cir. 2014) ................................................. 28

*State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ...................................... 27, 30

*Stubbs v. Dudley*, 849 F.2d 83 (2d Cir 1988) ....................................................................... 2

*Syrnik v. Polones Const. Corp.*, 918 F. Supp. 2d 262 (S.D.N.Y. 2013) .............................. 27, 28

*Tennant v. Peoria & Pekin Union Railway*, 321 U.S. 29 (1944) ............................................. 3

*This Is Me, Inc. v. Taylor*, 157 F.3d 139 (2d Cir. 1998) ...................................................... 3

*Thompson v. N. Am. Stainless LP*, 562 U.S. 170 (2011).............................................................7

*Thorsen v. Cty. of Nassau*, 722 F. Supp.2d 277 (E.D.N.Y. 2010) ........................................... 22

*Tolbert v. Queens College,* 242 F.3d 58 (2d Cir. 2001).......................................................... 3

*Town of Hempstead v. State Div. Human Rights*, 233 A.D.2d 451 (N.Y. App. Div. 1996) ......... 21

*Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014)................................................ 20

*Turley v. Police Dep't of City of N.Y.*, 167 F.3d 757 (2d Cir. 1999)........................................ 6

*U.S. v. Gleason*, 616 F.2d 2 (2d Cir. 1979)........................................................................ 1

*U.S. v. Luisi*, 568 F. Supp. 2d 106 (D. Mass. 2008) ........................................................... 1

*U.S. v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004)................................................................ 12

*Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881 (7th Cir. 1996)........................................................ 7

*Vioni v. Providence Inv. Mgmt., LLC*, No. 08 Civ. 2950,

    2017 WL 3283860 (S.D.N.Y. Aug. 2, 2017) ........................................................ 11

*Wanamaker v. Columbian Rope Co.*, 108 F.3d 462 (2d Cir. 1997)........................................ 7

*Warren v. Pataki*, 823 F.3d 125 (2d Cir. 2016) ............................................. 2

*Watson v. E.S. Sutton, Inc.*, No. 02 Civ. 2739, 2005 WL 2170659

    (S.D.N.Y. Sept. 6, 2005).......................................................... 28

*Wellington Funding & Bus. Consultants, Inc. v. Cont'l Grain Co.*,

    259 A.D.2d 323 (N.Y. App.Div. 1999) ............................................. 23

*Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp.2d 555

    (S.D.N.Y. 2008) .......................................................... 10, 28

*Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) ................................... 10, 20, 21

**Statutes and Constitutional Provisions**

U.S. Constitution, Amendment VII ............................................................ 1

New York Constitution, Article I § 2............................................................ 1

New York City Human Rights Law, NYC Admin. Code §§ 8-101, *et seq.* ......................... *passim*

**Rules**

Fed. R. Civ. P. 50........................................................................ *passim*

Fed. R. Civ. P. 59........................................................................ 10, 11

N.Y. CPLR § 4111........................................................................ 10, 11

N.Y. CPLR § 5501........................................................................ 10, 11, 12

**Other Authorities**

David D. Siegel, *New York Practice* (6th ed. 2018) ...................................... 11

## INTRODUCTION

Trial by jury is a basic constitutional right.[1]  It is axiomatic that the jury is the arbiter of the facts on Plaintiff's retaliation claims under the New York City Human Rights Law ("NYCHRL") and that its judgment represents the conscience of the community.[2]  Despite Defendant Bekaert's protestations, there is no basis to disturb the jury's liability or damages verdicts – which are well-supported by the trial record and applicable law. The verdicts are entitled to a high degree of deference, with the Court indulging every reasonable inference needed to sustain them.[3]

First, Defendant Bekaert seeks judgment as a matter of law under Rule 50(b). But the Court considered and firmly rejected his arguments twice: first on summary judgment and then on his Rule 50(a) motion. Nothing in the record warrants revision of the Court's well-drawn conclusions.

Second, in the alternative, Defendant Bekaert seeks remittitur – or a new trial – on the grounds that the damages verdicts are purportedly excessive. Bekaert's contention regarding the standard of review is erroneous. In any event, the verdicts must stand under any test.  The awards are well within a permissible range under the facts elucidated at trial. The jury's compensatory damages award is supported by unrebutted testimony establishing severe and ongoing psychological and physiological harm likely to persist well into the future. Moreover, unlike Defendant Bekaert's cited cases, this matter involves the key additional component of reputational

---

[1] U.S. Constitution Amendment VII; New York Constitution Article I § 2.

[2] *See e.g.*, *U.S. v. Gleason*, 616 F.2d 2, 15 (2d Cir. 1979) ("Confidence in our jury system leads us to leave credibility solely to the jury which, as the conscience of the community, is expected to act with sound judgment."); *Leather v. Ten Eyck*, 97 F. Supp. 2d 483, 488 (S.D.N.Y. 2000) ("The jury expresses the conscience of the community, and this Court must refrain from placing unreasonable restrictions on its power to do so, or second guessing its conclusions."); *Poventud v. City of N.Y.*, 750 F.3d 121, 139-40 (2d Cir. 2014) (Lynch, J., concurring) (noting the general principle that, as the "conscience of the community," "[i]t is the role of the jury . . . to weigh the strengths and weaknesses of the evidence before them" and render judgment); *U.S. v. Luisi*, 568 F. Supp. 2d 106, 110-11, 115, 118-19 (D. Mass. 2008).

[3] *See, e.g.*, *Gentile v. Cty. of Suffolk*, 926 F.2d 142, 154 (2d Cir. 1991) ("The policy of deferring to a jury verdict is a powerful one, even in cases in which the jury has taken action that is at first blush difficult to explain.").

1

injury. This combination warrants a significantly higher verdict.  Finally, the modest punitive

damages award is supported by evidence of Defendant Bekaert's persistent, egregious conduct and

high net worth. The jury could reasonably conclude that the award is necessary for adequate

deterrence and to satisfy the goals of the New York City Human Rights Law.

In sum, the Court should deny Defendant Bekaert's motions and uphold the jury's verdicts.

## ARGUMENT

## I.   THE COURT SHOULD DENY DEFENDANT BEKAERT'S RULE 50(b) MOTION

Defendant Bekaert claims that Plaintiff failed to establish the legal elements of retaliation

under the NYCHRL and that he is entitled to judgment as a matter of law. However, his motion

reads like his prior summary judgment motion and Rule 50(a) motion: a self-serving spin on the

evidence in the light most favorable to himself. As the Court held in response to those motions,

the jury was entitled to reach its own conclusions and find for Plaintiff on her retaliation claim.

(*See* 6/22/18 Summary Judgment Tr. at 11:8-15:8; Trial Tr. ("Tr.") at 2142:12-2151:9, 2160:7-8.)

### A.  The Applicable Rule 50(b) Standard is Highly Deferential to the Jury's Verdict

The standard on Bekaert's Rule 50(b) motion is "strict," *Stubbs v. Dudley*, 849 F.2d 83, 85

(2d Cir 1988): The motion may only be granted if "a reasonable jury would not have a legally

sufficient evidentiary basis to find for [Plaintiff] on [her retaliation claim.]" Fed. R. Civ. P.

50(a)(1).  As distilled by the Second Circuit, this means that:

> Judgment as a matter of law is appropriate only if [the court] can conclude that, with
> credibility assessments made against the moving party and all inferences drawn against the
> moving party, a reasonable juror would have been compelled to accept the view of the
> moving party. A Rule 50 motion may only be granted if there exists such a complete absence
> of evidence supporting the verdict that the jury's findings could only have been the result
> of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming
> that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Warren v. Pataki*, 823 F.3d 125, 139 (2d Cir. 2016) (citations omitted). "A less stringent standard

would risk impermissibly substituting [courts'] view of the evidence for that of the jury." *Cty. of*

*Suffolk v. Long Island Lighting Co*., 907 F.2d 1295, 1311 (2d Cir. 1990).

In reviewing the motion, "[t]he court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens College,* 242 F.3d 58, 70 (2d Cir. 2001) (citation omitted); *see also Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir. 1996) ("[W]e defer to the jury's assessments of both of these issues.") (citations omitted). Instead, the court "must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor." *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998). Additionally, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002) (citation omitted). "[W]eakness of the evidence does not justify judgment as a matter of law… the evidence must be such that a reasonable juror would have been compelled to accept the view of the moving party." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (citation omitted).[4]  The Court must also presume that the jury followed the law as set forth in the jury instructions. *E.g. Manufacturers Hanover Tr. v. Drysdale Secs. Corp*., 801 F.2d 13, 27 (2d Cir. 1986).

Thus, "[a] party seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden." *Norton*, 145 F.3d at 118. Notably, "[a] movant's burden . . . is particularly heavy after the jury has deliberated in the case and actually returned its verdict." *Cross v. N.Y.C. Transit Auth.,* 417 F.3d 241, 248 (2d Cir. 2005).[5] A Rule 50(b) motion should therefore "be

---

[4] *See also Mallis v. Bankers Tr. Co*., 717 F.2d 683, 690 (2d Cir. 1983) ("Although we doubt that reliance… was justified in light of the clear warnings given… there was sufficient evidence for a jury to reach a contrary conclusion. *See Tennant v. Peoria & Pekin Union Railway,* 321 U.S. 29, 35 (1944) ('Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.')").

