UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ENRICHETTA RAVINA,

Plaintiff,

-against-

COLUMBIA UNIVERSITY AKA THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK AND GEERT BEKAERT,

Defendant.

Case No.: 1:16-cv-02137

**ECF CASE**

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT BEKAERT'S MOTION FOR JUDGMENT AS A MATTER OF LAW, OR IN THE ALTERNATIVE, REMITTITUR OF THE DAMAGES AWARD, OR A NEW TRIAL**

---

v

HERNSTADT ATLAS PLLC
Edward Hernstadt

Attorneys for Defendant Geert Bekaert

## TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

POINT I

PLAINTIFF DID NOT REFUTE BEKAERT'S DEMONSTRATION OF HER FAILURE TO PROVE RETALIATION UNDER THE NYCHRL.......................... 1

POINT II

PLAINTIFF DID NOT REFUTE THE NEED TO REMIT EXCESSIVE EMOTIONAL DISTRESS AND PUNITIVE DAMAGES. .............................................. 8

A. Emotional Distress Damages ........................................................................... 8

B. Punitive Damages .......................................................................................... 13

CONCLUSION.......................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Gentile v. Cty of Suffolk,* 926 F.2d 142, 154 (2d Cir. 1991) .......... 1

*Guiterrez v. Taxi Club Mgmt, Inc.,* No. 17 Civ. 532, 2018 WL 3432786 (E.D.N.Y. June 25, 2018) .......... 15

*Levans v. Delta Airlines, Inc.,* 2016 WL 9447211 (E.D.N.Y. Aug. 1, 2016) .......... 13

*NYC Transit. Auth. V. State Div. of Human Rights*, 78 N.Y. 2d 207 (1991) .......... 8

*Osorio v. Source Enterprises, Inc.,* 2007 WL 683985 (S.D.N.Y. March 2, 2007) .......... 13

*Synik v. Polones Cost. Corp.*, 918 F. Supp. 2d 262 (S.D.N.Y. 2013) .......... 14

*Thorsen v. City of Nassau*, 722 F. Supp. 2d 277 (E.D.N.Y. 2010) .......... 13

**OTHER AUTHORITIES**

C.P.L.R. §5501(c) .......... 13

Fed. R. Civ. P. 50(b) .......... 1, 8

Fed. R. Civ. P. 59 .......... 1, 15

## PRELIMINARY STATEMENT

Plaintiff opposes Professor Bekaert's Motion for Judgment as a Matter of Law or in the alternative for Remittitur or a New Trial by restating undisputed and uncontroversial legal standards, too often misstating the clear meaning of cases and evidence, and continuing her practice throughout these long proceedings of taking words and phrases wholly out of context and exaggerating them into something the actual evidence does not support.[1] Ultimately, Plaintiff does not present any facts or law sufficient to refute Professor Bekaert's demonstration that the evidence adduced at trial did not provide a legally sufficient basis for the jury to find that he had retaliated against Professor Ravina, or to sustain a finding of punitive damages. Nor did Plaintiff negate Professor Bekaert's demonstration in the alternative that the Court should grant remittitur of the jury's excessively high compensatory and punitive damages awards, or a new trial. Accordingly, Professor Bekaert respectfully requests that the Court grant one of the alternative remedies he seeks under Fed. R. Civ. P. 50(b) or 59.

