UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/31/19

---

ENRICHETTA RAVINA,

                  Plaintiff,

        -v-

COLUMBIA UNIVERSITY and GEERT
BEKAERT,

                  Defendants.

No. 16-CV-2137 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Enrichetta Ravina, a former junior faculty member at Columbia Business School, brought this action against Geert Bekaert, a tenured member of the faculty, and Columbia University for, *inter alia*, gender discrimination and retaliation in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(1)(a), (7). After a fifteen-day trial, a jury found that Ravina failed to prove that either Defendant had discriminated against her, but that Bekaert had retaliated against her for accusing him of sexual harassment. The jury awarded Ravina $750,000 in compensatory damages against Bekaert and Columbia,[1] and $500,000 in punitive damages against Bekaert only. Before the Court are: (1) Bekaert's motion for judgment as a matter of law, or in the alternative, for a remittitur of the damages award or a new trial, (2) Ravina's motion for injunctive relief, and (3) Ravina's motion to seal a document submitted to the Court in connection with her motion for injunctive relief. For the reasons that follow, Bekaert's motion for judgment as a matter of law and Ravina's motion for injunctive relief,

---

[1] Although the jury found that Columbia was not liable for any retaliatory acts of its own, it was automatically liable, under the NYCHRL, for Bekaert's retaliatory conduct. *See* N.Y.C. Admin. Code § 8-107(13)(a) ("An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section[.]").

as well as her sealing request, are denied. Bekaert's motion for a remittitur of the damages award is granted.

## BACKGROUND

Familiarity with the facts and procedural history of this case is assumed. The Court here provides a brief overview of the factual background that is relevant to the instant motions.

Ravina initiated this action against Columbia in March of 2016, alleging that Bekaert sexually harassed her and obstructed her research, and that Columbia failed to intervene in the harassment and denied her tenure in retaliation for reporting it. She brought claims against Columbia for, *inter alia*, sexual harassment, hostile work environment, discrimination and retaliation under the NYCHRL, Title VII of the Civil Rights Act of 1964, and Title IX of the Education Amendments of 1972. In July of 2016, she filed an amended complaint adding Bekaert as a defendant to her NYCHRL claims.

In February and March of 2018, Bekaert and Columbia moved for summary judgment. The Court denied Bekaert's motion in its entirety, and granted Columbia's motion in part. Specifically, the Court granted summary judgment in favor of Columbia on the federal quid pro quo sexual harassment claims, as well as on the federal and city law discrimination claims to the extent that those claims alleged direct discrimination on the part of Columbia. The Court denied Columbia's motion with respect to the retaliation claims. The Court further held that the hostile work environment and discrimination claims against Columbia could proceed to the extent that they were based on Columbia's negligence, rather than on direct discrimination. Finally, the Court ruled that Bekaert was not Ravina's supervisor, and accordingly rejected any theory of liability predicated on that argument.

The trial, which was bifurcated into a liability phase and a damages phase, took place in July of 2018.

## I. Liability Phase

### A. Ravina's Testimony

During the liability phase of trial, Ravina testified first. She explained that she joined Columbia as an Assistant Professor in July of 2008, and that Bekaert was a senior tenured professor in her department. Tr. 118–19, 133. She described how she began working with Bekaert in 2009, when he approached her about an opportunity to work with him on a large data set belonging to Financial Engines, a company with which Bekaert had a relationship. Tr. 133–34. The data set concerned the savings habits of millions of Americans, and Ravina considered it to be valuable because of its size and its potential to generate numerous research projects. Tr. 135:19–25; 137:8–22. Bekaert and Ravina agreed to work together on the Financial Engines data, with Ravina taking on a larger role in preparing the data and performing the statistical analyses, and Bekaert taking on a larger role in writing the drafts. Tr. 136:13–17. In October of 2011, Bekaert and Ravina jointly entered into a research agreement with Financial Engines. Tr. 140:4–6; Pl's. Ex. 6. They received the data from Financial Engines in batches, with the final batch arriving in the summer of 2012. Tr. 142:13–143:19.

Ravina testified that the relationship between her and Bekaert began to change around that time. Whereas previously their relationship had been "mostly professional," in the summer of 2012 Bekaert began "talking more about personal stuff in [their] meetings" and inviting her to dinner. Tr. 153:8–154:4; Pl's. Ex. 8. At one dinner in September 2012, according to Ravina, Bekaert asked Ravina if she had a boyfriend and, when she exited the taxi that they shared on their way home, "passed his hand on [her] back and went down toward [her] butt." Tr. 162:1–19;

162:24–163:8. Ravina testified that Bekaert would talk to her about his sex life, Tr. 164:17 – 165:3; 177:6, send her songs and play music for her, Tr. 168:25–169:2, and ask her for compliments, which she would occasionally pay him, Tr. 165:7–168:17. She further testified that Bekaert "told [Ravina] that [her] walk was sexy," Tr. 180:7–9, walked her home after a dinner and tried to kiss her, Tr. 197:2–25, held her hand at a restaurant, Tr. 199:5–8, and once stared at her breasts while they were working together in his office, Tr. 200:5–15. According to Ravina, these incidents were embarrassing and frustrating, because she believed that Bekaert's focus on sex was delaying the progress on their joint projects. Tr. 200:19–201:7; 206:3–207:5.

At one meeting in late 2013, Ravina testified, Bekaert told her, "If you were nicer to [me], your papers would move faster," to which Ravina replied that "[she] was already as nice as [she] could be." Tr. 209–210. Following that meeting, Bekaert became "aggressive" and "confrontational" and seemed to stall the progress of their joint papers. Tr. 213:10–20. In December 2013, for example, Bekaert sent Ravina an email in which he wrote that "while [he had] started nibbling away at the draft, [he would] not show [her] anything, as [she did] not seem to grasp the concept of an evolving work in progress." Tr. 211: 8–15; Pl's. Ex. 24. Ravina testified that it was "unheard of" in the academic community for a professor to refuse to share a draft with a co-author. Tr. 212. She testified that Bekaert's refusal concerned her, and that she believed he was "turning" on her and "was not even participating in the work anymore." Tr. 213.

Sometime in the spring of 2014, Ravina went to Bekaert's office for a work-related matter. Tr. 218. When she got there, Bekaert told her to look at a mug that was sitting on his shelf. Tr. 219. She did, and she saw that it said, "I'm refined, I am a scholar, but . . . ." Tr. 219. Bekaert told her to look at the bottom of the mug and, when she did, she saw that it said "horny." Tr. 220. Bekaert "laughed and said that was true." Tr. 220. Also during the spring of 2014, Ravina

testified, Bekaert "started belittling [her] work [and her] professional status, [and] started saying that the data were wrong." Tr. 221. For example, Bekaert told Ravina that she was "insane," "crazy," and "had a masochistic desire to shoot [herself] in the foot." Tr. 221:19–22.

Ravina testified that she never explicitly told Bekaert that she felt he was harassing her, because she "didn't want to offend him." Tr. 225. She explained that Bekaert had told her about students and assistants who had complained about him in the past and had expressed to her that the complaints made him "really, really angry." Tr. 226. Ravina did, however, tell Bekaert that they needed to "reevaluate [their] working relationship" in order to make sure that they were treating each other professionally and with respect. Tr. 238:13–19; 241:11–15. She also proposed that they set a schedule for completing their joint work. Tr. 240. In response to that proposal, Bekaert wrote, among other things, "I CANNOT give you a schedule and asking for one is SILLY" and, "You fix it, or I am going to have to take drastic action." Tr. 241, Pl's. Ex. 36.

