**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ENRICHETTA RAVINA,**<br><br>    **PLAINTIFF,**<br><br>**-- against --**<br><br>**COLUMBIA UNIVERSITY**<br>**A/K/A THE TRUSTEES OF COLUMBIA**<br>**UNIVERSITY IN THE CITY OF NEW YORK**<br>**AND GEERT BEKAERT,**<br><br>    **DEFENDANTS.** | **Case No. 1:16-cv-02137-RA** |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND COSTS**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

I.  AS THE PREVAILING PARTY, PLAINTIFF IS ENTITLED TO ALL OF HER
    REASONABLE ATTORNEYS' FEES AND COSTS ....................................................3

    A. Professor Ravina Is the Prevailing Party .........................................................3

    B. Fee Awards Benefit the Public .........................................................................4

    C. Plaintiff Is Entitled to Recover Fees for All Legal Work Performed in Prosecuting This
       Action Despite Not Receiving a Favorable Verdict on Her Discrimination Claims ..........5

    D. Plaintiff Is Entitled to a Full Recovery of Attorneys' Fees and Costs, Even If They
       Exceed the Damages Verdict ...........................................................................7

II. PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES SHOULD BE GRANTED ...8

    A. The Lodestar Method Is Applied to Determine the Presumptively Reasonable
       Fee Award ...................................................................................................8

    B. Sanford Heisler Sharp Seeks Fees for Time Reasonably Expended....................................9

       1. Prosecuting this Matter Required a Vast Expenditure of Time and Resources...........10

       2. Sanford Heisler Sharp Staffed This Case Efficiently ...................................14

       3. Plaintiff Has Provided Satisfactory Records to Support the Award ...........................15

    C. Sanford Heisler Sharp's Standard Hourly Rates Should be Applied................................16

       1. The Requested Hourly Rates Are Consistent With, or Less Than, Sanford Heisler
          Sharp's Standard Hourly Rates....................................................................16

       2. The High Caliber of the Firm and the Services It Provides Justify The Requested
          Hourly Rates ...........................................................................................17

       3. Sanford Heisler Sharp's Hourly Rates Have Been Repeatedly Approved by Courts..19

       4. Sanford Heisler Sharp's Hourly Rates Are Consistent with Market Rates of Lawyers
          of Comparable Skill and Experience ...........................................................20

    D. Plaintiff's Exercise of Billing Discretion Militates in Favor of Granting Sanford Heisler
       Sharp's Requested Fee.................................................................................23

    E. Other Factors Warrant a Substantial Fee Award ...........................................................24

       1. The Contingency Risk in this Case Amply Supports the Requested Fee ....................24

       2. The Perceived "Undesirability" of the Case Amply Supports the Requested Fees .....26

       3. The Resources Expended by Plaintiff's Counsel and by Defendants Further Warrant
          the Requested Fee .....................................................................................27

III. PLAINTIFF'S APPLICATION FOR COSTS SHOULD BE GRANTED .......................27

    A. Deposition-Related Costs...............................................................................28

    B. Document Storage and Discovery-Related Expenses........................................................29

C.   Mediation Costs ........................................................................................................29

D.   Court-Related and Trial-Related Expenses....................................................................30

E.   Trial Consulting and Support .........................................................................................31

F.   Expert Costs ...................................................................................................................32

G.   Incidental Expenses .......................................................................................................34

IV.   PLAINTIFF IS ENTITLED TO REIMBURSEMENT OF OUT-OF-POCKET LEGAL
COSTS SHE PAID TO HER PRIOR COUNSEL IN CONNECTION WITH THIS
MATTER .................................................................................................................................35

CONCLUSION.................................................................................................................................36

# TABLE OF AUTHORITIES

## Cases

*Albunio v. City of New York*,
  23 N.Y.3d 65 (2014) ............................................................................................ 4
*Albunio v. City of New York.*,
  2012 WL 2122451 (N.Y. Sup. Ct. June 6, 2012) ............................................... 8
*Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*,
  No. 10 Civ. 1853, 2011 WL 1002439 (S.D.N.Y. Mar. 16, 2011),
  *aff'd*, 483 Fed. Appx. 634 (2d Cir. 2012) ..................................................... 15, 17
*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  522 F.3d 182 (2d Cir. 2008) ............................................................................. 27
*Ayers v. SGS Control Servs., Inc.*,
  No. 03 Civ. 9078, 2008 WL 4185813 (S.D.N.Y. Sept. 9, 2008)......................... 35
*Barrett v. Forest Labs., Inc.*,
  No. 1:12-cv-05224292 (S.D.N.Y. Apr. 26, 2018) ............................................. 20
*BCS Servs., Inc. v. BG Investments, Inc.*,
  728 F.3d 633 (7th Cir. 2013)............................................................................. 10
*Blackwell v. Foley*,
  724 F. Supp. 2d 1068 (N.D. Cal. 2010) ............................................................. 9
*Blanchard v. Bergeron*,
  489 U.S. 87 (1989)............................................................................................ 5
*Blum v. Stenson*,
  465 U.S. 886 (1984)......................................................................................... 22
*Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*,
  549 F. Supp. 2d 274 (E.D.N.Y. 2008) ............................................................... 35
*Chauca v. Abraham*,
  30 N.Y.3d 325 (2017)........................................................................................ 4
*Christianburg Garment Co. v. EEOC*,
  434 U.S. 412 (1978)........................................................................................... 4
*City of Providence v. Aeropostale, Inc.*,
  No. 11 Civ. 7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014)..................... 22, 24
*Clem v. Keybank*,
  No. 13 Civ. 789, 2014 WL 2895918 (S.D.N.Y. June 20, 2014).......................... 35
*Copeland v. Marshall*,
  641 F.2d 880 (D.C. Cir.1980)........................................................................... 10
*Cuff v. Trans State Holdings, Inc.*,
  768 F.3d 605 (7th Cir. 2014) ............................................................................. 7
*Degregorio v. Richmond Italian Pavillion, Inc.*,
  935 N.Y.S.2d 70 (App. Div. 2d Dept. 2011) ...................................................... 4
*Dibella v. Hopkins*,
  407 F. Supp. 2d 537 (S.D.N.Y. 2005) ............................................................... 31
*Dominic v. Consol. Edison Co. of N.Y., Inc.*,
  822 F.2d 1249 (2d Cir. 1987) ............................................................................. 6
*Dowdell v. City of Apopka, Fla.*,
  698 F.2d 1181 (11th Cir. 1983) ........................................................................ 28

*Echevarria v. Insight Med., P.C.*,
  102 F. Supp. 3d 511 (S.D.N.Y. 2015) ........................................................ 6
*E-Pass Tech., Inc. v. 3Com Corp.*,
  No. C-00-2255, 2007 WL 4170514 (N.D. Cal. Nov. 14, 2007) ...................... 9
*Ewald v. Royal Norwegian Embassy*,
  No. 11-CV-2116, 2015 WL 1746375 (D. Minn. Apr. 13, 2015)...................... 10
*Fleisher v. Phoenix Life Ins. Co.*,
  No. 11-cv-8405, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ................ 28, 29, 30
*Fornuto v. Nisi*,
  923 N.Y.S.2d 493 (App. Div. 1st Dept. 2011) ........................................ 4
*Fox v. Vice*,
  563 U.S. 826 (2011)........................................................................ 15
*Grant v. City of Syracuse*,
  357 F. Supp. 3d 180 (N.D.N.Y. 2019)..................................................... 34
*Grant v. Martinez*,
  973 F.2d 96 (2d Cir. 1992) ............................................................... 8
*Grice v. Pepsi Beverages Co.*,
  363 F. Supp. 3d 401 (S.D.N.Y. 2019) .................................................... 30
*Guzman v. Bevona*,
  Civ. No. 92 CIV.1500, 1996 WL 374144 (S.D.N.Y. 1996) ................................ 31
*Ha v. Google Inc.*,
  No. 116CV290847, 2018 WL 1052448 (Cal. Super. Feb. 8, 2018) ...................... 20
*Hallmark v. Cohen & Slamowitz, LLP*,
  378 F. Supp. 3d 222 (W.D.N.Y. May 8, 2019)............................................ 25
*Heng Chan v. Sung Yue Tung Corp.*,
  No. 03 Civ. 6048, 2007 WL 1373118 (S.D.N.Y. May 8, 2007)............................ 27
*Hernandez v. Kaisman*,
  139 A.D.3d 406 (N.Y. App. Div. 1st Dept. 2016) ....................................... 15
*In re AOL Time Warner S'holder Der. Lit.*,
  No. 02 Civ. 6302, 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ............................ 26
*In re Indep. Energy Holdings PLC Sec. Litig.*,
  302 F. Supp. 2d 180 (S.D.N.Y. 2003) .................................................... 30
*In re Light Tower Rentals, Inc.*,
  No. 16-34284, Dkt. No. 206 (Bankr. S.D. Tex. 2016)................................... 21
*In re Marsh & McLennan Companies, Inc. Securities Litigation*,
  2009 WL 5178546 (S.D.N.Y. 2009)........................................................ 18
*In re Pes Holdings, LLC*,
  No. 18-10112, Dkt. No. 551 (Bankr. D. Del. 2018) ..................................... 21
*In re Platinum & Palladium Commodities Litig.*,
  No. 10-cv-3617, 2015 WL 4560206 (S.D.N.Y. July 7, 2015)............................. 22
*In re Relativity Fashion LLC*,
  565 B.R 50 (Bankr. S.D.N.Y. 2017)...................................................... 22
*In re Velocity Holding Co., Inc.*,
  No. 17-12442, Dkt. No. 521 (Bankr. D. Del. 2018) ..................................... 21
*In re Visa Check/Mastermoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd*, 396 F.3d 96 (2d Cir. 2005)............. 28, 29, 31, 34

iv

*In re Westinghouse Electric Co. LLC*,
   No. 17-10751, Dkt. No. 3251 (Bankr. S.D.N.Y. 2018) ...................................... 21
*J .S. Nicol, Inc. v. Peking Handicraft, Inc.*,
   No. 03 Civ. 1548, 2008 WL 4613752 (S.D.N.Y. Oct. 17, 2008) ........................... 31
*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) .............................................................................................. 3
*Kassim v. City of Schenectady*,
   415 F.3d 246 (2d Cir. 2005) ............................................................................... 7, 8
*LeBlanc-Sternberg v. Fletcher*,
   143 F.3d 748 (2d Cir. 1998) ...................................................................... 8, 17, 28
*Lenihan v. City of N.Y.*,
   640 F. Supp. 822 (S.D.N.Y. 1986) ...................................................................... 14
*Luessenhop v. Clinton Cnty.*,
   *N.Y.*, 558 F. Supp. 2d 247 (N.D.N.Y. 2008), *aff'd*, 324 Fed. App'x 125 (2d Cir. 2009) .......... 8
*Lunday v. City of Albany*,
   42 F.3d 131 (2d Cir. 1994) .................................................................................. 6
*McEuen v. Riverview Bancorp, Inc.*,
   No. C12-5997, 2014 WL 2197851 (W.D. Wash. May 27, 2014) ........................... 9
*Mihalik v. Credit Agricole Cheuvreux North Amer., Inc.*,
   715 F.3d 102 (2d Cir. 2013) ................................................................................ 4
*Millea v. Metro-North R. Co.*,
   658 F.3d 154 (2d Cir. 2011) ............................................................................... 7, 8
*Missouri v. Jenkins*,
   491 U.S. 274 (1989).............................................................................................. 16
*Moreno v. City of Sacramento*,
   534 F.3d 1106 (9th Cir. 2008) ............................................................................. 9
*MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*,
   No. 16 Civ. 8103, 2017 WL 1194372 (S.D.N.Y. Mar. 30, 2017) ......................... 22
*N.Y. State Ass'n for Retarded Children v. Carey*,
   711 F.2d 1136 (2d Cir. 1983) .............................................................................. 15
*Nat'l Fed'n of the Blind v. Target Corp.*,
   No. C 06–01802, 2009 WL 2390261 (N.D. Cal. Aug. 3, 2009)............................ 23
*Newman v. Piggie Park Enters., Inc.*,
   390 U.S. 400 (1968)............................................................................................. 4
*Orchano v. Advanced Recovery, Inc.*,
   107 F.3d 94 (2d Cir. 1997) .................................................................................. 7, 8
*Parrish v. Sollecito*,
   280 F. Supp. 2d 145 (S.D.N.Y. 2003) ................................................................. 6
*Pennsylvania v. Del. Valley Citizens' Council for Clean Air*,
   478 U.S. 546 (1986).............................................................................................. 5
*Perdue v. Kenny A.*,
   559 U.S. 542 (2010)............................................................................................. 8
*Pinner v. Budget Mortg. Bankers, Ltd.*,
   336 F. Supp. 2d 217 (E.D.N.Y. 2004) ................................................................. 7
*Puerner v. Hudson Spine & Pain Med. P.C.*,
   No. 17-cv-03590, 2018 WL 4103491 (S.D.N.Y. Aug. 28, 2018) ......................... 4