[5] *See also Lavin-McEleney v. Marist Coll*., 239 F.3d 476, 479 (2d Cir. 2001) ("high bar"); *Health All. Network, Inc. v. Cont'l Cas. Co.*, 245 F.R.D. 121, 125 (S.D.N.Y. 2007) ("high burden").

granted cautiously and sparingly." *Meloff v. N.Y. Life Ins. Co.*, 240 F.3d 138, 145 (2d Cir. 2001). Here, Bekaert fails to carry his steep burden; the jury's verdict is backed by substantial evidence.

### B. <u>Plaintiff Engaged in Protected Activity and Bekaert Was Aware of Such Activity</u>

Defendant Bekaert does not dispute that Plaintiff engaged in protected activity and that he knew about such activity, including her repeated internal complaints about sexual harassment and her filing of this lawsuit with statutory discrimination and retaliation claims. (*See also* 6/22/2018 Summ. J. Tr. at 12:18-22.)  Instead, Defendant Bekaert quibbles about the timing of Plaintiff's complaints. In doing so, he improperly minimizes many instances of Plaintiff's protected activity.

Contrary to Bekaert's claims, there is substantial evidence that Plaintiff's initial complaints to Columbia administration squarely concerned gender discrimination. Prof. Patrick Bolton testified unequivocally that he and Prof. Ravina reported Bekaert's sexual harassment to Senior Vice Dean Johar in mid-May 2014. (Tr. 2006:1-6.)[6]  Plaintiff then brought Prof. Suzanne Goldberg to her next meeting with the administration in mid-June 2014 because of Prof. Goldberg's expertise on gender issues. (*Id.* 251:1-17.) Plaintiff also presented the administration with emails evincing Bekaert's gendered conduct. (*Id.* 247:7-11.) Moreover, there is unmistakable evidence that Bekaert knew from the outset that Plaintiff's complaints were about sexual harassment: he wrote an email on July 12, 2014, stating, ***"I am dealing with this harassment case."*** (Ex. 46.)[7] Hence, the Court

---

[6] In her video testimony, Senior Vice Dean Johar confirmed that Plaintiff's complaints raised gender issues. (Ex. A (Johar Video Test.) at 85:15-86:03.)

[7] Plaintiff engaged in additional protected activity by resisting Defendant Bekaert's conduct that she perceived as harassing and by expressing her disapproval. *See, e.g.*, *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 106-107, 112, 114-16 (2d Cir. 2013) (citing *Albunio v. City of N.Y.*, 16 N.Y.3d 472, 479 (2011)).  For example, Plaintiff made clear that she wanted their relationship to be strictly professional (Tr. 162:1-23) and rejected Bekaert's physical advances (*id.* 191:1-13, 197:1-25). When Bekaert told her suggestively that if she were "nicer" to him, her projects would go faster, Plaintiff rejected the overture, pointedly stating that she was *already as nice as she could be*. (*Id.* 209:19-210:18). She further protested Bekaert's harassing treatment by stating, "We need to re-evaluate our working relationship to make sure that everyone is treated professionally, respectfully, and correctly." (Ex. 35)

must disregard Bekaert's claims that Plaintiff did not engage in protected activity until July 2014 and that he did not know about such activity until September 2014.

### C. The Jury Properly Concluded that Bekaert's Conduct Would Be Reasonably Likely to Deter a Person from Engaging in Protected Activity

The NYCHRL expressly covers "*any manner*" of retaliation against a person who engages in protected activity; retaliatory acts need only be "reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7). Assessing the chilling effect of such acts is a quintessential jury question. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013). "A decision on whether an action was reasonably likely to deter the plaintiff must be made in light of the City Council's goal of melding the broadest vision of social justice with the strongest law enforcement deterrent." *Sotomayor v. City of N.Y.,* 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012) (citation omitted), *aff'd*, 713 F.3d 163 (2d Cir. 2013).[8] As detailed below, there is credible evidence that Bekaert engaged in multiple forms of actionable retaliation, including interfering with Plaintiff's work and disparaging her throughout her profession.

#### 1. Defendant Bekaert Obstructed Plaintiff's Work Progress

First, Plaintiff presented credible evidence that Bekaert impeded her work because of her complaints. Bekaert does not deny that such conduct would qualify as retaliatory,[9] but claims there is no evidence of actual delay. However, the jury need not have accepted Bekaert's spin.

Plaintiff provided extensive testimony explaining how Bekaert stalled their joint work in

---

[8] *See, e.g.*, *Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 661-62 (E.D.N.Y. 2015) (discussing lenient standard); *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 343 (S.D.N.Y. 2009) (finding that, under the "looser" NYCHRL standard, acts such as excluding an employee from meetings, failing to provide a translator, and excessive supervision are actionable); *Audrey v. Career Inst. of Health & Tech.*, No. 06-CV-5612, 2010 WL 10094570, at *18 (E.D.N.Y. Jan. 12, 2010) (hostility from co-workers and supervisor), *adopted by* 2014 WL 2048310, at *1; *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 851 (S.D.N.Y. 2013) (holding that "cumulative nature" of incidents alleged, including public reprimands and hostile treatment by senior management, could satisfy the NYCHRL's "broader standard" for retaliation).

[9] *See also* Pl. 5/1/18 Opp. to Bekaert MSJ at 24; Pl. 5/1/18 Opp. to Columbia MSJ at 9-10 & nn.10, 12-13.

reaction to her complaints, including by having her perform time-wasting exercises, manufacturing undue criticism, and delaying the approval of drafts. (*See, e.g.*, Tr. 259:22-265:4, 755:1-16, 757:7-18, explaining how Bekaert delayed the International Diversification paper by six months.) Bekaert refused to meet deadlines and would not commit to any schedule. (*See, e.g.*, Ex. 68: "Imagine what she will do if I do not make the deadline (which I guess I won't)"; Tr: 2268:13-23.) Further, Bekaert ignored Prof. Ravina's work, excluded her from the project, and flatly refused to share software codes that were necessary to complete the research.  (Ex. 58: "I am going to mostly ignore her work"; Tr. 301:19-303:12; Exs. 53, 91, 95.)  Defendant Bekaert put up these roadblocks at a time when he knew she was on the tenure clock and needed to publish quickly.[10]

Thus, the jury could reasonably have concluded that Bekaert impeded Ravina's research progress and that such actions were reasonably likely to deter a person from protected activity.[11]

### 2.   Bekaert Retaliated by Disparaging Ravina in the Profession

There is ample evidence that Bekaert widely disparaged Prof. Ravina in the profession shortly after she engaged in protected activity. He sent more than two dozen emails in which he attacked her mental stability, integrity, and professional abilities using vile epithets. (Exs. 39, 46, 57-58, 60-61, 73-74, 82, 89, 96, 111, 127, 135-137, 140-146, 149-153, 162, 165-167.) Bekaert

---

[10] Bekaert also caused delays after Plaintiff engaged in the protected activity of rebuffing his advances. (*See, e.g.*, Ex. 20: "I would not do anything right now… as I still want to write up a bullet point skeleton for the paper to jump start us."; Ex. 36: "I CANNOT give you a schedule and asking for one is SILLY"). He even admitted to having abandoned the research for months because she had "pissed [him] off," reflecting a strong intent to use his control over the project to punish her for opposing his conduct. (Ex. 57).

[11] Bekaert argues that that the jury did not base its verdict on any research delays because it did not award back pay or front pay. It is improper to draw this inference in Bekaert's favor. In exercising its constitutionally-mandated deference to the jury, the Court is bound to reconcile any potential inconsistency in the verdicts. *Turley v. Police Dep't of City of N.Y.*, 167 F.3d 757, 760 (2d Cir. 1999); *Delville v. Firmenich Inc.*, 23 F. Supp. 3d 414, 422 (S.D.N.Y. 2014). Here, for example, the jury could have rationally held that the evidence introduced at trial did not sufficiently establish particularized economic harm – i.e., that Plaintiff suffered discrete back and front pay losses as a result of Bekaert's retaliation – but still concluded that his conduct caused her emotional harm and that her professional reputation has been injured in a manner likely to affect her career and business prospects. *See* Dkt. 242-11, Damages Jury Instructions.

went well beyond denying Plaintiff's allegations. Instead, he blasted out these messages smearing her to leading economists and industry figures worldwide, in academia, government, business, consulting, and publishing – every key aspect of the finance world.  *See* § II(B)(1)(b), *infra*.[12]

While Bekaert attempts to present an innocuous version in which he was merely voicing his "personal opinions" to his "friends" and "girlfriend," the jury was not required to accept this slant.  There is ample contravening evidence that he intended his message to be widely distributed: He designated a "point person" for a leading journal, targeted his message to a top economist who was "well plugged in," and encouraged others to "feel free to take this to the right people."[13] (Exs. 140, 144, 145.)  Thus, the jury could rightly conclude that Bekaert's many emails disparaging Prof. Ravina in the finance community would be reasonably likely to deter similar complaints.[14]

### D.  The Jury Properly Concluded that Bekaert Acted from a Retaliatory Motive

While Bekaert claims he lacked retaliatory intent, the record is replete with evidence of his animus towards Prof. Ravina for pursuing her complaints and lawsuit. He repeatedly expressed his

---

[12] Bekaert sent all the disparaging emails after learning of Ravina's protected activity. *See* § I(B), *supra*.