### I. PLAINTIFF DID NOT REFUTE BEKAERT'S DEMONSTRATION OF HER FAILURE TO PROVE RETALIATION UNDER THE NYCHRL

Professor Bekaert agrees that in order to prevail on his Rule 50(b) motion he must show that a reasonable jury would not have a legally sufficient basis to rule in favor of Plaintiff. Professor Bekaert did so in his moving papers, and nothing in Professor Ravina's opposition is to the contrary. Thus, for example, while Plaintiff rejects Professor Bekaert's demonstration that at least six of the emails presented by Plaintiff as evidence of retaliation are dated prior to his

---

[1] Indeed, even the citation to *Gentile v. Cty of Suffolk,* 926 F.2d 142, 154 (2d Cir. 1991) on the first page of her Memorandum of Law in Opposition ("Opp. Mem.") is inapposite; in *Gentile*, the jury's verdict was clearly explained by the jury itself when it was polled by the Court and clarified its intentions to the Court.

learning that Plaintiff had made a discrimination complaint (*see* Bekaert Memorandum of Law in Support ("Bekaert Mem.") at 3-4) as mere quibbling about the timing of complaint, the dates are significant because they mean that those emails are not retaliatory as a matter of law.

In opposing this fact, Plaintiff attempts to rely on the testimony of Patrick Bolton (Opp. Mem. at 4), which is starkly contradicted by all of the other testimony in this case. Thus in her three days of testimony, Professor Ravina never stated that she made any complaint about sexual harassment or discrimination to Columbia (or anyone else) prior to her meeting with Dean Phillips on July 16, 2014. Rather, Plaintiff's testimony about her May 2014 meeting with Dean Johar is that she complained about Professor Bekaert's conduct, which she called vindictive and belittling, and about his emails from March-May 2014; she categorically did not state that she raised sexual harassment at that time. (Tr. 246:24-247:11). Nor did Dean Johar testify in the deposition transcript to which Plaintiff's cites that Professor Ravina made a complaint of sexual harassment or discrimination. Moreover, Plaintiff testified about what Professor Bolton had to say during their meeting with Dean Johar in May 2014, and it contradicts Bolton's allegation. (Tr. 248:21-22). Lastly, Professor Ravina's own testimony confirms Dean Philips' testimony that the July 16, 2014 meeting (Tr. 258:5-9) was the first time Professor Ravina raised any of her 2014 allegations of sexual harassment; this is confirmed as well by contemporaneous emails from Professor Ravina (*see* Exh. DM (email from Plaintiff summarizing June 2014 meeting with Deans Hubbard and Horan – no mention of sexual harassment or discrimination)) and Dean Philips (*see* Exh. ER (email from Dean Philips – "first time I heard sexual innuendo mentioned")).

Finally, Plaintiff's effort to rely on a July 12, 2014 email (Exh. 46) in which Professor Bekaert uses the word "harassment" to demonstrate that he was purportedly aware of

protected activity is baseless: that email was sent four days before the first time Professor Ravina complained about sexual harassment to Columbia and two months before Professor Bekaert first learned from Michael Dunn in mid-September 2014 about a sexual harassment complaint. The word "harassment" does not mean "sexual harassment" and no reasonable juror could believe, based on the testimony of Plaintiff and Deans Johar and Philips, as well as the contemporaneous emails, that Professor Ravina had complained about sexual discrimination – as opposed to disrespectful and brusque treatment – until days after July 12, 2014. In this regard, Plaintiff's argument that the allegations of sexual harassment that the jury rejected in finding that Professor Bekaert had not discriminated against Plaintiff can nonetheless be seen as protected activity (Opp. Mem. at 4, note 7) must be rejected, since the jury by definition did not credit those allegations.[2]

Plaintiff's contention that she presented credible evidence that Professor Bekaert delayed work because of her discrimination complaint, and that such conduct is retaliatory are both incorrect. In fact, the only purported evidence of "delay" presented by Plaintiff is found in her emails (and subsequent testimony) accusing Professor Bekaert of delay. As an initial matter,