In May of 2014, Ravina brought her concerns about Bekaert to the Columbia administration. Joined by two senior professors, Tano Santos and Patrick Bolton, she met with the Senior Vice Dean of the faculty, Gita Johar, and told her that "a senior tenured professor in [her] division with whom [she] was collaborating was being abusive, vindictive, and belittling [her]." Tr. 246:14–247:6. Approximately one month later, Ravina reiterated her concerns to another Senior Vice Dean, Janet Horan, telling her that Bekaert was "aggressive and abusive," and that she was worried he would take the Financial Engines data from her. Tr. 250:4–7. Then, on June 16, 2014, Ravina met with Horan, Glenn Hubbard (the Dean), and Suzanne Goldberg, a Columbia law professor who is an expert on gender and law. Tr. 251:4–7. At that meeting, according to Ravina, she again told the administration that Bekaert was harassing her and being abusive. Tr. 251:20–22. Finally, on July 16, 2014, she met with Senior Vice Dean Kathy Phillips and told her "about

the dinner invitations, the continuous requests for compliments [and] the abusive language," as well as about her "worry that [Bekaert] would take away the data . . . [and] start stalling the progress" or "badmouth [her] in the profession." Tr. 256:20–21; 258:7–13.

Ravina testified that, after she complained about Bekaert to the Columbia administration, her relationship with Bekaert underwent a "drastic change." Tr. 260:20. Bekaert began to tell Ravina that her work was wrong and that she needed to complete "busy work," which in her view was not "important and integral to the paper." Tr. 260:4–265:4. For example, as "a condition for him to write a draft," Bekaert required Ravina to conduct a time-consuming and non-essential data merge, which the professors ultimately did not use. Tr. 264–65. Bekaert also delayed working on a draft and repeatedly refused to share with Ravina the codes that he had developed for use on one of their papers. Tr. 302:13–25; Pl's. Ex. 91.

### B. Bekaert's Testimony

Bekaert testified next, providing a markedly different account of his relationship with Ravina. He testified that he was "a little bit blunt," Tr. 1098, but that he and Ravina were "very friendly" and "very honest with one another," Tr. 1490–91. He testified that he "never had any romantic interest in [her], and [] never asked her for a date and [] never talked about sex." Tr. 1482:9–11. Bekaert stated that he never put his hand on Ravina's back, attempted to kiss her, or stared at her breasts. Tr. 1499:2–1500:2; 1528–29. Although he occasionally went to dinner with Ravina, Bekaert testified, it was commonplace for him to have dinners with coauthors. Tr. 1497:3–5. Bekaert described what he perceived to be a mutual friendship with Ravina, and noted that she shared with him her taste in restaurants while he shared with her his taste in music. Tr. 1500:11–16. He also explained that his "horny" mug was a gift from his ex-mother-in-law, who had passed away, and remarked that "there was nothing sexual about it, in [his] opinion." Tr. 1538. He denied asking Ravina for compliments, but testified that she at times complimented his looks, including

by telling him that he was "definitely the most good looking" of a group in a photo from a publication that he had sent her. Tr. 1503–1504; Pl's. Ex. 16. Bekaert testified that he found that comment "embarrassing." Tr. 1504.

Bekaert further testified that he never told Ravina that her work would go faster if she were nicer to him, Tr. 1533, and that, in the spring of 2014, emails between Bekaert and Ravina "got[] a little bit heated"—not because of any sexual harassment, but rather because of several work-related disputes, mostly concerning the hiring and management of research assistants. Tr. 1539:16–19; 1543–45; 1553–56. For instance, Bekaert testified that Ravina cancelled an interview with a potential research assistant without telling Bekaert that she had done so, and then told the research assistant that he should look for a job elsewhere. Tr. 1553. Bekaert further testified that Ravina "refuse[d] to answer [his] questions," and used "weird language" with him over email. Tr. 1564:13–18; 1566:7–10. He explained that her behavior surprised him, because prior to that, the two professors had maintained a "good working relationship." Tr. 1559:22.

According to Bekaert, he first learned of Ravina's complaints about him on approximately July 12, 2014, at a meeting with Horan and Hubbard. Tr. 1538:21–23; 1587:20–25. He testified, however, that at that time he understood Ravina's complaints to be about their working relationship and the "heated" emails from the spring of 2014, not sexual harassment. Tr. 1539:10; 1588:3–7. He further testified that it was not until September of 2014 that he first learned that Ravina's complaints about him had a sexual component. Tr. 1689:21–25; 1690:23–1691:5.

Bekaert discussed how, upon learning about Ravina's complaints in July 2014, he was "very, very upset" and vented to his friends about it over email. Tr. 1580–81. Eight emails that he sent in the summer and fall of 2014 were adduced at trial. In one, which Bekaert sent on July 12, 2014 to his girlfriend, who is an economist at the European Central Bank, he wrote, "I am

dealing with this harassment case. If this is harassment, Americans really are total pussies." Tr. 952; 1588:16–17; Pl's. Ex. 46. In another, he wrote to a friend, "I just have to spend enormous amounts of time replying to her in the most neutral way possible . . . writing something bland and neutral, while I am thinking about what an incredible mean b. she is, is torture[]." Pl's. Ex. 67. He also wrote to his girlfriend, "I sometimes want to shout—damn evil bitch—it is so unfair," and "Can I just strangle her and get it over with?" Tr. 1589:25–1590:1; Pl's. Ex. 82, 61.

On March 23, 2016, Ravina filed this lawsuit. That same day, according to Bekaert, Bekaert learned both about the lawsuit and about the fact that multiple news outlets had reported on the case. Tr. 1600–01. He testified that it was "incredibly painful" to read the news reports about himself, and that he felt a need to reach out to his co-authors and friends to defend himself. *Id.* He explained that he "wrote an email that [he] really believed was how [he] felt, and then [he] wanted to just sent it out to as many people in [his] network as possible." Tr. 1601:13–25. Bekaert testified that, in sending these emails, he was not trying to harm Ravina, but rather "just hoping that [he] could defend himself." Tr. 1602:12–14.

Eighteen of these emails, sent in March and April of 2016, were introduced at trial. *See* Pl's. Exs. 136, 137, 140, 141–46, 149–53, 162, 165–67. In them, Bekaert asserted that Ravina's claims were false, and variously referred to Ravina as "horrible," "very crazy and sick," an "evil bitch," a "schizophrenic woman," and "mentally unstable and vicious." *Id.* He referred to his situation as a "touched by evil" moment in his life, and at times included a copy of an email he had received from a female research assistant, which referred to Ravina as "a disgusting person." In one email, Bekaert remarked that "in the rumor mill I am now described as an asshole and a villain, who must treat his students really badly too, whereas ironically she has the worst of reputations among PhD students, whom she treats like absolute sh\*\*." Tr. 1033; Pl's. Ex. 142.

8

Bekaert testified that he sent these emails to his "coauthors and friends," among whom were several "top scholars" in the field—professors at reputable universities, editors of top finance journals, and a former president of the American Finance Association, Campbell Harvey. Tr. 1025–33. Bekaert wrote to one professor and former student that he "figure[d he] should inform Cam," referring to Harvey, noting that, "He will see it, he could also be a voice of reason, and he is well plugged in." Tr. 1025; 1605; Pl's. Ex. 140. In another email, sent to a senior vice president at a financial consulting firm, Bekaert wrote that Ravina was "very crazy and sick" and further wrote that the recipient should "feel free to take this to the right people at [the firm]." Tr. 1046; Pl's. Ex. 145.

### C. Testimony from Columbia Administration and Faculty

After Bekaert's testimony,[2] the liability phase of trial proceeded with the testimonies of several members of the Columbia faculty and administration.[3] Michael Dunn, who conducted the investigation into Bekaert on behalf of Columbia's Office of Equal Opportunity and Affirmative Action ("EOAA"), testified about his investigation, as well as about other sexual harassment allegations that he had investigated at Columbia. Christopher Brown, the Vice Provost of Faculty Affairs, testified about the tenure review process and the events leading up to Ravina's denial of tenure. Dean Hubbard testified about his involvement in the dispute between Ravina and Bekaert. He testified, among other things, that in the June 2014 meeting with Horan and Goldberg, Ravina had raised "purely a professional dispute," with no mention of sexual harassment. Tr. 1804. Horan, who testified about Ravina's tenure vote and about her involvement in the dispute between

---

[2] For scheduling reasons, Michael Dunn testified before Bekaert's testimony was complete. Bekaert began testifying on Thursday, July 12, continued testifying on Friday, July 13, and resumed his testimony on Tuesday, July 17. Dunn testified on the intervening business day, Monday, July 16.