*Quarantino v. Tiffany & Co.*,
  166 F.3d 422 (2d Cir. 1999) ............................................................................. 5
*R.G. v. Federated, Inc.*,
  No. 14-cv-7734, 2016 WL 3072396 (S.D.N.Y. May 27, 2016) ........................... 25
*Regeneron Pharmas., Inc. v. Merus N.V.*,
  14-CV-1650, 2018 WL 3425013 (S.D.N.Y. June 25, 2018) ................................ 22
*Riverside v. Rivera*,
  477 U.S. 561 (1986)........................................................................................... 7
*Rougvie v. Ascena Retail Group, Inc.*,
  Civ. No. 15-724, 2016 WL 4784121 (E.D. Pa. Sept. 12, 2016) ......................... 9
*Safeco Ins. Co. of Am. v. M.E.S., Inc.*,
  09-CV-3312 (PKC) (VMS), 2018 WL 2766139 (E.D.N.Y. June 8, 2018) ........... 29
*Sakiko Fujiwara v. Sushi Yasuda Ltd.*,
  58 F. Supp. 3d 424 (S.D.N.Y. 2014) .................................................................. 24
*Samms v. Abrams*,
  198 F. Supp. 3d 311 (S.D.N.Y. 2016) ................................................................. 10
*Silverstein v. AllianceBernstein, L.P..*,
  No. 09–CV–5904, 2013 WL 7122612 (S.D.N.Y. Dec. 20, 2013).................... 29, 34
*Simmons v. N.Y.C. Transit Authority*,
  575 F.3d 170 (2d Cir. 2009) ............................................................................... 21
*Themis Capital v. Democratic Republic of Congo*,
  No. 09 Civ. 1652, 2014 WL 4379100 (S.D.N.Y. Sept. 4, 2014)........................ 34
*Thompson v. McQueeney*,
  56 A.D.3d 1254 (N.Y. App. 2008) ...................................................................... 35
*Tige Real Estate Dev. Co., Inc. v. Rankin-Smith*,
  233 A.D.2d 227 (N.Y. App. 1996) ...................................................................... 35
*Torres v. Gristede's Operating Corp.*,
  04 Civ. 3316, 2012 WL 3878144 (S.D.N.Y. Aug. 6, 2012), *aff'd*, 519 Fed. Appx. 1 (2d Cir.
  2013) ............................................................................................................... 10, 23
*Treglia v. Town of Manlius*,
  313 F.3d 713 (2d Cir. 2002) ............................................................................... 6
*U.S. Football League v. Nat'l Football League,*
  887 F.2d 408 (2d Cir. 1989) ............................................................................... 28
*Velez v. Novartis Pharm. Corp.*,
  No. 04 Civ. 09194, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) ...................... 22
*Vista Outdoor Inc. v. Reeves Family Tr.*,
  16 Civ. 5766, 2018 WL 3104631 (S.D.N.Y. May 24, 2018)........................... 21, 22
*Vista Outdoor Inc. v. Reeves Family Trust*,
  No. 1:16-cv-05766, Dkt. No. 101-30 (S.D.N.Y. Apr. 12, 2018) ......................... 21
*Wales v. Jack M. Berry, Inc.*,
  192 F. Supp. 2d 1313 (M.D. Fla. 2001)........................................................... 30, 31
*Wellens et al. v. Daiichi Sankyo, Inc.*,
  Case No. C 13-00581 (N.D. Cal. Feb. 10, 2016)............................................... 20
*Weyant v. Okst*,
  198 F.3d 311 (2d Cir. 1999) ............................................................................... 13

*Wilson v. Nomura Sec. Int'l, Inc.*,
   361 F.3d 86 (2d Cir. 2004) .......................................................................... 6
*Woburn Ret. Sys. v. Salix Pharm., Ltd.*,
   No. 14-CV-8925, 2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017)........................................ 24
*Wynn v. Chanos*,
   No. 14-cv-04329-WHO, 2015 WL 3832561 (N.D. Cal. June 19, 2015)................................ 22
*Yang v. Focus Media Holding Ltd.*,
   No. 11 Civ. 9051,  2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014)........................................ 30
*Zeltser v. Merrill Lynch & Co., Inc.*,
   No. 13 Civ. 1531, 2014 WL 4816134 (S.D.N.Y. Sept. 23, 2014)........................................ 30
*Zimmerman v. Portfolio Recovery Assocs., LLC*,
   No. 09 Civ. 4602, 2013 WL 6508813 (S.D.N.Y. Dec. 12, 2013)........................................ 15

## Other Authorities

Academic Female Finance Committee of the American Finance Association, Letter to the
   American Finance Association (Aug. 9, 2018)......................................................... 2
Renée Adams, *When It Comes to Gender Imbalances, Academia's Ignorance Is Self-Serving*,
   ProMarket (Aug. 7, 2018)............................................................................. 2
V. Berger, *Winners and Losers: Employment Discrimination Trials in the Southern and Eastern
   Districts of New York: 2016 Update*, NYSBA Labor and Empl. Law. J. (Apr. 2017)............ 29
John A. Byrne, *Columbia Probed Four Separate Harassment Cases at Its B-School in One Year*,
   Poets & Quants (July 17, 2018) ..................................................................... 22
Braden Campbell, *Spurned Columbia Prof Admits Stalling Colleague's Research*, Law360 (July
   12, 2018)........................................................................................... 22
Colleen Flaherty, *Damages, Damages*, Inside Higher Ed. (July 27, 2018) ..................................... 1
Mary Ann Georgantopoulos, *She Was A Columbia Professor Who Accused Her "Horny"
   Coworker Of Sexual Harassment. Then He Trashed Her To His Powerful Colleagues*,
   BuzzFeed News (July 28, 2018) ..................................................................... 31
Barbara E. Hoey, *The First 'Me Too' Verdict in New York Should Send a Strong Message to
   Managers and Employers*, Lexology (Aug. 6, 2018) ................................................ 2
Melissa Korn, *Jury Says Columbia Professor Retaliated Against Colleague*, Wall St. Journal
   (July 26, 2018) ..................................................................................... 1
Sydney Maki & Patricia Hurtado, *Ex-Columbia Professor Tells Jury of Male Mentor's
   Harassment*, Bloomberg (July 10, 2018)........................................................... 1
Martha Neil, *Top Partner Billing Rates at BigLaw Firms Approach $1,500 Per Hour*, ABA
   Journal (Feb. 8, 2016) ............................................................................. 25
Sara Randazzo and Jacqueline Palank, *Legal Fees Cross New Mark: $1,500 an Hour*, Wall
   Street Journal (Feb. 9, 2016) ....................................................................... 24
Aaron Robertson, *Former Assistant Professor Wins Retaliation Claim Against Columbia*, N.Y.
   Times (July 26, 2018) ............................................................................... 1
S. Rep. No. 94-1011, at 5 (1976) ...................................................................... 6, 19
*Top 100 Verdicts in New York in 2018* ................................................................ 3
Luigi Zingales, *Why Every Good Economist Should Be Feminist*, ProMarket (Aug. 2, 2018)...... 2

**Statutes**

N.Y.C. Admin Code § 8-130 ........................................................................................ 5

N.Y.C. Admin. Code § 8-502 ...................................................................................... 4

N.Y.C. Admin. Code. § 8-101 ..................................................................................... 5

## PRELIMINARY STATEMENT

Following a three-week, highly-publicized trial that marked one of the first trials of the #MeToo era,[1] the jury in this case held Columbia University and its senior, tenured professor, Geert Bekaert, liable for unlawful retaliation and awarded Professor Enrichetta Ravina compensatory and punitive damages totaling $1.25 million. This Court upheld the jury's liability verdict (including the determination that Bekaert's conduct warranted the imposition of punitive damages) and remitted the damages awards to a total of $750,000.

This influential civil rights victory vindicated not only Professor Ravina's rights, but also benefited the public at large. The case heightened public awareness about the dynamics of retaliation in the workplace and spurred calls to action—within academia and beyond—to implement stronger institutional protections for individuals like Professor Ravina who pursue good-faith complaints of discrimination and retaliation. Commentators observed that the "the academic world, and especially the economic and finance profession, can learn immensely" from the case;[2] that "the trial brings evidence to light that we can examine to gain a better understanding

---

[1] The trial and Professor Ravina's victory were widely reported, not only in publications for legal and academic audiences but also prominent general interest publications, including the *New York Times*, *Wall Street Journal*, and *Bloomberg*. *See, e.g.*, Colleen Flaherty, *Damages, Damages*, Inside Higher Ed. (July 27, 2018), https://www.insidehighered.com/news/2018/07/27/federal-jury-says-columbia-professor-retaliated-against-former-junior-faculty-member (calling this "one of relatively few academic harassment cases to make its way to trial" and noting that "the case attracted attention even from news outlets that aren't usually interested in tenure disputes"); Aaron Robertson, *Former Assistant Professor Wins Retaliation Claim Against Columbia*, N.Y. Times (July 26, 2018), https://www.nytimes.com/2018/07/26/nyregion/professor-sexual-harassment-suit-columbia.html; Melissa Korn, *Jury Says Columbia Professor Retaliated Against Colleague*, Wall St. Journal (July 26, 2018), https://www.wsj.com/articles/jury-says-columbia-university-prof-retaliated-against-colleague 1532644360; Sydney Maki and Patricia Hurtado, *Ex-Columbia Professor Tells Jury of Male Mentor's Harassment*, Bloomberg (July 10, 2018), https://www.bloomberg.com/news/articles/2018-07-10/ex-columbia-professor-tells-jury-of-male-mentor-s-harassment (noting that "[t]he trial may shed light on how sexual harassment claims are handled in academia").

[2] Luigi Zingales, *Why Every Good Economist Should Be Feminist*, ProMarket (Aug. 2, 2018), https://promarket.org/every-good-economist-feminist/ (former head of the American Finance Association

1

of flaws in [the finance] profession";[3] and that "[t]his verdict should send a message, not just to academia, but to all employers."[4] As the president of the American Finance Association's Academic Female Finance Committee distilled: "The *Ravina v. Columbia* case illustrates that challenging the status quo can be immensely costly. . . . The threat of retaliation is real. But challenging the status quo is immensely important. Having guts should be rewarded."[5]

As the prevailing party in this hard-fought litigation, Professor Ravina is entitled to an award of attorneys' fees and expenses. Her counsel at Sanford Heisler Sharp[6] took on extensive risk by agreeing, on a purely contingent basis, to mount a complex case—centered on the use of academic research as a tool of retaliation—against one of the world's most prestigious and richly-endowed universities. Despite staunch and well-funded opposition, the Firm persevered over three years of litigation and ultimately succeeded. Counsel developed a voluminous discovery record, won key motions (including surviving two separate summary judgment motions), and obtained a substantial jury verdict.[7] This commitment and assumption of risk by counsel is precisely what the

---

distilling lessons from the trial and noting, "[t]here will never be gender equality in academia until men care about sexual harassment as much as women; until creating a gender-unbiased environment is as important as being a good teacher; until the power conferred by the control of data is not left to the arbitrariness of the individuals. *If this trial helps move us even a little in this direction, the pain and suffering it has caused would not have been in vain*.") (emphasis added).