[13] Numerous courts have held that similar disparagement, rumor-spreading, and shunning are actionable retaliation. *See, e.g.*, *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997) ("blacklist[ing]" employee or "sully[ing] [her] reputation"); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178-79 (2d Cir. 2005) (false statement that interferes with plaintiff's employment prospects); *Mihalik*, 715 F.3d at 116 (humiliating and shunning plaintiff); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 891 (7th Cir. 1996) (conduct "that impinges on [former employees'] future employment prospects" such as providing false information to new employer); *Garrigan v. Ruby Tuesday, Inc.*, No. 14 Civ. 155, 2014 WL 2134613, at *6 (S.D.N.Y. May 22, 2014) (spreading rumors); *Johnson v. Strive E. Harlem Employment Grp.*, 990 F. Supp. 2d 435, 449 (S.D.N.Y. 2014) (admonishment, by individual with stature, to avoid contact with plaintiff); *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 196 (S.D.N.Y. 2001) ("[T]he sort of retaliatory conduct that would naturally create major obstacles for a former employee in obtaining future employment in her field is actionable…[.]") (citation omitted); *E.E.O.C. v. Die Fliedermaus*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999) (public distribution of defamatory flyers that "could affect Plaintiffs' ability to find jobs").
  Accordingly, Bekaert's half-hearted First Amendment objections are misplaced. The jury was entitled to conclude that he was not simply sharing his opinions on Plaintiff's claims but acting to foil her career.

[14] Bekaert claims that his emails could not have deterred Plaintiff because she did not learn of their details until later. But the test is objective: whether a person with perfect foresight of the retaliatory acts at the time of her complaints would be reasonably likely to be deterred. *Cf. Thompson v. N. Am. Stainless LP*, 562 U.S. 170, 175 (2011). Otherwise, the NYCHRL would fall far short of its mandate and enable latent retaliation.

outrage in no uncertain terms. (*See, e.g.*, Ex. 47, email to Ravina demanding to know "who set you

up" to bringing a complaint; Ex. 61: expressing a desire to "strangle" her; Ex. 136: responding to

this lawsuit as "[a] very angry, Geert"; Ex. 137, stating, after Ravina filed her suit, that the "evil

bitch went ahead" and that his "worst nightmare" had come true; Ex. 162, indicating his intention

to "strike back" at her after she brought suit); *see generally* § II(B)(1)(b), *infra*.  At trial, Defendant

Bekaert remained enraged; he testified that "what Enrichetta has done to me is pure evil" (Tr.

1605:14-16) and admitted he was "angry" when sending his disparaging emails (*id.* 1581:6-8).

Division Chair Zeldes confirmed that Bekaert made it known how upset he was about the process

Ravina initiated against him. (Ex. B (Zeldes Video Test.) at 140:21-141:18.)  Not only is Bekaert's

retaliatory rage palpable on the face of his emails, but he explained that he was driven by his wrath

even while trying to sound neutral and professional. (Ex. 61: "I will be over the hill professional

with her. That may actually get more under her skin than me giving in to her schemes."; Ex. 67:

indicating that that he was writing "something bland and neutral, while I am thinking what an

incredible mean b[itch] she is"). Thus, the jury could readily have inferred the requisite intent from

Bekaert's anger about Prof. Ravina's protected activity and his admissions of vengefulness.[15]

Further, the jury may have properly inferred Bekaert's intent from the marked change in

his behavior after she complained. (Tr. 260:4-263:1.) Of course, jurors were also entitled to

---

[15] Bekaert argues that his disparaging emails were merely a response to *press coverage* of Plaintiff's lawsuit. Again, the jury was free to reject this explanation and the Court must honor its judgment. Indeed, many of Bekaert's emails included his "official" press response denying Plaintiff's allegations; but he did not stop there and went on to viciously smear her name. Further, contrary to Bekaert's unsupported claims, Plaintiff's press interviews squarely concerned her NYCHRL allegations and were themselves protected activity. *See, e.g.*, *Lewis v. N.Y. City Transit Auth.*, 12 F. Supp. 3d 418, 449 (E.D.N.Y. 2014) ("speaking to the media"); *Flanagan v. N.Y. City Dept. of Ed.*, No. 13 Civ. 8456, 2015 WL 11142630, at *12 (S.D.N.Y. Aug. 21, 2015) ("media outreach"); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135–36 (3d Cir. 2006) ("public manifestations of disagreement with illegal employment practices," e.g., an appearance on 60 Minutes); *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp. 2d 332, 374 (W.D. Pa. 2008) ("public expressions of opposition, including interviews with the press"); *McMahan v. UMG Mfg. & Logistics, Inc.*, No. 1:06-cv-1149, 2008 WL 906152, at *4 (S.D. Ind. Mar. 31, 2008).

presume that Bekaert intended the "natural consequences" of his actions (e.g. *Beastie Boys v. Monster Energy Co*., 66 F. Supp. 3d 424, 459-60 (S.D.N.Y. 2014)) – e.g., that when he disparaged her in her field, he intended to damage her professional standing and long-term career prospects.

> As the Court recognized at summary judgment:
>
> Bekaert's anger towards plaintiff in the aftermath of her complaints has been well-demonstrated, allowing a reasonable jury to conclude that retaliation… motivated Bekaert's subsequent conduct, and that the conduct was reasonably likely to deter plaintiff from protected activity... At trial, Bekaert may of course argue his communications about plaintiff [to] his girlfriend and other friends were simply his personal opinions about a contentious matter. But because the people to whom Bekaert disparaged plaintiff plausibly could have been an effect on her career, a jury must decide the disputed nature of such communications and whether the intent behind them was retaliation.

(6/22/18 Summ. J. Tr. at 14:17-15:5) The jury has now spoken, and its verdict must stand.

### E.   There is No Basis to Overturn the Jury's Finding of Punitive Liability

Finally, Bekaert argues that the evidence at trial did not meet the standard for punitive liability under *Chauca v. Abraham*, 30 N.Y.3d 325 (2017). But Bekaert did not raise this point in his Rule 50(a) motion and cannot pursue it now. *See* Fed. R. Civ. P. 50(b); *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury.").[16]

## II.   THE COURT SHOULD UPHOLD THE DAMAGES VERDICTS

The jury's carefully-considered damages verdicts are entitled to great deference. Here, the awards are supported by extensive trial evidence concerning Bekaert's research interference and smear campaign and their profound impact on Ravina's emotional state and reputation. The awards

---

[16] In any case, the jury was fully justified in finding the *Chauca* standard satisfied. As set forth herein, there was evidence that Bekaert engaged in a concerted, multi-year effort to interfere with Plaintiff's work progress and badmouth her in her field, thereby tarnishing her professional standing and future opportunities. Moreover, Bekaert engaged in this conduct with knowing disregard for applicable anti-retaliation laws – clearly demonstrating willfulness. (*See, e.g.*, Exs. 153, 162, 165, 166.)  Bekaert's spin about the nature and extent of his conduct is insufficient to warrant judgment in his favor under Rule 50(b).

are consistent with a host of verdicts in similar cases. Thus, there is no basis to disturb the verdicts.

### A. Contrary to Defendant Bekaert's Arguments, a Deferential Standard Applies

The Second Circuit acknowledges that "calculation of damages is the province of the jury." Hence, under federal law, the Court may only set aside the jury's award "if it is so high as to shock the judicial conscience and constitute a denial of justice." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671-72 (2d Cir. 2012) (citations omitted).[17] Likewise, the Court should not grant a new trial under Rule 59 "unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Ng v. Schram*, No. 10 Civ. 8347, 2014 WL 3812331, at *2 (S.D.N.Y. July 31, 2014) (Abrams, J.) (citing *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370 (2d Cir. 1988)). Indeed, to warrant a new trial, the jury's verdict must be "egregious." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).

Bekaert seeks to buttress his motion by invoking an inapplicable State rule of civil practice, CPLR § 5501(c), which sets forth the standard for the review of monetary awards in a set of state common law tort cases that require an itemized verdict under CPLR § 4111. Such cases are limited to medical malpractice actions (CPLR § 4111(d)) and other personal injury, property, and wrongful death actions (CPLR § 4111(e)). However, Plaintiff's statutory NYCHRL claim is neither brought in state court nor under state tort law.  Further, at trial, Defendants did not maintain that an itemized verdict was required under CPLR § 4111 and the verdict sheet did not provide for one. *Cf. Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 420 (1996) (observing that § 5501(c) applies "when a jury returns an itemized verdict, as the jury did in this case"). Bekaert has thus waived the issue. *See Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) ("It is well-settled that Rule

---

[17] *See also Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 563-67 (S.D.N.Y. 2008) (applying this standard to claims under Title VII and NYCHRL, including a category of damages – punitive awards over $300,000 – available only under the NYCHRL), *aff'd* 344 Fed. Appx. 628 (2d Cir. 2009).

59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'").

Given the Court's mandate to construe and apply the NYCHRL as liberally as possible, with interpretations of Title VII and the NYSHRL acting as a floor (*see Chauca*, 30 N.Y.3d at 333-34; *Mihalik*, 715 F.3d at 109), the deferential federal test should apply.[18] Neither the Second Circuit nor the New York Court of Appeals has directly addressed the standard for remittitur in NYCHRL cases. However, the Second Circuit made its most definitive pronouncement on the intersection of § 5501(c) and the New York State Human Rights Law ("NYSHRL") in *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127 (2d Cir. 2008). The trial court engaged in an intensive examination of this issue, considering the plain language and legislative history of § 5501(c) and the strong public policy purposes of the NYSHRL. It concluded that § 5501(c) was designed for malpractice and common law personal injury cases and did not apply to NYSHRL claims. In particular, § 5501(c) "errs on the side of too little compensation for malpractice victims, whereas the [NYSHRL]… perceives a legislative intent to avoid insufficiently compensating the victims of discrimination." *See Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 189-97 (E.D.N.Y. 2006). Upon review, the Second Circuit agreed that *N.Y.C. Transit Auth. v. State Div. of Human Rights*, 78 N.Y.2d 207, 219 (1991), rather than § 5501(c), "states the applicable law of New York" on the standard for remittitur in NYSHRL cases. 531 F.3d at 137-38.[19] There have been no intervening developments in the New York Court of Appeals. Under the "one-way ratchet" rule applicable to the more-protective

---

[18] Application of restrictive state practice rules for common law tort claims would conflict with the remedial purposes of the NYCHRL (*see* NYC Admin. Code § 8-101) and the City Council's broad mandate that aggrieved individuals are entitled, without limitation, to "damages, including punitive damages, and… injunctive relief and such other remedies as may be appropriate." *Id*. § 8-502(a).