---

[2] In this regard, Plaintiff's rejection of Professor Bekaert's motion as "a self-serving spin on the evidence" is ironic, given his steadfast reliance on the actual words in the emails in question, read and understood in the context of when they were sent, what they convey, and to whom they were sent – that is, what the evidence itself shows. This is in stark contrast to Plaintiff's methodology – consistent throughout these proceedings – of extracting certain words from the documents (primarily emails) in which they are found without reference to context, timing, the rest of the emails, or to whom they were sent, and then making exaggerated arguments about the meaning, scope, and intent of these decontextualized words. For example, it is simply not the case that the word "crazy" – which is commonly used to convey dozens of different meanings in emails between people who are not medical professionals – has the same meaning in an email about Professor Bekaert's frustration with communications from Professor Ravina that were sent in the summer of 2014 (prior to his learning about any protected activity) to a girlfriend or to a research assistant who refused to work with Professor Ravina because of her unacceptable conduct (*see* Exhs. 39, 58), as it might be considered to have in emails sent in 2016 to his friends and co-authors in response to a savage media campaign.

it is important to recall that Professor Ravina testified extensively that prior to July 2014, after which time they had no further personal contact, Professor Bekaert's alleged "delays" were purportedly part and parcel of his discriminatory and sexually harassing scheme to force her into a relationship with her. These allegations of discriminatory delay the jury roundly rejected. Moreover, apart from overwhelming evidence no reasonable jury could fail to accept that Professor Bekaert not only did not delay their work, but was by far her most diligent and productive co-author (including Ravina herself on her single-authored papers), there is no way to square the jury's rejection of Plaintiff's discrimination claim and its refusal to award Plaintiff back or front pay damages with anything other than its rejection of the allegations of retaliatory delay. At trial, Plaintiff was adamant that she did not produce enough work to earn tenure because of Professor Bekaert's alleged delays, which were initially aspects of his alleged discrimination against her and then, after July 2014, his alleged retaliation. Plaintiff further argued that her front pay damages are based on the resulting failure to earn tenure. By rejecting Plaintiff's discrimination claims and refusing to award the damages Plaintiff directly tied to delay, the jury can only be stating that they reject any claims based upon purported delays.

As noted in Professor Bekaert's moving papers (Bekaert Mem. at 7-9), the documentary evidence, including the fact of a paper accepted for publication in time for Plaintiff's tenure consideration) one of only two papers Plaintiff completed with anyone between 2009 and 2018 and the only joint paper on which the parties continued working after early 2015), is overwhelming and incontrovertible that Professor Bekaert did not delay, but labored assiduously to complete the joint research. The emails to which Plaintiff cites in opposition are not the contrary. Exhibits 20, 36, and 68 all predate Professor Bekaert's learning that Plaintiff engaged in protected activity and are thus by definition not retaliatory; Exhibit 57 is Professor

Bekaert musing to research assistant Andrea Kiguel about holding off on starting work for a few months in June 2013, more than a year prior to Plaintiff's engaging in protected activity, so that whatever he might then have been thinking, it was not retaliation as a matter of law, particularly since he finished a draft of the paper, which Plaintiff presented, in December 2013; and Exhibit 58 is an email from Professor Bekaert to Ms. Kiguel expressing his shock and frustration about Professor Ravina's surprise second draft of the International Diversification paper ("ID paper"), which itself caused delay trying to reconcile the two drafts. Again, Plaintiff's effort (Opp. Mem. at 6, note 10, citing Exhs. 20 and 36, which also predate any protected activity) to argue for the first time on opposition that Professor Ravina's purported rejection of very allegations of sexual harassment that the jury did not credit would somehow constitute protected activity must be rejected out of hand, particularly since Professor Ravina herself admitted that she never stated to Professor Bekaert that any of the discredited and allegedly discriminatory conduct was unwelcome (*see, e.g.,* Tr. at 611, 646) – that is, she did not engage in protected activity.