[3] Most of the evidence presented during this portion of the trial concerned Columbia's conduct in response to learning about Ravina's complaints. Since Columbia has not filed any post-trial motions, the Court reviews this testimony only briefly.

Ravina and Bekaert, similarly testified that sexual harassment was not raised at the June 2014 meeting. Tr. 2236.

Patrick Bolton, a senior tenured member of the faculty, testified that, among other things, he had attended the May 2014 meeting with Johar and had told Johar of Ravina's "revelation that she had been sexually harassed by Professor Bekaert." Tr. 2006:1–6. The jury saw the video deposition of Johar and heard both videotaped and live testimony from Senior Vice Dean Katherine Phillips and Melissa Rooker, who supervised Dunn's investigation into Bekaert. Andrea Kiguel, a research assistant to Bekaert and Ravina, testified about her work with the professors. Among other things, she testified that she had never seen Bekaert harass Ravina and that, to her knowledge, Bekaert had not delayed his work on their joint papers. Tr. 2192, 2212. Finally, Professor Wei Jiang testified, primarily about Ravina's tenure vote. She testified, among other things, that "the quantity, quality, and impact of [Ravina's] research did not warrant . . . tenure." Tr. 2489.

### D. Rule 50(a) Motions, Withdrawal of Federal Claims, and Jury Verdict

On July 19, 2018, after Ravina had presented her case, both Bekaert and Columbia moved under Rule 50(a) for judgment as a matter of law. The Court denied Bekaert's motion and reserved ruling on Columbia's. Tr. 2160, 2164. Following the close of Defendants' case, Ravina withdrew her federal law claims against Columbia. Tr. at 2350. As a result, the jury was charged only on claims of gender discrimination and retaliation in violation of the NYCHRL. The jury charge included the instruction that if the jury found that Bekaert had engaged in unlawful retaliation, Columbia, under the NYCHRL, was—as Bekaert's employer—automatically liable for retaliation as well. *See* N.Y.C. Admin. Code §8-107(13)(a) ("An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section[.]").

After approximately two days of deliberations, the jury returned a verdict. It found that Bekaert was not liable under the NYCHRL for discriminating against Ravina, but that he was liable under the NYCHRL for retaliating against her. As to Columbia, the jury found that it was liable under the NYCHRL for retaliation based on Bekaert's conduct, but not based on any retaliatory acts of its own. The jury further found that Bekaert, but not Columbia, was liable for punitive damages.

## II.  Damages Phase

The case proceeded to the damages phase, which lasted about a day and a half. During the damages phase, Ravina testified about her projected monetary losses and about the emotional and reputational effects of Bekaert's retaliatory conduct. She testified that the emails Bekaert wrote about her were sent to people with "prominent positions in universities, in journals, in the litigation consulting firms," as well as "central banks where [she] could potentially get a job as an economist." Tr. 2972:23–2973:4. She testified that she began to see a psychiatrist in March of 2014 because of her concerns about Bekaert, and that she continued to go to therapy through the present day. Tr. 3022; 3028. She further testified that she suffered from insomnia, a herniated disc, anxiety, weight gain, and suicidal thoughts, and that this "was an all-consuming situation that took over [her] life." Tr. 3015; 3029.

Ravina's psychiatrist, Dr. Silbert, testified that, from July 2014 through the present day, Ravina had suffered from "extreme anxiety, disturbed sleep, disturbed appetite, impaired ability to enjoy usually pleasurable activities, fears, distrust, aversion to social situations, at times she's felt suicidal, and deep concern about her long-term prospects to achieve success." Tr. 3140. He testified that he had diagnosed her with generalized anxiety disorder, that her symptoms were "severe," and that her prognosis was "poor." Tr. 3140. He further testified that, when Ravina first came to see him, she had no prior psychiatric or mental health history, and that he believed her

symptoms were caused by the "very disturbing experiences she had with Dr. Bekaert and the aftermath or the continued consequences of those experiences." Tr. 3149.

Finally, Bekaert testified about his salary and assets. He testified, among other things, that his salary from Columbia was approximately $350,000 a year, and that he had about $1 million in retirement savings and $5 million in other accounts. Tr. 3168, 3175, 3177. He also testified that he believed he had approximately $2 million in liabilities. Tr. 3181.

After approximately three hours of deliberations, the jury returned a verdict awarding Ravina $750,000 in compensatory damages against Bekaert and Columbia, and $500,000 in punitive damages against Bekaert only. After trial, the parties brought the instant motions.

## DISCUSSION

Before the Court are the following motions: (1) Bekaert's motion for judgment as a matter of law; (2) Bekaert's motion, in the alternative, for a remittitur of the damages awards or a new trial on the issue of damages; (3) Ravina's motion for injunctive relief; and (4) Ravina's sealing request submitted to the Court in connection with her motion for injunctive relief. For the reasons that follow, Bekaert's motion for judgment as a matter of law is denied, but his motion for a remittitur of the damages awards is granted. Ravina's motion for injunctive relief and her sealing request are denied.

### I.    Bekaert's Motion for Judgment as a Matter of Law

Bekaert moves for judgment as a matter of law pursuant to Rule 50(b), arguing that the evidence presented at trial was insufficient to permit a reasonable jury to find Bekaert liable for (a) retaliation or (b) punitive damages. Because the Court finds that the evidence presented at trial was sufficient to sustain the jury's verdict, the motion is denied.

## A. Retaliation

A motion for judgment as a matter of law may be properly granted if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party." Fed. R. Civ. P. 50(a)(1). "In deciding such a motion, the court . . . may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998). Rather, the Court "must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor." *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998). Accordingly, "[a] district court may set aside a jury's verdict pursuant to Rule 50 only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127–28 (2d Cir. 2012) (internal quotation marks omitted).

Viewed under this standard, the evidence presented at trial was sufficient for the jury to rule in Ravina's favor on her retaliation claim. To prove a claim for retaliation under the NYCHRL, a "plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013) (internal citations omitted); N.Y.C. Admin. Code § 8-107(7) (prohibiting retaliation "in any manner . . . reasonably likely to deter a person from engaging in protected activity"). Here, there is no dispute that Ravina took actions opposing Bekaert's alleged sexual harassment—both by complaining to the Columbia administration and by filing this lawsuit. Bekaert argues, however, that the evidence presented at trial was insufficient to establish either a

causal connection between her actions and his alleged retaliatory conduct, or that any such conduct was "reasonably likely to deter a person from engaging in" protected activity.

### 1. Causal Connection

At trial, Ravina presented evidence sufficient to show that Bekaert had engaged in two forms of retaliation against her: (1) stalling his work on their joint papers, and (2) sending disparaging emails about her to members of their professional community. Bekaert argues that none of this alleged retaliatory conduct was conducted "as a result" of Ravina's complaints. He argues that the 2014 emails were sent *before* he learned that Ravina's complaints about him concerned sexual harassment, and that the 2016 emails were sent not in response to Ravina's filing of this lawsuit, but rather in response to media reports about the case. He further argues that the emails were sent with the goal of defending himself to a small group of close friends, rather than with any retaliatory intent. As to the purported stalling of their joint work, Bekaert argues that any delays were caused by other factors—such as Ravina's failure to hire a research assistant and Financial Engines' delays in sending them the data—rather than by any obstruction on his part.

All of these arguments turn on Bekaert's interpretation of contested evidence and ask this Court to—impermissibly—substitute its judgment for that of the jury. For example, although some evidence presented at trial suggested that Financial Engines, and Ravina herself, were responsible for delaying their joint research, *see, e.g.,* Tr. at 710, 1101, other evidence indicated that it was Bekaert who stalled and obstructed their progress, *see* Tr. at 755–57. Ravina testified, for example, that Bekaert's approach to supervising her work underwent a "drastic change" after she complained about him in the summer of 2014. Tr. at 260. She testified that Bekaert required her to complete busy work, delayed drafting a paper, declined to give his approval for Ravina to complete certain work, and repeatedly refused to send her the codes that he had developed with their research assistant. Ravina's testimony was corroborated by emails in which Bekaert, among

14

other things, refused to commit to a schedule or to send her drafts of their co-authored paper. In one email, sent to a research assistant in August of 2014, Bekaert wrote about Ravina, "Imagine what she will do if I do not make the deadline [for the draft] (which I guess I won't)." Pl's. Ex. 68. Ravina testified that Bekaert's stalling caused a six-month delay in finalizing her paper in the months leading up to her tenure vote. Tr. 755–57. The jury was entitled to credit Ravina's account.