[3] Renée Adams, *When It Comes to Gender Imbalances, Academia's Ignorance Is Self-Serving*, ProMarket (Aug. 7, 2018), https://promarket.org/comes-gender-imbalances-academias-ignorance-self-serving/.

[4] Barbara E. Hoey, *The First 'Me Too' Verdict in New York Should Send a Strong Message to Managers and Employers*, Lexology (Aug. 6, 2018), https://www.lexology.com/library/ detail.aspx?G=91b4eb4f-8bd5-4df0-925b-7ca5fdc3a16c

[5] Adams, *supra* note 3; *see also* Academic Female Finance Committee of the American Finance Association, Letter to the American Finance Association (Aug. 9, 2018), http://affectfinance.org/2018/08/letter-to-the-afa-board/ (stating "this is the first such legal case of its kind in our field" and that the "court ruling provides the AFA [American Finance Association] with a clear cut decision" and calling on the AFA to take "explicit and immediate action," including promulgation and enforcement of an ethics code).

[6] Sanford Heisler Sharp, LLP is referred to herein as "Sanford Heisler Sharp," "the Firm" or "Counsel."

[7] The jury verdict ranks among the top 100 plaintiffs' jury verdicts secured in New York State in 2018 and

fee-shifting provision of the New York City Human Rights Law is designed to reward. Because civil rights laws depend on individual enforcement, public policy is served when qualified counsel are rewarded for embracing civil rights battles such as this one. Without robust enforcement of anti-retaliation provisions, the remedial schemes of civil rights statutes would "unravel."[8]

For over three years of arduous litigation, Sanford Heisler Sharp did not receive a cent of payment for its services or any reimbursement for its out-of-pocket expenditures. Ultimately, the Firm committed over $8.5 million in lodestar to this case. Sanford Heisler Sharp is entitled to a lodestar *multiplier* in light of the exceptional quality of services provided, the enormous contingency risks it assumed, and the perceived undesirability of the case. But in an exercise of billing discretion, Plaintiff seeks a *reduced* fee award of under $6 million.[9] In addition, the Firm expended $866,870.99 in costs in connection with this case. But in a further exercise of discretion, Plaintiff requests a reduced award of $736,840.34 for costs incurred by the Firm. Finally, Plaintiff seeks to recoup $101,753.85 in legal fees she paid to her previous counsel in this matter. Under the circumstances here, this award of attorneys' fees and costs is justified.

## I.   As the Prevailing Party, Plaintiff Is Entitled to All of Her Reasonable Attorneys' Fees and Costs

### A.   Professor Ravina Is the Prevailing Party

The New York City Human Rights Law ("NYCHRL") provides for an award of reasonable attorneys' fees and costs to a prevailing plaintiff. N.Y.C. Admin. Code § 8-502(g); *see, e.g.*, *Puerner v. Hudson Spine & Pain Med. P.C.*, No. 17-cv-03590, 2018 WL 4103491, at *5 (S.D.N.Y.

---

is one of only eight employment discrimination/retaliation cases on the list. *See Top 100 Verdicts in New York in 2018*, https://topverdict.com/lists/2018/new-york/100.

[8] *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 180 (2005).

[9] This fee application includes fees and costs incurred through July 12, 2019. Plaintiff reserves the right to seek an award of attorneys' fees and costs incurred in connection with the case after that date.

Aug. 28, 2018) ("As Plaintiff has prevailed here, she will be awarded attorney's fees."); *Fornuto v. Nisi*, 923 N.Y.S.2d 493, 494 (App. Div. 1st Dept. 2011) (reversing the denial of fees where plaintiff recovered compensatory and punitive damages).[10]

"[A] plaintiff 'prevails' when actual relief on the merits of [her] claim materially alters the legal relationship between the parties," as when "a plaintiff obtains an enforceable judgment on the merits . . . requiring some action by a defendant such as payment of damages . . . ." *Degregorio v. Richmond Italian Pavillion, Inc.*, 935 N.Y.S.2d 70, 72 (App. Div. 2d Dept. 2011). Having obtained a substantial monetary judgment against Defendants, Plaintiff clearly is the prevailing party in this action.

### B.  Fee Awards Benefit the Public

Fee awards in favor of prevailing civil rights plaintiffs serve a fundamental public policy purpose. *See* N.Y.C. Admin. Code. § 8-101 (indicating that the provisions of the New York City Human Rights Law represent a public policy mandate of the first order); *Albunio v. City of New York*, 23 N.Y.3d 65, 75 (2014) ("[P]ermitting counsel to collect a statutory award . . . advances the 'uniquely broad and remedial purposes' of the NYCHRL by incentivizing the private bar to represent civil rights plaintiffs . . . .").[11]

---

[10] It is firmly established under Title VII's fee-shifting provision that "a prevailing plaintiff . . . is ordinarily to be awarded attorney's fees . . . in all but special circumstances." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 416-17 (1978) (applying the rule in *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400 (1968)). This standard is dispositive under the NYCHRL's "one-way ratchet" rule, as "interpretations of state and federal civil rights statutes. . .  serve only as a floor below which the City's . . . law cannot fall." *Mihalik v. Credit Agricole Cheuvreux North Amer., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (citation omitted); *Chauca v. Abraham*, 30 N.Y.3d 325, 333 (2017); *see also* N.Y.C. Admin Code § 8-130.

[11] *Cf. Christianburg*, 434 U.S. at 418 (recognizing that a successful Title VII plaintiff "is the chosen instrument of Congress to vindicate policy that Congress considered of the highest priority") (internal quotations omitted).

The fee-shifting provisions of civil rights acts are designed to make civil rights plaintiffs whole and to attract competent counsel to pursue civil rights litigation. *See, e.g., Blanchard v. Bergeron*, 489 U.S. 87, 95-96 (1989) ("The purpose of [the federal civil rights fee-shifting statute] is to ensure 'effective access to the judicial process' for persons with civil rights grievances. . . . Congress has elected to encourage meritorious civil rights claims because of the benefits of such litigation for the named plaintiff and for society at large . . . .") (citation omitted); *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 560 (1986) ("The effective enforcement of . . . civil rights statutes depends largely on the efforts of private citizens, and unless reasonable attorney's fees could be awarded for bringing these actions, . . . many legitimate claims would not be redressed.") (citation omitted); *Quarantino v. Tiffany & Co.*, 166 F.3d 422, 426 (2d Cir. 1999) (explaining that fee-shifting statutes in civil rights litigation were enacted "precisely because the expected monetary recovery in many cases was too small to attract effective legal representation"). As Congress recognized decades ago, "fee awards are essential if the [applicable statutes] are to be fully enforced. We find that . . . fee awards are an integral part of the remedies necessary to obtain such compliance." S. Rep. No. 94-1011, at 5 (1976). This logic applies with greater force in the context of the NYCHRL, which is designed to provide even more robust protections for plaintiffs than similar federal laws. *See supra* note 10.

**C. Plaintiff Is Entitled to Recover Fees for All Legal Work Performed in Prosecuting This Action Despite Not Receiving a Favorable Verdict on Her Discrimination Claims**

While Plaintiff did not receive a favorable verdict on her discrimination claims, she is nonetheless entitled to recover attorneys' fees for all legal work performed in prosecuting this matter. As the Second Circuit has held, "when a plaintiff fails to prove one of two overlapping claims—e.g. a discriminatory discharge—but prevails on the other—e.g. retaliation for

complaining of discrimination—the plaintiff may recover fees for all the legal work." *Wilson v. Nomura Sec. Int'l, Inc.*, 361 F.3d 86, 91 (2d Cir. 2004).   Indeed, as long as a plaintiff's unsuccessful claims are not "wholly unrelated" to the successful ones, counsel's work on the unsuccessful claims is compensable. *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 172 (S.D.N.Y. 2003) (quoting *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994)).

Discrimination and retaliation claims are inherently intertwined, particularly because a retaliation plaintiff must demonstrate a "good-faith reasonable belief that the underlying challenged actions of the employer violated the law." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  Further, a successful retaliation plaintiff must establish that her complaints of the underlying discrimination triggered the retaliation. *See Parrish*, 280 F. Supp. 2d at 172.

In that vein, courts have repeatedly declined to reduce fee awards where, as here, plaintiffs prevail on retaliation claims but do not establish discrimination.  *See, e.g., Dominic v. Consol. Edison Co. of N.Y., Inc.*, 822 F.2d 1249, 1260 (2d Cir. 1987) (upholding district court's award of full fee for successful retaliation claim and unsuccessful discrimination claim, reasoning that the plaintiff "could recover on his retaliation claim only if his complaints of . . . discrimination had a reasonable foundation"); *Parrish*, 280 F. Supp. 2d at  172 (concluding that "the facts underlying [the plaintiff's] sexual harassment claim were sufficiently related to the facts underlying her retaliation claim to justify an award of fees for her attorneys' work on both these claims"; noting that this finding was "underscored by the legal requirement that [the plaintiff] assert that she was subjected to discriminatory conduct by Defendants—and that her complaints concerning this alleged incident were the trigger for retaliation—in order to recover on her retaliation claim").[12]

---

[12] *See further, e.g., Echevarria v. Insight Med., P.C.*, 102 F. Supp. 3d 511, 520 (S.D.N.Y. 2015) (denying request to reduce attorneys' fees "to reflect the fact that Plaintiff did not succeed on her sexual harassment claims" because "[t]he Court finds that Plaintiff's harassment and retaliation claims were inextricably

**D.  Plaintiff Is Entitled to a Full Recovery of Attorneys' Fees and Costs, Even If They Exceed the Damages Verdict**

The fact that Plaintiff's attorneys' fees and costs exceed her damages award is no bar to full recovery.  Because of the strong public purposes of civil rights suits, the Supreme Court has expressly rejected the proposition that fee awards must be proportionate to the damages recovered. *Riverside v. Rivera*, 477 U.S. 561 (1986) (affirming fee of $245,456.25 where damages recovery was only $13,300 on the claims permitting fee-shifting and noting that "a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards").  In fact, "[t]he whole purpose of fee-shifting statutes is to generate attorneys' fees that are *disproportionate* to the plaintiff's recovery." *Millea v. Metro-North R. Co.*, 658 F.3d 154, 169 (2d Cir. 2011); *see also id.* at 167 (recognizing that, in enacting fee-shifting provision, the legislature "made the policy determination that [the] claims serve an important public purpose disproportionate to their cash value" and that courts "cannot second-guess this legislative policy decision"); *Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005) (noting that federal civil rights fee-shifting statute "was enacted in part to secure legal representation for plaintiffs whose constitutional injury was too small, in terms of expected monetary recovery, to create an incentive for attorneys to take the case under conventional fee arrangements.").