[19] *See also Vioni v. Providence Inv. Mgmt., LLC*, No. 08 Civ. 2950, 2017 WL 3283860, at *9 (S.D.N.Y. Aug. 2, 2017) (quantum meruit case: "It is not clear… that § 5501(c) applies here, because this is not an action in which [] § 4111 requires an itemized verdict."); David D. Siegel, *New York Practice* (6th ed. 2018) at 788 (indicating that § 5501(c) applies to "common personal injury and wrongful death actions").

NYCHRL (*see Mihalik,* 715 F.3d at 109), this Court is bound by *Brady* not to apply § 5501(c).[20]

*Transit Authority* sets out an intermediate, but still deferential, standard, meant to ensure that a compensatory damages award is "neither punitive nor arbitrary." A court considers: (1) whether the relief is reasonably related to the wrongdoing; (2) whether the award is supported by evidence; and (3) how the verdict compares with awards in similar cases. 78 N.Y.2d at 217, 219; *Brady*, 455 F. Supp. 2d at 191-97. "Unless the award is so arbitrary and capricious as to constitute an abuse of discretion, it is not erroneous as a matter of law." *Transit Auth.,* 78 N.Y.2d at 217.

Here, under any of the three standards – the federal "shocks the conscience" test, the *Transit Authority* factors for whether an award is "arbitrary and capricious," or § 5501(c)'s "deviates *materially*" rule – the jury's verdicts are well-justified and must withstand review.[21]

### B.   The Jury's Compensatory Damages Award Is Reasonable and Must Stand

### 1.   Plaintiff Established Severe and Ongoing Psychiatric and Reputational Harm Caused by Defendant Bekaert's Unlawful Retaliatory Conduct

The compensatory damages award here is supported by a unique combination of (i) severe psychiatric injury and (ii) substantial reputational harm, both with profound and lasting impacts.[22]

#### a.   The Evidence at Trial Established Serious, Ongoing Psychiatric Injury

Contrary to Bekaert's claims, Plaintiff presented extensive evidence of serious psychological and physiological injury that resulted from his retaliation and that is expected to

---

[20] Bekaert cites *Lore v. City of Syracuse*, 670 F.3d 127 (2d Cir. 2012), which made a simple suggestion that § 5501(c) applies to NYSHRL claims. *See id.* at 177. But *Brady* is the only case to substantively consider the issue; *Lore* suffers from the same defect identified by *Brady* with regard to an earlier decision: It "did not present the question of whether the 'deviates materially' standard or the *Transit Authority* standard applied." 531 F.3d at 138 n.2. Particularly where the *Lore* panel did not meaningfully address the issue or apply any reasoning, it was not entitled to reverse the prior *Brady* decision *sub silentio*, and *Brady* controls. *See U.S. v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004); *In re Payne*, 707 F.3d 195, 205 (2d Cir. 2013).

[21] Under any of the tests, a court should adopt the "least intrusive" approach possible and grant remittitur only to the "maximum amount" that is "not excessive" – i.e., the upper limit of an acceptable range. *E.g. Earl v. Bouchard Transp. Co., Inc.*, 917 F.2d 1320, 1328-30 (2d Cir. 1990).

[22] The bifurcated damages phase focused exclusively on injuries caused by Bekaert's retaliation.

persist long into the future and potentially for the rest of her life. Her account is supported by medical testimony that the Court must credit in its entirety, as Bekaert did not rebut Plaintiff's evidence with any expert testimony and *Bekaert did not even cross examine Plaintiff's psychiatrist*. *See Sermoneta v. N.Y.C. Transit Auth.*, 151 A.D.3d 565 (N.Y. App. Div. 2017) (where plaintiff's psychiatric evidence was left unrebutted, upholding awards of $700,000 for past pain and suffering and $1 million for future pain and suffering). Bekaert's motion simply ignores all this evidence.

The medical testimony established that Bekaert's retaliation caused Plaintiff symptoms of emotional distress consistent with multiple psychiatric disorders. Plaintiff's treating psychiatrist, Dr. Howard Silbert, testified that he diagnosed her with generalized anxiety disorder and that she also exhibited features of depression and post-traumatic stress disorder. (Tr. 3142:17-25) Dr. Silbert concluded that these conditions were caused by Bekaert's retaliation – what he described as the "very disturbing experiences [she] had with Dr. Bekaert and the aftermath of the continued consequences of those experiences." (*Id*. 3149:5-11.) Plaintiff had no prior psychiatric history (*id*. 3149:17-19), and Dr. Silbert ruled out other potential causes of her condition. (*Id*. 3148:4-15.)

Plaintiff's symptoms were wide-ranging and life-altering. She described Bekaert's retaliation and its effects on her as "an all-consuming situation that took over my life." (*Id*. 3029:15-16.) Dr. Silbert confirmed that she satisfied all the diagnostic criteria for generalized anxiety disorder, including "excessive anxiety and worry, meaning apprehensive expectation," difficulty controlling the worry, "[r]estlessness, easily fatigued… extreme difficulty concentrating, irritability, muscle tension, and an extreme sleep disturbance." (*Id*. 3147:3-9; *see also id.* 3146:3-3148:18.)[23] Dr. Silbert further testified that she has also experienced significant manifestations of depression – "[l]ow self-esteem, loss of interest in usually pleasurable activities, decreased energy,

---

[23] Dr. Silbert's billing records confirmed the diagnosis. (*See id.* at 3141:3-10, describing Trial Ex. 201)

increased fatigue, suicidal feelings, despair, hopelessness" (*id*. 3148:19-23), as well as symptoms of PTSD – "extreme anxiety, being flooded by memories of the traumatic experiences, being unable to get these feelings and thoughts out of her mind. They were intrusive in a way that she could not manage them at times and that continues to be the case." (*id*. 3148:24-3149:4)

Dr. Silbert testified unequivocally that Plaintiff's symptoms were "severe" (*id*. 3140:16-17) and "unabated" (*id*. 3140:18-21). Dr. Silbert also described a number of Plaintiff's symptoms as "extreme." (*Id*. 3134:1-8, 3138:5-11, 3140:9-15, 3147:3-9, 3147:21-25, 3149:1-4.) Indeed, Plaintiff's psychiatric condition was so dire that she experienced suicidal ideation. She testified that she began having thoughts of death in the Spring of 2015 and serious suicidal ideation during the Summer of 2015. (*Id*. 3025:15-3026:1: "It was now many months that I was trying to solve this [Bekaert's retaliation], and I just felt abandoned… I felt like... I was lost and there was nothing I could do. And I…started feeling that I would die. That I would cross the street, and some car would run me over...I felt like I would be crushed by the situation."; *id.* 3027:21-3028:7: "I started thinking about suicide…I felt the strong force in me to just jump in front of the subway. And… I started to, to fight that feeling, because I didn't want to jump. But at the same time I couldn't, I couldn't hold myself.") Dr. Silbert confirmed her suicidal ideation. (*Id*. 3140:9-15, 3148:19-23.)

Plaintiff also suffered various physical ailments as a result of Bekaert's conduct. For example, she testified about harrowing insomnia with recurring nightmares (*id*. 3022:24-3023:4); Dr. Silbert confirmed her "extreme sleep disturbance" (*id.* 3147:9). She also suffered substantial weight gain (*id*. 230:19-20, 3022:25-3023:1), back pain (*id*. 3022:25-3023:2), and the onset of subacute hyperthyroidism requiring medication. (*Id*. 3030:7-11.) Dr. Silbert testified about yet more "somatic complaints, like GI disturbance [and] headaches." (*Id*. 3134:1-8.)

Bekaert's retaliation has profoundly diminished Prof. Ravina's overall functioning in life.

As Dr. Silbert testified: "She's not functioning anywhere near what I believe her demonstrated potential is." (*Id.* 3153:4-11.) Dr. Silbert characterized the impact as "extreme": "It [ha]s had an extremely deleterious effect on her ability to get her work done to the point where she is despairing about her current status as well as her future status in the field." (*Id.* 3147:21-25.)  Plaintiff also explained to the jury just how profoundly she has been impaired in her ability to work. (*Id.* 371:1-7.)[24] Bekaert's retaliation has also impaired Plaintiff's social functioning. As Dr. Silbert testified, she now has an "aversion to social situations." (*Id.* 3140:13.) Dr. Silbert further testified: "The symptoms have impacted her social relationships. She's tended to shy away from friends, she avoids contact with people, she's miserable." (*Id.* 3147:21-3148:3.)  Prof. Ravina vividly described her isolation from others as feeling like being "in your own tunnel." (*Id.* 371:15-16.)