Plaintiff similarly misleadingly describes the actual contents of emails to which she cites for the proposition that Professor Bekaert disparaged her in the profession. Taken in context, as they must be, and ignoring the eight emails that plainly predate his knowledge of any protected activity (Exhs. 39, 46, 57, 58, 60, 61, 73, and 74), no reasonable jury could find that the emails constitute an attack on Professor Ravina's stability, integrity, or professional abilities. We urge the Court, as we urged the jury, to review the emails for their context, timing, and actual content. The 2014 emails are principally to Professor Bekaert's girlfriend and two close friends, only one of whom is an economist, and principally express anger and frustration with the situation in which Professor Bekaert found himself – many expressly speaking to issues that are not related to any protected activity. So, for example, in Exhibits 57 and 58 Professor Bekaert

expresses to Andrea Kiguel (who is not "in the profession") his frustration with Professor Ravina's antagonistic emails; Exhibit 73 expresses Professor Bekaert amazement and outrage that Professor Ravina wants to take his name off a paper he wrote; in Exhibit 74 Professor Bekaert is venting privately to his girlfriend about Professor Ravina's unprofessional email to a leading scholar in the field who had pointed out a potentially fatal flaw in the Automatic Enrollment paper they wrote (Professor Bekaert did an initial draft of the paper in 2013 and it has still not been submitted). None of the matters to which Professor Bekaert responds are protected activity. As noted before, the 18 emails Professor Bekaert sent to friends and colleagues in 2016 in response to Plaintiff's massive press campaign must also be read in full and in context. The mere presence of a word like "evil" or "crazy" in such emails, taken in context as they must be, is simply not retaliatory.

Rather than look at the emails in context, however, or explain how an email plainly responding to a non-protected activity such as Plaintiff's the press campaign could somehow be retaliatory, Plaintiff continues to cherry-pick isolated words and phrases and work them into an exaggerated description that has no evidentiary basis. Thus plaintiff presented no evidence that any of the 24 recipients of the 18 emails are leading economists or industry figures, or have any power or sway in "the profession." Professor Bekaert testified in this regard that many of the recipients were either not in the profession or his former students or still junior. The "point person" at the JBF (the journal Professor Bekaert co-edits) was its publisher (and thus not in the "profession"), who he hoped would respond to inquiries about the press Professor Ravina generated (*see* Exh. 144); the email identifying Professor Harvey as "well-plugged in" was not addressed to him, while the email sent to Professor Harvey does not contain any negative words about Professor Ravina (*see* Exhs. 136, 140); and so forth. And the cases to which Plaintiff cites

(Opp. Mem. at 7, note 13) are inapposite, as they describe very different conduct than the 18 emails upon which Plaintiff's entire case rests. Plaintiff has built a case on spin and hyperbole that collapses upon actual review of the contents of the emails from which she selects words and phrases.

Finally, the 18 emails do not contain anything that a reasonable jury could conclude shows a retaliatory motive. Rather, although the emails do express a certain level of anger, and express how distraught Professor Bekaert was about the false allegations of sexual harassment and the damage they did to his reputation, almost all of the content in the emails is a response to the very negative press generated by Professor Ravina after she filed her suit against Columbia, and not against the suit itself – which did not then even name Professor Bekaert as a defendant. The only motive or intent expressed in the emails was to defend his reputation to his friends and co-authors and assure them that the allegations, which the jury ultimately rejected, were not true.[3] That many, but not all, of the emails also contain the words crazy or evil or sick (or some variation thereof) does not change the intent or content of the emails, which was to deny the sordid allegations of sexual harassment against Professor Bekaert that were appearing in newspapers and blogs all over the world. Indeed, in her effort to overcome the absence in the emails of any attack or smear words, or any statement denigrating Professor Ravina's professional skills or abilities, Plaintiff describes virtually everything that Professor Bekaert wrote in an email as demonstrating a retaliatory animus, including statements that he will be professional, bland, and neutral; and that he was upset at how his colleagues and the dean's

[3] Again, as noted in his moving memorandum, it cannot be that denying allegations contained in complaint constitutes an attack on a plaintiff's integrity or retaliation, or every single defendant who denies an allegation against it, him, or her would have been engaged in retaliatory conduct.

office treated him (which is, again, not protected activity by, and not addressed at, Plaintiff)