Similarly, although Bekaert's emails could be interpreted merely as Bekaert's attempt to defend himself against negative press attention, they could also be construed, reasonably, as evincing a motivation to retaliate against Ravina for her complaints of sexual harassment. To that end, many of the emails contained angry and biting language, which a reasonable jury could conclude reveal a motive to retaliate, rather than merely to explain or defend. *See, e.g.*, Pl's. Ex. 61 ("I will be over the hill professional with her. That may actually get more under her skin than me giving in to her schemes."); Pl's. Ex. 67 ("I just have to spend enormous amounts of time replying to her in the most neutral way possible (you can image what a hard time I am having with that; I would even in normal circumstances, but now writing something bland and neutral, while I am thinking what an incredible mean b. she is, is torture.)"); Pl's. Ex. 137 ("The evil bitch went ahead."); Pl's. Exs. 141–45, 149, 151–52, 162, 165 ("You have no idea how upsetting this is. She is very crazy and sick . . . She has made my life hell for two years now . . . This is my 'touched by evil' experience in life.").

As to the timing of the 2014 emails, the dates on which Columbia and Bekaert learned of Ravina's sexual harassment complaints were disputed issues at trial. *Compare* Tr. 1538–39 (Bekaert's testimony that he did not learn about sexual harassment complaints until mid-September 2014) *with* Tr. 2006 (Bolton's testimony that he told Johar about the sexual harassment allegations in May 2014); Pl's. Ex. 46 (Bekaert's July 12, 2014 email stating, "I am dealing with

15

this harassment case. If this is harassment, the Americans really are total pussies."). In light of the arguably conflicting evidence presented, a reasonable jury could have discredited Bekaert's testimony that it was not until September of 2014 that he first learned that Ravina's complaints were about sexual harassment. In any event, the emails sent in the summer of 2014 constituted only a portion of Ravina's evidence on retaliation, without which there was still sufficient evidence—including the emails sent in 2016 and the evidence that Bekaert had stalled their joint work—for the jury to find in favor of her on her retaliation claim.

### 2. Reasonable Likelihood of Deterrence

Bekaert also argues that the evidence presented at trial was insufficient to permit the jury to conclude that he engaged in conduct "reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7). The Court disagrees.

The NYCHRL must be "construed liberally for the accomplishment of [its] uniquely broad and remedial purposes[.]" *Mihalik*, 715 F.3d at 109 (quoting Restoration Act § 7 (amending N.Y.C. Admin. Code § 8-130)). New York courts have, accordingly, "broadly interpreted the NYCHRL's retaliation provisions." *Id.* at 112. Assessing whether any particular conduct is "reasonably likely to deter" protected activity within the meaning of the NYCHRL should be made "with a keen sense of workplace realities, of the fact that the chilling effect of particular conduct is context-dependent, and of the fact that a *jury* is generally best suited to evaluate the impact of retaliatory conduct." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009)).

Here, the jury was presented with evidence that Bekaert repeatedly stalled the progress on their joint papers at a particularly sensitive time in Ravina's career. The jury was also shown 26 emails, sent soon after Ravina complained to Columbia in 2014 or filed the complaint in this action in 2016, in which Bekaert stated to colleagues in the profession that, for example, Ravina was an

"evil bitch," "insane," "schizophrenic," "very crazy and sick," treated the PhD students "like absolute sh**," and was "mentally unstable and vicious." *See, e.g.,* Pl's. Exs. 89, 136, 137, 141–45, 149, 150–53, 162, 165, 166. In some of the emails, Bekaert instructed the recipients to disseminate the information. He wrote, for example, that one recipient should be the "point person for the [journal]," Pl's. Ex. 144, and that another should "[f]eel free to take this to the right people at [the financial consulting firm]," Pl's. Ex. 145. In another email, Bekaert wrote that he believed he should write to Harvey, the former President of the American Finance Association, because Harvey was "well plugged in." Pl's. Ex. 140. Ravina testified, and Bekaert confirmed, that the recipients of these emails included several influential scholars in their field, including well-known professors and editors of top journals. The jury was entitled to conclude that these emails, and/or Bekaert's apparent stalling on their joint papers, were "reasonably likely to deter" complaints of sexual harassment.

### B. Punitive Liability

The Court also will not disturb the jury's verdict that Bekaert is liable for punitive damages. Under the NYCHRL, "a plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Chauca v. Abraham,* 30 N.Y.3d 325, 329 (2017) (internal quotation marks omitted). There was sufficient evidence presented at trial to permit a reasonable jury to conclude that Bekaert's retaliatory conduct met this standard. Several of the emails Bekaert sent to friends and colleagues, for instance, indicated that Bekaert was aware of, but disregarded, Ravina's right to be free from retaliation for having complained about him. *See, e.g.,* Pl's. Ex. 60 ("It is unreal what she did, but I am not even going to write about – I am scared shitless about anything I put in an email these days"); Pl's. Ex. 96 ("Since you did not react to my previous email . . . I decided to put it in writing. Given what we

are dealing with, this is a bit dangerous, but I am hoping you will simply delete the email and not mention it to anyone . . . We are dealing with at best a very sick person, at worst an incredibly evil person."). Given this evidence, the Court cannot conclude that the jury's verdict on punitive liability "could only have been the result of sheer surmise and conjecture." *Bucalo*, 691 F.3d at 127.

For the reasons explained above, Bekaert's motion for judgment as a matter of law with respect to his liability for retaliation and punitive damages is denied.

## II. Motion for Remittitur or a New Trial

Bekaert next moves pursuant to Rule 59 for a remittitur of the damages awards or, in the alternative, for a new trial on the issue of damages. "While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law." *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 327–28 (S.D.N.Y. 2016) (internal quotation marks omitted). "When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages. Alternatively, the court may grant remittitur[.]" *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 559 (S.D.N.Y. 2012). "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)). Bekaert moves for a remittitur of both the compensatory damages award and the punitive damages award.

### A.    Compensatory Damages

#### 1.  Standard for Remittitur

As a threshold matter, the parties dispute which standard governs remittitur in this case. Bekaert argues that the applicable standard is set forth in the state rules of civil practice, which provide that, in certain cases, a reviewing court may deem a monetary award excessive "if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). Ravina argues either for the application of the federal "shock[s] the judicial conscience" standard, *see Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012), or for the application of a test established by the New York Court of Appeals for the review of damages awarded by state agencies under the New York State Human Rights Law ("NYSHRL"). *See Matter of N.Y.C. Transit Auth. v. State Div. of Human Rights*, 78 N.Y.2d 207, 219 (1991). That test requires a court to consider (1) "whether the relief was reasonably related to the wrongdoing," (2) "whether the award was supported by evidence before the Commissioner," and (3) "how it compared with other awards for similar injuries." *Id.*

First, it is clear that the federal "shocks the conscience" standard does not apply. The jury was instructed only on Ravina's claims under the NYCHRL, and the Supreme Court has held that "when New York substantive law governs a claim for relief, New York law and decisions guide the allowable damages." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996); *see also Stampf*, 761 F.3d at 204 ("In considering motions for a new trial and/or remittitur, the role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." (internal quotation marks and brackets omitted)).  Accordingly,

the Court will not use the federal "shocks the conscience" standard to evaluate whether the compensatory damages award was excessive.