Tying fee awards to the amount of damages recovered would subvert the "goal of opening the court to all who have meritorious civil rights claims." *Orchano v. Advanced Recovery, Inc.*, 107 F.3d 94, 98 (2d Cir. 1997) (collecting cases in which the fee award significantly exceeded damages); *Cuff v. Trans State Holdings, Inc.*, 768 F.3d 605, 610-11 (7th Cir. 2014) ("Fee-shifting

---

intertwined"); *Pinner v. Budget Mortg. Bankers, Ltd.*, 336 F. Supp. 2d 217, 222 (E.D.N.Y. 2004) (finding unsuccessful sexual harassment/hostile work environment claim to be "related and inextricably linked" to successful retaliation claim and refusing to reduce fee award based on the interrelated unsuccessful claim).

statutes . . . are designed to prevent the potentially high costs of litigation from stifling justified claims."); *see, e.g.*, *Grant v. Martinez*, 973 F.2d 96, 101-102 (2d Cir. 1992) (approving fee award of $512,590.02 in an employment discrimination class action settled for damages totaling $60,000); *Kassim,* 415 F.3d at 252 (2d Cir. 2005) (finding it reversible error to refuse to award fee of over $65,000 in case with damages verdict of $2,500, if based on impermissible proportionality concerns); *Luessenhop v. Clinton Cnty., N.Y.*, 558 F. Supp. 2d 247, 256 & n.7 (N.D.N.Y. 2008), *aff'd*, 324 Fed. App'x 125 (2d Cir. 2009) (collecting cases where fee awards exceeded damages). Thus, absent evidence of poor quality of representation, courts should not reduce a requested fee merely because it exceeds the plaintiff's damages recovery. *See Orchano*, 107 F.3d at 98.

## II.   Plaintiff's Application for Attorneys' Fees Should Be Granted

### A. The Lodestar Method Is Applied to Determine the Presumptively Reasonable Fee Award

"In determining a reasonable award, the court utilizes the 'lodestar' method, calculating the amount to be awarded by multiplying the number of hours reasonably expended by a reasonable hourly rate." *Albunio v. City of New York.*, 2012 WL 2122451, at *3 (N.Y. Sup. Ct. June 6, 2012) (citation omitted); *see also Millea*, 658 F.3d at 166 ("[T]he lodestar . . . creates a presumptively reasonable fee.") (citation omitted).

There is a strong presumption that the lodestar represents a reasonable fee in civil rights actions because "if private citizens are able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (citation omitted).  Ultimately, "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010).

### B.  Sanford Heisler Sharp Seeks Fees for Time Reasonably Expended

The starting point in the lodestar analysis is the number of hours expended by Plaintiff's counsel in connection with the case.  In making this determination, the Court should grant reasonable deference to Sanford Heisler Sharp's judgment concerning the efforts that were required to win the case. "[A]fter all, [counsel] won, and might not have, had it been more of a slacker." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (recognizing that courts "should defer to the winning lawyer's professional judgment as to how much time . . . was required to spend on the case").

Reasonable deference to Counsel's judgment is particularly appropriate here, since the Firm took this case on a purely contingent basis. "[L]awyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees"; "[t]he payoff is too uncertain," and time spent on one matter necessarily precludes pursuit of others. *McEuen v. Riverview Bancorp, Inc.*, No. C12-5997, 2014 WL 2197851, at *5 (W.D. Wash. May 27, 2014) (citing *Moreno*, 534 F.3d at 1112); *Blackwell v. Foley*, 724 F. Supp. 2d 1068, 1080 (N.D. Cal. 2010) ("[I]f anything, an attorney working on contingency is less likely to expend unnecessary hours because the payoff is too uncertain."); *Moreno*, 534 F.3d at 1112 ("It would . . . be the highly atypical civil rights case where [a] plaintiff's lawyer engages in churning.").

Likewise, the Court should not reduce the fee "based on speculation as to how other firms would have staffed the case." *Moreno*, 534 F.3d at 1114-15; *accord, e.g.*, *Rougvie v. Ascena Retail Group, Inc.*, Civ. No. 15-724, 2016 WL 4784121, at *11 (E.D. Pa. Sept. 12, 2016) (declining to second-guess counsel's staffing and task-delegation decisions); *E-Pass Tech., Inc. v. 3Com Corp.*, No. C-00-2255, 2007 WL 4170514, at *8 (N.D. Cal. Nov. 14, 2007) (declining to "second-guess[]" prevailing party's fee request, where opponent argued fees were excessive).

**1.   Prosecuting this Matter Required a Vast Expenditure of Time and Resources**

Here, the vigorous defense mounted by Defendants—and the capacious scope of the action—required Sanford Heisler Sharp to devote over 13,500 hours over more than three years, resulting in a total lodestar of over $8.5 million. Declaration of David Sanford ("Sanford Decl.") ¶ 46.

Defendants forcefully contested this litigation, and Sanford Heisler Sharp had to match their efforts to prevail. *See, e.g.*, *Samms v. Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) ("Defendant 'cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response.'") (quoting *Copeland v. Marshall*, 641 F.2d 880, 904 (D.C. Cir.1980) (en banc)); *Torres v. Gristede's Operating Corp.*, 04 Civ. 3316, 2012 WL 3878144, at *4 (S.D.N.Y. Aug. 6, 2012), *aff'd*, 519 Fed. Appx. 1 (2d Cir. 2013) ("Given the Defendants' vigorous approach to litigating this case, they cannot now complain as to the amount that Plaintiffs were forced to expend in response. In light of this history, Plaintiffs' proposed hours are reasonable.").[13]

The case entailed extensive document discovery with a record that included over 115,000 pages of documents. Sanford Decl. ¶ 47.  Defendants propounded over 250 discovery requests, including 117 document requests, 98 requests for admission, and 40 interrogatories, that Sanford Heisler Sharp had to respond to individually.  *Id.* Defendants' extensive discovery requests required Sanford Heisler Sharp to review and produce over 45,000 pages of documents and 85

---

[13] *See also, e.g.*, *BCS Servs., Inc. v. BG Investments, Inc.*, 728 F.3d 633, 642 (7th Cir. 2013)  ("awarding legal fees reasonably incurred ex ante even if excessive-seeming ex post (which is to say with the wisdom of hindsight) is necessary to achieve [the] objective [of  facilitating suit by victims of unlawful behavior]"); *Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116, 2015 WL 1746375, at *15-16 (D. Minn. Apr. 13, 2015) ("As is apparent here, a heavily-litigated case is not typically a one-sided affair. [The parties] litigated this case tooth and nail, which explains why [plaintiff's] attorney's fees and costs are relatively high. . . . The Court therefore declines to deduct a percentage of the lodestar amount.").

audio recordings.  *Id*.  In addition, Sanford Heisler Sharp reviewed and evaluated over 70,000 pages of documents produced by Defendants.  *Id*. ¶ 48.  The allegations of Defendant Bekaert's research sabotage in particular required extensive document review of many dense and complex documents reflecting the parties' economic research.  *Id*.

Meanwhile, Defendants resisted the production of critical information that was relied upon in surviving summary judgment and at trial.  Defendant Bekaert repeatedly failed to comply with his discovery obligations; it took repeated efforts by Sanford Heisler Sharp before Defendant Bekaert produced any discovery at all.  Sanford Decl. ¶ 49; *see also* Dkt. No. 57.  Moreover, Defendant Bekaert made sweeping, unilateral redactions to emails in which he disparaged Plaintiff, forcing Plaintiff's Counsel to seek Court intervention to obtain versions for use at trial. (*See* Dkt. Nos. 74, 75.)  Meanwhile, Columbia refused to produce other complaints about sexual harassment at Columbia Business School, and Sanford Heisler Sharp had to seek Court intervention to obtain these documents used at trial.  (*See* Dkt. Nos. 101, 102.)  Additionally, Columbia initially claimed that it had not retained the emails of key University administrators and only produced those documents after Sanford Heisler Sharp objected. Sanford Decl. ¶ 49. Other discovery disputes consumed yet more time.  *Id*.

The case also entailed numerous fact depositions.  Defendants deposed Plaintiff for over 13.5 hours; this required Counsel to expend extensive efforts to prepare Plaintiff for and defend three separate days of deposition. *Id.* ¶ 50.  Additionally, Defendants' Rule 26(a)(1) disclosures identified over 50 potential witnesses in the case, including many Columbia administrators to whom Plaintiff made legally-protected complaints of discrimination and retaliation. *Id.* Sanford Heisler Sharp took the deposition of 10 of Defendants' fact witnesses (almost all of whom ultimately appeared as witnesses at trial, either live or by use of their videotaped depositions). *Id.*

11

In addition, the case involved substantial expert discovery. Columbia designated three separate experts who produced five expert reports; this required Sanford Heisler Sharp to take three expert depositions and expend time evaluating complex issues concerning medical conditions, economic damages, and social scientific research. *Id.* ¶ 51. Counsel also worked closely with two experts who were critical in assisting Counsel in identifying and developing themes and evidence that Counsel relied upon to survive summary judgment and prevail at trial. *Id.* Counsel had to defend the depositions of these experts and assisted in the preparation of expert reports, including two reports rebutting Columbia's social scientific expert. *Id.*

Defendants filed separate, extensive summary judgment motions, substantially increasing the work required from Plaintiff's Counsel in order to advance to trial. (Dkt. Nos. 107-111, 116, 125 124-126.) Sanford Heisler Sharp had to comb through an extensive documentary record and nearly 5,000 pages of deposition transcripts in order to respond to over 330 purported facts asserted by Defendants. Sanford Decl. ¶ 52. In the process, Counsel identified critical facts that Defendants omitted from their papers; the Court relied heavily upon these omitted facts in its summary judgment decision. (*See, e.g.*, Dkt. No. 235, 6/22/18 Tr. at 12:23-14:23.)

After Plaintiff overcame Defendants' summary judgment motions (Dkt. No. 190), an intense three-week trial ensued. In their original list of proposed trial exhibits, Defendants identified what amounted to over 700 potential trial exhibits. Sanford Decl. ¶ 53. In their final pretrial statement, Defendants designated what amounted to nearly 600 trial exhibits and over 25 potential trial witnesses, including three expert witnesses. *Id.* Further, a multitude of disputed evidentiary issues required Plaintiff to brief 15 motions *in limine*, including opposing Defendants' efforts to exclude over a dozen categories of evidence. (Dkt. Nos. 326, 329, 331, 354.) At trial, over a dozen witnesses testified, either live or via video deposition, and over 300 exhibits were

admitted in evidence. Sanford Decl. ¶ 54.  Meanwhile, Sanford Heisler Sharp briefed and argued various legal issues during trial, including defeating Defendants' separate Rule 50(a) motions. *Id.* ¶ 54.

Preparing for and conducting trial required a large investment of personnel and resources by Plaintiff's Counsel.  Defendants routinely had at least five attorneys, as well as multiple paralegal and litigation consulting professionals, present in Court, and Defendants provided no notice of the list of exhibits they would present on any given day. *Id.* ¶ 55.  To match their efforts, a team of Sanford Heisler Sharp attorneys and legal assistants worked around the clock to conduct the trial, prepare witnesses, develop testimony outlines, brief and argue time-sensitive evidentiary and legal issues, engage in argument on the jury instructions and other legal matters, and prepare the opening statement and closing arguments. *Id.*  Since prevailing at trial, Counsel has continued to expend time on this case, including defending against Defendant Bekaert's efforts to dismantle the jury verdict and preparing various submissions to the Court such as this fee petition.[14] *Id.*

Notably, Plaintiff and her Counsel diligently sought to avoid all of this litigation activity. Sanford Heisler Sharp repeatedly attempted to settle this matter in order to prevent litigation, including participating in a mediation before filing Plaintiff's initial complaint, participating in a second mediation before filing her amended complaint, initiating settlement discussions with Columbia before depositions began, and broaching settlement again before trial. Sanford Decl. ¶ 56.  But Plaintiff received no response to her settlement overtures on the eve of depositions and

---

[14] Post-verdict work, including work on a fee petition, is compensable. *See, e.g.*, *Weyant v. Okst*, 198 F.3d 311, 317 (2d Cir. 1999) (awarding attorneys' fees for time spent opposing post-judgment motions and in preparing and defending fee application).