The emotional and physical harms caused by Bekaert's retaliation have been so severe that Prof. Ravina has required years of ongoing, intensive psychiatric treatment. Dr. Silbert tailored a course of treatment comprised of regular, individualized psychotherapy. (*Id.* 3150:5-8.) With weekly appointments, Plaintiff had undergone approximately *one hundred and seventy (170)* sessions by the time of trial – at a total cost of over $50,000. (*Id.* 3131:9-17.)

The evidence establishes that Prof. Ravina's psychiatric condition has not improved and requires ongoing treatment.  Dr. Silbert testified that she would require continued treatment for the foreseeable future (*id.* 3153:23-25), and she confirmed that she would continue to go to therapy for a long time (*id.* 3029:4-5). ***Dr. Silbert described her prognosis as "poor."*** (*Id.* 3140:5-3141:2.)

In sum, Plaintiff's life and career have been dramatically impaired, to the point that she has felt suicidal. The fabric of her life is torn asunder. The effect is deep and lasting. As the trier of

---

[24] Prof. Ravina testified: "I would go to the office and I would just feel blank. I would be worrying about this constantly... I would try to work, but [] I had a very pressing issue. My life and my career… at Columbia, but even beyond that, were affected by it. I had a big problem that could not exit my mind... It was dominating my mind." (Tr. 371:1-7.)

fact, the jury was entitled to place substantial value on Plaintiff's past and anticipated future injuries. Indeed, the cost of medical treatment alone is likely to reach well into the six figures.[25]

### b.  The Evidence Reflects Serious Harm to Plaintiff's Reputation

Moreover, Plaintiff also established substantial harm to her reputation and professional standing. The record showed that Defendant Bekaert directed his poison pen emails to some of the most influential people in her field. Bekaert testified that he reached out to his "big network of co-authors and friends" (Tr. 1601:17-18) and Plaintiff confirmed that "the professional network that Professor Bekaert disparaged me to, it's quite extensive and quite powerful." (Tr. 2972:16-17.) The harm to Ravina's reputation may be inferred from the content of Bekaert's emails and the many people in her profession who received them.[26] In addition, Plaintiff also testified about the impact of Bekaert's campaign against her, including how she is being shunned in her profession.

Bekaert disparaged Prof. Ravina to many key academics in her field – such as Campbell Harvey, then President of the **American Finance Association**, the leading professional association for finance scholars.  (Tr. 1025:12-1026:3.) Bekaert admitted that he targeted Prof. Harvey because Harvey was "well plugged in" in the finance realm. (Ex. 140; Tr. 1025:1-5, 1993:2-4.)[27]

Bekaert also disparaged Plaintiff to **professors at business schools throughout the U.S. and around the world,** where she would have hoped to secure employment. These include

---

[25] In line with Dr. Silbert's testimony, the jury was entitled to apportion Plaintiff's damages to the retaliation claim and not to claims on which it found no liability; it must be presumed to have done so, per the Court's instructions. In any case, "[t]hat some of the emotional suffering might be attributable to defendant's conduct prior to [that for which it is liable] does not preclude an award of damages when it is manifest that a compensable injury has indeed occurred and that the harm may result from the aggravation of an existing injury." *Honzawa v. Honzawa*, 309 A.D.2d 629, 631 (N.Y. App. Div. 2003) (citations omitted).

[26] Defendant Bekaert's attack on Ravina in her profession may thus be likened to defamation *per se. See, e.g.*, *Cain v. Esthetique*, 182 F.Supp.3d 54, 73 (S.D.N.Y. 2016) (doctrine of presumed damages).

[27] Bekaert also expressed his views on Prof. Ravina to Prof. Wei Jiang, the Chair of her Reading Committee at Columbia, and Prof. Robert Hodrick, a representative on her Promotion & Tenure Committee.  (Ex. 135; Tr. 1041:11-24.)

Harvard (Ex. 151; Tr. 3058:3-6); Univ. of California, Berkeley (Ex. 111; Tr. 1072:24-1073:1);

Duke (Ex. 167; Tr. 1025:12-15); Univ. of North Carolina (Ex. 136; Tr. 1029:4-8); Univ. of

Washington (Exs. 136, 153; Tr. 1029:25-1030:2); Rice (Ex. 141; Tr. 1031:4-6); Univ. of

California, Davis (Ex. 162; Tr. 1069:2-6); Univ. of Maryland (Ex. 142; Tr. 1032:6-12); Fordham

(Ex. 136; Tr. 1030:11-13); Purdue (Ex. 137; Tr. 1023:11-16); Hong Kong Univ. of Science and

Technology (Exs. 89. 143; Tr. 958:11-15); NEOMA Business School (Ex. 165; Tr. 1070:1-7);

Univ. of British Columbia (Ex. 152; Tr. 1058:15-24); Univ. of Ghent (Ex. 149; Tr. 1055:22-24);

Univ. of Sussex (Ex. 144; Tr. 1045:6-10); and Univ. of Sydney (Ex. 127; Tr. 1017:12-16).

Plaintiff is currently in a temporary, non-tenure-track position with no significant

employment prospects, and she explained in testimony how Bekaert's emails to professors harm

her job search, especially given the nature of academic hiring (Tr. 2977:1-9):

> In academia the people that would decide whom to hire in terms of professors are other
> professors. They form a committee, and then they look at the credentials, they talk with
> each other, and they decide is this a person that we want to have around, both because of
> the academic credentials and also for the type of people that they are, especially because at
> some point, if you give tenure to someone, you are, quote, stuck with them, you are going
> to be with them for quite a long time, so these are considerations going in.

The evidence further showed Bekaert's interference with Prof. Ravina's ability to publish

research in her field.  In an email he vowed, "If she goes it alone against my will, I will stop her. I

know every single editor!"  (Ex. 73.)  Bekaert subsequently sent disparaging emails to **editors and**

**publishers of the top finance journals** where Plaintiff hoped to publish, including the *Journal of*

*Finance* (Ex. 136; Tr. 1025:19-20); *Journal of Banking and Finance* (Exs. 136, 137, 140, 144,

153; Tr. 1023:17-19, 1029:4-24; 1045:10); and the *Review of Financial Studies* (Ex. 142; Tr.

1032:15-17; *see also id.* 2976:5-16). Bekaert also wrote to the Director of Economics, Finance,

Accountancy, and Marketing at the Elsevier publishing house, designating her as the "point

person" for a prominent journal (Tr. 1044:22-25; Ex. 144) and ensuring his message would spread.

But Bekaert did not stop with academics and publications.  He smeared Prof. Ravina to other institutions where she might look for work. He sent emails to the Federal Reserve Board and European Central Bank (Exs. 46, 73, 74, 82, 135, 136; Tr. 952:17-21, 1030:3-8), **central banks** where she hoped to seek a job. Indeed, the people to whom Bekaert sent his emails are typically involved in the hiring process. (Tr. 2977:20-2978:2.) Bekaert further targeted his disparagement campaign to a **premier litigation consulting firm** for finance professionals, Cornerstone Research (Tr. 1046:21-23); Plaintiff explained that the firm "decides about very lucrative opportunities for people that are in finance and economics" (Tr. 2971:10-11), and Bekaert confirmed that consulting with the firm could generate hundreds of thousands of dollars of income.

Perhaps most glaringly, Bekaert disparaged Prof. Ravina to **Financial Engines**, the company that controlled the data upon which their joint work was based. (*See* Ex. 96, saying Ravina was "at best a very sick person, at worst an incredibly evil person"; claiming she "performed very poorly," describing her data as "poor quality," and saying, "I deeply apologize for picking the wrong person to work on these projects."). Since Bekaert's message, Ravina testified, Financial Engines has been "reluctant in [its] collaborations" with her (Tr. 2971:12-2972:6) and any consulting opportunities are no longer available (*id*. 2972:7-10).[28]

The messages that Bekaert sent to these professionals attacked Plaintiff's mental stability, integrity, and professional abilities. Bekaert depicted Prof. Ravina as mentally ill, calling her "**mentally unstable**" (Ex. 167), "**crazy**" (Exs. 96, 111, 141, 143-145, 149, 150-153, 162, 165, 166), "**insane**" (Exs. 58, 89), and "**sick**." (Exs. 96, 141, 143-145, 149). While Bekaert now claims he did not criticize her competence or work performance, his emails stated that she "**performed very poorly**" and produced "poor quality" data (Ex. 96); was "**abusive towards RAs and staff**"

---

[28] Consulting opportunities with Financial Engines are particularly lucrative; Bekaert testified to selling millions of dollars in its stock. (Tr. 3170:4-22, describing holding $1.8 million worth of company stock).

(Exs. 111, 141, 143-145, 149-152, 162, 165, 166); "has the **worst of reputations** among PhD students, whom she treats like **absolute sh\*\***" (Ex. 142); and is "**despised**" by them (Exs. 111, 150-152, 162, 165, 166).  And, impugning her integrity, he called her "**evil**" (Exs. 74, 82, 89, 96, 111, 127, 137, 150-152, 162, 165, 166), "**vicious**" (Ex. 167), and a "**bitch**" (Exs. 74, 82, 127, 137).

Notably, these are only the words Bekaert committed to writing at a time he claimed he was "scared shitless about anything [he] put in an email." (Ex. 60.) He repeatedly advised recipients that he would tell them further details off-line. (*See* Exs. 142, 144, 162, 165.) He also indicated that he intended to convey his side – i.e., disparage Prof. Ravina – at "any chance I see." (*See*, e.g., Exs. 82, 135, 165.) Thus, the jury could have reasonably inferred that he did so.