Taken in context, reviewed in their entirety and as full emails rather than looking at isolated words and phrases as a part of an over-the-top argument about a world-wide smear/attack, it is clear that no reasonable juror could read those emails and find them to be responses to protected activity, or revelatory of any retaliatory animus, or likely to deter an individual from engaging in protected activity. Rather, the emails are precisely what an individual who has filed and widely publicized a lawsuit containing a number of sordid allegations would expect in response to the negative press she intentionally generated.[4]

## II. PLAINTIFF DID NOT REFUTE THE NEED TO REMIT EXCESSIVE EMOTIONAL DISTRESS AND PUNITIVE DAMAGES

In the alternative, Professor Bekaert also moves under Rule 59 for an order remitting the excessive compensatory and punitive damages awards to less shocking figures. As an initial matter, whether *NYC Transit. Auth. V. State Div. of Human Rights*, 78 N.Y. 2d 207 (1991) or CPLR 5501(c) applies is not determinative, as under either standard the compensatory and punitive damages awards are excessive and shock the conscience compared to awards in similar cases.

### A. Emotional Distress Damages

In support of the compensatory damages award of $750,000, Plaintiff asserts that she suffered "severe" psychiatric injury and "substantial reputational harm." However, the record does not support either of these assertions. First, although it is the case the Plaintiff testified about her emotional distress, often over the objections (often sustained) of defense

[4] Plaintiff's opposition to the Rule 50(b) motion as regards punitive damages because it was allegedly not raised in Court at the close of discovery is a red herring, as the motion was to dismiss all remaining claims.

counsel, Plaintiff's several speeches to the jury about the emotional pain she allegedly suffered was tied to her reaction to the allegations of discrimination and sexual harassment that the jury rejected. Indeed, Plaintiff changed the focus of her emotional distress from the discrimination on which she focused prior to the liability verdict to retaliation during the damages phase of the trial. Similarly, notwithstanding efforts to cloak this fact by reference to retaliation rather than discrimination, it is clear that much of Plaintiff's treating psychiatrist's testimony is based on the alleged discrimination that brought Professor Ravina to him in 2014. In this regard, the fact that Professor Ravina did not learn of the 2016 (or even 2014) emails that are the sole basis for the retaliation verdict until they were turned over in discovery in this case in 2017 is relevant to her emotional distress damages, since it is clear beyond peradventure that Professor Ravina could not have experienced emotional distress about documents she did not know existed. Accordingly, approximately 75% of the 170 meetings Professor Ravina had with Dr. Silbert solely related to distress arising out of the rejected discrimination claim.

This is clear even in Plaintiff's citations to Dr. Silbert's testimony (Opp. Mem. at 13-14): Dr. Silbert did not state that Professor Ravina's conditions were caused by retaliation or rule out causes other than retaliation, as that word does not appear in either quote. Tr. 3149:5-11; 3148:4-15. Rather, the "very disturbing experiences" very clearly refers to the allegations of discrimination and delay the jury rejected rather than to the letters of which Plaintiff first became aware during the instant lawsuit. *See, e.g.* Tr. 3133-34 (Dr. Silbert testifies that Professor Ravina's distress in 2014 was based on her interactions with Professor Bekaert, i.e., the alleged discrimination). Professor Ravina's own testimony about the damages she was suffering as of the Spring 2014 – well before she had engaged in any protected activity, let alone become aware of the allegedly retaliatory emails, firmly establish that all of the damages referred to in her

opposition memorandum (including emotional distress, sleep issues, back pain, and weight gain, which caused her to seek out a psychiatrist (Tr. 229:16-231:1)) arose out of the rejected discrimination claims. Even the thoughts of death Professor Ravina said she experienced in the spring of 2015 cannot be not related to the 2016 emails that are the basis of the retaliation verdict. Lastly, the jury's refusal to award any lost wages damages makes it clear that whatever the compensatory damages are meant to compensate, it is not any damage to Professor Ravina's future earnings potential.