As to which New York law standard applies, neither the "deviates materially" test nor the three-part test set forth in *Transit Authority* appears to be the perfect fit. Although the "deviates materially" test is frequently used to review jury verdicts in cases involving NYCHRL and NYSHRL claims—*see, e.g., Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012); *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005); *Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 319 (S.D.N.Y. 2018); *McGrory v. City of New York*, 99-cv-4062 (FM), 2004 WL 2290898, at *14 (S.D.N.Y. Oct. 8, 2004); *Fowler v. New York Transit Auth.*, 96-cv-6796, 2001 WL 83228, at *10 (S.D.N.Y. Jan. 31, 2001)—Ravina correctly points out that the relevant statutory provision, by its terms, applies to "money judgment[s] in [] action[s] in which [] itemized verdict[s] [are] required by rule forty-one hundred eleven of this chapter," N.Y.C.P.L.R. § 5501(c). *See also Gasperini*, 518 U.S. at 420 (noting that CPLR § 5501(c) applies "when a jury returns an itemized verdict, as the jury did in this case"); N.Y. C.P.L.R. Rule 4111(d)–(e) (requiring itemized verdicts in malpractice and personal injury cases). Neither party has argued that an itemized verdict was required in this case, nor was one used at trial.

As for the *Transit Authority* test, that standard was developed to review the excessiveness of a damages award calculated by a state agency, not a jury, and it was justified, in part, by principles of deference to the administrative agency. In formulating the *Transit Authority* standard, the Court of Appeals expressly stated that its approach was deferential in part because of "the discretion vested in the agency to achieve [the important] objectives [of the Human Rights Law], and its four decades of special experience in weighing the merit and value of such claims." *Transit Authority*, 78 N.Y.2d at 215–16. Such considerations are inapplicable here, where the Court has

been asked to review a damages award assigned by a jury with no experience in cases of this nature. *See Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 193–96 (E.D.N.Y. 2006), *aff'd* 531 F.3d 127 (2d Cir. 2008). And although the *Transit Authority* test has at times been used to review jury verdicts in cases involving NYSHRL or NYCHRL claims, its use has not been consistent and, as explained above, there are reasons to doubt whether the approach applies with full force to jury awards. *Compare Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 138 (2d Cir. 2008) ("We believe that *Transit Authority* states the applicable law of New York."), *with Lore*, 670 F.3d at 177 ("Under New York law, which is pertinent to the extent that Lore was found entitled to recover under the [Human Rights Law] . . . an award is deemed excessive 'if it deviates materially from what would be reasonable compensation,' N.Y. C.P.L.R. § 5501(c)."); *see also Abel v. Town Sports Int'l, LLC*, 09-cv-10388 (DF), 2012 WL 6720919, at *14 n.9 (S.D.N.Y. Dec. 18, 2012) (noting that *Lore* "seems at odds with the court's prior statements in *Brady*"); *Brady*, 455 F. Supp. 2d at 193–96 (discussing the applicability of the *Transit Authority* test to jury verdicts).

Ultimately, the Court does not find the choice between the *Transit Authority* test and the "deviates materially" test to materially affect the outcome of this motion. The critical inquiry under either approach is to compare the damages awarded in this case to the damages awarded in cases involving similar injuries. *Cf. McGrory*, 2004 WL 2290898, at *13 ("Whichever rubric applies, the court must consider the reasonableness of the sums awarded by comparing the facts presented to the jury with the facts that led to the awards in other cases."). The *Transit Authority* test adds to this inquiry the supplemental considerations of "whether the relief was reasonably related to the wrongdoing, [and] whether the award was supported by evidence[.]" *Transit Auth.*, 78 N.Y.2d at 219. The Court does not view these considerations as incompatible with the "deviates

materially" standard and—as has been the approach of many other courts in New York and in this Circuit—it will thus incorporate these factors into its analysis of whether the damages award is comparable to awards that have been granted in similar cases. *See, e.g., Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 77–78 (2d Cir. 2004), *vacated and remanded on other grounds*, 544 U.S. 957 (2005) (incorporating both the *Transit Authority* considerations and N.Y. C.P.L.R. § 5501(c) into its description of the proper standard); *Emamian v. Rockefeller Univ.*, 07-cv-3919 (DAB), 2018 WL 2849700, at *15–16 (S.D.N.Y. June 8, 2018) (same); *Gleason v. Callanan Inds. Inc.*, 610 N.Y.S.2d 671, 673 (3d Dep't 1994) (same).

## 2. Assessment of Compensatory Damages

After three hours of deliberations, the jury returned a special verdict form awarding Ravina $750,000 in compensatory damages. The verdict form specified that the award was apportioned entirely to "other compensatory damages," which included loss of reputation or professional standing; emotional or physical pain, suffering, mental anguish, emotional or physical distress, or loss of health; embarrassment or humiliation; and loss of enjoyment of life. The jury awarded Ravina $0 in economic damages for back pay or front pay, thus reflecting the jury's judgment that Ravina was not entitled to damages for past or future lost earnings, but that she was entitled to damages for reputational and/or emotional harm. Bekaert argues that this award was excessive as compared to the awards granted in other cases involving purely emotional or reputational injuries. The Court agrees.

Although "[a]wards for mental and emotional distress are inherently speculative . . . a legal system [nevertheless] has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate." *Stampf*, 761 F.3d at 205 (internal quotation marks omitted). In this Circuit, emotional distress awards for cases involving discrimination and retaliation "can generally be grouped into three categories []: garden-variety, significant, and

22

egregious." *Emamian*, 2018 WL 2849700, at *16 (internal quotation marks omitted). "Garden-variety" claims are those in which "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms." *Id.* Recent decisions describe such claims as "generally merit[ing] $30,000 to $125,000 awards." *Id.*; *see also Duarte*, 341 F. Supp. 3d at 321–22 (granting a remittitur of a compensatory damages award from $624,000 to $125,000 where the "[p]laintiff's vague and subjective complaints of insomnia, lower self-esteem, depression, anxiety, and stomach aches and headaches—unsupported by medical corroboration—establish[ed] no more than 'garden-variety' emotional distress"); *Legg v. Ulster Cnty.*, 09-cv-550 (FJS/RFT), 2017 WL 3668777, at *11–12 (N.D.N.Y. Aug. 24, 2017) (granting a remittitur of a compensatory damages award from $200,000 to $75,000 where the plaintiff "produced only vague testimony regarding her alleged emotional distress" and "there was no testimony from a medical professional").

Significant emotional distress claims, by contrast, "are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Emamian*, 2018 WL 2849700, at *16; *Duarte*, 341 F. Supp. 3d at 320. Such claims typically support damages awards ranging from $50,000 to $200,000, though greater awards may be appropriate under some circumstances. *See, e.g., Lore*, 670 F.3d at 177–80 (upholding a compensatory damages award of $250,000 for reputational harm and emotional distress—while noting that the award was "generous"—where evidence included evidence of medical treatment, as well as testimony from the plaintiff and her mother that she suffered from "tension headaches, abdominal pain, insomnia, anxiety, and depression"); *Emamian*, 2018 WL 2849700 at *17 (granting a remittitur of an emotional distress award from $2 million to $200,000 where evidence

consisted of "[p]laintiff's own testimony regarding her mental state, her trichotillomania and physical manifestations of her emotional suffering," as well as "corroborative medical testimony"); *Gutierrez v. Taxi Club Mgmt., Inc.*, 17-cv-532 (AMD) (VMS), 2018 WL 3432786, at *10 (E.D.N.Y. June 25, 2018), *report and recommendation adopted*, 2018 WL 3429903 (E.D.N.Y. July 16, 2018) (awarding $130,000 in emotional distress damages where plaintiff testified that she "cried at work, had migraine headaches, routinely felt nauseous, vomited, had trouble sleeping, suffered from stress and anxiety, overate, and felt a general sensation of helplessness"); *Bouveng*, 175 F. Supp. 3d at 328–34 (S.D.N.Y. 2016) (granting a remittitur of a $500,000 compensatory damages award on a sexual harassment claim to $150,000, where there was evidence of significant sexual harassment, but the evidence of emotional distress was limited to plaintiff's testimony); *McGrory*, 2004 WL 2290898, at *15–16 (granting a remittitur of a $530,000 pain and suffering award to $100,000 where evidence included corroborating testimony, and plaintiff had "established far more than garden variety emotional distress").

Finally, "egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff." *MacMillan*, 873 F. Supp. 2d at 560 (internal quotation marks omitted). Awards for such claims can far exceed $200,000, with awards of over $1 million reserved for the most egregious cases. *See, e.g., Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014) (upholding an award of $1.32 million in compensatory damages for a "unique" case involving "extreme racial harassment in the workplace," while "acknowledg[ing] that the jury's compensatory award tests the boundaries of proportionality and predictability").