13

prior to trial.  *Id.*  Even in response to the Court's offers of assistance, Columbia expressed no interest in settlement.[15]  *Id.*

## 2.  Sanford Heisler Sharp Staffed This Case Efficiently

Sanford Heisler Sharp staffed this case efficiently. Tasks were delegated appropriately among partners, non-partner attorneys, legal assistants, and other staff, such that senior attorneys with higher billing rates expended time only where it was more efficient or otherwise necessary for them to do so. Sanford Decl. ¶ 57.  The time of senior partners, including David Sanford and Vincent McKnight, was used sparingly.  *Id.*

The case was run by a core team of two attorneys and one legal assistant: attorney Alexandra Harwin managed and oversaw all aspects of the case from its inception, and attorney Melinda Koster and legal assistant Melody Wong were integral in all aspects of discovery, motion practice, and trial preparation.  *Id.* ¶ 58.  Other Sanford Heisler Sharp attorneys and legal assistants played critical roles, supporting the case as needed to develop strategy, respond to voluminous discovery requests, review the extensive document production, prepare for specific depositions, oppose summary judgment, brief other motions, examine trial witnesses, and undertake the preparation needed for trial.  *Id.*

Given the staggering disparity in size and resources between Sanford Heisler Sharp and Columbia's defense attorneys, Proskauer Rose, plus the added challenge of opposing Defendant Bekaert's counsel, Counsel's staffing was reasonable.[16]

---

[15] During a Court conference, the Court asked, "[Is] there anything that the Court can do with respect to settlement? Is there anything that would be helpful to see a magistrate judge? Would it be helpful to see a mediator?" Columbia's counsel responded, "I don't really have a comment at this point. Appreciate the suggestion but we [have] not been successful in the past." (Dkt. No. 139, 4/17/2018 Tr. at 14:3-9.)

[16] It is common and not duplicative for more than one attorney to work on a particular draft of a filing or for an associate to accompany a partner to a deposition or court appearance.  *See, e.g.*, *Lenihan v. City of N.Y.*, 640 F. Supp. 822, 825 (S.D.N.Y. 1986); *see also, e.g.*, *N.Y. State Ass'n for Retarded Children v.*

### 3.   Plaintiff Has Provided Satisfactory Records to Support the Award

While fee applicants generally submit documentation of their time, courts "should not[] become green-eyeshade accountants. The essential goal in shifting fees . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011) (citations omitted). Counsel's timesheets need only include "sufficient detail to permit intelligent review of the necessity or reasonableness of the time expenditures recorded therein." *Hernandez v. Kaisman*, 139 A.D.3d 406, 407 (N.Y. App. Div. 1st Dept. 2016); *see also Zimmerman v. Portfolio Recovery Assocs., LLC*, No. 09 Civ. 4602, 2013 WL 6508813, at *11 (S.D.N.Y. Dec. 12, 2013) ("[B]illing descriptions that are fairly general, [including] terms such as 'case preparation' or 'meeting' . . . [may be] sufficiently concrete, when viewed in context, to permit the court to make a judgment about the reasonableness of the total hours claimed.") (citations omitted). Entries may include multiple tasks. *See Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, No. 10 Civ. 1853, 2011 WL 1002439, at *8 (S.D.N.Y. Mar. 16, 2011), *aff'd*, 483 Fed. Appx. 634 (2d Cir. 2012) ("[T]he practice of block billing is not prohibited in this Circuit. . . . It is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.") (citations omitted).

Sanford Heisler Sharp has provided detailed records reflecting all of the case-related work for which the Firm is seeking compensation.  Sanford Decl. ¶ 44, Ex. A.  The records chronicle the case work performed by each individual attorney and legal assistant on each day. The entries provide ample information to enable the Court to determine the reasonableness of the total hours for which Sanford Heisler Sharp seeks compensation.

---

*Carey*, 711 F.2d 1136, 1146 (2d Cir. 1983) (fee award permissible for portions of lodestar accrued in "sending a second attorney to depositions or an extra lawyer into court to observe and assist").

### C.  Sanford Heisler Sharp's Standard Hourly Rates Should be Applied

To complete the lodestar calculation, the time spent by Plaintiff's Counsel should be multiplied by reasonable hourly rates. These rates must be sufficient to attract counsel adept in comparable civil rights litigation with the skill and wherewithal to go head to head with top-notch, well-funded defense counsel. Further, they should reflect market rates typical in other complex federal litigation.  Here, Sanford Heisler Sharp's standard rates are well in-line with the rates charged by similarly-qualified practitioners in New York, including defense counsel Proskauer Rose.

### 1.  The Requested Hourly Rates Are Consistent With, or Less Than, Sanford Heisler Sharp's Standard Hourly Rates

In awarding fees to a successful civil rights attorney, the goal is to award a "fully compensatory fee," that is, a fee comparable to what "is traditional with attorneys compensated by a fee-paying client." *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989).  This does not mean what an actual civil rights plaintiff would pay but what it would be reasonable to charge an "affluent" client. *See id*.  Critically, it is well-recognized that the amount of fees awarded in civil rights cases should mirror what courts grant in other complex litigation, such as bankruptcy and antitrust matters. The fees awarded under civil rights statutes should "not be reduced because the rights involved may be non-pecuniary in nature." S. Rep. No. 94-1011, at 6 (1976).  If a fee award does not provide sufficient incentive to attract counsel competent to litigate such complex and hard-fought cases, the remedial purposes of the statute are not served.[17]

---

[17] Under the one-way ratchet rule, *see supra* note 10, the fee-shifting provision of the NYCHRL is interpreted even more liberally in favor of plaintiffs than the fee-shifting provision of 42 U.S.C. § 1988.

When calculating a presumptively reasonable fee, an attorney's own "customary rate"—what counsel "typically charges"— is a "reasonable starting point." *Amaprop*, 2011 WL 1002439, at \*6, *aff'd*, 483 F. App'x 635.[18] In recent hourly matters taken on by Sanford Heisler Sharp, the Firm's standard billing rates have included $1,200 per hour for Chairman David Sanford; $850-$1,000 per hour for other partners, including $850 per hour for Alexandra Harwin; $750-$850 per hour for senior litigation counsel; $425-$500 per hour for associates and litigation fellows; and $300 per hour for summer associates. Sanford Decl. ¶ 59. These are the rates billed in the instant fee petition. Moreover, while Sanford Heisler Sharp typically charges up to $295 per hour for senior legal assistants, as an exercise of billing discretion Plaintiffs' Counsel seeks only $150 per hour for the work of legal assistants on this case. *Id.*

### 2. The High Caliber of the Firm and the Services It Provides Justify The Requested Hourly Rates

Counsel's requested billing rates are warranted by the caliber of the legal professionals at the Firm. Sanford Heisler Sharp routinely litigates against the nation's largest institutions and top defense firms, consistently producing high-quality work. *Id.* ¶ 9. Sanford Heisler Sharp employs attorneys and legal assistants who are exceptionally accomplished and well-educated, including many who have graduated from the country's best undergraduate and law schools; in addition, many of Sanford Heisler Sharp's attorneys have completed prestigious clerkships. *Id.* ¶ 10.

Indeed, the Firm has been repeatedly recognized as one the country's preeminent civil rights law firms. In *Hernandez et al. v. C&S Wholesale Grocers, Inc.*, No. 7:06-CV-02675 (S.D.N.Y. 2008), the court described the Firm as "exceptionally able and experienced." Sanford

---

[18] It is well established that attorneys' "current rates, rather than historical rates, should be applied [to all hours expended] in order to compensate for the delay in payment." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998).

Decl. ¶ 5.  In *Zolkos v. Scriptfleet, Inc.*, No. 12 Civ. 8230, 2014 WL 7011819, at *5 (N.D. Ill. Dec. 12, 2014), the court noted that Sanford Heisler Sharp "has been repeatedly recognized for its skilled and effective representation" in employment cases.  Sanford Decl. ¶ 6.  In *Jane Doe 2 v. The Georgetown Synagogue et al*., Civil Action No. 2014 CAB 8073 (D.C. Super. Ct. 2018), the court concluded the case by praising the work of counsel on the case, stating, "I commend you highly for the work that you've done, the skill that you've demonstrated, and for the significant outcome that has occurred as a result of those efforts." Sanford Decl. ¶ 7.  Independent evaluations have confirmed Sanford Heisler Sharp's high standing at the bar. Among these accolades, Sanford Heisler Sharp has been recognized as an "AV" rated firm by Martindale-Hubbard, an "Employment Group of the Year" by *Law360*, and "Elite Trial Lawyers" by the *National Law Journal*.  *Id.* ¶ 8.

The partners who contributed to this case have been recognized individually for their excellence as well.  David Sanford has been inducted into the *National Law Journal*'s Elite Trial Lawyers Hall of Fame, has been named a Titan of the Plaintiffs Bar and Employment MVP by *Law360*, and last year was one of just three lawyers nationwide selected as a finalist for the Lawyer of the Year award by *American Lawyer*.  *Id.* ¶ 15. Alexandra Harwin was one of just five employment attorneys nationwide named a Rising Star by *Law360* in 2017. *Id.* ¶ 18. Additionally, David Sanford, Alexandra Harwin, Vincent McKnight, and Andrew Melzer have all been recognized as Labor & Employment Stars by *Benchmark Litigation*.  *Id.* ¶ 15, 18, 24, 28.

"Another consideration for assessing the quality of services rendered by Lead Counsel is the quality of opposing counsel. Here, [Columbia was] represented by first-rate attorneys who vigorously contested [Plaintiff's] claims and allegations."  *See In re Marsh & McLennan Companies, Inc. Securities Litig.*, 2009 WL 5178546, at *19 (S.D.N.Y. 2009).  The fact that

18

Columbia selected Proskauer Rose—and one of the most prominent and expensive lawyers in the defense bar, Bettina Plevan—to defend itself supports the determination that Sanford Heisler Sharp's hourly rates are appropriate.

Finally, Sanford Heisler Sharp has repeatedly demonstrated the quality of its legal services in this case. Throughout the course of this litigation, Plaintiff's Counsel has generated thorough, well-researched, and well-written briefing on a variety of legal issues, including various discovery disputes (*see, e.g.*, Dkt. Nos. 60, 75, 101, 102); summary judgment briefing (submitted under seal on May 1, 2018); briefing regarding trial and evidentiary issues (*see, e.g.*, Dkt. Nos. 192, 230, 234); and post-trial motions (*see, e.g.*, Dkt. Nos. 275, 289, 292, 293). During trial, Plaintiff's counsel elicited critical admissions from Defendant Bekaert about him stalling research[19] and other testimony characterized as "highly damaging to both Columbia University and finance professor Geert Bekaert."[20] The comprehensive and high-quality nature of Counsel's legal work was essential in driving this case forward to a successful and durable outcome.

### 3. Sanford Heisler Sharp's Hourly Rates Have Been Repeatedly Approved by Courts

Recognizing the Firm's track record of excellence, courts have repeatedly relied upon and approved Sanford Heisler Sharp's standard hourly rates in granting fee awards. Most recently, in approving attorneys' fees in *Jane Doe 2 v. The Georgetown Synagogue et al.*, Civil Action No. 2014 CAB 8073 (D.C. Super. Ct. 2018), the court held that the Firm's billing rates (which included $1,200 per hour for David Sanford, $850 for Alexandra Harwin and other partners, and $425-$500

---

[19] Braden Campbell, *Spurned Columbia Prof Admits Stalling Colleague's Research*, Law360 (July 12, 2018), https://www.law360.com/articles/1062936/spurned-columbia-prof-admits-stalling-colleague-s-research.

[20] John A. Byrne, *Columbia Probed Four Separate Harassment Cases at Its B-School in One Year*, Poets & Quants (July 17, 2018), https://poetsandquants.com/2018/07/17/columbia-probed-four-separate-harassment-cases-at-its-b-school-in-one-year/.

for associates and litigation fellows) were "reasonable and in line with the rates that would be charged by attorneys with comparable skill, experience and reputation." Sanford Decl. ¶ 60.