Plaintiff testified to the overall impact of Bekaert's conduct on her career:

> Everybody knows each other [in the field of finance economics]. People talk, people decide whether each other's papers are published, whether to give a job to someone, whether to invite them for conferences, whether to suggest them for [] other jobs in academia and outside opportunities…[A]s a result of Professor Bekaert's mail campaign and the bad mouthing, my reputation has been damaged… I interact with people in the profession, and I feel like I am seen as an outcast… someone that has been labeled as… unstable, difficult to work with, crazy, an evil bitch, someone that I think people will not want to hire or interact with or collaborate with on research projects… In our field people choose with whom to collaborate. They are anonymous referees to papers. They choose whom to invite for seminars, whom to… give opportunities to. As a result of this campaign, I feel that a lot of people have put a cross on me.

(Tr. 2966:5-11, 2967:3-7, 2967:11-15.) Plaintiff also described the humiliation she now experiences when interacting with colleagues and her reluctance to do so. (*Id*. 3124:12-3125:12.)

Thus, the jury's compensatory damages verdict provides Plaintiff with reasonable compensation in light of Plaintiff's reputational harm and emotional distress.

### 2.  The Verdict Is Well Within a Permissible Range for Comparable Cases

In a deliberate departure from Title VII, there is no cap on damages under the NYCHRL. By any measure, the jury's $750,000 award is reasonable, considering the severe emotional and

19

reputational harm Plaintiff has undergone for years and will likely suffer in perpetuity. A review of similar cases – including numerous verdicts ranging from $500,000 to well over $1 million, generally when only one of those two components is present – confirms the propriety of the award.

In *Osorio v. Source Enters., Inc.*, No. 05 Civ. 10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) , the court upheld an award of $4 million in damages ($4.911 million in 2018 dollars)[29] for emotional distress and harm to reputation in a retaliation case (plus an additional $3.5 million for defamation). The plaintiff "testified at some length about the emotional distress and damage to reputation caused by the retaliation, including how defendants' retaliation caused her to feel depressed and anxious and to feel embarrassed in front of others in the industry, as well as causing her difficulty during subsequent job interviews and professional events and the like." *Id.* at *5. Given this evidence, as well as the jury's finding of intentional retaliation, the court found a substantial award to be justified. *Id.*[30] Plaintiff here has gone beyond such evidence by introducing extensive, unchallenged medical testimony of severe and lasting psychiatric harm.

The Second Circuit has upheld compensatory damages awards in excess of $1 million.  In *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014), a race discrimination action, the Second Circuit upheld a verdict of $1.32 million ($1.417 million in 2018 dollars) for past and future emotional distress, mental anguish, inconvenience, and loss of enjoyment of life. *Turley* involved workplace abuse and a documented and extensive medical history of post-traumatic stress disorder, depression, and panic disorder. The court contrasted the case with *Zeno*, where the

---

[29] When comparing a verdict to prior awards, a court "must take into account inflation." *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003); *see Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014). Here, Plaintiff conservatively calculates inflation from the date of each court decision (including appellate decision) using government data through August 2018. https://www.bls.gov/data/inflation_calculator.htm/.

[30] Further in *Prozeralik v. Capital Cities Communications*, 222 A.D. 2d 1020 (N.Y. App. Div 1995), a defamation action, the court affirmed an award of $3.5 million – $5.749 million in 2018 dollars – for emotional harm, in addition to separate awards for reputational injury and direct economic losses.

Second Circuit upheld an award of $1 million ($1.098 million in 2018 dollars) in a matter involving no medical evidence. *Id.* at 163 (citing *Zeno*, 702 F.3d at 673).[31] This case likewise involves protracted (retaliatory) harassment and abuse and detailed medical testimony.

Many other cases support the jury's award. *See, e.g.*, *Phillips v. Bowen,* 278 F.3d 103, 111-12 (2d Cir. 2002) (sustaining $400,000 award for emotional distress – $569,000 in 2018 – in case with no medical evidence); *Town of Hempstead v. State Div. Human Rights,* 233 A.D.2d 451, 452 (N.Y. App. Div. 1996) (upholding awards of up to $500,000 – $795,000 in 2018); *Bianco v. Flushing Hosp. Med. Ctr.*, 2009 WL 2984842 (N.Y. Sup. Ct. Sept. 11, 2009) (finding an award of $750,000 – $875,000 in 2018 – for past emotional distress to be reasonable and allowing separate award of $5.5 million for anticipated future distress to stand); *Ramirez v. N.Y.C. Off-Track Betting Corp.*, 112 F.3d 38 (2d Cir. 1997) (upholding reduced award of $500,000 – $790,000 in 2018 – in employment case); *N.Y.C. Transit Auth. v. State Div. of Human Rights*, 181 A.D.2d 891 (N.Y. App. Div. 1992) (affirming award of $450,000 – or $814,000 in 2018; plaintiff suffered prolonged emotional distress likely to continue in the future); *Cavagnuolo v. Baker & McKenzie,* No. 1B–E–D–86–115824, 1993 WL 766865, at *9 (N.Y. Div. of Human Rights Dec. 17, 1993) (awarding $500,000 – $864,000 in 2018 – to discrimination victim, as his "psyche was punctured, his self-reliance was smashed, and his well-being was erased"); *McClain v. Pfizer, Inc.*, No. 3:06–cv–

---

[31] Indeed, such seven-figure awards are common, particularly when adjusting for inflation. *See, e.g.*, *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 503, 513 (9th Cir. 2000) (affirming award of $1 million – $1.472 million in 2018 – in discrimination case, where plaintiff testified that she constantly worried, cried, and felt trapped and upset; felt forced to spend less time with her family; suffered stomach problems, rashes, and headaches; and sought counseling from her pastor); *Munoz v. Sociedad Espanola De Auxilio Mutuo y Benefiencia De Puerto Rico*, 671 F.3d 49, 61-62 (1st Cir. 2012) (affirming $1 million award -- $1.112 million in 2018); *Pollard v. E.I. DuPont De Nemours*, 338 F. Supp.2d 865, 884 (W.D. Tenn. 2003), *aff'd*, 412 F.3d 657, 666 (6th Cir. 2005) (total awards of $1.25 million – or $1.62 million in 2018 – for sexual harassment that substantially affected plaintiff's personality, caused her to be anxious and depressed, and required psychiatric treatment); *Gagliardo v Connaught Labs, Inc.*, 311 F.3d 565, 573-74 (3d Cir. 2002) (affirming $1.55 million award – $2.155 million in 2018 – in discrimination case where plaintiff presented non-medical testimony that "demonstrated the effects of the mental trauma, transforming [her] from a happy and confident person to one who was withdrawn and indecisive").

1795, 2011 WL 2533670, at *2 (D. Conn. June 27, 2011) (in whistleblower retaliation case, affirming award of $685,000 – $765,000 in 2018 – where plaintiff testified that she lost sleep; felt sad, stressed, and frustrated; and feared her supervisor), *aff'd*, 505 Fed. Appx. 59 (2d Cir. 2012); *Chopra v. Gen. Elec. Co.,* 527 F. Supp. 2d 230, 246-47 (D. Conn. 2007) (sustaining award of $500,000 – $600,000 in 2018 – where employer's retaliatory acts caused extreme stress and poor health; citing verdicts from $500,000 to $1 million); *Olsen v. Cty. of Nassau*, 615 F. Supp. 2d 35, 47-49 (E.D.N.Y. 2009) (affirming award of $400,000 – $471,000 in 2018 – to plaintiff who was diagnosed with generalized anxiety disorder but no longer had the condition at the time of trial and $500,000 – $589,000 in 2018 – to plaintiff in ongoing psychological treatment).[32]

The element of reputational harm present here warrants a substantially higher award than in typical cases. *See Osorio*, 2007 WL 683985, at *5; *Thorsen v. Cty. of Nassau*, 722 F. Supp. 2d 277, 294 (E.D.N.Y. 2010) (in case involving "significant" but nonetheless "limited" emotional distress, "it was proper for the jury to consider the personal humiliation and loss of reputation that [plaintiff] suffered… It is clear from the full award that the jury credited [his] allegations that, not only did the defendants remove him from his job duties, but in doing so they subjected him to…

---

[32] *See also, e.g.*, *McIntyre v. Manhattan Ford, Lincoln Mercury*, 256 A.D.2d 269 (N.Y. App. Div. 1998) (deeming combined awards of $600,000 – or $923,000 in 2018 – appropriate for past and future emotional suffering in sexual harassment and retaliation case); *Thorsen v. Cty. of Nassau*, 722 F. Supp. 2d 277, 294-95 (E.D.N.Y. 2010) (granting remittitur to $500,000 – $578,000 in 2018 – where plaintiff stopped receiving medical treatment and suffered no "long-term or lasting effects"); *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 369-71 (S.D.N.Y. 2001) (affirming award of $400,000, or $566,000 in 2018, for acute psychological harm); *Brady*, 455 F. Supp. 2d at 197-201 (finding $600,000 – $745,000 in 2018 – to be proper award for discrimination plaintiff who experienced serious emotional trauma, including generalized anxiety disorder); *Kondracke v. Blue*, 277 A.D.2d 953, 954 (N.Y. App. Div. 2000) (affirming award of $400,000 for mental anguish – $579,000 in 2018); *Levans v. Delta Airlines, Inc.*, No. 12-cv-773, 2016 WL 9447211, at *9-11 (E.D.N.Y. Aug. 1, 2016) (in case where plaintiff was improperly detained for one day and falsely charged with a crime for two and half months, finding award of $550,000 ($575,000 in 2018) appropriate for past pain and suffering – including loss of enjoyment of life, physical discomfort while in custody, and "subjective experience of a tarred reputation"; the award did not consider future damages, such as future emotional distress and harm to reputation); *see further Harper v. Metro. Dist. Com'n*, 134 F. Supp. 2d 470, 472, 490 (D. Conn. 2001) (entering judgment on compensatory award of $1.6 million – $2.9 million in 2018 – in retaliation case with no financial loss, plus $1.6 million as general damages for defamation).

humiliation and attempted to destroy his professional reputation in retaliation for his political affiliation."); *Levans v. Delta Airlines, Inc*., 2016 WL 9447211, at *2, 10-11 (E.D.N.Y. Aug. 1, 2016) (higher award justified based on the particular value plaintiff placed on his reputation); *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 335-44 (S.D.N.Y. 2016) (affirming $1.5 million verdict for emotional distress and reputational harm on defamation claim arising from plaintiff's employment).[33] As Plaintiff testified, in the tight-knit finance economics community, she is "uniquely vulnerable" to reputational harm. *See Levans*, 2016 WL 9447211, at *10-11.