Professor Ravina's contentions regarding the purported harm to her reputation are even more troubling, in that she did not present a single shred of evidence of any actual harm to her reputation, only testimony that she feared such harm. Again, the jury's refusal to award any front pay establishes its conclusion that Professor Bekaert did nothing to damage her future earning potential, which could only be true if Professor Ravina's reputation remains unharmed. Apart from that obvious point, the record is devoid of any testimony or document demonstrating any actual reputational harm suffered by Professor Ravina. To the contrary: she was hired by a top-10 business school for more money than Columbia paid her; she was named a visiting scholar; she continued to be invited to conferences, even at the Hong Kong University at which two of the recipients of Professor Bekaert's emails taught; and Professor Ravina remained fully supported by luminaries in the profession like Patrick Bolton (also a new co-author), Charles Calomiris, and Paola Sapienza.

To make up for the complete and utter absence of any actual evidence of reputational harm, Plaintiff relies on hyperbole and distortion.[5] Thus, for example, she refers to

[5] Plaintiff also makes statements that are not supported by the citations on which they are purportedly based. *See, e.g.,* Opp. Mem. at 16, note 27 (neither Exh. 135 nor the transcript to which

a "big," "extensive," world-wide network that is, in fact, a total of 18 emails to 24 friends, former students, and co-authors. However, plaintiff presents no evidence of any kind that any of these 24 people could exercise any control over her career, or that her reputation was damaged with any of them. To the contrary, Plaintiff testified that she had not even begun to look for new employment, and provided no evidence that she would ever apply for a position at any of the universities at which Professor Bekaert's friends were located in 2016, that those individuals were still associated with those schools, or that they had any power of any kind over hiring faculty at them. Plaintiff similarly states that Professor Bekaert sent emails to editors and publishers of the journals, but those emails are the exact same emails already described as emails sent to various universities. In several cases the testimony to which plaintiff cites in support is to the contrary, that the person in question was an editor of a journal in 2012, not currently, or that Professor Bekaert did not even know if the person in question was an editor. (Tr. 1025:19-20 – Harvey former Journal of Finance editor; Tr. 1023:17-19 – don't know; Tr. 1029:4-24 – don't know; Tr. 1032:15-17 – I believe so). Exhibit 144 is addressed to the publisher and Professor Bekaert's co-editor at the Journal of Banking and Finance; the fact that he is alerting them to possible press coverage of the lawsuit is hardly retaliatory.

Plaintiff also misleadingly states that Professor Bekaert "smeared Prof. Ravina to other institutions." Opp. Mem. at 18 That is simply false: none of the emails contains "smears," and the fact that Professor Bekaert's girlfriend in 2014 worked at the European Central Bank (where Professor Bekaert has been for years a consultant) and he sent her emails in 2014 and early 2016 about his frustrations with Professor Ravina does not constitute a "smear" to that

---

Plaintiff cites the allegations in that note). Similarly, there simply can be no comparison between libel *per se* and the expression of opinion found in the 2016 emails here at issue. *See id.* note 26.

particular institution. Nor is an email to a friend who is one of hundreds of economists working at the Federal Reserve Board a smear to that institution. Certainly without more evidence about the roles of these two individuals at the institutions and the scope of their power and authority there, a jury could not find any reputational harm based on the emails in question.

Even more spurious and troubling are Plaintiff's references to lost consulting opportunities. First, Plaintiff was not permitted to testify about consulting opportunities at trial, and her counsel was only permitted to question Professor Ravina about Cornerstone over defendants' objection based on her statement to the court that "[w]e are not eliciting testimony regarding lost opportunities at Cornerstone. It is part of her general reputational harm." Tr. 2970:12-14. Notwithstanding both the Court's prohibition and counsel's representation, Plaintiff now seeks to justify the excessive compensatory award based on, yes, lost consulting opportunities. Indeed, Plaintiff goes so far as to justify the excessive award by comparing her potential earnings to the value of Professor Bekaert's Financial Engines stock, as if (a) Financial engines would hire Professor Ravina as a consultant (exactly the sort of speculation she was barred from testifying to) and (b) she would be awarded the same amount of stock granted to Professor Bekaert for his essential work for the company during its start-up days. Opp. Mem. at 18 and note 28. This argument must be rejected.