Here, the Court views the injuries Ravina testified about as significant. Ravina claimed during the damages phase that she suffered from insomnia, a herniated disc, anxiety, weight gain,

and suicidal thoughts. Tr. 3015, 3027–28. She testified that her situation with Bekaert "was an all-consuming situation that took over [her] life." Tr. 3029. Her psychiatrist, Dr. Silbert, testified that Ravina suffered from "extreme anxiety, disturbed sleep, disturbed appetite, impaired ability to enjoy usually pleasurable activities, fears, distrust, aversion to social situations, at times she's felt suicidal, and deep concern about her long-term prospects to achieve success." Tr. 3140. He explained that Ravina suffered from generalized anxiety disorder, and that she also experienced symptoms of depression and post-traumatic stress. Tr. 3141–42. Dr. Silbert further testified that Ravina's symptoms were "severe" and that her prognosis was "poor." Tr. 3140.

Such evidence distinguishes the present case from both the "garden-variety" emotional distress claims cited by Bekaert and the more egregious cases cited by Ravina. Unlike in cases of "garden-variety" emotional distress, Ravina testified that she continued to experience serious symptoms of anxiety and depression, and her treating psychiatrist corroborated her account. Unlike in cases of egregious emotional distress, however, the retaliatory conduct the jury found Ravina had endured—while undoubtedly serious—did not rise to the level of "outrageous or shocking." *MacMillan*, 873 F. Supp. 2d at 560. The extreme cases on which Ravina relies to justify an award approaching $1 million involved materially different factual circumstances. For example, *Turley* involved a plaintiff who had suffered "years of grotesque psychological abuse leading to a marked decline in [his] mental health," which culminated in his being "hospitalized and diagnosed with, *inter alia*, post-traumatic stress disorder, depression, and panic disorder." 774 F.3d at 163. The Second Circuit, affirming an award of $1.32 million, characterized the case as "unique" and remarked that the award "tests the boundaries of proportionality and predictability." *Id.* In *Osorio v. Source Enters., Inc.*, 05-cv-10029 (JSR), 2007 WL 683985, at *5 (S.D.N.Y. Mar. 2, 2007), not only did the court find the jury's "very full verdict" of $4 million for emotional

distress and harm to reputation to be justified, in part, by a finding that the plaintiff had been "summarily dismissed in retaliation for filing a complaint of gender discrimination" and had encountered "difficulty during subsequent job interviews"—factors which are not here present— but it also stands as an outlier in terms of the substantiality of its award.[4]

The Court finds cases like *Lore, Emamian,* and *Albunio v. City of New York*, 889 N.Y.S.2d 4 (1st Dep't 2009), to be more instructive. In *Lore*, the Second Circuit upheld an award of $250,000 for pain and suffering, emotional distress, and injury to reputation for the defendants' retaliation against plaintiff for her complaints of gender discrimination in a police department. 670 F.3d at 178–79. Evidence of emotional distress included plaintiff's own testimony that she suffered from "tension headaches, abdominal pain, insomnia, anxiety, and depression," which was corroborated by her medical records and by the testimony of her mother. *Id.* at 178. The *Lore* plaintiff also testified that she suffered reputational injury in that she was "shunned" by co-workers and was approached by members of the public who had seen negative comments about her made by one of the defendants to the media. *Id.* at 154. The Second Circuit upheld an award of $250,000—which was broken down into $150,000 for emotional distress and $100,000 for reputational injury—while noting that the award was "generous." *Id.* at 179.

*Emamian* also involved a comparable circumstance, in which a neuroscientist claimed that the university where she had been employed discriminated against her based on her race and national origin in violation of the NYCHRL. 2018 WL 2849700, at *1. The plaintiff was diagnosed with generalized anxiety disorder and trichotillomania, and she testified that the discrimination she endured "made her want to die," and that she continued to feel "perpetually anxious" and to have difficulty sleeping. *Id.* at *15. After the jury awarded her $2 million in

---

[4] Ravina also relies on several cases in which high damages awards were upheld in defamation cases. As Ravina has not brought any claims against Bekaert or Columbia for defamation, these cases are of limited value.

damages for emotional distress, the district court granted a remittitur to $200,000, finding that any higher amount would be excessive. *Id.* at *17–19. Finally, in *Albunio*, the First Department upheld a compensatory damages award of $491,706, where the plaintiff's psychiatrist testified that the plaintiff suffered from "major reactive depression" as a result of being "stereotyped as a pedophile." 889 N.Y.S.2d at 6. The plaintiff in that case testified that he had experienced "damage to his reputation and professional career caused by his being perceived as a gay man and stereotyped as a child molester," and the record showed that he had "endured anxiety and panic attacks [and had] experienced suicidal ideation." *Id.*

This case, like *Lore, Emamian*, and *Albunio*, involved significant and long-standing emotional distress, the evidence of which included not only plaintiff's testimony, but also the corroborating account of a medical professional. In addition, as in *Lore* and *Albunio*, the compensatory damages award here accounted for the reputational injury that Ravina may have sustained in her professional community, in addition to emotional harm. Given these similarities, the Court finds that the damages awards in *Lore, Emamian*, and *Albunio* provide useful benchmarks for assessing the appropriateness of the jury's compensatory damages award here. In particular, the emotional injuries Ravina and her psychiatrist testified to seem similar in intensity and duration to the injuries of the *Emamian* plaintiff. Ravina, however, also presented evidence of substantial reputational harm—testifying that the emails in which Bekaert called her, *inter alia*, an "evil bitch" and "very crazy and sick" were widely distributed to prominent members of her professional community. In other cases involving both reputational harm and significant emotional distress, courts have—in order to account for loss of reputation—permitted compensatory damages awards exceeding the typical range for emotional harm. *See Albunio*, 889 N.Y.S.2d at 6; *Thorsen v. Cnty. of Nassau*, 722 F. Supp. 2d 277, 294–95 (E.D.N.Y. 2010). In light

of these considerations, the Court concludes that the jury's award of $750,000 was excessive, and that an award of $500,000 is the "maximum amount that would be upheld . . . as not excessive."[5] *Emamian*, 2018 WL 2849700, at *19. The Court accordingly grants Bekaert's motion for a remittitur of the compensatory damages award.

### B. Punitive Damages

Bekaert next argues that the jury's $500,000 punitive damages, too, was excessive. "The NYCHRL permits punitive damages, without limitation on the maximum amount." *Syrnik v. Polones Constr. Corp.*, 918 F. Supp. 2d 262, 265 (S.D.N.Y. 2013). "Punitive damages are intended not only to punish the tortfeasor but also to deter future reprehensible conduct." *Chauca*, 30 N.Y.3d at 331. In reviewing an award of punitive damages for excessiveness, courts consider "three guideposts" established by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996): "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996). Courts also review the punitive damages awards in similar cases in order to gauge whether a particular punitive award is excessive. *See, e.g., Payne v. Jones*, 711 F.3d 85, 104 (2d Cir. 2013); *Rosas v. Balter Sales Co. Inc.*, 12-cv-6557 (VSB), 2018 WL 3199253, at *10 (S.D.N.Y. June 29, 2018).

The first guidepost—the degree of reprehensibility—"is particularly important and useful because punitive damages are intended to punish, and the severity of punishment . . . should vary with the degree of reprehensibility of the conduct[.]" *Payne*, 711 F.3d at 100. "In assessing the reprehensibility of a defendant's conduct, the Supreme Court has instructed that courts should

---

[5] The Court has taken into account inflation when comparing Ravina's award to the compensatory damages awards upheld in prior cases.

'consider whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.'" *Thomas v. iStar Fin. Inc.*, 652 F.3d 141, 148 (2d Cir. 2011) (brackets omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003)). In this case, the jury found Bekaert liable for retaliation, but not discrimination. While Bekaert's conduct was not violent, did not threaten violence, and did not evince a reckless disregard for the safety of others, the jury reasonably could have found that his retaliatory conduct involved repeated actions, rather than an isolated incident, and that he acted out of malice, rather than mere accident. Under the circumstances, the Court concludes that Bekaert's conduct "can be described as reprehensible, though it does not fall at the extreme end of the reprehensibility spectrum." *Quinby v. WestLB AG*, 04-cv-7406 (WHP), 2008 WL 3826695, at *4 (S.D.N.Y. Aug. 15, 2008).