Other courts have likewise approved Sanford Heisler Sharp's hourly rates. *See, e.g.*, *Wellens et al. v. Daiichi Sankyo, Inc.*, Case No. C 13-00581, Dkt. 191 at 5 ¶ 20 (N.D. Cal. Feb. 10, 2016) (approving Sanford Heisler Sharp's standard hourly rates of $850-$1,050 for the partners staffed on the case, $700 for senior litigation counsel, and $425-$750 for associates, as "in line with attorneys of comparable skill, experience, and reputation"); *Ha v. Google Inc.*, No. 116CV290847, 2018 WL 1052448, at *2 (Cal. Super. Feb. 8, 2018) (approving award of attorneys' fees to Sanford Heisler Sharp and calculating lodestar modifier based on billing rates of $850 for the partners staffed on the case, $750 for senior litigation counsel, up to $500 for associates, and $295 for a senior legal assistant); *see also Barrett v. Forest Labs., Inc.*, No. 1:12-cv-05224, Dkt. No. 292 (S.D.N.Y. Apr. 26, 2018) (Abrams, J.) (approving requested fee award to Sanford Heisler Sharp); *id.* at Dkt. No. 282 (declaration setting forth counsel's standard hourly rates used in lodestar cross-check calculation, including rates of up to $1,000 for the partners staffed on the case, up to $850 for senior litigation counsel, up to $550 for associates, and $295 for senior legal assistants).

### 4. Sanford Heisler Sharp's Hourly Rates Are Consistent with Market Rates of Lawyers of Comparable Skill and Experience

The rates requested by Plaintiff's Counsel are lower than, or comparable to, the rates charged by counsel of comparable skill, experience, and reputation—including the law firm that defended Columbia, Proskauer Rose.

Courts should calculate attorneys' fees based on the prevailing market rates in the location where the case is litigated,[21] and New York City has the highest rates in the nation.  Billing survey research shows that even several years ago, rates at New York-based firms were already up to $1,350 per hour for partners and up to $950 per hour for associates.[22] Courts have approved rates in this range. *See, e.g.*, *Vista Outdoor Inc. v. Reeves Family Tr.*, 16 Civ. 5766, 2018 WL 3104631, at *6 (S.D.N.Y. May 24, 2018) (approving rates up to $1,260 as "not excessive in the New York City 'big firm' market").

Proskauer's rates are at the higher end of what law firms charge, with top rates already approaching $1,500 per hour several years ago.[23] Recent fee petitions submitted by Proskauer confirm that the firm routinely charges rates ranging from $1,000 to $1,625 for partners, $975 for senior counsel, $595 to $950 for associates, and $225 to $460 for paralegals, even in *lower cost* jurisdictions than New York City.[24]

---

[21] *Simmons v. N.Y.C. Transit Authority*, 575 F.3d 170 (2d Cir. 2009).

[22] *See, e.g.*, *Vista Outdoor Inc. v. Reeves Family Trust*, No. 1:16-cv-05766, Dkt. No. 101-30 (S.D.N.Y. Apr. 12, 2018) (excerpt from the *National Law Journal*'s 2016 Billing Rate Survey).

[23] Sara Randazzo and Jacqueline Palank, *Legal Fees Cross New Mark: $1,500 an Hour*, Wall Street Journal (Feb. 9, 2016), https://www.wsj.com/articles/legal-fees-reach-new-pinnacle-1-500-an-hour-1454960708?cb=logged0.10928983175737395; Martha Neil, *Top Partner Billing Rates at BigLaw Firms Approach $1,500 Per Hour*, ABA Journal (Feb. 8, 2016), http://www.abajournal.com/news/article/top_partner_billing_rates_at_biglaw_firms_nudge_1500_per_hour.

[24] *See, e.g.*, *In re Westinghouse Electric Co. LLC*, No. 17-10751, Dkt. No. 3251 at 3-4 (Bankr. S.D.N.Y. 2018) (Proskauer fee application with rates ranging from $1,000 to $1,495 for partners and counsel, with 9 out of 10 billing over $1,000 per hour; $595 to $950 for associates, with 8 out of 11 associates billing $780 per hour or more; $545 for law clerks; and $225 to $460 for paralegals); *In re Velocity Holding Co., Inc.*, No. 17-12442, Dkt. No. 521 at 4-5 (Bankr. D. Del. 2018) (Proskauer fee application with rates ranging from $1,125 to $1,625 for partners, $975 for senior counsel, $595-$875 for associates, $545 for law clerks, and $225-$460 for paralegals); *In re Pes Holdings, LLC*, No. 18-10112, Dkt. No. 551 at 26 (Bankr. D. Del. 2018) (Proskauer fee application with rates ranging from $1,125 to $1,350 for partners, $695 to $950 for associates, and $350 for the legal assistant).  In 2016, Proskauer submitted a fee application with rates ranging from $900 to $1,300 for partners, with 8 out of 9 partners billing $1,000 per hour or more; $495 to $850 for associates; and $230 to $395 for paraprofessionals. *In re Light Tower Rentals, Inc.*, No. 16-34284, Dkt. No. 206 at 32-34 (Bankr. S.D. Tex. 2016). The increases to Proskauer's rates over the last few years are consistent with the general upward trend in billing rates in recent years.

Not only do Sanford Heisler Sharp's rates fall below those utilized by Proskauer Rose in its own fee petitions, but Judge McMahon, in awarding attorneys' fees to Sanford Heisler Sharp in a case in the Southern District of New York, observed that Sanford Heisler Sharp's rates (then, up to $700 for partners) were "below the rates charged by firms of this caliber (principally defense firms) that litigate regularly in this district." *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194, 2010 WL 4877852, at *20, 22 (S.D.N.Y. Nov. 30, 2010).

The requested rates are also consistent with those awarded in other complex federal litigation. *See Blum v. Stenson*, 465 U.S. 886, 893 (1984) ("It is intended that the amount of fees awarded under [the federal civil rights fee-shifting statute] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases."); *see, e.g.*, *Regeneron Pharmas., Inc. v. Merus N.V.*, 14-CV-1650, 2018 WL 3425013 (S.D.N.Y. June 25, 2018) (approving rates of up to $1,355 for partners and up to $965 for associates); *MSC Mediterranean Shipping Co. Holding S.A. v. Forsyth Kownacki LLC*, No. 16 Civ. 8103, 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (approving rates of up to $1,048 for partners and up to $753 for associates).[25]

---

[25] *See also, e.g.*, *Vista Outdoor*, 2018 WL 3104631, at *6 (approving rates up to $1,260 per hour for plaintiff's counsel; noting that affluent clients—such as businesses—regularly paid as much); *In re Relativity Fashion LLC*, 565 B.R 50, 71 (Bankr. S.D.N.Y. 2017) (approving Jones Day's rates and collecting precedents approving comparable rates, with endorsed rates in such cases ranging from $1,000 to $1,425); *In re Platinum & Palladium Commodities Litig*., No. 10-cv-3617, 2015 WL 4560206, at *3-4 (S.D.N.Y. July 7, 2015) (finding rates of up to $950 reasonable, particularly in light of then-average partner billing rate of $982 at the largest New York-based firms); *City of Providence v. Aeropostale, Inc*., No. 11 Civ. 7132, 2014 WL 1883494, at *13 (S.D.N.Y. May 9, 2014) (endorsing plaintiff's counsel's 2013/2014 rates of up to $875 per hour, in line with defense-side practitioners); *Wynn v. Chanos*, No. 14-cv-04329-WHO, 2015 WL 3832561, at *2 (N.D. Cal. June 19, 2015) (approving 2015 attorney rates ranging up to $1,085 as reasonable).

### D. Plaintiff's Exercise of Billing Discretion Militates in Favor of Granting Sanford Heisler Sharp's Requested Fee

Though a higher award is justified here, where a lodestar *multiplier* is warranted for the work Sanford Heisler Sharp has devoted to this case, Plaintiff seeks a *discounted* fee award of under $6 million.  Counsel has written off various categories of time, omitted the time spent by numerous attorneys and legal assistants, excised or reduced the time for various line items, slashed its usual hourly rate for legal assistants, and then – in addition to these reductions – applied a 25% across-the-board discount to its remaining lodestar amount.  Sanford Decl. ¶¶ 61-62.  Plaintiff's exercise of billing discretion strongly militates in favor of granting the requested fee.

Courts have repeatedly declined to order substantial reductions to counsel's requested fee award where attorneys have already exercised such billing discretion.  *See, e.g.*, *Torres*, 2012 WL 3878144 at *4 (awarding fee of $3,415,450; finding that "Plaintiffs' proposed hours are reasonable" in light of counsel's voluntary 25% reduction, which effectively eliminated recovery of "(1) time spent by attorneys who billed fewer than 30 hours to this case; (2) media or press-related work; (3) half of all travel time; (3) asserted 'overstaffing' and time spent integrating new attorneys into the case; (4) time spent revising billing entries; and (5) duplicative, vague, or erroneously billed entries"); *Nat'l Fed'n of the Blind v. Target Corp.*, No. C 06–01802, 2009 WL 2390261, at *5 (N.D. Cal. Aug. 3, 2009) (finding a voluntary 5% reduction "sufficient to offset the flawed time entries").

Here, Sanford Heisler Sharp has written off extensive work. Counsel has not charged anything for many attorneys and staff members who worked on this case, including all legal professionals who devoted fewer than fifteen hours to this matter. *Id*. ¶ 61. Counsel has also removed numerous other case-related charges, including many relating to case administration, publicizing the case, and integrating new attorneys and legal assistants into the litigation. *Id*.

23

Additionally, Sanford Heisler Sharp has reduced the rate for its legal assistants by nearly 50%. *Id.* Further, Sanford Heisler Sharp is not seeking compensation for hundreds of additional hours that the Firm's legal professionals have devoted to this case that are not included in the time records submitted to the Court, corresponding to approximately $250,000 in additional lodestar. *Id.* ¶ 46.

Following all of these adjustments and deductions, as an additional exercise of discretion, Sanford Heisler Sharp has voluntarily applied a further 25% reduction to the remaining lodestar. *Id.* ¶ 62. Regardless of whether this voluntary 25% across-the-board adjustment is viewed as a reduction in hours, a reduction in rates, or some combination of both, Sanford Heisler Sharp's final, reduced fee request is highly reasonable. With these adjustments and deductions, Sanford Heisler Sharp is forgoing recovery of approximately $2.7 million in lodestar that it expended in connection with this case. *Id.*

### E.  Other Factors Warrant a Substantial Fee Award

#### 1.  The Contingency Risk in this Case Amply Supports the Requested Fee

The enormous contingency risk assumed by Sanford Heisler Sharp warrants the requested fee award. *See Woburn Ret. Sys. v. Salix Pharm., Ltd.*, No. 14-CV-8925, 2017 WL 3579892, at *6 (S.D.N.Y. Aug. 18, 2017) ("[T]he risk of the litigation is one of the most important factors, if not the foremost factor, to consider when determining the reasonableness of fees."). As the court held in *City of Providence v. Aeropostale, Inc.*: "*No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.*" No. 11 Civ. 7132 2014 WL 1883494, at *13-14 (S.D.N.Y. May 9, 2014) (emphasis added). Indeed, courts have repeatedly recognized that attorneys should be rewarded for bearing such a contingency risk. *See Sakiko Fujiwara v. Sushi Yasuda Ltd.*, 58 F. Supp. 3d 424, 438-39 (S.D.N.Y. 2014) (awarding fees based on a *multiplier* of near 2, reasoning that "[t]he fact that counsel here worked on contingency clearly

entitles them to some *premium* for the risk incurred") (emphasis added); *Hallmark v. Cohen & Slamowitz, LLP*, 378 F. Supp. 3d 222, 233 (W.D.N.Y. May 8, 2019) ("[T]he attorneys' willingness to endure for many years the risk that their extraordinary efforts would uncompensated should be rewarded . . . .") (citation omitted).