Thus, Plaintiff's non-economic damages represent a nearly-unparalleled combination of (i) severe, ongoing clinical-level psychological and physiological distress and (ii) substantial reputational harm. The case law supports higher awards even with just one such element present.

### 3. The Cases that Bekaert Cites Are Readily Distinguishable

None of Bekaert's cited cases remotely approach the circumstances present here. Indeed, none of Bekaert's cited cases involve similar uncontroverted medical testimony confirming severe and ongoing injury, and none involve the element of reputational harm.

- In *Legg v. Ulster Cty.*, 2017 WL 3668777 (N.D.N.Y. Aug. 27, 2017), plaintiff "produced only vague testimony regarding her alleged emotional distress. Importantly, there was no testimony from a medical professional or any other person to corroborate [her] allegations." *Id*. at *11. By contrast, Plaintiff Ravina presented unrebutted medical testimony in this case.[34]

---

[33] *See also, e.g., Cantu v. Flanigan*, 705 F. Supp. 2d 220 (E.D.N.Y. 2010) (sustaining $150 million award for damage to reputation in defamation case); *Prozeralik*, 222 A.D.2d 1020 ($6 million award – $8.55 million in 2018); *Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir. 1994) (affirming $3.5 million award – $5.922 million in 2018 – in defamation case where it was reasonable for the jury to infer diminished earning capacity); *Wellington Funding & Bus. Consultants, Inc. v. Cont'l Grain Co.*, 259 A.D.2d 323 (N.Y. App. Div. 1999) (affirming award of $1 million – $1.528 million in 2018 – in defamation case: "Damage to business reputation is presumed and the compensatory award was not impermissibly speculative.").

[34] Likewise, *Norville v. Staten Island Univ. Hosp.*, No. 96-CV-5222, Dkt. 212 (E.D.N.Y. Oct. 17, 2003) was a "garden variety"-type case in which the plaintiff did not actually seek treatment; the court deemed her testimony "vague and conclusory." Here, Plaintiff Ravina's history of medical treatment is extensive.

- In *Caravantes v. 53d St. Partners, LLC*, 2012 WL 3631276 (S.D.N.Y. Aug. 23, 2012), the court – as fact-finder – considered conflicting medical testimony, discredited plaintiff's PTSD diagnosis, found that his condition was "treatable," and rendered its own damages verdict. *Id*. at *23-24. Here, the Court must defer to the jury's assessment.

- In *Rainone v. Potter*, 388 F. Supp. 2d 120 (E.D.N.Y. 2005), "there was no evidence of permanency, debilitation, or physical manifestations of distress"; plaintiff "did not consider himself incapacitated 'in any way shape or form.'" Moreover, he had completed treatment, "greatly improved," and made a "good recovery." *Id*. at 124-26.[35] By contrast, Prof. Ravina's functioning remains severely compromised; her condition has not significantly improved; she requires ongoing, intensive psychiatric treatment; and her prognosis remains "poor."

- In *McGrory v. City of N.Y.*, 2004 WL 2290898 (S.D.N.Y. Oct. 8, 2004), the award was not grounded in the liability verdict: in stark contrast to Plaintiff Ravina's case, the plaintiff's medical witnesses attributed most, if not all, of his psychological problems "to events for which the [defendant] cannot be held liable. Indeed, even [plaintiff] mentioned his termination only in passing in describing the significant decline in the quality of his life." *Id*. at *15-16.

- Similarly, in *Ruhling v. Newsday, Inc.*, 2008 WL 2065811 (E.D.N.Y. May 13, 2008), the plaintiff brought a host of serious discrimination and retaliation claims but the only one that was successful was the "least significant" – for a mere reprimand. The court found no significant emotional distress verdicts for such a reprimand and concluded that plaintiff's injuries must have been connected to her other claims. (Nor was plaintiff diagnosed with any psychiatric condition.) *Id*. at *8-9. In contrast, Plaintiff's retaliation claims were primary here – not an afterthought – and

---

[35] Similarly, in *Bick v. City of N.Y.*, 1998 WL 190283, at *24-25 (S.D.N.Y. Apr. 21, 1998), by the time of trial the plaintiff was "largely functional," "much improved," and "able to take mastery in her life."

nothing in the record undermines the presumption that the jury faithfully followed the law.

In sum, none of Bekaert's cited cases provide a basis to disturb the jury's verdict. The jury carried out its duties conscientiously, and its compensatory damages award should be sustained.

### C.   There is No Basis to Disturb the Jury's Punitive Damages Award

The jury's role as conscience of the community is particularly salient with regard to punitive damages. "Punitive damages are intended not only to punish the tortfeasor but also to deter future reprehensible conduct." *Chauca*, 30 N.Y.3d at 331 (citations omitted). "In determining whether a particular punitive damages award is excessive, a court must keep [these purposes] in mind." *Rosas v. Balter Sales Co. Inc.*, No. 12-CV-6557, 2018 WL 3199253, at *10 (S.D.N.Y. June 29, 2018) (citation omitted). "Whether to award punitive damages in a particular case is primarily a question within the sound discretion of the jury, and an award of punitive damages should not be lightly disturbed on appeal." *Solis-Vicuna v. Notias*, 71 A.D.3d 868, 871 (N.Y. App. Div. 2010). Under New York law, a jury's punitive damages award "should not be reduced… unless it is so grossly excessive as to show by its very exorbitancy that it was actuated by passion." *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267-68 (S.D.N.Y. 1999) (citation omitted).

At trial, the jurors were instructed to consider the reprehensibility of Bekaert's behavior, the nature and extent of the harm to Prof. Ravina, the amount of time she endured his retaliatory conduct, whether Bekaert engaged in a pattern of similar conduct towards others, and the amount of actual damages. (Dkt. 242-11 at 7.) Based on these considerations and the evidence introduced at trial, the modest $500,000 award in this case is eminently reasonable and must withstand review.

### 1.   The Punitive Damages Award is Not Unconstitutionally Excessive

In reviewing an award for due process concerns, courts consider "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory

damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (citation omitted). "[C]ourts must view the evidence in the light most favorable to the nonmoving party and reduce the award only if it shocks the judicial conscience." *Greenbaum*, 67 F. Supp. 2d at 269 (citation omitted). Based on these factors, the jury's award comes well within constitutional bounds.

### a.   *Bekaert's Protracted Course of Conduct Was Highly Reprehensible*

Bekaert's conduct was highly reprehensible. The jury could properly conclude that he acted with malice and that his conduct was willful and persistent. *See Greenbaum*, 67 F. Supp. 2d at 269.

Viewed in the light most favorable to Plaintiff, the evidence clearly shows that Bekaert acted with malice. (*See, e.g.*, Ex. 74: Bekaert calling Plaintiff an "[e]vil bitch in action…I have had it."; *see also* § II(B)(1)(b), *supra*.)  The jury was presented with evidence that allowed it to conclude that he repeatedly and purposefully sought to stall Plaintiff's work and undermine her professional standing. Contrary to Bekaert's spin, the record supports a finding that his interference and smear campaign persisted for over two years. Such "attempts to take away [Plaintiff's] livelihood" demonstrate "a level of malice and vindictiveness that fully justifies [the] punitive damages award." *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 590 (S.D.N.Y. 2010).

Further, "Plaintiff arguably established that Defendant acted maliciously – that is with knowledge that [he] might be depriving her of her rights – when [he] retaliated against her. Thus, Defendant's conduct can be described as reprehensible[.]" *Quinby v. WestLB AG*, No. 04 Civ. 7406, 2008 WL 3826695, at *4 (S.D.N.Y. Aug. 15, 2008). Bekaert repeatedly mocked U.S. employment laws. He displayed ample knowledge of relevant anti-retaliation protections but thumbed his nose at them and remained undeterred in his retaliatory behavior. (*See, e.g.*, Ex. 166, writing that his "lawyers were worried about 'retaliation claims' as long as her tenure case was

26

still running (what a country!).”; Ex. 152, writing that “[t]he laws in this country are screwed up and totally biased against the ‘privileged white males’[.]”; *see also* Exs. 153, 162, 165.)[36]

The jury also was presented with evidence that Bekaert engaged in a pattern of retaliation, including using retaliatory intimidation tactics towards another woman at Columbia who complained about his behavior.  (*See, e.g*., Ex. 31.1: “you can just hope I am too busy to take this further”). Such evidence is relevant to determining the degree of reprehensibility. *See, e.g.*, *Phillip Morris USA v. Williams*, 549 U.S. 346, 355, 357 (2007); Dkt. 242-11, Damages Jury Instructions at 7 (“Has Bekaert engaged in a pattern of similar conduct towards others?”).