Finally, the mélange of pull-quotes from a variety of emails written over the course of two years that Plaintiff present at pages 18-19 of her opposition brief, all of which are completely out of context, many of which are not emails sent to people in the "profession" but to Professor Bekaert's girlfriend, Ms. Kiguel, or to their mutual co-author to explain, for example, the two competing drafts sent to Financial engines on December 31, 2014. These curated and annotated excepts are also not – when reviewed in the context of the entire original emails,

taking into account when they were written and to whom and about what – attacks on Plaintiff's mental stability or professional abilities or intended to cause reputational harm. More importantly, no reasonable jury could infer actual compensable reputational harm from any of these emails, without more. And, ultimately, Plaintiff failed to adduce any evidence of any kind regarding actual harm. In light of the limitations on Plaintiff's emotional distress damages to distress arising out of retaliation, which she only learned of in 2017 in connection with this litigation, and the absence of any actual evidence of reputational harm, the award of $750,000 in compensatory damages for 18 emails is grossly excessive.

The cases to which Plaintiff cites (Opp. Mem. at 21-22) are not to the contrary, in that they present significantly more serious conduct and extensive damages. Additionally, as discussed above, Plaintiff's recitation of the evidence relating to emotional distress is keyed to distress suffered because of the alleged discrimination the jury rejected, and reputational harm of which there is zero evidence. This in contrast to *Osorio v. Source Enterprises, Inc.,* 2007 WL 683985 (S.D.N.Y. March 2, 2007) or *Thorsen v. City of Nassau*, 722 F. Supp. 2d 277, 283-84 (E.D.N.Y. 2010), in which the plaintiff's produced evidence of actual and significant reputational harm such as interviews intentionally shredding the plaintiff's reputation. *See also Levans v. Delta Airlines, Inc.,* 2016 WL 9447211 (E.D.N.Y. Aug. 1, 2016) (newspapers articles falsely identifying plaintiff as a drug dealer damaged his reputation). Plaintiff's testimony about her opinion regarding the "finance economics community," which is pure speculation based on her limited knowledge of a community of thousands, is not evidence upon which a jury can rely.

B. Punitive Damages

The jury's award of $500,000 in punitive damages against Professor Bekaert personally is shockingly excessive, not modest as Plaintiff proclaims. First, Professor Bekaert's

conduct in sending the 18 emails was not reprehensible or malicious.[6] As discussed above and in Professor Bekaert's moving memorandum, the jury clearly did not accept Plaintiff's argument that Professor Bekaert delayed or stalled their joint project. As also shown above, he is plainly defending himself against the highly negative press coverage Plaintiff engineered and denying to his friends, former students, and co-authors the false allegations of discrimination the jury also rejected, and no reasonable jury could find that 18 emails in 2016 constitute a two-year smear campaign. As such, Plaintiff attempts to create reprehensibility by noting that Professor Bekaert expressed frustration with the law in the United States evidence, which no reasonable jury could find constitutes reprehensible conduct, and making the claim, unsupported by any evidence, that Professor Bekaert retaliated against others. Opp. Mem. at 27. In fact, the evidence at trial was that the student in question did not believe Professor Bekaert had sexually harassed her, did not pursue a complaint, and Professor Bekaert took no actions of any kind towards her. Such an absence of similar conduct is hardly similar to the case Plaintiff cites for this proposition, *Synik v. Polones Cost. Corp.*, 918 F. Supp. 2d 262, 264 (S.D.N.Y. 2013), in which the plaintiff "ultimately was terminated following his revelation to a co-worker that he is in fact Jewish (following a comment by the co-worker after seeing religious Jews walking down the street expressing disappointment that Hitler 'didn't kill these pieces of shit')."