With respect to the ratio of punitive damages to compensatory damages, the punitive award of $500,000 is less than the jury's compensatory damages award (and equal to the reduced award offered by the Court) and thus does not raise concerns of excessiveness. *See Campbell*, 538 U.S. at 426 (While "there are no rigid benchmarks that a punitive damages award may not surpass," "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety.").

As to the third guidepost—the difference between the punitive damages award and the civil penalties authorized in comparable cases—the NYCHRL authorizes a maximum civil penalty of $250,000 for an "unlawful discriminatory practice that was the result of the respondent's willful, wanton or malicious act[.]" N.Y.C. Admin. Code § 8-126(a); *see also Thomas*, 652 F.3d at 149;

*Duarte*, 341 F. Supp. 3d at 332. The punitive damages award in this case is twice that amount, suggesting that the award was excessive. *See id.*

Finally, a comparison of the punitive damages award in this case to the awards sustained in other comparable cases further indicates that the $500,000 award was excessive. Although comparing punitive awards in the discrimination and retaliation context can be "of limited utility because a wide range of awards have been upheld," *Hill v. Airborne Freight Corp.*, 212 F. Supp. 2d 59, 76 (E.D.N.Y. 2002), most punitive awards for conduct involving a degree of reprehensibility similar to Bekaert's have been significantly lower than the award that was granted in this case, particularly where the defendant was an individual and was found liable for retaliation only, but not any underlying discrimination. *See, e.g., Thomas*, 652 F.3d at 149 (affirming remittitur of a $1.6 million dollar punitive award to $190,000, where the retaliatory conduct occurred over a period of time and was not merely negligent, but involved no violence or threatened violence); *Duarte*, 341 F. Supp. 3d at 330–31 (granting remittitur of a $750,000 punitive damages award to $125,000, where there was repeated harassment, but no evidence of violence, physical injury, financial vulnerability, or deceit); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 580 (S.D.N.Y. 2011) (granting remittitur of a $1 million punitive award to $50,000, where the punitive award was based on an individual supervisor's retaliatory conduct, which involved neither violence nor offensive language); *Norris v. N.Y.C. Coll. of Tech.*, 07-cv-853, 2009 WL 82556, at *7–8 (E.D.N.Y. Jan. 14, 2009) (granting remittitur of a $425,000 punitive award to $25,000 for retaliatory termination, where the defendant "acted intentionally and with knowledge that his conduct would violate [plaintiff's] rights, [but] no other indicia of reprehensibility [were] present"); *Manzo v. Sovereign Motor Cars, Ltd.*, 08-cv-1229 (JG) (SMG), 2010 WL 1930237, at *5 (E.D.N.Y. May 11, 2010) (upholding a $200,000 punitive damages award

where the defendant's harassing conduct was not violent, but also was not an isolated incident and caused the plaintiff significant emotional distress). The Court views these cases as more instructive than the cases relied upon by Ravina.

Having considered the degree of reprehensibility of Bekaert's conduct, the fact that the jury did not find him liable for the underlying harassment or discrimination, the punitive awards granted in similar cases, the ratio of punitive to compensatory damages, and the maximum civil penalty authorized by the NYCHRL, the Court concludes that the $500,000 punitive damages award was excessive. An award of $250,000, reflecting the maximum civil city law penalty, "would be maximally sufficient to serve the retributive and deterrent purposes of civil penalties without violating due process principles." *Thomas v. iStar Fin. Inc.*, 508 F. Supp. 2d 252, 264 (S.D.N.Y. 2007). Accordingly, Bekaert's motion for a remittitur of the punitive damages award is granted.

### III.      Plaintiff's Motion for Injunctive Relief

Ravina moves for injunctive relief to bar Bekaert from engaging in further retaliatory acts against her. She submits a proposed order that would (1) enjoin Bekaert from interfering with her career or making disparaging statements about her, and (2) require Columbia to monitor Bekaert's Columbia email account for violations of either the injunction or Columbia's email usage policy. The Court has carefully considered Ravina's request, but concludes that injunctive relief is not warranted under the circumstances of this case.

The NYCHRL provides a cause of action "for damages, including punitive damages, and for injunctive relief and such other remedies as may be appropriate." N.Y.C. Admin. Code § 8-502(a); *see also Wilson v. Phoenix House*, 978 N.Y.S.2d 748, 770 (Sup. Ct. 2013) ("Clearly, injunctive relief is available under the City's Human Rights Law."). The statute does not provide further guidance concerning when injunctive relief should be granted upon the finding of liability under the NYCHRL, and few cases have considered this issue directly. *See Wilson*, 978 N.Y.S.2d

at 770 ("It is unclear from the case law whether the courts have found any requirement that a plaintiff must show . . . that plaintiff faces 'irreparable injury' absent the injunction to seek permanent injunctive relief under the NYC Human Rights Law. In fact, there are few reported cases where this conceivably could have been raised as an issue."). In considering Ravina's requested relief, the Court has applied the usual principles of equitable discretion, while remaining mindful that the NYCHRL must be "construed liberally for the accomplishment of [its] uniquely broad and remedial purpose." *Mihalik*, 715 F.3d at 109. The Court has also, where appropriate, drawn on the guidance provided by cases in the Title VII context, with the caveat that such cases are "instructive only to the extent that [they] may provide guidance as to the 'uniquely broad and remedial purposes' of the local law." *Chauca*, 30 N.Y.3d at 333.

"An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (internal quotation marks omitted); *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987) ("In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies."). "The factors that are pertinent in assessing the propriety of injunctive relief are the balance of equities and consideration of the public interest." *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) (quoting *Winter*, 555 U.S. at 32) (internal quotation marks, brackets, and ellipses omitted).

In the Title VII context, where "Congress took care to arm the courts with full equitable powers," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975), the Second Circuit has stated that "in seeking an injunction, 'the moving party must satisfy the court that relief is needed. The

necessary determination is that there exists some cognizable danger of recurrent violation.'"[6]

*KarenKim*, 698 F.3d at 100 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

"A court may grant injunctive relief even where a defendant has ceased the offending conduct

upon consideration of 'the bona fides of the defendant's expressed intent to comply' with the law,

'the effectiveness of the discontinuance,' and 'the character of the past violations.'" *E.E.O.C. v.

United Health Programs of Am.*, 350 F. Supp. 3d 199, 211 (E.D.N.Y. 2018) (brackets omitted)

(quoting *W.T. Grant Co.*, 345 U.S. at 633). "However, there must be 'something more than the

mere possibility of recurrent violations which serves to keep the case alive.'" *Id.* (brackets

omitted) (quoting *W.T. Grant Co.*, 345 U.S. at 633).