Counsel took this case on a purely contingent basis. The risks were especially glaring, as both Defendants strenuously denied any wrongdoing, the case was complex and fraught with hurdles to recovery, and attorneys from respected civil rights firms had already passed on the case.[26] *See Hallmark*, 378 F. Supp. 3d at 232 (explaining that contingency "risk should be considered as of when the case is filed" and pointing to fact that "[d]efendants vehemently denied any wrongdoing in this action" as indicative of such risk) (citation omitted); *R.G. v. Federated, Inc.*, No. 14-cv-7734, 2016 WL 3072396, at *3 (S.D.N.Y. May 27, 2016) (citing the fact that several attorneys previously passed on the case as reflective of the significant contingency risk).

Counsel vigorously litigated the case for more than three years, throughout which Professor Ravina was not responsible for paying any fees or advancing any expenses unless she achieved a settlement or judgment. Declaration of Enrichetta Ravina ("Ravina Decl.") ¶ 7. The result was that the Firm devoted over $8.5 million worth of time and expended over $860,000 in out-of-pocket costs – without receiving any payment whatsoever. Sanford Decl. ¶¶ 46, 63, Ex. C; Ravina Decl. ¶ 7. Indeed, the Firm assumed the risk that there might never be *any* payment at all. This extraordinary commitment – and the tremendous risk incurred by Counsel – justifies the granting of a substantial fee award.

---

[26] Recent research has found that the vast majority of civil rights cases tried in the Southern and Eastern Districts of New York yielded defense verdicts at trial. *See* V. Berger, *Winners and Losers: Employment Discrimination Trials in the Southern and Eastern Districts of New York: 2016 Update*, NYSBA Labor and Empl. Law. J. (Apr. 2017), *available at* http://www.vberger-mediator.com/mediation/employment-discrimination-trials.html (noting that of the 160 cases studied, plaintiffs prevailed only 30 percent of the time). This confirms the significant risks associated with litigating this civil rights matter.

### 2. The Perceived "Undesirability" of the Case Amply Supports the Requested Fees

The perceived "undesirability" of this case weighs in favor of Sanford Heisler Sharp's requested hourly rate and overall fee. *See In re AOL Time Warner S'holder Der. Lit.*, No. 02 Civ. 6302, 2010 WL 363113, at \*16 (S.D.N.Y. Feb. 1, 2010).

Many other prominent lawyers shied away from Professor Ravina's case. Renowned civil rights litigation firms such as Allred, Maroko & Goldberg and Cuti Hecker Wang LLP declined to take on the case, and Vladeck, Raskin & Clark, P.C. (Plaintiff's prior counsel) and Outten & Golden, LLP were only willing to litigate if Professor Ravina agreed to pay them on an hourly basis.[27] Ravina Decl. ¶ 5. All this supports a conclusion that this action was complex and difficult to litigate and that a substantial fee is needed to provide sufficient incentive for attorneys to take on similar civil rights cases.

Indeed, the challenges associated with prosecuting this case and bringing it to trial were manifold. Plaintiff's allegations of research sabotage were particularly difficult to prove and required the review of many complex and dense documents. Sanford Decl. ¶ 48. Moreover, as one news outlet summarized in a lengthy article discussing this case, Plaintiff's allegations "weren't shocking, Harvey Weinstein–type accusations . . . . It was a 'he said, she said' case . . . . Each side said the exact same words in the exact same emails proved their own case."[28]

These challenges meant it was especially uncertain whether Sanford Heisler Sharp would recover any fees as a result of this case. The Firm's enterprise on behalf of its client should be

---

[27] At the time that she hired Sanford Heisler Sharp, Professor Ravina could no longer afford to pay out-of-pocket for her attorneys' fees and costs. Ravina Decl. ¶ 5.

[28] Mary Ann Georgantopoulos, *She Was A Columbia Professor Who Accused Her "Horny" Coworker Of Sexual Harassment. Then He Trashed Her To His Powerful Colleagues*, BuzzFeed News (July 28, 2018), https://www.buzzfeednews.com/article/maryanngeorgantopoulos/columbia-sexual-harassment-trial-ravina-bekaert-retaliation.

rewarded.  Without its intrepid and assiduous efforts, Plaintiff would have been left without counsel and without redress for her injuries and Defendants would have avoided any consequences for Defendant Bekaert's unlawful retaliation.

### 3. The Resources Expended by Plaintiff's Counsel and by Defendants Further Warrant the Requested Fee

The Second Circuit has instructed district courts determining presumptively reasonable rates to consider "the resources required to prosecute the case effectively . . . taking account of the resources being marshaled on the other side." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184 (2d Cir. 2008). "It is appropriate to award a relatively high hourly rate that reflects the institutional resources that made it possible for these attorneys to take on the case." *Heng Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048, 2007 WL 1373118, at *3 (S.D.N.Y. May 8, 2007).

While a small firm compared to Proskauer, Sanford Heisler Sharp is one of the nation's preeminent law firms devoted to representing civil rights plaintiffs.  Sanford Heisler Sharp provides unique institutional resources for a plaintiff-side firm—including extremely well-qualified, talented attorneys and legal assistants and the capacity to advance substantial litigation costs—to go toe-to-toe with the best defense counsel in the country.  Sanford Decl. ¶ 10; *see also generally* Ex. C.  Most lawyers would be unable to take on an individual case of this magnitude, much less prevail throughout the course of the litigation, win at trial, defeat dispositive post-trial motions, and avoid a lengthy appeal.  The exceptional institutional resources committed by Sanford Heisler Sharp to achieve this result justify a robust fee award.

### III.   Plaintiff's Application for Costs Should Be Granted

Sanford Heisler Sharp should also be reimbursed for its out-of-pocket costs.  Attorneys' fee awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily

charged to their clients.  *See LeBlanc-Sternberg*, 143 F.3d at 762; *U.S. Football League v. Nat'l Football League*, 887 F.2d 408, 416 (2d Cir. 1989) ("[W]e have held that attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."); *see also, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, No. 11-cv-8405, 2015 WL 10847814, at *23 (S.D.N.Y. Sept. 9, 2015) (reimbursing such "costs as fees paid to experts, mediation fees, notice costs, computerized research, document production and storage, court fees, reporting services, and travel in connection with th[e] litigation" and recognizing such expenses as the "type . . . typically billed by attorneys to paying clients in the marketplace"); *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) (awarding over $18.7 million in expenses where the "lion's share of these expenses reflects the costs of experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses"), *aff'd*, 396 F.3d 96 (2d Cir. 2005).[29]

Sanford Heisler Sharp has incurred costs in connection with this case that total $866,870.99.  Sanford Decl. ¶ 63, Ex. C. The Firm's expenses consist primarily of hard costs paid to third-party vendors for services such as document storage, depositions, trial support and consulting, experts, and mediation.  Clients regularly pay such costs to advance their claims.

In an exercise of discretion, however, Sanford Heisler Sharp has voluntarily applied a 15% reduction and seeks a *reduced* award of $736,840.34 in costs.  This award is appropriate here.

### A.  Deposition-Related Costs

Sanford Heisler Sharp incurred $69,555.70 in vendor costs for depositions and related

---

[29] *See further, e.g.*, *Dowdell v. City of Apopka, Fla.*, 698 F.2d 1181, 1192 (11th Cir. 1983) ("[W]ith the exception of routine office overhead normally absorbed by the practicing attorney, all reasonable expenses incurred in case preparation, during the course of litigation, or as an aspect of settlement of the case may be taxed as costs . . . .[T]he standard of reasonableness is to be given a liberal interpretation.").

services, including transcription and videography costs. Sanford Decl. ¶ 64, Ex. C. These deposition costs were necessary in light of the large number of witnesses in this action, and deposition testimony was relied upon heavily at summary judgment and at trial. *Id.* ¶ 64. Indeed, at trial, deposition testimony was routinely used to impeach witnesses and refresh recollection, and excerpts of videotaped deposition testimony were shown. *Id.* It is well-settled that such depositions costs are compensable. *See, e.g.*, *Silverstein v. AllianceBernstein, L.P.*., No. 09–CV–5904, 2013 WL 7122612, at *10 (S.D.N.Y. Dec. 20, 2013) (recognizing fees for deposition reporters and transcripts as "incidental and necessary to the representation" and awarding requested reimbursement).[30]

## B. Document Storage and Discovery-Related Expenses

Sanford Heisler Sharp incurred $64,525.10 in costs associated with discovery and document storage, primarily comprised of costs to a third-party electronic discovery vendor, HLP Integration LLC, for costs for processing and producing discovery materials and storing over 115,000 pages of electronic documents. Sanford Decl. ¶ 65, Ex. C. Such vendor costs are recoverable as part of a fee award. *See Fleisher*, 2015 WL 10847814, at *23 (recognizing costs for "document production and storage" as the "type of expense[] typically billed by attorneys to paying clients in the marketplace and awarding requested reimbursement for same); *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, 09-CV-3312 (PKC) (VMS), 2018 WL 2766139, at *19 (E.D.N.Y. June 8, 2018) (reimbursing counsel for "document production and e-discovery costs").

## C. Mediation Costs

Sanford Heisler Sharp incurred $16,761.19 in costs for two mediation sessions with

---

[30] *See also, e.g.*, *Fleisher*, 2015 WL 10847814**,** at *23 (recognizing fees for reporting services as the "type of expense[] typically billed by attorneys to paying clients in the marketplace" and awarding reimbursement for same); *In re Visa Check*, 297 F. Supp. 2d at 525 (awarding counsel reimbursement for deposition costs).

Columbia.  Plaintiff participated in these mediation sessions in a good-faith attempt to resolve this matter short of trial.  Sanford Decl. ¶ 66, Ex. C.

It is well-established that mediation costs incurred in connection with a case are compensable.  *See, e.g.*, *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1313, 1329 (M.D. Fla. 2001) (characterizing mediation costs as among the types of litigation expenses recoverable as part of an attorneys' fee award); *Zeltser v. Merrill Lynch & Co., Inc.*, No. 13 Civ. 1531, 2014 WL 4816134, at *10 (S.D.N.Y. Sept. 23, 2014) (finding plaintiff's share of the mediator's fees to be "incidental and necessary to the representation" and awarding requested reimbursement); *Yang v. Focus Media Holding Ltd.*, No. 11 Civ. 9051,  2014 WL 4401280, at *19 (S.D.N.Y. Sept. 4, 2014) (describing mediation fees as expenses "of the type that law firms typically bill to their clients").

### D.  Court-Related and Trial-Related Expenses

Sanford Heisler Sharp incurred $36,296.59 in costs relating to Court filings and proceedings, including transcripts from Court conferences and trial proceedings, filing fees, costs associated with motions for admission *pro hac vice*, and third-party vendor costs for printing and delivering exhibits and courtesy copies.  Sanford Decl. ¶ 67.  Courts routinely reimburse prevailing counsel for such costs.  *See, e.g.*, *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 411 (S.D.N.Y. 2019) (reimbursing for "filing fees, postage, copies," among other expenses); *Fleisher*, 2015 WL 10847814, at *23 (reimbursing for "court fees"); *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 (S.D.N.Y. 2003) (reimbursing for "messengers, photocopies, overnight delivery services, process service, court filing fees," among other expenses and holding that such expenses were "incidental and necessary to the representation").

### E.  Trial Consulting and Support

Sanford Heisler Sharp incurred $355,984.71 in costs for trial consulting and support services performed by DOAR litigation consultants.  Declaration of Raymond McLeod ("DOAR Decl.") ¶ 5, Ex. A.