As explained in *Chauca*, “NYCHRL violations, by their very nature, inflict serious harm to both the persons directly involved and the social fabric of the city as a whole.” 30 N.Y.3d at 334 (citation omitted); *see also Syrnik v. Polones Const. Corp*., 918 F. Supp. 2d 262, 265–66 (S.D.N.Y. 2013) (“Given . . . the ‘uniquely broad and remedial purposes’ of the NYCHRL . . . the Court finds the jury’s $500,000 damages award to be reasonable under the circumstances.”).  As detailed above, the harm done to Prof. Ravina is severe and likely to impact the rest of her life.

There is plenty of evidence in the record supporting a finding that Bekaert’s acts were reprehensible. Thus, the jury’s award is reasonably related to the flagrant nature of his misconduct.

### b. *The Fractional Ratio of Punitive Damages to Compensatory Damages Strongly Supports the Award*

Second, the ratio of punitive to compensatory damages is *less than one to one*. In general, a single-digit multiplier does not raise due process concerns. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). “Only in breathtaking cases, where, for example, the ratio is 500 to 1, is remittitur appropriate.” *Mugavero*, 680 F. Supp. 2d at 589 (citation omitted). Here, the

---

[36] *See also* Ex. 46: “If this is harassment, the Americans really are total pussies.”; Ex. 111: “I would never want to work with a junior woman again.”; Ex. 152: “[I]n the current environment people in my position should simply not work with women anymore, too risky.”

award "is a *fraction* of, not a multiple of, the compensatory award, and… does not cross the line into the area of constitutional impropriety." *Id*. (citations omitted).

### c. *The Award is Comparable to Punitive Damages in Similar Cases*

Finally, the NYCHRL permits punitive damages "without limitation on the maximum amount," *Syrnik*, 918 F. Supp. 2d at 265, and the verdict is well within the range of awards imposed for violations of the NYCHRL. *See, e.g.*, *Greenbaum*, 67 F. Supp. 2d at 268-69 ($1.25 million punitive damages award); *Gutierrez v. Taxi Club Mgmt., Inc*., No. 17 Civ. 532, 2018 WL 3429903, at *1 (E.D.N.Y. July 16, 2018) ($850,000); *Gallegos v. Elite Model Mgmt. Corp.,* 781 N.Y.S.2d 624 (Sup. Ct. 2004), *aff'd*, 28 A.D.3d 50 (N.Y. App. Div. 2005) ($2.6 million); *Salemi v. Gloria's Tribeca Inc*., 115 A.D.3d 569, 570 (N.Y. App. Div. 2014) ($1.2 million).[37] Moreover, comparable or substantially higher punitive damages are also awarded in defamation cases.[38]

Bekaert claims that the facts of this case "are easily distinguished from other cases with far worse conduct in which punitive damages are awarded." (Br. at 20.)  However, the cases he cites do not include "far worse" conduct; nor do they involve evidence of severe emotional distress.[39]

### 2. The Award Is Supported by Evidence of Bekaert's High Net Worth

Here, the jury heard evidence of Bekaert's wealth – as well as his willful conduct – and found a $500,000 award "necessary to punish and deter" a defendant in his position. *See Luciano*

---

[37] *See also, e.g.*, *McIntyre*, 256 A.D.2d at 271 ($1.5 million award reasonable); *Zakre*, 541 F. Supp. 2d at 567 (remittitur to $600,000); *Quinby*, 2008 WL 3826695 (remittitur to $750,000); *Syrnik*, 918 F. Supp. 2d at 265-66 ($500,000 award); *Jordan v. Bates Advert. Holdings, Inc.,* 816 N.Y.S.2d 310, 323 (Sup. Ct. 2006) (same).

[38] *See, e.g.*, *Bouveng*, 175 F. Supp. 3d at 344-51 ($1 million against employer, $1.5 million against second corporate defendant, and $1.5 million against individual defendant); *Purgess*, 33 F.3d at 143 (finding $500,000 award appropriate); *Armstrong v. Shirvell*, 596 Fed. Appx. 433, 458-59 (6th Cir. 2015) ($500,000 award not excessive in relation to compensatory damages of $750,000).

[39] *See, e.g.*, *Stampf v. Long Island R. Co*., 761 F.3d 192, 208 (2d Cir. 2014) ("[Plaintiff] has not been diagnosed with a permanent mental or emotional disorder, nor is there any medical evidence in the record."). In fact, the cases cited by Bekaert confirm that the award here is well within the appropriate range. *See, e.g. Rosas*, 2018 WL 3199253, at *11-12 (remitting award to $700,000); *Watson v. E.S. Sutton, Inc*., No. 02 Civ. 2739, 2005 WL 2170659, at *19 (S.D.N.Y. Sept. 6, 2005) (remittitur to $717,000).

*v. Olsten Corp.*, 110 F.3d 210, 222 (2d Cir. 1997); *see also Greenbaum*, 67 F. Supp. 2d at 267 (wealth relevant in reviewing award); *Rose v. Brown & Williamson Tobacco Corp.*, 10 Misc. 3d 680, 709 (Sup. Ct. 2005) ("A defendant's wealth is relevant to the amount of the punitive damages award, to ensure that the award carries the proper punishment and deterrent effect.").

At trial, Bekaert testified that his cash compensation from Columbia amounts to $428,000 per year and that he lives in subsidized housing provided by Columbia. (Tr. 3168:10-21.)  He testified that he had "about a million" in a retirement account with Columbia (*id*. 3175:5-13), "about a million" in another account (*id*. 3175:14-18), "about three million" in a third account (*id*. 3177:11-13), and "two [million], maybe" in a fourth account (*id*. 3177:14-18). All told, Bekaert has substantial earning capacity and assets approaching $10 million.[40] Given Bekaert's wealth and intransigent attitude, the jury could properly conclude that a $500,000 award is needed to make him feel the sting and to curtail similar future conduct.[41]

### 3. *Osorio* Does Not Counsel Against the Punitive Damages Award in this Case

In *Osorio*, the court upheld combined awards of $7,877,604.34, including $7,500,000 for intangible, non-economic harm. In light of their sheer size, the court held that these verdicts "were so comprehensive that they had the same deterrent effect that punitive damages would otherwise provide" and suggested that a punitive damages award would be "duplicative." 2007 WL 683985, at *2-3. These sentiments echo those raised by the Supreme Court in *Campbell*, where plaintiffs received a $1 million award for purported emotional distress arising from a simple economic

---

[40] Bekaert claims that the punitive damages award is excessive as it constitutes "approximately 15% of his net assets." (Br. at 22.) But, the trial evidence "does not suggest a lack of wealth." *Smith*, 861 F.2d at 373. Any "incompleteness of the record" "is not a basis for reducing the punitive damages award… for it is the defendant's burden to show that his financial circumstances warrant a limitation of the award." *Id*.

[41] Bekaert postulates that he has already been punished by the publicity surrounding this matter. But, he cites no authority that this is a pertinent consideration on punitive damages. Such awards are routinely made in high-profile cases. In any event, the jury found Bekaert liable for retaliatory acts and fully considered – and rejected – his testimony and arguments in rendering its liability and damages verdicts.

transaction; this award likely already reflected the purposes of punitive damages – i.e. moral indignation. 538 U.S. at 426. Thus, a 145-to-1 ratio between punitive and compensatory damages was improper; instead, an award "at or near" a 1-to-1 ratio would be justified. *Id*. at 425-26, 429.

Here, the jury awarded only $750,000 in compensatory damages – an amount amply justified by proof of actual harm (not mere indignation), and a sum that the jury could reasonably conclude will be paid by Columbia, which is vicariously liable under the NYCHRL. Thus, the compensatory damages award here – one tenth of the amount awarded in *Osorio* – would have no real deterrent effect on Defendant Bekaert. Again, absent unusual circumstances, the Court must presume that the jury faithfully followed the law and did not issue duplicative verdicts.

## CONCLUSION

Defendant Bekaert's Rule 50(b) motion is a rehash of arguments unsuccessfully made to the Court (on summary judgment and Rule 50(a)) and the jury (in opening and closing statements). Those arguments once again fail. Similarly, Bekaert's motion for remittitur or a new trial is premised on a one-sided take on the facts and the law.[42] The jury's verdicts are well-supported by the trial evidence and a host of applicable precedent. There is no basis to overturn them.

---

[42] Any doubts as to the extent of Plaintiff's damages should be resolved in her favor. *See Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1214 (2d Cir. 1993) (agreeing that "[a]ny uncertainty as to how far the remedy should reach in order to provide relief is the result of [defendant]'s unlawful retaliation; [defendant] should not be the beneficiary of that uncertainty"); *N.L.R.B. v. Ferguson Elec. Co.*, 242 F.3d 426, 432 (2d Cir. 2001) ("[T]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.") (citations omitted).

Dated: October 2, 2018

Respectfully submitted,

David Sanford (admitted *pro hac vice*)
H. Vincent McKnight (admitted *pro hac vice*)
Andrew Melzer (AM-4649)
Alexandra Harwin (AH-3111)
Melinda Koster (MK-1384)
Amy Donehower (admitted *pro hac vice*)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
vmcknight@sanfordheisler.com
amelzer@sanfordheisler.com
aharwin@sanfordheisler.com
mkoster@sanfordheisler.com
adonehower@sanfordheisler.com
*Counsel for Plaintiff Enrichetta Ravina*

31