Plaintiff also persists in misstating the evidence presented regarding Professor Bekaert's "net worth," including misstating total retirement and brokerage accounts of $7 million (including $2,000,000 in pre-tax retirement accounts thus worth significantly less) as

---

[6] Plaintiff's reliance on Exhibit 74 is unavailing as it both predates Professor Bekaert's learning that Plaintiff had engaged in protected activity, so that it is not retaliatory as a matter of law, and is not sent in response to any protected activity on the part of Plaintiff, but to his girlfriend to vent about her unprofessional email to an important scholar in the field.

$10,000,000; and ignoring total liabilities of $2,000,000 plus $150,000/year in child support/alimony. Accordingly, Plaintiff argues in favor of an award based on its having misleadingly more than doubled Professor Bekaert's actual net worth from roughly $4,200,000 (taking into account tax consequences) to the inaccurate and intentionally misleading figure of $10,000,000. In this regard, neither the jury nor the Court can "conclude," as Plaintiff would have it, that Columbia will pay the compensatory damages and exclude it from consideration of the appropriateness of the punitive damages award.

Finally, Plaintiff compares the awards in this case to cases presenting far more grave, reprehensible, or serious facts. For example, the default judgment in *Guiterrez v. Taxi Club Mgmt, Inc.,* adopts the Magistrate Judge's Report and Recommendation, *Guiterrez v. Taxi Club Mgmt, Inc.,* No. 17 Civ. 532, 2018 WL 3432786 at **1-2 (E.D.N.Y. June 25, 2018), which describes allegations of repugnant and repeated references to Plaintiff's "boobs" and calling plaintiff a prostitute among other comments, and that she was fired after she complained. The emails in this case present a much lesser level of conduct.

## **CONCLUSION**

Plaintiff's opposition to Professor Bekaert's motion under Rules 50 and/or 59 persists in ignoring the fact that the jury here rejected Plaintiff's discrimination claims and refused to award her any economic damages, establishing that the finding of retaliation is based only on the 18 emails Professor Bekaert sent in 2016. Notwithstanding that conduct by the jury, Plaintiff continues to rely on emails that predate any conceivable protected activity or are on their faces not related to protected activity, and contends that these 18 emails is equivalent to the worst conceivable conduct. These contentions are unsupported by the evidence and cannot stand. We respectfully urge that appropriate relief should be granted.

Dated: October 26, 2018
Brooklyn, New York

Hernstadt Atlas PLLC

By: ______________________________

Edward Hernstadt
Hernstadt Atlas PLLC
45 Main Street, Suite 1030
Brooklyn, New York 11201
ed@heatlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2018, the foregoing document was served on the following counsel of record via electronic mail with Plaintiff' consent, in accordance with the Federal Rules of Civil Procedure:

Andrew Melzer (AM-7649)
Alexandra Harwin, D.C. Bar No. 1003018
**SANFORD HEISLER, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (626) 402-0475
Facsimile: (646) 402-5651
amelzer@sanfordheisler.com
aharwin@sanfordheisler.com

David Sanford, D.C. Bar No. 457933
**SANFORD HEISLER, LLP**
1666 Connecticut Avenue NW, Suite 300
Washington, DC 20009
Telephone: (202) 499-5201
Facsimile: (202) 499-5199
dsanford@sanfordheisler.com

Bettina B. Plevan
Rachel Fischer
Steven Hurd
Kramer Rice
**Proskauer Rose LLP**
Eleven Times Square
New York, New York 10036-8299
bplevan@proskauer.com
rfischer@proskauer.com
shurd@proskauer.com
krice@proskauer.com

____/s/ Edward Hernstadt_________
Edward Hernstadt