Courts have thus granted injunctive relief under Title VII, as well as under the NYCHRL,

where, for example, "there is evidence of widespread and continuous retaliation or harassment that

indicates that the threat of future bad acts is high." *Lewis v. Am. Sugar Refining, Inc.*, 14-cv-02302

(CRK), 2018 WL 4179053, at *3 (S.D.N.Y. Aug. 15, 2018); *see also KarenKim*, 698 F.3d at 100–

02 (holding that the district court abused its discretion in declining to enjoin a store manager who

had sexually harassed multiple female employees from entering the premises, or from being re-

hired, where that manager was also in a longstanding romantic relationship with the owner); *United

Health Programs of Am.*, 350 F. Supp. 3d at 213 (granting injunctive relief where the "evidence at

trial established that the nature of defendants' past conduct, which was widespread and

---

[6] Ravina cites *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus.*, 186 F.3d 110, 116 (2d Cir. 1999) for
the proposition that once "a plaintiff establishes a defendant's liability under Title VII, there is no discretion to deny
injunctive relief completely." Pl's. Br. at 6. The quoted language comes from a Fourth Circuit case and has been
contradicted by Second Circuit precedent, which makes clear that injunctive relief, even in the Title VII context,
remains a matter of equitable discretion. *See KarenKim*, 698 F.3d at 100 ("Generally, an injunction is a matter of
equitable discretion; it does not follow from success on the merits as a matter of course. In seeking an injunction, the
moving party must satisfy the court that relief is needed. The necessary determination is that there exists some
cognizable danger of recurrent violation.") (internal quotation marks and citations omitted); *Barbano v. Madison
Cnty.*, 922 F.2d 139, 147 (2d Cir. 1999) (affirming the denial of injunctive relief in a Title VII case where the record
revealed that the relief awarded was "sufficient to make [plaintiff] whole.")

longstanding, support[ed] a finding that violations [were] likely to reoccur"); *Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 403 (S.D.N.Y. 2012) (concluding that injunctive relief was appropriate to prohibit future violations of the NYCHRL's source-of-income provisions, because "[d]efendants currently lack any written policies or procedures regarding housing discrimination and do not offer any training to their employees on such matters"); *Collins v. Suffolk Cnty. Police Dep't*, 349 F. Supp. 2d 559, 563 (S.D.N.Y. 2004) (enjoining defendants from engaging in further acts of retaliation, where the plaintiff submitted an affidavit stating that defendants were retaliating against her post-trial).

By contrast, where plaintiffs have failed to show a cognizable threat of future retaliation, courts have denied injunctive relief. *Lewis*, 2018 WL 4179053, at *3 (denying injunctive relief for claims under Title VII, the NYCHRL, and state law where the plaintiff and his supervisor were no longer in the same department and there was no evidence that the supervisor "continued to seek plaintiff out and use discriminatory language against him"); *see also Barbano*, 922 F.2d at 147 (affirming the denial of injunctive relief in a Title VII case where "on [the] record the denial was tantamount to stating that the relief actually awarded was sufficient to make [plaintiff] whole"); *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 199 (E.D.N.Y. 2012) (denying injunctive relief under the NYCHRL and state law where plaintiff's current position accommodated his disability and the risk of future discrimination was "speculative"); *Reiter v. Metro. Transp. Auth. of New York*, 01-cv-2762 (JGK), 2003 WL 22271223, at *15 (S.D.N.Y. Sept. 30, 2003) (denying request for permanent injunction to prevent future retaliation under Title VII where the individual responsible was no longer plaintiff's supervisor and "there [was] no showing that [the new supervisor] would retaliate against the plaintiff in any way").

Having considered this case law, the remedial purposes of the NYCHRL, and the principles of equitable discretion described above, the Court concludes that a permanent injunction is not warranted in this case. First, there is no "cognizable danger" that Bekaert's retaliatory conduct will continue. Ravina no longer works at Columbia, and she has not presented any evidence that Bekaert has "continued to seek [her] out" in order to retaliate against her. *Lewis*, 2018 WL 4179053, at *3. Since Bekaert and Ravina no longer work together, Bekaert is no longer in a position to obstruct Ravina's work product. And as to the disparaging emails Bekaert sent about Ravina three years ago, those were sent in the time period immediately following Ravina's complaints about him, and Ravina has not presented the Court with any indication that Bekaert has engaged in such conduct since. Moreover, the jury has already awarded Ravina substantial compensatory and punitive damages awards—even after the Court's remittitur—which take into account, among other things, Ravina's reputational injury and emotional distress, the nature of Bekaert's conduct, and the amount sufficient to punish Bekaert and to deter future retaliatory acts. Given the timing and duration of Bekaert's conduct, the fact that Bekaert and Ravina no longer work together, and the sizeable compensatory and punitive damages Ravina has already been awarded, the Court does not perceive a cognizable risk of further retaliation warranting injunctive relief.

Ravina argues that Bekaert's years-old emails are alone sufficient to establish a cognizable danger of future retaliation, because they show that Bekaert is "unable to control his vindictive impulses to lash out and disparage her." Pl's. Br. at 8. She argues that her case is similar to *KarenKim*, 698 F.3d at 100, in which the Second Circuit held that a district court had abused its discretion in refusing to enjoin an employer from re-hiring, or permitting on the premises, a terminated store manager who had sexually harassed numerous employees. In that case, however,

the offending store manager "remain[ed] in a long-standing romantic relationship with [the employer's] owner," creating a cognizable danger that future violations would occur. *Id.* Here, by contrast, there are no circumstances presenting a risk that Bekaert will continue to retaliate against Ravina, since the two no longer work together and it has been three years since the last incident of retaliation. *See Lewis*, 2018 WL 4179053, at *3 (denying injunctive relief where plaintiff and his supervisor no longer worked in the same department and there was no evidence that the supervisor had "continued to seek [p]laintiff out"); *Welch*, 871 F. Supp. 2d at 199 (denying injunctive relief where plaintiff's current job accommodated his disability and the risk of future discrimination was speculative); *Reiter*, 2003 WL 22271223, at *15 (denying injunctive relief where the individual who retaliated against plaintiff was no longer his supervisor and "there [was] no showing that [the new supervisor] would retaliate against the plaintiff in any way"). And although it is true that "[a] pattern of discriminatory conduct is not necessary to warrant the award of injunctive relief," *Short*, 916 F. Supp. 2d at 402, still there must be "more than the mere possibility which serves to keep the case alive," *W.T. Grant Co.*, 345 U.S. at 633. Here, the Court cannot conclude that "more than the mere possibility" of future retaliatory conduct persists.

Finally, in contrast to any remaining risk of retaliation—which the Court concludes is slight—stands the relatively significant burden Ravina seeks to impose upon Bekaert and Columbia through her proposed injunction. Ravina seeks to enjoin Bekaert from making any of a host of disparaging statements about her to anyone "within the academic community or the field of finance and economics," and to require Columbia to monitor Bekaert's email communications in order to identify any violations of its email usage policies or the proposed injunction. Such an order would go beyond merely requiring Bekaert and Columbia to "obey the law." *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1215 (2d Cir. 1993). Even if it were clear that the jury had found

Bekaert's disparaging emails, in particular, to be retaliatory, that would not establish that any future similar comment would constitute an act of retaliation for Ravina's complaints back in 2014 and 2016. Given, too, the privacy concerns that such an injunction would raise and the obligation it would place on Columbia to monitor Bekaert's email, Ravina's requested relief "impose[s] unnecessary burdens on lawful activity" and is not "narrowly tailored to fit specific legal violations[.]" *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 220 (2d Cir. 2003). Accordingly, and for the reasons explained above, Ravina's motion for injunctive relief is denied.

## IV.     Sealing Request

In connection with her motion for injunctive relief, Ravina has also submitted a request to seal a list of electronic search terms that she proposes Columbia be required to use in order to monitor Bekaert's email account. Ravina asserts that sealing the list of search terms is necessary because, if the list were made public, Bekaert "could easily continue to smear and disparage Professor Ravina but evade electronic detection by eschewing use of the terms in favor of similar variants." Pl's. Ltr, Dkt. 295. In light of the Court's denial of Ravina's motion for injunctive relief, Bekaert's potential to evade detection no longer supplies a basis for granting Ravina's sealing request. As the Court cannot discern any other basis for sealing the search terms, let alone one that is "essential to preserve higher values," Ravina's request is denied. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (Judicial documents are entitled to a presumption of access, which may be rebutted with "specific, on the record findings . . . that closure is essential to preserve higher values and is narrowly tailored to serve that interest."). Ravina shall file the list of electronic search terms on the public docket no later than April 5, 2019.

## CONCLUSION

For the foregoing reasons, Bekaert's motion for judgment as a matter of law and Ravina's motion for injunctive relief, as well as her sealing request, are denied. Bekaert's motion for a

remittitur of the damages awards is granted. No later than April 22, 2019, Ravina shall inform the Court in writing whether she will accept the reduced damages awards of $500,000 in compensatory damages and $250,000 in punitive damages. If she does not, the Court will grant Bekaert a new trial on the sole issue of damages. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 274, 281, 295, and 297.

SO ORDERED.

Dated:     March 31, 2019
          New York, New York

Ronnie Abrams
United States District Judge