Given the subtlety and complexity of Plaintiff's allegations, it was critical to work with experienced, sophisticated trial consultants who helped select the jury, frame and present the issues for trial, and create trial graphics. Sanford Decl. ¶ 68.  These costs are reimbursable. *See J .S. Nicol, Inc. v. Peking Handicraft, Inc.*, No. 03 Civ. 1548, 2008 WL 4613752, at *16 (S.D.N.Y. Oct. 17, 2008) ("Lawyers often use litigation support specialists and receive reimbursement for such services when awarded attorneys' fees."); *see, e.g.*, *In re Visa Check,* 297 F. Supp. 2d at 525 (following the "common practice in this circuit of granting expense requests" for the costs of "experts and consultants" and "litigation and trial support services"); *Dibella v. Hopkins*, 407 F. Supp. 2d 537, 540 (S.D.N.Y.2005) (recognizing that "blow-ups, digital presentations of scanned documents, and other computer graphics serve the same function as exhibits and other papers used at trial, and there is no logical reason to differentiate between the former and the latter in terms of their taxability as costs"); *Guzman v. Bevona*, Civ. No. 92 CIV.1500, 1996 WL 374144 (S.D.N.Y. 1996) (awarding counsel reimbursement for costs incurred in conducting focus group and noting that such "expenditures contributed to the litigation"); *Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1313, 1331 (M.D. Fla. 2001) (awarding reimbursement for "special services" in the form of audio-visual equipment, color exhibits, and aids).

DOAR's team of trial consultants was led by Dr. Roy Futterman, a Ph.D. psychologist, and Raymond McLeod, the former head of practice support at Proskauer, both of whom have extensive trial experience.  DOAR Decl. ¶¶ 3, 8, 11.  DOAR's team of professionals provided a range of

critical services to prepare for and support the trial in this case.  *Id.* ¶ 4.  Among other things, DOAR performed extensive pre-trial research to develop the case themes elicited at trial; helped select a jury based in part on a comprehensive analysis of pertinent research and data; assisted counsel in witness preparation for Professor Ravina and her treating psychiatrist; assisted with the development of counsel's opening statement and closing arguments; assisted with the development of comprehensive PowerPoint presentations for both the liability and damages closing arguments, which included key demonstratives synthesizing documentary evidence and trial testimony; created compilations of video deposition testimony presented during Plaintiff's case-in-chief and during closing arguments; created and managed a trial database containing all exhibits, video depositions, demonstratives, and other case materials; coordinated the presentation of evidence to the jury throughout the three-week trial; and provided on-site trial consulting and technical support.  *Id.*

DOAR's expertise and input were crucial to achieving a favorable result, and its services are reimbursable as instrumental to the prosecution of this matter.

### F.  Expert Costs

Sanford Heisler Sharp worked closely with two experts, Dr. Caren Goldberg and Professor Deborah Rhode, who were critical in identifying and developing themes and evidence that Plaintiff relied upon in surviving summary judgment and prevailing at trial.  Sanford Decl. ¶ 69.[31]

Drawing upon her expertise as an academic for over twenty years in the field of Human Resources Management, Dr. Goldberg provided essential consulting to Sanford Heisler Sharp regarding the norms governing employer policies, practices, and procedures concerning

---

[31] Additionally, Plaintiff's Counsel incurred expert costs as a result of the social scientific expert Columbia retained, including costs associated with rebuttal expert reports.

discrimination and retaliation. *Id.* ¶ 70. Counsel relied upon Dr. Goldberg's expertise and strategic insights at summary judgment to expose the inadequacies of Columbia's policies and the deficiencies of its response to Plaintiff's legally-protected complaints. *Id.* Likewise, Dr. Goldberg's strategic insights assisted Counsel in identifying exhibits for use at trial, developing pertinent lines of inquiry for numerous trial witnesses on the topics of Columbia's policies and response to Plaintiff's protected activity, and distilling key themes for presentation to the jury.[32] *Id.* Sanford Heisler Sharp incurred $116,291.81 in costs for Dr. Goldberg, including fees for approximately 215 hours on this matter at a rate of $525 per hour.[33] *Id.* ¶ 70, Ex. C.

Professor Deborah Rhode, the Ernest W. McFarland Professor of Law and the Director of the Center on the Legal Profession at Stanford University, is one of the country's preeminent experts on gender bias, with particular expertise regarding women in academic settings.[34] *Id.* ¶ 71. Professor Rhode's deep expertise concerning the institutional dynamics of academia shaped Counsel's development of the themes presented to survive summary judgment and win at trial. Indeed, the themes elicited during the direct examination of Professor Ravina and in the opening statement and closing arguments were developed in close consultation with Professor Rhode. *Id.* Sanford Heisler Sharp incurred $95,316.83 in costs for Professor Rhode, including fees for approximately 100 hours on this matter at a rate of $950 per hour. *Id.* ¶ 71, Ex. C.

---

[32] Further, Dr. Goldberg's expert opinions provided a critical roadmap for Plaintiff to successfully overcome Columbia's motion to exclude key evidence, relied upon at trial, regarding Columbia's investigations into contemporaneous complaints of harassment against other Columbia Business School professors. (*See* Dkt. No. 327 at 15-16.)

[33] In addition, Dr. Goldberg incurred modest expenses associated with travel from Washington, D.C. for her deposition at Proskauer Rose's New York office. Sanford Decl. ¶ 70.

[34] *See* Dkt. Nos. 328-2 at 1-2, 328-1 at 1-4; *see also* Dkt. No. 238, 7/5/18 Tr. 37:25-38:4, 38:24-39:1 (recognizing Professor Rhode as "exceedingly well credentialed and well versed in the subject matter of gender bias" and observing that Professor Rhode has "spent well over two decades studying gender bias particularly in the workplace, is well versed in the relevant social science research, and has written many academic peer reviewed articles on the subject").

Plaintiff's expert costs are compensable, even though the experts did not testify at trial. *See, e.g.*, *Themis Capital v. Democratic Republic of Congo*, No. 09 Civ. 1652, 2014 WL 4379100, at *9 (S.D.N.Y. Sept. 4, 2014) ("[C]ourts in this District routinely reimburse prevailing parties for the costs of expert witnesses and consultants, regardless whether the expert testified at trial."); *In re Visa Check,* 297 F. Supp. 2d at 525 (recognizing that it is common to allow reimbursement for costs of "experts and consultants").

As here, "the expertise of such non-testifying experts . . . often prove[s] pivotally helpful in educating counsel, shaping litigation strategy, and/or eliminating areas of controversy." *Themis*, 2014 WL 4379100, at *9. Thus, Sanford Heisler Sharp should be reimbursed for its expert costs. To do otherwise would fail to serve the make-whole purpose of the fee-shifting statute.

### G.  Incidental Expenses

Finally, Sanford Heisler Sharp incurred approximately $112,139.06 in incidental expenses associated with the litigation, including $91,963.01 in costs associated with lodging during the three-week trial, [35] and $20,176.05 in total costs over three years for working meals and transportation associated with Sanford Heisler Sharp's representation of Plaintiff, including mediation, discovery, case filings, and trial. Sanford Decl. ¶ 72, Ex. C. It is well-established that these costs are compensable. *See Silverstein*, 2013 WL 7122612, at *10 (recognizing working meals and transportation as compensable expenses and awarding full reimbursement for litigation costs); *Grant v. City of Syracuse*, 357 F. Supp. 3d 180, 208 (N.D.N.Y. 2019) (recognizing out-of-

---

[35] To facilitate the around-the-clock teamwork demanded by the three-week trial, lodging was provided to certain members of the trial team who resided outside of Manhattan. Sanford Decl. ¶ 72.

pocket expenses for lodging and transportation as recoverable under civil rights fee-shifting statute).[36]

### IV. Plaintiff Is Entitled to Reimbursement of Out-of-Pocket Legal Costs She Paid to Her Prior Counsel in Connection with this Matter

Finally, Plaintiff seeks reimbursement for $101,753.85 in legal fees and costs that she incurred for her prior counsel in this matter. Before being represented by Sanford Heisler Sharp, Plaintiff retained Anne L. Clark of Vladeck, Raskin & Clark, P.C., who negotiated with Defendants in an attempt to resolve Plaintiff's claims, and she retained Noah Messing to assist in settlement agreement drafting and otherwise advise Plaintiff. Ravina Decl. ¶¶ 2, 3. These lawyers' efforts ultimately helped lay the groundwork for this action. Fees charged for work performed by prior counsel are compensable. Further, the fact that early negotiations did not succeed does not preclude recoupment of Plaintiff's out-of-pocket legal costs. *See, e.g.*, *Tige Real Estate Dev. Co., Inc. v. Rankin-Smith*, 233 A.D.2d 227, 228 (N.Y. App. 1996) (where fee-shifting authorized, "fees incurred in settlement negotiations," even with non-parties, are "properly recoverable since such negotiations… could have thus terminated or simplified the entire litigation."); *Thompson v. McQueeney*, 56 A.D.3d 1254, 1259 (N.Y. App. 2008).

Here, the amount Plaintiff seeks for pre-suit work performed by her prior counsel is eminently reasonable. Notably, Ms. Ravina paid both of these lawyers on an hourly basis, paying $51,753.85 to Vladeck, Raskin & Clark, P.C. and $50,000.00 to Mr. Messing. Ravina Decl. ¶ 4.

---

[36] *See further, e.g.*, *Clem v. Keybank*, No. 13 Civ. 789, 2014 WL 2895918, at *10 (S.D.N.Y. June 20, 2014) (reimbursing counsel for working meals and transportation and recognizing such expenses as "reasonable . . . incidental and necessary to the representation"); *Ayers v. SGS Control Servs., Inc.*, No. 03 Civ. 9078, 2008 WL 4185813, at *9 (S.D.N.Y. Sept. 9, 2008) (recognizing lodging costs as the type of expense "for which the paying arms' length market reimburses attorneys" and awarding counsel's requested reimbursement); *Bobrow Palumbo Sales, Inc. v. Broan-Nutone, LLC*, 549 F. Supp. 2d 274, 287 (E.D.N.Y. 2008) (reimbursing counsel for lodging costs incurred during course of litigation, including in connection with trial).

The fact that Plaintiff – a junior, non-tenured professor who was on the verge of losing her job – paid these costs out-of-pocket shows that they are *per se* reasonable.

## **CONCLUSION**

This has been an influential civil rights case that has reverberated throughout academia and well beyond.  Sanford Heisler Sharp should be rewarded for taking on, persisting, and prevailing in this challenging litigation. Professor Ravina needed attorneys as skilled and experienced as Sanford Heisler Sharp to take on an institution as powerful as Columbia and succeed against top-flight corporate counsel at Proskauer Rose. If even preeminent civil rights lawyers cannot recover what amounts to less than three-quarters of their total lodestar, it will have a chilling effect on the plaintiffs' bar, and aggrieved civil rights victims may find it much more difficult to find qualified attorneys willing to represent them. The New York City Human Rights Law's remedial scheme demands a robust award. For the foregoing reasons, Plaintiff respectfully requests an award of $5,880,360.56 in attorneys' fees for the services of Sanford Heisler Sharp and $736,840.34 for costs incurred by the Firm.  Finally, Professor Ravina should be reimbursed in the amount of $101,753.85 for her out-of-pocket legal costs for her prior counsel.

Dated: July 25, 2019                    Respectfully submitted,

_____
David Sanford (admitted *pro hac vice*)
Alexandra Harwin (AH-3111)
Andrew Melzer (AM-7649)
H. Vincent McKnight (admitted *pro hac vice*)
Melinda Koster (MK-1384)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
aharwin@sanfordheisler.com
amelzer@sanfordheisler.com
vmcknight@sanfordheisler.com
mkoster@sanfordheisler.com

*Counsel for Plaintiff Enrichetta Ravina*